## Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF THE THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

General Background ....................................................................................................6

    The Commonwealth-COFINA Dispute ...............................................................7

Compliance with PROMESA Section 314(b)................................................................24

A.    PROMESA § 314(b)(1):  *The Plan Fully Complies with the Provisions of the
Bankruptcy Code Made Applicable by PROMESA § 301.* ...............................24

    i.    Bankruptcy Code Section 1122(a) ........................................................24

    ii.    Bankruptcy Code Section 1123(a)(1) ...................................................26

    iii.    Bankruptcy Code Section 1123(a)(2) ...................................................26

    iv.    Bankruptcy Code Section 1123(a)(3) ...................................................27

    v.    Bankruptcy Code Section 1123(a)(4) ...................................................27

    vi.    Bankruptcy Code Section 1123(a)(5) ...................................................30

    vii.    Bankruptcy Code Section 1123(b)(1) ...................................................31

    viii.    Bankruptcy Code Section 1123(b)(2) ...................................................32

    ix.    Bankruptcy Code Section 1123(b)(3)(A)...............................................32

    x.    Bankruptcy Code Section 1123(b)(3)(B)...............................................33

    xi.    Bankruptcy Code Section 1123(b)(5) ...................................................34

    xii.    Bankruptcy Code Section 1123(b)(6) ...................................................34

    xiii.    Bankruptcy Code Section 1123(d) ........................................................35

    xiv.    Bankruptcy Code Section 1129(a)(2) ...................................................35

    xv.    Bankruptcy Code Section 1129(a)(3). ...................................................36

    xvi.    Bankruptcy Code Section 1129(a)(6) ...................................................38

    xvii.    Bankruptcy Code Section 1129(a)(8) ...................................................38

    xviii.    Bankruptcy Code Section 1129(b)(1) ...................................................41

    xix.    Bankruptcy Code Section 1129(b)(2) ...................................................41

B.    PROMESA § 314(b)(2):  *The Plan Fully Complies with the Provisions in Title III
of PROMESA.* ...................................................................................................42

C.    PROMESA § 314(b)(3):  *The Debtor is Not Prohibited By Law From Taking Any
Action Necessary to Carry Out the Plan.*.........................................................42

D.    PROMESA § 314(b)(4):  *The Plan Provides Each Holder of an Administrative
Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date* ...........44

i

E.     PROMESA § 314(b)(5): *The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals* ...................................................................44

F.     PROMESA § 314(b)(6)*: The Plan is Feasible and in the Best Interests of Creditors* ...........................................................................................................45

Reorganized COFINA's Revenues are Sufficient to Service its Debt Obligations ......53

G.     PROMESA § 314(b)(7): Fiscal Plan Compliance ...........................................55

The Releases, Exculpation, and Injunctions Pursuant to the Plan ...............................55

     A.     Debtor Releases .......................................................................................56

     B.     Consensual Releases ...............................................................................57

     C.     Exculpation ............................................................................................59

     D.     Injunction ...............................................................................................59

Validity of COFINA Bonds .......................................................................................60

H.     Bankruptcy Rule 3019: *The Plan Does Not Adversely Change the Treatment of Claims of Creditors* ........................................................................................68

Conclusion ...............................................................................................................74

The Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the debtor under PROMESA section 315(b), having proposed and filed with the United States District Court for the District of Puerto Rico (the "Court") the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 [Case No. 18-3284, ECF No. 439] (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Amended Plan Supplement, and as may be modified pursuant to Section 313 of PROMESA, the "Plan");[1] and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated November 29, 2018 [ECF No. 375] (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices used in connection therewith, and approving the form of notice of the Confirmation Hearing; and the Court having entered the *Notice Regarding the Proper Method for Submission of Objections to the Proposed COFINA Plan of Adjustment* [ECF No. 384]; and the following documents having been filed by the Debtor, the COFINA Agent, or PSA Creditors in support of or in connection with confirmation of the Plan, including the Settlement of the Commonwealth-COFINA Dispute incorporated into the Plan:

(a) Amended Plan Supplement [Case No. 17-3283, ECF No. 4813];

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, or the Confirmation Brief (each as defined herein), as applicable; provided, however, that references herein to "COFINA Revenues" is used to maintain consistent terminology with the New Bond Legislation and shall have the same meaning as the term "COFINA Portion" as defined and used in the Plan, and shall include any collateral that may be substituted for the COFINA Revenues in accordance with the terms and provisions of the Plan and the New Bond Legislation.

(b) *Certificate of Service of Solicitation Materials* [ECF No. 387] (the "<u>Mailing Affidavit</u>");

(c) *Certificate of Publication* [Case No. 17-3283, ECF No. 4617] (the "<u>Publication Affidavit</u>");

(d) *Certificate of Service* [ECF No. 429] (the "<u>Radio Affidavit</u>", and together with the Mailing Affidavit and Publication Affidavit, the "<u>Service Affidavits</u>");

(e) *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment [ECF No. 4663]* (the "<u>Omnibus Reply</u>");

(f) *Memorandum of Law in Support of Puerto Rico Sales Tax Financing Corporation's Third Amended Title III Plan of Adjustment* [Case No. 17-3283, ECF No. 4644] (the "<u>Confirmation Brief</u>");

(g) *Declaration of Natalie A. Jaresko in Support of Puerto Rico Sales Tax Financing Corporation's Title III Plan of Adjustment* [Case No. 17-3283, ECF No. 4756] (the "<u>Jaresko Decl.</u>");

(h) *Declaration of David M. Brownstein in Support of Confirmation of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. 4757] (the "<u>Brownstein Decl.</u>");

(i) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "<u>Pullo Decl.</u>") [Case No. 17-3283, ECF No. 4794];

(j) *Statement of COFINA Agent in Support of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. 4656];

(k) *Declaration of Matthew A. Feldman in Support of COFINA Agent's Statement* [Case No. 17-3283, ECF No. 4656-1] (the "<u>Feldman Decl.</u>");

(l) *Omnibus Reply of COFINA Senior Bondholders' Coalition to Objections to Second Amended Title III Plan of Adjustment* [Case No. 17-3283, ECF No. 4665] (the "<u>Senior Coalition Reply</u>"), and the *Joinder of the Puerto Rico Funds* filed thereto [Case No. 17-3283, ECF No. 4670];

(m) *Declaration of Matthew Rodrigue in Support of Confirmation of Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. 4665-1] (the "<u>Rodrigue Decl.</u>"); and

(n) *Declaration of Natalie A. Jaresko in Support of Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between*

*Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. 4758] (the "<u>Jaresko (9019) Decl.</u>");

and objections to confirmation having been interposed by certain parties, as reflected on the docket of the Title III Cases and/or on the record of the Confirmation Hearing held by the Court on January 16 and 17, 2019; and, in the absence of formal court filings, the Court having provided the opportunity for and considered comments from members of the public provided at the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing; and the appearances of all interested parties having been noted in the record of the Confirmation Hearing; and the Court having entered the *Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. _____] in the Commonwealth Title III Case; and after full consideration of the record of the Title III Case, including, without limitation, motions, applications, and orders in the Title III Case, the foregoing documents, and the evidence admitted and arguments of counsel made at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor, the Court hereby FINDS, DETERMINES, AND CONCLUDES as follows:

1.      <u>Findings and Conclusions</u>.  The findings of fact and conclusions of law set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052 and 9014, and PROMESA section 310.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Order and the Plan.

2.      Jurisdiction.  This Court has exclusive jurisdiction of the Title III Case pursuant to PROMESA section 306(a).  Venue is proper before this Court pursuant to PROMESA section 307(a).  Pursuant to section 306(b) of PROMESA, upon commencement of the Commonwealth Title III Case and the Title III Case, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Commonwealth and COFINA, wherever located.  To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has granted consent to, and the Plan provides for, this Court to exercise jurisdiction over the property and revenues of the Debtor that are, pursuant to the Settlement Order, necessary to the entry of this Order.

3.      Judicial Notice.  The Court takes judicial notice of the New Bond Legislation, which the Governor of Puerto Rico signed into law on November 15, 2018, and, for the reasons set forth in Paragraph 119 hereof, has been duly enacted.  *See Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320–21 (1st Cir. 2004) ("Generally, in the federal system, '[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice without plea or proof.'" (quoting *Lamar v. Micou*, 114 U.S. 218 (1885))); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 590 B.R. 577, 590 n.12 (D.P.R. 2018) (citing *Getty* and taking judicial notice of the laws of Puerto Rico). An English-language version of the New Bond Legislation, certified by the Puerto Rico Department of State, is attached hereto as **Exhibit A**.[2]  The Court also takes judicial notice of the dockets of the Title III Case, the Commonwealth Title III Case, the appellate court dockets of any and all appeals filed from any order entered or opinions issued by the Court in the Title III Case and the Commonwealth Title III Case, and the following litigations and adversary

---

[2]    The New Bond Legislation is adopted in English and Spanish.  Pursuant to Article 5.2 of the New Bond Legislation, the English text governs in the event of a conflict between the English and Spanish texts.

proceedings: (a) The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Bettina Whyte, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS, currently pending before the Court, (the "Adversary Proceeding"), and The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"), each of which is maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Title III Case and such adversary proceedings; (b) Ambac Assurance Corp. v. The Bank of New York Mellon, Case No. 17-cv-3804-LTS, currently pending in the United States District Court for the Southern District of New York (the "Ambac Action"); (c) In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico, No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico, No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority, et al., Adv. Pro. No. 17-AP-228-LTS, currently pending before the Court, René Pinto Lugo, et al. v. The Government of the United States of America, et al., Adv. Pro. No. 18-041-LTS, currently pending before the Court, Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the United States of America, et al., Adv. Pro. No. 18-066-LTS, currently pending before the Court, Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico, Adv. Pro. No. 18-090-LTS, currently pending before the Court (collectively, the "Appointments Related

Litigation"); (c) (i) <u>Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York</u> <u>Mellon</u>, Adv. Pro. No. 17-AP-143-LTS, currently pending before the Court, and (ii) <u>Whitebox</u> <u>Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon</u>, Case No. 17-CV-3750-LTS, currently pending before the Court (collectively, the "<u>Whitebox Actions</u>"); and (d) <u>Natal-Albelo et al v. Estado Libre Asociado de Puerto Rico, et al</u>, Adv. Proc. No. 19-AP-0003-LTS, currently pending before the Court.

4.      <u>Burden of Proof</u>.  The Debtor has the burden of proving the elements of PROMESA section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019 of the Bankruptcy Rules by a preponderance of the evidence.  The Debtor has met its burden with respect to each element of PROMESA section 314 and, to the extent applicable to consideration of the confirmation of the Plan, Bankruptcy Rule 9019.

<u>**General Background**</u>

5.      For more than a decade, Puerto Rico has been facing an unprecedented fiscal and economic crisis.  The positions assumed and actions taken in the past caused Puerto Rico to lose access to the capital markets and precipitated the collapse of Puerto Rico's public finance system.  These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico.  Such situation was further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017.

6.      On June 30, 2016, the United States of America enacted the Puerto Rico Oversight Management and Economic Stability Act ("<u>PROMESA</u>") and the Oversight Board was established under PROMESA section 101(b).  Jaresko Decl. ¶ 3.  Pursuant to Section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law or regulation that is inconsistent therewith.

7.      On August 31, 2016, President Obama appointed the Oversight Board's seven voting members.  Jaresko Decl. ¶ 3.

8.      On September 30, 2016, the Oversight Board designated COFINA as a "covered entity" under PROMESA section 101(d).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification, pursuant to Sections 104(j) and 206 of PROMESA and, at the request of the Governor of Puerto Rico, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under title III thereof (the "Commonwealth Title III Case"). Jaresko Decl. ¶ 17.

10.     On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to Sections 104(j) and 206 of PROMESA and, at the Request of the Governor of Puerto Rico, filed a voluntary petition for relief for COFINA pursuant to Section 304(a) of PROMESA, commencing a case under title III thereof. Jaresko Decl. ¶ 17; [ECF No. 1].

11.     On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth Title III Case and the Title III Case, for procedural purposes only.  [ECF No. 131].

12.     On June 15, 2017, the United States Trustee for Region 21 (the "U.S. Trustee") appointed the statutory creditors' committee in the Commonwealth's Title III Case (the "Committee" or "UCC") [Case No. 17-3283, ECF No. 338].  That same day, on June 15, 2017, the U.S. Trustee filed a Notice of No Appointment of Official Committee of Unsecured Creditors for Puerto Rico Sales Tax Financing Corporation (COFINA), indicating there is no creditors' committee in the Title III Case. [Case No. 17-3283, ECF No. 339].

The Commonwealth-COFINA Dispute

13.     Prior to the commencement of the Commonwealth Title III Case, the Oversight Board recognized that resolution of the Commonwealth-COFINA Dispute would be a critical

component to the restructuring of Puerto Rico's public debt.  Jaresko Decl. ¶ 9; Jaresko (9019)
Decl. ¶ 8.  Of the approximately $74 billion in aggregate Puerto Rico debt, the GO Debt and
COFINA's Existing Securities together account for approximately fifty-five percent (55%) of the
total funded indebtedness to be restructured.  Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.  The
determination of which funds are available to service COFINA's debt and the Commonwealth's
debt is dependent upon which entity, the Commonwealth or COFINA, owns the portion of the
Commonwealth's general sales and use tax (the "SUT") that was purportedly transferred to
COFINA pursuant to Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246 *et seq.* (codified as
amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91").  Jaresko Decl. ¶ 9; Jaresko
(9019) Decl. ¶ 8.  The Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended
and restated on June 10, 2009 (as amended and supplemented, the "Resolution") states that a
portion of the SUT (the "Pledged Sales Tax Base Amount") was pledged by COFINA to secure
the repayment of the COFINA's Existing Securities.  Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8;
Exhibit DX-K.  The amount at issue in the Commonwealth-COFINA Dispute is significant—
approximately $783 million in the current fiscal year alone, which amount grows at four percent
(4%) annually until it reaches $1.85 billion in fiscal year 2041 and remains fixed at that amount
until COFINA's Existing Securities are repaid in full in accordance with their terms.  Under the
COFINA Fiscal Plan, this would result in billions of dollars over the next forty (40) years.  Jaresko
Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8; Exhibit DX-SSS.

14.     If the Pledged Sales Taxes were property of COFINA, the Commonwealth would
have $783 million less in fiscal year 2019 (which annual amount would increase over time) to pay
its liabilities and expenses, including addressing the essential services of the Commonwealth and
the needs of its citizens. Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.  Conversely, if the Pledged
Sales Taxes were property of the Commonwealth, there would not be any funds available to

8

address and satisfy COFINA's outstanding indebtedness. Unless and until a resolution were reached on the Commonwealth-COFINA Dispute, the Oversight Board would not be able to begin to formulate a Title III plan of adjustment for the Commonwealth, COFINA, or any of their other debtor-affiliates. Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.

15.     Prior to the commencement of the Commonwealth Title III Case, on July 20, 2016, certain holders of GO Bonds filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service payments and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on the Commonwealth's general obligations bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the government permitting transfers outside of the ordinary course. *Lex Claims, LLC v. Garcia-Padilla*; District Court, District of Puerto Rico, July 20, 2016, Case No. 16-2374-FAB (the "Lex Claims Litigation"); Exhibit DX-M; Jaresko Decl. ¶ 11; Jaresko (9019) Decl. ¶ 10. On November 4, 2016, the plaintiffs filed a second amended complaint, as further described below, adding new causes of action, including three causes of action relating to COFINA, and adding COFINA and other parties as defendants. On December 16, 2016, COFINA filed an answer to the second amended complaint generally denying the allegations and asserting various affirmative defenses. Certain COFINA bondholders who intervened in the Lex Claims Litigation also filed answers generally denying the allegations and asserting various defenses and

counter- and cross-claims.  Jaresko Decl. ¶ 10; Jaresko (9019) Decl. ¶ 10; Exhibits DX-M; DX-N; and DX-O.

16.     Plaintiffs in the Lex Claims Litigation, in their second amended complaint, argue, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure.  They claim that, pursuant to Article VI, Section 8 of the Puerto Rico Constitution, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  They further allege the Pledged Sales Taxes are an "available resource" and COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on "available resources" and related constitutional limitations on the amount of public debt the Commonwealth was permitted to issue.  Plaintiffs requested two declaratory judgments that challenge the legal validity of COFINA: (1) a declaration that the Pledged Sales Taxes constitute "available resources" and that such funds cannot be deposited with COFINA or its bondholders; and (2) a declaration that the Commonwealth is obligated to afford the GO Debt absolute priority, including priority over required deposits with COFINA and its bondholders.  Jaresko Decl. ¶ 11; Exhibits DX-M, DX-O, DX-UUU.

17.     Certain holders and insurers of COFINA's Existing Securities, permitted to intervene in the Lex Claims Litigation, asserted that the Pledged Sales Taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or "available resources" of the Commonwealth.  Such holders and insurers rely upon Act 91 providing the Pledged Sales Taxes "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary."  Act 91 § 2.  They further asserted that the question whether COFINA's property constitutes "available resources"

should be certified to the Supreme Court of Puerto Rico because, in their view, its resolution would involve a pure and undecided issue of Puerto Rico Constitutional law that would have long-lasting consequences for the Commonwealth.  They asserted that COFINA is essential in permitting Puerto Rico to access the capital markets on favorable terms, and that the plaintiffs in the Lex Claims Litigation were able to extract higher interest payments precisely because COFINA's property was not available to repay them.  Jaresko Decl. ¶ 12; Exhibit DX-P.

18.     On April 12 and May 2, 2017, in response to uncertainty surrounding the transfer of the SUT, and contending that an event of default had already occurred under the Existing Bond Resolution, Whitebox and Ambac, respectively, commenced separate litigations against BNYM, the trustee under the Existing Bond Resolution, alleging various causes of action, each premised upon allegations that an event of default occurred prior to April 29, 2017, and that BNYM breached its alleged duties by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate" Existing Securities.  If such creditors were correct, then, in their view, the subordination provisions attendant to the Existing Securities would apply and no payments to holders of "First Subordinate" Existing Securities would have been permissible until holders of "Senior" Existing Securities had been paid in full. Jaresko Decl. ¶ 13; Exhibits DX-Q, DX-R.

19.     BNYM responded that the Ambac Action and Whitebox Actions, including any claims and causes of action for gross negligence, willful misconduct, or intentional fraud, lacked merit and should be dismissed with prejudice.  BNYM claimed, and Whitebox and Ambac disagreed, that such actions should fail for a variety of reasons, including, without limitation: (i) there were no defaults or events of default under the Existing Bond Resolution prior to April 29, 2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request or direction of bond owners, unless the bond owners offered BNYM security or indemnity

11

satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred; and (iii) a failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond Resolution.  Jaresko Decl. ¶ 14.

20.     Promptly after certification of the Commonwealth's initial Fiscal Plan on March 13, 2017, the Oversight Board and AAFAF undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in such Fiscal Plan.  The Oversight Board and AAFAF requested that holders of GO Debt and COFINA's Existing Securities participate in mediation with the Oversight Board and AAFAF.  The mediation began on April 13, 2017, under the auspices of retired Bankruptcy Judge Allan L. Gropper.  Despite several mediation sessions and other private negotiations, no agreement was reached before the expiration of the pre-Title III stay provided in PROMESA section 405 on May 1, 2017.  Jaresko Decl. ¶ 15.

21.     After competing bondholder groups commenced litigation against the Commonwealth and COFINA, the Oversight Board determined, in consultation with AAFAF, and at the request of the Governor, and after consideration of creditor support for a Title III filing, that the best path forward for the Commonwealth and COFINA to resolve the Commonwealth-COFINA Dispute was to file the Commonwealth Title III Case and the Title III Case to afford the Commonwealth and COFINA additional time and breathing room to seek to resolve the impasse under the supervision of the Title III Court.  Jaresko Decl. ¶ 16.

22.     Following the filing of the Title III Case, BNYM, as trustee for the Existing Securities, was in possession of hundreds of millions of dollars for the benefit of holders of both junior and senior Existing Securities, but without clarity about how and to whom the money should be distributed.  On May 16, 2017, BNYM filed the Interpleader Action, seeking a determination of competing claims to the Disputed Funds by certain holders of beneficial interests in the Existing

Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA. On May 30, 2017, the Title III Court granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action. Jaresko Decl. ¶ 18; Exhibit DX-S, DX-T, and DX-U.

23.      Significant holders of "Senior" and "First Subordinate" Existing Securities intervened in the Interpleader Action. From June to September 2017, several parties, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, Rothschild (in its capacity as financial advisor to the Commonwealth), the Commonwealth, AAFAF, and the Oversight Board. The subpoenaed entities and individuals produced documents. In addition, depositions were taken of Banco Popular of Puerto Rico, a private financial services institution, in its capacity as the banking services institution of the Commonwealth, the Government Development Bank, and COFINA. AAFAF, COFINA, the Commonwealth, and the Oversight Board each stipulated to binding statements of facts in lieu of depositions.   Jaresko Decl. ¶ 19; Exhibits DX-U, DX-ZZZ.

24.      Based upon the parties' agreement, the Court stayed consideration of the Interpleader Action and did not render a determination as to whether an event of default under the Existing Bond resolution had occurred. [Case No. 17-133, ECF No. 518].

25.      If an event of default under the Existing Bond Resolution had occurred, the senior bondholders may have had repayment of their bonds accelerated, to the detriment of the junior bondholders.  Such acceleration might, in the senior bondholders' view, require the senior bondholders to be paid in full prior to junior bondholders being able to declare an event of default and exercise remedies. The Interpleader Action is in essence a dispute between junior and senior

COFINA creditors about their payment rights and priorities vis-à-vis each other.  The issues regarding such payment rights and priorities is being settled pursuant to the Plan.

26.     Pursuant to PROMESA section 315(b), the Oversight Board is representative of the Commonwealth and COFINA in their respective Title III cases.  The Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which process involved the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute.  Jaresko Decl. ¶ 21;

27.     On June 10, 2017, the Oversight Board filed *the Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-3284, ECF No. 303] (the "Commonwealth-COFINA Dispute Procedures Motion").  Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-V.

28.     On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.  Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-W.

29.     Consistent with the Court's request, the Oversight Board worked with Chief Bankruptcy Judge Houser and any creditor party who sought to participate to formulate procedures agreeable to the interested parties.  On July 21, 2017, the Oversight Board filed a revised motion seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including the appointment of respective agents with independence from the Oversight

14

Board as debtor representatives for the Commonwealth and COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the Agents to consult with creditors of their respective debtor in carrying out their charge, but at all times owing duties only to their respective debtor and to act solely in such debtor's best interest. Jaresko Decl. ¶ 22; Jaresko (9019) Decl. ¶ 16; DX-X.

30.    On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth; and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA.    Jaresko Decl. ¶ 23; Jaresko (9019) Decl. ¶ 17; Exhibit DX-B.

31.    The Procedures Order directed that "[e]ach Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents.  In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents.").  *See* Procedures Order [ECF No. 996] ¶ 4(f).

