```
 1                    UNITED STATES BANKRUPTCY COURT

 2                       DISTRICT OF PUERTO RICO

 3
     In Re:                      )       Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )       PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,                )       (Jointly Administered)
                                 )
 7   as representative of        )
                                 )
 8   The Commonwealth of         )
     Puerto Rico, et al.,        )       January 16, 2019
 9                               )
                 Debtors.        )
10
     _____
11
     In Re:                      )       Docket No. 3:17-BK-3284(LTS)
12                               )
                                 )       PROMESA Title III
13   The Financial Oversight and )
     Management Board for        )
14   Puerto Rico,                )
                                 )
15   as representative of        )
                                 )
16   Puerto Rico Sales Tax       )
     Financing Corporation,      )
17   (COFINA)                    )
                                 )
18               Debtor.         )

19   _____

20
     The Bank of New York        )       Docket No. 3:17-AP-133(LTS)
21   Mellon,                     )
                                 )       in 17-BK-3284(LTS)
22               Plaintiff,      )
     v.                          )
23                               )
     Puerto Rico Sales Tax       )
24   Financing Corporation,      )
     (COFINA), et al.,           )
25                               )
                 Defendants.     )
```

```
 1  _____

 2
    The Official Committe of    )      Docket No. 3:17-AP-133(LTS)
 3  Unsecured Creditors of the  )
    Commonwealth of Puerto      )      in 17-BK-3284 (LTS)
 4  Rico,                       )
                                )
 5  as agent of                 )
                                )
 6  The Financial Oversight and )
    Management Board for        )
 7  Puerto Rico,                )
                                )
 8  as representative of        )
                                )
 9  The Commonwealth of         )
    Puerto Rico,                )
10                              )
                    Plaintiff,  )
11  v.                          )
                                )
12  Bettina Whyte,              )
                                )
13  as agent of                 )
                                )
14  The Financial Oversight and )
    Management Board for        )
15  Puerto Rico,                )
                                )
16                  Defendant.  )
    _____

17

18                       MOTION HEARING

19    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

20              UNITED STATES DISTRICT COURT JUDGE

21  _____

22
    APPEARANCES:
23
    For The Commonwealth
24  of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
                             Mr. Brian Rosen, PHV
25                           Mr. Michael Firestein, PHV
                             Mr. Hermann Bauer, Esq.
```

```
 1   APPEARANCES, Continued:

 2   For the U.S. Trustee
     Region 21:                Ms. Monsita Lecaroz Arribas, AUST
 3
     For Official Committee
 4   of Unsecured Creditors:   Mr. Luc Despins, PHV

 5
     For Puerto Rico Fiscal
 6   Agency and Financial
     Advisory Authority:       Mr. John J. Rapisardi, PHV
 7                             Mr. Peter Friedman, PHV
                               Ms. Suzzanne Uhland, PHV
 8
     For Ad Hoc Group of
 9   General Obligation
     Bondholders:              Mr. Mark T. Stancil, PHV
10

11   For PROSOL-UTIER:         Mr. Rolando Emmanuelli Jimenez, Esq.

12   For UAW and SEIU:         Mr. Peter D. DeChiara, PHV

13   For Ambac Assurance
     Corporation:              Mr. Dennis Dunne, PHV
14
     For GMS Group:            Mr. Gary Eisenberg, PHV
15
     For COFINA Senior
16   Bondholders'
     Coalition:                Mr. Susheel Kirpalani, PHV
17                             Mr. Daniel Salinas, PHV
                               Mr. Eric Kay, PHV
18
     For Peter Hein:           Mr. Peter C. Hein, Pro Se
19
     For Mark Elliott:         Mr. Mark Elliott, Pro Se
20
     For Lawrence Dvores:      Mr. Lawrence B. Dvores, Pro Se
21
     For COFINA Agent:         Mr. Antonio Yanez, Jr. PHV
22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
1                          I N D E X

2    WITNESSES:                                        PAGE

3        The Declaration of Christina Pullo
             submitted into evidence.              146
4
         The Declaration of Natalie Jaresko
5            submitted into evidence.              146

6        The Declaration of David Brownstein
             submitted into evidence.              146
7
         The Declaration of Matthew Feldman
8            submitted into evidence.              146

9        The Declaration of Matthew Rodrigue
             submitted into evidence.              150
10
         The Declaration of Timothy Donahue
11           submitted into evidence.              191

12       The Declaration of Paul Konsig
             submitted into evidence.              192
13
         The Declaration of Mark Elliott
14           submitted into evidence.              192

15       The Declaration of Peter Hein
             submitted into evidence.              196
16
     MATTHEW RODRIGUE
17   Direct examination by Mr. Kirpalani           148
     Cross-examination by Mr. Eisenberg            149
18   Cross-examination by Mr. Elliott              166
     Redirect examination by Mr. Kirpalani         178
19   Recross-examination by Mr. Eisenberg          185
     Further examination by Mr. Kirpalani          188
20
     MARK ELLIOTT
21   Direct examination by Mr. Eisenberg           200
     Cross-examination by Mr. Kirpalani            206
22   Redirect examination by Mr. Eisenberg         211

23       MATTHEW RODRIGUE - Recalled as a witness
     Redirect examination by Mr. Kirpalani         212
24   Recross-examination by Mr. Eisenberg          213

25
```

```
1                    I N D E X (Continued)

2    EXHIBITS:                                   PAGE

3        Debtor's Exhibits B, C, D, E, K, L, M,
             N, O, P, V, W, X, Y, AA, BB, CC, MM,
4            NN, LL, OO, TT, UU, VV and ZZ          25

5    Exhibit CS One, CS Exhibit Two, and
         CS Exhibit Three                         149
6
     Exhibits - Documents 4793 and 4792           194
7
     Exhibit CS Four                              207
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                  San Juan, Puerto Rico

 2                                  January 16, 2019

 3                                  At or about 9:38 AM

 4                          *     *     *

 5          THE COURT:  Again, good morning.  Buenos dias.

 6   Welcome counsel, parties at interest, and members of the

 7   public and press here in San Juan, those observing here and in

 8   New York, and the telephonic participants.  As always, it is

 9   good to be back in Puerto Rico.

10          I remind everyone that consistent with court and

11   judicial conference policies and the Orders that have been

12   issued, there is to be no use of any electronic devices in the

13   courtroom to communicate with any person, source, or outside

14   repository of information, nor to record any part of the

15   proceedings.

16          Thus, all electronic devices must be turned off

17   unless you are using a particular device to take notes or to

18   refer to notes or documents that are already loaded on the

19   device.  All audible signals, including vibration features,

20   must be turned off.

21          No recording or retransmission of the hearing is

22   permitted by any person, including, but not limited to, the

23   parties or the press.  And anyone who is observed or otherwise

24   found to have been texting, e-mailing or otherwise

25   communicating with a device from a courtroom during the court
```

1   proceeding will be subject to sanctions, including, but not

2   limited to, confiscation of the device and denial of future

3   requests to bring devices into the courtroom.

4          Now, the motions that come before the Court today

5   address critical steps on the path to Puerto Rico's financial

6   recovery.  I have reviewed the thousands of pages of legal

7   submissions in support of and in opposition to these motions.

8   And I will hear further legal arguments and expect to receive

9   some additional evidence over the course of these two days of

10  hearings.

11         These motions present issues that are important not

12  only to the government entities, financiers, lawyers and

13  objectors directly involved in these proceedings, but also to

14  the hundreds of people from whom I have received letters,

15  e-mails, and messages expressing their concerns about Puerto

16  Rico, their own lives and financial situations, and the

17  proposals that are before the Court today.  From ordinary

18  citizens of Puerto Rico who are worried about the impact of

19  austerity measures on public services and the island's ability

20  to flourish in the future, to individuals who tell me that

21  they invested their entire retirement savings in either COFINA

22  or Commonwealth bonds and plead that they need to be paid in

23  full to survive, to financial investors on island and on the

24  mainland who want to receive the value that they believed they

25  bargained for.

1          The concerns expressed by those who have reached out

2    to the Court are wide ranging.  I have reviewed each of these

3    communications, and I confirm my receipt of them by posting

4    notices of correspondence on the case docket as promptly as

5    possible.  All of these concerns are significant and are

6    meaningful to the Court.  However, I can tell you right now

7    that there is no decision that can perfectly reconcile all of

8    these concerns.

9          There is, unfortunately, no decision that I can make

10   that would ensure that no interested party suffers pain.  The

11   reality of the situation is that there are contracts and legal

12   commitments, and legal disputes concerning those contracts and

13   commitments, that have to be addressed as part of PROMESA's

14   Title III process in order for Puerto Rico to move forward.

15         Congress has given the Oversight Board the authority

16   to negotiate agreements and proposed debt adjustment plans,

17   subject to particular legal requirements.  Today, the question

18   that the Court must consider is whether the agreement that has

19   been negotiated and the debt adjustment plan that COFINA has

20   proposed to the Court are compliant with the legal

21   requirements that have been established by Congress through

22   PROMESA.

23         Three motions are presented for my consideration

24   during this two-day hearing.  First, I am asked to consider a

25   proposed division of sales and use tax revenues, as between

1   COFINA and the Commonwealth.  The Commonwealth-COFINA dispute

2   about these taxes is the necessary starting point, because

3   even before these proceedings were filed, there were investors

4   on both sides arguing and suing COFINA and the Commonwealth

5   about the ownership of the sales and use tax.

6          The dispute must be resolved to establish what sales

7   and use tax resources are available to COFINA and what is

8   available to the Commonwealth.  If I approve the

9   Commonwealth-COFINA Settlement Agreement, the sales and use

10  tax will be divided between COFINA and the Commonwealth on the

11  terms specified in the proposed agreement.

12         After the presentation concerning the proposed

13  settlement of the issues raised in these ownership disputes, I

14  will consider COFINA's Proposed Plan of Adjustment.  That

15  Proposed Plan would determine how the portion of the sales and

16  use tax that COFINA will receive, if the proposed

17  Commonwealth-COFINA settlement is approved, will be used in

18  retiring the outstanding COFINA bonds and providing returns on

19  the new bonds.

20         Finally, I will address a dispute between the COFINA

21  Bond Trustee and certain bondholders over a particular

22  provision of the Proposed COFINA Plan.  It is important to

23  note that the motions on the agenda for this hearing do not

24  include any adjustment plan for the Commonwealth.  Such a plan

25  is not presented at this point.

1          Now, we will turn to some preliminary matters.  An

2     objection to the proposed time allocations in the Agenda was

3     filed last night by GMS Group and was joined by another

4     objector.  I'd like to start with -- well, then an Amended

5     Agenda was filed by the Oversight Board, but the amendments do

6     not appear to address the objection to the proposed time

7     allocation.

8          So I'd like to start with a couple questions to

9     counsel for the Oversight Board.  If counsel would come to the

10    podium.

11         MR. ROSEN:  Yes, Your Honor.

12         THE COURT:  Good morning.

13         MR. ROSEN:  Brian Rosen --

14         THE COURT:  I'm sorry.  Good morning, Mr. Rosen.

15         MR. ROSEN:  Good morning, Your Honor.

16         THE COURT:  So has the objection to the time

17    allocations been resolved?

18         MR. ROSEN:  Your Honor, we have not spoken with

19    counsel for GMS about that allocation.  I know that in their

20    informative motion, they suggested that they wanted to take

21    three hours for examination of Mr. Rodrigue.  We know that the

22    Court had allocated a much lesser time.  We're obviously --

23    whatever the Court would prefer to do is fine with us.  If you

24    think, based upon the way things are going, more time would be

25    appropriate, that would be fine with us as well, Your Honor.

1          THE COURT:  Well, under the Case Management Order and

2     under our practices, as you know, it is the Oversight Board

3     that is proactive --

4          MR. ROSEN:  Yes, Your Honor.

5          THE COURT:  -- in suggesting time allocations and in

6     preparing the Agenda.  And frankly, I had assumed that you had

7     consulted with the objectors in formulating the Agenda, and

8     so --

9          MR. ROSEN:  Your Honor.

10         THE COURT:  -- I'd be grateful -- yes.

11         MR. ROSEN:  I apologize for interrupting you.

12    Mr. Kirpalani is going to be putting on Mr. Rodrigue as a

13    direct examination witness.  I would like to confer with him

14    perhaps to find out what he thinks is appropriate for the

15    cross-examination.

16         THE COURT:  All right.  Another thing I'd like to put

17    out there is whether parties, and particularly the Oversight

18    Board, are prepared to stipulate to some or all of the factual

19    issues that the objectors claim are material and disputed,

20    because that -- if that's achievable, particularly in advance

21    of the COFINA Plan portion of the hearing, that could tighten

22    the time up.

23         Another possibility is completing the hearing in New

24    York in connection with the Omnibus Hearing.  I scheduled this

25    for two days.  I allocated two days a long time ago.

1          MR. ROSEN:  Your Honor, I think under any

2   circumstances, that two days is going to be more than

3   sufficient to accommodate all the matters which are on the

4   Agenda today.

5          THE COURT:  Well, I hope you're right.  I'm prepared

6   for you to be right, but I also need to make sure that issues

7   that truly are contested are presented to me in a way that is

8   fair, dignified and reasonable.

9          MR. ROSEN:  Absolutely, Your Honor.  And if you're

10  asking about stipulating to certain facts, are you asking

11  about the multitude of documents that were attached to some of

12  the declarations that the objectors filed?  Screenshots,

13  articles, things like that?

14         THE COURT:  It seems to me, from looking at the

15  filings, that there are certain kinds of portfolio objections,

16  I would call it, to --

17         MR. ROSEN:  Yes.

18         THE COURT:  -- certain types of evidence, certain

19  categories of evidence.  And there is another category of

20  matters as to which there is a dispute as to whether there's

21  relevance of the particular details that a party might want to

22  present or cross-examine another witness about.

23         And then I would imagine, from having read the

24  filings, that there are certain items as to which the

25  proponents might take the position that even if these issues

1    are true, they are not material to the outcome, and so the

2    proponents might choose not to contest those and thereby

3    obviate the need for some presentations or cross-examination

4    to move things along.

5           So those are issues that I would expect you to

6    explore in aid of --

7           MR. ROSEN:  Yes, Your Honor.  The last category

8    probably contains most of the documents that have been

9    attached to the various declarations.  They have no relevance

10   as far as we are concerned to the matters that are going to be

11   before the Court.  We will most likely not object to any of

12   their admissions, Your Honor, because they're just irrelevant

13   to what the issue is.  So we'll be fine with that.

14          With respect to the expert testimony that might be

15   offered, Your Honor, we will probably be addressing that

16   formally through the objections that have already been lodged

17   with the Court.  And Mr. Firestein, who's sitting with me at

18   counsel table, will be handling that aspect.

19          THE COURT:  All right.  Well, let's move on this way,

20   because Mr. Kirpalani's issues are with respect to the plan

21   hearing.

22          MR. ROSEN:  Yes, Your Honor.

23          THE COURT:  And so we need to start with the 9019

24   hearing.  And so are there any evidentiary or standing

25   objections with respect to 9019 evidentiary proffers that we

1    should address before the opening statement?

2         MR. ROSEN:  Your Honor, there have been no requests

3    for the proffering of any evidence by any objector to the 9019

4    motion.  The only evidence that is to be submitted was a

5    declaration by Ms. Jaresko and the exhibits, which are

6    appended to that declaration.

7         In accordance with your -- the Court's Order, no one

8    has submitted any cross-examination requests with respect to

9    Ms. Jaresko.  They have not included any factual issues to be

10   raised on a cross-examination, nor any exhibits to be proposed

11   as part of any cross-examination.

12        So as far as we are concerned, Your Honor, the only

13   evidence that is to be submitted in connection with the 9019

14   motion is the affirmative case of the Oversight Board and

15   COFINA through Ms. Jaresko and her exhibits.

16        THE COURT:  Is that PROSOL-UTIER's position as well?

17   Because the papers were not entirely clear on that.

18        MR. ROSEN:  You're right, Your Honor.  It was not

19   entirely clear.  There was a reservation, like several other

20   people, saying we reserved the right to do something, but no

21   one expressly complied with your Order with respect to setting

22   forth actual factual issues to cross-examine.

23        THE COURT:  All right.  Then let us proceed with the

24   debtor's opening statement as to the 9019 motion.

25        MR. ROSEN:  Thank you, Your Honor.

```
 1            Again, Your Honor, Brian Rosen from Proskauer Rose on
 2   behalf of the Oversight Board.  With me, Your Honor, as I
 3   mentioned, is Mr. Mike Firestein, Mr. Lary Rappaport, Jeff
 4   Levitan and Martin Bienenstock, and also Mr. Hermann Bauer
 5   from O'Neill Borges --
 6            THE COURT:  Good morning.
 7            MR. ROSEN:  -- who is our co-counsel on this matter.
 8            Your Honor, the principal speakers today as counsel
 9   will be myself and Mr. Firestein.  As I indicated, I'll be
10   doing a lot of the 9019 for sure, and Mr. Firestein will be
11   assisting with aspects associated with the Plan of Adjustment.
12            I'd also like to introduce, Your Honor, to the Court,
13   Ms. Natalie Jaresko, who is the director of the Oversight
14   Board.
15            THE COURT:  Good morning.
16            MR. ROSEN:  She will be a witness, Your Honor, with
17   respect to both matters which are on the Agenda today.
18            Also, Your Honor, Mr. Christian Sobrino is here in
19   the courtroom.
20            THE COURT:  Good morning.
21            MR. ROSEN:  He serves as the CEO of AAFAF, and he's
22   also the chairman of COFINA.
23            And Your Honor, I'd also like to note the presence in
24   the courtroom of Chief Judge Houser, who has served as our
25   mediation team leader throughout these cases, and as you will
```

1    hear, has been instrumental in what we are about to accomplish

2    today I hope.

3              THE COURT:  Good morning, Judge Houser.  And thank

4    you for working in the mediation capacity on these cases.

5              HONORABLE CHIEF JUDGE HOUSER OF THE UNITED STATES

6    BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS:  Good

7    morning, Judge.

8              MR. ROSEN:  Your Honor, with respect to the first two

9    items on the Agenda, the 9019 motion and the consideration of

10   the Plan of Adjustment, despite the magnitude and the

11   complexity of the issues, there are really only a few

12   objections by a few objectors.

13             And while there seems to be much paper, as you

14   noticed, that's been filed on this matter since January 2nd,

15   the paper actually has been generated by very few people.

16             And as acknowledged in the Interrogatories that were

17   submitted to the Court, they've been essentially generated by

18   five people working in concert with each other.  And they are

19   all, for the most part, junior holders of COFINA bonds.  But I

20   don't want to get ahead of myself, because that's going to be

21   our second item on the Agenda.

22             The first item, Your Honor, is the 9019 motion, and

23   that was filed -- and there are only four objections that are

24   pending.  As Your Honor notes, there was an objection that was

25   interposed by the Retiree Committee.

1          And as I announced to the Court on December 19th at

2     our Omnibus Hearing, the Retiree Committee, based upon an

3     understanding with the Oversight Board, agreed to withdraw

4     that objection.  And based upon the Court's request, that

5     formal notice of a withdrawal was filed, I believe, a week

6     ago.

7          There are remaining objections, Your Honor.  One is

8     by the -- a joint objection by the SEIU and the UAW, two

9     unions; another is by Mr. Lawrence Dvores; another by

10    PROSOL-UTIER; and then there was a joinder to those by

11    Federacion de Maestros.  And I apologize if I mispronounced

12    that.  They claim to represent the employees of the Department

13    of Education.

14         Likewise, Your Honor, Mr. Dvores, although I'm not

15    sure if it's technically an objection to this, although we do

16    note that he is an employee or former employee of GMS who is

17    one of the objectors on the Plan of Adjustment, he only filed

18    a letter, if you will, objecting to the adequacy of the

19    disclosure statement, but in a sentence there, he said he

20    opposed the settlement, also.

21         So we just included as a possibility that it is still

22    out there.  We have not heard from Mr. Dvores at all since

23    that, Your Honor.

24         So as far as we are concerned, Your Honor, there are

25    really only three objections from three groups of employee

1   groups here, and they're each concerned with -- and I don't

2   want to make light of this because it's very important and

3   it's what you noted already at the outset -- they are

4   concerned about funds available for the Commonwealth to meet

5   the needs of the Commonwealth citizenry, and specifically with

6   respect to their active and retired employees.

7           And I would like to say also for the record, Your

8   Honor, that the Oversight Board, COFINA, AAFAF and all the

9   governmental parties agree, we have a real concern for all of

10  those issues.  And it's based upon that that we're here today,

11  in support of a 9019 motion, which is going to provide

12  considerable amounts of funds for the benefit of the

13  Commonwealth, funds that they don't currently have an

14  entitlement to.

15          So what I'd like to do, Your Honor, is really just

16  move forward and understand what we're here to talk about with

17  respect to the 9019 motion and the Court's consideration of

18  it.  And I was very happy to hear at the outset your

19  understanding of how we got here.

20          And specifically, Your Honor, we got here because

21  there was a lot of litigation that actually predated the

22  commencement of the Title III cases.  It started with the Lex

23  Claims litigation, which is referred to in the documents, Your

24  Honor, where the plaintiffs in that proceeding challenged the

25  structure and the Constitutionality of COFINA itself.

1    There was a process, Your Honor, as you know, for

2    mediation on a pre-Title III basis through retired Bankruptcy

3    Judge Gropper.  And when that failed, Your Honor, and the

4    parties and the Commonwealth decided it was appropriate to

5    commence the Title III cases of both the Commonwealth and

6    COFINA, more litigation ensued.  Litigation ensued by Ambac

7    and Whitebox, and then ultimately through the litigation that

8    was commenced by Bank of New York Mellon in connection with

9    the interpleader action, and all of that screamed out to the

10   parties that we needed some form of resolution.

11   And because everybody realized, Your Honor, that the

12   only way to move forward in these cases and in connection with

13   the overall economic recovery of the Commonwealth, was a

14   resolution of the Commonwealth-COFINA dispute, and to

15   everyone's credit, Your Honor, the parties sat down and came

16   up with a stipulation that provided for procedures to move

17   forward with the resolution, negotiation, mediation, and

18   litigation of that dispute.

19   The stipulation appropriately appointed two agents,

20   the Commonwealth Agent, through the Unsecured Creditors

21   Committee, of which Mr. Despins is counsel; and the

22   appointment of a COFINA Agent, Ms. Bettina Whyte, to litigate

23   the issues, if necessary, and if not, to negotiate a

24   resolution of that.

25   And as the Court knows, in September of 2017,

1    litigation started.  It was not easy.  There were Complaints

2    filed.  There were Answers and Counterclaims filed.  There

3    were nine parties that intervened in the action.  There were

4    six Motions for Summary Judgment, Your Honor.

5          This Court heard oral argument of that, I believe it

6    was last April, and the Court took the matter under

7    advisement.  And it was following that, Your Honor, that the

8    parties got together again, through the mediation team led by

9    Judge Houser, and they negotiated a settlement that they

10   announced on June 7th, the agreement in principle.

11         And the agreement in principle did many, many things;

12   but as far as the Oversight Board was concerned, it did one

13   very critical thing.  It determined the split of the PSTBA,

14   the pledged sales taxes, the base amount of 53.65 percent for

15   COFINA and 46.35 percent for the Commonwealth.

16         Your Honor, as I indicated, the agreement in

17   principle did many things, but as far as the Oversight Board

18   was concerned, many of those things exceeded the scope of the

19   authority that was granted pursuant to the Stipulation and

20   Order.

21         But we didn't want to stop there, Your Honor, because

22   we thought it was a grand opportunity to move forward.  And

23   with the benefit of Judge Houser, Judge Ambro and Judge Atlas,

24   we conducted mediation with the parties to COFINA to develop

25   the securities that would be issued predicated upon the split

1    that COFINA was to receive as part of the Settlement Agreement

2    or the agreement in principle that had been reached by the two

3    agents.

4           And that process took two very, very long weeks, Your

5    Honor, and we were ultimately allowed or able to, on August

6    8th, announce the settlement for a negotiated agreement among

7    the parties.  Your Honor, that ultimately turned into what's

8    referred to as the Plan Support Agreement, and then the

9    Amended and Restated Plan Support Agreement.  But all of it

10   was predicated on the agreement in principle that had been

11   reached by the two agents, the Commonwealth agent and the

12   COFINA agent, without any input, Your Honor, whatsoever from

13   the Oversight Board.

14          We were not involved at all.  However, we took the

15   product that they presented to us and developed everything for

16   the COFINA Plan of Adjustment.

17          Your Honor, it's important for us, because as I said,

18   we believe that this settlement forms the foundation for the

19   overall recovery.  We believe that it provides recovery for

20   the Commonwealth, as I said, to which it is not currently

21   entitled.

22          If one were to look at the projections, or there was

23   actual results on an immediate basis that will provide in

24   excess of 350 million dollars to the Commonwealth on an annual

25   basis, and if that is true, Your Honor, that amount will grow

1    significantly over the lifetime of the bonds that are to be

2    issued pursuant to the COFINA Plan of Adjustment.

3           We believe the terms of the settlement, Your Honor,

4    that was ultimately negotiated between the Oversight Board and

5    the COFINA agent are fair and reasonable.  They are exactly

6    what was included in the agreement in principle.

7           And we believe that the evidence that will be

8    presented now, this morning, Your Honor, will establish that

9    it satisfies all of the requirements for Bankruptcy Rule 9019

10   to show that this falls way above the lowest range of

11   reasonableness for a compromise and settlement.

12          It eliminates -- the settlement eliminates the

13   inherent risks, delays, expense and uncertainty of further

14   protracted litigation, and what undoubtedly will be inevitable

15   appeals in the event that this Court were asked to rule on an

16   all or nothing basis for one side or the other.  It allows the

17   Commonwealth to move forward, knowing that it has access to

18   certain sales and use taxes, which had been in dispute.

19          Your Honor, I would like to point out that we can't

20   be swayed here by the unions that conflate the issues which

21   are before the Court today.  The unions are very much

22   interested in addressing the issues associated with the

23   Commonwealth Fiscal Plan and the Commonwealth Plan of

24   Adjustment.  And as the Court indicated at the outset, neither

25   of those matters are here before the Court today.

1      All that is before the Court, Your Honor, is approval

2  of a settlement pursuant to Bankruptcy Rule 9019, and the

3  satisfaction of the requirements there.

4      So with that, Your Honor, we are ready to move for

5  the admission of the Declaration of Ms. Jaresko.  Your Honor,

6  as I indicated, in accordance with the Court's Orders of

7  January 8th and January 11th, the Oversight Board submitted

8  the Declaration of Ms. Jaresko in support of the Bankruptcy

9  Rule 9019 motion.

10     At that time, Your Honor, and consistent with the

11  Court's Order, that was to be deemed the direct testimony of

12  Ms. Jaresko.  I have Ms. Jaresko in the courtroom today, as I

13  indicated, Your Honor, and I also have the original signed

14  declaration.

15     What was filed, Your Honor, was a conformed copy.

16  And if you would like, Your Honor, I can hand up to your clerk

17  the original version of that declaration.

18     THE COURT:  Yes, please.

19     MR. ROSEN:  Thank you.

20     THE COURT:  Thank you.

21     MR. ROSEN:  Your Honor -- I'm sorry.

22     THE COURT:  I have a question for you.  The motion

23  was brought on behalf of the Commonwealth, and the

24  argumentation is principally reasonableness from the

25  prospective of the Commonwealth.

1          The Proposed Order would, however, also authorize the

2   COFINA agent to enter into the Agreement and take actions that

3   are necessary or appropriate.  And so at what point would the

4   Court be presented with evidence for consideration as to

5   reasonableness of the settlement from COFINA's point of view,

6   and what's the predicate for the entry of the Order that

7   you've proposed?

8          MR. ROSEN:  Your Honor, absolutely fair question.

9   We've always viewed the settlement to be the foundation for

10  the COFINA Plan of Adjustment.  So to the extent that there

11  are any issues that have to be done in support of it on that

12  side of the ledger, it will be done presumably or interwoven

13  through the COFINA Plan of Adjustment presentation.

14         THE COURT:  All right.

15         MR. ROSEN:  Your Honor, at this time, what I'd like

16  to do is to move into evidence -- and as I said, I know that

17  the Court already deemed it to be the direct testimony, the

18  actual Jaresko Declaration.

19         I'd also like to move into evidence, Your Honor, the

20  exhibits which are referenced in the Jaresko Declaration in

21  support of the 9019 motion.  And if you would like, Your

22  Honor, I can just read off for the record which exhibits they

23  are, or I could hand up to the Court the list of what exhibits

24  they are.

25         THE COURT:  Let me ask what's best for our record.

1          COURTROOM DEPUTY:  The record, she has to have --

2          THE COURT:  So he has to read it.

3          COURTROOM DEPUTY:  I think he should, because of the

4    transcript.

5          THE COURT:  Yes.

6          So please read them off.

7          MR. ROSEN:  Okay, Your Honor.  Your Honor, rather

8    than being repetitive, each of these are preceded by a DX, a

9    Debtor's Exhibit.  So it would be B, DX-C, D, E, K, L, M, N,

10   O, P, V, as in Victor, W, X, Y, AA, BB, CC, MM, LL, OO, TT, as

11   in Tom, UU, VV and ZZ.

12         Your Honor, many of these documents are the pleadings

13   associated with the adversary proceeding themselves showing

14   the Court what the various positions are of the different

15   parties to the litigation, as well as the Settlement Agreement

16   itself that was executed by the Commonwealth -- excuse me, by

17   the Oversight Board and by the COFINA agent.

18         Your Honor, I would like to move for the admission of

19   the declaration and those exhibits.

20         THE COURT:  Are there any objections?

21         MR. FIRESTEIN:  May I have a moment, Your Honor?

22         THE COURT:  Yes.

23         MR. ROSEN:  I apologize.  I was corrected.  I did not

24   say NN, which should also be included.

25         THE COURT:  N, as in Nancy, N, as in Nancy?

26

```
 1              MR. ROSEN:  Yes, Your Honor.

 2              THE COURT:  All right.

 3              Seeing no objections, the proffered evidence is

 4    accepted into evidence.

 5              (At 10:07 AM, Debtor's Exhibits B, C, D, E, K, L, M,

 6    N, O, P, V, W, X, Y, AA, BB, CC, MM, NN, LL, OO, TT,

 7    UU, VV and ZZ admitted into evidence.)

 8              THE COURT:  And so the document number on the ECF

 9    system of the Jaresko Declaration is 4758, and the exhibits

10    attached thereto as enumerated by Mr. Rosen on the record --

11    which are part of which ECF filing?  Were they just attached

12    to 4758, or are you referring to the compilation for them?

13              MR. ROSEN:  They were annexed in an appendix to the

14    declaration, Your Honor.

15              THE COURT:  All right.  So they should be found under

16    the same number?

17              MR. ROSEN:  Yes, Your Honor.

18              THE COURT:  Very well, then.  Those are admitted in

19    evidence.

20              MR. ROSEN:  Thank you, Your Honor.

21              MR. FIRESTEIN:  Your Honor, I'm sorry.  They were

22    filed separately.  They were not attached to the declaration.

23    They were filed as an appendix.

24              THE COURT:  They were in the compilation?

25              MR. FIRESTEIN:  Yes.
```

1        THE COURT:  Is that 4759?

2        MR. FIRESTEIN:  We'll confirm that for you.

3        THE COURT:  Thank you.

4        COURTROOM DEPUTY:  I'm sorry, Your Honor.  The

5   appendix is 4759.

6        THE COURT:  So the compilation is 4759.

7        COURTROOM DEPUTY:  Well, there is a declaration of

8   Ms. Jaresko, which is 4758, and then the appendix of

9   consolidated exhibits is 4759.

10        THE COURT:  And then there were certain supplements

11   and corrections filed to 4759.

12        MR. ROSEN:  That's correct, Your Honor.

13        THE COURT:  So if any of the exhibits that were

14   mentioned were later supplemented or changed in those

15   subsequent filings, before we finish this portion of the

16   hearing, somebody give me those numbers so that I can recite

17   them on the record.

18        MR. FIRESTEIN:  Absolutely, Your Honor.

19        MR. ROSEN:  Thank you, Your Honor.  And I apologize

20   for the confusion.

21        THE COURT:  And thank you, Ms. Tacoronte.

22        So as you can all see, I am thoroughly familiar with

23   the record here.  I have studied it in advance of today's

24   proceedings.

25        MR. ROSEN:  Thank you, Your Honor.

1        And Your Honor, as I indicated here, as far as we

2   know, while there have been, in the informative motions, some

3   requests or reservations to cross-examine anyone who could be

4   a declarant, there is -- as far as we are aware, there's been

5   nothing expressly done in compliance with the Court's Order

6   with respect to the factual issues or any exhibits that would

7   be utilized in connection with cross-examination.

8        But as I indicated, Your Honor, Ms. Jaresko is here.

9   She is available for cross-examination if the Court would like

10  that, or if any other party would like to do that, Your

11  Honor.

12       THE COURT:  Is there any request to cross-examine

13  Ms. Jaresko?

14       The record will reflect that there are no indications

15  of such request.

16       MR. ROSEN:  Okay.  Your Honor, I think then, based

17  upon the Agenda, what we would be moving to now would be any

18  objector's direct testimony or the submission of any evidence

19  by any objector.

20       THE COURT:  Do any of the objectors, official

21  objectors, wish to present any evidence or declarations?

22       I see no requests.

23       MR. ROSEN:  Your Honor, I would like to point out one

24  other thing.  In connection with the Plan of Adjustment, it

25  was labeled as a Plan of Adjustment Statement in Support, was

1    the declaration of Mr. Matthew Feldman, who is counsel to the

2    COFINA agent.

3         I note it for the record, Your Honor, because in

4    reality, it is also a statement or a declaration in support of

5    the 9019 motion, because it goes to the compromise and

6    settlement itself.  As I had indicated before, Your Honor,

7    it's very helpful from the COFINA side, when we get to the

8    Plan of Adjustment, to have it there as well.  But to the

9    extent that the Court would want to consider that statement or

10   that declaration by Mr. Feldman as to the actions taken by the

11   COFINA agent, we would love for the Court to consider that as

12   well.

13        THE COURT:  Well, since that Affidavit does provide,

14   in evidentiary form, confirmation that the COFINA agent

15   negotiated as an adversarial party to the Oversight Board in

16   connection with the development of this proposal based on the

17   original Agreement in Principle, I had expected that that

18   would be tendered as evidence in connection with the 9019 as

19   well.  And so are you doing that now?

20        MR. ROSEN:  We would do that, Your Honor.  I do not

21   have the original of that.  I don't know where Mr. Minias is,

22   but I do not have the original of that.  But, Your Honor, that

23   was submitted as the direct testimony.  We would appreciate if

24   that would be included in the record on the 9019 motion as

25   well.

1            THE COURT:  Does someone have the -- I haven't

2    memorized the document number on that one.

3            MR. ROSEN:  Your Honor, I can get it.  I have it.

4            MR. SALINAS:  4656.

5            MR. ROSEN:  Thank you.  4656.

6            Your Honor, we would also then want to move it in as

7    an exhibit.  It would be the last letter that we could ever

8    come up with, Your Honor, DX --

9            THE COURT:  So are you giving exhibit designations by

10   letters to the declarations or are we --

11           MR. ROSEN:  We did not, Your Honor, but if the Court

12   will do it -- either way.  Whatever is easiest for the Court.

13   If you'd like it as an exhibit, we could designate

14   Ms. Jaresko's as an exhibit as well.  Otherwise, I don't think

15   that's necessary based upon the Court's Order to be

16   admitted.

17           THE COURT:  I think referring to them on the record

18   by the ECF number will be the most efficient thing to do and

19   make them easiest to find.

20           So exhibit -- document number 4656, which is the

21   Declaration of Mr. Feldman, has been tendered as direct

22   evidence.  Is there any objection to the admission of that?

23           Seeing none, the Feldman Exhibit -- I'm sorry, the

24   Feldman Declaration is admitted in evidence.

25           Now, I am told that Mr. Dvores, who is in New York,

1    wished to be heard.  And so let's switch to New York.

2              Good morning, Mr. Dvores.

3              MR. DVORES:  Good morning, Your Honor.

4              THE COURT:  Good morning.  Did you wish to offer

5    evidence at this point?

6              MR. DVORES:  Well, I'm here at this point because I

7    believe Mr. Rosen has made a misstatement regarding my

8    objection, and he's put me on the agenda as an objector to the

9    9019 motion.

10             I have appeared or filed two objections in this

11   matter, so maybe that's why Mr. Rosen only put me on the

12   schedule for objection to the 9019 motion.

13             I filed an objection in November to the November 20

14   hearing on the disclosure statement and its adequacy of

15   information to the bondholders.  I was overruled on that

16   objection by Your Honor.

17             I continue to believe that my objection has merit

18   because of the fact that even though Mr. Rosen had amended the

19   disclosure filing, that disclosure filing amendment took place

20   only very shortly before the hearing, and it was never sent to

21   the bondholders in time for them to be informed of the

22   amendment and make an objection that was timely at that point

23   in time.

24             Beyond that --

25             THE COURT:  And so, Mr. Dvores, are you saying that

1    you would like to be recognized and heard as an objector to

2    the COFINA Plan Confirmation Motion?

3            MR. DVORES:  Yes.  Exactly.

4            THE COURT:  And it looks like Mr. Rosen is agreeable

5    to that.

6            MR. ROSEN:  Yes, Your Honor.  We only mentioned

7    Mr. Dvores because, as I said, there was a line in his

8    disclosure statement objection which referenced the

9    settlement.  We acknowledge that he is also opposed to the

10   Plan of Adjustment and has filed an objection.

11           THE COURT:  And so you did not mean to exclude him

12   from the list of recognized objectors to the COFINA Plan

13   Confirmation Motion?

14           MR. ROSEN:  Not at all, Your Honor.  We include him

15   there.

16           THE COURT:  And so, Mr. Dvores, I would then plan to

17   call on you to make your statements of objection to the COFINA

18   Plan at the time when we take up the COFINA Plan Confirmation

19   Motion.  And I apologize for any confusion that my proceeding

20   with the printed Agenda for the 9019 may have caused.

21           MR. DVORES:  Thank you.

22           And for the record, my objection on the Plan of

23   Adjustment is document number 4316.  Thank you.

24           THE COURT:  And so if that is not in the list in the

25   Amended Agenda --

```
1          MR. ROSEN:  It is.

2          THE COURT:  It is?

3          MR. ROSEN:  I believe it is, Your Honor.  I will tell

4    you in a second.

5          THE COURT:  Well, if it isn't, file a further

6    amendment that reflects it so that the record is clear.  All

7    right?

8          MR. ROSEN:  Yes, Your Honor.  As I said, we just

9    wanted to give Mr. Dvores the opportunity to speak on this

10   matter as well if he so desired.

11         THE COURT:  Very well.  Thank you both for clearing

12   that up.

13         I'm sorry.  Mr. Dvores is walking back.  Yes?

14         MR. DVORES:  My anxiety as a result of the way I was

15   listed in the Agenda by Mr. Rosen and his statement that he

16   had not received my objection on the Plan of Adjustment, I did

17   neglect to state that on this 990 -- 9019 motion, where you

18   are going to decide a dispute between COFINA and the

19   Commonwealth, that dispute, as it is decided, will very much

20   impact the junior bondholders in terms of how much money is

21   then available for their so-called settlement.

22         So it is a matter of concern to all junior

23   bondholders as to the way in which that decision is made, that

24   basically denies the --

25         THE COURT:  So, Mr. Dvores, the reasonableness of
```

1   that settlement from the perspective of COFINA will be a

2   proper subject of the hearing on the Motion to Confirm the

3   COFINA Plan, because the settlement is incorporated into the

4   COFINA Plan.

5          And Mr. Rosen has confirmed that he is not asking me

6   to rule on approval of the 9019 motion until after I have

7   heard argument about whether it is reasonable from the COFINA

8   point of view, as well as from the Commonwealth point of view.

9   But this segment that we're calling the 9019 motion segment is

10  addressing whether the settlement is reasonable from the

11  Commonwealth's point of view.

12         It's a little complicated structurally, but my bottom

13  line message to you is that --

14         MR. DVORES:  I understand now.

15         THE COURT:  -- you can make that argument in

16  connection with the COFINA Plan.

17         MR. DVORES:  Thank you.

18         THE COURT:  Thank you.

19         MR. ROSEN:  Your Honor, I just would like to note

20  that reflected on the Agenda as item M on page six is the

21  objection of Mr. Dvores to the COFINA Plan of Adjustment.

22         THE COURT:  Thank you.  All right.

23         So now I think you are -- so you've moved in your

24  direct testimony of Ms. Jaresko and Mr. Feldman.  There have

25  been no requests to cross-examine them.  There has been no

1    tender of evidence by the objectors.

2           And so are we then ready to move to the objectors'

3    statements on the 9019?

4           MR. ROSEN:  Yes, Your Honor.

5           MR. FIRESTEIN:  Good morning, Your Honor.  Michael

6    Firestein of Proskauer Rose on behalf of the Oversight Board.

7           I just want to address one quick point.  Your Honor

8    noted earlier that to the extent that there were additions,

9    supplements or corrections to the exhibits to Ms. Jaresko's

10   Declaration that were reflected in ECF, that we should bring

11   those to the Court's attention so that they can be included as

12   part of the record for this particular portion of the

13   proceeding.

14          THE COURT:  Yes.

15          MR. FIRESTEIN:  My colleagues have looked and do not

16   believe that there were any additions or corrections or

17   supplements to the 9019 submission or the exhibits thereto.  I

18   don't know, and I'm hesitant to inquire of the Court, but

19   nonetheless, I don't know if the Court had anything particular

20   in mind relative to that because if there is, we'll redouble

21   our efforts.  But our current understanding is that there were

22   no supplements or corrections to that declaration.

23          THE COURT:  Frankly, I stopped filling out my score

24   card on those after the one that was QQQ and ZZ, and then I

25   saw that there were more.  So I don't have anything in

1    particular in mind, I just know that there were a number of

2    filings.

3            MR. FIRESTEIN:  Our current state of knowledge, Your

4    Honor, and consistent with what the Court's observations are,

5    is that we don't have any either.

6            THE COURT:  Thank you.

7            MR. FIRESTEIN:  Thank you very much.

8            THE COURT:  And so counsel for PROSOL-UTIER?

9            MR. DECHIARA:  No, your Honor.  Peter DeChiara from

10   the law firm of Cohen, Weiss and Simon, LLP, for the United

11   Auto Workers Union and the Service Employees International

12   Union.

13           THE COURT:  I apologize.

14           MR. DECHIARA:  We object to the settlement because it

15   is not in the best interest of the Commonwealth.  This is a

16   settlement that Puerto Rico simply can't afford.  The deal

17   gives too much to COFINA and leaves too little tax revenue to

18   meet the critical needs of Puerto Rico's people.

19           The settlement leaves in tact too much of the

20   staggering amount of bond debt that is dragging down the

21   island.  Insufficient restructuring of Puerto Rico's debt

22   raises the specter of a future round of reorganization.

23           Greece is a cautionary tale.  With a toxic

24   combination of austerity and anemic growth, Greece defaulted

25   on its new debt just years after its restructuring.

1          The Oversight Board concedes that for purposes of

2     debt sustainability analysis, the United States, the states of

3     the mainland, are the appropriate comparators.  Given Puerto

4     Rico's deep and widespread poverty, its fragile and inadequate

5     infrastructure and its feeble economic growth, the

6     Commonwealth, to have any meaningful chance at a fresh start,

7     should emerge from these Title III proceedings with less of a

8     debt load than the average U.S. state.  Certainly it should

9     not emerge with more of a debt load than the average U.S.

10    state.

11         Giving Puerto Rico a debt to revenue ratio no higher

12    than the average U.S. state would require reducing that ratio

13    for Puerto Rico by 84 percent from the current 28 percent,

14    which it is now, to 4.5 percent, which is the U.S. mainland

15    average.

16         And by the way, Your Honor, that's using entirely the

17    Oversight Board's numbers.  The numbers from the latest

18    certified fiscal plan.

19         That would leave the Commonwealth with an annual debt

20    capacity of approximately 450 million dollars.  This

21    settlement would require payment to the COFINA bondholders in

22    2019 of 420 million dollars.  Meaning nearly all of the

23    Commonwealth's debt capacity in 2019 would go to paying the

24    COFINA bondholders.

25         And the burden of this deal would become worse over

1    time, because the COFINA payments increase each year by four

2    percent until reaching almost a billion dollars a year.  The

3    required payments to COFINA would far outpace the projected

4    growth of the Puerto Rican economy and the projected growth of

5    Puerto Rico's tax revenues.

6         The payments to COFINA would divert funds that Puerto

7    Rico desperately needs to rebuild this economy and meet the

8    needs of its people.  Of course, COFINA represents only a

9    portion of Puerto Rico's total bond debt.

10        This settlement recklessly allows an overly generous

11   settlement for the COFINA bondholders without accounting for

12   the need to satisfy the claims of other bondholders.  In

13   neither its initial motion, nor in its reply papers, nor in

14   its presentation here today does the Oversight Board offer any

15   expert economic or financial analysis showing that the

16   Commonwealth can afford this deal.

17        And I would point out, it is the Oversight Board's

18   burden, it bears the burden of proving that this deal is

19   acceptable and that it is in the best interest of the

20   Commonwealth.

21        The settlement must also be considered in the context

22   of the Oversight Board's latest certified fiscal plan, which

23   calls for extensive and painful austerity measures, under

24   which schools will be shuttered, government agencies merged or

25   closed, subsidies to cities and to the University of Puerto

1    Rico slashed, public sector worker payrolls frozen and their

2    debts rolled back.

3         These austerity measures will deepen, not ease the

4    Commonwealth's economic malaise.  But even assuming that they

5    would help, the fiscal plan itself still projects that

6    before -- that with these measures and before the payment of

7    any debt service, the Commonwealth will fall back into

8    structural deficits, will fall back into the red in the coming

9    years.  That's the Oversight Board's projection under their

10   assumptions and their numbers.

11        Given that, imposing this unaffordable settlement on

12   the Commonwealth only heightens the risk of another

13   restructuring in the years to come.  This settlement requires

14   that first dollars from the sales and tax revenues go to

15   COFINA and that payments continue through 2058.

16        If a future economic calamity causes the revenues to

17   drop, and it's hard to imagine that over the course of the

18   next four decades, there won't be at least one economic

19   calamity to strike the island, if that happens, COFINA still

20   gets its money, even if the Commonwealth doesn't.

21        In other words, the deal shields the COFINA

22   bondholders from the risk of the island's economic

23   underperformance and places that risk squarely on the

24   Commonwealth.  How is that in the best interest of the

25   Commonwealth?

1          The Commonwealth's payment could stretch even beyond

2     2058, because the settlement requires the Commonwealth to make

3     up any missed payments with interest.  If another natural

4     disaster strikes Puerto Rico, or even a deep recession, any

5     time over the next 40 years, the Commonwealth remains on the

6     hook to make the payments required in the settlement, plus

7     interest.  The children of today's Puerto Ricans, possibly

8     their grandchildren, would bear the burden of this settlement.

9          And by the way, Puerto Ricans are already paying the

10    highest sales tax in America.  Of course, what will happen is

11    many of these Puerto Ricans won't stick around.  As so many

12    already have, they will move to the mainland, making the

13    burden even heavier on those who remain.

14         The gist of the Oversight Board's argument, indeed

15    basically its only argument, is that settling made sense

16    because the Commonwealth might have lost the litigation.  And

17    we get that.  Settlements often make sense, but not, as here,

18    where the settlement is unaffordable.

19         The Oversight Board in its brief cites a case for the

20    proposition that, quote, half a loaf is sometimes better than

21    none, end quote.  And that's sometimes true, except when you

22    can't survive on the half loaf.

23         THE COURT:  And in that case, exposing the

24    Commonwealth to the risk of no loaf at all is something that's

25    a better outcome or within the range of reasonable outcomes?

1          MR. DECHIARA:  Well, Your Honor, settling for

2    something that the Commonwealth can't afford, for the reasons

3    I said, is not acceptable.  But I don't think it would ever,

4    in reality, come to an end result litigation where the

5    Commonwealth ends up with a zero loss.

6          In the real world, what would happen is if Your Honor

7    issued a decision along the lines that I'm suggesting, that

8    this settlement does not cut enough of the COFINA debt, what

9    would really happen in the real world is the very intelligent

10   people surrounding me in this courtroom would very quickly get

11   together and strike a new deal along the terms that your

12   decision would suggest, and so that risk would never come

13   about.

14         It's true that the Commonwealth supports this

15   settlement, but the Commonwealth supported the issuance of all

16   the debt that over the years led to the present debt crisis.

17   The Court cannot rely on the decisions of the Commonwealth,

18   the Commonwealth's leadership, to guide its determination

19   here.

20         Congress enacted PROMESA to give Puerto Rico a

21   meaningful fresh start, after the island's leaders repeatedly

22   entered debt obligations that Puerto Rico could not afford.

23   The Court should not allow the same mistake to be repeated

24   here.

25         Your Honor, I'd just like to take a minute to address

1    a couple things that counsel said -- for the Oversight Board

2    said here today.  He pointed out that there were very few

3    formal objections.

4         First of all, as Your Honor knows, the standard is

5    not one of counting heads, how many people stand up and

6    object.  But even if it were, as Your Honor knows from the

7    letters and e-mails she's gotten, there is an immense amount

8    of opposition to this settlement among the people who really

9    count.

10        I don't know if Your Honor noticed outside the

11   courtroom today, but there were lots and lots of people out

12   there making a lot of noise in opposition to this

13   settlement.

14        THE COURT:  Yes.  I am aware that a number of people

15   have come out to show themselves and protest today.

16        MR. DECHIARA:  And while the professionals here, the

17   members of the Oversight Board, after this case is done, will

18   go on to the next assignment or go back to their pre-PROMESA

19   lives, it's the people of Puerto Rico, like the members of the

20   UAW and the SEIU, who work every day to make the Commonwealth

21   run, they're the ones whose votes -- not whose votes, I'm

22   sorry, whose voice counts.  And they are the ones who are very

23   strongly protesting this settlement.

24        Another point that counsel for the Oversight Board

25   made was that this settlement helps avoid the cost, the

1    complexity, the delay involved in litigation of the

2    Commonwealth-COFINA dispute.  But if there were insufficient

3    restructuring of the Commonwealth debt as a result of this

4    Title III and there had to be another round of restructuring

5    in the years to come, the complexity, the cost, the delay

6    caused by that second round, that so-called Title VI, would

7    dwarf the cost and complexity of this litigation.

8         And finally, there was a question, or counsel made

9    the point that the unions are just focusing on the interests

10   of the Commonwealth here.  Well, certainly, we are.  The

11   motion was made on behalf of the Commonwealth.  The unions are

12   creditors of the Commonwealth.  And one of the tests that this

13   Court must look at, in addition to the reasonableness test, is

14   whether this settlement is in the best interest of the estate

15   of the debtor, and that is the Commonwealth.

16        Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. DeChiara.

18        Yes, sir.

19        MR. EMMANUELLI JIMENEZ:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. EMMANUELLI JIMENEZ:  May I please, the Court.

22        THE COURT:  Yes.

23        MR. EMMANUELLI JIMENEZ:  I'm here with --

24        THE COURT:  Would you introduce yourself, please?

25        MR. EMMANUELLI JIMENEZ:  Yes.  Thank you.  My name is

1  Rolando Emmanuelli Jimenez.  I represent PROSOL-UTIER and

2  Asociacion de Maestros de Puerto Rico.

3          THE COURT:  Good morning.

4          MR. EMMANUELLI JIMENEZ:  With me is my partner,

5  Jessica Mendez; and Mr. Angel Figueroa Jaramillo, president of

6  UTIER; and Mr. Edwin Morales, vice president of Federacion de

7  Maestros.

8          THE COURT:  Good morning to you all.  Thank you for

9  being here.

10          MR. EMMANUELLI JIMENEZ:  PROSOL-UTIER is UTIER'S

11  public solidarity program with other public service workers.

12  PROSOL-UTIER'S purpose is to carry and promote UTIER's values

13  in advocating for workers' rights through collective

14  bargaining for workers in the Commonwealth of Puerto Rico,

15  other than PREPA.

16          It is composed of five chapters.  This accounts for a

17  total of approximately 827 members that are employees of the

18  Commonwealth of Puerto Rico, its instrumentalities or

19  retirees.  They are currently affected by the funds

20  determinations in the Title III proceedings.

21          PROSOL-UTIER members are also participants of the

22  Employees Retirement System of the Commonwealth, subject to

23  the pension reform according to the new fiscal plan.  Thus,

24  the appearing labor unions and retirees are parties in

25  interest and creditors of the Commonwealth that will be

1    severely affected in decades to come by the approval of the

2    proposed settlement and the Plan of Adjustment of COFINA.

3         Ms. Jaresko's declaration that is already submitted

4    in evidence stated in page five that the Settlement Agreement

5    is a necessary component for the Commonwealth to maximize

6    recoveries for its stakeholders.  Therefore, Your Honor, my

7    clients, PROSOL-UTIER Federacion, have standing to appear and

8    oppose these Rule 9019 settlement proposal.

9         THE COURT:  My understanding is that the Oversight

10   Board has not objected to PROSOL-UTIER's standing to contest

11   the 9019 motion, which is from the perspective of the

12   Commonwealth, but they do take the position that there is no

13   standing to contest the COFINA Plan confirmation proposal.

14        So it was my expectation that I would hear argument

15   on that standing issue in connection with the second motion.

16        MR. EMMANUELLI JIMENEZ:  No problem, Your Honor.  I

17   am advancing this issue, because it is important also for our

18   position here.

19        Well, parties seek Court approval of settlements

20   among -- Rule 9019, among other things, to prevent the making

21   of concealed agreements which are unknown to the creditors and

22   unevaluated by the Court.

23        The Court's objective review protects other creditors

24   against bad deals made between one creditor and the debtor and

25   ensures transparency.  Also, this procedure ensures that

1  creditors are given notice of the proposed settlement and

2  provides them with an opportunity to object.  The proposing of

3  a settlement in an organization's proceedings bears the burden

4  of demonstrating that it is in the best interest of the state.

5       In deciding whether the movant has met its burden,

6  the Court must exercise independent judgment.  The Court may

7  not act as a mere rubber stamp or rely on the Trustee or the

8  Board that the compromise is reasonable.  In exercising its

9  independent judgment, the Court is free to consider any

10  factors relevant to a full and fair assessment of the wisdom

11  of the compromise.

12       In the motion seeking approval of the form

13  settlement, the Oversight Board asserts that the settlement is

14  fair and reasonable.  For instance, it is just a line in

15  Jaresko's Declaration that it states that.  However, the

16  motion and the declaration of Mrs. Jaresko that's prepared to

17  support, it contains no analysis showing that the Commonwealth

18  can afford the anticipated new COFINA debt, neither the

19  sustainability of the revenues that would be received by the

20  Commonwealth.

21       Moreover, there is no evaluation of the detrimental

22  effect of the reduction of the revenues required by the

23  Commonwealth to cover for essential services and pensions, nor

24  the injurious effects on the appearing of similar parties and

25  the people of Puerto Rico.

1          There is no evidence in the declaration of

2     calculations, scientific evaluation or applied economic models

3     to demonstrate the reasonability of the settlement, much less

4     any foundation, economic evidence for that conclusion.

5     Ms. Jaresko's declaration is a mere recitation of procedural

6     and legal facts that do not address the real issues of a

7     governmental entity under a bankruptcy proceeding similar to

8     Chapter Nine.

9          Even accepting as true all the facts stated in

10    Mrs. Jaresko's direct declaration, they are not sufficient to

11    surpass the threshold necessary to determine that this is not

12    a bad deal for the Commonwealth and the people of Puerto Rico.

13         Therefore, Mrs. Jaresko's statements are baseless and

14    without any evidentiary value.  This side-stepping the

15    fundamental fiduciary and legal duty of the fund to protect

16    essential services and avoid damaging consequences, of

17    increasing the suffering of the people of Puerto Rico by

18    intensifying the austerity measures already in place or

19    projected in order to comply with the unpayable agreement that

20    is just a portion of an unbearable debt.

21         From now on, Your Honor, I join the statements of

22    Mr. DeChiara, because are almost the same.  And I would like

23    to finish saying that the COFINA settlement is very bad.  Very

24    bad deal for Puerto Rico.

25         This Court should reject the proposed settlement

1    because it gives too much to COFINA and leaves too little tax

2    revenue to meet debt obligations, funding for essential

3    services and pension payments that are critical for the people

4    of Puerto Rico.

5         Thank you.

6         THE COURT:  Thank you.  We have now come to the

7    segment of the motion hearing that I have set aside for

8    comments by members of the public who have made requests to

9    speak in connection with these proceedings and who were chosen

10   by a random process to speak.

11        I have to say that I did not anticipate that this

12   portion of the hearing would go so quickly, so they may not

13   all be here right now.  I advised them that they were unlikely

14   to be called before one o'clock.

15        So two people are here now.  All right.  So I will

16   call on the first two people who are here now, and then at --

17   well, I can just call the names and if they're here, they're

18   here.

19        COURTROOM DEPUTY:  I'm sorry, Your Honor.  Yes.

20        THE COURT:  So I will hear from those that are here

21   now, and then right after the lunch break, at one o'clock,

22   we'll hear any further of the public speakers who arrive

23   later.  And we'll hold the record on this open for that.

24        So before I call you up, I will also just explain

25   that each speaker is being allocated five minutes to address

1    the Court.  I apologize for the short time limit, but that's

2    important so that we can cover everything in these hearings

3    that we need to cover.

4            There is an electronic timer on the podium which has

5    green, yellow and red lights.  And so the yellow light will go

6    on when there's a minute and a half remaining to remind you

7    that you should start concluding your remarks.  And I will

8    also keep an eye on it and indicate when time is short.

9            So with that, I am -- hold on a moment.

10   Ms. Tacoronte?

11           COURTROOM DEPUTY:  Yes, ma'am.

12           THE COURT:  Can you move the counter part of the

13   light where I can see it, please?

14           COURTROOM DEPUTY:  The counter part?

15           THE COURT:  Yeah.  The part that you have that

16   shows --

17           COURTROOM DEPUTY:  That I have?

18           THE COURT:  You have.  Okay.  All right.  So I can

19   look at it from that side.  I needed to make sure that I could

20   see.

21           And so first, is Mr. Victor Gonzalez here?

22           COURTROOM DEPUTY:  Yes, Your Honor.  He just went to

23   the restroom.  Sorry.

24           THE COURT:  All right.  So when he --

25           COURTROOM DEPUTY:  Here he is.

1              THE COURT:  Mr. Victor -- Mr. Gonzalez?

2              MR. GONZALEZ:  Yes.

3              THE COURT:  So Mr. Gonzalez, we've reached the time

4     for you to make your remarks as a member of the public.  You

5     are allocated five minutes.  And as I explained, there are

6     lights that will be going on on the podium, a green light, a

7     yellow light and a red light.  I'll also be keeping track of

8     them.

9              The yellow light means you have a minute and a half

10    left.  The red light will mean the five-minute mark, and so --

11    but I will remind you so you don't have to worry about staring

12    at those.

13             And I want to thank you for coming to court today to

14    share your views publicly.  You may begin.

15             MR. GONZALEZ:  Good morning.  My name is Victor

16    Gonzalez, and I will address three subjects:  The sales and

17    use tax, the Proposed Settlement, and the Oversight Board.

18    The sales and use tax was predicated as a simpler, more

19    efficient and more fair tax than the excise tax of 6.6 percent

20    on goods that it replaced.

21             In fiscal year 2007, it collected 1.1 billion

22    dollars, of which 229 million dollars went to COFINA.  The

23    sales and use tax collection per inhabitant was 304 dollars.

24    The sales and use tax was a success.  More collected, less is

25    spent collecting, less circumventing.

1          Last fiscal year, 2017, it collected 2.5 billion

2     dollars, of which 753 million dollars went to COFINA.  The

3     sales and use tax per person went up to 777 dollars.  In 2017,

4     government taxes took 38 percent of the average household

5     income, a percentage that will continue to grow as the number

6     of households continues to shrink.

7          The projection for 2023 is 3.1 billion dollars in

8     collection, of which 491 million dollars will go to this

9     settlement.  By 2023, the sales and use tax per person will go

10    up to 1,061 dollars.

11         What will the government do with the remaining 2.6

12    billion dollars?  Can a shrinking household base continue

13    allocating such a large percentage of their income to the

14    government?

15         This Court will decide the reasonableness of the

16    proposed settlement on whether it is fair and equitable.  Is

17    the proponent's claim that the resolution of this dispute will

18    determine what tax revenues will be available to the

19    Commonwealth to address essential services disingenuous?

20         Is the end game access to capital markets to borrow

21    more and spend more?  Did bankers, lawyers, consultants,

22    underwriters, financial advisors, brokers play no part in this

23    disaster?  Is their penalty another go at the cookie jar?  Is

24    ay bendito the only one taking the blame?

25         Three years after its onset, the Oversight Board

1   claims that with this watershed settlement, it is resolving an

2   overarching and gating issue, key to Puerto Rico's

3   restructuring.

4        Is the Oversight Board correct in the assertion that

5   the failure to resolve results in significant delay, cost and

6   uncertainty to all of Puerto Rico stakeholders?

7        Is the assumption that a stimulus from disaster

8   funds, the structural and physical reforms to the Puerto Rico

9   economy, and improvement in tax collection methods will

10   maintain a robust amount of personal consumption in the

11   Commonwealth also correct?

12        While the Oversight Board is asking creditors,

13   bondholders and pensioners for a haircut on the 74 billion

14   dollars in aggregate Puerto Rico funded debt and the over 30

15   billion dollars of unfunded government pensions, the

16   Commonwealth continues to postpone the structural, labor,

17   energy and fiscal reforms needed.

18        Today, starting a business, getting a permit, dealing

19   with the countless state agencies, government-owned

20   corporations and the 77 municipal subdivisions is a struggle.

21   High taxes, fees and rates take a toll on the population.

22        THE COURT:  Mr. Gonzalez, you're coming toward the

23   end of your time.

24        MR. GONZALEZ:  Yes.  Just one more statement.

25        THE COURT:  Thank you.

1          MR. GONZALEZ:  Should the future of Puerto Rico be

2     mortgaged with a debt burden created by the insatiable, highly

3     bureaucratic, unpredictable and, in many cases, biased

4     apparatus that engaged in reckless borrowing with impunity?

5          The Oversight Board has failed in its mandate.  It is

6     a day late and a dollar long.  Its cavalier attitude, its

7     wishy-washy stand, its divide-and-concur strategy, its

8     backroom approach to negotiations have served no purpose.  Ay

9     bendito will again take the blame.

10         I thank the Court for their work, also Judge Houser

11    for her mediation, and for allowing me to express my view.

12    God bless you.

13         THE COURT:  And you.  Thank you, Mr. Gonzalez.

14         The next speaker is Mr. Miguel David, or David, who

15    will also be speaking in English.

16         MR. DAVID:  Yes.  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. DAVID:  Despite recognizing the magnitude of all

19    the negotiations that started way long before the Act III and

20    the creation of the Board, doing the negotiations of COFINA, I

21    understand, is irresponsible because before we can negotiate

22    the COFINA bonds, you need to recognize all the constitutional

23    debts that the island has acquired prior to that.

24         There is a list of things that I understand the

25    island should do prior to coming to a conclusion to these

1   negotiations.  The first and foremost is audit its financial

2   statements for the years 2016, 2017 and 2018, which are

3   currently not available.

4         In addition to that, a responsible fiscal plan needs

5   to be submitted by the Board, which includes predicted

6   population growth or decrease in the next 40 years, or for the

7   length of the fiscal plan.  The reduction of income to Puerto

8   Rico, especially revenue coming from pensions -- as you know,

9   something that's going on in the U.S., as well as here, on the

10  mainland, is that you have less revenue pensions for retirees

11  on both corporate and public.

12        Most companies are getting rid of their pension

13  plans, period, and just going with 401(k)s.  Meaning that in

14  the long term of these next 30, 40 years, it is plausible to

15  see that retirees will have less disposable income.  And that

16  should be taken into account as part of the fiscal plan.

17        The depreciation of assets, all depreciation of

18  assets.  I looked over previous fiscal statements for the

19  island.  What I was able to find was the fiscal statement for

20  2013, starting from 2012 to 2013 -- there's a drafted

21  financial statement for 2013, going to 2014, June 30th of

22  these years.  And I was able to find another financial

23  statement ending 2015, from 2014 to 2015.

24        With austerity measures, there's a gap of -- or an

25  increase of debt of over 25 billion dollars.  That's with

1    austerity measures already established by the island.  So

2    given that trend, it makes it very implausible that any

3    austerity measures that they'll be taking at this point in

4    time and moving forward will be realistic at reducing the

5    debt.

6          Other things that need to be taken into consideration

7    is negotiation of constitutional debts.  I believe I already

8    mentioned that prior.  The evaluation of COFINA bonds that

9    are actually legal and are admitted for the -- basically,

10   there's an act, a corporate act of 1940, which means that any

11   bonds sold in the U.S. mainland need to obey by that act, and

12   some specifically, the Oppenheimer or Maryland Fund was

13   deceiving, where actually 50 percent of the bonds were mostly

14   of Puerto Rico, deceiving investors.  So the legality of some

15   of these bonds needs to be asserted as far as the 1940

16   corporate act.

17         Also, one interesting notion that I -- or point that

18   I found in evaluating some of the financial statements was

19   that I found that in the financial statements of 2013, there

20   was an adjustment done by the federal government of 178

21   million dollars of money owed to the Army Corps of Engineers

22   of a total debt of 568 million dollars.

23         That raises the question of how much debt does the

24   island have that it has not accounted for, for projects that

25   it has committed to, for co-funding with the federal

1    government of which the federal government may come after it

2    later on in the coming years.

3         All those extraordinary debts, basically, the

4    government has practiced pay Peter -- borrow from Peter to pay

5    Paul, and we need to recognize any of those outstanding debts.

6         And finally, despite the not recognizing that people

7    are against this, as of yesterday, we had over 27,000

8    signatures in Change.org against the current negotiation with

9    the COFINA bonds.  I'd like to recognize that.  It's probably

10   close to 30,000 signatures at this point.

11        THE COURT:  And I should also note that I am aware of

12   the petition and have been kept apprised of the signature

13   count on the petition.

14        MR. DAVID:  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. DAVID:  That's all.

17        THE COURT:  Thank you for coming to court today and

18   sharing your views.

19        And so I will now call the names of others who were

20   to speak in this segment to see if they are here now.

21        Is Adriana Irizarry Irizarry here?

22        MS. IRIZARRY IRIZARRY:  Si.

23        THE COURT:  Emil Nieves Mounier?  Eulalia Centeno

24   Ramos?

25        COURTROOM DEPUTY:  Yes, Your Honor.

1           THE COURT:  And would the interpreter please come to

2   assist?

3           Buenos dias.

4           I think it would be most sensible for the interpreter

5   to stand closest to the microphone, so if you would switch

6   places?  Very good.

7           And so good morning.

8           MS. CENTENO RAMOS:  Good morning.

9           THE COURT:  And the system is set up with lights to

10  mark your five minute allocation to speak.

11          MS. CENTENO RAMOS:  Okay.

12          THE COURT:  Thank you.  Please proceed.

13          MS. CENTENO RAMOS:  Eulalia Centeno Ramos, a retired

14  teacher from the Government of Puerto Rico's Department of

15  Education.  My pension is 1,700 dollars, to cover all of the

16  basic expenses.  And I am the mother of two daughters and one

17  son, who are my dependents.

18          We teachers do not receive any other type of

19  benefits, such as a contribution to health insurance, a

20  Christmas bonus, or anything for medication.  If the COFINA

21  Agreement is approved, an excessive amount of resources would

22  be committed, of government resources would be committed, and

23  there will not be enough money to guarantee the pensions of us

24  teachers and other public employees.

25          In that case, the Board intends to guarantee a

1    maximum pension of merely 1,000 dollars a month for teachers

2    and police officers and public employees who do not have

3    Social Security, and of 600 dollars for those public servants

4    who do have Social Security.

5         This will have terrible implications for Puerto Rican

6    families, possibly leading us to bankruptcy, to losing our

7    homes, or being forced to emigrate, leaving us in misery.

8    Added to this, many Puerto Rican families who live on pensions

9    have dependents and children who have physical, academic and

10   health conditions.

11        If this agreement is approved, our children,

12   grandchildren, Puerto Rican youth and those who have not yet

13   been born are the ones who are going to have to live through

14   the worst crisis in the history of our country.

15        The COFINA Agreement is contrary to Puerto Rico's

16   recovery and, therefore, goes against the purposes of the

17   PROMESA Law.  None of this has to happen if we do not give

18   privilege to those creditors who are uninsured.  Regarding the

19   pensioners, as proposed in the case of COFINA, it is a debt

20   that was issued to ignore the constitutional limits of debt.

21   If we comply with the provision of PROMESA to protect

22   vulnerable sectors, as in the case of pensioners and future

23   pensioners, promote economic development and honor the

24   pensions of vulnerable sectors, we have a proposal that would

25   allow us to protect our pensions, protect economic development

1   and the island's sustainability.

2        I am unable to finish because of the time that it has

3   taken to do the translation, but I would like to finish by

4   saying that I only ask that the pain of the people, the

5   injustice, the innocence of our boys and girls, of those who

6   will have to leave the country and the suffering of our

7   workers not be indifferent to you.

8        You will leave the country, but our vulnerable

9   sectors, like our pensioners, our children, our college

10  students, our disabled and others will remain living here with

11  the hope of living in peace.  Gracias.  I can provide the rest

12  of the information in writing.

13        THE COURT:  Thank you.  I would appreciate that.  And

14  thank you for coming today.

15        Is Yohan Colon Agosto here?

16        Orlando Feliciano Aquino?

17        Eva Prado?

18        Eliza Llenza?  L-l-e-n-z-a.

19        Julio Lopez Varona?

20        Rigoberto Maldonado?

21        Nydia Cheverez Rodriguez?

22        Nereida Rodriguez?

23        All right.  We will call the names again at one

24  o'clock after the lunch break.  All right.  So now --

25        MR. DESPINS:  Your Honor.

```
 1              THE COURT:  Yes.

 2              MR. DESPINS:  Would you entertain a very short, less

 3     than five minutes, three-minute statement from the

 4     Commonwealth agent?

 5              THE COURT:  Is this the Statements in Support segment

 6     of the Agenda?

 7              MR. DESPINS:  Correct.  Sorry.  It's not set forward

 8     in the Agenda, but it's not in opposition of the Settlement.

 9     I think it provides context, because we negotiated the

10     transaction initially.

11              THE COURT:  Yes.  So there is a segment in the Agenda

12     for Statements in Support, and we've reached it now.

13              MR. DESPINS:  Oh.

14              THE COURT:  I'm just keeping track with my score

15     card.  So yes, you may speak.

16              MR. DESPINS:  Okay.

17              THE COURT:  Make brief remarks, and there may be

18     others.

19              MR. DESPINS:  It will be brief, Your Honor.  For the

20     record, Luc Despins with Paul Hastings, counsel to the

21     Creditors' Committee.  And the Creditors' Committee was also

22     acting, as you know, as the Commonwealth agent in this

23     process.  And the Committee, as Commonwealth agent, negotiated

24     that 46-53 split, and especially after hearing what we just

25     heard, I felt compelled to say something here.
```

1          The first thing is we were not writing on a clean

2     slate.  This is not a classic creditor versus creditor

3     dispute.  There was a statute, there is a statute, the COFINA

4     statute, that purports to give ownership, very important,

5     ownership of sales and use tax to COFINA.  So this is not your

6     traditional fight between creditors.  There's a statute that

7     purported to give ownership to them.

8          And from that, we mounted the strongest, best

9     challenge we could mount to that statute that says they own

10    it.  And did we want them, COFINA, to receive 53 percent?  No.

11    We wanted them to receive zero percent.  We want people to

12    understand that from our perspective.  But, as I said, we're

13    not writing on a clean slate.

14         And we don't know what Your Honor would have done.

15    We don't know what the First Circuit would have done.  And we

16    don't know what potentially the Supreme Court would have done

17    on this issue.

18         And we don't represent -- and this isn't a knock on

19    bondholders -- we don't represent bondholders or private

20    parties here.  We are the fiduciaries for others.  As I tell

21    the Committee all the time, we are playing with other people's

22    money.  Not literally playing, but we are making decisions,

23    especially when we're wearing the hat of Commonwealth agent,

24    we are making decisions as fiduciaries.

25         And in light of that, it would be, we believe,

1   irresponsible to roll the dice and potentially end up with no

2   loaf, zero loaf for the Commonwealth, to use the expression

3   that you used, Your Honor.

4        And I wanted Your Honor to know that and also the

5   public to know that, because obviously from our perspective,

6   we want to give the COFINA nothing.  That was what our mandate

7   was, is to fight them on everything.

8        And we fought them I think the best we could, given

9   the statute we had to deal with.  And we believe that in light

10  of that, that 46-53 was a very fair split.

11       Thank you, Your Honor.

12       THE COURT:  Thank you, Mr. Despins.

13       Mr. Friedman.

14       MR. FRIEDMAN:  Good morning, Your Honor.  Peter

15  Friedman on behalf of AAFAF.

16       Your Honor, we support the settlement.  The

17  government has been a guardian of its procedural rights, which

18  are protected by PROMESA, and the substance in the interest of

19  the people of Puerto Rico.

20       In terms of procedural rights, the government has

21  protected responsibilities and powers under Section 303 of

22  PROMESA, and in a role as a party at interest in this matter.

23  At various times, those have both been challenged, but

24  ultimately vindicated.  And by doing so, we have brought the

25  distinctive voice of the elected government to bear into this

1    dispute.

2          In terms of substance, when the settlement was

3    announced, we reserved rights and had concerns, but we

4    evaluated the situation very carefully.  The government didn't

5    demagogue.  The government didn't grand stand.  It studied and

6    analyzed and ultimately concluded that the settlement

7    reflected a fair resolution of the many, many legal issues

8    that were before the Court and which the Court is well aware

9    of.

10          And because it does that, we support the settlement.

11   We support it because it locks in money for the Commonwealth.

12   It takes a lawsuit and turns it into cash that can be used,

13   and it avoids a loser-take-none outcome for the Commonwealth.

14   And that's not a risk the government thought was appropriate

15   to take.

16          Mr. DeChiara says the Commonwealth needs more, and if

17   we just ask it, the COFINA holders will give it.  I don't

18   think that's the way it works, and I don't think that's the

19   legal test that the Court has to evaluate in this settlement.

20          He also says the Commonwealth can't afford this, but

21   it's the opposite of true.  What we can't afford is losing and

22   getting nothing.

23          UTIER asks, where's the model.  The model is this:

24   The settlement provides money to ameliorate austerity, to

25   avoid reductions to social services, and to take care of the

1   Puerto Rican people like those who have bravely come here

2   today to speak out, even in opposition.

3         But the fundamental precept is this:  Losing

4   litigation will actually reduce the Commonwealth's ability to

5   take care of people who don't have enough.  That's not a risk

6   that is appropriate for the government to take.

7         When you have a willing counter party that has made a

8   reasonable settlement proposal, that provides tangible upside

9   to address governmental needs, it would be the height of

10   irresponsibility to walk away.  And that's why the government

11   does not believe it's appropriate.  It supports the

12   Commonwealth agent and the Oversight Board in seeking approval

13   of the 9019 from the prospective of the Commonwealth.

14         Thank you, Your Honor.

15         THE COURT:  Thank you, Mr. Friedman.

16         MR. FELDMAN:  Good morning, Your Honor.  For the

17   record, Matthew Feldman from Willkie Farr & Gallagher on

18   behalf of the Commonwealth agent.

19         Your Honor, I think what's been missed a little bit

20   by the objectors is that, in fact, this is not a typical

21   debtor/creditor 9019.  In fact, this is debtor on debtor.

22         And just as Mr. Despins said, he wanted to give

23   COFINA nothing.  I can assure the Court that from the COFINA

24   agent perspective as a fiduciary for the COFINA creditors, she

25   obviously wanted to achieve the best result for those

1  creditors as well.  Your Honor, in fact, the settlement that's

2  before the Court does embody that best settlement.

3        I've been practicing in this space, Your Honor, for

4  almost 30 years.  I've dealt with many, many complex

5  situations.  I would hasten to say, Your Honor, that this is

6  the most complicated legal framework for any particular

7  situation that I've ever been involved in.

8        And rolling the dice was simply inappropriate for

9  everybody before the Court.  And as Mr. Friedman said, this

10  does result in an opportunity for the Commonwealth to continue

11  to take care of its people.  And no, Your Honor, the test for

12  approval of this is not the best interest of the Commonwealth

13  and it's not the best interest of COFINA.  It's simply above

14  the lowest rung in the ladder of reasonableness.

15        This settlement achieves that, Your Honor.  It is

16  both in the best interest of the Commonwealth and in the best

17  interest of COFINA because, in fact, it resolves what would be

18  years and years of litigation with a winner-take-all result

19  that would either completely bankrupt the Commonwealth in its

20  ability to even provide basic services to its people, or it

21  would completely bankrupt COFINA.

22        And I would point out to the Court, and it is worth

23  noting, that many, many holders of COFINA debt reside on this

24  island.  It is ironic that the unions are here complaining

25  about this settlement when, in fact, their pensions own a

1   portion of this debt.

2          So it is a very circular situation, as many of these

3   situations are.  It was ripe for settlement, and that's what

4   we believe we've achieved, one that protects both the

5   Commonwealth and COFINA.  And we would urge the Court to

6   approve it.

7          Thank you, Your Honor.

8          THE COURT:  Thank you, Mr. Feldman.

9          MR. DUNNE:  Good morning, Your Honor.  For the

10  record, Dennis Dunne from Milbank Tweed Hadley McCloy on

11  behalf of Ambac Assurance Corporation.

12         We're here as a creditor of the Commonwealth.  We

13  wrap GO bonds, but as Your Honor knows, we also insure bonds

14  elsewhere in Puerto RIco, including COFINA, HTA.

15         And I say that because we're here for the long hall.

16  Ambac is going nowhere.  We want nothing more than for Puerto

17  Rico to exit these cases as promptly as possible and to best

18  position it for long-term prosperity.

19         I'm going to make two quick points.  They're actually

20  quicker given the preceding comments.  And then I just wanted

21  to make one comment about some of the objections that Your

22  Honor has heard.

23         With respect to my two points, I think that if you go

24  back, when the SUT issue was just being joined, I think most

25  parties that hold debt across the structures, it became

1   apparent to them relatively early that this needed to be

2   settled.  That it was a gating item.

3        Why?  The uncertainty about who owned the SUT, the

4   unfortunately binary nature of court rulings, you either have

5   a winner or a loser, and the quantum of dollars involved in

6   the SUT created a road block to progress in the Commonwealth

7   case, the COFINA case, HTA, on and on and on.  So I think it

8   became clear to everybody that we needed to move forward with

9   this, and litigation would only breed more appellate

10  litigation.

11       Point number two is that you've heard about the kind

12  of relative unhappiness among the parties and the agents where

13  the GOs would have liked to have received more into the

14  Commonwealth bucket and the COFINA side as well.  I'd say that

15  that relative unhappiness, Your Honor, is probative of a true

16  settlement that falls within the range of reasonableness.

17       Last point.  With respect to the UAW's objection

18  specifically, let's focus on what is before the Court at least

19  this morning.  And that issue simply is ownership of the sales

20  and use tax.  It is, basically, is the 53 and a half, 46 and a

21  half settlement a reasonable compromise of that dispute.

22       We submit that it is.  But what is not before the

23  Court is a review of the amount of the debt that's going to be

24  issued by COFINA as a result of that, the terms, the tenor of

25  the new COFINA debt or the feasibility of that debt service

1   within COFINA.

2          One other quick point, Your Honor.  The comparison to

3   state debt burdens that I believe Your Honor heard earlier, I

4   submit is a false equivalence.  Why?  It doesn't include a

5   state share of the federal debt burden, which each citizen in

6   those states actually services by paying Federal Income Tax.

7          Here, for Puerto Rico, you have no Federal Income Tax

8   and as a result, you could have a much higher state tax rate.

9   And so that's why it's a false equivalency, Your Honor.

10         Lastly, coming back to my road block comment at the

11  outset, we basically need to tee up legal issues and

12  adjudicate or settle them one by one.  We will never resolve

13  these cases if every significant issue is folded into and up

14  into the macro issue of what will be the total debt on island

15  after we finish each and every one of these cases.  We will

16  never accomplish anything, Your Honor, I submit if we have to

17  wait to do it all at once.

18         And with that, Your Honor, unless Your Honor has any

19  questions of me, we submit that this is a reasonable

20  settlement and should be approved.

21         THE COURT:  Thank you, Mr. Dunne.

22         Are there any further statements in support?  Yes.

23         MR. STANCIL:  Very briefly, Your Honor.  Mark Stancil

24  from Robbins Russell.

25         THE COURT:  Good morning.

1          MR. STANCIL:  I represent the GO Ad Hoc Group that

2    argued the summary judgment motions before you.  And we, on

3    behalf of the GO Group, and on behalf of Robbins Russell and

4    Paul Weiss, we do not object to approval of the settlement

5    motion.  That's all I have to say.

6          THE COURT:  Thank you, Mr. Stancil.  Very concise.

7          Any other statements in support?  It looks like --

8    does someone want to speak from New York?

9          MR. GOLDBERG:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. GOLDBERG:  If I may, Adam Goldberg of Lathan &

12    Watkins on behalf of Autonomy Capital.

13          THE COURT:  Good morning.

14          MR. GOLDBERG:  Thank you, Your Honor.  We have no

15    objection to the settlement motion before the Court, and thank

16    you for allowing appearances by us.

17          THE COURT:  Thank you.

18          MR. GOLDBERG:  Thank you.

19          THE COURT:  Any further speakers in support?  All

20    right.

21          So now we will turn to the Debtor's reply and closing

22    statement.

23          MR. ROSEN:  Thank you, Your Honor.  Again, Brian

24    Rosen from Proskauer Rose on behalf of the Oversight Board and

25    the debtor.

1        Your Honor, as I said at the top of this, the

2   foundation for the rebuilding of the Puerto Rico economy

3   starts now.  And I think you just heard that from a lot of the

4   statements in support.

5        And the 9019 motion, the settlement itself is the

6   cornerstone for that recovery, Your Honor.  Without that, it

7   is our belief that these cases will languish for a

8   considerable period of time.  They will last through rounds

9   and rounds of litigation back and forth.

10       And all that while, Your Honor, funds that otherwise

11   might be released for the benefit of the Commonwealth will be

12   continued to be held in the interpleader action where no one

13   will get the benefit of those funds for a very, very long

14   time.

15       Your Honor, the Court has wide discretion to approve

16   the compromise and settlement, and the First Circuit has set

17   forth the four factors that it must review.  One of those in

18   this particular instance is not applicable, because that's

19   difficulties, if anything, in the collection of a recovery.

20   But the others, Your Honor, the probability of success in the

21   litigation, the complexity of the litigation and the paramount

22   interest of creditors, and a proper deference to those

23   reasonable views are.  And we believe, Your Honor, they all

24   weigh very firmly in favor of approval of a compromise and

25   settlement.

1       Your Honor, when we look at those, we see that the

2   issues are extremely complex, and many of those, Your Honor,

3   are a first impression.  As they are of that first impression,

4   they are far from clear that the Commonwealth would prevail.

5   As you just heard Mr. Despins say, he was not working from a

6   clean slate.  He was working from a statute there.

7       But everybody has to look at this in the

8   interconnection of PROMESA, the Bankruptcy Code, the

9   Bankruptcy Rules, the Puerto Rico Constitution and the

10  Commonwealth law.  And all of these, Your Honor, are extremely

11  complex issues.

12      So what should we do?  Should we sit back, Your

13  Honor, and allow the Commonwealth to receive nothing at this

14  time?  Because at this point in time, none of the pledged

15  sales taxes are available to the Commonwealth.  Or should we

16  take the opportunity to allow the Commonwealth to receive a

17  share that otherwise will be made available for the use of

18  services, like you heard many people stand up here and say,

19  and for the use of creditor payments?

20      Likewise, Your Honor, a total victory for the

21  Commonwealth might be a negative, as it may create a further

22  disincentive in connection with the ability to issue bonds in

23  the future and gain market access.

24      And a total win for the Commonwealth, Your Honor, as

25  I said, would only beget further, further litigation and years

1   of zero access to zero funds.  But if we were to break it

2   down, Your Honor, and look at the various points I just said

3   of the three factors that the Court must look at, let's first

4   look at the probability of success.  And Your Honor, you must

5   first look to the legal and evidentiary obstacles that are

6   there.

7            And as we have heard, Your Honor, we believe that

8   they are many.  They are vast.  This litigation has many

9   interwoven components, and here the result is totally

10  uncertain.  As I indicated, Your Honor, there are a multitude

11  of legal issues, including the Constitution and the law.

12           Your Honor, this Court recognized, and I believe it

13  was in the context of the Motion for Summary Judgment, I think

14  you said, the issues raised by the Commonwealth-COFINA dispute

15  are novel and of great importance to the people of Puerto

16  Rico, as well as their fellow stakeholders.  Because federal

17  law issues are thus necessarily bound up in the anteceding

18  question of ownership, the Commonwealth-COFINA dispute

19  presents a mixed question of federal and Puerto Rico law.

20           The Court explained, Your Honor, that nothing in the

21  procedures Order limits the dispute to Puerto Rico law, and

22  ultimately the Court must decide what the relevant property

23  rights are within the context of these Title III proceedings

24  under PROMESA and federal bankruptcy law provisions that

25  Congress has incorporated into PROMESA.

1          Your Honor, the critical issue, therefore, is the

2    interpretation of the law.  And we believe that so many people

3    have, through their involvement in this litigation, have laid

4    out extremely credible arguments on both sides.  As you heard

5    both agents statements in support here, Your Honor, they all

6    would have liked to have won.  They all would have liked to

7    have said, I won a hundred percent.  But they also realized

8    that there was no probability of that success, and they didn't

9    want to take the chance to get that zero loaf, as you already

10   indicated.

11         So from that aspect, Your Honor, the probability of

12   success, there can't be a determination here, and it is ripe

13   for a determination that the settlement is in the best

14   interest of the estate, because there is no certainty at all

15   that anyone would prevail, certainly the Commonwealth

16   prevailed, based upon the slate that Mr. Despins already

17   referred to.

18         Your Honor, we also talk about the complexity of that

19   litigation.  And as I just mentioned, this is not easy from

20   anyone's standpoint.  That's evident from the number of issues

21   and the parties that have presented positions.

22         Six separate motions, Your Honor, were filed for

23   summary judgment by the Commonwealth agent, the COFINA agent,

24   the Retiree Committee, holders of senior bonds, GO bonds, and

25   the Puerto Rico funds, Your Honor.  They span the -- there are

1   multiple litigations that have been involved here, Your Honor,

2   the adversary proceedings, the Lex Claims litigation, the

3   interpleader action, in which all the money continues to be

4   deposited.

5        Ultimately, Your Honor, as we know, there will be

6   appeals that will be spawned by any decision if, in fact, this

7   had to go to that conclusion.  So, Your Honor, the complexity

8   and the expense and the delay caused by the ongoing and

9   protracted litigation weigh in favor of granting the motion

10  and the relief requested.

11       Your Honor, the interest of creditors' component I

12  think is a very interesting one.  We have heard people come up

13  here today, and as I said at the outset of my remarks, we do

14  not want to belittle at all the issues that pensioners, union

15  employees are facing.  In fact, those are very significant

16  issues that the Oversight Board has been grappling with for

17  some period of time.

18       And we continue to have dialogue with many people,

19  Your Honor, the Retiree Committee and other factions that

20  support that, support and represent those employees.  But,

21  Your Honor, I want to make sure that we understand that those

22  issues are not the issues that are before the Court today.

23       The issue that's before the Court today is the 9019

24  settlement.  It is not the Commonwealth Fiscal Plan.  It is

25  not the Commonwealth Plan of Adjustment.  Those issues will be

1    taken up down the road, Your Honor.  But this issue that is

2    before the Court today provides us with information, and a

3    database, Your Honor, and funds that otherwise do not exist.

4          And it is those funds that will be factored into and

5    provided for as part of the -- excuse me, the Fiscal Plan and

6    the Plan of Adjustment.  But what this does, Your Honor, the

7    primary benefits for all creditors, as I said, it provides

8    certainty about the amounts for debt service and the usage for

9    services for the Commonwealth citizens.

10         It resolves billions of dollars in claims that are

11   currently against the Commonwealth filed by COFINA creditors,

12   and it enables the Commonwealth to move forward with its own

13   case and toward a Plan of Adjustment.  And the sooner that

14   occurs, Your Honor, and the sooner that there is fiscal

15   responsibility, there will be distribution to creditors.

16         Conversely, Your Honor, as I indicated, if, in fact,

17   this litigation is extended, there is no guarantee of success.

18   The delay after delay of appeals, what it means, Your Honor,

19   is that money will not be available for anyone for a

20   considerable period of time.

21         So what does that all mean to us, Your Honor, that

22   are here before you today?  That what we've provided you, Your

23   Honor, is with a reasonable solution to a complex problem.

24   The process that you laid out through the procedures Order

25   that was laid out and approved by the Court, through the use

 1    of the two agents, through the use of the mediation team and

 2    Judges Houser, Ambro and Atlas proved to be extremely

 3    successful.  It provides this Court with an opportunity to

 4    start the process toward a global restructuring of the

 5    Commonwealth indebtedness by providing it with certainty as to

 6    the amounts that it will recover.

 7         We believe, Your Honor, that there is no more of an

 8    indication of support for this and the reasonableness of this

 9    by the widespread creditor support on both sides of this

10    issue, on both the Commonwealth side and on the COFINA side.

11    We believe, Your Honor, that the settlement is in the best

12    interest of all the creditors, and we ask the Court to approve

13    the 9019 motion.

14         Thank you.

15         THE COURT:  Thank you, Mr. Rosen.

16         So I will hold these arguments and submissions under

17    advisement pending completion of the record as to COFINA, and

18    hearing the further public statements and until I'm ready to

19    issue a decision.

20         MR. ROSEN:  Yes, Your Honor.  Thank you.

21         THE COURT:  And so the next item on the agenda is the

22    Motion for Confirmation of the COFINA Plan.  There are two

23    preliminary issues in that connection.  One is the question of

24    the contest of standing by the union objectors, and then there

25    are some evidentiary objections that are related to that.  And

 1   then we have the timing issues as well.

 2          So what I would propose to do is take up the standing

 3   issues now, and ask the parties to rethink, recut, revisit, as

 4   may be appropriate, the evidentiary and timing issues over the

 5   lunch break so that perhaps some of those can go away, unless

 6   you'd like an opportunity to work on the standing questions as

 7   well over lunch?  We could take a somewhat longer break?

 8          Mr. Firestein.

 9          MR. FIRESTEIN:  Good morning again, Your Honor.

10   Michael Firestein of Proskauer Rose on behalf of the Oversight

11   Board.

12          Mr. Emmanuelli has indicated that he would like to

13   have a conversation with respect to the standing issue.

14          Is that correct, Mr. Emmanuelli?

15          MR. EMMANUELLI JIMENEZ:  Yes.

16          MR. FIRESTEIN:  So we will take the Court's offer up.

17   It would be shameful if I didn't.

18          THE COURT:  All right, then.  So we'll break until

19   one o'clock.  We'll resume at 1:00, because that's when I told

20   the other speakers to come.  So we will resume then with the

21   remaining public speakers.

22          I have not adjourned yet.  Court is still in session.

23   Please be quiet.  Please sit down.  Thank you.

24          So that worked.

25          MR. FIRESTEIN:  It often does.

1    THE COURT:  Yes.

2         So the first item on the Agenda will be the remaining

3    public speakers as to the 9019 motion, and then we will take

4    up any remaining standing and evidentiary issues, and then

5    we'll move into the presentations on the COFINA Plan

6    Confirmation Motion.

7         MR. FIRESTEIN:  Very well.  Thank you, Your Honor.

8         THE COURT:  Thank you all.  Thank you for your work

9    in speaking this morning.

10        Mr. Rosen.

11        MR. ROSEN:  Your Honor, may I just ask, will the

12   courtroom be locked so that we can leave our things here set

13   up or should we take them?

14        THE COURT:  Yes, you may leave your things there.

15   The courtroom will be locked.

16        MR. ROSEN:  Thank you, Your Honor.

17        THE COURT:  Have a good lunch, everyone.  We are

18   adjourned.

19        (At 11:30 AM, recess taken.)

20        (At 1:13 PM, proceedings reconvened.)

21        THE COURT:  Again, good afternoon.

22        We will begin this afternoon with further public

23   statements.  Before I turn to those speakers, I note that we

24   have noticed and been informed that there has been live

25   tweeting about these proceedings.  To the extent that is not

1    happening from a courtroom, that's not against the rules.  But

2    as I have explained, anyone who is physically in a courtroom,

3    whether it is this one, or one of the overflow courtrooms, or

4    in a courtroom in New York is not to be using any device to

5    communicate outside of the courtroom.  And I thank you for

6    complying with those rules.

7            And if anybody is seen tweeting from a courtroom,

8    appropriate measures will be taken.  So let's not have

9    occasion to do that.

10           And so we have further speakers, and I'm going to ask

11   that the interpreter interprets my comments now, because most

12   of the speakers are Spanish speakers.  And so if the

13   interpreter is ready, I would just like my announcement to be

14   interpreted.

15           Do you have a microphone?

16           THE INTERPRETER:  Yes.  Yes, ma'am.  Ms. Crescioni is

17   already interpreting, Your Honor.  She's already begun.

18           Ms. Crescioni is the third interpreter here in the

19   courtroom, and she is already interpreting what you are

20   saying.

21           THE COURT:  Okay.  Let me come and speak with you

22   over here.

23           THE INTERPRETER:  Yes, ma'am.

24           THE COURT:  My apologies for the delay.

25           We will now turn to the remaining public speakers on

1    the 9019 COFINA Commonwealth Settlement issue.  This morning

2    we heard evidence and presentations from the Oversight Board;

3    from those opposing the motion on behalf of the Union and

4    employee representatives; from supporters, including people

5    involved in the actual negotiations; and from some of the

6    public speakers, because we finished the other proceedings

7    earlier than we had expected.

8         I will now call the remaining speakers who are

9    present.  Each speaker has been notified in advance that five

10   minutes has been allocated for their address to the Court.

11        We have an interpreter so that I will understand what

12   is being said by those who are speaking in Spanish.  I regret

13   the short time limit, which does of course require you to be

14   concise in your remarks, but we have much on the Agenda.  And

15   so thank you for understanding that.

16        You will see that there is a timer on top of the

17   podium that has red, yellow and green lights.  When the red

18   light goes on is when the time is up.  When the yellow light

19   goes on, it is a warning that a minute and a half is left.

20   And I will watch it and remind as necessary.

21        And so now I would ask Ms. Nydia Cheverez Rodriguez

22   to come to the podium.

23        MS. CHEVEREZ RODRIGUEZ:  Buenas tardes.

24        THE COURT:  Good afternoon.

25        MS. CHEVEREZ RODRIGUEZ:  My name is Nydia Cheverez.

 1    I am a retired professor of the Medical Sciences Campus of the
 2    University of Puerto Rico in San Juan.  I am 62 years old.  I
 3    was born in a little town in the middle of the island.  I am
 4    the elder of nine.  I was raised in a rural, poor family.  My
 5    mother barely learned to read, and my father could not finish
 6    college.
 7            COURT REPORTER:  I'm sorry.  Can you slow down,
 8    please?
 9            THE COURT:  The court reporter has to be able to
10    write down everything that you say.
11            MS. CHEVEREZ RODRIGUEZ:  I studied in public schools,
12    and then at the University of Puerto Rico.  I completed a
13    Bachelor's Degree in natural sciences; then a Master's Degree
14    in public health education.  And finally, I obtained a
15    Doctoral Degree in public health.  All my achievements have
16    been earned with a lot of sacrifices.
17            I got married when I was at second year of
18    university.  I had two children, a boy and a girl.  After the
19    girl was born, I noticed that both children has signs of
20    developmental disabilities.  A genetic specialist confirmed
21    that both have Bardet-Biedl syndrome.  This syndrome includes
22    obesity, inborn error of metabolism, diabetes mellitus,
23    hypertension, and progressive blindness.
24            The male also has mild mental retardation and
25    developed liver cirrhosis.  Actually, he is disabled, and I am

1    the legal guardian.  The female is a little more independent.

2         It is important to mention that their father died

3    when the girl was ten years and the boy, 13.  I raised them

4    alone.  It has been hard, but I survived it because of my

5    education at the UPR.  Without the UPR, I will not have been

6    able to achieve my goals and raise my children as I did.

7         Immediately after my Master's Degree, the UPR hired

8    me as public health educator.  Then I became a professor.  And

9    finally, I retired two years ago, after 32 years of public

10   service.

11        While I was working, I needed to take several loans.

12   The last one I'm still paying.  These loans were basically to

13   increase my pension settlement, to be able to take care of my

14   disabled children, and to have quality of life in my oldness.

15   Obviously, I cannot count on my children to take care of me.

16   On the contrary, I have to plan for my older years and for the

17   future of them.

18        Your Honor, I came here to touch your intellect and

19   your feelings in regard of what the proposed COFINA deal means

20   to the people of Puerto Rico, especially the retired with

21   special situations like myself, people with special needs, the

22   poor class of Puerto Rico, and other vulnerable groups.

23        I feel frustrated, because I worked hard in my life

24   and have dedicated my time to public services; and now, when I

25   look at the future, all the retired employees from the UPR,

1   public school teachers, and other government workers will get

2   a cutback on pensions and unwanted changes in their retirement

3   plans.

4          We, the retired and working class, are not

5   responsible for this economic crisis.  Why we will have to pay

6   for a debt that is not created by us?  Why, after many

7   sacrifices, my children and me will have to live in extreme

8   poverty?  We don't deserve that.

9          To imagine my future hurts me, but it also hurts me

10   when I remember that I am not the only one in this situation.

11   Many of my colleagues are in charge of disabled relatives or

12   their parents.  Also, many old people are raising

13   grandchildren or nephews.  Most of them will not survive the

14   misery that will reach all of us.

15          The suicides are raising in the group of older

16   people.  If COFINA is approved, students and the working class

17   will continue to move to your country, and only the retired

18   will stay here.

19          Please analyze our situation with truly data but also

20   with compassion.  It is necessary to audit the debt and to

21   negotiate a fair deal.  Public and basic services like

22   education and health should not be destroyed to pay an unfair

23   and illegal debt.

24          I want the best for my people.  Our plea to you is:

25   Do not negotiate with our health; do not negotiate with the

1   right of all to access education; do not negotiate with our

2   retirement; do not negotiate with our right to a dignified

3   oldness; do not negotiate with our lives.

4           Thank you.

5           THE COURT:  Thank you, Ms. Cheverez.  Thank you for

6   your candor about the impact on your own life, as well as the

7   impact on the Puerto Rican people.

8           Next I will call on Ms. Adriana Irizarry Irizarry.

9   Will you be -- you'll be speaking in English as well?

10          MS. IRIZARRY IRIZARRY:  Yes.

11          THE COURT:  Thank you.

12          MS. IRIZARRY IRIZARRY:  Thank you.  Good afternoon,

13  Your Honor.

14          THE COURT:  Good afternoon.

15          MS. IRIZARRY IRIZARRY:   My name is Adriana Irizarry.

16  I am a resident of San Juan, Puerto Rico.  I am a mother of

17  three, and I work at a non-profit organization dedicated to

18  helping youths at risk in disadvantaged communities.

19          I come before you today to inform the Court of the

20  terrible experience we have had regarding lending our savings

21  to the government of Puerto Rico, and why we support the

22  proposed plan of adjustment that you will consider today.

23          Ten years ago my husband and I decided to invest most

24  of our savings in COFINA subordinate bonds.  Like thousands of

25  other hard-working Puerto Rican families, we did so with the

1   objective of securing and growing our small nest egg so that

2   we could count on enough financial resources for our

3   retirement.

4          We decided to invest in COFINA for two main reasons.

5   First, we felt good about investing in the future of Puerto

6   Rico.  And second, the fact that COFINA's promised repayment

7   was secured by a strong source of revenue, the Puerto Rico

8   sales and use tax.

9          However, as you can imagine, the value of our

10  investment has suffered greatly since 2013, when the

11  uncertainty of the financial condition of the government of

12  Puerto Rico became evident.  This negative impact on our

13  investment was exacerbated in 2016 when COFINA stopped paying

14  any debt service.

15         Given this situation, we feel betrayed and defrauded

16  by our government, who is now unwilling to pay us back as

17  promised.  It is very unfair, after entrusting our life

18  savings to them, we are now faced with the possibility of

19  losing everything that we have worked so hard to earn as a

20  result of the irresponsible management of its finances.

21         That being said, we are fully aware of the financial

22  challenges faced by our beloved island, and we feel that all

23  parties must be willing to come to the table and cooperate.

24  Everyone must contribute in some way.  This includes all

25  bondholders, the government, its workers, pensioners, the

1   private sector, and the people of Puerto Rico in general.

2          I am already giving the government half of my life

3   savings.  What are other parties willing to contribute?

4          We feel that the COFINA Proposed Plan of Adjustment

5   is very generous to the government by significantly reducing

6   debt service while maintaining a repayment period that is

7   similar to COFINA's original agreement.  Since current sales

8   tax revenues amounted to 2.5 billion, and the annual COFINA

9   debt service starts at around 420 million, we believe the Plan

10  is sustainable.

11         Objectors to the Plan who argue that it is too

12  onerous to the government don't seem to understand the

13  numbers, stating that the repayment terms will impact

14  essential services when, in fact, the government will gain

15  access to more than 350 million in additional annual funding

16  from the SUT beginning in 2019.  Therefore, payment of the

17  COFINA portion should not affect essential services in any

18  way.

19         Many others, who were not even willing to invest in

20  Puerto Rico in the first place, choose to ignore that many of

21  us local bondholders are not Wall Street vulture funds but

22  hard-working individuals who placed their faith in Puerto

23  Rico.  Very simply, they would like to punish us for having

24  invested in our island.

25         The savings of many Puerto Ricans like ourselves have

1   been decimated over the past six years.  There are many cases,

2   like my mother, who is retired, whose savings were also in

3   COFINA bonds, and she was forced to sell them at a huge loss

4   just to have enough money to cover her living expenses.

5          Although we will be extremely impacted by the loss of

6   44 percent of our investment in COFINA, we want to put this

7   frustrating chapter of our lives behind us and move forward.

8   Therefore, we are supporting the approval of this settlement

9   between COFINA and the Commonwealth.

10          Your Honor, we fear that if this Plan is not approved

11  now, Puerto Rico will be entangled in a costly litigation that

12  would hinder economic recovery, while we would receive no

13  return on our savings and would suffer great uncertainty as to

14  eventual repayment.  For the sake of Puerto Rico's future, we

15  hope you support the Proposed Plan.

16          Thank you for the opportunity to express my views,

17  Your Honor.

18          THE COURT:  Thank you, Ms. Irizarry.

19          Would Julio Lopez Varona please come forward?

20          I believe Mr. Lopez Varona will speak in Spanish?

21          MR. LOPEZ VARONA:  No, English.

22          THE COURT:  English.  Okay.  I have you down for

23  Spanish.  Thank you.

24          MR. LOPEZ VARONA:  Good afternoon, Your Honor.

25          I just wanted to, before I start talking, note the

1   people around the room.  I think it's interesting to see that

2   most of the people here are white men.  It's an interesting

3   contrast to the people outside, which are mostly brown and

4   black people, that are actually against this deal.

5        So I think my responsibility today is to talk a

6   little bit about who the people are that are outside, and also

7   talk about the five million people living in the U.S., and the

8   impact that this will have.

9        My name is Julio Lopez Varona.  I am the director of

10  the dignity campaigns at the Center for Popular Democracy.  I

11  am also the coordinator of Hedge Clippers.  I'm sure you all

12  read our reports.  And I also work with Vamos4PR.

13       Over the past year, we've worked with partners in

14  Florida, New Jersey, New York, Connecticut and Pennsylvania to

15  support newly-arrived Puerto Ricans.  After the hurricane,

16  those people just came.  They had nothing.  Many of them had

17  been promised hotels by FEMA, they had been promised support,

18  and they got very little.

19       Some of them, I remember, went to Connecticut in

20  specific, where I was living, and they had never been in the

21  cold, so they didn't understand what was the cold or what was

22  a coat or what was anything.  And when they got to the hotels

23  and they started asking FEMA for support, they got into a Red

24  Roof Hotel, which is like a motel, and they actually got --

25            THE COURT:  I'm going to ask you to speak directly

1   into the microphone, so people in New York and on the phone

2   can hear you.

3          MR. LOPEZ VARONA:  Yes.  And they also got one

4   voucher a day for food.  So as we worked with people, these

5   people, I saw what was happening to people in Puerto Rico.

6   These people were not able to come back because what we were

7   seeing is austerity and privatization.  And we were seeing an

8   increase of people that were getting out of Puerto Rico.

9          And it's interesting to think about that, because

10  when we think about the people who are coming back, those

11  stories are not necessarily being shown in this court or in

12  these proceedings.

13         Part of our concern is really about democracy, when

14  it comes to putting forth a deal that, in reality, most Puerto

15  Ricans have not talked about or had a conversation about and

16  are now being obliged to pay for the next 40 years' taxes.

17         So I wanted to start with the story of Brenda Suarez.

18  At 41 years old, because of the response of FEMA, she actually

19  went from Vega Baja to New York City with her 39-year-old

20  brother and her 81-year-old grandmother.  Brenda and her

21  family spent six months in Manhattan in a FEMA shelter, and

22  then spent the last eight months bouncing from New York -- in

23  our shelter system.

24         Three jobs in this moment are not enough to support

25  her family, because her grandmother has Alzheimer's.  Neither

1    of them has access to proper care in Puerto Rico's public

2    health system, so they choose to stay in Florida, where we

3    have more than a million Puerto Ricans.

4            I want to take a minute to remember Betsy.  Betsy

5    fled to Florida after the hurricane, and she was fleeing from

6    her husband who abused her.  And when she was there, at

7    43-years-old, she took up a construction job in Kissimmee to

8    provide for her 12-year-old and 14-year-old daughters.  Now,

9    because of the desperate situation she had, she unfortunately

10   took her life and wasn't able to come back to the island and

11   build.

12           You know, I've had so many conversations with so many

13   people from the diaspora, and the only thing that I hear

14   constantly is they love this island and they want to come

15   back.  They understand what's happening, and they want to make

16   it better.

17           Now at Hedge Clippers, our argument has always been

18   not that the deal had to be stopped or that the COFINA deal

19   doesn't have to be restructured.  I think what we heard on the

20   last testimony was a person that actually invested their money

21   and wants to get their money back.  And that's completely

22   fair.

23           What we are afraid of is that right now there's a

24   bunch of mostly white men that are defending Wall Street and

25   people from La Milla de Oro that are going to make a bunch of

1   money, because they didn't buy when she bought.  They bought

2   10 years ago when the debt was 30 cents on the dollar, and

3   they're now up to making hundreds of millions of dollars.

4          So we're here today specifically to ask not to -- not

5   to resolve the debts for Puerto Rico or to figure out a bill

6   that's good for Puerto Ricans.  It's to figure out how to make

7   that deal work for people like Brenda, and people that live in

8   New York and Pennsylvania, and all the people that want to

9   come back and are seeing their savings depleted, because we

10  are pushing a deal that has nothing to do with Puerto Rico and

11  Puerto Ricans and everything to do with making money and

12  having Wall Street actually make a buck today.

13         So thank you for this opportunity, Judge.  Thank you

14  for having us here.  It really means a lot to bring, you know,

15  our people here to talk about this.  Thank you.

16         THE COURT:  Thank you.

17         Court is in session.  Thank you very much.

18         The next speaker is Rigoberto Maldonado.

19         Good afternoon, sir.  Do you need the interpreter?

20         MR. MALDONADO:  No, Honorable Judge Swain.

21         THE COURT:  Okay.  I just wanted to make sure --

22         MR. MALDONADO:  I speak English.

23         THE COURT:  Thank you.  It's your choice.  I wanted

24  to make sure.

25         MR. MALDONADO:  Thanks.

1          Good afternoon, Judge Swain.  Thanks for this

2     opportunity to express my thoughts on a subject that matters

3     so much to me, and even more to the rest of the people of the

4     beautiful Island of Puerto Rico.

5          My name is Rigoberto Maldonado.  Sorry to say this.

6     I have so many letters in my first name and so many letters in

7     my last name.

8          Currently, I am a simple citizen of the United States

9     and resident of Puerto Rico.  I'm also a military veteran of

10    the United States Armed Forces, having retired with an

11    Honorable Discharge in 1999, with decorations and medals.  I

12    am a father, a devoted grandfather, and if the years and the

13    Lord allows, hopefully a great-grandfather to be.

14         One day, I left my family to join the military

15    service, overcoming so many obstacles in life in order to be a

16    better person, a better citizen and better family member.

17    After my military retirement, I became a civil service

18    employee with the Department of Veterans Affairs in Puerto

19    Rico, and later had to leave the federal government in 2008,

20    because of my disabilities.  Upon my departure, I was

21    recognized for my dedication and work, for saving thousands of

22    dollars to the federal government during my career with the

23    Veterans Affairs.

24         But I'm not here to talk about me, but to talk about

25    something that is near and dear to my heart.  It is my

1   understanding that about 35 percent of the population of this

2   island are children with some form of medically recognized

3   disability.  They need special care, specific education and

4   schools, medical services, employment, housing, and other --

5   among other things.

6        By the way, there is an active case in Federal Court

7   right now protecting the rights of disabled students.  When

8   faced with economic hardship and lack of resources, families

9   look to the government assistance for help for their loved

10  ones.  During the past year, and mostly due to the Hurricane

11  Maria, we know that some families moved to the U.S. mainland

12  in order to get a better life for them and their children.  At

13  the same time, a high percentage of medical specialists moved

14  to other states looking for better incomes, better ways of

15  life for them and their families.

16       Taking into consideration the local economy, the same

17  situation is happening with teachers and educators.  They left

18  this land looking for better ways of life, moving to Florida,

19  Texas, Georgia and other states.

20       It goes without saying that we are losing valuable

21  professionals that provide services to the disabled

22  population, including me.  And now some of us feel stranded

23  and out of hope.  It is very difficult for families to have a

24  disabled member without the proper education, health services

25  and other things.

1          I foresee this COFINA Agreement having a harsh impact

2      on these types of families.  In order to continue to be

3      successful members of our society, it is imperative for

4      parents or guardians to have the care, medical services,

5      resources and household facilities for them.

6          Should we agree to the COFINA Agreement, other areas

7      could be negatively impacted as well:  For example, police

8      officers, officers currently retired with low income benefits,

9      some without Social Security benefits and with high

10     probabilities of incurring expensive medical services.  This

11     is an old population in Puerto Rico that is also affected with

12     disabilities, and they cannot afford a negative economic

13     hardship.

14         Another example are public school teachers.  They too

15     retire with low income, some disabled, and without Social

16     Security.

17         THE COURT:  Mr. Maldonado, I'm going to have to ask

18     you to wrap up your remarks, because of the time limit.

19         MR. MALDONADO:  And yet these two groups diligently

20     and responsibly made their contributions to retirement plans.

21     However, over the years, there have been changes to retirement

22     benefits, and now this COFINA Agreement will hit them harder,

23     causing them to receive less than what was expected.  As a

24     consequence, they could end up being even more dependant on

25     welfare, something that would cause its set of major issues.

1          I ask you today to consider the following questions

2    before considering this Agreement.  What will happen with the

3    mental health of the disabled citizens of the island,

4    specifically with these groups, should COFINA pass?  How will

5    the lack of services impact the resources to these groups?

6          THE COURT:  Thank you, Mr. Maldonado.

7          MR. MALDONADO:  Thank you, Your Honor.

8          THE COURT:  Thank you for sharing your own situation

9    and speaking for the disabled.  And thank you for your service

10   to the people of the United States.

11         MR. MALDONADO:  Thank you, Your Honor.

12         THE COURT:  Would Emil Nieves Mounier please come to

13   the podium?

14         Good afternoon.

15         MR. NIEVES MOUNIER:  Good afternoon, Your Honor.

16         My name is Emil Nieves Mounier.  I am a retiree and a

17   taxpayer.  I'm opposed to the Agreement under the

18   consideration of this Court for the following reasons.  This

19   agreement is being made without first having to fund the

20   essential services that the people of Puerto Rico receive.  It

21   has not been established whether said services will be covered

22   during the term of this agreement.

23         Also, the issuance of bonds under COFINA must be

24   audited.  The serious fiscal crisis and economic depression

25   that Puerto Rico has suffered over the past 12 years, and

1  which is expected to continue for the next decade, make it

2  imperative to establish which are going to be the spending

3  priorities for the Government of Puerto Rico.

4          Those priorities must be based on the most important

5  services currently covered by the SUT, that is, health,

6  education, housing, safety and pensions.  And why should these

7  be the most important?  As I mentioned, I'm currently retired,

8  but before all of this, I was a child raised in the poor

9  countryside of the town of San Sebastian, in a small house

10  subsidized by the government in the San Jose Ward of the

11  Capital.

12          Poverty and need might have condemned my destiny, but

13  even in the remote countryside of El Pepino and in the streets

14  of noisy San Jose, there were public schools, with

15  limitations, but accessible.  At the house, there wasn't

16  always food.  So in school, not only did I deal with my idle

17  time and my ignorance, but I could also fill my belly.  Since

18  getting sick was and continues to be a luxury, medical clinics

19  offered basic health services.

20          After going to elementary and middle school in the

21  public school system, I went to the University of Puerto Rico,

22  which formed me as a professional, because it was the place

23  most accessible to me.  These services allowed me to create

24  stability, to overcome poverty, to build a family in my

25  country, and to likewise educate my children in the public

1    schools.

2         THE COURT:  Mr. Nieves, the time limit is almost

3    reached, so if you could wrap up.

4         MR. NIEVES MOUNIER:  So I ask myself, will the

5    agreement before the consideration of this Court return us to

6    a state of precarious poverty?  Will it reduce, for

7    pensioners, the income that we worked so hard for?  Will it

8    make our children not be able to stay in the country and give

9    back to Puerto Rico what public education gave to them?  Will

10   it condemn the destiny of those who today live under the

11   poverty level?

12        Your Honor, I am not the only person with these

13   concerns.  These concerns must be handled before reaching any

14   type of agreement.

15        THE COURT:  Thank you.

16        MR. NIEVES MOUNIER:  That's why I consider it unfair

17   as a retiree and a taxpayer that we were not allowed to vote

18   on this Agreement.

19        THE COURT:  Thank you.  Thank you, Mr. Nieves.

20        MR. NIEVES MOUNIER:  I'm opposed.

21        THE COURT:  Thank you, sir.

22        And the next speaker is Eva Prado.

23        MS. PRADO:  Yes, Your Honor.  I had said that my

24   speech will be in Spanish, but that is not enough time, five

25   minutes, with the translation.  So first, I have to say that

1  that is discriminatory for the people of Puerto Rico, because

2  this person that speaks before me had not enough time as the

3  people that speak in English.

4       So I decide for this moment to speak in English, but

5  I want it to be in the record that that is discriminatory and

6  unfair for the people that want to speak in Spanish.

7       Beside that, my name is Eva Prado.  I'm here.  I'm a

8  resident and raised and born in Puerto Rico.  I'm here

9  representing on behalf of 150 thousand people and more than 40

10  organizations that have asked for a comprehensive audit of the

11  public debt in Puerto Rico for the last three years.

12       Why we insist about this debt audit?  Because the

13  people of Puerto Rico, who -- are the ones that have to pay

14  this debt, because the Judicial Board, Control Board is not

15  going to pay.  We are the ones that are going to pay it, have

16  not any -- have not enough information of how this debt had

17  been accumulated; the legality of all these emissions and

18  assurance; and the responsible -- the people that make all

19  these decisions that today give the -- put us in this

20  bankruptcy process.

21       In Puerto Rico, the impunity and lack of transparency

22  is the rule.  Without this debt audit, we are in -- completely

23  in -- defenseless.  The government has said this bankruptcy

24  process will mean this kind of debt audit.  However, today we

25  are talking about a restructuring plan of one COFINA debt that

1  has not been audited yet.  This Agreement makes legal the

2  illegal.  COFINA is unconstitutional.

3       But besides that, the fact I want to talk about is

4  the impact of this crisis.  I am a lawyer, female lawyer and

5  human rights advocate.  This island cannot support any more

6  cuts, any more austerity measures.  Today, the payment of the

7  debt without being audited and all the reform, austerity

8  measures and cuts of public funds that have been -- put in

9  risk health, education, security, housing and transportation,

10 make a delegation of Puerto Ricans came three times, three

11 times to the Human Rights Commission to denounce and to talk

12 about all the human rights violations that the people of

13 Puerto Rico are living today.

14      We also work with domestic violence victims that --

15 today, Puerto Rico has more than 60, 61 women's deaths by

16 their partners.  In 2018, they report 26 deaths, the double of

17 the day (sic) before.  However, the government is cutting

18 funds in security and all the services to people that is

19 confronting this kind of violence.

20      This island being so small is actually one of the

21 countries with the highest incidents of domestic violence.

22 This emerging national situation is not taking address (sic).

23 Now, important economists in Puerto Rico and the United States

24 have said this restructuring plan is not sustainable.  We have

25 not the capacity to pay this debt.

1   More than 30 thousand people have signed their

2   opposition to the debt restructuring plan.  These 30 thousand

3   people have the right, should have the right to vote to this

4   restructuring plan.

5   We are paying, the people of Puerto Rico is paying

6   this debt with their life.  Judge Swain, do not allow more

7   debt in Puerto Rico.  Do not permit this government exist

8   inoperative because just their only function is to pay the

9   debt.  The people of Puerto Rico have not fault of all the bad

10  decisions that made the actors who were involved in this debt.

11  Judge Swain, make justice for the more regrettable --

12  the people who are not representing in this court.

13  THE COURT:  Thank you, Ms. Prado.

14  MS. PRADO:  Thank you so much.

15  THE COURT:  I will now call the names of others who

16  have been chosen but have not identified themselves yet.

17  Is Yohan Colon Agosto here?

18  Orlando Feliciano Aquino?

19  Eliza Llenza?

20  Nereida Rodriguez?

21  And so I thank the public speakers for having come

22  here and we will -- sir?

23  UNIDENTIFIED PERSON:  Will the Court entertain a

24  request for substitution of people?

25  THE COURT:  I'm afraid not.

1    UNIDENTIFIED PERSON:  Thank you, Your Honor.

2    THE COURT:  So now we will turn to the Motion for

3 Confirmation of the Plan of COFINA.  And first, I would like

4 an update on the standing and evidentiary issues that were

5 going to be discussed over the lunch break.

6    MR. ROSEN:  Good afternoon, Your Honor.  Brian Rosen

7 from Proskauer Rose on behalf of the Oversight Board.

8    Your Honor, unfortunately, there has been no progress

9 with respect to the standing issue.  And I believe that issue

10 will be presented to you as soon as I think I'm finished

11 speaking right now.

12    With respect to the evidentiary issues, and perhaps

13 it is dependant somewhat on your determination on standing, I

14 don't know, but I believe that there is an understanding with

15 respect to the declarations and the exhibits and

16 cross-examination that are to be presented in connection with

17 the Plan of Adjustment.

18    Specifically, Your Honor, and I will start in the

19 inverse order, because it was the declarations with their

20 attachments that gave rise about question about the length of

21 the cross-examination.

22    With respect to the GMS Group, they have several

23 witnesses that they are going to present.  I believe a total

24 of four witnesses.  Mr. Donahue, the people have agreed that

25 the -- or the parties, excuse me, will agree that the

1    declaration will be admitted, and both Exhibits A and B will

2    be admitted with no cross-examination.

3         With respect to Mr. Konsig, the CEO of GMS Group, his

4    declaration will be admitted with one clarification.  In

5    paragraph six, which refers to the pricing of COFINA bonds in

6    2010 and 2018, and the text only refers to pricing as of 2010.

7         The exhibits would be admitted except for F, H and I,

8    and there would be no cross-examination of Mr. Konsig.

9         With respect to Mark Elliott --

10        Thank you very much.

11        Your Honor, just to go back, I apologize, the docket

12   numbers, the docket numbers with respect to Mr. Donahue I

13   believe are 4606, 4641, and there is a translation at 4642.

14        With Mr. Konsig, it is 4564, the ECF numbers.

15        THE COURT:  And as we go into the actual presentation

16   of the evidence, I'll be asking for those numbers to be

17   repeated so that they can be in the relevant portion of the

18   transcript.

19        MR. ROSEN:  Yes, Your Honor.

20        With respect to Mr. Elliott, his Declaration would be

21   admitted; Exhibit One to that Declaration is admitted; and

22   Exhibits Two and Three are hearsay, and I -- do the parties

23   agree to that, please?

24        MR. KIRPALANI:  Yes.

25        MR. ROSEN:  And the parties agree Exhibits Two and

1    Three constitute hearsay.

2              THE COURT:  So that they would not be admitted or so

3    that there's some proffer other than for the truth or what?

4              MR. KIRPALANI:  Good afternoon, Your Honor.

5              Your Honor, Susheel Kirpalani from Quinn Emanuel on

6    behalf of the Senior Bondholders' Coalition.

7              With respect to Exhibits Two and Three of the Elliott

8    Declaration, those are newspaper or magazine articles.  They

9    would be not admitted for any purpose.  They're classic

10   hearsay.

11             THE COURT:  So is that agreed or are you going to ask

12   me to rule that they're not admissible as hearsay?

13             MR. KIRPALANI:  My understanding is Mr. Eisenberg is

14   here on behalf of the GMS Group, and it was agreed with

15   respect to those two exhibits.  We had a negotiated package

16   solution.  But I can ask Mr. Eisenberg if he will agree with

17   that.

18             THE COURT:  Okay.  I'll have to repeat what you say,

19   because you're not at a microphone.

20             MR. EISENBERG:  Can I approach to speak at the

21   microphone?

22             THE COURT:  Yes.

23             MR. EISENBERG:  And also, I can project if that

24   helps.

25             THE COURT:  No, because the microphones are going to

1  New York and the phone lines, so --

2          MR. ROSEN:  While he gets here, Your Honor, and I

3  know I'll repeat it later, the ECF number for Mr. Elliott is

4  4769.

5          MR. EISENBERG:  Good afternoon, Your Honor.  Gary

6  Eisenberg from Perkins Coie on behalf of the GMS Group, also

7  with co-counsel Rafael Gonzalez Valiente of the firm of

8  Godreau & Gonzalez.  And I thank the Court for allowing me to

9  approach the podium so for the first time in my life I do not

10 have to approach the bench from the jury box.

11         I wanted to just clarify back with respect to the

12 Exhibits F, H and I, the --

13         THE COURT:  Those are exhibits to what?

14         MR. EISENBERG:  Those are exhibits to the Konsig

15 Declaration, Your Honor, 4764.

16         THE COURT:  Yes.

17         MR. EISENBERG:  The agreement that the parties

18 reached during lunch was that they objected to their

19 admissibility.  Our only response to that is prior to the

20 conduct of the hearing today, the Court's Order regarding the

21 admissibility of declarations required that if anybody wished

22 to challenge any declaration, there had to be a notice filed

23 as to the intent to cross-examine that declarant.

24         And nobody objected to the admissibility of any of

25 the declarations that GMS has submitted.  So it's a very

1   simple question for the Court to address, whether or not that

2   timeline applies.  I think we agreed the three exhibits they

3   referred to are documents that would be hearsay if we actually

4   argued the matter.

5        So it's not lengthy legal argument.  It's an issue of

6   whether they come in because they were not objected to

7   timely.

8        THE COURT:  Well, I don't believe my Procedural Order

9   specified advance articulation of objections to documentary

10  exhibits.  What I was trying to get a handle on by issuing

11  that Order was the extent to which there would be requests for

12  cross-examination or proffers of additional witnesses.

13       MR. EISENBERG:  And we have an agreement that F, H

14  and I would not be admitted.

15       THE COURT:  Thank you.  And that same goes for

16  Exhibits Two and Three of Elliott?

17       MR. EISENBERG:  Two and Three of the Elliot

18  Declaration.

19       MR. ROSEN:  Your Honor, based on the agreement

20  Mr. Eisenberg and Mr. Kirpalani reached, there would be

21  cross-examination of Mr. Elliott for 30 minutes with a

22  redirect examination of ten minutes.

23       THE COURT:  Thank you.

24       MR. ROSEN:  There is one additional declaration of

25  Mr. Hein.  And I say Mr. Eisenberg does not represent

1    Mr. Hein.  He is appearing pro se out of New York, Your

2    Honor.

3          THE COURT:  Yes.

4          MR. ROSEN:  But Mr. Hein has attempted to use his

5    Declaration, and so there was a dialogue between the parties,

6    and I believe an understanding reached, with respect to it,

7    subject to speaking with Mr. Hein.  But he was not able to be

8    reached due to perhaps his inability to have an electronic

9    device in New York.  I don't know.  But I can at least state

10   on the record what the parties agreed to, Your Honor.

11         MR. EISENBERG:  And during the lunch, Your Honor, I

12   tried to call Mr. Hein and I tried to e-mail him.  I did send

13   an e-mail.  Whether he has seen it at this point, I don't

14   know.  He probably is in the courtroom or at least I hope he

15   is in the courtroom in New York, and maybe he can speak to

16   this himself.

17         There have been a number of portions of his

18   Declaration to which there is agreement that those portions

19   and those exhibits would be admitted.  And with respect to the

20   rest of that, I have to let Mr. Hein speak to it, because it's

21   his issue, not my issue.

22         MR. ROSEN:  I see that Mr. Hein has approached the

23   podium.  If I could at least announce what these parties

24   agreed to and then find out what Mr. Hein thinks of it, Your

25   Honor?

1          THE COURT:  Yes.

2          MR. ROSEN:  Your Honor, the Declaration would be

3    admitted except with respect to paragraphs 10, 11, 12, 13, 14,

4    15, 31, 35, 42, 43, 46, 49, 51, 52, 53.  And Your Honor,

5    Mr. Hein is an experienced litigator in New York at the

6    Wachtell firm.  And we believe that these are legal in nature,

7    and he'd be able to assert whatever he wants to do in

8    connection with his legal argument, but not in the nature of

9    any testimony itself.  And there would also be the exclusion

10   of paragraphs 28 and 41.

11         THE COURT:  So may I just say, so we would -- your

12   proposal is that I accept those particular paragraphs as legal

13   argument, but not as factual matter in the nature of

14   evidence.

15         MR. ROSEN:  That is correct, Your Honor.

16         With respect to paragraphs 28 and 41, they would be

17   not for the truth of what they asserted in those paragraphs.

18         Additionally, Your Honor, Exhibit N to his

19   declaration is a copy of his Proof of Claim.  Claim number

20   10701.  We believe the Court can take judicial notice of that

21   Proof of Claim, but it annexes as Exhibit B to it an article

22   from Bond Buyer, which is hearsay, and we would suggest or the

23   parties have agreed that it would be excluded.  I assume

24   Mr. Hein agrees with that as well.

25         THE COURT:  "It" being the Bond Buyer article?

1          MR. ROSEN:  Exactly, Your Honor.

2          THE COURT:  And I would take notice that the Proof of

3    Claim exists and that that is the assertion made by Mr. Hein

4    in his Proof of Claim?

5          MR. ROSEN:  That is correct, Your Honor.

6          And then there would be no cross-examination of

7    Mr. Hein.

8          THE COURT:  Thank you.

9          Mr. Hein, is this acceptable to you?

10          MR. HEIN:  Actually, Your Honor, this is the first

11    I'm hearing of it, because I cannot bring electronic devices

12    into the courthouse here.  I have not received any

13    communication, and don't have my electronic device in the

14    courtroom.  I had to check it downstairs.

15          So unfortunately, Your Honor, this is the first I'm

16    hearing of this.  I think, you know, my -- just -- I'm just

17    reacting on the spot.  The Exhibit B to my Proof of Claim, the

18    Bond Buyer article, I certainly think that ought to at least

19    be taken as legal argument, as part of my objection.

20          There was a reference to paragraph 28.  Paragraph 28

21    attaches a transcript of an October 31 investor call by the

22    Government Development Bank for Puerto Rico, referred to by

23    Puerto Rico as a conference call about COFINA legal opinions.

24    The transcript is on the Government Development Bank investor

25    resources website.  That's where I got the document.  It's

1     from a Puerto Rico Government website.

2          So this is something that would be certainly, I

3     think, appropriate for the Court to consider.  It's a public

4     record document, statement by the Government of Puerto Rico.

5     And I certainly think we can charge the Commonwealth with its

6     own statements.

7          And as to the other specifics, I was not able to

8     write down all of the paragraph numbers.  Forty-one, there

9     again you have a presentation made by the Commonwealth of

10    Puerto Rico on an investor webcast October 15, 2013.  I

11    highlight, at page 57, where the Commonwealth makes the point

12    that their per capita tax burden is the lowest of any U.S.

13    jurisdiction.  Why?  Because they don't pay federal taxes,

14    they don't have to pay federal taxes and service the U.S.

15    Government debt.

16         It's the Commonwealth who's making the point that you

17    cannot compare the Puerto Rico per capita debt to the per

18    capita debt of a state.  It's just apples to oranges.  It's

19    not a valid comparison.

20         Page 63 of that same Exhibit F.  And Your Honor, if I

21    may just pull my document?  May I indulge on you for ten

22    seconds to pull it?  It's out of my current reach.

23              THE COURT:  Yes.

24              MR. HEIN:  Thank you.

25              THE COURT:  Yes, you may.

1          MR. EISENBERG:  It appears the camera may have

2    frozen, Your Honor, because Mr. Hein is maintaining a very

3    stoic, unmoving position.

4          MR. HEIN:  I'm back.  So page 60 is another

5    Commonwealth document.  The Commonwealth is telling investors,

6    COFINA is secured by a stable stream of revenues that is not

7    subject to clawback.  Law 91, 2006, which created COFINA,

8    transferred ownership of a portion of the sales tax to COFINA

9    and provided that any transferred portion was not available

10   resources under the Constitution provisions related to full

11   faith and credit bonds.

12         So --

13         THE COURT:  I'm sorry.  So are you arguing that the

14   statements attributed to GDB and/or the Commonwealth in those

15   documents, the transcript and the record of the call, are

16   statements attributable to COFINA as a party opponent and

17   therefore excepted from the hearsay rule?  Is that where

18   you're going?

19         MR. HEIN:  I think they're both attributable to

20   COFINA, as well as the Commonwealth, which is seeking to take

21   bondholder money that does not belong to the Commonwealth.

22         And yes, absolutely, I believe that these statements

23   are chargeable to the Puerto Rican parties to this proceeding.

24   And I think -- frankly, I'm just honestly aghast that Puerto

25   Rico would take the position that its own official statements

1    cannot be offered in this proceeding.

2            MR. KIRPALANI:  May I respond?

3            THE COURT:  Mr. Kirpalani.

4            MR. KIRPALANI:  Yes.  If I can respond, Your Honor?

5        So to be clear, and I apologize in advance to

6    Mr. Hein, there was no attempt to surprise you with anything.

7    It's just we've all been doing a lot of things over the past

8    several days.

9            Paragraph 28 and paragraph 41 of Mr. Hein's

10   Declaration attach investor presentations by the GDB in the

11   first instance, and statements of former either government

12   officials or government advisors to the Commonwealth or GDB in

13   the case of paragraph 41.

14           Our position is those are not binding admissions as

15   against COFINA appearing through the Oversight Board.  But we

16   don't object they be included in Mr. Hein's Declaration.  We

17   just don't think that they're for the truth of the matter

18   asserted.

19           THE COURT:  So you don't have a problem with them

20   staying in the record, but what you're asking me to accept is

21   that it is recorded that those statements were made but not

22   accept that as proof of the underlying propositions?

23           MR. KIRPALANI:  That's correct.

24           THE COURT:  Mr. Hein, can you live with that?

25           MR. HEIN:  I honestly think that this should be

1   binding and preclusive.  And it goes beyond what I just read.

2   I mean, they're also referencing the Puerto Rico based

3   Underwriters Council, the Puerto Rico Secretary of Justice and

4   their strong legal opinions that SUT is not subject to

5   clawback by GO bondholders under the Puerto Rico Constitution.

6   Clawback opinion enjoys broad bipartisan support.  Four

7   different Secretaries of Justice serving three different

8   administrations of alternating political parties have issued

9   official opinions that the SUT allocated to COFINA is not

10  subject to clawback.

11        I mean, this is what Puerto Rico was telling

12  investors like me.  And to say this should not be admitted,

13  frankly, for the truth, I think Your Honor is doing an

14  injustice.

15        THE COURT:  I will take them for the fact that the

16  statements were made as recorded in those documents.  The

17  ultimate legal status of the bonds, which is a disputed issue

18  here, is one that either needs to be settled or litigated and

19  decided by a court, as opposed to -- oh, my goodness.  We've,

20  at least I've lost the picture.

21        Mr. Hein, can you still hear me?

22        MR. HEIN:  I can still hear you, Your Honor.  Thank

23  you.

24        THE COURT:  Okay.  Is one that would be decided by a

25  court, and not by an opinion or a statement of the government.

1          And so the objection is sustained to the extent that

2     Exhibits 28 and 41 are admitted for their existence of the

3     statements and not for the truth of the matters asserted.

4          MR. HEIN:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          And with respect to the paragraphs of your

7     Declaration, the proposal is to accept those particular

8     paragraphs as legal arguments, legal advocacy as opposed to

9     factual statements, and that's a distinction I understand and

10    work with all the time.  Can you live with that?

11         MR. HEIN:  I honestly haven't been able to reread

12    them, and I'm not sure I caught all of them.

13         What I would request, Your Honor, is that before I

14    make my legal argument, I'd like to have the complete list of

15    the paragraphs objected to, and at least look at them to see

16    whether I have a disagreement with that, Your Honor.

17         THE COURT:  That's fine.  Should I repeat the list

18    that I was given, or Mr. Kirpalani --

19         MR. KIRPALANI:  I can do it.  Thank you, Your Honor.

20         So it would be paragraphs 10, 11, 12, 13, 14, 15, 31,

21    35, 42, 43, 46, 49, 51, 52, 53, and 54.

22         MR. HEIN:  And I will take a look at those off line,

23    and when I speak to articulate my legal argument, I will

24    advise Your Honor if I have any problem with that.  Thank you

25    very much.

1          THE COURT:  Thank you, Mr. Hein.

2          MR. HEIN:  Thank you very much.

3          THE COURT:  Mr. Rosen.

4          MR. ROSEN:  Thank you, Your Honor.

5          Your Honor, that would take us back to what would be

6   the debtors' three witnesses to be presented.  And Your Honor,

7   subject to the Court's determination with respect to the

8   standing issue, but even then, I'm not even sure it will

9   matter, because I don't think that PROSOL-UTIER has made a

10  formal request with respect to either of the three witnesses.

11         The debtors would put up Ms. Christina Pullo from

12  Prime Clerk and admit her declaration and exhibits into

13  evidence.  There's been no request with respect to a

14  cross-examination.  She was the tabulation agent with respect

15  to the Plan of Adjustment, acceptances and elections.

16         We also have Ms. Natalie Jaresko again, Your Honor,

17  with respect to confirmation related issues, and we would move

18  her declaration and exhibits into evidence.

19         And there has been, as far as we know, Your Honor, no

20  request for any cross-examination.  And consistent with the

21  Court's Order, no one has posited any factual issues or any

22  exhibits with respect to cross-examination.

23         Likewise, there was Mr. David Brownstein, who would

24  be our third witness, Your Honor.  We have his declaration

25  also submitted to the Court and would have exhibits to be

1   admitted.

2          There was a request in connection with GMS Energy --

3   oh, okay.  There was a request by GMS Energy.  It wasn't even

4   a request, Your Honor.  It was a reference that they might

5   have an interest in doing cross-examination of Mr. Brownstein.

6   But based upon the understanding that was reached with respect

7   to the prior witnesses and those declarations, we've been

8   informed by GMS Energy that they do not have any desire to

9   cross-examine Mr. Brownstein.

10          And again, Your Honor, unless something else comes

11   out, we would not expect any of the three debtors to be

12   cross-examined.  There would also be, and I apologize,

13   Mr. Kirpalani just reminded me, that there would be

14   Mr. Feldman as well.  We would again put his declaration back

15   into evidence, Your Honor, as it was filed in connection with

16   the COFINA Plan of Adjustment.

17          And likewise, Your Honor, to the extent necessary, we

18   would want to incorporate Ms. Jaresko's prior declaration on

19   the 9019 issues that was submitted earlier today.

20          THE COURT:  I seem to recall that GMS had filed a

21   joinder to the PROSOL-UTIER evidentiary objection to the

22   Jaresko Plan and Brownstein Declarations.  I may be wrong

23   about that.

24          MR. ROSEN:  Your Honor, I think that that may be, in

25   fact, the truth.  But my understanding is that based upon

1  this, that joinder, with respect to those, would be removed

2  because they are agreeable to those being admitted into

3  evidence.

4         THE COURT:  Very well.  So I'll consider that joinder

5  withdrawn.

6         MR. ROSEN:  Yes.  Thank you, Your Honor.

7         MR. EISENBERG:  And one other point, Your Honor.

8  While I appreciate the energy boost that counsel gave me, it's

9  GMS Group, LLC, not GMS Energy.

10         MR. ROSEN:  I apologize.

11         THE COURT:  Mr. Eisenberg has just said that it was

12  GMS Group as opposed to GMS Energy, but he's not otherwise

13  disagreeing with the statement that Mr. Rosen has made.

14         MR. EISENBERG:  And that's just part of the overall

15  resolution, that we appreciate that.

16         THE COURT:  And Mr. Eisenberg confirmed that that

17  agreement to withdraw the joinder is part of the overall

18  agreement that has been reached.

19         MR. ROSEN:  Thank you, Your Honor.  I think that

20  would take us then back to the standing issue, Your Honor.

21         THE COURT:  Yes.

22         MR. ROSEN:  Your Honor, I apologize.  There was one I

23  omitted, because I went straight to the GMS Group witnesses.

24  The other witness would be Mr. Matt Rodrigue, who was someone

25  that GMS Group said that they wished to depose.

1      And as Your Honor recalls, in connection with the

2  Agenda, they filed an opposition to the Agenda with respect to

3  the timing necessary for cross-examination.  Mr. Rodrigue's

4  declaration will be put into evidence.  It will be accepted.

5  And Exhibits One, Two and Three to it will also be admitted.

6      Rather than the three hours that were previously

7  indicated in their informative motion, based upon the

8  understandings that have been reached with respect to the

9  other declarants, they are requesting a cross-examination time

10  of 15 -- 45 minutes, excuse me, and a redirect of 15 minutes.

11  I'm sorry about that.

12      THE COURT:  Thank you.

13      All right.  And so, Mr. Firestein?

14      MR. FIRESTEIN:  Thank you.  Good afternoon, Your

15  Honor.  Michael Firestein of Proskauer Rose on behalf of the

16  Oversight Board.

17      Unfortunately, over the lunch hour, we were unable to

18  resolve either the standing issue or the evidentiary concerns

19  that were expressed by both sides relative to the declarations

20  that were submitted.

21      If I could indulge the Court, perhaps the easiest and

22  best way to go about this is to first address the standing

23  issue, because to the extent that that objection is sustained,

24  it will moot the evidentiary points that relate to each of the

25  declarations and might well streamline this process even

1  further.

2  THE COURT:  Yes.  Yes.

3  MR. FIRESTEIN:  Would you like me to proceed, Your

4  Honor, on the standing issue?

5  THE COURT:  Yes, please.  You initially raised that

6  there was a Response filed last night by PROSOL, which I have

7  reviewed.  And so you can begin by way of sort of reply to

8  that Response and make any other points that you believe

9  crucial.

10  MR. FIRESTEIN:  Well, I think that the Response

11  actually proves the point that we're indeed seeking to make,

12  Your Honor.  And if I can back up for a moment, I think I can

13  fill in directly to the section of the Response that's helpful

14  to the issue that I have in mind.  I don't believe my argument

15  is going to take more than a couple of moments regardless.

16  PROSOL-UTIER has no standing to object regarding the

17  COFINA Plan.  They're not a creditor of COFINA.  They don't

18  claim to be a creditor of COFINA.  They don't even represent

19  such in their reply that they've submitted.

20  The only argument that they've made is with respect

21  to the Commonwealth position.  Under applicable law that we

22  cited in our objection, to which they really don't address,

23  per se, that's not enough, a party can't challenge a portion

24  of a plan that doesn't affect their interest.  They don't have

25  one.

1          The Commonwealth's Plan of Adjustment is not up for

2     hearing today, and the bulk of what they've spoken about and

3     what they reference, even in their reply papers that they have

4     filed here today, speaks directly to that.  I believe Your

5     Honor made reference to that topical issue in your opening

6     remarks this morning.

7          There is no understanding or suggestion relevant

8     today as to how much Commonwealth debt will be paid or

9     adjusted, or how much will be available for services pursuant

10    to any Plan of Adjustment that is put forth at some other time

11    in the future.

12         And I think the way this ties in is directly to the

13    notion of feasibility.  The feasibility concerns that they are

14    expressing relate to Commonwealth expenditures down the road.

15    They've not really offered any evidence that goes directly to

16    the issue about the feasibility of the matter that's before

17    the Court today.  And that's COFINA's ability to sustain that

18    debt.

19         In paragraph 8 of their reply, they, in fact,

20    virtually acknowledge the notion by referencing the SUT as

21    being a vital revenue for the Commonwealth that is crucial to

22    comply with the estimates of revenues and expenditures, in

23    conformance with agreed accounting standards, to ensure the

24    funding of essential services.  COFINA does not provide

25    essential services.

1      The circumstance that we're presented here today is

2  with respect to COFINA's ability to sustain that debt.  And so

3  under those circumstances, Your Honor, they don't really offer

4  any evidence that COFINA is unable to sustain that debt.

5      And the position that they are taking is not with

6  respect to COFINA.  They attempt to intermingle the two.  I

7  acknowledge that fact, COFINA and the Commonwealth, but this

8  is a fundamental standing issue and a gating issue.  As far as

9  their ability to raise issues, this is not the first time, I

10  don't believe, that this Court has encountered issues of

11  representative groups seeking to address or seek redress in

12  connection with matters for which they don't have prudential

13  standing or a direct pecuniary interest in connection with

14  what the claims happen to be.

15      So on that basis, Your Honor, we don't believe that

16  they have standing in connection with this to assert that.

17  And if this objection were sustained, it would preclude them

18  from either introducing any evidence in connection with those

19  Commonwealth-related issues, or frankly, cross-examining

20  relative to COFINA, because they don't have a direct interest

21  in the process.

22      THE COURT:  Now, are you taking the same position

23  with respect to the SEIU and UAW, which have also filed

24  objections to the Plan, and also the group of objectors that

25  includes Mr. Pinto Lugo, Mr. Natal Albelo and VAMOS, and other

1  entities?

2         MR. FIRESTEIN:  Yes, Your Honor, but -- the answer to

3  your question is yes.  However, the reason why we're having

4  this as a gating issue is because this particular party,

5  PROSOL-UTIER, is the only one that expressed any issues

6  concerning the evidence presentation regarding today's

7  proceedings.

8         THE COURT:  So are you -- well, my question is how

9  deep does your objection to the appearance go?  Are you saying

10 that you're not asking for those objection documents to be

11 stricken, or are you contemplating permitting representatives

12 of those objectors to speak as objectors and just seeking to

13 preclude evidentiary participation?

14        MR. FIRESTEIN:  You know, I think in fairness to this

15 process, Your Honor, that we would not object to them arguing,

16 but the use of evidence or presentation or countering to

17 evidence, I think, is something that goes to the heart of the

18 standing matter that should be precluded.

19        THE COURT:  All right.  So your motion here, your

20 application to the Court, just to be clear, would be to

21 preclude PROSOL-UTIER, which is the only one that has asked to

22 introduce evidence and participate in the evidentiary

23 proceedings from doing that, but you would -- you don't object

24 to my consideration of the arguments in the written objection

25 filed by that entity, and the other two that I mentioned, and

1    time may be allocated to counsel for those objectors to make

2    legal argument in opposition to the Plan Confirmation Motion?

3         MR. FIRESTEIN:  If I might confer with my client for

4    just one moment, Your Honor?

5         THE COURT:  Yes.

6         MR. FIRESTEIN:  You've correctly described our

7    position, Your Honor.

8         THE COURT:  Thank you.  So --

9         MR. FIRESTEIN:  And by the way, Your Honor, they are

10   separate and individualized type things, but this gating

11   issue, I think, needs to come first, because it will dictate

12   whether these other matters become relevant for consideration

13   by the Court.

14        THE COURT:  Yes.  And so if you're finished, I'll

15   call on Mr. Emmanuelli Jimenez to respond.

16        MR. EMMANUELLI JIMENEZ:  Yes.

17        THE COURT:  Yes.  And all those whose names I'm

18   mispronouncing, please forgive me.  I'm doing my best.

19        MR. EMMANUELLI JIMENEZ:  It's okay.  Emmanuelli

20   Jimenez is okay.

21        THE COURT:  Thank you.

22        MR. EMMANUELLI JIMENEZ:  For the record, I'm Rolando

23   Emmanuelli Jimenez on behalf of PROSOL-UTIER.  PROSOL-UTIER

24   represents governmental employees and retirees.  They are

25   parties in interest in these proceedings.  PROSOL members are

1   retirees that will be affected by the location of funds and

2   debt service to COFINA bondholders, according to the Plan of

3   Adjustment of debt.

4           This was very clear for the Oversight Board when it

5   did not object to PROSOL's opposition to the COFINA settlement

6   motion.  PROSOL will suffer an injury, in fact, if the COFINA

7   settlement is approved.

8           The Court has already received heartbreaking

9   testimony of the suffering of public workers in Puerto Rico,

10  many of them represented by UTIER.

11          THE COURT:  May I just say that I do -- I recognize

12  those statements and the arguments made by PROSOL-UTIER, as

13  ones that have been offered to the Court in opposition to the

14  motion for approval of the settlement.

15          And so to the extent they have been offered in

16  connection with the 9019, they are in the record.  I will have

17  to make a legal decision as to what the precise legal issues

18  are --

19          MR. EMMANUELLI JIMENEZ:  Yes.

20          THE COURT:  -- that drive the question of approval,

21  but it is recognized as opposition to the settlement, the

22  division of the SUT between COFINA and the Commonwealth.

23          MR. EMMANUELLI JIMENEZ:  Yes.  I'm going to the

24  issue.

25          The COFINA settlement is the only base for the COFINA

1    Plan of Adjustment.  The Oversight Board contends that

2    PROSOL-UTIER has standing to object to the settlement but not

3    the Plan of Adjustment.  Why so?  Because they say that PROSOL

4    is a creditor of a creditor.

5         That is just a game of words, Your Honor.  If PROSOL

6    has standing to object to the settlement, even without being a

7    COFINA creditor, how come there is no standing to object to

8    the Plan of Adjustment, when its confirmation will directly

9    affect the amount of funds available for pensions and

10   essential services?  PROSOL suffers an injury, in fact, under

11   both situations.

12        Even Mrs. Jaresko recognized that the settlement, and

13   therefore the Plan of Adjustment, is a necessary component of

14   the Commonwealth to maximize recoveries for stakeholders.

15   Besides, PROSOL is the only party who presented a scientific

16   study by a qualified expert about the lack of feasibility of

17   the Plan of Adjustment for COFINA.

18        The Oversight Board did not even submit a study to

19   sustain the allegations for the confirmation of the Plan.  In

20   that study of Mr. Almeida, Dr. Almeida, it is evident how come

21   PROSOL-UTIER and the people of Puerto Rico are going to be

22   affected by the confirmation of the Plan of Adjustment.

23        THE COURT:  Well, I've reviewed that declaration.

24   What in that declaration addresses the feasibility of the

25   commitment of the first 5.5 percent of the SUT to --

1          MR. EMMANUELLI JIMENEZ:  If I may find my -- the

2     study?

3          THE COURT:  I'm sorry.

4          MR. EMMANUELLI JIMENEZ:  If I may go back to find the

5     study?

6          THE COURT:  Yes.

7          And so, as I have reviewed the declaration, it

8     certainly makes holistic assertions that the full projections

9     for SUT revenues may not be achieved, and that SUT collections

10    in general may go down, further burdening the Commonwealth's

11    ability to provide for essential services, pensions and so

12    forth.

13         I do not recall seeing anything in that declaration

14    that says COFINA -- they would go so low that COFINA would not

15    be able to receive, over time, the five and a half percent

16    upon which distributions under the proposed COFINA Plan are

17    predicated.  And so I don't see in that proffer anything that

18    goes to the feasibility of the COFINA Plan as such.

19         So if there's something that you want to point me to

20    and help me understand that in a different way --

21         MR. EMMANUELLI JIMENEZ:  Yes.  You could go, Your

22    Honor, to part six of the study that is on page 35, where Dr.

23    Almeida ordered forecasting of the SUT collections.

24         And the issue here is, Your Honor, that confirmation

25    of the Plan of Adjustment of a governmental entity needs to

1   address, first, if the entity will be able to cover for

2   essential services and to provide the services the population

3   needs.

4           And if the COFINA Plan reduces the amount of funds of

5   the Commonwealth, the Commonwealth, as an entity that --

6   COFINA is part of the Commonwealth, would not be able to cover

7   for the essential services necessary for the population, that

8   you heard many testimonies here regarding that issue.

9           The feasibility issue is addressed by Dr. Almeida,

10  because he predicted that the income or the revenues from the

11  SUT are going to go down for the next 40 years.  And

12  therefore, we don't know, we could have any type of disaster,

13  we could have any type of economic situation in Puerto Rico

14  that would be necessary to reduce or even cancel payment to

15  COFINA bondholders.

16          So Dr. Almeida addressed all the concerns regarding

17  not only the Commonwealth plan, the fiscal plan, but also the

18  problems with the fiscal plan of COFINA and the Plan of

19  Adjustment of COFINA.

20          THE COURT:  Thank you.

21          MR. EMMANUELLI JIMENEZ:  I was saying, Your Honor,

22  that, besides, PROSOL was the only party who presented the

23  study, and that the presentation of a study to sustain the

24  allegations necessary to confirm the Plan are artificially the

25  burden of the Board, of the Oversight Board.

1           The only strategy that the Oversight Board could

2    resort to distract the attention on this fundamental omission

3    is to object to PROSOL's standing and to try to exclude Dr.

4    Almeida's testimony, affecting the access of this Court to

5    this essential information.

6           This is not comparable to any other Chapter Nine

7    case, Your Honor.  This is the adjustment of debt of a whole

8    country, Puerto Rico.  Everybody is injured by PROMESA and

9    these proceedings.  Therefore, it has standing to appear and

10   complain their grievances to this Court.

11          Just look at the hundred -- at the hundreds of people

12   that are outside of this court that are protesting the

13   settlement and the confirmation of the Plan.  We believe, Your

14   Honor, that PROSOL-UTIER has standing.

15          THE COURT:  Thank you.

16          MR. FIRESTEIN:  Very briefly.

17          THE COURT:  Mr. Firestein.

18          MR. FIRESTEIN:  Very briefly, Your Honor.  Michael

19   Firestein on behalf of the Oversight Board.

20          Point number one, as Your Honor pointed out, they

21   objected to the settlement.  That portion of the record has

22   been closed.  That does not give them standing to address the

23   Plan of Adjustment on behalf of COFINA.

24          The 9019 motion was brought on behalf of the

25   Commonwealth, and we heard lots of people raise their

1    concerns, both pro and con, with respect to the settlement.

2    But here we're focusing on the Plan of Confirmation for

3    COFINA.  They're not a creditor.

4         And I listened carefully to what Mr. Emmanuelli said

5    and what he's written, and nowhere are they reflected as

6    having a direct pecuniary interest, much less being a creditor

7    of COFINA, which is the subject of this.

8         Point two, the report that Dr. Almeida prepares goes

9    directly to the ability to sustain Commonwealth services, not

10   COFINA.  Your Honor's comment was insightful to the notion of

11   holistic references to the COFINA Plan, but the point of it

12   has to do with the Commonwealth.

13        That's not what is present for consideration here

14   today.  There is nothing in Dr. Almeida's report that

15   addresses the issue of COFINA's ability to sustain its debt

16   service.  And the reason why is because that's not the thesis

17   of what they're trying to present.

18        They're intending to try to inject Commonwealth

19   objections, which may or may not be appropriate under the 9019

20   motion, but that matter has been concluded.  But as far as we

21   stand here today, they don't have standing in the COFINA Plan

22   of Adjustment in order to be able to present evidence or to be

23   able to counter the evidence that has been presented here.

24        Again, we have no objection to them presenting their

25   arguments that they wish to do, but for purposes of these

1   proceedings, any other activity would be precluded by lack of

2   standing.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.  I would ask -- I'm sorry.

5   Mr. Eisenberg, did you wish to be heard?

6          MR. EISENBERG:  On one brief point, Your Honor.

7          THE COURT:  Come quickly, please.

8          MR. EISENBERG:  Your Honor, the standing argument is

9   not my client's argument, and we don't take a position on the

10  standing argument, except that to the extent that somebody

11  wants to allow time for Mr. Emmanuelli to argue his position,

12  it shouldn't come at the expense of my clients being able to

13  assert their positions.

14         Our position is as a creditor of COFINA, and we have

15  a direct opposite interest where it's not as if we're aligned

16  because we are called common objectors for the same reasons.

17  If Mr. Kirpalani had his way, my clients would get nothing.

18  If we had our way, his clients would have nothing --

19         THE COURT:  Slow down just a little.

20         MR. EISENBERG:  -- in an extreme sense.  So I think

21  that if the proponent of the plan wishes to allow the

22  objections to be made by Mr. Emmanuelli, it should not come at

23  the expense of our ability to have sufficient time to make our

24  presentation.

25         THE COURT:  Thank you.

1          It seems to me that the time projections and the time

2     we have left will permit us to hear whoever I need to hear.

3          MR. FIRESTEIN:  Thank you, Your Honor.

4          THE COURT:  So I'm asking everybody to sit quietly

5     with me for two or three minutes while I gather my thoughts,

6     and I will rule on the standing issue.

7          Thank you for your silence and your patience.

8          I've reviewed carefully the materials and written

9     arguments that were submitted on this issue before today, and

10    I've listened very carefully to everything that has been said

11    on this standing issue this afternoon.

12         The application by COFINA is to preclude PROSOL-UTIER

13    from offering evidence and cross-examining witnesses on the

14    grounds of lack of prudential standing.  I am not being

15    requested to preclude legal argument by PROSOL-UTIER, so I am

16    not considering the question of prudential standing on that

17    basis, because we will have time for arguments.

18         But the application that has been made to preclude

19    the proffer of evidence and cross-examination of evidence by

20    PROSOL-UTIER is granted.

21         Although a party in interest may object to the

22    confirmation of a proposed plan pursuant to Section 1128(b) of

23    the Bankruptcy Code, which is incorporated by PROMESA, the

24    party in interest must meet the requirements for prudential

25    standing, and may only challenge the portions of the plan that

1    affect its interest. *See In re: Quigley Company*, 391 B.R.

2    695 at 703 (Bankr. S.D.N.Y. 2008).

3          Furthermore, a party in interest cannot assert a

4    third party's rights to defeat confirmation, even if

5    confirmation would directly affect its own rights.  Prudential

6    standing is especially significant in bankruptcy cases where

7    numerous parties may seek to interject themselves on every

8    issue, thereby impeding the goal of an efficient

9    reorganization. *See In re: Revco 21, Inc.*, 505 F3d 109 at

10   118 (2d Cir. 2007).

11         The proposed COFINA Plan of Adjustment presents

12   issues relating to the reasonableness, from COFINA's

13   perspective, of the proposed settlement, the legal compliance

14   of the proposed Plan, and COFINA's relationship with its

15   bondholders going forward.

16         The Court has already heard evidence and argument

17   concerning the settlement from the Commonwealth's perspective.

18   The employees of the Commonwealth and the people of the

19   Commonwealth in general will not be directly affected by the

20   restructuring of COFINA's relationship with its bondholders.

21   Therefore, PROSOL-UTIER does not have prudential standing to

22   object to this proposed COFINA Plan.

23         PROSOL-UTIER has not shown how denial of confirmation

24   of the Plan, as opposed to a refusal of approval of a

25   settlement, will redress the alleged injuries of its

1   constituents.  And in particular, any overlap in projections

2   between the COFINA Plan and the Commonwealth's Fiscal Plan

3   does not confer standing to argue that the COFINA Plan is not

4   confirmable because aspects of the overlapping fiscal plans

5   that affect the Commonwealth's economic future allegedly do

6   not comply with PROMESA's requirements for fiscal plans or

7   might threaten the ability of the Commonwealth to propose a

8   feasible plan for the Commonwealth in the future.

9        Therefore, the application to preclude evidentiary

10  proffers by PROSOL-UTIER is granted, although argument as an

11  opponent will be permitted.  Thank you.

12       And so are we ready for opening argument?

13  Mr. Firestein.

14       MR. FIRESTEIN:  Thank you, Your Honor.  Just as a

15  matter of process, I believe that thereby renders moot the

16  evidentiary objections that went back and forth, as well as

17  the Motion in Limine that was filed by PROSOL-UTIER.

18       And I don't know from the Court's perspective whether

19  they just need to be either declared moot pursuant to the

20  Order, stricken from the record, denied as a consequence of

21  the Order, but I think as a function of complete record

22  keeping, for whatever purposes may follow --

23       THE COURT:  Yes.

24       MR. FIRESTEIN:  -- in the future of these

25  proceedings, some specific adjudication on that point should

1    be made, respectfully.

2            THE COURT:  And so the COFINA evidentiary objections

3    to the Lozada Declaration, which is ECF number 4761, and

4    whatever the parallel entry would be in Case No. 17-3284, if

5    it was filed in both, is denied as mooted by my determination

6    on standing.

7            And the evidentiary objections to the Jaresko Plan

8    and Brownstein Declaration filed by PROSOL-UTIER as entry

9    number 4790 in the 3283 case, and any parallel filing in

10   17-3284, is also denied as mooted by the decision on standing.

11           And the GMS joinder, which is docket number 4805, has

12   been withdrawn in light of the standing determination and

13   negotiations among the parties.

14           MR. FIRESTEIN:  Thank you, Your Honor.

15           THE COURT:  And so what we'll do is we'll have the

16   debtors' opening statement, and the direct testimony, and

17   moving of the debtors' declarations and exhibits into

18   evidence.  And we're not going to have cross-examination or

19   redirect under the agreement.

20           So then we'll take a break.  Let's see, the COFINA

21   Senior Bondholders were not actually on your table.  Okay.  So

22   we will -- yes, so we'll go through the debtors' proffer,

23   we'll take a break and then come back for the COFINA Senior

24   Bondholders.

25           And the break will be short, so don't everybody plan

1    to, you know, go to the park or anything.

2         Mr. Rosen.

3         MR. ROSEN:  Thank you very much, Your Honor.  I

4    appreciate it.

5         Your Honor, as I said several times already today,

6    the Plan is the work of many people and many work streams.

7    And again, I want to give tremendous credit to the mediation

8    team led by Judge Houser, and also the involvement of Judges

9    Ambro and Atlas in getting us to this point.  Without them,

10   Your Honor, I don't think we would have been able to

11   accomplish that.

12        And when I say "accomplish it," I mean that we're

13   here today in connection with the Plan of Adjustment that has

14   garnered the approval of every class of creditors that are

15   entitled to vote.  Class one of the plan, Your Honor, the

16   senior bonds, in amount -- 99.5 percent of that amount, and

17   over 85 percent in number of people voted to accept the plan.

18        Classes two and three, Your Honor, they were the

19   insured classes, and they were 100 percent in favor.  It was

20   only one creditor voting in each.

21        Class four were those that elected out of class one

22   and into class four, which is the taxable bonds, and they

23   deemed to have accepted the plan, Your Honor.  But again, 199

24   million dollars worth of bonds voted to accept the plan in

25   that class.

1          Your Honor, with respect to class five, which is the

2     junior bondholders, 92 -- 92 percent plus voted in favor.  And

3     when I say that, I mean in dollars, Your Honor.  6.4 billion

4     dollars voted in favor of the plan.  And over 67 percent of a

5     number, while only 50 percent is necessary, voted in favor of

6     the plan.

7          Class six is another insured class, but this time on

8     the junior basis, Your Honor.  That class voted in favor as

9     well.  It was one vote, and it was Assured.

10         Class seven, Your Honor, were the taxable bonds or

11    the election that was made by junior holders to opt out of

12    class five and go into class seven.  And there, Your Honor,

13    1.2 billion dollars worth of bonds voted in favor of the plan.

14    Of course, once they did that, there were no objections, so

15    that was unanimity again.

16         Class eight, Your Honor, it was a solo creditor,

17    Goldman Sachs, and they decided not to vote on the plan, but

18    pursuant to the disclosure statement Order, the no vote, Your

19    Honor, the null set, if you will, the null class, is deemed to

20    have accepted the Plan.

21         In class nine, the general unsecured creditors, Your

22    Honor, voted a hundred percent in favor of the Plan.

23         Your Honor, what we have here then today, and keeping

24    in mind or keeping off to the side the union arguments that

25    may arise later are just a few objections, and they are all on

1    behalf of junior bondholders.  And they're unhappy.

2         As I think Mr. Eisenberg said earlier, they would

3    love to have everything come in on the COFINA Commonwealth

4    dispute.  Thereby, it might make their argument a little bit

5    stronger.  But that's not where we are, Your Honor.

6         As mentioned, the Plan incorporates the hard fought

7    resolution of the Commonwealth-COFINA dispute by the agents

8    and the significant creditors of both debtors under the

9    auspices of the mediation team.  And it takes into account,

10   Your Honor, the pros and the cons of such dispute, and the

11   allegations that were asserted also by the senior bondholders

12   and the junior bondholders with respect to each other in the

13   context of the multiple litigations, including the

14   interpleader action where those senior, junior issues arose or

15   were at least voiced, Your Honor.

16        And by definition, Your Honor, there were many

17   compromises made pursuant to the Plan.  The seniors, just to

18   name a few, gave up the right to be paid 100 percent on their

19   claims.  Plus, they gave up a make whole that they allege is

20   worth 2.7 billion dollars.

21        The juniors recognize the existence and the validity

22   of the subordination provisions, and the risk that they may --

23   those provisions might be imposed and enforceable upon them,

24   leaving them to wait a very, very long time before they see

25   penny one.

1          Again, Your Honor, these compromises are embedded in

2    the respective distributions that have been accepted by all

3    classes of the Plan.  As I indicated, Your Honor, various

4    junior creditors acknowledged that they are working in concert

5    here and they oppose confirmation.  We accept that, Your

6    Honor.

7          And many of their arguments are predicated on what we

8    believe is a misunderstanding of the compromise and settlement

9    process and the agreement in principle, and the impact that

10   that compromise and settlement has upon the formulation of a

11   COFINA Plan.

12         They obviously take the position that that compromise

13   doesn't exist in many instances and, therefore, they should be

14   entitled to a greater distribution pursuant to the Plan.  So

15   as a result, Your Honor, they focused as if that litigation

16   didn't occur.  The juniors are in the position as if the Title

17   III case had not even occurred.  Unfortunately, Your Honor,

18   that is not the case and that is not the result.

19         Your Honor, on May 5th, the COFINA Title III case

20   started and the world changed with respect to that filing.

21   And it further changed, Your Honor, with the commencement of

22   the various pieces of litigation and the settlements reached.

23   And it further changed, Your Honor, when the creditors, which

24   are similarly situated to the objectors here, the five

25   objectors in class five, voted to accept the Plan.

1          Ultimately, Your Honor, such creditors have resorted

2     to essentially a shotgun approach to see if anything might

3     stick.  Their objections are vast.  They're far and wide.

4     They've asserted many different things.

5          And as the declarations that will be submitted or

6     already have been submitted to the Court and will be tendered

7     in a moment, they firmly establish every aspect of PROMESA,

8     and to the extent applicable, every aspect of the Bankruptcy

9     Code has been satisfied.

10          The classification of claims has been appropriate and

11     proper.  Every aspect of the Plan and its negotiations,

12     including the mediation process, Your Honor, has been

13     conducted in good faith.  There was no taint to any process,

14     and the parties at interest were more than adequately

15     represented every step of the way.

16          There have been allegations that parties were

17     excluded from that process, but there has been no proof of

18     that.  On the contrary, Your Honor, in connection with one of

19     the interrogatories that we submitted to the Court, in a

20     response that was submitted to us by the GMS Group, they, in

21     fact, acknowledged that they never asked to participate and

22     they were never told that they could not participate in any of

23     the mediation process.

24          And there's been no allegations, or at least no

25     proof, from any other of the objectors that they were

1    precluded in any way from participating in the Court

2    administered mediation process.

3          There are also allegations, Your Honor, about

4    discrimination in favor of on-island bondholders, but this is

5    far from accurate and it's inconsistent with the -- excuse

6    me -- with the provisions.

7          Here, Your Honor, the Puerto Rico investors and the

8    Puerto Rico institutions, as they're defined in the Plan, were

9    asked to assist mainland bondholders by agreeing to take all

10   taxable bonds.  Not the strip of taxable and tax exempt bonds

11   that are being distributed pursuant to the Plan, but rather

12   all taxable bonds, because of the fact that they do not have

13   to pay Federal Income Tax.

14         And by doing so, Your Honor, they are reducing the

15   amount of taxable bonds that would otherwise be distributed to

16   mainland bondholders, like the objecting parties, Your Honor.

17         So by doing so and electing to take a much more

18   illiquid security and, therefore, perhaps less valuable, the

19   Puerto Rico creditors who elected to move into these separate

20   classes, Your Honor, classes four and classes seven of the

21   Plan, and out of classes one and classes five respectively, it

22   was determined that they would be compensated appropriately.

23   And as noted in the boards, in the senior coalition responses,

24   this approach has been found to be appropriate in the context

25   of a Chapter 11 plan, Your Honor.

1          While the junior objectors have also raised a few

2     other points, I'll leave those, Your Honor, for later and the

3     replies that are going to be discussed and also included in

4     the memoranda that have been filed, Your Honor.  But the

5     bottom line that I would like to leave the Court with at this

6     time is that the process that you requested, the process that

7     was put in place by the mediation team, it worked.

8          And while not everyone is one thousand percent happy,

9     and I think Your Honor even acknowledged that's what a

10    compromise might be, from both sides of the dispute, Your

11    Honor, there is an acceptance to this.

12         There is an acceptance to the settlement of the

13    Commonwealth-COFINA split.  There's been an acceptance of the

14    junior, senior dispute.  And that's been voted upon by the

15    creditors, and it's been accepted.

16         So here, Your Honor, with respect to the Plan, we

17    would submit, and the testimony will show, Your Honor, that

18    every aspect of the process has been adhered to.  The

19    disclosure statement process and the solicitation process that

20    the Court asked us to do was extremely successful.

21         Over 8,000 bondholders in Puerto Rico voted or

22    elected in connection with the Plan.  This was done, Your

23    Honor, because we did mailings, we did publications, we did

24    radio broadcasts, all the things that were included in the

25    disclosure statement Order.

1          And they were done to promote access to the populous

2    here, and there was a tremendous response, Your Honor.  And I

3    think based upon that, we have shown that there's been

4    widespread acceptance and approval of the Plan across all

5    classes of creditors, Your Honor.

6          With that, Your Honor, I'd like to move to the

7    evidentiary piece.

8          THE COURT:  Yes.  Thank you.

9          MR. ROSEN:  Your Honor, as I indicated, there are

10   three declarations that we would like to tender in support of

11   the Plan.  They've all been filed in accordance with the

12   Court's Order, and they're deemed to be the Court's direct

13   testimony.

14         The first that I'd like to present the original of,

15   Your Honor, is the declaration of Ms. Christina Pullo of Prime

16   Clerk, LLC.  As I indicated before, Your Honor, she's the

17   representative -- she's the vice president of solicitation of

18   public securities of Prime Clerk.  And she is the

19   representative of Prime Clerk that has been in charge of the

20   tabulation process in connection with acceptances and

21   rejections to the Plan, as well as to the elections that were

22   made in accordance with the various provisions of the Plan.

23         Your Honor, if I could hand this up to your clerk,

24   the original?

25         THE COURT:  Yes.

 1              MR. ROSEN:  Thank you.

 2              THE COURT:  And that is ECF number 4794 in the

 3    17-3283 docket.

 4              MR. ROSEN:  Thank you, Your Honor.

 5              The second declaration I would like to hand up, Your

 6    Honor --

 7              THE COURT:  I'm sorry.  So you're tendering the

 8    declaration and exhibits that are attached, or are those

 9    exhibits that are in a separate compilation?  I see there are

10    some attachments.

11              MR. ROSEN:  Your Honor, those are attached to the

12    Declaration.  They are the actual tabulation of the votes and

13    the elections.

14              We also do have in the courtroom, Your Honor, if the

15    Court would like them or if anybody would like to see them,

16    which I would hope they don't, the actual votes that were

17    submitted to Prime Clerk.

18              THE COURT:  I do not need to have those handed up.

19              MR. ROSEN:  Thank you, Your Honor.

20              THE COURT:  And I don't see any clamoring for them in

21    other corners of the room, so you may go on.

22              MR. ROSEN:  Thank you, Your Honor.

23              Your Honor, the next declaration I would like to

24    tender to the Court is the declaration of Ms. Jaresko.  It is

25    document number 4756.  This was in accordance with the Court's

1    Order, submitted on Saturday and deemed the direct testimony

2    of Ms. Jaresko.

3              In accordance with the understanding that was reached

4    earlier, there would be no cross-examination of Ms. Jaresko

5    with respect to any aspect of the declaration.

6              May I approach, Your Honor?

7              THE COURT:  Yes, you may.  Thank you.

8              And as to this, are the -- what are the exhibits?

9              MR. ROSEN:  Your Honor, I was going to read all of

10   those in after the conclusion of the third.

11             THE COURT:  Okay.  That's fine.

12             MR. ROSEN:  Your Honor, the third declaration that we

13   are going to tender was likewise filed with the Court in

14   accordance with the Court's Order.  It is document number

15   4757.  It is the declaration of Mr. Brownstein.

16   Mr. Brownstein is the managing director and co-head of the

17   municipal finance department and global spread products at

18   Citigroup Global Markets, Inc.  Excuse me.

19             Again, there is no objection as far as we know to the

20   admission of this now, Your Honor.  And likewise, based upon

21   the understanding there is no effort or no request to

22   cross-examine Mr. Brownstein with respect to any aspect of his

23   declaration.

24             May I approach, Your Honor?

25             THE COURT:  Yes.

 1          MR. ROSEN:  Thank you.

 2          Your Honor, with respect to those three declarations

 3   and the following exhibits, I would like to offer them all

 4   into the evidence of this proceeding.

 5          Your Honor, I could do this one of two ways.  There

 6   are some exhibits which are directly related to Ms. Jaresko's

 7   Declaration, some from Mr. Brownstein's.  I could read them

 8   separately or I could do them all together.  It doesn't

 9   matter.

10          THE COURT:  I think in alphabetical order, all

11   together.

12          MR. ROSEN:  Okay, Your Honor.  And they are as

13   follows.  Each of them, Your Honor, is preceded by the DX yet

14   again.  All exhibits were filed, Your Honor, in ECF number

15   4759, but for -- but for there was an additional one, Your

16   Honor, which I'll refer to, which is ECF number 375, which was

17   the Order approving the Disclosure Statement.

18          THE COURT:  So that's 375 and 3284?

19          MR. ROSEN:  In the COFINA case, yes, Your Honor.

20          THE COURT:  And the 4759 is in the Commonwealth case,

21   3283?

22          MR. ROSEN:  Yes.

23          THE COURT:  I know that because we're in four

24   digits.

25          MR. ROSEN:  Right.  Yes, Your Honor.

1          The alphabetical order all proceeded by DX, Your

2    Honor, are A, B, C, D, E, F, G, H, J, K, M, N, O, P, Q, R, S,

3    T, U, V, W, X, Y, UU, VV, WW, XX, YY, QQQ, RRR, SSS, TTT, and

4    ZZZ, as in zebra.

5          THE COURT:  And which one is in 375?

6          MR. ROSEN:  That was WW, Your Honor.

7          THE COURT:  And then do you have a tender with

8    respect to the Feldman Declaration?

9          MR. ROSEN:  Yes, Your Honor.  That was -- I do not

10   have the original of that, and I don't know if Mr. Minias

11   does, but we would like to tender that.  That was attached as

12   an exhibit to the statement of the COFINA agent in support of

13   confirmation.

14         Mr. Feldman is here obviously, as he spoke earlier,

15   Your Honor, and is available for cross-examination.  We would

16   ask not only that Mr. Feldman's Declaration be admitted into

17   evidence, but also the Court incorporate, Your Honor, from the

18   prior hearing, the 9019 Declaration of Ms. Jaresko.

19         THE COURT:  All right.  So the 9019 Declaration of

20   Ms. Jaresko is 4758, I believe, from this morning?

21         MR. ROSEN:  Your Honor, I have -- I have 584 on the

22   top of mine.

23         THE COURT:  Well, 584 would be in 3284.

24         MR. ROSEN:  Yes.

25         THE COURT:  And Ms. Tacoronte tells me that 4758 is

1    the applicable number in 3283.

2            MR. ROSEN:  Okay.

3            THE COURT:  And then you're saying that the Feldman

4    Declaration is attached to the COFINA Agent Response, which by

5    my records is 4656 in 3283.  Does that sound right to you?

6            MR. ROSEN:  I think it does.  I'm just checking, Your

7    Honor.

8            I'm told it is, Your Honor.

9            THE COURT:  All right.  So are there any objections

10   to that tender of evidence by COFINA?

11           Seeing and hearing none -- we're waiting for a

12   possible correction here.

13           MR. ROSEN:  Okay.  Your Honor, I'm told that I might

14   have been off on an ECF number for two of the exhibits.  QQQ

15   I'm told is in 4760-2.  And WW, I guess, in the Commonwealth

16   case, is 4759.

17           THE COURT:  All right.  As I -- okay.  That's fine.

18   So QQQ is the only one that's not in 4759?

19           MR. ROSEN:  Yes.  I'm getting the high sign, Your

20   Honor.

21           THE COURT:  All right.  Thank you for that precision,

22   which is important for the permanent record.

23           So I saw no indications of objection.  All of the

24   tendered evidence enumerated by Mr. Rosen is admitted.

25           MR. ROSEN:  Thank you, Your Honor.

1          I think, with that, we're up to the point in time

2    where we are to go to the hall, but not the park.

3          THE COURT:  Very well.  Everybody back in our seats

4    in ten minutes, and we'll proceed with the Senior Bondholders'

5    proffer.  Thank you.

6          MR. ROSEN:  Thank you, Your Honor.

7             (At 3:08 PM, recess taken.)

8             (At 3:24 PM, proceedings reconvened.)

9          THE COURT:  Good afternoon.  Please be seated.

10   Please enter quietly.  Court is in session.

11         Please enter quickly and quietly, and then close the

12   door.  Court is in session.  Quietly.  Thank you.

13         Mr. Rosen.

14         MR. ROSEN:  Your Honor, yes.  Before we continue with

15   the presentation by the Senior Bondholders Coalition, I would

16   like to ask the Court for its permission, in as much as we

17   have finished with the testimony of Ms. Jaresko, Ms. Pullo and

18   Mr. Brownstein, if they could be released from the Court?

19         THE COURT:  That application is granted.

20         MR. ROSEN:  Thank you very much, Your Honor.

21         THE COURT:  Mr. Kirpalani.

22         MR. KIRPALANI:  Thank you, Your Honor.  Susheel

23   Kirpalani of Quinn Emanuel Urquhart & Sullivan on behalf of

24   the COFINA Senior Bondholders Coalition.

25         Your Honor, we'd like to -- we're a Plan support

1    agreement party in favor of the Plan, and we'd like to call

2    Mr. Matt Rodrigue of Miller Buckfire to the stand.

3            THE COURT:  Mr. Rodrigue, would you please come to

4    the witness stand, step up and remain standing to take the

5    oath?

6            COURTROOM DEPUTY:  Raise your right hand.

7            Do you solemnly swear that the testimony you are

8    about to give in this case is the truth, the whole truth, and

9    nothing but the truth?

10           THE WITNESS:  I do.

11           COURTROOM DEPUTY:  So help you God.

12           THE COURT:  Please be seated.

13           MR. KIRPALANI:  And Your Honor, for the record, we

14   had filed at ECF docket number 4665-1.  That's in the

15   Commonwealth case.  And in the COFINA case, which is 17-3284,

16   it is filed at ECF 445-1.

17           This is the Declaration of Matthew Rodrigue dated

18   June 9th -- I'm sorry, January 9th, 2019.  I'd just like to

19   hand a copy of the Declaration to the witness and ask him to

20   confirm that it's his signature and that that's his

21   Declaration, he has no changes.

22           THE COURT:  Yes, you may do that.

23           And so you're tendering the Declaration in evidence

24   after he's confirmed?

25           MR. KIRPALANI:  Yes.

1          M A T T H E W     R O D R I G U E,

2      called as a witness by the COFINA Senior Bondholders

3      Coalition, having been sworn, testified as follows:

4                    DIRECT EXAMINATION

5  BY MR. KIRPALANI:

6  Q.   Mr. Rodrigue, if you would please just take a look at the

7  Declaration that's been passed to you.  If you could confirm

8  that that is your Declaration and that on page six, that is

9  your signature?

10 A.   It is.

11      MR. KIRPALANI:  Okay.  The only clarification I'd

12 like to make, Your Honor, is the exhibits to this Declaration,

13 which in the text of the Declaration are referred to as

14 Exhibits One, Two and Three, for a variety of reasons I would

15 prefer not to go into, were filed as one exhibit to this

16 Declaration.

17      When we refer to the exhibit, if we could refer to

18 ECF page nine of 11 as Exhibit One; the ECF page ten of 11 as

19 Exhibit Two; and the ECF page 11 of 11 as Exhibit Three.  Then

20 we would have three exhibits, and we would mark them for the

21 record as CS Exhibit One, CS Exhibit Two, and CS Exhibit

22 Three.  CS standing for COFINA Seniors.

23      Is that acceptable, Your Honor?

24      THE COURT:  Yes, it is.

25      And so is there any objection to the proffer of the

1    Declaration and exhibits as enumerated in evidence?

2         Seeing none -- I'm sorry.

3         MR. EISENBERG:  We do -- we reserve the right to

4    cross-examine, but on the offer of the Declaration, no, we

5    don't.

6         THE COURT:  All right.  Just the Declaration with

7    exhibits.  All right.  No objection.  The Declaration and

8    exhibits as described on the record are admitted into

9    evidence.

10        (At 3:29 PM, CS Exhibit One, CS Exhibit Two, and CS

11         Exhibit Three admitted into evidence.)

12        MR. KIRPALANI:  Thank you, Your Honor.  And I pass

13   the witness to Mr. Eisenberg.

14        THE COURT:  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. EISENBERG:

17   Q.   Good afternoon, Mr. Rodrigue.  My name is Gary Eisenberg.

18   I am with the lawfirm of Perkins Coie, speaking on behalf of

19   the GMS Group, and also here working with a couple of the

20   other bondholders as well.

21   A.   Good afternoon.

22   Q.   I am going to direct your attention to your Declaration.

23   You have a copy in front of you?

24   A.   I do.

25   Q.   If you'll take a look at the end of paragraph four of

1   your paragraph -- your Declaration.

2   A.   Yes.

3   Q.   Can you just read for the record the last two sentences

4   of paragraph four?

5   A.   It says, if this amount were allowed and the seniority of

6   senior bonds were enforced, it would dramatically increase the

7   amount of claims of senior bondholders and thereby diminish

8   the value available for distribution to subordinate

9   bondholders.

10         Under the Plan, as negotiated by the PSA creditors,

11   no such make whole claims will be allowed.

12   Q.   And now the -- this amount that you're referring to is

13   back to the make whole amount as part of the senior blond

14   claim amount; is that right?

15   A.   Yes.

16   Q.   And you indicate that if this amount were allowed and the

17   seniority of the senior bondholders were enforced -- are you

18   referring to an effort to invoke the no pay provisions to the

19   subordinated holders?

20   A.   No, just under those two conditions.  So if the amount

21   were allowed and if the seniority of the senior bonds were

22   enforced, so as to say if the senior bonds were fully repaid

23   before the subordinate bonds were repaid, then that 2.7

24   billion would diminish the recovery to the subordinate

25   bondholders.

1   Q.   Have you done a calculation of the total amounts payable

2   over the life of the bond resolutions outstanding so as to

3   know the total amounts that would be payable on account of the

4   revenues coming in from sales and use tax that ultimately are

5   distributable under the lives of the various bonds?

6   A.   I'm sorry.  Could you repeat the question?

7   Q.   Okay.  Each year there's a portion of revenues that are

8   paid from the sales and use tax to support the payment of the

9   COFINA bonds.  Do you understand that?

10   A.   Yes.

11   Q.   And each year that those revenues are paid in, that is

12   the fund that is available to serve as debt, as debt payments

13   come due in the bonds; is that right?  As those funds come in,

14   that is the amount of money in any particular year that is

15   available to pay the debt service on the COFINA bonds; is that

16   right?

17   A.   In the ordinary course, that services the scheduled debt

18   payments, yes.

19   Q.   And have you done a calculation of the projected overall

20   amount of revenues to come in to COFINA from the sales tax

21   revenues over the course of the life of the bonds?

22   A.   So that wasn't part of this analysis, which was analyzed

23   in the context of the 9019 settlement, right, where there's a

24   fixed amount of currency available.  I have done calculations

25   like that separate and apart from this analysis.

1    Q.   But they're not here as part of this declaration?

2    A.   The analysis you described is not part of my declaration.

3    Q.   Okay.  And if the seniority provisions were invoked,

4    i.e., the seniors had to be paid before any of the subordinate

5    bondholders had to be paid, is it your understanding that the

6    tax lien, the sales and use tax lien, absent a PROMESA

7    proceeding or a legal challenge by Puerto Rico's Commonwealth

8    to invalidate the structure, that the tax lien would continue

9    in the future years for the remainder of the life of the

10   various bonds until the junior bonds are paid?

11              MR. KIRPALANI:  Objection.  Calls for a legal

12   conclusion.

13              MR. EISENBERG:  No.  It's a question on the

14   availability of funds, Your Honor, not to -- I'm not asking

15   him to make a legal conclusion.  I'm asking him to make an

16   analysis about whether the inflow of funds is sufficient over

17   time, if seniority is invoked, to pay the juniors as well.

18              THE COURT:  So you're asking a math question?

19              MR. EISENBERG:  That's a math question, Your Honor.

20              THE COURT:  If there were no change to the COFINA

21   inflow by this settlement, over time could the latter be

22   played out so that the juniors actually get paid?

23              MR. EISENBERG:  Exactly.  That's the question, Your

24   Honor.

25              THE COURT:  Objection overruled.

1          THE WITNESS:  Do you mind repeating the question?

2  I'm sorry.  There's just been a lot of dialogue and I want to

3  make sure I'm answering the correct question.

4  BY MR. EISENBERG:

5  Q.   I'm going to do the suppositions one by one to make sure

6  that you understand the context of the suppositions.  Assuming

7  that the validity of the lien were upheld so that the sales

8  and use tax lien continues to be part of the COFINA assets,

9  and assume that the bonds are subject to an invocation of

10  seniority by the senior bondholders, do you -- have you done

11  an estimation of the amount of money payable on account of the

12  sales and use tax projected to come in over the life of the

13  bonds?

14          And if the answer to that is yes, does that allow for

15  the payment of the junior bonds after the senior bonds?

16  A.   Oh, I see.  So if there were no settlements, if there

17  were no 9019 settlements and if there were strict acceleration

18  so as the senior bonds need to be fully repaid and defeased,

19  not including the make whole premium before the subordinate

20  bonds, then under the existing COFINA structure, if there are

21  sufficient sales and use taxes, the senior bonds could be

22  repaid and the subordinate bonds could also be repaid before

23  2058.

24  Q.   Okay.   Thank you.

25          And in paragraph five, you have a statement that

1    the -- and I'll read the language:  The plan does not,

2    however, enforce such strict priority.

3         I assume you're referring back to the priority

4    provisions of the seniors versus the subordinates in the

5    various bonds documents?

6    A.   Yes.

7         THE COURT:  Mr. Eisenberg, I'm going to have to ask

8    you to --

9         MR. EISENBERG:  Slow down?

10        THE COURT:  -- slow it down a tad.

11        MR. EISENBERG:  I understand, Your Honor.

12        THE COURT:  Thank you.

13   BY MR. EISENBERG:

14   Q.   So let me start the sentence again since you clearly

15   understand the same context that I do about the subordination

16   and priorities.

17        The Plan does not, however, enforce such strict

18   priority because the PSA parties wished to achieve a

19   consensual plan without the need to invoke the cramdown

20   provisions of the Bankruptcy Code.

21        Did the PSA parties include any junior bondholders,

22   who had bought COFINA bonds upon the initial issuance, who

23   were still holders at the time that the negotiations that

24   you're describing took place?

25   A.   I'm not aware of when the parties bought bonds.

1   Q.   Okay.  And at the end of paragraph five, you have a

2   reference to your Exhibit One, projecting recoveries for

3   senior and subordinate bondholders under the Plan, which you

4   say corresponds to an approximate 60 percent probability that

5   strict priority in favor of senior bondholders would prevail.

6        When you say -- again, just for the purpose of having

7   the context here, when you say strict priority in favor of the

8   senior bondholders, can you describe what you mean by that?

9   A.   Sure.  So similar to paragraph four, which we were

10  discussing previously, this is in the context of the

11  settlements where there's a fixed pot of value to be

12  allocated, approximately 13.5 billion dollars.

13       And what the analysis says on Exhibit One is that if

14  there is strict priority, the seniors will be repaid from that

15  pot of value first and the subordinates would receive what's

16  left over.

17  Q.   And in addition, would the subordinates, absent a

18  consensual plan, also have the ability to receive future bond

19  payments based on future tax revenues coming in as they accrue

20  and are paid over to COFINA?

21  A.   So in the context of the settlements, there is, as I

22  mentioned, 13.5 billion of present value that could be

23  allocated.

24       The seniors would be repaid from that first.  Some of

25  it is cash, some of it future cash flows.  That would be

1    structured in the form of bonds.  The subordinates would

2    receive what's left over, which would be presumably longer

3    dated bonds.

4    Q.   Now, the question of adjudication of strict priority

5    never reached a full conclusion, did it?

6    A.   No.

7    Q.   As far as you know, to this day, no Court has issued a

8    ruling anywhere in any forum that says that strict priority

9    prevails?

10   A.   Well, the interpleader was argued, and ultimately there's

11   a settlement, which is part of what we're here discussing.

12   Q.   And were you aware, at the time of the negotiation and

13   settlement, what various arguments had been lodged by senior

14   bondholders attempting to invoke the strict priority?

15   A.   I generally was.

16   Q.   And generally, just so we have the context, can you

17   describe what they were?

18   A.   Sure.  So the senior bondholders argued that there had

19   been a default and acceleration, and that they were entitled

20   to be repaid before the subordinate bondholders.

21   Q.   And did you have an understanding as to what the grounds

22   for the asserted default were by the various senior

23   bondholders?

24   A.   Generally.

25   Q.   And could you describe what you generally understood them

1  to be?

2  A.   Well, they related to various claims that the

3  Commonwealth had attacked the COFINA revenue stream and, you

4  know, the Bank of New York Mellon had not defended the

5  structure.

6  Q.   Was there any assertion of an event of default by a

7  failure of payment?

8  A.   Not that I am aware of.

9  Q.   And was there any assertion of a default by any senior

10 bondholder on the grounds of insufficiency of accumulation of

11 sales tax revenues in COFINA?

12 A.   I'm sorry.  Can you repeat the question?

13 Q.   Was there an assertion of an event of default by any of

14 the senior bondholders that the sales tax revenues coming into

15 COFINA were insufficient to make debt service payments as due

16 absent a PROMESA proceeding?

17 A.   There were concerns about the viability of the sales and

18 use tax, but I don't specifically recall the assertion that

19 you make.

20 Q.   Okay.  And in the particular year that you were involved

21 in negotiating the settlement, had sufficient revenues come in

22 to COFINA on account of the sales and use tax as of a point

23 before the end of the fiscal year so that there were

24 sufficient funds on behalf of COFINA, absent the PROMESA

25 proceeding to be able to pay the debt service payments that

1   were due absent invocation of strict seniority?

2   A.   So the negotiations took place in the Commonwealth's

3   fiscal 2018, which ended on June 30th, 2018, and the

4   Commonwealth's fiscal 2019, which we're currently in.  And for

5   fiscal 2018, I believe there was approximately 753 million

6   that was collected and remitted to the Bank of New York

7   Mellon.  For fiscal 2019, it's less than that as a function of

8   the settlement, and there were procedures approved by this

9   Court.

10  Q.   Right.  But for 2018, that 753 million, was that

11  sufficient to pay the debt service that came due absent an

12  invocation of seniority?

13  A.   Absent acceleration.

14  Q.   And absent acceleration?

15  A.   753 million is more than the original scheduled debt

16  service for fiscal 2018.

17  Q.   So as a result, there's no assertion of a payment

18  default, and the only -- is it accurate to say that the only

19  assertions of default all related to the Commonwealth

20  attempting to, for lack of a better way to put it, renege on

21  the structure that put COFINA in place in the first

22  instance?

23  A.   Sorry.  Can you repeat the question?

24  Q.   Were there any other events of default purported to be

25  asserted by seniors other than basically the Commonwealth

1   seeking to walk back on its commitment that COFINA owns the

2   sales and use tax revenues?

3   A.   I believe there were, but I don't recall them sitting

4   here right now.

5   Q.   Okay.  And so -- and you're not purporting to offer a

6   legal opinion as to the likelihood that strict seniority would

7   be invoked and upheld in a legal proceeding, are you?

8   A.   I'm not an attorney, I'm a financial advisor.  As is

9   reflected in my Declaration, I ran some calculations, largely

10  hypothetical calculations.  That's my area of expertise.

11  Q.   So the 16 percent approximate probability to which you

12  refer about strict priority in favor of senior bondholders

13  prevailing is not your own assessment of a legal analysis as

14  to likelihood that the seniors would be able to invoke strict

15  priority?

16           COURT REPORTER:  Counsel, can you --

17           MR. EISENBERG:  Yes.

18  BY MR. EISENBERG:

19  Q.   Let's try that again.  I wish I could go back in time and

20  do it over.

21           The reference in your Declaration to the approximate

22  60 percent probability, that strict priority in favor of

23  senior bondholders would prevail, is not your legal analysis

24  as to the likelihood that that would occur?

25  A.   So this is an arithmetic calculation, and 60 percent is

1  an output, not an input.  The way that this exhibit works is

2  that on one end, there's strict priority.  That's one book

3  end.  On the other book end, there's pari-passu treatment of

4  senior and subordinate bondholders, and everything in between

5  could be represented by a line with a slope.

6      And so on the strict priority end, you know, the

7  recovery for the senior bondholders would be approximately

8  106.8 percent, including post petition interest.

9      And on the pari-passu end, the recovery for both

10  senior and subordinates would be 76 percent.  And on the end

11  that's strict priority, that would be a hundred percent.  On

12  the end that's pari-passu, that would be zero percent chance

13  of strict priority.  Everything else is just represented by

14  this slope of the line.

15      And if you look at the page, you can see that for

16  each percentage recovery of seniors, there's approximately a

17  three percent difference in the probability of seniors being

18  senior and subordinates being subordinate.

19  Q.  So you're not expressing an opinion that any particular

20  percentage is the one that's likely to prevail ultimately in a

21  legal proceeding, if it were to be litigated out?

22  A.  That was not part of my declaration.

23  Q.  Okay.  Now, I'm going to ask you to focus on paragraph

24  seven of your Declaration, which you reflect, attachment of

25  Exhibit Three being an implied yield to worst sensitivity

1  analysis for the new COFINA bonds.

2         Can you describe what you mean by that?

3  A.   Sure.  The current COFINA bonds trade in the market.  And

4  the price of the current COFINA bonds, the senior bonds and

5  the subordinate bonds can be used to imply a price on the new

6  COFINA bonds.  The people who buy the COFINA bonds today know

7  that they're not going to likely hold those bonds.  They're

8  going to be replaced by new bonds pursuant to this Plan.  And

9  so the price that they buy them at implies a price on the new

10 bonds.

11        That's what this table attempts to represent.  And

12 you can take it a step further.  The implied price on the new

13 bonds will also apply a yield on the new bonds.  Yield to

14 worst is a term that's used by bankers and traders.  You can

15 think of it as just basically the yield on the bond.  That's

16 the way that the market prices bonds.

17 Q.   And the way you've calculated this, you did not put in a

18 factor to take into consideration the possibility that Puerto

19 Rico could develop future financial problems and seek to

20 attack the very lien that it is attacking here in the future

21 on account of the new bonds, are you?

22 A.   So any time a party buys bonds, there could be many

23 risks, those that are foreseen and those that are unforeseen.

24 You know, there could be a multitude of events that could

25 happen in the future.

```
 1              And I would say that the risks get priced into the
 2   market when a buyer buys the bonds.  The risk that you
 3   identify, I think, is actually quite low.  And in my
 4   discussions with market participants, quite low if the plan
 5   being discussed today is confirmed.
 6   Q.   And what is your basis for making that conclusion?
 7   A.   So I've read the draft Confirmation Order, and it has
 8   extremely solid language holding up the sanctity of the new
 9   bonds.  And a federal court Order is something that the old
10   COFINA structure did not have.
11   Q.   Okay.  But the current Plan, as proposed under the
12   current PROMESA statute?
13   A.   The Plan of Adjustment for COFINA.
14   Q.   And that PROMESA statute was itself not in existence at
15   the time the bonds were issued originally, was it?
16   A.   It was passed in 2016.
17   Q.   After the bonds were issued?
18   A.   Yes.
19   Q.   And so, therefore, there is a possibility in the future
20   that another federal statute could be enacted that would
21   address an effort to perhaps compromise the new bonds, sales
22   and use tax lien going forward.  Is that a possibility?
23   A.   Well, so among other things, the Court Order will uphold
24   the property rights of COFINA, and clear the title of COFINA.
25   And so the risk that you identified and whether or not that's
```

1    priced in the bonds, I would say many risks get priced into

2    bonds, but that one, I believe, is quite low based on the

3    settlement that's being discussed today.

4    Q.   Do you have an opinion as to the extent of that risk

5    existing today versus comparing similar risks back in 2006,

6    2007, 2008, 2009, when the COFINA bonds were being issued,

7    together with the statements of the Puerto Rico government

8    that the COFINA lien was a good lien, and the transfer of the

9    taxes was a good transfer of the taxes?

10   A.   Yeah.  I think the new bonds will indisputably be better

11   because despite those statements, there was not a Federal

12   Court Order.  And I have that opinion based on discussions

13   that I've had with market participants, ratings agencies, as

14   well as others.

15   Q.   I'm trying to recall if I saw it here.  Did you perform

16   any analysis as to the likely amount of recovery for either

17   senior or junior bonds in the event that the validity of the

18   transfer of the sales and use tax of COFINA were not upheld?

19   A.   Not as part of my declaration.

20   Q.   And so you don't express an opinion as to the amounts

21   likely to be recovered by the senior and/or junior bondholders

22   in the event that the challenge to the validity of the

23   transfer of the sales and use tax were successful by the

24   Commonwealth?

25   A.   I have thought about it and done analyses on those

1    issues, but not in the Declaration.

2    Q.   And have you considered, for example, whether or not the

3    senior and/or junior bondholders would have claims against the

4    Commonwealth, separate and apart from claims against COFINA,

5    if there were a valid challenge by the Commonwealth to the

6    transfer of the sales and use tax lien to COFINA?

7    A.   So the question you ask I think is a legal one.  You

8    know, I have thought about various scenarios, of outcomes.

9    And there was a very broad range of potential outcomes for

10   COFINA under the challenges that it faced from the

11   Commonwealth Agent, and I would say it ranged all the way from

12   zero percent recovery up to a hundred percent recovery.

13         And as we heard earlier this morning, the legal

14   issues that they were facing were issues that were novel and

15   on first impression.

16   Q.   Now, I have a slightly different question, which is if a

17   challenge were made to the COFINA structure that were

18   successful and as a result, the transfer of the tax base into

19   COFINA were vitiated, do you have a conclusion as to absent a

20   settlement, what the recovery for both seniors and juniors

21   would be in that circumstance?

22   A.   There are a lot of unknowns that go along with the

23   scenario that you describe, and I don't have a specific answer

24   for what the recovery would be sitting here today.

25         MR. EISENBERG:  Okay.  I don't have any further

1   questions.

2        THE COURT:  Thank you, Mr. Eisenberg.

3        MR. EISENBERG:  But I think Mr. Elliott may have a

4   couple of questions.  He's representing himself pro se and may

5   wish to question -- actually, you know what?  I do have a

6   couple of last questions, Your Honor.  I take that back, if I

7   may.

8        I just want to ask a couple of follow-up questions.

9   And hopefully I'll be brief enough and talk fast enough that

10  it won't take too long.

11       THE COURT:  Well, cut out that talking fast part.

12       MR. EISENBERG:  Another fast talking New York lawyer.

13  What can I tell you.

14  BY MR. EISENBERG:

15  Q.   Mr. Rodrigue, did Mr. Elliott participate in any

16  negotiations with you in connection with this settlement?

17  A.   He and people from his office have called me in the past

18  year.

19  Q.   But was he a participant in any of the actual

20  negotiations that you described as being at the heart of --

21  when the PSA parties wished to achieve a consensual plan

22  without the need to invoke the cramdown provisions of the

23  Bankruptcy Code?

24  A.   Not that I am aware.

25       MR. EISENBERG:  With that, I will ask if Mr. Elliott

 1   could have his turn, if he wishes, Your Honor.

 2               THE COURT:  Yes.  Mr. Elliott, would you come

 3   forward, please?

 4                         CROSS-EXAMINATION

 5   BY MR. ELLIOTT:

 6   Q.   Hi, Mr. Rodrigue.

 7   A.   Hello.

 8   Q.   Nice to meet you today out in the lobby.  I'm just going

 9   to follow up on a few of the questions.  Pretty

10   straightforward.

11   A.   Sure.

12   Q.   Before today, have you and I spoken?

13   A.   Yes, we have.

14   Q.   When was that?

15   A.   I believe it was around May of 2018.

16   Q.   Why do you recall that date?

17   A.   I had some e-mail exchange with your associates around

18   that time as well.  I believe it was a Mr. James Sparks.

19   Q.   Okay.   Did you say May of 2018?

20   A.   Yes.

21   Q.   Okay.  Was there anything in particular going on special

22   with your case, or our case at that time?

23   A.   There were negotiations going on at that time.  I think

24   there was a deal announced before the agents struck a deal.

25   It was between certain GO bondholders and certain COFINA

1    bondholders.  And there was some press related to that.

2    Q.   Do you recall how you were introduced to me and my firm?

3    A.   I do.  One of the traders from Stifel, Miller Buckfire's

4    parent company, reached out and asked if I would be willing to

5    speak to you.

6    Q.   Would it be correct or how -- I'll put it this way, I'm

7    not an experienced litigant -- does the name Andrew, the head

8    of distressed equities for Stifel, sound familiar to you?

9    A.   It might have been Andrew Hayne.  He's a research

10   director, though.

11   Q.   Does it sound -- does it sound plausible that it could

12   have been the director of distressed equities?

13   A.   I'm not sure who that would be.  Andrew Hayne is a

14   research analyst who sits on our desk.  It may have been him.

15   He follows Puerto Rico.

16   Q.   Do you recall why he introduced you to me?

17   A.   He said he had a client that was trading COFINA bonds,

18   and he was wondering if I'd be willing to talk to him.  It's

19   not an unusual request.

20   Q.   All right.  So what you recall is that simply me and my

21   firm, we just wanted to talk to you, there was nothing in

22   particular?

23   A.   I think you had some questions about the settlement that

24   had been announced -- not the settlement we're discussing here

25   today, but the deal between certain of the COFINA and GO

1    bondholders, and we also talked about COFINA in general.

2    Q.   Do you recall us discussing that my firm wanted to be

3    part of the discussions for the Plan of Adjustment?

4    A.   I don't specifically recall that.

5    Q.   Okay.  Are you saying that you don't recall that or

6    that's not the case?

7    A.   I don't recall saying that you wanted to be part of

8    negotiations.

9    Q.   So that could be the case, that we did want to be part of

10   settlement negotiations?

11   A.   It could be.  If you did want to, I mean, you certainly

12   had my contact information and, you know, contact information

13   for others.

14   Q.   Did we or did we not ask you to be part of the settlement

15   confirmation proceedings?

16   A.   I don't recall you asking me.

17   Q.   Okay.  I want to ask you a question about the exhibits

18   that you provided.  Pardon me.  I mean, you seem like a pretty

19   straightforward guy.  I'm not trying to harass you.  I'm

20   trying to get some information --

21   A.   As we discovered in the hallway, we both --

22            THE COURT:  Pardon me, gentlemen.  Only one of you

23   can speak at a time.  The court reporter has to be able to

24   write everything down.

25            MR. ELLIOTT:  I'm so sorry, Judge.

```
 1                  THE COURT:  Thank you.
 2   BY MR. ELLIOTT:
 3   Q.   On your graph -- you have the same graph that my
 4   colleague mentioned to you?
 5   A.   Which exhibit?
 6   Q.   I'm going to have to -- there's only one graph.
 7                  MR. EISENBERG:  I think it's Exhibit Two, Your
 8   Honor.
 9                  THE COURT:  So you think it's Exhibit Two, which is
10   page ten of 11 on document 4665-1?
11                  MR. ELLIOTT:  It is -- yes, it's labeled Exhibit Two.
12                  MR. EISENBERG:  Your Honor, I labeled it Exhibit Two.
13                  THE COURT:  All right.  So looking at that printed
14   header along the top, does it say doc number 4665-1 in the top
15   line, and Affidavit, page ten of 11 on the second line?
16                  MR. ELLIOTT:  Yes, it does, Your Honor.
17                  THE COURT:  All right.  We are all on the same page,
18   literally.  Please proceed.
19   BY MR. ELLIOTT:
20   Q.   Mr. Rodrigue, I want to ask you, you have this graph here
21   showing this is the movement in the price of junior and senior
22   COFINA bonds; is that correct?
23   A.   Two representative COFINA bonds.
24   Q.   Okay.  And you have different labels that show the change
25   in the value of the bonds, you have them marked with certain
```

1   events?

2   A.   Yes.  We refer to them as annotations.

3   Q.   Okay.  These annotations, are you alleging -- are you

4   confident that the events that you're labeling are, in fact,

5   what caused these movements in the price of the bonds?

6   A.   So the events that we annotate have certain significance

7   related to COFINA.  You can read them.

8            For example, on June 28, 2015, Governor Garcia

9   Padilla stated that Puerto Rico's debt is not payable.

10  Q.   Sure.  So my question to you --

11  A.   And --

12  Q.   My question to you, sir, is are you saying that this

13  decrease is as a result of Governor Garcia Padilla stating

14  that Puerto Rico debt is not payable, that it cannot be from

15  anything else?

16  A.   So the decrease happened almost immediately or shortly

17  after the statement.  And it's quite possible that the

18  statement drove the decrease.  Were there other things that

19  were happening at the same time?  It's possible.

20  Q.   Okay.   There is -- the scale of this graph, do you think

21  that it can define to a day?  You know, that we're looking at

22  a particular day that Governor Garcia Padilla made this

23  announcement?  Can you accurately represent from this graph

24  that, in fact, it was exactly that day that that decrease

25  happened?

```
 1   A.   It was on or about that time.

 2   Q.   Okay.  Was there anything else on or about that day that

 3   could have caused the value to go down?

 4   A.   There could have been.

 5   Q.   There could have been.  Also, if you'll look at that

 6   graph, you can see that, if I'm correct, the red line

 7   represents subordinate COFINAs and the blue line represents

 8   senior COFINAs; is that correct?

 9   A.   Yes.

10   Q.   And before that line, there is a dip.  And the first dip

11   that's before the line and the dip that's after that line, am

12   I accurate to -- you know, with my reading of the graph, that

13   the junior COFINAs go down more than the senior COFINAs?  That

14   they basically trade in tandem until that point?

15   A.   So I'm not sure exactly which dip you're referring to.

16   Q.   Okay.

17   A.   Because the line wiggles quite a bit.

18   Q.   I appreciate that.  So if you look at the left part of

19   your graph, you have the red line and the blue line, the red

20   representing the subordinate COFINAs and the blue representing

21   the senior COFINAs?

22   A.   Yes.

23   Q.   Initially, the subordinate COFINAS are higher in value, a

24   percent above par, I presume --

25   A.   Yes.
```

1    Q.    -- than the seniors.

2    A.    Yes.

3    Q.    If you follow your graph, basically the red and the blue

4    lines are almost directly on top of each other.  Is that

5    accurate to say?

6    A.    That's accurate.

7    Q.    There's an event, it appears, just before you have your

8    first label where there's a divergence, a pretty substantial

9    divergence between the senior and the junior price.  Do you

10   notice that, sir?

11   A.    There is some divergence before June 28, 2015.

12   Q.    Do you know what that event was?

13   A.    Sitting here today, I don't know what that event was.

14   Q.    Okay.  Is there anything -- you're employed by the Senior

15   COFINA Coalition, correct?

16   A.    My firm is.

17   Q.    Okay.  Do you recall anything that the Senior COFINA

18   Coalition did at that time that may have caused that dip?

19   A.    So the Senior COFINA Coalition actually formed in late

20   June 2015, and it was not engaged in any public activities, to

21   my knowledge, at that time.  My firm was actually hired in

22   August of 2015.

23   Q.    How confident are you in that the senior coalition was

24   formed in June of 2015?

25   A.    Quite confident.

1   Q.   Okay.  So you don't think -- so it would be impossible

2   for the Senior Coalition to have filed a lawsuit before June

3   of 2015?

4   A.   As the Senior Coalition?

5   Q.   As the Senior Coalition.

6   A.   Yeah.  I'm not aware of any lawsuit with that name filed.

7   Q.   Okay.  Do you recall at any time a lawsuit being filed by

8   the Senior Coalition to accelerate their -- to accelerate, to

9   force Bank of New York to accelerate payment of their bonds to

10  the detriment of the junior bonds?

11  A.   So there was activity around the time of the COFINA and

12  Commonwealth bankruptcy filings, which was 2017.  And it was

13  May of 2017.

14  Q.   Okay.

15  A.   And there was also some activity in the months and

16  perhaps the year leading up to that, to, you know, try to

17  enforce certain remedies.  The Commonwealth, really starting

18  with Governor Garcia Padilla's statement, was rattling sabers

19  toward COFINA for some time, and many members of the coalition

20  felt that that in and of itself would constitute a default.

21  Q.   Good point.  So let's move forward to May 3rd, 2017.  You

22  said that this is a particularly salient event, correct?

23  A.   That's the date that COFINA filed for Title III

24  protection.

25  Q.   The -- right before that dashed line that you have, it

1    appears that it's directly before that line, there is an

2    increase in the senior bonds and a decrease in the junior

3    bonds.  Do you notice that?

4    A.    There's, yeah, a wiggle on the line.

5    Q.    A pretty substantial wiggle, yes?

6    A.    Yes.

7    Q.    Okay.  And it's a pretty substantial drop in the junior

8    COFINAs; is that correct?

9    A.    There is a decline.

10   Q.    Okay.  Do you recall what may have caused that decline?

11   A.    So I just mentioned that in 2017, you know, issues were

12   rising to a head.  COFINA filed for bankruptcy.  It was not a

13   surprise when COFINA filed for bankruptcy, because the

14   automatic stay had expired that existed under PROMESA law, and

15   there were also activities related to default and

16   acceleration.

17         I believe the Bank of New York came out and said that

18   there had been a default.  And certain senior parties also

19   submitted notice to try to accelerate the bonds.

20   Q.    Do you recall the Senior Coalition filing a lawsuit on a

21   date slightly before the COFINA filed for the Title III?

22   A.    I don't recall the timing.

23   Q.    Could the Senior Coalition have filed a lawsuit

24   immediately before the filing of Title III?

25   A.    It could have.

1   Q.   If the Senior Coalition filed a lawsuit, could that have

2   caused a decrease in the value of the junior bonds?

3   A.   It could have.

4   Q.   Okay.  During this lawsuit, what used to be a

5   representative for the juniors, juniors actually had a

6   representative at the time.  It was called the Major COFINA

7   Bondholders.  They made an allegation that the Senior

8   Coalition was antagonistic towards the COFINA structure.  Do

9   you recall that?

10  A.   Not specifically, but I do recall the Major COFINA

11  Bondholders, or self-styled Major COFINA Bondholders, and they

12  certainly weren't happy with the Senior Coalition.

13  Q.   Do you recall that Major Senior -- the Major COFINA

14  Coalition stating that the Senior Coalition actually tried to

15  manufacture a default event?

16  A.   Claims like that.

17  Q.   Okay.

18  A.   Yeah.  I don't recall the exact wording, but they tried

19  to say that there's no default and the seniors are just trying

20  to manufacture one.

21  Q.   Do you believe that the seniors acted at any time in a

22  manner that was antagonistic toward the COFINA structure or

23  the junior interest?

24  A.   I think the seniors acted in good faith at all times.

25  Q.   You believe the seniors' interests are aligned with the

1    juniors' interests?

2    A.   I think there's differences between the two, as reflected

3    on this chart.

4    Q.   So how does this chart reflect the differences in

5    interests between the seniors and the juniors?

6    A.   Sure.  So starting in June of 2015, you can see the large

7    decline in the value of the juniors --

8    Q.   If you don't mind, I'm going to interrupt you, because I

9    don't think you understood my question.

10         I'm not asking for a difference in the market value,

11   the juniors or seniors.  I'm asking the interests in terms of

12   alignment of interests.  Were the seniors and juniors

13   interests aligned at all times?

14   A.   They were not aligned at all times.  The juniors had much

15   more exposure to potential loss by virtue of the senior

16   subordinate structure.

17   Q.   Okay.  So you're saying that the seniors' interests are

18   not necessarily -- or could actually be antagonistic to the

19   junior interest?

20   A.   The interests were not the same.

21   Q.   Okay.  Would you say that it's fair, then, that in order

22   for the juniors to be adequately represented, that they're

23   represented by a party that has -- doesn't have senior

24   interest?

25   A.   Sorry.  Could you repeat the question?

1   Q.   Yes.   What I'm saying is you've stated that the juniors

2   and the seniors have antagonistic interests, that they are not

3   aligned; is that correct?

4   A.   That's not the word that I said.

5          THE COURT:   There is an objection I think.

6          MR. KIRPALANI:   This is so far beyond the scope of

7   direct --

8          THE COURT:   Sustained.   You may move on to another

9   topic.

10          MR. ELLIOTT:   Okay.

11  BY MR. ELLIOTT:

12  Q.   In your report, you mention a 60 percent, you know --

13  strike that.

14          In the event that the COFINA structure is not upheld,

15  is there a difference in recovery, you know, assuming that

16  the -- excuse me.   Assuming the COFINA structure is not

17  upheld, is there any difference in what payment will be given

18  on a junior or senior bond?

19  A.   When you say the COFINA structure is not upheld, could

20  you be more specific about this scenario?

21  Q.   That if this is fully litigated and COFINA is determined

22  to be unconstitutional and the lien invalid, is there any

23  difference, you know, in the recoveries in the case of the

24  junior or the senior?

25  A.   There could, in fact, be.   The gentleman who was

 1   questioning me earlier, for instance, was suggesting could

 2   bondholders bring claims against the Commonwealth maybe for

 3   taking or some other purpose, and there is an open question,

 4   if not an issue, you know, whether the seniors' interest would

 5   be senior in that type of claim vis-a-vis the juniors.

 6           MR. ELLIOTT:  I have no further questions.  Thank

 7   you.

 8           THE COURT:  Thank you, Mr. Elliott.

 9           So I think we're ready for redirect?

10           MR. KIRPALANI:  Thank you, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MR. KIRPALANI:

13   Q.   Mr. Rodrigue, you were asked by Mr. Eisenberg whether you

14   knew when the junior bondholders that participated in the

15   mediation or in the negotiation, when they acquired their

16   bonds.  Do you recall that question?

17   A.   Yes.

18   Q.   And I believe you testified that you don't know when they

19   acquired their bonds; is that right?

20   A.   Not specifically.

21   Q.   Who was Mr. Eisenberg referring to, to your

22   understanding, as the junior bondholders that participated in

23   the negotiation?

24           I'm going to caution you not to talk about anything

25   that was specifically stated during confidential mediation.

1          MR. EISENBERG:  Objection to the form of the

2     question, Your Honor.

3          THE COURT:  If you're going to want to object, you

4     have to be near a microphone.  So maybe you can sit in this

5     beige seat over here, and there is a microphone over there

6     that Mr. Rosen is turning toward you.

7          Thank you.

8          MR. EISENBERG:  My objection is that I believe that

9     my question was whether any juniors who did not hold

10    seniors -- actually, I did I think -- my question was did any

11    juniors who held since the outset of the issuance of the

12    bonds, participate in the negotiations.

13         I don't think I indicated any specific identity.  It

14    would be very difficult for the witness to know whether or not

15    I had anybody specifically in mind.

16         THE COURT:  Do you want to reformulate the question,

17    Mr. Kirpalani?

18         MR. KIRPALANI:  Thank you, Your Honor.

19    BY MR. KIRPALANI:

20    Q.   What junior bondholders participated in the negotiations

21    over the COFINA Plan?

22    A.   Let me try to get this right.  So there was Goldman Sachs

23    Asset Management, Oppenheimer, the Puerto Rico Funds, which is

24    affiliated with UBS, and then through professionals and

25    counsel, I believe Santander participated, Assured Guaranty as

1   a wrapper of subordinate bonds.  And I may be forgetting one,

2   but I think that's it.

3   Q.   And did the junior bondholders that you mentioned have

4   experienced counsel advising them?

5   A.   Certainly.

6   Q.   Did they have any financial advisers advising them?

7   A.   They did.  BroadSpan Capital advised certain of the

8   junior bondholders, as did Houlihan Lokey.

9   Q.   Okay.  Moving on, you were asked whether there was ever a

10  failure of payment that caused a potential default under the

11  potential bond resolution.  Do you recall that question?

12  A.   Yes.

13  Q.   Okay.  And I think you indicated that the answer was no,

14  as of the bankruptcy filing, there had not been a failure of

15  payment, correct?

16  A.   But subsequent to the bankruptcy filing, there was.  The

17  payment on June 1st, 2017 was missed, and subsequent payments

18  were missed.  They were held in trust.

19  Q.   Thank you.

20        When Mr. Elliott, the pro se litigant, was asking

21  you some questions about whether he had spoken with you

22  before, I believe you testified that to the best of your

23  recollection, he had, in or around May of 2018; is that fair?

24  A.   Yes.

25  Q.   Okay.  And I believe he asked you if you recalled that he

```
 1   asked to participate in mediation.  Do you remember being

 2   asked that question?

 3   A.   Yes.

 4   Q.   And you testified that you didn't recall that, correct?

 5   A.   Correct.

 6   Q.   So I'm going to read you an e-mail from James Sparks to

 7   you dated May 11, 2018.  I'm not offering this e-mail into

 8   evidence.  I'm going to ask you if it refreshes your

 9   recollection at all.  Okay?

10           MR. EISENBERG:  Your Honor, if he's going to read it,

11   I'd like a copy or the opportunity to see it.

12           THE COURT:  Yes.

13           MR. KIRPALANI:  I would encourage Mr. Eisenberg to

14   look over my shoulder, if that's acceptable.

15           MR. EISENBERG:  That's fair.

16   BY MR. KIRPALANI:

17   Q.   The question simply for you, Mr. Rodrigue, is whether it

18   refreshes your recollection as to the communications in May of

19   2018 with Elliott Asset Management and his firm.

20           It says, Hello, Matt.  Thank you for taking time on

21   short notice to speak with us.  It is good to know there may

22   be a way for us to help each other to make sure we arrive at

23   the best possible solution for all parties.

24           Attached you will find Mark Elliott's letter to

25   Judge Swain, as well as a summary from a broker dealer that
```

1   has a large position in COFINA.  The summary may be a good

2   place to start, as it quotes a few relevant points from the

3   letter to Judge Swain.

4           We had a very short time frame to write the response

5   to Judge Swain, so it is long and somewhat repetitive.  We

6   believe there are many good points to consider, especially on

7   the first two pages.  And we believe as the broker dealer

8   noted, that the letter was entered into the records to help

9   move the parties closer to settlement talks.

10          Per your request, I have also a current list of our

11  largest custodian of our Puerto Rico bond holdings, mostly

12  COFINA, with approximate amounts, approximately 31 --

13          MR. EISENBERG:  Thousand.

14          MR. KIRPALANI:  31 million.

15          MR. EISENBERG:  The 31M is usually thousand.

16          MR. KIRPALANI:   It's 31,000 M.  So I think it's 31

17  million.

18  BY MR. KIRPALANI:

19  Q.   And CUSIPs, 139.  These are for approximately 50 accounts

20  and 15 households.  There is roughly another 6.2 million of

21  COFINA bonds at another custodian that we manage for four

22  clients.

23          That's the end of the e-mail.  Does that refresh

24  your recollection at all as to whether in your conversations

25  with Mr. Sparks or Mr. Elliott in May of 2018, that they

1  specifically asked you to get involved in the mediation and

2  you rejected that overture?

3  A.   I remember the conversation and I remember the e-mail.  I

4  remember reading it.  I remember reading the attachments.  But

5  I don't recall them asking to get involved in the mediation or

6  negotiations.

7        And it's also not an unusual communication.  We were

8  in regular contact with many investors who were not involved

9  in negotiations.  And among other things, we were trying to

10  collect data on bond holdings so that when the eventual time

11  came for plan vote and solicitation, we would know who owned

12  senior bonds and who owned subordinate bonds.

13        So that was a fairly standard communication, and I

14  don't recall them being asking to be involved in the mediation

15  negotiations.

16  Q.   Mr. Rodrigue, the last thing I want to ask you about is

17  Exhibit Two to your declaration.  So it's CS Two.  This is the

18  pricing chart of senior and subordinate bondholders.  Do you

19  see that?

20  A.   Yes.

21  Q.   Okay.  I want to correct something that may not be

22  correct.  The June 18th bubble at the top, that refers -- if

23  you go up from June 18th at the bottom and look up along the

24  dotted line, there's a May 14, 2018, balloon that has a

25  description in it.  Do you see that, May 14th?

1    A.   Yes.

2    Q.   Okay.  And it says, Agreement in Principle for

3    Commonwealth-COFINA dispute announced, and the date reflected

4    there is May 14.

5          Is it possible, Mr. Rodrigue, that that date was a

6    date of a different announcement, but not the

7    Commonwealth-COFINA dispute between the agents being

8    announced?

9    A.   That could be the agreement between certain GO

10    bondholders and COFINA bondholders.

11    Q.   Yes.  I just wanted to correct that.

12    A.   It may be a mislabel.  Yes.

13          MR. KIRPALANI:  I have no other questions for

14    Mr. Rodrigue.

15          THE COURT:  Thank you.

16          And so we had provision for direct and redirect,

17    which has been accomplished.  So were you going back to your

18    seat in the jury box, Mr. Eisenberg?

19          MR. EISENBERG:  I have a couple questions.

20          THE COURT:  You have to talk into the microphone if

21    you --

22          MR. EISENBERG:  I had a couple of quick follow-up

23    questions in response to the redirect, if I may address

24    them.

25          THE COURT:  Is there any objection to brief recross?

1          MR. EISENBERG:  Relating specifically to things you

2     had asked.

3          MR. KIRPALANI:  I have no objection.

4          THE COURT:  Please go ahead.

5                         RECROSS-EXAMINATION

6     BY MR. EISENBERG:

7     Q.   Mr. Rodrigue, Goldman Sachs you mentioned was one of the

8     holders of junior bonds who participated in the

9     negotiations?

10    A.   Yes.

11    Q.   At the time they participated, do you know if they also

12    held any senior positions?

13    A.   I do know what their positions are, but I don't believe

14    they are public, and I learned their positions during

15    mediation.

16    Q.   Okay.  Similarly, with Oppenheimer, did Oppenheimer have

17    any senior positions at the time it participated in the

18    mediation that you described?

19    A.   I believe Oppenheimer's positions are public because they

20    make filings, they're a mutual fund.  And Oppenheimer owned

21    some senior bonds.  They owned many more subordinate bonds.

22    Q.   Same question with who is the next -- there was someone

23    between Oppenheimer and Santander that you identified.

24    A.   It might have been the Puerto Rico Family of Funds.

25    Q.   Yes.  Do you know if they held any senior positions as

1   well as junior positions?

2   A.   My understanding is they owned both senior and

3   subordinate.  They also manage funds on behalf of clients, and

4   the funds that they manage own many more subordinate bonds.

5   Q.   Same question about Santander.

6   A.   Santander owns both senior and subordinate bonds.

7   Q.   Okay.  You mentioned Assured Guaranty.

8   A.   Yes.

9   Q.   Was Assured Guaranty a guarantor of any of the junior

10  COFINA bonds?

11  A.   Yes.

12  Q.   And at the time, was it also a guarantor of any

13  Commonwealth General Obligation bonds?

14  A.   I believe they are.

15  Q.   Do you know the ratio or the relative amounts of the

16  junior COFINA bonds that they insured versus the COFINA --

17  Commonwealth General Obligations bonds?

18  A.   I believe they wrap approximately 250 million subordinate

19  COFINA bonds and several billion GO bonds.

20  Q.   Okay.  So their position as an insurer of GO bonds is

21  much greater than their position -- than their position of

22  junior COFINA bonds?

23  A.   GO bonds, but they do not own any COFINA bonds.  They did

24  not wrap any COFINA bonds.

25  Q.   Any then any --

1    A.   Any COFINA senior bonds.

2    Q.   Okay.  Do you know if any of those entities sold any of

3    their portions of the junior bonds that they held and stopped

4    purporting to be acting on behalf of junior holders?

5    A.   Over a time period or --

6    Q.   During the time period that you were involved in the

7    mediation with them.

8    A.   So during mediation, negotiations were active and

9    ongoing, and the parties that were participating when

10   principals were present weren't doing any trading.

11   Q.   Okay.  Lastly, you were asked by your counsel about

12   payment events of default, and you referenced payments not

13   being made for the June 1 payment, and the subsequent

14   payments, I believe, starting in 2017?

15   A.   June 1, 2017.

16   Q.   Those dates are all after the PROMESA proceeding was

17   commenced by COFINA.  Is that not the case?

18   A.   Correct.

19   Q.   The money actually was paid into court by Bank of New

20   York Mellon, wasn't it?

21   A.   I think it was held by Bank of New York Mellon in trust.

22   It was pursuant to an Order of this Court.

23   Q.   It didn't disappear, did it?

24   A.   It was held in trust.

25        MR. EISENBERG:  Okay.  No further questions, Your

1    Honor.

2         THE COURT:  Thank you.

3         MR. KIRPALANI:  Just one, Your Honor.

4         THE COURT:  Yes.

5                    REDIRECT EXAMINATION

6    BY MR. KIRPALANI:

7    Q.   Mr. Rodrigue, I just have one question.  Mr. Eisenberg

8    asked you whether the junior representatives during the

9    negotiations also held senior bonds.  Do you recall that line

10   of questions?

11   A.   Yes.

12   Q.   Okay.  To your knowledge, did Mr. Elliott himself own

13   senior bonds, as well as subordinate bonds?

14   A.   I recall that he did.

15   Q.   How do you know that?

16   A.   He sent me the bond holdings.

17        MR. KIRPALANI:  Thank you, Your Honor.  No further

18   questions.

19        THE COURT:  Thank you, Mr. Rodrigue.  Your testimony

20   is concluded.  You may step down.

21        (At 4:19 PM, the witness left the stand.)

22        MR. KIRPALANI:  Judge, if I may, the next witness was

23   Mr. Elliott himself.  We agreed to allow the Declaration

24   subject to cross.  After conferring with the Oversight Board,

25   we waive our right to cross and don't have any questions for

1  Mr. Elliott.

2          THE COURT:  Thank you.  So on the list that I was

3  given, Mr. Elliott wasn't the next witness, but do you -- so

4  Mr. Rosen, how are we going?  How do you understand?

5          MR. ROSEN:  Your Honor, if I could, the next witness

6  would have been Mr. Donahue, and there was no

7  cross-examination of him.

8          The one after that was Mr. Konsig.  There was no

9  cross of him.

10          And the one after that was Mr. Hein, with no cross of

11  him.  Leaving --

12          THE COURT:  Subject to Mr. Hein coming back to us on

13  the proposal for treatment of his Declaration?

14          MR. ROSEN:  That's correct, Your Honor.

15          And then Mr. Elliott would have been the only witness

16  subject to cross-examination.  And after conferring with

17  Mr. Kirpalani, we think there's no reason for that

18  cross-examination.

19          MR. EISENBERG:  Your Honor, may I approach?

20          THE COURT:  Yes.

21          Mr. Eisenberg's coming down to the podium.

22          MR. EISENBERG:  Mr. Elliott was offered by us as a

23  rebuttal witness to Mr. Rodrigue, so we would still reserve

24  the right to call him.

25          The fact that they're willing to waive

1    cross-examination with him with respect to what's going on

2    here, I don't think should be taken as our abandonment of our

3    ability to have Mr. Elliott take the stand as a rebuttal

4    witness to Mr. Rodrigue. So I assume they'll want to

5    cross-examine him, assuming that I call him as a rebuttal

6    witness.

7         THE COURT: All right. So at this point, do you want

8    to tender the declarations and agreed exhibits of Donahue,

9    Konsig, and the existing declaration of Mr. Elliott?

10        MR. EISENBERG: Yes, I do, Your Honor. I don't have

11   physical, hard original signatures with me in reliance on the

12   Court's directive that the declarations would be admitted, if

13   not objected to. I can, however, for the record, reference

14   the items by the electronic filing, together with the

15   exhibits, so that there will be the ability to tie into the

16   specifics in the record if the Court would have me do that.

17        THE COURT: Yes, please do that.

18        MR. EISENBERG: With respect to Donahue, there were

19   three declarations, number 4606 and 4641 and 4642. 4642 had a

20   translation of some of the reports that were attached as

21   exhibits to his declaration. And his declaration had two

22   exhibits, an Exhibit A and an Exhibit B, that were attached to

23   the 4606 exhibit.

24        THE COURT: All right. Is there -- let's just do

25   this witness by witness. Any objection to any of those

1    exhibits and declaration?

2            MR. ROSEN:  No, Your Honor.

3            THE COURT:  Seeing none, the enumerated declaration

4    and exhibits associated with Mr. Donahue are admitted in

5    evidence.

6            (Whereupon Exhibits were admitted into evidence.)

7            MR. EISENBERG:  Okay.  And then with respect to

8    Mr. Konsig, Your Honor, that would be 4564, together with

9    exhibits -- I'm going to give the exhibit numbers, and then

10   there's certain ones that are excluded.  And then I'll give

11   the excluded ones.

12           He has Exhibits A through M, which with the

13   exceptions of Exhibits F, H and I, are to be admitted into

14   evidence.

15           THE COURT:  And are those exhibits attached to 4564?

16           MR. EISENBERG:  They are attached, yes, Your Honor,

17   just as the ones for Mr. Donahue were.

18           There also was a previous stipulation announced by

19   counsel for the Senior Bondholders and us, and as well as

20   COFINA, to the effect that there was a correction to paragraph

21   six with respect to the fact that the bond trading differences

22   refer to the year 2010 and not to 2010 and 2018.

23           THE COURT:  All right.  So is there any objection to

24   that tender with the correction to paragraph six of the

25   declaration?

1        MR. ROSEN:  No, Your Honor.

2        THE COURT:  The declaration and exhibits associated

3    with Mr. Konsig as enumerated are admitted.

4        (At 4:23 PM, Exhibits admitted into evidence.)

5        MR. EISENBERG:  Okay.  And then we have the

6    declaration of Mr. Elliott, which is docket 4769.  There were

7    three exhibits attached.  The second and third exhibits we

8    agreed would not be admitted, but the first exhibit would be

9    admitted.  I can't remember if it's Exhibit One or Exhibit A.

10   I apologize.

11       THE COURT:  It's referred to on the list I was given

12   as Exhibit One.

13       MR. EISENBERG:  Then Exhibit One it is.

14       THE COURT:  And those are all part of document 4769?

15       MR. EISENBERG:  That is correct, Your Honor.

16       THE COURT:  Any objection?

17       MR. ROSEN:  No objection, Your Honor.

18       THE COURT:  The Elliott Declaration and Exhibit One

19   are admitted in evidence.

20       And Mr. Kirpalani indicated there would be no

21   cross-examination as to that Declaration and Exhibit One.

22       (Whereupon Exhibits admitted into evidence.)

23       MR. EISENBERG: Okay.  Then there were two additional

24   submissions, Your Honor.  I will have to check with

25   Mr. Gonzalez Valiente as to the exact number.  There were

1   Interrogatories that we served that were answered by the

2   Oversight Board, and those were filed in accordance with the

3   Court's Order allowing each of the parties to serve responses

4   by four o'clock Eastern time on Monday.  And then if anybody

5   wished to use them, to submit them and file them with the

6   Court.  And the Interrogatories and answers were filed at

7   4793.

8          THE COURT:  Is there any objection to the tender of

9   the Interrogatories and answers?

10          MR. ROSEN:  No, Your Honor, there are none.

11          I just was also trying to get, and I think I referred

12   to this earlier, the number for the Interrogatories that we

13   served on GMS that they answered that we filed with the Court,

14   so there would be a complete record.

15          MR. EISENBERG:  That's correct.  And we have no

16   objection to their submission if they tender theirs.  And our

17   answers were voluminous, because there was a set of exhibit

18   attachments with them to provide one of the answers to one of

19   the questions.

20          THE COURT:  Okay.  All right.  So you are tendering

21   all of document 4793 as evidence here?

22          MR. EISENBERG:  Yes, that's correct, Your Honor.

23          THE COURT:  And there is no objection, Mr. Rosen?

24          MR. ROSEN:  No objection, Your Honor.  And our ECF

25   number was 4792.

1          THE COURT:  Okay.  So is there any objection to ECF

2     4792?

3          MR. EISENBERG:  No, Your Honor, there is none.

4          THE COURT:  Okay.  So documents 4793 and 4792 for

5     COFINA are admitted in evidence.  4793 being for GMS Group.

6          (At 4:25 PM, Exhibits admitted into evidence.)

7          MR. EISENBERG:  Obviously, Your Honor, I would be

8     hard-pressed to object moving into evidence of my client's own

9     answers to Interrogatories.

10         THE COURT:  Well, amazing things happen in these

11    proceedings, so you never know.

12         MR. EISENBERG:  Nobody calls me amazing.  It's okay.

13         And I think that leaves us with addressing Mr. Hein's

14    Declaration, which is number 4606.  And there was the previous

15    colloquy right after lunch about the sections of Mr. Hein's

16    Declaration to which there were objections.

17         Mr. Hein wanted the opportunity to review.  Obviously

18    there's been some other proceedings to review -- obviously

19    there's been some other proceedings that have taken place.

20    And I would take the view that I guess Mr. Hein is entitled to

21    speak as to the issue on those particular paragraphs.

22         I believe there was a resolution that all of the

23    exhibits to his Declaration were to be admitted subject to the

24    qualifications containing statements of Puerto Rican officials

25    which were admitting the fact they have been made, with the

1  Court having to make the determination as to it.  And then

2  there was the Court taking cognizance of Exhibit N, which was

3  Mr. Hein's proof of claim, which had as one of its exhibits an

4  article, which was acknowledged as being subject to a hearsay

5  attack, but was included as part of the Proof of Claim.  I

6  hope I am recalling correctly.

7       And so we would tender Mr. Hein's Declaration and

8  exhibits, of course, subject to the scope of what I'll call

9  the contested paragraphs.  And obviously Mr. Hein has to have

10  the opportunity to speak as to those.

11       THE COURT:  Yes.  And for the record, that

12  Declaration and exhibits are included in the compilation that

13  was filed as document 4606 in 3283?

14       MR. EISENBERG:  Yes, that is correct.

15       THE COURT:  All right.  Mr. Hein is at the podium in

16  New York.

17       Mr. Hein.

18       MR. HEIN:  Yes.  Thank you, Your Honor.

19       I have reviewed the paragraphs that were referenced

20  since the exhibits are being admitted.  I'm okay with the text

21  of the Affidavit paragraphs that were read out being treated

22  as argument.

23       THE COURT:  Thank you.  And so --

24       MR. HEIN:  Thank you, Your Honor.

25       THE COURT:  And so is there any objection to the

1  tender as described by Mr. Eisenberg and agreed to by

2  Mr. Hein?

3       MR. KIRPALANI:  No objection.

4       MR. ROSEN:  None, Your Honor.

5       THE COURT:  So the tender of the Hein Declaration

6  subject to the qualifications -- hold on a minute.  Yes.

7       Thank you.  I apologize for that pause.  We were just

8  dealing with some administrative matters as to how this will

9  be recorded in the Court records.

10       And so the tender with respect to Mr. Hein's

11  Declaration and exhibits with the caveats and qualifications

12  that have been recited on the record is accepted.

13       So at this point, Mr. Eisenberg, did you wish to

14  offer additional testimony of Mr. Elliott in rebuttal or

15  opposition to the COFINA and Senior Bondholders' case?

16       Now, Mr. Kirpalani is walking faster so he gets the

17  podium.

18       MR. EISENBERG:  He started closer, Your Honor.

19       THE COURT:  He chose his seat carefully.

20       MR. KIRPALANI:  Your Honor, I'm sorry, but I just --

21  Susheel Kirpalani on behalf of the COFINA Senior Bondholder

22  Coalition.

23       I don't mean to be difficult, but I just flatly

24  disagree with Mr. Eisenberg's characterization of being able

25  to call a live witness who submitted a declaration two days

1    ago.

2          And in Mr. Eisenberg's filing, it says, the following

3    documents may be submitted as part of the rebuttal

4    examination, and it's the Declaration of Mark Elliott.

5          So I don't think that the purpose of submitting a

6    declaration, which constitutes the entirety of a witness'

7    direct testimony, is something to be cast aside so that

8    litigants can decide, well, now I'd like to put in even more

9    testimony that I forgot to put in.

10          So I don't understand the basis for saying I'm going

11   to call a witness twice, when the direct testimony in support

12   of his objection as rebuttal was filed two days ago with the

13   Court.

14          THE COURT:  And just to be clear, so that I

15   understand the contextual cues here, you are saying that the

16   declarations that were admitted for the debtor, with the

17   exception of the voting tabulation, but the Jaresko,

18   Brownstein and Feldman Declarations, and the Rodrigue

19   Declaration, were served and filed before the Elliott

20   Declaration?

21          MR. KIRPALANI:  Absolutely.

22          THE COURT:  And so other than the live Rodrigue

23   testimony here, there is nothing new to be separately, and

24   newly rebutted.  Is that your argument?

25          MR. KIRPALANI:  Absolutely, Your Honor.  And if I can

1    just be clear, it's in the Declaration of Mark Elliott pro se.

2    I don't have the docket number, but I can represent to you

3    that it's been admitted in evidence, and it's January 14th,

4    2019, which is two days ago.

5            Mr. Elliott said in paragraph eight, I submit this

6    declaration in support of my objection.  It's not qualifying

7    how is he supporting his objection.

8            The scope of my testimony is limited to the specific

9    matters set forth in my objection and the additional matters

10   presented herein.  Not there could be additional areas that

11   I'd like to talk about in two days from now.

12           And then Mr. Eisenberg's Informative Motion of the

13   GMS Group submitting rebuttal evidence, rebuttal evidence for

14   the January 16th to 17th hearing, refers in paragraph seven to

15   the Declaration of Mark Elliott as the rebuttal evidence.

16           So everything that Mr. Eisenberg and the GMS Group

17   wanted to put in as rebuttal evidence is in.  That's our

18   position.

19           THE COURT:  Thank you.

20           Mr. Eisenberg, do you want to come to the podium and

21   respond?

22           MR. EISENBERG:  Of course.

23           Your Honor, Mr. Rodrigue testified live, and he was

24   subject to cross-examination.  And the scope of what he would

25   actually say at the cross-examination here at the hearing was

1   obviously unknown and incapable of being known.

2          And the fact that Mr. Elliott is identified as a

3   rebuttal witness to what he testified to here is what we put

4   in.  So we should have the right to be able to call him on

5   things to which Mr. Rodrigue testified here in court.  I

6   couldn't have him submit a declaration for items that he

7   didn't say in advance.

8          THE COURT:  Do you want to make an offer of proof?

9          MR. EISENBERG:  Yes.  I'm going to put Mr. Elliott on

10  to basically assert that -- the course of what happened when

11  he contacted Mr. Rodrigue and asked to be involved in the --

12  in the negotiation and what the response was.  It's a fairly

13  short piece of testimony.

14         THE COURT:  With that clarification, Mr. Kirpalani,

15  do you persist in your objection?

16         MR. KIRPALANI:  Your Honor, no, we stand by our

17  objection.  Your Honor's procedures Order specifically said

18  that any objector has to identify any live rebuttal witnesses,

19  too.  We don't know what Mr. Elliott is going to say beyond

20  his declaration.  His declaration was filed after

21  Mr. Rodrigue's direct testimony was filed.

22         The fact that Mr. Eisenberg may have wanted to ask

23  Mr. Rodrigue questions that went beyond the scope of his

24  redirect and was permitted to do so doesn't open the door to

25  him now being able to ask additional questions.

```
 1            THE COURT:  Well, there wasn't an objection to --
 2   there wasn't a scope objection to the cross-examination, so
 3   the issue was inserted into the record without an objection.
 4   So your objection is overruled.
 5            You may inquire of Mr. Elliott on that narrow topic.
 6            MR. EISENBERG:  We understand, Your Honor.  So with
 7   that --
 8            THE COURT:  Mr. Elliott, would you come to the
 9   witness stand, please?  Step up and remain standing to be
10   sworn.
11            COURTROOM DEPUTY:  Raise your right hand.
12            Do you solemnly swear that all the testimony you are
13   about to give will be the truth, the whole truth and nothing
14   but the truth?
15            MR. ELLIOTT:  I do.
16            COURTROOM DEPUTY:  So help you God.
17            THE COURT:  Please be seated.
18                      M A R K    E L L I O T T,
19       called as a witness by GMS Group, having been sworn,
20       testified as follows:
21                         DIRECT EXAMINATION
22   BY MR. EISENBERG:
23   Q.   Mr. Elliott, can you identify yourself and tell the Court
24   what you do for a living?
25   A.   Yes.  My name is Mark Elliott.  I'm president and CEO of
```

1    Elliott Asset Management, a small investment management firm

2    out of Boston, Massachusetts.

3    Q.   And what do you do for Elliott Asset Management?

4    A.   I am both the chief principal, but mostly I'm in charge

5    of the investment decisions.

6    Q.   How long have you been in charge of the investment

7    decisions?

8    A.   Since the founding of the company.  As a retail

9    investment firm, it started in March of 2006, but I did

10   investments before that for outside parties, qualified

11   investors since 1999.

12           THE COURT:  Is this background information

13   substantially in the written declaration?  I read the written

14   declaration, but I didn't memorize it, but it sounds

15   familiar.

16           MR. EISENBERG:  I think it may have been, Your Honor,

17   but I just wanted to put it in context so he wasn't having to

18   proceed from a vacuum.

19   BY MR. EISENBERG:

20   Q.   My question is simply, and at some point did you come to

21   acquire COFINA bonds?

22   A.   I did.

23   Q.   Can you tell the Court which COFINA bonds you acquired

24   and when?

25   A.   Well, I've acquired quite a large number of CUSIPs, of

```
 1   COFINA bonds, everything from mostly junior bonds, junior
 2   coupon bonds, but there's also junior CABs, senior CABs,
 3   senior coupon bonds, mostly tax free, but some taxables as
 4   well, and some insured bonds as well.
 5   Q.   You have an understanding of volumes and quantities that
 6   you held of each of the classes at various times?
 7   A.   Yes.
 8   Q.   Can you explain?
 9   A.   Well, what time period?
10   Q.   So let's focus specifically on May of 2018, because
11   that's the relevant question --
12           MR. KIRPALANI:   Objection, Your Honor.   This goes
13   beyond --
14           THE COURT:   Sustained.
15   BY MR. EISENBERG:
16   Q.   In any event, in May of 2018, Mr. Elliott, you were
17   previously talking to Mr. Rodrigue and examining him about a
18   call that you had to him and his response.   Can you tell the
19   Court when you first reached out to call Mr. Rodrigue?
20   A.   Yes.   We had been -- Lord, where do I start?   We had been
21   very concerned that the junior COFINAs were not being properly
22   represented.   At various times, we were very, very concerned
23   that there was potential conflict of interest, and there was
24   potentially nobody at the table that represented juniors.
25           So we reached out to numerous parties, including the
```

1    senior bondholder group, including the major bondholder group,

2    including the attorneys for Oppenheimer and -- and didn't get

3    any response.

4            So our bond dealer, which is Stifel --

5            MR. FIRESTEIN:  Your Honor, I'm going to object.

6    This is well beyond --

7            THE COURT:  I was waiting for someone.

8            MR. FIRESTEIN:  This is well beyond the scope.  In

9    fact, I move to strike the response.

10           THE COURT:  Sustained.

11           MR. FIRESTEIN:  Thank you.

12           THE COURT:  And your offer to proof was as to the

13   content of the particular conversation of Mr. Rodrigue, so I

14   suggest you proceed to that.

15           Mr. EISENBERG:  Yes.

16   BY MR. EISENBERG:

17   Q.   And can you relay what happened when you had the

18   conversation with Mr. Rodrigue, recount the conversation for

19   the Court?

20   A.   Yes.  We had the conversation, it was approximately May

21   11th of 2018.  The reason why I recall it so clearly is that

22   we spoke to Mr. Rodrigue.  We were inquiring about becoming

23   part of the negotiating group.

24           And he told us that there was a purge event that was

25   going to be occurring, and that we would delay our

1   conversation until that coming Monday.  I believe that was the

2   15th or 14th.

3          At that time, I really appreciated Mr. Rodrigue

4   taking his time during such a busy time.  They had just

5   announced an initial settlement with -- that incorporated the

6   General Obligation bonds, them basically taking a piece of

7   mostly the junior lien.

8          When we followed up on that conversation after the

9   purge event, I was very concerned because I had done extensive

10  research and believed that the junior and the senior lien

11  basically would be equal.

12         And I asked him, I said, Mr. Rodrigue, how could

13  anybody that's a junior possibly accept this horrible deal.

14  And he said to me, and I remember it very, very clearly

15  because it was so impressive to me, he goes, he said to me,

16  there was nobody at the table representing junior interests,

17  unquote.  That was literally his words.

18         MR. EISENBERG:  I think I have no further questions,

19  Your Honor, because I think it's clearly within the scope --

20  the narrow scope the Court afforded.  So I relinquish the

21  stand.

22         THE COURT:  Thank you.

23         Cross.

24         MR. KIRPALANI:  Thank you, Your Honor.  I need to beg

25  the Court's indulgence.  I think it would be helpful to the

1   record if I could have two -- the two e-mails that book ended

2   the so-called conversation with Mr. Rodrigue printed and

3   entered into evidence as admissions of Elliott Asset

4   Management.  And we can have the witness read from the

5   bookended correspondence.

6           THE COURT:  Do you have the printouts?

7           MR. KIRPALANI:  I have it electronically, and your

8   deputy was very generous to print something for me earlier.

9   If we would be able to take a five minute recess --

10          THE COURT:  Are you able to do that?

11          COURTROOM DEPUTY:  Well, it depends if it's

12  voluminous.

13          THE COURT:  These are one page or two page e-mails?

14          MR. KIRPALANI:  One and a half pages total.

15          THE COURT:  We can do that.  And so we will take a

16  five-minute recess.

17          MR. KIRPALANI:  Thank you.

18          THE COURT:  And that will be done.

19          MR. EISENBERG:  Your Honor, I would just like to

20  request a copy as well.

21          THE COURT:  So Mr. Eisenberg has requested a copy.

22  So would you print four copies, please, Ms. Tacoronte?

23          COURTROOM DEPUTY:  Yes, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Elliott, you can step down and in five minutes,

1    be back in your seat.  Thank you.

2               (At 4:41 PM, recess taken.)

3               (At 4:51 PM, proceedings reconvened.)

4          MR. KIRPALANI:  Thank you, Your Honor.

5          For the record, Susheel Kirpalani from Quinn Emanuel

6    on behalf of the COFINA Senior Bondholder Coalition.  I'd like

7    to mark at this time for identification purposes as CS Four,

8    an e-mail chain between James Sparks of Elliott Asset

9    Management and Matt Rodrigue of Miller Buckfire dated May

10   11th.

11         May I approach the witness, Your Honor?

12         THE COURT:  Yes, you may.

13         And one second.  Ms. Tacoronte, do you need to

14   physically mark something or --

15         COURTROOM DEPUTY:  I can, Your Honor.

16         THE COURT:  Okay.  Thank you.  You may proceed.

17         MR. KIRPALANI:  And I've given a copy of proposed

18   Exhibit CS Four to counsel for the GMS Group as well.

19                        CROSS-EXAMINATION

20   BY MR. KIRPALANI:

21   Q.   So, Mr. Elliott, can you identify who is James Sparks?

22   A.   James Sparks is -- the easiest way to explain it is he's

23   my business partner, but he works in the business.

24   Q.   Okay.  But he's an employee of your firm, correct?

25   A.   Essentially, without, you know, hashing things, yes.

1    Q.   Okay.  And do you see on the bottom of the first page of

2    proposed Exhibit CS Four is an e-mail chain from James Sparks

3    to Matt Rodrigue, copying Andrew Hayne of Stifel.  Do you see

4    that?

5    A.   I do.

6    Q.   And that's dated at -- 1:07 PM.  Do you see that?

7    A.   Yes, I do.

8    Q.   Would you please read into the record the text of this

9    e-mail?

10        THE COURT:  Before we go there, did you want to offer

11   this as evidence into the record?

12        MR. KIRPALANI:  Thank you, Your Honor.

13   BY MR. KIRPALANI:

14   Q.   Mr. Sparks is an individual you said is effectively your

15   business partner; is that right?

16   A.   Yes.

17        MR. KIRPALANI:  Okay.  I'd like to offer this e-mail

18   as an admission of Mr. Elliott's firm.

19        THE COURT:  Any objection?

20        MR. EISENBERG:  No objection, Your Honor.

21        THE COURT:  The CS Four is admitted into evidence.

22        (At 4:53 PM, Exhibit CS Four admitted into evidence.)

23        MR. KIRPALANI:  Thank you, Your Honor.

24   BY MR. KIRPALANI:

25   Q.   Would you please read what your partner, Mr. Sparks, said

1    to Mr. Rodrigue at the bottom of the first page of CS Four?

2    A.   Sure.  Would you like me to start with, Hello, Matt?

3    Q.   Yes.

4    A.   Okay.  Hello, Matt.  We have spoken before.  We were

5    given your name by Andrew Hayne at Stifel.  We have owned

6    COFINA bonds, senior and junior, for several years and have

7    been actively working with Stifel over the last year to

8    increase our position.

9         Last October, we sent a letter to Judge Swain

10   detailing some of our thoughts, and I've been closely

11   following the legal proceedings.  We would appreciate a few

12   minutes of your time in order to make sure --

13        THE COURT:  Slow down, please.

14        THE WITNESS:  Sorry.  My apologies.

15        We would appreciate a few minutes of your time in

16   order to make sure we have not missed any details and to see

17   if there is any way that we can help you.  We look forward to

18   hearing you soon.

19   BY MR. KIRPALANI:

20   Q.   Thank you.  And on top of this same page, Mr. Sparks is

21   e-mailing Mr. Rodrigue again at 4:36 PM, which is about three

22   and a half hours later.  You agree with me on the math?

23   A.   Yes.  That's about three and a half hours.

24   Q.   Okay.  And on the same day.  And could you please read

25   into the record the -- this e-mail as well?

A.    Sure.  Hello, Matt.  Thank you for taking time on short

notice to speak with us.  It is good to know there may be a

way for us to help each other to make sure we arrive at the

best solution for all parties.

Attached you will find Mark Elliott's letter to Judge

Swain, as well as a summary from her broker dealer that has a

large position in COFINA.

The summary may be a good place to start as it quotes

a few relevant points from the letter to Judge Swain.  We had

a very short time to write the response to Judge Swain, so it

is long and somewhat repetitive.

We believe there are many good points to consider,

especially on the first two pages, and believe, as the broker

dealer noted, that the letter was entered into the record to

help move the parties closer to settlement talks.

Per your request, I have attached a current list from

our largest custodian of our Puerto Rico bond holdings,

parentheses, mostly COFINA, unparentheses, with approximate --

excuse me, with amounts, parentheses, approximate 31,000 M,

which as you know, that stands for 31 million, and CUSIPs,

parentheses 139, unparentheses.

These are for approximately 50 accounts and 15

households.  There is roughly another 6.2 MM face of COFINA

bonds at another custodian that we manage for four clients.

Q.    Thank you.

1          So just to give some context to this e-mail chain,

2    is it your understanding that you spoke with Mr. Rodrigue

3    between 1:07 PM on May 11th and 4:36 PM on May 11th?

4    A.   That would be appear to be the case, yes.

5    Q.   Okay.  And you don't see anything in the e-mail sent

6    after your conversation with Mr. Rodrigue that indicates

7    surprise or outrage or anything of the kind relating to the

8    representation of junior bondholders in the negotiation?  Do

9    you see anything in there that says that?

10   A.   I don't.

11   Q.   Okay.  And just to be very, very clear, because it's a

12   pretty important point, Mr. Elliott, you never e-mailed Judge

13   Houser or any of the other two judges asking to participate in

14   the judicial supervised mediation, did you?

15   A.   I didn't e-mail either of the judges.  I didn't know that

16   was the proper -- you know, proper procedure.

17          MR. KIRPALANI:  No further questions, Your Honor.

18          THE COURT:  Thank you.  Nothing further.

19          MR. EISENBERG:  I have redirect.

20          THE COURT:  Do you have something that is -- I'm

21   asking this to Mr. Eisenberg, whether he has something that is

22   specific to this cross on which he wishes to redirect.

23          MR. EISENBERG:  One question.

24          THE COURT:  Come down, please.

25          Mr. Eisenberg indicated he has one question.

1                          REDIRECT EXAMINATION

2    BY MR. EISENBERG:

3    Q.   Just for the record, Mr. Elliott, at the time that the

4    e-mails were being sent to you on May 11th, did you know who

5    the mediation judges were?

6    A.   No.

7              MR. EISENBERG:  Thank you.

8              THE COURT:  Thank you, Mr. Elliott.  Your testimony

9    is concluded.  You may step down.

10             (Whereupon the witness left the stand.)

11             THE COURT:  All right.  So does that conclude the

12   presentation of evidence or -- Mr. Kirpalani.

13             MR. KIRPALANI:  After conferring with counsel for the

14   Oversight Board and AAFAF, we feel it's important, Your Honor,

15   to recall Mr. Rodrigue to ask him one question.

16             THE COURT:  Very well then.  Mr. Rodrigue, would you

17   return to the witness stand.

18             Mr. Rodrigue, do you understand that you are still

19   under oath?

20             THE WITNESS:  Yes.

21             THE COURT:  Please be seated.

22                  M A T T H E W    R O D R I G U E,

23         recalled as a witness, having been previously sworn,

24         testified as follows:

25                          REDIRECT EXAMINATION

```
 1   BY MR. KIRPALANI:
 2   Q.   Mr. Rodrigue, were you in the courtroom when Mr. Elliott
 3   testified that you told him there were no representatives of
 4   junior bondholders involved in the negotiations?
 5   A.   I was in the courtroom.
 6   Q.   Okay.  Do you agree with that statement?
 7   A.   No.
 8   Q.   Did you ever say that to Mr. Elliott?
 9   A.   No.
10   Q.   Do you believe that to be the case?
11   A.   It's not the case.  It's not true.
12          MR. KIRPALANI:  No further questions, Your Honor.
13          THE COURT:  Thank you.
14          Any inquiry?
15          MR. EISENBERG:  One.
16          THE COURT:  Mr. Eisenberg says he has one question,
17   and he's coming to the podium.
18                          RECROSS-EXAMINATION
19   BY MR. EISENBERG:
20   Q.   Was the -- was there a conversation with Mr. Elliott that
21   took place after May 11 of 2018?
22   A.   There could have been.  I don't specifically recall.
23          MR. EISENBERG:  Okay.  Thank you.  No further
24   redirect, Your Honor.
25          THE COURT:  Thank you.
```

1           Nothing further, Mr. Kirpalani?

2           MR. KIRPALANI:  Nothing further.  And thank you very

3   much, Your Honor, for the accommodations on the fly for the

4   witnesses.

5           THE COURT:  Thank you.

6           Thank you, Mr. Rodrigue.  You may step down again.

7           (At 4:59 PM, the witness left the stand.)

8           THE COURT:  Mr. Rosen.

9           MR. ROSEN:  Yes, Your Honor.  I believe, based upon

10  the Agenda and the score card, as you referred to it, I think

11  that would conclude all of the introduction of evidence with

12  respect to the confirmation hearing itself, leaving the

13  objector statements, public comment, et cetera, Your Honor.

14          THE COURT:  Yes.  So just for clarity, does the

15  Oversight Board rest on its tender of evidence?

16          MR. ROSEN:  We do, Your Honor.

17          THE COURT:  Does the party in support rest on its

18  tender of evidence?

19          MR. KIRPALANI:  We do, Your Honor.

20          THE COURT:  Does GMS Group rest on its tender of

21  evidence?

22          MR. EISENBERG:  We do, Your Honor.

23          THE COURT:  And so since it's five o'clock, and I

24  have informed the public speakers that they should arrive for

25  9:30 tomorrow morning, and after that we have just have

1   arguments and then the Bank of New York Mellon and Whitebox

2   issue, we will adjourn for the day today to resume tomorrow

3   morning with the objectors' statements.

4          And I will be grateful, Mr. Rosen, if you would

5   coordinate the time allocations on an agreed basis so that we

6   can move forward efficiently with that.

7          MR. ROSEN:  We will do that, Your Honor.

8          THE COURT:  Thank you.  And then after the objectors'

9   statements, we will hear the public statements, and then the

10  further statements in support, and the reply and closing

11  statement on the COFINA Plan Confirmation Motion.

12         Is there anything else that we need to discuss

13  tonight?

14         MR. ROSEN:  Your Honor, may we leave our items in the

15  courtroom?

16         THE COURT:  Ms. Tacoronte?

17         COURTROOM DEPUTY:  Yes, Your Honor.

18         THE COURT:  Yes, you may.  The courtroom will be

19  locked.

20         MR. ROSEN:  Thank you.

21         THE COURT:  Thank you all for your work here today,

22  and I again wish to acknowledge and thank Judge Houser and her

23  colleagues on the mediation team for their contribution to the

24  work that is before us today.

25         Good evening, everyone.

1              (At 5:01 PM, proceedings concluded.)

2                               *      *      *

```
 1   U.S. DISTRICT COURT     )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 217 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain on January 16,

 8   2019.

 9

10

11   S/ Amy Walker

12   Amy Walker, CSR 3799

13   Official Court Report

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
2014, June 54:21
9019 may 32:20
August 8th 21:5
December 19th 17:1
January 14th, 2019
   199:3
January 16, 2019
   1:16, 6:2, 217:7
January 16th 199:14
January 2nd 16:14
January 8th 23:7
January 9th, 2019
   148:18
June 1 188:13
June 1, 2017 188:15
June 18th 184:22,
   184:23
June 1st, 2017
   181:17
June 2015 173:20
June 28, 2015 171:8
June 28, 2015.
   173:11
June 7th 20:10
June 9th 148:18
May 11 213:21
May 11, 2018 182:7
May 14 185:4
May 14, 2018 184:24
May 14th 184:25
May 3rd, 2017 174:21
May 5th 137:19
November 20 31:13
October 15, 2013
   109:10
October 31 108:21


< 0 >
000 58:1
061 51:10


< 1 >
1 51:10, 57:15, 58:1
1.1 50:21
1.2 135:13
10 91:2, 107:3,
   113:20

100 134:19, 136:18
106.8 161:8
10701. 107:20
109 131:9
10:07 26:5
11 107:3, 113:20,
   139:25, 149:18,
   149:19, 170:10,
   170:15
1128(b 130:22
118 131:10
11:30 78:19
11th 23:7, 204:21,
   207:10, 211:3,
   212:4
12 95:25, 107:3,
   113:20
12-year-old 90:8
13 107:3, 113:20
13. 82:3
13.5 156:12, 156:22
139 210:21
139. 183:19
14 107:3, 113:20
14-year-old 90:8
146 4:6, 4:9, 4:12,
   4:15
148 4:33
149 4:34, 5:9
14th 205:2
15 107:4, 113:20,
   117:10, 183:20,
   210:22
150 4:18, 98:9
15th 205:2
16 160:11
166 4:35
17-3283 142:3
17-3284 133:4,
   133:10, 148:15
17-AP-133(LTS 1:40,
   2:4
17-BK-3283(LTS 1:6
17-BK-3284 2:6
17-BK-3284(LTS 1:22,
   1:42
178 4:36, 55:20
17th 199:14
185 4:37
188 4:38

191 4:21
192 4:24, 4:27
194 5:11
1940 55:10, 55:15
196 4:30
199 134:23
1999 92:11, 202:11
1:00 77:19
1:07 208:6, 211:3
1:13 78:20


< 2 >
2.5 51:1, 86:8
2.6 51:11
2.7 136:20, 151:23
200 4:41
2006 110:7, 164:5,
   202:9
2007 50:21, 164:6
2007). 131:10
2008 92:19, 164:6
2008). 131:2
2009 164:6
2010 102:6, 192:22
2010. 102:6
2012 54:20
2013 54:20, 54:21,
   55:19, 85:10
2014 54:21, 54:23
2015 54:23, 173:24,
   174:3, 177:6
2015. 54:23, 173:22
2016 54:2, 85:13
2016. 163:16
2017 19:25, 51:1,
   51:3, 54:2,
   175:11, 188:14
2017. 174:12, 174:13
2018 54:2, 99:16,
   102:6, 159:3,
   159:5, 159:10,
   167:19, 181:23,
   182:19, 183:25,
   203:10, 203:16,
   213:21
2018. 159:16,
   167:15, 192:22,
   204:21
2019 37:22, 37:23,

159:4, 159:7
2019. 86:16
2023 51:7, 51:9
2058 40:2
2058. 39:15, 154:23
206 4:42
207 5:13
21 131:9
211 4:43
212 4:46
213 4:47
217 217:4
21: 3:4
229 50:22
25 5:6, 54:25
250 187:18
26 99:16
27,000 56:7
28 37:13, 107:10,
   107:16, 108:20,
   111:9, 113:2
28. 108:20
2d 131:10


< 3 >
3.1 51:7
30 52:14, 54:14,
   65:4, 91:2, 100:1,
   100:2, 105:21
30,000 56:10
303 62:21
304 50:23
30th 54:21, 159:3
31 107:4, 113:20,
   183:12, 183:14,
   183:16, 210:20
31,000 183:16,
   210:19
31M 183:15
32 82:9
3283 133:9, 144:21,
   196:13
3283. 146:1, 146:5
3284 144:18, 145:23
35 93:1, 107:4,
   113:21, 125:22
350 21:24, 86:15
375 144:16, 144:18,
   145:5

3799 217:12
38 51:4
39-year-old 89:19
391 131:1
3: 1:6, 1:22, 1:40,
   2:4
3:08 147:7
3:24 147:8
3:29 150:10


< 4 >
4.5 37:14
40 40:5, 54:6,
   54:14, 89:16,
   98:9, 126:11
401(k)s 54:13
41 89:18, 107:10,
   107:16, 111:9,
   113:2
41. 111:13
42 107:4, 113:21
420 37:22, 86:9
43 107:4, 113:21
43-years-old 90:7
4316. 32:23
44 87:6
445-1. 148:16
45 117:10
450 37:20
4564 102:14, 192:8,
   192:15
46 67:20, 107:4,
   113:21
46-53 60:24, 62:10
46.35 20:15
4606 102:13, 191:19,
   191:23, 196:13
4606. 195:14
4641 102:13, 191:19
4642 191:19
4642. 102:13, 191:19
4656 30:4, 30:20,
   146:5
4656. 30:5
4665-1 170:10,
   170:14
4665-1. 148:14
4756. 142:25
4757. 143:15

4758 26:9, 26:12,
   27:8, 145:20,
   145:25
4759 27:1, 27:6,
   27:9, 144:15,
   144:20, 146:18
4759. 27:5, 27:11,
   146:16
4760-2. 146:15
4761 133:3
4764 104:15
4769 104:4, 193:14
4769. 193:6
4790 133:9
4792 194:25, 195:2,
   195:4
4792194 5:11
4793 5:11, 194:21,
   195:4, 195:5
4793. 194:7
4794 142:2
4805 133:11
49 107:4, 113:21
491 51:8
4:19 189:21
4:23 193:4
4:25 195:6
4:36 209:21, 211:3
4:41 207:2
4:51 207:3
4:53 208:22
4:59 214:7


< 5 >
5.5 124:25
50 55:13, 135:5,
   183:19, 210:22
505 131:9
51 107:4, 113:21
52 107:4, 113:21
53 61:10, 67:20,
   113:21
53. 107:4
53.65 20:14
54. 113:21
568 55:22
57 109:11
584 145:21, 145:23
5:01 216:1

< 6 >
6.2 183:20, 210:23
6.4 135:3
6.6 50:19
60 99:15, 110:4,
  156:4, 160:22,
  160:25, 178:12
600 58:3
61 99:15
62 81:2
63 109:20
67 135:4
695 131:2

< 7 >
700 57:15
703 131:2
74 52:13
753 51:2, 159:5,
  159:10, 159:15
76 161:10
77 52:20
777 51:3

< 8 >
8 119:19
8,000 140:21
81-year-old 89:20
827 44:17
84 37:13
85 134:17

< 9 >
9019. 64:21
91 110:7
92 135:2
99.5 134:16
990 33:17
9:30 214:25
9:38 6:3

< A >
A. 193:9
AA 5:5, 25:10, 26:6

AAFAF 15:21, 18:8,
  62:15, 212:14
abandonment 191:2
ability 7:19, 64:4,
  65:20, 71:22,
  119:17, 120:2,
  120:9, 125:11,
  128:9, 128:15,
  129:23, 132:7,
  156:18, 191:3,
  191:15, 217:5
able 21:5, 54:19,
  54:22, 81:9, 82:6,
  82:13, 89:6,
  90:10, 97:8,
  106:7, 107:7,
  109:7, 113:11,
  125:15, 126:1,
  126:6, 128:22,
  128:23, 129:12,
  134:10, 158:25,
  160:14, 169:23,
  197:24, 200:4,
  200:25, 206:9,
  206:10
above 22:10, 65:13,
  172:24
Absent 153:6,
  156:17, 158:16,
  158:24, 159:1,
  159:11, 159:13,
  159:14, 165:19
Absolutely 12:9,
  24:8, 27:18,
  110:22, 198:21,
  198:25
abused 90:6
academic 58:9
accelerate 174:8,
  174:9, 175:19
acceleration 154:17,
  157:19, 159:13,
  159:14, 175:16
accept 107:12,
  111:20, 111:22,
  113:7, 134:17,
  134:24, 137:5,
  137:25, 205:13
acceptable 38:19,
  41:3, 108:9,

149:23, 182:14
acceptance 140:11,
  140:12, 140:13,
  141:4
acceptances 114:15,
  141:20
accepted 26:4,
  117:4, 134:23,
  135:20, 137:2,
  140:15, 197:12
accepting 47:9
access 22:17, 51:20,
  71:23, 72:1, 84:1,
  86:15, 90:1,
  127:4, 141:1
accessible 96:15,
  96:23
accommodate 12:3
accommodations 214:3
accomplish 16:1,
  68:16, 134:11,
  134:12
accomplished 185:17
accordance 14:7,
  23:6, 141:11,
  141:22, 142:25,
  143:3, 143:14,
  194:2
according 44:23,
  123:2
account 54:16,
  136:9, 152:3,
  154:11, 158:22,
  162:21
accounted 55:24
accounting 38:11,
  119:23
accounts 44:16,
  183:19, 210:22
accrue 156:19
accumulated 98:17
accumulation 158:10
accurate 139:5,
  159:18, 172:12,
  173:5, 173:6,
  217:5
accurately 171:23
achievable 11:20
achieve 64:25, 82:6,
  155:18, 166:21

achieved 66:4, 125:9
achievements 81:15
achieves 65:15
acknowledge 32:9,
   119:20, 120:7,
   215:22
acknowledged 16:16,
   137:4, 138:21,
   140:9, 196:4
acquire 202:21
acquired 53:23,
   179:15, 179:19,
   202:23, 202:25
across 66:25, 141:4
Act 46:7, 53:19,
   55:10, 55:11,
   55:16
acted 176:21, 176:24
acting 60:22, 188:4
action 19:9, 20:3,
   70:12, 74:3,
   136:14
actions 24:2, 29:10
active 18:6, 93:6,
   188:8
actively 209:7
activities 173:20,
   175:15
activity 129:1,
   174:11, 174:15
actors 100:10
actual 14:22, 21:23,
   24:18, 80:5,
   102:15, 142:12,
   142:16, 166:19
Actually 16:15,
   18:21, 55:9,
   55:13, 64:4,
   66:19, 68:6,
   81:25, 88:4,
   88:24, 89:18,
   90:20, 91:12,
   99:20, 105:3,
   108:10, 118:11,
   133:21, 153:22,
   163:3, 166:5,
   173:19, 173:21,
   176:5, 176:14,
   177:18, 180:10,
   188:19, 199:25

Ad 3:16, 69:1
Adam 69:11
Added 58:8
addition 43:13,
   54:4, 156:17
additional 7:9,
   86:15, 105:12,
   105:24, 144:15,
   193:23, 197:14,
   199:9, 199:10,
   200:25
Additionally 107:18
additions 35:8,
   35:16
address 7:5, 9:20,
   10:6, 14:1, 35:7,
   41:25, 47:6,
   48:25, 50:16,
   51:19, 64:9,
   80:10, 99:22,
   105:1, 117:22,
   118:22, 120:11,
   126:1, 127:22,
   163:21, 185:23
addressed 8:13,
   126:9, 126:16
addresses 124:24,
   128:15
addressing 13:15,
   22:22, 34:10,
   195:13
adequacy 17:18,
   31:14
adequately 138:14,
   177:22
adhered 140:18
adjourn 215:2
adjourned 77:22,
   78:18
adjudicate 68:12
adjudication 132:25,
   157:4
adjusted 119:9
Administered 1:11,
   139:2
administrations
   112:8
administrative 197:8
admissibility
   104:19, 104:21,

104:24
admissible 103:12
admission 23:5,
   25:18, 30:22,
   143:20, 208:18
admissions 13:12,
   111:14, 206:3
admit 114:12
admitting 195:25
Adriana 56:21, 84:8,
   84:15
advance 11:20,
   27:23, 80:9,
   105:9, 111:5,
   200:7
advancing 45:17
adversarial 29:15
adversary 25:13,
   74:2
advise 113:24
advised 48:13, 181:7
advisement 20:7,
   76:17
advisers 181:6
advising 181:4,
   181:6
advisor 160:8
advisors 51:22,
   111:12
Advisory 3:12
advocacy 113:8
advocate 99:5
advocating 44:13
Affairs 92:18, 92:23
affect 86:17,
   118:24, 124:9,
   131:1, 131:5,
   132:5
affected 44:19,
   45:1, 94:11,
   123:1, 124:22,
   131:19
affecting 127:4
Affidavit 29:13,
   170:15, 196:21
affiliated 180:24
affirmative 14:14
afford 36:16, 38:16,
   41:2, 41:22,
   46:18, 63:20,

63:21, 94:12
afforded 205:20
afraid 90:23, 100:25
afternoon 78:21,
    78:22, 80:24,
    84:12, 84:14,
    87:24, 91:19,
    92:1, 95:14,
    95:15, 101:6,
    103:4, 104:5,
    117:14, 130:11,
    147:9, 150:17,
    150:21
agencies 38:24,
    52:19, 164:13
Agency 3:11
Agenda 9:23, 10:2,
    10:5, 11:6, 11:7,
    12:4, 15:17, 16:9,
    16:21, 28:17,
    31:8, 32:20,
    32:25, 33:15,
    34:20, 60:6, 60:8,
    60:11, 76:21,
    78:2, 80:14,
    117:2, 214:10
Agent 2:9, 2:25,
    3:42, 19:20,
    19:22, 21:11,
    21:12, 22:5, 24:2,
    25:17, 29:2,
    29:11, 29:14,
    60:4, 60:22,
    60:23, 61:23,
    64:12, 64:18,
    64:24, 73:23,
    114:14, 145:12,
    146:4, 165:11
agents 19:19, 21:3,
    21:11, 67:12,
    73:5, 76:1, 136:7,
    167:24, 185:7
aggregate 52:14
aghast 110:24
ago 11:25, 17:6,
    82:9, 84:23, 91:2,
    198:1, 198:12,
    199:4
Agosto 59:15, 100:17
agree 18:9, 94:6,

101:25, 102:23,
    102:25, 103:16,
    209:22, 213:6
agreeable 32:4,
    116:2
agreed 17:3, 101:24,
    103:11, 103:14,
    105:2, 106:10,
    106:24, 107:23,
    119:23, 189:23,
    191:8, 193:8,
    197:1, 215:5
agreeing 139:9
agreements 8:16,
    45:21
agrees 107:24
ahead 16:20, 186:4
aid 13:6
al 1:16, 1:48, 2:42
Albelo 120:25
aligned 176:25,
    177:13, 177:14,
    178:3
alignment 177:12
allegation 176:7
allegations 124:19,
    126:24, 136:11,
    138:16, 138:24,
    139:3
allege 136:19
alleged 131:25
allegedly 132:5
alleging 171:3
allocated 10:22,
    11:25, 48:25,
    50:5, 80:10,
    112:9, 122:1,
    156:12, 156:23
allocating 51:13
allocation 10:7,
    10:19, 57:10
allocations 10:2,
    10:17, 11:5, 215:5
allow 41:23, 58:25,
    71:13, 71:16,
    100:6, 129:11,
    129:21, 154:14,
    189:23
allowed 21:5, 96:23,
    97:17, 151:5,

151:11, 151:16,
    151:21
allowing 53:11,
    69:16, 104:8,
    194:3
allows 22:16, 38:10,
    92:13
Almeida 124:20,
    125:23, 126:9,
    126:16, 127:4,
    128:8, 128:14
almost 38:2, 47:22,
    65:4, 97:2,
    171:16, 173:4
alone 82:4
alphabetical 144:10,
    145:1
already 6:18, 13:16,
    18:3, 24:17, 40:9,
    40:12, 45:3,
    47:18, 55:1, 55:7,
    73:9, 73:16,
    79:17, 79:19,
    86:2, 123:8,
    131:16, 134:5,
    138:6
alternating 112:8
Although 17:14,
    17:15, 87:5,
    130:21, 132:10
Alzheimer 89:25
amazing 195:10,
    195:12
Ambac 3:25, 19:6,
    66:11, 66:16
Ambro 20:23, 76:2,
    134:9
ameliorate 63:24
Amended 10:4, 21:9,
    31:18, 32:25
amendment 31:19,
    31:22, 33:6
amendments 10:5
America 40:10
among 21:6, 42:8,
    45:20, 67:12,
    93:5, 133:13,
    163:23, 184:9
amount 20:14, 21:25,
    36:20, 42:7,

52:10, 57:21,
67:23, 124:9,
126:4, 134:16,
139:15, 151:5,
151:7, 151:12,
151:13, 151:14,
151:16, 151:20,
152:14, 152:20,
152:24, 154:11,
164:16
amounted 86:8
amounts 18:12, 75:8,
76:6, 152:1,
152:3, 164:20,
183:12, 187:15,
210:19
Amy 217:11, 217:12
an injury 123:6,
124:10
analyses 164:25
analysis 37:2,
38:15, 46:17,
152:22, 152:25,
153:2, 153:16,
156:13, 160:13,
160:23, 162:1,
164:16
analyst 168:14
analyze 83:19
analyzed 63:6,
152:22
and/or 110:14,
164:21, 165:3
Andrew 168:7, 168:9,
168:13, 208:3,
209:5
anemic 36:24
Angel 44:5
annexed 26:13
annexes 107:21
annotate 171:6
annotations 171:2,
171:3
announce 21:6,
106:23
announced 17:1,
20:10, 63:3,
167:24, 168:24,
185:3, 185:8,
192:18, 205:5

announcement 79:13,
171:23, 185:6
annual 21:24, 37:19,
86:8, 86:15
answer 121:2,
154:14, 165:23,
181:13
answered 194:1,
194:13
answering 154:3
Answers 20:2, 194:6,
194:9, 194:17,
194:18, 195:9
antagonistic 176:8,
176:22, 177:18,
178:2
anteceding 72:17
anticipate 48:11
anticipated 46:18
Antonio 3:42
anxiety 33:14
anybody 79:7,
104:21, 142:15,
180:15, 194:4,
205:13
apart 152:25, 165:4
apologies 79:24,
209:14
apologize 11:11,
17:11, 25:23,
27:19, 32:19,
36:13, 49:1,
102:11, 111:5,
115:12, 116:10,
116:22, 193:10,
197:7
apparatus 53:4
apparent 67:1
appeals 22:15, 74:6,
75:18
appear 10:6, 45:7,
127:9, 211:4
appearance 121:9
APPEARANCES 2:39,
3:1, 69:16
appeared 31:10
appearing 44:24,
46:24, 106:1,
111:15
appears 110:1,

173:7, 175:1
appellate 67:9
appended 14:6
appendix 26:13,
26:23, 27:5, 27:8
apples 109:18
applicable 70:18,
118:21, 138:8,
146:1
application 121:20,
130:12, 130:18,
132:9, 147:19
applied 47:2
applies 105:2
apply 162:13
appointed 19:19
appointment 19:22
appreciate 29:23,
59:13, 116:8,
116:15, 134:4,
172:18, 209:11,
209:15
appreciated 205:3
apprised 56:12
approach 53:8,
103:20, 104:9,
104:10, 138:2,
139:24, 143:6,
143:24, 190:19,
207:11
approached 106:22
appropriate 10:25,
11:14, 19:4, 24:3,
37:3, 63:14, 64:6,
64:11, 77:4, 79:8,
109:3, 128:19,
138:10, 139:24
appropriately 19:19,
139:22
approval 23:1, 34:6,
45:1, 45:19,
46:12, 64:12,
65:12, 69:4,
70:24, 87:8,
123:14, 123:20,
131:24, 134:14,
141:4
approve 9:8, 66:6,
70:15, 76:12
approved 9:17,

57:21, 58:11,
68:20, 75:25,
83:16, 87:10,
123:7, 159:8
approving 144:17
approximate 156:4,
160:11, 160:21,
183:12, 210:18,
210:19
approximately 37:20,
44:17, 156:12,
159:5, 161:7,
161:16, 183:12,
183:19, 187:18,
204:20, 210:22
April 20:6
Aquino 59:16, 100:18
area 160:10
areas 94:6, 199:10
argue 86:11, 129:11,
132:3
argued 69:2, 105:4,
157:10, 157:18
arguing 9:4, 110:13,
121:15
argument 20:5, 34:7,
34:15, 40:14,
40:15, 45:14,
90:17, 105:5,
107:8, 107:13,
108:19, 113:14,
113:23, 118:14,
118:20, 122:2,
129:8, 129:9,
129:10, 130:15,
131:16, 132:10,
132:12, 136:4,
196:22, 198:24
argumentation 23:24
arguments 7:8, 73:4,
76:16, 113:8,
121:24, 123:12,
128:25, 130:9,
130:17, 135:24,
137:7, 157:13,
215:1
arise 135:25
arithmetic 160:25
Armed 92:10
Army 55:21

arose 136:14
around 40:11, 86:9,
88:1, 167:15,
167:17, 174:11,
181:23
Arribas 3:4
arrive 48:22,
182:22, 210:3,
214:24
article 107:21,
107:25, 108:18,
196:4
articles 12:13,
103:8
articulate 113:23
articulation 105:9
artificially 126:24
aside 48:7, 198:7
asks 63:23
Asociacion 44:2
aspect 13:18, 73:11,
138:7, 138:8,
138:11, 140:18,
143:5, 143:22
aspects 15:11, 132:4
assert 107:7,
120:16, 129:13,
131:3, 200:10
asserted 55:15,
107:17, 111:18,
113:3, 136:11,
138:4, 157:22,
159:25
assertion 52:4,
108:3, 158:6,
158:9, 158:13,
158:18, 159:17
assertions 125:8,
159:19
asserts 46:13
assessment 46:10,
160:13
Asset 180:23,
182:19, 202:1,
202:3, 206:3,
207:8
assets 54:17, 54:18,
154:8
assignment 42:18
assist 57:2, 139:9

assistance 93:9
assisting 15:11
associated 15:11,
22:22, 25:13,
192:4, 193:2
associates 167:17
assume 107:23,
154:9, 155:3,
191:4
assumed 11:6
Assuming 39:4,
154:6, 178:15,
178:16, 191:5
assumption 52:7
assumptions 39:10
Assurance 3:25,
66:11, 98:18
assure 64:23
Assured 135:9,
180:25, 187:7,
187:9
Atlas 20:23, 76:2,
134:9
attach 111:10
Attached 12:11,
13:9, 26:10,
26:11, 26:22,
142:8, 142:11,
145:11, 146:4,
182:24, 191:20,
191:22, 192:15,
192:16, 193:7,
210:5, 210:16
attaches 108:21
attachment 161:24
attachments 101:20,
142:10, 184:4,
194:18
attack 162:20, 196:5
attacked 158:3
attacking 162:20
attempt 111:6, 120:6
attempted 106:4
attempting 157:14,
159:20
attempts 162:11
attention 35:11,
127:2, 150:22
attitude 53:6
attorney 160:8

attorneys 204:2
attributable 110:16,
   110:19
attributed 110:14
audible 6:19
audit 54:1, 83:20,
   98:10, 98:12,
   98:22, 98:24
audited 95:24, 99:1,
   99:7
August 173:22
auspices 136:9
AUST 3:4
austerity 7:19,
   36:24, 38:23,
   39:3, 47:18,
   54:24, 55:1, 55:3,
   63:24, 89:7, 99:6,
   99:7
Authority 3:12,
   8:15, 20:19
authorize 24:1
Auto 36:11
automatic 175:14
Autonomy 69:12
availability 153:14
available 9:7, 9:8,
   18:4, 28:9, 33:21,
   51:18, 54:3,
   71:15, 71:17,
   75:19, 110:9,
   119:9, 124:9,
   145:15, 151:8,
   152:12, 152:15,
   152:24
average 37:8, 37:9,
   37:12, 37:15, 51:4
avoid 42:25, 47:16,
   63:25
avoids 63:13
aware 28:4, 42:14,
   56:11, 63:8,
   85:21, 155:25,
   157:12, 158:8,
   166:24, 174:6
away 64:10, 77:5
Ay 51:24, 53:8

< B >

B. 3:40
Bachelor 81:13
background 202:12
backroom 53:8
bad 45:24, 47:12,
   47:23, 47:24,
   100:9
Baja 89:19
balloon 184:24
Bank 1:40, 19:8,
   108:22, 108:24,
   158:4, 159:6,
   174:9, 175:17,
   188:19, 188:21,
   215:1
bankers 51:21,
   162:14
Bankr 131:2
bankrupt 65:19,
   65:21
Bankruptcy 1:1,
   16:6, 19:2, 22:9,
   23:2, 23:8, 47:7,
   58:6, 71:8, 71:9,
   72:24, 98:20,
   98:23, 130:23,
   131:6, 138:8,
   155:20, 166:23,
   174:12, 175:12,
   175:13, 181:14,
   181:16
Bardet-biedl 81:21
barely 81:5
bargained 7:25
bargaining 44:14
base 20:14, 51:12,
   123:25, 165:18
based 10:24, 17:2,
   17:4, 18:10,
   28:16, 29:16,
   30:15, 73:16,
   96:4, 105:19,
   112:2, 115:6,
   115:25, 117:7,
   141:3, 143:20,
   156:19, 164:2,
   164:12, 214:9
baseless 47:13
basic 57:16, 65:20,
   83:21, 96:19

basically 33:24,
   40:15, 55:9, 56:3,
   67:20, 68:11,
   82:12, 159:25,
   162:15, 172:14,
   173:3, 200:10,
   205:6, 205:11
basis 19:2, 21:23,
   21:25, 22:16,
   120:15, 130:17,
   135:8, 163:6,
   198:10, 215:5
Bauer 2:45, 15:4
BB 5:5, 25:10, 26:6
bear 40:8, 62:25
bears 38:18, 46:3
beautiful 92:4
became 66:25, 67:8,
   82:8, 85:12, 92:17
become 37:25, 122:12
becoming 204:22
beg 205:24
beget 71:25
begin 50:14, 78:22,
   118:7
beginning 86:16
begun 79:17
behalf 15:2, 23:23,
   35:6, 43:11,
   62:15, 64:18,
   66:11, 69:3,
   69:12, 69:24,
   77:10, 80:3, 98:9,
   101:7, 103:6,
   103:14, 104:6,
   117:15, 122:23,
   127:19, 127:23,
   127:24, 136:1,
   147:23, 150:18,
   158:24, 187:3,
   188:4, 197:21,
   207:6
behind 87:7
beige 180:5
belief 70:7
believed 7:24,
   205:10
belittle 74:14
belly 96:17
belong 110:21

beloved 85:22
bench 104:10
bendito 51:24, 53:9
benefit 18:12,
    20:23, 70:11,
    70:13
benefits 57:19,
    75:7, 94:8, 94:9,
    94:22
Beside 98:7
Besides 99:3,
    124:15, 126:22
best 24:25, 36:15,
    38:19, 39:24,
    43:14, 46:4, 61:8,
    62:8, 64:25, 65:2,
    65:12, 65:13,
    65:16, 66:17,
    73:13, 76:11,
    83:24, 117:22,
    122:18, 181:22,
    182:23, 210:4,
    217:5
betrayed 85:15
Betsy 90:4
better 40:20, 40:25,
    90:16, 92:16,
    93:12, 93:14,
    93:18, 159:20,
    164:10
Bettina 2:23, 19:22
Beyond 31:24, 40:1,
    112:1, 178:6,
    200:19, 200:23,
    203:13, 204:6,
    204:8
biased 53:3
Bienenstock 2:42,
    15:4
bill 91:5
billion 38:2, 50:21,
    51:1, 51:7, 51:12,
    52:13, 52:15,
    54:25, 86:8,
    135:3, 135:13,
    136:20, 151:24,
    156:12, 156:22,
    187:19
billions 75:10
binary 67:4

binding 111:14,
    112:1
bipartisan 112:6
bit 64:19, 88:6,
    136:4, 172:17
black 88:4
blame 51:24, 53:9
bless 53:12
blindness 81:23
block 67:6, 68:10
blond 151:13
blue 172:7, 172:19,
    172:20, 173:3
boards 139:23
Bond 9:21, 36:20,
    38:9, 107:22,
    107:25, 108:18,
    152:2, 156:18,
    162:15, 178:18,
    181:11, 183:11,
    184:10, 189:16,
    192:21, 204:4,
    210:17
Bondholder 110:21,
    158:10, 197:21,
    204:1, 207:6
bonus 57:20
book 161:2, 161:3,
    206:1
bookended 206:5
boost 116:8
Borges 15:5
born 58:13, 81:3,
    81:19, 98:8
borrow 51:20, 56:4
borrowing 53:4
Boston 202:2
bottom 34:12, 140:5,
    184:23, 208:1,
    209:1
bought 91:1, 155:22,
    155:25
bouncing 89:22
bound 72:17
box 104:10, 185:18
boy 81:18, 82:3
boys 59:5
bravely 64:1
break 48:21, 59:24,
    72:1, 77:5, 77:7,

    77:18, 101:5,
    133:20, 133:23,
    133:25
breed 67:9
Brenda 89:17, 89:20,
    91:7
Brian 2:43, 10:13,
    15:1, 69:23, 101:6
brief 40:19, 60:17,
    60:19, 129:6,
    166:9, 185:25
briefly 68:23,
    127:16, 127:18
bring 7:3, 35:10,
    91:14, 108:11,
    179:2
broad 112:6, 165:9
broadcasts 140:24
Broadspan 181:7
broker 182:25,
    183:7, 210:6,
    210:13
brokers 51:22
brother 89:20
brought 23:23,
    62:24, 127:24
brown 88:3
Brownstein 4:11,
    114:23, 115:5,
    115:9, 115:22,
    133:8, 143:15,
    143:16, 143:22,
    144:7, 147:18,
    198:18
bubble 184:22
buck 91:12
bucket 67:14
Buckfire 148:2,
    168:3, 207:9
Buenas 80:23
Buenos 6:5, 57:3
build 90:11, 96:24
bulk 119:2
bunch 90:24, 90:25
burden 37:25, 38:18,
    40:8, 40:13, 46:3,
    46:5, 53:2, 68:5,
    109:12, 126:25
burdening 125:10
burdens 68:3

bureaucratic 53:3
business 52:18,
    207:23, 208:15
busy 205:4
buy 91:1, 162:6,
    162:9
Buyer 107:22,
    107:25, 108:18,
    163:2
buys 162:22, 163:2

< C >
C. 3:36
Cabs 203:2
calamity 39:16,
    39:19
calculated 162:17
calculation 152:1,
    152:19, 160:25
calculations 47:2,
    152:24, 160:9,
    160:10
call 12:16, 32:17,
    48:16, 48:17,
    48:24, 56:19,
    59:23, 80:8, 84:8,
    100:15, 106:12,
    108:21, 108:23,
    110:15, 122:15,
    148:1, 190:24,
    191:5, 196:8,
    197:25, 198:11,
    200:4, 203:18,
    203:19
called 48:14,
    129:16, 149:2,
    166:17, 176:6,
    201:19
calling 34:9
Calls 38:23, 153:11,
    195:12
camera 110:1
campaigns 88:10
Campus 81:1
cancel 126:14
candor 84:6
capacity 16:4,
    37:20, 37:23,
    99:25

capita 109:12,
    109:17, 109:18
Capital 51:20,
    69:12, 96:11,
    181:7
card 35:24, 60:15,
    214:10
care 63:25, 64:5,
    65:11, 82:13,
    82:15, 90:1, 93:3,
    94:4
career 92:22
carefully 63:4,
    128:4, 130:8,
    130:10, 197:19
carry 44:12
cases 15:25, 16:4,
    18:22, 19:5,
    19:12, 53:3,
    66:17, 68:13,
    68:15, 70:7, 87:1,
    131:6
cash 63:12, 156:25
cast 198:7
CAT 3:49
categories 12:19
category 12:19, 13:7
caught 113:12
cause 94:25
caused 32:20, 43:6,
    74:8, 171:5,
    172:3, 173:18,
    175:10, 176:2,
    181:10
causes 39:16
causing 94:23
caution 179:24
cautionary 36:23
cavalier 53:6
caveats 197:11
CC 5:5, 25:10, 26:6
Centeno 56:23, 57:8,
    57:11, 57:13
Center 88:10
cents 91:2
CEO 15:21, 102:3,
    201:25
certain 9:21, 12:10,
    12:15, 12:18,
    12:24, 22:18,

27:10, 167:25,
    168:25, 170:25,
    171:6, 174:17,
    175:18, 181:7,
    185:9, 192:10
Certainly 37:8,
    43:10, 73:15,
    108:18, 109:2,
    109:5, 125:8,
    169:11, 176:12,
    181:5
certainty 73:14,
    75:8, 76:5
certified 37:18,
    38:22
certify 217:4
cetera 214:13
chain 207:8, 208:2,
    211:1
chairman 15:22
challenge 61:9,
    104:22, 118:23,
    130:25, 153:7,
    164:22, 165:5,
    165:17
challenged 18:24,
    62:23
challenges 85:22,
    165:10
chance 37:6, 73:9,
    161:12
change 153:20,
    170:24
Change.org 56:8
changed 27:14,
    137:20, 137:21,
    137:23
changes 83:2, 94:21,
    148:21
Chapter 47:8, 87:7,
    127:6, 139:25
chapters 44:16
characterization
    197:24
charge 83:11, 109:5,
    141:19, 202:4,
    202:6
chargeable 110:23
chart 177:3, 177:4,
    184:18

check 108:14, 193:24
checking 146:6
Cheverez 59:21,
    80:21, 80:23,
    80:25, 81:11, 84:5
CHIEF 15:24, 16:5,
    202:4
child 96:8
children 40:7, 58:9,
    58:11, 59:9,
    81:18, 81:19,
    82:6, 82:14,
    82:15, 83:7, 93:2,
    93:12, 96:25, 97:8
choice 91:23
choose 13:2, 86:20,
    90:2
chose 197:19
chosen 48:9, 100:16
Christian 15:18
Christina 4:5,
    114:11, 141:15
Christmas 57:20
Cir 131:10
Circuit 61:15, 70:16
circular 66:2
circumstance 120:1,
    165:21
circumstances 12:2,
    120:3
circumventing 50:25
cirrhosis 81:25
cited 118:22
cites 40:19
cities 38:25
Citigroup 143:18
citizen 68:5, 92:8,
    92:16
citizenry 18:5
citizens 7:18, 75:9,
    95:3
City 89:19
civil 92:17
Claim 11:19, 17:12,
    51:17, 107:19,
    107:21, 108:3,
    108:4, 108:17,
    118:18, 151:14,
    179:5, 196:3,
    196:5

Claims 18:23, 38:12,
    52:1, 74:2, 75:10,
    120:14, 136:19,
    138:10, 151:7,
    151:11, 158:2,
    165:3, 165:4,
    176:16, 179:2
clamoring 142:20
clarification 102:4,
    149:11, 200:14
clarify 104:11
clarity 214:14
Class 82:22, 83:4,
    83:16, 134:14,
    134:15, 134:21,
    134:22, 134:25,
    135:1, 135:7,
    135:8, 135:10,
    135:12, 135:16,
    135:19, 135:21,
    137:25
Classes 134:18,
    134:19, 137:3,
    139:20, 139:21,
    141:5, 203:6
classic 61:2, 103:9
classification
    138:10
Clawback 110:7,
    112:5, 112:6,
    112:10
clean 61:1, 61:13,
    71:6
clear 14:17, 14:19,
    33:6, 67:8, 71:4,
    111:5, 121:20,
    123:4, 163:24,
    198:14, 199:1,
    211:11
clearing 33:11
clearly 155:14,
    204:21, 205:14,
    205:19
Clerk 23:16, 114:12,
    141:16, 141:18,
    141:19, 141:23,
    142:17
client 122:3, 129:9,
    168:17, 195:8
clients 45:7,

129:12, 129:17,
    129:18, 183:22,
    187:3, 210:24
clinics 96:18
Clippers 88:11,
    90:17
close 56:10, 147:11
closed 38:25, 127:22
closely 209:10
closer 183:9,
    197:18, 210:15
closest 57:5
closing 69:21,
    215:10
co-counsel 15:7,
    104:7
co-funding 55:25
co-head 143:16
Coalition 3:32,
    103:6, 139:23,
    147:15, 147:24,
    149:3, 173:15,
    173:18, 173:19,
    173:23, 174:2,
    174:4, 174:5,
    174:8, 174:19,
    175:20, 175:23,
    176:1, 176:8,
    176:12, 176:14,
    197:22, 207:6
coat 88:22
Code 71:8, 130:23,
    138:9, 155:20,
    166:23
Cofinas 172:7,
    172:8, 172:13,
    172:20, 172:21,
    172:23, 175:8,
    203:21
cognizance 196:2
Cohen 36:10
Coie 104:6, 150:18
cold 88:21
colleague 170:4
colleagues 35:15,
    83:11, 215:23
collect 184:10
collected 50:21,
    50:24, 51:1, 159:6
collecting 50:25

collection 50:23,
    51:8, 52:9, 70:19
collections 125:9,
    125:23
collective 44:13
college 59:9, 81:6
colloquy 195:15
Colon 59:15, 100:17
combination 36:24
comes 89:14, 115:10
coming 39:8, 50:13,
    52:22, 53:25,
    54:8, 56:2, 56:17,
    59:14, 68:10,
    89:10, 152:4,
    156:19, 158:14,
    190:12, 190:21,
    205:1, 213:17
commence 19:5
commenced 19:8,
    188:17
commencement 18:22,
    137:21
comment 66:21,
    68:10, 128:10,
    214:13
comments 48:8,
    66:20, 79:11
Commission 99:11
commitment 124:25,
    160:1
commitments 8:12,
    8:13
Committe 2:4
committed 55:25,
    57:22
Committee 3:6,
    16:25, 17:2,
    19:21, 60:21,
    60:23, 61:21,
    73:24, 74:19
common 129:16
Commonwealth-cofina
    9:1, 9:9, 9:17,
    19:14, 43:2,
    72:14, 72:18,
    136:7, 140:13,
    185:3, 185:7
Commonwealth-related
    120:19

communicate 6:13,
    79:5
communicating 6:25
communication
    108:13, 184:7,
    184:13
communications 8:3,
    182:18
communities 84:18
companies 54:12
Company 131:1,
    168:4, 202:8
comparable 127:6
comparators 37:3
compare 109:17
comparing 164:5
comparison 68:2,
    109:19
compassion 83:20
compelled 60:25
compensated 139:22
compilation 26:12,
    26:24, 27:6,
    142:9, 196:12
complain 127:10
complaining 65:24
Complaints 20:1
complete 113:14,
    132:21, 194:14
completed 81:12
completely 65:19,
    65:21, 90:21,
    98:22
completing 11:23
completion 76:17
complex 65:4, 71:2,
    71:11, 75:23
complexity 16:11,
    43:1, 43:5, 43:7,
    70:21, 73:18, 74:7
compliance 28:5,
    131:13
compliant 8:20
complicated 34:12,
    65:6
complied 14:21
comply 47:19, 58:21,
    119:22, 132:6
complying 79:6
component 45:5,

    74:11, 124:13
components 72:9
composed 44:16
comprehensive 98:10
compromise 22:11,
    29:5, 46:8, 46:11,
    67:21, 70:16,
    70:24, 137:8,
    137:10, 137:12,
    140:10, 163:21
compromises 136:17,
    137:1
con 128:1
concealed 45:21
concedes 37:1
concern 18:9, 33:22,
    89:13
concerned 13:10,
    14:12, 17:24,
    18:1, 18:4, 20:12,
    20:18, 203:21,
    203:22, 205:9
concerning 8:12,
    9:12, 121:6,
    131:17
concerns 7:15, 8:1,
    8:5, 8:8, 63:3,
    97:13, 117:18,
    119:13, 126:16,
    128:1, 158:17
concert 16:18, 137:4
concise 69:6, 80:14
conclude 212:11,
    214:11
concluded 63:6,
    128:20, 189:20,
    212:9
concluded. 216:1
concluding 49:7
conclusion 47:4,
    53:25, 74:7,
    143:10, 153:12,
    153:15, 157:5,
    163:6, 165:19
condemn 97:10
condemned 96:12
condition 85:11
conditions 58:10,
    151:20
conduct 104:20

conducted 20:24,
138:13
confer 11:13, 122:3,
132:3
conference 6:11,
108:23
conferring 189:24,
190:16, 212:13
confident 171:4,
173:23, 173:25
confidential 179:25
Confirm 8:3, 27:2,
34:2, 126:24,
148:20, 149:7
confirmable 132:4
Confirmation 29:14,
32:2, 32:13,
32:18, 45:13,
76:22, 78:6,
101:3, 114:17,
122:2, 124:8,
124:19, 124:22,
125:24, 127:13,
128:2, 130:22,
131:4, 131:5,
131:23, 137:5,
145:13, 163:7,
169:15, 214:12,
215:11
confirmed 34:5,
81:20, 116:16,
148:24, 163:5
confiscation 7:2
conflate 22:20
conflict 203:23
conformance 119:23
conformed 23:15
confronting 99:19
confusion 27:20,
32:19
Congress 8:15, 8:21,
41:20, 72:25
Connecticut 88:14,
88:19
connection 11:24,
14:13, 19:8,
19:12, 28:7,
28:24, 29:16,
29:18, 34:16,
45:15, 48:9,

71:22, 76:23,
101:16, 107:8,
115:2, 115:15,
117:1, 120:12,
120:13, 120:16,
120:18, 123:16,
134:13, 138:18,
140:22, 141:20,
166:16
cons 136:10
consensual 155:19,
156:18, 166:21
consequence 94:24,
132:20
consequences 47:16
consider 8:18, 8:24,
9:14, 29:9, 29:11,
46:9, 84:22, 95:1,
97:16, 109:3,
116:4, 183:6,
210:12
considerable 18:12,
70:8, 75:20
consideration 8:23,
16:9, 18:17, 24:4,
55:6, 93:16,
95:18, 97:5,
121:24, 122:12,
128:13, 162:18
considered 38:21,
165:2
considering 95:2,
130:16
consistent 6:10,
23:10, 36:4,
114:20
consisting 217:4
consolidated 27:9
constantly 90:14
constituents 132:1
constitute 103:1,
174:20
constitutes 198:6
Constitution 71:9,
72:11, 110:10,
112:5
constitutional
53:22, 55:7, 58:20
Constitutionality
18:25

construction 90:7
consultants 51:21
consulted 11:7
consumption 52:10
contact 169:12,
184:8
contacted 200:11
containing 195:24
contains 13:8, 46:17
contemplating 121:11
contends 124:1
content 204:13
contest 13:2, 45:10,
45:13, 76:24
contested 12:7,
196:9
context 38:21, 60:9,
72:13, 72:23,
136:13, 139:24,
152:23, 154:6,
155:15, 156:7,
156:10, 156:21,
157:16, 202:17,
211:1
contextual 198:15
continue 31:17,
39:15, 51:5,
51:12, 65:10,
74:18, 83:17,
94:2, 96:1,
147:14, 153:8
Continued 3:1, 5:1,
70:12
continues 51:6,
52:16, 74:3,
96:18, 154:8
contracts 8:11, 8:12
contrary 58:15,
82:16, 138:18
contrast 88:3
contribute 85:24,
86:3
contribution 57:19,
215:23
contributions 94:20
Control 98:14
conversation 77:13,
89:15, 184:3,
204:13, 204:18,
204:20, 205:1,

205:8, 206:2,
211:6, 213:20
conversations 90:12,
183:24
Conversely 75:16
cookie 51:23
cooperate 85:23
coordinate 215:5
coordinator 88:11
copies 206:22
copy 23:15, 107:19,
148:19, 150:23,
182:11, 206:20,
206:21, 207:17
copying 208:3
corners 142:21
cornerstone 70:6
corporate 54:11,
55:10, 55:16
Corporation 1:32,
1:47, 3:26, 66:11
corporations 52:20
Corps 55:21
Correct 27:12, 52:4,
52:11, 60:7,
77:14, 107:15,
108:5, 111:23,
154:3, 168:6,
170:22, 172:6,
172:8, 173:15,
174:22, 175:8,
178:3, 181:15,
182:4, 182:5,
184:21, 184:22,
185:11, 188:18,
190:14, 193:15,
194:15, 194:22,
196:14, 207:24
corrected 25:23
correction 146:12,
192:20, 192:24
corrections 27:11,
35:9, 35:16, 35:22
correctly 122:6,
196:6
correspondence 8:4,
206:5
corresponds 156:4
cost 42:25, 43:5,
43:7, 52:5

costly 87:11
Council 112:3
Counsel 6:6, 10:9,
10:19, 13:18,
15:8, 19:21, 29:1,
36:8, 42:1, 42:24,
43:8, 60:20,
116:8, 122:1,
160:16, 180:25,
181:4, 188:11,
192:19, 207:18,
212:13
count 42:9, 56:13,
82:15, 85:2
counter 49:12,
49:14, 64:7,
128:23
Counterclaims 20:2
countering 121:16
counting 42:5
countless 52:19
countries 99:21
country 58:14, 59:6,
59:8, 83:17,
96:25, 97:8, 127:8
countryside 96:9,
96:13
counts 42:22
couple 10:8, 42:1,
118:15, 150:19,
166:4, 166:6,
166:8, 185:19,
185:22
coupon 203:2, 203:3
course 7:9, 38:8,
39:17, 40:10,
80:13, 135:14,
152:17, 152:21,
196:8, 199:22,
200:10
courthouse 108:12
courtrooms 79:3
cover 46:23, 49:2,
49:3, 57:15, 87:4,
126:1, 126:6
covered 95:21, 96:5
cramdown 155:19,
166:22
create 71:21, 96:23
created 53:2, 67:6,

83:6, 110:7
creation 53:20
credible 73:4
credit 19:15,
110:11, 134:7
creditor 45:24,
61:2, 66:12,
71:19, 76:9,
118:17, 118:18,
124:4, 124:7,
128:3, 128:6,
129:14, 134:20,
135:16
Creditors 2:5, 3:7,
19:20, 43:12,
44:25, 45:21,
45:23, 46:1,
52:12, 58:18,
60:21, 61:6,
64:24, 65:1,
70:22, 74:11,
75:7, 75:11,
75:15, 76:12,
134:14, 135:21,
136:8, 137:4,
137:23, 138:1,
139:19, 140:15,
141:5, 151:10
Crescioni 79:16,
79:18
crisis 41:16, 58:14,
83:5, 95:24, 99:4
critical 7:5, 20:13,
36:18, 48:3, 73:1
Cross 189:24,
189:25, 190:9,
190:10, 205:23,
211:22
cross-examine 12:22,
14:22, 28:3,
28:12, 34:25,
104:23, 115:9,
143:22, 150:4,
191:5
cross-examined
115:12
cross-examining
120:19, 130:13
crucial 118:9,
119:21

CS 5:8, 5:9, 5:13,
    149:21, 149:22,
    150:10, 184:17,
    207:7, 207:18,
    208:2, 208:21,
    208:22, 209:1
CSR 217:12
cues 198:15
currency 152:24
current 35:21, 36:3,
    37:13, 56:8, 86:7,
    109:22, 162:3,
    162:4, 163:11,
    163:12, 183:10,
    210:16
Currently 18:13,
    21:20, 44:19,
    54:3, 75:11, 92:8,
    94:8, 96:5, 96:7,
    159:4
Cusips 183:19,
    202:25, 210:20
custodian 183:11,
    183:21, 210:17,
    210:24
cut 41:8, 166:11
cutback 83:2
cuts 99:6, 99:8
cutting 99:17


< D >
D. 3:23
damaging 47:16
Daniel 3:33
dashed 174:25
data 83:19, 184:10
database 75:3
date 167:16, 174:23,
    175:21, 185:3,
    185:5, 185:6
dated 148:17, 157:3,
    182:7, 207:9,
    208:6
dates 188:16
daughters 57:16,
    90:8
David 4:11, 53:14,
    53:16, 53:18,
    56:14, 56:16,

114:23
day 42:20, 53:6,
    89:4, 92:14,
    99:17, 157:7,
    171:21, 171:22,
    171:24, 172:2,
    209:24, 215:2
days 7:9, 11:25,
    12:2, 111:8,
    197:25, 198:12,
    199:4, 199:11
de 17:11, 44:2,
    44:6, 90:25
deal 36:16, 37:25,
    38:16, 38:18,
    39:21, 41:11,
    47:12, 47:24,
    62:9, 82:19,
    83:21, 88:4,
    89:14, 90:18,
    91:7, 91:10,
    96:16, 167:24,
    168:25, 205:13
dealer 182:25,
    183:7, 204:4,
    210:6, 210:14
dealing 52:18, 197:8
deals 45:24
dealt 65:4
dear 92:25
deaths 99:15, 99:16
Debtor 1:35, 5:4,
    14:24, 25:9, 26:5,
    43:15, 45:24,
    64:21, 69:21,
    69:25, 198:16
debtor/creditor
    64:21
Debtors 1:18, 114:6,
    114:11, 115:11,
    133:16, 133:17,
    133:22, 136:8
debts 39:2, 53:23,
    55:7, 56:3, 56:5,
    91:5
decade 96:1
decades 39:18, 45:1
deceiving 55:13,
    55:14
Dechiara 3:23, 36:9,

36:14, 41:1,
    42:16, 43:17,
    47:22, 63:16
decide 33:18, 51:15,
    72:22, 98:4, 198:8
decided 19:4, 33:19,
    84:23, 85:4,
    112:19, 112:24,
    135:17
deciding 46:5
decimated 87:1
decision 8:7, 8:9,
    33:23, 41:7,
    41:12, 74:6,
    76:19, 123:17,
    133:10
decisions 41:17,
    61:22, 61:24,
    98:19, 100:10,
    202:5, 202:7
declarant 28:4,
    104:23
declarants 117:9
Declarations 12:12,
    13:9, 28:21,
    30:10, 101:15,
    101:19, 104:21,
    104:25, 115:7,
    115:22, 117:19,
    117:25, 133:17,
    138:5, 141:10,
    144:2, 191:8,
    191:12, 191:19,
    198:16, 198:18
declared 132:19
decline 175:9,
    175:10, 177:7
decorations 92:11
decrease 54:6,
    171:13, 171:16,
    171:18, 171:24,
    175:2, 176:2
dedicated 82:24,
    84:17
dedication 92:21
deemed 23:11, 24:17,
    134:23, 135:19,
    141:12, 143:1
deep 37:4, 40:4,
    121:9

deepen 39:3
default 157:19,
   157:22, 158:6,
   158:9, 158:13,
   159:18, 159:19,
   159:24, 174:20,
   175:15, 175:18,
   176:15, 176:19,
   181:10, 188:12
defaulted 36:24
defeased 154:18
defeat 131:4
Defendant 2:31
Defendants 1:50
defended 158:4
defending 90:24
defenseless 98:23
deference 70:22
deficits 39:8
define 171:21
defined 139:8
definition 136:16
defrauded 85:15
Degree 81:13, 81:15,
   82:7
delay 43:1, 43:5,
   52:5, 74:8, 75:18,
   79:24, 204:25
delays 22:13
delegation 99:10
demagogue 63:5
Democracy 88:10,
   89:13
demonstrate 47:3
demonstrating 46:4
denial 7:2, 131:23
denied 132:20,
   133:5, 133:10
denies 33:24
Dennis 3:26, 66:10
denounce 99:11
Department 17:12,
   57:14, 92:18,
   143:17
departure 92:20
dependant 94:24,
   101:13
dependents 57:17,
   58:9
depends 206:11

depleted 91:9
depose 116:25
deposited 74:4
depreciation 54:17
depression 95:24
DEPUTY 25:1, 25:3,
   27:4, 27:7, 48:19,
   49:11, 49:14,
   49:17, 49:22,
   49:25, 56:25,
   148:6, 148:11,
   201:11, 201:16,
   206:8, 206:11,
   206:23, 207:15,
   215:17
describe 156:8,
   157:17, 157:25,
   162:2, 165:23
described 122:6,
   150:8, 153:2,
   166:20, 186:18,
   197:1
describing 155:24
description 184:25
deserve 83:8
designate 30:13
designations 30:9
desire 115:8
desired 33:10
desk 168:14
desperate 90:9
desperately 38:7
Despins 3:7, 19:21,
   59:25, 60:2, 60:7,
   60:13, 60:16,
   60:19, 60:20,
   62:12, 64:22,
   71:5, 73:16
Despite 16:10,
   53:18, 56:6,
   164:11
destiny 96:12, 97:10
destroyed 83:22
detailing 209:10
details 12:21,
   209:16
determination 41:18,
   73:12, 73:13,
   101:13, 114:7,
   133:5, 133:12,

196:1
determinations 44:20
determine 9:15,
   47:11, 51:18
determined 20:13,
   139:22, 178:21
detriment 174:10
detrimental 46:21
develop 20:24,
   162:19
developed 21:15,
   81:25
Development 29:16,
   58:23, 58:25,
   108:22, 108:24
developmental 81:20
device 6:17, 6:19,
   6:25, 7:2, 79:4,
   106:9, 108:13
devices 6:12, 6:16,
   7:3, 108:11
devoted 92:12
diabetes 81:22
dialogue 74:18,
   106:5, 154:2
dias 6:5, 57:3
diaspora 90:13
dice 62:1, 65:8
dictate 122:11
died 82:2
difference 161:17,
   177:10, 178:15,
   178:17, 178:23
differences 177:2,
   177:4, 192:21
different 25:14,
   112:7, 125:20,
   138:4, 165:16,
   170:24, 185:6
difficult 93:23,
   180:14, 197:23
difficulties 70:19
digits 144:24
dignified 12:8, 84:2
dignity 88:10
diligently 94:19
diminish 151:7,
   151:24
dip 172:10, 172:11,
   172:15, 173:18

DIRECT 4:33, 4:41,
    11:13, 23:11,
    24:17, 28:18,
    29:23, 30:21,
    34:24, 47:10,
    120:13, 120:20,
    128:6, 129:15,
    133:16, 141:12,
    143:1, 149:4,
    150:22, 178:7,
    185:16, 198:7,
    198:11, 200:21,
    201:21
directive 191:12
directly 7:13,
    88:25, 118:13,
    119:4, 119:12,
    119:15, 124:8,
    128:9, 131:5,
    131:19, 144:6,
    173:4, 175:1
director 15:13,
    88:9, 143:16,
    168:10, 168:12
disabilities 81:20,
    92:20, 94:12
disability 93:3
disabled 59:10,
    81:25, 82:14,
    83:11, 93:7,
    93:21, 93:24,
    94:15, 95:3, 95:9
disadvantaged 84:18
disagree 197:24
disagreeing 116:13
disagreement 113:16
disappear 188:23
disaster 40:4,
    51:23, 52:7,
    126:12
Discharge 92:11
Disclosure 17:19,
    31:14, 31:19,
    32:8, 135:18,
    140:19, 140:25,
    144:17
discovered 169:21
discretion 70:15
discrimination 139:4
discriminatory 98:1,

98:5
discuss 215:12
discussed 101:5,
    140:3, 163:5,
    164:3
discussing 156:10,
    157:11, 168:24,
    169:2
discussions 163:4,
    164:12, 169:3
disincentive 71:22
disingenuous 51:19
disposable 54:15
dispute 9:1, 9:6,
    9:20, 12:20,
    19:14, 19:18,
    22:18, 33:18,
    33:19, 43:2,
    51:17, 61:3, 63:1,
    67:21, 72:14,
    72:18, 72:21,
    136:4, 136:7,
    136:10, 140:10,
    140:14, 185:3,
    185:7
disputed 11:19,
    112:17
disputes 8:12, 9:13
distinction 113:9
distinctive 62:25
distract 127:2
distressed 168:8,
    168:12
distributable 152:5
distributed 139:11,
    139:15
distribution 75:15,
    137:14, 151:8
distributions
    125:16, 137:2
District 1:3, 2:35,
    2:36, 16:6, 217:1,
    217:2, 217:7
divergence 173:8,
    173:9, 173:11
divert 38:6
divide-and-concur
    53:7
divided 9:10
division 8:25,

123:22
doc 170:14
Docket 1:6, 1:22,
    1:40, 2:4, 8:4,
    102:11, 102:12,
    133:11, 142:3,
    148:14, 193:6,
    199:2
Doctoral 81:15
document 26:8, 30:2,
    30:20, 32:23,
    108:25, 109:4,
    109:21, 110:5,
    142:25, 143:14,
    170:10, 193:14,
    194:21, 196:13
documentary 105:9
Documents 5:11,
    6:18, 12:11, 13:8,
    18:23, 25:12,
    105:3, 110:15,
    112:16, 121:10,
    155:5, 195:4,
    198:3
doing 15:10, 29:19,
    53:20, 62:24,
    111:7, 112:13,
    115:5, 121:23,
    122:18, 139:14,
    139:17, 188:10
dollar 53:6, 91:2
dollars 21:24,
    37:20, 37:22,
    38:2, 39:14,
    50:22, 50:23,
    51:2, 51:3, 51:7,
    51:8, 51:10,
    51:12, 52:14,
    52:15, 54:25,
    55:21, 55:22,
    57:15, 58:1, 58:3,
    67:5, 75:10,
    92:22, 134:24,
    135:3, 135:4,
    135:13, 136:20,
    156:12
dollars. 91:3
domestic 99:14,
    99:21
Donahue 4:20,

101:24, 102:12,
190:6, 191:8,
191:18, 192:4,
192:17
done 24:11, 24:12,
28:5, 42:17,
55:20, 61:14,
61:15, 61:16,
140:22, 141:1,
152:1, 152:19,
152:24, 154:10,
164:25, 205:9,
206:18
door 147:12, 200:24
dotted 184:24
double 99:16
down 19:15, 36:20,
72:2, 75:1, 77:23,
81:7, 81:10,
87:22, 109:8,
119:14, 125:10,
126:11, 129:19,
155:9, 155:10,
169:24, 172:3,
172:13, 189:20,
190:21, 206:25,
209:13, 211:24,
212:9, 214:6
downstairs 108:14
draft 163:7
drafted 54:20
dragging 36:20
dramatically 151:6
drive 123:20
drop 39:17, 175:7
drove 171:18
due 93:10, 106:8,
152:13, 158:15,
159:1, 159:11
Dunne 3:26, 66:9,
66:10, 68:21
During 6:25, 8:24,
92:22, 93:10,
95:22, 104:18,
106:11, 176:4,
179:25, 186:14,
188:6, 188:8,
189:8, 205:4
duty 47:15
Dvores 3:40, 17:9,

17:14, 17:22,
30:25, 31:2, 31:3,
31:6, 31:25, 32:3,
32:7, 32:16,
32:21, 33:9,
33:13, 33:14,
33:25, 34:14,
34:17, 34:21
dwarf 43:7
DX 25:8, 30:8,
144:13, 145:1
DX-C 25:9


< E >
e-mail 106:12,
106:13, 167:17,
182:6, 182:7,
183:23, 184:3,
207:8, 208:2,
208:9, 208:17,
209:25, 211:1,
211:5, 211:15
e-mailed 211:12
e-mailing 6:24,
209:21
e-mails 7:15, 42:7,
206:1, 206:13,
212:4
earlier 35:8, 68:3,
80:7, 115:19,
136:2, 143:4,
145:14, 165:13,
179:1, 194:12,
206:8
early 67:1
earn 85:19
earned 81:16
ease 39:3
easiest 30:12,
30:19, 117:21,
207:22
Eastern 194:4
easy 20:1, 73:19
ECF 26:8, 26:11,
30:18, 35:10,
102:14, 104:3,
133:3, 142:2,
144:14, 144:16,
146:14, 148:14,

148:16, 149:18,
149:19, 194:24,
195:1
economic 19:13,
37:5, 38:15, 39:4,
39:16, 39:18,
39:22, 47:2, 47:4,
58:23, 58:25,
83:5, 87:12, 93:8,
94:12, 95:24,
126:13, 132:5
economists 99:23
economy 38:4, 38:7,
52:9, 70:2, 93:16
educate 96:25
Education 17:13,
57:15, 81:14,
82:5, 83:22, 84:1,
93:3, 93:24, 96:6,
97:9, 99:9
educator 82:8
educators 93:17
Edwin 44:6
effect 46:22, 192:20
effectively 208:14
effects 46:24
efficient 30:18,
50:19, 131:8
efficiently 215:6
effort 143:21,
151:18, 163:21
efforts 35:21
egg 85:1
eight 89:22, 135:16,
199:5
either 7:21, 30:12,
36:5, 65:19, 67:4,
111:11, 112:18,
114:10, 117:18,
120:18, 132:19,
164:16, 211:15
El 96:13
elder 81:4
elected 62:25,
134:21, 139:19,
140:22
electing 139:17
election 135:11
elections 114:15,
141:21, 142:13

electronic 6:12,
    6:16, 49:4, 106:8,
    108:11, 108:13,
    191:14
electronically 206:7
elementary 96:20
eliminates 22:12
Eliza 59:18, 100:19
Elliot 105:17
elsewhere 66:14
Emanuel 103:5,
    147:23, 207:5
embedded 137:1
embody 65:2
emerge 37:7, 37:9
emerging 99:22
emigrate 58:7
Emil 56:23, 95:12,
    95:16
emissions 98:17
Emmanuelli 3:21,
    43:19, 43:21,
    43:23, 43:25,
    44:1, 44:4, 44:10,
    45:16, 77:12,
    77:14, 77:15,
    122:15, 122:16,
    122:19, 122:22,
    122:23, 123:19,
    123:23, 125:1,
    125:4, 125:21,
    126:21, 128:4,
    129:11, 129:22
employed 173:14
employee 17:16,
    17:25, 80:4,
    92:18, 207:24
Employees 17:12,
    18:6, 36:11,
    44:17, 44:22,
    57:24, 58:2,
    74:15, 74:20,
    82:25, 122:24,
    131:18
employment 93:4
enables 75:12
enacted 41:20,
    163:20
encountered 120:10
encourage 182:13

end 40:21, 41:4,
    51:20, 52:23,
    62:1, 94:24,
    150:25, 156:1,
    158:23, 161:2,
    161:3, 161:6,
    161:9, 161:10,
    161:12, 183:23
ended 159:3, 206:1
ending 54:23
ends 41:5
Energy 52:17, 115:2,
    115:3, 115:8,
    116:8, 116:9,
    116:12
enforce 155:2,
    155:17, 174:17
enforceable 136:23
enforced 151:6,
    151:17, 151:22
engaged 53:4, 173:20
Engineers 55:21
English 53:15, 84:9,
    87:21, 87:22,
    91:22, 98:3, 98:4
enjoys 112:6
enough 41:8, 57:23,
    64:5, 85:2, 87:4,
    89:24, 97:24,
    98:2, 98:16,
    118:23, 166:9
ensued 19:6
ensure 8:10, 119:23
ensures 45:25
entangled 87:11
enter 24:2, 147:10,
    147:11
entered 41:22,
    183:8, 206:3,
    210:14
entertain 60:2,
    100:23
entire 7:21
entirely 14:17,
    14:19, 37:16
entirety 198:6
entities 7:12,
    121:1, 188:2
entitled 21:21,
    134:15, 137:14,

    157:19, 195:20
entitlement 18:14
entity 47:7, 121:25,
    125:25, 126:1,
    126:5
entrusting 85:17
entry 24:6, 133:4,
    133:8
enumerated 26:10,
    146:24, 150:1,
    192:3, 193:3
equal 205:11
equitable 51:16
equities 168:8,
    168:12
equivalence 68:4
equivalency 68:9
Eric 3:34
error 81:22
especially 54:8,
    60:24, 61:23,
    82:20, 131:6,
    183:6, 210:13
Esq 2:45, 3:21
essential 46:23,
    47:16, 48:2,
    51:19, 86:14,
    86:17, 95:20,
    119:24, 119:25,
    124:10, 125:11,
    126:2, 126:7,
    127:5
Essentially 16:17,
    138:2, 207:25
establish 9:6, 22:8,
    96:2, 138:7
established 8:21,
    55:1, 95:21
estate 43:14, 73:14
estimates 119:22
estimation 154:11
et 1:16, 1:48, 2:42,
    214:13
Eulalia 56:23, 57:13
Eva 59:17, 97:22,
    98:7
evaluate 63:19
evaluated 63:4
evaluating 55:18
evaluation 46:21,

47:2, 55:8
evening 215:25
event 22:15, 158:6,
    158:13, 164:17,
    164:22, 173:7,
    173:12, 173:13,
    174:22, 176:15,
    178:14, 203:16,
    204:24, 205:9
events 159:24,
    162:24, 171:1,
    171:4, 171:6,
    188:12
eventual 87:14,
    184:10
Everybody 19:11,
    65:9, 67:8, 71:7,
    127:8, 130:4,
    133:25, 147:3
Everyone 6:10,
    19:15, 78:17,
    85:24, 140:8,
    215:25
Everything 21:15,
    49:2, 62:7, 81:10,
    85:19, 91:11,
    130:10, 136:3,
    161:4, 161:13,
    169:24, 199:16,
    203:1
evidence. 26:7,
    150:11, 192:6,
    193:4, 193:22,
    195:6, 208:22
evident 73:20,
    85:12, 124:20
evidentiary 13:24,
    13:25, 29:14,
    47:14, 72:5,
    76:25, 77:4, 78:4,
    101:4, 101:12,
    115:21, 117:18,
    117:24, 121:13,
    121:22, 132:9,
    132:16, 133:2,
    133:7, 141:7
exacerbated 85:13
exact 176:18, 193:25
Exactly 22:5, 32:3,
    108:1, 153:23,

171:24, 172:15
EXAMINATION 4:33,
    4:36, 4:38, 4:41,
    4:43, 4:46, 10:21,
    11:13, 105:22,
    149:4, 179:11,
    189:5, 198:4,
    201:21, 212:1,
    212:25
examining 203:17
example 94:7, 94:14,
    165:2, 171:8
exceeded 20:18
except 40:21, 102:7,
    107:3, 129:10
excepted 110:17
exception 198:17
exceptions 192:13
excess 21:24
excessive 57:21
exchange 167:17
excise 50:19
exclude 32:11, 127:3
excluded 107:23,
    138:17, 192:10,
    192:11
exclusion 107:9
Excuse 25:16, 75:5,
    101:25, 117:10,
    139:5, 143:18,
    178:16, 210:19
executed 25:16
exempt 139:10
exercise 46:6
exercising 46:8
exist 75:3, 100:7,
    137:13
existed 175:14
existence 113:2,
    136:21, 163:14
existing 154:20,
    164:5, 191:9
exists 108:3
exit 66:17
expect 7:8, 13:5,
    115:11
expectation 45:14
expected 29:17,
    80:7, 94:23, 96:1
expenditures 119:14,

119:22
expense 22:13, 74:8,
    129:12, 129:23
expenses 57:16, 87:4
expensive 94:10
experience 84:20
experienced 107:5,
    168:7, 181:4
expert 13:14, 38:15,
    124:16
expertise 160:10
expired 175:14
explain 48:24,
    203:8, 207:22
explained 50:5,
    72:20, 79:2
explore 13:6
exposing 40:23
exposure 177:15
express 53:11,
    87:16, 92:2,
    164:20
expressed 8:1,
    117:19, 121:5
expressing 7:15,
    119:14, 161:19
expression 62:2
expressly 14:21,
    28:5
extended 75:17
extensive 38:23,
    205:9
extent 24:10, 29:9,
    35:8, 78:25,
    105:11, 113:1,
    115:17, 117:23,
    123:15, 129:10,
    138:8, 164:4
extraordinary 56:3
extreme 83:7, 129:20
extremely 71:2,
    71:10, 73:4, 76:2,
    87:5, 140:20,
    163:8
eye 49:8


< F >
F. 109:20
F3d 131:9

face 210:23
faced 85:18, 85:22, 93:8, 165:10
facilities 94:5
facing 74:15, 165:14
fact 31:18, 64:20, 64:21, 65:1, 65:17, 65:25, 74:6, 74:15, 75:16, 85:6, 86:14, 99:3, 112:15, 115:25, 119:19, 120:7, 123:6, 124:10, 138:21, 139:12, 171:4, 171:24, 178:25, 190:25, 192:21, 195:25, 200:2, 200:22, 204:9
factions 74:19
factor 162:18
factored 75:4
factors 46:10, 70:17, 72:3
facts 12:10, 47:6, 47:9
factual 11:18, 14:9, 14:22, 28:6, 107:13, 113:9, 114:21
failed 19:3, 53:5
failure 52:5, 158:7, 181:10, 181:14
fair 12:8, 22:5, 24:8, 46:10, 46:14, 50:19, 51:16, 62:10, 63:7, 83:21, 90:22, 177:21, 181:23, 182:15
fairly 184:13, 200:12
fairness 121:14
faith 86:22, 110:11, 138:13, 176:24
fall 39:7, 39:8
falls 22:10, 67:16
false 68:4, 68:9
familiar 27:22,

168:8, 202:15
families 58:6, 58:8, 84:25, 93:8, 93:11, 93:15, 93:23, 94:2
Family 81:4, 89:21, 89:25, 92:14, 92:16, 96:24, 186:24
far 13:10, 14:12, 17:24, 20:12, 20:17, 28:1, 28:4, 38:3, 55:15, 71:4, 114:19, 120:8, 128:20, 138:3, 139:5, 143:19, 157:7, 178:6
Farr 64:17
fast 166:9, 166:11, 166:12
faster 197:16
father 81:5, 82:2, 92:12
fault 100:9
favor 70:24, 74:9, 134:19, 135:2, 135:4, 135:5, 135:8, 135:13, 135:22, 139:4, 148:1, 156:5, 156:7, 160:12, 160:22
fear 87:10
feasibility 67:25, 119:13, 119:16, 124:16, 124:24, 125:18, 126:9
feasible 132:8
features 6:19
Federacion 17:11, 44:6, 45:7
Federal 55:20, 55:25, 56:1, 68:5, 68:6, 68:7, 72:16, 72:19, 72:24, 92:19, 92:22, 93:6, 109:13, 109:14, 139:13, 163:9, 163:20, 164:11

feeble 37:5
feel 82:23, 85:15, 85:22, 86:4, 93:22, 212:14
feelings 82:19
fees 52:21
Feldman 4:14, 29:1, 29:10, 30:21, 30:23, 30:24, 34:24, 64:16, 64:17, 66:8, 115:14, 145:8, 145:14, 145:16, 146:3, 198:18
Feliciano 59:16, 100:18
fellow 72:16
felt 60:25, 85:5, 174:20
FEMA 88:17, 88:23, 89:18, 89:21
female 82:1, 99:4
few 16:11, 16:12, 16:15, 42:2, 135:25, 136:18, 140:1, 167:9, 183:2, 209:11, 209:15, 210:9
fiduciaries 61:20, 61:24
fiduciary 47:15, 64:24
fight 61:6, 62:7
Figueroa 44:5
figure 91:5, 91:6
file 33:5, 194:5
filing 26:11, 31:19, 133:9, 137:20, 175:20, 175:24, 181:14, 181:16, 191:14, 198:2
filings 12:15, 12:24, 27:15, 36:2, 174:12, 186:20
fill 96:17, 118:13
filling 35:23
Finally 9:20, 43:8, 56:6, 81:14, 82:9
finance 143:17

finances 85:20
Financial 1:9, 1:25,
    2:11, 2:27, 3:11,
    7:5, 7:16, 7:23,
    38:15, 51:22,
    54:1, 54:21,
    54:22, 55:18,
    55:19, 85:2,
    85:11, 85:21,
    160:8, 162:19,
    181:6
financiers 7:12
Financing 1:32, 1:47
find 11:14, 30:19,
    54:19, 54:22,
    106:24, 125:1,
    125:4, 182:24,
    210:5
fine 10:23, 10:25,
    13:13, 113:17,
    143:11, 146:17
finish 27:15, 47:23,
    59:2, 59:3, 68:15,
    81:5
finished 80:6,
    101:10, 122:14,
    147:17
firm 36:10, 104:7,
    107:6, 168:2,
    168:21, 169:2,
    173:16, 173:21,
    182:19, 202:1,
    202:9, 207:24,
    208:18
firmly 70:24, 138:7
Fiscal 3:10, 22:23,
    37:18, 38:22,
    39:5, 44:23,
    50:21, 51:1,
    52:17, 54:4, 54:7,
    54:16, 54:18,
    54:19, 74:24,
    75:5, 75:14,
    95:24, 126:17,
    126:18, 132:2,
    132:4, 132:6,
    158:23, 159:3,
    159:4, 159:5,
    159:7, 159:16
five 16:18, 44:16,

45:4, 48:25, 50:5,
    57:10, 60:3, 80:9,
    88:7, 97:24,
    125:15, 135:1,
    135:12, 137:24,
    137:25, 139:21,
    154:25, 156:1,
    206:9, 206:25,
    214:23
five-minute 50:10,
    206:16
fixed 152:24, 156:11
flatly 197:23
fled 90:5
fleeing 90:5
Florida 88:14, 90:2,
    90:5, 93:18
flourish 7:20
flows 156:25
fly 214:3
focus 67:18, 161:23,
    203:10
focused 137:15
focusing 43:9, 128:2
folded 68:13
follow 132:22,
    167:9, 173:3
follow-up 166:8,
    185:22
followed 205:8
following 20:7,
    95:1, 95:18,
    144:3, 198:2,
    209:11
follows 144:13,
    149:3, 168:15,
    201:20, 212:24
food 89:4, 96:16
force 174:9
forced 58:7, 87:3
Forces 92:10
forecasting 125:23
foremost 54:1
foresee 94:1
foreseen 162:23
forgetting 181:1
forgive 122:18
forgot 198:9
form 19:10, 29:14,
    46:12, 93:2,

157:1, 180:1
formal 17:5, 42:3,
    114:10
formally 13:16
formed 96:22,
    173:19, 173:24
former 17:16, 111:11
forms 21:18
formulating 11:7
formulation 137:10
forth 14:22, 70:9,
    70:17, 89:14,
    119:10, 125:12,
    132:16, 199:9
Forty-one 109:8
forum 157:8
forward 8:14, 18:16,
    19:12, 19:17,
    20:22, 22:17,
    55:4, 60:7, 67:8,
    75:12, 87:7,
    87:19, 131:15,
    163:22, 167:3,
    174:21, 209:17,
    215:6
fought 62:8, 136:6
found 6:24, 26:15,
    55:18, 55:19,
    139:24
foundation 21:18,
    24:9, 47:4, 70:2
founding 202:8
Four 16:23, 38:1,
    39:18, 70:17,
    101:24, 112:6,
    134:21, 134:22,
    139:20, 144:23,
    150:25, 151:4,
    156:9, 183:21,
    194:4, 206:22,
    207:7, 207:18,
    208:2, 208:21,
    208:22, 209:1,
    210:24
Four207 5:13
fragile 37:4
frame 183:4
framework 65:6
Frankly 11:6, 35:23,
    110:24, 112:13,

120:19
free 46:9, 203:3
fresh 37:6, 41:21
Friedman 3:13,
   62:13, 62:14,
   62:15, 64:15, 65:9
front 150:23
frozen 39:1, 110:2
frustrated 82:23
frustrating 87:7
full 7:23, 46:10,
   110:10, 125:8,
   157:5
fully 85:21, 151:22,
   154:18, 178:21
function 100:8,
   132:21, 159:7
Fund 47:15, 55:12,
   95:19, 152:12,
   186:20
fundamental 47:15,
   64:3, 120:8, 127:2
funded 52:14
funding 48:2, 86:15,
   119:24
Funds 18:4, 18:12,
   18:13, 38:6,
   44:19, 52:8,
   70:10, 70:13,
   72:1, 73:25, 75:3,
   75:4, 86:21, 99:8,
   99:18, 123:1,
   124:9, 126:4,
   152:13, 153:14,
   153:16, 158:24,
   180:23, 186:24,
   187:3, 187:4
future 7:2, 7:20,
   36:22, 39:16,
   53:1, 58:22,
   71:23, 82:17,
   82:25, 83:9, 85:5,
   87:14, 119:11,
   132:5, 132:8,
   132:24, 153:9,
   156:18, 156:19,
   156:25, 162:19,
   162:20, 162:25,
   163:19

< G >
gain 71:23, 86:14
Gallagher 64:17
game 51:20, 124:5
gap 54:24
Garcia 171:8,
   171:13, 171:22,
   174:18
garnered 134:14
Gary 3:28, 104:5,
   150:17
gather 130:5
gating 52:2, 67:2,
   120:8, 121:4,
   122:10
gave 97:9, 101:20,
   116:8, 136:18,
   136:19
GDB 110:14, 111:10,
   111:12
General 3:17, 86:1,
   125:10, 131:19,
   135:21, 169:1,
   187:13, 187:17,
   205:6
Generally 157:15,
   157:16, 157:24,
   157:25
generated 16:15,
   16:17
generous 38:10,
   86:5, 206:8
genetic 81:20
gentleman 178:25
gentlemen 169:22
Georgia 93:19
gets 39:20, 104:2,
   197:16
getting 52:18,
   54:12, 63:22,
   89:8, 96:18,
   134:9, 146:19
girl 81:18, 81:19,
   82:3
girls 59:5
gist 40:14
give 27:16, 33:9,
   41:20, 58:17,
   61:4, 61:7, 62:6,

63:17, 64:22,
   97:8, 98:19,
   127:22, 134:7,
   148:8, 192:9,
   192:10, 201:13,
   211:1
Given 8:15, 37:3,
   39:11, 46:1, 55:2,
   62:8, 66:20,
   85:15, 113:18,
   178:17, 190:3,
   193:11, 207:17,
   209:5
gives 36:17, 48:1
Giving 30:9, 37:11,
   86:2
Global 76:4, 143:17,
   143:18
GMS 3:28, 10:3,
   10:19, 17:16,
   101:22, 102:3,
   103:14, 104:6,
   104:25, 115:2,
   115:3, 115:8,
   115:20, 116:9,
   116:12, 116:23,
   116:25, 133:11,
   138:20, 150:19,
   194:13, 195:5,
   199:13, 199:16,
   201:19, 207:18,
   214:20
goal 131:8
goals 82:6
God 53:12, 148:11,
   201:16
Godreau 104:8
GOLDBERG 69:9,
   69:11, 69:14,
   69:18
Goldman 135:17,
   180:22, 186:7
Gonzalez 49:21,
   50:1, 50:2, 50:3,
   50:15, 50:16,
   52:22, 52:24,
   53:1, 53:13,
   104:7, 104:8,
   193:25
goodness 112:19

goods 50:20
Gos 67:13
gotten 42:7
government-owned
  52:19
governmental 18:9,
  47:7, 64:9,
  122:24, 125:25
Governor 171:8,
  171:13, 171:22,
  174:18
Gracias 59:11
grand 20:22, 63:5
grandchildren 40:8,
  58:12, 83:13
grandfather 92:12
grandmother 89:20,
  89:25
granted 20:19,
  130:20, 132:10,
  147:19
granting 74:9
graph 170:3, 170:6,
  170:20, 171:20,
  171:23, 172:6,
  172:12, 172:19,
  173:3
grappling 74:16
grateful 11:10,
  215:4
great 72:15, 87:13
great-grandfather
  92:13
greater 137:14,
  187:21
greatly 85:10
Greece 36:23, 36:24
green 49:5, 50:6,
  80:17
grievances 127:10
Gropper 19:3
grounds 130:14,
  157:21, 158:10
Group 3:16, 3:28,
  10:3, 69:1, 69:3,
  83:15, 101:22,
  102:3, 103:14,
  104:6, 116:9,
  116:12, 116:23,
  116:25, 120:24,

138:20, 150:19,
  195:5, 199:13,
  199:16, 201:19,
  204:1, 204:23,
  207:18, 214:20
groups 17:25, 18:1,
  82:22, 94:19,
  95:4, 95:5, 120:11
grow 21:25, 51:5
growing 85:1
growth 36:24, 37:5,
  38:4, 54:6
guarantee 57:23,
  57:25, 75:17
guarantor 187:9,
  187:12
Guaranty 180:25,
  187:7, 187:9
guardian 62:17, 82:1
guardians 94:4
guess 146:15, 195:20
guide 41:18
guy 169:19


< H >
Hadley 66:10
haircut 52:13
half 40:20, 40:22,
  49:6, 50:9, 67:20,
  67:21, 80:19,
  86:2, 125:15,
  206:14, 209:22,
  209:23
hall 66:15, 147:2
hallway 169:21
hand 23:16, 24:23,
  141:23, 142:5,
  148:6, 148:19,
  201:11
handed 142:18
handle 105:10
handled 97:13
handling 13:18
happen 40:10, 41:6,
  41:9, 58:17, 95:2,
  120:14, 162:25,
  195:10
happened 171:16,
  171:25, 200:10,

204:17
happening 79:1,
  89:5, 90:15,
  93:17, 171:19
happens 39:19
happy 18:18, 140:8,
  176:12
harass 169:19
hard 39:17, 82:4,
  82:23, 85:19,
  97:7, 136:6,
  191:11
hard-pressed 195:8
hard-working 84:25,
  86:22
harder 94:22
hardship 93:8, 94:13
harsh 94:1
hashing 207:25
hasten 65:5
Hastings 60:20
hat 61:23
Hayne 168:9, 168:13,
  208:3, 209:5
head 168:7, 175:12
header 170:14
heads 42:5
health 57:19, 58:10,
  81:14, 81:15,
  82:8, 83:22,
  83:25, 90:2,
  93:24, 95:3, 96:5,
  96:19, 99:9
hear 7:8, 16:1,
  18:18, 45:14,
  48:20, 48:22,
  89:2, 90:13,
  112:21, 112:22,
  130:2, 215:9
heard 17:22, 20:5,
  31:1, 32:1, 34:7,
  60:25, 66:22,
  67:11, 68:3, 70:3,
  71:5, 71:18, 72:7,
  73:4, 74:12, 80:2,
  90:19, 126:8,
  127:25, 129:5,
  131:16, 165:13
Hearing 2:34, 6:21,
  8:24, 9:23, 11:21,

11:23, 11:24,
13:21, 13:24,
17:2, 27:16,
31:14, 31:20,
34:2, 48:7, 48:12,
60:24, 76:18,
104:20, 108:11,
108:16, 119:2,
145:18, 146:11,
199:14, 199:25,
209:18, 214:12
hearings 7:10, 49:2
hearsay 102:22,
103:1, 103:10,
103:12, 105:3,
107:22, 110:17,
196:4
heart 92:25, 121:17,
166:20
heartbreaking 123:8
heavier 40:13
Hedge 88:11, 90:17
height 64:9
heightens 39:12
held 70:12, 180:11,
181:18, 186:12,
186:25, 188:3,
188:21, 188:24,
189:9, 203:6
Hello 167:7, 182:20,
209:2, 209:4,
210:1
help 39:5, 93:9,
125:20, 148:11,
182:22, 183:8,
201:16, 209:17,
210:3, 210:15
helpful 29:7,
118:13, 205:25
helping 84:18
helps 42:25, 103:24
herein 199:10
Hermann 2:45, 15:4
hesitant 35:18
High 52:21, 93:13,
94:9, 146:19
higher 37:11, 68:8,
172:23
highest 40:10, 99:21
highlight 109:11

highly 53:2
hinder 87:12
hired 82:7, 173:21
history 58:14
hit 94:22
Hoc 3:16, 69:1
hold 48:23, 49:9,
66:25, 76:16,
162:7, 180:9,
197:6
holders 16:19,
63:17, 65:23,
73:24, 135:11,
151:19, 155:23,
186:8, 188:4
holding 163:8
holdings 183:11,
184:10, 189:16,
210:17
holistic 125:8,
128:11
homes 58:7
honestly 110:24,
111:25, 113:11
Honorable 2:35,
16:5, 91:20,
92:11, 217:6
hook 40:6
hope 12:5, 16:2,
59:11, 87:15,
93:23, 106:14,
142:16, 196:6
hopefully 92:13,
166:9
horrible 205:13
Hotel 88:24
hotels 88:17, 88:22
Houlihan 181:8
hour 117:17
hours 10:21, 117:6,
209:22, 209:23
house 96:9, 96:15
household 51:4,
51:12, 94:5
households 51:6,
183:20, 210:23
Houser 15:24, 16:3,
16:5, 20:9, 20:23,
53:10, 76:2,
134:8, 211:13,

215:22
housing 93:4, 96:6,
99:9
HTA 66:14, 67:7
huge 87:3
Human 99:5, 99:11,
99:12
hundred 73:7,
127:11, 135:22,
161:11, 165:12
hundreds 7:14, 91:3,
127:11
Hurricane 88:15,
90:5, 93:10
hurts 83:9
husband 84:23, 90:6
hypertension 81:23
hypothetical 160:10


< I >
identification 207:7
identified 100:16,
163:25, 186:23,
200:2
identify 163:3,
200:18, 201:23,
207:21
identity 180:13
idle 96:16
ignorance 96:17
ignore 58:20, 86:20
III 1:8, 1:24, 8:14,
18:22, 19:2, 19:5,
37:7, 43:4, 44:20,
53:19, 72:23,
137:17, 137:19,
174:23, 175:21,
175:24
illegal 83:23, 99:2
illiquid 139:18
imagine 12:23,
39:17, 83:9, 85:9
immediate 21:23
Immediately 82:7,
171:16, 175:24
immense 42:7
impact 7:18, 33:20,
84:6, 84:7, 85:12,
86:13, 88:8, 94:1,

95:5, 99:4, 137:9
impacted 87:5, 94:7
impeding 131:8
imperative 94:3,
    96:2
implausible 55:2
implications 58:5
implied 161:25,
    162:12
implies 162:9
imply 162:5
importance 72:15
important 7:11,
    9:22, 18:2, 21:17,
    45:17, 49:2, 61:4,
    82:2, 96:4, 96:7,
    99:23, 146:22,
    211:12, 212:14
imposed 136:23
imposing 39:11
impossible 174:1
impression 71:3,
    165:15
impressive 205:15
improvement 52:9
impunity 53:4, 98:21
in. 65:7, 159:4,
    198:9, 199:17,
    200:4
inability 106:8
inadequate 37:4
inappropriate 65:8
inborn 81:22
Inc. 131:9, 143:18
incapable 200:1
incidents 99:21
include 9:24, 32:14,
    68:4, 155:21
included 14:9,
    17:21, 22:6,
    25:24, 29:24,
    35:11, 111:16,
    140:3, 140:24,
    196:5, 196:12
includes 54:5,
    81:21, 85:24,
    120:25
including 6:19,
    6:22, 7:1, 66:14,
    72:11, 80:4,

93:22, 136:13,
    138:12, 154:19,
    161:8, 203:25,
    204:1, 204:2
Income 51:5, 51:13,
    54:7, 54:15, 68:6,
    68:7, 94:8, 94:15,
    97:7, 126:10,
    139:13
incomes 93:14
inconsistent 139:5
incorporate 115:18,
    145:17
incorporated 34:3,
    72:25, 130:23,
    205:5
incorporates 136:6
increase 38:1,
    54:25, 82:13,
    89:8, 151:6,
    175:2, 209:8
increasing 47:17
incurring 94:10
indebtedness 76:5
independent 46:6,
    46:9, 82:1
indicate 49:8,
    151:16
indicated 15:9,
    20:16, 22:24,
    23:6, 23:13, 28:1,
    28:8, 29:6, 72:10,
    73:10, 75:16,
    77:12, 117:7,
    137:3, 141:9,
    141:16, 180:13,
    181:13, 193:20,
    211:25
indicates 211:6
indication 76:8
indications 28:14,
    146:23
indifferent 59:7
indisputably 164:10
individual 208:14
individualized
    122:10
individuals 7:20,
    86:22
indulge 109:21,

117:21
indulgence 205:25
inevitable 22:14
inflow 153:16,
    153:21
inform 84:19
information 6:14,
    31:15, 59:12,
    75:2, 98:16,
    127:5, 169:12,
    169:20, 202:12
Informative 10:20,
    28:2, 117:7,
    199:12
informed 31:21,
    78:24, 115:8,
    214:24
infrastructure 37:5
inhabitant 50:23
inherent 22:13
initial 38:13,
    155:22, 205:5
Initially 60:10,
    118:5, 172:23
inject 128:18
injured 127:8
injuries 131:25
injurious 46:24
injustice 59:5,
    112:14
innocence 59:5
inoperative 100:8
input 21:12, 161:1
inquire 35:18, 201:5
inquiring 204:22
inquiry 213:14
insatiable 53:2
inserted 201:3
insightful 128:10
insist 98:12
instance 46:14,
    70:18, 111:11,
    159:22, 179:1
instances 137:13
institutions 139:8
instrumental 16:1
instrumentalities
    44:18
insufficiency 158:10
Insufficient 36:21,

43:2, 158:15
insurance 57:19
insure 66:13
insured 134:19,
  135:7, 187:16,
  203:4
insurer 187:20
intellect 82:18
intelligent 41:9
intending 128:18
intends 57:25
intensifying 47:18
intent 104:23
interconnection 71:8
interested 8:10,
  22:22
interesting 55:17,
  74:12, 88:1, 88:2,
  89:9
interests 43:9,
  176:25, 177:1,
  177:5, 177:11,
  177:12, 177:13,
  177:17, 177:20,
  178:2, 205:16
interject 131:7
intermingle 120:6
International 36:11
interpleader 19:9,
  70:12, 74:3,
  136:14, 157:10
interposed 16:25
interpretation 73:2
interpreted 79:14
INTERPRETER 57:1,
  57:4, 79:11,
  79:13, 79:16,
  79:18, 79:23,
  80:11, 91:19
interpreting 79:17,
  79:19
interprets 79:11
Interrogatories
  16:16, 138:19,
  194:1, 194:6,
  194:9, 194:12,
  195:9
interrupt 177:8
interrupting 11:11
intervened 20:3

interwoven 24:12,
  72:9
introduce 15:12,
  43:24, 121:22
introduced 168:2,
  168:16
introducing 120:18
introduction 214:11
invalid 178:22
invalidate 153:8
inverse 101:19
invest 84:23, 85:4,
  86:19
invested 7:21,
  86:24, 90:20
investing 85:5
investment 85:10,
  85:13, 87:6,
  202:1, 202:5,
  202:6, 202:9
investments 202:10
investor 108:21,
  108:24, 109:10,
  111:10
investors 7:23, 9:3,
  55:14, 110:5,
  112:12, 139:7,
  184:8, 202:11
invocation 154:9,
  159:1, 159:12
invoke 151:18,
  155:19, 157:14,
  160:14, 166:22
invoked 153:3,
  153:17, 160:7
involved 7:13,
  21:14, 43:1, 65:7,
  67:5, 74:1, 80:5,
  100:10, 158:20,
  184:1, 184:5,
  184:8, 184:14,
  188:6, 200:11,
  213:4
involvement 73:3,
  134:8
Irizarry 56:21,
  56:22, 84:8,
  84:10, 84:12,
  84:15, 87:18
ironic 65:24

irrelevant 13:12
irresponsibility
  64:10
irresponsible 53:21,
  62:1, 85:20
Island 7:19, 7:23,
  36:21, 39:19,
  39:22, 41:21,
  53:23, 53:25,
  54:19, 55:1,
  55:24, 59:1,
  65:24, 68:14,
  81:3, 85:22,
  86:24, 90:10,
  90:14, 92:4, 93:2,
  95:3, 99:5, 99:20
issuance 41:15,
  95:23, 155:22,
  180:11
issued 6:12, 20:25,
  22:2, 41:7, 58:20,
  67:24, 112:8,
  157:7, 163:15,
  163:17, 164:6
issuing 105:10
item 16:21, 16:22,
  34:20, 67:2,
  76:21, 78:2
items 12:24, 16:9,
  191:14, 200:6,
  215:14
itself 18:25, 25:16,
  29:6, 39:5, 70:5,
  107:9, 163:14,
  174:20, 214:12


< J >
J. 3:12
James 167:18, 182:6,
  207:8, 207:21,
  207:22, 208:2
January 23:7
jar 51:23
Jaramillo 44:5
Jeff 15:3
Jersey 88:14
Jessica 44:5
JIMENEZ 3:21, 43:19,
  43:21, 43:23,

43:25, 44:1, 44:4,
  44:10, 45:16,
  77:15, 122:15,
  122:16, 122:19,
  122:20, 122:22,
  122:23, 123:19,
  123:23, 125:1,
  125:4, 125:21,
  126:21
job 90:7
jobs 89:24
John 3:12
join 47:21, 92:14
joinder 17:10,
  115:21, 116:1,
  116:4, 116:17,
  133:11
joined 10:3, 66:24
joint 17:8
Jointly 1:11
Jose 96:10, 96:14
Jr 3:42
Juan 6:1, 6:7, 81:2,
  84:16
Judge 2:35, 2:36,
  15:24, 16:3, 16:5,
  16:7, 19:3, 20:9,
  20:23, 53:10,
  91:13, 91:20,
  92:1, 100:6,
  100:11, 134:8,
  169:25, 182:25,
  183:3, 183:5,
  189:22, 209:9,
  210:5, 210:9,
  210:10, 211:12,
  215:22, 217:7
Judges 76:2, 134:8,
  211:13, 211:15,
  212:5
Judgment 20:4, 46:6,
  46:9, 69:2, 72:13,
  73:23
Judicial 6:11,
  98:14, 107:20,
  211:14
Julio 59:19, 87:19,
  88:9
June 159:3, 173:24,
  174:2, 177:6

juniors 136:21,
  137:16, 153:17,
  153:22, 165:20,
  176:5, 177:1,
  177:5, 177:7,
  177:11, 177:12,
  177:14, 177:22,
  178:1, 179:5,
  180:9, 180:11,
  203:24
jurisdiction 109:13
jury 104:10, 185:18
Justice 100:11,
  112:3, 112:7


< K >
Kay 3:34
keep 49:8
keeping 50:7, 60:14,
  132:22, 135:23,
  135:24
kept 56:12
key 52:2
kind 67:11, 98:24,
  99:19, 211:7
kinds 12:15
Kissimmee 90:7
knock 61:18
knowing 22:17
knowledge 36:3,
  173:21, 189:12
known 200:1
knows 19:25, 42:4,
  42:6, 66:13
Konsig 4:23, 102:3,
  102:8, 102:14,
  104:14, 190:8,
  191:9, 192:8,
  193:3


< L >
L-l-e-n-z-a 59:18
La 90:25
label 173:8
labeled 28:25,
  170:11, 170:12
labeling 171:4
labels 170:24

labor 44:24, 52:16
lack 93:8, 95:5,
  98:21, 124:16,
  129:1, 130:14,
  159:20
ladder 65:14
laid 73:3, 75:24,
  75:25
land 93:18
language 155:1,
  163:8
languish 70:7
large 51:13, 177:6,
  183:1, 202:25,
  210:7
largely 160:9
largest 183:11,
  210:17
Lary 15:3
Last 10:3, 13:7,
  20:6, 30:7, 51:1,
  67:17, 70:8,
  82:12, 89:22,
  90:20, 92:7,
  98:11, 118:6,
  151:3, 166:6,
  184:16, 209:7,
  209:9
Lastly 68:10, 188:11
late 53:6, 173:19
later 27:14, 48:23,
  56:2, 92:19,
  104:3, 135:25,
  140:2, 209:22
latest 37:17, 38:22
Lathan 69:11
latter 153:21
Laura 2:35, 217:7
Law 36:10, 58:17,
  71:10, 72:11,
  72:17, 72:19,
  72:21, 72:24,
  73:2, 110:7,
  118:21, 175:14
lawfirm 150:18
Lawrence 3:40, 17:9
lawsuit 63:12,
  174:2, 174:6,
  174:7, 175:20,
  175:23, 176:1,

176:4
lawyer 99:4, 166:12
lawyers 7:12, 51:21
leader 15:25
leaders 41:21
leadership 41:18
leading 58:6, 174:16
learned 81:5, 186:14
least 39:18, 67:18,
   106:9, 106:14,
   106:23, 108:18,
   112:20, 113:15,
   136:15, 138:24
leave 37:19, 59:6,
   59:8, 78:12,
   78:14, 92:19,
   140:2, 140:5,
   215:14
leaves 36:17, 36:19,
   48:1, 195:13
Leaving 58:7,
   136:24, 190:11,
   214:12
Lecaroz 3:4
led 20:8, 41:16,
   134:8
ledger 24:12
left 50:10, 80:19,
   92:14, 93:17,
   130:2, 156:16,
   157:2, 172:18,
   189:21, 212:10,
   214:7
legality 55:14,
   98:17
lending 84:20
length 54:7, 101:20
lengthy 105:5
less 37:7, 47:3,
   50:24, 50:25,
   54:10, 54:15,
   60:2, 94:23,
   128:6, 139:18,
   159:7
lesser 10:22
letter 17:18, 30:7,
   182:24, 183:3,
   183:8, 209:9,
   210:5, 210:9,
   210:14

letters 7:14, 30:10,
   42:7, 92:6
level 97:11
Levitan 15:4
Lex 18:22, 74:2
lien 153:6, 153:8,
   154:7, 154:8,
   162:20, 163:22,
   164:8, 165:6,
   178:22, 205:7,
   205:10
life 82:14, 82:23,
   84:6, 85:17, 86:2,
   90:10, 92:15,
   93:12, 93:15,
   93:18, 100:6,
   104:9, 152:2,
   152:21, 153:9,
   154:12
lifetime 22:1
light 18:2, 49:5,
   49:13, 50:6, 50:7,
   50:9, 50:10,
   61:25, 62:9,
   80:18, 133:12
lights 49:5, 50:6,
   57:9, 80:17
ligned 129:15
likelihood 160:6,
   160:14, 160:24
likely 13:11,
   161:20, 162:7,
   164:16, 164:21
Likewise 17:14,
   71:20, 96:25,
   114:23, 115:17,
   143:13, 143:20
Limine 132:17
limit 49:1, 80:13,
   94:18, 97:2
limitations 96:15
limited 6:22, 7:2,
   199:8
limits 58:20, 72:21
line 32:7, 34:13,
   46:14, 113:22,
   140:5, 161:5,
   161:14, 170:15,
   172:6, 172:7,
   172:10, 172:11,

172:17, 172:19,
   174:25, 175:1,
   175:4, 184:24,
   189:9
lines 41:7, 104:1,
   173:4
list 24:23, 32:12,
   32:24, 53:24,
   113:14, 113:17,
   183:10, 190:2,
   193:11, 210:16
listed 33:15
listened 128:4,
   130:10
literally 61:22,
   170:18, 205:17
litigant 168:7,
   181:20
litigants 198:8
litigate 19:22
litigated 112:18,
   161:21, 178:21
Litigation 18:21,
   18:23, 19:6, 19:7,
   19:18, 20:1,
   22:14, 25:15,
   40:16, 41:4, 43:1,
   43:7, 64:4, 65:18,
   67:9, 67:10, 70:9,
   70:21, 71:25,
   72:8, 73:3, 73:19,
   74:2, 74:9, 75:17,
   87:11, 137:15,
   137:22
litigations 74:1,
   136:13
litigator 107:5
little 34:12, 36:17,
   48:1, 64:19, 81:3,
   82:1, 88:6, 88:18,
   129:19, 136:4
live 58:8, 58:13,
   78:24, 83:7, 91:7,
   97:10, 111:24,
   113:10, 197:25,
   198:22, 199:23,
   200:18
liver 81:25
lives 7:16, 42:19,
   84:3, 87:7, 152:5

living 59:10, 59:11,
    87:4, 88:7, 88:20,
    99:13, 201:24
LL 5:6, 25:10, 26:6
LLC 116:9, 141:16
Llenza 59:18, 100:19
LLP 36:10
load 37:8, 37:9
loaded 6:18
loaf 40:20, 40:22,
    40:24, 62:2, 73:9
loans 82:11, 82:12
lobby 167:8
local 86:21, 93:16
location 123:1
locked 78:12, 78:15,
    215:19
locks 63:11
lodged 13:16, 157:13
Lokey 181:8
long 11:25, 21:4,
    53:6, 53:19,
    54:14, 66:15,
    70:13, 136:24,
    166:10, 183:5,
    202:6, 210:11
long-term 66:18
longer 77:7, 157:2
look 21:22, 43:13,
    49:19, 71:1, 71:7,
    72:2, 72:3, 72:4,
    72:5, 82:25, 93:9,
    113:15, 113:22,
    127:11, 149:6,
    150:25, 161:15,
    172:5, 172:18,
    182:14, 184:23,
    209:17
looked 35:15, 54:18
looking 12:14,
    93:14, 93:18,
    170:13, 171:21
looks 32:4, 69:7
LOPEZ 59:19, 87:19,
    87:20, 87:21,
    87:24, 88:9, 89:3
Lord 92:13, 203:20
loser 67:5
loser-take-none
    63:13

Losing 58:6, 63:21,
    64:3, 85:19, 93:20
loss 41:5, 87:3,
    87:5, 177:15
lost 40:16, 112:20
lot 15:10, 18:21,
    42:12, 70:3,
    81:16, 91:14,
    111:7, 154:2,
    165:22
lots 42:11, 127:25
love 29:11, 90:14,
    136:3
loved 93:9
low 94:8, 94:15,
    125:14, 163:3,
    163:4, 164:2
lowest 22:10, 65:14,
    109:12
Lozada 133:3
LTS 2:6
Luc 3:7, 60:20
Lugo 120:25
lunch 48:21, 59:24,
    77:5, 77:7, 78:17,
    101:5, 104:18,
    106:11, 117:17,
    195:15
luxury 96:18


< M >
M. 183:16
ma'am 49:11, 79:16,
    79:23
macro 68:14
Maestros 17:11,
    44:2, 44:7
magazine 103:8
magnitude 16:10,
    53:18
mailings 140:23
main 85:4
mainland 7:24, 37:3,
    37:14, 40:12,
    54:10, 55:11,
    93:11, 139:9,
    139:16
maintain 52:10
maintaining 86:6,

110:2
Major 94:25, 176:6,
    176:10, 176:11,
    176:13, 204:1
malaise 39:4
MALDONADO 59:20,
    91:18, 91:20,
    91:22, 91:25,
    92:5, 94:17,
    94:19, 95:6, 95:7,
    95:11
male 81:24
manage 183:21,
    187:3, 187:4,
    210:24
Management 1:10,
    1:26, 2:12, 2:28,
    11:1, 85:20,
    180:23, 182:19,
    202:1, 202:3,
    206:4, 207:9
managing 143:16
mandate 53:5, 62:6
Manhattan 89:21
manner 176:22
manufacture 176:15,
    176:20
March 202:9
Maria 93:11
Mark 3:18, 3:38,
    4:26, 4:40, 50:10,
    57:10, 68:23,
    102:9, 149:20,
    182:24, 198:4,
    199:1, 199:15,
    201:25, 207:7,
    207:14, 210:5
marked 170:25
market 71:23, 162:3,
    162:16, 163:2,
    163:4, 164:13,
    177:10
Markets 51:20,
    143:18
married 81:17
Martin 2:42, 15:4
Maryland 55:12
Massachusetts 202:2
Master 81:13, 82:7
material 11:19, 13:1

materials 130:8
math 153:18, 153:19,
   209:22
Matt 116:24, 148:2,
   182:20, 207:9,
   208:3, 209:2,
   209:4, 210:1
matter 15:7, 16:14,
   20:6, 31:11,
   33:10, 33:22,
   62:22, 105:4,
   107:13, 111:17,
   114:9, 119:16,
   121:18, 128:20,
   132:15, 144:9
matters 10:1, 12:3,
   12:20, 13:10,
   15:17, 22:25,
   92:2, 113:3,
   120:12, 122:12,
   197:8, 199:9
Matthew 4:14, 4:17,
   4:32, 4:45, 29:1,
   64:17, 148:17
maximize 45:5,
   124:14
maximum 58:1
Mccloy 66:10
mean 32:11, 50:10,
   75:21, 98:24,
   112:2, 112:11,
   134:12, 135:3,
   156:8, 162:2,
   169:11, 169:18,
   197:23
Meaning 37:22, 54:13
meaningful 8:6,
   37:6, 41:21
means 50:9, 55:10,
   75:18, 82:19,
   91:14
measures 7:19,
   38:23, 39:3, 39:6,
   47:18, 54:24,
   55:1, 55:3, 79:8,
   99:6, 99:8
medals 92:11
mediation 15:25,
   16:4, 19:2, 19:17,
   20:8, 20:24,

53:11, 76:1,
   134:7, 136:9,
   138:12, 138:23,
   139:2, 140:7,
   179:15, 179:25,
   182:1, 184:1,
   184:5, 184:14,
   186:15, 186:18,
   188:7, 188:8,
   211:14, 212:5,
   215:23
Medical 81:1, 93:4,
   93:13, 94:4,
   94:10, 96:18
medically 93:2
medication 57:20
meet 18:4, 36:18,
   38:7, 48:2,
   130:24, 167:8
mellitus 81:22
Mellon 1:41, 19:8,
   158:4, 159:7,
   188:20, 188:21,
   215:1
member 50:4, 92:16,
   93:24
members 6:6, 42:17,
   42:19, 44:17,
   44:21, 48:8, 94:3,
   122:25, 174:19
memoranda 140:4
memorize 202:14
memorized 30:2
men 88:2, 90:24
Mendez 44:5
mental 81:24, 95:3
mention 82:2, 178:12
mentioned 15:3,
   27:14, 32:6, 55:8,
   73:19, 96:7,
   121:25, 136:6,
   156:22, 170:4,
   175:11, 181:3,
   186:7, 187:7
mere 46:7, 47:5
merely 58:1
merged 38:24
merit 31:17
message 34:13
messages 7:15

met 46:5
metabolism 81:22
methods 52:9
Michael 2:44, 35:5,
   77:10, 117:15,
   127:18
microphone 57:5,
   79:15, 89:1,
   103:19, 103:21,
   180:4, 180:5,
   185:20
microphones 103:25
middle 81:3, 96:20
Miguel 53:14
Mike 15:3
Milbank 66:10
mild 81:24
military 92:9,
   92:14, 92:17
Milla 90:25
Miller 148:2, 168:3,
   207:9
million 21:24,
   37:20, 37:22,
   50:22, 51:2, 51:8,
   55:21, 55:22,
   86:9, 86:15, 88:7,
   90:3, 134:24,
   159:5, 159:10,
   159:15, 183:14,
   183:17, 183:20,
   187:18, 210:20
millions 91:3
mind 35:20, 36:1,
   118:14, 135:24,
   154:1, 177:8,
   180:15
mine 145:22
Minias 29:21, 145:10
minute 41:25, 49:6,
   50:9, 57:10,
   80:19, 90:4,
   197:6, 206:9
minutes 48:25, 50:5,
   60:3, 80:10,
   97:25, 105:21,
   105:22, 117:10,
   130:5, 147:4,
   206:25, 209:12,
   209:15

misery 58:7, 83:14
mislabel 185:12
mispronounced 17:11
mispronouncing
    122:18
missed 40:3, 64:19,
    181:17, 181:18,
    209:16
misstatement 31:7
mistake 41:23
misunderstanding
    137:8
mixed 72:19
MM 5:5, 25:10, 26:6,
    210:23
model 63:23
models 47:2
moment 25:21, 49:9,
    89:24, 98:4,
    118:12, 122:4,
    138:7
moments 118:15
Monday 194:4, 205:1
money 33:20, 39:20,
    55:21, 57:23,
    61:22, 63:11,
    63:24, 74:3,
    75:19, 87:4,
    90:20, 90:21,
    91:1, 91:11,
    110:21, 152:14,
    154:11, 188:19
Monsita 3:4
month 58:1
months 89:21, 89:22,
    174:15
moot 117:24, 132:15,
    132:19
mooted 133:5, 133:10
Morales 44:6
mortgaged 53:2
mostly 55:13, 88:3,
    90:24, 93:10,
    183:11, 202:4,
    203:1, 203:3,
    205:7, 210:18
motel 88:24
mother 57:16, 81:5,
    84:16, 87:2
Motions 7:4, 7:7,

    7:11, 8:23, 9:23,
    20:4, 28:2, 69:2,
    73:22
MOUNIER 56:23,
    95:12, 95:15,
    95:16, 97:4,
    97:16, 97:20
mount 61:9
mounted 61:8
movant 46:5
move 8:14, 13:4,
    13:19, 18:16,
    19:12, 19:16,
    20:22, 22:17,
    23:4, 24:16,
    24:19, 25:18,
    30:6, 35:2, 40:12,
    49:12, 67:8,
    75:12, 78:5,
    83:17, 87:7,
    114:17, 139:19,
    141:6, 174:21,
    178:8, 183:9,
    204:9, 210:15,
    215:6
moved 34:23, 93:11,
    93:13
movement 170:21
movements 171:5
Moving 28:17, 55:4,
    93:18, 133:17,
    181:9, 195:8
multiple 74:1,
    136:13
multitude 12:11,
    72:10, 162:24
municipal 52:20,
    143:17
mutual 186:20
myself 15:9, 16:20,
    82:21, 97:4


< N >
name 43:25, 50:15,
    80:25, 84:15,
    88:9, 92:5, 92:6,
    92:7, 95:16, 98:7,
    136:18, 150:17,
    168:7, 174:6,

    201:25, 209:5
names 48:17, 56:19,
    59:23, 100:15,
    122:17
Nancy 25:25
narrow 201:5, 205:20
Natal 120:25
Natalie 4:8, 15:13,
    114:16
national 99:22
natural 40:3, 81:13
nature 67:4, 107:6,
    107:8, 107:13
near 92:25, 180:4
nearly 37:22
necessarily 72:17,
    89:11, 177:18
necessary 9:2,
    19:23, 24:3,
    30:15, 45:5,
    47:11, 80:20,
    83:20, 115:17,
    117:3, 124:13,
    126:7, 126:14,
    126:24, 135:5
need 7:22, 12:6,
    13:3, 13:23,
    38:12, 49:3,
    53:22, 55:6,
    55:11, 56:5,
    68:11, 91:19,
    93:3, 96:12,
    130:2, 132:19,
    142:18, 154:18,
    155:19, 166:22,
    205:24, 207:13,
    215:12
needed 19:10, 49:19,
    52:17, 67:1, 67:8,
    82:11
needs 18:5, 36:18,
    38:7, 38:8, 54:4,
    55:15, 63:16,
    64:9, 82:21,
    112:18, 122:11,
    125:25, 126:3
negative 71:21,
    85:12, 94:12
negatively 94:7
neglect 33:17

negotiate 8:16,
  19:23, 53:21,
  83:21, 83:25,
  84:1, 84:2, 84:3
negotiated 8:19,
  20:9, 21:6, 22:4,
  29:15, 60:9,
  60:23, 103:15,
  151:10
negotiating 158:21,
  204:23
negotiation 19:17,
  55:7, 56:8,
  157:12, 179:15,
  179:23, 200:12,
  211:8
negotiations 53:8,
  53:19, 53:20,
  54:1, 80:5,
  133:13, 138:11,
  155:23, 159:2,
  166:16, 166:20,
  167:23, 169:8,
  169:10, 180:12,
  180:20, 184:6,
  184:9, 184:15,
  186:9, 188:8,
  189:9, 213:4
Neither 22:24,
  38:13, 46:18,
  89:25
nephews 83:13
Nereida 59:22,
  100:20
nest 85:1
newly 198:24
newly-arrived 88:15
newspaper 103:8
Next 39:18, 40:5,
  42:18, 53:14,
  54:6, 54:14,
  76:21, 84:8,
  89:16, 91:18,
  96:1, 97:22,
  126:11, 142:23,
  186:22, 189:22,
  190:3, 190:5
Nice 167:8
NIEVES 56:23, 95:12,
  95:15, 95:16,

97:2, 97:4, 97:16,
  97:19, 97:20
night 10:3, 118:6
Nine 20:3, 127:6,
  135:21, 149:18
Nine. 47:8, 81:4
NN 5:6, 25:24, 26:6
No. 1:6, 1:22, 1:40,
  2:4, 61:10, 133:4,
  153:13, 157:6,
  212:6, 213:7
Nobody 104:24,
  195:12, 203:24,
  205:16
noise 42:12
noisy 96:14
non-profit 84:17
None 30:23, 40:21,
  58:17, 71:14,
  146:11, 150:2,
  192:3, 194:10,
  195:3, 197:4
nonetheless 35:19
nor 6:14, 14:10,
  38:13, 46:23
NORTHERN 16:6
note 9:23, 15:23,
  17:16, 29:3,
  34:19, 56:11,
  78:23, 87:25
noted 18:3, 35:8,
  139:23, 183:8,
  210:14
notes 6:17, 6:18,
  16:24
Nothing 22:16, 28:5,
  62:6, 63:22,
  64:23, 66:16,
  71:13, 72:20,
  88:16, 91:10,
  128:14, 129:17,
  129:18, 148:9,
  168:21, 198:23,
  201:13, 211:18,
  214:1, 214:2
notice 17:5, 46:1,
  104:22, 107:20,
  108:2, 173:10,
  175:3, 175:19,
  182:21, 210:2

noticed 16:14,
  42:10, 78:24,
  81:19
notices 8:4
notified 80:9
noting 65:23
notion 55:17,
  119:13, 119:20,
  128:10
novel 72:15, 165:14
November 31:13
nowhere 66:16, 128:5
null 135:19
numbers 27:16,
  37:17, 39:10,
  86:13, 102:12,
  102:14, 102:16,
  109:8, 192:9
numerous 131:7,
  203:25
Nydia 59:21, 80:21,
  80:25


< O >
o'clock 48:14,
  48:21, 59:24,
  77:19, 194:4,
  214:23
O'neill 15:5
oath 148:5, 212:19
obesity 81:22
obey 55:11
object 13:11, 36:14,
  42:6, 46:2, 69:4,
  111:16, 118:16,
  121:15, 121:23,
  123:5, 124:2,
  124:6, 124:7,
  127:3, 130:21,
  131:22, 180:3,
  195:8, 204:5
objected 45:10,
  104:18, 104:24,
  105:6, 113:15,
  127:21, 191:13
objecting 17:18,
  139:16
objections 12:15,
  13:16, 13:25,

16:12, 16:23,
17:7, 17:25,
25:20, 26:3,
31:10, 42:3,
66:21, 76:25,
105:9, 120:24,
128:19, 129:22,
132:16, 133:2,
133:7, 135:14,
135:25, 138:3,
146:9, 195:16
objective 45:23,
85:1
objector 10:4, 14:3,
28:18, 28:19,
31:8, 32:1,
200:18, 214:13
Objectors 7:13,
11:7, 11:19,
12:12, 16:12,
17:17, 28:20,
28:21, 32:12,
35:1, 35:2, 64:20,
76:24, 86:11,
120:24, 121:12,
122:1, 129:16,
137:24, 137:25,
138:25, 140:1,
215:3, 215:8
Obligation 3:17,
187:13, 205:6
Obligations 41:22,
48:2, 187:17
obliged 89:16
observations 36:4
observed 6:23
observing 6:7
obstacles 72:5,
92:15
obtained 81:14
obviate 13:3
Obviously 10:22,
62:5, 64:25,
82:15, 137:12,
145:14, 195:7,
195:17, 195:18,
196:9, 200:1
occasion 79:9
occur 137:16, 160:24
occurred 137:17

occurring 204:25
occurs 75:14
October 209:9
offer 31:4, 38:14,
77:16, 120:3,
144:3, 150:4,
160:5, 197:14,
200:8, 204:12,
208:10, 208:17
offered 13:15,
96:19, 111:1,
119:15, 123:13,
123:15, 190:22
offering 130:13,
182:7
office 166:17
officers 58:2, 94:8
Official 2:4, 3:6,
28:20, 110:25,
112:9, 217:13
officials 111:12,
195:24
often 40:17, 77:25
old 81:2, 83:12,
89:18, 94:11,
163:9
older 82:16, 83:15
oldness 82:14, 84:3
omission 127:2
omitted 116:23
Omnibus 11:24, 17:2
on-island 139:4
once 68:17, 135:14
One. 68:12, 74:12,
118:25, 136:25,
165:7, 176:20,
193:21
onerous 86:12
ones 42:21, 42:22,
58:13, 93:10,
98:13, 98:15,
123:13, 192:10,
192:11, 192:17
ongoing 74:8, 188:9
onset 51:25
OO 5:6, 25:10, 26:6
open 48:23, 179:3,
200:24
opening 14:1, 14:24,
119:5, 132:12,

133:16
opinion 112:6,
112:25, 160:6,
161:19, 164:4,
164:12, 164:20
opinions 108:23,
112:4, 112:9
Oppenheimer 55:12,
180:23, 186:16,
186:19, 186:20,
186:23, 204:2
opponent 110:16,
132:11
opportunity 20:22,
33:9, 46:2, 65:10,
71:16, 76:3, 77:6,
87:16, 91:13,
92:2, 182:11,
195:17, 196:10
oppose 45:8, 137:5
opposed 17:20, 32:9,
95:17, 97:20,
112:19, 113:8,
116:12, 131:24
opposing 80:3
opposite 63:21,
129:15
opposition 7:7,
42:8, 42:12, 60:8,
64:2, 100:2,
117:2, 122:2,
123:5, 123:13,
123:21, 197:15
opt 135:11
oral 20:5
oranges 109:18
ordered 125:23
Orders 6:11, 23:6
ordinary 7:17,
152:17
organization 46:3,
84:17
organizations 98:10
original 23:13,
23:17, 29:17,
29:21, 29:22,
86:7, 141:14,
141:24, 145:10,
159:15, 191:11
originally 163:15

Orlando 59:16,
    100:18
Oro 90:25
others 56:19, 59:10,
    60:18, 61:20,
    70:20, 86:19,
    100:15, 164:14,
    169:13
Otherwise 6:23,
    6:24, 30:14,
    70:10, 71:17,
    75:3, 116:12,
    139:15
ought 108:18
ourselves 86:25
outcome 13:1, 40:25,
    63:13
outcomes 40:25,
    165:8, 165:9
outpace 38:3
output 161:1
outrage 211:7
outset 18:3, 18:18,
    22:24, 68:11,
    74:13, 180:11
outside 6:13, 42:10,
    79:5, 88:3, 88:6,
    127:12, 202:10
outstanding 9:18,
    56:5, 152:2
overall 19:13,
    21:19, 116:14,
    116:17, 152:19
overarching 52:2
overcome 96:24
overcoming 92:15
overflow 79:3
overlap 132:1
overlapping 132:4
overly 38:10
overruled 31:15,
    153:25, 201:4
overture 184:2
owed 55:21
own 7:16, 61:9,
    65:25, 75:12,
    84:6, 95:8, 109:6,
    110:25, 131:5,
    160:13, 187:4,
    187:23, 189:12,

195:8
owned 67:3, 184:11,
    184:12, 186:20,
    186:21, 187:2,
    209:5
ownership 9:5, 9:13,
    61:4, 61:5, 61:7,
    67:19, 72:18,
    110:8
owns 160:1, 187:6


< P >
package 103:15
Padilla 171:9,
    171:13, 171:22,
    174:18
Page 4:3, 5:2,
    34:20, 45:4,
    109:11, 109:20,
    110:4, 125:22,
    149:8, 149:18,
    149:19, 161:15,
    170:10, 170:15,
    170:17, 206:13,
    208:1, 209:1,
    209:20
pages 7:6, 183:7,
    206:14, 210:13,
    217:4
paid 7:22, 119:8,
    136:18, 152:8,
    152:11, 153:4,
    153:5, 153:10,
    153:22, 156:20,
    188:19
pain 8:10, 59:4
painful 38:23
paper 16:13, 16:15
papers 14:17, 38:13,
    119:3
par 172:24
Paragraph 102:5,
    108:20, 109:8,
    111:9, 111:13,
    119:19, 150:25,
    151:1, 151:4,
    154:25, 156:1,
    156:9, 161:23,
    192:20, 192:24,

199:5, 199:14
paragraphs 107:3,
    107:10, 107:12,
    107:16, 107:17,
    113:6, 113:8,
    113:15, 113:20,
    195:21, 196:9,
    196:19, 196:21
parallel 133:4,
    133:9
paramount 70:21
Pardon 169:18,
    169:22
parent 168:4
parentheses 210:18,
    210:19, 210:21
parents 83:12, 94:4
pari-passu 161:3,
    161:9, 161:12
park 134:1, 147:2
participant 166:19
participants 6:8,
    44:21, 163:4,
    164:13
participate 121:22,
    138:21, 138:22,
    166:15, 180:12,
    182:1, 211:13
participated 179:14,
    179:22, 180:20,
    180:25, 186:8,
    186:11, 186:17
participating 139:1,
    188:9
participation 121:13
particular 6:17,
    8:17, 9:21, 12:21,
    35:12, 35:19,
    36:1, 65:6, 70:18,
    107:12, 113:7,
    121:4, 132:1,
    152:14, 158:20,
    161:19, 167:21,
    168:22, 171:22,
    195:21, 204:13
particularly 11:17,
    11:20, 174:22
partner 44:4,
    207:23, 208:15,
    208:25

partners 88:13,
    99:16
party 8:10, 12:21,
    28:10, 29:15,
    62:22, 64:7,
    110:16, 118:23,
    121:4, 124:15,
    126:22, 130:21,
    130:24, 131:3,
    131:4, 148:1,
    162:22, 177:23,
    214:17
pass 95:4, 150:12
passed 149:7, 163:16
past 87:1, 88:13,
    93:10, 95:25,
    111:7, 166:17
path 7:5
patience 130:7
Paul 4:23, 56:5,
    60:20, 69:4
pause 197:7
pay 56:4, 83:5,
    83:22, 85:16,
    89:16, 98:13,
    98:15, 99:25,
    100:8, 109:13,
    109:14, 139:13,
    151:18, 152:15,
    153:17, 158:25,
    159:11
payable 152:1,
    152:3, 154:11,
    171:9, 171:14
paying 37:23, 40:9,
    68:6, 82:12,
    85:13, 100:5
payment 37:21, 39:6,
    40:1, 86:16, 99:6,
    126:14, 152:8,
    154:15, 158:7,
    159:17, 174:9,
    178:17, 181:10,
    181:15, 181:17,
    188:12, 188:13
payments 38:1, 38:3,
    38:6, 39:15, 40:3,
    40:6, 48:3, 71:19,
    152:12, 152:18,
    156:19, 158:15,

158:25, 181:17,
    188:12, 188:14
payrolls 39:1
peace 59:11
pecuniary 120:13,
    128:6
penalty 51:23
pending 16:24, 76:17
Pennsylvania 88:14,
    91:8
penny 136:25
pension 44:23, 48:3,
    54:12, 57:15,
    58:1, 82:13
pensioners 52:13,
    58:19, 58:22,
    58:23, 59:9,
    74:14, 85:25, 97:7
pensions 46:23,
    52:15, 54:8,
    54:10, 57:23,
    58:8, 58:24,
    58:25, 65:25,
    83:2, 96:6, 124:9,
    125:11
Pepino 96:13
Per 50:23, 51:3,
    51:9, 109:12,
    109:17, 118:23,
    183:10, 210:16
percentage 51:5,
    51:13, 93:13,
    161:16, 161:20
perfectly 8:7
perform 164:15
perhaps 11:14, 77:5,
    101:12, 106:8,
    117:21, 139:18,
    163:21, 174:16
period 54:13, 70:8,
    74:17, 75:20,
    86:6, 188:5,
    188:6, 203:9
Perkins 104:6,
    150:18
permanent 146:22
permission 147:16
permit 52:18, 100:7,
    130:2
permitted 6:22,

132:11, 200:24
permitting 121:11
persist 200:15
PERSON 6:13, 6:22,
    51:3, 51:9, 90:20,
    92:16, 97:12,
    98:2, 100:23,
    101:1
personal 52:10
perspective 34:1,
    45:11, 61:12,
    62:5, 64:24,
    131:13, 131:17,
    132:18
Peter 3:13, 3:23,
    3:36, 4:29, 36:9,
    56:4, 62:14
petition 56:12,
    56:13, 161:8
phone 89:1, 104:1
PHV 2:42, 2:43,
    2:44, 3:7, 3:12,
    3:13, 3:14, 3:18,
    3:23, 3:26, 3:28,
    3:32, 3:33, 3:34,
    3:42
physical 52:8, 58:9,
    191:11
physically 79:2,
    207:14
picture 112:20
piece 141:7, 200:13,
    205:6
pieces 137:22
Pinto 120:25
place 31:19, 47:18,
    86:20, 96:22,
    140:7, 155:24,
    159:2, 159:21,
    183:2, 195:19,
    210:8, 213:21
placed 86:22
places 39:23, 57:6
Plaintiff 1:43, 2:20
plaintiffs 18:24
plans 8:16, 54:13,
    83:3, 94:20,
    132:4, 132:6
plausible 54:14,
    168:11

play 51:22
played 153:22
playing 61:21, 61:22
plea 83:24
plead 7:22
pleadings 25:12
pledged 20:14, 71:14
Plus 40:6, 135:2,
  136:19
PM 78:20, 147:7,
  147:8, 150:10,
  189:21, 193:4,
  195:6, 207:2,
  207:3, 208:6,
  208:22, 209:21,
  211:3, 214:7,
  216:1
podium 10:10, 49:4,
  50:6, 80:17,
  80:22, 95:13,
  104:9, 106:23,
  190:21, 196:15,
  197:17, 199:20,
  213:17
point. 9:25, 35:7,
  67:17, 134:9,
  174:21
pointed 42:2, 127:20
points 66:19, 66:23,
  72:2, 117:24,
  118:8, 140:2,
  183:2, 183:6,
  210:9, 210:12
police 58:2, 94:7
policies 6:11
political 112:8
poor 81:4, 82:22,
  96:8
Popular 88:10
population 52:21,
  54:6, 93:1, 93:22,
  94:11, 126:2,
  126:7
populous 141:1
portfolio 12:15
portion 9:15, 11:21,
  27:15, 35:12,
  38:9, 47:20,
  48:12, 66:1,
  86:17, 102:17,

110:8, 110:9,
  118:23, 127:21,
  152:7
portions 106:17,
  106:18, 130:25,
  188:3
posited 114:21
position 12:25,
  14:16, 45:12,
  45:18, 66:18,
  110:3, 110:25,
  111:14, 118:21,
  120:5, 120:22,
  122:7, 129:9,
  129:11, 129:14,
  137:12, 137:16,
  183:1, 187:20,
  187:21, 199:18,
  209:8, 210:7
positions 25:14,
  73:21, 129:13,
  186:12, 186:13,
  186:14, 186:17,
  186:19, 186:25,
  187:1
possibility 11:23,
  17:21, 85:18,
  162:18, 163:19,
  163:22
possible 8:5, 66:17,
  146:12, 171:17,
  171:19, 182:23,
  185:5
possibly 40:7, 58:6,
  205:13
post 161:8
posting 8:3
postpone 52:16
pot 156:11, 156:15
potential 165:9,
  177:15, 181:10,
  181:11, 203:23
potentially 61:16,
  62:1, 203:24
Poverty 37:4, 83:8,
  96:12, 96:24,
  97:6, 97:11
powers 62:21
practiced 56:4
practices 11:2

practicing 65:3
PRADO 59:17, 97:22,
  97:23, 98:7,
  100:13, 100:14
pre-promesa 42:18
pre-title 19:2
precarious 97:6
preceded 25:8,
  144:13
preceding 66:20
precept 64:3
precise 123:17
precision 146:21
preclude 120:17,
  121:13, 121:21,
  130:12, 130:15,
  130:18, 132:9
precluded 121:18,
  129:1, 139:1
preclusive 112:1
predated 18:21
predicate 24:6
predicated 20:25,
  21:10, 50:18,
  125:17, 137:7
predicted 54:5,
  126:10
prefer 10:23, 149:15
preliminary 10:1,
  76:23
premium 154:19
PREPA 44:15
prepared 11:18,
  12:5, 46:16
prepares 128:8
preparing 11:6
presence 15:23
present 7:11, 12:22,
  28:21, 41:16,
  80:9, 101:23,
  128:13, 128:17,
  128:22, 141:14,
  156:22, 188:10
presentation 9:12,
  24:13, 38:14,
  102:15, 109:9,
  121:6, 121:16,
  126:23, 129:24,
  147:15, 212:12
presentations 13:3,

78:5, 80:2, 111:10
presented 8:23,
    9:25, 12:7, 21:15,
    22:8, 24:4, 73:21,
    101:10, 101:16,
    114:6, 120:1,
    124:15, 126:22,
    128:23, 199:10
presenting 128:24
presents 72:19,
    131:11
president 44:5,
    44:6, 141:17,
    201:25
press 6:7, 6:23,
    168:1
presumably 24:12,
    157:2
presume 172:24
Pretty 167:9,
    169:18, 173:8,
    175:5, 175:7,
    211:12
prevail 71:4, 73:15,
    156:5, 160:23,
    161:20
prevailed 73:16
prevailing 160:13
prevails 157:9
prevent 45:20
previous 54:18,
    192:18, 195:14
previously 117:6,
    156:10, 203:17,
    212:23
price 162:4, 162:5,
    162:9, 162:12,
    170:21, 171:5,
    173:9
priced 163:1, 164:1
prices 162:16
pricing 102:5,
    102:6, 184:18
primary 75:7
Prime 114:12,
    141:15, 141:18,
    141:19, 142:17
principal 15:8,
    202:4
principally 23:24

principals 188:10
Principle 20:10,
    20:11, 20:17,
    21:2, 21:10, 22:6,
    29:17, 137:9,
    185:2
print 206:8, 206:22
printed 32:20,
    170:13, 206:2
printouts 206:6
prior 53:23, 53:25,
    55:8, 104:19,
    115:7, 115:18,
    145:18
priorities 96:3,
    96:4, 155:16
priority 155:2,
    155:3, 155:18,
    156:5, 156:7,
    156:14, 157:4,
    157:8, 157:14,
    160:12, 160:15,
    160:22, 161:2,
    161:6, 161:11,
    161:13
private 61:19, 86:1
privatization 89:7
privilege 58:18
Pro 3:36, 3:38,
    3:40, 106:1,
    128:1, 166:4,
    181:20, 199:1
proactive 11:3
probabilities 94:10
probability 70:20,
    72:4, 73:8, 73:11,
    156:4, 160:11,
    160:22, 161:17
probably 13:8,
    13:15, 56:9,
    106:14
probative 67:15
problem 45:16,
    75:23, 111:19,
    113:24
problems 126:18,
    162:19
Procedural 47:5,
    62:17, 62:20,
    105:8

procedure 45:25,
    211:16
procedures 19:16,
    72:21, 75:24,
    159:8, 200:17
proceed 14:23,
    57:12, 118:3,
    147:4, 170:18,
    202:18, 204:14,
    207:16
proceeded 145:1
proceeding 7:1,
    18:24, 25:13,
    32:19, 35:13,
    47:7, 110:23,
    111:1, 144:4,
    153:7, 158:16,
    158:25, 160:7,
    161:21, 188:16
Proceedings 3:48,
    6:15, 7:13, 9:3,
    27:24, 37:7,
    44:20, 46:3, 48:9,
    72:23, 74:2,
    78:20, 78:25,
    80:6, 89:12,
    121:7, 121:23,
    122:25, 127:9,
    129:1, 132:25,
    147:8, 169:15,
    195:11, 195:18,
    195:19, 207:3,
    209:11, 216:1,
    217:6
process 8:14, 19:1,
    21:4, 48:10,
    60:23, 75:24,
    76:4, 98:20,
    98:24, 117:25,
    120:21, 121:15,
    132:15, 137:9,
    138:12, 138:13,
    138:17, 138:23,
    139:2, 140:6,
    140:18, 140:19,
    141:20
produced 3:48
product 21:15
products 143:17
professional 96:22

professionals 42:16,
    93:21, 180:24
professor 81:1, 82:8
proffer 103:3,
    125:17, 130:19,
    133:22, 147:5,
    149:25
proffered 26:3
proffering 14:3
proffers 13:25,
    105:12, 132:10
program 44:11
progress 67:6, 101:8
progressive 81:23
project 103:23
projected 38:3,
    38:4, 47:19,
    152:19, 154:12
projecting 156:2
projection 39:9,
    51:7
projections 21:22,
    125:8, 130:1,
    132:1
projects 39:5, 55:24
PROMESA 1:8, 1:24,
    8:13, 8:22, 41:20,
    58:17, 58:21,
    62:18, 62:22,
    71:8, 72:24,
    72:25, 127:8,
    130:23, 132:6,
    138:7, 153:6,
    158:16, 158:24,
    163:12, 163:14,
    175:14, 188:16
promised 85:6,
    85:17, 88:17
promote 44:12,
    58:23, 141:1
promptly 8:4, 66:17
Proof 107:19,
    107:21, 108:2,
    108:4, 108:17,
    111:22, 138:17,
    138:25, 196:3,
    196:5, 200:8,
    204:12
proper 34:2, 70:22,
    90:1, 93:24,

138:11, 211:16
properly 203:21
property 72:22,
    163:24
proponent 51:17,
    129:21
proponents 12:25,
    13:2
proposal 29:16,
    45:8, 45:13,
    58:24, 64:8,
    107:12, 113:7,
    190:13
proposals 7:17
propose 77:2, 132:7
proposing 46:2
proposition 40:20
propositions 111:22
pros 136:10
Proskauer 15:1,
    35:6, 69:24,
    77:10, 101:7,
    117:15
PROSOL 118:6,
    122:25, 123:5,
    123:6, 124:3,
    124:5, 124:10,
    124:15, 126:22,
    127:3
PROSOL-UTIER 3:21,
    14:16, 17:10,
    36:8, 44:1, 44:10,
    44:21, 45:7,
    45:10, 114:9,
    115:21, 118:16,
    121:5, 121:21,
    122:23, 123:12,
    124:2, 124:21,
    127:14, 130:12,
    130:15, 130:20,
    131:21, 131:23,
    132:10, 132:17,
    133:8
PROSOL-UTIER'S 44:12
prospective 23:25,
    64:13
prosperity 66:18
protect 47:15,
    58:21, 58:25
protected 62:18,

62:21
protecting 93:7
protection 174:24
protects 45:23, 66:4
protest 42:15
protesting 42:23,
    127:12
protracted 22:14,
    74:9
proved 76:2
proves 118:11
provide 18:11,
    21:23, 29:13,
    59:11, 65:20,
    90:8, 93:21,
    119:24, 125:11,
    126:2, 194:18
provided 19:16,
    75:5, 75:22,
    110:9, 169:18
provides 21:19,
    46:2, 60:9, 63:24,
    64:8, 75:2, 75:7,
    76:3
providing 9:18, 76:5
proving 38:18
provision 9:22,
    58:21, 185:16
provisions 72:24,
    110:10, 136:22,
    136:23, 139:6,
    141:22, 151:18,
    153:3, 155:4,
    155:20, 166:22
Prudential 120:12,
    130:14, 130:16,
    130:24, 131:5,
    131:21
PSA 151:10, 155:18,
    155:21, 166:21
PSTBA 20:13
publications 140:23
publicly 50:14
pull 109:21, 109:22
Pullo 4:5, 114:11,
    141:15, 147:17
punish 86:23
purge 204:24, 205:9
purported 61:7,
    159:24

purporting 160:5,
    188:4
purports 61:4
purpose 44:12, 53:8,
    103:9, 156:6,
    179:3, 198:5
purposes 37:1,
    58:16, 128:25,
    132:22, 207:7
pursuant 20:19,
    22:2, 23:2, 119:9,
    130:22, 132:19,
    135:18, 136:17,
    137:14, 139:11,
    162:8, 188:22
pushing 91:10
put 11:16, 31:8,
    31:11, 87:6,
    98:19, 99:8,
    114:11, 115:14,
    117:4, 119:10,
    140:7, 159:20,
    159:21, 162:17,
    168:6, 198:8,
    198:9, 199:17,
    200:3, 200:9,
    202:17
putting 11:12, 89:14


< Q >
QQQ 35:24, 145:3,
    146:14, 146:18
qualifications
    195:24, 197:6,
    197:11
qualified 124:16,
    202:10
qualifying 199:6
quality 82:14
quantities 203:5
quantum 67:5
questioning 179:1
questions 10:8,
    68:19, 77:6, 95:1,
    166:1, 166:4,
    166:6, 166:8,
    167:9, 168:23,
    179:6, 181:21,
    185:13, 185:19,

185:23, 188:25,
    189:10, 189:18,
    189:25, 194:19,
    200:23, 200:25,
    205:18, 211:17,
    213:12
quick 35:7, 66:19,
    68:2, 185:22
quicker 66:20
quickly 41:10,
    48:12, 129:7,
    147:11
quiet 77:23
Quietly 130:4,
    147:10, 147:11,
    147:12
Quigley 131:1
Quinn 103:5, 147:23,
    207:5
Quite 163:3, 163:4,
    164:2, 171:17,
    172:17, 173:25,
    202:25
quote 40:20, 40:21
quotes 183:2, 210:8


< R >
radio 140:24
Rafael 104:7
Raise 82:6, 120:9,
    127:25, 148:6,
    201:11
raised 9:13, 14:10,
    72:14, 81:4, 82:3,
    96:8, 98:8, 118:5,
    140:1
raises 36:22, 55:23
raising 83:12, 83:15
Ramos 56:24, 57:8,
    57:11, 57:13
ran 160:9
random 48:10
range 22:10, 40:25,
    67:16, 165:9
ranged 165:11
ranging 8:2
Rapisardi 3:12
Rappaport 15:3
rate 68:8

rates 52:21
Rather 25:7, 117:6,
    139:11
ratings 164:13
ratio 37:11, 37:12,
    187:15
rattling 174:18
Re 1:6, 1:22, 131:1,
    131:9
reach 83:14, 109:22
reached 8:1, 21:2,
    21:11, 50:3,
    60:12, 97:3,
    104:18, 105:20,
    106:6, 106:8,
    115:6, 116:18,
    117:8, 137:22,
    143:3, 157:5,
    168:4, 203:19,
    203:25
reaching 38:2, 97:13
reacting 108:17
read 12:23, 24:22,
    25:2, 25:6, 81:5,
    88:12, 112:1,
    143:9, 144:7,
    151:3, 155:1,
    163:7, 171:7,
    182:6, 182:10,
    196:21, 202:13,
    206:4, 208:8,
    208:25, 209:24
reading 172:12,
    184:4
ready 23:4, 35:2,
    76:18, 79:13,
    132:12, 179:9
real 18:9, 41:6,
    41:9, 47:6
realistic 55:4
reality 8:11, 29:4,
    41:4, 89:14
realized 19:11, 73:7
really 16:11, 17:25,
    18:15, 41:9, 42:8,
    89:13, 91:14,
    118:22, 119:15,
    120:3, 174:17,
    205:3
reason 121:3,

128:16, 190:17,
204:21
reasonability 47:3
reasonable 12:8,
22:5, 34:7, 34:10,
40:25, 46:8,
46:14, 64:8,
67:21, 68:19,
70:23, 75:23
reasonableness
22:11, 23:24,
24:5, 33:25,
43:13, 51:15,
65:14, 67:16,
76:8, 131:12
reasons 41:2, 85:4,
95:18, 129:16,
149:14
rebuild 38:7
rebuilding 70:2
rebuttal 190:23,
191:3, 191:5,
197:14, 198:3,
198:12, 199:13,
199:15, 199:17,
200:3, 200:18
rebutted 198:24
Recalled 4:45,
181:25, 212:23
recalling 196:6
recalls 117:1
receipt 8:3
receive 7:8, 7:24,
9:16, 21:1, 57:18,
61:10, 61:11,
71:13, 71:16,
87:12, 94:23,
95:20, 125:15,
156:15, 156:18,
157:2
received 7:14,
33:16, 46:19,
67:13, 108:12,
123:8
recess 78:19, 147:7,
206:9, 206:16,
207:2
recession 40:4
recitation 47:5
recite 27:16

recited 197:12
reckless 53:4
recklessly 38:10
recognize 53:22,
56:5, 56:9,
123:11, 136:21
recognized 32:1,
32:12, 72:12,
92:21, 93:2,
123:21, 124:12
recognizing 53:18,
56:6
recollection 181:23,
182:9, 182:18,
183:24
reconcile 8:7
reconvened. 78:20,
147:8, 207:3
recorded 3:48,
111:21, 112:16,
197:9
recording 6:21
records 146:5,
183:8, 197:9
recount 204:18
recover 76:6
recovered 164:21
recoveries 45:6,
124:14, 156:2,
178:23
recovery 7:6, 19:13,
21:19, 58:16,
70:6, 70:19,
87:12, 151:24,
161:7, 161:9,
161:16, 164:16,
165:12, 165:20,
165:24, 178:15
recross 185:25
RECROSS-EXAMINATION
4:37, 4:47, 186:5,
213:18
recut 77:3
Red 39:8, 49:5,
50:7, 50:10,
80:17, 88:23,
172:6, 172:19,
173:3
REDIRECT 4:36, 4:43,
4:46, 105:22,

117:10, 133:19,
179:9, 179:11,
185:16, 185:23,
189:5, 200:24,
211:19, 211:22,
212:1, 212:25,
213:24
redouble 35:20
redress 120:11,
131:25
reduce 64:4, 97:6,
126:14
reduces 126:4
reducing 37:12,
55:4, 86:5, 139:14
reduction 46:22,
54:7
reductions 63:25
refer 6:18, 144:16,
149:17, 160:12,
171:2, 192:22
reference 108:20,
115:4, 119:3,
119:5, 156:2,
160:21, 191:13
referenced 24:20,
32:8, 188:12,
196:19
references 128:11
referencing 112:2,
119:20
referred 18:23,
21:8, 73:17,
105:3, 108:22,
149:13, 193:11,
194:11, 214:10
referring 26:12,
30:17, 151:12,
151:18, 155:3,
172:15, 179:21
refers 102:5, 102:6,
184:22, 199:14
reflect 28:14,
161:24, 177:4
reflected 34:20,
35:10, 63:7,
128:5, 160:9,
177:2, 185:3
reflects 33:6
reform 44:23, 99:7

reforms 52:8, 52:17
reformulate 180:16
refresh 183:23
refreshes 182:8,
    182:18
refusal 131:24
regard 82:19
Regarding 31:7,
    58:18, 84:20,
    104:20, 118:16,
    121:6, 126:8,
    126:16
regardless 118:15
Region 3:4
regret 80:12
regrettable 100:11
regular 184:8
reject 47:25
rejected 184:2
rejections 141:21
relate 117:24,
    119:14
related 76:25,
    110:10, 114:17,
    144:6, 158:2,
    159:19, 168:1,
    171:7, 175:15
Relating 131:12,
    186:1, 211:7
relationship 131:14,
    131:20
relative 35:20,
    67:12, 67:15,
    117:19, 120:20,
    187:15
relatively 67:1
relatives 83:11
relay 204:17
released 70:11,
    147:18
relevance 12:21,
    13:9
relevant 46:10,
    72:22, 102:17,
    119:7, 122:12,
    183:2, 203:11,
    210:9
reliance 191:11
relief 74:10
relinquish 205:20

rely 41:17, 46:7
remain 40:13, 59:10,
    148:4, 201:9
remainder 153:9
remaining 17:7,
    49:6, 51:11,
    77:21, 78:2, 78:4,
    79:25, 80:8
remains 40:5
remarks 49:7, 50:4,
    60:17, 74:13,
    80:14, 94:18,
    119:6
remedies 174:17
remember 83:10,
    88:19, 90:4,
    182:1, 184:3,
    184:4, 193:9,
    205:14
remind 6:10, 49:6,
    50:11, 80:20
reminded 115:13
remitted 159:6
remote 96:13
removed 116:1
renders 132:15
renege 159:20
reorganization
    36:22, 131:9
repaid 151:22,
    151:23, 154:18,
    154:22, 156:14,
    156:24, 157:20
repayment 85:6,
    86:6, 86:13, 87:14
repeat 103:18,
    104:3, 113:17,
    152:6, 158:12,
    159:23, 177:25
repeated 41:23,
    102:17
repeatedly 41:21
repeating 154:1
repetitive 25:8,
    183:5, 210:11
replaced 50:20,
    162:8
replies 140:3
reply 38:13, 69:21,
    118:7, 118:19,

    119:3, 119:19,
    215:10
Report 99:16, 128:8,
    128:14, 178:12,
    217:13
REPORTER 81:7, 81:9,
    160:16, 169:23
reports 88:12,
    191:20
repository 6:14
represent 17:12,
    44:1, 61:18,
    61:19, 69:1,
    74:20, 105:25,
    118:18, 162:11,
    171:23, 199:2
representation 211:8
representative 1:13,
    1:29, 2:15,
    120:11, 141:17,
    141:19, 170:23,
    176:5, 176:6
representatives
    80:4, 121:11,
    189:8, 213:3
represented 123:10,
    138:15, 161:5,
    161:13, 177:22,
    177:23, 203:22,
    203:24
representing 98:9,
    100:12, 166:4,
    172:20, 205:16
represents 38:8,
    122:24, 172:7
request 17:4, 28:12,
    28:15, 100:24,
    113:13, 114:10,
    114:13, 114:20,
    115:2, 115:3,
    115:4, 143:21,
    168:19, 183:10,
    206:20, 210:16
requested 74:10,
    130:15, 140:6,
    206:21
requesting 117:9
requests 7:3, 14:2,
    14:8, 28:3, 28:22,
    34:25, 48:8,

105:11
require 37:12,
    37:21, 80:13
required 38:3, 40:6,
    46:22, 104:21
requirements 8:17,
    8:21, 22:9, 23:3,
    130:24, 132:6
requires 39:13, 40:2
reread 113:11
research 168:9,
    168:14, 205:10
reservation 14:19
reservations 28:3
reserve 150:3,
    190:23
reserved 14:20, 63:3
reside 65:23
resident 84:16,
    92:9, 98:8
resolution 19:10,
    19:14, 19:17,
    19:24, 51:17,
    63:7, 116:15,
    136:7, 181:11,
    195:22
resolutions 152:2
resolve 52:5, 68:12,
    91:5, 117:18
resolved 9:6, 10:17
resolves 65:17,
    75:10
resolving 52:1
resort 127:2
resorted 138:1
resources 9:7,
    57:21, 57:22,
    85:2, 93:8, 94:5,
    95:5, 108:25,
    110:10
respectfully 133:1
respective 137:2
respectively 139:21
respond 111:2,
    111:4, 122:15,
    199:21
Response 89:18,
    104:19, 118:6,
    118:8, 118:10,
    118:13, 138:20,

141:2, 146:4,
    183:4, 185:23,
    200:12, 203:18,
    204:3, 204:9,
    210:10
responses 139:23,
    194:3
responsibilities
    62:21
responsibility
    75:15, 88:5
responsible 54:4,
    83:5, 98:18
responsibly 94:20
rest 59:11, 92:3,
    106:20, 214:15,
    214:17, 214:20
Restated 21:9
restroom 49:23
restructured 90:19
restructuring 36:21,
    36:25, 39:13,
    43:3, 43:4, 52:3,
    76:4, 98:25,
    99:24, 100:2,
    100:4, 131:20
result 33:14, 41:4,
    43:3, 64:25,
    65:10, 65:18,
    67:24, 68:8, 72:9,
    85:20, 137:15,
    137:18, 159:17,
    165:18, 171:13
results 21:23, 52:5
resume 77:19, 77:20,
    215:2
retail 202:8
retardation 81:24
rethink 77:3
retire 94:15
retired 18:6, 19:2,
    57:13, 81:1, 82:9,
    82:20, 82:25,
    83:4, 83:17, 87:2,
    92:10, 94:8, 96:7
Retiree 16:25, 17:2,
    73:24, 74:19,
    95:16, 97:17
retirees 44:19,
    44:24, 54:10,

54:15, 122:24,
    123:1
Retirement 7:21,
    44:22, 83:2, 84:2,
    85:3, 92:17,
    94:20, 94:21
retiring 9:18
retransmission 6:21
return 87:13, 97:5,
    212:17
returns 9:18
Revco 131:9
revenue 36:17,
    37:11, 48:2, 54:8,
    54:10, 85:7,
    119:21, 158:3
revenues 8:25, 38:5,
    39:14, 39:16,
    46:19, 46:22,
    51:18, 86:8,
    110:6, 119:22,
    125:9, 126:10,
    152:4, 152:7,
    152:11, 152:20,
    152:21, 156:19,
    158:11, 158:14,
    158:21, 160:2
review 45:23, 67:23,
    70:17, 195:17,
    195:18
reviewed 7:6, 8:2,
    118:7, 124:23,
    125:7, 130:8,
    196:19
revisit 77:3
Rican 38:4, 58:5,
    58:8, 58:12, 64:1,
    84:7, 84:25,
    110:23, 195:24
Ricans 40:7, 40:9,
    40:11, 86:25,
    88:15, 89:15,
    90:3, 91:6, 91:11,
    99:10
rid 54:12
Rights 44:13, 62:17,
    62:20, 63:3,
    72:23, 93:7, 99:5,
    99:11, 99:12,
    131:4, 131:5,

163:24
Rigoberto 59:20,
    91:18, 92:5
ripe 66:3, 73:12
rise 101:20
rising 175:12
risk 39:12, 39:22,
    39:23, 40:24,
    41:12, 63:14,
    64:5, 84:18, 99:9,
    136:22, 163:2,
    163:25, 164:4
risks 22:13, 162:23,
    163:1, 164:1,
    164:5
road 67:6, 68:10,
    75:1, 119:14
Robbins 68:24, 69:3
robust 52:10
Rodriguez 59:21,
    59:22, 80:21,
    80:23, 80:25,
    81:11, 100:20
Rolando 3:21, 44:1,
    122:22
role 62:22
roll 62:1
rolled 39:2
rolling 65:8
Roof 88:24
room 88:1, 142:21
Rose 15:1, 35:6,
    69:24, 77:10,
    101:7, 117:15
roughly 183:20,
    210:23
round 36:22, 43:4,
    43:6
rounds 70:8, 70:9
RRR 145:3
rubber 46:7
Rule 22:9, 22:15,
    23:2, 23:9, 34:6,
    45:8, 45:20,
    98:22, 103:12,
    110:17, 130:6
Rules 71:9, 79:1,
    79:6
ruling 157:8
rulings 67:4

run 42:21
rung 65:14
rural 81:4
Russell 68:24, 69:3


< S >
S/ 217:11
sabers 174:18
Sachs 135:17,
    180:22, 186:7
sacrifices 81:16,
    83:7
safety 96:6
sake 87:14
salient 174:22
SALINAS 3:33, 30:4
San 6:1, 6:7, 81:2,
    84:16, 96:9,
    96:10, 96:14
sanctions 7:1
sanctity 163:8
Santander 180:25,
    186:23, 187:5,
    187:6
sat 19:15
satisfaction 23:3
satisfied 138:9
satisfies 22:9
satisfy 38:12
Saturday 143:1
saving 92:21
savings 7:21, 84:20,
    84:24, 85:18,
    86:3, 86:25, 87:2,
    87:13, 91:9
saw 35:25, 89:5,
    146:23, 164:15
saying 14:20, 31:25,
    47:23, 59:4,
    79:20, 93:20,
    121:9, 126:21,
    146:3, 169:5,
    169:7, 171:12,
    177:17, 178:1,
    198:10, 198:15
says 61:9, 63:16,
    63:20, 125:14,
    151:5, 156:13,
    157:8, 182:20,

185:2, 198:2,
    211:9, 213:16
scale 171:20
scenario 165:23,
    178:20
scenarios 165:8
schedule 31:12
scheduled 11:24,
    152:17, 159:15
school 83:1, 94:14,
    96:16, 96:20,
    96:21
schools 38:24,
    81:11, 93:4,
    96:14, 97:1
Sciences 81:1, 81:13
scientific 47:2,
    124:15
scope 20:18, 178:6,
    196:8, 199:8,
    199:24, 200:23,
    201:2, 204:8,
    205:19, 205:20
score 35:23, 60:14,
    214:10
screamed 19:9
Screenshots 12:12
Se 3:36, 3:38, 3:40,
    106:1, 118:23,
    166:4, 181:20
se. 199:1
seat 180:5, 185:18,
    197:19, 207:1
seated 147:9,
    148:12, 201:17,
    212:21
seats 147:3
Sebastian 96:9
second 16:21, 33:4,
    43:6, 45:15,
    81:17, 85:6,
    142:5, 170:15,
    193:7, 207:13
seconds 109:22
Secretaries 112:7
Secretary 112:3
Section 62:21,
    118:13, 130:22
sections 195:15
sector 39:1, 86:1

sectors 58:22,
  58:24, 59:9
secured 85:7, 110:6
securing 85:1
securities 20:25,
  141:18
Security 58:3, 58:4,
  94:9, 94:16, 99:9,
  99:18, 139:18
Seeing 26:3, 30:23,
  89:7, 91:9,
  125:13, 146:11,
  150:2, 192:3
seek 45:19, 120:11,
  131:7, 162:19
seeking 46:12,
  64:12, 110:20,
  118:11, 120:11,
  121:12, 160:1
seem 86:12, 115:20,
  169:18
seems 12:14, 16:13,
  130:1
seen 79:7, 106:13
segment 34:9, 48:7,
  56:20, 60:5, 60:11
SEIU 3:23, 17:8,
  42:20, 120:23
self-styled 176:11
sell 87:3
send 106:12
seniority 151:5,
  151:17, 151:21,
  153:3, 153:17,
  154:10, 159:1,
  159:12, 160:6
Seniors 136:17,
  149:22, 153:4,
  155:4, 156:14,
  156:24, 159:25,
  160:14, 161:16,
  161:17, 165:20,
  173:1, 176:19,
  176:21, 176:24,
  176:25, 177:5,
  177:11, 177:12,
  177:17, 178:2,
  179:4, 180:10
sense 40:15, 40:17,
  129:20

sensible 57:4
sensitivity 161:25
sent 31:20, 189:16,
  209:9, 211:5,
  212:4
sentence 17:19,
  155:14
sentences 151:3
separate 73:22,
  122:10, 139:19,
  142:9, 152:25,
  165:4
separately 26:22,
  144:8, 198:23
September 19:25
serious 95:24
servants 58:3
serve 152:12, 194:3
served 15:24, 53:8,
  194:1, 194:13,
  198:19
serves 15:21
Service 36:11, 39:7,
  44:11, 67:25,
  75:8, 82:10,
  85:14, 86:6, 86:9,
  92:15, 92:17,
  95:9, 109:14,
  123:2, 128:16,
  152:15, 158:15,
  158:25, 159:11,
  159:16
serving 112:7
session 77:22,
  91:17, 147:10,
  147:12
set 48:7, 57:9,
  60:7, 70:16,
  78:12, 94:25,
  135:19, 194:17,
  199:9
setting 14:21
settle 68:12
settled 67:2, 112:18
Settlements 40:17,
  45:19, 137:22,
  154:16, 154:17,
  156:11, 156:21
settling 40:15, 41:1
seven 135:10,

139:20, 161:24,
  199:14
seven. 135:12
several 14:19,
  82:11, 101:22,
  111:8, 134:5,
  187:19, 209:6
severely 45:1
shameful 77:17
share 50:14, 68:5,
  71:17
sharing 56:18, 95:8
shelter 89:21, 89:23
shields 39:21
short 49:1, 49:8,
  60:2, 80:13,
  133:25, 182:21,
  183:4, 200:13,
  210:1, 210:10
shortly 31:20,
  171:16
shotgun 138:2
shoulder 182:14
shouldn't 129:12
show 22:10, 42:15,
  140:17, 170:24
showing 25:13,
  38:15, 46:17,
  170:21
shown 89:11, 131:23,
  141:3
shows 49:16
shrink 51:6
shrinking 51:12
shuttered 38:24
Si 56:22
sic 99:17, 99:22
sick 96:18
side 22:16, 24:12,
  29:7, 49:19,
  67:14, 76:10,
  135:24
side-stepping 47:14
sides 9:4, 73:4,
  76:9, 117:19,
  140:10
sign 146:19
signals 6:19
signature 56:12,
  148:20, 149:9

signatures 56:8,
  56:10, 191:11
signed 23:13, 100:1
significance 171:6
significant 8:5,
  52:5, 68:13,
  74:15, 131:6,
  136:8
significantly 22:1,
  86:5
signs 81:19
silence 130:7
similar 46:24, 47:7,
  86:7, 156:9, 164:5
Similarly 137:24,
  186:16
Simon 36:10
simple 92:8, 105:1
simpler 50:18
simply 36:16, 65:8,
  65:13, 67:19,
  86:23, 168:20,
  182:17, 202:20
sir 43:18, 91:19,
  97:21, 100:22,
  171:12, 173:10
sit 71:12, 77:23,
  130:4, 180:4
sits 168:14
Sitting 13:17,
  160:3, 165:24,
  173:13
situated 137:24
situation 8:11,
  63:4, 65:7, 66:2,
  83:10, 83:19,
  85:15, 90:9,
  93:17, 95:8,
  99:22, 126:13
situations 7:16,
  65:5, 66:3, 82:21,
  124:11
Six 20:4, 34:20,
  73:22, 87:1,
  89:21, 102:5,
  125:22, 135:7,
  149:8, 192:21,
  192:24
slashed 39:1
slate 61:2, 61:13,

71:6, 73:16
slightly 165:16,
  175:21
slope 161:5, 161:14
Slow 81:7, 129:19,
  155:9, 155:10,
  209:13
small 85:1, 96:9,
  99:20, 202:1
so-called 33:21,
  43:6, 206:2
Sobrino 15:18
Social 58:3, 58:4,
  63:25, 94:9, 94:15
society 94:3
sold 55:11, 188:2
solemnly 148:7,
  201:12
solicitation 140:19,
  141:17, 184:11
solid 163:8
solidarity 44:11
solo 135:16
solution 75:23,
  103:16, 182:23,
  210:4
somebody 27:16,
  129:10
someone 30:1, 69:8,
  116:24, 186:22,
  204:7
sometimes 40:20,
  40:21
somewhat 77:7,
  101:13, 183:5,
  210:11
son 57:17
soon 101:10, 209:18
sooner 75:13, 75:14
Sorry 10:14, 23:21,
  26:21, 27:4,
  30:23, 33:13,
  42:22, 48:19,
  49:23, 60:7, 81:7,
  92:5, 110:13,
  117:11, 125:3,
  129:4, 142:7,
  148:18, 150:2,
  152:6, 154:2,
  158:12, 159:23,

169:25, 177:25,
  197:20, 209:14
sort 118:7
sound 146:5, 168:8,
  168:11
sounds 202:14
source 6:13, 85:7
space 65:3
span 73:25
Spanish 79:12,
  80:12, 87:20,
  87:23, 97:24, 98:6
Sparks 167:18,
  182:6, 183:25,
  207:8, 207:21,
  207:22, 208:2,
  208:14, 208:25,
  209:20
spawned 74:6
speaker 48:25,
  53:14, 80:9,
  91:18, 97:22
speakers 15:8,
  48:22, 69:19,
  77:20, 77:21,
  78:3, 78:23,
  79:10, 79:12,
  79:25, 80:6, 80:8,
  100:21, 214:24
speaking 53:15,
  78:9, 80:12, 84:9,
  95:9, 101:11,
  106:7, 150:18
speaks 98:2, 119:4
special 82:21, 93:3,
  167:21
specialist 81:20
specialists 93:13
specific 88:20,
  93:3, 132:25,
  165:23, 178:20,
  180:13, 199:8,
  211:22
Specifically 18:5,
  18:20, 55:12,
  67:18, 91:4, 95:4,
  101:18, 158:18,
  169:4, 176:10,
  179:20, 179:25,
  180:15, 184:1,

186:1, 200:17,
  203:10, 213:22
specifics 109:7,
  191:16
specified 9:11,
  105:9
specter 36:22
speech 97:24
spend 51:21
spending 96:2
spent 50:25, 89:21,
  89:22
split 20:13, 20:25,
  60:24, 62:10,
  140:13
spoke 145:14,
  204:22, 211:2
spoken 10:18, 119:2,
  167:12, 181:21,
  209:4
spot 108:17
spread 143:17
squarely 39:23
SSS 145:3
stability 96:24
stable 110:6
staggering 36:20
stakeholders 45:6,
  52:6, 72:16,
  124:14
stamp 46:7
Stancil 3:18, 68:23,
  69:1, 69:6
stand 42:5, 53:7,
  57:5, 63:5, 71:18,
  128:21, 148:2,
  148:4, 191:3,
  200:16, 201:9,
  205:21, 212:17
stand. 189:21,
  212:10, 214:7
standard 42:4,
  184:13
standards 119:23
standpoint 73:20
stands 210:20
staring 50:11
start 10:4, 10:8,
  13:23, 37:6,
  41:21, 49:7, 76:4,

87:25, 89:17,
  101:18, 155:14,
  183:2, 203:20,
  209:2, 210:8
started 18:22, 20:1,
  53:19, 88:23,
  137:20, 197:18,
  202:9
starting 9:2, 52:18,
  54:20, 174:17,
  177:6, 188:14
starts 70:3, 86:9
state 33:17, 36:3,
  37:8, 37:10,
  37:12, 46:4,
  52:19, 68:3, 68:5,
  68:8, 97:6, 106:9,
  109:18
stated 45:4, 47:9,
  171:9, 178:1,
  179:25
Statement 14:1,
  14:24, 17:19,
  28:25, 29:4, 29:9,
  31:14, 32:8,
  33:15, 52:24,
  54:19, 54:21,
  54:23, 60:3,
  69:22, 109:4,
  112:25, 116:13,
  133:16, 135:18,
  140:19, 140:25,
  144:17, 145:12,
  154:25, 171:17,
  171:18, 174:18,
  213:6, 215:11
States 1:1, 2:36,
  16:5, 37:2, 46:15,
  68:6, 92:8, 92:10,
  93:14, 93:19,
  95:10, 99:23,
  217:7
stating 86:13,
  171:13, 176:14
status 112:17
statute 61:3, 61:4,
  61:6, 61:9, 62:9,
  71:6, 163:12,
  163:14, 163:20
stay 83:18, 90:2,

97:8, 175:14
staying 111:20
stenography 3:48
Step 138:15, 148:4,
  162:12, 189:20,
  201:9, 206:25,
  212:9, 214:6
steps 7:5
stick 40:11, 138:3
Stifel 168:3, 168:8,
  204:4, 208:3,
  209:5, 209:7
stimulus 52:7
stipulate 11:18
stipulating 12:10
Stipulation 19:16,
  19:19, 20:19,
  192:18
stoic 110:3
stop 20:21
stopped 35:23,
  85:13, 90:18,
  188:3
stories 89:11
story 89:17
straight 116:23
straightforward
  167:10, 169:19
stranded 93:22
strategy 53:7, 127:1
stream 110:6, 158:3
streamline 117:25
streams 134:6
Street 86:21, 90:24,
  91:12
streets 96:13
stretch 40:1
stricken 121:11,
  132:20
strict 154:17,
  155:2, 155:17,
  156:5, 156:7,
  156:14, 157:4,
  157:8, 157:14,
  159:1, 160:6,
  160:12, 160:14,
  160:22, 161:2,
  161:6, 161:11,
  161:13
strike 39:19, 41:11,

178:13, 204:9
strikes 40:4
strip 139:10
strong 85:7, 112:4
stronger 136:5
strongest 61:8
strongly 42:23
struck 167:24
structural 39:8,
  52:8, 52:16
structurally 34:12
structure 18:25,
  153:8, 154:20,
  158:5, 159:21,
  163:10, 165:17,
  176:8, 176:22,
  177:16, 178:14,
  178:16, 178:19
structured 157:1
structures 66:25
struggle 52:20
students 59:10,
  83:16, 93:7
studied 27:23, 63:5,
  81:11
study 124:16,
  124:18, 124:20,
  125:2, 125:5,
  125:22, 126:23
Suarez 89:17
subdivisions 52:20
Subject 7:1, 8:17,
  34:2, 44:22, 92:2,
  106:7, 110:7,
  112:4, 112:10,
  114:7, 128:7,
  154:9, 189:24,
  190:12, 190:16,
  195:23, 196:4,
  196:8, 197:6,
  199:24
subjects 50:16
submission 28:18,
  35:17, 194:16
submissions 7:7,
  76:16, 193:24
submit 67:22, 68:4,
  68:16, 68:19,
  124:18, 140:17,
  194:5, 199:5,

200:6
submitting 198:5,
  199:13
subordinate 84:24,
  151:8, 151:23,
  151:24, 153:4,
  154:19, 154:22,
  156:3, 157:20,
  161:4, 161:18,
  162:5, 172:7,
  172:20, 172:23,
  177:16, 181:1,
  184:12, 184:18,
  186:21, 187:3,
  187:4, 187:6,
  187:18, 189:13
subordinated 151:19
subordinates 155:4,
  156:15, 156:17,
  157:1, 161:10,
  161:18
subordination
  136:22, 155:15
subsequent 27:15,
  181:16, 181:17,
  188:13
subsidies 38:25
subsidized 96:10
substance 62:18,
  63:2
substantial 173:8,
  175:5, 175:7
substantially 202:13
substitution 100:24
success 50:24,
  70:20, 72:4, 73:8,
  73:12, 75:17
successful 76:3,
  94:3, 140:20,
  164:23, 165:18
suffer 87:13, 123:6
suffered 85:10,
  95:25
suffering 47:17,
  59:6, 123:9
suffers 8:10, 124:10
sufficient 12:3,
  47:10, 129:23,
  153:16, 154:21,
  158:21, 158:24,

159:11
suggest 41:12,
  107:22, 204:14
suggested 10:20
suggesting 11:5,
  41:7, 179:1
suggestion 119:7
suicides 83:15
suing 9:4
Sullivan 147:23
Summary 20:4, 69:2,
  72:13, 73:23,
  182:25, 183:1,
  210:6, 210:8
supervised 211:14
supplemented 27:14
supplements 27:10,
  35:9, 35:17, 35:22
supported 41:15
supporters 80:4
supporting 87:8,
  199:7
supports 41:14,
  64:11
suppositions 154:5,
  154:6
Supreme 61:16
surpass 47:11
surprise 111:6,
  175:13, 211:7
surrounding 41:10
survive 7:23, 40:22,
  83:13
survived 82:4
Susheel 3:32, 103:5,
  147:22, 197:21,
  207:5
sustain 119:17,
  120:2, 120:4,
  124:19, 126:23,
  128:9, 128:15
sustainability 37:2,
  46:19, 59:1
sustainable 86:10,
  99:24
Sustained 113:1,
  117:23, 120:17,
  178:8, 203:14,
  204:10
SUT 66:24, 67:3,

67:6, 86:16, 96:5,
112:4, 112:9,
119:20, 123:22,
124:25, 125:9,
125:23, 126:11
Suzzanne 3:14
Swain 2:35, 91:20,
92:1, 100:6,
100:11, 182:25,
183:3, 183:5,
209:9, 210:6,
210:9, 210:10,
217:7
swayed 22:20
swear 148:7, 201:12
switch 31:1, 57:5
sworn 149:3, 201:10,
201:19, 212:23
syndrome 81:21
System 26:9, 44:22,
57:9, 89:23, 90:2,
96:21


< T >
T. 3:18
table 13:18, 85:23,
133:21, 162:11,
203:24, 205:16
tabulation 114:14,
141:20, 142:12,
198:17
Tacoronte 27:21,
49:10, 145:25,
206:22, 207:13,
215:16
tact 36:19
tad 155:10
taint 138:13
taken. 78:19, 147:7,
207:2
tale 36:23
talked 89:15, 169:1
talks 183:9, 210:15
tandem 172:14
tangible 64:8
tardes 80:23
taxable 134:22,
135:10, 139:10,
139:12, 139:15

taxables 203:3
taxes 9:2, 20:14,
22:18, 51:4,
52:21, 71:15,
89:16, 109:13,
109:14, 154:21,
164:9
taxpayer 95:17,
97:17
Taylor 2:35, 217:7
teacher 57:14
teachers 57:18,
57:24, 58:1, 83:1,
93:17, 94:14
team 15:25, 20:8,
76:1, 134:8,
136:9, 140:7,
215:23
technically 17:15
tee 68:11
telephonic 6:8
tells 145:25
Ten 82:3, 84:23,
105:22, 109:21,
147:4, 149:18,
170:10, 170:15
tender 35:1, 141:10,
142:24, 143:13,
145:7, 145:11,
146:10, 191:8,
192:24, 194:8,
194:16, 196:7,
197:1, 197:5,
197:10, 214:15,
214:18, 214:20
tendered 29:18,
30:21, 138:6,
146:24
tendering 142:7,
148:23, 194:20
tenor 67:24
term 54:14, 95:22,
162:14
terms 9:11, 22:3,
33:20, 41:11,
62:20, 63:2,
67:24, 86:13,
177:11
terrible 58:5, 84:20
test 43:13, 63:19,

65:11
testified 149:3,
179:18, 181:22,
182:4, 199:23,
200:3, 200:5,
201:20, 212:24,
213:3
testimonies 126:8
testimony 13:14,
23:11, 24:17,
28:18, 29:23,
34:24, 90:20,
107:9, 123:9,
127:4, 133:16,
140:17, 141:13,
143:1, 147:17,
148:7, 189:19,
197:14, 198:7,
198:9, 198:11,
198:23, 199:8,
200:13, 200:21,
201:12, 212:8
tests 43:12
Texas 16:6, 93:19
text 102:6, 149:13,
196:20, 208:8
texting 6:24
Thanks 91:25, 92:1
theirs 194:16
themselves 25:13,
42:15, 100:16,
131:7
Thereby 13:2, 131:8,
132:15, 136:4,
151:7
thereto 26:10, 35:17
thesis 128:16
they'll 55:3, 191:4
They've 16:17,
118:19, 118:20,
119:2, 119:15,
138:4, 141:11
thinks 11:14, 106:24
third 79:18, 114:24,
131:4, 143:10,
143:12, 193:7
thoroughly 27:22
though 31:18, 168:10
thoughts 92:2,
130:5, 209:10

thousand 98:9,
    100:1, 100:2,
    140:8
Thousand. 183:13,
    183:15
thousands 7:6,
    84:24, 92:21
threaten 132:7
three-minute 60:3
Three. 149:19,
    149:22
Three149 5:9
threshold 47:11
throughout 15:25
tie 191:15
ties 119:12
tighten 11:21
timeline 105:2
timely 31:22, 105:7
timer 49:4, 80:16
timing 77:1, 77:4,
    117:3, 175:22
Timothy 4:20
Title 1:8, 1:24,
    8:14, 18:22, 19:5,
    37:7, 43:4, 43:6,
    44:20, 72:23,
    137:16, 137:19,
    163:24, 174:23,
    175:21, 175:24
together 20:8,
    41:11, 144:8,
    144:11, 164:7,
    191:14, 192:8
toll 52:21
Tom 25:11
tomorrow 214:25,
    215:2
tonight 215:13
took 20:6, 21:4,
    21:14, 31:19,
    51:4, 90:7, 90:10,
    155:24, 159:2,
    213:21
top 70:1, 80:16,
    145:22, 170:14,
    173:4, 184:22,
    209:20
topic 178:9, 201:5
topical 119:5

total 38:9, 44:17,
    55:22, 68:14,
    71:20, 71:24,
    101:23, 152:1,
    152:3, 206:14
totally 72:9
touch 82:18
toward 52:22, 75:13,
    76:4, 174:19,
    176:22, 180:6
towards 176:8
town 81:3, 96:9
toxic 36:23
track 50:7, 60:14
trade 162:3, 172:14
traders 162:14,
    168:3
trading 168:17,
    188:10, 192:21
traditional 61:6
transaction 60:10
Transcript 3:48,
    25:4, 102:18,
    108:21, 108:24,
    110:15, 217:4
transcription 217:5
transfer 164:8,
    164:9, 164:18,
    164:23, 165:6,
    165:18
transferred 110:8,
    110:9
translation 59:3,
    97:25, 102:13,
    191:20
transparency 45:25,
    98:21
transportation 99:9
treated 196:21
treatment 161:3,
    190:13
tremendous 134:7,
    141:2
trend 55:2
tried 106:12,
    176:14, 176:18
true 13:1, 21:25,
    40:21, 41:14,
    47:9, 63:21,
    67:15, 213:11,

    217:5
truly 12:7, 83:19
trust 181:18,
    188:21, 188:24
Trustee 3:3, 9:21,
    46:7
truth 103:3, 107:17,
    111:17, 112:13,
    113:3, 115:25,
    148:8, 148:9,
    201:13, 201:14
try 127:3, 128:18,
    160:19, 174:16,
    175:19, 180:22
trying 105:10,
    128:17, 164:15,
    169:19, 169:20,
    176:19, 184:9,
    194:11
TT 5:6, 25:10, 26:6
TTT 145:3
turn 10:1, 69:21,
    78:23, 79:25,
    101:2, 167:1
turned 6:16, 6:20,
    21:7
turning 180:6
turns 63:12
Tweed 66:10
tweeting 78:25, 79:7
twice 198:11
two-day 8:24
Two. 120:6, 170:11,
    170:12, 184:17
type 57:18, 97:14,
    122:10, 126:12,
    126:13, 179:5
types 12:18, 94:2
typical 64:20

< U >
UAW 3:23, 17:8,
    42:20, 67:17,
    120:23
UBS 180:24
Uhland 3:14
ultimate 112:17
Ultimately 19:7,
    21:5, 21:7, 22:4,

62:24, 63:6,
72:22, 74:5,
138:1, 152:4,
157:10, 161:20
unable 59:2, 117:17,
120:4
unaffordable 39:11,
40:18
unanimity 135:15
unbearable 47:20
uncertain 72:10
uncertainty 22:13,
52:6, 67:3, 85:11,
87:13
unconstitutional
99:2, 178:22
underlying 111:22
underperformance
39:23
understand 18:16,
34:14, 53:21,
53:24, 61:12,
74:21, 80:11,
86:12, 88:21,
90:15, 113:9,
125:20, 152:9,
154:6, 155:11,
155:15, 190:4,
198:10, 198:15,
201:6, 212:18
understanding 17:3,
18:19, 35:21,
45:9, 80:15, 93:1,
101:14, 103:13,
106:6, 115:6,
115:25, 119:7,
143:3, 143:21,
153:5, 157:21,
179:22, 187:2,
203:5, 211:2
understandings 117:8
understood 157:25,
177:9
Underwriters 51:22,
112:3
undoubtedly 22:14
unevaluated 45:22
unfair 83:22, 85:17,
97:16, 98:6
unforeseen 162:23

Unfortunately 8:9,
67:4, 90:9, 101:8,
108:15, 117:17,
137:17
unfunded 52:15
unhappiness 67:12,
67:15
unhappy 136:1
UNIDENTIFIED 100:23,
101:1
uninsured 58:18
Union 36:11, 36:12,
74:14, 76:24,
80:3, 135:24
unions 17:9, 22:20,
22:21, 43:9,
43:11, 44:24,
65:24
United 1:1, 2:36,
16:5, 36:10, 37:2,
92:8, 92:10,
95:10, 99:23,
217:6
University 38:25,
81:2, 81:12,
81:18, 96:21
unknown 45:21, 200:1
unknowns 165:22
unless 6:17, 68:18,
77:5, 115:10
unlikely 48:13
unmoving 110:3
unparentheses
210:18, 210:21
unpayable 47:19
unpredictable 53:3
unquote 205:17
Unsecured 2:5, 3:7,
19:20, 135:21
until 34:6, 38:2,
76:18, 77:18,
153:10, 172:14,
205:1
unusual 168:19,
184:7
unwanted 83:2
unwilling 85:16
update 101:4
upheld 154:7, 160:7,
164:18, 178:14,

178:17, 178:19
uphold 163:23
UPR 82:5, 82:7,
82:25
upside 64:8
urge 66:5
Urquhart 147:23
usage 75:8
using 6:17, 37:16,
79:4
UTIER 44:6, 44:12,
63:23, 123:10
UTIER'S 44:10
utilized 28:7
UU 5:6, 25:11, 26:7,
145:3


< V >
v. 1:44, 2:21
vacuum 202:18
valid 109:19, 165:5
validity 136:21,
154:7, 164:17,
164:22
Valiente 104:7,
193:25
valuable 93:20,
139:18
value 7:24, 47:14,
85:9, 151:8,
156:11, 156:15,
156:22, 170:25,
172:3, 172:23,
176:2, 177:7,
177:10
values 44:12
VAMOS 120:25
Vamos4pr 88:12
variety 149:14
various 13:9, 25:14,
62:23, 72:2,
137:3, 137:22,
141:22, 152:5,
153:10, 155:5,
157:13, 157:22,
158:2, 165:8,
203:6, 203:22
VARONA 59:19, 87:19,
87:20, 87:21,

87:24, 88:9, 89:3
vast 72:8, 138:3
Vega 89:19
version 23:17
versus 61:2, 155:4,
  164:5, 187:16
veteran 92:9
Veterans 92:18,
  92:23
VI 43:6
viability 158:17
vibration 6:19
vice 44:6, 141:17
victims 99:14
Victor 25:10, 49:21,
  50:1, 50:15
victory 71:20
view 24:5, 34:8,
  34:11, 53:11,
  195:20
viewed 24:9
views 50:14, 56:18,
  70:23, 87:16
vindicated 62:24
violations 99:12
violence 99:14,
  99:19, 99:21
virtually 119:20
virtue 177:15
vis-a-vis 179:5
vital 119:21
vitiated 165:19
voice 42:22, 62:25
voiced 136:15
volumes 203:5
voluminous 194:17,
  206:12
vote 97:17, 100:3,
  134:15, 135:9,
  135:17, 135:18,
  184:11
voted 134:17,
  134:24, 135:2,
  135:4, 135:5,
  135:8, 135:13,
  135:22, 137:25,
  140:14, 140:21
votes 42:21, 142:12,
  142:16
voting 134:20,

198:17
voucher 89:4
vulnerable 58:22,
  58:24, 59:8, 82:22
vulture 86:21
VV 5:6, 25:11, 26:7,
  145:3


< W >
Wachtell 107:6
wait 68:17, 136:24
waiting 146:11,
  204:7
waive 189:25, 190:25
walk 64:10, 160:1
Walker 217:11,
  217:12
walking 33:13,
  197:16
Wall 86:21, 90:24,
  91:12
wanted 10:20, 33:9,
  61:11, 62:4,
  64:22, 64:25,
  66:20, 87:25,
  89:17, 91:21,
  91:23, 104:11,
  168:21, 169:2,
  169:7, 185:11,
  195:17, 199:17,
  200:22, 202:17
wants 90:21, 107:7,
  129:11
Ward 96:10
warning 80:19
watch 80:20
watershed 52:1
Watkins 69:12
ways 93:14, 93:18,
  144:5
wearing 61:23
webcast 109:10
website 108:25,
  109:1
week 17:5
weeks 21:4
weigh 70:24, 74:9
Weiss 36:10, 69:4
Welcome 6:6

welfare 94:25
Whatever 10:23,
  30:12, 107:7,
  132:22, 133:4
whatsoever 21:12
Whereupon 192:6,
  193:22, 212:10
Whether 8:18, 11:17,
  12:20, 34:7,
  34:10, 43:14,
  46:5, 51:16, 79:3,
  95:21, 105:1,
  105:6, 106:13,
  113:16, 122:12,
  132:18, 153:16,
  163:25, 165:2,
  179:4, 179:13,
  180:9, 180:14,
  181:9, 181:21,
  182:17, 183:24,
  189:8, 211:21
white 88:2, 90:24
Whitebox 19:7, 215:1
whoever 130:2
whole 127:7, 136:19,
  148:8, 151:11,
  151:13, 154:19,
  201:13
whom 7:14
Whyte 2:23, 19:22
wide 8:2, 70:15,
  138:3
widespread 37:4,
  76:9, 141:4
wiggle 175:4, 175:5
wiggles 172:17
willing 64:7, 85:23,
  86:3, 86:19,
  168:4, 168:18,
  190:25
Willkie 64:17
win 71:24
winner 67:5
winner-take-all
  65:18
wisdom 46:10
wish 28:21, 31:4,
  128:25, 129:5,
  160:19, 166:5,
  197:13, 215:22

wished 31:1, 104:21, 116:25, 155:18, 166:21, 194:5
wishes 129:21, 167:1, 211:22
wishy-washy 53:7
withdraw 17:3, 116:17
withdrawal 17:5
withdrawn 116:5, 133:12
within 40:25, 67:16, 68:1, 72:23, 205:19
Without 21:12, 38:11, 47:14, 70:6, 82:5, 93:20, 93:24, 94:9, 94:15, 95:19, 98:22, 99:7, 124:6, 134:9, 155:19, 166:22, 201:3, 207:25
WITNESSES 4:3, 101:23, 101:24, 105:12, 114:6, 114:10, 115:7, 116:23, 130:13, 200:18, 214:4
women 99:15
won 73:6, 73:7
wondering 168:18
word 178:4
wording 176:18
words 39:21, 124:5, 205:17
work 42:20, 53:10, 77:6, 78:8, 84:17, 88:12, 91:7, 92:21, 99:14, 113:10, 134:6, 215:21, 215:24
worked 77:24, 82:23, 85:19, 88:13, 89:4, 97:7, 140:7
worker 39:1
Workers 36:11, 44:11, 44:13, 44:14, 59:7, 83:1, 85:25, 123:9

working 16:4, 16:18, 71:5, 71:6, 82:11, 83:4, 83:16, 137:4, 150:19, 209:7
works 63:18, 161:1, 207:23
world 41:6, 41:9, 137:20
worried 7:18
worry 50:11
worse 37:25
worst 58:14, 161:25, 162:14
worth 65:22, 134:24, 135:13, 136:20
wrap 66:13, 94:18, 97:3, 187:18, 187:24
wrapper 181:1
write 81:10, 109:8, 169:24, 183:4, 210:10
writing 59:12, 61:1, 61:13
written 121:24, 128:5, 130:8, 202:13
WW 145:3, 145:6, 146:15

< X >
XX 145:3

< Y >
Yanez 3:42
year 38:1, 38:2, 50:21, 51:1, 81:17, 88:13, 93:10, 152:7, 152:11, 152:14, 158:20, 158:23, 166:18, 174:16, 192:22, 209:7
yellow 49:5, 50:7, 50:9, 80:17, 80:18
yesterday 56:7
Yield 161:25,

162:13, 162:15
Yohan 59:15, 100:17
York 1:40, 6:8, 11:24, 19:8, 30:25, 31:1, 69:8, 79:4, 88:14, 89:1, 89:19, 89:22, 91:8, 104:1, 106:1, 106:9, 106:15, 107:5, 158:4, 159:6, 166:12, 174:9, 175:17, 188:20, 188:21, 196:16, 215:1
yourself 43:24, 201:23
youth 58:12
youths 84:18
YY 145:3

< Z >
zebra 145:4
zero 41:5, 61:11, 62:2, 72:1, 73:9, 161:12, 165:12
ZZ 5:6, 25:11, 26:7, 35:24
ZZZ 145:4