```
 1                    UNITED STATES BANKRUPTCY COURT

 2                      DISTRICT OF PUERTO RICO

 3
     In Re:                      )       Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )       PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,                )       (Jointly Administered)
                                 )
 7   as representative of        )
                                 )
 8   The Commonwealth of         )
     Puerto Rico, et al.,        )       January 17, 2019
 9                               )
                    Debtors.     )
10
     _____
11
     In Re:                      )       Docket No. 3:17-BK-3284(LTS)
12                               )
                                 )       PROMESA Title III
13   The Financial Oversight and )
     Management Board for        )
14   Puerto Rico,                )
                                 )
15   as representative of        )
                                 )
16   Puerto Rico Sales Tax       )
     Financing Corporation,      )
17   (COFINA)                    )
                                 )
18                  Debtor.      )

19   _____

20
     The Bank of New York        )       Docket No. 3:17-AP-133(LTS)
21   Mellon,                     )
                                 )       in 17-BK-3284(LTS)
22                  Plaintiff,   )
     v.                          )
23                               )
     Puerto Rico Sales Tax       )
24   Financing Corporation,      )
     (COFINA), et al.,           )
25                               )
                    Defendants.  )
```

```
1   _____

2
    The Official Committee of     )      Docket No. 3:17-AP-257(LTS)
3   Unsecured Creditors of the    )
    Commonwealth of Puerto        )      in 17-BK-3284 (LTS)
4   Rico,                         )
                                  )
5   as agent of                   )
                                  )
6   The Financial Oversight and   )
    Management Board for          )
7   Puerto Rico,                  )
                                  )
8   as representative of          )
                                  )
9   The Commonwealth of           )
    Puerto Rico,                  )
10                                )
                   Plaintiff,     )
11  v.                            )
                                  )
12  Bettina Whyte,                )
                                  )
13  as agent of                   )
                                  )
14  The Financial Oversight and   )
    Management Board for          )
15  Puerto Rico,                  )
                                  )
16                 Defendant.     )
    _____
17

18                           MOTION HEARING

19    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

20                 UNITED STATES DISTRICT COURT JUDGE

21  _____

22
    APPEARANCES:
23
    For The Commonwealth
24  of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
                             Mr. Brian Rosen, PHV
25                           Mr. Michael Firestein, PHV
                             Mr. Hermann Bauer, Esq.
```

```
 1    APPEARANCES, Continued:

 2    For the U.S. Trustee
      Region 21:               Ms. Monsita Lecaroz Arribas, AUST
 3
      For Official Committee
 4    of Unsecured Creditors:  Mr. Luc Despins, PHV

 5
      For Puerto Rico Fiscal
 6    Agency and Financial
      Advisory Authority:      Mr. John J. Rapisardi, PHV
 7                             Mr. Peter Friedman, PHV
                               Ms. Suzzanne Uhland, PHV
 8
      For Ad Hoc Group of
 9    General Obligation
      Bondholders:             Mr. Mark T. Stancil, PHV
10
11    For PROSOL-UTIER:        Mr. Rolando Emmanuelli Jimenez, Esq.

12    For UAW and SEIU:        Mr. Peter D. DeChiara, PHV

13    For Ambac Assurance
      Corporation:             Mr. Dennis Dunne, PHV
14
      For GMS Group:           Mr. Gary Eisenberg, PHV
15
      For COFINA Senior
16    Bondholders'
      Coalition:               Mr. Susheel Kirpalani, PHV
17                             Mr. Daniel Salinas, PHV
                               Mr. Eric Kay, PHV
18
      For Peter Hein:          Mr. Peter C. Hein, Pro Se
19
      For Mark Elliott:        Mr. Mark Elliott, Pro Se
20
      For Lawrence Dvores:     Mr. Lawrence B. Dvores, Pro Se
21
      For COFINA Agent:        Mr. Antonio Yanez, Jr. PHV
22
      For Whitebox
23    Multi-Strategy
      Partners:                Mr. Andrew K. Glenn, PHV
24
      For National Public
25    Finance Guarantee:       Ms. Marcia Goldstein
```

```
 1   APPEARANCES, Continued:

 2   For Assured Guaranty:     Mr. Mark C. Ellenberg, PHV

 3   For COFINA Agent:         Mr. Matthew A. Feldman, PHV

 4   For Bank of New York
     Mellon:                   Mr. Eric A. Schaffer, PHV
 5                             Mr.  Louis M. Solomon, PHV

 6   For Credit Unions:        Mr. Wigberto Lugo Mender, Esq.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                         I N D E X

 2   WITNESSES:                                    PAGE

 3        The Declaration of Daniel Goldberg
             submitted into evidence.              163
 4
          The Declaration of Robert Fishman
 5           submitted into evidence.              163

 6
     EXHIBITS:
 7
          Exhibits A, B, C and D at document 4767  164
 8        Exhibits 4767-2, 3, 4, 5, 6, 7, 8 and 9  164

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                San Juan, Puerto Rico

 2                                January 17, 2019

 3                                At or about 9:37 AM

 4                           *      *      *

 5            THE COURT:  Again, buenos dias.  Good morning.

 6   Welcome to counsel, parties in interest, members of the public

 7   and the press here in San Juan, those observing here and in

 8   New York and the telephonic participants.

 9            The rules prohibiting the use of electronic

10   communication devices in the courtrooms still apply, and I

11   thank you all for continuing to comply with those rules of the

12   Court and the Judicial Conference.

13            We're here for the continuation of the first stage of

14   the hearing on the Motion for Confirmation of the Proposed

15   Plan of Adjustment for COFINA.  And before we go on to the

16   statements of the objecting parties, the parties who have

17   filed formal objections with the Court, I would like to raise,

18   for the proponents of the motion, some specific questions that

19   I have based on my review of the proposed findings of fact and

20   conclusions of law, so that perhaps those can be addressed, at

21   least in the first instance, in connection with the remarks

22   here in court today.

23            Specifically, several of the paragraphs of the

24   proposed findings and conclusions and the Proposed

25   Confirmation Order contemplate that the Court will make
```

preclusive findings and rulings as to legal issues involving

the status of the new entity and instruments under

nonbankruptcy law, including the validity of the new bond

legislation and the status of the COFINA revenues under the

Puerto Rican Constitution.

In particular, these issues are raised by paragraphs

119, 124, and 170 of the findings of fact and conclusions of

law, and paragraph 1(B) of the Confirmation Order.  Those are

the principal provisions that stuck out for me.  There may be

some others.

I am assuming that the intention is that the legal

authority for requesting the determinations is Section 944(b)

of the Bankruptcy Code, which requires a determination of the

validity of new securities and provisions for payment and

securing payment.  But what I do not see in the briefs or

submissions, as I went back and re-reviewed them, is a

specific iteration of the factual basis in the record for the

findings and conclusions.  And specifically, no concise legal

presentation of reasoning and authority demonstrating the

substantive legal basis for those aspects for the proposed

findings and Order.

There have been thousands of pages of submissions and

many briefs, and it's possible that I missed it.  But we did

search the record insofar as we could last night and did not

see that.  And since, of course, many of these issues go to

 1   ones that have been raised in litigation and that we all

 2   recognize are complex and unsettled, I need more than

 3   something -- than the desire for it to be able to consider

 4   giving it.  So that is the first issue.

 5        The second issue goes to the supremacy related

 6   paragraphs of the proposed findings and the proposed Order.

 7   So that's paragraph 190 of the proposed findings and paragraph

 8   53 of the proposed Order, which state that not only the Order

 9   and the Plan, but that unspecified related documents,

10   including subsequent modifications and amendments, shall apply

11   and be enforceable, not withstanding any otherwise applicable

12   nonbankruptcy law.

13        So I need to know what the related documents are to

14   which this refers; what the legal basis is for the contention

15   that the Court has authority to find and Order that such

16   private documents can override any nonbankruptcy law; why it

17   is that authority should continue, even with respect to post

18   confirmation modifications and amendments to such documents

19   when you don't even appear to require a Court approval of

20   modifications and amendments.

21        And again, I need to know, to be pointed to the

22   aspects of the submissions in support that demonstrate that

23   there's substantive federal law that would render such

24   ancillary documents enforceable as a matter of supreme federal

25   law in the way that the proposed Order contemplates.  And

1   thank you for your attention to that.

2         So now we are ready to receive the statements of the

3   objectors, unless there's something else that counsel want to

4   raise before we go to the objector statements?

5         All right.  And I've been given a schedule of the

6   agreed allocations, and I appreciate that.

7         And so first, Mr. DeChiara for SEIU and the UAW.  And

8   I gather you've requested one minute, so it will be a brief

9   statement?

10        MR. DECHIARA:  It will be brief.

11        Good morning, Your Honor.  Peter DeChiara from the

12  law firm of Cohen Weiss & Simon, LLP, for the Service

13  Employees International Union and the United Auto Workers

14  Union.

15        The COFINA Plan of Adjustment is expressly

16  conditioned on the approval of the settlement of the

17  Commonwealth-COFINA dispute.  Yesterday, in our opposition to

18  the Oversight Board's 9019 motion, we explained why that

19  unaffordable settlement should be rejected.

20        If the Court rejects the Settlement Agreement, as it

21  should for all the reasons we've explained yesterday and we've

22  explained in our brief, the Plan must necessarily fail as

23  well.  Thank you.

24        THE COURT:  Thank you.

25        And now Mr. Emmanuelli Jimenez for PROSOL-UTIER.

1  Good morning.

2          MR. EMMANUELLI JIMENEZ:  Good morning, Your Honor.

3          MR. EISENBERG:  Your Honor, just in the calendar, if

4  the Court has a calendar --

5          THE COURT:  I'm sorry.  Will you please come to the

6  microphone?

7          MR. ROSEN:  I have one.

8          THE COURT:  So there's a revised order of speakers?

9          MR. ROSEN:  No.  No.  It's the same one.

10          MR. EISENBERG:  Your Honor, I need to address -- Gary

11  Eisenberg, Perkins Coie, on behalf of GMS Group.

12          Yesterday afternoon I had a discussion with Mr. Rosen

13  about the issue of the allotted time.  Mr. Hein was not here

14  in the courtroom when Mr. Rosen and I spoke.  After I went

15  back from the courtroom, I spoke to Mr. Hein, and he wanted to

16  address the Court on the allocation of timing.  And so I

17  wanted to make it clear to the Court that Mr. Hein had not

18  agreed on the particular timing in the allocation.

19          And I'd also sent an e-mail to Mr. Rosen and

20  Mr. Kirpalani last night indicating that Mr. Hein had not

21  agreed, and as a result, we didn't have an agreement on the

22  allocation of time.  So I think that issue has to be addressed

23  before the Court proceeds on the assumption that there

24  actually has been an agreement on the time allocation.

25          The Court can make a determination on it, but I don't

1   want it to be unaddressed here on the record that there was

2   not an agreement on the time allocation.

3          And as the Court may recall, yesterday I had

4   indicated that if there were going to be objections lodged

5   from parties who were opposing the COFINA-Commonwealth

6   settlement, from the perspective of being creditors of the

7   Commonwealth, that we had opposition to them eating into our

8   objection time because we had different perspectives.  And I

9   think the Court indicated that there should be ample time to

10  address the various positions of the parties.

11         So I think this has to be dealt with at the outset,

12  and I think Mr. Hein can probably address in particular the

13  substance of it.  So I think it's appropriate for him to be

14  heard on the time allocation.

15         THE COURT:  Well, just one moment.  We're having some

16  problems with audio in New York, so we all need to be quiet

17  for a minute until -- so Mr. Emmanuelli Jimenez, would you go

18  back to your seat?  Because I think we need to process this

19  first.

20         MR. EISENBERG:  Should I do the same, Your Honor, or

21  should I stay here?

22         THE COURT:  Why don't you stay here.  And we'll feel

23  hopeful, but perhaps you can have a side conversation with

24  Mr. Rosen.

25         MR. ROSEN:  Your Honor, I apologize.  I did not get

1   an e-mail last night.  It didn't go through to me anywhere.  I

2   did not know about this.

3          THE COURT:  All right.  Let's stop talking to each

4   other until this gets fixed.

5          Thank you.  All right.  And I see someone from the AV

6   Department in New York has just come into that courtroom.

7   Ms. Ng, in the New York courtroom, may we proceed?

8          Lisa, can you speak into a microphone?

9          MS. Ng:  Yes, Your Honor.  You can proceed.  Yes.  We

10  can hear you now.

11         THE COURT:  Thanks very much.

12         All right, then.

13         MR. ROSEN:  Your Honor, Mr. Eisenberg informs me

14  rather than the 33 minutes the parties agreed to, rather, they

15  would like an hour and five minutes for those three people.

16  Mr. Hein would like 30 minutes himself; Mr. Elliott, 15

17  minutes; and Mr. Eisenberg would like 20 minutes.

18         Your Honor, we leave it to you to make the decision

19  as to what is appropriate.

20         THE COURT:  Well, the allocation on the prior version

21  of the Agenda was 30 minutes for objectors all together.  This

22  now proposes 50 minutes for objectors all together.  And I had

23  undertaken yesterday, that permitting the other parties to

24  speak would not cut into the overall time allocation.  I did

25  not hear yesterday and did not anticipate requests for over an

1    hour to speak.

2         I will increase the total allocation for the four

3    related objectors to 45 minutes, and you can decide among

4    yourselves how to split that up.

5         MR. EISENBERG:  Thank you, Your Honor.  We appreciate

6    the Court's decision.

7         MR. ROSEN:  Thank you, Your Honor.

8         THE COURT:  Thank you.

9         All right.  Mr. Emmanuelli Jimenez.

10        MR. EMMANUELLI JIMENEZ:  Good morning.

11        THE COURT:  Good morning.

12        MR. EMMANUELLI JIMENEZ:  For the record, Rolando

13   Emmanuelli Jimenez on behalf of PROSOL-UTIER.  May it please

14   the Court.

15        THE COURT:  Yes.  Good morning.

16        MR. EMMANUELLI JIMENEZ:  First of all, we want the

17   record to show that we respectfully disagree with the Court's

18   ruling of yesterday's hearing regarding PROSOL-UTIER's

19   standing in this proceeding.  And we reserve our rights

20   regarding the admissibility of Dr. Almeida's report according

21   to Rule 103 of the Federal Rules of Evidence.  Dr. Almeida's

22   report is at ECF number 4787.

23        For this argument, we adopt by reference our

24   arguments in motioning our position to the COFINA Settlement,

25   that is in 4251.  Given the ruling regarding standing of

1   PROSOL-UTIER, our legal arguments will focus now on the

2   required burden of proof for confirmation.

3          The Oversight Board has the burden of proof to

4   establish that the Plan of Adjustment is confirmable under

5   Section 314 of PROMESA.   However, the Oversight Board

6   submitted witnesses whose testimony is without substance,

7   thus, insufficient to satisfy the burden of proof.

8          Without an expert testimony to validate the

9   conclusion of the COFINA Fiscal Plan and the COFINA Plan of

10  Adjustment, it is impossible for this Court to evaluate the

11  applicable criteria for confirmation and compliance with

12  PROMESA, particularly with Sections 201 and 314.

13         None of the declarants in support of the Plan were

14  proffered as expert witnesses.   They were presented as lay

15  witnesses.   You can see on page four of the opposition of the

16  Oversight Board to our Motion in Limine.   That is docket 4819.

17  The declarants' opinions are based on just their plain belief,

18  not applying any scientific principles that produce reliable

19  results.

20         Moreover, the qualifications stated in the

21  Declaration do not establish the relevant competencies to

22  testify regarding the reliability and feasibility of the

23  economic projections of the COFINA Plan of Adjustment.   For

24  example, none of them are economists.

25         Moreover, none of the declarants did any calculation,

1    scientific evaluation or applied economic models to

2    demonstrate the feasibility of the Plan of Adjustment, nor

3    establish the economic and financial foundation of their

4    opinions.  Therefore, their opinions are baseless and without

5    any probative value.

6         Their opinions are based on the words of out-of-court

7    communications of others that are not witnesses in these

8    proceedings.  Therefore, it is forbidden hearsay.

9         Additionally, there is no evidence about who

10   performed the projections used to conclude that the COFINA

11   Plan of Adjustment complies with PROMESA and is it feasible.

12   The assertions in the COFINA Fiscal Plan and the Plan of

13   Adjustment are anonymous and without the required oath to be

14   considered admissible as evidence.  They are just plain

15   hearsay.

16        The declarants, particularly Ms. Jaresko, appeared to

17   believe everything she was told by the legal advisors and the

18   Oversight Board without any evidence of independent

19   verification or corroboration.  For instance, many of the

20   explanations of purported compliance with Section 314(b) of

21   PROMESA are just recitations of summarized portions of

22   COFINA's Plan of Adjustment.

23        It is particularly important that Ms. Jaresko's

24   opinions of the supposed compliance of the COFINA Plan of

25   Adjustment with Section 314(b) of PROMESA are based upon

1    information provided by the fund, by the fund attorneys which

2    are not witnesses in these proceedings.

3          Ms. Jaresko's Declaration states many conclusions

4    regarding compliance with PROMESA and the applicable sections

5    of the Bankruptcy Code.  However, she is not a legal advisor,

6    nor is this type of testimony relevant and admissible to the

7    questions at hand.  This Honorable Court does not need

8    testimony about the application of the law.

9          Furthermore, none of the witnesses addressed the

10   feasibility requirements stated in Section 314(b)(6) of

11   PROMESA, much less the consistency of the COFINA Plan of

12   Adjustment with the COFINA Fiscal Plan as required by Section

13   314(b)(7) of PROMESA.

14         Therefore, the declarations are not satisfactory, nor

15   sufficient to sustain a finding that the COFINA Plan of

16   Adjustment complies with the provisions of PROMESA.  Thus, the

17   request for confirmation of the COFINA Plan of Adjustment

18   should be denied.

19         Thank you.

20         THE COURT:  Thank you.

21         And so the representative of the Natal Group of

22   objectors?

23         I'm sorry.  Before we hear the next speaker, I

24   understand that when we were having the sound issues,

25   Mr. Dvores and Mr. Hein both wanted to speak from New York on

1   the time allocation issue.  I see that Mr. Hein is at the

2   podium now in New York.

3          Mr. Hein.

4          MR. HEIN:  Yes.  Thank you, Your Honor.

5          I had requested an opportunity to respond to the

6   legal arguments that Plan proponents presented in their briefs

7   of January 9.  I did that in a filing with Your Honor.  Your

8   Honor denied my request to respond in writing but said I could

9   present argument.

10         And I would like to address the legal issues, which

11   the proponent's position on the legal issues I raised in my

12   objections was first presented on January 9th.  I have not had

13   an opportunity to respond in writing to that.  It will take me

14   30 minutes to do that.

15         Respectfully, even with the other objectors, I think

16   we're talking about a total time, for the people that have

17   filed objections, significantly less than the amount that's

18   been allocated for public participants who have not submitted

19   formal objections.

20         It's billions of dollars at stake here.  And

21   respectfully, we're, I believe, running ahead of the schedule.

22   And respectfully, I request the opportunity to argue the legal

23   points that we have not yet had an opportunity to respond to.

24         The COURT:  So what I had ruled was that your group

25   could have 45 minutes all together.  And so I'm assuming now

1    that the other members of your group do not believe that in

2    the remaining 15 minutes of that 45, they can make the

3    arguments that they need to make, summing the arguments

4    already submitted in the papers?

5          MR. EISENBERG:  That would be correct, Your Honor.  I

6    would need about 20 minutes to handle mine, and I think

7    Mr. Elliott would need about ten to handle his.

8          Should I repeat that with the microphone?

9          THE COURT:  Yes, please.

10          That's Mr. Eisenberg speaking.

11          MR. EISENBERG:  Your Honor, as I indicated, I think

12    that on behalf of GMS, I would need about 20 minutes, and I

13    think Mr. Elliott would need about ten for his arguments.

14          MR. ELLIOTT:  Yes, Your Honor.  I had requested 15

15    minutes.  I'd like to try to accommodate the Court's wishes

16    and cut mine down as much as possible, but ten to 15 minutes I

17    think is reasonable, Your Honor.

18          THE COURT:  All right.  I will provide a total of an

19    hour, so that's 30 plus -- 30 for Mr. Hein and 30 to be

20    divided between Mr. Eisenberg and Mr. Elliott.

21          MR. HEIN:  Your Honor, I think Mr. Dvores who is here

22    as well had wanted to speak as well.  He filed an objection.

23    Thank you.

24          THE COURT:  And so what is Mr. -- oh, thank you.  So

25    Mr. Dvores is coming to the podium.

1           MR. DVORES:  Your Honor, thank you for the

2  opportunity.

3           THE COURT:  Good morning.

4           MR. DVORES:  I wanted to just address one point.  You

5  mentioned that we are a group.  We actually filed these

6  objections independently of one another.

7           We do have things in common, issues in common.  My

8  particular issue, which I raised at the November 20 hearing on

9  the issue of disclosure, is still a very much alive issue,

10  because now we have information that the tax question, what is

11  going to be the tax consequence of these new bonds, the issue

12  has been submitted, I believe, to the IRS for their review and

13  their ruling, whether or not the new bonds that would be

14  exchanged for the old COFINA bonds would be, in fact, tax

15  free.

16          That information, that issue, has not yet been

17  disclosed.  That's quite an important issue.  I wasn't

18  planning to address just that issue.  I wanted to address some

19  others, but certainly we need more time than just five minutes

20  or ten minutes to take care of these issues, which as Mr. Hein

21  mentioned, involve millions of dollars, involve serious

22  constitutional questions.

23          And until now, until we've had this opportunity to

24  come here and object, we, the junior COFINA bondholders, have

25  not had an opportunity to participate in these negotiations

1    which resulted in this settlement.

2            So we are asking for something quite reasonable.  I'm

3    asking for some additional time.  I myself am willing to yield

4    to Mr. Hein, because he understands this so much better than I

5    do, but I would like at least five minutes.

6            THE COURT:  Five minutes for Mr. Dvores.  Thank you.

7            All right.  So now the schedule that I've been given

8    allocates five minutes to the group that includes Mr. Natal.

9    Who is going to speak for that group?

10           That's the Vamos, Pinto Lugo, Natal Group objection.

11   All right.  Well, let's go on to the representative of the --

12           I'm sorry.  Someone is speaking.

13           MR. NATAL ALBELO:  May I approach?

14           THE COURT:  Yes.  Good morning.

15           MR. NATAL ALBELO:  Good morning, Your Honor.  My name

16   is Manuel Natal.  I am here because I am one of the 24 people

17   of Puerto Rico that would deliver testimony.  I was not told

18   that we were allocated any sort of time in regard to the claim

19   that we presented and that -- it was removed from the Puerto

20   Rico judicial system.  Is that what you're referring to, Your

21   Honor?

22           THE COURT:  Well, I had anticipated calling you as

23   part of the public comment period, as you had been notified by

24   e-mail.  Counsel this morning gave me a schedule of objector

25   statements that included a provision for a statement by a

1    representative of your group.

2        Mr. Rosen, would you come to the microphone, along

3 with Mr. Natal, and explain the structure?

4        MR. ROSEN:  Yes, Your Honor.  We did not know who was

5 on the list for the public comment.  Because Mr. Natal had

6 filed an objection, we wanted to give him the opportunity to

7 speak as part of the objectors' statements.  So to us, it

8 doesn't matter whether it's now or during the public comment

9 phase, though, Your Honor.

10        THE COURT:  Well, Mr. Natal has filed an objector

11 statement and he had also applied to speak.  And it wasn't

12 clear in his application to speak that he was the same person.

13 Nonetheless, he was chosen as one of the randomly chosen

14 people.

15        So Mr. Natal may have five minutes now, and then

16 we'll also call you in connection with the public comment.

17        MR. NATAL ALBELO:  Perfect.  Thank you, Your Honor.

18        THE COURT:  So you can speak now for five minutes on

19 the objection filed.  And then if you have anything further to

20 say, I'll give you another five minutes when I call up the

21 public speakers.

22        MR. NATAL ALBELO:  That's great, Your Honor.  Thank

23 you.

24        My name is Manuel Natal Albelo.  I am a

25 representative at large here in Puerto Rico.  And given the

 1  way the process in which the Adjustment Plan was -- or the

 2  bill that created -- that gave way to the Adjustment Plan was

 3  passed through the legislature in Puerto Rico, we decided to

 4  file a claim in Puerto Rico's courts questioning the

 5  constitutionality of that process, as well as COFINA.

 6          In that time, last Tuesday, we received notice of

 7  removal from the Fiscal Control Board in the case that was

 8  pending in Puerto Rico's court.  And in that notice of

 9  removal, the Fiscal Control Board confirms what we have in

10  some ways or shapes argued in our claim in front of the courts

11  of Puerto Rico.

12          What we're saying is that the process in which the

13  legislative assembly in Puerto Rico passed the bill that gives

14  way to this agreement was not a process according -- and was

15  not done accordingly to our Constitution, to our laws, and to

16  the internal process established in Puerto Rico's House of

17  Representatives.

18          The Fiscal Control Board, in its notice of removal,

19  confirms that the approval of that legislation is a condition

20  precedent to what's going on right now and to the

21  consideration of the Adjustment Plan that you have in front of

22  you.

23          What we're arguing in that claim is that this process

24  cannot move forward until that controversy is taken care of,

25  until we are able to present to the courts of Puerto Rico our

 1    arguments on how that legislation was passed in Puerto Rico's

 2    House of Representatives, and how it violated the

 3    Constitution, the laws, and particularly the internal process

 4    of Puerto Rico's House of Representatives.

 5           THE COURT:  Mr. Natal, I am informed that a lawyer

 6    actually has appeared for your group and filed the papers on

 7    behalf of your group.  And so this legal argument is one that,

 8    under the rules of the court, should be presented by your

 9    lawyer.

10           Is your lawyer here?

11           MR. NATAL ALBELO:  We haven't been informed, Your

12    Honor.  This is the first time we hear that we were going to

13    be given an opportunity to speak here today in terms of the

14    claim that we filed in Puerto Rico's court and that was

15    removed last Tuesday night by the Fiscal Control Board.

16           So no, I had conversations with my lawyers as of this

17    morning, and they were not informed in any way, shape or form

18    they would have to be present here today.

19           THE COURT:  Well, it is just -- so your lawyer is

20    Roberto Maldonado Nieves?

21           MR. NATAL ALBELO:  Yes.  Yes, Your Honor.

22           THE COURT:  Well, the normal rules of procedure in

23    the court are that someone who files a paper and wishes to

24    advocate in a hearing is not only allowed, but expected to

25    come to the hearing if they want to speak.

1          Having said that, I think you're at least three

2    minutes into the five-minute statement, and I will let you

3    finish the statement on behalf of your group.

4          MR. NATAL ALBELO:  Oh, Your Honor, I'll just round up

5    and I'll continue my statement when you allow me in terms of

6    the representation of one of the 24 public testimonies.

7          But in essence, what we're trying to say is that this

8    Court has to allow for the issue of how this bill was passed

9    in Puerto Rico's House of Representatives to be taken care of

10   before you decide on if you will move forward with this

11   Adjustment Plan, because if not, the legality of this Plan

12   would be in question.

13         And I would respectfully argue that, in a sense, if

14   you're looking for certainty moving forward, moving forward

15   with this legality question would not be in the best interest

16   not only of the people of Puerto Rico, but also in the best

17   interest of the other parties represented here.

18         Thank you, Your Honor.

19         THE COURT:  Thank you.

20         Mr. Eisenberg, come up.

21         There is another speaker scheduled before you, sir.

22   Are you coming up to speak or are you coming up because you

23   have a problem?

24         MR. EISENBERG:  I'm sorry.  No.  I apologize, Your

25   Honor.

1          THE COURT:  I thought you had a problem.  Okay.

2     Fine.

3          So the representative of the cooperativas objectors.

4     Good morning, sir.

5          MR. LUGO MENDER:  Good morning, Your Honor, court

6     staff and all people present.  My name is Wigberto Lugo

7     Mender.

8          I appear here today before this Honorable Court in

9     the name of Cooperativa de Ahorro y Credito de Rincoln,

10    Cooperativa de Ahorro y Credito Zeno Gandia, Cooperativa de

11    Ahorro y Credito del Valenciano, and Cooperativa de Ahorro y

12    Credito de Juana Diaz.

13         These four entities are part of 115 community-based

14    nonprofit credit unions which serve over a million members and

15    depositories island wide.

16         As a result of an improper misuse of the government's

17    regulatory powers, resources of these credit unions were taken

18    by the Commonwealth and its instrumentalities, including

19    COFINA.  In order to protect the interests of their members

20    and depositors, various credit unions filed an adversary

21    proceeding.

22         The record of this Honorable Court will show that on

23    May 22, the year 2018, several credit unions, including the

24    four appearing herein today, filed an adversary Complaint

25    which was docketed as Case Number 18-28.  The parties named in

1   this Complaint are the Commonwealth of Puerto Rico,

2   Cooperativa Publica Para la Seguridad y Seguro de Cooperativas

3   de Puerto Rico, COSSEC, which is the regulatory branch within

4   the system, the Government Development Bank, and other

5   parties.

6           Among others, and within the causes of actions,

7   claimants in this Complaint are, first, an exception to

8   discharge pursuant to the provisions of Section 11 U.S.C. 105,

9   declaratory judgment, and exception to discharge pursuant to

10  PROMESA provisions, provision of contract and warranties,

11  promissories to uphold, violations of security statutes,

12  violations of fault, negligence, violations of officious

13  manager statutes, fraud, misrepresentation and omission

14  statutes.

15          Our objection in this case, Your Honor, seeks to

16  preserve our right to the judicial adjudication of the state

17  case, meaning the adversary proceeding --

18          THE COURT:  Yes.

19          MR. LUGO MENDER:  Furthermore, the protection of the

20  credit unions and of their members and depositories is aligned

21  with the policy of a Plan of Adjustment of a municipality,

22  which is the higher aim of ensuring the governmental function

23  of protecting and serving the municipality's citizens.

24  Failure to protect the credit unions and their members and

25  depositories, including those claims asserted under adversary

1   proceeding 18-28, defeats that purpose by affecting that same

2   constituency.

3       Based on that published by COSSEC, as of September

4   18, plaintiff of adversary 18-28 had 152,000 members and

5   approximately 25,000 nonmember depositors.  The parties whom I

6   represent deem necessary that the Court limits those

7   provisions contained in the Plan of Adjustment, which appear

8   to release and discharge not only the claims, but also the

9   parties -- but also other parties which are under the

10  jurisdiction of this Honorable Court in active and still

11  pending litigation docketed under adversary 18-28.

12      This is detailed in the Motion for Objection, which

13  was filed under dockets 415 and 476.  Absent a limitation on

14  the releases, exculpations, and discharge provisions, the

15  right to the judicial adjudication of unrenounced and

16  nonreleased claims and rights asserted in the adversary

17  proceeding may be severely effected unknowingly, in foundation

18  and in violation of the credit unions' principal rights.

19      As was done in Section 30-12 of the Plan, which

20  incorporated language preserving the rights of plaintiffs and

21  defendants under adversary proceeding number 18 -- under other

22  adversary -- inserting that type of language will avoid the

23  failure of injustice at probably no significant cost to

24  COFINA's organization process.

25      On the contrary, confirming the Plan of Adjustment

1    with an intended release of the Commonwealth of Puerto Rico,

2    the validity of which is dubious, will cause the most

3    unwarranted set of circumstances that will result in a

4    significant financial and economic harm to the Commonwealth of

5    Puerto Rico -- to the public of Puerto Rico.

6           We have suggested a language, Your Honor, which we

7    believe may be inserted either in the Plan or in the Order of

8    Confirmation, which simply reads as follows:  Not withstanding

9    anything contained in the Plan to the contrary, the rights,

10   claims and defenses of all parties to adversary proceeding

11   number 18-28 shall be unaffected until duly adjudicated by the

12   Court.

13          This language provides clarity as to the preservation

14   of the rights to all parties to be active in pending

15   litigation.

16          That would be our proffer, Your Honor.

17          THE COURT:  Thank you.

18          Now, Mr. Eisenberg, are you the first speaker?

19          MR. EISENBERG:  I am, Your Honor.

20          THE COURT:  Please come to the podium.  So I'm

21   allocating you 20 minutes.

22          MR. EISENBERG:  Thank you, Your Honor.

23          Good morning, Your Honor.  Gary Eisenberg, Perkins

24   Coie on behalf of the GMS Group.  And I want to start out by

25   saying that I will do my best to heed the Court's admonition

1     that I speak slowly, difficult as it may be for me.

2             THE COURT:  We all appreciate that, especially the

3     court reporter.

4             MR. EISENBERG:  Your Honor, I will try to be brief

5     because I think the points can be summarized fairly

6     succinctly.  We've put out an extensive record.  The Court has

7     admitted into evidence our substantial filings with exhibits

8     that make it clear that the following are essentially not

9     disputed.

10            Number one, in 2006, Puerto Rico was not in a

11    position to borrow from the credit markets.  To induce people

12    who do not live on the mainland to lend money to Puerto Rico,

13    a Commonwealth in which they do not have voting rights, so

14    they can't vote to change the government if they don't like

15    the way the government is handling their money, they asked for

16    security, a lien.  Banking 101, as the Third Circuit calls it.

17            They received a transfer to COFINA of the sales and

18    use tax revenues, a portion of it, and the bondholders

19    received a lien on those revenues, which ultimately are cash.

20    That is not in dispute.  It was reaffirmed multiple times by

21    the Government of Puerto Rico, and it was on that basis that

22    the bondholders were induced to lend their money to COFINA, a

23    separate entity, because they could not trust the Commonwealth

24    not to backtrack from its promises to pay.

25            The revenues from the sales and use tax have been

1    sufficient every single year to fund, well in advance of the

2    end of the fiscal year, the portion of the monies payable to

3    COFINA so that the bonds could be paid.

4         No payment default occurred until these PROMESA

5    proceedings were filed.  And the testimony before the Court

6    and the record established before the Court is essentially

7    undisputed, that the monies have always been sufficient and

8    are being projected to be sufficient in future years, assuming

9    the validity of the belief.

10        And so, therefore, if you are trying to upset this,

11   you have to come up with some way to vitiate the lien.  The

12   only attempts have been through purported challenges to the

13   validity of the lien structure, and those really are all based

14   on essentially running afoul of the Constitution.  Because in

15   addition to the protection of the lien, the creditors who lent

16   money through purchasing the senior and subordinated bonds

17   received two additional protections.

18        Number one, they lent the money to an entity that was

19   not eligible to file for Chapter Nine at the time they filed.

20   So they had assurance that their loans were not subject to

21   involuntary restructuring through the Bankruptcy Code process.

22   The proponents of the Plan claimed that that was simply a mere

23   legislative oversight, but it was a 32-year period between

24   eligibility for the Commonwealth in 1984 that they contend,

25   and then the enactment of PROMESA 32 years later.

1           I'm sorry, but legislative oversights are an invalid

2    way to adjudicate substantial claims, especially when

3    bondholders are induced to make loans to a

4    Commonwealth-created entity precisely because of the absence

5    of the ability to file for Chapter Nine.

6           And then the second thing upon which they relied is

7    the provision of the Constitution that prohibits the taking of

8    private property without the payment of just compensation.

9    The Supreme Court has made it clear for a long time that a

10   lien is a property interest, and if it is taken, that is a

11   violation of the Takings Clause and it must be compensated.

12          Here we're dealing with a lien on cash.  We're not

13   dealing with a situation where there is an asset like a

14   building which could fluctuate in value, where senior

15   bondholders might have first priority on the building and

16   juniors a junior priority, and the building could decline in

17   value and not have enough value to pay the juniors off.

18          We're talking about cash, which indisputably is

19   sufficient to pay all of the bondholders in full, which I will

20   get to in a moment.  It also means that the subordination

21   provisions really don't ever ultimately matter, because when

22   there is collateral sufficiency for both the senior and the

23   junior classes, they both get paid in full and subordination

24   is an irrelevant concept.

25          But the notion that they were protected from having

1   their lien rights taken and that they had a security interest

2   in cash, that means that taking that lien away is a taking.

3   And you can't simply say, well, if you have a lien that would

4   have paid a hundred cents on the dollar, I can leave you 56

5   cents on the dollar and I don't have to count the 44 cents on

6   the dollar that I've taken.

7        Every single one of those 44 cents on the dollar

8   independently, in and of itself, is a stick in the bundle of

9   property rights that form the lien on each of those dollars.

10   And taking that money away from the juniors is a taking, and

11   that is the way the case law comes out under *Armstrong* and its

12   progeny.  This is not a *Penn Central* takings case.

13        That is the situation that is the reality of the

14   bondholders until the PROMESA cases are instituted.  And there

15   is basically an unending assault on the structure of the

16   COFINA bonds, purely trying to rely on the assertions by the

17   Commonwealth that it itself is somehow able to backtrack on

18   its own repeated assurances that the lien is a good lien.

19        There are two possible outcomes in an actual

20   litigation.  The lien is a good lien or the lien isn't a good

21   lien.  And what happens to be the case, Your Honor, is that if

22   you look at those outcomes, there is not a situation that has

23   had evidence presented before this Court and this hearing that

24   ever is a situation where the seniors can wind up doing better

25   than the juniors, or that the juniors don't get paid in full

1    if they both prevail.

2         If the lien is a good lien, Your Honor, then the

3    seniors get paid and the juniors get paid.  The revenues are

4    sufficient.  That's essentially not disputed by Mr. Rodrigue's

5    testimony, and it's not disputed by the statements of the

6    Treasury reports that are in evidence before the Court.

7         So there's complete payment if the lien is a good

8    lien, and there's no default and no subordination is invoked.

9    If the seniors invoke subordination based on an event of

10   default -- well, the only default that is purported to be

11   alleged is the attack on the structure itself.  By the seniors

12   purporting to support a proposed attack on the structure

13   itself, they can't benefit from challenging the very structure

14   that was put in place for both the seniors and the juniors.

15        But even if that were to be the case, Your Honor, if

16   that subordination were to take effect, Mr. Rodrigue

17   acknowledged on the examination that was taking place

18   yesterday, that ultimately, you would just simply shift the

19   order in which the payments occurred to both the seniors and

20   juniors and they would all be paid in full.  Again, the

21   seniors and the juniors, with the same results, each getting

22   paid in full.

23        The only other possibility is that the litigation

24   results in a loss.  If the lien is invalidated, then the

25   situation is the seniors don't have a lien and the juniors

1    don't have a lien.

2            There was some discussion about the possibility that

3    there may be claims that could be asserted by both the seniors

4    and the juniors against the Commonwealth for committing a

5    taking, for impairing the structure, for tortious interference

6    with contract, but those would all be direct claims of

7    individual bondholders against the Commonwealth, to which no

8    subordination provision would apply.

9            And however much would be the payment ultimately to

10   those unsecured claims of both the seniors and the juniors,

11   they would be the same percentages.  There is no circumstance

12   where the seniors can do better than the juniors given that we

13   have cash as the collateral, cash in sufficiency to pay in

14   full, and cash over a stream of time that will result in

15   payment in full.

16           The result of all of that, Your Honor, is that any

17   proposed settlement that allocates a greater percentage to the

18   seniors than to the juniors is unfair, improper, and we submit

19   clearly have been negotiated in bad faith, as evidenced by the

20   fact that the juniors were essentially cut out of the process.

21           The Court heard the testimony from Mr. Elliott to

22   that effect.  The Court has heard the argument of Mr. Hein and

23   has his Declaration to that effect.

24           And yesterday when Mr. Rodrigue was on the stand, he

25   identified four or five different holders of bonds who were

1    supposedly involved in the negotiations, all of whom he

2    acknowledged either also had senior bonds or were insurers of

3    Commonwealth General Obligation bonds in a much greater

4    volume, which gave them an incentive and a lack of -- interest

5    in this because they would have an incentive to see the

6    Commonwealth prevails, to minimize the insurance payments on

7    account of their own senior positions on the Commonwealth bond

8    that they've insured.

9         So you don't have any circumstance that is the result

10   of any outcome where the seniors really can assert and have an

11   evidentiary basis that they would do better than the juniors.

12   There may be trading differences, Your Honor, but those are

13   not sales in the market.  Those are not payors entitled to

14   make payments on the claim.

15        And so, therefore, that is the basis of having us

16   establish that 1129(a)(3) is not met, because this Plan and

17   this settlement together have plainly not been negotiated in

18   good faith, because they've deprived the junior creditors of

19   representation and they've resulted in a wildly deviant

20   imbalance in a circumstance where there should never be an

21   imbalance because all the outcomes are the same for both the

22   seniors and the juniors.

23        I think I've made a point of the fact that there is a

24   taking, and under the Fourth Amendment and Fifth Amendment,

25   with Mr. Hein's papers that we joined in, Puerto Rico does not

1  have a right to conduct a taking any more than a state or

2  municipality.

3        And so those are the two points that we think compel

4  denial of the Confirmation of the Plan and confirmation of

5  settlement.  I also note, were this to be litigated to the

6  fullest, because there's no difference in outcome -- seniors

7  or juniors approving a settlement effectively puts a large

8  difference between the two.  Effectively puts a difference,

9  absent a proceeding has to be put into effect.

10        And finally, the Plan provision that purports to give

11  releases to anybody that had any of these bond issues is

12  nothing more than an attempt to whitewash responsibility that

13  may be due and owing under the law for other parties who bear

14  responsibility for having had this fiasco come about the way

15  it is, and the Bankruptcy Code, PROMESA, and the various

16  statutes binding on this Court do not authorize the release of

17  third party claims of parties who are not debtors in

18  proceedings before this Court.

19        I know that the proponents are going to argue that

20  Section 254(e) of the Bankruptcy Code is not incorporated into

21  PROMESA, but still, there's no authority to wipe out a claim

22  that one of my clients may have against a third party, not a

23  debtor here, when that party, who is essentially seeking

24  release from that claim, has not been a debtor proceeding

25  before this Court.

1              I realize I asked for 20 minutes.  I hope I have not

2    spoken too fast, but I think I've made the points I need to

3    make, Your Honor.  So in the interest of going forward, I

4    thank the Court for its time and allowing me to be heard.

5              THE COURT:  Thank you, Mr. Eisenberg.

6              Mr. Elliot, do you want to speak next?  Good morning.

7              MR. ELLIOTT:  Good morning.

8              It is with great humility that I'm here in front of

9    the Court, Your Honor.  I've changed some of what I wanted to

10   say in the interest of time.  Mr. Eisenberg, I have to say, he

11   did a good job representing a lot of the points I wanted to

12   make.

13             I just wanted to make a couple of other points, too,

14   Your Honor.  One, thank you, and it's a great testament to the

15   legal system that somebody like myself can come up, be heard

16   in front of Your Honor, the Court, in front of the Oversight

17   Committee, that I can object to some of the most powerful

18   financial firms and law firms in the country.

19             THE COURT:  I think you're right --

20             MR. ELLIOTT:  I did this because of what Gary said --

21   sorry.  I saw there was a tremendous amount of discord between

22   the junior holders, which I believe have an equal lien and

23   right of claims.

24             And if you recall, Your Honor, in my letter to you

25   back in November -- it's quite ironic that I'm here arguing on

1   the rejection of a more rapid claim.  I believe that I was the

2   first one to write a letter saying -- you know, I made the

3   argument that we have a constitutional right against having

4   our claims taken.

5           I believe I also made the claim that I created my

6   firm to provide a service to common people, to people that

7   don't have billions of dollars, like the people that are

8   representing the seniors.  I charge a very small amount for

9   what I do, and I work very hard to find good value for my

10  clients that support their retirement.

11          And in order for me to be able to do this, I need to

12  be able to -- in my letter to you, I stated the reason why the

13  United States is so successful financially and in corporate

14  ways, is that we have the strong -- we have the power of law

15  and we uphold property rights.  That's the reason why people

16  from all over the world come to the United States and invest

17  money in our country.

18          That's why I, as a small investor, have access to

19  public information, and can say, the government, Puerto Rico's

20  promise to pay me and my clients that worked very hard for it

21  -- I don't need a litany of lawyers that I'm spending 200

22  million dollars on to make my case.

23          Now, one other point my friend here didn't bring up

24  is that, I hope all the kids back home show us, education is

25  important.  But they acted in good faith.  My expert

1    testimony, my expert opinion that I provided to the Court was

2    not only are the juniors (sic) asking for every penny of their

3    money back, they are actually, in many instances, getting well

4    above the amount of money that they asked for.

5         THE COURT:  Did you mean to refer to the seniors just

6    then?  I'm just making sure.

7         MR. ELLIOTT:  Yes.

8         I had just stated to the Court the nominal amount of

9    recovery can be very different than other recoveries.  The

10   fact seniors have been able to get 93 cents on the dollar,

11   that they get tax-free coupons, whereas before a lot of their

12   issues were tax free, it's a huge issue.

13        They get a coupon.  They get it non-callable for a

14   number years.  That actually provides them with recovery above

15   a dollar.  Above a dollar.  And that comes from the junior.

16        And it's important to note, the people of Puerto Rico

17   have made a lot of sacrifices.  They are one of the largest

18   holders of COFINA juniors.  And their interest is in COFINA

19   juniors.  So we are in alignment with the people of Puerto

20   Rico.

21        And thank you, Your Honor, for the opportunity to be

22   here.  I am blessed to have met the folks at the Oversight

23   Committee.  I think it's worked very hard to get to a good

24   resolution, just, respectfully, haven't had somebody

25   advocating, with the complex math that they're going through

```
 1  -- and their expert said everything they said.  There's no

 2  difference between the two.

 3        Finally, Your Honor, one last point.  I was reviewing

 4  the letters and, you know, things that individuals -- you

 5  spend a lot of time making sure everything is being heard, and

 6  I think maybe my testimony is part of what you can see,

 7  inherent conflict, but -- in the countless letters of the

 8  disenfranchised, and I needed to be a second person, for a

 9  second interest.

10        Finally, I want to make a quote.  Hopelessly

11  conflicted.  Hopelessly conflicted.  That's what Whitebox

12  stated in their suit against Bank of New York, who is the

13  fiduciary responsible for holding both the seniors' and

14  juniors' money.

15        The juniors themselves claimed it is impossible for

16  one person to represent both parties.  So the largest

17  percentage of par value is the junior interest.  We haven't

18  been represented.  We are small, mom and pop investors.  And

19  we're here now to ask you to reject this motion, as it is

20  unfair, it is unconstitutional, it is completely against

21  PROMESA, which as you know requires that whatever agreement

22  comes to be would provide us with as much as we get for

23  litigation.  And it's absolutely impossible to tell the

24  seniors would get more than the juniors if this were

25  litigated.
```

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Elliott.

3          And now I will turn to Mr. Hein in New York.

4          MR. HEIN:  Yes.  Thank you very much, Your Honor.

5          I intend to focus my remarks on the legal and

6   constitutional reasons the Plan cannot be confirmed, and in

7   particular, respond to the conclusions of law and the

8   arguments in the paper that Plan proponents filed on or after

9   January 9, to which we have not yet been able to respond.

10         An overarching point, Your Honor, is the proposed new

11  bonds are to be secured by what in substance is the same

12  statutory lien as the current COFINA bonds.  The Oversight

13  Board describes the new bonds as secured by a statutory lien

14  in the COFINA Fiscal Plan.  That is exactly how the Oversight

15  Board, in a 2017 brief to the First Circuit, described the

16  current COFINA bonds.

17         The Oversight Board told the First Circuit that the

18  current bonds are, quote, secured by a statutory lien,

19  unquote.  That's my declaration, Exhibit K, record 4606-7, at

20  pages 78 to 59.

21         The new bond legislation describes the pledged taxes

22  as present and future revenues and collections generated by

23  the applicable share of the sales tax.  The official statement

24  for the current bonds uses essentially the same language to

25  describe the security for the current bonds under Act 91.

1    Namely, all present and future collections of the pledged

2    sales tax are transferred to and made the property of COFINA.

3         And both the new bond legislation and Act 91, the

4    current legislation, are express that COFINA revenues do not

5    constitute available resources or revenues of the

6    Commonwealth.

7         The Plan proponents do not want Your Honor to rule on

8    the legality of the current COFINA lien and bonds, but as Your

9    Honor noted at the outset this morning, they do want Your

10   Honor to issue some very, very specific legal rules and

11   factual findings on the materially same, new COFINA lien and

12   bonds.

13        The extensive proposed findings and conclusions of

14   law and Proposed Order, I think it's over 120 pages of

15   materials, that has just been submitted by Plan proponents the

16   last couple of days, ask Your Honor to, quote, specifically

17   determine, closed quote, that the new lien against the pledged

18   taxes is valid.

19        They ask Your Honor to specifically determine that

20   the COFINA revenue shall not constitute available resources or

21   available revenues of the Commonwealth, and ask Your Honor to

22   judicially determine that all new COFINA bonds be stamped with

23   the legend, to be confirmed by the Order of the Court.

24        But since the new liens and new bonds are

25   substantially the same as -- judicially the same as new liens

1    and new bonds, if the new liens are binding, then so must be

2    the new bonds.  Simply put, Your Honor, unless Your Honor

3    would issue an Order upholding the validity of the current

4    lien and current bonds, Your Honor cannot issue the judicial

5    determinations you have been asked to issue in this Proposed

6    Order.

7           But if Your Honor can issue the determinations

8    they're seeking, then the current liens and current bonds are

9    also legal and valid and enforceable.  And there is absolutely

10   no legal justification to give away half of the collateral,

11   almost half of the collateral as the Plan would do.

12          Your Honor, Plan proponents have created a legal

13   catch 22 for Your Honor.  If Your Honor does not first decide

14   the legality of the current COFINA liens and bonds, as we

15   respectfully request, Your Honor, we would submit, cannot

16   literally authorize the stamping of your judicial imprimatur

17   on the new bonds as the Plan proponents have requested.

18          And, Your Honor, I do not believe this is simply a

19   question of Plan proponents giving you more specifications for

20   their factual basis and legal authority.  This inherent catch

21   22 they've based you with, is a problem, means Your Honor

22   cannot, I respectfully submit, approve the Plan.

23          Let me turn now to the constitutional doctrines that

24   preclude the discrimination that the Plan provides.  My

25   objection and supplement detailed the constitutional doctrines

1    that preclude approval of a plan that discriminates based on

2    place of residence against United States citizens in the 50

3    states and in favor of residents of Puerto Rico.

4         The discrimination is evident on the face of the

5    Plan.  Puerto Rican residents, simply because they're Puerto

6    Rican residents, get the right to elect a larger distribution.

7    And if you look at the disclosure statement, compare tables

8    2-A and 2-B, that's at docket 4364, at 21 to 23, you'll see

9    that Puerto Rico residents can elect a two percent cash

10   payment not available to anyone in the 50 states.

11        Puerto Rico residents can elect one tranche of

12   interest bearing bonds mature in 22 years, 20, 40, as compared

13   to the 11 splintered fragments going out 40 years to 2058 that

14   citizens in the 50 states get.  Plan proponents argue, well,

15   this discrimination is justified, but I submit that

16   discrimination against United States citizens because they do

17   not reside in Puerto Rico violates the Constitution

18   irrespective of any asserted justification.

19        48 USC 737 is express that the same rights that

20   United States citizens have in the 50 states also apply in

21   Puerto Rico.  And there's no justification exception in the

22   statute for discrimination.  Moreover, it's not justified to

23   discriminate here.

24        Many of the COFINA bonds were originally sold to

25   residents of the 50 states as federally tax exempt, but other

1  bonds were sold to Puerto Rico residents as federally taxable.

2  Originally sold as federally taxable, because the residents of

3  Puerto Rico are not taxed federally, just in Puerto Rico.

4         Other bonds were sold to Puerto Rican government

5  entities and were not sold on the basis of being tax exempt.

6  A Puerto Rican resident or entity who bought bonds without a

7  federal tax exemption has no right to exempt -- a federally

8  tax exempt bond.  They get exemptions of Puerto Rico Income

9  Tax just at the time they bought the original bonds.

10        That's what they should get.  But here they're

11 getting an additional benefit.  The added benefit going to

12 residents of Puerto Rico alone includes cash, cash that could

13 otherwise be distributed prorata among bondholders.  And they

14 also, as I mentioned, get significantly better bond coup --

15 the coupon paying bond, in one tranche maturing in 20, 40, not

16 11 splintered fragments.

17        In a major institution -- you could have the biggest

18 institution based in Puerto Rico.  They could have bought at

19 eight to ten cents on the dollar, as some did, according to

20 the records I submitted as Exhibits B and C to my Declaration.

21 They will now get the benefit of the separate cash and the

22 better bonds on top of their huge profit, because they bought

23 at eight to ten cents on the dollar.

24        Contrast a retired bondholder in the 50 states who

25 invested, as I did, at par, at the original offering price, to

1   have a stream of retirement income.  We don't get those

2   special benefits.

3            The professed concern that the Plan proponents -- I'm

4   sorry.  The Plan proponents have said there's a limited number

5   of bonds, but that underscores another problem here.  Plan

6   proponents want to proceed without knowing what the IRS

7   position is.

8            The IRS has something to say.  They wanted to say it.

9   Because of the government shutdown, we have not heard what

10  their position is.  Respectfully, I believe Your Honor must

11  withhold the ruling until we know the IRS position.

12           According to the record, the taxpayers' exemption may

13  be imputed going out to 2058 if any of those are taxable.

14  Under 11 U.S.C. 1125(a), bondholders are entitled to a clear

15  disclosure of tax consequences.  They were required to vote

16  when there's been no disclosure of the IRS position.

17           Let me now turn to the Contracts Clause.  There can

18  be no dispute that the new bond legislation is a law.  And by

19  its terms, that law, to quote the legislature of Puerto Rico's

20  statement, no difficulties, quote, will serve to release the

21  lien that holders of COFINA bonds currently have and thus,

22  impair the obligation of the contract.

23           Plan proponents argue, well, the law does not take

24  effect unless and until the Court confirms a plan.  Plan

25  proponents argue that sidesteps the constitutional problem,

1   but respectfully, it does not.

2          First, this Court must follow the U.S. Constitution.

3   This Court cannot sanction an abrasive plan, premised on

4   Puerto Rico legislature, that is a violation of the Contracts

5   Clause.

6          Second, under Section 2174(b)(3) of PROMESA, a

7   requirement of plan confirmation is that the debtor is not

8   prohibited by law from taking any action necessary to carry

9   out the plan.  The U.S. Constitution Contracts Clause is such

10  a legal prohibition.  So under PROMESA, the Court cannot

11  confirm the Plan.

12         Third, there is no Congressional authorization

13  exception to the Contracts Clause.  Even if Congress and

14  PROMESA did purport to authorize Puerto Rico to impair

15  existing contracts, that Congressional legislation would not

16  be effective.

17         The Supreme Court in the *Saenz* case -- it's 526 U.S.

18  489, at 508.  I cite it in my Supplement -- specifically ruled

19  that Congress' legislative powers may not be exercised in a

20  way that violates other specific provisions of the

21  Constitution.

22         Fourth, there is no judicial approval exception to

23  the Commerce Clause.  If there is a law that impairs the

24  violation of contracts, a Court blessing or adopting that

25  legislative impairment does not obviate the constitutional

1  violation.

2  Congress and/or PROMESA did not in any effect

3  authorize retroactive impairment by the Puerto Rico

4  legislature, and the Plan proponents here ignore the sections

5  of PROMESA cited in my objection at Docket 4545, at page 18,

6  Section 4121(d), read together with 2174(b)(7), 2194(k),

7  2194(m)(5)(B), which echoes 2174(b)(6) and 2195(a).

8  I submit, Plan proponents argue it is not Puerto

9  Rico's legislation clause that impairs the contract.  They

10  say, well, there's a settlement that impairs the contract.

11  But there's no settlement exception to the Contracts Clause,

12  much less parties who are not parties to the settlement and

13  whose contracts will be impaired.

14  Eight, Plan proponents say the *United States Trust*

15  opinion recognizes that a state, or here, Puerto Rico, could

16  impair contracts, quote, if it is reasonable and necessary to

17  serve an important government purpose.  But the pledged sales

18  tax revenue for the current COFINA bonds is roughly two times

19  annual debt service.  COFINA can pay all bonds as long as the

20  lien is not abrogated.

21  The only evidence in this record is that if the lien

22  is not abrogated, there will be sufficient revenues.  The

23  Senior COFINA's witness, Mr. Rodrigue, admitted that

24  yesterday.

25  Also, the pledged sales tax revenues do not belong to

1   the Commonwealth.  Mr. Rosen yesterday admitted that the

2   pledged sales tax revenues do not currently belong to the

3   Commonwealth.  That may be disputed by others, but there has

4   been no judicial Order ruling that the pledged sales tax

5   revenues belong to the Commonwealth.  No Court has so Ordered.

6          In any event, the notion that the Commonwealth needs

7   more money and thus it is reasonable and necessary to take

8   pledged sales tax revenue that does not belong to the

9   Commonwealth and that no Court, no Court has ever held belongs

10  to the Commonwealth, this also leads to hold -- an

11  unreasonable and unnecessary standard, even looking at it from

12  the view of the Commonwealth desiring more money.

13         I looked at specific facts based on statements,

14  documents and website materials from the Puerto Rican

15  Government and Puerto Rican officials.  There has been no

16  official response to any of these facts by Plan proponents.

17         Puerto Rico represents to bondholders -- and I

18  mentioned this yesterday.  This is Exhibit S -- that on a

19  proper analysis, Puerto Rico stands last in outstanding debt

20  per capita in all U.S. jurisdictions, because Puerto Rican

21  residents don't pay Federal Income Tax as a general matter,

22  and thus, do not pay income tax toward the federal debt.

23         As Puerto Rico's own current auditors concluded that

24  Puerto Rico's tax burden is less than one-third of the average

25  OECD country, Puerto Rico's own comptroller, their own

1    comptroller shows on his website -- and you can look it up,

2    it's up there today -- that Puerto Rico has taken on literally

3    thousands of contracts for advertising, public relations and

4    consulting since July 1, 2018, alone.  Thousands of contracts

5    for PR, advertising and consulting.

6         Puerto Rico does not dispute it continues to pay

7    Christmas bonuses, at least 400 million in Christmas bonuses

8    since the Governor declared in 2015 that the Commonwealth

9    would not pay its debt.

10        At the current rate, Puerto Rico is going to end up

11   spending over two billion dollars, over two billion dollars

12   just in its effort to avoid its debt.  Puerto Rico, and again

13   this is not disputed, just two months ago, lowered taxes,

14   lowered taxes for people in Puerto Rico by about two billion

15   dollars.

16        Puerto Rico, according to the financial records that

17   they publish on the internet, has over 12 billion dollars in

18   cash currently.  12 billion dollars in cash.  And there's no

19   dispute that over 1.8 billion in pledged sales tax revenues

20   sits in bank accounts, and that this money could be disbursed

21   to COFINA bondholders but for the distribution being held up

22   by this proceeding.  But for this proceeding, the money would

23   have been disbursed, bondholders would be fully paid.

24        I believe that the United States Supreme Court, in

25   *United States Trust*, viewed the burden of showing "reasonable

1   and necessary", as falling upon the state, or here the

2   Commonwealth, that is trying to avoid or impair its own

3   obligations.  And I address that in my objection, page 20,

4   note ten.

5         But regardless of where the burden lies, if Puerto

6   Rico can just brush off secure bondholders and justify the

7   impairment of debt obligations on this record, respectfully,

8   Illinois, New Jersey and Connecticut are not going to be far

9   behind.

10        Other factors that don't militate against deference

11   to Puerto Rico here include the fact that here the

12   Commonwealth's self interest is at stake.  To quote the United

13   States Supreme Court in the *United States Trust* case at page

14   26, the fact the Plan discriminates in favor of some parties,

15   the ones who helped negotiate it, and including some Puerto

16   Rican interests, the fact the impairment is not just contrary

17   but is substantial permanent, the fact that the impairment

18   operates retroactively.  Puerto Rico took our money.  Now it

19   just wants to keep it.

20        The fact is Puerto Rico is violating its statutory

21   non-impairment covenant.  Puerto Rico agreed by Statute not to

22   impair the rights of bondholders, but now has defied that

23   solemn pledge.  All these factors militate against deference

24   to Puerto Rico's view here.  Indeed, the force of the

25   constitutional prohibition implied in *United States Trust*

1    should have even greater application in this case.

2         Chief Judge Burger, concurring, would have imposed on

3    a state seeking to incorporate its own contracts, bondholders,

4    an even more stringent standard.  The Chief Justice said, the

5    state must demonstrate it is essential to an important state

6    purpose.  The Chief Justice further said, it must state that

7    it did not know and could not have known the impact of the

8    contract on the state at the time the contract was made.

9         And that I would argue would be the standard if the

10   Supreme Court would hear this matter.  It would certainly be

11   urged to adopt and could adopt the covenant abrogated in

12   *United States Trust*.  And the Supreme Court held there was a

13   violation of the Contracts Clause there.  It did not directly

14   jeopardize payment of interest and principal of the

15   bondholders.

16        This was a fairly technical point, as the dissent

17   pointed out in that case involving whether or not the Port

18   Authority could subsidize rail passenger transportation from

19   revenues.  Here the impairment is not technical.  It tears up

20   the obligation to pay principal and interest.  This case is

21   from *United States Trust*.

22        A few points on the Takings Clause.  Plan proponents

23   do not dispute there's been a taking here.  Rather, they argue

24   that although -- a taking occurs while subordinate bondholders

25   are supposedly provided just compensation, but there has never

1    been a judicial ruling that invalidates the current structure

2    and lien.  And the Plan proponents admit there's currently a

3    statutory lien in place.

4          You have that pension from 2013 that I referred to

5    yesterday, Exhibit S, page 63 of the Hein Declaration.  You

6    have the fact that, as I mentioned, the Oversight Board itself

7    represented to the First Circuit Court of Appeals just in 2017

8    that the bonds are, quote, secured by a statutory lien against

9    pledged SUT revenue.  That remains the current status.  As of

10   today, the bonds are secured by a statutory lien.

11         The Oversight Board also admitted to the First

12   Circuit that the pledged sales tax revenue are not available

13   revenues or available resources under the Puerto Rican

14   Constitution.  That's not just me saying this.  This is the

15   Oversight Board representing to the First Circuit Court of

16   Appeals that the pledged sales tax revenues currently are not

17   available revenues or not available resources under the Puerto

18   Rico Constitution.

19         And the Puerto Rico legislature, in the new bond

20   legislation, the legislature states that the COFINA

21   bondholders, quote, currently have, close quote, a quote,

22   lien, close quote, over pledged sales tax revenues.  And the

23   new bond tax revenue purports to release a lien over 17.5

24   billion of what it calls, quote, previously pledged SUT

25   revenues.

1          A very premise, as I noted, of the new liens and new

2     bonds is that Your Honor will issue a new Order that confirms

3     the new lien, judicially determines the new bonds, materially

4     the same as the current lien, and the bonds are legally

5     binding and enforceable.

6          So how and by who has it been decided that pledged

7     sales tax revenues are supposedly only worth half of what

8     they're really worth, even though no court has invalidated the

9     structure, even though the new lien and new bonds would be

10    materially the same as the old lien and the old bonds, while

11    Plan proponents say, well, this was determined by settlement,

12    a reference to the confidential settlement process.

13         There's of course, as Your Honor knows, no public

14    record.  We have no idea what occurred in that process.  The

15    objecting bondholders in the 50 states were not participants.

16    We had no ability to be heard.  There simply was no notice

17    saying to juniors, juniors, this is confidential confirmation,

18    you can reply to this e-mail address and are invited to

19    participate.

20         As Mr. Elliott pointed out, many bondholders have put

21    in letters to the Court and otherwise indicated their

22    concerns, and none of them were invited to participate.

23         There's also, fundamentally, whatever the merits are

24    of the mediation, it's not a judicial ruling.  There's no

25    judicial opinion.  It's a voluntary, non-binding process.

1          If someone had a desire to impose the result of a

2     confidential mediation process on junior bondholders, they

3     should have notified juniors; and in short, they should have

4     ensured that juniors without conflicts were represented in

5     that process.

6          All the participants in that confidential mediation

7     process receive special benefits.  The junior bondholders do

8     not receive those special benefits who were not represented.

9     Our rights cannot be valued based on a confidential settlement

10    process in which we were not participants, and where it just

11    so happens that the people who were participants get special

12    benefits.

13         Before our property is given away, respectfully, we

14    are entitled to a judicial ruling on the validity of the

15    current COFINA structure and lien.  Plan proponents themselves

16    admit there is a binary choice here.  Either the COFINA lien

17    structure is valid or it's not.  Simply because some people

18    have challenged the COFINA structure of the lien, it does not

19    mean it's valid.

20         Proponents admit it's a binary choice, either all

21    valid or not valid.  Your Honor can judicially determine and

22    issue the rulings that you're being asked to do in that

23    Proposed Finding and Order.  That COFINA revenues shall not

24    represent available revenues of the Commonwealth.  If Your

25    Honor is willing to do that at the behest of Plan proponents,

1    respectfully, there is no basis to approve a Plan that gives

2    away almost half of the pledged revenues.

3         A few words in response to what Plan proponents also

4    argue on the Takings Clause.  First, PROMESA does not

5    authorize a retroactive taking of bondholder property.  And

6    again, I point to the section in my objection, page 15, note

7    eight.

8         Second, even if PROMESA, by its terms, authorized a

9    retroactive taking of the statutory lien, Congress by statute

10   cannot override the constitutional protections of the Takings

11   Clause.  Plan proponents argue that under some 35 year old

12   bankruptcy court opinion from Colorado, COFINA bondholders

13   supposedly have no interest in future sales tax revenues, but

14   that's a legal issue the Court here needs to decide.

15        And Your Honor is being asked to judicially declare

16   and specifically determine, as part of the approval of the new

17   bonds, new bond legislation that says pledged sales taxes

18   include present and future revenues.  The current lien is on

19   present and future collections.

20        If Your Honor believes what the Oversight Board

21   argues in its Reply, Your Honor cannot approve the new lien

22   and the new bonds.  Your Honor cannot give the judicial stamp

23   of approval they're seeking if Your Honor believes what

24   they're arguing about, that 35 year old bankruptcy case from

25   Colorado.

 1          The notion that there was just a mistake, as

 2   Mr. Eisenberg has said, it's just false by its terms.  If

 3   we're going to abrogate property rights based on supposed

 4   mistakes of Congress that last for decades, and also mistakes

 5   of Puerto Rico officials who repeatedly confirmed the validity

 6   of the structure and lien, if we're going to do it based on

 7   the idea of a mistake having been made, the Rule of Law will

 8   have lost all of its meaning.

 9          The Oversight Board argued that had Congress

10   exercised its Territories Clause power, rather than bankruptcy

11   authority, that Congress could have abrogated bankruptcy and

12   under that power -- could Congress pass a law that

13   expropriates all private homes or all private businesses in

14   San Juan without compensation on the theory that the

15   Territories Clause trumps the Takings Clause?  I don't think

16   so.

17          The Territories Clause clearly does not trump the

18   Takings Clause or the Contracts Clause or any other specific

19   Constitutional rights, as the Supreme Court in the *Saenz* case,

20   526 U.S. 489, at 508, indicates, I think, quite persuasively.

21          The Oversight Board's argument that the economic

22   impact is supposedly amenable on theory, it's a settlement

23   that has a Plan, but of course it's the Plan that has the

24   increment.  The settlement without the approval of the Plan

25   has no legal force.  Any claim that the distribution here to

1    junior bondholders is just compensation, also argues that the

2    tax revenues, if not given away, would be sufficient to pay

3    the debt.

4         Of course the Plan proponents have the burden of

5    proof here.  No evidence has been argued that the sales tax

6    coffers have not been sufficient.  The only evidence is that

7    they are.

8         So in sum, the Plan proponents have the burden to

9    show that the requirements of confirmation are met.  Even

10   apart from PROMESA, the constitutional violations are an

11   obligation here.  The United States is obliged to uphold the

12   Constitution.  That's an obstacle.  You don't even have to

13   look at PROMESA.

14        But PROMESA also requires, and Plan proponents have

15   the burden of proving that the Plan complies with law,

16   including the U.S. Constitution.  That has not been shown by

17   Plan proponents.  Section 2174(b)(3), thus, is not met.

18        Plan proponents also must prove that the settlement

19   is in the best interest of bondholders, which requires the

20   Court to consider whether, under bankruptcy law, junior

21   bondholders receive a greater recovery.  And clearly they

22   would, because if you don't advocate the lien, junior bond

23   proponents get a percent.  Therefore, 7142(b)(6) has been met.

24        One last thought.  I know Plan proponents talk about

25   a vote.  No vote can abrogate the Constitutional rights of

1    myself and others that are objecting.

2              Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Hein.

4              Mr. Dvores, you may come to the podium in New York

5    now.

6              MR. DVORES:  Thank you, Your Honor.

7              Yesterday Mr. Rosen made reference to the ballot

8    counts in saying that this so-called settlement, the Plan of

9    Adjustment, had overwhelming support.  Of course it had

10   overwhelming support from those who would benefit from the

11   Plan, the insurance companies, the seniors, all the members of

12   the negotiating committee who used the opportunity to have the

13   negotiations and the secret bargaining that went on, to enrich

14   themselves by trading in the bonds, all through this process

15   that lasted almost a year and a half.  They're approving this.

16             They're approving a settlement which would give them

17   broad releases from any claims of causes of actions which we,

18   the junior bondholders, might have against them for their

19   unfair, illegal activities, and using this negotiation process

20   for unjust enrichment for themselves and to take advantage of

21   the unrepresented junior bondholders.

22             Then you have the people from Puerto Rico who

23   accepted this.  Well, they're getting a better deal than the

24   juniors who live on the mainland, in the 50 states.  All of

25   the ones that -- the members of the juniors who live in Puerto

1   Rico, are getting approximately double the income from their

2   bonds that the juniors who live in the mainland, the United

3   States, are getting from their bonds, because we, as juniors,

4   have to accept a settlement where not only are we not getting

5   the same recovery as the seniors, which we should be entitled

6   to under all the reasons given by Mr. Hein and Mr. Eisenberg

7   for a matter of a statutory lien, and the ability of Puerto

8   Rico's sales taxes to fully pay those debts, but we're also

9   being treated in a very miserable, shabby way, because our end

10  of the half a loaf theory, which states that as juniors,

11  somehow you can accept half a loaf and you should be happy

12  with that half a loaf, is the moldy half.

13        When you look at what the juniors are getting, look

14  on the mainland, we're getting half of our recovery in zero

15  coupon bonds.  If you're a person like myself who bought the

16  bonds for income, the zero coupon bonds, which mature well

17  after I'm gone, have no value to me.  And if I try to sell

18  them in the market, I couldn't get anywhere near their fair

19  value on the accrual rate, because I'm getting a fraction of

20  odd lots or very small odd lots which have really no practical

21  market value.

22        So even the so-called 56 percent recovery for the

23  juniors, as far as the people who live on the mainland, that's

24  really a sham.  It's not true.  And it's wrong.

25        This entire process needs to be sent back to where

1    the Court makes the ruling on the law.  This settlement that

2    was imposed in place of a ruling from the Court on the law is

3    a settlement that was imposed by people who only were looking

4    out for themselves and are using the negotiation process for

5    themselves.

6            We have claims of unjust enrichments, breach of

7    fiduciary duty.  We're going to go ahead with that.  I would

8    suggest to the Court, that while we're waiting for the IRS to

9    rule on whether or not the exchange of new COFINA bonds in

10   so-called claim adjustment will be treated as tax free or

11   taxable, while we're waiting for the IRS to make a ruling on

12   that important issue, that perhaps this whole matter could be

13   sent back to the negotiation table, this time to include

14   unconflicted members who would represent the junior

15   subordinate bondholders, so that we actually do have a chance

16   to negotiate a better settlement, a fair settlement, and one

17   which would reflect the realities of law.

18           Thank you.

19           THE COURT:  Thank you, Mr. Dvores.

20           We will now take a break of ten minutes, and then

21   resume with comments from members of the public.  And so

22   everyone, after I adjourn -- don't jump up just now, so we can

23   be orderly.  Come back to your seats in ten minutes.

24           Thank you very much.  We are adjourned.  You can

25   stand and leave the room now.

```
 1              (At 11:08 AM, recess taken.)

 2              (At 11:29 AM, proceedings reconvened.)

 3         THE COURT:  Good morning.  Please be seated.

 4         We will now turn to statements by the members of the

 5  public who have joined us here today to share their views.

 6  And I will call out the names, and when I get to your name,

 7  please rise.

 8         So first, Nicole Crespo Martinez.  All right.  Not

 9  here.

10         Rafaela Esteves.  Please come forward.

11         Thank you.  Good morning, ma'am.

12         MS. ESTEVES:  Good morning.  Greetings to everyone

13  present here today, and especially to you, Judge Swain.  Thank

14  you for this opportunity.

15         My name is Rafaela Esteves.  I would like to start

16  off by stating that as a citizen of Puerto Rico, I am here

17  because the people of Puerto Rico have had enough.  This

18  hearing represents so much more than just a hearing to discuss

19  COFINA 9019.  It's the legalities and ability to repay COFINA

20  bondholders looking to ensure a return on their investment.

21         THE COURT:  I know the time period is short.  I

22  apologize for that.  But the court reporter still needs to get

23  everything down, so if you could go a little slower.

24         MS. ESTEVES:  Okay.  No problem.

25         This hearing is about the Puerto Rican people saying
```

1    we did not authorize this debt, and again, we have had enough

2    of our own government disrespecting us by creating this bill

3    and approving it within each legislative body behind the backs

4    of the people it was intended to serve.

5           In this hearing, we represent ourselves, because no

6    one is willing to represent us as our democracy intended.

7    There was no referendum held when this agreement, House Bill

8    1837, was presented by House Speaker Johnny Mendez Nunez of

9    the New Progressive Party back in November, 2018.  Local media

10   sources didn't make this information public until the

11   following day.  Why, you may ask.  The answer is simple.  This

12   party, our current administration, doesn't care what its

13   people have to say.

14          This administration has made crass decisions with our

15   pensions, our healthcare, our education, our workers' rights,

16   etc., without consulting the very people these public policies

17   are going to affect in the long run.  We are here, Your Honor,

18   because we want a voice, and we want to make you aware of the

19   public's distrust in this COFINA Agreement and its domino

20   effect.  We distrust this agreement because we do not confide

21   in this administration's intent.  We absolutely do not feel

22   that our best interest was at heart when this bill was drawn

23   up and passed.

24          Unfortunately, I believe that this agreement doesn't

25   even honor our Constitution, Article VI, Section Two, which

1    establishes ground rules for the issuing and repayment of

2    bonds, loans and the taxation of its people.  COFINA was

3    created in 2006 to bypass these directives, so the Puerto

4    Rican government could continue to issue bonds and other

5    public debt, even though we were already maxed out.

6           If our government can't uphold our Constitution, we

7    are here to make sure that we uphold our rights within our

8    democracy to ensure that this agreement becomes null and void.

9    Simply put, they can do better.

10          Regarding the SUT, we are currently the highest taxed

11   United States territory, yet we have the highest poverty and

12   unemployed rates per capita.  If this agreement is approved

13   and signed by you, Your Honor, you would be condemning us to a

14   40 year long enslavement.  We would not be able to sustain our

15   own modules.  We would not be able to provide basic services

16   that our democracy demands be provided to the people.

17          We already feel broke, unsafe and insecure about our

18   future, which obligates us to make the decision to leave this

19   land and look for a better future in the continental United

20   States.  People confuse us as immigrants, because although we

21   are citizens of this great country, our leaders treat us as

22   less than.  If this is our situation, what would become of us

23   after defaulting on this agreement within the 40 years of its

24   installment?

25          The big picture is not being considered in this case,

1   and I will not stand by while my daughter's future and her

2   ability to thrive here is taken away and deprived of her.  I

3   am originally from the Bronx, New York.  I was born to a

4   Dominican mother and a Puerto Rican father.  In my own

5   ignorance, I didn't know how my own people were being treated

6   here on the Island.  It wasn't until I moved here that I

7   realized the injustices the Puerto Rican people, my people

8   continue to face and have faced for a century now.  And I am

9   here to join hands with fellow boricuas in objection to this

10  COFINA agreement.

11          Investment returns on bonds and other public debt

12  cannot be more important nor held in higher regard than my

13  daughter's education, her safety, her healthcare, her quality

14  of life, and those of all our children.

15          In addition, the people carrying the Commonwealth on

16  their backs, working 30 years to establish their way of life

17  and that of their children, cannot even say they have a decent

18  retirement, and these senior bondholders are looking for more.

19  40 years' worth.

20          Seeing this agreement for what it is, certain people

21  want to make money off of the misery of our people.  We are

22  here, I am here to implore the Court to reconsider this

23  agreement, and to force our administration and the Fiscal

24  Control Board set up through PROMESA, and all other parties

25  involved, to go back to the drawing board, and this time,

1   uphold the integrity and best interest of the people of Puerto

2   Rico.

3         I can only hope that the evidence submitted to the

4   Court in objection to this agreement, my humble words, and

5   those of my constituents have moved you and that you

6   reconsider the approval of this settlement.

7         I thank the Court again for the time granted to me in

8   my stance on this matter.  My family's life and those of my

9   people depend on it.

10        THE COURT:  Thank you, Ms. Estevez.

11        When court is in session, please, no applause.  We

12   all have to remain quiet and respectful of each other.

13        Is Tashalye Grajales here?

14        Darlah Lopez Rodriguez?

15        Mr. Natal Albelo, this is your second opportunity.

16   Thank you.

17        MR. NATAL ALBELO:  I'll take as many as I can use.

18        Good morning again, Your Honor.  My name Manuel Natal

19   Albelo.  I'm 32 years old, and I serve my country as a member

20   of Puerto Rico's House of Representatives.

21        As the youngest elected official in Puerto Rico, with

22   some luck, I'll be one of the few current government officials

23   that could possibly be around to see the consequences of the

24   judgment plan you have been presenting.  Most of the people

25   deciding the future of my generation and generations to come,

1  respectfully, including Your Honor, will not be around to live

2  in their own skin the negative consequences of your decisions.

3         Pain and suffering, some have described as

4  inevitable.  Yesterday, in your opening remarks, you mentioned

5  that regardless of your decision, you wouldn't be able to

6  satisfy the claims of all parties without provoking some pain

7  or suffering.  Dolor (ph) is the Spanish translation for pain,

8  and I guess the question is, how do we measure something as

9  abstract and subjective as pain?

10        Before you decide on how to split this creature

11 called COFINA, I believe it's necessary for you to account for

12 the pain and suffering that my country has already endured in

13 order to satisfy the claims of those who support this Plan.

14 We do not come to this process and this Court having drawn the

15 same amount of blood, both figuratively and literally.

16        The individual and financial institutions represented

17 by these lawyers have not experienced dolor like the people of

18 Puerto Rico have for more than a decade in order to pay our

19 debt service, including COFINA, and comply with the austerity

20 policies forced upon us by the same economic interest heavily

21 represented here today, which of course is not limited to the

22 lawyers, to the lobbyists, to the media outlets, but also

23 includes the politicians they invest upon, as well as their

24 campaign managers, who coincidentally end up ripping the

25 bondholder Governor and the Fiscal Control Board that

1    negotiated this agreement.

2            Your Honor, how do you measure the pain and suffering

3    of 30,000 public employees that were laid off by Act Seven in

4    2009 in order to pay our debt?  The pain and suffering of

5    30,000 public employees, who now have to work between five and

6    seven more years in order to retire, in some cases up to ten

7    more years after the minimum retirement age was raised by Act

8    Three in 2013.  The 6,537 students at the University of Puerto

9    Rico lost since COFINA was created, and the millions of

10   dollars that have been gutted from the University's budget.

11   The 619 communities whose public schools were closed in just

12   the last five years, which represents 43 percent of our public

13   school system.  The 700,000 Puerto Ricans that have been

14   forced out of the island since 2006.  The 3,759 brothers and

15   sisters that have decided to take their own lives during the

16   same 12-year period, including 26-year-old Jose Ramon Alomar

17   Vega, who hung himself from a mango tree in front of his house

18   after a prolonged period of unemployment.

19           Only one side on this controversy has come to this

20   crosspoint having sacrificed plenty, in some cases their own

21   life.  Regardless of your decision, one has to wonder what

22   would be the pain and suffering that Steve Tannenbaum and Josh

23   Berman would endure from this Plan when their vulture funds

24   bought over 680 million dollars of COFINA bonds after

25   Hurricane Maria.

```
 1                Since James Glassman proposed a hearing of the

 2    subcommittee in the western hemisphere in the summer of 2014,

 3    DCI Group and others that laid a path to this point had a

 4    particular outcome in mind, one that would favor bondholders

 5    at the expense of the people of Puerto Rico.

 6                But even the rich and powerful have to abide by the

 7    rule of law.  Last November, Puerto Rico's House of

 8    Representatives passed the new bond legislation for COFINA.

 9    The process that lead to this legislation violated our

10    Constitution, our laws, and the internal rules of procedure of

11    Puerto Rico's legislative assembly.  My rights as an elected

12    official, and that of my constituents, were violated during

13    this process.

14                In December 2018, we filed a claim in Puerto Rico's

15    courts challenging the constitutionality of the new bond

16    legislation, as well as COFINA itself.  Last Tuesday the

17    Fiscal Control Board removed the case, and in such, it admits

18    the new condition was effective to the COFINA Adjustment Plan.

19                I respectfully ask that you allow the Puerto Rico

20    judicial system to revise our claim before you move forward

21    with your decision.  The legality of the newborn legislation,

22    as well as this Plan, is in question.

23                Thank you, Your Honor.

24                THE COURT:  Thank you, sir.

25                Yansey Ramirez Maiz?
```

1          Nicole Rodriguez?  Yes.  Please come forward now.

2          Good morning.

3          MS. RODRIGUEZ:  Good morning, Your Honor.  My name is

4    Nicole Rodriguez, and I am the president of Maurice R. Ferrer

5    Puerto Rican Democratic Club, in Miami, Dade.

6          First of all, I want to thank you for giving me the

7    opportunity to speak on behalf of the community of Puerto

8    Ricans living in south Florida, who are concerned and keeping

9    tabs on what is happening to the families we left behind in

10   order to pursue a better life on the mainland.

11         You can ask the vast majority of Puerto Ricans living

12   in south Florida, if you had a better job, if you had a better

13   job opportunity, the guarantee of the pension you worked so

14   hard for, an affordable cost of living, and felt safe in your

15   neighborhood, would you have stayed in Puerto Rico?  Most of

16   us would say that we would love to stay.

17         Boricuas living in the mainland have this island in

18   our mind and heart.  We all have roots in Puerto Rico, whether

19   it be because of our family and friends that still live here,

20   or because we still have property here that requires us to be

21   up-to-date with issues that affect the island as a whole.

22         It is part of the reason why we, as a community, have

23   organized around issues within and out of the mainland.  But

24   this issue devastatingly affects all our families here in

25   Puerto Rico.

1          We believe that justice needs to be at the forefront

2     in any decision made in our court systems.  This is essential

3     to uphold the U.S. Constitution and enables us, as a society,

4     to pursue liberty and happiness.

5          With this said, how can we pursue justice by putting

6     sophisticated investors against the future of society.  Right

7     now our island is already going through so many austerity cuts

8     in order to repay a debt that hasn't even been audited in a

9     transparent way for the people of Puerto Rico.  There have

10    been hundreds of schools closed as a result of devastating

11    cuts to education, salary and pension cuts, decrease of

12    vacation days to employees.  Government and community programs

13    have been slashed, if not altogether eliminated.  And our

14    police department is suffering from these measures as well, to

15    the point that a vast majority of the cops are leaving the

16    island.  And it's resulting in a dangerous rise of crime,

17    which recently made the news in the mainland.

18         Most of the people here have no pension, and if they

19    do, it has been drastically reduced.  They live paycheck to

20    paycheck, which forces them to have a second job or take part

21    in an underground economy.  Add to that the last nail to this

22    coffin, which is what COFINA will do by using the already high

23    sales tax, one of the highest in the USA, to pay bondholders

24    instead of what it was really meant for, and prolonging this

25    for 40 years, this will result in making it extremely hard to

1    make ends meet.  And at the same time, will not help the

2    society, because it will now go directly to pay a debt.

3         The people that made this decision did so without

4    analyzing how this will corrode society and everyday boricuas,

5    because how can we do this to vital law enforcement, after

6    school programs, and basically anything needed to foster a

7    healthy community that is deserving of any human being.

8         We are all American citizens, and we deserve to

9    pursue happiness the same way that the citizens living in the

10   mainland do.

11        This agreement is an ineffective way to address an

12   issue that we all understand needs to be dealt with, but the

13   health of our society is paramount and needs to be secured

14   first.  And only then can we establish measures to pay

15   bondholders.

16        I am here to ask you, please, please reconsider this

17   deal, as it only benefits the pockets of people who are not

18   vested in the island, who don't care about a fixed economy,

19   who don't care about the professionals trying to survive and

20   remain here on the island.

21        If this decision remains, I am sure that the end goal

22   is not restructuring our debt and helping us in the long run.

23   No.  Let us not fool ourselves.  The end goal, if this becomes

24   final, will be to make the exodus of Puerto Ricans to the

25   mainland skyrocket even more, and only the extremely well off

1  will remain.

2         Thank you.  And I'll go back.  Thank you.

3         THE COURT:  Thank you, Ms. Rodriguez.

4         Is Jesuan Rodriguez here?

5         Luis Jose Torres Asencio?  Please come forward.

6         MR. TORRES ASENCIO:  Good morning.

7         THE COURT:  Good morning.

8         MR. TORRES ASENCIO:  My name is Luis Jose Torres

9  Asencio.  I'm a clinical and constitutional law professor at

10  the Inter American University of Puerto Rico School of Law.

11         I'm here also as a member of the Citizens Commission

12  for the Comprehensive Audit of the Public Debt, a non-profit

13  organization created when the Government of Puerto Rico

14  unsurprisingly abdicated its responsibility to audit Puerto

15  Rico's bond issuances for the past five decades.

16         I speak today on behalf of this organization, but I

17  also speak from my own account, as a lawyer that represents

18  the increasing number of communities and individuals facing

19  evictions from their homes in Puerto Rico, and generally, as

20  one of the very few people in this courtroom that will have to

21  bear the consequences of the Adjustment Plan under

22  consideration.

23         I begin by asking this Court not to follow through

24  with this Adjustment Plan without allowing for a comprehensive

25  and independent audit of COFINA's debt to be completed, and

1   demanding that the government, or better yet an independent

2   stakeholder, vigorously litigate the consequences of said

3   institution's bond issuances.

4          No just result can come out of a process that

5   approves a debt adjustment plan without examining the legality

6   of the debt and without participation of those who will bear

7   its cost with what little they have left.  If the Government

8   of Puerto Rico and the Fiscal Control Board have chosen to

9   renounce their obligations to protect the public interest and

10  guarantee any debt restructuring does not harm our vulnerable

11  communities and individuals, this Court should not follow

12  course.

13         Questions abound about the legality of the

14  transactions.  Publicly available information reviewed by the

15  Citizens Commission reveals that COFINA was something of a

16  dummy public corporation, one that was completely controlled

17  by the GDB, did not have independent sources of revenue other

18  than a portion of a Commonwealth tax, and was used to directly

19  or indirectly finance Commonwealth operations, including

20  balancing the budget and paying for the made-up severance

21  packages of the tens of thousands of public employees

22  dismissed by Puerto Rico's Act Number Seven of 2009.  Through

23  that system, we believe COFINA impermissibly evaded our

24  constitutional debt limit and violated our balanced budgets

25  clause, whose best interpretation does not allow bond

1   issuances to be included as total revenues.

2          While litigating these issues certainly carries risk,

3   said risk is minimal given how small of a haircut these

4   creditors are getting and how steep a debt sentence is being

5   imposed on the residents of Puerto Rico.

6          This Adjustment Plan robs us of our next 40 years,

7   not to pay the few remaining individual bondholders that

8   invested their savings in our government, but to pay companies

9   that did not see Puerto Rico's bankruptcy and its post-Maria

10  devastation as possibilities for humanitarian aid and relief,

11  but rather as investment opportunities.

12         Almost half of COFINA's debt is in the hands of 17

13  investment companies, according to bond filings.  Those

14  bondholders who bought their credits for far less than what

15  they're bound to receive from these plans are the only ones

16  benefiting from this agreement.

17         Condemning us to continue paying the sales and use

18  tax, which disproportionately penalizes our poorest

19  individuals, not to pay for public works or public services,

20  but to pay off a potentially illegal and definitely

21  illegitimate debt is not only demoralizing, it is an eviction

22  notice for my clients and the thousands of people who face

23  displacement from their homes because their budgets are not

24  able to compensate for a tax that does nothing for them but

25  takes everything from them, even their right to a decent roof.

1          In my case, I am privileged enough to, if need be,

2   pack my bags and move to a place that grants me a decent

3   living and is not constrained by the burden of an unpayable

4   public debt.  But I don't want to do that.  I want to stay and

5   survive and contribute what I can to my homeland, this

6   beautiful and sad colony that is being forced to restructure

7   its debts without any exploration of the role that the Federal

8   Government has played in its accumulation, a process akin to

9   repairing an old, broken down house by painting over its

10  cracks.

11         While approving this Plan of Adjustment will surely

12  test our resolve and seriously hamper our possibilities of

13  having a future in which we can live with dignity and basic

14  respect for our human rights, the residents of Puerto Rico

15  will surely endure.  Our lives, or our permanence in this fair

16  archipelago will be at stake, but we will find ways to grow

17  and resist, until we have grown enough not to have to resist.

18         However, what is truly at risk is the legitimacy of

19  this proceeding and the idea that enough people will see it

20  fit to comply with whatever comes out of it.  Our people are

21  not in this courtroom.  They are outside, and they are

22  waiting.  Thank you.

23         THE COURT:  Thank you.

24         And finally, is Adriana Rodriguez Lazaro here?

25         COURTROOM DEPUTY: (Shaking head from side to side.)

1          THE COURT:  I thank the members of the public who

2     have come and spoken directly from their hearts and minds and

3     have participated in these proceedings in this way.  And as I

4     said yesterday, and as I have said in the notices of

5     correspondence that I have posted, I have read and continue to

6     read everything that has been sent to me as well.

7          Now we are returning to the lawyers' presentations.

8     We have a few minutes before the time for the lunch break, and

9     in the interest of us using this day as thoroughly as we can,

10    I will hear the first two statements in support.  First, by

11    National.

12         Who's speaking for National?

13         Good morning, Ms. Goldstein.

14         MS. GOLDSTEIN:  Good morning, Your Honor.  I did not

15    realize I would have the first spot, so thank you.

16         Your Honor, Marcia Goldstein from Weil, Gotshal &

17    Manges, and we represent National Public Finance Guarantee

18    Corporation, which insures and owns a total of approximately

19    1.2 billion dollars of COFINA senior bonds.

20         As we've made clear to the Court before, and to those

21    we've negotiated with in this case, National is not only a

22    COFINA creditor, but also deeply invested across the island,

23    with additional exposures with respect to GO debt, PREPA debt,

24    HTA debt, and University of Puerto Rico debt.  As such, we are

25    a long-term player, and we are necessarily concerned with the

1   long-term prospects of Puerto Rico.

2          In that context, National supports both the

3   COFINA-Commonwealth settlement, and primarily from a COFINA

4   perspective, and the COFINA Plan.  As a Commonwealth creditor,

5   we also acknowledge the benefits of that settlement to the

6   Commonwealth, but we think it's also important with respect to

7   our COFINA debt.

8          From our -- you know, from our perspective, the

9   settlement is a very important milestone in a number of

10  respects, as is the COFINA Plan.  This is an integral part of

11  the overall COFINA-Commonwealth resolution, and it provides

12  significant certainty to COFINA creditors by embodying a

13  settlement of the litigation which has created a cloud over

14  COFINA's rights with respect to SUT collection, and also

15  contemplates protection of the SUT attributable to COFINA,

16  hopefully by an Order of this Court approving the settlement

17  and the Plan.

18         I would point out that for National, as an insurer,

19  the protection of the COFINA ownership rights for a COFINA

20  creditor under the Plan is vital to us.  While we don't insure

21  the new COFINA bonds, National will continue to bear economic

22  risk with respect to the performance of the new bonds.

23         The settlement that is embodied between the

24  Commonwealth and COFINA, I would note once before -- once is a

25  settlement of litigation that was before this Court.  The

1   objectors made a number of arguments with respect to upholding

2   the sanctity of the COFINA structure.

3         There are many who would tell you that National was a

4   vigorous advocate of the sanctity of that structure.   The

5   constitutional arguments were made on behalf of my client, and

6   also made on behalf of COFINA.   And derivatively, on behalf of

7   all COFINA creditors, by the COFINA agent, which was

8   represented by experienced counsel.   Those arguments were made

9   before this Court, and before this Court ruled, both sides,

10  the Commonwealth agent and the COFINA agent, decided that a

11  settlement was appropriate with respect to avoidance of risk

12  on both sides of the table.

13        I know you heard those arguments in connection with

14  the Commonwealth's motion, but they are equally applicable

15  with respect to the COFINA side of the settlement, which is to

16  be taken up in connection with this Plan of Reorganization.

17        And so I think that while I couldn't say National

18  disagreed necessarily with some of the arguments put forward

19  on behalf of the COFINA structure, we also felt it was

20  important to settle this case and bring some conclusion and

21  certainty to the payment on behalf of COFINA bondholders going

22  forward.   And therefore, we urge the Court to approve that

23  settlement in the first instance.

24        But I think it is also significant that the Plan

25  represents a consensual resolution between senior and junior

1    COFINA bondholders and insurers.  I mean, this is a settlement

2    of issues that was also coming to some head before this Court.

3          So I think that we should take note, not only that

4    that is a settlement that meets the standards for a

5    settlement, which I believe has been fully articulated in the

6    Oversight Board's filing.  So I don't want to take up too much

7    more time, Your Honor.

8          Am I already there?

9          THE COURT:  Actually, you're just over your time

10   limit, so if you will wrap up.

11         MS. GOLDSTEIN:  I will wrap up.  And I would

12   appreciate maybe just two extra minutes.

13         I think that, one, the overwhelming support of

14   creditors is demonstrated, and I know Mr. Rosen has already

15   made this point, by the votes in all classes, senior and

16   junior.

17         And I just wanted to conclude by saying that we do

18   appreciate all the hard work of the mediation parties, the

19   Oversight Board, the government parties, all the creditor

20   representatives, including junior representatives, and of

21   course the mediators, especially in bringing this plan to a

22   conclusion.

23         Again, I emphasize that this is a very important

24   milestone for Puerto Rico, and therefore, we submit that both

25   the COFINA-Commonwealth settlement and the COFINA Plan of

1    Adjustment should be approved.  Hopefully, that will get us to

2    further rounds of negotiations with respect to the

3    Commonwealth.

4            Thank you, Your Honor.

5            THE COURT:  Thank you, Ms. Goldstein.

6            And now Ambac has been allotted ten minutes.  Mr.

7    Dunne.

8            MR. DUNNE:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. DUNNE:  It is still morning.  For the record,

11   Dennis Dunne from Milbank, Tweed, Hadley & McCloy on behalf of

12   Ambac.

13           Let me start by saying I think that there's a common

14   thread from almost every party that's stood up yesterday and

15   today.  We were all hoping for greater results for, in our

16   case here, COFINA, and for our specific class of holdings.

17   Such hopes were unrealistic.  And as Ms. Goldstein mentioned,

18   we proffered and argued, as Your Honor knows, in the summary

19   judgment motion, many of the arguments that you're hearing

20   now; but at the end of the day, all of us had a choice of

21   continuing the protracted, costly and binary litigation or

22   taking a mediated settlement that approximated the outcome of

23   a litigated solution.

24           I'll say it's not the solution I had originally in

25   mind when we started, but it was one that was possible.  And

1  when one became possible, and you look at something that had

2  potential and it was executable, there was a real cost to

3  continuing to litigate.

4         And we decided with the other Plan support parties,

5  it was the best available path, not because anybody was

6  influencing a phenomenal outcome, but the alternatives with

7  the incremental cost delaying uncertainty were worse, not just

8  for the PSA counter-parties, but for everybody else in the

9  case.

10        We stand today to urge the Court to confirm the

11 COFINA Plan of Adjustment, not because someone won or someone

12 lost, but because the price of continued acrimony and

13 contention is simply too high.

14        Your Honor, I think there's also another thread here,

15 which is when we are doing a retrospective review of a

16 transaction that occurred six months ago, there is an air of

17 inevitability about the outcome.  Nothing could be further

18 from the truth.  It was the most difficult deal to come

19 together in my career.

20        A deal was never certain.  There were scores of

21 parties that were negotiating to dry value to one bucket, one

22 pocket, one debtor, one class or another.  Some held positions

23 just in one class or just with respect to one debtor.  Many

24 held positions across a number of tranches or debtors.  This

25 led not to an easier or more identifiable path forward, but to

1    chaos.

2         At the outset, basically everybody had a different

3    opinion as to not just where the settlement level should be,

4    but what the structure should be, what the currency involved

5    should be, and from my perspective, it's outstanding that a

6    deal coalesced at all.

7         Your Honor has heard testimony and comments from the

8    Commonwealth Creditors wanting more of the SUT.  The COFINA

9    agent wanted more of the SUT for the COFINA house.  The senior

10   creditors and subordinated creditors each wanted more of what

11   came into the COFINA house.  All of that, Your Honor, I submit

12   is evidence of the good faith, arm's length and hard fought

13   nature of the negotiations, and the ultimate reasonableness.

14        Let me talk quickly about some of the objections,

15   particularly Mr. Eisenberg's and Mr. Hein's.  They both start

16   from a position that COFINA has a valid lien, that the holders

17   have a valid lien on the SUT and COFINA, and that COFINA owns

18   the SUT.

19        Of course the whole issue here is whether that lien

20   would be a lien on property that never gets into COFINA, and

21   you would have an empty box.  COFINA would have nothing in it

22   if you lost the ownership.

23        So the validity of a lien was really beside the

24   point.  It was really who owned the SUT at the end.  And I'm

25   going to walk through some of the risks, because it wasn't

1    just the ownership of the SUT, it was whether or not they

2    could constitute available resources.

3         And lastly, they had -- even if you prevailed, could

4    Puerto Rico sustain the debt that COFINA was bearing, and

5    would the government divert the dollars in any event?  And all

6    of that comes back to this, Your Honor.  Wherever we were,

7    whether we litigated the outcome or not, litigated and won, if

8    you have a Plan that is overwhelmingly accepted by every

9    class, that ends it.

10        That means that even as we -- as Mr. Eisenberg

11   suggested, that you had ownership of the SUT, but Puerto Rico

12   came around and said everyone needs to contribute to the

13   future prosperity and health of Puerto Rico, I need every

14   instrumentality to contribute something.  And they go to the

15   creditors with this Plan and voted it up on the levels they

16   have today, that would have ended it as well, Your Honor.

17        But I want to address another thread, which is

18   somehow this notion of a deal embedded in the Plan of

19   Adjustment today was the product of some back-room negotiation

20   between interested and conflicted parties.  Nothing could be

21   further from the truth, Your Honor.

22        And I just have to be clear here.  We have to

23   separate the two steps that the juniors actually object to.

24   Step one is the split of the SUT between the Commonwealth and

25   COFINA.  Step number two is the allocation of COFINA's value

1    between the seniors and the subs.

2            First off, all the negotiations occurred subject to

3    Orders that Your Honor entered after public notice.  With

4    respect to the mediation, I believe it is on the docket, Judge

5    Houser's mediation protocol that had a set of required parties

6    and said anyone else who wants to participate, you're welcome,

7    sign the requisite confidentiality agreement.  So nobody was

8    forbidden from participating.

9            With respect to the first half of that, on the

10   Commonwealth-COFINA settlement, that was negotiated, as we all

11   know, between two court-appointed fiduciaries.  Bettina Whyte,

12   as the COFINA agent, and the Commonwealth agent.  Neither one

13   of those agents held debt.  There was no argument of conflict

14   that they were doing anything other than what they were

15   designed to do, which would be to be zealous champions for the

16   debtor that they were assigned to.

17           And second, the COFINA split between the seniors and

18   the subs was negotiated between the guidance and active

19   participation of the Court-appointed mediators.  Each of those

20   mediators are sitting judges with impeccable reputations and

21   limitless energy.  They became knowledgeable of the issues and

22   were not shy of sharing the risks associated with those

23   issues.  They allowed anybody to participate, and they helped

24   guide us to the solution we have today.  And I submit Your

25   Honor can take comfort from that.

1          Your Honor also heard a lot of argument at the

2     podium, testimony regarding the treatment of the subordinate

3     notes under the Plan, and whether there was anybody actually

4     negotiating for them, and that there's not really a default

5     out there, so they should be pari-passu.

6          As the testimony actually was quite clear on, there

7     has been a default.  There's been a payment default since the

8     filing.  The automatic stay prevents taking remedial action,

9     but with respect to the rights between the seniors and subs,

10    it's very relevant.

11         That payment default today means the subs face the

12    specter that there is a default that says seniors will be paid

13    in full first.  And decades later, you'll start to get the

14    SUT.  What's in the Plan today does much better for the subs.

15         One point that is conveniently or consistently

16    omitted is the acceptance by the sub -- subordinated class of

17    the Plan.  When a settlement is embodied in a Plan, and the

18    classes on both sides of the settlement vote to accept, that

19    should end the issue, as Judge Gerber said in the *Adelphia*

20    case going back to 2007.  Whereas here the settlement is in

21    the context of a Plan, I think it requires some material

22    consideration of the votes that were obtained on the Plan.  If

23    the approval percentages are high, and many feel that the Plan

24    and settlement are worthy of approval, one must consider why a

25    Judge should feel otherwise.  *Adelphia Communications*, 368

1  B.R. at 235, Bankruptcy Southern District of New York, 2007.

2          The other point I want to make is with respect to who

3  was representing the subordinate debt.  As the testimony was

4  heard, there were a number of parties that either had

5  exclusive subordinate debt holdings or were weighted

6  predominantly to the subordinate debt class.

7          And even Mr. Elliott in his testimony said that he

8  had senior debt as well.  So even if he was participating in

9  the mediation, he would be like many of the others that held

10  more than just one tranche of the debt.

11          But my favorite attempt to marginalize an unfortunate

12  fact, I think relates to Assured.  Their role in the

13  negotiations is inconvenient, counter factual to the argument

14  that there was no one in the room with a pure subordinate hat

15  on.  Why?  Because they argued that they also had -- they

16  wrapped GO bonds.

17          But that's not what we're talking about right now.

18  The GO bonds would be relevant potentially to the split of the

19  SUT between the Commonwealth and COFINA.  Once that

20  happened -- and this is the sequence in which it actually

21  happened.  That happened first, and then COFINA knew what

22  percentage of the SUTs they had inside the COFINA house, and

23  Assured was in the room negotiating that.

24          There is no basis to conclude that their economic

25  interest within the COFINA negotiations was to do anything

1   more than drive the most possible value to the subordinated

2   class.

3          Your Honor, one last comment in my 20 seconds about

4   the release.  They challenged the good faith findings.  We

5   think there's enough evidence for you to make the good faith

6   findings, but it's basically linked with the release, the

7   exculpation for the party's conduct in connection with the

8   negotiation of the Plan.

9          It is a proper objection to say the Plan shouldn't be

10  confirmed for a lack of good faith.  We think it will fail for

11  that.   But if Your Honor said I'm not confirming it for a

12  lack of good faith, then there's no release granted because

13  the release is in the same Order.

14         If Your Honor does find that the parties acted in

15  good faith, then the release is appropriate.  And what should

16  not happen is the ability for parties to relitigate the actual

17  issue and the actual finding that Your Honor made a connection

18  with the parties' conduct before Your Honor, before the

19  mediators in connection with the Plan.

20         With that, Your Honor, we submit that the Plan of

21  Adjustment should be confirmed.

22         THE COURT:  Thank you, Mr. Dunne.

23         All right.  When we come back from the lunch break, I

24  will hear from the Senior Bondholders Coalition, AAFAF, and

25  from the debtor.  And then if the BNY Mellon, Whitebox, and

1   I'm sorry, I am -- the other party involved in that motion

2   practice, please excuse me for that, Ambac, wish to go forward

3   with the hearing on that motion, we will follow on from there.

4          And so with that, I wish you all a good lunch, and

5   productive activities over that time if you're engaging in

6   activities other than eating.  And let's all be back here at

7   one o'clock.  It's a slightly shorter lunch break.  Forty

8   minutes.

9          Thank you all.  We're adjourned.

10          (At 12:10 PM, recess taken.)

11          (At 1:07 PM, proceedings reconvened.)

12          THE COURT:  Just a moment, Mr. Kirpalani.  I just

13   have to get myself together here.

14          And so we continue the statements in support with

15   Mr. Kirpalani for the Senior Bondholders Coalition.

16          MR. KIRPALANI:  Thank you, Your Honor, and good

17   afternoon.  Susheel Kirpalani of Quinn Emanuel on behalf of

18   the COFINA Senior Bondholders Coalition.

19          Your Honor, after yesterday's testimony, I was

20   checking my calendar to look back and figure out when exactly

21   did our group start, and I think we've been working together

22   literally every day for the last 1,300 days.  And as the

23   person who, over that period, seemingly found new ways each

24   week to disappoint people, I do understand that a lot of the

25   people here, frankly, are still unhappy.

```
 1              And I don't want to make light of it, but this is not

 2  uncommon in bankruptcy cases.  And the seriousness of the

 3  issues here transcend any ordinary bankruptcy case.

 4              But there are so many people besides creditors who

 5  worked for years trying to forge compromises that would get us

 6  to a truly consensual Plan --

 7              THE COURT:  Just one moment.  We have audio problems

 8  in New York, so we'll have to start again when we get that

 9  straightened out.

10              It may take a few more minutes because it needs to be

11  checked.  So --

12              COURTROOM DEPUTY:  I don't know how close Pablo is,

13  but it could be a couple minutes.

14              THE COURT:  So if you want to rest your feet, you

15  can, or you can stand there.

16              MR. KIRPALANI:  If I'm not offending anyone, I'll

17  just stand here.

18              THE COURT:  It works for me.  Thank you.

19              Mr. Hein, would you wave your hand if you can hear?

20  All right.  Thank you, Mr. Hein.  We are back online with New

21  York.

22              So Mr. Kirpalani, would you start again, please?

23              MR. KIRPALANI:  Sure.  Your Honor, I was just

24  mentioning that this process has gone on for a very long time.

25  And I know some people are very unhappy, and I don't want to
```

1    make light of it.  This case is very serious.

2           And although it's not uncommon in bankruptcy cases

3    for folks to walk away disappointed, the seriousness of the

4    issues affecting the people of Puerto Rico really transcend

5    any ordinary bankruptcy case.  And this is not just not about

6    creditors and debtors.

7           There are so many people besides creditors who've

8    worked for years trying to forge compromises and avoid all or

9    nothing litigation results.  Their hope was to get to a truly

10   consensual Plan.  And they really did do it, and they deserve

11   honorable mention.

12          I need to single out Chief Judge Houser, Judge Atlas,

13   Judge Ambro.  Others have mentioned them, but they were truly

14   the source of strength throughout the Title III case when many

15   people, including myself, wanted to throw in the towel and

16   just litigate.

17          There is the Official Committee of Unsecured

18   Creditors of the Commonwealth, and its capacity as the

19   Commonwealth agent, where it was a fiduciary for the

20   Commonwealth, and for no other party.

21          The Retiree Committee of the Commonwealth, who was

22   one of the original consent parties under the

23   Commonwealth-COFINA protocol.  From the Commonwealth side,

24   they are now on board with the settlement.

25          The GO representative, our highly respected adversary

1    who represented the GO bondholders who started this all with

2    the Lex Claims lawsuit, but ultimately issued a very welcome

3    "no objection" yesterday.

4          The COFINA agent, a veteran restructuring

5    professional who's an expert in securitizations and some of

6    the most complicated transactions ever engineered by

7    financiers in America.

8          I also need to express my gratitude for the

9    government officials and their advisors, both at the Board

10   level and at the elected Government level.  They have had to

11   work nonstop through the complexities of the largest municipal

12   bankruptcy in history, with the largest litigation machine

13   previously unknown to man or woman.

14         Despite what the objectors here may feel, in our

15   view, those officials always did what was in the best interest

16   of the citizens of Puerto Rico.  And that's a much more

17   complicated question than just how much of COFINA's money did

18   they recapture.

19         These officials are also looking forward to the

20   bright future of Puerto Rico, where it won't have an Oversight

21   Board anymore.  But in order to do that, they have to restore

22   credibility with creditors.  The good faith of the

23   participants in formulating a Plan cannot fairly be

24   challenged, and there is not a scintilla of evidence that

25   actually does that.

1    Some concerns have been expressed by Commonwealth

2    creditors that they don't know how this will all end.

3    Is there a problem with the sound again?  I'm just

4    wondering --

5    THE COURT:  Ms. Ng?

6    MS. Ng:  No.  There was just a problem with the feed

7    to the podium.  We couldn't see.

8    THE COURT:  All right.  So is everything sufficiently

9    in place that we can continue?

10   MS. Ng:  Yes.

11   THE COURT:  All right.

12   MR. KIRPALANI:  I think I pretty much look the same

13   as I did yesterday anyway, but okay.

14   Some concerns have been expressed by the Commonwealth

15   creditors that they don't know how is this all going to end.

16   And we can't evaluate the COFINA Plan without knowing the rest

17   of the Commonwealth plan for paying its creditors and

18   providing for essential services.

19   And the best I can say about that is maybe we can

20   learn from children how they solve big problems.  My son loves

21   jigsaw puzzles.  I'm pretty bad at them.  But when he was

22   seven, he told me the reason why I'm so bad at them is because

23   I always try to solve the whole thing at once.

24   And he said, you need to start with a border, and if

25   not, you're just never going to finish it.  And I think that's

1    what the Oversight Board did here, and it's the only way the

2    puzzle was going to be solved.

3         Mr. Rosen is going to cover the statutory bases for

4    confirmation, but you had asked at the outset some questions

5    about the proposed findings of fact and conclusions of law

6    that are really critical to the new COFINA bondholders and the

7    viability of the new COFINA structure.  So I'm going to try to

8    address them.

9         Specifically, Your Honor asked about paragraphs 119,

10   124, and 170.  We didn't mention there was also a summary of

11   those important determinations in paragraph one of the

12   Confirmation Order.

13        THE COURT:  I did mention 1(B) of the Order.

14        MR. KIRPALANI:  Okay.  Thank you, then.  I missed it.

15        So I think that you're asking then essentially about

16   three things that I want to try to cover.  The first is the

17   Court's ability to determine that the new COFINA bond

18   legislation is valid.

19        The second is the Court's ability to quiet title to

20   COFINA's property for all time, so we know that COFINA

21   bondholders didn't give up their property rights in a

22   settlement only for the validity of the bonds and the finality

23   of the settlement to be attacked years from now.

24        The first is actually a question of state law, and

25   the second is a mixed question of federal and state law as to

1    which the Supremacy Clause applies.

2            So the validity of the new legislation.  Your Honor,

3    the laws of Puerto Rico are presumed constitutional unless

4    otherwise determined by the Court.  I can give you two

5    citations for that, both from the Supreme Court of Puerto

6    Rico.  The first is *Brau,* B-r-a-u, *Linares,* L-i-n-a-r-e-s,

7    *versus ELA*.  The cite is 2014 TSPR 26; also at 190 DPR 315, at

8    337.  And the Westlaw cite is 2014 WL 997526.  It's the

9    Supreme Court of Puerto Rico from 2014.

10           The second Supreme Court of Puerto Rico case cite is

11   *PSP against ELA*, 107 DPR 590.  And there's an official

12   translation of that one at 7PR, official translations, 653727.

13   And it's available at Westlaw at 1978 WL 48833.  And that's

14   from 1978.

15           In that case, in the translated version, which I

16   believe it was modified and the official translation is at

17   1988 WL 580845 from 1988, quote, to begin with, laws are

18   presumed to be constitutional and the movant should place the

19   courts in a position to decide by introducing evidence to

20   sustain the facts alleged and then stating the legal arguments

21   on which its assignment of unconstitutionality is based --

22   unconstitutionality is based, specifically mentioning the

23   constitutional provisions involved and the legal precedence

24   supporting its assignment, end quote.

25           Given the presumption of the validity, it's incumbent

1    on the objectors to come forward with that evidence.  The

2    objectors have not met the burden to rebut the presumption.

3         The COFINA restructuring legislation, also known as

4    the new bond legislation, was filed before the Puerto RIco

5    legislature.  It was debated in both chambers.  It was passed

6    by the House and by the Senate.  The secretaries of both

7    chambers certified the valid approval of the law and the

8    Governor signed it into law.

9         Proposed finding of fact paragraph three provides,

10   the Court to take judicial notice of the new law.  And Mr.

11   Friedman, on behalf of AAFAF, will further ensure the Court

12   has whatever Your Honor needs in terms of anything you need

13   from the state system.

14        The Natal Albelo objection, Your Honor, we addressed

15   it in our papers.  Essentially, the legislative assembly House

16   member argued that he filed a litigation in state court.

17        In paragraph 49 of our Reply papers, there are three

18   reasons why his objection should be overruled.  First, the

19   lawsuit itself is void ab initio as a violation of the stay.

20   We cite *Jefferson County* and *Detroit* for that in our briefs.

21        Second, claims about constitutionality of COFINA's

22   creation has already been the focal point of the litigation

23   with parties who have actual standing in the correct legal

24   forum, which was here.  Those parties, with consent of the

25   Board and AAFAF, chose to settle the matter rather than roll

1    the dice and its consequences.

2             Third, the allegations of representative Natal Albelo

3    is nothing more than an internal procedural dispute among

4    legislators.  This type of dispute is not judicial.  We cited

5    *Noriega Rodriguez against Jarabo*, 136 DPR 497, Supreme Court

6    of Puerto Rico, 1994.

7             On Monday of this week, we filed an official

8    transcript of that case.  It's at ECF cite for the

9    Commonwealth, 4762-1, and in the COFINA case, 488-1.

10            So let me shift gears, while I have some time left,

11   to what's really critical for the bondholders.  That's the

12   support from the findings of fact and the summary for those

13   findings in paragraph 1(B) of the confirmation Order.

14            This concerns the Court's determination of validity

15   for all of the bonds.  The bonds will be stamped as such.  The

16   stamping itself is something that comes out of the *Jefferson

17   County* precedent.  It was important there for the new

18   bondholders, and that was where the idea of stamping the new

19   bonds came from.  So on the substance --

20            THE COURT:  Validity is a legal determination.

21            MR. KIRPALANI:  It is a legal determination that this

22   Court is being asked to make.

23            THE COURT:  You referred to it as a finding of fact,

24   so I just wanted to be clear on that.  I need to engage the

25   legal basis of the statement that something is valid.

1           MR. KIRPALANI:  Absolutely right.  It is a legal

2    determination, Your Honor.  And I do believe that the form

3    findings of fact, the conclusion of law, if one is listed in

4    the wrong category, it will be deemed in the right category,

5    but there is no reason not to get it precise.

6           Let's talk about PROMESA and the authority vested in

7    this Court by Congress.  First, under PROMESA Section 4, it

8    was enacted pursuant to the Territories Clause and overrides

9    all contrary state or territory law.  That's what Section 4

10   says.  And I quote, the provisions of this Act shall prevail

11   over any general or specific state law or regulation that is

12   inconsistent with this Act.

13          Bankruptcy laws and PROMESA's bankruptcy provisions,

14   too, are in large part an in-rem proceeding.  Under Section

15   306(b) of PROMESA, this Court, and only this Court, has

16   exclusive jurisdiction over all property of the Commonwealth

17   and COFINA once they commence their cases.

18          As such, you have the judicial power conferred by

19   Congress to determine who is the owner of the property, and

20   you have the power to quiet title to that property.  This

21   happens all the time under the Bankruptcy Code and under

22   bankruptcy plans.  In fact, it is fundamental to achieving

23   finality and res judicata effect on all issues that were

24   raised or that could have been raised in an umbrella

25   bankruptcy case, which is what bankruptcy is, and it's what

1     the Plan asks the Court to do.

2            Section 944, which Your Honor mentioned this morning,

3     is the effect of the discharge provisions.  It was enacted

4     specifically to remove doubts concerning the validity of the

5     bonds issued by a municipality.

6            That section is specifically incorporated into

7     PROMESA under Section 301(a.)  On page seven, footnote seven

8     of our Reply brief, we cited Collier on Bankruptcy, and I

9     quote, the requirement of a court determination of validity is

10    extra assurance for those who might be skittish about the

11    nature of the bonds being issued.  It has the added feature of

12    removing any doubt concerning the matter because the

13    determination of the Court on that issue should be binding in

14    the future, end quote.  That's Six, Collier of Bankruptcy,

15    Section 994.03, subsection 1(B), as in boy.

16           Now, as the Court is aware, there's the potential of

17    limitation of Federal Bankruptcy Law in Section 305 of

18    PROMESA.  It says, the Court cannot interfere with the

19    political or governmental powers of the debtor, or any

20    property or revenues of the debtor, or the use and enjoyment

21    by the debtor of any income producing property.  Well, that's

22    the sales tax, right?

23           There's an important exception built right into

24    Section 305.  It says, quote, unless the Oversight Board

25    consents or the Plan so provides.  And the reason for that is

1   obvious, because without it, Puerto Rico can never use the

2   bankruptcy laws because title to property will never be

3   settled.  And without that and the determinations in 944,

4   COFINA and the Commonwealth will never get the discharge or

5   the release that's integral to the Plan.

6        So we are here now to confirm the Plan in which the

7   Oversight Board expressly consented to the allocation of

8   property and future revenues as between two debtors in which

9   this Court exercises exclusive in-rem jurisdiction.

10        The elected bodies of Puerto Rico have also consented

11   to the settlement and the Plan, so there's nothing that will

12   be standing in the way of the Court exercising its

13   jurisdiction, and that exercise is required under 944(e)(3)(b)

14   in order to get the debtors their discharge.

15        So how do we know, as a matter of law, that this

16   Court has the legal authority to make the determinations

17   requested?  There's at least three reasons.

18        First, the Commonwealth, through its adversary

19   proceeding filed by its duly authorized agent, is an actual

20   disputed creditor of COFINA.  And under Section 944(a), the

21   Plan is binding on all creditors, whether it's the state of

22   New York or the state of Puerto Rico.  And that certainly

23   includes the Commonwealth.

24        Second, we have the separate 9019 Order, which if

25   entered, will bind the Commonwealth by the final settlement of

1    its property entitlements versus COFINA, which the Oversight

2    Board consented to, and even the elected government consented

3    to.

4         And most fundamentally is the question of the Federal

5    Court's power to determine the competing property rights of

6    the Commonwealth versus COFINA.  I'm running short on time, so

7    let me just wrap up.

8         THE COURT:  Well, you are responding to my question,

9    so please give your full response.

10        MR. KIRPALANI:  Thank you, Your Honor.

11        So third, in terms of judicial power, Your Honor may

12   recall that in the adversary proceeding, the COFINA agent and

13   virtually all of the COFINA creditors, including us,

14   specifically asked to have the Supreme Court of Puerto Rico

15   determine the issues of which debtor owns the property,

16   whether the COFINA legislation is constitutional, whether --

17   if the Commonwealth still owns it, whether it's available

18   resources or available revenues, including which language

19   needs to be employed, because we thought, or we were fearful

20   that these may be considered pure state law issues.

21        The Oversight Board fought us on that, as did all of

22   the Commonwealth side litigants.  They cited appellant cases,

23   including from the First Circuit.  They cited *Abboud, et al.,*

24   *versus The Ground Round*, 482 F3d at page -- F3d 15, at page

25   17, First Circuit, 2007.  And the quote from the First Circuit

1 is, the label that state law affixes to a particular interest

2 in certain context is not always dispositive, end quote.

3 And what was the context there? Federal bankruptcy.

4 The First Circuit was citing *In Re:   Nejberger*, which was the

5 Third Circuit's case from 1991, 934 F2d 1300, jump cite 1302,

6 for the same proposition.  That's law of the case.

7 The Court has already held that the issues being

8 litigated were mixed questions of federal and state law.  And

9 as such, the Court has proper jurisdiction over the dispute.

10 No one, not even us, appealed from that ruling.

11 Your Honor's decision is docket 483 in the adversary

12 proceeding, 17-00257, entered on May 24, 2018.

13 THE COURT:  Can I properly hear you as saying, not

14 only that there's a general principle established as law of

15 the case here that the question of ownership is at least at

16 some level a mixed -- a federal one, as well as a state one,

17 but that PROMESA Section 4 and negotiated Plan terms

18 essentially empower me to make PROMESA federal common law and

19 establish that; and then say something is valid because it has

20 been made pursuant to a law that I have put in place by virtue

21 of endorsing a negotiated resolution?

22 MR. KIRPALANI:  So I think there's two or three

23 different ways to support the proposition that the Court has

24 exclusive jurisdiction to determine the property of COFINA

25 verses the Commonwealth.

1          The first is, is it, once the debtors filed for

2     bankruptcy, a mixed question of federal and state law.  That's

3     what I said was law of the case.  At page three of the

4     decision of Your Honor, you noted that parties contend, and

5     you're referring to the Commonwealth side parties, that

6     property law concepts inherent in Federal Bankruptcy Law are

7     relevant to and ultimately dispositive of the question of

8     whether the pledged sales taxes are the property of the

9     Commonwealth or COFINA in their -- in the context of their

10    prospective PROMESA Title III proceedings, regardless of how

11    the Supreme Court of Puerto Rico may rule on the related

12    questions of Puerto Rico law, end quote.  That was on page

13    three of the decision.

14          Your Honor reasoned at page five, and again, I'm

15    quoting from the decision, the Court must decide what the

16    relevant property rights are within the context of these Title

17    III proceedings under PROMESA and Federal Bankruptcy Law

18    conditions that Congress has incorporated into PROMESA.  And

19    accordingly, at page six of the decision, the Court held the

20    issues being litigated were mixed questions of federal and

21    Puerto Rico law.

22          So first, it is law of the case.  Secondly, I don't

23    know if it would be considered federal common law.  It would

24    be considered federal statutory law, however.  There are

25    provisions in PROMESA that specifically provide that the

1   Oversight Board, in formulating a fiscal plan, determines

2   which assets are in which debtor entity.

3        We've heard a lot about the Court's ability to review

4   the Board's determinations of fiscal plans at various periods

5   of time in the case.  This is the time.  It is the plan being

6   confirmed that incorporates the fiscal plan, where the Court

7   has to determine whether it's consistent with the Oversight

8   Board's Fiscal Plan for COFINA, which does allocate and

9   earmark these specific revenues to the COFINA estate.

10        So if the Court has jurisdiction over that Board

11   determination, it would have it now.  If it doesn't have

12   jurisdiction over that issue, the Board's determination, then

13   Congress said the Board will have discretion to determine it,

14   which they have done.

15        So whether it's -- I don't know if you would call it

16   common law.  It's in the Statute, how it's being determined.

17   But it's either federal common law or it's interwoven within

18   the statutory determinations that are within the congressional

19   authority assigned to the Board as a creature of the Puerto

20   Rico Government to determine state law.

21        THE COURT:  And is it the Board's interpretation, and

22   I'm thinking now specifically of the debt limit and maturity

23   limit provisions that I'm -- or determinations that I'm asked

24   to adopt.  Is that an exercise of recognition of a Board power

25   to determine what the Constitution of Puerto Rico means, or

1    does that somehow come into the mix of traditional

2    property-related concepts that inform the application of

3    bankruptcy laws as we had talked about in connection with

4    *Ground Round* and other cases, because it doesn't seem to me to

5    fit neatly into either of those processes.

6         MR. KIRPALANI:  It is the latter.  It is the mixed

7    question that is being asked to be determined, because of the

8    jurisdiction over all property that was expressly granted to

9    the Court by Congress pursuant to the Territories Clause.

10        THE COURT:  And is there anything in previously

11   established and recognized general principles of property law

12   that would directly inform the Court's, either determination

13   that this ruling is consistent with the Puerto Rico

14   Constitution, or allow the Court to write a new constitutional

15   provision for Puerto Rico that specifically accepts the new

16   COFINA bonds in a way that it might not have accepted the

17   existing COFINA bonds?

18        MR. KIRPALANI:  I think it's -- of course, the

19   Court's not rewriting any Constitutions of the states.  I

20   think what it is, however, is that the Court is being asked to

21   determine the constitutionality of the law.

22        We've covered that question -- that specific question

23   is a question of state law, and it's presumptively valid.  And

24   the objectors have not met their burden to rebut that

25   presumption.  That's issue one.

1        Issue two is where is the Court's power to say that

2   not withstanding what happens in the future, this property

3   will always belong to COFINA.  That is the Supremacy Clause.

4   That is Section 4 of PROMESA that gives Your Honor that

5   determination.

6        And there is similar case law in Chapter 11 and other

7   contexts, merely by question of determining property of the

8   estate in Section 541.  I didn't go there, because Section 541

9   doesn't apply in PROMESA.

10       So what we do have is the expressed Congressional

11  grant and jurisdiction over all property, as well as the

12  provisions of PROMESA that confer authority on the Board to

13  determine which silos hold which assets.

14       That's what the Board has done here and this is the

15  opportunity, and frankly the only opportunity, for the Court

16  to determine whether that is, in fact, valid or whether it is

17  an integral part of the Plan.  We submit, as COFINA

18  bondholders, it's absolutely integral.  Otherwise, we don't

19  know what we're getting.

20       In exchange, some of the juniors bondholders have

21  raised that objection.  We think they're wrong as a matter of

22  law, but it's critical that the record reflects that.

23       THE COURT:  Thank you.

24       MR. KIRPALANI:  Thank you, Your Honor.

25       MR. FRIEDMAN:  Good afternoon, Your Honor.  Peter

 1   Friedman from O'Melveny and Myers for AAFAF.

 2          One other point I wanted to make is with respect to

 3   constitutional obligations on tenure and length of debt.  We

 4   don't think it would apply here, because it doesn't apply to

 5   debt issued by the government.  But here property has been

 6   transferred.  And Mr. Kirpalani is right, the proposed Order

 7   doesn't intend to quiet title of the SUT, the portion of the

 8   SUT that's going to COFINA.  So we don't think it's even

 9   applicable with some of the issues of length that have been

10   raised.

11          Your Honor, I want to -- like I said, if it's helpful

12   to note --

13          THE COURT:  And are you saying that that argument is

14   different from the argument that was made on the Commonwealth

15   side in 257, as to the nature of the property --

16          MR. FRIEDMAN:  Yes.

17          THE COURT:  -- as distinguished from --

18          MR. FRIEDMAN:  Yes.

19          THE COURT:  Okay.

20          MR. FRIEDMAN:  Your Honor, in a Schoolhouse Rock

21   version of one of issues of what --

22          THE COURT:  I want to hear you say, I'm just a

23   bill.

24          MR. FRIEDMAN:  On Capitol Hill.

25          So, Your Honor, Act 8 of 2 LPR, Sections 186 and 188

1    to 189, established that the Secretary of State of Puerto Rico

2    shall promulgate laws by stamping the great seal of the

3    Commonwealth as soon as bills are signed by the Governor.  And

4    then they're put online at the Office of Legislative Services.

5         I know we say in the Order, or the Board says in the

6    Order, you can take judicial notice, but I'm going to give a

7    citation to a Government-run website, and if it's too long, I

8    can later submit an informative motion --

9         THE COURT:  I'm asking you now to follow up with that

10   informative motion.

11        MR. FRIEDMAN:  Okay.  Great.

12        So, Your Honor, if you look at the objections filed

13   by Mr. Eisenberg's party, they say, in paragraph 39, that the

14   Oversight Board expects subordinate holders to accept a 56

15   percent recovery.  The Board and Government seem to be out of

16   touch with reality.  It's just not true, Your Honor.  And we

17   know that because of the evidence submitted in this case.

18        If you look at the Pullo Declaration and combine the

19   classes of junior and subordinate bondholders in classes five,

20   six and seven, you will see that 9,267 bondholders voted in

21   favor of the Plan, and 1,826 voted against.

22        People voted overwhelmingly with their ballots and

23   their wallets to accept the offer on the table as fair to

24   junior creditors.  And, you know, the consequences of such

25   overwhelming acceptance is, cramdown issues aside, class-based

1    issues of unfair discrimination don't exist under the

2    Bankruptcy Code, and I think that's highly salient.

3         Your Honor, you heard live testimony from two

4    witnesses yesterday, one that I believe is quite credible, and

5    one for which I think there are some questions about.  But

6    what's equally important is what you did not hear, which is

7    the cross-examination of David Brownstein.

8         And if you look at the Brownstein Declaration, his

9    testimony is unrebutted on three critical points.  First is

10   that all parties were represented in connection with

11   discussions regarding settlement.  And, in fact, it literally

12   says, all major claims, classes of claims, were represented in

13   Plan negotiations.  Unrebutted testimony, not cross-examined.

14        And the second two important points in

15   Mr. Brownstein's Declaration, unrebutted, are, first, that he

16   lays out the rationale for why the intercreditor class

17   settlement, which is accepted by so many junior creditors, is

18   fair and makes sense given the economic and legal realities of

19   the case.  No evidence to the contrary.

20        The third point, Your Honor, is Mr. Brownstein

21   explains why there isn't discrimination.  There's differential

22   treatment, but that differential treatment is actually quite

23   helpful across the Board.

24        So all of Mr. Hein's arguments which rely on some

25   purported notion of legal discrimination that's unfair or

1    inappropriate shouldn't even get out of the starting gate,

2    because there's a quantum of evidence that shows the premise

3    is wrong as a factual matter.  And that hasn't been

4    challenged.

5          Your Honor, there was also an argument raised about

6    whether the mediation process was fair.  Mr. Dunne made

7    reference to obviously the Mediation Panel's June 12 Order.  I

8    think he left out, actually, the best part, which is you heard

9    testimony from people yesterday and argument that they didn't

10   know how to get in touch with the mediators, even though they

11   followed the case very carefully.

12         But if you look at the -- I think it's docket 560, at

13   the very bottom, it actually has Matthew Hindman's e-mail

14   address.  Mr. Hindman is the clerk to the Mediation Panel.  So

15   it's just not a real argument to say people couldn't get in

16   touch with the Mediation Panel if they really wanted to

17   participate.

18         And of course there was an interpleader, which, by

19   its nature, is open to anybody who has an interest in

20   property.  The objectors didn't show up there.

21         There was an adversary proceeding, as we announced,

22   in the First Circuit, and someone could intervene in it.  The

23   objectors didn't show up there.  And, for example, when

24   parties argued, particularly when Mr. Despins and Ms. Whyte

25   reached the preliminary settlement, parties like AAFAF said,

1    you know, we'd like a chance to evaluate public filings and

2    we'd like a chance to evaluate things, and so should everybody

3    else have the opportunity, including bondholders.

4         No response from objectors at the time that we can

5    see, at least in certain terms of record evidence of reaching

6    out of to the mediators or other parties.

7         Your Honor, another issue that was addressed was best

8    interest, by Mr. Hein.  And what I would say in respect to

9    that is effectively what his argument, I think, misses is that

10   the best interest here is simply a replica of what happened in

11   this Court.

12        There's no reason to assume or speculate that there

13   would be a different outcome than the one negotiated outside

14   of PROMESA than there was under PROMESA in the Title III, and

15   the creditors would do any better outside of the Title III

16   process.

17        Now, we happen to think that the best interest test

18   is actually all creditor based as opposed to any single

19   creditor.  But under either scenario, I don't think Mr. Hein

20   has an argument for best interest.

21        Your Honor, turning now to why AAFAF particularly

22   supports this deal, I don't have any soaring rhetoric as to

23   this, but I think it's worth quoting the German philosopher,

24   Max Webber, who said, governance is a strong and slow boring

25   of hard boards.  And that's really what happened here.

1          The government worked exceptionally hard to get this

2     deal done.  It started with AAFAF entering into a PSA.  The

3     legislature took the appropriate steps after notice to pass a

4     bill, which the Governor signed.

5          As in GDB, you have all parties working together, and

6     then the Governor, having to consult with parties, appointed

7     three independent, nonpartisan members of the new COFINA board

8     in a great show of excellent corporate governance going

9     forward, that's part of a planned biography of those

10    individuals.

11         One other point I think is worth raising with respect

12    to the issue raised by the various creditors regarding the

13    debt -- regarding public speakers regarding the debt audit.

14    And I think there are a couple of points.  The first, Your

15    Honor, is that the litigation here fundamentally was a debt

16    audit.

17         You had the Commonwealth Agent, paid for by the

18    people of Puerto Rico, examining in extreme detail the

19    validity of the COFINA issuances, multiple summary judgment

20    motions, extensive litigation over it.  That's a proxy for a

21    debt audit.

22         And then as this Court knows from the Kobre & Kim

23    report, which has been detailed endlessly in front of Judge

24    Dein, the Commonwealth has worked hand in hand with Kobre &

25    Kim and the Oversight Board, which issued a 535 page report, I

1   believe, and acknowledged the cooperation with the government,

2   worked closely with the government.  And there's already been

3   output as to that, as the Court knows, from the objection

4   filed earlier this week.

5        So the debt audit is essentially being effectuated

6   through other means.  The last thing Puerto Rico needs to do

7   is spend more money on a different debt audit when the full

8   goal is being accomplished.

9        I don't have anything else, Your Honor, other than

10  appreciation for the Court's time.  Thank you.

11       THE COURT:  Thank you, Mr. Friedman.

12       MR. ROSEN:  Your Honor, Brian Rosen, Proskauer Rose.

13       With the Court's indulgence, Mr. Mark Ellenberg, who

14  is in the New York courtroom and represents Assured, has asked

15  if he could speak for five minutes in support because of the

16  allegations that have been made with respect to Assured and

17  its involvement in the mediation process.

18       THE COURT:  That's fine.  And so are you asking for

19  an additional five minutes to be allocated for Mr. Ellenberg?

20  Because I imagine you'll want to use at least the amount of

21  time that the printed table allocates to you.

22       MR. ROSEN:  Your Honor, actually, you offered me ten

23  minutes and I'm actually going to yield one of my minutes to

24  Mr. Feldman as well.  And I will stick with nine as well.

25       So yes, it's five in addition to the ten, Your Honor,

1    or five in addition to the minutes that were for the support

2    parties.

3              THE COURT:  All right.  I will permit that.

4              MR. ROSEN:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              So Mr. Ellenberg, good afternoon.

7              MR. ELLENBERG:  Good afternoon.  May it please the

8    Court.  Mark Ellenberg on behalf of Assured Guaranty.

9              Your Honor, Assured has insured over five billion

10   dollars of Puerto Rico bonds.  Those bonds are scattered

11   throughout the debt structure, but it includes a substantial

12   amount of junior COFINA bonds.

13             That five billion dollar exposure, Your Honor, is the

14   largest of any monoline insurer in this case, and it may well,

15   in fact, make us the largest single creditor of Puerto Rico.

16   As such, Your Honor, we have a long term and indeed profound

17   interest in the success of Puerto Rico.

18             Our contracts require us to pay these bonds when they

19   come due, both principal and interest.  So 20 years from now,

20   30 years from now, 40 years from now, we will still be here

21   meeting our contractual obligations.

22             And thus, in fact, we have made a five billion dollar

23   investment in Puerto Rico's long-term success.  And when we

24   support the 9019 motion before the Court, and this Plan, we

25   certainly believe that both of those are consistent with that

1    long-term success.

2            Your Honor, as I mentioned, we insured COFINA

3    juniors.  We do not insure any COFINA seniors.

4            As Mr. Dunne mentioned, there are two distinct phases

5    to the settlement before the Court.  The first was agreed to

6    by the agents, and that was a split between the COFINA estate

7    and the Commonwealth estate.  The agents were expressly

8    authorized to negotiate that settlement by a protocol so

9    Ordered by this Court.  And in so doing, they were taking the

10   mantel of the authority given to each of the principals, the

11   COFINA estate and the Commonwealth estate under the Bankruptcy

12   Code.

13           Because the Bankruptcy Code takes all common claims

14   of creditors and gives them to the debtors, and permits the

15   debtors to settle them under bankruptcy law, and that includes

16   the constitutional claims mentioned by Mr. Hein, the

17   Bankruptcy Code routinely permits those to be settled by a

18   debtor in a way that's binding on all creditors.  And indeed,

19   that's just under 9019.  You don't even need to confirm a Plan

20   to do that.

21           So the first phase of the negotiation, Your Honor,

22   was the basic split between the two estates.  That was by the

23   agents.  Assured, nor any other bondholder, played any part of

24   that.

25           Phase Two is the intraCOFINA negotiation.  That was

1   entirely between the senior COFINA creditors and the junior

2   COFINA creditors.  That is when Assured became involved, as

3   witnesses mentioned in their testimony yesterday.

4           At that point, our GO interests were not relevant.

5   The split was already a done deal.  We had to deal with that

6   as a fact on the ground.  What we then did was try to argue

7   for the greatest recovery for the juniors that we could

8   achieve.

9           Would we have liked to have achieved more?  Yes.

10  Certainly.  But we believed we did the best that we could.

11          Finally, Your Honor, I would just like to address the

12  validity issue that has been raised.  And while I agree with

13  most of what Mr. Kirpalani said, I think really that the

14  validity issue is inherent in the settlement.

15          If Your Honor has the authority to approve the

16  settlement, then you necessarily have the authority to protect

17  the various pots that were created by that settlement,

18  because, as Mr. Kirpalani mentioned, absent that protection,

19  then the settlement really achieves nothing.

20          That's all I have, Your Honor.  I appreciate your

21  time.

22          THE COURT:  Thank you, Mr. Ellenberg.

23          Good afternoon, Mr. Feldman.

24          MR. FELDMAN:  Good afternoon, Your Honor.  For the

25  record, Matthew Feldman of Willkie Farr & Gallagher on behalf

1 of the COFINA Agent.

2          Mr. Ellenberg actually took on some of the issues I

3 was going to, so I will use less than 60 seconds.

4          I did want to start, Your Honor, by expressing

5 apologies for the agent, Bettina Whyte, who was going to be a

6 witness.  She had an operation a couple weeks ago and her

7 doctor wouldn't let her travel, but she apologizes for not

8 being here.

9          THE COURT:  I am sure we all wish her a speedy

10 recovery.

11          MR. FELDMAN:  Thank you.

12          Your Honor, I did want to emphasize, with respect to

13 communication of junior creditors and senior creditors, while

14 it was outside the scope of the Agent's mandate and the

15 stipulation approved by this Court, in fact, on a very regular

16 basis, including meetings as well as telephone calls, the

17 agent and its multiple counsel communicated with junior

18 creditors, both represented by counsel and not represented by

19 counsel.

20          So to say that there was no one at the table when we

21 negotiated the split would not be accurate, but what we did

22 not take into account, because we were not permitted to, is

23 what the senior-junior split would be.

24          Further, regarding that, perhaps more importantly,

25 Your Honor -- I'm not going to repeat Mr. Kirpalani's

1    arguments, but the foundation to the settlement, with

2    certainty -- and in fact, Mr. Despins could testify to that

3    because, as he knows, it was originally in the settlement

4    agreement that the settlement would not be approved unless we

5    actually had that level of certainty from this Court that we

6    would not create new debt that would find its way back before

7    the Court to another Title III proceeding.

8         It was a foundation of the settlement.  It ultimately

9    migrated to go into the Plan, but obviously the foundation of

10   the Plan is the settlement, and the foundation of the

11   settlement is the need for certainty.

12        If this Court is not persuaded by Mr. Kirpalani, as I

13   think it should be, then frankly, I think we ought to be

14   revisiting all of this, because the economic split was based

15   on an understanding that we would not be back before Your

16   Honor or any other court and have to deal with these issues

17   five, ten, 20 years out.  This was a one-and-done situation.

18        Thank you, Your Honor.

19        THE COURT:  Thank you.

20        Good afternoon again.

21        MR. ROSEN:  Thank you, Your Honor.

22        Your Honor, as you can tell, what we tried to do was

23   to divide up some of the issues there so that we could each

24   hit them in the limited time that we each had.  So I am going

25   to be focusing, Your Honor, on mainly the evidence that was

1    submitted and the compliance with PROMESA and the provisions

2    of the Bankruptcy Code.  And I will try to address some of the

3    individual points also at the end, if I have a few more

4    moments.

5        THE COURT:  And I'll tell you now, I will be asking

6    you before you sit down to provide some further clarity as to

7    the scope of the releases and injunctions.

8        MR. ROSEN:  Yes, Your Honor.

9        THE COURT:  Particularly, their effect with respect

10   to potential actions against former government officials in

11   their private capacity, and others who were involved in the

12   marketing of the securities, transfers of assets.

13       MR. ROSEN:  Absolutely, Your Honor.

14       THE COURT:  Thank you.

15       MR. ROSEN:  Your Honor, not to steal the Schoolhouse

16   Rock reference, but my theory is, what do we know.  What do we

17   know so far?  Your Honor, we have five declarations that were

18   provided in support of the approval of the compromise and

19   settlement and the confirmation of the Plan.

20       We've incorporated by reference the first, the

21   Jaresko 2019 Declaration.  We have the Matt Feldman

22   Declaration as well, Your Honor, in support of the 9019 and

23   the compromise and settlement in the COFINA case.  And then,

24   Your Honor, again, we have the Jaresko Declaration, the

25   Brownstein Declaration and the Pullo Declaration.

1      As was said several times, Your Honor, none of the

2  information that was set forth in any of those declarations

3  was controverted and none of the declarants were subject to

4  cross-examination.

5      So what do we know from the 9019 declarations, Your

6  Honor?  We know that the two agents were appointed to address

7  an extremely novel and complex set of issues.  And included in

8  those issues -- they were developed in prior litigations, and

9  included also in the adversary proceeding and the summary

10  judgments that were filed before the Court.

11      We know that with the benefit of the mediation team,

12  we were able to -- excuse me -- craft a compromise of the

13  PSTBA that provided for the 53, 46 split, plus or minus, Your

14  Honor.  We know that they believed that there was no

15  assurance, and "they" being the agents, Your Honor, there was

16  no assurance of success and that the winner-take-all approach

17  was too risky from both of their vantage points.

18      We know also, Your Honor, that by compromising the

19  matter, it provided the Commonwealth with funds that it

20  currently does not have an entitlement to.  We know that

21  certainty and conclusion to a process that could have used

22  more, with no funds being available to either the Commonwealth

23  or COFINA until an alternate decision, or an ultimate decision

24  became final.

25      We know that by reaching an agreement, it allowed

1   COFINA to move forward with a Plan of Adjustment.  And the

2   Commonwealth will have a greater understanding of the funds

3   that will be available to satisfy the needs of the

4   Commonwealth and its citizens for decades pursuant to the

5   Commonwealth Plan of Adjustment.

6          We also know, Your Honor, that all of these factors

7   weigh heavily in support of approval of the settlement that

8   favors or forms the basis for the COFINA Plan of Adjustment.

9          With respect to the three other declarations, Your

10  Honor, and Mr. Friedman took some of this already, but I want

11  to go to the Brownstein Declaration first, because from his

12  uncontroverted declaration, we know that the Oversight

13  Committee took the compromise and settlement that was reached

14  by the agents and developed securities for the issuance

15  pursuant to the COFINA Plan of Adjustment.

16         And we know that in doing that, and in conjunction

17  and consistent with the Fiscal Plan and its projections, the

18  securities were to provide debt service that would be

19  sustainable and payable for the life of the securities.

20         We know that the Plan of Adjustment negotiations

21  ensued that were led by the mediation team, and that the

22  participants included Bonistas (ph) as representatives of the

23  island bondholders; some senior only bondholders; some junior

24  only bondholders; some bondholders who held both junior and

25  senior bonds, some weighted more heavily to the senior and

1    some weighted more heavily to the junior.

2            Your Honor, in fact, Mr. Brownstein said in paragraph

3    18 of his Declaration, and if I may read that quickly -- which

4    I don't even have the time.  Paragraphs 18 and 19, Your Honor,

5    of his Declaration make clear the people who were involved in

6    the negotiation and the fact that all parties were adequately

7    represented.

8            We also know that to the best of anyone's knowledge,

9    no one that requested admission to the mediation process was

10   excluded.  And from the testimony and declarations and the

11   answers to the Interrogatories that were served upon GMS and

12   answered, we know that none of GMS -- excuse me, we know that

13   GMS never requested to participate in the mediation.

14           And lastly, Your Honor, from Mr. Brownstein, we know

15   that many issues associated with the development of the Plan

16   of Adjustment were hammered out during those sessions,

17   including the senior-junior issues, and what emphasis should

18   be placed on those issues, including the subordination and

19   make whole entitlements.

20           With respect to Ms. Pullo, Your Honor, we know the

21   solicitation of acceptances and elections with respect to the

22   Plan of Adjustment were done in accordance with the provisions

23   of the Disclosure Statement Order.

24           We know that the solicitation was extremely

25   successful, with over 8,000 votes or elections cast.  But most

1   importantly, we know that every class entitled to vote on the

2   Plan, voted to accept the Plan in accordance with the

3   provisions of PROMESA and the Bankruptcy Code.  Again, Your

4   Honor, that is all uncontroverted.

5         From Ms. Jaresko's Declaration and its exhibits,

6   which include the Plan of Adjustment itself, we learned of a

7   general Plan development process.  We learned that the Plan

8   contained all of the requisite provisions required pursuant to

9   PROMESA and the Bankruptcy Code.

10        We learned that the Oversight Board took all steps

11   necessary, consistent with PROMESA, in connection with

12   certification of the Plan of Adjustment and the Fiscal Plan

13   consistency.  And we know, Your Honor, that her testimony was

14   uncontroverted.

15        From all of these five declarants, Your Honor, we

16   know that the Court should approve the compromise and

17   settlement, from not only the Commonwealth side of the ledger,

18   but also the COFINA side.

19        And we know that the compromise settlement, as a

20   basis for development, was used to satisfy all the

21   requirements for confirmation and the development of the

22   COFINA Plan of Adjustment.  And that all of those

23   requirements, Your Honor, have been met and the Plan should be

24   confirmed.

25        Your Honor, I would note also that there is, within

1    the findings of fact, a reference to compliance with 3019,

2    Bankruptcy Rule 3019, and that was because, Your Honor, there

3    was a slight modification to the Plan subsequent to the

4    conclusion of solicitation.

5         It provided no modification to any of the treatment

6    of creditors, other than a reference in Article 10, I believe

7    Section 10.1 of the Plan, but that provided no different

8    distribution, Your Honor, to creditors, because already

9    provided pursuant to the Plan was that creditors were

10   receiving in the Assured junior and Assured -- excuse me, the

11   COFINA junior Assured bonds, Assured class, 100 cents on the

12   dollar.

13        All it provided for, Your Honor, was a mechanism, and

14   then Assured to receive the bonds, and then the marketing of

15   the bonds that Assured received pursuant to an agreement

16   between the government and Assured.

17        Your Honor, you also asked with respect to the Plan

18   provisions regarding the release's exculpation and injunction

19   language.  I would first like to go back to a comment that was

20   made earlier by counsel representing the Cooperativas who had

21   a concern about his litigation that's outstanding and the

22   releases that might otherwise be given.

23        We have discussed the issue between us, Your Honor,

24   and I pointed out that one of the defendants there is COFINA.

25   And, of course, COFINA, that claim would be treated as a

1    Section 510(b) subordinated claim, and class ten, and receive

2    no distribution pursuant to the Plan.  And counsel agreed.

3    And so it's not an issue with respect to COFINA being released

4    from that litigation.

5         We also discussed that the Commonwealth is a named

6    defendant in that case.  And we are not here, Your Honor, to

7    provide a release for the Commonwealth, but I did note that

8    it's the same claims and causes of action against the

9    Commonwealth.

10        And pursuant to that Plan of Adjustment, there was no

11   doubt there would be a Section 510(b) subordinated claim.

12   Similarly, we will probably receive no distribution pursuant

13   to that Plan of Adjustment.

14        So that left several parties who were named

15   defendants.  And I think this goes to the crux of the question

16   that you were asking.  Your Honor, we're not here to try to

17   stop ongoing litigation by the cooperativas against any of

18   those parties.  And if you recall, Your Honor, at the

19   disclosure statement hearing, you asked me to make sure that

20   there was no coverage within those releases of underwriters,

21   investment bankers, et cetera.

22        I went back and I looked at the releasees, Your

23   Honor.  There were no underwriters listed, but there were

24   investment bankers listed.  So when we filed a Modified Plan,

25   Your Honor, prior to the solicitation, I believe it was, or

1    even the third amended one that got filed just before, Your

2    Honor, we made sure that we deleted the reference to the

3    investment bankers.

4            THE COURT:  But there is, I think, and I don't have

5    it right in the front of me, a general reference to related

6    parties of the Commonwealth and COFINA and employees, agents,

7    so on and so forth.

8            And I didn't remember seeing a definition that

9    specifically cabined that reference, so as to make it

10   absolutely clear that you didn't intend to reach others in the

11   categories that I've just mentioned.

12           MR. ROSEN:  Your Honor, I do have that definition in

13   front of me.  It is 1.150 of the Third Amended Plan, entitled,

14   Related Persons.  There is a reference in there to

15   professionals.  But we'd be happy, Your Honor, to make sure we

16   carve that other out, because it is not our intention to

17   provide that at this time.

18           And we can do that either of two ways, Your Honor.

19   We can include it in the Proposed Confirmation Order, saying

20   not withstanding the definition, these expressly are not to be

21   included, rather than filing another Plan --

22           THE COURT:  That would be helpful.  And what about

23   the former official issue?

24           MR. ROSEN:  There are references in there, Your

25   Honor, to former employees or managers.  And is it the Court's

1    request that we also exclude those as well?

2             THE COURT:  Well, my first question was whether you

3    intended that to mean former government decision makers who

4    were involved with these and --

5             MR. ROSEN:  Based upon the terms of the definition,

6    Your Honor, it would be included.  It was a request of the

7    governmental parties in the context of the negotiation of the

8    Plan.  I obviously could address that issue with them.

9             THE COURT:  If there's some consideration being put

10   into all of this by some of those people, perhaps I might be

11   able to be persuaded that that's appropriate --

12            MR. ROSEN:  Absolutely, Your Honor.

13            THE COURT:  -- but I don't see that right now.

14            MR. ROSEN:  I understand, Your Honor.

15            Mr. Friedman is concerned that there -- to the extent

16   that they are carved out, which we would understand the

17   Court's position, there would be resulting claims back against

18   the Commonwealth, probably indemnification claims of some

19   sort.

20            I don't know where they would fall in the spectrum of

21   claims against the Commonwealth estate at this time.  Probably

22   general unsecured claims, Your Honor.  I don't know if they

23   would be Section 510(b) subordinated claims, because I don't

24   know what the claims would be against them, and then the

25   parallel back again against the Commonwealth.  But --

1          THE COURT:  So --

2          MR. DESPINS:  May I confer with Mr. Rosen one second?

3          THE COURT:  Yes.

4          MR. ROSEN:  Mr. Friedman is concerned about people

5   who were working during the Title III process, Your Honor.

6   And we believe that to the extent they were providing services

7   during the Title III, they would be covered by the exculpation

8   provisions of the Plan in providing services to COFINA, or to

9   the Commonwealth in connection with respect to COFINA, Your

10  Honor, because everything is linked solely to the actions with

11  respect to COFINA.

12         Mr. Despins is concerned about some claims that might

13  be lodged, and to the extent that they are lodged, he's

14  essentially asking for the judgment reduction provisions.  So

15  that is a claim, there couldn't be more of a recovery, or an

16  assessment against one than recovery --

17         THE COURT:  Well, rather than doing this on the

18  fly --

19         MR. ROSEN:  Yes.

20         THE COURT:  -- may I request a supplemental

21  submission and proposal on the issue, and just add into this

22  mix as to indemnification.  I don't know whether there are

23  individual employment contracts or whatever, but in the flood

24  of the lift stay litigation that I've seen involving Section

25  1983 claims, I understand that there is a statute that lets --

1    that gives the Commonwealth discretion as to whether to

2    indemnify voluntarily, but doesn't mandate it or make it

3    automatic.

4            MR. ROSEN:  Right, Your Honor.  Your Honor, I see

5    that I'm well past my time.

6            THE COURT:  Keep going.

7            MR. ROSEN:  Okay.  Thank you, Your Honor.  I

8    appreciate that very much.

9            Your Honor, one of the comments that was made, and I

10   know Mr. Friedman said it, but -- or responded to it, the

11   statement by Mr. Hein I think is just a misapplication of

12   PROMESA and what it says.  The best interest test is not with

13   respect to a single class.

14           And we have reserved that right or that argument in

15   connection with the brief that we filed.  We noted it, Your

16   Honor.  And that it's the best interest of creditors taken as

17   a whole.

18           And we looked at what would happen here on the COFINA

19   side if, in fact, that litigation -- what would the recovery

20   be.  And we believe the compromise and settlement, Your Honor,

21   sufficiently establishes that the best interest test for all

22   the creditors of COFINA has been satisfied.

23           There were some comments made by Mr. Eisenberg, and

24   specifically his argument that if the bondholders' lien is

25   defective, then the seniors and juniors would be equal.  But

1    again, Your Honor, that ignores what the controversy is all

2    about.

3            The controversy was whether the senior versus junior

4    -- or, excuse me, the sales and use tax.  I can't even read my

5    writing here.  The sales and use tax was property of COFINA or

6    the Commonwealth.  And the settlement effectively said some,

7    but not all, of the SUT are COFINA's property.

8            So the lien that COFINA grants the bondholders, Your

9    Honor, is good, but it is against less sales and use taxes

10   than COFINA used to get as part of the original resolution.

11   Therefore, the seniors get more satisfied than the juniors.

12   There is no taking.  There is no discharge issue with respect

13   to that, Your Honor.

14           With respect to Mr. Hein's comment, Your Honor, or

15   several of his comments -- I want to make sure I read it

16   again.  The reasonable -- the new bonds can be enforceable,

17   and the SUT, not available resources of the Commonwealth, it's

18   that the SUT is a smaller share of the former SUT, and that

19   smaller share, Your Honor, implements the settlement.

20           The new bond legislation that has been talked about

21   by Mr. Kirpalani and Mr. Friedman here, the COFINA Title III

22   Plan, excuse me, that restructures the liens are granted by

23   COFINA.  And that legislation is -- it is correct that it is a

24   necessary condition precedent to the effectiveness of the

25   Plan.  It cannot be viewed in the abstract.  But also, the

1  legislation itself does not violate the Contracts Clause,

2  excuse me, not when COFINA itself carries out the terms of the

3  Plan of Adjustment.

4       Lastly, Your Honor, there was a statement by one of

5  the objecting parties, and I cannot recall which at this time,

6  it might have been Mr. Hein, making a statement that I said

7  something.  And I don't think that's what I said.

8       Specifically, he said that Brian Rosen claims that

9  the sales and use tax belongs to COFINA.  That's not it at

10 all, Your Honor.  I said that the Commonwealth Statute -- let

11 me rephrase it.  I said that the issue of ownership of that

12 was in dispute, and while the Commonwealth claims that title

13 did not transfer, the COFINA side of the house claims that it

14 did.

15      So I just want to point out that there never was an

16 admission by me or by anyone else that actually was property

17 of one or the other.  Rather, that it was a point that was in

18 constant dispute by the parties, by 2016, when Lex Claims

19 litigation was commenced, and through the adversary

20 proceeding, and the Summary Judgment Motions that were argued

21 before the Court, until they're compromised before the Court

22 today, Your Honor.

23      With that, Your Honor, we would submit that this

24 phase of the -- oh, another question.

25      THE COURT:  Yes.  I had asked you in the morning --

1        MR. ROSEN:  I'm sorry.

2        THE COURT:  -- to put on your agenda the supremacy

3   provision of the Proposed Order insofar as it goes to related

4   documents of the Plan and would seem to say that contracts,

5   other documents in that collection, which is unspecified, have

6   the force of federal law by virtue of the Supremacy Clause.

7   And it's also a little bit confusing, insofar as they include

8   internal choice of law provisions that point to Puerto Rico

9   law with regard to Puerto Rico's choice of law requirements.

10       And so, first of all, are you trying to get me to

11  transform commercial paper, commercial deal documents, into

12  federal law?

13       And second of all, how does one avoid the spiral loop

14  that at least is facially suggested by the choice of law

15  provisions?

16       MR. ROSEN:  Your Honor, I know that Mr. Kirpalani

17  tried to answer that question for you.

18       THE COURT:  No pointing fingers.  You're there.

19       MR. ROSEN:  Thank you.

20       THE COURT:  This one's for you.

21       MR. ROSEN:  I really do appreciate that.  You're

22  right, Your Honor, in them -- I think it's -- I'm looking at

23  one of the documents.  I assume it's --

24       THE COURT:  It's findings of fact.

25       MR. ROSEN:  190?

1          THE COURT:  Yes, paragraph 190, and paragraph 53 of

2    the Proposed Order.

3          MR. ROSEN:  Right.  I'm looking currently at 190,

4    Your Honor.

5          You're right.  We are asking you to make that

6    finding.

7          We look at this transaction as a whole, Your Honor,

8    including the various documents that are necessary to do it,

9    including all the documents that were included in the Plan

10   Supplement, Your Honor, because all of those documents are

11   designed to give the level of certainty that the creditors

12   have been looking for as part of the process.  The certainty

13   that Mr. Feldman referred to in the negotiation process with

14   Mr. Despins.

15         So the answer is yes, we're asking the Court to do

16   that.  I understand the Court's concern, however, about future

17   amendments, modifications, et cetera.  And the question is how

18   could you do that if you don't even know what's coming down

19   the pipe.

20         I do understand that concern, Your Honor.

21         THE COURT:  And how do I do that when -- you're

22   either asking me to, you know, put on my Hogwarts hat and say,

23   anything I've read is now federal law because I signed an

24   Order, or to create my own path through precedent and other

25   recognized provisions of general legal principles to decide if

1    there's a logical path through these very complicated

2    documents that says they are unquestionably, indisputably,

3    naturally consistent, so consistent with law that I can make

4    them law as a federal matter.

5         And honestly, I'm not well enough staffed to do the

6    latter, given the traffic into my inbox.  And the former seems

7    a little presumptuous to me.  So how are you going to help me

8    out?

9         MR. ROSEN:  Okay.  Well, I won't go to the former,

10   because it's too presumptuous for us to ask you to do that.

11   With respect to the latter, though, I think we tried to weave

12   that for you today, and I think we might be able to provide

13   you the pathway, if you will, as you indicated, to how to get

14   there through the various provisions that we talked about

15   earlier today.

16        MR. KIRPALANI:  Your Honor, could I be heard on this

17   question?

18        THE COURT:  Yes.

19        Mr. KIRPALANI:  So I think there are two distinct

20   issues.  And if I understand the Court's concern, it's that

21   paragraph that says ancillary documents have the force of law,

22   too, even though Your Honor has never seen them.  And they

23   provide for Puerto Rico law; in some instances, New York law;

24   in other instances, the indenture.

25        That's governed by New York law.  It's not federal

 1  law.  It's an indenture on the instructions agreement or the

 2  flow of funds.  Things like this are ancillary documents that

 3  are important, but they're governed by state law.

 4          I think the key distinction is the Confirmation Order

 5  is obviously federal law.  The Plan has the force of federal

 6  law pursuant to statute.

 7          THE COURT:  As I said, I can understand as to the

 8  order in the Plan.  It's the rest of that sentence --

 9          MR. KIRPALANI:  And I think the rest of the

10  documents, what they're designed to do is to protect the

11  property rights that have been validated, that have been

12  determined to be valid, but they themselves aren't governed by

13  state law.

14          So the indenture is a New York contract.  And the

15  other ancillary documents, to the extent they're governed by

16  Puerto Rico law, they are Puerto Rico law agreements.  So I'm

17  not sure that there's as much attention here -- maybe the

18  wording needs to be fixed.

19          THE COURT:  So in your supplemental submission that

20  deals with the release issue, tell me what you want paragraph

21  190 and 53 to say.

22          MR. ROSEN:  We will address that, Your Honor.

23  Absolutely.

24          THE COURT:  Thank you.

25          MR. KIRPALANI:  One more thing, I'm sorry, on that

1   subject, Your Honor.  So some of those documents are almost in

2   final form.

3           THE COURT:  Hogwarts hat time again, yes.

4           MR. KIRPALANI:  So there's one or two small drafting

5   issues that remain open, but the PSA parties, pursuant to the

6   Plan, are still working with AAFAF and the Board to finalize

7   them.  And we will conclude that promptly after the hearing,

8   Your Honor.

9           THE COURT:  So you'll let me know what the universe

10  is and what you want me to say about that.

11          MR. KIRPALANI:  Yes.

12          MR. ROSEN:  And he's not in Slytherin, Your Honor,

13  not at all.

14          THE COURT:  Right.  I think Mr. Stancil is --

15          MR. ROSEN:  Yes.  I just wanted to make one other

16  comment.  Well, come --

17          MR. STANCIL:  Your Honor, Mark Stancil on behalf of

18  the General Obligation Bondholders Group.  Mr. Rosen mentioned

19  best interest of creditors test and the Board's view that it

20  applies to creditors as a whole in the alternative.

21          I would just like to urge the Court not to reach

22  whether it applies to the individual creditor class or the

23  creditors as a whole in this case, because we think the Plan

24  can be confirmed without deciding that question.

25          And I think that question will be hotly disputed in

1    the Commonwealth case, and so to the end of trying to get us

2    all there without a lot of fighting here, I think that it

3    would be best if the Court doesn't reach it.

4            If the Court is inclined to reach it, such a

5    difficult and complicated question, we respectfully ask the

6    Court to reach it, if the Court is inclined in this matter --

7            MR. ROSEN:  Mr. Stancil is correct, Your Honor.  We

8    believe if you would look individually, you'd be more than

9    satisfied.  They did ask us in the context of preparation of

10   the Memorandum of Law and Reply, and not just Mr. Stancil's

11   group, but other creditors of other people who had an

12   opportunity to weigh in pursuant to the Plan Support

13   Agreement, not to make an argument, as the primary argument.

14   But we did include it as a footnote, as an alternative base.

15           But we do believe, as Mr. Stancil said, that we could

16   confirm this Plan just by satisfaction on a class-by-class

17   basis.

18           THE COURT:  And so in my remarks for follow-up here,

19   I'm going to take these remarks under advisement.  Should I

20   come to the conclusion I need further briefing on anything, I

21   will let you all know.

22           MR. ROSEN:  Thank you, Your Honor.

23           I believe, unless you have any additional questions,

24   that would conclude the confirmation aspect of this matter,

25   and then we would move on to Section 19.5 of the Agenda.

1          THE COURT:  Thank you, all.

2          And I believe we'll take a ten-minute break in

3     between the two.  While everybody's here, I don't know if

4     everybody's staying for the 19.5 part, I do want to thank

5     everyone who has worked so hard for so long, of course

6     including the mediation team, but also including each of the

7     other parties to these negotiations and drafting.

8          And I also thank the general people of Puerto Rico

9     who are concerned about their homeland and who have been

10    trying to make their voices heard contextually, you know.

11         Whether that's material to particular decisions of

12    law or not is something that I will address in some fashion as

13    I go along, but I recognize the investment of hearts, minds,

14    souls, lives and bodies here, and of the objectors as well in

15    this litigation.

16         And I thank you all for the privilege of being in the

17    incredibly challenging position of making these important

18    decisions for the future of Puerto Rico and the future of

19    these proceedings.  And I recognize that you all didn't choose

20    me, but I am honored to have been chosen and will continue to

21    seek to bring my best to the task.

22         MR. ROSEN:  Your Honor, I do want to take this

23    opportunity to thank not only you, but your chambers, Judge

24    Dein, and the entire court staff for helping us throughout the

25    process.

1          THE COURT:  Thank you.  And my thanks are added to

2    those.

3          So now that we've all thanked each other thoroughly,

4    let's take a ten-minute rest.  We'll reconvene at 2:30.

5          (At 2:20 PM, recess taken.)

6          (At 2:35 PM, proceedings reconvened.)

7          THE COURT:  Good afternoon.  Please be seated.  I beg

8    everyone's indulgence while I sit down.

9          I'd like to round up my request on the other two

10   matters.  Okay?

11         Mr. Rosen, you are still here?

12         MR. ROSEN:  Do you need me to come down, ma'am?

13         THE COURT:  No.  I'm hoping your answer to this will

14   be yes and I'll just repeat it.  Oh, the microphone is coming

15   to you.

16         MR. ROSEN:  Yes.

17         THE COURT:  So I'm reserving decision on the 9019

18   motion and the confirmation motion.  I have specifically

19   requested supplementation regarding clarification and scope of

20   the releases, injunctions and related provisions.  And also

21   with respect to the supremacy provision, I am accepting the

22   offer from AAFAF of the background for the legislative

23   development process.

24         And you can throw in there the legal basis for the

25   independent corporation of the Commonwealth of Puerto Rico,

1    because I don't -- I didn't see statutory citations for

2    that.

3                    MR. ROSEN:  Yes, Your Honor.

4                    THE COURT:  And it would be very helpful to have a

5    cogent, in one place, written iteration with the citations of

6    the rationale for the validity provisions that Mr. Kirpalani

7    and Mr. Rosen have together offered today.

8                    And what would you suggest as a deadline for that?

9                    MR. ROSEN:  Monday, Your Honor.

10                   THE COURT:  That would be very helpful.  Thank you.

11                   MR. ROSEN:  For me, too.

12                   THE COURT:  All right.  Then I will look forward to

13   it.  And thank you.

14                   MR. ROSEN:  Thank you, Your Honor.

15                   THE COURT:  Good afternoon.

16                   MR. SCHAFFER:  Your Honor, perhaps before we go on

17   the clock, I can report that Judge Houser has been relentless

18   and there has been some progress with regard to the remainder

19   of what we're doing here.

20                   Your Honor, for the record, I'm Eric Schaffer of Reed

21   Smith on behalf of the Bank of New York.  My partner, Louis

22   Solomon, will be handling the evidentiary aspects today.

23                   Your Honor, what I'd like to report is that with

24   Judge Houser's urging, we have reached an agreement with

25   regard to the Section 19.5 issues with Ambac.  On the basis of

 1   that agreement, Ambac will not be participating in the legal

 2   argument or the evidentiary part of the hearing.

 3           MR. HERTZBERG:  Good afternoon, Your Honor.  I'm Gabe

 4   Hertzberg from the Curtis Mallet firm.  I represent Ambac

 5   Assurance Corporation.  I'm here to tell you that what

 6   Mr. Schaffer said is correct.

 7           THE COURT:  Well, thank you for this news.

 8           And thank you, Judge Houser, who I gather helped make

 9   this happen.

10           MR. HERTZBERG:  I second that.

11           THE COURT:  So thank you, and congratulations.

12           MR. GLENN:  Good afternoon, Your Honor.  Andrew Glenn

13   from Kasowitz, Benson, Torres, LLP, on behalf of Whitebox

14   entities.

15           THE COURT:  Good afternoon.

16           MR. GLENN:  Up until three hours ago, we were

17   coordinating with Ambac on the presentation, argument, and

18   evidence before Your Honor.  I'm going to try to stick to the

19   time limits even without their participation.  I would just

20   like to ask the Court for its indulgence with a little

21   flexibility, given that this all came about at the last

22   minute.  Thank you.

23           THE COURT:  Understood, and you will have it.

24           All right.  So are you ready to begin opening

25   statements?

1          Mr. SCHAFFER:  Yes, Your Honor.  Again,  Eric

2    Schaffer.

3          Your Honor, in the last two weeks, we've submitted

4    two expert reports, two briefs.  Whitebox has submitted four

5    briefs.  I don't think there's a lot that's really new here,

6    but I think what's most significant, though, is this is not

7    the first time we've seen a plaintiff suing an indentured

8    trustee, trying to deprive the trustee of the ability to pay

9    fees and expenses for funds held by the trustee.

10          In our papers, we cited you to five recent New York

11   cases that considered the same arguments that plaintiffs are

12   making here.  Each of those cases determined that unless and

13   until the plaintiff can prove that it comes within the

14   exception, there is willful misconduct or gross negligence,

15   until that time, the trustee should be permitted to draw upon

16   funds in its possession to pay fees in the ordinary course.

17          There are four decisions from just last year in the

18   Southern District of New York.  They were issued by four

19   different judges, involved four different trustees, and each

20   of them rejected efforts by plaintiffs to delay payment of

21   defense costs until after merits were determined.

22          In each of those cases, the plaintiffs alleged

23   wrongdoing within an exception, and in each case the Court

24   said, we're going to stay that challenge until the trustee is

25   proven to have been found guilty of this misconduct.

1          In the most recent of these cases, *Royal Park versus*

2    *U.S. Bank*, Judge Marrero held that plaintiff's arguments must

3    await such time, if any, that the trustee, quote, is found to

4    have acted grossly negligently, unquote.  And, of course, all

5    of these cases are in the federal court, so no real harm,

6    because the trustees were not going away.

7          Similarly, in *Pimco versus Wells Fargo Bank*, a state

8    court decision, it was the same sort of facts.  The Court

9    permitted the Trustee to reserve 57 million dollars to pay

10   anticipated legal fees.

11         Now, Whitebox has said, ah, that case didn't involve

12   a gross negligence claim.  No, it involved a claim of willful

13   misconduct.  It's in paragraph one of the underlying

14   complaint.  And the Court said that there's really no

15   prejudice because the trustee, quote, is going to be around if

16   plaintiffs succeed, unquote, on the underlying merits.

17         Whitebox says, well, those decisions just maintain

18   the status quo.  Well, Your Honor, the status quo here is the

19   trustee holds the money and the trustee is able to pay its

20   expenses on a current basis.

21         There's no prejudice here to Whitebox, because we

22   agree, first, if there's money left over, of course we're

23   going to refund it.  Second, as in the RPI cases, we agree

24   that they may, subject to some appropriate procedures,

25   challenge reasonableness.

1          And finally, if they prevail, they may seek a

2   judicial determination that we need to disgorge any fees that

3   we may not be entitled to based on a theoretical determination

4   that we were grossly negligent or we engaged in willful

5   misconduct.

6          So with these protections, I think we are squarely

7   within the *Pimco* decision, the *Royal Park* decision.  There is

8   no harm in our retaining these funds.

9          Now, it's interesting, Whitebox does not acknowledge

10  all of these protections.  Your Honor, no one questions the

11  credit of the Bank of New York Mellon, and by contrast, we

12  should not be left to pursue a Cayman Fund or others.  In this

13  case, until we are proven to have engaged in bad conduct, we

14  should be entitled to retain these monies and apply them on a

15  current basis.

16         Now, let me turn to the Plan.  The Plan recognizes we

17  have a secure claim.  And under 19.5, this Court has

18  determined the amount that, quote, shall satisfy, unquote,

19  shall satisfy all obligations of COFINA and all rights of the

20  trustee under the resolution.

21         Now, Whitebox has argued it never assumed COFINA's

22  obligations.  Well, they didn't object to the Plan.  They are

23  stuck with the requirements of 19.5.  And the requirement

24  there is that COFINA must satisfy its obligations and the

25  trustee's rights.

1    This requires that we get, in accordance with PROMESA

2    and the Bankruptcy Code, the indubitable equivalent of our

3    secured claim.  They ignored this in their papers as well.

4    Again, there's no objection to this in their plan.  We are

5    entitled to the indubitable equivalent.

6         And standing in the shoes of COFINA, for purposes of

7    19.5, under that mechanism, they have to show that we are

8    receiving the indubitable equivalent by a preponderance of the

9    evidence.  And, Your Honor, they have no evidence.  We've

10   submitted two expert reports.  They have not submitted

11   anything.

12        Now, Your Honor, turning to the resolution, which is

13   addressed in 19.5, it gives us multiple layers of protection.

14   I don't think I have time to get into everything in our

15   papers, but of course we covered a lot of this.

16        We have payment priority.  We have lien priority.

17   Section 804 of the Resolution says that we are entitled to

18   payment of trustee's expenses, and it indemnifies us as well

19   against losses and liabilities.

20        Section 1103 is an intercreditor agreement that kicks

21   in after a default, not between us and COFINA, but between us

22   and bond owners.  It gives us a payment priority.  And under

23   that waterfall, it is only after we have provided for our

24   expenses and set aside funds that payments would go out to

25   bond owners.

1          Finally, Your Honor, as we've addressed in our

2     papers, Section 501 is a pledge of the taxes subject to our

3     payment rights under Section 804, and in the express language,

4     all other provisions permitting application for the purposes

5     set forth in the resolution.  That includes not just 804, but

6     it includes the payment priority, the intercreditor agreement

7     in 1103.

8          Let me focus on 1103.  They acknowledge that this is

9     an intercreditor agreement among nondebtors.  And after

10    default, the Trustee, in its sole opinion, is entitled to

11    reserve amounts that may be advanced for legal fees.  This is

12    expressly senior to the bond owner.

13         The purpose is if COFINA cannot meet its obligations

14    under 804, we have a payment priority against Whitebox.  And

15    1103.3 gives us discretion to make periodic contributions.

16         Your Honor, we pointed you to the First Circuit's

17    decision in the *HSBC* case.  Under Section 510(a), the

18    enforcement of subordination provisions is no longer a matter

19    committed to the Bankruptcy Court's notion of what may or may

20    not be equitable.

21         Now, we say that our rights are secured, but even if

22    they were not, under the payment priority, under 1103,

23    intercreditor agreement, we come first.  And under case law

24    we've cited, if you have a junior creditor that is secured and

25    a payment priority in favor of a senior unsecured creditor,

1   the senior unsecured creditor receives payment.  It recovers.

2          The only real dispute here under Section 1103 is what

3   comes within the waterfall.  And with this, I think it's clear

4   that the litigation expenses here undoubtedly are incurred in

5   a context of our performance of our duties under the

6   resolution.

7          Our performance is at the heart of the Whitebox

8   claims.  It all implicates the integrity of the resolution,

9   the existence of events of default, and the relationship

10  between us and bond owners.  We also say under 1103, these are

11  expenses that are necessary, quote, in the opinion of the

12  trustee, unquote, to protect the interest of bond owners.

13         Now, they say how are bond owners protected?  Well,

14  we have an interest in protecting the integrity of the

15  resolution.  That includes protecting all other bond owners

16  against specious claims.

17         It also is a fact that we reserve the right to pursue

18  counterclaims under 19.5, and all of this is determined not

19  now, but it's determined when they file their lawsuit.  And

20  it's not altered by the intervention of a Title III

21  proceeding.

22         They point to 1103, to the language subject to 804.

23  Well, that's not a limitation, it's a priority provision.

24  It's intended to insure that the intercreditor waterfall only

25  becomes applicable if COFINA can't pay.  And that makes all

1    the sense in the world.  We should have to look to COFINA

2    first, and where there's a default, as 1103 provides, if

3    COFINA can't pay, then we go to the waterfall.

4         All of this is part of what I'll call a seamless,

5    interconnected set of protections for the Trustee.  And as

6    sophisticated parties -- and the Whitebox folks are very

7    sophisticated.  They certainly had the ability to read the

8    indenture, to do their due diligence before investing.  They

9    cannot escape the subordination agreement.

10        Your Honor, there is a lot I could say about 804, but

11   I think, consistent with the time limits here, I'm going to

12   move on, and I'll come back to that if I have time.

13        And I'll move to Section 501.  Under Section 501,

14   COFINA pledges all of the taxes, the sales and use taxes to

15   the trustee as security for payment of the bonds.  But if you

16   look at 501, that pledge is subject to Section 804 and subject

17   to the provisions of the resolution for application -- or the

18   purposes set forth in the resolution.

19        Now, what does this mean?  It's subject to 804.

20   That's where COFINA has to pay us.  And it's subject to the

21   payment priority in 1103.  Those are provisions that are

22   expressly provided to come within the 501 pledge, and they

23   come on a senior basis.

24        The effect is that even if we were not secured by the

25   charging lien in 804, even then, we still come first.  We get

1   priority under the Section 501 pledge.

2          The argument they make here is that the 501 pledge

3   really only secures principal and interest.  We read these

4   provisions subject to 804, subject to other provisions of the

5   resolution.  We read them, right out of the document, this is

6   not a limitation of the trustee's rights.  It's a

7   recommendation that we have rights under these other

8   provisions.

9          If you look at the language, 501 does not say it's

10  subject to 804, but really only for things that may be current

11  expenses or that might be subject to a charging lien.  It

12  doesn't say that all rights and priorities under the waterfall

13  exist, but they really only come in after principal and

14  interest.

15         It doesn't say that because, of course, that would do

16  violence to the intent of this section, and indeed, it would

17  do violence to the intent of the indenture read as a whole.

18  It doesn't exclude the payment priority giving meaning to 501.

19  Our rights are senior.  Our rights are secured.

20         Your Honor, I could get into a discussion of the

21  cases that they cite, *Becker* and others.  I really think we've

22  covered them.

23         THE COURT:  I've read the briefs.

24         MR. SCHAFFER:  It's wholly inapplicable.  And that

25  enables me to move on.

1          Your Honor, let me back up quickly to 804, as I see I

2    have a little bit of time that I've left myself.  804 needs to

3    be read as an integrated provision.  There are two clauses.

4    There's a clause for payment of expenses.  There's an

5    indemnification.  They are not redundant.

6          The indemnification picks up losses and liabilities,

7    but they are completely integrated because the indemnification

8    clause starts out, further, it is all one in the same, and

9    that read is consistent with what this Court did.  Harkening

10   back to the first time we were before you in the interpleader,

11   where you said that from time to time, we can reserve for and

12   pay reasonable fees and expenses, whether or not due and

13   owing, and you noted COFINA's obligations survived

14   satisfaction and discharge of the bonds and survived

15   termination of the resolution for any reason.

16         Just heading to my conclusion, Your Honor.  Again, we

17   have layers of protection.  We've got the protections in the

18   Plan.  We've got the protections, we have the lien and payment

19   priorities in 804 from COFINA.  We have the 1103 intercreditor

20   priority of payment over bond owners.

21         Now, Your Honor, I think it's useful to recognize

22   that when they're attacking our rights under the

23   intercreditor, they're not bond owners.  A beneficial owner,

24   as Whitebox claims that it is, does not have standing under

25   the resolution.  The bond owners are the registered bond

1  owners.  They have no standing to even challenge our rights

2  under Section 1103.

3       We then have 501.  Your Honor, if you read all of

4  this together, compensation, indemnification, lien priority,

5  payment priority, it demonstrates an intent to protect the

6  trustee and ensure we are not out of pocket unless we have

7  been found, actually found to have been engaged in gross

8  negligence or willful misconduct.

9       It's confirmed by reading all of the protections that

10  we had, the various exculpations, the limitations.  It's

11  confirmed by the cases we've cited about the public policy,

12  protecting the trustee, recognizing the critical role of the

13  trustee.

14       Your Honor, the notion that when this resolution was

15  drafted, there was an intention that we should assume an

16  obligation to fund, self-fund unknown litigation years into

17  the future, where we're getting compensation of 2,000 dollars

18  per year, per series, that notion would be absurd, and it

19  would be contrary to the history of the role of the indenture

20  trustee, and it would be contrary to practice.

21       We bargained for the right to cash collateral.  It's

22  protected by the indubitable equivalent provisions as

23  incorporated by PROMESA and the Bankruptcy Code.  We have a

24  payment priority.

25       Your Honor, I don't believe they can meet their

 1   burdens with regard to PROMESA and the Bankruptcy Code, and

 2   they certainly cannot meet their priorities -- excuse me,

 3   certainly cannot meet their burdens with regard to an

 4   intercreditor agreement, as to which they are not even a

 5   beneficiary.

 6              Thank you.

 7              THE COURT:  Thank you, Mr. Schaffer.

 8              Good afternoon, Mr. Glenn.

 9              MR. GLENN:  Good afternoon.  For the record, again,

10   Andrew Glenn on behalf of Whitebox.

11              I'd like to start my presentation, Your Honor, with

12   an overview of this undisputed set of consequences.  First,

13   the Plan of Adjustment in this case provides Bank of New York

14   with a release of all claims of the parties to the Plan

15   Support Agreement other than Whitebox and Ambac.  And our

16   claims were expressly reserved under that Plan Support

17   Agreement.

18              The record is clear, if you read the words in the

19   resolution and in the security agreement to the resolution,

20   the Bank of New York never has had a secured claim against

21   COFINA.  And as much as Mr. Schaffer would want the words to

22   say that, that's not what those words say.

23              It does not have any right to withhold distributions

24   to any COFINA bondholders for any indemnity claims under the

25   resolution.  That is, it does not have a charging lien for the

1    expenses to be incurred in this litigation.  And in fact,

2    COFINA has never had any obligation to advance any defense

3    costs to BNY.

4           Finally, BNY confirms that Whitebox never agreed to

5    indemnify it as would be required by applicable law.

6           I think the narrow question Your Honor has to answer

7    in this particular dispute is whether Section 19.5 creates any

8    rights to indemnification beyond those already set forth in

9    the resolution.  As we demonstrate in our papers, we think the

10   answer is no.

11          THE COURT:  And so, just to be clear, you dispute the

12   proposition that the resolution creates such rights even as

13   against COFINA?

14          MR. GLENN:  Correct.

15          THE COURT:  And you also say that neither rights, nor

16   a basis for holding Whitebox to any COFINA obligation that

17   might exist --

18          MR. GLENN:  Correct.

19          THE COURT:  -- is imposed by 19.5?

20          MR. GLENN:  Correct.

21          THE COURT:  Thank you.

22          MR. GLENN:  I think the best way to put this is their

23   best case here is they have a general unsecured claim for

24   indemnification that would have been validated at the end of

25   the litigation, which is consistent with what the law says

 1    about general validation claims such as this.

 2           Looking at Section 19.5, Your Honor.  The question

 3    is, does Section 19.5 state in clear and unequivocal terms

 4    that Whitebox must indemnify Bank of New York?

 5           Given that there's no agreement outside of 19.5, we

 6    have to parse through this language, and it's all very

 7    equivocal.

 8           THE COURT:  This language you're talking about is

 9    going back to the resolution now?

10           MR. GLENN:  No.  19.5 of the Plan of Adjustment, Your

11    Honor.

12           THE COURT:  Just for clarity, I didn't think I heard

13    Mr. Schaffer argue, and I didn't think I had seen in Bank of

14    New York's briefs, a contention that 19.5 is the source of the

15    indemnification right, although there is an argument that 19.5

16    is what makes Whitebox responsible for paying COFINA's

17    obligation.

18           MR. GLENN:  Correct.

19           THE COURT:  And I don't see Mr. Schaffer indicating

20    that I've misunderstood his argument.

21           MR. GLENN:  I mean, I think, Your Honor, they need

22    19.5.

23           THE COURT:  You think they need 19.5.

24           MR. GLENN:  That's our position.  That's our

25    position.  And if you look at the language in Section 19.5, it

1    says only -- and again, I'm going to only cite the relevant

2    words, what amount, if any, shall be withheld by the

3    disbursing agent or Bank of New York.  And whether Bank of New

4    York shall be reimbursed by Ambac and Whitebox, with the

5    occurrence of fees.

6          And then it concludes by saying, in each case, such

7    determination and the fulfillment of any obligations of Ambac

8    and Whitebox shall satisfy COFINA's obligations.

9          So we think, and again, if it's undisputed, that's

10   great, that 19.5 does not create any new obligation.  It's

11   merely a reservation of rights.

12         And I want to make something clear for the record.

13   Whitebox supports this Plan of adjustment.  There's a dispute,

14   Your Honor, as to what Whitebox's obligation is under Section

15   19.5.

16         If Your Honor concludes that we're wrong about what

17   19.5 says and what our -- what we believe our legal

18   obligations are, we'll live with that.  That's why we voted in

19   favor of the Plan and that's why we're a party to the Plan

20   Support Agreement.

21         Now, getting to the issue of 1129 and 510(a),  we

22   think these provisions are completely irrelevant to this

23   dispute.  1129(b)(2) applies in a cramdown.  I think you heard

24   from Mr. Rosen chapter and verse that this is the opposite of

25   a cramdown.  This is a fully consensual bankruptcy case.

1    And even if somehow cramdown were relevant, there's

2  no obligation for Whitebox to provide indubitable equivalency.

3  The subordination agreement, Your Honor, presupposes that

4  there is a priority obligation to pay Bank of New York, and

5  that's what Your Honor otherwise needs to determine without

6  regard to Section 510(a) of the Bankruptcy Code.

7    We think that the *Becker* case we cited, which is also

8  a very recent vintage, is the most relevant case here, Your

9  Honor.  That, too, was a bankruptcy proceeding.  The only

10  bankruptcy proceeding, I think, that's at issue in this case

11  or cited in this case.

12    And if you parse through what happened there, it's

13  fully analogous to this case.  You had a Plan that settled the

14  indentured trustee's obligations, vis-a-vis the debtor.  It

15  was a litigation against the Bank of New York.  The Plan there

16  preserved indemnification rights solely to the extent it could

17  assert a charging lien.

18    And Bank of New York, in that case, tried to assert

19  that there was a charging lien, and the Court rejected it and

20  said, just as we're contesting here, that the Plan did not

21  create any additional rights beyond those in the bond

22  documents.  It only preserves specific rights and obligations

23  in order to permit indenture trustee to achieve specified

24  goals.  But in the end, the bondholders never agreed to assume

25  any of the borrower's indemnity obligation.

1    The COURT:  So there was no provision in *Becker*

2 similar to Bank of New York's construction of 19.5, which

3 makes particular beneficiaries responsible for covering

4 COFINA's obligations, according to Mr. Schaffer.

5    As I read *Becker*, there was no such provision in the

6 Plan, and the initial distribution of the assets of the bond

7 issuer held by the trustee had already been distributed.  And

8 this was a second tranche of collections that, under the Plan,

9 was to go to the bondholders.

10    MR. GLENN:  That's correct.

11    THE COURT:  So if Mr. Schaffer is right about what

12 19.5 does, as between COFINA and Whitebox, in terms of

13 responsibility, then *Becker* is distinguishable, wouldn't it

14 be?

15    MR. GLENN:  Yes, Your Honor, it would be, because

16 there was no Section 19.5 in *Becker* or anything analogous to

17 it.

18    But then that gets back to my original argument, does

19 19.5 create a new obligation?  And our position is that it

20 does not.  And that's why *Becker* is right on point.

21    There were lots of hurdles for them to come to the

22 conclusion that we have any indemnification obligations under

23 19.5.  The obligation, as we've cited in the cases, must be

24 unmistakably clear from the language of promise.

25    The Statute of Frauds applies.  There has to be

1    writing against a party who is charged with indemnification

2    obligations.  And we cited the *Santa Fe* case from Judge

3    Daniels, where he said, indemnity is also different whereby a

4    court is presented with a dispute.  It's really a fee shifting

5    provision, so there's an extra layer.

6        Here it's not really indemnification.  It's one party

7    agreeing to pay another party's legal fees up front, in that

8    case, in a dispute between those two parties.  And Judge

9    Daniels said that that also must be unmistakably clear from a

10   writing.

11       Let's get to the provisions of the actual bond

12   resolutions that I think are most relevant, which Mr. Schaffer

13   glossed over at a very high level.  I think we both agree that

14   804 of the bond resolution is the starting point of the

15   analysis.  And there's no dispute that the provision --

16   starting provision of 804, the first provision, indicates that

17   they do have the right, they do have a lien for fees and

18   expenses incurred in and about the performance of their powers

19   and duties under the resolution.

20       That's what we call the compensation provision.  And

21   that starts with an intro that COFINA shall, from time to

22   time, pay reasonable compensation.

23       It goes on to say that there's a further agreement to

24   indemnify and hold the trustee harmless for any costs and

25   expenses of the trustee defending itself against any claim,

1  whether asserted by COFINA, the bondholders or any other

2  parties.  And that's not secured.

3      I mean, I think we've cited case law to the point of

4  you have to read each provision to make sure it's sensible,

5  that it's not superfluous, and that one provision that's very

6  specific on a particular issue must be given some prominence,

7  some deference beyond the more general provisions.

8      Here it is very clear, and it wouldn't have been

9  necessary to provide that indemnification provision if the

10  compensation provision gave them what they want, or if 1103.1

11  gave them what they want.  We wouldn't need the

12  indemnification in Section 804 of the resolution.

13      What they've said in 1103.1 is that these were

14  liabilities incurred in and about the performance of powers

15  and duties under the resolution.  But that's not what's in

16  dispute here.  These are not -- defending yourself in a

17  litigation is not a power and duty that a contract must confer

18  upon you.  You have that right under our American legal

19  system.

20      If we said they didn't have the right to defend

21  themselves in court, that would create another set of

22  problems.  So we have to read these provisions together.

23      THE COURT:  So what do you do with the other argument

24  that Bank of New York makes, which is to say that they are

25  defending themselves in and about their powers and duties,

1    insofar as the litigation that you've brought is about the

2    exercise of its powers and duties?  And so it is litigation

3    that's about that leaving aside whether the power to defend

4    yourself is something inherent in existence or something

5    conferred by a resolution.

6           MR. GLENN:  The provision of powers and duties in

7    1103.

8           THE COURT:  And it's also in 804.

9           MR. GLENN:  And it's in 804.

10          In 804, it's in the section that provides a lien.  If

11   that provision means what it says -- I think I went over this

12   already -- the second part of 804 would be superfluous.

13          And then if you go to 1103.1, that's the final

14   waterfall provision, the charging lien provision that they're

15   relying on.  And first it says, subject to 804.  If that

16   language means what they claim it says, then there's no reason

17   to have that language in the indenture.  That would render it

18   a nullity.

19          Second --

20          THE COURT:  Is there a meaningful difference in the

21   specific party obligations, insofar as in the second sentence

22   of 804, it's an affirmative indemnification covenant by

23   COFINA, and Bank of New York is saying that 1103 is an

24   intercreditor provision in which the bondholders are

25   specifically agreeing to this application of the waterfall?

1            So that although the function arguably may not be the

2    same, the party signing on to the commitment is added to the

3    universe of whoever would be bound by a hold back from funds

4    held by the trustee under the indenture, as to which a

5    charging lien is granted by the first sentence of 804.

6            MR. GLENN:  Again, we have the language in the

7    performance of duties and powers under the resolution.  That's

8    a limitation to the waterfall as well.

9            And if you go back to 804, okay, with the dichotomy

10   of COFINA's obligations, which have the lien, and the

11   indemnification that does not, the part that has the lien is

12   in the performance of their duties under the resolution.  So

13   any of that's just buttressing the first part of 804 as well.

14           And again, we're relying on the word "duties."  Okay?

15   And if they wanted to mirror the obligation for the waterfall

16   for that second part of 804, that language could have been

17   inserted in here as well to make it very clear that that's

18   what they were entitled to get.  It does not have that

19   language.

20           The other provision here is that the word "incurred"

21   is in past tense.  So if you look at the first part of 1103.1,

22   there's a setup that the part that's necessary to protect the

23   interests of bondholders is a forward-looking obligation,

24   stuff that might happen in the future.  You hold back some

25   money to make sure that the bondholders are protected.

1          The second part of 1103.1 is all in the past tense.

2    It speaks of liabilities incurred and advances made, not

3    future liabilities to be incurred to their law firms, to their

4    expert witnesses and the like.  So we think that language must

5    be given effect as well.

6          I'll conclude by showing Your Honor that the security

7    agreement in this case is at the end of the resolution.  It

8    says very clearly that only principal, interest and other

9    nonindemnification -- not even fee-related matters are covered

10   by the security agreement and the grant to Bank of New York.

11         They cited Section 501 as well.  And that's almost a

12   mirror image.  But there's no language in 501 that provides

13   them with a grant of the pledged property for this purpose.

14   They are relying on language at the end of there that really

15   does not support what they're saying.

16         So just to recap, we think the *Becker* case is

17   controlling if Your Honor concludes that Section 19.5 doesn't

18   create any new rights.

19         The *Royal Park* line of cases that they cited relates

20   to parties that challenged actions, I think three years in the

21   future in one case before Judge Caproni, where they were

22   already litigating and funding themselves.  And the Court

23   stepped in and said, look, this is a matter of judicial

24   economy.  Right?  Why am I going to deal with this now when I

25   can deal with this later?

1          It's a much different situation here where we're

2     dealing with the finality of a bankruptcy distribution and

3     moving forward in this case based on what the terms of the

4     Plan are.

5          Thank you very much.

6          THE COURT:  Thank you.

7          MR. SOLOMON:  Good afternoon, Your Honor.  Lou

8     Solomon.

9          THE COURT:  Good afternoon, Mr. Solomon.

10          MR. SOLOMON:  I think my job right now is to offer

11     into evidence the Declarations and documents which we have

12     already provided to the Court.

13          We will begin with the Declaration of Daniel

14     Goldberg, which is at 4767-10 of the ECF numbering.  All of

15     these were submitted under motion 4767.  So dash ten is his

16     Declaration.  Exhibits A, B, C and D are 4767-11, 12, 13, 14.

17     And the Declaration of Robert Fishman is 4767-15.

18          Your Honor has, by Order, directed that those

19     declarations were their direct testimony.  And at this point,

20     I would move those in.

21          THE COURT:  Any objection?

22          MR. GLENN:  No, Your Honor.

23          THE COURT:  The Goldberg and Fishman Declarations at

24     4767 with the enumerated Exhibits A, B, C and D to the

25     Goldberg Declaration are admitted.

1              (Whereupon Exhibits A, B, C and D admitted into

2    evidence.)

3              MR. SOLOMON:  Thank you, Your Honor.

4              The balance of the documents I wish to offer are all

5    in 4767.  And other than 4767-1 which are demonstratives,

6    which we're not offering -- I think we're not going to get to

7    it.  And beginning with 4767-2, 3, 4, 5, 6, 7, 8, 9, these are

8    documents either that support some of the legal arguments that

9    Your Honor heard, and it's just easy for Your Honor to have

10   it, or they are documents that either one or the other of the

11   witnesses has relied on.

12             We would offer them at this point.

13             THE COURT:  Any objection?

14             MR. GLENN:  One moment, Your Honor.  No objection.

15             THE COURT:  Exhibits 4767-2, 3, 4, 5, 6, 7, 8 and 9

16   are admitted in evidence.

17             (Whereupon Exhibits 4767-2, 3, 4, 5, 6, 7, 8 and 9

18   admitted into evidence.)

19             MR. SOLOMON:  Thank you, Your Honor.

20             That is the evidence prior to the cross-examination.

21   I see I have a minute, and just to help move this along more

22   quickly, I'd like to lodge an objection to any

23   cross-examination of these witnesses.

24             Your Honor's Order 4647 directed that we -- that we

25   be told by January 10 at 12 o'clock whether there was going to

1    be any request for cross-examination, including factual issues

2    to which the proposed cross-examination or testimony relates.

3    The subject matter of the testimony and its relevance to the

4    factual issues, that was not filed.  Four days later, we did

5    get something that was not in compliance with Your Honor's

6    Order, but it was also not timely.

7              The witnesses are here.  If Your Honor has questions,

8    we would love for Your Honor to ask them anything you want,

9    but we do object to the cross-examination.  We think it's

10   untimely.

11             THE COURT:  Have you flagged this untimeliness

12   objection before to Mr. Glenn or --

13             MR. GLENN:  (Shaking head from side to side.)

14             THE COURT:  I don't remember seeing this happening in

15   writing, and Mr. Glenn is shaking his head, so I guess --

16             MR. SOLOMON:  And I don't think so, Your Honor.

17             THE COURT:  Then I'll hear Mr. Glenn's response.

18   Thank you.

19             MR. GLENN:  Your Honor, we did not provide the

20   writing that he indicated.  We had the time allotted.  I

21   didn't understand that we were going to be held to provide

22   cross-examination, an outline of cross-examination in advance,

23   and I apologize for not realizing that.

24             It's unusual, and I didn't realize it existed.  So I

25   would like to cross-examine the witnesses.

1          THE COURT:  You didn't read the Order that I filed?

2          MR. GLENN:  I did not see it, no.

3          THE COURT:  You did not comply with the Order, which

4     was specifically designed to give appropriate notice to any

5     party whose witnesses were to be cross-examined, and so the

6     objection is sustained.

7          MR. GLENN:  Okay.

8          MR. SOLOMON:  Your Honor, considering the fact that

9     there's no cross-examination, we have no redirect and we would

10    rest.

11         THE COURT:  And since there is no evidentiary --

12    principal evidentiary proffer, and there is no

13    cross-examination, the Whitebox necessarily rests.  Would you

14    agree, Mr. Glenn?

15         MR. GLENN:  Yes, Your Honor.

16         THE COURT:  All right.  And so we will -- and there

17    are no other parties who wish to make statements that I've

18    been made aware of.  Oh, Ms. Goldstein.

19         MS. GOLDSTEIN:  Thank you, Your Honor, for allowing

20    me to speak.  I will be very brief.

21         We do not take a position and we have not

22    participated in the --

23         THE COURT:  And you're representing National?

24         MS. GOLDSTEIN:  National Public Finance Guarantee

25    Corporation.

1          We do not take a position and we have not

2    participated in this litigation insofar as it is to be a

3    determination as to whether and to what extent there would be

4    a charging lien against Whitebox or any indemnification to be

5    put up against Whitebox.  We take no position on the merits of

6    that.

7          However, there's been discussion of a charging lien

8    generally against COFINA cash.  To the extent that that is

9    being offered, and I don't believe -- or suggested, we do have

10   a view.

11         We understand that Bank of New York does not take the

12   position that it's -- such alleged charge, or asserted

13   charging lien would impact any holder of COFINA bonds insofar

14   as those bonds are entitled to distributions under the Plan,

15   other than Whitebox.

16         The Ambac matter has been resolved, so I don't need

17   to reference them.

18         So my understanding from Section 19.5 of the Plan,

19   also from BONY's own filings, is that no distribution that is

20   required to be made under the Plan with respect to any other

21   COFINA bondholder will be withheld as a result of, or on

22   account of, the claims.  And I'm reading from 19.5.

23         THE COURT:  That's what it says literally, yes.

24         MS. GOLDSTEIN:  Yes.  But there's some lack of

25   consistency when you're talking about a charging lien against

1    COFINA cash.  The COFINA cash is what is going to be

2    distributed.

3         I don't think there's an issue with Bank of New York,

4    but I just wanted to make it clear on the record that we are

5    relying on Section 19.5 and, therefore, would expect -- and

6    perhaps Bank of New York's counsel can clarify, because I

7    believe it is their position that there will be no withholding

8    of any other bondholders' distribution, if there is to be a

9    withholding of any distribution.

10        THE COURT:  So just before Mr. Schaffer speaks, I

11   want to make sure that I understand the depth or breadth of

12   your position here.

13        Are you saying that your bottom line is you want to

14   be certain that any distribution to which National is entitled

15   will not be debited for any amount that I determine might be

16   properly withheld in order to protect Bank of New York Mellon?

17   You're not so concerned with my reasoning?  You're concerned

18   with the bottom line, and you want your hundred percent of

19   your distribution?  Is it that?

20        Or are you saying that you take exception to the line

21   of argument that says this isn't a withholding from Whitebox

22   as such; it is a withholding on account of COFINA's obligation

23   from COFINA's cash before it's distributed?

24        But in view of the particular provisions of 19.5, it

25   is to be charged against Whitebox's distribution, which leaves

1    your client in the same cash position, but this line of

2    reasoning that walks through COFINA --

3              MS. GOLDSTEIN:  Our only concern is that -- the cash

4    distributions anticipated to go to COFINA bondholders and,

5    therefore, to our client, and those cash distributions will be

6    for the most part distributed to our insureds.  We want to

7    make sure that the charging lien could not impact those

8    distributions.

9              What happens with respect to the Whitebox

10   distribution is a matter that's before this Court.

11             THE COURT:  Yes.

12             MS. GOLDSTEIN:  We take no position on that.

13             THE COURT:  Thank you.

14             Mr. Schaffer.

15             MR. SCHAFFER:  Your Honor, Eric Schaffer on behalf of

16   the Bank of New York Mellon.  I think we are in complete

17   agreement.  Section 19.5 sets forth that it is the mechanism

18   for satisfying the obligations of COFINA, and that they shall

19   be satisfied with monies that otherwise would be going to

20   Whitebox and Ambac.

21             And of course with Ambac, we still have the agreement

22   we announced at the beginning.  So I don't think there is

23   anything in 19.5 that would provide for monies to come from

24   anyone other than Whitebox in this instance.

25             THE COURT:  Thank you.

1           Mr. Rosen.

2           MR. ROSEN:  Yes, Your Honor.  Thank you.  I think I

3    was allocated ten minutes, but I think I'll take one or two.

4           Your Honor, I did participate in a lengthy mediation

5    with Judge Houser, Bank of New York, Ambac and Whitebox with

6    respect to these issue.  I'm obviously not getting into what

7    was discussed.  19.5 is the outgrowth of that mediation

8    effort.

9           And I'm happy that Mr. Schaffer stood up and

10   acknowledged the understanding is that no other COFINA

11   creditor -- no other bondholder, excuse me, would be taxed

12   with any obligations other than Ambac and Whitebox, because

13   that was a very, very important provision to the Plan, and it

14   was important for the PSA creditors that they not be in any

15   way taxed with the ongoing litigation that either Ambac or

16   Whitebox would bring.

17          I just want to point to one other thing.  I

18   appreciate what Mr. Glenn said at the near outset, which is

19   that they do not oppose the Plan and, in fact, they voted in

20   favor of it.

21          Our concern, Your Honor, is that some of the

22   positions taken by Whitebox in the context of this litigation,

23   however, are tantamount to an objection to the Plan.  And if

24   the Court so determines that, Your Honor, that does have

25   severe consequences to a lot parties, especially Whitebox.

1          So we would want, if the Court goes in that

2   direction, to make a reference as to whether or not it

3   constitutes an objection to the Plan or not.  Specifically,

4   Your Honor, if I could elaborate, it would be a violation of

5   the Plan Support Agreement.

6          THE COURT:  Well, I think -- I'm sorry.  I understand

7   the connection there.  I'm just not sure that I see that

8   that's a necessary stop on my road to a decision, even if I

9   were to rule in favor of the bank.

10          If I were to say there are these issues that are

11   raised, and even if they might conceivably be construed as an

12   objection, they don't work for whatever other reasons without

13   ruling squarely on whether it's an objection, which you then

14   would say it's a breach of the PSA, since the PSA is not

15   before me for construction.

16          So what are you asking me to do or not to do?

17          MR. ROSEN:  Your Honor, we've only been concerned

18   that in light of some of the very well-articulated positions

19   by Whitebox in their papers, they have said that the

20   obligation is COFINA's and COFINA's alone if, in fact, it does

21   exist.

22          And I appreciate that Mr. Schaffer stands up and says

23   if it's COFINA's, I'm still not going to do anything.  That's

24   wonderful.  And if we get to that point, I don't really care.

25   But if there is a determination that COFINA has the

1    obligation, and it is not in any way limited to just the

2    distributions of Ambac and Whitebox, and it is taxed on other

3    creditors, that in our opinion, Your Honor, would be

4    tantamount to a Plan objection.

5         And in as much as they didn't file a Plan objection,

6    it's certainly in accordance -- by January 2nd, and they voted

7    in favor of the Plan, we think they waived any rights to

8    object.  But not withstanding that, Your Honor, they continue

9    to say that it is COFINA's obligation to pay any costs to Bank

10   of New York Mellon.

11        THE COURT:  All right.  So here's what I plan to do,

12   and I'm going to reserve decision today because I reserved

13   decision on the Plan, which this is a part.

14        MR. ROSEN:  Sure.

15        THE COURT:  I'm going to make a decision as to what

16   19.5 and the resolution of other documents that have been

17   cited do, as relates to the rights and obligations of Bank of

18   New York and COFINA, insofar as those could financially

19   implicate Whitebox.

20        I've been asked not to say that as to Ambac, because

21   there is some sort of agreement to which I'm not privy, and

22   that's fine by me.  And I hope it stays that way.  But, yes,

23   to the appropriate extent, if the other PSA parties decide to

24   take the position that Whitebox has violated the PSA and,

25   therefore, want to deny Whitebox whatever they want to deny

1   Whitebox, if that ripens into litigation, I'm sure I'll be

2   seeing something from you.  But until then, I don't see a need

3   to give you a ruling one way or another.

4           Mr. ROSEN:  That's fine, Your Honor.

5           May I ask one request of the Court?  And I have not

6   discussed this with Mr. Schaffer.  I have not discussed it

7   with Mr. Glenn.

8           Whatever determination that you make with respect to

9   this dispute between these parties, could you please include

10  it in a separate Order or decision and not have it be included

11  in whatever is done with respect to the confirmation of the

12  Plan of Adjustment?

13          Because in the event one of them wants to appeal, we

14  do not want it to effect in any way the finality of any Order

15  that you might enter in connection, with respect to the

16  confirmation.

17          THE COURT:  Yes.  I see that this has been queued up

18  as a separate contested matter, but, in a weird way, not

19  calling itself a motion.  But I've conceptually considered it

20  that way, except that I realize I don't have a docket entry to

21  resolve because of the way this has been done.

22          So it would be helpful, and I think consistent with

23  the way that we're proceeding for Bank of New York Mellon, to

24  file a motion requesting an Order resolving this dispute for

25  the reasons that have been developed on the record in these

1     proceedings.  And on the basis of the prior briefs, for

2     Whitebox to file an affirmation of its opposition to that

3     request for the reasons that have been proffered on the record

4     and in the briefs referenced there.  And then I can resolve

5     that motion with an Order that resolves this controversy.

6              And before I ask you whether that's acceptable to

7     you, I wanted to find out whether Ms. Tacoronte would still

8     speak to me if I told you to do that.

9              Does that work procedurally in this district?

10             COURTROOM DEPUTY:  Your Honor, I could create an

11    empty motion on the record on behalf of whichever party.  It

12    won't have a PDF attached to it, and it will make reference to

13    today's hearing, if that's appropriate for Your Honor.

14             THE COURT:  I think that Ms. Tacoronte has suggested

15    is an even more streamlined approach, which is for her to

16    create in the system a motion that refers to these proceedings

17    today, in respect of which I can enter an Order when I make my

18    decision.

19             MR. ROSEN:  May I suggest one alternative?

20             THE COURT:  Yes.

21             MR. ROSEN:  You already entered an Order in

22    connection with the establishment of this procedure to get

23    here today.  Could it just be a tag along to that existing

24    Order?

25             THE COURT:  Well, that request was to establish a

1    procedure, and so I resolved that motion by establishing the

2    procedure.

3            But Ms. Tacoronte, what do you think?

4            COURTROOM DEPUTY:  I can link it to whichever filing,

5    existing filing on the record.  I just need all the details.

6    So since there is not -- we don't have a PDF attached to it, I

7    will need, you know, filer --

8            THE COURT:  I'm going to go back to my original

9    proposal, because then that bookkeeping can be done in one

10   place by the parties.

11           So, Mr. Schaffer, will you file a motion asking me

12   for the determination that under the combination of 19.5 and

13   whatever you're entitled to --

14           MR. SCHAFFER:  And Your Honor, may we have until

15   Monday to do that?

16           THE COURT:  Yes.

17           MR. SCHAFFER:  Thank you.

18           THE COURT:  And since Monday is a National holiday,

19   will you, Mr. Glenn, file your formal opposition paper to that

20   by Tuesday?

21           MR. GLENN:  Yes, Your Honor.

22           THE COURT:  All right.  Thank you.

23           MR. ROSEN:  Your Honor, thank you very much.

24           THE COURT:  Thank you.

25           And so I think that brings us to replies and closing

1    statements.

2          And so Mr. Glenn, you're up first.

3          MR. GLENN:  I won't, Your Honor, repeat what I've

4    said on my opening statements.  We think that if you parcel

5    the language in our brief, that that's dispositive of the

6    issue and you don't need Mr. Goldberg's testimony or certainly

7    not Mr. Fishman's testimony.

8          Their analysis in their expert reports was based on

9    theoretical assumptions concerning the estimated legal fees to

10   be incurred in these cases.  There was no budget provided by

11   the Reed Smith law firm.  There was no use of comparable

12   analyses of other cases handled by Bank of New York or Reed

13   Smith.  And so we think that it's inappropriate to use those

14   expert reports as a basis to impose any liability on Whitebox.

15         Similarly, there's no allocation --

16         THE COURT:  You say imposed liability.  You mean if I

17   find that there is an obligation to reserve or make provision

18   for defense costs, those aren't an appropriate basis for

19   quantifying that obligation?

20         MR. GLENN:  Correct.  Correct.

21         THE COURT:  Thank you.

22         MR. GLENN:  We understand, and I respect

23   Mr. Goldberg.  He's a former partner of my firm.  And it's

24   always difficult, as we know, to create litigation budgets

25   prospectively.

1          But there's been a lot of litigation in this case

2     already, a lot of overlap with the interpleader case that was

3     well under way with document discovery.  And instead, what

4     Mr. Goldberg did is he created a hypothetical, round-up

5     analysis that was untethered to any work that had been done

6     previously in the case, untethered to whether 40 depositions,

7     which was his assumption what was needed, untethered to the

8     allocation between Whitebox and Ambac litigation.

9          And frankly, we don't know what the Ambac resolution

10    is.  So it's hard with no allocation from the Court to figure

11    out how much now Whitebox would have to pay, given the

12    settlement and given the unreliable nature of Mr. Goldberg's

13    approach.  But we don't think you need to get there.

14         And we provided Your Honor with, I think, three

15    briefs, where we parse through the language in this case.  And

16    I don't think I need to say anything more, other than to refer

17    back to those briefs, which I think parse through the actual

18    words in this resolution as opposed to what the Bank of New

19    York would like them to say.

20         Thank you very much.

21         THE COURT:  Thank you.

22         MR. SOLOMON:  Thank you.  May it please the Court.

23    Lou Solomon.

24         I have only recently been exposed to this, frankly,

25    dazzling display of the administration of justice, the likes

1   of which I've never seen.  I do know how to read Your Honor's

2   Order from May 30, 2017.  It was the Interpleader Order.  And

3   at that time, the claims against the Bank of New York had

4   already been asserted.  They have to be changed now because of

5   the releases that had already been asserted.

6        Your Honor was reviewing the same resolution, the

7   same instrument that forms the basis of the legal argument

8   Mr. Schaffer gave.  And Your Honor says in paragraph nine,

9   from time to time, BNYM shall be entitled to reserve for or

10   pay its reasonable fees and expenses, whether or not due and

11   owing, from the disputed funds.

12        So that's how Your Honor read the resolution in

13   connection with the Interpleader Order, and it's argued that

14   it hasn't changed, nor should the reading of it change.  So

15   the legal issue aside, there's an entitlement to reserve for

16   or pay reasonable fees and expenses.

17        Mr. Schaffer hasn't proven that it is Whitebox who

18   should be making that payment.  The question then becomes one

19   of quantum.  We showed up.  They didn't.  We offered Your

20   Honor two experts, both of them highly skilled in their

21   particular areas of expertise.

22        Mr. Goldberg does budgets in complex litigation.  He

23   lays it out in extraordinary detail, 30 pages, single spaced,

24   that Your Honor has seen.  And then in his exhibit, he goes

25   through tasks that would need to be done, how many hours it

1   will take, what's the blended billing rate for it.

2          Is there speculation in it?  There is speculation in

3   it.  Whose responsibility is that speculation?  It is

4   Whitebox's responsibility.  So Whitebox, who was asked by us

5   on November 29, that is Exhibit 4767-9 -- when the mediation

6   failed, you said okay, we're going into this phase of this.

7   Tell us what the claim is.  Tell us what your damages are.

8   And they didn't respond.

9          So this is Whitebox, who is -- this is the fellow

10  throwing himself on the mercy of the Court, having killed his

11  parents, claiming he's an orphan.  They've created the

12  uncertainty, and now he is complaining that there is

13  speculation.

14         The experts did the best they could, knowing what

15  kind of litigation this is.  It was certainly a misstatement

16  when Mr. Glenn said there were no analogies, because having

17  gone through 25 single-spaced pages of telling Your Honor what

18  will need to be done in this case, in three separate places in

19  the Goldberg testimony, in the Goldberg Declaration, he steps

20  back and he says, let me test this against what is reasonable.

21         And he goes through the fees of other firms in this

22  bankruptcy proceeding.  He goes through other complex cases.

23  And in the end, he goes through an analogy to another case

24  against a trustee.

25         So that is all in the record before Your Honor.  And

1    in that regard, the range that he comes up with between 25 and

2    40 million dollars is on -- as he said, on the lower end of

3    the range.

4         Mr. Glenn had said, well, you know, a lot of work had

5    already been done in the interpleader action.  He asked the

6    witness that in his deposition.  But very little work had been

7    done in the interpleader action, because Your Honor had stayed

8    that portion of the interpleader action.

9         And in one of the Orders that was an exhibit we have

10   that we offered Your Honor today, it shows that stage three

11   was the claim that Mr. Glenn says they had been litigating.

12   And this case has not gotten to stage three.  That was already

13   stayed.

14        And so nothing, very little had been done.  But even

15   so, Mr. Goldberg explains in his testimony to Your Honor, and

16   he took into account, minimally, but still took into account,

17   savings that might be incurred because of the earlier claims

18   that had been asserted.  Those earlier claims are going to

19   wash away.

20        There's not a fraud claim earlier.  There is a fraud

21   claim that they say they're going to bring now.  And when you

22   sue the Bank of New York for fraud and for willful misconduct,

23   guess what?  It is going to defend itself.  And the first sort

24   of act contrary to public policy is the notion that Whitebox

25   here can actually tell the Bank of New York how much it can

1    spend to defend itself.

2           Mr. Glenn talked about the American legal system.

3    That ain't the American legal system.  So we brought you two

4    experts:  One, Mr. Goldberg; one, Mr. Fishman.  And

5    Mr. Fishman addresses it from the context of a fee examiner,

6    like assuming what Mr. Goldberg said.

7           Now, is it reasonable in the context that he has

8    experienced.  And he tells Your Honor, yes.  No

9    cross-examination.  No other experts.  No other evidence.

10          The range that they found reasonable, between 25 and

11   40 million dollars, there's no allocation that should arise

12   because of that, because what the witnesses were telling the

13   Court is how much do his claims cost to defend.

14          Whitebox doesn't get a buy or a reduction or setoff

15   because Ambac was reasonable and they resolved this through

16   the efforts of Judge Houser.  That Whitebox is the dog in the

17   manger, that Whitebox is the holdout, is not a reason to

18   reward it.  It's a reason to draw inferences against it.

19          The midway point between 25 and 40 million dollars is

20   32.5.  Your Honor should ask and direct and set aside 32.5

21   million dollars be paid by Whitebox.  Your Honor has the

22   protections that each of our witnesses has talked about, and

23   that is, if the money is not used, obviously the Bank of New

24   York will repay it.

25          Second, there is a challenge of reasonableness at the

1  end of the day.  If they want to claim that the Reed Smith

2  firm or whoever's going to do the case was not reasonable,

3  they are not losing their opportunity to argue that.  And if

4  they can prove that the Bank of New York acted fraudulently,

5  and one has to suspend his belief in this part of the

6  proceedings -- Judge, I think it's a groundless claim.  But

7  that's not what we're here for.

8        If they can prove that there was gross negligence or

9  willful misconduct, then they have a right to come to court

10  and say that the Bank of New York should turn it all back.

11  Those are protections that we have agreed, the Bank of New

12  York Mellon has agreed should go into the holdback.  And with

13  that, I will stop.

14        Thank you.

15        THE COURT:  Thank you, Mr. Solomon.

16        Thank you, Counsel, for these arguments and for your

17  submissions.  I am taking this matter under submission.

18        I will look forward to the procedural motions that

19  will give me something to hang an Order on.  And you will be

20  notified when I've reached a decision.

21        Ms. Uhland.

22        MS. UHLAND:  Good afternoon, Your Honor.  Suzanne

23  Uhland for AAFAF, representing AAFAF here today for O'Melveny

24  Myers.

25        If now is a good time, I had a quick question about

1    the supplemental briefing.  I just wanted to make sure.

2         THE COURT:  Yes.

3         MS. UHLAND:  I understand the additional briefing

4    with respect to the legislation, but the Court also said that

5    explanation -- I think you said of the legal basis of the

6    independent corporation?

7         THE COURT:  Well, I left 170 back in my office, but I

8    think the first item in 170 is that new COFINA is an

9    independent public corporation entirely separate and validly

10   established, and some legal anchors in Puerto Rico law for

11   those propositions would be helpful.

12        MS. UHLAND:  All right.  Thank you, Your Honor.  That

13   clarifies it.

14        THE COURT:  And if there's anything yet similar in

15   there that is a -- because I don't remember the whole list.

16        MS. UHLAND:  But it's paragraph 170?

17        THE COURT:  Paragraph 170.

18        MS. UHLAND:  Thank you, Your Honor.

19        THE COURT:  It deals with the status of entities and

20   the nature of the entities.

21        MS. UHLAND:  Thank you.

22        THE COURT:  All right.  Anything else, Mr. Rosen?

23        MR. ROSEN:  No.

24        THE COURT:  He says no.

25        Once again, thank you, advocates; thank you, Judge

1  Houser; and thank you also to Judges Ambro and Atlas and the

2  other members of your team.  And I trust that you will convey

3  those thanks.

4       Keep well.  Safe travels, everyone.  And I will see

5  you in New York in two weeks I think.  I haven't had any

6  objections to New York.

7       And I'm sorry.  Once again, thank you so very much to

8  the Court staff here and in New York for smooth administration

9  of these proceedings and their gracious and hard service.

10 Thank you.

11       (At 3:44 PM, proceedings reconvened.)

12                    *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   U.S. DISTRICT COURT    )

2   DISTRICT OF PUERTO RICO)

3

4       I certify that this transcript consisting of 185 pages is

5   a true and accurate transcription to the best of my ability of

6   the proceedings in this case before the Honorable United

7   States District Court Judge Laura Taylor Swain on January 17,

8   2019.

9

10

11  S/ Amy Walker

12  Amy Walker, CSR 3799

13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
December 2018 69:14
January 10 164:25
January 17, 2019
  1:16, 6:2, 185:7
January 2nd 172:6
January 9 17:7, 41:9
January 9th 17:12
July 1, 2018 50:4
June 12 110:7
May 22 25:23
May 24, 2018 102:12
May 30, 2017 178:2
November 20 19:8
November 29 179:5
November, 2018 63:9
September 18 27:3


< 0 >
000 151:17


< 1 >
1(B 7:8, 94:13,
  97:13, 99:15
1,300 89:22
1,826 108:21
1.150 126:13
1.2 77:19
1.8 50:19
10 124:6
10.1 124:7
100 124:11
101 29:16
103 13:21
105 26:8
107 95:11
11 26:8, 44:13,
  45:16, 46:14,
  106:6
1103 145:20, 146:22,
  147:2, 147:10,
  147:22, 148:2,
  150:19, 160:7,
  160:23
1103. 146:7, 146:8,
  148:21, 151:2
1103.1 159:10,
  159:13, 160:13,

161:21, 162:1
1103.3 146:15
1125(a 46:14
1129 155:21
1129(a)(3 35:16
1129(b)(2 155:23
115 25:13
119 7:7, 94:9
11:08 62:1
11:29 62:2
12 50:17, 50:18,
  163:16, 164:25
12-year 68:16
120 42:14
124 7:7, 94:10
12:10 89:10
13 163:16
1300 102:5
1302 102:5
136 97:5
14. 163:16
15 12:16, 18:2,
  18:14, 18:16,
  56:6, 101:24
152,000 27:4
163 5:6, 5:9
164 5:14, 5:15
17 75:12, 101:25
17-00257 102:12
17-AP-133(LTS 1:40
17-AP-257(LTS 2:4
17-BK-3283(LTS 1:6
17-BK-3284 2:6
17-BK-3284(LTS 1:22,
  1:42
17.5 53:23
170 7:7, 183:7,
  183:8, 183:16,
  183:17
170. 94:10
18 27:21, 48:5,
  122:3, 122:4
18-28 27:1, 27:4,
  28:11
18-28. 25:25, 27:11
1837 63:8
185 185:4
186 107:25
188 107:25
189 108:1

19 122:4
19.5. 144:23,
  154:23, 155:15,
  157:23
190 8:7, 95:7,
  132:25, 133:1,
  133:3, 135:21
1978 95:13
1978. 95:14
1983 128:25
1984 30:24
1988 95:17
1991 102:5
1994. 97:6
1:07 89:11


< 2 >
2 107:25, 151:17
2-A 44:8
2-B 44:8
20 12:17, 18:6,
  18:12, 28:21,
  37:1, 44:12,
  45:15, 51:3, 88:3,
  114:19, 118:17
200 38:21
2006 29:10, 64:3
2006. 68:14
2007. 86:20, 87:1,
  101:25
2009 68:4
2009. 74:22
201 14:12
2013 53:4
2013. 68:8
2014 69:2, 95:7,
  95:8
2014. 95:9
2015 50:8
2016 131:18
2017 41:15, 53:7
2018 25:23
2019 119:21
2058 44:13, 46:13
21 44:8
2174(b)(3 47:6,
  58:17
2174(b)(6 48:7
2174(b)(7 48:6

2194(k 48:6
2194(m)(5)(b 48:7
2195(a 48:7
21: 3:4
22 43:13, 43:21,
   44:12
23 44:8
235 87:1
24 20:16, 24:6
25 179:17, 180:1,
   181:10, 181:19
25,000 27:5
254(e 36:20
257 107:15
26 51:14, 95:7
26-year-old 68:16
2:20 139:5
2:30. 139:4
2:35 139:6


< 3 >
3 5:15, 164:7,
   164:15, 164:17
3,759 68:14
30 12:16, 12:21,
   17:14, 18:19,
   65:16, 114:20,
   178:23
30,000 68:3, 68:5
30-12 27:19
301(a. 99:7
3019 124:1, 124:2
305 99:17
305. 99:24
306(b 98:15
314 14:5
314(b 15:20, 15:25
314(b)(6 16:10
314(b)(7 16:13
314. 14:12
315 95:7
32 30:25, 66:19
32-year 30:23
32.5 181:20
32.5. 181:20
33 12:14
337. 95:8
35 56:11, 56:24
368 86:25

3799 185:12
39 108:13
3: 1:6, 1:22, 1:40,
   2:4
3:44 184:11


< 4 >
4 5:15, 98:7, 98:9,
   102:17, 106:4,
   164:7, 164:15,
   164:17
40 44:12, 44:13,
   45:15, 64:14,
   64:23, 65:19,
   71:25, 75:6,
   114:20, 177:6,
   180:2, 181:11,
   181:19
400 50:7
4121(d 48:6
415 27:13
4251. 13:25
43 68:12
4364 44:8
44 32:5, 32:7
45 13:3, 17:25, 18:2
4545 48:5
46 120:13
4606-7 41:19
4647 164:24
476. 27:13
4762-1 97:9
4767 5:14, 163:24
4767-1 164:5
4767-10 163:14
4767-11 163:16
4767-15. 163:17
4767-2 5:15, 164:7,
   164:15, 164:17
4767-9 179:5
4767. 163:15, 164:5
4787. 13:22
48 44:19
4819. 14:16
482 101:24
483 102:11
488-1. 97:9
48833. 95:13
489 47:18, 57:20

49 96:17
497 97:5


< 5 >
5 5:15, 164:7,
   164:15, 164:17
50 12:22, 44:2,
   44:10, 44:14,
   44:20, 44:25,
   45:24, 54:15,
   59:24
501 146:2, 148:13,
   148:16, 148:22,
   149:1, 149:2,
   149:9, 162:11,
   162:12
501. 148:13, 149:18,
   151:3
508 57:20
508. 47:18
510(a 146:17,
   155:21, 156:6
510(b 125:1, 125:11,
   127:23
526 47:17, 57:20
53 8:8, 120:13,
   133:1, 135:21
535 112:25
541 106:8
541. 106:8
56 32:4, 60:22,
   108:14
560 110:12
57 143:9
580845 95:17
59. 41:20
590. 95:11


< 6 >
6 5:15, 164:7,
   164:15, 164:17
6,537 68:8
60 117:3
619 68:11
63 53:5
653727. 95:12
680 68:24

< 7 >
7 5:15, 164:7,
  164:15, 164:17
700,000 68:13
7142(b)(6 58:23
737 44:19
78 41:20
7PR 95:12

< 8 >
8 5:15, 107:25,
  164:7, 164:15,
  164:17
8,000 122:25
804 145:17, 146:3,
  146:5, 146:14,
  148:10, 148:16,
  148:25, 149:4,
  149:10, 150:1,
  150:2, 150:19,
  158:14, 158:16,
  159:12, 160:10,
  160:12, 160:22,
  161:9, 161:13,
  161:16
804. 147:22, 148:19,
  160:8, 160:9,
  160:15, 161:5

< 9 >
9 5:15, 164:7,
  164:15, 164:17
9,267 108:20
9019 9:18, 100:24,
  114:24, 119:22,
  120:5, 139:17
9019. 62:19, 115:19
91 42:3
91. 41:25
93 39:10
934 102:5
944 99:2, 100:3
944(a 100:20
944(b 7:12
944(e)(3)(b 100:13
994.03 99:15
997526. 95:8

9:37 6:3

< A >
A. 4:5, 4:8
AAFAF 88:24, 96:11,
  96:25, 107:1,
  110:25, 111:21,
  112:2, 136:6,
  139:22, 182:23
ab 96:19
Abboud 101:23
abdicated 73:14
abide 69:6
ability 31:5, 54:16,
  60:7, 62:19, 65:2,
  88:16, 94:17,
  94:19, 104:3,
  142:8, 148:7,
  185:5
able 8:3, 22:25,
  32:17, 38:11,
  38:12, 39:10,
  41:9, 64:14,
  64:15, 67:5,
  75:24, 120:12,
  127:11, 134:12,
  143:19
abound 74:13
Above 39:4, 39:14,
  39:15
abrasive 47:3
abrogate 57:3, 58:25
abrogated 48:20,
  48:22, 52:11,
  57:11
absence 31:4
Absent 27:13, 36:9,
  116:18
Absolutely 40:23,
  43:9, 63:21, 98:1,
  106:18, 119:13,
  126:10, 127:12,
  135:23
abstract 67:9,
  130:25
absurd 151:18
accept 60:4, 60:11,
  86:18, 108:14,
  108:23, 123:2

acceptable 174:6
acceptance 86:16,
  108:25
acceptances 122:21
accepted 59:23,
  84:8, 105:16,
  109:17
accepting 139:21
accepts 105:15
access 38:18
accommodate 18:15
accomplished 113:8
accordance 122:22,
  123:2, 145:1,
  172:6
According 13:20,
  22:14, 45:19,
  46:12, 50:16,
  75:13, 157:4
accordingly 22:15,
  103:19
account 35:7, 67:11,
  73:17, 117:22,
  167:22, 168:22,
  180:16
accounts 50:20
accrual 60:19
accumulation 76:8
accurate 117:21,
  185:5
achieve 116:8,
  156:23
achieved 116:9
achieves 116:19
achieving 98:22
acknowledge 78:5,
  144:9, 146:8
acknowledged 33:17,
  35:2, 113:1,
  170:10
acrimony 82:12
across 77:22, 82:24,
  109:23
Act 41:25, 42:3,
  68:3, 68:7, 74:22,
  98:10, 98:12,
  107:25, 180:24
acted 38:25, 88:14,
  143:4, 182:4
action 47:8, 86:8,

125:8, 180:5,
  180:7, 180:8
actions 26:6, 59:17,
  119:10, 128:10,
  162:20
active 27:10, 28:14,
  85:18
activities 59:19,
  89:5, 89:6
actual 32:19, 88:16,
  88:17, 96:23,
  100:19, 158:11,
  177:17
Actually 10:24,
  19:5, 23:6, 39:3,
  39:14, 61:15,
  80:9, 84:23, 86:3,
  86:6, 87:20,
  92:25, 94:24,
  109:22, 110:8,
  110:13, 111:18,
  113:22, 113:23,
  117:2, 118:5,
  131:16, 151:7,
  180:25
Ad 3:16
Add 71:21, 128:21
added 45:11, 99:11,
  139:1, 161:2
addition 30:15,
  65:15, 113:25,
  114:1
additional 20:3,
  30:17, 45:11,
  77:23, 113:19,
  137:23, 156:21,
  183:3
Additionally 15:9
address 10:10,
  10:16, 11:10,
  11:12, 17:10,
  19:4, 19:18, 51:3,
  54:18, 72:11,
  84:17, 94:8,
  110:14, 116:11,
  119:2, 120:6,
  127:8, 135:22,
  138:12
addressed 6:20,
  10:22, 16:9,

96:14, 111:7,
  145:13, 146:1
addresses 181:5
Adelphia 86:19,
  86:25
adequately 122:6
adjourn 61:22
adjourned 61:24,
  89:9
adjudicate 31:2
adjudicated 28:11
adjudication 26:16,
  27:15
Administered 1:11
administration
  63:12, 63:14,
  63:21, 65:23,
  177:25, 184:8
admissibility 13:20
admissible 15:14,
  16:6
admission 122:9,
  131:16
admit 53:2, 55:16,
  55:20
admits 69:17
admitted 29:7,
  48:23, 49:1,
  53:11, 163:25,
  164:1, 164:16,
  164:18
admonition 28:25
adopt 13:23, 52:11,
  104:24
adopting 47:24
Adriana 76:24
advance 30:1, 153:2,
  165:22
advanced 146:11
advances 162:2
advantage 59:20
adversary 25:20,
  25:24, 26:17,
  26:25, 27:4,
  27:11, 27:16,
  27:21, 27:22,
  28:10, 91:25,
  100:18, 101:12,
  102:11, 110:21,
  120:9, 131:19

advertising 50:3,
  50:5
advisement 137:19
advisor 16:5
advisors 15:17, 92:9
Advisory 3:12
advocate 23:24,
  58:22, 79:4
advocates 183:25
advocating 39:25
affect 63:17, 70:21
affecting 27:1, 91:4
affects 70:24
affirmation 174:2
affirmative 160:22
affixes 102:1
affordable 70:14
afoul 30:14
afternoon 10:12,
  89:17, 106:25,
  114:6, 114:7,
  116:23, 116:24,
  118:20, 139:7,
  140:15, 141:3,
  141:12, 141:15,
  152:8, 152:9,
  163:7, 163:9,
  182:22
age 68:7
Agency 3:11
Agenda 12:21, 132:2,
  137:25
Agent 2:9, 2:25,
  3:42, 4:5, 79:7,
  79:10, 83:9,
  85:12, 91:19,
  92:4, 100:19,
  101:12, 112:17,
  117:1, 117:5,
  117:14, 117:17,
  155:3
agents 85:13, 115:6,
  115:7, 115:23,
  120:6, 120:15,
  121:14, 126:6
ago 50:13, 82:16,
  117:6, 141:16
agree 116:12,
  143:22, 143:23,
  158:13, 166:14

agreed 9:6, 10:18,
    10:21, 12:14,
    51:21, 115:5,
    125:2, 153:4,
    156:24, 182:11,
    182:12
agreeing 158:7,
    160:25
agreements 135:16
ah 143:11
ahead 17:21, 61:7
Ahorro 25:9, 25:10,
    25:11
aid 75:10
aim 26:22
ain't 181:3
air 82:16
akin 76:8
al 1:16, 1:48, 2:42,
    101:23
Albelo 20:13, 20:15,
    21:17, 21:22,
    21:24, 23:11,
    23:21, 24:4,
    66:15, 66:17,
    66:19, 96:14, 97:2
aligned 26:20
alignment 39:19
alive 19:9
allegations 97:2,
    113:16
alleged 33:11,
    95:20, 142:22,
    167:12
allocate 104:8
allocated 17:18,
    20:18, 113:19,
    170:3
allocates 20:8,
    34:17, 113:21
allocating 28:21
allocation 10:16,
    10:18, 10:22,
    10:24, 11:2,
    11:14, 12:20,
    12:24, 13:2, 17:1,
    84:25, 100:7,
    176:15, 177:8,
    177:10, 181:11
allocations 9:6

allotted 10:13,
    81:6, 165:20
allow 24:5, 24:8,
    69:19, 74:25,
    105:14
allowed 23:24,
    85:23, 120:25
allowing 37:4,
    73:24, 166:19
Almeida 13:20, 13:21
Almost 43:11, 56:2,
    59:15, 75:12,
    81:14, 136:1,
    162:11
Alomar 68:16
alone 45:12, 50:4,
    171:20
already 18:4, 64:5,
    64:17, 67:12,
    71:7, 71:22, 80:8,
    80:14, 96:22,
    102:7, 113:2,
    116:5, 121:10,
    124:8, 153:8,
    157:7, 160:12,
    162:22, 163:12,
    174:21, 177:2,
    178:4, 178:5,
    180:5, 180:12
altered 147:20
alternate 120:23
alternative 136:20,
    137:14, 174:19
alternatives 82:6
although 52:24,
    64:20, 91:2,
    154:15, 161:1
altogether 71:13
Ambac 3:25, 81:6,
    81:12, 89:2,
    140:25, 141:1,
    141:4, 141:17,
    152:15, 155:4,
    155:7, 167:16,
    169:20, 169:21,
    170:5, 170:12,
    170:15, 172:2,
    172:20, 177:8,
    177:9, 181:15
Ambro 91:13, 184:1

amenable 57:22
Amended 126:1,
    126:13
Amendment 35:24
amendments 8:10,
    8:18, 8:20, 133:17
America 92:7
American 72:8,
    73:10, 159:18,
    181:2, 181:3
Among 13:3, 26:6,
    45:13, 97:3, 146:9
amount 17:17, 37:21,
    38:8, 39:4, 39:8,
    67:15, 113:20,
    114:12, 144:18,
    155:2, 168:15
amounts 146:11
ample 11:9
Amy 185:11, 185:12
analogies 179:16
analogous 156:13,
    157:16
analogy 179:23
analyses 176:12
analysis 49:19,
    158:15, 176:8,
    177:5
analyzing 72:4
anchors 183:10
ancillary 8:24,
    134:21, 135:2,
    135:15
and/or 48:2
Andrew 3:46, 141:12,
    152:10
announced 110:21,
    169:22
annual 48:19
anonymous 15:13
answer 63:11,
    132:17, 133:15,
    139:13, 153:6,
    153:10
answered 122:12
answers 122:11
anticipate 12:25
anticipated 20:22,
    143:10, 169:4
Antonio 3:42

anybody 36:11, 82:5,
  85:23, 86:3,
  110:19
anyway 93:13
apart 58:10
apologies 117:5
apologize 11:25,
  24:24, 62:22,
  165:23
apologizes 117:7
appeal 173:13
appealed 102:10
Appeals 53:7, 53:16
appear 8:19, 25:8,
  27:7
APPEARANCES 2:39,
  3:1, 4:1
appeared 15:16, 23:6
appearing 25:24
appellant 101:22
applause 66:11
applicable 8:11,
  14:11, 16:4,
  41:23, 79:14,
  107:9, 147:25,
  153:5
application 16:8,
  21:12, 52:1,
  105:2, 146:4,
  148:17, 160:25
applied 15:1, 21:11
applies 95:1,
  136:20, 136:22,
  155:23, 157:25
apply 6:10, 8:10,
  34:8, 44:20,
  106:9, 107:4,
  144:14
applying 14:18
appointed 112:6,
  120:6
appreciate 9:6,
  13:5, 29:2, 80:12,
  80:18, 116:20,
  129:8, 132:21,
  170:18, 171:22
appreciation 113:10
approach 20:13,
  120:16, 174:15,
  177:13

appropriate 11:13,
  12:19, 79:11,
  88:15, 112:3,
  127:11, 143:24,
  166:4, 172:23,
  174:13, 176:18
approval 8:19, 9:16,
  22:19, 44:1,
  47:22, 56:16,
  56:23, 57:24,
  66:6, 86:23,
  86:24, 96:7,
  119:18, 121:7
approve 43:22, 56:1,
  56:21, 79:22,
  116:15, 123:16
approved 64:12,
  81:1, 117:15,
  118:4
approves 74:5
approving 36:7,
  59:15, 59:16,
  63:3, 76:11, 78:16
approximated 81:22
approximately 27:5,
  60:1, 77:18
archipelago 76:16
areas 178:21
arguably 161:1
argue 17:22, 24:13,
  36:19, 44:14,
  46:23, 46:25,
  48:8, 52:9, 52:23,
  56:4, 56:11,
  116:6, 154:13,
  182:3
argued 22:10, 57:9,
  58:5, 81:18,
  87:15, 96:16,
  110:24, 131:20,
  144:21, 178:13
argues 56:21, 58:1
arguing 22:23,
  37:25, 56:24
argument 13:23,
  17:9, 23:7, 34:22,
  38:3, 57:21,
  85:13, 86:1,
  87:13, 107:13,
  107:14, 110:5,

110:9, 110:15,
  111:9, 111:20,
  129:14, 129:24,
  137:13, 141:2,
  141:17, 149:2,
  154:15, 154:20,
  157:18, 159:23,
  168:21, 178:7
arguments 13:24,
  14:1, 17:6, 18:3,
  18:13, 23:1, 41:8,
  79:1, 79:5, 79:8,
  79:13, 79:18,
  81:19, 95:20,
  109:24, 118:1,
  142:11, 143:2,
  164:8, 182:16
arise 181:11
arm 83:12
Armstrong 32:11
around 66:23, 67:1,
  70:23, 84:12,
  143:15
Arribas 3:4
Article 63:25, 124:6
articulated 80:5
Asencio 73:5, 73:6,
  73:8, 73:9
aside 108:25,
  145:24, 160:3,
  178:15, 181:20
asks 99:1
aspect 137:24
aspects 7:20, 8:22,
  140:22
assault 32:15
assembly 22:13,
  69:11, 96:15
assert 35:10,
  156:17, 156:18
asserted 26:25,
  27:16, 34:3,
  44:18, 159:1,
  167:12, 178:4,
  178:5, 180:18
assertions 15:12,
  32:16
assessment 128:16
asset 31:13
assets 104:2,

106:13, 119:12,
  157:6
assigned 85:16,
  104:19
assignment 95:21,
  95:24
associated 85:22,
  122:15
assume 111:12,
  132:23, 151:15,
  156:24
assumed 144:21
assuming 7:11,
  17:25, 30:8, 181:6
assumption 10:23,
  177:7
assumptions 176:9
Assurance 3:25,
  30:20, 99:10,
  120:15, 120:16,
  141:5
assurances 32:18
Assured 4:3, 87:12,
  87:23, 113:14,
  113:16, 114:8,
  114:9, 115:23,
  116:2, 124:10,
  124:11, 124:14,
  124:15, 124:16
Atlas 91:12, 184:1
attached 174:12,
  175:6
attack 33:11, 33:12
attacked 94:23
attacking 150:22
attempt 36:12, 87:11
attempts 30:12
attention 9:1,
  135:17
attorneys 16:1
attributable 78:15
audio 11:16, 90:7
Audit 73:12, 73:14,
  73:25, 112:13,
  112:16, 112:21,
  113:5, 113:7
audited 71:8
auditors 49:23
AUST 3:4
austerity 67:19,

71:7
Authority 3:12,
  7:12, 7:19, 8:15,
  8:17, 36:21,
  43:20, 52:18,
  57:11, 98:6,
  100:16, 104:19,
  106:12, 115:10,
  116:15, 116:16
authorization 47:12
authorize 36:16,
  43:16, 47:14,
  48:3, 56:5, 63:1
authorized 56:8,
  100:19, 115:8
Auto 9:13
automatic 86:8,
  129:3
AV 12:5
available 42:5,
  42:20, 42:21,
  44:10, 53:12,
  53:13, 53:17,
  55:24, 74:14,
  82:5, 84:2, 95:13,
  101:17, 101:18,
  120:22, 121:3,
  130:17
average 49:24
avoid 27:22, 50:12,
  51:2, 91:8, 132:13
avoidance 79:11
await 143:3
aware 63:18, 99:16,
  166:18
away 32:2, 32:10,
  43:10, 55:13,
  56:2, 58:2, 65:2,
  91:3, 143:6,
  180:19


< B >
B-r-a-u 95:6
B. 3:40
back-room 84:19
background 139:22
backs 63:3, 65:16
backtrack 29:24,
  32:17

bad 34:19, 93:21,
  93:22, 144:13
bags 76:2
balance 164:4
balanced 74:24
balancing 74:20
ballot 59:7
ballots 108:22
bankers 125:21,
  125:24, 126:3
Banking 29:16
bargained 151:21
bargaining 59:13
base 137:14
Based 6:19, 14:17,
  15:6, 15:25, 27:3,
  30:13, 33:9,
  43:21, 44:1,
  45:18, 49:13,
  55:9, 57:3, 57:6,
  95:21, 95:22,
  111:18, 118:14,
  127:5, 144:3,
  163:3, 176:8
baseless 15:4
bases 94:3
basic 64:15, 76:13,
  115:22
basically 32:15,
  72:6, 83:2, 88:6
basis 7:17, 7:20,
  8:14, 29:21,
  35:11, 35:15,
  43:20, 45:5, 56:1,
  87:24, 97:25,
  117:16, 121:8,
  123:20, 137:17,
  139:24, 140:25,
  143:20, 144:15,
  148:23, 153:16,
  174:1, 176:14,
  176:18, 178:7,
  183:5
Bauer 2:45
bear 36:13, 73:21,
  74:6, 78:21
bearing 44:12, 84:4
beautiful 76:6
became 82:1, 85:21,
  116:2, 120:24

Becker 149:21,
  156:7, 157:1,
  157:5, 157:13,
  157:16, 157:20,
  162:16
become 64:22
becomes 64:8, 72:23,
  147:25, 178:18
beg 139:7
begin 73:23, 95:17,
  141:24, 163:13
beginning 164:7,
  169:22
behalf 10:11, 13:13,
  18:12, 23:7, 24:3,
  28:24, 70:7,
  73:16, 79:5, 79:6,
  79:19, 79:21,
  81:11, 89:17,
  96:11, 114:8,
  116:25, 136:17,
  140:21, 141:13,
  152:10, 169:15,
  174:11
behest 55:25
behind 51:9, 63:3,
  70:9
belief 14:17, 30:9,
  182:5
believed 116:10,
  120:14
believes 56:20,
  56:23
belong 48:25, 49:2,
  49:5, 49:8, 106:3
belongs 49:9, 131:9
beneficial 150:23
beneficiaries 157:3
beneficiary 152:5
benefit 33:13,
  45:11, 45:21,
  59:10, 120:11
benefiting 75:16
benefits 46:2, 55:7,
  55:8, 55:12,
  72:17, 78:5
Benson 141:13
Berman 68:23
beside 83:23
besides 90:4, 91:7

best 24:15, 24:16,
  28:25, 58:19,
  63:22, 66:1,
  74:25, 82:5,
  92:15, 93:19,
  110:8, 111:7,
  111:10, 111:17,
  111:20, 116:10,
  122:8, 129:12,
  129:16, 129:21,
  136:19, 137:3,
  138:21, 153:22,
  153:23, 179:14,
  185:5
better 20:4, 32:24,
  34:12, 35:11,
  45:14, 45:22,
  59:23, 61:16,
  64:9, 64:19,
  70:10, 70:12,
  74:1, 86:14,
  111:15
Bettina 2:23, 85:11,
  117:5
beyond 153:8,
  156:21, 159:7
Bienenstock 2:42
big 64:25, 93:20
biggest 45:17
Bill 22:2, 22:13,
  24:8, 63:2, 63:7,
  63:22, 107:23,
  112:4
billing 179:1
billion 50:11,
  50:14, 50:17,
  50:18, 50:19,
  53:24, 77:19,
  114:9, 114:13,
  114:22
billions 17:20, 38:7
bills 108:3
binary 55:16, 55:20,
  81:21
bind 100:25
binding 36:16, 43:1,
  54:5, 99:13,
  100:21, 115:18
biography 112:9
bit 132:7, 150:2

blended 179:1
blessed 39:22
blessing 47:24
blood 67:15
BNY 88:25, 153:3,
  153:4
BNYM 178:9
boards 111:25
bodies 100:10,
  138:14
body 63:3
bondholder 45:24,
  56:5, 67:25,
  115:23, 167:21,
  170:11
Bonistas 121:22
bonuses 50:7
BONY 167:19
bookkeeping 175:9
border 93:24
Boricuas 65:9,
  70:17, 72:4
boring 111:24
born 65:3
borrow 29:11
borrower 156:25
bottom 110:13,
  168:13, 168:18
bought 45:6, 45:9,
  45:18, 45:22,
  60:15, 68:24,
  75:14
bound 75:15, 161:3
box 83:21
boy 99:15
branch 26:3
Brau 95:6
breach 61:6, 171:14
breadth 168:11
break 61:20, 77:8,
  88:23, 89:7, 138:2
Brian 2:43, 113:12,
  131:8
brief 9:8, 9:10,
  9:22, 29:4, 41:15,
  99:8, 129:15,
  166:20, 176:5
briefing 137:20,
  183:1, 183:3
briefs 7:15, 7:23,

17:6, 96:20,
142:4, 142:5,
149:23, 154:14,
174:1, 174:4,
177:15, 177:17
bright 92:20
bring 38:23, 79:20,
138:21, 170:16,
180:21
bringing 80:21
brings 175:25
broad 59:17
broke 64:17
broken 76:9
Bronx 65:3
brothers 68:14
brought 160:1, 181:3
Brownstein 109:7,
109:8, 109:15,
109:20, 119:25,
121:11, 122:2,
122:14
brush 51:6
bucket 82:21
budget 68:10, 74:20,
176:10
budgets 74:24,
75:23, 176:24,
178:22
buenos 6:5
building 31:14,
31:15, 31:16
built 99:23
bundle 32:8
burden 14:2, 14:3,
14:7, 49:24,
50:25, 51:5, 58:4,
58:8, 58:13, 76:3,
96:2, 105:24
burdens 152:1, 152:3
Burger 52:2
businesses 57:13
buttressing 161:13
buy 181:14
bypass 64:3


< C >
C. 3:36, 4:3
cabined 126:9

calculation 14:25
calendar 10:3, 10:4,
89:20
call 21:16, 21:20,
62:6, 104:15,
148:4, 158:20
called 67:11
calling 20:22,
173:19
calls 29:16, 53:24,
117:16
campaign 67:24
capacity 91:18,
119:11
capita 49:20, 64:12
Capitol 107:24
Caproni 162:21
care 19:20, 22:24,
24:9, 63:12,
72:18, 72:19,
171:24
career 82:19
carefully 110:11
carries 75:2, 131:2
carry 47:8
carrying 65:15
carve 126:16
carved 127:16
cases 32:14, 68:6,
68:20, 90:2, 91:2,
98:17, 101:22,
105:4, 142:11,
142:12, 142:22,
143:1, 143:5,
143:23, 149:21,
151:11, 157:23,
162:19, 176:10,
176:12, 179:22
cash 29:19, 31:12,
31:18, 32:2,
34:13, 34:14,
44:9, 45:12,
45:21, 50:18,
151:21, 167:8,
168:1, 168:23,
169:1, 169:3,
169:5
cast 122:25
CAT 4:48
catch 43:13, 43:20

categories 126:11
category 98:4
cause 28:2
causes 26:6, 59:17,
125:8
Cayman 144:12
Central 32:12
cents 32:4, 32:5,
32:7, 39:10,
45:19, 45:23,
124:11
century 65:8
certain 65:20,
82:20, 102:2,
111:5, 168:14
Certainly 19:19,
52:10, 75:2,
100:22, 114:25,
116:10, 148:7,
152:2, 152:3,
172:6, 176:6,
179:15
certainty 24:14,
78:12, 79:21,
118:2, 118:5,
118:11, 120:21,
133:11, 133:12
certification 123:12
certified 96:7
certify 185:4
cetera 125:21,
133:17
challenge 142:24,
143:25, 151:1,
181:25
challenged 55:18,
88:4, 92:24,
110:4, 162:20
challenges 30:12
challenging 33:13,
69:15, 138:17
chambers 96:5, 96:7,
138:23
champions 85:15
chance 61:15, 111:1,
111:2
change 29:14, 178:14
changed 37:9, 178:4,
178:14
chaos 83:1

Chapter 30:19, 31:5,
   106:6, 155:24
charge 38:8, 167:12
charged 158:1,
   168:25
charging 148:25,
   149:11, 152:25,
   156:17, 156:19,
   160:14, 161:5,
   167:4, 167:7,
   167:13, 167:25,
   169:7
checked 90:11
checking 89:20
Chief 52:2, 52:4,
   52:6, 91:12
children 65:14,
   65:17, 93:20
choice 55:16, 55:20,
   81:20, 132:8,
   132:9, 132:14
choose 138:19
chose 96:25
chosen 21:13, 74:8,
   138:20
Christmas 50:7
Circuit 29:16,
   41:15, 41:17,
   53:7, 53:12,
   53:15, 101:23,
   101:25, 102:4,
   102:5, 110:22,
   146:16
circumstance 34:11,
   35:9, 35:20
circumstances 28:3
citation 108:7
citations 95:5,
   140:1, 140:5
cite 47:18, 95:7,
   95:8, 95:10,
   96:20, 97:8,
   102:5, 149:21,
   155:1
cited 48:5, 97:4,
   99:8, 101:22,
   101:23, 142:10,
   146:24, 151:11,
   156:7, 156:11,
   157:23, 158:2,

159:3, 162:11,
   162:19, 172:17
citing 102:4
citizen 62:16
Citizens 26:23,
   44:2, 44:14,
   44:16, 44:20,
   64:21, 72:8, 72:9,
   73:11, 74:15,
   92:16, 121:4
claimants 26:7
claimed 30:22, 40:15
claiming 179:11
clarification 139:19
clarifies 183:13
clarify 168:6
clarity 28:13,
   119:6, 154:12
class 81:16, 82:22,
   82:23, 84:9,
   86:16, 87:6, 88:2,
   109:16, 123:1,
   124:11, 125:1,
   129:13, 136:22
class-based 108:25
class-by-class
   137:16
classes 31:23,
   80:15, 86:18,
   108:19, 109:12
Clause 31:11, 46:17,
   47:5, 47:9, 47:13,
   47:23, 48:9,
   48:11, 52:13,
   52:22, 56:4,
   56:11, 57:10,
   57:15, 57:17,
   57:18, 74:25,
   95:1, 98:8, 105:9,
   106:3, 131:1,
   132:6, 150:4,
   150:8
clauses 150:3
clear 10:17, 21:12,
   29:8, 31:9, 46:14,
   77:20, 84:22,
   86:6, 97:24,
   122:5, 126:10,
   147:3, 152:18,
   153:11, 154:3,

155:12, 157:24,
   158:9, 159:8,
   161:17, 168:4
clearly 34:19,
   57:17, 58:21,
   162:8
clerk 110:14
client 79:5, 169:1,
   169:5
clients 36:22,
   38:10, 38:20,
   75:22
clinical 73:9
clock 140:17
close 53:21, 53:22,
   90:12
closed 42:17, 68:11,
   71:10
closely 113:2
closing 175:25
cloud 78:13
Club 70:5
coalesced 83:6
Coalition 3:32,
   88:24, 89:15,
   89:18
Code 7:13, 16:5,
   30:21, 36:15,
   36:20, 98:21,
   109:2, 115:12,
   115:13, 115:17,
   119:2, 123:3,
   123:9, 145:2,
   151:23, 152:1,
   156:6
coffers 58:6
coffin 71:22
Cofina-commonwealth
   11:5, 78:3, 78:11,
   80:25
cogent 140:5
Cohen 9:12
Coie 10:11, 28:24
coincidentally 67:24
collateral 31:22,
   34:13, 43:10,
   43:11, 151:21
collection 78:14,
   132:5
collections 41:22,

42:1, 56:19, 157:8
Collier 99:8, 99:14
colony 76:6
Colorado 56:12,
  56:25
combination 175:12
combine 108:18
comes 32:11, 39:15,
  40:22, 76:20,
  84:6, 97:16,
  142:13, 147:3,
  180:1
comfort 85:25
coming 18:25, 24:22,
  80:2, 133:18,
  139:14
commence 98:17
commenced 131:19
comment 20:23, 21:5,
  21:8, 21:16, 88:3,
  124:19, 130:14,
  136:16
comments 61:21,
  83:7, 129:9,
  129:23, 130:15
Commerce 47:23
commercial 132:11
Commission 73:11,
  74:15
commitment 161:2
committed 146:19
Committee 2:4, 3:6,
  37:17, 39:23,
  59:12, 91:17,
  91:21, 121:13
committing 34:4
common 19:7, 38:6,
  81:13, 102:18,
  103:23, 104:16,
  104:17, 115:13
Commonwealth-cofina
  9:17, 85:10, 91:23
Commonwealth-created
  31:4
communicated 117:17
communication 6:10,
  117:13
Communications 15:7,
  86:25
communities 68:11,

73:18, 74:11
community 70:7,
  70:22, 71:12, 72:7
community-based
  25:13
companies 59:11,
  75:8, 75:13
comparable 176:11
compare 44:7
compared 44:12
compel 36:3
compensate 75:24
compensated 31:11
compensation 31:8,
  52:25, 57:14,
  58:1, 151:4,
  151:17, 158:20,
  158:22, 159:10
competencies 14:21
competing 101:5
complaining 179:12
Complaint 25:24,
  26:1, 26:7, 143:14
complete 33:7,
  169:16
completed 73:25
completely 40:20,
  74:16, 150:7,
  155:22
complex 8:2, 39:25,
  120:7, 178:22,
  179:22
complexities 92:11
compliance 14:11,
  15:20, 15:24,
  16:4, 119:1,
  124:1, 165:5
complicated 92:6,
  92:17, 134:1,
  137:5
complies 15:11,
  16:16, 58:15
comply 6:11, 67:19,
  76:20, 166:3
Comprehensive 73:12,
  73:24
compromise 119:18,
  119:23, 120:12,
  121:13, 123:16,
  123:19, 129:20

compromised 131:21
compromises 90:5,
  91:8
compromising 120:18
comptroller 49:25,
  50:1
conceivably 171:11
concept 31:24
concepts 103:6,
  105:2
conceptually 173:19
concern 46:3,
  124:21, 133:16,
  133:20, 134:20,
  169:3, 170:21
concerned 70:8,
  77:25, 127:15,
  128:4, 128:12,
  138:9, 168:17,
  171:17
concerning 99:4,
  99:12, 176:9
concerns 54:22,
  93:1, 93:14, 97:14
concise 7:18
conclude 15:10,
  80:17, 87:24,
  136:7, 137:24,
  162:6
concluded 49:23
concludes 155:6,
  155:16, 162:17
conclusion 14:9,
  79:20, 80:22,
  98:3, 120:21,
  124:4, 137:20,
  150:16, 157:22
conclusions 6:20,
  6:24, 7:7, 7:18,
  16:3, 41:7, 42:13,
  94:5
concurring 52:2
Condemning 64:13,
  75:17
condition 22:19,
  69:18, 130:24
conditioned 9:16
conditions 103:18
conduct 36:1, 88:7,
  88:18, 144:13

confer 106:12,
  128:2, 159:17
Conference 6:12
conferred 98:18,
  160:5
confide 63:20
confidential 54:12,
  54:17, 55:2, 55:6,
  55:9
confidentiality 85:7
confirm 47:11,
  82:10, 100:6,
  115:19, 137:16
confirmable 14:4
Confirmation 6:14,
  6:25, 7:8, 8:18,
  14:2, 14:11,
  16:17, 28:8, 36:4,
  47:7, 54:17, 58:9,
  94:4, 94:12,
  97:13, 119:19,
  123:21, 126:19,
  135:4, 137:24,
  139:18, 173:11,
  173:16
confirmed 41:6,
  42:23, 57:5,
  88:10, 88:21,
  104:6, 123:24,
  136:24, 151:9,
  151:11
confirming 27:25,
  88:11
confirms 22:9,
  22:19, 46:24,
  54:2, 153:4
conflict 40:7, 85:13
conflicted 40:11,
  84:20
conflicts 55:4
confuse 64:20
confusing 132:7
congratulations
  141:11
Congress 47:13,
  47:19, 48:2, 56:9,
  57:4, 57:9, 57:11,
  57:12, 98:7,
  98:19, 103:18,
  104:13, 105:9

Congressional 47:12,
  47:15, 104:18,
  106:10
conjunction 121:16
Connecticut 51:8
connection 6:21,
  21:16, 79:13,
  79:16, 88:7,
  88:17, 88:19,
  105:3, 109:10,
  123:11, 128:9,
  129:15, 171:7,
  173:15, 174:22,
  178:13
consensual 79:25,
  90:6, 91:10,
  155:25
consent 91:22, 96:24
consented 100:7,
  100:10, 101:2
consents 99:25
consequence 19:11
consequences 46:15,
  66:23, 67:2,
  73:21, 74:2, 97:1,
  108:24, 152:12,
  170:25
consider 8:3, 58:20,
  86:24
consideration 22:21,
  73:22, 86:22,
  127:9
considered 15:14,
  64:25, 101:20,
  103:23, 103:24,
  142:11, 173:19
considering 166:8
consistency 16:11,
  123:13, 167:25
consistent 104:7,
  105:13, 114:25,
  121:17, 123:11,
  134:3, 148:11,
  150:9, 153:25,
  173:22
consistently 86:15
consisting 185:4
constant 131:18
constituency 27:2
constituents 66:5,

69:12
constitute 42:5,
  42:20, 84:2
constitutes 171:3
Constitution 7:5,
  22:15, 23:3,
  30:14, 31:7,
  44:17, 47:2, 47:9,
  47:21, 53:14,
  53:18, 58:12,
  58:16, 63:25,
  64:6, 69:10, 71:3,
  104:25, 105:14
Constitutional
  19:22, 38:3, 41:6,
  43:23, 43:25,
  46:25, 47:25,
  51:25, 56:10,
  57:19, 58:10,
  58:25, 73:9,
  74:24, 79:5, 95:3,
  95:18, 95:23,
  101:16, 105:14,
  107:3, 115:16
constitutionality
  22:5, 69:15,
  96:21, 105:21
Constitutions 105:19
constrained 76:3
construction 157:2,
  171:15
construed 171:11
consult 112:6
consulting 50:4,
  50:5, 63:16
contained 27:7,
  28:9, 123:8
contemplate 6:25
contemplates 8:25,
  78:15
contend 30:24, 103:4
contention 8:14,
  82:13, 154:14
contested 173:18
contesting 156:20
context 78:2, 86:21,
  102:2, 102:3,
  103:9, 103:16,
  127:7, 137:9,
  147:5, 170:22,

181:5, 181:7
contexts 106:7
contextually 138:10
continental 64:19
continuation 6:13
continue 8:17, 24:5,
    64:4, 65:8, 75:17,
    77:5, 78:21,
    89:14, 93:9,
    138:20, 172:8
Continued 3:1, 4:1,
    82:12
continues 50:6
continuing 6:11,
    81:21, 82:3
contract 26:10,
    34:6, 46:22, 48:9,
    48:10, 52:8,
    135:14, 159:17
Contracts 46:17,
    47:4, 47:9, 47:13,
    47:15, 47:24,
    48:11, 48:13,
    48:16, 50:3, 50:4,
    52:3, 52:13,
    57:18, 114:18,
    128:23, 131:1,
    132:4
contractual 114:21
contrary 27:25,
    28:9, 51:16, 98:9,
    109:19, 151:19,
    151:20, 180:24
Contrast 45:24,
    144:11
contribute 76:5,
    84:12, 84:14
contributions 146:15
Control 22:7, 22:9,
    22:18, 23:15,
    65:24, 67:25,
    69:17, 74:8
controlled 74:16
controlling 162:17
controversy 22:24,
    68:19, 130:1,
    130:3, 174:5
controverted 120:3
conveniently 86:15
conversation 11:23

conversations 23:16
convey 184:2
cooperation 113:1
Cooperativa 25:9,
    25:10, 25:11, 26:2
Cooperativas 25:3,
    26:2, 124:20,
    125:17
coordinating 141:17
cops 71:15
corporate 38:13,
    112:8
Corporation 1:32,
    1:47, 3:26, 74:16,
    77:18, 139:25,
    141:5, 166:25,
    183:6, 183:9
Correct 18:5, 96:23,
    130:23, 137:7,
    141:6, 153:14,
    153:18, 153:20,
    154:18, 157:10,
    176:20
correspondence 77:5
corroboration 15:19
corrode 72:4
COSSEC 26:3, 27:3
cost 27:23, 70:14,
    74:7, 82:2, 82:7,
    181:13
costly 81:21
costs 142:21, 153:3,
    158:24, 172:9,
    176:18
Counsel 6:6, 9:3,
    20:24, 79:8,
    117:17, 117:18,
    117:19, 124:20,
    125:2, 168:6,
    182:16
count 32:5
counter 87:13
counter-parties 82:8
counterclaims 147:18
countless 40:7
country 37:18,
    38:17, 49:25,
    64:21, 66:19,
    67:12
counts 59:8

County 96:20, 97:17
coup 45:14
couple 37:13, 42:16,
    90:13, 112:14,
    117:6
coupon 39:13, 45:15,
    60:15, 60:16
coupons 39:11
course 7:25, 54:13,
    57:23, 58:4, 59:9,
    67:21, 74:12,
    80:21, 83:19,
    105:18, 110:18,
    124:25, 138:5,
    142:16, 143:4,
    143:22, 145:15,
    149:15, 169:21
Court-appointed
    85:11, 85:19
COURTROOM 10:14,
    10:15, 12:6, 12:7,
    73:20, 76:21,
    76:25, 90:12,
    113:14, 174:10,
    175:4
courtrooms 6:10
courts 22:4, 22:10,
    22:25, 69:15,
    95:19
covenant 51:21,
    52:11, 160:22
cover 94:3, 94:16
coverage 125:20
covered 105:22,
    128:7, 145:15,
    149:22, 162:9
covering 157:3
cracks 76:10
craft 120:12
cramdown 108:25,
    155:23, 155:25,
    156:1
crass 63:14
create 118:6,
    133:24, 155:10,
    156:21, 157:19,
    159:21, 162:18,
    174:10, 174:16,
    176:24
created 22:2, 38:5,

43:12, 64:3, 68:9,
  73:13, 78:13,
  116:17, 177:4,
  179:11
creates 153:7,
  153:12
creating 63:2
creation 96:22
creature 67:10,
  104:19
credibility 92:22
credible 109:4
Credit 4:11, 25:14,
  25:17, 25:20,
  25:23, 26:20,
  26:24, 27:18,
  29:11, 144:11
Credito 25:9, 25:10,
  25:11, 25:12
creditor 77:22,
  78:4, 78:20,
  80:19, 100:20,
  111:18, 111:19,
  114:15, 136:22,
  146:24, 146:25,
  147:1, 170:11
credits 75:14
Crespo 62:8
crime 71:16
criteria 14:11
critical 94:6,
  97:11, 106:22,
  109:9, 151:12
cross-examination
  109:7, 120:4,
  164:20, 164:23,
  165:1, 165:2,
  165:9, 165:22,
  166:9, 166:13,
  181:9
cross-examine 165:25
cross-examined
  109:13, 166:5
crosspoint 68:20
crux 125:15
CSR 185:12
currency 83:4
current 41:12,
  41:16, 41:18,
  41:24, 41:25,

42:4, 42:8, 43:3,
  43:4, 43:8, 43:14,
  48:18, 49:23,
  50:10, 53:1, 53:9,
  54:4, 55:15,
  56:18, 63:12,
  66:22, 143:20,
  144:15, 149:10
currently 46:21,
  49:2, 50:18, 53:2,
  53:16, 53:21,
  64:10, 120:20,
  133:3
Curtis 141:4
cut 12:24, 18:16,
  34:20
cuts 71:7, 71:11

< D >
D. 3:23
Dade 70:5
damages 179:7
dangerous 71:16
Daniel 3:33, 5:5,
  163:13
Daniels 158:3, 158:9
Darlah 66:14
dash 163:15
daughter 65:1, 65:13
David 109:7
day 63:11, 77:9,
  81:20, 89:22,
  182:1
days 42:16, 71:12,
  89:22, 165:4
dazzling 177:25
DCI 69:3
de 25:9, 25:10,
  25:11, 25:12,
  26:2, 26:3
deadline 140:8
deal 59:23, 72:17,
  82:18, 82:20,
  83:6, 84:18,
  111:22, 112:2,
  116:5, 118:16,
  132:11, 162:24,
  162:25
dealing 31:12,

31:13, 163:2
deals 135:20, 183:19
dealt 11:11, 72:12
debated 96:5
debited 168:15
Debtor 1:35, 36:23,
  36:24, 47:7,
  82:22, 82:23,
  85:16, 88:25,
  99:19, 99:20,
  99:21, 101:15,
  104:2, 115:18,
  156:14
Debtors 1:18, 36:17,
  82:24, 91:6,
  100:8, 100:14,
  103:1, 115:14,
  115:15
debts 60:8, 76:7
decade 67:18
decades 57:4, 73:15,
  86:13, 121:4
decent 65:17, 75:25,
  76:2
Dechiara 3:23, 9:7,
  9:10, 9:11
decide 13:3, 24:10,
  43:13, 56:14,
  67:10, 95:19,
  103:15, 133:25,
  172:23
decided 22:3, 54:6,
  68:15, 79:10, 82:4
deciding 66:25,
  136:24
decision 12:18,
  13:6, 64:18, 67:5,
  68:21, 69:21,
  71:2, 72:3, 72:21,
  102:11, 103:4,
  103:13, 103:15,
  103:19, 120:23,
  127:3, 139:17,
  143:8, 144:7,
  146:17, 171:8,
  172:12, 172:13,
  172:15, 173:10,
  174:18, 182:20
decisions 63:14,
  67:2, 138:11,

138:18, 142:17,
143:17
declarants 14:13,
14:17, 14:25,
15:16, 120:3,
123:15
Declaration 5:5,
5:8, 14:21, 16:3,
34:23, 41:19,
45:20, 53:5,
108:18, 109:8,
109:15, 119:21,
119:22, 119:24,
119:25, 121:11,
121:12, 122:3,
122:5, 123:5,
163:13, 163:16,
163:17, 163:25,
179:19
Declarations 16:14,
119:17, 120:2,
120:5, 121:9,
122:10, 163:11,
163:19, 163:23
declaratory 26:9
declare 56:15
declared 50:8
decline 31:16
decrease 71:11
deem 27:6
deemed 98:4
deeply 77:22
default 30:4, 33:8,
33:10, 86:4, 86:7,
86:11, 86:12,
145:21, 146:10,
147:9, 148:2
defaulting 64:23
defeats 27:1
defective 129:25
defend 159:20,
160:3, 180:23,
181:1, 181:13
Defendant 2:31,
125:6
Defendants 1:50,
27:21, 124:24,
125:15
defending 158:25,
159:16, 159:25

defense 142:21,
153:2, 176:18
defenses 28:10
deference 51:10,
51:23, 159:7
defied 51:22
definitely 75:20
definition 126:8,
126:12, 126:20,
127:5
Dein 112:24, 138:24
del 25:11
delay 142:20
delaying 82:7
deleted 126:2
deliver 20:17
demanding 74:1
demands 64:16
democracy 63:6,
64:8, 64:16
Democratic 70:5
demonstrate 8:22,
15:2, 52:5, 153:9
demonstrated 80:14
demonstrates 151:5
demonstrating 7:19
demonstratives 164:5
demoralizing 75:21
denial 36:4
denied 16:18, 17:8
Dennis 3:26, 81:11
deny 172:25
Department 12:6,
71:14
depend 66:9
deposition 180:6
depositions 177:6
depositories 25:15,
26:20, 26:25
depositors 25:20,
27:5
deprive 142:8
deprived 35:18, 65:2
depth 168:11
DEPUTY 76:25, 90:12,
174:10, 175:4
derivatively 79:6
describe 41:25
described 41:15,
67:3

describes 41:13,
41:21
deserve 72:8, 91:10
deserving 72:7
designed 85:15,
133:11, 135:10,
166:4
desire 8:3, 55:1
desiring 49:12
Despins 3:7, 110:24,
118:2, 128:2,
128:12, 133:14
Despite 92:14
detail 112:18,
178:23
detailed 27:12,
43:25, 112:23
details 175:5
determination 7:13,
10:25, 97:14,
97:20, 97:21,
98:2, 99:9, 99:13,
104:11, 104:12,
105:12, 106:5,
144:2, 144:3,
155:7, 167:3,
171:25, 173:8,
175:12
determinations 7:12,
43:5, 43:7, 94:11,
100:3, 100:16,
104:4, 104:18,
104:23
determine 42:17,
42:19, 42:22,
55:21, 56:16,
94:17, 98:19,
101:5, 101:15,
102:24, 104:7,
104:13, 104:20,
104:25, 105:21,
106:13, 106:16,
156:5, 168:15
determined 54:11,
95:4, 104:16,
105:7, 135:12,
142:12, 142:21,
144:18, 147:18,
147:19
determines 54:3,

104:1, 170:24
determining 106:7
Detroit 96:20
devastating 71:10
devastatingly 70:24
devastation 75:10
developed 120:8,
  121:14, 173:25
Development 26:4,
  122:15, 123:7,
  123:20, 123:21,
  139:23
deviant 35:19
devices 6:10
dias 6:5
Diaz 25:12
dice 97:1
dichotomy 161:9
difference 36:6,
  36:8, 40:2, 160:20
differences 35:12
different 11:8,
  34:25, 39:9, 83:2,
  102:23, 107:14,
  111:13, 113:7,
  124:7, 142:19,
  158:3, 163:1
differential 109:21,
  109:22
difficult 29:1,
  82:18, 137:5,
  176:24
difficulties 46:20
dignity 76:13
diligence 148:8
direct 34:6, 163:19,
  181:20
directed 163:18,
  164:24
direction 171:2
directives 64:3
directly 52:13,
  72:2, 74:18, 77:2,
  105:12
disagree 13:17
disagreed 79:18
disappoint 89:24
disappointed 91:3
disbursed 50:20,
  50:23

disbursing 155:3
discharge 26:8,
  26:9, 27:8, 27:14,
  99:3, 100:4,
  100:14, 130:12,
  150:14
disclosed 19:17
Disclosure 19:9,
  44:7, 46:15,
  46:16, 122:23,
  125:19
discord 37:21
discovery 177:3
discretion 104:13,
  129:1, 146:15
discriminate 44:23
discriminates 44:1,
  51:14
discrimination
  43:24, 44:4,
  44:15, 44:16,
  44:22, 109:1,
  109:21, 109:25
discuss 62:18
discussed 124:23,
  125:5, 170:7,
  173:6
discussion 10:12,
  34:2, 149:20,
  167:7
discussions 109:11
disenfranchised 40:8
disgorge 144:2
dismissed 74:22
displacement 75:23
display 177:25
dispositive 102:2,
  103:7, 176:5
disproportionately
  75:18
dispute 9:17, 29:20,
  46:18, 50:6,
  50:19, 52:23,
  97:3, 97:4, 102:9,
  131:12, 131:18,
  147:2, 153:7,
  153:11, 155:13,
  155:23, 158:4,
  158:8, 158:15,
  159:16, 173:9,

173:24
disputed 29:9, 33:4,
  33:5, 49:3, 50:13,
  100:20, 136:25,
  178:11
disrespecting 63:2
dissent 52:16
distinct 115:4,
  134:19
distinction 135:4
distinguishable
  157:13
distinguished 107:17
distributed 45:13,
  157:7, 168:2,
  168:23, 169:6
distribution 44:6,
  50:21, 57:25,
  124:8, 125:2,
  125:12, 157:6,
  163:2, 167:19,
  168:8, 168:9,
  168:14, 168:19,
  168:25, 169:10
distributions
  152:23, 167:14,
  169:4, 169:5,
  169:8, 172:2
District 1:3, 2:35,
  2:36, 87:1,
  142:18, 174:9,
  185:1, 185:2,
  185:7
distrust 63:19,
  63:20
divert 84:5
divide 118:23
divided 18:20
Docket 1:6, 1:22,
  1:40, 2:4, 14:16,
  44:8, 48:5, 85:4,
  102:11, 110:12,
  173:20
docketed 25:25,
  27:11
dockets 27:13
doctor 117:7
doctrines 43:23,
  43:25
document 5:14,

149:5, 177:3
documents 8:9, 8:13,
   8:16, 8:18, 8:24,
   49:14, 132:4,
   132:5, 132:11,
   132:23, 133:8,
   133:9, 133:10,
   134:2, 134:21,
   135:2, 135:10,
   135:15, 136:1,
   156:22, 163:11,
   164:4, 164:8,
   164:10, 172:16
dog 181:16
doing 32:24, 82:15,
   85:14, 115:9,
   121:16, 128:17,
   140:19
dollar 32:4, 32:5,
   32:6, 32:7, 39:10,
   45:19, 114:13,
   114:22
dollar. 39:15,
   45:23, 124:12
dollars 17:20,
   19:21, 38:7,
   38:22, 50:11,
   50:15, 50:17,
   50:18, 68:10,
   68:24, 77:19,
   84:5, 114:10,
   143:9, 151:17,
   180:2, 181:11,
   181:19, 181:21
dollars. 32:9
Dolor 67:7, 67:17
Dominican 65:4
domino 63:19
done 22:15, 27:19,
   104:14, 106:14,
   112:2, 116:5,
   122:22, 173:11,
   173:21, 175:9,
   177:5, 178:25,
   179:18, 180:5,
   180:7, 180:14
double 60:1
doubt 99:12, 125:11
doubts 99:4
down 18:16, 62:23,

76:9, 119:6,
   133:18, 139:8,
   139:12
DPR 95:7, 95:11,
   97:5
drafted 151:15
drafting 136:4,
   138:7
drastically 71:19
draw 142:15, 181:18
drawing 65:25
drawn 63:22, 67:14
drive 88:1
dry 82:21
dubious 28:2
due 36:13, 114:19,
   148:8, 150:12,
   178:10
duly 28:11, 100:19
dummy 74:16
Dunne 3:26, 81:7,
   81:8, 81:10,
   81:11, 88:22,
   110:6, 115:4
during 21:8, 68:15,
   69:12, 122:16,
   128:5, 128:7
duties 147:5,
   158:19, 159:15,
   159:25, 160:2,
   160:6, 161:7,
   161:12
duties. 161:14
duty 61:7, 159:17
Dvores 3:40, 16:25,
   18:21, 18:25,
   19:1, 19:4, 20:6,
   59:4, 59:6, 61:19


< E >
e-mail 10:19, 12:1,
   20:24, 54:18,
   110:13
earlier 113:4,
   124:20, 134:15,
   180:17, 180:18,
   180:20
earmark 104:9
easier 82:25

easy 164:9
eating 11:7, 89:6
ECF 13:22, 97:8,
   163:14
echoes 48:7
economic 14:23,
   15:1, 15:3, 28:4,
   57:21, 67:20,
   78:21, 87:24,
   109:18, 118:14
economists 14:24
economy 71:21,
   72:18, 162:24
education 38:24,
   63:15, 65:13,
   71:11
effect 33:16, 34:22,
   34:23, 36:9,
   46:24, 48:2,
   63:20, 98:23,
   99:3, 119:9,
   148:24, 162:5,
   173:14
effected 27:17
effective 47:16,
   69:18
Effectively 36:7,
   36:8, 111:9, 130:6
effectiveness 130:24
effectuated 113:5
effort 50:12, 170:8
efforts 142:20,
   181:16
Eight 45:19, 45:23,
   48:14
eight. 56:7
Eisenberg 3:28,
   10:3, 10:10,
   10:11, 11:20,
   12:13, 12:17,
   13:5, 18:5, 18:10,
   18:11, 18:20,
   24:20, 24:24,
   28:18, 28:19,
   28:22, 28:23,
   29:4, 37:5, 37:10,
   57:2, 60:6, 83:15,
   84:10, 108:13,
   129:23
Either 28:7, 35:2,

55:16, 55:20,
87:4, 104:17,
105:5, 105:12,
111:19, 120:22,
126:18, 133:22,
164:8, 164:10,
170:15
ELA 95:7, 95:11
elaborate 171:4
elect 44:6, 44:9,
44:11
elected 66:21,
69:11, 92:10,
100:10, 101:2
elections 122:21,
122:25
electronic 6:9
eligibility 30:24
eligible 30:19
eliminated 71:13
Ellenberg 4:3,
113:13, 113:19,
114:6, 114:7,
114:8, 116:22,
117:2
Elliot 37:6
Elliott 3:38, 12:16,
18:7, 18:13,
18:14, 18:20,
34:21, 37:7,
37:20, 39:7, 41:2,
54:20, 87:7
Emanuel 89:17
embedded 84:18
embodied 78:23,
86:17
embodying 78:12
EMMANUELLI 3:21,
9:25, 10:2, 11:17,
13:9, 13:10,
13:12, 13:13,
13:16
emphasis 122:17
emphasize 80:23,
117:12
employed 101:19
Employees 9:13,
68:3, 68:5, 71:12,
74:21, 126:6,
126:25

employment 128:23
empower 102:18
empty 83:21, 174:11
enables 71:3, 149:25
enacted 98:8, 99:3
enactment 30:25
end 30:2, 50:10,
60:9, 67:24,
72:21, 72:23,
81:20, 83:24,
86:19, 93:2,
93:15, 95:24,
99:14, 102:2,
103:12, 119:3,
137:1, 153:24,
156:24, 162:7,
162:14, 179:23,
180:2, 182:1
ended 84:16
endlessly 112:23
endorsing 102:21
ends 72:1, 84:9
endure 68:23, 76:15
endured 67:12
energy 85:21
enforceable 8:11,
8:24, 43:9, 54:5,
130:16
enforcement 72:5,
146:18
engage 97:24
engaged 144:4,
144:13, 151:7
engaging 89:5
engineered 92:6
enjoyment 99:20
enough 31:17, 62:17,
63:1, 76:1, 76:17,
76:19, 88:5, 134:5
enrich 59:13
enrichment 59:20
enrichments 61:6
enslavement 64:14
ensued 121:21
ensure 62:20, 64:8,
96:11, 151:6
ensured 55:4
ensuring 26:22
enter 173:15, 174:17
entered 85:3,

100:25, 102:12,
174:21
entering 112:2
entire 60:25, 138:24
entirely 116:1,
183:9
entities 25:13,
45:5, 141:14,
183:19, 183:20
entitled 35:13,
46:14, 55:14,
60:5, 123:1,
126:13, 144:3,
144:14, 145:5,
145:17, 146:10,
161:18, 167:14,
168:14, 175:13,
178:9
entitlement 120:20,
178:15
entitlements 101:1,
122:19
entity 7:2, 29:23,
30:18, 31:4, 45:6,
104:2
entry 173:20
enumerated 163:24
equal 37:22, 129:25
equally 79:14, 109:6
equitable 146:20
equivalency 156:2
equivalent 145:2,
145:5, 145:8,
151:22
equivocal 154:7
Eric 3:34, 4:8,
140:20, 142:1,
169:15
escape 148:9
especially 29:2,
31:2, 62:13,
80:21, 170:25
Esq 2:45, 3:21, 4:11
essence 24:7
essential 52:5,
71:2, 93:18
Essentially 29:8,
30:6, 30:14, 33:4,
34:20, 36:23,
41:24, 94:15,

96:15, 102:18,
113:5, 128:14
establish 14:4,
14:21, 15:3,
35:16, 65:16,
72:14, 102:19,
174:25
established 22:16,
30:6, 102:14,
105:11, 108:1,
183:10
establishes 64:1,
129:21
establishing 175:1
establishment 174:22
estate 104:9, 106:8,
115:6, 115:7,
115:11, 127:21
estates 115:22
ESTEVES 62:10,
62:12, 62:15,
62:24
Estevez 66:10
estimated 176:9
et 1:16, 1:48, 2:42,
101:23, 125:21,
133:17
etc. 63:16
evaded 74:23
evaluate 14:10,
93:16, 111:1,
111:2
evaluation 15:1
event 33:9, 49:6,
84:5, 173:13
events 147:9
everybody 82:8,
83:2, 111:2,
138:3, 138:4
everyday 72:4
everyone 61:22,
62:12, 84:12,
138:5, 139:8,
184:4
everything 15:17,
40:1, 40:5, 62:23,
75:25, 77:6, 93:8,
128:10, 145:14
eviction 75:21
evictions 73:19

Evidence 5:6, 5:9,
13:21, 15:9,
15:14, 15:18,
29:7, 32:23, 33:6,
48:21, 58:5, 58:6,
66:3, 83:12, 88:5,
92:24, 95:19,
96:1, 108:17,
109:19, 110:2,
111:5, 118:25,
141:18, 145:9,
163:11, 164:16,
164:20, 181:9
evidence. 164:2,
164:18
evidenced 34:19
evident 44:4
evidentiary 35:11,
140:22, 141:2,
166:11, 166:12
exactly 41:14, 89:20
examination 33:17
examiner 181:5
examining 74:5,
112:18
example 14:24,
110:23
excellent 112:8
except 173:20
exception 26:7,
26:9, 44:21,
47:13, 47:22,
48:11, 99:23,
142:14, 142:23,
168:20
exceptionally 112:1
exchange 61:9,
106:20
exchanged 19:14
exclude 127:1,
149:18
excluded 122:10
exclusive 87:5,
98:16, 100:9,
102:24
exculpation 88:7,
124:18, 128:7
exculpations 27:14,
151:10
excuse 89:2, 120:12,

122:12, 124:10,
130:4, 130:22,
131:2, 152:2,
170:11
executable 82:2
exempt 44:25, 45:5,
45:7, 45:8
exemption 45:7,
46:12
exemptions 45:8
exercise 100:13,
104:24, 160:2
exercised 47:19,
57:10
exercises 100:9
exercising 100:12
Exhibit 41:19,
49:18, 53:5,
178:24, 179:5,
180:9
Exhibits 5:12, 5:14,
5:15, 29:7, 45:20,
123:5, 163:16,
163:24, 164:1,
164:15, 164:17
exist 109:1, 149:13,
153:17, 171:21
existed 165:24
existence 147:9,
160:4
existing 47:15,
105:17, 174:23,
175:5
exodus 72:24
expect 168:5
expected 23:24
expects 108:14
expense 69:5
expenses 142:9,
143:20, 145:18,
145:24, 147:4,
147:11, 149:11,
150:4, 150:12,
153:1, 158:18,
158:25, 178:10,
178:16
experienced 67:17,
79:8, 181:8
expert 14:8, 14:14,
38:25, 39:1, 40:1,

92:5, 142:4, 145:10, 162:4, 176:8, 176:14
expertise 178:21
experts 178:20, 179:14, 181:4, 181:9
explain 21:3
explained 9:18, 9:21, 9:22
explains 109:21, 180:15
explanation 183:5
explanations 15:20
exploration 76:7
exposed 177:24
exposure 114:13
exposures 77:23
express 42:4, 44:19, 92:8, 146:3
expressed 93:1, 93:14, 106:10
expressing 117:4
expressly 9:15, 100:7, 105:8, 115:7, 126:20, 146:12, 148:22, 152:16
expropriates 57:13
extensive 29:6, 42:13, 112:20
extent 127:15, 128:6, 128:13, 135:15, 156:16, 167:3, 167:8, 172:23
extra 80:12, 99:10, 158:5
extraordinary 178:23
extreme 112:18
extremely 71:25, 72:25, 120:7, 122:24

< F >
F2d 102:5
F3d 101:24
face 44:4, 65:8, 75:22, 86:11

faced 65:8
facially 132:14
facing 73:18
factors 51:10, 51:23, 121:6
facts 49:13, 49:16, 95:20, 143:8
factual 7:17, 42:11, 43:20, 87:13, 110:3, 165:1, 165:4
fail 9:22, 88:10
failed 179:6
Failure 26:24, 27:23
fair 60:18, 61:16, 76:15, 108:23, 109:18, 110:6
fairly 29:5, 52:16, 92:23
faith 34:19, 35:18, 38:25, 83:12, 88:4, 88:5, 88:10, 88:12, 88:15, 92:22
fall 127:20
falling 51:1
false 57:2
families 70:9, 70:24
family 66:8, 70:19
far 51:8, 60:23, 75:14, 119:17
Fargo 143:7
Farr 116:25
fashion 138:12
fast 37:2
father 65:4
fault 26:12
favor 44:3, 51:14, 69:4, 108:21, 146:25, 155:19, 170:20, 171:9, 172:7
favorite 87:11
favors 121:8
Fe 158:2
fearful 101:19
feasibility 14:22, 15:2, 16:10
feasible 15:11
feature 99:11

Federal 8:23, 8:24, 13:21, 45:7, 49:21, 49:22, 76:7, 94:25, 99:17, 101:4, 102:3, 102:8, 102:16, 102:18, 103:2, 103:6, 103:17, 103:20, 103:23, 103:24, 104:17, 132:6, 132:12, 133:23, 134:4, 134:25, 135:5, 143:5
federally 44:25, 45:1, 45:2, 45:3, 45:7
fee 158:4, 181:5
fee-related 162:9
feed 93:6
feel 11:22, 63:21, 64:17, 86:23, 86:25, 92:14
fees 142:9, 142:16, 143:10, 144:2, 146:11, 150:12, 155:5, 158:7, 158:17, 176:9, 178:10, 178:16, 179:21
feet 90:14
Feldman 4:5, 113:24, 116:23, 116:24, 116:25, 117:11, 119:21, 133:13
fellow 65:9, 179:9
felt 70:14, 79:19
Ferrer 70:4
few 52:22, 56:3, 66:22, 73:20, 75:7, 77:8, 90:10, 119:3
fiasco 36:14
fiduciaries 85:11
fiduciary 40:13, 61:7, 91:19
Fifth 35:24
fighting 137:2
figuratively 67:15
figure 89:20, 177:10

file 22:4, 30:19,
  31:5, 147:19,
  172:5, 173:24,
  174:2, 175:11,
  175:19
filed 6:17, 17:17,
  18:22, 19:5, 21:6,
  21:10, 21:19,
  23:6, 23:14,
  25:20, 25:24,
  27:13, 30:5,
  30:19, 41:8,
  69:14, 96:4,
  96:16, 97:7,
  100:19, 103:1,
  108:12, 113:4,
  120:10, 125:24,
  126:1, 129:15,
  165:4, 166:1
filer 175:7
files 23:23
filing 17:7, 80:6,
  86:8, 126:21,
  175:4, 175:5
filings 29:7, 75:13,
  111:1, 167:19
final 72:24, 100:25,
  120:24, 136:2,
  160:13
finality 94:22,
  98:23, 163:2,
  173:14
finalize 136:6
Finally 36:10, 40:3,
  40:10, 76:24,
  116:11, 144:1,
  146:1, 153:4
Finance 3:49, 74:19,
  77:17, 166:24
Financial 1:9, 1:25,
  2:11, 2:27, 3:11,
  15:3, 28:4, 37:18,
  50:16, 67:16
financially 38:13,
  172:18
financiers 92:7
Financing 1:32, 1:47
find 8:15, 38:9,
  76:16, 88:14,
  118:6, 174:7,

176:17
Finding 16:15,
  55:23, 88:17,
  96:9, 97:23, 133:6
findings 6:19, 6:24,
  7:1, 7:7, 7:18,
  7:21, 8:6, 8:7,
  42:11, 42:13,
  88:4, 88:6, 94:5,
  97:12, 97:13,
  98:3, 124:1,
  132:24
Fine 25:2, 113:18,
  172:22, 173:4
fingers 132:18
finish 24:3, 93:25
Firestein 2:44
firm 9:12, 38:6,
  141:4, 176:11,
  176:23, 182:2
firms 37:18, 162:3,
  179:21
Fiscal 3:10, 14:9,
  15:12, 16:12,
  22:7, 22:9, 22:18,
  23:15, 30:2,
  41:14, 65:23,
  67:25, 69:17,
  74:8, 104:1,
  104:4, 104:6,
  104:8, 121:17,
  123:12
Fishman 5:8, 163:17,
  163:23, 176:7,
  181:4, 181:5
fit 76:20, 105:5
Five 12:15, 19:19,
  20:5, 20:6, 20:8,
  21:15, 21:18,
  21:20, 34:25,
  68:5, 68:12,
  73:15, 103:14,
  108:19, 113:15,
  113:19, 113:25,
  114:1, 114:9,
  114:13, 114:22,
  118:17, 119:17,
  123:15, 142:10
five-minute 24:2
fixed 12:4, 72:18,

135:18
flagged 165:11
flexibility 141:21
flood 128:23
Florida 70:8, 70:12
flow 135:2
fluctuate 31:14
fly 128:18
focal 96:22
focus 14:1, 41:5,
  146:8
focusing 118:25
folks 39:22, 91:3,
  148:6
follow 47:2, 73:23,
  74:11, 89:3, 108:9
follow-up 137:18
followed 110:11
following 29:8,
  63:11
follows 28:8
fool 72:23
footnote 99:7,
  137:14
forbidden 15:8, 85:8
force 51:24, 57:25,
  65:23, 132:6,
  134:21, 135:5
forced 67:20, 68:14,
  76:6
forces 71:20
forefront 71:1
forge 90:5, 91:8
form 23:17, 32:9,
  98:2, 136:2
formal 6:17, 17:19,
  175:19
former 119:10,
  126:23, 126:25,
  127:3, 130:18,
  134:6, 134:9,
  176:23
forms 121:8, 178:7
formulating 92:23,
  104:1
forth 120:2, 126:7,
  146:5, 148:18,
  153:8, 169:17
Forty 89:7
forum 96:24

forward 22:24,
  24:10, 24:14,
  37:3, 62:10,
  69:20, 70:1, 73:5,
  79:18, 79:22,
  82:25, 89:2,
  92:19, 96:1,
  112:9, 121:1,
  140:12, 163:3,
  182:18
forward-looking
  161:23
foster 72:6
fought 83:12, 101:21
found 89:23, 142:25,
  143:3, 151:7,
  181:10
foundation 15:3,
  27:17, 118:1,
  118:8, 118:9,
  118:10
Four 13:2, 14:15,
  25:13, 25:24,
  34:25, 142:4,
  142:17, 142:18,
  142:19, 165:4
Fourth 35:24, 47:22
fraction 60:19
fragments 44:13,
  45:16
frankly 89:25,
  106:15, 118:13,
  177:9, 177:24
fraud 26:13, 180:20,
  180:22
Frauds 157:25
fraudulently 182:4
free 19:15, 39:12,
  61:10
Friedman 3:13,
  96:11, 106:25,
  107:1, 107:16,
  107:18, 107:20,
  107:24, 108:11,
  113:11, 121:10,
  127:15, 128:4,
  129:10, 130:21
friend 38:23
friends 70:19
front 22:10, 22:21,

37:8, 37:16,
  68:17, 112:23,
  126:5, 126:13,
  158:7
fulfillment 155:7
full 31:19, 31:23,
  32:25, 33:20,
  33:22, 34:14,
  34:15, 86:13,
  101:9, 113:7
fullest 36:6
fully 50:23, 60:8,
  80:5, 155:25,
  156:13
function 26:22,
  161:1
Fund 16:1, 30:1,
  144:12, 151:16
fundamental 98:22
fundamentally 54:23,
  101:4, 112:15
funding 162:22
funds 68:23, 120:19,
  120:22, 121:2,
  135:2, 142:9,
  142:16, 144:8,
  145:24, 161:3,
  178:11
future 30:8, 41:22,
  42:1, 56:13,
  56:18, 56:19,
  64:18, 64:19,
  65:1, 66:25, 71:6,
  76:13, 84:13,
  92:20, 99:14,
  100:8, 106:2,
  133:16, 138:18,
  151:17, 161:24,
  162:3, 162:21


< G >
Gabe 141:3
Gallagher 116:25
Gandia 25:10
Gary 3:28, 10:10,
  28:23, 37:20
gate 110:1
gather 9:8, 141:8
gave 20:24, 22:2,

35:4, 159:10,
  159:11, 178:8
GDB 74:17, 112:5
gears 97:10
General 3:17, 35:3,
  49:21, 98:11,
  102:14, 105:11,
  123:7, 126:5,
  127:22, 133:25,
  136:18, 138:8,
  153:23, 154:1,
  159:7
generally 73:19,
  167:8
generated 41:22
generation 66:25
generations 66:25
Gerber 86:19
German 111:23
gets 12:4, 83:20,
  157:18
getting 33:21, 39:3,
  45:11, 59:23,
  60:1, 60:3, 60:4,
  60:13, 60:14,
  60:19, 75:4,
  106:19, 151:17,
  155:21, 170:6
give 21:6, 21:20,
  36:10, 43:10,
  56:22, 59:16,
  94:21, 95:4,
  101:9, 108:6,
  133:11, 166:4,
  173:3, 182:19
Given 9:5, 13:25,
  20:7, 21:25,
  23:13, 34:12,
  55:13, 58:2, 60:6,
  75:3, 95:25,
  109:18, 115:10,
  124:22, 134:6,
  141:21, 154:5,
  159:6, 162:5,
  177:11, 177:12
gives 22:13, 56:1,
  106:4, 115:14,
  129:1, 145:13,
  145:22, 146:15
giving 8:4, 43:19,

70:6, 149:18
Glassman 69:1
glossed 158:13
GMS 3:28, 10:11,
   18:12, 28:24,
   122:11, 122:12,
   122:13
goal 72:21, 72:23,
   113:8
goals 156:24
Goldberg 5:5,
   163:14, 163:23,
   163:25, 176:6,
   176:23, 177:4,
   177:12, 178:22,
   179:19, 180:15,
   181:4, 181:6
GOLDSTEIN 3:49,
   77:13, 77:14,
   77:16, 80:11,
   81:5, 81:17,
   166:18, 166:19,
   166:24, 167:24,
   169:3, 169:12
Gotshal 77:16
gotten 180:12
governance 111:24,
   112:8
governed 134:25,
   135:3, 135:12,
   135:15
Government-run 108:7
governmental 26:22,
   99:19, 127:7
Governor 50:8,
   67:25, 96:8,
   108:3, 112:4,
   112:6
gracious 184:9
Grajales 66:13
grant 106:11,
   162:10, 162:13
granted 66:7, 88:12,
   105:8, 130:22,
   161:5
grants 76:2, 130:8
gratitude 92:8
Great 21:22, 37:8,
   37:14, 64:21,
   108:2, 108:11,

112:8, 155:10
greater 34:17, 35:3,
   52:1, 58:21,
   81:15, 121:2
greatest 116:7
Greetings 62:12
gross 142:14,
   143:12, 151:7,
   182:8
grossly 143:4, 144:4
Ground 64:1, 101:24,
   105:4, 116:6
groundless 182:6
Group 3:16, 3:28,
   10:11, 16:21,
   17:24, 18:1, 19:5,
   20:8, 20:9, 20:10,
   21:1, 23:6, 23:7,
   24:3, 28:24, 69:3,
   89:21, 136:18,
   137:11
grow 76:16
grown 76:17
Guarantee 3:49,
   70:13, 74:10,
   77:17, 166:24
Guaranty 4:3, 114:8
guess 67:8, 165:15,
   180:23
guidance 85:18
guide 85:24
guilty 142:25
gutted 68:10


< H >
Hadley 81:11
haircut 75:3
half 43:10, 43:11,
   54:7, 56:2, 59:15,
   60:10, 60:11,
   60:12, 60:14,
   75:12, 85:9
hammered 122:16
hamper 76:12
hand 16:7, 90:19,
   112:24
handle 18:6, 18:7
handled 176:12
handling 29:15,

140:22
hands 65:9, 75:12
hang 182:19
happen 88:16,
   111:17, 129:18,
   141:9, 161:24
happened 87:20,
   87:21, 111:10,
   111:25, 156:12
happening 70:9,
   165:14
happens 32:21,
   55:11, 98:21,
   106:2, 169:9
happiness 71:4, 72:9
happy 60:11, 126:15,
   170:9
hard 38:9, 38:20,
   39:23, 70:14,
   71:25, 80:18,
   83:12, 111:25,
   112:1, 138:5,
   177:10, 184:9
Harkening 150:9
harm 28:4, 74:10,
   143:5, 144:8
harmless 158:24
hat 87:14, 133:22,
   136:3
head 76:25, 80:2,
   165:13, 165:15
heading 150:16
health 72:13, 84:13
healthcare 63:15,
   65:13
healthy 72:7
hear 12:10, 12:25,
   16:23, 23:12,
   52:10, 77:10,
   88:24, 90:19,
   102:13, 107:22,
   109:6, 165:17
heard 11:14, 34:21,
   34:22, 37:4,
   37:15, 40:5, 46:9,
   54:16, 79:13,
   83:7, 86:1, 87:4,
   104:3, 109:3,
   110:8, 134:16,
   138:10, 154:12,

155:23, 164:9
HEARING 2:34, 6:14,
  13:18, 19:8,
  23:24, 23:25,
  32:23, 62:18,
  62:25, 63:5, 69:1,
  81:19, 89:3,
  125:19, 136:7,
  141:2, 174:13
hearsay 15:8, 15:15
heart 63:22, 70:18,
  147:7
hearts 77:2, 138:13
heavily 67:20,
  121:7, 121:25,
  122:1
heed 28:25
held 49:9, 50:21,
  52:12, 63:7,
  65:12, 82:22,
  82:24, 85:13,
  87:9, 102:7,
  103:19, 121:24,
  142:9, 143:2,
  157:7, 161:4,
  165:21
help 72:1, 134:7,
  164:21
helped 51:15, 85:23,
  141:8
helpful 107:11,
  109:23, 126:22,
  140:4, 140:10,
  173:22, 183:11
helping 72:22,
  138:24
hemisphere 69:2
herein 25:24
Hermann 2:45
HERTZBERG 141:3,
  141:4, 141:10
high 71:22, 82:13,
  86:23, 158:13
higher 26:22, 65:12
highest 64:10,
  64:11, 71:23
highly 91:25, 109:2,
  178:20
Hill 107:24
Hindman 110:13,

110:14
history 92:12,
  151:19
hit 118:24
Hoc 3:16
Hogwarts 133:22,
  136:3
hold 49:10, 106:13,
  158:24, 161:3,
  161:24
holdback 182:12
holder 167:13
holders 34:25,
  37:22, 39:18,
  46:21, 83:16,
  108:14
holding 40:13,
  153:16
holdings 81:16, 87:5
holdout 181:17
holds 143:19
holiday 175:18
home 38:24
homeland 76:5, 138:9
homes 57:13, 73:19,
  75:23
honestly 134:5
Honorable 2:35,
  16:7, 25:8, 25:22,
  27:10, 91:11,
  185:6
honored 138:20
hope 37:1, 38:24,
  66:3, 91:9, 172:22
hopeful 11:23
Hopefully 78:16,
  81:1
Hopelessly 40:10,
  40:11
hopes 81:17
hoping 81:15, 139:13
hotly 136:25
hour 12:15, 13:1,
  18:19
hours 141:16, 178:25
House 22:16, 23:2,
  23:4, 24:9, 63:7,
  63:8, 66:20,
  68:17, 69:7, 76:9,
  83:9, 83:11,

87:22, 96:6,
  96:15, 131:13
Houser 85:5, 91:12,
  140:17, 140:24,
  141:8, 170:5,
  181:16, 184:1
HSBC 146:17
HTA 77:24
huge 39:12, 45:22
human 72:7, 76:14
humanitarian 75:10
humble 66:4
humility 37:8
hundred 32:4, 168:18
hundreds 71:10
hung 68:17
hurdles 157:21
Hurricane 68:25
hypothetical 177:4

< I >
idea 54:14, 57:7,
  76:19, 97:18
identifiable 82:25
identified 34:25
ignorance 65:5
ignore 48:4
ignored 145:3
ignores 130:1
III 1:8, 1:24,
  91:14, 103:10,
  103:17, 111:14,
  111:15, 118:7,
  128:5, 128:7,
  130:21, 147:20
illegal 59:19, 75:20
illegitimate 75:21
Illinois 51:8
image 162:12
imagine 113:20
imbalance 35:20,
  35:21
immigrants 64:20
impact 52:7, 57:22,
  167:13, 169:7
impair 46:22, 47:14,
  48:16, 51:2, 51:22
impaired 48:13
impairing 34:5

impairment 47:25,
    48:3, 51:7, 51:16,
    51:17, 52:19
impairs 47:23, 48:9,
    48:10
impeccable 85:20
impermissibly 74:23
implements 130:19
implicate 172:19
implicates 147:8
implied 51:25
implore 65:22
important 15:23,
    19:17, 38:25,
    39:16, 48:17,
    52:5, 61:12,
    65:12, 78:6, 78:9,
    79:20, 80:23,
    94:11, 97:17,
    99:23, 109:6,
    109:14, 135:3,
    138:17, 170:13,
    170:14
importantly 117:24,
    123:1
impose 55:1, 176:14
imposed 52:2, 61:2,
    61:3, 75:5,
    153:19, 176:16
impossible 14:10,
    40:15, 40:23
imprimatur 43:16
improper 25:16,
    34:18
imputed 46:13
in-rem 98:14, 100:9
inapplicable 149:24
inappropriate 110:1,
    176:13
inbox 134:6
incentive 35:4, 35:5
inclined 137:4,
    137:6
include 51:11,
    56:18, 61:13,
    123:6, 126:19,
    132:7, 137:14,
    173:9
included 20:25,
    75:1, 120:7,

120:9, 121:22,
    126:21, 127:6,
    133:9, 173:10
includes 20:8,
    45:12, 67:23,
    100:23, 114:11,
    115:15, 146:5,
    146:6, 147:15
including 7:3, 8:10,
    25:18, 25:23,
    26:25, 51:15,
    58:16, 67:1,
    67:19, 68:16,
    74:19, 80:20,
    91:15, 101:13,
    101:18, 101:23,
    111:3, 117:16,
    122:17, 122:18,
    133:8, 133:9,
    138:6, 165:1
Income 45:8, 46:1,
    49:21, 49:22,
    60:1, 60:16, 99:21
inconsistent 98:12
inconvenient 87:13
incorporate 52:3
incorporated 27:20,
    36:20, 99:6,
    103:18, 119:20,
    151:23
incorporates 104:6
increase 13:2
increasing 73:18
incredibly 138:17
increment 57:24
incremental 82:7
incumbent 95:25
incurred 147:4,
    153:1, 158:18,
    159:14, 161:20,
    162:2, 162:3,
    176:10, 180:17
indemnification
    127:18, 128:22,
    150:5, 150:6,
    150:7, 151:4,
    153:8, 153:24,
    154:15, 156:16,
    157:22, 158:1,
    158:6, 159:9,

159:12, 160:22,
    161:11, 167:4
indemnifies 145:18
indemnify 129:2,
    153:5, 154:4,
    158:24
indemnity 152:24,
    156:25, 158:3
indenture 134:24,
    135:1, 135:14,
    148:8, 149:17,
    151:19, 156:23,
    160:17, 161:4
indentured 142:7,
    156:14
independent 15:18,
    73:25, 74:1,
    74:17, 112:7,
    139:25, 183:6,
    183:9
independently 19:6,
    32:8
indicated 11:4,
    11:9, 18:11,
    54:21, 134:13,
    165:20
indicates 57:20,
    158:16
indicating 10:20,
    154:19
indirectly 74:19
indisputably 31:18,
    134:2
individual 34:7,
    67:16, 75:7,
    119:3, 128:23,
    136:22
individually 137:8
individuals 40:4,
    73:18, 74:11,
    75:19, 112:10
indubitable 145:2,
    145:5, 145:8,
    151:22, 156:2
induce 29:11
induced 29:22, 31:3
indulgence 113:13,
    139:8, 141:20
ineffective 72:11
inevitability 82:17

inevitable 67:4
inferences 181:18
influencing 82:6
inform 105:2, 105:12
information 16:1,
   19:10, 19:16,
   38:19, 63:10,
   74:14, 120:2
informative 108:8,
   108:10
informed 23:5,
   23:11, 23:17
informs 12:13
inherent 40:7,
   43:20, 103:6,
   116:14, 160:4
initial 157:6
initio 96:19
injunction 124:18
injunctions 119:7,
   139:20
injustice 27:23
injustices 65:7
insecure 64:17
inserted 28:7,
   161:17
inserting 27:22
inside 87:22
insofar 7:24, 132:3,
   132:7, 160:1,
   160:21, 167:2,
   167:13, 172:18
installment 64:24
instance 6:21,
   15:19, 79:23,
   169:24
instances 39:3,
   134:23, 134:24
instead 71:24, 177:3
instituted 32:14
institution 45:17,
   45:18, 74:3
institutions 67:16
instructions 135:1
instrument 178:7
instrumentalities
   25:18
instrumentality
   84:14
instruments 7:2

insufficient 14:7
insurance 35:6,
   59:11
insure 78:20, 115:3,
   147:24
insured 35:8, 114:9,
   115:2
insureds 169:6
insurer 78:18,
   114:14
insurers 35:2, 80:1
insures 77:18
integral 78:10,
   100:5, 106:17,
   106:18
integrated 150:3,
   150:7
integrity 66:1,
   147:8, 147:14
intend 41:5, 107:7,
   126:10
intended 28:1, 63:4,
   63:6, 127:3,
   147:24
intent 63:21,
   149:16, 149:17,
   151:5
intention 7:11,
   126:16, 151:15
Inter 73:10
interconnected 148:5
intercreditor
   109:16, 145:20,
   146:6, 146:9,
   146:23, 147:24,
   150:19, 150:23,
   152:4, 160:24
interested 84:20
interesting 144:9
interests 25:19,
   51:16, 116:4,
   161:23
interfere 99:18
interference 34:5
internal 22:16,
   23:3, 69:10, 97:3,
   132:8
International 9:13
internet 50:17
Interpleader 110:18,

150:10, 177:2,
   178:2, 178:13,
   180:5, 180:7,
   180:8
interpretation
   74:25, 104:21
Interrogatories
   122:11
intervene 110:22
intervention 147:20
interwoven 104:17
intracofina 115:25
intro 158:21
introducing 95:19
invalid 31:1
invalidated 33:24,
   54:8
invalidates 53:1
invest 38:16, 67:23
invested 45:25,
   75:8, 77:22
investing 148:8
Investment 62:20,
   65:11, 75:11,
   75:13, 114:23,
   125:21, 125:24,
   126:3, 138:13
investor 38:18
investors 40:18,
   71:6
invited 54:18, 54:22
invoke 33:9
invoked 33:8
involuntary 30:21
involve 19:21,
   143:11
involved 35:1,
   65:25, 83:4, 89:1,
   95:23, 116:2,
   119:11, 122:5,
   127:4, 142:19,
   143:12
involvement 113:17
involving 7:1,
   52:17, 128:24
ironic 37:25
irrelevant 31:24,
   155:22
irrespective 44:18
IRS 19:12, 46:6,

46:8, 46:11,
  46:16, 61:8, 61:11
Island 25:15, 65:6,
  68:14, 70:17,
  70:21, 71:7,
  71:16, 72:18,
  72:20, 77:22,
  121:23
issuance 121:14
issuances 73:15,
  74:3, 75:1, 112:19
issued 92:2, 99:5,
  99:11, 107:5,
  112:25, 142:18
issuer 157:7
issuing 64:1
item 183:8
iteration 7:17,
  140:5
itself 32:8, 32:17,
  33:11, 33:13,
  53:6, 69:16,
  96:19, 97:16,
  123:6, 131:1,
  131:2, 158:25,
  173:19, 180:23,
  181:1


< J >
J. 3:12
James 69:1
Jarabo 97:5
Jaresko 15:16,
  15:23, 16:3,
  119:21, 119:24,
  123:5
Jefferson 96:20,
  97:16
jeopardize 52:14
Jersey 51:8
Jesuan 73:4
jigsaw 93:21
JIMENEZ 3:21, 9:25,
  10:2, 11:17, 13:9,
  13:10, 13:12,
  13:13, 13:16
job 37:11, 70:12,
  70:13, 71:20,
  163:10

John 3:12
Johnny 63:8
join 65:9
joined 35:25, 62:5
Jointly 1:11
Jose 68:16, 73:5,
  73:8
Josh 68:22
Jr 3:42
Juan 6:1, 6:7, 57:14
Juana 25:12
Judge 2:35, 2:36,
  52:2, 62:13, 85:4,
  86:19, 86:25,
  91:12, 91:13,
  112:23, 138:23,
  140:17, 140:24,
  141:8, 143:2,
  158:2, 158:8,
  162:21, 170:5,
  181:16, 182:6,
  183:25, 185:7
Judges 85:20,
  142:19, 184:1
Judgment 26:9,
  66:24, 81:19,
  112:19, 128:14,
  131:20
judgments 120:10
judicata 98:23
Judicial 6:12,
  20:20, 26:16,
  27:15, 43:4,
  43:16, 47:22,
  49:4, 53:1, 54:24,
  54:25, 55:14,
  56:22, 69:20,
  96:10, 97:4,
  98:18, 101:11,
  108:6, 144:2,
  162:23
judicially 42:22,
  42:25, 54:3,
  55:21, 56:15
jump 61:22, 102:5
jurisdiction 27:10,
  98:16, 100:9,
  100:13, 102:9,
  102:24, 104:10,
  104:12, 105:8,

106:11
jurisdictions 49:20
Justice 52:4, 52:6,
  71:1, 71:5, 177:25
justification 43:10,
  44:18, 44:21
justified 44:15,
  44:22
justify 51:6


< K >
K. 3:46
Kasowitz 141:13
Kay 3:34
Keep 51:19, 129:6,
  184:4
keeping 70:8
key 135:4
kicks 145:20
kids 38:24
killed 179:10
Kim 112:22, 112:25
kind 179:15
knowing 46:6, 93:16,
  179:14
knowledge 122:8
knowledgeable 85:21
known 52:7, 96:3
knows 54:13, 81:18,
  112:22, 113:3,
  118:3
Kobre 112:22, 112:24


< L >
L-i-n-a-r-e-s 95:6
la 26:2
label 102:1
lack 35:4, 88:10,
  88:12, 167:24
laid 68:3, 69:3
land 64:19
language 27:20,
  27:22, 28:6,
  28:13, 41:24,
  101:18, 124:19,
  146:3, 147:22,
  149:9, 154:6,
  154:8, 154:25,

157:24, 160:16,
160:17, 161:6,
161:16, 161:19,
162:4, 162:12,
162:14, 176:5,
177:15
large 21:25, 36:7,
98:14
larger 44:6
largest 39:17,
40:16, 92:11,
92:12, 114:14,
114:15
Last 7:24, 10:20,
12:1, 22:6, 23:15,
40:3, 42:16,
49:19, 57:4,
58:24, 68:12,
69:7, 69:16,
71:21, 88:3,
89:22, 113:6,
141:21, 142:3,
142:17
lasted 59:15
Lastly 84:3, 122:14,
131:4
later 30:25, 86:13,
108:8, 162:25,
165:4
latter 105:6, 134:6,
134:11
Laura 2:35, 185:7
Lawrence 3:40
laws 22:15, 23:3,
69:10, 95:3,
95:17, 98:13,
100:2, 105:3,
108:2
lawsuit 92:2, 96:19,
147:19
lawyer 23:5, 23:9,
23:10, 23:19,
73:17
lawyers 23:16,
38:21, 67:17,
67:22, 77:7
lay 14:14
layer 158:5
layers 145:13,
150:17

lays 109:16, 178:23
Lazaro 76:24
lead 69:9
leaders 64:21
leads 49:10
learn 93:20
learned 123:6,
123:7, 123:10
least 6:21, 20:5,
24:1, 50:7,
100:17, 102:15,
111:5, 113:20,
132:14
leave 12:18, 32:4,
61:25, 64:18
leaves 168:25
leaving 71:15, 160:3
Lecaroz 3:4
led 82:25, 121:21
ledger 123:17
left 70:9, 74:7,
97:10, 110:8,
125:14, 143:22,
144:12, 150:2,
183:7
legalities 62:19
legality 24:11,
24:15, 42:8,
43:14, 69:21,
74:5, 74:13
legally 54:4
legend 42:23
legislation 7:4,
22:19, 23:1,
41:21, 42:3, 42:4,
46:18, 47:15,
48:9, 53:20,
56:17, 69:8, 69:9,
69:16, 69:21,
94:18, 95:2, 96:3,
96:4, 101:16,
130:20, 130:23,
131:1, 183:4
Legislative 22:13,
30:23, 31:1,
47:19, 47:25,
63:3, 69:11,
96:15, 108:4,
139:22
legislators 97:4

legislature 22:3,
46:19, 47:4, 48:4,
53:19, 53:20,
96:5, 112:3
legitimacy 76:18
lend 29:12, 29:22
length 83:12, 107:3,
107:9
lengthy 170:4
lent 30:15, 30:18
less 16:11, 17:17,
48:12, 49:24,
64:22, 75:14,
117:3, 130:9
letter 37:24, 38:2,
38:12
letters 40:4, 40:7,
54:21
level 83:3, 92:10,
102:16, 118:5,
133:11, 158:13
levels 84:15
Lex 92:2, 131:18
liabilities 145:19,
150:6, 159:14,
162:2, 162:3
liability 176:14,
176:16
liberty 71:4
liens 42:24, 42:25,
43:1, 43:8, 43:14,
54:1, 130:22
lies 51:5
life 65:14, 65:16,
66:8, 68:21,
70:10, 121:19
lift 128:24
light 90:1, 91:1,
171:18
likes 177:25
Limine 14:16
limit 74:24, 80:10,
104:22, 104:23
limitation 27:13,
99:17, 147:23,
149:6, 161:8
limitations 151:10
limited 46:4, 67:21,
118:24, 172:1
limitless 85:21

limits 27:6, 141:19, 148:11
Linares 95:6
line 162:19, 168:13, 168:18, 168:20, 169:1
link 175:4
linked 88:6, 128:10
Lisa 12:8
list 21:5, 183:15
listed 98:3, 125:23, 125:24
litany 38:21
literally 43:16, 50:2, 67:15, 89:22, 109:11, 167:23
litigants 101:22
litigate 74:2, 82:3, 91:16
litigated 36:5, 40:25, 81:23, 84:7, 102:8, 103:20
litigating 75:2, 162:22, 180:11
litigations 120:8
little 62:23, 74:7, 132:7, 134:7, 141:20, 150:2, 180:6, 180:14
live 29:12, 59:24, 59:25, 60:2, 60:23, 67:1, 70:19, 71:19, 76:13, 109:3, 155:18
lives 68:15, 76:15, 138:14
living 70:8, 70:11, 70:14, 70:17, 72:9, 76:3
LLP 9:12, 141:13
loaf 60:10, 60:11, 60:12
loans 30:20, 31:3, 64:2
lobbyists 67:22
Local 63:9
lodge 164:22

lodged 11:4, 128:13
logical 134:1
long 31:9, 48:19, 63:17, 64:14, 72:22, 90:24, 108:7, 114:16, 138:5
long-term 77:25, 78:1, 114:23, 115:1
longer 146:18
look 32:22, 44:7, 50:1, 58:13, 60:13, 64:19, 82:1, 89:20, 93:12, 108:12, 108:18, 109:8, 110:12, 133:7, 137:8, 140:12, 148:1, 148:16, 149:9, 154:25, 161:21, 162:23, 182:18
looked 49:13, 125:22, 129:18
Looking 24:14, 49:11, 61:3, 62:20, 65:18, 92:19, 132:22, 133:3, 133:12, 154:2
loop 132:13
Lopez 66:14
losing 182:3
loss 33:24
losses 145:19, 150:6
lost 57:8, 68:9, 82:12, 83:22
lot 37:11, 39:11, 39:17, 40:5, 86:1, 89:24, 104:3, 137:2, 142:5, 145:15, 148:10, 170:25, 177:1, 177:2, 180:4
lots 60:20, 157:21
Lou 163:7, 177:23
Louis 4:9, 140:21
love 70:16, 165:8
loves 93:20

lower 180:2
lowered 50:13, 50:14
LPR 107:25
LTS 2:6
Luc 3:7
luck 66:22
LUGO 4:11, 20:10, 25:5, 25:6, 26:19
Luis 73:5, 73:8
lunch 77:8, 88:23, 89:4, 89:7


< M >
M. 4:9
ma'am 62:11, 139:12
machine 92:12
made-up 74:20
mainland 29:12, 59:24, 60:2, 60:14, 60:23, 70:10, 70:17, 70:23, 71:17, 72:10, 72:25
mainly 118:25
maintain 143:17
Maiz 69:25
major 45:17, 109:12
majority 70:11, 71:15
makers 127:3
Maldonado 23:20
Mallet 141:4
man 92:13
Management 1:10, 1:26, 2:12, 2:28
manager 26:13
managers 67:24, 126:25
mandate 117:14, 129:2
manger 181:17
Manges 77:17
mango 68:17
mantel 115:10
Manuel 20:16, 21:24, 66:18
Marcia 3:49, 77:16
marginalize 87:11
Maria 68:25

Mark 3:18, 3:38,
    4:3, 113:13,
    114:8, 136:17
market 35:13, 60:18,
    60:21
marketing 119:12,
    124:14
markets 29:11
Marrero 143:2
Martin 2:42
Martinez 62:8
material 86:21,
    138:11
materially 42:11,
    54:3, 54:10
materials 42:15,
    49:14
math 39:25
Matt 119:21
matter 8:24, 21:8,
    31:21, 49:21,
    52:10, 60:7,
    61:12, 66:8,
    96:25, 99:12,
    100:15, 106:21,
    110:3, 120:19,
    134:4, 137:6,
    137:24, 146:18,
    162:23, 165:3,
    167:16, 169:10,
    173:18, 182:17
matters 139:10,
    162:9
Matthew 4:5, 110:13,
    116:25
mature 44:12, 60:16
maturing 45:15
maturity 104:22
Maurice 70:4
Max 111:24
maxed 64:5
Mccloy 81:11
mean 39:5, 55:19,
    80:1, 127:3,
    148:19, 154:21,
    159:3, 176:16
meaning 26:17, 57:8,
    149:18
meaningful 160:20
means 31:20, 32:2,

43:21, 84:10,
    86:11, 104:25,
    113:6, 160:11,
    160:16
meant 71:24
measure 67:8, 68:2
measures 71:14,
    72:14
mechanism 124:13,
    145:7, 169:17
media 63:9, 67:22
mediated 81:22
Mediation 54:24,
    55:2, 55:6, 80:18,
    85:4, 85:5, 87:9,
    110:6, 110:7,
    110:14, 110:16,
    113:17, 120:11,
    121:21, 122:9,
    122:13, 138:6,
    170:4, 170:7,
    179:5
mediators 80:21,
    85:19, 85:20,
    88:19, 110:10,
    111:6
meet 72:1, 146:13,
    151:25, 152:2,
    152:3
meeting 114:21
meetings 117:16
meets 80:4
Mellon 1:41, 4:8,
    88:25, 144:11,
    168:16, 169:16,
    172:10, 173:23,
    182:12
member 66:19, 73:11,
    96:16
members 6:6, 18:1,
    25:14, 25:19,
    26:20, 26:24,
    27:4, 59:11,
    59:25, 61:14,
    61:21, 62:4, 77:1,
    112:7, 184:2
Memorandum 137:10
MENDER 4:11, 25:5,
    25:7, 26:19
Mendez 63:8

mention 91:11,
    94:10, 94:13
mentioned 19:5,
    19:21, 45:14,
    49:18, 53:6, 67:4,
    81:17, 91:13,
    99:2, 115:2,
    115:4, 115:16,
    116:3, 116:18,
    126:11, 136:18
mentioning 90:24,
    95:22
mercy 179:10
mere 30:22
merely 106:7, 155:11
merits 54:23,
    142:21, 143:16,
    167:5
met 35:16, 39:22,
    58:9, 58:17,
    58:23, 96:2,
    105:24, 123:23
Miami 70:5
Michael 2:44
microphone 10:6,
    12:8, 18:8, 21:2,
    139:14
midway 181:19
migrated 118:9
Milbank 81:11
milestone 78:9,
    80:24
militate 51:10,
    51:23
million 25:14,
    38:22, 50:7,
    68:24, 143:9,
    180:2, 181:11,
    181:19, 181:21
millions 19:21, 68:9
mind 69:4, 70:18,
    81:25
minds 77:2, 138:13
mine 18:6, 18:16
minimal 75:3
minimally 180:16
minimize 35:6
minimum 68:7
minus 120:13
minute 9:8, 11:17,

141:22, 164:21
mirror 161:15,
  162:12
misapplication
  129:11
misconduct 142:14,
  142:25, 143:13,
  144:5, 151:8,
  180:22, 182:9
miserable 60:9
misery 65:21
misrepresentation
  26:13
missed 7:23, 94:14
misses 111:9
misstatement 179:15
mistake 57:1, 57:7
mistakes 57:4
misunderstood 154:20
misuse 25:16
mix 105:1, 128:22
mixed 94:25, 102:8,
  102:16, 103:2,
  103:20, 105:6
models 15:1
modification 124:3,
  124:5
modifications 8:10,
  8:18, 8:20, 133:17
Modified 95:16,
  125:24
modules 64:15
moldy 60:12
mom 40:18
moment 11:15, 31:20,
  89:12, 90:7,
  164:14
moments 119:4
Monday 97:7, 140:9,
  175:15, 175:18
money 29:12, 29:15,
  29:22, 30:16,
  30:18, 32:10,
  38:17, 39:3, 39:4,
  40:14, 49:7,
  49:12, 50:20,
  50:22, 51:18,
  65:21, 92:17,
  113:7, 143:19,
  143:22, 161:25,

181:23
monies 30:2, 30:7,
  144:14, 169:19,
  169:23
monoline 114:14
Monsita 3:4
months 50:13, 82:16
mother 65:4
Motion 2:34, 6:14,
  6:18, 9:18, 14:16,
  27:12, 40:19,
  79:14, 81:19,
  89:1, 89:3, 108:8,
  108:10, 114:24,
  139:18, 163:15,
  173:19, 173:24,
  174:5, 174:11,
  174:16, 175:1,
  175:11
motioning 13:24
Motions 112:20,
  131:20, 182:18
movant 95:18
move 22:24, 24:10,
  69:20, 76:2,
  121:1, 137:25,
  148:12, 148:13,
  149:25, 163:20,
  164:21
moved 65:6, 66:5
moving 24:14, 163:3
Multi-strategy 3:45
multiple 29:20,
  112:19, 117:17,
  145:13
municipal 92:11
municipality 26:21,
  26:23, 36:2, 99:5
Myers 107:1, 182:24
myself 20:3, 37:15,
  59:1, 60:15,
  89:13, 91:15,
  150:2


< N >
nail 71:21
name 20:15, 21:24,
  25:6, 25:9, 62:6,
  62:15, 66:18,

70:3, 73:8
named 25:25, 125:5,
  125:14
Namely 42:1
names 62:6
narrow 153:6
Natal 16:21, 20:8,
  20:10, 20:13,
  20:15, 20:16,
  21:3, 21:5, 21:10,
  21:15, 21:17,
  21:22, 21:24,
  23:5, 23:11,
  23:21, 24:4,
  66:15, 66:17,
  66:18, 96:14, 97:2
National 3:48,
  77:11, 77:12,
  77:17, 77:21,
  78:2, 78:18,
  78:21, 79:3,
  79:17, 166:23,
  166:24, 168:14,
  175:18
naturally 134:3
nature 83:13, 99:11,
  107:15, 110:19,
  177:12, 183:20
near 60:18, 170:18
neatly 105:5
necessarily 9:22,
  77:25, 79:18,
  116:16, 166:13
necessary 27:6,
  47:8, 48:16, 49:7,
  51:1, 67:11,
  123:11, 130:24,
  133:8, 147:11,
  159:9, 161:22,
  171:8
needed 40:8, 72:6,
  177:7
needs 49:6, 56:14,
  60:25, 62:22,
  71:1, 72:12,
  72:13, 84:12,
  90:10, 96:12,
  101:19, 113:6,
  121:3, 135:18,
  150:2, 156:5

negative 67:2
negligence 26:12,
    142:14, 143:12,
    151:8, 182:8
negligent 144:4
negligently 143:4
negotiate 51:15,
    61:16, 115:8
negotiated 34:19,
    35:17, 68:1,
    77:21, 85:10,
    85:18, 102:17,
    102:21, 111:13,
    117:21
negotiating 59:12,
    82:21, 86:4, 87:23
negotiation 59:19,
    61:4, 61:13,
    84:19, 88:8,
    115:21, 115:25,
    122:6, 127:7,
    133:13
negotiations 19:25,
    35:1, 59:13, 81:2,
    83:13, 85:2,
    87:13, 87:25,
    109:13, 121:20,
    138:7
neighborhood 70:15
Neither 85:12,
    153:15
Nejberger 102:4
newborn 69:21
news 71:17, 141:7
next 16:23, 37:6,
    75:6
Ng 12:7, 12:9, 93:5,
    93:6, 93:10
Nicole 62:8, 70:1,
    70:4
Nieves 23:20
night 7:24, 10:20,
    12:1, 23:15
Nine 30:19, 113:24,
    178:8
Nine. 31:5
No. 1:6, 1:22, 1:40,
    2:4, 10:9, 24:24,
    72:23, 93:6,
    139:13, 153:10,

154:10, 166:2,
    183:23, 183:24
nobody 85:7
nominal 39:8
non-binding 54:25
non-callable 39:13
non-impairment 51:21
non-profit 73:12
nonbankruptcy 7:3,
    8:12, 8:16
nondebtors 146:9
None 14:13, 14:24,
    14:25, 16:9,
    54:22, 120:1,
    120:3, 122:12
Nonetheless 21:13
nonindemnification
    162:9
nonmember 27:5
nonpartisan 112:7
nonprofit 25:14
nonreleased 27:16
nonstop 92:11
nor 15:2, 16:6,
    16:14, 65:12,
    115:23, 153:15,
    178:14
Noriega 97:5
normal 23:22
note 36:5, 39:16,
    51:4, 56:6, 78:24,
    80:3, 107:12,
    123:25, 125:7
noted 42:9, 54:1,
    103:4, 129:15,
    150:13
notes 86:3
Nothing 36:12,
    75:24, 82:17,
    83:21, 84:20,
    91:9, 97:3,
    100:11, 116:19,
    180:14
notice 22:6, 22:8,
    22:18, 54:16,
    75:22, 85:3,
    96:10, 108:6,
    112:3, 166:4
notices 77:4
notified 20:23,

55:3, 182:20
notion 31:25, 49:6,
    57:1, 84:18,
    109:25, 146:19,
    151:14, 151:18,
    180:24
novel 120:7
November 37:25, 69:7
null 64:8
nullity 160:18
Number 13:22, 25:25,
    27:21, 28:11,
    29:10, 30:18,
    39:14, 46:4,
    73:18, 74:22,
    78:9, 79:1, 82:24,
    84:25, 87:4
numbering 163:14
Nunez 63:8


< O >
o'clock 89:7, 164:25
O'melveny 107:1,
    182:23
oath 15:13
object 19:24, 37:17,
    84:23, 144:22,
    165:9, 172:8
objecting 6:16,
    54:15, 59:1, 131:5
objections 6:17,
    11:4, 17:12,
    17:17, 17:19,
    19:6, 83:14,
    108:12, 184:6
objector 9:4, 20:24,
    21:10
objectors 9:3,
    12:21, 12:22,
    13:3, 16:22,
    17:15, 21:7, 25:3,
    79:1, 92:14, 96:1,
    96:2, 105:24,
    110:20, 110:23,
    111:4, 138:14
obligates 64:18
Obligation 3:17,
    35:3, 46:22,
    52:20, 58:11,

136:18, 151:16,
153:2, 153:16,
154:17, 155:10,
155:14, 156:2,
156:4, 156:25,
157:19, 157:23,
161:15, 161:23,
168:22, 171:20,
172:1, 172:9,
176:17, 176:19
obligations 51:3,
51:7, 74:9, 107:3,
114:21, 144:19,
144:22, 144:24,
146:13, 150:13,
155:7, 155:8,
155:18, 156:14,
156:22, 157:4,
157:22, 158:2,
160:21, 161:10,
169:18, 170:12,
172:17
obliged 58:11
observing 6:7
obstacle 58:12
obtained 86:22
obviate 47:25
obvious 100:1
obviously 110:7,
118:9, 127:8,
135:5, 170:6,
181:23
occurred 30:4,
33:19, 54:14,
82:16, 85:2
occurrence 155:5
occurs 52:24
odd 60:20
OECD 49:25
offending 90:16
offer 108:23,
139:22, 163:10,
164:4, 164:12
offered 113:22,
140:7, 167:9,
178:19, 180:10
offering 45:25,
164:6
Office 108:4, 183:7
Official 2:4, 3:6,

41:23, 49:16,
66:21, 69:12,
91:17, 95:11,
95:12, 95:16,
97:7, 126:23,
185:13
officials 49:15,
57:5, 66:22, 92:9,
92:15, 92:19,
119:10
officious 26:12
Okay 25:1, 62:24,
93:13, 94:14,
107:19, 108:11,
129:7, 134:9,
139:10, 161:9,
161:14, 166:7,
179:6
old 19:14, 54:10,
56:11, 56:24,
66:19, 76:9
omission 26:13
omitted 86:16
Once 78:24, 87:19,
93:23, 98:17,
103:1, 183:25,
184:7
one-and-done 118:17
one-third 49:24
one. 105:25
ones 8:1, 51:15,
59:25, 75:15
ongoing 125:17,
170:15
online 90:20, 108:4
open 110:19, 136:5
opening 67:4,
141:24, 176:4
operates 51:18
operation 117:6
operations 74:19
opinion 39:1, 48:15,
54:25, 56:12,
83:3, 146:10,
147:11, 172:3
opinions 14:17,
15:4, 15:6, 15:24
opportunities 75:11
opportunity 17:5,
17:13, 17:22,

17:23, 19:2,
19:23, 19:25,
21:6, 23:13,
39:21, 59:12,
62:14, 66:15,
70:7, 70:13,
106:15, 111:3,
137:12, 138:23,
182:3
oppose 170:19
opposed 111:18,
177:18
opposing 11:5
opposite 155:24
opposition 9:17,
11:7, 14:15,
174:2, 175:19
Ordered 49:5, 115:9
orderly 61:23
Orders 85:3, 180:9
ordinary 90:3, 91:5,
142:16
organization 27:24,
73:13, 73:16
organized 70:23
original 45:9,
45:25, 91:22,
130:10, 157:18,
175:8
Originally 44:24,
45:2, 65:3, 81:24,
118:3
orphan 179:11
Others 7:10, 15:7,
19:19, 26:6, 49:3,
59:1, 69:3, 87:9,
91:13, 119:11,
126:10, 144:12,
149:21
Otherwise 8:11,
45:13, 54:21,
86:25, 95:4,
106:18, 124:22,
156:5, 169:19
ought 118:13
ourselves 63:5,
72:23
out-of-court 15:6
outcome 35:10, 36:6,
69:4, 81:22, 82:6,

82:17, 84:7,
  111:13
outcomes 32:19,
  32:22, 35:21
outgrowth 170:7
outlets 67:22
outline 165:22
output 113:3
outset 11:11, 42:9,
  83:2, 94:4, 170:18
outside 76:21,
  111:13, 111:15,
  117:14, 154:5
outstanding 49:19,
  83:5, 124:21
overall 12:24, 78:11
overarching 41:10
overlap 177:2
override 8:16, 56:10
overrides 98:8
overruled 96:18
oversights 31:1
overview 152:12
overwhelming 59:9,
  59:10, 80:13,
  108:25
overwhelmingly 84:8,
  108:22
owing 36:13, 150:13,
  178:11
own 32:18, 35:7,
  49:23, 49:25,
  51:2, 52:3, 63:2,
  64:15, 65:4, 65:5,
  67:2, 68:15,
  68:20, 73:17,
  133:24, 167:19
owned 83:24
owner 98:19, 146:12,
  150:23
owners 145:22,
  145:25, 147:10,
  147:12, 147:13,
  147:15, 150:20,
  150:23, 150:25,
  151:1
ownership 78:19,
  83:22, 84:1,
  84:11, 102:15,
  131:11

owns 77:18, 83:17,
  101:15, 101:17


< P >
Pablo 90:12
pack 76:2
packages 74:21
PAGE 5:3, 14:15,
  48:5, 51:3, 51:13,
  53:5, 56:6, 99:7,
  101:24, 103:3,
  103:12, 103:14,
  103:19, 112:25
pages 7:22, 41:20,
  42:14, 178:23,
  179:17, 185:4
paid 30:3, 31:23,
  32:4, 32:25, 33:3,
  33:20, 33:22,
  50:23, 86:12,
  112:17, 181:21
Pain 67:3, 67:6,
  67:7, 67:9, 67:12,
  68:2, 68:4, 68:22
painting 76:9
Panel 110:7, 110:14,
  110:16
paper 23:23, 41:8,
  132:11, 175:19
papers 18:4, 23:6,
  35:25, 96:15,
  96:17, 142:10,
  145:3, 145:15,
  146:2, 153:9,
  171:19
par 40:17, 45:25
Para 26:2
Paragraph 7:8, 8:7,
  94:11, 96:9,
  96:17, 97:13,
  108:13, 122:2,
  133:1, 134:21,
  135:20, 143:13,
  178:8, 183:16,
  183:17
Paragraphs 6:23,
  7:6, 8:6, 94:9,
  122:4
parallel 127:25

paramount 72:13
parcel 176:4
parents 179:11
pari-passu 86:5
Park 143:1, 144:7,
  162:19
parse 154:6, 156:12,
  177:15, 177:17
part 20:23, 21:7,
  25:13, 40:6,
  56:16, 70:22,
  71:20, 78:10,
  98:14, 106:17,
  110:8, 112:9,
  115:23, 130:10,
  133:12, 138:4,
  141:2, 148:4,
  160:12, 161:11,
  161:13, 161:16,
  161:21, 161:22,
  162:1, 169:6,
  172:13, 182:5
participants 6:8,
  17:18, 54:15,
  55:6, 55:10,
  55:11, 92:23,
  121:22
participate 19:25,
  54:19, 54:22,
  85:6, 85:23,
  110:17, 122:13,
  170:4
participated 77:3,
  166:22, 167:2
participating 85:8,
  87:8, 141:1
participation 74:6,
  85:19, 141:19
particular 7:6,
  10:18, 11:12,
  19:8, 41:7, 69:4,
  102:1, 138:11,
  153:7, 157:3,
  159:6, 168:24,
  178:21
Particularly 14:12,
  15:16, 15:23,
  23:3, 83:15,
  110:24, 111:21,
  119:9

partner 140:21,
  176:23
Partners 3:46
Party 36:17, 36:22,
  36:23, 63:9,
  63:12, 81:14,
  88:7, 89:1, 91:20,
  108:13, 155:19,
  158:1, 158:6,
  158:7, 160:21,
  161:2, 166:5,
  174:11
pass 57:12, 112:3
passed 22:3, 22:13,
  23:1, 24:8, 63:23,
  69:8, 96:5
passenger 52:18
past 73:15, 129:5,
  161:21, 162:1
path 69:3, 82:5,
  82:25, 133:24,
  134:1
pathway 134:13
payable 30:2, 121:19
paycheck 71:19,
  71:20
paying 45:15, 74:20,
  75:17, 93:17,
  154:16
payments 33:19,
  35:6, 35:14,
  145:24
payors 35:13
PDF 174:12, 175:6
penalizes 75:18
pending 22:8, 27:11,
  28:14
Penn 32:12
penny 39:2
pension 53:4, 70:13,
  71:11, 71:18
pensions 63:15
per 49:20, 64:12,
  151:18
percent 44:9, 58:23,
  60:22, 68:12,
  108:15, 168:18
percentage 34:17,
  40:17, 87:22
percentages 34:11,

86:23
Perfect 21:17
performance 78:22,
  147:5, 147:7,
  158:18, 159:14,
  161:7, 161:12
performed 15:10
perhaps 6:20, 11:23,
  61:12, 117:24,
  127:10, 140:16,
  168:6
period 20:23, 30:23,
  62:21, 68:16,
  68:18, 89:23
periodic 146:15
periods 104:4
Perkins 10:11, 28:23
permanence 76:15
permanent 51:17
permit 114:3, 156:23
permits 115:14,
  115:17
permitted 117:22,
  142:15, 143:9
permitting 12:23,
  146:4
person 21:12, 40:8,
  40:16, 60:15,
  89:23
Persons 126:14
perspective 11:6,
  78:4, 78:8, 83:5
perspectives 11:8
persuaded 118:12,
  127:11
persuasively 57:20
Peter 3:13, 3:23,
  3:36, 9:11, 106:25
ph 67:7, 121:22
Phase 21:9, 115:21,
  115:25, 131:24,
  179:6
phases 115:4
phenomenal 82:6
philosopher 111:23
PHV 2:42, 2:43,
  2:44, 3:7, 3:12,
  3:13, 3:14, 3:18,
  3:23, 3:26, 3:28,
  3:32, 3:33, 3:34,

3:42, 3:46, 4:3,
  4:5, 4:8, 4:9
picks 150:6
picture 64:25
Pimco 143:7, 144:7
Pinto 20:10
pipe 133:19
place 33:14, 33:17,
  44:2, 53:3, 61:2,
  76:2, 93:9, 95:18,
  102:20, 140:5,
  175:10
placed 122:18
places 179:18
plain 14:17, 15:14
plainly 35:17
Plaintiff 1:43,
  2:20, 27:4, 142:7,
  142:13, 143:2
plaintiffs 27:20,
  142:11, 142:20,
  142:22, 143:16
planned 112:9
planning 19:18
plans 75:15, 98:22,
  104:4
played 76:8, 115:23
player 77:25
Please 10:5, 13:13,
  18:9, 28:20, 62:3,
  62:7, 62:10,
  66:11, 70:1,
  72:16, 73:5, 89:2,
  90:22, 101:9,
  114:7, 139:7,
  173:9, 177:22
pledge 51:23, 146:2,
  148:16, 148:22,
  149:1, 149:2
pledged 41:21, 42:1,
  42:17, 48:17,
  48:25, 49:2, 49:4,
  49:8, 50:19, 53:9,
  53:12, 53:16,
  53:22, 53:24,
  54:6, 56:2, 56:17,
  103:8, 162:13
pledges 148:14
plenty 68:20
plus 18:19, 120:13

PM 89:10, 89:11,
  139:5, 139:6,
  184:11
pocket 82:22, 151:6
pockets 72:17
podium 17:2, 18:25,
  28:20, 59:4, 86:2,
  93:7
point 19:4, 35:23,
  38:23, 41:10,
  52:16, 56:6, 69:3,
  71:15, 78:18,
  80:15, 86:15,
  87:2, 96:22,
  107:2, 109:20,
  112:11, 116:4,
  131:15, 131:17,
  132:8, 147:22,
  158:14, 159:3,
  163:19, 170:17,
  171:24, 181:19
point. 40:3, 83:24,
  157:20, 164:12
pointed 8:21, 52:17,
  54:20, 124:24,
  146:16
pointing 132:18
points 17:23, 29:5,
  36:3, 37:2, 37:11,
  37:13, 52:22,
  109:9, 109:14,
  112:14, 119:3,
  120:17
police 71:14
policies 63:16,
  67:20
policy 26:21,
  151:11, 180:24
political 99:19
politicians 67:23
poorest 75:18
pop 40:18
Port 52:17
portion 29:18, 30:2,
  74:18, 107:7,
  180:8
portions 15:21
position 13:24,
  17:11, 29:11,
  46:7, 46:10,

46:11, 46:16,
  83:16, 95:19,
  127:17, 138:17,
  154:24, 154:25,
  157:19, 166:21,
  167:1, 167:5,
  167:12, 168:7,
  168:12, 169:1,
  169:12, 172:24
positions 11:10,
  35:7, 82:22,
  82:24, 170:22,
  171:18
possession 142:16
possibilities 75:10,
  76:12
possibility 33:23,
  34:2
possible 7:23,
  18:16, 32:19,
  81:25, 82:1, 88:1
possibly 66:23
post 8:17
post-maria 75:9
posted 77:5
potential 82:2,
  99:16, 119:10
potentially 75:20,
  87:18
pots 116:17
poverty 64:11
power 38:14, 57:10,
  57:12, 98:18,
  98:20, 101:5,
  101:11, 104:24,
  106:1, 159:17,
  160:3
powerful 37:17, 69:6
powers 25:17, 47:19,
  99:19, 158:18,
  159:14, 159:25,
  160:2, 160:6,
  161:7
PR 50:5
practical 60:20
practice 89:2,
  151:20
precedence 95:23
precedent 22:20,
  97:17, 130:24,

133:24
precise 98:5
precisely 31:4
preclude 43:24, 44:1
preclusive 7:1
predominantly 87:6
prejudice 143:15,
  143:21
preliminary 110:25
premise 54:1, 110:2
premised 47:3
PREPA 77:23
preparation 137:9
preponderance 145:8
present 17:9, 22:25,
  23:18, 25:6,
  41:22, 42:1,
  56:18, 56:19,
  62:13
presentation 7:19,
  141:17, 152:11
presentations 77:7
presented 14:14,
  17:6, 17:12,
  20:19, 23:8,
  32:23, 63:8, 158:4
presenting 66:24
preservation 28:13
preserve 26:16
preserved 156:16
preserves 156:22
preserving 27:20
president 70:4
press 6:7
presumed 95:3, 95:18
presumption 95:25,
  96:2, 105:25
presumptively 105:23
presumptuous 134:7,
  134:10
presupposes 156:3
pretty 93:12, 93:21
prevail 33:1, 98:10,
  144:1
prevailed 84:3
prevails 35:6
prevents 86:8
previously 53:24,
  92:13, 105:10,
  177:6

price 45:25, 82:12
primarily 78:3
primary 137:13
principal 7:9,
    27:18, 52:14,
    52:20, 114:19,
    149:3, 149:13,
    162:8, 166:12
principals 115:10
principle 102:14
principles 14:18,
    105:11, 133:25
printed 113:21
prior 12:20, 120:8,
    125:25, 164:20,
    174:1
priorities 149:12,
    150:19, 152:2
priority 31:15,
    31:16, 145:16,
    145:22, 146:6,
    146:14, 146:22,
    146:25, 147:23,
    148:21, 149:1,
    149:18, 150:20,
    151:4, 151:5,
    151:24, 156:4
private 8:16, 31:8,
    57:13, 119:11
privilege 138:16
privileged 76:1
privy 172:21
Pro 3:36, 3:38, 3:40
Probably 11:12,
    27:23, 125:12,
    127:18, 127:21
probative 15:5
problem 24:23, 25:1,
    43:21, 46:5,
    46:25, 62:24,
    93:3, 93:6
problems 11:16,
    90:7, 93:20,
    159:22
procedural 97:3,
    182:18
procedurally 174:9
procedure 23:22,
    69:10, 174:22,
    175:1, 175:2

procedures 143:24
proceed 12:7, 12:9,
    46:6
proceeding 13:19,
    25:21, 26:17,
    27:1, 27:17,
    27:21, 28:10,
    36:9, 36:24,
    50:22, 76:19,
    98:14, 100:19,
    101:12, 102:12,
    110:21, 118:7,
    120:9, 131:20,
    147:21, 156:9,
    156:10, 173:23,
    179:22
Proceedings 4:47,
    15:8, 16:2, 30:5,
    36:18, 62:2, 77:3,
    89:11, 103:10,
    103:17, 138:19,
    139:6, 174:1,
    174:16, 182:6,
    184:9, 184:11,
    185:6
proceeds 10:23
processes 105:5
produce 14:18
produced 4:47
producing 99:21
product 84:19
productive 89:5
professed 46:3
professional 92:5
professionals 72:19,
    126:15
professor 73:9
proffer 28:16,
    166:12
proffered 14:14,
    81:18, 174:3
profit 45:22
profound 114:16
progeny 32:12
programs 71:12, 72:6
progress 140:18
Progressive 63:9
prohibited 47:8
prohibiting 6:9
prohibition 47:10,

51:25
prohibits 31:7
projected 30:8
projections 14:23,
    15:10, 121:17
prolonged 68:18
prolonging 71:24
prominence 159:6
promise 38:20,
    157:24
promises 29:24
promissories 26:11
promptly 136:7
promulgate 108:2
proof 14:2, 14:3,
    14:7, 58:5
proper 49:19, 88:9,
    102:9
properly 102:13,
    168:16
property-related
    105:2
proponent 17:11
proposal 128:21,
    175:9
Proposed 6:14, 6:19,
    6:24, 7:20, 8:6,
    8:7, 8:8, 8:25,
    33:12, 34:17,
    41:10, 42:13,
    42:14, 43:5,
    55:23, 69:1, 94:5,
    96:9, 107:6,
    126:19, 132:3,
    133:2, 165:2
proposes 12:22
proposition 102:6,
    102:23, 153:12
propositions 183:11
prorata 45:13
Proskauer 113:12
PROSOL-UTIER 3:21,
    9:25, 13:13,
    13:18, 14:1
prospective 103:10
prospectively 176:25
prospects 78:1
prosperity 84:13
protect 25:19,
    26:24, 74:9,

116:16, 135:10,
147:12, 151:5,
161:22, 168:16
protected 31:25,
147:13, 151:22,
161:25
protecting 26:23,
147:14, 147:15,
151:12
protection 26:19,
30:15, 78:15,
78:19, 116:18,
145:13, 150:17
protections 30:17,
56:10, 144:6,
144:10, 148:5,
150:17, 150:18,
151:9, 181:22,
182:11
protocol 85:5,
91:23, 115:8
protracted 81:21
prove 58:18, 142:13,
182:4, 182:8
proven 142:25,
144:13, 178:17
provide 18:18, 38:6,
40:22, 64:15,
103:25, 119:6,
121:18, 125:7,
126:17, 134:12,
134:23, 156:2,
159:9, 165:19,
165:21, 169:23
provided 16:1, 39:1,
52:25, 64:16,
119:18, 120:13,
120:19, 124:5,
124:7, 124:9,
124:13, 145:23,
148:22, 163:12,
176:10, 177:14
provides 28:13,
39:14, 43:24,
78:11, 96:9,
99:25, 148:2,
152:13, 160:10,
162:12
providing 93:18,
128:6, 128:8

proving 58:15
provision 20:25,
26:10, 31:7, 34:8,
36:10, 105:15,
132:3, 139:21,
147:23, 150:3,
157:1, 157:5,
158:5, 158:15,
158:16, 158:20,
159:4, 159:5,
159:9, 159:10,
160:6, 160:11,
160:14, 160:24,
161:20, 170:13,
176:17
provoking 67:6
proxy 112:20
PSA 82:8, 112:2,
136:5, 170:14,
171:14, 172:23,
172:24
PSP 95:11
PSTBA 120:13
Publica 26:2
Publicly 74:14
publish 50:17
published 27:3
Pullo 108:18,
119:25, 122:20
purchasing 30:16
pure 87:14, 101:20
purely 32:16
purport 47:14
purported 15:20,
30:12, 33:10,
109:25
purporting 33:12
purports 36:10,
53:23
purpose 27:1, 48:17,
52:6, 146:13,
162:13
purposes 145:6,
146:4, 148:18
pursuant 26:8, 26:9,
98:8, 102:20,
105:9, 121:4,
121:15, 123:8,
124:9, 124:15,
125:2, 125:10,

125:12, 135:6,
136:5, 137:12
pursue 70:10, 71:4,
71:5, 72:9,
144:12, 147:17
put 29:6, 33:14,
36:9, 43:2, 54:20,
64:9, 79:18,
102:20, 108:4,
127:9, 132:2,
133:22, 153:22,
167:5
puts 36:7, 36:8
putting 71:5
puzzle 94:2
puzzles 93:21

< Q >
qualifications 14:20
quality 65:13
quantifying 176:19
quantum 110:2,
178:19
questioning 22:4
Questions 6:18,
16:7, 19:22,
74:13, 94:4,
102:8, 103:12,
103:20, 109:5,
137:23, 144:10,
165:7
queued 173:17
quick 182:25
quickly 83:14,
122:3, 150:1,
164:22
quiet 11:16, 66:12,
94:19, 98:20,
107:7
Quinn 89:17
quite 19:17, 20:2,
37:25, 57:20,
86:6, 109:4,
109:22
quo 143:18
quote 40:10, 41:18,
42:16, 42:17,
46:19, 46:20,
48:16, 51:12,

53:8, 53:21,
53:22, 53:24,
95:17, 95:24,
98:10, 99:9,
99:14, 99:24,
101:25, 102:2,
103:12, 143:3,
143:15, 144:18,
147:11
quoting 103:15,
111:23

< R >
R. 70:4
Rafaela 62:10, 62:15
rail 52:18
raise 6:17, 9:4
raised 7:6, 8:1,
17:11, 19:8, 68:7,
98:24, 106:21,
107:10, 110:5,
112:12, 116:12,
171:11
raising 112:11
Ramirez 69:25
Ramon 68:16
randomly 21:13
range 180:1, 180:3,
181:10
rapid 38:1
Rapisardi 3:12
rate 50:10, 60:19,
179:1
rates 64:12
Rather 12:14, 52:23,
57:10, 75:11,
96:25, 126:21,
128:17, 131:17
rationale 109:16,
140:6
Re 1:6, 1:22, 102:4
re-reviewed 7:16
reach 126:10,
136:21, 137:3,
137:4, 137:6
reached 110:25,
121:13, 140:24,
182:20
reaching 111:5,

120:25
read 48:6, 77:5,
77:6, 122:3,
130:4, 130:15,
133:23, 148:7,
149:3, 149:5,
149:17, 149:23,
150:3, 150:9,
151:3, 152:18,
157:5, 159:4,
159:22, 166:1,
178:1, 178:12
reading 151:9,
167:22, 178:14
reads 28:8
ready 9:2, 141:24
reaffirmed 29:20
real 82:2, 110:15,
143:5, 147:2
realities 61:17,
109:18
reality 32:13,
108:16
realize 37:1, 77:15,
165:24, 173:20
realized 65:7
realizing 165:23
really 30:13, 31:21,
35:10, 54:8,
60:20, 60:24,
71:24, 83:23,
83:24, 86:4, 91:4,
91:10, 94:6,
97:11, 110:16,
111:25, 116:13,
116:19, 132:21,
142:5, 143:14,
149:3, 149:10,
149:13, 149:21,
158:4, 158:6,
162:14, 171:24
reason 38:12, 38:15,
70:22, 93:22,
98:5, 99:25,
111:12, 150:15,
160:16, 181:17,
181:18
reasonable 18:17,
20:2, 48:16, 49:7,
50:25, 130:16,

150:12, 158:22,
178:10, 178:16,
179:20, 181:7,
181:10, 181:15,
182:2
reasonableness
83:13, 143:25,
181:25
reasoned 103:14
reasoning 7:19,
168:17, 169:2
reasons 9:21, 41:6,
60:6, 96:18,
100:17, 171:12,
173:25, 174:3
rebut 96:2, 105:24
recall 11:3, 37:24,
101:12, 125:18,
131:5
recap 162:16
recapture 92:18
receive 9:2, 55:7,
55:8, 58:21,
75:15, 124:14,
125:1, 125:12
received 22:6,
29:17, 29:19,
30:17, 124:15
receives 147:1
receiving 124:10,
145:8
recent 142:10,
143:1, 156:8
recently 71:17,
177:24
recess 62:1, 89:10,
139:5
recitations 15:21
recognition 104:24
recognize 8:2,
138:13, 138:19,
150:21
recognized 105:11,
133:25
recognizes 48:15,
144:16
recognizing 151:12
recommendation 149:7
reconsider 65:22,
66:6, 72:16

reconvene 139:4
reconvened. 62:2,
   89:11, 139:6,
   184:11
record 7:17, 7:24,
   11:1, 13:12,
   13:17, 25:22,
   29:6, 30:6, 41:19,
   46:12, 48:21,
   51:7, 54:14,
   81:10, 106:22,
   111:5, 116:25,
   140:20, 152:9,
   152:18, 155:12,
   168:4, 173:25,
   174:3, 174:11,
   175:5, 179:25
recorded 4:47
records 45:20, 50:16
recoveries 39:9
recovers 147:1
recovery 39:9,
   39:14, 58:21,
   60:5, 60:14,
   60:22, 108:15,
   116:7, 117:10,
   128:15, 128:16,
   129:19
redirect 166:9
reduced 71:19
reduction 128:14,
   181:14
redundant 150:5
Reed 140:20, 176:11,
   176:12, 182:1
refer 39:5, 177:16
reference 13:23,
   54:12, 59:7,
   110:7, 119:16,
   119:20, 124:1,
   124:6, 126:2,
   126:5, 126:9,
   126:14, 167:17,
   171:2, 174:12
referenced 174:4
references 126:24
referendum 63:7
referred 53:4,
   97:23, 133:13
referring 20:20,

103:5
refers 8:14, 174:16
reflect 61:17
reflects 106:22
refund 143:23
regard 20:18, 65:12,
   132:9, 140:18,
   140:25, 152:1,
   152:3, 156:6,
   180:1
Regarding 13:18,
   13:20, 13:25,
   14:22, 16:4,
   64:10, 86:2,
   109:11, 112:12,
   112:13, 117:24,
   124:18, 139:19
Regardless 51:5,
   67:5, 68:21,
   103:10
Region 3:4
registered 150:25
regular 117:15
regulation 98:11
regulatory 25:17,
   26:3
reimbursed 155:4
reject 40:19
rejected 9:19,
   142:20, 156:19
rejection 38:1
rejects 9:20
Related 8:5, 8:9,
   8:13, 13:3,
   103:11, 126:5,
   126:14, 132:3,
   139:20
relates 87:12,
   162:19, 165:2,
   172:17
relations 50:3
relationship 147:9
release 27:8, 28:1,
   36:16, 36:24,
   46:20, 53:23,
   88:4, 88:6, 88:12,
   88:13, 88:15,
   100:5, 124:18,
   125:7, 135:20,
   152:14

released 125:3
releasees 125:22
releases 27:14,
   36:11, 59:17,
   119:7, 124:22,
   125:20, 139:20,
   178:5
relentless 140:17
relevance 165:3
relevant 14:21,
   16:6, 86:10,
   87:18, 103:7,
   103:16, 116:4,
   155:1, 156:1,
   156:8, 158:12
reliability 14:22
reliable 14:18
relied 31:6, 164:11
relief 75:10
relitigate 88:16
rely 32:16, 109:24
relying 160:15,
   161:14, 162:14,
   168:5
remain 66:12, 72:20,
   73:1, 136:5
remainder 140:18
remaining 18:2, 75:7
remains 53:9, 72:21
remarks 6:21, 41:5,
   67:4, 137:18,
   137:19
remedial 86:8
remember 126:8,
   165:14, 183:15
removal 22:7, 22:9,
   22:18
remove 99:4
removed 20:19,
   23:15, 69:17
removing 99:12
render 8:23, 160:17
renounce 74:9
Reorganization 79:16
repairing 76:9
repay 62:19, 71:8,
   181:24
repayment 64:1
repeat 18:8, 117:25,
   139:14, 176:3

repeated 32:18
repeatedly 57:5
rephrase 131:11
replica 111:10
replies 175:25
Reply 54:18, 56:21,
   96:17, 99:8,
   137:10
report 13:20, 13:22,
   112:23, 112:25,
   140:17, 140:23
Reporter 29:3,
   62:22, 185:13
reports 33:6, 142:4,
   145:10, 176:8,
   176:14
represent 27:6,
   40:16, 55:24,
   61:14, 63:5, 63:6,
   77:17, 141:4
representation 24:6,
   35:19
representative 1:13,
   1:29, 2:15, 16:21,
   20:11, 21:1,
   21:25, 25:3,
   91:25, 97:2
Representatives
   22:17, 23:2, 23:4,
   24:9, 66:20, 69:8,
   80:20, 121:22
represented 24:17,
   40:18, 53:7, 55:4,
   55:8, 67:16,
   67:21, 79:8, 92:1,
   109:10, 109:12,
   117:18, 122:7
representing 37:11,
   38:8, 53:15, 87:3,
   124:20, 166:23,
   182:23
represents 49:17,
   62:18, 68:12,
   73:17, 79:25,
   113:14
reputations 85:20
request 16:17, 17:8,
   17:22, 43:15,
   127:1, 127:6,
   128:20, 139:9,

165:1, 173:5,
   174:3, 174:25
requested 9:8, 17:5,
   18:14, 43:17,
   100:17, 122:9,
   122:13, 139:19
requesting 7:12,
   173:24
requests 12:25
require 8:19, 114:18
required 14:2,
   15:13, 16:12,
   46:15, 85:5,
   100:13, 123:8,
   153:5, 167:20
requirement 47:7,
   99:9, 144:23
requirements 16:10,
   58:9, 123:21,
   123:23, 132:9,
   144:23
requires 7:13,
   40:21, 58:14,
   58:19, 70:20,
   86:21, 145:1
requisite 85:7,
   123:8
res 98:23
reservation 155:11
reserve 13:19,
   143:9, 146:11,
   147:17, 150:11,
   172:12, 176:17,
   178:9, 178:15
reserved 129:14,
   152:16, 172:12
reserving 139:17
reside 44:17
residence 44:2
resident 45:6
residents 44:3,
   44:5, 44:6, 44:9,
   44:11, 44:25,
   45:1, 45:2, 45:12,
   49:21, 75:5, 76:14
resist 76:17
resolutions 158:12
resolve 76:12,
   173:21, 174:4
resolved 167:16,

175:1, 181:15
resolves 174:5
resolving 173:24
resources 25:17,
   42:5, 42:20,
   53:13, 53:17,
   84:2, 101:18,
   130:17
respected 91:25
respectful 66:12
Respectfully 13:17,
   17:15, 17:21,
   17:22, 24:13,
   39:24, 43:15,
   43:22, 46:10,
   47:1, 51:7, 55:13,
   56:1, 67:1, 69:19,
   137:5
respects 78:10
respond 17:5, 17:8,
   17:13, 17:23,
   41:7, 41:9, 179:8
responded 129:10
responding 101:8
response 49:16,
   56:3, 101:9,
   111:4, 165:17
responsibility
   36:12, 36:14,
   73:14, 157:13,
   179:3, 179:4
responsible 40:13,
   154:16, 157:3
rest 90:14, 93:16,
   135:8, 135:9,
   139:4, 166:10
restore 92:21
restructure 76:6
restructures 130:22
restructuring 30:21,
   72:22, 74:10,
   92:4, 96:3
rests 166:13
result 10:21, 25:16,
   28:3, 34:14,
   34:16, 35:9, 55:1,
   71:10, 71:25,
   74:4, 167:21
resulted 20:1, 35:19
resulting 71:16,

127:17
results 14:19,
    33:21, 33:24,
    81:15, 91:9
resume 61:21
retain 144:14
retaining 144:8
retire 68:6
retired 45:24
Retiree 91:21
retirement 38:10,
    46:1, 65:18, 68:7
retroactive 48:3,
    56:5, 56:9
retroactively 51:18
retrospective 82:15
return 62:20
returning 77:7
returns 65:11
reveals 74:15
revenue 42:20,
    48:18, 49:8, 53:9,
    53:12, 53:23,
    74:17
review 6:19, 19:12,
    82:15, 104:3
reviewed 74:14
reviewing 40:3,
    178:6
revise 69:20
revised 10:8
revisiting 118:14
reward 181:18
rewriting 105:19
rhetoric 111:22
Rican 7:5, 44:5,
    44:6, 45:4, 45:6,
    49:14, 49:15,
    49:20, 51:16,
    53:13, 62:25,
    64:4, 65:4, 65:7,
    70:5
Ricans 68:13, 70:8,
    70:11, 72:24
rich 69:6
Rincoln 25:9
ripens 173:1
ripping 67:24
rise 62:7, 71:16
risk 75:2, 75:3,

76:18, 78:22,
    79:11
risks 83:25, 85:22
risky 120:17
road 171:8
Robert 5:8, 163:17
Roberto 23:20
robs 75:6
Rock 107:20, 119:16
Rodrigue 33:4,
    33:16, 34:24,
    48:23
Rodriguez 66:14,
    70:1, 70:3, 70:4,
    73:3, 73:4, 76:24,
    97:5
Rolando 3:21, 13:12
role 76:7, 87:12,
    151:12, 151:19
roll 96:25
roof 75:25
room 61:25, 87:14,
    87:23
roots 70:18
Rose 113:12
roughly 48:18
Round 24:4, 101:24,
    105:4, 139:9
round-up 177:4
rounds 81:2
routinely 115:17
Royal 143:1, 144:7,
    162:19
RPI 143:23
Rule 13:21, 42:7,
    57:7, 61:9, 69:7,
    103:11, 124:2,
    171:9
ruled 17:24, 47:18,
    79:9
Rules 6:9, 6:11,
    13:21, 23:8,
    23:22, 42:10,
    64:1, 69:10
ruling 13:18, 13:25,
    19:13, 46:11,
    49:4, 53:1, 54:24,
    55:14, 61:1, 61:2,
    61:11, 102:10,
    105:13, 171:13,

173:3
rulings 7:1, 55:22
run 63:17, 72:22
running 17:21,
    30:14, 101:6


< S >
S/ 185:11
sacrificed 68:20
sacrifices 39:17
sad 76:6
Saenz 47:17, 57:19
Safe 70:14, 184:4
safety 65:13
salary 71:11
Sales 1:31, 1:46,
    29:17, 29:25,
    35:13, 41:23,
    42:2, 48:17,
    48:25, 49:2, 49:4,
    49:8, 50:19,
    53:12, 53:16,
    53:22, 54:7,
    56:13, 56:17,
    58:5, 60:8, 71:23,
    75:17, 99:22,
    103:8, 130:4,
    130:5, 130:9,
    131:9, 148:14
salient 109:2
Salinas 3:33
San 6:1, 6:7, 57:14
sanction 47:3
sanctity 79:2, 79:4
Santa 158:2
satisfaction 137:16,
    150:14
satisfactory 16:14
satisfied 129:22,
    130:11, 137:9,
    169:19
satisfy 14:7, 67:6,
    67:13, 121:3,
    123:20, 144:18,
    144:19, 144:24,
    155:8
satisfying 169:18
savings 75:8, 180:17
saw 37:21

saying 22:12, 28:25,
    38:2, 53:14,
    54:17, 59:8,
    62:25, 80:17,
    81:13, 102:13,
    107:13, 126:19,
    155:6, 160:23,
    162:15, 168:13,
    168:20
says 56:17, 86:12,
    98:10, 99:18,
    99:24, 108:5,
    109:12, 129:12,
    134:2, 134:21,
    143:17, 145:17,
    153:25, 155:1,
    155:17, 160:11,
    160:15, 160:16,
    162:8, 167:23,
    168:21, 171:22,
    178:8, 179:20,
    180:11, 183:24
scattered 114:10
scenario 111:19
Schaffer 4:8,
    140:16, 140:20,
    141:6, 142:1,
    142:2, 149:24,
    152:7, 152:21,
    154:13, 154:19,
    157:4, 157:11,
    158:12, 168:10,
    169:14, 169:15,
    170:9, 171:22,
    173:6, 175:11,
    175:14, 175:17,
    178:8, 178:17
schedule 9:5, 17:21,
    20:7, 20:24
scheduled 24:21
School 68:13, 72:6,
    73:10
Schoolhouse 107:20,
    119:15
schools 68:11, 71:10
scientific 14:18,
    15:1
scintilla 92:24
scope 117:14, 119:7,
    139:19

scores 82:20
Se 3:36, 3:38, 3:40
seal 108:2
seamless 148:4
search 7:24
seat 11:18
seated 62:3, 139:7
seats 61:23
Second 8:5, 31:6,
    40:8, 40:9, 47:6,
    56:8, 66:15,
    71:20, 85:17,
    94:19, 94:25,
    95:10, 96:21,
    100:24, 109:14,
    128:2, 132:13,
    141:10, 143:23,
    157:8, 160:12,
    160:19, 160:21,
    161:16, 162:1,
    181:25
Secondly 103:22
seconds 88:3, 117:3
secret 59:13
secretaries 96:6
Secretary 108:1
Sections 14:12,
    16:4, 48:4, 107:25
secure 51:6, 144:17
secured 41:11,
    41:13, 41:18,
    53:8, 53:10,
    72:13, 145:3,
    146:21, 146:24,
    148:24, 149:19,
    152:20, 159:2
secures 149:3
securing 7:15
securities 7:14,
    119:12, 121:14,
    121:18, 121:19
securitizations 92:5
security 26:11,
    29:16, 32:1,
    41:25, 148:15,
    152:19, 162:6,
    162:10
Seeing 65:20, 126:8,
    165:14, 173:2
seek 138:21, 144:1

seeking 36:23, 43:8,
    52:3, 56:23
seeks 26:15
seem 105:4, 108:15,
    132:4
seemingly 89:23
seems 134:6
seen 128:24, 134:22,
    142:7, 154:13,
    178:1, 178:24
Seguridad 26:2
Seguro 26:2
SEIU 3:23, 9:7
self 51:12
self-fund 151:16
sell 60:17
Senate 96:6
Senior 3:30, 30:16,
    31:14, 31:22,
    35:2, 35:7, 48:23,
    65:18, 77:19,
    79:25, 80:15,
    83:9, 87:8, 88:24,
    89:15, 89:18,
    116:1, 117:13,
    121:23, 121:25,
    130:3, 146:12,
    146:25, 147:1,
    148:23, 149:19
senior-junior
    117:23, 122:17
seniors 32:24, 33:3,
    33:9, 33:11,
    33:14, 33:19,
    33:21, 33:25,
    34:3, 34:10,
    34:12, 34:18,
    35:10, 35:22,
    36:6, 38:8, 39:5,
    39:10, 40:13,
    40:24, 59:11,
    60:5, 85:1, 85:17,
    86:9, 86:12,
    115:3, 129:25,
    130:11
sense 24:13, 109:18,
    148:1
sensible 159:4
sent 10:19, 60:25,
    61:13, 77:6

sentence 75:4,
    135:8, 160:21,
    161:5
separate 29:23,
    45:21, 84:23,
    100:24, 173:10,
    173:18, 179:18,
    183:9
sequence 87:20
series 151:18
serious 19:21, 91:1
seriously 76:12
seriousness 90:2,
    91:3
serve 25:14, 46:20,
    48:17, 63:4, 66:19
served 122:11
Service 9:12, 38:6,
    48:19, 67:19,
    121:18, 184:9
Services 64:15,
    75:19, 93:18,
    108:4, 128:6,
    128:8
serving 26:23
session 66:11
sessions 122:16
set 28:3, 65:24,
    85:5, 120:2,
    120:7, 145:24,
    146:5, 148:5,
    148:18, 152:12,
    153:8, 159:21,
    181:20
setoff 181:14
sets 169:17
settle 79:20, 96:25,
    115:15
settled 100:3,
    115:17, 156:13
setup 161:22
Seven 68:3, 68:6,
    74:22, 93:22,
    99:7, 108:20
several 6:23, 25:23,
    120:1, 125:14,
    130:15
severance 74:20
severe 170:25
severely 27:17

shabby 60:9
Shaking 76:25,
    165:13, 165:15
shall 8:10, 28:11,
    42:20, 55:23,
    98:10, 108:2,
    144:18, 144:19,
    155:2, 155:4,
    155:8, 158:21,
    169:18, 178:9
sham 60:24
shape 23:17
shapes 22:10
share 41:23, 62:5,
    130:18, 130:19
sharing 85:22
shift 33:18, 97:10
shifting 158:4
shoes 145:6
short 55:3, 62:21,
    101:6
shorter 89:7
shouldn't 88:9,
    110:1
show 13:17, 25:22,
    38:24, 58:9,
    110:20, 110:23,
    112:8, 145:7
showed 178:19
showing 50:25, 162:6
shown 58:16
shows 50:1, 110:2,
    180:10
shutdown 46:9
shy 85:22
sic 39:2
side 11:23, 68:19,
    76:25, 79:15,
    91:23, 101:22,
    103:5, 107:15,
    123:17, 123:18,
    129:19, 131:13,
    165:13
side. 76:25, 165:13
sides 79:9, 79:12,
    86:18
sidesteps 46:25
sign 85:7
signed 64:13, 96:8,
    108:3, 112:4,

133:23
significant 27:23,
    28:4, 78:12,
    79:24, 142:6
significantly 17:17,
    45:14
signing 161:2
silos 106:13
similar 106:6,
    157:2, 183:14
Similarly 125:12,
    143:7, 176:15
Simon 9:12
simple 63:11
Simply 28:8, 30:22,
    32:3, 33:18, 43:2,
    43:18, 44:5,
    54:16, 55:17,
    64:9, 82:13,
    111:10
single 30:1, 32:7,
    91:12, 111:18,
    114:15, 129:13
single spaced 178:23
single-spaced 179:17
sir 24:21, 25:4,
    69:24
sisters 68:15
sit 119:6, 139:8
sits 50:20
sitting 85:20
situation 31:13,
    32:13, 32:22,
    32:24, 33:25,
    64:22, 118:17,
    163:1
Six 82:16, 99:14,
    103:19, 108:20
skilled 178:20
skin 67:2
skittish 99:10
skyrocket 72:25
slashed 71:13
slight 124:3
slightly 89:7
slow 111:24
slower 62:23
slowly 29:1
Slytherin 136:12
small 38:8, 38:18,

40:18, 60:20,
75:3, 136:4
smaller 130:18,
130:19
Smith 140:21,
176:11, 176:13,
182:1
smooth 184:8
so-called 59:8,
60:22, 61:10
soaring 111:22
society 71:3, 71:6,
72:2, 72:4, 72:13
sold 44:24, 45:1,
45:2, 45:4, 45:5
sole 146:10
solely 128:10,
156:16
solemn 51:23
solicitation 122:21,
122:24, 124:4,
125:25
Solomon 4:9, 140:22,
163:7, 163:8,
163:9, 163:10,
164:3, 164:19,
165:16, 166:8,
177:22, 177:23,
182:15
solution 81:23,
81:24, 85:24
solve 93:20, 93:23
solved 94:2
somebody 37:15,
39:24
somehow 32:17,
60:11, 84:18,
105:1, 156:1
Someone 12:5, 20:12,
23:23, 55:1,
82:11, 110:22
son 93:20
soon 108:3
sophisticated 71:6,
148:6, 148:7
sorry 10:5, 16:23,
20:12, 24:24,
31:1, 37:21, 46:4,
89:1, 132:1,
135:25, 171:6,

184:7
sort 20:18, 127:19,
143:8, 172:21,
180:23
souls 138:14
sound 16:24, 93:3
source 91:14, 154:14
sources 63:10, 74:17
south 70:8, 70:12
Southern 87:1,
142:18
Spanish 67:7
Speaker 16:23,
24:21, 28:18, 63:8
speakers 10:8,
21:21, 112:13
speaking 18:10,
20:12, 77:12
speaks 162:2, 168:10
special 46:2, 55:7,
55:8, 55:11
specific 6:18, 7:17,
42:10, 47:20,
49:13, 57:18,
81:16, 98:11,
104:9, 105:22,
156:22, 159:6,
160:21
Specifically 6:23,
7:18, 42:16,
42:19, 47:18,
56:16, 94:9,
95:22, 99:4, 99:6,
101:14, 103:25,
104:22, 105:15,
126:9, 129:24,
131:8, 139:18,
160:25, 166:4,
171:3
specifications 43:19
specified 156:23
specious 147:16
specter 86:12
spectrum 127:20
speculate 111:12
speculation 179:2,
179:3, 179:13
speedy 117:9
spend 40:5, 113:7,
181:1

spending 38:21,
50:11
spiral 132:13
splintered 44:13,
45:16
split 13:4, 67:10,
84:24, 85:17,
87:18, 115:6,
115:22, 116:5,
117:21, 117:23,
118:14, 120:13
spoke 10:14, 10:15
spoken 37:2, 77:2
spot 77:15
squarely 144:6,
171:13
staff 25:6, 138:24,
184:8
staffed 134:5
stage 6:13, 180:10,
180:12
stake 17:20, 51:12,
76:16
stakeholder 74:2
stamp 56:22
stamped 42:22, 97:15
stamping 43:16,
97:16, 97:18,
108:2
stance 66:8
Stancil 3:18,
136:14, 136:17,
137:7, 137:10,
137:15
stand 34:24, 61:25,
65:1, 82:10,
90:15, 90:17
standard 49:11,
52:4, 52:9
standards 80:4
standing 13:19,
13:25, 96:23,
100:12, 145:6,
150:24, 151:1
stands 49:19, 171:22
start 28:24, 62:15,
81:13, 83:15,
86:13, 89:21,
90:8, 90:22,
93:24, 117:4,

152:11
started 81:25, 92:1,
  112:2
starting 110:1,
  158:14, 158:16
starts 150:8, 158:21
State 8:8, 26:16,
  36:1, 48:15, 51:1,
  52:3, 52:5, 52:6,
  52:8, 94:24,
  94:25, 96:13,
  96:16, 98:9,
  98:11, 100:21,
  100:22, 101:20,
  102:1, 102:8,
  102:16, 103:2,
  104:20, 105:23,
  108:1, 135:3,
  135:13, 143:7,
  154:3
stated 14:20, 16:10,
  38:12, 39:8, 40:12
Statement 9:9,
  20:25, 21:11,
  24:2, 24:3, 24:5,
  41:23, 44:7,
  46:20, 97:25,
  122:23, 125:19,
  129:11, 131:4,
  131:6
statements 6:16,
  9:2, 9:4, 20:25,
  21:7, 33:5, 49:13,
  62:4, 77:10,
  89:14, 141:25,
  166:17, 176:1,
  176:4
States 1:1, 2:36,
  16:3, 38:13,
  38:16, 44:2, 44:3,
  44:10, 44:14,
  44:16, 44:20,
  44:25, 45:24,
  48:14, 50:24,
  50:25, 51:13,
  51:25, 52:12,
  52:21, 53:20,
  54:15, 58:11,
  59:24, 60:3,
  60:10, 64:11,

64:20, 105:19,
  185:7
stating 62:16, 95:20
status 7:2, 7:4,
  53:9, 143:18,
  183:19
Statute 44:22,
  51:21, 56:9,
  104:16, 128:25,
  131:10, 135:6,
  157:25
statutes 26:11,
  26:13, 26:14,
  36:16
statutory 41:12,
  41:13, 41:18,
  51:20, 53:3, 53:8,
  53:10, 56:9, 60:7,
  94:3, 103:24,
  104:18, 140:1
stay 11:21, 11:22,
  70:16, 76:4, 86:8,
  96:19, 128:24,
  142:24
stayed 70:15, 180:7,
  180:13
staying 138:4
stays 172:22
steal 119:15
steep 75:4
stenography 4:47
Step 84:24, 84:25
stepped 162:23
steps 84:23, 112:3,
  123:10, 179:19
Steve 68:22
stick 32:8, 113:24,
  141:18
stipulation 117:15
stood 81:14, 170:9
stop 12:3, 125:17,
  171:8, 182:13
straightened 90:9
stream 34:14, 46:1
streamlined 174:15
strength 91:14
stringent 52:4
strong 38:14, 111:24
structure 21:3,
  30:13, 32:15,

33:11, 33:12,
  33:13, 34:5, 53:1,
  54:9, 55:15,
  55:17, 55:18,
  57:6, 79:2, 79:4,
  79:19, 83:4, 94:7,
  114:11
stuck 7:9, 144:23
students 68:8
stuff 161:24
sub 86:16
subcommittee 69:2
subject 30:20, 85:2,
  120:3, 136:1,
  143:24, 146:2,
  147:22, 148:16,
  148:19, 148:20,
  149:4, 149:10,
  149:11, 160:15,
  165:3
subjective 67:9
submission 128:21,
  135:19, 182:17
submissions 7:16,
  7:22, 8:22, 182:17
submit 34:18, 43:15,
  43:22, 44:15,
  48:8, 80:24,
  83:11, 85:24,
  88:20, 106:17,
  108:8, 131:23
submitted 5:6, 5:9,
  14:6, 17:18, 18:4,
  19:12, 42:15,
  45:20, 66:3,
  108:17, 119:1,
  142:3, 142:4,
  145:10, 163:15
subordinate 52:24,
  61:15, 86:2, 87:3,
  87:5, 87:6, 87:14,
  108:14, 108:19
subordinated 30:16,
  83:10, 86:16,
  88:1, 125:1,
  125:11, 127:23
subordination 31:20,
  31:23, 33:8, 33:9,
  33:16, 34:8,
  122:18, 146:18,

148:9, 156:3
subs 85:1, 85:18,
   86:9, 86:11, 86:14
subsection 99:15
subsequent 8:10,
   124:3
subsidize 52:18
substance 11:13,
   14:6, 41:11, 97:19
substantial 29:7,
   31:2, 51:17,
   114:11
substantially 42:25
substantive 7:20,
   8:23
succeed 143:16
success 114:17,
   114:23, 115:1,
   120:16
successful 38:13,
   122:25
succinctly 29:6
sue 180:22
suffering 67:3,
   67:7, 67:12, 68:2,
   68:4, 68:22, 71:14
sufficiency 31:22,
   34:13
sufficient 16:15,
   30:1, 30:7, 30:8,
   31:19, 33:4,
   48:22, 58:2, 58:6
sufficiently 93:8,
   129:21
suggest 61:8, 140:8,
   174:19
suggested 28:6,
   84:11, 132:14,
   167:9, 174:14
suing 142:7
suit 40:12
sum 58:8
summarized 15:21,
   29:5
Summary 81:18,
   94:10, 97:12,
   112:19, 120:9,
   131:20
summer 69:2
summing 18:3

superfluous 159:5,
   160:12
Supplement 43:25,
   47:18, 133:10
supplemental 128:20,
   135:19, 183:1
supplementation
   139:19
Support 8:22, 14:13,
   33:12, 38:10,
   59:9, 59:10,
   67:13, 77:10,
   80:13, 82:4,
   89:14, 97:12,
   102:23, 113:15,
   114:1, 114:24,
   119:18, 119:22,
   121:7, 137:12,
   152:15, 152:16,
   155:20, 162:15,
   164:8, 171:5
supporting 95:24
supports 78:2,
   111:22, 155:13
supposed 15:24, 57:3
supposedly 35:1,
   52:25, 54:7,
   56:13, 57:22
Supremacy 8:5, 95:1,
   106:3, 132:2,
   132:6, 139:21
Supreme 8:24, 31:9,
   47:17, 50:24,
   51:13, 52:10,
   52:12, 57:19,
   95:5, 95:9, 95:10,
   97:5, 101:14,
   103:11
surely 76:11, 76:15
survive 72:19, 76:5
survived 150:13,
   150:14
Susheel 3:32, 89:17
suspend 182:5
sustain 16:15,
   64:14, 84:4, 95:20
sustainable 121:19
sustained 166:6
SUT 53:9, 53:24,
   64:10, 78:14,

78:15, 83:8, 83:9,
   83:17, 83:18,
   83:24, 84:1,
   84:11, 84:24,
   86:14, 87:19,
   107:7, 107:8,
   130:7, 130:17,
   130:18
Suts 87:22
Suzzanne 3:14,
   182:22
Swain 2:35, 62:13,
   185:7
system 20:20, 26:4,
   37:15, 68:13,
   69:20, 74:23,
   96:13, 159:19,
   174:16, 181:2,
   181:3
systems 71:2

< T >
T. 3:18
table 61:13, 79:12,
   108:21, 113:21,
   117:20
tables 44:7
tabs 70:9
Tacoronte 174:7,
   174:14, 175:3
tag 174:23
taken. 62:1, 89:10,
   139:5
Takings 31:11,
   32:12, 52:22,
   56:4, 56:10,
   57:15, 57:18
talked 105:3,
   130:20, 134:14,
   181:2, 181:22
Tannenbaum 68:22
tantamount 170:23,
   172:4
Tashalye 66:13
task 138:21
tasks 178:25
tax-free 39:11
taxable 45:1, 45:2,
   46:13, 61:11

taxation 64:2
taxed 45:3, 64:10,
    170:11, 170:15,
    172:2
taxes 41:21, 42:18,
    50:13, 50:14,
    56:17, 60:8,
    103:8, 130:9,
    146:2, 148:14
taxpayers 46:12
Taylor 2:35, 185:7
team 120:11, 121:21,
    138:6, 184:2
tears 52:19
technical 52:16,
    52:19
telephone 117:16
telephonic 6:8
tells 181:8
ten 18:7, 18:13,
    18:16, 19:20,
    45:19, 45:23,
    61:20, 61:23,
    68:6, 81:6,
    113:22, 113:25,
    118:17, 125:1,
    163:15, 170:3
ten-minute 138:2,
    139:4
ten. 51:4
tens 74:21
tense 161:21, 162:1
tenure 107:3
term 114:16
termination 150:15
terms 23:13, 24:5,
    46:19, 56:8, 57:2,
    96:12, 101:11,
    102:17, 111:5,
    127:5, 131:2,
    154:3, 157:12,
    163:3
Territories 57:10,
    57:15, 57:17,
    98:8, 105:9
territory 64:11,
    98:9
test 76:12, 111:17,
    129:12, 129:21,
    136:19, 179:20

testament 37:14
testify 14:22, 118:2
testimonies 24:6
testimony 14:6,
    14:8, 16:6, 16:8,
    20:17, 30:5, 33:5,
    34:21, 39:1, 40:6,
    83:7, 86:2, 86:6,
    87:3, 87:7, 89:19,
    109:3, 109:9,
    109:13, 110:9,
    116:3, 122:10,
    123:13, 163:19,
    165:2, 165:3,
    176:6, 176:7,
    179:19, 180:15
thanked 139:3
Thanks 12:11, 139:1,
    184:3
themselves 40:15,
    55:15, 59:14,
    59:20, 61:4, 61:5,
    135:12, 159:21,
    159:25, 162:22
theoretical 144:3,
    176:9
theory 57:14, 57:22,
    60:10, 119:16
They've 35:8, 35:18,
    35:19, 43:21,
    159:13, 179:11
thinking 104:22
Third 29:16, 36:17,
    36:22, 47:12,
    97:2, 101:11,
    102:5, 109:20,
    126:1, 126:13
thoroughly 77:9,
    139:3
though 21:9, 54:8,
    54:9, 64:5,
    110:10, 134:11,
    134:22, 142:6
Thousands 7:22,
    50:3, 50:4, 74:21,
    75:22
thread 81:14, 82:14,
    84:17
Three 12:15, 24:1,
    68:8, 94:16, 96:9,

96:17, 100:17,
    102:22, 103:3,
    103:13, 109:9,
    112:7, 121:9,
    141:16, 162:20,
    177:14, 179:18,
    180:10
three. 180:12
thrive 65:2
throughout 91:14,
    114:11, 138:24
throw 91:15, 139:24
throwing 179:10
timely 165:6
timing 10:16, 10:18
Title 1:8, 1:24,
    91:14, 94:19,
    98:20, 100:2,
    103:10, 103:16,
    107:7, 111:14,
    111:15, 118:7,
    128:5, 128:7,
    130:21, 131:12,
    147:20
today 6:22, 23:13,
    23:18, 25:8,
    25:24, 50:2,
    53:10, 62:5,
    62:13, 67:21,
    73:16, 81:15,
    82:10, 84:16,
    84:19, 85:24,
    86:11, 86:14,
    131:22, 134:12,
    134:15, 140:7,
    140:22, 172:12,
    174:13, 174:17,
    174:23, 180:10,
    182:23
together 12:21,
    12:22, 17:25,
    35:17, 48:6,
    82:19, 89:13,
    89:21, 112:5,
    140:7, 151:4,
    159:22
took 51:18, 112:3,
    117:2, 121:10,
    121:13, 123:10,
    180:16

top 45:22
Torres 73:5, 73:6,
  73:8, 141:13
tortious 34:5
total 13:2, 17:16,
  18:18, 75:1, 77:18
touch 108:16,
  110:10, 110:16
toward 49:22
towel 91:15
trading 35:12, 59:14
traditional 105:1
traffic 134:6
tranche 44:11,
  45:15, 87:10,
  157:8
tranches 82:24
transaction 82:16,
  133:7
transactions 74:14,
  92:6
transcend 90:3, 91:4
Transcript 4:47,
  97:8, 185:4
transcription 185:5
transfer 29:17,
  131:13
transferred 42:2,
  107:6
transfers 119:12
transform 132:11
translated 95:15
translation 67:7,
  95:12, 95:16
translations 95:12
transparent 71:9
transportation 52:18
travel 117:7
travels 184:4
Treasury 33:6
treat 64:21
treated 60:9, 61:10,
  65:5, 124:25
treatment 86:2,
  109:22, 124:5
tree 68:17
tremendous 37:21
tried 118:22,
  132:17, 134:11,
  156:18

true 60:24, 108:16,
  185:5
truly 76:18, 90:6,
  91:9, 91:13
trump 57:17
trumps 57:15
Trust 29:23, 48:14,
  50:25, 51:13,
  51:25, 52:12,
  52:21, 184:2
Trustee 3:3, 142:8,
  142:9, 142:15,
  142:24, 143:3,
  143:9, 143:15,
  143:19, 144:20,
  144:25, 145:18,
  146:10, 147:12,
  148:5, 148:15,
  149:6, 151:6,
  151:12, 151:13,
  151:20, 156:14,
  156:23, 157:7,
  158:24, 158:25,
  161:4, 179:24
trustees 142:19,
  143:6
truth 82:18, 84:21
try 18:15, 29:4,
  60:17, 93:23,
  94:7, 94:16,
  116:6, 119:2,
  125:16, 141:18
trying 24:7, 30:10,
  32:16, 51:2,
  72:19, 90:5, 91:8,
  132:10, 137:1,
  138:10, 142:8
TSPR 95:7
Tuesday 22:6, 23:15,
  69:16, 175:20
turn 41:3, 43:23,
  46:17, 62:4,
  144:16, 182:10
turning 111:21,
  145:12
Tweed 81:11
two. 36:8, 40:2,
  138:3, 170:3
type 16:6, 27:22,
  97:4

< U >
UAW 3:23, 9:7
UHLAND 3:14, 182:21,
  182:22, 182:23,
  183:3, 183:12,
  183:16, 183:18,
  183:21
ultimate 83:13,
  120:23
ultimately 29:19,
  31:21, 33:18,
  34:9, 92:2, 103:7,
  118:8
umbrella 98:24
unaddressed 11:1
unaffected 28:11
unaffordable 9:19
uncertainty 82:7,
  179:12
uncommon 90:2, 91:2
unconflicted 61:14
unconstitutional
  40:20
unconstitutionality
  95:21, 95:22
uncontroverted
  121:12, 123:4,
  123:14
underground 71:21
underlying 143:13,
  143:16
underscores 46:5
understand 16:24,
  72:12, 89:24,
  127:14, 127:16,
  128:25, 133:16,
  133:20, 134:20,
  135:7, 165:21,
  167:11, 168:11,
  171:6, 176:22,
  183:3
understanding
  118:15, 121:2,
  167:18, 170:10
understands 20:4
Understood 141:23
undertaken 12:23
underwriters 125:20,

125:23
undisputed 30:7,
    152:12, 155:9
undoubtedly 147:4
unemployed 64:12
unemployment 68:18
unending 32:15
unequivocal 154:3
unfair 34:18, 40:20,
    59:19, 109:1,
    109:25
unfortunate 87:11
Unfortunately 63:24
unhappy 89:25, 90:25
Union 9:13, 9:14
Unions 4:11, 25:14,
    25:17, 25:20,
    25:23, 26:20,
    26:24, 27:18
United 1:1, 2:36,
    9:13, 38:13,
    38:16, 44:2,
    44:16, 44:20,
    48:14, 50:24,
    50:25, 51:12,
    51:13, 51:25,
    52:12, 52:21,
    58:11, 60:2,
    64:11, 64:19,
    185:6
universe 136:9,
    161:3
University 68:8,
    68:10, 73:10,
    77:24
unjust 59:20, 61:6
unknowingly 27:17
unknown 92:13,
    151:16
unless 9:3, 43:2,
    46:24, 95:3,
    99:24, 118:4,
    137:23, 142:12,
    151:6
unmistakably 157:24,
    158:9
unnecessary 49:11
unpayable 76:3
unquestionably 134:2
unquote 41:19,

143:4, 143:16,
    144:18, 147:12
unrealistic 81:17
unreasonable 49:11
Unrebutted 109:9,
    109:13, 109:15
unreliable 177:12
unrenounced 27:15
unrepresented 59:21
unsafe 64:17
Unsecured 2:5, 3:7,
    34:10, 91:17,
    127:22, 146:25,
    147:1, 153:23
unsettled 8:2
unspecified 8:9,
    132:5
unsurprisingly 73:14
untethered 177:5,
    177:6, 177:7
until 11:17, 12:4,
    19:23, 22:24,
    22:25, 28:11,
    30:4, 32:14,
    46:11, 46:24,
    63:10, 65:6,
    76:17, 120:23,
    131:21, 141:16,
    142:13, 142:15,
    142:21, 142:24,
    144:13, 173:2,
    175:14
untimeliness 165:11
untimely 165:10
unusual 165:24
unwarranted 28:3
up-to-date 70:21
uphold 26:11, 38:15,
    58:11, 64:6, 64:7,
    66:1, 71:3
upholding 43:3, 79:1
upset 30:10
urge 79:22, 82:10,
    136:21
urged 52:11
urging 140:24
USA 71:23
USC 44:19
useful 150:21
uses 41:24

using 59:19, 61:4,
    71:22, 77:9


< V >
v. 1:44, 2:21
vacation 71:12
Valenciano 25:11
valid 42:18, 43:9,
    55:17, 55:19,
    55:21, 83:16,
    83:17, 94:18,
    96:7, 97:25,
    102:19, 105:23,
    106:16, 135:12
validate 14:8
validated 135:11,
    153:24
validation 154:1
Validity 7:3, 7:14,
    28:2, 30:9, 30:13,
    43:3, 55:14, 57:5,
    83:23, 94:22,
    95:2, 95:25,
    97:14, 97:20,
    99:4, 99:9,
    112:19, 116:12,
    116:14, 140:6
validly 183:9
value 15:5, 31:14,
    31:17, 38:9,
    40:17, 60:17,
    60:19, 60:21,
    82:21, 84:25, 88:1
valued 55:9
Vamos 20:10
vantage 120:17
various 11:10,
    25:20, 36:15,
    104:4, 112:12,
    116:17, 133:8,
    134:14, 151:10
vast 70:11, 71:15
Vega 68:17
verification 15:19
verse 155:24
verses 102:25
version 12:20,
    95:15, 107:21
versus 95:7, 101:1,

101:6, 101:24,
130:3, 143:1,
143:7
vested 72:18, 98:6
veteran 92:4
VI 63:25
viability 94:7
view 49:12, 51:24,
92:15, 136:19,
167:10, 168:24
viewed 50:25, 130:25
views 62:5
vigorous 79:4
vigorously 74:2
vintage 156:8
violate 131:1
violated 23:2, 69:9,
69:12, 74:24,
172:24
violates 44:17,
47:20
violating 51:20
violation 27:18,
31:11, 47:4,
47:24, 48:1,
52:13, 96:19,
171:4
violations 26:11,
26:12, 58:10
violence 149:16,
149:17
virtually 101:13
virtue 102:20, 132:6
vis-a-vis 156:14
vital 72:5, 78:20
vitiate 30:11
voice 63:18
voices 138:10
void 64:8, 96:19
volume 35:4
voluntarily 129:2
voluntary 54:25
vote 29:14, 46:15,
58:25, 86:18,
123:1
voted 84:15, 108:20,
108:21, 108:22,
123:2, 155:18,
170:19, 172:6
votes 80:15, 86:22,

122:25
voting 29:13
vulnerable 74:10
vulture 68:23


< W >
waiting 61:8, 61:11,
76:22
waived 172:7
walk 83:25, 91:3
Walker 185:11,
185:12
walks 169:2
wallets 108:23
wanted 10:15, 10:17,
16:25, 18:22,
19:4, 19:18, 21:6,
37:9, 37:11,
37:13, 46:8,
80:17, 83:9,
83:10, 91:15,
97:24, 107:2,
110:16, 136:15,
161:15, 168:4,
174:7, 183:1
wanting 83:8
wants 51:19, 85:6,
173:13
warranties 26:10
wash 180:19
waterfall 145:23,
147:3, 147:24,
148:3, 149:12,
160:14, 160:25,
161:8, 161:15
wave 90:19
ways 22:10, 38:14,
76:16, 89:23,
102:23, 126:18
weave 134:11
Webber 111:24
website 49:14, 50:1,
108:7
week 89:24, 97:7,
113:4
weeks 117:6, 142:3,
184:5
weigh 121:7, 137:12
weighted 87:5,

121:25, 122:1
Weil 77:16
weird 173:18
Weiss 9:12
Welcome 6:6, 85:6,
92:2
well-articulated
171:18
Wells 143:7
western 69:2
Westlaw 95:8, 95:13
Whatever 40:21,
54:23, 76:20,
96:12, 128:23,
171:12, 172:25,
173:8, 173:11,
175:13
Whereas 39:11, 86:20
whereby 158:3
Whereupon 164:1,
164:17
Wherever 84:6
whichever 174:11,
175:4
whitewash 36:12
who've 91:7
whoever 161:3, 182:2
whole 61:12, 70:21,
83:19, 93:23,
122:19, 129:17,
133:7, 136:20,
136:23, 149:17,
183:15
wholly 149:24
whom 27:5, 35:1
Whyte 2:23, 85:11,
110:24, 117:5
wide 25:15
Wigberto 4:11, 25:6
wildly 35:19
willful 142:14,
143:12, 144:4,
151:8, 180:22,
182:9
willing 20:3, 55:25,
63:6
Willkie 116:25
wind 32:24
winner-take-all
120:16

wipe 36:21
wish 89:2, 89:4,
   117:9, 164:4,
   166:17
wishes 18:15, 23:23
withheld 155:2,
   167:21, 168:16
withhold 46:11,
   152:23
withholding 168:7,
   168:9, 168:21,
   168:22
within 26:3, 26:6,
   63:3, 64:7, 64:23,
   70:23, 87:25,
   103:16, 104:17,
   104:18, 123:25,
   125:20, 142:13,
   142:23, 144:7,
   147:3, 148:22
Without 14:6, 14:8,
   15:4, 15:13,
   15:18, 31:8, 45:6,
   46:6, 55:4, 57:14,
   57:24, 63:16,
   67:6, 72:3, 73:24,
   74:5, 74:6, 76:7,
   93:16, 100:1,
   100:3, 136:24,
   137:2, 141:19,
   156:5, 171:12
withstanding 8:11,
   28:8, 106:2,
   126:20, 172:8
witness 48:23,
   117:6, 180:6
WITNESSES 5:3, 14:6,
   14:14, 14:15,
   15:7, 16:2, 16:9,
   109:4, 116:3,
   162:4, 164:11,
   164:23, 165:7,
   165:25, 166:5,
   181:12, 181:22
WL 95:8, 95:13,
   95:17
woman 92:13
won 82:11, 84:7
wonder 68:21
wonderful 171:24

wondering 93:4
word 161:14, 161:20
wording 135:18
words 15:6, 56:3,
   66:4, 152:18,
   152:21, 152:22,
   155:2, 177:18
work 38:9, 68:5,
   80:18, 92:11,
   171:12, 174:9,
   177:5, 180:4,
   180:6
worked 38:20, 39:23,
   70:13, 90:5, 91:8,
   112:1, 112:24,
   113:2, 138:5
Workers 9:13, 63:15
working 65:16,
   89:21, 112:5,
   128:5, 136:6
works 75:19, 90:18
world 38:16, 148:1
worse 82:7
worth 54:7, 54:8,
   65:19, 111:23,
   112:11
worthy 86:24
wrap 80:10, 80:11,
   101:7
wrapped 87:16
write 38:2, 105:14
writing 17:8, 17:13,
   130:5, 158:1,
   158:10, 165:15,
   165:20
written 140:5
wrongdoing 142:23


< Y >
Yanes 3:42
Yansey 69:25
year 25:23, 30:1,
   30:2, 56:11,
   56:24, 59:15,
   64:14, 142:17,
   151:18
years 30:8, 30:25,
   39:14, 44:12,
   44:13, 64:23,

65:16, 65:19,
   66:19, 68:6, 68:7,
   68:12, 71:25,
   75:6, 90:5, 91:8,
   94:23, 114:19,
   114:20, 118:17,
   151:16, 162:20
Yesterday 9:17,
   9:21, 10:12, 11:3,
   12:23, 12:25,
   13:18, 33:18,
   34:24, 48:24,
   49:1, 49:18, 53:5,
   59:7, 67:4, 77:4,
   81:14, 89:19,
   92:3, 93:13,
   109:4, 110:9,
   116:3
yield 20:3, 113:23
youngest 66:21
yourself 159:16,
   160:4
yourselves 13:4


< Z >
zealous 85:15
Zeno 25:10
zero 60:14, 60:16