# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>           Debtors.* | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>           Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>This Pleading Relates Only to COFINA and Shall be Filed in Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS |

---

     * The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DECLARATION OF SUSHEEL KIRPALANI IN SUPPORT OF
SUPPLEMENTAL BRIEF OF PLAN SUPPORT PARTIES IN SUPPORT OF
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER
CONFIRMING THIRD AMENDED PLAN OF ADJUSTMENT OF
PUERTO RICO SALES TAX FINANCING CORPORATION**

I, SUSHEEL KIRPALANI, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.    I am a partner at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, co-counsel to the COFINA Senior Bondholders' Coalition (the "Senior Coalition") in the above-captioned Title III Case.

2.    I submit this declaration in support of the *Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "Supplemental Brief").

3.    Attached to this declaration as Exhibits 1-8 are true and correct copies of the following documents[1]:

| Exhibit No. | Document |
|---|---|
| 1. | *Rodríguez Román v. Banco Gubernamental de Fomento para Puerto Rico*, 151 D.P.R. 383 (P.R. 2000), certified English translation |
| 2. | *Commoloco of Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478 (P.R. 1990), certified English translation |
| 3. | *P. R. Tel. Co. v. Sec. of Treasury*, 81 D.P.R. 982 (1960), certified English translation |
| 4. | *Int. Devs. v. Mun. de San Juan*, 177 D.P.R. 693 (2009), certified English translation |
| 5. | *Diary of Sessions of the Constituent Convention* 2574-76 (1952), certified English translation |

---

[1]   Certified English translations of Exhibits 7-9 are currently being prepared and, with the Court's permission, will be filed as soon as they are completed.

| Exhibit No. | Document |
|:---:|:---|
| 6. | *Diary of Sessions of the Constituent Convention* 2505 (1952), original Spanish version |
| 7. | *Telefonica Larga Distancia de Puerto Rico, Inc. v. Departamento de Hacienda*, No. KCO97-0021, 2001 WL 1764054 (P.R. Nov. 26, 2001), original Spanish version |
| 8. | *Asociación De Empleados Gerenciales De La Corporación Del Fondo Del Seguro Del Estado v. Corporacion Del Fondo Del Seguro Del Estato*, 2015 WL 4075649, at *15 (P.R. May 29, 2015), original Spanish version |

4.      I declare under penalty of perjury that the foregoing is true and accurate to the best

of my knowledge and belief.

Dated: January 24, 2019
         New York, New York

By:      */s/ Susheel Kirpalani*
          Susheel Kirpalani

# Exhibit 1

Case 17-03283-LTS Doc#4890-1 Filed 01/24/19 Entered 01/24/19 Page 2 of 10 Desc:
Rodriguez Roman v. Puerto Rico Government Development Bank, 2000 TSPR 93 (2000)
Exhibit Kirpalani Declaration. Page 5 of 92
151 D.P.R. 383, 2000 TSPR 93
CERTIFIED TRANSLATION
EXHIBIT A

2000 JTS 104, 151 D.P.R. 383, 2000
WL 975618 (P.R.), 2000 TSPR 93

MARITZA RODRÍGUEZ ROMÁN
et al, plaintiffs and appellants,
v.
PUERTO RICO GOVERNMENT DEVELOPMENT
BANK, PUERTO RICO HIGHER EDUCATION
ASSISTANCE CORPORATION et al, defendants
and appellees.

In the Supreme Court of Puerto Rico.
*Number:* AC-96-6

## Synopsis

JUDGMENT issued by *Judge Ángel F. Rossy García, Judge José M. Aponte Jiménez* and *Judge Antonio J. Negroni Cintrón*, Judges of the Circuit Court of Appeals (Regional Circuit I), affirming a judgment issued by the Court of First Instance, Superior Court of San Juan, dismissing a torts and injunction action. *The judgment of the Circuit Court of Appeals is modified for the sole purpose of ordering the file to be returned to the Court of First Instance in order for the latter to hold a hearing that is consistent with the decision issued by the Supreme Court. The judgment of the Circuit Court of Appeals is affirmed as to such employees who were not employees of the Government Development Bank prior to the moment they began to provide services as employees of the Puerto Rico Superior Education Assistance Corporation.*

*Ebenecer López Ruyol*, attorney for appellants; *Rafael J. Vázquez González*, of *Nieto, Vázquez & Rodríguez Marxuach, Radamés A. Torruella* and *José A. Nolla Mayoral*, of *McConnell Valdés* attorneys for the Puerto Rico Superior Education Assistance Corporation and the Puerto Rico Government Development Bank. *391

CHIEF JUDGE ANDRÉU GARCÍA issued the opinion of the Court.

**1   We are tasked with considering whether there is a right to retain employment for employees of a public corporation which validly ceases its operations, while said corporation is a subsidiary of another public corporation but is independent and separate from

it. We believe that they do not have a right to retain employment, for the reasons set forth below.

Let us examine the facts that give rise to this appeal.

## I

On May 8, 1981, the Board of Directors of the Government Development Bank by resolution created, in accordance with the Charter of "the Bank," Art. 2 of Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 552), 1 as amended, a subsidiary corporation known as the Puerto Rico Higher Education Assistance Corporation (hereinafter PRHEAC, the purpose of which was to guarantee loans issued to students by commercial banks. This corporation was made up of forty-seven (47) workers and was dissolved by a resolution of the Board. It ceased its operations on April 15, 1994, at which time all employees lost their jobs. It was stated that changes in federal regulations had made the operation of PRHEAC inefficient, and therefore they had been receiving fines for breach of said regulations. Due to this they were facing a financial crisis.

On February 22, 1994, twenty-two (22) union employees and five (5) managerial employees filed separate lawsuits, which were subsequently consolidated, in the Court of First Instance *392 against the Government Development Bank (hereinafter the Bank) and the Bank's employee Union, PRHEAC and Great Lakes Higher Education Corporation. They alleged that they were actually employees of the Bank assigned to a subsidiary, and that therefore they had the right to be reinstated in the bank's facilities and to compete with the other employees of said institution in accordance with the merit principle and the seniority principle, for any available positions and for positions held by employees of the Bank that had less seniority than them. They requested a temporary restraining order and a preliminary and permanent injunction to halt the imminent layoff of the employees which had been announced by the corporation, and their reinstatement in their regular duties; notice to each employee of a general layoff plan that covered the Bank and all of its departments and that said plan be published and approved by the Department of State in accordance with established rules. They also requested damages in the amount of one hundred thousand dollars ($100,000) for each of them.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Two (2) days later, the Court of First Instance denied the temporary restraining order and preliminary injunction, ordering plaintiffs to serve defendants through the ordinary procedure. As a consequence, on March 30, 1994, codefendants the Bank and PRHEAC filed a motion in which they requested that summary judgment be issued dismissing the complaint, based on the fact that PRHEAC and the Bank were separate and independent entities, that PRHEAC was exempt from the provisions of the Puerto Rico Public Service Personnel Act, and therefore, the plans to layoff union employees had to be governed by the collective bargaining agreement entered into by PRHEAC and the Government Development Bank Employee Union, and with regards to managerial employees, by the PRHEAC regulations. *393

**2 Codefendants, Employee Union of the Government Development Bank and Great Lakes Higher Education Corporation, also filed separate motions requesting dismissal of the complaint. The former argued lack of jurisdiction and of ripeness of the controversy and the latter was based on the claim that the complaint failed to state a claim upon which relief could be granted.

The Court of First Instance, granting codefendants' motions, dismissed the actions filed for the reasons indicated. As to the Bank and PRHEAC it also held that plaintiffs did not exhaust available administrative relief.

Plaintiffs appealed before us from said decision, and therefore, after careful analysis, we issue judgment, partially revoking the judgment as to codefendants Bank and PRHEAC. On that occasion we stated the following:

> We have repeatedly held that the doctrine that requires administrative remedies to be exhausted prior to turning to courts is a rule of judicial self-limitation intended to facilitate judicial review. It seeks to ensure that courts have the most accurate information as to the grounds of a governmental action, thus placing courts in a position to make the most informed decision possible as to the petition filed. It also seeks to free courts from matters that may be decided administratively. … It is not a rigid doctrine. Rather, it must be applied flexibly, enforcing it only when, in light of the circumstances of the case, it is clear that judicial intervention would be premature. … This is why we have decided that the requirement of exhausting administrative remedies may be ignored when the litigious matter is essentially a legal question, or when exhausting said remedies constitutes a useless or ineffective measure. ...

In this case, requiring that administrative resources be exhausted, as the lower court decided, was not justified. The essential question raised by appellants before the Court of First Instance, as to which we do not render judgment in this decision, *394 was essentially a legal question, and deciding it did not require waiting for the administrative agency to contribute specialized knowledge. According to the appellants, the layoffs that were contemplated and then ordered by appellees [Government Development Bank and Puerto Rico Higher Education Assistance Corporation] were not due to the merit principle and the guiding principle of seniority and amount of time in service, as decided in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R. 757 (1983). Appellees alleged that they were actually employees of the Government Development Bank, and that as such they were entitled to compete with the other employees of the Bank for the remaining positions, according to the merit principle and the criteria of seniority. Since this was the main question raised by appellants, it was not necessary to exhaust administrative remedies in order to consider and decide it.

**3 It should also be noted that when appellants filed their judicial action, it was clear that the decision of the Bank to cease the operation of the Puerto Rico Higher Education Assistance Corporation was final and not subject to delay. The steps and claims carried out by appellants before the Bank's upper management and other entities prior to filing the judicial action in question, and their response to said steps and claims clearly demonstrated that the possibility that the Bank cancel or modify its intention to layoff appellants immediately was remote. Under such circumstances, it made little sense and was pointless to require appellants to exhaust available administrative remedies prior to filing their judicial

---

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS Doc#:4890-1 Filed:01/24/19 Entered:01/24/19 Page:3 of 10 Desc:
Exhibit Kirpalani Declaration. Page 7 of 92

CERTIFIED TRANSLATION

Rodríguez Román v. Puerto Rico Government Development Bank, 2000 TSPR 93 (2000)
151 D.P.R. 383, 2000 TSPR 93

action against the Bank and PRHEAC. (Citations omitted) Appendix, *Exhibit* 4, pp. 13.

Thus we decided that the file should be returned to the Court of First Instance to continue proceedings in accordance with our decision. The lower court interpreted our order *to mean that it only needed to decide the question of law, that is, whether plaintiff employees were entitled to compete with the other employees of the Government Development Bank for the positions existing in accordance with the merit principle and seniority criteria*. It gave the parties a period to submit memoranda in support of their positions, after which it **\*395** issued judgment, and *summarily* dismissed the actions filed. Petitioners filed an appeal before the Circuit Court of Appeals, which affirmed the Court of First Instance.

Petitioners appear before us through a so-called "appeal petition", 2 in which they argue that the Court of Appeals committed several errors; including that the Court erred in summarily dismissing the complaint, in deciding that plaintiffs were not employees of the bank, without allowing evidence to be submitted to decide the situation of each employee; intimately linked to this, whether the Bank can create public corporations that deprive employees who had already been hired by it prior to creating PRHEAC; whether it is appropriate to pierce the corporate veil between PRHEAC and the Bank; whether the Public Service Personnel Act and the retention right apply to employees of PRHEAC, and that the Court erred in not granting an equity remedy to avoid public policy violation and avoiding gross injustice.

In order to evaluate the petition, on February 23, 1996, we issued a decision in which we ordered the original files held by the Court of Appeals to be transferred to us. When said order was complied with on June 20, 1996, we mistakenly ordered petitioner to submit its appeal, as if it involved a writ that had already been issued. After said party complied with said order, appellee filed a brief opposing *issuance of the writ*.

**\*\*4** Having examined the file in its entirety as well as the positions of the parties, we proceed to issue our decision. **\*396**

## II

[1–3] The Government Development Bank, instrumentality of the Government of Puerto Rico, was created by Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 551 *et seq.*), in order to "help the State Government perform its fiscal duties and carry out its governmental duty to develop the economy of Puerto Rico and especially its industrialization more effectively." 7 L.P.R.A. sec. 551. Through Law No. 97 enacted on June 26, 1974, the legislature added section *Four* of Art. 2 of Law No. 17 (7 L.P.R.A. sec. 552), known as the Bank's Charter, sections (I) and (J). Section (J) granted the Bank the authority to create, through a resolution, subsidiary or affiliated companies that in turn would be government instrumentalities that were independent and separate from the Bank, with powers, rights, authority and duties granted to the Bank and delegated to them. 3

[4–5] In accordance with this section the Bank created, through Resolution No. 4530, the Puerto Rico Higher Education Assistance Corporation (PRHEAC), which in accordance with said section, came into legal **\*397** existence as a government instrumentality of the Commonwealth of Puerto Rico, that was independent and separate from the Bank. By provision of law, the Board of Directors of the Bank *is* the Board of Directors of each and every one of the subsidiaries so created. Art. 1(J) of Law No. 97, *supra*.

Appellants invoke the doctrine of alter ego, to argue that they are actually employees of the Bank and as such have the right to compete for the positions remaining in the Bank in accordance with the merit principle and the governing principle of seniority. In support of said argument they list a series of circumstances, that is, that both agencies share the same board of directors, that the employees of both public corporations have the same employment office, use the same form to verify employment, use the same identification card, use the same checks, have the same medical plan. They allege furthermore that the Association of Employees of the Commonwealth of Puerto Rico have them under the same employer identification number and the same account with the State Insurance Fund and they make transfers of personnel between both instrumentalities at their discretion.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[6–7] In Puerto Rico we have adopted the doctrines of piercing the corporate veil (alter ego), successorship and the doctrine of "single employer," developed as case law in federal courts and the Federal Labor Relations Board to protect the rights of workers. The single employer doctrine is generally used when there are companies that coexist. The doctrines of alter ego and successor employer are used when a company substitutes another company. *J.R.T. v. Asoc. Playa Azul I*, 117 D.P.R. 20, 29 (1986); See also, *Fugazy Continental Corp. v. N.L.R.B.*, 725 F.2d 1416, 1419 (D.C. Cir. 1984); *Penntech Papers, Inc. v. N.L.R.B.*, 706 F.2d 18, 24 (1st Cir. 1983). Specifically, the **398** alter ego doctrine, in the labor field, is used as a general rule when a corporation takes control of another entity, which usually disappears and that substitution is shown to have illegal purposes, to constitute a violation of public policy, to entail injustice or fraud, or to breach an obligation. The analysis under this doctrine requires proving purposes or intentions to commit illegal acts. *J.R.T. v. Asoc. Playa Azul I*, supra, p. 29.

**5** Having examined the entirety of the file we see that in effect both agencies share centralized administration which, according to the file that we have before us is explained by the fact that PRHEAC hired the administrative services and other personnel administration services with the Bank, since being a small agency it was not worth having its own administrative and Human Resource office. *PRHAEC paid the Bank for said services.* As part of these services of personnel administration and contracted support, Bank personnel were frequently sent to PRHEAC's offices. However, they were always kept under the Bank's payroll.

Furthermore, both agencies had different employer's identification numbers, different accounts with the State Insurance Fund and were represented in the union by different appropriate units certified by the Puerto Rico Labor Relations Board.

[8] It is also pointless to extend the alter ego doctrine to these two (2) agencies, since it is *by mandate of the law itself* that these are "separate and independent government instrumentalities of the Commonwealth of Puerto Rico". Art. 1(J) of

Law No. 97, *supra*. The fundamental distinction for a public corporation to be considered a subsidiary of another public corporation consists of the statute by virtue of which the existence of the first arises to impart said characteristic upon it **399**, in addition to its own legal personality. See *Torres Ponce v. Jiménez*, 113 D.P.R. 58, 6365 (1982). The enabling statute by virtue of which PRHEAC was created made it a public corporation independent of the Bank.

[9] Appellants argue that PRHEAC has not been incorporated in the Department of State. Appellants forget that the General Corporations Act, 14 L.P.R.A. ant. sec. 1101 *et seq.*, does not apply to public corporations, as said statute was conceived to specifically regulate the creation and operation of private corporations and it is as to these that Registration in the State Department is required. The organic statute that enabled the creation of the PRHEAC constituted it as a public corporation without requiring any sort of registration.

## III

The constitutional validity of the delegation of powers that the Legislative Assembly makes to the public corporation for it to have the capacity to create or constitute governmental instrumentalities that are independent and separate is questioned.

During the development of administrative law, especially at its origin, the constitutional validity of the delegation to agencies of powers originally assigned to the three (3) governmental powers was challenged many times. The emphasis was at the moment of reconciliation of the constitutional tradition with that delegation of powers.

**6** Nowadays the validity of this type of delegation, which was the source of judicial decisions from the start of administrative law, is rarely doubted. From 1935, the year in which the Social Security Act was created, a great development began in the areas of social legislation through which administrative agencies became the **400** main purveyors of governmental services and the main emphasis of decisions that interpreted said legislation fell on the *administrative procedure.* B., Schwartz, *Administrative Law*, 3ra ed., Boston, Ed. Little, Brown & Co., 1991, Sec. 1.14.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 17-03283-LTS Doc#4899-1 Filed:01/24/19 Entered:01/24/19 Page 3 of 10 Desc:
Exhibit Kirpalani Declaration. Page 9 of 92

CERTIFIED TRANSLATION

Rodríguez Román v. Puerto Rico Government Development Bank, 151 D.P.R. 383 (2000)
151 D.P.R. 383, 2000 TSPR 93

[10] Currently, the validity of the delegation is upheld as long as the law that creates the agency establishes appropriate rules, guidelines, standards, criteria or intelligible principles or procedural and substantive safeguards or guarantees that guide the delegation and limit their powers to prevent the actions from the agency to be arbitrary and capricious. Said criteria do not need to be express; they can arise, in fact, from he legislative history and may be broad and general. If it has a public interest or purpose, generally this is sufficient justification to uphold the delegation. See: Viajes *Gallardo v. Clavell*, 131 D.P.R. 275 (1992); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Hernández Montero v. Montero Cuevas, Director*, 88 D.P.R. 785 (1963); *López v. Junta Planificación*, 80 D.P.R. 646 (1958); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670 (1953); *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1943); D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, Bogotá, Ed. Forum, 1993, Sec. 2.2.5; Schwartz, *op. cit.*, Sec. 2.102.30; *2 Am. Jur. 2d Administrative Law* Sec. 56.

[11] The definition of what a public corporation is can be found in Art. 27 of the Civil Code, 31 L.P.R.A. sec. 101, which regulates legal persons in Puerto Rico. In that regard, Art. 27 of the Civil Code states the following:

Sec. 101 *Legal persons—Who shall be considered legal persons*

The following shall be legal persons:

(1) Corporations and public interest associations with legally recognized legal personality. *401

Their personality starts from the very instant in which, under law, they would have been validly established.

**7 (2) Corporations, companies, associations of particular interest, be they civil, commercial, or industrial, to which the law grants legal personality. 31 L.P.R.A. sec. 101.

[12–14] We have interpreted person, in the legal sense, to be any being capable of having rights and obligations and legal persons to be the community of people or collection of assets that are organized for carrying out a permanent goal and obtain the recognition of

the state as a subject of law. *A legal person receives its personality directly from the law, therefore the limits to its powers, rights and responsibilities are established by the creating law.* *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74, 81 (1987).

It has been interpreted similarly in Federal administrative law. "The jurisdictional principle is the root principle of administrative power. The statute is the source of agency authority as well as of its limits. If an agency act is within the statutory limits (or vires), its action is valid; if it is outside them (or ultra vires), it is invalid...." (Notations omitted.) Schwartz, *op. cit.*, Sec. 4.4, p. 171.

[15] Art. 29 of the Civil Code, 31 L.P.R.A. sec. 103, provides that the civil capacity of corporations, companies, and associations shall be regulated by *the laws that created or recognized them*. Art. 80 (31 L.P.R.A. sec. 30) establishes, in turn, that legal persons can acquire and possess assets of all kinds, and enter into obligations and exercise civil or criminal actions, in accordance with the laws and rules that create them.

[16–17] Sec. 1.3 of the Uniform Administrative Procedure Act of the Commonwealth of Puerto Rico, 3 L.P.R.A. sec. 2102, also characterizes the public corporation. "Agency", for purposes of said law, means any board, body, examining court, *public *402 corporation*, commission, independent office, division, administration, bureau, department, authority, employee, person, entity or any instrumentality of the Commonwealth of Puerto Rico or administrative entity legally authorized to carry out regulatory or investigative duties and or which can issue a decision or has authority to issue licenses, certificates, permits, concessions, accreditations, privileges, franchises, acknowledge or adjudicate. An exception is made for those entities mentioned in said law, for example, municipalities, its entities or corporations, the Legislative Branch, Judicial Branch, the office of the governor, among others.

[18] The public corporation is a governmental creature, the creation of which is according to the needs of the State.

**8 … On the other hand, a public corporation, being an instrument or means of government, is subject to creation or dissolution at the will of the *legislative body or lawmaking power*, and in total disregard of the wishes

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

of the members who compose it. In the same manner its charter is subject to change or amendment.

While all corporations are public in the sense that they affect and are dependent upon the public to a greater or lesser extent, strictly speaking, a public corporation is one that is created for political purposes with political powers to be exercised for purposes connected with the public good in the administration of civil government. It is an instrument of the government subject to the control of the legislature, and its members are officers of the government appointed for the discharge of public duties; and where a corporation, exercises all of its franchises for public purposes, it is a public corporation.

Corporations in which the public is interested only in their objects and in which the whole interest is not in the government or the corporation is not created for administration of political power, are private. ...

Stated generally, a public corporation is a corporation created merely for purposes of government, as distinguished from a private corporation, which is one that is created for other purposes than those of government. Statutes may be found embodying the substance of this definition. (Emphasis added and notations **403** omitted.) I *Fletcher, Cyclopedia Corporation* Sec. 58, pp. 790792 (Perm ed. 1999).

Through Law No. 97, *supra*, 7 L.P.R.A. sec. 552, the legislature amended the law to add sections (I) and (J) to section *Four* of Art. 2, *supra*, known as the Bank's Charter, to authorize the Bank to create instrumentalities that are separate and independent from the Bank.

There is no doubt that the Bank was conferred the delegation of the legislative authority to create subsidiaries which were independent and separate; that is, to establish public interest corporations that were recognized in our laws as subjects of law.

**[19]** The Government Development Bank was created in 1942 and since then has had two (2) main duties.

First of all, it has been its responsibility and that of its subsidiaries to promote the development of the economy of Puerto Rico, providing sources of financing that were necessary to incentivize the development of the private, industrial, commercial and cooperative sector in such risks that private commercial banks

have not been willing to assume, given that the latter evaluates a request for loan based on its recoverability and the payment capacity of the entity that requests it. The persons who benefit are those who have not been given loans by private banks due to the high risks. On many occasions, providing this financing has as a consequence that the investment in the loan is not recovered.

**\*\*9 [20]** It was the Government's intention, with the Bank, to provide a source of financing to natural or legal persons who work in manufacture, commerce, agriculture or tourism (with an emphasis on small and medium businesspeople), through direct **\*404** loans, loan guarantees, as well as capital investments. It was intended, among other things, to develop a Puerto Rican economy that was more solid, promote activities that lead to substitution of importation of goods and services, generation of employment without having to depend as much on federal funds. See Legislative Debate in the House of Representatives, H.B. as to Law No. 22 enacted on July 24, 1985, p. 7; Joint report of the House of Representatives from July 20, 1985.

**[21]** Besides this role, the Government Development Bank provides financing to different governmental instrumentalities that need loans to comply with their public purposes, acts as a fiscal agent as well as a financial advisor to all of the government, both central and municipal and to the different public corporations of Puerto Rico. That is, one single entity combined both public and private financing duties. Id.

**[22]** As a main provider of *public* sector financing, it is often required to enter different fund markets to borrow money in substantial amounts or serve as guarantor to debt issues in said sector. This requires that its financial statements not reflect high-risk activity, which may jeopardize its payment of its obligations. See Legislative debate as to S. B. 807 from May 2, 1974, pp. 101106.

Puerto Rico faced one of the most difficult economic periods between 1973 and 1984, when the global oil crisis occurred, and the second great recession of the eighties. The unemployment index in Puerto Rico reached an unprecedented rate of 24.4 percent, causing

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

a halt in economic growth. The Bank, as a State tool, whose public policy it was to promote the country's economy, had to respond creatively to this historic moment. It was precisely in 1974 that the Bank Act **\*405** was amended in order to authorize it to create instrumentalities that were separate and independent from it.

These were years of intense and complex activity in the BGF (Government Development Bank). In 1974 the BGF for the first time entered the market with a sale in competitive auction of Tax and Revenue Anticipation Notes for the Government of the Commonwealth of Puerto Ricowhich allowed fast access to temporary financing sources [...]. In 1975, when the doors of the United States municipal bond market closed, and in light of the growing resistance of commercial banks to continue financing short-term public debt, the BGF negotiated the first Promissory Note Purchase Agreement which allowed Puerto Rico to have access to financing. Also in 1975, the BGF for the first time entered the European market to sell Puerto Rican obligations. [...] In 1976 the BGF developed a completely new concept to gather funds for the government coffers: the concept of savings bonds.

**\*\*10** In 1977, the BGF established the Puerto Rico Development Fund, a subsidiary that could make capital stock investments and guarantee long term loans for private companies who could not obtain credit from other financial institutions. In 1978 the Development Fund issued obligations in an amount of $25 million to supplement its original capitalization of $5 million and to be able to make a greater contribution to the private sector. [...]

Also in 1977, the BGF actively promoted the creation of the Puerto Rico Housing Financing Corporation, the main duties of which were to finance construction, reconstruction, improvement, and rehabilitation of housing for low and moderate income families; to grant mortgage loans to help limited income families acquire a residence; and temporary financing guarantees for construction projects under the Mortgage Trusts that were created after 1985. [...]

The creation, also in 1977, of the Authority for Financing Industrial and Environmental Control Facilities (AFICA) was extremely important. AFICA would have the capacity to operate as an alternate mechanism for the public placement of limited obligation bonds of private issuers. [...]

In 1981 the Puerto Rico Higher Education Assistance Corporation was established to administer the Federal Guarantee Program for Loans to Students in Puerto Rico. Under this program, the subsidiary guaranteed the amount loaned by a commercial bank to a student and **\*406** also guaranteed the payment of the entirety of the debt in the event of the death of the borrower. During the past 12 years after its creation the CAES [PRHEAC] has guaranteed loans for over $434 million for the benefit of over 171,000 students in every area of study and in all university levels, including post-graduate specializations such as Law. The Government Development Bank also established the Puerto Rico Student Loan Association, created to offer loans at a low interest rate for students to undertake post-secondary studies. The intention of this subsidiary was to fill space that private banks had not yet filled. Through APE (SLA), the Bank issued loans in excess of $24 million and sold its portfolio in 1988, when the private banking sector had already learned the need for this type of loan and its profitability.

In general terms, these years were of great creativity and productivity for the Government Development Bank. They were years in which adversity, created as a reflection of the great oil crisis was, literally, the mother of invention. [...]. *Innovación, experiencia y solidez para Puerto Rico*, Publication of the Government Development Bank, pp. 109112 (1992).

**\*\*11** Clearly, a large part of these achievements would not have been possible if the Legislature had not given the Bank such broad powers and, on the contrary, had subjected it to its scrutiny, during the process of each creation of a subsidiary, in topics that the Legislature in full session would not have had either the expertise or elements of judgment, and would lack the dynamism, speed, and expertise that said activities required.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[23] As we can see, the power that the Legislature delegated to the Bank through legislative action is limited to creating separate and independent subsidiaries in such cases in which it is advisable, desirable or necessary to comply with the duties, powers, purposes and that they shall have, within the universe of powers, rights, authorities and duties of the Bank, those delegated by it. The Bank may never delegate more powers than it itself has and the powers of the Bank are established in **407** detail in its enabling law which limit the scope of its authority.

[24] The instrumentality is created to carry out a specific task that is limited within the multiple tasks of the Bank. Its attention is focused on the assigned task. Its Board of Directors is the Bank's Board of Directors, appointed by the Governor, which ensures the continuity of the public policy of the Executive.

[25] The Legislature does not surrender its control before said subsidiaries, since it is a legislative action which establishes the authority to create them by resolution, limits its powers to the universe of powers granted to the Bank by a legislative act, and ultimately, the Legislature can strip the Bank of the delegated authority.

[26] Certainly, "[p]ublic corporations '[a]re an important part of the administrative organization of the Modern State' [and t]hey occupy broad sectors of modern economic life. *The variety of forms and the enormous disparity of legal systems to which they can be subject*, have given rise to much discussion." (Emphasis added.) *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 126 (1989). See, also, A.R. Brewer Carías, *Las empresas públicas en el derecho comparado*, Caracas, Universidad Central de Venezuela, Pubs. Facultad de Derecho, 1967, Vol. XXXVII, p. 29. "In the great majority of cases, the various forms of public enterprise have developed as empirical responses to specific needs, *without any preconceived theory, and without much uniformity.*" (Emphasis added.) W. Friedmann, *The Public Corporation: A comparative Symposium*, Canada, Ed. The Carsell Co., 1954, p. 542.

[27] Given the variety of forms and functions that a public corporation can exercise, and that its creation, in the majority of cases, is a result of satisfying specific historic needs that constitute *a **408** public purpose*, the Legislature may, through law,

delegate the role of creating them *in the manner it feels most efficiently serves these urgent needs that are sought to be met*, as long as the legislation that empowers them has adequate rules or criteria and intelligible principles that shall govern both their creation and their operation, to prevent their actions from being arbitrary or capricious. No statute or constitutional clause prevents the Legislature from delegating this role.

**\*\*12** [28–29] The universal requirement for the creation of a public corporation, 4 both in constitutional governments and in other types of governments, is that it be created by a governmental procedure. "*Creation of the Public corporation.* It appears to be a universal practice that public corporations are created by a *governmental procedure*, either a *special statute* or a *governmental ordinance.* Unlike the commercial company they do not automatically come into existence by fulfilling certain statutory requirements." (Emphasis added.) Fletcher, *op. cit.*, page 558.

It should be noted that *in general* [public corporations] are *created or regulated* by a legislative act establishing their powers, duties and immunities, providing the manner in which they shall operate and shall be directed and, above all, regulating their relationship with the departments of the government. Brewer Carías, *op. cit.*, page 84.

[30] We have already estimated that on many occasions these public corporations are created as a result of emergency situations, and so in order to be able to handle them they are imbued by lawmakers with the flexibility and autonomy that are necessary **\*409** for success in a competitive environment. *McCrillis v. Aut. Navieras de P.R.*, supra, page 127.

> In the common law countries, where the government still enjoys considerable inmunities and privilegdes in the fields of legal responsabilities, taxation, or the binding force of statutes, other considerations played their part. It seemed necessary to create bodies which, if they where to compete on fair terms in the economic field, had to be separate and distinct from the government as regards inmunities

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

and privileges. Friedmann, *op. cit.*, page 548.

