## __Exhibit A__

Deposition of Daniel P. Goldberg

Page 1

```
 1
 2           UNITED STATES DISTRICT COURT
 3             DISTRICT OF PUERTO RICO
 4    --------------------------------X
      IN RE:                          PROMESA
 5                                     Title III

      THE FINANCIAL OVERSIGHT AND
 6    MANAGEMENT BOARD FOR PUERTO RICO,  No. 17 BK 3283-LTS
 7          as representative of
                                     (Jointly
 8    THE COMMONWEALTH OF PUERTO RICO,  Administered)
      et al,
 9
                        Debtors.
10    --------------------------------X
      IN RE:                          PROMESA
11                                     Title III

      THE FINANCIAL OVERSIGHT AND
12    MANAGEMENT BOARD FOR PUERTO RICO,  No. 17 BK 3284-LTS
13          as representative of
14    PUERTO RICO SALES TAX FINANCING
      CORPORATION (COFINA)
15
                        Debtor.
16    --------------------------------X
17              DEPOSITION
18                 OF
19            DANIEL P. GOLDBERG
20         Thursday, January 10, 2019
21             101 Park Avenue
22            New York, New York
23
      Reported by:
24    AYLETTE GONZALEZ, RPR, CLR, CCR
      JOB NO. 153834
25
```

Page 2

1

2                    DATE:  January 10, 2019

3                    TIME:  9:37 a.m.

4

5

6        Deposition of DANIEL P. GOLDBERG, held

7    at the offices of CURTIS, MALLET-PREVOST,

8    COLT & MOSLE, LLP., 101 Park Avenue, New

9    York, New York  10178, pursuant to NOTICE,

10   before AYLETTE GONZALEZ, a Registered

11   Professional Reporter, Certified LiveNote

12   Reporter, Certified Court Reporter and

13   Notary Public of the States of New York and

14   New Jersey.

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4    CURTIS, MALLET-PREVOST, COLT & MOSLE

5    Counsel for Ambac Assurance

6           101 Park Avenue

7           New York, New York 10178

8    BY:    MICHAEL MOSCATO, ESQ.

9    BY:    GABRIEL HERTZBERG, ESQ.

10   BY:    JACOB KEARNEY, ESQ.

11

12

13

14   KASOWITZ BENSON TORRES

15   Counsel for Whitebox Multi-Strategy

16   Partners, L.P.

17          1633 Broadway

18          New York, New York 10019

19   BY:    TREVOR WELCH, ESQ.

20

21

22

23

24

25

Page 4

1

2    A P P E A R A N C E S:   (CON'T)

3

4    REED SMITH

5    Counsel for Bank of New York Mellon

6            599 Lexington Avenue

7            New York, New York 10022

8    BY:     LOUIS SOLOMON, ESQ.

9

10

11

12    ALSO PRESENT:

13    HOLWELL SHUSTER & GOLDBERG

14    BY:     BRENDON DeMAY, ESQ.

15

16

17

18

19

20

21

22

23

24

25

Page 5

1

2              (Goldberg Exhibit 1, Declaration

3          of Daniel P. Goldberg was premarked

4          for identification, as of this date.)

5              (Goldberg Exhibit 2, Exhibit D to

6          the Declaration was premarked for

7          identification, as of this date.)

8    D A N I E L   P.   G O L D B E R G,

9        called as a witness, having been

10       duly sworn by a Notary Public,

11       was examined and testified as

12       follows:

13   EXAMINATION BY

14   MR. MOSCATO:

15       Q.   Mr. Goldberg, I'm Mike Moscato.

16   I'm from the law firm of Curtis, Mallet.  I

17   represent Ambac in this case.

18              I'm going to show you two documents

19   that have been marked as Goldberg 1 and

20   Goldberg 2.  Goldberg 1 is your declaration in

21   this case.  And Goldberg 2 is Exhibit D, I

22   believe, to your declaration.  I think all the

23   pages are there.

24              All right.  Ready to go?

25       A.   I'm ready.

Page 6

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   Can you turn to paragraph 6 of your

3    declaration, please.

4          A.   Paragraph 6, not page 6?

5          Q.   Paragraph 6, page 2.

6          A.   I'm there.

7          MR. SOLOMON:  Just one second.  I

8          don't need extra copies because I

9          brought mine.  Did that exhibit have a

10         first page and then --

11         THE WITNESS:  This is two-sided.

12         MR. SOLOMON:  I'll do it at a

13         break.  Please go ahead.  I'm sorry.

14         MR. MOSCATO:  I should have handed

15         out copies.  If you want one, just let

16         me know.

17         Just for the record, Exhibit 2,

18         which I think is Exhibit D of your

19         declaration, is Document 412-5, all

20         right, just so everyone's on the same

21         page.

22         MR. SOLOMON:  Thanks.

23    BY MR. MOSCATO:

24         Q.   Mr. Goldberg, you state in

25    paragraph 6 of your declaration that you've

1          DANIEL P. GOLDBERG (1/10/19)

2    been the person responsible for crafting the

3    litigation budget for the trustees in a number

4    of contexts, correct?

5          A.    Correct.

6          Q.    Have you ever crafted the

7    litigation budget for a trustee in a case that

8    is similar to the actions in this case?  And

9    when I say "actions," I mean the Whitebox

10   claim and the Ambac claim.

11         A.    You mean a claim by a noteholder

12   against a trustee claiming the trustee failed

13   to act properly in whatever way; is that the

14   meaning of your question?

15         Q.    Yes.

16         A.    I don't think I have.

17         Q.    Okay.  Have you ever crafted a

18   litigation budget for a trustee that is being

19   sued for gross negligence, willful misconduct

20   and fraud, but not being sued for negligence?

21         A.    I don't believe so.

22         Q.    Have you ever crafted a litigation

23   budget for a trustee that is being sued for

24   gross negligence, willful misconduct and fraud

25   at all?  Let me restate the question.

Page 8

DANIEL P. GOLDBERG (1/10/19)

1

2          I made a distinction between a

3   claim for gross negligence, willful misconduct

4   and fraud, but without negligence.  Okay?

5          So this question is, have you ever

6   crafted a litigation budget for a trustee when

7   it's being sued for negligence, gross

8   negligence, willful misconduct and fraud?

9          A.   I don't believe so.

10          Q.   In the cases when you were

11   responsible for crafting the litigation budget

12   for a trustee, at what point in the litigation

13   is it your practice to craft such a budget?

14          A.   The most typical time is at the

15   very beginning, the earliest outset, which is

16   not to say it's to the exclusion of other

17   times when it might get revisited, but the

18   time that you create the budget is at the

19   outset of the matter.

20          Q.   Now, this is a bit of a

21   hypothetical question, but if you or your firm

22   had been retained by Bank of New York Mellon

23   to represent it in defense of the actions, do

24   you expect you would've created a litigation

25   budget for it, for the litigation?

Page 9

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   Are you asking if my firm were

3    engaged to defend Bank of New York Mellon in

4    the cases that your clients are bringing?

5          Q.   Just to be clear, when I say "the

6    actions," I'm talking about the Whitebox

7    complaint and the Ambac complaint.  I

8    should've --

9          A.   Okay.

10          Q.   I should've defined the term,

11    but -- so let me ask the question again.

12    Okay?

13               MR. SOLOMON:  And as supplemented

14          with the claims of fraud that you were

15          talking about --

16               MR. MOSCATO:  I'm sorry?

17               MR. SOLOMON:  As supplemented with

18          the claims of gross negligence,

19          willful misconduct and fraud?

20               MR. MOSCATO:  Yeah.  Yeah, yeah,

21          yeah.

22               MR. SOLOMON:  Got it.

23               MR. MOSCATO:  Okay.

24               MR. SOLOMON:  Okay.  That's the

25          action.

Page 10

1           DANIEL P. GOLDBERG (1/10/19)

2    BY MR. MOSCATO:

3        Q.   Let me ask the question again then.

4            If you've been retained by Bank of

5    New York Mellon to represent it in defense of

6    the actions, do you expect you would've

7    created a litigation budget for Bank of New

8    York Mellon in those circumstances?

9        A.   Possibly.  The most typical time or

10   circumstances that bring about such a budget

11   is if the client asks for it.  If the client

12   doesn't ask for it, it's not unusual not to

13   create such a budget.

14       Q.   But if you were asked to create

15   such a budget, you'd probably do it at the

16   beginning of the litigation, that would be the

17   ideal time?

18       A.   You just threw in the qualifier of

19   "ideal."  It would be the typical time.

20       Q.   "The typical time."  Okay, good.

21       A.   But I think it'd be more accurate

22   to say you'd prepare the budget when the

23   client asks you to prepare the budget, so...

24       Q.   Is it your experience that in

25   trustee litigations the trustee will ask you

Page 11

1              DANIEL P. GOLDBERG (1/10/19)

2   to prepare a budget?

3        A.   At some point.  It's -- you usually

4   get asked to prepare a budget.  It's not

5   always at the outset in the trustee -- in an

6   indenture trustee circumstance.

7        Q.   Is it usually?

8        A.   Closer to the beginning of the case

9   than the end of the case.  I don't know if I

10  can give you a better answer.

11       Q.   Can you look at your paragraph 5,

12  please.

13       A.   I'm there.

14       Q.   You're there?  I'm looking at about

15  seven lines down, the sentence beginning "In

16  this role."

17       A.   Yes, I'm there.

18       Q.   Do you see that?

19       A.   I do.

20       Q.   You say "In this role, I review,

21  negotiate and approve every nonstandard fee

22  arrangement entered into by the firm.  Part of

23  that process entails analyzing what a

24  litigation would cost if the engagement were

25  on a standard hourly fee arrangement."  Do you

Page 12

                    DANIEL P. GOLDBERG (1/10/19)

1    see that?

2         A.   I do.

3         Q.   Is that essentially the exercise

4    you've undertaken in your declaration?

5         A.   If I'm understanding your question

6    correctly, I don't think so.  I wasn't asked

7    to evaluate a non-hourly fee arrangement here.

8         Q.   Well, to your knowledge, has

9    Reed Smith entered into what you term a,

10   quote/unquote, nonstandard fee arrangement

11   with Bank of New York with respect to the

12   defense of the actions?

13        A.   That's -- that's not my

14   understanding.  I don't have personal

15   knowledge.  I've been given assumptions and I

16   have a certain understanding.  And that

17   understanding is that it's anticipated that

18   Reed Smith would proceed on a -- what I'll

19   characterize as a standard hourly basis.

20        Q.   And who gave you that

21   representation?

22        A.   The team at Reed Smith.

23        Q.   Do you know whether Reed Smith has

24   presented Bank of New York with any budget for

Page 13

1              DANIEL P. GOLDBERG (1/10/19)

2    the defense of the actions?

3          A.   I don't know one way or the other.

4          Q.   Did you ever ask?

5          A.   I did not.

6          Q.   Why not?

7          A.   That wasn't the assignment that I

8    was asked to perform.  I was asked to evaluate

9    on my own without undo influence, if you

10   would, without getting skewed.  They wanted to

11   know what I thought it would cost to defend

12   the actions, as you've defined them, and to

13   provide a range.  And -- and so I undertook

14   that exercise.

15              I was not asked to look at, for

16   instance, a budget Reed Smith put together and

17   ask if that was a good or bad budget.  I was

18   asked to figure out from scratch on my own

19   what I thought it would cost to defend the

20   cases.

21         Q.   Would you agree that Reed Smith has

22   a little more background in these actions than

23   you do?

24         A.   Of course, yes.

25         Q.   Were you at all curious what --

Page 14

1    DANIEL P. GOLDBERG (1/10/19)

2 whether Reed Smith had provided Bank of New

3 York with a budget?

4   A. It was not significant to the

5 analysis I was asked to perform.

6   Q. If Reed Smith has provided bank of

7 New York with a budget that's materially

8 different than the estimates you give in your

9 declaration, is it your position that that's

10 not relevant?

11   A. Not relevant to what?

12   Q. To a reasonable estimate of legal

13 fees.

14   A. I guess the best way for me to

15 answer your question is to say more

16 information is always better than less

17 information I suppose.  But I wasn't asked to

18 opine or provide an estimate as to what

19 another firm's budget would entail or whether

20 it was reasonable.

21    I was asked to evaluate what I

22 thought from start to finish, meaning on my

23 own, what a reasonable range of defense costs

24 would be for these actions and I undertook

25 that.  I didn't -- so I don't -- sorry if this

Page 15

1          DANIEL P. GOLDBERG (1/10/19)

2     is a long way of answering your question.

3          Q.   No, take your time.

4          A.   So whether Reed Smith had its own

5     budget and whether it provided it to its

6     client or not, it was not something that went

7     into the mix of things I had considered in

8     evaluating what I thought a reasonable range

9     of defense costs could be.

10              Let me -- if I could add to that.

11    If Reed Smith provided a budget that said

12    $800 million to defend the cases, that would

13    not alter my view as to what I would think a

14    reasonable range of defense costs would be,

15    so...

16         Q.   What if Reed Smith gave the client

17    a budget that estimated $10 million as opposed

18    to the 25 or 40 million range that you have,

19    would that be relevant to you?

20         A.   Not particularly because I would

21    think that that would be unrealistic in the

22    context of these cases.  And it wouldn't --

23    and it's not unheard of that law firms give

24    clients budgets and then blow right through

25    them.  So if the firm -- if Reed Smith or any

Page 16

1          DANIEL P. GOLDBERG (1/10/19)

2    firm had provided a budget, you asked would it

3    be relevant to would I want to know.  I guess

4    on some level.  Like I said, more

5    information's always better than less

6    information.  But I don't believe it would've

7    altered my view as to what I believe a

8    reasonable range of defense costs would be.

9          Q.   Okay, but just to be clear, you're

10   not providing any sort of opinion as to the

11   legal fees -- let me withdraw the question.

12             Are you providing an opinion as to

13   what you believe Reed Smith's legal fees will

14   be in defending the action or are you

15   providing more of a hypothetical -- and I'm

16   not using the term in a derogatory sense, but

17   more of a hypothetical estimate of what legal

18   fees would be in this sort of litigation?

19         A.   It's -- on some level it's a bit of

20   a hybrid because I was asked to provide what I

21   thought a reasonable range of the defense

22   costs would be, but I was given certain

23   assumptions to use in order to make that

24   evaluation and some of those assumptions

25   involved specifics about Reed Smith.

Page 17

DANIEL P. GOLDBERG (1/10/19)

2        So I wasn't asked to opine what

3  will Reed Smith spend in this case and I

4  wasn't asked to opine hypothetical law firm A,

5  what would law firm A charge.  So it's sort of

6  somewhere between the two --

7        Q.   I'm trying to figure out what the

8  between is.

9        A.   They gave me rates to assume.  I

10  knew they were Reed Smith rates.  And from

11  there I crafted what I thought would be a

12  reasonable estimate.  So separate and apart

13  from the rates, it didn't matter what firm it

14  would be.

15        Q.   Okay.  Let me just ask this

16  question, very simple question.  Did you ever

17  ask Reed Smith point blank have you provided a

18  budget to Bank of New York Mellon?

19        A.   No, I did not ask anyone at

20  Reed Smith that question.

21        Q.   Were you -- did you get the sense

22  that you were not to ask that question?

23        A.   Absolutely not.  It was made quite

24  clear to me that I could have whatever

25  information I thought I needed to have.

Page 18

1              DANIEL P. GOLDBERG (1/10/19)

2          Q.   So the Reed Smith lawyers told you

3   that you could look at their budget, assuming

4   they had a budget, and you decided not to?

5          A.   No.  You added a layer of

6   specificity that was not intended in my

7   answer.  Your prior question asked if I was

8   given the impression that I should not ask for

9   a budget or I should not look at their budget.

10  My response was no, that's not the case.  I

11  was told I could have whatever I want.  No one

12  ever discouraged me from looking at anything.

13         Q.   You just chose not to ask if they

14  had a budget and you chose not to look at a

15  budget, right?

16         A.   Correct.  For the reasons I have

17  said to you, it wasn't particularly relevant

18  to the assignment I was given.

19         Q.   But you do have an understanding

20  that Reed Smith -- well, let me ask the

21  question again.

22              Do you have an understanding one

23  way or the other whether Reed Smith has a

24  nonstandard fee arrangement with Bank of

25  New York as you've -- as you use the term in

Page 19

1          DANIEL P. GOLDBERG (1/10/19)

2     paragraph 5 of your declaration?

3          A.   Can I see the question?

4               (Whereupon, an off-the-record

5          discussion was held.)

6          A.   I don't have personal knowledge, so

7     I don't know one way or the other, but I am

8     under the impression that it is a standard

9     hourly fee arrangement.

10     BY MR. MOSCATO:

11          Q.   Well, how did you get under that

12     impression?

13          A.   Because that was one of the

14     assumptions I was given to craft my opinion.

15          Q.   Do you have an understanding one

16     way or the other -- well, let me --

17          A.   I should -- can I modify that last

18     question?

19          Q.   Listen, say anything you want to

20     say in response to a question.  All right?

21          A.   That's an inference that I drew

22     from the assumptions I was given.  I was told

23     to use certain rates and work up what I

24     thought would be a reasonable range of defense

25     costs based on those rates, which led me to

Page 20

1          DANIEL P. GOLDBERG (1/10/19)

2    conclude that it's an hourly billing

3    arrangement.  If it were a flat fee, the

4    hourly rates would be irrelevant.

5          Q.   Now, if you -- so you understand

6    that -- you were given some rates, correct?

7          A.   Correct.

8          Q.   Do you know one way or the other

9    whether Reed Smith has agreed with Bank of New

10   York to discount those rates?

11         A.   I do not know one way or the other.

12         Q.   Did you ask?

13         A.   I did not ask.

14         Q.   And that would not have been

15   relevant to your declaration; is that why you

16   didn't ask?

17         A.   I was given -- I was told to assume

18   certain rates, so I used those rates.  If you

19   change those rates, yes, it would change the

20   analysis.

21         Q.   So if you were given rates.  But in

22   reality, there was an agreement to have a

23   discount for those rates; that would change

24   your declaration, wouldn't it?

25         A.   Certainly if the actual rates turn

Page 21

1              DANIEL P. GOLDBERG (1/10/19)

2    out to be different than the rates that I was

3    given, that would change the conclusion, yes.

