## **Exhibit B**

Deposition of Robert M. Fishman

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                    DISTRICT OF PUERTO RICO

4      --------------------------------X

       IN RE:                              PROMESA

5                                          Title III

       THE FINANCIAL OVERSIGHT AND

6      MANAGEMENT BOARD FOR PUERTO RICO,   No. 17 BK 3283-LTS

7            as representative of

                                             (Jointly

8      THE COMMONWEALTH OF PUERTO RICO,    Administered)

       et al,

9

                        Debtors.

10     --------------------------------X

       IN RE:                              PROMESA

11                                         Title III

       THE FINANCIAL OVERSIGHT AND

12     MANAGEMENT BOARD FOR PUERTO RICO,   No. 17 BK 3284-LTS

13           as representative of

14     PUERTO RICO SALES TAX FINANCING

       CORPORATION (COFINA)

15

                         Debtor.

16     --------------------------------X

17                       DEPOSITION

18                           OF

19              ROBERT M. FISHMAN, ESQ.

20            Thursday, January 10, 2019

21                  101 Park Avenue

22               New York, New York

23

24     Reported by:

       AYLETTE GONZALEZ, RPR, CLR, CCR

25     JOB NO. 153834

Page 2

1

2                    DATE:  January 10, 2019

3                    TIME:  1:30 p.m.

4

5

6       Deposition of ROBERT M. FISHMAN, ESQ.,

7    held at the offices of CURTIS,

8    MALLET-PREVOST, COLT & MOSLE, LLP., 101 Park

9    Avenue, New York, New York  10178, pursuant

10   to NOTICE, before AYLETTE GONZALEZ, a

11   Registered Professional Reporter, Certified

12   LiveNote Reporter, Certified Court Reporter

13   and Notary Public of the States of New York

14   and New Jersey.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4    CURTIS, MALLET-PREVOST, COLT & MOSLE

5    Counsel for Ambac Assurance

6            101 Park Avenue

7            New York, New York 10178

8    BY:    MICHAEL MOSCATO, ESQ.

9    BY:    GABRIEL HERTZBERG, ESQ.

10    BY:    JACOB KEARNEY, ESQ.

11

12

13

14    KASOWITZ BENSON TORRES

15    Counsel for Whitebox Multi-Strategy

16    Partners, L.P.

17            1633 Broadway

18            New York, New York 10019

19    BY:    TREVOR WELCH, ESQ.

20

21

22

23

24

25

Page 4

1

2  A P P E A R A N C E S:  (CON'T)

3

4  REED SMITH

5  Counsel for Bank of New York Mellon

6          599 Lexington Avenue

7          New York, New York 10022

8  BY:    LOUIS SOLOMON, ESQ.

9  BY:    C. NEIL GRAY, ESQ.

10

11

12

13  ALSO PRESENT:

14  HOLWELL SHUSTER & GOLDBERG

15  BY:    BRENDON DeMAY, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 5

1

2      R O B E R T   M.   F I S H M A N,

3          called as a witness, having been

4          duly sworn by a Notary Public,

5          was examined and testified as

6          follows:

7      EXAMINATION BY

8      MR. HERTZBERG:

9          Q.   Good afternoon, Mr. Fishman.  My

10     name is Gabe Hertzberg.  I'm from the law firm

11     Curtis, Mallet-Prevost, Colt & Mosle, the law

12     firm where we're sitting today.  Thank you for

13     being here.

14               Have you been deposed before?

15         A.   I have been deposed several times

16     before.

17         Q.   How many times have you been

18     deposed?

19         A.   Three times are coming to mind over

20     40 years, but there could be more.  Those are

21     the three that I'm remembering right now.

22         Q.   In those instances were you deposed

23     in your capacity as an expert witness or as a

24     regular witness?

25         A.   Once as an expert, once as a fact

Page 6

ROBERT M. FISHMAN (1/10/19)

1

2    witness and one is kind of hard to describe

3    what exactly that role was.

4         Q.   Tell me about the time that you

5    were deposed as an expert.

6         A.   It involved -- a long time ago.  It

7    involved a dispute that called into play

8    commonalty between U.S. bankruptcy law and

9    Mexican bankruptcy law.  And there was a

10   question about whether a U.S. Court could

11   grant certain relief and they needed testimony

12   about how a U.S. Court would decide if it

13   could do what U.S. law required or if it

14   needed to do what Mexican law required.

15        Q.   What year was that, approximately?

16        A.   1990s.  I'm not sure.

17        Q.   And were you an expert on U.S.

18   bankruptcy law?

19        A.   Yes.

20        Q.   What facet of U.S. bankruptcy law

21   were you hired as an expert for?

22        A.   I don't know that it was narrow.  I

23   think it was probably a sort of generally

24   speaking.  I don't -- you know, the case was a

25   long time ago, I can't really recall the

Page 7

                    ROBERT M. FISHMAN (1/10/19)

1

2    specific controversy or the issue that was

3    involved in the underlying dispute.

4         Q.   Was that the last time you were

5    hired as an expert witness?

6         A.   It was not the last time I was

7    hired, but it was the last time I was deposed.

8         Q.   Have you given testimony in court

9    as an expert witness?

10        A.   I have never given testimony as an

11   expert witness unless we can figure out what

12   to call that hybrid I described, which maybe

13   it was an expert witness and maybe it wasn't,

14   I don't know.

15        Q.   Why don't you say a little more

16   about it.

17        A.   It was in the Tolson case in the

18   early 1990s, and it involved testimony about a

19   settlement between the debtor and the bank

20   group of a series of fraudulent conveyance and

21   related kinds of disputes.  And the

22   investigation that was conducted to support

23   the settlement was an issue in controversy and

24   I was a witness on that topic.  And I don't

25   know whether you'd call that an expert witness

Page 8

1          ROBERT M. FISHMAN (1/10/19)

2    or not, but I was a witness.

3          Q.   You're an expert witness -- or

4    you're here today in your capacity as an

5    expert witness, correct?

6          A.   Yes.

7          Q.   How do you understand the nature of

8    your retention?

9          A.   I'm not sure exactly what you mean

10   by that.

11         Q.   What is your area of expertise in

12   this matter?

13         A.   I see.  Well, I have been a fee

14   examiner in a number of cases, and I believe

15   that it is the combination of my general

16   experience as a bankruptcy lawyer and my

17   experience as a fee examiner that gives rise

18   to the notion that I am an expert.

19         Q.   In your report --

20         MR. HERTZBERG:  Which I will ask

21         the reporter to mark and I'll hand you

22         a copy, sir.

23         (Fishman Exhibit 1, Declaration of

24         Robert M. Fishman was marked for

25         identification, as of this date.)

Page 9

1           ROBERT M. FISHMAN (1/10/19)

2    BY MR. HERTZBERG:

3        Q.   So your report has been marked as

4    Fishman 1, and you have that in front of you,

5    correct?

6        A.   Yes, I do.

7        Q.   In your report you identify two

8    prior matters in which you worked as a fee

9    examiner, one of those is the Chapter 9 case

10   of Detroit?

11       A.   Correct.

12       Q.   Another one is the bankruptcy

13   arising out of the Petters' Ponzi scheme,

14   right?

15       A.   Correct.

16       Q.   And are there any other matters in

17   which you have worked as a fee examiner?

18       A.   I believe the report also discusses

19   my fee examinership in Velocity Holdings.

20       Q.   Are there any other, other than

21   those three?

22       A.   No.

23       Q.   In the Detroit matter, were you the

24   only fee examiner in the case?

25       A.   Yes.

Page 10

ROBERT M. FISHMAN (1/10/19)

1

2      Q.    And you were appointed by the

3  Bankruptcy Court?

4      A.    Judge Rhodes, yes.

5      Q.    And were you called upon in that

6  case to set any budget for any litigation

7  arising in that case?

8      A.    I was not.

9      Q.    Were you called upon in that case

10  to review any budget for any litigation --

11      A.    I was not.

12      Q.    -- arising in that case?

13           How is it that that case prepared

14  you in any way to be an expert in this one?

15      A.    Well, I reviewed tens of millions

16  of dollars of invoices for services rendered

17  in what I'll call, very broadly speaking,

18  comparable kinds of disputes.  And so I had

19  the opportunity to see what kind of lawyers

20  provided what kind of service in conjunction

21  with what other lawyers at their firms

22  provided similar services and how many people

23  they used to do X, Y and Z and what the cost

24  of those things were.  And I believe that we

25  reviewed approximately $175 million in

1          ROBERT M. FISHMAN (1/10/19)

2     invoices.  And so I believe that it gives me

3     some insight into the kind of costs that would

4     be associated with major projects conducted by

5     major firms in those kinds of cases.

6          Q.   You mentioned "comparable kinds of

7     disputes."  What were some of the comparable

8     disputes in the Detroit bankruptcy?

9          A.   Well, there were many, many

10    disputes in the Detroit bankruptcy case.

11    There were fights about revenue streams of

12    bonds.  There were fights about special

13    revenue streams versus general revenue

14    streams.  There were fights about the Detroit

15    art museum collection.  There were fights

16    about the water and sewer district bond.

17    There were fights about labor contracts.

18    There were renegotiations of labor contracts.

19    Those are the ones that come to my mind

20    quickly.

21          Q.   Were any of them state court

22    actions?

23          A.   No.

24          Q.   Were any of them matters involving

25    the rights and obligations of indenture

Page 12

ROBERT M. FISHMAN (1/10/19)

1
2      trustees?

3          A.   You know, I'm not sure.

4      Remembering that I am reviewing invoices and

5      not so much reviewing pleadings, I did look at

6      some pleadings, I'm just not -- I'm not

7      certain on whether there were any implications

8      for the rights of indenture trustees in those

9      cases.

10         Q.   What about your role in the

11     Petters' bankruptcy; how did that differ from

12     your role in Detroit?

13         A.   Well, that was a private

14     engagement.  That was not appointed by the

15     Court.  The Petters' plan was confirmed

16     sometime I think in 2016, if I remember

17     correctly.  A trustee, a post-confirmation

18     trustee and a post-confirmation advisory

19     committee were created under the plan.  I was

20     retained by them privately to be the -- I

21     think we may have called it a fee

22     administrator just to differentiate between a

23     Court-position and a non-Court-appointed

24     position to handle the professional fees for

25     the myriad of post-confirmation legal services

Page 13

ROBERT M. FISHMAN (1/10/19)

1

2   that the trustee and the advisory committee

3   were utilizing to finish their obligations

4   under the plan.

5        Q.   How did that engagement differ in

6   terms of your specific role in terms of

7   reviewing legal bills from the Detroit case?

8        A.   The context is a little different

9   because it wasn't a Court-appointed position.

10  So whatever authority, in quotes, you want to

11  say is attributable to a fee examiner because

12  of his appointment by the Court doesn't exist

13  in the Petters' case.

14            In the Detroit case, a very

15  intricate fee review order was drafted by me

16  and commented on by others and ultimately

17  entered by the Court, and so the fee review

18  process was a Court-imposed fee review

19  process.

20            In the Petters' case, I did the

21  same thing, which is to create a fee review

22  process.  That fee review process was

23  something that people had to voluntarily agree

24  to be bound by.  And of course the advisory

25  committee made it a condition of their

Page 14

1          ROBERT M. FISHMAN (1/10/19)

2    employment that they agreed to it.  So it

3    wasn't like it was really optional, but it

4    didn't have the force of a Court order.

5               Secondly, in the Petters'

6    situation, we used a slightly less formal

7    process, mostly because the formality required

8    by Title 9 of the Bankruptcy Code isn't

9    present in the Petters' case, and so many of

10   the bells and whistles that we needed in

11   Detroit were unnecessary in the Petters'

12   situation.

