**<u>Exhibit C</u>**

Relevant Excerpt from the January 17, 2019 Hearing Transcript
Pages 139-184

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 2 of 47

139

1          THE COURT:  Thank you.  And my thanks are added to

2    those.

3          So now that we've all thanked each other thoroughly,

4    let's take a ten-minute rest.  We'll reconvene at 2:30.

5          (At 2:20 PM, recess taken.)

6          (At 2:35 PM, proceedings reconvened.)

7          THE COURT:  Good afternoon.  Please be seated.  I beg

8    everyone's indulgence while I sit down.

9          I'd like to round up my request on the other two

10   matters.  Okay?

11         Mr. Rosen, you are still here?

12         MR. ROSEN:  Do you need me to come down, ma'am?

13         THE COURT:  No.  I'm hoping your answer to this will

14   be yes and I'll just repeat it.  Oh, the microphone is coming

15   to you.

16         MR. ROSEN:  Yes.

17         THE COURT:  So I'm reserving decision on the 9019

18   motion and the confirmation motion.  I have specifically

19   requested supplementation regarding clarification and scope of

20   the releases, injunctions and related provisions.  And also

21   with respect to the supremacy provision, I am accepting the

22   offer from AAFAF of the background for the legislative

23   development process.

24         And you can throw in there the legal basis for the

25   independent corporation of the Commonwealth of Puerto Rico,

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 3 of 47

140

1   because I don't -- I didn't see statutory citations for

2   that.

3           MR. ROSEN:  Yes, Your Honor.

4           THE COURT:  And it would be very helpful to have a

5   cogent, in one place, written iteration with the citations of

6   the rationale for the validity provisions that Mr. Kirpalani

7   and Mr. Rosen have together offered today.

8           And what would you suggest as a deadline for that?

9           MR. ROSEN:  Monday, Your Honor.

10          THE COURT:  That would be very helpful.  Thank you.

11          MR. ROSEN:  For me, too.

12          THE COURT:  All right.  Then I will look forward to

13  it.  And thank you.

14          MR. ROSEN:  Thank you, Your Honor.

15          THE COURT:  Good afternoon.

16          MR. SCHAFFER:  Your Honor, perhaps before we go on

17  the clock, I can report that Judge Houser has been relentless

18  and there has been some progress with regard to the remainder

19  of what we're doing here.

20          Your Honor, for the record, I'm Eric Schaffer of Reed

21  Smith on behalf of the Bank of New York.  My partner, Louis

22  Solomon, will be handling the evidentiary aspects today.

23          Your Honor, what I'd like to report is that with

24  Judge Houser's urging, we have reached an agreement with

25  regard to the Section 19.5 issues with Ambac.  On the basis of

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 4 of 47

141

```
 1   that agreement, Ambac will not be participating in the legal

 2   argument or the evidentiary part of the hearing.

 3             MR. HERTZBERG:  Good afternoon, Your Honor.  I'm Gabe

 4   Hertzberg from the Curtis Mallet firm.  I represent Ambac

 5   Assurance Corporation.  I'm here to tell you that what

 6   Mr. Schaffer said is correct.

 7             THE COURT:  Well, thank you for this news.

 8             And thank you, Judge Houser, who I gather helped make

 9   this happen.

10             MR. HERTZBERG:  I second that.

11             THE COURT:  So thank you, and congratulations.

12             MR. GLENN:  Good afternoon, Your Honor.  Andrew Glenn

13   from Kasowitz, Benson, Torres, LLP, on behalf of Whitebox

14   entities.

15             THE COURT:  Good afternoon.

16             MR. GLENN:  Up until three hours ago, we were

17   coordinating with Ambac on the presentation, argument, and

18   evidence before Your Honor.  I'm going to try to stick to the

19   time limits even without their participation.  I would just

20   like to ask the Court for its indulgence with a little

21   flexibility, given that this all came about at the last

22   minute.  Thank you.

23             THE COURT:  Understood, and you will have it.

24             All right.  So are you ready to begin opening

25   statements?
```

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 5 of 47

142

1          Mr. SCHAFFER:  Yes, Your Honor.  Again, Eric

2    Schaffer.

3          Your Honor, in the last two weeks, we've submitted

4    two expert reports, two briefs.  Whitebox has submitted four

5    briefs.  I don't think there's a lot that's really new here,

6    but I think what's most significant, though, is this is not

7    the first time we've seen a plaintiff suing an indentured

8    trustee, trying to deprive the trustee of the ability to pay

9    fees and expenses for funds held by the trustee.

10         In our papers, we cited you to five recent New York

11   cases that considered the same arguments that plaintiffs are

12   making here.  Each of those cases determined that unless and

13   until the plaintiff can prove that it comes within the

14   exception, there is willful misconduct or gross negligence,

15   until that time, the trustee should be permitted to draw upon

16   funds in its possession to pay fees in the ordinary course.

17         There are four decisions from just last year in the

18   Southern District of New York.  They were issued by four

19   different judges, involved four different trustees, and each

20   of them rejected efforts by plaintiffs to delay payment of

21   defense costs until after merits were determined.

22         In each of those cases, the plaintiffs alleged

23   wrongdoing within an exception, and in each case the Court

24   said, we're going to stay that challenge until the trustee is

25   proven to have been found guilty of this misconduct.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 6 of 47

143

1            In the most recent of these cases, *Royal Park versus*

2    *U.S. Bank*, Judge Marrero held that plaintiff's arguments must

3    await such time, if any, that the trustee, quote, is found to

4    have acted grossly negligently, unquote.  And, of course, all

5    of these cases are in the federal court, so no real harm,

6    because the trustees were not going away.

7            Similarly, in *Pimco versus Wells Fargo Bank*, a state

8    court decision, it was the same sort of facts.  The Court

9    permitted the Trustee to reserve 57 million dollars to pay

10   anticipated legal fees.

11           Now, Whitebox has said, ah, that case didn't involve

12   a gross negligence claim.  No, it involved a claim of willful

13   misconduct.  It's in paragraph one of the underlying

14   complaint.  And the Court said that there's really no

15   prejudice because the trustee, quote, is going to be around if

16   plaintiffs succeed, unquote, on the underlying merits.

17           Whitebox says, well, those decisions just maintain

18   the status quo.  Well, Your Honor, the status quo here is the

19   trustee holds the money and the trustee is able to pay its

20   expenses on a current basis.

21           There's no prejudice here to Whitebox, because we

22   agree, first, if there's money left over, of course we're

23   going to refund it.  Second, as in the RPI cases, we agree

24   that they may, subject to some appropriate procedures,

25   challenge reasonableness.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 7 of 47

144

1         And finally, if they prevail, they may seek a

2    judicial determination that we need to disgorge any fees that

3    we may not be entitled to based on a theoretical determination

4    that we were grossly negligent or we engaged in willful

5    misconduct.

6         So with these protections, I think we are squarely

7    within the *Pimco* decision, the *Royal Park* decision.  There is

8    no harm in our retaining these funds.

9         Now, it's interesting, Whitebox does not acknowledge

10   all of these protections.  Your Honor, no one questions the

11   credit of the Bank of New York Mellon, and by contrast, we

12   should not be left to pursue a Cayman Fund or others.  In this

13   case, until we are proven to have engaged in bad conduct, we

14   should be entitled to retain these monies and apply them on a

15   current basis.

