UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

         Debtors.[1]

-----------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

     The Court has received and reviewed the attached correspondence, described

below, from interested persons in the above-captioned cases. Although the Court cannot respond

individually to all of those who have expressed their thoughts or concerns, the Court is deeply

mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the

importance of the issues that are raised in these unprecedented cases.

    1.      Email dated January 17, 2019 from Adalberto Nunez Lopez
    2.      Email dated January 17, 2019 from Alanis Rosa
    3.      Email dated January 17, 2019 from Camille Alexandra Padilla Dalmau
    4.      Email dated January 17, 2019 from Chabela Rodriguez

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case
number and the last four (4) digits of each Debtor's federal tax identification number, as
applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS)
(Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation
("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:
8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No.
17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System
of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK
3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power
Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax
ID: 3747).  (Title III case numbers are listed as Bankruptcy Case numbers due to software
limitations).

5.	Email dated January 17, 2019 from Cruz Miguel Ortiz Cuadra
6.	Email dated January 17, 2019 from Doris Boyer
7.	Email dated January 17, 2019 from Dr. Carlos J. Vasquez-Berrios
8.	Email dated January 17, 2019 from Dr. Josue Segarra Lucena
9.	Email dated January 17, 2019 from Grace Rodriguez
10.	Email dated January 17, 2019 from Griselle M. Robles Ortiz
11.	Email dated January 17, 2019 from Jose Olmedo
12.	Email dated January 17, 2019 from Matthew Perry
13.	Email dated January 17, 2019 from Myra Rivera
14.	Email dated January 17, 2019 from Nancy Matos Vazquez
15.	Email dated January 17, 2019 from Ramon Torres
16.	Email dated January 17, 2019 from Ramon Torres
17.	Email dated January 17, 2019 from Steven Susko
18.	Email dated January 17, 2019 from Vivian Azalia
19.	Email dated January 17, 2019 from Yadira Figueroa
20.	Email dated January 17, 2019 from Daniel Nagy
21.	Email dated January 18, 2019 from Cruz M. Ortiz
22.	Email dated January 18, 2019 from Eileen Llorens
23.	Email dated January 18, 2019 from Eileen Llorens
24.	Email dated January 18, 2019 from Eileen Llorens
25.	Email dated January 18, 2019 from Jose Caraballo Cueto
26.	Email dated January 18, 2019 from Juan Carlos Shannon Melendez
27.	Email dated January 18, 2019 from Maria Cristina Oruna
28.	Email dated January 18, 2019 from Nahiri Rivera
29.	Email dated January 18, 2019 from Nashalie Vazquez
30.	Email dated January 18, 2019 from Raquel Gonzalez-Sparks
31.	Email dated January 19, 2019 from Aaron Jose-Basurto
32.	Email dated January 19, 2019 from Juan Cruet
33.	Email dated January 19, 2019 from Lianabel Oliver Bigas
34.	Email dated January 19, 2019 from Myrtha Rose Santiago-Fernandez
35.	Email dated January 19, 2019 from Sonia Carrasquillo
36.	Email dated January 20, 2019 from Arlene Garcia
37.	Email dated January 20, 2019 from Arthur Samodovitz
38.	Email dated January 20, 2019 from Maria De Mar Irizarry
39.	Email dated January 21, 2019 from Anthony Rodriguez
40.	Email dated January 21, 2019 from Arthur Samodovitz
41.	Email dated January 21, 2019 from Cate Long
42.	Email dated January 21, 2019 from Edwin Navarro Monserrat
43.	Email dated January 21, 2019 from Frank Rosario
44.	Email dated January 21, 2019 from John Rullan

45.     Email dated January 21, 2019 from Lydia Gilligan Washington
46.     Email dated January 21, 2019 from Manuel Velez Calle Arquitecto Pedro Bigay
47.     Email dated January 21, 2019 from Meralis Hood
48.     Email dated January 21, 2019 from Rodolfo Plancarte
49.     Email dated January 21, 2019 from Sonia Rivera
50.     Email dated January 21, 2019 from The Democratic Socialists of American –
        Palm Beach Chapter
51.     Email dated January 22, 2019 from Eileen Llorens
52.     Email dated January 22, 2019 from Jason Martinez
53.     Email dated January 22, 2019 from Lisa Lewis
54.     Email dated January 22, 2019 from Sean Seary
55.     Email dated January 23, 2019 from Christopher Cuevas
56.     Email dated January 23, 2019 from Erik Ortiz
57.     Email dated January 23, 2019 from Jaime Diaz Oneill
58.     Email dated January 23, 2019 from Jaime Diez Oneill
59.     Email dated January 23, 2019 from Julissa Vazquez
60.     Email dated January 24, 2019 from Alexander Burgos
61.     Email dated January 24, 2019 from Andres Hernandez
62.     Email dated January 24, 2019 from Elba Rivera
63.     Email dated January 24, 2019 from Samuel Rodriguez
64.     Email dated January 25, 2019 from Arthur Samodovitz
65.     Email dated January 25, 2019 from Basilio Gaztambide
66.     Email dated January 25, 2019 from Bertha Mendez
67.     Email dated January 25, 2019 from Eileen Llorens
68.     Email dated January 25, 2019 from Mariel Muniz-Otero
69.     Email dated January 25, 2019 from Rosannie Sierra
70.     Email dated January 25, 2019 from Fred Zaya
71.     Email dated January 25, 2019 from Jezmina Lora
72.     Email dated January 25, 2019 from Luis Pagan
73.     Email dated January 26, 2019 from Eileen Llorens
74.     Email dated January 26, 2019 from Eileen Llorens
75.     Email dated January 26, 2019 from Eileen Llorens
76.     Email dated January 29, 2019 from Javier Mandry

Dated:  January 30, 2019



**Judge Swain, please reject the COFINA agreement under your consideration today.**

Adalberto Nunez    to: swaindprcorresp                    01/17/2019 03:31 PM

From:    ███████████████████████

To:    swaindprcorresp@nysd.uscourts.gov

Judge Swain,

Please reject the COFINA agreement under your consideration today.

It is too onerous for the people of Puerto Rico. Surely there are other better alternatives.

Thanks for your attention.

--

**ADALBERTO NÚÑEZ LÓPEZ**



**Debt**

Alanis Rosa    to: swainDPRCorresp@nysd.uscourts.gov        01/17/2019 11:21 AM

From:    ████████████████████

To:      "swainDPRCorresp@nysd.uscourts.gov" <swainDPRCorresp@nysd.uscourts.gov>

We are afraid of our future as puertorican citizens.



**About Puerto Rico**

Camille Alexandra   to: swainDPRCorresp                                    01/17/2019 12:04 PM

From:   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To:   swainDPRCorresp@nysd.uscourts.gov

Dear Hon. Judge Swain,

I've been crying all morning worrying about the future of Puerto Rico. I used to live in New York City and moved to the island in the summer of 2018 to be with my family and do my part in making it better. There are many like me, who have come back in the hopes that we can contribute by giving what we've learned outside of Puerto Rico. (Our story barely gets told.)

My name is Camille and I'm a storyteller, journalist, healer, and proud born and raised Puerto Rican. I moved to the United States to pursue an education and was able to get my master's degree in Columbia University in New York.

I feel so impotent. How can I help Puerto Rico when the most important decisions over the island are made by people thousands of miles away?

I have so much respect for you and I ask that you remember the colonial legacy of Puerto Rico as you make a decision. We never chose to be part of the United States, never chose to be ground of medical and financial experiments, never chose to be U.S. citizens, and we didn't vote for the members of Congress that passed PROMESA.

I ask that you demand a proper and comprehensive debt audit. In places like Argentina, auditing the debt was necessary for restructuring. I ask that you hold the people who decided to play with other's livelihood accountable. Puerto Rico's constitutions is very clear and this impunity cannot continue.

I'm praying for you, asking the ancestors and guides to help you through this decision.

I want to make Puerto Rico a better place. I see so much potential in my island. But a plan like COFINA makes me lose hope that I can help.

Sincerely and lovingly,
Camille Alexandra Padilla Dalmau



**No Cofina**
Chabela Rodríguez   to: swaindprcorresp                      01/17/2019 09:16 PM
Cc: diasporaenresistencia

| | |
|---|---|
| From: | ████████████████████████ |
| To: | swaindprcorresp@nysd.uscourts.gov |
| Cc: | ████████████████████ |

Judge Swain,

Please reject the COFINA agreement under your consideration today. It is  unconstitutional (our constitution forbids such loans),  discriminatory (giving COFINA bondholders unwarranted preferential treatment), and  inhumane (it works at the expense of restricting essential services that though not specified by our  government or the "Junta", are universally defined as services, the interruption of which endangers the life, health or personal safety of the whole or part of the population.)

On the last point, the inevitable "austerity plan" required threatens the public health, education, pension and security systems, endangering the population and promoting impoverishment  across the board.

Respectfully,

María Isabel Rodríguez González, Sparks

Citizen of Puerto Rico



**Fwd: Dont rule_ COFINA_SOCIAL Capital**
Cruz M Ortiz Cuadra    to: swaindprcorresp                    01/17/2019 07:34 PM

From:    ▮▮▮▮▮▮▮▮▮▮

To:    swaindprcorresp@nysd.uscourts.gov

---------- Mensaje reenviado ----------
De: "Cruz M Ortiz Cuadra" ▮▮▮▮▮▮▮▮▮▮
Fecha: 17 ene. 2019 7:34 PM
Asunto: Dont rule_ COFINA_SOCIAL Capital
Para: <swainDCPRCorresp@nysd.uscourts.gov>
Cc:

Honourable Judge Taylor Swain:

My name is Cruz Miguel Ortiz Cuadra, food historian and retierd professor of The University of Puerto Rico. I am 64 years old and worked as professor for 37 years at the University of Puerto Rico, Humacao Campus.

With ddue respect I bring to your attention my deepest concern about the agreement accorded by the Goverment of Puert Rico (GPR) and COFINA. My argument wont be adorned with numbers, nor legal terms. Its a straight forward claim of justice-to-act- upon injustice.

First of all, historical experience have demonstrated that in the last decade the GPR have misused COFINA revenues for pourposes other than advancig the fiscal health and social capital of Puerto Rican US citizens. It is highly probable that this accord -that in fact increases exponentially the incapacity of PRG to repay the debt- will put in high risk  the actual social fragility of Puerto Rican society, particularlly the  over 65 yrs. population ( which from 2010 to 2017 increased from 15%  to 20% of the total popuation of PR).

If I may, let me say I know you were born in 1958, probably grew up as a brooklyner experiencig  the social, political and world-shaking era of the sixties and seventies and underwent - and surely surpassed- all the inequalities suffered by minorities in those years.

But you took the necesarry steps to keep looking ahead. I have no doubght your highschooling and your  Harvard School of Law degree is the result of family and personal endeavors, always looking forward to make a dream come through: the social, cultural and economic well being of you and your familiy.

It is possible, your Honor, that at this moment of your life you have go over your autobiography  time and time again.  And probably, if I am correct, it is has come as re-examination of the *nature*  of your familiy and personal efforts set against the *historical circumstances*   that both of you grew upon. A mindly exersice obliged when any one nears the age of retirement or is thinkig about it.

My biography is somewhat like yours. I was not born a poor child, but neither a rich one . But mom and dad always taught me to put my best efforts in taking advantage of the *social capital* a democrtatic and free State can bring to their citizens: education, jobs, health, access to simple commodities, higher education, etc. I think you framed your future valuing and taking positive advantages of  this *social capital* .

I am a Ph D graduate from the University of Puerto Rico. My education at *La IUPI* - as everybody in Puerto Rico calls our highly loved University,with 50k students- permited me to stuydy at Ruskin College, Oxord Uk back in the early 80`s. Since then I became a professor And since then I kept looking forward to work and transmit the values of *cultural capital*.

When I was near my retiement age- as you are now- I felt at ease, bearing in my concience the satisfaction of a well done job. But also I felt confident that I could keep advancing the *social capital*  as a senior consumer, transmiting my knowledge, and also learnig from young people. You know why?   Because I saved all my retierment money  -through 37 years- to a strong- and still strong-  *Sistema de Retiro de la Universidad de Puerto RIco.*

 As I said at the begining, the high probabilities of a new endebment by the GPR if the COFINA pact is ruled,  will drive policy makers to make improvissation the norm,  and  to shrink over and over the retierment fund of the UPR, not only because of ideological considerations ( there have always been an undercovered ideological argument by greedy capiltalism against UPR academic social capital education)- bot because they don really believe in high education as an esencial service.

I beg you please not to rule COFINA agreement. If COFINA agreement is ruled,  the benefiits of *social capita*  l will no longer be the steps to imagine the future -as you and I did- throuhg education and personal maneagement. The well being retired professors of the UPR and the sound future of coming genereations are highly at risk.

Sicerely yours

Cruz M Ortiz Cuadra



**COFINA - A view from a subordinate bondholder**
Doris Boyer   to: swainDPRCorresp                                    01/17/2019 01:00 PM

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To:     swainDPRCorresp@nysd.uscourts.gov



COFINA statement.docx

I don't know how the COFINA situation will end after everything is said and done, but I do have a proposal that I think could satisfy the Puerto Rican bondholders.  Whatever difference remains between the money invested and the amount finally paid should be credited towards government services.

And this is how it would work.  The final amount owed to each COFINA bondholder should be put into an account and the transactions run by a private company.  A debit card would be issued and a nominal fee would take care of expenses incurred.  Then, the investor would debit the account every time he needs to pay the license plates or "marbete", any utilities run by the government, income tax, property tax (CRIM), stamps for legal documents, taxes on property sales, tolls, even the IVU on purchases.  In short, all government taxes and services.  Should the cardholder die before the total amount is used, as most of us will because of our age, the heirs could use it to pay estate taxes (of course, with the necessary documents to prove the precedence).  And, against which account will the disbursements be made?   Against one of the bank accounts the government always finds, or one of those accounts that miraculously appears every once in a while to avoid a government shut down.  I'm sure they can find the money.

The reasoning behind this is that no matter the legal language used, it boils down to this.  We lent the government money that had a guaranteed repaying source.  That was what we were told and that's the agreement we signed.  If the government or the Board later decided, without our consent, to change the contract, they must somehow come forward with a solution.  This is my solution.  If the roles were reversed, would the government forgive me for spending all the money and some more, and then telling them that they will have to bear the loss? No.  Then why should we?

All the money invested in COFINA bonds is based on the sacrifices I made during my whole working life. As a secretary for 44 years, I was very frugal with my purchases, wore a uniform to save on clothing, brown bagged to save on lunches, live in a working class neighborhood, saved in all kinds of summer and Christmas clubs so I could take vacations, had an IRA account, etc.  To this day, I drive a 1999 Toyota and my dining room furniture is the same as when I married in 1983 (widowed since 2010).

I am sure that my story will repeat over and over with each and every one of my fellow Puerto Rican investors.  We all thought that by investing our hard earned money would assure us a worry-free old age (moneywise), that we would not become a burden to our families because we are not used to being burdens to the government or anyone, and then our world was turned upside down because the government decided that it would be great to steal and forget.  I, for one, will never forget that my money has gone down the drain.  My fault? Absolutely not.

And finally, if the idea referred to above is not possible, I implore you to rule in a very clear manner on how we can take the loss because, believe me, this is very hard on our future.


Doris Boyer Ayestarán



**Reject COFINA**
Dr. Carlos J. Vázquez-Berríos    to: swaindprcorresp                          01/17/2019 01:22 PM

From:   ████████████████████████

To:     swaindprcorresp@nysd.uscourts.gov

Judge Swain please reject the COFINA agreement under your consideration today.



**Please, read this.**
Dr. Josué Segarra Lucena   to: swaindprcorresp                    01/17/2019 03:54 PM

From:

To:        swaindprcorresp@nysd.uscourts.gov

Dear Judge Taylor Swain:

Receive a cordial greeting. I am an American citizen and a newly graduated doctor. I still can not find work in Puerto Rico. I want to stay here and not have to emigrate to the USA because of the terrible austerity measures that have to be implemented if the COFINA agreement is signed.

**The debt of COFINA is illegal**. <u>I do not say it, the experts say</u>. **That debt was contracted unconstitutionally**. Please, I ask you, I implore you, **do not sign the COFINA agreement.**

Do not condemn me and future generations to have to leave our country because of the corruption of people who got us into this debt. **Have empathy with the pain and suffering of the people.** <u>That agreement was approved by the legislature of Puerto Rico without public hearings, violating the due process of law and as dictated by our Constitution.</u> Do not be an accomplice to legalize a debt that was obtained illegally. **It's like laundering money.** Convert something illegal into something legal.

Please, on behalf of my entire generation, do not condemn us to extreme poverty.

Thank you for your time and again, I implore your good will and put yourself in the shoes of Puerto Ricans.

Very respectfully,

Att. Dr. Segarra



**REJECT the agreement between COFINA and the FOMB on Jan . 16**

Grace Rodriguez    to: swaindprcorresp                                  01/17/2019 02:18 PM
Cc:  diasporaenresistencia

From:        ████████████████████████████

To:          swaindprcorresp@nysd.uscourts.gov

Cc:          ████████████████████████



Press Release.docx

REJECT the agreement between COFINA and the FOMB on Jan. 16

**Email Content:**
Dear Honorable Judge Taylor Swain,

I am Grace Rodriguez. I write to you because I am very disappointed and worried about the actions that the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another never-ending economic crisis that will lead Puerto Rico into another debt default and will only cause more harsh austerity measures, cuts in public services and pensions. The measures dictated by the FOMB have been implemented in a disorganized, illogical, and irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto Ricans from a real opportunity to get affordable education and healthcare, and limiting the capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The weak attempts of the board to fake an audit process are not going to work on us; we know this debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that allows us to really know how the debt was issued and to ensure that is it paid justly and legally. Please do what is right and rule against this agreement on January 16th's 2019 hearing.

Sincerely,

Grace M. Rodriguez
Quebradillas, PR, 00678



**COFINA**

Griselle Robles   to: swainDPRCorresp                    01/17/2019 01:25 PM

From: ███████████████████████

To:      swainDPRCorresp@nysd.uscourts.gov


Thanks for your time. Puerto Rico does not deserve this treatment. We are hard
working people.

For me the real question is how much the bond holders paid for this bonds vis
a vis how much they are going to get with this agreement.

I request respectfully from you to send the parties back to the negotiation
table. Meanwhile, the debt shall be audited, and the term "essential services"
should be defined. Otherwise, our country will fall apart, due to more
migration and social instability, factors which will leave the debt unpaid.

Sent from my iPhone
Griselle M. Robles Ortiz



**Puerto Rico debt and bankruptcy case**

jose olmedo    to: swaindprcorresp                                    01/17/2019 09:56 AM

From:

To:        swaindprcorresp@nysd.uscourts.gov

Hi Judge Swain

    I am writing since I am amazed to all the letters I have seen (open) and commentaries I have read all over the newspapers and other informational items.

As you may already realize Puerto Rico (PR from now on) is highly politized in every aspect and every business everywhere and anywhere. I have seen some bond holders say pay me but don't pay my neighbor??, give me money but someone else is rich so don't give him money. I am shocked about this culture and the me comes first and everyone else forget about it. I personally do not have and did not even looked at the PR bonds since I always saw that PR was so much in debt that it would come to this. But then again my father lost a lot of money with these bonds.I remember when these bonds were available it was like a thing to say to your neighbor " I got invited to the meeting" I mean it was like a status symbol. Also the ones who got early into the bonds were also spreading the word about the 10% or 15% yield they were getting and payments that were received.

Then it all happened the snow ball hits a wall, everybody is running around losing money and blaming someone else. The old people want their money and say to the young you have all your life to recover. Bla Bla Bla.

Now for the truth. Tobin the economist forecasted this around 1970s, people ignored this, the party goes on.

The government keeps lying about PR GDP numbers and the banks keep lending money. Is this legal? Up to a point yes because the PR government had the number for it although there had not been a financial statement to back this up! Still I remember  going to the bank with my father and he ask for a loan. the manager ask him Can you handle this debt? my father yes and 10 minutes later we had the check in hand is this legal? do we have to pay? Who is liable?

My best guess is that the debt has to be analyzed completley. The culprits should pay with their property and their freedom and the law should fall on them. The debt illegal or not, there or false is a debt and was requested and received by the government and its structure it has to be paid.

Adding to this the government has not done anything to cut debt or structure its working ability still worse it is spending money like it is going out of style.There are agencies that could close down and it would not interfere with day to day operations i.e. metropolitan bus system; the train that goes nowhere; the electoral sites; the municipal senate offices; a lot of municipalities that have no reason to be there; there are more

As you may know salaries for the government and its employees are way better than the ones in private business, so is their retirement plan medical plan and all the benefits that they have, these should come down and monitored same as private business.

Anyway is there a way I can help just let me know.

Have a great day

--

JR Olmedo



**Cofina Bonds**
Matthew Perry   to: swainDPRCorresp                    01/17/2019 11:37 AM

From:        ████████████████████████████████
To:          <swainDPRCorresp@nysd.uscourts.gov>

Dear Judge Swain,

As a bondholder of a number of COFINA bonds, I am most disappointed in the direction that this case
has taken.  The major players in the litigation were permitted to purchase additional bonds at severely
discounted prices because they had the funds to do so, thus averaging down their costs.  Unfortunately,
I, along with most retail investors were not in the same position to do the same. They end up profiting,
thus they were willing to settle for "peanuts".

Since their cost basis is likely below the current or negotiated price for the bonds, it is no wonder they
are in favor of the deal.  They never should have been allowed to purchase more bonds, particularly
while in litigation.  This is grossly unfair.

Additionally, I along with all investors purchased these bonds for the tax free income that they were to
generate.  With the distribution frozen for nearly two years, I, again along with many investors, lost any
and all income.  No deal should have been approved or negotiated in the first place without making the
bondholders whole with respect to the bond interest.  This should be an absolute requirement that a full
distribution of the funds being held by The Bank of New York be distributed to the bondholders.

I hope that you are still in a position to rule on this.  It is bad enough that we are getting shortchanged.
Don't add insult to injury by not ruling in favor of a full distribution of the accrued interest.

Respectfully,

*Matthew Perry*

████████████████████
████████████████████
████████████████████



**Do the right thing**

Myra Rivera   to: swaindprcorresp                                    01/17/2019 11:08 PM

From:   ████████████████████

To:   swaindprcorresp@nysd.uscourts.gov

Dear Judge Taylor Swain:
To do the right thing is what it's expected from a person in your position. And what would the right thing be? I would say what is fair and good for the majority of the people, specially for the most vulnerable: our children, our old people, those with disability, the poor, single mothers, those of us who will not just catch a flight and leave the country. No agreement is more important than the welfare of the people of my country. No one has the right to put such heavy burden on our present and future generations. No one has the right to put a lien on those who are not yet born neither condemn those of us who are retired, who worked hard all our life and can't make ends meet now to live without dignity. The sensible thing any ordinary person would do is to check the debt, to see if it's legal before engaging in a payment contract. We, the people of Puerto Rico, have been demanding that an independent audit be performed, to establish what part of the debt is legal, and then we can talk about negotiating payments. So the right thing is to not approve the COFINA agreement. The right thing is to order the audit. You have the opportunity to make history.
Sincerely,

*Myra Rivera Torres*





### REJECT COFINA's AGREEMENT
Nancy   to: swaindprcorresp                                01/17/2019 05:40 PM

From:   ████████████████████
To:     swaindprcorresp@nysd.uscourts.gov


swaindprcorresp@nysd.uscourts.gov

REJECT COFINA's Agreement

Dear Judge Laura Taylor Swain:

My name is NANCY MATOS VAZQUEZ from San Juan, Puerto Rico. I stand with the
Puerto Rican people on their struggle, so I ask you Judge Swain to REJECT
COFINA's Agreement.

Merry Christmas!

Cordially,

NANCY MATOS VAZQUEZ
Sent from my iPhone



**Interpretación de la constitución relacionada a deuda pública**
Ramon Torres   to: swaindprcorresp                    01/17/2019 09:31 PM

From:

To:        swaindprcorresp@nysd.uscourts.gov

http://revistajuridica.uprrp.edu/wp-content/uploads/2016/06/85-Rev.-Jur.-UPR-7
05-2016.pdf



85-Rev.-Jur.-UPR-705-2016.pdf

Sent from my iPad

# DISPOSICIONES SOBRE LA DEUDA PÚBLICA EN LA CONSTITUCIÓN DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO: BREVE REFLEXIÓN HISTÓRICA-CONSTITUCIONAL

## PONENCIA

CARLOS E. RAMOS GONZÁLEZ*

Introducción .................................................................................................... 705
I. Génesis de las disposiciones constitucionales sobre la deuda pública ............ 705
II. Enmienda a la disposición sobre el margen prestatario.................................. 710
    A. Antecedentes ............................................................................................ 710
    B. La enmienda de 1961 ................................................................................ 712
    C. Trámite legislativo de la enmienda de 1961 ............................................ 714
    D. Referéndum y la campaña proselitista..................................................... 715
Conclusión ....................................................................................................... 719

## INTRODUCCIÓN

A PARTIR DE 1950 EL PROYECTO DE CRECIMIENTO ECONÓMICO DE PUERTO Rico necesitó de disposiciones constitucionales fundamentales que serían pilares para las finanzas públicas del Gobierno de Puerto Rico. De un lado, se constitucionalizaría la emisión de deuda pública y, de otro lado, se funcionaría a través de un presupuesto balanceado, todo sujeto a condiciones impuestas por la Asamblea Legislativa que ofrecerían estabilidad financiera al gobierno. Esto produjo varias disposiciones en la Constitución de 1952. Me propongo reflexionar sobre estas disposiciones constitucionales, prestando particular atención a una importante enmienda aprobada en 1961.

## I. GÉNESIS DE LAS DISPOSICIONES CONSTITUCIONALES SOBRE LA DEUDA PÚBLICA

Voy a dirigir mi atención inicial a una disposición original de la Constitución aprobada en 1952 relativa a la deuda pública. Leía esta sección en la cláusula pertinente: "El poder del Estado Libre Asociado de Puerto Rico para contraer y autorizar deudas se ejercerá según se disponga por la Asamblea Legislativa . . .".[1] Antes

---

\* Catedrático de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico.

**1** CONST. PR art. VI, § 2.

**REVISTA JURÍDICA UPR**                          **Vol. 85**

de 1952, este margen era fijado únicamente por las leyes orgánicas federales *Foraker* y *Jones* de 1900 y 1917, respectivamente.[2] Con el advenimiento de la Constitución de 1952, esta disposición constitucional creaba una interesante coexistencia con algunas disposiciones de las leyes antes mencionadas, las cuales se agruparían y permanecerían en vigor bajo el título de *Ley de relaciones federales*, según disponía la *Ley 600*.[3] Puerto Rico seguía autorizado, entre otros poderes, a emitir deuda pública exenta de contribuciones federales (al menos en cuanto al principal), pero con un margen prestatario sujeto al valor de su propiedad.[4] Por lo tanto, la fuente de ciertos poderes financieros y económicos emanaba tanto de la Constitución de Puerto Rico como de la *Ley de relaciones federales*. En cuanto al margen prestatario, el límite establecido por la ley federal a la deuda del Gobierno de Puerto Rico se fijaba en términos de un diez por ciento del valor de la propiedad en Puerto Rico, con un margen similar para ciertos gobiernos municipales y un cinco por ciento para todos los demás municipios.[5]

---

**2**   Organic Act of 1900 (Foraker Act), Pub. L. No. 56-191, 31 Stat. 77 (1900); Puerto Rico Federal Relations Act of 1917 (Jones Act), Pub. L. No. 64-368, 39 Stat. 951 (1917).

**3**   Puerto Rico Federal Relations Act of 1950 (Ley 600), Pub. L. No. 81-600, 64 Stat. 314 (1950). La sección 4 disponía:

> Except as provided in section 5 of this Act, the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, is hereby continued in force and effect and may hereafter be cited as the "Puerto Rican Federal Relations Act".

*Id.* § 4.

**4**   La sección 3 de la *Ley Jones* crea la llamada triple exención de contribuciones sobre los bonos emitidos por el Gobierno de Puerto Rico o autorizados por este. Esta disposición sigue vigente a través de la *Ley de relaciones federales*, 48 U.S.C. § 745 (2012). De ordinario estas exenciones deben extenderse tanto a los ingresos derivados por la negociabilidad de la obligación principal, así como de los intereses devengados. Obsérvese, sin embargo, que la antes citada disposición, de sus propios términos exime del pago de contribuciones *sobre los bonos*, su tenencia y tráfico, *pero no necesariamente del pago de intereses de estos bonos*. Ahora bien, una interpretación o regla del Internal Revenue Service (I.R.S.) establece que los intereses deben estar exentos de contribuciones del Gobierno federal. *Véase* Rev. Rul. 70-219, 1970-1 C.B. 23. Nada dice sobre la imposición de contribuciones por el Gobierno de Puerto Rico o por otros estados, territorios o posesiones. Ello explica cómo algunos estados imponen o intentan imponer contribuciones sobre estos intereses y otros las eximen, bien por sentirse obligados por ley federal o bien porque entienden que se trata de la imposición de contribuciones sobre unos bonos emitidos por el Gobierno de Estados Unidos, es decir, consideran al Gobierno de Puerto Rico como una dependencia o entidad federal. *Véase* STEVEN MAGUIRE & JEFFREY M. STUPAK, TAX-EXEMPT BONDS: A DESCRIPTION OF STATE AND LOCAL GOVERNMENT DEBT (2015); Kevin M. Yamamoto, *A Proposal for the Elimination of the Exclusion for State Bond Interest*, 50 FLA. L. REV. 145 (1998); Kenda K. Tomes, *State Taxation of Puerto Rican Obligations: An Interest(ing) Question*, 66 CHI.-KENT L. REV. 903 (1990).

**5**   Jones Act, § 3, 39 Stat. 951 (1917), *enmendada por* Act of Feb. 3, 1921, 41 Stat. 1096 (1921); Act of Mar. 4, 1927, 44 Stat. 1418 (1927); Act of Aug. 26, 1937, 50 Stat. 844 (1937); Act of Aug. 17, 1950, 64 Stat. 458 (1950); Pub. L. No. 87-121, 75 Stat. 245 (codificada en 48 U.S.C. § 745 (2012)).

Así pues, el constituyente[6] puertorriqueño no incorporó en la Constitución las limitaciones estatutarias federales específicas sobre el margen prestatario. Es decir, optó por no incluir una disposición mediante la cual se autorizara a la Asamblea Legislativa a establecer el margen a la vez que nada incluyó sobre la limitación que de por sí establecía la ley federal y que en adelante coexistiría con la disposición constitucional de Puerto Rico. Debe indicarse que el delegado José Gelpí Bosch, representante del Distrito de Mayagüez por el Partido Estadista Republicano (PER), específicamente propuso que, con independencia del margen autorizado por el Congreso, la Constitución de Puerto Rico debía reiterar de forma expresa estos límites de la ley federal, aunque alterando sin contradecir el porciento atado al valor de la propiedad mueble.[7] Aun más, proponía que la Constitución estableciera que toda emisión de bonos que constituyera deuda pública debía ser previamente sometida para aprobación o rechazo mediante referéndum.[8]

Es muy parco el debate en la Convención Constituyente que pueda arrojar más luz sobre las razones por las cuales se decidió establecer un margen prestatario sujeto a lo dispuesto por la Asamblea Legislativa de Puerto Rico, cuando era evidente que este margen lo fijaba la ley federal. José Trías Monge comenta que se discutió con Luis Muñoz Marín la posibilidad de reproducir en la Constitución exactamente lo dispuesto sobre el margen prestatario en las leyes orgánicas "como base para la obtención futura de la eliminación de dicho aspecto de gobierno local de la referida ley y de la consiguiente autonomía del pueblo de Puerto Rico sobre tan importante asunto".[9] Sin embargo, anticipando fuerte oposición de los estadistas-republicanos y dificultades en el Congreso, se optó por dejar la fraseología antes indicada, es decir, dejar en manos de la Asamblea Legislativa el poder de fijar dicho margen, conscientes de que este poder legislativo estaba limitado a su

---

6    En adelante, me referiré a los participantes de la Convención como *constituyentes* y a la propia convención como una *constituyente*. Estos términos son de uso común en nuestra literatura jurídica y en las decisiones del Tribunal Supremo de Puerto Rico. Sin embargo, es cuestionable, cuando menos, utilizar tal calificativo. La Convención aludida fue celebrada solo después de ser autorizada por una ley federal y su producto final ser aprobado por el Congreso de Estados Unidos. La voluntad original del pueblo de Puerto Rico no pudo manifestarse plenamente en dicha convocatoria. Sobre el particular, véase Carlos E. Ramos González, *La Carta de Derechos y el Derecho Constitucional puertorriqueño*, *en* EL DERECHO EN CLAVE HISTÓRICA: ENSAYOS SOBRE EL ORDENAMIENTO JURÍDICO PUERTORRIQUEÑO 427 (Pedro G. Salazar ed., 2014).

7    José Gelpí Bosch, *Proposición Núm. 260* (31 de octubre de 1951), *reimpresa en* PROPOSICIONES Y RESOLUCIONES DE LA CONVENCIÓN CONSTITUYENTE DE PUERTO RICO (1951-1952) 461-62 (Academia Puertorriqueña de Jurisprudencia y Legislación ed., 1992). *Véase también* Miguel A. García Méndez *et al.*, *Proposición Núm. 103* (16 de octubre de 1951), *reimpresa en* PROPOSICIONES Y RESOLUCIONES DE LA CONVENCIÓN CONSTITUYENTE DE PUERTO RICO, *supra*, en las págs. 226-86. En particular, véase el artículo 3 que proponía reproducir las disposiciones de la *Ley Jones* pertinentes al margen prestatario. *Id.* en las págs. 233-34. Trías Monge comenta que la delegación estadista estaba dividida en dos facciones, una capitaneada por su presidente Celestino Iriarte y otra por Miguel Á. García Méndez y Luis A. Ferré, quienes cuestionaban el liderato de Iriarte. Cada facción presentaba sus proposiciones. PROPOSICIONES Y RESOLUCIONES DE LA CONVENCIÓN CONSTITUYENTE DE PUERTO RICO (1951-1952), *supra*, en la pág. 3

8    Gelpí, *supra* nota 7, en la pág. 462.

9    3 JOSÉ TRÍAS MONGE, HISTORIA CONSTITUCIONAL DE PUERTO RICO 217 (1982) (nota omitida).

vez por las leyes orgánicas que ahora formarían parte de la llamada *Ley de relaciones federales*. Como discutiré en detalle más adelante, el tema del margen prestatario volvió a la consideración del debate público nueve años después en 1961, mediante una propuesta de enmienda constitucional que, de hecho, se adoptó mediante referéndum.

La segunda disposición constitucional que discutiré es la sección octava del artículo VI. Esta reza:

> Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley.[10]

Es decir, establece cuáles serían las prioridades en caso de insuficiencia presupuestaria.

Hasta ese momento, la *Ley Jones* de 1917 establecía que, si se producía una insuficiencia presupuestaria en el Gobierno del territorio, había que seguir una orden de prelación o prioridades en los gastos. Contrario al poder retenido sobre el margen prestatario, la *Ley 600* eliminaba ese control directo del Congreso sobre las prioridades en el orden de pago establecido por la *Ley Jones*. La disposición estatutaria no retenida en la *Ley de relaciones federales* era establecida por la sección 34 de la *Ley Jones* de 1917.[11] En la misma se atendía la forma de manejar los *revenues* (traducido en la versión oficial en español como *ingresos* o *rentas*) para el año fiscal en curso. De producirse una insuficiencia de *revenues* o un *surplus* en el Tesoro insular para hacer frente a todas las asignaciones votadas por la Asamblea Legislativa, la ley federal establecía con cierta especificidad un sistema consistente en un orden o clases de pagos que se debía seguir. Además, permitía la intervención del Gobernador de manera que pudiera alterar la prelación establecida.

En la primera clase, o prelación de gastos, aparecían los gastos ordinarios de las ramas de gobierno y los intereses de cualquier deuda pública. No incluía autorización de gasto alguno para la amortización del principal de la deuda. En la segunda clase procedía pagar en la totalidad los gastos principales para "todas las instituciones tales como el presidio, manicomio, escuela industrial, y otras semejantes en que los asilados [eran] recluídos involuntariamente".[12] La tercera clase constituía las asignaciones para "instrucción e instituciones educativas y benéficas", las que también debían ser pagadas en su totalidad.[13] En la cuarta clase pro-

---

**10**   CONST. PR art. VI, § 8.

**11**   Jones Act, § 34, 39 Stat. 951, 960-63 (1917), *derogada por* Puerto Rico Federal Relations Act of 1950, § 5(2), 64 Stat. 319, 320 (1950).

**12**   Celestino Iriarte *et al.*, *Proposición Núm. 326* (31 de octubre de 1951), *reimpresa en* PROPOSICIONES Y RESOLUCIONES DE LA CONVENCIÓN CONSTITUYENTE DE PUERTO RICO (1951-1952), *supra* nota 7, en la pág. 568.

**13**   *Id.*

cedía pagar la totalidad de los gastos de "otro funcionario o funcionarios, negociados o juntas".[14] Como última y quinta clase, se daba paso a las asignaciones para todos los demás objetos de pago.

Lo anterior implica que en los inicios del siglo XX, el Congreso de Estados Unidos consideraba como una sana administración pública para su territorio colocar como primera prioridad los gastos del funcionamiento del Gobierno y el pago de intereses de la deuda en caso de insuficiencia presupuestaria. Además, este orden de pagos siempre estaría sujeto al criterio del gobernador de turno, quien recordemos que para entonces era designado por el presidente de los Estados Unidos.

Resalta también que el constituyente puertorriqueño retuvo e incorporó otras importantes normas presupuestarias provenientes de la *Ley Jones* de 1917, las cuales seguirían vigentes a través de la *Ley de relaciones federales*. Por ejemplo, retuvo la necesidad de tener un presupuesto balanceado que incluiría las medidas impositivas necesarias para lograrlo, así como la aplicación del presupuesto anterior en caso de no aprobarse un presupuesto con el año fiscal en curso. Sin embargo, repito, no incluyó las disposiciones ya citadas de la *Ley Jones* relacionadas con la prelación u orden de pago específico en caso de insuficiencia presupuestaria así como dejó fuera la discreción del Gobernador de alterar este orden. Al contrario, lo cambió radicalmente. Propuso que, en caso de insuficiencia de *recursos* (traduciendo así el término *revenues* de la *Ley Jones*, en lugar de *ingresos* o *rentas*) para cubrir asignaciones aprobadas para ese año, se pagara primero los intereses y la amortización de la deuda pública, y luego se realizara el desembolso para las prioridades que la Asamblea Legislativa estableciera por ley. Recuérdese que la primera prioridad de pagos de la *Ley Jones* solo incluía, después de los gastos ordinarios del gobierno, el pago de intereses de la deuda y no así la amortización del principal.[15]

La Convención Constituyente debatió brevemente este asunto. El delegado Gelpí presentó una enmienda formal para autorizar a la Asamblea Legislativa a decretar "en caso de una emergencia nacional o insular, una moratoria en cuanto

---

14    *Id.*

15    Es de notar que en la Convención Constituyente se discutió el significado del término *recursos totales calculados* cuando se debatía sobre la necesidad de mantener un presupuesto balanceado. De forma categórica, se aclaró que se abandonaba el concepto de *rentas* (o *revenues*, en inglés) que incluía la *Ley Jones*. El delegado Luis Negrón López explicaba que conforme con "las finanzas modernas", el término *recursos* era el apropiado, de modo que pudiese incluir cualquier superávit de años anteriores. En específico explicaba que:

> [I]ncluye ingresos no contributivos como el producto de la venta de propiedades, *royalties*, o regalías de corporaciones públicas hechas al Estado, sobrantes de beneficios obtenidos por corporaciones públicas, ayudas federales, los llamados *grant [in] aids* federales, y los recursos que se alleguen mediante la emisión de bonos, que es una de las maneras que tiene el Estado de levantar fondos para el desarrollo de su programa.

