J1UQPRO1

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF PUERTO RICO
 2    ------------------------------x
      IN RE: THE FINANCIAL OVERSIGHT       PROMESA
 3    & MANAGEMENT BOARD FOR PUERTO
      RICO,                                TITLE III
 4
          as representative of
 5                                         17 BK 3283 (LTS)
      THE COMMONWEALTH OF
 6    PUERTO RICO, et al.                  (Jointly Administered)
                         Debtors.
 7    ------------------------------x

 8                                         Omnibus Hearing
                                           January 30, 2019
 9                                         9:15 A.M.

10    Before:

11                   HON. LAURA TAYLOR SWAIN,

12                                         District Judge

13    Also Present:

14                   Hon. Magistrate Judge Judith Gail Dein

15                   APPEARANCES

16    PROSKAUER ROSE LLP
           Attorneys for FOMB Oversight Board
17    BY:  MARGARET DALE
           MAJA ZERJAL
18         LAURA STAFFORD

19    PAUL HASTINGS LLP
           Attorneys for Official Committee of Unsecured Creditors
20                     and its capacity as Commonwealth Agent
      BY:  LUC A. DESPINS
21         NICHOLAS BASSETT

22    ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER LLP
           Attorneys for Ad Hoc Group of General Obligation
23                     Bondholders
      BY:  DONALD BURKE
24         MARK T. STANCIL

