1

UNITED STATES BANKRUPTCY COURT

2

DISTRICT OF PUERTO RICO

3

In Re:                              )        Docket No. 3:17-BK-3283(LTS)

4                                    )
                                     )        PROMESA Title III

5     The Financial Oversight and    )
      Management Board for           )

6     Puerto Rico,                   )        (Jointly Administered)
                                     )

7     *as representative of*         )
                                     )

8     The Commonwealth of            )
      Puerto Rico, *et al.,*         )        January 17, 2019

9                                    )
                  Debtors.           )    [CORRECTIONS BY

10                                             PETER HEIN]

11

In Re:                              )        Docket No. 3:17-BK-3284(LTS)

12                                   )
                                     )        PROMESA Title III

13    The Financial Oversight and    )
      Management Board for           )

14    Puerto Rico,                   )
                                     )

15    *as representative of*         )
                                     )

16    Puerto Rico Sales Tax          )
      Financing Corporation,         )

17    (COFINA)                       )
                                     )

18                  Debtor.          )

19

20

The Bank of New York                )        Docket No. 3:17-AP-133(LTS)

21    Mellon,                        )
                                     )        *in 17-BK-3284(LTS)*

22                  Plaintiff,       )
                                     )

23    v.                             )
                                     )

24    Puerto Rico Sales Tax          )
      Financing Corporation,         )

25    (COFINA), *et al.,*            )
                                     )
                  Defendants.        )

**Exhibit 2**

1  the time allocation issue.  I see that Mr. Hein is at the

2  podium now in New York.

3       Mr. Hein.

4       MR. HEIN:  Yes.  Thank you, Your Honor.

5       I had requested an opportunity to respond to the

6  legal arguments that Plan proponents presented in their briefs

7  of January 9.  I did that in a filing with Your Honor.  Your

8  Honor denied my request to respond in writing but said I could

9  present argument.

10       And I would like to address the legal issues, which

11  the proponent's position on the legal issues I raised in my

12  objections was first presented on January 9th.  I have not had

13  an opportunity to respond in writing to that.  It will take me

14  30 minutes to do that.

15       Respectfully, even with the other objectors, I think

16  we're talking about a total time, for the people that have

17  filed objections, significantly less than the amount that's

18  been allocated for public participants who have not submitted

19  formal objections.

20       It's billions of dollars at stake here.  And

21  respectfully, we're, I believe, running ahead of the schedule.

22  And respectfully, I request the opportunity to argue the legal

23  points that we have not yet had an opportunity to respond to.

24       The COURT:  So what I had ruled was that your group

25  could have 45 minutes all together.  And so I'm assuming now

1    that the other members of your group do not believe that in

2    the remaining 15 minutes of that 45, they can make the

3    arguments that they need to make, summing the arguments

4    already submitted in the papers?

5        MR. EISENBERG:  That would be correct, Your Honor.  I

6    would need about 20 minutes to handle mine, and I think

7    Mr. Elliott would need about ten to handle his.

8        Should I repeat that with the microphone?

9        THE COURT:  Yes, please.

10       That's Mr. Eisenberg speaking.

11       MR. EISENBERG:  Your Honor, as I indicated, I think

12   that on behalf of GMS, I would need about 20 minutes, and I

13   think Mr. Elliott would need about ten for his arguments.

14       MR. ELLIOTT:  Yes, Your Honor.  I had requested 15

15   minutes.  I'd like to try to accommodate the Court's wishes

16   and cut mine down as much as possible, but ten to 15 minutes I

17   think is reasonable, Your Honor.

18       THE COURT:  All right.  I will provide a total of an

19   hour, so that's 30 plus -- 30 for Mr. Hein and 30 to be

20   divided between Mr. Eisenberg and Mr. Elliott.

21       MR. HEIN:  Your Honor, I think Mr. Dvores who is here

22   as well had wanted to speak as well.  He filed an objection.

