UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING<br>CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF
LAW IN CONNECTION WITH CONFIRMATION OF THE THIRD AMENDED
TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Exhibit A to Docket Entry No. 439 in Case No. 17-3284[2]) (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Second Amended Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan")[3] filed by the Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtor under PROMESA section 315(b).[4]  In connection with the Plan, the following documents have been filed by the Debtor, the COFINA Agent, or PSA Creditors in support of or in connection with confirmation of the Plan, including the Settlement of the Commonwealth-COFINA Dispute incorporated into the Plan:

(a) *Second Amended Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4956 in Case No. 17-3283, the "Second Amended Plan Supplement");

---

[2]   All docket entry references are to entries in Case No. 17-3284, unless otherwise noted.

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, or the Confirmation Brief (each as defined herein), as applicable; provided, however, that references herein to "COFINA Revenues" are used to maintain consistent terminology with the New Bond Legislation and shall have the same meaning as the term "COFINA Portion" as defined and used in the Plan, and shall include any collateral that may be substituted for the COFINA Revenues in accordance with the terms and provisions of the Plan and the New Bond Legislation.

[4]   The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated November 29, 2018 (Docket Entry No. 375, the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices used in connection therewith, and approving the form of notice of the Confirmation Hearing.   Moreover, the Court previously entered the *Notice Regarding the Proper Method for Submission of Objections to the Proposed COFINA Plan of Adjustment* (Docket Entry No. 384).

(b) *Certificate of Service of Solicitation Materials* (Docket Entry No. 387, the "<u>Mailing Affidavit</u>");

(c) *Certificate of Publication* (Docket Entry No. 585, the "<u>Publication Affidavit</u>");

(d) *Certificate of Service* (Docket Entry No. 429, the "<u>Garraway Affidavit</u>", and together with the Mailing Affidavit and Publication Affidavit, the "<u>Service Affidavits</u>");

(e) *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* (Docket Entry No. 4663 in Case No. 17-3283, the "<u>Omnibus Reply</u>");

(f) *Memorandum of Law in Support of Puerto Rico Sales Tax Financing Corporation's Third Amended Title III Plan of Adjustment* (Docket Entry No. 4664 in Case No. 17-3283, the "<u>Confirmation Brief</u>");

(g) *Declaration of Natalie A. Jaresko in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4756 in Case No. 17-3283, the "<u>Jaresko Decl.</u>");

(h) *Declaration of David M. Brownstein in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4757 in Case No. 17-3283, the "<u>Brownstein Decl.</u>");

(i) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4794 in Case No. 17-3283, the "<u>Pullo Decl.</u>");

(j) *Statement of COFINA Agent in Support of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4656 in Case No. 17-3283);

(k) *Declaration of Matthew A. Feldman* (Docket Entry No. 4656-1 in Case No. 17-3283, the "<u>Feldman Decl.</u>");

(l) *Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4665 in Case No. 17-3283, the "<u>Senior Coalition Reply</u>"), and the joinder filed thereto by the certain Puerto Rico based mutual funds (Docket Entry No. 4670 in Case No. 17-3283);

(m) *Declaration of Matthew Rodrigue in Support of Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation ("COFINA")* (Docket Entry No. 4665-1 in Case No. 17-3283, the "<u>Rodrigue Decl.</u>");

(n) *Declaration of Natalie A. Jaresko in Support of Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4758 in Case No. 17-3283, the "Jaresko (9019) Decl.");

(o) *Informative Motion of National Public Finance Guarantee Corporation in Support of COFINA Plan of Adjustment* (Docket Entry No. 4888 in Case No. 17-3283);

(p) *Ambac Assurance Corporation's Statement Concerning the Court's Authority to Determine and Declare the Validity of the New Bond Legislation* (Docket Entry No. 4889 in Case No. 17-3283);

(q) *Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4890 in Case No. 17-3283); and

(r) *Declaration of Susheel Kirpalani in Support of Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4892 in Case No. 17-3283).

Opposition submissions were filed by the following parties: (i) Stephen T. Mangiaracina (Docket Entry No. 4481 in Case No. 17-3283, the "Mangiaracina Objection"), (ii) the Service Employees International Union and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (Docket Entry No. 4556 in Case No. 17-3283), (iii) Peter C. Hein (Docket Entry Nos. 4585, 4595, 4673, 4911, and 5041 in Case No. 17-3283), (iv) GMS Group, LLC (Docket Entry Nos. 4564, 4587, 4605, 4853, and 5002 in Case No. 17-3283), (v) PROSOL-UTIER[5] (Docket Entry No. 4592 in Case No. 17-3283), (vi) Mark Elliott (Docket Entry Nos. 4597, 4598, 4606, and 4641 in Case No. 17-3283), (vii) the

---

[5]     As used herein, the term "PROSOL-UTIER" refers collectively to (1) Capítulo Autoridad de Carreteras, (2) Capítulo Instituto de Cultura Puertorriqueña, (3) Capítulo Oficina del Procurador del Veterano, (4) Capítulo de Oficina Desarrollo Socioeconómico y Comunitario y (5) Capítulo de Jubilados.

VAMOS Group[6] (Docket Entry No. 4607 in Case No. 17-3283, the "VAMOS Objection"), (viii) Lawrence B. Dvores (Docket Entry No. 4613 in Case No. 17-3283), and (ix) the Credit Union Group[7] (Docket Entry No. 415).[8] The Court heard argument and received evidence in connection with the motion for confirmation of the Plan on January 16 and 17, 2019 (the "Confirmation Hearing").[9] The Court has considered carefully the Plan, as well as the above-referenced supporting and opposition submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties. The Court has also reviewed and considered carefully hundreds of letters and email messages, including a petition, submitted by members of the public and has listened carefully to the oral remarks made on the record of the Confirmation Hearing by

---

[6]   As used herein, the term "VAMOS Group" refers collectively to René Pinto Lugo, VAMOS, Movimiento de Concertación Ciudadana Inc., Unión de Empleados de Oficina y Profesionales de la Autoridad de Edificios Públicos, Unión Insular de Trabajadores Industriales y Construcciones Eléctricas Inc., Unión Independiente de Empleados de la Autoridad de Acueductos y Alcantarillados, Unión de Empleados de Oficina Comercio y Ramas Anexas, Puertos, Unión de Empleados Profesionales Independientes, Unión Nacional de Educadores y Trabajadores de la Educación, and la Asociación de Inspectores de Juegos de Azar, and Manuel Natal-Albelo.

[7]   As used herein, the term "Credit Union Group" refers collectively to Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, Cooperativa de Ahorro y Crédito del Valenciano and Cooperativa de Ahorro y Crédito de Juana Díaz.

[8]   In addition to the briefing enumerated above, the Legal Brief of Amicus Curiae Popular Democratic Party Caucus of the Puerto Rico Senate (Against an Order of Plan Confirmation Containing Findings of Fact and Law That Sanction Legislative Entrenchment) (Docket Entry No. 529, the "PDP Amicus Brief") was filed in opposition to the Plan. The Response of Financial Oversight and Management Board to Amicus Curiae Brief of Popular Democratic Party Caucus of the Puerto Rico Senate (Docket Entry No. 4887 in Case No. 17-3283) was filed in response to the PDP Amicus Brief as instructed by the Court.

[9]   On January 16 and 17, 2019, the Court also heard argument on the (i) *Commonwealth's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4067 in Case No. 17-3283, the "9019 Motion"), and (ii) a dispute regarding section 19.5 of the Plan (see Docket Entry No. 4067 in Case No. 17-3283, the "19.5 Dispute").

members of the public.  For the following reasons, the Plan is hereby confirmed and the objections
are overruled.[10]

INTRODUCTION

Nearly two years ago, the Commonwealth of Puerto Rico, through the Oversight
Board, initiated unprecedented proceedings to restructure the debts of the Commonwealth of
Puerto Rico and certain of its instrumentalities, including COFINA, under Title III of PROMESA.
At the outset of these historic proceedings, the Court emphasized that the goal of Title III of
PROMESA and the Court's goal in overseeing these cases would be to find a path forward for
Puerto Rico, its citizens, and the others who hold stakes in its future, including the financial
investors who held obligations or are otherwise dependent on Puerto Rico for their financial
wellbeing.  The COFINA Plan represents a significant step on the path towards Puerto Rico's
financial recovery, economic stability, and prosperity.

The Court is deeply mindful that the COFINA Plan, which is based on compromises
of strongly contested positions, commits substantial portions of Puerto Rico's scarce revenues to
bond payments over a period of decades while at the same time affording bondholders less value,
on different terms, than they had expected when they invested in COFINA.  Citizens who live and
work in Puerto Rico and institutions that serve them are concerned that the financial settlement

---

[10]     On January 29, 2019, the Court received and carefully reviewed *The Autonomous Municipality of San Juan's Motion for Leave to File Amicus Brief Regarding the COFINA Plan of Adjustment* (Docket Entry No. 4985 in Case No. 17-3283, the "San Juan Motion"). Because the arguments untimely raised in the proffered amicus brief will not provide "supplementing assistance" to existing counsel, and because the Autonomous Municipality of San Juan has not established that it has a "special interest in this case" that justifies the filing of an amicus brief at this juncture, the San Juan Motion is hereby denied.  See Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970).

that made the Plan possible will hinder the Commonwealth's ability to provide for its people,[11] even though the Settlement gives the Commonwealth access to a substantial amount of revenues that had previously been allocated to COFINA.  However, after considering the applicable legal standards and the evidence, the Court is persuaded that the COFINA Plan is a necessary and legally complaint component of Puerto Rico's recovery efforts and is essential to ensure that Puerto Rico is on a path that will restore its access to financial markets as it builds a stronger economy.  It is important for all to bear in mind that the Plan before the Court addresses only COFINA's assets and liabilities.  It does not map the way forward for the Commonwealth of Puerto Rico.  In formulating a separate plan for the Commonwealth, the Oversight Board and the elected Government will have to address the logical and well-founded concerns of citizens and creditors of the Commonwealth in responsible, meaningful ways.

The Court has also considered the argument raised by certain public participants at the Confirmation Hearing, as by well as citizens of Puerto Rico who have written numerous letters to the Court, that a comprehensive audit of Puerto Rico's financial circumstances should be conducted prior to confirmation of the COFINA Plan.  (See, e.g., Docket Entry No. 4348 in Case No. 17-3283 (Notice of Correspondence dated November 20, 2018), at 17; Jan. 16, 2019 Hr'g Tr. 54:1-3, 83:19-23, 95:23-96:3, 98:8-99:13, Docket Entry No. 4848 in Case No. 17-3283; and Jan. 17, 2019 Hr'g Tr. 71:5-17, 73:11-76:22, Docket Entry No. 4850 in Case No. 17-3283; see also Docket Entry No. 4494 in Case No. 17-3283 (Notice of Correspondence dated December 18, 2018); Docket Entry No. 4576 in Case No. 17-3283 (Notice of Correspondence dated December 27, 2018); Docket Entry No. 4650 in Case No. 17-3283 (Notice of Correspondence dated January

---

[11]     The Settlement is addressed in the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation*.  (See Docket Entry No. 5045 in Case No. 17-3283.)

9, 2019); Docket Entry No. 4809 in Case No. 17-3283 (Notice of Correspondence dated January 15, 2019).)  The COFINA Plan represents a consensual resolution of complicated and expensive litigation that presented serious issues that had been raised well before the commencement of COFINA's Title III case.  This resolution resulted from arm's length negotiations and is necessary to allow the Commonwealth to move forward while reducing certain of its existing obligations to COFINA, and to enable COFINA to fulfill reliably its reduced and restructured obligations.  The timing of this Plan is therefore reasonable and appropriate.  The Court notes that approval of the Settlement and the Plan does not foreclose further investigation, whether through regulatory, law enforcement, or civil litigation channels, into the origins of Puerto Rico's debt crisis and the application of the proceeds of the pre-PROMESA borrowings.  The Court's decision on the motion for confirmation of the COFINA Plan, and the reasons for that decision, are explained in the further Findings of Fact and Conclusions of Law that follow.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  <u>Findings and Conclusions</u>.  This Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014, and PROMESA section 310.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Memorandum and the Plan.

2.  <u>Jurisdiction</u>.  This Court has exclusive jurisdiction of the Title III Case pursuant to PROMESA section 306(a).  Venue is proper before this Court pursuant to PROMESA section

307(a).  Pursuant to section 306(b) of PROMESA, upon commencement of the Commonwealth

Title III Case and the COFINA Title III Case, the Title III Court exercised, and continues to

exercise, exclusive jurisdiction over all property of the Commonwealth and COFINA, wherever

located.  To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has

granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property

and revenues of the Debtor as necessary to effectuate the Settlement Order and to approve and

authorize the implementation of this Memorandum, the Confirmation Order, and the Plan.

      3.    <u>Judicial Notice</u>.  The Court takes judicial notice of the New Bond Legislation,

which the Governor of Puerto Rico signed into law on November 15, 2018, and, as explained in

Paragraph 120 hereof, has been duly enacted.  <u>See</u> <u>Getty Petroleum Mktg., Inc. v. Capital Terminal</u>

<u>Co.</u>, 391 F.3d 312, 320–21 (1st Cir. 2004) ("Generally, in the federal system, '[t]he law of any

state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which

the courts of the United States are bound to take judicial notice without plea or proof.'" (quoting

<u>Lamar v. Micou</u>, 114 U.S. 218, 223 (1885))); <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 590 B.R.

577, 590 n.12 (D.P.R. 2018) (citing <u>Getty</u> and taking judicial notice of the laws of Puerto Rico).

The New Bond Legislation, certified by the Puerto Rico Department of State, is attached hereto as

**<u>Exhibit A</u>**.[12]  The Court also takes judicial notice of the dockets of the Title III Case, the

Commonwealth Title III Case, the appellate court dockets of any and all appeals filed from any

order entered or opinions issued by the Court in the Title III Case and the Commonwealth Title III

Case, and the following litigations and adversary proceedings:  (a) <u>The Official Committee of</u>

<u>Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of the Commonwealth of</u>

---

12     The New Bond Legislation was adopted in English and Spanish.  Pursuant to Article 5.2
of the New Bond Legislation, the English text governs in the event of a conflict between
the English and Spanish texts.

Puerto Rico v. Bettina Whyte, as agent of the Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS, currently pending before the Court, (the "Adversary Proceeding"), and The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"), each of which is maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Title III Case and such adversary proceedings; (b) Ambac Assurance Corp. v. The Bank of New York Mellon, Case No. 17-cv-3804-LTS, currently pending in the United States District Court for the Southern District of New York (the "Ambac Action"); (c) In re Fin. Oversight & Mgmt. Bd. for P.R., No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, In re Fin. Oversight & Mgmt. Bd. for P.R., No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. P.R Elec. Power Auth., et al., Adv. Pro. No. 17-AP-228-LTS, currently pending before the Court, René Pinto Lugo, et al. v. The Government of the United States of America, et al., Adv. Pro. No. 18-041-LTS, currently pending before the Court, Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the United States of America, et al., Adv. Pro. No. 18-066-LTS, currently pending before the Court, Hon. Rafael Hernandez-Montanez, et al. v. The Fin. Oversight & Mgmt. Bd. for P.R., Adv. Pro. No. 18-090-LTS, currently pending before the Court (collectively, the "Appointments Related Litigation"); (d) (i) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No. 17-AP-143-LTS, currently pending before the Court, and (ii) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending before the Court (collectively, the "Whitebox Actions"); and (e) Natal-Albelo et al v. Estado Libre

Asociado de Puerto Rico, et al, Adv. Proc. No. 19-AP-0003-LTS, currently pending before the Court.

