UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

MEMORANDUM OPINION AND ORDER RELATED TO SECTION 19.5 OF THE
TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge

I. Introduction

Before the Court are cross memoranda of the Bank of New York Mellon ("BNYM") and Whitebox Multi-Strategy Partners, L.P. and certain of its affiliates (collectively, "Whitebox")[2] regarding the questions presented for the Court by Section 19.5 of the Plan of Adjustment[3] for COFINA. Section 19.5 requires the Court to determine whether and to what extent monies must be withheld from the distribution of Whitebox under the Plan of Adjustment to cover legal fees and expenses that BNYM may incur in connection with certain litigation that Whitebox has commenced. The memoranda were submitted in connection with procedures established by the Court. (See Docket Entry No. 4518.) BNYM also submitted evidentiary declarations in support of its position in the form of the Declaration of Daniel P. Goldberg, Esq. (Docket Entry No. 4600-1, the "Goldberg Declaration") and the Declaration of Robert M. Fishman, Esq. (Docket Entry No. 4601-1, the "Fishman Declaration" and, collectively with the Goldberg Declaration, the "Declarations"). The dispute initially also involved a third party, Ambac Assurance Corporation ("Ambac"). The Court held a hearing on this matter on January

---

[2] The relevant memoranda of BNYM can be found at Docket Entry Nos. 4599, 4657, and 4751 in Case No. 17-3283. The relevant memoranda of Whitebox can be found at Docket Entry Nos. 4602, 4646, 4653, and 4752 in Case No. 17-3283. Hereafter, unless otherwise indicated, all docket entry references are to entries in Case No. 17-3283.

[3] This Court's *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 5055, the "Amended Confirmation Order") was issued on February 5, 2019, along with this Court's associated *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 5053). The confirmed *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 5055-1, the "Plan of Adjustment") is attached as Exhibit A to the Amended Confirmation Order.

17, 2019 (the "Hearing") in connection with the hearing related to confirmation of the Plan of Adjustment. At the Hearing, the parties informed the Court that Ambac and BNYM had reached an agreement and that "Ambac [would] not be participating in the legal argument or the evidentiary part of the hearing." (Docket Entry No. 4850, Jan. 17, 2019 Hr'g Tr. at 140:23-141:3.) The Court heard argument from Whitebox and BNYM and BNYM introduced the Declarations into evidence. As explained below, the Court sustained BNYM's objection to Whitebox's effort to cross-examine the Declarants.[4]

## II. Motion for Reconsideration of Ruling Precluding Cross-Examination

At the Hearing, BNYM objected to Whitebox cross-examining the Declarants on the grounds that Whitebox had failed to comply with the Court's procedural orders requiring it to notify the Court and parties of its intention to cross-examine and to identify the subject matter and exhibits it intended to use in cross-examination. When asked by the Court if it had complied with the procedural orders, counsel for Whitebox informed the Court that it had not, in fact, made the required disclosures. (See Docket Entry No. 4965, the "Glenn Declaration," ¶¶ 15-16.) Under such circumstances, this Court appropriately precluded Whitebox from cross-examining the Declarants. See Martinez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 283 (1st Cir. 2009) ("It is a bedrock principle that federal trial courts possess wide-ranging authority to manage the conduct of litigation and, as a necessary corollary of that authority, to sanction litigants who fail to comply with court-imposed deadlines."). The Court did allow Whitebox to present its oral arguments in opposition to BNYM's position on Section 19.5.

---

[4] The term "Declarants" shall mean, collectively, Daniel P. Goldberg, Esq. and Robert M. Fishman, Esq.

