# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 3284-LTS<br><br>**This Application relates only to COFINA, and shall be filed in the lead Case No. 17 BK 3283-LTS, and COFINA's Title III case (Case No. 17 BK 3284-LTS)** |

# URGENT MOTION OF THE
# PUERTO RICO SALES TAX FINANCING CORPORATION
# FOR (I) ORDER APPROVING SETTLEMENT WITH GOLDMAN
# SACHS BANK USA (F/K/A GOLDMAN SACHS CAPITAL MARKETS, L.P.)
# AND (II) ORDER EXPEDITING CONSIDERATION OF THE SETTLEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement.................................................................................................1

Jurisdiction and Venue..............................................................................................3

Background.................................................................................................................3

    **A.**    The COFINA Title III Case ................................................. 3

    **B.**    GS Bank's Claim ............................................................... 4

Basis for Relief ..........................................................................................................7

    **A.**    Probability of Success and Complexity of Litigation Involved and Expense,
Inconvenience and Delay Attending It. ........................................... 9

    **B.**    Interest of the Creditors .................................................. 12

Request for Expedited, Urgent Consideration ...........................................................13

Notice.......................................................................................................................15

No Prior Request.......................................................................................................15

Certification of Compliance with
Local Rule 9013-1 and the Eighth Amended Case Management Procedures\ ............15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bos v. Jalbert (In re ServiSense.com, Inc.)*,
  2003 U.S. Dist. LEXIS 17057 (D. Mass. Sep. 26, 2003) ......................................................10

*City Sanitation, LLC v. Allied Waste Serves. Of Mass., LLC
(In re Am. Cartage, Inc.)*,
  656 F.3d 82 (1st Cir. 2011)..........................................................................................6, 7, 11

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983).........................................................................................................7

*Hill v. Burdick (In re Moorhead Corp.)*,
  2008 B.R. 87 (B.A.P. 1st Cir. 1997) ..........................................................................................6

*In re C.P. del Caribe, Inc.*,
  140 B.R. 320 (Bankr. D.P.R. 1992) ............................................................................................7

*In re City of Detroit*,
  524 B.R. 147 (Bankr. E.D. Mich. 2014) ...................................................................................1

*In re City of Stockton*,
  486 B.R. 194 (Bankr. E.D. Cal. 2013)......................................................................................1

*In re Fibercore, Inc.*,
  391 B.R. 647 (Bankr. D. Mass. 2008) .................................................................................9, 10

*In re Hansen*,
  2017 Bankr. LEXIS 1120 (Bankr. D.N.H. Apr. 25, 2017) ...................................................7, 8

*In re Healthco Int'l, Inc.*,
  136 F.3d 45 (1st Cir. 1998).....................................................................................................6, 7, 8

*In re Hunt*,
  2016 Bankr. LEXIS 1993 (Bankr. C.D. Cal. May 12, 2016) .................................................10

*In re Indian Motorcycle Co.*,
  289 B.R. 269 (B.A.P. 1st Cir. 2003) .....................................................................................6, 7

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
  2009 Bankr. LEXIS 2846 (Bankr. D.P.R. Mar. 31, 2009) ...........................................7, 9, 11

*In re Receivership Estate of Indian Motorcycle Mfg., Inc.*,
  299 B.R. 8 (D. Mass. 2003) ........................................................................................................6

*In re Thompson*,
   965 F.2d 1136 (1st Cir. 1992)...................................................................................6

*Jeffrey v. Desmond*,
   70 F.3d 183 (1st Cir. 1995)...........................................................................6, 7, 10

*Jeremiah v. Richardson*,
   148 F.3d 17 (1st Cir. 1998)....................................................................................6

*LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*,
   212 F.3d 632 (1st Cir. 2000)................................................................................10

*Yacovi v. Rubin & Rudman, L.L.P. (In re Yacovi)*,
   411 Fed. Appx. 342 (5th Cir. 2011).......................................................................8

STATUTES

11 U.S.C. § 105(a) ..................................................................................................2, 5

11 U.S.C. § 526(a) ..................................................................................................4, 5

11 U.S.C. § 904 ..........................................................................................................1

48 U.S.C. §§ 2101-2241 .............................................................................................1

PROMESA § 104(j)......................................................................................................3

PROMESA § 206...........................................................................................................3

PROMESA § 301(a) ..................................................................................................3, 5

PROMESA § 301(d)......................................................................................................5

PROMESA § 303...........................................................................................................2

PROMESA § 304(a) ......................................................................................................3

PROMESA § 305......................................................................................................1, 2

PROMESA § 306(a) ......................................................................................................2

PROMESA § 307(a) ......................................................................................................2

PROMESA § 310......................................................................................................1, 3, 5

PROMESA § 315(b) ..................................................................................................1, 5

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2002 ..................................................................................................13

Fed. R. Bankr. P. 9006(c)(1) .........................................................................................12

Fed. R. Bankr. P. 9019 ............................................................................................1, 3, 5

To The Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] respectfully submits this urgent motion ("Urgent Motion"), for (*i*) approval and entry of the stipulation and order attached hereto as **Exhibit 1** (the "Stipulation and Order"), between COFINA and Goldman Sachs Bank USA (f/k/a Goldman Sachs Capital Markets, L.P.) ("GS Bank"), allowing the claim (the "Claim") of GS Bank arising from the Swap Agreement (as defined in Stipulation and Order ¶ A), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this case pursuant to PROMESA section 310,[2] and (*ii*) entry of an order substantially in the form attached hereto as **Exhibit 2** (the "Scheduling Order") setting a schedule to adjudicate this Urgent Motion and enter the Stipulation and Order.  In further support of this Urgent Motion, COFINA respectfully represents as follows:

### Preliminary Statement

1. For months, the Swap Agreement and the Claim have been the subject of controversy between COFINA and GS Bank, both as to the ongoing need of the Swap Agreement[3]

---

[1]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[2]   A debtor under PROMESA Title III is not required to seek court approval of settlements pursuant to Bankruptcy Rule 9019, and by filing this Urgent Motion, COFINA does not waive any argument as to whether any other settlement or compromise entered into by COFINA is subject to the requirements of Bankruptcy Rule 9019.  *See In re City of Stockton*, 486 B.R. 194, 195-200 (Bankr. E.D. Cal. 2013) ("11 U.S.C. § 904 gives a chapter 9 debtor freedom to decide whether to ignore or to follow the Rule 9019 compromise-approval procedure . . . ."); PROMESA § 305 (incorporating similar provisions as 11 U.S.C. § 904); *see also In re City of Detroit*, 524 B.R. 147, 198-99 (Bankr. E.D. Mich. 2014) (recognizing that "the City exercised its right under § 904 not to request Court approval of this memorandum of understanding." (citing *In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013)).  COFINA has elected to file this Urgent Motion to approve the Settlement as part of the orderly administration of COFINA's Title III case.

[3]   On July 12, 2007, COFINA and GS Bank entered into a swap agreement, governed by (i) the terms of a confirmation, dated July 12, 2007 (the "Confirmation"), and (ii) an International Swap Dealers Association, Inc. Master Agreement, dated as of July 31, 2007 (the "ISDA Master Agreement"), as amended by (1) the Credit Support Annex to the Schedule to the ISDA Master Agreement, dated as of September 24, 2014 (the "Credit Support Annex"), and (2) the Amendment to the ISDA Master Agreement, dated as of September 24, 2014 (the

and the amount and priority of the Claim relative to other claims.  Such dispute necessitated the alternative treatment provided pursuant to the Plan (as defined below)[4] and the effect such treatment would have on other claimholders.

2.      On February 7, 2019, three days after the Court entered an order confirming the Plan, COFINA and GS Bank reached an agreement resolving such dispute and provided for (1) the rejection of the Swap Agreement, (2) the quantification of damages associated with such rejection, and (3) the treatment of such claims in accordance with the provisions of the Plan. Specifically, pursuant to the Plan and the corresponding Stipulation and Order, the Swap Agreement shall be deemed rejected, GS Bank shall be entitled to liquidate and apply the Collateral in partial satisfaction of the Claim, and COFINA shall pay to GS Bank $11 million.

3.      The settlement memorialized in the Stipulation and Order represents a fair compromise between COFINA and GS Bank and obviates the need to reserve consideration that would otherwise be distributable to holders of Senior COFINA Bond Claims pursuant to the Plan. Accordingly, entry of the Stipulation and Order will clear away one of the final disputes related to the treatment of claims under the Plan.  Indeed, the Senior Bondholder Coalition, the party affected by the Claim and its potential dilution of recoveries, approves the settlement embodied in the Stipulation and Order.  The settlement represents a reasonable resolution of complex legal issues, is in the best interests of creditors, and should be approved by the Court.

4.      Approval of the Stipulation and Order is a matter of extreme urgency.  The Oversight Board intends for the Plan to go effective as early as February 12, 2019.  If the Stipulation and Order is not approved by this Court prior to the Effective Date, COFINA will be

---

"Amendment," and, collectively with the Confirmation, the ISDA Master Agreement, and the Credit Support Annex, the "Swap Agreement").

[4] Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

forced to reserve approximately $20 million in COFINA Bonds and cash from the Senior COFINA

Bond Distribution, an amount equal to approximately 93% of GS Bank's asserted Claim in excess

of the Collateral.  Given the relative insignificance of such amount compared to the aggregate

allowed amount of approximately $7.7 billion of Senior COFINA Bond Claims, it would be a

logistical impossibility to redistribute any amount wrongfully reserved from the Senior COFINA

Bond Distribution in the likely event that GS Bank's Claim is disallowed in whole or in part.

Accordingly, to avoid any difficulties that would arise if the Claim were left unresolved following

the Effective Date, the Oversight Board respectfully requests that the Court consider this Urgent

Motion on an expedited basis, as detailed below.

### Jurisdiction and Venue

5.      The United States District Court for the District of Puerto Rico (the "Court") has

subject matter jurisdiction over this matter pursuant to PROMESA section 306(a).

6.      Venue is proper pursuant to PROMESA section 307(a).

7.      The statutory predicates for the relief sought herein are PROMESA sections 303,

305 and 306(b), section 105(a) title 11 of the United States Code (the "Bankruptcy Code"), made

applicable to this case pursuant to PROMESA section 301(a), and Bankruptcy Rule 9019, made

applicable to this case by PROMESA section 310.

### Background

**A.  The COFINA Title III Case**

8.      COFINA is a public corporation and instrumentality of the Commonwealth

constituting a corporate and political entity independent and separate from the Commonwealth,

created under Act No. 91 of the Legislative Assembly of the Commonwealth.

9.      On May 5, 2017, the Oversight Board, at the request of the Governor, issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "COFINA Title III Case").

10.     On October 19, 2018, the Oversight Board filed a proposed plan of adjustment for COFINA [Case No. 17-3284-LTS, ECF No. 309].  On November 16, 2018, the Oversight Board filed an amended plan of adjustment for COFINA [Case No. 17-3284-LTS, ECF No. 352].  On November 26, 2018, the Oversight Board filed a second amended plan of adjustment for COFINA [Case No. 17-3284-LTS, ECF No. 367], a corrected version of which was filed on November 30, 2018 [Case No. 17-3284-LTS, ECF No. 377].  On January 9, 2019 the Oversight Board filed a third amended plan of adjustment for COFINA [Case No. 17-3284-LTS, ECF No. 439] (the "Plan").

11.     On February 4, 2019, the Court entered the *Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284-LTS, ECF No. 559] confirming the Plan, an amended version of which was filed on February 5, 2019 [Case No. 17-3284-LTS, ECF No. 561] (the "Confirmation Order").

