## **Exhibit C**

Credit Support Annex Dated as of September 14, 2014

1

Case:17-03283-LTS   Doc#:5088-3   Filed:02/11/19   Entered:02/11/19 14:30:45   Desc:
Exhibit C   Page 2 of 9

EXECUTION VERSION                                                        ANNEX I

CREDIT SUPPORT ANNEX

to the Schedule to the

Master Agreement

dated as of September 24, 2014

between

**GOLDMAN SACHS**            and            **PUERTO RICO SALES**
**BANK USA**                                **TAX FINANCING**
                                            **CORPORATION**

("Party A")                                                            ("Party B")

**Paragraph 13.**        **Elections and Variables**

(a)    **Security Interest for "Obligations".**  The term "Obligations" as used in this Annex includes the following additional obligations:

      With respect to Party A:    Not Applicable.

      With respect to Party B:    Not Applicable.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount, Credit Support Amount, Exposure and Demands.**

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a); *provided*, however, that with respect to Party B the Delivery Amount shall not exceed USD 12,000,000 in respect of the Valuation Date occurring on September 23, 2014 and shall not exceed USD 15,000,000 in respect of any Valuation Date thereafter.

        (B)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (C)    **"Credit Support Amount"** means, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases,

the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

(D) **"Exposure"** has the meaning specified in Paragraph 12; *provided*, however, at any time Exposure is an amount that would be payable to Party A as the Secured Party, Exposure shall not exceed the Party B Exposure Cap. For the purposes hereof, the ***"Party B Exposure Cap"*** means an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 60,000,000 *minus* the applicable Independent Amount of Party B determined in accordance with Paragraph 13(b)(iv)(A) below.

(ii) **Eligible Collateral.** The following items will qualify as "Eligible Collateral" for the party specified:

|  | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A) Cash | Yes | Yes | 100% |

(iii) **Other Eligible Support.** The following items will qualify as "Other Eligible Support" for the party specified: None.

(iv) **Thresholds.**

(A) **"Independent Amount"** means with respect to Party A: None, unless otherwise specified in a Confirmation.

**"Independent Amount"** means with respect to Party B:

(A) at any time Exposure is an amount that would be payable to Party A as the Secured Party, an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 10,000,000; and

(B) at any time Exposure is an amount that would be payable to Party B as the Secured Party (**"Party B Exposure Amount"**), an amount equal to the product of (i) the quotient of (a) the Notional Amount (as such term is defined in the Confirmation of the Transaction under this Agreement), *divided by* (b) USD 136,000,000, *multiplied by* (ii) USD 10,000,000, *minus* (iii) the Party B Exposure Amount (rounded down to the nearest

integral multiple of USD 100,000, such amount deemed to be zero whenever such calculation yields an amount less than zero);

*provided*, however, notwithstanding (A) and (B) above, if Party A's long term unsecured, unenhanced, unsubordinated debt rating is withdrawn, suspended or reduced below (I) "BBB" in the case of S&P or (II) "Baa2" in the case of Moody's, the Independent Amount with respect to Party B shall be zero.

(B) **"Threshold"** means with respect to Party A and Party B: zero.

(C) **"Minimum Transfer Amount"** means with respect to Party A and Party B, USD $1; provided, however, that if an Event of Default or a Specified Condition has occurred and is continuing with respect to a party, the Minimum Transfer Amount with respect to such party shall be zero.

(D) **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down, respectively, to the nearest integral multiple of USD 100,000.

(c) **Valuation and Timing.**

(i) **"Valuation Agent"** means Party A unless (i) an Event of Default has occurred and is continuing with respect to Party A, and (ii) an Event of Default is not continuing with respect to Party B, in which case Party B shall appoint a leading dealer in the relevant market that is reasonably acceptable to Party A to act as substitute Valuation Agent for so long as such Event of Default is continuing with respect to Party A and an Event of Default is not continuing with respect to Party B. In the case of clause (ii), Party B shall notify Party A of the proposed appointed Valuation Agent and Party A will notify Party B within three Local Business Days whether such appointment is reasonably acceptable to Party A; provided that if Party A fails to provide such notice to Party B, such proposed appointment will be deemed to be reasonably acceptable to Party A.

(ii) **"Valuation Date"** means September 23, 2014 and thereafter, January 15th of each year commencing on January 15, 2015.

(iii) **"Valuation Time"** means the close of business in New York on the Local Business Day immediately preceding the Valuation Date or date of calculation as applicable; provided, however, that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

(iv) **"Notification Time"** means no later than 1:00 p.m., New York time, on a Local Business Day; provided, however, that the Valuation Agent will only be obligated to give notice of its calculations to a party upon request by such party.

    (v)    "**Transfer Timing**" has the meaning specified in Paragraph 4(b); *provided however* that (A) solely with respect to the Valuation Dates occurring on January 15, 2015, January 15, 2016, January 15, 2017 and January 15, 2018, the relevant Transfer by Party B to Party A shall occur on the earlier of (i) the close of business on March 15 of the relevant year, and (ii) the close of business on the first Local Business Day following the date on which an amount equal to or greater than the Delivery Amount is on deposit in the Goldman Swap Account and (B) with respect to all Valuation Dates thereafter, the relevant Transfer shall occur on the earlier of (i) the close of business on June 1st of the relevant year, and (ii) the close of business on the first Local Business Day following the date on which an amount equal to or greater than the Delivery Amount is on deposit in the Goldman Swap Account. For the avoidance of doubt and notwithstanding the foregoing, anything in the Agreement, or otherwise to the contrary, Party A and Party B hereby agree that, at any time the Goldman Swap Account is the Goldman CSA Account, Party B shall transfer, or cause to be transferred, all Surplus Revenues (or other available monies) to Party A as soon as such Surplus Revenues (or other available monies) become available until the Goldman Swap Account Funding Amount has been satisfied.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** For the purposes of Paragraphs 8(a)(2) and 8(b), each Termination Event for which all Transactions are Affected Transactions will constitute a Specified Condition. For all other purposes of this Annex, the following Termination Event(s) will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party): With respect to Party A and Party B, Not Applicable.

