## **Exhibit D**

Amendment to ISDA Master Agreement Dated as of September 14, 2014

105788694v3

EXECUTION VERSION

# AMENDMENT

dated as of September 24, 2014

to the

# ISDA MASTER AGREEMENT

dated as of July 31, 2007

between

**GOLDMAN SACHS BANK USA**
(formerly Goldman Sachs Capital Markets, L.P.)

("Party A")

and

**PUERTO RICO SALES TAX FINANCING CORPORATION**

("Party B")

The parties have previously entered into that certain ISDA Master Agreement dated as of July 31, 2007, which Agreement includes the Schedule and any annexes attached thereto (as amended from time to time) and all Confirmations exchanged between the parties confirming the Transactions (or Swap Transactions) thereunder (the "Agreement"). The parties have agreed to amend the Agreement in accordance with the terms of this Amendment (the "Amendment").

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1. *Amendment of the Agreement.* Upon execution of this Amendment by both parties, the Agreement shall be and hereby is amended as follows:

    (a) *Additional Termination Event.* Part 1(i) of the Schedule to the Agreement is hereby deleted in its entirety.

    (b) *Additional Events of Default.* A new Part 1(i) shall be added to the Schedule to the Agreement as follows:

    "(i) It shall be an Event of Default with respect to Party B as the Defaulting Party if a "Bankruptcy Eligibility Event" occurs. "**Bankruptcy Eligibility Event**" means that the Legislative Assembly of Puerto Rico enacts any act of law that permits Party B to adjust its debts or to commence proceedings to otherwise challenge claims of Party B's creditors pursuant to any federal, state, or Puerto Rico statute (irrespective of whether such law requires any additional approvals or consents as a condition to Party B commencing any such proceeding), including, without limitation, authorizing Party B to file a petition for relief under title 11 of the United States Code (the "Bankruptcy Code") or permitting Party B to seek relief under the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, No. 71-2014 (the "Recovery Act")."

    (c) *Optional Early Termination.* A new Part 1(j) shall be added to the Schedule to the Agreement as follows:

    "(j) Solely in connection with the Transaction between Party A and Party B bearing reference number LTAA1707524333.0 / 00647654301 (the "OET Transaction"), Party B shall have the right to early terminate, cancel and cash settle the OET Transaction, in whole or in part, effective on any Business Day on or after September 24, 2014 (the "Optional Termination Date"). This right may be exercised by written, telex or facsimile notice delivered to Party A no later than one

USActive 30091501.35

(1) Business Day prior to the Optional Termination Date (the "Notification Date"), which notice shall only be effective upon actual receipt by Party A. Following any such early termination and cancellation and payment of the Cash Settlement Amount (calculated as described below), the parties shall be relieved of all further payment obligations hereunder except for (i) payment of all accrued but yet unpaid amounts calculated to but excluding the Optional Termination Date (unless otherwise included in the Cash Settlement Amount as calculated below) and (ii) payment of amounts under the remaining portion of the OET Transaction in the case of partial cancellation. If the OET Transaction is cancelled in part, all payment calculations following the Optional Termination Date will be based on the remaining portion of the OET Transaction after giving effect to such partial cancellation, as set forth in a partial termination Confirmation to be provided by Party A.

Notwithstanding anything to the contrary contained herein, Party B may not exercise its right to early terminate the OET Transaction, if following such termination, a Cash Settlement Amount would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A that: (i) such Cash Settlement Amount will be made by Party B on or before the second Business Day immediately following the Optional Termination Date, and (ii) such Cash Settlement Amount will not cause Party B to be in violation of, or in default of, any material obligation under any material agreement of Party B, including the Covered Document.

Upon the occurrence of an Optional Termination Date, the U.S. Dollar value for the terminated portion of the OET Transaction (the "Cash Settlement Amount") will be determined as of a time of day that is mutually acceptable to Party A and Party B (the "Cash Settlement Valuation Time"). Notwithstanding anything herein to the contrary, Party A and Party B hereby agree that for the purpose of determining a Cash Settlement Amount hereunder, the Calculation Agent will use mid-market values without regard to any bid-ask spread (including credit, funding, hedging or capital charges or revenue considerations), the creditworthiness of Party A or Party B, any existing Credit Support Document or any other collateral arrangements between Party A and Party B. The Calculation Agent will provide facsimile, e-mail, or phone notice of the Cash Settlement Amount to Party B and Party B will provide a response by facsimile, e-mail, or phone as to whether Party B wishes to terminate the transaction.

If the parties are unable to agree on the Cash Settlement Amount, the Calculation Agent will request the Reference Market-makers to provide a mid-market quotation using the methodology described above. If at least three quotations are provided, the Cash Settlement Amount will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest). If fewer than three quotations are provided, the Cash Settlement Amount will be determined by the Calculation Agent in good faith and using commercially reasonable procedures."

