**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

```
-------------------------------------------------------------x
In re:                                              :
                                                    :
THE FINANCIAL OVERSIGHT AND                         :
MANAGEMENT BOARD FOR PUERTO RICO,                   :   PROMESA
                                                    :   Title III
        as representative of                        :
                                                    :   Case No. 17-BK-3283 (LTS)
THE COMMONWEALTH OF PUERTO RICO et al.,             :
                                                    :   (Jointly Administered)
        Debtors.¹                                   :
-------------------------------------------------------------x
In re:                                              :
                                                    :
THE FINANCIAL OVERSIGHT AND                         :
MANAGEMENT BOARD FOR PUERTO RICO,                   :   PROMESA
                                                    :   Title III
        as representative of                        :
                                                    :   Case No. 17-BK-3284 (LTS)
PUERTO RICO SALES TAX FINANCING,                    :
CORPORATION ("COFINA")                              :
                                                    :
        Debtor.                                     :
                                                    :
-------------------------------------------------------------x
```

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (A) FURTHER RESPONSE
TO AAFAF'S INFORMATIVE MOTION DISCLOSING PROPOSED PAYMENT OF
$7 MILLION TO BONISTAS DEL PATIO, INC. [DOCKET NO. 5097] AND
(B) URGENT MOTION REQUESTING HEARING ON PROPOSED PAYMENT**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") respectfully submits this further response to the *Informative Motion Regarding Stipulation Section 15.2 Expenses* [Docket No. 5097] and makes this urgent motion[2] (the "Scheduling Motion") requesting a hearing on the Commonwealth's proposed $7 million payment (the "Bonistas Payment") to Bonistas del Patio, Inc. ("Bonistas"). In support of this Scheduling Motion, the Committee respectfully states as follow:

## FURTHER RESPONSE

1. As this Court is aware, late in the evening of February 11, 2019—indeed, literally on the eve of the effective date of COFINA's plan of adjustment[3]—the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") advised the Court that AAFAF had entered into a stipulation with itself[4] (the "Stipulation") pursuant to which AAFAF purported to obligate the Commonwealth to make a $7 million payment to Bonistas *from its own funds* on account of professional fees purportedly incurred by Bonistas in connection with the Plan. Following the filing of the Committee's urgent response [Docket No. 5100] (the "Committee Response") raising serious questions[5] regarding the propriety of the proposed Bonistas Payment,

---

[2] The Committee submits its request for a hearing as an urgent motion because, according to Section I.H of the *Eighth Amended Case Management Procedures* [Docket No. 4866], "[s]cheduling requests (other than from the Debtors) must be brought by urgent motion." In other words, under the case management procedures, the Committee may not seek to schedule a hearing, even on regular notice, without making an "urgent" request. To be clear, the Committee is not seeking to schedule the hearing on the Bonistas Payment on an expedited basis. In fact, the Committee has no objection to having this matter heard at the next omnibus hearing on March 13, 2019, which would give parties in interest more than the standard 22 days' notice.

[3] The effective date of the *Third Amended Title III Plan of Adjustment for Puerto Rico Sales Tax Financing Corporation dated January 9, 2019* (the "Plan") occurred on February 12, 2019. *See* Docket No. 5104. Capitalized terms not defined herein have the meanings set forth in the Plan.

[4] It is remarkable that the Stipulation is not a stipulation between AAFAF and Bonistas but some form of unilateral declaration by AAFAF.

[5] Among other things, the Committee questioned whether it was appropriate for the Commonwealth to make a $7 million payment to an entity that is admittedly not a creditor of COFINA on account of undocumented and

1

the Court entered an order on February 12, 2019 [Docket No. 5101] (the "Stay Order") (a) directing AAFAF to respond to the Committee Response and (b) directing the Commonwealth not to make the proposed Bonistas Payment pending submission of AAFAF's response and further order of the Court.

