Hearing Date: February 26, 2019 at 3:00 pm (A.S.T.)
Reply Date: February 22, 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>        Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>**This court filing relates only to Case No. 17 BK 4780-LTS** |

**OPPOSITION OF ASSURED GUARANTY CORP.,
ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC
FINANCE GUARANTEE CORPORATION, AND SYNCORA GUARANTEE
INC. TO THE URGENT MOTION OF FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD, AS REPRESENTATIVE OF DEBTOR,
TO COMPEL PRODUCTION OF DOCUMENTS FROM MOVANTS
RELATING TO THEIR MOTION FOR RELIEF FROM AUTOMATIC STAY**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

      A.     Loss Reserve Information ........................................................................3

      B.     The Lift Stay Motion ...............................................................................6

      C.     Lift Stay Motion Discovery ....................................................................7

ARGUMENT ...................................................................................................................11

      A.     The Loss Reserve Information Is Irrelevant To The Lift Stay
             Motion And Producing The Loss Reserve Information Would
             Impose A Disproportionate Burden On The Insurers ...............................12

      B.     The Loss Reserve Information Is Protected By The Work Product
             Doctrine ...................................................................................................17

      C.     The Loss Reserve Information Is Protected By The Attorney-Client
             Privilege ..................................................................................................21

      D.     The Loss Reserve Information Provided To The Regulators Is
             Protected By The Bank Examiner Privilege and Confidentiality
             Statutes ....................................................................................................22

      E.     The Insurers Did Not Waive Privilege By Providing The Loss
             Reserve Information To Their Regulators ...............................................25

CONCLUSION ................................................................................................................27

USActive 53395468.19

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES:**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126,
2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016)....................................................25

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*,
No. 04 Civ. 4309, 2006 WL 278131 (S.D.N.Y. Feb. 2, 2006) ...........................20

*Blattman v. Scaramellino*,
891 F.3d 1 (1st Cir. 2018) ...................................................................................25

*Bryan Corp. v. ChemWerth*,
296 F.R.D. 31 (D. Mass. 2013) (Dein, M.J.) ......................................................25

*CH Properties, Inc. v. First Am. Title Ins. Co.*,
48 F. Supp. 3d 143 (D.P.R. 2014) .......................................................................18

*Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*,
212 F. Supp. 3d 312 (D.P.R. 2016) .....................................................................18

*Fed. Realty Inv. Trust v. Pac. Ins. Co.*,
760 F. Supp. 533 (D. Md. 1991) .........................................................................17

*Franco v. Yale Univ.*,
No. 03-7060, 80 F. Appx. 707 (2d Cir. 2003) ....................................................17

*Gill v. Gulfstream Park Racing Ass'n., Inc.*,
399 F.3d 391 (1st Cir. 2005) ...............................................................................11

*In re Balco Equities Ltd.*,
312 B.R. 734 (Bankr. S.D.N.Y. 2004) .................................................................14

*In re Bankers Trust Co.*,
61 F.3d 465 (6th Cir. 1995) .................................................................................23

*In re Buspirone Antitrust Litig.*,
211 F.R.D. 249 (S.D.N.Y. 2002) .........................................................................22

*In re Citigroup Bond Litig.*,
No. 08 Civ. 9522, 2011 WL 8210671 (S.D.N.Y. Dec. 5, 2011) .........................22

-ii-

*In re Elmira Litho*, *Inc.*
174 B.R. 892 (Bankr. S.D.N.Y. 1994) .........................................................14

*In Re Grand Jury Subpoena No. 2013R00691-009*,
201 F. Supp. 3d 768 (W.D.N.C. 2016) .......................................................21

*In re McDowell*,
483 B.R. 471 (Bankr. S.D. Tex. 2012) ........................................................18

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*,
No. 13-cv-2419, 2015 WL 13715296 (D. Mass. Nov. 6, 2015) ...........................16

*In re Quigley Co., Case No. 04-15739,*
2009 Bankr. LEXIS 1352 (Bankr. S.D.N.Y. Apr. 24, 2009) .................................18

*In re Raytheon Securities Litig.*,
218 F.R.D. 354 (D. Mass. 2003) .............................................................. 26

*In re Steinhardt Partners, L.P.*,
9 F.3d 230 (2d Cir. 1993) .....................................................................25

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of*
*Fed. Reserve Sys.*, 967 F.2d 630 (D.C. Cir. 1992) ........................................22, 23

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
899 F.3d 13 (1st Cir. 2018) ....................................................................6

*Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*,
937 F. Supp. 2d 202 (D.P.R. 2012) .......................................................11, 16

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
237 F.R.D. 176 (N.D. Ill. 2006) .............................................................19

*Lexington Ins. Co. v. Swanson*,
240 F.R.D. 662 (W.D. Wash. 2007) ..........................................................20

*Lluberes v. Uncommon Productions, LLC*,
663 F.3d 6 (1st Cir. 2011) ....................................................................26

*Matrix Essentials, Inc. v. Quality King Distributors, Inc.*, No. CV90-1070,
2006 WL 8435312 (E.D.N.Y. Jan. 12, 2006) ...............................................25

*Miller v. Regents of Univ. of Colo.*,
No. 98-1012, 1999 WL 506520 (10th Cir. July 19, 1999) ..................................16

USActive 53395468.19

*Mullins v. Dep't of Labor of Puerto Rico*,
   269 F.R.D. 172 (D.P.R. 2010) ..............................................................20

*Nicholas v. Bituminous Cas. Corp.*,
   235 F.R.D. 325 (N.D. W.Va. 2006) .................................................18, 20

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   No. 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) ...........25

*Progressive Cas. Ins. Co. v. F.D.I.C.*,
   298 F.R.D. 417 (N.D. Iowa 2014) .......................................................18

*Resolution Tr. Corp. v. Diamond*,
   773 F. Supp. 597 (S.D.N.Y. 1991) .......................................................22

*United States v. Richey*,
   632 F.3d 559 (9th Cir. 2011) ..............................................................20

*Rivera v. Kmart Corp.*,
   190 F.R.D. 298 (D.P.R. 2000) ............................................................21

*Schreib v. American Family Mutual Ins. Co.*,
   304 F.R.D. 282 (W.D. Wash. 2014) ................................................18, 20

*Simon v. G.D. Searle & Co.*,
   816 F.2d 397 (8th Cir. 1987) ..............................................................20

*State of Maine v. U.S. Dep't of Interior*,
   298 F.3d 60 (1st Cir. 2002). ................................................................18

*Union Carbide v. Travelers Indemn. Co.*,
   61 F.R.D. 411 (W.D. Pa. 1973) ...........................................................17

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) ..............................................................18

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ........................................................25, 26

*United States v. Olano*,
   507 U.S. 725 (1993) ...........................................................................25

*United States v. Textron Inc. & Subsidiaries*,
   577 F.3d 21 (1st Cir. 2009) .................................................................19

USActive 53395468.19

*United Therapeutics Corp. v. Watson Labs., Inc.*,
   200 F. Supp. 3d 272 (D. Mass. 2016) ...................................................................17

*Westernbank Puerto Rico v. Kachkar*,
   Civil No. 07-1606, 2009 WL 530131 (D.P.R. Feb. 9, 2009) ..................................20

*W Holding Co. v. Chartis Ins. Co. of Puerto Rico*,
   300 F.R.D. 48 (D.P.R. 2014) ...............................................................................19

## STATUTES & OTHER AUTHORITIES:

Fed. R. Civ. P. 26(b)(1)...............................................................................10, 11, 16
Md. Code Ann., Ins. § 2-209 ..................................................................................26
N.Y. Pub. Off. L. § 87(2)(d) .............................................................................24, 26

USActive 53395468.19

To the Honorable United States Magistrate Judge Judith G. Dein:

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora," and collectively with Assured and National, the "Insurers") respectfully submit this opposition (the "Opposition") to the *Urgent Motion Of Financial Oversight And Management Board, As Representative Of Debtor, To Compel Production Of Documents From Movants Relating To Their Motion For Relief From Automatic Stay* (ECF No. 1065)[2] (the "Motion to Compel") filed by the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), as representative of the Puerto Rico Electric Power Authority ("PREPA") in these Title III cases, seeking loss reserve information (collectively, "Loss Reserve Information"), and state as follows:

## **INTRODUCTION**

1.      Loss reserves established in the course of litigation are both irrelevant to any valuation of the Insurers' collateral and privileged.  What is more, the profound risks inherent in forcing regulated entities like the Insurers to reveal proprietary, confidential and highly sensitive information that they are required to provide to their regulators far outweighs the minimal probative value the information may contribute to determination of the underlying motion. *See Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed* (ECF No. 975) ("Lift Stay Motion").

