PUBLIC VERSION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>    Debtors. | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS<br><br>**(This court filing relates only to Case No. 17 BK 4780-LTS)** |

PUBLIC VERSION :

DECLARATION OF ADAM BERGONZI
IN OPPOSITION TO MOTION TO
<u>COMPEL PRODUCTION OF LOSS RESERVES</u>

I, Adam Bergonzi, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. I am the Chief Risk Officer of National Public Finance Guarantee Corporation ("National"), a position I have held since 2010. In that role, I oversee all of National's risk and

insured portfolio management activities. These activities include, but are not limited to, the monitoring and remediation of public finance credits insured by National. In addition, I chair National's Risk Oversight Committee, am a member of MBIA Inc.'s (National's parent) Risk Oversight Committee, and serve on both companies' Loss Reserve Committees.

2. I submit this declaration in opposition to the Motion to Compel filed on February 7, 2019 by the Financial Oversight and Management Board ("FOMB"). The purpose of my declaration is to describe the nature of certain documents that National has withheld from its production on the grounds that they are not responsive to the requests made and, in any event, are protected from disclosure by attorney-client privilege, the work-product doctrine, and the bank examiner privilege, to name a few.

3. As a financial guaranty insurer, National issues insurance policies that guaranty the scheduled payment of principal and interest on bonds, notes, and similar securities in the event the issuer of the security fails to make all or a portion of any principal and/or interest payment when due. The holders of the insured security (often through a representative, such as a bond trustee or paying agent) are the beneficiaries of the National policy, since the policy protects the holders against the issuer's failure to pay. Payment by National neither satisfies nor discharges an issuer's obligation to pay.

4. Certain bonds issued by the Puerto Rico Electric Power Authority ("PREPA") are among the bonds that National insures. PREPA has not made any payments on the PREPA bonds during its Title III case. As is typical for municipal bonds, and as described more fully in the pending lift-stay motion, National's collateral for the PREPA bonds consists of a lien on PREPA's revenues, in combination with various covenants intended to ensure that PREPA produces sufficient revenues to repay the bonds over time.

5. I understand that FOMB has asked the Court to compel the production of documents that relate to National's "valuation and/or quantification of [its] security interest in PREPA's revenues."

6. For purposes of this declaration, I have reviewed the documents that National is currently withholding from its production in response to the discovery requests that are the subject of FOMB's Motion to Compel. *None* of the documents being withheld value National's collateral or security for the PREPA bonds, nor do they reflect any quantitative analysis of PREPA's actual or expected revenues. Instead, all of the documents being withheld pertain to loss reserves that National has set aside to satisfy its regulatory insurance obligations with respect to the PREPA bonds (among other Puerto Rico credits). As I describe below, these loss reserves are based not upon any valuation of National's security interest in PREPA's revenues, but rather upon National's ongoing evaluation of this Title III proceeding and its anticipated outcomes through litigation or settlement.

### National's Calculation of Loss Reserves

7. Loss reserves are funds set aside for paying anticipated claims under National's insurance policies. To calculate reserves that are sufficient in the aggregate to cover its anticipated claims, National first estimates the amounts it will have to pay to satisfy claims with respect to particular "Classified" credits—*i.e.*, credits for which a loss is expected or has occurred. All Classified credits are reviewed on a quarterly basis, and based on that review, National might adjust its reserves needed for expected losses.

8. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Those

expected losses reflect the amount of National's aggregate reserves that are attributable to its insured PREPA bonds (hereinafter, "PREPA Reserves").

9. ████████████████████████████████████████████████████████
████████████████████████████████████████████ National has undertaken these assessments during and in anticipation of litigation, based on advice from counsel regarding the strength of National's legal positions and likelihood of success, the prospects of achieving certain potential settlements with PREPA, and the status of any litigation and settlement discussions.

10. Accordingly, National considers its PREPA Reserves (and its reserves for other specific Puerto Rico credits) to be privileged, confidential, and extremely sensitive. Only *aggregate* reserve amounts (covering all Classified credits, including non-Puerto Rico credits) are reported in National's public financial statements. National does not share its loss reserve information for specific credits with the public, nor with any parties with which it has an adverse relationship.

