# United States Court of Appeals
## For the First Circuit

---

Nos. 18-1671, 18-1746, 18-1787

AURELIUS INVESTMENT, LLC, ET AL.,
Appellants,

v.

COMMONWEALTH OF PUERTO RICO, ET AL.,
Appellees.

---

ASSURED GUARANTY CORPORATION, ET AL.,
Appellants,

v.

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, ET AL.,
Appellees.

---

UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO (UTIER),
Appellant,

v.

PUERTO RICO ELECTRIC POWER AUTHORITY, ET AL.,
Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

---

---

* Of the Southern District of New York, sitting by designation.

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

---

Theodore B. Olson, with whom Matthew D. McGill, Helgi C. Walker, Lucas C. Townsend, Lochlan F. Shelfer, Jeremy M. Christiansen, and Gibson, Dunn & Crutcher LLP were on brief, for appellants Aurelius Investment, LLC and Assured Guaranty Corporation.

Rolando Emmanuelli-Jiménez, with whom Jessica E. Méndez-Colberg, Yasmín Colón-Colón, and Bufete Emmanuelli, C.S.P. were on brief, for appellant UTIER.

Donald B. Verrilli, Jr., with whom Ginger D. Anders, Chad I. Golder, Sarah G. Boyce, Rachel G. Miller-Ziegler, Munger, Tolles & Olson LLP, Martin J. Bienenstock, Stephen L. Ratner, Timothy W. Mungovan, Mark D. Harris, Chantel L. Febus, Proskauer Rose LLP, Hermann D. Bauer, Ubaldo M. Fernández, and O'Neill & Borges LLC were on brief, for appellee The Financial Oversight and Management Board for Puerto Rico.
Walter Dellinger, Peter Friedman, John J. Rapisardi, William J. Sushon, and O'Melveny & Myers LLP on brief, for The Puerto Rico Fiscal Agency and Financial Advisory Authority.

Jeffrey B. Wall, with whom Laura E. Myron, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Joseph H. Hunt, Assistant Attorney General, Thomas G. Ward, Deputy Assistant Attorney General, Mark R. Freeman, Michael S. Raab, and Michael Shih, Attorneys, Appellate Staff, Civil Division, were on brief, for appellee the United States.

José A. Hernández-Mayoral, with whom Rafael Hernández-Colón, and Héctor Ferrer-Ríos, were on brief, as amicus curiae, for the Popular Democratic Party of Puerto Rico and its President.

Jorge Martínez-Luciano, with whom Emil Rodríguez-Escudero, M.L. & R.E. Law Firm, Aníbal Acevedo-Vilá and Law Office Aníbal Acevedo-Vilá were on brief, as amici curiae.

Luc A. Despins and Paul Hastings LLP on brief, for The Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors.

Ian Heath Gershengorn, Lindsay C. Harrison, William K. Dreher, Catherine Steege, Melissa Root, Robert Gordon, Richard Levin, A.J. Bennazar-Zequeira, and Bennazar, García, & Milián, C.S.P. on brief, for The Official Committee of Retired Employees of the Commonwealth of Puerto Rico.

-2-

Charles J. Cooper, Michael W. Kirk, Howard C. Nielson, Jr., John D. Ohlendorf, Haley N. Proctor, Cooper & Kirk, PLLC, Rafael Escalera, Carlos R. Rivera-Ortiz, Sylvia M. Arizmendi-López de Victoria, and Reichard & Escalera on brief, for Creditors-Appellees the Cofina Senior Bondholders' Coalition.

Manuel A. Rodríguez-Banchs, and Matthew S. Blumin, on brief, for appellee American Federal of State, County & Municipal Employees.

────────────────

February 15, 2019

────────────────

**TORRUELLA**, **Circuit Judge**.   The matter before us arises from the restructuring of Puerto Rico's public debt under the 2016 Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").   This time, however, we are not tasked with delving into the intricacies of bankruptcy proceedings.   Instead, we are required to square off with a single question of constitutional magnitude: whether members of the Financial Oversight and Management Board created by PROMESA ("Board Members") are "Officers of the United States" subject to the U.S. Constitution's Appointments Clause.   Title III of PROMESA authorizes the Board to initiate debt adjustment proceedings on behalf of the Puerto Rico government, and the Board exercised this authority in May 2017.   Appellants seek to dismiss the Title III proceedings, claiming the Board lacked authority to initiate them given that the Board Members were allegedly appointed in contravention of the Appointments Clause.

Before we can determine whether the Board Members are subject to the Appointments Clause, we must first consider two antecedent questions that need be answered in sequence, with the answer to each deciding whether we proceed to the next item of inquiry.   The first question is whether, as decided by the district court and claimed by appellees, the Territorial Clause displaces the Appointments Clause in an unincorporated territory such as

-4-

Puerto Rico.  If the answer to this first question is "no," our second area of discussion turns to determining whether the Board Members are "Officers of the United States," as only officers of the federal government fall under the purview of the Appointments Clause.  If the answer to this second question is "yes," we must then determine whether the Board Members are "principal" or "inferior" United States officers, as that classification will dictate how they must be appointed pursuant to the Appointments Clause.  But before we enter fully into these matters, it is appropriate that we take notice of the developments that led to the present appeal.

**BACKGROUND**

The centerpieces of the present appeals are two provisions of the Constitution of the United States.  The first is Article II, Section 2, Clause 2, commonly referred to as the "Appointments Clause," which establishes that:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

The second is Article IV, Section 3, Clause 2, or the "Territorial Clause," providing Congress with the "power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

### A.   Puerto Rico's Financial Crisis

The interaction between these two clauses comes into focus because of events resulting from the serious economic downfall that has ailed the Commonwealth of Puerto Rico since the turn of the 21st Century, see Center for Puerto Rican Studies, Puerto Rico in Crisis Timeline, Hunter College (2017), https://centropr.hunter.cuny.edu/sites/default/files/PDF_Publica tions/Puerto-Rico-Crisis-Timeline-2017.pdf; see generally Juan R. Torruella, Why Puerto Rico Does Not Need Further Experimentation with Its Future: A Reply to the Notion of "Territorial Federalism", 131 Harv. L. Rev. F. 65 (2018), and its Governor's declaration in the summer of 2015 that the Commonwealth was unable to meet its estimated $72 billion public debt obligation, see Michael Corkery & Mary Williams Walsh, Puerto Rico's Governor Says Island's Debts Are "Not Payable", N.Y. Times (June 28, 2015), https://www.nytimes .com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islands-debts-are-not-payable.html.  This obligation developed, in substantial part, from the triple tax-exempt bonds issued and

-6-

sold to a large variety of individual and institutional investors, not only in Puerto Rico but also throughout the United States.[1] Given the unprecedented expansiveness of the default in terms of total debt, the number of creditors affected, and the creditors' geographic diversity, it became self-evident that the Commonwealth's insolvency necessitated a national response from Congress.  Puerto Rico's default was of particular detriment to the municipal bond market where Commonwealth bonds are traded and upon which state and local governments across the United States rely to finance many of their capital projects.  See Nat'l Assoc. of Bond Lawyers, Tax-Exempt Bonds: Their Importance to the National Economy and to State and Local Governments 5 (Sept. 2012), https://www.nabl.org/portals/0/documents/NABL_White_Paper.pdf.

From 1938 until 1984, Puerto Rico was able, like all other U.S. jurisdictions, to seek the protection of Chapter 9 of the U.S. Bankruptcy Code when its municipal instrumentalities ran into financial difficulties.  See Franklin Cal. Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 345-50 (1st Cir. 2015) (Torruella, J., concurring).  But without any known or documented explanation, in 1984, Congress extirpated from the Bankruptcy Code the

---

[1] Since 1917 Congress has authorized exemption of Puerto Rico bonds from taxation by the federal, state, and municipal governments.  See An Act to provide a civil government for Porto Rico, and for other purposes, ch. 145, § 3, 39 Stat. 953 (1917).

availability of this relief for the Island.  Id. at 350.  In an
attempt to seek self-help, and amidst the Commonwealth's deepening
financial crisis, the Puerto Rico Legislature passed its own
municipal bankruptcy legislation in 2014.  See Puerto Rico Public
Corporation Debt Enforcement and Recovery Act of 2014, 2014 P.R.
Laws Act No. 71; see generally Lorraine S. McGowen, Puerto Rico
Adopts a Debt Recovery Act for Its Public Corporations, 10 Pratt's
J. Bankr. L. 453 (2014).  The Commonwealth's self-help journey,
however, was cut short by the Supreme Court in Puerto Rico v.
Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938 (2016), which
invalidated the Puerto Rico bankruptcy statute.  Coincidentally,
the Supreme Court decided Franklin Cal. on June 13, 2016 -- seven
days before the following congressional intervention into this
sequence of luckless events.

