## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-03283 (LTS)<br><br>(Jointly Administered) |

## INFORMATIVE MOTION REGARDING PUBLICATION AND FILING OF FINAL INVESTIGATIVE REPORT – MCKINSEY & COMPANY, INC.

**PLEASE TAKE NOTICE** that Luskin, Stern & Eisler LLP, special counsel to the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] hereby files its Final Investigative Report – McKinsey & Company, Inc. (the "Report"). The Report is attached as Exhibit A and will also available on the Oversight Board's official website at https://oversightboard.pr.gov/.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Dated: New York, New York
       February 18, 2019

Respectfully submitted,

/s/ Michael Luskin
Michael Luskin (admitted *pro hac vice*)
Stephan E. Hornung (admitted *pro hac vice*)
Lucia T. Chapman (admitted *pro hac vice*)

**LUSKIN, STERN & EISLER LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 597-8200
Facsimile:  (212) 974-3205

*Special Counsel to the Financial Oversight
and Management Board for Puerto Rico*

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, Puerto Rico 00918-1813
New York, New York 10036
Telephone: (787) 764-8181
Facsimile:  (787) 753-8944

*Co-Counsel for the Financial Oversight and
Management Board for Puerto Rico*

**<u>EXHIBIT A</u>**

**Final Investigative Report – McKinsey & Company, Inc.**

**Prepared for**

**The Financial Oversight & Management Board for Puerto Rico**

**By**

**Luskin, Stern & Eisler LLP**

**February 18, 2019**

## Table of Contents

I.      Introduction ................................................................................................................. 1

II.     Events Leading to Investigation ................................................................................. 6

      A.    News Articles ..................................................................................................... 6

      B.    Litigation Relating to McKinsey and its Affiliates ............................................ 8

      C.    Congressional Inquiries ................................................................................... 14

III.    Scope of Investigation .............................................................................................. 15

      A.    Purpose of Investigation ................................................................................. 15

      B.    Description of Investigation ............................................................................. 15

            1.  Documents ............................................................................................. 15

            2.  Interviews .............................................................................................. 16

            3.  Legal Research ....................................................................................... 17

IV.     The Oversight Board's Selection of a Strategic Consultant in 2016 ........................ 17

      A.    The Request for Proposal – Strategic Consulting Firm ................................... 18

      B.    Responses to the RFP and Selection of McKinsey as Strategic Consultant ......... 21

      C.    McKinsey's Disclosures ................................................................................... 22

V.      McKinsey's Scope of Work ...................................................................................... 24

      A.    Initial Engagement ........................................................................................... 24

      B.    Continuing Non-Title III Work ....................................................................... 27

      C.    Title III Work ................................................................................................... 29

      D.    Relevant Contract Provisions .......................................................................... 33

      E.    McKinsey Staffing ........................................................................................... 36

      F.    Compensation ................................................................................................... 37

VI.     Disclosure Law and Obligations ............................................................................... 39

      A.    Bankruptcy Code and PROMESA ................................................................... 39

      B.    The Proposed Puerto Rico Recovery Accuracy in Disclosures Act ................ 41

VII.    Oversight Board Conflict Policies and Procedures ................................................... 42

      A.    Oversight Board Code of Conduct ................................................................... 43

      B.    Vendor Code of Conduct ................................................................................. 43

      C.    Ethics Advisor ................................................................................................. 45

VIII.   McKinsey's Corporate Structure ............................................................................... 45

IX.     MIO Partners ............................................................................................................. 47

      A.    MIO Investments ............................................................................................. 48

            1.  Third-Party Funds ................................................................................. 50

|  |  | 2. Separately Managed Accounts ................................................ | 50 |
|  |  | 3. MIO Direct Investments ......................................................... | 51 |
|  | B. | Investment Decisions .................................................................... | 51 |
|  | C. | Investment Advisors ..................................................................... | 54 |
|  | D. | Information Available to Investors ............................................... | 55 |
|  |  | 1. Investment Prospectus ............................................................ | 55 |
|  |  | 2. Periodic Account Statements .................................................. | 55 |
|  |  | 3. Periodic Newsletters and Reports .......................................... | 56 |
|  |  | 4. Audited Financial Statements ................................................ | 56 |
|  |  | 5. Publicly-Available Information .............................................. | 57 |
| X. | | McKinsey and MIO Conflict Policies and Training ............................... | 59 |
|  | A. | MIO – CSP Collaboration Policy .................................................. | 59 |
|  | B. | McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes .................................................................... | 61 |
|  | C. | MIO Trading Policy ...................................................................... | 62 |
|  | D. | McKinsey Personal Investments Policy ......................................... | 63 |
|  | E. | MIO Personal Investment and Trading Policy and Code of Ethics ..... | 64 |
|  | F. | MIO Board Conflict and Confidentiality Policy ............................ | 64 |
|  | G. | Training and Certification ............................................................. | 66 |
| XI. | | MIO Investments in Puerto Rico Public Debt ........................................ | 66 |
|  | A. | Separately Managed Accounts ...................................................... | 67 |
|  | B. | Third-Party Funds ......................................................................... | 70 |
|  | C. | MIO Direct Investments ............................................................... | 72 |
| XII. | | McKinsey's Involvement in the COFINA Settlement and Plan of Adjustment .............. | 72 |
| XIII. | | Analysis and Conclusions .................................................................... | 78 |
|  | A. | McKinsey Made All Disclosures Required by Applicable Law and Requested by the Oversight Board ................................................ | 78 |
|  |  | 1. The Strategic Consultant RFP ................................................ | 78 |
|  |  | 2. The Vendor Code of Conduct ................................................. | 79 |
|  |  | 3. The September 1, 2018 Core Contract ................................... | 79 |
|  |  | 4. PROMESA ............................................................................. | 80 |
|  | B. | McKinsey's Procedures and Policies Mitigated any Conflicts Arising from MIO's Investments in Puerto Rico Public Debt ........................... | 81 |
|  | C. | Had the Oversight Board Known about MIO's Investments in Puerto Rico Public Debt, It Would Have Sought Additional Disclosure ...................... | 82 |

XIV.   Recommendations ........................................................................................ 83

    A.    Recommendation No. 1 – Vendors Should Disclose Affiliate Relationships ...... 85

    B.    Recommendation No. 2 – The Interested Parties List Should Be Expanded........ 86

    C.    Recommendation No. 3 – Direct Relationships, and to What Extent,
        if Any, They Raise Conflicts, Should Be Described in Detail............................. 87

    D.    Recommendation No. 4 – Indirect Relationships, and to What Extent,
        if Any, They Raise Conflicts, Should Be Described ........................................ 89

    E.    Recommendation No. 5 – Vendors Should Disclose Relevant Data
        in Their Public Filings ..................................................................................... 92

    F.    Recommendation No. 6 – Vendors Should Describe the Policies, Practices,
        and Procedures That They Have or Will Have to Guard Against Conflicts ........ 93

    G.    Recommendation No. 7 – Disclosures Must Be Updated
        and Certified Periodically ................................................................................. 94

    H.    Recommendation No. 8 – Oversight Board Forms Should Be
        Reviewed and Revised ..................................................................................... 94

XV.   Conclusion .................................................................................................... 95

## I.    **Introduction**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board")

retained Luskin, Stern & Eisler LLP ("LS&E") to conduct an investigation into its relationship

with its strategic consultant, McKinsey & Company, Inc. Washington D.C. ("McKinsey USG,"

and together with its other consulting affiliates, "McKinsey"), following reports in the press

about investments by McKinsey's investment affiliate, MIO Partners, Inc. ("MIO"), in Puerto

Rico public debt.  McKinsey's disclosures about MIO and MIO's holdings have also been the

focus of other press reports and of litigation in other cases unrelated to these PROMESA

proceedings, and have been the subject of Congressional inquiries and of proposed changes to

PROMESA governing disclosures required of retained professionals.

The Oversight Board's relationship with McKinsey raises issues that are important to

how the Court overseeing the PROMESA proceedings, the parties to those proceedings, and the

public perceive the PROMESA process.  We, therefore, investigated the Oversight Board's

retention of McKinsey, paying particular attention to what disclosures the Oversight Board

required in its Strategic Consultant Request for Proposal; what applicable law required

McKinsey to disclose; what the parties' agreements required McKinsey to disclose; what

McKinsey did in fact disclose; and whether or not McKinsey has any conflicts of interest, and if

it does, what McKinsey and the Oversight Board have done and will do to mitigate their impact.

The Oversight Board also asked that we consider what recommendations we would make to

improve the Oversight Board's policies and procedures so as to ensure that full disclosure by its

vendors (including its retained professionals) is made and that the impact of any conflicts or

perceived conflicts is minimized.

We have concluded that McKinsey USG made the disclosures required by the Oversight

Board and by applicable law, and that McKinsey's policies, procedures, and practices ensured

and continue to ensure that McKinsey's consulting work and MIO's investment management work were and are separate and that there is no information sharing between them. We have also found, however, that MIO did hold a direct investment in Puerto Rico public debt that it controlled while McKinsey was engaged by the Oversight Board and that, as reported in the press, MIO has held or holds investments in Puerto Rico public debt through third-party funds and separately managed accounts over which MIO exercises no investment discretion. These investments could be perceived as a conflict.

MIO is an SEC-registered investment manager that manages pre-tax pension plans sponsored by McKinsey and after-tax investment vehicles in which McKinsey partners, former partners, and their immediate family members may invest. MIO does not trade for its own account, but rather for the benefit of current and former McKinsey employees who are invested through MIO. MIO generally employs a "fund of funds" strategy, with approximately 90% of its assets managed by third-party asset managers. The remaining 10% is directly invested by MIO.

MIO's direct investment (liquidated in January 2017 and April 2018) was in bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"). However, we have seen no evidence suggesting that the McKinsey consultants working for the Oversight Board knew about this direct investment, let alone altered their behavior because of it, or that MIO had access to McKinsey's confidential consulting work for the Oversight Board, or altered its investment strategy because of it. And, in any event, McKinsey did not work on the Commonwealth-COFINA settlement or the COFINA plan of adjustment, both of which are built on an agreed-upon allocation of sales and use tax proceeds between the Commonwealth and COFINA that was negotiated by the COFINA Agent and the Creditors Committee on behalf of the Commonwealth, not by McKinsey. In particular, neither the Oversight Board nor McKinsey played any role in

negotiating the sales and use tax allocation that is at the center of the COFINA plan of adjustment.  The Oversight Board was involved in negotiating the terms of the plan of adjustment and the terms of the new securities, but was assisted in this task by its financial advisor, Citigroup Global Markets Inc. ("Citi"), not by McKinsey.

Had PROMESA or the Oversight Board required disclosure of MIO's direct investment in COFINA bonds (it did not), the Oversight Board likely would have regarded the investment as a potential conflict and would have required divestiture of the bonds or an explanation as to why ownership of these bonds did not present a disabling conflict (for instance, because the investment was *de minimis* or because McKinsey was not providing consulting advice regarding the COFINA bonds).  In fact, neither the Oversight Board nor McKinsey's consulting side learned of this direct investment in COFINA bonds until this investigation, and that is testimony to the effectiveness of the information barriers between MIO's investment business and McKinsey's consulting business.  Those policies, procedures, and practices are intended to ensure that MIO's investment decisions are not based on McKinsey's consulting work and that McKinsey's consulting advice is not based on MIO's investments.  McKinsey employees are not provided with information related to MIO's underlying investments and have no ability to influence MIO's investment decisions.  However, we now know that MIO has in the past made direct investments in Puerto Rico public debt, and there is no policy preventing MIO from doing so in the future.  Accordingly, we recommend that McKinsey update its disclosures to alert the Oversight Board whether its affiliate MIO has any such direct investments.  We also recommend that going forward, all vendors be required to update their disclosures with respect to direct investments held by them or their investment affiliates.

The vast majority of MIO's investments are through third-party funds or separately

managed accounts managed by third-party asset managers over which MIO exercises no

investment discretion.  Although MIO has known at all relevant times that these third-party fund

managers have made investments in Puerto Rico public debt, MIO does not share that

information with McKinsey consulting professionals, and again, we have seen no evidence that

anyone working on McKinsey's Puerto Rico service team was aware of these investments until

the press became involved.  However, had the Oversight Board known of these investments in

Puerto Rico public debt at the outset, it would have asked for additional information about how

the bonds were held, what discretion MIO had over investment decisions involving the bonds,

whether any information about the bonds was shared with McKinsey's consulting business or

with MIO's investors, and what policies and procedures McKinsey and MIO had in place to

ensure that information was not shared between McKinsey's consulting and MIO's investment

businesses.  The Oversight Board could then have assessed whether these investments

constituted a disabling conflict, or whether their size, MIO's lack of investment discretion and

control over them, the various information barriers, and limitations on McKinsey's scope of

work reduced the risk of a conflict to an acceptable level.

McKinsey did not disclose MIO's non-discretionary investments to the Oversight Board

as part of the RFP process – it was not required to – and neither the Oversight Board nor

McKinsey's consulting side learned of the investments until the press began reporting on them.

As the articles make clear, however, there is enough publicly-available information to enable a

determined investigator to uncover, for example, that three of MIO's investment funds filed

proofs of claim in the Title III proceedings or that MIO might have an indirect investment in

Puerto Rico public debt through a third-party asset manager that has been active in the Title III

proceedings.  We assume that similar investments will be made in the future by the third-party-

managers through which MIO primarily invests, so again, as we do with respect to direct

investments, we recommend that McKinsey now update its disclosures to alert the Oversight

Board to any MIO investments in Puerto Rico public debt controlled by third-parties it is able to

disclose or, if disclosure is not possible (because it does not know or is prevented by contract

from disclosing), to describe with particularity the safeguards it has in place to ensure the

investments do not present a conflict.  Going forward, all vendors should be required to update

their disclosures about such investments.

  As the Recommendations at the end of this Report make clear, we do not believe that

every connection with Puerto Rico a potential vendor might have presents a conflict, and we do

believe that the Oversight Board must be practical in setting the parameters for its vendors'

disclosures.  The economy of the entire Commonwealth is implicated in the PROMESA

proceedings, and it is hard to imagine there are any vendors who are in a position to serve the

Oversight Board and who do not also have relationships with the bankers, advisors, investors,

and other vendors who do business with or are invested in Puerto Rico.

  Accordingly, we have attempted to strike a balance.  We recommend that the Oversight

Board take steps to ensure that vendors like McKinsey USG make full disclosure about their own

businesses (*e.g.*, McKinsey's consulting business) and the businesses of their affiliates

(*e.g.*, MIO's investment business).  We recommend that vendors be responsible for checking

their own public filings (*e.g.*, regulatory filings, proofs of claim, etc.) for relevant names and

relationships.  Vendors should then cross-check the relevant names (*e.g.*, clients, funds and fund

managers, etc.) against an expanded list of interested parties.  We recommend that the Oversight

Board expand the list of interested parties to include investors, creditors, banks, insurers,

litigation parties, and other parties with significant roles in the PROMESA proceedings.  The list should be updated periodically, and vendors should be required to update their conflict checks against the updated list and to certify that they have done so.  Vendors should also disclose their own policies, procedures, and practices that they have or will put in place to ensure that the impact of any conflict is minimized.

The Oversight Board should review and revise its current conflict and disclosure policies and its RFP and disclosure forms in light of our Recommendations, and the Oversight Board should be responsible for updating the list of interested parties.  In addition, the Oversight Board should set reasonable disclosure parameters on a vendor-by-vendor basis.  For example, major vendors like McKinsey, who undertake a very broad scope of work, should be required to do more due diligence to uncover potential conflicts and to run more exhaustive conflict checks than a smaller vendor doing routine work for the Oversight Board.  In the end, though, the Oversight Board must require sufficient due diligence and disclosure so it can assess any conflicts, minimize their impact, and ensure that the Oversight Board's selection process and its vendors' work for the Oversight Board will be seen as unbiased and free of influence by actual or perceived conflicts.

## II.   **Events Leading to Investigation**

### A.   **News Articles**

On June 19, 2018, the *Wall Street Journal* reported on allegations that McKinsey's restructuring unit, McKinsey Recovery and Transformation Services US, LLC ("McKinsey RTS"), failed to disclose MIO investments in two hedge funds – Whitebox Advisors, LLC ("Whitebox") and Strategic Value Partners LLC – that gave McKinsey a financial interest in six

companies in bankruptcy for which McKinsey was providing consulting services.[1]  The
Oversight Board learned of MIO and its investment in Whitebox in May 2018, when the *Wall
Street Journal* contacted the Oversight Board for comment related to that story.  At that time,
based on conversations with McKinsey and a review of public filings, and on representations
concerning the separation of MIO from McKinsey's consulting business, the Oversight Board
determined that McKinsey's prior disclosures were appropriate and that no conflict existed.

On September 26, 2018, the *New York Times* reported that McKinsey, through its
affiliate, MIO, and specifically through three MIO investment funds – Compass CSS High Yield
Fund LLC, Compass ESMA LP, and Compass TSMA LP – owned at least $20 million in Puerto
Rico public debt.[2]  The story noted that these investments were not disclosed previously (nor was
there any requirement to disclose them under PROMESA) but came to light only through three
proofs of claim filed by the Compass funds in the Title III proceedings.  The article also reported
that, as of December 31, 2016, MIO held an investment in a fund called Pandora Select, which is
managed by Whitebox, an asset manager that has been active in the Title III proceedings.

Following publication of the *New York Times* article, the Oversight Board retained LS&E
to conduct an examination of the underlying facts, consequences, and implications of these

---

[1] Gretchen Morgenson and Tom Corrigan, *McKinsey Investments Weren't Disclosed in
Bankruptcy Cases*, Wall Street Journal, June 19, 2018.  MIO itself was the subject of coverage
by the *Financial Times*, which in June of 2016 reported on the existence of a "secretive $5bn
internal investment arm that manages the fortunes of past and present partners, raising questions
over possible conflicts of interest."  Miles Johnson and Harriet Agnew, *McKinsey's secret $5bn
fund in spotlight*, Financial Times, June 5, 2016.

[2]  Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*,
N.Y. Times, Sept. 26, 2018.

disclosures.[3]  The Oversight Board instructed LS&E to coordinate with the Oversight Board's

Ethics Advisor, and to investigate the circumstances surrounding McKinsey's and its affiliates'

holdings of Puerto Rico public debt, to analyze McKinsey's disclosure obligations under

PROMESA and pursuant to the Oversight Board's RFP procedures and McKinsey's contractual

arrangements with the Oversight Board, and to recommend any corrective action and

improvements that might be warranted.

      **B.**      <u>**Litigation Relating to McKinsey and its Affiliates**</u>

      Contemporaneously with the *Wall Street Journal* and *New York Times* articles, there was

a flurry of activity in two bankruptcy cases involving McKinsey RTS as either the approved

professional, in the case of *In re Alpha Natural Resources, Inc.*, Case No. 15-33896 (KRH)

(Bankr. E.D. Va.) ("*ANR*"), or as a professional applying for approval of its retention, in the case

of *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.)

("*Westmoreland*").  The following summary of these litigations is not meant to be a

comprehensive review of all of the facts or arguments made by the parties, and is provided

primarily to provide context for this investigation.  We take no position on the merits of the

allegations in any of these disputes.[4]

---

[3] The Oversight Board asked LS&E to conduct the investigation because its lead outside United
States counsel, Proskauer Rose LLP ("Proskauer"), represents McKinsey in separate litigation
related to McKinsey's disclosures in other proceedings.  LS&E has also acted as special counsel
to the Oversight Board in certain litigation matters before and since commencement of the
PROMESA Title III proceedings.

[4] Towards the end of our investigation, there was additional activity in a third bankruptcy case,
discussed more fully below.  *See In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr.
S.D.N.Y.) ("*SunEdison*"), ECF No. 5751.