32.    On September 8, 2017, the Commonwealth Agent commenced an adversary proceeding against the COFINA Agent seeking a resolution of the Commonwealth-COFINA Dispute and related issues (the "Adversary Proceeding").  Concurrently with the litigation of the Adversary Proceeding, the Agents and various parties to the Commonwealth-COFINA Dispute

engaged in mediation led by Mediation Team leader Hon. Barbara J. Houser to resolve the dispute. At the time, such efforts were unsuccessful.  Jaresko Decl. ¶ 24; Jaresko (9019) Decl. ¶ 18; Exhibit DX-Y.

33.     During the intervening months, (a) the COFINA Agent answered the complaint and asserted counterclaims, (b) multiple parties intervened in the Adversary Proceeding, (c) discovery was undertaken and (d) the Agents and certain intervenors filed cross motions for summary judgments. Additionally, during this period, the Court clarified the scope of the Agents' authority to litigate and/or settle the issues raised in the Adversary Proceeding.

34.     Following oral argument regarding the respective motions for summary judgment filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled their efforts to mediate a resolution.  The Oversight Board was not a party to such mediation efforts, other than to be informed of their existence.  Likewise, the Oversight Board was unaware of the parties which may have participated in such mediation.  Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.

35.     On June 7, 2018, the Agents announced the terms of an Agreement in Principle to resolve the Commonwealth-COFINA Dispute.  The Agreement in Principle was the product of arm's-length negotiations between the Agents free from any influence or direct participation by the Oversight Board.  Feldman Decl. ¶ 4; Jaresko (9019) Decl. ¶ 21.  At the time the Agreement in principle was reached, both the COFINA Agent and the Commonwealth Agent agreed that it was the best possible outcome for each of their respective estates given the enormous stakes and uncertainty involved in litigating the Commonwealth-COFINA Dispute to conclusion.  Feldman Decl. ¶ 4.

36.     The Oversight Board asserted that certain aspects of the Agreement in Principle concerned matters beyond the scope of the Commonwealth-COFINA Dispute, as framed by the Procedures Order and the Scope Orders, including the design of new securities to be issued under

16

a plan of adjustment for COFINA and a requirement on how the Oversight Board may use funds allocated to the Commonwealth.   Moreover, the Oversight Board asserted that, among other things, the Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures Order by attempting to, among other things, dictate the terms of plans of adjustment in the Title III Cases and limit the availability and use of funds. However, the Oversight Board determined, after reviewing the extensive litigation history and issues raised in the Adversary Proceeding and assessing the likelihood of success for the Commonwealth in the litigation, that the central component of the Agreement in Principle—the 53.65% / 46.35% allocation of the disputed sales and use tax revenue between COFINA and the Commonwealth, respectively—was a fair and reasonable settlement and compromise of the Commonwealth-COFINA Dispute given the substantial risks of litigation, and determined to build upon the central component of the Agreement in Principle to garner support for a confirmable COFINA plan of adjustment. Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.

37.     Beginning in July 2018, and using the economic framework of the Agreement in Principle, the Oversight Board and its advisors engaged in over two weeks of court-sanctioned mediation among interested parties convened by the Mediation Team on a COFINA plan of adjustment, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action.  Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22.

38.     On August 8, 2018, the Oversight Board announced that it had reached an agreement with certain holders and insurers of COFINA's Existing Securities and AAFAF on the economic treatment of COFINA's Existing Securities and the terms of new securities to be issued pursuant to a proposed COFINA plan of adjustment (the "Securities Terms"), which Securities Terms were developed by Citigroup Global Markets, Inc. ("Citi") at the request of the Oversight Board and included in a presentation, of which the Agreement in Principle was the foundation.

Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22; Exhibit DX-UU; Brownstein Decl. ¶ 12; Exhibit DX-YY.

39.     The Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del Patio, Inc. (collectively, the "Settlement Parties") entered into that certain Plan Support Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that sets forth, among other things, (a) terms to the compromise and settlement of the Commonwealth-COFINA Dispute implemented by the Oversight Board and Citi and consistent with the terms of the Agreement in Principle developed by the Agents, which, among other things, allocates the first collections of SUT revenues in an amount up to fifty-three and sixty five one-hundredths percent (53.65%) of the annual Pledged Sales Tax Base Amount to COFINA, and confirms that COFINA is the sole and exclusive owner of the amounts held at BNYM as of June 30, 2018, and (b) terms of the relative treatment between junior and senior Existing Securities to resolve the dispute between holders of junior and senior Existing Securities regarding whether or not a default and acceleration had been triggered under the Resolution.  Jaresko Decl. ¶ 27; Jaresko (9019) Decl. ¶ 24; Brownstein Decl. ¶ 12.

40.     On September 20, 2018, the Settlement Parties amended and restated the Original Plan Support Agreement (the "A&R Plan Support Agreement") to (a) include additional holders of Existing Securities, who also hold significant amounts of GO Bonds and were among the plaintiffs in the Lex Claims Litigation and (b) provide that Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable affiliates, who are significant holders of Existing Securities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the SUT revenues purportedly transferred by the Commonwealth to

COFINA, and any other claims and causes of action which may challenge the transactions contemplated in the A&R Plan Support Agreement or the Plan, effective upon the entry of an order approving the Settlement and confirmation of the Plan. Jaresko Decl. ¶ 28; Exhibit DX-D; A&R Plan Support Agreement § 4.13.

41.    As of the date of the August 8, 2018 announcement, and due to the changes in the Commonwealth's then-certified fiscal plan, the Commonwealth Agent was unwilling to proceed to finalize any further documentation regarding the Agreement in Principle. Feldman Decl. ¶ 5. As such, the Oversight Board, as representative of the Commonwealth, began negotiation of the terms of the Settlement Agreement with the COFINA Agent, consistent with the economic terms of the Agreement in Principle. Feldman Decl. ¶ 6. The Settlement Agreement was the result of a good faith, arm's-length negotiation between the COFINA Agent and the Oversight Board. Feldman Decl. ¶ 7. The Oversight Board did not exert any influence on the COFINA Agent's decision to enter into the Settlement Agreement, nor did the COFINA Agent permit the Oversight Board to affect her judgment or ability to carry out her duty to act in the best interest of the debtor she was appointed to represent. Feldman Decl. ¶ 7. The Settlement Agreement is faithful to and consistent with the Agreement in Principle. Feldman Decl. ¶ 8. On October 19, 2018, after extensive discussion and deliberations, the Oversight Board, as representative of the Commonwealth, approved entry into the Settlement Agreement with the COFINA Agent. Jaresko Decl. ¶ 29.

42.    Contemporaneously thereto, on October 19, 2018, the Debtor filed the Plan, Disclosure Statement, and *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI)*

19

*Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VIII)
Approving Vote Tabulation Procedures* [Case No. 17 BK 3284, ECF No. 307].

43.     On November 5, 2018, the Commonwealth Agent entered into a stipulation with
the Oversight Board and the COFINA Agent withdrawing any objections to the Settlement
Agreement.  Pursuant to such stipulation, the Commonwealth Agent agreed, among other things,
not to object to the approval of the Settlement Agreement, approval of the Disclosure Statement,
or confirmation of the Plan, except in the circumstances set forth in paragraph 4 therein.  [Case
No. 17-3283, ECF No. 4202].  On January 10, 2019, the Retiree Committee withdrew its objection
to the Settlement Agreement.  [Case No. 17-3283, ECF No. 4704].  In light of the foregoing, as of
the date hereof, (a) each of the COFINA Agent, the GO Representative, and the Retiree Committee
have agreed to or ratified the terms of the Settlement Agreement resolving the Commonwealth-
COFINA Dispute in a manner consistent with the requirements of the Procedures Order, and (b)
the Commonwealth Agent also does not object to the approval of the Settlement Agreement.  The
Oversight Board's execution of the Settlement Agreement with the COFINA Agent was
appropriate under the circumstances.

44.     Contemporaneously with negotiations on the Settlement and the Plan, the
Government of Puerto Rico (the "Government") was considering legislation that would amend
Act 91-2006 to complement the Settlement and Plan, and provide protections for holders of the
COFINA Bonds.  On November 15, 2018, in furtherance of the Settlement and the Plan, the
Government  enacted Act 241-2018 ("Act 241"), amending Act 91-2006, which originally created
COFINA.

45.     On November 29, 2018, the Court entered an order [Case No. 17 BK 3284, ECF
No. 375] (the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing
adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) establishing

(1) January 2, 2019, at 5:00 p.m. (Atlantic Standard Time), as the Confirmation Objection

Deadline, (2)  January 8, 2019, at 6:00 p.m. (Atlantic Standard Time), as the deadline by which (i)

ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting

Deadline"), and (ii) elections regarding the form of distribution (including a determination

regarding commutation with respect to certain insured claims) were required to be received by

Prime Clerk (the "Election Deadline"), which Election Deadline was subsequently extended to

January 11, 2019, at 6:00 p.m. (Atlantic Standard Time)  [Exhibit DX-HHH; Case No. 17-3284,

ECF No. 400], and (c) scheduling a hearing on January 16, 2019, at 9:30 a.m. (Atlantic Standard

Time), to consider confirmation of the Plan [Case No. 17-3284, ECF No. 302]; Exhibit DX-J.

46.     Consistent with the Disclosure Statement Order, the Debtor caused Prime Clerk to

distribute solicitation packages to all claim holders entitled to vote.  The solicitation packages

contained, among other things:  (i) the notice setting forth the time, date, and place of the

Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or hard copy, in the

Debtor's discretion) containing this Disclosure Statement Order (without the exhibits thereto) and

Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate

form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid

return envelope; (iv) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or

W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating

to distributions under the Plan; and (v) in the case of creditors in Class 6, the Class 6 Notice.  Prime

Clerk also served election notices to holders of Claims in Classes 1 and 5, to permit the election

into Classes 4 and 7, respectively, or, if in Class 2 or 3, to elect to receive the applicable trust

certificates rather than the commutation alternative being offered by the respective monoline

insurers.  Pullo Decl. ¶¶ 4-6.

**Compliance with PROMESA Sections 104(j) and 313**

47.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  *See* PROMESA § 104(j)(1)–(2). The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified fiscal plan. *See id.* § 104(j)(3).  Further, the Oversight Board, after the issuance of a certification pursuant to PROMESA section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.   *See id.* § 313.   After the Oversight Board files a modification, the plan as modified becomes the plan.

48.     The Oversight Board has complied with its obligations pursuant to PROMESA sections 104(j) and 313.  On October 18, 2018, the Oversight Board certified COFINA's current fiscal plan (the "COFINA Fiscal Plan"). Exhibit DX-FFFF.

49.     On October 19, 2018, the Oversight Board certified the submission of the *Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* [Case No. 17-3283, ECF No. 4072] (the "Original Plan") upon a determination, in the Oversight Board's sole discretion, that the Original Plan was consistent with the COFINA Fiscal Plan.  Exhibit DX-BBBB.  Accordingly, the Oversight Board certified the submission of the Original Plan in accordance with PROMESA section 104(j).

50.     On November 16, 2018, the Oversight Board certified the modification of the Original Plan and the submission of the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* [Case No. 17-3283, ECF No. 4296] (the "First Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the First Amended Plan was consistent with the COFINA Fiscal Plan.  Exhibit DX-CCCC.  Accordingly, the Oversight Board certified

the modification of the Original Plan and the submission of the First Amended Plan in accordance with PROMESA section 104(j).

51.     On November 26, 2018, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* [Case No. 17-3283, ECF No. 4363] (as subsequently corrected pursuant to ECF No. 4390, the "Second Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Second Amended Plan was consistent with the COFINA Fiscal Plan.  Exhibit DX-DDDD.  Accordingly, the Oversight Board certified the modification of the First Amended Plan and the submission of the Second Amended Plan in accordance with PROMESA section 104(j).

52.     On January 9, 2019, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* [Case No. 17-3283, ECF No. 4652] (the "Third Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Third Amended Plan is consistent with the COFINA Fiscal Plan.  Exhibit DX-EEEE. Accordingly, the Oversight Board certified the modification of the Second Amended Plan and the submission of the Third Amended Plan in accordance with PROMESA section 104(j).

53.     For the reasons described herein, the Third Amended Plan meets the requirements of PROMESA; the First Amended Plan and Second Amended Plan met the requirements of PROMESA to the same extent that the Third Amended Plan meets the requirements of PROMESA; and the Oversight Board has complied with all applicable provisions of PROMESA. Accordingly, the Oversight Board modified the Original Plan, First Amended Plan, and Second Amended Plan in accordance with PROMESA section 313, and the Third Amended Plan has become the "Plan."

## Compliance with PROMESA Section 314(b)

**A.  PROMESA § 314(b)(1)**:  *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

54.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent.  Plan at 1, 78.  In addition, as detailed below, the Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code:

**i.  Bankruptcy Code Section 1122(a)**

55.     With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the Plan designates the classification of Claims.  Such classification complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are substantially similar to each other.  The Plan designates the following ten (10) Classes of Claims:

> Class 1 (Senior COFINA Bond Claims)
> Class 2 (Senior COFINA Bond Claims (Ambac))
> Class 3 (Senior COFINA Bond Claims (National))
> Class 4 (Senior COFINA Bond Claims (Taxable Election))
> Class 5 (Junior COFINA Bond Claims)
> Class 6 (Junior COFINA Bond Claims (Assured))
> Class 7 (Junior COFINA Bond Claims (Taxable Election))
> Class 8 (GS Derivative Claim)
> Class 9 (General Unsecured Claims)
> Class 10 (Section 510(b) Subordinated Claims)

Exhibit DX-G.

56.     The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon

differences in the legal nature and/or priority of such Claims in accordance with applicable law. Jaresko Decl. ¶ 36.

57.     All holders of Claims in Classes 1, 2, and 3 hold substantially similar securities, "Senior" Existing Securities, but are classified separately based on whether they are uninsured (Class 1) or insured by Ambac (Class 2) or National (Class 3), as such insurance agreements provide bondholders different rights thereunder.  Holders of Claims in Classes 5 and 6 hold substantially similar securities, "First Subordinate" Existing Securities, but are classified separately based on whether they are uninsured (Class 5) or insured by Assured (Class 6).  Jaresko Decl. ¶ 36.

58.     Senior COFINA Bond Claims and Junior COFINA Bond Claims are in different Classes because they have different underlying rights.  Specifically, in determining whether claims are "substantially similar" for the purpose of section 1122 of Title 11 of the United States Code, made applicable to the Title III Case pursuant to PROMESA section 301(a), the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.  *See* PROMESA § 301(e).  Under the Resolution, in the event of default, payment to the Junior COFINA Bond Claims, such as those bonds issued under the Seventh Supplemental Sales Tax Revenue Bond Resolution, is subordinate in payment of the Senior COFINA Bond Claims. Jaresko Decl. ¶ 37; Exhibit DX-XX.

59.     Based upon the elections offered pursuant to the Plan, holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims which are either Puerto Rico Institutions or Puerto Rico Individuals, to the extent elections were made, were shifted appropriately to other Classes (Class 4 and Class 7, respectively) to denote the election made and the alternative form of distribution elected to be received.  Jaresko Decl. ¶ 38; Exhibit DX-G.

60.     The Claim in Class 8 arises from or relates to that certain ISDA Master Agreement, dated as of July 31, 2007, between Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, L.P.) and COFINA, as amended by that certain Amendment, dated September 24, 2014.  The treatment of the Claim in Class 8 is dependent on the termination value of such Claim and whether the rejection damages, if any, associated with such Claim constitute a Parity Obligation.  Exhibit DX-G.

61.     The Claims in Class 9 are for all other liabilities of COFINA other than an Administrative Expense Claim, a Professional Claim, a Senior COFINA Bond Claim, a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National), a Senior COFINA Bond Claim (Taxable Election), a Junior COFINA Bond Claim, a Junior COFINA Bond Claim (Assured), a Junior COFINA Bond Claim (Taxable Election), a GS Derivative Claim or a Section 510(b) Subordinated Claim.  Exhibit DX-G.

## ii.  Bankruptcy Code Section 1123(a)(1)

62.     Section 4.1 of the Plan designates ten (10) separate Classes of Claims for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code. Exhibit DX-G.

63.     The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

## iii.  Bankruptcy Code Section 1123(a)(2)

64.     Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are impaired. Exhibit DX-G.  Existing holders of Allowed Junior COFINA Bond Claims (Assured) will receive (through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus, be effectively rendered unimpaired; provided, however, Assured will be subrogated to the rights of such holders and will received distributions pursuant to the Plan, thereby rendering Assured's claims impaired.  Therefore, there are no unimpaired Classes under the Plan,

26

65.     The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

**iv.  Bankruptcy Code Section 1123(a)(3)**

66.     Articles V through XIV of the Plan identify the treatment of all Classes of Claims that are impaired under the Plan.  Exhibit DX-G.

67.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

**v.  Bankruptcy Code Section 1123(a)(4)**

68.     Articles V through XIV of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  If a holder of a Claim in Class 1 or 5 elects out of such Class so as to receive all taxable bonds, rather than a mix of taxable and tax-exempt bonds, pursuant to the Plan, such holder is no longer in such Class, and, instead, is treated as a holder of a Claim in Class 4 or 7, respectively.  Jaresko Decl. ¶ 42; Exhibit DX-G.  Accordingly, all holders of Claims in each of Classes 1, 4, 5, and 7 receive the same treatment as other Claims in the same Class pursuant to the Plan.

69.     Consummation Costs are being paid to the parties to the A&R Plan Support Agreement and are not being paid to the Consummation Cost Parties on account of their Claims against COFINA.  Jaresko Decl. ¶ 43; Exhibit DX-G.  During the lengthy and complex court-appointed mediation led by Chief Bankruptcy Judge Houser, the Consummation Cost Parties agreed to various conditions and covenants set forth in the A&R Plan Support Agreement, including, among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means, including through substantial contribution claims.  As consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, continuing to assist in the finalization of definitive agreements and ancillary documents, and the costs incurred

27

in those and other efforts (including the expenses of defending COFINA's property interests for which the PSA Creditors asserted a right to seek substantial contribution claims), the Oversight Board determined that it was fair and reasonable for the Consummation Cost Parties to be paid the Consummation Costs. Based upon representations of counsel and, in some instances, pleadings filed with the Title III Court, the Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to be at least $135 million. Jaresko Decl. ¶ 43; Rodrigue Decl. ¶ 8.

70. The Consummation Cost Parties hold nearly $10 billion of the outstanding $17.6 billion in outstanding Bond Claims. Thus, approximately $190 million ($10 billion / $17.6 billion * $332 million) of the Consummation Costs (2% of their collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the absence of the Consummation Costs provision. Accordingly, the Consummation Cost provision provides for a "net" incremental payment for the Consummation Cost Parties of approximately $140 million. This amount equates to approximately 1.3% of the total Allowed Bond Claims of the Consummation Cost Parties. The Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to exceed the "net" cost of the Consummation Costs of approximately $140 million. Jaresko Decl. ¶ 44.

71. Unlike the Commonwealth and the other title III debtors in these jointly-administered cases, COFINA does not have a statutory creditors' committee representing the interests of COFINA creditors. Under section 1103(c)(3) of the Bankruptcy Code, made applicable to COFINA's Title III Case under section 301 of PROMESA, participation in the formulation of a plan is the function of a statutory committee, the expenses of which are entirely borne by the debtor. Here, the PSA Creditors served as the counterparty to the Oversight Board

and AAFAF in negotiating the Plan and in ensuring the Oversight Board that it had significant creditor support for the Plan.

72.     The payment of the Consummation Costs was a critical component of the interlocking agreements set forth in the A&R Plan Support Agreement.  The absence of the A&R Plan Support Agreement could have resulted in a costly, contentious, and lengthy confirmation process for COFINA.  Under such a scenario, there would be no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than eighteen (18) months.  In consideration of the benefits obtained for COFINA in entering into the A&R Plan Support Agreement, the benefits to COFINA creditors from the mediation and the costs to and burdens of intense mediation with the Consummation Cost Parties, the Oversight Board determined that it was an appropriate use of COFINA's property to pay the Consummation Costs and provide an opportunity for COFINA to emerge from Title III as expeditiously as possible. Jaresko Decl. ¶ 45; Rodrigue Decl. ¶ 8.

73.     The payment of Consummation Costs to the PSA Creditors does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C. § 1123(a)(4).  While it is true that all *claims* must be treated equally, the same is not true for all *claimants*.  *See* 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2013) ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interest . . . . Creditors should not confuse equal treatment of claims with equal treatment of claimants."); *see also In re Peabody Energy Corp.*, 582 B.R. 771, 781 (E.D. Mo. 2017) (same); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment

for all class members in all respects under a plan, and that the requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class— not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions.") (emphasis in original).

74.     The *claims* held by the PSA Creditors are treated the same as every other bondholder pursuant to the Plan:  holders of Senior COFINA Bond Claims will receive a 93.01% recovery on their bonds while holders of Junior COFINA Bond Claims will receive a 56.41% recovery, *see* Plan §§ 1.114, 1.168, irrespective of whether the holder is a retail investor, an institutional investor, or a PSA Creditor.  *See also* Jaresko Decl. ¶ 42.  The payment of the Consummation Costs is intended to compensate the PSA Creditors for:  (i) the significant costs and expenses expended by the PSA Creditors in order to achieve a confirmable plan in lieu of seeking substantial contribution; (ii) agreeing to "lock up" their bonds until potentially June 1, 2019, and accepting the attendant risk of unfavorable market conditions; and (iii) agreeing to support the Plan—another restriction not applicable to non-PSA Creditors.  Jaresko Decl. ¶ 43-45.

### vi. Bankruptcy Code Section 1123(a)(5)

75.     Various provisions of the Plan provide adequate and proper means for its implementation:

- Section 16.1 provides for the issuance of COFINA Bonds on the Effective Date;

- Section 19.1 provides for distributions to be made to holders of Allowed Claims under the Plan;

- Section 26.1 provides that, "[e]xcept as set forth in the Plan, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA;"

- Section 28.1 provides that, on the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive

Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, without further action by any Person or Entity under any other applicable law, regulation, order, or rule;

- Section 28.3 provides for the appointment of the board of directors of Reorganized COFINA, consisting of three (3) persons appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in the Definitive Documents;

- Section 28.5 provides that "[t]he COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan and as reflected in the Term Sheet;" and

- Section 30.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan."

Jaresko Decl. ¶ 46; Exhibit DX-g.

76.     The Amended Plan Supplement contains, among other things, substantially final forms of the (i) New Bond Indenture, (ii) the COFINA Bonds, (iii) the Reorganized COFINA By-Laws, and (iv) the Instructions Agreement. The Plan, together with the documents and arrangements set forth in the Amended Plan Supplement, provides adequate means for its implementation.  Jaresko Decl. ¶ 47.

77.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vii. Bankruptcy Code Section 1123(b)(1)

78.     Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are all impaired.  Jaresko Decl. ¶ 48; Exhibit DX-G.