We are talking about a fundamental change in the structure of the Puerto Rican government, having transcendental repercussions, whether to provide the Bank with the tools to compete under equal conditions with private banks, releasing it from restrictions and allowing for flexibility and dynamism, whether to make these corporations recipients of federal aid that they would not be able to receive as affiliates, or to allow for access to tax-exempt aid, or in order to avoid committing and divest ELA and Bank credit to high-risk financing, or based on all of the aforementioned reasons, the Legislature decided, precisely in 1974 and under the circumstances at that time, to give to the Bank the power to create, by way of resolution, public corporations that were also independent and separate. See, also, PUBLIC HEARING PC 56 "Create the Development Bank of Puerto Rico. Committees on Finance, on Government and on Socioeconomic Development. 18 June 1985." To question the soundness of said delegation of power, which promoted and continues to promote so much positive economic activity and on which an entire economic and social apparatus is still built, violates our constitutional power. Especially when the Legislature still has ultimate control over said corporations.

**13** It was within the power given by the Legislative Assembly that the Bank created and operated the PRHEAC, in accordance with the **410** end and purpose for which it was created. Its dissolution was also carried out in accordance with the law. Nothing in the record indicates that it was done for the purpose of committing or attempting to commit illegal acts. Therefore, appellants' arguments in relation to the discussed error are wrong.

## IV

The plaintiffs allege that the retention right applied to the employees of the PRHEAC subsidiary, as an essential part of the merit principle under the Puerto Rico Public Service Personnel Act, as well as under the doctrine established in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R. 757 (1983). They argue that by failing to accommodate the PRHEAC employees in the remaining positions or in positions currently occupied by temporary employees or employees with less seniority in the Bank, taking both the Bank and the PRHEAC

as a whole, the provisions of the Puerto Rico Public Service Personnel Act were violated.

**[31–32]** The public policy of the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. sec. 1301 *et seq.*, "[e]stablishes merit as the principle governing all public service, in order for the most competent people to serve the Government and for all employees to be selected, trained, promoted and retained in their jobs based on merit and capacity, without discriminating on the basis of race, color, sex, birth, age, social condition or origin, or political or religious ideas." 3 L.P.R.A. sec. 1311(1). A paradigm of this principle is the right of retention, namely, providing employment security to suitable career employees who meet the productivity and discipline requirements that must exist in public service. 3 L.P.R.A. sec. 1336.

**[33]** However, the law specifically excludes **411** certain branches or agencies to which its provisions shall not apply. In this regard, it provides:

*1338. Exclusions*

The provisions of this Chapter shall not apply to the following branches, agencies and instrumentalities of the Government:

(1) Legislative Branch

(2) Judicial Branch

(3) *The employees of agencies or instrumentalities of the Government which operate as private businesses or companies*

(4) *The employees of agencies or instrumentalities of the Government having the right to negotiate* collectively under special laws

(5) The University of Puerto Rico

(6) The Governor's Office and

(7) The Puerto Rico State Elections Commission

As to the Judicial Branch and the Legislative Branch, they shall be governed as regards administration of personnel by the current provisions specifically applicable to each of these Branches of Government. 5 (Emphasis added.) 3 L.P.R.A. sec. 1338.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**\*\*14** **[34–35]** Notwithstanding the aforementioned exclusions, which were a result, in relation to the branches of Government, of observing the principle of separation of powers and, in relation to public agencies, to avoid any conflict which may arise between the provisions of the law and the collective bargaining agreements which in relation to most employees applied to said agencies, 6 the public policy of the Commonwealth has been to extend the merit principle to all public service, including the agencies and instrumentalities excluded by the aforementioned personnel act. 7 For said purpose, the Legislative Assembly, when it **\*412** added Sec. 10.6 to the Puerto Rico Public Service Personnel Act, *supra*, specifically provided:

> The agencies and instrumentalities herein excluded under paragraphs (3) and (4) must adopt, with the advice of the Office of Personnel, and within 120 days from approval of this law, personnel regulations including the merit principle which shall govern the personnel rules applicable to employees who are not covered by collective bargaining agreements. A copy of the regulations so approved shall be sent to the Puerto Rico Legislative Assembly. 8

**[36]** In accordance with said mandate, the PRHEAC promulgated Personnel Regulations including the merit principle applicable to all managerial employees and employees not covered by any collective bargaining agreement. It also provided a collective bargaining agreement governing the labor relations between union employees and the PRHEAC. The effective period of said agreement was extended to June 30, 1994. Therefore, since the Public Service Personnel Act did not apply, the collective bargaining agreement applied to union employees and the promulgated Regulations applied to managerial and non-union employees. The case record reveals that the layoffs followed the procedures established in the Regulations and in the collective bargaining agreement.

The doctrine stated in *Calzada Quiñones v. D.A.C.O.*, supra, in which we decided that for a personnel reduction, based on lack of funds or elimination of programs in an agency, to comply with the provisions of the Personnel Act as to the merit principle, it must be done taking into consideration all of the divisions of the agency or instrumentality in question and using the seniority criterion as a retention element, does not apply to the present case. **\*413**

In *Calzada Quiñones v. D.A.C.O.*, supra, a career employee with twenty-six (26) years of service was laid off upon the elimination of an agency program based on economic reasons. The Consumer Affairs Department (D.A.CO., acronym in Spanish) is an agency of the Central Administration and, as a result, it is not excluded from the provisions of the Puerto Rico Public Service Personnel Act as to the merit principle and the retention right. The Board of Appeals of the Personnel System (J.A.S.A.P., acronym in Spanish) affirmed the validity of the layoffs, deciding that it was not necessary to submit employees to the competition based on seniority process since as a result of the elimination of the program all of the employees in it became unemployed. The J.A.S.A.P. considered each program within the agency as a separate and independent whole for purposes of the process to determine the order of priority in which said layoffs would be carried out and, therefore, [avoid] the competition based on seniority between employees under the same classification from other agency programs. After said decision was appealed, the then Superior Court denied the request for review of administrative decision. When revoking said decision, we then affirmed that, even though the Puerto Rico Public Service Personnel Act authorizes the separation of an employee from public service, without it implying a dismissal, among other reasons, based on lack of funds, 9 it was necessary for the agency to carry out the layoffs fully observing the law and the rules and regulatory procedures. Id., page 760.

**\*\*15** In the present case, it is clear that the PRHEAC cannot be taken as part of the Bank as a whole, because the PRHEAC enabling act provides otherwise. This case involves an instrumentality that is "independent and separate" from the Bank and, as a result, it would not be appropriate to relocate the employees from one independent **\*414** public corporation to another, with the serious consequence of laying off other employees validly hired by the Bank that would be displaced by employees with more seniority from another independent agency whose operations have ended. Given the fact that it was a total layoff, there was no possibility of relocating employees or retaining them in existing positions.

**[37]** In cases such as this one, in which all employees are laid off based on the closing of a subsidiary public corporation created by

---

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Rodríguez Román v. Banco Gubernamental de Fomento, et al.
151 D.P.R. 383, 2000 TSPR 93

another public corporation whose enabling statute has assigned to it a legal personality that is separate and independent from the one which created it, it is not appropriate to request placing, in the surviving corporation, the employees hired by the subsidiary corporation, in accordance with the merit principle and seniority criterion. The closing of the subsidiary corporation of the Bank, namely the PRHEAC, results in the automatic layoff of all of the employees hired by the latter, since said closing implies the disappearance of all union or managerial positions of the closing corporation.

## V

Furthermore, the appellants allege that the Court of First Instance erred when it *summarily* dismissed the complaint, by deciding that the plaintiffs were not employees of the bank without allowing them to present evidence to establish their allegations to the effect that they were so.

A careful analysis of the entire record in this case reveals allegations to the effect that some of the plaintiffs were hired by the Bank *before the creation of the PRHEAC*. If the process for transferring these **\*415** employees was not carried out through a valid resignation from employment in the Bank, there is a possibility that said employees retained their Bank employee condition, and therefore may have the right to some kind of remedy. The judgment issued summarily is completely void of any determination in this regard. Furthermore, we have not found in the case record any evidence supporting the summary disposal of said allegation. Therefore, the court of first instance should have received evidence in cases of employees that were hired *before the creation of the subsidiary* that would allow it to determine who their actual employer was. To do so, it was important to establish whether at any time they validly resigned from the Bank to become part of the PRHEAC, *or whether they were simply transferred to the subsidiary retaining their job with the Bank*.

Based on the aforementioned grounds and considering the motion to appeal filed in this case as a Petition for *Certiorari*, since that is the appropriate petition, [10] *said writ shall be issued and the judgment of the Circuit Court of Appeals shall be modified for the sole purpose of ordering that it remand the case to the Court of First Instance for holding of hearing in accordance with this decision.* [11] *However, the judgment issued by said appellate court is affirmed in relation to the*

*employees who were not employees of the Government Development Bank before they began to provide services as employees of the PRHEAC.* **\*416**

--O--

Concurring and dissenting opinion issued by Associate Judge Fuster Berlingeri.

**\*\*16** I concur with the decision of the majority of the Court in the present case to remand it to the court of first instance in order for the latter to receive evidence in relation to the employees of the Puerto Rico Higher Education Assistance Corporation (hereinafter the PRHEAC) that were hired by the Government Development Bank (hereinafter the Bank) *before* the PRHEAC was created, in order to determine who was the actual employer of said employees.

However, I do not agree with the dismissal of the action of the other employees of the PRHEAC who have filed an appeal in this Court. These other employees have alleged that they were also "hired, appointed, certified, paid and evaluated by the Government Development Bank". They have also alleged that in practice the PRHEAC was not an entity that was different and separate from the Bank since the latter actually closely directed and controlled the affairs of the PRHEAC. Lastly, the above-referenced employees have alleged that the Bank considered them as employees of the same, and so they had a reasonable expectation that they were in fact employees of the Bank. If said allegations are true, I think that it is evident that these other employees would have a right to some type of remedy against the Bank.

The majority of the Court dismisses the above-referenced employees' claim on grounds that said employees worked for a subsidiary of the Bank constituting an instrumentality that was independent and separate from the latter, and so they were automatically laid off upon the closing of said subsidiary. But the thing is that what the above-referenced employees are actually challenging is whether they were in fact employees of the aforementioned subsidiary of the **\*417** Bank, and not of the Bank itself. Said controversy *cannot be adjudicated* without a previous discovery procedure and presentation of evidence in order to decide based on the evidence whether or not the allegations of the above-referenced employees are valid and true.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case: 17-03283-LTS Doc#:4380-1 Filed:01/24/19 Entered:01/24/19 CERTIFIED TRANSLATION
Rodriguez Roman v. Banco Gubernamental de Fomento, 151 D.P.R. 383 11 Sup. Ct. 2000 03:16 - Page 12 of 18
Exhibit Kirpalani Declaration: Page 16 of 92

Rodríguez Román v. Banco Gubernamental de Fomento
151 D.P.R. 383, 2000 TSPR 93

The majority of the Court dedicates most of its opinion to affirming the novel theory of the Bank that it received a valid delegation of Legislative Power that in fact allows it to become a "mini-legislature" as regards the creation of public corporations to exercise any of the broad and substantial powers of the Bank. After deciding that said extraordinary delegation of power is valid, the majority proceeds *ipso jure* to also affirm the allegations of the Bank to the effect that in this case a separate and independent corporation was created and that the above-referenced employees were employees of the same. All of it was affirmed based only on Bank resolutions whose validity is what is in fact being challenged.

The majority does not only give a dreadful "carte blanche" to the Bank to create the aforementioned public corporations at its discretion, but, for all practical purposes, *assumes* that in this case said corporation was actually created and the above-referenced employees are not employees of the Bank and cannot be considered as such. All of this is done *without any evidence*, even though said facts are precisely what is being challenged.

**17 In our jurisdiction it has been firmly established that a complaint cannot be summarily dismissed unless the petitioner does not have a right to any remedy under any factual situation that may be proven in support of its claim. The courts must consider a request for dismissal in the most favorable light for the plaintiff and must deny it if there is any doubt to the benefit of the petitioner. *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970); *Colón v. San Patricio Corporation* **418 , 81 D.P.R. 242 (1959). In this case, the meaning and purpose of said rule have not been observed. On the contrary, the allegations of the Bank have been considered as true without *evidence* to support them. The benefit of the doubt has been fully given to the powerful Bank, disregarding the claim of employees who were suddenly laid off. The fact that the PRHEAC is an entity that is different and separate from the Bank is accepted only based on the fact that the latter determined so, as if the reality of the PRHEAC only depended on the manner in which the Bank classifies it. It affirms the notion that even if the PRHEAC is actually a mere puppet of the Bank administered by the same at its discretion, if the Bank certifies that the PRHEAC is an entity that is different and separate from the same, said determination cannot be refuted. Since I cannot

agree with this other "carte blanche" which the majority gives to the Bank, I dissent.

--O--

Dissenting opinion issued by Associate Judge Negrón García.

In the end, the fair solution to this case introduces from the beginning a purely legal matter; namely, the constitutional validity of an exceptional delegation of powers by the Legislative Assembly, a matter that has not been adjudicated by the court of first instance, the Circuit Court and, now, by this Court, *as explained below*.

**I**

The Puerto Rico Higher Education Assistance Corporation (PRHEAC) is a *subsidiary* corporation of the Government Development Bank created on May 8, 1991, by Resolution No. 4530 of the Board of Directors of the Bank, in accordance with the powers given in Art. 2 of Law No. **419 17 enacted on September 23, 1948, as amended, 7 L.P.R.A. sec. 552. It was dissolved on April 15, 1994 by resolution, the date on which the PRHEAC ceased operations and *terminated all of its employees*.

After the terminations were carried out, Maritza Rodríguez Román, twenty-one (21) union employees and five (5) managerial employees filed a complaint in the Court of First Instance, Superior Court of San Juan, against the Government Development Bank, the PRHEAC, the Union of Employees of the Government Development Bank (hereinafter the Government Bank) and the Great Lakes Higher Education Corporation (Great Lakes). In short, they alleged that they were employees of the Government Bank with the right to compete with the other employees of said corporation for the remaining positions, in accordance with the merit principle and the seniority criterion. 1

**18 On the other hand, the Government Development Bank and the PRHEAC requested the summary dismissal of the complaint. They argued that the PRHEAC was a corporate entity that was different and independent from the Government Bank, and exempt from the provisions of the Puerto Rico Public Service Personnel Act. The codefendant, Union of Employees of the Government Bank, also requested dismissal based on lack of ripeness of the controversy and lack of jurisdiction. The other codefendant, Great Lakes, requested the same remedy arguing that the complaint failed to state a

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

claim that would justify granting a remedy. Upon considering said motions, **420** the court of first instance (Hon. Arnaldo López Rodríguez, Judge) dismissed the complaint in relation to the Government Bank and the PRHEAC, based on failure to exhaust the available administrative remedies. It dismissed it in relation to the Union and Great Lakes based on the stated grounds.

Said decision was appealed in this court. On November 2, 1994, we revoked it in relation to codefendants Government Development Bank and the PRHEAC because we believed that the controversy in question was essentially a legal controversy which did not justify requiring the exhaustion of administrative remedies. We remanded it for continuation of the proceedings.

In accordance with said order, the court of first instance ordered the parties to submit briefs to support their respective allegations. Maritza Rodríguez Román *et al.* argued that the PRHEAC was an alter ego of the Bank and invoked the application of the rule stated in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R 757 (1983). On the other hand, the defendants argued that the doctrine established in said case did not apply because the labor relations between union members and the PRHEAC were governed by the collective bargaining agreement. They also insisted that the PRHEAC was a corporation that was different and independent from the Bank by provision of law and was not covered by the Puerto Rico Public Service Personnel Act because the collective bargaining agreement which governed the labor conditions of the unionized plaintiffs "constitutes the exclusive regulations for purposes of layoffs".

The court of first instance decided that the PRHEAC was not an alter ego of the Government Bank *because Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 551 et seq.) describes it as an entity that is completely independent from the Bank.* It decided that the closing of a subsidiary corporation results in the layoff of **421** all of the employees hired by the latter, and dismissed the complaint based on this.

Maritza Rodríguez Román *et al.* filed an appeal in the Circuit Court of Appeals, which affirmed it by concluding, among other things, that by "*express legislative mandate the PRHEAC is not part of the Government Development Bank*". Said decision was appealed in this Court. 2

**19** The Government Bank is a public corporation validly and directly created by the Legislative Assembly for the purpose of assisting the State in the performance of its fiscal duties and in promoting the economy, especially its industrialization. 7 L.P.R.A. sec. 551. Its organic charter includes the following power:

> (J) *To create subsidiary or affiliate companies by resolution of its Board of Directors* when in the opinion of the latter said action is advisable, desirable or necessary for performance of the duties of the Bank or for compliance with its institutional purposes or for execution of its powers. The Bank may sell, lease, lend, donate or transfer any of its assets to the subsidiary companies so created. *The subsidiaries created by the Bank by virtue of the power given to it on this paragraph shall constitute government instrumentalities of the Commonwealth of Puerto Rico that are independent and separate from the Bank, and shall have all of the powers, rights, functions and duties that this law gives to the Bank and that are delegated by the Board of Directors of the same.* The Board of Directors of the Bank shall be the Board of Directors of each and every one of said subsidiaries, except for the subsidiary that shall be known as the Puerto Rico Tourism Development Fund, which shall have a Board of Directors composed of the President of the Government Development Bank for Puerto Rico, the Executive Director of the Tourism **422** Company and the Secretary of the Treasury. ... (Emphasis added.) 7 L.P.R.A. sec. 552(*Fourth*)(J).

Said precept clearly introduces the following question: can the Legislative Assembly delegate to a public corporation the creation of subsidiary or affiliate entities,

II


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

which are also independent and separate corporate government instrumentalities?

## III

A brief historical background would be appropriate. Public corporations were created based on the need to promote and maximize the efficacy of public work and comply with the new and numerous tasks of the State after the Second World War. *Torres Ponce v. Jiménez*, 113 D.P.R. 58, 6263 (1982). In Puerto Rico, with the beginning of the socioeconomic development program, they were created to reduce costs, provide infrastructure and improve the services offered by the State. *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 127 (1989).

As such, it offers public social or socioeconomic services on behalf of the Government, *but as an independent legal entity*. Said characteristic gives it the legal and commercial attributes of a commercial company, allowing it to compete and achieve its objectives efficiently. *Commoloco de Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478, 490492 (1990). The functions of public corporations are framed within the powers given by the Legislative Assembly in their enabling statutes, but we know that said powers and faculties delegated by legislation are limited by constitutional imperatives stemming from the separation of powers. 3 "The limitations stemming from the **\*423** constitution are introduced in light of the broad question as to whether a legislature may, and under which circumstances, delegate powers to an agency."
D. Fernández Quiñones, *Derecho Administrativo y Ley Uniforme de Procedimientos Administrativos*, Bogota, Ed. Forum, 1993, 1993, page 60.

**\*\*20** In the past, when adjudicating said questions, we have recognized the need to delegate taking into consideration our social and economic conditions. In *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992), we stated that given the complexity of the system of government, the Legislature cannot be required to directly detail and establish, and on a daily basis, its programs, and that its essential duty is to establish guidelines to direct the mandate and discretion of the administrative agencies. We also recognized, as grounds for it, the technical knowledge and specialized experience of the administrative bodies. See, also, *López v. Junta Planificación*, 80 D.P.R. 646, 661 (1958).

## IV

Based on the foregoing, there is no question that the Legislative Assembly may delegate regulatory or adjudicative functions. To legally evaluate said delegations we have made their validity contingent on the provision of adequate and sufficient criteria to guide the actions of the agency. *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1943); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670 (1953); *López Salas v. Junta de Planificación*, supra; *Consejo de Educación Superior v. U.I.A.*, 120 D.P.R. 224 (1987).

The Uniform Administrative Procedure Act of the Commonwealth of Puerto Rico incorporates the classical meaning recognized for regulatory delegation. It defines it as the process by which an agency formulates, adopts, amends or repeals rules or regulations. **\*424** 3 L.P.R.A. sec. 2102(m). A rule is any rule or group of rules of general application which implement or interpret public policy or the law or which regulate the requirements of the practices of an agency. 3 L.P.R.A. sec. 2102(l). Furthermore, an administrative adjudicative process determines facts and rights in particular cases or claims.

In the present case, the power given by the Legislative Assembly to the Government Bank is not contained within the traditional regulatory delegation *vis-à-vis* adjudicative delegation dichotomy. Clearly, the power via resolution to create a subsidiary, which is also a separate and independent instrumentality of the State, is not framed within the regulatory power or the adjudicative power.

Based on the foregoing, we must set aside the usual standard for court review regarding the adequacy of guidelines - which only applies to regulatory or adjudicative delegations- since it would be inadequate for the evaluation of the present delegation.

In the present novel case the nature and scope of the delegated duty must be analyzed.

**\*\*21** We recognize the important economic, social and political reasons that have made it necessary, for a better operation of the system of government, for the Legislative Assembly to create administrative bodies to which it delegates quasi-legislative and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

quasi-judicial functions. But, no matter how laudable it may be, to also allow the creation of public corporations to be delegated —whether or not they are described as subsidiaries— could go beyond the limits of the doctrine of separation of powers. Creating an agency, establishing the scope of its functions, and stating the public policy that it shall implement, are inherent duties of the Legislative Branch that cannot be delegated. Under *the governing principles limiting the Legislative Power, the latter may create public corporations, but "quaere" whether it may delegate said* **\*425** *prerogative.* Based on said perspective, if negative, giving the Government Bank the power to create separate and independent public corporations, in this case PRHEAC, would be unconstitutional.

In short, the Legislature could give and actually gave to the Government Bank the power to create subsidiaries if in the opinion of its Board of Directors it was advisable or necessary to fully perform the duties of the Bank. There is still the constitutional question regarding whether it could delegate its prerogative to make them independent from the Government Bank and create the PRHEAC as a separate and independent public corporation.

Said decision is vital for the right adjudication of the case. Of the life and death of a public corporation, subject only to the will of a Board of Directors, depends whether all or only some of the petitioners-employees are condemned to a purgatory, without the possibility of work or salary redemption.

Based on the aforementioned grounds we cannot join the opinion of the majority which leaves plaintiffs Maritza Rodríguez Román *et al.* completely defenseless, without adjudicating the above-referenced constitutional question.

What should have been done, via resolution, was to give the Secretary of Justice a period to, through the Attorney General, state his arguments in relation to the potential unconstitutionality of the power delegated to the Government Bank to create subsidiaries, which are also separate and independent corporate entities. 4

**\*426**

Footnotes

1     7 L.P.R.A. sec. 552(*Fourth*)(J).

2     The petition that would actually be appropriate is a *certiorari* petition since the motion does not state any circumstance that would allow filing an appeal in this case. Art. 3.002 of the Puerto Rico Judiciary Act of 1994 (4 L.P.R.A. sec. 22i).

3     "(J) To create subsidiary or affiliate companies by resolution of its Board of Directors when in the opinion of the latter said action is advisable, desirable or necessary for performance of the duties of the Bank or for compliance with its institutional purposes or for execution of its powers. The Bank may sell, lease, lend, donate or transfer any of its assets to subsidiary companies so created. *The subsidiaries created by the Bank by virtue of the power given to it on this paragraph shall constitute government instrumentalities of the Commonwealth of Puerto Rico that are independent and separate from the Bank, and shall have all of the powers, rights, functions and duties which this law gives to the Bank and that are delegated by the Board of Directors of the same. The Board of Directors of the Bank shall be the Board of Directors of each and every one of said subsidiaries, except for the subsidiary that shall be known as the Puerto Rico Tourism Development Fund,* which shall have a Board of Directors composed of the President of the Government Development Bank for Puerto Rico, the Executive Director of the Tourism Company, and the Secretary of the Treasury. ... The provisions of sec. 558 of this title shall apply to all subsidiary companies so organized and which are subject to control by the Bank...." (Emphasis added.) 7 L.P.R.A. sec. 552(*Fourth*) (J).

4     See, to compare the different forms in which a public corporation can be "born," the experience in some countries with planned economy (or socialist) systems in which by way of a government action private companies were expropriated and nationalized. In other words, the public corporations were "born" from private law entities which already existed. A.R. Brewer Carías, *Las empresas públicas en el derecho comparado*, Caracas, Universidad Central de Venezuela, Pubs. Facultad de Derecho, 1967, Vol. XXXVII, page 59.

5     It is important to note that the aforementioned provision was amended in 1996 to ass an eighth exclusion, namely: "(8) The Human Resources and Occupational Development Council, attached to the Department of Labor and Human Resources". 3 L.P.R.A. sec. 1338.

6     *Reyes Coreano v. Director Ejecutivo,* 110 D.P.R. 40, 47 (1980); *Aut. de Puertos v. Mun. de San Juan,* 123 D.P.R. 496, 502 (1989).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Rodriguez Roman v. Banco Gubernamental de Fomento para..., 151 D.P.R. 383...
151 D.P.R. 383, 2000 TSPR 93

7   *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 132 (1989); *Reyes Coreano v. Director Ejecutivo*, supra, page 47.

8   By way of Law No. 18 enacted on February 22, 1979 the aforementioned section was amended, eliminating the second to last paragraph, since said terms had been met in excess.

9   3 L.P.R.A. sec. 1336.

10  4 L.P.R.A. sec. 22j.

11  There is a possibility that the remedy to which those plaintiffs, who retained the Bank employee condition, may have a right, if so determined by the Court of First Instance after holding the above-referenced hearing, may be the right to be reinstated as employees of said entity. If said remedy implied the termination of other persons currently employed by the Bank due to having less seniority than the petitioners to be reinstated, said persons would have the right to intervene and be heard in the present litigation before the aforementioned remedy is issued. The Court of First Instance shall take the necessary measures to guarantee said right.

1   As a remedy they requested provisional, preliminary and permanent injunction orders to: stay a general layoff announced by the Puerto Rico Higher Education Assistance Corporation (PRHEAC) for all of its employees and create a relocation plan within all of the departments of the Government Development Bank (hereinafter the Government Bank); notify each employee of the existence of said plan; reinstate to their jobs all employees transferred, laid off or who resigned as a result of the imposition of the layoff process; and indemnify for alleged resulting harm, which was estimated at one hundred thousand dollars ($100,000) for each of them.

2   Several errors were alleged, including that the Circuit Court erred when it did not adjudicate *whether the Bank may create government instrumentalities.*

3   B. Schwartz, *Administrative Law*, 3rd ed., Boston, Ed. Little Brown & Co., 1991; 1 *Davis*, *Administrative Law Treatise* (3rd ed. 1991).

4   Depending on the answer to the constitutional question the Circuit Court of Appeals would or would not be affirmed. If revoked, the case would be remanded to the court of first instance for the opportune adjudication of the suitability of the claims and defenses presented by the parties.

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 2

Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)

_____

**126 D.P.R. 478**

1990 JTS 80, 126 D.P.R. 478, 1990 WL 710118 (P.R.)

COMMOLOCO OF CAGUAS, INC.,
plaintiff and petitioner

v.

RAMIRO BENITEZ DIAZ, defendant;
AUTORIDAD DE CARRETERAS DE
PUERTO RICO, intervenors and appellees.

In the Supreme Court of Puerto Rico

Numbers: RE-86-470, CE-87-9, CE-86-759,
CE-86-583, CE-86-694, CE-86-722, CE-86-448

**Synopsis**

CERTIORARI PETITION (CE-87-9) to review an ORDER of Rafael Riefkohl Marcano, Judge (Ponce) that confirms a previous order that ordered the garnishment of the wages of an employee of certain public corporation. The writ is issued and the appealed order is reversed in Case No. CS-86-2084.

Carmelo Nieves Figueroa, José Julián Álvarez González and Cándido F. Monteserrin, attorneys for the Autoridad de Acueductos y Alcantarillados, petitioner, José E. Vila Barnes, attorney of Commoloco of Sabana Grande, Inc., appellee; Norma Cotti Cruz, Sub District Attorney; Blanca Díaz Segarra and Anabelle Rodríguez Assistant General Attorneys, in Report; Patrick D. O'Neill, Luce Vela Gutiérrez and Lawrence Odell, of Martínez, Odell Calabria & Sierra, and Carlos F. López attorneys of **\*483** the Asociación Puertorriqueña de Financieras del Consumidor, amicus curiae.

**Synopsis**

CERTIORARI PETITION (CE-86-759) to review an ORDER of Delia Lugo Bougal,

Judge (Ponce) that confirms a previous order that ordered the garnishment of wages of an employee of certain public corporation. The writ is issued and the appealed order is reversed in Case No. CS-86-1909.

Richard V. Pereira and Jose Julian Alvarez Gonzalez, attorneys of the Autoridad de Acueductos y Alcantarillados, petitioner, Oreste Ramos, attorney of Metro Finance Co., appellee; Norma Cotti Cruz, Sub Attorney General, Blanca Diaz Segarra and Anabelle Rodríguez Assistant General District Attorneys, in Report; Patrick D. O'Neill, Luce Vela Gutierrez and Lawrence Odell from Martinez, Odell Calabria & Sierra and Carlos F. Lopez, attorneys from the Asociacion Puertorriquena de Financieras del Consumidor, amicus curiae.

**Synopsis**

CERTIORARI PETITION (CE-86-583) to review an ORDER of Enrique Rivera Santana, Judge (Bayamon) that denies a certiorari petition to review an order that ordered the garnishment of wages of an employee of certain public corporation. The writ is issued and the appealed order is reversed in Case No. CS-86-3080.

Gilberto Rodríguez Zayas, Carmelo Nieves Figueroa and José Julián Álvarez González, attorneys for the Autoridad de Acueductos y Alcantarillados, petitioner; Oreste Ramos, attorney of Metro Finance Co., Appellee; Norma Cotti Cruz, Sub-General Attorney, Blanca Díaz Segarra and Anabelle Rodríguez; Assistant General Attorneys in Report; Patrick D. O'Neill, Luce Vela Gutiérrez and Lawrence Odell from Martínez, Odell Calabria & Sierra and Carlos F. López, attorneys for the Asociación Puertorriqueña de Financieras del Consumidor, amicus curiae.

**Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)**

---

**126 D.P.R. 478**

## Synopsis

JUDGMENT (RE-86-470) of Angel G. Hermida, Judge (San Juan) that reverses a previous judgment that ordered the garnishment of wages of an employee of certain public corporation. Confirmed the Judgment in case No. PE-86-805.

Luis A. Arrufat Pimentel, attorney of the Cooperativa de Ahorro y Credito de Catano, petitioner; Moraima Arbona, Cándido F. Monteserrin and José Julián Álvarez González, attorneys of the **\*484** Autoridad de Acueductos y Alcantarillados, appellee; Norma Cotti Cruz, General Sub District Attorney, Blanca Díaz Segarra and Anabelle Rodríguez, Assistant General Attorneys in Report; Patrick D. O'Neill, Luce Vela Gutiérrez and Lawrence Odell from Odell Calabria & Sierra and Carlos F. López attorneys for the Asociación Puertorriqueña de Financieras del Consumidor, amicus curiae.