4         Q.   Do you know if Reed Smith has

5    agreed with Bank of New York to put a cap on

6    its legal fees in the actions?

7         A.   I don't know one way or the other.

8         Q.   And, again, you did not ask?

9         A.   I did not ask.

10        Q.   Does your estimated budget

11   distinguish between the cost of defending

12   against the Ambac complaint versus the

13   Whitebox complaint?

14        A.   It assumes that they will be

15   defended together, meaning that the cases will

16   either be consolidated or at least coordinated

17   so that it will all happen as a practical

18   matter as one lawsuit so that efficiencies

19   will be achieved.  That's the assumption.

20        Q.   And the one lawsuit basically --

21   I'm sorry, withdrawn.

22             Is your assumption that once the

23   complaints are amended, if they're amended,

24   that they will be quite similar to each other

25   insofar as the allegations?

Page 22

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   I don't know that I thought about

3     it in that way.  I assumed that the crux of

4     the claims that would be asserted by the two

5     holders would be similar, and so the scope of

6     the litigation for their claims would be

7     similar.  That is the assumption that I had.

8          Q.   Can you go to paragraph 38 of your

9     declaration, please.  It's page 7.  I'm

10    looking at the first sentence.  And you state

11    "First, I understand that Bank of New York

12    Mellon has but a single opportunity in advance

13    to set a holdback."  Do you see that?

14         A.   I do.

15         Q.   What's the basis for your

16    understanding?

17         A.   It's one of the assumptions I was

18    given by Reed Smith.  And from reading

19    generally some of the pleadings, my

20    understanding is that as part of the

21    confirmation process, the Court's going to

22    make a determination as to whether there will

23    be a holdback; and if so, how much.

24         Q.   Well, you use the term "holdback."

25    What do you mean by "holdback"?

Page 23

1        DANIEL P. GOLDBERG (1/10/19)

2        A.   As I understand it, there will be

3    certain distributions that will be made to

4    interest holders in what I'll call the estate,

5    which is a little bit of a -- this is somewhat

6    of a sui generis proceeding.  And a certain

7    amount of money will not be distributed to

8    interest holders and held back to fund the

9    defense of Bank of New York Mellon.  I should

10   put in the emphatic caveat, I've not been

11   asked to opine on that and I'm not offering an

12   opinion on that; you just asked the question

13   as to what my understanding is, and so I gave

14   it to you.

15       Q.   You just saved me a question.

16       A.   Okay.

17       Q.   Have you read the paragraph 19.5 of

18   the plan?

19       A.   I have.

20       Q.   Okay.  Well, let me ask a follow-up

21   question.

22            After the first sentence I just

23   read, you state "As a result, prudence

24   dictates that all reasonable possible

25   litigation contingencies be reserved to ensure

Page 24

DANIEL P. GOLDBERG (1/10/19)

1
2     that Bank of New York receives the benefit of
3     its bargained-for indemnification rights."  Do
4     you see that?
5          A.   I do.
6          Q.   Okay.  Just following up on the
7     caveat you gave me a moment ago, I take it
8     you're not providing a legal opinion
9     concerning what those, quote/unquote,
10    bargained-for indemnification rights are?
11         A.   No.
12         Q.   That's not your province in this
13    litigation, right?
14         A.   Correct.  I have some modicum of
15    experience in the area, but it is not one of
16    the opinions that I'm offering in this case.
17         Q.   Okay.  When you prepare actual
18    budgets for your trustee clients, do you
19    include in them all reasonable possible
20    litigation contingencies?
21         A.   I give a range of what I believe to
22    be the reasonable range of contingencies, and
23    I think uniformly I give the caveat that
24    litigation inherently is uncertain and things
25    can happen that could cause cost to be either

Page 25

1              DANIEL P. GOLDBERG (1/10/19)

2    higher or lower than the estimate.

3         Q.   But I guess I'm focusing on the

4    word "possible."  The quote you use is "all

5    reasonable possible litigation contingencies."

6              Is it your practice when you

7    prepare actual budgets for your trustee

8    clients to include in them all reasonable

9    possible litigation contingencies?

10        A.   So long as you keep the word

11   "reasonable" in there, my answer is yes.  I

12   think I intended to say the same thing.  If I

13   said something differently, then I misspoke.

14        Q.   You didn't misspeak.

15        A.   Okay.

16        Q.   Is it accurate to say that your

17   declaration assumes that the Court, Judge

18   Swain, will order that some amount be withheld

19   from Ambac and Whitebox as distributions under

20   the plan rather than the judge ordering

21   Whitebox or Ambac to post a bond?

22        A.   No.

23        Q.   Does your report talk at all about

24   the possibility of Ambac or Whitebox posting a

25   bond rather than having a distribution

Page 26

1              DANIEL P. GOLDBERG (1/10/19)

2    withheld?

3         A.   It wasn't something that I was

4    asked to opine on, so it's not addressed or

5    analyzed.  But you ask if my opinion, if I

6    recall it correctly, either hinges upon or

7    assumes or is based upon the assumption or

8    conclusion that they'll be a holdback versus a

9    bonds.  The answer to that is no.

10             The opinion I've been asked to

11   provide is a reasonable range of defense costs

12   to defend the actions that your clients are

13   bringing.  That's the extent of the opinion.

14   If you want my view as to the efficient way to

15   handle that, I'm happy to give it to you.  But

16   the opinion that I was asked to provide --

17        Q.   Well, if it's not part of your

18   opinion, no offense, but I'm really not

19   interested in your views other than what are

20   part of your opinions.

21        A.   I understand.  So my opinion is

22   about the reasonable range of defense costs to

23   defend the actions.

24        Q.   But is your reasonable range -- the

25   reasonable range that you give in your

Page 27

DANIEL P. GOLDBERG (1/10/19)

1   declaration, is that informed at all by your

2   assumption that there is but a single

3   opportunity in advance to set a holdback?

4       A.  On some level -- well, you said

5   "holdback."  Do you mean -- are you

6   intentionally distinguishing between a

7   holdback and a bond?

8       Q.  I thought you were, but I guess

9   you're not.  So no, I'm not.  You want me to

10  rephrase the question then?

11      A.  Please.

12      Q.  Is the reasonable range that you

13  provide in your declaration informed at all by

14  your assumption that there is but a single

15  opportunity in advance to set either a

16  holdback or a bond?

17      A.  On some level.  The lower range of

18  the estimate that I came up with I believe to

19  be conservative, meaning it's on the -- it's a

20  low range on -- because it's a low range, I

21  believe that to be conservative.  That said,

22  as I understand it, the money is to be set

23  aside if it's a holdback and any money not

24  spent would get returned.  And this is the one

Page 28

1              DANIEL P. GOLDBERG (1/10/19)

2    opportunity -- again, this is my understanding

3    in the assumptions I've been given.  This is

4    the one opportunity to set that amount.

5              So in that sense if there's a

6    question as to whether to include an expense

7    or category of expense or not, the fact that

8    this is the only shot that they get to have

9    that amount set; and if it's not spent, the

10   money goes back, the money gets returned, that

11   might have made me lean in a circumstance or

12   two to include something.

13       Q.   To include something or to exclude

14   something?

15       A.   Include in the estimate.

16       Q.   So the fact that you believe

17   there's only a one-time shot to set either a

18   bond or a holdback, that would cause you to

19   include certain expenses that you might not

20   include otherwise; is that basically what

21   you're saying?

22       A.   That puts it into stark alight.  If

23   it's around the margins, that could be the

24   case.  It's not as if -- to take an example,

25   it's not as if I included deposition costs.

Page 29

1              DANIEL P. GOLDBERG (1/10/19)

2     But if I thought they were going to have

3     another opportunity to go back to the Court

4     and have a holdback set, I wouldn't have

5     included deposition costs.  It's not that

6     stark.  It's just sort of at the margins.

7          Q.   Do you have an understanding one

8     way or the other whether at least it's Ambac's

9     position that the Court should set a bond as

10    opposed to a holdback?

11         A.   I have come to learn that, yes.

12         Q.   And have you come to learn that

13    it's Ambac's position that not only should the

14    Court set a bond, if there's any security

15    whatsoever, that if -- if the Court is to set

16    a bond, it should be a stayed bond?

17         A.   I think I learned that for the

18    first time yesterday when I read your brief.

19         Q.   What's your view of that?

20         A.   So you gave me an instruction

21    before.

22         Q.   Well, no --

23         A.   I'm happy to give you my view.  I'm

24    happy give you my view.

25         Q.   Would that be a more efficient way

1          DANIEL P. GOLDBERG (1/10/19)

2    of setting -- of estimating legal fees here;

3    in other words, to do it -- to say, okay, here

4    are going to be the legal fees up through the

5    motion to dismiss, let's do that, and then if

6    we get past the motion to dismiss, what are

7    the legal fees?  Answer:  Discovery, summary

8    judgment.  You get through that.  What are the

9    legal fees for trial?  You get the point.

10          And the question is, isn't that a

11   more efficient way of estimating what will be

12   the true cost of the litigation rather than

13   what you've done in your declaration?

14          A.   So with the caveats that we

15   discussed before about the contours of -- and

16   parameters of my opinion, with those caveats

17   applying, I say to you I think that's actually

18   a particularly inefficient way to do it for a

19   few reasons.  And it probably raises more

20   questions than it provides answers.

21          Who determines the amount at the

22   individual phases?  They would be a problem.

23   You would -- in the scenario you described,

24   you likely would have a circumstance where the

25   parties would engage in seriatim motion

Page 31

1          DANIEL P. GOLDBERG (1/10/19)

2     practice litigating the amount of the seriatim

3     bonds that you're proposing.  You have the

4     dynamic where the Plaintiff is attempting to

5     have influence and dictate what the Defendant

6     gets to spend to defend the case effectively

7     or you're -- you're having the Plaintiff

8     having put on how vigorous a defense the

9     Defense gets to have.  That's troublesome.

10             So in those -- and for those

11    reasons, the notion of having the Defendant

12    have to come back periodically and effectively

13    beg for more money at every stage of the case

14    and have a fight about that every time that

15    happens is actually not a particularly

16    efficient way to proceed.

17             If you overlay on that, my

18    understanding -- and, again, this my

19    understanding.  If it's incorrect, things

20    could change.  Whatever the Court does at the

21    outset in terms of a holdback, if there's a

22    holdback, if that money's not spent, it gets

23    returned.  And moreover, at the end when

24    there's the final fee application, as I'm told

25    and I understand to be the case, your clients,

Page 32

1              DANIEL P. GOLDBERG (1/10/19)

2      the holders, then have an opportunity to

3      challenge the reasonableness of the fees

4      overall.  It strikes me that setting it all at

5      once protects all the parties and has the

6      virtue of having the matter resolved and not

7      having one litigant in the pocket of the other

8      litigant or sticking his hands or fingers in

9      the pocket of the other litigant trying to

10     dictate how much gets spent by one's

11     adversary, which strikes me as fraud with

12     peril.

13              So I think it's -- I wasn't asked

14     to opine on this and therefore that's why you

15     see it's not in the report, but you have asked

16     me --

17          Q.   I have asked you.

18          A.   I think it's not actually

19     particularly an efficient way to do it.

20          Q.   One thing I couldn't tell from your

21     report, and I'd like you to clarify, are you

22     assuming that -- when you say that Bank of

23     New York -- or I'm sorry.  When you say that

24     Ambac or Whitebox could get the money back at

25     the end if it wasn't spent, do you have an

Page 33

1              DANIEL P. GOLDBERG (1/10/19)

2    understanding that Ambac and Whitebox are

3    responsible for the legal fees even if they

4    prevail in the litigations?

5         A.   Who's the "they"?

6         Q.   Ambac and Whitebox.

7         A.   You're asking -- just to make sure

8    I understand the question -- if Ambac and/or

9    Whitebox prevail are they then still obligated

10   to pay the defense costs of Bank of New York

11   Mellon; is that your question?

12        Q.   Yes.

13        A.   I don't know.

14        Q.   You don't know one way or another?

15        A.   I don't.

16        Q.   So when you talk about getting the

17   money back, right, getting the unspent money

18   back, are you making a distinction between

19   what Whitebox and Ambac would get back if they

20   actually -- if BNY were actually found liable

21   for gross negligence, et cetera, rather than

22   BNY prevailing?

23        A.   The way you phrase that, I think

24   that might call into question whether they get

25   back money that was actually spent.  The point

Page 34

1          DANIEL P. GOLDBERG (1/10/19)

2    I was making is that if the money is not spent

3    from the holdback, that money goes back.

4          Q.   Right.  I understand that.

5          A.   Okay.

6          Q.   I understand that that's what

7    you're saying, but my question to you is,

8    let's say BNY spends the money to defend

9    themselves, but then either a Court or a jury

10   finds that BNY was liable for gross

11   negligence, willful misconduct or intentional

12   fraud, what's your understanding as to whether

13   BNY gets to keep the money they spent in that

14   circumstance?

15         A.   I don't have an opinion on that in

16   this circumstance.  Typically indenture

17   trustees get their defense costs paid

18   regardless.  But I don't have an opinion on

19   that in this case, I have not evaluated that,

20   I have not looked at the specific indenture on

21   that issue here at all.  I don't have a view

22   one way or the other.

23         Q.   It's your experience that indenture

24   trustees get their legal fees back if they're

25   found liable for gross negligence, willful

Page 35

1              DANIEL P. GOLDBERG (1/10/19)

2    misconduct or intentional fraud?

3           A.   I'd have to look at that more

4    thoroughly, honestly.  I don't know that I

5    have evaluated that specific question, is

6    probably a better way to answer that question.

7           Q.   Are you aware of the interpleader

8    litigation that's occurred in connection with

9    the COFINA Title III case?

10          A.   At a reasonably high level, I am

11   aware of it.

12          Q.   What do you know -- what's your

13   understanding of that litigation?

14          A.   That there was a dispute over --

15   different constituencies were seeking -- or

16   believed they were entitled to the proceeds

17   from the various sales and used tax revenues.

18   There was a fight about how that money was to

19   be distributed.  There wasn't enough money to

20   make everyone whole.  And so the interpleader

21   action was started to sort that out, is

22   probably the extent to which I know.

23          Q.   Have you reviewed any of the

24   pleadings in the interpleader litigation?

25          A.   I may have, but as I sit here I

Page 36

1              DANIEL P. GOLDBERG (1/10/19)

2    can't recall specifically.

3         Q.   Do you recall specifically

4    reviewing any of Bank of New York's pleadings

5    in the interpleader litigation?

6         A.   Same answer.  I may have, I don't

7    recall specifically as I sit here.

8         Q.   Do you have an understanding one

9    way or the other whether during the course of

10   that litigation certain issues that relate to

11   the actions; in other words, the Whitebox and

12   Ambac complaint, were the subject of motions

13   for summary judgment?

14        A.   I understand that there were

15   motions for summary judgment and that those

16   issues could touch upon issues that will be

17   relevant to what you've characterized as the

18   actions.

19        Q.   Well, what's your specific

20   understanding in that regard?

21        A.   That there was some motion practice

22   over whether there were or were not certain

23   specific events of default.

24        Q.   And specifically events of default

25   in 2017, correct?

Page 37

1          DANIEL P. GOLDBERG (1/10/19)

2      A.    That's my understanding.

3      Q.    That's your understanding.

4          Now, you understand that the Ambac

5   complaints against Bank of New York alleges

6   that between September 2015 and May 2017 there

7   occurred seven events of default -- seven

8   events that Ambac contends constituted events

9   of default under the resolution; you're aware

10  of that, right?

11     A.    I thought there were six, you're

12  saying seven.  That's fine.  Yes, I'm aware

13  that in the main, that's Ambac's claim.

14     Q.    And you've read the Ambac

15  complaint, I take it, right?

16     A.    I have.

17     Q.    And your understanding, just to be

18  clear, is that certain of those events,

19  specifically the ones occurring in 2017, were

20  at issue in the interpleader litigation,

21  right?

22     A.    My understanding is that the two

23  alleged events of default from 2017 were at

24  issue in the interpleader.  The others were

25  not.

Page 38

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   And do you understand that at least

3     five different parties submitted summary

4     judgment motions in connection with the

5     interpleader litigation?

6          A.   I knew various parties moved.  I'm

7     not sure I knew the actual number.

8          Q.   But you do understand that Bank of

9     New York was one of those parties?

10         A.   I did understand that.

11         Q.   And that Ambac was one of those

12    parties?

13         A.   I think I assumed that, yes, I

14    think that was my understanding.

15         Q.   Were you told that or just assumed

16    that?

17         A.   I think I was told that.

18         Q.   Did you discuss the interpleader

19    litigation with Reed Smith counsel?

20         A.   In -- on some level, yes.

21         Q.   Well, what level is some level?

22         A.   To the extent there was overlap

23    between the work that was done in the

24    interpleader action and the work that would

25    need to be done in these actions.

Page 39

1          DANIEL P. GOLDBERG (1/10/19)

2       Q.   But you do understand that one of

3   the issues in the summary judgment motions in

4   the interpleader action was whether or not an

5   event of default under the resolution had

6   occurred in 2017; you are aware of that,

7   right?

8       A.   My understanding is that was one of

9   the issues, yes.

10       Q.   And the two events of default that

11   you were talking about -- well, the two

12   alleged events of default you were talking

13   about in 2017 that were at issue in the

14   interpleader action are also in dispute in the

15   Ambac complaint; is that your understanding?

16       A.   That is my understanding.

17       Q.   In connection with the interpleader

18   litigation, do you have an understanding one

19   way or the other about the following:  Do you

20   have an understanding whether Bank of New York

21   drafted requests for production to various

22   parties including Ambac?

23       A.   Production of documents?

24       Q.   Yes.  Requests for production of

25   documents to various parties; do you have on

Page 40

1           DANIEL P. GOLDBERG (1/10/19)

2    understanding one way or the other?

3           A.   I understand there was -- there was

4    document discovery in the interpleader

5    actions.  So from that I infer that the

6    parties drafted requests for production.  No

7    one specifically told me whether Bank of

8    New York drafted document requests.  I assumed

9    they did.

10          Q.   But you didn't ask that?

11          A.   I assumed they did because if

12   I'm -- if what I'm told is that there was

13   document discovery, that happens only in

14   response to requests.