13        Q.   In the Detroit case, did you have

14   say over whether a particular fee entry by

15   counsel in that case was reasonable or not

16   reasonable?

17        A.   Yes.

18        Q.   And did the judge have some role in

19   that as well?

20        A.   Well, it's an interesting question.

21   Chapter 9 is a lot different than Chapter 11

22   in some very meaningful ways.  And some of

23   those really meaningful ways are the fact that

24   parties are not retained pursuant to Court

25   order.  Fees are not allowed pursuant to Court

Page 15

1                ROBERT M. FISHMAN (1/10/19)

2      order.  Fee applications are not filed.  And

3      so I'd say it's a somewhat unsettled area of

4      the law as to exactly what role a bankruptcy

5      judge in a Chapter 9 case can have with

6      respect to the approval of the fees of

7      professionals paid for by the estate.  And the

8      provision in Chapter 9 that gives the judge a

9      role in that issue is one that doesn't exist

10     in Chapter 11, and it's in the planned

11     confirmation part of the statute.  And it says

12     that one of the things that the Court has to

13     find in order to confirm plan is that the fees

14     are reasonable and had been publicly

15     disclosed.

16                And so the judge wasn't involved in

17     the operation of the fee review process at

18     all.  He just didn't have a role in it.  He

19     did ultimately find at the confirmation

20     hearing that the fees that were incurred were

21     reasonable, and that they had been publicly

22     disclosed.  I'm the one that did the public

23     disclosure of the fees by the filing of the

24     report that I did on a quarterly basis.

25                Q.   Did there come occasions that you

Page 16

1                 ROBERT M. FISHMAN (1/10/19)

2      found that fees were unreasonable?

3           A.   Well, I'd answer that question in

4      two ways.  There were many, many, many

5      occasions where I raised questions about the

6      invoices of the various professionals.  And

7      I -- the process was that I would send a

8      preliminary report to whichever professional

9      firm we're talking about and only to them in

10     which I would question whatever I found in

11     their invoice that I either needed clarifying

12     or that I felt might not be reasonable or that

13     I needed more explanation for in order to

14     understand why it was reasonable.

15               And so every single month we sent a

16     report to each of the professional firms, and

17     then we had a discussion period by virtue of

18     the Court order that followed that -- I want

19     to say it may have been 20 days, but I may not

20     be remembering correctly -- in which that

21     professional firm and I would discuss my

22     questions and their answers.  And in most

23     instances we were able to reach an

24     understanding of an appropriate adjustment.

25     Occasionally I was persuaded an adjustment

Page 17

ROBERT M. FISHMAN (1/10/19)

1
2   wasn't needed.  More times than not I
3   persuaded them that some adjustment was
4   needed.  And in only one circumstance did I
5   ever have to file a quarterly report which
6   said someone's fees were unreasonable for a
7   particular task.  And the one time that I
8   needed to do that, I did that and they called
9   me up and said let's not do that again.
10       Q.   When you would engage in that
11  process that you just described where you
12  would -- I'll be a bit colloquial here, but
13  where you would push back on the fees; you
14  understand what I mean by that?
15       A.   Yeah.
16       Q.   Where you would push back on the
17  fees contained in a legal invoice that you
18  were reviewing, what criteria did you use to
19  determine that the fees were excessive?
20       A.   Well, we created a list which maybe
21  had, I'm estimating, 15 criteria that we used
22  to review the fees and we assigned each one a
23  letter.  And when we went through the -- when
24  the invoices were submitted, they were
25  converted to Excel spreadsheets and we created

Page 18

1              ROBERT M. FISHMAN (1/10/19)

2    a column for fee examiner comments, and one or

3    more of those letters would go into a box in

4    which we questioned the fees on that line, and

5    then there would be a comment section out to

6    the right of that where we would try to

7    articulate with a little more detail what it

8    was about the particular entry that gave us

9    pause.  And then that Excel spreadsheet with

10   those letters and comments was what we would

11   send as the preliminary report.

12              So it could be all kinds of things.

13   It could be it's a duplicate entry.  It could

14   be you sent too many people to a deposition.

15   It could be you used a senior person to do a

16   junior person's work.  It could be lumping or

17   bundling, the kind of things that every

18   Chapter 11 lawyer likes to talk about.  It

19   could be an unreimbursable expense or an

20   excessive expense.  Like I said, there were at

21   least 15 things, and I really don't remember

22   the whole list off the top of my head, but I

23   would say that if you are looking at the list,

24   as an experienced Chapter 11 lawyer, you

25   wouldn't be surprised at the things that you

Page 19

                   ROBERT M. FISHMAN (1/10/19)

1

2    would see on the list.

3         Q.   So let me just pick out one of the

4    things you mentioned.

5         A.   Okay.

6         Q.   Staffing and senior lawyers doing

7    work that could be done by junior lawyers?

8         A.   Sure.

9         Q.   What is it about your experience

10   that allowed you to make that call, whether --

11   that there was some time entry and you

12   determined that that time entry should have

13   been -- or the work behind that time entry

14   should have been done by a junior lawyer as

15   opposed to the more senior lawyer?

16        A.   All right.  Let's use Jones Day as

17   an example.  They were the debtor's lawyers

18   and they incurred more fees than anyone else.

19   If David Hyman was reviewing documents for

20   privilege, that would probably be something

21   that I would question, why David Hyman would

22   need to be reviewing documents for privilege.

23   And I would suggest that there's likely not a

24   justification for having your most expensive

25   lawyer and your most senior lawyer reviewing

Page 20

1          ROBERT M. FISHMAN (1/10/19)

2    documents for privilege.  I would certainly

3    give them chance to explain to me why he

4    needed to do it instead of a $450 an hour most

5    junior associate.

6              So when it comes to going to

7    hearings, when it comes to creating reports,

8    when it comes to going to depositions or

9    attending mediations or whatever things you

10   can think of, I believe that I have a general

11   sense what staffing should look like for most

12   of these kinds of projects.  That doesn't mean

13   that a particular project doesn't justify more

14   top-heavy staffing or it doesn't justify even

15   less top-heavy staffing.  Sometimes from the

16   invoice itself you can't tell that, but that's

17   the point of raising the question and asking

18   for clarification.  Because if there's an

19   explanation as to why five lawyers needed to

20   attend a particular deposition or a particular

21   mediation, I might not be able to get that

22   simply from the invoice, and so I give them a

23   chance to explain to me why this particular

24   circumstance would justify greater

25   participation.

Page 21

ROBERT M. FISHMAN (1/10/19)

1

2     Q.   So there are some tasks -- and

3  correct me if I'm wrong, but there are some

4  tasks that are appropriate to be staffed with

5  a concentration of junior lawyers and there

6  are some tasks that law firms provide that are

7  appropriate to concentrate with senior

8  lawyers, right?

9     A.   Well, I can't disagree with that

10  general statement, no.

11     Q.   And so let's take a task like

12  document review.

13     A.   Um-hum.

14     Q.   That's a task that should be more

15  concentrated in terms of staffing at the

16  junior lawyer level, correct?

17     A.   Well, talking about a hypothetical,

18  document review of a hypothetical case, but my

19  instinct is that generally speaking that would

20  be true.  I certainly appreciate that there

21  might be circumstances in which that won't

22  necessarily be true, but that's -- that's the

23  point of the preliminary review.  And the

24  discussion is to give people a chance to

25  explain why what appears to be top-heavy

Page 22

1             ROBERT M. FISHMAN (1/10/19)

2   staffing isn't.  And sometimes the

3   explanations make sense to me and sometimes

4   they don't.

5        Q.   And there are other tasks like

6   appearing at a court hearing for argument

7   where you would expect to see a concentration

8   of more senior lawyers; is that fair?

9        A.   Yes, typically I would say that

10  would be the norm.

11       Q.   And so applying the same

12  concentration of junior lawyers to senior

13  lawyers across all tasks wouldn't fit within

14  the framework that we just outlined, right?

15       A.   Well, theoretically it might not be

16  appropriate.

17       Q.   Okay.  How -- tell me how you came

18  to be engaged for this project?

19       A.   This one here?

20       Q.   Yes.

21       A.   A Reed Smith lawyer called me and

22  explained the project to me and asked me if I

23  thought I was capable of expressing opinions

24  on the topic.  And after a couple of

25  back-and-forths, he and I decided that I could

1          ROBERT M. FISHMAN (1/10/19)

2     be an appropriate person to do that.

3          Q.    When was that contact made?

4          A.    The very first call came on

5     Thanksgiving weekend, but then I didn't hear

6     from anybody for a while or there was just

7     sort of modest general follow-up and the

8     real -- the real meat-and-potatoes discussions

9     didn't occur until the middle of December.

10    And I don't remember the exact dates.

11         Q.    Who was the Reed Smith lawyer who

12    contacted you?

13         A.    The first person that contacted me

14    was Eric Schaffer, who I've known for some

15    time.

16         Q.    That gets to where I was going.

17    How do you know Mr. Schaffer?

18         A.    From bankruptcy organizations over

19    the years.  I've never been in a case with

20    him, but National Conference of Bankruptcy

21    Judges, American Bankruptcy Institute,

22    American College of Bankruptcy, I've seen him

23    in those settings numerous times.

24         Q.    Have you socialized together?

25         A.    I have gone out to dinner with him

Page 24

1           ROBERT M. FISHMAN (1/10/19)

2    at such conferences a few times.  I have never

3    socialized with him in other respects.

4           Q.   Has he hired you as an expert

5    before?

6           A.   No.

7           Q.   Has Reed Smith hired you as an

8    expert before?

9           A.   No.

10          Q.   Has Reed Smith hired you for any

11   purpose before?

12          A.   I had a case referred to me by

13   Reed Smith five, six, seven years ago.

14          Q.   Was that by Mr. Schaffer?

15          A.   No, it was by Stephen Bobo in the

16   Chicago office who I've known for 30 years.

17          Q.   Okay.  What about The Bank of

18   New York, have you ever had an engagement for

19   The Bank of New York before?

20          A.   I don't believe so.

21          Q.   Have you ever appeared as counsel

22   for The Bank of New York?

23          A.   I don't believe so.  I can't speak

24   to whether anyone at my firm has, especially

25   since I'm at a new firm.  Frankly I don't even

Page 25

1                ROBERT M. FISHMAN (1/10/19)

2       know the answer to that question other than it

3       was cleared for conflicts.  But I personally

4       do not believe that I have represented The

5       Bank of New York.

6            Q.   And you've never done any work for

7       Ambac Assurance Corporation, right?

8            A.   I do not believe I have ever done

9       any work for him.

10           Q.   How about Whitebox Advisors?

11           A.   Until this case was presented to

12      me, I'm not sure I've even heard of them.

13           Q.   Okay.  Are you familiar with a

14      gentleman named Daniel Goldberg?

15           A.   I know him by name.

16           Q.   Have you met him in person?

17           A.   I met him in person once in line to

18      get sandwiches for lunch.

19           Q.   When was that?

20           A.   Yesterday.

21           Q.   Are you familiar with a report that

22      Mr. Goldberg has written in connection with

23      this matter?

24           A.   I am familiar with it.

25           Q.   That report is in front of you.  It

Page 26

1          ROBERT M. FISHMAN (1/10/19)

2     was marked earlier today.

3          A.   Right here?

4          Q.   You can refer to it if you need to,

5     I just want you to know it's there.

6          A.   Okay.

7          Q.   The other document that's there --

8     and his report is Goldberg 1.  The other

9     document that's there is Goldberg 2.

10         A.   Okay.

11         Q.   When was the -- I may have asked

12    you this, I'm sorry.  Have you ever spoken to

13    Mr. Goldberg on the phone?

14         A.   I have never spoke to him on the

15    phone.

16         Q.   Have you ever spoken to any of his

17    colleagues at his law firm on the phone?