16        Now, let me turn to the Plan.  The Plan recognizes we

17   have a secure claim.  And under 19.5, this Court has

18   determined the amount that, quote, shall satisfy, unquote,

19   shall satisfy all obligations of COFINA and all rights of the

20   trustee under the resolution.

21        Now, Whitebox has argued it never assumed COFINA's

22   obligations.  Well, they didn't object to the Plan.  They are

23   stuck with the requirements of 19.5.  And the requirement

24   there is that COFINA must satisfy its obligations and the

25   trustee's rights.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 8 of 47

145

1          This requires that we get, in accordance with PROMESA

2     and the Bankruptcy Code, the indubitable equivalent of our

3     secured claim.  They ignored this in their papers as well.

4     Again, there's no objection to this in their plan.  We are

5     entitled to the indubitable equivalent.

6          And standing in the shoes of COFINA, for purposes of

7     19.5, under that mechanism, they have to show that we are

8     receiving the indubitable equivalent by a preponderance of the

9     evidence.  And, Your Honor, they have no evidence.  We've

10    submitted two expert reports.  They have not submitted

11    anything.

12         Now, Your Honor, turning to the resolution, which is

13    addressed in 19.5, it gives us multiple layers of protection.

14    I don't think I have time to get into everything in our

15    papers, but of course we covered a lot of this.

16         We have payment priority.  We have lien priority.

17    Section 804 of the Resolution says that we are entitled to

18    payment of trustee's expenses, and it indemnifies us as well

19    against losses and liabilities.

20         Section 1103 is an intercreditor agreement that kicks

21    in after a default, not between us and COFINA, but between us

22    and bond owners.  It gives us a payment priority.  And under

23    that waterfall, it is only after we have provided for our

24    expenses and set aside funds that payments would go out to

25    bond owners.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 9 of 47

146

```
 1              Finally, Your Honor, as we've addressed in our

 2   papers, Section 501 is a pledge of the taxes subject to our

 3   payment rights under Section 804, and in the express language,

 4   all other provisions permitting application for the purposes

 5   set forth in the resolution.  That includes not just 804, but

 6   it includes the payment priority, the intercreditor agreement

 7   in 1103.

 8              Let me focus on 1103.  They acknowledge that this is

 9   an intercreditor agreement among nondebtors.  And after

10   default, the Trustee, in its sole opinion, is entitled to

11   reserve amounts that may be advanced for legal fees.  This is

12   expressly senior to the bond owner.

13              The purpose is if COFINA cannot meet its obligations

14   under 804, we have a payment priority against Whitebox.  And

15   1103.3 gives us discretion to make periodic contributions.

16              Your Honor, we pointed you to the First Circuit's

17   decision in the HSBC case.  Under Section 510(a), the

18   enforcement of subordination provisions is no longer a matter

19   committed to the Bankruptcy Court's notion of what may or may

20   not be equitable.

21              Now, we say that our rights are secured, but even if

22   they were not, under the payment priority, under 1103,

23   intercreditor agreement, we come first.  And under case law

24   we've cited, if you have a junior creditor that is secured and

25   a payment priority in favor of a senior unsecured creditor,
```

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 10 of 47

147

1   the senior unsecured creditor receives payment.  It recovers.

2            The only real dispute here under Section 1103 is what

3   comes within the waterfall.  And with this, I think it's clear

4   that the litigation expenses here undoubtedly are incurred in

5   a context of our performance of our duties under the

6   resolution.

7            Our performance is at the heart of the Whitebox

8   claims.  It all implicates the integrity of the resolution,

9   the existence of events of default, and the relationship

10  between us and bond owners.  We also say under 1103, these are

11  expenses that are necessary, quote, in the opinion of the

12  trustee, unquote, to protect the interest of bond owners.

13           Now, they say how are bond owners protected?  Well,

14  we have an interest in protecting the integrity of the

15  resolution.  That includes protecting all other bond owners

16  against specious claims.

17           It also is a fact that we reserve the right to pursue

18  counterclaims under 19.5, and all of this is determined not

19  now, but it's determined when they file their lawsuit.  And

20  it's not altered by the intervention of a Title III

21  proceeding.

22           They point to 1103, to the language subject to 804.

23  Well, that's not a limitation, it's a priority provision.

24  It's intended to insure that the intercreditor waterfall only

25  becomes applicable if COFINA can't pay.  And that makes all

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 11 of 47

148

1   the sense in the world.  We should have to look to COFINA

2   first, and where there's a default, as 1103 provides, if

3   COFINA can't pay, then we go to the waterfall.

4        All of this is part of what I'll call a seamless,

5   interconnected set of protections for the Trustee.  And as

6   sophisticated parties -- and the Whitebox folks are very

7   sophisticated.  They certainly had the ability to read the

8   indenture, to do their due diligence before investing.  They

9   cannot escape the subordination agreement.

10        Your Honor, there is a lot I could say about 804, but

11  I think, consistent with the time limits here, I'm going to

12  move on, and I'll come back to that if I have time.

13        And I'll move to Section 501.  Under Section 501,

14  COFINA pledges all of the taxes, the sales and use taxes to

15  the trustee as security for payment of the bonds.  But if you

16  look at 501, that pledge is subject to Section 804 and subject

17  to the provisions of the resolution for application -- or the

18  purposes set forth in the resolution.

19        Now, what does this mean?  It's subject to 804.

20  That's where COFINA has to pay us.  And it's subject to the

21  payment priority in 1103.  Those are provisions that are

22  expressly provided to come within the 501 pledge, and they

23  come on a senior basis.

24        The effect is that even if we were not secured by the

25  charging lien in 804, even then, we still come first.  We get

Case:17-03283-LTS  Doc#:4965-3  Filed:01/29/19  Entered:01/29/19 02:05:15  Desc:
Exhibit Exhibit C - January 17  2019 Hearing Transcript  Page 12 of 47

149

1   priority under the Section 501 pledge.

2            The argument they make here is that the 501 pledge

3   really only secures principal and interest.  We read these

4   provisions subject to 804, subject to other provisions of the

5   resolution.  We read them, right out of the document, this is

6   not a limitation of the trustee's rights.  It's a

7   recommendation that we have rights under these other

8   provisions.

9            If you look at the language, 501 does not say it's

10  subject to 804, but really only for things that may be current

11  expenses or that might be subject to a charging lien.  It

12  doesn't say that all rights and priorities under the waterfall

13  exist, but they really only come in after principal and

14  interest.

15           It doesn't say that because, of course, that would do

16  violence to the intent of this section, and indeed, it would

17  do violence to the intent of the indenture read as a whole.

18  It doesn't exclude the payment priority giving meaning to 501.

19  Our rights are senior.  Our rights are secured.

20           Your Honor, I could get into a discussion of the

21  cases that they cite, *Becker* and others.  I really think we've

22  covered them.

23           THE COURT:  I've read the briefs.

24           MR. SCHAFFER:  It's wholly inapplicable.  And that

25  enables me to move on.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 13 of 47

150

1          Your Honor, let me back up quickly to 804, as I see I

2     have a little bit of time that I've left myself.  804 needs to

3     be read as an integrated provision.  There are two clauses.

4     There's a clause for payment of expenses.  There's an

5     indemnification.  They are not redundant.