2 Diario de sesiones de la Convención Constituyente 893 (1951). Ese debate lo recoge y lo aplica a las corporaciones públicas una opinión del Secretario de Justicia de 1974. *Op. Sec. Just. Núm.* 1974-15, 21 de mayo de 1974.

al pago y cobro de cualquier clase de contribuciones y prohibir que, por la vía judicial, se proceda al cobro de obligaciones particulares mientras dure dicha emergencia".[16] Pero la Comisión correspondiente rechazó la misma "por ser clara y peligrosamente perjudicial al crédito del nuevo estado que estamos organizando".[17] Es decir, se rechazó en un primer momento bajo el fundamento de que la enmienda afectaría el crédito del Gobierno de Puerto Rico.[18] Sin embargo, a mi juicio, la propuesta del delegado Gelpí posiblemente estaba pensada en proteger la deuda personal y privada, mas no necesariamente la deuda pública o del Estado. De ahí surge su admitida ambivalencia sobre dónde correspondía ubicar su enmienda. De hecho, justificaba su enmienda recordando los estragos y abusos de acreedores contra personas e instituciones privadas luego del huracán San Ciriaco de 1899. La enmienda solo recibió seis votos a favor. Sus detractores señalaban que si la preocupación era la protección al deudor personal y privado, este deudor siempre tendría a su disposición la protección de la ley de quiebras federal o la invocación de los poderes inherentes de la Asamblea Legislativa para resolver situaciones de emergencia.

La propuesta de la Comisión de la Rama Legislativa, alterando las prioridades de pago en caso de insuficiencia presupuestaria y eliminando el poder interventor del gobernador para así hacerlo, se convirtió en la sección octava del artículo VI de la Constitución, la cual hemos citado. En síntesis, la *Ley 600* autorizaba la redacción de una constitución, pero dejaba en vigor ciertas disposiciones fundamentales de la *Ley Jones* de 1917. En el tema que nos ocupa, a través de la *Ley de relaciones federales*, el Congreso dejó bajo su control directo el margen prestatario, el cual mantuvo atado al valor de la propiedad mueble de Puerto Rico. Sin embargo, eliminó la prelación u orden de pagos, permitiendo que Puerto Rico controlara el asunto a través de su Constitución.

## II. Enmienda a la disposición sobre el margen prestatario

### A. Antecedentes

El debate sobre la naturaleza y alcance de la Constitución aprobada frente al poder del Congreso sobre los asuntos del Gobierno de Puerto Rico se intensificó tan pronto esta se puso en vigor.[19] De hecho, en marzo de 1952, antes de ser efectiva la Constitución, ya el comisionado residente Antonio Fernós Isern presentaba un proyecto de ley para aclarar ciertos asuntos de naturaleza "cosmética" en la *Ley de*

---

**16**    3 Diario de Sesiones de la Convención Constituyente 1962 (1952).

**17**    *Id.*

**18**    El breve debate sobre este asunto aparece en 3 Diario de Sesiones de la Convención Constituyente 1962-64 (1952).

**19**    *Véase* 4 Trías Monge, *supra* nota 9, en las págs. 60-248 (1983); I Raúl Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico 567-68 (1986); Antonio Fernós Isern, Estado Libre Asociado de Puerto Rico: Antecedentes, creación y desarrollo hasta la época presente 357-621 (1974).

*relaciones federales*.[20] Ese *Proyecto cosmético*, como era identificado por sus proponentes, se abandonó eventualmente a finales de 1953. En marzo de 1954 ocurre el ataque a tiros del nacionalismo al Congreso, denunciando la *Ley 600* y la Constitución como un engaño, pues no alteraba en lo fundamental la naturaleza colonial de Puerto Rico.[21] Mientras se estudiaba el llamado *Proyecto cosmético*, el Gobierno de Puerto Rico trabajaba otro proyecto de ley conocido como el *Proyecto Fernós-Murray*, que descansaba en la teoría de la soberanía propia del Estado Libre Asociado (ELA), la cual era "constituid[a] por el pueblo de Puerto Rico, quien pone en manos del Estado ciertos poderes de soberanía que éste delega[ba] a su vez al gobierno de los Estados Unidos".[22] Sería el segundo esfuerzo, en apenas dos años de aprobarse la Constitución del ELA, de "perfeccionar" nuestro estatus.[23]

Importantes sectores del Gobierno pedían que uno de los poderes a reclamarse al Congreso fuera la autoridad de Puerto Rico para reglamentar los límites de la deuda pública.[24] Como he mencionado, el margen prestatario coexistía con aquel fijado por la *Ley Jones* de 1917. Lo anterior conllevaba enmendar la Constitución hacia estos fines. A su vez, requería solicitar al Congreso que alterara la *Ley de relaciones federales* de modo que Puerto Rico quedara autorizado para enmendar su Constitución. Explica Fernós Isern que este trayecto procesal, es decir, el de pedir que se eliminara una disposición de la *Ley de relaciones federales*, a la vez que se autorizaba a Puerto Rico a enmendar su Constitución para regular lo eliminado por el Congreso, arrojaba dudas y existía la posibilidad de que iniciara una nueva discusión inoportuna sobre el alcance de la bilateralidad del llamado "pacto", razón por la cual deciden abandonar la idea.[25] Trías Monge comenta que traer este asunto a la discusión en el Congreso podía poner en peligro la exención contributiva de los bonos puertorriqueños que autorizaba la propia ley federal,

---

20   H.R.J. Res. 252, 83rd Cong., 99 CONG. REC. 4434 (1953).

21   Véase Clayton Knowles, *Five Congressmen Shot in House by 3 Puerto Rican Nationalists; Bullets Spray from Gallery*, N. Y. TIMES, 2 de marzo de 1954, en las págs. 1, 16, para un recuento fáctico detallado del ataque al Congreso.

22   FERNÓS ISERN, *supra* nota 19, en la pág. 399.

23   Para Fernós, el proyecto tenía como fundamento de que Puerto Rico:

[N]o *forma parte de los Estados Unidos constitucionalmente*; que Estados Unidos obtuvo autoridad sobre Puerto Rico según la recibió de la Corona de España; que si Estados Unidos ha actuado por cincuenta años como si la autoridad recibida de la Corona de España hubiera sido absoluta, eso no nos obliga a nosotros a aceptar esa interpretación del Tratado. La contención de Puerto Rico ha sido siempre que Puerto Rico por sí tenía, dentro de la monarquía española, derechos que tenían que ser respetados tanto por la monarquía española como por sus sucesores; Puerto Rico aceptó el traspaso de soberanía, pero el traspaso de soberanía no disminuyó los derechos de Puerto Rico. Es decir, Estados Unidos se entendió con la Corona de España; tenía luego que entenderse con Puerto Rico. Se ha entendido: esa es la Ley 600.

*Id.* en la pág. 397.

24   *Id.*

25   *Id*. en la pág. 400.

asunto que no era altamente cuestionado en ese momento.[26] Sin embargo, lo cierto es que la planificación económica de los próximos quince años dependía en gran medida del crédito en los mercados financieros de Estados Unidos. Más urgente aún, para 1961 se esperaba que se agotara el margen prestatario que autorizaban las leyes orgánicas de principios del siglo pasado.[27]

Ya para 1960 se abandona la idea de propulsar el *Proyecto Fernós-Murray*. Entre otras razones, había reservas entre los congresistas sobre su constitucionalidad, en particular sobre la interpretación de que congresos futuros no podrían ejercer su autoridad sobre algunos poderes delegados al Gobierno de Puerto Rico. Es decir, era objeto de duda que el Congreso pudiese "desprenderse irrevocablemente de parte de su soberanía sobre la Isla" de la forma como proponía el proyecto.[28] La creatividad que invocaba Muñoz Marín ante el Congreso no encontraría eco en ese cuerpo legislativo.[29]

### B.   La enmienda de 1961

La cercanía al agotamiento del margen presupuestario que imponía la *Ley Jones* de 1917 obligó al Gobierno a actuar al margen de esfuerzos integrados o noveles para revisar la arquitectura jurídica del Estado Libre Asociado. Así, en 1961, el Comisionado Residente retoma la idea abandonada apenas unos años antes y presenta un proyecto para enmendar esta ley solo en lo concerniente al margen prestatario. El proyecto perseguía, esta vez sin temores o pretensiones de ocultación, solicitar *de facto* autorización del Congreso para enmendar una disposición de la Constitución del Estado Libre Asociado.[30]

Con este fin, se propuso ante el Congreso eliminar de la *Ley de relaciones federales* lo referente al margen prestatario, dejando este asunto a cargo del Gobierno de Puerto Rico, lo cual elevaría a rango constitucional la nueva base para calcular este margen.[31] La eliminación se activaría tan pronto la Constitución fuera en efecto enmendada. La propuesta recibió la aprobación de varias dependencias del Gobierno federal. Sin embargo, para al menos una de ellas, el Departamento de lo Interior, el poder autorizado comprometía solo al Gobierno de Puerto Rico:

> As previously stated, Puerto Rico has heretofore been given generous powers over its own internal affairs. Under these circumstances it is not believed that an objection should be raised to this proposal permitting the people of the Commonwealth to determine their own debt limits, since it is their credit to be established

---

26   4 TRÍAS MONGE, *supra* nota 9, en las págs. 132-33.

27   *Id.* en la pág. 174.

28   *Id.* en la pág. 167.

29   FERNÓS ISERN, *supra* nota 19, en la pág. 448.

30   4 TRÍAS MONGE, *supra* nota 9, en la pág. 174.

31   107 CONG. REC. 4394, 4400-01 (1961).

and not that of the United States, and since they will be responsible for the payment of their debts with interest.[32]

Aunque no se le ofrecieron al Congreso las particularidades de la enmienda que se insertaría en la Constitución de Puerto Rico, el expediente público refleja que lo entendido fue que el nuevo margen sería necesario para "mejorar el programa educativo y la red de carreteras".[33] El preámbulo del proyecto mencionaba que estaba cimentado en la naturaleza del "pacto" establecido por la *Ley 600* y la necesidad de continuar fomentando el gobierno propio de los puertorriqueños.[34] La sustancia del proyecto recibió el aval de las subcomisiones y comisiones legislativas correspondientes, aunque solo después de que su auspiciador, el comisionado Fernós, aceptase eliminar todo el preámbulo del mismo.[35] Según relata el propio Fernós, resulta problemática la alusión en el preámbulo al alegado pacto entre Puerto Rico y Estados Unidos.[36] Un congresista argumentó que con esta eliminación se evitaría volver a discutir un asunto que había sido objeto de controversia y dudas durante la aprobación de la *Ley 600*.[37] Aceptada la eliminación del preámbulo, se aprobó de forma unánime el proyecto del margen prestatario. Quedaba así el Gobierno de Puerto Rico autorizado a controlar constitucionalmente el margen prestatario sobre las bases que estimase apropiado, es decir, sin estar atado a la *Ley de relaciones federales*.[38]

Luego, se presentó ante la Asamblea Legislativa el proyecto correspondiente para celebrar el referéndum en Puerto Rico, el cual daría paso a la enmienda a la sección 2 del artículo VI de la Constitución.[39] La propuesta sometida al pueblo sería una extensa y confusa disposición que fijaba el margen de la deuda pública al quince por ciento del promedio de "rentas anuales obtenidas . . . e ingresadas" (no se usó el término "recursos disponibles" de la sección 8 del artículo VI) al Tesoro de Puerto Rico durante los dos años precedentes a la emisión de la deuda.[40] Se dejaba en manos de la Asamblea Legislativa la fijación del margen prestatario de los municipios, aunque sujeto a un límite porcentual a base del valor de la propiedad inmueble en esos municipios.[41] La enmienda propuesta establecía una vin-

---

**32**   S. Rep. No. 87-593, en la pág. 3 (1961).

**33**   107 Cong. Rec. 4394, 4401 (1961) (declaraciones del Rep. Wayne N. Aspinall) (traducción suplida).

**34**   *Id.* en la pág. 4400.

**35**   Fernós Isern, *supra* nota 19, en la pág. 545.

**36**   *Id.*

**37**   *Id. Véase también* 4 Trías Monge, *supra* nota 19, en las págs. 173-75.

**38**   Joint Resolution to provide for amending section 3 of the Puerto Rican Federal Relations Act, Pub. L. No. 87-121, 75 Stat. 245 (1961).

**39**   P. del S. 259 de 21 de septiembre de 1961, 3ra Ses. Extra., 4ta Asam. Leg.

**40**   Const. PR art. VI, § 2.

**41**   *Id.*

REVISTA JURÍDICA UPR **Vol. 85**

culación directa entre esta sección y la sección 8 del mismo artículo. Como se recordará, la sección 8 del artículo VI es la que establece el orden de pago en caso de insuficiencia de recursos para cubrir las asignaciones aprobadas. La enmienda propuesta aseguraba el pago de intereses y amortización de la deuda pública por encima de cualquier otro desembolso. Además, la enmienda incluía una disposición sin paralelo en las leyes orgánicas previamente aprobadas por el Congreso o retenidas a través de la *Ley de relaciones federales*. Se trataba de la cláusula que establecía que el Secretario de Hacienda podía ser requerido para que destinase recursos, incluyendo sobrantes al pago de intereses y amortización de deuda pública, para la eventualidad de una demanda incoada por cualquier acreedor de bonos en caso de que se activara la sección 8 antes mencionada. Es decir, se establecía una garantía constitucional adicional para estos acreedores a la vez que se autorizaba la radicación de estas demandas contra el Estado Libre Asociado sin necesidad de obtener previo consentimiento del propio Estado.

## C.  Trámite legislativo de la enmienda de 1961

El proyecto de ley para proponer una enmienda a la Constitución para fijar el margen prestatario se debatió ampliamente en la legislatura de Puerto Rico. El mensaje del gobernador Luis Muñoz Marín dirigido a la Asamblea Legislativa expresaba, entre otras justificaciones, que se trataba de una necesidad financiera del Estado a la vez que constituía una conquista autonómica, pues era un paso más "hacia un más cabal dominio sobre [nuestros] asuntos internos".[42]

En el Informe de la Comisión Especial de la Asamblea Legislativa designada para estudiar la propuesta se mencionan varios asuntos que quiero resaltar:

1.  Se reconoce que es una práctica fiscal novel fijar el margen prestatario en los ingresos del Estado, en vez del valor de la propiedad. Solo los estados de Connecticut y Mississippi habían adoptado en tiempos recientes políticas parecidas. Un margen prestatario basado en los ingresos del Estado ya tenía paralelo en las políticas fiscales de las corporaciones públicas y privadas. Dado el buen crédito de Puerto Rico hasta ese momento, se valoraba que al aprobar esta enmienda se estaría haciendo una aportación al campo de la ciencia político-fiscal.[43]

2.  Al calcular este margen, no se tendrían en cuenta los bonos de estas corporaciones públicas, dado que estas responderían por sus propios ingresos, excepción que los bonos de estas corporaciones que estuvieran garantizados por el Estado.[44]

---

**42**   14 Diario de Sesiones de la Asamblea Legislativa del Estado Libre Asociado de Puerto 88 (1961).

**43**   *Id.* en las págs. 220-21.

**44**   *Id.* en la pág. 221.

3.  El derecho a demandar y la autorización para ser demandado, en caso de incumplimiento, por el trato preferente que se otorgaba a esta deuda, estaba modelado por lo dispuesto en la Constitución de Nueva York y de otros estados. Establece el Informe que "esta renuncia a la inmunidad del Estado a ser demandado, ha de redundar en una mejor aceptación y clasificación de [sus] obligaciones".[45] Al parecer esta información sobre la disposición constitucional de Nueva York fue obtenida por la Comisión por sugerencia hecha mediante carta por uno de los bancos extranjeros que apoyaban la disposición. Me refiero a la carta del Sr. John W. Demilhoe, Vicepresidente del Chase Manhattan Bank, que alude a este hecho y que es reproducida en el Informe.[46]

La representación legislativa del Partido Estadista Republicano trató de forma insistente, pero sin éxito, de incluir una disposición para establecer un "techo" o *ceiling* al margen que se autorizaba.[47] Es decir, con independencia de los ingresos promedio de los años anteriores, la deuda tendría siempre un tope acumulativo máximo. De igual forma, sugerían prohibir aumentar la deuda en año electoral. Ambas enmiendas fueron derrotadas. Por el contrario, los defensores de la enmienda adscribían como valor positivo que bajo la mecánica o fórmula del nuevo margen "el límite de la deuda en que puede incurrirse se expresa en términos de la cantidad de dinero disponible para amortizar la deuda, en lugar de expresarse como actualmente, en términos de la cantidad de dinero total que puede tomarse a préstamo en determinado momento".[48]

### D.  Referéndum y la campaña proselitista

Se inició así una campaña para que el pueblo elector aprobara la enmienda constitucional presentada como una necesidad económica y financiera, a la vez que constituiría una conquista autonómica o de mayor gobierno propio. Dirijo mi atención a esta campaña destacando algunos asuntos medulares. La enmienda fue apoyada por el Gobierno, en ese entonces controlado por el Partido Popular Democrático (PPD). La enmienda recibió el respaldo de los periódicos El Mundo, El Imparcial y el San Juan Star, la Asociación de Bancos de Puerto Rico, el Presidente de la Asociación de Industriales, entidades sindicales como la Federación Estadounidense del Trabajo y el Congreso de Organizaciones Industriales (AFL-CIO, por sus siglas en inglés) y el Sindicato Obrero Packinghouse, así como de varios

---

45  *Id*. en la pág. 222.

46  *Id*. en la pág. 225.

47  *Id*. en la pág. 227.

48  *Id*. en la pág. 221.

profesionales y grupos cívicos.[49] Como expondré a continuación, se opuso el PER por la forma en que estaba redactada la enmienda, es decir sin tope o *techo* máximo acumulativo. El Partido Independentista Puertorriqueño (PIP) recomendó la abstención electoral.[50]

Como era común a principios de la década del 60, gran parte del debate público ocurría en los periódicos del País. Por la pertinencia a nuestro tiempo, destaco una importante parte de ese debate enunciada principalmente por Miguel Ángel García Méndez. El PER no se oponía a que este margen se fijara en la Constitución. Sin embargo, abogaba por fijar un tope a la deuda pública, es decir, argumentaba que el límite de quince por ciento era insuficiente sin establecer un "techo" máximo que no dependiera solo de los ingresos al fisco de años anteriores. De lo contrario, el Gobierno tendría un cheque en blanco para endeudarse progresivamente según aumentaran los ingresos. Ello tendría el efecto de endeudar a futuras generaciones. Además, el Gobierno de Puerto Rico nunca hizo claro al Congreso cuál sería la fórmula específica que utilizaría al ejercer el poder que ahora se le delegaba. El tope por el que García Méndez abogaba de forma persistente establecía una forma de fiscalización que se vería fortalecida si se aprobaba un mecanismo para obligar al Gobierno a consultarle al pueblo mediante referéndum cada vez que se quisiera aumentar. Por último, se afirmaba un argumento político ideológico: la enmienda, tal como estaba redactada, retrasaba la aspiración a la estadidad o anexión a los Estados Unidos. De aprobarse, se estaría "entregando al País en manos de los capitalistas e inversionistas continentales o en manos de bonistas para que sean éstos los que -a su conveniencia- objeten la estadidad".[51]

El PIP fomentó la abstención electoral por entender que era "una de tantas reformas coloniales" que no implicaba reconocimiento de la soberanía de Puerto Rico, pues mantenía los "poderes plenos e irrevocables por la potencia colonial".[52] Para el PIP, "[l]o que pretend[ía] e[ra] darle dignidad de conquista de soberanía a una concesión colonial y hacer aparecer como que realmente exist[ía] un pacto entre Puerto Rico y Estados Unidos".[53] El referéndum era innecesario, ya que para

---

**49**    Véase anuncio a página completa en el periódico El Mundo. El anuncio se titulaba *La Prensa dice que sí*. Se reproducían editoriales de los tres diarios mencionados. Incluía una exhortación "a la Marcha del Progreso". En un recuadro se hacía mención de varios sindicatos y entidades cívicas que apoyaban la causa del "Sí". *La Prensa dice que sí*, EL MUNDO, 9 diciembre de 1961, en la pág. 2

**50**    *Véase García Méndez cree votar que "Sí" el domingo retrasaría el advenimiento de la estadidad*, EL MUNDO, 9 de diciembre de 1961, en la pág. 31; Fernando Millán Jr. & Gilberto Concepción, *Aprueba Resolución: PIP acuerda recomendar no participar referéndum*, EL MUNDO, 22 de noviembre de 1961, en la pág. 24.

**51**    *García Méndez cree votar que "Sí" el domingo retrasaría el advenimiento de la estadidad, supra* nota 50.

**52**    Millán Jr. & Concepción, *supra* nota 50.

**53**    *Id.* Esta información periodística fue inicialmente obtenida de la carpeta sobre el PIP que mantenía la División de Inteligencia de la Policía de Puerto Rico la cual custodia al presente la dirección administrativa de ese partido. En esos años, cualquier información del PIP, periodística o de cualquier

cambiar el margen prestatario "basta que el Congreso de Estados Unidos apruebe -como pasa en todas las colonias- una ley al efecto, ya que es el Parlamento federal norteamericano el que usurpa las funciones de soberanía del Pueblo de Puerto Rico".[54] Criticaba a su vez la posición asumida por el PER, pues estos:

> [F]avorecieron la Ley 600 y la Ley de Relaciones Federales . . . [,] participaron en la llamada Constituyente y votaron a favor de la llamada Constitución . . . [y] no t[enían] autoridad moral . . . [, siendo] una fuerza anexionista de carácter colonial disolvente".[55]

La defensa de la posición oficial a favor de la enmienda fue hecha de forma preeminente por el entonces Presidente de la Cámara de Representantes, Ernesto Ramos Antonini. Se argumentaba que la enmienda autorizaba una forma común de financiar la obra pública. El Gobierno estimaba que necesitaba cerca de $360 millones para los próximos seis años, es decir, hasta 1967. Este dinero había que tomarlo prestado principalmente mediante la emisión de bonos a razón de una cantidad progresiva durante estos años. No era una novedad financiera del todo; para el año 1962, la deuda pública de Puerto Rico ascendía a $182 millones. Para 1967, estaría en $336 millones, representando un promedio de $140 dólares per cápita. Había una ventaja adicional, Puerto Rico no tendría que recurrir al Congreso para estar solicitando que se enmendara la ley federal de modo que se pudiese aumentar el margen prestatario. De hecho, desde 1917, la ley había sido enmendada al menos en cuatro ocasiones para estos propósitos.[56] Explicó Ramos Antonini que, entre 1941 y 1961, el Gobierno del PPD había hecho veintidós emisiones de bonos.[57]

Nada más elocuente para entender el clima prevaleciente que analizar las palabras del propio gobernador Luis Muñoz Marín en defensa de la propuesta enmienda. En conferencia de prensa televisada, celebrada en noviembre de 1961, explicó la propuesta de enmienda que se sometería a votación mientras respondía a preguntas de la prensa. Transcribo a continuación dos de las preguntas hechas por los periodistas:

---

otro medio de comunicación, era *fichada* por tratarse de la prédica de unas ideas políticas para todos los efectos *criminalizadas*. *Véase* Noriega v. Hernández Colón, 122 DPR 650 (1988).

**54**   Millán Jr. & Concepción, *supra* nota 50.

**55**   *Id.*

**56**   *Véase* Puerto Rico Federal Relations Act of 1917 (Jones Act), Pub. L. No. 64-368, 39 Stat. 951 (1917), *enmendada por* Act of Feb. 3, 1921, 41 Stat. 1096 (1921); Act of Mar. 4, 1927, 44 Stat. 1418 (1927); Act of Aug. 26, 1937, 50 Stat. 844 (1937); Act of Aug. 17, 1950, 64 Stat. 458 (1950); Pub. L. No. 87-121, 75 Stat. 245 (codificada en 48 U.S.C. § 745 (1961)).

**57**   Ernesto Ramos Antonini, *Los argumentos de la oposición*, EL IMPARCIAL, 8 de diciembre 1961, en las págs. 58-59; Ernesto Ramos Antonini, *Las ventajas del cambio sistema deuda pública*, EL IMPARCIAL, 9 de diciembre de 1961, en las págs. 32, 55.

REVISTA JURÍDICA UPR                    **Vol. 85**

Periodista 1:          Señor Gobernador, este método para calcular el margen
                       prestatario que será sometido a referéndum, ¿ha sido en-
                       sayado en alguna parte anteriormente?

Gobernador:            Es el método que generalmente usan las corporaciones
                       públicas en todas partes. Pero en otras entidades es un
                       método nuevo. Fue por eso que el Gobierno de Puerto
                       Rico lo consultó con los banqueros de Puerto Rico y de
                       fuera de Puerto Rico . . . . Porque los banqueros son los
                       que manejan estas ventas de bonos, estos adelantos de
                       fondos para la obra pública que se hacen a base de . . .
                       vender bonos en el mercado. Y el Gobierno consultó; el
                       Secretario del Tesoro, el Presidente del Banco Guberna-
                       mental de Fomento, otros funcionarios públicos, consul-
                       taron con un número de banqueros aquí y fuera de aquí,
                       para estar seguros que esos banqueros no veían defecto;
                       no veían que esta nueva manera de fijar esa norma pu-
                       diera en forma alguna disminuir el excelente crédito, el
                       magnífico crédito, que goza Puerto Rico en cuanto a sus
                       bonos. Y todos los banqueros y . . . las casas que se dedi-
                       can a eso que se llama clasificar los bonos, que si son "A"
                       o "B" o "AA", todos los que se consultaron, que son los
                       que han manejado estas cosas del crédito de Puerto Rico,
                       se manifestaron enteramente favorables al método. Dije-
                       ron que posiblemente hasta mejoraría la clasificación de
                       los bonos en Puerto Rico; el crédito de Puerto Rico.

                       . . . .

Periodista 2:          Señor Gobernador, por lo que he oído, a pesar de las ex-
                       plicaciones que se han dado, se insiste en la objeción a la
                       formula a base de que pondrá al alcance del Gobierno
                       ingresos más allá de sus necesidades y que se prestaría a
                       despilfarro, ¿tiene algún argumento nuevo?

Gobernador:            La obra pública no puede ser despilfarro. Fíjense que el
                       dinero que proviene del crédito, o sea, de la emisión y
                       venta de bonos, no se usa para pagar gastos corrientes
                       del Gobierno, se usa para hacer obra pública, obra sólida.
                       Edificios para escuelas, acueductos, postes y hilos de
                       electricidad hacia los campos de Puerto Rico; edificios
                       para fábricas en el programa de industrialización, par-
                       ques de obra para recreo y muchas otras clases de obras
                       que no vamos a gastar el tiempo ahora en enumerar. De
                       manera que si es una obra, ¿podrá ser despilfarro que se
                       haga una escuela donde hay niños que necesitan esa es-
                       cuela? ¿Podrá ser despilfarro hacer hospitales, que todo

> el mundo sabe que están haciendo falta para el cuido
> adecuado y cada día mejor de la salud en Puerto Rico?
> ¿Podrá ser despilfarro hacer edificios para fábricas de
> modo que se facilite el establecimiento de industrias
> nuevas para proveer empleos y a salarios cada día mejor
> para los trabajadores de Puerto Rico? Es imposible que
> haya despilfarro. Ahora, la legislatura es la que juzga. Si
> la legislatura cree que la obra pública debe hacerse más
> despacio, la legislatura es la que decide emitir una canti-
> dad menor de bonos. Si la legislatura cree que la obra
> pública debe hacerse con la mayor rapidez posible para
> que el progreso continúe con la mayor rapidez posible,
> la legislatura entonces decide emitir mayor cantidad de
> bonos. Es la legislatura la que decide eso.[58]

Unas semanas después, dos días antes del referéndum, Muñoz Marín rebatió las alegaciones de la oposición política sobre lo que ocurriría en caso de incumpli-miento con el pago de su deuda. Al rechazar rumores de la oposición política de que este incumplimiento conllevaría que "toda la propiedad del pueblo tanto pri-vada como pública quedar[í]a hipotecada por la cantidad adeudada", Muñoz afirmó: "Lo único que ocurriría, de verse la Isla envuelta en una crisis económica, es que todas las obras públicas permanentes ser[í]an suspendidas o achicadas. . . . Los líderes republicanos también cogían prestado cuando estaban en el poder, con la diferencia de que ellos cogían poco, porque hacían poco, también".[59]

El referéndum se celebró el 10 de diciembre de 1961. Participaron cerca del cincuenta y ocho por ciento de los electores inscritos, aprobándose la misma con 385,369 votos a favor y 80,224 votos en contra.[60]

## Conclusión

Es evidente que, durante el proceso constitucional de 1951-1952 y la enmienda de 1961, la preocupación del constituyente puertorriqueño era facilitar la obten-ción de crédito mediante la emisión de deuda pública ofreciendo las mejores ga-rantías posibles a sus acreedores. Ese fue el valor prevaleciente para entonces. Es evidente también que, en ese momento histórico, nunca se contempló la posibili-dad *real* de una insuficiencia de recursos para mantener un presupuesto balan-ceado y mucho menos sostener una deuda pública impagable. De ahí la obtusa y maleable disposición sobre el margen prestatario, y el que no se incluyera una

---

**58**    Conferencia de prensa televisada del gobernador Luis Muñoz Marín (20 de noviembre de 1961) (en los archivos de la Fundación Luis Muñoz Marín) (última fecha de revisión 2 de marzo de 2016).

**59**    Salvador Guzmán, *Muñoz insta campesinos votar 'Sí'*, EL IMPARCIAL, 8 de diciembre de 1961, en la pág. 44.

**60**    JUNTA ESTATAL DE ELECCIONES, ESTADÍSTICAS DE LAS ELECCIONES GENERALES 67 (1964).

prelación protegiendo los gastos de las ramas del Gobierno por encima de la amortización de la deuda. Por el contrario, la amortización y pago de intereses se valoró más que el interés colectivo y la razón de Estado del Gobierno.

Se actuó bajo el entendido del ejercicio responsable de poderes autorizados por el Congreso, incrementando así el gobierno propio en coexistencia con el poder del Congreso. En su momento histórico, se rechazaron las insistentes propuestas de fijar un tope acumulativo a esa deuda. Se informó y convenció al País que la emisión de deuda pública sería solo para inversión productiva, particularmente dirigida al desarrollo de infraestructura necesaria para el crecimiento económico. En la dialéctica de la historia, a veces inexorablemente cruel, fue también el inicio del endeble crecimiento sin desarrollo, metas que se irían distorsionando por la alternancia en el poder y parte fundamental de la crisis del *dependentismo* que hoy padecemos.

No he de exponer en esta ocasión mi reflexión sobre otras disposiciones constitucionales pertinentes a esta discusión. Conviene recordar que las disposiciones de una Constitución deben ser interpretadas de forma integrada y orgánica. De esta manera, es concerniente reflexionar, por ejemplo, sobre la prohibición al menoscabo de las obligaciones contractuales mientras se reconoce y valora la obligación ineludible de ejercer el poder de razón de Estado para proteger a sus ciudadanos. Más aún, toda interpretación constitucional debe fundamentarse siempre sobre el principio rector constitucional puertorriqueño que declara la inviolabilidad de la dignidad humana.



**COFINA**
Ramon Torres   to: swaindprcorresp                    01/17/2019 09:23 PM

From:   ████████████████████

To:     swaindprcorresp@nysd.uscourts.gov

The constitution of the Commonwealth of PR regulates the issuance of bonds. In no article speaks of extra constitutional debt, and does not talk about imposing excise taxes to pay bond debt! And if the bond issue must comply with the rules of the constitution! And if the bond issue is made by other methods it

constitutes a change and must be approved by the people! COFINA is not constitutional, therefore it is illegal. The imposition of taxes or taxes must be fair, necessary and constitutional, the IVU DE 11.5 does not comply with the constitution! Even worse the COFINA money was used to balance the PR budget deficit prohibited by the constitution! This is a fraud

of the PPD and PNP and nobody has been accused! - translated with the app Translate Now: wzp.solutions/t-now

Sent from my iPad



**Puerto Rico Bonds**
<span style="color:orange">Steven Susko</span>   to: swainDPRCorresp                01/17/2019 11:30 AM

From:    ███████████████████
To:      swainDPRCorresp@nysd.uscourts.gov

Dear Judge Swain

Please help end the corruption.  I am an individual bond holder living in the US dependent on the income from these bonds.  A life of savings is being destroyed by the political corruption.  We need laws and we need the corporate structure to be validated.

Thanks for your service.

Steve



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

<span style="color:orange">Vivianazaliaphotography</span>   to: Swaindprcorresp                    01/17/2019 10:23 PM

From: ██████████████████████████

To:   Swaindprcorresp@nysd.uscourts.gov
      ██████████████████████████

Dear Judge Laura Taylor Swain, My name is Vivian Azalia. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Vivian Azalia ███████████████████████

**Robo**
Yadira Figueroa     to: swainDPRCorresp                    01/17/2019 06:45 PM

From:    ████████████████████
To:      swainDPRCorresp@nysd.uscourts.gov


Señora jueza el problema de Puerto Rico es que ha tenido gobiernos que roban y
la gente empobrecida y ellos, la mayoría, robando. Ahora pagamos todo por algo
que no disfrutamos, especialmente los que dedicamos 32 años trabajando. Revise
los sueldos que este gobierno de turno le da a sus amigos del alma. Por favor
que su decisión sea basada en buena fe para la gente honrada y trabajadora de
este país. Gracias por su tiempo.
Enviado desde mi iPhone



January 17, 2019

Daniel Patrick Moynihan
United States Courthouse
500 Pearl St
New York, NY 10007-1312
Attn: Honorable Laura Taylor Swain
United States District Judge

We respectfully request that you review the proposed orders in regards to instruments
representing bond default insurance policies on COFINA obligations ("Insurance Policies")
issued by Assured Guaranty and by National Public Finance ("Insurance Companies"). We are
owners of both.

The following analysis represents our opinions regarding the Disclosure Statement and Plan of
Adjustment (the "Plan") and Class Notices #3 and #6 ("Notices").

We believe that impairing policyholders as proposed under the Plan and Notices, even as a
quid pro quo for concessions in favor of COFINA from the Insurance Companies, requires the
Court to make orders that are not under the jurisdiction of PROMESA, significantly and
unnecessarily impair bond insurance policyholders in a manner that contradicts US federal and
state bankruptcy and insurance law, represents a serious and unnecessary overreach and
rewriting of such US laws by the Court, and if used by the insurance companies in the future,
will result in hundreds of millions of dollars in losses among investors in insured municipal
bonds across the United States, leading to decades of expensive litigation.