25
```

J1UQPRO1

1                          APPEARANCES

2                          (Continued)

3    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for GO Group
4    BY:  ANDREW ROSENBERG

5    DAVIS POLK & WARDWELL LLP
          Attorneys for GO Group
6    BY:  DONALD BERNSTEIN

7    O'MELVENY & MYERS LLP
          Attorneys for Movant AAFAF
8    BY:  PETER FRIEDMAN

9    REED SMITH LLP
          Attorneys for The Bank of New York Mellon
10   BY:  LUKE SIZEMORE

11   QUINN EMANUEL URQUHART & SULLIVAN, LLP
          Attorneys for COFINA Senior Bondholders
12   BY:  SUSHEEL KIRPALANI

13   MILBANK, TWEED, HADLEY & McCLOY LLP
          Attorneys for Ambac Assurance Corp.
14   BY:  ATARA MILLER

15   WILLKIE FARR & GALLAGHER LLP
          Attorneys for Bettina M. Whyte (COFINA Agent)
16   BY:  ANTONIO YANEZ, JR.

17   MORRISON & FOERSTER LLP
          Attorneys for Ad Hoc Group
18   BY:  JAMES M. PECK

19   LATHAM & WATKINS LLP
          Attorneys for Autonomy Capital LP
20   BY:  CHRISTOPHER HARRIS

21   LUSKIN, STERN & EISLER LLP
          Attorneys for FOMB for Puerto Rico
22   BY:  MICHAEL LUSKIN

23

     GODFREY & KAHN, S.C.
24        Attorneys for The Fee Examiner
     BY:  KATHERINE STADLER

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

J1UQPRO1

1

2                                    APPEARANCES
                                    (Continued)

3    CADWALADER, WICKERSHAM & TAFT LLP
          Attorneys for Assured Guaranty Corp. and Assured Municipal
4                                Corp.
     BY:  MARK ELLENBERG
5
     PETER HEIN
6         Pro Se

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  Again, buenos dias.  Good morning.

3  Welcome counsel, parties in interest, members of the public and

4  press here in New York, those observing here and in San Juan,

5  and telephonic participants.

6          I remind you -- this is my usual speech -- consistent

7  with the Court and Judicial Conference policies and the orders

8  that have been issued, there is to be no use of any electronic

9  devices in the courtroom to communicate with any person,

10  source, or outside repository of information, nor to record any

11  part of the proceedings.  So all electronic devices must be

12  turned off unless you're using the particular device to take

13  notes or to refer to notes or documents already loaded on the

14  device.

15          All audible signals, including vibration features,

16  must be turned off, and no recording or re-transmission of the

17  hearing is permitted by any person, including, but not limited

18  to, the parties or the press.  Anyone who is observed or

19  otherwise found to have been texting, emailing, or otherwise

20  communicating with a device from a courtroom during the court

21  proceeding will be subject to sanctions, including, but not

22  limited to, confiscation of the device and denial of future

23  requests to bring devices into the courtroom.

24          And I thank you all for your continued respect of

25  these rules and cooperation with them.

1           Our first order of business is the status report from

2    the Oversight Board.

3           MS. ZERJAL:  Good morning, your Honor.

4           Maja Zerjal of Proskauer Rose on behalf of the

5    Oversight Board for itself and as Title III representative of

6    the debtors.

7           THE COURT:  Good morning.  Ms. Zerjal?

8           MS. ZERJAL:  That's right.

9           THE COURT:  It is good to see you and your colleagues

10   here to speak at the omnibus hearing.

11          MS. ZERJAL:  Thank you very much.

12          Your Honor, I will provide a status update on the

13   plans of adjustment, and I would then like to turn it over to

14   Mr. Luskin to provide a report on the McKinsey investigation.

15          THE COURT:  Very well.

16          MS. ZERJAL:  As your Honor is aware, two weeks ago

17   there was a hearing on the COFINA plan of adjustment and the

18   9019 motion on the COFINA Commonwealth dispute.

19          Since then, as the Court ordered, we filed

20   supplemental briefing on the findings of fact and conclusions

21   of law as well as the proposed order.  We also filed a reply to

22   the amicus brief filed by the Popular Democratic Party of the

23   Senate of Puerto Rico.  This Monday we filed a second amended

24   plan supplement, and the notice of submission provided that the

25   documents submitted therein are going to be executed on the

1    effective date assuming the plan is confirmed.  At the same

2    time we are also continuing with the claims administration

3    process, some of which is addressed in the agenda later today.

4         Moving on to PREPA, we are continuing negotiations on

5    a restructuring support agreement with a significant portion of

6    PREPA uninsured bondholders who represent approximately

7    3.2 billion of the approximately 8.3 billion of PREPA bond

8    debt.  In parallel, the Oversight Board, AAFAF, and the

9    Puerto Rico P3 Authority are working collaboratively to

10   accomplish a transformation of the transmission and

11   distribution systems of PREPA that will include the transfer of

12   operations to a private investor under a long-term concession

13   agreement.

14        We updated the Court on that previously but just to

15   give another update, in October the P3 Authority issued a

16   request for qualifications, and as a result of that, four

17   parties turned out to be qualified.  We understand that in the

18   near term the P3 Authority will issue a request for proposals

19   to those four parties and then diligence will commence.

20        THE COURT:  Is there a particular focus in terms of

21   renewables, fossil fuels, the type of structure, or the

22   different parties representing different options for

23   strategies?

24        MS. ZERJAL:  Your Honor, I would have to check on

25   that, and we're happy to update the Court on that.

1          THE COURT:  I would be grateful for a supplemental

2     filing that everyone can see.

3          MS. ZERJAL:  Absolutely.  Thank you.

4          I was just going to say that we expect at this time

5     that the winning bidder will be selected in the third quarter

6     of 2019.

7          As for the operations and cash position at PREPA, they

8     are stable at this time, and absent any unforeseen

9     circumstances, which we know are a little unpredictable in this

10    case, we do not expect to need any additional post position

11    financing.

12         As for the Commonwealth, there have been significant

13    one-on-one discussions with certain parties, and the board is

14    looking forward to resuming negotiations on a Commonwealth plan

15    of adjustment.  In terms of timing, it would really depend on

16    the progress, or actually lack thereof, in February and March.

17    As we noted to your Honor in December, we may ask the Court to

18    resolve certain legal differences among the parties that would

19    remove at least those obstacles to negotiation and hopefully a

20    resolution.

21         Since then, the Board and the Official Committee of

22    Unsecured Creditors filed an adversarial complaint seeking

23    declarations that the PBA leases are not true leases for

24    purposes of Bankruptcy Code, Section 365(d)(3).

25         The Board and the UCC also filed a claim objection

1   seeking to disallow all claims arising from GO bonds issued on

2   or after March 2012 on the basis that such bonds were issued in

3   violation of the Commonwealth Constitution's debt limit, some

4   of which will be touched upon later today.

5           If it proves beneficial to further negotiations, more

6   issues may be presented to the Court to help further narrow the

7   legal differences among the parties.

8           Your Honor, there are no other material updates.  And

9   unless your Honor has any questions, I'm happy to turn it over

10  to Mr. Luskin.

11          THE COURT:  So when you speak of assessing progress in

12  early February, is that in relation to some anticipated

13  discussions or is that a continuation of the one-on-one and

14  legal analytical challenge activity you've mentioned?

15          MS. ZERJAL:  Your Honor, we're expecting the mediation

16  to continue.  As you know, those conversations are very

17  sensitive.

18          THE COURT:  Yes.

19          MS. ZERJAL:  But we do expect material progress in

20  terms of at least conversations with parties.

21          THE COURT:  Thank you.

22          MS. ZERJAL:  Thank you very much.

23          MR. LUSKIN:  Good morning, your Honor.  Michael

24  Luskin, Luskin stern & Eisler for the Board.

25          THE COURT:  Good morning, Mr. Luskin.

1           MR. LUSKIN:  I will give a very brief report on the

2    status of our investigation and report on the McKinsey matter.

3           The report and investigation are in their final

4    stages.  We've completed all interviews, all document review.

5    There's some follow-up, as you would expect.  A near final

6    draft is being reviewed by the Board this week, and we plan to

7    file it -- we will file our report by February 18.  The plan is

8    to both post it on the Board's website, and with your Honor's

9    consent, we would file an informative motion so it's on the

10   docket and available to parties in interest who've signed onto

11   pacer.

12          THE COURT:  I not only consent.  I request that you do

13   so.

14          MR. LUSKIN:  Thank you, and we're happy to do that.

15          As to what happens after we file it, whether you'll

16   want to engage me in any sense with questions or anything like

17   that, I leave it to the Court.  The plan now is just to file

18   it.  It does contain recommendations for the Board, and I'm

19   sure the Board will be taking further action following the

20   completion of the report.

21          But unless your Honor has questions, that is my

22   report, and I'd request that I can be excused from the rest of

23   the hearing.  I have no part in it.

24          THE COURT:  All right.  Well, I thank you for the

25   report.  I will look forward to seeing what you file in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    mid-February and then, as you say, if you're making

2    recommendations for the Board and depending on the other

3    content of the report, I'd ask that you don't make any

4    immediate plans to be in Antarctica in mid-March when we have

5    the first omni, but we will reach out to you agenda-wise.

6            MR. LUSKIN:  I'm available whenever you need me.

7    Thank you, your Honor.

8            THE COURT:  Thank you, Mr. Luskin.

9            The next agenda items are the examiner-related

10   matters.  And so Ms. Stadler.

11           MS. STADLER:  Good morning, your Honor.

12           THE COURT:  Good morning.

13           MS. STADLER:  Katherine Stadler of Godfrey & Kahn.

14   Brady Williamson, Fee Examiner, is here in the courtroom with

15   me as well.

16           Judge, we filed last week a brief report on our

17   status.  As you know from that report, we have three interim

18   applications that we're recommending for the Court's approval

19   today.  Two of them are for the third interim fee period, and

20   one of them is for the first and second interim fee periods.

21           Those applications have been subject to our process

22   and negotiation with the professionals.  Agreements have been

23   reached on adjustments to compensation where appropriate, and

24   the amounts of those adjustments and the final recommendations

25   are contained in the exhibit to our report.

1          If you have questions, your Honor, about any of the

2     applications, I'm happy to field them.  Otherwise, we recommend

3     their approval today and will submit an order as soon after

4     this hearing as possible.

5          THE COURT:  Thank you.  I have reviewed the filed

6     information, and I have no further questions.  And so the

7     application is granted as to the recommended approvals, and I

8     will look forward to your proposed order.

9          MS. STADLER:  OK.  Thank you.

10          Our counsel in Puerto Rico, who I see on the screen

11     there, will submit that order shortly as soon as he gets back

12     to his office I'm told.

13          THE COURT:  Thank you.

14          MS. STADLER:  I wanted to provide the Court with a

15     brief status on the fee application process as a whole.

16          We are in the process of reporting on fourth interim

17     fee period applications.  Those, as you know, cover June

18     through September of 2018.  Professionals have begun receiving

19     reports, and we are in discussions with many of them.  We

20     expect to have a group of fourth interim fee applications as

21     well as many of the held-over third interim fee applications

22     ready for the Court's approval in connection with the March

23     omnibus hearing.

24          The Fee Examiner asked me to address briefly the tax

25     issue, which, as everyone in the room knows, is causing quite a

1    bit of head scratching.  We as Fee Examiner's counsel are

2    receiving many inquiries from professionals as to what to do,

3    and while we don't wish to put ourselves at the center of the

4    discussions, we do have a lot of inquiries coming in, so that

5    the Fee Examiner asked me to let your Honor know that we have

6    been gathering information from AAFAF and the Oversight Board

7    and their respective counsel.  We have been hearing from

8    individual professionals.

9         Perhaps not surprisingly, smaller firms, smaller

10   non-Puerto Rican firms, are expressing the most concern because

11   the tax withholding has a potential to have a significant

12   impact on cash flow for those smaller firms.  Larger firms are

13   also concerned, but many of them have obtained tax advice or

14   are in the process of obtaining tax advice and are at least

15   coming up with a plan for how to deal with the withholding.

16        What we do know is that starting with January

17   invoices, Hacienda has told us that it intends to begin

18   withholding the tax from all outgoing payments to

19   non-Puerto Rico professionals at the rate of 29 percent.

20        I've learned from the Oversight Board general counsel

21   just this morning that there is a lower tax rate applicable to

22   professionals who meet certain criteria.  One would be having a

23   physical presence in Puerto Rico.  The other would be filing

24   Puerto Rico can tax returns.  Obviously tax returns for 2018

25   won't be filed before January payments need to start being

1  made, and I am told that until a professional has established

2  they're entitled to a lower withholding rate, the withholding

3  will be done at the rate of 29 percent.

4         What I can tell professionals right now is the same

5  thing that we have stated in our written communications to them

6  and in our informal telephone communications with many of them,

7  which is that we cannot provide individual firms with tax

8  advice -- whether it's what rate will apply, whether they're

9  entitled to a credit at some point or any other tax issue --

10 but what we can say is that for purposes of the fee review

11 process, to the extent that a professional deems it necessary

12 to make an adjustment to an invoice because of the tax

13 withholding, that that should be accounted for and itemized

14 separately and below the line, so to speak.

15        They should not be adjusting hourly rates.  They

16 should not be making changes to any pre-agreed discounts.

17 Their invoices should be run as they always have been.  And any

18 adjustments that they deem appropriate need to be clearly

19 delineated as related to the tax withholding so that if at a

20 future point there is a reconciliation that needs to take

21 place, that can be done -- I don't want to say simply, but more

22 simply than if the tax issue is incorporated into the billing

23 structure.

24        So we encourage professionals who want to discuss any

25 of that to contact us, but we also encourage the Oversight

1    Board and AAFAF to continue providing us with information.  My

2    understanding, and AAFAF representatives can probably comment

3    on this, is that there are regulations being promulgated that

4    may address some of the questions regarding withholding rates,

5    and so we are awaiting with interest those regulations and any

6    guidance that we get from either Hacienda, AAFAF, or the

7    Oversight Board

8          THE COURT:  Do you have an understanding as to whether

9    this withholding is a -- I'll say a true withholding in

10   anticipation of further computations of some actual tax

11   liability or whether it's, in essence, a 29 percent flat tax

12   that's not intended to be given back.

13         MS. STADLER:  With a very big caveat that I don't have

14   the authority to speak definitively, my understanding is that

15   there is a tax liability associated with it, and the

16   withholding is keyed to what the tax liability would be.

17   Whether there are adjustments, credits, lower rates that might