23   Thank you.

24       THE COURT:  And so what is Mr. -- oh, thank you.  So

25   Mr. Dvores is coming to the podium.

1    Thank you, Your Honor.

2    THE COURT:  Thank you, Mr. Elliott.

3    And now I will turn to Mr. Hein in New York.

4    MR. HEIN:  Yes.  Thank you very much, Your Honor.

5    I intend to focus my remarks on the legal and

6    constitutional reasons the Plan cannot be confirmed, and in

7    particular, respond to the conclusions of law and the

8    arguments in the paper that Plan proponents filed on or after

9    January 9, to which we have not yet been able to respond.

10    An overarching point, Your Honor, is the proposed new

11    bonds are to be secured by what in substance is the same

12    statutory lien as the current COFINA bonds.  The Oversight

13    Board describes the new bonds as secured by a statutory lien

14    in the COFINA Fiscal Plan.  That is exactly how the Oversight

15    Board, in a 2017 brief to the First Circuit, described the

16    current COFINA bonds.

17    The Oversight Board told the First Circuit that the

18    current bonds are, quote, secured by a statutory lien,

19    unquote.  That's my declaration, Exhibit K, record 4606-7, at

20    pages 78 to 79.

21    The new bond legislation describes the pledged taxes

22    as present and future revenues and collections generated by

23    the applicable share of the sales tax.  The official statement

24    for the current bonds uses essentially the same language to

25    describe the security for the current bonds under Act 91.

1   Namely, all present and future collections of the pledged

2   sales tax are transferred to and made the property of COFINA.

3         And both the new bond legislation and Act 91, the

4   current legislation, are express that COFINA revenues do not

5   constitute available resources or revenues of the

6   Commonwealth.

7         The Plan proponents do not want Your Honor to rule on

8   the legality of the current COFINA lien and bonds, but as Your

9   Honor noted at the outset this morning, they do want Your

10  Honor to issue some very, very specific legal rulings [~~rules~~] and

11  factual findings on the materially same, new COFINA lien and

12  bonds.

13        The extensive proposed findings and conclusions of

14  law and Proposed Order, I think it's over 120 pages of

15  materials, that has just been submitted by Plan proponents the

16  last couple of days, ask Your Honor to, quote, specifically

17  determine, closed quote, that the new lien against the pledged

18  taxes is valid.

19        They ask Your Honor to specifically determine that

20  the COFINA revenue shall not constitute available resources or

21  available revenues of the Commonwealth, and ask Your Honor to

22  judicially determine that all new COFINA bonds be stamped with

23  a [determined;] ~~the~~ legend, [valid and] to be [~~re~~]confirmed by the Order of the Court.

24        But since the new liens and new bonds are (the current)

25  substantially the same as -- materially ~~judicially~~ the same as new liens

1 and new bonds, if the new liens are binding, then so must be
*[handwritten: current]* *[handwritten: and bonds]*

2 the new bonds.  Simply put, Your Honor, unless Your Honor
*[handwritten: current liens and]*

3 would issue an Order upholding the validity of the current

4 lien and current bonds, Your Honor cannot issue the judicial

5 determinations you have been asked to issue in this Proposed

6 Order.

7 But if Your Honor can issue the determinations

8 they're seeking, then the current liens and current bonds are

9 also legal and valid and enforceable.  And there is absolutely

10 no legal justification to give away half of the collateral,

11 almost half of the collateral as the Plan would do.

12 Your Honor, Plan proponents have created a legal

13 catch 22 for Your Honor.  If Your Honor does not first decide

14 the legality of the current COFINA liens and bonds, as we

15 respectfully request, Your Honor, we would submit, cannot

16 literally authorize the stamping of your judicial imprimatur

17 on the new bonds as the Plan proponents have requested.

18 And, Your Honor, I do not believe this is simply a

19 question of Plan proponents giving you more specifications for

20 their factual basis and legal authority.  This inherent catch

21 22 they've ~~based~~ you with, is a problem; means Your Honor
*[handwritten: faced]* *[handwritten: It]*

22 cannot, I respectfully submit, approve the Plan.

23 Let me turn now to the constitutional doctrines that

24 preclude the discrimination that the Plan provides.  My

25 objection and supplement detailed the constitutional doctrines

1   that preclude approval of a plan that discriminates based on

2   place of residence against United States citizens in the 50

3   states and in favor of residents of Puerto Rico.

4          The discrimination is evident on the face of the

5   Plan.  Puerto Rican residents, simply because they're Puerto

6   Rican residents, get the right to elect a larger distribution.

7   And if you look at the disclosure statement, compare tables

8   2-A and 2-B, that's at docket 4364, at 21 to 23, you'll see

9   that Puerto Rico residents can elect a two percent cash

10   payment not available to anyone in the 50 states.