4.      Burden of Proof.  The Debtor has the burden of proving the elements of PROMESA section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019 of the Bankruptcy Rules by a preponderance of the evidence.  The Debtor has met its burden with respect to each element of PROMESA section 314 and, to the extent applicable to consideration of the confirmation of the Plan, Bankruptcy Rule 9019.


GENERAL BACKGROUND

5.      For more than a decade, Puerto Rico has been facing an unprecedented fiscal and economic crisis.  The positions assumed and actions taken in the past caused Puerto Rico to lose access to the capital markets and precipitated the collapse of Puerto Rico's public finance system.  These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico.  The situation was further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017.

6.      On June 30, 2016, the United States of America enacted PROMESA and the Oversight Board was established under PROMESA section 101(b).  (Jaresko Decl. ¶ 3.)  Pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

7.      On August 31, 2016, President Obama appointed the Oversight Board's seven voting members.  (Jaresko Decl. ¶ 3.)

8.      On September 30, 2016, the Oversight Board designated COFINA as a "covered entity" under PROMESA section 101(d).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification, pursuant to sections 104(j) and 206 of PROMESA and, at the request of the Governor of Puerto Rico, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under Title III thereof (the "Commonwealth Title III Case").  (Jaresko Decl. ¶ 17.)

10.      On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA and, at the Request of the Governor of Puerto Rico, filed a voluntary petition for relief for COFINA pursuant to section 304(a) of PROMESA, commencing a case under Title III thereof.  (Jaresko Decl. ¶ 17; Docket Entry No. 1).

11.      On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth Title III Case and the COFINA Title III Case, for procedural purposes only. (Docket Entry No. 131.)

12.      On June 15, 2017, the United States Trustee for Region 21 (the "U.S. Trustee") appointed the statutory creditors' committee in the Commonwealth's Title III Case (the "Committee" or "UCC").  (Docket Entry No. 338 in Case No. 17-3283.)  That same day, on June 15, 2017, the U.S. Trustee filed a *Notice of No Appointment of Official Committee of Unsecured Creditors for Puerto Rico Sales Tax Financing Corporation (COFINA)*, indicating that there is no creditors' committee in the Title III Case.  (Docket Entry No. 339 in Case No. 17-3283.)

The Commonwealth-COFINA Dispute

13.      Prior to the commencement of the Commonwealth Title III Case, the Oversight Board recognized that resolution of the Commonwealth-COFINA Dispute would be a critical component to the restructuring of Puerto Rico's public debt.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  Of the approximately $74 billion in aggregate Puerto Rico debt, the GO Debt and COFINA's Existing Securities together account for approximately fifty-five percent (55%) of the

total funded indebtedness to be restructured.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  The determination of which funds are available to service COFINA's debt and the Commonwealth's debt is dependent upon which entity, the Commonwealth or COFINA, owns the portion of the Commonwealth's general sales and use tax (the "SUT") that was purportedly transferred to COFINA pursuant to the Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246 et seq. (codified as amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91").  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  The Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended and restated on June 10, 2009 (as amended and supplemented, the "Resolution"), states that a portion of the SUT (the "Pledged Sales Tax Base Amount") was pledged by COFINA to secure the repayment of COFINA's Existing Securities.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8; Exhibit DX-K.)  The amount at issue in the Commonwealth-COFINA Dispute is significant— approximately $783 million in the current fiscal year alone, which amount grows at four percent (4%) annually until it reaches $1.85 billion in fiscal year 2041 and remains fixed at that amount until COFINA's Existing Securities are repaid in full in accordance with their terms.  Under the COFINA Fiscal Plan, this would result in billions of dollars over the next forty (40) years.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8; Exhibit DX-SSS.)

14.    If the Pledged Sales Taxes were property of COFINA, the Commonwealth would have $783 million less in fiscal year 2019 (which annual amount would increase over time) to pay its liabilities and expenses, including addressing the essential services of the Commonwealth and the needs of its citizens.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  Conversely, if the Pledged Sales Taxes were property of the Commonwealth, there would not be any funds available to address and satisfy COFINA's outstanding indebtedness.  Unless and until a resolution were reached on the Commonwealth-COFINA Dispute, the Oversight Board would not be able to begin

to formulate a Title III plan of adjustment for the Commonwealth, COFINA, or any of their other debtor-affiliates.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)

15.     Prior to the commencement of the Commonwealth Title III Case, on July 20, 2016, certain holders of GO Bonds filed a complaint in the United States District Court for the District of Puerto Rico against the Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service payments and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on the Commonwealth's general obligations bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the government permitting transfers outside of the ordinary course.  Lex Claims, LLC v. Garcia-Padilla; District Court, District of Puerto Rico, July 20, 2016, Case No. 16-2374-FAB (the "Lex Claims Litigation"); (Exhibit DX-M; Jaresko Decl. ¶ 11; Jaresko (9019) Decl. ¶ 10).  On November 4, 2016, the plaintiffs in that case filed a second amended complaint, as further described below, adding new causes of action, including three causes of action relating to COFINA, and adding COFINA and other parties as defendants.  On December 16, 2016, COFINA filed an answer to the second amended complaint generally denying the allegations and asserting various affirmative defenses.  Certain COFINA bondholders who intervened in the Lex Claims Litigation also filed answers generally denying the allegations and asserting various defenses and counter- and cross-claims.  (Jaresko Decl. ¶ 10; Jaresko (9019) Decl. ¶ 10; Exhibits DX-M, DX-N, and DX-O.)

16.     Plaintiffs in the Lex Claims Litigation, in their second amended complaint, argue, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure.  They claim that, pursuant to Article VI, Section 8 of the

Puerto Rico Constitution, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." They further allege the Pledged Sales Taxes are an "available resource" and that COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on "available resources" and related constitutional limitations on the amount of public debt the Commonwealth was permitted to issue. Plaintiffs request two declaratory judgments that challenge the legal validity of COFINA: (1) a declaration that the Pledged Sales Taxes constitute "available resources" and that such funds cannot be deposited with COFINA or its bondholders; and (2) a declaration that the Commonwealth is obligated to afford the GO Debt absolute priority, including priority over required deposits with COFINA and its bondholders. (Jaresko Decl. ¶ 11; Exhibits DX-M and DX-O.)

17.     Certain holders and insurers of COFINA's Existing Securities, permitted to intervene in the Lex Claims Litigation, asserted that the Pledged Sales Taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or "available resources" of the Commonwealth. Such holders and insurers rely upon Act 91, which provides that the Pledged Sales Taxes "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." Act 91 § 2. They further assert that the question whether COFINA's property constitutes "available resources" should be certified to the Supreme Court of Puerto Rico because, in their view, its resolution would involve a pure and undecided issue of Puerto Rico constitutional law that would have long-lasting consequences for the Commonwealth. They assert that COFINA is essential in permitting Puerto Rico to access the capital markets on favorable terms, and that the plaintiffs in the Lex Claims Litigation had been able to obtain higher interest rates on the Commonwealth's

general obligation bonds precisely because COFINA's property was not available to repay them. (Jaresko Decl. ¶ 12; Exhibit DX-P.)

18.     On April 12 and May 2, 2017, in response to uncertainty surrounding the transfer of the SUT, and contending that an event of default had already occurred under the Existing Bond Resolution, Whitebox and Ambac, respectively, commenced separate litigations against BNYM, the trustee under the Existing Bond Resolution, alleging various causes of action, each premised upon allegations that an event of default occurred prior to April 29, 2017, and that BNYM breached its alleged duties by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate" (sometimes referred to herein as "junior") Existing Securities.  If such creditors were correct, then, in their view, the subordination provisions attendant to the Existing Securities would apply and no payments to holders of "First Subordinate" Existing Securities would have been permissible until holders of "Senior" Existing Securities had been paid in full. (Jaresko Decl. ¶ 13; Exhibits DX-Q and DX-R.)

19.     BNYM responded that the Ambac Action and Whitebox Actions, including any claims and causes of action for gross negligence, willful misconduct, or intentional fraud, lacked merit and should be dismissed with prejudice.  BNYM claimed, and Whitebox and Ambac disagreed, that such actions should fail for a variety of reasons, including, without limitation: (i) there were no defaults or events of default under the Existing Bond Resolution prior to April 29, 2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request or direction of bond owners, unless the bond owners offered BNYM security or indemnity satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred; and (iii) a failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond Resolution.  (Jaresko Decl. ¶ 14.)

20.     Promptly after certification of the Commonwealth's initial Fiscal Plan on March 13, 2017, the Oversight Board and AAFAF undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in such Fiscal Plan.  The Oversight Board and AAFAF requested that holders of GO Debt and COFINA's Existing Securities participate in mediation with the Oversight Board and AAFAF.  The mediation began on April 13, 2017, under the auspices of retired Bankruptcy Judge Allan L. Gropper.  Despite several mediation sessions and other private negotiations, no agreement was reached before the expiration of the pre-Title III stay provided in PROMESA section 405 on May 1, 2017.  (Jaresko Decl. ¶ 15.)

21.     After competing bondholder groups commenced litigation against the Commonwealth and COFINA, the Oversight Board determined, in consultation with AAFAF, and at the request of the Governor, and after consideration of creditor support for a Title III filing, that the best path forward for the Commonwealth and COFINA to resolve the Commonwealth-COFINA Dispute was to file the Commonwealth Title III Case and the Title III Case to afford the Commonwealth and COFINA additional time and breathing room to seek to resolve the impasse under the supervision of the Title III Court.  (Jaresko Decl. ¶ 16.)

22.     Following the filing of the Title III Case, BNYM, as trustee for the Existing Securities, was in possession of hundreds of millions of dollars for the benefit of holders of both junior and senior Existing Securities, but without clarity about how and to whom the money should be distributed.  On May 16, 2017, BNYM filed the Interpleader Action, seeking a determination of competing claims to the Disputed Funds by certain holders of beneficial interests in the Existing Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA.  On May 30, 2017, the Title III Court granted the interpleader request and ordered that

the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action.  (Jaresko Decl. ¶ 18; Exhibits DX-S, DX-T, and DX-U.)

23.     Significant holders of "Senior" and "First Subordinate" Existing Securities intervened in the Interpleader Action.  From June to September 2017, several parties, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, Rothschild (in its capacity as financial advisor to the Commonwealth), the Commonwealth, AAFAF, and the Oversight Board.  The subpoenaed entities and individuals produced documents.  In addition, depositions were taken of Banco Popular of Puerto Rico, a private financial services institution, in its capacity as the banking services institution of the Commonwealth, the Government Development Bank, and COFINA.  AAFAF, COFINA, the Commonwealth, and the Oversight Board each stipulated to binding statements of facts in lieu of depositions.  (Jaresko Decl. ¶ 19; Exhibits DX-U and DX-ZZZ.)

24.     Based upon the parties' agreement, the Court stayed consideration of the Interpleader Action and did not render a determination as to whether an event of default under the Existing Bond Resolution had occurred.  (Docket Entry No. 518 in Adv. Proc. No. 17-133.)

25.     If an event of default under the Existing Bond Resolution had occurred, the senior bondholders may have had repayment of their bonds accelerated, to the detriment of the junior bondholders.  Such acceleration might, in the senior bondholders' view, require the senior bondholders to be paid in full prior to junior bondholders being able to declare an event of default and exercise remedies.  The Interpleader Action is in essence a dispute between junior and senior COFINA creditors about their payment rights and priorities vis-à-vis each other.  The issues regarding such payment rights and priorities are being settled pursuant to the Plan.

26.     Pursuant to PROMESA section 315(b), the Oversight Board is representative of the Commonwealth and COFINA in their respective Title III cases.  The Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which process involved the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute.  (Jaresko Decl. ¶ 21.)

27.     On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*.  (Docket Entry No. 303 in Case No. 17-3283, the "Commonwealth-COFINA Dispute Procedures Motion"; Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-V.)

28.     On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.  (Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-W.)

29.     Consistent with the Court's request, the Oversight Board worked with Chief Bankruptcy Judge Houser and any creditor party who sought to participate to formulate procedures agreeable to the interested parties.  On July 21, 2017, the Oversight Board filed a revised motion seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including the appointment of respective agents with independence from the Oversight Board as debtor representatives for the Commonwealth and COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the

Agents to consult with creditors of their respective debtor in carrying out their charge, but at all times owing duties only to their respective debtor and to act solely in such debtor's best interest. (Jaresko Decl. ¶ 22; Jaresko (9019) Decl. ¶ 16; Exhibit DX-X.)

30.     On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Docket Entry No. 996 in Case No. 17-3283, the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth; and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA.  (Jaresko Decl. ¶ 23; Jaresko (9019) Decl. ¶ 17; Exhibit DX-B.)

31.     The Procedures Order directed that "[e]ach Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents.  In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents.").  See Procedures Order ¶ 4(f).

32.     On September 8, 2017, the Commonwealth Agent commenced the Adversary Proceeding against the COFINA Agent seeking a resolution of the Commonwealth-COFINA Dispute and related issues.  Concurrently with the litigation of the Adversary Proceeding, the Agents and various parties to the Commonwealth-COFINA Dispute engaged in mediation led by Mediation Team leader Chief Bankruptcy Judge Barbara J. Houser to resolve the dispute.  At the time, such efforts were unsuccessful.  (Jaresko Decl. ¶ 24; Exhibit DX-Y.)

33.     During the intervening months, (a) the COFINA Agent answered the complaint and
asserted counterclaims, (b) multiple parties intervened in the Adversary Proceeding, (c) discovery
was undertaken, and (d) the Agents and certain intervenors filed cross motions for summary
judgment.  Additionally, during this period, the Court clarified the scope of the Agents' authority
to litigate and/or settle the issues raised in the Adversary Proceeding.  (See Docket Entry Nos. 167,
257, and 284 in Adv. Proc. No. 17-257.)

34.     Following oral argument regarding the respective motions for summary judgment
filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled their efforts to
mediate a resolution.  The Oversight Board was not a party to such mediation efforts, other than
to be informed of their existence.  Likewise, the Oversight Board was unaware of the parties which
may have participated in such mediation.  (Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.)

35.     On June 7, 2018, the Agents announced the terms of an Agreement in Principle to
resolve the Commonwealth-COFINA Dispute.  The Agreement in Principle was the product of
arm's-length negotiations between the Agents free from any influence or direct participation by
the Oversight Board.  (Feldman Decl. ¶ 4; Jaresko (9019) Decl. ¶ 21.)  At the time the Agreement
in Principle was reached, both the COFINA Agent and the Commonwealth Agent agreed that it
was the best possible outcome for each of their respective estates given the enormous stakes and
uncertainty involved in litigating the Commonwealth-COFINA Dispute to conclusion.  (Feldman
Decl. ¶ 4.)

36.     The Oversight Board asserted that certain aspects of the Agreement in Principle
concerned matters beyond the scope of the Commonwealth-COFINA Dispute, as framed by the
Procedures Order and the Scope Orders, including the design of new securities to be issued under
a plan of adjustment for COFINA and a constraint on the Oversight Board's use of funds allocated
to the Commonwealth.  Moreover, the Oversight Board asserted that, among other things, the

Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures Order by attempting to, among other things, dictate the terms of plans of adjustment in the Title III Cases and limit the availability and use of funds. However, the Oversight Board determined, after reviewing the extensive litigation history and issues raised in the Adversary Proceeding and assessing the likelihood of success for the Commonwealth in the litigation, that the central component of the Agreement in Principle—the 53.65% / 46.35% allocation of the disputed sales and use tax revenue between COFINA and the Commonwealth, respectively—was a fair and reasonable settlement and compromise of the Commonwealth-COFINA Dispute given the substantial risks of litigation, and determined to build upon the central component of the Agreement in Principle to garner support for a confirmable COFINA plan of adjustment. (Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.)