Twelve days after the Hearing, on January 29, 2019, Whitebox filed a motion for reconsideration of the Court's ruling precluding the cross-examination of the Declarants. (See Docket Entry No. 4964, the *Motion of Whitebox Multi-Strategy Partners, L.P. and Certain of Its Affiliates for Reconsideration of the Court's Order Precluding the Cross-Examination of Certain Witnesses*.) Therein, Whitebox dissected the Court's various procedural orders, and concluded that it had, in fact, made timely disclosures, argued that if there was an error, it was unintentional, *de minimis*, and excusable under the circumstances, and further contended that allowing cross-examination would not prejudice any party and would benefit the Court. (See id. at 2-3.) Whitebox attached the depositions taken by Ambac and Whitebox of the Declarants in support of the contention that BNYM was on notice of their intention to cross-examine. (Glenn Decl. ¶ 5, Exs. A and B.) BNYM, representing that operational considerations in connection with planned distributions under the confirmed Plan of Adjustment require the resolution of the Section 19.5 issues before February 8, 2019, filed its objection to the motion for reconsideration on an expedited basis, continuing to argue that its analysis of the Court's orders establish that Whitebox did not comply with this Court's requirements, and further asserting that Whitebox failed to preserve any objection at the Hearing and did not make any offer of proof, thereby precluding review of the ruling. (Docket Entry No. 5066, the *Objection of the Bank of New York Mellon, as Trustee, to Whitebox's Motion for Reconsideration of this Court's Order Sustaining an Evidentiary Objection During the Hearing of the Section 19.5 Dispute*, at 3-9.) In addition, BNYM contended that, while Whitebox would not be harmed by a holdback under Section 19.5, delay would affect all of the bondholders since no distribution can be made until the Section 19.5 issues are resolved. (Id. at 13-14.) Whitebox filed its reply promptly, in accordance with the Court's expedited scheduling order. (Docket Entry No. 5073, the *Reply of Whitebox Mutlti-*

*Strategy Partners, L.P. and Certain of Its Affiliates in Further Support of Motion Seeking Reconsideration of the Court's Order Precluding the Cross-Examination of Certain Witnesses*.)

"Ordinarily, a district court faced with a motion to reconsider must apply an interests-of-justice test." United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992). "Justice is an ideal that defies precise definition[,]" so that it is "impossible to list a series of integers that will necessarily dominate the interests-of-justice equation in every case." Id. However, the First Circuit has offered "certain rules of thumb to guide the district courts" including:

> (1) the nature of the case, (2) the degree of tardiness, (3) the reasons underlying the tardiness, (4) the character of the omission, (5) the existence vel non of cognizable prejudice to the nonmovant in consequence of the omission, (6) the effect of granting (or denying) the motion on the administration of justice, and (7) whether the belated filing would, in any event, be more than an empty exercise.

Id. at 21-22.

As noted above, Whitebox has submitted the depositions of the Declarants. The examinations at the depositions are presumably indicative of the cross-examination Whitebox would have pursued at the Hearing. As evidenced by the questioning, Whitebox and Ambac focused on the hypothetical nature of many of the underlying assumptions in the proposed budget, and challenged the investigation made into the scope of legal work to be done. Similarly, Ambac challenged the Declarants' assumptions and highlighted the deficiencies it perceived in their analyses in its Response Memorandum. (Docket Entry No. 4654, *Memorandum of Ambac Assurance Corporation in Response to Declarations of the Bank of New York Mellon Pursuant to Section 19.5 of COFINA's Amended Title III Plan of Adjustment*, at 5-12.)[5] Neither Ambac nor Whitebox has provided the Court with an alternative proposed budget

---

[5] Whitebox never challenged the amount of BNYM's proposed litigation budget in its Section 19.5 briefing. Instead, it focused its briefing on its interpretation of Section 19.5

or examples of budgets in comparable litigation. In its motion for reconsideration and related filings, Whitebox has not made an offer of proof or indicated in any way that its cross-examination would elicit additional facts beyond those already in the record.

In the interest of justice, the Court will consider the depositions of the Declarants as well as Ambac's filings in making its determinations on the Section 19.5 issues presented to the Court by Whitebox. See Anderson v. Brennan, 911 F.3d 1, 13 (1st Cir. 2018) ("A district court's decision to reopen the record turns on flexible and case-specific criteria.") (internal quotations and citation omitted). However, the Court will not allow further cross-examination as it will unnecessarily delay the proceedings for no purpose. It is clear to the Court that any cross-examination would focus on the amount of any holdback endorsed by this opinion, and Whitebox has not shown that it would elicit any facts not now before the Court. In light of the fact that Whitebox has not shown that allowing cross-examination would add any meaningful information to the record, and the fact that re-opening the Hearing would cause unnecessary delay and harm to many beneficiaries under the Plan of Adjustment, the motion for reconsideration is denied. The Court declines to analyze the multitude of filings to assess whether an argument can be made that, contrary to its representations to the Court, Whitebox did make timely disclosures.