**B.  GS Bank's Claim**

12.     On May 25, 2018, GS Bank asserted an unliquidated claim against COFINA for not less than $3,664,244.72, logged as Proof of Claim No. 36364 (the "Proof of Claim"), based on purported "missed coupon payments" pursuant to the Swap Agreement.

13.     Pursuant to the Swap Agreement, COFINA posted with GS Bank collateral having a value, as of February 6, 2019, of $49,938,101.53 million (the "Collateral").  From February 2, 2017 up to and including the date hereof, coupon payments in the aggregate amount of

4

$7,968,497.20 million became due and owing pursuant to the Swap Agreement. Such amounts remain unpaid.

14.     The Plan provides that, subject to certain exceptions, "all Executory Contracts and Unexpired Leases that exist between COFINA and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by COFINA as of the Effective Date." Plan § 18.1. Pursuant to this provision, the Swap Agreement will be rejected on the Effective Date. Upon rejection, GS Bank would be entitled to a damages claim on account of the Swap Agreement determined in accordance with Bankruptcy Code section 562(a). GS Bank asserts that, after application of the Collateral to the missed payments and rejection damages, GS Bank would have a claim against COFINA in the approximate amount of $24,500,000.

15.     Class 8 of the Plan provides for the allowance of the Claim and alternative treatments depending upon its priority. Specifically, the Plan provides that, on the Effective Date of the Plan, to the extent the termination value of GS Bank's claim is greater than the Collateral, GS Bank would be entitled to retain the Collateral in its entirety. Plan § 12.1. With respect to the balance of GS Bank's claim after the exhaustion of the Collateral, to the extent it were determined the claim is entitled to the same priority as Senior COFINA Bond Claims (as defined in the Plan), then GS Bank would be entitled to a *pro rata* share of the Senior COFINA Bond Distribution (as defined in the Plan). *Id.* If, on the other hand, it were determined the Claim is not entitled to the same priority as Senior COFINA Bond Claims, GS Bank would be entitled to no distribution on account of the Claim after exhaustion of the Collateral. *Id.* To the extent GS Bank's claim was less than the amount of the Collateral, GS Bank would be required to return the balance of the Collateral to COFINA. *Id.*

### C.  The Stipulation and Order

16.    After months of arms-length negotiation, on February 7, 2019, COFINA and GS

Bank agreed to resolve the Claim on the terms set forth in the Stipulation and Order, the salient

terms of which are as follows:[5]

| Effectiveness of Stipulation | The Stipulation and Order shall be effective and binding upon COFINA and GS Bank on the date that it is "so ordered" by the Court. |
|---|---|
| Rejection of Swap Agreement | Pursuant to the Plan and Bankruptcy Code section 365(a) the Swap Agreement shall be deemed rejected as of the Effective Date (as defined in the Plan). |
| Disposal of Collateral | Upon the later to occur of (i) the Effective Date of the Plan, and (ii) the Court's approval of the Stipulation and Order, the automatic stay extant pursuant to sections 362 and 922 of the Bankruptcy Code, applicable to the COFINA Title III Case pursuant to Section 301 of PROMESA, shall be deemed modified to the extent necessary to permit GS Bank to sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of or otherwise use in its business, any and all of the Collateral for GS Bank's benefit, free from any claim or right of any nature whatsoever of COFINA, the Oversight Board, or the Commonwealth of Puerto Rico.  COFINA and the Oversight Board shall facilitate the provision of any and all written instructions or consents necessary to effectuate the purposes of this paragraph. |
| Cash Payment | Upon the later to occur of (i) the Effective Date of the Plan, and (ii) the Court's approval of the Stipulation and Order, or as soon as practicable thereafter, COFINA shall pay to GS Bank the sum of Eleven Million Dollars ($11,000,000.00) (the "Cash Payment"), by wire transfer of immediately available funds to the account set forth on written instructions that GS Bank's outside counsel will provide in writing to COFINA's outside counsel. |
| Discharge | Upon payment of the Cash Payment, COFINA and GS Bank shall have no further obligation to each other pursuant to the Plan or the Swap Agreement, and each shall be deemed to be discharged and released of any claims and liabilities to the other arising from or relating to the Swap Agreement. |

---

[5] Any summary of the terms of the Stipulation and Order herein is qualified in its entirety by reference to the Stipulation and Order, a copy of which is attached hereto as Exhibit 1.  In the event that there are any inconsistencies between summaries in the Urgent Motion and the terms of the Stipulation and Order, the terms of the Stipulation and Order shall control.

| | Upon GS Bank's receipt of the Cash Payment, the Parties shall not be required to perform any obligations under the Swap Agreement and the Swap Agreement shall be deemed terminated. |
|---|---|

### Basis for Relief

17.      The Oversight Board files this Urgent Motion as the representative of COFINA

under PROMESA section 315(b) and consents to this Court's consideration of the Stipulation and

Order under the compromise-approval procedure of Bankruptcy Rule 9019, as incorporated by

PROMESA section 310.[6]  The Stipulation and Order reflects a compromise of the Claim, fixing

GS Bank's treatment and resolving the complex legal issues raised by the Swap Agreement.

18.      Applying Bankruptcy Rule 9019, the Court may enter the Stipulation and Order

under Bankruptcy Code section 105(a).  *See* 11 U.S.C. § 105(a) (providing that a court may issue

any order "necessary and appropriate to carry out the provisions of this title"); PROMESA § 301(a)

(incorporating Bankruptcy Code section 105 into PROMESA Title III); PROMESA § 301(d)

(providing that references to "this title" in sections of the Bankruptcy Code incorporated into

PROMESA Title III shall be deemed references to PROMESA Title III).    Bankruptcy Rule

9019(a) provides that a court may approve a debtor's "compromise and settlement" after notice

and a hearing.  Bankruptcy Rule 9019(a).  The First Circuit has emphasized that "[s]tipulations of

settlement are favored by the courts, and they will rarely be set aside absent fraud, collusion,

mistake or other such factor." *In re Indian Motorcycle Co.*, 289 B.R. 269, 282 (B.A.P. 1st Cir.

2003); *see also In re Healthco Int'l, Inc.*, 136 F.3d 45, 50 n.5 (1st Cir. 1998).

19.      The approval of settlements is within the court's "wide discretion." *See Jeremiah

v. Richardson*, 148 F.3d 17, 22 (1st Cir. 1998).  However, while a court should apply its own

independent judgment to determine whether to approve a settlement, it should also afford

---

[6] *See supra* n. 2.

deference to the judgment of the trustee or debtor in possession.  *See In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. 8, 21 (D. Mass. 2003) (the court should give "substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement"); *Hill v. Burdick (In re Moorhead Corp.)*, 2008 B.R. 87, 89 (B.A.P. 1st Cir. 1997) ("The [bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." (citation omitted)); *City Sanitation, LLC v. Allied Waste Serves. Of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness . . . If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference.") (citing *In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *In re Healthco Int'l, Inc.*, 136 F.3d at 50 n.5. ("the bankruptcy judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference.  Compromises are favored in bankruptcy.") (internal citations and quotations omitted).

20.    The court also should consider the paramount interests of creditors and give deference to their views.  *See Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995) (noting that court should give proper deference to the reasonable views of creditors).  Accordingly, a settlement should generally be approved unless it "falls below the lowest point in the range of reasonableness."  *City Sanitation, LLC v. Allied Waste Serves. Of Mass., LLC (In re Am. Cartage, Inc.),* 656 F.3d 82, 91 (1st Cir. 2011) (citing *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).

21.     In determining the reasonableness of a settlement, courts in the First Circuit consider the following four factors: (*i*) the probability of success in the litigation being compromised; (*ii*) the difficulties, if any, to be encountered in the matter of collection; (*iii*) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (*iv*) the paramount interest of the creditors and a proper deference to their reasonable views. *Jeffrey*, 70 F.3d at 185; *see also In re Indian Motorcycle Co.*, 289 B.R. at 283; *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846, at *9 (Bankr. D.P.R. Mar. 31, 2009); *In re C.P. del Caribe, Inc.*, 140 B.R. 320, 325 (Bankr. D.P.R. 1992).

22.     The Oversight Board respectfully submits that consideration of the relevant factors shows that the Stipulation and Order is eminently reasonable and should be approved.  The Stipulation and Order is a product of arm's length, good faith negotiations between GS Bank and COFINA, resolving complex issues relating to the size of the Claim as well as its priority relative to the other claims.  Absent the entry of the Stipulation and Order, these issues could require costly and lengthy litigation to resolve, and would likely pose unnecessary logistical issues related to distribution after the Effective Date.

A. **Probability of Success and Complexity of Litigation Involved and Expense, Inconvenience and Delay Attending It.**

23.     In examining the probability of success in the litigation being compromised, courts look to the legal and evidentiary obstacles to litigating the claim.  *In re Healthco Int'l, Inc.*, 136 F.3d 45, 50 (1st Cir. 1998); *In re Hansen*, 2017 Bankr. LEXIS 1120, at *12 (Bankr. D.N.H. Apr. 25, 2017).  In addition, the probability of success is measured against the "definitive, concrete and immediate benefit" that a settlement provides against the uncertainty and delay of litigation.  *See Yacovi v. Rubin & Rudman, L.L.P. (In re Yacovi)*, 411 Fed. Appx. 342, 346-47 (5th Cir. 2011) (citing *In re Healthco Int'l, Inc.*, 136 F.3d 45, 50 (1st Cir. 1998)).  In deciding the probability of

9

success in the litigation, the court is not required to decide the merits of the litigation, but rather, to assess the probability that the debtor would succeed on its claims. *In re Hansen*, 2017 Bankr. LEXIS 1120, at *12-13.

24.    The Claim raises complex, difficult legal issues about the construction of the Swap Agreement and the Amended and Restated Sales Tax Revenue Bond Resolution adopted by COFINA on July 13, 2007 and amended on June 10, 2009, attached to the Proof of Claim as Exhibit C (the "<u>COFINA Resolution</u>"). Notably, pursuant to the COFINA Resolution, only "Parity Obligations" are entitled to the same priority as obligations to COFINA's senior bonds. *See* COFINA Resolution, at 14. "Parity Obligations," in turn, are defined by the COFINA Resolution to include "Parity Hedge Obligations," which, in turn, are defined to mean only "fixed and scheduled payments by the Corporation under Qualified Hedges," such as the Swap Agreement. *Id.* The definition further provides that "Parity Hedge Obligations *shall not include*, among other things, *any costs*, *indemnities*, *termination payments or similar non-recurring amounts*, or any amortization of any thereof." *Id.* (emphases added).

25.    Similarly, the Swap Agreement provides, in relevant part:

> [COFINA] agrees that regularly scheduled payments hereunder (the "Regularly Scheduled Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, Parity Obligations payable and secured by a lien on the Pledged Property . . . on parity with Senior Bonds and other Parity Obligations. [COFINA] agrees that *all payments other than Regularly Scheduled Payments (the "Other Swap Payments") are*, and until the termination of this Agreement pursuant to the terms hereof shall remain, payable and secured by (i) a first priority lien in the Goldman Swap Account and (ii) Pledged Property . . . *immediately subordinate to the Subordinated Bonds*.

Amendment to the ISDA Master Agreement dated as of September 14, 2014 at Part 1(*i*) (emphases added).

10

26.    The Swap Agreement and the COFINA Resolution therefore give different priority levels to different types of payments potentially due to GS Bank under the Swap Agreement, depending on whether they are considered "fixed and scheduled payments" or "non-recurring amounts."  Specifically, it could be asserted that, pursuant to the Swap Agreement and COFINA Resolution: (*i*) all payments due GS Bank under the Swap Agreement are entitled to the same priority as the Senior COFINA Bonds, (*ii*) some payments (such as missed coupon payments) are entitled to such priority and some payments (such as rejection damages) are not, or (*iii*) all payments are subordinated below the Junior COFINA Bonds.