Paragraph 4(a) is hereby amended by adding the following clause "(iii)" at the end thereof:

"(iii) Solely with respect to the obligations of Party A, as Pledgor, to make any Transfers to Party B, as Secured Party: Party A, Party B and a custodian have entered into a tri-party account control agreement (the "Account Control Agreement"), whereby the custodian entering into the Account Control Agreement is reasonably acceptable to Party A, and the Account Control Agreement (i) is reasonably acceptable in form and substance to Party A, and (ii) provides that the assets contained in the account (the "Tri-Party Account")shall not be transferred unless (A) such transfer is directed by joint instruction of both Party A and Party B, or (B) Party B has delivered a notice of exclusive control certifying that an Event of Default with respect to Party A as the Defaulting Party has occurred and is continuing, in which case Party B shall have exclusive control over withdrawals from the Tri-Party Account. Any obligation of Party A to Transfer any Eligible Credit Support hereunder shall be satisfied by Transferring such Eligible Credit Support to the Tri-Party Account and upon any such Transfer the Eligible Credit Support will constitute Posted Credit Support."

(e) **Substitution.**

    (i)     "**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

    (ii)     **Consent.** The Pledgor is not required to obtain the Secured Party's consent for any substitutions pursuant to Paragraph 4(d).

(f) **Dispute Resolution.**

    (i)     "**Resolution Time**" means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

    (ii)     "**Value**". For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows:

        The Value of Cash will be the face amount thereof, multiplied by the applicable Valuation Percentage.

    (iii)     "**Alternative**". The provisions of Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral.**

    (i)     **Eligibility to Hold Posted Collateral.** Party A will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

        (A)     Party A is not a Defaulting Party.

        (B)     Posted Collateral is held only in the United States.

Party B will be entitled to hold Posted Collateral pursuant to Paragraph 6(b) solely through a Custodian in accordance with the Account Control Agreement. All Posted Collateral Transferred by Party A hereunder shall be maintained pursuant to the terms of the Account Control Agreement (as defined in Paragraph 4(a)(iii)). Each party hereby agrees to negotiate in good faith and commercially reasonable manner any amendments to this Annex that are necessary in connection with the execution and delivery of the Account Control Agreement.

    (ii)     **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A and will not apply Party B.

(h) **Distributions and Interest Amount.**

    (i)     **Interest Rate.** The "Interest Rate" will be the Federal Funds (Effective) rate published in N.Y. Federal Reserve Statistical Release H.15(519) for that day, or such other recognized source used for the purpose of displaying such rate. If the

Interest Rate for the relevant day is a negative number, such Interest Rate will be deemed to be zero.

(ii) **Transfer of Interest Amount.** The Transfer of the Interest Amount will be made on or prior to the fifth Local Business Day of each calendar month and on any Local Business Day when cash collateral is transferred to the Pledgor.

(iii) **Alternative to Interest Amount.** Not Applicable.

(iv) **Interest Period**. The definition of *"Interest Period"* in Paragraph 12 shall be deleted and replaced by the following:-

"'*Interest Period*' means the period from (and including) the first Local Business Day of a calendar month to (and excluding) the first Local Business Day of the following calendar month."

(i) **Additional Representations.** Party B represents to Party A (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that the Transfer of Eligible Collateral is in compliance with the Covered Document.

(j) **Other Eligible Support and Other Posted Support.**

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not Applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not Applicable.

(k) **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

With respect to Party A:	200 West Street
New York, New York 10282-2198
Tel.: (212) 902-1444
Fax: (212) 346-4237
Attn: Swap Operations
E-mail: ficc-swaps-collateral@gs.com

With respect to Party B:	_____
_____
_____

(l)  **Addresses for Transfers.**

    Party A:    To be specified by Party A in writing.

    Party B:    To be specified by Party B in writing.

(m) **Other Provisions:**

    (i)  **No offset.** On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

    (ii) **Local Business Day.** For the purposes of this Annex, *"Local Business Day"* means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York and Puerto Rico.

    (iii) **Satisfying Certain Termination Payments with Excess Posted Collateral.** The parties hereby agree that in the event that the Transaction under this Agreement is being terminated in whole, or in part, by mutual agreement of Party A and Party B or by exercise by Party B of its optional termination right in respect of such Transaction or by Party A exercising its rights hereunder, Party B may use Posted Collateral Transferred by it to Party A as Secured Party hereunder, if any, to satisfy some, or all, of its obligations arising from such termination. If any such Posted Collateral is used to satisfy Party B's obligations arising from any such termination, such Posted Collateral will no longer constitute Posted Collateral hereunder and Party A and Party B will have no further rights or obligations hereunder in respect of such Posted Collateral.

    (iv) **Posted Collateral and Posted Credit Support.** For the avoidance of doubt, all Eligible Collateral Transferred hereunder (including Eligible Collateral Transferred to satisfy an obligation in respect of an Independent Amount) will constitute Posted Collateral and Posted Credit Support.

**IN WITNESS WHEREOF** the parties have executed this Annex as of the date specified on the first page hereof.

**GOLDMAN SACHS BANK USA**

By: _____
    Name:
    Title:
    Date:

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By: *[signature]*
    Name:
    Title:
    Date:

[CREDIT SUPPORT ANNEX]