Notwithstanding the foregoing described process, no termination will occur under this Part 1(j) unless Party B affirmatively communicates to the Calculation Agent by facsimile, e-mail, or phone after being provided the calculated Cash Settlement Amount from the Calculation Agent, that Party B wishes to have the termination take effect."

(d) *Payments on Early Termination.* Part 1(h) of the Agreement is hereby amended by adding the following language at the end thereof:

"Notwithstanding anything herein to the contrary, Party A and Party B hereby agree that for the purpose of determining a Settlement Amount hereunder, the party designating the relevant Early Termination Date (the "Determining Party") will (i) if obtaining quotations from one or more third parties, ask each third party not to take into account the creditworthiness of the Determining Party, any existing Credit Support Document or any other collateral arrangements between Party A and Party B and to provide mid-market quotations without regard to any bid-ask spread (including credit, funding, hedging or capital charges or revenue considerations), and (ii) in any other case, use mid-market values without regard to any bid-ask spread (including credit, funding, hedging or

2

capital charges or revenue considerations), the creditworthiness of the Determining Party, any existing Credit Support Document or any other collateral arrangements between Party A and Party B."

(e) *Goldman Swap Account.* A new Part 1(k) shall be added to the Schedule to the Agreement as follows:

"(k) *Goldman Swap Account.* Party B hereby agrees to transfer or cause to be transferred Surplus Revenues (as defined herein) to the extent such Surplus Revenues are available in an amount equal to the Goldman Swap Account Funding Amount to the Goldman Swap Account until this Agreement has been terminated in accordance with its terms and all obligations of Party B under this Agreement have been satisfied in full.

"*Goldman Swap Account*" means (i) at any time prior to the earlier of (A) the date on which the parties have entered into the Goldman Swap Account Control Agreement, and (B) the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman CSA Account, (ii) at any time (A) after the date on which the parties have entered into the Goldman Swap Account Control Agreement, and (B) prior to the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman ACA Account, and (iii) at any time (A) after the date on which Party B incurs Additional Obligations (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman Resolution Account.

"*Goldman ACA Account*" means the account opened in connection with, and subject to, the Goldman Swap Account Control Agreement.

"*Goldman CSA Account*" means an account identified by Party A to Party B as the account to which Party B shall transfer collateral under the Credit Support Annex to the Agreement. Any Surplus Revenues transferred to such account will be deemed Transferred (as such term is defined in the Credit Support Annex to the Agreement) to Party A by Party B under the Credit Support Annex to the Agreement and constitute Posted Collateral (as such term is defined in the Credit Support Annex to the Agreement) thereunder.

*Goldman Resolution Account*" means a trust account that is held by a trustee for the benefit of Party A that satisfies the Pari Passu Requirement and from which obligations of Party B under this Agreement (including payment obligations and obligations in respect of collateral) may be satisfied.

"*Goldman Swap Account Funding Amount*" means, in respect of any fiscal year, (i) if an Early Termination Date has not occurred, (A) on any day in such fiscal year on or prior to January 15 of such fiscal year, the lesser of (x) USD 15,000,000 and (y) the Party B Exposure Cap *plus* the Independent Amount applicable to Party B *minus* the Value of Posted Collateral held by Party A as of such day, subject to Party B's Excess Withdrawal Option, and (B) on any day in such fiscal year after January 15 of such fiscal year, the Delivery Amount of Party B on the Valuation Date of such fiscal year, (ii) if an Early Termination Date has occurred as a result of a Failure to Pay, Cross Default or Bankruptcy and an amount is payable by Party B to Party A in respect thereof, the amount payable by Party B to Party A, (iii) if an Early Termination Date has occurred other than as a result of a Failure to Pay, Cross Default or Bankruptcy and an amount is payable by Party B to Party A in respect thereof, (A) in the fiscal year in which the Early Termination Date has occurred, USD 15,000,000 and (B) in any fiscal year other than the fiscal year in which the Early Termination Date occurred, the remaining amount payable by Party B to Party A in connection with such Early Termination Date, and (iv) if an Early Termination Date has occurred and an amount is payable by Party A to Party B in respect thereof, zero. For the avoidance of doubt, the Goldman Swap Account Funding Amount shall be determined without regard to the Delivery Amount of Party B in respect of the Valuation Date occurring on September 23, 2014.

3

*"Excess Withdrawal Option"* means, in respect of any fiscal year and subject to the terms of the Goldman Swap Account Control Agreement or Goldman Resolution Account, Party B's option to remove any Excess Funding Amount from the Goldman Swap Account on or after January 15th of such fiscal year.

*"Excess Funding Amount"* means, in respect of any fiscal year and any date, an amount equal to the difference between (i) the balance in the Goldman Swap Account, and (ii) the Delivery Amount of Party B on the Valuation Date of such fiscal year; *provided, however,* that the Excess Funding Amount will be deemed to be zero whenever the calculation of Excess Funding Amount yields a number less than zero."