A. **Additional Disclosure Is Required, as Selective Disclosure Raises Numerous New Issues**

2. On February 13, 2019, AAFAF filed its response to the Committee Response [Docket No. 5117] (the "AAFAF Response"), which included a supporting declaration from counsel to Bonistas (the "Declaration"). This was AAFAF's and Bonistas' opportunity to provide full disclosure with respect to what transpired here. Instead, the AAFAF Response and the Declaration present a carefully crafted, one-sided presentation that fails to provide the Court with the most basic documentation (which is alluded to, but not provided) with respect to these issues.

3. By and large, the AAFAF Response and the Declaration speak only in generalities,[6] often fail to specify whether the work at issue was even connected to COFINA (or the Commonwealth-COFINA Dispute),[7] or make other uninformative statements.[8] Even the

---

unsubstantiated expenses that were purportedly incurred by such entity in connection with the COFINA plan. Notably, this would amount to an *ex post facto* contract by the Commonwealth for services purportedly rendered on behalf of private citizens/entities in violation of every single principle of government contracting laws of Puerto Rico. *See,e.g.*, *Ramiro Rodríguez v E.L.A.*, 2014 TSPR 32 (2014) (holding that attorney providing services for the Department of Transportation and HTA under "verbal" agreement cannot secure payment for those services via a retroactive agreement); *Alco Corp. v Municipio Toa Alta*, 183 D.P.R. 530 (2011) (holding that contractor who started to perform services without written contract and finished the work could not seek payment of work performed through a retroactive contract). English translations of these cases will be provided separately.

[6] *See, e.g.*, Declaration ¶7 (Bonistas' professionals were "deeply involved" in negotiations, "actively seeking to drive consensus," and "aiming to smooth the process towards confirmation");¶8 (Bonistas "made a significant contribution . . . by helping bridge differences among creditor parties").

[7] *See, e.g.*, Declaration ¶6 (Bonistas and its professionals engaged "in discussions regarding the fiscal plan, debt capacity, potential settlement structures and the implications of hurricanes Irma and Maria").

[8] *See, e.g.*, Declaration ¶8 (Bonistas "provided a balanced voice on behalf of both senior and subordinate bondholders").

2

bullet point list in paragraph 9 of the Declaration falls short of justifying $7 million in fees and expenses—instead, again, resorting to vague and generalized descriptions of services purported provided by Bonistas and its professionals. In that regard, the claim that Bonistas needed to engage in solicitation efforts is particularly dubious given that the Commonwealth already incurred more than $25 million as a "Solicitation Fee" to certain dealer managers for their efforts in soliciting votes of COFINA bondholders.[9] Moreover, the Committee strenuously disputes statements contained in the Declaration to the effect that Bonistas or its professionals were involved for hundreds of hours in the settlement of the Commonwealth-COFINA Dispute (which dispute dealt with the issue of which entity, as between the Commonwealth and COFINA, owned the Sales Tax). These settlement negotiations were handled by the Commonwealth Agent and the COFINA Agent, and not even the Oversight Board was involved.[10]

4. In any event, because no supporting documents (such as engagement letters, fee statements, time entries, etc.) are attached to the AAFAF Response, it is plainly impossible to determine (a) whether Bonistas' professionals provided $7 million in services and (b) whether those services benefited the Commonwealth, and if, under Puerto Rico Law, the Bonistas Payment is legal as in compliance with the rules of government contracting. The AAFAF Response, instead of providing real answers, raises a host of new questions, including, among others:

- As a general matter, fee structures of professional are set forth in an engagement letter entered into between the professional and the client at

---

[9] *See Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation* [Docket No. 4588], Ex. K (Fee Letter). The Solicitation Fee is 0.15% of the aggregate principal amount of the old COFINA bonds ($17,512,573,537.70).

[10] *See Amended Memorandum of Findings of Fact and Conclusions of Law in Connection With Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Docket No. 5053] ¶34 ("Following oral argument regarding the respective motions for summary judgment filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled their efforts to mediate a resolution. The Oversight Board was not a party to such mediation efforts, other than to be informed of their existence.")