---

[2]    "ECF No." refers to documents filed in Case No. 17-BK-4780-LTS, unless otherwise noted. Accompanying this Opposition are declarations submitted on behalf of each of the Insurers. *See* Declarations of Benjamin Rosenblum, Adam Bergonzi and Drew Hoffman, each dated February 14, 2019 (the "Rosenblum Decl.", "Bergonzi Decl." and "Hoffman Decl.", respectively).

2.      FOMB's entire motion rests on the manifestly incorrect premise that the requested
Loss Reserve Information contains collateral valuations.  It does not.  What the Insurers' loss
reserves actually reflect are privileged assessments of various litigation and settlement outcomes
and attorney-client communications.  The Insurers, with advice of their counsel, established the
loss reserves in anticipation of and during the existing Title III cases and related litigations to
assess the Insurers' risk and the likelihood of various litigation outcomes, not as part of any
collateral valuation.  The Insurers shared loss reserves with their regulators under statutory
provisions assuring that the information would remain confidential.  Moreover, one of Assured's
primary regulators, the Maryland Insurance Administration, has expressly asserted the bank
examiner privilege over Assured's loss reserves.  Consequently, a variety of privileges bar
disclosure of these documents, including the work product, attorney-client, and bank examiner
privileges, and the potential prejudice from disclosure far outweighs any possible evidentiary
value.

3.      FOMB asserts a need for documents revealing the Insurers' internal valuations of
the collateral underlying the PREPA bonds.  But the Insurers have already produced documents
sufficient to show the value of their collateral and its threatened diminution.  And, as FOMB
knows, the Insurers will be filing additional expert reports that will further demonstrate the threats
to collateral posed by the gross mismanagement of PREPA.

4.      Disclosure of the Loss Reserve Information would violate the core tenets of
attorney work product protection: it would give FOMB an unfair negotiation and litigation
advantage.  While the Loss Reserve Information has no relevance to the issues raised in the Lift
Stay Motion, it can be used by FOMB, PREPA and the Puerto Rico Fiscal Agency and Financial

Advisory Authority ("AAFAF")[3] to triangulate settlement ranges, since it reveals litigation counsel's assessments of various outcomes on various issues.  No litigant would ever provide, or be forced to provide, such internal analyses to their adversary.  Yet that is precisely what this motion seeks to achieve.  Movants have explained on numerous occasions that loss reserves are not valuations of collateral, but instead reflect core work product.  Thus, the Motion to Compel appears less about discovery and much more about leverage and, perhaps, retaliation for the exposure of the gross mismanagement and political interference in the Lift Stay Motion.  The Motion to Compel should be denied.[4]

## BACKGROUND

### A.    Loss Reserve Information

5.    Each of the Insurers are insurance companies that guarantee payments of principal and interest when due on bonds issued by PREPA.  *See* Rosenblum Decl. ¶ 3; Bergonzi Decl. ¶¶ 3-4; Hoffman Decl. ¶ 6.  The Insurers pay claims to insured bondholders whenever PREPA defaults on principal and/or interest payments due on PREPA bonds.  *See* Rosenblum Decl. ¶¶ 3-4; Bergonzi Decl. ¶¶ 3-4; Hoffman Decl. ¶ 6.  PREPA has not made any payments on the bonds during its Title III case.  *See* Rosenblum Decl. ¶ 4; Bergonzi Decl. ¶ 4; Hoffman Decl. ¶ 7.

6.    Loss reserves are the amounts that each Insurer sets aside to satisfy its estimated insurance obligations.  They allow each Insurer to cover future claims made against their respective policies.  Each of the Insurers has loss reserves to cover future claims on PREPA bonds and other

---

[3]    AAFAF and PREPA are not parties to the Motion to Compel but are participating in the Lift Stay Motion discovery.  In particular, in addition to the discovery served by FOMB, AAFAF also served discovery requests on the Insurers to which the Insurers produced documents in response.

[4]    The Motion to Compel does not appear to seek the production of any documents apart from Loss Reserve Information that the Insurers provided to their respective regulators.  To the extent that FOMB is seeking additional documents, such as each of the Insured's internal documents that were not submitted to regulators, the Insurers object for the same reasons that they are objecting to the production of the Loss Reserve Information:  such documents lack relevance, their production would impose an undue burden and they also are privileged.

bonds issued by Puerto Rico entities.[5]  *See* Rosenblum Decl. ¶ 7; Bergonzi Decl. ¶¶ 7-8; Hoffman Decl. ¶ 13.

7.      FOMB seeks Loss Reserve Information regarding the PREPA bonds that was sent to the Insurers' regulators, which reflects each of the Insurer's loss reserves and, in some instances, substantive and detailed presentations and other communications regarding the calculations of such loss reserves.  *See* Rosenblum Decl. ¶¶ 11-16; Bergonzi Decl. ¶¶ 20-22; Hoffman Decl. ¶¶ 24-29.  Loss Reserve Information was sent to the New York Department of Financial Services ("NYDFS") in the case of National, Syncora and Assured, and also to the Maryland Insurance Administration ("MIA") in the case of Assured.  *See* Rosenblum Decl. ¶ 18-19; Bergonzi Decl. ¶ 20-22; Hoffman Decl. ¶ 24.   While National, Syncora and Assured all share Loss Reserve Information with the same regulator, the NYDFS, they communicate separately with the NYDFS, not as a group.  *See* Rosenblum Decl. ¶¶ 20-22, 24; Bergonzi Decl. ¶¶ 20-22; Hoffman Decl. ¶ 26.

8.      The Loss Reserve Information being sought by FOMB contains information prepared in anticipation of or during the Title III cases and related pending litigations.  *See* Rosenblum Decl. ¶¶ 11-17; Bergonzi Decl. ¶¶ 9-18; Hoffman Decl. ¶¶ 13, 18, 20.  Although loss reserves and related material can be prepared outside of litigation, here, the Loss Reserve Information reflects assessments of potential litigation and settlement outcomes regarding PREPA as well as other Title III litigations and disputes.  *See* Rosenblum Decl. ¶¶ 11-17; Bergonzi Decl. ¶¶ 9-18; Hoffman Decl. ¶¶ 13, 18, 20.  Each of the Insurers' assessment of these outcomes is based on the advice of counsel regarding the strength of their legal positions and prospects for achieving certain potential settlements and litigation outcomes.  *See* Rosenblum Decl. ¶¶ 11-17; Bergonzi

---

[5]   The Loss Reserve Information sought by FOMB contains information unrelated to PREPA. Irrespective of the Court's ultimate decision on the Motion to Compel, the Insurers do not waive the right to redact information unrelated to PREPA that is not responsive to FOMB's requests.

Decl. ¶¶ 9-18; Hoffman Decl. ¶¶ 13, 18, 20, 28. The Loss Reserve Information reflects subjective legal advice regarding (i) the strength of Insurers' litigation positions, and (ii) prospects for achieving various litigation outcomes or settlements with PREPA based on such legal positions, prior efforts to reach settlement, and the status of any current and ongoing settlement discussions. *See* Rosenblum Decl. ¶¶ 11-17; Bergonzi Decl. ¶¶ 9-18; Hoffman Decl. ¶¶ 18, 21.

9.      Given that the Loss Reserve Information contains assessments of potential litigation and settlement outcomes, disclosure of the Loss Reserve Information to FOMB would be extremely harmful and prejudicial to the Insurers. *See* Rosenblum Decl. ¶¶ 11-12, 17, 25; Bergonzi Decl. ¶¶ 17, 26; Hoffman Decl. ¶¶ 23, 29. The Loss Reserve Information is proprietary and highly sensitive commercial and financial information of each of the Insurers. *See* Rosenblum Decl. ¶¶ 10, 17, 25; Bergonzi Decl. ¶ 10; Hoffman Decl. ¶¶ 28, 29. Moreover, disclosure of potential litigation and settlement outcomes would cause substantial injury to the Insurers by revealing their litigation and settlement assessments to adverse parties. *See* Rosenblum Decl. ¶¶ 17, 20, 25; Bergonzi Decl. ¶¶ 17, 26; Hoffman Decl. ¶¶ 12, 23.