11. Although National has reported its PREPA Reserves to New York's regulatory authorities on a confidential basis (as described in paragraphs 20-25 below), National has not disclosed to regulators the details of its projected litigation and settlement scenarios for the Title III proceeding and how those are used to calculate the PREPA Reserves. In this declaration, I describe the manner in which National calculates its PREPA Reserves, to demonstrate that these reserves are not based on any valuation or quantification of National's security interest in PREPA's revenues.

12. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

4

13.

14.

15.

16. 

17.

18.

19. At no point in the reserving process does National attempt to estimate, value, or otherwise quantify the collateral that PREPA pledged as security for the bonds—*i.e.*, PREPA's present and future revenues. Nor is any such valuation used as an input for calculating the reserves. In short, collateral valuations cannot be extracted from the PREPA Reserves.

**National's Confidential Reporting of Reserves To Its Regulator**

20. Pursuant to statutory and regulatory requirements in its home state of New York, National reports the amounts of its loss reserves to its regulator, the New York Department of Financial Services ("NYDFS"). National has made such reports to NYDFS as part of statutorily-

required examinations, as well as in response to specific NYDFS requests in connection with the department's ongoing regulatory oversight.

21. In response to FOMB's requests for production in this proceeding, National has made a diligent inquiry regarding the extent of the PREPA reserve information reported to NYDFS from January 2017 to the present. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████

22. Moreover, the reserve information that National did report to NYDFS—███████

███████████████████████—was made on a strictly confidential basis, pursuant to a law- and fact-based understanding between National and NYDFS that National's proprietary, privileged, and highly sensitive loss-reserve information would be protected from disclosure to third parties.

23. Indeed, NYDFS is bound by specific confidentiality provisions under law that would keep National's reserve information confidential. *See, e.g.*, N.Y. Ins. Law § 1504(c) ("The superintendent shall keep the contents of each report made pursuant to this article and any information obtained in connection therewith confidential and shall not make the same public without the prior written consent of the controlled insurer to which it pertains . . . ."); N.Y. Pub. Off. Law § 87(2)(d) (exempting from New York's Freedom of Information Law ("FOIL") any "trade secrets" submitted by regulated entities to NYDFS "which if disclosed would cause substantial injury to the competitive position of the subject enterprise").

24. National has reinforced its expectation of confidentiality established by these laws by typically including an express request for confidential treatment in its submissions containing loss reserves and other sensitive information to NYDFS personnel. Submissions on their face generally request confidential treatment and cite to the State provisions establishing the confidentiality expectations.

25. To the best of my knowledge, as a matter of practice, NYDFS has always honored and preserved National's expectation of confidentiality of loss reserves and other trade secrets shared in the ordinary course of regulation. The Department's consistent, reliable protection of National's most sensitive information has helped to preserve an open dialogue between National and NYDFS on matters requiring regulatory oversight, including the setting of loss reserves.

26. If National's confidential, highly sensitive reserve information were to be disclosed to other parties—including the other parties to this proceeding—the resulting harms would be serious. Construing National's reporting to NYDFS as a waiver of privilege over the amount of its loss reserves would destroy National's expectation of confidentiality over the information provided to NYDFS—thus interfering with that regulatory relationship and impairing National's transparent line of communication with regulatory authorities. Even more alarmingly for purposes of this proceeding, the disclosure of National's PREPA Reserves to FOMB would reveal privileged legal advice from National's attorneys, along with those attorneys' mental impressions and opinions regarding the strength of National's positions and the likely litigation and/or settlement outcomes of this very proceeding. Ultimately, National's reserves could be misused to infer internal settlement ranges considered or recommended by counsel—thus interfering with settlement discussions and thwarting the efforts of all involved to ensure a fair legal process in the Title III proceeding.

I declare under penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

Date: February 14, 2019
New York, New York

_____
Adam Bergonzi