    **B.  Congress Enacts PROMESA**

        On June 30, 2016, Congress's next incursion into Puerto
Rico's economic fortunes took place in the form of Public Law 114-
187, the Puerto Rico Oversight, Management, and Economic Stability
Act (PROMESA),[2] 48 U.S.C. § 2101 et seq., which Congress found
necessary to deal with Puerto Rico's "fiscal emergency" and to

---

[2]  Since its proposed enactment this legislation has been labeled
by the acronym "PROMESA," which in the Spanish language stands for
"promise."

-8-

help mitigate the Island's "severe economic decline." <u>See</u> <u>id.</u>
§ 2194(m)(1).  Congress identified the Territorial Clause as the
source of its authority to enact this law.  <u>See</u> <u>id.</u> § 2121(b)(2).

       To implement PROMESA, Congress created the Financial
Oversight and Management Board of Puerto Rico (the "Board").
Congress charged the Board with providing independent supervision
and control over Puerto Rico's financial affairs and helping the
Island "achieve fiscal responsibility and access to the capital
markets."  <u>Id.</u> § 2121(a).  In so proceeding, Congress stipulated
that the Board was "an entity [created] within the territorial
government" of Puerto Rico, <u>id.</u> § 2121(c)(1), which "shall not be
considered to be a department, agency, establishment, or
instrumentality of the Federal Government," <u>id.</u> § 2121(c)(2), and
that it was to be funded entirely from Commonwealth resources, <u>id.</u>
§ 2127.[3]

       Although PROMESA places the Board "within" the Puerto
Rico territorial government, Section 108 of PROMESA, which is
labeled "Autonomy of Oversight Board," <u>id.</u> § 2128, precludes the
Puerto Rico Governor and Legislature from exercising any power or
authority over the so-called "territorial entity" that PROMESA

---

[3]  A new account -- under the Board's exclusive control -- was
required to be established by the Puerto Rico government within
its Treasury Department to fund Board operations.

creates.   Instead, it subordinates the Puerto Rico territorial government to the Board, as it unambiguously pronounces that:

> (a) . . . Neither the Governor nor the Legislature may --
>
>> (1) exercise any control, supervision, oversight, or review over the . . . Board or its activities; or
>>
>> (2) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of this chapter, as determined by the . . . Board.

Id. § 2128(a).

PROMESA also provides additional authority and powers to the Board with similarly unfettered discretion.  For example, Section 101(d)(1)(A) grants the Board, "in its sole discretion at such time as the . . . Board determines to be appropriate," the designation of "any territorial instrumentality as a covered territorial instrumentality that is subject to the requirements of [PROMESA]."  Id. § 2121(d)(1)(A).  Under Section 101(d)(1)(B), the Board, "in its sole discretion," may require the Governor of Puerto Rico to submit "such budgets and monthly or quarterly reports regarding a covered territorial instrumentality as the . . . Board determines to be necessary . . ." Id. § 2121(d)(1)(B). Pursuant to Section 101(d)(1)(C), the Board is allowed, "in its sole discretion," to require separate budgets and reports for covered territorial instrumentalities apart from the

-10-

Commonwealth's budget, and to require the Governor to develop said separate documents. Id. § 2121(d)(1)(C). Per Section 101(d)(1)(D), the "Board may require, in its sole discretion," that the Governor "include a covered territorial instrumentality in the applicable Territory Fiscal Plan." Id. § 2121(d)(1)(D). Further, as provided in Section 101(d)(1)(E), the Board may, "in its sole discretion," designate "a covered territorial instrumentality to be the subject of [a separate] Instrumentality Fiscal Plan." Id. § 2121(d)(1)(E). Finally, Section 101(d)(2)(A) bestows upon the Board, again "in its sole discretion, at such time as the . . . Board determines to be appropriate," the authority to "exclude any territorial instrumentality from the requirements of [PROMESA]." Id. § 2121(d)(2)(A).

PROMESA also requires the Board to have an office in Puerto Rico and elsewhere as it deems necessary, and that at any time the United States may provide the Board with use of federal facilities and equipment on a reimbursable or non-reimbursable basis. Id. § 2122. Additionally, Section 103(c) waives the application of Puerto Rico procurement laws to the Board, id. § 2123(c), while Section 104(c) authorizes the Board to acquire information directly from both the federal and Puerto Rico governments without the usual bureaucratic hurdles, id. § 2124(c). Moreover, the Board's power to issue and enforce compliance with

-11-

subpoenas is to be carried out in accordance with Puerto Rico law. Id. § 2124(f).[4]  Finally, PROMESA directs the Board to ensure that any laws prohibiting public employees from striking or engaging in lockouts be strictly enforced.  Id. § 2124(h).

We thus come to PROMESA's Title III, the central provision of this statute, which creates a special bankruptcy regime allowing the territories and their instrumentalities to adjust their debt.  Id. §§ 2161-77.  This new bankruptcy safe haven applies to territories more broadly than Chapter 9 applies to states because it covers not just the subordinate instrumentalities of the territory, but also the territory itself. Id. § 2162.

An important provision of PROMESA's bankruptcy regime is that the Board serves as the sole representative of Puerto Rico's government in Title III debtor-related proceedings, id. § 2175(b), and that the Board is empowered to "take any action necessary on behalf of the debtor" -- whether the Commonwealth government or any of its instrumentalities -- "to prosecute the case of the debtor," id. § 2175(a).

---

[4]  We note that 48 U.S.C. § 2124(f)(1) makes reference to the Puerto Rico Rules of Civil Procedure of 1979, 32 L.P.R.A. App. III, even though those rules were repealed and replaced by the Puerto Rico Rules of Civil Procedure of 2009, 32 L.P.R.A. App. V.

-12-

## C.  Appointment of Members to PROMESA's Board

PROMESA establishes that the "Board shall consist of seven members appointed by the President," who must comply with federal conflict of interest statutes. Id. § 2121(e)(1)(A).[5] The Board's membership is divided into six categories, labelled A through F, with one member for Categories A, B, D, E, and F, and two members for Category C. Id. § 2121(e)(1)(B).[6] The Governor of Puerto Rico, or his designee, also serves on the Board, but in an ex officio, non-voting capacity. Id. § 2121(e)(3). The Board's duration is for an indefinite period, at a minimum four years and likely more, given the certifications that Section 209 of PROMESA requires.[7]

---

[5]  Section 2121(e)(1)(A) of PROMESA cross-references section 2129(a), which, for its part, incorporates 18 U.S.C. § 208's dispositions governing conflicts of interest.

[6]  As will be discussed in detail below, the assigned category affects a prospective Board member's eligibility requirements and appointment procedure.

[7]  Section 209 of PROMESA states that the Board shall terminate when it certifies that:

   (1) the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and

   (2) for at least 4 consecutive fiscal years --

      (A) the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and

Pursuant to Section 101(f) of PROMESA, individuals are eligible for appointment to the Board only if they:

> (1) ha[ve] knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government; and

> (2) prior to appointment, [they are] not an officer, elected official, or employee of the territorial government, a candidate for elected office of the territorial government, or a former elected official of the territorial government.

Id. § 2121(f). In addition, there are certain primary residency or primary business place requirements that must be met by some of the Board Members. Id. § 2121(e)(2)(B)(i), (D) (requiring that the Category A Board Member "maintain a primary residence in the territory or have a primary place of business in the territory").

Of particular importance to our task at hand is Section 101(e)(2)(A), which outlines the procedure for the appointment of the Board Members:

> (A) The President shall appoint the individual members of the . . . Board of which --

> (i) the Category A member should be selected from a list of individuals submitted by the Speaker of the House of Representatives;

---

> (B) the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards.

48 U.S.C. § 2149.

-14-

(ii) the Category B member should be selected from a separate, non-overlapping list of individuals submitted by the Speaker of the House of Representatives;

(iii) the Category C member should be selected from a list submitted by the Majority Leader of the Senate;

(iv) the Category D member should be selected from a list submitted by the Minority Leader of the House of Representatives;

(v) the Category E member should be selected from a list submitted by the Minority leader of the Senate; and

(vi) the category F member may be selected in the President's sole discretion.

Id. § 2121(e)(2)(A).