In *ANR*, the debtors retained McKinsey RTS to serve as their turnaround advisor.[5]  The
United States Trustee believed that McKinsey RTS's disclosures were inadequate and, in
May 2016, filed a motion to compel McKinsey RTS to comply with Bankruptcy Rule 2014 by
disclosing the identities of parties-in-interest with whom McKinsey RTS and its affiliates had
connections.[6]  McKinsey RTS filed a supplemental declaration that satisfied the concerns of the
United States Trustee.[7]

Unsatisfied with McKinsey's disclosures, Mar-Bow Value Partners, LLC ("Mar-Bow"),
an entity formed and owned by Jay Alix, a self-described "industry leader in the restructuring
sector" and founder of AlixPartners, purchased a claim in the *ANR* bankruptcy and filed its own
motion to compel McKinsey RTS to make further disclosures concerning its connections to the
Debtors, creditors, and parties-in-interest.[8]  On July 1, 2016, the Court granted Mar-Bow's
motion in part, directing, *inter alia*, McKinsey RTS to provide the Court for *in camera* review a
list containing the names of 121 undisclosed connections; identification of interested parties that
manage investments for MIO; and identification of interested parties in which MIO owns
securities, except in cases where MIO invests in "funds of funds, funds, or third party managers,
and has no input or control over investment decisions," in which case McKinsey RTS needed
only to disclose any such funds that were interested parties.[9]  To the extent MIO "directed an

---

[5] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 212.

[6] *Id.*, ECF No. 2308.

[7] *Id.*, ECF Nos. 2464, 2474.

[8] *Id.*, ECF No. 2603 nn.1, 2.

[9] *Id.*, ECF No. 2895.

investment with its investment discretion," the Court ordered McKinsey RTS to disclose any "[i]nterested [p]arties whose names match with names on MIO's ledger of investments."[10] McKinsey RTS complied with the Court order and provided *in camera* disclosures to the Court.[11]

The Court confirmed the *ANR* plan of reorganization and approved McKinsey RTS's final fee application, both over Mar-Bow's objection.[12] As part of the plan, ANR's pre-petition secured lenders, which included Whitebox, were given equity in the reorganized debtors. Mar-Bow appealed the confirmation order, the order approving McKinsey RTS's fee application, and the orders related to McKinsey RTS's disclosures. On September 30, 2017, the United States District Court for the Eastern District of Virginia dismissed Mar-Bow's appeals as equitably moot or for lack of standing.[13] On September 6, 2018, the Fourth Circuit Court of Appeals affirmed the District Court orders dismissing the appeals.[14] On January 22, 2019, Mar-Bow filed a petition for certiorari with the United States Supreme Court.[15]

---

[10] *Id.* ¶ 2(c)(ii).

[11] *Id.*, ECF No. 4198.

[12] *Id.*, ECF Nos. 3038, 3666.

[13] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, No. 16-cv-612 (MHL) (E.D. Va.), ECF No. 50; *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, No. 16-cv-799 (MHL) (E.D. Va.), ECF No. 52.

[14] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, 736 F. App'x 412 (4th Cir. 2018).

[15] *Mar-Bow Value Partners, LLC v. McKinsey Recovery and Transformation Servs. US LLC (In re Alpha Nat. Res., Inc.)*, Case No. 18-974 (Sup. Ct.).

On June 28, 2018, the Court entered a final decree closing the *ANR* bankruptcy cases.[16]
On July 18, 2018, Mar-Bow filed a motion to reopen the *ANR* bankruptcy cases and for relief
from prior denials of its requests for additional disclosure based on evidence that MIO owned
previously-undisclosed interests in certain Whitebox funds that had received a substantial equity
interest in the reorganized debtors through the plan.[17]  The United States Trustee supported the
Mar-Bow motion, citing to allegedly "inaccurate" characterizations of MIO as a "blind trust" and
calling that explanation, "at best, misleading in a way that deflected further questions about MIO
at the outset."  According to the United States Trustee, McKinsey RTS was "not forthcoming"
about the role Jon Garcia, the president of McKinsey RTS, played on the MIO Board of
Directors.[18]

By order dated January 16, 2019, the Court granted Mar-Bow's motion to reopen the
main *ANR* bankruptcy case for the limited purpose of addressing Mar-Bow's allegations and the
United States Trustee's concerns, and directed McKinsey RTS to file its July 2016 *in camera*
disclosures on the public docket.[19]  McKinsey RTS complied with the disclosure order the same
day.[20]  The *in camera* disclosures included: (1) the names of the 121 previously-undisclosed
connections, along with each interested party's relationship to the Debtors; (2) the names of nine
interested parties that "manage investments in funds, funds of funds, or third-party managers

---

[16] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4119.

[17] *Id.*, ECF Nos. 4122, 4124.

[18] *Id.*, ECF Nos. 4126, 4164.

[19] *Id.*, ECF No. 4194.

[20] *Id.*, ECF No. 4195.  The Court also opened a miscellaneous proceeding for purposes of addressing the dispute.  *See OLD ANR, LLC*, Case No. 19-00302 (KRH) (Bankr. E.D. Va.).

-11-

where MIO has no input or control over investment decisions"; (3) the names of twelve

interested parties "whose name match with names on MIO's ledger of investments where MIO

has directed an investment with its investment discretion"; and (4) information concerning

response rates to email surveys related to McKinsey RTS's conflicts check.[21]

   In *Westmoreland*, Mar-Bow challenged the debtors' application to retain McKinsey RTS

as "performance improvement advisors" in a lengthy objection alleging that McKinsey was not

disinterested and had concealed a large number of MIO investments.[22]  The objection catalogued

allegedly similar behavior in other, unrelated bankruptcies (including *ANR*) in which McKinsey

RTS had been retained by the debtor.[23]  By order dated November 30, 2018, the Court directed

the United States Trustee to review Mar-Bow's allegations and to make a written

recommendation to the Court, noting that the conduct alleged by Mar-Bow, "if true, could

violate Title 18."[24]  On December 14, 2018, the United States Trustee filed its response to the

---

[21] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4195.
According to MIO's counsel, the names of the twelve interested parties "whose name match with
names on MIO's ledger of investments where MIO has directed an investment with its
investment discretion" are entities that "served as lenders, counterparties, or brokers to MIO or
appeared on the basis of the name to be an affiliate of an institution that served in such capacity,
and for which MIO manages its credit exposure through credit default swaps."

[22] *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.),
ECF Nos. 452, 629.

[23] *Id.*, ECF No. 629.

[24] *Id.*, ECF No. 632.  Title 18 of the United States Code is the main Federal criminal code.  The
Court also noted that Mar-Bow's objection was "filed subject to Bankruptcy Rule 9011" which,
*inter alia*, provides that parties signing a filing make certain certifications regarding the basis of
statements in the filing and are subject to sanctions should the Court determine that the Rule has
been violated.  *Id.*; *see* Fed. R. Bankr. P. 9011.

Court's November 30, 2018 Order.[25]  The United States Trustee took the position that McKinsey RTS's disclosures were "not transparent and by its own admission are incomplete," as they omitted "critical details" about McKinsey RTS's connections to interested parties, including a "Confidential Client" that accounts for 17.5% of McKinsey RTS's gross annual revenue.[26]  After depositions of both Jay Alix and a McKinsey representative, Judge Jones reiterated that McKinsey could have a Title 18 problem if statements made by Jay Alix at his deposition were true.  He cautioned, however, that if those statements were not true, Alix could have one.[27]

In addition to raising issues relating to the adequacy of McKinsey RTS's disclosures in *ANR* and *Westmoreland*, Jay Alix personally filed a lawsuit in the United States District Court for the Southern District of New York against McKinsey, certain affiliates, and several senior partners alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962, and asserting other contract and tort causes of action.[28]  McKinsey moved to dismiss the case.[29]  The motion is *sub judice*.

On January 16, 2019, Judge Jones (in *Westmoreland*) and Judge Huennekens (in *ANR*) entered a joint order directing Mar-Bow and McKinsey RTS to mediate those disputes before

---

[25] *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 785.

[26] *Id.*

[27] *Id.*, Jan. 3, 2019, Hr'g Tr. at 28:2–10, ECF No. 943 (hearing transcript available to the public April 4, 2019); *see* ECF No. 905 (deposition transcripts).

[28] *Alix v. McKinsey & Co., Inc.*, Case No. 18-CV-04141 (JMF) (S.D.N.Y.) ("*JayAlix*"), ECF No. 73.

[29] *Id.*, ECF No. 88.

Bankruptcy Judge Marvin Isgur of the United States Bankruptcy Court for the Southern District of Texas.[30]  The mediation is ongoing.

On January 22, 2019, Mar-Bow filed a motion in the *SunEdison* bankruptcy, asking the Court to vacate its orders approving McKinsey RTS's retention and final fee applications.[31]  The motion repeats the allegations made in *ANR* and *Westmoreland* and accuses McKinsey RTS of perpetrating a fraud on the Court by failing to disclose connections to the debtors and other parties-in-interest.  On January 25, 2019, the Court ordered the parties to include the *SunEdison* dispute in the matters being mediated before Judge Isgur.[32]

### C.  Congressional Inquiries

In late December 2018, both McKinsey and the Oversight Board received letters from members of Congress with questions and concerns relating to the facts reported in the September, 26, 2018, *New York Times* article, and in the case of the inquiry addressed to McKinsey, to the *ANR* and *Westmoreland* chapter 11 cases and the *JayAlix* lawsuit in New York. The Oversight Board's response, dated January 2, 2019, informed the inquiring Senators that LS&E is conducting an investigation which would address the issues raised in connection with the Oversight Board's retention and employment of McKinsey and noted that the investigation would examine McKinsey's disclosure obligations under current law and pursuant to its contracts with the Oversight Board and would result in a public report that would address any corrective action and improvements that might be warranted.  McKinsey's response, dated

---

[30] *OLD ANR, LLC*, Case No. 19-00302 (KRH) (Bankr. E.D. Va.), ECF No. 5; *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 1088.

[31] *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y.), ECF No. 5751.

[32] *Id.*, ECF No. 5756.

January 15, 2019, disagreed with the assertions in the letter it received, emphasized the

separateness and independence of MIO from McKinsey, and disputed any implication that

McKinsey had leveraged its relationship with the Oversight Board for purposes of financial gain.

We take no position on the Congressional inquiries.[33]

### III.   Scope of Investigation

#### A.    Purpose of Investigation

The Oversight Board directed LS&E to conduct an investigation into McKinsey's

disclosures in connection with its retention and continued employment by the Oversight Board

and any conflicts of interest; to review the policies and procedures of the Oversight Board

relating to retention of advisors and relationships with third-party vendors; and to make

recommendations to the Oversight Board.

#### B.    Description of Investigation

##### 1.    Documents

We obtained and reviewed documents from public sources, the Oversight Board,

McKinsey, and MIO.[34]  Public sources included news articles, court filings, and regulatory

filings.  We reviewed court filings in *ANR*, *Westmoreland*, *SunEdison*, *JayAlix*, and the

Commonwealth and COFINA Title III cases.  Among them were the declarations filed by

McKinsey and MIO personnel in the *ANR* and *Westmoreland* cases, the Mar-Bow objections and

McKinsey responses in those cases and in *SunEdison*, various hearing transcripts, the *JayAlix*

complaint and motion papers, and the McKinsey and Jay Alix depositions in the *Westmoreland*

case.  Among the regulatory filings we reviewed were Department of Labor Forms 5500 filed by

---

[33] Congress is considering changes to PROMESA that would alter current disclosure
requirements.  The proposed legislation is described in Section VI.B below.

[34] We did not serve subpoenas on McKinsey or MIO.  All documents were provided voluntarily.

the McKinsey Master Retirement Trust ("MMRT") and Forms ADV filed by MIO with the

Securities and Exchange Commission ("SEC").  From the Oversight Board, we received and

reviewed contracts, policies and procedures, letters, and emails, both internal and with

McKinsey.  The documents produced by McKinsey and MIO included contracts, policies and

procedures, organizational charts, bylaws, public filings, McKinsey's response to the RFP for a

strategic consultant issued by the Oversight Board, letters, fee applications, communications with

the Title III Fee Examiner, and email communications related to negotiation of McKinsey's

contracts with the Oversight Board.

### 2.    Interviews

We conducted interviews of 13 witnesses, some multiple times.  Those witnesses

included:

- Senior partners at McKinsey USG and its consulting affiliates who are in charge of McKinsey's work for the Oversight Board;

- MIO's chief investment officer and co-CEO and the portfolio managers at MIO with responsibility for MIO's direct and third-party managed holdings of Puerto Rico public debt;

- Members of the Oversight Board's Selection Committee appointed to conduct the strategic consultant RFP process;

- The Oversight Board's Executive Director;

- The Oversight Board's General Counsel;

- The Oversight Board's Ethics Advisor; and

- The Oversight Board's outside counsel at Proskauer.

We also followed up with certain of these witnesses either directly or through counsel as needed, and had numerous conversations, meetings, and telephone calls with counsel for the Oversight Board, McKinsey, and MIO.

### 3.    Legal Research

We performed legal research as required.

## IV.    The Oversight Board's Selection of a Strategic Consultant in 2016

The Oversight Board was established by the bipartisan Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which was signed into law by President Obama on June 30, 2016, to address the economic crisis in Puerto Rico and to provide Puerto Rico with the tools it needed to restructure its debts and embark on a path to economic recovery.  On August 31, 2016, President Obama appointed José B. Carrión, Andrew G. Biggs, José R. González, Ana J. Matosantos, Carlos M. García, Arthur J. González, and David A. Skeel to the Oversight Board.[35]

PROMESA provided the broad policy framework and a considerable toolbox to restructure Puerto Rico's crippling debt, but left the nuts and bolts to the Oversight Board itself. When the Oversight Board was appointed, there were no offices, no staff, no telephones, no email addresses, no bylaws, and no instruction manuals, policies, or procedures in place.  The task of getting the Oversight Board up and running was left to the individual members of the

---

[35] Pursuant to Section 101 of PROMESA, the "Governor, or the Governor's designee, shall be an ex officio member of the Oversight Board without voting rights."  48 U.S.C. § 2121(e)(3).  The current ex officio member of the Oversight Board is Christian Sobrino.

-17-

Oversight Board.  It was immediately apparent to the Oversight Board that it needed a strategic

consulting firm to help make the Oversight Board operational.[36]

A.      **The Request for Proposal – Strategic Consulting Firm**

In October 2016, the Oversight Board appointed three of its members to a Selection

Committee to lead the search for a strategic consultant:  Carlos M. García, Ana J. Matosantos,

and José R. González.  On October 20, 2016, the Oversight Board issued the Request for

Proposal for Strategic Consulting Firm (the "Initial Consultant RFP").[37]  On October 24, 2016,

the Oversight Board issued clarifications and additional guidelines to the Initial Consultant RFP

(as clarified, the "Consultant RFP").[38]

---

[36] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.  Beginning over the summer of 2016
and continuing into the fall of 2016, various creditors and monoline insurers had sought relief
from the automatic stay imposed by PROMESA § 405.  *See* 20 U.S.C. § 2194.  In early
October 2016, the Oversight Board retained LS&E to intervene in these actions and to protect the
Oversight Board's interests while the Oversight Board retained lead counsel and established its
operating structure.  The Oversight Board issued a Request for Proposal for Outside Legal
Counsel on the same day it issued the Initial Consultant RFP.  A copy of the Request for
Proposal for Outside Counsel is available on the Oversight Board's website at https://drive.
google.com/file/d/1McTD5d_oTbfMut6eGjUpm14xj4ElaAD4/view.  The Oversight Board
announced its retention of Proskauer on November 27, 2016, the same day it announced its
retention of McKinsey.  A copy of the Oversight Board's press release announcing the retention
of Proskauer and McKinsey is available on the Oversight Board's website at https://drive.google.
com/file/d/1meBQhCh9AG6QjQHi0SrCG9jej4zvB_sU/view.

[37] A copy of the Initial Consultant RFP is available on the Oversight Board's website at
https://drive.google.com/file/d/1ahH7EPmcUU18s4pNSWq4JR9N7QWnB3kX/view.

[38] A copy of the Clarifications and Additional Guidelines to the Response to the RFP for
Strategic Consultant is available on the Oversight Board's website at https://drive.google.com
/file/d/1AHqf1Q8xaWt6B8BYcdwA-SWMJueTPVrE/view.

The Consultant RFP sought a global strategic consulting firm that was capable of assisting the Oversight Board with eleven projects:

1.  Assist in designing a comprehensive planning process in line with the requirements of PROMESA (including each title of the statute) under a project management office (PMO) approach.

2.  Develop an actionable initial strategic plan, including a projected budget for its implementation and the critical work streams to address in the next 120 days.

3.  Develop recommendations regarding the plan's implementation and support structure, including staffing levels, initial policies and guidelines, and a proposed organizational structure to support the [Oversight] Board in carrying out its duties as envisioned in the statute as soon as possible.

4.  Assist in the development of a fact-based framework to evaluate and certify fiscal plans and annual budgets presented to the [Oversight] Board by covered entities under PROMESA, including an initial assessment and stress test about the Commonwealth of Puerto Rico fiscal year 2017 budget and the Fiscal and Economic Growth Plan (FEGP) presented by the Governor of Puerto Rico to the [Oversight] Board.

5.  Collaborate with the [Oversight] Board's legal advisors in the development of a framework and guidelines to address litigation and legal proceedings, including operational implications.

6.  Provide a fact-based framework to evaluate critical projects under PROMESA.

7.  Present to the [Oversight] Board a set of initiatives and "quick-wins" for Puerto Rico related to: (i) creating the foundation for economic growth and (ii) improving government services to the people of Puerto Rico, specifically in the areas of technology, welfare programs, health, and education.

8.  Provide a framework and proposed process to address debt restructuring negotiations.

9.  Provide a framework, initial assessment and benchmarks to evaluate the structure of the Government of Puerto Rico, its agencies, instrumentalities and public corporations, including their productivity, efficiency and performance.

10. Provide a framework, initial assessment and benchmarks to evaluate the pension system.

11. Provide best practices and recommendations to promote transparency and public participation, including, but not limited to, format and structure for public hearings, use of social media and technology, and the design, content, and technological platform of the [Oversight] Board's website.

The Consultant RFP made clear that the selection criteria and process would include a "[c]onflicts of interest review" and asked each applicant to:

- include "**a list and description of any connections, past and present, with Puerto Rico and any work that your firm has performed or is performing for the Government of Puerto Rico or any of its instrumentalities**"; and

- "**state if you have any conflict of interest or potential appearance of conflict of interest in taking this engagement by virtue of your firm's current or prior engagements with other parties**."[39]

The Consultant RFP did not specifically ask applicants about their affiliates or whether applicants had an investment arm or whether they had pension funds or other investment vehicles with investments in Puerto Rico public debt. As the Selection Committee explained, the issue was simply not on its radar.[40] Given the unique – and indeed unprecedented – nature of the initial engagement, the Selection Committee's concern with conflicts led it to focus on work prospective consulting firms had done, or were doing, for the Government of Puerto Rico, including its various agencies and departments and related entities. Although prospective applicants would have known, for example, the identities of the "covered" Commonwealth instrumentalities and the names of the members of the Oversight Board and could have identified parties to litigations against the Commonwealth seeking relief from the PROMESA stay, applicants were not provided an "interested parties list" containing the names of major investors, creditors, banks, advisors, insurers, litigation parties, and other parties-in-interest against which to check connections.[41]

---

[39] Initial Consultant RFP at 3 (emphasis in original).

[40] Oversight Board Interview, Dec. 14, 2018.