79.     The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### viii.   Bankruptcy Code Section 1123(b)(2)

80.     Article XVIII of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which COFINA is a party are rejected, "except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Amended Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."  Plan § 18.1; Amended Plan Supplement at Exhibit I [Case No. 17-3283, ECF No. 4813].

81.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### ix.  Bankruptcy Code Section 1123(b)(3)(A)

82.     The Plan incorporates the settlement and compromise of, among other things, (a) the Commonwealth-COFINA Dispute Settlement in Article II of the Plan, (b) issues regarding the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action, and (c) the treatment of holders of Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National).  The Plan is the result of extensive arms' length negotiations among the Governmental Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Governmental Parties and various PSA Creditors form the very foundation of the Plan.  In absence of such compromises and settlements, COFINA's emergence from Title

III would likely be significantly delayed by currently stayed and other litigation and burdened by additional expense, which could impair the ability of COFINA to successfully adjust its debts, thereby prejudicing the recovery for all creditors and raising further uncertainties concerning the Commonwealth and COFINA's financial condition.  Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, is fair, equitable, and reasonable; (b) is in the best interests of COFINA, its creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.

83.    Further, the Plan will fairly and consensually resolve six adversary proceedings pending in the Court, two appeals pending in the First Circuit Court of Appeals, and an additional court action pending in the District of Puerto Rico but not before the Title III Court, each of which raises difficult and complex issues.  The Plan thus incorporates a complex series of interrelated compromises and settlements that resolve the most significant potential obstacle to confirmation of a plan of adjustment.  Moreover, since the compromises and settlements are inextricably interwoven, they all hinge on one another and the approval of all of these compromises and settlements is required in order to satisfy the conditions to the Effective Date set forth in the Plan.

84.    Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### x.  Bankruptcy Code Section 1123(b)(3)(B)

85.    The Plan is premised upon the Settlement, which is integral to the Plan and settles and compromises the Commonwealth-COFINA Dispute.  The Settlement has been determined to

be fair and reasonable and in the best interests of all creditors and above the lowest rung in the range of reasonableness.

86.     Section 26.1 of the Plan provides that, "[e]xcept as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court."  Exhibit DX-G.

87.     The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### xi.  Bankruptcy Code Section 1123(b)(5)

88.     Articles V through XIV of the Plan modify the rights of holders of Claims in all Classes.  There are no Classes whose holders' rights have been left unaffected pursuant to the Plan. Jaresko Decl. ¶ 52; Exhibit DX-G.

89.     The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xii. Bankruptcy Code Section 1123(b)(6)

90.     The Plan provides for, among other things, (a) certain releases, injunctions, and exculpations by COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons, (b) releases by each of the PSA Creditors and their respective Related Persons, (c) a release of BNYM, (d) a release of the Commonwealth, (e) a release of the Commonwealth Agent Releasees, (f) consensual releases by holders of Claims, (g) customary exculpation provisions for the Government Parties, PSA Creditors and Bonistas, the COFINA Agent, the Commonwealth Agent, and each of Ambac, Assured, and National and their respective Related Persons; (h) assumption of certain director and

officer indemnification and reimbursement obligations, and (i) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of COFINA Bonds, Ambac Certificates, and National Certificates.  Jaresko Decl. ¶ 53; Exhibit DX-G.

91.    Each of the foregoing is an integral part of the Plan and is essential to its implementation.  Jaresko Decl. ¶¶ 73-83.

92.    The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xiii.    Bankruptcy Code Section 1123(d)

93.    Section 18.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed or assumed and assigned under the Plan.  All cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan.  Exhibit DX-G.  The Debtor is not aware of any monetary defaults it must cure.  Jaresko Decl. ¶ 54.

94.    The Plan is consistent with section 1123(d) of the Bankruptcy Code.

### xiv.    Bankruptcy Code Section 1129(a)(2)

95.    COFINA (i) has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court and (ii) has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan.  Jaresko Decl. ¶ 55.

96.    The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement, and sought and received input and comment thereon from all the parties to the A&R Plan Support Agreement, and all other parties in interest.  This Court approved the Disclosure Statement as containing

adequate information and meeting the requirements of section 1125 and 1126 of the Bankruptcy Code.  Based upon the volume of ballots received and elections made, it is clear the Debtor has properly solicited with respect to the Plan, including with respect to each of the possible elections under the Plan.  Jaresko Decl. ¶ 55; Pullo Decl. ¶¶ 7-8, Exh. A.

97.     The Debtor has complied with section 1129(a)(2) of the Bankruptcy Code.

**xv.        Bankruptcy Code Section 1129(a)(3).**

98.     The Plan was proposed in good faith with the legitimate and honest purpose to provide a method for a covered territory to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA.  The Oversight Board, as proponent of the Plan, is the duly-appointed representative of COFINA in its Title III Case as provided under PROMESA and is in all respects consistent with applicable law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Case, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution.  The Debtor's good faith is evident from the facts and records of the Title III Case, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Case, including related adversary proceedings.  The Plan (including the settlements and compromises contained therein) is the result of extensive arm's-length negotiations among the Settlement Parties through mediation led by Chief Bankruptcy Judge Houser.  The Agreement in Principle was the product of an independent process overseen by the court-appointed Mediation Team in which the Oversight Board did not participate nor did it have any control over the parties who could participate.  Jaresko Decl. ¶ 56.

99.     The Oversight Board built upon the Agreement in Principle and engaged in over two weeks of mediation among interested parties on a COFINA plan of adjustment including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action.  Jaresko Decl. ¶ 57.

100.     All major Classes of Claims were represented in such mediation.  Brownstein Decl. ¶ 18-20; Jaresko Decl. ¶ 58.  The Senior COFINA Bondholders' Coalition represented the interests of holders of Senior COFINA Bond Claims. Ambac and National, as monoline insurers of such Claims, in aggregate amounts in excess of $2 billion, participated on behalf of their respective interests and protected the interests of their insureds.  Assured, an insurer of approximately $274 million in "First Subordinate" Existing Securities, is aligned with the economic interest of the holders of Junior COFINA Bond Claims and has no exposure, either through insurance coverage or beneficial ownership, to Senior COFINA Bonds.  Assured participated in Plan mediation and was a party to the A&R Plan Support Agreement.  Additionally, retail COFINA bondholders were represented throughout the process by retail or mutual funds, representing the interests of mainland and "on-island" bondholders, and Bonistas, advocating for the interests of Puerto Rico resident bondholders, actively participated.  All are signatories to the A&R Plan Support Agreement that included terms for the treatment of senior and junior COFINA bondholders to settle the issues of the relative rights between the senior and junior COFINA bondholders.  Brownstein Decl. ¶ 19.

101.     The Plan represents the culmination of months of intensive negotiations and discussions among parties representing the interests of all COFINA and Commonwealth stakeholders in an independently driven process by the court-appointed Mediation Team. Throughout the Plan negotiations, various constituencies were represented in the negotiation of the Plan, as illustrated by the widespread creditor participation and execution of the A&R Plan Support Agreement.   Cumulatively, such parties hold, own, beneficially own, or insure

approximately an aggregate $5.6 billion in senior COFINA bonds, and $3.7 billion in junior COFINA bonds.  Brownstein Decl. ¶ 20.

102.    The Plan is designed to implement the settlement and compromise of, among other things, the Commonwealth-COFINA Dispute and the Interpleader Action, and maximize value for COFINA's creditors, while avoiding protracted litigation which could delay distributions to creditors, or worse, result in no recoveries for any COFINA creditors.  Jaresko Decl. ¶ 57.

103.    The Plan and the Disclosure Statement reflect the culmination of those efforts and the substantial input of each representative group.

104.    The Plan (including the Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) achieves a rational adjustment of COFINA's debts, and properly distributes value to Creditors based upon their respective priorities, including through the implementation of parties' elections with respect to distributions.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of COFINA's property, and to maximize distributions to all creditors.  Jaresko Decl. ¶ 57.

105.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xvi.       Bankruptcy Code Section 1129(a)(6)**

106.    The Plan does not provide for any rate changes by COFINA, and, accordingly, such section of the Bankruptcy Code does not apply.

**xvii.      Bankruptcy Code Section 1129(a)(8)**

107.    Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the Debtor to solicit acceptance and rejections of the Plan, as well as certain elections with respect

thereto.  Disclosure Statement Order ¶¶ B, 2.  Prior to the transmission of the Disclosure Statement, the Debtor did not solicit acceptances of the Plan by any holder of Claims.

108.    The (i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement (which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Notices, (vi) Class 6 Notice, and (vii) Notice of Non-Voting Status – Class 10 (collectively, the "Solicitation Packages") were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the Disclosure Statement Order.  Pullo Decl. ¶ 6; Mailing Affidavit.

109.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing date, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Case; (ii) provided adequate and sufficient notice of the Voting Deadline, the Election Deadline, the Confirmation Objection Deadline, the method of voting or making an election of distribution under the Plan and the date, time and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the COFINA Title III Case.  Pullo Decl. ¶¶ 4-6; Service Affidavits.

110.    No other or further notice with respect to the Plan or the Confirmation Hearing is required.  Based upon the foregoing, the Debtor and its successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys and advisors of the foregoing (i) have acted in "good faith" within the

meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with all its activities relating to the solicitation of acceptances to the Plan or elections thereunder and its participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 30.7 of the Plan.  Plan § 30.7.

111.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  Pullo Decl. ¶¶ 7-8.

112.    All classes of creditors entitled to vote to accept or reject the Plan have voted to accept the Plan in accordance with the requirements set forth in the Bankruptcy Code and as applicable in accordance with Sections 301 and 314(b) of PROMESA.  Pullo Decl. ¶ 8.

113.    Holders of Claims in Classes 1, 2, 3, 5, 6, 8, and 9 voted, or are deemed to have voted, to accept the Plan.  Pullo Decl. ¶ 8.  Pursuant to the Plan, holders of Claims who have elected to be treated under Class 4 or Class 7 are deemed to have voted to accept of the Plan.  Plan §§ 5.2, 9.2.  The Plan therefore satisfies section 1129(a)(8) of the Bankruptcy Code with respect

40

to Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9.  Holders of Claims in Class 10 are deemed to reject the Plan, so section 1129(a)(8) of the Bankruptcy Code is unsatisfied with respect to Class 10.  Plan § 14.1.

114.    Notwithstanding such deemed rejection, the Plan is confirmable because the Plan satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to Class 10.

### xviii.    Bankruptcy Code Section 1129(b)(1)

115.    The Debtor is unaware of any Section 510(b) Subordinated Claims other than thinly-documented assertions set forth in several proofs of claim, but the Debtor included such Claims and classification within the Plan.  The Plan's treatment of Claims in Class 10 is proper, because all similarly-situated holders of Claims will receive similar treatment.  All holders of subordinated claims in Class 10 will not be receiving distributions pursuant to the Plan, and Class 10 is deemed to reject the Plan.  Jaresko Decl. ¶ 60; Exhibit DX-G.  Accordingly, the Plan does not unfairly discriminate against holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

### xix.    Bankruptcy Code Section 1129(b)(2)

116.    The Plan's treatment of Claims in Class 10 is proper, because no class of junior claims will receive distributions under the Plan.  There is no Class that is junior to Class 10 and, thus, no holder of claims or interests junior to Claims in Class 10 will receive or retain any property under the Plan on account of any such claim or interest.  Jaresko Decl. ¶ 61; Exhibit DX-G. Accordingly, the Plan is fair and equitable to holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

**B. PROMESA § 314(b)(2)**:  *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

117.    Except as otherwise provided for or permitted by orders of the Court, the Debtor has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan.  Brownstein Decl. ¶ 25; Jaresko Decl. ¶ 62.

118.    The Plan complies with PROMESA Section 314(b)(2).

**C. PROMESA § 314(b)(3)**:  *The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan.*

119.    The Plan contains no provisions which would require it to violate Commonwealth law.  The Commonwealth passed the New Bond Legislation, which established the legal framework for the restructuring of COFINA's issued and outstanding bonds.  Legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor.  *E.g., Brau, Linares v. ELA*, 2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct. 5, 1978), holding modified by *P.I.P. v. C.E.E.*, 120 D.P.R. 580; 1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of unconstitutionality is based, specifically mentioning the constitutional provisions involved and the legal precedents supporting its assignment."). No objector presented any evidence at the Confirmation Hearing regarding the passage and enactment of the New Bond Legislation, and, thus, has not met its burden to rebut this presumption with

respect to the New Bond Legislation.[3]  Accordingly, the New Bond Legislation has been validly

enacted, is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and

enforceable.  The New Bond Legislation implements the transactions contemplated by the Plan,

including, without limitation, providing for (a) on the Effective Date, confirmation of Reorganized

COFINA's sole and exclusive ownership of the COFINA Revenues and incorporating such other

terms as set forth in the Plan, *see*, *e.g.*, New Bond Legislation art. 2.2, (b) the modification of

COFINA's corporate governance structure consistent with its independence from the

Commonwealth, *see id*. art. 2.7, (c) the authorization for Reorganized COFINA to issue COFINA

Bonds and COFINA Parity Bonds pursuant to the New Bond Indenture and to provide for the

terms of such bonds, *see id*. art. 3.1(a), (d) confirmation of Reorganized COFINA's ownership of

the COFINA Revenues, *see id*. art. 2.2, (e) the creation of a statutory lien to secure the COFINA

Bonds and COFINA Parity Bonds, *see id*. art. 3.2, and (f) covenants to secure further the repayment

of the COFINA Bonds and COFINA Parity Bonds, such as the COFINA Revenues being funded

from first funds, a non-impairment covenant and covenants that allow the Commonwealth to

modify the Pledged Sales Tax and substitute New Collateral only upon satisfaction of certain

specific requirements, *see id*. arts. 3.3, 4.1.  Jaresko Decl. ¶ 63; Exhibit DX-G.

     120.     The Plan complies with PROMESA section 314(b)(3).

---

[3]    The objection filed by Legislative Assembly Member Natal Albelo cites in support an action initially filed in the Commonwealth court, which was subsequently removed by the Oversight Board to this Court.  This action does not prevent confirmation of the Plan for three alternative reasons.  First, it is void *ab initio* because the action violated the automatic stay.  *In re City of Detroit*, 504 BR 97, 166-67 (Bankr. E.D. Mich. 2013); *In re Jefferson County*, 484 BR 427, 446-47 (Bankr. N.D. Ala. 2012) (suit vs government officers are subject to the automatic stay).  Second, claims about constitutionality of COFINA's creation have already been litigated by the duly authorized agents, the Commonwealth Agent and the COFINA Agent, with standing and in the correct legal forum, and a compromise of the issue forms the basis for the Plan.  Third, the allegations of Legislative Assembly Member Natal Albelo concern an internal procedural dispute amongst legislators regarding challenges to their debate procedures.  This type of dispute is not justiciable.  *See Noriega Rodriguez v. Jarabo*, 136 D.P.R. 497, 534 (P.R. 1994) ("We cannot transfer to the judicial forum the internal controversies of the legislative branches that are the product of discrepancies between legislators that arose through the normal and usual process of the legislative debate.").  A certified translation of this decision can be found at ECF No. 4762-1 and ECF No. 488-1.

**D. PROMESA § 314(b)(4)**: *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date*

121.    Section 3.1 of the Plan provides that, "[o]n the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized COFINA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan." Exhibit DX-G.

122.    Consummation Costs are being paid in Cash on the Effective Date of the Plan.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the Plan.

123.    The Plan complies with PROMESA section 314(b)(4).

**E. PROMESA § 314(b)(5)**: *The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals*

124.    As discussed above, the Commonwealth has validly enacted the New Bond Legislation, which New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and enforceable, and there are no approvals left to obtain to effectuate

the Plan.  By approving and certifying the COFINA Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA section 207.  Jaresko Decl. ¶ 66.

125.    The Plan satisfies PROMESA section 314(b)(5).

**F. PROMESA § 314(b)(6)**: *The Plan is Feasible and in the Best Interests of Creditors*

126.    The COFINA Fiscal Plan, certified on October 18, 2018, demonstrates that the Plan is feasible, because the COFINA Fiscal Plan provides for the incurrence of obligations contemplated by the Plan and states such obligations can be repaid.  COFINA's Fiscal Plan projections (as set forth in greater detail in Section XVIII of the Disclosure Statement, entitled "Financial Information and Projections" and Exhibit E thereto) demonstrate, as a result of COFINA's ownership of the COFINA Portion, COFINA's ability to fulfill its obligations under the Plan.  COFINA's financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that COFINA will be able to satisfy its obligations under the Plan. Brownstein Decl. ¶¶ 29-34.

127.    COFINA has no power to raise taxes.  The alternative to the Plan is protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for either holders of Commonwealth claims or COFINA's Existing Securities.  For any individual class of creditors to do better than the Plan, such creditors would have to prevail in the Adversary Proceeding, which is at best uncertain.  Even if one side to the litigation were to prevail, litigation costs would skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT Revenues.  Jaresko Decl. ¶ 67.

128.    Moreover, the Plan provides additional protections for COFINA and its creditors, such as a federal court order "quieting title" to COFINA's ownership of a majority of the Pledged Sales Tax Base Amount—and on a first-dollars basis—against all challenges, removing the cloud

over title to COFINA's property interest that has existed since COFINA's creation in 2007, as well as enhanced non-impairment and substitution covenants. If the Plan were to be rejected, and the Commonwealth-COFINA Dispute were litigated to conclusion, even if COFINA were successful, it would not have these ironclad protections. Nor would successful litigation on COFINA's ownership rights have necessarily prevented the Commonwealth from attempting to enact other measures that could have reduced the sales tax transferred to COFINA, or even from outright repealing the sales tax, spurring rounds of litigation as to the appropriate remedies, if any. The Plan, and the Confirmation Order, will ensure COFINA's revitalization and will prevent any challenges to COFINA's ownership of, and any attempts by over parties to divert, COFINA's portion of the Pledged Sales Tax base Amount. Such outcome is unquestionably in the best interest of COFINA's creditors.

129.     Independent of the validity of the transfer of the SUT to COFINA, the holders of "First Subordinate" Existing Securities face the risk that an event of default will accelerate the bonds such that "First Subordinate" Existing Securities are not paid until holders of "Senior" Existing Securities are paid in full. The Existing Bond Resolution provides that, upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the "Senior" Existing Securities to be immediately due and payable. Upon such declaration, the principal of, and accrued interest on, the "Senior" Existing Securities becomes immediately due and payable. In addition, upon a declaration of an event of default, holders of "First Subordinate" Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder until such time that the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution. Upon an event of default, the senior bondholders have taken the view that the Existing Bond Resolution provides for the priority of payments in favor of

the "Senior Existing Securities" if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due.  Jaresko Decl. ¶ 68.

130.    If the Plan were not confirmed, the parties would lose the benefit of the Court-sanctioned agreement resolving the Commonwealth-COFINA Dispute.  Litigation would continue in an all-or-nothing fashion, leaving some creditors potentially much worse off and some creditors potentially better off.  The Plan's provision for a distribution of approximately 93% to holders of "Senior" Existing Securities and approximately 56% to "First Subordinate" Existing Securities, in light of the risks attendant to the Commonwealth-COFINA Dispute and the Interpleader Action, among others, is likely far superior to what both groups of bondholders might receive outside of the Plan.  The Plan avoids the pitfalls of delay, litigation costs, and uncertainty by implementing the consensual agreement reached by the major stakeholders in the Title III Case in a manner consistent with the Procedures Order.  The overwhelming acceptance of the Plan by the various classes indicates such creditors believe the Plan to be in their best interests.  Jaresko Decl. ¶ 69.

131.    The Oversight Board retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's statutory duties under PROMESA and its task of working with the Commonwealth to create the necessary foundation for economic growth and to restore  opportunity to the  people of  the  Commonwealth.  Citi developed the Securities Terms to address the concerns of both COFINA and its bondholders and were designed with two focal points in mind: (i) to ensure broad market access to Reorganized COFINA on a go-forward basis; and (ii) to provide all existing COFINA creditors with as increased a potential recovery as possible by ensuring as high a market value as possible for the bonds issued pursuant to the Plan.  In doing so, Citi  had been informed by creditor representatives that they were particularly concerned about a possible double "haircut" (*i.e.*, <u>first</u>, a reduction to

the amount of their original claims through the Plan, and second, a subsequent reduction through less-valuable replacement bonds they receive in exchange for their original bonds).  Brownstein Decl. ¶¶ 12-13.

132.    The Securities Terms also provide that the COFINA Bonds to be issued pursuant to the Plan will bear fixed interest rates, including Current Interest Bonds, ("CIBs"), which pay cash interest, and Capital Appreciation Bonds ("CABs"), which accrete non-cash interest until maturity.  All COFINA Bonds accrue interest beginning as of August 1, 2018.  The CIBs mature in 2034, 2040, 2053, and 2058 and have a par value in the aggregate of approximately $9.25 billion. The CABs mature in 2024, 2027, 2029, 2031, 2033, 2046, and 2051 and have an initial value of approximately $2.7 billion.  Brownstein Decl. ¶ 14.

133.    To provide protection to holders of the COFINA Bonds, the Securities Terms provide that no parity debt may be issued by Reorganized COFINA other than refinancing bonds ("COFINA Parity Bonds") that produce debt savings in each year for Reorganized COFINA and no maturity extensions.  The Securities Terms also provide that Reorganized COFINA may issue subordinate lien bonds for the benefit of the Commonwealth only if the following requirements are satisfied (the "Additional Bonds Test"): (i) the projected 5.5% SUT equals or exceed one and one-half times (1.5x), in any succeeding Fiscal Year, the annual aggregate debt service due on the COFINA Bonds, the COFINA Parity Bonds and subordinated lien bonds to remain outstanding after the issuance of such subordinated lien bonds (including the subordinated lien bonds to be issued); (ii) the preceding Fiscal Year's collections from the 5.5% SUT is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding Fiscal Year on all COFINA Bonds, COFINA Parity and subordinated lien bonds to remain outstanding after the issuance of such subordinated lien bonds (including the subordinated lien bonds to be issued); and (iii) the subordinated lien bonds have a maturity not

later than Fiscal Year 2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing Additional Bonds Test, final maturity beyond Fiscal Year 2058 shall be permissible for future subordinated lien bonds. In addition, the Securities Terms provide that the repayment of such subordinated lien bonds shall be secured by a second lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of subordinated lien bonds being secured by a subordinated second or more junior lien on the 5.5% SUT Taxes; provided, however, that repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Revenues. To support the credit rating of the COFINA Bonds, the Securities Terms also provide for (a) a non-impairment covenant of the Commonwealth, which provides, among other things, that (i) the pledged SUT percentage shall not be reduced to a rate less than 5.5% unless, in connection with such reduction, Reorganized COFINA shall have received a Rating Confirmation from each of at least two of the rating services then providing a credit rating on the outstanding COFINA Bonds and COFINA Parity Bonds, that the rating of such rating service on the COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other credit enhancement) will not be downgraded and will be at least A2/A category or higher following such reduction; provided, however, that, notwithstanding the foregoing, if the pledge SUT percentage is reduced below 3%, then, in connection with such reduction, the Commonwealth shall comply with the certain substitution requirements. Further, the Securities Terms provide that repayment of the COFINA Bonds and COFINA Parity Bonds is to be secured by a statutory first lien on Reorganized COFINA's interest in the 5.50% pledged SUT. Brownstein Declaration ¶¶ 15-16. The Securities Terms are set forth in the Plan and Amended Plan Supplement and may be amended, restated, supplemented, or otherwise modified in accordance with the terms and provisions hereof and thereof, as applicable.