## Synopsis

CERTIORARI PETITION (CE-86-448) to review a JUDGMENT of Angel G. Hermida, Judge (San Juan) that reverses a previous judgment that ordered the garnishment of wages of an employee of certain public corporation. The writ is issued and the appealed judgment is confirmed in case no. PE-86-562.

Jose M. Casanova Edelmann, attorney of Island Finance Corporation of Santurce, petitioner, Gilberto Rodriguez Zayas, Ernesto Lebron Gonzalez, Moraima Arbona and Candido F. Monteserrin, attorneys for the Autoridad de Acueductos y Alcantarillados, appellee; Norma Cotti Cruz, General Sub District Attorney, Blanca Diaz Segarra and Anabelle Rodriguez Assistant General

Attorneys, in Report; Patrick D. O'Neill, Luce Vela Gutierrez and Lawrence Odell, of Martinez, Odell Calabria & Sierra and Carlos F. Lopez attorneys for the Asociacion Puertorriquena de Financieras del Consumidor, amicus curiae.

## Synopsis

CERTIORARI PETITION (CE-86-722) to review an ORDER of Carlos de Jesus Rivera Marrero, Judge (Humacao) that reverses a previous order that ordered the garnishment of wages of an employee of certain public corporation. The writ is issued and the appealed order is confirmed in Case No. CS-86-732.

Jimmy Soto Ledesma, attorney of Best Finance Corporation, petitioner, Carmelo Nieves Figueroa, Jose Julian Alvarez Gonzalez, and Candido F. Moteserrin, attorneys of the Autoridad de Acueductos y Alcantarillados, appellee; Norma Cotti Cruz, General Sub District Attorney, Blanca Diaz Segarra and Anabelle Rodriguez Assistant General District Attorneys in Report; Patrick D. O'Neill, Luce Vela Gutierrez and Lawrence Odell, from Martinez, Odell Calabria & Sierra, and Carlos F. Lopez attorneys for the Asociacion Puertorriquena de Financieras del Consumidor, amicus curiae.

## Synopsis

CERTIORARI PETITION (CE-86-694) to review an ORDER of Enrique A. Jordan Musa, Judge (Caguas) that reverses a previous order that ordered the garnishment of wages of an employee of certain public corporation. The writ is issued and the appealed order is reversed in case No. CS-86-1071.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)**

126 D.P.R. 478

Jose E. Vila Barnes, attorney for Commoloco of Caguas, Inc., petitioner; Hector M. Torres Cartagena, attorney for the Autoridad de Carreteras de Puerto Rico, appellee; Norma Cotti Cruz, General Sub District Attorney; Blanca Diaz Segarra and Anabelle Rodriguez, Assistant General District Attorneys, in Report; Patrick D. O'Neill., Luce Vela Gutierrez and Lawrence Odell, of Martinez, Odell Calabria & Sierra and Carlos F. Lopez, attorneys of the Asociacion Puertorriquena de Financieras del Consmidor, amicus curiae.

ASSOCIATE JUDGE MRS. NAVEIRA DE RODON issued the opinion of the Court.

[1] From the beginning of the century the question of whether the wages of the public employees are subject to garnishment or not has been presented before this Court, with different variants. Consistently we have denied the use of this procedural mechanism for these purposes. The policy has been to "exempt the wages of officers and employees of the Government not to favor the debtors but to ensure an efficient and continuous service to the very [G]overnment" Blanco v. Carballeira, Judge, 41 D.P.R. 533 (1930).

[2-3] 'The rule in this jurisdiction, as in the United States is that the wages of the public employees are exempt from garnishment. That rule is based on a reason of public order, which is, that if such garnishment were allowed, the government that must receive the services of that employee would be greatly affected because it is presumed that said employee that is deprived of his/her wages will not render services with the same efficiency that he/she would, having the incentive of receiving in due time the compensation for his/her work. 'Padron Rivera v. Cordoves, Juez 59 D.P.R. 255, 258

(1941). Also, 'the governmental activities must not be subject to the inconveniences of these proceedings that interfere with the carrying out of public duties in detriment of the common good…' Stump Corp. v Tribunal Superior. **486** 99 D.P.R. 179, 181 (1970). 'That has the effect of converting the State in a collecting agent of plaintiff against its will. ' Torres Santa v. Benitez Roldan, 115 D.P.R. 85, 87 (1984).

## I.

In the case before us we are posed with the question of whether the aforementioned principles apply as to the garnishment of wages of employees of a public corporation. Below we will state the facts that give rise to the question.

Within a relatively short period of time seven (7) seven petitions were filed before this Court with basically identical questions of fact and law. In view of such situation we consolidated them. In each one of those cases, the plaintiff in collection of money was a company of small personal loans (finance company) and defendant an employee of a public corporation. Specifically six (6) of these work in the Autoridad de Acueductos y Alcantarillados (hereinafter AAA) and one (1) in the Autoridad de Carreteras.

In each of the cases the Court of First Instance entered judgments favorable to the plaintiffs. In view of this, and to that effect, the parties that won the cases requested and obtained from the respective courts garnishment of wages orders addressed to the public corporations for which defendants worked. In such circumstances, the referenced public corporations obtained authorization to intervene in the proceedings with the objective of presenting arguments in favor of removing the garnishment orders.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)**

126 D.P.R. 478

The main argument of the aforementioned corporations was basically that their employees must be considered public employees and that, as such, their wages cannot be garnished pursuant to the doctrine stated above by this Court.

The courts of first instance agreed with the argument in four (4) of the seven (7) consolidated cases, while in the remaining three (3) they decided that the **\*487** principles that support the prohibition of garnishment of wages of public employees are not applicable to the public corporations. As there are conflicting decisions in the courts of instance we decided to review and we issued the writs of certiorari.

## II.

Until mid-1919 the Code of Civil Procedure of Puerto Rico, Art. 249(7) had an express provision that forbade the garnishment of wages of the public officers or employees. Law No. 32 of June 3, 1919 (32 L.P.R.A. sec. 1130) eliminated the distinction between the public employees and those of the private entities. It provided a limited protection to three fourths parts of the salary of the employee as long as he/she could prove that such amount was necessary to support his/her family. There is no discussion in the legislative history regarding the reason for eliminating the specific provision that forbade the garnishment of the wages of the public employee.

In absence of provision of law about the protection against garnishment of the wages of the public employee, the norm that occupies us today was born via case law in Blanco v. Carballeira, Judge, supra. In that case Associate Judge Mr. Wolf decided that the wages of public employees could not be subject to garnishment.[1] Its principal

argument was that from the elimination of the express provision that forbade the garnishment of the wages of the public employees it 'the intention to make such wages subject to garnishment could not be inferred unless they were generally subject to garnishment pursuant to some specific provision of law'. Id. Page 534. After all, there was no specific provision of law that imposed upon any officer the duty to retain the garnished wages.

[4] Since that case, the doctrine has only been adding arguments in favor of maintaining the prohibition of **\*488** garnishment of public employees' wages. See: Padron Rivera v. Cordoves, Judge, supra; ELA v. Tribunal Superior, supra; Stump Corp. v. Tribunal Superior, supra; Torres Santa v. Benítez Roldan, supra. However, in none of these cases was there a garnishment of wages of employees of a public corporation implied. The cases that are most similar to the problem before us are Rodriguez v. Fontes y Am. R.R. Co. Int., 51 D.P.R. 670, 672, 678 (1937) and Arraiza v. Reyez; Leon, Intervenor, 70 D.P.R. 614 (1949). In the first, the American Railroad filed a motion to intervene in which it alleged that a garnishment of wages ordered by the court of first instance regarding one of its employees "interrupted the operation of its office and affected the service that it rendered as a public service company that it was". Rodríguez v. Fontes y Am. R.R. Co. Int., supra, page 672. The court of instance stated in its order that "a private corporation, even if it exploits a public service company, is not in the same position of privilege that is inherent to the organisms and official offices of the government and the very prerogatives of these organisms are not enjoyed at all by the private entities." Rodriguez v. Fontes y Am. R.R. Co. Int.,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)

126 D.P.R. 478

supra page 675. On that occasion, when reversing the court of first instance, we stated that the American Railroad was not obligated to comply with the garnishment order as to "wages that had not been accrued at the date it refers to."[2] We did not say anything as to the effect it had it was a private corporation, not public.

**489** On the other hand, in Arraiza v. Reyes; Leon, Intervenor, supra, there was an attempt to garnish a credit that a judgment debtor had against the AAA. Through a motion to intervene, a third party requested the nullity of the garnishment alleging that said credit could not be garnished as it derived from the construction of a public work and the amount garnished was in possession of the AAA a public corporation.[3] The petition was dismissed.

It was determined, pursuant to the express provisions of the organic law of the AAA, Law No. 40 of May 1st, 1945 (22 L.P.R.A. sec. 144) and what was resolved in F.H.A v. Burr, 309 U.S. 242 (1940), that the Legislature had granted sufficient operational powers to the AAA to consider it "so subject to judicial procedures as in analogous circumstances any private company would be, as long as it does not interfere with the execution of its executive duties'; Arraiza v. Reyes; Leon, Intervenor, supra, page 618. This case is clearly distinguishable from the present one. Firstly, in Arraiza v. Reyes; Leon, Intervenor, supra, the seizable credit did not belong to a regular employee of the corporation. It was an independent contractor. Secondly, even facing this fact, the permission to garnish was conditioned to not interfering with the work of the executive duties of the corporation.

The case before us is not an isolated incident regarding an independent contractor in whose favor the public corporation has an unpaid credit. On the contrary, the expected garnishments would potentially include all the wages of the regular employees that operate any of the public corporations.

Having clarified the foregoing, in view that the prohibition to garnish wages has been applied in cases of public employees assigned to the central government system, we now have to determine if this doctrine should be extended to the employees of the public corporations.

**490 III.**

[5] Public corporations, as they operate currently, arose as a response to the desire to quicken and promote the efficiency of the public works in view of the complexity of the duties faced by the governments since World War One. Torres Ponce v. Jimenez, 113 D.P.R. 58 (1982)[4]

[6-7] Pursuant to their functional configuration, the public corporations are defined as "institutions that offer an economic or social service in the name of the government, but as an independent judicial entity; they conduct their operations with great autonomy, even though it is responsible in front of the public, through the government and the parliament and subject to some direction on the part of the government, equipped on the other hand, with their own independent and separate funds, and with the legal and commercial attributes of a commercial enterprise. These attributes would place the public corporation someplace in between a pure public authority and a commercial company of private right. (Our translation). W. Friedman, the Public

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)

126 D.P.R. 478

Corporation: A Comparative Symposium, Toronto, Carswell, Co., 1954, page 541. [5]

[8] What impulses the strategic adoption of this independent entity is the reality that "the corporation is intrinsically more apt to succeed in certain fields, than the ordinary department of the administration." A.R. Brewer Carias, Las empresas publicas en el derecho comparado, Caracas, U. Central de Venezuela, Vol.XXXVII, 1967, page 86.

**\*491** [9] However, despite of the autonomy that characterizes the public corporations, they do not lose their quality of governmental instrumentality, created to respond to purposes of public utility. See York County Fair Assn. v. South Carolina Tax Commn., 154 S.E.2d 361 (1967); Sharon Realty Company v. Westlake, 188 N.E.2d 318 (1961). [6] For that reason, inasmuch as that they carry out this type of duty, the Executive and the Legislature exercise, pursuant to law and custom, different degrees of control over their duties. Friedman, op. cit, pages 557-558.

[10] The public corporations receive through their organic statute certain degree of economic independence as to their operational budget. Aside of the budget assignments that they may receive from the State, the objective with this is that they seek in whole or in part to generate their own capital, be it through issuing obligations, loans or through the income they receive from the properties and services they offer. We have to clarify, however, that this financial autonomy receives more or less supervision on the part of the State pursuant to the focus or public policy that to that end the country in which the public corporation operates, adopts. [7]

[11] In Puerto Rico, the governmental control over the public corporations is expressed through the organic laws of the public corporation in question and laws that directly or indirectly have an impact on it.

**\*492** [12] Also, Art. III, Sec. 22 of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A. Tome 1, ed. 1982, page 347, provides that:

There shall be a Comptroller that shall be appointed by the Governor with the counsel and consent of the majority of the total number of members that compose each House. The Comptroller shall have the requirements provided by law, he/she will carry out his/her duty for a term of ten years and until his/her successor is appointed and takes possession. The Comptroller shall supervise all the profits, accounts, and disbursements of the State, its agencies and instrumentalities and of the municipalities, to determine if they have been done according to the law. It will render annual reports and all those special reports that are required by the Legislative Assembly or the Governor. (Emphasis provided).

[13-15] In order to provide validity to the cited constitutional provision Law No. 9 of July 24, 1952, as amended, 2 L.P.R.A. sec. 72 was approved. It created the Office of the Comptroller. Through this statute the mechanisms through which the Comptroller carries out his/her supervision duty were elaborated. These duties "will be performed regarding the accounts, the funds, the income, the disbursements and the properties of the Government and the ones placed in trust." 2 L.P.R.A. sec. 73. The supervising duties of the Comptroller encompass the operations of the public corporations.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 3:17-cv-01589-GAG Document 419-2 Filed 01/24/19 Page 21 of 9
CERTIFIED TRANSLATION Exhibit Kirpalani Declaration. Page 28 of 92

**Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)**

126 D.P.R. 478

See also, for illustrative purposes as to the governmental control, among others, Accounting Law of the Government of Puerto Rico, Law No. 230 of July 23, 1974 (3 L.P.R.A. sec. 283 and ss); Law of the Ombudsman, Law No. 134 of June 30, 1977, amended by Law No. 6 of March 16, 1987 (2 L.P.R.A. secs. 701-726.) [8] *493 [16-17] The governmental intervention in the development of the public corporations responds primarily to that, despite the combination of public and private characteristics we have stated, the funds with which the entity operates are considered public regardless that they do not form part of the State's budget. Therefore, we have stated that the funds with which the employees of the public corporations are paid come from governmental sources and constitute public funds. Municipio de Mayaguez v. Rivera, 113 D.P.R. 467 (1982).

[18-19] The State chooses the figure of the public corporation as a tool to implement a public policy in particular when it determines that through this means is how, with greater probability of efficiency, it can carry out a program or service. It should be noted that great part of them are classified as essential services. This means that even though the public corporations are erected on certain bases of operational autonomy, they still are invested with a great governmental interest in that their operation is of the greatest possible quality and efficiency, and therefore its operation be protected from all unnecessary interference.

[20-21] as to the inquiry of whether the employees of said corporations are public employees or not, recently in Pueblo v. Hernandez Torres y Barreda, 125 D.P.R. 560 (1989) we stated the following in regards to the employees of the Puerto Rico Telephone Co. a public-private corporation:

…[T]he fact that they are not part of the central system of personnel does not alter their condition of public employees. The Law of Public Service Personnel of Puerto Rico [31 L.P.R.A. sec 1301 and ss.] expressly excludes from the application of the law all of the employees of public corporations. However, this does not mean they are private employees. On the contrary, from the language of the referenced provision it is evident that even if they are considered public employees, for reasons of public policy it was decided not to submit them to the detailed application of the law, although to the merit principles yes.

*494 [22] Also, that quality is not devalued at all by the fact that pursuant to Art. II, Sec. 17 of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A., Tome 1 they were acknowledged the right of collective bargaining.

[23] Even though in some countries they are not considered public employees, in Puerto Rico all legislation that directly or incidentally alludes to the employees of public corporations has been consistent as to consider them public employees. See for illustrative purposes: the law that creates the Retirement System for Employees of the Government of Puerto Rico and its Instrumentalities, Law No. 447 of May 15, 1951, as amended, 3 L.P.R.A. secs. 761-788, Art.7(16) of the Penal Code of Puerto Rico, 33 L.P.R.A. sec. 3022(16); the Governmental Ethics Law of the Commonwealth of Puerto Rico, Law No. 12 of July 24, 1985 (3 L.P.R.A. sec. 1801 and ss).

The Economic Report to the Governor of 1984, and the preliminary data of the Report



Case 17-03283-LTS Doc#7890-1 Filed 01/24/19 Entered 01/24/19 18:07:21 Desc:
Exhibit Kirpalani Declaration. Page 29 of 92

CERTIFIED TRANSLATION

Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)

**126 D.P.R. 478**

of 1986 reflect an alarming increase in the rate of the growth of the debt of the consumers. The data regarding that matter, per the last report published for the period 1986-1987, state that "at the end of the fiscal year 1987, the debt of the consumers amounted to $7,779.9 million (amount that represented a growth of $1,534.8 million or 24.6 percent over the debt of $6,245.0 million of the fiscal year 1986. That growth is superior to the one shown in fiscal year 1986 that was of $1,129.8 million or 22.1 percent when you compare such debt with the one registered in fiscal year 1985[9]. Economic Report to the Governor of 1986-1987, Planning Board of Puerto Rico, Part VIII, page 18.

A logic consequence of this consumption behavior is that a proportional number of employees of the public corporations shall be comprised within the universe of Puerto Rican debtors **\*495** whose wages would be subject to garnishment if the use of this procedural mechanism is authorized. If we add the fact that the employees of the A.A.A. are already subject to a series of discounts[10] that include those coming from loans obtained within the work place acquired usually at lower interest than those in the regular market, we can deduce that this places them, on multiple occasions, as high risk debtors for private entities known as finance companies. These circumstances increase the probability of the use of the wage garnishment mechanism, with the consequential detrimental and damaging effect for the public corporation.

[24-26] In accordance with the foregoing, we extend the protection against the use of the procedural mechanism of garnishment-as adopted by our case law as to the wages of the employees of the central government

system-to the wages of the employees of public corporations. Deciding the contrary would be to add foreign and unconnected duties to the tasks of the officers of public corporations, as they would have to carry out the duties regarding the discount process. The expenses incurred would be paid with public funds in benefit of the exclusive interest of a private entity and the time invested by the officers would take away from public duty. Undeniably, this, in addition to being contrary to the interests of the State, causes an unjustified and undue interference in the execution of the tasks of the agency and an unallowable deviation of public funds. "[T]the governmental activities must not be subject to the inconvenience of these proceedings that interfere with the discharge of public duties in detriment of common wellbeing.' Stump Corp. v. Tribunal **\*496** Superior, supra, page 181. This procedure also has the effect of reducing the motivation and enthusiasm with which these employees must serve our people. Padron Rivera v. Cordoves, Judge, supra.

[27] Private financial entities have to take the necessary precautions to guarantee the suitability of their debtors, minimizing the possible delinquency in the payment of the loans.

Wherefore, judgment shall be entered reversing the ones entered by the Superior Court, Ponce Part, in cases CS-86-2084 and CS-86-1909 and by the Superior Court, Bayamon Part, in the case CS-86-3080 and that confirms the ones issued by the Superior Court, San Juan Part, in cases PE-86-805 and PE-86-562 by the Superior Court, Humacao Part, in the case CS-86-732 and by the Superior Court, Caguas Part, in case CS-86-1071.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**Commoloco of Caguas v. Benitez Diaz, 1990 JTS 80 (1990)**

**126 D.P.R. 478**

The President Judge Mr. Pons Nunez, notes that even when he dissented from the majority in Pueblo v. Hernandez Torres y Barreda, 125 D.P.R. 560 (1989) for the reasons stated in his dissent, which he reaffirms, he votes in agreement with the opinion of the Court in this case as it is the same logic consequence of the majority of the Court in such case. Associate Judge Mr. Rebollo Lopez did not intervene. Associate

Judge Hernandez Denton inhibited himself. *497

FOOTNOTES:

---

[1] This matter had been brought up but not resolved in Torres v. Corte Municipal, 35 D.P.R. 378 (1926).

[2] For the definition of what are un-accrued wages refer to Diego Agueros & Co. v. Heres, 50 D.P.R. 533 (1936). Specifically, as to the wages of public employees, they are not subject to garnishment even if accrued while they had not been paid. We so decided in Torres Santa v. Benitez Roldan, 115 D.P.R. 85, 87 (1984): "Call it garnishment, seizure, or whatever, the truth is that the order entered has the effect of forcing the State to discount from every biweekly pay of defendant an amount of money and pay it to a third party. That has the effect of turning the State in a collecting agent of plaintiff against its will. It is easy to imagine the adverse effect that this practice would have on the process of the Treasury Department to pay the State's employees, if it were generalized." The prohibition of garnishment of wages of public employees is applicable to un-accrued wages as to those already accrued, as they are in the possession of the State.

[3] In a footnote the Court clarifies that it does not know the interest of the intervenor, but presumes it must have had one.

[4] 'It should be noted that before all that it is a universal phenomenon that of the progressive and each time faster extension of the tasks of the state entities, in light of the satisfaction of needs of general interest." A.R. Brewer Carias, Las empresas publicas en el derecho comparado, Carracas, U. Central De Venezuela, 1967, Vol. XXXVII, page 22.

[5] Precisely, pursuant to the factors in this definition, President Roosevelt referred to the public corporations as those with the power of Government but that possess the flexibility of a private entity. W. Friedman, The Public Corporation: A Comparative Symposium, Toronto, Carswell Co., 1954, page 541.

[6] The very nature of the public enterprise, in all its major forms, implies some degree of government supervision, both on the administrative and on the financial plane.' W. Friedman, International Encyclopedia of Comparative Law, Vol. XIII, Chap. 13, page 53.

[7] The objective sought through establishing public corporations was not freedom from all governmental controls, but freedom from governmental restrictions unsuited to a business operation which stifle efficient operations. ; P. Teeguarden and D. Thomas, A Public Corporation Model for Federal Forest Land Management, 1985, Vol. 25, No. 2, pages 373 and 379.

[8] Different from the public corporations in England or other European countries, in the United States, through the Government Corporation Control Act of 1945, as amended, 31 U.S.C. Sec. 9101 and ss, a mechanism is provided to audit and control the financial operation of public corporations. See Brewer Carias, op. cit, Sec. 55 pages 86-90 and 166.

[9] This Economic Report to the Governor of 1986-1987 reveals the excessive use of the sources of credit on the part of the Puerto Rican consumer and therefore, the imminent need that the organisms concerned elaborate a plan of action to create awareness about the effects of the indiscriminate use of sources of credit.

[10] Among them are Social Security, Income Tax, Retirement, A.E.G., Savings, A.E.G. Loans, Life Insurance, Union Fees, Cancer Insurance, Retirement Loan, Union Loan, Cooperative Action A.A.A., Cooperative Deposits A.A.A., Cooperative Loan A.A.A., Life Insurance Cabali, Medical Insurance, Asoc. Empleados (trips); Loan Banco Vivienda and others.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 3

948   P. R. TELEPHONE *v.* TAX CT.;   SEC. OF THE TREAS., INT.   [Vol. 81 P.R.R.

and taking general care of the property was normally the proper one.

That evidence having been weighed [10] in the light of our decisions cited, of the applicable doctrine and provisions of the Code, we must conclude that there was no omission on the part of the defendant —§ 1057— in exercising the diligence required by the character of the obligation (slight fault of the father of the family, § 1445(2), "average or normal type of diligent person") and which pertain to the circumstances of persons, time and place as indicated by the evidence.

In view of the foregoing the judgment appealed from is reversed and another will be entered instead, dismissing the complaints, with costs on plaintiffs, without attorney's fees.

Mr. Chief Justice Negrón Fernández, Mr. Justice Pérez Pimentel and Mr. Justice Saldaña did not participate herein.

———————

PORTO RICO TELEPHONE COMPANY, Petitioner, *v.* TAX COURT, Respondent; SOL LUIS DESCARTES, Secretary of the Treasury, Intervener.

Nos. 295, 296 and 297.   Resubmitted October 13, 1959.
—Decided June 30, 1960.

1. TAXATION—NATURE AND EXTENT OF POWER IN GENERAL—POWERS OF STATE—AS TO PROPERTY OF FEDERAL GOVERNMENT.—The doctrines of governmental immunity between the federal and state governments and the immunity of the municipalities in the field of tort invoked herein in support of the strict interpretation of the power to levy tax granted by Congress to the Puerto Rican government under § 3 of the Organic Act of 1917, are not applicable to the situation in this case.

2. TERRITORIES—TERRITORIAL LEGISLATURE—POWERS IN GENERAL.—Under the Organic Acts of 1900 and 1917 the Federal Congress endowed Puerto Rico with powers similar to those of a state.

———————

[10] We are in the same position as the trial court to weigh the evidence, since the case was submitted on the record, and as to the brief oral testimony presented before the lower court, we accept the manner it settled the sole conflict that arose with Cedeño's testimony to the effect that he had already discontinued serving food.

June 30, 1960]    P. R. TELEPHONE *v.* TAX CT.;   SEC. OF THE TREAS., INT.   **949**

3. ID.—CONSTRUCTION AND OPERATION OF ORGANIC ACTS.—The phrase "for the purposes of the insular and municipal governments" of § 3 of the Organic Act of 1917 is equivalent to the phrase "for a public purpose" which limits the powers of Congress and of the state.

4. TAXATION—CONSTRUCTION, OPERATION AND APPLICATION OF CONSTITUTIONAL PROVISIONS—WHO MAY RAISE CONSTITUTIONAL QUESTIONS—IN GENERAL.—The fact that an Act which levies a tax at the same time diverts it to a specific purpose instead of ordering its payment into governmental funds, merely grants to whomever pays the tax the special standing which otherwise the taxpayer would not have to challenge the constitutionality of the expenditure and consequently, of the tax. If the tax, *qua* tax, be valid and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation.

5. ID.—ID.—DETERMINATION OF CONSTITUTIONAL QUESTIONS—AUTHORITY AND DUTY OF COURTS.—In view of the fact that varied elements of the policy which serves as a basis for the determinations of the Legislature as to what constitutes "a public purpose" in tax assessment and the wide legislative discretion in determining what expenditures would serve the public interest, the judicial functions to review such determinations is extremely limited. To warrant intervention of a court it is necessary to have a plain case of departure from every public purpose which could reasonably be conceived or a display of arbitrary power, not an exercise of judgment.

6. CONSTITUTIONAL LAW—DISTRIBUTION OF GOVERNMENTAL POWERS AND FUNCTIONS—JUDICIAL POWERS AND FUNCTIONS—ENCROACHMENT ON LEGISLATIVE POWER—INQUIRY INTO CAUSES OR MOTIVE OF LEGISLATURE.—The concept of a public purpose is not static; it is one bound to the general welfare and, like this one, must conform to the ever-changing social conditions of a specific community and to the peculiar problems created by them, and to the new obligations imposed by the citizen on its government in a highly complex society.

7. ID.—ID.—ID.—ID.—ID.—An Act does not pursue a private purpose upon directing payments to individuals or enterprises in order to enforce a public program, particularly if the enterprise is public.

8. ID.—ID.—ID.—ID.—ID.—A tax assessment can not be set aside merely because its purpose is new, but said tax whose objectives have been long continued by the government and the public is additionally evidenced.

9. TAXATION—NATURE AND EXTENT OF POWER IN GENERAL—PUBLIC PURPOSES IN GENERAL.—The development of telecommunications and the support of a telephone and telegraph system constituted in the economic and social circumstances of 1945-47, and constitute nowadays an appropriation of funds for a public purpose.

950   P. R. Telephone v. Tax Ct.; Sec. of the Treas., Int.   [Vol. 81 P.R.R.

10. Id.—Id.—Id.—Private Purposes.—Only a case of manifest diversion of public funds for a completely private use justifies the setting aside judicially of a governmental activity which for more than half a century has received the approval of the government and the people.

11. Constitutional Law—Distribution of Governmental Powers and Functions—Judicial Powers and Functions—Encroachment of Legislative Power—In General.—The determination of what type of organization is best suited for the discharge of a public function is of the exclusive power of the legislature. The preference for either type of organization is conclusive for the courts unless it is expressly prohibited by constitutional provisions.

12. Corporations—Incorporation and Organization—Creation and Organization—Power or Authority to Create Corporations.——The Communications Authority is a public corporation or agency of the People of Puerto Rico through which the Government of Puerto Rico discharges public functions.

13. Taxation—Nature and Extent of Power in General—Public Purposes in General.—The tax imposed by § 2 of Act No. 301 of 1945 does not violate § 3 of the Organic Act of 1917.

14. Constitutional Law—Distribution of Governmental Powers and Functions—Legislative Powers and Delegation Thereof—Delegation of Powers in General—To Corporations or Individuals.—The standards established by Act No. 301 of 1945 for the Communications Authority to invest the proceeds of the tax imposed by § 2 of that Act pass the constitutional test, and therefore, it does not constitute an undue delegation of legislative powers to the mentioned Authority.

15. Taxation—Review, Correction and Annulment of Assessment —Certiorari to Review Assessment—Appeal in General.—The fact of whether a taxpayer to the fund established by § 2 of Act No. 301 of 1945 may receive direct benefits from said fund is a matter which besides not being primarily raised in this proceeding, need not be decided inasmuch as the pertinent constitutional standards are not based on the determination of that fact.

16. Constitutional Law—Equal Protection of the Laws—Property Tax in General.—A taxpayer can not complain of not receiving direct benefits from the funds established by § 2 of Act No. 301 of 1945 to which it contributes, if it appears that it never requested appropriations from said fund nor that part of the money be assigned for experiments or investigations benefiting it directly.

17. Id.—Id.—Id.—A tax is not unconstitutional merely because the expenditure of its product does not benefit those who pay it.

18. Id.—Due Process of Law—Property Tax in General.—The tax established by § 2 of Act No. 301 of 1945 does not infringe the due process and equal protection of the laws merely because it applies exclusively to the telephone and telegraph companies operating in Puerto Rico. In view of the wide legislative authority to establish reasonable classifications for the assessment of taxes, this classification is neither arbitrary nor oppressive or capricious.

June 30, 1960]   P. R. TELEPHONE *v.* TAX CT.; SEC. OF THE TREAS., INT.   951

19. TAXATION—CONSTITUTIONAL REQUIREMENTS AND RESTRICTIONS—EQUALITY AND UNIFORMITY—CLASSIFICATION FOR PURPOSES OF TAXATION. —The legislative discretion to establish reasonable classifications for the assessment of taxes is not reduced because the class described in the Act, as a question of fact, includes only one taxpayer.

20. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—PROPERTY TAX IN GENERAL.—A state may, in the public interest, constitutionally engage in a business commonly carried on by private enterprise, levy a tax to support said business and compete with private interests engaged in a like activity.