15          Q.   And did you also assume that Bank

16   of New York responded to requests for

17   production from various parties including

18   Ambac?

19          A.   Yes.

20          Q.   And do you have an understanding

21   one way or the other whether Bank of New York

22   collected, preserved and reviewed documents in

23   response to requests of production that it

24   received from various parties in the

25   interpleader?

Page 41

1          DANIEL P. GOLDBERG (1/10/19)

2          A.    That would fall within the ambit of

3     the answer I gave a moment ago.  I am under

4     the understanding, pardon the redundancy, that

5     document discovery occurred.  In parcel with

6     that, from that I inferred that all the usual

7     things that happen with a document production

8     happened.

9          Q.    But did you ever talk to the

10    Reed Smith lawyers just about the specific

11    details of -- of the discovery process?

12         A.    No, not in any particular level of

13    detail.

14         Q.    Do you have an understanding

15    whether Bank of New York actually produced

16    documents in the interpleader litigation in

17    response to requests for production from

18    various parties?

19         A.    I am under the impression they

20    did -- it did.

21         Q.    Well, what gave you that

22    impression?

23         A.    Same -- falls within the ambit of

24    the answer I gave previously.  I am advised

25    that document discovery occurred in the

Page 42

1          DANIEL P. GOLDBERG (1/10/19)

2    interpleader action.  From that I inferred

3    that all the usual things that happen in

4    document discovery in fact happened, which

5    includes people drafting requests, people

6    responding to requests, parties reviewing

7    their own documents, parties producing

8    documents, parties reviewing the documents the

9    other side produced.  I assumed all that

10   happened and -- I infer all that happened, I

11   should say.  And I infer that from the fact

12   that I was told that document discovery took

13   place in the interpleader.  That's the extent

14   of the --

15        Q.   Do you have any idea whatsoever how

16   much time counsel for Bank of New York spent

17   in the discovery process in the interpleader

18   action?

19        A.   I do not.

20        Q.   Do you have any idea whatsoever how

21   many pages of documents BNY produced in the

22   interpleader litigation?

23        A.   I do not.

24        Q.   Do you have any idea how much time

25   Bank of New York attorneys spent reviewing

Page 43

1        DANIEL P. GOLDBERG (1/10/19)

2   documents produced from other parties in the

3   interpleader litigation?

4        A.   I do not.

5        Q.   Do you have an understanding one

6   way or the other whether Bank of New York

7   performed a case assessment, at least with

8   respect to the 2017 events that Ambac contends

9   were events of default, in connection with the

10  interpleader litigation?  I can re-ask if

11  you'd like.

12       A.   I want to make sure I understand

13  it.  I did not have discussions about that

14  specifically.  My understanding is that

15  probably did, but that's only based on me

16  supposing that here as I sit here now.  I did

17  not have that discussion.

18       Q.   Well, wouldn't you be surprised if

19  they didn't?

20       A.   It would be surprising if they

21  didn't.

22       Q.   But you have no idea how much time

23  Bank of New York's attorneys would have spent

24  in the interpleader litigation on case

25  assessment, at least with regard to the 2017

Page 44

1          DANIEL P. GOLDBERG (1/10/19)

2   events that Ambac contends were events of

3   default; is that correct?

4          A.   I do not know how much time they

5   spent.

6          Q.   And you never asked?

7          A.   I did not ask.

8          Q.   Do you have an understanding one

9   way or the other whether Bank of New York

10  identified various legal defenses as to why it

11  was not obligated to declare an event of

12  default or accelerate the COFINA bonds in

13  connection with the 2017 events that Ambac

14  claims were events of default?

15         A.   I certainly do not know the

16  specifics.  I know that the matter was

17  litigated, so I am under the impression that

18  they asserted defenses into each.

19         Q.   But you have no idea what defenses

20  they asserted?

21         A.   I don't know what defenses they

22  asserted.

23         Q.   And you've never looked at the

24  summary judgement briefs to see what defenses

25  they've asserted?

Page 45

1              DANIEL P. GOLDBERG (1/10/19)

2        A.   I didn't say that.  I may have

3   looked at some of the interpleader pleadings

4   and it may have included some of the summary

5   judgment filings.  I just can't recall one way

6   or the other as I sit here.  I might have, I

7   might not have.

8        Q.   But you don't discuss that in your

9   declaration at all, do you?

10       A.   I do not know, no.

11       Q.   Do you have any idea how much time

12  Bank of New York's attorneys spent identifying

13  various legal defenses as to why it was not

14  obligated to declare an event of default or

15  accelerate the COFINA bonds in connection with

16  the interpleader litigation?

17       A.   I do not.  I didn't view it as

18  relevant to the assignment I was given.

19       Q.   And why was that?

20       A.   Why was it not relevant; is that

21  the question?  One, that I wasn't asked to

22  evaluate how much it would cost to litigate

23  the interpleader action, so I wasn't focused

24  on that.  The amount of time that Reed Smith

25  actually spent wasn't anything I was asked to

Page 46

1            DANIEL P. GOLDBERG (1/10/19)

2    evaluate or the reasonableness of that time.

3    I was asked to estimate what I believe to be a

4    reasonable range of the defense costs.  So

5    it's conceivable Reed Smith spent an

6    unreasonable amount of time litigating that

7    case.  Whether too much or too little, I

8    wasn't asked to evaluate that.

9            So you're asking me these questions

10   did I know how much time they spent and do I

11   know what they billed for this and that.  I

12   suspect if you wanted to stipulate that

13   whatever Reed Smith did was a reasonable

14   amount, they'd probably take you up on that,

15   but that was not the assignment I was asked to

16   do.

17       Q.   But when you're in your declaration

18   estimating the amount -- a reasonable fee for

19   defending the cases, do you make any efforts

20   to subtract from that reasonable amount work

21   that Bank of New York's counsel has already

22   done in the interpleader litigation?

23       A.   Yes.

24       Q.   How do you do that?

25       A.   In the number of hours that I

Page 47

1          DANIEL P. GOLDBERG (1/10/19)

2    estimated people would spend, I factored in --

3    and I even say in the report that were

4    factored in certain efficiencies and the

5    elimination of certain redundancies from work

6    that was already done.  That's a limited

7    value, however.  I mean, it involved some

8    reduction in my hours' estimates, but the --

9    it's not that hour for hour whatever was done

10   in the interpleader action could get fully

11   credited as defending the actions as defined

12   them that are at issue here.  The claims are

13   different, the events of default do not

14   totally overlap.

15          As I understand it, there were no

16   depositions in the interpleader action.  When

17   there are depositions, presumably that will be

18   a year from now or at least several months

19   from now, so when you get to the point of

20   having to do depositions, even if there was a

21   document review two years ago, people are

22   going to have to re-review the documents

23   anyway because people don't memorize documents

24   from large-scale productions from years ago.

25   So while I did account for it in my hours'

Page 48

1           DANIEL P. GOLDBERG (1/10/19)

2      estimates, it's -- in my opinion, it's not

3      going to result in a dollar-for-dollar or

4      hour-for-hour reduction.  It just doesn't work

5      that way.

6           Q.   Well, then how specifically did you

7      account for it?

8           A.   I probab- -- when I estimated

9      hours, I just lessened on the document

10     production because that's really the only

11     thing that I think really has any kind of

12     meaningful impact on the cost.  I lessened the

13     number of hours that I thought lawyers would

14     take on the document production factoring in

15     that some of that work had been done.

16               Mind you, a lot of that work has

17     not been done, right?  The claims are

18     different, the amounts of default are

19     different, the time frame is different.  Those

20     are going to be all new documents, at least

21     that's my assumption.

22          Q.   Well, they're not going to be all

23     new documents for 2017, are they?

24          A.   No, that's why I would have -- I

25     did lower the hours' estimates because two of

Page 49

1          DANIEL P. GOLDBERG (1/10/19)

2    the events of default overlap.  And to the

3    extent the parties produce documents

4    concerning those two alleged events of

5    default, they would not have to reproduce

6    them.  They still would have to re-review

7    those documents, however, when they get to the

8    deposition phase in evaluating the case.

9          Q.   Well, in your declaration do you

10   say anywhere how much you reduced your

11   estimate of legal fees based on the work that

12   had been done?  Do you quantify it?

13         A.   Do I say how many hours

14   specifically I lessened?

15         Q.   Yes.

16         A.   May I look at the document for a

17   moment?

18         Q.   You can do anything you'd like.

19   You know, if you'd like, we can take a break

20   and you can look at your report during the

21   break and we can revisit this question.

22         A.   If you want to take a break, that's

23   fine with me.

24         Q.   No.

25              MR. SOLOMON:  Do you have an extra

Page 50

1        DANIEL P. GOLDBERG (1/10/19)

2    copy of the report?  Thank you very

3    much.

4        MR. MOSCATO:  That's why I'm

5    suggesting we take a break so he

6    doesn't have to read the whole report.

7        MR. SOLOMON:  We're just trying to

8    be mindful of a couple of depositions

9    today and don't want to be wasting any

10   time.  That's all.  If you want to

11   take a short break, we --

12       THE WITNESS:  If you want to do

13   that, that's fine.

14       MR. MOSCATO:  We're going to take

15   a break in the hour range anyway,

16   so...

17       THE WITNESS:  And we're there.  So

18   if you want to take a break, that's

19   fine.

20       MR. MOSCATO:  Off the record.

21       (Whereupon, at this time, a short

22   break was taken.)

23       MR. WELCH:  I want to formally

24   appear for the record.  My name's

25   Trevor Welch, Kasowitz Benson Torres.

Page 51

1      DANIEL P. GOLDBERG (1/10/19)

2      I'm appearing for Whitebox

3      Multi-Strategy Partners, L.P.

4  BY MR. MOSCATO:

5      Q.   I think there's a question pending.

6      A.   There's a question pending.

7           The report does not delineate a

8  specific number of hours that were excluded

9  that would be related to the document review

10 production and other work in connection with

11 the interpleader action.

12          The way I worked up my estimate was

13 I considered the work that needed to get done

14 and looking at four events of default over a

15 two-year period and the related ancillary

16 issues that would come up with that is how my

17 estimates were built.  So I would say it

18 excluded the fact that there were two events

19 of default in 2017 from the work I assumed had

20 to be done.

21     Q.   So it's your testimony that the

22 estimate of legal fees in your declaration

23 just covers the pre-2017 events of default?

24     A.   No.  It covers -- I didn't -- I'm

25 not litigating the case, so I don't have

Page 52

1                    DANIEL P. GOLDBERG (1/10/19)

2       sufficient insight to opine as to exactly

3       every last little thing that's going to be

4       subject to discovery in the actions.  I'm

5       saying that when I did my estimate, I did my

6       best to exclude the amount of time it would

7       take to produce documents that were already

8       produced in the interpleader action that

9       would've been related to the 2017 alleged

10      events of default.

11           Q.   But I'm curious how you could have

12      done that if you don't know how much time

13      Reed Smith spent on the 2017 activities in

14      connection with the interpleader litigation?

15           A.   I wasn't evaluating how much time

16      Reed Smith took to do anything.  I was

17      estimating what I thought was a reasonable

18      range for the work that I thought would need

19      to be done for a case like this.  Again, I

20      wasn't Monday morning quarterbacking what

21      Reed Smith did to evaluate whether what they

22      did was reasonable.  I was doing it from whole

23      cloth with certain assumptions that were given

24      to me to estimate what I thought would be a

25      reasonable range.

Page 53

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   So to be clear, and I don't want to

3    put words in your mouth so correct me if I'm

4    wrong, but your opinion, your declaration is

5    not an attempt to estimate what Reed Smith

6    will actually spend or charge Bank of New York

7    in connection with the defense of the actions;

8    is that fair?

9          A.   I think that's reasonably accurate.

10   My -- what I was attempting to do was evaluate

11   what I believe to be a reasonable range of the

12   defense costs.  Whether Reed Smith or any

13   other firm charges what I believe to be a

14   reasonable range or some other range was not

15   what I was asked to opine.

16         Q.   Again -- and if I asked this,

17   forgive me, I'm trying not to be repetitive --

18   does the legal fee estimate you provide in

19   your declaration take into account all the

20   activities that were performed on Bank of

21   New York Mellon's behalf during the

22   interpleader litigation?

23         A.   Yes, I did my best to do so.

24         Q.   But you can't assign a dollar value

25   to any reduction in your estimate as a result

Page 54

1          DANIEL P. GOLDBERG (1/10/19)

2    of those interpleader-related activities?

3          A.   I didn't -- the analysis I did

4    didn't lend itself to a reduction the way you

5    have articulated it.  I evaluated the work

6    that I believe needed to get done and

7    estimated the costs for that.  I did not

8    include in the universe of work that I thought

9    to get done, to the best of my ability, work

10   that I believe had already been done in the

11   interpleader action.  But, again, with keeping

12   in mind, it would not have been an

13   hour-for-hour or dollar-for-dollar reduction.

14         Q.   But what work did you exclude from

15   your declaration based on what had been

16   performed during the interpleader litigation?

17   And I'd like you to be as specific as possible

18   here.

19         A.   So the most significant things is

20   what I told you, that the universe of

21   documents that would need to be produced would

22   be, at least to a certain degree, smaller

23   because some of those documents already had

24   been produced in the interpleader action.

25              In addition, I suppose on some

1          DANIEL P. GOLDBERG (1/10/19)

2     pre-answer motion matters, some legal issues

3     that might pertain to the 2017 alleged events

4     of default, some of that work might already

5     have been done, but not in toto because you're

6     going to have different legal fee reasonality

7     in here that were at issue in the interpleader

8     action because of the nature of the claims

9     that are left to be asserted by your client.

10    So even in that respect, the briefing in the

11    main will still have to get done on -- on --

12    for motion practice, but I suppose at least

13    theoretically some of that work has been done.

14         Q.   But you can't quantify?

15         A.   I did not quantify it in the report

16    in that way.  I did not evaluate what do I

17    think the reasonable amount of money it

18    would've taken to litigate the interpleader

19    action and then let me -- and evaluate what

20    that number is and then not include that.  I

21    didn't look at it that way.  That's not the

22    way I performed the assignment.

23         Q.   But you also didn't really try to

24    investigate what exactly had been done in the

25    interpleader litigation, did you?

Page 56

1        DANIEL P. GOLDBERG (1/10/19)

2        A.   You use the word "investigate."  I

3   certainly didn't investigate.  I was told what

4   was done and I had high-level discussions

5   about it because that's all I thought I needed

6   to know in order to do the assignment that I

7   was doing, keeping in mind I was evaluating --

8   and I'm sorry I keep saying this over and over

9   again.  I was evaluating what I believed to be

10  a reasonable range of defense costs for these

11  actions.  I was not focusing on what was a

12  reasonable amount of money to spend to

13  litigate the interpleader action.

14       Q.   And you have no idea one way or the

15  other how much Reed Smith has billed Bank of

16  New York Mellon to date in connection with the

17  interpleader action, right?

18       A.   I do not know.

19       Q.   Do you have any idea how much

20  Reed Smith has billed Bank of New York Mellon

21  to date in connection with the actions

22  themselves?

23       A.   I do not know.

24       Q.   And you never asked?

25       A.   I did not ask.

Page 57

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   Because it's not relevant to your

3    assignment?

4          A.   Correct.  Again, as I say, if you

5    all wanted to stipulate that whatever

6    Reed Smith charged was reasonable, you might

7    be able to strike a deal, but that wasn't part

8    of my assignment.

9          Q.   Well, that's really not the point.

10         A.   It wasn't part of my assignment to

11   evaluate anything that Reed Smith actually

12   specifically did.

13         Q.   So is it your opinion that it's --

14   it would not be appropriate in estimating Bank

15   of New York's legal fees going forward in

16   connection with the actions to take into

17   account the legal fees it's incurred to date

18   in connection with the actions?

19         A.   I didn't say that.  I'm not

20   suggesting it would be inappropriate.  I'm

21   saying that's not how I did it and that's not

22   how I would do it.

23         Q.   Does your declaration estimate

24   legal fees starting at a particular point in

25   time?

Page 58

DANIEL P. GOLDBERG (1/10/19)

1

2      A.    You mean temporally?

3      Q.    Yes, temporally.

4      A.    No.

5      Q.    During a certain period, does it --

6  for example, does your declaration attempt to

7  estimate legal fees that BNY will incur post

8  plan confirmation?

9      A.    That wasn't the framework under

10 which I was doing my work.  I was doing my

11 analysis with reference to the stages of the

12 litigations, the actions -- sorry, the stages

13 of the actions.  It was not tethered in any

14 way to the date when that work would begin.

15     Q.    And when you say "the stages," you

16 began from the very first stages of the

17 litigation, right?

18     A.    Yes.  My assumption is that the

19 holders will -- Ambac and Whitebox will amend

20 their complaints and the -- effectively start

21 anew.  That's my -- that's my assumption.

22     Q.    The cases will start anew, and so

23 your -- your estimate assumes that the case is

24 starting anew?

25     A.    My estimates assume that there will

Page 59

1            DANIEL P. GOLDBERG (1/10/19)

2    be amended complaints and the case will start

3    to get litigate from there substantively.

4    That's -- that's my assumption.

5            Q.   Is it your understanding one way or

6    the other whether Ambac and Whitebox may be

7    responsible for legal fees related to the

8    actions that were incurred by Bank of New York

9    Mellon prior to the effective date of plan?

10           A.   I have no opinion one way or the

11   other.

12           Q.   Well, what does your declaration

13   assume?

14           A.   I don't believe it does.  I don't

15   believe it addresses that issue.

16           Q.   Well, let me put it this way.  Does

17   your declaration attempt to estimate legal

18   fees that Bank of New York will incur post

19   effective date of the plan?

20           A.   No aspect of the work that I did

21   was tethered to a date, a commencement date

22   like you've talked about.  So the evaluation I

23   did was trying to ascertain a reasonable range

24   of defense costs for the actions.  It was

25   entirely untethered to a date on the calendar

Page 60

1           DANIEL P. GOLDBERG (1/10/19)

2    as to when that work would begin.  So whether

3    it's pre-confirmation, post-confirmation, not

4    addressed, I -- it's not part of the analysis

5    that I did and I have no opinion on that.

6           Q.   Can you turn to paragraph 63 of

7    your report for, please.  And I might be

8    flipping back and forth between your report

9    and your Exhibit D.