18         A.   Not knowingly.

19         Q.   Have you ever met with any of his

20    colleagues from his law firm?

21         A.   I have not.

22         Q.   The report that is in front of you

23    at Goldberg 1, when was the first time that

24    you -- well, strike that.

25              The report that's in front of you

Page 27

1            ROBERT M. FISHMAN (1/10/19)

2     as Goldberg 1, you've seen it before?

3            A.   Yes.

4            Q.   When was the first time you saw it?

5            A.   Well, certainly it was in the

6     latter part of December.  I'm not sure that I

7     could tell you precisely what day.  I just

8     can't.  I guess I could look at e-mails and

9     figure it out if I needed to, but I don't know

10    the answer.  But it was in late December.

11           Q.   Do you understand the first time

12    you saw it that you were looking at a draft of

13    it?

14           A.   I believe I was looking at a draft,

15    yes.

16           Q.   Did you subsequently see later

17    drafts over time?

18           A.   Maybe.  Maybe one other one.  I

19    don't remember precisely.  Maybe one.

20           Q.   You mentioned that you saw

21    Mr. Goldberg yesterday in line for sandwiches?

22           A.   Yes.

23           Q.   Was that at or near the law firm of

24    Reed Smith?

25           A.   It was at the law firm of

Page 28

1              ROBERT M. FISHMAN (1/10/19)

2    Reed Smith.

3         Q.   Were you there to prepare for

4    today?

5         A.   I was.

6         Q.   Was it your understanding

7    Mr. Goldberg was there to prepare for today?

8         A.   It's my assumption he was.

9         Q.   Did you prepare together?

10        A.   We did not.

11        Q.   When was the last time you read

12   Mr. Goldberg's report?

13        A.   I looked at part of it earlier

14   today.

15        Q.   How would you characterize the

16   opinion that you've offered in this case?

17        A.   I'm not sure what you mean by that.

18        Q.   What is your expert opinion in this

19   case?

20        A.   Well, at a minimum, my expert

21   opinion is that the amount of money that

22   Mr. Goldberg has identified as an appropriate

23   holdback for the anticipated litigation, the

24   defining term that I think both he and I use,

25   is a reasonable holdback.

Page 29

ROBERT M. FISHMAN (1/10/19)

1

2      Q.   And what is that amount that

3   Mr. Goldberg estimates to be a reasonable

4   holdback?

5      A.   If I remember correctly, it's a

6   range between 25 million and 40 million with a

7   midpoint of 32 if my math is -- I know the

8   round numbers.  I don't remember the exact

9   numbers.

10     Q.   And describe for me as you

11  understand it the anticipated litigation.

12     A.   Well, I mean, I think in my report,

13  I set out what I think the topics are, I'm not

14  sure that I can recite them perfectly off the

15  top of my head, but it involves claims by

16  two -- I'll use the word "bondholders"

17  loosely, two bondholders alleging gross

18  negligence and/or willful misconduct and/or

19  fraud on the part of the Bank of New York as

20  trustee of the bonds.

21     Q.   What is the nature of the failing,

22  if you will, by the bank as alleged by the two

23  bondholders?

24     A.   Well, since the case isn't filed,

25  I'm not sure I can answer that question.

Page 30

1          ROBERT M. FISHMAN (1/10/19)

2      Q.   When you say "the case isn't

3   filed," what do you mean by that?

4      A.   Well, my understanding is that the

5   pending lawsuits, which I have at least looked

6   at, are not necessarily the cases that we're

7   talking about as the, quote/unquote,

8   anticipated litigation, and that therefore I

9   don't know what the allegations of the

10  anticipated litigation are going to be, what

11  the relief that's requested is going to be,

12  what the damages that are going to be

13  requested will be.

14     Q.   Have you read the Complaints that

15  were filed by Ambac and Whitebox, which are

16  the two bondholders that you're referring to?

17     A.   I certainly looked at them both.

18  They are fairly lengthy and I would not want

19  to say that I read them word for word, cover

20  for cover, but I did try to get a flavor for

21  what they were about.

22     Q.   When did you first read the

23  Complaints?

24     A.   Sometime in the latter half of

25  December.

Page 31

1          ROBERT M. FISHMAN (1/10/19)

2          Q.    Did you read the Complaints before

3    you prepared a report?

4          A.    Certainly.

5          Q.    And you reviewed Mr. Goldberg's

6    declaration before you prepared your report,

7    correct?

8          A.    I'm not sure that's 100 percent

9    accurate.   I think I probably was working on

10   the report already in anticipation of what I

11   thought Goldberg's report might say.   I didn't

12   write the parts that relied on his report

13   before I saw his report, but there were plenty

14   of parts of this that I could write without

15   his report, and so I'm certain I had started

16   those parts beforehand.   Wasn't much time

17   here.

18         Q.    Are you referring to the background

19   sections?

20         A.    And -- well, yeah, I guess I'm

21   probably referring to certainly Roman numerals

22   I, II and III of the table of contents in my

23   report.

24         Q.    When did you first hear or learn of

25   the estimated range that Mr. Goldberg was

Page 32

1              ROBERT M. FISHMAN (1/10/19)

2      going to offer of 25- to $40 million?

3          A.   Sometime in late December.  Like I

4      said, I can't recall what day that was.

5          Q.   And how long after you learned of

6      that range did you determine that that range

7      was reasonable?

8          A.   Ten days, a week, give or take.  I

9      don't know.  It could have been a little more,

10     it could've been a little less.  Those days

11     all sort of seem the same to me right now.

12         Q.   And what did you do in that week or

13     ten days to get yourself comfortable that the

14     range that Mr. Goldberg offered was

15     reasonable?  And please be as specific as you

16     can.

17         A.   Well, the main thing I did was read

18     his report and his exhibits very carefully

19     because I was asked to assume that what he

20     provided was -- were the facts.  That was an

21     assumption that I was asked to make.  And so I

22     read them in order to understand the

23     assumption because I couldn't express an

24     opinion about the assumption if I didn't

25     understand it.

Page 33

ROBERT M. FISHMAN (1/10/19)

1

2      Q.   Do you now feel that you understand

3  Mr. Goldberg's assumptions?

4      A.   I think I understand them fairly

5  well, yes.

6      Q.   Okay.  Mr. Goldberg makes an

7  assumption that the blended billing rate for

8  the attorneys that are going to represent The

9  Bank of New York and the anticipated

10  litigations is -- well, let me ask you, do you

11  recall what the blended rate is?

12      A.   Well, there were two blended rates

13  in his report.  One was the simple, add up the

14  lawyers, add up the rates, divide by the

15  number of lawyers.  And the second one was the

16  weighted blended rate where he lowered the

17  rate to account for more work by junior people

18  and less work by senior people.  If I remember

19  correctly, the average number was 895, and the

20  weighted number was 800.  That's what I

21  remember.

22      Q.   And how did he arrive at the

23  weighted figure?

24      A.   I don't know what adjustment he

25  made specifically in calculating the amount of

Page 34

ROBERT M. FISHMAN (1/10/19)

1   time the junior people would spend versus the

2   senior people, other than the extent to which

3   if I engaged in a detailed mathematical

4   analysis of his exhibits, I might be able to

5   figure that out, but I was told to take those

6   things as assumptions, and so I didn't try to

7   deconstruct his number.

8          Q.   Well, you would agree with me that

9   built into the weighting are some assumptions

10  about how many hours are going to be devoted

11  to a particular task by junior people versus

12  senior people, correct?

13         A.   Yes, I think that's in his

14  exhibits.

15         Q.   And did you make any finding as to

16  the reasonableness of that weighting?

17         A.    I did because I looked at those

18  exhibits, I read them very carefully line by

19  line.  And I -- again, trying to apply them to

20  what I consider to be a hypothetical lawsuit

21  is a little bit complicated, but I thought

22  based on the assumptions that I was asked to

23  make about what that anticipated litigation

24  would look like and would involve, I found

Page 35

ROBERT M. FISHMAN (1/10/19)

1

2    that the range of numbers that he put forth

3    was reasonable.

4         Q.   But, again, you don't know --

5    correct me if I'm wrong.  You don't know how

6    the blended rate was arrived at mathematically

7    in terms of weighting between junior lawyers

8    and senior lawyers?

9         A.   I did not do the math to figure out

10   what adjustment he made specifically.  I know

11   it's a $95 an hour adjustment and I'm not sure

12   what weights he moved where in order to come

13   up with that.

14        Q.   Do you know whether he changed that

15   weighting for a particular task so that a

16   document review task, for example, would have

17   a different weighting than an argument in

18   court might have?

19        A.   I believe on some of the tasks in

20   his exhibit he specifically referenced --

21   let's just call them less expensive lawyers to

22   do certain document and privilege review

23   stuff, I think they were $350 an hour people,

24   which would, by definition, sort of bring that

25   weighted average down for those particular

Page 36

ROBERT M. FISHMAN (1/10/19)

1  projects.

3       Q.   But other than that one example of

4  document review where there's a separate cost

5  associated with the document review team, is

6  there any other task where the weighting on

7  the blended rate has changed from one task to

8  another task?

9       A.   I think the answer is no.

10      Q.   Let's take a look at the

11  spreadsheet that has been marked as Goldberg 2

12  in front of you.  And I'll represent to you

13  that's Exhibit D to the Goldberg declaration.

14      A.   There's two sides.  I was going to

15  say it's a two-page thing I thought.

16      Q.   Let's take the first item on the

17  spreadsheet.

18      A.   Okay.

19      Q.   So the first column has a dollar

20  figure for the lower end of Mr. Goldberg's

21  reasonable estimate, correct?

22      A.   Yes.

23      Q.   And the second column is the number

24  of hours estimated for that task, correct?

25      A.   Yes.

Page 37

ROBERT M. FISHMAN (1/10/19)

1

2    Q.   And if you look at the next column

3  over, which is "Explanation," Mr. Goldberg has

4  inserted some explanation for how he's arrived

5  at these numbers; is that right?

6    A.   It's how he arrived at the number

7  of hours, yes.

8    Q.   And if you look at -- for the first

9  row, which is "Fact Investigation,"

10 Mr. Goldberg explains that there are going to

11 be three associates and two partners working

12 on fact examination, right?

13   A.   That is what it says.

14   Q.   And he estimates that those

15 lawyers, those five lawyers total, are going

16 to be work 150 hours per month, correct?

17   A.   That's what it says.

18   Q.   For one month?

19   A.   Um-hum.

20   Q.   And he arrives at a lower estimate

21 of lawyers at 750 by multiplying the five

22 lawyers times 150 hours per month, right?

23   A.   That is what I understood it to

24 mean.

25   Q.   And then he multiplies the

Page 38

ROBERT M. FISHMAN (1/10/19)

1   750 hours times the blended rate of 800 to

2   arrive at the $600,000 lower reasonable

3   estimate; is that right?

4       A.   I think that's correct.

5       Q.   That same formula in terms of

6   multiplying the number of lawyers times the

7   number of hours is carried forward on the next

8   line, which is "Analysis and strategy" on

9   "motion to dismiss," which is the fourth or

10  fifth row down; do you see all that?

11      A.   Um-hum.

12      Q.   So you'd agree with me that on

13  those tasks, the blended rate of $800 an hour

14  is being used regardless of whether the tasks

15  are being accomplished by partners and

16  associates?

17      A.   Well, I can't say that I went

18  through and did the math on each line item to

19  have a factual opinion that what you just said

20  is correct, but it seems to be that's what

21  he's doing, yes.

22      Q.   Without having done the math, as

23  I've just done it, how did you determine that

24  these entries were reasonable?