6          The indemnification picks up losses and liabilities,

7     but they are completely integrated because the indemnification

8     clause starts out, further, it is all one in the same, and

9     that read is consistent with what this Court did.  Harkening

10    back to the first time we were before you in the interpleader,

11    where you said that from time to time, we can reserve for and

12    pay reasonable fees and expenses, whether or not due and

13    owing, and you noted COFINA's obligations survived

14    satisfaction and discharge of the bonds and survived

15    termination of the resolution for any reason.

16         Just heading to my conclusion, Your Honor.  Again, we

17    have layers of protection.  We've got the protections in the

18    Plan.  We've got the protections, we have the lien and payment

19    priorities in 804 from COFINA.  We have the 1103 intercreditor

20    priority of payment over bond owners.

21         Now, Your Honor, I think it's useful to recognize

22    that when they're attacking our rights under the

23    intercreditor, they're not bond owners.  A beneficial owner,

24    as Whitebox claims that it is, does not have standing under

25    the resolution.  The bond owners are the registered bond

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 14 of 47

151

1   owners.  They have no standing to even challenge our rights

2   under Section 1103.

3           We then have 501.  Your Honor, if you read all of

4   this together, compensation, indemnification, lien priority,

5   payment priority, it demonstrates an intent to protect the

6   trustee and ensure we are not out of pocket unless we have

7   been found, actually found to have been engaged in gross

8   negligence or willful misconduct.

9           It's confirmed by reading all of the protections that

10  we had, the various exculpations, the limitations.  It's

11  confirmed by the cases we've cited about the public policy,

12  protecting the trustee, recognizing the critical role of the

13  trustee.

14          Your Honor, the notion that when this resolution was

15  drafted, there was an intention that we should assume an

16  obligation to fund, self-fund unknown litigation years into

17  the future, where we're getting compensation of 2,000 dollars

18  per year, per series, that notion would be absurd, and it

19  would be contrary to the history of the role of the indenture

20  trustee, and it would be contrary to practice.

21          We bargained for the right to cash collateral.  It's

22  protected by the indubitable equivalent provisions as

23  incorporated by PROMESA and the Bankruptcy Code.  We have a

24  payment priority.

25          Your Honor, I don't believe they can meet their

Case:17-03283-LTS  Doc#:4965-3  Filed:01/29/19  Entered:01/29/19 02:05:15  Desc:
Exhibit Exhibit C - January 17  2019 Hearing Transcript  Page 15 of 47

152

1  burdens with regard to PROMESA and the Bankruptcy Code, and

2  they certainly cannot meet their priorities -- excuse me,

3  certainly cannot meet their burdens with regard to an

4  intercreditor agreement, as to which they are not even a

5  beneficiary.

6          Thank you.

7          THE COURT:  Thank you, Mr. Schaffer.

8          Good afternoon, Mr. Glenn.

9          MR. GLENN:  Good afternoon.  For the record, again,

10  Andrew Glenn on behalf of Whitebox.

11          I'd like to start my presentation, Your Honor, with

12  an overview of this undisputed set of consequences.  First,

13  the Plan of Adjustment in this case provides Bank of New York

14  with a release of all claims of the parties to the Plan

15  Support Agreement other than Whitebox and Ambac.  And our

16  claims were expressly reserved under that Plan Support

17  Agreement.

18          The record is clear, if you read the words in the

19  resolution and in the security agreement to the resolution,

20  the Bank of New York never has had a secured claim against

21  COFINA.  And as much as Mr. Schaffer would want the words to

22  say that, that's not what those words say.

23          It does not have any right to withhold distributions

24  to any COFINA bondholders for any indemnity claims under the

25  resolution.  That is, it does not have a charging lien for the

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 16 of 47

153

1    expenses to be incurred in this litigation.  And in fact,

2    COFINA has never had any obligation to advance any defense

3    costs to BNY.

4           Finally, BNY confirms that Whitebox never agreed to

5    indemnify it as would be required by applicable law.

6           I think the narrow question Your Honor has to answer

7    in this particular dispute is whether Section 19.5 creates any

8    rights to indemnification beyond those already set forth in

9    the resolution.  As we demonstrate in our papers, we think the

10   answer is no.

11          THE COURT:  And so, just to be clear, you dispute the

12   proposition that the resolution creates such rights even as

13   against COFINA?

14          MR. GLENN:  Correct.

15          THE COURT:  And you also say that neither rights, nor

16   a basis for holding Whitebox to any COFINA obligation that

17   might exist --

18          MR. GLENN:  Correct.

19          THE COURT:  -- is imposed by 19.5?

20          MR. GLENN:  Correct.

21          THE COURT:  Thank you.

22          MR. GLENN:  I think the best way to put this is their

23   best case here is they have a general unsecured claim for

24   indemnification that would have been validated at the end of

25   the litigation, which is consistent with what the law says

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 17 of 47

154

1   about general validation claims such as this.

2          Looking at Section 19.5, Your Honor.  The question

3   is, does Section 19.5 state in clear and unequivocal terms

4   that Whitebox must indemnify Bank of New York?

5          Given that there's no agreement outside of 19.5, we

6   have to parse through this language, and it's all very

7   equivocal.

8          THE COURT:  This language you're talking about is

9   going back to the resolution now?

10         MR. GLENN:  No.  19.5 of the Plan of Adjustment, Your

11   Honor.

12         THE COURT:  Just for clarity, I didn't think I heard

13   Mr. Schaffer argue, and I didn't think I had seen in Bank of

14   New York's briefs, a contention that 19.5 is the source of the

15   indemnification right, although there is an argument that 19.5

16   is what makes Whitebox responsible for paying COFINA's

17   obligation.

18         MR. GLENN:  Correct.

19         THE COURT:  And I don't see Mr. Schaffer indicating

20   that I've misunderstood his argument.

21         MR. GLENN:  I mean, I think, Your Honor, they need

22   19.5.

23         THE COURT:  You think they need 19.5.

24         MR. GLENN:  That's our position.  That's our

25   position.  And if you look at the language in Section 19.5, it

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 18 of 47

155

1    says only -- and again, I'm going to only cite the relevant

2    words, what amount, if any, shall be withheld by the

3    disbursing agent or Bank of New York.  And whether Bank of New

4    York shall be reimbursed by Ambac and Whitebox, with the

5    occurrence of fees.

6           And then it concludes by saying, in each case, such

7    determination and the fulfillment of any obligations of Ambac

8    and Whitebox shall satisfy COFINA's obligations.

9           So we think, and again, if it's undisputed, that's

10   great, that 19.5 does not create any new obligation.  It's

11   merely a reservation of rights.

12          And I want to make something clear for the record.

13   Whitebox supports this Plan of adjustment.  There's a dispute,

14   Your Honor, as to what Whitebox's obligation is under Section

15   19.5.

16          If Your Honor concludes that we're wrong about what

17   19.5 says and what our -- what we believe our legal

18   obligations are, we'll live with that.  That's why we voted in

19   favor of the Plan and that's why we're a party to the Plan

20   Support Agreement.

21          Now, getting to the issue of 1129 and 510(a),  we

22   think these provisions are completely irrelevant to this

23   dispute.  1129(b)(2) applies in a cramdown.  I think you heard

24   from Mr. Rosen chapter and verse that this is the opposite of

25   a cramdown.  This is a fully consensual bankruptcy case.