1.  The status and disposition of the insurance Policies are not matters under the jurisdiction of the
    PROMESA Oversight Board, nor are they within the powers of the Court, provided the Court
    restrains itself and limits its powers to making orders regarding matters that are under the
    jurisdiction of the Oversight Board.
    a.  The Insurance Companies that issued the Insurance Policies have not requested to
        be identified as being eligible debtors under PROMESA and the Oversight Board
        has not certified the Insurance Companies as being eligible debtors under
        PROMESA.
    b.  The Insurance Policies are not obligations of any territory or territorial
        instrumentality, including of Puerto Rico or any of its territorial instrumentalities, and
        the Insurance Policies have not been certified by the Oversight Board as obligations
        of any territory or territorial instrumentality, including Puerto Rico or any of its
        territorial instrumentalities.
    c.  The Insurance Policies are obligations of the Insurance Companies, and only of the
        Insurance Companies. The Insurance Companies are domiciled in New York, NY.
        The Insurance Companies are not affiliated with any territory or any territorial
        instrumentality.
    d.  Policyholders of the Insurance Policies on the COFINA bonds are not creditors of
        Puerto Rico nor of any of its territorial instrumentalities and have no claim against
        them. Naming policyholders of the Insurance Policies as a creditor class is not valid
        under PROMESA.
        i.  Example – COFINA bond CUSIP 74529JHT5 is an obligation of COFINA
            and was issued in June 2009. AGM's insurance policy on 74529JHT5, as
            represented by CUSIP 74529JPR0, was issued three years later, in May

2012, by AGM in the aftermarket. It is a separate instrument with a separate CUSIP. It was not issued by COFINA, is not an obligation of COFINA (otherwise, its issuance would have increased COFINA's obligations, which it did not) and COFINA had no involvement in its issuance. CUSIP 74529JPR0 is only a derivative instrument representing an insurance contract against default on 74529JHT5. 74528JHT5 has an Official Statement, naming COFINA as the issuer and Obligor. 74529JPR0 has no Official Statement, and COFINA is neither the Issuer nor the Obligor.

ii.   The interest rate on 74529JHT5 is 7.125%, until maturity in 2034. AGM is obligated by its insurance policy to pay policyholders this interest rate annually (i.e. since it a zero coupon, the payments take the form of annual accretion) until 2034. This 7.125% interest rate is well above the current market rate for a credit such as AGM (Moody's A, S&P AA), which is currently about 4.5%. At the market rate of 4.5%, the 7.125% current principal value plus scheduled "coupon" payments until 2034 have a net present value of about 50. AGM is attempting to have the policy extinguished at the 7.125% rate, or a price of about 33.5 (the current principal value). The difference of 16.5 points represents an impairment of 33%, and is equal to the net present value of scheduled coupon payments due on the underlying bond (discounted at a 4.5% rate). Contrary to AGM's statements that they do not impair policy holders, AGM is attempting to inappropriately impose a significant impairment on its policyholders through the Plan.

iii.   According to the bond contract for 74529JHT5, (i.e. its Official Statement), it may be accelerated upon the occurrence of a default if and when the bond trustee (i.e. BNY Mellon) has declared a default, <u>AND</u> the <u>trustee has then also declared the bond accelerated</u> and immediately due and payable. BNY Mellon has declared 74529JHT5 in default, but **BNY MELLON HAS NOT DELCARED 74529JHT5 IMMEDIATELY DUE AND PAYABLE AND THERE HAS BEEN NO ACCELERATION.** Per the bond contract, only the trustee may declare the acceleration. Per the bond contract, as a bond holder, AGM may request that the trustee declare an acceleration, but AGM does not have the power to declare an acceleration. This is an important safeguard in the bond documents. It gives this power only to the trustee, who is the fiduciary protecting the interests of the bond holders and who sees to it that the terms of the bond contract are followed. This restriction on who may declare an acceleration helps to prevent those who may have economic interests in conflict with the bond holder's interests (i.e. issuers and/or bond insurance providers) from acting unilaterally, or in concert, to impair the bond holders to their individual or combined economic gain. If the Court gives the Insurance Companies the orders they are requesting regarding the Insurance Policies, it will set a dangerous precedent that issuers and insurers may unilaterally take the powers of the trustee, and as proposed here, accelerate the bonds so as to eliminate the call protection as contained in a bond contract. If successful, the Insurance Companies will likely use this template with all the other Puerto Rico high coupon, call protected debt they insure, and eventually extend this to all high coupon, distressed issuer, municipal bonds they insure throughout the US.

iv.   According to their insurance policy contract, in order for AGM to be able extinguish their insurance policy on 74529JHT5 at the current compounded "minimum" value of 33.5, 74529JHT5 must have been accelerated. However, as stated above, BNY Mellon has not accelerated it, and only the trustee may do so. In an attempt to get around this, in complete abrogation of the terms of the Official Statement for 74529JHT5 and in complete abrogation of the terms of their insurance policy, AGM is unilaterally stating they "deem the bonds to have been accelerated" and then asking the Court to ratify this "deemed acceleration" and then one could say it wasn't them

but the Court that did it.

    v.   As we understand it, this deeming accelerated language is not pertinent to or necessary for any settlement between COFINA and AGM, but has been inserted for the primary or possibly sole purpose of providing cover for AGM to allow them to impair their policyholders. While it may well be that AGM conceded a few pennies to COFINA in exchange for the substantial savings this language provides them on the insurance policies, we believe it is inappropriate because it is false, violates the terms of the underlying bond's Official Statement reserving the power to accelerate to the bond trustee, and is a violation of AGM's insurance policy limiting their ability to elect to pay off the policy at the underlying bond's Compounded Amount only upon acceleration of the bond, a declaration or "deeming" they may not make and which the Court has no business ratifying, except if the bond trustee has informed the Court that the trustee, as the fiduciary protecting the interests of the bond holders, has made an acceleration declaration.

    vi.  The AGM insurance contract on 74529JPR0 states that AGM's obligation to make payments is based on the original terms of the underlying obligation (i.e. 74529JHT5) when issued and without regard to any amendment or modification of such Obligation thereafter. AGM's attempt to declare or "deem" an acceleration is an inappropriate attempt to modify the terms of their insurance contract by giving themselves the power to declare an acceleration (subsequently ratified by the Court), when this power is vested only in the trustee.

e.  If policyholders are creditors of any party, policyholders are creditors of the Insurance Companies. As such, policyholders are creditors of the entities that are creditors of COFINA. The status and/or disposition of the debts and/or obligations of any entity which is a creditor of COFINA, including but not limited to the Insurance Companies, is not a matter that is under the jurisdiction of the Oversight Board nor of the Court in this case (provided of course, that no territory nor any instrumentality of any territory is a party to or otherwise obligated by such debt or obligation).

f.  It may be true that AGM granted concessions that it otherwise would not have as a COFINA creditor in exchange for the substantial relief from its obligations under its Insurance Policies as proposed under the Plan and Notices. We do not dispute that seeking such concessions from AGM is a worthy goal and is in accordance with the terms and intent of PROMESA. However, as stated previously, we believe that impairing bond insurance policyholders as proposed under the Plan and Notices, as a quid pro quo for such concessions, requires the Court to make orders that are not under the jurisdiction of PROMESA, significantly and unnecessarily impair policyholders in contradiction to US federal and state bankruptcy and insurance law, and represent a serious and unnecessary overreach and rewriting of such laws by the Court.

g.  The Plan and Notices impose significant unfair and unnecessary impairments on policyholders.

h.  The Insurance Policies provide for full payment of principal and interest when and as due on the underlying COFINA bonds. The Plan and Notices reduce the obligation of the Insurance Companies to make such payments, impairing policyholders by as much as 33%.

    i.  Assured Guaranty ("AGM") – AGM's insurance policies guarantee against default of both principal and interest, when and as due, on the applicable underlying COFINA bonds, as per the Official Statement for each respective insured underlying COFINA bond.  The AGM Notice for AGM policyholders (identified in the Plan as Class 6) provides for full payment of principal but eliminates most, if not all payments due for interest. The insured underlying COFINA bonds are mostly zero coupon "capital appreciation" notes with high above market interest rates ranging from 6.2% to 7.125%.

i. The Insurance Companies do not need an adjustment of their obligations under the

Insurance Policies. They are fully capable of making all payments as due under the terms of their Insurance Policies without the detrimental alterations, amendments and modifications to their Insurance Policies as proposed in the Plan and the Notices.

j. There is a better alternative, which is to eliminate all language in the Plan regarding the Insurance Policies, eliminate the Notices pertaining to the Insurance Policies and to order that the Insurance Companies and their policyholders resolve any claim or civil cause of action they may have between them or that may arise between them as a separate matter in accordance with US federal and state law, and in a US court having jurisdiction over such matters.

k. The Insurance Policies specifically state that the Insurance Companies are the holders of the underlying COFINA obligations, not the policyholders.

2. The Plan and Notices do not provide policyholders of the Insurance Policies any opportunity to vote on the Plan.

3. The National insured bonds proposed Notice has similar violations of the bond contract which impair the policy holders. However, since their underlying bonds have a much lower accretion rate (i.e. 5.05%), and National is a weaker credit (Moody's Baa2 and market rate around 5.25%) than AGM, National does not have the same economic incentive to pay them off at the Compounded Value.

a. National is, like AGM, attempting to violate the bond contract call protection provisions.

b. The National insurance contract states that the 5.05% rate is call protected (except a make whole call). So if market rates moved down, and bond prices up, the policy holders would benefit because they would continue to be able to clip their 5.05% coupons.

c. National is saying if you get their National Certificates, either when the trust is being formed, or any time thereafter, and market rates value the new COFINA bonds above par, National can sell them, take all the profit and call your National certificates away at par. In other words, National unilaterally removes your call protection, which is INCOME PROTECTION, and they get all the upside.

d. The National insurance contract does not allow National to alter the terms of the underlying bonds, particularly to the detriment of the policyholders as would be the case if the call protection is removed as National proposes, without the consent of the policy holders.

e. The National Policies are contracts between National and the policy holders, and are not obligation of COFINA, are not under the jurisdiction of the Oversight Board, and not a matter that is under the jurisdiction of this Court under PROMESA.

f. There is a better alternative, which is to eliminate all language in the Plan regarding the Insurance Policies, eliminate the Notices pertaining to the Insurance Policies and to order that the Insurance Companies and their policyholders resolve any claim or civil cause of action they may have between them or that may arise between them as a result of confirmation of the Plan as a separate matter in accordance with US federal and state law, and in a US court having jurisdiction over such matters.

I am happy to discuss this matter, provide supporting documents, or assist with your review of these issues.

Kind Regards,

Daniel Nagy, CFA



**Please don`t rule COFINA**

Cruz M Ortiz Cuadra      to: swaindprcorresp                01/18/2019 11:08 AM

From:
To:       swaindprcorresp@nysd.uscourts.gov

Dear Honorable Judge Mrs Taylor Swain

A recent study reported by the Center for Census Information of the University of Puero Rico
Cayey Campus,  shows that 57% of the  population of children and youth of 17 years or less
lived under the poverty level prior the hurricane María. The same study expects a signifcant
increase of people  living under poberty level  in the next the next ten years , lifting the figures to
59.8% of all Puerto Rican US Citizens living on the Island.

How poor parents will navigate essencial institutional services (education most af all, but health
and other services as well), if a significant piece of the IVU will go to pay COFINA bonds from
2022 till 2040.

 Please, dont rule COFINA. Make them negotiate in equal terms.

Cordially yours

Cruz m Ortiz

**Eating Puerto Rico: A History of Food Culture and Identity**

It is a food centered history matching an approach that has been applied to a number of countries
in recent times, from Italy to Japan.
*The Americas, 2014*

...a rich tour de force by a food historian and Professor of Humanities at the University of Puerto Rico, Humacao.
He is an authority on the history of food, food habits and diet of Puerto Rico.
*Research Gate,2015*

Eating Puerto Rico, a historical feast …..is significant not only for Puerto Rican research
but for the entire Caribbean….it will be useful for food scholars, educated audiences, and lay readers…
*New West Indian Guide, 2016*

Eating Puerto Rico contributes to multiple scholarly fields, addressing issues relevant to the field of culture and gender
studies, sociology, nutrition, food science, the culinary arts and history. A great resource for scholars focusing on food in
the Caribbean.
*Food Culture and Society:*
*An International Journal of Multidisciplinary Research, 2016*

Eating Puerto Rico is an important contribution to the social and cultural history of the Caribbean
and may be also fruitful as a primary source
for studies of colonialism, Third World Poverty and underdevelopment.
*The Historian, 2015*



**Fwd: People's cry... Independent Integral Audit of Puerto Rico 's Debt**

eileen llorens   to: swaindprcorresp@nysd.uscourts.gov        01/18/2019 08:12 AM

From:

To:        "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>







**corruption at the junta / santander at Spanish courts**

eileen llorens   to: swaindprcorresp@nysd.uscourts.gov          01/18/2019 08:32 AM

From:

To:        "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

https://youtu.be/yLZPO8HkLj0

Publicado el 12 jun. 2017

El Banco Santander en España está en el punto de mira. En la Audiencia siete directivos han declarado por supuestamente ayudar a esconder miles de millones en Suiza.

Además, en el Congreso del país varios grupos de la sociedad civil han denunciado el supuesto expolio del banco en Puerto Rico.

El juez José de la Mata considera que hay indicios suficientes y que presuntamente ayudaron a esconder 1700 millones de euros en cuentas del banco HSBC en Suiza para no tributar.

Sobre esta noticia del Santander, el segundo banco europeo, poco se habla en los medios españoles y la sociedad civil aprovecha para denunciar las malas praxis de este banco en Puerto Rico.

Denuncian que el Santander ha usado prácticas similares a las que ocurrieron en España o Grecia para que con la crisis, determinados actores pudieran hacerse con el patrimonio público.

Los activistas de Puerto Rico llegados hasta Madrid, capital española, denuncian que su país se está convirtiendo en una residencia turística para norteamericanos.

El Congreso de los Diputados ha recibido a varios grupos de la sociedad civil de Puerto Rico que han denunciado las malas prácticas del banco Santander en su país. Aseguran que la entidad dirigida por Patricia Botín es la responsable de la bancarrota y del expolio que sufren.

Rafael González, Madrid.

¡Suscríbete a HispanTV!
https://www.youtube.com/user/hispantv...



### Fwd: Citizens participation, ?

eileen llorens   to: swaindprcorresp@nysd.uscourts.gov          01/18/2019 08:10 AM

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

To: "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>



¿Sabías q en estados como Nueva Jersey y ciudades como Filadelfia, los ciudadanxs participan activamente en las emisiones de deuda pública? En PR el pueblo no ha tenido ni tiene espacio para participar en los procesos de emisión de deuda pública y reestructuración. ¿Sabías q el proyecto legislativo (PC 1837) que aprobó el Plan de Ajuste de COFINA— se pasó en la Legislatura sin audiencias públicas y sin permitir que ningún miembro de la legislatura, organización o ciudadano hiciera preguntas, expresara sus opiniones o presentara cualquier propuesta o enmienda? ¿Y ahora en el tribunal solamente ofrecen 24 turnos de 5 minutos a ciudadanxs? Son nuestros $$$ ¿Dónde está la participación ciudadana?





### Restructuring debt after a disaster

Jose Caraballo Cueto   to: swainDPRCorresp                    01/18/2019 09:08 AM

From:  ████████████████████████████████

To:    swainDPRCorresp@nysd.uscourts.gov

Dear Judge Taylor:

Thank you for your willingness to hear the public: the Board and the Legislature didn't hear the public. Your openness bring some democracy to what has been a process reserved for privileged professionals who will not pay for the crisis.

I'm a professor of economics who opposes the adjustment plan of COFINA (plan) for the following reasons:

1.  A plan with a high probability of default is not an adequate plan and does not bring the "fresh start" that bankruptcy should bring: we, the residents, will have another restructuring round in the next decades. No serious economist state otherwise. The division of the sales tax in the plan is not the problem per se; it is the low haircut. My colleagues Martin Guzman and Joseph Stiglitz and the former banker Gregory Makoff (https://www.cgsonline.org/publications/update-promesa-and-proposal-restructuring-puerto-ricos-debt) separately reach the same conclusion: debt sustainability is reached with a haircut of at least 60% to the principal and zero interest payments. As you know, this plan has a haircut of just 32%, but the interest payments will be far greater than such haircut ($15.8 billion).

2. I know that the parties in this case are looking for what is best for them and are a bit tired, but this plan of adjustment is not consistent with PROMESA: a high probability of a second default means a low probability of returning to the credit market.

3. We do not know if essential services are adequately funded because those have not been defined before and after Hurricane Maria; another inconsistency with PROMESA. We do know that after Hurricane Maria there are greater needs for essential services, but the fiscal plan post-Maria does not provide local funding for the reconstruction; just more funds for debt payments. I compared the fiscal plans pre and post Maria and debt service increased by 115% for the period 2019-2023. In other words, the parties are trying to bailout bondholders with the reconstruction multiplier effect: new economic activity will raise government revenues. Those new revenues should be used to satisfy the new essential services (e.g., households claims that were rejected by FEMA and other damages not covered by the federal government. Debt payments should be kept at the pre-Maria levels. The reconstruction should not reconstruct private benefits. After the earthquake in Haiti, debt was forgiven but in Puerto Rico the privileged professionals want us to pay more after the disaster.

4. By using the best-case scenario of the reconstruction, the plan has a high probability of default: if the federal government decides to relocate reconstruction funds (e.g. to construct a wall with Mexico), the multiplier effect would be lower, risking the sustainability of the plan. That will increase the austerity to essential services in the future, what will lead to more migration and to higher probability of a second restructuring.

I urge you to raise the haircut to both junior and senior bondholders up to the market prices before the plan was announced. With a haircut of larger than 50%, you will make sure that the plan is sustainable and you'll make a great service in the history of Puerto Rico.

I tried to testify in your court but I was not chosen. However, I'm willing to testify or hold a meeting now or in the future.

Thank you,
Jose

José Caraballo-Cueto, PhD

████████████████████████████████
████████████████████████████████████████████
████████████████████████████

Centre for International
Governance Innovation

Policy Brief No. 129 — April 2018

# An Update on PROMESA and a Proposal for Restructuring Puerto Rico's Debt

## Gregory Makoff

### Key Points

→ The Financial Oversight and Management Board for Puerto Rico (FOMB) should quickly move to certify a fiscal plan that specifies the cash flow available to debt service so that negotiations can begin over the distribution of losses among creditors.

→ Puerto Rico's tax-supported debt should be reduced from about US$45 billion to about US$6 billion, with debt service fixed at about US$350 million a year.

→ Contingent payment obligations, such as GDP warrants, should be avoided.

## Introduction

It has been almost two years since the US Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), a law designed to facilitate the recovery of Puerto Rico's finances and economy. And yet, these many months later, there is little progress with the debt restructuring or fiscal reforms to report.

To allow for discernible progress before PROMESA hits its two-year anniversary in June, the FOMB should undertake steps in the next few weeks to certify a comprehensive and robust fiscal plan for Puerto Rico. Importantly, this plan should specify the aggregate cash available for debt service, so that the debt restructuring process can move on to the resolution of thorny intercreditor issues.

This policy brief suggests one way to do it. The idea is to reset the size of Puerto Rico's debt so that the US territory's debt service burden as a percentage of its own revenue approximates that of the 50 states. This approach suggests creditor recoveries of about 13.6 cents on the dollar and annual debt service capacity for Puerto Rico of about US$350 million a year. This brief also advises against the use of GDP warrants as part of the solution on both policy and technical grounds.

The discussion begins with an update of events since the passage of PROMESA, as well as a short summary of the structure of Puerto Rico's debt. It then moves on to the debt restructuring proposal, followed by a discussion of the use of GDP warrants.

## About the Author

Gregory Makoff has been a CIGI senior
fellow with the Global Economy Program
since February 2015. At CIGI, Gregory's
research focuses on issues in sovereign debt
management, including the management
of sovereign debt crises. From 1993
through 2014 Gregory was a professional
at Salomon Brothers/Citigroup specializing
in debt advisory, liability management
and derivatives for sovereign borrowers,
corporations and financial institutions.
His sovereign advisory assignments have
varied widely and have included helping
the Republic of Colombia establish its
debt management team in the mid-1990s,
assisting the Republic of the Philippines in
carrying out debt reprofiling transactions
in both its local and international markets,
and serving as adviser to the government of
Jamaica in its 2010 and 2013 domestic debt
restructurings. He has worked extensively
in Latin America, the Caribbean, Asia,
Europe, Eastern Europe and Africa, and
recently worked for one year at the US
Department of the Treasury as a senior
policy adviser on the Puerto Rico team.
Gregory holds a Ph.D. in physics from the
University of Chicago and a B.Sc. from the
Massachusetts Institute of Technology
in both physics and political science.
Gregory is also a CFA® charterholder.

# PROMESA Update

Box 1 lists some of the most important events that
have occurred since the enactment of PROMESA.

The first key event after the passage of the
law in June 2016 was the appointment of
the FOMB in September 2016. The FOMB is
composed of seven voting members who were
chosen by then US President Barack Obama in
consultation with members of the US Congress
from both the Democratic and the Republican
parties. The FOMB's voting members are
distinguished professionals from both on and
off the island whose individual expertise covers
public finance, bankruptcy, pensions and the
Puerto Rican economy. The FOMB's executive
team includes an executive director, a legal
counsel and a revitalization coordinator.[1]

After its appointment, the FOMB moved to
work with the Puerto Rican government and
various advisers to develop fiscal plans for the
commonwealth, as well as for other key borrowers
subject to restructuring, including the Puerto Rico
Electric Power Authority (PREPA), the Puerto Rico
Aqueduct and Sewer Authority, the Government
Development Bank for Puerto Rico and the
University of Puerto Rico. As a federally mandated
entity, the board is fully transparent about its
operations and its determinations, and therefore all
relevant materials may be found on its website.[2]

Progress was fairly steady in the first year after the
law's passage but stalled in the fall of 2017. First,
the government of Puerto Rico began a campaign
of pushing back heavily against FOMB-mandated
fiscal reforms, and then the island was pummelled
by two hurricanes that caused massive damage.

Although in the past several months the
Government of Puerto Rico has tabled new
fiscal plans for the commonwealth and its key
instrumentalities and agencies (to adjust for the
impact of the hurricanes), consensus has been
hard to find. In the last week of March 2018, the
FOMB asked the government to tighten terms in
its fiscal plans, which triggered a fiery speech by
Governor Ricardo Rosselló, in which he declared his

---

1    See https://juntasupervision.pr.gov/index.php/en/home/.

2    See https://juntasupervision.pr.gov/index.php/en/documents/.

## Box 1: Selected Events since the Enactment of PROMESA

| | |
|---|---|
| June 2016 | → PROMESA is enacted and an eight-month stay of litigation goes into effect. |
| September 2016 | → The FOMB is appointed. |
| January 2017 | → Governor Rosselló takes power in Puerto Rico, and President Donald Trump is inaugurated in Washington, DC. |
| February 2017 | → The stay of litigation is extended by three months. |
| March 2017 | → The FOMB confirms a fiscal plan for Puerto Rico. |
| April 2017 | → Ongoing discussions take place with creditors about a voluntary out-of-court debt restructuring. |
| May 2017 | → Puerto Rico files for protection from creditors in the federal court system. |
| June 2017 | → Puerto Rico approves a budget consistent with the fiscal plan. |
| | → The FOMB does not approve PREPA's Restructuring Support Agreement, which had been negotiated prior to the enactment of PROMESA. |
| July 2017 | → Puerto Rico begins implementation of the new budget. |
| August 2017 | → The FOMB sues Governor Rosselló for refusing to implement furloughs or reduce pension payments (Coto 2018). |
| | → US hedge fund Aurelius Capital Management files suit against PROMESA, arguing that the FOMB's creation was unconstitutional (Hals 2017). |
| September 2017 | → Hurricanes Irma and Maria create widespread devastation on the island and knock out the power grid. |
| November 2017 | → The FOMB loses litigation against Governor Rosselló over the appointment of an emergency manager for PREPA (US District Court 2018). |
| | → The FOMB sends a letter to Governor Rosselló following his announcement of payment of Christmas bonuses without FOMB approval (FOMB 2017). |
| January 2018 | → Governor Rosselló announces a privatization plan for PREPA (PREPA 2018). |
| | → Puerto Rico announces a new fiscal plan for the commonwealth (Government of Puerto Rico 2018a). |
| February 2018 | → The FOMB carries out a public listening session in New York on the future of Puerto Rico's energy sector (FOMB 2018a). |
| | → The US Congress passes a funding bill with significant money allocated to Puerto Rico. |
| | → Puerto Rico presents a revised fiscal plan with significantly more funding for creditors, following the passage of the federal funding bill (Government of Puerto Rico 2018b). |
| March 2018 | → The FOMB announces required changes to the fiscal plans for Puerto Rico (FOMB 2018b). |
| | → Governor Rosselló announces a refusal to implement key reforms (Giel 2018). |

*Source:* Author.

"tenacious opposition" to key reforms and accused the FOMB of intending to dictate policy (Giel 2018).

As of early April 2018, the various stakeholders await the release of a certified fiscal plan and clarity regarding whether or not the governor will cooperate with the restructuring process.

# Puerto Rico's Debt Spaghetti

Before presenting a proposal on how to restructure Puerto Rico's debt, it is useful to briefly discuss its structure.

A look at Puerto Rico's debt, set out in Table 1 in the annex, brings to mind a line heard around the time of Enron Corporation's default in November 2001, that it would "take years to untangle all the debt spaghetti." And years it did take for forensic auditors, lawyers and bankruptcy judges to clean up the mess. That tangle is the sort of situation Puerto Rico and its creditors now face.

The largest portion of Puerto Rico's US$70 billion of debt, and the concern of this policy brief, is the approximately US$45 billion of bonds backed by the commonwealth's taxing powers. The central problem for creditors is that Puerto Rico has little capacity to repay this debt while also providing essential public services. Creditor recoveries will be low.

However, as a result of ambiguities in the different financing contracts, the biggest challenge of the operation will be to allocate losses among creditors. Of greatest import is the battle for priority between the holders of constitutionally prioritized general obligation (GO) bonds and the holders of Puerto Rico Sales Tax Financing Corporation (COFINA) bonds, which are backed by a pledge of sales tax revenues. However, the great GO-COFINA battle is but the tip of the iceberg of legal issues that need to be resolved in Puerto Rico's bankruptcy process.

Because of the legal complexity of Puerto Rico's debt, it will take many months, if not a year, for the parties to negotiate or litigate all of the issues that need to be resolved in distributing the losses among Puerto Rico's creditors — hence the urgency of fixing the aggregate amount of cash flow available

for debt service, so that the process can move on to the resolution of intercreditor disputes.

# Restructuring Puerto Rico's Debt

The problem at hand is to reduce Puerto Rico's US$45 billion dollars of tax-supported debt to a sustainable level.

A wide range of approaches can be used to set the terms of a sovereign or municipal debt restructuring. There are top-down approaches, where the losses to creditors are fixed with reference to prior debt restructurings, and there are bottom-up approaches, where economic and fiscal models are used to project the debtor's ability to repay debt in the future. However, in this case, neither the top-down nor the bottom-up approaches work very well.

Top-down approaches are not appropriate here because fixing the haircut to be applied to Puerto Rico's creditors using an average of levels agreed in prior deals does not meet the technical requirements of PROMESA; the law requires that the FOMB certify a fiscal plan that assures debt sustainability based on Puerto Rico's facts and circumstances.

Unfortunately, neither do conventional, International Monetary Fund (IMF)-style, bottom-up models work very well in this instance. Not only is the economy in a steep and unprecedented decline and household and business behaviour hard to predict, but the one factor that is known to help — increases in federal support for the island — raises problems of circularity and public policy. Economic growth and territory revenue are strongly correlated to aggregate federal spending on the island, so if more money is promised to the island, creditor recoveries go up, while if less money is promised, recoveries go down. It is an awkward situation, as recently underlined when the Government of Puerto Rico proposed increased payments to bondholders on the heels of the recent US budget deal that included substantial emergency aid for hurricane recovery (Slavin 2018; Kaske 2018).

As a result, solving the problem requires a different, third approach. The idea is to resize Puerto Rico's debt against a neutral benchmark to resolve the

## Figure 1: Debt Metrics — Puerto Rico Debt vs. the 50 States



*Source:* Adapted and reprinted from Government of Puerto Rico (2018a, 42).

circularity of Puerto Rico's dependence on federal funding. The proposed approach is to reduce Puerto Rico's debt service burden to a level that matches that of the 50 states, using the conventional debt rating metrics as presented in Figure 1.

Of the various options, the data displayed in the first panel of Figure 1, the debt service to revenue ratio, is the most relevant.[3] This metric is a robust choice because the data required to complete the analysis is readily measurable. It also directly informs the policy problem at hand — how to fairly divide government resources among servicing debt, spending on social services and supporting economic growth.

To cuff the implied recovery for creditors (using the numbers from Figure 1), one can simply take the ratio of what Puerto Rico's debt service ratio should be (about 4.4 percent) to what it currently is (28.1 percent) — 4.4/28.1 — which equals 15.6 percent.

A more detailed analysis below suggests a somewhat smaller recovery for creditors, because Puerto Rico's competiveness and growth prospects are below average while its social spending needs are much higher than average, given that Puerto Rico's poverty rate is more than three times the national average (Bishaw and Benson 2017) and the quality of its social services are far below par.[4]

Here is a five-step method for calculating Puerto Rico's debt service capacity and creditor recoveries:

→ **Select the scaling factor.** Choose the debt service to revenue ratio as the scaling factor for determining Puerto Rico's debt capacity based on the ratio observed in the 50 states.

→ **Select the scaling factor value.** Select 3.5 percent, or about 20 percent below the 4.4 percent average for the 50 states, in light of Puerto Rico's outsized social needs and weak long-term growth prospects.

---

3   There are clear problems with using any of the other three measures illustrated in Figure 1: debt per capita is not fair, given the relatively low income on the island; debt to personal income would imply a recovery below three percent to creditors; and debt to GDP would give a recovery below five percent and is not robust because of tax differences.

4   For the quality of education, see a New York Federal Reserve report (Chakrabarti, De Giorgi and Schuh 2016); for the state of health care, see an Urban Institute report (Perreira et al. 2017).

→ **Identify the cash flow baseline.** Identify US$10 billion as the revenue base, which is Puerto Rico's proven own cash-flow-generating ability.[5]

→ **Calculate annual cash flow available for debt service.** Multiply US$10 billion revenue by the 3.5 percent debt service to revenue ratio to obtain the estimated annual debt service of US$350 million.

→ **Calculate the nominal debt amount.** The present value of 30 years of US$350 million annual payments is approximately US$6.1 billion if a four percent discount rate is applied. Hence, creditor recoveries would be US$6.1 billion/US$45 billion or about 13.6 cents on the dollar.

Of course, there is plenty of room to debate the exact magnitude of Puerto Rico's debt capacity, as many will doubtless do. However, the resulting debt should not be either significantly lower or significantly larger than that recommended here, for the following reasons.

On the low end of the debate, some analysts believe — and this analyst believes — that Puerto Rico has no capacity to pay debt given the territory's lack of growth and great social needs. Yet, it is not legally practical to simply wipe out the debt, because a vote of creditors is required *and* the judge needs to certify that the plan of adjustment is in the best interests of creditors. As well, it does not seem fair to have creditors bear a complete loss when there is a diversity of responsibility for the situation.

On the high end, it is hard to see how Puerto Rico could be left with a debt burden two or three times that of the average state. It seems implausible that Puerto Rico would have any chance of regaining market access on reasonable terms — and the FOMB leaving the island — if Puerto Rico were to be left with much more debt than the average municipal market borrower.

To be sure, there will be those who say that this approach that uses a simple ratio to fix Puerto Rico's debt capacity is too simplistic — after all, the IMF always bases its recommendations on detailed models. But that would be to misunderstand the argument implicit in the discussion. The point is that an appropriately conservative model will show that Puerto Rico has no debt capacity and that its finances and its economic health are completely dependent on federal transfers.[6] Since giving creditors nothing is not a practical way forward, the idea here is to reduce Puerto Rico's debt to a level comparable to that of the 50 states — an approach that seems fair because it would expose creditors to losses to the extent that they lent far too much to Puerto Rico. Since money is fungible, it is inevitable that federal money will be used to pay this debt. However, given the scale of the social and economic crisis, policy makers should have much more to worry about in Puerto Rico than the possibility that US$350 million of federal money might leak to creditors each year, provided that that is a cap and not a floor.

For further details on the proposed restructuring, please see the indicative term sheet provided in Table 2 in the annex.

# Should Contingent Payment Instruments Be Part of the Solution?

As is common in debt restructuring discussions, some observers have suggested that state-contingent instruments — that is, GDP warrants — should form part of the consideration given to Puerto Rico's creditors (Guzman, Stiglitz and Weiss 2017). However, this approach does not make sense for Puerto Rico.

The idea of the use of such instruments in debt restructurings has deep roots in the economic literature. For example, Nobel Prize winner Kenneth Arrow points out in his classic *The Limits to Organization* (1974) that the variability of economic outcomes leads one to prefer contingent contracts

---

5   This revenue number excludes revenues derived by Puerto Rico from its local Act 154, since these revenues are, in economic substance, temporary federal government budgetary transfers rather than sustainable own revenue (Sullivan 2014).

6   To get any debt capacity the analyst would need to assume: one, continued federal support for Medicaid, an optimistic read on Puerto Rico's ability to replace Act 154 revenue when federal support lapses; and/or two, unrealistic growth expectations, given Puerto Rico's fundamental lack of competitiveness combined with its lack of reliable power (Makoff and Setser 2016); and/or three, unrealistic assumptions for Puerto Rico's ability to increase its tax revenue or cut public services without losing investment or its population.

— contracts whose terms depend on the state of the world. However, the market experience is mixed.

On the positive side, several Brady bond restructurings completed in the late 1980s and early 1990s included state-contingent instruments. The most important of these were the oil warrants issued by Nigeria and Venezuela that increased the coupon of the bonds issued if oil prices increased, in light of the direct dependence of the states' revenue on international oil prices. These instruments worked well.

On the negative side, Argentina's use of GDP warrants in its contentious 2005 debt restructuring had many downsides. First of all, investors in fixed-rate bonds attributed little value to the warrants, given their complexity, and in the end the warrants were very expensive to service. In retrospect, Argentina should have offered creditors the choice of accepting a base amount of bonds plus the warrants, or the base amount plus one or two percent additional base bonds in place of the warrant. If they offered this choice, the deal might have been much more successful and the realized cost probably would have been much lower.

There are market, policy and technical grounds for skepticism about the potential use of GDP warrants or similar instruments in Puerto Rico's debt restructuring. To start with, the instruments are far too complicated for most of the holders (many of whom are retail investors), who would just sell them quickly at a poor price. Furthermore, the application to Puerto Rico is questionable because the key state variable is the level of federal support for the island (Makoff and Setser 2017) — would it really be appropriate for a federally appointed board to approve an instrument that pays bonuses to creditors if federal funding increases in the future? Lastly, there is no precedent for the use of these instruments in the municipal bond market, where their tax character is uncertain.

Finally, there is the issue of complexity. Puerto Rico is in the middle of a terribly complicated restructuring process. There is hardly room to introduce a highly complex contingent instrument into the negotiation process. As experienced debt

managers often advise, the best way forward in the area of debt is to keep it simple.[7]

To close, even Arrow (1974, 34–36) admits that "there is more than one reason for the failure of the theoretically desirable contingent prices to exist. One doubtlessly is the sheer complexity of the price schedule."

# Conclusions

Despite the initial actions taken under PROMESA, Puerto Rico remains mired in a deep social, political and economic crisis. The long-term damage is increasing because investors are holding their wallets as they await clarity about the future of power and policy on the island, while outmigration continues apace.

To restore confidence on the island, now is the time to make headline progress on the debt restructuring.

The FOMB should move in the upcoming weeks to certify a comprehensive plan for Puerto Rico and the restructuring of its debt. Aggregate terms of the debt restructuring should be fixed so that the process can move on to resolving intercreditor disputes.

This policy brief recommends that Puerto Rico devote approximately US$350 million a year to debt service for the next 30 years, based on an approach that benchmarks Puerto Rico's debt service capacity to the average debt service burden assumed by the 50 states.

---

7    However, if GDP warrants were to be included, three rules of the road would be essential: first, cap the size; second, include a call option; and third, give creditors the choice of the warrants or a small incremental payment.

# Annex

## Table 1: Puerto Rico's Tax-Supported Debt (as of July 31, 2016)

| Issuer | US$ Billions | Repayment Source | Special Features and Concerns |
|---|---|---|---|
| GO bonds | 12.54 | General revenues | Constitutional priority of payment |
| Public Buildings Authority | 4.01 | Rent on public buildings | Constitutional priority guarantee |
| COFINA (senior bonds) | 7.59 | Sales tax | Subject to a dispute with GO bondholders over priority and constitutionality |
| COFINA (junior bonds) | 9.73 | Sales tax | Subordinated to COFINA senior bonds |
| Infrastructure Financing Authority | 1.86 | Allocated rum and other taxes | Subordinated to GO bonds on a cash flow basis* |
| Highways & Transportation Authority | 4.18 | Allocated gas and other taxes | Subordinated to GO bonds on a cash flow basis |
| Convention Center District Authority | 0.39 | Allocated hotel-room tax | Subordinated to GO bonds on a cash flow basis |
| Employee Retirement System Pension Obligation Bonds | 3.14 | Commonwealth's annual contributions to the retirement system | Authorization limited to board of the Employee Retirement System |
| Public Finance Corporation | 1.09 | Appropriated funds | Payment limited to appropriations, and therefore payment has ceased |
| University of Puerto Rico | 0.50 | Tuition and budget transfers | Payments supported directly by tuition revenue and indirectly by general fund transfers |
| Total Tax-Supported Debt | 45.03 | | |

*Data source:* Commonwealth of Puerto Rico (2016).

*Bonds subject to non-payment, or a "clawback" provision, if GO bonds are not paid.

*Notes:* This table excludes:

- debt of Puerto Rico's municipalities that are supported by various taxes;

- relatively small borrowings by the Puerto Rico Industrial Development Company, the Mortgage Bankers' Association, the Port of the Americas Authority, the transportation authority's Teodoro Moscoso Bridge revenue bonds, Puerto Rico Infrastructure Financing Authority's Port Authority, Mental Health and Anti-Addiction Services Administration secured bonds;

- debt secured on external cash flows, including the Children's Trust (tobacco litigation cash flow securitization) and Housing Finance Authority (securitization of Department of Housing and Urban Development revenues);

- US$4 billion of debt of Puerto Rico's Government Development Bank, which will be separately restructured; and

- US$13 billion of revenue bonds and other facilities issued by PREPA and the Aqueduct and Sewer Authority, which will be separately restructured.

## Table 2: Indicative Terms and Conditions for Puerto Rico's Debt Restructuring

| Parameter | Indicative Term | Rationale |
|---|---|---|
| Amount | US$6 billion (area) | Debt sustainability |
| Final maturity | 30 years | As required by the Puerto Rican Constitution |
| Cash flow profile | Level pay, US$350 million a year | Standard practice in the municipal bond market and financially prudent as it leaves reasonable capacity to meet capital expenditure needs |
| Legal ranking | Senior unsecured GO bonds | The simplest possible structure should meet the widest appeal, provided debt covenants protect against subordination |
| Debt covenants and negative pledge | Debt covenants should tightly constrain the amount of future debt<br><br>The pledge of any general tax revenues should be forbidden | Prevent the recurrence of financial distress and prevent the subordination of bondholders with new financing structures |
| Bond modification provisions | Aggregate vote of two-thirds of creditors to approve any future debt restructurings | Prevents the imposition of a new PROMESA process if Puerto Rico needs to restructure its debt again in the future |
| GDP warrants or other contingent pay instruments | Should be avoided in the municipal bond context | Inefficient, complex |

*Source:* Author.

# Works Cited

Arrow, Kenneth. 1974. *The Limits to Organization*. New York, NY: W. W. Norton.

Bishaw, Alemayehu and Craig Benson. 2017. "Poverty: 2015 and 2016." American Community Survey Brief, September. Suitland, MD: US Census Bureau.

Chakrabarti, Rajashri, Giacomo De Giorgi and Rachel Schuh. 2016. "Human Capital and Education in Puerto Rico." *Liberty Street Economics* (blog), August 11. Federal Reserve Bank of New York.

Commonwealth of Puerto Rico. 2016. *Financial Information and Operating Data Report*. December 18. www.gdb.pr.gov/documents/Commonwealthof PuertoRicoFinancial InfoFY201612-18-16.pdf.

Coto, Danica. 2018. "Board sues Puerto Rico governor for rejecting furloughs." Associated Press, August 28.

FOMB. 2017. Letter to Governor Rosselló with Board Response to Early Issuance of Christmas Bonus. November 27. https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5a1dc95dcf714.pdf.

———. 2018a. Panelists Presentations During the Energy Sector Listening Session. February 2. https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5a7480819885d.pdf.

———. 2018b. "FOMB — Letter — Required Changes FP — CW." March 28. https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5abbd041d186e.pdf.

Giel, Dawn. 2018. "'They intend to dictate public policy': Puerto Rico's governor spars with federal oversight board." CNBC.com, August 28.

Government of Puerto Rico. 2018a. *New Fiscal Plan for Puerto Rico*. Draft submission, January 24. www.aafaf.pr.gov/assets/newfiscalplanforpr-01-24-18.pdf.

———. 2018b. *New Fiscal Plan for Puerto Rico*. Draft submission, February 12. www.aafaf.pr.gov/assets/newfiscalplanforpr-02-12-2018.pdf.

Guzman, Martin, Joseph E. Stiglitz and Anonio Weiss. 2017. "Don't expect debt payments from Puerto Rico any time soon." *The Washington Post*, December 11.

Hals, Tom. 2017. "Aurelius hedge fund seeks to toss Puerto Rico's bankruptcy filing." Reuters, August 7.

Kaske, Michelle. 2018. "Stunned investors reap 95% gains on defaulted Puerto Rico bonds." Bloomberg, April 3. www.bloomberg.com/news/articles/2018-04-03/stunned-investors-reap-95-gains-on-defaulted-puerto-rico-bonds.

Makoff, Gregory and Brad W. Setser. 2017. *Puerto Rico Update: PROMESA, Population Trends, Risks to the Fiscal and Economic Plan — and Now Maria*." CIGI Papers No. 146, September. Waterloo, ON: CIGI. www.cigionline.org/publications/puerto-rico-update-promesa-population-trends-risks-fiscal-and-economic-plan-and-now.

Perreira, Krista, Rebecca Peters, Nicole Lallemand and Stephen Zuckerman. 2017. *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*. January. Washington, DC: Urban Institute. www.urban.org/sites/default/files/publication/87011/2001050-puerto-rico-health-care-infratructure-assessment-site-visit-report_1.pdf.

PREPA. 2018. *Amended and Restated Fiscal Plan*. Draft submission, January 24. www.aafaf.pr.gov/assets/prepa-revisedfiscalplan-01-24-18.pdf.