18   retroactively apply upon the filing of a tax return, that

19   remains to be seen.  But as I understand it, it is withholding

20   of a tax that is expected to be levied.  It is not just a

21   temporary hold.

22         THE COURT:  Thank you.  And perhaps if any of the

23   AAFAF representatives have information they would like to

24   share.  I'm told not.  All right.  Thank you, Mr. Friedman.

25         Ms. Stadler.

1          MS. STADLER:  With that, Judge, unless you have

2     additional questions about the report, the fee review process,

3     or any other matters within the Fee Examiner's purview, I've

4     completed my statements.

5          THE COURT:  Thank you.

6          Is Mr. Williamson also going to speak or should I just

7     ask you?

8          MS. STADLER:  I don't believe he plans to.  He can if

9     your Honor would like to hear from him.

10         THE COURT:  Not necessarily.  It's always an honor,

11    but my only request is that you confirm what you said in your

12    written statement, which is that discussions are ongoing

13    concerning the requests and suggestions that I made regarding

14    the adjustments of proposed protocols.

15         MS. STADLER:  Yes.  We are working diligently on that.

16    As your Honor may imagine, there was a lot of concern

17    articulated to us after the December hearing.  Between

18    intervening holidays and the flurry of activities surrounding

19    the COFINA confirmation process and 9019 process, many

20    professionals simply wanted and asked to defer discussions and

21    more detailed discussions on that issue, and we have honored

22    that request.

23         We have had many conversations with professionals,

24    with the Oversight Board, with AAFAF.  We are getting input,

25    and we plan to circulate a new proposed order that incorporates

1    all of that input and hopefully addresses some of the

2    professionals' concerns.

3            Within the next couple of weeks, we plan to submit

4    that proposed order to the Court, whether it's contested or

5    not, hopefully not, for discussion and potential Court approval

6    in connection with the March omnibus hearing.

7            THE COURT:  Thank you, Ms. Stadler.

8            MS. STADLER:  Thank you.

9            THE COURT:  The next group of items on the agenda are

10   matters that are on presentment, the first being the

11   stipulation and agreed order on COFINA proofs of claim of the

12   Senior Bondholders Coalition.

13           Ms. Stafford.

14           MS. STAFFORD:  Good morning, your Honor.  Laura

15   Stafford on behalf of the Oversight Board.

16           I'm here to present for approval a stipulation and

17   agreed order between the Oversight Board and the COFINA Senior

18   Bondholders Coalition.  The stipulation seeks to withdraw

19   certain proofs of claim by members of the Coalition in respect

20   of COFINA bonds.

21           And I just want to note for the record that the

22   original stipulation that was filed on the public docket

23   included a placeholder for one of the proof of claim numbers,

24   and subsequently counsel for the Coalition identified the proof

25   of claim number and so we submitted to the Court earlier this

1    week a revised stipulation that replaced the placeholder with a

2    new proof of claim number.  No material changes were made to

3    the stipulation as it was filed on the record.

4         The response and objection deadline was yesterday.  No

5    responses or objections were filed, and so we'd request the

6    Court enter the parties' stipulation and agreed order

7    withdrawing these claims.

8         THE COURT:  So for clarity, what you're asking me to

9    enter is a version of docket entry 4875-1 that was filed in the

10   3283 case with the blank filled in?

11        MS. STAFFORD:  That's correct.

12        THE COURT:  You've emailed it to us in Word form?

13        MS. STAFFORD:  That's correct, your Honor.

14        THE COURT:  No objections having been filed, the

15   stipulation will be approved and entered as discussed.

16        MS. STAFFORD:  Thank you, your Honor.

17        The next item on the agenda are four of the omnibus

18   claim objections which were filed in early December.  I will

19   just briefly address the ones that are outstanding.  The first

20   objection seeks to disallow four proofs of claim that were

21   amended and superseded by subsequently filed claims.

22        The second seeks to disallow 16 proofs of claim that

23   assert the exact same liability as subsequently filed claims.

24        The third omnibus objection seeks to disallow five

25   proofs of claim that are exact duplicates of proofs of claim

1    filed against other debtors.

2            And the fifth seeks to reclassify 284 proofs of claim

3    that were filed against the incorrect debtor.

4            Each party whose claim was subject to one of these

5    omnibus objections received a notice in both English and

6    Spanish informing them of the response deadlines, and no

7    responses were filed as to either of these four --

8            THE COURT:  As to any of the four?

9            MS. STAFFORD:  As to any of the four.

10           Because no responses were filed, the Court may grant

11   these omnibus objections without further notice or hearing, and

12   so we'd request that the Court enter an order granting the

13   first, second, and third omnibus objections and disallowing the

14   claims pursuant to those objections, and granting the fifth

15   omnibus objection and reclassifying those claims.

16           THE COURT:  Thank you for that overview.

17           No responses to the objections having been filed, the

18   Court will enter orders granting the objections, and so the

19   proposed order with respect to the first omnibus objection is

20   docket entry 4405-5 in the 3283 case.

21           The order with respect to the second omnibus objection

22   is docket entry 4406-5 in the 3283 case.

23           The order with respect to the third omnibus objection

24   is docket entry 4407-5 in the 3283 case.

25           And the proposed order with respect to the fifth

1    omnibus objection is docket entry number 4409-5 in the 3283

2    case.  And the Court will enter those proposed orders.

3              Thank you, Ms. Stafford.

4              MS. STAFFORD:  Thank you so much.

5              I will turn it over to the next item on the agenda.

6              THE COURT:  Thank you.

7              The next agenda item is the one contested matter,

8    which is the urgent motion of the Oversight Board and the

9    Unsecured Creditors Committee to establish procedures regarding

10   the omnibus objection to claims of certain GO bondholders that

11   was alluded to earlier.  And I understand that Mr. Despins is

12   going to be the opening speaker.

13             MR. DESPINS:  Yes, your Honor.

14             Good morning, your Honor.

15             THE COURT:  Good morning.

16             MR. DESPINS:  I am Luc Despins from Paul Hastings on

17   behalf of the Official Creditors Committee, one of the

18   co-objectors to certain GO proofs of claims.

19             Your Honor, I want to give the Court a little bit of

20   background.  As you know, we filed the objection to over

21   $6 billion of GO claims on January 14.  That was 16 days ago.

22   At that point we had sort of a fundamental choice, which is do

23   we object only to what I will refer in this proceeding as the

24   big holders, the ones that have hundreds of millions of dollars

25   and sometimes a billion dollars of these bonds, or do we set up

1    or attempt to set up a process so that everyone can be involved

2    if they want to.

3          And although we believe we have the absolute right to

4    file an objection just to the big holders who have filed proofs

5    of claims, we decided to try to set up a procedure so that

6    everyone could be involved if they want to because we believe

7    probably that the Court doesn't want to do this twice or

8    certainly wouldn't want -- because there would be practically a

9    preclusive effect in the sense that if you have a full-blown

10   trial with the big holders and us and you find one way or

11   another, that's likely to be binding on others practically.

12         So we decided to design a process to try to address

13   this, and the way we did that is by making sure that no

14   substantive deadlines of any kind, no discovery, no response on

15   the merits, none of that would be running while we attempt to

16   set up this procedure that we're here to discuss today.

17         And we wouldn't come back to the Court until we gather

18   information from the holders that I will describe in a second,

19   and only at that time would the Court not entertain the merits

20   of the objection at all but say, OK, I've listened to this.  I

21   think this is the way we should litigate this matter.

22         And I was struck last night in preparing for this that

23   that date, your Honor, would not occur, meaning the first date

24   where you might consider what I call the shape of the table and

25   who is sitting where, that wouldn't happen under our procedures

1    as modified until at the earliest April 20.  That means that

2    practically the actual hearing on the merits would not take

3    place for some time thereafter that, and we know that -- we

4    expect they'll ask for discovery, etc., etc.  So we're talking

5    about the hearing on the objection itself not taking place for

6    months.

7          And the reason I'm emphasizing this is because the

8    rule focuses on notice of the hearing on the objection.  So we

9    are under -- what we're proposing, your Honor, giving holders

10   multiples and multiples of the notice that is required under

11   the rules because the rule only requires 30 days.  And by the

12   way, we're not naïve, we know you wouldn't be trying something

13   like that in 30 days' notice, but the point is from a due

14   process point of view, we're giving all the holders much, much

15   more notice than they would normally have.

16         THE COURT:  One of the concerns that I perceive is

17   about the gatekeeping element of your proposal now is that it

18   does require not a substantive objection but some action now

19   that as written would seemingly preclude, at least under

20   certain circumstances, later substantive participation if there

21   isn't action within a short time frame.

22         MR. DESPINS:  Yes.  So, first we've addressed that in

23   several ways.  The first one is we've divided in our revised

24   procedures, we've divided the world into what we've called the

25   big holders.  It's easy.  It's the people who filed an

1    objection.  They have billions of dollars collectively in

2    claims.  And the rest of the world.

3            So the big holders would be those folks and the people

4    who have a claim for more than $10 million, fairly large, and

5    the rest of the folks would get more time, and we would also

6    dispense those other folks, meaning -- I don't want to be

7    demeaning when I say this, but the smaller holders, holders of

8    less than $10 million, they would have more time and also this

9    isn't new, your Honor, they would not have to file a statement

10   of position, etc., etc., because the purpose of that statement

11   of position is to help us devise a procedure to try this.  And

12   they're saying, no, you're seeking pretrial discovery and all

13   of that.  That's not the point.

14           The point of this is to know what defenses they're

15   going to raise so we know how to sequence this trial, and we

16   don't need that from the smaller holders because we're assured

17   that the big holders will cover the field in spades on that.

18   So from the point of view of a small holder, they only have to

19   file something that says, hey, I'm here, I want to participate.

20   I'm owed $5 million in bonds.  I purchased those on that date,

21   and this is the CUSIP number that I hold.  Minimal, minimal

22   requirement.  And they have 50 days to do that, your Honor.

23           On top of that, we've added another safety valve, your

24   Honor, which is if they fail to comply with that, they can

25   still jump on the train later as long as they do that 30 days

1    before the trial.  So from their point of view of the small

2    holders, they're getting lots of notice.  The gatekeeping is

3    minimal.  Just say raise your hand, how much you're owed, when

4    did you purchase your bonds.  That's it.

5          Big holders have to say the same thing;-- meaning, the

6    holdings that they have on a confidential basis to us, but they

7    also have to file a five pager.  And we've told them you don't

8    need to cite cases.  It can be bullet points.  We just want to

9    know -- I'll give you an example.  Will they argue that the

10   Oversight Board is barred from raising this issue.  We need to

11   know if that's a defense or not.  We need to know who is

12   raising the defense because under the UCC there may be

13   applicable rules.  So it's a gatekeeping function.

14         From our point of view, your Honor, I don't think you

15   would want us to try to have a pretrial order without having

16   canvassed the issues first, and that's the purpose of that.

17   Five pages is not burdensome.  We say that's not binding.  We

18   can't use it later and, aha, you said X, Y, Z.  Now you're

19   saying the opposite.  It's purely for the purpose of

20   identifying the issues for trial, sequencing the issues for

21   trial, and also hopefully having groups so we know who's doing

22   what, who's arguing what.  That's the sole purpose of that.  We

23   say that in the revised procedures.

24         It's not binding.  It cannot be used by us at all.

25   Therefore, the gatekeeping is really minimal.  It's nonexistent

1    practically for the smaller holders, but for the big holders,

2    these guys are well-heeled, and they can do that very easily.

3            THE COURT:  I have just a quick question for you, and

4    fair warning, at the end of your presentation, I'll probably

5    have some more granular questions for you, which will be on my

6    time clock and not yours.

7            But on this one, you have a provision in your proposed

8    order and you've mentioned again today wanting acquisition date

9    information.  And that's one of the subjects of the objections.

10   As I read your reply, you say that that requirement goes to

11   distinguishing primary from secondary market holders.

12           At this stage, why wouldn't it be sufficient to simply

13   have a yes or no answer to:  Do your holdings include secondary

14   market purchases or something along those lines?

15           MR. DESPINS:  Because if the UCC applies -- we're

16   saying in our objection that we don't believe the UCC can trump

17   the Constitution.  But putting that argument aside, if it does

18   apply -- I'll give you a crazy example.  If somebody bought

19   some of these GO bonds yesterday, so that's clearly secondary

20   market, but I need to know that they bought it yesterday

21   because clearly they bought it on knowledge that there's a

22   challenge, right, if they bought it yesterday.  So it's key to

23   that issue, your Honor, which is, when did they buy.

24           And, by the way, we're going to keep this

25   confidential.  There's no secret sauce that we're going to

1    reveal to the world.  We just need it so we understand who is

2    in what bucket from that point of view.  Because we believe

3    that this challenge existed years ago.  We mention that in the

4    objection.  And, therefore, we need to know, not only if you're

5    a secondary buyer or not, we need to know when you bought.

6              And there is no harm to them in the sense that we're

7    going to keep it confidential.  It's not going to be filed with

8    the Court.  We changed that.  It's just provided to the Board

9    and to us.  We have to keep it confidential.  There is no real

10   detriment to them because it's used solely for the purpose of

11   determining whether they were on knowledge or can argue they

12   were on knowledge or not.  And that's going to go to the shape

13   of this trial, how is it going to be sequenced.  So that's why

14   that's important, your Honor.

15             As I said, the notice of participation is not binding.

16   We've said that the small holders who miss the cutoff can still

17   jump in after the fact if they do so 30 days before the trial,

18   so that would be months from now.  So let me address some of

19   their arguments because I'm almost out of time.

20             The first one is that they say you should not be able

21   to proceed without telling us all the objections you have to

22   our claims.  The point, your Honor, here we're saying their

23   claims are not valid.  It makes no sense to go into whether

24   they're secured, priority or not, if the validity is not there.

25   And these are separate issues.  Whether they have a security