11          Puerto Rico residents can elect one tranche of

12   interest bearing bonds, that mature in 22 years, 20, 40, as compared

13   to the 11 splintered fragments going out 40 years to 2058 that

14   citizens in the 50 states get.  Plan proponents argue, well,

15   this discrimination is justified, but I submit that

16   discrimination against United States citizens because they do

17   not reside in Puerto Rico violates the Constitution

18   irrespective of any asserted justification.

19          48 USC 737 is express that the same rights that

20   United States citizens have in the 50 states also apply in

21   Puerto Rico.  And there's no justification exception in the

22   statute for discrimination.  Moreover, it's not justified to

23   discriminate here.

24          Many of the COFINA bonds were originally sold to

25   residents of the 50 states as federally tax exempt, but other

1   bonds were sold to Puerto Rico residents as federally taxable.

2   Originally sold as federally taxable, because the residents of

3   Puerto Rico are not taxed federally, just in Puerto Rico.

4         Other bonds were sold to Puerto Rican government

5   entities and were not sold on the basis of being tax exempt.

6   A Puerto Rican resident or entity who bought bonds without a

7   federal tax exemption has no right to exempt -- a federally

8   tax exempt bond.  They get exemptions *from* Puerto Rico Income

9   Tax just *as they had* at the time they bought the original bonds.

10        That's what they should get.  But here they're

11  getting an additional benefit.  The added benefit going to

12  residents of Puerto Rico alone includes cash, cash that could

13  otherwise be distributed prorata among bondholders.  And they

14  also, as I mentioned, get significantly better bond coup --

15  the coupon paying bond, in one tranche maturing in 20, 40, not

16  11 splintered fragments.

17        In a major institution -- you could have the biggest

18  institution based in Puerto Rico.  They could have bought at

19  eight to ten cents on the dollar, as some did, according to

20  the records I submitted as Exhibits B and C to my Declaration.

21  They will now get the benefit of the separate cash and the

22  better bonds on top of their huge profit, because they bought

23  at eight to ten cents on the dollar.

24        Contrast a retired bondholder in the 50 states who

25  invested, as I did, at par, at the original offering price, to

1  have a stream of retirement income.  We don't get those

2  special benefits.

3          The professed concern that the Plan proponents -- I'm

4  sorry.  The Plan proponents have said there's a limited number

5  of _(TAX EXEMPT)_ bonds, but that underscores another problem here.  Plan

6  proponents want to proceed without knowing what the IRS

7  position is.

8          The IRS has something to say.  They wanted to say it.

9  Because of the government shutdown, we have not heard what

10  their position is.  Respectfully, I believe Your Honor must

11  withhold the ruling until we know the IRS position.

12  ~~According to~~ the record, _ON THIS (AN INDIVIDUAL IN THE 50 STATES WHO BOUGHT_ the taxpayers' exemption may

13  ~~be~~ imputed _GET TAXED ON_ going out to 2058 if any of those are taxable.  _(BONDS)_

    _(INCOME ON ZERO COUPON BONDS)_

14  Under 11 U.S.C. 1125(a), bondholders are entitled to a clear

15  disclosure of tax consequences.  They were required to vote

16  when there's been no disclosure of the IRS position.

17          Let me now turn to the Contracts Clause.  There can

18  be no dispute that the new bond legislation is a law.  And by

19  its terms, that law, to quote the legislature of Puerto Rico's

20  statement, _OF MOTIVES_ " ~~no difficulties, quote~~, will serve to release the

21  lien that holders of COFINA bonds currently have and thus,

22  impair the obligation of the contract.

23          Plan proponents argue, well, the law does not take

24  effect unless and until the Court confirms a plan.  Plan

25  proponents argue that sidesteps the constitutional problem,

1  but respectfully, it does not.

2        First, this Court must follow the U.S. Constitution.

3  This Court cannot sanction ~~an abrasive~~ AND EMBRACE A plan, premised on

4  Puerto Rico legislat~~ure~~ion, that is a violation of the Contracts

5  Clause.

6        Second, under Section 2174(b)(3) of PROMESA, a

7  requirement of plan confirmation is that the debtor is not

8  prohibited by law from taking any action necessary to carry

9  out the plan.  The U.S. Constitution Contracts Clause is such

10  a legal prohibition.  So under PROMESA, the Court cannot

11  confirm the Plan.