37.     Beginning in July 2018 and using the economic framework of the Agreement in Principle, the Oversight Board and its advisors engaged in over two weeks of court-sanctioned mediation among interested parties convened by the Mediation Team on a COFINA plan of adjustment, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action. (Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22.)

38.     On August 8, 2018, the Oversight Board announced that it had reached an agreement with certain holders and insurers of COFINA's Existing Securities and AAFAF on the economic treatment of COFINA's Existing Securities and the terms of new securities to be issued pursuant to a proposed COFINA plan of adjustment (the "Securities Terms"), which Securities Terms were developed by Citigroup Global Markets, Inc. ("Citi") at the request of the Oversight Board and included in a presentation, of which the Agreement in Principle was the foundation. (Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22; Exhibit DX-UU; Brownstein Decl. ¶ 12; Exhibit DX-YY.)

39.     The Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del Patio, Inc. (collectively, the "Settlement Parties") entered into that certain Plan Support Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that sets forth, among other things, (a) terms to the compromise and settlement of the Commonwealth-COFINA Dispute implemented by the Oversight Board and Citi and consistent with the terms of the Agreement in Principle developed by the Agents, which, among other things, allocates the first collections of SUT revenues in an amount up to fifty-three and sixty five one-hundredths percent (53.65%) of the annual Pledged Sales Tax Base Amount to COFINA, and confirms that COFINA is the sole and exclusive owner of the amounts held at BNYM as of June 30, 2018, and (b) terms of the relative treatment between junior and senior Existing Securities to resolve the dispute between holders of junior and senior Existing Securities regarding whether or not a default and acceleration had been triggered under the Resolution.  (Jaresko Decl. ¶ 27.)

40.     On September 20, 2018, the Settlement Parties amended and restated the Original Plan Support Agreement (the "A&R Plan Support Agreement") to (a) include additional holders of Existing Securities, who also hold significant amounts of GO Bonds and were among the plaintiffs in the Lex Claims Litigation and (b) provide that Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable affiliates, who are significant holders of Existing Securities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the SUT revenues purportedly transferred by the Commonwealth to COFINA, and any other claims and causes of action which may challenge the transactions contemplated in the A&R Plan Support Agreement or the Plan, effective upon the entry of an order

approving the Settlement and confirmation of the Plan.  (Jaresko Decl. ¶ 28; Exhibit DX-D (<u>A&R</u>
<u>Plan Support Agreement</u>), § 4.13.)

41.     As of the date of the August 8, 2018, announcement, and due to the changes in the
Commonwealth's then-certified fiscal plan, the Commonwealth Agent was unwilling to proceed
to finalize any further documentation regarding the Agreement in Principle.  (Feldman Decl. ¶ 5.)
As such, the Oversight Board, as representative of the Commonwealth, began negotiation of the
terms of the Settlement Agreement with the COFINA Agent, consistent with the economic terms
of the Agreement in Principle.  (Feldman Decl. ¶ 6.)  The Settlement Agreement was the result of
a good faith, arm's-length negotiation between the COFINA Agent and the Oversight Board.
(Feldman Decl. ¶ 7.)  The Oversight Board did not exert any influence on the COFINA Agent's
decision to enter into the Settlement Agreement, nor did the COFINA Agent permit the Oversight
Board to affect her judgment or ability to carry out her duty to act in the best interest of the debtor
she was appointed to represent.  (Feldman Decl. ¶ 7.)  The Settlement Agreement is faithful to and
consistent with the Agreement in Principle.  (Feldman Decl. ¶ 8.)  On October 19, 2018, after
extensive discussion and deliberations, the Oversight Board, as representative of the
Commonwealth, approved entry into the Settlement Agreement with the COFINA Agent.  (Jaresko
Decl. ¶ 29.)

42.     Contemporaneously thereto, on October 19, 2018, the Debtor filed the Plan,
Disclosure Statement, and *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I)*
*Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation*
*Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V)*
*Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI)*
*Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VIII)*
*Approving Vote Tabulation Procedures* (Docket Entry No. 307).

43.     On November 5, 2018, the Commonwealth Agent entered into a stipulation with the Oversight Board and the COFINA Agent withdrawing any objections to the Settlement Agreement.  Pursuant to such stipulation, the Commonwealth Agent agreed, among other things, not to object to the approval of the Settlement Agreement, approval of the Disclosure Statement, or confirmation of the Plan, except in the circumstances set forth in paragraph 4 therein.  (Docket Entry No. 4204 in Case No. 17-3283.)  On January 10, 2019, the Retiree Committee withdrew its objection to the Settlement Agreement.  (Docket Entry No. 4704 in Case No. 17-3283.)  In light of the foregoing, as of the date hereof, (a) each of the COFINA Agent, the GO Representative, and the Retiree Committee have agreed to or ratified the terms of the Settlement Agreement resolving the Commonwealth-COFINA Dispute in a manner consistent with the requirements of the Procedures Order, and (b) the Commonwealth Agent also does not object to the approval of the Settlement Agreement.  The Oversight Board's execution of the Settlement Agreement with the COFINA Agent was appropriate under the circumstances.

44.     On November 15, 2018, in furtherance of the Settlement and the Plan, the Government enacted Act 241-2018 ("Act 241"), amending Act 91, which originally created COFINA.

45.     On November 29, 2018, the Court entered an order (Exhibit DX-J, Docket Entry No. 375, the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) establishing (1) January 2, 2019, at 5:00 p.m. (Atlantic Standard Time), as the Confirmation Objection Deadline, (2) January 8, 2019, at 6:00 p.m. (Atlantic Standard Time), as the deadline by which (i) ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting Deadline"), and (ii) elections regarding the form of distribution (including a determination regarding commutation with respect to certain insured claims) were required to be received by

Prime Clerk (the "Election Deadline"), which Election Deadline was subsequently extended to January 11, 2019, at 6:00 p.m. (Atlantic Standard Time)  (Docket Entry No. 400), and (c) scheduling a hearing on January 16, 2019, at 9:30 a.m. (Atlantic Standard Time), to consider confirmation of the Plan (Docket Entry No. 302).

46.     Consistent with the Disclosure Statement Order, the Debtor caused Prime Clerk to distribute solicitation packages to all claim holders entitled to vote.  The solicitation packages contained, among other things: (i) the notice setting forth the time, date, and place of the Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating to distributions under the Plan; and (v) in the case of creditors in Class 6, the Class 6 Notice.  Prime Clerk also served election notices to holders of Claims in Classes 1 and 5, to permit the election into Classes 4 and 7, respectively, or, if in Class 2 or 3, to elect to receive the applicable trust certificates rather than the commutation alternative being offered by the respective monoline insurers.  (Pullo Decl. ¶ 4.)

COMPLIANCE WITH PROMESA SECTIONS 104(J) AND 313

47.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  See PROMESA § 104(j)(1)–(2). The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified fiscal plan.  See id. § 104(j)(3).  Further, the Oversight Board, after the issuance

of a certification pursuant to PROMESA section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.   See id. § 313.   After the Oversight Board files a modification, the plan as modified becomes the plan.

48.     The Oversight Board has complied with its obligations pursuant to PROMESA sections 104(j) and 313.  On October 18, 2018, the Oversight Board certified COFINA's current fiscal plan (the "COFINA Fiscal Plan").  (Exhibit DX-FFFF.)

49.     On October 19, 2018, the Oversight Board certified the submission of the *Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4072 in Case No. 17-3283, the "Original Plan") upon a determination, in the Oversight Board's sole discretion, that the Original Plan was consistent with the COFINA Fiscal Plan.   (Exhibit DX-BBBB.) Accordingly, the Oversight Board certified the submission of the Original Plan in accordance with PROMESA section 104(j).

50.     On November 16, 2018, the Oversight Board certified the modification of the Original Plan and the submission of the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4296 in Case No. 17-3283, the "First Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the First Amended Plan was consistent with the COFINA Fiscal Plan.  (Exhibit DX-CCCC.)  Accordingly, the Oversight Board certified the modification of the Original Plan and the submission of the First Amended Plan in accordance with PROMESA section 104(j).

51.     On November 26, 2018, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4363 in Case No. 17-3283, as subsequently corrected pursuant to Docket Entry No. 4390, the "Second Amended Plan") upon a determination,

in the Oversight Board's sole discretion, that the Second Amended Plan was consistent with the COFINA Fiscal Plan. (Exhibit DX-DDDD.) Accordingly, the Oversight Board certified the modification of the First Amended Plan and the submission of the Second Amended Plan in accordance with PROMESA section 104(j).

52.     On January 9, 2019, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4652 in Case No. 17-3283, the "Third Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Third Amended Plan is consistent with the COFINA Fiscal Plan. (Exhibit DX-EEEE.) Accordingly, the Oversight Board certified the modification of the Second Amended Plan and the submission of the Third Amended Plan in accordance with PROMESA section 104(j).

53.     For the reasons explained herein, the Third Amended Plan meets the requirements of PROMESA; the First Amended Plan and Second Amended Plan met the requirements of PROMESA to the same extent that the Third Amended Plan meets the requirements of PROMESA; and the Oversight Board has complied with all applicable provisions of PROMESA. Accordingly, the Oversight Board modified the Original Plan, First Amended Plan, and Second Amended Plan in accordance with PROMESA section 313, and the Third Amended Plan has become the "Plan."

### COMPLIANCE WITH PROMESA SECTION 314(B)

**A. PROMESA § 314(b)(1)**: *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301*.

54.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent. Plan at 1, 78. In addition, as detailed below, the Plan satisfies the requirements

of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d)
of the Bankruptcy Code:

### i.   Bankruptcy Code Section 1122(a)

55.     With the exception of Administrative Expense Claims and Professional Claims,
which need not be classified, Article IV of the Plan designates the classification of Claims.  Such
classification complies with section 1122(a) of the Bankruptcy Code because each Class contains
only claims that are substantially similar to each other.  The Plan designates the following ten (10)
Classes of Claims:

> Class 1 (Senior COFINA Bond Claims)
>
> Class 2 (Senior COFINA Bond Claims (Ambac))
>
> Class 3 (Senior COFINA Bond Claims (National))
>
> Class 4 (Senior COFINA Bond Claims (Taxable Election))
>
> Class 5 (Junior COFINA Bond Claims)
>
> Class 6 (Junior COFINA Bond Claims (Assured))
>
> Class 7 (Junior COFINA Bond Claims (Taxable Election))
>
> Class 8 (GS Derivative Claim)
>
> Class 9 (General Unsecured Claims)
>
> Class 10 (Section 510(b) Subordinated Claims)

(Exhibit DX-G.)

56.     The classification of Claims set forth in the Plan is reasonable and was not done to
control the outcome of voting to accept or reject the Plan, as the classification is based upon
differences in the legal nature and/or priority of such Claims in accordance with applicable law.
(Jaresko Decl. ¶ 36.)

57.     All holders of Claims in Classes 1, 2, and 3 hold substantially similar securities,
"Senior" Existing Securities, but are classified separately based on whether they are uninsured
(Class 1) or insured by Ambac (Class 2) or National (Class 3), as such insurance agreements

provide bondholders different rights thereunder.  Holders of Claims in Classes 5 and 6 hold substantially similar securities, "First Subordinate" Existing Securities, but are classified separately based on whether they are uninsured (Class 5) or insured by Assured (Class 6).  (Jaresko Decl. ¶ 36.)

58.     Senior COFINA Bond Claims and Junior COFINA Bond Claims are in different Classes because they have different underlying rights.  Specifically, in determining whether claims are "substantially similar" for the purpose of section 1122 of Title 11 of the United States Code, made applicable to the Title III Case pursuant to PROMESA section 301(a), the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.  See PROMESA § 301(e).  Under the Resolution, in the event of default, payment to the Junior COFINA Bond Claims, such as those bonds issued under the Seventh Supplemental Sales Tax Revenue Bond Resolution, is subordinate in payment of the Senior COFINA Bond Claims. (Jaresko Decl. ¶ 37; Exhibit DX-XX.)

59.     Based upon the elections offered pursuant to the Plan, holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims which are either Puerto Rico Institutions or Puerto Rico Individuals, to the extent elections were made, were shifted appropriately to other Classes (Class 4 and Class 7, respectively) to denote the election made and the alternative form of distribution elected to be received.  (Jaresko Decl. ¶ 38; Exhibit DX-G.)

60.     Numerous formal and informal objections contest the existence of the Taxable Election Class and the different treatment of holders of claims who elect to have their claims placed into Class 7, or the "Junior Taxable Election Class."  In particular, the objections note that the bonds issued to the Junior Taxable Election Class have different payment schedules and maturities, and holders of claims who elect to place their claims in the Junior Taxable Election Class will receive shares of Taxable Election Cash (equal to up to two percent of the aggregate amount of

Senior and Junior COFINA Bond Claims).  The total amount of such cash will not exceed $60 million.  The Junior Taxable Election Class is properly treated as a separate class of claims from the other classes of claims for holders of junior bonds and it therefore does not implicate Section 1122(a), which concerns whether claims may be classified together.

61.     The Claim in Class 8 arises from or relates to that certain ISDA Master Agreement, dated as of July 31, 2007, between Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, L.P.) and COFINA, as amended by that certain Amendment, dated September 24, 2014.  The treatment of the Claim in Class 8 is dependent on the termination value of such Claim and whether the rejection damages, if any, associated with such Claim constitute a Parity Obligation.  (Exhibit DX-G.)

62.     The Claims in Class 9 are for all other liabilities of COFINA other than an Administrative Expense Claim, a Professional Claim, a Senior COFINA Bond Claim, a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National), a Senior COFINA Bond Claim (Taxable Election), a Junior COFINA Bond Claim, a Junior COFINA Bond Claim (Assured), a Junior COFINA Bond Claim (Taxable Election), a GS Derivative Claim, or a Section 510(b) Subordinated Claim.  (Exhibit DX-G.)

### ii. Bankruptcy Code Section 1123(a)(1)

63.     Section 4.1 of the Plan designates ten (10) separate Classes of Claims for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code. (Exhibit DX-G.)

64.     The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iii. Bankruptcy Code Section 1123(a)(2)

65.     Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are impaired. (Exhibit DX-G.)  Existing holders of Allowed Junior COFINA Bond Claims (Assured) will receive

(through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus, be effectively rendered unimpaired; provided, however, Assured will be subrogated to the rights of such holders and will receive distributions pursuant to the Plan, thereby rendering Assured's claims impaired. Therefore, there are no unimpaired Classes under the Plan.

66.     The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(3)

67.     Articles V through XIV of the Plan identify the treatment of all Classes of Claims that are impaired under the Plan.  (Exhibit DX-G.)

68.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(4)

69.     Articles V through XIV of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  If a holder of a Claim in Class 1 or 5 elects out of such Class so as to receive all taxable bonds, rather than a mix of taxable and tax-exempt bonds, pursuant to the Plan, such holder is no longer in such Class, and, instead, is treated as a holder of a Claim in Class 4 or 7, respectively.  (Jaresko Decl. ¶ 42; Exhibit DX-G.)  Accordingly, all holders of Claims in each of Classes 1, 4, 5, and 7 receive the same treatment as other Claims in the same Class pursuant to the Plan.  Objections to the existence of the Taxable Election Class and the different treatment of holders of claims who elect to have their claims placed into the Junior Taxable Election Class do not implicate Section 1123(a)(4).