III. Section 19.5 Determinations

The Court has jurisdiction of the Plan of Adjustment Section 19.5 issues presented here pursuant to Section 306 of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2101, et seq. ("PROMESA"). This decision constitutes the

---

as not allowing for any holdback and related legal arguments. (See Docket Entry Nos. 4646 and 4653.)

Court's findings of fact and conclusions of law for the purposes of Federal Rule of Bankruptcy Procedure 7052.

The Court has reviewed thoroughly and considered carefully the arguments and evidence submitted by the parties. For the reasons set forth below, BNYM is authorized to withhold $20 million, to be withdrawn from the funds otherwise payable under the Plan of Adjustment to Whitebox.

Section 19.5 of the Plan of Adjustment provides in relevant part that the Court will determine what amounts, if any, will be withheld from or posted by Whitebox in order to satisfy potential litigation fees and expenses that might be incurred by BNYM in connection with lawsuits by Whitebox alleging that BNYM engaged in gross negligence, willful misconduct, and/or intentional fraud in connection with alleged events of default affecting COFINA bonds. These claims are not discharged through the Plan of Adjustment. Section 19.5 also provides that the Court is to determine whether BNYM is entitled to reimbursement for such expenses on a current basis or only upon the final disposition of the Whitebox Actions.[6]

---

[6] Section 19.5 of the COFINA Plan of Adjustment reads in relevant part:
> [W]ith respect to Trustee Claims that may arise from and after the Effective Date as a result of, or on account of, the Ambac Action and the Whitebox Actions, respectively, at the Confirmation Hearing, the Title III Court shall determine (a) what amount, if any, shall be either (i) withheld by the Disbursing Agent or BNYM as trustee for the Existing Securities from distributions to be made to Ambac and Whitebox or (ii) posted by Ambac and Whitebox as collateral for the reimbursement of fees and expenses which may be incurred by BNYM in connection with the defense of the Ambac Action and the Whitebox Actions, and (b) whether BNYM shall be reimbursed by Ambac and Whitebox for the incurrence of any such fees and expenses from either the holdback amount or collateral posted and referred to in the preceding subsection (a) on a current basis or upon entry of a Final Order in connection with the Ambac Action and the Whitebox Actions, in each case, such determination and the fulfillment of any obligations of Ambac and Whitebox as a

The Court interprets the language of the Plan of Adjustment, as well as the relevant *Amended and Restated Sales Tax Revenue Bond Resolution* (Docket Entry No. 4599-1, the "Resolution"), which defines the relationship between BNYM and Whitebox, in accordance with principles of contract law, and must "afford[] a fair meaning to all of the language employed by the parties in the contract and leave[] no provision without force and effect." Hooper Assocs., Ltd. v. AGS Computs., Inc., 74 N.Y.2d 487, 493 (N.Y. 1989).

Since Section 19.5 of the Plan of Adjustment deals with satisfaction of COFINA's obligation and BNYM's rights, if any, to payment of litigation fees and expenses incurred in connection with the Whitebox Actions[7], the Court first considers the parties' arguments as to whether there are any such obligations and rights of COFINA and BNYM, which serves as indenture Trustee for COFINA bonds, under the Resolution that created COFINA. The parties have presented conflicting interpretations of Sections 804, 1103, and 501 of the Resolution. Sections 1103 and 501 are expressly subject to Section 804. Therefore, this Court will address Section 804 first.

Section 804 of the Resolution provides that:

> The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of

---

[7] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan of Adjustment.

> result thereof shall satisfy in full any obligations of COFINA and any rights of BNYM under the Bond Resolution and applicable law with regard to the payment of BNYM's fees and expenses and indemnification arising from or relating to the Ambac Action or the Whitebox Actions.