27.    Without entry of the Stipulation and Order, the only way to resolve these issues would be through unpredictable, costly, and potentially lengthy litigation as to the correct construction of the COFINA Resolution and the Swap Agreement.  Where, as here, parties' positions are diametrically opposed, courts generally favor the certainty of a settlement.  *See In re Fibercore, Inc.*, 391 B.R. 647, 655 (Bankr. D. Mass. 2008) ("[W]hat is 'clear' to one party appears foggy to another and the Trustee believes it is better to pursue a guaranteed, relatively immediate payment to the estate . . . than pursue litigation hoping for more.  This Court cannot quarrel with that conclusion."); *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846, at *9-10 (Bankr. D.P.R. Mar. 31, 2009) ("The Court concludes that the uncertainty of the litigation between the debtors and Citibank weighs heavily in favor of the approval of the Settlement Agreement . . .").

28.    Entry of the Stipulation and Order is therefore justified in the best interests of COFINA and its stakeholders, to fairly and expeditiously resolve these complex issues.  *See Jeffrey v. Desmond*, 70 F.3d 183, at 187 (1st Cir. 1995) ("[C]oupled with the bankruptcy court's inquiries and findings regarding the inconvenience and expense to the estate in attending the state court

11

action, and the fact that the compromise would provide creditors with an immediate and certain payment of a large percentage of the outstanding debt, illustrates that the bankruptcy court did not abuse its discretion in approving the compromise."); *Bos v. Jalbert (In re ServiSense.com, Inc.)*, 2003 U.S. Dist. LEXIS 17057 at *16 (D. Mass. Sep. 26, 2003) ("When augmentation of an asset involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously - and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle.") (quoting *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632 (1st Cir. 2000); *In re Fibercore, Inc.*, 391 B.R. 647, 656 (Bankr. D. Mass. 2008) ("To pursue the actions which Silica Tech proposes would likely result in a significant delay in administering the estate without the guaranty of success - and an indeterminable increase in administrative costs."); *In re Hunt*, 2016 Bankr. LEXIS 1993 at *9 (Bankr. C.D. Cal. May 12, 2016) ("The certainty that the estate will receive funds now—as opposed to the uncertainty that the estate might obtain a recovery after protracted litigation— weighs in favor of approving the Settlement Agreement.").

## B. Interest of the Creditors

29.     Creditors will be benefited by the entry of the Stipulation and Order.  The Stipulation and Order resolves the remaining controversy in COFINA's Title III case, and its entry will bring certainty as to the size and treatment of the Claim.  Moreover, the Stipulation and Order resolves the Claim for a reasonable amount that will not substantially impact the recoveries of other creditors.  Indeed, the Senior Bondholder Coalition, the party affected by the Claim and its potential dilution of recoveries, approves of the settlement embodied in the Stipulation and Order. If the Stipulation and Order is not approved, it would be logistically impossible for Reorganized COFINA to redistribute a portion or all of the approximately $20 million that would need to be

12

reserved to any holder of a Senior COFINA Bond Claim after the Effective Date. Accordingly, the settlement of the Claim on the terms provided in the Stipulation and Order creates the most certainty for creditors and other parties-in-interest, and is in the best interests of creditors. *See Am. Cartage*, 656 F.3d at 91-92 (the court should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."); *City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 93 (1st Cir. 2011) ("Finally, the bankruptcy court appropriately took into account the paramount interest of the creditors. Settling quickly for $12,000 allowed the trustee to distribute something to creditors. In bankruptcy, as in life, half a loaf is sometimes better than none."); *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846, at \*11-12 (Bankr. D.P.R. Mar. 31, 2009) (holding that the interest of creditors weighs in favor of the settlement because "[with the settlement], the Court anticipates the expeditious conclusion of these bankruptcy cases and the attendant distribution to all other creditors.").

30.     For all these reasons, the Oversight Board respectfully submits the Court should enter the Stipulation and Order memorializing the settlement between GS Bank and COFINA.

## **Request for Expedited Consideration**

31.     On February 4, 2019, the Court entered the Confirmation Order (an amended version of which was filed on February 5, 2019), confirming the Plan. The Oversight Board intends for Effective Date of the Plan to occur as early as February 12, 2019. Only once the Plan is effective will the restructuring transactions contemplated by the Plan be consummated and creditors receive distributions on account of their claims.

32.     The Oversight Board respectfully requests that the Court enter the Scheduling Order, setting the following expedited briefing schedule to consider the approval of the Stipulation and Order:

- Any response or objection to the Urgent Motion must be filed and served in accordance with the *Eighth Amended Notice, Case Management and Administrative Procedures* [Case No. 17-3283-LTS, ECF No. 4866-1] (the "Case Management Procedures") so as to be received no later than **12:00 p.m. (AST) on February 11, 2019**.

- Any reply by COFINA and/or GS Bank must be filed and served in accordance with the Case Management Procedures so as to be received no later than **5:00 p.m. (AST) on February 11, 2019**.

- The Court will take the Urgent Motion on submission, without a hearing, unless the Court otherwise determines to schedule a hearing on request of a party.

33.     Expedited consideration of the Urgent Motion is warranted under Bankruptcy Rule 9006(c)(1), which provides that "the court for cause shown may in its discretion with or without motion or notice order the period [for notice] reduced."  Further, Local Rule 9013-1(a) allows a party to request that a court "consider a motion on an expedited basis."  The Oversight Board respectfully submits cause exists.  Without expedited consideration of this Urgent Motion, logistical difficulties related to distribution may be caused by leaving the Claim unresolved following the Effective Date.  Moreover, shortening the response period will not prejudice any party-in-interest—the primary (if not the only) parties affected by the shortened response deadline are GS Bank and the Senior Bondholder Coalition, and they have agreed to the terms of the Stipulation and Order.  Any other parties that may have a stake in the outcome likewise have an interest in an expedited decision to ensure that the pendency of the Urgent Motion does not cause any logistical issues related to distribution after the Effective Date.  As such, cause exists to enter the Scheduling Order.

**Notice**

34.     The Debtor has provided notice of this Urgent Motion to: (a) the Office of the

United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as

applicable, for the Debtor's bonds; (c) any party that has requested notice pursuant to Rule 2002

of the Federal Rules of Bankruptcy Procedure; (d) counsel to the statutory committee appointed in

the Title III case; (e) the Office of the United States Attorney for the District of Puerto Rico; (f)

counsel to AAFAF; (g) the Puerto Rico Department of Justice; (h) the Puerto Rico Treasury

Department; (i) the Other Interested Parties;[7] and (j) all parties filing a notice of appearance in this

Title III case. The Debtor submits that, in light of the nature of the relief requested herein, no other

or further notice need be given.

**No Prior Request**

35.     No prior request for the relief sought in this Urgent Motion has been made to this

or any other court.

**Certification of Compliance with
Local Rule 9013-1 and the Eighth Amended Case Management Procedures\**

36.     Pursuant to Local Rule 9013-1 and ¶ I.H of the Case Management Procedures, the

Oversight Board, as representative for COFINA, hereby certifies that it has (a) carefully examined

the matter and concluded that there is a true need for urgent consideration of this motion; (b) not

created the urgency through any lack of due diligence; (c) made a bona fide effort to resolve the

matter without the need for urgent consideration; and (d) made reasonable, good-faith

communications in an effort to resolve or narrow the issues that are being brought to the Court.

---

[7]   The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds
issued or guaranteed by the Debtors; and (ii) counsel to certain ad hoc groups of holders of bonds issued or
guaranteed by the Debtors.

15

WHEREFORE the Oversight Board respectfully requests the Court to grant the relief requested herein and any other relief as is just and proper.

Dated: February 8, 2018
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*_____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for COFINA*

*/s/ Hermann D. Bauer*_____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for COFINA*

16

## **Exhibit 1**

**Stipulation and Order**

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

      as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION, *et al.*,

      Debtor.

-------------------------------------------------------------x

PROMESA
Title III

Case No. 17 BK 3284-LTS

## STIPULATION AND ORDER
## WITH RESPECT TO (A) REJECTION OF SWAP AGREEMENT
## BETWEEN GOLDMAN SACHS BANK USA AND PUERTO RICO SALES
## TAX FINANCING CORPORATION, (B) RELIEF FROM STAY WITH RESPECT
## TO CASH COLLATERAL AND (C) ALLOWANCE AND TREATMENT OF CLAIM

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number (listed as a bankruptcy case number due to software limitations) and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK- 3567-LTS) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Sales Tax Financing Corporation ("COFINA"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] and Goldman Sachs Bank USA (f/k/a Goldman Sachs Capital Markets, L.P.) ("GS Bank", and, together with COFINA, the "Parties") hereby stipulate and agree as follows:

**RECITALS**

A.      On July 12, 2007, COFINA and GS Bank entered into a swap agreement, governed by (i) the terms of a confirmation, dated July 12, 2007, a copy of which is attached hereto as Exhibit "A" (the "Confirmation"), and (ii) an International Swap Dealers Association, Inc. Master Agreement, dated as of July 31, 2007, a copy of which is attached hereto as Exhibit "B" ("ISDA Master Agreement"), as amended by (1) the Credit Support Annex to the Schedule to the ISDA Master Agreement, dated as of September 24, 2014, a copy of which is attached hereto as Exhibit "C" (the "Credit Support Annex"), and (2) the Amendment to the ISDA Master Agreement, dated as of September 24, 2014, a copy of which is attached hereto as Exhibit "D" (the "Amendment," and, collectively with the Confirmation, the ISDA Master Agreement, and the Credit Support Annex, the "Swap Agreement");

B.      In connection with the Swap Agreement, COFINA has posted with GS Bank collateral in a designated account that, as of February 6, 2019, contains Forty-Nine Million Nine Hundred Thirty-Eight Thousand One Hundred One Dollars and Fifty-Three Cents $49,938,101.53 (the "Collateral");

---

[2] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

2

C.       On May 5, 2017, COFINA, by and through the Oversight Board, as COFINA's representative pursuant to Section 315(b) of PROMESA, filed a petition with the United States District Court for the District of Puerto Rico (the "Title III Court") under title III of PROMESA (the "COFINA Title III Case");

D.       From February 2, 2017, up to and including the date hereof, periodic payments (the "Periodic Payments") in the aggregate amount of Seven Million Nine Hundred Sixty-Eight Thousand Four Hundred Ninety-Seven Dollars and Twenty Cents ($7,968,497.20) became due and owing pursuant to the Swap Agreement.  Such amounts remain unpaid as of the date hereof.

E.       On October 19, 2018, the Oversight Board filed a proposed plan of adjustment for COFINA (as amended, the "Plan").  Class 8 of the Plan provides for the allowance of a claim relating to the Swap Agreement and alternative treatments for such claim depending upon the priority of GS Bank's claim.  Specifically, the Plan provides that, on the effective date of the Plan, to the extent the termination value of GS Bank's claim is greater than the Collateral, GS Bank would be entitled to retain the Collateral in its entirety.  Plan § 12.1.  With respect to the balance of GS Bank's claim after the exhaustion of the Collateral, to the extent it was determined GS Bank's claim is entitled to the same priority as Senior COFINA Bond Claims (as defined in the Plan), then GS Bank would be entitled to a *pro rata* share of the Senior COFINA Bond Distribution (as defined in the Plan).  *Id.*  If, on the other hand, it was determined GS Bank's claim is not entitled to the same priority as Senior COFINA Bond Claims, GS Bank would be entitled to no distribution on account of the claim after exhaustion of the Collateral.  *Id.*  To the extent GS Bank's claim was less than the amount of the Collateral, GS Bank would be required to return the balance of the collateral to COFINA.  *Id.*

3

F.      Under section 18.1 of the Plan, "all Executory Contracts and Unexpired Leases that exist between COFINA and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by COFINA as of the Effective Date." Plan § 18.1.  Pursuant to this provision, the Swap Agreement shall be deemed rejected on the Effective Date (as defined in the Plan).  Upon rejection, GS Bank would be entitled to a damages claim on account of the Swap Agreement determined in accordance with Bankruptcy Code section 562(a).