(f)   *Goldman Swap Account Control Agreement.* A new Part 1(l) shall be added to the Schedule to the Agreement as follows:

"(l)   *Goldman Swap Account Control Agreement.* Party B hereby agrees that it will use commercially reasonable efforts to negotiate and enter into the Goldman Swap Account Control Agreement as soon as practicable and in any event no later than January 15, 2015. Upon the incurrence of Additional Obligations by Party B (in accordance with the terms of Section 4(h) of the Agreement, as amended by Part 5(j)(ii) of this Schedule), the Goldman Swap Account Control Agreement will be terminated and any amounts held therein will be transferred to the Goldman Resolution Account in accordance with the provisions of the Goldman Swap Account Control Agreement.

*"Goldman Swap Account Control Agreement"* means, the tri-party account control agreement among Party A, Party B and The Bank of New York (or other entity reasonably acceptable to Party A) (the "ACA Custodian") that (i) is reasonably acceptable in form and substance to Party A (ii) pursuant to which Party B opens an account with such ACA Custodian, (iii) grants Party A a first priority security interest in all of the assets contained in such account, and (iv) provides that the assets contained in the account shall not be transferred unless (A) such transfer is directed by joint instruction of both Party A and Party B, or (B) Party A has delivered a notice of exclusive control certifying that an Event of Default hereunder with respect to Party B as the Defaulting Party has occurred and is continuing, in which case Party A shall have exclusive control over withdrawals from the account."

(g)   *Surplus Moneys in the Revenue Account.* A new Part 1(m) shall be added to the Schedule to the Agreement as follows:

"(m) *Surplus Moneys in the Revenue Account.*

(i) *Use.* Party B hereby agrees that from and after September 24, 2014, it will not, other than in accordance with this Agreement, transfer, deposit, release or otherwise use any moneys available under Section 505.2 of the Covered Document (such moneys, the *"Surplus Revenues"*), until it has satisfied its obligation to fund the Goldman Swap Account.

(ii) *Irrevocable Instructions.* On or prior to September 30, 2014, Party B shall give the Trustee (as such term is defined in the Covered Document) irrevocable written instructions to, on any date on which there are Surplus Revenues, deposit all such Surplus Revenues into the Goldman Swap Account until such account contains an amount equal to the Goldman Swap Account Funding Amount. Such instructions shall (i) be in in form and substance reasonably acceptable to Party A, and (ii) specify that they may not be amended, supplemented or otherwise modified in any way without the written consent of both Party A and Party B."

(h)   *Agreement to Deliver Documents.* Part 3(b) of the Schedule to the Agreement is hereby amended by adding the following deliverable:

4

| Party required to deliver | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B (or Party B shall cause to be delivered to Party A) | Reports of (i) any Revenue received by the Trustee, (ii) any deposits, transfers or distributions of such Revenues by the Trustee, (iii) account balances for each Account and Subaccount created pursuant to Section 502 of the Covered Document, and (iv) the current funding requirement for each such Account and Subaccount. | On the first Business Day of each Calendar Month | Yes. |

(i)     *Source of Payments.* Section 4(h) of the Agreement, as added by Part 5(j)(ii) of the Schedule to the Agreement, is hereby amended in its entirety as follows:

"(h) Party B agrees that regularly scheduled payments hereunder (the "Regularly Scheduled Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, Parity Obligations payable and secured by a lien on the Pledged Property, including but not limited to, all amounts in the Debt Service Reserve Account, on parity with Senior Bonds and other Parity Obligations. Party B agrees that all payments other than Regularly Scheduled Payments (the "Other Swap Payments") are, and until the termination of this Agreement pursuant to the terms hereof shall remain, payable and secured by (i) a first priority lien in the Goldman Swap Account and (ii) Pledged Property, including but not limited to, all amounts in the Debt Service Reserve Account, immediately subordinate to Subordinate Bonds. Party B agrees that any Other Swap Payments that are not paid from the amounts in the Goldman Swap Account or Pledged Property will be payable from amounts that Party B is entitled to receive for such purpose pursuant to the first sentence of Article 4(e) of the Authorizing Law. Party B hereby covenants to comply, inter alia, with Section 710 of the Covered Document and the Authorizing Law to ensure payment of all sums thereunder and hereunder. Party B shall take any other actions as may be necessary to fulfill the intent of this Section 4(h).

Party B represents Party A that as of the date hereof, it does not have any obligations in respect of borrowed money other than Senior Bonds and First Subordinate Bonds, and has no Credit Facilities, Liquidity Facilities or Qualified Hedges other than this Agreement (as each such term is defined in the Covered Document).