3

the inception of the engagement. Based on the Declaration, however, it appears that there are *no* such engagement letters with Bonistas. If this is the case, how was the amount of $7 million in fees and expenses determined? Is this amount based on hourly rates? Is there a success fee for the financial advisor, and, if so, how would that success fee be earned? Who approved the hourly rates and/or any success fee?

- AAFAF asserts that, in or around August 2018, it "agreed *in concept* to incur *an* obligation on behalf of the Commonwealth." AAFAF Response ¶7 (emphasis added). What is the nature of this supposed "agreement in concept" (***which is not attached*** to the AAFAF Response) pursuant to which the Commonwealth incurred such unspecified obligation? When entering into this "agreement in concept," did AAFAF comply with applicable legal requirements under Puerto Rico law for entry into government contracts (including registration with the comptroller's office and the prohibition on entering into *ex post facto* contracts for services)?

- AAFAF notes that the August 2018 "agreement in concept" was communicated to the Oversight Board, but carefully avoids any reference to the Oversight Board's consent (or lack thereof) to the Commonwealth making a $7 million payment. AAFAF Response ¶7. The Oversight Board is the only entity that should be speaking for the Commonwealth on Title III issues such as this one.

- AAFAF asserts that it did not believe that disclosure of the Bonistas Payment "was warranted until the structure of the agreement was formulated." AAFAF Response ¶7. However, the agreement setting forth this supposed "structure" appears to be nothing other than the 4-page Stipulation by AAFAF with itself, which simply provides that $7 million of Bonistas expenses are covered under Section 15.2 of the Plan. Why did negotiations on memorializing such a simple arrangement only commence after confirmation of the Plan (*i.e.*, on February 7, 2019), given that the "parties" purportedly expected that this would be the "structure" for over six months? *See* Declaration ¶13 (noting that "[i]t was anticipated that such payment was to be made pursuant to Section II(N) of the Plan Support Agreement, which later became Section 15.2 of the COFINA Plan of Adjustment").

- AAFAF asserts that AAFAF, Bonistas, and Bonistas' professionals agreed to the final terms of the Stipulation on February 11, 2019. If so, how can it be that AAFAF entered into the Stipulation only with itself, without Bonistas or the Bonistas' professionals as a party? Is there any other document evidencing the February 11, 2019 agreement between AAFAF, Bonistas, and Bonistas' professionals?

4

- The Declaration asserts that, in July 2018, a letter agreement (the "July 2018 Letter Agreement") was executed by AAFAF, pursuant to which AAFAF purportedly agreed that "a provision *could be* included in *any* plan of adjustment for the Commonwealth or other Title III Debtor that would require the payment of the fees and expenses of [Bonistas' professionals] by the Commonwealth or the applicable Debtor." Declaration ¶10 (emphasis added). The legal effect of this letter (*which is not attached* to the Declaration) is questionable, to say the least. Even so, an agreement by AAFAF that a provision "could be included" in a plan does not address whether the expense provision actually included in the Plan, *i.e.*, Section 15.2, covers the expenses at issue here.[11] Moreover, when entering into the July 2018 Letter Agreement, did AAFAF comply with applicable legal requirements under Puerto Rico law for entry into government contracts (including registration with the comptroller's office and the prohibition on entering into *ex post facto* contracts for services)?

- If it was the "expectation" of Bonistas' professionals that they would be paid through Section 15.2 of the Plan, Declaration ¶13, why is there not a scintilla of evidence or disclosure in these Title III cases on this point? In that regard, the statement of support by the COFINA senior bondholder coalition [Docket No. 5118] (the "Coalition Statement") speaks volumes. While the COFINA senior bondholder coalition is supportive of the payment (as it would be paid by the Commonwealth and not come out of its pockets), the coalition is only supportive of "AAFAF *now* seek[ing] to compensate Bonistas[]," Coalition Statement at 4 (emphasis added), but it gives no indication that it ever understood, prior to February 11, 2019, that there would be a $7 million payment to Bonistas or that such payment would be paid pursuant to Section 15.2 of the Plan.