10.      The Loss Reserve Information that the Insurers provided to their regulators does not contain valuations of the collateral securing the PREPA bonds or reflect any valuation of PREPA's actual or expected future revenues. *See* Rosenblum Decl. ¶¶ 11-16; Bergonzi Decl. ¶¶ 6, 9-19; Hoffman Decl. ¶¶ 12, 14-15, 22.[6] Each of the Insurer's respective methodology for calculating loss reserves is not based in any way upon any valuation or quantification of the collateral securing the PREPA bonds. *See* Rosenblum Decl. ¶¶ 11-16; Bergonzi Decl. ¶¶ 6, 9-19; Hoffman Decl. ¶¶ 12, 14-15, 22. Collateral valuations could not be extracted from the Loss

---

[6]    As loss reserves are the amounts that each Insurer sets aside to satisfy its estimated insurance obligations under different legal risk scenarios (*see* Rosenblum Decl. ¶¶ 8-16; Bergonzi Decl. ¶¶ 3, 7-9; Hoffman Decl. ¶¶ 12, 13), FOMB's request for estimates of payment to be made to policyholders (Mot. to Compel ¶ 12) are just requests for the Insurers' loss reserves in another guise.

Reserve Information.  The reason is simple—the loss reserves here do not calculate collateral value or use collateral value as an input.  *See* Rosenblum Decl. ¶¶ 11, 16; Bergonzi Decl. ¶ 19; Hoffman Decl. ¶¶ 12, 14-15, 22.

**B.**     **The Lift Stay Motion**

11.     As collateral for the bonds that it issued, PREPA pledged its revenues and made covenants that constitute property interests entitled to protection in and outside of bankruptcy. Congress expressly preserved and protected the liens held by PREPA's bondholders under the Bankruptcy Code's special revenue provisions incorporated into PROMESA.  The Insurers and other PREPA bondholders therefore have a continuing lien on PREPA's current and future pledged revenues.

12.     On July 2, 2017, PREPA filed its Title III case.  On July 18, 2017, the Insurers and other PREPA bondholders moved to lift the automatic stay to commence an action against PREPA for the appointment of a receiver.  *See* ECF No. 74.

13.     On September 14, 2017, the Court denied the original lift stay motion finding that "Section 305 [of PROMESA] prohibits this Title III court from transferring control of PREPA's management and property to a receiver without the Oversight Board's consent."  *See* ECF No. 299 at 12.  The Insurers and other bondholders appealed the Court's Order.  On August 8, 2018, the First Circuit vacated the Court's Order and remanded for further proceedings.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 24 (1st Cir. 2018).  In particular, the First Circuit found that Section 305 does not prohibit the Title III Court "from lifting the stay when the facts establish a creditor's entitlement to the appointment of a receiver in a different court in order to protect a creditor's collateral should that protection otherwise be necessary and appropriate." *Id.* at 21. The First Circuit discussed the importance of assessing "the pre-petition value of the

bondholders' collateral (if any)" and "whether the bondholders face a threat of uncompensated diminution in such value." *Id.*

14.    In accordance with the First Circuit's decision, on October 3, 2018, the Insurers filed the renewed Lift Stay Motion. *See* ECF No. 975.  The Lift Stay Motion again seeks the stay to be lifted in order to commence an action to appoint a receiver due to the mismanagement and improper political interference at PREPA that is impairing the PREPA collateral. *Id.* at 25, 32-35.

15.    As set forth in the Lift Stay Motion, a receiver would be free from political influence and would have proven expertise in managing public utilities. *Id.* at 2-3.  Since the filing of PREPA's Title III case, the obvious mismanagement and politicalization at PREPA clearly has increased. *Id.* at 9-14.  PREPA's mismanagement and politicalization puts the Insurers' interests at risk. *Id.* at 32-35.

16.    A receiver would benefit all stakeholders in PREPA, including the people of Puerto Rico. *Id.* at 34-35; ECF No. 975-1 ¶¶ 115-119.  A receiver would not interfere with any functions of FOMB, which is and would remain PREPA's representative in the Title III case. *See* ECF No. 975 at 4, 35 & Ex. 1 (Proposed Order Granting Relief From The Automatic Stay).  Under a receiver's stewardship, PREPA would remain subject to this Court's jurisdiction, just as it is now. *Id.*

**C.    Lift Stay Motion Discovery**

17.    Following the filing of the Lift Stay Motion, the parties engaged in discovery. FOMB and AAFAF issued substantial document requests on each of the Insurers.  In response to these document requests, Assured produced over 21,000 pages of documents, National produced over 11,000 pages of documents and Syncora produced over 6,700 pages of documents.

18.    FOMB's document requests on the Insurers included requests for (i) documents reflecting the value of the Insurers' collateral, (ii) documents concerning the Insurers' diminishing

collateral, and (iii) estimates of amounts Insurers expect to pay on PREPA bond insurance claims. *See* Mot. to Compel ¶ 12.  The Insurers produced documents in response to these requests, including their respective financial statements, bond resolutions, bond offering documents, underwriting files and other documents reflecting the collateral securing the PREPA bonds.  The Insurers objected to producing Loss Reserve Information.

19.     The Insurers did, however, produce documents reflecting PREPA revenues, which have been pledged to bondholders as collateral for PREPA's debt.  Unfortunately, this task has been complicated by AAFAF's failure to issue audited financial statements for FY2015, FY2016 and FY2017 for Commonwealth entities, including PREPA, despite repeated requests by FOMB to do so.  *See* ECF No. 975-1 ¶¶ 12, 60; May 1, 2018 Notice of Violation, attached as Exhibit 1; Jan. 9, 2019 FOMB Letter, attached as Exhibit 2.  PREPA also has withheld certain information on the basis of various purported privileges, including the deliberative process privilege. *See* PREPA's Categorical Privilege Log of Materials Redacted or Withheld From Production of Documents in Response to Document Requests Related to the Motion to Lift Stay (Feb. 1, 2019), attached as Exhibit 3.[7]

20.     Nonetheless, directly answering FOMB's request for documents relating to diminishing collateral, the Insurers produced extensive public reports, materials reviewed by their expert concerning mismanagement, media accounts, and other documents reflecting PREPA's mismanagement that has hindered its revenues and thereby affected the value of PREPA's collateral.  Indeed, FOMB admits that the Insurers produced a multitude of documents concerning mismanagement, which speaks directly to the diminution of collateral, and FOMB does not

---

[7]     Although the Insurers did not file a motion to compel these documents in connection with the Lift Stay Motion, the Insurers do not agree with various assertions of privilege by PREPA as well as AAFAF, and reserve any and all rights regarding these assertions of purported privilege on such information.

challenge the sufficiency of such production.  *See* Mot. at 6, n.9.  The Insurers also produced bond

offering documents that clearly state the par value of the bonds.  The Insurers each filed detailed

proofs of claim setting forth payments that each Insurer made as a result of defaults on PREPA

bonds and future contingent obligations in the event that PREPA continues to default on insured

bonds.

21.    Additionally, pursuant to the stipulated scheduling order entered by the Court for

the Lift Stay Motion, on February 25, 2019, the Insurers will file additional expert reports (ECF

No. 1064 ¶ 1(i)) and such reports will further address collateral valuation.  In connection with

those reports, the Insurers' experts will produce any documents that they considered in preparing

such reports.

22.    The Insurers have, however, rightly declined to produce confidential Loss Reserve

Information because that information reflects legal advice on potential settlement ranges, strength

of legal positions, and likelihood of litigation or settlement outcomes.  This Motion to Compel

ensued as a result.