In synthesis, pursuant to this scheme, six of the seven Board Members shall be selected by the President from the lists provided by House and Senate leadership, with PROMESA allowing the President to select the seventh member at his or her sole discretion. Senatorial advice and consent is not required if the President makes the appointment from one of the aforementioned lists. Id. § 2121(e)(2)(E). In theory, the statute allows the President to appoint a member to the Board who is not on the lists, in which case, "such an appointment shall be by and with the advice and consent of the Senate." Id. Consent by the Senate had to be obtained by September 1, 2016 so as to allow an off-list appointment, else the President was required to appoint directly

-15-

from the lists.  And because the Senate was in recess for all but eight business days between enactment of the statute and September 1, one might conclude that, in practical effect, the statute forced the selection of persons on the list.

As was arguably inevitable, on August 31, 2016, the President chose all Category A through E members from the lists submitted by congressional leadership and appointed the Category F member at his sole discretion.[8]

---

[8]   *President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico*, The White House Off. of the Press Sec'y (Aug. 31, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/08/ 31/president-obama-announces-appointment-seven-individuals- financial.  The appointees included **Andrew G. Biggs**, a resident scholar at the American Enterprise Institute, and former holder of multiple high ranking positions in the Social Security Administration; **José B. Carrión III**, an experienced insurance industry executive from Puerto Rico and the President and Principal Partner of HUB International CLC, LLC, which operates therein; **Carlos M. García**, a resident of Puerto Rico, the Chief Executive Officer of BayBoston Managers LLC, Managing Partner of BayBoston Capital LP, who formerly served as Senior Executive Vice President and board member at Santander Holdings USA, Inc. (2011-2013), among other executive posts at Santander entities (1997-2008), and as Chairman of the Board, President, and CEO of the Government Development Bank for Puerto Rico (2009-2011); **Arthur J. González**, a Senior Fellow at the New York University School of Law and former U.S. Bankruptcy Judge in the Southern District of New York (1995-2002); **José R. González**, CEO and President of the Federal Home Loan Bank of New York, which he joined in 2013, former Chief Executive Officer and President of Santander Bancorp (2002-2008), and President of Santander Securities Corporation (1996-2001) and the Government Development Bank of Puerto Rico (1986-1989); **Ana J. Matosantos**, President of Matosantos Consulting, former Director of the State of California's Department of Finance (2009-2013) and Chief Deputy Director for Budgets (2008-2009); and, **David A. Skeel Jr.**, professor of Corporate Law at the University of Pennsylvania

-16-

It is undisputed that the President did not submit any of the Board member appointments to the Senate for its advice and consent prior to the Board Members assuming the duties of their office, or, for that matter, at any other time.

**D.  Litigation Before the District Court**

In May 2017, the Board initiated Title III debt adjustment proceedings on behalf of the Commonwealth in the U.S. District Court for the District of Puerto Rico.  See Title III Petition, In re Commonwealth of P.R., Bankruptcy Case No. 17-BK-3283 (LTS) (D.P.R. May 3, 2017).  This was followed by the filing of several other Title III proceedings on behalf of various Commonwealth government instrumentalities.  See Title III Petitions in: In re P.R. Sales Tax Fin. Corp. (COFINA), Bankruptcy Case No. 17-BK-3284 (LTS) (D.P.R. May 5, 2017); In re Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R. (ERS), 17-BK-3566 (LTS) (D.P.R. May 21, 2017); In re P.R. Highways and Transp. Aut. (HTA); Bankruptcy Case No. 17-BK-3567 (LTS) (D.P.R. May 21, 2017); In re P.R. Elec. Power Auth. (PREPA) [hereinafter In re PREPA], Bankruptcy Case No. 17-BK-4780 (LTS) (D.P.R. Jul. 7, 2017). Thereafter, some entities -- now the appellants before us -- arose

---

Law School, which he joined in 1999.

-17-

in opposition to the Board's initiation of debt adjustment proceedings on behalf of the Commonwealth.

Among the challengers are Aurelius Investment, LLC, et al. and Assured Guaranty Corporation, et al. ("Aurelius"). Before the district court, Aurelius argued that the Board lacked authority to initiate the Title III proceeding because its members were appointed in violation of the Appointments Clause and the principle of separation of powers. The Board rejected this argument, positing that its members were not "Officers of the United States" within the meaning of the Appointments Clause, and that the Board's powers were purely local in nature, not federal as would be needed to qualify for Appointments Clause coverage. The Board further argued that, in any event, the Appointments Clause did not apply even if the individual members were federal officers, because they exercised authority in Puerto Rico, an unincorporated territory where the Territorial Clause endows Congress with plenary powers. This, according to the Board, exempted Congress from complying with the Appointments Clause when legislating in relation to Puerto Rico. In the alternative, the Board argued that the Board Members' appointment did not require Senate advice and consent because they were "inferior officers." The United States intervened on behalf of the Board, pursuant to 28 U.S.C. § 2403(a), to defend the

-18-

constitutionality of PROMESA and the validity of the appointments and was generally in agreement with the Board's contentions.

The other challenger to the Board's appointments process, and an appellant here, is the Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER"), a Puerto Rican labor organization that represents employees of the government-owned electric power company, the Puerto Rico Electric Power Authority ("PREPA"). The Board had also filed a Title III petition on behalf of PREPA, see In re PREPA, supra, which led the UTIER to file an adversary proceeding as a party of interest before the District Court in which it raised substantially the same arguments as Aurelius regarding the Board Members' defective appointment, see Unión de Trabajadores de la Industria Eléctrica y Riego v. P.R. Elec. Power Auth., No. 17-228 (LTS) (D.P.R. Aug. 15, 2018); see also Adversary Complaint, Unión de Trabajadores de la Industria Eléctrica y Riego v. P.R. Elec. Power Auth., No. 17-229 (LTS) (D.P.R. Aug. 7, 2017) (describing the terms of the UTIER-PREPA collective bargaining agreement).

**E. The District Court's Opinion**

The district court, in separate decisions, ruled against Aurelius and UTIER and rejected their motions to dismiss the Board's Title III petitions. In re Commonwealth of P.R., Bankruptcy Case No. 17-BK-3283 (LTS) (D.P.R. July 3, 2018);

-19-

<u>Assured Guar. Mun. Corp.</u> v. <u>Fin. Oversight and Mgmt. Bd. for P.R.</u>,
No. 18-87 (LTS) (D.P.R. Aug. 3, 2018); <u>UTIER</u> v. <u>PREPA</u>, No. 17-228
(LTS).   In brief, the district court determined that the Board is
an instrumentality of the Commonwealth government established
pursuant to Congress's plenary powers under the Territorial
Clause, that Board Members are not "Officers of the United States,"
and that therefore there was no constitutional defect in the method
of their appointment.   The court arrived at this conclusion after
considering the jurisprudence and practice surrounding the
relationship between Congress and the territories, including
Puerto Rico, along with Congress's intent with regards to PROMESA.

The district court based its ruling on the premise that
"the Supreme Court has long held that Congress's power under [the
Territorial Clause] is both 'general and plenary.'"   Such a
plenary authority is what, according to the district court, allows
Congress to "establish governmental institutions for territories
that are not only distinct from federal government entities but
include features that would not comport with the requirements of
the Constitution if they pertained to the governance of the United
States."   The district court further pronounced that Congress "has
exercised [its plenary] power with respect to Puerto Rico over the
course of nearly 120 years, including the delegation to the people

-20-

of Puerto Rico elements of its . . . Article IV authority by authorizing a significant degree of local self-governance."

The district court also relied on judicial precedents holding that Congress may create territorial courts that do not "incorporate the structural assurances of judicial independence" provided for in Article III of the Constitution -- namely, life tenure and protection against reduction in pay -- as decisive authority. From the perdurance of these non-Article III courts across the territories (excepting, of course, Puerto Rico which although still an unincorporated territory has had, since 1966, an Article III court),[9] the district court reasoned that "Congress can thus create territorial entities that are distinct in structure, jurisdiction, and powers from the federal government."