[41] By contrast, when the Oversight Board issued its Request for Proposal for Financial Advisor (the "FA RFP") in December 2016, it asked applicants to conduct their own review of public

**B.**     <u>**Responses to the RFP and Selection of McKinsey as Strategic Consultant**</u>

The Oversight Board received 18 responses to the Consultant RFP by the

October 27, 2016 deadline and, based upon the written submissions, narrowed the field down to

three global, "brand name" finalists.[42]  The Selection Committee held in-person interviews with

the three finalists and, ultimately, selected McKinsey USG based on, *inter alia*, the strength of

the McKinsey team, its familiarity with Puerto Rico, and its proposed fee structure, which was

considerably less costly than the next best proposal.[43]

---

court filings to see if the applicant had any connections with major bondholders and litigation
parties.  The FA RFP stated:

> Please include in your submission a list and description of any connections, past
> and present, with Puerto Rico and its financial crisis, including its creditors and
> other constituencies of which you are aware or can identify from pending
> litigation.  Although there are no publicly available "lists" of litigations related to
> the Commonwealth of Puerto Rico, there are a number of litigations that provide
> some information about creditors participating in those litigations.  So to the extent
> applicant represents creditors of the Commonwealth of Puerto Rico, whether
> related to the fiscal crisis or not, such relationships should be identified in the
> response to the RFP as best you can.  Further, applicants should set forth any direct
> or indirect connection applicant has with members of the [Oversight] Board or
> their families.

FA RFP at 2.  A copy of the FA RFP is available on the Oversight Board's website at
https://drive.google.com/file/d/10EahJn5tDyj8uppKdQUqAj2p_L032SGe/view.  However, the
Oversight Board only asked applicants to disclose actual or potential conflicts of interest based
upon the applicant's "current or prior engagements."  *Id.*

[42] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

[43] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

C.    <u>**McKinsey's Disclosures**</u>

McKinsey USG's response to the Consultant RFP stated that it was "not conflicted" and

that it could "credibly act without conflicts or bias."[44]  It also stated:

> McKinsey [USG] does not have any current contracts with the Government of
> Puerto Rico or any of its instrumentalities.  Further, to the best of McKinsey
> [USG]'s knowledge and belief, McKinsey [USG] does not currently have any
> conflict of interest or potential appearance of conflict of interest caused by any
> contract resulting from this request for proposal.  Should McKinsey [USG]
> become aware of any actual or potential conflict of interest, McKinsey [USG] will
> provide notice to and work with the [Oversight] Board to provide a detailed
> mitigation plan if requested.[45]

With respect to work done for the Government of Puerto Rico, McKinsey USG's

response to the Oversight Board disclosed prior work that McKinsey affiliates had done in 2007,

in connection with Puerto Rico supply chain management and inventory; in 2007 and 2008, in

connection with the Central American and Caribbean Games for 2010; and in 2015, with the

Puerto Rico Science, Technology, and Research Trust relating to manufacturing facilities to

support bio-medical manufacturing on the island.  McKinsey also disclosed to the Selection

Committee work that McKinsey had done for the Puerto Rico Government and Department of

Education in 2003; certain due diligence work by McKinsey on the Puerto Rico economy and

related issues on behalf of a private sector client related to a public/private partnership involving

the purchase of one of Puerto Rico's toll roads in 2012; and prior work that McKinsey had done

---

[44] McKinsey Response to Consultant RFP, dated Oct. 27, 2016.  According to McKinsey, all of
its government contracts are with this entity.  McKinsey often uses the acronym "USG" –
meaning United States Government – and we have adopted that acronym in this Report.

[45] *Id.*

for a Puerto Rican bank.[46]  Finally, McKinsey disclosed that one of the lead partners on the

engagement provided consulting services to a client whose interests were or could be implicated

by a specific provision of the Puerto Rico tax code.  McKinsey confirmed to the Oversight Board

that this partner would recuse himself from any work or conversations about issues relating to

that provision, should they arise.[47]

       As the members of the Oversight Board's Selection Committee and McKinsey have made

clear to us, the Oversight Board was primarily focused on whether the consultants being

considered had worked for the Government of Puerto Rico, since whatever firm won the

engagement would need to work closely with the Government as well as with the Oversight

Board.  While some of the major investors, creditors, banks, advisors, insurers, litigation parties,

and other parties-in-interest were named in the public record, the Oversight Board did not

specifically request and McKinsey did not perform any checks against any of those parties

during the RFP process.[48]

       McKinsey did not disclose the existence or ownership of MIO or its place in McKinsey's

corporate structure or its relationship to McKinsey USG, or its purpose as an investment vehicle

for current and former McKinsey partners and their families.[49]  Nor did McKinsey USG disclose

that MIO was invested (both directly and through third-party funds) in Puerto Rico public debt.

---

[46] *Id.*; McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018; Oversight Board Interviews,
Dec. 10 & 17, 2018.  McKinsey notified the bank team that any future interactions with that
client needed to be brought to the lead partner's attention.  McKinsey Interview, Nov. 20, 2018.

[47] Oversight Board Interview, Dec. 17, 2018.

[48] McKinsey Interviews, Nov. 20, 2017, Dec. 12, 2018, Feb. 1, 2019; Oversight Board
Interviews, Dec. 10, 14, & 17, 2018.

[49] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

To be sure, while the McKinsey partners working on the Puerto Rico engagement were aware of MIO's existence, this investigation has uncovered no evidence that MIO shared information related to its investments in Puerto Rico public debt with anyone on the Puerto Rico engagement team or that the partners leading the Puerto Rico engagement were aware of MIO's Puerto Rico investments until 2018, at the time, or shortly before, it was reported in the press.

## V.    McKinsey's Scope of Work

### A.    Initial Engagement

It was clear in early November 2016 that McKinsey would be selected as the strategic consultant, but it took until the end of November to finalize the agreement.  Ultimately, McKinsey USG and the Oversight Board executed an initial consulting agreement dated as of November 27, 2016 (the "Initial Consulting Agreement"; as amended from time to time, the "Core Consulting Agreement"), which set forth the terms of McKinsey USG's initial engagement on a "Firm Fixed Price" basis.[50]  As discussed more fully in Section V.D below, the Core Consulting Agreement contains three complementary provisions that govern the use of confidential information and conflicts of interest.

The Initial Consulting Agreement laid out in broad terms the planned scope of McKinsey's work for the Oversight Board.  The Oversight Board needed assistance in becoming a workable organization.  McKinsey was to assist in developing a planning process for the Oversight Board's organization, develop a 120-day work plan, and design the Oversight Board's organizational and support structure – essentially to get the Oversight Board up and running.  In addition, McKinsey was to help establish "frameworks" to support the Oversight Board's

---

[50] A copy of the Initial Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1qeH3RM1Ic0q0N0qLb8fa9o-s-la_3AZ3/view.

deliberations and decision-making.  McKinsey would help the Oversight Board prioritize short-
and long-term initiatives, and would provide a team member, selected by the Governor of Puerto
Rico, to serve as the Commonwealth's interim Revitalization Coordinator.[51]

McKinsey assembled a team that had familiarity with Puerto Rico, as well as expertise in
government consulting; infrastructure, strategy, and organization; organization and investments
of state pension funds; sovereign balance sheet and debt management; restructuring; and tax.[52]
Aaron Bielenberg, a McKinsey associate principal, was appointed the interim Chief
Revitalization Officer.[53]

The team began to assess how best to approach the problems in Puerto Rico, identifying
and interacting with key members of the Commonwealth administration to understand the issues
and to lay out a timeline.  The initial intent was for the team to gather a general sense of revenues
and expenses of different government agencies.  The parties contemplated that one of
McKinsey's primary responsibilities would be to stress-test the Commonwealth's fiscal plan.
However, it soon became clear to both McKinsey and the Oversight Board that the scope of
McKinsey's work would be far greater than initially envisioned.  Reliable revenue and expense-

---

[51] Initial Consulting Agreement, Attachment 1.  Section 502 of PROMESA required the
Governor, in consultation with the Oversight Board, to appoint a Revitalization Coordinator from
a list of nominees proposed by the Oversight Board.  The Oversight Board was required to
provide the Governor a list of three nominees within 60 days of its full appointment.
48 U.S.C. § 2212(b).

[52] McKinsey's public sector work does not typically involve distressed municipalities; the
incidence of distressed municipalities is, in fact, fairly low.  McKinsey Interview, Dec. 12, 2018.
However, according to its response to the Consultant RFP, McKinsey has advised distressed
municipalities and countries, including Detroit, Morocco, and Ukraine.  McKinsey Response to
Consultant RFP, dated Oct. 27, 2016.

[53] Then-Governor García-Padilla selected Mr. Bielenberg from three finalists for the position.

related data was not available, meaning that McKinsey had to spend considerable time developing baseline revenue and cost data to be able to assess and stress test multiple Government fiscal plan submissions, ultimately leading to a certified fiscal plan. Work on revenue projections, expenses, and fiscal plans, therefore, constituted the bulk of McKinsey's work for the Oversight Board from the outset.[54]

Prior to McKinsey's engagement, the Oversight Board had determined which agencies were "covered" instrumentalities.[55] The Oversight Board determined that the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Public Corporation for the Supervision and Insurance of Cooperatives ("COSSEC"), the University of Puerto Rico ("UPR"), and the Government Development Bank ("GDB") accounted for the vast majority of the Government budget (other than the Commonwealth central government agencies and departments). Accordingly, McKinsey and the Oversight Board focused their attention and efforts on those six instrumentalities.[56] However, as it became clear that McKinsey and the Oversight Board would need to take on additional tasks, some functions enumerated in the Initial Consulting Agreement fell off the scope of McKinsey's work, including, for example, developing a litigation framework and strategy and a restructuring framework and process.[57]

---

[54] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

[55] Pursuant to Section 101(d) of PROMESA, the Oversight Board was authorized to "designate any territorial instrumentality as a covered territorial instrumentality that is subject to the requirements" of PROMESA. 48 U.S.C. § 2121(d).

[56] McKinsey Interview, Nov. 20, 2018.

[57] *Id.* The Initial Consulting Agreement envisioned that McKinsey would work with the Oversight Board's counsel "to build a baseline assessment of legal proceedings and litigation, develop a framework and guidelines to enable the [Oversight] Board to develop a strategy for

For a variety of reasons, data collection and analysis turned out to be much more difficult than McKinsey originally anticipated. It became clear to the Oversight Board at an early point that McKinsey would need to play a major role in the development of the Commonwealth's fiscal plan. Despite significant challenges, and after several Government fiscal plan submissions and revisions, the Oversight Board with McKinsey's support was able to certify a fiscal plan on March 13, 2017. After that, McKinsey continued to monitor implementation of the Commonwealth fiscal plan and to develop a budget.[58]

### B.   Continuing Non-Title III Work

The Core Consulting Agreement was amended by agreement dated March 9, 2017 (the "March 9, 2017 Amendment").[59] The March 9, 2017 Amendment revised McKinsey's scope of work and added, for the first time, a "Vendor Conflict of Interest Disclosure Certification" (described more fully below) that required McKinsey to certify that it had no specified conflicts of interest based upon connections to certain "Interested Parties" (the members of the Oversight Board and its designated staff, the Commonwealth, and its

---

managing existing claims (*e.g.*, Covina [sic] related claims and amounts due to contractors and taxpayers), and then put in place a robust framework for evaluation of potential litigation risk and trade-offs that will support the [Oversight] Board in developing its debt restructuring and stakeholder engagement strategy." McKinsey was also expected to "[d]esign with the [Oversight] Board a bespoke restructuring process and strategy to restructure Puerto Rico's public debt across all of its sovereign and sub-sovereign issuers." Initial Consulting Agreement, Attachment 1.

[58] McKinsey Interview, Nov. 20, 2018.

[59] A copy of the March 9, 2017 Amendment is available on the Oversight Board's website at https://drive.google.com/file/d/1n5u9kDhqHoIemLhSfGc0Q-W2PTx0oeuU/view.

instrumentalities).[60]  The March 9, 2017 Amendment provided for McKinsey to provide project management office and organization support; to perform stress-tests of fiscal plans for various covered instrumentalities, including PRASA, PREPA, GDB, HTA, COSSEC, and UPR; to provide implementation planning; to provide support for "critical projects" aimed at involving the private sector; to identify which critical projects the Oversight Board should select to fast-track; and to continue to provide a Revitalization Coordinator.[61]

By July 1, 2017 – the beginning of the Commonwealth's fiscal year – McKinsey and the Oversight Board had worked with the Government to develop a budget and had begun working on how to implement the fiscal plan.  After that, McKinsey continued monitoring the activities of the covered instrumentalities and providing support as needed, as well as executing necessary planning.  Hurricanes Maria and Irma in September 2017 complicated these tasks; the destruction they caused required that the Commonwealth, the Oversight Board, and McKinsey revisit virtually every assumption underlying the budget and fiscal plans.  The nature of McKinsey's non-Title III work – work on developing, stress testing and implementing fiscal plans for the Commonwealth and select instrumentalities – remained substantially the same, however.[62]

McKinsey and the Oversight Board entered into a second amendment (the "Second Amendment") to the Core Consulting Agreement dated January 1, 2018, that provided, *inter alia*, that McKinsey would work on stress testing and supporting fiscal plans and annual budgets

---

[60] The March 9, 2017 Amendment was signed by McKinsey & Company, Inc., United States, not McKinsey USG.  The change appears to have been a drafting error.

[61] March 9, 2017 Amendment.

[62] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

for non-Title III instrumentalities (PRASA, COSSEC, and UPR); review government-recovery related contracts over $10 million; and work with the Oversight Board's financial advisor, Citi, to ensure that fiscal plans were "aligned with restructuring strategy and pension reforms."[63]

On September 1, 2018, the parties entered into a new Independent Contractor Services Agreement that provided that McKinsey would "[s]upport implementation related to the Fiscal Plans for the Title III entities (Commonwealth, PREPA and HTA) and PRASA, COSSEC, and UPR" as well as continue to review proposed government contracts as needed and to work with Citi to ensure that fiscal plans aligned with restructuring strategy.[64]

## C.   Title III Work

It was apparent from the outset of the Oversight Board's and McKinsey's work that a Title III filing was likely if not inevitable. The original pre-Title III stay under PROMESA was extended to May 1, 2017, permitting mediation with the major bondholders. Ultimately, however, the mediation was not successful, and various bondholder groups filed actions against the Commonwealth and COFINA. On May 3 and 5, 2017, the Oversight Board filed Title III petitions on behalf of the Commonwealth and COFINA, respectively. The Oversight Board subsequently filed Title III petitions on behalf of HTA, ERS, and PREPA. As a result,

---

[63] A copy of the Second Amendment is available on the Oversight Board's website at https://drive.google.com/file/d/1Y_ixsfwgosD8IC73G9R_HUeCsytxw0O1/view. The Second Amendment had a term of six months. The parties subsequently signed a third amendment, dated July 1, 2018 (the "Third Amendment"), that extended the engagement for an additional two months. A copy of the Third Amendment is available on the Oversight Board's website at https://drive.google.com/file/d/1wEP8BSDBZAQrz1btUCtKlJwH8Qj9lXdY/view.

[64] Independent Contractor Services Agreement (McKinsey & Company, Inc. Washington DC), effective September 1, 2018 (the "September 1, 2018 Core Consulting Agreement"). A copy of the September 1, 2018 Core Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1xRRLnxH5RWWGten23w97uV6uorlPlR7T/view.

-29-

McKinsey established another team – with some overlap with the non-Title III team at the leadership level only – to work on the Title III-related matters.[65]

The Oversight Board entered into a separate Consulting Agreement with McKinsey USG (the "Title III Consulting Agreement," and together with the Core Consulting Agreement, the "Consulting Agreements") dated as of July 3, 2017, which delineated McKinsey's scope of work in the Commonwealth, PREPA, and HTA Title III cases.[66]  The Title III Consulting Agreement envisioned that McKinsey would provide litigation and mediation support and liquidity analysis for the Commonwealth case.[67]  In the PREPA and HTA cases, McKinsey USG was to "[c]oordinate and provide analysis related to development of the transformation plan and plan of arrangement" for the two agencies.[68]  With respect to conflicts of interest, the Title III Consulting Agreement contains identical language to the Core Consulting Agreement (described in Section V.D below).[69]

In connection with the Title III cases, the Oversight Board asked McKinsey to educate the Oversight Board's other advisors – including its primary financial advisor, Citi, and its law firm, Proskauer – about the fiscal plan, to support litigation, to perform some liquidity planning relating to the implementation of the fiscal plan, and to support the Oversight Board in mediation

---

[65] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018.

[66] A copy of the Title III Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1iV82ACFcYQfgtCq02v8rk19nx-g4_VA7/view.

[67] Title III Consulting Agreement, Attachment 1.

[68] *Id.*, Attachments 2 & 3.

[69] There was a minor change to the confidentiality provision in the Title III consulting agreement related to the Oversight Board's ability to disclose certain information.  However, the change had no impact on the conflict of interest provisions.

sessions, which began soon after the Title III filings.  McKinsey's liquidity planning efforts

centered primarily on the Commonwealth and to a lesser extent on PREPA, but not GDB.[70]

     Although the Title III Consulting Agreement contemplated that McKinsey would provide

mediation support, McKinsey's role in the Commonwealth-COFINA mediation (discussed more

fully in Section XII below) was purely informative.  During the summer of 2017, there were

several day-long mediation sessions with large groups of creditors in which members of the

Court-appointed mediation panel, along with individuals from McKinsey and Ernst & Young (an

advisor to the Oversight Board), answered pre-submitted questions.[71]  The participants prepared

in advance for the sessions with Judge Barbara Houser, whom Judge Swain had appointed to

chair the mediation panel.  McKinsey was not involved in or privy to conversations relating to

how any settlement would be structured or how available funds would be allocated.[72]

---

[70] McKinsey Interview, Nov. 20, 2018; *see In re Fin. Oversight & Mgmt. Bd. for P.R.*,
Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 2073 ¶ 13, Ex. C.

[71] By agreement dated February 15, 2017, the Oversight Board retained Ernst & Young Puerto
Rico LLC to provide certain analyses concerning the Government of Puerto Rico's audited 2014
financials and the 2017 fiscal plan proposed by the Government of Puerto Rico (the "Financial
Bridge").  Copies of the Ernst & Young engagement letter and the Financial Bridge Analysis are
available on the Oversight Board's website at https://drive.google.com/file/d/1WWHcS_Uv8fL
Z43J215KQRGZdOyzh88ai/view (E&Y Engagement Letter) and https://drive.google.com/file/d
/1ZGT6oeZP3c8BFpGr93vr5ZaV3ymcu75N/view (Financial Bridge Analysis).

[72] McKinsey Interview, Nov. 20, 2018.  Those mediation efforts during the summer of 2017 did
not succeed.  On September 8, 2017, the Oversight Board-appointed representative of the
Commonwealth commenced an adversary proceeding to resolve the Commonwealth-COFINA
Dispute.  *See Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v.
Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-257-LTS (D.P.R.).  The
parties recommended mediation following oral argument on motions for summary judgment, and
on June 7, 2018, announced an Agreement in Principle.  Although the Oversight Board believed
that the Agreement in Principle exceeded the scope of the mediation order in the adversary
proceeding, the Oversight Board supported the Agreement's core provision governing how to
allocate sales and use tax revenue between the Commonwealth and COFINA.  More mediation

The Oversight Board realized that in the cases of PREPA and HTA, there were likely to be structural transformations, and asked McKinsey to take the lead in the transformation plans for those entities.  McKinsey worked with those entities to develop fully fleshed-out transformation plans with six-year terms.  McKinsey helped with the practicalities of implementing the proposed transformation plans and worked with the Oversight Board's other financial advisors to develop a workable timeline.[73]

When the hurricanes hit Puerto Rico in the fall of 2017, McKinsey and the Oversight Board again had to revise McKinsey's scope of work.  As noted above, the destruction caused by the hurricanes rendered many of the assumptions underlying the Commonwealth fiscal plan obsolete and necessitated a wholesale review of the fiscal plans for the Commonwealth and its instrumentalities.  The revised scope of work was memorialized in the First Amendment to the Title III Consulting Agreement dated November 1, 2017.

McKinsey USG and the Oversight Board entered into a Second Amendment to the Title III Consulting Agreement, dated April 1, 2018, which extended the term of that agreement through June 30, 2019, and fine-tuned McKinsey's scope of work for HTA and the Commonwealth.[74]

---

ensued, and the parties ultimately entered into a Plan Support Agreement on August 29, 2018, and an amended Plan Support Agreement dated September 20, 2018.  *See* Section XII below.

[73] McKinsey Interview, Nov. 20, 2018; Title III Consulting Agreement, Attachments 2 & 3; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 2073 ¶ 13, Ex. C.