134.    Each series of Existing Securities was issued pursuant to a supplemental resolution providing for its issuance and the terms of such series, in each case adopted by the Board of Directors of COFINA.  The Resolution together with the supplemental resolutions issued pursuant thereto is referred to as the "Existing Bond Resolution."  The various supplemental resolutions authorized the issuance of both "Subordinate Bonds" and "Senior Bonds" as defined in the Resolution.  Brownstein Decl. ¶ 21.

135.    As of the Petition Date, COFINA had outstanding $17.64 billion aggregate principal and unpaid interest amount of bonds issued under the Existing Bond Resolution, including approximately $7.76 billion of claims arising from "Senior" Existing Securities and approximately $9.88 billion of claims arising from "First Subordinate" Existing Securities. Approximately $1.33 billion of the "Senior" Existing Securities are insured by Ambac and $1.10 billion are insured by National.  Approximately $0.25 billion of the "First Subordinate" Existing Securities are insured by Assured.  Brownstein Decl. ¶ 21.

136.    The Existing Bond Resolution in respect of "Senior" Existing Securities provides for the issuance of additional bonds that are "subordinate to payment of the Senior Bonds and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds."  Many supplemental resolutions issued subsequent to the Resolution indicate that Bonds issued thereunder are "First Subordinate" Existing Securities.  For example, the Seventh Resolution provides that "[a]ll of the Series 2009A Bonds shall constitute "Subordinate Bonds" under the Resolution."  Brownstein Decl. ¶ 22; DX-XX.

137.    The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.  If an event of default under the Existing Bond Resolution had occurred, the senior bondholders could have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Furthermore,

senior bondholders could have established an entitlement to the face value of their bond and a "make-whole" provision before the junior bondholders received any distributions.  Rodrigue Decl. ¶ 4.  Independent of the validity of the transfer of certain sales and use taxes to COFINA, senior bondholders have taken the view that such acceleration would have required the senior bondholders to be paid in full before junior bondholders could declare an event of default and exercise remedies.  Brownstein Decl. ¶ 23; Rodrigue Decl. ¶ 4; Exhibit DX-K.  However, neither the Ambac Insurance Policy nor the National Insurance Policies insure against loss of prepayment premiums, which include "make-whole" provisions.

138.    The contractual subordination of the junior COFINA bondholders to the senior COFINA bondholders includes the risk that the amount of SUT available to bondholders is compromised.  The original bargained-for agreement between junior and senior COFINA bondholders includes the possibility that, if monies available to COFINA bondholders are reduced, senior bondholders shall be satisfied first.  This contractual subordination is not just related to the risk the SUT revenues are less than projected, but covers all possible reasons for a reduction in revenues.  One risk was that an event of default occurred, and the acceleration provision in the Bond Resolution was triggered, such that only senior COFINA bondholders received cash flows thereunder.  In the senior bondholders' view, the senior-subordinate relationship and payment waterfall entitle seniors to payment in full before subordinate bondholders receive any recovery.  Enforcement of strict priority following an event of default could result in senior bondholders receiving a par recovery plus post-petition interest and other entitlements under the Bond Resolution.  In such a situation, subordinate bondholders would not receive any recovery for many years and the present value of any such recovery would be substantially less than the recovery subordinate bondholders will receive under the Plan.  Brownstein Decl. ¶ 24.

139.    A settlement regarding the validity of the COFINA structure and the ability of the SUT to flow into COFINA was also a potential risk to COFINA bondholders, even when the bondholders first purchased COFINA bonds.   The Settlement alleviates junior bondholders of these risks.   Brownstein Decl. ¶ 25.

140.    The senior COFINA bondholders are receiving less than par on their bonds (approximately 93% recovery is projected for Class 1), while the junior bondholders are receiving a significant recovery.   Had an event of default been recognized, or the SUT revenues been insufficient to satisfy all bondholders outside of this settlement, junior bondholders would bear the risk of not receiving any monies prior to senior bondholders being paid in full.   Brownstein Decl. ¶ 25.

141.    The Settlement and securities issued pursuant to the Plan appropriately do not reflect the varying interest rates and maturities on the Existing Securities.   As provided in Bankruptcy Code section 502, made applicable to COFINA's Title III Case pursuant to PROMESA section 301, for the purposes of distribution pursuant to the Plan, claims arising from the Existing Securities are valued, based solely on the outstanding principal amount and accrued interest and/or accreted capital appreciation, as of the day before the commencement of COFINA's Title III Case. Exhibit DX-G; Brownstein Decl. ¶ 26.

142.    It is uncertain whether all of the COFINA Bonds issued to holders of Existing Securities under the Plan will be tax-exempt.   During the mediation sessions regarding the COFINA plan of adjustment, mainland investors were concerned that their recovery would be artificially depressed if they received taxable bonds on account of their Existing Securities.   Puerto Rico Investors and Puerto Rico Institutions are not subject to federal taxation.   Accordingly, to address this concern, and with the full involvement of Bonistas and Puerto Rico-based mutual funds representing the interests of "on island" bondholders, the Plan contains provisions that all

Puerto Rico Investors and Puerto Rico Institutions can elect to receive taxable bonds as well as a supplemental 2% cash recovery rather than a strip of taxable and tax-exempt bonds.  Recoveries for mainland investors are enhanced by this election by maximizing the amount of tax-exempt securities available for such investors.  Brownstein Decl. ¶ 27.

143.    Recoveries for all bondholders are enhanced if "on island" bondholders, who generally are not subject to U.S. federal income taxation, elect to be treated in Classes 4 or 7 and, as a result receive taxable bonds. When "on island" bondholders elect taxable treatment, the ability of mainland bondholders to receive a higher proportion, and potentially even all, of their distribution in tax-exempt COFINA bonds is enhanced, thereby enhancing recoveries for mainland bondholders.  Providing the taxable election only to on-island bondholders ensures that both local and mainland investors receive reasonably equivalent treatment in respect of their claims. Brownstein Decl. ¶ 28.

## Reorganized COFINA's Revenues are Sufficient to Service its Debt Obligations

144.    Citi reviewed the COFINA Fiscal Plan for accuracy and conformity to the Agreement in Principle.  The COFINA Fiscal Plan contemplates that debt service on the COFINA Bonds equals 53.65% of the PSTBA.  Brownstein Decl. ¶ 30; Exhibit DX-SSS.

145.    Citi helped negotiate the terms of the Plan so that the debt service on the COFINA Bonds is slightly below 53.65% of the PSTBA, virtually identical to the amount contemplated by the COFINA Fiscal Plan.  Critically, the COFINA Revenues comprise the first collections of the 5.50% SUT in each Fiscal Year.  Thus, the debt service on the COFINA Bonds is backed by the entire amount of the 5.50% SUT because a shortfall will only exist in the event that the entire amount of the 5.50% SUT generated in a Fiscal Year is less than 53.65% of the Pledged Sales Tax Base Amount.  Accordingly, the debt service on the COFINA Bonds is consistent with the debt sustainability analysis contained in the COFINA Fiscal Plan.  Brownstein Decl. ¶ 30.

146.     Citi's analysis of the COFINA Fiscal Plan showed that sound assumptions—that stimulus from disaster funds, structural and fiscal reforms to the Puerto Rico economy, and improvements in tax collection methods will maintain a robust amount of personal consumption in the Commonwealth—justify the COFINA Fiscal Plan's SUT projections.  Brownstein Decl. ¶ 31.

147.     Citi's analysis further showed that, because the SUT is a tax of general application covering a broad range of goods and services with few exceptions, more spending and buying in the Commonwealth generates greater SUT revenues.  Government and private disaster funding will stimulate spending and buying, and in turn, bolster SUT revenues.  Altogether, over $82 billion in disaster relief funding is projected from 2018 to 2033.  Among other things, this funding will be distributed directly to individuals and families affected by Hurricane Maria and will support reconstruction on the island.  Such funds are reasonably projected to stimulate spending in the Commonwealth and maintain robust SUT revenue projections.  Government reforms including labor, energy and corporate reforms are projected, to increase Puerto Rico's economic output by 0.95% by FY 2023.  It is reasonable to assume that this economic growth will translate to growth in SUT revenues and that better tax collection methods and increased compliance efforts will yield a 5% increase in total SUT collected by 2021. Brownstein Decl. ¶ 32.

148.     In FY 2019, the 5.50% SUT, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, is projected to be approximately $1.4 billion.  The SUT taxable base from which Reorganized COFINA collects its revenue in "first dollars" should more than amply cover the debt service on COFINA Bonds in FY 2019 of $420 million.  COFINA has a significant debt service coverage ratio of 3.33x (*i.e.*, $1.4 billion / $420 million) in FY 2019.  While the debt service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the 40-year average coverage ratio is still a robust 2.46x.  Further, the projected PSTBA reaches a plateau

in FY 2041 and never increases after that point, so any subsequent increase in the 5.5% SUT after FY 2041 will necessarily improve the debt service coverage ratio.  In fact, the 5.5% SUT could remain exactly the same until the last stated maturity date of any of the COFINA Bonds in FY 2058, and Reorganized COFINA would have no issue servicing the debt obligations on the COFINA Bonds.  Brownstein Decl. ¶ 33.

149.     The feasibility of the Plan is plainly established.

### G.  PROMESA § 314(b)(7): Fiscal Plan Compliance

150.     On August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for Fiscal Years 2019 to 2023. On August 27, 2018, COFINA submitted its fiscal plan to the Oversight Board. On August 30, 2018, the Oversight Board delivered to COFINA a notice of violation pursuant to section PROMESA 201(c)(3)(B) requiring certain changes and/or explanations in a revised COFINA fiscal plan. On September 7, 2018, COFINA submitted a revised fiscal plan to the Oversight Board. On October 18, 2018, the Oversight Board voted to certify the COFINA Fiscal Plan, as amended.  *See* Brownstein Decl. at 3 n.2.

151.     The Plan is consistent in all respects with the COFINA Fiscal Plan, as amended.

152.     The Plan complies with PROMESA section 314(b)(7).

### The Releases, Exculpation, and Injunctions Pursuant to the Plan

153.     The Commonwealth-COFINA Dispute presented the potential for extended, complex, expensive, and value-destructive litigation among competing interests and entities.  A fundamental objective of the Debtor and the Oversight Board throughout COFINA's Title III Case has been to structure a transaction to fairly divide the SUT while avoiding the winner-take-all nature of litigation related to the validity of the COFINA structure and related claims.  The prompt, efficient conclusion of COFINA's Title III Case is premised on the proposed comprehensive resolution and settlement of this dispute.  Jaresko Decl. ¶ 73.

154.    None of these issues has been fully litigated in these cases.  However, cross-motions for summary judgment had been filed on the underlying constitutional questions, and significant resources were expended on these initial phases.   In an effort to avoid disputes that could jeopardize a consensual resolution creating the highest value for all stakeholders, the Agents and then the PSA Creditors engaged in good faith negotiations over a period of many months, as discussed above.   The robust, arm's-length negotiations were successful and yielded substantial consensus and support for a consensual plan, as evidenced by the Agreement in Principle, culminating in the Settlement Agreement and the Plan that has garnered substantial creditor support from all impaired voting classes.  Jaresko Decl. ¶ 74.

155.    In order to incentivize the PSA Creditors to grant the concessions outlined above, and in consideration of the substantial benefits provided by the Released Parties, the Debtor agreed to prosecute and pursue the releases, exculpation, and injunction provisions set forth in the Plan. Each aspect of the Settlement is interdependent and relied upon by the Agents and, especially, the PSA Creditors, who made material concessions as to their respective positions to enable the expeditious confirmation of the Plan.  Such settlements take into account the legal and factual risks to the allowance of the claims.  Modifications to any aspect of the Settlement or the failure to approve the Settlement undoubtedly may result in events of termination under the A&R Plan Support Agreement, jeopardize settlement of the Commonwealth-COFINA Dispute, and set back the administration of COFINA's Title III Case for an extended period as holders of GO Debt and COFINA's Existing Securities get bogged down in the maze of uncontrolled litigation for prosecution of their claims.  Jaresko Decl. ¶ 75.

**A.  Debtor Releases**

156.    Pursuant to Section 30.5 of the Plan, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons

proposed to release the Released Parties from Claims or Causes of Action they may have against such Released Parties.  The Debtor's Release constitutes a sound exercise of the Debtor's judgment and meets the applicable legal standard:  the Debtor's Release is fair, reasonable, and in the best interests of the Debtor.  During the course of negotiations regarding the Plan and predecessor agreements, it was clear that the Debtor's Release would be a necessary condition to consummation of the Settlement embodied in the Plan.  In exchange for such releases, the Debtor secured the substantial concessions provided by the Settlement and the Plan.  Similarly, the Released Parties provided integral support throughout COFINA's Title III Case, and incurred significant costs in doing so.  Jaresko Decl. ¶ 76.

157.    Furthermore, with the exclusion of the Commonwealth-COFINA Dispute, which is being compromised pursuant to the Settlement and incorporated into the Plan, and acts relating to the Ambac Action and Whitebox Actions, which are being preserved pursuant to the Plan, *see* Section 30.2(c), the Debtor is not aware of any claims that could be asserted against the Released Parties and no creditor has informed the Debtor that it believes such an action should be brought, which the Debtor believes would be meritorious.  In addition, without the assurance of protection from liability, the Released Parties involved in the Plan process may not have participated in the negotiations that led to the development of the Settlement and Plan.  Had the Debtor's Release not been provided, the Debtor's chances of resolving the Commonwealth-COFINA Dispute, and proposing the Plan which was ultimately accepted by every voting Class, would have been diminished.  Jaresko Decl. ¶ 77.

## B.  Consensual Releases

158.    Section 30.2 of the Plan provides for the Consensual Releases of the Released Parties by the holders of Claims.  The consensual releases seek only to release parties that made a significant contribution to the Plan:

a. COFINA and Reorganized COFINA, from all Claims or Causes of Action, and from all Entities, *see* Plan § 30.2(a)–(b);

b. the Government Releasees, from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the PSA Creditors and their respective Related Persons, *see* Plan, § 30.2(c);

c. BNYM and (a) each of its Related Persons, from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution by each of the PSA Creditors, *see* Plan § 30.2(c), excluding any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively, and (b) each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions, *see* Plan § 30.2(d);

d. the Commonwealth Agent Releasees, from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order, *see* Plan § 30.2(e); and

e. the Commonwealth, from all Claims and Causes of Action held by any Creditor, solely in such capacity.  *See* Plan § 30.2(f).

Exhibit DX-G.

159.   The consensual releases are necessary and essential to the Plan.  As mentioned above, the releases have been negotiated with COFINA's key creditor constituencies as part of the formulation of the Plan.  Thus, it is clear that a substantial number of creditors have expressly consented to the releases.  The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM—can likewise be approved under the appropriate standard.  The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the

Settlement.  Without the release, the Commonwealth would not have agreed to the Settlement, which laid the groundwork for the formulation of this Plan.  Jaresko Decl. ¶ 79.

160.    Further, it is imperative to the Plan that BNYM be released.  Without a release, BNYM would attempt to withhold distributions to bondholders necessary to effectuate the Plan. Additionally, the release is narrowly tailored so that it exempts acts of gross negligence, intentional fraud, or willful misconduct, solely in the context of the Ambac Action and Whitebox Actions. Jaresko Decl. ¶ 80.

### C.  Exculpation

161.    Section 30.7 of the Plan contains a release and exculpation for certain parties for claims arising out or relating to, among other things, any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan (the "Exculpation Provision").  Exhibit DX-G.

162.    Such parties greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan in exchange, in part, for the Exculpation Provision.  Failing to approve this provision would expose the parties to litigation after months of  good faith negotiations.  Jaresko Decl. ¶ 82.

### D.  Injunction

163.    The injunction set forth in Sections 30.3, 30.6, and 30.11 of the Plan provides for an injunction (the "Injunction") against all Entities from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, both prior to and after the Effective Date.  The Injunction is

necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose.  Jaresko Decl. ¶ 83; Exhibit DX-G.

164.    The releases, exculpation provisions and injunctions pursuant to the Plan are integral and critical parts of the Plan and the compromises and settlements implemented pursuant to the Plan.  The approval of such releases is a condition to the occurrence of the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan.  Accordingly, such provisions are justified and warranted based upon the circumstances of the Title III Case and the consideration being provided by all parties in connection with the Plan.

### Validity of COFINA Bonds

165.    On November 15, 2018, in furtherance of the Settlement, the Commonwealth validly enacted the New Bond Legislation, amending Act 91-2006, which originally created COFINA.  The New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and enforceable.  The effectiveness of such legislation is subject only to the occurrence of the Effective Date.

166.    Confirmation of the Plan demonstrates Puerto Rico is taking the steps necessary to enable its return to the capital markets.  The restructuring of the COFINA debt under title III of PROMESA is expected to act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy and reducing costly litigation.

167.    The Plan demonstrates Puerto Rico's continued good faith commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital

markets and achieve economic certainty and debt sustainability for Puerto Rico.  For their part, in exchange for the material concessions and releases provided through the Plan, COFINA's bondholders will benefit from the elimination of the previous uncertainty as to whether the property transferred to COFINA to secure their repayment nevertheless remained "available resources" or "available revenues" of the central government of Puerto Rico under the Puerto Rico Constitution.  The issues that previously cast a cloud on the structure are being resolved through the Plan, rather than "all or nothing" litigation.

168.    The Plan will quiet title to the Pledged Sales Tax Base Amount and resolve all disputes of all parties relating thereto.  Moreover, the Court shall retain jurisdiction over all matters related to the COFINA Bonds to ensure compliance with the Plan.

169.    Confirmation of the Plan constitutes a judicial determination pursuant to Section 4 of PROMESA, the terms of this Findings of Fact and Conclusions of Law shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith and be full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum.

170.    As a separate debtor with its own Title III case, its own certified fiscal plan, and its own plan of adjustment, COFINA is a separate covered territorial instrumentality that is legally distinct from the Commonwealth.  *See* 13 L.P.R.A. § 11a(a) ("A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the Corporacion del Fondo de Interes Apremiante de Puerto Rico ('COFINA'), Spanish acronym), whose name in English shall be Puerto Rico Sales Tax Financing Corporation."); New Bond Legislation art. 2.1 (providing that Reorganized COFINA "shall be recognized for all purposes as an independent and separate legal entity from the Government of

Puerto Rico and any other Government Entity.").  The Court has previously held, in connection

with the Commonwealth-COFINA Dispute, that the nature of each debtor's interest in the Pledged

Sales Taxes, for purposes of PROMESA, is a mixed question of federal and Commonwealth law.[4]

The Plan, however, provides for an agreed upon allocation of the Pledged Sales Taxes premised

upon this Court's approval of the Settlement and confirmation of the Plan, and, upon such

approval, the COFINA Revenues shall be the sole and exclusive property of COFINA, and shall

not be property of the Commonwealth or available to the Commonwealth.  The Settlement and the

allocation of the Pledged Sales Taxes are necessary for the implementation of the Plan, and,

pursuant to Bankruptcy Code section 1123(a)(5), made applicable to COFINA's Title III Case

pursuant to PROMESA section 301(a), are self-executing and preemptive notwithstanding

otherwise applicable nonbankruptcy law, including otherwise applicable Commonwealth law.  *See*

11 U.S.C. § 1123(a)(5) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan

shall . . . provide adequate means for the plan's implementation, such as (A) retention by the debtor

of all or any part of the property of the estate . . . ."); PROMESA § 301(c)(5) ("The term 'property

of the estate', when used in a section of title 11, United States Code, made applicable in a case

under this title by subsection (a), means property of the debtor."); *see also In re Irving Tanning*

*Co.*, 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013) ("[O]nly those means may preempt state law that

are sufficient for the implementation of the plan: they must be sufficient to implement the plan,

equal to what is required, but also not more than is required.").  Furthermore, pursuant to the

---

[4]   Adversary Proceeding. ECF No. 483, Decision and Order, dated May 24, 2018, at 5-6, Exhibit DX-TT ("the Court
must decide what the relevant property rights are within the context of these Title III proceedings, under
PROMESA and federal bankruptcy law provisions that Congress has incorporated into PROMESA . . . . [T]he
Commonwealth-COFINA Dispute presents a mixed question of federal and Puerto Rico law").  *See also Abboud
v. Ground Round, Inc. (In re Ground Round, Inc.)*, 482 F.3d 15, 17 (1st Cir. 2007) ("The label … that state law
affixes to a particular interest in certain contexts is not always dispositive." (citing *In re Nejberger*, 934 F.2d 1300,
1302 (3d Cir. 1991)).

Settlement Order and the Plan, and subject to the terms of the plan, claims of COFINA's creditors

are released as against the Commonwealth and the Commonwealth itself shall not be liable for the

repayment of the COFINA Bonds, nor will the COFINA Bonds have any recourse to any property

of the Commonwealth.  *See* New Bond Legislation art. 3.1(c).