21. TAXATION—CONSTITUTIONAL REQUIREMENTS AND RESTRICTIONS—EQUALITY AND UNIFORMITY—TAXES APPLICABLE TO PARTICULAR LOCALITY —DIFFERENT LOCALITIES.—The rule of uniformity of taxation incorporated into the Organic Act requires geographical and not intrinsic uniformity and the same bears no relation to how the product of the tax is spent.

22. ID.—NATURE AND EXTENT OF POWER IN GENERAL—PUBLIC PURPOSES. —The fact that a group of citizens is more benefited than others by an improvement or public service is not in itself a sign that the tax expended in such improvement or service is not for a "public purpose."

23. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—PROPERTY TAX IN GENERAL.—Since the tax established by § 2 of Act No. 301 of 1945 is for a public purpose and the taxing classification provided therein is valid and complies with the rule of geographical uniformity, the same is constitutional even where the expenditure of its product benefits some citizens more than others and not at all the taxpayer who pays it.

24. ID.—CONSTRUCTION, OPERATION AND APPLICATION OF CONSTITUTIONAL PROVISIONS—WHO MAY RAISE CONSTITUTIONAL QUESTIONS—ESTOPPEL IN GENERAL.—A public service enterprise can not adduce as a ground of unconstitutionality of Act No. 301 of 1945 the fact that it prohibits charging the tax provided by § 2 of said Act to the persons using the services rendered by it, where having had the opportunity to raise in a petition for rate increase which it made to the Public Service Commission for reasons which it deemed good at that time, decided that the expenses caused by said tax was not sufficient reason to apply for the increase in question.

25. ID.—EQUAL PROTECTION OF THE LAWS—PROPERTY TAX IN GENERAL.— The legislative prohibition of passing a tax to the consumer is not in itself and in all circumstances, ground for unconstitutionality.

26. TAXATION—NATURE AND EXTENT OF POWER IN GENERAL—PUBLIC PURPOSES.—Section 2 of Act No. 301 of 1945 is constitutional in the light of the applicable provisions of the Organic Act of 1917, as well as of those of the Federal Constitution.

PROCEEDINGS in Certiorari to review judgments of Tax Court (*C. Santana Becerra,* Judge, San Juan), dismissing complaints in actions for tax refund. *Judgments affirmed.*

952   P. R. Telephone v. Tax Ct.;   Sec. of the Treas., Int.   [Vol. 81 P.R.R.

*Franceschi & Sifre* for petitioner.   *Hiram R. Cancio, Secretary of Justice;* (B. Fernández Badillo, former Acting Secretary of Justice and *J. C. Santiago Matos,* Assistant Attorney General, on the brief) for intervener.

Mr. Justice Serrano Geyls delivered the opinion of the Court.

In this proceeding the petitioner, Porto Rico Telephone Co., challenges the constitutionality of § 2 of Act No. 301 of May 15, 1945 (Sess. Laws, p. 1146; 27 L.P.R.A. § 342), which provides as follows:

"The Secretary of the Treasury is hereby authorized and directed to levy and collect a tax of 2 per cent on the gross operating revenue collected by any public-service company or governmental instrumentality of the Commonwealth of Puerto Rico for the transmission of telephone or telegraph messages, including telegraphic money orders. All sums received by the Secretary of the Treasury pursuant to the provisions of this section shall be deposited by him in a special fund to be known as the Special Fund for Communications Development. Said fund shall be made available from time to time upon request of the Governing Board of the Puerto Rico Communications Authority for expenditure by said Board, or under its direction, for such improvements, extensions, research, experiments and special investigations as it may deem desirable for the purpose of extending and improving the quality of telephone and telegraphic communications facilities and systems in Puerto Rico. Said tax shall be paid by the public-service companies or the public instrumentalities which render said service within sixty (60) days after an accounting for the fiscal year has been made; and shall not in any manner charge the amount of said tax to the persons who use their services."

The petitioner filed an action for refund in the former Tax Court, which was denied upholding the validity of the provision assailed. In its elaborate and able opinion, the trial court found proved certain facts which should be set forth before analyzing the legal problems. They are as follows:

In the years to which the suit refers there existed, and still exist, in Puerto Rico, two organizations: a governmental and a private concern, both engaged in rendering telephone services. The former is named Puerto Rico Communications Authority and serves the city of Caguas and nine other neighboring towns. It also administers a telegraphic system which covers the whole island. The latter petitioner herein, operates under the name of Porto Rico Telephone Company and renders service in the whole island, except the area covered by the Authority. The telephone systems of the two organizations are interconnected by long distance lines. The Public Service Commission regulates petitioner's services and rates but not those of the Authority. The latter has complete freedom to fix its prices.

Both the Porto Rico Telephone Company and the Authority have paid the tax imposed by Act No. 301.[1] During the years 1945, 1946, and 1947 the Authority requested and obtained money from the special fund created by that Act "and with said money . . . has improved the quality of the telephone service in the area served thereby, substituting an old and useless system received from the Telegraph Bureau of the Insular Government by another new one, aside from having increased and extended its original capacity, mainly the telephone system to Vieques and Culebra." The Authority has received from the special fund larger sums than those it has paid thereto, but most of the funds used in said improvements have been appropriated from general funds by the Legislature. The Authority has not used any part of those funds for "direct improvements" in petitioner's system. The latter "benefits indirectly from the improvements made by the Authority, that is, through the interconnection or unification of both services. The improvement

---

[1] The petitioner paid $18,850.59 in 1945; $34,693.88 in 1946, and $38,246.93 in 1947. The Authority paid $6,000 in 1945 and about $8,000 in the other years.

of the services of the Authority has resulted in benefit for both entities due to said interconnection."

"The Authority has substituted the system acquired by a new automatic and more efficient system in all the towns served thereby. Telephone communications in the island have been extended to Vieques and Culebra and the quality of the service has improved." Until 1947 there had been an increase of 340 per cent in the number of subscribers to the Authority. "The improvements made by the Authority in its telephone system have benefited the public in general, including the petitioner's subscribers; and they benefit the government."

Between the years 1945 and 1947 the Porto Rico Telephone Company neither requested nor obtained from the Public Service Commission an increase in its rates. In 1948 it applied for an increase which it later withdrew and subsequently made another one in 1949. On the following year the Commission authorized an increase.

"The petitioner's operating net profits in 1944 were $67,214; in 1945, $121,881; in 1946, $277,509; and in 1947, $281,019. Based on the investment and the plant, the aforesaid net profits represent 2.4 per cent in 1944, 2.61 per cent in 1945, 4.39 per cent in 1946, and 4.10 per cent in 1947." Both the income tax and the special tax of 2 per cent of Act No. 301 were taken into consideration in computing said profits. In granting the temporary increase in 1950, the Public Service Commission did so on the basis of the minimum of 5 per cent profit authorized by Act No. 12 of April 9, 1941 (Sess. Laws, p. 342). The increase in petitioner's gross income during the aforesaid years was due (1) to the increase in the number of telephones and (2) to the development of long distance service.

During the years prior to 1948 the petitioner's operating expenses increased constantly. One of the main causes was the raise in wages and other concessions to the workers which

resulted in an expense of more than one and one half million dollars from 1943 to 1948. "The additional expense caused by the 2 per cent tax was not what prompted the petitioner to apply to the Public Service Commission for an increase in its rates."

In view of that Act and those facts, petitioner adduces the following grounds in support of its petition of unconstitutionality: (1) The Act challenged here violates § 3 of the Organic Act of Puerto Rico because the tax levied is not "for the purposes of the insular and municipal governments." (2) The Act leaves the investment of the tax to the fancy of the Communications Authority and constitutes, therefore, an undue delegation of legislative powers. (3) The tax constitutes an exaction of the petitioner's property, under the guise of taxing power. (4) The Act violates the uniformity rule and deprives the petitioner of its property without due process of law. (5) The Act is void because it prohibits passing the tax to the consumer. We shall analyze each one of those contentions separately.

I. *"Purposes of the insular and municipal governments."*

[1] Section 3 of the Organic Act, in effect in the years mentioned in this suit,[2] provides that "taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges and concessions may be imposed *for the purposes of the insular and municipal governments, respectively*, as may be provided and defined by the Legislature of Puerto Rico." (Italics ours.)

In the light of that provision, the petitioner briefly alleges that the phrase "for the purposes of the insular and municipal governments" is not equivalent to the phrase "for a public purpose" which defines the power of taxation as part

---

[2] This provision is still in effect as part of the "Puerto Rican Federal Relations Act." 64 Stat. 320.

of due process of law;[3] that "a tax is an exaction for the support of the government and of those services which are a logical and natural governmental function"; that the improvement of telecommunications is not a "governmental purpose"; and that the Communications Authority is not a part of the government nor exercises a governmental function.

In support of its strict interpretation of the phrase "for the purposes of the insular and municipal governments" the petitioner cites parts of judicial opinions which discuss the well-known doctrines of intergovernmental immunity between the federal and state governments and immunity of the municipalities for damages caused in the exercise of their "governmental" functions as distinguished from their "proprietary" functions.[4]    Irrespective of the fact that the strength of both doctrines has long dwindled, there is no

---

[3] Some states also expressly require by constitutional provision that the taxes be for "a public purpose."    McAllister, *Public Purpose in Taxation*, 18 Cal. L. Rev. 137, 138 (1929). Section 9 of Art. VI of the Constitution of the Commonwealth of Puerto Rico, effective since 1952, provides that: "Public property and funds shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law."

[4] Aside from the afore-mentioned case law, the petitioner relies on two other lines of precedent. It cites, on the one hand, decisions rendered by some American courts at the beginning of the second half of the nineteenth century when a very narrow concept of governmental functions prevailed and consequently, of what constituted a "public purpose." The following belong to this class: *Lowell* v. *City of Boston*, 15 Am. Rep. 39 (1873)—a city cannot issue bonds to make loans to persons whose homes were destroyed by fire; *Weimer* v. *Village of Douglas*, 21 Am. Rep. 586 (1876)—a municipality cannot issue bonds to buy stock in a corporation for the purpose of inducing it to establish itself in said municipality; *Loan Association* v. *Topeka*, 87 U.S. 655 (1875)—a city cannot issue bonds to aid manufacturing companies to establish themselves in the city. As will be shown hereafter in this opinion, the holdings of those cases have been abandoned for several decades and their actual value is mainly historical.    On the other hand, the petitioner cites decisions—*State, City of Reno* v. *Boyd*, 74 Pac. 654 (1903); *State* v. *Lafayette Tire Ins. Co.*, 63 So. 630 (1913); *Peterson* v. *Hancock*, 54 N.W. 2d 85 (1952)—which decree the nullity of a tax levied by a city or district for the benefit of other districts or cities. That case law is based on the strong tradition

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:21   Desc:
Exhibit Kirpalani Declaration.   Page 41 of 92

June 30, 1960]   P. R. TELEPHONE *v.* TAX CT.; SEC. OF THE TREAS., INT.   957

doubt that they are clearly inapplicable to the circumstances of this case. The former seeks to protect the stability of the American federal system and the autonomy of its components, and bars the national government and the states from the mutual levying of taxes which would weaken or destroy their functions. That doctrine encountered great hardships and many of the points raised by its initial application have been corrected in recent years. *Phillips Chemical Co.* v. *Dumas School District*, 4 L. Ed. 2d 384 (1960); *United States* v. *City of Detroit*, 355 U.S. 466 (1958); *United States* v. *Township of Muskegon*, 355 U.S. 484 (1958); *City of Detroit* v. *Murray Corp.*, 355 U.S. 489 (1958); Powell, *The Waning of Intergovernmental Tax Immunities*, 58 Harv. L. Rev. 633 (1945). The latter doctrine constitutes one of the means by which the courts attempted to mitigate the harsh effects of the doctrine of sovereign immunity in the field of torts. To that effect the municipal functions were divided into "governmental" and "proprietary," it having been decided that when the municipalities exercised the latter there were no good reasons to confront the injured parties with the doctrine of immunity. *Government of the Capital* v. *Executive Council*, 63 P.R.R. 417, 420–22 (1944); *Serra* v. *Transportation Authority*, 67 P.R.R. 574 (1947); *Rodríguez* v. *People*, 75 P.R.R. 377,

---

of municipal autonomy which exists in the United States, and on its facts, it has no application whatever to the problem at bar.

The petitioner also repeatedly relies on *United States* v. *Butler*, 297 U. S. 1 (1936), which decided that a tax laid by Congress was unconstitutional because its product was going to be used, not for a private purpose, but as part of a plan for regulating agriculture which the Federal Supreme Court considered as beyond the powers delegated to the federal government by the Constitution. Aside from the fact that this last determination in *Butler* has been definitively rejected—*Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U.S. 381 (1940) *Wickard* v. *Filburn*, 317 U.S. 111 (1942)—we are not confronted in the case at bar with the problem of whether the product of the tax will be used in support of a regulatory plan beyond the powers of the Puerto Rican government, but simply whether or not said tax is for a "public purpose," an issue which the Court expressly bypassed in *Butler*. 297 U.S. 68.

386 (1953); Symposium—*Governmental Tort Liability*, 9 L. & Contemp. Prob. 179–370 (1942); *Municipal Corporations—Sovereign Immunity*, 11 Vand. L. Rev. 253 (1957).

It is evident that those distinctions stem from juridical and social circumstances far afield in the problem before us. The petitioner does not present nor have we been able to find cogent reasons warranting its use as a measure of the powers of taxation and expenditure of public funds which Congress delegated to the Legislature of Puerto Rico. There is no question that we would need much more than those meager analogies to subjugate governmental authority to the narrow concepts submitted by the petitioner. *Cf. Puget Sound Co.* v. *Seattle*, 291 U.S. 619, 623–626 (1934).

[2, 3] It is indispensable, therefore, to resort to other sources. The legislative history of the Organic Act—53 Cong. Rec., Parts 6–9; 64th Cong., H. R. Rep. No. 77 and S. Rep. No. 579—contains no specific expression whatever on the aforesaid phrase of § 3. It shows palpably, however, that Congress intended to confer upon the Government of Puerto Rico powers similar to those possessed by the states of the Union.

On several occasions, the Federal Supreme Court has reiterated that rule of construction. It said in *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 261–262 (1937):

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. The effect was to confer upon the territory many of the attributes of *quasi*-sovereignty possessed by the states—as, for example, immunity from suit without their consent. By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. 'A body politic'—a commonwealth—was created. The power of taxation, the power to enact and enforce laws, and other

characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures." (Citations eliminated.)   See, also, *Puerto Rico* v. *Rubert Co.*, 309 U.S. 543, 547 (1940); *cf. De Castro* v. *Board of Commissioners*, 322 U.S. 451 (1944); *Bonet* v. *Yabucoa Sugar Co.*, 306 U.S. 505 (1939); *Bonet* v. *Texas Co.*, 308 U.S. 463 (1940); *Domenech* v. *National City Bank*, 294 U.S. 199 (1935).

It seems absurd to accept that such was not the legislative intent when dealing with a power of such vastness and vital importance as the taxing power. Surely, Congress intended to grant that power to the Puerto Rican government,[5] subject to the general rule of "public purpose" which limits constitutionally both the federal [6] and the state governments. There is no reason to believe that it sought to encase the Puerto Rican government so as to preclude it from expending public funds in activities which for several decades have been commonplace in federal and state experience.[6a] A legal instrument defining the powers of a government cannot be interpreted in such parochial fashion.

---

[5] The limitation under analysis was incorporated into the Organic Acts of other territories by the use of identical or very similar words. Virgin Islands—48 U.S.C. § 1406i; Guam—48 U.S.C. § 1423a; Philippine Islands—39 Stat. 548; Alaska—48 U.S.C. § 79.

[6] The limitation is imposed on Congress by way of the "general welfare" clause—Art. I, § 8, Cl. 1 of the Constitution of the United States—and on the states by the "due process" clause of the Fourteenth Amendment. The applicable principles, however, are similar.

[6a] Other provisions of the two Organic Acts clarify the Congressional intent. Foraker: § 4—all the money collected in Puerto Rico for duties and taxes prior to the effectiveness of the Act, shall be paid into the treasury of Puerto Rico "to be expended as required by law for the government and benefit thereof"; § 12—directs the Treasurer to pay from local revenues "all expenses and obligations contracted for the internal improvement or development of the island"; § 38—where necessary to anticipate taxes and revenues, bonds may be issued "to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys which have been or may

More than half a century [7] of governmental practice confirms the purpose of Congress. From 1900 to 1952, and particularly in the last decade of that period, the Legislative Assembly of Puerto Rico authorized taxes and expenditures for the myriad of purposes [8] that modern governments are compelled to pursue. The pertinent laws were signed by presidentially-appointed governors and reported to Congress pursuant to the provisions of § 23 of the Organic Act, and not once have any of them been disapproved or the local power to approve them put in doubt. In 1950 Congress, obviously familiar with the economic development of Puerto Rico and the active intervention of its government in economic processes, frequently by engaging in activities of industrial and commercial nature, maintained, with the approval of the Puerto Rican voters, identical limitation in the "Puerto Rican Federal Relations Act." We conclude, in the light of

---

be expended out of the emergency fund of the War Department for the relief of the industrial conditions of Puerto Rico caused by the hurricane. . . ." Organic Act (Jones) of 1917: § 6—directs the Treasurer to pay from insular revenues—"all expenses and obligations contracted for the internal improvement or development of the island"; § 18—"That the Commissioner of Agriculture and Commerce shall have general charge of such bureaus and branches of government as have been or shall be legally constituted for the study, advancement, and benefit of agriculture, commerce and other industries."

[7] The limitation in question was originally incorporated into § 38 of the Foraker Act of 1900. We have examined Vol. 33, Part 4 of the Congressional Record (1900) and Senate Report No. 249, Congress No. 56, submitted by Senator Foraker, and we have found no explanation to the said provision. It has not been possible to use other sources of the legislative history of the two Organic Acts.

[8] It would be tedious and completely unnecessary to enumerate all the Acts supporting this statement. Suffice it to state that from the beginning of the century to the years mentioned in the present suit, the Puerto Rican government, aside from discharging its classical functions, has appropriated funds for numerous others. A haphazard search shows that the insular government levied taxes and apportioned money for the sale of electricity, water for irrigation, and dock facilities and services, and the municipalities for acqueducts, electric plants and also some for docks. Agricultural and livestock activity was developed by various means —subsidies, schools, experimental stations, campaigns against diseases, fairs, expositions, advertisements, etc.—there having been established for

Case:17-03283-LTS    Doc#:4890-1    Filed:01/24/19    Entered:01/24/19 18:07:21    Desc:
Exhibit Kirpalani Declaration.    Page 45 of 92

the logical and ordinary meaning of the words used, of the
vital importance of governmental power, of the Congres-
sional intent to confer upon Puerto Rico governmental powers
similar to those of a state, and of the invariable practice of
more than half a century, that the phrase "for the purposes
of the insular and municipal governments" of § 3 of the
Organic Act does not have a narrower meaning than the
phrase "for a public purpose," restrictive of Congressional
and state powers.    We thus reaffirm what we had impliedly
decided in *Márquez & Co.* v. *Sancho, Treas.*, 57 P.R.R. 312
(1940).    *Cf. P. R. Distilling Co.* v. *Treasurer*, 52 P.R.R.
651, 657 (1938); *P. R. Tobacco Corp.* v. *Buscaglia, Treas.*,
62 P.R.R. 782, 800 (1944).

[4–8] Accordingly, we now turn to consider whether
the legislative purposes expressed in § 2 of Act No. 301
—"expenditure . . . for . . . improvements, extensions, re-
search, experiments and special investigations . . . for the
purpose of extending and improving the quality of telephone
and telegraphic communications facilities and systems in
Puerto Rico"—constitute a public purpose." [9]    Before we
decide this specific problem it is imperative, however, to men-
tion some underlying principles.

---

such purpose numerous separate funds which were maintained by special
taxes or other sources. The industry also received aid although to a
lesser extent. Laws were also provided for low-cost housing programs,
varied services for the poverty-stricken classes and cultural development
activities. As is known, these activities were heightened as of 1941 and
others were added. The government appropriated substantial sums for
economic development and participated directly in the ownership and
administration of agricultural, industrial and commercial enterprises. For
some examples, see the following volumes and pages of the Acts of Puerto
Rico: 1903–35, 49; 1911–82, 157; 1912–80; 1913–146; 1914–158, 227;
1917–368; 1917 II–292; 1919–349; 1921–90; 1925–326; 1930–130; 1934–
216, 272; 1936–542; 1937–221, 225, 233; 1938–186, 281, 396, 492; 1939–
714; 1940–324, 726, 1144; 1941–388, 684, 762, 862, 934, 944; 1942–570,
710, 934, 1064, 1364; 1945–330, 1064.

[9] Regarding what constitutes a "public purpose" see, in general,
Judson, *Public Purposes for Which Taxation is Justifiable*, 17 Yale L. J.
162 (1908); McAllister, *op. cit. supra*; Bergman, *The Federal Power to
Tax and to Spend*, 31 Minn. L. Rev., 328 (1947).

962   P. R. Telephone v. Tax Ct.; Sec. of the Treas., Int.   [Vol. 81 P.R.R.

*First:* Considered alone, the tax challenged here is perfectly valid. The objection set forth stems from the fact that the Act which imposes it at the same time diverts it to a specific purpose, instead of ordering its payment into government funds. That circumstance grants to whomever pays it a special standing to challenge the constitutionality of the expenditure, and consequently of the tax, which otherwise and as part of the general mass of taxpayers it would not have. *United States* v. *Butler,* 297 U.S. 1, 57–58 (1936); *Massachusetts* v. *Mellon,* 262 U.S. 447 (1923); *Suárez* v. *Tugwell, Governor,* 67 P.R.R. 166 (1947); *Cafeteros de Puerto Rico* v. *Treasurer,* 74 P.R.R. 704 (1953). "But if the tax, *qua* tax, be good . . . and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation. The only concern which we have in that aspect of the matter is to determine whether the purpose specified is one for which Congress can make an appropriation without violating the fundamental law. If Congress, for reasons deemed by it to be satisfactory, chose to adopt the quantum of receipts from this particular tax as the measure of the appropriation, we perceive no valid bases for challenging its power to do so." *Cincinnati Soap Co.* v. *United States,* 301 U.S. 308, 313 (1937); Bergman, *op. cit. supra* at 350–353.

*Second:* The judicial function of reviewing legislative determinations as to what constitutes a "public purpose" in taxation is extremely limited.[10] To the usual tests of self-restraint which guide the "grave and delicate [judicial] function" of passing upon the constitutional validity of legislative measures—*Commonwealth* v. *Aguayo,* 80 P.R.R. 534,

---

[10] As to the scope of the judicial function in reviewing what constitutes a "public use" in condemnation of private property, see *Berman* v. *Parker,* 348 U.S. 26 (1954); *Commonwealth* v. *Heirs of Gautier,* 81 P.R.R. 565 (1959).

June 30, 1960]    P. R. TELEPHONE *v.* TAX CT.; SEC. OF THE TREAS., INT.    963

576 (1958)—we add in this case the special fact that the determination of the legislature relies on varied elements of public policy, the scrutiny of which is beyond the competence of judges. The approval of a tax measure requires the careful study of difficult political, social and administrative problems, and above all, the weighing of the economic effect of the new tax on consumption, expenditures, production, employment, income and savings. The repeated reluctance of the courts to intervene actively in this matter is thus explained.

The Federal Supreme Court has repeatedly fixed the scope of judicial investigations in this area. In *Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, 514–515 (1937), the Court explained that since the adoption of the Fourteenth Amendment the state taxing power can be exerted only to effect a public purpose and not for private purposes but that the requirements of due process leave "free scope for the exercise of wide legislative discretion in determining what expenditures will serve the public interest." That discretion embraces, of course, expenditures for the "general welfare." "The modes of advancing the public interest . . . are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods." Accordingly, to warrant the intervention of a court it is necessary to have "a plain case of departure from every public purpose which could reasonably be conceived," or, as was said in *Helvering* v. *Davis*, 301 U.S. 619, 640 (1937), "a display of arbitrary power, not an exercise of judgment." And that judicial authority, it was added in *Everson* v. *Board of Education*, 330 U.S. 1, 6 (1947), must be exercised with the "most extreme caution." See, also, *United States* v. *Butler, supra*, at 67; *Magnano* v. *Hamilton*, 292 U.S. 40–44 (1934); *Milheim* v. *Moffat Tunnel District*, 262 U.S. 710, 717 (1923); *Green* v. *Frazier*, 253 U.S. 233, 239 (1920).

*Third:* The concept of "public purpose" is not static, bound forever to the ideas which at a particular historical time defined the powers and responsibilities of the government. It is, on the contrary, indissolubly interwoven with the general welfare and, like the latter, must conform to the ever-changing social conditions of a specific community and the peculiar problems created by them, and to the new obligations imposed by the citizens on its government in a highly complex democratic society. *Helvering* v. *Davis, supra* at 641. It is well to recall that "the Fourteenth Amendment did not strip the states of their power to meet problems previously left for individual solution." *Everson* v. *Board of Education, supra* at 7.

*Fourth:* An Act does not pursue a private purpose upon directing payments to individuals or enterprises in order to enforce a public program. ". . . Subsidies and loans to individuals such as farmers and home-owners, and to privately owned transportation systems, as well as many other kinds of businesses, have been commonplace practices in our state and national history." *Everson* v. *Board of Education, supra* at 7; *Carmichael* v. *Southern Coal Co., supra* at 518. A fortiori, the test applies more forcibly to a public enterprise.

*Fifth:* Although a tax can not be set aside merely because its purpose is new, there is no question that the tax whose objectives have been long continued by the government and the public is additionally evidenced. *Loan Association* v. *Topeka, supra* at 664–665; *Cincinnati Soap Co.* v. *United States, supra* at 314–315; *State* v. *Johnson,* 175 N.W. 589, 595–596 (Wis. 1919).

[9–10] Once these basic principles are established, the objections to the Act disappear. It seems obvious that the development of telecommunications and the support of a telephone and telegraph system constituted in the economic and social circumstances of 1945–47, and constitute nowadays,

an appropriation of funds for a public purpose. Indeed, it is surprising that at this stage such governmental power is questioned. On numerous occasions, both the Federal Supreme Court and other courts of appeal, have approved the assessment of taxes and the use of public funds for state activities practically identical to those above-mentioned. Some of the examples are as follows: manufacturing and marketing farm products, providing low-cost housing, creating a bank—*Green* v. *Frazier,* 253 U.S. 233 (1920); operation of a railroad—*Boston* v. *Jackson,* 260 U.S. 309 (1922); construction of a tunnel to lease it to a railroad, telegraph, electric power corporations, etc.—*Milheim* v. *Moffat Tunnel District, supra;* development of water resources for domestic uses, irrigation and electric power—*Gallardo* v. *Porto Rico Ry. Light and Power Co.,* 18 F.2d 918 (1 C.C.A. 1927); advertising campaign and exportation of coffee—*Márquez & Co.* v. *Sancho, Treas., supra;* advertising for an important industry—*C. V. Lloyd Fruit Co.* v. *Florida Citrus Commission,* 175 So. 248 (Fla. 1937).

And even in the area of municipal law, where by tradition the courts tend to be more strict, there are also numerous examples of the same attitude. *Jones* v. *City of Portland,* 245 U.S. 217 (1917)—yard for the sale of fuel; *Spangler* v. *City of Mitchell,* 152 N.W. 339 (S.D. 1915)—construction and operation of a telephone system; *Standard Oil Co.* v. *City of Lincoln,* 207 N.W. 172 (Neb. 1926) aff. in 275 U.S. 504 (1927)—sale of gasoline and oil; *City of Tombstone* v. *Macia,* 245 Pac. 677 (Ariz. 1926)—ice plant; *Bank* v. *Bell,* 217 Pac. 538 (1923)—market for the sale of foodstuff; *City of Frostburg* v. *Jenkins,* 136 A.2d 852 (Md. 1957)—construction of a building for private industry; *Mitchell* v. *City of Negaunee,* 71 N.W. 646 (Mich. 1897)—electric plant; *Turner* v. *City of Reidsville,* 29 S.E.2d 211 (N.C. 1944)—construction of an airport; *Albritton* v. *City of Winona,* 178 So. 799 (Miss. 1938), appeal dismissed,

303 U.S. 627 (1938)—construction of buildings for factories. See, Antieau, *Municipal Power to Tax—Its Constitutional Limitations*, 8 Vand. L. Rev. 698, 732–738 (1955).

If there should remain any doubt on these points it rapidly disappears when we consider that uninterruptedly from the beginning of the century [11] and up to the present and as revealed by the opinion of the trial court, the Puerto Rican government has maintained a telegraph and telephone communication system for which public funds have been appropriated for many millions of dollars. Service has been rendered during the administration of all the political parties and with the consent of all the governors. Only in a case of manifest diversion of public funds for a completely private use would there be justification to set aside judicially a governmental activity which has so often received the approval of the government and the people.

[11–13] And again petitioner treads on the wrong path when it says that the Communications Authority is not "part of the government" nor exercises a "governmental function." It is the exclusive power of the legislature to determine what type of organization is best suited for the discharge of a public function. If the legislature prefers a board to a department or a public corporation to a bureau, that preference, except for constitutional provisions expressly prohibiting it, is conclusive for the courts.[12]  The Legislature

---

[11] The first telegraph line in Puerto Rico was installed by Samuel F. Morse in 1849. At the end of the century the Spanish government operated a system of 41 stations, which was destroyed by a hurricane in 1899. The American military régime reconstructed the system and in 1901 transferred it to the insular government. It was put under the administration of the Commissioner of the Interior and extended to all the towns of the Island. On March 14, 1907 an Act was approved (Sess. Laws, p. 338), authorizing the Commissioner to construct and operate a system of long-distance and local telephone lines. It was not until 1914 that the petitioner received the franchise to establish the telephone system which it possesses today. See, Fernández García, *El Libro Azul de Puerto Rico* 702–12 (1923).

[12] Since *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819), the Federal Supreme Court recognized that Congress may create public corporations

303 U.S. 627 (1938)—construction of buildings for factories. See, Antieau, *Municipal Power to Tax—Its Constitutional Limitations*, 8 Vand. L. Rev. 698, 732–738 (1955).

If there should remain any doubt on these points it rapidly disappears when we consider that uninterruptedly from the beginning of the century [11] and up to the present and as revealed by the opinion of the trial court, the Puerto Rican government has maintained a telegraph and telephone communication system for which public funds have been appropriated for many millions of dollars. Service has been rendered during the administration of all the political parties and with the consent of all the governors. Only in a case of manifest diversion of public funds for a completely private use would there be justification to set aside judicially a governmental activity which has so often received the approval of the government and the people.