10          A.   Okay.

11          Q.   So you state in paragraph 63,

12   "Based on my experience in complex litigation

13   matters, my opinion is that Bank of New York

14   Mellon will reasonably spend approximately

15   1 million to 2.25 million (1400 to 2700 hours)

16   on case assessment, development and

17   administration over the life of the

18   anticipated litigations."  Do you see that?

19          A.   I do.

20          Q.   Now, where -- where in your

21   Exhibit D do those numbers come up?

22          A.   If you look at -- so what I'm going

23   to call page 1 of Exhibit D, can you see there

24   are --

25          Q.   I do see that.  There's a line item

Page 61

                    DANIEL P. GOLDBERG (1/10/19)

1    that says "low or reasonable estimate," it's

2    1,112,000.  And then you have 1390 hours.  Is

3    that it?

4         A.   Correct.  So in the body of the

5    report, I used round numbers just for ease of

6    reading.  The details are in the schedule.

7         Q.   Sure.  How exactly did you arrive

8    at those numbers?

9         A.   I built them up from the ground up.

10   So you see, for instance, you take the -- if

11   you take the row that reads "Fact

12   investigation" and you see it's the low end,

13   it's 750 hours.  I didn't start at 750 hours.

14   I said, okay, for the fact investigation over

15   the life of the matter -- and a good chunk of

16   it takes place at the early stages, but this

17   is intended to be an estimate over the life of

18   the matter, which my going in assumption was

19   about three years, I figured three associates

20   and two partners would work about a month each

21   in lawyer hours on that task.  And for the

22   hourly -- for a month -- excuse me.  I'm

23   trying to get that out correctly.  The number

24   of hours in a month, the assumption I was

Page 62

1          DANIEL P. GOLDBERG (1/10/19)

2    using was 150, which I believe to be fairly

3    conservative.

4              Most hard-charging lawyers in the

5    commercial litigation space and complex

6    matters like this typically work more than

7    150 hours a month, but I was trying to be

8    conservative and I assumed maybe they'll work

9    on other things and so forth and so on.  But

10   that was my overarching assumption.  When I

11   made estimates based on people working a

12   month, I used 150 hours.  When I made an

13   assumption based on them working just a week,

14   I used a 40-hour week.  I appreciate the 40

15   times 4.3 does not equal 150, but I -- this is

16   the analysis I did.

17             So you see I assumed over the life

18   of the matter three associates would spend

19   about a month's worth of time and two partners

20   would spend about a month's worth of time.

21   That could be four partners spending a half a

22   month each, but that's the estimates I used.

23             My assumption too is that this -- a

24   lot of this in this first category will be

25   front loading, but it's not limited to the

Page 63

1          DANIEL P. GOLDBERG (1/10/19)

2    front -- the early stage of the case.  So I

3    added up the hours.  I did the multiplication

4    by the weighted blended hourly rate that I

5    used and I came up with these numbers.

6          Q.   But I understand how you're saying

7    you did it, but -- so the lower reasonable

8    range is 750, higher reasonable range 1500,

9    right?

10         A.   Correct.

11         Q.   Why not 500 hours for the lower

12   range and a thousand hours for the higher

13   range?

14         A.   Using my experience and judgment as

15   to what I thought would be the likely number

16   of hours and amount of time and if I -- I also

17   consulted -- you'll see in the report there's

18   a chart of the lawyers and rates that I was

19   assumed would work the matter.  And so based

20   on those numbers, I used the number of

21   associates and partners available and made my

22   estimate.

23         Q.   Now, when you talk about fact

24   investigation, all right, that's the first

25   line item where you attribute anywhere from

Page 64

1          DANIEL P. GOLDBERG (1/10/19)

2    750 to 1500 hours, right?

3          A.   Yes.

4          Q.   Do you have an understanding one

5    way or the other whether Reed Smith has

6    already conducted fact investigation with

7    respect to the actions?

8          A.   I don't know one way or the other.

9          Q.   Did you ask?

10         A.   I did not.

11         Q.   Did you ask how much -- so you have

12   no idea whether or how much time Reed Smith

13   spent on fact investigation for the actions to

14   date, correct?

15         A.   Correct.

16         Q.   I'm going to ask the same question.

17   Do you have a line item analysis strategy?  Do

18   you see that?

19         A.   I do.

20         Q.   And you attribute anywhere from 360

21   to 600 hours, low and high estimates, right?

22         A.   Correct.

23         Q.   Do you have any idea how much time

24   Reed Smith has spent to date on

25   analysis/strategy with respect to the actions?

Page 65

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   It wasn't part of what I was asked

3     to do, so the answer's no.

4          Q.   And you never asked?

5          A.   I did not.  It wasn't part of what

6     I was asked to do.

7          Q.   Why do you say it wasn't part of

8     what you were asked to do?

9          A.   Because it wasn't part of what I

10    was asked to do.  I was asked to evaluate what

11    a reasonable range of defense costs would be

12    for the actions, and so that's what I set

13    about doing.  I wasn't asked to evaluate

14    whether all the work had already been done or

15    would be done.

16         Q.   It wasn't relevant to your --

17         A.   It was not relevant to what I was

18    asked to do.

19         Q.   And it wasn't relevant to what you

20    did do, right?

21         A.   Correct.

22         Q.   I'm not finding it here, but

23    somewhere you talk about four experts per

24    side?

25         A.   Yes.

Page 66

1                DANIEL P. GOLDBERG (1/10/19)

2          Q.   What's your basis for estimating

3    that there would be four experts per side?

4          A.   It was an assumption that was given

5    to me.  I think I say that in the report.

6          Q.   I think you do.

7          A.   I was asked to assume it was four.

8          Q.   Who gave you that?

9          A.   Reed Smith.

10         Q.   Who at Reed Smith?

11         A.   I don't specifically recall the

12   lawyer, which lawyer.

13         Q.   Did you ask, well, what topics are

14   these four experts per side going to cover?

15         A.   That was included in the

16   assumptions given to me.

17         Q.   Well, what topics?

18         A.   What were they?  One was financial

19   expert for damages.  Another was an expert on

20   indenture trustee administration.  Another was

21   on the rights and obligations of indenture

22   trustees.  Basically one is mechanics on how

23   they operate and the other is what they

24   actually -- what indenture trustees are

25   required and prohibited from doing.  And then

Page 67

DANIEL P. GOLDBERG (1/10/19)

1
2   a fourth was sort of an unknown on the
3   assumption that there will be some issue that
4   could come up that people haven't foreseen at
5   the outset, so we may have to leave room for
6   an expert.  Whether that's because one of the
7   other litigants has an expert on the topic
8   that now Bank of New York Mellon has to
9   address or some -- an issue comes up.
10          Q.   Do you know one way or the other
11  whether Reed Smith has already retained and
12  begun working with any of these experts?
13          A.   I do not know.
14          Q.   Did you ask?
15          A.   I did not ask.
16          Q.   Because it wasn't relevant to your
17  declaration?
18          A.   Correct.
19          Q.   Paragraph 64 of your declaration.
20  It's the last sentence.  You state -- are you
21  there?
22          A.   I am.
23          Q.   "Counsel will need to conduct a
24  series of interviews and meetings and to
25  collect, preserve and review documents to

Page 68

1              DANIEL P. GOLDBERG (1/10/19)

2    determine facts in the perspective of the

3    client and others."  Do you see that?

4         A.   I do.

5         Q.   What series of interviews do you

6    have in mind?

7         A.   Fact witness interviews.  That's

8    what that's -- that's what I mean by that.

9         Q.   How many?  How many are you

10   assuming?

11        A.   I don't have a specific number that

12   I assumed.

13        Q.   Do you give a specific number to

14   this -- to the conducting interviews and

15   meetings and collecting, preserving and

16   reviewing documents?

17        A.   No.  I -- the format of Exhibit D,

18   I think, right?  Well, what's marked as

19   Goldberg 2.

20        Q.   Um-hum.

21        A.   It comes from the AVA format for

22   different categories for evaluating cases and

23   case costs and budgeting.  So I was -- I

24   budgeted and I analyzed what I thought the

25   fact investigation would entail by a number of

Page 69

1            DANIEL P. GOLDBERG (1/10/19)

2    hours.

3            In the body of the report, I then,

4    for the benefit of the Court, just ascribed

5    what it would be included in the various

6    components, what would be included in fact

7    investigation and what would be included in

8    the analysis and strategy, what are the types

9    of things that lawyers do and law firms do

10   under those headings.

11           So that is how it's laid out.  I

12   did not say there's going to be "X" number of

13   fact witnesses in the case that need to be

14   interviewed as part of the fact investigation

15   piece and then do it that way.  I did it in

16   the reverse order.

17       Q.   But you don't have an understanding

18   I take it as to whether or not Bank of New

19   York's counsel has already conducted a series

20   of interviews as part of the fact

21   investigation in this matter, right?

22       A.   I don't know one way or Ott other.

23       Q.   And you never asked, right?

24       A.   And I did not ask.

25       Q.   And the same question, do you have

Page 70

                DANIEL P. GOLDBERG (1/10/19)

1  any idea the extent to which Bank of

2  New York's counsel has collected, preserved

3  and reviewed documents already?

4      A.   It wasn't part of the work I was

5  asked to do and I do not know.

6      Q.   So you have no idea whether Bank of

7  New York has already collected, preserved and

8  reviewed all documents that its counsel deemed

9  relevant to the actions, right?

10     A.   I wasn't part of the work I was

11 asked to do.  I do not know one way or the

12 other.

13     Q.   And you have no idea what documents

14 still remain to be collected, preserved and

15 reviewed in connection with the actions,

16 right?

17     A.   You mean in actuality, what --

18     Q.   Yes.

19     A.   -- has been reviewed versus what

20 needs to be reviewed; is that basically your

21 question?

22     Q.   My question is, do you have any

23 idea what documents still remain to be

24 collected, preserved and reviewed in

Page 71

1              DANIEL P. GOLDBERG (1/10/19)

2   connection with the actions?

3       A.   It wasn't part of the work I was

4   asked to perform.  I do not know.

5       Q.   Can you look at your Goldberg

6   Exhibit 2.  I'm looking at motion to dismiss

7   now.  Am I reading this correctly that you

8   are -- your lower reasonable estimate for a

9   motion to dismiss is $1,463,200 and your

10  higher reasonable estimate is 1,816,000.  Am I

11  reading that correct?

12      A.   You are.

13      Q.   And the lower reasonable estimate

14  of hours is 1829?

15      A.   You are, yes.  Sorry.  Yes, it is.

16      Q.   And the higher reasonable estimate

17  is 2270 hours?

18      A.   Correct.

19      Q.   Okay.  How did you arrive at that

20  estimate?

21      A.   I figured that in the ordinary

22  course in commercial litigation, parties

23  typically get some form of extension before

24  they answer and the parties tend to negotiate

25  a briefing schedule.  So I figured from the

Page 72

1          DANIEL P. GOLDBERG (1/10/19)

2    time that the Amended Complaint comes in,

3    roughly I figured that the motion to dismiss

4    would be due in about six weeks give or take.

5    Maybe that number is eight weeks, maybe it's

6    seven weeks, but I was thinking it would be

7    about six weeks give or take.

8              If you figure that you've got four

9    associates -- excuse me, two associates,

10   right?  Bear with me a second.  Yes, I figured

11   somewhere between three and five associates

12   working for about six weeks full time -- I

13   have that wrong.  I apologize.  That's why I'm

14   looking at this.  Sorry.  I just confused on a

15   number.

16        Q.   Well, is your assumption set out in

17   Exhibit D?  I don't want you to have to just

18   read it.

19        A.   No, I'm not reading it.  It is set

20   out, but there's something that is not in

21   there, which is the -- bear with me one

22   second, I apologize.

23              Yeah, I figured two associates

24   working roughly full time for about six weeks

25   on a motion to dismiss would be about

Page 73

DANIEL P. GOLDBERG (1/10/19)

1   480 hours.  I figured they wouldn't work

2   about -- they wouldn't work the full 480 hours

3   either because at least some of the issues

4   from the 2017 alleged events of default might

5   have already been briefed, at least on some

6   level.  And some of the briefing could be

7   reutilized or repurposed.  And so that's why I

8   used 450 hours.  So I had two associates

9   working on this for about six weeks to put

10  together the motion to dismiss.

11        Q.   You mean if it hadn't been for the

12  summary judgment motions in the interpleader

13  actions, it would have been a higher number?

14        A.   Well, two associates at 40 hours a

15  week for six weeks is 480 hours.  I used 450

16  hours.

17        Q.   So you cut it down 30 hours because

18  of what happened --

19        A.   In part.  It wasn't -- in part.

20        Q.   Well, I'm sorry.  I interrupted.

21        A.   That's okay.  And then I have 120

22  partner hours, which is roughly three weeks of

23  partner time figuring associates will spend

24  roughly twice as much as the partners on a

Page 74

1          DANIEL P. GOLDBERG (1/10/19)

2    motion to dismiss.

3          Then I simply took half that for

4    the reply, as you can see.  I just have the

5    amounts for the reply.  And then I have listed

6    for the oral argument.  And then a significant

7    input to this, especially if one or both of

8    these actions end up going forward in state

9    court in New York with interlocutory appeals,

10   there were always appeals for motions to

11   dismiss no matter which way it goes.  And so I

12   included in my motion to dismiss number the

13   appeal.

14          What I didn't include in --

15   certainly not in the low range, I just

16   increased the numbers on the high range, but

17   another thing just to factor into -- this

18   doesn't get applied here mathematically, it's

19   just sort of an overlay -- if -- there's

20   always the possibility that a party repleads

21   either because the Court in response to a

22   motion to dismiss allows the party to replead

23   and then it does or depending on the results

24   of an appeal, there is a repleading and then a

25   second round of motion practice on that -- on

Page 75

1          DANIEL P. GOLDBERG (1/10/19)

2    that amended pleading.  That's not really

3    factored into here, but it's an overlay and it

4    gave me some modicum of comfort that my

5    numbers were not excessive.

6          Q.   Okay.  I'm curious about your

7    reduction of the 480 associate hours to 450

8    hours based on the work that was done in the

9    interpleader.  And you explained the lower

10   range, you did that.  Did you do that at the

11   higher range too?

12         A.   I think probably not in the same

13   proportion.

14         Q.   You mean a lesser proportion?

15         A.   I think I just basically add

16   roughly 25 percent to what I thought the low

17   range would be in this instance,

18   approximately.

19         Q.   That's how you got --

20         A.   That's how I got from the --

21         Q.   From the low to the high?

22         A.   Yeah.

23         Q.   You just mathematically

24   added 25 percent?

25         A.   I think the range -- I think that

Page 76

1              DANIEL P. GOLDBERG (1/10/19)

2   there are other areas.  You'll see the ranges

3   from low to high are greater than they are in

4   the motion to dismiss.

5         Q.   I noticed that.

6         A.   Because I think the range of

7   unforeseen instances or the range of variables

8   for a pre-answer motion to dismiss are less

9   than they are in other aspects of litigation.

10        Q.   Well, let's focus on -- so if I'm

11  hearing you correctly, and tell me if I'm

12  hearing you wrong, you do believe that it's

13  appropriate to reduce your estimate, at least

14  for the motion to dismiss hours, based on work

15  that has been done already in the interpleader

16  summary judgment context; is that a fair

17  statement?

18        A.   The way I would word it is, I think

19  it would be reasonable for defense counsel not

20  to duplicate work that has already been done.

21  But motion to dismiss claims that were not at

22  issue in the interpleader action are not the

23  same as claims that were at issue -- a summary

24  judgment motion that was at issue in the

25  interpleader action.

Page 77

1          DANIEL P. GOLDBERG (1/10/19)

2              The legal standard for a pre-answer

3     motion is different.  The claims are

4     different.  The alleged events of default are

5     different.  It's a different motion.  It

6     doesn't mean some aspects of what was briefed

7     in the interpleader action couldn't be, as I

8     said before, repurposed.  But it's not --

9     certainly not a one for one.

10         Q.  Well, you do understand that in the

11    interpleader action -- well, let me withdraw

12    that.

13             Do you have an understanding one

14    way or the other whether in the interpleader

15    summary judgment motions Bank of New York

16    offered various legal defenses that could also

17    be used in a motion to dismiss context?

18         A.  I'm not specifically aware one way

19    or the other.

20         Q.  Did you bother to try to determine

21    one way or the other whether that was the

22    case?

23         A.  It wasn't part of the assignment

24    that I was asked to perform, no.

25         Q.  I mean, do you have an

Page 78

1          DANIEL P. GOLDBERG (1/10/19)

2     understanding one way or the other whether

3     certain of the defenses that -- certain of the

4     legal defenses that BNY interposed in the

5     interpleader summary judgment defense would

6     apply across the board to all of the events of

7     default that are alleged in the actions?

8          A.   I don't have -- I don't know one

9     way or the other.

10          Q.   I've just been handed a note that

11     you stated that -- one of your prior answers,

12     that the reduction of 30 from 480 to 450 was

13     in part due to interpleader work.  Is that --

14          A.   Yes.

15          Q.   What else was it due to?

16          A.   My assumption is that the -- when I

17     did the math, that came to 480.  That is on

18     the assumption that the associates were

19     working full time on the motion to dismiss

20     over that entire period of time.  That's what

21     480 times 40 times six would be.  They may not

22     have worked full time on the motion to

23     dismiss.

24          Q.   So of the 30 hours that you're

25     haircutting, how much was for work that was

Page 79

```
1              DANIEL P. GOLDBERG (1/10/19)
2    already done on the summary judgment motions
3    in the interpleader action versus what you
4    just explained?
5         A.   I didn't delineate it in that way.
6         Q.   In your opinion, what work beyond
7    what has already been done in connection with
8    the interpleader summary judgment pleadings
9    would have to be done in connection with the
10   motion to dismiss?
11        A.   I didn't evaluate that specifically
12   in my report.  If you're asking me now what I
13   think would be the case, I'm happy to give you
14   my view, yes.
15        Q.   Yes.  Well, first of all, why
16   didn't you evaluate it in your report?
17        A.   It wasn't part of what I was asked
18   to do and it wasn't necessary to me to -- if
19   someone asked me what I think it'll cost to
20   litigate a motion to dismiss, one of the
21   inputs that I need to do that is not what one
22   particular law firm did on a summary judgment
23   motion in a different case.  It's just not one
24   of the inputs I would think of.
25        Q.   Even if the same law firm who
```

Page 80

1           DANIEL P. GOLDBERG (1/10/19)

2   worked on the prior summary judgment case was

3   the law firm handling the motion to dismiss?