Page 39

ROBERT M. FISHMAN (1/10/19)

1

2      A.   It was my understanding that he was

3  creating the number of hours by saying how

4  he's going to staff it and multiplying it by

5  the blended rate, which was apparently the way

6  he chose to take into account the

7  junior/senior ratio, and I went through and

8  looked at these numbers.  And I can't say that

9  in each instance I took out my calculator and

10  determined that he did the math correctly, but

11  that was my understanding of how he was doing

12  it.  So if there's a math error in here,

13  then -- if it was brought to my attention, I

14  could comment on it.

15      Q.   The blended rate of 800, that could

16  be -- if I represented to you that that was a

17  one-to-one ratio of associates to partners,

18  would that be reasonable to you?

19      A.   I would have to be persuaded that

20  in those instances the work was appropriately

21  divided on a -- basically on a 50/50 basis for

22  me to conclude that it was reasonable.

23      Q.   And if it was 67/33, same answer,

24  you'd have to look at it?

25      A.   Well, in order to express an

Page 40

1          ROBERT M. FISHMAN (1/10/19)

2  opinion about any particular ratio, I'd have

3  to look at it, but my level of skepticism

4  might rise as the ratio was tilted more in

5  favor of senior and less in favor of junior,

6  but then certain projects might justify that

7  and certain other ones might not.  And so the

8  particular project would bear on how I would

9  feel about it as well.

10         Q.   And you haven't done that work on a

11 project-by-project basis in this case?

12         A.   I have not because I was asked to

13 assume that these were the facts.

14         Q.   Okay.  Do you have any knowledge

15 one way or the other as to whether The Bank of

16 New York has already engaged in some fact

17 investigation in connection with the

18 anticipated litigations?

19         A.   I have -- I can only presume that

20 they have done some because the case has been

21 ongoing, but I can't help you with explaining

22 the level of it, I don't know.

23         Q.   Well, how do you determine how much

24 time for fact investigation is reasonable when

25 you don't know how much institutional

Page 41

1          ROBERT M. FISHMAN (1/10/19)

2    knowledge the lawyers representing The Bank of

3    New York already have on this case?

4          A.   I'll give you two answers.  One,

5    Mr. Goldberg tells me that he took it into

6    account.  Number two, without having an actual

7    complaint to look at, I wouldn't -- I'm not

8    entirely sure what to say about it because

9    it's hypothetical.  So the reasonableness test

10   is not here about the actuality of this.  It's

11   about whether it's hypothetically reasonable

12   because that's all we have.

13             So, for instance, the extent to

14   which a new complaint, if there is a new

15   complaint, because I don't even know if there

16   will be one, the extent to which a new

17   complaint raises lots of issues that are not

18   raised in the original complaint, that would

19   certainly impact my thinking.  I don't have a

20   new complaint to look at.

21        Q.   You said in your last answer that

22   Mr. Goldberg tells me that he took it into

23   account?

24        A.   I believe it's in his report in a

25   couple of places.

Page 42

1          ROBERT M. FISHMAN (1/10/19)

2          Q.    What did he take into account?

3          A.    The benefit of the learning curve

4    that people who had already been working on

5    the case would have.

6          Q.    You relied on Mr. Goldberg to make

7    that assessment; is that correct?

8          A.    I did.

9          Q.    You did not take it upon yourself

10   to make any assessment as to how much work had

11   already been done by the lawyers representing

12   Bank of New York over the last two and a half

13   years?

14         A.    I was not asked to do that and I

15   did not do that.

16         Q.    Mr. Goldberg says in his report in

17   paragraph 39 if you want to take a look at it.

18         A.    Okay.

19         Q.    In the second sentence he says "The

20   anticipated litigation is reasonably viewed as

21   a serious threat to the core of the corporate

22   trust business.  The issues" --

23         A.    Yes.

24         Q.    "The issues raised in the

25   anticipated litigation appear to be wide

Page 43

1              ROBERT M. FISHMAN (1/10/19)

2    ranging and consequential."  Do you see that?

3         A.   I do.

4         Q.   Is that consistent with your

5    understanding of the seriousness of how Bank

6    of New York views this case or views the

7    anticipated litigations?

8         A.   Yes.

9         Q.   And it's your understanding that

10   the complaints filed by Ambac and Whitebox

11   against The Bank of New York have been pending

12   since sometime in 2017, correct?

13        A.   I believe that's right.

14        Q.   Would you also agree with me that

15   where a litigation -- where litigation is

16   filed against The Bank of New York and that

17   litigation is as serious as Mr. Goldberg says

18   it is and as you have agreed, that there would

19   be a significant amount of work from the day

20   the action is filed to start looking at it

21   very carefully, evaluating defenses, doing

22   case assessment, doing it legal research,

23   et cetera?

24        A.   These sentences are about the

25   anticipated litigation, which he doesn't know

Page 44

1            ROBERT M. FISHMAN (1/10/19)

2    exactly what that's going to be, and I don't

3    know exactly what that's going to be.  How

4    much work they did on the existing litigation

5    and of how much benefit it will be with

6    respect to the anticipated litigation can't

7    really be answered factually.  I don't know

8    whether it's going to be largely the same

9    allegations or substantively different

10   allegations.  And therefore all I was agreeing

11   with was his analysis of the anticipated

12   litigation.  He didn't opine on, as near as I

13   could tell, and I wasn't asked to opine on

14   what was done by The Bank of New York in the

15   existing litigation.

16         Q.   What is your understanding of how

17   the existing litigation differs from the

18   anticipated litigation?

19         A.   Well, I'm not sure how to describe

20   how it will differ from anticipated litigation

21   because I can't see what the anticipated

22   litigation's actually going to be.  But my

23   understanding is there are -- there's a line

24   drawn by the confirmation of the plan, which

25   will release and eliminate certain kinds of

Page 45

1              ROBERT M. FISHMAN (1/10/19)

2    claims and leave open for future disposition

3    certain other kinds of claims.  And the

4    anticipated litigation, as I understand it,

5    will be about those claims on the remaining

6    side of the line and won't have anything to do

7    with -- although I say that very loosely

8    because there may be similar facts, I don't

9    know, there may be similar conduct for those

10   claims that are being released by virtue of

11   confirmation on the plan.

12        Q.   What kinds of claims were left open

13   for future disposition; that's a quote from

14   your answer?

15        A.   I think they're described as gross

16   negligence, willful misconduct and fraud, if I

17   remember correctly.

18        Q.   And what kind of claims are barred

19   by the plan?

20        A.   I'm not sure I remember the list as

21   well as I do the ones that are going to be

22   part of the anticipated litigation, but it's

23   breach of contract, breach of fiduciary duty,

24   negligence.  That's what I remember

25   specifically.

Page 46

1          ROBERT M. FISHMAN (1/10/19)

2          Q.   Let's take a look at paragraph 28

3     of your declaration.

4          A.   Okay.

5          Q.   About six, seven lines down,

6     there's a sentence that begins "Ambac alleges

7     that BNYM is liable for failing to recognize

8     events of default and failing to accelerate

9     the senior bonds.  Ambac asserts six causes of

10    action for breach of fiduciary duty, breach of

11    contract, breach of the implied covenant,

12    gross negligence/breach of trust, declaratory

13    judgment and injunctive relief.  Ambac alleges

14    that BNYM's conduct has caused Ambac to suffer

15    millions of dollars in damages."  Did I read

16    that correctly?

17         A.   You did.

18         Q.   And one of those causes of action

19    that I just read, as you describe them in your

20    report, is for gross negligence, correct?

21         A.   Correct.

22         Q.   And gross negligence, as you

23    acknowledge, is a claim that survives the

24    plan, correct?

25         A.   Yes.

Page 47

ROBERT M. FISHMAN (1/10/19)

1

2      Q.   You understand that the anticipated

3  litigation includes Ambac's claim for gross

4  negligence, right?

5      A.   I understand that the

6  anticipated -- the anticipated litigation

7  might include claims for gross negligence,

8  yes.

9      Q.   So the gross negligence allegation

10  that was filed in 2017 by Ambac and that

11  Mr. Goldberg says is a threat to the core of

12  the indenture business, correct?

13          MR. SOLOMON:  Object to the form

14      of the question.

15      A.   I think his reference to a threat

16  to the core of the business is a broader

17  reference that incorporates more than just

18  gross negligence.

19      Q.   But it includes the gross

20  negligence claim, correct?

21      A.   I believe it includes it, yes.

22      Q.   And so back to where we started a

23  few minutes ago, would you agree with me that

24  as soon as the Complaint was filed alleging

25  gross negligence, that Bank of New York would

Page 48

1            ROBERT M. FISHMAN (1/10/19)

2    start doing fact assessment and legal research

3    and developing its defense right away?

4            A.   I would agree that it is likely

5    that they would do some of that, yes.

6            Q.   And when you reviewed the estimated

7    fees laid out by Mr. Goldberg, did you

8    incorporate into what was reasonable or not

9    reasonable any accounting for the prior work

10   that was done?

11           A.   I don't know what the prior work

12   that was done is.

13           Q.   Did you ask anyone?

14           A.   I did not.

15           Q.   Do you have an understanding one

16   way or the other of what Reed Smith's fee

17   arrangement is with The Bank of New York?

18           A.   I really don't know what it is.

19           Q.   And you haven't asked anyone?

20           A.   I have not asked anyone.

21           Q.   Do you know whether Reed Smith

22   presented Bank of New York with a budget for

23   the defense of the anticipated litigation?

24           A.   I do not know that.

25           Q.   Have you asked for it?

Page 49

ROBERT M. FISHMAN (1/10/19)

1

2      A.   No.

3      Q.   If Reed Smith had actually prepared

4  and presented to The Bank of New York a budget

5  for the anticipated litigation, would you

6  consider that to be a more realistic predictor

7  of the actual legal fees to be incurred than

8  the hypothetical estimate in the Goldberg

9  declaration?

10     A.   I guess in order to answer that I'd

11 have to see the budget that they prepared in

12 order to determine if it was more or less

13 reasonable.

14     Q.   Are you aware of any distinction

15 made by Mr. Goldberg between the Ambac side of

16 the anticipated litigation versus the Whitebox

17 side?

18     A.   I am not recalling any significant

19 difference.

20     Q.   So is it your understanding that

21 if -- let's just say hypothetically that

22 Whitebox would settle out tomorrow and only

23 the Ambac litigation was going forward -- you

24 following me through that hypothetical?  How

25 would Mr. Goldberg's estimates change?

Page 50

ROBERT M. FISHMAN (1/10/19)

1

2      A.    Well, I'm not sure I can tell you

3  how Mr. Goldberg would change his estimates.

4  He'd have to tell you that.

5      Q.    Would the assessment of the

6  reasonableness of his assessments change if

7  that were the case?

8      A.    Well, I would assume that he would

9  provide me with new material based on the

10  changed circumstances, which either would

11  change his adjustment -- change his assessment

12  or wouldn't, and that at the time I would read

13  what he proposed and I would be able to react

14  to whether it changed my view of the

15  reasonableness of his assessment.

16      Q.    If there were one plaintiff versus

17  two, would you expect that to change the

18  estimates in the Goldberg report?

19      A.    You know, I'm not sure because

20  claims that are extremely similar are made by

21  one party versus that are made by two parties,

22  I'm not sure how much that changes the fire

23  drill.  It might change it somewhat because if

24  party A is not asserting claims, then

25  certainly there's some -- some discovery that

Page 51

ROBERT M. FISHMAN (1/10/19)

1  wouldn't need to be done because party A isn't

2  involved anymore.  But the underlying proof of

3  the issues might still implicate party A and

4  its behavior and its allegations at the time,

5  and so it's also possible that it would

6  largely be unchanged.

7          But then I don't have the benefit

8  of saying party A's anticipated litigation or

9  party B's anticipated litigation, and so I

10  don't know how similar they are or how unique

11  they are.

12      Q.  Mr. Goldberg estimates a range of

13  25- to $40 million for the anticipated

14  litigations, correct?