Case:17-03283-LTS  Doc#:4965-3  Filed:01/29/19  Entered:01/29/19 02:05:15  Desc:
Exhibit Exhibit C - January 17  2019 Hearing Transcript  Page 19 of 47

156

```
 1              And even if somehow cramdown were relevant, there's

 2    no obligation for Whitebox to provide indubitable equivalency.

 3    The subordination agreement, Your Honor, presupposes that

 4    there is a priority obligation to pay Bank of New York, and

 5    that's what Your Honor otherwise needs to determine without

 6    regard to Section 510(a) of the Bankruptcy Code.

 7              We think that the Becker case we cited, which is also

 8    a very recent vintage, is the most relevant case here, Your

 9    Honor.  That, too, was a bankruptcy proceeding.  The only

10    bankruptcy proceeding, I think, that's at issue in this case

11    or cited in this case.

12              And if you parse through what happened there, it's

13    fully analogous to this case.  You had a Plan that settled the

14    indentured trustee's obligations, vis-a-vis the debtor.  It

15    was a litigation against the Bank of New York.  The Plan there

16    preserved indemnification rights solely to the extent it could

17    assert a charging lien.

18              And Bank of New York, in that case, tried to assert

19    that there was a charging lien, and the Court rejected it and

20    said, just as we're contesting here, that the Plan did not

21    create any additional rights beyond those in the bond

22    documents.  It only preserves specific rights and obligations

23    in order to permit indenture trustee to achieve specified

24    goals.  But in the end, the bondholders never agreed to assume

25    any of the borrower's indemnity obligation.
```

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 20 of 47

157

1          The COURT:  So there was no provision in *Becker*

2     similar to Bank of New York's construction of 19.5, which

3     makes particular beneficiaries responsible for covering

4     COFINA's obligations, according to Mr. Schaffer.

5          As I read *Becker*, there was no such provision in the

6     Plan, and the initial distribution of the assets of the bond

7     issuer held by the trustee had already been distributed.  And

8     this was a second tranche of collections that, under the Plan,

9     was to go to the bondholders.

10          MR. GLENN:  That's correct.

11          THE COURT:  So if Mr. Schaffer is right about what

12     19.5 does, as between COFINA and Whitebox, in terms of

13     responsibility, then *Becker* is distinguishable, wouldn't it

14     be?

15          MR. GLENN:  Yes, Your Honor, it would be, because

16     there was no Section 19.5 in *Becker* or anything analogous to

17     it.

18          But then that gets back to my original argument, does

19     19.5 create a new obligation?  And our position is that it

20     does not.  And that's why *Becker* is right on point.

21          There were lots of hurdles for them to come to the

22     conclusion that we have any indemnification obligations under

23     19.5.  The obligation, as we've cited in the cases, must be

24     unmistakably clear from the language of promise.

25          The Statute of Frauds applies.  There has to be

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 21 of 47

158

1    writing against a party who is charged with indemnification

2    obligations.  And we cited the *Santa Fe* case from Judge

3    Daniels, where he said, indemnity is also different whereby a

4    court is presented with a dispute.  It's really a fee shifting

5    provision, so there's an extra layer.

6         Here it's not really indemnification.  It's one party

7    agreeing to pay another party's legal fees up front, in that

8    case, in a dispute between those two parties.  And Judge

9    Daniels said that that also must be unmistakably clear from a

10   writing.

11        Let's get to the provisions of the actual bond

12   resolutions that I think are most relevant, which Mr. Schaffer

13   glossed over at a very high level.  I think we both agree that

14   804 of the bond resolution is the starting point of the

15   analysis.  And there's no dispute that the provision --

16   starting provision of 804, the first provision, indicates that

17   they do have the right, they do have a lien for fees and

18   expenses incurred in and about the performance of their powers

19   and duties under the resolution.

20        That's what we call the compensation provision.  And

21   that starts with an intro that COFINA shall, from time to

22   time, pay reasonable compensation.

23        It goes on to say that there's a further agreement to

24   indemnify and hold the trustee harmless for any costs and

25   expenses of the trustee defending itself against any claim,

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 22 of 47

159

1   whether asserted by COFINA, the bondholders or any other

2   parties.  And that's not secured.

3          I mean, I think we've cited case law to the point of

4   you have to read each provision to make sure it's sensible,

5   that it's not superfluous, and that one provision that's very

6   specific on a particular issue must be given some prominence,

7   some deference beyond the more general provisions.

8          Here it is very clear, and it wouldn't have been

9   necessary to provide that indemnification provision if the

10  compensation provision gave them what they want, or if 1103.1

11  gave them what they want.  We wouldn't need the

12  indemnification in Section 804 of the resolution.

13         What they've said in 1103.1 is that these were

14  liabilities incurred in and about the performance of powers

15  and duties under the resolution.  But that's not what's in

16  dispute here.  These are not -- defending yourself in a

17  litigation is not a power and duty that a contract must confer

18  upon you.  You have that right under our American legal

19  system.

20         If we said they didn't have the right to defend

21  themselves in court, that would create another set of

22  problems.  So we have to read these provisions together.

23         THE COURT:  So what do you do with the other argument

24  that Bank of New York makes, which is to say that they are

25  defending themselves in and about their powers and duties,

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 23 of 47

160

1    insofar as the litigation that you've brought is about the

2    exercise of its powers and duties?  And so it is litigation

3    that's about that leaving aside whether the power to defend

4    yourself is something inherent in existence or something

5    conferred by a resolution.

6            MR. GLENN:  The provision of powers and duties in

7    1103.

8            THE COURT:  And it's also in 804.

9            MR. GLENN:  And it's in 804.

10           In 804, it's in the section that provides a lien.  If

11   that provision means what it says -- I think I went over this

12   already -- the second part of 804 would be superfluous.

13           And then if you go to 1103.1, that's the final

14   waterfall provision, the charging lien provision that they're

15   relying on.  And first it says, subject to 804.  If that

16   language means what they claim it says, then there's no reason

17   to have that language in the indenture.  That would render it

18   a nullity.

19           Second --

20           THE COURT:  Is there a meaningful difference in the

21   specific party obligations, insofar as in the second sentence

22   of 804, it's an affirmative indemnification covenant by

23   COFINA, and Bank of New York is saying that 1103 is an

24   intercreditor provision in which the bondholders are

25   specifically agreeing to this application of the waterfall?

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 24 of 47

161

1          So that although the function arguably may not be the

2     same, the party signing on to the commitment is added to the

3     universe of whoever would be bound by a hold back from funds

4     held by the trustee under the indenture, as to which a

5     charging lien is granted by the first sentence of 804.

6          MR. GLENN:  Again, we have the language in the

7     performance of duties and powers under the resolution.  That's

8     a limitation to the waterfall as well.

9          And if you go back to 804, okay, with the dichotomy

10    of COFINA's obligations, which have the lien, and the

11    indemnification that does not, the part that has the lien is

12    in the performance of their duties under the resolution.  So

13    any of that's just buttressing the first part of 804 as well.

14         And again, we're relying on the word "duties."  Okay?

15    And if they wanted to mirror the obligation for the waterfall

16    for that second part of 804, that language could have been

17    inserted in here as well to make it very clear that that's

18    what they were entitled to get.  It does not have that

19    language.