Slavin, Robert. 2018. "Puerto Rico bonds rally as plan projects more money available for debt." *The Bond Buyer*, March 26. www.bondbuyer.com/news/puerto-rico-bonds-rally-on-more-money-available-for-debt.

Sullivan, Martin A. 2014. "Economic Analysis: The Treasury Bailout of Puerto Rico." Taxanalysts, January 27. www.taxanalysts.org/content/economic-analysis-treasury-bailout-puerto-rico.

United States District Court District of Puerto Rico. 2017. "Opinion and order denying urgent motion of FOMB to confirm appointment of a Chief Transformation Officer." November 16.

# About the Global Economy Program

Addressing limitations in the ways nations tackle shared economic challenges, the Global Economy Program at CIGI strives to inform and guide policy debates through world-leading research and sustained stakeholder engagement.

With experts from academia, national agencies, international institutions and the private sector, the Global Economy Program supports research in the following areas: management of severe sovereign debt crises; central banking and international financial regulation; China's role in the global economy; governance and policies of the Bretton Woods institutions; the Group of Twenty; global, plurilateral and regional trade agreements; and financing sustainable development. Each year, the Global Economy Program hosts, co-hosts and participates in many events worldwide, working with trusted international partners, which allows the program to disseminate policy recommendations to an international audience of policy makers.

Through its research, collaboration and publications, the Global Economy Program informs decision makers, fosters dialogue and debate on policy-relevant ideas and strengthens multilateral responses to the most pressing international governance issues.

# About CIGI

We are the Centre for International Governance Innovation: an independent, non-partisan think tank with an objective and uniquely global perspective. Our research, opinions and public voice make a difference in today's world by bringing clarity and innovative thinking to global policy making. By working across disciplines and in partnership with the best peers and experts, we are the benchmark for influential research and trusted analysis.

Our research programs focus on governance of the global economy, global security and politics, and international law in collaboration with a range of strategic partners and support from the Government of Canada, the Government of Ontario, as well as founder Jim Balsillie.

# À propos du CIGI

Au Centre pour l'innovation dans la gouvernance internationale (CIGI), nous formons un groupe de réflexion indépendant et non partisan doté d'un point de vue objectif et unique de portée mondiale. Nos recherches, nos avis et nos interventions publiques ont des effets réels sur le monde d'aujourd'hui car ils apportent de la clarté et une réflexion novatrice pour l'élaboration des politiques à l'échelle internationale. En raison des travaux accomplis en collaboration et en partenariat avec des pairs et des spécialistes interdisciplinaires des plus compétents, nous sommes devenus une référence grâce à l'influence de nos recherches et à la fiabilité de nos analyses.

Nos programmes de recherche ont trait à la gouvernance dans les domaines suivants : l'économie mondiale, la sécurité et les politiques mondiales, et le droit international, et nous les exécutons avec la collaboration de nombreux partenaires stratégiques et le soutien des gouvernements du Canada et de l'Ontario ainsi que du fondateur du CIGI, Jim Balsillie.

## CIGI Masthead

### Executive

President Rohinton P. Medhora
Deputy Director, International Intellectual Property Law and Innovation Bassem Awad
Chief Financial Officer and Director of Operations Shelley Boettger
Director of the International Law Research Program Oonagh Fitzgerald
Director of the Global Security & Politics Program Fen Osler Hampson
Director of Human Resources Susan Hirst
Interim Director of the Global Economy Program Paul Jenkins
Deputy Director, International Environmental Law Silvia Maciunas
Deputy Director, International Economic Law Hugo Perezcano Díaz
Director, Evaluation and Partnerships Erica Shaw
Managing Director and General Counsel Aaron Shull
Director of Communications and Digital Media Spencer Tripp

### Publications

Publisher Carol Bonnett
Senior Publications Editor Jennifer Goyder
Publications Editor Susan Bubak
Publications Editor Patricia Holmes
Publications Editor Nicole Langlois
Publications Editor Lynn Schellenberg
Graphic Designer Melodie Wakefield

For publications enquiries, please contact publications@cigionline.org.

### Communications

For media enquiries, please contact communications@cigionline.org.

Copyright © 2018 by the Centre for International Governance Innovation

The opinions expressed in this publication are those of the author and do not necessarily reflect the views of the Centre for International Governance Innovation or its Board of Directors.



This work is licensed under a Creative Commons Attribution — Non-commercial — No Derivatives License. To view this license, visit (www.creativecommons.org/licenses/by-nc-nd/3.0/). For re-use or distribution, please include this copyright notice.

Printed in Canada on paper containing 100% post-consumer fibre and certified by the Forest Stewardship Council® and the Sustainable Forestry Initiative.

Centre for International Governance Innovation and CIGI are registered trademarks.

Centre for International
Governance Innovation

67 Erb Street West
Waterloo, ON, Canada N2L 6C2
www.cigionline.org





**REJECT the agreement between COFINA and the FOMB on Jan . 16**

juan-carlos ruddick-shannon   to: swaindprcorresp@nysd.uscour
ts.gov,                                         01/18/2019 06:38 PM

From:

To:   "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>,

Dear Honorable Judge Taylor Swain,

I am Juan CarlosShannon Meléndez_____. I write to you because I am very disappointed and worried about the actions that the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another never-ending economic crisis that will lead Puerto Rico into another debt default and will only cause more harsh austerity measures, cuts in public services and pensions. The measures dictated by the FOMB have been implemented in a disorganized, illogical, and irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto Ricans from a real opportunity to get affordable education and healthcare, and limiting the capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The weak attempts of the board to fake an audit process are not going to work on us; we know this debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that allows us to really know how the debt was issued and to ensure that is it paid justly and legally. Please do what is right and rule against this agreement on January 16th's 2019 hearing.

Sincerely,

NAME JuanCarlos Shannon Meléndez
CITY, STATE, ZIP CODE Caguas, PR 00725

---

English Template Ends

---

Español
CORREO ELECTRÓNICO DE JUDGE TAYLOR SWAIN: swaindprcorresp@nysd.uscourts.gov
cc:

Título:
RECHAZAR el acuerdo entre COFINA y la FOMB el 16 de enero.

Contenido del correo electrónico:
Estimada Honorable Juez Taylor Swain,

Yo soy _____. Le escribo porque estoy muy decepcionado y preocupado por las acciones que está llevando a cabo la Junta de Supervisión y Administración Financiera (FOMB, por sus siglas en inglés) para enfrentar la crisis fiscal. En el acuerdo alcanzado con los bonistas

COFINA arrastrará a Puerto Rico a otra crisis económica interminable que llevará a Puerto Rico a otro impago de deuda y solo causará medidas de austeridad más severas, recortes en los servicios públicos y pensiones. Las medidas dictadas por el FOMB se han implementado de manera desorganizada, ilógica e irresponsable hasta el momento, poniendo en peligro la seguridad de los ciudadanos, limitando a miles de puertorriqueños de una oportunidad real de obtener educación y atención médica asequibles, y limitando la capacidad de las personas para convertirse y permanecer empleado(a) en la isla.

En lugar de seguir adelante con este acuerdo injusto y anticonstitucional, solicitamos una renegociación justa de los acuerdos que sean legales, justos y no gravosos para el país. Los débiles intentos de la junta de falsificar un proceso de auditoría no van a funcionar con nosotros. Sabemos que esta deuda se impuso a Puerto Rico sin el debido proceso de una auditoría integral real que nos permita saber realmente cómo se emitió la deuda y garantizar que se pague de manera justa y legal. Por favor, haga lo correcto y descarte este acuerdo en la audiencia del 16 de enero del 2019.

Sinceramente,

NOMBRE
CIUDAD (*): ESTADO (*): CÓDIGO POSTAL

_____

Fin de plantilla en español



### Please do not accept the COFINA Agreement

María Cristina Oruña   to: SwainDPRCorresp@nysd.uscourts.gov                01/18/2019 05:54 PM

From: ██████████████████████████████████

To:     "SwainDPRCorresp@nysd.uscourts.gov" <SwainDPRCorresp@nysd.uscourts.gov>

Dear Judge Swain

This must be a really difficult decision for you, I bet.  The future of our beautiful Island is really in your hands.

Economists like the Nobel Prize winner Joseph Stiglitz believe we won't be able to recover if you accept this decision.

Please listen to experts like him.  Unlike many other parties, he does not have anything to gain from this.

Thank you for your consideration

**maría cristina oruña**
president





### Pledge to please Rule against COFINA

**Nahiri Rivera**    to: swaindprcorresp@nysd.uscourts.gov          01/18/2019 01:59 PM
Cc:  "diasporaenresistencia@gmail.com"

| | |
|---|---|
| From: | |
| To: | "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov> |
| Cc: | |

Estimada Honorable Juez Taylor Swain,

Yo soy Nahiri Rivera. Le escribo porque estoy muy decepcionada y preocupada por las acciones que está llevando a cabo la Junta de Supervisión y Administración Financiera (FOMB, por sus siglas en inglés) para enfrentar la crisis fiscal. En el acuerdo alcanzado con los bonistas COFINA arrastrará a Puerto Rico a otra crisis económica interminable que llevará a Puerto Rico a otro impago de deuda y solo causará medidas de austeridad más severas , recortes en los servicios públicos y pensiones. Solicitamos una renegociación justa de los acuerdos que sean legales, justos y no gravosos para el país. Sabemos que esta deuda se impuso a Puerto Rico sin el debido proceso de una auditoría integral que nos permita saber realmente cómo se emitió la deuda y garantizar que se pague de manera justa y legal.Por favor, haga lo correcto y descarte este acuerdo en la audiencia del 16 de enero del 2019.

Sinceramente,  Nahiri Rivera Barreto

Dear Honorable Judge Taylor Swain,

I am Nahiri Rivera. I write to you because I am very disappointed and worried about the actions that the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another never-ending economic crisis that will lead Puerto Rico into another debt default and will only cause more harsh austerity measures, cuts in public services and pensions. We request a fair renegotiation of the agreements that is legal, fair and not burdensome for the country. We know this debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that allows us to really know how the debt was issued and to ensure that is it paid justly and legally. Please do what is right and rule against this agreement on January 16th's 2019 hearing.

Sincerely, Nahiri Rivera Barreto



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

nmv9    to: Swaindprcorresp                                      01/18/2019 07:45 AM

From:    ███████████████████

To:      Swaindprcorresp@nysd.uscourts.gov
         ███████████████████

Dear Judge Laura Taylor Swain, My name is Nashalie Vazquez. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Nashalie Vazquez ████████████████████████



Petition against the COFINA accord

Raquel Gonzalez    to: swaindprcorresp@nysd.uscourts.gov          01/18/2019 05:52 AM

From:     ████████████████████

To:       "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Judge Swain,

**Please reject the COFINA agreement under your consideration today.** It is
**unconstitutional** (our constitution forbids such loans),  **discriminatory** (giving COFINA
bondholders unwarranted preferential treatment), and  **inhumane** (it works at the expense of
restricting essential services that though not specified by our  government or the "Junta", are
universally defined as services**,**  the interruption of which endangers the life, health or personal
safety of the whole or part of the population.)

On the last point, the inevitable "austerity plan" required threatens the public health, education,
pension and security systems, endangering the population and promoting impoverishment  across
the board.

Respectfully,

Raquel Gonzalez-Sparks

Citizen of Puerto Rico

Sent from my iPhone



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

Aaronjbasurto    to: Swaindprcorresp                            01/19/2019 05:41 PM

From:    ██████████████████████

To:      Swaindprcorresp@nysd.uscourts.gov ██████████████

Dear Judge Laura Taylor Swain, My name is Aaron Jose-Basurto. I am emailing you to urge you
to reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Aaron Jose-Basurto ████████████████████████



**COFINA**
Juan Cruet      to: swaindprcorresp@nysd.uscourts.gov                01/19/2019 10:40 AM

From:  ▓▓▓▓▓▓▓▓▓▓▓▓
To:    "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Honorable Judge Taylor Swain:

I am an old man of 65 years, at 63 I had to retire, because the American company with factories here, used to open windows with some economic benefits for us , to get out of old people like me, although we continue being able to work, they replace us with young people, not only because they are more productive, but because they hire them for less wages and without having to give benefits of medical plan, vacations, sick days, or permanence for the first two years. When I retired I was able to pay out my house and some minor debts, now I only receive 75% of what Social Security would be if I had retired at the regular age. When I left, I felt comfortable financially, I could make the purchase and buy some other cravings. Today only two years of that, It's barely give me to cover our expenses, I still have a daughter university and the oldest one who lives with me, only works a few days in the month. Sometimes I have to decide between paying for late utilities or buying food.

Please Honorable Judge, do not approve the COFINA agreement, if you do so, you will also be guilty of compromising the bleak future of my country, of my children and grandchildren and of thousands of old people like me, who only receive about $300.00 of SS and they survive helped by the food stamps and health subsidies that your President does not want to approve right now, because he wants money for the "Racist Wall of Poverty".

Please Honorable Judge, instead of approving this fateful agreement for my country please order a true audit of our debt, I am sure that the real culprits of our misfortunes will appear, that they are not only in our past and present government, but also in the banks,

brokerage houses, debt appraisers and even several of the "sitting on the" PROMESA Board "" imposed by your government to my country.

I thank you very much if you read this letter, not because I have not many years left, but for my children, grandchildren and thousands of Puerto Ricans like me, who love our beautiful little country and we do not want to have to go to look for another future.

Respectfully; Juan A. Cruet Luna, █████████████
█████████

January 19, 2019

Judge Laura Taylor Swain
United States District Court
District of Puerto Rico
150 Carlos Chardon Street
San Juan, PR  00918-1767

Honorable Judge Laura Taylor Swain:

I am again writing to you as a concerned citizen of Puerto Rico, who is following the court proceedings and your rulings in the government bankruptcy hearing. I hereby express my opposition to the restructuring of the COFINA debt as proposed by the Puerto Rican government and the Fiscal Control Board (FCB), both organizations that do not represent the best interests of the people of Puerto Rico.

The proposed restructuring would commit the revenues of the Puerto Rican government for 40 years, without having defined essential services, putting at risk our health, security, and education. There are very serious concerns about the legality of the bond issues dating back to 2007, when COFINA was established, as it was a mechanism to bypass the constitutional limit of government debt. Two members of the FCB, Carlos García and José Ramón González, have a very real conflict of interest, as they were actively involved in the issuance of government debt, and part of the revolving door with Santander Bank, which were the underwriters of this debt.

Very prominent local and internationally renowned economists have pronounced themselves against this agreement and have issued dire warnings that in 10 years we will again be renegotiating the debt.  The legality of this debt has been repeatedly called into question, but the government and the FCB have refused to audit the debt. We have been swamped with increases in taxes and public services (electricity, water, tolls) over the past ten years and a sales tax of 11.5%, which is the highest in the nation. This agreement, for the benefit of the ruling class and the vulture capitalists, is bad for the people of Puerto Rico and bad for our economic growth and development.

Please do not approve this restructuring agreement and send them back to the drawing board. It also sets a very dangerous precedent for all future debt restructurings and the viability of a decent standard of living on the island for future generations.

Sincerely,

Lianabel Oliver Bigas, MBA, CPA, CMA



**COFINA-PUERTO RICO**
Myr San-Fer    to: SwainDPRCorresp                                    01/19/2019 11:18 AM

From:
To:            SwainDPRCorresp@nysd.uscourts.gov

Honorable Judge Swain,

As the People and the Nation, we ask from you to please do not deny us a future to be able to stand up and reconstruct our lives and our society.

Slavery and COFINA are just the same thing but named differently.  Do not allow those who have brought our Nation to this economical crisis to be able to subject our people's lives to a long lasting enslavery and economical, cultural and social jmpoverishment.

In the name of dignity and freedom we ask you not to become an accomplice in the destruction of a Nation who for centuries has been denied the right to self-determination and liberty.

We profoundly trust and expect that wisdom will rule your heart and your judgement.

Truly yours,

*Myrtha Rosa Santiago-Fernández*
*One of many Puertorricans born in the USA and deeply proud to be a Puertorrican.*



**COFINA**

Sonia M Carrasquillo    to: SwainDPRCorresp                    01/19/2019 09:37 PM

From:

To:        SwainDPRCorresp@nysd.uscourts.gov

I am again writing to you as a concerned citizen of Puerto Rico, who is following the court proceedings and your rulings in the government bankruptcy hearing. I hereby express my opposition to the restructuring of the COFINA debt as proposed by the Puerto Rican government and the Fiscal Control Board, both organizations that do not represent the best interests of the people of Puerto Rico.

The proposed restructuring would commit the revenues of the Puerto Rican government for 40 years, without having defined essential services, putting at risk our health, security, and education. There are very serious concerns about the legality of the bond issues dating back to 2007, when COFINA was established, as it was a mechanism to bypass the constitutional limit of government

debt. Two members of the FCB, Carlos García and José Ramón González, have a very real conflict of interest, as they were actively involved in the issuance of government debt, and part of the revolving door with Santander Bank, which were the underwriters of this debt.

Very prominent local and internationally renowned economists have pronounced themselves against this agreement and have issued dire warnings that in 10 years we will again be renegotiating the debt. The legality of this debt has been repeatedly called into question, but the government and the FCB have refused to audit the debt. We have been swamped with increases in taxes over the past ten years and a sales tax of 11.5%, which is the highest in the nation. This agreement is bad for the people of Puerto Rico and bad for our economic growth and development.

Please do not approve this restructuring agreement and send them back to the drawing board. It also sets a very dangerous precedent for all future debt restructurings and the viability of a decent standard of living on the island for future generations.



**No al acuerdo de COFINA**
Arlene Garcia Zambrana    to: SwainDPRCorresp                    01/20/2019 12:59 AM

From:   ████████████████████████

To:     SwainDPRCorresp@nysd.uscourts.gov

Saludos Jueza Swain
Como muchos puertorriqueños nose mucho inglés pero a pesar de eso pienso que
nos es impedimento para mi escribirle. Yo como muchos puertorriqueños Día a
día trabajamos para mantener a nuestras familias. No dependemos del gobierno,
somos clase media. Creemos que antes de hacer cualquier cosa deberían hacer
una auditoría de la deuda ya que nosotros pensamos que esta deuda fue adrede
para robar y beneficiar a otros.
Y los que van a pagar por esa deuda es el pueblo imponiéndonos cada vez más
impuestos. Ya de por si estamos hasta el cuello no me imagino de aquí a 20 o
30 años. Por favor Jueza Swain audite la deuda y meta a la carcel a los
criminales que causaron esto.
Atentamente

Arlene García
Artista Gráfico
Trabajo por cuenta propia

Enviado desde mi iPhone



**Correction to my word document entitled  "False and Misleading Statements
and Material Omissions in Junion Taxable Bond Distribution Election Notice for
Cofina Bond Holders with Claims in Class  5" sent to you as an email
attachment dated 1/15/2019**

arthursail     to: 'swaindprcorresp@nysd.uscourts.gov'          01/20/2019 03:17 PM

From:

To:          '"swaindprcorresp@nysd.uscourts.gov'" <swaindprcorresp@nysd.uscourts.gov>

I hereby correct the document that I mailed to you on January 15, 2019
entitled "False and Misleading Statements and Material Omissions in
Junior Taxable Bond Distribution Election Notice for Cofina Bond Holders
with Claims in Class 5" that you published on the prime.clerk website, as
follows:

Even though my broker did **not** send me any version of the Plan of
Adjustment with my ballots, I subsequently learned through further
investigation that the source of the Junior Cofina Notice, presumably the
Consummation Cost Parties, furnished copies of a version of the Plan of
Adjustment to the brokers to forward to the bond holders along with the
ballots.  (My broker inadvertently did not send me the Plan of Adjustment.)
Nevertheless, the Junior Cofina Notice contains false and misleading
statements and material omissions as explained in the document, and I
think the "average" bondholder relied on these statements in casting
his/her ballot.  I think the "average" bond holder did not read and
understand the entire Plan of Adjustment Doc#4392 because of its length
and complexity and the short time to cast the ballot, and the succinct Junior
Cofina Notice which indicated that the bond holder would simply receive a
tax-free replacement bond similar to the original bond except for its value.
Arthur Samodovitz



Puerto Rico COFINA

**Maria del Mar Irizarry**   to: SwainDPRCorresp@nysd.uscourts.gov       01/20/2019 10:58 PM

From:

To:          "SwainDPRCorresp@nysd.uscourts.gov" <SwainDPRCorresp@nysd.uscourts.gov>

Dear Honorable Judge Taylor Swain:

I am María Irizarry. I write to you because I am very disappointing and worried about the COFINA deal and the actions of the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The debt is illegal and it breaks the Constitution of Puerto Rico. We need to audit the debt.

The debt of COFINA is the largest slice of Puerto Rico's public debt, about 24% of the total. The Board argues that the deal will save 17.5 billion to the government, but the reality is that the agreement condemns the country to pay a total of 33 billion dollars, when Puerto Rico received 17 billion in loans from COFINA. In other words, the agreement forces us to pay two times what the government received in loans, for a debt whose legality has been questioned and with a country recovering from the devastation caused by an unprecedented hurricane.

In addition, the agreement privileges the most powerful bondholders, mostly vulture funds, committing the people of Puerto Rico to pay up to 93 cents per dollar of the original value of the 'senior' bonds, when most of these were acquired at 50 cents per dollar. In the case of 'junior' bonds, several vulture funds bought these after Hurricane María, when their value was 10 to 15 cents for every dollar, but now they will receive up to 56 cents per dollar. Thus, the proposed agreement will allow the bondholders to earn two, three and even four times what they actually invested, and that profit will come from the pockets of those who pay the SUT in Puerto Rico.

The agreement also makes the COFINA bondholders the actual owners of the SUT collections for more than 40 years. That is, the agreement would bind current and future generations to pay this tax, and Puerto Rico could not do anything afterwards.

The majority of economists have warned that economic growth is not projected to generate enough revenue to comply with the agreement.

In fact, projections suggest that the agreement will lead the government to a new default as soon as in six to eight years, and all at the expense of the abandonment of infrastructure, of more cuts for pensioners and workers, more reductions in essential services, and increases in cost of living. In other words, with this agreement, the country will end up more indebted and under worse conditions than before.

Please reject this agreement and demand fair conditions for the country in any bondholder agreement, ones that will provide for our recovery and reconstruction and that do not require additional austerity measures.

Sincerely,

Maria Irizarry



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**
Aaaarodriguez1   to: Swaindprcorresp                    01/21/2019 09:55 PM

From: ███████████████████████████
To:    Swaindprcorresp@nysd.uscourts.gov
       ███████████████████████████

Dear Judge Laura Taylor Swain, My name is Anthony Rodriguez. I am emailing you to urge you
to reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Anthony Rodriguez ███████████████████████████



**Cofina Plan of Adjustment and Junior Cofina Notice - Additional Material Omissions**

arthursail    to: 'swaindprcorresp@nysd.uscourts.gov'                    01/21/2019 09:59 PM

From:    ████████████

To:    '"swaindprcorresp@nysd.uscourts.gov"' <swaindprcorresp@nysd.uscourts.gov>

Additional Material Omissions in "Junior Taxable Bond Distribution Election Notice for Cofina Bond Holders with Claims in Class 5" and Plan of Adjustment Doc#4392

For the vote on the Plan of Adjustment Doc#4392, ballots were sent to the First Subordinate Cofina bond holders accompanied by a document entitled "Junior Taxable Bond Distribution Election Notice for Cofina Bond Holders with Claims in Class 5" (hereinafter called "Junior Cofina Notice"). The Junior Cofina Notice states the following, but in bold, upper case letters,

"If you elect to receive the Junior Taxable Bond Distribution, you will receive a distribution consisting primarily of Cofina bonds approximately equal to 56.414% of your First Subordinate existing securities and cash in an amount approximately equal to 2% of your First Subordinate existing securities.  If you do not elect to receive the Junior Taxable Bond Distribution, you will receive a distribution consisting primarily of Cofina bonds approximately equal to **56.414% of your First Subordinate existing securities** and no cash."

The Plan of Adjustment Doc#4392 similarly states,

"1.112 Junior Cofina bond Distribution:  A distribution of Cofina bonds, section 103 cash, if applicable, and rounding amount cash, if necessary, allocable to holders of Junior Cofina bond claims, Junior Cofina bond claims (Assured) and Junior Cofina bond claims (taxable election) equal to fifty-six and forty-one one hundredths percent (56.41%) **of such holders' aggregate Junior Cofina bond claims,** Junior Cofina bond claims (Assured) and Junior Cofina Bond Claims (taxable election), …"

But there is no explanation of the reference value to multiply the "56.414% of your First Subordinate existing securities" or "56.41% of such holders' aggregate Junior Cofina bond claims" where the original Junior Cofina bonds were zero coupon bonds.  The zero coupon bonds were originally issued at a fraction of their maturity value and had a nominal specified growth rate.  Assuming normal circumstances, the bonds would grow faster in market value than the nominal growth rate during the earlier years, and grow slower in market value than the nominal growth rate during the later

years.  Do the zero coupon bond holders get 56.4% of the imputed value of the zero coupon bonds on (1) August 1, 2018 when the replacement bonds begin to accrue interest, (2) August 1, 2017 when the first interest payment was missed for the interest bearing bonds, OR (3) February 1, 2017 when the period began for the first missed interest payment for the interest bearing bonds?  And is the "imputed" value based on the normal growth rate of the original zero coupon bonds to one of these dates, or a fictional straight-line application of the nominal growth rate of the original zero coupon bonds to one of these dates?  Neither the Junior Cofina Notice nor the Plan of Adjustment Doc #4392 answers these questions, and they are material to the value of the replacement bonds.  Date (3) above, using the fictional straight line growth of the bonds, will yield the lowest imputed value and recovery for these bond holders.  The Consummation Cost Parties know what date and manner of growth will be used to calculate the imputed value of the original zero coupon bonds, but I doubt the average affected bond holder knows.  This is another reason to invalidate the vote, especially if some of these bond holders think a higher imputed value will be used as the reference for the 56.4% multiplier.

This Court is also guilty of skewing the vote toward the Plan of Adjustment because interest has not been paid for almost two years, nor have any zero coupon bonds which should have matured since August 1, 2017 been paid off, and the option to vote against the Plan of Adjustment did not state a time period or even a commitment for the Court to resolve the challenges to the Junior Cofina Bonds.  So, a vote against the Plan of Adjustment would keep the bond holders in limbo and unpaid indefinitely despite their right to payment.

On a separate issue, Constitutional rights, including the Fifth Amendment's right to just compensation for a "taking", are PERSONAL to each citizen, so no group of citizens can take away any Constitutional right of any other citizen.  Therefore, the proposed Plan of Adjustment cannot constitutionally be "crammed down" on the bond holders (such as myself) who voted against the Plan of Adjustment.

Sincerely,

Arthur Samodovitz, Jr. Cofina bond holder



**Proskauer Rose conflicts of interest**

Cate Long   to: ████████████████████████████                    01/21/2019 12:43 PM

Cc:  swaindprcorresp

From:   ████████████████████

To:     ████████████████████████████

Cc:     swaindprcorresp@nysd.uscourts.gov

To the Honorable Judges of the Court:

Please see the attached letter regarding substantial conflicts of interest on the part of Proskauer Rose in the mediation and litigation surrounding the Commonwealth of Puerto Rico.

Because the Honorable Judge Victor Marrero does not accept letters by email he is not copied on this email. And for the Honorable Judge Nancy Friedman Atlas I have copied her Case Manager Shelia Ashabranner.

Kindly advise any questions.

Cate Long

--

████████████████████

Proskauer-conflicts-Long-to-mediation-team-Jan-21-19.pdf



January 21, 2019

Honorable Barbara J. Houser, Chief Judge U.S. Bankruptcy Court N. District of Texas
Honorable Thomas L. Ambro, Judge, U.S. Court of Appeals, Third Circuit
Honorable Nancy Friedman Atlas, Judge, U.S. District Court Southern District of Texas
Honorable Roberta A. Colton, Judge, U.S. Bankruptcy Court, Middle District of Florida
Honorable Victor Marrero, Judge, U.S. District Court, Southern District of New York

Via email:

Dear Chief Judge Houser and Judges Ambro, Atlas, Colton and Marrero:

> *Judge Friendly admonished, "The conduct of bankruptcy proceedings not only should be
> right but must seem right."[1]*

I write to bring a matter of significant importance to the attention of the Mediation Team
appointed[2] in connection with the Title III petitions filed to resolve the debts and pension
liabilities of the Commonwealth of Puerto Rico.

After the Title III court heard motions related to the Cofina Settlement Agreement and
Plan of Adjustment on January 16 and 17, 2019 attention has shifted to the unsecured
general obligation (GO) debt of the Commonwealth and secured debt of the Public
Building Authority (PBA). The Unsecured Creditors Committee and the Special Claims
Committee for the Oversight Board have filed a motion[3] to invalidate a substantial
portion of this debt due to the alleged breach of the constitutional limitation on debt
issuance for the Commonwealth.

Although the Oversight Board has given the task of litigating this claim to the Special
Claims Committee the primary counsel to the Oversight Board, Proskauer Rose, was

---

[1] In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966)
[2] "Order Appointing Mediation Team", Case:17-03283-LTS Doc#:430 Filed:06/23/17
[3] "Oversight Board, UCC Seek to Nullify More Than $6B in GO Bonds Citing Constitutional Debt Limit",
Reorg, Jan. 15, 2019 (Case:17-03283-LTS Doc#:4784 Filed:01/14/19)

directly involved in the issuance of the March, 2014 $3.5 billion general obligation debt that the Oversight Board is seeking to invalidate and therefore is deeply conflicted with respect to this portion of the Commonwealth's indebtedness.

**The conflict is so deep that I ask the Mediation team to disallow the participation of Proskauer Rose in advising the Oversight Board in the mediation efforts around general obligation and Public Building Authority debt and further request that the Mediation Team consider requesting the Title III court block Proskauer Rose from litigating any matters related to the Special Claims Committee and UCC invalidation motion and Plan of Adjustment for the Commonwealth.**

As evidence of the participation of Proskauer Rose in the issuance of the $3.5 billion GO debt issuance of March 11, 2014 please see the attached contract between the Government Development Bank (GDB) as representative of the Commonwealth and Proskauer Rose dated February 3, 2014.

This contract (2014-BGF090) was executed for $1.3 million dollars for a term that extended from February 3, 2014 through March 31, 2014. As such employees of Proskauer Rose who were listed in the contract likely have direct knowledge of whether the 2014 securities were issued in compliance with Puerto Rico's constitutional debt limit or if there was fraudulent activity on the part of the GDB officials and underwriters.

Proskauer Rose employees listed in the contract as working on matters for the Government Development Bank for the term of the contract who should be prohibited from involvement in mediation and litigation on GO and PBA debt and the Commonwealth Plan of Adjustment are as follows (page 23 of 2014-BGF090):

| Timekeeper name | Title | Rate |
|---|---|---|
| Jacobs, Arnold | Partner | $1,250 |
| Ma, Steve | Law Clerk | $425 |
| Miller, Andrea | Associate | $595 |
| Bienenstock, Martin J. | Partner | $1,150 |
| Theodoridis, Chris | Associate | $595 |
| Lui, Judy G. | Partner | $1,100 |

| Zerjai, Maja | Associate | $595 |
| Goldstein, Irena M. | Partner | $975 |
| Barak, Ehud | Associate | $690 |
| Abelson, Philip M. | Partner | $975 |
| Indelicato, Vincent | Associate | $725 |

**If Proskauer Rose participates in mediation to resolve Commonwealth debt that they were involved in issuing the process would be irrevocably tainted and subject to challenge during the Commonwealth Plan of Adjustment process.**

Moreover creditors involved in the mediation process would not have an opportunity for mediation that was honest and forthright. There is a general belief among creditors and the bond market that the Oversight Board has tasked the Special Claims Committee to pursue the invalidation of certain GO and PBA debt now as a means to threaten creditors to settle for terms in mediation that they might not accept without this threat. Fraudulent representations and coercion are an unstable foundation upon which resolutions to complex problems are created.

**<u>New federal legislation to force disclosure of conflicts of interest among attorneys and advisors to the Oversight Board</u>**

On January 17, 2019 two members of the U.S. House of Representatives, who have led efforts to assist Puerto Rico, Nydia Velazquez (D-NY) and Rob Bishop (R-UT, Ranking Member and formerly chairman of the Natural Resources Committee and the principal author of Promesa) filed H.R. 683 the ''Puerto Rico Recovery Accuracy in Disclosures Act of 2019''. The purpose of the legislation is "To impose requirements on the payment of compensation to professional persons employed in voluntary cases commenced under title III of the Puerto Rico Oversight Management and Economic Stability Act (commonly known as "PROMESA").

Text of the legislation:

Ranking Member Bishop made the following statement upon the introduction of Puerto Rico Recovery Accuracy in Disclosures Act (PRRADA) (see attached email):

*""The introduction of the PRRADA represents a good first step in acknowledging the need for improved transparency in PROMESA's Title III cases. Although this bill is not yet perfect, it can be made better through further input from the stakeholders this bill will impact, including the Financial Oversight and Management Board.  I thank Ms. Velazquez for introducing this bill, and look forward to working with her and the relevant Committees of jurisdiction to improve this legislation and ensure its passage."* **– Ranking Republican Rob Bishop**

## Cate Long background related to Puerto Rico

As reference I was the first person to publicly identify the likely insolvency of the Government of Puerto Rico in 2012[4] as a municipal bonds columnist for the news agency Reuters. Over a period of two years I wrote 76 columns for Reuters covering Puerto Rico's fiscal condition including an analysis of the constitutional debt limit ahead of the March 2014 general obligation issuance[5].

I have presented to the American Bankruptcy Institute three times on the topic of Puerto Rico's bankruptcy including a panel earlier this month at ABI's Caribbean conference in Grand Cayman with U.S. Bankruptcy Judges of the District of Puerto Rico Enrique Lamoutte and Brian Tester.

Additionally I worked closely with the staff of the House Natural Resources Committee through multiple iterations of Promesa prior to its approval by the U.S. Senate on June 29, 2016.

Since 2014 I have worked with large and small creditors to understand the complex process around resolving Puerto Rico's fiscal problems. I also cover the bankruptcy on Twitter (@cate_long) where I share court filings, federal and Puerto Rico government documents, news accounts and personal analysis. I believe that providing public documents on the bankruptcy is an important effort to broadly share information so stakeholders are more informed of the complexities of the process. I also believe it serves as a prod to the Puerto Rico government in their efforts to be more transparent after decades of hiding information from their citizens, the U.S. government, Congress and the municipal market.

Puerto Rico is the most complex state level entity in the United States due to continuous intergovernmental borrowing, use of off balance sheet borrowings, delayed and opaque official statements and audited financials and a general level of corruption that far

---

[4] "Puerto Rico is America's Greece", "Muniland", Reuters, March 8, 2012
[5] "Puerto Rico's debt limit", Muniland", Reuters, February 13, 2014

exceeds other formerly insolvent U.S. public entities such as Central Falls, Rhode Island[6], Detroit, Michigan[7], Harrisburg, Pennsylvania[8], and San Bernardino, California[9].

The insolvency of Puerto Rico has taken many years to unwind and now all major parties have been gathered in a process, proscribed by Congress, to resolve the most significant and weighty issues around the Commonwealth's liabilities. Hundreds of people have dedicated massive amounts of time to understanding, debating, legislating, litigating and mediating matters related to the bankruptcy.

In the final crescendo of all these forces parties on all sides deserve the most transparent, truthful and unconflicted process that can be established. Allowing Proskauer Rose to participate in the final round of battle will permanently taint the process.

If I may provide additional information please advise. As a matter of full disclosure I was not asked or paid by any client to write this letter.

Many kind regards,

Cate Long
cate.long@pr-clearing.com
646-242-3751

Cc: Honorable Laura Taylor Swain, United States District Judge of the Southern District of New York

---

[6] "Judge frees corrupt ex-Central Falls Mayor after year in jail", Providence Journal, Feb 28. 2014
[7] "Kilpatrick faces $11M debt once he leaves prison", Detroit News, April 30, 2018
[8] "Ex-Harrisburg Mayor Reed gets no jail time for stealing city artifacts", Penn Live, Jan 27, 2017
[9] "San Bernardino: That Other Scandal-Ridden Bankrupt City", Reason, Oct 18, 2013

2014-DGP000
PROSKAUER ROSE LLP

## AGREEMENT FOR PROFESSIONAL SERVICES

This **AGREEMENT FOR PROFESSIONAL SERVICES** (hereinafter the "Agreement") dated as of February 3, 2014, by and between:

AS PARTY OF THE FIRST PART: **THE GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**, a public corporation of the Commonwealth of Puerto Rico, created by Act Number 17, enacted on September 23, 1948, as amended ("Act 17"), represented herein by its Executive Vice President, Jorge A. Clivillés Díaz, of legal age, married, and a resident of San Juan, Puerto Rico, (hereinafter referred to as the "Bank").

AS PARTY OF THE SECOND PART: **PROSKAUER ROSE LLP**, a limited liability partnership incorporated and existing under the laws of the state of New York, United States of America, with a place of business at Eleven Times Square, New York, New York 10026-8299, herein represented by Martin J. Bienenstock, Member, of legal age, married, and a resident of the State of New York (hereinafter referred to as the "Proskauer" or the "Firm").

**WHEREAS**, the Bank, by virtue of the powers conferred to it under Act 17, has the authority to engage the professional, technical and consulting services necessary and convenient to the activities, programs, and operations of the Bank;

**WHEREAS**, Proskauer has extensive experience as a legal advisor to sovereign entities and their instrumentalities; and

NOW, THEREFORE, being each party empowered to enter into this Agreement and perform their obligations hereunder in consideration of the premises and the mutual covenants contained herein, the Bank and Proskauer agree to enter into this Agreement under the following:

## TERMS AND CONDITIONS

**FIRST:**     The Bank engages the Firm to provide specialized legal services with respect to the evaluation of potential liability management transactions as may be requested by the Bank, its subsidiaries or affiliates, from time to time, and as agreed to by the Firm.

**SECOND:**   This Agreement shall be in effect from the date of its execution until March 31, 2014 (the "Contract Period").

**THIRD:** Either party shall have the right to terminate this Agreement by providing the other party thirty (30) days notice by registered mail, return receipt requested, or overnight express mail.  If notice is given, this Agreement shall terminate upon the expiration of thirty (30) days and the Bank shall be obligated to pay all fees and expenses incurred up to the day of effective termination, in accordance with the terms of this Agreement.

The rights, duties and responsibilities of the Bank and the Firm shall continue in full force and effect during the thirty (30) day notice period.  The Firm shall have no further right to compensation except for what has been accrued for services rendered under this Agreement until said date of effective termination.

**FOURTH**:    As compensation for services rendered under this Agreement, the Bank and the Firm agree that the Bank will pay the Firm a total amount of one million three hundred thousand dollars ($1,300,000) to be paid in two monthly installments of six hundred and fifty thousand ($650,000) (the "Contract Amount") on each of February 28, 2014 and March 31, 2014. However, nothing herein shall preclude the parties from agreeing to increase said amount. Notwithstanding the foregoing, any increase to the Contract Amount and any limits for services after March 31, 2014 shall be evidenced in writing and signed by both the Firm and the Bank. Because this is a fixed fee arrangement, the Firm understands that it may incur time in excess of the Contract Amount for the Contract Period and shall not seek payment in excess of the Contract Amount for any such time. For the avoidance of doubt, the Bank acknowledges that the Contract Amount does not include any fees or expenses related to any actual litigation or implementation of specific transactions.