```
 1   interest or they have priority has nothing do with validity.

 2   Nothing to do.  So, therefore, there's no issue there in terms

 3   of duplication or anything like that.

 4              The other point is they mentioned mediation, and we

 5   were very careful not to go into that because --

 6              THE COURT:  And I have no need for you to go into the

 7   substance or sequence of mediation.

 8              MR. DESPINS:  Thank you, because I thought those were

 9   off limits.

10              And, your Honor, I think at this point I would reserve

11   for a reply, but I think you have some more granular questions

12   for me.

13              THE COURT:  Yes.  Thank you.

14              One is with respect to the objection that you didn't

15   consult anyone prior to filing this motion, and you say you

16   weren't required to.  There is a provision in the case

17   management procedures that says all urgent motions be preceded

18   by reasonable good faith communications in an effort to resolve

19   or narrow.  So did you do that, and if not --

20              MR. DESPINS:  We're not saying that we did not need

21   to.  Two answers.  We said that we did.  So just so you know

22   the facts.  A full week before the petition was filed,

23   Mr. Weisfelner, who is our co-counsel and special counsel to

24   the claims committee of the Board, he's our co-counsel in this

25   matter, and myself met with lawyers who have represented in
```

1    this case throughout Robbins Russell and Paul Weiss, the main

2    players, and told them, hey, we are considering filing an

3    objection.  This is the basis, etc., etc.  So first,

4    discussion.

5           Second, I'm not going to go into the back and forth

6    just to say they were fully on notice that this was happening.

7           THE COURT:  The "this" being the omnibus objection as

8    opposed to the initial procedures proposal?

9           MR. DESPINS:  Correct.

10          Now, let's talk about the procedures motion.  Before

11   the filing, let's say, three, four hours before the filing, we

12   had a call with the same folks to tell them, hey, we're filing

13   the objection and also we are seeking entry of a procedures

14   motion.  And I proceeded to describe in detail what the

15   procedure motions did and especially what it did not.  And I

16   said, if you have any questions on that, and the response

17   that's in our motion.  The motion to shorten says that, relates

18   that conversation.  And their response was:  We have no client

19   authority.  We need to seek client authority to engage on this

20   with you.  And, second, we need to see the actual document

21   before we can give comments.  We said, OK, fine, but we're

22   filing today because we need to file the motion because, as you

23   know, your Honor, it's not that -- you know, emergency motions

24   are kind of misnomers because there are true emergency motions

25   where you're shortening the time, but you also have to file an

1    emergency motion every time you want to go off calendar.

2           So in our case we had the choice of having this motion

3    heard in March because remember there is no February omnibus

4    hearing.  So the only way to get that done was to file that.

5    But there was a meet-and-confer.  Was it satisfactory to them?

6    No, I'm not saying it was.  And the way we addressed the

7    emergency nature is to give them as much time.  And actually

8    later we gave them more time than they would have had if this

9    motion had been filed on regular notice.

10          But the point we're also making is it's true that

11   because we're shortening time of the hearing, not of their time

12   to respond, we needed to meet and confer.  But for that --

13   let's put it this way:  If we had filed this motion a week

14   before, there would be no requirement at all of

15   meet-and-confer.  So it's not a nature of the bankruptcy rules

16   that is the meet-and-confer.  Under your court order, there is,

17   and we did.  And, by the way, we have had subsequent

18   discussions with them which did not bear fruit.  So the meet

19   and confer we believe was satisfied.  But we also believe that

20   the point we're making is that, in any event, the underlying

21   relief that is sought here, which is a procedures motion, does

22   not require a meet-and-confer process.

23          THE COURT:  Thank you.  I hear you.

24          So your revised procedures are now anticipating that

25   the order with the notice of participation procedure will be

1    served by Prime Clerk on every bondholder claimant, and that's

2    a difference from the original iteration?

3         MR. DESPINS:  Yes.  We've enlarged that.  So let me be

4    precise about that, your Honor.  There are two things we did.

5    One is Prime Clerk has this category called bond claim, but, by

6    the way, that could be so many things.  It could be people

7    sometimes mistakenly filing against the Commonwealth when they

8    have a claim against PREPA, etc., etc.  But we said let's not

9    look at the expenditure.  Let's give notice to everyone who

10   filed something that is classified by Prime Clerk as a bond

11   claim.  They're getting actual notice by mail.

12        As to the people who are the challenged bondholders,

13   meaning the bondholders that are subject to this objection, all

14   bondholders, they will get actual notice through Prime Clerk.

15   So I called them yesterday and said, "Are you sure you can do

16   this?"  Yes.  In fact, they've done it before.

17        And the way to do it is -- the best way to know this

18   is the right address is it's where they send the money when the

19   money is due on the bonds, so that the holders have two

20   options, either to say "I want to get paper notices," in which

21   case they will get paper notice through the system that Prime

22   Clerk will set up.  Or if the holder has checked the box and it

23   wants email communications, they will send it to them by email.

24   But all holders of challenged bonds will get notice of this --

25   of the notice of participation requirement modified, by the

1  way, to say you only have to -- if you're a small holder,

2  meaning $10 million or less, you just have to raise your hand,

3  give your name, date of purchase, and the amount and the CUSIP,

4  and that's it for you.  So they will all get that notice.

5       THE COURT:  All right.  There seems to be an

6  inconsistency between the notice of participation which says

7  that the notice of participation has to be filed on the, I

8  think it's 35- or 50-day timetable if people wish to

9  participate in the litigation, and the new provision in

10  paragraph 6 for late entrance.  So that's something that will

11  need to be resolved.  And the late entrance procedure doesn't

12  speak to dispositive motion practice.  So that is something

13  that, again, you will need to think further about.  So I just

14  want to flag those two things.  I don't need you to comment on

15  those right now, but I will flag those.

16       One thing that I do want to ask you about specifically

17  is the provision as to what you're now calling significant

18  bondholders, which I think is a really unfortunate term because

19  I don't think you should have an implication that they are

20  insignificant bondholders.

21       MR. DESPINS:  We'll change that.

22       THE COURT:  So, think about major, leading, first

23  responding, I don't know, but something other than

24  significant/insignificant, but that they would risk having a

25  default judgment entered against them.

1          So my concern is on a couple of levels.  One is, are

2     you really proposing to seek to disallow simply on a default

3     basis even a major bondholder where the issues that you're

4     raising really are fundamentally legal ones.  Let me just ask

5     these three questions.

6          So that's the first one.  So should anybody be at risk

7     of having a default judgment as opposed to ultimately being

8     bound in some way by the litigated result.

9          And then the notice as it exists now only speaks to a

10    substantive consequence of failure to file as to this

11    significant group and doesn't say anything about what happens

12    to other bondholders who don't respond.  Would you want to put

13    them at risk of a default judgment as well, or is there some

14    other mechanism, a law of the case mechanism.

15         And the other thing to be thinking about is what would

16    happen with respect to a settlement?  Would you queue up

17    defendant Rule 23 motion practice.  Is there something that

18    would be appropriate to say in the notices at this juncture

19    about what happens if I don't respond.

20         MR. DESPINS:  Easy questions.  Not.

21         THE COURT:  So, actually, let me add a fourth point,

22    which is, if I grant this motion, I'm going to ask you to think

23    about these issues and very specifically include in your second

24    stage procedures meet-and-confer and recommendation exercise

25    language as to the consequences and the situations that I have

 1   just laid out.

 2            MR. DESPINS:  OK.  I was obviously joking when I said

 3   these were easy questions, but let me try to address them.

 4            The first one is the default against the big holders.

 5   And by that -- when I say big holders here, I meant the ones

 6   that are attached as Exhibit 1 to the objection.  These are

 7   identified.  Most of them are here.

 8            THE COURT:  But what if they're in one of these clubs

 9   and they don't necessarily want -- or ad hoc groups, and they

10   don't want to necessarily file a paper in their name.  They

11   trust the guy next to them to advance their issues.  Why do

12   they have to start filing briefs or filing papers just in order

13   to --

14            MR. DESPINS:  Well, they could indicate that.  We

15   could have a provision, your Honor, that would basically

16   provide that, which is -- we're talking about the Exhibit 1

17   list now.  There's about ten names there.

18            THE COURT:  Yes.

19            MR. DESPINS:  Any of these individuals can send us a

20   notice saying that Group X, Y, Z will represent them or they

21   will be bound by the outcome of what happens with that group or

22   something like that.  We are happy to have that.

23            What we didn't want is a situation where they are not

24   participating, and, therefore, we don't know what happens to

25   them.  We've identified them.  They have filed proofs of claim,

1    so technically we could get a default judgment, but that is not

2    our intent.  Our intent is really to have them participate.  If

3    they don't want to participate directly, they can rely on the

4    efforts of others.  They can tell us that.  That's fine.  We

5    can provide for that.

6            The second one is what happens to the other

7    bondholders?  Somebody who just doesn't doing anything, doesn't

8    respond.  Your Honor, I think that practically that bondholder

9    will be bound by the outcome, and I'll put aside settlement for

10   a second.

11           THE COURT:  I think we have a little feedback issue.

12           MR. DESPINS:  I will continue.  So acting practically

13   they were bound, but there's nothing in the order now that says

14   that.  We probably can add something in the notice.  We

15   actually have something in the notice that says, "this will

16   affect your rights" or "may affect your rights."  So we could

17   bolster that and say that any ruling by the Court in this

18   matter could be binding on you.  We're happy to -- my point is

19   practically they are bound.  I know in other cases where there

20   was no indenture trust, the other mega cases, essentially

21   nobody showed up because they knew the judge was not going to

22   change her/his mind after ruling on the merits of one of these

23   things.

24           THE COURT:  But you wouldn't be making, for instance,

25   an early application for disallowance of non-responding claims

1    simply on the basis of winning by default.

2            MR. DESPINS:  Not on those, no, your Honor.  The only

3    ones we really want to capture that way are the ones on Exhibit

4    1 to the objection.  We would not seek default against -- the

5    only thing people are affected is at this point if they don't

6    raise their hands and say "I want to participate," they cannot

7    participate although we have the safety valve where they can

8    raise their hand again 30 days before the trial.  I understand

9    we need to address the dispositive motions in that section but

10   we are not going to seek default against the great unwashed

11   here, no.  That's not the intent.

12           THE COURT:  That's another unfortunate term.  We won't

13   use that again, please.

14           MR. DESPINS:  The smaller holders.

15           On the issue of settlement, your Honor, I don't think

16   we can address this in this context because we're really -- the

17   proceeding is in its infancy at this point.  It's true that we

18   should add some language in the notice that would say, in order

19   to protect your rights, you may want to participate.  There

20   could be dispositive motions, there could be a settlement,

21   something like that, but to say how we would implement a

22   settlement today, because it's likely if there's a settlement

23   to be implemented through a plan where they'd be voting and,

24   therefore, I think I would be getting ahead of myself --

25           THE COURT:  I'm certainly not asking you to do it in

1    the procedural documents that you are requesting me to sign in

2    connection with this particular urgent motion practice.  I'm

3    suggesting that in your next stage where, after the notices of

4    participation come in, you start having your meet-and-confer to

5    develop the, whatever you want to call them, procedural

6    recommendations with the discovery and the briefing and how the

7    case ought to be litigated, certainly at least as part of those

8    discussions, you should start thinking about mechanics of

9    access notification, how broadly in different scenarios you

10   might want to try to capture the less active participants.  And

11   so that shouldn't be something that's thought of at the last