12        Third, there is no Congressional authorization

13  exception to the Contracts Clause.  Even if Congress and

14  PROMESA did purport to authorize Puerto Rico to impair

15  existing contracts, that Congressional legislation would not

16  be effective.

17        The Supreme Court in the *Saenz* case -- it's 526 U.S.

18  489, at 508,  I cite it in my Supplement -- specifically ruled

19  that Congress' legislative powers may not be exercised in a

20  way that violates other specific provisions of the

21  Constitution.

22        Fourth, there is no judicial approval exception to

23  the Commerce Clause.  If there is a law that impairs the

24  ~~violation~~ OBLIGATION of contracts, a Court blessing or adopting that

25  legislative impairment does not obviate the constitutional

1  violation.

2        Congress and/or PROMESA did not in any ~~effect~~ EVENT

3  authorize retroactive impairment by the Puerto Rico

4  legislature, and the Plan proponents here ignore the sections
   is and note B

5  of PROMESA cited in my objection at Docket 4545, at page ∧18,
   b (1)(N)

6  Section 4121(d)/, read together with 2174(b)(7), 2194(k),

7  2194(m)(5)(B), which echoes 2174(b)(6), and 2195(a).

8        I submit, ∧Plan proponents argue it is not Puerto

9  Rico's legislation clause that impairs the contract.  They

10  say, well, there's a settlement that impairs the contract.

11  But there's no settlement exception to the Contracts Clause,
    A SETTLEMENT OBJECTED TO BY PEOPLE

12  much less ~~parties~~ ∧who are not parties to the settlement and

13  whose contracts will be impaired.

14        Eight, Plan proponents say the *United States Trust*

15  opinion recognizes that a state, or here, Puerto Rico, could

16  impair contracts, quote, if it is reasonable and necessary to

17  serve an important government purpose.  But the pledged sales

18  tax revenue for the current COFINA bonds is roughly two times

19  annual debt service.  COFINA can pay all bonds as long as the

20  lien is not abrogated.

21        The only evidence in this record is that if the lien

22  is not abrogated, there will be sufficient revenues.  The

23  Senior COFINA's witness, Mr. Rodrigue, admitted that

24  yesterday.

25        Also, the pledged sales tax revenues do not belong to

1  the Commonwealth.  Mr. Rosen yesterday admitted that the

2  pledged sales tax revenues do not currently belong to the

3  Commonwealth.   That may be disputed by others, but there has

4  been no judicial Order ruling that the pledged sales tax

5  revenues belong to the Commonwealth.  No Court has so Ordered.

6       In any event, the notion that the Commonwealth needs

7  more money and thus it is reasonable and necessary to take

8  pledged sales tax revenue that does not belong to the

9  Commonwealth and that no Court, no Court, has ever held belongs

10 to the Commonwealth, ~~this~~ also ~~leads to hold -- an~~ FAILS TO MEET THE

11 unreasonable and unnecessary standard, even looking at it from

12 the view of the Commonwealth desiring more money.

13       I ~~looked at~~ LAID OUT specific facts, based on statements,

14 documents and website materials from the Puerto Rican

15 Government and Puerto Rican officials.   There has been no

16 ~~official~~ SPECIFIC response to any of these facts by Plan proponents.

17       Puerto Rico represents to bondholders -- and I

18 mentioned this yesterday.  This is Exhibit S -- that on a

19 proper analysis, Puerto Rico stands last in outstanding debt

20 per capita ~~in~~ OF all U.S. jurisdictions, because Puerto Rican

21 residents don't pay Federal Income Tax as a general matter,

22 and thus, do not pay income tax toward the federal debt.

23       ~~As~~ AND Puerto Rico's own current auditors concluded that

24 Puerto Rico's tax burden is less than one-third of the average

25 OECD country, Puerto Rico's own comptroller, their own

1  comptroller shows on his website -- and you can look it up,

2  it's up there today -- that Puerto Rico has taken on literally

3  thousands of contracts for advertising, public relations and

4  consulting since July 1, 2018, alone.  Thousands of contracts

5  for PR, advertising and consulting.

6       Puerto Rico does not dispute it continues to pay

7  Christmas bonuses, at least $400 million in Christmas bonuses

8  since the Governor declared in 2015 that the Commonwealth

9  would not pay its debt.