70.     Consummation Costs are being paid to the parties to the A&R Plan Support Agreement and are not being paid to the Consummation Cost Parties on account of their Claims against COFINA.  (Jaresko Decl. ¶ 43; Exhibit DX-G.)  During the lengthy and complex court-sanctioned mediation led by Chief Bankruptcy Judge Houser, the Consummation Cost Parties

agreed to various conditions and covenants set forth in the A&R Plan Support Agreement, including, among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means, including through substantial contribution claims.  As consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, continuing to assist in the finalization of definitive agreements and ancillary documents, and the costs incurred in those and other efforts (including the expenses of defending COFINA's property interests for which the PSA Creditors asserted a right to seek substantial contribution claims), the Oversight Board determined that it was fair and reasonable for the Consummation Cost Parties to be paid the Consummation Costs.  Based upon representations of counsel and, in some instances, pleadings filed with the Title III Court, the Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to be at least $135 million.  (Jaresko Decl. ¶ 43; Rodrigue Decl. ¶ 8.)

71.     The Consummation Cost Parties hold nearly $10 billion of the outstanding $17.6 billion in outstanding Bond Claims.  Thus, approximately $190 million ($10 billion / $17.6 billion * $332 million) of the Consummation Costs (approximately 2% of their collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the absence of the Consummation Costs provision.  Accordingly, the Consummation Cost provision provides for a "net" incremental payment for the Consummation Cost Parties of approximately $140 million. This amount equates to approximately 1.3% of the total Allowed Bond Claims of the Consummation Cost Parties.  The Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to exceed the "net" cost of the Consummation Costs of approximately $140 million.  (Jaresko Decl. ¶ 44.)

72.     Unlike the Commonwealth and the other Title III debtors in these jointly-administered cases, COFINA does not have a statutory creditors' committee representing the interests of COFINA creditors.   Under section 1103(c)(3) of the Bankruptcy Code, made applicable to COFINA's Title III Case under section 301 of PROMESA, participation in the formulation of a plan is a function of a statutory committee, the expenses of which are entirely borne by the debtor.   Here, the PSA Creditors served as the counterparty to the Oversight Board and AAFAF in negotiating the Plan and in ensuring the Oversight Board that it had significant creditor support for the Plan.

73.     The payment of the Consummation Costs was a critical component of the interlocking agreements set forth in the A&R Plan Support Agreement.   The absence of the A&R Plan Support Agreement could have resulted in a costly, contentious, and lengthy confirmation process for COFINA.   Under such a scenario, there would be no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than eighteen (18) months.   In consideration of the benefits obtained for COFINA in entering into the A&R Plan Support Agreement, the benefits to COFINA creditors from the mediation and the costs to and burdens of intense mediation with the Consummation Cost Parties, the Oversight Board determined that it was an appropriate use of COFINA's property to pay the Consummation Costs and provide an opportunity for COFINA to emerge from Title III as expeditiously as possible.   (Jaresko Decl. ¶ 45; see also Rodrigue Decl. ¶ 8.)

74.     The payment of Consummation Costs to the PSA Creditors does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (West 2016).   While it is true that all *claims* must be treated equally, the same is not true for all *claimants*.

See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2013) ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the plan's overall treatment of the creditors holding such claims or interest . . . . Creditors should not confuse equal treatment of claims with equal treatment of claimants."); see also In re Peabody Energy Corp., 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment for all class members in all respects under a plan, and that the requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions.") (emphasis in original).

75.     The *claims* held by the PSA Creditors are treated the same as every other bondholder pursuant to the Plan:  holders of Senior COFINA Bond Claims will receive a 93.01% recovery on their bonds while holders of Junior COFINA Bond Claims will receive a 56.41% recovery, see Plan §§ 1.114, 1.168, irrespective of whether the holder is a retail investor, an institutional investor, or a PSA Creditor.  (See also Jaresko Decl. ¶ 42.)  The payment of the Consummation Costs is intended to compensate the PSA Creditors for:  (i) the significant costs and expenses expended by the PSA Creditors in order to achieve a confirmable plan in lieu of seeking substantial contribution; (ii) agreeing to "lock up" their bonds until potentially June 1, 2019, and accepting the attendant risk of unfavorable market conditions; and (iii) agreeing to support the Plan—another restriction not applicable to non-PSA Creditors.  (Jaresko Decl. ¶¶ 43-45.)

### vi. Bankruptcy Code Section 1123(a)(5)

76.    Various provisions of the Plan provide adequate and proper means for its implementation:

- Section 16.1 provides for the issuance of COFINA Bonds on the Effective Date;

- Section 19.1 provides for distributions to be made to holders of Allowed Claims under the Plan;

- Section 26.1 provides that, "[e]xcept as settled and released [in the Plan], from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA";

- Section 28.1 provides that, on the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, without further action by any Person or Entity under any other applicable law, regulation, order, or rule;

- Section 28.3 provides for the appointment of the board of directors of Reorganized COFINA, consisting of three (3) persons appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in the Definitive Documents;

- Section 28.5 provides that "[t]he COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a 'bankruptcy remote,' single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan and as reflected in the Term Sheet"; and

- Section 30.1 provides for the re-vesting of assets: "[e]xcept as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan."

(Jaresko Decl. ¶ 46; Exhibit DX-G.)

77.     The Amended Plan Supplement contains, among other things, substantially final forms of the (i) New Bond Indenture, (ii) the COFINA Bonds, (iii) the Reorganized COFINA By-Laws, and (iv) the new Banking Services Contract.  The Plan, together with the documents and arrangements set forth in the Amended Plan Supplement, provides adequate means for its implementation.  (Jaresko Decl. ¶ 47.)  On January 28, 2019, the Oversight Board filed the Second Amended Plan Supplement amending the Amended Plan Supplement to revise certain exhibits.

78.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vii. Bankruptcy Code Section 1123(b)(1)

79.     Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are all impaired.  (Jaresko Decl. ¶ 48; Exhibit DX-G.)

80.     The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### viii.   Bankruptcy Code Section 1123(b)(2)

81.     Article XVIII of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which COFINA is a party are rejected, "except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Amended Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."  Plan § 18.1; see also Second Amended Plan Supplement at Exhibit I.

82.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### ix. Bankruptcy Code Section 1123(b)(3)(A)

83.     The Plan incorporates the settlement and compromise of, among other things, (a) the Commonwealth-COFINA Dispute Settlement in Article II of the Plan, (b) issues regarding the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action, and (c) the treatment of holders of Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National).  The Plan is the result of extensive arms' length negotiations among the Governmental Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Governmental Parties and various PSA Creditors form the very foundation of the Plan.  In absence of such compromises and settlements, COFINA's emergence from Title III would likely be significantly delayed by currently stayed and other litigation and burdened by additional expense, which could impair the ability of COFINA to successfully adjust its debts, thereby prejudicing the recovery for all creditors and raising further uncertainties concerning the Commonwealth and COFINA's financial condition.  Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, is fair, equitable, and reasonable; (b) is in the best interests of COFINA, its creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.

84.     Further, the Plan will fairly and consensually resolve six adversary proceedings pending in the Court, two appeals pending in the First Circuit Court of Appeals, and an additional

court action pending in the District of Puerto Rico but not before the Title III Court, each of which raises difficult and complex issues.  The Plan thus incorporates a complex series of interrelated compromises and settlements that resolve the most significant potential obstacle to confirmation of a plan of adjustment.  Moreover, since the compromises and settlements are inextricably interwoven, they all hinge on one another and the approval of all of these compromises and settlements is required in order to satisfy the conditions to the Effective Date set forth in the Plan.

85.     Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### x.  Bankruptcy Code Section 1123(b)(3)(B)

86.     The Plan is premised upon the Settlement, which is integral to the Plan and settles and compromises the Commonwealth-COFINA Dispute.  The Settlement has been determined to be fair and reasonable and in the best interests of all creditors and above the lowest rung in the range of reasonableness.

87.     Section 26.1 of the Plan provides that, "[e]xcept as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court."  (Exhibit DX-G.)

88.     The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### xi.  Bankruptcy Code Section 1123(b)(5)

89.     Articles V through XIV of the Plan modify the rights of holders of Claims in all Classes.  There are no Classes whose holders' rights have been left unaffected pursuant to the Plan.  (Jaresko Decl. ¶ 52; Exhibit DX-G.)

90.     The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xii. Bankruptcy Code Section 1123(b)(6)

91.     The Plan provides for, among other things, (a) certain releases, injunctions, and exculpations by COFINA and Reorganized COFINA, the Disbursing Agent, and each of COFINA's and Reorganized COFINA's Related Persons, (b) releases by each of the PSA Creditors and their respective Related Persons, (c) a release of BNYM, (d) a release of the Commonwealth, (e) a release of the Commonwealth Agent Releasees, (f) consensual releases by holders of Claims, (g) customary exculpation provisions for the Government Parties, PSA Creditors and Bonistas, the COFINA Agent, the Commonwealth Agent, and each of Ambac, Assured, and National and their respective Related Persons; (h) assumption of certain director and officer indemnification and reimbursement obligations, and (i) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of COFINA Bonds, Ambac Certificates, and National Certificates.  (Exhibit DX-G; see also Jaresko Decl. ¶ 53.)

92.     Each of the foregoing is an integral part of the Plan and is essential to its implementation.  (Jaresko Decl. ¶¶ 73-83.)

93.     The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xiii.      Bankruptcy Code Section 1123(d)

94.     Section 18.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed, or assumed and assigned under the Plan.  All cure amounts will be determined in accordance with the underlying agreements and

applicable nonbankruptcy law, and pursuant to the procedures established by the Plan.  (Exhibit DX-G.)  The Debtor is not aware of any monetary defaults it must cure.  (Jaresko Decl. ¶ 54.)

95.     The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xiv.      Bankruptcy Code Section 1129(a)(2)**

96.     COFINA (i) has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan. (Jaresko Decl. ¶ 55.)

97.     The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement, and sought and received input and comment thereon from all the parties to the A&R Plan Support Agreement, and all other parties in interest.  This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code.  (Jaresko Decl. ¶ 55.)  Based upon the volume of ballots received and elections made, it is clear the Debtor has properly solicited with respect to the Plan, including with respect to each of the possible elections under the Plan.  (See Pullo Decl. ¶¶ 7-8, Exh. A.)

98.     The Debtor has complied with section 1129(a)(2) of the Bankruptcy Code.

**xv.       Bankruptcy Code Section 1129(a)(3)**

99.     The Plan was proposed in good faith with the legitimate and honest purpose to provide a method for a covered territory to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA.  The Oversight Board, as proponent of the Plan, is the duly-appointed representative of COFINA in its Title III Case as provided under

PROMESA and is in all respects consistent with applicable law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Case, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution.  The Debtor's good faith is evident from the facts and records of the Title III Case, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Case, including related adversary proceedings.  The Plan (including the settlements and compromises contained therein) is the result of extensive arm's-length negotiations among the Settlement Parties through mediation led by Chief Bankruptcy Judge Houser.  The Agreement in Principle was the product of an independent process overseen by the court-appointed Mediation Team in which the Oversight Board did not participate nor did it have any control over the parties who could participate. (Jaresko Decl. ¶ 56.)

100.    The Oversight Board built upon the Agreement in Principle and engaged in over two weeks of mediation among interested parties on a COFINA plan of adjustment and the attendant issues that needed to be resolved for a viable plan to be proposed, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action.  (Jaresko Decl. ¶ 57.)

101.    All major Classes of Claims were represented in such mediation.  (Brownstein Decl. ¶ 18-20; Jaresko Decl. ¶ 58.)  The Senior COFINA Bondholders' Coalition represented the interests of holders of Senior COFINA Bond Claims. Ambac and National, as monoline insurers of such Claims, in aggregate amounts in excess of $2 billion, participated on behalf of their respective interests and protected the interests of their insureds.   Assured, an insurer of approximately $274 million in "First Subordinate" Existing Securities, is aligned with the

economic interest of the holders of Junior COFINA Bond Claims and has no exposure, either through insurance coverage or beneficial ownership, to Senior COFINA Bonds.    Assured participated in Plan mediation and was a party to the A&R Plan Support Agreement.    Additionally, retail COFINA bondholders were represented throughout the process by retail or mutual funds, representing the interests of mainland and "on-island" bondholders, and Bonistas, advocating for the interests of Puerto Rico resident bondholders, actively participated.    All are signatories to the A&R Plan Support Agreement that included terms for the treatment of senior and junior COFINA bondholders to settle the issues of the relative rights between the senior and junior COFINA bondholders.    (Brownstein Decl. ¶ 19.)

102.    The Plan represents the culmination of months of intensive negotiations and discussions among parties representing the interests of all COFINA and Commonwealth stakeholders in an independently driven process facilitated by the court-appointed Mediation Team.    Throughout the Plan negotiations, various constituencies were represented in the negotiation of the Plan, as illustrated by the widespread creditor participation in and execution of the A&R Plan Support Agreement.    Cumulatively, such parties hold, own, beneficially own, or insure approximately an aggregate $5.6 billion in senior COFINA bonds, and $3.7 billion in junior COFINA bonds.    (Brownstein Decl. ¶ 20.)    No entity or constituency was denied access to the mediated settlement negotiation process.    (See Jaresko Decl. ¶ 22 (stating that the Oversight Board worked with "any creditor party who sought to participate to formulate procedures agreeable to the interested parties" as part of the mediation process); (see also Docket Entry No. 560 in Case No. 17-3283, *Order and Notice of Meeting with Representatives of Mediation Team*).)[13]

---

[13]    In his *Response to Proposed Findings of Fact and Conclusions of Law Submitted by Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices* (Docket Entry No. 4911 in Case No. 17-3283), Mr. Hein contends that the confidentiality of the mediation process within which the Settlement and

103.    The Plan is designed to implement the settlement and compromise of, among other things, the Commonwealth-COFINA Dispute and the Interpleader Action, and maximize value for COFINA's creditors, while avoiding protracted litigation which could delay distributions to creditors, or worse, result in no recoveries for any COFINA creditors.  (Jaresko Decl. ¶ 57.)

104.    The Plan and the Disclosure Statement reflect the culmination of those efforts and the substantial input of each representative group.

105.    The Plan (including the Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) achieves a rational adjustment of COFINA's debts, and properly distributes value to Creditors based upon their respective priorities, including through the implementation of parties' elections with respect to distributions.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of COFINA's property, and to maximize distributions to all creditors.  (See Jaresko Decl. ¶ 57.)

106.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xvi.    Bankruptcy Code Section 1129(a)(6)**

107.    The Plan does not provide for any rate changes by COFINA, and, accordingly, such section of the Bankruptcy Code does not apply.

---

Plan proposals were developed ran afoul of the First Amendment right of access to judicial proceedings.  Mr. Hein's reliance on Delaware Coalition for Open Government, Inc. v. Strine, 733 F.3d 510 (3d Cir. 2013) is unavailing because, unlike the closed courthouse-based binding arbitration proceedings, presided over by judges, that were the subject of that case, the mediation program here is open to all interested participants on terms announced by the Mediation Team, the members of the Mediation Team do not render binding decisions, and all stakeholders with standing have the opportunity to challenge in open adversarial proceedings before the Court any proposals developed in mediation for which judicial approval is sought.  Given these circumstances, the experience and logic test does not support a finding of a First Amendment right of public access to the mediation proceedings.  The objection is therefore overruled.