(Plan of Adjustment § 19.5.)

> their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

(Resolution § 804.)

Whitebox argues that legal fees and expenses relating to litigation concerning BNYM's performance of its duties are covered only by the indemnity granted in the second sentence of Section 804, and are outside the scope of the lien rights granted by the first sentence. Whitebox misapprehends the scope of the first sentence. The first sentence of Section 804 of the Resolution provides that COFINA shall pay BNYM "from time to time reasonable compensation for all services rendered under the Resolution" and that such payment includes expenses and

charges "of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution." (Id.) The Whitebox Actions focus on and are about BNYM's performance of its powers and duties as Trustee. BNYM's decisions as Trustee constitute the exercise of its powers and duties under the Resolution. Thus, legal fees and expenses associated with defense of litigation about or concerning such actions are contemplated by the language of the first sentence of Section 804.

It is undisputed that the first sentence creates a charging lien for such fees and expenses by providing that "the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution." (Id.) Because the legal fees and expenses at issue in this dispute are encompassed within the fees and expenses provided for by the first sentence, they are covered by that charging lien, giving BNYM a priority right to payment of those fees and expenses from the funds it is holding pursuant to the Resolution.

The Court has considered Whitebox's argument that legal fees and expenses associated with litigation are only encompassed by the second sentence of Section 804, because only that sentence expressly mentions litigation, and that to conclude otherwise would render the second sentence superfluous. (See Docket Entry No. 4752, *Reply of Whitebox Multi-Strategy Partners, L.P. and Certain of Its Affiliates to Memorandum of Law of the Bank of New York Mellon, as Trustee, Regarding Section 19.5 of the Plan*, ¶¶ 9-10.) Whitebox argues further that the fees and expenses included in the second sentence are not covered by a priority lien. (Id. ¶ 1.) The Court does not need to reach the issue of whether the indemnity provided for under the second sentence is also subject to a priority lien. As explained previously, the legal fees and expenses incurred in litigation concerning BNYM's performance of its duties are clearly within

the scope of the first sentence of Section 804. Moreover, as the Court will now explain, the second sentence does not alter those indemnity rights and obligations.

The second sentence of Section 804 builds or expands upon the types of harm against which COFINA must indemnify BNYM. For example, under the second sentence, COFINA must indemnify BNYM for damages which were not caused by BNYM's willful misconduct or gross negligence. The second sentence coexists with, and does not replace, COFINA's obligation under the first sentence to indemnify BNYM for legal fees and expenses incurred "in and about the performance of their powers and duties under the Resolution." (Resolution § 804.) This is made clear by the fact that the second sentence of Section 804 begins with the words "[t]he corporation **further** agrees to indemnify and save the Trustee harmless against any loss . . . ." (Id.) (emphasis added). The natural meaning of the word "further" in that sentence simply indicates an expansion of the indemnity provided for in the first sentence.

The coordinated provisions of Section 804 make clear that COFINA's obligation to indemnify the Trustee, and the Trustee's right to receive such indemnification, are critical to the parties' relationship. Thus, the penultimate sentence of Section 804 provides: "[t]he obligation of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee." (Id.) In addition, pursuant to the final sentence of Section 804, the "Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of this Resolution." (Id.) With respect to litigation concerning the execution of the Trustee's duties under the Resolution, it is clear that the other provisions of Section 804 work with the payment right and charging lien granted in the first sentence of Section 804 to ensure that BNYM's right to payment of its legal fees and expenses is

satisfied. This interpretation is consistent with case law and commercial practices that recognize that "[u]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988). It also gives the words and phrases of the Resolution their plain meaning, and construes the contract, as the Court must, "so as to give full meaning and effect to all of its provisions." Lansuppe Feeder, LLC v. Wells Fargo Bank, N.A., No. 15-7034-LTS, 2016 WL 5477741, at *3 (S.D.N.Y. Sept. 29, 2016) (internal citations and quotations omitted). It would be inconsistent with the comprehensive and protective nature of the language of Section 804 to interpret the first sentence of Section 804 as narrowly as Whitebox proposes.