G.      On February 4, 2019, the Title III Court entered an order confirming the Plan [Case No. 17-BK-3284-LTS, ECF No. 559] and a memorandum of findings of fact and conclusions of law in connection with the confirmation of the plan [Case No. 17-BK-3284-LTS, ECF No. 558].  On February 5, 2019, the Title III Court entered modified versions of both, issuing the *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-BK-3284-LTS, ECF No. 561] and the *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-BK-3284-LTS, ECF No. 560].

H.      The Plan shall become effective as early as February 12, 2019.

I.      The Parties have agreed to (1) the rejection of the Swap Agreement pursuant to the terms hereof, (2) the quantification of damages associated with such rejection, and (3) the treatment of such claims in accordance with the provisions of the Plan.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and between COFINA and GS Bank, through their undersigned counsel, as follows:

4

**STIPULATION**

1.      This Stipulation shall be effective and binding upon the Parties on the date that it
is "so ordered" by the Title III Court.

2.      Pursuant to the Plan and section 365(a) of title 11 of the United States Code (the
"Bankruptcy Code"), applicable to the COFINA Title III Case pursuant to Section 301 of
PROMESA, the Swap Agreement shall be deemed rejected as of the Effective Date (as defined
in the Plan).

3.      Upon the later to occur of (i) the Effective Date of the Plan, and (ii) the Title III
Court's approval of this Stipulation, the automatic stay extant pursuant to sections 362 and 922
of the Bankruptcy Code, applicable to the COFINA Title III Case pursuant to Section 301 of
PROMESA, shall be deemed modified to the extent necessary to permit GS Bank to sell, pledge,
rehypothecate, assign, invest, use, commingle or otherwise dispose of or otherwise use in its
business, any and all of the Collateral for GS Bank's benefit, free from any claim or right of any
nature whatsoever of COFINA, the Oversight Board, or the Commonwealth of Puerto Rico.
COFINA and the Oversight Board shall facilitate the provision of any and all written instructions
or consents necessary to effectuate the purposes of this paragraph.

4.      Upon the later to occur of (i) the Effective Date of the Plan, and (ii) the Title III
Court's approval of this Stipulation, or as soon as practicable thereafter, COFINA shall pay to
GS Bank the sum of Eleven Million Dollars ($11,000,000.00) (the "Cash Payment"), by wire
transfer of immediately available funds to the account set forth on written instructions that GS
Bank's outside counsel will provide in writing to COFINA's outside counsel.

5.      Upon payment of the Cash Payment, COFINA and GS Bank shall have no further
obligation to each other pursuant to the Plan or the Swap Agreement, and each shall be deemed

5

to be discharged and released of any claims and liabilities to the other arising from or relating to the Swap Agreement.

6.      Upon GS Bank's receipt of the Cash Payment, the Parties shall not be required to perform any obligations under the Swap Agreement and the Swap Agreement shall be deemed terminated.

7.      This Stipulation is subject to and conditioned on approval by the Title III Court. In the event such approval is not obtained: (a) nothing contained herein shall be deemed to be a waiver of any claims or admission of liability by any Parties hereto; and (b) this Stipulation shall be null and void, and all rights of the Parties prior to this Stipulation shall be preserved.

8.      Upon approval of this Stipulation by the Title III Court, the Parties are authorized and empowered to take all actions deemed necessary to implement the terms of this Stipulation.

9.      This Stipulation contains the entire agreement by and between the Parties with respect to the subject matter hereof, and all prior understandings or agreements, if any, are merged into this Stipulation.  For purposes of construing this Stipulation, neither of the Parties shall be deemed to have been the drafter of the Stipulation.

10.     This Stipulation may be executed in any number of counterparts, by original or electronic signature, each of which is deemed an original, but when taken together constitute one and the same document.

11.     This Stipulation shall be binding upon all successors and assigns of the Parties and shall continue to bind the Parties in the event the COFINA Title III Case is subsequently dismissed prior to consummation of the Plan.

12.     This Stipulation may not be modified other than by a signed writing executed by the Parties hereto and approved by the Title III Court.

13.     The Title III Court shall have jurisdiction to hear any matters or disputes arising
from or relating to this Stipulation.

[*Remainder of page intentionally left blank*]

Dated: February 8, 2019
      San Juan, Puerto Rico

By: */s/  Brian S. Rosen*           

Martin J. Bienenstock
Brian S. Rosen
(Admitted *Pro Hac Vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

             -and-

O'NEILL & BORGES LLP
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

By: */s/  Christopher E. Duffy*

     Christopher E. Duffy
     BOIES SCHILLER FLEXNER LLP
     55 Hudson Yards
     New York, NY 10001
     Tel:  (212) 446-2300
     Fax:  (212) 446-2350

        -and-

     Gary Kaplan
     FRIED FRANK HARRIS
     SHRIVER & JACOBSON LLP
     One New York Plaza
     New York, NY 10004
     Tel:  (212) 859-8000
     Fax:  (212) 859-4000

     *Attorneys for Goldman Sachs Bank USA*

SO ORDERED, this _____ day of February, 2019

_____
HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

**<u>Exhibit A</u>**

Confirmation Dated July 12, 2007

Goldman Sachs Capital Markets, L.P. | 85 Broad Street | New York, New York 10004 | Tel: 212-902-1000

Goldman
Sachs

PATPAT121498424-39647TAPTAP

CONFIRMATION

DATE:            July 12, 2007

TO:              PUERTO RICO SALES TAX FINANCING CORPORATION
                 Telephone No.:    787 722 6260
                 Facsimile No.:    787 728 0975
                 E-mail:           jorge.irizarry@bgf.gobierno.pr
                 Attention:        Jorge Irizarry

                 Telephone No.:    787 722 7060
                 Facsimile No.:    787 721 0540
                 E-mail:           jose.l.carrasquillo@bgf.gobierno.pr
                 Attention:        Jose L. Carrasquillo

FROM:            Goldman Sachs Capital Markets, L.P.

SUBJECT:         Swap Transaction

OUR REF NO:      LTAA1707524333.0 / 00647654301

The purpose of this communication is to set forth the terms and conditions of the above
referenced transaction entered into on the Trade Date specified below (the "Transaction")
between Goldman Sachs Capital Markets, L.P. ("GSCM"), guaranteed by The Goldman
Sachs Group, Inc. ("Goldman Group"), and PUERTO RICO SALES TAX FINANCING
CORPORATION ("Counterparty"). This communication constitutes a "Confirmation" as
referred to below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"),
as published by the International Swaps and Derivatives Association, Inc. are incorporated
into this Confirmation.

2. This Confirmation evidences a complete and binding agreement between you and us as to
the terms of the Transaction to which this Confirmation relates. In addition, you and we agree
to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the
form of the ISDA Master Agreement (Local Currency-Single Jurisdiction) (the "ISDA Form"),
with such modifications as you and we will in good faith agree. Upon the execution by you
and us of such an agreement or if such an agreement or other form of ISDA master
agreement has already been executed by you and us, this Confirmation will supplement,
form a part of, and be subject to that agreement. Until we execute and deliver that
agreement, this Confirmation, together with all other documents referring to the ISDA Form
(each a "Confirmation") confirming transactions (each a "Transaction") entered into between
us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part
of, and be subject to an agreement (which shall survive the termination of this Transaction) in

1 of 4

the form of the ISDA Form as if we had executed an agreement in such form effective as of the Trade Date of the first Transaction between us (but without any Schedule except for (i) the election of Loss and Second Method, New York law (without regard to the conflicts of law principles) as the governing law and US Dollars as the Termination Currency, (ii) the election that subparagraph (ii) of Section 2(c) will not apply to Transactions, and (iii) the replacement of the word "third" in the last line of Section 5(a)(i) with the word "first"). In the event of any inconsistency between the Definitions, the ISDA Form and this Confirmation, this Confirmation will govern.

3. The terms of the Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Notional Amount: | USD 218,000,000.00 |
| Trade Date: | July 11, 2007 |
| Effective Date: | July 31, 2007 |
| Termination Date: | August 1, 2057 |
| Swap Advisor Fee: | |
| Swap Advisor: | Mesirow Financial, Inc. |
| Swap Advisor Fee: | At the request of the Counterparty, a fee of USD 175,000 is being paid by GSCM on behalf of the Counterparty to the Swap Advisor in respect of this Transaction subject to the full execution of this Confirmation. Such fee is equal to the present value of .502 basis points per annum on the Notional Amount of this Transaction, to the Termination Date, using the LIBOR swap curve. The fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Floating Amounts: | |
| Floating Rate Payer: | GSCM |
| Floating Rate Payer Payment Dates: | Quarterly, on each February 1, May 1, August 1 and November 1, commencing on November 1, 2007 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention |
| Floating Rate for initial Calculation Period: | 5.35485% x 67% (exclusive of Floating Rate Spread) |
| Floating Rate: | 3 month USD-LIBOR x 67%<br><br>Where:<br><br>3 month USD-LIBOR = USD-LIBOR-BBA with a |

JUL-17-2007 MAR 07:28 PM    Case:17-03283-LTS    Doc#:5083    Filed:02/08/19    Entered:02/08/19 20:37:34    Desc: Main
Document    Page 36 of 78

P.008

Designated Maturity of 3 Months

Floating Rate Spread: Plus 0.93%

Floating Rate Reset Dates: The first day of each Calculation Period

Floating Rate Day Count Fraction: Actual/Actual

Floating Rate Period End Dates: Adjusted in accordance with the Following Business Day Convention.

<u>Fixed Amounts:</u>

Fixed Rate Payer: Counterparty

Fixed Rate Payer Payment Dates: Semiannually, on each February 1 and August 1, commencing on February 1, 2008 and ending on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention

Fixed Rate: 4.92%

Fixed Rate Day Count Fraction: 30/360

Fixed Rate Period End Dates: No Adjustment

Business Days: New York

Calculation Agent: GSCM

4. Additional Provisions: None

5. Documentation: ISDA Master Agreement with GSCM Schedule

6. Credit Support Documents: Standard Guaranty of The Goldman Sachs Group, Inc.

7. Offices:

 (a) The Office of GSCM for this Transaction is 85 Broad Street, New York, New York, 10004.

 (b) The Office of Counterparty for this Transaction is c/o Government Development Bank for Puerto Rico, Roberto Sanchez Vilella Government Ctr, Avenida de Diego, Parada 22, San Juan, PR 00940.

8.    Counterparty hereby agrees (a) to check this Confirmation (Reference No.: LTAA1707524333.0) carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing correctly sets forth the terms of the agreement between GSCM and Counterparty with respect to the particular Transaction to which this Confirmation relates, by manually signing this Confirmation and providing the other information requested herein and immediately returning an executed copy to Swap Administration, facsimile No. 212-902-5692.