Party B hereby covenants to Party A that it will not issue any Bonds (as such term is defined in the Covered Document) (other than Refunding Bonds (as such term is defined in the Covered Document)) or other indebtedness, or enter into any Credit Facilities, Liquidity Facilities or Qualified Hedges (as each such term is defined in the Covered Document) (any such debt or obligation incurred referred to herein as "Additional Obligations"), provided however, Party B may incur Additional Obligations, other than obligations that are secured and or payable prior to the Second Subordinate Obligations, if each of the following conditions are satisfied, as applicable:

(i)     (A) if such Additional Obligations constitute Second Subordinate Obligations, the Pari Passu Requirement has been satisfied, or (B) if such Additional Obligations do not constitute Second Subordinate Obligations (such Additional Obligations hereinafter referred to as the *"Third Subordinate Obligations"*), (1) Party B

5

has agreed to withdraw all Surplus Revenues as they become available from the Revenue Account and deposit such Surplus Revenues into accounts (the *"Third Subordinate Obligations Accounts"*) that are not pledged to secure the Bonds other than the Third Subordinate Obligations, (2) such Surplus Revenues and Third Subordinate Obligations Accounts are pledged to secure such Third Subordinate Obligations, (3) the Pari Passu Requirement is satisfied and (4) Party B irrevocably agrees that it will not incur any Additional Obligations (other than Refunding Bonds) that would be secured or payable on a more senior basis than the Third Subordinate Obligations; and

(ii) with respect to any fiscal year in which such Additional Obligations are incurred and any fiscal year thereafter, the Pledged Sales Tax Base Amount for such fiscal year is projected to be equal to or exceed an amount equal to the sum of (A) the debt service requirements for the Bonds and any amounts required to be set aside for the Bonds in accordance with the Covered Document, (B) the debt service requirements for such proposed Additional Obligations and any amounts required to be set aside for such Additional Obligations in accordance with the proposed terms thereof and (C) USD 15,000,000.

Party B authorizes Party A to file any Uniform Commercial Code financing statement or similar document describing the foregoing negative covenants with any governmental office or other body that Party A deems appropriate.

As used herein, *"Pari Passu Requirement"* means, with respect to any Additional Obligations, that (i) Other Swap Payments are secured and payable equally and ratably with such Additional Obligations and (ii) the Goldman Swap Account is funded on a pro rata basis with the applicable debt service account securing such Additional Obligations."

(j) *Addresses for Notices.* Part 4(a)(i) of the Schedule to the Agreement is deleted in its entirety and replaced with the following:

"(a) **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

(i) Address for notices or communications to Party A:

| | |
|---|---|
| Address: | 200 West Street |
| | New York, New York, 10282-2198 |
| Attention: | Swap Administration |
| Telephone: | 212-902-1000 |
| Fax: | 212-902-5692" |

(k) *Credit Support Document.* Part 4(c) of the Schedule to the Agreement shall be amended by adding the following new clause (iii) at the end thereof: "(iii) If the Goldman Swap Account Control Agreement is entered into by Party A and Party B, The Goldman Swap Account Control Agreement shall constitute a Credit Support Document with respect to the material obligations of Party B."

(l) *Credit Support Annex.* Each of Party A and Party B agree that <u>Annex I</u> attached hereto shall be added as a Credit Support Annex to the Agreement and such Credit Support Annex shall be effective as of the date hereof.

2. *Representations.* Each party represents to the other party that all representations contained in the Agreement, as amended, are true and accurate as of the date of this Amendment and that such representations are deemed to be given or repeated by each party, as the case may be, on the date of this Amendment.

3. *Miscellaneous*

6

(a) **_Definitions._** Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings specified for such terms in the Agreement. As used in the Agreement (including any Confirmation relating thereto), as amended by this Amendment, the terms "ISDA Master Agreement", "Agreement", "this Agreement", "herein", "hereinafter", "hereof", "hereto" and other words of similar import, shall mean the Agreement as amended hereby, unless the context otherwise specifically requires.

(b) **_Entire Agreement._** This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

(c) **_Counterparts._** This Amendment may be executed and delivered in counterparts (including by facsimile transmission) each of which will be deemed an original.

(d) **_Headings._** The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Amendment.

(e) **_Governing Law._** This Amendment shall be governed by and construed in accordance with the applicable laws governing the Agreement.

(f) **_Jurisdiction._** The terms of Section 13(b) of the Agreement, as modified in the Schedule to the Agreement, shall apply to this Amendment with references in such Section to "this Agreement" being deemed references to this Amendment.

**IN WITNESS WHEREOF,** the parties have executed this Amendment on the respective dates specified below with effect from the date specified in this Amendment.

**GOLDMAN SACHS BANK USA**

By: _____
    Name:
    Title:
    Date:

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By: _____
    Name:
    Title:
    Date:

[ISDA AMENDMENT]

ANNEX I

[CSA]