- The Declaration states that the $7 million payment will also be used to pay the fees of unnamed "local legal and financial advisors to Bonistas del Patio." Declaration ¶14. Who are these other advisors and what services did they provide and are the Bonistas executives such other "local advisors"?

What the AAFAF Response makes clear, however, is that the statement in the Stipulation that Bonistas "has represented to AAFAF that it *incurred expenses* in the aggregate amount of $7,000,000.00 for professional services" is not accurate. Stipulation at 2 (emphasis added). As

---

[11] It is also questionable whether any such agreement by AAFAF would be enforceable in any event, given that, under section 312(a) of PROMESA, the Oversight Board has the exclusive power to propose a plan of adjustment.

5

the Declaration explains, Bonistas' professionals never expected payment from Bonistas and, therefore, Bonistas has "incurred" nothing here. Declaration ¶4.

B. **The Disclosure Provided Shed Little Light on Bonistas' Obscure Role in these Title III Cases**

5. Neither the AAFAF Response nor the Declaration shed much light on Bonistas' obscure role in these Title III cases—an entity that is not a creditor, has never filed a notice of appearance or any other pleading, and has not filed a Rule 2019 statement (despite purporting to be a representative of local bondholders). How can a self-appointed representative[12] for a group of creditors immerse itself in plan negotiations in the hope of earning a fee without complying with any disclosure obligations? There is no doubt that, at times, the various parties involved in these cases found it quite convenient to refer to Bonistas' support for their position as a proxy for local bondholder support. However, whether Bonistas really "represented" one, or one thousand, local bondholders, these parties could not verify.

6. At the end of the day, the role of Bonistas was really no different than the role of a radio talk show host or an internet blogger that is supportive of the plan. This does not translate into an entitlement to receive millions in fees as a plan expense from a Title III debtor, and the fact that a law firm and an investment bank associated themselves with the self-appointed representative in the hope that their fees would be paid does not change the analysis. These professionals chose not to file a Rule 2019 statement or appear in the case and, therefore, should not be heard now to speak about the key role they played in the Title III case. Moreover, Bonistas also made a decision not to disclose the $7 million payment to the local bondholders it allegedly represented and which it encouraged to vote for the very plan that gave

---

[12] The Committee cannot overstate the risks to the integrity of the bankruptcy and reorganization process presented by such a self-appointment by an entity that owes no duties to anyone.

6

its professionals the right to get paid $7 million in fees. Indeed, if the AAFAF Response makes one thing clear, it is that the Commonwealth would *only* pay Bonistas' expenses if the Plan was confirmed.[13]

## Bonistas Is NOT a Pro Bono Operation

7. The Committee also takes issue with the entire narrative that Bonistas is a "not-for-profit" entity devoting itself *pro bono* for the good of the small island bondholders. While Bonistas may be, as a technical matter, a non-for-profit corporation, the two main principals of Bonistas, Mr. Rafael Rojo (President of Bonistas) and Mr. Jorge Irizzary (Executive Director of Bonistas), are not mere by-standers in these cases. Mr. Irizzary is a former president of the Government Development Bank for Puerto Rico ("GDB") and a holder of Puerto Rico bonds. Furthermore, Mr. Rafael Rojo, also a holder of Puerto Rico bonds, has had dealings with the Government of Puerto Rico during these Title III cases. According to a published report (which quotes Mr. Rojo),[14] in November 2018, Mr. Rojo purchased, through one of his investment vehicles, a 90-acre property (known as the Río Bayamón Community) for $12 million from GDB—a property that, as recently as 2017, had been appraised at $19.6 million. This transaction closed on November 16, 2018, *i.e.*, only a few days *after* this Court approved GDB's Qualifying Modification. It is therefore clear that, while he was purportedly negotiating a resolution of the COFINA issues on behalf of on-island bondholders, he was also negotiating with GDB to close a transaction for his own pecuniary gain. What is not clear is what other involvements these two gentlemen may have in these Title III cases.