23.    One of the primary regulators that receives Loss Reserve Information has, itself,

objected to the disclosure of this information to FOMB.  By letter dated February 6, 2019, the MIA

advised Assured that it objected to the disclosure of the Loss Reserve Information that was

submitted to the MIA in connection with the Administration's examination and regulatory

oversight of Assured.  *See* Rosenblum Decl., Ex. A at 3.  The MIA asserted all applicable

privileges, including those akin to a bank examination privilege and expressed concern about how

disclosure would negatively impact the important policy of "assuring the flow of sensitive, confidential and proprietary information between insurers and the Administration." *Id.* at 2.[8]

24.     FOMB's attempt to compel disclosure of this Loss Reserve Information is a stark reversal of FOMB's earlier position.  Following multiple meet and confers, in a November 30, 2018 letter, attached as Exhibit 4, FOMB disclaimed that they were seeking Loss Reserve Information by stating "that is not the case." *Id.* at 2.  In a December 13, 2018 letter, attached as Exhibit 5, FOMB reiterated its position by stating that it does "not dispute [the Insurers'] assertion of privilege over the advice of counsel regarding the likely outcomes of any particularized litigation or settlement discussions." *Id.* at 3.  In a December 21, 2018 letter, attached as Exhibit 6, FOMB again did not contest the Insurers' objections to producing Loss Reserve Information by stating (and these are their words): "[The Insurers] now agree to search for and provide non-privileged documents responsive to both requests, but will *explicitly exclude documents concerning loss reserves and privileged assessments of likely litigation outcomes. . . .* If our understanding is correct, then ***this is acceptable to us*** *. . . ."  Id.* at 4 (emphasis added).

25.     In a January 11, 2019 letter, FOMB reversed course and disavowed the parties' previous agreement regarding Loss Reserve Information.  *See* Mot. to Compel, Ex. C.  FOMB claimed that its prior agreement was based on the Insurers' representation that "loss reserve analyses are, among other things, privileged and are *not* based upon any valuation of PREPA, its revenues or any other collateral, but rather upon irrelevant factors that include privileged assessments of probable litigation outcomes (including the pending Title III cases and related disputes) and ongoing settlement and mediation discussions." *Id.* at 4 (emphasis in original).

---

[8]   The Insurers have asked NYDFS, as the MIA has done, to object to the Insurers having to produce the Loss Reserve Information at issue here.  Thus far, NYDFS has determined not to intervene in this dispute at this time.

However, that representation remains true—the Insurers' Loss Reserve Information is not based upon any valuation of PREPA, its revenues, or any other collateral securing the PREPA bonds. *See* Rosenblum Decl. ¶¶ 11, 16; Bergonzi Decl. ¶¶ 6, 9-19; Hoffman Decl. ¶¶ 12, 14-15, 22. FOMB also took the position that disclosure of Loss Reserve Information to the Insurers' regulators constituted a waiver of any such privilege. *See* Mot. to Compel, Ex. C at 4-6.

## ARGUMENT

26.     Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that the scope of discovery includes relevant and non-privileged matter "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1); *Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, n.5 (1st Cir. 2005); *Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*, 937 F. Supp. 2d 202, 204-205 (D.P.R. 2012), *aff'd*, 802 F.3d 99 (1st Cir. 2015).  The Loss Reserve Information requested does not pass the relevancy test and, in any event, production would be disproportionally burdensome on Insurers by disclosing their settlement and litigation risk analyses.  The Loss Reserve Information is also shielded from disclosure by multiple privileges.

27.     FOMB's Motion to Compel reads as if it were a substantive opposition to the Lift Stay Motion, contesting the merits arguments in the Insurers' Lift Stay Motion with a brazen claim in this limited discovery motion that "the value of [the Insurers'] collateral is zero, remains zero, and cannot, as a matter of law, be diminishing."  Mot. to Compel ¶ 3.  The Motion to Compel is not a motion on the merits of the Lift Stay Motion.  It is a discovery motion—plain and simple. The Insurers reserve the right to more fully brief the merits issues at the appropriate time, but for

the avoidance of doubt, FOMB's claim is false and should not distract this Court from the limited

discovery issue before it.[9]

A.     **The Loss Reserve Information Is Irrelevant To The Lift Stay Motion And
       Producing The Loss Reserve Information Would Impose A Disproportionate
       Burden On The Insurers**

28.     The Loss Reserve Information is irrelevant to the Lift Stay Motion because FOMB

fundamentally misapprehends what this information contains or can provide.  Consequently,

FOMB asks this Court to compel production of documents that offer entirely different information

than FOMB purports to seek.  In other words, the information that FOMB repeatedly claims to

seek does not exist in the Loss Reserve Information.

29.     FOMB assumes that loss and collateral value are inversely related as a matter of

"basic math":  "Loss equals payout [to insureds] minus collateral."  *See* Mot. to Compel at 11 n.10.

Because collateral value in this analysis is inversely proportional to loss—loss increases as

collateral value decreases—FOMB presumes that loss reserves must depend on a valuation of

collateral.

---

[9]     FOMB's premature merits argument disregards that in the context of the DIP motion, the prior lift stay
motion and other papers, the Insurers consistently argued that the collateral includes PREPA's revenues,
which are clearly not "zero." *See, e.g.*, ECF No. 177 at 4-7; ECF No. 585 at 23; ECF No. 652 at 1-3.  On
that point, FOMB conceded in at least three separate filings before this Court that the Trust Agreement is
clear on that issue.  In FOMB's statement filed on the first day of PREPA's Title III case, FOMB stated,
"All the Bonds were issued under the 1974 Trust Agreement (as amended), and have the same priority, lien
and collateral structure, ***secured by a lien on all of PREPA's revenues***."  ECF No. 2 at 3 ¶ 6 (emphasis
added).  And even in the context of the DIP motion, FOMB and AAFAF both conceded that PREPA's
bondholders have a security interest in ***all*** of PREPA's revenues.  *See* ECF No. 549 at 2 (noting that under
the Trust Agreement, "the Debtor issued certain bonds . . . ***secured by a lien on all the Debtor's
'Revenues'***"); ECF No. 617 ¶ 23 ("As explained in the Postpetition Financing Motion, the holders of Power
Revenue Bonds have a security interest in Revenues.").  Moreover, FOMB's baseless assertion that the
collateral is worth zero ignores the adversary complaint filed by Insurers, which specifically alleged facts
demonstrating that, based on FOMB's own fiscal plan, even after payment of Current Expenses, there were
sufficient revenues remaining to pay debt service on PREPA's bonds.  *See* Adv. Proc. No. 17-00232-LTS,
ECF No. 1 ¶¶ 75-77 (alleging that even after payment of all operating expenses included in PREPA's fiscal
plan, at least $754 million of revenues would be available to fund debt service).  Finally, the Insurers have
maintained throughout the Title III cases that their lien attaches to all of PREPA's revenues and, in any
event, that PREPA had net revenues on the petition date.  *Id.*; ECF No. 975 at 26-31.

30.     But, in reality, none of the Insurers uses FOMB's "basic math" to calculate their loss reserves. *See* Rosenblum Decl. ¶¶ 9-10, 11-16; Bergonzi Decl. ¶¶ 6, 9-19; Hoffman Decl. ¶¶ 13, 16.  Instead, the Insurers work with their attorneys to assess ***litigation risk*** and outcomes, then use those assessments to calculate the ***probability*** of their recovery in connection with such litigations.  Representatives of each of the Insurers have submitted declarations demonstrating that their loss reserve calculations are not collateral valuations, but rather, estimations based on various litigation and settlement outcome risk assessments, and are therefore not responsive to FOMB's requests.  *See* Rosenblum Decl. ¶¶ 11-15; Bergonzi Decl. ¶¶ 6, 9-19; Hoffman Decl. ¶¶ 9, 13, 18, 19.  Such litigation scenarios and their probability assessments are simply not the valuation documents FOMB has requested.  As previously noted, a key driver of loss reserves is the assessment of litigation risk, which has no role in FOMB's equation and which is and should be privileged.  Because the Insurers' reserves fundamentally are not an arithmetic exercise involving collateral value, the reserve numbers cannot be used to back out a collateral valuation.[10]

31.     Moreover, FOMB—as representative of PREPA—should have far more up-to-date and detailed information about the collateral, including PREPA's revenues, than do the Insurers.  For years, PREPA has been unable or unwilling to issue audited financial statements.  *See* ECF No. 975-1 ¶ 12, 60; Exs. 1, 2.  In response to the Insurers' discovery requests, PREPA has consistently referred the Insurers to and produced publicly available reports concerning PREPA's financial condition, revenues and expenses.  PREPA also has withheld certain information on the basis of various purported privileges, including the deliberative process privilege, but shared such

---

[10]    FOMB's demand for loss reserves as a means of estimating future payments on the bonds is equally improper when such reserves are based upon litigation risk scenarios and potential and actual settlement positions.  In any event, the Insurers have produced documents showing the insured par value and filed proofs of claims setting forth payments that each Insurer has made as a result of defaults on PREPA bonds and each Insurers' future contingent obligations in the event that PREPA continues to default.

information with FOMB.  *See* Ex. 3.  Thus, FOMB does not need the Insurers' sensitive Loss

Reserve Information to understand or value PREPA's own revenues that have been pledged as

collateral to bondholders because FOMB has far more detailed financial information than do the

Insurers.  This Court should not permit FOMB to improperly redefine the Insurers' loss reserves

as a way to determine the value of PREPA's own revenues.