---

[9] Act of Sept. 12, 1966, Public Law 89-571, 80 Stat. 764 (granting judges appointed to the District of Puerto Rico the same life tenure and retirement rights granted to judges of all other United States district courts); see also Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 594 n.26 (1976) ("The reason given [by Congress] for [Public Law 89-571] was that the Federal District Court in Puerto Rico 'is in its jurisdiction, powers, and responsibilities the same as the U. S. district courts in the (several) States.'" (quoting S. Rep. No. 89-1504 at 2 (1966))); Igartúa-De La Rosa v. United States, 417 F.3d 145, 169 (1st Cir. 2005) (en banc) (Torruella, J., dissenting) ("An Article III District Court sits [in Puerto Rico], providing nearly one-third of the appeals filed before [the Court of Appeals for the First Circuit], which sits in Puerto Rico at least twice a year, also in the exercise of Article III power."); United States v. Santiago, 23 F. Supp. 3d 68, 69 (D.P.R. Feb. 12, 2014) (collecting cases and scholarly articles).

-21-

Turning to the relationship between Congress and Puerto
Rico, the district court noted that "Congress has long exercised
its Article IV plenary power to structure and define governmental
entities for the island," in reference to the litany of
congressional acts that have shaped Puerto Rico's local government
since 1898, including the Treaty of Paris of 1898, the Foraker Act
of 1900, the Jones-Shafroth Act of 1917, and Public Law 600 of
1950.

Furthermore, with regards to PROMESA and its Board, the
district court afforded "substantial deference" to "Congress's
determination that it was acting pursuant to its Article IV
territorial powers in creating the . . . Board as an entity of the
government of Puerto Rico." The district court then proceeded to
consider whether Congress can create an entity that is not
inherently federal. It concluded in the affirmative, because
finding otherwise would "ignore[] both the plenary nature of
congressional power under Article IV and the well-rooted
jurisprudence . . . establish[ing] that any powers of self-
governance exercised by territorial governments are exercised by
virtue of congressional delegation rather than inherent local
sovereignty." Accordingly, the district court found that the
"creation of an entity such as the . . . Board through popular
election would not change the . . . Board's ultimate source of

authority from a constitutional perspective."  The court deemed
this so because "neither the case law nor the historical practice
. . . compels a finding that federal appointment necessarily
renders an appointee a federal officer."  The district court
therefore concluded that the Board is a territorial entity
notwithstanding

> [t]he fact that the . . . Board's members hold office
> by virtue of a federally enacted statutory regime and
> are appointed by the President[,] [because this] does
> not vitiate Congress's express provisions for
> creation of the . . . Board as a territorial
> government entity that "shall not be considered to be
> a department, agency, establishment, or
> instrumentality of the Federal Government."

After ruling that the Board is a "territorial entity and
its members are territorial officers," the district court finally
determined that "Congress had broad discretion to determine the
manner of selection for members of the . . . Board," which Congress
"exercised . . . in empowering the President with the ability to
both appoint and remove members from the . . . Board."  On this
final point, the district court observed that "[a]lthough
historical practice . . . indicates that Congress has required
Senate confirmation for certain territorial offices, nothing in
the Constitution precludes the use of that mechanism for positions
created under Article IV, and its use does not establish that
Congress was obligated to invoke it."

The district court was certainly correct that Article IV conveys to Congress greater power to rule and regulate within a territory than it can bring to bear within the fifty states. In brief, within a territory, Congress has not only its customary power, but also the power to make rules and regulations such as a state government may make within its state. See U.S. Const. art. IV, § 3, cl. 2; D.C. v. John R. Thompson Co., 346 U.S. 100, 106 (1953); Simms v. Simms, 175 U.S. 162, 168 (1899). As we will explain, however, we do not view these expanded Article IV powers as enabling Congress to ignore the structural limitations on the manner in which the federal government chooses federal officers, and we deem the Board Members -- save its ex officio member[10] -- to be federal officers.

## DISCUSSION

### A.   The Territorial Clause Does Not Trump the Appointments Clause

However much Article IV may broaden the reach of Congress's powers over a territory as compared to its power within a state, this case presents no claim that the substance of PROMESA's numerous rules and regulations exceed that reach.

---

[10]   No Appointments Clause challenge has been brought concerning the Governor of Puerto Rico, or the Governor's designee, who serves as an ex officio Board member without voting rights. See 48 U.S.C. § 2121(e)(3). Our holding is therefore limited to the seven Board Members appointed pursuant to 48 U.S.C. § 2121(e)(1)-(2).

Instead, appellants challenge the way the federal government has chosen the individuals who will implement those rules and regulations. This challenge trains our focus on the power of Congress vis-à-vis the other branches of the federal government. Specifically, the Board claims that Article IV effectively allows Congress to assume what is otherwise a power of the President, and to share within the two bodies of Congress a power only assigned to the Senate.

We reject this notion that Article IV enhances Congress's capabilities in the intramural competitions established by our divided system of government. First, the Board seems to forget -- and the district court failed to recognize and honor -- the ancient canon of interpretation that we believe is a helpful guide to disentangle the interface between the Appointments Clause and the Territorial Clause: generalia specialibus non derogant (the "specific governs the general"). See, e.g., Turner v. Rogers, 564 U.S. 431, 452-53 (2011) (Thomas, J., dissenting) (applying this canon in the context of constitutional interpretation in a conflict between the Due Process Clause and the Sixth Amendment); Albright v. Oliver, 510 U.S. 266, 273-74 (1994) (plurality opinion).

The Territorial Clause is one of general application authorizing Congress to engage in rulemaking for the temporary

governance of territories.  See Reid v. Covert, 354 U.S. 1, 14
(1957) (plurality opinion).  But such a general empowerment does
not extend to areas where the Constitution explicitly contemplates
a particular subject, such as the appointment of federal officers.
Nowhere does the Territorial Clause reference the subject matter
of federal appointments or the process to effectuate them.  On the
other hand, federal officer appointment is, of course, the raison
d'etre of the Appointments Clause.  It cannot be clearer or more
unequivocal that the Appointments Clause mandates that it be
applied to "all . . . Officers of the United States."  U.S. Const.
art II, § 2, cl. 2 (emphasis added).  Thus, we find in answering
the first question before us a prime candidate for application of
the specialibus canon and for the strict enforcement of the
constitutional mandate contained in the Appointments Clause.

      Consider next the Presentment Clause of Article I,
Section 7.  Under that clause, a bill passed by both chambers of
Congress cannot become law until it is presented to, and signed
by, the President (or the President's veto is overridden).  U.S.
Const. art. I, § 7, cl. 2.  Surely no one argues that Article IV
should be construed so as to have allowed Congress to enact PROMESA
without presentment, or to have overridden a veto without the
requisite super-majority vote in both houses.  Nor does anyone
seriously argue that Congress could have relied on its plenary

powers under Article IV to alter the constitutional roles of its
two respective houses in enacting PROMESA.

Like the Presentment Clause, the Appointments Clause
constitutionally regulates how Congress brings its power to bear,
whatever the reach of that power might be.  The Appointments Clause
serves as one of the Constitution's important structural pillars,
one that was intended to prevent the "manipulation of official
appointments" -- an "insidious . . . weapon of eighteenth century
despotism."  Freytag v. Comm'r, 501 U.S. 868, 883 (1991)
(citations omitted); see also Edmond v. United States, 520 U.S.
651, 659 (1997).  The Appointments Clause was designed "to
prevent[] congressional encroachment" on the President's
appointment power, while "curb[ing] Executive abuses" by requiring
Senate confirmation of all principal officers.  Edmond, 520 U.S.
at 659.  It is thus universally considered "among the significant
structural safeguards of the constitutional scheme."  Id.

It is true that another restriction that is arguably a
structural limitation on Congress's exercise of its powers -- the
nondelegation doctrine -- does bend to the peculiar demands of
providing for governance within the territories.  In normal
application, the doctrine requires that "when Congress confers
decisionmaking authority upon agencies," it must "lay down by
legislative act an intelligible principle to which the person or

-27-

body authorized to [act] is directed to conform." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). Otherwise, Congress has violated Article I, Section 1 of the Constitution, which vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." Id.; see also U.S. Const. art. I, § 1. In connection with the territories, though, Congress can delegate to territorial governments the power to enact rules and regulations governing territorial affairs. See John R. Thompson Co., 346 U.S. at 106 ("The power of Congress to delegate legislative power to a territory is well settled."); Cincinnati Soap Co. v. United States, 301 U.S. 308, 321-23 (1937); see also Simms, 175 U.S. at 168 ("In the territories of the United States, Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state; and may, at its discretion, intrust that power to the legislative assembly of a territory."). The Supreme Court has analogized the powers of Congress over the District of Columbia and the territories to that of states over their municipalities. See John R. Thompson Co., 346 U.S. at 109. In the state-municipality context, "[a] municipal corporation . . . is but a department of the State. The legislature may give it all the

powers such a being is capable of receiving, making it a miniature
State within its locality." Barnes v. D.C., 91 U.S. 540, 544
(1875); see also John R. Thompson Co., 346 U.S. at 109 ("It would
seem then that on the analogy of the delegation of powers of self-
government and home rule both to municipalities and to territories
there is no constitutional barrier to the delegation by Congress
to the District of Columbia of full legislative power subject of
course to constitutional limitations to which all lawmaking is
subservient and subject also to the power of Congress at any time
to revise, alter, or revoke the authority granted."). The Supreme
Court has also made clear that, in delegating power to the
territories, Congress can only act insofar as "other provisions of
the Constitution are not infringed." Atl. Cleaners & Dyers v.
United States, 286 U.S. 427, 435 (1932).