[74] A copy of the Second Amendment to the Title III Consulting Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1xeRQxneihzth19WBCOLyNtxX9-iGVgOu/view.

D.    **Relevant Contract Provisions**

The Consulting Agreements contain three provisions related to conflicts of interest.

First, the Consulting Agreements contain a confidentiality provision limiting who at McKinsey may receive "Confidential Information" (those "who have a need to know and are bound to keep it confidential") and how it may be used (for providing services to the Oversight Board).[75]

Second, the Consulting Agreements disclosed McKinsey's long-standing policy of serving competing clients and competitors, and provided that anyone who received Confidential Information would be prohibited from working on a competitively-sensitive project for one year. Each of the Consulting Agreements provides:

> 6.    SERVING COMPETITORS.  It is McKinsey's long-standing policy to serve competing clients and clients with potentially conflicting interests as well as counter-parties in merger, acquisition and alliance opportunities, and to do so without compromising McKinsey's professional responsibility to maintain the confidentiality of client information. Consistent with such practice and McKinsey's confidentiality obligations to its other clients, McKinsey is not able to advise or consult with the Client about McKinsey's serving the Client's competitors or other parties.  To avoid situations of potential conflict, McKinsey will not, for a period of one year following an engagement for the Client, assign any consultant who receives Confidential Information in connection with such engagement to a competitively sensitive project, **including a directly-conflicting engagement with the Government of Puerto Rico.  Notwithstanding the foregoing, the Client understands and agrees that so long as McKinsey has appropriate procedures in place to mitigate any potential conflict, it may serve the Government of Puerto Rico on related matters.**[76]

---

[75] Initial Consulting Agreement § 3.

[76] *Id.* § 6 (emphasis added).

With the exception of the bold language added as part of the negotiations with the Oversight Board, this is a standard provision found in McKinsey's consulting agreements.[77]  The final sentence was added as part of the negotiations between the Oversight Board and McKinsey to provide flexibility to the parties.  For example, fiscal plan implementation might be better handled directly with the Government of Puerto Rico (as opposed to through the Oversight Board).  Accordingly, McKinsey USG and the Oversight Board agreed that McKinsey could work with the Government of Puerto Rico on "related" matters, provided, however, that McKinsey put in place adequate procedures to mitigate against any conflicts of interest.  The specific procedures were not discussed, but the Selection Committee understood that McKinsey would come back to the Oversight Board if the Government of Puerto Rico sought to retain McKinsey.[78]  In fact, after discussing it with the Oversight Board and giving the Oversight Board assurances that McKinsey personnel working for the Oversight Board would not be involved, McKinsey did a small project for the Puerto Rico Education Foundation that benefited the Puerto Rico Department of Education in September 2018.[79]

Finally, the Consulting Agreements provide that McKinsey USG may work for the Government of Puerto Rico or other stakeholders subject to the restrictions set forth in Section 6 (which requires that proper safeguards be in place and that no consultant who receives

---

[77] McKinsey Response to Consultant RFP, dated Oct. 27, 2016; see In re Alpha Nat. Res., Inc., Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 212 at 25 ¶ 7; In re Westmoreland Coal Co., Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.), ECF No. 452 at 30 ¶ 9.

[78] Oversight Board Interview, Dec. 10, 2018.

[79] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019.

-34-

confidential information work on a competitively-sensitive project for at least one year).

Section 9 of the Consulting Agreements provides:

> 9.    CONFLICTS OF INTEREST.  The Client agrees that performance of Services hereunder shall not conflict McKinsey from serving the Government of Puerto Rico or any stakeholders to the work, subject to the restrictions in Section 6 – "Serving Competitors."[80]

Again, we understand this is a standard provision that is included in all McKinsey contracts.

None of the amendments to the consulting agreements changed the provisions related to conflicts of interest.  However, the March 9, 2017 Amendment required McKinsey to complete a "Vendor Conflict of Interest Disclosure Certification" (the "Disclosure Certification").[81]  As discussed more fully in Section VII below, the Disclosure Certification requires a vendor to certify that it does not have a conflict of interest and to disclose connections between certain identified "Interested Parties" or any person associated with any Interested Party and the vendor. The Disclosure Certification contains seven questions which primarily focus on determining whether any Interested Party has a financial interest in the vendor, as opposed to whether the vendor has a financial interest in or connection to the Interested Party.[82]

The September 1, 2018 Core Consulting Agreement contains an expanded conflict of interest provision that prohibits McKinsey USG from accepting any work "inconsistent or incompatible" with its contractual obligations to the Oversight Board or to take any actions "that would constitute or could create the appearance of a conflict of interest with the [Oversight]

---

[80] Initial Consulting Agreement § 9.

[81] March 9, 2017 Amendment, App'x A & Sched. A.  While the Disclosure Certification is attached to the Oversight Board's Vendor Code of Conduct, the March 9, 2017 Amendment does not include the Vendor Code of Conduct.

[82] See Section VII.B below.

Board's mission or the work performed by [McKinsey] for the [Oversight] Board."[83]  The

"serving competitors" policy remains in the September 1, 2018 Core Consulting Agreement, but

now requires the Oversight Board's express written consent before McKinsey may undertake an

engagement for the Government of Puerto Rico on a "related" matter.[84]

In response to reporting by the *Wall Street Journal*, McKinsey provided the Oversight

Board certain information regarding McKinsey's corporate structure, the separation of MIO from

McKinsey's consulting business, and MIO's investments in Whitebox.  However, other than

information provided in response to this investigation, McKinsey did not provide information

concerning MIO's direct investments in Puerto Rico public debt.

### E.     McKinsey Staffing

At the very outset, McKinsey USG made clear that its team would include experts from

various McKinsey consulting affiliates, as well as from the McKinsey Global Institute, a think

tank that performs research for the firm and which could provide an economist if needed.  The

standard team structure at McKinsey, which held true in its work for the Oversight Board,

included a layered staff consisting of:

- a Director (or Directors) of Client Services (typically one or two senior partners who take responsibility for client service);

- one or more Engagement Directors (partners who lead delivery of the work);

- one or more Engagement Managers (partners who lead specific work streams under an Engagement Director);

- associates and analysts; and

---

[83] September 1, 2018 Core Consulting Agreement § 7.

[84] *Id.* § 10.

- other people as needed, bringing in particular expertise.[85]

McKinsey USG ultimately "borrowed" team members from four McKinsey consulting affiliates.[86]

### F.    Compensation

McKinsey – and to a limited extent, the Oversight Board – have come under criticism for the sheer amount of fees charged.  According to the September 26, 2018 *New York Times* article McKinsey has received more than $50 million in payment for its work for the Oversight Board.[87] But one of the major reasons that the Oversight Board selected McKinsey USG over another major consulting firm with similar expertise and depth was that McKinsey's proposed fees were significantly lower even after the competitor lowered its proposed rates.[88]

Moreover, as a retained professional, McKinsey must file fee applications with the Court seeking approval of its fees for its Title III-related work.  McKinsey's fees are reviewed by the Court-appointed Title III Fee Examiner, Brady Williamson.[89]  In his Third Interim Report on Professional Fees and Expenses dated October 31, 2018, the Fee Examiner concluded, after an in-depth review, that "the fees the Oversight Board has agreed to pay McKinsey [in the Title III

---

[85] McKinsey Interview, Nov. 20, 2018.

[86] *See* Section VIII below.

[87] Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018.

[88] Oversight Board Interviews, Dec. 10, 14, & 17, 2018.

[89] McKinsey's non-Title III work is not subject to review by Mr. Williamson.  The Oversight Board retained Robert Keach to act as a fee examiner to review non-Title III work.  However, the Oversight Board determined that it was not cost effective to have Mr. Keach separately analyze McKinsey's fees because McKinsey works on a fixed-fee basis.

proceedings] are reasonable."[90]  The Fee Examiner observed that "[i]n response to the Fee
Examiner's initial comments, and the Court's instructions, McKinsey has added significant detail
to its monthly fee statements, including a listing of all team members by name and title/position,
stating whether each team member performed services on a full-time or part-time basis, and
detailed descriptions of the services performed, including specific activities and work product."[91]
Moreover, as discussed in detail in the Fee Examiner's report, the fees that McKinsey charges to
the Oversight Board are based on a schedule established by the United States General Services
Administration.[92]  Given the Fee Examiner's close review of McKinsey's fees, we saw no reason
to investigate this further.

Finally, the Oversight Board and its staff have been pleased with McKinsey's work.
From the outset, McKinsey team has worked tirelessly – often times around the clock – and
provided broad-based experience and expertise across a wide-range of areas to provide a skill set
that few can match, and would be impossible for the Oversight Board to replicate internally.[93]
Accordingly, we did not investigate the quality of McKinsey's work; this was simply not an
issue.

---

[90] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 4126 at 13.

[91] *Id.* at 10–11 (footnote omitted).

[92] *Id.*

[93] *Id.* at 10; Oversight Board Interviews, Dec. 10, 14, & 17. 2018, Jan. 28, 2019.

## VI.     Disclosure Law and Obligations

### A.     Bankruptcy Code and PROMESA

In a typical Chapter 11 bankruptcy (but not in a municipal bankruptcy under Chapter 9 or in cases under PROMESA), Section 327(a) of the Bankruptcy Code applies and empowers a trustee, subject to approval by the Court, to employ professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."[94]   Under the Bankruptcy Code a "disinterested person" is a person that:

    (a)    is not a creditor, equity security holder, or an insider;

    (b)    is not and was not, within two (2) years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

    (c)    does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.[95]

Rule 2014 of the Federal Rules of Bankruptcy Procedure requires a professional to submit in support of its retention application a verified statement disclosing the professional's connections with the "debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."[96] Ordinarily, in a case where Section 327 and Bankruptcy Rule 2014 apply, a professional would review a list of "interested parties" (*e.g.*, creditors, debtor affiliates, business counter-parties,

---

[94] 11 U.S.C. § 327; *see* 11 U.S.C. § 901 (listing provisions of Chapter 11 of the Bankruptcy Code applicable to a case under Chapter 9).

[95] 11 U.S.C. § 101(14).

[96] Fed. R. Bankr. P. 2014(a).

etc.) prepared by debtor's counsel and file a declaration supporting its application disclosing any

connections.[97]  However, as is well documented, in drafting PROMESA, Congress chose not to

include Section 327 of the Bankruptcy Code, leaving out the requirement that the Oversight

Board's retention of professionals be approved by the Court, that the Oversight Board's

professionals be "disinterested,"[98] and that the Oversight Board's professionals be required to

file a Rule 2014 declaration disclosing "connections" to the debtors, creditors and other parties-

in-interest.[99]

PROMESA contains two provisions governing disclosure of potential conflicts of

interest, but neither of those provisions applies to McKinsey.  Section 108 of PROMESA

requires the Oversight Board's legal counsel to comply with "applicable professional rules of

---

[97] Local court rules may further refine or impose additional disclosure obligations.  For example, Rule 2014-1 of the Puerto Rico Local Bankruptcy Rules requires a professional to affirm under penalty of perjury that the firm is disinterested and provides additional guidance regarding what "connections" must be disclosed.  P.R. LBR 2014-1.

[98] *See* 48 U.S.C. § 2161 (listing Bankruptcy Code provisions applicable to PROMESA Title III proceedings); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4126 n.17; Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018.  The Oversight Board may retain professionals in its "sole discretion."  48 U.S.C. §§ 2176–77.

[99] PROMESA provides that the Federal Rules of Bankruptcy Procedure are generally applicable to Title III proceedings.  48 U.S.C. § 2170.  However, Bankruptcy Rule 2014 by its terms applies only to retention applications filed under Sections 327, 1103 and 1114 of the Bankruptcy Code. *See* Fed. R. Bankr. P. 2014(a).  While Congress elected not to include Section 327 of the Bankruptcy Code, it did include Section 1103, which requires court approval of attorneys and accountants retained by any committee and prohibits such advisors from representing "any other entity having an adverse interest in connection with the case."  11 U.S.C. § 1103(b).  Thus, professionals employed by the Official Committee of Unsecured Creditors and the Official Committee of Retired Employees have filed Bankruptcy Rule 2014 disclosures in the Commonwealth's Title III case.  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF Nos. 610, 611, 615, 670, 671, 2325.

conduct governing conflicts of interest."[100]  Section 109 of PROMESA imposes Federal conflict

of interest rules on the Oversight Board and staff designated by the Oversight Board.[101]

As McKinsey USG was not required (and was not asked) to comply with Bankruptcy

Rule 2014, and there is ongoing litigation concerning the disclosures required by Bankruptcy

Rule 2014 in the unrelated litigations involving McKinsey and Jay Alix, we take no position on

what disclosures Bankruptcy Rule 2014 would require if it were applicable here or whether

McKinsey USG would be "disinterested" under the Bankruptcy Code were Section 327

applicable.

### B.  The Proposed Puerto Rico Recovery Accuracy in Disclosures Act

On December 19, 2018, as a direct consequence of the reporting by the *New York Times*,

Representative Nydia M. Velázquez introduced the Puerto Rico Recovery Accuracy in

Disclosures Act (the "PRRADA").[102]  The PRRADA would impose Bankruptcy Code-like

disclosure obligations on professionals working in the Title III proceedings.[103]  Specifically, it

would require professionals to disclose their "connections with the debtor, creditors, any other

parties in interest, their respective attorneys and accountants, the Oversight Board, and any

person employed by the Oversight Board" prior to being compensated under PROMESA

---

[100] 48 U.S.C. § 2128(b).

[101] 48 U.S.C. § 2129.

[102] Puerto Rico Recovery Accuracy in Disclosures Act of 2018, H.R. 7355, 115th Cong. (2018).

[103] The bill was co-sponsored by Representative Rob Bishop (Utah), then chair of the House
Natural Resources Committee, Representative Raúl M. Grijalva (Arizona), incoming chair of the
House Natural Resources Committee, and Representative Jennifer González-Colón (Puerto
Rico).  The House Natural Resources Committee has jurisdiction over United States territories
and drafted PROMESA.  *See* Mary Williams Walsh, *Transparency of Puerto Rico Bankruptcy Is
the Aim of a New Bill*, N.Y. Times, Dec. 19, 2018.

§ 316.[104]  Professionals would be required to update their disclosures as additional information becomes known and to file an annual notice confirming the accuracy of their disclosures.[105]

Although the PRRADA does not incorporate Section 327 of the Bankruptcy Code into PROMESA, the proposed legislation would authorize (but not require) the Court to deny a fee application if the professional person:  (1) fails to file the required disclosures or has filed inadequate disclosures; (2) is not disinterested as defined in 11 U.S.C. § 101(14); or (3) represents, or holds an interest adverse to, the interest of the estate with respect to the matter on which such professional person is employed.[106]

On January 17, 2019, the PRRADA was reintroduced in the new Congress.[107]  We take no position on this legislation or what disclosures McKinsey would be required to make in the event the legislation is passed.

VII.   **Oversight Board Conflict Policies and Procedures**

On January 28, 2017, the Oversight Board approved amended bylaws that, *inter alia*, required (1) the Oversight Board's General Counsel to retain an "Ethics Advisor" to oversee the Oversight Board and its staff's compliance with Section 109 of PROMESA;[108] and (2) the

---

[104] PRRADA, H.R. 7355 §§ 2(a), (d).

[105] *Id.* § 2(a).

[106] *Id.* § 2(d).

[107] Puerto Rico Recovery Accuracy in Disclosures Act of 2019, H.R. 683, 116th Cong. (2019).

[108] Financial Oversight and Management Board for Puerto Rico Bylaws, as amended Jan. 28, 2017 (the "Oversight Board Bylaws"), § 11.4.  The Oversight Board Bylaws are available on the Oversight Board's website at https://drive.google.com/file/d/1oW2VE5RPYb4c85TBq-ao6wWX0TM9y27r/view.

Oversight Board to adopt a "Code of Conduct to govern the operations of the [Oversight] Board and its members, the ex officio member and staff."[109]

### A.   **Oversight Board Code of Conduct**

The Oversight Board Code of Conduct primarily governs "Covered Persons" (*e.g.*, the Oversight Board and its full-time staff) and, for example, prohibits Covered Persons from owning Puerto Rico public securities while serving on or working for the Oversight Board.[110] With respect to third-party vendors employed by the Oversight Board, the Oversight Board Code of Conduct requires the Oversight Board to ensure that each "third-party vendor has agreed to comply with the [Oversight] Board's Vendor/Consultant/Representative Code of Conduct" (the "Vendor Code of Conduct").[111]

### B.   **Vendor Code of Conduct**

Among other things, the Vendor Code of Conduct requires vendors to "promptly inform the Executive Director, the General Counsel, or a member of the Oversight Board when any situation develops that causes, or may cause, the Vendor to violate any provision of [the Vendor] Code of Conduct."[112]  With respect to Conflicts of Interest, the Vendor Code of Conduct provides:

> **Conflicts of Interest**.  Vendors shall scrupulously avoid any conflict, real or perceived, direct or indirect, between their own individual, professional, or business interests and the interests of the [Oversight] Board.  Among other things,

---

[109] *Id.* § 6.9.

[110] Oversight Board Code of Conduct § 5.  The Oversight Board's current Code of Conduct is available on the Oversight Board's website at https://drive.google.com/file/d/1Zi4nojiQ4t55Swu wXGkqjP0Wv8mhwVaE/view.

[111] *Id.* § 12.

[112] September 1, 2018 Core Consulting Agreement, App'x B.

Vendors must not deal directly with any [Oversight] Board member or ex officio member or employee whose spouse, domestic partner, or other family member or relative is associated with and/or holds any ownership or other financial interest in the Vendor.  In the course of negotiating the Vendor agreement or performing the Vendors obligations, dealing directly with a Vendor personnel's spouse, domestic partner, or other family member or relative employed by the [Oversight] Board is also prohibited.  Complying with this requirement includes, but is not limited to, each Vendor's completion of the Vendor Conflict of Interest Disclosure Certification [(the "Disclosure Certification")] . . . .[113]

The Disclosure Certification Provides:

Except as otherwise fully disclosed below . . . the Vendor affirms, to the best of its knowledge, information and belief, that no Interested Party (as defined in Schedule A hereto), nor any person associated with any Interested Party, is an employee, Director or Trustee, Officer or consultant to/of, or has any financial interest, direct or indirect, in the Vendor, or has received or will receive any financial benefit, directly or indirectly, from the Vendor or from the contract associated with this certification.[114]

The Disclosure Certification requires a vendor to respond to seven questions concerning

connections any "Interested Party" or any person associated with any Interested Party has with

the vendor:[115]

1.      Is any Interested Party, or any person associated with any Interested Party, associated with any employee, Director or Trustee, Officer or consultant to/of the Vendor?

2.      Does any Interested Party, or any person associated with an Interested Party, have an ownership interest in the Vendor's company?

---

[113] *Id.*

[114] *See id.*, App'x C.  The "Interested Parties" list includes 75 persons and entities consisting of the members of the Oversight Board and its designated staff, the Commonwealth, and its instrumentalities.  It does not include investors, creditors, banks, advisors, insurers, litigation parties, and other parties-in-interest.  *See id.*, Sched. A.

[115] The Disclosure Certification provides that "'associated' persons include: a spouse, domestic partner, child, parent or sibling of an Interested Party; a person with whom an Interested Party has a business or other financial relationship, including but not limited to employees of an Interested Party and/or a spouse, domestic partner, child, parent or sibling of such employees; and each firm in which an Interested Party has a present or potential interest."

-44-

3.      Has any Interested Party, or any person associated with an Interested Party, received, or will any Interested Party, or any person associated with an Interested Party receive, a financial benefit from the Vendor or from this contract?

4.      Is any Interested Party, or any person associated with an Interested Party, contemporaneously employed or prospectively to be employed with the Vendor?

5.      Is any Interested Party, or any person associated with an Interested Party, acting as a consultant for the Vendor?

6.      Has the Vendor provided, or will the Vendor provide, any gifts or hospitality of any dollar value or any other gratuities to any Interested Party or elected official to obtain or maintain a contract?