171.      Pursuant to PROMESA, including section 4 thereof, as well as sections 944[5] and

1123 of the Bankruptcy Code, and in accordance with the Confirmation Order, the Settlement, the

Plan, and Act 241, the Court determines that the COFINA Bonds are legal, valid, binding and

enforceable obligations of Reorganized COFINA benefitting from the following protections, each

---

[5]      Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations.  11 U.S.C. § 944(b)(3).  *See generally In re City of Stockton*, 526 B.R. 35, (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing *Ass'n of Retired Employees of the City of Stockton v. City of Stockton (In re City of Stockton, CA*), 478 B.R. 8, 14–16 (Bankr. E.D. Cal. 2012); U.S. CONST. art. VI, cl. 2; *Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262, 268–70 (E.D. Cal. 2010), aff'g 403 B.R. 72, 76–77 (Bankr. E.D. Cal. 2009) (additional citations omitted)).  As set forth in the leading bankruptcy treatise: "The requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . .  It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future."  6 COLLIER ON BANKRUPTCY § 944.03[1][b] ((16th ed. 2013).  *See, e.g., Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California*, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . ."); *Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit*, dated November 12, 2014, ¶ 86 (" in accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . ."); *Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama*, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law").

of which is legal, valid, binding, and enforceable against Reorganized COFINA, the
Commonwealth, and other persons and entities, as applicable, under Puerto Rico and federal law:

    a.  The Confirmation Order is full, final, complete, conclusive, and binding and
shall not be subject to collateral attack or other challenge in any court or other
forum.

    b.  Subject to the occurrence of and upon the Effective Date, Reorganized
COFINA shall be an independent public corporation and instrumentality of the
Commonwealth, separate from the Commonwealth and any other
instrumentality of the Commonwealth.

    c.  Subject to the occurrence of and upon the Effective Date, ownership of the
COFINA Revenues shall have been legally and validly transferred to
Reorganized COFINA, and such transfer of ownership shall have been an
absolute transfer of all legal and equitable right, title, and interest in the
COFINA Revenues, free and clear of all liens, claims, encumbrances, and other
interests of any party (except for the statutory lien that arises automatically to
secure the COFINA Bonds);

    d.  Subject to the occurrence of and upon the Effective Date, the COFINA
Revenues shall not constitute, and shall not be deemed to be, "available
resources" or "available revenues" of the Commonwealth, as that term is used
in the Puerto Rico Constitution (whether construed pursuant to the Spanish or
English version of the Puerto Rico Constitution).

    e.  Subject to a "Quarterly Installment" funding construct, to the extent certain
conditions are satisfied, each fiscal year until the COFINA Bonds are paid in
full or otherwise satisfied in accordance with their terms, the first funds

comprising the COFINA Pledged Taxes shall be transferred to and deposited with Reorganized COFINA until such time that Reorganized COFINA has received an amount equal to the COFINA Revenues for such fiscal year.

f.   Reorganized COFINA's sole and exclusive ownership of the COFINA Revenues shall not be affected in any way by the manner of or control over collection, any person who collects or holds the COFINA Revenues shall do so on behalf of Reorganized COFINA, and no person or entity that collects or holds the COFINA Revenues shall have any legal or equitable right, title, or interest to the COFINA Revenues other than Reorganized COFINA, for the benefit of holders of the COFINA Bonds.

g.   The statutory first lien against the COFINA Pledged Taxes (including any New Collateral substituted for the COFINA Pledged Taxes in accordance with the terms of the Plan and the New Bond Legislation) arising by operation of the New Bond Legislation in favor of holders of COFINA Bonds is legaly, valid, binding and enforceable and shall remain in full force and effect and shall be "closed" until, in each case, the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

h.   Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien as described in Section 16.2 of the Plan, which Lien shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

i.   The statutory lien on the COFINA Pledged Taxes as provided in the New Bond Legislation and all other provisions made to pay or secure payment of the

COFINA Bonds and COFINA Parity Bonds are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, and provide for the conditions regarding substitution of New Collateral as adequate protection for the property rights conferred under the Plan and the Confirmation Order.

j.  At the time of issuance and delivery of the COFINA Bonds, Reorganized COFINA is hereby directed to be stamped or written on each of the COFINA Bonds a legend substantially as follows:

> DETERMINED TO BE VALID AND CONFIRMED BY JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THIS ___ DAY OF JANUARY, 2019

k.  Pursuant to the Settlement Order and the Confirmation Order, the transfer of the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan) pursuant to the Plan is appropriate and binding and specifically enforceable against Reorganized COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the Plan, including, without limitation, because the transfer of the COFINA Portion created in Reorganized COFINA an ownership interest in such property (and any substitution of New Collateral on the terms and conditions provided for in the Plan) and is a valid provision made to pay or secure payment of the COFINA Bonds.

l.  The Commonwealth's agreement, on behalf of itself and its governmental entities, not to take any action that would, among other things, (a) impair COFINA's right to receive the COFINA Revenues, (b) limit or alter the rights

vested in COFINA in accordance with the Plan to fulfill the terms of the COFINA Bonds, (c) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year, or (d) impair the rights and remedies of the holders of the COFINA Bonds or the statutory lien established pursuant to Article 3.2 of the New Bond Legislation, each as provided in the New Bond Legislation and the New Bond Indenture, serve as adequate protection for the property interests of Reorganized COFINA and the holders of the COFINA Bonds in the COFINA Pledged Taxes under all applicable law and constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA, and the Commonwealth, as applicable, and an integral part of the settlements set forth in the Plan.

m.  The covenants described in Sections 16.6 and 16.7 of the Plan (including, but not limited to, the rating agency covenant, the tax exemption covenant, the substitution covenant, the non-impairment covenant and the sales tax covenant), to be provided by Reorganized COFINA and the Commonwealth, as the case may be, to the holders of COFINA Bonds, shall constitute adequate protection for the property interests of Reorganized COFINA and the holders of COFINA Bonds in the COFINA Pledged Taxes under all applicable law.

172.    The Plan, the Settlement, and the settlement and compromise of claims embodied in the Plan are the result of extensive arms' length negotiations among the Debtor, the Commonwealth Agent, the COFINA Agent, the Settlement Parties, and other significant Creditor

constituencies, and, among other things, resolves the Commonwealth-COFINA Dispute.  Jaresko
Decl. ¶¶ 15-29.

173.     Any attempt to confirm a Title III plan of adjustment without the compromises and
settlements embodied in the Plan would have invited significant confirmation objections by
various significant Creditor constituencies.   Jaresko Decl. ¶ 45.   Without addressing the
Commonwealth-COFINA Dispute, among other issues settled and compromised pursuant to the
Plan, it is beyond doubt that such issues were likely to lead to further contested confirmation
hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions.  *Id*.

174.     The detrimental effects of further delay in confirmation and consummation of a
plan of adjustment in the Title III Case cannot be underestimated.  As delay in consummation of a
plan would be accompanied by a continued depletion of COFINA's resources and increase in total
Claims, further delay would have significantly eroded recoveries for COFINA's junior-most
Creditors and stakeholders.  Jaresko Decl. ¶¶ 45, 57, 69.  Thus, it is a reasonable exercise of
business judgment for the Debtor to conclude that the Plan was more likely to result in an
expeditious exit from the Title III Case and prevent further deterioration of Creditors' recoveries
than any alternative plan.  *Id*.  The Court finds that the compromises and settlements embodied in
the Plan are fair, reasonable, in the best interests of COFINA's stakeholders and above the lowest
level of the range of reasonableness.

H. **Bankruptcy Rule 3019**: *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

175.     After the Voting Deadline passed, the Oversight Board filed the "Third Amended
Plan," containing minor revisions to address certain concerns raised by certain parties.  DX-G.
None of the modifications adversely change the treatment of the Claims of any creditor.  In Article
X, the Plan was amended to provide that COFINA will enter a remarketing agreement with

68

Assured with respect to the COFINA Bonds allocable to the holders of Allowed Junior COFINA Bond Claims (Assured), and which will be received by Assured as subrogee of such holders.  DX-G.  Assured was already responsible for the 100% cash payment of the Acceleration Price to holders of Allowed Junior COFINA Bond Claims (Assured) on the Effective Date, so the holders of Claims in Class 6 are not impacted in any way by this change.  Jaresko Decl. ¶ 70.

176.    The Plan was updated to ensure the releases provided thereunder are consistent with the agreement reached in the A&R Plan Support Agreement, *see* Plan § 30.2, as well as other technical changes to ensure that neither the Ambac Action nor Whitebox Actions interfere with distributions to bondholders.  Specifically, the Plan has been modified to ensure that BNYM, Whitebox, and Ambac can continue their litigation among themselves, *see* Plan § 2.1, but also to ensure that COFINA or Reorganized COFINA, as the case may be, is not responsible for any of BNYM's fees or expenses in connection with that litigation after the Effective Date.  *See* Plan § 19.13.

177.    The modifications do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances or rejections thereto.

178.    Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the "Third Amended Plan".

179.    Elections made by holders of Claims pursuant to the Plan were solicited, tabulated, and implemented fairly, in good faith, and in a manner consistent with the Plan, the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. Pullo Decl. ¶ 9.

180.    Any beneficial holder of Senior COFINA Bond Claims (Ambac) that chose to commute the Ambac Insurance Policy pursuant to Article 6 of the Plan shall have no other or

further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust or Ambac Certificates.  The Plan is a settlement with respect to the Ambac Insurance Policy for those beneficial holders that elect to commute.  The treatment of Senior COFINA Bond Claims (Ambac) under the Plan is not inconsistent with the Ambac Insurance Policy.

181.    Any beneficial holder of Senior COFINA Bond Claims (National) that chose to commute the National Insurance Policies pursuant to Article 7 of the Plan shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust or National Certificates.  The Plan is a settlement with respect to the National Insurance Policies for those beneficial holders that elect to commute.  The treatment of Senior COFINA Bond Claims (National) under the Plan is not inconsistent with the National Insurance Policies.

182.    Neither the Ambac Insurance Policy nor the National Insurance Policies shall insure the COFINA Bonds.

183.    _Plan Supplement_.  All materials contained in the Amended Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and no other or further notice is or shall be required.  Service Affidavits; Amended Plan Supplement.

184.    _Satisfaction of Confirmation Requirements_.  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA section 314.

185.    _Implementation_.  All documents necessary to implement the Plan, including those contained in the Amended Plan Supplement and the Settlement Agreement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtor, prior to the Effective Date, and Reorganized COFINA, from and after the Effective

Date, are authorized to consummate the transactions contemplated in the Plan and Amended Plan
Supplement.  The execution, delivery, or performance by the Debtor or Reorganized COFINA, as
the case may be, of any documents in connection with the Amended Plan Supplement, and
compliance by the Debtor or Reorganized COFINA, as the case may be, with the terms thereof, is
hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

186.    _Good Faith_.  The Debtor will be acting in good faith if it proceeds to (i) consummate
the Plan and the agreements, settlements, transactions, and transfers contemplated thereby,
including, without limitation, the Settlement Agreement, and (ii) take the actions authorized and
directed by the Confirmation Order.  The COFINA Agent Releasees and the Commonwealth
Agent Releasees have acted in good faith in connection with their evaluation of, and their conduct
with respect to, the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement,
the Settlement Motion, and the Title III Case.

187.    _Retention of Jurisdiction_.  This Court may properly and, upon the Effective Date
shall, to the extent consistent with Article XXIX of the Plan, retain exclusive jurisdiction over all
matters arising out of, and related to, the COFINA Title III Case, including, without limitation, all
Causes of Action not otherwise released pursuant to the Plan and the matters set forth in Section
29.1 of the Plan and section 1142(b) of the Bankruptcy Code.  Plan § 29.1.

188.    Without limiting the generality of the foregoing, the Court shall retain jurisdiction
to (i) enter appropriate orders with respect to the payment, enforcement, and the remedies of the
COFINA Bonds under the New Bond Indenture, (ii) enter and implement such orders as may be
necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii)
adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any
actions taken by any entity pursuant to or in furtherance of the Plan or this Confirmation Order,
including, without limitation, issuance of the COFINA Bonds, and (iv) to enforce prohibitions

against any subsequent collateral attack on the validations contained in the Plan and this Confirmation Order.

189. <u>Funds Flow</u>. In order to implement the Plan, the collection of the COFINA Portion shall occur in accordance with the Instruction Agreement and the Banking Services Agreement, which may not be changed except as provided in the Indenture. The flow of funds set forth in the Instruction Agreement and the Banking Services Agreement will be generally as follows:

A. A financial institution, which currently is Banco Popular de Puerto Rico (the "<u>Depositary</u>") shall receive all tax revenues generated by the COFINA Pledged Taxes and, pursuant to the Sales Tax Financing Corporation Act of 2018 and the Plan, shall not have any legal or equitable right, title or interest to the COFINA Portion solely by virtue of the fact that it holds the COFINA Pledged Taxes;

B. All revenues received on account of the COFINA Pledged Taxes shall be directly deposited to an account at the Depositary jointly held in the name of the Treasury Department and Reorganized COFINA (the "SUT Collection Account"); <u>provided</u>, <u>however</u>, that the commingling of COFINA Pledged Taxes in the SUT Collection Account shall be solely for administrative convenience, shall not create any equitable interest in favor of the Commonwealth with respect to the COFINA Portion, shall not constitute property of the Commonwealth, and shall not have any impact on Reorganized COFINA's sole and exclusive ownership of the COFINA Portion; provided, further, that such commingling shall not create any equitable interest in favor of Reorganized COFINA with respect to revenues owned by the Commonwealth, such Commonwealth revenues shall not constitute property of Reorganized COFINA and shall not have any impact on the Commonwealth's sole and exclusive ownership of revenues other than the COFINA Portion;

C. Promptly after deposit into the SUT Collection Account, on a daily basis with no more than a 2 business day delay, the Depositary, based on information provided by the Treasury Department's tax collection system, shall transfer the COFINA Portion to the Dedicated Sales Tax Fund Account at the Depositary which shall at all times be owned exclusively by Reorganized COFINA; provided, that transfer to the Dedicated Sales Tax Fund Account shall not be required to the extent the COFINA Portion is being transferred from the SUT Collection Account to the Revenue Account at The Bank of New York Mellon ("<u>BNYM</u>");

D. All monies deposited in the Dedicated Sales Tax Fund shall be transferred on a daily basis account to the Revenue Account at BNYM until 53.65% of the Pledged Sales Tax Base Amount (the "<u>Adjusted PSTBA</u>") has been deposited for that Fiscal Year as calculated by the Trustee;

E. All trustee accounts at BNYM shall be solely in the name of Reorganized COFINA;

and

F.     After the Adjusted PSTBA has been deposited in the Revenue Account at BNYM, all subsequent collections of the COFINA Pledged Taxes shall be transferred to the Commonwealth's Treasury Department.

190.    Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

191.    Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Confirmation Order and the Plan, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.  The documents contained in the Amended Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date), including, without limitation, Reorganized COFINA By-Laws, the COFINA Bonds, the New Bond Indenture, the Instructions Agreement, the Ambac Trust Agreement, the National Trust Agreement, the Standard Terms to National Trust Agreement, the Remarketing Agreement, and the Continuing Disclosure Agreement provide adequate means for implementation of the Plan pursuant to Section 1123(a)(5) of the Bankruptcy Code, and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of COFINA and the Commonwealth, as applicable, and valid provisions to pay or

secure payment of the COFINA Bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and

be enforceable in accordance with their terms.

### <u>Conclusion</u>

The Court makes the foregoing Findings of Fact and Conclusions of Law with respect to

confirmation of the Plan.

Dated: January \_\_\_, 2019
      San Juan, Puerto Rico        _____

                                        Laura Taylor Swain
                                        United States District Court Judge

# Exhibit A

## New Bond Legislation

**(P. de la C. 1837)**

ASAMBLEA ___ SESION
LEGISLATIVA   ORDINARIA
Ley Núm. _____ 241
(Aprobada en 6 de nov de 2018 )

## LEY

Para renumerar el Artículo 1 como Artículo 1.1 y enmendar el mismo; añadir un nuevo Artículo 1.2; renumerar el Artículo 2 como Artículo 2.1 y enmendar el mismo; añadir nuevos Artículos 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8 y 2.9; derogar el Artículo 3 y sustituirlo por un nuevo Artículo 3.1; añadir nuevos Artículos 3.2 y 3.3; derogar el Artículo 4 y sustituirlo por un nuevo Artículo 4.1, añadir un nuevo Artículo 4.2, derogar el Artículo 5 y sustituirlo por un nuevo Artículo 5.1, añadir un nuevo Artículo 5.2, derogar los Artículos 6, 7, 8, 9, 10 y 11 y dividir en capítulos la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", a los fines de permitir la reestructuración de la deuda de la Corporación del Fondo del Interés Apremiante (COFINA) bajo el Título III de la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico", mejor conocida como PROMESA; autorizar a COFINA a emitir bonos como parte de dicha reestructuración y establecer los términos de los mismos; establecer los poderes y facultades de COFINA y la composición y los poderes de su Junta de Directores; establecer la titularidad de COFINA sobre una porción de los recaudos sobre el impuesto sobre ventas y uso y disponer para la transferencia y uso de dichos recaudos; crear un gravamen estatutario en beneficio de los tenedores de bonos de COFINA; establecer ciertos acuerdos a nombre del Gobierno de Puerto Rico para beneficio de los tenedores de bonos de COFINA; disponer que el texto en inglés prevalecerá sobre el texto en español; derogar los Artículos 2 y 4 de la Ley 116-2013, según enmendada; enmendar el Artículo 25-A de la Ley 44 de 21 de junio de 1988, según enmendada; a los fines de permitir la venta de ciertos bonos de COFINA que tiene la Autoridad para el Financiamiento de la Infraestructura con la aprobación de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico; establecer que esta Ley será efectiva en la fecha de la consumación del plan de ajuste de deuda de COFINA bajo el Título III de PROMESA; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

Puerto Rico enfrenta una crisis fiscal y económica sin precedentes. Este proyecto, al igual que el acuerdo de reestructuración del Banco Gubernamental de Fomento, encamina a Puerto Rico en la ruta de la credibilidad. Con este acuerdo, hacemos ajustes significativos en el repago de la deuda gubernamental que otras administraciones tomaron prestado pero que nos toca a nosotros resolver. De esta forma, aseguramos que el Gobierno continúe operando y sirviendo a nuestro pueblo.

Las posiciones asumidas y acciones tomadas por la administración pasada causaron que Puerto Rico perdiera acceso a los mercados de capital y precipitaron el colapso de su sistema de financiamiento público. Estas acciones aceleraron la contracción de la economía de Puerto Rico y precipitaron la migración de puertorriqueños a los Estados Unidos continentales.

La administración pasada desarrolló una relación hostil con los participantes de los mercados financieros, incluyendo cientos de miles de puertorriqueños que invirtieron sus ahorros confiando en el buen nombre y crédito del Gobierno de Puerto Rico y sus corporaciones públicas. Este ambiente hostil hacia Puerto Rico también resonó en el Congreso de los Estados Unidos debido a la falta de transparencia y honestidad, generando consistentemente coberturas noticiosas negativas sobre Puerto Rico a nivel local, nacional e internacional.

Las decisiones equivocadas de la pasada administración llevaron al "Estado Libre Asociado de Puerto Rico" a la quiebra, lo que requirió el uso de sus recursos para atender y proveer servicios esenciales al pueblo de Puerto Rico. Esto, a su vez, actuó como catalítico para una controversia en la cual se cuestionó la estructura bajo la cual la Corporación del Fondo del Interés Apremiante (COFINA) emitió sus bonos. En particular, algunos acreedores radicaron reclamaciones argumentando, entre otras cosas, que (i) las emisiones de bonos de COFINA violaron la Constitución de Puerto Rico, y (ii) la porción de la contribución sobre ventas y uso impuesta por el Gobierno de Puerto Rico a la tasa de 5.5% (el IVU) y transferida a COFINA constituye "recursos disponibles" del Gobierno de Puerto Rico bajo el Artículo VI, Sección 8 de la Constitución de Puerto Rico y debe utilizarse para el pago de la "deuda pública". Algunos acreedores también presentaron argumentos sobre el alcance de la Constitución de Puerto Rico que giran en base a si utiliza el término "recursos disponibles", según la versión en español, o *available revenues, including surplus* según la versión en inglés. El 5 de mayo de 2017, la Junta de Supervisión y Administración Financiera (la Junta de Supervisión) creada bajo la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico" (PROMESA, por sus siglas en inglés), como representante de COFINA, comenzó un proceso de reestructuración para COFINA bajo el Título III de PROMESA.

Las partes interesadas del Gobierno de Puerto Rico y COFINA comenzaron un proceso ordenado para resolver las disputas relacionadas a COFINA y la titularidad sobre el IVU (colectivamente, la Disputa ELA-COFINA). A esos fines, el 10 de agosto de 2018, el tribunal del Título III aprobó una estipulación y orden designando al Comité Oficial de Acreedores no Asegurados del Gobierno para actuar como agente la de Junta de Supervisión en su capacidad como representante del Gobierno de Puerto Rico (el Agente del Gobierno) y a Bettina M. Whyte para actuar como agente de la Junta de Supervisión en su capacidad como representante de COFINA (el Agente de COFINA) en un esfuerzo para facilitar la transacción de la Disputa ELA-COFINA.

El 5 de junio de 2018, el Agente del Gobierno y el Agente de COFINA anunciaron que habían llegado a un acuerdo en principio para resolver la Disputa ELA-COFINA (el Acuerdo en Principio). El Acuerdo en Principio estaba fundamentado en dividir la cantidad fija del IVU transferida a COFINA cada año fiscal (la Renta Fija) entre el Gobierno y COFINA comenzando en el año fiscal 2019, donde COFINA recibiría el 53.65% de la cantidad anual de la Renta Fija y el Gobierno recibiría el 46.35% de la cantidad anual de la Renta Fija, además de todos los demás ingresos recaudados por concepto del IVU.

Consistente con la política pública implementada por el Gobernador de Puerto Rico, la Autoridad de Asesoría Financiera y Agencia Fiscal, la Junta de Supervisión y ciertos acreedores y aseguradores de los bonos de COFINA, llegaron a un acuerdo en apoyo a un plan de reestructuración para COFINA (según enmendado y reformulado el 21 de septiembre de 2018, el Acuerdo de Reestructuración), el cual incorpora la división de la Renta Fija conforme al Acuerdo en Principio y provee para la transacción de la Disputa ELA-COFINA conforme a un plan de ajuste de deuda para COFINA bajo el Título III de PROMESA (el Plan de COFINA).

Ahora le corresponde a la Asamblea Legislativa implementar el acuerdo entre las partes enmendando las disposiciones de la ley que creó a COFINA y que autorizó la emisión de sus bonos, la Ley 91-2006. Estas enmiendas liberarán el gravamen que tienen actualmente los tenedores de COFINA sobre $17.5 billones de ingresos del IVU. Estos ingresos ahora estarán disponibles para ser utilizados por el Gobierno de Puerto Rico para atender y brindar servicios a los puertorriqueños. Al implementar el Acuerdo de Reestructuración, esta legislación también pone fin al costoso litigio entre los agentes nombrados por la Junta de Supervisión y a las reclamaciones de los acreedores de COFINA mientras que, a la misma vez, clarifica la intención legislativa original de la Ley 91-2006, según enmendada. Además, como resultado de esta legislación, se ahorrará aproximadamente $437.5 millones por año al Gobierno de Puerto Rico para beneficio del pueblo de Puerto Rico.

Igualmente, esta legislación demuestra que la Asamblea Legislativa está comprometida con tomar los pasos necesarios para permitir el regreso de Puerto Rico a los mercados de capital. Como paso necesario para la implantación del Acuerdo de Reestructuración, esta legislación autorizará la restructuración de la deuda de COFINA bajo el Título III de PROMESA, actuará como catalítico para otras restructuraciones, sentará las bases para que Puerto Rico resurja de la bancarrota, reducirá los costos relacionados a los litigios y aligerará la terminación de la Junta de Supervisión bajo PROMESA.