[11–13] And again petitioner treads on the wrong path when it says that the Communications Authority is not "part of the government" nor exercises a "governmental function." It is the exclusive power of the legislature to determine what type of organization is best suited for the discharge of a public function. If the legislature prefers a board to a department or a public corporation to a bureau, that preference, except for constitutional provisions expressly prohibiting it, is conclusive for the courts.[12] The Legislature

---

[11] The first telegraph line in Puerto Rico was installed by Samuel F. Morse in 1849. At the end of the century the Spanish government operated a system of 41 stations, which was destroyed by a hurricane in 1899. The American military régime reconstructed the system and in 1901 transferred it to the insular government. It was put under the administration of the Commissioner of the Interior and extended to all the towns of the Island. On March 14, 1907 an Act was approved (Sess. Laws, p. 338), authorizing the Commissioner to construct and operate a system of long-distance and local telephone lines. It was not until 1914 that the petitioner received the franchise to establish the telephone system which it possesses today. See, Fernández García, *El Libro Azul de Puerto Rico* 702–12 (1923).

[12] Since *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819), the Federal Supreme Court recognized that Congress may create public corporations

of Puerto Rico, for reasons which it deemed sufficient, decided
that as of 1942 the telegraph and telephone services rendered
by the government should be assigned to a "public corpora-
tion and governmental instrumentality of The People of
Puerto Rico" (Sess. Laws, p. 1064), which would have legal
standing separate and apart from that of the government
and officers who would operate it.   As the trial court stated:
"Suffice it to read the Act which created it to conclude that
it is a public corporation that belongs to the community in
general, that it operates for the exclusive benefit of the latter
and not for any private interest and that it is an agency
or vehicle through which the Puerto Rican government dis-
charges certain public functions.   The fact that it uses the
corporative form for reasons of internal conveniences of an
administrative character of the government, or for con-
veniences of a commercial character, does not alter its afore-
described nature."

If we accept petitioner's contention we would place our-
selves in the untenable position of deciding that up to 1942
the telegraph and telephone services were "part and func-
tion of the government" because they were under a bureau
of the Department of Interior but that as of that date they
ceased to be a "part and function of the government" because
they were the responsibility of a public corporation entirely
owned by the same government.[13]

In view of all the foregoing, we decide that the tax laid
by Act No. 301 does not violate § 3 of the Organic Act.

---

to execute the powers granted to it, by the Constitution.   As to Puerto
Rico, see *People of Puerto Rico* v. *Eastern Sugar Assn.*, 156 F.2d 316,
325 (1946), *cert: denied*, 329 U.S. 772 (1946).

[13] Our decision on this question is limited to the constitutional problem
causing it and should not be extended to other fields (liability for con-
tracts or for damages, etc.), which are regulated by the pertinent
legislative determinations.   *Cf. Government of the Capital* v. *Executive
Council, supra* at 432.   The line of authorities cited by the petitioner in
support of its contention refers specifically to these last problems.

968   P. R. Telephone v. Tax Ct.;   Sec. of the Treas., Int.   [Vol. 81 P.R.R.

## II. *Undue delegation of powers.*

[14] Petitioner alleges that the Act challenged here leaves the proceeds of the tax to be expended "at the fancy of the Authority," that it does not fix standards to expend the tax and that for those reasons it constitutes an undue delegation of powers. We need not stop long on this point. As the trial court stated: "The Legislature levied the tax and determined its amount, chose the object as well as the subject thereof and fixed the purpose or use which it should be given. Henceforth, all the rest lies within the field of execution and implementation of the Act to enforce its purposes."

Even assuming, not free from doubt, *Cincinnati Soap Co.* v. *United States, supra* at 321–322, that the requirement of adequate standards applicable to the regulatory functions of the state are equally effective in the field of public expenditures, it is clear that the standards provided by Act No. 301 pass the constitutional test. Certainly, they are no less specific than that of "public interest, convenience, or necessity" approved in *NBC* v. *United States,* 319 U.S. 190 (1943), or that of "excessive profits" approved in *Lichter* v. *United States,* 334 U.S. 742 (1948), or that of "unfair methods of competition" approved in *Federal Trade Commission* v. *Gratz,* 253 U.S. 421 (1920). See also, *Yakus* v. *United States,* 321 U.S. 414 (1944); *United States* v. *Rock Royal Cooperatives,* 307 U.S. 533 (1939); 1 Davis, Administrative Law Treatise 81–87 (1959).

## III. *Exaction of petitioner's property, under the guise of taxing power.*

## IV. *Lack of uniformity and privation of property without due process of law.*

[15, 16] We discuss these objections jointly because they actually constitute a single one. The petitioner briefly alleges that it alone, as a practical question, pays the tax and that the proceeds thereof have been spent for the "direct"

June 30, 1960]   P. R. Telephone *v.* Tax Ct.; Sec. of the Treas., Int.   969

benefit of the inhabitants of Caguas and neighboring towns served by the Communications Authority. The inhabitants of the other towns are only benefited "indirectly" by the interconnection of the petitioner's system with that of the Authority in long distance calls. Furthermore, the petitioner "does not receive any particular benefit from the expenditure in which the tax has been involved, . . ." while "the majority of taxpayers has been exempt from paying any money to the special fund. . . ." For those reasons it maintains that the tax constitutes a binding exaction, violates the uniformity provision and deprives it of its property without due process of law. Let us examine the applicable considerations.

*First:* The problem of whether or not the petitioner can receive "direct" benefits from the fund established by § 2 of Act No. 301 is not primarily raised in this proceeding. Besides, it is unnecessary to decide it because the pertinent constitutional standards are not based on the determination of that fact.[14] It is well to indicate, however, that although in the years mentioned in this suit only the Authority received money from said fund, the evidence shows that the petitioner never requested appropriations nor that part of the money be assigned for "experiments or investigations" benefiting it directly. Besides, it is somewhat euphemistic to label "indirect" the benefits admittedly received by the petitioner from long distance calls to the towns served by the Authority, where, as the evidence showed, by the use of money from the special fund and from substantial appropriations of general funds, the number of subscribers has multiplied and the service has been extended and markedly improved.

_____

[14] As shown in the record, the officers of the Authority believe that they cannot make improvements on the territory served by the Porto Rico Telephone Co. That determination, of course, is not binding on the petitioner nor on the courts and must be elucidated in a proper judicial proceeding.

[17] *Second:* A tax is in no way unconstitutional merely because the expenditure of its product does not benefit those who pay it.[15] "Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

"A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good. A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him." *Carmichael* v. *Southern Coal Co., supra* at 521–523. See, also, *Rapid Transit Corp.* v. *New York*, 303 U.S. 573, 584–587 (1938); *Magnano Co.* v. *Hamilton, supra* at 43.

[18] *Third:* The petitioner does not affirm, nor is it in a position to affirm, that the tax of Act No. 301 infringes the due process and equal protection of the laws merely because it applies exclusively to the telephone and telegraph com-

---

[15] Nor is it, of course, *merely* because it restricts or destroys certain occupations or businesses. *Magnano Co.* v. *Hamilton, supra* at 44–47; Cushman, *Social and Economic Control Through Federal Taxation*, 18 Minn. L. Rev. 757, 763–764 (1934).

panies operating in Puerto Rico. In view of the wide legislative authority to establish reasonable classifications for the assessment of taxes, the classification previously described is neither arbitrary nor oppressive or capricious. *Citizens' Telephone Co.* v. *Fuller,* 229 U.S. 322 (1913); *Nashville C. & St. L. Ry.* v. *Browning,* 310 U.S. 362, 368 (1940); *Steward Machine Co.* v. *Davis,* 301 U.S. 548, 584 (1937); *Rapid Transit Corp.* v. *New York, supra* at 578–581; *Carmichael* v. *Southern Coal Co., supra* at 509; *Walters* v. *City of St. Louis,* 347 U.S. 231, 237 (1954); *South Porto Rico Sugar Co.* v. *Buscaglia,* 154 F.2d 96, 100. (C.C.A. 1st 1946). And it is obvious that "the provisions of the legislation earmarking the funds collected are not of importance in determining whether or not the classification of the challenged acts is discriminatory." *Rapid Transit Corp.* v. *New York, supra* at 587.

[19] The legislative discretion is not reduced because the class described in the Act, as a question of fact, includes only one taxpayer. The public service enterprises—especially telephone, telegraph, electricity, water, and some transportation enterprises—are usually found in that position. For well-known reasons, the state very frequently grants to those enterprises the monopoly of the service in specific areas, subject, as we know, to a detailed regulation of their activities. The granting of that monopoly does not bar the state, however, from levying special taxes for the privilege granted or from including them reasonably within a particular class of taxpayers. The opposite would mean that the enterprise had acquired, together with the monopoly, a tax exemption on the privilege of its franchise and on its business activities and that the state could not impose thereon any special tax but only those taxes of a general type—income, property, excises—which all other taxpayers pay. That theory has been repeatedly rejected by the Federal Supreme Court. *Puget Sound Co.* v. *Seattle, supra*

972    P. R. TELEPHONE v. TAX CT.;   SEC. OF THE TREAS., INT.    [Vol. 81 P.R.R.

at 627;  cf. *Rapid Transit Corp.* v. *New York, supra* at 588–596.

[20]  *Fourth:* The judgments of the Federal Supreme Court "leave no doubt that a state may, in the public interest, constitutionally engage in a business commonly carried on by private enterprise, levy a tax to support it, . . . and compete with private interests engaged in a like activity." *Puget Sound Co.* v. *Seattle, supra* at 624; Smith, *Constitutional Limitation on Sovereign Competition,* 13 Temple L. Q. 415, 457–458 (1939).

[21–23]  *Fifth:* The rule of uniformity of taxation incorporated into the Organic Act requires, like the federal provision, geographical and not intrinsic uniformity—*Steward Machine Co.* v. *Davis, supra* at 583; *South Porto Rico Sugar Co.* v. *Buscaglia, supra* at 100; *Rullán* v. *Buscaglia,* 168 F.2d 401, 403 (C.C.A. 1st 1948)—and it is obvious that it is not violated in the case at bar.  How the product of the tax is spent bears no relation to that rule either.  This is something that belongs to the determination of whether or not the tax is for a "public purpose."  And, of course, the fact that a group of citizens is more benefited than others by an improvement or public service is not, as we have already seen, in itself a sign that the tax expended in such improvement or service is not for a "public purpose." [16]  We are surrounded by hundreds of public works and services which because of the physical fact of their location benefit some citizens more "directly" than others.  It would be impossible to administer the public funds if the opposite rule were adopted.

Once it is established that the tax is for a "public purpose" and that the taxing classification is valid and complies with the rule of geographical uniformity, we must uphold its constitutionality even where the expenditure of

---

[16] The same rule prevails in condemnation of property for "public use." *Rindge Co.* v. *Los Angeles,* 262 U.S. 700 (1923); *Mt. Vernon Cotton Co.* v. *Alabama Power Co.,* 240 U.S. 30, 32 (1916).

its product benefits some citizens more than others and not at all, if such were the case here, the taxpayer who pays it.

V. *The Act is void because it prohibits passing the tax to the consumer.*

[24–26] The petitioner maintains that the provision of Act No. 301 which prohibits charging the tax to the persons using the telephone and telegraph services is void "because he who sells commercial articles cannot be constitutionally forced to absorb ultimately the burden of a tax, which is an expense, and be prohibited from recovering it in any way whatever."

The trial court decided correctly that the said prohibition of the Act applies in practice only to the Communications Authority because the latter is the only one authorized to fix its rates without the intervention of any other official body.  The petitioner, on the contrary, cannot increase its rates without the approval of the Public Service Commission. We have to accept, of course, that the Legislature knew that basic fact.  We must equally accept, as did the trial court, that the Legislature knew at the time of approving Act No. 301, that the petitioner was entitled, as a constitutional and legal right, to obtain reasonable profits from its enterprise and that it did not try to prevent that the tax of Act No. 301 be taken into consideration in the determination of its rates.  *Galveston Electric Co.* v. *City of Galveston,* 258 U.S. 388, 399 (1922); *Georgia Railway and Power Co.* v. *Railroad Commission,* 262 U.S. 625 633 (1923).  Consequently, it was before the Public Service Commission that the petitioner had to raise, in the first instance, the effects of the new tax, in a petition for rate increase.[17]  It could have done this as soon as Act No. 301 went into effect, and since the tax is paid annually, it would have had ample

---

[17] Petitioner points out that the practice of public service commissions in the United States is to authorize enterprises "to charge the tax in the monthly bills directly to its clients as a surcharge . . . and not to open rate proceedings each time a new tax arises."  It affirms that Act

opportunity to recover it if the Commission would have granted the necessary authority. However, the petitioner chose to wait until 1949, to apply for an increase. That petition, as we saw in the statement of facts proven, was due to considerable increases in wages and other employment conditions which the petitioner made to its employees during several years. The only conclusion which arises from those facts is that the Porto Rico Telephone Co., by reasons which it deemed good, decided that the increase in its expenses caused by the tax of Act No. 301 was not sufficient reason to apply to the Commission for a rate increase. Having made that decision, the petitioner cannot now adduce, as a ground for unconstitutionality, that Act No. 301 forbade it to pass the tax to the consumers of the service.

It is also well to clarify that the legislative prohibition of passing a tax to the consumer is not in itself and in all circumstances, ground for unconstitutionality. *Rapid Transit Corp.* v. *New York, supra* at 581–582; *Southern Boulevard R. Co.* v. *City of New York*, 86 F.2d 633, 637 (C.C.A. 2d) (1936) *cert. denied*, 301 U.S. 703 (1937). Our decision in *Pyramid Products* v. *Buscaglia, Treas.*, 64 P.R.R. 788, 809 (1945), main precedent cited by the petitioner, is based on the retroactivity of the tax. That circumstance is not present in the case at bar.

For the reasons stated in this opinion, we decide that § 2 of Act No. 301 of May 15, 1945 is constitutional in the light of the applicable provisions of the Organic Act of 1917, as well as of those of the Federal Constitution.

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Santana did not participate herein.

---

No. 301 prohibits this procedure. Aside from the fact that the petitioner is actually complaining that something which it did not request might be denied, we do not believe that Act No. 301 in itself constitutes an obstacle for the aforesaid procedure, provided the latter is authorized by our public service laws.

# Exhibit 4

177 D.P.R. 693, 2009 WL 5449127 (P.R.), 2009 TSPR 191

INTERIOR DEVELOPERS, INC., petitioner,
v.
MUNICIPALITYDE SAN JUAN, appellee.

In The Supreme Court of Puerto Rico.
*Number:* CC-2008-156

**Synopsis**
WRIT OF *CERTIORARI* to request the reversal of a JUDGMENT of *Emmalind García García, Aleida Varona Méndez* y *Carlos A. Cabán García*, Judges of the Court of Appeals which reversed the Court of First Instance and determined that the Works performed in the Capitol imposed the obligation to pay constriction excise taxes as they are not among the Works expressly exempt from payment of construction excise taxes. Judgment appealed is reversed and consequently, the complaint filed by Interior Developers is granted.

*Bridget M. Timm Ríos*, attorney for petitioner; *Jorge R. Quintana Lajara*, attorney for appellee.

THE PRESIDENT JUDGE MR. HERNÁNDEZ DENTON issued the opinion of the Court.

We have to determine if the Law of Autonomous Municipalities of the Commonwealth of Puerto Rico of 1991 (Law of Autonomous Municipalities), Law No. 81 of August 30, **\*698** 1991, as amended, 21 L.P.R.A. sec. 4001 *et seq.*, grants the municipalities the authority to impose construction excise taxes on the works of the Legislative Branch. As we believe that the construction works of such Branch of government are outside of the scope of the taxing power of the municipalities, we reverse the appealed judgment.

**I**
In the beginning of 2004, Interior Developers, Inc. (Interior Developers) executed a contract with the Superintendent of the Capitol[1] to perform some construction Works in the Capitol. Specifically, it was contracted to construct some offices for the House of Representatives and for the Senate. In February of 2005, the Municipality of San Juan, (Municipality) sent a preliminary notice of excise

taxes to Interior Developers. Through such communication, the Municipality informed Interior Developers that it had to pay $65,020.03 in construction excise taxes for the works to be performed in the Capitol. In the referenced notice, it was informed as well that it had the following options, pursuant to Art. 2.007 of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4057: (1) pay the excise taxes within fifteen workdays following the return receipt of the notice; (2) pay the excise tax under protest within the next fifteen days and within the same term, file a written request for reconsideration, or (3) refuse to make the payment, stop the construction plan, postpone the date of the beginning of the work and request judicial review before the Court of First Instance within the term of twenty days not subject to extension. **\*699**

In response to the action of the Municipality, Interior Developers filed a declaratory judgment before the Court of First Instance, San Juan Part. It alleged, in essence, that the Municipality did not have the authority to impose construction excise tax on the works performed on the Capitol, as the Law of Autonomous Municipalities excludes the Legislative Branch from the scope of the taxing power of the municipalities. Also, it alleged that it is not a taxpayer pursuant to the definition of such term provided in the Law of Autonomous Municipalities. In the alternative, it held that even if the Municipality had the authority to impose the construction excise tax, the amount notified was incorrect. This because according to Interior Developers the Capitol was classified as a historic building by the State Office of Historic Preservation and the Municipality provided in a municipal ordinance that constructions in such buildings are subject to a payment of fifty percent less for construction tax.

On the other hand, the Municipality, filed a motion to dismiss in which it alleged that the Court of First Instance did not have jurisdiction to see the complaint as Interior Developers had not followed any of the courses of action stated in the Law of Autonomous Municipalities to request the revision of the excise tax notified. The lower court denied the motion to dismiss.

Not in agreement, the Municipality questioned such decision before the Court of Appeals which reversed the appealed judgment and dismissed the complaint. Such court agreed with the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:31   Desc:
Exhibit Kirpalani Declaration.   Page 62 of 92

CERTIFIED TRANSLATION

Interior Developers v. Mun. de San Juan, 177 D.P.R. 693 (2009)

2009 TSPR 191

Municipalities argument that Interior Developers had not followed the course of action provided in the Law of Autonomous Municipalities to request the revision of the notice of excise tax. Interior Developers timely filed a motion for reconsideration. The Court of Appeals granted such motion and issued a new judgment in which it confirmed the decision of the lower court. **\*700**. It concluded that the Law of Autonomous Municipalities did not give the municipalities the authority to impose construction excise tax on the Works performed or contracted by the Legislative Branch, therefore Interior Developers did not have to comply with the requirements provided in such law to question the excise tax imposed.

According to this new judgment, the Municipality filed a motion for reconsideration. The court again modified its decision and reversed the judgment of the lower court. IN said judgment the Court of Appeals concluded in essence that the Law of Autonomous Municipalities only provides an exemption of payment of construction excise tax for the works made directly by the Central Government, its agencies, a public corporation, a municipality or an agency of the Federal Government. It reasoned that as the works made in the Capitol were not among the works expressly exempt from payment, they had the obligation to pay construction excise tax. In light of this decision, Interior Developers filed a motion for reconsideration which was denied.

In disagreement, Interior Developers comes before us to allege that the Court of Appeals did not have jurisdiction to grant the motion for reconsideration field by the Municipality after the first judgment issued in reconsideration because the regulation of such court does not allow the filing of more than one motion for reconsideration. It holds, also that the municipalities do not have the authority, per the Law of Autonomous Municipalities to impose construction excise tax to works made by the Legislative Branch.

On the other hand, the Municipality alleges that each judgment issued by the Court of Appeals is different and independent from the ones before therefore with every judgment there is a right to request reconsideration. It also alleges, that Interior Developers is obligated to pay the construction excise tax because the Works performed by **\*701** the Legislative Branch are not included in the list of exemptions to the construction

excise tax of the Law of Autonomous Municipalities. Lastly, it alleges that the Court of First Instance lacked jurisdiction to oversee the complaint of Interior Developers because it did not follow the proceeding provided in the Law of Autonomous Municipalities to request the revision of the notice of excise tax.

Having reviewed the writ filed by Interior Developers, we issue the writ of *certiorari*. With the benefit of the appearance of both parties, we proceed to decide.

## II

The first issue to be resolved is the matter brought by Interior Developers as to the filing of multiple motions of reconsideration before the Court of Appeals.

**[1]** The courts have the inherent power to reconsider their determinations and amend them substantially, per petition of a party or *motu proprio*, as long as they still have jurisdiction in the case. *Insular Highway v. A.I.I. Co.*, 174 D.P.R. 793 (2008); *Dumont v. Inmobiliaria Estado, Inc.*, 113 D.P.R. 406, 413 (1982). As it is known, the Rule 47 of Civil Procedure, 32 L.P.R.A. Ap. III, regulates the motions of reconsideration before the lower court. Such motion is the mechanism to allow a court to modify its decision and amend or correct any mistakes made. *Lagares v. E.L.A.*, 144 D.P.R. 601, 609 (1997); *Castro v. Sergio Estrada Auto Sales, Inc.*, 149 D.P.R. 213, 217 (1999); *Dávila v. Collazo*, 50 D.P.R. 494, 503 (1936).

**[2]** On the other hand, Rule 84 of the Regulation of the Court of Appeals, 4 L.P.R.A. Ap. XXII-B, provides the way in which the motions of reconsideration **\*702** shall be filed before the Court of Appeals. Item (D) of such rule provides that "[t]he filing of more than one motion for reconsideration by one same party will not be allowed, *if the first was denied". (*Emphasis added.) 4 L.P.R.A. Ap. XXII-B.

In this case, el Court of Appeals issued a first judgment of which Interior Developers requested the reconsideration. The intermediate appellate forum granted such petition and issued another judgment in which it modified its previous decision and decided differently than before. In response to this new decision, the Municipality filed a motion for reconsideration which was granted by the Court


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:04   Desc:
Exhibit Kirpalani Declaration.   Page 63 of 92

CERTIFIED TRANSLATION

Interior Developers v. Mun. de San Juan, 177 D.P.R. 693 (2009)

2009 TSPR 191

of Appeals. This led such forum to issue a third judgment favoring the Municipality. In such circumstances, , Interior Developers states that such court did not have jurisdiction to issue the second judgment in reconsideration pursuant to Rule 84 del Regulation del Court of Appeals, *supra.* It is not correct.

A superficial review of Rule 84 of the Regulation of the Court of Appeals, *supra,* shows that such court was allowed to issue the appealed judgment. Item (d) of such rule only proscribes that one same party filed a second motion of reconsideration on the same judgment after the first is denied. 4 L.P.R.A. Ap. XXII-B; *Juliá et al. v. Epifanio Vidal, S.E.*, 153 D.P.R. 357, 363 (2001).

In this case, however, there is no filing of a second motion for reconsideration by the same party for having been denied a first motion. Instead, the Court of Appeals exercised its discretion and reconsidered its judgments in two occasions. As in both the previous result was altered, that gave way to the affected party to request reconsideration. Indeed, both, Interior Developers **\*703 and** the Municipality file only one motion for reconsideration on one judgment which was adverse to them. None of the parties filed a motion for reconsideration after their first was denied. As they were different judgments, the intermediate appellate court had jurisdiction to evaluate the motion for reconsideration filed by the Municipality as to the first judgment in reconsideration. Evidence of the foregoing is that despite its own allegation of error, Interior Developers filed a motion for reconsideration to question the last appealed judgment which was denied.

Having clarified this matter, let's examine the applicable law regarding the controversy before us.

### III

[3–4] A. Pursuant to the Constitution of the Commonwealth of Puerto Rico, the main authority to impose taxes falls upon the Legislative Assembly. It provides specifically that "[t]he power of the Commonwealth to impose and collect taxes and authorize its imposition and collection by the municipalities will be exercised as provided by the Legislative Assembly, and will never be waived or suspended". *Art. VI, Sec. 2, Const.* E.L.A., Volume 1, ed. 2008, page 420. AS it states in such article, the Legislative Assembly has the faculty to delegate the

authority to impose taxes on the municipalities by express and clear mandate. *Café Rico, Inc. v. Mun. de Mayagüez*, 155 D.P.R. 548, 553 (2001). As it is a delegated authority, "the municipalities do not have inherent power, independent from the State to impose taxes". *Levy, Hijo v. Mun. de Manatí*, 151 D.P.R. 292, 299 (2000).

[5] On the other hand, the Legislative Assembly also had the constitutional faculty to "create, suppress, consolidate, and reorganize municipalities, modify its territorial limits **\*704 and** determined what is relative to its regime and function...". *Art. VI, Sec. 1, Const.* E.L.A., *supra*, page. 419. It is because of that that through the Law of Autonomous Municipalities the Legislative Assembly gave the municipalities diverse mechanisms to exercise a wide array of faculties. Art. 2.001 of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4051. Among them it gave the municipalities the faculty to impose taxes with the objective that they can raise funds to bring more services to the citizens. *Mun. de Utuado v. Aireko Const. Corp.*, 176 D.P.R. 897 (2009).

[6–7] Some of the taxes that the municipalities can impose and collect within their limits are the taxes, the fees, licenses and construction excise taxes, rates and tariffs. Art. 2.002 of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4052; *HBA Contractors v. Mun. de Ceiba*, 166 D.P.R. 443 (2005). In regards to the construction excise tax, they are denied as that tax is imposed by the municipalities by municipal ordinance that fall in the construction activity or a construction work within the territorial limits of the municipality. Art. 1.003(cc) of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4001(cc).

[8–9] However, the faculty of the municipalities to impose construction excise tax to a certain work is subject that the "taxable event" "contributive effect" "takes place, which is defined as the fact stated in law which realization has the consequence of giving rise to the obligation to pay tax. See A. Martínez Lafuente, *Derecho tributario: estudios sobre la jurisprudencia tributaria*, Madrid, Ed. Civitas, 1985, pages. 207–215. Therefore if the "taxable event" is not realized the obligation to pay the tax will not arise. Article 2.002(d), of the Law of Autonomous Municipalities, *supra*, 21 L.P.R.A. sec. 4052(d), provides the tax event **\*705** that gives rise to the imposition of construction excise tax. It

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                3



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS Doc#:4890-1 Filed:01/24/19 Entered:01/24/19 18:07:31 Desc:
Exhibit Kirpalani Declaration. Page 64 of 92

CERTIFIED TRANSLATION

provides:

> Every construction work within the territorial limits of a municipality, performed by a person or private Company or carried out by a person or private company in favor of or *by contractor or subcontract executed with an agency or entity of the Central Government or federal or municipal government,* included that work that does not require the request or issuance of *permit of the Administration of Regulations and Permits or by an autonomous municipality will have to pay the appropriate....* (Emphasis added.) 21 L.P.R.A. sec. 4052.

From the quoted text it is deduced that the taxable event that gives rise to payment of construction excise tax is composed of a series of elements. These are: (1) that it is a construction work; (2) that is within the territorial limits of the municipality, and (3) that is made by a person or private entity contracted by an agency or entity of the Central municipal or federal Government. 21 L.P.R.A. sec. 4052. Therefore, to determine if a Municipality has the faculty to charge the construction excise tax we also have to examine the type of work and its location, who the work belongs to.

[10] In other words, the focus when determining if a Municipality can collect construction excise tax has to be the work itself. Recently, we had the opportunity to state our position regarding the nature of the construction excise tax in *Mun. de Utuado v. Aireko Const. Corp.*, supra. There we decided that the construction excise tax imposed by the municipalities pursuant to Art. 2.002(d) of the Law of Autonomous Municipalities, *supra*, fall on the construction work not in the contractor that performs the work. To that effect, we stated that "if the economic activity that generates the payment obligation —in this case construction of the school— continues but changes the **\*706** contractor building it, the new imposition of payment of construction excise taxes on the same work is not appropriate". *Mun. de Utuado v. Aireko Const. Corp.*, supra, page 911.

[11–12] On the other hand, Art. 1.003(r) of the Law of Autonomous Municipalities defines "Central Government" as the "Government of the Commonwealth of Puerto Rico, its public agencies, offices and political subdivisions, *excluding the Legislative Branch* and the Judicial Branc". (Emphasis added.) 21 L.P.R.A. sec. 4001(r).Also, item (ee) of such article defines "taxpayer" as

> [t]hat person or entity obligated to the payment of the excise tax on the construction activity when:
>
> > (1) It is owner of the work and personally executes the labor of administration and the physical and intellectual labors inherent to the activity of construction.
> >
> > (2) Is contracted to make the tasks described in [t]he clause (1) of this item for the benefit of the owner of the work be it a person or governmental entity. The tax can from part of the cost of the work. 21 L.P.R.A. sec. 4001(ee).

As it is stated in this article, in regards to the construction excise taxes, the taxpayers can be the person owner of the work that personally executes it, as the one hired to perform the construction that at the same time can charge the cost to the owner of the work. That is due to the fact that the construction excise tax imposed by the municipalities pursuant to Art. 2.002 of the Law of Autonomous Municipalities, *supra*, fall on the work not on the person that executes it. *Mun. de Utuado v. Aireko Const. Corp.*, supra.

[13–14] On the other hand, Art. 2.007 of the Law of Autonomous Municipalities, *supra*, establishes that the municipalities may, by ordinance, exempt from the payment of the construction excise tax the works made of social **\*707** interest purposes. In tax law, the exemptions have been defined as those norms of special application that establish that one general tax norm does not apply to certain supposed facts that limit and as a consequence prevent their judicial effects from coming into effect, that is, they prevent the tax obligation from rising. Martínez Lafuente, *op. cit.*, page 215, quoting Cortés Domínguez y Martín Delgado, *Ordenamiento Tributario Español*, Madrid, Ed. Civitas, 1977, page 308.

As they are special norms that deny the effects of



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the general tax norms, the exemptions are restrictively interpreted. To that effect, we have decided that the tax exemptions are legislative gifts that shall be interpreted strictly as to who claims to have a right to them. *PARDAVCO, Inc. v. Srio. de Hacienda*, 104 D.P.R. 65, 73 (1975). However, we have also stated that those norms shall not be interpreted so restrictively as to frustrate the legislative intention. *Francis v. Tribl. Contribuciones y Tes.*, 74 D.P.R. 19, 24 (1952).

[15] Among the Works exempt from payment of construction excise tax as authorized by the Law of Autonomous Municipalities—per Art. 2.007— are those that are made by non-profit entities that provide rent properties to low income families and for persons older than 62 years, and those made by project developers of social interest Art. 2.007(f) of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4057(f). Also, such article provides that "[t]he Works made by an administration of an agency of central government or its instrumentalities, public corporation, a Municipality or an agency of the federal government are exempt from payment". Íd.

Lastly, Art. 4.57 of Ordinance No. 52 of the Municipality of San Juan, Series 2001-2002, approved on December 21, 2001, provides that the structures declared **\*708** having historical-architectural value by the Puerto Rico Planning Board, by law to that effect, through recommendations of the Puerto Rican Culture Institute or by the State Office of Historic Preservation shall pay the equivalent to fifty percent of what the rest of the structures pay.