4           A.   Not necessarily.  I mean, I'm sure

5   the same law firm has done other motions to

6   dismiss too, and I'm sure that in other cases,

7   no, it's not.  It's not how I look at it.

8   When clients come to me or my partners come to

9   me and say how much do you think it would cost

10  to litigate a certain motion, the thing I do

11  not do is run out into the marketplace to see

12  what every other law firm has ever done on

13  other kinds of motions in different cases.

14          Q.   But don't you -- if someone comes

15  to you and says how much will it cost to

16  litigate a particular motion, wouldn't you be

17  curious as to whether the firm litigating the

18  particular motion had already done a body of

19  work that was relevant to that motion?

20          A.   I'm not sure I understand the

21  question the way you phrased it.  I apologize.

22          Q.   Let's just take a hypothetical.

23  You're asked how much should firm A charge for

24  litigating a motion to dismiss, right?

25          A.   Just to be clear --

Page 81

DANIEL P. GOLDBERG (1/10/19)

1

2     Q.   And would you ask yourself, well,

3   has firm A ever in the past year or so

4   litigated a motion that was very similar and

5   had very many of the same issues that the

6   motion to dismiss will have?

7     A.   So a couple of things.  The way you

8   phrased that question is not the assignment I

9   was asked here in a qualitatively different

10  way.  Your question now is, what should firm A

11  charge for a motion to dismiss.  I was not

12  asked to perform any analysis like that.  I

13  was asked what's a reasonable range of defense

14  costs, which is not the same as what should a

15  firm charge.  Those are two different

16  questions.

17          But I think if -- surely a firm

18  that has more experience and more expertise in

19  a certain area will be able to handle a motion

20  more efficiently than one that does not.  I

21  think that's basically a truism.  But that

22  doesn't impact what I believe to be a

23  reasonable range of in the market what it

24  would cost to litigate a motion to dismiss.

25    Q.   I understand.  And I'm not trying

Page 82

DANIEL P. GOLDBERG (1/10/19)

1

2   to argue with you, but I'm not -- I'm not

3   talking about a situation where you have a

4   firm that has more experience or more

5   expertise in a certain area.  I'm talking

6   about a firm who actually has litigated the

7   very issues that are at stake in the motion

8   for which you are trying to estimate

9   reasonable legal fees.

10          A.   What's the question?

11          Q.   Doesn't that make a difference?

12          A.   On some level, perhaps, but it

13   wasn't part of what I was asked to do.

14          Q.   So just to be clear, does your

15   estimate for legal fees relating to the

16   motions to dismiss the actions take into

17   account all of the research, analysis and

18   drafting that has already been conducted in

19   connection with the interpleader summary

20   judgment motions?

21          A.   On some level it is baked in, but I

22   believe just the nature -- the way you asked

23   the question, that you overstate the amount of

24   overlap.  But to the extent I believe there

25   was overlap, yes, I baked that in.

Page 83

1          DANIEL P. GOLDBERG (1/10/19)

2        Q.   Well, how did you bake it in again?

3   By reducing -- by 30 hours?

4        A.   Yes.  That's roughly a week's worth

5   of lawyer time.  That's not a significant

6   amount of time.

7        Q.   And you say you baked it in, but

8   you're really not aware of the extent of the

9   research, analysis and drafting that Bank of

10  New York Mellon's lawyers have already

11  conducted in connection with the interpleader

12  summary judgment motions; isn't that true?

13       A.   It wasn't part of what I was asked

14  to evaluate, so correct, I don't know.

15       Q.   Can you go to paragraph 68, please.

16  I'm looking at the second sentence

17  specifically.

18            You say "For example, I've been

19  asked to assume that the anticipated

20  litigation might present complex choice of law

21  questions."

22            Who asked you to assume that?

23       A.   The lawyers at Reed Smith.

24       Q.   Did they explain to you what those

25  complex choice of law questions were?

Page 84

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   At a high level, yes.

3          Q.   What was explained to you?

4          A.   Basically as written in

5     paragraph 68 here, that there was some issues

6     as to where the holders were, where they

7     bought their bonds, what implications that

8     might have on some damages analyses.

9          Q.   Do you have a view whether that

10    would have an implication on choice of law?

11         A.   I don't, but I have a view as to --

12    I do have a view that it would be reasonable

13    to look at the question to see if it does.  I

14    don't know the answer as to whether it, in

15    fact, does.

16         Q.   Do you have an understanding one

17    way or the other whether Bank of New York in a

18    summary judgment brief in the interpleader

19    action stated that New York law applies?

20         A.   My understanding is that -- this is

21    my understanding, is that New York law applies

22    to the transaction documents, but it may or

23    may not apply to some of the claims that your

24    clients are bringing or some of the related

25    issues.  So those are questions to be asked.

Page 85

1              DANIEL P. GOLDBERG (1/10/19)

2     I'm not offering an opinion as to whether a

3     different law applies.  I'm simply stating

4     that it's not unreasonable to evaluate that.

5              Q.   Do you know whether at all in the

6     interpleader summary judgment motions choice

7     of law was a contested issue?

8              A.   I don't know.

9              Q.   And you didn't ask, right?

10             A.   I did not ask.

11             Q.   Go back to Goldberg 2, please.

12             A.   Yes, sir.

13             Q.   You don't have to call me sir.

14                  You have a lower reasonable

15    estimate of 290 hours for the answer and 410

16    as the higher reasonable estimate.  Do you see

17    that?

18             A.   That's what the exhibit says, yes.

19             Q.   Have you ever worked on a case

20    where the answer required a range of 290 to

21    410 hours?

22             A.   I would say that's a reasonable

23    range for probably all of the cases on which I

24    worked on where an answer needed to be

25    prepared, all the answers in complex

Page 86

1            DANIEL P. GOLDBERG (1/10/19)

2    commercial cases.

3            Q.    Paragraph 97, please.

4            Now in paragraph 97, second line,

5    you estimate for discovery 13,000 to 20,000

6    hours at -- and that would translate to eight

7    and a quarter million to 12 and three quarter

8    million?

9            A.    Approximately, yes.

10           Q.    How did you arrive at those hourly

11   estimates?

12           A.    If you look at Goldberg Exhibit 2,

13   you'll see one of the headings is "Discovery."

14           Q.    I see that.

15           A.    And if you go and add up -- I see

16   it's not totaled here for you.

17           Q.    I think it is.

18           A.    For "Discovery"?

19           Q.    It may not be.

20           A.    I don't think this one is totaled

21   for some reason.  I apologize.  I believe if

22   you add up the sums, you'll come up to these

23   numbers.

24           Q.    I think it is on the second page.

25           A.    The dollars are, but the hours are

Page 87

1              DANIEL P. GOLDBERG (1/10/19)

2    not.

3         Q.   Got it.  Okay.  Good.

4              How did you arrive at the partner

5    associate breakdown for that?

6         A.   For the entirety of the discovery?

7         Q.   Yes.

8         A.   You'd have to do it.

9         Q.   Issue by issue?

10        A.   Yes, subheading by subheading.

11        Q.   What's your understanding of the

12   extent of discovery that's already been

13   conducted in the interpleader litigation?

14        A.    Nothing beyond what I've already

15   told you before, which is that I understand

16   there was document discovery and that's it,

17   and that there were not depositions.  In fact,

18   maybe that the document discovery wasn't

19   entirely completed I think, maybe, because of

20   something having to do with Hurricane Maria,

21   but I might not have that exactly precise.

22        Q.   Well, you understand, do you not,

23   that Bank of New York's position in the

24   summary judgment pleadings was that enough

25   discovery had been conducted to allow Bank of

Page 88

1          DANIEL P. GOLDBERG (1/10/19)

2     New York to move for summary judgment, right?

3          A.   I don't know if I have that

4     understanding one way or the other.  I

5     understand there was discovery, I understand

6     there's motions for summary judgment.  Your

7     question was that Bank of New York had the

8     view that it had enough discovery.  I don't

9     know that one way or the other.  For all I

10    know they wanted a lot more and the Court told

11    them no you can't have it, so they made the

12    best of the circumstance.  I just don't know

13    one way or the other what their view was on

14    that topic.

15         Q.   Well, we talked about earlier in

16    connection with the motion to dismiss, I

17    think, that you gave a haircut of 30 hours for

18    work that had already been done, right?

19         A.   Approximately.

20         Q.   Approximately.  Not counting, you

21    know, the associates having to work on other

22    matters.

23              Did you do a similar exercise with

24    respect to your estimates for discovery?

25         A.   No, I did it a little bit

Page 89

1          DANIEL P. GOLDBERG (1/10/19)

2    differently, as I explained before.  I looked

3    at discovery -- again, this really only

4    applies to the document production piece.  My

5    understanding is that there would've been no

6    overlap for things outside -- discovery

7    related outside the document production

8    because there weren't depositions in the

9    interpleader action and so forth.

10          The way I did it was, I looked at

11   what I understood the issues to be in the time

12   frame to be and did an estimate as to how long

13   I thought it would take lawyers to review the

14   documents for those issues.  And that's how I

15   did it.

16       Q.   Well, did you exclude in your

17   estimate -- in your declaration any work

18   reviewing documents for 2017?

19       A.   We discussed this before.  The

20   report doesn't say that expressly, but that's

21   basically how I came up with the estimates.

22       Q.   You mentioned depositions.  Go to

23   page -- not page.  Go to paragraph 111.

24       A.   I'm there.

25       Q.   You say "I have been asked to

Page 90

1            DANIEL P. GOLDBERG (1/10/19)

2    assume there will be 40 fact depositions

3    roughly, ten for each Plaintiff, the Defendant

4    and third parties."

5            All right.  Who asked to you assume

6    that?

7        A.   Reed Smith.

8        Q.   Did you ask what particular

9    deponent they had in mind?

10       A.   I did not ask the names of the

11   deponents, no.  I thought the numbers -- I

12   thought the number was not unreasonable in

13   light of the federal rules and just general

14   practice for complex lawyer commercial

15   multi-party litigation.  But beyond that,

16   beyond them giving me the assumption and me

17   sort of gut checking as to whether I thought

18   it was in the range of reasonableness, beyond

19   that I did not evaluate the specifics of

20   deposition.

21       Q.   In your experience in litigating a

22   complex trustee case, right, would you expect

23   there to be a significant number of

24   depositions prior to the summary judgment

25   motions?

Page 91

1          DANIEL P. GOLDBERG (1/10/19)

2          A.    Apologies for answering your

3     question with a question.

4          Q.    That's okay.

5          A.    Do you mean post discovery summary

6     judgment motions, like the prototypical 56

7     motion that happens at the close of discovery?

8          Q.    Yes, yes, yes.

9          A.    Then you would think all the

10    depositions --

11         Q.    All the deposition would have been

12    taken, right?

13               You are aware, are you not, that in

14    the interpleader action Bank of New York moved

15    for summary judgment -- and I'm sure your

16    counsel will correct me if I'm wrong --

17    without taking a single deposition?

18         A.    My understanding is that there were

19    summary judgment motions in that matter and

20    there were no depositions.  Why that took

21    place, I don't know.  I'm not privy to that.

22         Q.    Did you ask?

23         A.    I did not ask.

24         Q.    Did you ask Reed Smith -- well,

25    since you didn't feel the need to have any

Page 92

1           DANIEL P. GOLDBERG (1/10/19)

2    depositions taken in connection with moving

3    for summary judgment in the interpleader

4    action, why are you assuming there are going

5    to be 40 depositions in defense of the

6    actions?

7           A.   We did not have discussions about

8    that issue, but they are entirely different

9    cases.  The case that I've been asked to

10   evaluate is likely to be fact specific and

11   fact intensive.  So it wouldn't surprise me at

12   all if it -- I didn't do this analysis, but I

13   would not find it surprising if an

14   interpleader action fundamentally based on

15   contract had a very different scope of

16   discovery than a fraud and intentional

17   malfeasance case by noteholders against the

18   indenture trustee.  I wouldn't be surprised if

19   the scopes were entirely different.

20          Q.   Well, as far the 2017 events of

21   default, right, which are at issue in the

22   interpleader and/or at issue in the actions,

23   what's the difference between the issues?

24          A.   Well, the issues -- there could be

25   many differences.  The overlap, as I

Page 93

DANIEL P. GOLDBERG (1/10/19)

1   understand it, is whether there were events of

2   default in 2017.  But that's not the end of

3   the inquiry as to whether the trustee is

4   liable for anything because of that or not.

5        Q.   Well, right, but the -- you're

6   aware -- well, maybe you're not aware.  Are

7   you aware one way or the other whether the

8   interpleader summary judgment motions not only

9   discussed whether the events that happened in

10   2017 were, quote/unquote, events of default

11   under the resolution, but also whether Bank of

12   New York had defenses to the claims that

13   Whitebox and Ambac were making against them?

14        A.   I don't have that specific of an

15   understanding as you just described it, but I

16   can say that the cases, the actions that

17   you're going to be litigating or that your

18   clients are going to be litigating, as I

19   understand it, require them to prove that Bank

20   of New York acted with some form of

21   intentional misconduct.  Gross negligence I

22   understand is -- may or may not rise to the

23   level of intentional misconduct.

24        But that's a very different

Page 94

1           DANIEL P. GOLDBERG (1/10/19)

2    standard and rubric than -- than what I

3    understand to be the legal standards governing

4    what happened in the interpleader action.  So,

5    again, I'm not surprised that the scope of the

6    discovery in these cases could be quite

7    different.

8                The specific answer to your

9    question is, I didn't have those discussions

10   and didn't ask about that level of specificity

11   that you indicated in your question about the

12   summary judgment motion.

13        Q.   I can show you the document I'm

14   referring to if you want, but I'm going to

15   represent to you that in Bank of New York's

16   opening summary judgment brief in the

17   interpleader litigation Bank of New York on

18   contended that, quote, "The material facts are

19   not in genuine dispute.  Rather, the parties

20   disagree on the application of the law to the

21   resolution and other undisputed facts.

22   Consequently, the issues addressed in this

23   motion are right for summary judgment."

24                You're not familiar with that

25   language because you didn't read the -- you

Page 95

1              DANIEL P. GOLDBERG (1/10/19)

2    don't remember reading the summary judgment

3    motion by BNY, correct?

4         A.   I may have read it or I may have

5    read parts of it.  I just can't recall the

6    specifics as I sit here, so I may or may not

7    have.  I don't specifically recall the passage

8    you just read.  However, that is -- in sum,

9    that is a sentence that appears in every

10   summary judgment motion I've ever seen.  The

11   material facts --

12        Q.   Right.

13        A.   Genuine dispute of material fact is

14   the standard for the motion.

15        Q.   But surely Bank of New York's

16   counsel would not have made that statement if

17   they didn't believe it to be true, would they?

18        A.   Presumably not.

19        Q.   Are you aware that recently within

20   the last months or two Bank of New York has

21   moved Judge Swain to decide its summary

22   judgment motion in the interpleader

23   litigation?

24             MR. SOLOMON:  Would you accept

25        "reinstate"?

Page 96

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.    Are you aware as recently as a

3     month or two ago Bank of New York has moved

4     Judge Swain to reinstate its summary judgment

5     motion in the interpleader litigation?

6          A.    No.

7          Q.    Pardon?

8          A.    No.

9          Q.    You're not aware of that?

10         A.    No.

11         Q.    No one told you that?

12         A.    No one told me that.

13         Q.    And so I take it you're not aware

14    that in --

15         A.    Sorry.  I'm aware that the

16    resolu- -- that there's an agreement,

17    basically a settlement, that came out of a

18    mediation that resolves the summary judgment

19    motions.  I don't know one way or the other

20    whether that predates or happened after what

21    you're now telling me was a request to

22    reinstate summary judgment motions.  I don't

23    know the -- I say that only because it's

24    possible.  Maybe it's possible that somebody

25    told me that that interpleader -- summary

Page 97

1          DANIEL P. GOLDBERG (1/10/19)

2    judgment motion in the interpleader action was

3    still a plan until very recently, but I could

4    have that wrong.

5          Q.   Well, are you aware that in

6    requesting that the Court reinstate the

7    summary judgment motion Bank of New York

8    argued that if the Court grants the

9    interpleader summary judgment motion on Bank

10   of New York's behalf, it would dispose of the

11   Whitebox and Ambac actions?

12         A.   Certainly not.

13         Q.   And you're not aware of that?

14         A.   I'm not aware of that level of

15   specificity for sure.

16         Q.   Paragraph 87.

17              In the first sentence of 87, you

18   state "In my experience, post discovery

19   summary judgment motions require massive

20   resources, both professional and financial,

21   and the costs associated with them can easily

22   be underestimated."  Do you see that?

23         A.   I do.

24         Q.   That's your opinion, right?

25         A.   It is.

Page 98

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   And going to your Exhibit D, which

3   is Goldberg Exhibit 2, is it accurate that for

4   summary judgment, you estimate a lower

5   reasonable range of 2260 hours and a higher

6   reasonable estimate of 3580 hours?

7          A.   Correct.

8          Q.   And I see a description of how you

9   arrived at those hourly rates, correct?

10         A.   As phrased you asked me what you

11  see.

12         Q.   Yeah.  I mean --

13         A.   That information is laid out in

14  Goldberg Exhibit 2.

15         Q.   You answered the question much

16  better than I asked it.  Okay?

17              Now when you give these ranges, you

18  give the 2260 hours for summary judgment all

19  total as the lower end and 3580 for the high

20  end, I mean, could another expert who is

21  providing an opinion as to reasonable number

22  of hours for summary judgment in this

23  particular case, would it -- would it be

24  unreasonable to come up with 1500 hours for

25  the lower reasonable estimate and 2,000 hours

Page 99

1           DANIEL P. GOLDBERG (1/10/19)

2    for the higher reasonable estimate?

3           A.   I would have to see the specific

4    analysis of the hypothetical expert you

5    mentioned.  I don't mean to suggest this is

6    the only range of costs that could possibly be

7    incurred on a summary judgment motion on that

8    matter.  This is my estimation as to what I

9    believe to be a reasonable estimate as to what

10   it ought to cost.