15      A.  That's what I recall.

16      Q.  If his estimate had been 25- to

17  50 million instead of 25 to 40, such that the

18  upper range of his estimate had been increased

19  by that proportionate amount, would you have

20  found that to be reasonable?

21      A.  Well, I don't think I can really

22  answer your question.

23      Q.  Why not?

24      A.  I'll tell you.  He provides on

Page 52

ROBERT M. FISHMAN (1/10/19)

1

2  his -- I guess it's Goldberg Exhibit 2 an

3  explanation of what adjustment he made to go

4  from the lower estimate to the higher

5  estimate.  If he raised his estimate by

6  $10 million, I presume he would provide me

7  with an explanation of why he chose that

8  larger number.  And then when I read that

9  explanation I would be in a position to say

10  that makes sense to me or that doesn't make

11  sense to me.

12      Q.   Okay.  Let's take it on a line item

13  basis.  Let's look, again, at fact

14  investigation, which is the first line.

15  Explain to me, as you understand it, the

16  difference between the low end and the high

17  end of that estimate.

18      A.   Just appears to be a longer period

19  of time.

20      Q.   What is the difference between the

21  two periods of time?

22      A.   One month to two months, I believe.

23      Q.   So if the high end hadn't been two

24  months, but two and a half months, would you

25  have found that to be reasonable?

Page 53

1          ROBERT M. FISHMAN (1/10/19)

2          A.   I'm not sure.  I certainly would

3    accept the notion that as the number gets

4    bigger, the likelihood that I question it gets

5    higher, but that's without the benefit of any

6    explanation.  And an important -- to me, an

7    important part of the reasonableness of a

8    budget is the extent to which it controls the

9    ultimate amount of fees that are paid.  And so

10   if we were talking about a budget which once

11   established meant you'd get paid that amount,

12   then the budget is a more important factor in

13   the consideration.

14             But if the fees that are ultimately

15   going to be earned are themselves going to be

16   subject to not a pre-performance hypothetical

17   analysis, but a post-performance actual

18   analysis and you sort of have a fail safe in

19   the sense that if you took two and a half or

20   three months to do that investigation and you

21   couldn't explain why you needed to do that,

22   then that might cause me to find those actual

23   services to be unreasonable.  It's a lot

24   harder to talk about what's an unreasonable

25   amount of time to investigate a hypothetical

Page 54

1           ROBERT M. FISHMAN (1/10/19)

2    complaint because I don't know what it says.

3    And that makes it a much more challenging

4    prospect.

5        Q.   Well, you do know to some extent

6    what it says, right, because the Complaint

7    that you reviewed alleges gross negligence and

8    the complaint that will be filed in the

9    anticipated litigation will also allege gross

10   negligence, right?

11       A.   Well, if you're telling me that the

12   new complaint is going to say the same thing

13   that the old one did and nothing more, that

14   would help me with that issue.  If you're

15   telling me that the new complaint will include

16   something that was in the old complaint, but

17   might or will have all kinds of other things

18   in it, that becomes, to me, a much less

19   important question you've asked.

20       Q.   So if you don't know what the new

21   complaint is going to say, how do you

22   determine if anything is going to be

23   reasonable or unreasonable?

24       A.   Well, it's difficult, but what I

25   was asked to do was not figure that out for

Page 55

1                ROBERT M. FISHMAN (1/10/19)

2      myself, but take what Mr. Goldberg told me was

3      going to be the likely contents of that

4      complaint and the likely staffing in order to

5      address that complaint and determine if his

6      assessment was reasonable.

7                So I'm not actually making an

8      assessment of the anticipated complaint

9      because I don't know what it's going to say.

10     I'm making an assessment of his assessment of

11     that complaint.  And I thought -- I thought

12     that he gave a thorough analysis of why he

13     reached the conclusions that he did.  People

14     could disagree with it.  I didn't particularly

15     disagree with it.

16          Q.   Your assessment of reasonableness

17     is based on the description given to you by

18     Mr. Goldberg of the anticipated litigation?

19          A.   Yes, that's what I was asked to do.

20          Q.   What was that description?

21          A.   Well, I think I lay it out.  It --

22     the anticipated litigation description that he

23     gave me was about what services would be

24     likely used to respond to the Complaint and

25     the various component parts of it and who

Page 56

1              ROBERT M. FISHMAN (1/10/19)

2    would perform the services and how much they

3    would charge.

4              And he didn't so much tell me what

5    the anticipated litigation complaint was going

6    to say because I don't -- I doubt if he knows.

7    I certainly don't know what the allegations of

8    that anticipated complaint are going to be, so

9    we're all hamstrung by dealing with a

10   hypothetical set of claims.  No one -- you

11   guys maybe, but nobody reading pieces of paper

12   that are available to the public knows what

13   this subsequent complaint is going to say.  We

14   might be able to guess, but we don't know.

15        Q.   Again, I don't mean to argue with

16   you, but I'm struggling with what anchors you

17   to any assessment to reasonableness when

18   there's an entire universe of possibility in

19   terms of what could be in the anticipated

20   litigation?  What anchors you to some

21   assessment of reasonableness?

22        A.   Well, I'm not sure there's an

23   entire universe.  We know the three things

24   that survived the confirmation on the plan.

25   Mr. Goldberg has made an assessment based on

Page 57

ROBERT M. FISHMAN (1/10/19)

1

2   his extensive experience in handling what I'll

3   call comparable cases about what he thinks it

4   likely could cost to deal with these kinds of

5   issues.  And I was asked to rely on that.  And

6   so rather than substitute my judgment for his

7   about an area that he has more expertise than

8   I do, I relied on his assessment and looked at

9   it and said this appears to be reasonable

10  based on what we know.

11       Q.   Okay.  So within the parameters of

12  Mr. Goldberg's assumptions, which have been

13  adopted by you, and we look at the -- the

14  amount of time Mr. Goldberg estimates for a

15  fact investigation, which is the first row on

16  Goldberg Exhibit 2, and Goldberg says the low

17  end of the range is 750 hours, which is what

18  he says is one month of work.  The high end of

19  the range is 1500 hours, which he says is two

20  months of work.  It's double.  It could be one

21  month, it could be two, right?

22       A.   Yeah.

23       Q.   Okay.  And I'm saying if Goldberg

24  had written that it might be one month, might

25  be two and a half months, would you deem that

Page 58

1          ROBERT M. FISHMAN (1/10/19)

2   reasonable?

3          A.   All I can say is I might because

4   I'd have to -- I'd have to look at the rest of

5   the budget.  If that's the only thing that

6   changed, it might not affect my opinion very

7   much.  If every single thing moved like that,

8   it might start to cause me to -- to question

9   it.  So you've pick one line item and you've

10  moved it up a few dollars in a 25- to

11  $40 million thing, so maybe you've caused it

12  to now be 25.5 to 40.5, I don't know how

13  excited I'd get about that.

14          When you asked me about going from

15  40 to 50, I said I'd have to read his

16  justification for that additional time before

17  I could decide if I thought it was reasonable

18  or not.

19          Q.   Let's go down a line.  This is for

20  "Analysis and strategy."  You see that?

21          A.   I do.

22          Q.   The low end of the range is 360

23  hours, which he estimates is six lawyers

24  working two weeks?

25          A.   I don't think that's what that

Page 59

1              ROBERT M. FISHMAN (1/10/19)

2      says.

3              Q.   You're right.   Three partners

4      working one week and three associates working

5      two weeks?

6              A.   I believe that's what it says.

7              Q.   Okay.   And the high range is three

8      partners working two weeks and three

9      associates working three weeks, right?

10             A.   Right.

11             Q.   And if the three associates had

12     instead of in the high range been estimated to

13     work three weeks, but four, how would you make

14     a determination as to whether that's

15     reasonable?  What methodology would you use to

16     determine whether that's reasonable?

17             A.   You know, there's no science to the

18     way you do this.  I would not -- I would not

19     propose to you that there is science where you

20     can look at something and you can say this is

21     reasonable and this is unreasonable by

22     definition.  It is how does it appear in the

23     overall context of the discussion.  And there

24     is no point where it is by definition no

25     longer reasonable.  And it's just a matter of

Page 60

1              ROBERT M. FISHMAN (1/10/19)

2    using your experience to try to recognize

3    something that doesn't make sense to you.

4         Q.   Okay.  What you just said, that's

5    true on the low end of the range as well,

6    right?

7         A.   I suspect it is because it's still

8    just an assessment of hypothetical litigation.

9         Q.   Let's look at paragraph 5 of your

10   declaration.

11        A.   Yep.

12        Q.   You say here that "One of the

13   principal unresolved issues and the issue that

14   this report will address is the amount of

15   funds that the trustee is entitled to

16   reserve" -- and you define that as, quote,

17   "reserve funds," end quote -- "from funds

18   otherwise distributable to beneficial holders

19   of the bonds."  Did I read that correctly?

20        A.   I believe you did.

21        Q.   Is it your understanding that a

22   holdback from distribution is the only method

23   of providing security to The Bank of New York

24   in this case?

25        A.   It is my understanding that 19.5

Page 61

ROBERT M. FISHMAN (1/10/19)

1   provides for the possibility of at least two

2   approaches.

3       Q.   Okay.  What's the second one?

4       A.   I don't have it in front of me to

5   be precise, but I think it's the posting of a

6   bond or other collateral.

7       Q.   And if a bond is posted for the

8   benefit of Bank of New York, would you still

9   hold to your assessment that -- withdrawn.

10  Strike that.

11          Your report does not contemplate

12  the posting of a bond, correct?

13      A.   I don't specifically mention that,

14  no.

15      Q.   Is there any particular reason why

16  you ignored that facet of Section 19.5?

17          MR. WELCH:  Object to the form.

18      A.   I guess I viewed the topic as being

19  more about the amount and less about the

20  vehicle.  And because no particular bond

21  proposal was put forth for me to look at, I

22  didn't really have anything to say about that

23  whereas the reserve fund, I could understand

24  what was being contemplated.  You take money

Page 62

1              ROBERT M. FISHMAN (1/10/19)

2    and you put in a basket and you hold it, and

3    so I understand that.  I think the math

4    applies similarly, probably identically, in

5    both contexts, the value piece.

6          Q.   In paragraph 38 of your

7    declaration, you say "The reserve fund needs

8    to have an amount in it that will cover all of

9    the potential costs to BNYM from the

10   anticipated litigation."

11         A.   I'm trying to find that.

12         Q.   That's about ten lines down.

13         A.   Got it.  I don't know why I was

14   being so obtuse, but I found it.

15         Q.   Okay.  If the Plaintiffs or one of

16   them in the anticipated litigation were to

17   bond as opposed to have the security provided

18   to Bank of New York through a holdback, but

19   were to bond successive stages of litigation,

20   all right, you would agree with me that the

21   bond required at the beginning of the case

22   would not need to cover all of the potential

23   costs of the Bank of New York over the course

24   of the litigation?

25         A.   I'm not sure just exactly what I

Page 63

1          ROBERT M. FISHMAN (1/10/19)

2    would agree with.  There were a lot of parts

3    to that question.  If you want me to express

4    an opinion about how a bond might fit into

5    this story, I would need to know everything

6    about that bond.  I would need to know who's

7    posting it, what's it posted for, what does it

8    take to get it, what conditions are there, how

9    long does it last.  I mean, there's a lot of

10   questions that I would have before I would be

11   able to say this bond is just like cash.

12        Q.   And if it were a cash bond, how

13   would that change your answer?

14        A.   Again, I'd need to read the

15   document that governs access to it because

16   there are bonds that you get by touching a

17   button and there are bonds you get by engaging

18   in a fight with somebody over whether you're

19   entitled to it or not.  And the two are not in

20   my mind identical in any way.