20         The other provision here is that the word "incurred"

21    is in past tense.  So if you look at the first part of 1103.1,

22    there's a setup that the part that's necessary to protect the

23    interests of bondholders is a forward-looking obligation,

24    stuff that might happen in the future.  You hold back some

25    money to make sure that the bondholders are protected.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 25 of 47

162

1      The second part of 1103.1 is all in the past tense.

2   It speaks of liabilities incurred and advances made, not

3   future liabilities to be incurred to their law firms, to their

4   expert witnesses and the like.  So we think that language must

5   be given effect as well.

6      I'll conclude by showing Your Honor that the security

7   agreement in this case is at the end of the resolution.  It

8   says very clearly that only principal, interest and other

9   nonindemnification -- not even fee-related matters are covered

10  by the security agreement and the grant to Bank of New York.

11     They cited Section 501 as well.  And that's almost a

12  mirror image.  But there's no language in 501 that provides

13  them with a grant of the pledged property for this purpose.

14  They are relying on language at the end of there that really

15  does not support what they're saying.

16     So just to recap, we think the *Becker* case is

17  controlling if Your Honor concludes that Section 19.5 doesn't

18  create any new rights.

19     The *Royal Park* line of cases that they cited relates

20  to parties that challenged actions, I think three years in the

21  future in one case before Judge Caproni, where they were

22  already litigating and funding themselves.  And the Court

23  stepped in and said, look, this is a matter of judicial

24  economy.  Right?  Why am I going to deal with this now when I

25  can deal with this later?

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 26 of 47

163

1          It's a much different situation here where we're

2    dealing with the finality of a bankruptcy distribution and

3    moving forward in this case based on what the terms of the

4    Plan are.

5          Thank you very much.

6          THE COURT:  Thank you.

7          MR. SOLOMON:  Good afternoon, Your Honor.  Lou

8    Solomon.

9          THE COURT:  Good afternoon, Mr. Solomon.

10          MR. SOLOMON:  I think my job right now is to offer

11   into evidence the Declarations and documents which we have

12   already provided to the Court.

13          We will begin with the Declaration of Daniel

14   Goldberg, which is at 4767-10 of the ECF numbering.  All of

15   these were submitted under motion 4767.  So dash ten is his

16   Declaration.  Exhibits A, B, C and D are 4767-11, 12, 13, 14.

17   And the Declaration of Robert Fishman is 4767-15.

18          Your Honor has, by Order, directed that those

19   declarations were their direct testimony.  And at this point,

20   I would move those in.

21          THE COURT:  Any objection?

22          MR. GLENN:  No, Your Honor.

23          THE COURT:  The Goldberg and Fishman Declarations at

24   4767 with the enumerated Exhibits A, B, C and D to the

25   Goldberg Declaration are admitted.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 27 of 47

164

1          (Whereupon Exhibits A, B, C and D admitted into

2     evidence.)

3          MR. SOLOMON:  Thank you, Your Honor.

4          The balance of the documents I wish to offer are all

5     in 4767.  And other than 4767-1 which are demonstratives,

6     which we're not offering -- I think we're not going to get to

7     it.  And beginning with 4767-2, 3, 4, 5, 6, 7, 8, 9, these are

8     documents either that support some of the legal arguments that

9     Your Honor heard, and it's just easy for Your Honor to have

10    it, or they are documents that either one or the other of the

11    witnesses has relied on.

12         We would offer them at this point.

13         THE COURT:  Any objection?

14         MR. GLENN:  One moment, Your Honor.  No objection.

15         THE COURT:  Exhibits 4767-2, 3, 4, 5, 6, 7, 8 and 9

16    are admitted in evidence.

17         (Whereupon Exhibits 4767-2, 3, 4, 5, 6, 7, 8 and 9

18    admitted into evidence.)

19         MR. SOLOMON:  Thank you, Your Honor.

20         That is the evidence prior to the cross-examination.

21    I see I have a minute, and just to help move this along more

22    quickly, I'd like to lodge an objection to any

23    cross-examination of these witnesses.

24         Your Honor's Order 4647 directed that we -- that we

25    be told by January 10 at 12 o'clock whether there was going to

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 28 of 47

165

1    be any request for cross-examination, including factual issues

2    to which the proposed cross-examination or testimony relates.

3    The subject matter of the testimony and its relevance to the

4    factual issues, that was not filed.  Four days later, we did

5    get something that was not in compliance with Your Honor's

6    Order, but it was also not timely.

7            The witnesses are here.  If Your Honor has questions,

8    we would love for Your Honor to ask them anything you want,

9    but we do object to the cross-examination.  We think it's

10   untimely.

11           THE COURT:  Have you flagged this untimeliness

12   objection before to Mr. Glenn or --

13           MR. GLENN:  (Shaking head from side to side.)

14           THE COURT:  I don't remember seeing this happening in

15   writing, and Mr. Glenn is shaking his head, so I guess --

16           MR. SOLOMON:  And I don't think so, Your Honor.

17           THE COURT:  Then I'll hear Mr. Glenn's response.

18   Thank you.

19           MR. GLENN:  Your Honor, we did not provide the

20   writing that he indicated.  We had the time allotted.  I

21   didn't understand that we were going to be held to provide

22   cross-examination, an outline of cross-examination in advance,

23   and I apologize for not realizing that.

24           It's unusual, and I didn't realize it existed.  So I

25   would like to cross-examine the witnesses.

Case:17-03283-LTS  Doc#:4965-3  Filed:01/29/19  Entered:01/29/19 02:05:15  Desc:
Exhibit Exhibit C - January 17  2019 Hearing Transcript  Page 29 of 47

166

1          THE COURT:  You didn't read the Order that I filed?

2          MR. GLENN:  I did not see it, no.

3          THE COURT:  You did not comply with the Order, which

4    was specifically designed to give appropriate notice to any

5    party whose witnesses were to be cross-examined, and so the

6    objection is sustained.

7          MR. GLENN:  Okay.

8          MR. SOLOMON:  Your Honor, considering the fact that

9    there's no cross-examination, we have no redirect and we would

10   rest.

11         THE COURT:  And since there is no evidentiary --

12   principal evidentiary proffer, and there is no

13   cross-examination, the Whitebox necessarily rests.  Would you

14   agree, Mr. Glenn?

15         MR. GLENN:  Yes, Your Honor.

16         THE COURT:  All right.  And so we will -- and there

17   are no other parties who wish to make statements that I've

18   been made aware of.  Oh, Ms. Goldstein.

19         MS. GOLDSTEIN:  Thank you, Your Honor, for allowing

20   me to speak.  I will be very brief.

21         We do not take a position and we have not

22   participated in the --

23         THE COURT:  And you're representing National?

24         MS. GOLDSTEIN:  National Public Finance Guarantee

25   Corporation.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 30 of 47

167

1          We do not take a position and we have not

2     participated in this litigation insofar as it is to be a

3     determination as to whether and to what extent there would be

4     a charging lien against Whitebox or any indemnification to be

5     put up against Whitebox.  We take no position on the merits of

6     that.

7          However, there's been discussion of a charging lien

8     generally against COFINA cash.  To the extent that that is

9     being offered, and I don't believe -- or suggested, we do have

10    a view.