Appendix A attached hereto provides a schedule of the attorneys assigned to this matter. Should the Firm assign another person not included in Appendix A hereto to attend to the Bank's matters pursuant to this Agreement, the Firm shall promptly send the Bank an amended schedule to include such person's name and/or position and request approval from the Bank for such amended schedule.

**FIFTH**: The Contract Amount shall compensate the Firm for all expenses and disbursements other than those related to travel and lodging costs. The Bank will not reimburse the Firm for travel and lodging costs related to the

3

services rendered under this Agreement unless the trip has been requested or authorized in writing and in advance by the President or the General Counsel of the Bank. Travel expenses and lodging costs will be reimbursed by the Bank through the presentation of acceptable evidence for such expenses. Reimbursement for air travel expenses is restricted to economy class fares, including restricted fares. In the event of a scheduled trip has to be cancelled, the Bank will assume the cost of the penalty fee. If traveling is required, only one member from Proskauer shall be authorized to travel, unless otherwise authorized by the Bank.

The Bank shall not pay for travel time, except for work related to the services being provided under this Agreement. Payment for travel time shall be made only if the invoice details the services rendered and the time billed on each matter as required in this Agreement.

Any travel and lodging expense for which a reimbursement is requested shall be reasonable and necessary, and any extraordinary travel and lodging expenses shall be authorized in writing and in advance by the Bank. The Bank will not reimburse expenses which do not comply with this provision. Under no circumstances will expenses for alcoholic beverages be reimbursed. The Firm accepts and agrees to comply with the Bank's Pre-Intervention Office requirements and procedures for the reimbursements of expenses.

Any petition for reimbursement of travel and lodging expenses must be accompanied by the corresponding receipt and shall specify the relation of the

4

expenses to the services rendered. All reimbursements shall be for actual expenses incurred and shall be billed at cost. Payment for travel time shall be made only if the invoice details the services rendered and the time billed on each matter, as required in this Agreement.

**SIXTH:** The Firm shall submit monthly invoices within the first thirty (30) days following the period invoiced which will include a description of the services rendered and the number of hours spent by each person. Each invoice for professional services shall be itemized and must be duly certified by an authorized representative of the Firm.

The Bank will not honor invoices submitted after the later of one hundred and twenty days (120) from the rendering of the service or thirty days (30) after this Agreement is registered with the Office of the Controller, and Proskauer accepts and agrees to this requirement, and understands that if Proskauer does not comply with this requirement it waives its right to payment for the services rendered and for expenses with respect to such invoices.

The Bank will review the invoices and if they are in compliance with the requirements set forth in this Agreement, it will proceed with payment. Payment is due upon receipt of a valid invoice. The Bank reserves the right to conduct the audits it deems necessary, and it will not be subject to finance charges regarding invoice payments.

**SEVENTH:** Invoices must also include a written and signed certification stating that no officer or employee of the Bank, and their respective subsidiaries or

5

affiliates, will personally derive or obtain any benefit or profit of any kind from this Agreement, with the acknowledgment that invoices which do not include this certification will not be paid. This certification must read as follows:

> "We certify under penalty of nullity that no public servant of the Government Development Bank for Puerto Rico, their respective subsidiaries or affiliates, will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for services provided is the agreed-upon price that has been negotiated with an authorized representative of the Government Development Bank for Puerto Rico. The total amount shown on this invoice is true and correct. The services have been rendered, and no payment has been received."

**EIGHTH:**    All  invoices  shall  be  signed  and  mailed  or  physically delivered to the attention of:

| POSTAL ADDRESS | PHYSICAL ADDRESS |
|---|---|
| Government Development Bank PREINTERVENTION PO Box 42001 San Juan, Puerto Rico 00940-2001 | Government Development Bank PREINTERVENTION José V. Pagán Beauchamp Government Center De Diego Avenue No. 100 Central Building – Floor P San Juan, PR  00907-2345 |

**NINTH:**    The Firm agrees to submit checking account transfer data to the Bank in order to facilitate payment by means of electronic transfer.

The Bank certifies that all disbursements made to the Firm under this Agreement shall be drawn from operating Bank accounts opened at the Bank for such purpose.

**TENTH:**   The Bank will provide such access to its facilities and information, and such other cooperation in working with the Firm, as the Firm may from time to time reasonably determine to be necessary for the Firm to render any services requested; provided that such access and cooperation shall not interfere with the Bank's continuing conduct of its operations.

**ELEVENTH:**   At the direction of the Bank, the Firm may be required to work with other consulting, legal, investment, or other firms.  The parties agree to discuss such assignments in advance, so that all parties have clear expectations as to their responsibilities.  The Firm is not responsible for work performed by others.

**TWELFTH:**  The Firm shall not subcontract the services to be provided under this Agreement, or contract Firms or other services without the prior written authorization of the President of the Bank or any of its authorized representatives. A request to subcontract, or to contract experts or other Firms, shall specify the issues or matters that will be referred to the supplier. The professional fees earned by these suppliers will be deducted from the total maximum amount that the Firm may receive under the terms of this Agreement.

**THIRTEENTH:**   The Firm shall not request any payment for services rendered under the terms of this Agreement until it has been registered by the

7

Bank at the Office of the Comptroller of Puerto Rico as established in Act 18-1975, as amended. The Bank undertakes to register this Agreement pursuant to such Act as soon as practicable after the execution of this Agreement.

**FOURTEENTH:**   The Firm will submit any reports required by the Bank regarding services performed under this Agreement.  If required by the Bank, at the completion of the assigned tasks, the Firm will submit a final written report describing the work it has performed.  This requirement shall not be interpreted as a waiver by the Bank of the Firm's ethical obligation and responsibility of keeping the Bank informed of the progress of the assigned matters.  This obligation includes the Firm's commitment to preparing and delivering to the Bank's external auditors, in a timely manner, the legal letters periodically requested in connection with pending or threatened litigation, claims and assessments or loss contingencies, as part of the financial statements audit process for the Bank, its subsidiaries and affiliates.  The Firm shall not invoice the time spent in preparing letters to auditors, as it is understood that this is an administrative obligation complementary to the services rendered hereunder.

**FIFTEENTH:**   The Bank will provide all the documentation necessary of the adequate fulfillment of the Firm's obligations under this Agreement.

**SIXTEENTH:**   The Firm acknowledges the proprietary and confidential nature of all internal, non-public, information systems, financial, and

8

business information relating to the Bank and its personnel, its subsidiary corporations and affiliates and their personnel, the Commonwealth of Puerto Rico, its agencies, corporations and/or municipalities and their personnel, now or hereafter provided to the Firm or otherwise obtained by the Firm in the course of rendering services for the Bank (collectively, "Confidential Information").

The Firm and its employees, affiliates and authorized sub-contractors shall keep in strict confidence all Confidential Information, and [1] shall not make public or disclose any of said materials without the previous written consent of the Bank, [2] shall use the Confidential Information only to perform the Firm's obligations under this Agreement; and [3] will reproduce the Confidential Information only as required to perform the Firm's obligations under this Agreement.

"Confidential Information" shall not apply to any information which:

(a) is generally known to the public at the time of disclosure to the Firm or becomes generally known through no wrongful act on the part of the Firm;

(b) is in the Firm's possession at the time of disclosure otherwise than as a result of the Firm's breach of any legal obligation;

(c) becomes known to the Firm through disclosure by sources other than the Firm having the legal right to disclose such information; or

(d) is independently developed by the Firm without reference to or reliance upon the confidential information.

In addition, these provisions shall not prohibit the Firm from making any disclosure pursuant to any subpoena or order of a court or a Governmental or Administrative tribunal which may assert jurisdiction over the Firm; provided that, to the extent legally permissible, the Firm shall promptly notify the Bank of

any such disclosure obligations and reasonably cooperate with the Bank's efforts to lawfully avoid and/or minimize the extent of such disclosure.

The Firm will not make public, without the prior written approval of the Bank, that the Bank is a client of the Firm, nor will the Firm disclose any confidential information relating to the work that the Firm performs under this Agreement.

The Firm may divulge Confidential Information to its employees who need to know such information to fulfill the purposes of this engagement provided that such persons (i) shall have been advised of the confidential nature of such information and the Firm shall direct them, and they shall agree, to treat such information as confidential and to return all materials to the Firm upon request but for one copy for record purposes only; and (ii) in each case, such person is bound by obligations of confidentiality and non-use consistent with and at least as stringent as those set forth in this Agreement.

In connection with the services rendered under this Agreement, the Firm will furnish the Bank any necessary reports, analyses or other such materials that exist as of the date requested, as the Bank may reasonably request. The Firm shall not invoice the time spent to gather and deliver such information. The Bank, however, acknowledges that the Firm may develop for itself, or for others, problem solving approaches, frameworks or other tools and processes developed in performing the services and any additional services provided hereunder, and nothing contained herein precludes the Firm from developing or disclosing such

materials and information provided that the same do not contain or reflect Confidential Information.

The Firm shall return all Confidential Information, as well as any other document that may relate to its work under this Agreement, to the Bank within thirty (30) days after date of the expiration or earlier termination of this Agreement or destroy such information, certifying that all the information has been returned to the Bank or destroyed, but for electronic information held in archive and/or backup files to the extent such files cannot be deleted without unreasonable effort or expense and created in the ordinary course pursuant to established data backup/archive procedures; provided, however, the Firm may retain its own work products as long as it maintains the confidentiality of such the Bank's Confidential Information as otherwise provided in this Agreement. During this thirty (30) day period, these documents shall be available for inspection by the Office of the Comptroller of Puerto Rico.

Except as required by law, no reference may be made to the Firm in any materials prepared for public distribution without the written consent of the President of the Bank or any of its authorized representatives.

This section SIXTEENTH shall survive the termination, expiration or completion of this Agreement.

**SEVENTEENTH:** The Firm's material negligent discharge continuing after receipt of written warning or abandonment of the duties assigned hereunder or the breach of the confidentiality clause hereinabove shall constitute

11

a breach of this Agreement by the Firm and the Bank will be entitled to terminate this Agreement forthwith, without having to comply with the requirements of notice set forth above, without limitations of any other rights and remedies under law, and will release and discharge the Bank from any further obligations and liabilities hereunder.

**EIGHTEENTH:**    The Firm acknowledges that in executing its services pursuant to this Agreement, it has an obligation of complete loyalty towards the Bank, including having no adverse interests.   "Adverse interests" means representing clients who have or may have interests that are contrary to the Bank, but does not include rendering services that are unrelated to this engagement.  This duty includes the continued obligation to disclose to the Bank all circumstances of its relations with clients and third parties which would result in an adverse interest, and any adverse interest which would influence the Firm when executing the Agreement or while it is in effect.  The Bank acknowledges the Firm is a large global law firm having multiple financial institutions and investors as clients, and with or without the Firm's knowledge, any of such clients may from time to time acquire, hold or trade interests adverse to the Bank or its affiliates.  The Firm's representations of those clients in unrelated matters shall not be deemed conflicts or influences on the Firm within the meaning of this Agreement.

This conduct by one of the Firm's partners, members, directors, executives, officers, associates, clerks or employees shall be imputed to the Firm

for purposes of this prohibition. The Firm shall endeavor to avoid even the appearance of the existence of a conflict of interest that has not otherwise been waived.

The Firm acknowledges the power of the President of the Bank to oversee the enforcement of the prohibitions established herein.  If the President of the Bank determines the existence or the emergence of adverse interest with the Firm, he shall inform such findings in writing and his intentions to terminate the Agreement within a fifteen (15) day term.  Within such term, the Firm can request a meeting with the President of the Bank to present its arguments regarding the alleged conflict of interest. This meeting shall be granted in every case. If such meeting is not requested within the specified term, or if the controversy is not settled satisfactorily during the meeting, this Agreement shall be terminated at the end of said fifteen (15) day period.

The Firm certifies that at the time of the execution of this Agreement, it does not have nor does it represent anyone who has adverse interests that are in conflict with the Bank. If such conflicting interests arise after the execution of this Agreement, the Firm shall, to the extent consistent with its obligations to other clients, notify the Bank immediately.

**NINETEENTH:**    The Bank and the Firm agree that the Firm's status hereunder, and the status of any agents, employees and subcontractors engaged by the Firm, shall be that of an independent subcontractor only and not that of an employee or agent of the Bank. The Firm recognizes that it shall not be entitled to

employment benefits such as vacations, sick leave, retirement benefits and others because of its condition as an independent contractor. The Firm shall not have any power or right to enter into contracts on behalf of the Bank.

**TWENTIETH:**     The Firm certifies that, at the time of execution of this Agreement, it has no other contracts with agencies, public corporations, municipalities, or instrumentalities of the Commonwealth of Puerto Rico.

**TWENTY-FIRST:**   The Firm certifies and guarantees that at the execution of this Agreement, neither the Firm, nor any of its, directors, employees or agents, have been convicted, and that it has no knowledge that any of them is or are the subject of any investigation in either a civil or a criminal procedure in a state or federal court, for charges related to the public treasury, the public trust, a public function, or a fault that involves public funds or property.  It is expressly acknowledged that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute sufficient cause for the Bank to terminate this Agreement immediately, without prior notice, and the Firm will have to reimburse the Bank any amount of money received under this Agreement.

If the status of the Firm with regards to the charges previously mentioned should change at any time during the term of the Agreement, it shall notify the Bank promptly after the Firm's managing partner acquires knowledge thereof. The failure to comply with this responsibility constitutes a violation of this section, and shall result in the remedies mentioned previously.

14

**TWENTY-SECOND:** The Firm certifies that it has received copies of (a) Act No. 84, enacted on June 18, 2002, as amended, which establishes the Code of Ethics for Contractors, Suppliers and Applicants for Economic Incentives of the Executive Agencies of the Government of the Commonwealth of Puerto Rico and (b) the Government Ethics Law, Act No. 1, enacted on January 3, 2012, as amended from time to time, and its implementing regulations. The Firm agrees that it, as well as all personnel providing services under this Agreement, will comply with such acts.

**TWENTY-THIRD:** The parties hereby declare that, to the best of their knowledge, no public officer or employee of the Commonwealth of Puerto Rico, its agencies, instrumentalities, public corporations or municipalities or employee of the Legislative or Judicial branches of the Government has any direct or indirect interest in the present Agreement.

**TWENTY-FOURTH:** The Firm certifies that neither it nor any of its partners, directors, executives, officers, and employees receives salary or any kind of compensation for the delivery of regular services by appointment in any agency, instrumentality, public corporation, or municipality of the Commonwealth of Puerto Rico.

**TWENTY-FIFTH:** The Firm certifies that it maintains sufficient professional liability insurance to adequately provide for any liability that may arise from the services provided under this Agreement except to the extent that the customary ceilings on and deductibles for such insurance for law firms similar to the Firm limit such coverage.

**TWENTY-SIXTH:** The Firm certifies that no internal authorization or dispensation of any kind is required prior to the Firm's execution of this Agreement.

**TWENTY-SEVENTH:** The Firm certifies that at the execution of this Agreement it does not have, and has not had, to submit income tax returns in Puerto Rico during the past five (5) years, and that it has no outstanding debts with the Government of Puerto Rico for income taxes, real or chattel property taxes.

The Firm also certifies it does not have outstanding debts regarding its treatment of unemployment insurance premiums, workers' compensation payments, Social Security for chauffeurs in Puerto Rico or the Administration for the Sustenance of Minors (known by its Spanish acronym as *ASUME*).

Accordingly, a sworn statement provided by the Firm, subscribed by its Authorized Signatory, is appended hereto and made to form part of this Agreement as Appendix B.

It is expressly acknowledged that the certifications provided by the Firm, pursuant to this TWENTY-SEVENTH clause, are essential conditions of this

16

Agreement, and if these certifications are incorrect, the Bank shall have sufficient cause to terminate this Agreement immediately.

**TWENTY-EIGHTH:** The Firm will be responsible for providing the Bank with the information and certifications required under the previous clause from any professional or technical Firms subcontracted by the Firm as authorized by the Bank. For purposes of this clause, any subcontractor engaged by the Firm in accordance with the conditions herein established, or who dedicates twenty five (25%) percent or more of his or her time to provide services related to the Agreement on behalf of the Firm, will be considered as subcontractor.

**TWENTY-NINTH:** For purposes of this Agreement, tax debt shall mean any debt that the Firm, or any of its partners or other parties which the Bank authorizes the Firm to subcontract, may have with the Government of Puerto Rico for income taxes, excise taxes, real or chattel property taxes, including any special taxes levied, license rights, tax withholdings for payment of salaries and professional services, taxes for payment of interests, dividends and income to individuals, corporations and non-resident partnerships, for payment of interests, dividends and other earnings shares to residents, unemployment insurance premiums, workers' compensation payments, and Social security to chauffeurs.

**THIRTY:** Except as set forth in the next paragraph, no withholding or deductions shall be made from payments to the Firm for income tax purposes. The Firm shall be responsible for paying: (i) all applicable income taxes in accordance with any and all applicable income tax laws, and (ii) any

17

corresponding contributions to the Social Security Administration. Payments due to the Firm shall be paid into a bank account in the United States designated to the Firm.

When invoicing the Bank, the Firm shall allocate fees between those relating to activities undertaken outside of Puerto Rico and constituting gross income from sources outside of Puerto Rico, and those relating to activities undertaken within Puerto Rico and constituting gross income from sources within Puerto Rico. The Bank shall deduct and withhold twenty nine percent (29%) of the gross amounts paid for services relating to activities undertaken within Puerto Rico, when any of the invoiced amounts constitute gross income from sources within Puerto Rico, in accordance with Section 1062.11 of the Puerto Rico Internal Revenue Code, Act 1-2011, as amended. Services identified in invoices as being rendered by the Firm for its activities outside of Puerto Rico shall not result in such withholding. The Bank shall also deduct and withhold one point five percent (1.5%) of the gross amounts paid under this Agreement, in accordance with Article 1 of Act No. 48 of June 30, 2013. The Bank shall forward such amounts to the Department of Treasury of Puerto Rico and, within thirty (30) days after paying any amount to the Department of Treasury of Puerto Rico, the Bank shall deliver evidence satisfactory to the Firm of such payments.

**THIRTY-FIRST:** This Agreement shall be governed by the laws of the Commonwealth of Puerto Rico.

**THIRTY-SECOND:** The court and authorities of the Commonwealth of Puerto Rico and the federal courts of the United States shall have jurisdiction over all controversies that may arise with respect to this Agreement. The parties hereby waive any other venue to which they might be entitled by the virtue of domicile or otherwise. Should either party initiate or bring suit or action before any other court, it is agreed that upon application, any such suit or action shall be dismissed, without prejudice, and may be filed in accordance with this provision. The party bringing the suit or action before a court not agreed to herein shall pay to the other party all the costs of seeking dismissal including reasonable attorney's fees. Should any clause or conditions of hits Agreement be declared null and void by a competent court of law, the remaining parts of this Agreement shall remain in full force and effect.

**THIRTY-THIRD:** It is understood that this Agreement is the sole agreement between the parties with regard to the services covered hereby and supersedes any prior agreements written or verbal. This Agreement may not be changed orally, but may be amended in writing, by mutual agreement of the parties.

**THIRTY-FOURTH:** The Firm agrees that it will not discriminate against any employee or applicant for employment on account of race, color, religion, sex, sexual orientation, disability or national origin.

**THIRTY-FIFTH:** Neither party shall be liable to the other for any delay or failure to perform any of the services or obligations set forth in this Agreement

due to a cause beyond its reasonable control.   Performance times shall be considered extended for the period required to make up the work lost because of such cause.

**THIRTY-SIXTH:** This Agreement may not be assigned or otherwise transferred without the prior express written consent of the other party.

**THIRTY-SEVENTH:** Each of the parties represents to the other that:

(1)     it has the legal power and authority to enter into this Agreement and to perform its obligations hereunder, and neither the execution of this Agreement nor the performance of its obligations hereunder will violate any agreement or obligation from that party to others; and

(2)     the officer or representative who has executed and delivered this Agreement on its behalf is authorized to do so.

**THIRTY-EIGHTH:** All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or sent by telecopy, or sent, postage prepaid, by registered, certified or express mail (return receipt requested) or reputable overnight courier service and shall be deemed given when so delivered by hand, or telecopied, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service) to the parties at the following addresses:

(i) If to the Firm:

Martin J. Bienenstock, Member
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299

(ii) If to the Bank:

José V. Pagán Beauchamp, Interim President
Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Governmental Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico  00940
PO Box 42001
San Juan, Puerto Rico 00940-2001

**THIRTY-NINTH:** The parties hereto will attempt in good faith to promptly resolve any controversy or claim arising out of or relating to this Agreement through negotiations between them in the normal course of business, before resorting to other remedies available to them pursuant to this Agreement.  For any dispute whatsoever which has not been resolved through negotiation as set forth above, the parties may seek resolution of the matter utilizing any remedies available at law or in equity.

**FORTY:** This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original instrument, but all of which taken together shall constitute one instrument.

**IN WITNESS THEREOF,** the parties hereto sign this Agreement the date first written above.

GOVERNMENT DEVELOPMENT
BANK FOR PUERTO RICO

By: _____
Name:
Title:

Tax ID: 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

PROSKAUER ROSE
LLP

By: _____
Name:  Martin J. Bienenstock
Title:  Member

Tax ID: 13-1840454

22

APPENDIX A

| | Timekeeper Name | Title | Class Year | Rate |
|---|---|---|---|---|
| 0225 | JACOBS, ARNOLD S. | PARTNER | | 1,250.00 |
| 2621 | MA, STEVE | LAW CLERK | | 425.00 |
| 2694 | MILLER, ANDREA G. | ASSOCIATE | 2011 | 595.00 |
| 2696 | BIENENSTOCK, MARTIN J. | PARTNER | | 1,150.00 |
| 2697 | THEODORIDIS, CHRIS | ASSOCIATE | 2011 | 595.00 |
| 2702 | LIU, JUDY G. | PARTNER | | 1,100 00 |
| 2705 | ZERJAL, MAJA | ASSOCIATE | 2011 | 595.00 |
| 2713 | GOLDSTEIN, IRENA M. | PARTNER | | 975.00 |
| 2716 | BARAK, EHUD | ASSOCIATE | 2009 | 690.00 |
| 2718 | ABELSON, PHILIP M. | PARTNER | | 975.00 |
| 8927 | INDELICATO, VINCENT | ASSOCIATE | 2008 | 725.00 |

## APPENDIX B

### SWORN STATEMENT

Martin J. Bienenstock, of legal age, married, and a resident of New York, New York , in his capacity as member of PROSKAUER ROSE LLP (the "Firm"), being duly sworn in and says:

That the Firm has offices at Eleven Times Square, New York, NY 10036-8299. That the Firm has not submitted income tax returns in Puerto Rico during the past five years because it was not required by law to do so, and that it is not aware of any outstanding debts with the Government of Puerto Rico for income taxes, real or chattel property taxes.  The Firm also certifies that it is not aware of any outstanding debts regarding its payment of unemployment insurance premiums, workers' compensation payments or Social Security for chauffeurs in Puerto Rico and the Administration for the Sustenance of Minors (known by its Spanish acronym, *ASUME*).

In New York, New York this 29th day of January, 2014.

PROSKAUER ROSE LLP

Affidavit No. _____

Sworn and subscribed to before me *Martin Bienenstock* in his capacity as Partner of Proskauer Rose LLP.

In New York, New York, this 29th day of January, 2014.

My Commission expires: 8/8/2015                                        Notary Public

SOWON YOON
Notary Public, State of New York
No. 01YO6246242
Qualified in New York County
Commission Expires Aug. 8, 2015

**Bishop Statement on the Introduction of the Puerto Rico Recovery Accuracy in Disclosures Act**

Natural Resources Press Office <naturalresourcesrepublicans@mail.house.gov>

Jan 17, 2019, 5:48 PM (4 days ago)



## Bishop Statement on the Introduction of the Puerto Rico Recovery Accuracy in Disclosures Act

**FOR IMMEDIATE RELEASE:** Jan. 17, 2019
**CONTACT:** Kristina Baum; Austin Hacker (202) 226-9019

**WASHINGTON –** Today, House Natural Resources Committee Ranking Republican Rob Bishop (R-Utah) issued the following statement regarding the introduction of the *Puerto Rico Recovery Accuracy in Disclosures Act* (PRRADA). This legislation requires attorneys, accountants, consultants, and other professional persons employed by the Oversight Board in a Title III case to submit verified disclosures of their connections with the debtor, creditors, or persons employed by the Oversight Board, prior to being compensated under the *Puerto Rico Oversight, Management and Economic Stability Act* (PROMESA).

*"The introduction of the PRRADA represents a good first step in acknowledging the need for improved transparency in PROMESA's Title III cases. Although this bill is not yet perfect, it can be made better through further input from the stakeholders this bill will impact, including the Financial Oversight and Management Board. I thank Ms. Velazquez for introducing this bill, and look forward to working with her and the relevant Committees of jurisdiction to improve this legislation and ensure its passage."* **– Ranking Republican Rob Bishop**

*"How can anyone be confident this oversight board is putting the people of Puerto Rico first if consultants involved in the restructuring could potentially profit from how the fiscal plan is designed?"* Velázquez said. *"The very same disclosure requirements that apply to a bankruptcy on the mainland should also apply to Puerto Rico."* **– Rep. Nydia Velazquez**

*"The people of Puerto Rico should be aware that the funding that I have tirelessly worked with Congressional leaders to get appropriated for disaster recovery is going to be utilized for just that- disaster recovery. The Puerto Rico Recovery Accuracy in Disclosures Act will provide transparency between those employed by the Oversight Board and creditors, debtors, and other employees. With recovery efforts currently underway, and with over $40 billion in disaster recovery funding at stake we want the highest levels of transparency necessary to ensure that funding is invested into the island and benefits the local economy."*
**– Rep. Jenniffer Gonzalez-Colon**



**No to Cofina**
Edwin D. Navarro    to: swaindprcorresp                    01/21/2019 07:52 PM

From:

To:        swaindprcorresp@nysd.uscourts.gov

Dear Judge Swain,

I would like to express my disagreement with Cofina. As a young puertorican, I
believe the future of younger generations is being put at risk with Cofina and
terms of such should be classified as heinous. I plead you to consider  ruling
against Cofina.

Sincerely,

Edwin Navarro Monserrat



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

frankrosario2011    to: Swaindprcorresp                    01/21/2019 06:20 PM

From:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

To:    Swaindprcorresp@nysd.uscourts.gov
       ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dear Judge Laura Taylor Swain, My name is Frank Rosario. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Frank Rosario ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

johnfritzrullan   to: Swaindprcorresp                    01/21/2019 07:47 PM

From: ██████████████████████

To:    Swaindprcorresp@nysd.uscourts.gov
       ██████████████████████████

Dear Judge Laura Taylor Swain, My name is John Rullan. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, John Rullan ████████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

lydiagilligan   to: Swaindprcorresp                                    01/21/2019 04:42 PM

From:

To:        Swaindprcorresp@nysd.uscourts.gov

Dear Judge Laura Taylor Swain, My name is Lydia Gilligan. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Lydia Gilligan Washington, DC



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

mv   to: Swaindprcorresp                                    01/21/2019 04:20 PM

From:   ▮▮▮▮▮▮▮▮

To:   Swaindprcorresp@nysd.uscourts.gov
        ▮▮▮▮▮▮▮▮

Dear Judge Laura Taylor Swain, My name is Manuel Velez. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Manuel Velez Calle Arquitecto Pedro A. Bigay, ▮▮▮▮▮▮▮▮
▮▮



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

meralisthood    to: Swaindprcorresp                                01/21/2019 05:47 PM

From:

To:        Swaindprcorresp@nysd.uscourts.gov

Dear Judge Laura Taylor Swain, My name is Meralis Hood. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Meralis Hood



**REJECT the agreement between COFINA and the FOMB on Jan . 16**
Rodolfo Plancarte   to: swaindprcorresp                    01/21/2019 12:13 PM
Cc:  diasporaenresistencia

From:   ██████████████████████
To:     swaindprcorresp@nysd.uscourts.gov
Cc:     ██████████████████████

Dear Honorable Judge Taylor Swain,

I am Rodolfo Plancarte. I write to you because I am very disappointed and worried about the
actions that the Financial Oversight and Management Board (FOMB) is taking to address the
fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another
never-ending economic crisis that will lead Puerto Rico into another debt default and will only
cause more harsh austerity measures, cuts in public services and pensions. The measures dictated
by the FOMB have been implemented in a disorganized, illogical, and irresponsible manner so
far, endangering the safety of citizens, limiting thousands of Puerto Ricans from a real
opportunity to get affordable education and healthcare, and limiting the capacity of people to
become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a
fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The
weak attempts of the board to fake an audit process are not going to work on us; we know this
debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that
allows us to really know how the debt was issued and to ensure that is it paid justly and legally.
Please do what is right and rule against this agreement on January 16th's 2019 hearing.

Sincerely,

Rodolfo J Plancarte

██████████████████████

Sent from my iPhone



**Cofina**
Sonia Rivera    to: SwainDPRCorresp@nysd.uscourts.gov                01/21/2019 06:40 PM

From:

To:          "SwainDPRCorresp@nysd.uscourts.gov" <SwainDPRCorresp@nysd.uscourts.gov>

Please see no to Cofina Agreement.
Thanks
--
null



**REJECT the agreement between COFINA and the FOMB on Jan . 16**

Palmbeach DSA    to: swaindprcorresp@nysd.uscourts.gov          01/21/2019 10:15 PM

From:

To:         "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Dear Honorable Judge Taylor Swain,

We are writing to you because we are very disappointed and worried about the actions that the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another never-ending economic crisis that will lead Puerto Rico into another debt default and will only cause more harsh austerity measures, cuts in public services and pensions. The measures dictated by the FOMB have been implemented in a disorganized, illogical, and irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto Ricans from a real opportunity to get affordable education and healthcare, while limiting the capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The weak attempts of the board to fake an audit process are not going to work on us! We know this debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that allows us to really know how the debt was issued and to ensure that is it was paid justly and legally. Please do what is right and rule against this agreement on January 16th's 2019 hearing.

Sincerely,
The Democratic Socialists of America - Palm Beach Chapter
--





**Unrealistic financial expectations strangling three generations ...**

eileen llorens   to: swaindprcorresp@nysd.uscourts.gov          01/22/2019 11:25 PM

From:

To:           "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

https://www.elnuevodia.com/videos/noticias/locales/elacuerdodecofinahariaqueladeudaseatangra
ndequeasfixiariaalaisla-251969/



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

pmrex   to: Swaindprcorresp                                    01/22/2019 12:47 AM

From: ████████████████████████
To:   Swaindprcorresp@nysd.uscourts.gov
      ████████████████████████

Dear Judge Laura Taylor Swain, My name is Jason Martinez. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Jason Martinez ████████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

Lewielocks   to: Swaindprcorresp                                     01/22/2019 05:48 AM

From: ███████████████████████████████

To:   Swaindprcorresp@nysd.uscourts.gov
      ███████████████████████████████

Dear Judge Laura Taylor Swain, My name is Lisa Lewis. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Lisa Lewis ████████████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

seanseary    to: Swaindprcorresp                                      01/22/2019 04:00 PM

From:

To:        Swaindprcorresp@nysd.uscourts.gov

Dear Judge Laura Taylor Swain, My name is Sean Seary. I am emailing you to urge you to reject
and vote against the COFINA agreement presented to you by the island's unelected Financial
Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the
Puerto Rican people. We call on you to denounce the unjust and unfair management and
distribution of resources that prioritizes the private interests of COFINA bondholders at the
expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA.
Sincerely, Sean Seary



**REJECT the agreement between COFINA and the FOMB**

Christopher Cuevas    to: swaindprcorresp                                          01/23/2019 10:57 AM
Cc:  diasporaenresistencia

From:         ███████████████████████████████
To:           swaindprcorresp@nysd.uscourts.gov
Cc:           ████████████████████

Dear Honorable Judge Taylor Swain,

I am Christopher Cuevas, a local community advocate living in Central Florida and working to support members of the Latino/a and LGBTQ+ communities. Central Florida has been a longstanding and flourishing community that has seen over 200,000 Puerto Ricans coming off the island in the aftermath of Hurricane Maria seeking refuge and safety because of the destruction of the island and laxed infrastructure that would support their needs as they sought to rebuild their lives.

I write to you because I am very disappointed and worried about the actions that the Financial Oversight and Management Board (FOMB) is taking to address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into another never-ending economic crisis that will lead Puerto Rico into another debt default and will only cause more harsh austerity measures, cuts in public services and pensions - and while Central Florida has seen an increase in individuals leaving the island to rebuild their lives not all individuals from the island have this same opportunity and will be left to deal with the impact of this decision to uphold this unjust agreement.

The measures dictated by the FOMB have been implemented in a disorganized, illogical, and irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto Ricans from a real opportunity to get affordable education and healthcare, and limiting the capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The weak attempts of the board to fake an audit process are not going to work on us; we know this debt has been imposed on Puerto Rico without a due process of a real comprehensive audit that allows us to really know how the debt was issued and to ensure that is it paid justly and legally. Please do what is right and rule against this agreement.

Sincerely,

Christopher

████████████████
████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

coloradoerik3030    to: Swaindprcorresp                01/23/2019 11:23 AM

From:    ████████████████████████

To:      Swaindprcorresp@nysd.uscourts.gov
         ████████████████████████

Dear Judge Laura Taylor Swain, My name is Erik Ortiz. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Erik Ortiz ████████████████████████



**Title 28 judiciary and judicial procedure part 1 chapter 5 section 144 bias or prejudice of judge and chapter 21 section 455 disqualification of justice, judge or magistrate**

**Jaime A Diaz Oneill**   to:   david.o.martorani, usdoj, swaindprcorresp, marperez, eberrios, srivera, corraldieg, afernandez,          01/23/2019 04:39 PM

Cc:   usdoj, swaindprcorresp

From:

To:

swaindprcorresp@nysd.uscourts.gov

Cc:



IMG_6320.jpg



IMG_6321.jpg



IMG_6322.jpg

IMG_6317.jpg



IMG_6318.jpg



IMG_6319.jpg

Sent from my iPhone



**17-cv-2340 (exhibits 2) David O. Martorani Dale / Hector Martinez Calvo**
**United States District Court**
Jaime A Diaz Oneill    to: david.o.martorani                01/23/2019 03:29 PM

Cc:

From:
To:

History:            This message has been forwarded.

IMG_6325.jpg

IMG_6345.jpg

IMG_6350.jpg

IMG_6353.jpg

IMG_6355.jpg

IMG_6356.jpg

IMG_6358.jpg



IMG_6359.jpg



IMG_6363.jpg



IMG_6364.jpg



IMG_6365.jpg



IMG_6369.jpg



IMG_6368.jpg



IMG_6367.jpg



IMG_6366.jpg

IMG_6361.jpg



IMG_6362.jpg



IMG_6360.jpg



IMG_6357.jpg

Sent from my iPhone



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

vazquezj015   to: Swaindprcorresp                                    01/23/2019 07:58 AM

From: ▮▮▮▮▮▮▮▮▮▮

To:   Swaindprcorresp@nysd.uscourts.gov ▮▮▮▮▮▮▮▮▮

Dear Judge Laura Taylor Swain, My name is Julissa Vazquez. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Julissa Vazquez ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

alexander.burgos1    to: Swaindprcorresp                    01/24/2019 11:45 AM

From:

To:          Swaindprcorresp@nysd.uscourts.gov

Dear Judge Laura Taylor Swain, My name is Alexander Burgos. I am emailing you to urge you
to reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Alexander Burgos



**About the COFINA deal**

Andres Hernandez    to: swaindprcorresp                    01/24/2019 03:35 PM
Cc: diasporaenresistencia

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To:    swaindprcorresp@nysd.uscourts.gov
Cc:    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dear Hon. Judge Swain,

My name is Andre J Hernandez. I write to you because I am very disappointed and worried
about the actions that the Financial Oversight and Management Board (FOMB) is taking to
address the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico
into another never-ending economic crisis that will lead Puerto Rico into another debt default
and will only cause more harsh austerity measures, cuts in public services and pensions. The
measures dictated by the FOMB have been implemented in a disorganized, illogical, and
irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto
Ricans from a real opportunity to get affordable education and healthcare, and limiting the
capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a
fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The
weak attempts of the board to fake an audit process are not going to work on us; we know this
debt has been imposed on Puerto Rico without a due process of a real comprehensive audit
that allows us to really know how the debt was issued and to ensure that is it paid justly and
legally. Please do what is right and rule against this agreement on your next hearing.

Sincerely,

Andres J Hernandez

▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**REJECT the agreement between COFINA and the FOMB**

elba rivera   to: swaindprcorresp@nysd.uscourts.gov          01/24/2019 08:18 AM
Cc: ███████████████

From:          ███████████████████
To:            swaindprcorresp@nysd.uscourts.gov  <swaindprcorresp@nysd.uscourts.govÂ >
Cc:            ███████████████████████████

Dear Honorable Judge Taylor Swain,

I am Elba I. Rivera Rodriguez. I write to you because I am very disappointed and worried about
the actions that the Financial Oversight and Management Board (FOMB) is taking to address
the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into
another never-ending economic crisis that will lead Puerto Rico into another debt default and
will only cause more harsh austerity measures, cuts in public services and pensions. The
measures dictated by the FOMB have been implemented in a disorganized, illogical, and
irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto
Ricans from a real opportunity to get affordable education and healthcare, and limiting the
capacity of people to become and remain employed in the island.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a
fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The
weak attempts of the board to fake an audit process are not going to work on us; we know this
debt has been imposed on Puerto Rico without a due process of a real comprehensive audit
that allows us to really know how the debt was issued and to ensure that is it paid justly and
legally. Please do what is right and rule against this agreement on your next hearing.

Sincerely,

NAME
Elba I. Rivera Rodriguez
████████████████████
████████████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

srod1478    to: Swaindprcorresp                                    01/24/2019 05:40 PM

From:
To:       Swaindprcorresp@nysd.uscourts.gov

Dear Judge Laura Taylor Swain, My name is Samuel Rodriguez. I am emailing you to urge you
to reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Samuel Rodriguez



**Request under Chapter 11 section 107A**

arthursail    to: 'swaindprcorresp@nysd.uscourts.gov'                                01/25/2019 12:11 AM

From:          ▮▮▮▮▮▮▮▮▮▮▮▮▮

To:            '"swaindprcorresp@nysd.uscourts.gov'" <swaindprcorresp@nysd.uscourts.gov>

Judge Swain, I request under Chapter 11 section 107A disclosure of the following information or documents which provide the following information for the Cofina Plan of Adjustment Doc#4392 ("Plan"):

-Total number of bond holders in each class.

-Total dollar amount of bonds in each class.

-Number of bond holders in each class that voted for the Plan, and the dollar amount of the bonds they voted for the Plan.

-Number of bond holders in each class that voted against the Plan, and the dollar amount of the bonds they voted against the Plan.

-How much money will be paid to each Consummation Cost Party if the Plan is approved.

-Which Consummation Cost Parties voted for the Plan, and the number of bond holders and dollar amount of bonds attributed to each of these Consummation Cost Parties with their vote for the Plan.