12   minute.  As you know, with COFINA, we had a lot of concern

13   articulated by people who said things happened, they were

14   totally shut out, it was not on their radar, and have not been

15   completely happy with the response that you get to respond to

16   the settlement proposal when it turns up in the plan.

17          So it's something that is worth thinking about in the

18   earlier stages, and that's why I wanted to put it on the radar

19   now.

20          MR. DESPINS:  Actually, you make me think that one

21   thing we should do is probably have a third category of people

22   who just want to know what's going on, an email chain or

23   notice.  So we would say send us your email address and we

24   would post things regularly to tell them this is what's

25   happening in the case, and the judge will hear on April 30 a

1   motion to approve for joint trial or proceeding or something

2   like that so that we could communicate to everyone.  So we will

3   add something like that.

4          THE COURT:  You might even want to create a basic

5   information form that has name, what do you hold, email

6   address, and say if you fill out that form, you will be on some

7   sort of list serve, and you won't have to go to Prime Clerk all

8   the time.

9          MR. DESPINS:  Yes, your Honor, we will do that.  That

10  makes a lot of sense.

11         THE COURT:  I will try not to prolong this too much,

12  but I want to get these questions out because it may also help

13  with the responses.

14         We've talked about the specific bond holding

15  information.  I'm sorry, I have a couple of lists here, so let

16  me look through what I have.

17         So were you not proposing to translate the objection

18  procedures in full into Spanish?

19         MR. DESPINS:  We will do that.  But you're right that

20  we just drafted one paragraph that says there is an objection.

21  We will do the full translation.

22         THE COURT:  All right.  You may have explained this a

23  couple minutes ago, but I didn't follow it.  Is Prime Clerk

24  able to identify the beneficial holders of the challenged GO

25  bond claims?

1          MR. DESPINS:  Yes.  They have the ability to know

2     exactly, whether it's 10,000, 13,000 people.  They know exactly

3     how many there are.  That have the CUSIP.  We just give them

4     CUSIP numbers, which we have in multiples.  They can actually

5     give us a price how much it will cost to contact them, so

6     that's the way we know.

7          THE COURT:  Thank you.

8          You have DTC posting copies, so CEDE & Company doesn't

9     need to be involved at all?

10          MR. DESPINS:  No, we made a mistake.  CEDE does not

11     have sub-holders.  Everything goes through DTC electronically.

12          THE COURT:  So, turning to the notices, you said you

13     do have a line that says, "An objection has been filed, and it

14     may affect your rights."  I would plan to ask you to be more

15     specific about that to get people's attention and to include an

16     additional bold sentence along the line of:  "If the Court

17     grants the objection in whole or in part, claimants recovery on

18     account of effective bonds will be eliminated in whole or in

19     part, and claimants will be forever barred from asserting such

20     claims against the Commonwealth, from voting on any plan of

21     adjustment filed in this Title III case, and from participating

22     in any distribution in this Title III case on account of such

23     claims.  Thus, the objection may affect your rights."

24          And that should be in the Spanish version as well.

25          MR. DESPINS:  Yes, your Honor.

1      THE COURT:  Let's see.  I'm trying not to bother you

2  with line edits, though there will be a process for that, but

3  you want to look at your nomenclature.  Sometimes you call

4  people "challenged GO bondholders" and then you call them

5  "challenged bondholders."  So you will want to look at that.

6      MR. DESPINS:  Yes.

7      THE COURT:  On page 2, it's the new revised paragraph

8  two of the procedures regarding notice of participation to

9  respondents who are not challenged bondholders.  Who is that?

10  Are they insurers?

11      MR. DESPINS:  No -- well, it could be insurers, but I

12  think the insurers will probably view themselves as

13  respondents, but it could be other parties in interest.  If

14  they have standing to be heard, that would be people like that,

15  because other people may have views on this, either for or

16  against in the case, I mean, other creditors.

17      THE COURT:  OK.  And I think I have flagged the other

18  things.  Just give me one moment to check.

19      Actually, I've gotten through the issues on my list.

20  So thank you for bearing with me on that.

21      MR. DESPINS:  No problem, your Honor.

22      THE COURT:  Mr. Stancil.

23      MR. STANCIL:  I think Mr. Peck was going to begin,

24  your Honor.

25      THE COURT:  That's fine.  I had you written down as

1    the second person.

2            MR. PECK:  Good morning, your Honor.

3            THE COURT:  Good morning, Mr. Peck.

4            MR. PECK:  James Peck of Morrison & Foerster.  We're

5    counsel to the Ad Hoc Group of constitutional debt holders.  We

6    have joined with the Commonwealth Bondholder Group and with

7    Assured Guaranty in filing a joint objection.  I can tell from

8    having witnessed the colloquy that you are familiar with our

9    objections and also with the procedures that concern us.

10           This is not a standard omnibus objection to claims.  I

11   think it is apparent to everybody that this is truly

12   extraordinary, and it's happening very quickly.  We are

13   watching sausage made in realtime.  Yesterday we had a

14   meet-and-confer, Mr. Despins claims that it didn't bear fruit.

15   It actually bore the fruit of the revised order that was

16   submitted late yesterday, and that's what we're dealing with.

17           What we are looking for is a reasonable opportunity to

18   continue to engage with the Movants so that we can help to

19   develop a set of procedures that work in a massively

20   complicated case management challenge.  This isn't just

21   challenged bonds.  This is a case management challenge of

22   extraordinary proportions.

23           As some of your Honor's questions point out, we have

24   categories of bondholders that have chosen to organize during

25   the bankruptcy who are being treated as "significant" holders

1    or holders that because they have organized are going to be

2    treated less favorably in terms of time limits than those that

3    have not yet appeared and been active in the case.  We have

4    bondholders, some of whom have filed proofs of claim.  We have

5    others that have not filed proofs of claim.  There are

6    thousands of them.

7        We have essentially class action-type challenges

8    associated with something that is styled as an omnibus claim

9    objection.  It's true it's an omnibus claim objection, but it

10   is pervasive in its potential impact, and all we seek is a bit

11   more time so that we can continue to engage with Mr. Weisfelner

12   and Mr. Despins and their colleagues in an effort to develop a

13   thoughtful set of procedures that actually will work, at least

14   in our judgment will work, better than the ones that have been

15   now imposed on us in two hasty moves.

16       The first hasty move was the filing of the motion on

17   January 14.  We objected to it jointly.  It took quite a lot of

18   work just to coordinate among the lawyers who needed to review

19   drafts and work together, but we did that, and we filed a joint

20   objection.  That joint objection was filed on the 25th.  The

21   reply was on the 28th.  We met yesterday to talk about ways

22   that we might work this out and avoid a contest.

23       Mr. Stancil is going to provide some detail concerning

24   proposals that the bondholders would assert would be

25   appropriate changes to these proposed procedures.  The only

1    thing that I suggest as an overview is that we give the parties

2    who are to be affected by these procedures an opportunity to

3    engage with one another and to develop something that works,

4    something that's consensual as opposed to something that's

5    being jammed on us.

6            THE COURT:  So is your concern -- I see the proposal

7    as it stands now to have a 30- to 50-day period for people to

8    say, I want to be at least in some part of the room where it

9    happens in terms of the development of actual case management

10   and litigation procedures and the ability to participate on a

11   substantive basis when we get around to substantive litigation.

12   So that's 35 to 50 days, depending on which group you're in.

13   And then after that, there is a period which is now proposed to

14   be a shorter period of time than that, whether it's 20 days, 30

15   days, something like that, for meet-and-confers to actually

16   develop the case management proposal.

17           So, is your concern more with a lack of time within

18   the actual "let's sit down together to develop a case

19   management proposal" which will then be noticed up with an

20   opportunity for people to object to it and for a reply and then

21   a conference with the Court, or do you feel that there is even

22   still more time needed than that 35- to 50-day "raise your hand

23   and you know sign the Board"?

24           (Continued on next page)

25

1          MR. PECK:  These time limits, as they have been

2     proposed, are entirely arbitrary, your Honor.  35 days was

3     apparently out of the air.  It wasn't anything that we

4     discussed or agreed to.

5          THE COURT:  Why is it too short?

6          MR. PECK:  It may not be too short for the group that

7     is already represented, but if the group that is already

8     represented is going to have some meaningful role, and I am not

9     offering it, if liaison counsel, to try to be helpful in

10    dealing with those parties that truly don't understand this, is

11    going to take some more time.  Also, it is kind of unfair

12    discrimination within the class of GO holders that some get

13    quite a bit of time and others get less time.

14         THE COURT:  What if everybody had 50 days?

15         MR. PECK:  Why not 60 days for everybody?

16         THE COURT:  I think we said pretty much the same thing

17    at the same time.  I said what if everybody had 50 days.

18    You're bidding 60.

19         MR. PECK:  That would be an improvement for sure.

20         It is an example, however, that to some extent we're

21    preparing a special ad hoc bankruptcy rule without a period for

22    comment.

23         THE COURT:  There is no notice and comment requirement

24    for case specific orders, but I do want to make sure that there

25    is enough time for the thoughtful development of procedures.

J1UsPRO2

1    But we don't have all the time in the world here, and at some

2    point, people need to focus, get together, and write something

3    down.  What I want to do is provide enough time, but not lose

4    time unnecessarily.

5         MR. PECK:  I would think that a week or two would be

6    sufficient for us to be able to work together and develop

7    something that might be consensual.

8         THE COURT:  The something being a different procedure

9    for raising your hand or what?

10        Because the more complicated case management

11   development portion of the proposed procedure here takes place

12   after people have raised their hand, and said they want to come

13   into the room, then we get together and really start talking

14   about the stuff that is hard.

15        Are you trying to push the beginning of that phase off

16   later, or do you want that to be longer?

17        What do you want?

18        MR. PECK:  Your Honor, it is not just raising your

19   hand.  It is using your hand to write something down, and what

20   is it that actually has to be written down at that point, if

21   anything.

22        What does it mean to indicate your willingness to

23   participate?  Is there to be, what Mr. Despins and his

24   colleagues have requested, which is they get the chance to

25   control how claims get organized?

J1UsPRO2

 1          Or maybe --

 2          THE COURT:  They get the chance to propose it.

 3          MR. PECK:  Maybe we can be helpful in

 4  self-organization that could be more efficient, things of that

 5  sort might be reasonably discussed.

 6          I am well over my time, and I know that Mr. Stancil

 7  has more detailed proposals to suggest to your Honor, and that

 8  might be a good time to transition to him, with your

 9  permission.

10          THE COURT:  Thank you, Mr. Peck.

11          MR. PECK:  Thank you very much.

12          MR. STANCIL:  Good morning, your Honor.

13          THE COURT:  Good morning, Mr. Stancil.

14          MR. STANCIL:  Mark Stancil for the Commonwealth Fund.

15          With the court's indulgence, I would like to start up

16  in the clouds and work my way down to the weeds.

17          THE COURT:  Fair enough.

18          MR. STANCIL:  At the highest level, I do think we

19  would be remiss not to clarify the status report offered by the

20  Oversight Board.  Regarding progress and where we are, I think

21  this is directly relevant to the motion we are discussing, I

22  think it would be generous to say that levying a claim

23  objection against $6 billion of bonds on the eve of mediation

24  and reserve the right to raise an objection as to billions more

25  is a strange way to go about consensus building.

J1UsPRO2

1        I would add only that if we are going to end up in

2   litigation of issues to clear out the chaff, if we can't get to

3   something consensual, I am hopeful the Oversight Board will be

4   equally as interested in litigating our issues that I think

5   undermine the Board's position thus far as it is in litigating

6   issues that underlie the bond holders' positions.

7        With respect to the specific motion.  I don't want to

8   spend too much time on the meet and confer.  I do feel

9   compelled to correct the record.  We did meet with Mr. Despins

10  roughly a week before his objection was filed.  We agreed at

11  the outset that the content of that session would be