10      At the current rate, Puerto Rico is going to end up

11  spending over two billion dollars, over two billion dollars,

12  just in its effort to avoid its debt.  Puerto Rico, and again

13  this is not disputed, just two months ago, lowered taxes,

14  lowered taxes for people in Puerto Rico by about two billion

15  dollars.

16      Puerto Rico, according to the financial records that

17  they publish on the internet, has over 12 billion dollars in

18  cash currently.  12 billion dollars in cash.  And there's no

19  dispute that over $1.8 billion in pledged sales tax revenues

20  sits in bank accounts, and that this money could be disbursed

21  to COFINA bondholders but for the distribution being held up

22  by this proceeding.  But for this proceeding, the money would

23  have been disbursed, bondholders would be fully paid.

24      I believe that the United States Supreme Court, in

25  *United States Trust*, viewed the burden of showing "reasonable

1  and necessary", as falling upon the state, or here the

2  Commonwealth, that is trying to avoid or impair its own

3  obligations.  And I address that in my objection, page 20,

4  note ten.

5       But regardless of where the burden lies, if Puerto

6  Rico can just brush off secured bondholders and justify the

7  impairment of debt obligations on this record, respectfully,

8  Illinois, New Jersey and Connecticut are not going to be far

9  behind.

10      Other factors that *should* militate against deference

11  to Puerto Rico here include the fact that here the

12  Commonwealth's self interest is at stake, To quote the United

13  States Supreme Court in the *United States Trust* case at page

14  26, the fact the Plan discriminates in favor of some parties,

15  the ones who helped negotiate it, and including some Puerto

16  Rican interests, the fact the impairment is not just ~~contrary~~ TEMPORARY

17  but is substantial, AND permanent, the fact that the impairment

18  operates retroactively.  Puerto Rico took our money.  Now it

19  just wants to keep it.

20      The fact is Puerto Rico is violating its statutory

21  non-impairment covenant.  Puerto Rico agreed by Statute not to

22  impair the rights of bondholders, but now has defied that

23  solemn pledge.  All these factors militate against deference

24  to Puerto Rico's view here.  Indeed, the force of the

25  constitutional prohibition ~~implied~~ APPLIED in *United States Trust*

1  should have even greater application in this case.

2  Chief Judge [JUSTICE] Burger, concurring, would have imposed on

3  a state seeking to incorporate [ABROGATE] its own contracts [WITH] bondholders,

4  an even more stringent standard.  The Chief Justice said, the

5  state must demonstrate it is essential to an important state

6  purpose.  The Chief Justice further said, it must [THE] state [MUST SHOW] that

7  it did not know and could not have known the impact of the

8  contract on the state at the time the contract was made.

9  And that I would argue would be the standard if the

10  Supreme Court would hear this matter.  It would certainly be

11  urged to adopt and could adopt [THAT. I] the covenant abrogated in

12  *United States Trust*, [Yet] And the Supreme Court held there was a

13  violation of the Contracts Clause there.  It [It] did not directly

14  jeopardize payment of interest and principal of the

15  bondholders.

16  This was a fairly technical point [IMPAIRMENT], as the dissent

17  pointed out in that case, involving whether or not the Port

18  Authority could subsidize rail passenger transportation from

19  revenues.  Here the impairment is not technical.  It tears up

20  the obligation to pay principal and interest.  This case is

21  [A FORTIORI] from *United States Trust*.

22  A few points on the Takings Clause.  Plan proponents

23  do not dispute there's been a taking here.  Rather, they argue

24  that although -- a taking occurs, while [BUT] subordinate bondholders

25  are supposedly provided just compensation, but [BUT] there has never

1    been a judicial ruling that invalidates the current structure

2    and lien.   And the Plan proponents admit there's currently a

3    statutory lien in place. PRESENTATION)

4         You have that ~~pension~~ from 2013 that I referred to

5    yesterday, Exhibit S, page 63 of the Hein Declaration.   You

6    have the fact that, as I mentioned, the Oversight Board itself

7    represented to the First Circuit Court of Appeals just in 2017

8    that the bonds are, quote, secured by a statutory lien against

9    pledged SUT revenue.   That remains the current status.   As of

10   today, the bonds are secured by a statutory lien.