### xvii.    Bankruptcy Code Section 1129(a)(8)

108.    Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the Debtor to solicit acceptance and rejections of the Plan, as well as certain elections with respect thereto.  (Disclosure Statement Order ¶¶ B, 2.)  Prior to the transmission of the Disclosure Statement, the Debtor did not solicit acceptances of the Plan by any holder of Claims.

109.    The (i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement (which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Notices, (vi) Class 6 Notice, and (vii) Notice of Non-Voting Status – Class 10 (collectively, the "Solicitation Packages") were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the Disclosure Statement Order.  (Pullo Decl. ¶ 6; Mailing Affidavit.)

110.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing date, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Case; (ii) provided adequate and sufficient notice of the Voting Deadline, the Election Deadline, the Confirmation Objection Deadline, the method of voting or making an election of distribution under the Plan and the date, time and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure Statement

Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the COFINA Title III Case.  (Pullo Decl. ¶¶ 4-6; Service Affidavits.)

111.    No other or further notice with respect to the Plan or the Confirmation Hearing is required.  Based upon the foregoing, the Debtor and its successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with all its activities relating to the solicitation of acceptances to the Plan or elections thereunder and its participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 30.7 of the Plan.  Plan § 30.7.

112.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (Pullo Decl. ¶¶ 7–8.)

113.    All classes of creditors entitled to vote to accept or reject the Plan have voted to accept the Plan in accordance with the requirements set forth in the Bankruptcy Code and as applicable in accordance with sections 301 and 314(b) of PROMESA.  (Pullo Decl. ¶ 8.)

114.    Holders of Claims in Classes 1, 2, 3, 5, 6, 8, and 9 voted, or are deemed to have voted, to accept the Plan.  (Pullo Decl. ¶ 8.)  Pursuant to the Plan, holders of Claims who have elected to be treated under Class 4 or Class 7 are deemed to have voted to accept of the Plan.  (Plan §§ 5.2, 9.2.)  The Plan therefore satisfies section 1129(a)(8) of the Bankruptcy Code with respect to Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9.  Holders of Claims in Class 10 are deemed to reject the Plan, so section 1129(a)(8) of the Bankruptcy Code is unsatisfied with respect to Class 10.  (Plan § 14.1.)

115.    Notwithstanding such deemed rejection, the Plan is confirmable because the Plan satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to Class 10.

**xviii.      Bankruptcy Code Section 1129(b)(1)**

116.    The Debtor is unaware of any Section 510(b) Subordinated Claims other than assertions set forth in several proofs of claim, but the Debtor included such Claims and classification within the Plan.  The Plan's treatment of Claims in Class 10 is proper, because all similarly-situated holders of Claims will receive similar treatment.  All holders of subordinated claims in Class 10 will not be receiving distributions pursuant to the Plan, and Class 10 is deemed to reject the Plan.  (Jaresko Decl. ¶ 60; Exhibit DX-G.)  Accordingly, the Plan does not unfairly discriminate against holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

**xix.       Bankruptcy Code Section 1129(b)(2)**

117.    The Plan's treatment of Claims in Class 10 is proper, because claims junior to the claims in Class 10 will receive no distributions under the Plan.  There is no Class that is junior to Class 10 and, thus, no holder of claims or interests junior to Claims in Class 10 will receive or

retain any property under the Plan on account of any such claim or interest. (Jaresko Decl. ¶ 61; Exhibit DX-G.) Accordingly, the Plan is fair and equitable to holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

**B. PROMESA § 314(b)(2)**: *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

118.    Except as otherwise provided for or permitted by orders of the Court, the Debtor has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan. (See generally Jaresko Decl.)

119.    The Plan complies with PROMESA section 314(b)(2).

**C. PROMESA § 314(b)(3)**: *The Debtor Is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan.*

120.    The Plan contains no provisions which would require it to violate Commonwealth law. The Commonwealth's Legislative Assembly passed, and its Governor signed, the New Bond Legislation, which established the legal framework for the restructuring of COFINA's issued and outstanding bonds. The terms of the New Bond Legislation provide the legislative structure to carry out the terms of the Plan. Specifically, and among other things, the New Bond Legislation provides (a) confirmation that, on the Effective Date, Reorganized COFINA is and will be the sole and exclusive owner of the COFINA Revenues and incorporates such other terms as set forth in the Plan, see, e.g., New Bond Legislation art. 2.2, (b) that the modification of COFINA's corporate governance structure is consistent with its independence from the Commonwealth, see id. art. 2.7, (c) the authorization for Reorganized COFINA to issue COFINA Bonds and COFINA Parity Bonds pursuant to the New Bond Indenture and to provide for the terms of such bonds, see id. art. 3.1(a), (d) confirmation of Reorganized COFINA's ownership of the COFINA Revenues, see id.

art. 2.2, (e) the creation of a statutory lien to secure the COFINA Bonds and COFINA Parity

Bonds, see id. art. 3.2, and (f) covenants to secure further the repayment of the COFINA Bonds

and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-

impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales

Tax and substitute New Collateral only upon satisfaction of certain specific requirements, see id.

arts. 3.3, 4.1.  (Jaresko Decl. ¶ 63; Exhibit DX-G.)  Moreover, the New Bond Legislation provides

that the COFINA Revenues do not constitute "available resources" or "available revenues" of the

Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or

as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or

English version of the Puerto Rico Constitution).  See New Bond Legislation art. 2.2(e).  Pursuant

to Puerto Rico case law, legislation of the Commonwealth is presumed to be valid if enacted by

the Legislative Assembly of Puerto Rico and signed into law by the Governor.  E.g., Brau v. ELA,

2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); Partido Socialista

Puertorriqueño v. ELA, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct.

5, 1978), holding modified by Partido Independentista Puertorriqueño v. CEE, 120 D.P.R. 580,

1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with,

laws are presumed to be constitutional and the movant [objector] should place the courts in a

position to decide by introducing evidence to sustain the facts alleged, and then stating the legal

arguments on which its assignment of unconstitutionality is based, specifically mentioning the

constitutional provisions involved and the legal precedents supporting its assignment.").  In this

case, no objector presented persuasive evidence, either in their written opposition submission or

at the Confirmation Hearing, of any defect undermining the presumptively valid enactment of the

New Bond Legislation.[14]  Therefore, the presumption of validity has not been rebutted as required

by Puerto Rico case law.  Based on an analysis of the provisions of the New Bond Legislation and

the record before the Court, the Court finds that the enactment of the New Bond Legislation was

a proper exercise of the Legislative Assembly's constitutional power to designate revenues for a

legitimate public purpose.  Specifically, the New Bond Legislation designates a portion of the

COFINA sales tax revenues to be transferred to COFINA in order for COFINA to fully satisfy and

discharge the potential judicial liabilities of the Commonwealth and COFINA by issuing new non-

recourse bonds.  Accordingly, the Court finds that the New Bond Legislation has been validly

---

[14]     The VAMOS objectors argue that a pending adversary proceeding challenging the
constitutionality of the New Bond Legislation must be resolved prior to confirmation of
the proposed COFINA Plan.  (See VAMOS Obj. at 2-6.)  These objectors contend that the
New Bond Legislation is unconstitutional under both the United States and Puerto Rico
Constitutions because Representative Natal-Albelo was prohibited, in violation of the rules
of the House of Representatives, from participating in the legislative process leading up to
the House of Representatives vote on the New Bond Legislation.  Plaintiffs also assert that
both the original COFINA legislation and the New Bond Legislation violate the
Constitution of Puerto Rico because borrowing authorized thereunder allegedly exceeds
the limits on "public debt" set forth in Sections 2 and 7 of Article VI of the Constitution of
Puerto Rico (which sections respectively limit the amount and duration of direct
obligations of the Commonwealth backed by a pledge of the full faith and credit and taxing
power of the Commonwealth, and provide that appropriations for a fiscal year shall not
exceed total estimated revenues for the year absent the imposition of taxes to cover the
shortfall).   Plaintiffs' arguments regarding an alleged violation of the rules of the
Commonwealth House of Representatives are nonjusticiable and are therefore overruled
insofar as they are raised as objections to the Plan.  See Noriega Rodríguez v. Jarabo, 136
D.P.R. 497 (P.R. 1994); Silva v. Hernández Agosto, 118 D.P.R. 45, 18 P.R. Offic. Trans.
55 (P.R. 1986).  Furthermore, arguments regarding the Commonwealth's "public debt"
limit have been resolved as part of the 9019 Settlement Agreement between the
Commonwealth and COFINA insofar as they relate to the statutory authorization of the
existing COFINA bonds.  The New Bond Legislation, which is presumptively valid and
not facially inconsistent with the cited Puerto Rico constitutional provisions, clearly
provides that Reorganized COFINA is a "corporate and political entity independent and
separate from the Government of Puerto Rico," that Plan of Adjustment Bonds shall be
payable solely from COFINA Revenues, and that the "COFINA Revenues do not constitute
'available resources' or 'available revenues' of the Government of Puerto Rico as used in
Section 8 of Article VI of the Puerto Rico Constitution."  (Exhibit DX-QQQ §§ 2.1, 2.2(e),
3.1(c).)  The VAMOS objectors' objections are overruled.  (See also infra ¶¶ 175-76.)

enacted, is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and enforceable.

121.    The Plan contains no provisions that would require it to violate the Contracts Clause of the Constitution of the United States.  The Contracts Clause provides that no state shall pass any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl. 1.  While a state or territory cannot make a law impairing the obligation of contracts, Congress is empowered to do so pursuant to Article I, Section 8 of the Constitution, which provides that Congress shall have the power to establish uniform laws on the subject of bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor relationship, that is, to alter contract rights.  See In re City of Stockton, Cal., 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012).  "While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "expressly vested with the power of passing [bankruptcy] laws, and is not prohibited from passing laws impairing the obligation of contracts."  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122, 191 (1819)).  It follows that this Court may approve the Plan under PROMESA, a federal law enacted by Congress with the express purpose of allowing Puerto Rico to achieve fiscal responsibility and access to the capital markets through, inter alia, adjustment of its debts and those of its instrumentalities, without offending the Constitution.  In this connection, Mr. Hein has failed to demonstrate that the fiscal plans constitute territorial laws subject to the restrictions of the Contracts Clause, and his objection with respect to the fiscal plans is therefore overruled.  To the extent that Mr. Hein argues that the New Bond Legislation is itself unconstitutional under the Contracts Clause, the Court concludes that the legislation is reasonable and necessary in light of the surrounding circumstances.  Although the language of the Contracts

Clause is "unequivocal," it "does not make unlawful every state law that conflicts with any contract." United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011). In considering claims brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens." Id. In doing so, courts apply a two-pronged test: they examine first "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was reasonable and necessary to serve an important government purpose." Id. Assuming arguendo that the New Bond Legislation will substantially impair contractual obligations, the Court examines the reasonableness and necessity of the New Bond Legislation. The First Circuit considers "the reasonableness inquiry" to "ask[] whether the law is reasonable in light of the surrounding circumstances," while "the necessity inquiry focuses on whether Puerto Rico imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well." Id. at 45-46. In analyzing these questions, courts may consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." Id. at 46. The circumstances surrounding the enactment of the New Bond Legislation are clear: the Commonwealth Legislature enacted the New Bond Legislation in response to the Commonwealth's unprecedented fiscal and economic crisis and the need to resolve litigation concerning the legality of the COFINA structure. Faced with the possibilities that, on the one hand, if COFINA were to prevail in the Commonwealth-COFINA dispute, none of the SUT Revenues that are the subject of that dispute would be available for the Commonwealth's use towards payment for essential services or for distribution to its creditors and, on the other, the purported dedication of SUT revenues to COFINA

to support bond repayments could be invalidated if the Commonwealth were to prevail, the Legislature agreed to enact a law that would aid the effectuation of the settlement of that dispute. The Legislature's decision is a reasonable one under the surrounding circumstances.  It is also necessary in light of the ongoing fiscal emergency in Puerto Rico.  The Court therefore concludes that the Contracts Clause does not prohibit confirmation of the Plan, and Mr. Hein's objections invoking the Contracts Clause are therefore overruled.

122.    The Plan contains no provisions that would violate the Takings Clause of the Constitution of the United States.  Several bondholders have argued that the Plan and Settlement Agreement take bondholder property—specifically, the lien on revenues dedicated to COFINA that secures repayment of the bonds issued by COFINA—without just compensation.  The proper analytical framework for addressing the objectors' Takings Clause challenge is set forth in Penn Central Transportation v. City of New York, 438 U.S. 104, 124 (1978).  See Patriot Portfolio v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code). Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action."   Id. Considering the first factor, the Court notes that the actions challenged by the objecting parties will not result in the total destruction of the value of the liens securing the existing bonds.  Pursuant to the terms of the Plan, bondholders will receive substantial value in new secured bonds and, in some cases, cash.  Furthermore, based upon the record before it, the Court finds that the resolution of substantial legal challenges to the structure underlying the existing COFINA bonds provides significant value to the bondholders.  Second, although the proposed treatment of bondholders' claims may interfere with certain bondholders' subjective investment expectations, bondholders'

reasonable expectations must take account of the claims and potential claims that have been the subject of the substantial litigation that the Settlement Agreement and the Plan, which were negotiated with the assistance of the Mediation Team, propose to resolve.  Cf. New Haven Inclusion Cases, 399 U.S. 392, 492 (1970) (noting that security holders "invested their capital in a public utility that does owe an obligation to the public [and thereby] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs") (quotation marks omitted)).  Third, the character of the governmental action strongly supports the Court's conclusion that the Plan and Settlement Agreement do not result in an unconstitutional taking.  The challenged proposals are not physical invasions of property by the government.  Rather, the restructuring of the relationships between the Commonwealth and COFINA, and between COFINA and its bondholders, using the powers established by Congress in PROMESA is a quintessential example of a "public program adjusting the benefits and burdens of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  Furthermore, even if the reduction of dedicated revenues and restructuring of bond terms under the Plan or Settlement Agreement incorporated therein result in a Fifth Amendment "taking" of bondholder property, the Court is satisfied that the value to be received by bondholders as a result of the settlement of the Commonwealth-COFINA dispute and under the Plan constitutes just compensation.  The secured creditors' Takings Clause claim is properly assessed based upon the value of the lien, not the face amount of debt.  See In re Aegean Fare, Inc., 33 B.R. 745, 747–48 (Bankr. D. Mass. 1983) (citing Wright v. Union Central Life Insurance Co., 311 U.S. 273, 278 (1940)).  Here, creditors will receive consideration that is discounted by a settlement that recognizes significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties, and creditors have ratified the result by voting in favor of the Plan.  These characteristics of the settlement and the Plan and the circumstances under which they were

developed provide sufficient proof that the consideration to be received by bondholders under the Plan constitutes just compensation within the meaning of the Takings Clause.  The objections to the Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled.

123.    The Plan complies with PROMESA section 314(b)(3).

**D.  PROMESA § 314(b)(4)**: *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date*

124.    Section 3.1 of the Plan provides that, "[o]n the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized COFINA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan." (Exhibit DX-G.)

125. Consummation Costs are being paid in Cash on the Effective Date of the Plan. All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the Plan.[15]

126. The Plan complies with PROMESA section 314(b)(4).

**E. PROMESA § 314(b)(5)**: *The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals*

127. As discussed above, the Commonwealth has validly enacted the New Bond Legislation, which New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and enforceable, and there are no approvals left to obtain to effectuate the Plan. By approving and certifying the COFINA Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA section 207. (Jaresko Decl. ¶ 66.)