Accordingly, the Court concludes that Section 804 of the Resolution imposes on COFINA the obligation to indemnify BNYM for litigation fees and expenses incurred in the Whitebox Actions, unless BNYM is actually found responsible for gross negligence or willful misconduct. The Court further concludes that under Section 804, BNYM has an express lien prior to that of Bondholders and other Beneficiaries securing this payment right on "all funds" that BNYM holds "at any time" under the Resolution. (Resolution § 804.) The primacy of this lien is confirmed by the incorporation of Section 804 in Sections 501 and 1103 of the Resolution.

In light of the clear provisions of Section 804, the Court does not need to separately address the parties' arguments concerning the language of Sections 501 and 1103 of the Resolution. As the parties all recognize, these provisions, by their terms, are "subject to Section 804." (Resolution §§ 501, 1103.) Therefore, this Court's interpretation of Section 804 is sufficient to define the scope of BNYM's rights and COFINA's obligations.

Having determined that COFINA has the obligation to indemnify BNYM for its litigation fees and expenses, and that BNYM has a charging lien on COFINA funds to protect its right to those payments, the next inquiry is whether BNYM can hold back these fees and expenses from the distributions to Whitebox. Section 19.5 of the Plan of Adjustment makes provision for satisfaction of COFINA's obligations by requiring that the funds necessary to spend in responding to the Whitebox Actions be held back from the distributions to be made to Whitebox. These withheld distributions, according to Section 19.5, are the source of funds to be used to "satisfy in full any obligations of COFINA and any rights of BNYM." (Plan of Adjustment § 19.5.) This provision of the Plan of Adjustment was not challenged in any objection and is a binding element of the confirmed Plan. Because Section 19.5 defines the treatment of the COFINA funds in BNYM's possession, and mandates a holdback before any distributions, Whitebox has no right to receive its full distribution in respect of Existing Securities at this time. Rather, Whitebox's distribution is to be net of the amount, if any, that the Court determines is necessary to satisfy COFINA's obligation and BNYM's rights in respect of anticipated litigation fees and expenses in connection with the Whitebox Actions.

Whitebox's contention that it cannot be the subject of a holdback because it never separately assumed any obligations of COFINA, and its reliance on the legal reasoning in Becker v. Bank of N.Y. Mellon Trust Co., N.A., 172 F. Supp. 3d 777 (E.D. Pa. 2016), is misplaced. Unlike in Becker, where the issue of reducing a bondholder's distribution to cover the trustee's litigation costs arose after plan confirmation, and after the distribution of the debtor's assets pursuant to a plan that made no explicit provision for such a reduction, the holdback issue is presented here in connection with a plan of adjustment that expressly provides that certain of COFINA's indemnity obligations will be satisfied through pre-distribution withholding of funds

that would otherwise go to Whitebox. The Plan of Adjustment obligates Whitebox to suffer withholding, or to post collateral, as directed by the Court, sufficient to satisfy COFINA's obligation and to fulfill BNYM's right to reimbursement. Whitebox did not object to confirmation of the Plan of Adjustment, which was accepted by the requisite proportions of bondholders, has now been confirmed, and is binding on Whitebox.

The next issue presented is the amount that BNYM is entitled to withhold to cover COFINA's obligation to indemnify BNYM for legal fees and expenses associated with the Whitebox Actions.

BNYM has proffered the Goldberg Declaration an experienced litigator familiar with fee arrangements and complex financial litigation. He estimated the range of fees and expenses to be between approximately $25 million and $40 million, with a midpoint of approximately $32.5 million, for the defense of all possible phases of the Ambac Action and the Whitebox Actions. (Goldberg Decl. ¶ 151.) BNYM also proffered the Fishman Declaration, another experienced litigator with relevant experience as a fee examiner in complex restructuring matters, who opines that "under the circumstances presented, the proposed holdback for the Anticipated Litigation is reasonable, and there exist effective protections for [] Whitebox even if the amount of the Reserve Fund exceeds the amount of fees and expenses actually to be paid." (Fishman Decl. ¶ 42.) These protections include refunds of unused amounts and the ability to challenge the reasonableness of the expenditures that are made. While Whitebox has not proffered alternative projected computations, the Court has weighed carefully concerns, originally expressed by Ambac prior to its withdrawal from this dispute and as explored in the Declarants' depositions, about the reasonableness of assumptions underlying Mr. Goldberg's analysis, as well as the argument that BNYM has improperly minimized the amount of relevant