Very truly yours,

**GOLDMAN SACHS CAPITAL MARKETS, L.P.**

By: Goldman Sachs Capital Markets, L.L.C.
General Partner

Very truly yours,

By: _____

Name: James T. Gavin
Title: Vice President

Agreed and Accepted By:
PUERTO RICO SALES TAX FINANCING
CORPORATION

By: _____
Name:
Title:

Counterparty Reference Number:    [Please Provide] _____

## **Exhibit B**

ISDA Master Agreement Dated as of July 31, 2007

1

(Multicurrency—Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 31, 2007

| GOLDMAN SACHS CAPITAL MARKETS, L.P. | and | PUERTO RICO SALES TAX FINANCING CORPORATION |
|---|---|---|

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

## 1. Interpretation

(a)     ***Definitions.***  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     ***Inconsistency.***  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)     ***Single Agreement.***  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2. Obligations

(a)     ***General Conditions.***

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(ii)  *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.**      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations*.

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)      *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)      *Credit Support Default*.

(1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)      *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)      *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)      *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

           **ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   **Calculations.**

(i)   **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

**ISDA® 1992**

**7.     Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.     Contractual Currency**

(a)     *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)     *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)     *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)     *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

>     (i)     if in writing and delivered in person or by courier, on the date it is delivered;

>     (ii)     if sent by telex, on the date the recipient's answerback is received;

>     (iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

>     (iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

>     (v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.     Governing Law and Jurisdiction**

(a)     *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

>     (i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

>     (ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

(Multicurrency – Cross Border)

**SCHEDULE**
**to the**
**ISDA MASTER AGREEMENT**
**dated as of**
**July 31, 2007**

**between**

**GOLDMAN SACHS CAPITAL MARKETS, L.P.,**
**a limited partnership organized under the laws of the State of Delaware**
**("Party A"),**

**and**

**PUERTO RICO SALES TAX FINANCING CORPORATION,**
**an independent governmental instrumentality of the Commonwealth of Puerto Rico**
**("Party B").**

**Part 1. Termination Provisions**

(a)   **"Specified Entity"**

      (i)    means, in relation to Party A, J. Aron & Company, Goldman, Sachs & Co., Goldman Sachs International, Goldman Sachs Japan Co., Ltd., Goldman Sachs International Bank, Goldman Sachs (Asia) Finance, Goldman Sachs Financial Markets, L.P., Goldman Sachs Paris Inc. et Cie, Goldman Sachs Mitsui Marine Derivative Products, L.P., Goldman, Sachs & Co. oHG and J. Aron & Company (Singapore) Pte. for the purpose of Section 5(a)(v), and shall not apply for purposes of Sections 5(a)(vi), 5(a)(vii) and 5(b)(iv); and

      (ii)    means, in relation to Party B, Not Applicable for the purpose of Sections 5(a)(v), 5(a)(vi), 5(a)(vii) and 5(b)(iv).

(b)   **"Specified Transaction".**  The term "Specified Transaction" in Section 14 of the Agreement is amended in its entirety as follows:

"**_Specified Transaction_**" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, commodity spot transaction, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap

Entity of such party, as the case may be, for making the relevant payment when due and (B) such relevant payment is made within two Local Business Days after notice of such failure is given to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party, as the case may be."

**"Specified Indebtedness"** will have the meaning specified in Section 14 of the Agreement.

**"Threshold Amount"** means (A) in relation to Party A, U.S.$50,000,000 (or its equivalent in another currency) and (B) in relation to Party B, U.S.$50,000,000 (or its equivalent in another currency).

(d)     Section 5(b)(iv) is hereby amended by deleting it in its entirety and replacing it with the following:

**Credit Event Upon Merger.**  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets (or, in the case of Party B, all or substantially all of the project, program or other enterprise from which the funds specified in Section 4(h) are derived in whole or in part) to (or, without limiting the foregoing, with respect to Party B, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, Party B or any Credit Support Provider of Party B or any applicable Specified Entity of Party B generally, or with respect to the project, program or other enterprise from which the funds specified in Section 4(h) are derived in whole or in part), another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, such Credit Support Provider, or such Specified Entity (as the case may be) or any resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider, or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(e)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) as amended will apply to Party A and will apply to Party B.

(f)     The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(g)     The parties agree to amend Section 5(a)(viii) by adding, following the word "entity" in line 3 of the introductory paragraph: "or, with respect to Party B, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, Party B or any Credit Support Provider of Party B generally, or with respect to the funds specified in Section 4(h) or the project, program or other enterprise from which

3

(b)     **Payee Tax Representations.**  For the purpose of Section 3(f) of this Agreement, Party B makes the following representation: (1) it is a public corporation and instrumentality of the Commonwealth of Puerto Rico and is treated as a foreign corporation for U.S. Federal Income Tax purposes; (2) it is a wholly-owned agency or instrumentality of the Commonwealth of Puerto Rico, a possession of the United States, in accordance with section 1.6049-4(c)(1)(ii)(F) of the U.S. Treasury Regulations (the "Regulations"); (3) it is a foreign corporation in accordance with section 1.6049-4(c)(1)(ii)(A) of the Regulations; and (4) it is a government instrumentality of the Commonwealth of Puerto Rico that is exempt from U.S. income taxation with respect to all payments under this Agreement under Section 892 of the Internal Revenue Code of 1986, as amended.

**Part 3. Agreement to Deliver Documents**

(a)     For the purpose of Section 4(a), Tax forms, documents, or certificates to be delivered are:

| Party required to deliver | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | An original executed United States Internal Revenue Service Form W-8 EXP (or any successor thereto) | (i) Upon the execution of this Agreement; (ii) promptly upon reasonable demand by Party A; and (iii) promptly upon any Form W-8 EXP (or any successor thereto) previously provided by Party B becoming obsolete, incorrect or expired | Yes |
| Party A | An original executed United States Internal Revenue Service Form W-9 (or any successor thereto) | (i) Upon the execution of this Agreement; (ii) promptly upon reasonable demand by Party B; and (iii) promptly upon any Form W-9 (or any successor thereto) previously provided by Party A becoming obsolete, incorrect | Yes |

USActive 8846662.6

| Party required to deliver | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Certified resolutions of Party B's board of directors or other governing body authorizing this Agreement and the Transactions contemplated hereby and authorizing a specified person or persons to execute and deliver (as appropriate) on its behalf this Agreement, the exhibits, supplements, and attachments hereto, the documents incorporated by reference herein, and the Confirmations hereunder. | At execution of this Agreement and, in the case of amendments, promptly following the time each such amendment is made | Yes |
| Party B | Reliance letter on the approving opinion of bond counsel delivered in connection with the issuance of the Bonds | At execution of this Agreement | No |
| Party B | Covered Document | At execution of this Agreement | Yes |
| Party B | Evidence of perfection of the security securing the Bonds and Parity Obligations | At execution of this Agreement | Yes |

**Part 4. Miscellaneous**

(a)      Addresses for Notices.  For the purpose of Section 12(a):

      (i)      Address for notices or communications to Party A:

            Address:          85 Broad Street
                          New York, New York 10004

            Attention:       Swap Administration

            Telephone No.:  212-902-1000

            Facsimile No.:   212-902-5692

      (ii)      Address for notices or communications to Party B:

USActive 8846662.6

(ii)    deleting the final paragraph thereof.

(g)    **Netting of Payments.**  Subparagraph (ii) of Section 2(c) will not apply to Transactions. Notwithstanding anything to the contrary in Section 2(c), unless otherwise expressly agreed by the parties, the netting provided for in Section 2(c) will not apply separately to any pairings of branches or Offices through which the parties make and receive payments or deliveries.

**Part 5. Other Provisions**

(a)    **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding immediately after the word "respect" and before the period, the phrase "or, in the case of audited or unaudited financial statements, a fair presentation of the financial condition of the relevant person."

(b)    **Scope of Agreement; Interpretation.** Any transaction outstanding between the parties at the date this Agreement comes into force or entered into by the parties at or after the date this Agreement comes into force that is an FX Transaction or a Currency Option Transaction as defined in the 1998 FX and Currency Option Definitions (the "FX Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), the Emerging Markets Traders Association, and the Foreign Exchange Committee, unless otherwise specified in the relevant confirmation, will constitute a "Transaction" for the purposes of this Agreement and the Confirmation relating thereto and will be deemed to incorporate the FX Definitions.

Reference is made to the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc., which definitions are hereby incorporated by reference. Any terms used and not otherwise defined herein which are contained in the 2000 Definitions shall have the respective meanings set forth therein (without regard to any amendments thereto subsequent to the date hereof). Any reference in the 2000 Definitions to a Swap Transaction shall be deemed to include a Transaction hereunder.

In the event of any inconsistency between the provisions of this Agreement and the 2000 Definitions, the provisions of this Agreement shall prevail.

If there is any inconsistency between the provisions of this Schedule and the printed form of the Agreement of which it is part, the provisions set forth in this Schedule will prevail, and in the event of any inconsistency between the provisions of a Confirmation, the printed form of the Agreement and this Schedule, the provisions set forth in such Confirmation will prevail.

(c)    **Telephone recording.**  Each party consents to the recording, with or without the use of a warning tone, of the telephone conversations of the trading, marketing and other relevant personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction.

9

Transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(j)      **Assessment and Understanding.**  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

(k)      **Status of Parties.**  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(l)      **Termination Payments.**  Each party acknowledges that, pursuant to the terms of this Agreement (including, without limitation, Section 6(e) hereof), it may owe a payment to the other party upon the designation of an Early Termination Date hereunder, even in the event such Early Termination Date is the result of an Event of Default with respect to such other party."

(g)      **Additional Representations of Party B.**  Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B on each date on which a Transaction is entered into and at all times until the termination of this Agreement) that:

(i)      **Non-Speculation.**  This Agreement has been, and each Transaction has been and will be entered into not for purpose of speculation but solely in connection with the financing activities of Party B, including without limitation converting interest on all or a portion of certain of Party B's debt from a fixed rate to a floating rate, or from a floating rate to a fixed rate, or from one floating rate to a different floating rate, reducing the cost of borrowing on its outstanding debt by optimizing the relative amounts of fixed and floating rate obligations or the risk of variations in its debt service costs, and by increasing the predictability of cash flow from earnings on invested funds and thereby improving Party B's ability to manage its funds and revenues.

(ii)      **No Immunity.**  It is not entitled to claim immunity, and to the fullest extent permitted by applicable law irrevocably waives, on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) immunity from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction, and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

11

(iii)    Notwithstanding Section 7 of the Agreement but subject to Part 6 (f) of this Schedule:

Party A may effect a transfer without the consent of Party B so long as the transfer is to an Affiliate of Party A, provided that if such transfer is to an entity other than Goldman Group, or any successor thereto, Party B is furnished with a guaranty of Goldman Group, or any successor thereto, of such transferor's obligations; and

Party B may effect a transfer without the consent of Party A so long as: (i) the transferee and Party A shall have executed a master agreement (including any Credit Support Documents) in form and substance reasonably satisfactory to Party A or, in the event such a master agreement has not been executed with a transferee that otherwise satisfies the terms and conditions set forth below for a transferee, Party A shall promptly negotiate, execute and deliver such master agreement and Party B shall reimburse Party A for all reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with such negotiation, execution and delivery; (ii) the creditworthiness of the transferee is reasonably acceptable to Party A; (iii) the transfer will not result in the violation of any law, regulation, rule, judgment, order or other legal limitation or restriction applicable to Party A; (iv) at the time of such transfer, no Early Termination Date shall have been declared by Party A and no Event of Default, Potential Event of Default or Termination Event shall have occurred and be continuing under this Agreement with respect to Party B; (v) the transfer will not result in any adverse tax consequences to Party A; (vi) such transfer will not result in a violation of Party A's counterparty eligibility or credit practices or policies or exposure limitations; and (vii) at the time of such transfer, no event which would constitute a Termination Event, Event of Default or Potential Event of Default with respect to the transferee if the transferee were a party to this Agreement shall have occurred.