---

[13] AAFAF Response ¶7 (payment of Bonistas expenses "conditioned on the consummation of a COFINA Title III plan"); Declaration ¶13 (Bonistas expenses "to be paid upon the consummation of the COFINA Restructuring").

[14] A copy of the report is attached hereto a **Exhibit B**.

7

## C.     AAFAF's "Anything Goes" Argument Should Be Rejected by This Court

8.     AAFAF argues that because section 943(b)(3) and section 1129(a)(4) of the Bankruptcy Code are incorporated into a case under Title III of PROMESA, not only is the Court powerless to review the proposed Bonistas Payment, the Court also had no right to know about it. This argument is deeply flawed. For one, the issue here isn't merely whether AAFAF and Bonistas were required to fully disclose the proposed Bonistas Payment to COFINA creditors (they were), but whether the fees and expenses purportedly incurred by Bonistas properly fall within Section 15.2 of the Plan such that the Commonwealth is required to pay them—*i.e.*, whether these expenses were "***incurred by the Commonwealth or COFINA***, as the case may be, in connection with the in connection with the development, negotiation, confirmation and consummation of the Plan and the compromise and settlement of the Commonwealth-COFINA Dispute." Plan § 15.2 (emphasis added). It is unequivocally this Court—not AAFAF—that is the arbiter of this question. In fact, under Section 29.1(g) of the Plan, this Court retains *exclusive* jurisdiction "to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan." Plan 29.1(g). AAFAF cannot somehow circumvent the Court's exclusive jurisdiction by stipulating (with itself, no less) what this provision of the Plan means. AAFAF's position is also directly contrary to the Stipulation, pursuant to which "any and all disputes arising out of or otherwise relating to th[e] Stipulation" are subject to the *exclusive* jurisdiction of this Court.[15] Stipulation ¶8.

---

[15]     The Stipulation also provides that it "shall be governed by and construed in accordance with PROMESA, the Bankruptcy Code (to the extent made applicable to cases under Title III of PROMESA pursuant to section 301(a) of PROMESA), and the laws of the Commonwealth of Puerto Rico, without regard to the conflict of laws principles thereof." Stipulation ¶7.

8

9. Moreover, AAFAF and Bonistas clearly were required to fully disclose the Bonistas Payment prior to solicitation of the COFINA creditors, irrespective of any express statutory mandate.[16] Indeed, the United States Supreme Court emphasized many years ago that a court sitting in bankruptcy has "the control . . . over the whole process of formulation and approval of plans of composition or reorganization, and obtaining assets thereto" and that the court's power "inheres in the jurisdiction of a court of bankruptcy" and "is ***not*** dependent on express statutory provisions." *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 145-46 (1940) (emphasis added). Thus, a court sitting in bankruptcy has an independent duty to be satisfied that "the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and ***devoid of overreaching, however subtle***." *Id.* at 146 (emphasis added). Specifically, in *City of Avon Park*, the Supreme Court reversed the lower court's confirmation of a plan for a municipality because the entity soliciting votes from bondholders on the plan ***had secured an undisclosed benefit for itself (if the plan was confirmed) and that fact had not been disclosed to the bondholders that were solicited***.

10. Almost forty years after Avon Park was decided, its fundamental ruling that "full disclosure is the very essence of obligation imposed by the requirement of good faith" was the basis of the court's refusal to deny confirmation in *Matter of Cyr Bros. Meat Packing*, 2 B.R. 620 (Bankr. D. Me. 1980). In that case, Judge Cyr pointed to multiple "respects in which disclosure appears to have been deficient," *id.* at 626, including the failure of both the plan and the letter soliciting acceptances to explain to creditors that the fund from which unsecured creditors would, in theory, receive distributions was subject to depletion to pay, among other things, professional fees. *Id.* at 624. Citing to *City of Avon Park*, the court explained that "it is

---

[16] Under AAFAF's "anything goes" approach, the Commonwealth would be free to make payments to selected creditors to vote in favor of a plan without disclosing any such payments to the Court.