32.     In addition to producing available financial data, the Insurers have also produced

voluminous evidence showing that PREPA has been grossly mismanaged.  And mismanagement

bears directly on PREPA's revenues.  Whether it is deferring maintenance of a leaky roof, using

pledged revenues to fund subordinate capital improvements, or mismanaging the revenue stream

of a public utility, qualitative threats to collateral constitute lack of adequate protection.[11]  As

FOMB admits, the Insurers have produced mismanagement-related documents.

33.     The Insurers, in short, have already produced non-privileged documents sufficient

to show the value of their collateral with regard to the PREPA bonds as of July 2, 2017 to the

present.  In fact, the Insurers have produced ***all*** readily available non-privileged documents located

in their possession or control showing the value of their collateral.  The Insurers will soon file

expert reports that further address collateral valuation.

34.     If FOMB obtains the Loss Reserve Information, it will not be fodder for evidence

to use in the hearing on the Lift Stay Motion.  Rather, it will become leverage in settlement,

---

[11]   Cases cited by FOMB demonstrate that a quantification of the collateral's diminution in value is not
necessary when there is a threat to the collateral.  For instance, in *In re Elmira Litho, Inc.*, 174 B.R. 892
(Bankr. S.D.N.Y. 1994), the bankruptcy court stated "without quantifying the decline in value, the creditor
can often establish its *prima facie* case by demonstrating that the debtor has completely failed, or
substantially failed, to make post-petition payments."  *Id*. at 903; *see also In re Balco Equities Ltd.*, 312
B.R. 734, 751 (Bankr. S.D.N.Y. 2004) (even where the creditor likely had equity cushion, the creditor
lacked adequate protection because the debtor failed to make post-petition payments or to maintain the
collateral in good condition).

compromise or restructuring support agreement ("RSA") negotiations, to gain access to the Insurers' internal and privileged assessments of potential litigation and settlement outcomes.

35.     In sum, the Loss Reserve Information does not address any of the categories of document requests identified in the Motion to Compel, to which the Insurers have already responded and provided documents.  FOMB posits a number of hypothetical documents that could exist relating to the valuation of collateral, *i.e.*, FOMB states that the Insurers may have been "assuring the regulators that they will not have to pay much out of their pockets on their guaranty liability because the collateral is so valuable."  Mot. to Compel ¶ 29; *see also id.* ¶ 13.  These types of hypothetical wish lists do not change the simple and confirmed fact—the Insurers have no further documents to produce concerning the PREPA collateral.  The production of Loss Reserve Information would not give FOMB what it is seeking through this motion—rather, production would serve only to burden Insurers in any PREPA-related settlement and mediation discussions. *See* Rosenblum Decl. ¶¶ 11, 17, 25; Bergonzi Decl. ¶¶ 17, 26; Hoffman Decl. ¶ 23.  The Insurers have already produced their relevant documents, and repeatedly assured FOMB through meet and confer discussions that responsive collateral valuation, collateral diminution, and estimated payments documents were ***not*** withheld from production.  All the while, Insurers frequently reiterated that the Loss Reserve Information is privileged, contains litigation risk assessments, and is not responsive to the document requests at issue here.  While FOMB may feign surprise at the purported lack of additional documents, there are no further documents and the documents they seek are simply not relevant to show collateral value.  Moreover, the Insurers have produced documents regarding PREPA's mismanagement and such documents demonstrate the diminishment of PREPA's collateral.  To that end, their Motion to Compel falls flat.

36.     In addition to the lack of any relevance of the Loss Reserve Information, the Court must also consider the negative burden and impact on settlement, mediation and litigation

processes of requiring the requested production.  "While Rule 26 contemplates liberal discovery and a broad concept of relevance, the Rule also recognizes that discovery must be proportionate to the case and issues at hand and must protect responding parties from undue burden or expense." *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-cv-2419, 2015 WL 13715296, at *1 (D. Mass. Nov. 6, 2015) (citation omitted).  "[T]he court may limit the frequency or scope of discovery upon determining" that the discovery is outside the scope of Rule 26(b)(1). *Int'l Jr. Coll. of Bus. and Tech., Inc.*, 937 F. Supp. 2d at 205.  "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. District courts have "wide discretion to limit the scope of discovery based on the rights and needs of the parties."  *Miller v. Regents of Univ. of Colo.*, No. 98-1012, 1999 WL 506520, at *12 (10th Cir. July 19, 1999) ("the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery").

37.     Here, not only is the Insurers' Loss Reserve Information irrelevant to FOMB's search for collateral valuation documents, compelling its production would substantially burden both the Insurers' business interests and the efficacy, good faith, and trust in any settlement, compromise and/or RSA negotiations.  Those processes serve the efficient administration of justice and conservation of judicial resources, and their success would benefit all parties.  Any such processes would be compromised if counsel for FOMB, PREPA and AAFAF are able to obtain the Insurers' settlement ranges, outcome assessments, and litigation probabilities accompanying and baked into Loss Reserve Information.  Producing Loss Reserve Information would not meaningfully benefit this Court or any other parties to the Lift Stay Motion, however, it would severely damage the integrity of negotiation and settlement proceedings by imposing information asymmetry.  The Court should not force Insurers to disclose Loss Reserve Information that would

-16-

likely be misconstrued (as FOMB does now) and compromise any such proceedings as a result. *United Therapeutics Corp. v. Watson Labs., Inc.*, 200 F. Supp. 3d 272, 280 (D. Mass. 2016) (denying motion to compel discovery where burden of producing confidential documents outweighs the benefit where documents are of limited relevance); *Franco v. Yale Univ.*, No. 03-7060, 80 F. Appx. 707, 710 (2d Cir. 2003) (district court properly denied motion to compel the production of documents where moving party's theories were vague and failed to articulate the relevance of the documents sought).

38.     The Loss Reserve Information, if produced, would not aid the litigation process and could become impediments to the negotiation process, especially because FOMB and PREPA could wrongly assume reserves set a range of desired recovery. *Union Carbide v. Travelers Indemn*. Co., 61 F.R.D. 411, 413 (W.D. Pa. 1973) (finding that "we do not believe that the proper end of discovery—expedition of the litigation either by narrowing the area of controversy or by avoiding unnecessary testimony or by providing a lead to evidence—will be served by allowing discovery of the reserves in question" and describing the nature of reserves as "contingent" and "uncertain"); *see also Fed. Realty Inv. Trust v. Pac. Ins. Co*., 760 F. Supp. 533, 540 (D. Md. 1991) (finding that "[r]eserve decisions are mere guesses at the outcome of litigation based on conservative accounting principles" and holding that loss reserve evidence was not admissible at trial because "the probative value of [the loss reserve] predictions, if any, is substantially outweighed by its prejudicial aspects").

**B.     The Loss Reserve Information Is Protected By The Work Product Doctrine**

39.     The Loss Reserve Information should be shielded from disclosure for the independent reason that it is protected by the work product privilege.  The work product privilege protects "work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party."  *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 66 (1st Cir. 2002); *CH*

*Properties, Inc. v. First Am. Title Ins. Co.*, 48 F. Supp. 3d 143, 149-150 (D.P.R. 2014).  The

doctrine "protects (1) documents and tangible things; (2) prepared in anticipation of litigation or

for trial; (3) by or for another party or by or for that other party's representative, protecting the

mental impressions, conclusions, or legal theories of a party's attorney concerning the litigation."

*Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*, 212 F. Supp. 3d 312, 368 (D.P.R. 2016).  Courts

have found that a bankruptcy filing can be considered to be litigation for the purposes of the work

product doctrine.  *In re Quigley Co.,* Case No. 04-15739, 2009 Bankr. LEXIS 1352, at *21 (Bankr.

S.D.N.Y. Apr. 24, 2009); *see also In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex. 2012).

40.    The work product doctrine applies to loss reserve calculations prepared in

anticipation of or during litigation.  *United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998)

(the work product doctrine applies if a company's attorneys "estimate[e] the likelihood of success

in litigation and an accompanying analysis of the company's legal strategies and options to assist

it in estimating what should be reserved for litigation losses."); *Schreib v. Am. Family Mut. Ins.

Co.*, 304 F.R.D. 282, 285 (W.D. Wash. 2014) ("reserve information that was created in anticipation

of litigation is protected by the work product doctrine."); *Progressive Cas. Ins. Co. v. F.D.I.C.*,

298 F.R.D. 417, 426 (N.D. Iowa 2014) (finding work product doctrine applicable to loss reserves

when litigation was reasonably foreseeable); *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325,

331–34 (N.D. W.Va. 2006) (finding that "all documents concerning loss reserves . . . are protected

by the work-product doctrine and are not discoverable").

41.    The Insurers' Loss Reserve Information is protected by the work product doctrine

because the loss reserves were prepared in connection with litigation in the ongoing Title III cases,

including PREPA's Title III case and Lift Stay Motion.  The loss reserves are prepared by

consulting the Insurers' attorneys and reflect legal assessments and risks, possible litigation

outcomes, potential settlements, and other confidential work product of counsel.  *See* Rosenblum

Decl. ¶¶ 11-17, 25; Bergonzi Decl. ¶¶ 9-18; Hoffman Decl. ¶¶ 18, 19, 23, 28.  The loss reserves

are based upon "assessment[s] of the merits and value of the underlying" Title III cases, and thus

fall squarely within the work product doctrine.  *Lawrence E. Jaffe Pension Plan v. Household Int'l,*

*Inc.*, 237 F.R.D. 176, 185 (N.D. Ill. 2006).[12]

42.     Citing the First Circuit's decision in *United States v. Textron Inc. & Subsidiaries*,

577 F.3d 21, 26-27 (1st Cir. 2009), a case that did not involve any pending or threatened litigation,

FOMB argues that loss reserve calculations are not protected by the work product privilege

because they are financial calculations prepared in the ordinary course of business and/or pursuant

to regulatory requirements.  *See* Mot. to Compel ¶ 36.[13]  However, as courts in the District of

Puerto Rico have recognized since *Textron*, documents created with the dual purpose of business

operations ***and*** litigation are entitled to work product protection so long as they were created in

anticipation of litigation.  *W Holding Co. v. Chartis Ins. Co. of Puerto Rico*, 300 F.R.D. 48, 50

(D.P.R. 2014) ("Litigation does not need to be the primary purpose for which the document was

created; the document simply has to be prepared *because of* litigation or the prospect of litigation.")

---

[12]   As set forth above, FOMB appears to seek only documents provided to regulators, not other documents,
such as the Insurers' internal documents.  *See* n.4, *supra*.  If FOMB was seeking such internal documents
regarding loss reserves all such documents would be protected by the work product doctrine for the same
reasons that the Loss Reserve Information is protected.

[13]   This argument overstates the holding of *Textron* and grossly mischaracterizes the content of the Loss
Reserve Information at issue.  Unlike the tax reserves in *Textron*, which were prepared for a business
purpose and well before any threatened, much less pending litigation (577 F.3d at 27), the Loss Reserve
Information here reflects core privileged assessments of ongoing litigation outcomes and settlement
probabilities in these Title III cases.  Disclosure of the Loss Reserves Information therefore will undermine
the very purposes of the work product doctrine by giving an adversary the ability to intrude on litigation
and settlement strategies and assessments, to gain an unfair advantage and to undermine any PREPA-related
settlement, compromise or RSA discussions.  Nor does *Textron* stand for the proposition that ongoing
litigation and settlement assessments should suddenly lose work production protection merely because the
work product materials were incorporated into a confidential regulatory document.  Indeed, if the same
information appeared in an internal memorandum in any of the Insurers' files, no one would seriously
question that it would qualify for work product protection under *Textron*.  Moreover, *Textron* is inapplicable
here because it focused on the policy interests of providing the IRS with resources to enforce its own
regulatory regime.  *See id.* at 25, 31.  Finally, the documents in *Textron* were not prepared with a dual
purpose of both conducting ordinary business and in preparation for litigation.  *Id.* at 31.

(emphasis in original); *Mullins v. Dep't of Labor of Puerto Rico*, 269 F.R.D. 172, 175 (D.P.R. 2010) (rejecting the notion that litigation must be the "primary" purpose of a document because that "implies that documents prepared with a dual purpose of litigation and business do not fall within the protective scope of the Rule."); *Westernbank Puerto Rico v. Kachkar*, Civil No. 07-1606, 2009 WL 530131, at *4 (D.P.R. Feb. 9, 2009); *see also Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*, No. 04 Civ. 4309, 2006 WL 278131, at *1 (S.D.N.Y. Feb. 2, 2006).

43.     It is essential to grasp the indisputable dual nature of loss reserves calculations made during pending litigation.  As the court recognized in *Schreib v. American Family Mutual Ins. Co.*, 304 F.R.D. 282 (W.D. Wash. 2014):

> [I]n the context of pending litigation, "the purpose for setting the loss reserves [goes] beyond its ordinary course of investigating and handling claims and [is] a financial evaluation of the claim from the standpoint of pending or anticipated litigation." *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 332 (N.D. W. Va. 2006); *see also* [*Lexington Ins. Co. v. Swanson*, 240 F.R.D. 662 at 668, (W.D. Wash. 2007)] (noting that an insurer's reserve information may represent "individual case reserves calculated by its attorneys") (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987)). . . . Individual loss reserve documents created once an insurer anticipates litigation are not "created in [a] substantially similar form" to those created in the absence of impending litigation. *See* [*United States v. Richey*, 632 F.3d 559 at 568 (9th Cir. 2011)]. **The difference occurs because, once litigation is anticipated, loss reserve documents by definition reflect the mental impressions, thoughts, and conclusions of attorneys or employees evaluating the merits and risk of a legal claim.**

*Id.* at 286 (emphasis added).

44.     The rationale of these cases, which also involved litigation, are equally applicable here.  The Loss Reserve Information was created with the dual purpose of assessing the Title III cases and related litigations and complying with the Insurers' obligations to calculate reserves or provide information to their regulators, with the involvement of legal advice obviously present

-20-

during the pendency of the litigation.  *See* Rosenblum Decl. ¶¶ 11-16, 25; Bergonzi Decl. ¶¶ 6, 9-18; Hoffman Decl. ¶ 28.  The fact that the Insurers would have created Loss Reserve Information absent PREPA's Title III case and other Title III cases does not change the outcome.  Here, there is no question that the Loss Reserve Information being sought by FOMB was prepared during litigation and specifically reflected attorney evaluations of legal, litigation and settlement scenarios that would not have existed absent the litigation context.  *See* Rosenblum Decl. ¶¶ 11, 17, 25; Bergonzi Decl. ¶¶ 6, 9-18; Hoffman Decl. ¶ 21, 23.  FOMB should not be permitted to penetrate these strategic calculations containing risk assessments and litigation and settlement scenarios relating to PREPA's Title III case and other Title III cases.  To allow such intrusion would contradict the fundamental purpose of the work product doctrine.  *W. Holding Co*., 300 F.R.D. at 50 ("[t]he rule is intended to safeguard the adversarial process by protecting a lawyer's mental impressions, legal analysis, and conclusions from discovery by the opponent.").[14]