        The territorial variations on the traditional
restrictions of the nondelegation doctrine pose no challenge by
Congress to the power of the other branches. Any delegation must
take the form of a duly enacted statute subject to the President's
veto. Furthermore, the territorial exception to the nondelegation
doctrine strikes us as strongly implicit in the notion of a
territory as envisioned by the drafters of the Constitution. The
expectation was that territories would become states. See Downes
v. Bidwell, 182 U.S. 244, 380 (1901) (Harlan, J., dissenting).

Hence, Congress had a duty -- at least a moral duty -- to manage a transition from federal to home rule.  While the final delegation takes place in the act of formally creating a state, it makes evident sense that partial delegations of home-rule powers would incrementally precede full statehood.  Accordingly, from the very beginning, Congress created territorial legislatures to which it delegated rule-making authority.  See, e.g., An Ordinance for the Government of the Territory of the United States north-west of the river Ohio (1787), ch. 8, 1 Stat. 50, 51 n.(a) (1789).

None of these justifications for limiting the nondelegation doctrine to accommodate one of Congress's most salient purposes in exercising its powers under Article IV applies to the Appointments Clause.  Nor does the teaching of founding era history.  To the contrary, the evidence suggests strongly that Congress in 1789 viewed the process of presidential appointment and Senate confirmation as applicable to the appointment by the federal government of federal officers within the territories. That first Congress passed several amendments to the Northwest Ordinance of 1787 "so as to adopt the same to the present Constitution of the United States." Id. at 51.  One such conforming amendment eliminated the pre-constitutional procedure for congressional appointment of officers within the territory and

-30-

replaced it with presidential nomination and appointment "by and with the advice and consent of the Senate." Id. at 53.

More difficult to explain is United States v. Heinszen, 206 U.S. 370, 384-85 (1907). The actual holding in Heinszen sustained tariffs on goods to the Philippines where the tariffs were imposed first by the President and then thereafter expressly ratified by Congress. In sustaining those tariffs, the Court stated that Congress could have delegated the power to impose the tariffs to the President beforehand, citing United States v. Dorr, 195 U.S. 138 (1904), a case that simply held that Congress could provide for criminal tribunals in the territories without also providing for trial by jury. Id. at 149. Heinszen cannot be explained as an instance of Congress enabling home rule in a territory. Rather, it seems to allow Congress to delegate legislative power to the President, citing the territorial context as a justification. Heinszen, though, has no progeny that might shed light on how reliable it might serve as an apt analogy in the case before us. Moreover, Heinszen concerned a grant of power by Congress, not a grab for power at the expense of the executive.

For the foregoing reasons, we find in the nondelegation doctrine no apt example to justify an exception to the application of the Appointments Clause within the territories. An exception from the Appointments Clause would alter the balance of power

-31-

within the federal government itself and would serve no necessary purpose in the transitioning of territories to states.

Further, the Board points us to Palmore v. United States, 411 U.S. 389 (1973). That case arose out of Congress's exercise of its plenary powers over the District of Columbia under Article I, Section 8, Clause 17, powers which are fairly analogous to those under Article IV. See John R. Thompson Co., 346 U.S. at 105-09. The Court held that Congress could create local courts -- like state courts -- that did not satisfy the requirements of Article III. Palmore, 411 U.S. at 410. The Board would have us read Palmore as an instance of Congress's plenary powers over a territory trumping the requirements of another structural pillar of the Constitution. We disagree. The Court explained at length how Article III itself did not require that all courts created by Congress satisfy the selection and tenure requirements of Article III. Id. at 407 ("It is apparent that neither this Court nor Congress has read the Constitution as requiring every federal question arising under the federal law, or even every criminal prosecution for violating an Act of Congress, to be tried in an Art. III court before a judge enjoying lifetime tenure and protection against salary reduction."). Rather, the requirements of Article III are applicable to courts "devoted to matters of national concern," id. at 408, and that local courts "primarily

-32-

. . . concern[ed] . . . with local law and to serve as a local court system" created by Congress pursuant to its plenary powers are simply another example of those courts that did not fit the Article III template (like state courts empowered to hear federal cases, military tribunals, the Court of Private Land Claims, and consular courts), id. at 404, 407, 408.  In short, Article III was not trumped by Congress's creation of local courts pursuant to its Article I  power.    Rather,  Article III  itself  accommodates exceptions, and the local D.C. court system fits within the range of those exceptions.  That there are courts in other territories of the same ilk does not alter this analysis.  Palmore therefore offers no firm ground upon which to erect a general Article IV exception  to  separation-of-powers  stalwarts  such  as  the Appointments Clause.

Finally, nothing about the "Insular Cases"[11] casts doubt over our foregoing analysis.  This discredited[12] lineage of cases,

---

[11]  De Lima v. Bidwell, 182 U.S. 1 (1901); Goetze v. United States, 182 U.S. 221 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes, 182 U.S. 244; Huus v. New York & Porto Rico Steamship Co., 182 U.S. 392 (1901).

[12]  See, e.g., Christina Duffy Burnett, A Convenient Constitution?: Extraterritoriality After Boumediene, 109 Colum. L. Rev. 973, 982 (2009) (noting the Insular Cases have "long been reviled" for concluding that "the Constitution does not 'follow the flag' outside the United States"); Jamal Greene, The Anticanon, 125 Harv. L. Rev. 379, 437 (2011) (criticizing that "the Insular Cases relied on Dred Scott as authority for the constitutional relationship

-33-

which ushered the unincorporated territories doctrine, hovers like a dark cloud over this case. To our knowledge there is no case even intimating that if Congress acts pursuant to its authority under the Territorial Clause it is excused from conforming with the Appointments Clause, whether this be by virtue of the "Insular Cases" or otherwise. Nor could there be, for it would amount to the emasculation from the Constitution of one of its most important structural pillars. We thus have no trouble in concluding that the Constitution's structural provisions are not limited by geography and follow the United States into its unincorporated

---

between Congress and acquired territories"); Andrew Kent, Boumediene, Munaf, and the Supreme Court's Misreading of the Insular Cases, 97 Iowa L. Rev. 101 (2011); Charles E. Littlefield, The Insular Cases, 15 Harv. L. Rev. 169, 170 (1901) ("The Insular Cases, in the manner in which the results were reached, the incongruity of the results, and the variety of inconsistent views expressed by the different members of the court, are, I believe, without a parallel in our judicial history."); Gerald L. Neuman, Anomalous Zones, 48 Stan. L. Rev. 1197, 1221 (1996) (observing that "the colonialism authorized in the Insular Cases . . . was not justified by either peculiar necessity or consent"); Efrén Rivera Ramos, The Legal Construction of American Colonialism: The Insular Cases (1901-1922), 65 Rev. Jur. U.P.R. 225 (1996); Juan R. Torruella, The Insular Cases: The Establishment of a Regime of Political Apartheid, 29 U. Pa. J. Int'l L. 283 (2007); Adriel I. Cepeda Derieux, Note, A Most Insular Minority: Reconsidering Judicial Deference to Unequal Treatment in Light of Puerto Rico's Political Process Failure, 110 Colum. L. Rev. 797 (2010); Lisa María Pérez, Note, Citizenship Denied: The Insular Cases and the Fourteenth Amendment, 94 Va. L. Rev. 1029 (2008); see also José A. Cabranes, Puerto Rico: Colonialism as Constitutional Doctrine, 100 Harv. L. Rev. 450 (1986) (reviewing Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985)).

-34-

territories. See Downes, 182 U.S. at 277 (Brown, J.) (noting that "prohibitions [going] to the very root of the power of Congress to act at all, irrespective of time or place" are operative in the unincorporated territories).