7.      Has any Interested Party, or any person associated with an Interested Party, provided any gifts of any dollar value or any other gratuities to Vendor?

Any Vendor that answers "yes" to any of the questions is required to provide additional information.

## C.    Ethics Advisor

In accordance with Section 11.4 of the Oversight Board's Bylaws, by agreement dated March 13, 2017, the Oversight Board retained GEC Risk Advisory LLC to provide the services of Andrea Bonime-Blanc as external Ethics Advisor to the Oversight Board.  Dr. Bonime-Blanc is an expert on ethics, governance, compliance, and risk management.  The Ethics Advisor reports to the Oversight Board's General Counsel and provides a wide array services as needed, including helping the Oversight Board to evaluate and determine the appropriate course of action to take with respect to real or perceived conflicts of interest.[116]

## VIII.  McKinsey's Corporate Structure

The Oversight Board's Consulting Agreements are with McKinsey USG – the McKinsey subsidiary that provides services to its government clients.  However, McKinsey USG has

---

[116] A copy of the Ethics Advisor's agreement with the Oversight Board is available on the Oversight Board's website at https://drive.google.com/file/d/1QXzZSWfrtNhg4WRoWWYsb TEht3AaNQE5/view.

"borrowed" the majority of the consultants who have worked on the engagement for the

Oversight Board from other McKinsey entities, including McKinsey & Company, Inc. United

States, McKinsey RTS, McKinsey & Company Colombia, Inc., and McKinsey and Company

Canada.

The below diagram depicts the corporate structure of McKinsey & Company, Inc. and the

subsidiaries that have "loaned" consultants who have provided services to the Oversight Board,

as well as the relationship between the McKinsey consulting affiliates and MIO.



As discussed more fully in Section IX.B below, while there is shared ownership, the only

overlap between the McKinsey consulting entities and MIO is at the Board of Directors level.

Currently, the MIO Board of Directors (the "MIO Board") consists of nine current or former

McKinsey partners and two independent directors who are not current or former McKinsey

partners, none of whom is on the McKinsey Puerto Rico service team.[117]

## IX.    MIO Partners

MIO is registered with the SEC as an investment adviser.[118]  By design, MIO is operated

separately and distinctly from McKinsey's consulting business.  MIO has its own offices

separate from those of McKinsey.  The MIO staff of approximately 150 is dedicated exclusively

to MIO.  MIO staff do not provide consulting services.  MIO's investment professionals do not

share office space, infrastructure, computer systems, or email addresses with McKinsey's

consulting business, and do not provide consulting services.[119]

MIO manages assets for (1) pension plans sponsored by McKinsey ("Plans") in which

current and former McKinsey employees participate ("Participants") and (2) privately-offered

investment vehicles ("Funds") in which McKinsey partners, former partners, and their immediate

---

[117]  Non-Title III Staffing List, dated Nov. 9, 2018; Title III Staffing List, dated Nov. 9, 2018; *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 8; MIO Form ADV, dated Dec. 11, 2018, Schedule A.  Prior to November 1, 2017, all members of the MIO Board were current or former McKinsey partners.  *In re Alpha Nat. Res.*, *Inc.*, Case No. 15-33896 (KRH), ECF No. 4152 ¶ 8.

[118] MIO also has a European counterpart, MIO Partners (EU) Limited, which is authorized and regulated by the Financial Conduct Authority in the United Kingdom.

[119] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 4; ECF No. 4160 ¶ 4; MIO Interview, Dec. 7, 2018.

family members may invest ("Investors").[120]  According to its publicly-available website, MIO

"makes investments essentially on a 'blind trust' basis, with MIO investors having no access to

information about the underlying holdings in the third-party funds.  This helps McKinsey

partners and staff minimize any perceived or actual conflict of interest associated with investing

themselves."[121]

### A.    MIO Investments

Eligible Participants and Investors may invest both on a before tax (*e.g.*, pension funds)

and an after-tax basis.  Participants (pension fund investors) may invest in "passive" portfolios

that are managed by State Street Global Advisors ("SSGA")[122] or in the MIO "Special Situations

Portfolios" of McKinsey's U.S. Pension Plan.[123]  Investors (after tax investors) may invest in the

Special Situations Fund.[124]

---

[120] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 3; MIO Interview, Dec. 7, 2018.  Many of the funds use the brand name "Compass."  *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH), ECF No. 4160 ¶ 10.

[121] https://www.miopartners.com.  McKinsey's characterization of this relationship as a "blind trust" has been criticized by the United States Trustee and the Court in *ANR*.  *See* Section II.B above.  As discussed more fully below, although there is very minimal visibility through MIO-provided sources, a determined investigator could uncover certain connections based upon publicly-available information, especially now given the recent news and court filings explaining how to make the connections, although much of the information revealed by such an exercise would be dated and incomplete.

[122] *E.g.*, Passive U.S. Dollar Money Markets Portfolio; Passive German Bonds Portfolio; Passive Inflation-Linked Bonds Portfolio; Passive U.S. Bonds Portfolio; Passive Non-U.S. Equities Portfolio; Passive US Equities Portfolio; Target Retirement Funds.  *See* Financial Statements and Report of Independent Certified Public Accounts, McKinsey & Company, Inc. Partner Cash Balance Plan, Dec. 31, 2017 and 2016 at 20–22.  These passive funds are managed by SSGA.

[123] *Id.* at 20–21.  The Special Situations Portfolios include the Special Situations Portfolio and the Special Situations Enhanced Liquidity Portfolio USD.

[124] MIO Interview, Dec. 7, 2018.

The Special Situations Fund is actually comprised of multiple separate legal entities.[125] The Special Situations Funds are sometimes referred to as "Investable Compass Funds" because Participants and Investors are able to invest directly in those funds.[126]  Where a Participant's or Investor's investment is placed depends on the geographic location of the investor (domestic or foreign) and whether the investment is pre-tax or after-tax.  In addition, there are various currency-hedged fund options for foreign partners to protect against changes in exchange rates. However, the investment makeup of each of the Special Situations Funds is substantially the same.[127]

MIO – through the Investable Compass Funds – generally employs a "fund of funds" strategy.  The funds fall into two buckets:  (1) funds (generally third-party limited partnerships) managed by third-party asset managers ("Third-Party Managers" and "Third-Party Funds," respectively); and (2) other MIO-owned and created investment vehicles ("MIO Investment Vehicles"; sometimes referred to as "Non-Investable Compass Funds").[128]

The Non-Investable Compass Funds may (1) invest in Third-Party Funds; (2) invest in other Non-Investable Compass Funds; (3) retain a Third-Party Manager to manage a specified

---

[125] The Special Situations Funds include Compass Special Situations Fund LLC, Compass Special Situations IRA Fund LLC, Compass Offshore Special Situations Fund PCC Limited, and Special Situations Investment Fund LP.  Pre-tax investments are made through the Special Situations Portfolios in the MMRT and SSALT Fund Ltd.  MIO Interview, Dec. 7, 2018.

[126] McKinsey partners may also invest in Compass-branded private equity funds that employ the same fund of funds approach described below.  However, the bulk of MIO's assets under management are in the Special Situations Fund.  *Id.*

[127] *Id.*

[128] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 5; MIO Interview, Dec. 7, 2018; MIO Form ADV Part 2A, dated March 28, 2018, Item 4.

sum of money (an "allocation") in the name of a Non-Investable Compass Fund (a "Separately

Managed Account"); or (4) make "direct" investments in securities ("MIO Direct Invest-

ments").[129]

Thus, MIO has three main categories of investments:  (1) Third-Party Funds,

(2) Separately Managed Accounts, and (3) Direct Investments.

## 1.    Third-Party Funds

Approximately 50% to 60% of MIO's assets under management are invested in Third-

Party Funds that are managed by Third-Party Managers.  Investment decisions are made by the

Third-Party Managers in their sole discretion.  The degree to which MIO knows what individual

investments are made by the Third-Party Funds depends on, *inter alia*, the particular manager

and the terms of the agreements with the Third-Party Manager.  However, the investment

decision remains with the Third-Party Manager, and while MIO may discuss individual

investments with the Third-Party Manager, MIO does not make the underlying investment

decisions.[130]

## 2.    Separately Managed Accounts

Separately Managed Accounts make up approximately 30 to 40% of MIO's assets under

management.[131]  A Separately Managed Account is a portfolio of individual securities managed

on behalf of a Non-Investable Compass Fund and MIO by a Third-Party Manager.  The Non-

---

[129] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 12; MIO Interview, Dec. 7, 2018; MIO Form ADV Part 2A, dated March 28, 2018, Item 4.

[130] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 11 n.7; MIO Interviews, Dec. 7, 2018, Jan. 11, 2019, Feb. 1, 2019.

[131] The relative breakdown between Third-Party Funds and Separately Managed Accounts varies over time.  MIO Interview, Feb. 1, 2019.

Investable Compass Funds own the individual securities and MIO knows what securities are held through each account.  MIO enters into a written agreement with each Third-Party Manager that authorizes the Third-Party Manager to make investment decisions on behalf of the fund in accordance with written investment guidelines that are annexed to the agreement.  While the individual securities are owned by one of the Compass funds and MIO may discuss investments with the Third-Party Manager, as with Third-Party Funds, the Third-Party Manager makes all investment decisions.[132]

### 3.    MIO Direct Investments

The remaining roughly 10% of MIO's assets under management are MIO Direct Investments, where MIO makes the investment decisions regarding individual securities on behalf of the Compass funds.[133]

### B.    <u>Investment Decisions</u>

Investment decisions are overseen by MIO's Chief Investment Officer, who oversees a team of portfolio managers.  Portfolio managers specialize in various asset classes, and the CIO speaks to the portfolio managers daily on position changes, asset managers being proposed, investment proposals and, generally, in making sure that MIO's investment strategy is being

---

[132] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 9; ECF No. 4160 ¶ 11 n.7; MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.

[133] Thus, at a minimum, MIO has the ability to view the individual securities that account for approximately 40 to 50% of its assets under management (those investments that are held in MIO Investment Vehicles either through Separately Managed Accounts or as MIO Direct Investments).

followed.  All MIO investment decisions are approved by the CIO.[134]  Participants and Investors

have no control whatsoever over the individual investments made by the Plans or the Funds.[135]

The MIO Board has delegated responsibility for making investment decisions to MIO's

investment team.  On a quarterly basis, the Investments Committee of the MIO Board reviews a

list of redemptions (a decision to eliminate or reduce the amount of an investment with a Third-

Party Manager) and allocations (a decision to establish or increase the amount of an investment

with a Third-Party Manager) made by the MIO investment team.  Until September 11, 2017, the

Investments Committee of the MIO Board "ratified" or approved fund-level redemption and

allocation decisions made by MIO's investment team in the prior quarter.[136]

The MIO Board ended the "ratification" process in September 2017.[137]  However, the

MIO Board (and in particular, the Investments Committee) continues to oversee and monitor, in

their capacities as fiduciaries to the Funds managed by MIO, redemption and allocation decisions

made by the MIO investment team.  In connection with this quarterly review process, the MIO

Board receives a quarterly investment report prepared primarily by the MIO staff.  It is very

unusual for the quarterly investment report to refer to an individual security or for the MIO

Board to discuss an individual security at a quarterly meeting.  However, from time to time

individual investments may be disclosed.  Generally, the quarterly investment report shows how

---

[134] MIO Form ADV Part 2A, dated March 28, 2018, Item 13; MIO Interview, Dec. 7, 2018.

[135] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 7; MIO Interview, Dec. 7, 2018.

[136] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶ 4; ECF No. 4160 ¶ 6; MIO Interview, Dec. 7, 2018.

[137] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶ 4; ECF No. 4160 ¶ 8; MIO Interview, Dec. 7, 2018.

the Special Situations Fund is performing against various measuring criteria.[138]  The quarterly

investment report includes a schedule that discloses changes in assets and identifies Third-Party

Funds and Third-Party Managers, and where an investment is made with a new Third-Party

Manager, the report includes a writeup containing, *inter alia*, facts about the manager and its

principals, the asset manager's strategy, and MIO's rationale for investing with the manager.[139]

Although members of the MIO Board have oversight responsibilities with respect to the

Plans and the Funds, no member of the Puerto Rico service team currently serves or has served

on the MIO Board during the engagement with the Oversight Board.[140]  If MIO makes a new

investment in a Third-Party Fund or a new allocation to a new Third-Party Fund Manager, the

MIO Board is notified after the investment decision has already been made.  The MIO Board is

generally not provided any information related to Direct Investments made by MIO, nor is the

MIO Board provided a specific rationale underlying individual direct investment decisions.[141]

Individual MIO Board members do not have direct access to information related to investments

in individual securities held in Non-Investable Compass Funds (either MIO Direct Investments

---

[138] MIO Interview, Dec. 7, 2018; MIO Investments Committee Quarterly Report, dated Mar. 3, 2017.

[139] MIO Interview, Dec. 7, 2018; MIO Investments Committee Quarterly Report, dated Mar. 3, 2017.

[140] Non-Title III Staffing List, dated Nov. 9, 2018; Title III Staffing List, dated Nov. 9, 2018. From December 8, 2006, through June 9, 2017, Jon Garcia, who is the president of McKinsey RTS, served on the Investments Committee of the MIO Board.  As noted in Section VI above, McKinsey RTS employees have provided services to the Oversight Board.  *See In re Alpha Nat. Res. Inc.*, Case. No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4159 ¶¶ 1, 7; MIO Interview, Dec. 7, 2018.  However, Mr. Garcia is not on the McKinsey Puerto Rico service team.

[141] MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.  MIO's counsel reviewed all quarterly investment reports from 2014 through 2018, and has represented to us that no investments in Puerto Rico public debt were discussed in the quarterly investment reports.

-53-

or Separately Managed Accounts).  Members of the MIO Board do not maintain offices at MIO and do not have MIO email addresses.[142]

Currently, the MIO Board consists of nine current or former McKinsey Partners and two independent directors who are not current or former McKinsey partners.[143]  The Investments Committee consists of four current or former McKinsey partners and one independent director who is not a current or former McKinsey partner.[144]

### C.   Investment Advisors

MIO's investment advisors provide financial advice and wealth management services to Participants and Investors.  MIO's investment advisors operate independently from MIO's investment management team, and are not incentivized to raise assets for MIO-managed or sponsored investment products.  The Investment Advisors are technically hired by MIO, but they are compensated by McKinsey & Company Inc. and their services are provided to McKinsey employees free of charge.  They do not maintain offices at MIO.  The Investment Advisors are not provided any information regarding the underlying investments held by the Third-Party Funds or the Non-Investable Compass Funds.[145]  The Investment Advisors are generally

---

[142] MIO Interview, Dec. 7, 2018.

[143] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 8; MIO Form ADV, dated Dec. 11, 2018, Schedule A.  Prior to November 1, 2017, all members of the MIO Board were current or former McKinsey partners.  *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH), ECF No. 4152 ¶ 8.

[144] MIO Board of Directors and Committees, dated October 17, 2018.

[145] MIO Interview, Dec. 7, 2018.

provided with the same types and level of information related to the underlying holdings as are

the Participants and Investors, which as discussed more fully below, is quite limited.[146]

### D.    Information Available to Investors

#### 1.    Investment Prospectus

Participants and Investors are provided options to invest in the Special Situations Fund

(after tax) or Portfolio (pre-tax) and various passive funds managed by State Street Global

Advisors.  While Participants and Investors are provided general information related to the

holdings (*e.g.*, asset class allocations), they are not provided information identifying the

underlying investments (*e.g.*, individual securities or Third-Party Funds) held by the either the

Investable or Non-Investable Compass Funds.  Participants and Investors are provided periodic

windows to make new investments, make withdrawals, and reallocate assets, but they do not

(and cannot) direct investments in particular securities or particular Third-Party Funds.[147]

#### 2.    Periodic Account Statements

Participants and Investors are provided periodic account statements that set forth their

holdings in MIO-managed Plans and Funds.  As part of our investigation, we reviewed a

redacted account statement for one of the partners involved in the Puerto Rico engagement.  The

statements provide the number of units or shares in the Special Situations Fund and the value of

the investment and various metrics regarding profits, losses, additions and withdrawals.  The

statements do not provide information regarding the underlying funds owned by the Special

Situations Funds (*e.g.*, Non-Investable Compass Funds or the Third-Party Funds) or any of the

---

[146] *Id.*

[147] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4150 ¶ 4;
ECF No. 4160 ¶ 17; McKinsey Interview, Nov. 20, 2018; MIO Interview, Dec. 7, 2018.

underlying investments (*e.g.*, individual securities) held by any of the funds, and the partners

could not obtain this information from MIO.[148]

### 3.    Periodic Newsletters and Reports

Investors in the after-tax Special Situations Fund are provided periodic reports and an

annual newsletter.  Generally, the annual newsletters and reports describe the fund's

performance.  They do not disclose specific investments (*e.g.*, investments in underlying

securities) or investments with specific Third-Party Managers.  Rather, they review the

performance of the Special Situations Fund against various metrics and benchmarks.  The annual

newsletter may also provide information related to the performance of any private equity

investments.[149]

### 4.    Audited Financial Statements

Investors in the after-tax Special Situations Funds are provided (or given access to)

audited annual financial statements for the Fund in which the Investor is invested.  The financial

statements identify any MIO Direct Investments or allocations to Third-Party Managers that

exceed 5% of the Fund's assets.[150]  They do not disclose underlying investments in securities

made by Third-Party Managers or the Non-Investable Compass Funds.  The 2016 audited

financial statements for the Special Situations Funds we reviewed disclose that those funds were

invested in the three Compass Funds that filed proofs of claim in the Title III proceedings.

---

[148] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 19;
MIO Interview, Dec. 7, 2018.

[149] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4152 ¶ 4;
ECF No. 4160 ¶ 22–23; MIO Interview, Dec. 7, 2018.

[150] *In re Alpha Nat. Res., Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va.), ECF No. 4160 ¶ 20;
MIO Interview, Dec. 7, 2018.

Specifically, as of December 31, 2016, Compass Special Situations Fund LLC was invested in

Compass CSS High Yield LLC and Compass TSMA LP, and Compass Offshore Special

Situations PCC Limited was invested in Compass ESMA LP.  However, the financial statements

we reviewed do not disclose the identities of any Third-Party Managers or Third-Party Funds or

any investments held by any of the underlying funds or any investments held by the Non-

Investable Compass Funds, including any investments in Puerto Rico public debt.

### 5.   Publicly-Available Information

In addition to information provided directly to Participants and Investors, certain

information is publicly available, including Forms ADV filed with the SEC, Forms 5500 filed

with the Department of Labor, court filings, and news articles.  Each is summarized below.

### a)   Forms ADV

A Form ADV is used by investment advisers to register with the SEC.[151]  It contains

information concerning, *inter alia*, the identities of auditors, fund managers and funds, and the

location of books and records.  In Part 2A of Form ADV: Firm Brochure, a registrant discloses

further information about the investment advisor's operations, the fees it charges, its investment

strategies and potential risks, and certain policies and procedures.

Investment advisors update their Form ADV periodically.  The most recent form is

generally available on the SEC's website and easily found through a simple internet search.[152]

MIO has updated its Form ADV two times since the *New York Times* reported MIO's

investments in Puerto Rico public debt.  The first update, filed on October 1, 2018, discloses that

---

[151] https://www.sec.gov/fast-answers/answersformadvhtm.html.

[152] https://www.adviserinfo.sec.gov/IAPD/Default.aspx.