Esta Ley demuestra el compromiso de política pública continuo de la Asamblea Legislativa para corregir la crisis fiscal de Puerto Rico, honrar las obligaciones financieras

de Puerto Rico, recuperar acceso a los mercados de capital, eliminar la incertidumbre económica y alcanzar un nivel de deuda sostenible para Puerto Rico.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

Sección 1.-Se añade un Capítulo I a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO I – TITULO Y DEFINICIONES"

Sección 2.-Se renumera el Artículo 1 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", como Artículo 1.1, y se enmienda el mismo para que lea como sigue:

"Artículo 1.1.-Título.

Esta Ley se conocerá como la "Ley de la Corporación del Fondo de Interés Apremiante".

Sección 3.-Se añade un Artículo 1.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 1.2.-Definiciones.

Los siguientes términos tendrán los significados que se expresan a continuación:

(a) "AAFAF"– significa la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico.

(b) "Ley"– significa la Ley 91-2006, según enmendada, también conocida como "Ley de la Corporación del Fondo del Interés Apremiante".

(c) "Acuerdos Complementarios"– significa el Plan de Ajuste de la Corporación, el Contrato de Bonos, el Acuerdo de Transacción y cualquier otro acuerdo o instrumento otorgado por la Corporación o el Fiduciario del Contrato de Bonos relacionado a, o en apoyo de, la Transacción de Reestructuración y relacionado a, o en apoyo de, el Plan de Ajuste de la Corporación.

(d) "Actividades Autorizadas"– significa las actividades que la Corporación está autorizada a llevar a cabo conforme al Artículo 2.4 de esta Ley.

(e)     "Junta de Directores"– significa la Junta de Directores de la Corporación.

(f)     "Contrato de Bonos"– significa uno o más contratos de fideicomiso, contratos de bonos y cualquier suplemento o enmienda a éstos, o cualquier contrato o acuerdo similar otorgado por la Corporación y el Fiduciario del Contrato de Bonos mediante el cual se emitan los Bonos del Plan de Ajuste y que establezca los derechos y responsabilidades de la Corporación y los tenedores de Bonos del Plan de Ajuste emitidos bajo el mismo.

(g)     "Presidente" – significa el presidente de la Junta de Directores.

(h)     "Ingresos de la Corporación" – significa los Primeros Ingresos hasta una cantidad igual al cincuenta y tres punto sesenta y cinco por ciento (53.65%) de la Renta Fija para cada Año Fiscal y todo derecho legal y en equidad, título e interés con respecto a los mismos, incluyendo el derecho a recibir los Primeros Ingresos según se dispone en el Artículo 4.1 de esta Ley.

(i)     "Fondo de Ingresos de la Corporación " – significa el fondo o los fondos segregados propiedad de la Corporación en la(s) cual(es) se depositan los Ingresos de la Corporación, cuya cuenta (1) deberá estar a nombre del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste, (2) no puede ser propiedad de, ni estar controlada por, el Gobierno de Puerto Rico o una Entidad Gubernamental (excepto la Corporación) de ninguna manera, y (3) se mantendrá en uno o más bancos en los Estados Unidos continentales.

(j)     "Corporación" – significa la Corporación del Fondo del Interés Apremiante creada por esta Ley.

(k)     "Plan de Ajuste de la Corporación"– significa el plan de ajuste consumado con relación al caso de la Corporación bajo el Título III de PROMESA, incluyendo la orden del Tribunal de Distrito confirmando dicho plan de ajuste.

(l)     "Tribunal de Distrito"– significa el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

(m)     "Fecha de Efectividad" – significa la fecha en la cual el Plan de Ajuste de la Corporación advenga efectivo de acuerdo a sus términos.

(n)     "Costos de Financiamiento"– significa todos los costos asociados con la Transacción de Reestructuración, incluyendo los costos, honorarios y gastos de: (1) emitir, dar servicio a, repagar o refinanciar los Bonos del Plan

de Ajuste, independientemente de si dichos costos se incurren en la emisión de dichos Bonos del Plan de Ajuste o a través del término de los mismos, (2) hacer pagos conforme a los Acuerdos Complementarios, (3) pagar cualquier sello, impuesto de emisión, impuesto similar u otros cargos relacionados a la Transacción de Reestructuración; disponiéndose, además, que esta cláusula no limita de manera alguna la exención contributiva provista en el Artículo 2.8 de esta Ley, (4) prepararse para y completar la Transacción de Reestructuración y (5) llevar a cabo todas las actividades relacionadas a la Transacción de Reestructuración.  Es menester señalar, que, los Costos de Financiamiento también incluyen honorarios y gastos administrativos incurridos antes o después del cierre relacionado a los Acuerdos Complementarios, pero no incluyen pagos de principal e intereses bajo los Bonos del Plan de Ajuste.

(o)  "Primeros Ingresos" – significa los primeros ingresos que corresponden a Contribuciones Pignoradas en cualquier Año Fiscal, según se describe en el Artículo 4.1 de esta Ley.

(p)  "Año Fiscal" – significa el año fiscal del Gobierno de Puerto Rico, el cual comienza el 1 de julio y termina el 30 de junio.

(q)  "Renta Fija" – significa, para el Año Fiscal 2018-2019, setecientos ochenta y tres millones ciento noventa y siete mil doscientos cincuenta y un (783,197,251.00) dólares y, para cada Año Fiscal subsiguiente, la Renta Fija del Año Fiscal anterior más cuatro (4)  por ciento de dicha Renta Fija, hasta la Cantidad Máxima. La Renta Fija para cada año fiscal se pagará de los primeros ingresos recaudados de las Contribuciones Pignoradas.

(r)  "Entidad Gubernamental"– significa cualquier agencia, departamento, oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Gobierno de Puerto Rico.

(s)  "Gobierno de Puerto Rico"– significa el Estado Libre Asociado de Puerto Rico y su gobierno.

(t)  "Fiduciario del Contrato de Bonos"– significa la Persona designada como fiduciario o fiduciario del contrato de bonos bajo el Contrato de Bonos, incluyendo cualquier sucesor de éstos bajo el Contrato de Bonos.

(u)  "Cantidad Máxima"– significa mil ochocientos cincuenta millones (1,850,000,000.00) de dólares.

(v)   "Junta de Supervisión"– significa la Junta de Supervisión y Administración Financiera para Puerto Rico establecida conforme a la Sección 101 de PROMESA.

(w)   "Persona"– significa cualquier persona natural o entidad legal, incluyendo, pero sin limitarse a, el Gobierno de Puerto Rico, cualquier Entidad Gubernamental, o cualquier individuo, firma, sociedad, proyecto conjunto, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación, corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, los Estados Unidos de América, o cualquier otra jurisdicción o de cualquier otro estado, municipalidad, subdivisión política, autoridad fiscal, agencia o instrumentalidad de Puerto Rico, de los Estados Unidos de América o cualquier otra jurisdicción, o cualquier combinación de éstas.

(x)   "Bonos del Plan de Ajuste" – significa cualquier Bono de Reestructuración y cualquier Bono de Refinanciamiento.

(y)   "Contribuciones Pignoradas" – significa, sujeto a las disposiciones del Artículo 3.3 de esta Ley, (1) los ingresos y recaudos presentes y futuros generados por la porción del IVU que corresponda a una tasa contributiva de cinco punto cinco (5.5) por ciento y (2) la Colateral Substituta, si alguna.

(z)   "PROMESA"– significa la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico", *Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.*

(aa)   "Bonos de Refinanciamiento"– significa los bonos emitidos por la Corporación conforme a la Ley y los Acuerdos Complementarios, con igualdad de prioridad que los Bonos de Reestructuración (pari passu), para retirar o refinanciar cualquier Bono del Plan de Ajuste.

(bb)   "Bonos de Reestructuración"– significa los bonos emitidos por la Corporación conforme a esta Ley, el Plan de Ajuste de la Corporación y los Acuerdos Complementarios, bajo términos consistentes con, y que estén autorizados, validados y distribuidos conforme a, el Plan de Ajuste de la Corporación.

(cc)   "Resolución de Reestructuración"– significa una o más resoluciones de la Junta de Directores autorizando: (1) la emisión de los Bonos del Plan de Ajuste y describiendo sus términos y (2) el pago de los Costos de Financiamiento, en cada caso de acuerdo a los términos del Plan de Ajuste de la Corporación.

(dd)   "Transacción de Reestructuración"– significa las transacciones contempladas por, o en apoyo de, el Plan de Ajuste de la Corporación.

(ee)   "IVU"– significa el impuesto de ventas y uso impuesto por el Gobierno de Puerto Rico bajo las Secciones 4020.01 y 4020.02 del Súbcapítulo D de la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico".

(ff)   "Acuerdo de Transacción"– significa el Acuerdo de Transacción del 15 de octubre de 2018 entre la Junta de Supervisión, a nombre del Gobierno de Puerto Rico, y el agente de la Corporación designado por la Junta de Supervisión para transar o litigar la disputa entre el Gobierno de Puerto Rico y la Corporación con respecto a la titularidad sobre el IVU.

(gg)   "Colateral Sustituta"– significa todo o una porción de una contribución de aplicación general a través de Puerto Rico que se legisle en sustitución total de las Contribuciones Pignoradas o que de otra manera constituya colateral similar o comparable para los Bonos del Plan de Ajuste.

(hh)   "Requisitos de Sustitución" – significa (1) la aprobación de legislación disponiendo para Colateral Sustituta, que a su vez disponga (A) que la Colateral Sustituta en una cantidad igual a los Ingresos de la Corporación se ha transferido irrevocablemente y es propiedad única y exclusivamente de la Corporación en la misma medida en que se provee bajo el Artículo 2.2 de esta Ley, (B) que, luego de dicha transferencia, la Colateral Sustituta en una cantidad igual a los Ingresos de la Corporación no es, y no constituirá, "recursos disponibles" o "ingresos disponibles" del Gobierno de Puerto Rico según dicho término se utiliza en la Sección 8 del Artículo VI de la Constitución de Puerto Rico o de cualquier otra manera en la Constitución de Puerto Rico (independientemente de si se interpreta la versión en español o inglés de la Constitución de Puerto Rico), (C) para la creación de un gravamen sobre la Colateral Substituta a favor del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste en la misma medida que se establece en el Artículo 3.2 de esta Ley y (D) que el Gobierno de Puerto Rico y las Entidades Gubernamentales continuarán proveyendo las garantías establecidas en el Artículo 3.3 de esta Ley con respecto a dicha Colateral Sustituta, y (2) que, previo a la sustitución de la Colateral Sustituta, se hayan satisfecho los requisitos de calificación establecidos en los Acuerdos Complementarios con respecto a la Colateral Sustituta."

Sección 4.-Se añade un Capítulo II a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO II – LA CORPORACION DEL FONDO DE INTERÉS APREMIANTE"

Sección 5.-Se renumera el Artículo 2 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", como Artículo 2.1, y se enmienda el mismo para que lea como sigue:

"Artículo 2.1.-Creación y Existencia Legal Separada de la Corporación.

Se crea una corporación pública e instrumentalidad del Gobierno de Puerto Rico que constituye un cuerpo corporativo y político independiente y separado del Gobierno de Puerto Rico que se conocerá como la Corporación del Fondo de Interés Apremiante de Puerto Rico, cuyo nombre en inglés será *Puerto Rico Sales Tax Financing Corporation*. La Corporación que existe por virtud de esta Ley es y se reconocerá para todos los propósitos como una entidad legal independiente y separada del Gobierno de Puerto Rico y cualquier otra Entidad Gubernamental. Será operada independientemente y sus negocios y asuntos serán dirigidos por, o bajo la dirección de su Junta de Directores."

Sección 6.-Se añade un Artículo 2.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.2.-Titularidad sobre los Ingresos de la Corporación.

(a)     Cualquier y toda titularidad y derechos sobre los Ingresos de la Corporación, fueron o han sido transferidos o por la presente se transfieren a la Corporación.

(b)     La transferencia descrita en el inciso (a) arriba es una transferencia absoluta de todo derecho legal y en equidad, título e interés, y no una pignoración u otro financiamiento.

(c)     La Corporación es y será la única y exclusiva dueña de los Ingresos de la Corporación hasta que los Bonos del Plan de Ajuste, incluyendo los intereses que devenguen éstos, y todas las cantidades y obligaciones bajo los Acuerdos Complementarios se paguen en su totalidad en efectivo o hayan sido de otra manera satisfechas conforme a sus términos.

(d)     Las Personas designadas como agentes retenedores para propósitos de la imposición y recaudación del IVU conforme a la Ley 1-2011, según enmendada, también conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico", se entenderá que recaudan a nombre de la Corporación cualquier porción del IVU en la cual la Corporación tiene un

interés propietario. Dichos agentes retenedores continuarán estando sujetos a toda y cualquier obligación y responsabilidad impuesta por el Código de Rentas Internas para un Nuevo Puerto Rico, a agentes retenedores con relación a la imposición y recaudación del IVU.

(e)     Los Ingresos de la Corporación no constituyen "recursos disponibles" o "ingresos disponibles" del Gobierno de Puerto Rico según dicho término se utiliza en la Sección 8 del Artículo VI de la Constitución de Puerto Rico o de cualquier otra manera en la Constitución de Puerto Rico (independientemente de si se interpreta la versión en español o inglés de la Constitución de Puerto Rico)."

Sección 7.-Se añade un Artículo 2.3 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.3.-Propósito de la Corporación.

En y después de la Fecha de Efectividad, el propósito de la Corporación será (a) emitir los Bonos del Plan de Ajuste, (b) ser dueña de y administrar los Ingresos de la Corporación, y (c) emitir otros bonos, notas o evidencia de deuda de la Corporación según autorizado por el Plan de Ajuste de la Corporación y los Acuerdos Complementarios, los cuales serán pagaderos de aquellos ingresos que disponga la Asamblea Legislativa."

Sección 8.-Se añade un Artículo 2.4 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.4.-Actividades de la Corporación.

Las actividades de la Corporación se limitarán a las siguientes:

(a)     recibir y ser dueña de los Ingresos de la Corporación y aquellos otros ingresos o propiedades que se le provean o transfieran a la Corporación;

(b)     aprobar la Resolución de Reestructuración;

(c)     emitir, de tiempo en tiempo, los Bonos del Plan de Ajuste y cualquier bono, nota o evidencia de deuda cuya emisión esté permitida por el Artículo 2.3 de esta Ley;

(d)     otorgar y cumplir con los Acuerdos Complementarios;

(e)     para garantizar el pago de cualquier bono, nota o evidencia de deuda cuya emisión esté autorizada por el Artículo 2.3 de esta Ley, pignorar, de manera subordinada en todos los aspectos al gravamen establecido en el Artículo 3.2 de esta Ley, (1) cualquier cantidad remanente de los Ingresos de la Corporación después del pago de los Bonos del Plan de Ajuste o (2) cualquier otro fondo o propiedad que se asigne a la Corporación después de la Fecha de Efectividad.

(f)     tomar cualquier y toda otra acción que sea necesaria o apropiada para consumar la Transacción de Reestructuración y el Plan de Ajuste de la Corporación, incluyendo hacer enmiendas a, intercambiar y/o cancelar, los bonos emitidos por la Corporación previo a la Fecha de Efectividad y enmendar y reformular los acuerdos de la Corporación con respecto a los mismos."

Sección 9.-Se añade un Artículo 2.5 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.5.-Poderes Adicionales.

Para llevar a cabo las Actividades Autorizadas, la Corporación tendrá, sin limitación de lo anterior, los siguientes poderes:

(a)     demandar y ser demandada en cualquier tribunal de Puerto Rico o en el Tribunal de Distrito Federal;

(b)     adoptar, cambiar y usar un sello;

(c)     formular, adoptar, enmendar y derogar estatutos para la administración de sus asuntos y aquellas normas, reglas y reglamentos que sean necesarios o pertinentes para ejercer y desempeñar las Actividades Autorizadas;

(d)     abrir y mantener cuentas de banco, incluyendo el Fondo de Ingresos de la Corporación;

(e)     adquirir, arrendar, tener dominio sobre y vender propiedad;

(f)     tener completo dominio sobre todas sus propiedades (incluyendo los Ingresos de la Corporación), sujeto al gravamen estatutario establecido bajo el Artículo 3.2 de esta Ley;

(g)     negociar, otorgar y enmendar contratos y cualquier otro instrumento necesario o conveniente para desempeñar las Actividades Autorizadas;

(h)     nombrar o destituir oficiales, agentes y empleados, establecer sus compensaciones, poderes y facultades, en cada caso, de conformidad con los Acuerdos Complementarios;

(i)     pagar sus gastos operacionales y los Costos de Financiamiento;

(j)     procurar seguros contra pérdidas con relación a sus actividades, propiedades o activos, incluyendo seguros que cubran a sus directores y oficiales;

(k)     invertir fondos y establecer y mantener reservas según requerido por, y bajo los estándares establecidos en, los Acuerdos Complementarios;

(l)     indemnizar a los miembros de la Junta de Directores, sus oficiales, agentes, empleados, contratistas y terceros por conducta que no constituya negligencia crasa, dolo o fraude;

(m)     ejercer todos aquellos otros poderes no incompatibles con los aquí expresados que sean necesarios para llevar a cabo las Actividades Autorizadas;

(n)     llevar a cabo todos los actos o medidas necesarias o convenientes para cumplir su propósito y llevar a cabo los poderes que se le confieren expresamente en esta Sección;

(o)     delegar a sus oficiales, agentes, empleados o contratistas autoridad para tomar acciones para cumplir con esta Ley; y

(p)     firmar, radicar y enmendar cualquier planilla, formulario, elecciones o declaraciones con cualquier autoridad gubernamental."

Sección 10.-Se añade un Artículo 2.6 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 2.6.-Actividades Prohibidas.

Mientras los Bonos del Plan de Ajuste estén en circulación, la Corporación no estará autorizada a:

(a)     fusionarse o consolidarse, directa o indirectamente, con ninguna Persona;

(b)     incurrir, garantizar o de alguna otra manera obligarse a pagar deuda alguna u otras obligaciones que no sean los Bonos del Plan de Ajuste, gastos

operacionales, los Costos de Financiamiento y cualquier bono, nota, o
evidencia de deuda permitida bajo el Artículo 2.3 de esta Ley;

(c) gravar, crear o registrar gravámenes sobre cualquier propiedad
(incluyendo los Ingresos de la Corporación), excepto (1) por el gravamen
para garantizar el pago de los Bonos del Plan de Ajuste creado por el
Artículo 3.2 de esta Ley o (2) cualquier pignoración o gravamen para
garantizar un bono, nota o evidencia de deuda permitida bajo el Artículo
2.3 de esta Ley, pero sólo en la medida en que dicha prenda o gravamen
esté subordinado en todos los aspectos al gravamen establecido en el
Artículo 3.2 de esta Ley;

(d) llevar a cabo actividades de negocio que no sean las autorizadas
expresamente en esta Ley;

(e) disolver, liquidar, vender o, excepto según permitido por el Artículo 2.4(e),
de otra manera transferir toda o una parte de su propiedad (incluyendo los
Ingresos de la Corporación);

(f) los directores de la Corporación no votarán para autorizar a la Corporación
a comenzar un caso bajo el Título III de PROMESA o procesos judiciales de
reestructuración similares bajo las leyes aplicables sujeto a las disposiciones
de tales leyes; y

(g) tomar cualquier otra acción que sea inconsistente con el propósito de la
Corporación, según establecido por esta Ley o complementaria a ésta."

Sección 11.-Se añade un Artículo 2.7 a la Ley 91-2006, según enmendada, conocida
como "Ley del Fondo de Interés Apremiante", para que lea en su totalidad como sigue:

"Artículo 2.7.-Junta de Directores

Los poderes de la Corporación se ejercerán a través de la Junta de Directores.

(a) Composición de la Junta de Directores.

La Junta de Directores estará compuesta por tres (3) miembros, que
cumplirán los requisitos establecidos en el Artículo 2.7(b)(iii) de esta Ley y
quienes serán nombrados por el Gobernador de Puerto Rico; disponiéndose
que, conforme a las disposiciones de los Acuerdos Complementarios,
ciertos tenedores de Bonos del Plan de Ajuste podrán someter, para la
consideración del Gobernador, hasta tres (3) recomendaciones para el

nombramiento inicial de los directores de la Corporación, pero el Gobernador no estará obligado a seleccionar a dichas personas.

(b)     Disposiciones Generales con respecto a la Junta de Directores.

    (i)     Cada director será nombrado por un término de tres (3) años y podrá servir términos consecutivos; disponiéndose, que el Gobernador podrá remover a cualquier director previo a la expiración de su término si dicho director incumple con las responsabilidades establecidas en esta Ley o por negligencia crasa, dolo o fraude;

    (ii)     cada miembro de la Junta de Directores tendrá derecho a un (1) voto;

    (iii)     cada miembro de la Junta de Directores deberá satisfacer los requisitos de independencia y cualificación esbozados en los Acuerdos Complementarios (incluyendo que ningún miembro de la Junta de Directores puede ser un oficial, empleado o director de cualquier Entidad Gubernamental que no sea la Corporación);

    (iv)     todas las decisiones y acciones de la Junta de Directores requerirán el voto afirmativo de una mayoría de los miembros de la Junta de Directores que estén en funciones, disponiéndose que los estatutos corporativos de la Corporación podrán requerir la aprobación de una cantidad mayor de directores para ciertos propósitos; y

    (v)     los miembros de la Junta de Directores seleccionarán entre sus miembros un Presidente.

(c)     Vacantes.

    En la medida que surja una vacante en el puesto de un miembro de la Junta de Directores por muerte, remoción, renuncia o de cualquier otra manera, el Gobernador nombrará un director sucesor que cumpla con los requisitos establecidos en el Artículo 2.7(b)(iii) de esta Ley conforme al Artículo 2.7(b)(i) de esta Ley.

(d)     Compensación.

    Los miembros de la Junta de Directores recibirán compensación conforme a lo permitido por los Acuerdos Complementarios.

(e)     Aprobación y Enmienda de Reglas.

Tan pronto como sea factible luego del nombramiento de todos los directores y el nombramiento del Presidente, la Corporación adoptará reglas y procedimientos para gobernar sus actividades bajo esta Ley. La Junta de Directores podrá enmendar dichas reglas y procedimientos de tiempo en tiempo.

(f)   Quórum.

Una mayoría de los miembros de la Junta de Directores en funciones constituirán el quórum para tomar decisiones o ejercer cualquier poder o función de la Corporación. Uno o más miembros podrán participar de una reunión de la Junta de Directores mediante teleconferencia o equipo de comunicaciones similar. La participación por dichos medios constituirá participación presencial en la reunión. Cualquier acción necesaria o permitida en cualquier reunión de la Junta de Directores será autorizada sin necesidad de una reunión siempre y cuando todos los miembros de la Junta de Directores den su consentimiento por escrito a dicha acción.

(g)   Delegación.

La Junta de Directores podrá delegar a uno o más de los miembros o a los oficiales, agentes y empleados de la Corporación aquellos poderes y responsabilidades que la Junta de Directores determine sean apropiados."

Sección 12.-Se añade un Artículo 2.8 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.8.-Exención Contributiva.