[16–17] B. Art. 2.007(c) of the Law of Autonomous Municipalities, 21 L.P.R.A. sec. 4057(c), establishes that upon receiving the preliminary notice of the excise tax to pay, a tax payer may: (1) pay the excise taxes within fifteen workdays following the return receipt of the notice; (2) pay the excise tax under protest within the next fifteen days from the return receipt and within the same term, file a request for reconsideration, or (3) refuse to make the payment, stop the construction plan, postpone the date of the beginning of the work and request judicial review. On the other hand, Art. 15.002 of the Law of Autonomous Municipalities establishes that the Court of First Instance shall have jurisdiction to "[r]eview any legislative or administrative action of any officer or municipal organism that impairs the constitutional rights of the

claimants or that is contrary to the laws of Puerto Rico". 21 L.P.R.A. sec. 4702.

[18] IN the past we have decided that if a Municipality lacks the authority in law to impose a tax it is not necessary that a party initiate the administrative procedure. Therefore, in *Mun. Trujillo Alto v. Cable TV*, 132 D.P.R. 1008 (1993), we decided that as the Municipality of Trujillo Alto lacked the authority to impose the payment of municipal patents upon Cable TV of Greater San Juan (Cable TV), the latter was not obligated to follow the administrative procedure provided in the Municipal Patent Law as prior requirement to go to court. In that case it was questioned whether the collection of municipal patent by a Municipality where the offices of the company were not located. When deciding, we stated that when the controversy is **\*709** the legal authority of a Municipality to impose a tax and not its amount, it is not necessary to follow the administrative procedure. Íd.

Similarly, in *Compañía Azucarera del Toa v. Municipality*, 76 D.P.R. 331 (1954), we decided that if there is no valid law that authorizes a Municipality to impose a tax it is unnecessary to begin the administrative remedies, as that would be futile. In the referenced case, there was a controversy regarding the appropriateness of a collection of municipal patents in light of an insular tax. When deciding that the municipalities lacked authority to impose the patents in question as an insular tax existed over the same articles, we stated it was not necessary to comply with the administrative procedure provided in the Law of Municipal Patents so that the courts could have jurisdiction. Íd.

With the foregoing in mind, we shall finally resolve the controversy before us.

### IV

A. Before deciding the matter regarding the tax power of the municipalities to demand construction excise taxes on the works made by the Legislative Branch, it is necessary to dispose of the argument brought by the Municipality regarding the lack of jurisdiction of the Court of First Instance to preside over the declaratory judgment complaint filed against it by Interior Developers. The Municipality alleged before the Court of First Instance, and before us, that the Law of Autonomous Municipalities specifies the procedure that a

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 5

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Interior Developers v. Mun. de San Juan, 177 D.P.R. 693 (2009)

2009 TSPR 191

taxpayer must follow when not in agreement with the amount of construction excise tax imposed by the Director de Finances of a municipality. It alleges that when Interior Developers did not follow any of the courses of action provided in the law, the Preliminary Notice of Excise Taxes to pay became firm and final **710** thus it has no option but to pay. That is not correct.

As stated above, when a party questions the authority of a Municipality to demand a particular tax it is unnecessary to exhaust the administrative proceeding provided in law. In this case, as in *Mun. Trujillo Alto v. Cable TV*, supra, and *Compañía Azucarera del Toa v. Municipality*, supra, the amount notified is not questioned, but the authority in law of a Municipality to demand the tax. Therefore, what is in controversy in this case is the authority of the Municipality to impose payment of the construction excise tax, therefore it was not necessary that Interior Developers exhaust the administrative remedies provided in Art. 2.007 of the Law of Autonomous Municipalities, *supra*, before filing before the court of first instance.

Indeed, in the complaint of declaratory judgment filed by Interior Developers, it requested in the first place, that the court declare that the construction excise tax notified be deemed inappropriate as the work is outside the scope of  the taxing authority of the Municipality. Secondly, it requested that it be declared that it is not a taxpayer pursuant to the Law of Autonomous Municipalities and in the alternative, it requested that if it was determined that the construction excise tax was appropriate it be calculated based on the percentage applicable to the structures of historical value.  It is clear from the complaint that the main argument of Interior Developers is that the Municipality does not have the authority to impose the construction excise tax on the construction works made in the Capitol. Therefore, Interior Developers did not have to follow the procedure provided in the Law of Autonomous Municipalities before filing in the Court of First Instance.

One could argue, as the Municipality indeed does, that it is contrary to the judicial procedure to allow a party who is demanded payment of tax **711**  to forego the administrative process before going to the courts. The Municipality states that this can lead to a party alleging lack of authority of a Municipality as a subterfuge to refute the amount notified without having to pay it. However, as the

power of the municipalities to impose taxes is delegated it is necessary that the judicial process be open for the parties who are demanded—without authority in law— the payment of a tax so they have an available remedy. It would be futile and unjust to require that a party exhaust the administrative remedies when it sufficiently alleges that a Municipality does not have the faculty in law to impose the tax in question.

Having decided the jurisdictional argument of the Municipality, we go on to decide the matter regarding the power of the Municipality to request the payment of construction excise tax for the works made at the Capitol.

B. As stated above, a construction work made within from the quoted text of Art. 2.002 of the Law of Autonomous Municipalities, *supra*, it is deduced that the taxable event that generates the obligation to pay the construction excise tax is when a person or private entity or a person or private entity contracted by the an agency or office of the municipal, federal or Central Government builds within the territorial limits of the municipality. As the construction excise tax falls on the work and not on the person that builds it, if the work does not have the elements provided in law there is no obligation to pay the construction excise tax. Véase, además, *Mun. de Utuado v. Aireko Const. Corp.*, supra.

Consequently, if the tax obligation does not arise because the taxable event is not produces it is not necessary to determine who the taxpayer is as such figure is considered only once the obligation to pay tax arises. Therefore as provided in Art. 1.003(ee) of the Law of Autonomous Municipalities, *supra*, the taxpayer is who is obligated to pay the construction excise tax. Such article **712** states that the obligated to payment of excise tax could be the owner of the work or the persons contracted by him to make them, that in turn could include the construction excise tax in the cost of the work. Íd. However, none of these persons can be a taxpayer if the construction work is outside the taxing scope of municipality. IN other words, if the obligation to pay the construction excise tax does not arise there is no need to speak of the taxpayer.

Similarly, if the construction work does not generate the obligation to pay taxes, it is not necessary to determine if any exemption is applicable. An exemption is a provision that as an

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:24   Desc:
Exhibit Kirpalani Declaration.   Page 67 of 92

CERTIFIED TRANSLATION

Interior Developers v. Mun. de San Juan, 177 D.P.R. 693 (2009)

2009 TSPR 191

exception, exempts from payment of a tax those who would be obligated to pay it if the exemption were not applicable. Therefore we see that Art. 2.007 of the Law of Autonomous Municipalities, *supra*, authorizes the municipalities to exonerate from payment of the construction excise tax certain Works that were it not for the exemption would be subjected to paying it as for example, those made by developers in projects of social interest.

Therefore it is forcible to conclude that for the obligation to pay construction excise tax to arise the elements necessary must all be present so that the taxable event can occur. As the law provides, aside from being a construction work within the territorial limits of the Municipality, it is required that the work be made by a natural person or private entity or person or private entity contracted by an agency or office of the municipal, federal or Central Government. 21 L.P.R.A. sec. 4001(r) y (s). AS stated above, Art. 2.002 of the Law of Autonomous Municipalities, *supra*, excludes form the definition of Central Government the Legislative Branch and the Judicial Branch. Art. 1.003(r) of the Law of Autonomous Municipalities, *supra*.

In this case, a private entity—Interior Developers—was obligated, pursuant to a contract *713 with the Legislative Branch, to make the works in the Capitol. In those Works there are two of the elements that compose the taxable event that would give rise to the rise of the obligation to pay the construction excise tax, to wit, that it is a construction work and that it was made within the territorial limits of the municipality. However, there is an essential element missing for the taxable event

to be configured as provided in the Law of Autonomous Municipalities: the work was not done by a person or private entity or a person or private entity contracted by an agency or office of the municipal, federal or Central Government. See 21 L.P.R.A. sec. 4001(r) y (s). Per the Law of Autonomous Municipalities, the Legislative Branch is excluded from the definition of the *Central Government*. Therefore, the Municipality lacked authority in law to demand Interior Developers the payment of the construction excise tax for the Works performed in the Capitol because, as deduced from Arts. 1.003 y 2.002 of the Law of Autonomous Municipalities, *supra*, every construction work performed by the Legislative Branch, or the persons or private entities contracted by it is outside the scope of the taxing authority of the municipalities.

In view of the foregoing, the Court of Appeals erred when deciding that the construction Works that Interior Developers made are subject to the payment of construction excise tax for not being expressly included in the exemptions provided in the Law of Autonomous Municipalities.

**V**

In view of the foregoing, the appealled judgment is reversed and consequently, the complaint of Interior Developers is Granted.

*Judgment shall be entered accordingly.*

Footnotes

1    La Superintendence of the State Capitol of the Legislative Assembly of Puerto Rico was created by Law No. 4 of July 21, 1977 to direct everything related with the conservation, maintenance, extension, construction, remodeling and every work done in the Capitol. 2 L.P.R.A. secs. 651 y 655.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 5

CERTIFIED TRANSLATION

Mr. PRESIDENT: We are going to put Mr. García Méndez's amendment to a vote. Delegates in favor of the amendment shall make it known by stating "yea"… Those against, say "nay"… The amendment does not pass.

Any other amendment to section 1?

Let us proceed to section 2.

Mr. SECRETARY: "Section 2.—Imposition and collection of taxes.—Debt.—The power of the Commonwealth of Puerto Rico to impose and collect taxes and authorize the municipalities to impose and collect them, shall be exercised as legally determined by the Legislative Assembly and shall never be surrendered, suspended or subject to contract. The power of the Commonwealth of Puerto Rico to enter into and authorize debt shall be exercised by the Legislative Assembly."

Mr. IRIARTE: Mr. President...

Mr. PRESIDENT: Mr. Iriarte...

Mr. IRIARTE: Section 37 of the Organic Charter, which is part of the Federal Relations Act, provides the same thing as this article which was just read. I think we should not legislate anything that is completely empty, which does not represent anything, because if it goes against the provisions of the Federal Relations Act, it is not worth anything; and what this article does is repeat what the Federal Relations Act says, which is Article 37 of the current Organic Act. It does not say anything else. It does not grant new powers to the Legislative Assembly, which the Legislative Assembly does not have under the Federal Relations Act. So, why put that article in the constitution?

Mr. PRESIDENT: What is the amendment?

Mr. IRIARTE: The amendment is to eliminate that article as unnecessary, since those powers have already been granted to the Legislative Assembly by the Federal Relations Act.

Mr. PRESIDENT: Does anyone second? Seconded.

Mr. SOLA MORALES: To oppose, Mr. President.

Mr. PRESIDENT: It shall be submitted to a vote. All those in favor of Mr. Iriarte's amendment, say yea… Those against, say nay... Defeated.

Mr. FIGUEROA: For an amendment... defeated.

Mr. PRESIDENT: Mr. Figueroa.

Mr. FIGUEROA: The amendment is as follows, which I will state without arguments. It speaks for itself. In line 10, after the word "legislative," add: "In the event of

2574


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

entering into contract for municipal or island loans, they shall be submitted to a municipal or island referendum on their own merits."

Mr. PRESIDENT: It shall be put to vote. Anyone in favor of Mr. Figueroa's amendment, say yea... Anyone against, say nay... Defeated.

Mr. POLANCO ABREU: Mr. President, an amendment.

Mr. PRESIDENT: Mr. Polanco Abréu.

Mr. POLANCO ABREU: To eliminate the comma after the word "surrendered" in line 7 page 2, and substitute "or suspended"; that is, to add the word "or" and put a period after "suspended" and eliminate "or subject to contract." So that it reads: "The power of the Commonwealth of Puerto Rico to impose and collect taxes and authorize the municipalities to impose and collect them shall be exercised, as legally determined by the Legislative Assembly, and shall not be surrendered or suspended."

This amendment is because of the doubt that members of the committee have as to the scope of that phrase "or subject to contract" regarding tax exemptions. That is why I request that this aspect be eliminated.

Mr. GARCIA MENDEZ: An explanation.

Mr. PRESIDENT: Mr. García Méndez.

Mr. GARCIA MENDEZ: Clearly, sir, that amendment, that is to say, the way the phrase was, at no point did it have- I ask as a question, but a stated one – the [purpose of] if there is an island tax and a municipal tax is passed and that municipal tax becomes a double tax, in accordance with case law… Wasn't that the purpose? To suspend, for the phrase "not be suspended," to substitute double taxes, both municipal and insular, sir?

Mr. POLANCO ABREU: That is not the purpose.

Mr. GARCIA MENDEZ: What is the purpose of the basis?

Mr. POLANCO ABREU: The elimination. The doubts that we had. I would like to clarify this part of the [minutes]. The doubt that we have that this could imply a limit to the power of the Commonwealth of Puerto Rico, as regards entering into loan agreements, by imposing special tax rates and the aspect of the tax exemption. That is why I request that it be eliminated.

Mr. GARCIA MENDEZ: In other words, it is geared more towards guaranteeing the rights of the Legislative [Assembly] as creator?

2575



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Mr. POLANCO ABREU: The amendment is geared more towards not limiting the powers of the Legislative Assembly to impose and collect taxes.

Mr. GARCIA MENDEZ: But not increase the powers of the municipality, isn't that the purpose?

Mr. POLANCO ABREU: That is not the purpose.

Mr. GARCIA MENDEZ: Nothing else. Thank you, sir.

Mr. PRESIDENT: It shall be submitted to a vote. All those in favor, say yea… All those against, say "nay"… Passed.

Mr. PRESIDENT: Section 3.

Mr. SECRETARY: "Section 3.—Electoral Process.—Starting in 1952, general elections shall be held every four years on the date in November determined by the Legislative Assembly. Said election shall elect a governor, a vice-governor, the members of the Legislative Assembly and the Resident Commissioner in the United States. The other popularly-elected employees shall be elected during those same elections, unless otherwise provided by law. Any person who has turned twenty-one and meets the other conditions determined by law shall be a voter. And no one shall be deprived of the right to vote based on not knowing how to read or write, not having property or for economic reasons. The Legislative Assembly shall determine by law everything related to the electoral process and the process of registering voters in electoral records, as well as everything regarding registering political parties. All election employees shall be elected by direct vote and the person elected shall be the candidate for a position who obtains an amount of votes that is higher than those obtained by any of the other candidates to the same position."

Mr. PARKHURST: Mr. President.

Mr. PRESIDENT:  Mr. Parkhurst.

Mr. PARKHURST: Mr. President and fellow delegates. In line 16, after "resident," to insert "and or representatives to whom have the future," [I mean,] "that the Commonwealth of Puerto Rico has the right to in the future under federal legislation."

Mr. PRESIDENT: Is it seconded?

A DELEGATE: I second.

Mr. POLANCO ABREU: Mr. President, to oppose the amendment.

2576



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 6

4: suprimir toda la línea 12. Entonces, en la línea 13, suprimir hasta "disposiciones", e insertar en su lugar, "y reglas"; y en la línea 14 suprimir, "tales asignaciones", e insertar "las mismas", de manera que toda la oración leería: "La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas." La enmienda es solamente para perfeccionar la definición del presupuesto, de manera que el propósito general es que pueda incluir, no solamente los gastos ordinarios de funcionamiento, sino también mejoras permanentes, asignaciones a empresas públicas y otras asignaciones, incluyendo, desde luego, el principial e intereses de la deuda pública, de manera que se pueda utilizar una mejor técnica de presupuesto.

Sr. PRESIDENTE: Ha sido propuesta la reconsideración. Los que estén por la reconsideración, dirán que sí. En contra, no. Concedida la reconsideración. Está entonces la enmienda formulada, la enmienda en la forma en que está.

Sr. REYES DELGADO: Sr. Presidente.

Sr. PRESIDENTE: Sr. Delegado.

Sr. REYES DELGADO: Compañero Negrón López: Una enmienda en lo que respecta a la definición de lo que es la ley del presupuesto. ¿Eso significaría que podría incluirse en la ley de presupuesto, por ejemplo, el presupuesto de gastos y las operaciones de la Autoridad de Transporte, por ejemplo?

Sr. NEGRON LOPEZ: Si la Asamblea Legislativa determina así hacerlo, puede incluirlo, pero no se implica eso necesariamente. O sea, la Asamblea Legislativa puede crear instrumentalidades y agencias públicas con aquella autonomía de funcionamiento que desee. Ése es el criterio que prevalece en toda la constitución, por lo menos en su aspecto de rama legislativa y hasta donde conocemos e interpretamos, ésa ha sido la intención en cuanto a las demás ramas de la estructura gubernamental.

No hay ninguna disposición de la rama legislativa ni en ninguna otra del artículo que se ha considerado, que pueda ser susceptible válidamente de interpretación, en el sentido de que los presupuestos de las agencias públicas necesariamente tenga que aprobarlos la Asamblea Legislativa. Eso lo prescribirá la Asamblea Legislativa por ley, de acuerdo con el criterio que  prevalezca en cuanto a la forma de organizar y determinar el funcionamiento de esas agencias.

Sr. PRESIDENTE: Hay mayor discusión sobre la enmienda propuesta por el señor delegado, Negrón López? Si no la hay, se somete a votación. Los que estén por la afirmativa, lo significarán levantando la mano derecha. Los delegados no están votando. 51 votos a favor. Ha sido adoptada la enmienda.

Sr. GUTIERREZ FRANQUI: Sr. Presidente.

Sr. PRESIDENTE: Sr. Delegado.

2505

# Exhibit 7

2001 WL 1764054 (TCA)

TELEFONICA LARGA DISTANCIA DE PUERTO
RICO, INC., AT & T DE PUERTO RICO, INC. y
SPRINT COMMUNICATIONS COMPANY, L.P.,
Demandantes–Apelantes,
v.
DEPARTAMENTO DE HACIENDA,
Demandado–Apelado.

EN EL TRIBUNAL DE CIRCUITO DE
APELACIONES
Civil Núm. KCO97–0021
KLAN0100568, KLAN0100727, KLAN0100770
En San Juan, Puerto Rico, a 26 de noviembre de
2001.
Nov. 26, 2001.

Apelación procedente del Tribunal de Primera Instancia,
Sala Superior de San Juan

Panel integrado por su presidenta, la Jueza Fiol Matta, la
Jueza Rodríguez de Oronoz y el Juez González Rivera.

*SENTENCIA*

RODRÍGUEZ DE ORONOZ, JUEZA PONENTE

**\*1** Se nos solicita la revisión de la sentencia emitida por
el Tribunal de Primera Instancia, Sala Superior de San
Juan, el 29 de octubre de 2000. Mediante la referida
sentencia se decretó la constitucionalidad de la
contribución impuesta por la Ley Núm. 69 de 9 de agosto
de 1993 a las compañías de telecomunicaciones de larga
distancia.

Examinados en su totalidad los autos del caso y el
derecho aplicable, resolvemos que procede confirmar la
sentencia apelada.

**I**

En el año 1999 las apelantes, Telefónica Larga Distancia
de Puerto Rico, Inc. ("TLD"), AT & T de Puerto Rico,
Inc. ("AT & T") y Sprint Communications Company, L.P.
("SPRINT"), radicaron por separado demandas contra el
Departamento de Hacienda ("Hacienda") cuestionando la
constitucionalidad de la Ley Núm. 69 de 9 de agosto de
1993 ("Ley Núm. 69"), la cual imponía una contribución
de dos por ciento (2%) sobre el ingreso bruto de

operación en la prestación de servicios de
telecomunicaciones por cualquier compañía de larga
distancia.[1]

TLD presentó su demanda el 23 de marzo de 1999. Alegó
que el 22 de junio de 1998 presentó ante Hacienda una
solicitud de reintegro de la contribución de 2% pagada a
tenor con lo dispuesto en la Ley Núm. 69 correspondiente
a los años 1994, 1995 y 1996 (período del 1 de enero al
11 de septiembre de 1996), por la cantidad de
$3,576,456.30 más intereses, la cual le fue denegada.
Adujo que la Ley Núm. 69 violaba la prohibición
impuesta por la Constitución de Estados Unidos contra la
imposición de gravámenes al comercio interestatal con el
propósito de favorecer o proteger el comercio estatal.
Argumentó que dicha ley era inconstitucional porque
tributaba más opresivamente una misma actividad cuando
cruzaba los límites estatales que cuando ocurría
enteramente dentro de Puerto Rico pues le imponía una
contribución de 2% sobre el ingreso bruto de operación en
la "prestación de servicios de telecomunicaciones a
cualquier compañía de larga distancia" y no le imponía
una contribución similar al ingreso bruto derivado de la
prestación de servicios de telecomunicaciones
intraestatales a las compañías que prestaban ese tipo de
servicio. Solicitó que el tribunal de instancia declarara
inconstitucional dicha contribución y que le ordenara a
Hacienda reintegrar a TLD la suma reclamada de
$3,576,456.30 más intereses al 6% anual a partir de la
fecha de pago.

Por su parte, SPRINT presentó su demanda el 26 de
marzo de 1999. Argumentó que el 30 de diciembre de
1998 presentó ante Hacienda una solicitud de reintegro de
la contribución de 2% pagada a tenor con lo dispuesto en
la Ley Núm. 69 correspondiente a los años 1994, 1995 y
1996 (período del 1 de enero al 11 de septiembre de
1996), pero la misma le fue denegada. Reclamó el
reintegro de los siguientes pagos: $288,719.00 en el año
1994; $351,034.00 en el 1995; y 288,790.00 en el 1996,
para una cantidad total de $928,542.00 más los intereses
dispuestos por ley. Al igual que TLD, alegó que la Ley
Núm. 69 violaba la prohibición impuesta por la
Constitución de Estados Unidos contra la imposición de
gravámenes al comercio interestatal con el propósito de
favorecer o proteger el comercio estatal. Argumentó que
dicha ley era inconstitucional porque tributaba más
opresivamente una misma actividad cuando cruzaba los
límites estatales que cuando ocurría enteramente dentro
de Puerto Rico, lo que constituía un trato desigual y
discriminatorio bajo la cláusula de comercio. Solicitó que
el tribunal de instancia declarara inconstitucional dicha
contribución y que le ordenara a Hacienda reintegrar a
SPRINT la suma reclamada de $928,543.00 más el 6% de

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:21   Desc:
Exhibit Kirpalani Declaration.   Page 76 of 92

Telefonica Larga Distancia De Puerto Rico, Inc. v...., 2001 WL 1764054...

interés desde la fecha de pago a Hacienda hasta su reintegro a SPRINT.

**\*2** Por último, AT & T presentó su demanda el 29 de marzo de 1999. Sostuvo que el 28 de diciembre de 1998 presentó ante Hacienda una solicitud de reintegro de la contribución de 2% pagada a tenor con lo dispuesto en la Ley Núm. 69 correspondiente a los años 1993 al 1997, en la que reclamó el reintegro de los siguientes pagos: (1) $1,018,317.30 en el año 1993; $1,340,700.50 en el 1994; $1,453,228.19 en el 1995; $1,678,998.19 en el 1996; y $1,533,156.82 en el 1997. Explicó que Hacienda denegó su solicitud de reintegro. Alegó que la Ley Núm. 69 era inconstitucional y discriminaba contra el comercio interestatal pues exigía el pago de contribuciones sobre ingresos de las operaciones de servicios de telecomunicaciones de larga distancia interestatales pero a las compañías que ofrecían servicios de Telecomunicaciones de larga distancia dentro de los límites territoriales de Puerto Rico no se le exigía que pagaran dicha contribución ni alguna otra cantidad por los ingresos derivados de tales servicios.

Las compañías apelantes solicitaron la consolidación de los casos y el 26 de mayo de 1999 el tribunal de instancia consolidó los mismos bajo el número KCO97–0021, exclusivamente para tratar el asunto de la constitucionalidad del impuesto. Una vez consolidados los casos, Hacienda contestó las demandas negando todas las alegaciones y planteando como defensa afirmativa, entre otras, que las actuaciones del Secretario de Hacienda estaban protegidas por una presunción de corrección, la cual no había sido controvertida ni derrotada por la causa de acción presentada. Además, presentó una moción solicitando sentencia sumaria o desestimación de los casos consolidados.

Las compañías apelantes se opusieron a tal solicitud y a su vez solicitaron se dictara sentencia sumaria a su favor. Luego de que las partes sometieran sus respectivos memorandos de derecho, el 19 de octubre de 2000 el tribunal de instancia emitió sentencia decretando la constitucionalidad de la contribución en controversia. A pesar de que la sentencia fue notificada originalmente el 2 de noviembre de 2000, su notificación fue defectuosa por lo que se requirió realizar una notificación enmendada, la cual se llevó a cabo el 6 de junio de 2001. Inconformes, TLD, Sprint y AT & T presentaron sendos escritos de apelación el 14 de junio, 23 de julio y 6 de agosto de 2001. Las partes plantearon los siguientes señalamientos de error:

*TLD*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA LEY 69 NO VIOLA LA CLÁUSULA DE COMERCIAL INTERESTATAL DE LA CONSTITUCIÓN DE ESTADOS UNIDOS.

*SPRINT*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA LEY NÚM. 69 DE 9 DE AGOSTO DE 1993 NO DISCRIMINA CONTRA EL COMERCIO INTERESTATAL Y, POR TANTO, ES CONSTITUCIONAL.

SIENDO LA LEY NÚM. 69 DISCRIMINATORIA, ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONSIDERAR OTROS FACTORES QUE ALEGADAMENTE SUSTENTAN SU CONSTITUCIONALIDAD.

**\*3** *AT & T*

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR COMO CUESTIÓN DE HECHO QUE LA CONTRIBUCIÓN ES APLICABLE A TODAS LAS COMPAÑÍAS DE TELECOMUNICACIONES DE LARGA DISTANCIA Y QUE LA MISMA ESTÁ RELACIONADA CON LOS SERVICIOS QUE PUERTO RICO LES PROVEE A DICHAS COMPAÑÍAS Y AL IGNORAR EVIDENCIA SOBRE HECHOS RELEVANTES A LA CONTROVERSIA LA CUAL NO ESTÁ EN DISPUTA Y DEMUESTRA LA NATURALEZA DISCRIMINATORIA DEL IMPUESTO.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR CONFORME A DERECHO QUE LA CONTRIBUCIÓN NO DISCRIMINA CONTRA EL COMERCIO INTERESTATAL Y QUE LA MISMA ES VÁLIDA CONSTITUCIONALMENTE.

En esencia, las compañías apelantes impugnan la constitucionalidad de la Ley Núm. 69 alegando que dicha ley viola la prohibición de la cláusula de comercio de la Constitución de Estados Unidos contra la imposición de gravámenes al comercio interestatal con el propósito de favorecer o proteger el comercio estatal. Sostienen que la contribución es discriminatoria pues se aplica al ingreso bruto generado por los servicios de comunicaciones interestatales y se exime de la misma al ingreso bruto generado por servicios de comunicaciones intraisla.

Ante la solicitud del Procurador General, ordenamos la consolidación de los casos mediante resolución del 16 de

agosto de 2001. Pasamos a resolver.

## II

La facultad de tributación del Estado Libre Asociado es el más fundamental de sus poderes públicos y gubernamentales. *Burlington Air Express v. Mun. de Carolina,* ___ D.P.R. ___ (2001), 2001 T.S.P.R. 98; *RCA v. Gob. de la Capital,* 91 D.P.R. 416, 428 (1964). Se trata de un poder que es "esencial a su subsistencia y para su supervivencia" como un Estado político. *Id.* Tiene una "gravísima y vital importancia". *P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982 (1960). Por ello el Tribunal Supremo ha resuelto que este amplio poder lo ejerce el Estado Libre Asociado "libre de autoridad superior, sujeto sólo a las limitaciones de su propia Constitución ..., y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de existir y existen con los Estados Unidos a tenor de la Ley Pública 600". *Burlington Air Express v. Mun. de Carolina, supra,* citando a *RCA v. Gob. de la Capital, supra.*

Cuando los estados ejercen el poder de imponer contribuciones, tienen amplia discreción de seleccionar los sujetos y los objetos a ser tributados. El derecho al debido proceso de ley o a la igual protección de las leyes no impone una regla rígida que exija igualdad en la imposición de las contribuciones. La Asamblea Legislativa tiene vasta discreción para establecer clasificaciones y se justifica una clasificación si está razonablemente relacionada con el propósito de la legislación. *Coca Cola Bottling Co. v. Srio. De Hacienda,* 112 D.P.R. 702 (1982).

**\*4** La jurisprudencia federal ha mostrado deferencia hacia los estados cuando la reglamentación no es discriminatoria de su faz y su objetivo es proteger a la ciudadanía de posibles prácticas engañosas o perjudiciales por parte de intereses extraños a la localidad. *M. & B.S., Inc. v. Depto. de Agricultura,* 118 D.P.R. 319 (1987). "Porque la reglamentación afecte al comercio interestatal no debe ser invalidada necesariamente, particularmente si los beneficios de salud o bienestar público son determinantes al aprobarla, mientras que su impacto sobre el comercio interestatal es secundario o incidental". *M. & B.S., Inc. v. Depto. de Agricultura, supra,* citando a *Mintz v. Baldwin,* 289 U.S. 346 (1933). "[U]na ley estatal no debe ser dejada sin efecto con meramente demostrar que su administración afecta el comercio interestatal de alguna forma". *Id.,* citando a *Head v. New Mexico Board,* 374 U.S. 424, 429 (1963).

En *RCA v. Gob. de la Capital, supra,* el Tribunal

Supremo hizo un recuento de la autoridad del Estado Libre Asociado respecto a la imposición de impuestos a partir de la Ley de Relaciones Federales, conocida también como la Ley 600. En ese caso se presentaron demandas contra el Municipio de San Juan solicitando la devolución de unas cantidades pagadas al municipio por concepto de patentes municipales. Las demandantes alegaron que el cobro de las patentes a las compañías dedicadas exclusivamente a las comunicaciones entre Estados Unidos y países extranjeros era una intervención indebida por parte del Municipio de San Juan en el comercio interestatal de los Estados Unidos.