11          Q.   Well, that's what I was getting at.

12   This is your estimation of a reasonable

13   estimate, but you're not saying that any other

14   estimate would be necessarily unreasonable,

15   are you?

16          A.   I'm not suggesting that this is the

17   only reasonable estimate ever to be made on

18   the planet.  But if you want me to evaluate

19   something that somebody else thinks or

20   believes, I'm happy to do so.  You just got

21   give me the information as to why somebody

22   would think instead of two months, it would

23   only be one month or a month and a half worth

24   of work.

25          Q.   But that's not what you did here,

Page 100

```
 1              DANIEL P. GOLDBERG (1/10/19)
 2   because you didn't ever try to find out what
 3   Reed Smith actually believes is the reasonable
 4   amount of hours to be spent on summary
 5   judgment, right?
 6        A.   That's not the question you asked
 7   me.
 8        Q.   I know, but it's the question I'm
 9   asking you now.
10        A.   All right.  So did I figure out
11   what Reed Smith actually spent on their
12   summary judgment motion on the interpleader
13   action?
14        Q.   No.  Did you take any steps to try
15   to determine what Reed Smith today is
16   estimating it will charge Bank of New York in
17   filing a summary judgment motion in the
18   actions?
19        A.   No.
20        Q.   Again, we talked about haircutting
21   the motion to dismiss hours.  Did you do
22   anything to reduce your estimate of hours to
23   be spent on summary judgment work for the
24   actions to take into account work that had
25   been done by Reed Smith in the interpleader
```

Case:17-03283-LTS   Doc#:4965-1   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit A - Deposition of Daniel P. Goldberg   Page 102 of 160

Page 101

1          DANIEL P. GOLDBERG (1/10/19)

2  summary judgment actions?

3      A.  No, I didn't think that would be

4  appropriate for this entry.  The post

5  discovery judgment summary motion would happen

6  literally years later with a much more fulsome

7  record on different claims involving different

8  alleged events of default.  There would not

9  be -- in my estimation, there would not be a

10  material savings in time spent to prepare the

11  summary judgment motion based on the motion

12  done in the interpleader action three years

13  earlier -- or two years earlier.

14      Q.  You say different events of

15  default.  You do realize that there's an

16  overlap between the events of default, right?

17      A.  There are two overlapping, but

18  there are four that are not, so I think any

19  savings would be de minimus if even

20  perceptible.

21      Q.  Even if the same defenses that Bank

22  of New York would interpose for the two 2017

23  events of default were the exact same defenses

24  they would interpose for the four previous

25  events of default?

Page 102

1          DANIEL P. GOLDBERG (1/10/19)

2        A.   I don't believe that would change

3   the amount of time the lawyers would have to

4   spend to prepare the summary judgment papers.

5        Q.   Can you go to paragraph 80, please.

6   I'm sorry, 83, my mistake.

7             In 83, the first sentence, you say

8   "In addition to responding to Ambac and

9   Whitebox fact allegations, I have been asked

10  to assume that Bank of New York Mellon might

11  assert counterclaims and third-party claims."

12            Who asked you to assume that?

13       A.   Reed Smith.

14       Q.   Did you do anything to try to

15  determine if that assumption was reasonable?

16       A.   I don't know that if I did anything

17  in particular.  Counterclaims and complex

18  commercial multi-party cases are common, so I

19  didn't think it to be -- on its face to be an

20  unreasonable assumption.  I don't know that I

21  undertook any specific analysis to ascertain

22  whether Bank of New York Mellon had a factual

23  basis to assert counterclaims here.

24       Q.   Let's stick with counterclaims for

25  a second.  Do you understand one way the other

Page 103

DANIEL P. GOLDBERG (1/10/19)

1   whether under the COFINA resolution Bank of

2   New York had a right to be indemnified for

3   counterclaims as opposed to the defense of its

4   claims against it?

5        A.   I don't know if counterclaims are

6   specifically addressed in the transaction

7   documents.  The way I think of counterclaims

8   in cases like this is that they are defensive

9   as opposed to offensive.  I they're

10  denominated as counterclaims, but most often

11  they're used as a means to offset damages or

12  to parry certain claims.

13            And my -- my impression is that

14  whatever counterclaims there are, are not the

15  types of claims that in the absence of your

16  clients bringing these actions that Bank of

17  New York Mellon would pursue.  I view them as

18  defensive in nature, at least that's the

19  impression -- that's the assumption I have

20  made in doing this analysis.

21        Q.   Well, when you were told to assume

22  that there may be counterclaims against -- by

23  Bank of New York against Ambac and Whitebox,

24  did you ask what kind of counterclaims do you

Page 104

1              DANIEL P. GOLDBERG (1/10/19)

2    have in mind?

3         A.   No.

4         Q.   Why not?

5         A.   It was an assumption that was given

6    to me for the assignment.  And on its face it

7    did not seem like an unreasonable assumption,

8    that in a matter like this, the parties -- the

9    Defendant might assert counterclaims.  And so

10   I just took that assumption that I was given

11   at face value.

12              Again, part of my assignment was

13   not to evaluate whether they have good or

14   meritorious counterclaims.  My assignment

15   focused on what it would cost to litigate.

16        Q.   Do you have an understanding one

17   way or the other whether under the plan of

18   adjustment Ambac or Whitebox would be

19   responsible for legal fees relating to

20   counterclaims brought by Bank of New York

21   against them?

22        A.   Not part of the assignment I was

23   asked to do.  I had not evaluated that at all.

24   So I guess the shorter way to answer that

25   question would be to say I do not know.

Page 105

1          DANIEL P. GOLDBERG (1/10/19)

2      Q.   What specific third-party claims

3  are you assuming in your declaration?

4      A.   I'm not assuming specific

5  third-party claims.  I've been asked to assume

6  that generically there would be counterclaims

7  and/or third-party claims.

8      Q.   But how can you do an estimate of

9  reasonable legal fees when you don't even ask

10  when -- when your -- let me withdraw.

11          How can you perform an estimate of

12  reasonable legal fees with respect to how much

13  expense Bank of New York would incur in

14  pursuing third-party claims when you don't

15  even know what third-party claims are being

16  contemplated?

17      A.   There's no additional line item for

18  like discovery of counterclaims and

19  third-party claims.  My assumption is that it

20  would be subsumed.  So I don't know whether

21  we're dancing on the head of a pin focusing --

22  I appreciate -- I understand why you're

23  focusing on certain aspects of the report and

24  asking questions and I'm happy to answer all

25  your questions.

Page 106

1          DANIEL P. GOLDBERG (1/10/19)

2               But I was asked to assume there

3     were going to be counterclaims and third-party

4     claims and kind of bake that into what you

5     thought it would cost.  And so the work I did

6     is what would a reasonable cost be to defend a

7     prototypical but complicated commercial -- a

8     multi-party commercial litigation.  I do that

9     all the time.  I suspect you do too.  If a

10    client came to you and said I have a matter

11    and here are some generic high-level facts,

12    can you give me some range as to what it would

13    cost, I doubt you tell the client I refuse to

14    give you an answer until I undertake an

15    intense investigation into your claims.  It's

16    something lawyers are asked to do and

17    something I've been asked to do a lot, which

18    is estimate what I believe a litigation will

19    cost at the outset before you know all the

20    details.  It's not such an unusual request.

21         Q.   I know, but you have -- you

22    specifically break out counterclaims and

23    third-party claims.  And I'm just curious how

24    you could be --

25         A.   Well -- finish your question.

Page 107

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   No, I'm curious why you even

3    mention it.  Let's just take third-party

4    claims.  I'm curious why you even mention

5    third-party claims in your declaration if you

6    have no idea what third-party claims are

7    contemplated or even if Bank of New York has

8    released any -- all potential third-party

9    claims under the plan of adjustment?

10         A.   You're taking issue with the

11   assumption that I was given.  I understand why

12   you might be doing that.  It was an assumption

13   I was given.  You're asking me why did I use

14   the assumptions I was given.  Because experts

15   use the assumptions they're given.

16         Q.   But don't experts sometimes try to

17   inquire whether the assumptions they're given

18   are reasonable or are not reasonable?

19         A.   Yes.  And the inquiry that I engage

20   in on this specific issue is, is it reasonable

21   to assume that in a multi-party litigation

22   like this there will be counterclaims and

23   cross-claims or other third-party claims

24   somewhere in this case, and I think that's a

25   reasonable assumption in the context.

Page 108

1    DANIEL P. GOLDBERG (1/10/19)

2         I don't need to know the specifics

3    of what each and every claim for contribution

4    or indemnity or other cross-claim or

5    third-party claim might be to draw the

6    conclusion that it might be reasonable to

7    assume that some party might at some point try

8    to assert such a claim.  That's the extent of

9    the assumption.

10        Q.   Hypothetically speaking, let's just

11   take a hypothetical.  If the plan of

12   adjustment provided that Bank of New York was

13   giving a release to any potential third-party

14   claims related to the actions, you wouldn't be

15   listing that as one of the components of

16   reasonable attorneys' fees, would you?

17        A.   I'd like to read the question.  I

18   don't know that I --

19             MR. SOLOMON:  I'm going to -- for

20        the first time I'm going to object to

21        the form of the question because I

22        think it misstates his report.

23             Please go ahead.

24        A.   I wasn't tasked with evaluating

25   whether Bank of New York or any other party

Page 109

1          DANIEL P. GOLDBERG (1/10/19)

2    would have valid or meritorious counter- or

3    cross- or third-party claims.  I was asked to

4    assume that they would make those claims and

5    thus they would get litigated and so what

6    would -- include that in the mix of

7    information that I was using to ascertain what

8    it would cost to litigate the case.  That's

9    the extent of my analysis.  Certainly nobody

10   said to me we're going to assert frivolous

11   claims, please price out what it would cost to

12   litigate that.

13             MR. MOSCATO:  Can we take a break.

14             (Whereupon, at this time, a short

15        break was taken.)

16    BY MR. MOSCATO:

17        Q.   Welcome back, Mr. Goldberg.

18        A.   Thank you.

19        Q.   Earlier this morning you gave one

20   example, and it was in the context of the

21   motion to dismiss where you recalled reducing

22   hours from your estimate based on work that

23   had been done in the interpleader action.  Do

24   you recall that?

25        A.   I do.

Page 110

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   And that was -- you were saying

3     that in connection with the motion to dismiss,

4     you probably would have done 480 associate

5     hours for the briefing, but you reduced that

6     to 450 because some of the 30 hours was

7     because of work that had already been done in

8     the interpleader and some was for some other

9     reason, I don't remember.

10               Looking at Goldberg 2, Exhibit D of

11    your declaration, can you point out any other

12    time that you consciously reduced hours

13    because of what had been done in connection

14    with the interpleader litigation?

15               MR. SOLOMON:  He doesn't have to

16          repeat -- he gave you a whole

17          discussion about the document

18          production.  You don't need him to

19          repeat that, do?

20               MR. MOSCATO:  Why not?

21               MR. SOLOMON:  As you wish.

22     BY MR. MOSCATO:

23          Q.   What I'm looking is, you were

24     pretty specific going from 480 to 450, and I'm

25     curious as to what some of these numbers might

Page 111

1          DANIEL P. GOLDBERG (1/10/19)

2     have been if it had not been for the

3     interpleader litigation?

4          A.   I think looking at the schedule, I

5     think the only two things that I had something

6     approaching something tangible would be the

7     pre-answer motion to dismiss and the document

8     production.  Based on what I know in my

9     understanding of the circumstance, I don't

10    know that the interpleader action will have an

11    effect on the amount of time it will take to

12    litigate the cases otherwise.

13         Q.   That's your view, I understand

14    that.

15         A.   That's what I'm saying.  That's why

16    it's not reflected anywhere as far as I can

17    tell and as far as I can recollect other than

18    those two areas.

19         Q.   Well, you were able to come up with

20    a number of the reduction in the motion to

21    dismiss context.  You may have done it

22    already, I might have missed it.  Did you --

23    do you have a number that, for example, the

24    document production review would have been if

25    not for -- if the interpleader had not

Page 112

1          DANIEL P. GOLDBERG (1/10/19)

2    occurred?

3          A.   I don't want you to apply too much

4    precision to what I said about the -- or

5    applying too much precision can sometimes make

6    an answer inaccurate.  I said six weeks at 40

7    hours a week with two associates is 480 hours.

8    I gave that a little bit of a haircut for a

9    number of reasons.  One of which included the

10   fact that some of the pure straight-up legal

11   issues on a pre-answer motion might -- some of

12   that work that was done in the interpleader

13   action might translate.  It wasn't intended to

14   be an hour-for-hour reduction.  It wasn't

15   intended to be exclusive of anything else.

16          I believe you asked me of the 30,

17   how much went to the interpleader versus

18   others.  And I told you I didn't break it up

19   that way.  I just -- six weeks worth of work

20   at 40 hours a week is 480 hours, and I gave it

21   a little bit of a haircut is how I did that

22   analysis.

23          On the document production, I think

24   I explained that I did that a little

25   differently.  I didn't take the entirety of

Page 113

1            DANIEL P. GOLDBERG (1/10/19)

2    what every -- the whole document production

3    would be and then subtract out what I thought

4    was applicable to the production that happened

5    in the interpleader.  It was -- the other way

6    is I looked at what I believed the production

7    would be with respect to the four alleged

8    events of default that were not at issue and

9    just generically issues that may not have been

10   covered and figured out what I thought that

11   kind of a production would look like.  And

12   that's where I came up with the estimates that

13   you see in the report.

14           Q.   But just to be clear, you don't

15   explain that in your declaration, do you?

16           A.   Not in that level of specificity.

17           Q.   In any level of specificity?

18           A.   Well, I do say that I took into

19   account -- let me look at the paragraph.

20   Paragraph 102 I address it.  I just describe

21   for you the detail behind the -- what I'm

22   talking about in paragraph 102.

23           Q.   Why do you refer to it as limited

24   discovery in the interpleader action?

25           A.   That's what I was told.

Page 114

1          DANIEL P. GOLDBERG (1/10/19)

2              MR. MOSCATO:  I think I'll pass

3       the witness.

4    EXAMINATION BY

5    MR. WELCH:

6          Q.   Good afternoon, Mr. Goldberg.  How

7    are you doing?

8          A.   I'm well, thank you.  And yourself?

9          Q.   I'm good.  You seem to have a bit

10   of a cold today.  Is that so?

11         A.   It is.

12         Q.   Are you taking any medication?

13         A.   No.

14         Q.   Is there any reason why --

15         A.   Other than cough drops.

16         Q.   Cough drops.  Okay.  I'll have one

17   too, just in solidarity.

18              Is there any reason why you can't

19   give your best testimony today?

20         A.   None that I'm aware of.

21         Q.   You and I have a prior connection,

22   right?

23         A.   We do.

24         Q.   What's the nature of that

25   connection?

Page 115

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   We both -- I used to work at your

3    current firm.

4          Q.   Kasowitz Benson?

5          A.   At the time, it was Kasowitz,

6    Benson, Torres & Friedman.  I understand today

7    it's Kasowitz Benson Torres.

8          Q.   And when's the last time we've

9    spoken?

10         A.   I don't recall.  A long time ago.

11         Q.   So a long time ago.

12              And apart from this deposition

13   right here now, have we discussed this case at

14   all?

15         A.   No.

16         Q.   How did you come to be retained as

17   an expert in this case?

18         A.   My firm was engaged by Reed Smith

19   to provide an opinion as to what the

20   reasonable range of defense costs would be for

21   the actions, as your colleague has defined

22   them.  And from there we determined within the

23   firm that I would be the best person to

24   actually testify and provide the opinion.

25         Q.   Have you or anyone in your firm

Page 116

1                DANIEL P. GOLDBERG (1/10/19)

2      been retained by Reed Smith before?

3           A.   Not to my knowledge.  Not that I

4      could -- certainly not that I can recollect.

5           Q.   Have you or anyone in your firm

6      done any work for Bank of New York before?

7           A.   Yes.

8           Q.   And can you describe the nature of

9      that work?

10          A.   In a prior matter we were

11     prosecuting a residential mortgage-backed

12     securities case, commonly known as a putback

13     case.  And in one or maybe two of those cases

14     Bank of New York Mellon was the trustee.

15          Q.   So Bank of New York -- I'm sorry.

16     Bank of New York Mellon was your client?

17          A.   In name they were our client.  The

18     way those matters tend to work is that the

19     directing holder instructs the trustee who to

20     hire.  And in those instances like most, the

21     directing holder instructed the trustee to

22     hire our firm, but the trustee in those

23     matters was Bank of New York Mellon.

24          Q.   And could the Bank of New York have

25     objected to you being hired?

Page 117

1          DANIEL P. GOLDBERG (1/10/19)

2          A.    I believe they could have actually,

3      yes.

4          Q.    And --

5          A.    But I'm not 100 percent certain of

6      that.  I'm sure if there was a reason or if we

7      had a conflict or if there was some basis to

8      be objectionable, I imagine they could have.

9      But I'd have to go back and look at the

10     operative pooling and servicing agreement to

11     see.

12         Q.    Was this just one action we're

13     talking about?

14         A.    My recollection is there might have

15     been two.  There might have been two putback

16     cases.

17         Q.    Two putback cases that your current

18     firm represented Bank of New York at?

19         A.    Correct.

20         Q.    Do you have a sense, a ballpark, of

21     how much money your firm made in that

22     representation?

23         A.    I don't.

24         Q.    Is that representation ongoing?

25         A.    No.

Page 118

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   Have you had any -- you or anyone

3    in your firm had any other representations of

4    Bank of New York?

5          A.   Not to my knowledge.

6          Q.   Do you anticipate representing Bank

7    of New York either directly or indirectly as

8    you've described?

9          A.   No.  As I say, we were engaged in

10   those other matters because we had the

11   relationship with the directing certificate

12   holder who instructed the bank to hire us.  We

13   did not have the relationship directly with

14   the bank as the trustee.

15         Q.   Do you have a relationship with

16   anybody at Bank of New York apart from your

17   work on this case?

18         A.   On this case?  You mean the one

19   that brings us here together today?

20         Q.   Yes.

21         A.   Not that I recall.  I'm sure I know

22   someone over there, but not anything material

23   that comes to mind.

24         Q.   Do you have any reason to believe

25   that you or your firm will get work from Bank

Page 119

1          DANIEL P. GOLDBERG (1/10/19)

2     of New York going forward?