21          MR. HERTZBERG:  We've been going a

22        little over an hour.  Let's take a

23        break.

24          (Whereupon, at this time, a short

25        break was taken.)

Page 64

1          ROBERT M. FISHMAN (1/10/19)

2     BY MR. HERTZBERG:

3          Q.   Mr. Fishman, let me call your

4     attention, please, to Goldberg Exhibit 2 and

5     specifically to the line item relating to the

6     motion to dismiss.

7          A.   Okay.

8          Q.   You reviewed that line item,

9     correct?

10         A.   I did.

11         Q.   And you deemed it reasonable?

12         A.   I did.

13         Q.   And in the "Explanation" section,

14    Mr. Goldberg explains that he would, for the

15    briefing, estimate 450 associate hours.  Do

16    you see that?

17         A.   I see that.

18         Q.   Do you have any sense of the

19    methodology behind how Mr. Goldberg arrived at

20    that number?

21         A.   No.

22         Q.   I'll represent to you that earlier

23    today Mr. Goldberg testified he initially

24    estimated that number to be 480 hours, but he

25    knocked 30 hours off for a particular reason.

Page 65

1          ROBERT M. FISHMAN (1/10/19)

2     Is this the first time you're hearing that?

3          A.   Yes.

4          Q.   Mr. Goldberg never told you that he

5     knocked 30 hours off of that number?

6          A.   I never talked to Mr. Goldberg.

7          Q.   Did anybody ever tell you that he

8     knocked 30 hours off?

9          A.   No.

10         Q.   Do you know why he knocked 30 hours

11    off?

12         A.   No.

13         Q.   I want to ask you some questions

14    about the prior litigation that has already

15    taken place between Ambac and Whitebox, on the

16    one hand, and The Bank of New York on the

17    other.

18         A.   Okay.

19         Q.   Are you aware that there has been

20    litigation between the parties relating to the

21    matters that bring us here today?

22         A.   Yes.

23         Q.   And what have you reviewed from the

24    Court filings in connection with that

25    litigation?

Page 66

1          ROBERT M. FISHMAN (1/10/19)

2          A.    I looked at the Whitebox complaint.

3    I looked at the Ambac complaint.  And I looked

4    at the interpleader action.

5          Q.    When you say you looked at the

6    interpleader action, did you look at the

7    interpleader complaint?

8          A.    Yes, I'm sorry, the interpleader

9    complaint.  That's what I meant to say.

10         Q.    The complaint filed by The Bank of

11   New York?

12         A.    Right.

13         Q.    And are you aware whether there's

14   been any motion practice in the context of the

15   interpleader action?

16         A.    I believe there's been some.  I'm

17   not sure I can be pre- -- off the top of my

18   head I don't know that I could be precise

19   about exactly what it was.

20         Q.    Are you aware there were summary

21   judgment motions filed?

22         A.    Yes, I am aware of that.

23         Q.    Did you review the summary judgment

24   papers?

25         A.    I did not.

Page 67

1          ROBERT M. FISHMAN (1/10/19)

2          Q.   Are you aware that there was

3    discovery among the parties?

4          A.   I'm aware that there was some

5    discovery, yes.

6          Q.   Are you aware of the volume of the

7    discovery?

8          A.   No.

9          Q.   Are you aware of whether Bank of

10   New York made requests for production to

11   various parties?

12         A.   I believe they did, but I couldn't

13   be specific about to whom or for what.

14         Q.   Did you review those requests for

15   production?

16         A.   I did not.

17         Q.   Are you aware of whether The Bank

18   of New York responded to requests for

19   production from various parties including

20   Ambac?

21         A.   I'm not specifically aware one way

22   or the other.

23         Q.   Are you aware of whether Bank of

24   New York internally collected documents for

25   the review of its counsel?

Page 68

1          ROBERT M. FISHMAN (1/10/19)

2          A.    I don't know.

3          Q.    Are you aware of whether Bank of

4     New York produced documents to other parties?

5          A.    I'm not certain.

6          Q.    Are you aware of how much time Bank

7     of New York and its counsel spent reviewing

8     document productions made by parties in the

9     interpleader action?

10         A.    No.

11         Q.    Are you aware of whether Bank of

12    New York performed some case assessment with

13    respect to the Ambac and Whitebox complaints?

14         A.    I'm not specifically aware,

15    although I assume they did.

16         Q.    Are you aware of how many hours

17    were spent by Reed Smith in connection with

18    that case assessment?

19         A.    No.

20         Q.    Are you aware of whether Reed Smith

21    has identified legal defense on behalf of the

22    Bank of New York in connection with the events

23    of default alleged by Ambac and Whitebox?

24         A.    I'm not specifically aware, no.

25         Q.    Are you aware of how many hours

Page 69

1              ROBERT M. FISHMAN (1/10/19)

2      were spent by Reed Smith in the identification

3      and development of those legal defense?

4              A.   No.

5              Q.   Are you aware of how many hours

6      were spent by Reed Smith in the drafting of

7      summary judgment papers?

8              A.   No.

9              Q.   Are you aware of how many hours

10     were spent by Reed Smith in responding to

11     other parties' summary judgment papers?

12             A.   I am not.

13             Q.   Are you aware of how the Goldberg

14     estimate takes into account all of the work

15     that was performed by Reed Smith on behalf of

16     Bank of New York in the interpleader action?

17             A.   Mathematically I'm not aware of it.

18     I know he says he did.

19             Q.   Do you know how much Reed Smith has

20     billed to Bank of New York to date in

21     connection with the Ambac and Whitebox

22     actions, including the interpleader

23     litigation?

24             A.   No.

25             Q.   Have you asked?

Page 70

ROBERT M. FISHMAN (1/10/19)

1

2      A.    No.

3      Q.    When assessing the reasonableness

4   of the time and cost estimates of

5   Mr. Goldberg, how did you factor in your own

6   mind the prior work that had been done by

7   Reed Smith on behalf of Bank of New York in

8   connection with the Ambac and Whitebox

9   actions?

10      A.    I guess the only thing I could say

11   about that is it's not clear to me the extent

12   to which the anticipated litigation is going

13   to be the same as the existing litigation, be

14   similar to the existing litigation or be

15   completely different than the existing

16   litigation.  And, therefore, it's very hard to

17   assign a value to the work that's already been

18   done when you're asked to assign that value in

19   conjunction with a case that you don't know

20   what it's going to say.

21      Q.    So in that case, are you

22   effectively, when assessing reasonableness,

23   assuming that Reed Smith is starting from

24   zero?

25      A.    No, I don't think I'm assessing it

Page 71

1              ROBERT M. FISHMAN (1/10/19)

2    that way because I believe Mr. Goldberg made

3    clear that he took into account some benefit

4    of prior knowledge.

5         Q.   It's totally unquantified, correct?

6         A.   I can't quantify it.

7         Q.   Does he quantify it?

8         A.   I don't know that he quantifies it

9    in his report.  He may or may not be able to

10   quantify it.  I don't know that.

11        Q.   You don't know whether he

12   quantifies it in his report?

13        A.   No, I said I don't believe it is

14   quantified in his report, not in a way I can

15   point to.  But he may be capable of

16   quantifying it.  I just don't know the answer

17   to the question.

18        Q.   You're not capable of quantifying

19   it, correct?

20        A.   How he took it into account, no,

21   I'm not capable of quantifying how he took it

22   into account.

23        Q.   And you haven't attempted to

24   quantify how he took it into account?

25        A.   I have not.

Page 72

1        ROBERT M. FISHMAN (1/10/19)

2        Q.   Mr. Goldberg estimates part of the

3   investment to be made by Reed Smith in the

4   defense of Bank of New York that there would

5   be a number of interviews that would have to

6   be conducted.  Do you recall that?

7        A.   Yes.

8        Q.   Do you recall how many interviews

9   Mr. Goldberg estimated would have to be

10  conducted?

11       A.   I don't off the top of my head

12  recall.

13       Q.   If I represented to you that it

14  would be 40, would that refresh your

15  recollection?

16       A.   I remember 40 is a number relating

17  to depositions, but I'm not sure that it

18  relates to interviews.  I don't know if you're

19  meaning to differentiate between interviews

20  and depositions.

21       Q.   Let's take depositions.  Thank you

22  for the correction.  Mr. Goldberg estimates 40

23  depositions.  How did you make any assessment

24  of reasonableness as to whether 40 was high,

25  low, just right?

Page 73

1          ROBERT M. FISHMAN (1/10/19)

2          A.   Well, the possibility of there

3    being fraud allegations in the anticipated

4    litigation raises -- to me raises a lot of

5    complicated fact issues.  And that means

6    there's a lot of people who may or may not

7    have information relative to the kinds of

8    proofs that you need in a fraud case.  And so

9    I don't really find it particularly surprising

10   that someone would estimate that it might take

11   40 people to consider all of the people

12   involved at the Plaintiffs, at the Defendants,

13   at third parties, at governmental entities.

14   That number doesn't really strike me as

15   particularly surprising.

16          Q.   A fraud is a material

17   misrepresentation, correct?

18          A.   It can be.

19          Q.   Okay.  A fraud can be committed by

20   a single person, right?

21          A.   It's possible for a fraud to be

22   committed by a single person, yes.

23          Q.   A fraud can be committed by a

24   single person on the defense side to a single

25   person on the plaintiff side, right?

Page 74

ROBERT M. FISHMAN (1/10/19)

1

2      A.   That is possible, yes.

3      Q.   Do you have any reason to believe

4  in this case that if there were a fraud

5  allegation, there would be two witnesses to

6  that fraud, to that act of fraud?

7      A.   I do not have any reason to believe

8  that that is specifically true in this

9  instance.

10     Q.   You don't know one way or the

11  other?

12     A.   I don't.  I don't have any idea

13  what the allegations are.

14     Q.   The number of witnesses to the

15  fraud could be two, correct?

16     A.   Could be.

17     Q.   Could be a number greater than two,

18  correct?

19     A.   Yes.

20     Q.   So how do you make any assessment

21  as to the number of relevant witnesses for

22  deposition is 40?

23     A.   Mr. Goldberg makes the assessment

24  that it's 40 and I was asked whether I thought

25  that was an unreasonable assessment or a

Page 75

1          ROBERT M. FISHMAN (1/10/19)

2    reasonable assessment.  And since all I have

3    to work with is the hypothetical of the

4    anticipated case and while I guess it's

5    possible that this fraud is a two-person

6    fraud, I guess it's equally possible that it's

7    a 200-person fraud and 40 therefore seemed

8    like a reasonable number to pick about an

9    unknown fraud alleged to have been done in an

10   unknown way.

11        Q.   And because of those unknowns,

12   there's a universe of possibilities as to the

13   numbers of witnesses that could be required to

14   prove the claim of fraud or the defense to

15   fraud, correct?

16        A.   I certainly can't tell you how many

17   witnesses it will take to prove and/or defend

18   the unknown claim of fraud.

19        Q.   You can't tell me with any degree

20   of certainty how many witnesses there could be

21   to that claim?

22        A.   I don't know what the complaint is

23   going to say.

24        Q.   So the number 40 is as good an

25   estimate as 20, 60 or a hundred, correct?

Page 76

ROBERT M. FISHMAN (1/10/19)

1

2      A.   No, I don't think I would agree

3  with that.

4      Q.   Why not?

5      A.   If it said two, I'd be surprised.

6  If it said 200, I'd be even more surprised.

7  And so I'm trying to imagine a hypothetical

8  story.  And in a hypothetical story, 40 seems

9  like the kind of number -- if it said 35

10  versus 40, I don't think I would have had any

11  different kind of reaction to it.  If it said

12  50 instead of 40, I might not have had a

13  different reaction to it.  But if it had said

14  two or three or 200 or 300, I might have had a

15  different reaction to it.  But, again, without

16  having an actual complaint to review to see

17  actual allegations about who did what to who,

18  it's impossible to have an actual right

19  answer.  I guess that's why it's an estimate.