11         We understand that Bank of New York does not take the

12    position that it's -- such alleged charge, or asserted

13    charging lien would impact any holder of COFINA bonds insofar

14    as those bonds are entitled to distributions under the Plan,

15    other than Whitebox.

16         The Ambac matter has been resolved, so I don't need

17    to reference them.

18         So my understanding from Section 19.5 of the Plan,

19    also from BONY's own filings, is that no distribution that is

20    required to be made under the Plan with respect to any other

21    COFINA bondholder will be withheld as a result of, or on

22    account of, the claims.  And I'm reading from 19.5.

23         THE COURT:  That's what it says literally, yes.

24         MS. GOLDSTEIN:  Yes.  But there's some lack of

25    consistency when you're talking about a charging lien against

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 31 of 47

168

 1   COFINA cash.  The COFINA cash is what is going to be

 2   distributed.

 3        I don't think there's an issue with Bank of New York,

 4   but I just wanted to make it clear on the record that we are

 5   relying on Section 19.5 and, therefore, would expect -- and

 6   perhaps Bank of New York's counsel can clarify, because I

 7   believe it is their position that there will be no withholding

 8   of any other bondholders' distribution, if there is to be a

 9   withholding of any distribution.

10        THE COURT:  So just before Mr. Schaffer speaks, I

11   want to make sure that I understand the depth or breadth of

12   your position here.

13        Are you saying that your bottom line is you want to

14   be certain that any distribution to which National is entitled

15   will not be debited for any amount that I determine might be

16   properly withheld in order to protect Bank of New York Mellon?

17   You're not so concerned with my reasoning?  You're concerned

18   with the bottom line, and you want your hundred percent of

19   your distribution?  Is it that?

20        Or are you saying that you take exception to the line

21   of argument that says this isn't a withholding from Whitebox

22   as such; it is a withholding on account of COFINA's obligation

23   from COFINA's cash before it's distributed?

24        But in view of the particular provisions of 19.5, it

25   is to be charged against Whitebox's distribution, which leaves

Case:17-03283-LTS Doc#:4965-3 Filed:01/29/19 Entered:01/29/19 02:05:15 Desc:
Exhibit Exhibit C - January 17 2019 Hearing Transcript Page 32 of 47

169

1   your client in the same cash position, but this line of

2   reasoning that walks through COFINA --

3            MS. GOLDSTEIN:  Our only concern is that -- the cash

4   distributions anticipated to go to COFINA bondholders and,

5   therefore, to our client, and those cash distributions will be

6   for the most part distributed to our insureds.  We want to

7   make sure that the charging lien could not impact those

8   distributions.

9            What happens with respect to the Whitebox

10  distribution is a matter that's before this Court.

11           THE COURT:  Yes.

12           MS. GOLDSTEIN:  We take no position on that.

13           THE COURT:  Thank you.

14           Mr. Schaffer.

15           MR. SCHAFFER:  Your Honor, Eric Schaffer on behalf of

16  the Bank of New York Mellon.  I think we are in complete

17  agreement.  Section 19.5 sets forth that it is the mechanism

18  for satisfying the obligations of COFINA, and that they shall

19  be satisfied with monies that otherwise would be going to

20  Whitebox and Ambac.

21           And of course with Ambac, we still have the agreement

22  we announced at the beginning.  So I don't think there is

23  anything in 19.5 that would provide for monies to come from

24  anyone other than Whitebox in this instance.

25           THE COURT:  Thank you.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 33 of 47

170

1          Mr. Rosen.

2          MR. ROSEN:  Yes, Your Honor.  Thank you.  I think I

3     was allocated ten minutes, but I think I'll take one or two.

4          Your Honor, I did participate in a lengthy mediation

5     with Judge Houser, Bank of New York, Ambac and Whitebox with

6     respect to these issue.  I'm obviously not getting into what

7     was discussed.  19.5 is the outgrowth of that mediation

8     effort.

9          And I'm happy that Mr. Schaffer stood up and

10    acknowledged the understanding is that no other COFINA

11    creditor -- no other bondholder, excuse me, would be taxed

12    with any obligations other than Ambac and Whitebox, because

13    that was a very, very important provision to the Plan, and it

14    was important for the PSA creditors that they not be in any

15    way taxed with the ongoing litigation that either Ambac or

16    Whitebox would bring.

17         I just want to point to one other thing.  I

18    appreciate what Mr. Glenn said at the near outset, which is

19    that they do not oppose the Plan and, in fact, they voted in

20    favor of it.

21         Our concern, Your Honor, is that some of the

22    positions taken by Whitebox in the context of this litigation,

23    however, are tantamount to an objection to the Plan.  And if

24    the Court so determines that, Your Honor, that does have

25    severe consequences to a lot parties, especially Whitebox.

1          So we would want, if the Court goes in that

2    direction, to make a reference as to whether or not it

3    constitutes an objection to the Plan or not.  Specifically,

4    Your Honor, if I could elaborate, it would be a violation of

5    the Plan Support Agreement.

6          THE COURT:  Well, I think -- I'm sorry.  I understand

7    the connection there.  I'm just not sure that I see that

8    that's a necessary stop on my road to a decision, even if I

9    were to rule in favor of the bank.

10          If I were to say there are these issues that are

11    raised, and even if they might conceivably be construed as an

12    objection, they don't work for whatever other reasons without

13    ruling squarely on whether it's an objection, which you then

14    would say it's a breach of the PSA, since the PSA is not

15    before me for construction.

16          So what are you asking me to do or not to do?

17          MR. ROSEN:  Your Honor, we've only been concerned

18    that in light of some of the very well-articulated positions

19    by Whitebox in their papers, they have said that the

20    obligation is COFINA's and COFINA's alone if, in fact, it does

21    exist.

22          And I appreciate that Mr. Schaffer stands up and says

23    if it's COFINA's, I'm still not going to do anything.  That's

24    wonderful.  And if we get to that point, I don't really care.

25    But if there is a determination that COFINA has the

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 35 of 47

172

1   obligation, and it is not in any way limited to just the

2   distributions of Ambac and Whitebox, and it is taxed on other

3   creditors, that in our opinion, Your Honor, would be

4   tantamount to a Plan objection.

5         And in as much as they didn't file a Plan objection,

6   it's certainly in accordance -- by January 2nd, and they voted

7   in favor of the Plan, we think they waived any rights to

8   object.  But not withstanding that, Your Honor, they continue

9   to say that it is COFINA's obligation to pay any costs to Bank

10  of New York Mellon.

11        THE COURT:  All right.  So here's what I plan to do,

12  and I'm going to reserve decision today because I reserved

13  decision on the Plan, which this is a part.

14        MR. ROSEN:  Sure.

15        THE COURT:  I'm going to make a decision as to what

16  19.5 and the resolution of other documents that have been

17  cited do, as relates to the rights and obligations of Bank of

18  New York and COFINA, insofar as those could financially

19  implicate Whitebox.

20        I've been asked not to say that as to Ambac, because

21  there is some sort of agreement to which I'm not privy, and

22  that's fine by me.  And I hope it stays that way.  But, yes,

23  to the appropriate extent, if the other PSA parties decide to

24  take the position that Whitebox has violated the PSA and,

25  therefore, want to deny Whitebox whatever they want to deny

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 36 of 47

173

1    Whitebox, if that ripens into litigation, I'm sure I'll be

2    seeing something from you.  But until then, I don't see a need

3    to give you a ruling one way or another.