-Which Consummation Cost Parties voted against the plan, the number of bond holders and dollar amount of bonds attributed to each of these Consummation Cost Parties with their vote against the Plan.

I own multiple different, Subordinate Cofina Bonds, and one Sr. Cofina Bond, and therefore, I am a creditor in two of the classes, am a party in interest and entitled to this information.  My bonds are held by FMS bonds, Inc. in Boca Raton, Fl.   I voted all my bonds against the Plan.

I request this information because Promesa is expressly subject to section 1126 of Chapter 11, which states in part:

"(e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."

I think some of the entities that voted for the Plan should be disqualified under section 1126, i.e. (1) the Consummation Cost Parties who hold or control the vote of Cofina bonds and voted for the Plan because they will be paid if the Plan is approved, and (2)  bond holders who voted for

the Plan because they were deceived by the false and misleading statements in the Plan and the Notice accompanying the ballots, i.e. that 56.4% will be recovered, including 56.4% of interest due on August 1, 2017, February 1, 2018 and August 1, 2018, and the material omissions as previously explained.

Sincerely,

Arthur Samodovitz. ████████████████████████



**REJECT the agreement between COFINA and the FOMB**

teresa basilio    to: swaindprcorresp                                    01/25/2019 06:04 PM
Cc:  diasporaenresistencia

From:    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒
To:      swaindprcorresp@nysd.uscourts.gov
Cc:      ▒▒▒▒▒▒▒▒▒▒▒▒

Dear Honorable Judge Taylor Swain,

I am Teresa Basilio Gaztambide, a Puerto Rican woman living in New York City and the Director
of an organization that works with Puerto Ricans in the diaspora and the archipelago to promote
Puerto Rican's human rights. I write to you because I am very disappointed and worried about
the actions that the Financial Oversight and Management Board (FOMB) is taking to address
the fiscal crisis. The agreement made with COFINA bondholders will drag Puerto Rico into
another never-ending economic crisis that will lead Puerto Rico into another debt default and
will only cause more harsh austerity measures, cuts in public services and pensions. The
measures dictated by the FOMB have been implemented in a disorganized, illogical, and
irresponsible manner so far, endangering the safety of citizens, limiting thousands of Puerto
Ricans from a real opportunity to get affordable education and healthcare, and limiting the
capacity of people to become and remain employed in the island. Furthermore, FOMB is an
unelected board that doesn't represent the interests of most Puerto Ricans who are already
suffering from severe unemployment, poverty, lack of medical resources, and cruel austerity
measures.

Instead of just moving forward with this unjust and anti-constitutional agreement, we request a
fair renegotiation of the agreements that is legal, fair and not burdensome for the country. The
weak attempts of the board to fake an audit process are not going to work on us; we know this
debt has been imposed on Puerto Rico without a due process of a real comprehensive audit
that allows us to really know how the debt was issued and to ensure that is it paid justly and
legally. Please do what is right and rule against this agreement on your next hearing.

Sincerely,
Teresa Basilio
▒▒▒▒▒▒▒▒▒▒▒▒▒



**Regarding COFINA bond**
Bertha Mendez    to: swaindprcorresp                    01/25/2019 05:45 PM

From:    ████████████████████████████

To:      swaindprcorresp@nysd.uscourts.gov

Good Evening Judge Swain,

Please be advised Judge Swain that I and many petitioners reject the agreement with the COFINA bondholders promoted by the Fiscal Control Board, because it would drag the country into another economic crisis, cause the imposition of more austerity measures, cuts in public services and pensions, and would lead to a new debt default. Instead, please consider a fair renegotiation of the agreements that is not burdensome for the country.

Thank you

Sincerely,

Bertha Y Mendez



**it will get worst for our people ...**

eileen llorens   to: swaindprcorresp

01/25/2019 04:38 PM

From:

To:   swaindprcorresp@nysd.uscourts.gov

            

IMG-3040.JPG   IMG-3042.JPG   IMG-3048.JPG   IMG-3050.JPG   IMG-3051.JPG   IMG-3052.JPG   IMG-3053.JPG



IMG-3046.JPG



**COFINA**
Mariel Muniz   to: swaindprcorresp@nysd.uscourts.gov        01/25/2019 07:42 PM

From:   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To:     "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Please,  reject COFINA. We can do better.
Mariel Muniz-Otero
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sent from Yahoo Mail on Android



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

Rosanniesierra   to: Swaindprcorresp                                    01/25/2019 07:08 PM

From:      ███████████████████████

To:        Swaindprcorresp@nysd.uscourts.gov
           ███████████████████████

Dear Judge Laura Taylor Swain, My name is Rosannie Sierra. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Rosannie Sierra ██████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**
Fredzaya   to: Swaindprcorresp                    01/26/2019 12:09 PM

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To:      Swaindprcorresp@nysd.uscourts.gov
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dear Judge Laura Taylor Swain, My name is Fred Zaya. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Fred Zaya ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Reject the COFINA agreement proposed by the unelected Financial Oversight
and Management Board for Puerto Rico**

Jezmine.lora    to: Swaindprcorresp                                    01/26/2019 08:11 AM

From:    ██████████████████████

To:      Swaindprcorresp@nysd.uscourts.gov
         ██████████████████████

Dear Judge Laura Taylor Swain, My name is Jezmine Lora. I am emailing you to urge you to
reject and vote against the COFINA agreement presented to you by the island's unelected
Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best
interest of the Puerto Rican people. We call on you to denounce the unjust and unfair
management and distribution of resources that prioritizes the private interests of COFINA
bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no
to COFINA. Sincerely, Jezmine Lora ████████████████████████



**Reject the COFINA agreement proposed by the unelected Financial Oversight and Management Board for Puerto Rico**

luispaganstudio   to: Swaindprcorresp                01/26/2019 08:55 AM

From: ████████████████████████████

To:    Swaindprcorresp@nysd.uscourts.gov
████████████████████████████████

Dear Judge Laura Taylor Swain, My name is Luis Pagan. I am emailing you to urge you to reject and vote against the COFINA agreement presented to you by the island's unelected Financial Oversight and Management Board of Puerto Rico. Your duty is to protect the best interest of the Puerto Rican people. We call on you to denounce the unjust and unfair management and distribution of resources that prioritizes the private interests of COFINA bondholders at the expense of the Puerto Rican people. Stand on the right side of justice. Say no to COFINA. Sincerely, Luis Pagan ████████████████████████████



**The junta, the government, the corrupt and their proposed "agreements" ...**
eileen llorens    to: swaindprcorresp                                01/28/2019 09:47 PM

From:
To:        swaindprcorresp@nysd.uscourts.gov



**Puerto Rico Protests PROMESA**

15 h · 🌐





**Puerto Rico**
eileen llorens   to: swaindprcorresp@nysd.uscourts.gov          01/28/2019 08:09 PM

From:   ████████████████
To:     "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-2018.01%20Guzman%20Stiglitz.pdf



**An analysis of Puerto Rico's debt relief needs to restore debt sustainability**

January 2018

Pablo Gluzmann, Martin Guzman, and Joseph E. Stiglitz

This page intentionally left blank.

# AN ANALYSIS OF PUERTO RICO'S DEBT RELIEF NEEDS TO RESTORE DEBT SUSTAINABILITY

BY PABLO GLUZMANN, MARTIN GUZMAN, AND JOSEPH E. STIGLITZ*

Note: The analyses and computations included in this report were performed before Hurricane Maria hit Puerto Rico. The devastating effects of the hurricane have significant effects on the necessary debt relief for restoring Puerto Rico's public debt sustainability. We still do not have precise estimates of the economic costs imposed by Maria, but we expect to update our computations when more precise information on those costs becomes available.

*Pablo Gluzmann: CEDLAS (FCE-UNLP); CONICET. Martin Guzman: Columbia Business School, Division of Economics; University of Buenos Aires, Department of Economics; Espacios Abiertos & Center for a New Economy (Non-resident Senior Fellow). Joseph Stiglitz: Columbia University, University Professor; Roosevelt Institute (Chief Economist). We wish to thank Gustavo J. Bobonis for improving the quality of the study with his comments and suggestions; Brad Setser for valuable discussions on Puerto Rico's current debt and economic situation; the anonymous reviewer; Deepak Lamba-Nieves, Sergio M. Marxuach, and Jennifer Wolff from the Center for a New Economy; and Daniel Santamaria Ots from Espacios Abiertos for valuable discussions. Martin Guzman and Joseph Stiglitz are grateful to the Institute for New Economic Thinking for supporting their research agenda on debt crises resolution.

This study was commissioned by Espacios Abiertos (EA). Founded in 2014, EA seeks a more transparent, accountable democratic society in Puerto Rico with increased justice and equity for its citizens. We are grateful to the Center for a New Economy for their ongoing technical assistance and collaboration in this project, and to Open Society Foundations for their generous support.

## Executive Summary

Puerto Rico's economy has been suffering a recession for more than a decade. The recession has led to a debt and economic crisis. The lack of opportunities has resulted in migration outflows that affect the lives of thousands of families and leave a higher burden on those who stay. Overall, the current macroeconomic dynamics is destabilizing the lives of nearly 3.5 million U.S. citizens in Puerto Rico. Reversing this dynamic requires appropriate macroeconomic and debt policies.

The collapse of economic activity has made the full payment of public debt unfeasible. Our study's main goal is to offer insights for designing a plan of action for resolving Puerto Rico's current debt crisis. The design of a restructuring proposal must note that the relationship between debt restructuring and fiscal policies exhibits bi-directional causality. On one hand, absent macroeconomic policies that expand the aggregate demand, Puerto Rico will not recover; and if the economy does not recover, Puerto Rico will not be able to pay its creditors without imposing severe damages on its nearly 3.5 million residents. On the opposite direction of causality, a larger debt reduction would imply that the territory would have more resources for expansionary macroeconomic policies, making the recovery more feasible and full repayment of the restructured debt more likely.

Our contribution is thus twofold. First, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that has been approved for fiscal years 2017-18 to 2026-27, as it is a crucial element for a computation of Puerto Rico's debt restructuring needs. Second, we perform a Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute Puerto Rico's restructuring needs.

Our analysis of the fiscal plan detects two core flaws in its design:

(I) The plan is based on assumptions that are not sensible, thus it fails to appropriately recognize the magnitude of the destabilizing dynamics that it would create. Specifically:

    (i)    The values of fiscal multipliers used for the GNP projections are unjustifiably optimistic: they assume that the fiscal contractions scheduled in the Fiscal Plan will be associated with output contractions that fall on the lower bound of the range of estimates provided by the empirical literature.

(ii)     The GNP projections ignore the feedback effects that the fall in economic activity would have on fiscal revenues, leading to an underestimation of the contractionary impact of the proposed fiscal policies.

(iii)    The plan's assumption that structural reforms that affect mostly the formation of aggregate supply will be the driver of economic recovery by as early as 2022 is inconsistent with sound macroeconomic theory, given that Puerto Rico's economy is in a demand-constrained regime, i.e. it is in a situation where there is underutilization of the factors of production of the economy. Any spending-reducing reform will more likely deepen the recession in the short-term.

(iv)    The plan is silent about how a deeper depression would likely intensify migratory outflows.

(II) The plan falls short on presenting a debt restructuring and sustainability analysis. Instead, it simply specifies what is the amount that must be repaid to creditors during the next decade, without being explicit about the longer-term obligations that the island will face and their sustainability. This has negative consequences in the short term, because the uncertainty about the island's long-term obligations will reduce the attractiveness of investing in the island in the present, thus harming the recovery prospects.

We also conduct a sensitivity analysis of the expected macroeconomic dynamics implied by Puerto Rico's Fiscal Plan. This allows us to construct more realistic scenarios of Puerto Rico's debt restructuring needs. The GNP projections of the Fiscal Plan lie on the upper-bound of our range of projections. And the entire range of projections predicts that real GNP will be lower by the end of the Fiscal Plan (year 2026) than in 2017. Thus, the implementation of the Fiscal Plan is projected to lead to a lost decade in terms of the evolution of economic activity.

Subsequently, we report the results of a Debt Sustainability Analysis (DSA) that incorporates our sensitivity analysis of the expected macroeconomic dynamics implied by Fiscal Plan. We report three main conclusions of this exercise.

(I) Assuming the fiscal plan will be respected, and absent a debt restructuring that reduces the current public debt stock, the territory would have to permanently sustain primary fiscal surpluses between approximately 3.5 and 7.4 percent of GNP, from 2027 onwards. Such a target is economically and politically infeasible. As a result, Puerto Rico's current debt position is unsustainable.

(II.A) When we maintain the assumptions of the Fiscal Plan, we obtain that the necessary reduction of Puerto Rico's debt to restore debt sustainability should include a full cancellation of the interest payments that are scheduled not to be repaid in the Fiscal Plan, plus a face value reduction that should lie roughly between 45 and 65 percent of the current debt stock of $51.9 billions included in the Fiscal Plan.[1]

(II.B) However, the relevant universe of the public sector's debt obligations may go beyond the debts included in the Fiscal Plan, as the sustainability of the public sector's debt may also depend on the sustainability of a large part of debt issued by other public entities that is not included in the Fiscal Plan. When we compute the necessary relief assuming that the relevant stock of debt corresponds to the total debt of the public sector[2], which increases the relevant stock to $72.2 billions, we obtain that the necessary reduction includes full cancellation of unpaid interest plus a face value reduction of between 60 and 73 percent of this alternative relevant stock of public debt.

(III.A) Under a more comprehensive range of assumptions for fiscal multipliers that includes both the assumption of the Fiscal Plan and other more realistic scenarios, and dismissing the unjustifiably optimistic positive assumed effects of the structural reforms on GNP growth for the period 2017-2026, we conclude that if the fiscal plan is implemented, the territory would need full cancellation of interest payments not included in the Fiscal Plan plus a face value reduction that lies between roughly 50 and 80 percent to restore debt sustainability – and again, the necessary reduction is larger if we take $72.2 billions instead of the just $51.9 billions included in the Fiscal Plan as the relevant universe of debt obligations.

(III.B) These computations remain conservative, as we are not addressing how migration flows will be affected by the deeper depression that the fiscal plan is projected to generate, and we are also maintaining the Fiscal Plan's assumption that the territory will achieve a steady state annual nominal GNP growth rate of 2.6 percent without implementing any expansionary aggregate demand policies. Thus, the computation of a necessary debt reduction that includes full interest cancellation plus 50 to 80 percent of face value reduction must be considered as a lower-bound, i.e. as the most conservative estimate of the territory's relief needs.

---

[1] In a letter sent by one of the authors of this report, Martin Guzman, to the Executive Director of the Financial Oversight and Management Board for Puerto Rico, Ms. Natalia Jaresko, the figures on the necessary debt reduction were adding the face value reduction and interest cancellation. This report separates the necessary face value reduction from interest cancellation.
[2] Net of Children's Trust's and HFA's debts, the reason for excluding the debts of those two entities being that their payment is not the responsibility of residents of Puerto Rico.

Finally, we note that these computations were performed before Hurricane Maria. The devastating effects of the hurricane have significant effects on the necessary debt relief for restoring sustainability. We still do not have precise estimates of the economic costs imposed by Maria, but we expect to update our computations when more precise information on those costs becomes available.

## Conclusions and Further Considerations

The future macroeconomic dynamics of the Puerto Rican economy will hinge upon the fiscal and debt restructuring plan that is adopted. We claim that the fiscal plan does not promote the economic recovery of Puerto Rico nor the sustainability of its debt position. Instead, the fiscal plan will almost certainly lead to an additional decade of depressed economic activity and will worsen the island's debt sustainability, perpetuating a crisis that all parties would like to end.

Restoring debt sustainability requires substantial debt reduction. A voluntary process of restructuring would be very unlikely to deliver the amount of relief that Puerto Rico needs. Recent experiences of public debt restructurings demonstrate that voluntary negotiations often lead to delays, insufficient relief for the country, and unequitable treatment for certain classes of creditors. The predictions from economic theory are aligned with this historical evidence. Thus, we contend that the government made a sensible move when it filed for bankruptcy under Title III of PROMESA on May 3, 2017. Otherwise, Puerto Rico would have been exposed to massive litigation that would have undermined the restructuring efforts and the road to economic recovery.

The restructuring proposal must take into account that decisions will be made under uncertainty. There are different layers of uncertainty, both in terms of the parameters that are used for the computations and in terms of the exogenous shocks to which Puerto Rico will be exposed over the coming decades. To deal with the underlying uncertainty, the restructuring process could be improved by the inclusion of GNP linked bonds that align debt payments with Puerto Rico's capacity to pay. By definition, these bonds improve the sustainability of the restructured debt, and they align the incentives of the debtor and the creditors such that the creditors would also benefit from a stronger recovery.

Our analysis does not study how the debt write-off will be distributed among bondholders but simply provides a perspective on the aggregate relief needs. The seniority structure will imply that not all bondholders will get the same discount, but the distribution of creditor losses will be determined by legal

considerations that go beyond the objective of this study. What this study offers is a computation of the aggregate relief needs to restore the sustainability of Puerto Rico's public debt.

Finally, we claim that the debt restructuring will not be a sufficient but just a necessary condition for economic recovery. Puerto Rico needs more than just the restoration of debt sustainability: it needs a new economic growth strategy that replaces the old one that has clearly failed. However, if debt is not appropriately restructured, no new growth strategy will be feasible. The CNE Growth Commission is doing complementary work to this study that devises a new growth strategy for Puerto Rico.

## 1. INTRODUCTION

Puerto Rico's economy has been suffering a recession for more than a decade. The recession has led to a debt and economic crisis. The lack of opportunities has resulted in migration outflows that affect the lives of thousands of families and leave a higher burden on those who stay. Overall, the current macroeconomic dynamics is destabilizing the lives of nearly 3.5 million U.S. citizens in Puerto Rico. Reverting this dynamic requires appropriate macroeconomic and debt policies.

The collapse of economic activity has made the full payment of public debt unfeasible. Our study's main goal is to offer insights for designing a plan of action for resolving Puerto Rico's current debt crisis. The design of a restructuring proposal must note that the relationship between debt restructuring and fiscal policies exhibits bi-directional causality. On one hand, absent macroeconomic policies that expand the aggregate demand, Puerto Rico will not recover; and if the economy does not recover, Puerto Rico will not be able to pay its creditors without imposing severe damages on its nearly 3.5 million residents. On the opposite direction of causality, a larger debt reduction would imply that the territory would have more resources for expansionary macroeconomic policies, making the recovery more feasible and full repayment of the restructured debt more likely.

Our contribution is thus twofold. First, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that has been approved for fiscal years 2017-18 to 2026-27, as it is a crucial element for a computation of Puerto Rico's debt restructuring needs. Second, we perform a Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute the island's restructuring needs. Thus, the offers insights for designing a plan of action for resolving Puerto Rico's current crisis.

Besides this introduction, this work includes six other sections. Section 2 provides an overview of the current economic and fiscal situation. Section 3 introduces the conceptual framework that serves as the basis of our analysis of the Fiscal Plan and the computation of the debt restructuring needs. Section 4 examines the Fiscal Plan for the period 2017-2026. It first discusses its assumptions. We claim that some of its critical assumptions are unsound and analyze their implications. We identify a number of core flaws in its design and perform a sensitivity analysis, with respect to the assumptions, for the fiscal multipliers and the effects of the structural reforms. This analysis suggests that the fall in real GNP over the next decade is likely to be significantly larger than what the plan overoptimistically predicts.

Section 5 presents a computation of Puerto Rico's debt restructuring needs. We first demonstrate that the island's current debt position is by all means unsustainable. Assuming the fiscal plan will be respected, absent a debt restructuring, the territory would be forced to sustain primary fiscal surpluses between 3.5% and 7.4% of GNP from 2027 onwards, forever. But pursuing such a fiscal surplus would lead to a contraction that would make the collection of the necessary tax revenues to achieve it simply untenable, making the fiscal surplus unfeasible. Maintaining the assumptions of the fiscal plan, we obtain that the Puerto Rico's debt reduction, should include a full cancellation of the interest payments that are scheduled not to be repaid in the Fiscal Plan, plus a face value reduction that should lie roughly between 45 and 65 percent of the current debt stock if we take the $51.9 billions of debt included as the Fiscal Plan as  the relevant stock of public debt, or full cancellation of interest payments plus between 60 and 73 percent of face value reduction if we assume the relevant public debt stock is $72.2 billions, which corresponds to the total debt of the public sector net of Children's Trust's and HFA's debts.[3] But as the Fiscal Plan's assumptions are flawed, those figures must be taken with caution. Under a wider set of assumptions for the fiscal multipliers and dismissing the positive assumed effects of the structural reforms on GNP growth for the period 2017-2026, we conclude that if the fiscal plan is implemented, the necessary debt reduction would be larger, including full interest cancellation plus roughly between 50 and 80 percent of the current debt stock – again, the necessary reduction is larger if we take $72.2 billions rather than the $51.9 billions included in the Fiscal Plan as the relevant amount of debt obligations. But even those computations are conservative, as we are not addressing how migration flows will be affected by the deeper depression that the fiscal plan is projected to generate, and more importantly, we are maintaining the fiscal plan's controversial assumption that the territory will somehow manage to achieve a steady state annual nominal GNP growth rate of 2.6% without having implemented any expansionary aggregate demand policies. Thus, that range must be considered as a lower-bound, i.e. as the most conservative estimate of the territory's relief needs.

The structure of seniority will imply that not all bondholders will get the same discount. Our analysis does not study how the debt write-off will be distributed among bondholders, but simply provides a perspective on the macroeconomic needs. The distribution of losses will be determined by legal considerations that go beyond the object of this study.

---

[3] The reason for excluding the debts of those Children's Trust and HFO is that their payment will not be made with Puerto Rican people's funds.

We argue that in order to deal with the uncertainty that will underlie the implementation of the fiscal plan and the debt restructuring, the restructuring process could be improved with the inclusion of GNP linked bonds that align debt payments with Puerto Rico's capacity to pay. By definition, these bonds improve the sustainability of the restructured debt and align the incentives of the debtor and the creditors such that the creditors would also benefit from a stronger recovery. Section 6 explains why the restructuring is simply a necessary but not a sufficient condition for achieving a superior path of long-term growth, and it claims that the restructuring plan must be part of a broader economic plan that devises a new growth strategy for Puerto Rico. The capacity to implement a new growth strategy will depend on the effectiveness of the restructuring to restore the sustainability of Puerto Rico's debt position.

Finally, section 7 concludes. The section includes an analysis of the tensions that eventual differences between the Fiscal Plan projections and realizations will create in the short run, offers policy recommendations to deal with those contingencies, and summarizes our proposals for resolving Puerto Rico's social, economic, and debt crisis.

## 2. PUERTO RICO'S CURRENT ECONOMIC AND FISCAL SITUATION[4]

Puerto Rico currently faces two distinct, yet related, crises. The first is an economic and social crisis, the product of the chronic stagnation of productive activity in the island over the last decade. The second is a fiscal crisis that arises out of the government's weak financial position.

In general, decades of fiscal and economic mismanagement have engendered an economy characterized by: (1) chronic primary deficits; (2) high debt-to-GNP ratios; (3) low employment levels in the formal economy; (4) a large informal economy, encompassing both legal and illegal activities; (5) significant government corruption and predatory rent-seeking behavior in both the public and private sectors; (6) substantial tax evasion; (7) a weak productive base; (8) low growth rates; and (9) high levels of private consumption and public indebtedness enabled by having access to a stronger currency than its economic fundamentals would warrant.[5]

---

[4] This Chapter was written by Sergio M. Marxuach, Public Policy Director and General Counsel at the Center for a New Economy.
[5] Puerto Rico's currency is the US dollar, over which it has no control. If the island was managing its own exchange rate, its real exchange rate would surely be weaker.

## THE ECONOMIC SITUATION

Puerto Rico's economy is currently in a state of secular decline, both as a result of the failure to implement a new economic strategy and of the current destabilizing macroeconomic dynamics. Most significant economic indicators have been contracting or stagnant for the last decade.

*GNP* – The Puerto Rican economy, as measured by its Gross National Product ("GNP"), has been contracting in real terms for more than a decade. While nominal GNP increased at a modest compound growth annual rate of 1.6% between fiscal years 2007 and 2016, in real terms the island's economy shrunk by an aggregate of 14% during that period.

*Employment* – Since fiscal year 2008, total employment has declined by 17%, while payroll employment is estimated to have decreased by approximately 13%.  Meanwhile, the employment to working-age population ratio has decreased from 41.4% in 2008 to 35.5% during fiscal year 2016.  The picture with respect to labor force participation is quite similar, with the participation rate declining from 46.6% in 2008 to 40.2% in 2016.

*Population* – The prolonged economic contraction, the lack of employment opportunities and a significant decline in birth rates, has led to a significant decrease in the island's population. Puerto Rico's population has declined from approximately 3.8 million in 2000 to a little over 3.4 million in 2016, an aggregate reduction of 11% during that period. Between 2010 and 2016, the population's contraction rate exceeded 1% annually, and approached 2% in 2016. Over the same period, the population between 15 and 64 years old contracted from 2.47 to 2.28 million, a reduction of 7.7%.

## THE FISCAL SITUATION

For more than a decade, Puerto Rico has experienced significant General Fund budget deficits. These deficits, including the payment of a portion of the Commonwealth's debt service obligations, have been covered primarily with the net proceeds of bonds issued by the Puerto Rico Public Finance Corporation, the Puerto Rico Sales Tax Financing Authority ("COFINA") and Commonwealth general obligation bonds, with interim financing provided by the Government Development Bank and, in some cases, with extraordinary one-time revenue measures or expense adjustment measures.

In addition to running General Fund deficits, Puerto Rico has been running significant primary deficits, defined as non-interest revenues minus non-interest expenditures plus net interfund transfers, at least since 1998 (with a rather odd exception in 1999). Consistently running a primary deficit has real consequences over the long run, especially for a territory that lacks the traditional instruments of monetary policy.

Therefore, Puerto Rico, just like most governments facing this situation, ended up issuing large amounts of debt, at ever-higher costs, just to cover the payment of existing debts, a situation that eventually becomes unsustainable.  This is the situation Puerto Rico is facing right now. Several debt obligations of the Commonwealth are currently in default and the island has thus lost all access to capital markets.

On May 3, 2017, the Board, recognizing the island's unsustainable debt position and acting on behalf of the Commonwealth, filed a petition for the adjustment of Puerto Rico's debts in the Federal Court for the District of Puerto Rico pursuant to Title III of PROMESA.


# 3. CONCEPTUAL FRAMEWORK

## 3.A PUBLIC DEBT SUSTAINABILITY AND MACROECONOMIC DYNAMICS

A public debt sustainability analysis must be able to answer the two following questions:

Q1. Does the government have the means to repay its debt with high probability?

Q2. If it doesn't, what are the restructuring needs in order to restore debt sustainability?

Answering Q1 and Q2 requires a definition of the concept of debt sustainability. The economic definition of public debt sustainability refers to the capacity of the government to satisfy its intertemporal budget constraint (IBC) without resorting to a debt default. The IBC states that the present discounted value of primary fiscal surpluses has to be equal to the value of outstanding debt. Formally, in an infinite time setup we can describe the IBC as:

$$d_t^* = E_t \sum_{j=0}^{\infty} (1+r)^{-j} E_t s_{t+j} \qquad \text{(IBC)}$$

which holds if and only if

$$\lim_{j \to \infty} E_t \frac{1}{(1+r)^j} d_{t+j} = 0 \qquad \text{(TC)}$$

where the condition (TC) is known as the government's transversality condition, $d_t^* = (1 + r)d_{t-1,t}$ denotes debt to output ratio at the start of period $t$, $s_t$ is the primary fiscal surplus to output ratio in period t, and $1 + r = \frac{1+R}{1+\gamma}$, where $R$ is the nominal interest rate and $g$ is the growth rate of output (for simplicity we denote them as constant). In the context of Puerto Rico, we will use GNP as the measure of output.

More generally, the definition of debt sustainability may also refer to other economic or non-economic principles that are meant to ensure a continuing efficient functioning of debt markets and to respect human rights. For instance, debt could be considered unsustainable if full payment would entail the need to cut on essential public services.[6] Therefore, the satisfaction of the government's solvency condition is a necessary but not a sufficient condition for debt sustainability, as the territory's development needs have to be taken into account. Relatedly, defining debt sustainability also requires a definition of the relevant universe of creditors. Defining the universe of creditors in a public debt restructuring is different than in a corporate debt restructuring, as the creditors of a country need not be only the formal creditors but also the informal ones – as pensioners and workers.

## PUBLIC DEBT AND MACROECONOMIC DYNAMICS

The objects of each side of the (IBC) are not independent. The capacity to collect revenues depends on the level of economic activity. In turn, the level of economic activity depends on fiscal policies. But the space of feasible fiscal policies depends on the debt burden. Formally, the primary fiscal surpluses that enter the IBC must be "fixed-points" – consistent objects that respect the functional relationship between fiscal policies, economic activity, and fiscal revenues. The consideration of these endogenous feedback effects in a system in which fiscal outcomes, the level of economic activity, and the borrowing costs are endogenous variables is central in any analysis of debt sustainability, and missing it leads to flawed estimates of the implications of debt policies.

Puerto Rico's deep and long-lasting downturn has put the economy into a demand-constrained regime. Such a situation calls for the application of macroeconomic policies that expand the aggregate demand – a basic principle of macroeconomic theory.

---

[6] The literature on the principles that should be respected in a restructuring process significantly grown over the last few years. For instance, see Blankenburg and Kozul-Wright (2016), Bohoslavsky and Goldmann (2016), Goldmann (2016), Guzman and Stiglitz (2016a, 2016b), Kolb (2006), Raffer (2016), and Li (2015).

Implementing expansionary macroeconomic policies requires the capacity for financing them. But a country that is in a demand-constrained regime and faces a debt burden that is unsustainable lacks the capacity for expansionary policies. Instead, the unsustainable debt position becomes a drag for economic growth. The logic is simple: when the debt position is perceived as unsustainable with larger probability, the cost of refinancing debt increases; this in turn increases the burden of interest payments, and decreases the available resources net of interest payments for financing public policies. Attempting to force full repayment under those conditions creates a destabilizing dynamic. The induced fiscal austerity decreases aggregate demand, which in the demand-constrained regime leads to a deeper recession, which in turn leads to a debt position perceived as even more unsustainable, and so on. Indeed, the idea that fiscal austerity could somehow restore solvency in an already depressed economy, in times in which the private sector is also contracting, without contemplating the possibility of deviation-amplifying contractionary spirals, is ill conceived and not aligned with sound macroeconomic theory or evidence.[7] The uncertainty created by an unresolved debt problem also deters new investment in the economy, such that the formation of supply is severely damaged in addition to the negative impact on aggregate demand.[8] [9]

Thus, recovery of debt sustainability is a necessary condition for economic recovery, because there is no possibility of implementing the policies needed for macroeconomic recovery when debt is unsustainable. To recover debt sustainability, debt must be restructured. Even creditors as a group may benefit from a restructuring, because the expansionary effects that it allows increases the size of the pie that is distributed among the claimants.[10]

The theoretical literature also suggests various channels through which debt defaults are associated with output losses as the result of, for example, reputational damage and international trade

---

[7] See, for example, Jayadev and Konczal (2010, 2015), Auerbach and Gorodnichenko (2012a, 2012b, 2012c, 2012d); Eggertsson and Krugman (2012); Herndon, Ash, and Polish (2014), Jorda and Taylor (2013); see also the commentaries by Krugman (2010, 2013, 2015) and Stiglitz (2010).

[8] The destabilizing dynamics at play in the context of a financial crisis has been thoroughly analyzed in the macroeconomics literature by seminal authors as Fisher (1933), Keynes (1936), Minsky (1977, 1992), Kindleberger (1978), Leijonhufvud (1981), Stiglitz and Heymann (2014), Koo (2003), and Eggertsson and Krugman (2014), among many others.

[9] In Puerto Rico, the sub-utilization of factors can rapidly turn migration, a phenomenon that would not be captured by measures of intensity of use of the available factors of production.

[10] This claim has been demonstrated by Krugman (1988), who demonstrates that the expected present discounted value of payments for creditors takes the shape of a Laffer curve as a function of the value of the debtor's total liabilities. The reason is that the probability of default, and thus the interest rate, is an increasing function of the debt burden. Sachs (1989) also emphasizes the potential welfare benefits of forgiving debt in a situation of debt overhang, in a model where both creditors and debtors can gain from a partial debt write-down, since an excessive debt stock and the prospect of large future debt repayments act as a tax on domestic investment and depress the present value of claims held by investors. Under those conditions, debt relief should be followed by a period of higher growth.

exclusion costs (e.g., Eaton and Gersovitz 1981; Bulow and Rogoff 1989; Cole and Kehoe 1998; Aguiar and Gopinath 2006; Arellano 2008). However, the empirical literature shows that the costs associated with those traditional mechanisms have not been significant in recent decades, but that the major costs have been those associated with the impact of defaults on domestic bondholders (Sandleris, 2016). The literature also suggests that defaults have dire political consequences for incumbent governments and finance ministers (Borensztein and Panizza, 2009).

Debt restructuring renegotiations under insufficient legal frameworks for dealing with collective action problems and inefficient delays that reduce output (Benjamin and Wright 2009; Pitchford and Wright 2012).

## Relationships between Fiscal Policies, Revenues, and GNP Growth: The Fiscal Multipliers

The effects of the fiscal policies that are included in a macroeconomic plan will depend on the size of fiscal multipliers, i.e. the parameters that describe the impact of fiscal policies on the level of economic activity. Thus, any fiscal plan must aim at making realistic assessments on the values of the fiscal multipliers.

There are different types of multipliers. The 'spending to output multiplier' refers to the effect of changes in public spending on output. The 'tax rate to output multipliers' refer to the effects of changes of different tax rates on output; from the tax multipliers, we can infer the values of the 'revenues to output multipliers', which indicate how a variation in fiscal revenues will affect output. Finally, the 'spending to revenues multipliers' indicates how a change in public spending will affect tax revenues through the effects that it will have on the endogenous tax bases. Table 1 summarizes the different types of multipliers.

Table 1: Types of fiscal multipliers

| Multiplier | Concept |
|---|---|
| Spending to output multiplier | How changes in public spending affect output |
| Tax rate to output multipliers | How changes in tax rates affect output |
| Revenues to output multiplier | How a variation in fiscal revenues affects output |
| Spending to revenues multiplier | How a change in public spending will affect tax revenues through the effect that it will have on the tax bases |

There is a sizable empirical literature that estimates different types of fiscal multipliers for different regions or countries, in different stages of the cycle, and with different methodologies. Although to our knowledge there are no precise estimates for Puerto Rico, the literature offers valuable insights for assessing what assumptions are sensible at the moment of studying the consequences of a fiscal plan for the island. This section offers a brief review of the main findings from that literature.

*Fiscal multipliers are non-linear*. The evidence tells that fiscal multipliers are state-dependent. Auerbach and Gorodnichenko (2012b, 2012c), using regime-switching models, estimate the effects of fiscal policies over the business cycle and find that fiscal policy is considerably more effective in recessions than expansions. They provide estimates for multipliers for disaggregate spending variables for US regions. Military spending has the largest multiplier: estimates range from 3.69, with standard error of 0.83 (Auerbach and Gorodnichenko, 2012c) to 1.67, with standard error of 0.72 (Auerbach and Gorodnichenko, 2012b). The estimates for non-defense spending multipliers range from 1.34, with standard error of 0.31, to 1.09, with the same standard error. These values demonstrate the effect of $1 of additional spending on output; for example, according to Auerbach and Gorodnichenko (2012c) an additional dollar of public spending in the non-defense sector increases output by $1.34. In the expansion, the defense spending multiplier changes sign: it ranges from -1.03, with standard error of 0.25 (Auerbach

and Gorodnichenko, 2012c), to -0.43, with standard error of 0.24 (Auerbach and Gorodnichenko, 2012b). And the non-defense spending multiplier keeps the positive sign but the magnitudes are smaller: it ranges from 1.17, with standard error of 0.15 (Auerbach and Gorodnichenko, 2012c), to 1.03, with the same standard error (Auerbach and Gorodnichenko, 2012b).

Auerbach and Gorodnichenko (2012a) also estimate fiscal multipliers for OECD economies. The effects in recessions are stronger for this group of economies: Their point estimate is that an increase of government purchases of $1 results in about $3.50 of added GDP when the economy is weak, with a 90 percent confidence interval running from 0.6 to 6.3. On the other hand, in times of a strong economy, added government purchases reduce GDP, according to the point estimate. The confidence interval for that estimate includes moderate positive values. In all those estimates, the effects of fiscal policies are not necessarily concentrated in one year, but can be accumulated over time.

The IMF has also recognized the importance of considering the non-linear nature of multipliers (Blanchard and Leigh, 2013). This recognition received special attention as the calls for a reconsideration of the methodology for assessing debt sustainability and the assumptions on multipliers had intensified after the dramatic consequences that the underestimation of the impact of fiscal austerity had for Greece, and also for other European economies in distress (see Guzman and Heymann, 2015).

Another estimate is provided by Nakamura and Steinsson (2014), who using historical data on military procurement to estimate the effects of government spending, obtain a so-called "open economy relative multiplier" of approximately 1.5 – the "open economy relative multiplier" estimates the effects on output that an increase in government spending in one region of the union relative to another, and differs from the "closed economy aggregate multiplier" that is estimated using aggregate US data.

More recently, Chodorow-Reich (2017), based on an analysis of the American Recovery Reinvestment Act and of a survey of empirical studies, suggests that his "preferred" point estimate of the cross-sectional fiscal spending to output multiplier lies around 1.8.

*There are negative endogenous feedback effects from fiscal contractions.* The design of a fiscal plan has to take into account that changes in public spending will not only affect the level of economic activity, but also that the changes in economic activity will affect fiscal revenues. The endogenous feedback effects are central for estimating the impact of a fiscal contraction on the sustainability of the debt position and

on the level of economic activity. Auerbach and Gorodnichenko (2012b, 2012c) also offer evidence on the impulse-responses regarding the effects of an increase in public spending on tax revenues. For non-defense spending, the tax revenues response to an increase in $1 ranges from $0 to $1.[11]

*Fiscal multipliers depend on the exchange rate regime.* Consistent with the predictions from economic theory, the empirical literature finds that they are larger in economies operating under predetermined exchange rates than under flexible exchange rates (Ilzetki, Mendoza, and Végh, 2012).

*There is uncertainty about the values of multipliers in a particular economy at a particular time.* This is a simple corollary of the multipliers state-dependence. Certainly, there is no precise knowledge about the correct distributions for the values of multipliers for Puerto Rico. Extrapolating values found for US regions or other economies may be of help, but an analysis for Puerto Rico must take into account that the territory is currently in a deep recession, hence multipliers are likely to be larger than what is obtained for US regions in more "normal" recessions.

There are other elements from economic theory that must be taken into account even if the evidence to assess their quantitative relevance for Puerto Rico's case is scarce. In Puerto Rico, fiscal policies will also have effects on the size of the population that will in turn affect fiscal revenues.

Ultimately, the uncertainty about the values of the multipliers has practical implications for an analysis of debt sustainability and for the study of the consequences of a fiscal plan. It makes sensitivity analysis with respect to the baseline assumptions an especially necessary part of the exercise. Our analysis will include a sensitivity analysis that refers to the ranges of estimates that we reported in this section.