12  confidential.

13       But now that we're discussing what was discussed in

14  there, not a whiff about this procedures motion was mentioned.

15  I received a phone call.  We had a phone call at 4:45 on

16  January 14, the very day they filed the procedures motion, less

17  than that, I believe, five or six minutes.  Mr. Despins gave an

18  oral summary of the procedures motion, which is now 18 or 20

19  pages long.

20       I did not tell Mr. Despins simply that I couldn't

21  respond.  I said, I don't understand what you're asking.  I

22  said, I can't tell if your procedures are substantive.  I would

23  like to get to how very substantive these procedures are.  I

24  said, Luc, you need to send me the motion and I can read it and

25  comment on it, but I can't tell you what I think or give you my

1  views without seeing what you're actually proposing.  Now

2  having seen it, I understand why he didn't want to share it in

3  advance.  Certainly we are getting closer on the first version

4  that is substantive to this procedure, your Honor.  With that,

5  I think that is probably enough said on that.

6          If I may, I think there is a much simpler path here.

7  I think it is in line with something your Honor suggested a few

8  moments ago.  We don't need and we should not have two tracks

9  for large and small bondholders and, in fact, there is a layer

10  of complexity to this that I think is not yet apparent, and I

11  want to make sure the court is aware of it.

12          This claim objection directly targets two bond issues.

13  As you will notice, there is conspicuous preservation of rights

14  to apply this logic -- I use that term loosely -- to other

15  bonds.  They may go after other bonds.  We are not talking

16  contrary to what Mr. Despins said about priority claims or fair

17  equity work environments or other arguments that ultimately

18  determine the rights of GO bondholders.

19          We are talking about whether we even know what the

20  universe is of bondholders affected by this theory.  Just at

21  the outset, I think it is incredibly important to give ample

22  notice to people who may need be to reading in Spanish, they

23  may be coming for still further bonds as well, particularly

24  given the nature of this challenge.  This is a challenge based

25  on recharacterizing bonds that have been issued by this entity

1    for 60 years on the backs of commonwealth guarantees that have

2    been given for 50 years.  Some of these bonds that they're now

3    trying to move over to the commonwealth category were issued in

4    1993.

5           So in terms of getting people notice, that a piece of

6    paper that they hold may be the product of what they are

7    calling now the sham entity.  I think we ought to take a deep

8    breath.  We are going to get there --

9           THE COURT:  So I think it is 18-0149, there is an

10   adversary that targets PBA bonds.  This objection on its face

11   targets bonds that were denominated as GO bonds and two series

12   of GO bonds, 2012 and 2014.

13          Are you collapsing the two and saying that these two

14   pieces of litigation are harbingers of future

15   recharacterizations, which I gather is what you're thinking

16   about and how you're describing the PBA litigation, or is this

17   something that is truly focused on in this omnibus claims

18   objection?

19          MR. STANCIL:  Both, your Honor, with respect.

20          These two lawsuits that have been filed thus far.

21   They are not entirely overlapping, but they are not entirely

22   distinct.  You will see in the GO claim objection, for

23   example -- I want to say it is in paragraph 66, but I'm pulling

24   that out of memory so someone will correct me -- where they

25   refer to the PBA itself being a sham entity.  I would think

1    that would bear and be born upon by whether there are, in fact,

2    true leases.

3           Their entire premise in the GO claim objection is that

4    PBA is a farce.  I would think it would be highly relevant to

5    know whether PBA is actually entered into, as we believe, arm's

6    length real business arrangements.  It has 1,000 employees.

7    It's got 1800 leases.  I think these are facts that are

8    directly relevant to whether it is, on the claim objection

9    side, a sham.

10          I think there is significant overlap, and one of the

11   reasons we think it is necessary to take a breath and get an

12   orderly procedure here, I would like to get to in a second, is

13   these things, I think, can proceed in parallel.  But I think we

14   need to be quite candid about the fact that there are

15   overlapping issues certainly of fact and maybe also as of law.

16          Let me get to the other part of your Honor's question,

17   which is are we just talking about them recharacterizing other

18   bonds.  They have not disclaimed applying this debt limit

19   theory to still further categories of GO bonds.  So, I mean,

20   let notice be given, if notice is necessary.  It can come from

21   me.

22          The notice that you're going to see, the statements of

23   interest that you will see flowing in here, will not just be

24   other 2012 and 2014 bondholders, I don't think.  I think they

25   may well be at least overtly or indirectly statements of

J1UsPRO2

1    interest from other people.  As Mr. Despins said, he basically

2    wants to litigate the legal issues here for all purposes.  It

3    is going to be a mess.

4          So if I can be constructive instead of merely

5    critical, let me propose what I think is a much simpler

6    solution to the problem that is much more in line with what the

7    court has, I think, indicated so far.

8          We think notice along the lines of what we're

9    discussing is fine.  I do want to clarify one mechanical issue.

10   The Prime Clerk has only those parties who filed proofs of

11   claim, and since a proof of claim is not necessary here, even

12   with respect to the people that it can reach.  We don't know

13   who that is.  I don't think they have -- so they don't have a

14   universe.

15         DTC does not actually have information on individual

16   beneficial holders.  As your Honor may be aware, there is, I

17   believe, a registered security that basically sits in DTC.  DTC

18   owns the security.  Participants in DTC have accounts there,

19   and they basically say, I, Goldman, or I, you know, Merrill, or

20   whomever, my clients collectively own X hundred million of this

21   security.  And it is Goldman and Merrill and the other prime

22   brokers who are called participants in the DTC system, in turn,

23   have information about which clients they have.

24         Some of the those clients may be funds, which, in

25   turn, may have individual holders.  The idea that there is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J1UsPRO2

1    mouse click to give notice out to thousands of bondholders is

2    going to take a lot more time.

3            THE COURT:  So this is the system that Prime Clerk is

4    proposing to tap into that Mr. Despins talked about as a means

5    of identifying and notifying beneficial holders?

6            Because right now the proposal is just for DTC to put

7    it up on their litigation relevant page on their website, and

8    so presumably, you have to be somebody who is in the habit of

9    visiting there at all.  But Mr. Despins suggested that Prime

10   Clerk would be able to tap into a more specific database.

11           Are you saying that that more specific database is

12   only going to give you either Goldman or Goldman street names,

13   and then Goldman would still be the only one who would know

14   what that goes to?

15           MR. STANCIL:  I'm getting a little out of my depth,

16   your Honor, but that is my current understanded.  All DTC knows

17   is the name of the participants, and the participant is the

18   Goldman and the prime brokers.  I don't believe that DTC

19   possesses individual holder data.  If I'm wrong, someone will

20   correct me.

21           THE COURT:  You would think that there would still

22   have to be, one way to do this would be that the Prime Clerk

23   notice to whoever is in there listed as beneficial holder would

24   have to include, as we do in the securities litigations, a

25   request that whoever it is who knows the true parties in

1    interest, then further can convey the information to the true

2    beneficial holders and parties in interest?

3              MR. STANCIL:  Yes.  I'm getting vigorous nods from the

4    people who know that.  I think that is right.

5              The point being not that it cannot be done, but that

6    it is going to take time to do and to do correctly.

7              if I can just apologize.  I'm going over, your Honor.

8              THE COURT:  You're responding to me, so...

9              MR. STANCIL:  You'll give me the hook when it is my

10   time.

11             THE COURT:  I'll tell you "thank you" when I've heard

12   enough.

13             MR. STANCIL:  So notice should go out.  We think

14   this should be one period for responding of an intent to

15   participant.  60 days, I think, is realistic.  I originally

16   considered proposing 90.  I think 60 is probably about right to

17   get this, because we're going to be burning days up front with

18   all sorts of phone calls and e-mails between the DTCs and the

19   Goldmans and I think there is hundreds of participants within

20   the thousands of individual holders.  So I think a 60-day

21   period for responding.

22             If I may, your Honor, I think there is a couple points

23   on the statement of interest that need to be addressed, because

24   I think Mr. Despins is not entitled to what he seeks.  And I

25   think actually what he is asking for is counterproductive.  We

1    should not have to give a summary -- bullet points, high-level

2    or whatever -- of our defenses that we intend to raise, and

3    that is really for two reasons.

4          Mr. Despins now acknowledges, in response to our

5    objection, he is willing to make that a non-binding statement

6    of what you might say.  OK.  Well, that tells me that he

7    doesn't actually need to bind people to what they are going to

8    say to organize them.  He would like to know.

9          What is interesting is Mr. Despins illustrated the

10   defenses that he is interested in.  He knows exactly what

11   people intend to argue.  In fact, he tried to anticipate some

12   of these arguments in his claim objection.  What he wants to

13   know is who is going to argue them.  That is improper.

14         He wants to know who, within these individual ad hoc

15   groups, is going to raise which defense.  But he knows, as well

16   as we all know, that knowing who may be soft on this point or

17   other will give him leverage in trying to shape the procedures,

18   perhaps, in trying to pursue other strategies outside of the

19   litigation.

20         Your Honor, we think that is improper.  Let me tell

21   you why, in any event, it is not going to help.  The best way

22   to narrow the issue is not to require bondholders, whose claims

23   are being challenged, to give their adversary a summary of the

24   defenses.  The best way -- and this is baked into step three of

25   our procedure here, after notice, 60 days, and step three.  The

1    best way to really narrow this is to let the creditors who are

2    affected -- all of them, large and small, these series and

3    other series that may feel threatened -- let them all get into

4    the room and they can organize much better in a common interest

5    basis what needs to be presented and when.

6         Now, Mr. Despins may not agree with it.  We can talk

7    about it.  We think if we had, say, 30 days to work together to

8    try to come back to your Honor with a joint proposal for

9    briefing and discovery, we think we can do it.  But for someone

10   who has lived this for however many years now, I can assure we

11   can get much farther down the road to winning and organizing

12   these issues, if we can have candid conversations with other

13   creditors about the most logical way to proceed, instead of I

14   think what your Honor would see, is if Mr. Despins' procedures

15   are adopted, a bunch of sort of cover the waterfront, you know,

16   it is going to read like a list of affirmative defenses at the

17   end of a standard civil complaint.  It is going to be, you

18   know, unclean hands, hands that are too clean, it is going to

19   be my dog ate my homework.  It is going to be every defense in

20   the world, and it is going to be far less helpful than letting

21   us do it ourselves, without inviting the adversary into our

22   proceeding.

23        THE COURT:  May I just ask you this.  If, in fact,

24   anybody with an IQ in the high two digits is going to present a

25   laundry list and/or say, and furthermore, I will raise in my

1   discretion any other defense not mentioned here that one of my

2   friends raises on their piece of paper.  You will all have

3   identified yourselves to each other.  You will all have

4   identified that to Mr. Despins.

5        At this first meeting when it becomes a true

6   meet-and-confer of the objector and respondent constituencies,

7   each constituency is going to have to come with a wish list,

8   starting wish list as to sequence anyway, all which leads me to

9   believe that there is no real harm in what Mr. Despins has

10  asked.

11       You're still going to want to have your premeeting

12  with people you think are similarly in interest, and you'll

13  have this premeeting, and then you're going to come to discuss

14  lists.

15       MR. STANCIL:  I respectfully disagree, your Honor.

16  This is based, in large part, on personal experience dealing

17  with this issue in particular over the last few weeks alone

18  with my own clients.  The issues that I think we're going to be

19  discussing are more complicated.

20       In order for Mr. Despins to prevail, there are about,

21  you know, 18 different steps you have to go through.

22  Organizing those 18 steps is a much more complicated endeavor.

23  It is aided by a candid assessment of claims and defenses more

24  than it is aided by sort of a shotgun scattergun approach.