11        The Oversight Board also admitted to the First

12   Circuit that the pledged sales tax revenue are not available

13   revenues or available resources under the Puerto Rican

14   Constitution.   That's not just me saying this.   This is the

15   Oversight Board representing to the First Circuit Court of

16   Appeals that the pledged sales tax revenues currently are not

17   available revenues or not available resources under the Puerto

18   Rico Constitution.

19        And the Puerto Rico legislature, in the new bond

20   legislation, the legislature states that the COFINA

21   bondholders, quote, currently have, close quote, a quote,

22   lien, close quote, over pledged sales tax revenues.   And the
     LEGISLATION
23   new bond ~~tax revenue~~ purports to release a lien over $17.5

24   billion of what it calls, quote, previously pledged SUT

25   revenues.

1    A very premise, as I noted, of the new liens and new

2   bonds is that Your Honor will issue a new Order that confirms

3   the new lien, judicially determines the new bonds, materially

4   the same as the current lien, and the bonds are legally

5   binding and enforceable.

6    So how and by who has it been decided that pledged

7   sales tax revenues are supposedly only worth half of what

8   they're really worth, even though no court has invalidated the

9   structure, even though the new lien and new bonds would be

10   materially the same as the old lien and the old bonds, ~~while~~

11   Plan proponents say, well, this was determined by settlement,

12   a reference to the confidential settlement process.

13    There's of course, as Your Honor knows, no public

14   record. We have no idea what occurred in that process. The

15   objecting bondholders in the 50 states were not participants.

16   We had no ability to be heard. There simply was no notice

17   saying to juniors, juniors, this is A confidential MEDIATION ~~confirmation~~,

18   you can reply to this e-mail address and are invited to

19   participate.

20    As Mr. Elliott pointed out, many bondholders have put

21   in letters to the Court and otherwise indicated their

22   concerns, and none of them were invited to participate.

23    There's also, fundamentally, whatever the merits are

24   of the mediation, it's not a judicial ruling. There's no

25   judicial opinion. It's a voluntary, non-binding process.

1   If someone had a desire to impose the result of a

2   confidential mediation process on junior bondholders, they

3   should have notified juniors; and in short, they should have

4   ensured that juniors without conflicts were represented in

5   that process.

6   All the participants in that confidential mediation

7   process receive special benefits.  The junior bondholders WHO do

8   not receive those special benefits who were not represented.

9   Our rights cannot be valued based on a confidential settlement

10  process in which we were not participants, and where it just

11  so happens that the people who were participants get special

12  benefits.

13  Before our property is given away, respectfully, we

14  are entitled to a judicial ruling on the validity of the

15  current COFINA structure and lien.  Plan proponents themselves

16  admit there is a binary choice here.  Either the COFINA lien

17  structure is valid or it's not.  Simply because some people

18  have challenged the COFINA structure AND of the lien, it does not

19  mean it's IN valid.

20  Proponents admit it's a binary choice, either all

21  valid or not valid. IF Your Honor can judicially determine and

22  issue the rulings that you're being asked to do in that

23  Proposed Finding and Order,  That COFINA revenues shall not

24  represent available revenues of the Commonwealth,  If Your

25  Honor is willing to do that at the behest of Plan proponents,

1  respectfully, there is no basis to approve a Plan that gives

2  away almost half of the pledged revenues.

3      A few words in response to what Plan proponents also

4  argue on the Takings Clause.  First, PROMESA does not

5  authorize a retroactive taking of bondholder property.  And

6  again, I point to the section is listed in my objection, page 15, note

7  eight.

8      Second, even if PROMESA, by its terms, authorized a

9  retroactive taking of the statutory lien, Congress by statute

10 cannot override the constitutional protections of the Takings

11 Clause.  Plan proponents argue that under some 35 year old

12 bankruptcy court opinion from Colorado, COFINA bondholders

13 supposedly have no interest in future sales tax revenues, but

14 that's a legal issue the Court here needs to decide.

15     And Your Honor is being asked to judicially declare

16 and specifically JUDICIALLY determine, as part of the approval of the new

17 bonds, the new bond legislation that says pledged sales taxes

18 include present and future revenues.  The current lien is on

19 present and future collections.

20     If Your Honor believes what the Oversight Board

21 argues in its Reply, Your Honor cannot approve the new lien

22 and the new bonds.  Your Honor cannot give the judicial stamp

23 of approval they're seeking if Your Honor believes what

24 they're arguing about, that 35 year old bankruptcy case from

25 Colorado.

1   The notion that there was just a mistake, as

2   Mr. Eisenberg has said, it's just ~~false~~ *FAILS* by its terms.   If

3   we're going to abrogate property rights based on supposed

4   mistakes of Congress that last for decades, and also mistakes

5   of Puerto Rico officials who repeatedly confirmed the validity

6   of the structure and lien, if we're going to do it based on

7   the idea of a mistake having been made, the Rule of Law will

8   have lost all of its meaning.