128. The Plan satisfies PROMESA section 314(b)(5).

**F. PROMESA § 314(b)(6)**: *The Plan Is Feasible and in the Best Interests of Creditors*

129. The COFINA Fiscal Plan, certified on October 18, 2018, demonstrates that the Plan is feasible, because the COFINA Fiscal Plan provides for the incurrence of obligations contemplated by the Plan and shows that such obligations can be repaid. COFINA's Fiscal Plan projections (as set forth in greater detail in Section XVIII of the Disclosure Statement, entitled "Financial Information and Projections" and Exhibit E thereto) demonstrate, as a result of COFINA's ownership of the COFINA Portion, COFINA's ability to fulfill its obligations under

---

[15]    At least one opponent argues that the Consummation Costs are "intended as a payoff to buy the votes of institutional bondholders and insurers." Mangiaracina Obj. at 3. However, no evidence of any such "payoff" or other illicit conduct has been presented to the Court. To the contrary, as the Court has found above, there is ample evidence that the consummation cost payments have a sound basis in law and in fact. (See supra ¶¶ 70-74.) The objections to the Consummation Costs payments are therefore overruled.

the Plan.  COFINA's financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that COFINA will be able to satisfy its obligations under the Plan.  (See Brownstein Decl. ¶¶ 29-34.)

130.    COFINA has no power to raise taxes.  The alternative to the Plan is protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for either the Commonwealth or COFINA.  For any individual class of COFINA creditors to do better than it will under the Plan, COFINA would have to prevail in the Adversary Proceeding, which result is at best uncertain.  Even if one side to the litigation were to prevail in this Court, litigation costs would skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT Revenues.  (Jaresko Decl. ¶ 67.)

131.    Moreover, the Plan provides additional protections for COFINA and its creditors, such as a federal court order "quieting title" to COFINA's ownership of a majority of the Pledged Sales Tax Base Amount—and on a first-dollars basis—against all challenges, removing the cloud over title to COFINA's property interest that has existed since COFINA's creation in 2007, as well as enhanced non-impairment and substitution covenants.  If the Plan were to be rejected, and the Commonwealth-COFINA Dispute were litigated to conclusion, even if COFINA were successful, it would not have these strong protections.  Nor would successful litigation regarding COFINA's ownership rights necessarily have prevented the Commonwealth from attempting to enact other measures that could have reduced the sales tax transferred to COFINA, or even from outright repealing the sales tax, spurring rounds of litigation as to the appropriate remedies, if any.  The Plan, and the Confirmation Order, will ensure COFINA's revitalization and will prevent any challenges to COFINA's ownership of, and any attempts by other parties to divert, COFINA's portion of the Pledged Sales Tax Base Amount.  Such outcome is unquestionably in the best interest of COFINA's creditors.

132.     Independent of the validity of the transfer of the SUT to COFINA, the holders of "First Subordinate" Existing Securities face the risk that an event of default will accelerate the bonds such that "First Subordinate" Existing Securities are not paid until holders of "Senior" Existing Securities are paid in full.  The Existing Bond Resolution provides that, upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the "Senior" Existing Securities to be immediately due and payable.  Upon such declaration, the principal of, and accrued interest on, the "Senior" Existing Securities becomes immediately due and payable.  In addition, upon a declaration of an event of default, holders of "First Subordinate" (i.e., junior) Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder until such time that the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution.  The senior bondholders have taken the view that, upon an event of default, the Existing Bond Resolution provides for the priority of payments in favor of the "Senior Existing Securities" if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due.  (Jaresko Decl. ¶ 68.)

133.     If the Plan were not confirmed, the parties would lose the benefit of the Court-sanctioned agreement resolving the Commonwealth-COFINA Dispute.  Litigation would continue in an all-or-nothing fashion, leaving some creditors potentially much worse off and some creditors potentially better off.  The Plan's provision for a distribution of approximately 93% of the aggregate value of claims held by the holders of "Senior" Existing Securities (see Plan § 1.168) and approximately 56% of the aggregate value of claims held by the  "First Subordinate" Existing Securities (see Plan § 1.114), in light of the risks attendant to the Commonwealth-COFINA Dispute and the Interpleader Action, among others, is likely far superior to what both groups of

bondholders might receive outside of the Plan.  The Plan avoids the pitfalls of delay, litigation costs, and uncertainty by implementing the consensual agreement reached by the major stakeholders in the Title III Case in a manner consistent with the Procedures Order.  The robust acceptance of the Plan by the various classes indicates such creditors believe the Plan to be in their best interests.  (Jaresko Decl. ¶ 69.)

134.     The Oversight Board retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's statutory duties under PROMESA and its task of working with the Commonwealth to create the necessary foundation for economic growth and to restore  opportunity to the  people of  the  Commonwealth.  Citi developed the Securities Terms to address the concerns of both COFINA and its bondholders and were designed with two focal points in mind: (i) to ensure broad market access to Reorganized COFINA on a go-forward basis; and (ii) to provide all existing COFINA creditors with as increased a potential recovery as possible by ensuring as high a market value as possible for the bonds issued pursuant to the Plan.  In doing so, Citi had been informed by creditor representatives that they were particularly concerned about a possible double "haircut" (*i.e.*, <u>first</u>, a reduction to the amount of their original claims through the Plan, and <u>second</u>, a subsequent reduction through less-valuable replacement bonds they receive in exchange for their original bonds).  (Brownstein Decl. ¶¶ 12-13.)

135.     The Securities Terms also provide that the COFINA Bonds to be issued pursuant to the Plan will bear fixed interest rates, including Current Interest Bonds ("<u>CIBs</u>"), which pay cash interest, and Capital Appreciation Bonds ("<u>CABs</u>"), which accrete non-cash interest until maturity.  All COFINA Bonds accrue interest beginning as of August 1, 2018.  The CIBs mature in 2034, 2040, 2053, and 2058 and have a par value in the aggregate of approximately $9 billion.

The CABs mature in 2024, 2027, 2029, 2031, 2033, 2046, and 2051 and have an initial value of approximately $3 billion.  (Plan § 16.1(a)-(b); Brownstein Decl. ¶ 14.)

136.    To provide protection to holders of the COFINA Bonds, the Securities Terms provide that no parity debt may be issued by Reorganized COFINA other than refinancing bonds ("COFINA Parity Bonds") that produce debt savings in each year for Reorganized COFINA and no maturity extensions.  (Brownstein Decl. ¶ 15.)  The Securities Terms also provide that Reorganized COFINA may issue subordinate lien bonds for the benefit of the Commonwealth only if the following requirements are satisfied (the "Additional Bonds Test"):  (i) the projected 5.5% SUT equals or exceeds one and one-half times (1.5x), in any succeeding Fiscal Year, the annual aggregate debt service due on the COFINA Bonds, the COFINA Parity Bonds and subordinated lien bonds to remain outstanding after the issuance of such subordinated lien bonds (including the subordinated lien bonds to be issued); (ii) the preceding Fiscal Year's collections from the 5.5% SUT is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding Fiscal Year on all COFINA Bonds, COFINA Parity and subordinated lien bonds to remain outstanding after the issuance of such subordinated lien bonds (including the subordinated lien bonds to be issued); and (iii) the subordinated lien bonds have a maturity not later than Fiscal Year 2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing Additional Bonds Test, final maturity beyond Fiscal Year 2058 shall be permissible for future subordinated lien bonds.  (Brownstein Decl. ¶ 15; Second Amended Plan Supplement at Exhibit A, § 2.04(b).)  In addition, the Securities Terms provide that the repayment of such subordinated lien bonds shall be secured by a second lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of subordinated lien bonds being secured by a subordinated second or more junior lien on the 5.5% SUT Taxes;

provided, however, that repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Revenues.  To support the credit rating of the COFINA Bonds, the Securities Terms also provide for (a) a non-impairment covenant of the Commonwealth, which provides, among other things, that (i) the pledged SUT percentage shall not be reduced to a rate less than 5.5% unless, in connection with such reduction, Reorganized COFINA shall have received a Rating Confirmation from each of at least two of the rating services then providing a credit rating on the outstanding COFINA Bonds and COFINA Parity Bonds, that the rating of such rating service on the COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other credit enhancement) will not be downgraded and will be at least A2/A category or higher following such reduction; provided, however, that, notwithstanding the foregoing, if the pledged SUT percentage is reduced below 3%, then, in connection with such reduction, the Commonwealth shall comply with the certain substitution requirements.  Further, the Securities Terms provide that repayment of the COFINA Bonds and COFINA Parity Bonds is to be secured by a statutory first lien on Reorganized COFINA's interest in the 5.5% pledged SUT.  (Brownstein Decl. ¶ 16.)  The Securities Terms are set forth in the Plan and Amended Plan Supplement and may be amended, restated, supplemented, or otherwise modified in accordance with the terms and provisions hereof and thereof, as applicable.

137.    Each series of Existing Securities was issued pursuant to a supplemental resolution providing for its issuance and the terms of such series, in each case adopted by the Board of Directors of COFINA.  The Resolution together with the supplemental resolutions issued pursuant thereto is referred to as the "Existing Bond Resolution."  The various supplemental resolutions authorized the issuance of both "Subordinate Bonds" and "Senior Bonds" as defined in the Resolution.  (Brownstein Decl. ¶ 21.)

138.    As of the Petition Date, COFINA had outstanding $17.64 billion aggregate principal and unpaid interest amount of bonds issued under the Existing Bond Resolution, including approximately $7.76 billion of claims arising from "Senior" Existing Securities and approximately $9.88 billion of claims arising from "First Subordinate" Existing Securities. Approximately $1.33 billion of the "Senior" Existing Securities are insured by Ambac and $1.10 billion are insured by National.  Approximately $0.25 billion of the "First Subordinate" Existing Securities are insured by Assured.  (Brownstein Decl. ¶ 21.)

139.    The Existing Bond Resolution in respect of "Senior" Existing Securities provides for the issuance of additional bonds that are "subordinate to payment of the Senior Bonds and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds."  Many supplemental resolutions issued subsequent to the Resolution indicate that Bonds issued thereunder are "First Subordinate" Existing Securities.  For example, the Seventh Resolution provides that "[a]ll of the Series 2009A Bonds shall constitute "Subordinate Bonds" under the Resolution."  (Brownstein Decl. ¶ 22; DX-XX.)

140.    The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.  If an event of default under the Existing Bond Resolution had occurred, the senior bondholders could have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Furthermore, senior bondholders could have established an entitlement to the face value of their bonds and a "make-whole" provision before the junior bondholders received any distributions.  (Rodrigue Decl. ¶ 4.)  Independent of the validity of the transfer of certain sales and use taxes to COFINA, senior bondholders have taken the view that such acceleration would have required the senior bondholders to be paid in full before junior bondholders could declare an event of default and exercise remedies.  (Brownstein Decl. ¶ 23; Rodrigue Decl. ¶ 4; Exhibit DX-K.)  However, neither

the Ambac Insurance Policy nor the National Insurance Policies insures against loss of prepayment premiums, which include "make-whole" provisions.

141.    The contractual subordination of the junior COFINA bondholders to the senior COFINA bondholders includes the risk that the amount of SUT available to bondholders is compromised.   The original bargained-for agreement between junior and senior COFINA bondholders includes the possibility that, if monies available to COFINA bondholders are reduced, senior bondholders shall be satisfied first.  This contractual subordination is not just related to the risk the SUT revenues are less than projected, but covers all possible reasons for a reduction in revenues.  One risk was that an event of default occurred, and the acceleration provision in the Bond Resolution was triggered, such that only senior COFINA bondholders would be entitled to receive cash flows thereunder.   In the senior bondholders' view, the senior-subordinate relationship and payment waterfall entitle seniors to payment in full before subordinate bondholders receive any recovery.  Enforcement of strict priority following an event of default could result in senior bondholders receiving a par recovery plus post-petition interest and other entitlements under the Bond Resolution.  In such a situation, subordinate bondholders would not receive any recovery for many years and the present value of any such recovery would be substantially less than the recovery subordinate bondholders will receive under the Plan. (Brownstein Decl. ¶ 24.)

142.    A settlement regarding the validity of the COFINA structure and the ability of the SUT to flow into COFINA was also a potential risk to COFINA bondholders, even when the bondholders first purchased COFINA bonds.  The Settlement relieves junior bondholders of these risks.  (Brownstein Decl. ¶ 25.)

143.    The senior COFINA bondholders are receiving less than par on their bonds (approximately 93% recovery is projected for Class 1), while the junior bondholders are receiving

a significant recovery. Had an event of default been recognized, or the SUT revenues been insufficient to satisfy all bondholders outside of this settlement, junior bondholders would bear the risk of not receiving any monies prior to senior bondholders being paid in full. (Brownstein Decl. ¶ 25.)

144. The Settlement and securities issued pursuant to the Plan appropriately do not reflect the varying interest rates and maturities on the Existing Securities. As provided in Bankruptcy Code section 502, made applicable to COFINA's Title III Case pursuant to PROMESA section 301, for the purposes of distribution pursuant to the Plan, claims arising from the Existing Securities are valued, based solely on the outstanding principal amount and accrued interest and/or accreted capital appreciation, as of the day before the commencement of COFINA's Title III Case. (Exhibit DX-G; Brownstein Decl. ¶ 26.) Any objections premised on the failure of the stated return percentage computations under the Plan to take into account future interest and maturity differentials are therefore overruled.

145. It is uncertain whether all of the COFINA Bonds issued to holders of Existing Securities under the Plan will be tax-exempt. The Plan recognizes that many mainland investors were concerned that their recovery would be artificially depressed if they received taxable bonds on account of their Existing Securities. Puerto Rico Investors and Puerto Rico Institutions, however, generally are not subject to federal taxation. Accordingly, to address this concern, the Plan contains provisions that permit Puerto Rico Investors and Puerto Rico Institutions to elect to receive taxable bonds as well as a supplemental 2% cash recovery rather than a mix of taxable and tax-exempt bonds. Recoveries for mainland investors are enhanced by this election by maximizing the amount of tax-exempt securities available for such investors. (Brownstein Decl. ¶ 27.)

146. Recoveries for all bondholders are enhanced if "on island" bondholders, who generally are not subject to U.S. federal income taxation, elect to be treated in Classes 4 or 7 and,

as a result receive taxable bonds.  When "on island" bondholders elect taxable treatment, the ability of mainland bondholders to receive a higher proportion, and potentially even all, of their distribution in tax-exempt COFINA bonds is enhanced, thereby enhancing recoveries for mainland bondholders.  Providing the taxable election only to on-island bondholders ensures that both local and mainland investors receive reasonably equivalent treatment in respect of their claims. (Brownstein Decl. ¶ 28.)

147.    For all of these reasons, the Court finds that the Oversight Board has met its burden of demonstrating that the plan is in the best interests of creditors within the meaning of section 314(b)(6) of PROMESA.  As in Chapter 9, PROMESA's "best interests" test differs substantially from the Chapter 11 "best interests" requirement.  In Chapter 11, the test requires a court to determine whether an individual creditor would receive more if the Chapter 11 debtor were to liquidate its assets.  Cf. In re City of Detroit, Mich., 524 B.R. 147, 212-13 (Bankr. E.D. Mich. 2014) (comparing the "best interests" tests in Chapter 9 and Chapter 11 of the Bankruptcy Code). In contrast, the "best interests" test under PROMESA requires the Court to consider "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan."  48 U.S.C.A. § 2174(b)(6) (West 2017).