legal and factual work that has already been done on the underlying issue of default, and greatly inflated the amount of factual and legal work remaining before the relevant issues in the Whitebox Actions can be finally resolved. The Court finds that Mr. Goldberg's high-end assumptions as to the extent and cost of discovery, especially discovery concerning the existence of the alleged defaults that were the subject of the summary judgment motion practice in the Interpleader Action, and as to the likelihood that every possible litigation event will actually take place, are excessive. The Court further finds that Ambac's withdrawal from the litigation warrants reduction of the proposed budget.

The Court recognizes, as Mr. Goldberg has attested, that "litigation inherently is uncertain" and that "it is impossible to predict with certainty what any given case will cost to litigate[.]" (Goldberg Decl. ¶ 2.) The Court further recognizes, as Mr. Goldberg has asserted, "that BNYM has but a single opportunity, in advance, to set a holdback" and that unspent funds will be returned to Whitebox. (Id. ¶ 38.) The proposition that a single holdback must cover all relevant anticipated litigation expenses comports with the language in Section 19.5 of the Plan of Adjustment, which directs the Court to determine the amount that "shall satisfy in full any obligations of COFINA and any rights of BNYM." (Plan of Adjustment § 19.5.) BNYM, having been sued by Whitebox, must defend itself against claims which it vigorously disputes, and which, as Mr. Goldberg recognizes, threaten its reputation and impugn its business practices. (Id. ¶ 39.) Nevertheless, the holdback must not exceed an amount that the Court finds is reasonably necessary to cover BNYM's reasonably anticipated litigation expenses. It need not be an amount that will insure coverage of every conceivable litigation expense.

The Whitebox Actions basically present the issues of whether there have been events of default, how BNYM responded to any events of default, and whether, if the response

was improper, the impropriety rose to the level of gross negligence or willful misconduct on the part of BNYM. Extensive relevant discovery has already taken place in connection with the Interpleader Action, and relevant summary judgment pleadings on the issue of the existence of certain alleged defaults have already been researched, drafted and filed. The history of this litigation establishes that the parties can focus their discovery when necessary, albeit sometimes with the assistance of the Court, and present critical issues to the Court efficiently and expeditiously. On the other hand, Whitebox has to date declined to give BNYM insight into key issues relevant to the scope and basis of Whitebox's claims, and BNYM is reasonable in estimating significant litigation costs in connection with issues concerning the reasonableness of its own conduct and the basis of any damages claimed by Whitebox. (Id. ¶ 40.) The Court also considers the fact that, in view of the Ambac settlement, the holdback no longer needs to make provision for coverage of additional costs associated with the simultaneous defense of overlapping actions brought by two plaintiffs.

Based on this Court's review of the pleadings, familiarity with the progress of the Whitebox Actions and the PROMESA cases, and its own experience with fee petitions in complex litigation, the Court finds that the low-end estimate proffered by BNYM is the most appropriate starting benchmark insofar as it is based on reasonable fee assumptions and lower litigation activity assumptions.[8] However, even the low-end estimate assumes an intensity to the litigation schedule of the Whitebox Actions that is objectively likely to overestimate the necessary costs. Specifically, the Court finds it necessary to discount Mr. Goldberg's estimate as to post-trial expenses, as his analysis assumes a number of post-trial possibilities, and it is

---

[8] Nothing herein is intended to specifically endorse the occurrence of any of the litigation events contemplated by and detailed in the Goldberg Declaration.

unlikely that each and every one of those events would occur. (See id. ¶¶ 128-141.)