In addition, Party B may effect any such transfer with the consent of Party A, unless such consent is not required pursuant to the previous paragraph, as long as Party B establishes to the reasonable satisfaction of Party A that no payment will be required to be made by Party B as a result of such transfer or, if any such payment is required, that Party B has the funds legally available in order to make whatever payment would be required in a timely and complete manner.

The determination as to the fulfillment or lack thereof of the conditions to any such transfer by either party shall be at the determining party's sole discretion (Party B in the case of the conditions to such transfer in the third preceding paragraph and Party A in the case of the conditions to such transfer in the second preceding paragraph), and neither shall have an obligation to provide any details

13

modified for the purposes of this Agreement with the prior written consent of Party A (the "Incorporated Provisions"), with the effect, among other things, and without limiting the generality of the foregoing, that Party A will have the benefit of each of the Incorporated Provisions (including without limitation, covenants, right to consent to certain actions subject to consent under the Covered Document and delivery of financial statements and other notices and information). In the event the Covered Document ceases to be in effect for any reason, including, without limitation, defeasance of the Bonds, prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued in connection with the Covered Document) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of Party B under this Agreement and any obligations of Party B or any Credit Support Provider of Party B under a Credit Support Document have been fully satisfied. The Incorporated Provisions are hereby incorporated by reference in and made a part of this Agreement to the same extent as if such provisions were set forth herein. For purposes of this Agreement, the Incorporated Provisions shall be construed as though (i) all references therein to any party making loans, extensions of credit or financial accommodations thereunder or commitments therefor (the "Financings") were to Party A hereto and (ii) to the extent that such Incorporated Provisions are conditioned on or related to the existence of such Financings or Party B having any obligations in connection therewith, all references to such Financings or obligations were to the obligations of Party B under this Agreement. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of Party A shall have no force and effect with respect to this Agreement. Any amendment, supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement.

(g)     **Notice of Incipient Illegality.**  If an Incipient Illegality occurs, Party B will, promptly upon becoming aware of it, notify the Party A, specifying the nature of that Incipient Illegality and will also give such other information about that Incipient Illegality as the other Party A may reasonably require.

(h)     **Source of Payments.**  Party B agrees that regularly scheduled payments hereunder (the "Regularly Scheduled Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, Parity Obligations payable and secured by a lien on the Pledged Property, including but not limited to, all amounts in the Debt Service Reserve Account, on parity with Senior Bonds and other Parity Obligations.  Party B agrees that all payments other than Regularly Scheduled Payments (the "Other Swap Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain,

15

(l)    **WAIVER OF TRIAL BY JURY.** EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING

.

USActive 8846662.6

**<u>Exhibit C</u>**

Credit Support Annex Dated as of September 14, 2014

105788694v3

EXECUTION VERSION                                                    ANNEX I

## CREDIT SUPPORT ANNEX

### to the Schedule to the

### Master Agreement

### dated as of September 24, 2014

#### between

**GOLDMAN SACHS**              **and**              **PUERTO RICO SALES**
**BANK USA**                                        **TAX FINANCING**
                                                    **CORPORATION**

("Party A")                                                    ("Party B")

**Paragraph 13.**        **Elections and Variables**

(a)    **Security Interest for "Obligations".**  The term "Obligations" as used in this Annex includes the following additional obligations:

        With respect to Party A:       Not Applicable.

        With respect to Party B:       Not Applicable.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount, Credit Support Amount, Exposure and Demands.**

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a); *provided*, however, that with respect to Party B the Delivery Amount shall not exceed USD 12,000,000 in respect of the Valuation Date occurring on September 23, 2014 and shall not exceed USD 15,000,000 in respect of any Valuation Date thereafter.

        (B)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (C)    **"Credit Support Amount"** means, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases,

the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

(D)    **"Exposure"** has the meaning specified in Paragraph 12; *provided*, however, at any time Exposure is an amount that would be payable to Party A as the Secured Party, Exposure shall not exceed the Party B Exposure Cap. For the purposes hereof, the **"Party B Exposure Cap"** means an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 60,000,000 *minus* the applicable Independent Amount of Party B determined in accordance with Paragraph 13(b)(iv)(A) below.

(ii)    **Eligible Collateral.** The following items will qualify as "Eligible Collateral" for the party specified:

|  | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A)   Cash | Yes | Yes | 100% |

(iii)    **Other Eligible Support.** The following items will qualify as "Other Eligible Support" for the party specified: None.

(iv)    **Thresholds.**

(A)    **"Independent Amount"** means with respect to Party A: None, unless otherwise specified in a Confirmation.

**"Independent Amount"** means with respect to Party B:

(A) at any time Exposure is an amount that would be payable to Party A as the Secured Party, an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 10,000,000; and

(B) at any time Exposure is an amount that would be payable to Party B as the Secured Party (**"Party B Exposure Amount"**), an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 10,000,000, *minus* (iii) the Party B Exposure Amount (rounded down to the nearest

integral multiple of USD 100,000, such amount deemed to be zero whenever such calculation yields an amount less than zero);

*provided*, however, notwithstanding (A) and (B) above, if Party A's long term unsecured, unenhanced, unsubordinated debt rating is withdrawn, suspended or reduced below (I) "BBB" in the case of S&P or (II) "Baa2" in the case of Moody's, the Independent Amount with respect to Party B shall be zero.

(B)   "**Threshold**" means with respect to Party A and Party B: zero.

(C)   "**Minimum Transfer Amount**" means with respect to Party A and Party B, USD $1; provided, however, that if an Event of Default or a Specified Condition has occurred and is continuing with respect to a party, the Minimum Transfer Amount with respect to such party shall be zero.

(D)   **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down, respectively, to the nearest integral multiple of USD 100,000.

(c)   **Valuation and Timing.**

(i)   "**Valuation Agent**" means Party A unless (i) an Event of Default has occurred and is continuing with respect to Party A, and (ii) an Event of Default is not continuing with respect to Party B, in which case Party B shall appoint a leading dealer in the relevant market that is reasonably acceptable to Party A to act as substitute Valuation Agent for so long as such Event of Default is continuing with respect to Party A and an Event of Default is not continuing with respect to Party B. In the case of clause (ii), Party B shall notify Party A of the proposed appointed Valuation Agent and Party A will notify Party B within three Local Business Days whether such appointment is reasonably acceptable to Party A; provided that if Party A fails to provide such notice to Party B, such proposed appointment will be deemed to be reasonably acceptable to Party A.

(ii)   "**Valuation Date**" means September 23, 2014 and thereafter, January 15th of each year commencing on January 15, 2015.

(iii)   "**Valuation Time**" means the close of business in New York on the Local Business Day immediately preceding the Valuation Date or date of calculation as applicable; provided, however, that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

(iv)   "**Notification Time**" means no later than 1:00 p.m., New York time, on a Local Business Day; provided, however, that the Valuation Agent will only be obligated to give notice of its calculations to a party upon request by such party.

(v)  "**Transfer Timing**" has the meaning specified in Paragraph 4(b); *provided however* that (A) solely with respect to the Valuation Dates occurring on January 15, 2015, January 15, 2016, January 15, 2017 and January 15, 2018, the relevant Transfer by Party B to Party A shall occur on the earlier of (i) the close of business on March 15 of the relevant year, and (ii) the close of business on the first Local Business Day following the date on which an amount equal to or greater than the Delivery Amount is on deposit in the Goldman Swap Account and (B) with respect to all Valuation Dates thereafter, the relevant Transfer shall occur on the earlier of (i) the close of business on June 1st of the relevant year, and (ii) the close of business on the first Local Business Day following the date on which an amount equal to or greater than the Delivery Amount is on deposit in the Goldman Swap Account. For the avoidance of doubt and notwithstanding the foregoing, anything in the Agreement, or otherwise to the contrary, Party A and Party B hereby agree that, at any time the Goldman Swap Account is the Goldman CSA Account, Party B shall transfer, or cause to be transferred, all Surplus Revenues (or other available monies) to Party A as soon as such Surplus Revenues (or other available monies) become available until the Goldman Swap Account Funding Amount has been satisfied.

(d)  **Conditions Precedent and Secured Party's Rights and Remedies.** For the purposes of Paragraphs 8(a)(2) and 8(b), each Termination Event for which all Transactions are Affected Transactions will constitute a Specified Condition. For all other purposes of this Annex, the following Termination Event(s) will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party): With respect to Party A and Party B, Not Applicable.

Paragraph 4(a) is hereby amended by adding the following clause "(iii)" at the end thereof:

"(iii) Solely with respect to the obligations of Party A, as Pledgor, to make any Transfers to Party B, as Secured Party: Party A, Party B and a custodian have entered into a tri-party account control agreement (the "Account Control Agreement"), whereby the custodian entering into the Account Control Agreement is reasonably acceptable to Party A, and the Account Control Agreement (i) is reasonably acceptable in form and substance to Party A, and (ii) provides that the assets contained in the account (the "Tri-Party Account")shall not be transferred unless (A) such transfer is directed by joint instruction of both Party A and Party B, or (B) Party B has delivered a notice of exclusive control certifying  that an Event of Default with respect to Party A as the Defaulting Party has occurred and is continuing, in which case Party B shall have exclusive control over withdrawals from the Tri-Party Account. Any obligation of Party A to Transfer any Eligible Credit Support hereunder shall be satisfied by Transferring such Eligible Credit Support to the Tri-Party Account and upon any such Transfer the Eligible Credit Support will constitute Posted Credit Support."

(e)     **Substitution.**

    (i)     **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

    (ii)    **Consent.**  The Pledgor is not required to obtain the Secured Party's consent for any substitutions pursuant to Paragraph 4(d).

(f)     **Dispute Resolution.**

    (i)     **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

    (ii)    **"Value"**.  For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows:

        The Value of Cash will be the face amount thereof, multiplied by the applicable Valuation Percentage.

    (iii)   **"Alternative"**.  The provisions of Paragraph 5 will apply.

(g)     **Holding and Using Posted Collateral.**

    (i)     **Eligibility to Hold Posted Collateral.**  Party A will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

        (A)     Party A is not a Defaulting Party.

        (B)     Posted Collateral is held only in the United States.

Party B will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) solely through a Custodian in accordance with the Account Control Agreement. All Posted Collateral Transferred by Party A hereunder shall be maintained pursuant to the terms of the Account Control Agreement (as defined in Paragraph 4(a)(iii)). Each party hereby agrees to negotiate in good faith and commercially reasonable manner any amendments to this Annex that are necessary in connection with the execution and delivery of the Account Control Agreement.

    (ii)    **Use of Posted Collateral.**  The provisions of Paragraph 6(c) will apply to Party A and will not apply Party B.

(h)     **Distributions and Interest Amount.**

    (i)     **Interest Rate.**  The "Interest Rate" will be the Federal Funds (Effective) rate published in N.Y. Federal Reserve Statistical Release H.15(519) for that day, or such other recognized source used for the purpose of displaying such rate. If the

Interest Rate for the relevant day is a negative number, such Interest Rate will be deemed to be zero.

(ii) **Transfer of Interest Amount.**  The Transfer of the Interest Amount will be made on or prior to the fifth Local Business Day of each calendar month and on any Local Business Day when cash collateral is transferred to the Pledgor.

(iii) **Alternative to Interest Amount.**  Not Applicable.