9

far from evident in these circumstances that the elementary obligation of full disclosure has been met," *id.* at 627 (internal references omitted) and that, in the exercise of the court's duty "to prevent any use of the reorganization process that is contrary to the purpose and spirit of the" bankruptcy law, the court could not "condone compromise settlement or confirm a plan of arrangement absent full disclosure and a sufficient showing that the arrangement and its acceptance comport with the salutary spirit and the equitable purposes of the bankruptcy laws." *Id.*

11. Although *City of Avon Park* and *Cyr Bros.* were decided under a now superseded version of chapter IX of the Bankruptcy Act and on facts that are different than those present here, the principles enumerated in that Supreme Court decision have the same vitality here. As the Declaration notes, the Bonistas actively encouraged local bondholders to vote to accept the Plan.[17] Moreover, while the Disclosure Statement advised these holders in great detail about the financial benefits that other parties supporting the Plan were receiving,[18] the Disclosure Statement and the Plan were completely silent about the fact that Bonistas would be receiving $7 million if the Plan was confirmed.[19]

---

[17] Declaration ¶9 (Bonistas and/or its professionals "[e]ncouraged support for the COFINA Plan of Adjustment, through preparing and disseminating to Local Bondholders 'Questions and Answers' regarding the COFINA Plan of Adjustment and distributing announcement notifying and reminding Local Bondholders of the voting and election deadlines for the Plan of Adjustment").

[18] Under the Plan, the Consummation Cost Parties (which include certain COFINA senior and junior bondholders as well as certain monoline insurers that are parties to the Plan Support Agreement) are entitled to receive the Consummation Costs in the amount of approximately $332 million for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan. *See* Plan § 3.3.

[19] While the Disclosure Statements contains a discussion of the contributions of the various plan support parties made in connection with the Plan (including garnering significant creditor support and continuing to assist in the finalization of definitive documentation), that discussion is limited to the Consummation Cost Parties, which do not include Bonistas. *Disclosure Statement of for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Docket No. 4364] at 79-80. Indeed, the Disclosure Statement's reference to the Oversight Board's determination that the payment of the Consummation Costs is appropriate only applies to the Consummation Cost Parties, not Bonistas. *Id.*

12. AAFAF also asserts that the inclusion of Section 15.2 of the Plan does not mean that the Commonwealth agreed to seek Court approval of all expenses to be paid thereunder. *See* AAFAF Response n. 2. This is a red herring. The Committee is not challenging the Commonwealth's payment of fees ***actually incurred by the Commonwealth or COFINA*** in connection with the solicitation of the Plan, such as the Solicitation Fee paid to the dealer managers for their services in soliciting the votes of COFINA bondholders because they were retained by a debtor to provide services to the debtors.[20] The Bonistas Payment is simply not such a Section 15.2 expense.

13. To be clear, the Committee is ***not*** suggesting that the COFINA confirmation order should be set aside; rather, the Committee's position is that the only way to cleanse the solicitation and confirmation process is to preclude the payment of these undisclosed fees and expenses to Bonistas. Indeed, it is unclear, from the point of view most favorable to Bonistas, that Bonistas' purported influence with local, on-island bondholders swayed the overall voting results. Given the overwhelming plan acceptance among mainland bondholders, it would essentially have required a large amount of on-island bondholders to change their "yes" vote to a "no" vote in order to "flip" the classes of senior and junior bondholders from plan acceptance to plan rejection.[21]

---

[20] *See supra* note 9

[21] According to the *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Docket No. 4794], 1,724 senior bondholders elected to receive taxable bonds and thus are Puerto Rico based bondholders. In contrast, 1,849 senior bondholders did not make such an election (and most of them are likely non-Puerto Rico based bondholders). Thus, on a combined basis (*i.e.*, 3573 voting senior bondholders), it would have required 1,787 "no" votes for the senior bondholder class to have rejected the Plan. This means that, in addition to the 267 actual "no" votes, an additional **1,520** "no" votes (or approximately **88%** of the 1,724 local bondholders that elected taxable bonds) would have been needed. Similarly, 5,560 junior bondholders elected to receive taxable bonds and thus are Puerto Rico based bondholders. In contrast, 5,592 junior bondholders did not make such an election (and most of them are likely non-Puerto Rico based bondholders). Thus, on a combined basis (*i.e.*, 11,152 voting junior bondholders), it would have required 5,577 "no" votes for the junior bondholder class to have rejected the plan. This means