**C.**     **The Loss Reserve Information Is Protected By The Attorney-Client Privilege**

45.     The attorney-client privilege protects documents and correspondence underlying and accompanying the loss reserve materials that attorneys generated and provided in connection with the Insurers' business.  *See generally Rivera v. Kmart Corp.*, 190 F.R.D. 298, 301-302 (D.P.R. 2000).  The privilege extends to "documents prepared based upon the substance of counsel's opinion or advice . . . [and] reports of attorney-client communications," including when they "contain privileged attorney-client communications that appear to be so inextricably intertwined with the rest of the text that they cannot be separated."  *Resolution Tr. Corp. v. Diamond*, 773 F. Supp. 597, 601 (S.D.N.Y. 1991).  In the course of privileged communications, the presence of

---

[14]     FOMB's reliance upon *In Re Grand Jury Subpoena No. 2013R00691-009,* 201 F. Supp. 3d 768 (W.D.N.C. 2016), is misplaced.  There, unlike here, there was "no evidence whatsoever that the subject real estate closing files or other related documents were prepared while Movant faced actual or potential claims."  *Id*. at 776.

business or commercial issues in the legal advice does not defeat the underlying privilege. *See In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, 253 (S.D.N.Y. 2002) (finding that when "a request to counsel was sent simultaneously to non-legal personnel should not by itself dictate the conclusion that the document was not prepared for the purpose of obtaining legal advice.").

46.     The Insurers' loss reserve documents reflect the substance of opinion and advice from the Insurers' counsel (*see* Rosenblum Decl. ¶¶ 11-17, 25; Bergonzi Decl. ¶¶ 9-18; Hoffman Decl. ¶ 19, 23, 28) and remain protected by the attorney-client privilege.  Thus, the attorney-client privilege protects all of the Insurers' internal documents regarding loss reserves to the extent that FOMB is seeking such documents through this Motion to Compel.  *See* n.4, *supra*.  Those legal opinions and advice are also inextricably linked to the Loss Reserve Information, which was only shared with regulators under the statutory assurances of confidentiality and the understood protection of the bank examination privilege.  That privilege continues to apply with full force here, where the substance of Insurers' counsel's privileged communications with the Insurers should not be disclosed.

**D.    The Loss Reserve Information Provided To The Regulators Is Protected By The Bank Examiner Privilege and Confidentiality Statutes**

47.     The bank examiner privilege protects bank examiner reports and communications against disclosure.  *See In re Citigroup Bond Litig.*, No. 08 Civ. 9522, 2011 WL 8210671, at *1 (S.D.N.Y. Dec. 5, 2011); *In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d 630, 633 (D.C. Cir. 1992).  The privilege protects a critical "flow of communication between the bank and the regulatory agency." *In re Subpoena*, 967 F.2d at 634.  That necessary flow of information would not be possible "if communications between the bank and its regulators were not privileged." *Id*.  Therefore, bank examination reports,

related communications, and agency reports are not subject to discovery unless a court determines

that the documents are necessary to promote the interests of justice.  *See id*. at 635-636.[15]

48.     Appropriately, FOMB concedes that the bank examiner privilege "has been

asserted . . . with respect to communications and information between Assured and MIA."  Mot.

to Compel ¶ 39.  In a letter to Assured, the MIA acknowledged that Assured falls within the

Administration's direct regulatory purview, and that Assured regularly shares sensitive

information and analysis.  *See* Rosenblum Decl., Ex. A.  The MIA, by its letter, specifically objects

to the disclosure of the documents sought here and asserts all privileges to do so, including the

State's statutory protection mechanisms which is "in the nature of a 'bank examination' privilege

statute."  *Id.* at 2.[16]

49.     Moreover, the Loss Reserve Information was part of the critical open flow of

information that enables effective regulation, so Loss Reserve Information and related

communications fall squarely within the type of protection covered by the bank examination

privilege.  FOMB does not and cannot assert an interest in this irrelevant or marginally relevant

disclosure so strong that it overrides the bank examination privilege.  On the contrary, FOMB has

already received thousands of responsive documents in response to their document requests.

---

[15]   FOMB alleges, incorrectly, that the bank examiner privilege only applies to documents prepared by regulatory authorities.  *See* Mot. to Compel ¶ 38.  The privilege "accords agency opinions and recommendations and banks' responses thereto protection from disclosure" to "preserve candor in communication between bankers and examiners."  *In re Bankers Trust Co*., 61 F.3d 465, 471 (6th Cir. 1995); *In re Subpoena*, 967 F.2d at 634  ("Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if *communications between the bank and its regulators were not privileged*.") (emphasis added).  The "privilege is designed to promote the effective functioning of an agency by allowing the agency and the regulated banks the opportunity to be forthright in all communications."  *In re Bankers Trust Co*., 61 F.3d at 471.

[16]   Contrary to FOMB's unsupported claim that the Loss Reserve Information is "factual information," the Loss Reserve Information contains proprietary risk assessments, business forecasts, litigation position, and other opinions and reports.  *See* Rosenblum Decl. ¶¶ 11-17, 25; Bergonzi Decl. ¶¶ 6-19; Hoffman Decl. ¶ 13.  This is not factual material.

FOMB has not articulated and cannot articulate a particularized need for Loss Reserve Information reflecting the Insurers' litigation risk assessments and settlement ranges and, as detailed earlier, FOMB's only asserted justification regarding the need for collateral valuation documents has no applicability to loss reserves.

50.    State statutes in New York express the same policy interest as the federal bank examination privilege, and those provisions extend to the Loss Reserve Information that the Insurers provided to NYDFS.  State law explicitly protects such confidential and proprietary information shared with a regulator as trade secrets, and bars the state from disclosing that information.  *See* N.Y. Pub. Off. L. § 87(2)(d).  FOMB argues that Loss Reserve Information cannot amount to trade secrets.  *See* Mot. to Compel ¶ 37.  Their reasoning is that disclosure would not harm the Insurers' positions in the market because FOMB and AAFAF "are not competitors of [the Insurers], and the information can be produced with confidentiality restrictions to the extent [the Insurers] are concerned about the effect of such disclosure among themselves or to the public." *Id*.  But that logic is circular.  If these materials require confidentiality protections to avoid damaging Insurers' positions in the marketplace, then they are by definition trade secrets, and entitled to be protected against disclosure.  In any event, FOMB ignores the obvious—the applicable protective order would still, at a minimum, permit disclosure to FOMB's counsel (ECF No. 1052 ¶¶ 4, 17) and would result in substantial interference with the Insurers' ability to meaningfully and fairly participate in confidential settlement, compromise or RSA discussions. The prejudice is obvious, both in terms of litigating these proceedings, and the Insurers' potential market positions.

E.     **The Insurers Did Not Waive Privilege By Providing The Loss Reserve
Information To Their Regulators**

51.     The Insurers did not waive privilege by disclosing their Loss Reserve Information

to their regulators.  In general, "waiver is the intentional relinquishment or abandonment of a

known right."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted).  The First

Circuit has specifically recognized that "disclosure of work-product to a third-party does not

necessarily waive the protection; only disclosing material in a way inconsistent with keeping it

from an adversary waives work product protection."  *Blattman v. Scaramellino*, 891 F.3d 1, 5 (1st

Cir. 2018) (citation omitted); *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010)

(finding that work product privilege was not waived over material shared with an independent

auditor because that third-party disclosure was not inconsistent with maintaining secrecy from

their litigation adversary); *Matrix Essentials, Inc. v. Quality King Distributors, Inc.*, No. CV90-

1070, 2006 WL 8435312, at *3 (E.D.N.Y. Jan. 12, 2006).  In the District of Massachusetts, this

Court has recognized the applicability of this waiver standard.  *Bryan Corp. v. ChemWerth*, 296

F.R.D. 31, 38-40 (D. Mass. 2013) (Dein, M.J.) (no waiver of the work product privilege when a

plaintiff disclosed materials to its agent because: (1) the agent was not an adversary of the plaintiff,

(2) the disclosure did not substantially increase an adversary's likelihood of obtaining the

materials, and (3) all of the relevant communication occurred in furtherance of a common strategy

against the defendant).  Given this standard, submissions to regulators do not waive work product

privilege when there is an expectation of confidentiality.  *Police & Fire Ret. Sys. of City of Detroit

v. SafeNet, Inc.,* No. 06 Civ. 5797, 2010 WL 935317, at *1 (S.D.N.Y. Mar. 12, 2010); *In re

Steinhardt Partners, L.P.,* 9 F.3d 230, 235 (2d Cir. 1993); *see generally Alaska Elec. Pension Fund

v. Bank of Am. Corp.*, No. 14-CV-7126, 2016 WL 6779901, at **4-5 (S.D.N.Y. Nov. 16, 2016).