Notwithstanding this doctrine, appellant UTIER asks us to go one step further and reverse the "Insular Cases." Although there is a lack of enthusiasm for the perdurance of these cases,[13] which have been regarded as a "relic from a different era," Reid, 354 U.S. at 12, and which Justice Frankfurter described as "historically and juridically, an episode of the dead past about as unrelated to the world of today as the one-hoss shay is to the latest jet airplane," Reid v. Covert 351 U.S. 487, 492 (1956)(Frankfurter, J., reserving judgment), we cannot be induced to engage in an ultra vires act merely by siren songs. Not only do we lack the authority to meet UTIER's request, but even if we were writing on a clean slate, we would be required to stay our hand when dealing with constitutional litigation if other avenues of decision were available, and we believe there are in this case.

In this respect, we are aided again by the Supreme Court's decision in Reid, which although refusing to reverse the "Insular Cases" outright, provides in its plurality opinion

---

[13] See supra note 12.

instructive language that outlines the appropriate course we ought

to pursue in the instant appeal:

> The "Insular Cases" can be distinguished from the
> present cases in that they involved the power of
> Congress to provide rules and regulations to govern
> temporarily territories with wholly dissimilar
> traditions and institutions whereas here the basis
> for governmental power is American citizenship. . . .
> [I]t is our judgment that neither the cases nor their
> reasoning should be given any further expansion.

Reid, 354 U.S. at 14 (plurality opinion) (emphasis added); see

also Boumediene v. Bush, 553 U.S. 723, 765 (2008) ("Our basic

charter cannot be contracted away . . . . The Constitution grants

Congress and the President the power to acquire, dispose of, and

govern territory, not the power to decide when and where its terms

apply.").

The only course, therefore, which we are allowed in light

of Reid is to not further expand the reach of the "Insular Cases."

Accordingly, we conclude that the Territorial Clause and the

"Insular Cases" do not impede the application of the Appointments

Clause in an unincorporated territory, assuming all other

requirements of that provision are duly met.

## B. Board Members Are "Officers of the United States" Subject to the Appointments Clause

We must now determine whether the Board Members qualify

within the rubric of "Officers of the United States," the

Appointments Clause's job description that marks the entry point

for its coverage.   The district court determined that the Board
Members do not fall under such a rubric.  We disagree.

We begin our analysis by turning to a triad of Supreme
Court decisions:  Lucia v. SEC, 138 S. Ct. 2044 (2018); Freytag,
501 U.S. 868; and Buckley v. Valeo, 424 U.S. 1 (1976).  From these
cases, we gather that the following "test" must be met for an
appointee to qualify as an "Officer of the United States" subject
to  the  Appointments  Clause:  (1)  the  appointee  occupies  a
"continuing"  position  established  by  federal  law;  (2)  the
appointee  "exercis[es]  significant  authority";  and  (3)  the
significant  authority  is  exercised  "pursuant  to  the  laws  of  the
United States."  See Lucia, 138 S. Ct. at 2050-51; Freytag, 501
U.S. at 881; Buckley, 424 U.S. at 126.  In our view, the Board
Members readily meet these requirements.

First, Board Members occupy "continuing positions" under
a federal law since PROMESA provides for their appointment to an
initial term of three years and they can thereafter be reappointed
and serve until a successor takes office.  48 U.S.C. § 2121(e)(5)
(A), (C)-(D).  The continuity of the Board Members' position is
fortified by the provision that only the President can remove them
from office and then only for cause.   Id. § 2121(e)(5)(B).   In
fact, the Board Members' term in office could well extend beyond
three years, as PROMESA stipulates that the Board will continue in

operation until it certifies that the Commonwealth government has met various fiscal objectives "for at least 4 consecutive fiscal years." Id. § 2149(2).

Second, the Board Members plainly exercise "significant authority." For example, PROMESA empowers the Board Members to initiate and prosecute the largest bankruptcy in the history of the United States municipal bond market, see Yasmeen Serhan, Puerto Rico Files for Bankruptcy, The Atlantic (May 3, 2017), https://www.theatlantic.com/news/archive/2017/05/puerto-rico-files-for-bankruptcy/525258/, with the bankruptcy power being a quintessential federal subject matter, see U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . [t]o establish uniform Laws on the subject of Bankruptcies throughout the United States."). The Supreme Court recently reminded the Commonwealth government of the bankruptcy power's exclusive federal nature in Franklin Cal. Tax-Free Trust, 136 S. Ct. at 1938.

The Board Members' federal authority includes the power to veto, rescind, or revise Commonwealth laws and regulations that it deems inconsistent with the provisions of PROMESA or the fiscal plans developed pursuant to it. See 48 U.S.C. § 2144 ("Review of activities to ensure compliance with fiscal plan."). Likewise, the Board showcases what can be construed as nothing but its significant authority when it rejects the budget of the

-38-

Commonwealth or one of its instrumentalities, see id. § 2143
("Effect of finding of noncompliance with budget"); when it rules
on the validity of a fiscal plan proposed by the Commonwealth, id.
§ 2141(c)(3); when it issues its own fiscal plan if it rejects the
Commonwealth's proposed plan, id. § 2141(d)(2) (authorizing the
Board to develop a "Revised Fiscal Plan"); and when it exercises
its sole discretion to file a plan of adjustment for Commonwealth
debt, id. § 2172(a) ("Only the Oversight Board . . . may file a
plan of adjustment of the debts of the debtor.").  The Board can
only employ these significant powers because a federal law so
provides.

Moreover, Board Members' investigatory and enforcement
powers, as carried out collectively by way of the Board, exceed or
are at least equal to those of the judicial officers the Supreme
Court found to be "Officers of the United States" in Lucia. See
138 S. Ct. at 2053.  There, the Supreme Court held that
administrative law judges are "Officers of the United States," in
part, because they can receive evidence at hearings and administer
oaths.  Id.  PROMESA grants the Board Members the same right and
more.  See 48 U.S.C. § 2124(a); id. § 2124(b) ("Any member . . .
of the Oversight Board may, if authorized by the Oversight Board,
take any action that the Oversight Board is authorized to take by
this section."); id. § 2124(c) ("Obtaining official data"); id.

-39-

§ 2124(f) ("Subpoena power").  In short, the Board Members enjoy "significant discretion" as they carry out "important functions," Freytag, 501 U.S. at 881, under a federal law -- qualities that the Supreme Court has considered for decades as the birthmark of federal officers who are subject to the Appointments Clause.

Third, the Board Members' authority is exercised "pursuant to the laws of the United States."  The Board Members trace their authority directly and exclusively to a federal law, PROMESA.  That federal law provides both their authority and their duties.  Essentially everything they do is pursuant to federal law under which the adequacy of their performance is judged by their federal master.  And this federal master serves in the seat of federal power, not San Juan.  The Board Members are, in short, more like Roman proconsuls picked in Rome to enforce Roman law and oversee territorial leaders than they are like the locally selected leaders that Rome allowed to continue exercising some authority. See, e.g., Louis J. Sirico, Jr., The Federalist and the Lessons of Rome, 75 Miss. L.J. 431, 484 (2006); Dávila Asks House for Reily Inquiry, N.Y. Times (Apr. 5, 1922), https://timesmachine.nytimes. com/timesmachine/1922/04/05/112681107.pdf.  (comparing the then-appointed Governor of Puerto Rico to a Roman proconsul)

The United States makes two arguments in support of the district court's opinion and PROMESA's current appointments

protocol that warrant our direct response at this point. First,
the United States argues that historical precedent suggests the
inapplicability of the Appointments Clause to the territories.
Second, the United States contends that if we find for appellants,
such a ruling will invalidate the present-day democratically
elected local governments of Puerto Rico and the other
unincorporated territories because the officers of such
governments took office without the Senate's advice and consent.
We reject each argument in turn.

The relevant historical precedents of which we are aware
lead us to a different conclusion than that claimed by the United
States. Excepting the short period during which Puerto Rico was
under military administration following the Spanish-American War,
the major federal appointments to Puerto Rico's civil government
throughout the first half of the 20th century all complied with
the Appointments Clause.