MIO is investment advisor to Compass CSS High Yield LLC and Compass TSMA LP – two of the three Compass funds that filed proofs of claim in the Title III proceedings in late May 2018. The second, filed on December 1, 2018, no longer lists Compass TSMA LP.[153]

### b)   Department of Labor Form 5500

The McKinsey Master Retirement Trust, the McKinsey & Company, Inc. Partner Cash Balance Plan, and the McKinsey & Company, Inc. Money Purchase Pension Plan file annual reports on Form 5500 with the Department of Labor.[154]  The annual report for the MMRT includes a schedule listing assets that were "acquired and disposed of" during the prior calendar year and a "schedule of assets held for investment" as of the end of a particular fiscal year.[155] These forms generally must be filed within nine and a half months of the end of the plan year.[156] The MMRT's most recent Form 5500 was filed on October 10, 2018, and discloses investments that were held as of December 31, 2017.[157]  It lists investments in the Pandora Select Fund Ltd., managed by Whitebox, and Compass ESMA LP.[158]

---

[153] Compass CSS High Yield LLC and Compass TSMA LP are both listed on MIO's March 28, 2018, Form ADV.

[154] These filings only include retirement assets.  They do not disclose investments made by the after-tax Special Situations Funds.

[155] The MMRT's Forms 5500 are available from the United States Department of Labor website at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e1s1.

[156] https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2017-instructions.pdf.

[157] MMRT Form 5500 for the year ended Dec. 31, 2017, Statement # 1.

[158] *Id.*  These investments were also disclosed in the MMRT's Form 5550 for the year ended December 31, 2015, filed on September 29, 2016, and the MMRT's Form 5500 for the year ended December 31, 2016, filed on October 11, 2017.

### c)     Court Filings and News Articles

Both MIO and McKinsey (and the general public) have access to public court filings (like the Title III proceedings, *ANR, Westmoreland*, *SunEdison* and *JayAlix*) and news articles (like those published by the *New York Times* and the *Wall Street Journal*) disclosing, for example, that MIO, through three Compass-branded funds, holds or has held millions of dollars in COFINA bonds and explaining where to find information related to MIO's investments.[159]

## X.     McKinsey and MIO Conflict Policies and Training

McKinsey and MIO have multiple complementary and overlapping policies designed to avoid conflicts of interest.  Those policies include: (1) the MIO – CSP Collaboration Policy; (2) the McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes; (3) the MIO Trading Policy; (4) the McKinsey Personal Investments Policy; (5) the MIO Personal Investment and Trading Policy and Code of Ethics; and (6) the MIO Board Conflict and Confidentiality Policy.  These policies, summarized below, are designed to ensure that the consulting (McKinsey) and investment (MIO) sides do not share information and do not engage in activities that result in actual or perceived conflicts of interest.[160]

### A.     MIO – CSP Collaboration Policy

The MIO – CSP Collaboration Policy (the "Collaboration Policy") is intended to guard against "potential real or perceived conflicts of interest" which "may create reputational harm

---

[159] *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y.), ECF No. 5751 ¶ 6 n.4.

[160] McKinsey has other policies in place that, for example, govern organizational conflicts of interest in connection with the procurement of government contracts.  Those policies are not relevant here.

both to [McKinsey] and MIO."[161]  It addresses communications between McKinsey consultants
and MIO employees and sets forth policies to ensure that confidential information and potential
conflicts of interest are managed appropriately.

The Collaboration Policy includes an "information barrier" between McKinsey's
consulting activities and MIO's investment activities and dictates that the two must be managed
independently and with separate operations, including separate offices, IT systems (including
email servers) and, with limited exceptions (*e.g.*, certain employees of the McKinsey legal
department), employees.[162]  Except for limited disclosures to the MIO Board and parties
providing oversight over the pension plans or as required by law (*e.g.*, disclosures to the SEC or
Department of Labor), McKinsey consultants are not provided information related to MIO's
investments.  Likewise, McKinsey's consulting relationships are not shared with MIO personnel.
MIO does not have regular access to McKinsey consultants and does not participate in client
interactions on the consulting side.[163]  There are certain restrictions on the sharing of information
between McKinsey consultants and MIO, including general prohibitions against:

- McKinsey providing client information to MIO in connection with a proposed transaction for any purpose;

---

[161] MIO-CSP Collaboration Policy, dated Sept. 2017.  "CSP" stands for Client Service
Professionals.  The Collaboration Policy was substantially revised in December 2016, at
approximately the same time McKinsey was retained by the Oversight Board, to further restrict
sharing of information regarding the identities of McKinsey's clients and MIO's investments and
generic market or industry-wide information.  The Collaboration Policy was revised again in
May 2017 and in September 2017.  We reviewed each iteration of the Collaboration Policy that
has applied during the McKinsey engagement.

[162] MIO may hire former McKinsey consultants only after the consultant has officially left the
consulting side and after the passage of a reasonable period of time between the last time the
consultant performed any client-related work and his or her start date at MIO.

[163] Both MIO and McKinsey may make introductions of potential clients or managers, provided
there is no further involvement.

- MIO employees attending McKinsey practice meetings;

- MIO discussing specific investments with McKinsey client service professionals (outside of the MIO Board governance context);

- McKinsey consultants disclosing to MIO whether or not McKinsey is serving a particular client; and

- MIO disclosing to McKinsey consultants the entities in which MIO holds investments.

The Collaboration Policy requires interactions between MIO and McKinsey to be limited and, to the extent practicable, monitored. MIO may retain McKinsey consulting on the same terms as any other engagement, provided, however, McKinsey cannot be retained to identify or assess any investment opportunity.

Exceptions to the Collaboration Policy require approval by the Chairman of the MIO Board. Employees violating the Collaboration Policy are subject to remedial actions, which can range from a warning to termination or referral to civil or governmental authorities.

### B.     McKinsey Information Sharing Guidelines and Conflicts of Interest Mitigation Processes

Pursuant to the McKinsey Firmwide Information Sharing Policy, confidential information acquired or developed may only be shared within the firm on a need-to-know basis. In particular, information (whether written or not) developed from non-public client sources is confidential to that client (including information from third-party sources that is available to the client service team only through access provided by the client). Such information may not be shared outside of the client service team. Pursuant to the Conflicts of Interest Mitigation Processes, McKinsey uses password-protected "virtual team rooms." Employees are required to sign non-disclosure agreements which prohibit disclosure of confidential information, even to

other employees of the firm.  Employees are required to report potential or actual violations of
McKinsey's policies.[164]

### C.    MIO Trading Policy

The MIO Trading Policy is intended "to manage the reputational risk that could arise if
MIO inadvertently traded securities related to clients of [McKinsey]."[165]  "The general spirit of
the policy is to enable MIO to acquire macro-style or asset class-type exposures without seeking
board pre-approval, but to not allow trading in individual name securities similar to what the
Firm's Personal Trading Policy intends to achieve."[166]

Although there is no express policy that prohibits MIO from investing in McKinsey's
consulting clients, MIO's trading policy is intended to eliminate the possibility of MIO directly
making such an investment.[167]  With limited exceptions (*e.g.*, certain basket trades),[168] MIO is
prohibited from purchasing single name corporate issuer securities and debt instruments.
Nevertheless, MIO is permitted to invest freely in bonds issued by sovereigns, municipalities,
and government agencies including their issuing entities, which would include bonds issued by
the Commonwealth of Puerto Rico and its instrumentalities, so long as MIO is not in possession
of material non-public information ("MNPI").  MIO may also trade credit default swaps, futures,
and total return swaps on those bonds.[169]

---

[164] McKinsey Information Sharing Guidelines, dated Nov. 2, 2017; McKinsey Conflicts of
Interest Mitigation Processes.

[165] MIO Trading Policy, dated Mar. 5, 2018.

[166] *Id.* The MIO Personal Trading Policy is described in Section X.E below.

[167] MIO Form ADV Part 2A, dated Mar. 28, 2018, Item 11; MIO Interview, Dec. 7, 2018.

[168] A basket trade is an order to buy or sell a group of securities simultaneously.

[169] MIO Trading Policy, dated Mar. 5, 2018.

According to MIO, this long-standing exception to the trading policy was intended to achieve a balance between avoiding conflicts of interest, on the one hand, and allowing MIO to make direct investments to achieve its desired asset exposure in an area where conflicts with McKinsey's consulting business are less likely, on the other.  Historically, trading in sovereign, state, and local municipal debt has been regarded as a "safe" space because there have been few bankruptcies in this sector and McKinsey has done limited work for distressed government entities.[170]

### D.    McKinsey Personal Investments Policy

McKinsey employees are prohibited from buying or selling securities while in the possession of MNPI and from buying or selling publicly-traded securities of any McKinsey client.[171]  Employees must "pre-clear" all trades, and if the security was issued by a McKinsey client, the employee will be informed that the investment is prohibited.[172]  Additionally, employees may not:

- Serve a non-public client and simultaneously hold any investment whatsoever in that client (*e.g.*, a private equity firm);

- Make investments that conflict with one's firm or client responsibilities;

- Engage in activities that impact one's commitment to the firm or its clients;

- Share MNPI with others where it appears likely that others will misuse such information; or

- Recommend the purchase or sale of a security to another while in possession of MNPI about the security or the issuer.

---

[170] MIO Interviews, Jan. 25, 2019, Feb. 1, 2019.

[171] McKinsey Personal Investments Policy, dated Feb. 2019.

[172] There are exclusions from the policy, including, for example, mutual funds, ETFs, and other investments where the employee has no input about purchases or sales of specific securities.

Until February 2019, trading in state, local, and municipal securities was permissible (and did not require pre-clearance) provided that (1) the firm member or household member did not have any MNPI about the entity or the security, and (2) in the case of industrial revenue bonds, the employee was not serving the entity that would receive or benefit from such bond. As of February 2019, trading in these securities is prohibited if McKinsey serves the issuing entity or the entity that will receive or benefit from such security.[173]

### E.   MIO Personal Investment and Trading Policy and Code of Ethics

MIO's Personal Investment and Trading Policy and Code of Ethics is intended to ensure that "Supervised Persons" (*e.g.*, MIO officers, directors, and employees) put the interests of MIO ahead of their own. There are detailed principles and standards of conduct that require Supervised Persons to act with competence, dignity, and integrity, and in an ethical manner. The Code of Ethics places considerable restrictions on the trading activities of Supervised Persons and requires annual certifications from all Supervised Persons that they have read the policy, understand its terms and are bound by it. The MIO Policies and Procedures to Detect and Prevent Insider Trading likewise restricts trading on MNPI.[174]

### F.   MIO Board Conflict and Confidentiality Policy

The MIO Board Conflict and Confidentiality Policy, implemented in June 2018, recognizes that potential conflicts are inherent in MIO's structure as a subsidiary of McKinsey, and the various activities, actions, and investments of the individual board members. The MIO Board Conflict and Confidentiality Policy lays out the MIO Board's main concerns, which

---

[173] McKinsey Personal Investments Policy, dated July 2017; McKinsey Personal Investments Policy, dated Feb. 2019.

[174] MIO Partners, Inc. and MIO Order Funds Personal Investments and Trading Policy and Code of Ethics, dated March 2016; MIO Partners, Inc. and MIO Order Funds Personal Investments and Trading Policy and Code of Ethics, dated June 2017.

include, *inter alia*, avoiding real and perceived conflicts of interest.  For example, the policy

states that McKinsey partners may not advise a client in its investment decision-making for

trading public equity or public debt.  The MIO Board Conflict and Confidentiality Policy

additionally provides that MIO Board members may not advise asset managers for two years

following their Board tenure.[175]

The Governance Committee of the MIO Board is responsible for monitoring conflict

issues and ensuring implementation of MIO Board's policies in coordination with the Board

Chair, MIO's General Counsel, and McKinsey's Legal Department.  The MIO Board Conflict

and Confidentiality Policy includes the following provisions:

- MIO Board members' engagements are reviewed to determine whether any conflicts exist.

- All MIO Board members must disclose potential conflicts to the board's governance committee and recuse themselves from any discussion.

- All MIO Board members are subject to Collaboration Policy (described in Section X.A. above) and are obligated to guard client confidences (if applicable) and MIO's intellectual property.

- Board members who are active partners of McKinsey are subject to McKinsey's personal trading policy (described in Section X.D above).

Each MIO Board member must annually certify adherence to (a) the MIO Board Conflict and

Confidentiality Policy; (b) the Collaboration Policy; and (c) if on the Investments Committee, the

Investments Committee Personal Account Trading Policy.  Each active McKinsey partner must

also review his or her client service with the Governance Committee to confirm there are no

conflicts of interest.[176]

---

[175] MIO Board Conflict and Confidentiality Policy, dated June 2018.

[176] *Id.*

The Investments Committee Personal Account Trading Policy imposes further restrictions on the members of the Investments Committee.  In recognition of the additional information provided to Investments Committee members, the policy imposes enhanced reporting and places additional restrictions on the ability of Investments Committee members to make personal investments.[177]

### G.    Training and Certification

McKinsey and MIO employees are required to complete annual policy certifications confirming that they have read and understand the various policies and will continue to abide by them.  In addition, McKinsey employees are required to complete training modules, and there are periodic presentations regarding the McKinsey and MIO policies.  The McKinsey and MIO personnel we interviewed confirmed their participation in the training programs, their periodic certifications, and their compliance with the policies and procedures.[178]

### XI.    MIO Investments in Puerto Rico Public Debt

MIO has held at least five direct or indirect investments in Puerto Rico public debt during the course of McKinsey's engagement by the Oversight Board.  It is clear that at all relevant times, MIO's portfolio managers and CIO knew that MIO was invested directly and indirectly in Puerto Rico public debt.  However, we have uncovered no evidence that information in MIO's possession concerning these investments was shared with the McKinsey Puerto Rico service team or any other McKinsey consultant.  Nevertheless, a McKinsey consulting professional investing through MIO theoretically could have determined that MIO was invested in Puerto

---

[177] Investments Committee Personal Account Trading Policy, dated July 2016.

[178] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019; MIO Interviews, Dec. 7, 2018, Jan. 11, 2019, Feb. 1, 2019.

Rico public debt by reviewing publicly-available (albeit usually dated and incomplete) information.  Each of MIO's investments and the publicly-available information related to that investment is discussed below.

### A.   Separately Managed Accounts

As disclosed in the September *New York Times* article and confirmed to LS&E, MIO funds hold or have held investments in Puerto Rico public debt through three Separately Managed Accounts, where a Third-Party Manager filed a proof of claim on behalf of a Non-Investable Compass Fund.  Those proofs of claim are set forth below:

| Claimant | Date Filed | Asset Manager | Bond | Claim Amount |
|---|---|---|---|---|
| Compass CSS High Yield LLC[179] | May 22, 2018 | ASA Managed Account Managers LLC ("ASA") | COFINA PREPA AFICA | $16,276,085.64 in principal and accrued interest |
| Compass TSMA LP[180] | May 25, 2018 | Aristeia Capital LLC ("Aristeia") | COFINA | $2,277,657.46 in principal and accrued interest, plus unliquidated amounts |
| Compass ESMA LP[181] | May 25, 2018 | Aristeia | COFINA | $1,570,572.67 in principal and accrued interest, plus unliquidated amounts |

---

[179] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), Claim No. 18575.

[180] *Id.*, Claim Nos. 34183, 38948.

[181] *Id.*, Claim Nos. 22063, 32025.  The proofs of claim filed by Compass ESMA LP and Compass TSMA LP were withdrawn as part of the confirmation of the COFINA plan of adjustment.  *Id.*, ECF Nos. 4996, 5047.

As discussed more fully in Section X.A.2 above, investments through Separately Managed Accounts, while made in the name of and nominally owned by an MIO-controlled Compass fund, are made by Third-Party Managers – in this case, ASA and Aristeia.  Each of ASA and Aristeia was delegated authority to invest and reinvest in the name of the particular fund in accordance with investment guidelines attached to their agreements with MIO and the fund.  MIO exercises no discretion over these investments; they are managed by ASA and Aristeia, respectively.  MIO's investments through these Third-Party Managers pre-dated McKinsey USG's retention by the Oversight Board.[182]  At all relevant times, MIO's investment team was aware that these Third-Party Fund Managers had made investments in Puerto Rico public debt.[183]

We have seen no information indicating that a Participant or Investor would have been able to confirm that MIO was invested in Puerto Rico public debt through ASA and Compass CSS High Yield LLC until May 22, 2018, when ASA filed a proof of claim on behalf of Compass CSS High Yield LLC.  Although ASA is listed in MIO's March 28, 2018 Form ADV, ASA was not active in the Title III proceedings.[184]  However, upon filing of the proof of claim, a determined investigator could have "connected the dots" and determined that MIO was invested in Puerto Rico public debt by comparing the proof of claim to MIO's most recent publicly-filed Form ADV, which discloses Compass CSS High Yield LLC's relationship to MIO.

---

[182] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

[183] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

[184] MIO Form ADV, dated Mar. 28, 2018.

With respect to the investments managed by Aristeia, an investigator could have determined based upon MIO's publicly-filed June 9, 2017 Form ADV that Aristeia had invested on behalf of MIO's fund Compass TSMA LP and that funds owned or controlled by Aristeia were invested in COFINA bonds at least as early as July 25, 2017, when Aristeia's name appeared in the Senior COFINA Bondholders' Coalition's Bankruptcy Rule 2019 disclosure.[185] However, no one could have confirmed based upon publicly-available information that Compass TSMA LP or Compass ESMA LP was invested in Puerto Rico public debt until Aristeia filed proofs of claim on their behalf on May 25, 2018.

MIO's counsel has confirmed to us that, as of September 30, 2018, Compass ESMA LP and Compass TSMA LP are no longer invested in COFINA bonds through these Separately Managed Accounts. All securities from the Separately Managed Accounts that Aristeia managed for Compass ESMA LP and Compass TSMA LP were transferred (based on market valuations of the relevant securities at the time of transfer) to Aristeia-controlled funds; this included all Puerto Rico public debt obligations held in the accounts at the time of transfer. MIO is now invested in Aristeia Partners LP and Aristeia International Limited, both of which are feeder funds for Aristeia Master LP (managed by Aristeia), over which MIO has no control or investment discretion.

MIO's counsel has also represented to us that, as of February 7, 2019, the Plans and Funds no longer hold any investments in Puerto Rico public debt through Separately Managed Accounts. However, investment discretion is vested with the Third-Party Managers and it is

---

[185] MIO Form ADV, dated June 9, 2017; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 749. Bankruptcy Rule 2019 requires groups or committees that consist of or represent and every entity that represents multiple unrelated creditors or equity security holders that are acting to advance their common interests to make certain disclosures, including their identities and economic interests. *See* Fed. R. Bankr. P. 2019.

possible that MIO may in the future hold positions in Puerto Rico public debt through a

Separately Managed Account.

### B.   Third-Party Funds

As was also reported by the *New York Times* and confirmed to LS&E, MIO has an

indirect investment in Pandora Select Partners, LP ("Pandora Select Partners") managed by a

Third-Party Manager, Whitebox.[186]  Pandora Select Partners filed three proofs of claim in the

Title III proceedings as set forth below:

| Pandora Select Partners Claim | Date Filed | Asset Manager | Bond | Claim Amount |
|---|---|---|---|---|
| Claim Nos. 100667, 109765 | June 29, 2018 | Whitebox | COFINA | $368,211.93, plus unliquidated amounts |
| Claim No. 50742[187] | June 20, 2018 | Whitebox | GO | $8,876,500.00 |

According to MIO, Whitebox has complete discretionary authority with respect to these

investments, and MIO cannot and does not direct Whitebox with respect to Pandora Select

Partners' investments in Puerto Rico public debt or generally.[188]

---

[186] Mary Williams Walsh, *McKinsey Advises Puerto Rico on Debt. It May Profit on the Outcome.*, N.Y. Times, Sept. 26, 2018; MIO Interview, Feb. 1, 2019.  The MMRT's Form 5500 for the year ended December 31, 2017 lists an investment in Pandora Select Fund Ltd., which we understand is an offshore feeder fund for Pandora Select Partners, LP.  *See* Whitebox Form ADV Part 2A, dated Mar. 28, 2018.

[187] Pandora Select Partners acquired this claim on August 28, 2018, from Syncora Guarantee Inc. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 3872. The face amount of the claim filed by Syncora is more than $108 million.  However, Pandora Select Partners acquired only a portion of the claim.  The remainder was assigned to other Whitebox-managed entities.

[188] MIO Interviews, Dec. 7, 2018, Feb. 1, 2019.