(a)   Por la presente se determina y declara que las actividades de la Corporación tienen un propósito público. Por lo tanto, la Corporación estará totalmente exenta de, y no tendrá que pagar contribución, impuesto, licencia, sello, honorario u otro cargo similar alguno impuesto por el Gobierno de Puerto Rico o cualquier Entidad Gubernamental sobre cualquiera de las propiedades de las cuales es dueña, posee, custodia o usa o sobre sus actividades o sobre cualquier ingreso, pago o ganancia derivada de lo antes mencionado.

(b)   Los Bonos del Plan de Ajuste, incluyendo, pero sin limitarse a, cualquier pago o ingreso con relación a los Bonos del Plan de Ajuste y la transferencia de los Bonos del Plan de Ajuste, estará, en todo momento, exento de contribución, impuesto, licencia, sello, honorario u otro cargo impuesto por el Gobierno de Puerto Rico o cualquier Entidad Gubernamental. Los

tenedores y dueños beneficiarios de los Bonos del Plan de Ajuste no estarán sujetos a la obligación de radicar planilla, planilla informativa contributiva o cualquier otro requisito similar del Gobierno de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser titular de o transferir los Bonos del Plan de Ajuste."

Sección 13.-Se añade un Artículo 2.9 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 2.9.-Inaplicabilidad de Ciertas Leyes.

Las siguientes leyes o disposiciones no serán aplicables a la Corporación:

(a) Capítulos 4 y 6 de la Ley 26-2017, según enmendada, conocida como "Ley para el Cumplimiento del Plan Fiscal";

(b) Ley 1-2012, según enmendada, conocida como la "Ley de Ética Gubernamental de Puerto Rico de 2011";

(c) Ley 103-2006, según enmendada, conocida como "Ley de Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006";

(d) Ley 8-2017, según enmendada, conocida como la "Ley para la Transformación de los Recursos Humanos en el Gobierno de Puerto Rico";

(e) Ley 237-2004, según enmendada, conocida como la "Ley para Establecer Parámetros Uniformes para la Contratación de Servicios Profesionales y Consultivos por las Agencias e Instrumentalidades del Gobierno de Puerto Rico";

(f) Ley 197-2002, según enmendada, conocida como la "Ley para Regular el Proceso de Transición del Gobierno de Puerto Rico";

(g) Ley 78-2011, según enmendada, conocida como el "Código Electoral de Puerto Rico para el Siglo XXI";

(h) Ley 38-2017, según enmendada, conocida como la "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico";

(i) Plan 3-2011, según enmendado, conocido como el "Plan de Reorganización de Administración de Servicios Generales";

(j)     Ley 230 de 23 de julio de 1974, según enmendada, conocida como la "Ley de Contabilidad del Gobierno";

(k)     Ley 3-2017, conocida como la "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico"; y

(l)     Ley 14 de 17 de abril de 1972, según enmendada."

Sección 14.-Se añade un Capítulo III a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"Capítulo III - LA TRANSACCIÓN DE REESTRUCTURACIÓN"

Sección 15.–Se deroga el Artículo 3 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" y se sustituye por un nuevo Artículo 3.1, que leerá como sigue:

"Artículo 3.1-Emisión de los Bonos del Plan de Ajuste

(a)     En y después de la Fecha de Efectividad, la Corporación estará autorizada a emitir los Bonos del Plan de Ajuste, de tiempo en tiempo, bajo los términos del Plan de Ajuste de la Corporación y los términos y condiciones autorizados por la Corporación y establecidos en la Resolución de Reestructuración y los Acuerdos Complementarios.

(b)     Los Bonos del Plan de Ajuste estarán fechados, devengarán interés a las tasas y vencerán en la fecha o fechas, que determine la Corporación y así lo autorice en la Resolución de Reestructuración de acuerdo a, y consistente con, el Plan de Ajuste de la Corporación. La Corporación determinará la forma de los Bonos del Plan de Ajuste y la manera de otorgamiento de los Bonos del Plan de Ajuste, y fijará la denominación o denominaciones de los Bonos del Plan de Ajuste y el lugar o lugares de pago del principal y los intereses de los mismos, los términos para su redención y compra en lugar de redención y los otros términos de los mismos, todo conforme a, y consistente con, el Plan de Ajuste de la Corporación.

(c)     Los Bonos del Plan de Ajuste serán pagaderos únicamente de los Ingresos de la Corporación conforme los términos del Contrato de Bonos y los Acuerdos Complementarios.

(d)     La Corporación podrá adquirir bonos emitidos por la Corporación bajo los términos de, y conforme a, el Plan de Ajuste de la Corporación y los

Acuerdos Complementarios aplicables, a un precio que no exceda el precio de redención de los mismos. Todos los bonos así adquiridos serán cancelados.

(e)    Los Bonos del Plan de Ajuste no constituirán deuda del Gobierno de Puerto Rico ni de ninguna Entidad Gubernamental excepto por la Corporación. Esta aseveración se incluirá en los Bonos del Plan de Ajuste, el Contrato de Bonos y los documentos de divulgación relacionados a dichos bonos."

Sección 16.-Se añade un Artículo 3.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 3.2.-Gravamen Estatutario.

Los Bonos del Plan de Ajuste estarán, automáticamente tras ser emitidos, garantizados por un primer gravamen estatutario sobre todos los derechos, título e interés de la Corporación sobre las Contribuciones Pignoradas, incluyendo cualquier dinero, ingreso, renta, cuenta, derecho contractual o intangible derivado de éstas, a favor del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste. Dicho primer gravamen estatutario será automático y se constituirá, perfeccionará, será válido y exigible automáticamente desde y después de la Fecha de Efectividad, sin necesidad acción por Persona alguna. Ningún instrumento tendrá que ser otorgado, registrado o inscrito en un récord oficial o registro gubernamental u oficina para perfeccionar o continuar el primer gravamen estatutario o para establecer o mantener la prioridad del mismo. Ningún contacto de las Contribuciones Pignoradas con cualquier propiedad del Gobierno de Puerto Rico, de cualquier otra Entidad Gubernamental o de cualquier Persona limitará, frustrará, menoscabará o interferirá con dicho gravamen estatutario. Dicho gravamen estatutario será válido, vinculante, estará perfeccionado y será ejecutable contra cualquier Persona que tenga una reclamación de cualquier tipo, extracontractual, contractual u otra, contra la Corporación y sus activos, independientemente de si dicha Persona fue notificada de dicho gravamen.

Sección 17.-Se añade un Artículo 3.3 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea en su totalidad como sigue:

"Artículo 3.3.-Convenios relacionados a los Bonos del Plan de Ajuste y la Transacción de Reestructuración.

El Gobierno de Puerto Rico, con la intención de estar contractualmente obligado, por la presente acuerda y se compromete con la Corporación y con cualquier tenedor de Bonos del Plan de Ajuste, y autoriza a la Corporación a

incluir dicho compromiso en el Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste, a no, y que ninguna Entidad Gubernamental estará autorizada a, hasta que los Bonos del Plan de Ajuste, incluyendo cualquier interés devengado por éstos y cualquier cantidad u obligación bajo los Acuerdos Complementarios, se paguen en su totalidad en efectivo o se satisfagan conforme a sus términos:

(a)     tomar cualquier acción que (A) menoscabe el derecho de la Corporación a recibir los Ingresos de la Corporación, (B) limite o altere los derechos de la Corporación conforme al Plan de Ajuste de la Corporación para cumplir con los términos de cualquier acuerdo con los tenedores de Bonos del Plan de Ajuste, (C) material y adversamente menoscabe el cobro de las Contribuciones Pignoradas en cualquier Año Fiscal, o (D) menoscabe los derechos y remedios de los tenedores de Bonos del Plan de Ajuste o la colateral establecida bajo el Artículo 3.2 de esta Ley;

(b)     reducir las Contribuciones Pignoradas a una tasa menor de cinco punto cinco por ciento (5.5%) a menos que, con relación a dicha reducción, se cumpla con la calificación crediticia y demás requisitos establecidos en los Acuerdos Complementarios; disponiéndose, sin embargo, que, no obstante lo anterior, hasta que todas las obligaciones con respecto a los Bonos del Plan de Ajuste se paguen o satisfagan en su totalidad conforme a sus términos, si la tasa de las Contribuciones Pignoradas se reduce por debajo de tres (3) por ciento, entonces, con relación a dicha reducción, el Gobierno de Puerto Rico deberá cumplir con los Requisitos de Sustitución;

(c)     menoscabar, limitar, restringir, rescindir, atrasar o modificar los derechos o poderes de la Corporación, el Fiduciario del Contrato de Bonos o los tenedores de Bonos del Plan de Ajuste bajo esta Ley o con relación a los Ingresos de la Corporación o la habilidad de la Corporación para cumplir con sus obligaciones a sus bonistas;

(d)     enmendar esta Ley para menoscabar, limitar, restringir, rescindir, atrasar o modificar cualquier obligación o convenio de la Corporación con los tenedores de Bonos del Plan de Ajuste; y

(e)     limitar o restringir los derechos y poderes de los oficiales pertinentes del Gobierno de Puerto Rico para imponer, mantener, cobrar o recaudar las Contribuciones Pignoradas, disponiéndose que lo anterior no impedirá que el Gobierno de Puerto Rico ejerza su poder, a través de un cambio en ley, de reemplazar la porción del IVU que corresponde a una tasa contributiva de cinco punto cinco (5.5) por ciento con la Colateral Substituta de acuerdo a los Requisitos de Sustitución."

Sección 18.-Se añade un Capítulo IV a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO IV - INGRESOS DE LA CORPORACIÓN, DEPÓSITOS Y DESEMBOLSOS."

Sección 19.-Se deroga el Artículo 4 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", y se sustituye por un nuevo Artículo 4.1, que leerá como sigue:

"Artículo 4.1.-Satisfacción de los Ingresos de la Corporación con los Primeros Ingresos.

(a)     Cada Año Fiscal, los primeros ingresos correspondientes a las Contribuciones Pignoradas se transferirán a, y se depositarán con, la Corporación o en cualquier cuenta o fondo, incluyendo el Fondo de Ingresos de la Corporación  o una cuenta o fondo controlado por el Fiduciario del Contrato de Bonos designada en el Contrato de Bonos bajo el cual dichas obligaciones fueron incurridas bajo esta Ley y los Acuerdos Complementarios, designada por la Corporación, hasta que la Corporación reciba una cantidad equivalente a los Ingresos de la Corporación para dicho Año Fiscal. El requisito de que los primeros ingresos correspondientes a las Contribuciones Pignoradas, hasta los Ingresos de la Corporación, se depositen con la Corporación o en cualquier cuenta o fondo, incluyendo el Fondo de Ingresos de la Corporación o una cuenta o fondo controlado por el Fiduciario del Contrato de Bonos designada en el Contrato de Bonos bajo el cual dichas obligaciones fueron incurridas bajo esta Ley y los Acuerdos Complementarios designada por la Corporación no podrá ser modificado; disponiéndose, que el Contrato de Bonos podrá contener disposiciones que permitan la distribución trimestral de las Contribuciones Pignoradas entre la Corporación y el Gobierno de Puerto Rico tras la satisfacción de los requisitos establecidos en el Contrato de Bonos y de manera consistente con el Plan de Ajuste de la Corporación. La Corporación tendrá los derechos establecidos en este Artículo 4.1, hasta que los Bonos del Plan de Ajuste, incluyendo cualquier interés devengado por éstos, y todas las obligaciones bajo los Acuerdos Complementarios, hayan sido pagadas en su totalidad en efectivo o de otra manera hayan sido satisfechas de conformidad con sus términos.

(b)     Durante cada Año Fiscal, el Fiduciario del Contrato de Bonos o aquella otra Persona que sea designada en el Contrato de Bonos determinará, mensualmente, si la Corporación ha recibido los Ingresos de la Corporación. Una vez el Fiduciario del Contrato de Bonos o dicha otra

Persona determine que se han depositado los Ingresos de la Corporación con el Fiduciario del Contrato de Bonos, o aquella porción de los Ingresos de la Corporación que la Corporación tenga derecho a recibir si la distribución trimestral a la cual se hace referencia en este Artículo 4.1(a) está en efecto, todos los ingresos de las Contribuciones Pignoradas recibidos después de dicha determinación se transferirán al Gobierno de Puerto Rico.

(c)     Ninguna Persona que recaude o tenga posesión de las Contribuciones Pignoradas tendrá derecho legal o en equidad, título o interés alguno sobre dichas Contribuciones Pignoradas sólo por virtud del hecho que recaude o tenga posesión de las Contribuciones Pignoradas.

Sección 20.-Se añade un Artículo 4.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 4.2.-Exceso de Ingresos.

Las cantidades depositadas con la Corporación en cada Año Fiscal en exceso de las cantidades necesarias para pagar principal e intereses de los Bonos del Plan de Ajuste que venzan y sean pagaderos, incluyendo el principal y los intereses vencidos bajo cualquier Bono del Plan de Ajuste, satisfacer las obligaciones asumidas bajo el Contrato de Bonos u otros Acuerdos Complementarios que venzan o sean pagaderas, pagar los Costos de Financiamiento o gastos operacionales según se dispone en los Acuerdos Complementarios o hacer cualquier otro pago relacionado u otras obligaciones incurridas por la Corporación, se transferirá a la Corporación, libre del gravamen establecido en el Artículo 3.2 de esta Ley y cualquier otro gravamen establecido por el Contrato de Bonos u otro Acuerdo Complementario."

Sección 21.- Se añade un Capítulo V a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO V – DISPOSICIONES MISCELANEAS"

Sección 22.-Se deroga el Artículo 5 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", y se sustituye por un nuevo Artículo 5.1, que leerá en su totalidad como sigue:

"Artículo 5.1.-Separabilidad.

Esta Ley se interpretará de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección,

título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia."

Sección 23.-Se añade un Artículo 5.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 5.2.-Idioma que Prevalece.

Esta Ley se adoptará en español y en inglés. Si en la interpretación o aplicación de esta Ley surgiere algún conflicto entre el texto en inglés y el texto en español, prevalecerá el texto en inglés."

Sección 24.-Se derogan los Artículos 6 al 11 de la Ley 91-2006, según enmendada.

Sección 25.-Se añade el texto en inglés de la Ley 91-2006, según enmendado en esta Ley, inmediatamente después del final del texto en español, para que lea en su totalidad como sigue:

## "ENGLISH VERSION OF THE PUERTO RICO SALES TAX FINANCING CORPORATION ACT:

### STATEMENT OF MOTIVES

Puerto Rico faces an unprecedented fiscal and economic crisis. This bill, as well as the restructuring agreement reached with the creditors of Government Development Bank for Puerto Rico, will enhance Puerto Rico's credibility. With this agreement, we will achieve significant adjustments in the repayment of the government's debts incurred by other administrations, but that it is now our responsibility to resolve. This way, we ensure that the Government is able to continue operating and serving the people of Puerto Rico.

The positions assumed and actions taken by the prior administration caused Puerto Rico to lose access to the capital markets and precipitated the collapse of our public finance system. These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico to the United States mainland.

The prior administration developed a hostile relationship with participants of the financial markets, including tens of thousands of residents of Puerto Rico that invested their savings trusting the good name and credit of the Commonwealth and that of its public corporations. This hostile environment towards Puerto Rico also pervaded the United States Congress due to the lack of transparency and honesty, while generating consistently negative news coverage for Puerto Rico at the local, national and global level.

Misguided decisions of the prior administration led to the bankruptcy of the Commonwealth of Puerto Rico and its need to gather its resources to address and provide essential services to the people of Puerto Rico. This, in turn, acted as a catalyst for a controversy that challenged the structure pursuant to which the Puerto Rico Sales Tax Financing Corporation (COFINA by its Spanish acronym) issued its bonds. In particular, certain parties asserted claims arguing, among other things, that (i) COFINA's issuance of its bonds violated the Puerto Rico Constitution and (ii) the portion of the sales and use tax imposed by the Commonwealth at a rate of 5.5% (the SUT) and transferred to COFINA constituted "available resources" of the Commonwealth pursuant to Article VI, Section 8, of the Puerto Rico Constitution and must be used for the payment of the Commonwealth's "public debt." Certain creditors also challenged the scope of the Puerto Rico Constitution based on the whether the Spanish term "recursos disponibles" or the English term "available revenues, plus surplus" was used. On May 5, 2017, the Financial Oversight and Management Board (Oversight Board) created pursuant to the provisions of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) commenced a proceeding as representative of COFINA under Title III.

The Commonwealth's and COFINA's various stakeholders sought an orderly process to resolve the disputes relating to COFINA and the ownership of the SUT (collectively, the Commonwealth-COFINA Dispute). To that end, on August 10, 2017, the Title III Court entered a stipulation and order appointing the Commonwealth's Official Committee of Unsecured Creditors to act as agent for the Oversight Board in its capacity as representative of the Commonwealth (the Commonwealth Agent) and Bettina M. Whyte to act as agent for the Oversight Board in its capacity as representative of COFINA (the COFINA Agent) in an effort to facilitate a settlement of the Commonwealth-COFINA Dispute.

On June 5, 2018, the Commonwealth Agent and the COFINA Agent announced that they had reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the Agreement in Principle). The Agreement in Principle was premised on

splitting the fixed amount of the SUT transferred to COFINA each fiscal year (the PSTBA) between the Commonwealth and COFINA beginning in fiscal year 2019, with COFINA receiving 53.65% of the yearly scheduled PSTBA and the Commonwealth receiving 46.35% of the yearly scheduled PSTBA plus all other revenues collected on account of the SUT.

Consistent with the public policy implemented by the Governor of Puerto Rico, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and various creditors and insurers of COFINA bonds executed a plan support agreement (as amended and restated on September 21, 2018, the Plan Support Agreement), which incorporates the Agreement in Principle's PSTBA split and provides for the settlement of the Commonwealth-COFINA Dispute pursuant to a plan of adjustment for COFINA under Title III of PROMESA (the COFINA Plan).

The Legislative Assembly is now called upon to implement the agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the provisions of Act No. 91, which created COFINA and authorized it to issue bonds. These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government of Puerto Rico to better serve and provide for its citizens. By implementing the Plan Support Agreement, this legislation also puts an end to the costly litigation between the agents appointed by the Oversight Board and settles the claims of COFINA's bondholders, while also making clear the original legislative intent of Act 91-2006, as amended. Moreover, as a result of this implementing legislation, we will be saving the Government of Puerto Rico approximately $437.5 million per year, which will now be available to the Government for the benefit of the people of Puerto Rico.

Equally important, this legislation shows that the Legislative Assembly is determined to take the steps necessary to enable Puerto Rico's return to the capital markets. As one of the steps required to implement the Plan Support Agreement, this legislation will allow for the restructuring of the COFINA debt under Title III of PROMESA, act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy, reduce costly litigation, and accelerate termination of the Oversight Board in accordance with PROMESA.

This Act demonstrates the Legislative Assembly's continued public policy commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets, and achieve economic certainty and debt sustainability for Puerto Rico.

CHAPTER 1. – TITLE AND DEFINITIONS

Article 1.1.-Title.

This Act shall be known as the "Puerto Rico Sales Tax Financing Corporation Act."
Article 1.2.-Definitions.

The following terms shall have the meanings stated below:

(a)     "AAFAF"– means the Puerto Rico Fiscal Agency and Financial Advisory
        Authority.

(b)     "Act"– means Act 91-2006, as amended, also known as the "Puerto Rico
        Sales Tax Financing Corporation Act".

(c)     "Ancillary Agreements"– means the Corporation Plan of Adjustment, the
        Bond Indenture, the Settlement Agreement, and any other agreement or
        instrument entered into by the Corporation or the Indenture Trustee in
        connection with, or in furtherance of, the Restructuring Transaction and in
        accordance with, or in furtherance of, the Corporation Plan of Adjustment.

(d)     "Authorized Activities"– means the activities authorized to be carried out
        by the Corporation under Article 2.4 of this Act.

(e)     "Board of Directors"– means the Board of Directors of the Corporation.

(f)     "Bond Indenture"– means one or more trust agreements, bond indentures
        and any supplements or amendments thereto, or similar contracts or
        agreements, entered into by the Corporation and the Indenture Trustee
        pursuant to which Plan of Adjustment Bonds are issued, and establishing
        the rights and responsibilities of the Corporation and of the holders of Plan
        of Adjustment Bonds issued thereunder.

(g)     "Chair" – means the chairperson of the Board of Directors.

(h)     "COFINA Revenues" – means the First Funds up to an amount equal to
        fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed
        Income for each Fiscal Year and all legal and equitable rights, title and
        interest thereto (including the right to receive the First Funds as set forth
        under Article 4.1 of this Act).

20

(i)  "COFINA Revenues Fund" – means the segregated fund or funds owned by the Corporation into which the COFINA Revenues are deposited (1) which account shall be held in the name of the Indenture Trustee for the benefit of the holders of the Plan of Adjustment Bonds, (2) may not be owned or controlled in any way by the Government of Puerto Rico or any Government Entity other than the Corporation, and (3) is maintained in one or more mainland U.S. banks.

(j)  "Corporation" – means the Puerto Rico Sales Tax Financing Corporation created by this Act.

(k)  "Corporation Plan of Adjustment" – means the plan of adjustment consummated in connection with the Corporation's case under Title III of PROMESA, including the order of the District Court confirming such plan of adjustment.

(l)  "District Court" – means the United States District Court for the District of Puerto Rico.

(m)  "Effective Date" – means the date on which the Corporation Plan of Adjustment becomes effective in accordance with its terms.

(n)  "Financing Costs" – means all costs associated with the Restructuring Transaction, including the costs, fees and expenses to (1) issue, service, repay or refinance the Plan of Adjustment Bonds, whether such costs are incurred upon issuance of such Plan of Adjustment Bonds or over the term of the Plan of Adjustment Bonds, (2) make payments as required by the Ancillary Agreements, (3) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transaction; provided, however that this provision does not limit in any way the exemption from taxes set forth in Article 2.8 hereof, (4) prepare for and enter into the Restructuring Transaction, and (5) perform all ongoing activities relating to the Restructuring Transaction. It should be noted that, the Financing Costs also includes pre-closing and post-closing administrative fees and expenses incurred in connection with all Ancillary Agreements, but does not include payments of principal and interest on the Plan of Adjustment Bonds.

(o)  "First Funds" – means the first funds comprising the Pledged Taxes in any Fiscal Year as described in Article 4.1 of this Act.

(p)  "Fiscal Year" – means the fiscal year of the Government of Puerto Rico, which begins on July 1 and ends on June 30.

(q)    "Fixed Income" – means, for Fiscal Year 2018-2019, seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one (783,197,251) dollars and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four (4) percent of such Fixed Income, up to the Maximum Amount.  The Fixed Income for each Fiscal Year shall be funded from the first revenues collected of the Pledged Taxes.

(r)    "Government Entity" – means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Government of Puerto Rico.