El Tribunal Supremo comenzó su análisis reiterando el hecho histórico que "la Constitución de los Estados Unidos, de su faz y por su propia fuerza, no se extendió a los habitantes de Puerto Rico por el hecho mismo de la cesión en el Tratado de París". *RCA v. Gob. de la Capital, supra,* a las págs. 430–431. Continuó explicando que el Congreso de los Estados Unidos "desde un principio no extendió ni ha extendido directamente a Puerto Rico las disposiciones mismas de la constitución, como hizo en relación con otras comunidades". *Id.* Además, el Tribunal Supremo reiteró que "la disposición constitucional que reserva al Congreso el poder de reglamentar el comercio con naciones extranjeras, entre los Estados y con las tribus indias, no sólo no ha regido ni rige por su propia fuerza en Puerto Rico sino que por el contrario, el Congreso dispuso de manera expresa que no serían aplicables a Puerto Rico la Ley sobre Comercial Interestatal y las varias enmiendas hechas o que se hicieran a ella ... ni tampoco una Ley para regular el comercio, de 4 de febrero de 1887 y las leyes enmendatorias de la misma ... y que aún prevalece formando parte de la Ley de Relaciones Federales". *RCA v. Gob. de la Capital, supra.*

Basado en el antes mencionado trasfondo históricolegal, el Tribunal Supremo concluyó en *RCA v. Gob. de la Capital, supra,* que la relación de comercio interestatal que rige entre Puerto Rico y los Estados Unidos siempre "ha tenido y aún tiene perfiles distintos de la que por virtud de la Constitución rige entre los Estados de la Unión". Expresó también el Tribunal que como resultado de esa diferencia el Estado Libre Asociado puede ejercer hoy su facultad de tributación en cuanto al comercio interestatal en una forma que "tal vez a un Estado cubierto por las disposiciones de la constitución Federal no le sería permisible".

**\*5** En *RCA v. Gob. de la Capital, supra,* el Tribunal Supremo también analizó jurisprudencia del Tribunal Supremo de Estados Unidos. En lo aquí pertinente, y citando extensamente el caso de *General Motors Corp. v. State of Washington,* 377 U.S. 436 (1964), se indicó que

"... la legalidad de la contribución descansa en el hecho de si el Estado hace una demanda constitucionalmente razonable sobre aquel aspecto del comercio interestatal con el que guarda especial relación ... [L]a cuestión es si el Estado ha ejercido su facultad en proporción adecuada a las actividades de la apelante dentro del Estado y al consiguiente disfrute por la apelante dentro de las oportunidades y protecciones que el Estado ha brindado". *RCA v. Gob. de la Capital, supra,* a la pág. 435. En *General Motors, supra,* citando a *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444 (1940), el Tribunal Supremo de Estados Unidos reiteró que "la cuestión simple pero decisiva es si el Estado ha concedido algo a cambio de lo cual puede solicitar recompensa".

### III

Al examinar la Ley Núm. 301 de 15 de mayo de 1945, 27 L.P.R.A. §§ 341 *et seq.,* legislación que originalmente impuso el impuesto de 2%, encontramos que la misma se promulgó para responder a la situación de carácter urgente que presentaba el desarrollo de la infraestructura para propulsar el desarrollo de las telecomunicaciones en Puerto Rico. Dicho impuesto sería pagado por las compañías que rindieran servicio de transmisión de mensajes telefónicos y telegráficos. Con ese propósito en mente, la Sección 2 de la Ley Núm. 301, 27 L.P.R.A. § 342, estableció lo siguiente:

> Sección 2—Por la presente se autoriza y ordena al Tesorero de Puerto Rico para imponer y cobrar una contribución o impuesto de dos por ciento sobre el ingreso bruto de operación cobrado por cualquier compañía de servicio público o instrumentalidad gubernamental de El Pueblo de Puerto Rico, por la transmisión de mensajes telefónicos y telegráficos, incluyendo giros telegráficos. Toda cantidad recibida por el Tesorero de Puerto Rico a virtud de las disposiciones de esta sección será depositada por él en un fondo especial que se denominará Fondo Especial para el Fomento de Comunicaciones. Dichos fondos serán puestos, de tiempo en tiempo, a la disposición de la Junta de Directores de la Autoridad de Comunicaciones de Puerto Rico,

mediante su requerimiento para su inversión por dicha junta, o bajo sus órdenes, en aquellas mejoras, extensiones, investigaciones, experimentos o investigaciones especiales, que crea conveniente, con el fin de extender y mejorar la calidad del sistema y facilidades de las comunicaciones telefónicas y telegráficas en Puerto Rico. Dicho impuesto deberá ser pagado por las compañías de servicio público o por las instrumentalidades públicas que rindan dicho servicio, dentro de los sesenta (60) días después de haber cerrado la contabilidad de cada año económico; y bajo ningún concepto deberá cargarse el mismo a personas que utilicen sus servicios.

**\*6** El impuesto de 2% se constituyó en una fuente de recaudos constante que se dirigiría al fomento de las telecomunicaciones. Cabe señalar que el impuesto de 2%, tal y como fue dispuesto en la Sección 2 de la Ley Núm. 301, fue declarado constitucional por nuestro Tribunal Supremo, tanto a la luz de las disposiciones aplicables de la Carta Orgánica de 1917 como de aquellas de la Constitución de los Estados Unidos. Véase *P.R. Telephone Co. v. Trbl. Contribuciones,* 81 D.P.R. 982, 992–994 (1960).

Luego que se creara la Comisión Reguladora de Telecomunicaciones de Puerto Rico en 1990 se enmendó la Sección 2 de la Ley Núm. 301 mediante la Ley Núm. 64 de 23 de agosto de 1990.[2] El propósito de la enmienda fue "imponer y autorizar al Secretario de Hacienda a cobrar las contribuciones impuestas a las compañías de telecomunicaciones no cubiertas por la Ley de la Comisión Reguladora de Telecomunicaciones". Además, en dicha ley se ordenó que las cantidades recaudadas por dicho concepto fueran depositadas en un fondo especial y que los fondos depositados en el Fondo Especial para el Fomento de las Comunicaciones fueran transferidos al fondo especial denominado "Fondo Especial de la Comisión Reguladora de Telecomunicaciones".

Por otro lado, la Ley Núm. 69 claramente expresó en su título que la misma se aprobó para enmendar la Sección 2 de la Ley Núm. 301 de 1945, según enmendada, "a fin de mantener la imposición y autorización del Secretario de Hacienda a cobrar las contribuciones impuestas a las compañías de telecomunicaciones de larga distancia; para

que las cantidades recaudadas por dicho concepto sean depositadas en el Fondo General; y autorizar la transferencia al Fondo General de los dineros depositados en el Fondo Especial de la Comisión Reguladora de Telecomunicaciones". Además, en su Exposición de Motivos se expresó que:

"Consideraciones imperiosas de orden público requieren que las compañías de telecomunicaciones de larga distancia continúen pagando el impuesto requerido por ley. A este fin es necesario canalizar esos fondos a áreas de necesidad a fin de cumplir con los programas de gobierno".

Como podemos ver, la contribución dispuesta en la Ley Núm. 69 se impuso con el mismo propósito por el cual se impuso originalmente bajo la Ley Núm. 301, es decir, con el propósito de fomentar las telecomunicaciones. Mediante ese impuesto del 2% del ingreso bruto de las compañías que ofrecían servicio de telecomunicaciones de larga distancia se creó una fuente de recaudos constantes. Es evidente que los fondos obtenidos mediante este impuesto han propulsado los avances tecnológicos habidos en la provisión de servicios de telecomunicaciones.

De esta manera el Estado Libre Asociado comenzó a involucrarse en el campo de las telecomunicaciones, invirtiendo en desarrollo e infraestructura por más de medio siglo. De ella ha crecido la infraestructura de las comunicaciones que hoy en día nos permite no sólo estar a la par con los países más desarrollados comercialmente sino también propulsar el desarrollo económico de la Isla.

**\*7** Las compañías apelantes, participantes todas ellas en el mercado de las telecomunicaciones en Puerto Rico, se benefician plenamente del desarrollo propulsado con los fondos recolectados desde el 1945 mediante la contribución en controversia. Surge de esta forma una situación en que, de acuerdo a la jurisprudencia federal citada por nuestro Tribunal Supremo en *RCA v. Gob. de la Capital, supra,* "el Estado ha concebido algo a cambio de lo cual puede solicitar recompensa".

Existen variadas actividades de las compañías apelantes dentro del Estado Libre Asociado, como por ejemplo, la actividad de mercadeo y publicidad de sus productos y la utilización de la infraestructura de telecomunicaciones desarrollada en la Isla, son incidentes locales suficientes sobre los que puede basarse la contribución impuesta por la Ley Núm. 301, según enmendada. No se trata pues de un caso donde Hacienda intenta imponer una contribución por el mero privilegio de dedicarse al comercio interestatal sino que se trata de una contribución impuesta sobre aspectos del negocio que están sujetos al amplio

poder soberano del estado.

A primera vista, el argumento presentado por las apelantes que la contribución del 2% impuesta sobre el ingreso bruto de las compañías de telecomunicaciones de larga distancia ultramarinas, a exclusión de las compañías de larga distancia intraisla, es discriminatorio, aparenta ser uno viable. Las apelantes logran esta apariencia de validez refiriéndose indistintamente a ambos tipos de llamadas, tanto las ultramarinas como las que no salen del límite geográfico de Puerto Rico, como llamadas de larga distancia. Clasificando todas las llamadas fuera del área metropolitana como llamadas de larga distancia, sin distinción de su alcance geográfico, aparentemente no surge una explicación razonable para que el Estado sólo le imponga el impuesto del 2% a los ingresos derivados de servicios de larga distancia fuera de Puerto Rico.

Sin embargo, un análisis más pausado de la alegada discriminación revela que existe una diferencia sustancial entre un tipo y otro de llamadas de larga distancia que sostiene la distinción en cuanto al tratamiento contributivo. Esta diferencia estriba en que al proveer servicio de telecomunicaciones fuera de los límites territoriales de Puerto Rico, el servicio provisto por las compañías apelantes se convierte en uno transoceánico. Por lo tanto, la utilización de la infraestructura de telecomunicaciones que hacen las compañías apelantes es una distinta a la utilización de esa misma infraestructura por las compañías que ofrecen servicio de telecomunicaciones limitado a la extensión territorial de Puerto Rico.

Para alegar discriminación en el estatuto contributivo en controversia, las compañías apelantes venían obligadas a establecer que no existía una justificación tecnológica o de política pública específica al área de las telecomunicaciones que justificara que se aplicara un impuesto a un tipo de llamada (llamadas de larga distancia fuera de los límites territoriales de Puerto Rico) y no a otro (llamadas de larga distancia dentro de los límites territoriales). Las compañías apelantes no lograron así establecerlo. Meramente se limitaron a aglomerar todas las llamadas fuera del área metropolitana bajo la clasificación de "llamadas de larga distancia" y alegaron, de forma genérica, que existía discrimen en el trato contributivo de unas compañías y otras. Obviaron que la diferenciación contributiva obedecía a consideraciones tecnológicas y de infraestructura relacionadas a la condición de Puerto Rico como isla. No tomaron en consideración que la infraestructura y la tecnología utilizadas para las llamadas de larga distancia transoceánicas son distintas a las utilizadas para las llamadas de larga distancia intraisla. Es esa la distinción que justifica que se aplique un trato contributivo diferente

a cada actividad.

**\*8** Las compañías apelantes no han demostrado que la contribución impuesta por la Ley Núm. 69 afecta el comercio interestatal. Tampoco han demostrado que mediante dicho impuesto se discrimina contra las compañías que ofrecen servicios de larga distancia transoceánico, favoreciendo a las compañías que ofrecen servicios de larga distancia intraisla. Resolvemos que fue correcta la determinación del Tribunal de Primera Instancia al declarar la constitucionalidad de la ley impugnada.

**IV**

Por los fundamentos expresados, se confirma la sentencia apelada.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau

Secretaria General

Footnotes

1    En 1997 las compañías apelantes presentaron demandas contra el Departamento de Hacienda alegando que a partir del 12 de septiembre de 1996 no eran responsables del pago de la contribución impuesta por la Ley Núm. 69 por razón de que la Ley Núm. 213 del 12 de septiembre de 1996, 27 L.P.R.A. §§ 265–272, derogó dicha contribución. El 3 de julio de 2000 el Tribunal de Primera Instancia emitió una sentencia sumaria parcial (Caso Núm. KCO97–0021) en la que determinó que la Ley Núm. 213 derogó la contribución del 2% que la Ley Núm. 69 le imponía a las compañías que prestaban servicio de telecomunicaciones de larga distancia. Esa determinación fue apelada ante este Tribunal (Caso Núm. KLAN0000945), el cual emitió sentencia el 24 de enero de 2001 confirmando la sentencia apelada. Al presente, esa controversia está pendiente ante el Tribunal Supremo (CC–2001–223).

2    Esta ley fue derogada por la Ley Núm. 213 del 12 de septiembre de 1996. Véase nota al calce núm. 1.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# **Exhibit 8**

2015 WL 4075649 (TCA)

ASOCIACIÓN DE EMPLEADOS GERENCIALES
DE LA CORPORACIÓN DEL FONDO DEL
SEGURO DEL ESTADO, Apelante
v.
CORPORACIÓN DEL FONDO DEL SEGURO DEL
ESTADO; Liza Estrada Figueroa; Administradora
De La Corporación Del Fondo Del Seguro Del
Estado; Estado Libre Asociado De Puerto Rico;
Hon. Alejandro García Padilla, Gobernador De
Puerto Rico, Apelados.

TRIBUNAL DE APELACIONES
Caso Núm.: SJ2014CV00204 (907)
KLAN201500471
En San Juan, Puerto Rico a 29 de mayo de 2015.
May 29, 2015.

*Apelación* Procedente del Tribunal de Primera Instancia,
Sala de San Juan
Sobre: Solicitud de *Mandamus, Injunction* y Sentencia
Declaratoria

Panel integrado por su presidenta, la Juez García García,
el Juez Hernández Sánchez y la Jueza Soroeta Kodesh

**SENTENCIA**

SOROETA KODESH, JUEZA PONENTE

**\*1** Comparece la Asociación de Empleados Gerenciales
de la Corporación del Fondo del Seguro del Estado (en
adelante, la Asociación o la apelante), mediante un
recurso de apelación presentado el 1 de abril de 2015. Nos
solicita que revoquemos una *Sentencia* dictada el 29 de
enero de 2015 y notificada el 2 de febrero de 2015 en la
que el Tribunal de Primera Instancia (en adelante, TPI),
Sala de San Juan, desestimó la *Demanda* incoada por la
apelante y decretó la constitucionalidad de los Artículos
11 y 17 de la Ley Núm. 66 de 2014, conocida como Ley
Especial de Sostenibilidad Fiscal y Operacional del
Gobierno del Estado Libre Asociado (en adelante, Ley
Núm. 66). El 12 de febrero de 2015, la apelante solicitó
reconsideración, la cual fue declarada *No Ha Lugar* en
una *Resolución* emitida el 2 de marzo de 2015.

Por los fundamentos que se expresan a continuación, se
confirma la *Sentencia* apelada.

**I.**

El 24 de octubre de 2014, la apelante presentó una
*Demanda* sobre *mandamus, injunction* y sentencia
declaratoria en contra de la Corporación del Fondo del
Seguro del Estado (en adelante, la CFSE). En dicha
*Demanda*, la Asociación cuestionó la constitucionalidad
de los Artículos 11 y 17 de la Ley Núm. 66, *supra*. La
apelante adujo que la implantación de la Ley Núm. 66,
*supra*, establece una clasificación irrazonable, sospechosa
y discriminatoria que coloca al empleado no unionado
gerencial y/o supervisor de carrera en una situación de
inferioridad frente a los empleados unionados. En
consecuencia, solicitó la expedición de un auto de
*injunction* preliminar para que cesara la aplicación
inconstitucional de los Artículos 11 y 17 de la Ley Núm.
66, *supra*.[1]

La Asociación también solicitó al TPI que expidiera un
auto de *mandamus* para que la CFSE cumpliera con el
deber ministerial de entregarle los siguientes documentos
públicos: meta de ahorro establecida por la CFSE;
informe de plazas de confianza y cuantías; plan propuesto
para el cumplimiento con los Artículos 8–11, y 17–18;
informe de puestos gerenciales ocupados y vacantes,
según enumerados en el Artículo 11, sección (i), de la Ley
Núm. 66; y otros documentos relacionados y necesarios
para el cumplimiento con las disposiciones y metas de
ahorro dispuestas en la Ley Núm. 66, *supra*. Por último,
la apelante peticionó al tribunal de instancia que dictara
una sentencia declaratoria determinando la
inconstitucionalidad de los Artículos 11 y 17, *supra*, y la
imposición del pago de las costas y honorarios de
abogado a la CFSE.

Con posterioridad, el Estado solicitó la desestimación de
la *Demanda* y sentencia declaratoria a su favor
reconociendo la constitucionalidad de la Ley Núm. 66,
*supra*. Argumentó que dicha legislación no violenta las
cláusulas constitucionales que prohíben el menoscabo de
obligaciones contractuales y garantizan la igual
protección de las leyes debido a que se trata de una
medida socioeconómica razonable y necesaria para
atender la crisis fiscal del Gobierno de Puerto Rico.
Además, cuestionó la procedencia del *injunction* debido a
que la apelante tenía otros remedios disponibles en ley,
toda vez que la Comisión Apelativa del Servicio Público
(en adelante, la CASP) es el organismo con jurisdicción
primaria exclusiva para atender las reclamaciones al
amparo de la Ley Núm. 66, *supra*.

**\*2** La CFSE se unió a la solicitud de desestimación de la

*Demanda* y adoptó los argumentos esgrimidos por el Estado sobre la constitucionalidad de la Ley Núm. 66, *supra,* y la desestimación del *injunction.* Asimismo, solicitó la desestimación de la solicitud de *mandamus,* ya que no existe un deber ministerial de entregar la información requerida por la apelante. Por su parte, la apelante expresó su oposición a las mociones de desestimación presentas por el Estado y la CFSE.

Así las cosas, el 29 de enero de 2015, el TPI dictó la *Sentencia* apelada en la que desestimó la *Demanda* de autos. El foro apelado sostuvo la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* porque no establecen una clasificación sospechosa y discriminatoria contra los empleados gerenciales de carrera de la CFSE que atente contra la igual protección de las leyes. Asimismo, concluyó que tampoco violentaban la prohibición constitucional contra la aprobación de leyes que menoscaben las obligaciones contractuales debido al interés apremiante que persigue la Ley Núm. 66, *supra.*

El tribunal de instancia resolvió que la Ley Núm. 66, *supra,* trata por igual a los empleados gerenciales de carrera y a los empleados unionados de la CFSE, ya que ninguno de los dos (2) grupos está excluido de la aplicación de las medidas de ahorro. Dictaminó que el hecho de que solo los empleados unionados cobijados por convenios colectivos se sometan al proceso participativo alterno, no implica que la medida sea arbitraria o caprichosa. Esta conclusión está basada en que el fin último y el propósito de la negociación es precisamente garantizar que los acuerdos de los convenios colectivos cumplan con los ahorros contemplados en la Ley Núm. 66, *supra.*

Igualmente, el foro de instancia concluyó que existe un interés apremiante del Estado que justifica su intromisión en la relación contractual entre la CFSE y apelante, así como el menoscabo sustancial en sus condiciones de empleo. El TPI, además, expresó que las medidas de la Ley Núm. 66, *supra,* son las menos onerosas y el Estado ha rechazado tajantemente otras más drásticas como el despido y cesantías de los empleados públicos de carrera.

Por otro lado, el tribunal de instancia se declaró sin jurisdicción sobre la materia para atender las solicitudes de *mandamus* e *injunction* preliminar presentadas por la apelante. Según el foro apelado, la jurisdicción primaria exclusiva para atender las controversias sobre la solicitud de información y el cese de la aplicación de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* le pertenecen a la CASP.

De conformidad con sus conclusiones de derecho, el TPI declaró *Ha Lugar* las mociones de desestimación presentadas por la CFSE y el Estado, dictó sentencia declaratoria donde reconoce la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* se declaró sin jurisdicción sobre la materia para atender la solicitud de *mandamus* y desestimó la *Demanda* de epígrafe.

**\*3** El 12 de febrero de 2015, la apelante interpuso una *Moción de Reconsideración* en la que incluyó unos hechos que alegó debían ser reconsiderados. El 27 de febrero de 2015, el Estado presentó una *Moción en Cumplimiento de Orden y en Oposición a Escrito de Reconsideración.* Por otro lado, y en esa misma fecha, la CFSE también expresó su oposición mediante escrito intitulado *Oposición a Moción de Reconsideración.* El 2 de marzo de 2015, el TPI emitió una *Resolución* en la que declaró *No Ha Lugar* la solicitud de reconsideración.

Inconforme con el aludido resultado, el 1 de abril de 2015, la apelante presentó el recurso de apelación de epígrafe y adujo que el TPI cometió los siguientes errores:

> Erró el Honorable Tribunal de Primera Instancia al no incluir en su Sentencia una determinación de los hechos esenciales y pertinentes no controvertidos por la parte apelada, omisión que acarrea errores en las conclusiones de derecho de la Sentencia.

> Erró el Honorable Tribunal de Primera Instancia al resolver que los Artículos 11 y 17 de la Ley 66–2014 son constitucionales porque no violentan los principios de igual protección de las leyes y la prohibición al menoscabo de obligaciones contractuales.

> Erró el Honorable Tribunal de Primera Instancia al resolver que carece de jurisdicción para atender la solicitud de *Mandamus* requiriendo a la Administradora de la CFSE el acceso y entrega a los documentos públicos y la orden de cese y desista de aplicar los Artículos 11 y 17 de la Ley 66–2014 a la parte apelante.

Subsecuentemente, el 1 de mayo de 2015, la CFSE y el Estado presentaron por separado sus respectivos alegatos en oposición al recurso de apelación.

Con el beneficio de la comparecencia de las partes, procedemos a exponer el derecho aplicable.

**II.**

**A.**

La Regla 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V R 59.1, autoriza al TPI a declarar derechos, estados y

Case:17-03283-LTS   Doc#:4890-1   Filed:01/24/19   Entered:01/24/19 18:07:21   Desc: Exhibit Kirpalani Declaration.   Page 84 of 92

Asociacion De Empleados Gerenciales De La Corporacion..., 2015 WL 4075649...

otras relaciones jurídicas aunque se inste o pueda instarse otro remedio. La declaración podrá ser en forma y efectos, afirmativa o negativa, y tendrá la eficacia y vigor de las sentencias o resoluciones definitivas. La solicitud de sentencia declaratoria tiene como resultado una decisión judicial sobre cualquier divergencia en la interpretación de la ley. La sentencia declaratoria tiene el propósito de disipar la incertidumbre jurídica, en aquellos casos en que existe una controversia sustancial entre partes con intereses legales adversos. Las personas jurídicas facultadas para solicitar sentencia declaratoria son aquellas cuyos derechos, estado u otras relaciones jurídicas son afectadas por un estatuto. *Mun. Fajardo v. Srio. Justicia et als.,* 187 D.P.R. 245, 254 (2012).

**B.**

Por otro lado, la Regla 10.2 de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V R. 10.2, establece que cualquier defensa de hechos o de derecho que se tenga contra una reclamación se expondrá en la alegación responsiva. No obstante, esta misma Regla permite que la parte contra quien se ha instado la demanda presente una moción de desestimación, en la que se alegue cualquiera de las siguientes defensas: (1) falta de jurisdicción sobre la materia; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; (5) dejar de exponer una reclamación que justifique la concesión de un remedio; y(6) dejar de acumular una parte indispensable. *Trans–Oceanic Life Ins. v. Oracle Corp.,* 184 D.P.R. 689, 701 (2012).

**\*4** Esta Regla también dispone que ante una moción de desestimación, el tribunal debe tomar como ciertos todos los hechos bien alegados en la demanda e interpretar las aseveraciones de la forma más favorable para el demandante y hacer todas las inferencias que puedan asistirle en su reclamación. *Ortiz Matías et al. v. Mora Development,* 187 D.P.R. 649, 654 (2013); *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 D.P.R. 920, 935 (2011); *Candal Vicente v. CT Radiology Office, Inc.,* 112 D.P.R. 227, 231 (1981). En estos casos, únicamente se desestimará la demanda si se demuestra que el demandante no tiene derecho a remedio alguno bajo cualesquiera hechos que se puedan probar en el juicio. *Ortiz Matías et al. v. Mora Development,* supra; *Pressure Vessels P.R. v. Empire Gas P.R.,* 137 D.P.R. 497, 505 (1994).

No obstante, esta doctrina aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que de su faz no dan margen a dudas. *Pressure Vessels P.R. v. Empire Gas P. R.,* supra.

Únicamente se darán como ciertos todos los hechos correctamente alegados sin considerar las conclusiones de derecho o las alegaciones redactadas, de tal forma que su contenido resulte hipotético y hagan imposible que el juzgador detecte sin margen de error los hechos definitiva y correctamente alegados. *Asoc. Importadores de Cerveza v. E.L.A.,* 171 D.P.R. 140, 149 (2007).

De otra parte, constituye norma firmemente establecida que de ordinario los tribunales apelativos no debemos intervenir en el ejercicio de la discreción de los foros de instancia, salvo que se demuestre que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad. *Trans–Oceanic Life Ins. v. Oracle Corp.,* supra; *Lluch v. España Service Sta.,* 117 D.P.R. 729, 745 (1986). La parte afectada por una sentencia de desestimación al amparo de las Reglas 10.2 y 10.3 de Procedimiento Civil, no tiene disponible el mecanismo de determinaciones de hecho adicionales, debido a que el tribunal no está obligado a hacer determinaciones de hecho. Se entiende que el juez presumió como ciertos y tomó en consideración los hechos bien alegados en la demanda. De modo que el TPI no está obligado a exponer en la sentencia las determinaciones de hecho que sustenten su decisión. *Roldán Rosario v. Lutrón S.M.,* 151 D.P.R. 883, 889 (2000). La Regla 42.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V R. 42.2(a), establece que no será necesario especificar los hechos probados y consignar separadamente las conclusiones de derecho al resolver mociones al amparo de la Regla 10 de Procedimiento Civil, *supra.*

**C.**

Todo estatuto es y se presume constitucional hasta que se determine lo contrario. Cuando el Tribunal Supremo de Puerto Rico ausculta la validez de un estatuto, lo hace consciente de la deferencia que merece el poder legislativo y de acuerdo al esquema de separación de poderes. Nuestro Tribunal Supremo busca lograr aquellas interpretaciones que sostengan la validez de la ley frente a los ataques de inconstitucionalidad. *E.L.A. v. Northwestern Selecta,* 185 D.P.R. 40, 71 (2012).

**\*5** Una ley puede ser declarada inconstitucional tanto de su faz como en su aplicación. Al evaluar si es inconstitucional de su faz, hay que considerar si el vicio surge de su propio texto. No obstante, para determinar la inconstitucionalidad en su aplicación, hay que analizar el contexto en el cual ha sido empleada. *E.L.A. v. Northwestern Selecta,* supra, a las págs. 71–72. Las leyes pueden resultar discriminatorias de su faz por el propósito que persiguen o por su efecto y en ambos casos se consideran inválidas de por sí. El ente regulador tiene la

obligación de defenderlas y presentar evidencia de que sirven para un propósito legítimo que es imposible de atender por otros medios razonables y no discriminatorios. No obstante, las leyes se presumen lícitas si están redactadas en términos neutrales y su aplicación no resulta parcializada. *E.L.A. v. Northwestern Selecta,* supra, a las págs. 73–74.

#### D.

La Sección 7 del Artículo II de la Constitución de Puerto Rico dispone que ninguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. Tampoco se aprobarán leyes que menoscaben las obligaciones contractuales. Const. de P.R., Art. II, Sec. 7, L.P.R.A., Tomo 1; *López v. E.L.A.,* 165 D.P.R. 280, 296–297 (2005).

La igual protección de las leyes se funda en el principio cardinal de "trato similar para personas similarmente situadas". El Gobierno puede hacer clasificaciones entre las personas para cualesquiera propósitos legítimos, pero al realizarlas tiene que observar esa norma básica. El Estado necesita establecer clasificaciones para poder gobernar una sociedad tan compleja y variada, con distintos intereses individuales y grupales, y diversas relaciones sociales. Significa que es imposible gobernar cualquier sociedad y en especial una sociedad moderna sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y perjudiquen a otros. *López v. E.L.A.,* supra, a la pág. 297.

El Estado puede hacer clasificaciones entre las personas sin infringir la igual protección de las leyes, siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo. No toda discriminación viola el precepto de igual protección ante la ley, aunque este sí prohíbe un tratamiento desigual injustificado. *López v. E.L.A.,* supra, a las págs. 297–298.

Los tribunales al hacer un análisis constitucional sobre la razonabilidad de una clasificación legislativa, deben usar uno de los dos (2) escrutinios establecidos jurisprudencialmente. Nos referimos al uso del: (1) escrutinio estricto; o el (2) escrutinio tradicional mínimo o de nexo racional. El Estado tiene una amplia latitud para el establecimiento de clasificaciones relativas a cuestiones sociales y económicas. El análisis de leyes que establecen clasificaciones en esos campos debe ser realizado mediante el escrutinio del nexo racional o tradicional mínimo. Al amparo de dicho escrutinio, las clasificaciones no se considerarán inválidas, salvo que

sean claramente arbitrarias y no exista un interés legítimo del Estado. Las clasificaciones tampoco pasarán el cedazo constitucional, si no puede establecerse un nexo racional entre estas y el interés estatal. Cuando se utiliza el escrutinio racional, la ley impugnada goza de una presunción de constitucionalidad y la persona que impugna su validez tiene el peso de rebatir la presunción. *López v. E.L.A.,* supra, a las págs. 298–299.

**\*6** Por otro lado, para que se justifique el uso del escrutinio riguroso o estricto, el tribunal tiene que identificar, si la clasificación afecta algún derecho fundamental del ciudadano o si establece alguna clasificación sospechosa que no guarde relación con la habilidad o aptitud de las personas afectadas. Cuando se identifican esas clasificaciones, se presume que la legislación es inconstitucional y el Estado tiene que probar la existencia de un interés apremiante o de superior jerarquía que lo justifique. Este escrutinio ha sido aplicado a ciertas leyes que establecen distinciones sospechosas como las basadas en raza, nacionalidad, ciudadanía, pobreza o nacimiento. *López v. E.L.A.,* supra, a la pág. 299; *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 278 (1975).

#### E.

El Artículo II, Sección 7, de la Constitución de Puerto Rico, *supra,* también prohíbe la aprobación de leyes que menoscaben las obligaciones contractuales. Esta garantía constitucional limita la intervención del gobierno con las obligaciones contractuales entre partes privadas y las contraídas por el Estado. Su propósito es asegurar la estabilidad de las relaciones contractuales. Sin embargo, su protección no es absoluta, ya que debe ser armonizada con el poder de reglamentación del Estado en beneficio del interés público. El Tribunal Supremo de Puerto Rico ha expresado reiteradamente que no todo menoscabo de una obligación contractual es inconstitucional. *AMPR v. Sist. Retiro—Maestros V,* 190 D.P.R. 854, 868 (2014). El análisis de esta cláusula constitucional depende de si el contrato que se modifica es entre entes privados o es uno en el que el Estado es parte.