3          A.   No.  One way or the other, no.

4          Q.   Have you been designated as an

5     expert before with respect to anticipated

6     legal fees?

7          A.   No.

8          Q.   This is the first time?

9          A.   Yes.

10          Q.   Have you been designated as an

11     expert in any capacity or concerning any

12     subject matter before?

13          A.   You mean expert witness I assume,

14     right?

15          Q.   Right?

16          A.   No.  The answer's no.

17          Q.   Okay.  And so have you testified

18     before?

19          A.   Yes, but not as an expert.

20          Q.   All right.  Can you describe the

21     nature of the testimony, just very high level?

22          A.   I have been -- so in one matter,

23     Kasowitz, when I was at Kasowitz, had a fee

24     dispute with a client on a matter I was

25     handling and the firm sued the client.  And in

Page 120

1              DANIEL P. GOLDBERG (1/10/19)

2     that matter I was deposed.  In another matter

3     at my current firm we obtained an award of

4     attorneys' fees, which was then referred to a

5     referee and I testified before the referee on

6     the reasonable amount of our firm's attorneys'

7     fees in connection with that fee shift.  And

8     years and years ago I believe I testified in

9     Delaware Bankruptcy Court on something

10    unrelated to legal fees.

11         Q.   All right.  So apart from those

12    three occasions you just described, have you

13    testified in any other occasions?

14         A.   I think those were four occasions,

15    but maybe there were three, three or four

16    occasions as best as I can recollect as I sit

17    here.  I think that's it.  It's possible

18    there's something I'm not remembering.

19         Q.   I want to focus your attention on

20    the second one you mentioned, which was where

21    you testified concerning, in some respect,

22    legal fees at your current firm.

23         A.   Okay.

24         Q.   What was the caption of that case?

25         A.   I don't recall specifically.  The

Page 121

1          DANIEL P. GOLDBERG (1/10/19)

2    name of our client was Progresso Ventures.

3          Q.    Progresso Ventures was a named

4    party?

5          A.    Yes, that's the plaintiff, and that

6    was our client.

7          Q.    Where was the case pending?

8          A.    New York Supreme.

9          Q.    You testified in that matter?

10          A.    I testified before a referee.

11          Q.    Was there a transcript taken of the

12    testimony?

13          A.    Presumably.

14          Q.    Do you have a copy of that?

15          A.    No.

16          Q.    If you were to make your best

17    effort to obtain a copy of that transcript,

18    how would you go about it?

19          A.    I would inquire of my partner who

20    was the lawyer litigating the fee aspect of it

21    and ask him if he was able -- if he were able

22    to get one.

23          Q.    Can you elaborate a little more

24    about the subject matter of your testimony in

25    that case?

Page 122

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   Sure.  It was a contractual dispute

3   that also had related business torts we under

4   the agreements were entitled to recover --

5   well, our client under the agreement was

6   entitled to recover its attorneys' fees.  We

7   prevailed before Justice Ramos.  He gave us an

8   award of attorneys' fees.  He referred the

9   matter to a referee to set the amount of the

10  attorneys' fees.  The referee scheduled a

11  hearing on a day.  We showed up.  I put the

12  legal bills into evidence and discussed what

13  we -- the work we did on the matter and the

14  referee ruled.

15         Q.   Okay.  What were the nature of the

16  claims?  Or withdrawn.

17              I'm trying to ascertain whether

18  there's any sort of relationship or connection

19  between the types of claims at issue here and

20  the types of claims at issue there?

21         A.   Not particularly.  I mean, it was a

22  loan agreement.  Our client entered into an

23  arrangement where it loaned money to an

24  investment firm that did not pay it back.

25  Rough and tough, that's what -- and they

Page 123

1          DANIEL P. GOLDBERG (1/10/19)

2    committed other frauds, but rough and tough,

3    that was the case.  And so our claim that

4    pursuant to which we got attorneys' fees that

5    led to my testimony was under the applicable

6    loan agreement that our adversary had not

7    repaid our client, so got an award of summary

8    judgment for the amount owed, and the

9    documents allowed us to -- or our client to

10   recover attorneys' fees and that was it.

11        Q.   Okay.

12        A.   It wasn't the trustee, it wasn't

13   noteholders, it wasn't anything like that.

14        Q.   Your current firm was founded in

15   2012; is that right?

16        A.   Correct.

17        Q.   Since that time, have you or your

18   firm been involved in bankruptcy matters?

19        A.   Yes.

20        Q.   Have you or your firm made fee

21   applications?

22        A.   No, not to my knowledge.  If it's

23   happened, it happened with my knowledge.

24        Q.   So you consider yourself to be an

25   expert in the estimation of anticipated legal

Page 124

1           DANIEL P. GOLDBERG (1/10/19)

2    fees?

3           A.   Yes.

4           Q.   And what in your view qualifies you

5    as an expert in that subject matter?

6           A.   I've been a commercial litigator

7    for over 23 years.  I've been a partner at

8    three commercial firms in New York.  And as

9    part of my work, I've engaged in this exercise

10   literally countless times, more times than I

11   can count.  And at my current firm for the

12   past seven years I'm the person responsible at

13   the firm for reviewing the firm's fee

14   arrangements.  And as part of that process I

15   regularly go through the process of estimating

16   what a litigation will cost, both on an hourly

17   basis and sometimes that's done in connection

18   with alternative fee arrangements.  But that's

19   irrelevant here.  Evaluating what a litigation

20   will cost or providing budgets on an hourly

21   basis and I do it all the time, not just for

22   the matters for which I have primary

23   responsibility, but for the matters of the

24   firm generally.

25          Q.   Okay.  And so you have formulated

Page 125

1          DANIEL P. GOLDBERG (1/10/19)

2    an opinion that your offering in this matter?

3          A.   I am.

4          Q.   At the highest level what's your

5    opinion?

6          A.   I'm not sure I understand the

7    question, sir.  You're asking what my

8    opinion -- at the highest level, you don't

9    mean the highest dollar amount?  You mean at a

10   high level, describe what my opinion is?

11         Q.   Yes.

12         A.   My opinion is that a reasonable

13   range of defense costs for an indenture

14   trustee such as Bank of New York Mellon to

15   defend the actions, as your colleague has

16   defined them in this deposition, would be

17   within a range of about 25 million to about

18   $40 million.

19         Q.   That's a fairly significant range,

20   wouldn't you agree?

21         A.   Commercial litigation is

22   significantly uncertain.

23         Q.   You say you've done budgets

24   countless number of times.  How many times

25   have you done a budget for $40 million in

Page 126

1              DANIEL P. GOLDBERG (1/10/19)

2    anticipated legal fees?

3         A.   I don't know a specific number.

4    Several.  I've done budgets several times

5    where the amount of the fee is as much as

6    $40 million.

7         Q.   Okay.  And have you done matters

8    where the firm has actually recovered

9    $40 million?

10        A.   When you say "recovered," you mean

11   have I worked on matters when I -- the firm I

12   was working for has been paid $40 million over

13   the life of -- sure.

14        Q.   So have you had the opportunity to

15   compare the budgets that you've made with the

16   actual fees recovered at your firm over the

17   course of the six years you've been there?

18        A.   It's happened from time to time.

19        Q.   And how would you characterize the

20   accuracy of your budgets when compared to

21   actual billables?

22        A.   Reasonably on target.  If anything,

23   I might be prone to underestimate the costs,

24   but reasonably accurate.

25        Q.   All right.  I believe you said that

Page 127

                    DANIEL P. GOLDBERG (1/10/19)

1    you've been involved in several matters where

2    the fees at issue were 40 million or more; is

3    that correct?

4          A.   Well, you asked have I worked on

5    matters where the firm has collected 40

6    million or more.  The answer to that is yes.

7    What you just asked me is a little bit

8    different.

9          Q.   Okay.  Well, I want to understand

10   if you've personally formulated a budget where

11   the top end of the range was $40 million for

12   anticipated legal fees?

13         A.   Yes.  I believe I said yes, I

14   believe I have.

15         Q.   How many times?

16         A.   I don't know.  I don't know the

17   number specifically.  Several.

18         Q.   Is it a few, many?  Can you

19   characterize it at all?

20         A.   I wouldn't say many.  I would

21   say -- I would not say many, but several.  I

22   don't know exactly.

23         Q.   Several?

24         A.   I don't want to guess.

Page 128

DANIEL P. GOLDBERG (1/10/19)

1

2      Q.   So two or three?

3      A.   More than two or three.  Fewer than

4  ten.

5      Q.   Would you characterize a case with

6  a budget of $40 million to be unusual in your

7  experience?

8      A.   An upper range budget?

9      Q.   Yes.

10      A.   Or like in -- like in an actual

11  estimate, you will spend $40 million or it

12  could be as much as $40 million?

13      Q.   The latter.

14      A.   The latter.  Is it unusual; that's

15  your question?

16      Q.   Yes.

17      A.   It's becoming less and less

18  unusual.  I mean, spending -- it's hard to do

19  a meaningful multi-party commercial litigation

20  in New York that runs through discovery and

21  goes all the way through for less than

22  $20 million by the time you're done if your at

23  a -- if you're at a firm that charges what

24  I'll characterize as Am Law 200 rates.  It

25  just doesn't happen.

Page 129

1        DANIEL P. GOLDBERG (1/10/19)

2            A large case -- I'm not talking

3    about a single plaintiff, single defendant

4    small breach of contract case.  I'm talking

5    about multi-party case with large documents,

6    legal issues, parties scattered and witnesses

7    around different jurisdictions, cases that

8    look like this case.  So it's difficult to do

9    a case like that all the way through for less

10   than $20 million.

11           So your question is, is it unusual

12   for the upper range to be 40?  I think that's

13   becoming more and more common.

14       Q.   In your experience, have you

15   actually seen it?

16       A.   I've seen it several -- I've

17   estimated it several times and I've been

18   involved in matters where the firm's collected

19   $40 million several times.

20       Q.   You said that in your experience

21   20 million is not unusual?

22       A.   Correct.

23       Q.   And that's half of your upper

24   range, right?

25       A.   Approximately.

Page 130

1        DANIEL P. GOLDBERG (1/10/19)

2        Q.   In fact, it's $5 million less than

3   your lower range here?

4        A.   Correct.

5        Q.   Can you describe -- do you recall

6   any of the specific cases that had an upper

7   estimated range of $40 million or greater that

8   you were involved in budgeting?

9        A.   The question is can I recall them?

10        Q.   Yes.  You said there were several.

11   Can you name one?

12        A.   I could, but I won't for

13   confidentiality reasons.

14        Q.   Do you recall them?

15        A.   I recall a few, yes.

16        Q.   Okay.  If you recall them, then you

17   can number them, right?  How many do you

18   recall?

19        A.   I don't agree with your premise

20   because I can't recall them all.  How many can

21   I recall?

22             MR. SOLOMON:  Is this different

23        than the question you asked before

24        about more than two or three, less

25        than ten?  If it's not different, then

Page 131

1          DANIEL P. GOLDBERG (1/10/19)

2          I'm not understanding it.

3          A.    Three specifically that I can

4    recall.

5          Q.    Okay.  So you can recall three

6    occasions where the upper range of the

7    estimated legal fees was 40 million or

8    greater?

9          A.    Correct.

10          Q.    That's over the course of your

11   entire 23-year career as a -- including as a

12   partner at multiple commercial engagement

13   firms?

14          A.    Correct.  Those are the ones I can

15   recollect as I sit here today.

16          Q.    And those three, did they -- any of

17   them relate to -- were they in any way similar

18   to the case that we have here?

19          A.    As your question is framed, the

20   answer is yes.

21          Q.    Because it's extremely broad.  Fair

22   enough.

23              How about do any of those three

24   matters, do they involve a trustee, litigation

25   against a trustee for, you know, alleged

Page 132

1            DANIEL P. GOLDBERG (1/10/19)

2    malfeasance?

3            A.   You asked two questions there.  One

4    of them concerns a trustee.  It does not

5    concern claims against a trustee for

6    malfeasance.

7            Q.   Okay.  So none of the three that

8    you can recall where the upper range of the

9    anticipated legal fees was $40 million

10   involved claims against a trustee for alleged

11   malfeasance?

12           A.   Correct.

13           Q.   Can you describe the -- what was

14   your methodology?

15           A.   For what?

16           Q.   Well, coming up with a range.

17           A.   As I described to your colleague, I

18   went through, I started with the ABA model on

19   different facets and components of a

20   litigation, went through each one, estimated

21   how many hours different categories of lawyers

22   would spend on those different subparts,

23   developed a range between what I thought would

24   be on the lower side and a range on what I

25   thought would be on the higher side.  I did

Page 133

1          DANIEL P. GOLDBERG (1/10/19)

2     that for each of the subcomponents of the ABA

3     model, added up those hours and multiplied

4     them by the blended hourly rate, weighted

5     blended hourly rate that I derived.  That's

6     how I came up with the numbers.

7          Q.   Okay.  The ABA model components;

8     did I hear that right?

9          A.   Yes.

10          Q.   Were there any ABA model components

11     that you elected to exclude from your

12     analysis?

13          A.   No, none that come to mind.

14     Certainly I made no conscious choice to

15     exclude something in particular.

16          Q.   So your intent was to include them

17     all?

18          A.   Maybe I don't understand your

19     question.

20          Q.   Your intent was to include every

21     single component identified by the ABA as a

22     facet of litigation?

23          A.   I think me and my team pulled this

24     model and we used this model.  I'm not aware

25     of any specific component that we

Page 134

1          DANIEL P. GOLDBERG (1/10/19)

2    intentionally chose to omit, which is not to

3    say maybe there is some component that doesn't

4    show up here, but it wasn't intentional.

5          Q.   Did you evaluate the components to

6    make an assessment of whether they -- they

7    made sense in this particular case?

8          A.   Yes.

9          Q.   And in your view, every single one

10   of them without exception made sense in this

11   case?

12         A.   I think every one of these

13   components is related and relatable to a

14   commercial litigation.  And I've certainly

15   done budgets and models where I have not used

16   the ABA model, but in particular because this

17   is an expert opinion to be relied upon by the

18   Court, I thought it prudent to use an accepted

19   ABA model, something that was recognizable

20   that I didn't just create on my own.  And so

21   we used this model.

22         Q.   You indicated that one of the steps

23   in your analysis was to estimate the hours for

24   each of these components?

25         A.   Yes.

Page 135

1          DANIEL P. GOLDBERG (1/10/19)

2          Q.   Can you describe for me how you

3     estimated the number of hours?

4          A.   I used my experience and judgment

5     to estimate how many lawyers I thought would

6     be necessary for the various tasks and how

7     long I thought it would take them to perform

8     those tasks.  And then generally speaking, I

9     estimated then in either work weeks or work

10    months on the same terms I described earlier

11    in the deposition.

12         Q.   Okay.  Did you rely on any academic

13    texts or treatises?

14         A.   I did not.

15         Q.   Did you rely on any generally

16    accepted methodology of some kind?

17         A.   I'm unaware of a generally accepted

18    methodology for estimating how many hours it

19    will take a lawyer to perform a task on an

20    hourly basis.

21         Q.   Apart from your experience, was

22    there any other basis for your assessment of

23    the estimated hours for each of the components

24    under the ABA model?

25         A.   It's based on my judgment and

Page 136

1          DANIEL P. GOLDBERG (1/10/19)

2    experience.

3          Q.   And nothing else?

4          A.   Correct.  No.  Sorry.  Not entirely

5    true.

6               That's how I derived the schedule

7    and number of hours.  I did then instruct my

8    team to do a little bit of research just sort

9    of as a sanity check to see if there were

10   other cases out there and so forth that kind

11   of might have looked a little bit like this

12   one or at least complex commercial cases where

13   we could find publicly reported fees and fee

14   estimates and things like that.  And so we did

15   that.

16              That gave me comfort that,

17   notwithstanding your kind questions here today

18   about how $40 million sounds like a crazy

19   number, I found other cases where fee

20   applications were in excess of $40 million for

21   comparable litigations and things.

22         Q.   And all of that is set forth in

23   your report?

24         A.   Certainly some of it is set forth

25   in my report.  I'm trying to ascertain if

Page 137

1           DANIEL P. GOLDBERG (1/10/19)

2    there's something that we found that we

3    omitted.  I don't think so.

4           Q.   Well, did you come across any

5    examples, you or your team come across any

6    examples where there were significantly lower

7    numbers and you elected to exclude them from

8    your analysis report?

9           A.   I'm sure there are cases in the

10   world where it costs less to litigate.  We did

11   not find a comparable case where the numbers

12   were materially lower and omitted it.

13          Q.   Okay.  Who worked on -- Exhibit 1

14   is your declaration, right?

15          A.   You're saying Exhibit 1?  Yes, I

16   mean, the document that's entitled

17   "Declaration of Daniel P. Goldberg"?

18          Q.   Yes.

19          A.   That's my declaration.

20          Q.   And this memorialize the opinion

21   that you're offering in this case?

22          A.   It does, along with the exhibits.

23          Q.   Okay.  Did you intend to offer any

24   opinions outside the four corners of this

25   document?

Page 138

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   I intend to do what's asked of me

3    by counsel and the Court.  My understanding at

4    the moment is that my opinions will be what's

5    contained in Exhibit 1.

6          Q.   Okay.  There was -- you were asked

7    a question -- and we may have to go back to

8    the transcript, but counsel asked you to

9    describe some aspect of your methodology and

10   you said, well, that's basically it, although

11   it's not expressly set forth in the opinion.

12   Do you recall that testimony?

13         A.   Not sufficiently to be able to

14   answer whatever your next question is going to

15   be.

16         Q.   Okay.  Maybe it's worth going to

17   the record.  I think it is an important

18   clarification anyway.

19              MR. WELCH:  Can I ask the court

20         reporter to look for testimony using

21         the word "expressly."

22              (Whereupon, the referred to

23         question and answer was read back by

24         the Reporter.)

25         Q.   Do you recall that question and

Page 139

1          DANIEL P. GOLDBERG (1/10/19)

2    that answer?

3          A.    Generally, yes.

4          Q.    Okay.  It caught my attention

5    because I want to make sure that we have a

6    full understanding of the opinion you intend

7    to offer in this case.  And that jumped out at

8    me because you suggested that it wasn't

9    expressly set forth in your report?

10          MR. SOLOMON:  The witness has

11          answered questions at the deposition.