20      Q.   I may be in a position to pass the

21  witness I'm just taking a last look,

22  particularly a look at paragraph 69, please,

23  of the Goldberg.

24      A.   Okay.

25      Q.   Mr. Goldberg states in paragraph

Page 77

ROBERT M. FISHMAN (1/10/19)

1    69, "The trial counsel may have to analyze

2    certain legal and factual issues, including

3    jurisdiction, standing, venue, removal,

4    sufficiency of process, et cetera."  Do you

5    see that?

6        A.   I do.

7        Q.   Did you form any opinion as to

8    whether those were viable issues to be

9    addressed in the anticipated litigation or did

10   you rely entirely on Mr. Goldberg's

11   assessment?

12       A.   Well, I would say I mostly relied

13   on his assessment, but I did give some

14   consideration to where is the case being filed

15   and who's filing it and are there issues that

16   can challenge their right to file it in a

17   place or their right to file it at all.  And

18   while I don't know enough about the underlying

19   dispute to say that I have an opinion that

20   those issues are, in fact, present, I don't --

21   I certainly don't have any problem imagining

22   the possibility of those kinds of issues

23   arising in the context of this litigation.

24       Q.   So did you make a determination

Page 78

1          ROBERT M. FISHMAN (1/10/19)

2     that standing could be an issue in the -- in

3     the anticipated litigation?

4          A.   I did not make an independent

5     determination that standing was an issue, but

6     in the context of preparing the report, I saw

7     and/or spoke about that as a possible issue.

8          Q.   You spoke about that with who?

9          A.   With counsel.

10         Q.   At Reed Smith?

11         A.   Yes.

12         Q.   You had a conversation with

13    Reed Smith about standing?

14         A.   Not specifically about the merits

15    of standing, but about the identification of

16    issues that could arise.

17         Q.   Did you make an assessment that

18    standing -- and I'm just taking an example

19    from paragraph 69, that standing is an issue

20    that could arise in the anticipated

21    litigation?

22         A.   I didn't make an independent

23    assessment that there are grounds for a

24    standing dispute.  I made an assessment that

25    it is possible that that issue could arise.

Page 79

1          ROBERT M. FISHMAN (1/10/19)

2          Q.   About what fact did you make that

3    assessment that that issue could arise?

4          A.   I was just told that it could

5    arise.

6          Q.   You were told that; you didn't make

7    an assessment of it?

8          A.   I said I did not make an

9    independent assessment of whether there's a

10   valid standing argument.  I was advised that

11   there might be a standing argument.

12         Q.   And Reed Smith advised you of that?

13         A.   Yes.

14         Q.   What about venue, did you make an

15   independent assessment as to whether there are

16   venue issues in the anticipated litigation?

17         A.   Where is the anticipated litigation

18   filed?  Because I can't really direct myself

19   to venue if I don't know where it's filed,

20   which is the only way I could know if maybe it

21   should have been filed somewhere else.

22         Q.   What about sufficiency of process,

23   is that --

24         A.   I don't think I -- I don't think I

25   gave particular consideration to that issue.

Page 80

1                ROBERT M. FISHMAN (1/10/19)

2       I don't recall.  I don't recall it.

3            Q.   What about jurisdiction, did you

4       make any assessment as to whether jurisdiction

5       was an issue that would require analysis in

6       the anticipated litigation?

7            A.   I didn't make my own analysis of

8       that, no.  I can imagine jurisdiction as a

9       potential issue depending on who files what

10      where.  What Court they're asking to address

11      it and I can imagine that some Courts have the

12      right to address that issue and other Courts

13      might not have the right to address that

14      issue, or at least an argument could be made

15      that they don't.

16                MR. HERTZBERG:  All right.  I'll

17           pass the witness.  Thank you.

18                THE WITNESS:  You almost did

19           something I've never seen before.  You

20           said you might pass the witness and

21           you did it without asking another

22           question, which never happens.

23      EXAMINATION BY

24      MR. WELCH:

25           Q.   Good afternoon.  My name is

Page 81

1              ROBERT M. FISHMAN (1/10/19)

2      Trevor Welch with Kasowitz Benson for

3      Whitebox.

4                 You said you were retained in

5      December?

6              A.   Yes.

7              Q.   And you received a draft of

8      Mr. Goldberg's declaration sometime in

9      December?

10             A.   Yes.

11             Q.   Was it different from the final one

12     that has been filed in this case?

13             A.   Yes, it was somewhat different.

14             Q.   Did you give any pushback or

15     comments on Mr. Goldberg's draft declaration?

16             A.   No, I did not.

17             Q.   Did you in any way communicate with

18     Mr. Goldberg in your review of the draft

19     declaration?

20             A.   No, I did not.

21             Q.   What purpose were you given a draft

22     declaration?

23             A.   I'm not sure what the purpose was.

24     I guess to give me a running start at what he

25     might be saying so that I could get a running

Page 82

1              ROBERT M. FISHMAN (1/10/19)

2    start on what I might be saying.

3         Q.   And you indicated that you began

4    drafting your report before you had even

5    gotten Mr. Goldberg's declaration; is that

6    right?

7         A.   Before I got the final one, yes.

8         Q.   And then you get the declaration,

9    and then what, what did you do?

10        A.   Well, those days all run into each

11   other.  I'm not sure that I could specifically

12   tell you what day I did which thing when we're

13   talking about a total of about ten days in

14   which I did a lot of things.  I'm not sure.

15   I'm not sure I can -- I'm not sure I can

16   really give you a meaningful answer to that.

17        Q.   You use the figure "ten," ten days?

18        A.   I made up ten days.  It might have

19   been 12, 13, it might have been nine.  All I

20   know is I spent two weeks in Florida on a

21   vacation in which I didn't do very much

22   vacationing.

23        Q.   Instead what you focused on was

24   crafting your expert report in this case?

25        A.   That was the lion's share of the

Page 83

1          ROBERT M. FISHMAN (1/10/19)

2   work that I did when I was supposed to be on

3   vacation, yes.

4          Q.   Well, I want to understand what the

5   work is that you did?

6          A.   Okay.

7          Q.   You read Mr. Goldberg's report?

8          A.   That's one of the things that I

9   did.

10          Q.   What else did you do?

11          A.   I read a variety of pleadings that

12   were sent to me.  I read some Court orders.  I

13   read some plan provisions.  That probably is a

14   pretty fair description of what I looked at.

15          Q.   What did you do that the Court

16   can't do for itself?

17          A.   What did I do that the Court can't

18   do for itself?  I don't know what the Court

19   can do for itself.  I guess I don't know how

20   to answer that question.

21          Q.   You intend to offer an expert

22   opinion in this matter?

23          A.   I think that's the intent, yes.

24          Q.   Do you believe your opinion will

25   assist the Court as the trier of fact in

Page 84

1           ROBERT M. FISHMAN (1/10/19)

2   making certain determinations in the matter?

3          A.   I certainly believe it has the

4   possibility of assisting the Court.  I guess

5   the Court will have to decide if it's of any

6   assistance.

7          Q.   What's the assistance you imagine

8   your report will give the Court?

9          A.   A reflection on the reasonableness

10  of the assessment of the potential costs and

11  the protections that are afforded to the

12  Plaintiffs under that scenario.

13         Q.   But you didn't do any independent

14  assessment of those issues, right?

15         A.   I didn't do an independent

16  assessment of the costs.  I relied on

17  Mr. Goldberg's assessment and I looked at it

18  to determine if I thought it was reasonable.

19         Q.   Okay.  So you did an assessment of

20  Mr. Goldberg's assessment?

21         A.   In a manner of speaking.

22         Q.   Anything else?

23         A.   Well, I -- Mr. Goldberg's

24  assessment isn't -- I didn't rely on

25  Mr. Goldberg's assessment in discussing the

Page 85

1          ROBERT M. FISHMAN (1/10/19)

2    protections that would be available to the

3    Plaintiffs in the event that the reserve fund

4    is funded and an amount of money is put in it

5    that exceeds the amount of the fees that are

6    ultimately allowed to -- using the word

7    "allowed" loosely, allowed to with The Bank of

8    New York.

9          Q.   Okay.  Do you think that the Court

10   is capable of evaluating Mr. Goldberg's

11   assessment of the potential fees in this case?

12         A.   I don't really have an opinion

13   about what the Court is capable of doing.

14         Q.   What is it that you think you've

15   done that the Court can't do by simply reading

16   Mr. Goldberg's declaration?

17         A.   Well, I didn't say that I did

18   something that the Court can't do.  I imagine

19   that the Court might be interested in someone

20   who is familiar with and has experience in

21   looking at fees in the context of insolvency

22   cases and expressing an opinion about the

23   topic.  And if the Court doesn't find it

24   helpful, then the Court won't pay attention to

25   it.

Page 86

1              ROBERT M. FISHMAN (1/10/19)

2        Q.   You don't have experience in doing

3   estimates, do you, sir?

4        A.   I don't have experience in doing an

5   estimate of fees for this case or a case

6   exactly like this, no, I don't.

7        Q.   How about any case?

8        A.   Sure, I've done lots of budgets in

9   my career.

10       Q.   You made a distinction between

11  looking at pre-performance estimates and

12  post-performance analysis?

13       A.   Those are two different things, but

14  that's not the same as doing a budget.

15       Q.   So here do you agree with me what

16  Mr. Goldberg has done is a pre-performance

17  estimate of fees?

18       A.   I certainly agree with that.

19       Q.   And what you as a fee examiner have

20  done professionally is a post-performance

21  analysis of actually billed fees?

22       A.   That is certainly one of the things

23  I have done as a fee examiner.

24       Q.   So what, if anything, have you done

25  that qualifies you to evaluate Mr. Goldberg's

Page 87

1              ROBERT M. FISHMAN (1/10/19)

2    pre-performance estimate of fees?

3         A.   For instance in the Petters' case,

4    we use budgets in the Petters' case and did

5    from 2016 through the current time period.

6    And every professional submits to me a

7    quarterly budget that sets forth their best

8    guess about what they're going to do for the

9    next quarter going forward.  So I have looked

10   at many budgets in that context.

11              I have prepared my own budgets for

12   litigation over time, including as recently as

13   submitting budgets in the Toys "R" Us case

14   because the U.S. Trustee guidelines require

15   that.  So I have -- I have some familiarity

16   with the concept of trying to project what

17   litigation is going to look like or what legal

18   proceedings is going to look like.  It isn't

19   always litigation.

20        Q.   Some familiarity.  What else

21   besides what you've just described?  What

22   other experience do you have?

23        A.   I'd be hard pressed to list the

24   name of every case I ever submitted a budget

25   for, but there's more than a few.

Page 88

1          ROBERT M. FISHMAN (1/10/19)

2          Q.   Well, can you quantify; five?

3          A.   More than five.

4          Q.   Any cases comparable to this?

5          A.   No, I don't think I have ever

6    myself handled a piece of litigation

7    comparable to this.  It's not what I do.

8          Q.   Your opinion is wholly derivative;

9    isn't that true?

10         A.   No, I don't think it is.

11         Q.   If Mr. Goldberg's opinion was

12   stripped out of this case, let's imagine there

13   was no declaration being submitted by

14   Mr. Goldberg, what could you offer the Court?

15         A.   Well, I wouldn't be able to create

16   the assessment that Mr. Goldberg has created

17   for the entirety of the case because I don't

18   have a level of familiarity with handling that

19   kind of litigation.  That's why I was asked to

20   make assumptions based on what he produced.

21         Q.   So it's something you're not

22   capable of doing?