4            Mr. ROSEN:  That's fine, Your Honor.

5            May I ask one request of the Court?  And I have not

6    discussed this with Mr. Schaffer.  I have not discussed it

7    with Mr. Glenn.

8            Whatever determination that you make with respect to

9    this dispute between these parties, could you please include

10   it in a separate Order or decision and not have it be included

11   in whatever is done with respect to the confirmation of the

12   Plan of Adjustment?

13           Because in the event one of them wants to appeal, we

14   do not want it to effect in any way the finality of any Order

15   that you might enter in connection, with respect to the

16   confirmation.

17           THE COURT:  Yes.  I see that this has been queued up

18   as a separate contested matter, but, in a weird way, not

19   calling itself a motion.  But I've conceptually considered it

20   that way, except that I realize I don't have a docket entry to

21   resolve because of the way this has been done.

22           So it would be helpful, and I think consistent with

23   the way that we're proceeding for Bank of New York Mellon, to

24   file a motion requesting an Order resolving this dispute for

25   the reasons that have been developed on the record in these

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 37 of 47

174

1    proceedings.  And on the basis of the prior briefs, for

2    Whitebox to file an affirmation of its opposition to that

3    request for the reasons that have been proffered on the record

4    and in the briefs referenced there.  And then I can resolve

5    that motion with an Order that resolves this controversy.

6         And before I ask you whether that's acceptable to

7    you, I wanted to find out whether Ms. Tacoronte would still

8    speak to me if I told you to do that.

9         Does that work procedurally in this district?

10        COURTROOM DEPUTY:  Your Honor, I could create an

11   empty motion on the record on behalf of whichever party.  It

12   won't have a PDF attached to it, and it will make reference to

13   today's hearing, if that's appropriate for Your Honor.

14        THE COURT:  I think that Ms. Tacoronte has suggested

15   is an even more streamlined approach, which is for her to

16   create in the system a motion that refers to these proceedings

17   today, in respect of which I can enter an Order when I make my

18   decision.

19        MR. ROSEN:  May I suggest one alternative?

20        THE COURT:  Yes.

21        MR. ROSEN:  You already entered an Order in

22   connection with the establishment of this procedure to get

23   here today.  Could it just be a tag along to that existing

24   Order?

25        THE COURT:  Well, that request was to establish a

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 38 of 47

175

1    procedure, and so I resolved that motion by establishing the

2    procedure.

3            But Ms. Tacoronte, what do you think?

4            COURTROOM DEPUTY:  I can link it to whichever filing,

5    existing filing on the record.  I just need all the details.

6    So since there is not -- we don't have a PDF attached to it, I

7    will need, you know, filer --

8            THE COURT:  I'm going to go back to my original

9    proposal, because then that bookkeeping can be done in one

10   place by the parties.

11           So, Mr. Schaffer, will you file a motion asking me

12   for the determination that under the combination of 19.5 and

13   whatever you're entitled to --

14           MR. SCHAFFER:  And Your Honor, may we have until

15   Monday to do that?

16           THE COURT:  Yes.

17           MR. SCHAFFER:  Thank you.

18           THE COURT:  And since Monday is a National holiday,

19   will you, Mr. Glenn, file your formal opposition paper to that

20   by Tuesday?

21           MR. GLENN:  Yes, Your Honor.

22           THE COURT:  All right.  Thank you.

23           MR. ROSEN:  Your Honor, thank you very much.

24           THE COURT:  Thank you.

25           And so I think that brings us to replies and closing

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 39 of 47

176

1   statements.

2        And so Mr. Glenn, you're up first.

3        MR. GLENN:  I won't, Your Honor, repeat what I've

4   said on my opening statements.  We think that if you parcel

5   the language in our brief, that that's dispositive of the

6   issue and you don't need Mr. Goldberg's testimony or certainly

7   not Mr. Fishman's testimony.

8        Their analysis in their expert reports was based on

9   theoretical assumptions concerning the estimated legal fees to

10  be incurred in these cases.  There was no budget provided by

11  the Reed Smith law firm.  There was no use of comparable

12  analyses of other cases handled by Bank of New York or Reed

13  Smith.  And so we think that it's inappropriate to use those

14  expert reports as a basis to impose any liability on Whitebox.

15        Similarly, there's no allocation --

16        THE COURT:  You say imposed liability.  You mean if I

17  find that there is an obligation to reserve or make provision

18  for defense costs, those aren't an appropriate basis for

19  quantifying that obligation?

20        MR. GLENN:  Correct.  Correct.

21        THE COURT:  Thank you.

22        MR. GLENN:  We understand, and I respect

23  Mr. Goldberg.  He's a former partner of my firm.  And it's

24  always difficult, as we know, to create litigation budgets

25  prospectively.

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 40 of 47

177

1          But there's been a lot of litigation in this case

2    already, a lot of overlap with the interpleader case that was

3    well under way with document discovery.  And instead, what

4    Mr. Goldberg did is he created a hypothetical, round-up

5    analysis that was untethered to any work that had been done

6    previously in the case, untethered to whether 40 depositions,

7    which was his assumption what was needed, untethered to the

8    allocation between Whitebox and Ambac litigation.

9          And frankly, we don't know what the Ambac resolution

10   is.  So it's hard with no allocation from the Court to figure

11   out how much now Whitebox would have to pay, given the

12   settlement and given the unreliable nature of Mr. Goldberg's

13   approach.  But we don't think you need to get there.

14         And we provided Your Honor with, I think, three

15   briefs, where we parse through the language in this case.  And

16   I don't think I need to say anything more, other than to refer

17   back to those briefs, which I think parse through the actual

18   words in this resolution as opposed to what the Bank of New

19   York would like them to say.

20         Thank you very much.

21         THE COURT:  Thank you.

22         MR. SOLOMON:  Thank you.  May it please the Court.

23   Lou Solomon.

24         I have only recently been exposed to this, frankly,

25   dazzling display of the administration of justice, the likes

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 41 of 47

178

1    of which I've never seen.  I do know how to read Your Honor's

2    Order from May 30, 2017.  It was the Interpleader Order.  And

3    at that time, the claims against the Bank of New York had

4    already been asserted.  They have to be changed now because of

5    the releases that had already been asserted.

6         Your Honor was reviewing the same resolution, the

7    same instrument that forms the basis of the legal argument

8    Mr. Schaffer gave.  And Your Honor says in paragraph nine,

9    from time to time, BNYM shall be entitled to reserve for or

10   pay its reasonable fees and expenses, whether or not due and

11   owing, from the disputed funds.

12        So that's how Your Honor read the resolution in

13   connection with the Interpleader Order, and it's argued that

14   it hasn't changed, nor should the reading of it change.  So

15   the legal issue aside, there's an entitlement to reserve for

16   or pay reasonable fees and expenses.

17        Mr. Schaffer hasn't proven that it is Whitebox who

18   should be making that payment.  The question then becomes one

19   of quantum.  We showed up.  They didn't.  We offered Your

20   Honor two experts, both of them highly skilled in their

21   particular areas of expertise.