## THE STOCHASTIC NATURE OF THE DSA

Given that any analysis is made under uncertainty, the implication is that the assessment of debt sustainability must be stochastic (see IMF, 2013; Celasun, Debrun, and Ostry, 2006; Consiglio and Zenios,

---

[11] See Appendix Figure A.3 in Auerbach and Gorodnichenko (2012c) and Figure A.3 in Auerbach and Gorodnichenko (2012b).

2015, 2017; Guzman and Heymann, 2015; Guzman and Lombardi, 2017). There may be multiple states of nature, and each state of nature will have a different associated IBC.

### 3.B EMPIRICAL EVIDENCE ON DEBT REDUCTION AND MACROECONOMIC PERFORMANCE

The hypothesis that a deeper debt restructuring is associated with a better post-restructuring economic performance is supported by the evidence. Reinhart and Trebesch (2016) examine the economic performance of debtor countries during and after sovereign debt relief operations, for samples that cover the periods 1920-1939 for defaults on official (government to government) debt and 1978-2010 for emerging markets defaults with private creditors. They find evidence that is clearly consistent with the notion that debt relief has beneficial economic effects for debtor countries. Specifically, they find that per capita GDP increases 11 percent for emerging markets and 20 percent for advanced economies during the five years following a restructuring that results in exiting from the state of default. They also find a strong increase in average ratings for emerging markets – a result predicted by economic theory, as the market perceptions of debt sustainability should improve if the debt restructuring is effective for resolving the debt crisis. Besides, debt levels decline strongly following the exit of crises. Within five years, total government debt/GDP falls by 27 percentage points across emerging market episodes and by 22 percentage points in the sample of defaults with official creditors.

However, they find that not every type of restructuring is associated with improvements in economic performance and ratings: the effects are significant only in deals that involve face value reductions. Reprofiling deals, such as operations with maturity extensions and interest reductions, were not associated with improvements in economic performance.

Recent commentaries and research have made the mistake of looking at what has been the average in past restructurings as a guide for future debt policies (Edwards 2015a, 2015b). But what has been the norm in recent practice should instead be taken as representative of what is unacceptable. The amount of relief that distressed countries have obtained has generally been insufficient to resolve debt crises. This has been recognized by the IMF: "Any assessment of debt sustainability needs to be underpinned by realistic—rather than heroic—assumptions regarding future growth prospects, taking into account the reality that economies have often taken longer to recover from crises than was originally expected." (Hagan, Obstfeld, and Thomsen, 2017).

Indeed, restructurings are coming in the form of "too little and too late" (cf. Guzman, Ocampo, and Stiglitz, 2016). From 1970 to 2010, between 49.9% and 60% of sovereign debt restructurings with private creditors were followed by another restructuring or default within 3 to 7 years, respectively (Guzman and Lombardi, 2017, based on data from Cruces and Trebesch, 2013).

## DESCRIPTION OF CASE STUDIES

Among the successful cases, two stand out – at least in terms of their magnitude and the attention they have received in the literature. One of them is the case of West Germany following World War II. West Germany obtained significant debt relief through the London Debt Agreement (LDA). The case is studied by Galofré-Vilà et al. (2016), who conclude that West Germany's spectacular recovery would have not been possible without the LDA. The significant debt write-down released resources for fiscal policies that allowed the pursuing of the public policies that the recovery required. Absent such a relief, West Germany would have been forced to obtain sizable fiscal surpluses that would not only have undermined the recovery, but would also have fostered political instability, potentially renewed geopolitical conflict, and ultimately be self-defeating.

The other case was Argentina's debt restructuring following the default of 2001 – the largest recorded sovereign default in history at the time. The country followed a strategy that resulted in significant debt relief (see Basualdo et al. (2015); Guzman (2016); Chodos (2016); and Cruces and Samples (2016) for details), which created space for fiscal policies that played a crucial role in the fast and large recovery that the country experienced following the default.[12] However, the country also got immersed in a complex legal dispute with holdout bondholders – bondholders who decide not to cooperate in restructuring negotiations even when a large majority accepts the proposal of the debtor – including the so-called vulture funds who bought debt at a low fraction of its face value when it was already in default, sued the country in US courts seeking full payment and won, making billions for themselves at

---

[12] In a context of favorable international conditions and under the implementation of a policy of competitive and effectively multiple real exchange rates, GDP grew more than 8 percent on average from 2003 until the eruption of the global financial crisis in 2008 (see also Damill, Frenkel, and Rapetti (2015) for a more comprehensive description of the post-default dynamics, and Guzman, Ocampo, and Stiglitz (2017) for a description of the rationale of those policies and their importance in the Argentine post-default recovery). These conditions are markedly different than the ones Puerto Rico will face after its debt restructuring.

the expense of the Argentinian people. The case is also telling of the complexities of resolving debt crisis under severe gaps in the legal frameworks.

Among the recent unsuccessful cases, Greece stands out. The case is extensively analyzed by Varoufakis (2016). The management of Greece's ongoing debt crisis is an example of too little and too late. After a few years of recession and of an unsustainable debt position, the country restructured its debt in 2012. But the restructuring was not effective to restore debt sustainability. It came with conditions of fiscal austerity imposed by the Troika that undermined the possibility of escaping the recession. The draconian demands have continued since then. The Troika later imposed an absurd program for reducing Greece's public debt to GDP ratio that included a target of primary surplus of 3.5 percent of GDP for 2015, and 4.5 percent of GDP from 2015 onwards, forever. The country continues to struggle, and throughout this period, opportunities have vanished for many Greeks. The unemployment rate was 7 percent in 2008 and skyrocketed since then, growing higher than 25 percent; it was 23 percent in 2016. Youth unemployment statistics are even more alarming. The youth unemployment rate peaked at 60 percent in 2013, then declined to 47 percent at the time of this study after many migrated or stopped looking for jobs. The failure of Greek's restructuring process is a case that we would do well not to repeat.

## The Importance of Legal Frameworks

The poor outcomes in sovereign debt restructurings are related to the lack of proper legal frameworks for resolving the disputes that arise when debts cannot be repaid in full. There is no equivalent of an international bankruptcy court for sovereigns, or not even something remotely close to it (Guzman and Stiglitz, 2016a; Guzman and Stiglitz, 2016b; Li, 2015; Gelpern, 2016; Goldmann, 2016, Bohoslavsky and Goldmann, 2016; Raffer, 2016; Howse, 2016; Ocampo, 2016; Brooks et al., 2015; Gelpern, Heller, and Setser, 2016). Restructurings often involve protracted negotiations with multiple creditors with different interests and different capacities. In that context, there is a serious risk of holdout behavior. Litigation related to countries' debt restructuring disputes has been increasing over the last two decades (see Schumacher, Trebesch, and Enderlein, 2014). Holdouts pose the risk of making the finalization of a restructuring process impossible to achieve, thus undermining the prospect for economic recovery of the distressed debtor and also creating vast inequities between the treatment of different creditors.

But Puerto Rico's restructuring will occur in a different context. Unlike the case of sovereigns, Puerto Rico will restructure under the framework that was established with the enactment of PROMESA. This could be a valuable advantage.

But Puerto Rico will face a constraint that sovereign debtors generally do not face: the island does not have the authority to make its own decisions. The people of Puerto Rico thus have to rely on the good intentions of an appointed Fiscal Board which must ultimately approve any restructuring plan presented. If the government presents a plan that is aligned with the development goals of the territory and the Board supports it, PROMESA will help. But if the Board demands a plan that intends to squeeze as much as possible to satisfy creditor demands at the expense of the Puerto Rican people, PROMESA will hurt.

### 3.C Methodology for Computing the Appropriate Size of Relief in the Debt Restructuring Process

The computation of the appropriate debt relief must identify what is the maximum amount of debt that can be repaid in each state subject to the satisfaction of other constraints defined in the restructuring process, as for instance a minimum acceptable growth rate of output in steady state. Section 5 describes in detail how we perform the computations of the appropriate debt relief for Puerto Rico and the assumptions on which they are based.

This restructuring plan must come with a macroeconomic plan for the short-term recovery, as well as with a development strategy for improving long-term prospects.

Our empirical application consists of the following functional relationships:

The growth rate of real GNP, $g_t^y$, is defined as

$$g_t^y = g_t^b + g_t^d + g_t^s$$

where $g^y$ is the real GNP growth, $g_t^b$ is the baseline real GNP growth rate, $g_t^d$ is the growth rate of real GNP that comes from fiscal policy measures, and $g_t^s$ is the growth rate in real GNP that comes from structural reforms, in all cases between years $t-1$ and $t$. The growth rate of real GNP that comes from fiscal policy measures is given by

$$g_t^d = \frac{\Delta RGNP_t^d}{RGNP_{t-1}}$$

where $RGNP_t$ is the real GNP in year $t$, and

$$\Delta RGNP_t^d = \alpha_{Y,G} \Delta G_t + \alpha_{Y,T} \Delta T_t^C + \alpha_{Y,T} \Delta T_t$$

where $\alpha_{Y,G}$ is the public spending to real GNP multiplier and $\alpha_{Y,T;t}$ is the fiscal revenues to real GNP multiplier.

The component $\Delta T_t^C$ denotes the necessary change in tax revenues to compensate the initial variation due to the change in public spending in year $t$:

$$\Delta T_t^C = -\alpha_{T,G;t} \Delta G_t$$

where $\alpha_{T,G;t}$ is the public spending to fiscal revenues multiplier that denotes the endogenous feedback effect that a contraction of public spending creates on fiscal revenues through the fall in economic activity.[13]

Informed by the literature (see section 3.A above), we project the real and nominal GNP for each possible combination of the following parameters: $\alpha_{Y,G} = \{1, 1.34, 1.5, 2, 2.5, 3, 3.5\}$, $\alpha_{Y,T} = \{0, 0.5, 1, 1.34\}$, and $\varepsilon_{T,G} = \{0, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7\}$ where $\varepsilon_{T,G}$ is the elasticity of fiscal revenues to public spending,

$$\varepsilon_{T,G} = -\alpha_{T,G;t} \frac{G_t}{T_t}$$

We are making a conservative assumption for the tax revenues to real GNP multiplier, under the premise that part of the increases in tax revenues will fall on agents with low marginal propensities to consume. Our projections would be more pessimistic if we chose the same range for $\alpha_{Y,T}$ as for $\alpha_{Y,G}$.[14]

The nominal GNP growth rate is denoted by $g^Y$, where

$$g_t^Y = g_t^y + \pi_t + g_t^y \pi_t$$

---

[13] The latter multiplier includes the time sub-index $t$, because we assume constant values for the elasticities of fiscal revenues to public spending, hence the multiplier will vary over time with the variations in the fiscal revenues to public spending ratio.

[14] Not all the measures on the fiscal revenues side will lead to a reduction of Puerto Ricans' spending. For instance, while the Fiscal Plan plans to replace Act 154 by taxes that would achieve the current revenues over the next decade, if Act 154 was replaced with a tax that is paid by multinationals there would be no associated depressing effect on Puerto Rico's economy. Our conservative range of assumptions for the multiplier of tax revenues on output accounts for the possibility of a less depressing effect of revenues measures relative to public spending measures. It must be noted, however, that there is uncertainty about Act 154 being replaced by a scheme that has no cost on Puerto Ricans. This will depend on Federal policies that are beyond Puerto Rico's reach, which adds a layer of uncertainty to the projections of the effects of the Fiscal Plan. This uncertainty is indeed a matter of major concern. Makoff and Setser (2017) explain that "how Puerto Rico will [Act 154 will eventually be replaced by a set of taxes that maintain current levels of revenue over the next 10 years] is a great mystery: nobody has explained how Puerto Rico will continue to collect the same amount of revenue from the tax-allergic multinational corporations if federal forbearance on credibility lapses." (p.23).

and where $\pi_t$ is the rate of inflation between years $t-1$ and $t$.

The real GNP in period $t$ is given by

$$RGNP_t = RGNP_{t-1}(1 + g_t^y)$$

and the nominal GNP in period $t$ is given by

$$NGNP_t = NGP_{t-1}(1 + g_t^Y)$$

Our choice of parameters for the multipliers $\alpha_{Y,G}$, $\alpha_{Y,T}$, and the elasticity $\varepsilon_{T,G}$ results in 192 combinations of parameters that can be defined as "scenarios". We project real and nominal GNP for each of those 192 scenarios.

## 4. AN ANALYSIS OF THE FISCAL PLAN 2017-2026[15]

In this section, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that has been approved for fiscal years 2017-18 to 2026-27, as it is a crucial element for a computation of Puerto Rico's debt restructuring needs. The Fiscal Plan presented by the Government of Puerto Rico was approved by the Oversight Board on March 13, 2017.

The plan includes a detailed path of policies, including spending and tax policies as well as structural reforms. It offers a projection of the effects of those policies on Puerto Rico's GNP for the ten-year period under a set of assumptions regarding the macroeconomic effects of fiscal policies, the effects of the structural reforms, the migration flows, the growth rate of GNP in absence of changes in fiscal policy, and the inflation rate.

On the demand side, the program is characterized by fiscal contractions over the entire decade but mainly concentrated in years 2018 and 2019. Regarding the structural reforms, the plan features four packages that are classified as (i) improve the ease of business activity, (ii) improve capital efficiency, (iii) energy reform, and (iv) promoting economic development. The concrete measures include (textually reproduced from the approved Fiscal Plan, p. 23):

- Institute public policy measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand.

---

[15] For a non-technical summary of the findings presented in this section, see Guzman and Stiglitz (2017).

- Change welfare and labor incentives to encourage greater sector participation,  thus increasing labor supply.

- Centralize, streamline, and modernize and expedite permitting processes; increase business friendly environmental and economic growth.

- Lower marginal tax rates and broaden the tax base; simplify and optimize the existing tax code to achieve gains in efficiency, ease of doing business and reducing tax evasion.

- Reduce unnecessary regulatory burdens to reduce the drag of government on the private sector.

- Augmenting competitiveness by investing in critical infrastructure and quality of public services in roads, ports, telecommunications, water and waste, knowledge services, and other strategically important sectors.[16]

- Leverage key public assets through long-term concessions to optimize quality of public infrastructure, services to public and sustainable operations and maintenance.

- Implement management system to boost development of critical projects through expedited processes.

- Leverage and facilitate expedited private sector investments in modern, cost- efficient, and environmentally compliant energy infrastructure; reform PREPA operations and services to clients; and allow for greater competition in energy generation.

- Promote productivity growth, attract FDI & incentivize investments in technology through collaboration with the private sector.

- Externalize the overseeing of marketing efforts & continuity under a single brand and as a unified front representing all of Puerto Rico's tourism components.

Table 2, reproduced from the Fiscal Plan (p.10), summarizes the fiscal measures and the projections for the growth rate of nominal GNP.

---

[16] Public investments do not only affect supply formation but also have demand multiplier effects.

Table 2

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **($MM)** | | | | | | | | | | | |
| *PR Nominal GNP Growth* | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% | |
| Revenues before Measures [1] | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Noninterest Exp. before Measures [1] | ($17,872) | ($18,981) | ($19,233) | ($19,512) | ($19,950) | ($20,477) | ($20,884) | ($21,310) | ($21,973) | ($22,316) | ($202,507) |
| **Cash flows pre-Measures** | $1,080 | ($1,470) | ($2,826) | ($3,077) | ($3,456) | ($3,886) | ($4,139) | ($4,357) | ($4,769) | ($4,807) | ($31,708) |
| **Measures** | | | | | | | | | | | |
| Revenue measures | – | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897.1 |
| Expense measures | – | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683.3 |
| Net impact of measures | – | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash flows post-Measures, before Debt Service** | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

Source: Fiscal Plan 2017-2026

The plan assumes a constant annual population growth rate of -0.2% for the entire period and an evolution of the inflation rate as described in Table 3.

Table 3

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| PR Annual Inflation Rate (%) | -0.2 | 1.2 | 1.0 | 1.0 | 1.1 | 1.3 | 1.5 | 1.5 | 1.6 | 1.6 |

Source: Fiscal Plan 2017-2026

As publicly reported, the plan assumes that the multiplier associated with fiscal contractions will be 1.34, which means that every dollar of contraction in the primary surplus will be associated with a fall in GNP of 1.34 dollars. The Fiscal Plan assumes baseline real GNP growth rates for the decade as described in Table 4.[17]

---

[17] These assumptions were made by the Fiscal Board and accepted by Puerto Rico's government.

Table 4

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Baseline Real GNP Growth (%) | -2.4 | -1.31 | -1.39 | -1.44 | -1.47 | -1.49 | -1.50 | -1.51 | -1.52 | -1.53 |

Source: Fiscal Plan 2017-2026

The plan also assumes that the effects of the structural reforms will kick in by 2022 and will make a contribution to real GNP growth as described in Table 5.

Table 5

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Impact of structural reforms on real GNP growth (%) | 0 | 0 | 0 | 0 | 0 | 0.5 | 1 | 1.5 | 2 | 2.5 |

Source: Fiscal Plan 2017-2026

CRITIQUES

Our analysis of the fiscal plan detects two core flaws in its design:

(I) The plan is based on assumptions that are not sensible, thus it fails to appropriately recognize the magnitude of the destabilizing dynamics that it would create.

(II) The plan falls short on presenting a debt restructuring and sustainability analysis. Specifically, instead it simply specifies what is the amount that must be repaid to creditors during the next decade, without being explicit about the longer-term obligations that the island will face and their sustainability.

We discuss each of these in turn. Specifically:

(i)     The values of fiscal multipliers used for the GNP projections are unjustifiably optimistic: they assume that the fiscal contractions scheduled in the Fiscal Plan will be associated with output contractions that fall on the lower bound of the range of estimates provided by the empirical literature.

(ii)     The GNP projections ignore the feedback effects that the fall in economic activity would have on fiscal revenues, leading to an underestimation of the contractionary impact of the proposed fiscal policies.

(iii)    The plan's assumption that structural reforms that affect mostly the formation of aggregate supply will be the driver of economic recovery by as early as 2022 is inconsistent with sound macroeconomic theory, given that Puerto Rico's economy is in a demand-constrained regime, i.e. it is in a situation where there is underutilization of the factors of production of the economy. Any spending-reducing reform will more likely deepen the recession in the short-term.

(iv)     The plan is silent about how a deeper depression would likely intensify migratory outflows.

1.  The values of fiscal multipliers used for the GNP projections are overoptimistic.

The value for the multiplier associated with the fiscal contraction of 1.34 is close to the lower-bound of the estimates corresponding to times of recession, as described in the review of the literature in section 3. That value corresponds to estimates for US regions in recessions,[18] but Puerto Rico is suffering a depression that is deeper than a "normal" recession. And even if the assumption is considered sensible, a robust plan should consider the consequences of deviations from it. It is not only the point estimate what matters, but also the distribution.

2.  The endogenous feedback effects that the fall in economic activity would have on fiscal revenues are not taken into account.

While the assumption on the fiscal multiplier cannot be classified as a wrong assumption – but simply as an overoptimistic one, ignoring the effects that the fall in economic activity would have on tax revenues is a plain mistake. Implicitly, the projections assume that the elasticity of public spending on tax revenues is zero – or else the multiplier associated with the fiscal contraction would have to be lower, but this would contradict what has been said in public. This is not aligned neither with economic theory nor with the empirical evidence described in section 3.

---

[18] The definition of a recession comes from a calibration that is consistent with the duration of recessions according to the NBER business cycle dates since 1946.

3. The plan assumes that the territory will begin to experience a recovery starting in 2022 entirely because of structural reforms that mostly affect the supply side. This assumption goes against sound macroeconomic theory, because Puerto Rico's economy is a demand-constrained regime.

In a supply-constrained regime, structural reforms that remove obstacles to supply formation will likely have expansionary effects. But Puerto Rico's economy is in a demand-constrained regime. Thus, the assumption that supply-side reforms will be the driver of economic recovery is not well-founded. On the contrary, any spending-reducing reform as cuts in pensions will more likely deepen the recession in the short-term.

In summary, the entire reasoning of the fiscal plan for how Puerto Rico will recover relies on an assumption that is not aligned with sound economic theory. Puerto Rico will not manage to recover if it does not implement policies that push aggregate demand while the economy is in a demand-constrained regime.

4. The assumption on migration flows assume that migration pressures will not intensify with the projected contraction in economic activity.

Puerto Rico's population has declined from approximately 3.8 million in 2000 to a little more than 3.4 million in 2016. Between 2010 and 2016, the annual rate of population contraction exceeded 1%, and reached 1.8% in 2016. A deeper recession – as anticipated by the Board's plan – will further decrease opportunities in the island, fueling more migration to the mainland. And yet the plan assumes that the migration flows will taper off, with the population declining by only 0.2% per year over the 2017-2026 period. This is an unrealistic assumption.[19]

An intensification of migration outflows would accelerate the fall in fiscal revenues. Then, to achieve the revenue targets stated in the Fiscal Plan, the adjustments would need to be larger – but that would trigger

---

[19] Makoff and Setser (2017) provide a detailed analysis of Puerto Rico's migration dynamics in its recent history and argue that the Fiscal Plan's assumptions on migration over the next decade are off. In their words: "Something is off here. How does the economy drop by 12 percent over 10 years and the population by only two percent? How does the rate of net migration improve from its current run rate of -2 percent a year to only -0.2 percent a year at the same time that the island is being hit by a significant cut in jobs and services? Absent a miraculous shift in household sentiment, Puerto Rico's population will certainly fall by more than the plan projects." (Makoff and Setser (2017), p.16.). They also observe that the Puerto Rico Institute of Statistics reported that the new Census Bureau outmigration projection for the next 10 years is 1.4 percent annually.

further contractions in economic activity and would increase the per capita burden for those remaining in the island, leading to a destabilizing dynamic that the Fiscal Plan fails to recognize.

5.   The plan does not present a proposal for debt restructuring.

The plan simply states what is the amount that must be repaid to creditors during the next decade, but it falls short on the specifics of a restructuring plan as, for instance, on the amount of relief that the territory should obtain to restore debt sustainability. This is a mistake, because the possibilities that the territory will face in terms of fiscal policies are contingent on the restructuring it achieves. The plan should first specify a restructuring proposal, and craft a fiscal plan that is consistent with that restructuring proposal.

There is a sixth issue that deserves attention. The annual growth rate of nominal and real GNP are assumed to reach 2.6% and 1% respectively in 2026. It is not specified whether these assumptions correspond to a steady state.[20]

Ultimately, the exercise of projecting the effects of public policies must take into account that there is uncertainty about the values that the relevant parameters and shocks will take. The sensitivity analysis, where changes in the assumptions are analyzed, must be part of the projections analysis. We next engage into such an exercise.

PROJECTIONS: SENSITIVITY ANALYSIS

In order to address the limitations of the Fiscal Plan forecasts, we conduct a sensitivity analysis of the expected macroeconomic dynamics implied by Puerto Rico's Fiscal Plan. This allows us to construct more realistic scenarios of Puerto Rico's debt restructuring needs. We project the trajectories under

---

[20] An additional concern, not analyzed in this study but in Makoff and Setser (2017), is that the baseline trend of Puerto Rico's economy may be worse than projected by the Fiscal Plan. They point out that while the Fiscal Plan takes a continued fall of the economy on its historic trend (about 1.5 percent a year since 2005) as the baseline scenario, this is a controversial assumption, "because the territory's historic downward trajectory likely would have been much worse if it were not for the billions of dollars injected into the economy through emergency federal transfers (Obamacare, the American Recovery Act stimulus and the backdoor transfer provided by the federal tax treatment of Act 154), the commonwealth's aggressive debt financings (primarily general obligation, "GO," and sales tax backed, "COFINA," bonds), and the depletion of Puerto Rico's public pension plan assets to pay benefits." (p.16).

alternative assumptions for fiscal multipliers described in Section 3X above, maintaining the same assumptions of the Fiscal Plan for the trajectory of baseline real GNP growth and the annual inflation rates until 2026. We maintain those assumptions because our initial goal is to assess how the GNP projections react to changes in the values of the fiscal multipliers. We assume that the component of the fiscal primary balance that corresponds to the line "Measures" in Table 2 is the unanticipated component of the fiscal policy, to which the multipliers apply – the Fiscal Plan assumes the same.

Our choice of parameters for the multipliers $\alpha_{Y,G}$, $\alpha_{Y,T}$, and the elasticity $\varepsilon_{T,G}$ results in 192 combinations of parameters that can be defined as "scenarios". We project real and nominal GNP for each of those 192 scenarios. Figures 1 and 2 show the range of our projections maintaining the Fiscal Plan's assumptions on the effects of structural reforms on GNP and the Fiscal Plan's projections. Figures 3 and 4 repeat the comparison under the assumption that the Fiscal Plan's structural reforms have no effect on GNP.

Figures 1 and 2 show the range of our projections under the maintaining the Fiscal Plan's assumptions on the effects of structural reforms on GNP and the Fiscal Plan's projections. Figures 3 and 4 repeat the comparison under the assumption that the Fiscal Plan's structural reforms have no effect on GNP.

Figure 1

(assuming the Fiscal Plan's assumption on structural reforms hold)



Figure 2

(assuming the Fiscal Plan's assumption on structural reforms hold)



Figure 3

(assuming structural reforms have no effect on GNP)



Figure 4

(assuming structural reforms have no effect on GNP)



Our projections strongly suggest that the Fiscal Plan's projections are overoptimistic. They lie on the most optimistic bound within the range of assumptions on the values of multipliers that are aligned with the empirical evidence. The magnitude of the differences between our range of projections and the projections of the Fiscal Plan is noticeably larger if we dismiss the presumably positive effects that the structural reforms will have on GNP.

And even under those optimistic assumptions, the plan falls into an "austerity trap": the target for primary surpluses are of a magnitude that lead to a decrease in GNP over a decade that is larger than the reduction in the stock of debt, leading to an increase in the debt to GNP ratio by 2026. If there was no reduction in the debt principal, and if missed payments either of interest or principal were capitalized at zero interest rate, the total public debt to GNP ratio would rise from 1.09 in 2016 to 1.41 in 2026 in the scenario projected by the Fiscal Plan.

And as figures 5a-5b and 6a-6b show, the magnitude of the austerity trap will likely be larger, as the projected debt to GNP ratio for 2026 is even larger in the large majority of the postulated scenarios.

Figure 5a

(assuming the Fiscal Plan's assumption on structural reforms hold)

Debt included in Fiscal Plan to GNP

Figure 5b

(assuming structural reforms have no effect on GNP)

Debt Included in the Fiscal Plan to GNP



Figure 6a

(assuming the Fiscal Plan's assumption on structural reforms hold)

Total Public Debt to GNP (net of Children's Trust and HFO)



Figure 6b

(assuming structural reforms have no effect on GNP)

Total Public Debt to GNP (net of Children's Trust and HFO)



True, the lower-bound of our projections corresponds to projections that may be too pessimistic. Prospects should be certainly better if there is a restructuring that restores sustainability, as the baseline growth rate of GNP would probably be larger if the debt position of the territory is perceived as sustainable by market participants. But our projections call the attention on the dramatic consequences that the implementation of the Fiscal Plan could have for Puerto Rico's economy. And our projections still ignore the larger effects that the fall of economic activity could have on migration outflows.

## 5.  A COMPUTATION OF PUERTO RICO'S DEBT RELIEF NEEDS

In this section, we perform a Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute Puerto Rico's restructuring needs. The analysis includes a computation of the amount of debt relief that is required in order to restore Puerto Rico's public sector debt sustainability. More specifically, we compute the reduction in the value of Puerto Rico's public debt that would make full repayment of the restructured debt feasible with high probability, being consistent with the Fiscal Plan assumptions that the country will achieve a real GNP growth rate of 1 percent in 2026, and that will settle on that rate as a steady state.

Our DSA takes the premise that the Fiscal Plan will be respected. We assume that any discrepancy between the Fiscal Plan's GNP projections and realizations will be addressed in a way that respects the schedule of debt payments – or equivalently, the schedule of cash after measures available for debt service – established in the Fiscal Plan. Therefore, each projection will lead to the same face value of debt in 2026, because by construction we force the economy to do whatever it takes to reach the targets of fiscal revenues included in the Fiscal Plan. But each scenario will be associated with different GNP trajectories, as shown in figures 1 to 4. Thus, for each of the 192 scenarios that are defined by the assumed range of fiscal multipliers, we obtain a different value of the debt to GNP ratio for 2026, $d^i$, as depicted in figures 5a-5b and 6a-6b.

For each of those 192 projected debt to GDP ratios, we need to respond the following questions:

(a) What path of primary fiscal surpluses would the economy necessitate since 2027 to satisfy the government's IBC?

(b) Is that path feasible?

(c) If it is not, what is the size of the debt write-down that would make the satisfaction of the government's IBC feasible with high probability?

Responding the questions above requires to take a stance on the functional form that governs the relationship between fiscal policies and GNP growth. We use exactly the same functional form that is used for the projections of the Fiscal Plan.

To perform the computations for responding (a) to (c), we make the following additional assumptions:

*Assumption i.* We take the value of the fiscal surplus to GNP ratio of 2026 as the new structural fiscal balance for year 2027 – the first year for which there is no information from the Fiscal Plan. This is an optimistic assumption, because it assumes that the increases in the fiscal surpluses achieved during 2017-2026 will become structural. If anything, this assumption leads to an underestimation of Puerto Rico's debt relief needs –consistently with our strategy of making assumptions in each step of the analysis that imply that our computations of the debt relief needs must be interpreted as lower bounds.

36/64

*Assumption ii*. With the same goal of making our computations a representation of lower-bounds, we assume that the interest payments that are missed during the period 2017-2026 are capitalized after being rolled-over to 2027 at zero interest rate. We refer to this assumption as the no-restructuring assumption.

*Assumption iii*. We assume that by 2027 the economy will have already settled on a trend of real GNP growth rate of 1 percent, as predicted by the government. We also assume that the inflation rate will settle on a trend of 1.6 percent per year since 2026 – which is the inflation rate the Fiscal Plan assumes for 2026. As discussed above, this is a controversial assumption. If the country does not implement policies that push aggregate demand, this target will likely not be met. Again, the goal is to err on the underestimation side of relief needs rather than on the overestimation side.

*Assumption iv*. Finally, we assume that the nominal interest rate stabilizes at 6 percent after the restructuring, which corresponds to a scenario of a risk free nominal interest rate of 3 percent, recovery of sustainability with probability 95 percent, and recovery rate of 46 percent in case of default. The online appendix presents the sensitivity analysis regarding this assumption.

THE DEBT STABILIZING PRIMARY FISCAL SURPLUS TO GNP RATIO

We search for the value of the debt stabilizing primary fiscal surplus to GNP ratio in a steady state situation. We denote this variable in scenario $i$ as $s^i$, and it is defined as

$$s^i = d^i \frac{(R - g^B)}{1 + g^B}$$

where $g^B$ is the steady state nominal GNP growth, and, as defined before, $d^i$ is the debt to GNP ratio in scenario $i$, and $R$ is the nominal interest rate that corresponds to the situation where debt has been stabilized. The debt stabilizing primary fiscal surplus denotes the value of the primary fiscal surplus as a ratio of GNP that must be achieved to satisfy the government's intertemporal budget constraint. But that value may or may not be feasible, i.e. it may or may not be achievable once we take into account the endogenous feedback effects between fiscal policies and economic performance.

Let $s_{2026}^i$ be the structural primary fiscal balance by the end of 2026 in scenario $i$, i.e. the new primary fiscal balance in absence of measures by the time the Fiscal Plan ends. From 2027 onwards, we do not take a stance on what component of the primary balance (revenues or spending) will have to be adjusted in order to achieve the target of primary surplus defined for each scenario. Therefore, we assume the same multipliers for tax revenues and public spending for each combination $i$: $\alpha_{G,Y}^i = \alpha_{T,Y}^i = \beta^i$. We redefine the function that determines the effects of fiscal contractions on real GNP growth as

$$g_t^{y,i} = g_t^b - \beta^i \Delta s_t^i \qquad\qquad\qquad (1)$$

which, as stated, is the same function used for the Fiscal Plan projections. We assume $\beta^i = \alpha_{G,Y}^i$ for each $i$.[21]

Computing $s^i$ requires a series of iterations until the economy stabilizes on a path of constant nominal GNP growth and stable debt-to-GNP ratio.

The iteration process works as follows:

Step 1: Under the no-restructuring assumption, we compute $d^i$ for each $i$ for 2026.

Step 2: For each $d_{2026}^i$, we compute $s^i$. If $s^i \neq s_{2026}$, the economy will not be in a steady state situation, and then we need to compute $g_{2027}^{i,Y}$, where $g_{2027}^{i,Y}$ is the nominal growth rate of GNP in scenario $i$. This will result in new $d_{2027}^i$ that will differ from $d_{2026}^i$.

Step 3: For the new value of $d_{2027}^i$, we compute again the new $s^i$. If $s^i \neq s_{2027}$, then $g_{2027}^{i,Y} \neq g_{2027}^B$, and we need to compute $d_{2028}^i$.

Step 4 to N: This iteration will continue until $s_t^i = s_{t-1}^i$, with $g_{t-1}^{i,Y} = g_t^{i,Y} = g^B$. At that moment (step N), we get a constant $s^i$ that satisfies the government's IBC.

Results: The debt stabilizing primary fiscal surpluses to GNP and the evolution of debt to GNP ratios

---

[21] For each public spending to real GNP multiplier, once we take into account the endogenous feedback effects from public spending contractions on tax revenues, we can find a lower associated value of $\beta^i$.

In the absence of restructuring, the debt included in the Fiscal Plan to GNP ratio would have to stabilize at values from 1.04 (when $\alpha_{G,Y} = 1.34$, $\alpha_{G,T} = 0$, $\alpha_{T,Y} = 0$) to 1.45 (when $\alpha_{G,Y} = 3.5$, $\alpha_{G,T} = 0.7$, $\alpha_{T,Y} = -1.34$), and the total public debt (net of Children's Trust and HFO) to GNP ratio would have to stabilize at values from 1.38 to 2.04. The lower bound of 1.04 corresponds to $s = 0.035$, and the upper bound corresponds to $s = 0.074$. Under the Fiscal Plan assumptions, those ratios take values of 1.08 and 1.43 respectively, and in 2026 they take values of 1.04 and 1.36 respectively.

Therefore, in absence of any relief, Puerto Rico should achieve primary fiscal surpluses between 3.5% and 7.4% of GNP after the end of current Fiscal Plan, forever. Under the Fiscal Plan's assumptions, the primary surpluses after 2028 should be 3.5% or 4.7% of GNP, forever, depending on whether the relevant debt stock is the one included in the Fiscal Plan or the total public debt net of Children's Trust and HFO. Table 6 summarizes these findings. These results strongly suggest that Puerto Rico's public debt is unsustainable. We will next reinforce this claim arguing that those targets would be unfeasible – they would undermine the functioning of the economy to an extent that would make them simply impossible to achieve.

Table 6: Debt-stabilizing primary fiscal surplus, $R = 0.06$, $g^B = 0.026$

| Scenarios | Measure of debt | Fiscal Plan assumptions on structural reforms | Mean | Minimum | Maximum |
|---|---|---|---|---|---|
| 192 | Total public debt net of Children's Trust and HFO | No | 5.8% | 4.9% | 7.4% |
| 192 | Debt included in Fiscal Plan | No | 4.3% | 3.7% | 5.2% |
| 192 | Total public debt net of Children's Trust and HFO | Yes | 5.3% | 4.6% | 6.7% |
| 192 | Debt included in Fiscal Plan | Yes | 3.9% | 3.5% | 4.7% |

### ON THE FEASIBLE PRIMARY FISCAL BALANCE PATHS

The functional form (1) used for the Fiscal Plan projections relates the growth rate of GNP to the change in the primary surplus, but it does not relate it to the level of the primary surplus. Then, even if the government is forced to sustain primary surpluses of 7 percent of GNP forever, according to that function that would not affect the performance of the economy in the long term. The only period in which economic activity would be affected would be the one in which the large contraction to achieve the target of 7 percent occurs.

But such premise is of course flawed. The need to maintain massive primary surpluses for a long time would have significant effects on the possibilities of the government to implement development policies. A draconian plan as requiring constant primary surpluses between 4.7 to 7 percent of GNP would entail drastic cuts to spending in items of the public budget as education, health, pensions, and R&D, that would have long term effects. The targets would be inconsistent with the baseline assumption of convergence to a real GNP growth rate of 1%.

The IMF DSA framework and its fan charts approach provide a helpful basis for complementing our analysis. IMF (2011) recognizes that sustained large surpluses are not common, and incorporates this constraint in its debt sustainability analyses; it reports that out of a sample of 87 countries, only 16 countries (less than 20 percent) sustained surpluses exceeding 5 percent of GDP for five years or longer. Some episodes of sustained large surpluses were related to specific conditions that are not easily applicable to most countries. Out of the 16 countries that recorded episodes of sustained surpluses, five had this performance in connection to exogenous factors—large increases in revenues related to natural resources (Botswana, Chile, Egypt, and Uzbekistan) or transfers arising from customs union membership (Lesotho). Episodes of sustained large surpluses in the absence of facilitating exogenous factors have been limited to 11 countries (13 percent of the sample). And a few of these countries ran large primary surpluses in the absence of a large debt burden (Denmark, New Zealand, Turkey). The ones that sustained sustained surpluses exceeding 5 percent of GDP for five years or longer at times where debt levels were above 60 percent of GDP were Belgium, Canada, Dominica, Israel, Jamaica, Panama, Seychelles, and Singapore. And no country targeted those values forever.

Besides, there is no evidence that supports the premise that targeting those high primary fiscal surpluses has been associated with recoveries in situations of distress. Indeed, four of those eight economies faced situations that are significantly different from the one of debt distress Puerto Rico is facing (Belgium, Canada, Israel, and Singapore were in situations where austerity could ensure the sustainability of the public sector without triggering a self-defeating macroeconomic process). Dominica combined a debt restructuring in 2004 with an average primary fiscal surplus of 3.9 percent of GDP for the period 2004-2008 and an average fiscal surplus of 1.19 during the decade that followed the restructuring; Jamaica has been keeping sizable primary fiscal surpluses since its last debt restructuring in 1990, on average of 7.48 of GDP, and the economy has suffered the consequences: the unemployment rate has kept at two digits for almost the entire period, and the government's debt to GDP ratio is at about

the same levels now as in 1990, above 120 per cent; Panama combined two debt restructuring episodes in 1994 and 1996 with an average primary fiscal surplus of 1.08 percent of GDP in the decade that followed the latter restructuring; and Seychelles combined a debt restructuring in 2010 with an average primary fiscal surplus of 5.98 percent of GDP during the period 2010-2015 – in a context of significant increases in the prices of its exports. And the most important, the primary surplus is an endogenous outcome; if a country recovers due to the implementation of an appropriate mix of policies that include a debt restructuring, obtaining primary surpluses becomes a more likely outcome.

In summary, while there is no evidence that suggests that a country in a situation of debt distress, in a demand-constrained regime, can do well by avoiding a restructuring through the achievement of very large primary fiscal surpluses, there is evidence that tells that long periods of large primary fiscal surpluses are rare, and that a restructuring has been almost always ultimately unavoidable under those circumstances.