25       The idea that we're going to put everything on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     table, Mr. Despins knows what is on the table.  Now everything

2     is on the table, and we are going to be able to work something

3     out is, I think, helpful to him in that he can start to say,

4     Well, this is a bondholder that wants to raise this defense,

5     this is a bondholder that wants to raise this defense.  Now let

6     me say, Well, this ad hoc group shouldn't be participating in

7     this defense, because you've got this two clients who have this

8     defense and two clients with that defense.  That is what I

9     think, with respect, I think he is seeking.

10         If we came back to your Honor and said, We have

11    caucused and maybe we can't perfect it, but we think here are

12    three issues that all the bondholders agree should be litigated

13    first.  I think that is realistically what is going to happen

14    under our proposal.  These are the three issues that should be

15    litigated first, and we may not have to get to issues 4 through

16    20, or I forget how many I said there were.

17         I think that is going to be a lot more effective.

18    And, I guess --

19         THE COURT:  So you want to bring it back to me before

20    you talk about it with him?

21         MR. STANCIL:  No.  I think we can get -- I mean, with

22    respect, your Honor, I think if all of the bondholders,

23    substantially all of the bondholders can agree among themselves

24    which issues ought to be litigated up front and how, I think

25    that is how we ought to do it, and we're happy to consult with

J1UsPRO2

1   Mr. Despins.

2          If there are certain things that he wants to bring in,

3   we can discuss it.  But asking my adversary to sort through my

4   defenses and decide to make his own proposal use to which ones

5   he wants to do, and first to get a roster of who intends to

6   make them, I think is counterproductive.

7          Can I add one other dimension to this that I think is

8   actually problematic?

9          Mr. Despins said he doesn't need anything substantive.

10  I think he does.  That is what he is asking for by definition.

11  He said, I don't know need any discovery.  That is not correct.

12  He is asking for holdings information, dates of purchase, etc.,

13  etc.  That is discovery germane to -- if it is relevant --

14  germane to a defense that he anticipates will be raised.  That

15  is very much the kind of prefiling discovery he is seeking to

16  obtain.

17         I respectfully submit that what they are trying to do

18  is predetermine whether issues like this ought to be relevant.

19  I will tell you I do not think that issue he previewed is going

20  to make one wit of difference to the success of his claim.  I

21  am not going to preview our legal strategy, but I think it will

22  not pan out the way he thinks it will pan out.  That is

23  precisely the sort of issue we should and could discuss among

24  creditors.

25         If I could, your Honor, the simplicity of the proposal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J1UsPRO2

1     is give your notice, come in in 60 days and say, Whose team are

2     you on?  Are you pro-objection or are you anti-objection?  OK.

3     Anti-objection people, you have 30 days to come back to the

4     court with a proposal for briefing and discovery, if necessary,

5     and we will meet and confer exhaustively with Mr. Despins in

6     that period.

7          If we go down Mr. Despins's route, and we are doing

8     this sort of bullet point list in advance, I think we need more

9     than 30 days in that stage, your Honor, because I think there

10    is going to be a lot of additional chaff to clear out among

11    creditors, if we haven't had the opportunity to organize

12    ourselves ahead of time.

13         But if I may, your Honor, the thing that I think is

14    crucial, because I think it will simplify everything, we should

15    have one set of deadlines.  The small bondholder/large

16    bondholder distinction does not make sense.  We did live

17    through two days of COFINA hearings and people feeling they

18    were excluded from the process.  I don't see any value in

19    saying we are going to get part of the way down to deciding the

20    procedures that are going to affect everybody, but you can come

21    in later and argue about them.  That seems like a terribly

22    inefficient way to do it.

23         To Mr. Despins' point that we are months and months

24    and months away from a substantive hearing, I agree.  I cannot,

25    for the life of me, imagine why it matters to get started on

J1UsPRO2

1    day 35, as opposed to day 60, with a process that we all agree

2    should come.

3          Unless there are other questions, I think that I have

4    well exhausted my time.

5          Thank you, your Honor.

6          THE COURT:  Thank you, Mr. Stancil.

7          Mr. Ellenberg.

8          MR. ELLENBERG:  Mark Ellenberg on behalf of Assured

9    Guaranty.

10         Your Honor, we have in excess of $5 billion of

11   liabilities we have insured in this case, and one and a half

12   billion of those liabilities are GO bonds, some of which are

13   subject to this objection, some of which are not.

14         Your Honor, we have received no prior notice of either

15   the objection or this motion.

16         Your Honor, it is hard to over the size how big a

17   boulder this is being dropped in the middle of this case at a

18   very delicate time in this case.  I think it is a very dubious

19   road for us to be going down at this point, if ever.  And

20   certainly if we go down this road, we should be walking down

21   this road, not running down this road, because due process

22   concerns and compliance with federal rules of bankruptcy

23   procedure are very much at stake.

24         Just to give you a few examples of the complications

25   relating to here.  If their assertions are correct, then the

J1UsPRO2

1    government of Puerto Rico committed securities fraud when it

2    sold the bonds at issue.

3         Is that a compulsory counterclaim that needs to be

4    asserted in this case?  If so, that is going to dramatically

5    complicate things.  It is one of the issues that we have just

6    now started thinking about.

7         I would also point out that the Oversight Board

8    retained the firm of Kobre & Kim to diligence, just this claim,

9    just these claims, and they, without expressly opining on this

10   litigation, could find no evidence to support it.  In fact,

11   they concluded to the contrary, that Puerto Rico has been

12   extremely consistent in having interpreted the debt ceiling and

13   that they had a very robust procedure for determining

14   compliance.

15        If that is the Oversight Board's own expert retained

16   for the purpose of determining whether future lawsuits were

17   appropriate, and having paid for that report at the expense of

18   the estate, would have two law firms pursuing that litigation

19   at very high costs with no basis whatsoever to the Kobre & Kim

20   firm.

21        If I can raise one other issue, your Honor.  If you

22   wanted a bold-faced notice that if the objectors prevail here,

23   your bonds will no longer have value and you will receive

24   nothing on your claim.  It is not that simple, your Honor.

25   Actually, the very cases they cite in their objection point out

J1UsPRO2

1    that if you want to attack a bond issue as exceeding the debt

2    limit, you should do it before the bonds are issued.  If you do

3    it after the bonds are issued, you may prevent future issuances

4    in violation of the debt limit, but you do not get retroactive

5    relief.  The bonds remain outstanding.

6           THE COURT:  I meant to frame a worst case analysis to

7    get people's attention, not to cover the entire scope of

8    possible outcomes.

9           MR. ELLENBERG:  I understand, your Honor.  My only

10   point -- I know I am going over my time -- is this is very

11   complex.  It raises a host of 504 issues, and at the end of the

12   day, it is a frolic and a detour and a distraction from the

13   real issues that need to be hammered out to obtain a

14   commonwealth plan of adjustment.  Because, indeed, as long as

15   the GO claims still have a priority, the unsecured creditors

16   don't even benefit from invalidating these bonds if they could

17   even achieve that invalidation, because the remaining bonds

18   will just get moved.  This is the wrong issue to be taking up

19   at this time.

20          Thank you.

21          THE COURT:  Thank you, Mr. Ellenberg.

22          Mr. Despins, we'll go back to you.

23          MR. DESPINS:  Thank you, your Honor.

24          Luc Despins with Paul Hastings.  Very briefly, your

25   Honor.

J1UsPRO2

1          The whole theme here is that we're running where it is

2     hasty, etc., etc.  We don't believe it is hasty at all.  Just

3     to resolve this issue of the 35 or 50, we'll give them 60 both

4     sides.  We think that is plenty of time.

5          I want to be very clear about this.  I did check with

6     Prime Clerk, and I said, Are you sure you can reach out to

7     these people and give them paper notice, if they elected to

8     give that?  They said yes.  And I said, How do I know that?

9     Because we just did it in COFINA with 42,000 bondholders, a

10    total of $17 billion.

11         And they already have sent notices to the same

12    challenge bondholders, other notices in the case.  So, again,

13    as I said, that is why they are able to tell us, it will cost

14    $5,700 to send this, because they know how many beneficial

15    holders of these CUSIPs there are.  I don't want to leave any

16    doubt about their ability to do that.

17         Yes, there may be a period of five days before it

18    takes place and all that, but that is plenty covered by the

19    60 days that we just agreed to.

20         THE COURT:  Because there are different understandings

21    of how this works and the layers of information, I would like

22    you to follow up by filing something in writing from Prime

23    Clerk that describes its process and makes very clear whether

24    the paper noticing ultimately goes to the individuals or

25    entities that are the beneficial holders or just to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J1UsPRO2

1   brokerage or mutual fund level or whatever.

2            MR. DESPINS:  For those people who have elected not to

3   receive e-mail notification, they should get paper, paper

4   notice.

5            THE COURT:  I've used paper as sort of a generic, the

6   notice, also electronic or paper.

7            MR. DESPINS:  Yes.  But we will do that, your Honor.

8   And it may be that they go through steps where it goes through

9   Merrill Lynch first, and Merrill Lynch -- meaning that is what

10  the Prime Clerk does for a living.  They solicit people.  They

11  know how to get the notices out.  They did it for COFINA for

12  42,000 people.  We can do it again.  But we will address that

13  in a formal manner.

14           THE COURT:  I think it would be helpful to me and to

15  the assembled to understand that Prime Clerk is the service

16  provider here.

17           MR. DESPINS:  Of course, your Honor.

18           THE COURT:  Do you think you can get that out of them

19  by Monday?

20           MR. DESPINS:  Pardon?

21           THE COURT:  Do you think you can get that information

22  out of Prime Clerk and filed by Monday?

23           MR. DESPINS:  I would hope before then.

24           THE COURT:  Before that?

25           MR. DESPINS:  At the latest Monday.  Yes, your Honor.

1          The statement of intent, your Honor, the point on that

2     is I don't know if you had a chance to read the objection, but

3     it is incredibly --

4          THE COURT:  I read the objection.

5          MR. DESPINS:  For an objection, it is incredibly

6     detailed.  People who drafted it said, Why are you putting all

7     this stuff in?  Because we wanted to have all our cards on the

8     table, and it is now their turn to put their cards on the table

9     in order to have an idea of how to sequence these proceedings.

10    I think that what we're asking them, a five-page outline is

11    really not too much to ask in that context.

12         In terms of the issue, the implication by Mr. Stancil

13    is if you allow the objectors to make the first proposal,

14    somehow we won't play ball, it won't be done the right way.  We

15    have language in the proposed procedures that your Honor would

16    approve, if you approved it, that says the objectors and the

17    challenge bondholders shall use reasonable efforts to submit

18    a preliminary recommendation, which is agreed to by all such

19    parties.

20         So one, we have to meet and confer for 30 days.  Two,

21    we have an obligation to try to file the one.  Whether we will

22    be able to accomplish that or not, time will tell.  In any

23    event, if we do file something, they have certainly enough time

24    to respond to that or say no, they've got it all wrong.  They

25    have their shot.  We don't understand how we what we're

1    preposing is prejudicial to them.

2            Unless you have other questions, your Honor, I think

3    we're done.

4            THE COURT:  I have nothing further.

5            Sir.

6            MR. WEISFELNER:  Your Honor, Edward Weisfelner on

7    behalf of the Special Claims Committee.

8            THE COURT:  Would you go to the podium so that the

9    people in Puerto Rico can see you?

10           Thank you.

11           MR. WEISFELNER:  Thank you, Judge.

12           Again, for the record, Ed Weisfelner, Brown Rudnick,

13   on behalf of the Special Claims Committee of the Financial

14   Advisory Board.

15           Your Honor, thank you for the opportunity to address

16   you.  This is my first appearance.  I was hoping for just a

17   minute to address or correct some of things I heard that,

18   frankly, made no sense to me.

19           First of all, on the merits of the objection, I have

20   read it characterized in a number of different ways, I have

21   heard it characterized today as a frolic, a detour, the wrong

22   issue, somehow inconsistent with prior statements that have

23   been issued by or on behalf of the Financial Advisory Board.