9   The Oversight Board argued that ~~had~~ *SINCE* Congress

10   exercised its Territories Clause power, rather than bankruptcy

11   authority, that Congress could have abrogated ~~bankruptcy and~~ *PROPERTY RIGHTS*

12   ~~under that power,~~ *AND CONTRACT RIGHTS -- SO LET'S DO A THOUGHT EXPERIMENT,* -- Could Congress pass a law that

13   expropriates all private homes or all private businesses in

14   San Juan without compensation on the theory that the

15   Territories Clause trumps the Takings Clause?  I don't think

16   so.

17   The Territories Clause clearly does not trump the

18   Takings Clause or the Contracts Clause or any other specific

19   Constitutional rights, as the Supreme Court in the *Saenz* case,

20   526 U.S. 489, at 508, indicates, I think, quite persuasively.

21   The Oversight Board's ~~argument~~ *ARGUES* that the economic

22   impact is supposedly ~~amenable~~ *MINIMAL, THE* on theory, it's a settlement

23   that has ~~a Plan,~~ *THE IMPACT.* But of course it's the Plan that has the

24   ~~increment.~~ *IMPACT* The settlement without the approval of the Plan

25   has no legal force.  Any claim that the distribution here to

1  junior bondholders is just compensation, ~~also argues~~ that the [*IGNORES*]

2  tax revenues, if not given away, would be sufficient to pay

3  the debt.

4          Of course the Plan proponents have the burden of

5  proof here.  No evidence has been argued that the sales tax

6  ~~coffers~~ have not been sufficient.  The only evidence is that [*REVENUES*]

7  they are.

8          So in sum, the Plan proponents have the burden to

9  show that the requirements of confirmation are met.  Even

10  apart from PROMESA, the constitutional violations are an

11  ~~obligation~~ here.  The United States is obliged to uphold the [*OBSTACLE*]

12  Constitution.  That's an obstacle.  You don't even have to

13  look at PROMESA.

14          But PROMESA also requires, and Plan proponents have

15  the burden of proving that the Plan complies with law,

16  including the U.S. Constitution.  That has not been shown by

17  Plan proponents.  Section 2174(b)(3), thus, is not met.

18          Plan proponents also must prove that the settlement

19  is in the best interest of bondholders, which requires the

20  Court to consider whether, under [*NON*] bankruptcy law, junior

21  bondholders [*WOULD*] receive a greater recovery.  And clearly they

22  would, because if you don't ~~advocate~~ the lien, junior bond [*ABROGATE*]

23  proponents get ~~a percent~~ [*100 %*].  Therefore, ~~7142~~[*2174*](b)(6) has [*NOT*] been met.

24          One last thought.  I know Plan proponents talk about

25  a vote.  No vote can abrogate the Constitutional rights of

1  myself and others that are objecting.

2  Thank you, Your Honor.

3  THE COURT:  Thank you, Mr. Hein.

4  Mr. Dvores, you may come to the podium in New York

5  now.

6  MR. DVORES:  Thank you, Your Honor.

7  Yesterday Mr. Rosen made reference to the ballot

8  counts in saying that this so-called settlement, the Plan of

9  Adjustment, had overwhelming support.  Of course it had

10  overwhelming support from those who would benefit from the

11  Plan, the insurance companies, the seniors, all the members of

12  the negotiating committee who used the opportunity to have the

13  negotiations and the secret bargaining that went on, to enrich

14  themselves by trading in the bonds, all through this process

15  that lasted almost a year and a half.  They're approving this.

16  They're approving a settlement which would give them

17  broad releases from any claims of causes of actions which we,

18  the junior bondholders, might have against them for their

19  unfair, illegal activities, and using this negotiation process

20  for unjust enrichment for themselves and to take advantage of

21  the unrepresented junior bondholders.

22  Then you have the people from Puerto Rico who

23  accepted this.  Well, they're getting a better deal than the

24  juniors who live on the mainland, in the 50 states.  All of

25  the ones that -- the members of the juniors who live in Puerto