148.    The Oversight Board has demonstrated that, absent approval of the Plan and the Settlement Agreement, COFINA would be embroiled in ongoing litigation that would likely last months or even years.  Beyond the costs associated with that litigation, COFINA's bondholders would also bear a substantial risk of an unfavorable outcome that would invalidate the Commonwealth's transfer of SUT revenues to COFINA.  Furthermore, COFINA's subordinate bondholders would bear a further risk that, if an event of default occurred, their claims against COFINA would not be addressed until after satisfaction of the claims of senior bondholders.

Under these circumstances, the proposed plan of adjustment satisfies PROMESA's best interest of creditors test.

### REORGANIZED COFINA'S REVENUES ARE SUFFICIENT TO SERVICE ITS DEBT OBLIGATIONS

149.    Citi reviewed the COFINA Fiscal Plan for accuracy and conformity to the Agreement in Principle.  The COFINA Fiscal Plan contemplates that debt service on the COFINA Bonds equals 53.65% of the PSTBA.  (Brownstein Decl. ¶ 30; Exhibit DX-SSS.)

150.    Citi helped negotiate the terms of the Plan so that the debt service on the COFINA Bonds is slightly below 53.65% of the PSTBA, virtually identical to the amount contemplated by the COFINA Fiscal Plan.  (Brownstein Decl. ¶ 30.)  Critically, the COFINA Revenues comprise the first collections of the 5.50% SUT in each Fiscal Year.  Thus, the debt service on the COFINA Bonds is backed by the entire amount of the 5.50% SUT because a shortfall will only exist in the event that the entire amount of the 5.50% SUT generated in a Fiscal Year is less than 53.65% of the Pledged Sales Tax Base Amount.  Accordingly, the debt service on the COFINA Bonds is consistent with the debt sustainability analysis contained in the COFINA Fiscal Plan.

151.    Citi's analysis of the COFINA Fiscal Plan showed that sound assumptions—that stimulus from disaster funds, structural and fiscal reforms to the Puerto Rico economy, and improvements in tax collection methods will maintain a robust amount of personal consumption in the Commonwealth—justify the COFINA Fiscal Plan's SUT projections.  (Brownstein Decl. ¶ 31.)

152.    Citi's analysis further showed that, because the SUT is a tax of general application covering a broad range of goods and services with few exceptions, more spending and buying in the Commonwealth generates greater SUT revenues.  Government and private disaster funding will stimulate spending and buying, and in turn, bolster SUT revenues.  Altogether, over $82 billion in disaster relief funding is projected from 2018 to 2033.  Among other things, this funding

will be distributed directly to individuals and families affected by Hurricane Maria and will support

reconstruction on the island.  Such funds are reasonably projected to stimulate spending in the

Commonwealth and maintain robust SUT revenue projections.  Government reforms including

labor, energy and corporate reforms are projected, to increase Puerto Rico's economic output by

0.95% by FY 2023.  It is reasonable to assume that this economic growth will translate to growth

in SUT revenues and that better tax collection methods and increased compliance efforts will yield

a 5% increase in total SUT collected by 2021.  (Brownstein Decl. ¶ 32.)

153.    In FY 2019, the 5.5% SUT, from which COFINA collects "first dollars" pursuant

to Section 16.3 of the Plan, is projected to be approximately $1.4 billion.  The SUT taxable base

from which Reorganized COFINA collects its revenue in "first dollars" should more than amply

cover the debt service on COFINA Bonds in FY 2019 of $420 million.  COFINA has a significant

debt service coverage ratio of 3.33x (*i.e.*, $1.4 billion / $420 million) in FY 2019.  While the debt

service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the 40-

year average coverage ratio is still a robust 2.46x.  Further, the projected PSTBA reaches a plateau

in FY 2041 and never increases after that point, so any subsequent increase in the 5.5% SUT after

FY 2041 will necessarily improve the debt service coverage ratio.  In fact, the 5.5% SUT could

remain exactly the same until the last stated maturity date of any of the COFINA Bonds in FY

2058, and Reorganized COFINA would have no issue servicing the debt obligations on the COFINA Bonds.  (Brownstein Decl. ¶ 33.)

154.    The feasibility of the Plan is plainly established.[16]

### G.  PROMESA § 314(b)(7): Fiscal Plan Compliance

155.    On August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for Fiscal Years 2019 to 2023.  On August 27, 2018, COFINA submitted its fiscal plan to the Oversight Board.  On August 30, 2018, the Oversight Board delivered to COFINA a notice of violation pursuant to section PROMESA 201(c)(3)(B) requiring certain changes and/or explanations in a revised COFINA fiscal plan.  On September 7, 2018, COFINA submitted a revised fiscal plan to the Oversight Board.  On October 18, 2018, the Oversight Board voted to certify the COFINA Fiscal Plan, as amended.

156.    The Plan is consistent in all respects with the COFINA Fiscal Plan, as amended.

157.    The Plan complies with PROMESA section 314(b)(7).

### THE RELEASES, EXCULPATION, AND INJUNCTIONS PURSUANT TO THE PLAN

158.    The Commonwealth-COFINA Dispute presented the potential for extended, complex, expensive, and value-destructive litigation among competing interests and entities.  A fundamental objective of the Debtor and the Oversight Board throughout COFINA's Title III Case has been to structure a transaction to fairly divide the SUT while avoiding the winner-take-all nature of litigation related to the validity of the COFINA structure and related claims.  The prompt,

---

[16]    The Court precluded the tender of an economist's declaration concerning future Commonwealth finances because its proponent, PROSOL-UTIER, lacks standing as a non-creditor of COFINA.  (Docket Entry No. 4848 in Case No. 17-3283, January 16, 2019 Hearing Transcript, 130:8-132:11.)  PROSOL-UTIER also argued that the Plan's proponents had a burden to tender expert economic evidence.  The Court finds the declaration of Brownstein, an experienced municipal finance professional who participated in the formulation of the COFINA Fiscal Plan, sufficient to carry the Plan proponents' burden as to feasibility.

efficient conclusion of COFINA's Title III Case is premised on the proposed comprehensive resolution and settlement of this dispute. (Jaresko Decl. ¶ 73.)

159.    None of these issues has been fully litigated in these cases. However, cross-motions for summary judgment had been filed on the underlying constitutional questions, and significant resources had already been expended on the litigation. In an effort to avoid disputes that could jeopardize a consensual resolution creating the highest value for all stakeholders, the Agents and then the PSA Creditors engaged in good faith negotiations over a period of many months, as discussed above. The robust, arm's-length negotiations were successful and yielded substantial consensus and support for a consensual plan, as evidenced by the Agreement in Principle, culminating in the Settlement Agreement and the Plan that has garnered substantial creditor support from all impaired voting classes. (Jaresko Decl. ¶ 74.)

160.    In order to incentivize the PSA Creditors to grant the concessions outlined above, and in consideration of the substantial benefits provided by the Released Parties, the Debtor agreed to prosecute and pursue the releases, exculpation, and injunction provisions set forth in the Plan. Each aspect of the Settlement is interdependent and relied upon by the Agents and, especially, the PSA Creditors, who made material concessions as to their respective positions to enable the expeditious confirmation of the Plan. Such settlements take into account the legal and factual risks to the allowance of the claims. Modifications to any aspect of the Settlement or the failure to approve the Settlement undoubtedly may result in events of termination under the A&R Plan Support Agreement, jeopardize settlement of the Commonwealth-COFINA Dispute, and set back the administration of COFINA's Title III Case for an extended period as holders of GO Debt and COFINA's Existing Securities get bogged down in the maze of litigation for prosecution of their claims. (Jaresko Decl. ¶ 75.)

### A. Debtor Releases

161.    Pursuant to Section 30.5 of the Plan, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons proposed to release the Released Parties from Claims or Causes of Action they may have against such Released Parties.  The Debtor's Release constitutes a sound exercise of the Debtor's judgment and meets the applicable legal standard:  the Debtor's Release is fair, reasonable, and in the best interests of the Debtor.  During the course of negotiations regarding the Plan and predecessor agreements, it was clear that the Debtor's Release would be a necessary condition to consummation of the Settlement embodied in the Plan.  In exchange for such releases, the Debtor secured the substantial concessions provided by the Settlement and the Plan.  Similarly, the Released Parties provided integral support throughout COFINA's Title III Case, and incurred significant costs in doing so.  (Jaresko Decl. ¶ 76.)

162.    Furthermore, with the exclusion of the Commonwealth-COFINA Dispute, which is being compromised pursuant to the Settlement and incorporated into the Plan, and acts relating to the Ambac Action and Whitebox Actions, which are being preserved pursuant to the Plan, see Section 30.2(c), the Debtor is not aware of any claims that could be asserted against the Released Parties and no creditor has informed the Debtor that it believes such an action should be brought, which the Debtor believes would be meritorious.  In addition, without the assurance of protection from liability, the Released Parties involved in the Plan process may not have participated in the negotiations that led to the development of the Settlement and Plan.  Had the Debtor's Release not been provided, the Debtor's chances of resolving the Commonwealth-COFINA Dispute, and proposing the Plan that was ultimately accepted by every voting Class, would have been diminished.  (Jaresko Decl. ¶ 77.)

### B. Consensual Releases

163.    Section 30.2 of the Plan provides for the Consensual Releases of the Released Parties by the holders of Claims.  The consensual releases seek only to release parties that made a significant contribution to the Plan:

    a.    COFINA and Reorganized COFINA, from all Claims or Causes of Action, and from all Entities, <u>see</u> Plan § 30.2(a)–(b);

    b.    the Government Releasees, from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the PSA Creditors and their respective Related Persons, <u>see</u> Plan § 30.2(c);

    c.    BNYM and (a) each of its Related Persons, from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution by each of the PSA Creditors, <u>see</u> Plan § 30.2(c), excluding any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively, and (b) each holder and beneficial holder of Existing Securities and their transferees, successors or assigns, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions, <u>see</u> Plan § 30.2(d);

    d.    the Commonwealth Agent Releasees, from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order, <u>see</u> Plan § 30.2(e); and

    e.    the Commonwealth, from all Claims and Causes of Action held by any Creditor, solely in such capacity.  <u>See</u> Plan § 30.2(f).

(Exhibit DX-G.)

164.    The consensual releases are necessary and essential to the Plan.  As mentioned above, the releases have been negotiated with COFINA's key creditor constituencies as part of the formulation of the Plan.  Thus, it is clear that a substantial number of creditors have expressly

consented to the releases.  The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM—can likewise be approved.  The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the Settlement.  See In re Master Mortgage Investment Fund, Inc., 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994) (enumerating various factors to be considered in approving third-party releases, including whether the non-debtor has contributed substantial assets to the reorganization).  Without the release, the Commonwealth would not have agreed to the Settlement, which laid the groundwork for the formulation of this Plan.  (Jaresko Decl. ¶ 79.)

165.    Further, it is imperative to the Plan that BNYM be released.  Without a release, BNYM would attempt to withhold distributions to bondholders necessary to effectuate the Plan. Additionally, the release is narrowly tailored so that it exempts acts of gross negligence, intentional fraud, or willful misconduct, solely in the context of the Ambac Action and Whitebox Actions. (Jaresko Decl. ¶ 80.)  For these reasons, the Court finds that the third-party releases are reasonable, necessary and appropriate to implementation of the Plan and, therefore, the third-party releases are hereby approved.

## C.  Exculpation

166.    Section 30.7 of the Plan contains a release and exculpation for certain parties for claims arising out of or relating to, among other things, any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan (the "Exculpation Provision"). (Exhibit DX-G.)

167.    Such parties greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan in exchange, in part, for the Exculpation Provision.  Failing

to approve this provision would expose the parties to litigation after months of good faith negotiations. (Jaresko Decl. ¶ 82.)

### D. Injunction

168.    The injunction set forth in Sections 30.3, 30.6, and 30.11 of the Plan provides for an injunction (the "Injunction") against all Entities from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, both prior to and after the Effective Date. The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose. (Jaresko Decl. ¶ 83; Exhibit DX-G.)

169.    The releases, exculpation provisions and injunctions pursuant to the Plan are integral and critical parts of the Plan and the compromises and settlements implemented pursuant to the Plan. The approval of such releases is a condition to the occurrence of the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan. Accordingly, such provisions are justified and warranted based upon the circumstances of the Title III Case and the consideration being provided by all parties in connection with the Plan.

### VALIDITY OF COFINA BONDS

170.    On November 15, 2018, in furtherance of the Settlement, the Commonwealth validly enacted the New Bond Legislation, amending Act 91, which originally created COFINA. The New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the

Plan, is binding and enforceable.  The effectiveness of such legislation is subject only to the occurrence of the Effective Date.

171.    Confirmation of the Plan demonstrates that Puerto Rico is taking the steps necessary to enable its return to the capital markets.  The restructuring of the COFINA debt under Title III of PROMESA is expected to act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy and reducing costly litigation.

172.    The Plan demonstrates Puerto Rico's continued good faith commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets and achieve economic certainty and debt sustainability for Puerto Rico.  For their part, in exchange for the material concessions and releases provided through the Plan, COFINA's bondholders will benefit from the elimination of the previous uncertainty as to whether the property transferred to COFINA to secure their repayment nevertheless remained "available resources" or "available revenues" of the central government of Puerto Rico under the Puerto Rico Constitution.  The issues that previously cast a cloud on the structure are being resolved through the Plan, rather than through "all or nothing" litigation.

173.    The Plan will quiet title to the Pledged Sales Tax Base Amount and resolve all disputes of all parties relating thereto.  Moreover, the Court shall retain jurisdiction over all matters related to the COFINA Bonds to ensure compliance with the Plan.

174.    Confirmation of the Plan constitutes a judicial determination and, pursuant to section 4 of PROMESA and sections 944, 1123, and 1125 of the Bankruptcy Code as incorporated by section 301 of PROMESA, the terms of these Findings of Fact and Conclusions of Law shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith and be full, final, complete, conclusive, and binding and shall not be subject

to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

175.    COFINA is a separate covered territorial instrumentality that is legally distinct from the Commonwealth, with its own Title III case, its own certified fiscal plan, and its own plan of adjustment.  See 13 L.P.R.A. § 11a(a) ("A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the Corporacion del Fondo de Interes Apremiante de Puerto Rico ('COFINA'), Spanish acronym), whose name in English shall be Puerto Rico Sales Tax Financing Corporation."); New Bond Legislation art. 2.1 (providing that Reorganized COFINA "shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico and any other Government Entity."). The Court has previously held, in connection with the Commonwealth-COFINA Dispute, that the nature of each debtor's interest in the Pledged Sales Taxes, for purposes of PROMESA, is a mixed question of federal and Commonwealth law.[17]  The Plan, however, provides for an agreed upon allocation of the Pledged Sales Taxes premised upon this Court's approval of the Settlement and confirmation of the Plan, and, upon such approval, the COFINA Revenues shall be the sole and exclusive property of COFINA, and shall not be property of the Commonwealth or available to the Commonwealth.  The Settlement and the allocation of the Pledged Sales Taxes are necessary for the implementation of the Plan, and, pursuant to Bankruptcy Code section 1123(a)(5), made

---

[17]    Adversary Proceeding, Docket Entry No. 483, *Decision and Order*, dated May 24, 2018, at 5-6, Exhibit DX-TT ("the Court must decide what the relevant property rights are within the context of these Title III proceedings, under PROMESA and federal bankruptcy law provisions that Congress has incorporated into PROMESA. . . .  [T]he Commonwealth-COFINA Dispute presents a mixed question of federal and Puerto Rico law . . . ."); see also Abboud v. Ground Round, Inc. (In re Ground Round, Inc.), 482 F.3d 15, 17 (1st Cir. 2007) ("The label . . . that state law affixes to a particular interest in certain contexts is not always dispositive." (citing In re Nejberger, 934 F.2d 1300, 1302 (3d Cir. 1991)).

applicable to COFINA's Title III Case pursuant to PROMESA section 301(a), are self-executing and preemptive notwithstanding otherwise applicable nonbankruptcy law, including otherwise applicable Commonwealth law.  See 11 U.S.C.A. § 1123(a)(5) (West 2016) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as (A) retention by the debtor of all or any part of the property of the estate . . . ."); 48 U.S.C.A. § 2161(c)(5) (West 2017) ("The term 'property of the estate', when used in a section of Title 11 made applicable in a case under this subsection by subsection (a), means property of the debtor."); see also Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.), 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013) ("[O]nly those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required.").  Furthermore, pursuant to the Settlement Order and the Plan, and subject to the terms of the plan, claims of COFINA's creditors are released as against the Commonwealth and the Commonwealth itself shall not be liable for the repayment of the COFINA Bonds, nor will the COFINA Bonds have any recourse to any property of the Commonwealth.  See New Bond Legislation art. 3.1(c).