Accordingly, the Court adopts Mr. Goldberg's lower reasonable estimates through trial and discounts those post-trial estimates by seventy-five percent. Applying such a discount, the Court's re-calculation of the low-end estimate equals $22,200,400.[9] Further, the Court finds just cause to further discount these estimates to account for the fact that they should no longer include the Ambac Action. While there are significant overlaps between the two sets of litigation, it is reasonable to expect some savings from only proceeding with one. Accordingly, the Court discounts the holdback amount further and sets the final amount at $20 million. BNYM shall hold these monies in a segregated account, and retain them subject to disbursements as authorized by this decision, until the Whitebox Actions are finally concluded.[10]

        The Court now turns to the question of whether BNYM is entitled to be reimbursed for fees and expenses on a current basis during the life of the Whitebox Actions, or whether BNYM must await a final determination in its favor on the merits before it is entitled to recoup its fees and costs. Section 804 of the Resolution provides that BNYM has a right to payment "from time to time," and that the "Trustee shall not be required to expend any of its own funds in the execution of its duties." (Resolution § 804.) Reading these provisions together, the Court concludes that BNYM is entitled to current payment of its reasonable attorney's fees and expenses. Otherwise, BNYM would have to expend its own funds

---

[9]     The numbers used for the Court's calculation are taken from the chart attached to the Goldberg Declaration. (See Docket Entry No. 4600-4.)

[10]    Although pressed by Ambac, this Court hereby overrules the suggestion that the expenses should be paid from a staged bond as opposed to a holdback from distributions because it would provide insufficient collateral to "satisfy in full any obligations of COFINA and any rights of BNYM" as required by the language of Section 19.5 of the Plan of Adjustment. (Plan of Adjustment § 19.5.) Such proposal is also unworkable and would prejudice the parties' rights by requiring litigation strategy disclosures.

throughout the course of litigation about the exercise of its duties under the Resolution. The Resolution's language recognizing that BNYM is not required to expend any of its own funds in the execution of its duties expressly rejects such an out-of-pocket obligation as to covered expenses.

Whitebox's argument that the Resolution does not entitle BNYM to payment unless and until BNYM has proven that it was not grossly negligent or did not engage in willful misconduct is unavailing, as it stands the clear language of the Resolution on its head. The Resolution does not provide that BNYM is paid only if and when it proves that its conduct was not wrongful. Instead, the Resolution provides that BNYM has a right to be paid unless the challengers prove that its conduct was wrongful. The use of the present tense in the Resolution's provision providing that BNYM shall be indemnified "except to the extent that such loss . . . is due to its own gross negligence or willful misconduct" indicates that the exception requires actual proof and a finding of wrongful conduct before exception from payment rights is triggered. (Resolution § 804.) The protections of Section 804 would be meaningless if BNYM were forced to expend its own funds to defend against accusations that may ultimately fail. The Resolution does not allocate the risk to BNYM; instead, BNYM is protected by rights to security and current payment. Whitebox is protected by its ability to seek disgorgement in connection with a decision in its favor and its ability to challenge the reasonableness of BNYM's expenditures at the conclusion of the litigation. Finally, requiring current payments is consistent with case law recognizing that a party does not have to wait until the end of litigation for compensation where, as here, the defendant would have the resources to reimburse the plaintiff if necessary. See Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n, No. 14-2590, 2018 WL 6920768, at *9 (S.D.N.Y. Nov. 30, 2018).

IV. Conclusion

In accordance with this Order, BNYM is authorized to withhold $20 million, to be withdrawn from the funds otherwise payable to Whitebox. The funds shall be kept in a segregated account until final resolution of the Whitebox Actions, subject to withdrawals as relevant expenses are incurred. The parties are instructed to meet and confer to develop a method by which BNYM shall document and account for such withdrawals, and to identify an appropriately liquid and stable income-producing vehicle for the investment of the holdback funds.

This Order resolves Docket Entry Nos. 4844 and 4964 in Case No. 17-3283 and Docket Entry No. 519 in Case No. 17-3284.

SO ORDERED.

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Court Judge

DATED: February 7, 2019