(iv) **Interest Period**.  The definition of *"Interest Period"* in Paragraph 12 shall be deleted and replaced by the following:-

"'*Interest Period*' means the period from (and including) the first Local Business Day of a calendar month to (and excluding) the first Local Business Day of the following calendar month."

(i) **Additional Representations.**  Party B represents to Party A (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that the Transfer of Eligible Collateral is in compliance with the Covered Document.

(j) **Other Eligible Support and Other Posted Support.**

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support means:  Not Applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means:  Not Applicable.

(k) **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

With respect to Party A:          200 West Street
New York, New York 10282-2198
Tel.:  (212) 902-1444
Fax:  (212) 346-4237
Attn:  Swap Operations
E-mail: ficc-swaps-collateral@gs.com

With respect to Party B: _____
_____
_____

(l)   **Addresses for Transfers.**

      Party A:      To be specified by Party A in writing.

      Party B:      To be specified by Party B in writing.

(m)   **Other Provisions:**

  (i)   **No offset.**  On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

  (ii)   **Local Business Day.**  For the purposes of this Annex, *"Local Business Day"* means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York and Puerto Rico.

  (iii)   **Satisfying Certain Termination Payments with Excess Posted Collateral.**  The parties hereby agree that in the event that the Transaction under this Agreement is being terminated in whole, or in part, by mutual agreement of Party A and Party B or by exercise by Party B of its optional termination right in respect of such Transaction or by Party A exercising its rights hereunder, Party B may use Posted Collateral Transferred by it to Party A as Secured Party hereunder, if any, to satisfy some, or all, of its obligations arising from such termination.  If any such Posted Collateral is used to satisfy Party B's obligations arising from any such termination, such Posted Collateral will no longer constitute Posted Collateral hereunder and Party A and Party B will have no further rights or obligations hereunder in respect of such Posted Collateral.

  (iv)   **Posted Collateral and Posted Credit Support.**  For the avoidance of doubt, all Eligible Collateral Transferred hereunder (including Eligible Collateral Transferred to satisfy an obligation in respect of an Independent Amount) will constitute Posted Collateral and Posted Credit Support.

**IN WITNESS WHEREOF** the parties have executed this Annex as of the date specified on the first page hereof.

GOLDMAN SACHS BANK USA

By: _____

       Name:
       Title:
       Date:

PUERTO RICO SALES TAX FINANCING
CORPORATION

By: _____

       Name:
       Title:
       Date:

[CREDIT SUPPORT ANNEX]

**<u>Exhibit D</u>**

Amendment to ISDA Master Agreement Dated as of September 14, 2014

105788694v3

EXECUTION VERSION

# AMENDMENT

dated as of September 24, 2014

to the

# ISDA MASTER AGREEMENT

dated as of July 31, 2007

between

**GOLDMAN SACHS BANK USA**
(formerly Goldman Sachs Capital Markets, L.P.)

("Party A")

and

**PUERTO RICO SALES TAX FINANCING CORPORATION**

("Party B")

The parties have previously entered into that certain ISDA Master Agreement dated as of July 31, 2007, which Agreement includes the Schedule and any annexes attached thereto (as amended from time to time) and all Confirmations exchanged between the parties confirming the Transactions (or Swap Transactions) thereunder (the "Agreement"). The parties have agreed to amend the Agreement in accordance with the terms of this Amendment (the "Amendment").

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1. *Amendment of the Agreement.* Upon execution of this Amendment by both parties, the Agreement shall be and hereby is amended as follows:

   (a)   *Additional Termination Event.* Part 1(i) of the Schedule to the Agreement is hereby deleted in its entirety.

   (b)   *Additional Events of Default.* A new Part 1(i) shall be added to the Schedule to the Agreement as follows:

   "(i)      It shall be an Event of Default with respect to Party B as the Defaulting Party if a "Bankruptcy Eligibility Event"   occurs. "**Bankruptcy Eligibility Event**" means that the Legislative Assembly of Puerto Rico enacts any act of law  that permits Party B to adjust its debts or to commence proceedings to otherwise challenge claims of Party B's creditors pursuant to any federal, state, or Puerto Rico statute (irrespective of whether such law requires any additional approvals or consents as a condition to Party B commencing any such proceeding), including, without limitation, authorizing Party B to file a petition for relief under title 11 of the United States Code (the "Bankruptcy Code") or permitting Party B to seek relief under the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, No. 71-2014 (the "Recovery Act")."

   (c)   *Optional Early Termination*. A new Part 1(j) shall be added to the Schedule to the Agreement as follows:

   "(j)      Solely in connection with the Transaction between Party A and Party B bearing reference number LTAA1707524333.0 / 00647654301 (the "OET Transaction"), Party B shall have the right to early terminate, cancel and cash settle the OET Transaction, in whole or in part, effective on any Business Day on or after September 24, 2014 (the "Optional Termination Date"). This right may be exercised by written, telex or facsimile notice delivered to Party A no later than one

(1) Business Day prior to the Optional Termination Date (the "Notification Date"), which notice shall only be effective upon actual receipt by Party A. Following any such early termination and cancellation and payment of the Cash Settlement Amount (calculated as described below), the parties shall be relieved of all further payment obligations hereunder except for (i) payment of all accrued but yet unpaid amounts calculated to but excluding the Optional Termination Date (unless otherwise included in the Cash Settlement Amount as calculated below) and (ii) payment of amounts under the remaining portion of the OET Transaction in the case of partial cancellation. If the OET Transaction is cancelled in part, all payment calculations following the Optional Termination Date will be based on the remaining portion of the OET Transaction after giving effect to such partial cancellation, as set forth in a partial termination Confirmation to be provided by Party A.

Notwithstanding anything to the contrary contained herein, Party B may not exercise its right to early terminate the OET Transaction, if following such termination, a Cash Settlement Amount would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A that: (i) such Cash Settlement Amount will be made by Party B on or before the second Business Day immediately following the Optional Termination Date, and (ii) such Cash Settlement Amount will not cause Party B to be in violation of, or in default of, any material obligation under any material agreement of Party B, including the Covered Document.

Upon the occurrence of an Optional Termination Date, the U.S. Dollar value for the terminated portion of the OET Transaction (the "Cash Settlement Amount") will be determined as of a time of day that is mutually acceptable to Party A and Party B (the "Cash Settlement Valuation Time"). Notwithstanding anything herein to the contrary, Party A and Party B hereby agree that for the purpose of determining a Cash Settlement Amount hereunder, the Calculation Agent will use mid-market values without regard to any bid-ask spread (including credit, funding, hedging or capital charges or revenue considerations), the creditworthiness of Party A or Party B, any existing Credit Support Document or any other collateral arrangements between Party A and Party B.  The Calculation Agent will provide facsimile, e-mail, or phone notice of the Cash Settlement Amount to Party B and Party B will provide a response by facsimile, e-mail, or phone as to whether Party B wishes to terminate the transaction.

If the parties are unable to agree on the Cash Settlement Amount, the Calculation Agent will request the Reference Market-makers to provide a mid-market quotation using the methodology described above. If at least three quotations are provided, the Cash Settlement Amount will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest). If fewer than three quotations are provided, the Cash Settlement Amount will be determined by the Calculation Agent in good faith and using commercially reasonable procedures."

Notwithstanding the foregoing described process, no termination will occur under this Part 1(j) unless Party B affirmatively communicates to the Calculation Agent by facsimile, e-mail, or phone after being provided the calculated Cash Settlement Amount from the Calculation Agent, that Party B wishes to have the termination take effect."

(d)  **Payments on Early Termination.** Part 1(h) of the Agreement is hereby amended by adding the following language at the end thereof:

"Notwithstanding anything herein to the contrary, Party A and Party B hereby agree that for the purpose of determining a Settlement Amount hereunder, the party designating the relevant Early Termination Date (the "Determining Party") will (i) if obtaining quotations from one or more third parties, ask each third party not to take into account the creditworthiness of the Determining Party, any existing Credit Support Document or any other collateral arrangements between Party A and Party B and to provide mid-market quotations without regard to any bid-ask spread (including credit, funding, hedging or capital charges or revenue considerations), and (ii) in any other case, use mid-market values without regard to any bid-ask spread (including credit, funding, hedging or

2

capital charges or revenue considerations), the creditworthiness of the Determining Party, any existing Credit Support Document or any other collateral arrangements between Party A and Party B."

(e)     *Goldman Swap Account.*  A new Part 1(k) shall be added to the Schedule to the Agreement as follows:

"(k)     *Goldman Swap Account.* Party B hereby agrees to transfer or cause to be transferred Surplus Revenues (as defined herein) to the extent such Surplus Revenues are available in an amount equal to the Goldman Swap Account Funding Amount to the Goldman Swap Account until this Agreement has been terminated in accordance with its terms and all obligations of Party B under this Agreement have been satisfied in full.

"*Goldman Swap Account*" means (i) at any time prior to the earlier of (A) the date on which the parties have entered into the Goldman Swap Account Control Agreement, and (B) the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman CSA Account, (ii) at any time (A) after the date on which the parties have entered into the Goldman Swap Account Control Agreement, and (B) prior to the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman ACA Account, and (iii) at any time (A) after the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman Resolution Account.

"*Goldman ACA Account*" means the account opened in connection with, and subject to, the Goldman Swap Account Control Agreement.

"*Goldman CSA Account*" means an account identified  by Party A to Party B as the account to which Party B shall transfer collateral under the Credit Support Annex to the Agreement.  Any Surplus Revenues transferred to such account will be deemed Transferred (as such term is defined in the Credit Support Annex to the Agreement) to Party A by Party B under the Credit Support Annex to the Agreement and constitute Posted Collateral (as such term is defined in the Credit Support Annex to the Agreement) thereunder.

*Goldman Resolution Account*" means a trust account that is held by a trustee for the benefit of Party A that satisfies the Pari Passu Requirement and from which obligations of Party B under this Agreement (including payment obligations and obligations in respect of collateral) may be satisfied.

"*Goldman Swap Account Funding Amount*" means, in respect of any fiscal year, (i) if an Early Termination Date has not occurred, (A) on any day in such fiscal year on or prior to January 15 of such fiscal year, the lesser of (x) USD 15,000,000 and (y) the Party B Exposure Cap *plus* the Independent Amount applicable to Party B *minus* the Value of Posted Collateral held by Party A as of such day, subject to Party B's Excess Withdrawal Option, and (B) on any day in such fiscal year after January 15 of such fiscal year, the Delivery Amount of Party B on the Valuation Date of such fiscal year, (ii) if an Early Termination Date has occurred as a result of a Failure to Pay, Cross Default or Bankruptcy and an amount is payable by Party B to Party A in respect thereof, the amount payable by Party B to Party A, (iii) if an Early Termination Date has occurred other than as a result of a Failure to Pay, Cross Default or Bankruptcy and an amount is payable by Party B to Party A in respect thereof, (A) in the fiscal year in which the Early Termination Date has occurred, USD 15,000,000 and (B) in any fiscal year other than the fiscal year in which the Early Termination Date occurred, the remaining amount payable by Party B to Party A in connection with such Early Termination Date, and (iv) if an Early Termination Date has occurred and an amount is payable by Party A to Party B in respect thereof, zero. For the avoidance of doubt, the Goldman Swap Account Funding Amount shall be determined without regard to the Delivery Amount of Party B in respect of the Valuation Date occurring on September 23, 2014.

*"Excess Withdrawal Option"* means, in respect of any fiscal year and subject to the terms of the Goldman Swap Account Control Agreement or Goldman Resolution Account, Party B's option to remove any Excess Funding Amount from the Goldman Swap Account on or after January 15th of such fiscal year.