11

14. In the alternative, and solely to the extent the Court rejects the Committee's argument that the Bonistas Payment is improper *per se*, the Committee submits that the fees and expenses incurred by Bonistas' professionals should be submitted to a reasonableness review by the fee examiner appointed in these Title III cases.

## RELIEF REQUESTED

15. It is important for the Court to consider that the issues presented here are not the result of an unintentional mistake or that the Committee is somehow playing a game of "gotcha." The negotiation of the Bonistas Payment involved incredibly sophisticated professionals, who appear to have carefully orchestrated the procedural "vehicle" they would use to justify the Bonistas Payment and the method and timing of the disclosure relating to such payment.

16. Accordingly, the Committee believes that the Court, or at least the process, may greatly benefit from a more thorough airing of these issues, and, therefore, the Committee respectfully requests that the Court schedule a hearing to address the issue of the Commonwealth's proposed Bonistas Payment. The Committee further requests that, pending such hearing and a ruling from the Court, the Court maintain the *status quo* and direct the Commonwealth not to make the proposed $7 million payment to Bonistas. In addition, prior to such hearing, AAFAF, Bonistas, and Bonistas' professionals should, at a minimum,[22] produce to the Committee all documents referenced in the AAFAF Response and the Declaration, as well as

---

that, in addition to the 1,826 actual "no" votes, an additional **3,751** "no" votes (or approximately **67%** of the 5,560 local bondholders that elected taxable bonds) would have been needed. The foregoing analysis is limited to the numerosity requirement. Given the overwhelming acceptance by senior and junior bondholder in amount, it is practically impossible for local bondholders to have "flipped" the senior or junior bondholder classes based on the amounts held. The foregoing analysis also excludes the monoline insurers which were classified separately under the Plan.

[22] The Committee reserves its right to seek further discovery with respect to this matter after review of the documents produced in response to its request.

12

all correspondence related to such documents. The Committee will obviously meet and confer with the parties regarding such request.

17. Pursuant to Section I.H. of the *Eighth Amended Case Management Procedures* [Docket No. 4866 in Case No. 17-3283 (LTS)], undersigned counsel certifies that it has advised counsel to AAFAF and the Oversight Board of its request a hearing with respect to the issues raised in the AAFAF Response. As of the time of the filing of this Scheduling Motion, undersigned counsel had not received a response to such request. Moreover, in accordance with Local Bankruptcy Rule 9013-1(a)(2), undersigned counsel certifies that counsel has carefully examined the matter and concluded that there is a true need for expedited consideration (to the extent required under Section I.H of the *Eighth Amended Case Management Procedures*, *see supra* note 2) of this Scheduling Motion, and that the movant has not created the urgency through lack of due diligence on its part. Furthermore, as noted above, the Committee is not seeking to schedule the hearing on the Bonistas Payment on an expedited basis and has no objection to having this matter heard at the next omnibus hearing on March 13, 2019 on regular notice.

## NOTICE

18. Notice of this Scheduling Motion has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United State Attorney for the District of Puerto Rico; (iii) the Oversight Board; (iv) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (v) the official committee of retirees; (vi) the insurers of the bonds issued or guaranteed by the Debtors; (vii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; and (viii) all parties that have filed a notice of appearance in these Title III cases.

## **NO PRIOR REQUEST**

19. No previous request for the relief requested herein has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court enter the proposed order attached hereto as **Exhibit A**, granting the relief requested herein and any other relief as is just and proper.

Dated: February 14, 2019 /s/ *G. Alexander Bongartz*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington @paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA)*

- and -

/s/ *Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA)*

15