52.      Here, disclosure of the Loss Reserve Information to the Insurers' regulators was
not a disclosure to a litigation adversary; nor did the disclosures increase the probability that the
Insurers' adversaries in the Lift Stay Motion would obtain the information.  Instead, the Insurers
shared the Loss Reserve Information with their regulators with the factually-supported
understanding that providing such information was protected by the bank examiner privilege as
well as applicable state statues regarding confidentiality.  *See* Rosenblum Decl. ¶¶ 20-20, 23;
Bergonzi Decl. ¶¶ 22-25; Hoffman Decl. ¶ 26.  The disclosure was fully consistent with
maintaining secrecy from litigation adversaries.  *Deloitte*, 610 F.3d at 140.[17]

53.      FOMB tries to distinguish cases such as *Chemworth* as not involving disclosures to
a state governmental agency whose records are "subject to public records requests."  Mot. to
Compel ¶ 37.  But the relevant State laws here confirm that the precise submissions at issue are
directly protected against further disclosure by the State entity and are ***not*** subject to disclosure
through "public records requests."  *See* N.Y. Pub. Off. L. § 87(2)(d); Md. Code Ann., Ins. § 2-209.
The Insurers' disclosures here did not increase any risk of disclosure to adversarial parties or the
public generally.  Loss reserve information is, by nature, highly proprietary, sensitive, and
confidential, and was shared with regulators with the legally supported expectation that its
confidentiality would be preserved.  Accordingly, the Insurers relinquished no rights and waived
no privilege in their disclosures to State regulatory authorities.[18]

---

[17]    To the extent that FOMB is seeking the Insurers' internal documents through this Motion to Compel
(*see* n.4, *supra*), no applicable privileges would have been waived on such documents because they were
not sent outside of the Insurers.

[18]    FOMB's cited cases (Mot. to Compel ¶ 37) do not support an assertion of waiver.  In *Lluberes v.
Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011), there was evidence that the document at issue
"was designed to be disclosed to third parties" and there was testimony that there was "no expectation" that
the document was to be kept confidential. *Id.* at 25.  This is not the case here.  Similarly, in *In re Raytheon
Securities Litig*., 218 F.R.D. 354 (D. Mass. 2003), the Court recognized, as the First Circuit has confirmed,
that the "pivotal question is whether disclosure of documents protected by the work product doctrine . . .

-26-

## <u>CONCLUSION</u>

The Loss Reserve Information at issue here does not constitute or relate to a valuation of the Insurers' collateral.  FOMB should not be permitted to abuse the discovery process based upon an unsupportable justification to obtain confidential, proprietary and privileged Loss Reserve Information that could be misused to obtain leverage in any settlement or compromise negotiations.  The Insurers have produced their documents responsive to FOMB's document requests and that is all FOMB is entitled to.  FOMB's Motion to Compel is without merit and should be denied.

---

substantially increases the opportunities for potential adversaries to obtain the information."  *Id*. at 360. That question, when properly answered here, does not support waiver.

-27-

Dated:  February 14, 2019
New York, New York


CASELLAS ALCOVER & BURGOS P.S.C.

By: /s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, PR 00936-4924
Telephone:  (787) 756-1400
Facsimile:  (787) 756-1401
Email:  hburgos@cabprlaw.com
            rcasellas@cabprlaw.com
            dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT
LLP

By:/s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William J. Natbony*
Ellen Halstead*
Thomas J. Curtin*
Casey J. Servais
200 Liberty Street
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 406-6666
Email:  howard.hawkins@cwt.com
            mark.ellenberg@cwt.com
            bill.natbony@cwt.com
            ellen.halstead@cwt.com
            thomas.curtin@cwt.com
            casey.servais@cwt.com

*admitted pro hac vice

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

ADSUDAR MUÑOZ GOYCO SEDA &
PÉREZ-OCHOA, PSC, P.S.C.

By: /s/ Eric Pérez-Ochoa
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    Email:    epo@amgprlaw.com

    /s/ Luis A. Oliver-Fraticelli
    Luis A. Oliver-Fraticelli
    USDC-PR NO. 209,204
    Email:    loliver@amgprlaw.com

    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Telephone:  (787) 756-9000
    Facsimile:  (787) 756-9010

*Counsel for National Public Finance
Guarantee Corporation*

WEIL, GOTSHAL & MANGES LLP

By: /s/ Robert Berezin
    Marcia Goldstein*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin*
    767 Fifth Avenue
    New York, New York 10153
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007
    Email:    marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com

* admitted *pro hac vice*

*Counsel for National Public Finance
Guarantee Corporation*

GOLDMAN ANTONETTI & CORDOVA, LLC

/s/ *Carlos A. Rodríguez-Vidal*
Carlos A. Rodríguez-Vidal
USDC-PR No. 201,213
E-mail: crodriguez-vidal@gaclaw.com

/s/ *Solymar Castillo-Morales*
Solymar Castillo-Morales
USDC-PR NO. 218,310
E-mail: scastillo@gaclaw.com

P.O. Box 70364
San Juan, PR 00936-8364
Tel.: (787) 759-4117
Fax: (787) 767-9177

*Counsel for Syncora Guarantee Inc.*

DEBEVOISE & PLIMPTON LLP

/s/ *Elie J. Worenklein*
My Chi To*
Craig A. Bruens*
Elie J. Worenklein*
919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email: mcto@debevoise.com
        cabruens@debevoise.com
        eworenklein@debevoise.com

*admitted *pro hac vice*

*Counsel for Syncora Guarantee Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the Court

using the CM/ECF System, which will send notification of such filing to all parties of record in

the captioned case.  Further, I directed that the following counsel of record be served by U.S. Mail:

Office of the United States Trustee for Region 21
Edificio Ochoa
500 Tanca Street, Suite 301
San Juan, PR 00901-1922

Gerardo Portela
Mohammad Yassin
Puerto Rico Fiscal Agency and Financial
Advisory Authority (AAFAF)
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

John J. Rapisardi, Esq.
Suzzanne Uhland, Esq.
Peter Friedman, Esq.
Nancy A. Mitchell, Esq.
Maria J. DiConza, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036

Luis C. Marini-Biaggi, Esq.
Carolina Velaz-Rivero Esq.
Maria T. Alvarez-Santos Esq.
Marini Pietrantoni Muniz, LLC
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, PR 00917

Martin J. Bienenstock, Esq.
Paul V. Possinger, Esq.
Ehud Barak, Esq.
Maja Zerjal, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299

Hermann D. Bauer, Esq.
O'Neill & Borges LLC
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

Luc A. Despins, Esq.
James Bliss, Esq.
James Worthington, Esq.
Paul Hastings LLP
200 Park Avenue
New York, New York 10166

Arturo Diaz-Angueira, Esq.
Cancio, Nadal, Rivera & Diaz, P.S.C.
403 Muñoz Rivera Ave.
San Juan (Hato Rey), PR 00918-3345

Robert Gordon, Esq.
Richard Levin, Esq.
Catherine Steege, Esq.
Jenner & Block LLP
919 Third Avenue
New York, New York 10022

Juan. J. Casillas Ayala
Diana M. Batlle-Barasorda
Alberto J. E. Añeses Negrón
Ericka C. Montull-Novoa
Casillas, Santiago & Torres LLC
El Caribe Office Building
53 Palmeras Street, Suite 1601
San Juan, PR 00901-2419

A.J. Bennazar-Zequeira
Bennazar, Garcia & Milian, C.S.P.
Edificio Union Plaza PH-A piso 18 Avenida
Ponce de Leon #416
Hato Rey, PR 00918

At New York, New York, this 14th day of February, 2019.


By: _/s/ Howard R. Hawkins, Jr._____
Howard R. Hawkins, Jr.*
* Admitted *pro hac vice*