Beginning in 1900 with the Foraker Act, the Governor of
Puerto Rico was to be nominated by the President and confirmed by
the Senate to a term of four years "unless sooner removed by the
President." An Act temporarily to provide revenues and a civil
government for Porto Rico, ch. 191, 31 Stat. 77, 81 (1900). The
Foraker Act also mandated presidential nomination and Senate
confirmation of the members of Puerto Rico's "Executive Council"

-41-

(which assumed the dual role of executive cabinet and upper chamber of the territorial legislature). Id. The Executive Council consisted of a secretary, an attorney general, a treasurer, an auditor, a commissioner of the interior, a commissioner of education, and five other persons "of good repute." Id. In addition, the Foraker Act also subjected the justices of the Puerto Rico Supreme Court, along with the marshal and judge of the territorial U.S. District Court for the District of "Porto" Rico, to the strictures of the Appointments Clause. Id. Even the three members of a commission established to compile and revise the laws of "Porto" Rico were made subject to the Appointments Clause. Id.

        The Foraker Act regime lasted until 1917, when Congress passed the Jones-Shafroth Act. See An Act to provide a civil government for Porto Rico, ch. 145, 39 Stat. 951 (1917). Here again, Congress provided for all key appointments by Washington to Puerto Rico's territorial government to meet the Appointments Clause: the governor, attorney general, commissioner of education, supreme court justices, district attorney, U.S. marshal, and U.S. territorial district judge were to be appointed by the President with the advice and consent of the Senate. Id. In sum, between 1900 and 1947 -- the last time the Island had a federally-selected Governor -- each of the presidentially appointed Governors of

-42-

Puerto Rico acquired their office after receiving the Senate's blessing.[14]

As the United States would have it, Congress's requirement of Senate confirmation for presidential nominees in all of the aforementioned contexts was mere voluntary legislative surplusage. This position, however, directly contravenes the published opinions of the United States' own Office of Legal Counsel issued as recently as 2007. See "Officers of the United States Within the Meaning of the Appointments Clause," 31 Op. O.L.C. 73, 122 (2007) ("[A]n individual who will occupy a position to which has been delegated by legal authority a portion of the sovereign powers of the federal government, which is 'continuing,' must be appointed pursuant to the Appointments Clause."); see also Jennifer L. Mascott, Who Are "Officers of the United States", 70 Stan. L. Rev. 443, 564 (2018) ("Extensive evidence suggests that

---

[14] The early appointments to high-level office in the territorial governments of the Philippines, Guam, and the Virgin Islands also conformed with the Appointments Clause. See Organic Act of Guam of 1950, § 6, 64 Stat. 512 (1950) (providing that the Governor of Guam "shall be appointed by the President, by and with the advice and consent of the Senate of the United States"); Organic Act of Virgin Islands, § 20, 49 Stat. 1807 (1936) (providing for the presidential nomination and Senate confirmation of the Governor, who will then be under supervision of the Secretary of the Interior). Even the Panama Canal Zone, during its period under United States control, had a Governor appointed by the President "by and with the advice of the Senate." See Panama Canal Act, 37 Stat. 560 (1912).

-43-

the original public meaning of 'officer' in Article II includes all federal officials with responsibility for an ongoing statutory duty.").   At a minimum, the United States' posture runs head against the sound principle of legislative interpretation bordering on dogma that "'[l]ong settled and established practice is a consideration of great weight in proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." NLRB v. Noel Canning, 134 S. Ct. 2550, 2559 (2014) (citing The Pocket Veto Case, 279 U.S. 655, 689 (1929)).   Furthermore, the United States fails to support its assertion with legislative history or other evidence establishing that Congress's largely consistent adherence to Appointments Clause procedures in appointing territorial officials was gratuitous.   Lacking such an explanation, we believe it is more probable that Congress was simply complying with what the Constitution requires.   Furthermore, that largely consistent compliance with Appointment Clause procedures in hundreds if not thousands of instances over two centuries belies any claim that adherence to those procedures impedes Congress's exercise of its plenary powers within the territories.

The United States, as well as the Board, also point to the manner in which Congress has for centuries allowed territories to elect territorial officials, including for example the governor

of Puerto Rico since 1947.  See An Act to amend the Organic Act
of Puerto Rico, ch. 490, 61 Stat. 770 (1947).  Congress created
many of these territorial positions and they were filled not
through presidential nomination and Senate confirmation, but
rather by elections within the territory.  The Board's basic point
(and the United States' basic point as well) is this:  If we find
that the Board Members must be selected by presidential nomination
and Senate confirmation, then that would mean that, for example,
all elected territorial governors and legislators have been
selected in an unconstitutional manner.

     We disagree.  The elected officials to which the Board
and the United States point -- even at the highest levels -- are
not federal officers.  They do not "exercise significant authority
pursuant to the laws of the United States."  See Lucia, 138 S. Ct.
at 2051; Freytag, 501 U.S. at 881; Buckley, 424 U.S. at 126; see
also United States v. Germaine, 99 U.S. 508, 511-12 (1878).
Rather, they exercise authority pursuant to the laws of the
territory.  Thus, in Puerto Rico for example, the Governor is
elected by the citizens of Puerto Rico, his position and power are
products of the Commonwealth's Constitution, see Puerto Rico
Const. art. IV, and he takes an oath similar to that taken by the
governor of a state, id. § 16; see also, e.g., N.Y. Const.

-45-

art. XIII, § 1; Ala. Const. art. XVI, § 279; N.H. Const. pt. II, art. 84.

It is true that the Commonwealth laws are themselves the product of authority Congress has delegated by statute.  See Puerto Rico v. Sánchez Valle, 136 S. Ct. 1863, 1875 (2016).  So the elected Governor's power ultimately depends on the continuation of a federal grant.  But that fact alone does not make the laws of Puerto Rico the laws of the United States, else every claim brought under Puerto Rico's laws would pose a federal question.  See Viqueira v. First Bank, 140 F.3d 12, 19 (1st Cir. 1998) ("[T]he plaintiffs' complaint alleges manifold claims under Puerto Rico law, but it fails to assert any claim arising under federal law.  Accordingly, no jurisdiction lies under 28 U.S.C. § 1331."); Everlasting Dev. Corp. v. Sol Luis Descartes, 192 F.2d 1, 6 (1st Cir. 1951) ("Of course, in so far as the controversy relates to the construction of an insular [Puerto Rico] tax exemption statute, that is not a federal question.").

## C.  The Board Members are Principal Officers of the United States

Having concluded that the Board Members are indeed United States officers, we now turn to the specific means by which they must be appointed pursuant to the Appointments Clause.  If the officer is a "principal" officer, the only constitutional method of appointment is by the President, by and with the advice

-46-

and consent of the Senate.  U.S. Const. Art. II, § 2, cl. 2;
Edmond, 520 U.S. at 659.  But when an officer is "inferior,"
Congress may choose to vest the appointment in the President alone,
the courts, or a department head.  Edmond, 520 U.S. at 660; U.S.
Const. Art. II, § 2, cl. 2.  And the Board argues (but we do not
decide) that the President appointed the Board Members
notwithstanding the restricted choice from congressional lists.

In Morrison v. Olson, the Supreme Court held that an
independent counsel was an "inferior" officer because she was
subject to removal by the attorney general and because she had
limited duties, jurisdiction, and tenure, among other factors.
487 U.S. 654, 671-672 (1988).  More than a decade later, the Court
held that an "inferior" officer was one "whose work is directed
and supervised at some level by others who were appointed by
Presidential nomination with the advice and consent of the Senate."
Edmond, 520 U.S. at 663.  Our circuit later squared the two cases
by holding that Edmond's supervision test was sufficient, but not
necessary.[15]  See United States v. Hilario, 218 F.3d 19, 25 (1st

---

[15] There has been long-lasting confusion as to whether Morrison
is still good law.  See NLRB v. SW Gen., Inc., 137 S. Ct. 929, 947
(2017) (Thomas, J., concurring) ("Although we did not explicitly
overrule Morrison in Edmond, it is difficult to see how Morrison's
nebulous approach survived our opinion in Edmond."); Akhil Reed
Amar, Intratextualism, 112 Harv. L. Rev. 747, 810, 811 (1999)
(arguing that Morrison provided "a doctrinal test good for one day
only" and that in Edmond the Supreme Court "apparently abandoned
Morrison's ad hoc test"); but see In re Grand Jury Investigation,

-47-

Cir. 2000). Therefore, inferior officers are those who are directed and supervised by a presidential appointee; otherwise, they "might still be considered inferior officers if the nature of their work suggests sufficient limitations of responsibility and authority." Id.