By reviewing the MMRT's 2015 Form 5500 filed with the Department of Labor on

September 29, 2016, and litigation filed by Pandora Select Partners in New York State Court on

April 12, 2017,[189] and in the Title III proceedings against Pandora Select Partners by the Bank of

New York Mellon ("BNYM") on May 16, 2017,[190] an investigator could have surmised that

MIO was invested in Puerto Rico public debt through Pandora Select Partners. However, the age

of the information contained in the Forms 5500 makes it impossible to confirm, based upon

publicly-available information, whether and to what extent those investments still existed at the

time the litigations were filed or at any time afterward (including now).[191]

MIO did not provide us with a list of Third-Party Managers, so we could not compare the

list of Third-Party Managers and Third-Party Funds to the list of claims filed in the Title III

---

[189] *Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon Corp.*, Index No. 651969/2017
(Sup. Ct. N.Y. Cnty.). On May 18, 2017, the case was removed to the United States District
Court for the Southern District of New York and subsequently transferred to the United States
District Court for the District of Puerto Rico. *See Whitebox Multi-Strategy Partners, L.P. v.
Bank of N.Y. Mellon Corp.*, Adv. Proc. No. 17-143-LTS (D.P.R.).

[190] BNYM also filed a declaratory action in the COFINA Title III proceedings against Pandora
Select Partners L.P. *See Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp. (In re Fin. Oversight
& Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-133-LTS (D.P.R.).

[191] The September 2018 *New York Times* article reported that Whitebox held more than $140
million of Puerto Rico bonds. It is not clear how the *New York Times* calculated that amount, but
public filings indicate that, as of October 31, 2018, Whitebox managed approximately $310
million in Puerto Rico public debt, not just the $140 million disclosed in the article. *See In re
Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4332.
However, only approximately $9.3 million is held by Pandora Select Partners. The other
approximately $300 million is held in other funds managed by Whitebox, including Whitebox
Asymmetric Partners LP (Claim Nos. 23452, 50742, 102245, & 115134); Whitebox Multi-
Strategy Partners, LP (Claim Nos. 32093, 65838, 27008, 118254 & 50742); Whitebox Term
Credit Fund I LP (Claim Nos. 28605, 31755); Whitebox GT Fund, LP (Claim No. 50742);
Whitebox Institutional Partners LP (Claim Nos. 43498, 25609, 36206, 66556, 115673); and
Whitebox Caja Blanca Fund, LP (Claim Nos. 32265, 52002, 27429, 51434, 50742). MIO has
represented to us that it does not currently have any investments in these other Whitebox-
managed funds.

proceedings, and we have not been able to confirm that no other investments exist.  Both

McKinsey and MIO acknowledged that it was possible that there may be additional holdings

through Third-Party Funds, but reiterated that MIO has no discretion to control the underlying

investments made by these Third-Party Funds.

### C.   MIO Direct Investments

MIO also held a direct investment in COFINA bonds through a Non-Investable Compass

Fund.  In 2014, MIO purchased $58,345,000 par value of COFINA bonds at a steep discount.

MIO disposed of $8,345,000 par value in three transactions in the first quarter of 2017, and

disposed of the remaining $50,000,000 par value in two transactions in April 2018.  The Non-

Investable Compass Fund realized a total profit of approximately $765,000 on this investment.

MIO made the decision to dispose of the investment independently and without information

received from the consulting side of McKinsey.[192]  This investment was not disclosed in any

public filings and no one working on McKinsey's Puerto Rico service team would have been

able to learn of this investment at any time prior to the filing of this Report.  MIO has

represented to LS&E that it does not currently have any other Direct Investments in Puerto Rico

public debt.

### XII.   McKinsey's Involvement in the COFINA Settlement and Plan of Adjustment

Because of MIO's direct and indirect investments in COFINA bonds, we believe it was

important to investigate and determine what, if any, involvement McKinsey had in the

development and formulation of the COFINA plan of adjustment and the allocation of the sales

and use tax revenue to be used to pay COFINA bondholder claims.  As discussed more fully

below, we have not seen any evidence that a member of the McKinsey Puerto Rico service team

---

[192] MIO Interviews, Dec. 7, 2018, Jan. 11, 2019.

was aware of MIO's investments in COFINA bonds or other Puerto Rico public debt.  Moreover,

even if an individual team member had been aware of those investments, McKinsey did not

participate in any of the negotiations that led to the COFINA settlement or the COFINA plan of

adjustment.

On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure
to Resolve Commonwealth-COFINA Dispute*.[193]  Pursuant to the Stipulation, the Oversight

Board authorized (1) "the statutory committee of unsecured claimholders appointed by the

United States Trustee on June 15, 2017 (the "Creditors' Committee") to serve as the

Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on

behalf of the Commonwealth (the "Commonwealth Agent")" and (2) "Bettina Whyte to serve as

the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on

behalf of COFINA" (the "COFINA Agent" and together with the Commonwealth Agent, the

"Agents").[194]

On June 5, 2018, the Agents filed the *Joint Urgent Motion of Commonwealth Agent and
COFINA Agent Requesting that Court Hold Decision on Motions for Summary Judgment in
Abeyance for 60-Day Period*.[195]  On June 7, 2018, the Agents filed the *Joint Informative Motion*

---

[193] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 996.

[194] *Id.* ¶ 4(a), (b).

[195] *Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Whyte
(In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Proc. No. 17-257-LTS (D.P.R.), ECF No. 484.

*of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle*.[196]  As set forth

in the COFINA Fiscal Plan, the Agreement in Principle is premised on:

> splitting the 'Pledged Sales Tax Base Amount' ("PSTBA") between the
> Commonwealth and COFINA.  The PSTBA is an amount established under Act
> 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended
> and restated on June 10, 2009 (the "Bond Resolution"), that, under current law,
> must be received by COFINA from 5.5% of the SUT before the Commonwealth
> can receive any of the other 5.5% SUT.  Under the [Agreement in Principle],
> COFINA will receive (a) 53.65% of the yearly scheduled PSTBA beginning with
> payments made on July 1, 2018 and (b) all of the cash held in trust at [BNYM], as
> trustee under the Bond Resolution, as of June 30, 2018 (approximately $1.2
> billion).  The Commonwealth will receive the remaining 46.35% of the
> PSTBA.[197]

Beginning in July, the Oversight Board engaged in more than two weeks of mediation

among interested parties on a COFINA plan of adjustment and the attendant issues that needed to

be resolved for a viable plan to be proposed, including the relative rights between senior and

junior COFINA bondholders.[198]  On August 8, 2018, the Oversight Board and the Government

of Puerto Rico announced that an agreement had been reached with Senior and Junior COFINA

bondholders and monoline insurers on the economic treatment of COFINA bondholders and on

the terms of new COFINA securities.[199]

---

[196] *Id.*, ECF No. 486.

[197] COFINA Fiscal Plan, as Certified by the Financial Oversight and Management Board for
Puerto Rico, Oct. 18, 2018 ("COFINA Fiscal Plan"), at 5.  A copy of the COFINA Fiscal Plan is
available on the Oversight Board's website at https://drive.google.com/file/d/1iotA4SxTa19aXk
_3BwMyepe6n84v8SjZ/view.

[198] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.),
ECF No. 4756 ¶ 26; ECF No. 4758 ¶ 22.

[199] *Id.*, ECF No. 4758 ¶ 22.  A copy of the Oversight Board's press release is available on the
Oversight Board's website at https://oversightboard.pr.gov/oversight-board-reaches-deal-with-
cofina-bondholders/?mod=article_inline.

The Oversight Board, COFINA, the Puerto Rico Fiscal Agency & Financial Advisory Authority ("AAFAF"), certain holders of Senior COFINA Bonds, certain holders of Junior COFINA Bonds, certain monoline insurers, and Bonistas del Patio, Inc. (collectively, the "Settlement Parties") entered into a Plan Support Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that contemplates, *inter alia*, (a) terms to the compromise and settlement of the Commonwealth-COFINA Dispute developed by the Oversight Board and consistent with the terms of the Agreement in Principle which, *inter alia*, allocates an amount up to (53.65%) of the annual PSTBA to COFINA, and confirms that COFINA is the sole owner of the amounts held at BNYM as of June 30, 2018, and (b) terms of the treatment between Junior and Senior COFINA Bondholders.[200]

After further mediation, on September 20, 2018, the Settlement Parties entered into an amended Plan Support Agreement (the "A&R Plan Support Agreement") that included additional bondholders, all of whom are holders of GO Bonds.[201]

Neither the Oversight Board nor McKinsey was a party to the negotiations that led to the settlement of the Commonwealth-COFINA Dispute or in the PBSTA allocation.[202]  As noted above, the Agreement in Principle was reached by two independent agents who negotiated on behalf of COFINA and the Commonwealth.  Neither the Oversight Board nor McKinsey was "at the negotiating table," and although the Oversight Board was actively involved in negotiation of

---

[200] A copy of the Original Plan Support Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1YfGXodyeTEezi56XEbYH-YpTVV1sqGuY/view.

[201] A copy of the A&R Plan Support Agreement is available on the Oversight Board's website at https://drive.google.com/file/d/1yp6WR-lE6KwPH8DrQjIDf4Ty4IAl0qYr/view.

[202] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 5047 ¶ 34.

the subsequent plan of adjustment, the Oversight Board was aided by its financial advisor, Citi,

not by McKinsey, and the economics of the PSTBA allocation did not change from the June

2018 Agreement in Principle.[203]

　　　McKinsey's primary role (after making the Oversight Board operational) has been to

"stress test" fiscal plans for the Commonwealth and certain of its instrumentalities. The

Commonwealth fiscal plan does not differentiate between the sources of available revenue or

indicate how much should be paid to particular bondholders or other creditors. McKinsey has

played no role in setting the allocations of revenue available for debt service for the various

bondholders (*e.g.*, COFINA, GO, PREPA, HTA, etc.) or in developing the terms of the new

securities that will be issued pursuant to the COFINA plan of adjustment, which were developed

by Citi.[204]

　　　As disclosed in McKinsey's contract with the Oversight Board and in its fee applications

filed with the Court, McKinsey did provide "mediation support" to the Oversight Board.[205]

McKinsey's role in the mediation was limited to providing information to the various creditor

constituencies so that creditors could understand the particular provisions of the fiscal plans and

---

[203] McKinsey Interview, Dec. 12, 2018; Proskauer Interview, Dec. 28, 2018; Oversight Board Interviews, Dec. 10 & 17, 2018, Jan. 28, 2019.

[204] McKinsey Interview, Dec. 12, 2018; Proskauer Interview, Dec. 28, 2018; Oversight Board Interviews, Dec. 10 & 17, 2018, Jan. 28, 2019. As is contemplated by Section 201 of PROMESA, the COFINA Fiscal Plan was prepared by AAFAF and revised with input from the Oversight Board and its advisors (primarily Citi). McKinsey was involved in conforming the COFINA Fiscal Plan to the Commonwealth Fiscal Plan insofar as the macroeconomic analysis of Puerto Rico was incorporated into the COFINA Fiscal Plan. Oversight Board Interview, Jan. 31, 2019; McKinsey Interview, Feb. 1, 2019; *compare* COFINA Fiscal Plan Ch. 5 *with* Commonwealth Fiscal Plan Ch. 4.

[205] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 3580 at 13–14, 132; Title III Consulting Agreement, Attachment 1.

the assumptions that underlay them.  There were multiple sessions where McKinsey personnel

provided answers to questions so that all constituencies could be working with the same set of

operative facts.  The sessions generally involved McKinsey personnel providing answers to

questions (in one case more than 1,000) that had been posed by the creditor constituencies ahead

of time.[206]

Similarly, McKinsey did not and has not taken any position on the seniority or

entitlement of bondholders to the various revenue streams.  McKinsey provided the "bottom

line" number, but even that was only a recommendation to the Oversight Board, which

ultimately made its own decision whether or not to certify the Commonwealth's fiscal plan.

Importantly, McKinsey was not and is not involved in the allocation of revenue among

bondholders and creditors.  McKinsey was not involved in negotiating the COFINA settlement

or plan of adjustment, developing the terms of the new securities that have now been issued

under the COFINA plan of adjustment, framing any legal arguments in connection with the

Commonwealth-COFINA Dispute, or reviewing draft documents in connection with the

COFINA settlement or plan of adjustment.  While McKinsey was aware of ongoing negotiations

between the Agents, McKinsey did not learn of the settlement until it became public.[207]

---

[206] McKinsey Interviews, Nov. 20, 2018, Dec. 12, 2018, Feb. 1, 2019; Oversight Board
Interviews, Dec. 17, 2018, Jan. 28, 2019; Proskauer Interview, Dec. 28, 2018.

[207] McKinsey Interview, Dec. 12, 2018.  As noted above, McKinsey played a limited role in the
preparation of the COFINA Fiscal Plan after the economics of the COFINA settlement had
already been agreed upon.  On February 4, 2019, the Court entered orders approving the
settlement of the Commonwealth-COFINA Dispute and confirming the Third Amended
COFINA Plan of Adjustment.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17 BK 2383-
LTS (D.P.R.), ECF Nos. 5045, 5055.

## XIII.   <u>Analysis and Conclusions</u>

Based upon our investigation, we have concluded that McKinsey USG complied with all legal and contractual requirements.  However, MIO's direct and third-party managed investments in Puerto Rico public debt could create the appearance of a potential conflict.  The Oversight Board likely would have considered MIO's direct investments in Puerto Rico public debt a conflict and would have required MIO to divest or to explain why the investments did not present a disabling conflict had it known about the investment at the outset.  The Oversight Board also would have sought additional information on MIO's third-party managed investments in Puerto Rico public debt – how they were held, the extent of MIO's control over investment decisions involving the bonds, what information MIO shared with the consulting side or investors, and what policies or procedures are in place to mitigate any potential conflicts.  Only then could the Oversight Board have made its own informed determination whether there was a conflict and, if so, whether it was disabling.

### A.   **McKinsey Made All Disclosures Required by Applicable Law and Requested by the Oversight Board**

#### 1.   **The Strategic Consultant RFP**

The Consultant RFP did not ask applicants to disclose whether the applicant, or its affiliates, had any investments in Puerto Rico public debt.  Instead, the Consultant RFP focused on conflicts of interest related to past and present work performed by the applicant for the Government of Puerto Rico and its instrumentalities, and asked applicants to disclose potential conflicts of interest arising out of "current or prior engagements with other parties."[208]  The Consultant RFP did not ask applicants to identify their affiliates or any connections those

---

[208] Consultant RFP at 3.

affiliates might have, and McKinsey USG fairly responded, based upon the information available

to it and the parameters set by the Oversight Board, that it did not have any conflicts of interest.

### 2.    The Vendor Code of Conduct

Similarly, McKinsey USG complied with the Oversight Board's Vendor Code of

Conduct and Disclosure Certification.  Although COFINA is listed as an "Interested Party," none

of the seven questions can reasonably be interpreted as seeking disclosure of the existence of

MIO or of MIO's investments in Puerto Rico public debt.  Rather, the questions are all aimed at

determining whether any Interested Party or any person associated with any Interested Party has

a financial interest in the vendor.  And even if these questions arguably required disclosure of an

investment held by MIO in Puerto Rico public debt, we have uncovered no evidence that the

McKinsey employees working on the Oversight Board engagement were aware of any MIO

investments in COFINA bonds.  McKinsey and MIO have strict policies in place to make sure

that McKinsey consultants never learn about such investments, and the McKinsey partners in

charge of the Oversight Board engagement did not, in fact, know about MIO's investments in

Puerto Rico public debt.

### 3.    The September 1, 2018 Core Contract

As discussed in Section V.C above, the Oversight Board signed a new agreement with

McKinsey USG in September 2018 governing McKinsey's non-Title III work.  That agreement

contains the following provision – now standard in Oversight Board contracts – addressing

conflicts of interest:

> **7. No Conflict of Interest**.  During the term of this Agreement, Contractor
> will not accept work, enter into a contract, or accept an obligation from any third
> party, inconsistent or incompatible with Contractor's obligations, or the scope of
> services rendered for the [Oversight] Board, under this Agreement or any Project
> Assignment.  Contractor shall not take actions during the term of this Agreement
> or any Project Assignment that would constitute or could create the appearance of

a conflict of interest with the [Oversight] Board's mission or the work performed by the Contractor for the [Oversight] Board. . . .[209]

Again, nothing in this provision – applicable to McKinsey USG – would, on its face, cover

investments held by or through MIO.

### 4.     PROMESA

Finally, McKinsey complied with all disclosure obligations and conflict of interest rules

imposed by PROMESA.  Two provisions in PROMESA address Oversight Board conflicts of

interest, but neither is applicable to McKinsey.  The first – Section 108 of PROMESA –

authorizes the Oversight Board to choose counsel in "any action brought by, on behalf of, or

against the Oversight Board . . . so long as the representation complies with the applicable

professional rules of conduct governing conflicts of interest."[210]  The second – Section 109 of

PROMESA – requires the Oversight Board and its staff to comply with "Federal conflict of

interest requirements described in Section 208 of title 18, United States Code" and requires the

Oversight Board and staff designated by the Oversight Board to "disclos[e] their financial

interests" in conformity with Section 102 of the Ethics in Government Act of 1978 (5. U.S.C.

App.).[211]  By their clear terms, neither is applicable to McKinsey.

Section 327 of the Bankruptcy Code was not included in PROMESA, so professionals

like McKinsey USG retained by the Oversight Board are not required to disclose their

"connections" to the Debtors, their creditors, and other parties-in-interest or to establish that they

---

[209] September 1, 2018 Core Consulting Agreement § 7.

[210] 48 U.S.C. § 2128(b).

[211] 48 U.S.C. § 2129.  Section 208 generally prohibits officers and employees of specified governmental branches or agencies from participating personally and substantially in government matters in which they or their immediate family members have a financial interest. 18 U.S.C. § 208.

are "disinterested."  As noted above, we take no position regarding what McKinsey would have

been required to disclose if its retention had been governed by Section 327 of the Bankruptcy

Code and Bankruptcy Rule 2014 or whether McKinsey USG would be able to establish that it is

disinterested.

**B.**   **McKinsey's Procedures and Policies Mitigated any Conflicts Arising from MIO's Investments in Puerto Rico Public Debt**

The McKinsey consulting arm is effectively walled off from its investment arm, and there

is no sharing of confidential information or resources, except in very limited circumstances, none

of which is implicated here.  There are physical information barriers – for example, separate

offices, email accounts, and computer systems – as well as detailed policies designed to ensure

that client information is kept confidential and not shared between the consulting and investment

sides, and that if it is, the information is not acted on.  Indeed, even on the consulting side,

McKinsey has robust policies in place to ensure that information is shared only on a "need to

know" basis, and for example, uses password-protected document repositories to ensure that

information is not shared beyond the client service team.  MIO and McKinsey personnel are

required to undergo training, to review the policies on an annual basis, to certify their

compliance with these policies, and to report any violations.

The only overlap between the two sides is at the MIO Board level, which does include

current McKinsey consulting professionals (though no one on the Puerto Rico service team).

However, the MIO Board has delegated all investment making discretion to MIO's investment

professionals.  While certain investment level information is available to the MIO Board (for

example, the identities of Third-Party Funds and Third-Party Managers), none of the MIO Board

members is on the McKinsey Puerto Rico service team.  And, in recognition of the fact that

investment information is shared with the MIO Board, MIO has policies in place to address and

-81-

mitigate any potential conflicts that may arise from any active McKinsey partners' consulting activities.

MIO has during the course of McKinsey's engagement for the Oversight Board held direct (now liquidated) and third-party managed (still in existence) investments in Puerto Rico public debt.  However, we have seen no evidence indicating that McKinsey consulting personnel knew about those investments prior to the inquiries from the *Wall Street Journal* and the *New York Times* or that McKinsey personnel were in a position to take or actually took any action intended to influence the terms of the COFINA settlement.  Indeed, McKinsey did not have any involvement in the negotiations related to the PSBTA allocation, the COFINA plan of adjustment, or the terms of the securities that have now been issued pursuant to the confirmed COFINA plan of adjustment.