(s)    "Government of Puerto Rico"– means the Commonwealth of Puerto Rico and the government thereof.

(t)    "Indenture Trustee"– means the Person designated as trustee or indenture trustee under the Bond Indenture, including any successor trustee or indenture trustee under the Bond Indenture.

(u)    "Maximum Amount" – means One Billion Eight Hundred and Fifty Million (1,850,000,000.00) dollars.

(v)    "Oversight Board" – means the Financial Oversight and Management Board for Puerto Rico established pursuant to Article 1.1 of PROMESA.

(w)    "Person" – means any natural person or legal entity, including, but not limited to, the Government of Puerto Rico, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(x)    "Plan of Adjustment Bonds" – means any Restructuring Bonds and any Refunding Bonds.

(y)    "Pledged Taxes" – means, subject to the provisions of Article 3.3 hereof, (1) the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half (5.5) percent, and (2) the Substituted Collateral, if any.

(z)     "PROMESA" – means the "Puerto Rico Oversight, Management, and Economic Stability Act", Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.

(aa)    "Refunding Bonds" – means the bonds issued by the Corporation pursuant to the Act and the Ancillary Agreements, on a pari passu basis with the Restructuring Bonds, to retire, refinance or defease any Plan of Adjustment Bonds.

(bb)    "Restructuring Bonds" – means the bonds issued by the Corporation pursuant to this Act, the Corporation Plan of Adjustment, and the Ancillary Agreements, having terms that conform to, and that are authorized, determined to be valid, and distributed in accordance with, the Corporation Plan of Adjustment.

(cc)    "Restructuring Resolution" – means one or more resolutions of the Board of Directors authorizing: (1) the issuance of Plan of Adjustment Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Corporation Plan of Adjustment.

(dd)    "Restructuring Transaction" – means the transactions contemplated by, or in furtherance of, the Corporation Plan of Adjustment.

(ee)    "Sales Tax" – means the sales and use taxes imposed by the Government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, known as the Internal Revenue Code for a New Puerto Rico.

(ff)    "Settlement Agreement" – means the Settlement Agreement, dated as of October [15], 2018, between the Oversight Board, on behalf of the Government of Puerto Rico, and the agent for the Corporation appointed by the Oversight Board to settle or litigate the dispute between the Government of Puerto Rico and the Corporation regarding the ownership of the Sales Tax.

(gg)    "Substituted Collateral" – means all or a portion of a tax of general applicability throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise constitutes like or comparable security for the Plan of Adjustment Bonds.

(hh)    "Substitution Requirements" – means (1) the enactment of legislation providing for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal to the COFINA Revenues has

been irrevocably transferred to and is owned solely and exclusively by the Corporation to the full extent provided under Article 2.2 of this Act, (B) that, following such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not, and shall not constitute, "available resources" or "available revenues" of the Government of Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution), (C) for a lien on such Substituted Collateral in favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds to the full extent provided for under Article 3.2 of this Act, and (D) that the Government of Puerto Rico and the Government Entities shall continue to provide the covenants set forth in Article 3.3 of this Act with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect to the Substituted Collateral.

CHAPTER 2. - THE PUERTO RICO SALES TAX FINANCING CORPORATION

Article 2.1. - Creation and Separate Legal Existence of the Corporation.

There is created a public corporation and instrumentality of the Government of Puerto Rico, which constitutes a corporate and political entity independent and separate from the Government of Puerto Rico to be known as the Puerto Rico Sales Tax Financing Corporation. The Corporation, which was created pursuant to the provisions of this Act, is and shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico and any other Government Entity.  It shall be operated independently, and its business and affairs shall be governed by or under the direction of its Board of Directors.

Article 2.2. - Ownership of the COFINA Revenues.

(a)     Any and all ownership interests and rights to the COFINA Revenues were, have been or are hereby transferred to the Corporation.

(b)     The transfer described in (a) above is an absolute transfer of all legal and equitable right, title and interest, and not a pledge or other financing.

(c)     The Corporation is and will be the sole and exclusive owner of the COFINA Revenues until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

(d)     Persons designated as withholding agents for purposes of the imposition and collection of the Sales Tax pursuant to the Act 1-2011, as amended, also known as the "Internal Revenue Code for a New Puerto Rico", shall be deemed to collect any portion of the Sales Taxes in which the Corporation has an ownership interest on behalf of the Corporation. Any such withholding agent will continue to be subject to any and all obligations and responsibilities imposed by the Internal Revenue Code for a New Puerto Rico, on withholding agents in relation to the imposition and collection of the Sales Tax.

(e)     The COFINA Revenues do not constitute "available resources" or "available revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

Article 2.3.-Purpose of the Corporation.

On and after the Effective Date, the Corporation's purpose will be to (a) issue the Plan of Adjustment Bonds, (b) own and administer the COFINA Revenues, and (c) issue any other bonds, notes or evidence of indebtedness of the Corporation as may be permitted by the Corporation Plan of Adjustment and the Ancillary Agreements and which will be payable from such sources as may be provided for by the Legislative Assembly.

Article 2.4.-The Corporation's Activities.

The Corporation's activities shall be limited to the following:

(a)     receiving and owning the COFINA Revenues and such other revenues or property as may be provided or transferred to the Corporation;

(b)     adopting the Restructuring Resolution;

(c)     issuing, from time to time, Plan of Adjustment Bonds and any bonds, notes or evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act;

(d)     entering into and performing the Ancillary Agreements;

(e)     to pay any bonds, notes or evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act by pledging, on a basis subordinate in all respects to the lien established in Article 3.2 of this Act, (1) any

amounts remaining of the COFINA Revenues after the payment of principal and interest on the Plan of Adjustment Bonds or (2) any other funds or property that may be allocated to the Corporation after the Effective Date; and

(f)     taking any and all other actions as may be necessary or appropriate to effectuate the Restructuring Transaction and the Corporation Plan of Adjustment, including making amendments to, exchanging and/or canceling bonds issued by the Corporation prior to the Effective Date and amending and restating agreements of the Corporation relating thereto.

Article 2.5.-Ancillary Powers.

In order to carry out the Authorized Activities, without limiting the foregoing, the Corporation shall have the power to:

(a)     sue and be sued in any Commonwealth court or the Federal District Court;

(b)     adopt, alter and use a seal;

(c)     formulate, adopt, amend and revoke rules for the administration and management of its affairs, and such standards, rules and regulations that may be necessary or convenient to exercise and perform the Authorized Activities;

(d)     open and maintain bank accounts, including the COFINA Revenues Fund;

(e)     acquire, hold, lease, sell and otherwise transfer property;

(f)     have complete legal and equitable dominion over its properties (including the COFINA Revenues), subject to the statutory lien established under Article 3.2 of this Act;

(g)     make, execute and amend contracts and all other instruments necessary or convenient to perform the Authorized Activities;

(h)     appoint and remove officers, agents, employees and contractors, establish their compensations, powers and duties, in each case, in accordance with the Ancillary Agreements;

(i)     pay its operating expenses and the Financing Costs;

(j)     procure insurance, including insurance covering the Corporation's directors and officers, against loss in connection with its activities, properties or assets;

(k)     invest funds and establish and maintain reserves as required by, and pursuant to standards set forth in, the Ancillary Agreements;

(l)     indemnify the members of the Board of Directors, its officers, agents, employees, contractors and other third parties for conduct that does not constitute gross negligence, willful misconduct or fraud;

(m)     exercise such other powers, not inconsistent herewith, as may be necessary to carry out the Authorized Activities;

(n)     take any action or measure necessary or convenient to carry out its purposes and exercise the powers expressly granted in this Article;

(o)     delegate to its officers, agents, employees or contractors authority to take actions in furtherance of this Act; and

(p)     execute, file and amend any relevant returns, forms, elections or statements with any governmental authority.

Article 2.6.-Prohibited Activities.

While the Plan of Adjustment Bonds are outstanding, the Corporation shall not be authorized to:

(a)     merge or consolidate, directly or indirectly, with any Person;

(b)     incur, guarantee or otherwise become obligated to pay any debt or other obligations other than the Plan of Adjustment Bonds, operating costs, the Financing Costs and any bond, note or evidence of indebtedness permitted under Article 2.3 hereof;

(c)     pledge, create or record liens on any of its properties (including the COFINA Revenues), other than (1) the pledge to secure the payment of Plan of Adjustment Bonds created pursuant to Article 3.2 of this Act or (2) any pledge or lien to secure any bond, note or evidence of indebtedness permitted under Article 2.3 hereof but only to the extent such pledge or lien is subordinate in all respects to the lien established in Article 3.2 of this Act;

(d)     engage in business activities other than as expressly authorized in this Act;

(e)     dissolve, liquidate, sell or, except as permitted by Article 2.4(e), otherwise transfer any or all of its properties (including the COFINA Revenues);

(f)     the directors of the Corporation shall not vote to authorize the Corporation to commence a case under Title III of PROMESA or other similar judicial restructuring process under applicable law subject to the provisions thereof; and

(g)     take any other action that is inconsistent with the Corporation's purpose set forth in this Act or ancillary thereto.

Article 2.7.-Board of Directors.

The powers of the Corporation shall be exercised by the Board of Directors.

(a)     Composition of the Board of Directors.

The Board of Directors shall be composed of three (3) members, who shall meet the requirements set forth in Article 2.7 (b)(iii) of this Act and shall be appointed by the Governor of Puerto Rico; provided, that, pursuant to the provisions of the Ancillary Agreements, certain holders of Plan of Adjustment Bonds may submit up to three (3) recommendations for the Governor's consideration of the initial appointment of the Corporation's directors but the Governor shall be under no obligation to appoint any such recommended persons.

(b)     General Provisions regarding the Board of Directors.

(i)     Each member of the Board of Directors shall be appointed for a term of three (3) years and may serve consecutive terms as an appointed member; provided, that the Governor may remove any member prior to the expiration of their term if such member fails to uphold the responsibilities set forth in this Act or for gross negligence, willful misconduct or fraud;

(ii)     each member of the Board of Directors shall be entitled to one (1) vote;

(iii)     each member of the Board of Directors shall satisfy the independence and qualification standards (including that no member of the Board of Directors may be an officer, employee or director of any

Government Entity other than the Corporation) set forth in the Ancillary Agreements;

(iv) all decisions and actions of the Board of Directors shall require the affirmative vote of the majority of the members of the Board of Directors at the time serving; provided, that, the Corporation's bylaws may require a higher approval threshold for particular matters described therein; and

(v) the members of the Board of Directors shall select a Chair from among themselves.

(c) Vacancies.

In the event of a vacancy in the office of a member of the Board of Directors by death, removal, resignation or otherwise, a successor member who meets the requirements set forth in Article 2.7 (b)(iii) of this Act shall be appointed by the Governor of Puerto Rico subject to Article 2.7(b)(i) hereof.

(d) Compensation.

Members of the Board of Directors shall receive such compensation as is authorized pursuant to the Ancillary Agreements.

(e) Adoption and Amendment of Rules.

As soon as practicable after the appointment of all members and appointment of the Chair, the Corporation shall adopt rules and procedures governing its activities under this Act. The Board of Directors shall be entitled to amend such rules and procedures from time to time.

(f) Quorum.

A majority of the members of the Board of Directors at the time serving shall constitute a quorum to make decisions or exercise any power or function of the Corporation. Any one or more members may participate in a meeting of the Board of Directors by teleconference or similar communications equipment. Participation by such means shall constitute presence in person at the meeting. Any action necessary or allowed in any meeting of the Board of Directors shall be authorized with no need for a meeting, if all the members of the Board of Directors give their written consent concerning such action.

(g)     Delegation.

      The Board of Directors may delegate to one or more of the members, or to the Corporation's officers, agents and employees, such powers and duties as the Board of Directors may deem appropriate.

Article 2.8.-Tax Exemption.

(a)     It is hereby found and declared that the activities of the Corporation are for a public purpose. As a result, the Corporation shall be totally exempt from, and shall not be required to pay any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the Government of Puerto Rico or any Government Entity upon any of the property that the Corporation owns, possesses, holds or uses or on its activities, or upon any income, payment or gain derived therefrom.

(b)     The Plan of Adjustment Bonds, including, but not limited to, any payments or income with respect to the Plan of Adjustment Bonds and the transfer of the Plan of Adjustment Bonds, shall, at all times, be totally exempt from all kinds of taxes, assessments, licenses, stamps, fees and other charges levied by the Government of Puerto Rico or any Government Entity. Holders and beneficial owners of the Plan of Adjustment Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Government of Puerto Rico or any Government Entity by reason of holding, owning or transferring the Plan of Adjustment Bonds.

Article 2.9.-Inapplicability of Certain Laws.

The following laws or provisions shall not apply to the Corporation:

(a)     Chapters 4 and 6 of Act 26-2017, as amended, known as the "Fiscal Plan Compliance Act";

(b)     Act 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011";

(c)     Act 103 of May 25, 2006, as amended, known as the "Act for the Fiscal Reform of the Government of the Commonwealth of Puerto Rico of 2006";

(d)     Act 8-2017, as amended, known as the "Act for the Transformation of the Government's Human Resources";

(e)     Act 237-2004, as amended, known as the "Act to Establish Uniform Parameters for Contracting Professional and Consulting Services by Agencies and Instrumentalities of the Government of Puerto Rico";

(f)     Act 197-2002, as amended, known as the "Act to Regulate the Transition Process of the Government of Puerto Rico";

(g)     Act 78-2011, as amended, known as the "Electoral Code of Puerto Rico for the XXI Century";

(h)     Act 38-2017, known as the "Uniform Administrative Procedures Act of the Government of Puerto Rico";

(i)     Plan 3-2011, as amended, known as "General Services Administration Reorganization Plan";

(j)     Act 230 of July 23, 1974, as amended, known as the "Government Accounting Act";

(k)     Act 3-2017, known as the "Law to Address the Economic, Fiscal and Budgetary Crisis and Ensure the Functioning of the Government of Puerto Rico"; and

(l)     Act 14 of April 17, 1972, as amended.

CHAPTER 3.-THE RESTRUCTURING TRANSACTION

Article 3.1.–Issuance of Plan of Adjustment Bonds.

(a)     From and after the Effective Date, the Corporation shall be authorized to issue Plan of Adjustment Bonds, from time to time, pursuant to the Corporation Plan of Adjustment and the terms and conditions authorized by the Corporation and set forth in the applicable Restructuring Resolution and the Ancillary Agreements.

(b)     Plan of Adjustment Bonds shall be dated, shall bear interest at such rates and shall mature at such time or times as may be determined by the Corporation and authorized in the applicable Restructuring Resolution in accordance and consistent with the Corporation Plan of Adjustment. The Corporation shall determine the form of Plan of Adjustment Bonds and the manner of execution of Plan of Adjustment Bonds, and shall fix the denomination or denominations of Plan of Adjustment Bonds and the place or places of payment of principal thereof and interest thereon, the terms of

redemption and purchase in lieu of redemption and the other terms thereof, all in accordance and consistent with the Corporation Plan of Adjustment. Such Plan of Adjustment Bonds may be sold at public or private sale for such price or prices as the Corporation shall determine, or issued in exchange for existing bonds of the Corporation in accordance with the Plan of Adjustment.

(c) Plan of Adjustment Bonds shall be payable solely from the COFINA Revenues in accordance with the terms of this Act and the Ancillary Agreements.

(d) The Corporation may purchase bonds issued by the Corporation on the terms and in accordance with the Corporation Plan of Adjustment and applicable Ancillary Agreements at a price not exceeding the redemption price thereof. All bonds so purchased shall be cancelled.

(e) Plan of Adjustment Bonds shall not constitute a debt of the Government of Puerto Rico or of any Government Entity other than the Corporation. This statement shall be included in the Plan of Adjustment Bonds, the Bond Indenture and the disclosure documentation relating to such bonds.

Article 3.2.-Statutory Lien.

Plan of Adjustment Bonds shall automatically, upon the issuance of such Plan of Adjustment Bonds, be secured by a statutory first lien on all of the Corporation's right, title and interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds. Such statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory first lien or to establish or maintain the priority thereof. No commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other Government Entity or any other Person shall limit, defeat, impair or interfere with such statutory lien. Such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of whether such Persons have notice of such lien.

Article 3.3.-Covenants Regarding Plan of Adjustment Bonds and the Restructuring Transaction.

The Government of Puerto Rico, with the intent of being contractually bound, hereby agrees and covenants with the Corporation and each Person that holds Plan of Adjustment Bonds, and authorizes the Corporation to include such covenant in the Bond Indenture for the benefit of the holders of Plan of Adjustment Bonds, that it will not, and no Government Entity shall be authorized to, until the Plan of Adjustment Bonds, together with the interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or otherwise discharged in accordance with their terms:

(a)     take any action that would (A) impair the Corporation's right to receive the COFINA Revenues, (B) limit or alter the rights vested in the Corporation in accordance with the Corporation Plan of Adjustment to fulfill the terms of any agreements with the holders of Plan of Adjustment Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any Fiscal Year, or (D) impair the rights and remedies of the holders of the Plan of Adjustment Bonds or the collateral security established under Article 3.2 of this Act;

(b)     reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless, in connection with such reduction, the credit rating and other requirements set forth in the Ancillary Agreements are satisfied; provided, however, that, notwithstanding the foregoing, until all obligations with respect to the Plan of Adjustment Bonds have been paid or satisfied in full in accordance with their terms, if the rate of the Pledged Taxes is reduced below three (3) percent, then, in connection with such reduction, the Government of Puerto Rico must comply with the Substitution Requirements;

(c)     impair, limit, restrict, rescind, delay or modify the rights or powers of the Corporation, the Indenture Trustee or the holders of Plan of Adjustment Bonds under this Act or relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to its bondholders;

(d)     amend this Act to impair, limit, restrict, rescind, delay or modify any obligation or commitment of the Corporation to the holders of Plan of Adjustment Bonds; and

(e)     limit or restrict the rights or powers of the appropriate officers of the Government of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing shall not preclude the Government of Puerto Rico from exercising its power, through a change in law, replace the portion of the Sales Tax that corresponds to a tax rate of

five and one half (5.5) percent with Substituted Collateral in accordance with the Substitution Requirements.

CHAPTER 4.-FUNDING OF THE CORPORATION; DEPOSITS AND DISBURSEMENTS.

Article 4.1.-First Dollars Funding of COFINA Revenues.

(a)     Each Fiscal Year, the first funds comprising the Pledged Taxes shall be transferred to, and deposited with, the Corporation, or any account or fund, including the COFINA Revenues Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were incurred in accordance with this Act and the Ancillary Agreements, designated by the Corporation, until such time as the Corporation has received an amount equal to the COFINA Revenues for such Fiscal Year. The requirement that the first funds comprising the Pledged Taxes up to the COFINA Revenues be deposited with the Corporation or in any account or fund, including the COFINA Revenues Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were incurred in accordance with this Act and the Ancillary Agreements, designated by the Corporation may not be modified; provided, that the Bond Indenture may contain provisions allowing for the quarterly distribution of the Pledged Taxes between the Corporation and the Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture and consistent with the Corporation Plan of Adjustment. The Corporation shall have the rights set forth in this Article 4.1 until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

(b)     During each Fiscal Year, the Indenture Trustee or such other Person as may be designated in the Bond Indenture shall determine, on a monthly basis, if the Corporation has received the COFINA Revenues. Once the Indenture Trustee or such other Person determines that the COFINA Revenues have been deposited with the Indenture Trustee, or that portion of the COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution referenced in Article 4.1(a) above is in effect, all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico.

(c)    No Person who collects or holds the Pledged Taxes shall have any legal or equitable right, title or interest thereto solely by virtue of the fact that it collects or holds the Pledged Taxes.

Article 4.2.-Excess Funding.

The amounts deposited with the Corporation each Fiscal Year in excess of the amounts required to pay principal and interest on the Plan of Adjustment Bonds then due and payable (including the principal and interest due and payable on any past due Plan of Adjustment Bonds), satisfy obligations assumed pursuant to the Bond Indenture or other Ancillary Agreements then due and payable, pay its Financing Costs or operating expenses as provided in the Ancillary Agreement, or make any other payment related to other obligations incurred by the Corporation, will be transferred to the Corporation, free and clear of the lien established by Article 3.2 of this Act and any other lien established by the Bond Indenture or other Ancillary Agreement.

CHAPTER 5.-MISCELLANEOUS PROVISIONS.

Article 5.1.-Severability.

This Act shall be interpreted in accordance with the Puerto Rico Constitution and the U.S. Constitution.  If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order to such effect will neither affect nor invalidate the remainder of this Act. The effect of such an order shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act so annulled or declared unconstitutional. If the application to a Person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order to such effect will neither affect nor invalidate the application of the remainder of this Act to such Persons or circumstances to which it may be validly applied. It is the express and unequivocal intent of this Legislative Assembly that the courts of law enforce the provisions and application of this Act even if any of its parts is annulled, invalidated, affected or declared unconstitutional, or even if the application thereof to any Person or circumstance is annulled, invalidated or declared unconstitutional.

Article 5.2.-Language Conflict.

This Act shall be adopted both in English and Spanish. If in the interpretation or application of this Act any conflict arises as between the English and Spanish texts, the English text shall govern."

Sección 26.-Se derogan los Artículos 2 y 4 de la Ley 116-2013, según enmendada.

Sección 27.-Se enmienda el Artículo 25-A de la Ley 44 del 21 de junio de 1988, según enmendada, para que lea en su totalidad como sigue:

"(a)   ...

...

(k)   Durante el período comprendido entre la fecha de aprobación de esta Ley y el 31 de diciembre de 2012, la Corporación habrá de disponer de los activos depositados en la Cuenta del Corpus de la siguiente manera:

(i)   ...

(ii)   el remanente, permanecerá en la Cuenta del Corpus y se utilizará para comprar un bono de apreciación de capital emitido por la Corporación para el Fondo de Interés Apremiante de Puerto Rico con un vencimiento no menor de 30 años ni mayor de 40 años y a una tasa de interés de no menos de 7.00%. El Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico y la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico no podrán disponer voluntariamente del bono de la Corporación del Fondo de Interés Apremiante de Puerto Rico, a menos que dicha disposición sea autorizada por la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico."

Sección 28.-Separabilidad.

Esta Ley se interpretará de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e

inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Sección 29.-Supremacía.

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno de Puerto Rico que sea inconsistente con esta Ley.

Sección 30.-Vigencia.

Esta Ley comenzará a regir en la fecha en que el plan de ajuste con relación al caso de la Corporación al amparo del Título III de PROMESA advenga efectivo de acuerdo a sus términos.

**DEPARTAMENTO DE ESTADO**
**Certificaciones, Reglamentos, Registro**
**de Notarios y Venta de Leyes**
Certifico que es copia fiel y exacta del original
Fecha: 3 de DICIEMBRE de 2018

Firma

**Eduardo Arosemena Muñoz**
**Secretario Auxiliar**
**Departamento de Estado**
**Gobierno de Puerto Rico**