Los contratos privados se analizan mediante un escrutinio de razonabilidad en el que se toma en cuenta cuán sustancial es el interés público promovido y la extensión del menoscabo contractual. El primer paso es determinar si existe una relación contractual, y si su modificación representa un menoscabo sustancial o severo. Si se determina que existe un menoscabo severo, entonces es necesario evaluar, si la intervención gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de ese objetivo. *AMPR v.*

*Sist. Retiro Maestros V,* supra, a la pág. 869.

Un escrutinio más cuidadoso es aplicado cuando el Estado es parte de la relación contractual debido a que podría actuar para su propio beneficio. El menoscabo contractual tiene que ser razonable y necesario para adelantar un propósito gubernamental importante. Al evaluar la necesidad y razonabilidad de una ley procede conferir alguna deferencia al criterio de la Asamblea Legislativa. A mayor severidad del menoscabo, mayor rigor debe tener el foro judicial en el análisis de la legislación impugnada. No obstante, la validez será sostenida, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público. *AMPR v. Sist. Retiro Maestros V,* supra, a las págs. 869–870; *Trinidad Hernandez et al. v. ELA et al., 188 D.P.R. 828, 835 (2013).*

### F.

**\*7** La Ley Núm. 66, *supra,* declaró el estado de emergencia fiscal en que se encuentra el Gobierno de Puerto Rico. Esta crisis es descrita como "la más crítica que ha atravesado el país en su historia". Las corporaciones públicas no están ajenas a la crisis fiscal, por lo que también han sido impactadas por el plan que incluye: (1) medidas de reducción de gastos de la Rama Ejecutiva; (2) normas y restricciones sobre concesión de aumentos en beneficios económicos o compensaciones económicas extraordinarias; (3) disposiciones sobre convenios colectivos; y(4) disposiciones sobre el control fiscal de las corporaciones públicas. Exposición de Motivos y Art. 2 de la Ley Núm. 66, *supra.* Esta legislación especial de carácter socio económico fue aprobada en virtud del poder de razón del Estado, con el objetivo de garantizar la liquidez suficiente para pagar la nómina de los empleados públicos y sufragar los servicios esenciales que se ofrecen a la ciudadanía. Exposición de Motivos de la Ley Núm. 66, *supra.*

El Artículo 2 establece la adopción de un plan para manejar las consecuencias de la crisis fiscal y permitir la continuidad de los servicios esenciales de salud, seguridad, educación, trabajo social y desarrollo, entre otros. Además, establece la restauración del crédito público como política pública del Estado. Estos objetivos serán conseguidos mediante la eliminación a corto plazo del déficit del Fondo General y el mejoramiento de la condición fiscal de las corporaciones públicas, pero sin despedir empleados públicos ni afectar los servicios esenciales.

La Ley Núm. 66, *supra,* tiene primacía sobre cualquier otra legislación, toda vez que fue aprobada al amparo del poder de razón del Estado y la facultad constitucional de la Asamblea Legislativa de aprobar leyes que protejan la vida, salud y bienestar del Pueblo cuando estén en grave peligro los servicios gubernamentales esenciales. Art. 3 de la Ley Núm. 66, *supra.*

Durante la vigencia de la Ley Núm. 66, *supra,* los empleados de la Rama Ejecutiva no recibirán aumentos en beneficios económicos ni compensaciones monetarias extraordinarias, con excepción a lo establecido en el inciso (d) del Artículo 11. Art. 11(a) de la Ley Núm. 66, *supra.* Las limitaciones establecidas en el Artículo 11 aplican a todos los empleados de la Rama Ejecutiva independientemente de su clasificación de confianza, regular o de carrera, transitorio o irregular, e irrespectivamente de su función particular dentro de la entidad de la Rama Ejecutiva. Además, aplican sin distinción de cualquier disposición contraria, bien sea en una ley, normativa, reglamento, convenio colectivo, políticas, manuales de empleo, cartas circulares, cartas contractuales, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o retribución. Art. 11(f) y(h) de la Ley Núm. 66, *supra.*

> **\*8** El inciso (i) del Artículo 11 dispone expresamente que:
>
> En reconocimiento de la importancia de la sindicalización de empleados públicos no solamente para representar el bienestar económico de los trabajadores, sino para elevar el servicio público al máximo de su potencial y mantener la paz laboral, se establece un proceso participativo alterno y uniforme para lograr los objetivos de política pública de esta Ley, incluyendo el ahorro necesario dentro de los parámetros establecidos en los incisos (j) y(k), según sea el caso, siguiendo como principio rector la negociación colectiva. Los acuerdos alcanzados con los representantes autorizados de los empleados unionados, y a su vez, ratificados por escrito por la matrícula de unionados concernida y el representante autorizado de la Entidad de la Rama Ejecutiva conforme a los parámetros de la negociación aquí permitida, sustituirán lo dispuesto en los incisos (a), (b), (c) y(d) de este Articulo y cualquier otra disposición que resulte pertinente en esta ley y que haya sido objeto de la negociación.

Por su parte, el inciso (j) autoriza que las entidades de la Rama Ejecutiva sujetas a la Ley Núm. 45–1998, conocida como la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1454 *et seq.,* utilicen el proceso de negociación para enmendar los convenios colectivos y modificar las condiciones

económicas de empleo y establecidas en el Artículo 11, *supra*. No obstante, dichas modificaciones deben garantizar un ahorro promedio por empleado unionado, comparable al que hubiese sido obtenido mediante la aplicación de los referidos incisos. Art. 11(j) de la Ley Núm. 66, *supra*.

El Artículo 14 dispone cuál es el foro para dirimir las controversias relacionadas a la Ley Núm. 66, *supra*. Su texto dispone como sigue a continuación:

> La Comisión Apelativa del Servicio Público (CASP), o la entidad sucesora de esta, en lo que corresponde a asuntos de naturaleza laboral o que de otra forma ordinariamente caerían dentro de la jurisdicción de CASP, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este Capítulo, de aquellos empleados cubiertos o no cubiertos por las disposiciones de la Ley Número 45–1998, según enmendada, conocida como la Ley de Relaciones del Trabajo para el Servicio Público; así como de aquellos empleados no organizados sindicalmente de aquellas Entidades de la Rama Ejecutiva excluidas de la aplicación de las disposiciones de la Ley Núm. 184–2004, según enmendada, conocida como la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, y empleados de aquellas Entidades de la Rama Ejecutiva que no están organizados y les aplica las disposiciones de la Ley Núm. 184–2004.

**\*9** Por su parte, la Junta de Relaciones del Trabajo, o la entidad sucesora de esta, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este Capítulo, de aquellos empleados cubiertos por la Ley Núm. 130 de 8 de mayo de 1945, según enmendada. Disponiéndose, que conforme a lo indicado en esta Ley, ninguna actuación llevada conforme a sus disposiciones constituirá una violación a los convenios colectivos existentes, o una negativa a negociar de buena fe o una práctica ilícita.

Por otro lado, el Artículo 17 de la Ley Núm. 66, *supra,* establece las medidas de control fiscal que deben tomar las corporaciones públicas. Este Artículo suspende el cumplimiento de las cláusulas no económicas negociadas en los convenios vigentes, que tienen efectos económicos directos o indirectos en la operación de las corporaciones públicas, agravan su situación presupuestaria, o que es necesario suspenderlas para aliviar la situación presupuestaria. Además, incluye una lista de algunas cláusulas no económicas que pueden tener un efecto

económico directo o indirecto.

## G.

Como es sabido, el término "jurisdicción" significa el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir casos o controversias. *CBS Outdoor v. Billboard One, Inc. et al.,* 179 D.P.R. 391, 403 (2010). Como norma general, los foros judiciales de Puerto Rico son de jurisdicción general. Es decir, tienen autoridad para entender en cualquier causa de acción que presente una controversia para adjudicación. *Clases A, B y C v. PRTC,* 183 D.P.R. 666 (2011), citando a *Mun. Arecibo v. Mun. Quebradillas,* 161 D.P.R. 109, 114 (2004); *Junta Dir. Cond. Montebello v. Fernández,* 136 D.P.R. 223, 230 (1994).

La norma de la jurisdicción general prevalece, salvo que el tribunal adolezca de jurisdicción sobre la materia. *Rodríguez v. De León,* 191 D.P.R. 700 (2014). La jurisdicción sobre la materia se refiere a la capacidad del tribunal para atender y resolver una controversia sobre un aspecto legal. La jurisdicción sobre la materia no puede ser otorgada por las partes. El tribunal tampoco puede arrogársela debido a que solo el Estado, a través de sus leyes, puede otorgar o privar a los tribunales de jurisdicción sobre la materia. *Rodríguez v. De León,* supra.

Por su parte, las agencias administrativas solamente tienen los poderes otorgados expresamente por una ley habilitadora y aquellos que sean indispensables para llevar a cabo sus deberes y responsabilidades. De lo anterior, pueden surgir situaciones en las que los tribunales y las agencias puedan entender en un mismo asunto, en cuyo caso, es aquí donde la doctrina de jurisdicción primaria juega un papel importante. *CBS Outdoor v. Billboard One, Inc. et al.,* supra.

**\*10** La jurisdicción primaria exclusiva o estatutaria, ocurre cuando el legislador legisla para conferir jurisdicción primaria exclusiva a un organismo administrativo. La jurisdicción primaria exclusiva no admite otro medio de solución, ajuste o prevención y no se trata de jurisdicción compartida o concurrente. Por el contrario, es una jurisdicción sobre la materia que el legislador depositó en el ámbito jurisdiccional de la agencia de forma exclusiva. Como resultado, los tribunales quedan excluidos de intervenir en primera instancia en los asuntos o materias sobre las cuales se les ha conferido la jurisdicción exclusiva a las agencias. *Rodríguez v. De León,* supra.

La doctrina de jurisdicción primaria es una de creación

jurisprudencial. *CBS Outdoor v. Billboard One, Inc. et al.,* supra, a las págs. 403–404. Esta doctrina no priva de jurisdicción a los foros judiciales, sino que atiende una cuestión de prioridad de jurisdicción. Su principal propósito es promover la armonía entre los tribunales y los organismos administrativos. Específicamente, la doctrina de jurisdicción primaria dispone cuál foro, judicial o administrativo, debe atender inicialmente una controversia. Para ello, la doctrina tiene dos (2) vertientes: (1) la exclusiva; y(2) la concurrente. *Id.,* a la pág. 404.

En la primera vertiente, la jurisdicción primaria exclusiva, una ley o estatuto le confiere jurisdicción a determinado organismo administrativo e indica que este será el único foro con facultad para atender, inicialmente, determinada controversia. *Id.* Por otro lado, "la segunda vertiente se manifiesta cuando el foro judicial y el foro administrativo comparten la facultad para dilucidar un mismo asunto. En estas ocasiones se habla de verdadera jurisdicción primaria o jurisdicción primaria concurrente." *Id.,* a la pág. 405. El fundamento de esta vertiente reside en la deferencia judicial que las agencias administrativas merecen en atención a su preparación, especialización, pericia y conocimiento para atender determinados asuntos. *Id.*

La aplicación de la doctrina de jurisdicción primaria requiere que los tribunales examinen los alcances de la ley habilitadora de una agencia administrativa y determinen si el asunto cae estrictamente dentro de su ámbito. Además, exige que los tribunales ponderen y determinen si es imprescindible y necesario que se resuelva en favor de que intervenga inicialmente la agencia. *Consejo Titulares v. Gómez Estremera, et al.,* 184 D.P.R. 407, 430–431 (2012).

### H.

El recurso extraordinario del *injunction* pretende prohibir u ordenar la ejecución de un acto para evitar que se causen perjuicios inminentes o daños irreparables a alguna persona, cuando no existe otro remedio adecuado en ley. *Next Step Medical v. Bromedicon, et al.,* 190 D.P.R. 474, 485–486 (2014); *Mun. Fajardo v. Srio Justicia et al.,* supra, a la pág. 255. Nuestro ordenamiento jurídico cuenta con tres (3) modalidades de este tipo de recurso que son: el entredicho provisional, el *injunction* preliminar y el *injunction* permanente. *Next Step Medical v. Bromedicon, et al.,* supra, a la pág. 486.

**\*11** El *injunction* preliminar o *pendente lite* es un recurso que emite el tribunal antes de la celebración del juicio en su fondo y, de ordinario, posterior a la celebración de una vista en donde las partes tienen la oportunidad de presentar prueba en apoyo y oposición a la expedición del mismo. El objetivo principal de este recurso es mantener el estado actual de las cosas hasta tanto se celebre el juicio en sus méritos, para que el caso no se convierta en académico. Posteriormente, el derecho sustantivo será ventilado en un juicio plenario como en cualquier tipo de acción. El *injunction* preliminar va dirigido a requerir o prohibir hacer determinado acto, con el objetivo de impedir que se causen perjuicios inminentes o menoscabos irreparables a alguna persona durante la pendencia del litigio. El factor cardinal que gobierna la expedición de este remedio extraordinario estrechamente ligado a la doctrina de equidad es la existencia de una amenaza real de sufrir algún menoscabo para el cual no existe un remedio adecuado en ley. *Next Step Medical v. Bromedicon et al .,* supra.

Ahora bien, al ponderar la expedición de un *injunction* preliminar, el tribunal debe considerar los siguientes criterios: (1) la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el recurso; (2) la irreparabilidad del daño o la inexistencia de un remedio adecuado en ley; (3) la probabilidad de que eventualmente la parte promovente prevalezca al resolverse el litigio en su fondo; (4) la probabilidad de que la causa se torne académica de no concederse el *injunction;* y(5) el posible impacto sobre el interés público del remedio que se solicita. Además de los criterios enumerados, la Regla 57.3 de Procedimiento Civil añade que el tribunal deberá considerar el criterio de "la diligencia y la buena fe de la parte peticionaria". 32 L.P.R.A. Ap. V R. 57.3; *Next Step Medical v. Bromedicon et al .,* supra.

Estos requisitos no son absolutos, ya que son directrices que dirigen al tribunal al momento de decidir si la evidencia presentada justifica la expedición del recurso. La concesión del remedio descansará en la sana discreción judicial, que se ejercerá al considerar tanto los intereses como las necesidades de las partes involucradas en el caso. El mismo debe expedirse con mesura y únicamente ante una demostración clara e inequívoca de la violación de un derecho. La determinación del tribunal no será revocada en apelación, a menos que se demuestre que el foro de instancia abusó de su facultad. *Next Step Medical v. Bromedicon et al.,* supra, a la pág. 487.

Al determinar si procede otorgar un interdicto permanente, el tribunal debe considerar los siguientes criterios: (1) si el demandante ha prevalecido en un juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público involucrado; y(4) el balance de equidades. Estos criterios no son de naturaleza absoluta, sino de directrices que encausan la discreción del tribunal al determinar si la evidencia

justifica el interdicto. *Plaza Las Américas v. N & H,* 166 D.P .R. 631, 643–644 (2005).

## I.

**\*12** Con relación a un recurso de *mandamus,* el Tribunal Supremo de Puerto Rico ha resuelto que, de conformidad con lo dispuesto por el Artículo 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3421, "el auto de mandamus es un recurso altamente privilegiado y discrecional que se expide para ordenar a cualquier persona natural, corporación o a un tribunal de inferior jerarquía que cumpla o ejecute un acto que forma parte de sus deberes y atribuciones". *AMPR v. Srio. Educación, E.L.A.,* 178 D.P.R. 253, 263 (2010). Dicho recurso únicamente procede cuando se exige el cumplimiento de un deber impuesto por la ley. Esto se refiere a un deber calificado de ministerial y que, por ende, no admite discreción en su ejercicio, sino que es mandatorio e imperativo. *Noriega v. Hernández Colón,* 135 D.P.R. 406, 447–448 (1994); *Hernández Agosto v. Romero Barceló,* 112 D.P.R. 407, 418 (1982); *% 21Alvarez de Choudens v.. Tribunal Superior,* 103 D.P.R. 235, 242 (1975). Es decir, debe tratarse de "un mandato específico que la parte demandada tiene que cumplir y que no le permite decidir si cumple o no el acto solicitado". *AMPR v. Srio. Educación, E.L.A.,* supra, a la pág. 264.

Por el contrario, "cuando la ejecución del acto o la acción que se describe depende de la discreción o juicio del funcionario, tal deber es considerado como no ministerial". *Id.* Véanse, además, *Díaz Saldaña v. Acevedo Vilá,* 168 D.P.R. 359, 365 (2006); *%21Alvarez de Choudens v. Tribunal Superior,* supra. Por consiguiente, al no ser ministeriales, los deberes discrecionales quedan fuera del ámbito del recurso de *mandamus. AMPR v. Srio. Educación, E.L.A.,* supra. Además, cabe señalar que, al constituir un recurso altamente privilegiado, la expedición del auto de *mandamus* no procede como cuestión de derecho, sino que descansa en la sana discreción del tribunal. *Báez Galib y otros v. C.E.E. II,* 152 D.P.R. 382, 391–392 (2000). En consecuencia, la expedición del auto de mandamus resulta improcedente si existe otro remedio adecuado en ley, ya que el propósito principal del auto no es remplazar remedios legales disponibles, sino suplir la falta de ellos. *AMPR v. Srio. Educación, E.L.A.,* supra, a las págs. 266–267; *Hernández Agosto v. Romero Barceló,* supra; *Dávila v. Superintendente de Elecciones,* 82 D.P.R. 264, 274 (1960).

Resulta menester reiterar que un mandamus puede ser considerado cuando la parte peticionaria no tiene disponible un recurso legal adecuado y eficaz en el curso

ordinario de la ley. Véase, Art. 651 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3423. La petición de mandamus tiene que evaluarse a la luz de varios requisitos. Estos son: (1) que el demandado tenga un deber u obligación ministerial impuesto por ley; (2) que el peticionario tenga un interés especial en el derecho que reclama; (3) que el deber de actuar de la agencia y el derecho del peticionario surjan de la ley de forma clara y patente; (4) que el peticionario no tiene otro remedio legal para hacer valer su derecho; y(5) que, estimado el efecto que tendrá la expedición del auto, el Tribunal entienda que los fines de la justicia obligan a su expedición. *Dávila v. Superintendente de Elecciones,* supra, a las págs. 274–275. Véanse, además, Arts. 649 al 651 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421–3423.

**\*13** Conforme al marco doctrinal antes delineado, procedemos a resolver las controversias ante nuestra consideración.

## III.

En el recurso que nos ocupa, en su primer señalamiento de error, la apelante cuestionó la negativa del TPI a no hacer parte de la *Sentencia* apelada las determinaciones de hechos adicionales solicitadas en una moción de reconsideración interpuesta por la apelante. Además, argumentó que el foro primario incumplió con los requisitos de la Regla 42.2 de Procedimiento Civil, *supra,* porque dictó una sentencia sumaria sin determinar los hechos incontrovertidos. Los planteamientos esbozados por la apelante en torno a este particular son inmeritorios. A tales efectos, cabe destacar que la *Sentencia* apelada fue dictada al amparo de la Regla 10.2, *supra,* por lo que el TPI ni siquiera estaba obligado a formular determinaciones de hechos. Se presume que dicho foro tomó como ciertos los hechos que fueron bien alegados en la *Demanda.* Resulta menester indicar que la Regla 42.2, *supra,* establece que cuando se dicta sentencia a favor de una moción de desestimación, no es necesario especificar los hechos probados y consignar por separado las conclusiones de derecho.

No obstante, aun tomando como ciertos los hechos bien alegados en la *Demanda,* el TPI resolvió que la apelante no tenía una causa de acción que justificara la concesión de un remedio. En consecuencia, dictó sentencia declaratoria reconociendo la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra.* Además, se declaró sin jurisdicción sobre la materia para atender el recurso de *mandamus* y expedir el auto de *injunction* solicitado debido a que el reclamo de la apelante es una controversia de la jurisdicción exclusiva de la CASP.

Como segundo señalamiento de error, la apelante atacó la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra*. La Asociación alegó que la aplicación de esos Artículos viola el derecho de los empleados gerenciales no unionados de la CFSE a la igual protección de las leyes y atenta contra la prohibición al menoscabo de las obligaciones contractuales. La apelante adujo que los Artículos citados establecen una clasificación irrazonable entre los empleados de carrera y los unionados que gozan de los beneficios de convenios colectivos. Sostuvo que dicha clasificación atenta y reduce dramáticamente los beneficios económicos de sus representados, en comparación a los de los empleados unionados.

Según la apelante, dichos Artículos establecen un trato desigual y discriminatorio debido a que: (1) excluyen a los empleados no unionados gerenciales de carrera del proceso participativo alterno; (2) la cuota de ahorro promedio impuesta a los empleados gerenciales es dos veces y media mayor que la establecida para empleados unionados; (3) dan un trato preferencial a los empleados unionados *vis à vis* los empleados no unionados gerenciales de carrera afiliados a organizaciones laborales bonafides, cuyo efecto es la imposición de una carga mayor; (4) permiten acuerdos con las organizaciones laborales que otorguen condiciones de trabajo y beneficios económicos superiores a los de los empleados de la Asociación; y(5) no provean a los miembros de la Asociación los mismos beneficios económicos y condiciones de trabajo acordados con las organizaciones laborales.

**\*14** Por su parte, el Estado afirmó que la Ley Núm. 66, *supra*, no establece clasificaciones arbitrarias o caprichosas y manifestó que dicha legislación cumple con el interés apremiante del Estado de atender y resolver la grave crisis fiscal que enfrenta el Gobierno de Puerto Rico. Asimismo, el Estado planteó que la Ley Núm. 66, *supra*, fue promulgada para garantizar la continuidad de la gestión pública en áreas esenciales como la salud, seguridad pública, educación y trabajo social. Además, tiene los objetivos de restaurar el crédito del Estado y eliminar el déficit fiscal del fondo general, sin recurrir al despido de empleados públicos, ni afectar las funciones esenciales de las agencias del Gobierno. A su vez, la CFSE adoptó los argumentos del Estado a favor de la constitucionalidad de la Ley Núm. 66, *supra*.

La determinación sobre la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra*, requiere un análisis del texto de la ley para establecer si son discriminatorios de su faz y del contexto en que han sido empleados para ver si su aplicación es discriminatoria. Véase, *E.L.A. v. Northwestern Selecta*, supra. El Artículo

11 de la Ley Núm. 66, *supra*, prohíbe el aumento de los beneficios económicos y las compensaciones monetarias extraordinarias, recibidos por los empleados de la Rama Ejecutiva, salvo las excepciones determinadas por el legislador. Dicho Artículo contiene una lista de los beneficios económicos y compensaciones monetarias extraordinarias que no serán concedidas durante la vigencia de la Ley Núm. 66, *supra*.

La suspensión de beneficios económicos y compensaciones monetarias extraordinarias no hace exclusiones, ya que es extensiva a todos los empleados de la Rama Ejecutiva e incluye a las corporaciones públicas. La medida afecta a todos los empleados de la Rama Ejecutiva irrespectivamente de si su clasificación es de confianza, regular de carrera, transitorio o irregular y de sus funciones particulares. El Artículo 11, *supra*, permite a los empleados organizados colectivamente negociar beneficios económicos distintos a los permitidos en la Ley Núm. 66, *supra*, pero sujeto a que se logren ahorros dentro de los parámetros que establece esa legislación.

Por su parte, el Artículo 17 de la Ley Núm. 66, *supra*, establece las medidas de control fiscal que deben tomar las corporaciones públicas. Este Artículo suspende el cumplimiento de las cláusulas no económicas negociadas en los convenios vigentes que tienen efectos económicos directos o indirectos en la operación de la corporación pública, agravan su situación presupuestaria, o que es necesario suspenderlas para aliviar la situación presupuestaria. El aludido Artículo tiene un listado de algunas cláusulas no económicas que pueden tener un efecto económico directo o indirecto.

**\*15** El análisis del texto de los Artículos 11 y 17, *supra*, hace evidente que el Estado no violó la cláusula constitucional que garantiza la igual protección de las leyes. Los Artículos, cuya constitucionalidad cuestiona la apelante, no establecen una clasificación sospechosa basada en raza, color, sexo, nacimiento, origen o condición social, ideas políticas, religiosas o nacionalidad, que violente derechos fundamentales de la apelante y justifique el uso de un escrutinio estricto y la activación de la presunción de inconstitucionalidad de la ley. Véase, *López v. E.L.A.*, supra. Sin embargo, aun en el caso de que dicha presunción fuera activada, se probó que la Ley Núm. 66, *supra*, obedece a la política pública e interés apremiante del Estado de combatir y solucionar la grave crisis fiscal del país que pone en riesgo la salud, seguridad y los servicios públicos esenciales a la ciudadanía.

La Ley Núm. 66, *supra*, evidentemente es una legislación de carácter económico, cuyo objetivo principal es sacar al país de la crisis fiscal. Por consiguiente, su

constitucionalidad debe ser analizada a base de un escrutinio tradicional. Los Artículos 11 y 17, *supra*, pasan el cedazo del escrutinio del nexo racional o tradicional mínimo. La apelante no derrotó la presunción de constitucionalidad, ya que no probó la existencia de una clasificación arbitraria. El Estado, en cambio, sí logró probar la existencia de un fin legítimo. La crisis fiscal es un hecho incontrovertido. La reducción de beneficios económicos a todos los componentes de la Rama Ejecutiva, incluyendo a las corporaciones públicas, es parte de las medidas de reducción de gastos necesarias para salvar el crédito del país y garantizar los servicios esenciales.

Las medidas del Artículo 11, *supra,* son extensivas a todos los empleados públicos de la Rama Ejecutiva independientemente de su clasificación. No obstante, la apelante alegó que la Ley Núm. 66, *supra,* es inconstitucional porque únicamente les permite a los empleados organizados colectivamente negociar beneficios económicos distintos a los permitidos en la Ley Núm. 66, *supra*. Sin embargo, la apelante obvió que la negociación con la autoridad nominadora tiene el propósito y está sujeta a que se logren ahorros dentro de los parámetros que establece esa legislación. Los empleados gerenciales representados por la apelante no están en una posición de desventaja debido a que la posibilidad de negociar de los empleados organizados colectivamente con la autoridad nominadora es precisamente para garantizar que se logren los ahorros proyectados en la Ley Núm. 66, *supra*.

El Artículo 17 de la Ley Núm. 66, *supra,* tampoco pone en desventaja a la apelante frente a los empleados cobijados por convenios colectivos. Por el contrario, dicho Artículo solo afecta los derechos de los empleados organizados colectivamente, ya que suspende el cumplimiento de las cláusulas no económicas negociadas en sus convenios, pero que tienen un impacto económico directo o indirecto en la operación de la corporación y que agravan su situación presupuestaria. Recordamos que a la apelante no le asiste un derecho constitucional a negociar colectivamente términos y condiciones de empleo. Por lo tanto, lo que se persigue con la Ley Núm. 66, *supra,* es precisamente ajustar ese derecho de los empleados organizados a la necesidad que pretende aliviar la Ley Núm. 66, *supra*.

**\*16** La Ley Núm. 66, *supra,* no hace una clasificación arbitraria ni sospechosa entre los empleados gerenciales no unionados del servicio de carrera de la CFSE y los empleados unionados cobijados por convenios colectivos. Por el contrario, sostenemos que la ley les da un trato similar. Ambos grupos han sido afectados por las medidas de reducción de gastos que involucran a todos los

empleados de la Rama Ejecutiva, incluyendo a las corporaciones públicas y sin distinción del puesto que ocupen. Las medidas de los Artículos 11 y 17 lejos de establecer una clasificación sospechosa en detrimento de la apelante, tienen la intención de evitar el colapso económico del Gobierno y garantizar que los acuerdos de los convenios colectivos cumplan con los ahorros establecidos en la Ley Núm. 66, *supra*.

Como expresamos anteriormente, la apelante no ha derrotado la presunción de constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra*. El Estado, en cambio, sí ha probado que dicha legislación tiene el fin legítimo y apremiante de evitar el colapso de las finanzas del Gobierno de Puerto Rico y garantizar a la ciudadanía los servicios básicos y esenciales. Los Artículos 11 y 17, *supra,* tampoco atentan contra la prohibición constitucional a la aprobación de leyes que menoscaban las obligaciones contractuales. No podemos obviar que esa protección no es absoluta, toda vez que debe ser armonizada con el poder reglamentario del Estado en beneficio del interés público.

La constitucionalidad de los Artículos citados es incuestionable. Las medidas tomadas por el Estado en la Ley Núm. 66, *supra,* sin lugar a dudas son razonables y necesarias para adelantar el importante propósito gubernamental de salvar las finanzas de Puerto Rico. Además, resultan ser lo menos onerosas posibles, ya que la intención del Estado es lograr la estabilidad económica del Gobierno sin afectar la prestación de los servicios esenciales y sin despedir empleados públicos. *AMPR v.. Sist. Retiro Maestros V,* supra; *Trinidad Hernandez et al. v. ELA et al.,* supra.

Por último, la apelante argumentó que incidió el TPI al no expedir el auto de *mandamus* solicitado para que la CFSE cumpla con su deber ministerial de entregarle unos documentos públicos. La apelante se refirió específicamente a los siguientes documentos: (1) la meta de ahorro establecida por la CFSE; (2) el informe de plazas de confianza y cuantías; (3) el plan propuesto para el cumplimiento con los Artículos 8–11, 17–18; (4) el informe de puestos gerenciales ocupados y vacantes, según enumerados en el Artículo 11, sección (i) de la Ley Núm. 66; y(5) otros documentos relacionados necesarios para el cumplimiento con las disposiciones y metas de ahorro dispuestas en la Ley Núm. 66, *supra*.

El planteamiento de la apelante es errado. El TPI actuó correctamente al declararse sin jurisdicción sobre la materia y no atender la petición de *mandamus*. La CASP es el organismo con jurisdicción primaria exclusiva para atender las controversias relacionadas con la implementación de las medidas de reducción de gastos

**Asociacion De Empleados Gerenciales De La Corporacion..., 2015 WL 4075649...**

tomadas por la Rama Ejecutiva al amparo de la Ley Núm. 66, *supra*. Por disposición expresa del legislador, la apelante debió acudir en primera instancia a la CASP para cuestionar las medidas de reducción de gastos tomadas por la CFSE que alega afectan sus beneficios económicos. Del mismo modo, concluimos que tampoco procedía la expedición del auto extraordinario de *injunction*[2] debido a que la apelante tiene como remedios disponibles los provistos por la CASP. En consecuencia, procede confirmar la *Sentencia* apelada.

**IV.**

Footnotes

[1]  Véase, Apéndice del recurso de apelación, págs. 206–229.

[2]  Es imprescindible destacar que una vez decretada la constitucionalidad de los Artículos 11 y 17 de la Ley Núm. 66, *supra,* es inmeritorio e improcedente discutir si el TPI erró al no emitir un *injunction* para evitar la supuesta aplicación inconstitucional de la ley.

**\*17** En atención a los fundamentos antes esbozados, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada

Secretaria del Tribunal de Apelaciones

---

**End of Document** 

© 2019 Thomson Reuters. No claim to original U.S. Government Works.