12          Those areas might be gone into at the

13          trial.  We don't know.  We're not

14          going to foreclose that if there was

15          discussion about it here at this

16          deposition.

17          Q.    Is there anything else sitting here

18    right now that you intend to or believe you

19    will testify about that's not expressly set

20    forth in your expert report?

21          A.    Your question I think has a false

22    presumption in it.  I didn't testify earlier

23    in the -- that you had the reporter recite

24    wasn't an opinion that wasn't set forth in the

25    report.  The opinion is in the report.  The

Page 140

1          DANIEL P. GOLDBERG (1/10/19)

2    basis upon which I excluded document review

3    work related to the 2017 alleged events of

4    default, that methodology and the thinking in

5    my head for how I did it wasn't necessarily

6    set forth expressly, but the opinion is in the

7    report.

8          With that clarification, to my

9    knowledge, no, I'm not aware of any opinion

10   that I'm being asked to offer that's not

11   reflected in the report.

12        Q.   Okay.  Turning your attention to

13   Exhibit 1, which is your declaration, I want

14   to focus your attention to paragraph 2.

15        A.   I'm there.

16        Q.   For the record, the first sentence

17   in paragraph 2 reads "It's important to note

18   at the outset that litigation inherently is

19   uncertain and it is impossible to predict with

20   certainty what any given case will cost to

21   litigate when the lawyers are billing by the

22   hour, which is a standard method of billing

23   today."  Did I read that correctly?

24        A.   I believe you did.

25        Q.   And that's your opinion?

Page 141

1        DANIEL P. GOLDBERG (1/10/19)

2        A.    It is.

3        Q.    And what do you mean by "inherently

4    is uncertain"?

5        A.    The process is adversarial.

6    Lawyers on both sides make tactical and

7    strategic calls and undertake various actions

8    that are not necessarily foreseen by the other

9    side.  Courts are manned by judges who are

10   people, and so they make decisions.  And so

11   you -- while you might have a good sense as to

12   how you think any given issue might come out,

13   there's no way to predict with certainty how

14   any given judge will rule on any given issue

15   on any given day, and that could have a

16   material impact on the cost of the litigation.

17            So just as a for instance, you may

18   think that you have a very good motion or a

19   basis not to have to review large volumes of

20   documents, but the Court might disagree with

21   you and therefore the scope of discovery might

22   be orders of magnitude greater than you

23   thought or the opposite is the case.  You

24   might think that you're going to have to

25   review troves and troves of documents, but you

Page 142

1             DANIEL P. GOLDBERG (1/10/19)

2    get a ruling from a Court unexpectedly that

3    limits the scope of discovery or you win on a

4    motion to dismiss that you didn't think you

5    were going to win so it knocks out various

6    claims or whatever the case may be.

7                   So you have judges that will rule.

8    And because they're human and because lawyers

9    are human, you can't fully predict how that

10   will go.  You have no ability to control what

11   the other side, what your adversaries will do,

12   whether they make a lot of motions, fewer

13   motions, whether they seek more or fewer

14   depositions.  So that's what I mean by it is

15   inherently uncertain.  You cannot predict how

16   the process will go.  As I say to my clients

17   who are sports fans, can you tell me today

18   who's going to win the Super Bowl next year?

19   The answer is no, you can't, and that's why

20   they play the games.  And litigation has a bit

21   of element to that.

22       Q.   You go on in that same sentence to

23   say that "Litigation is impossible to predict

24   with certainty what any given case will cost

25   to litigate."  And that's your view?

Page 143

1              DANIEL P. GOLDBERG (1/10/19)

2          A.   Yes, you can't omit the "with

3     certainty."  It is impossible to predict with

4     certainty what the case will cost.

5          Q.   Okay.  So I want to compare and

6     contrast that with another statement you made

7     in the first sentence -- in the first

8     paragraph.  Do you see the phrase "reasonable

9     degree of certainty"?

10         A.   Yes.

11         Q.   For the record, it reads "I

12    estimate to a reasonable degree of certainty

13    that the reasonable range of BNYM's defense

14    costs would be approximately 25 million to

15    40 million."  Did I read that correctly?

16         A.   I believe you did.

17         Q.   And that's your opinion?

18         A.   It is.

19         Q.   And focusing your attention on the

20    phrase "reasonable degree of certainty"?

21         A.   Yes.

22         Q.   First of all, why do you use that

23    phrase?

24         A.   That's typically the standard when

25    you're offering -- an expert is offering an

Page 144

1              DANIEL P. GOLDBERG (1/10/19)

2      opinion.

3           Q.   What do you understand "reasonable

4      degree of certainty" to mean when used -- when

5      offering an expert opinion?

6           A.   I have a reasonably high degree of

7      confidence that the estimate of the reasonable

8      range of defense costs as set forth is a

9      reasonable estimate, it's a good estimate.

10          Q.   And so I'd like to -- focusing your

11     attention again on that phrase, "reasonable

12     degree of certainty" in the first paragraph

13     and then your statement in the second

14     paragraph that it's impossible to predict with

15     certainty with any given case will cost to

16     litigate, how do you square those two

17     statements?

18          A.   I think you noted at the outset

19     when you first started asking the questions,

20     wow, that's quite a range, 25 to $40 million.

21     I have a reasonable degree of certainty that

22     it's a reasonable estimate that the defense

23     will be between 25- and $40 million.  That is

24     hardly predicating with certainty what the

25     case will actually cost to the dollar.  That's

Page 145

          DANIEL P. GOLDBERG (1/10/19)

1

2   how.

3       Q.   So your reasonable degree of

4   certainty is based on the fact that you've

5   given a fairly wide range?

6       A.   The reasonable degree of certainty

7   means that I have a high degree of confidence

8   in the opinion that I'm offering.  That's what

9   that phrase means in the first paragraph.

10      Q.   Okay.

11      A.   So I have a reasonable degree of

12  certainty that my opinion is good and

13  accurate.  My opinion is a reasonable range of

14  defense costs is between 25- and $40 million.

15      Q.   Okay.  Do you have a reasonable

16  degree of certainty that it's going to cost

17  $40 million?

18      A.   That it will cost $40 million?

19      Q.   Yes.

20      A.   I would not say that.

21      Q.   Why won't you say that?

22      A.   Because it's not what I believe.  I

23  believe that it could cost as much as

24  $40 million.  I do not believe that -- I would

25  not offer an opinion that it will cost

Page 146

1            DANIEL P. GOLDBERG (1/10/19)

2      $40 million.

3            Q.   And why won't you offer an opinion

4      that it will cost $40 million?

5            A.   Why will I not?

6            Q.   Yes.

7            A.   Because I don't know that it will.

8      It may very well cost less.  It could cost

9      more, but it very well could cost less.

10           Q.   What do you mean it very well may

11     cost less?

12           A.   I give a range of 25- to

13     $40 million, so I believe that it could cost

14     anywhere from 25- to $40 million.  If I

15     thought it would definitively cost

16     $40 million, that's the opinion I would have

17     given.  But it's not what I believe.  I

18     believe that it's a range.  It's impossible to

19     give a specific number if you're billing by

20     the hour.  It's impossible.

21           Q.   Is it possible that the case will

22     cost less than $25 million to litigate?

23           A.   Yes.

24           Q.   And why do you say that?

25           A.   It could end early.  A motion to

Page 147

DANIEL P. GOLDBERG (1/10/19)

1   dismiss could be granted, the parties could

2   settle.  I mean, any number of things could

3   happen.

4       Q.   Is it more difficult to predict the

5   anticipated costs of discovery further out in

6   the lifecycle of the litigation?

7       A.   Could you clarify that question for

8   me?

9       Q.   Yes.  So litigation occurs in a

10  series of steps, which I think you've set out

11  as components under the ABA model; is that

12  fair?

13      A.   Yes, but they're not necessarily

14  seriatim.  Sometimes they are concurrent, but

15  okay.

16      Q.   Okay.  So they're not necessary

17  rigidly sequential.  Fine.  I agree.  But some

18  are closer to the beginning of litigation and

19  some are closer to the end of litigation; is

20  that fair?

21      A.   I think that's fair.

22      Q.   Okay.  And is it more difficult to

23  predict with accuracy what it's going to cost

24  the components of litigation at the end than

Page 148

1      DANIEL P. GOLDBERG (1/10/19)

2  it is to estimate the cost of those that are

3  temporally closer?

4      A.   I won't quibble with your question.

5  I think generally speaking that's probably

6  fair.

7      Q.   Okay.  Well, it sounds like you

8  wouldn't adopt my question, so how would you

9  state it?

10      A.   It's -- I'm looking at it on the

11  realtime, so it's -- it is more difficult to

12  predict what it will cost -- what components

13  will cost that occur much later in the case

14  than the ones that are going to occur more

15  close in time.  I think that's a fair

16  estimate -- a fair statement.

17      Q.   You said it better than I did.

18  Thank you.

19      A.   I mean, there could be exceptions

20  to that, but I think just generally speaking,

21  that's a fair statement.

22      Q.   Okay.  So turning your attention to

23  paragraph 63.  Do you have that before you?

24      A.   I do.

25      Q.   This is a paragraph we talked about

Page 149

1                DANIEL P. GOLDBERG (1/10/19)

2    before, but I just want to focus on it for a

3    couple of minutes.  And for the record, it

4    reads "Based on my experience in complex

5    litigation matters, my opinion is that BNYM

6    will reasonably spend approximately 1- to

7    2.25 million (1400 to 2700 hours) on case

8    assessment, development and administration

9    over the life of the anticipated litigation."

10   Did I read that correctly?

11        A.    You did.

12        Q.    And that's your opinion?

13        A.    It is.  Reading this now, I might

14   substitute the word "will" for "could."  It's

15   probably written a little too definitively

16   that they will spend that amount of money, but

17   generally speaking it is my opinion.

18        Q.    Now, 1400 to 2700 is fairly broad

19   range; would you agree?

20        A.    It's reasonably broad.

21        Q.    And so 1400 is almost half of 2700,

22   right?

23        A.    It's more than half, but sure, I

24   understand what you're saying.

25        Q.    Did you make any effort to break

Page 150

1          DANIEL P. GOLDBERG (1/10/19)

2     down that total range by the subsections that

3     follow in the following paragraphs?

4          A.   Yes.  If you look at Exhibit 2, it

5     is.  And, in fact, it was done in the reverse.

6     It was done with the subsections and then

7     tallied up, and that's how you got to the

8     numbers that are reflected in paragraph 63.

9          Q.   Okay.  Just focusing your attention

10    on the first phrase, "Based on my experience

11    in complex litigation matters," is there any

12    other basis for the opinion expressed in this

13    paragraph?

14          A.   Just my experience and judgment.

15          Q.   Have you been asked to express any

16    opinions with respect to the indemnification

17    rights or obligations of the parties in this

18    matter?

19          A.   No.

20          Q.   Do you have any personal knowledge

21    of any discussions or negotiations concerning

22    the indemnification rights or obligation in

23    this matter?

24          A.   No.

25          Q.   So you're not offering an expert

Page 151

1            DANIEL P. GOLDBERG (1/10/19)

2    opinion on that matter?

3        A.   Correct.

4        Q.   And you have no factual knowledge

5    about that?

6        A.   Correct.

7            MR. WELCH:  I'd like to just take

8        a break to review my notes and I think

9        we're done.

10           MR. MOSCATO:  I may have -- sorry

11       I passed, but if you would indulge me,

12       I have two minutes worth of additional

13       questions.

14           MR. SOLOMON:  I'm not troubled by

15       the passing back and forth, but

16       where's that 12:45 estimate.

17   EXAMINATION BY

18   MR. MOSCATO:

19       Q.   This is a hypothetical question for

20   you.

21       A.   Okay.

22       Q.   If only the Ambac action were going

23   forward and not the Whitebox action, would

24   that materially change your estimate of

25   anticipated reasonable legal fees?

Page 152

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   I'd have to do that work, which I

3     haven't done.  So the short answer is I don't

4     know, I'd have to do the work.  As I sit here

5     just thinking about it extemporaneously, it

6     probably would have some impact, I don't know

7     the magnitude.  I mean, as a for instance, one

8     of the assumptions is there would be ten

9     depositions per party.  If one of the parties

10    weren't the party, there'd probably still be a

11    few depositions, but maybe not ten.  There

12    might be fewer motions because you've got one

13    fewer party and things like that, but I

14    haven't done that work.

15         Q.   But is it fair to say, even though

16    you haven't done the work, your sense is it

17    would reduce to some extent the amount of

18    reasonable anticipated legal fees?

19         A.   I would think it would likely

20    result in some reduction.

21         Q.   But you can't -- as you sit here

22    today, you can't estimate it because you

23    haven't been asked to do that, right?

24         A.   Correct.

25         Q.   At page 107 you were answering a

Page 153

1          DANIEL P. GOLDBERG (1/10/19)

2     question by my colleague and you were talking

3     about complex commercial cases where we could

4     find publicly reported fees and fee estimates

5     and things like that.  So we did that.  And

6     you say "That gave me comfort that

7     notwithstanding your kind questions here today

8     about how $40 million sounds like a crazy

9     number, I found other cases where fee

10    applications were in excess of 40 million for

11    comparable litigations and things."

12              Did you find other cases where fee

13    applications in excess of 40 million were for

14    lawsuits brought against trustees for

15    malfeasance?

16         A.   I don't know if -- if I said "fee

17    application," then I'm going to quibble a

18    little bit and then I'm going to answer --

19         Q.   Well, you did say that.

20         A.   I may very well have.

21         Q.   Well, that's what's recorded.

22         A.   I understand.  Fee application may

23    not have been accurate, but we found at least

24    one circumstance where the estimated fees were

25    $50 million and up in a claim against the

Page 154

1          DANIEL P. GOLDBERG (1/10/19)

2   trustee by noteholders claiming malfeasance by

3   the trustee.  And that was the BlackRock

4   matter.

5               MR. MOSCATO:  Okay.  I'll look

6       into that.

7       Q.   BlackRock you said?

8       A.   BlackRock.

9       Q.   And that's in your report?

10      A.   It is.

11              MR. MOSCATO:  We'll look into

12      that.  That's all I have.

13              THE WITNESS:  Thank you.

14   EXAMINATION BY

15   MR. WELCH:

16      Q.   Mr. Goldberg, just to round it out,

17   how much has your firm been paid in connection

18   with your retention in this matter?

19      A.   Actually been paid; I don't know.

20      Q.   Or rather, how much has the firm,

21   your firm, billed?

22      A.   I don't know.

23      Q.   Do you have just some general sense

24   how much your firm expects to make on this

25   engagement?

Page 155

1          DANIEL P. GOLDBERG (1/10/19)

2          A.   I really don't.  I really don't.

3    We're billing by the hour at our standard

4    rates.  It is not a particularly large team,

5    and it is not a particularly lengthy

6    assignment, so I don't believe it will be a

7    particularly large number comparatively

8    speaking, but I don't know.

9               MR. WELCH:  I have no further

10        questions.

11              MR. SOLOMON:  Thank you all very

12        much.  Thank you for the courtesy.

13              (Time noted:  12:54 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 156

1       DANIEL P. GOLDBERG (1/10/19)

2

3              J U R A T

4

5

6          I, DANIEL P. GOLDBERG, do hereby

7       certify under penalty of perjury that

8       I have read the foregoing transcript

9       of my deposition taken on January 10,

10      2019; that I have made such

11      corrections as appear noted herein in

12      ink, initialed by me; that my

13      testimony as contained herein, as

14      corrected, is true and correct.

15

16

                _____

17              DANIEL P. GOLDBERG

18

19

       Subscribed and sworn to before me

20

       This _____ day of _____, 2019.

21

22     _____

              NOTARY PUBLIC

23

24

25

Page 157

1               DANIEL P. GOLDBERG (1/10/19)

2     ------------------I N D E X------------------

3     WITNESS:    DANIEL P. GOLDBERG

4     EXAMINATION BY                       PAGE

5     MR. MOSCATO                       5, 151

6     MR. WELCH                      114, 154

7

8

9

10

11     ---------------E X H I B I T S--------------

12      GOLDBERG EXHIBIT           FOR I.D.

13      Goldberg Exhibit 1,             5

14      Declaration of Daniel P.

15      Goldberg

16

17      Goldberg Exhibit 2,             5

18      Exhibit D to the Declaration

19

20

21

22

23

24

25

Page 158

1          DANIEL P. GOLDBERG (1/10/19)

2            C E R T I F I C A T E

3

4   STATE OF NEW YORK         )

                              :  SS.:

5   COUNTY OF RICHMOND        )

6

7          I, AYLETTE GONZALEZ, a Notary Public

8   for and within the State of New York, do

9   hereby certify:

10         That the witness, DANIEL P.

11  GOLDBERG, whose examination is hereinbefore

12  set forth was duly sworn and that such

13  examination is a true record of the testimony

14  given by that witness.

15         I further certify that I am not

16  related to any of the parties to this action

17  by blood or by marriage and that I am in no

18  way interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20  set my hand this 10th day of January, 2019.

21

22  _____

            AYLETTE GONZALEZ

23

24

25

Page 159

1            DANIEL P. GOLDBERG (1/10/19)

2        ERRATA SHEET FOR THE TRANSCRIPT OF:

3  Case Name:       In re:  The Financial Oversight
                   and Mgmt Board for Puerto Rico

4  Dep. Date:       January 10, 2019
    Deponent:        DANIEL P. GOLDBERG

5

    Pg. Ln.  Now Reads     Should Read   Reason

6  ___ ___  _____  _____  _____

7  ___ ___  _____  _____  _____

8  ___ ___  _____  _____  _____

9  ___ ___  _____  _____  _____

10  ___ ___  _____  _____  _____

11  ___ ___  _____  _____  _____

12  ___ ___  _____  _____  _____

13  ___ ___  _____  _____  _____

14  ___ ___  _____  _____  _____

15  ___ ___  _____  _____  _____

16  ___ ___  _____  _____  _____

17  ___ ___  _____  _____  _____

18  ___ ___  _____  _____  _____

19  ___ ___  _____  _____  _____

20             _____
                DANIEL P. GOLDBERG

21

  SUBSCRIBED AND SWORN BEFORE ME,

22

  This___ day of_____, 2019.

23

  _____

24         Notary Public

25  My Commission Expires:_____