23         A.   That particular thing I would not

24   be able to do on my own.  I probably, given

25   enough time, could have collected up a group

Page 89

1          ROBERT M. FISHMAN (1/10/19)

2    of people and done that assessment, but I

3    didn't have enough time to do that and

4    therefore wasn't a choice.

5          Q.   So you didn't do that?

6          A.   I absolutely didn't do that.

7          Q.   So apart from reviewing

8    Mr. Goldberg's opinion and opining that you

9    think it was reasonable, based on the

10   experience you've described, what is it that

11   you did to offer your opinion?

12         A.   I also provided my view on the

13   reasons why the reserve fund approach was a

14   reasonable approach to protect the interests

15   of all of the litigants.

16         Q.   Okay.  Anything else?

17         A.   No, not so much.  I think that's, I

18   think, the two principal things that I

19   expressed an opinion about.

20         Q.   You expressed an opinion on the

21   reasonableness of Mr. Goldberg's opinion?

22         A.   Of his assessment.

23         Q.   So you did an assessment of his

24   assessment?

25         A.   You could call it that I guess.

Page 90

1          ROBERT M. FISHMAN (1/10/19)

2          Q.    An assessment that you don't have

3    an independent basis to make?

4          A.    I would not be making an

5    independent assessment of the management of

6    the litigation of this sort.

7          Q.    Right, because you don't have the

8    experience to do that?

9          A.    I don't, although I do have the

10   experience to read other people's assessments

11   of their cases because I do that all the time

12   as a fee examiner.

13         Q.    I'm sure the Court does as well.

14         A.    I have no idea what the Court does.

15         Q.    So I want to talk about the

16   protections that you referred to, which is the

17   only independent opinion that you intend to

18   offer in this case; is that right?

19         A.    Those are your words.  I don't

20   know.  I'm not sure I'd say it that way.

21         Q.    How would you say it?

22         A.    I'd say I offered opinions on

23   Mr. Goldberg's assessment and on the

24   protections.

25         Q.    Okay.  And apart from that,

Page 91

1        ROBERT M. FISHMAN (1/10/19)

2    anything else?

3        A.   I don't think so.

4        Q.   What's the nature of your opinion

5    concerning the protections?

6        A.   That Bank of New York Mellon would

7    refund any amount in excess of fees that it

8    was ultimately entitled to take.  Number two,

9    that the budgeting process and the reserve

10   funds does not in any way infringe on the

11   right of parties to challenge the

12   reasonableness of the fees.  And number three,

13   to the extent that there ever was a

14   determination that the conduct of the bank was

15   such that it should not be entitled to fees

16   and if that was successfully prosecuted to

17   conclusion, that that protection wasn't being

18   taken away either.  In all those instances

19   there would still be a prospect for the

20   Plaintiffs to affect the amount of fees that

21   the Defendant was entitled to receive.

22       Q.   And how did you reach those

23   conclusions?

24       A.   Well, number one, my understanding

25   is that Bank of New York has agreed to give

Page 92

1          ROBERT M. FISHMAN (1/10/19)

2     back any excess amounts that are withheld.  So

3     my understanding comes from them saying that's

4     what they're going to do.  Number two, I

5     understand that there is an opportunity to

6     review and object to the fees at an

7     appropriate time as being reasonable because I

8     think this comes from the contractual

9     relationship.  And number three, as just as a

10    matter of law, there are certain conduct,

11    which if you were able to successfully prove

12    they were engaged in you'd have the

13    opportunity to argue that that deprives a

14    party of the right to receive fees.

15         Q.  So it sounds to me that you made

16    some factual assumptions and applied a legal

17    analysis; is that fair?

18         A.  I don't think I applied a legal

19    analysis.  I think I applied a factual

20    analysis.

21         Q.  As a matter of law, what were you

22    referring to?

23         A.  I believe -- and I'm not -- I'm not

24    expressing an opinion about what law would

25    apply or how it would apply.  Again, we're

Page 93

1          ROBERT M. FISHMAN (1/10/19)

2    talking about a hypothetical case.  But I

3    believe there are circumstances in which a

4    Court could conclude that a party has lost its

5    right to have its fees reimbursed based on its

6    conduct.  And someone would have to allege

7    that, and someone would have to prove that and

8    a Court have to find that and you might be in

9    a position to make that argument.

10          Q.   Are you familiar with Section 19.5

11   in the plan?

12          A.   I am.

13          Q.   Are you offering an opinion on the

14   meaning of Section 19.5 in this case?

15          A.   The meaning of it?

16          Q.   Yes.

17          A.   I don't know what you're asking me

18   about when you ask that question.

19          Q.   Well, let me ask a very open-ended

20   question.  What, if anything, do you have to

21   say about Section 19.5 within the confines of

22   the expert opinion that you intend to offer in

23   this case?

24          A.   Well, I mean, it says what it says.

25   And so there's really no opinions to be

Page 94

1          ROBERT M. FISHMAN (1/10/19)

2  offered about the words that are there.  It

3  appears to create the Court's right to

4  determine if one of the two sets of

5  protections are appropriate; and if they are,

6  to establish what they would be.

7          Q.   It appears that's just --

8          A.   That's what I think Section 19.5

9  says.

10         Q.   That's how you read it?

11         A.   That's what I think it says.

12         Q.   And you'd agree that the Court is

13  capable of reading 19.5 as well, right?

14         A.   I'm sure the Court is capable of

15  reading 19.5.

16         Q.   In evaluating as a matter of law

17  what it means?

18         A.   I assume the Court is ultimately

19  going to do that regardless who it hears from

20  on the topic.

21         Q.   Do you have any factual knowledge

22  with respect to the negotiation of

23  Section 19.5?

24         A.   None whatsoever.

25              MR. WELCH:  I have no further

Page 95

1              ROBERT M. FISHMAN (1/10/19)

2         questions.

3     EXAMINATION BY

4     MR. HERTZBERG:

5         Q.    Just a follow-up to Mr. Welch.

6               Paragraph 41 of your declaration.

7         A.    Yeah.

8         Q.    You offer the opinion that "In the

9     event that Whitebox and/or Ambac are

10    ultimately successful on the merits of the

11    anticipated litigation, Whitebox and/or Ambac

12    could thereafter elect to seek a judicial

13    determination that BNYM's conduct was such

14    that BNYM should not as a matter of public

15    policy be entitled to retain its fees and

16    expenses."  Do you see that?

17        A.    I do.

18        Q.    You understand that the only claims

19    of Ambac and Whitebox that survived the claim

20    are claims for gross negligence, willful

21    misconduct and intentional fraud, correct?

22        A.    Yes.  Yes.

23        Q.    If Whitebox or Ambac are successful

24    on any of those claims, is there any scenario

25    that you're aware of by which BNYM could

Page 96

1          ROBERT M. FISHMAN (1/10/19)

2    retain its fees and expenses?

3          A.   I would say I'm not aware that

4    there is one and I'm not aware that there

5    isn't one.

6          Q.   So then it puzzles me that you say

7    that after succeeding on the merits, Whitebox

8    and/or Ambac could thereafter then seek a

9    determination?

10         A.   Right.

11         Q.   Isn't the success on the merits the

12   determination that Whitebox and Ambac need to

13   establish that BNYM isn't entitled to its fee?

14         A.   If I knew what the Complaint said,

15   I might be able to answer your questions.  But

16   since I don't know what the Complaint is going

17   to allege, what it's going to seek, what

18   you're going to be able to prove and what a

19   Court is ultimately going to decide, I really

20   have no way of knowing if it is automatic that

21   you would get that or if you would merely have

22   the right to try to get that.

23         Q.   You do know the Complaints that

24   survive the plan can only allege gross

25   negligence or more serious conduct, correct?

Page 97

1        ROBERT M. FISHMAN (1/10/19)

2        A.   Well, I know that gross negligence,

3    willful misconduct and intentional fraud are

4    the description of what survived.

5        Q.   And if Whitebox and/or Ambac

6    prevail on any of those three causes of

7    action, BNYM is not, as a matter of public

8    policy, entitled to retain its fees, correct?

9        A.   I'm not sure if that's correct or

10   not.

11       Q.   Under what scenario could Bank of

12   New York be found grossly negligent or to have

13   engaged in willful misconduct or intentional

14   fraud and still be able to retain its fees and

15   expenses?

16       A.   I don't know the answer to that

17   question.

18       Q.   You can't identify one?

19       A.   I don't know the answer to that

20   question.

21            MR. HERTZBERG:  Thank you, sir.

22            (Time noted:  3:52 p.m.)

23

24

25

Page 98

1        ROBERT M. FISHMAN (1/10/19)

2

3               J U R A T

4

5

6        I, ROBERT M. FISHMAN, ESQ., do

7    hereby certify under penalty of

8    perjury that I have read the foregoing

9    transcript of my deposition taken on

10   January 10, 2019; that I have made

11   such corrections as appear noted

12   herein in ink, initialed by me; that

13   my testimony as contained herein, as

14   corrected, is true and correct.

15

16


         _____

17        ROBERT M. FISHMAN, ESQ.

18

19

     Subscribed and sworn to before me

20

     This _____ day of _____, 2019.

21

22   _____

          NOTARY PUBLIC

23

24

25

```
1              ROBERT M. FISHMAN (1/10/19)

2     ------------------I N D E X------------------

3     WITNESS:   ROBERT M. FISHMAN, ESQ.

4     EXAMINATION BY                      PAGE

5     MR. HERTZBERG                       5, 95

6     MR. WELCH                           80

7

8

9

10

11    ----------------E X H I B I T S--------------

12     FISHMAN EXHIBIT              FOR I.D.

13     Fishman Exhibit 1,                8

14     Declaration of Robert M. Fishman

15

16

17

18

19

20

21

22

23

24

25
```

Page 100

ROBERT M. FISHMAN (1/10/19)

1

C E R T I F I C A T E

2

3

STATE OF NEW YORK        )

4

: SS.:

COUNTY OF RICHMOND       )

5

6

I, AYLETTE GONZALEZ, a Notary Public

7

for and within the State of New York, do

8

hereby certify:

9

That the witness, ROBERT M. FISHMAN,

10

ESQ., whose examination is hereinbefore set

11

forth was duly sworn and that such

12

examination is a true record of the testimony

13

given by that witness.

14

I further certify that I am not

15

related to any of the parties to this action

16

by blood or by marriage and that I am in no

17

way interested in the outcome of this matter.

18

IN WITNESS WHEREOF, I have hereunto

19

set my hand this 10th day of January, 2019.

20

21

_____

22

AYLETTE GONZALEZ

23

24

25

1          ROBERT M. FISHMAN (1/10/19)
2        ERRATA SHEET FOR THE TRANSCRIPT OF:
3     Case Name:        In re:  The Financial Oversight
                         and Mgmt Board for Puerto Rico
4     Dep. Date:        January 10, 2019
      Deponent:         ROBERT M. FISHMAN, ESQ.
5
      Pg. Ln.  Now Reads        Should Read      Reason
6     ___ ___  _____  _____  _____
7     ___ ___  _____  _____  _____
8     ___ ___  _____  _____  _____
9     ___ ___  _____  _____  _____
10    ___ ___  _____  _____  _____
11    ___ ___  _____  _____  _____
12    ___ ___  _____  _____  _____
13    ___ ___  _____  _____  _____
14    ___ ___  _____  _____  _____
15    ___ ___  _____  _____  _____
16    ___ ___  _____  _____  _____
17    ___ ___  _____  _____  _____
18    ___ ___  _____  _____  _____
19    ___ ___  _____  _____  _____
20           _____
                ROBERT M. FISHMAN, ESQ.
21
      SUBSCRIBED AND SWORN BEFORE ME,
22
      This___ day of_____, 2019.
23
      _____
24            Notary Public
25    My Commission Expires:_____