22        Mr. Goldberg does budgets in complex litigation.  He

23   lays it out in extraordinary detail, 30 pages, single spaced,

24   that Your Honor has seen.  And then in his exhibit, he goes

25   through tasks that would need to be done, how many hours it

1    will take, what's the blended billing rate for it.

2           Is there speculation in it?  There is speculation in

3    it.  Whose responsibility is that speculation?  It is

4    Whitebox's responsibility.  So Whitebox, who was asked by us

5    on November 29, that is Exhibit 4767-9 -- when the mediation

6    failed, you said okay, we're going into this phase of this.

7    Tell us what the claim is.  Tell us what your damages are.

8    And they didn't respond.

9           So this is Whitebox, who is -- this is the fellow

10   throwing himself on the mercy of the Court, having killed his

11   parents, claiming he's an orphan.  They've created the

12   uncertainty, and now he is complaining that there is

13   speculation.

14          The experts did the best they could, knowing what

15   kind of litigation this is.  It was certainly a misstatement

16   when Mr. Glenn said there were no analogies, because having

17   gone through 25 single-spaced pages of telling Your Honor what

18   will need to be done in this case, in three separate places in

19   the Goldberg testimony, in the Goldberg Declaration, he steps

20   back and he says, let me test this against what is reasonable.

21          And he goes through the fees of other firms in this

22   bankruptcy proceeding.  He goes through other complex cases.

23   And in the end, he goes through an analogy to another case

24   against a trustee.

25          So that is all in the record before Your Honor.  And

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 43 of 47

180

1    in that regard, the range that he comes up with between 25 and

2    40 million dollars is on -- as he said, on the lower end of

3    the range.

4           Mr. Glenn had said, well, you know, a lot of work had

5    already been done in the interpleader action.  He asked the

6    witness that in his deposition.  But very little work had been

7    done in the interpleader action, because Your Honor had stayed

8    that portion of the interpleader action.

9           And in one of the Orders that was an exhibit we have

10   that we offered Your Honor today, it shows that stage three

11   was the claim that Mr. Glenn says they had been litigating.

12   And this case has not gotten to stage three.  That was already

13   stayed.

14          And so nothing, very little had been done.  But even

15   so, Mr. Goldberg explains in his testimony to Your Honor, and

16   he took into account, minimally, but still took into account,

17   savings that might be incurred because of the earlier claims

18   that had been asserted.  Those earlier claims are going to

19   wash away.

20          There's not a fraud claim earlier.  There is a fraud

21   claim that they say they're going to bring now.  And when you

22   sue the Bank of New York for fraud and for willful misconduct,

23   guess what?  It is going to defend itself.  And the first sort

24   of act contrary to public policy is the notion that Whitebox

25   here can actually tell the Bank of New York how much it can

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 44 of 47

181

1    spend to defend itself.

2         Mr. Glenn talked about the American legal system.

3    That ain't the American legal system.  So we brought you two

4    experts:  One, Mr. Goldberg; one, Mr. Fishman.  And

5    Mr. Fishman addresses it from the context of a fee examiner,

6    like assuming what Mr. Goldberg said.

7         Now, is it reasonable in the context that he has

8    experienced.  And he tells Your Honor, yes.  No

9    cross-examination.  No other experts.  No other evidence.

10        The range that they found reasonable, between 25 and

11   40 million dollars, there's no allocation that should arise

12   because of that, because what the witnesses were telling the

13   Court is how much do his claims cost to defend.

14        Whitebox doesn't get a buy or a reduction or setoff

15   because Ambac was reasonable and they resolved this through

16   the efforts of Judge Houser.  That Whitebox is the dog in the

17   manger, that Whitebox is the holdout, is not a reason to

18   reward it.  It's a reason to draw inferences against it.

19        The midway point between 25 and 40 million dollars is

20   32.5.  Your Honor should ask and direct and set aside 32.5

21   million dollars be paid by Whitebox.  Your Honor has the

22   protections that each of our witnesses has talked about, and

23   that is, if the money is not used, obviously the Bank of New

24   York will repay it.

25        Second, there is a challenge of reasonableness at the

Case:17-03283-LTS Doc#:4965-3 Filed:01/29/19 Entered:01/29/19 02:05:15 Desc:
Exhibit Exhibit C - January 17 2019 Hearing Transcript Page 45 of 47

182

1   end of the day.  If they want to claim that the Reed Smith

2   firm or whoever's going to do the case was not reasonable,

3   they are not losing their opportunity to argue that.  And if

4   they can prove that the Bank of New York acted fraudulently,

5   and one has to suspend his belief in this part of the

6   proceedings -- Judge, I think it's a groundless claim.  But

7   that's not what we're here for.

8          If they can prove that there was gross negligence or

9   willful misconduct, then they have a right to come to court

10  and say that the Bank of New York should turn it all back.

11  Those are protections that we have agreed, the Bank of New

12  York Mellon has agreed should go into the holdback.  And with

13  that, I will stop.

14         Thank you.

15         THE COURT:  Thank you, Mr. Solomon.

16         Thank you, Counsel, for these arguments and for your

17  submissions.  I am taking this matter under submission.

18         I will look forward to the procedural motions that

19  will give me something to hang an Order on.  And you will be

20  notified when I've reached a decision.

21         Ms. Uhland.

22         MS. UHLAND:  Good afternoon, Your Honor.  Suzanne

23  Uhland for AAFAF, representing AAFAF here today for O'Melveny

24  Myers.

25         If now is a good time, I had a quick question about

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 46 of 47

183

1      the supplemental briefing.  I just wanted to make sure.

2                THE COURT:  Yes.

3                MS. UHLAND:  I understand the additional briefing

4      with respect to the legislation, but the Court also said that

5      explanation -- I think you said of the legal basis of the

6      independent corporation?

7                THE COURT:  Well, I left 170 back in my office, but I

8      think the first item in 170 is that new COFINA is an

9      independent public corporation entirely separate and validly

10     established, and some legal anchors in Puerto Rico law for

11     those propositions would be helpful.

12               MS. UHLAND:  All right.  Thank you, Your Honor.  That

13     clarifies it.

14               THE COURT:  And if there's anything yet similar in

15     there that is a -- because I don't remember the whole list.

16               MS. UHLAND:  But it's paragraph 170?

17               THE COURT:  Paragraph 170.

18               MS. UHLAND:  Thank you, Your Honor.

19               THE COURT:  It deals with the status of entities and

20     the nature of the entities.

21               MS. UHLAND:  Thank you.

22               THE COURT:  All right.  Anything else, Mr. Rosen?

23               MR. ROSEN:  No.

24               THE COURT:  He says no.

25               Once again, thank you, advocates; thank you, Judge

Case:17-03283-LTS   Doc#:4965-3   Filed:01/29/19   Entered:01/29/19 02:05:15   Desc:
Exhibit Exhibit C - January 17   2019 Hearing Transcript   Page 47 of 47

184

1    Houser; and thank you also to Judges Ambro and Atlas and the

2    other members of your team.  And I trust that you will convey

3    those thanks.

4            Keep well.  Safe travels, everyone.  And I will see

5    you in New York in two weeks I think.  I haven't had any

6    objections to New York.

7            And I'm sorry.  Once again, thank you so very much to

8    the Court staff here and in New York for smooth administration

9    of these proceedings and their gracious and hard service.

10   Thank you.

11           (At 3:44 PM, proceedings reconvened.)

12                          *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25