We conclude that if Puerto Rico's government need to collect primary surpluses in the order of 3.5% to 7.4% of GNP after 2027 forever, this means that Puerto Rico's debt is unsustainable, and that it needs to be restructured to a level where the required path of primary fiscal surpluses becomes feasible.

### COMPUTING THE NECESSARY DEBT RELIEF TO RESTORE DEBT SUSTAINABILITY

The debt position that can be deemed as sustainable with high probability depends on the path of fiscal policies that are considered feasible.

To compute the necessary relief to restore sustainability, we first compute the stabilizing debt to GNP ratio for values of $s$ from the value that corresponds to each of our projections for 2026, $s_{2026}$ (the range of these values goes from 0.012 to 0.016) to a maximum of 0.035. Next, we calculate the necessary relief for restoring sustainability as the difference between the debt to GNP ratio in scenario $i$ in 2026 and the stabilizing debt to GNP ratio for $s = \{s_{2026}, 0.015, 0.02, 0.025, 0.03, 0.035\}$.

We perform these computations for two groups of scenarios:

(i)    First, we assume that the Fiscal Plan's assumptions on the effects of the structural reforms on GNP hold.

(ii)        Second, we assume that the structural reforms stated in the Fiscal Plan have no effects on
GNP growth during the period 2017-2026.

The results are summarized in figures 7 to 12 and in tables 7 to 12. The results correspond to the
necessary face value reduction, assuming that there will be a full write-off the debt interest whose
payment has not been scheduled in the Fiscal Plan, that should have been achieved in 2017 before
Hurricane Maria through a restructuring process, assuming the debt service scheduled in the Fiscal Plan
will be respected.

Figure 7a: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural
reforms on GNP growth as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan



Figure 7b: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth in billions of $ – Relevant debt: Debt included in Fiscal Plan



Table 7: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 61.6 | 69.8 | 63.0 |
| 0.015 | 192 | 42.4 | 54.7 | 44.4 |
| 0.02 | 192 | 23.2 | 39.7 | 25.9 |
| 0.025 | 192 | 4.0 | 24.6 | 7.4 |
| 0.03 | 192 | 0.0 | 9.5 | 0.0 |
| 0.035 | 192 | 0.0 | 0.0 | 0.0 |

Figure 8a: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO



Figure 8b: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, in billions of $ – Relevant debt: Total Public Debt Net of Children's Trust and HFO



Table 8: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 72.4 | 78.3 | 73.4 |
| 0.015 | 192 | 58.6 | 67.5 | 60.1 |
| 0.02 | 192 | 44.8 | 56.6 | 46.8 |
| 0.025 | 192 | 31.1 | 45.8 | 33.5 |
| 0.03 | 192 | 17.3 | 35.0 | 20.2 |
| 0.035 | 192 | 3.5 | 24.1 | 6.9 |

Figure 9a: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan



Figure 9b: Necessary face value reduction under the assumption that structural reforms have no effects
on GNP growth, in billions of $ – Relevant debt: Debt included in Fiscal Plan



Table 9: Necessary face value reduction under the assumption that structural reforms have no effects
on GNP growth, as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 64.4 | 72.0 | 65.7 |
| 0.015 | 192 | 46.6 | 58.1 | 48.5 |
| 0.02 | 192 | 28.8 | 44.1 | 31.3 |
| 0.025 | 192 | 11.0 | 30.1 | 14.1 |
| 0.03 | 192 | 0.0 | 16.1 | 0.0 |
| 0.035 | 192 | 0.0 | 2.2 | 0.0 |

Figure 10a: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO



Figure 10b: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, in billions of $ – Relevant debt: Total Public Debt Net of Children's Trust and HFO



Table 10: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 74.4 | 79.9 | 75.3 |
| 0.015 | 192 | 61.6 | 69.9 | 63.0 |
| 0.02 | 192 | 48.9 | 59.8 | 50.7 |
| 0.025 | 192 | 36.1 | 49.8 | 38.3 |
| 0.03 | 192 | 23.3 | 39.8 | 26.0 |
| 0.035 | 192 | 10.5 | 29.7 | 13.6 |

Figure 11: Sustainable debt under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, in billions of $



Table 11: Sustainable debt under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, in billions of $

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Sustainable Debt (Billions of USD) | | |
|---|---|---|---|---|
| | | Minimun | Maximun | Under government multiplier assumptions |
| s2026 | 192 | 15.7 | 19.9 | 19.2 |
| 0.015 | 192 | 23.5 | 29.9 | 28.8 |
| 0.02 | 192 | 31.3 | 39.9 | 38.5 |
| 0.025 | 192 | 39.2 | 49.8 | 48.1 |
| 0.03 | 192 | 47.0 | 59.8 | 57.7 |
| 0.035 | 192 | 54.8 | 69.8 | 67.3 |

Figure 12: Sustainable debt under the assumption that structural reforms have no effects on GNP growth, in billions of $



Table 12: Sustainable debt under the assumption that structural reforms have no effects on GNP growth, in billions of $

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Sustainable Debt (Billions of USD) | | |
|---|---|---|---|---|
| | | Minimun | Maximun | Under government multiplier assumptions |
| s2026 | 192 | 14.5 | 18.5 | 17.8 |
| 0.015 | 192 | 21.8 | 27.7 | 26.7 |
| 0.02 | 192 | 29.0 | 37.0 | 35.7 |
| 0.025 | 192 | 36.3 | 46.2 | 44.6 |
| 0.03 | 192 | 43.5 | 55.4 | 53.5 |
| 0.035 | 192 | 50.8 | 64.7 | 62.4 |

To reach a conclusion on the necessary relief needs for Puerto Rico, we need to take a stance on the set of feasible values of $s$. Even under the most optimistic projections the economy will have a lower GNP in 2026 than in 2016, and as was described above, the projected debt to GNP ratio absent a restructuring will be larger. The Fiscal Plan projects the evolution of primary fiscal surplus to GNP ratios that is described in Table 13. Requiring a larger $s$ after 2027 than the values of $s_{2026}$ would not be a sensible stance; the economy is projected to be in worse in shape 2027 than at the moment we perform this analysis, hence being even more ambitious in terms of the fiscal targets would not lead to better outcomes than the ones projected for the next decade. Instead, being overly ambitious with the primary fiscal surplus targets would most likely lead to another lost decade after 2027.

Table 13: Fiscal Plan projections of primary fiscal surpluses to GNP ratio, 2017-2026

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| s | 0.0161 | 0.0107 | 0.0089 | 0.0114 | 0.017 | 0.0145 | 0.0137 | 0.0118 | 0.0112 | 0.0122 |

Source: Fiscal Plan 2017-2026

For a stable primary fiscal surplus after 2027 that takes values between $s_{2026}$ and 1.5 percent of GNP, the necessary debt reduction includes the full cancellation of interest payments not included in the Fiscal Plan plus a face value reduction that under the Fiscal Plan assumptions should be between 44.4 percent and 63 percent if the relevant debt stock is $51.9 billions (table 7, column "Face value reduction under Fiscal Plan multiplier assumptions"), and between 60.1 percent and 73.4 percent if the relevant debt stock is $72.2 billions (table 8, column "Face value reduction under Fiscal Plan multiplier assumptions"). Under a broader range of assumptions that include different values for the fiscal multipliers and under the assumption of no effects of structural reforms on GNP growth, the debt reduction should include the full cancellation of interest payments not included in the Fiscal Plan plus a face value reduction of between 46.6 and 72 percent if the relevant debt stock is $51.9 billions (Table 9, column "Min Face Value Reduction" for $s = 0.015$ and column "Max Face Value Reduction" for $s = s_{2026}$, respectively), or between 61.6 and 79.9 percent if the relevant debt stock is $72.2 billions (Table 10, column "Min Face Value Reduction" for $s = 0.015$ and column "Max Face Value Reduction" for $s = s_{2026}$, respectively). Clearly, Puerto Rico needs substantial relief. But the interpretation of these results must take into account important caveats, to which we next turn our attention.


INTERPRETATION OF OUR RESULTS

Our computations show that in order to restore debt sustainability with high probability the restructuring should deliver a substantial reduction of Puerto Rico's debt. The figures we presented are "macroeconomic" figures that do not establish how the debt write-off should be distributed across the different bond series. And these are conservative estimates due to a number of reasons.

First, we have kept throughout all the computations the Fiscal Plan assumption that annual real GNP growth will reach 1 percent in 2027, and we assume that this will correspond to a new steady state. But if the Fiscal Plan 2017-2026 is respected, for the reasons discussed in this study, getting to that state will be an unlikely outcome. If no expansionary aggregate demand policies are implemented to escape out of the current depression, the appropriate relief to restore sustainability will have to be the entire current stock of debt. Puerto Rico has no capacity to repay today, and if it does not recover, it will not improve its repayment capacity in the future either.

Second, as we described above, in every step of our analysis we made conservative assumptions as to err on the "too little" side of debt relief.

A final caveat is that we do not study how the write-off will be distributed, and this is an issue that will have macroeconomic effects. The expansionary effects of the restructuring will be increasing in the fraction of the write-off that falls on external bondholders, rather than on domestic bondholders, as far as the marginal propensity to spend in Puerto Rico's economy is lower for external than for domestic bondholders. The evidence supports this basic theoretical insight, as it shows that the macroeconomic costs of a default are increasing in the proportion of debt held by domestic residents (see Alessandro, 2011; Guembel and Sussman, 2014) and are highly related to the transmission through the balance sheets of domestic banks (cf. Gennaioli, Martin, and Rossi, 2014). This is matter that must receive policy attention.[22]

## GNP LINKED BONDS

A non-contingent debt relief is always exposed to the risk that ex-post the relief ends being "too little" – harming the recovery – or "too much" – implying that creditors could have got more without undermining sustainability. To deal with the uncertainty that is present at the time of the restructuring, the proposal could include GNP growth linked bonds, that relate the debt payments to the evolution of the territory's GNP. These instruments would improve sustainability, as the payments would be related to the payment capacity of the debtor; and they would also align the interests of creditors and the debtor, as both would benefit from a larger recovery. The economic rationale has been largely developed in the literature (see Borensztein and Mauro 2004, for a review, and Barr, Bush, and Pienkowski 2014, for a more recent contribution, as well as Robert Shiller's related proposal to create "macro markets" for GDP-linked securities (Shiller, 1993, 2003)).

Despite their virtues, the implementation of this type of contingent debt has not been straightforward. In practice, securities with a return linked to economic growth have been issued only in

---

[22] However, there are important binding constraints for designing a selective default strategy that requires targeting the bondholdings of foreigners, as these bonds are actively traded in secondary markets (see Broner, Martin, and Ventura, 2010; Broner and Ventura, 2011). Besides, the transfer from domestic bondholders to the state that the restructuring would entail will still be expansionary in the short run if the government uses the funds for policies that have a larger macroeconomic expansionary effect. And the larger space for public policies can also have positive long-term consequences.

the context of debt restructurings, including those in Bulgaria (1994), Argentina (2005)[23], Greece (2012), and Ukraine (2015). To date, no advanced economy has issued growth-indexed bonds in normal times. But the support in policy spheres has been increasing (Blanchard, Mauro, and Acalin, 2016).

Puerto Rico's restructuring should try to adopt them. Our computations provide insights for their design, because they show what would be the necessary relief as a function of the realizations of GNP. However, this will not be a trivial task. If markets do not give value to them, it would not be sensible for the debtor to just give them away for free. The value of this instrument will of course be contingent on their market value, which in turn will depend on how well understood they are.

## 6. THE NEED FOR A NEW DEVELOPMENT STRATEGY

The debt restructuring is a necessary but not a sufficient condition to drive Puerto Rico's economy onto a path of sustained and dynamic economic growth. Puerto Rico will need to do more than just the restructuring; it will also need to replace a structure of production that failed to deliver the productivity growth and the job opportunities that the territory's development goals require by another one that can lead to a superior trajectory of long-term growth with social inclusion.

### WHEN DEBT RESTRUCTURING IS SUFFICIENT TO RESTORE A DYNAMIC PATH OF ECONOMIC GROWTH

A debt restructuring happens to be sufficient to resolve the problems of a distressed economy only under very special circumstances. To illustrate the difference between a situation when the restructuring is a sufficient condition versus the case in which it is only a necessary condition, let's compare two different debt dynamics of two hypothetical islands that end up in situations of debt distress.

In one island, that we will call Green Island, real output was growing at 2 percent per year, and everyone – the islanders and the creditors – was thinking that that output growth rate corresponded to a steady state situation. In that island the debt-to-output ratio had stabilized. But suddenly, the island is hit

---

[23] Argentina implemented a variant of known as GDP warrants. But the results of the experiment were ambiguous. On the one hand, the warrants paid off extremely well, benefitting the creditors who kept them in their portfolios. But on the other hand, they were not well received by markets at the time of issuance. This may have had to do with their complex design, that made pricing difficult: the trigger for the payment was a threshold growth rate of GDP, but the formula for the amount of payments depended on the difference between the actual level of GDP and a threshold level (see Cruces and Samples (2016), Guzman (2016), and Benford, Best, and Joy (2016) for details).

by an external and rare large shock, like a tsunami, that destroys its infrastructure. The destruction of the infrastructure reduces the production capacity, increasing the debt-to-output ratio. Now Green Island owes a larger share of its output, and absent public policies that help rebuilding the production capacity, the island will be permanently poorer. The island's public sector could have dealt with this situation if the shock was smaller, redefining the public policies' priorities as to rebuild the island's infrastructure. But with a shock of this size, it cannot. Creditors understand what is going on, and revise their perceptions of the Green Island's debt sustainability. The borrowing cost increases, and the island has to set aside an even larger share of its output to repay the higher debt interests. The public sector may decide to cut salaries, which depresses the aggregate demand. Some sectors that depend on the domestic demand will face more troubles; aggregate production will decrease even further, creating a debt spiral.

In this context, an appropriate debt restructuring will suffice to resolve the problem. The debt relief will release resources that can be used to rebuild Green Island's infrastructure, taking it back to its pre-shock growth dynamics of annual real output growth of 2 percent. The restructuring makes the effects of the negative shock transitory, while the lack of restructuring would have made them permanent. This is not the situation Puerto Rico is experiencing.


## WHEN DEBT RESTRUCTURING IS ONLY A NECESSARY CONDITION TO RESTORE A DYNAMIC PATH OF ECONOMIC GROWTH

Let's now turn our attention to another island, Brown Island. Brown Island's real output had also been growing at 2 percent per year and there was also a shared perception that the economy had permanently settled on that growth path. The island was borrowing and creditors were lending under terms that reflected that perception. But at some point doubts about Brown Island's growth prospects start to appear.

The doubts get quickly reaffirmed, and social perceptions change drastically: now, the shared view is that the island's structure of production is not as dynamic as previously believed, and cannot deliver a real output growth rate of 2 percent permanently. Growth prospects are significantly revised downwards. The new expected steady state real growth rate is 0 percent. The labor demand and investment fall, output falls, and the burden of debt relative to output increases.

If the revision in expectations is sufficiently large, the island's debt will become unsustainable. Like Green Island, Brown Island will also be in trouble if it does not contain the debt spiral through a restructuring. But unlike the case of Green Island, the debt restructuring will not suffice to bring Brown Island back to a real output growth path of 2 percent. Instead, it will only serve to contain destabilizing dynamics; it will allow the economy's real output to grow at the new steady state of 0 percent, but not at the old perceived steady state of 2 percent.

If Brown Island wants to go back to a more dynamic growth path as one where real output grows at 2 percent per year, it will need to do more than just a debt restructuring: it will need to implement reforms that change the structure of production to one that is indeed more dynamic. It will need a new growth strategy. But absent the restructuring, Brown Island will not have the resources to do the productive policies that the new growth strategy requires.

If in the context of this situation of an unsustainable debt burden Brown Island gets hit by a significant negative external shock, as a hurricane that devastates the basic infrastructure of the island, the resolution of the crisis will require even deeper actions. The island will not only need to change the structure of production, but it will also need to rebuild its basic infrastructure in the first place as to at least maintain its the pre-shock stagnant growth dynamics, or else the economic activity will simply collapse. Such a shock will increase the magnitude of the necessary debt relief to restore sustainability – and a sufficiently large shock could increase the island's needs to an extent to which even a full debt write-off would not suffice for restoring the conditions that would make the recovery feasible. In such a negative scenario, Brown Island's future be conditioned by the amount of external help that it receives in the aftermath of the shock.

## 7. CONCLUSIONS

The most urgent structural reform that Puerto Rico needs is a debt restructuring that provides substantial debt relief. The computation of the size of the restructuring needs requires a careful debt sustainability analysis based on sound economic theory and on assumptions that are aligned with the empirical evidence. The analysis must also be transparent about the methodology and its assumptions. This is precisely the kind of analysis that this study offers.

We made two main contributions. First, our results shed light on the consequences of the Fiscal Plan for the period 2017-2026. Our analysis suggests that the fiscal plan will more likely lead to a 'lost decade' in terms of economic activity and will worsen the sustainability of the debt position. We identified a number of problems with its assumptions, and showed that the fiscal plan's choice of assumptions led to overoptimistic projections – but even the Fiscal Plan's optimistic projections indicate that Puerto Rico's real GNP will be lower by 2026 than today.

If the Fiscal Plan's projections do turn out to be overoptimistic, there will need to be adjustments to the Fiscal Plan over the course of the decade. Our analysis also sheds light on the consequences of the different possible policy reactions to the eventual discrepancies between projections and realizations. Forcing more austerity when the realized fiscal revenues fall short of the projected values would aggravate the depression and worsen debt sustainability.

Second, our analysis informs what are the actual restructuring needs of the territory. If the Fiscal Plan is implemented, its contractionary consequences will basically make the entire debt burden unpayable. The Fiscal Plan assumes that the entire recovery will come from structural reforms that affect the formation of aggregate supply, but that assumption is flawed. Even though our analysis does not deny the importance of supply side reforms in a longer term, we consider that the effectiveness of any supply side reform meant to increase the economy's long-term productivity will depend on how the current macroeconomic crisis is handled. In the current demand-constrained regime, Puerto Rico will not recover if it does not recover the capacity for implementing policies that expand the aggregate demand.

An analyst that believes in the validity of the Fiscal Plan's assumptions would conclude that the necessary reduction of Puerto Rico's public debt should include a full cancellation of interest payments not scheduled in the Fiscal Plan, plus a face value reduction of between 44.4 percent and 73.4 percent of the current stock, where the appropriate range depends on whether the relevant debt stock is $51.9 billions or $72.2 billions. Clearly, the relief should be substantial even under the unrealistic assumptions of the Fiscal Plan. Under a broader range of assumptions that include different values for the fiscal multipliers and that assume that the Fiscal Plan's structural reforms will have no effects on GNP growth during the period 2017-2026, and under the assumption that by maintaining constant primary fiscal surpluses between 1.2 and 1.6 of GNP after 2027 will be consistent with a real GNP steady state growth rate of 1 percent, the debt reduction should be between 46.6 and 79.9 percent of the current stock (again,

the appropriate range includes larger values if the relevant debt stock is $72.2 billions instead of the $51.9 billions included in the Fiscal Plan).

We consider that the appropriate approach for dealing with Puerto Rico's crisis is markedly different than the one that is being pursued. A plan for resolving the crisis must start with the premise that the restructuring proposal and the fiscal plan are interdependent. An appropriate plan would begin by crafting a restructuring proposal that provides substantial relief as implied by our computations. The recovery of the sustainability of the debt position would bring two direct benefits: it would release resources for the implementation of public policies, and it would decrease the uncertainty about Puerto Rico's prospects which in turn would increase the size of the multipliers associated with expansionary fiscal policies. The next element should be the implementation of expansionary fiscal policies in the short run. The moment where Puerto Rico most needs expansionary policies is now. But even if the territory were to make zero payments on its debt, it would still face constraints for running expansionary fiscal policies as it has a primary fiscal deficit. Thus, the implementation of expansionary policies requires something else. That something else should be a clause of lending into arrears or debtor in possession, that makes new creditors senior to old creditors. This would relax borrowing constraints, facilitating access to the credit markets when it is more necessary – and in a context of sustainable debt that would be guaranteed by the deep restructuring.[24]

We also claimed that the restructuring plan should consider the adoption of GNP linked bonds. This would improve sustainability, as the scheduled payments would be aligned with the actual payment capacity of the territory. And it would align the interests of the debtor and its creditors.

The debt restructuring process should not be delayed. Given the uncertainty about the future of Puerto Rico's economy, from the viewpoint of creditors it may pay off to delay the initiation of the restructuring process, to wait and see if the recovery is larger than what is projected, which would decrease the debt relief needs. However, the recovery prospects also depend on the speed with which debt relief is achieved. A delayed resolution of the current unsustainable debt position would add uncertainty about future taxing policies and would thus depress spending in investment, harming the recovery prospects. This endogenous feedback effects from the timing of restructuring to Puerto Rico's performance have

---

[24] It must be noted that a clause of lending into arrears or debtor in possession, while it would certainly benefit the debtor, would not necessarily benefit the existing creditors, who would face a trade-off: the size of the pie to be distributed among all creditors would increase, but their position in the line to get part of that pie would worsen, as they would become junior to the new creditors that lend into arrears.

not been incorporated into the model for projections used in the Fiscal Plan approved by the Board, but should be take into account in the debt policy decisions. We note that the inclusion of GNP linked bonds would also play a positive role for dealing with the uncertainty on the actual payment capacity of Puerto Rico.

Finally, we argued that debt restructuring will be a necessary but not a sufficient condition to drive Puerto Rico to a more dynamic and inclusive growth path. The debt restructuring must be accompanied by other productive policies. The Center for the New Economy is tackling this problem. In March 2017, it launched a Growth Commission that is studying how to restore the dynamism and inclusiveness of Puerto Rico's economy. The Commission is already working on identifying opportunities and innovative strategies to cope with the island's main structural problems with the goal of embarking on a superior path of long term growth.

The approach that is taken for resolving the crisis will affect the lives of hundreds of thousands of Puerto Rican families in the decades to come. The consequences of delaying a resolution to the crisis would be severe. An ineffective approach to deal with it would imply more social suffering for many; it would result in more vulnerability to health issues, more exclusion from the local labor markets, and lower possibilities for the youth for acquiring the education that the 21st century demands for a meaningful inclusion in the global market economy. A more persistent stagnation would also lead to more migration, which would not only take families apart, but would also leave an even larger burden on those who stay in the island. Such an outcome must be avoided. Our study presented a plan for effectively resolving the crisis and avoiding such a perverse social outcome. We hope our findings help those making decisions on behalf of the Puerto Ricans to have a more informed view of what the territory actually needs.

## REFERENCES

Aguiar, Mark and Gita Gopinath (2006). "Defaultable Debt, Interest Rates and the Current Account." Journal of International Economics, 69, 64–83.

Alessandro, Mauro (2011). Three essays on sovereign debt and financial markets. MIT Doctoral Dissertation, Chapter 2.

Arellano, Cristina (2008). "Default Risk and Income Fluctuations in Emerging Economies." American Economic Review, 98(3), 690–712.

Auerbach, Alan, and Yuriy Gorodnichenko (2012a). "Fiscal Multipliers in Recession and Expansion," in Fiscal Policy after the Financial Crisis, edited by Alberto Alesina and Francesco Giavazzi (Chicago: University of Chicago Press).

Auerbach, Alan, and Yuriy Gorodnichenko (2012b). "Measuring the Output Responses to Fiscal Policy," American Economic Journal – Economic Policy, Vol. 4, pp. 1–27.

Auerbach, Alan, and Yuriy Gorodnichenko (2012c). "Measuring the Output Responses to Fiscal Policy," NBER Working Paper No. 16311.

Auerbach, Alan, and Yuriy Gorodnichenko (2012d). "Output Spillovers from Fiscal Policy," NBER Working Paper No. 18578.

Barr, David, Oliver Bush, and Alex Pienkowski (2014). "GDP-linked bonds and sovereign default." In Life After Debt (Joseph Stiglitz and Daniel Heymann, eds.), pp. 246-275. Palgrave Macmillan UK, 2014.

Basualdo, Eduardo, Pablo Manzanelli, Mariano Barrera, Andrés Wainer, and Leandro Bona (2015). "Deuda externa, fuga de capitales y restricción externa. Desde la última dictadura militar hasta la actualidad." CEFIDAR, Documento de Trabajo No. 68, Abril.

Benford, James, Thomas Best, and Mark Joy (2016). "Sovereign GDP-linked bonds." Bank of England, Financial Stability Paper No. 39, September.

Benjamin, David, and Mark L. J. Wright (2009). "Recovery Before Redemption: A Theory of Delays in Sovereign Debt Renegotiations."

Blanchard, Olivier and Daniel Leigh (2013). "Growth Forecast Errors and Fiscal Multipliers", IMF Working Paper, Research Department, WP/13/1.

Blanchard, Olivier, Paolo Mauro, and Julien Acalin (2016). "The Case for Growth-Indexed Bonds in Advanced Economies Today". Peterson Institute for International Economics Policy Brief 16-2.

Blankenburg, Stephanie and Richard Kozul-Wright (2016). "Sovereign Debt Restructurings in the Contemporary Global Economy: The UNCTAD Approach." Yale Journal of International Law.

Bohoslavsky, Juan Pablo (2016) Economic Inequality, Debt Crises and Human Rights, Yale Journal of International Law.

Borensztein, Eduardo, and Paolo Mauro (2004). "The case for GDP-indexed bonds." Economic Policy 19, No. 38: 166-216.

Borensztein, Eduardo, and Ugo Panizza (2009). "The Costs of Sovereign Default", IMF Staff Papers, Volume 56, Issue 4, pp 683–741.

Broner, Fernando, Alberto Martin, and Jaume Ventura (2010). "Sovereign risk and secondary markets." The American Economic Review 100, No. 4: 1523-1555.

Broner, Fernando, and Jaume Ventura (2011). "Globalization and risk sharing." The Review of Economic Studies 78, No. 1: 49-82.

Brooks, Skylar, Martin Guzman, Domenico Lombardi, and Joseph E. Stiglitz (2015). "Identifying and Resolving Inter-Creditor and Debtor-Creditor Equity Issues in Sovereign Debt Restructuring." CIGI Policy Brief No. 53 (January).

Bulow, Jeremy and Kenneth Rogoff (1989). "A Constant Recontracting Model of Sovereign Debt." Journal of Political Economy, 97, 155–178.

Celasun, Oya, Xavier Debrun, and Jonathan Ostry (2006). "Primary Surplus Behavior and Risks to Fiscal Sustainability in Emerging Market Countries: A "Fan-Chart" Approach," International Monetary Fund Working Paper 06/67.

Chodorow-Reich, Gabriel (2017). "Geographic Cross-Sectional Fiscal Spending Multiplier: What Have We Learned?". NBER Working Paper No. 23577, July.

Chodos, Sergio (2016). "From the pari passu discussion to the Illegality of Making Payments", in Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Columbia University Press. New York.

Cole, Harold L. and Patrick Kehoe (1998). "Models of Sovereign Debt: Partial versus General

Reputations." International Economic Review, 39, 55–70.

Consiglio, Andrea, and Stavros A. Zenios (2015). "Risk management optimization for sovereign debt restructuring," Journal of Globalization and Development, 6, 181–213.

Consiglio, Andrea, and Stavros A. Zenios (2017). "Stochastic debt sustainability analysis for sovereigns and the scope for optimization modeling." Optimization and Engineering: 1-22.

Cruces, Juan Jose and Tim Samples (2016). "Settling Sovereign Debt's Trial of the Century." Emory International Law Review.

Cruces, Juan José, and Christoph Trebesch (2013). "Sovereign defaults: the price of haircuts", American Economic Journal: Macroeconomics, 5, 85–117.

Damill, Mario, Roberto Frenkel, and Martín Rapetti (2015). "Macroeconomic Policy in Argentina During 2002–2013." Comparative Economic Studies 57, No. 3: 369-400.

Eaton, Jonathan and Mark Gersovitz (1981). "Debt with Potential Repudiation: Theoretical and Empirical Analysis." Review of Economic Studies, 48, 289–309.

Edwards, Sebastian (2015a). "Sovereign default, debt restructuring, and recovery rates: was the Argentinean 'haircut' excessive?" Open Economies Review, 26, 839–67.

Edwards, Sebastian (2015b). "Argentina's Haircut as an Outlier." VoxEU, March 4.

Fisher, Irving (1933). "The debt-deflation theory of great depressions." Econometrica: Journal of the Econometric Society: 337-357.

Galofré-Vilà, Gregori, Martin McKee, Christopher M. Meissner, and David Stuckler (2016). "The Economic Consequences of the 1953 London Debt Agreement". National Bureau of Economic Research Working Paper No. 22557.

Gelpern, Anna, Ben Heller, and Brad Setser (2016). "Count the Limbs: Designing Robust Aggregation Clauses in Sovereign Bonds." Forthcoming in Too Little, Too Late: The Quest of Resolving Sovereign Debt Crises, Columbia University Press, New York.

Gennaioli, Nicola, Alberto Martin, and Stefano Rossi (2014). "Sovereign default, domestic banks, and financial institutions." The Journal of Finance 69, No. 2: 819-866.

Goldmann, Matthias (2016). "Putting your Faith in Good Faith: A Principled Strategy for Smoother Sovereign Debt Workouts." Yale Journal of International Law.

Guembel, Alexander, and Oren Sussman (2009). "Sovereign debt without default penalties." The Review of Economic Studies 76, No. 4: 1297-1320.

Guzman, Martin (2016a). "Reestructuración de Deuda Soberana en una arquitectura financiera-legal con huecos." Revista Jurídica, Universidad de Puerto Rico.

Guzman, Martin (2016b). "An Analysis of Argentina's 2001 Default Resolution." Centre for International Governance Innovation Paper No. 110.

Guzman, Martin, and Daniel Heymann (2015). "The IMF Debt Sustainability Analysis: Issues and Problems." Journal of Globalization and Development 6, No. 2: 387-404.

Guzman, Martin, and Domenico Lombardi (2017). "Assessing the Appropriate Size of Relief in Sovereign Debt Restructuring." Working Paper.

Guzman, Martin, Jose Antonio Ocampo, and Joseph E. Stiglitz, eds. (2016). Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises. Columbia University Press, New York.

Guzman, Martin, Jose Antonio Ocampo, and Joseph E. Stiglitz (2017). "Real Exchange Rate Policies for Economic Development." NBER Working Paper No. 23868.

Guzman, Martin and Joseph E. Stiglitz (2016a). "Creating a Framework for Sovereign Debt Restructuring that Works". In Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Chapter 1. Columbia University Press.

Guzman, Martin and Joseph E. Stiglitz (2016b) "A soft law mechanism for sovereign debt restructuring based on the UN Principles", International Policy Analysis.

Guzman, Martin and Joseph E. Stiglitz (2017). "PROMESA's Dangerous Premises". Project Syndicate.

Hagan, Sean, Maurice Obstfeld, and Poul Thomsen (2017). "Dealing with Sovereign Debt—The IMF Perspective". https://blogs.imf.org/2017/02/23/dealing-with-sovereign-debt-the-imf-perspective/

Herndon, Thomas, Michael Ash, and Robert Pollin (2014). "Does high public debt consistently stifle economic growth? A critique of Reinhart and Rogoff." Cambridge Journal of Economics 38, No. 2: 257-279.

Howse, Robert (2016). "Towards a Framework for Sovereign Debt Restructuring: What Can Public International Law Contribute?" In Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Columbia University Press. New York.

Ilzetzki, Ethan, Enrique G. Mendoza, and Carlos A. Végh (2013). "How big (small?) are fiscal multipliers?" Journal of Monetary Economics 60, No. 2: 239-254.

IMF (2011). "Modernizing the Framework for Fiscal Policy and Public Debt Sustainability Analysis." Prepared by the Fiscal Affairs Department and the Strategy, Policy, and Review Department. Approved by Carlo Cottarelli and Reza Moghadam.

IMF (2013); "Staff Guidance Note for Public Debt Sustainability Analysis in Market-Access Countries". Approved by Siddharth Tiwari.

Jayadev, Arjun and Mike Konczal (2010). "The Boom not the Slump: The Right Time for Austerity." University of Massachusetts Boston, ScholarWorks at UMass Boston, Economics Faculty Publication Series.

Jayadev, Arjun, and Mike Konczal (2015). "Searching for Expansionary Austerity." University of Massachusetts Boston Working Paper.

Jordà, Òscar, and Alan M. Taylor (2013). "The time for austerity: estimating the average treatment effect of fiscal policy." Working Paper No. 19414. National Bureau of Economic Research.

Keynes, J. M. (1936). The general theory of employment, interest and money. London: Macmillan and Co., limited.

Kindleberger, Charles (1978). Manias, Panics, and crashes; a history of financial crises.

Krugman, Paul (1988). "Market-based debt-reduction schemes." NBER Working Paper No. 2587.

Kolb, Robert (2006). "Principles as sources of international law (with special reference to good faith)." Netherlands International Law Review 53 (1): 1-36.

Krugman, Paul (2010). "Myths of austerity." The New York Times.

Krugman, Paul (2013). "How the Case for Austerity has Crumbled," The New York Review of Books, June 6.

Krugman, Paul (2015). "The Expansionary Austerity Zombie," The Conscience of a Liberal, The New York Times, November 20, 2015.

Koo, R. (2003). Balance sheet recession: Japan's struggle with uncharted economics and its global implications. John Wiley & Sons.

Leijonhufvud, Axel (1981). Information and coordination: essays in macroeconomic theory. Oxford University Press.

Li, Yuefen (2015). "The long march towards an international legal framework for sovereign debt restructuring." Journal of Globalization and Development 6, No. 2: 329-341.

Makoff, Gregory, and Brad Setser (2017). "Puerto Rico Update: PROMESA, Population Trends, Risks to the Fiscal and Economic Plan — and Now Maria". CIGI Paper No. 146.

Minsky, Hyman P. (1977). "The financial instability hypothesis: an interpretation of Keynes and an alternative to "standard" theory." Challenge 20, No. 1: 20-27.

Minsky, Hyman P. (1992). "The financial instability hypothesis."

Nakamura, Emi, and Jon Steinsson (2014). "Fiscal stimulus in a monetary union: Evidence from US regions." The American Economic Review 104, No.3: 753-792.

Ocampo, José Antonio (2016). "A Brief History of Sovereign Debt Resolution, and a Proposal for a Multilateral Instrument". Forthcoming in Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Columbia University Press, New York.

Pitchford, Rohan and Mark L. J. Wright (2012). "Holdouts in Sovereign Debt Restructuring: A Theory of Negotiation in a Weak Contractual Environment." Review of Economic Studies, 79, 812–837.

Raffer, Kunibert (2016). "Debts, Human Rights, and the Rule of Law: Advocating a Fair and Efficient Sovereign Insolvency Model". In Too Little, Too Late: The Quest of Resolving Sovereign Debt Crises, Columbia University Press, New York.

Reinhart, Carmen M., and Christoph Trebesch (2016). "Sovereign debt relief and its aftermath," Journal of the European Economic Association, 14, 215–51.

Sachs, Jeffrey (1989). "The Debt Overhang of Developing Countries." In Debt Stabilization and Development, edited by Guillermo A. Calvo, Ronald Findlay, Pentti Kouri, and Jorge Braga de Macedo. Basil Blackwell.

Sandleris, Guido (2016). "The Costs of Sovereign Default: Theory and Empirical Evidence". Economia, Volume 16, Number 2, Spring 2016, pp. 1-27.

Shiller, Robert J. (1993). Macro Markets: Creating Institutions for Managing Society's Largest Economic Risks. Clarendon Press, Oxford.

Shiller, Robert J. (2003). The New Financial Order: Risk in the 21st Century, Princeton University Press, Princeton, NJ.

Schumacher, Julian, Christoph Trebesch, and Henrik Enderlein (2014). "Sovereign defaults in court."

Stiglitz, Joseph E. (2010). "The dangers of deficit reduction." The Economists' Voice.

Stiglitz, Joseph, and Daniel Heymann, eds (2014). Life after debt: The origins and resolutions of debt crisis. Springer.

Varoufakis, Yanis (2016). "Greek Debt Denial". In Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Guzman, Ocampo, and Stiglitz, eds., Chapter 5. New York: Columbia University Press.



PO Box 9024270, Viejo San Juan, PR 00902-4270
**T: 787.622.1123 | Fax: 787.721.1121**
**www.espaciosabiertos.org**
espaciosabiertos
eapuertorico



**Please choose justice not misery for our people**

eileen llorens    to: swaindprcorresp@nysd.uscourts.gov          01/29/2019 08:29 AM

From:

To:         "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Be in history as a brave juror who imparted justice and helped change history for thousands of
oppressed fellow human beings for the better.
We do not need to be condemned any more.
☀

https://www.villagevoice.com/2018/03/19/a-cartoon-history-of-colonialism-in-puerto-rico/



**INFORMING ASSISTANCE TO OMNIBUS HEARING ON JAN .31**
Javier    to: swaindprcorresp                                01/29/2019 11:11 AM

| From: | ███████████████ |
| To: | swaindprcorresp@nysd.uscourts.gov |
| History: | This message has been forwarded. |

To: Honorable Judge Swain

Attached is a motion being sent by us mail on today's date informing assistance to omnibus hearing on January 31.  I am unable to assist on January 30th. I strongly believe that I have something worth sharing, relevant to the 'invalid debt' issue.

Sincerely,

PARTICIPATION OMINIBUS HEARING.pdf

Javier Mandry

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>          Debtors. | [1]PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>          Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS |

## INFORMATIVE MOTION PURSUANT TO ORDER REGARDING PROCEDURES FOR ATTENDANCE, PARTICIPATION AND OBSERVATION

I, Javier Mandry, hereby files this Informative Motion pursuant to the Order Regarding Procedures for Attendance, Participation and Observation of the January 30-31, 2019, Omnibus Hearing [Dkt. No. 4863].

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780- LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

It has come to my attention that the special committee has questioned the validity of more than $6 billion in debt.  Javier Mandry  intends to appear and present argument at the January 30-31, 2019 omnibus hearing on behalf of himself  in connection with the Urgent Motion of (I) Financial Oversight and Management Board Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Requesting Related Relief [ECF No. 4788]. <u>I can only attend on January 31, 2019.</u>

 Although I agree 100% with the allegations as to why they claim the debt is invalid, I do not agree with the focus the committee has given to seek invalidity of debt. Even though the intention is reasonable, I suggest that it represents a myopic point-of-view of the historical events that represent the fundamental relationship between the United States and Puerto Rico.  In my modest opinion and suggestion, it would be a mistake to argue invalidity of the debt in the void without taking into consideration how the debt became a debt in the first place day would require to modify the relationship that the United States has to its territories by means of the Territory Clause of the US Constitution.  I will argue that the US Supreme Court case Limtiaco v. Camacho  549 U.S. 483 (2007) can be used to convey what it is that occurred in Puerto Rico, and why the question should not be one to determine the validity of lack thereof, but one that should establish the liability for the debt.

This litigant has standing to defend and clarify an issue relating to the Constitution of Puerto Rico and intend to attend and observe the omnibus hearing on behalf of the Ad Hoc Group by video teleconference in a courtroom of the United States District Court for the District of Puerto Rico, 150 Carlos Chardón Street, Federal Building, San Juan, Puerto Rico 00918-1767.

Date: January 28, 2019

By: _____
Javier Mandry