24           I take issue with those statements.  The Financial

25   Advisory Board, working through the Special Claims Committee,

1  takes --

2              THE COURT:  The Oversight Board?

3              MR. WEISFELNER:  The Oversight Board, working through

4  the Special Claims Committee, took the filing of this

5  objection, together with the official creditors committee, very

6  seriously after a great deal of examination, including a review

7  of the Kobre & Kim report, and will allow the merits of the

8  objection to stand on its own as, when, and if it gets

9  litigated.

10             Judge, the other thing I wanted to address was

11  different unfortunate labels we have placed on large holders,

12  or small holders, active holders, inactive holders.  Whatever

13  labels we ultimately choose to use, lets keep in mind that

14  these bonds were sold in increments.  I believe the minimum

15  increment was $100,000.  By saying that, I am trying to

16  distinguish between sophisticated holders and what sometimes

17  people refer to as retail holders.

18             My guess is there aren't very much people, especially

19  on the island of Puerto Rico, that bought these bonds as part

20  of their retirement savings or their long-term investment

21  goals.  These are not retail holders.

22             I would think that the focus we should all have, be it

23  50 days from now, 60 days from now, or 75 days from now, when

24  viewed from the perspective of the litigants and the court, is

25  to come up with a list of case management procedures or a

J1UsPRO2

1    pretrial order where we have all had an opportunity to advise

2    the court of what issues we thought needed to be litigated as a

3    matter of law, or as a matter of fact, or as a mixed matter of

4    law and fact, and in what order.

5           Your Honor is going to make that decision.  You are

6    the trier.  We can only recommend and tell you why we think

7    certain issues ought to come up in a certain segment or segway.

8    This is going to be complicated.  It is going to be complicated

9    not because of the objectors' side of the equation, quite

10   frankly, but because of the respondents' side of the equation.

11          You have the ad hoc groups that have defined in their

12   2019 statements have what is called crossover holdings.  Some

13   of them have the subject bonds, some of them have other

14   GO bonds that are not the subject of the objection.  The

15   resolution of the objection will have different implications

16   for different members of their constituents, and maybe even for

17   those single holder whose got PBA bonds, GO bonds that are

18   subject to the objection, GO bonds that are not subject to the

19   objection.

20          So of course it is going to take them a while to get

21   their act together, because they've got a lot of internal

22   conflicts.  That is not our fault and, quite frankly, it is not

23   our problem.  We filed an objection.  Sooner or later, it is

24   going to get tried, if it is not ultimately resolved, and your

25   Honor needs to know how to sequence the concerns, how to

1    sequence the legal issues, how to sequence the fact discovery

2    issues, if any, that need to be resolved.

3         We think we have afforded more than enough time for

4    the inactive holder to know what is going on.  The likelihood

5    that the inactive holders are going to say to themselves, you

6    know what, the law firms of Cadwalader, the law firms of Paul

7    Weiss, Mr. Stancil's firm, Robbins Russell, Davis Polk, these

8    are all fly-by-night, second-tier, garbage law firms.  So I

9    need to make sure I'm properly protected.  I don't care what

10   issues those guys bring to the table.  I need to make sure I

11   can protect myself.  That is a fantasy.

12        The people that will drive the bus, so to speak, with

13   regard to structuring the legal arguments are going to be the

14   law firms that are in this courtroom today and have been

15   actively involved in these issues for years.  There is a

16   difference between getting people involved and due process.

17   Every holder will get due process notice.  The idea that we

18   need to wait months and months and months for those inactive

19   bondholders to show up and decide whether or not they can do a

20   better job than Robbins Russell in litigating this, or in Judge

21   Peck, Mr. Peck articulating the issues, I think is an excuse.

22        We need to get on with our side saying what we think

23   the issues are that need to be determined as a matter of law

24   and as a matter of fact, the other side needs to tell you the

25   same thing, and then you need to decide, and then we get on to

J1UsPRO2

1    a trial.  But whether it is 30 days, 50 days, or 60 days, it

2    ought not be that complicated.

3              Your Honor, thank you for the opportunity to address

4    the court.

5              THE COURT:  Thank you.

6              MR. STANCIL:  Your Honor, may I have 30 seconds, your

7    Honor, just to correct one statement?

8              THE COURT:  Yes.

9              MR. STANCIL:  Mark Stancil for the Commonwealth Bond

10   Group, your Honor.

11             Mr. Weisfelner said that these are big holdings by

12   big funds.  The 2014 bonds were issued in a minimum amount of

13   $100,000.  The 2012 bonds are issued in $5,000 increments.  The

14   Public Improvement Refunding Bond Series 2012(a) are issuable

15   as registered bonds in denominations of $5,000.  There will be

16   small holders.

17             Second, it is utterly irrelevant to due process and

18   notice how many bonds you hold.  We have an objection from

19   Mr. Hein, who is not here today, I believe --

20             MR. HEIN:  I am.

21             MR. STANCIL:  -- who is an individual bondholder.

22   That is not a way to make -- I appreciate the free advertising

23   for my law firm from Mr. Weisfelner, but lets get this right

24   and do it properly.

25             THE COURT:  Thank you.

J1UsPRO2

1          Mr. Hein wishes to be heard.

2          MR. HEIN:  Thank you, your Honor.

3          I was not planning to speak, but I must say that --

4          THE COURT:  I'll put you on for five minutes.

5          How's that?

6          MR. HEIN:  Thank you.

7          -- the individual bondholders, I think, do have a

8    right to participate in the litigation on a fair basis.  And

9    just as one example, I filed my objection before any other

10   objections were filed, and I am being faced with the argument

11   by the FOMB and the UCC that it is untimely because it didn't

12   comply with their initial request for responses on a federal

13   holiday.  So, you know, I first submit, your Honor, I request

14   that your Honor take and accept my objection.  It was filed

15   before any of the other responses.

16          Secondly, I think that if there is going to be an

17   effort to invalidate the bonds of individual holders who bought

18   the bonds, there has to be consideration of other interests,

19   and we should not have the situation, as I submit occurred in

20   the COFINA situation, where certain major holders with

21   different interests worked out something in a confidential

22   mediation and settlement, and then was announced as a complaint

23   of people, the only notice going after the settlement was

24   struck rather than before the process began.  I believe there

25   should be, as a matter of due process, as well as rule 3007, a

J1UsPRO2

1    notice to all holders before the process begins, including

2    before the procedures are set.

3            Secondly --

4            THE COURT:  When you say the process, do you mean if

5    it is going the mediation route?

6            Because we are here today because a process to be

7    notified in some manner for the litigation to all holders is

8    what we're talking about today.  I'm just not sure I follow

9    you.

10           MR. HEIN:  I was not, for example, even though I have

11   a claim on file with the Prime Clerk -- they have my address,

12   they have my e-mail -- there was no notification at all of the

13   supposed motion that was made here.

14           THE COURT:  This procedures motion, but this proposal

15   for further development of the procedures, includes a notice to

16   go out via Prime Clerk to everyone who filed a proof of claim

17   that says bond on it, and through Prime Clerk to everyone that

18   they trace.

19           MR. HEIN:  I think there has to be notice given before

20   things are put in place, including procedures that would bind

21   people.  And two points that I wanted to make on procedures is

22   that I think there has to be some accommodation of the rights

23   of individuals who, with modest holdings, aren't doing to be

24   retaining Puerto Rico counsel with access to the electronic

25   filing system, so that individuals can submit, perhaps, to an

1    e-mail address at Prime Clerk their filings that can then be

2    uploaded onto the docket, thereby giving notice to all.

3            I think that would be a very simple and easy and cost

4    effective way to allow individuals to submit their positions

5    without having to air courier things to Puerto Rico and serve

6    over 20 parties.

7            Secondly, I think there is a fundamental unfairness of

8    asymmetry where the FOMB and the UCC are spending huge amounts

9    of money, and even though the individuals bought bonds that

10   have a first claim against the Commonwealth's resources and

11   were given a pledge by the Commonwealth, we have a situation

12   where the FOMB and the UCC are spending large amounts of money,

13   in effect, being funded by those resources that the bondholders

14   have a first claim on.

15           I would respectfully submit that there has to be some

16   type of structure here so that individuals whose interests may

17   differ from some of the major holders have the ability to be

18   represented on a coherent basis without this asymmetry where

19   the individuals have no resources and the FOMB and the UCC

20   command huge resources.

21           I request your Honor consider appointing a committee

22   for the individuals who would be able to retain counsel and be

23   compensated on the same basis as the UCC's counsel.

24           Thank you.

25           THE COURT:  Thank you.

J1UsPRO2

1          MR. LUSKIN:  One more, your Honor.

2          THE COURT:  Mr. Despins?

3          MR. DESPINS:  Sorry to do this out of turn.  I didn't

4     know Mr. Hein was going to be heard.

5          Just on the last point, your Honor already ruled a

6     long time ago that the bondholder commission not be appointed.

7     The facts are not different here.  More importantly, we know

8     that there are tons of very competent law firms, including

9     Davis Polk, Paul Weiss, etc., that are going to fight this to

10    the end.

11         So I feel Mr. Hein's concern, but on the other hand,

12    there is adequate representation of the interests of the

13    holders here.

14         Thank you.

15         THE COURT:  Thank you.

16         Thank you all for your arguments.  I intend to grant

17    the motion, to the extent that a two-stage procedure, that

18    being first identification and then moving on to collaboration

19    on and flagging of any disagreements on case management

20    proposals, will be set up.

21         I think that the most efficient thing for me to do as

22    a next step would be to put out on ECF some sort of written

23    document requesting revisions to the proposed revised order and

24    flagging issues for further consideration at one stage or

25    another, and ask the objectors and respondents, Mr. Despins'

J1UsPRO2

1    constituency and the objectors to the procedures motions

2    constituencies, to do some meeting and conferring over a

3    reasonably brief period of time to result in a notice of

4    presentment of a revised procedural order that then anyone who

5    still is objecting to that can submit a written objection to,

6    and I'll consider it.

7          I think that is the best undertaking I can make at

8    this point, and it will also give me an opportunity to reflect

9    on everything that has been said today.

10         Let us go on.  I think everything else that was on the

11   agenda was listed as adjourned to the March omnibus hearing.  I

12   don't believe there is anything else that we have to take up by

13   way of discussion today.

14         The next scheduled hearing date is the March 13, 2019,

15   omni, which will take place in San Juan with a video connection

16   to New York.

17         I want to thank the court staff here in New York and

18   in Puerto Rico and in Boston for their consistent excellent

19   work in preparing for, conducting, and supporting the hearings,

20   and the administration of these very, very complex cases.

21         I thank everyone who has made submissions and spoken

22   today in connection with the matters that are on the calendar.

23   As always, they are very helpful to me, and I will endeavor to

24   be clear in my response to the matter that is submitted to me.

25         With that, keep well, safe travels to all, and thank

J1UsPRO2

1    you to the examiner, to Mr. Wilson and Ms. Stadler, for their

2    continuing work both in front of and behind the scenes.

3              Take care, everyone.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J1UsPRO2

```
 1   UNITED STATES DISTRICT COURT)
                                ) ss.
 2   OF PUERTO RICO             )

 3

 4

 5

 6                    REPORTERS' CERTIFICATE

 7

 8        We, Lisa Franko and Alena Lynch, do hereby certify

 9   that the above and foregoing, consisting of the preceding 74

10   pages, constitutes a true and accurate transcript of my

11   stenographic notes and is a full, true and complete transcript

12   of the proceedings to the best of our ability.

13             Dated this 30th day of January, 2019.

14             S/Lisa Franko_____

15             Lisa Franko, RMR, CSR, RPR, CRR

16             S/Alena Lynch_____

17             Alena Lynch, RMR, CSR, RPR, CRR

18             Official Court Reporters

19             500 Pearl Street

20             New York, NY 10007

21             212-805-0320

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300