176.    Pursuant to PROMESA, including section 4 thereof, as well as sections 944[18] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order, the Settlement, the

---

[18]    Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations.  11 U.S.C. § 944(b)(3).  See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)).  As set forth in the

Plan, and Act 241, the Court determines that the COFINA Bonds are legal, valid, binding and enforceable obligations of Reorganized COFINA benefitting from the following protections, each of which is legal, valid, binding, and enforceable against Reorganized COFINA, the Commonwealth, and other persons and entities, as applicable, under Puerto Rico and federal law:

    a.  The Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

    b.  Subject to the occurrence of and upon the Effective Date, Reorganized COFINA shall be an independent public corporation and instrumentality of the Commonwealth, separate from the Commonwealth and any other instrumentality of the Commonwealth.

    c.  Subject to the occurrence of and upon the Effective Date, ownership of the COFINA Revenues shall have been legally and validly transferred to

---

leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013). See, e.g., *Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernadino, California*, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); *Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit*, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); *Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama*, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.").

Reorganized COFINA, and such transfer of ownership shall have been an absolute transfer of all legal and equitable right, title, and interest in the COFINA Revenues, free and clear of all liens, claims, encumbrances, and other interests of any party (except for the statutory lien that arises automatically, pursuant to the terms of the New Bond Legislation, to secure the COFINA Bonds);

d.  Subject to the occurrence of and upon the Effective Date, the COFINA Revenues shall not constitute, and shall not be deemed to be, "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

e.  Subject to a "Quarterly Installment" funding construct, to the extent certain conditions are satisfied, each fiscal year until the COFINA Bonds are paid in full or otherwise satisfied in accordance with their terms, the first funds comprising the COFINA Pledged Taxes shall be transferred to and deposited with Reorganized COFINA until such time that Reorganized COFINA has received an amount equal to the COFINA Revenues for such fiscal year.

f.  Reorganized COFINA's sole and exclusive ownership of the COFINA Revenues shall not be affected in any way by the manner of or control over collection, any person who collects or holds the COFINA Revenues shall do so on behalf of Reorganized COFINA, and no person or entity that collects or holds the COFINA Revenues shall have any legal or equitable right, title, or

interest to the COFINA Revenues other than Reorganized COFINA, for the benefit of holders of the COFINA Bonds.

g.   The statutory first lien against the COFINA Pledged Taxes (including any New Collateral substituted for the COFINA Pledged Taxes in accordance with the terms of the Plan and the New Bond Legislation) arising by operation of the New Bond Legislation in favor of holders of COFINA Bonds is legal, valid, binding and enforceable and shall remain in full force and effect and shall be "closed" until, in each case, the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

h.   Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien as described in Section 16.2 of the Plan, which Lien shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

i.   The statutory lien on the COFINA Pledged Taxes as provided in the New Bond Legislation and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, and provide for the conditions regarding substitution of New

Collateral as adequate protection for the property rights conferred under the Plan and the Confirmation Order.

j.   At the time of issuance and delivery of the COFINA Bonds, Reorganized COFINA is hereby authorized and directed to have stamped or written on each of the COFINA Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 4TH DAY OF FEBRUARY, 2019

k.   Pursuant to the Settlement Order and the Confirmation Order, the transfer of the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan) pursuant to the Plan is appropriate and binding and specifically enforceable against Reorganized COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the Plan, including, without limitation, because the transfer of the COFINA Portion created in Reorganized COFINA an ownership interest in such property (and any substitution of New Collateral on the terms and conditions provided for in the Plan) and is a valid provision made to pay or secure payment of the COFINA Bonds.

l.   The Commonwealth's agreement, on behalf of itself and its governmental entities, not to take any action that would, among other things, (a) impair COFINA's right to receive the COFINA Revenues, (b) limit or alter the rights vested in COFINA in accordance with the Plan to fulfill the terms of the COFINA Bonds, (c) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year, or (d) impair the rights and remedies of the

holders of the COFINA Bonds or the statutory lien established pursuant to Article 3.2 of the New Bond Legislation, each as provided in the New Bond Legislation and the New Bond Indenture, serve as adequate protection for the property interests of Reorganized COFINA and the holders of the COFINA Bonds in the COFINA Pledged Taxes under all applicable law and constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA, and the Commonwealth, as applicable, and are an integral part of the settlements set forth in the Plan.

m. The covenants described in Sections 16.6 and 16.7 of the Plan (including, but not limited to, the rating agency covenant, the tax exemption covenant, the substitution covenant, the non-impairment covenant and the sales tax covenant), to be provided by Reorganized COFINA and the Commonwealth, as the case may be, to the holders of COFINA Bonds, shall constitute adequate protection for the property interests of Reorganized COFINA and the holders of COFINA Bonds in the COFINA Pledged Taxes under all applicable law.

177.    The Plan, the Settlement, and the settlement and compromise of claims embodied in the Plan are the result of extensive arms' length negotiations among the Debtor, the Commonwealth Agent, the COFINA Agent, the Settlement Parties, and other significant Creditor constituencies, and, among other things, resolve the Commonwealth-COFINA Dispute. (Jaresko Decl. ¶¶ 15-29.)

178.    Any attempt to confirm a Title III plan of adjustment without the compromises and settlements embodied in the Plan would have invited significant confirmation objections by various significant Creditor constituencies.  (Jaresko Decl. ¶ 45.)  Without addressing the Commonwealth-COFINA Dispute, among other issues settled and compromised pursuant to the

Plan, it is beyond doubt that such issues were likely to lead to further contested confirmation hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions.  Id.

179.    The detrimental effects of further delay in confirmation and consummation of a plan of adjustment in the Title III Case cannot be underestimated.  As delay in consummation of a plan would be accompanied by a continued depletion of COFINA's resources and increase in total Claims, further delay would have significantly eroded recoveries for COFINA's junior-most Creditors and stakeholders.  (Jaresko Decl. ¶¶ 45, 57, 69.)  Thus, it is a reasonable exercise of business judgment for the Debtor to conclude that the Plan is more likely to result in an expeditious exit from the Title III Case and prevent further deterioration of Creditors' recoveries than any alternative plan.  The Court finds that the compromises and settlements embodied in the Plan are fair, reasonable, in the best interests of COFINA's stakeholders and above the lowest level of the range of reasonableness.[19]

**H. Bankruptcy Rule 3019**: *The Plan Does Not Adversely Change the Treatment of Claims of Creditors.*

180.    After the Voting Deadline passed, the Oversight Board filed the "Third Amended Plan," containing minor revisions to address certain concerns raised by certain parties.  (Exhibit DX-G.)  None of the modifications adversely changes the treatment of the Claims of any creditor.  In Article X, the Plan was amended to provide that COFINA will enter a remarketing agreement with Assured with respect to the COFINA Bonds allocable to the holders of Allowed Junior COFINA Bond Claims (Assured), and which will be received by Assured as subrogee of such holders.  (Exhibit DX-G.)  Assured was already responsible for the 100% cash payment of the Acceleration Price to holders of Allowed Junior COFINA Bond Claims (Assured) on the Effective

---

[19]     See also *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation*.  (See Docket Entry No. 5045 in Case No. 17-3283.)

Date, so the holders of Claims in Class 6 are not impacted in any way by this change.  (Jaresko Decl. ¶ 70.)

181.    The Plan was updated to ensure the releases provided thereunder are consistent with the agreement reached in the A&R Plan Support Agreement, see Plan § 30.2, as well as other technical changes to ensure that neither the Ambac Action nor Whitebox Actions interfere with distributions to bondholders.  Specifically, the Plan has been modified to ensure that BNYM, Whitebox, and Ambac can continue their litigation among themselves, see Plan § 2.1, but also to ensure that COFINA or Reorganized COFINA, as the case may be, is not responsible for any of BNYM's fees or expenses in connection with that litigation after the Effective Date.  (See Plan § 19.13.)

182.    The modifications do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances or rejections thereto.

183.    Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the "Third Amended Plan".

184.    Elections made by holders of Claims pursuant to the Plan were solicited, tabulated, and implemented fairly, in good faith, and in a manner consistent with the Plan, the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. (Pullo Decl. ¶ 9.)

185.    Any beneficial holder of Senior COFINA Bond Claims (Ambac) that chose to commute the Ambac Insurance Policy pursuant to Article 6 of the Plan shall have no other or further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust or Ambac Certificates.  The Plan is a settlement with respect to the Ambac Insurance Policy for those

beneficial holders that elect to commute.  The treatment of Senior COFINA Bond Claims (Ambac) under the Plan is not inconsistent with the Ambac Insurance Policy.

186.    Any beneficial holder of Senior COFINA Bond Claims (National) that chose to commute the National Insurance Policies pursuant to Article 7 of the Plan shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust or National Certificates.  The Plan is a settlement with respect to the National Insurance Policies for those beneficial holders that elect to commute.  The treatment of Senior COFINA Bond Claims (National) under the Plan is not inconsistent with the National Insurance Policies.

187.    Neither the Ambac Insurance Policy nor the National Insurance Policies shall insure the COFINA Bonds.

188.    Plan Supplement.    All materials contained in the Second Amended Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and no other or further notice is or shall be required.  Service Affidavits; Amended Plan Supplement; Second Amended Plan Supplement.

189.    Satisfaction of Confirmation Requirements.  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA section 314.

190.    Implementation.  All documents necessary to implement the Plan, including those contained in the Amended Plan Supplement, the Second Amended Plan Supplement, and the Settlement Agreement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law. Without limiting the generality of the foregoing, the Debtor, prior to the Effective Date, and Reorganized COFINA, from and after the Effective Date, are authorized to consummate the

transactions contemplated in the Plan and Amended Plan Supplement(s).  The execution, delivery, or performance by the Debtor or Reorganized COFINA, as the case may be, of any documents in connection with the Amended Plan Supplement(s), and compliance by the Debtor or Reorganized COFINA, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

191.    Good Faith.  The Debtor will be acting in good faith if it proceeds to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby, including, without limitation, the Settlement Agreement, and (ii) take the actions authorized and directed by the Confirmation Order.  The COFINA Agent Releasees and the Commonwealth Agent Releasees have acted in good faith in connection with their evaluation of, and their conduct with respect to, the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion, and the Title III Case.

192.    Retention of Jurisdiction.  This Court may properly and, upon the Effective Date shall, to the extent consistent with Article XXIX of the Plan, retain exclusive jurisdiction over all matters arising out of, and related to, the COFINA Title III Case, including, without limitation, all Causes of Action not otherwise released pursuant to the Plan and the matters set forth in Section 29.1 of the Plan and section 1142(b) of the Bankruptcy Code.  (Plan § 29.1.)

193.    Without limiting the generality of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and the remedies of the COFINA Bonds under the New Bond Indenture, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any entity pursuant to or in furtherance of the Plan or this Confirmation Order, including, without limitation, issuance of the COFINA Bonds, and (iv) to enforce prohibitions

against any subsequent collateral attack on the validations contained in the Plan and this Confirmation Order.

194.   <u>Funds Flow</u>.  In order to implement the Plan, the collection of the COFINA Portion shall occur in accordance with the Instruction Agreement and the Banking Services Agreement, which may not be changed except as provided in the Indenture.  The flow of funds set forth in the Instruction Agreement and the Banking Services Agreement will be generally as follows:

A.   A financial institution, which currently is Banco Popular de Puerto Rico (the "<u>Depositary</u>") shall receive all tax revenues generated by the COFINA Pledged Taxes and, pursuant to the Sales Tax Financing Corporation Act of 2018 and the Plan, shall not have any legal or equitable right, title or interest to the COFINA Portion solely by virtue of the fact that it holds the COFINA Pledged Taxes;

B.   All revenues received on account of the COFINA Pledged Taxes shall be directly deposited to an account at the Depositary jointly held in the name of the Treasury Department and Reorganized COFINA (the "SUT Collection Account"); <u>provided, however</u>, that  the commingling of COFINA Pledged Taxes in the SUT Collection Account shall be solely for administrative convenience, shall not create any equitable interest in favor of the Commonwealth with respect to the COFINA Portion, shall not render the COFINA Portion property of the Commonwealth, and shall not have any impact on Reorganized COFINA's sole and exclusive ownership of the COFINA Portion; provided, further, that such commingling shall not create any equitable interest in favor of Reorganized COFINA with respect to revenues owned by the Commonwealth, such Commonwealth revenues shall not constitute property of Reorganized COFINA and shall not have any impact on the Commonwealth's sole and exclusive ownership of revenues other than the COFINA Portion;

C.   Promptly after deposit into the SUT Collection Account, on a daily basis with no more than a 2 business day delay, the Depositary, based on information provided by the Treasury Department's tax collection system, shall transfer the COFINA Portion to the Dedicated Sales Tax Fund Account at the Depositary which shall at all times be owned exclusively by Reorganized COFINA; provided, that transfer to the Dedicated Sales Tax Fund Account shall not be required to the extent the COFINA Portion is being transferred from the SUT Collection Account to the Revenue Account at The Bank of New York Mellon ("<u>BNYM</u>");

D.   All monies deposited in the Dedicated Sales Tax Fund shall be transferred on a daily basis to the Revenue Account at BNYM until 53.65% of the Pledged Sales Tax Base Amount (the "<u>Adjusted PSTBA</u>") has been deposited for that Fiscal Year

as calculated by the Trustee;

E.  All trustee accounts at BNYM shall be solely in the name of Reorganized COFINA; and

F.  After the Adjusted PSTBA has been deposited in the Revenue Account at BNYM, all subsequent collections of the COFINA Pledged Taxes shall be transferred to the Commonwealth's Treasury Department.

195.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

196.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.  The documents contained in the Second Amended Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date), including, without limitation, Reorganized COFINA By-Laws, the COFINA Bonds, the New Bond Indenture, the Instructions Agreement, the Ambac Trust Agreement, the National Trust Agreement, the Standard Terms to National Trust Agreement, the Remarketing Agreement, and the Continuing Disclosure Agreement, provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of COFINA and the Commonwealth, as applicable,

and valid provisions to pay or secure payment of the COFINA Bonds pursuant to section 944(b)(3)

of the Bankruptcy Code, and be enforceable in accordance with their terms.

CONCLUSION

For the foregoing reasons, the Court is concurrently entering its *Order Approving
Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing
Corporation*.

Dated: February 4, 2019

                            /s/ Laura Taylor Swain
                            LAURA TAYLOR SWAIN
                            United States District Judge