*"Excess Funding Amount"* means, in respect of any fiscal year and any date, an amount equal to the difference between (i) the balance in the Goldman Swap Account, and (ii) the Delivery Amount of Party B on the Valuation Date of such fiscal year; *provided, however,* that the Excess Funding Amount will be deemed to be zero whenever the calculation of Excess Funding Amount yields a number less than zero."

(f)   *Goldman Swap Account Control Agreement.*  A new Part 1(l) shall be added to the Schedule to the Agreement as follows:

"(l)      *Goldman Swap Account Control Agreement.* Party B hereby agrees that it will use commercially reasonable efforts to negotiate and enter into the Goldman Swap Account Control Agreement as soon as practicable and in any event  no later than January 15, 2015.  Upon the incurrence of Additional Obligations by Party B (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman Swap Account Control Agreement will be terminated and any amounts held therein will be transferred to the Goldman Resolution Account in accordance with the provisions of the Goldman Swap Account Control Agreement.

*"Goldman Swap Account Control Agreement"* means, the tri-party account control agreement among Party A, Party B and The Bank of New York (or other entity reasonably acceptable to Party A) (the "ACA Custodian") that (i) is reasonably acceptable in form and substance to Party A (ii) pursuant to which Party B opens an account with such ACA Custodian, (iii) grants Party A a first priority security interest in all of the assets contained in such account, and (iv) provides that the assets contained in the account shall not be transferred unless (A) such transfer is directed by joint instruction of both Party A and Party B, or (B) Party A has delivered a notice of exclusive control certifying  that an Event of Default hereunder with respect to Party B as the Defaulting Party has occurred and is continuing, in which case Party A shall have exclusive control over withdrawals from the account."

(g)   *Surplus Moneys in the Revenue Account*.  A new Part 1(m) shall be added to the Schedule to the Agreement as follows:

"(m) *Surplus Moneys in the Revenue Account*.

(i) *Use.*  Party B hereby agrees that from and after September 24, 2014, it will not, other than in accordance with this Agreement, transfer, deposit, release or otherwise use any moneys available under Section 505.2 of the Covered Document (such moneys, the *"Surplus Revenues"*), until it has satisfied its obligation to fund the Goldman Swap Account.

(ii) *Irrevocable Instructions.*  On or prior to September 30, 2014, Party B shall give the Trustee (as such term is defined in the Covered Document) irrevocable written instructions to, on any date on which there are Surplus Revenues, deposit all such Surplus Revenues into the Goldman Swap Account until such account contains an amount equal to the Goldman Swap Account Funding Amount.  Such instructions shall (i) be in in form and substance reasonably acceptable to Party A, and (ii) specify that they may not be amended, supplemented or otherwise modified in any way without the written consent of both Party A and Party B."

(h)   *Agreement to Deliver Documents.*  Part 3(b) of the Schedule to the Agreement is hereby amended by adding the following deliverable:

4

| Party required to deliver | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B (or Party B shall cause to be delivered to Party A) | Reports of (i) any Revenue received by the Trustee, (ii) any deposits, transfers or distributions of such Revenues by the Trustee, (iii) account balances for each Account and Subaccount created pursuant to Section 502 of the Covered Document, and (iv) the current funding requirement for each such Account and Subaccount. | On the first Business Day of each Calendar Month | Yes. |

(i)     ***Source of Payments.*** Section 4(h) of the Agreement, as added by Part 5(j)(ii) of the Schedule to the Agreement, is hereby amended in its entirety as follows:

"(h) Party B agrees that regularly scheduled payments hereunder (the "Regularly Scheduled Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, Parity Obligations payable and secured by a lien on the Pledged Property, including but not limited to, all amounts in the Debt Service Reserve Account, on parity with Senior Bonds and other Parity Obligations. Party B agrees that all payments other than Regularly Scheduled Payments (the "Other Swap Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, payable and secured by (i) a first priority lien in the Goldman Swap Account and (ii) Pledged Property, including but not limited to, all amounts in the Debt Service Reserve Account, immediately subordinate to Subordinate Bonds. Party B agrees that any Other Swap Payments that are not paid from the amounts in the Goldman Swap Account or Pledged Property will be payable from amounts that Party B is entitled to receive for such purpose pursuant to the first sentence of Article 4(e) of the Authorizing Law. Party B hereby covenants to comply, inter alia, with Section 710 of the Covered Document and the Authorizing Law to ensure payment of all sums thereunder and hereunder. Party B shall take any other actions as may be necessary to fulfill the intent of this Section 4(h).

Party B represents Party A that as of the date hereof, it does not have any obligations in respect of borrowed money other than Senior Bonds and First Subordinate Bonds, and has no Credit Facilities, Liquidity Facilities or Qualified Hedges other than this Agreement (as each such term is defined in the Covered Document).

Party B hereby covenants to Party A that it will not issue any Bonds (as such term is defined in the Covered Document) (other than Refunding Bonds (as such term is defined in the Covered Document)) or other indebtedness, or enter into any Credit Facilities, Liquidity Facilities or Qualified Hedges (as each such term is defined in the Covered Document) (any such debt or obligation incurred referred to herein as "Additional Obligations"), provided however, Party B may incur Additional Obligations, other than obligations that are secured and or payable prior to the Second Subordinate Obligations, if each of the following conditions are satisfied, as applicable:

(i)     (A) if such Additional Obligations constitute Second Subordinate Obligations, the Pari Passu Requirement has been satisfied, or (B) if such Additional Obligations do not constitute Second Subordinate Obligations (such Additional Obligations hereinafter referred to as the ***"Third Subordinate Obligations"***), (1) Party B

5

has agreed to withdraw all Surplus Revenues as they become available from the Revenue Account and deposit such Surplus Revenues into accounts (the *"Third Subordinate Obligations Accounts")* that are not pledged to secure the Bonds other than the Third Subordinate Obligations, (2) such Surplus Revenues and Third Subordinate Obligations Accounts are pledged to secure such Third Subordinate Obligations, (3) the Pari Passu Requirement is satisfied and (4) Party B irrevocably agrees that it will not incur any Additional Obligations (other than Refunding Bonds) that would be secured or payable on a more senior basis than the Third Subordinate Obligations; and

(ii) with respect to any fiscal year in which such Additional Obligations are incurred and any fiscal year thereafter, the Pledged Sales Tax Base Amount for such fiscal year is projected to be equal to or exceed an amount equal to the sum of (A) the debt service requirements for the Bonds and any amounts required to be set aside for the Bonds in accordance with the Covered Document, (B) the debt service requirements for such proposed Additional Obligations and any amounts required to be set aside for such Additional Obligations in accordance with the proposed terms thereof and (C) USD 15,000,000.

Party B authorizes Party A to file any Uniform Commercial Code financing statement or similar document describing the foregoing negative covenants with any governmental office or other body that Party A deems appropriate.

As used herein, *"Pari Passu Requirement"* means, with respect to any Additional Obligations, that (i) Other Swap Payments are secured and payable equally and ratably with such Additional Obligations and (ii) the Goldman Swap Account is funded on a pro rata basis with the applicable debt service account securing such Additional Obligations."

(j) *Addresses for Notices.* Part 4(a)(i) of the Schedule to the Agreement is deleted in its entirety and replaced with the following:

"(a) **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

(i) Address for notices or communications to Party A:

| | |
|---|---|
| Address: | 200 West Street |
| | New York, New York, 10282-2198 |
| Attention: | Swap Administration |
| Telephone: | 212-902-1000 |
| Fax: | 212-902-5692" |

(k) *Credit Support Document.* Part 4(c) of the Schedule to the Agreement shall be amended by adding the following new clause (iii) at the end thereof: "(iii) If the Goldman Swap Account Control Agreement is entered into by Party A and Party B, The Goldman Swap Account Control Agreement shall constitute a Credit Support Document with respect to the material obligations of Party B."

(l) *Credit Support Annex.* Each of Party A and Party B agree that Annex I attached hereto shall be added as a Credit Support Annex to the Agreement and such Credit Support Annex shall be effective as of the date hereof.

2. *Representations.* Each party represents to the other party that all representations contained in the Agreement, as amended, are true and accurate as of the date of this Amendment and that such representations are deemed to be given or repeated by each party, as the case may be, on the date of this Amendment.

3. *Miscellaneous*

(a)      *Definitions.*  Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings specified for such terms in the Agreement.  As used in the Agreement (including any Confirmation relating thereto), as amended by this Amendment, the terms "ISDA Master Agreement", "Agreement", "this Agreement", "herein", "hereinafter", "hereof", "hereto" and other words of similar import, shall mean the Agreement as amended hereby, unless the context otherwise specifically requires.

(b)      *Entire Agreement.*  This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

(c)      *Counterparts.*  This Amendment may be executed and delivered in counterparts (including by facsimile transmission) each of which will be deemed an original.

(d)      *Headings.*  The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Amendment.

(e)      *Governing Law.*  This Amendment shall be governed by and construed in accordance with the applicable laws governing the Agreement.

(f)      *Jurisdiction.*  The terms of Section 13(b) of the Agreement, as modified in the Schedule to the Agreement, shall apply to this Amendment with references in such Section to "this Agreement" being deemed references to this Amendment.

**IN WITNESS WHEREOF,** the parties have executed this Amendment on the respective dates specified below with effect from the date specified in this Amendment.

**GOLDMAN SACHS BANK USA**

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By: _____
    Name:
    Title:
    Date:

By: _____
    Name:
    Title:
    Date:

[ISDA AMENDMENT]

ANNEX I

[CSA]

## **Exhibit 2**

**Scheduling Order**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | Case No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* | (Jointly Administered) |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO | |
| as representative of | Case No. 17 BK 3284-LTS |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | **This Application relates only to COFINA, and shall be filed in the lead Case No. 17 BK 3283-LTS, and COFINA's Title III case (Case No. 17 BK 3284-LTS)** |
| Debtor. | |

## ORDER SETTING EXPEDITED BRIEFING SCHEDULE FOR APPROVAL OF SETTLEMENT BETWEEN THE PUERTO RICO SALES TAX FINANCING CORPORATION AND GOLDMAN SACHS BANK USA (F/K/A GOLDMAN SACHS CAPITAL MARKETS, L.P.)

Upon the *Urgent Motion of the Puerto Rico Sales Tax Financing Corporation for (I) Order*

*Approving Settlement with Goldman Sachs Bank USA (F/K/A Goldman Sachs Capital Markets,*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

*L.P.), and (II) Order Expediting Consideration of the Settlement* (the "Urgent Motion")[2] filed by

the Puerto Rico Sales Tax Financing Corporation ("COFINA"); and the Court having jurisdiction

to consider the Objection and to grant the relief requested therein pursuant to PROMESA section

306(a); and venue being proper pursuant to PROMESA section 307(a); and due and proper notice

of the Urgent Motion having been provided to those parties identified therein, and no other or

further notice being required;

**IT IS HEREBY ORDERED THAT:**

1.      Any response or objection to the Urgent Motion must be filed and served in

accordance with the *Eighth Amended Notice, Case Management and Administrative Procedures*

[Case No. 17-3283-LTS, ECF No. 4866-1] (the "Case Management Procedures") so as to be

received no later than **12:00 p.m. (AST) on February 11, 2019**.

2.      Any reply by COFINA and/or GS Bank must be filed and served in accordance

with the Case Management Procedures so as to be received no later than **5:00 p.m. (AST) on**

**February 11, 2019**.

3.      The Court will take the Urgent Motion on submission, without a hearing, unless the

Court otherwise determines to schedule a hearing on request of a party.

Dated:   February_____, 2019      _____
                                       Honorable Laura Taylor Swain
                                       United States District Judge

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Motion.

3