The Board Members clearly satisfy the Edmond test. They are answerable to and removable only by the President and are not directed or supervised by others who were appointed by the President with Senate confirmation. 48 U.S.C. § 2121(e)(5)(B); Edmond, 520 U.S. at 663. Considering the additional Morrison factors does not change the calculus. Though the Board Members' tenure "is 'temporary' in the sense that [they are] appointed essentially to accomplish a single task, and when that task is over the [Board] is terminated," Morrison, 487 U.S. at 672, the Board's vast duties and jurisdiction are insufficiently limited. Significantly, while the independent counsel in Morrison was

315 F. Supp. 3d 602, 640 (D.D.C. 2018) (considering the Morrison factors in determining that special counsel is an inferior officer of the United States). More recently, in Free Enter. Fund v. Public Co. Accounting Oversight Bd., the Supreme Court held that members of the Public Company Accounting Oversight Board, who were supervised by the SEC, were inferior officers. 561 U.S. 477, 510 (2010). In so doing, the Court cited Edmond for the proposition that "[w]hether one is an 'inferior' officer depends on whether he has a superior." Id. However, the Edmond language has already been analyzed by this court and reconciled with Morrison. Because Free Enterprise does not explicitly overrule Morrison, it does not affect our precedent.

-48-

unable to "formulate policy for the Government or the Executive Branch," PROMESA explicitly grants such authority.  <u>See</u> 48 U.S.C. § 2144(b)(2).  And whereas the jurisdiction of the independent counsel was limited, <u>Morrison</u>, 487 U.S. at 672, the Board's authority spans across the economy of Puerto Rico -- a territory with a population of nearly 3.5 million -- overpowering that of the Commonwealth's own elected officials.  Under <u>Edmond</u> and <u>Morrison</u>, the Board Members are "principal" United States officers.  <u>See</u> <u>Hilario</u>, 218 F.3d at 25.  They therefore should have been appointed by the President, by and with the advice and consent of the Senate.  Art. II, § 2, cl.2.

## THE REMEDY

Having concluded that the process PROMESA provides for the appointment of Board Members is unconstitutional, we are left to determine the relief to which appellants are entitled.  Both Aurelius and the UTIER ask that we order dismissal of the Title III petitions that the Board filed to commence the restructuring of Commonwealth debt.  In doing so, appellants suggest that we ought to deem invalid all of the Board's actions until today and that this case does not warrant application of the <u>de facto</u> officer doctrine.  It would then be on a constitutionally reconstituted Board, they say, to ratify or not ratify the unconstitutional Board's actions.  Appellants also request that we sever from 48

U.S.C. § 2121(e) the language that authorizes the Board Members'
appointment without Senate confirmation.

There is no question but that in fashioning a remedy to
correct the constitutional violation we have found it is unlikely
that a perfect solution is available.  In choosing among potential
options, we ought to reduce the disruption that our decision may
cause.  But we are readily aided by several factors in this
respect.

First, PROMESA itself contains an express severability
clause, stating as follows:

> Except as provided in subsection (b) [regarding
> uniformity of similarly situated territories], if any
> provision of this chapter or the application thereof
> to any person or circumstance is held invalid, the
> remainder of this chapter, or the application of that
> provision to persons or circumstances other than those
> as to which it is held invalid, is not affected
> thereby, provided that subchapter III is not severable
> from subchapters I and II, and subchapters I and II
> are not severable from subchapter III.

48 U.S.C. § 2102.

Such a clause "creates a presumption that Congress did
not intend the validity of the statute in question to depend on
the validity of [a] constitutionally offensive provision." Alaska
Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987).

Severability in this instance is especially appropriate
because Congress, within PROMESA, has already provided an
alternative appointments mechanism, at least as to six of the Board

-50-

Members.    PROMESA directs that if the mechanism we found
unconstitutional is not employed, "[w]ith respect to the
appointment of a Board member . . . such an appointment shall be
by and with the advice and consent of the Senate, unless the
President appoints an individual from a list, . . . in which case
no Senate confirmation is required."   48 U.S.C. § 2121(e)(2)(E)
(emphasis added).

Accordingly, we hold that the present provisions
allowing the appointment of Board Members in a manner other than
by presidential nomination followed by the Senate's confirmation
are invalid and severable.   We do not hold invalid the remainder
of the Board membership provisions, including those providing the
qualifications for office and for appointment by the President
with the advice and consent of the Senate.

Second, we reject appellants' invitation to dismiss the
Title III petitions and cast a specter of invalidity over all of
the Board's actions until the present day.   To the contrary, we
find that application of the de facto officer doctrine is
especially appropriate in this case.

An ancient tool of equity, the de facto officer doctrine
"confers validity upon acts performed by a person acting under the
color of official title even though it is later discovered that
the legality of that person's appointment . . . to office is

-51-

deficient."  Ryder v. United States, 515 U.S. 179, 180 (1995)
(citing Norton v. Shelby Cnty., 118 U.S. 425, 440 (1886)); see
also Note, The De Facto Officer Doctrine, 63 Colum. L. Rev. 909,
909 n.1 (1963) ("The first reported case to discuss the concept of
de facto authority was The Abbe of Fountaine, 9 Hen. VI, at 32(3)
(1431)."). A de facto officer is "one whose title is not good in
law, but who is in fact in the unobstructed possession of an office
and discharging its duties in full view of the public, in such
manner and under such circumstances as not to present the
appearance of being an intruder or usurper." Waite v. Santa Cruz,
184 U.S. 302, 323 (1902). Our sister court for the D.C. Circuit
has described the doctrine as "protect[ing] citizens' reliance on
past government actions and the government's ability to take
effective and final action." Andrade v. Lauer, 729 F.2d 1475,
1499 (D.C. Cir. 1984).

Here, the Board Members were acting with the color of
authority -- namely, PROMESA -- when, as an entity, they decided
to file the Title III petitions on the Commonwealth's behalf, a
power squarely within their lawful toolkit. And there is no
indication but that the Board Members acted in good faith in moving
to initiate such proceedings. See Leary v. United States, 268
F.2d 623, 627 (9th Cir. 1959). Moreover, the Board Members' titles
to office were never in question until our resolution of this

-52-

appeal.

Other considerations further counsel for our application of the de facto officer doctrine. We fear that awarding to appellants the full extent of their requested relief will have negative consequences for the many, if not thousands, of innocent third parties who have relied on the Board's actions until now. In addition, a summary invalidation of everything the Board has done since 2016 will likely introduce further delay into a historic debt restructuring process that was already turned upside down once before by the ravage of the hurricanes that affected Puerto Rico in September 2017. See Stephanie Gleason, Puerto Rico's Bankruptcy Delayed, Moved to New York Following Hurricane María, The Street (Sept. 26, 2017), https://www.thestreet.com/story/ 14320965/1/puerto-rico-s-bankruptcy-delayed-moved-to-new-york- following-hurricane-maria.html. At a minimum, dismissing the Title III petitions and nullifying the Board's years of work will cancel out any progress made towards PROMESA's aim of helping Puerto Rico "achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a).

We therefore decline to order dismissal of the Board's Title III petitions. Our ruling, as such, does not eliminate any otherwise valid actions of the Board prior to the issuance of our mandate in this case. In so doing, we follow the Supreme Court's

-53-

exact approach in <u>Buckley</u>, 424 U.S. at 1, which involved an Appointments Clause challenge to the then recently formed Federal Election Commission. Although the Court held that the Commission was in fact constituted in violation of the Appointments Clause, <u>id.</u> at 140, it nonetheless found that such a constitutional infirmity did "not affect the validity of the Commission's . . . past acts," <u>id</u>. at 142. We conclude the same here and find that severance is the appropriate relief to which appellants are entitled after they successfully and "timely challenge[d] . . . the constitutional validity of" the Board Members' appointment. <u>Ryder</u>, 515 U.S. at 182-83.

Finally, our mandate in these appeals shall not issue for 90 days, so as to allow the President and the Senate to validate the currently defective appointments or reconstitute the Board in accordance with the Appointments Clause. <u>Cf. Weinberger</u> v. <u>Romero-Barceló</u>, 456 U.S. 305, 312-313 (1982). During the 90-day stay period, the Board may continue to operate as until now.

## CONCLUSION

In sum, we hold that the Board Members (other than the ex officio Member) must be, and were not, appointed in compliance with the Appointments Clause. Accordingly, the district court's conclusion to the contrary is reversed. We direct the district court to enter a declaratory judgment to the effect that PROMESA's

-54-

protocol for the appointment of Board Members is unconstitutional
and must be severed. We affirm, however, the district court's
denial of appellants' motions to dismiss the Title III
proceedings. Each party shall bear its own costs.

So ordered.

**Reversed in part and Affirmed in part.**