Theoretically, a McKinsey professional might have been able to determine that MIO had investments in Puerto Rico public debt by reviewing information (much of it stale and incomplete) contained in publicly-available regulatory and court filings.  But even if a McKinsey professional were aware of such an investment, the McKinsey professional could not have known for certain whether that investment was still in place until May 2018, and would not have known what action to take had the professional wanted to influence the investment; and the professional could not have done so without using material non-public information – a violation of multiple McKinsey policies, fiduciary duties, and applicable securities laws.

### C.    Had the Oversight Board Known about MIO's Investments in Puerto Rico Public Debt, It Would Have Sought Additional Disclosure

Although as a result of the newspaper articles and this investigation, the Oversight Board has now received information related to MIO, its investments in Puerto Rico public debt, and McKinsey's and MIO's practices and policies, neither the Oversight Board nor PROMESA

required McKinsey to make these disclosures, and the Oversight Board did not have the

opportunity to determine at the outset of McKinsey's engagement whether MIO's holdings in

Puerto Rico debt constituted a conflict or, if they did, whether the conflict was significant

enough to require MIO to sell those investments in Puerto Rico public debt or take any other

ameliorative action.  Nor did the Oversight Board have the opportunity then to review

McKinsey's and MIO's policies and procedures designed to avoid or eliminate conflicts, or to

consider whether those policies and procedures effectively mitigated the impact of any potential

conflicts.

When the Oversight Board first learned of MIO and of MIO's investments in Whitebox

in May 2018, the Oversight Board spoke with McKinsey, and determined based on conversations

with McKinsey and a review of public filings, and on representations concerning the separation

of MIO from McKinsey's consulting business, that McKinsey's prior disclosures were

appropriate and that no conflict existed.  After the *New York Times* reported that three MIO-

controlled funds owned additional Puerto Rico public debt, the Oversight Board directed LS&E

to conduct this investigation and asked that we consider what recommendations we would make

to improve the Oversight Board's disclosure policies and procedures.

## XIV. <u>Recommendations</u>

The heart of this matter is disclosure.  The Oversight Board is committed to transparency

in its work, and that includes its relationships with its vendors, including consultants like

McKinsey.  The Oversight Board is also keenly aware that its creation by Congress as an

instrumentality of the Commonwealth, its powers over the restructuring and revitalization

processes, and its role in the generation and approval of fiscal plans, budgets, transformation

plans, and plans of arrangement are not without controversy.  This only heightens the need for

the Oversight Board to avoid even the appearance of bias and to be particularly vigilant in identifying and dealing with conflicts and potential conflicts of interest.

As described elsewhere in this Report, the Oversight Board has over the course of its short life developed policies and procedures governing conflicts, initially on its own and since March 2017, with the assistance of its Ethics Advisor. Detailed disclosure, and particularly financial disclosure, is required of all members of the Oversight Board and key staff in order to ferret out connections to Puerto Rico's government and agencies (the "covered instrumentalities" under PROMESA), including as holders of Puerto Rico public debt. The same kind of detailed disclosure has not been required of or made by the Oversight Board's vendors, and that has led to inconsistencies and uncertainties about disclosure requirements and how to deal with conflicts that are disclosed.[212]

McKinsey's case is not unique: it is a very large organization with thousands of employees and thousands of clients spread across the globe. It is acutely aware of the confidential nature of its work. It has organized itself and adopted policies and procedures, which it has enforced and continues to enforce, that are designed to, and in fact do, maintain client confidences, ensure that information does not leak between the consulting side and the investing side of McKinsey's business, and minimize the likelihood of conflicts.

The Recommendations that follow take this into account and attempt to strike a balance between the Oversight Board's need to know, to assess the likelihood and avoid even the appearance of conflicts (on the one hand), and the Oversight Board's recognition that precisely because large organizations have erected information barriers and other procedures to ensure

---

[212] We have reviewed responses by many of the Oversight Board's vendors and potential vendors, and the degree of disclosure regarding connections to Puerto Rico and conflict mitigation policies varied widely from vendor to vendor.

confidentiality and to minimize conflicts, not every fact bearing on every possible conflict is readily obtainable (on the other).  If the facts are known, steps can be taken to eliminate the conflict entirely or to mitigate against the impact a conflict might have.  And, in the end, the Oversight Board recognizes that not every potential conflict is disabling.

### A.   Recommendation No. 1 – Vendors Should Disclose Affiliate Relationships

While the Oversight Board's vendor contacts are generally with one particular entity within a much larger organization (*e.g.*, McKinsey USG), relationships that other entities within the organization have that could give rise to conflicts should be disclosed.  Trading in Puerto Rico public debt is particularly problematic, as it gives rise to the appearance of conflict:  Will investments influence advice, and vice versa; will advice influence investments?  Vendors' relationships with Puerto Rico, directly or through investment vehicles holding and trading in Puerto Rico public debt, should be disclosed to the extent feasible.

Large organizations (not just McKinsey) have affiliates that oversee retirement and other investments for employees or are themselves major players in the financial world as bankers, investors, market makers, underwriters, and advisors.  While these affiliates are not themselves the Oversight Board's vendors and are not themselves providing goods or services to the Oversight Board, their activities might touch on Puerto Rico in one way or another, and it is important that the Oversight Board know this.  Thus, for instance, while McKinsey may have every confidence that the activities of its investment arm (MIO) are completely walled off from the activities of its consulting arm (McKinsey), the fact is that MIO now has, has had in the past, or could have in the future, investments in Puerto Rico public debt, some or all of which are already (*e.g.*, COFINA) or will be subject to plans of adjustment proposed by the Oversight

Board and, if confirmed by the Court, implemented under PROMESA. Other Oversight Board vendors are in similar situations.

From the Oversight Board's perspective, it is important that the Oversight Board know about these situations so it can decide whether it needs more information to assess whether there is a conflict or the appearance of a conflict, and so it can take appropriate action. This cannot happen if the Oversight Board does not have the facts. Accordingly, the Oversight Board's RFP and disclosure forms should be modified to call for a list of the vendor's affiliates and a description of any that have connections to Puerto Rico, and a description of what those connections are. The Oversight Board should encourage the submission of organization charts, descriptions of lines of business conducted by affiliates, and similar documents that will give the Oversight Board a better understanding of who its vendors are.

### B.    Recommendation No. 2 – The Interested Parties List Should Be Expanded

The Oversight Board is currently using an interested party list of 75 parties, consisting of the Oversight Board's members and key personnel, the Commonwealth and its "covered instrumentalities" and various government agencies, authorities, public corporations, and retirement systems.[213] It does not list investors, creditors, banks, advisors, insurers, litigation parties, or other parties with significant roles in the Title III proceedings. The Oversight Board should consider using a broader list, adding, for instance, those on the Master Service list[214] and

---

[213] *See, e.g.*, September 1, 2018 Core Consulting Agreement, App'x C, Sched. A.

[214] The Master Service List is available on Primeclerk's website at https://cases.primeclerk.com/puertorico/. Pursuant to the Case Management Order, it is updated every 15 days. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4866 § II.E.

those who have filed proofs of claim above a sensible threshold amount.[215]  Typically, the

identities of interested parties will not be fully known before a case is filed but will come to light

only weeks or months later.  This means the process of identifying interested parties is ongoing

and the list will have to be updated every few months.  Vendors should be required to update

their conflict checks periodically and whenever the list is updated.  Updating the list is a task that

calls for coordination between the Oversight Board and the Commonwealth to streamline the

process and avoid duplication.  Once the list is updated, vendors should be required to re-run

their conflicts checks against the new list.

Clearly, this is a task that must vary by vendor – the larger the vendor and the scope of

the engagement, the broader the required cross-check.  Not every vendor should be required to

check for relationships with every interested party.  The scope of the search should be agreed on

a case-by-case basis.[216]

C.      **Recommendation No. 3 – Direct Relationships, and to What Extent, if Any, They Raise Conflicts, Should Be Described in Detail**

Vendors and their affiliates who have direct relationships with Puerto Rico must disclose

them.  If the vendor is doing work for the Commonwealth or its instrumentalities, it must

disclose them and must describe any steps it will take to prevent conflicts.  This is fairly

straightforward.  Investments are more complex.  If the relationship involves a direct investment

in Puerto Rico public debt over which the vendor or its affiliate can exercise discretion, details of

---

[215] There are more than 165,000 proofs of claim totaling approximately $43.5 trillion on file in the Title III proceedings.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, Case No. 17-BK-3283-LTS (D.P.R.), ECF No. 4052 ¶ 7.  We are confident that the Oversight Board will be able to eliminate duplicate and erroneous claims and identify the major creditors to include in its conflicts check procedures.

[216] How to deal with investments is discussed in the following Recommendations Nos. 3 and 4.

all holdings and trades since the beginning of 2016 should be itemized.  The vendor or its

affiliate should state whether or not it has divested or will divest any holdings, and if not, why

not, and should explain why in its view the holdings are not a conflict – for instance, because

they are *de minimis*; or because all decisions with respect to the holdings are made by an affiliate

(like McKinsey's MIO) that is walled off and has no access to the work being done by the

vendor (and vice versa); or because the contract party's scope of work will have no impact on the

particular holding.  Of course, disclosing these details and offering to adopt remedial measures

does not mean that the Oversight Board will agree there is no conflict, but if these details are not

disclosed, the Oversight Board cannot decide.  As the Oversight Board's Disclosure Certification

provides:

> Disclosing a potential conflict of interest will not automatically disqualify the
> Vendor.  The potential conflict of interest will be investigated to determine
> whether it precludes the contract award.  In the event, however, that the Vendor
> does not disclose potential conflicts of interest and they are discovered by the
> [Oversight] Board, the Vendor will be barred from doing business with the
> [Oversight] Board.[217]

This provision places the burden of disclosure squarely on the vendor, and not on the Oversight

Board, and we recommend that it stay there.

Accordingly, we recommend that the Oversight Board's RFP and disclosure forms be

reviewed and modified as necessary to require these disclosures.  Vendors, including McKinsey,

should make and update their disclosures to describe any direct relationships the vendor or its

affiliates have with Puerto Rico and, in particular, any direct investments in Puerto Rico public

debt and any work it has done for interested parties since January 1, 2016.

---

[217] September 1, 2018 Core Consulting Agreement, App'x C.

D.     **Recommendation No. 4 – Indirect Relationships, and to What Extent,**
       **if Any, They Raise Conflicts, Should Be Described**

How to deal with vendors' indirect relationships that bear on Puerto Rico and the

Oversight Board's work is much more difficult.  The PROMESA proceedings involve the

economy of the entire Commonwealth.  It is hard to imagine a major vendor that would be

retained by the Oversight Board in these cases that has no dealings with any Commonwealth

instrumentality, or with any other vendor or banker or customer of any Commonwealth

instrumentality, or with any investor in Commonwealth public debt, or with any advisor to any

such instrumentalities, vendors, bankers, customers, or investors.  Determining how many

"degrees of separation"[218] to investigate should be done on a case-by-case basis.  The Oversight

Board must exercise its judgment and common sense to determine how far to dig, keeping in

mind that the purpose of the exercise is to ensure that the relationship will not bias the vendor's

work for the Oversight Board.

In McKinsey's case, investments made through Third-Party Funds and Separately

Managed Accounts are challenging.  As described earlier in this Report, approximately 90% of

MIO's investments are managed by Third-Party Managers, and by contract, MIO delegates

investment discretion to these Third-Party Managers.  It does not exercise discretion over which

individual securities to buy, hold, or sell.

MIO knows, or at a minimum has access to, information detailing the underlying

securities that account for 40 to 50% of its assets under management that are Direct Investments

or held through Separately Managed Accounts.[219]  For MIO's remaining investments in Third-

---

[218] *See* John Guare, *Six Degrees of Separation* (1990).

[219] *See* Section IX above.

-89-

Party Funds, the degree of visibility depends on the fund, the asset manager, and the governing

agreement.  While MIO has investment-level information, MIO does not share it with McKinsey

consultants, and it is not otherwise accessible by the consulting side.  Indeed, the McKinsey

partners we interviewed did not learn of MIO's third-party investments in Puerto Rico bonds

(through certain Compass and Whitebox funds) until the press became interested.[220]  However,

even though the McKinsey partners did not know this information, as reporters and the litigants

in *ANR*, *Westmoreland* and *SunEdison* have pointed out, some information is obtainable by

parsing the public record.[221]  It should not be up to the Oversight Board to ferret out vendors'

indirect investments and trades that could present conflicts.  Vendors should be required to:

### 1.    Describe details of indirect relationships, including third-party investments

Which affiliates are doing what, and under whose direction?  What have those affiliates

done in the past, and what do they anticipate doing in the future?  For example, vendors should

describe any investment affiliates, what they do, and whether and how those affiliates make

investment decisions.  Vendors should make clear the degree of control that the investment

affiliate has over individual investment decisions.

---

[220] This is why, for instance, the Oversight Board's own financial disclosure forms do not require investments held through large mutual funds to be disclosed.  Oversight Board Bylaws, Attachment B.

[221] And, as already noted, just because a Third-Party Fund in which MIO has invested owns Puerto Rico public debt, it does not mean that MIO's fund owns all of it, just its own allocable interest.  Nor does the mere fact of the fund's ownership of the bond tell us whether the bond is insured or whether the fund's investment is hedged.  This information is not public, and without it, it would be impossible to know what one would have to do to influence its value even if one were in a position to do so and not otherwise prevented by law from doing so.

**2.    Describe how third-party investments are reported, and to whom**

What information is reported to the vendor by the affiliate or fund?  The vendor should

describe what investment information the investment affiliate receives, and what if anything the

investment affiliates reports to its investors.  If no information related to individual investments

is disclosed, the vendor should say so.

**3.    Disclose actual knowledge of third-party investments that could give rise to conflicts**

It is difficult to impose blanket rules without knowing the particular facts, policies, and

procedures in place, and disclosure with respect to third-party investments must, therefore, be

tailored to the particular vendor.  With that in mind, generally, if a vendor affiliate has actual

knowledge of a relationship with Puerto Rico or the Oversight Board, it should disclose it.  For

example, MIO should disclose investments in Puerto Rico public debt made through Separately

Managed Accounts even though they are managed by a Third-Party Manager because MIO has

access to information detailing those holdings.  Similarly, if MIO receives periodic account

statements in the ordinary course that disclose securities owned by Third-Party Funds and learns

of an investment in Puerto Rico public debt, that should be disclosed to the Oversight Board.

Where an investment affiliate receives specific and systematic disclosures, requiring disclosure

should not be a terrible burden.  Finally, vendors should check lists of third-party funds and

managers against the interested parties list and disclose any connections.

However, we recognize there may be legal or practical hurdles to disclosing indirect

investments (for example, confidentiality agreements with third-party managers or possible

breach or impairment of the very information barriers and other measures designed to prevent

conflicts).  Accordingly, one option would be to have the vendor's investment affiliate report

directly to the Oversight Board without making any disclosure to the vendor itself.  This would

enable the Oversight Board to conduct its own "*in camera*" inspection of the information and

then to determine what additional steps to take, while leaving the vendor's information barriers

intact.  Alternatively, to the extent a vendor or its affiliate is unable or unwilling to disclose this

information to the Oversight Board, the Oversight Board could just assume that the vendor has a

significant indirect investment in Puerto Rico public debt and evaluate any potential conflict in

light of that assumption.  The Oversight Board would then consider how the vendor proposes to

mitigate the impact of the apparent conflict.  If the vendor cannot convince the Oversight Board

that its conflict mitigation measures are adequate to eliminate the conflict, the Oversight Board

would not engage the vendor.

### E.     Recommendation No. 5 – Vendors Should Disclose Relevant Data in Their Public Filings

Vendors should monitor their and their affiliates' public filings for disclosures regarding

their relationships with Puerto Rico and the Oversight Board.  For example, the Oversight Board

should not have to search SEC and Department of Labor filings; vendors should, and they should

cross-check them against the interested parties list.  Vendors should also be familiar with court

filings made on their or their affiliates' behalf, although, again, we recognize that this may not

always be easy.  For instance, in McKinsey's case, two asset managers filed proofs of claim on

behalf of Compass CSS High Yield LLC, Compass TSMA LP, and Compass ESMA LP in the

Title III proceedings relating to COFINA, PREPA, and AFICA bonds.  Under this

Recommendation, these filings would trigger updated disclosures.[222]  Vendors should review

their and their affiliates' public filings in real time.  If a vendor determines based upon a public

---

[222] Proofs of claim are typically not filed for weeks or months after the petition date.  Here, they were filed more than one year after the Title III petitions were filed – hence, the recommendation that vendors update their disclosures periodically.

filing that it has additional disclosures to make, the vendor should promptly make them to the Oversight Board.

**F.      Recommendation No. 6 – Vendors Should Describe the Policies, Practices, and Procedures That They Have or Will Have to Guard Against Conflicts**

Vendors should be required to describe their policies, practices, and procedures regarding conflicts.  We have learned, for example, that McKinsey and MIO have robust written confidentiality and conflict of interest policies and procedures; they train their personnel in them; they require annual certification of compliance; and they enforce their policies.  Vendors' RFP responses and disclosures should give particulars about their policies and practices, information barriers and security, staffing "black-outs," and so on.  The Oversight Board should know that all of its vendors address conflicts seriously.

In addition, vendors should describe what they have done to mitigate the impact of any conflicts, with reference both to past work for the Oversight Board or other clients and with respect to any potential conflicts that might arise from the vendor's proposed or current work for the Oversight Board, or from a vendor or vendor affiliate's investments, past, present, or future. This might require new procedures to ensure that personnel working on Oversight Board matters do no other work related to Puerto Rico, at least not for a set period of time and not without prior Oversight Board consent.[223]  It might also require divestiture of an investment or termination of another advisory relationship.  We recognize that these are extreme measures and may not be warranted or possible in all cases, but the decision on whether to require these measures should be the Oversight Board's, and the decision must be based on full disclosure of the conflict or potential conflict by the vendor.  The burden of explanation should be on the vendor.

---

[223]  Indeed, both are part of the Oversight Board's standard Independent Contract Services Agreement, including the September 1, 2018, Core Consulting Agreement that it signed with McKinsey extending the non-Title III engagement.

### G.     Recommendation No. 7 – Disclosures Must Be Updated and Certified Periodically

The Oversight Board should update its list of interested parties periodically.  We recommend that this be done quarterly, and take into account any significant new filings – *e.g.*, new parties to adversary proceedings and contested matters in the Title III cases; new creditors who file large proofs of claim (above a sensible threshold); new parties to the Title VI proceedings; parties to mediations; and so on.  Significant disclosures (*e.g.*, new possible filings, new direct investments, etc.) should be made as soon as they are known without waiting for the next scheduled periodic update.

Vendors should run conflict checks against the updated interested party lists and should supplement the lists with names of their own – for instance, by adding the names of any new clients and affiliates with relationships that could present conflicts.  This will probably require that vendors have their affiliates review the lists and understand their disclosure obligations, but that seems the only way to ensure that relationships are uncovered.

Vendors should also periodically (at least annually) certify that they have conducted conflict searches for themselves and relevant affiliates and have reported all material relationships that could give rise to conflicts.

### H.     Recommendation No. 8 – Oversight Board Forms Should Be Reviewed and Revised

The Oversight Board, with the assistance of its General Counsel and its Ethics Advisor, should review all of its RFP and contract, disclosure, and certification forms and revise them to take these Recommendations into account.  This will enable the Oversight Board to make better informed decisions regarding whether or not to retain a vendor.

-94-

XV.    **<u>Conclusion</u>**

   The Oversight Board will make a copy of this Report available on its website at

<u>https://oversightboard.pr.gov/</u> and file a copy of this Report on the public docket in the

Commonwealth Title III proceedings.

Dated: New York, New York     Respectfully submitted,
   February 18, 2019

                LUSKIN, STERN & EISLER LLP
                Michael Luskin
                Stephan E. Hornung
                Lucia T. Chapman
                Eleven Times Square
                New York, New York 10036
                (212) 597-8200