# EXHIBIT A

# United States Court of Appeals
## For the First Circuit

Nos. 18-1836
     18-1837

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE OPPORTUNITIES FUND IX
(PARALLEL 2), L.P.; OAKTREE VALUE OPPORTUNITIES FUND, L.P.;
OCHER ROSE, L.L.C.; SV CREDIT, L.P.,

Movants, Appellants,

PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA
PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA PORTFOLIO TARGET
MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO
RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND
III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO
FIXED INCOME FUND V, INC.; PUERTO RICO GNMA AND U.S. GOVERNMENT
TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS BOND FUND I,
INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND II, INC.; PUERTO RICO INVESTORS TAX-FREE
FUND III, INC.; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND V, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND VI, INC.; PUERTO RICO MORTGAGE-BACKED &

U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO RICO
FUND, INC.; TAX-FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO
RICO TARGET MATURITY FUND, INC.; UBS IRA SELECT GROWTH & INCOME
PUERTO RICO FUND,

Movants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtor, Appellee,

AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES;
OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF
PUERTO RICO,

Movants, Appellees.

—————————————————

No. 18-1841

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

—————————————————

PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA
PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA PORTFOLIO TARGET
MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO
RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND
III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO
FIXED INCOME FUND V, INC.; PUERTO RICO GNMA AND U.S. GOVERNMENT
TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS BOND FUND I,

INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND II, INC.; PUERTO RICO INVESTORS TAX-FREE
FUND III, INC.; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND V, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND VI, INC.; PUERTO RICO MORTGAGE-BACKED &
U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO RICO
FUND, INC.; TAX-FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO
RICO TARGET MATURITY FUND, INC.,

Movants, Appellants.

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER
ROSE, L.L.C.; SV CREDIT, L.P.; UBS IRA SELECT GROWTH & INCOME
PUERTO RICO FUND,

Movants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtor, Appellee,

AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES;
OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF
PUERTO RICO,

Movants, Appellees.

————————————

No. 18-1855

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO

SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

———————————

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellee,

OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF
PUERTO RICO,

Interested Party, Appellee,

v.

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER
ROSE, L.L.C.; SV CREDIT, L.P.,

Defendants, Appellants,

PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA
PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA PORTFOLIO TARGET
MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND II, INC.;
PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO FIXED INCOME
FUND V, INC.; PUERTO RICO FIXED INCOME FUND III, INC.; PUERTO
RICO FIXED INCOME FUND, INC.; PUERTO RICO GNMA AND U.S.
GOVERNMENT TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS
BOND FUND I, INC.; PUERTO RICO INVESTORS TAX-FREE FUND II, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND III, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND IV, INC.; PUERTO RICO INVESTORS TAX-FREE
FUND V, INC.; PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO MORTGAGE-
BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO
RICO FUND II, INC.; TAX-FREE PUERTO RICO FUND, INC.; TAX-FREE
PUERTO RICO TARGET MATURITY FUND, INC.; UBS IRA SELECT GROWTH &
INCOME PUERTO RICO FUND,

Defendants.

_____

No. 18-1858

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

_____

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellee,

OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF
PUERTO RICO,

Interested Party, Appellee,

v.

PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA
PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA PORTFOLIO TARGET
MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO
RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND
III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO
FIXED INCOME FUND V, INC.; PUERTO RICO GNMA AND U.S. GOVERNMENT
TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS BOND FUND I,
INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND II, INC.; PUERTO RICO INVESTORS TAX-FREE
FUND III, INC.; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND V, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND VI, INC.; PUERTO RICO MORTGAGE-BACKED &

U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO RICO
FUND, INC.; TAX-FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO
RICO TARGET MATURITY FUND, INC.,

Defendants, Appellants,

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER
ROSE, L.L.C.; SV CREDIT, L.P.; UBS IRA SELECT GROWTH & INCOME
PUERTO RICO FUND,

Defendants.

---

No. 18-1868

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION
AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO
SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

---

PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA
PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA PORTFOLIO TARGET
MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO
RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND
III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO
FIXED INCOME FUND V, INC.; PUERTO RICO GNMA AND U.S. GOVERNMENT
TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS BOND FUND I,
INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO
INVESTORS TAX-FREE FUND II, INC.; PUERTO RICO INVESTORS TAX-FREE
FUND III, INC.; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.;
PUERTO RICO INVESTORS TAX-FREE FUND V, INC.; PUERTO RICO

INVESTORS TAX-FREE FUND VI, INC.; PUERTO RICO MORTGAGE-BACKED &
U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO RICO
FUND, INC.; TAX-FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO
RICO TARGET MATURITY FUND, INC.,

Movants, Appellants,

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER
ROSE, L.L.C.; SV CREDIT, L.P.; UBS IRA SELECT GROWTH & INCOME
PUERTO RICO FUND,

Movants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtor, Appellee,

AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES;
OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF
PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Movants, Appellees.

———————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

———————————————

---

* Of the Southern District of New York, sitting by
designation.

Before

Lynch, Stahl, and Kayatta,
<u>Circuit Judges</u>.

———————————————

<u>Bruce Bennett</u>, with whom <u>Benjamin Rosenblum</u>, <u>James M. Gross</u>, <u>Geoffrey S. Stewart</u>, <u>Sparkle L. Sooknanan</u>, <u>Parker A. Rider-Longmaid</u>, <u>Jones Day</u>, <u>Alfredo Fernández-Martínez</u>, and <u>Delgado & Fernández, LLC</u> were on brief, for Altair Global Credit Opportunities Fund (A), LLC; Andalusian Global Designated Activity Company; Glendon Opportunities Fund, LP; Mason Capital Master Fund LP; Nokota Capital Master Fund, L.P.; Oaktree-Forrest Multi-Strategy, L.L.C. (Series B); Oaktree Opportunities Fund IX, L.P.; Oaktree Opportunities Fund IX, (Parallel 2), L.P.; Oaktree Value Opportunities Fund, L.P.; Ocher Rose, L.L.C; SV Credit, L.P.

<u>Jason N. Zakia</u>, with whom <u>Glenn M. Kurtz</u>, <u>John K. Cunningham</u>, <u>White & Case LLP</u>, <u>José C. Sánchez-Castro</u>, <u>Alicia I. Lavergne-Ramírez</u>, <u>Maraliz Vázquez-Marrero</u>, and <u>Sanchez Pirillo LLC</u> were on brief, for Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico GNMA and U.S. Government Target Maturity Fund, Inc.; Puerto Rico Investors Bond Fund I, Inc.; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; UBS IRA Select Growth & Income Puerto Rico Fund.

<u>Jeffrey W. Levitan</u>, with whom <u>Timothy W. Mungovan</u>, <u>John E. Roberts</u>, <u>Michael R. Hackett</u>, <u>William D. Dalsen</u>, <u>Martin J. Bienenstock</u>, <u>Mark D. Harris</u>, <u>Kevin J. Perra</u>, and <u>Proskauer Rose LLP</u> were on brief, for the Financial Oversight and Management Board for Puerto Rico, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

<u>Richard B. Levin</u>, with whom <u>Catherine Steege</u>, <u>Melissa Root</u>, <u>Ian Heath Gershengorn</u>, <u>Lindsay C. Harrison</u>, <u>William K. Dreher</u>, <u>Robert Gordon</u>, <u>Richard Levin</u>, <u>Jenner & Block LLP</u>, <u>A.J. Bennazar-Zequeira</u>, and <u>Bennazar, García, & Milián, C.S.P.</u> were on brief, for the Official Committee of Retired Employees of the Commonwealth of Puerto Rico.

Case: 17-03283-LTS    Doc#:5196-1    Filed:02/21/19    Entered:02/21/19 22:11:49    Desc:
Exhibit A    Page 10 of 56

Michael Shih, Appellate Division, Civil Staff, Joseph H. Hunt, Assistant Attorney General, Mark R. Freeman, and Michael S. Raab, Appellate Division, Civil Staff, for the United States, amicus curiae.

---

January 30, 2019

---

LYNCH, **Circuit Judge**.    These   appeals   involve   bonds
issued in 2008 by the Employees Retirement System of the Government
of  the  Commonwealth  of  Puerto  Rico[1]  (the  "System"),  which  were
bought  by  bondholders  (the  "Bondholders"),  the  appellants  here.
The  bond  documentation  offered  as  security  certain  property
belonging  or  owed  to  the  System,  as  defined  in  a  "Pension  Funding
Bond  Resolution."    The  Bondholders  claim  that  they  have  a  perfected
security  interest  in  that  property  under  Puerto  Rico's  version  of
the  Uniform  Commercial  Code  ("UCC").

Through  the  Financial  Oversight  and  Management  Board  for
Puerto  Rico  (the  "Oversight  Board"),  the  System  filed  suit  in  the
district  court  on  July  21,  2017,  seeking  declaratory  judgments  on
several  issues  related  to  the  validity,  breadth,  and  perfection  of
the  Bondholders'  asserted  security  interest,  and  regarding  the
System's  compliance  with  a  stipulation  between  the  parties  (the
"January  2017  Stipulation").    The  Bondholders  brought  nine
counterclaims  concerning  their  asserted  security  interest  as  well
as  an  alleged  violation  of  the  January  2017  Stipulation.    After

---

[1]      We  use  this  name  here  rather  than  "Retirement  System  for
Employees  of  the  Government  of  the  Commonwealth  of  Puerto  Rico,"
because  the  System,  through  the  Financial  Oversight  and  Management
Board  for  Puerto  Rico,  filed  its  complaint  in  the  district  court
under  this  name  and  refers  to  itself  by  this  name  in  its  brief  to
this  court.    In  this  opinion,  the  "ERS  name"  refers  to  the  term
beginning  with  "Employees  Retirement  System";  the  "RSE  name"
refers  to  the  term  beginning  with  "Retirement  System  for
Employees."

both sides moved for summary judgment, the district court ruled in favor of the System, finding that the Bondholders' interest was not perfected and so could be avoided under 48 U.S.C. § 2161(a), that there had been no violation of the January 2017 Stipulation, and that two of the Bondholders' counterclaims should be dismissed with prejudice. The Fin. Oversight and Mgmt. Bd. for P.R. v. Altair Glob. Credit Opportunities Fund (a), LLC (In re: The Fin. Oversight and Mgmt. Bd. for P.R.), 590 B.R. 577 (D.P.R. 2018). We are told the dollar value of the security for the bonds at stake is about $2.9 billion. The Bondholders appealed.

We agree with the district court on the particular facts here that the UCC financing statements filed in 2008 (the "2008 Financing Statements") did not perfect the Bondholders' security interest, as they lacked a sufficient description of collateral. But we find that the financing statement amendments filed in 2015 and 2016 (together, the "Financing Statement Amendments") satisfied the filing requirements for perfection when read in conjunction with the 2008 Financing Statements. We reverse the district court's determination on the satisfaction of filing requirements for perfection by amendment, and hold that the Bondholders satisfied the filing requirements for perfection as of December 17, 2015.

Because the Bondholders' security interest was perfected, this interest cannot be avoided under the Puerto Rico

- 11 -

Oversight, Management, and Economic Stability Act's ("PROMESA") incorporation of parts of the Bankruptcy Code, including 11 U.S.C. § 544(a), and so we do not reach the issue of whether PROMESA and other relevant Commonwealth law would allow for the retroactive avoidance of <u>unperfected</u> liens.[2]   Accordingly, we vacate the district court's holding on avoidance of the Bondholders' security interest.   We vacate the dismissal of two of the Bondholders' counterclaims and remand to the district court for further proceedings in light of this opinion.   Finally, we affirm the dismissal of the Bondholders' claim regarding the January 2017 Stipulation.

As to the first issue, concerning the 2008 Financing Statements alone, we decide narrowly on the particular facts presented.   As to the issue of perfection by amendment, also narrowly decided, this case presents a unique confluence of circumstances involving two languages and a translation, particularly regarding the sufficient name of the System under Article 9 of the UCC (Secured Transactions), as adopted by the Commonwealth.   Puerto Rico recognizes two official statutory languages. P.R. Laws Ann. tit. 1, § 59.   We face a statutory amendment from 2013 (officially translated in 2014) that variously

---

[2]    Although we do not reach this issue, we acknowledge with appreciation the assistance provided by the United States Department of Justice in submitting a brief as amicus curiae in support of the appellees.

uses two English terms when translating the same unvaried Spanish
term for the name of the System.  Id. tit. 3, §§ 761, 763.  Further,
past  official  translations,  and  the  System  itself,  have
consistently used the ERS name (including in many court filings)
for over sixty years.  We craft our holding narrowly to accommodate
the very unusual circumstances presented by a new translation that
is, on its face, inconsistent, that varies from every other formal
version both before and after its presentation, and that arises in
a context in which there is no realistic likelihood that anyone
would search the Department of State of the Government of Puerto
Rico's (the "P.R. Department of State") records only under one of
the two forms of the name that appear in the English translation
of the amended statute.

I.

The System is a trust and government agency created in
1951 by an Act of the Commonwealth.  Law No. 447 of May 15, 1951,
1951 P.R. Laws 1298 (the "1951 Enabling Act") (codified as amended
at P.R. Laws Ann. tit. 3, §§ 761 et seq.).  The System is structured
to provide pensions and other retirement benefits to employees and
officers of the Commonwealth government, members and employees of
the  Commonwealth's  Legislative  Assembly,  and  officers  and
employees  of  the  Commonwealth's  municipalities  and  public
corporations.  P.R. Laws Ann. tit 3, § 764.  It is designated as
"independent and separate" from other Commonwealth agencies.  Id.

- 13 -

§ 775.  Until legislation that went into effect on July 1, 2017, the System was funded by mandatory contributions from employees and employers, and by the System's investment earnings.  See Concurrent Resolution 188 of the House of Representatives of the Government of Puerto Rico; Law No. 106 of August 23, 2017.

As of 2008, the Enabling Act allowed the System to incur debt when the Board of Trustees of the System so authorized.  P.R. Laws Ann. tit. 3, § 779(d) (2008).  Seeking to decrease an unfunded liability of approximately $9.9 billion, the Board of Trustees adopted a "Pension Funding Bond Resolution" (the "Resolution") on January 24, 2008.  The Resolution allowed for the issuance of about $2.9 billion in bonds.  The Resolution was made publicly available on several governmental websites, including on the Government Development Bank for Puerto Rico's website and on the System's own website.

The Bondholders hold some of those bonds issued by the System.  The System executed a security agreement (the "Security Agreement"), which purports to grant the Bondholders a security interest in "Pledged Property" belonging or owed to the System. "Pledged Property" was defined in the Resolution but not in the Security Agreement.  The Resolution's definition included the required employer contributions to the System and proceeds from

these contributions.[3] The Security Agreement did not itself define or otherwise describe "Pledged Property." Rather, it stated that "[a]ll capitalized words not defined herein shall have the meaning ascribed to them in the Resolution." But the Resolution was not attached to the Security Agreement, and the Security Agreement did not even say what types of property were pledged, whether the Resolution was available to the public, or where the Resolution

---

[3]     The Resolution defined "Pledged Property" as:

1.    All Revenues.
2.    All right, title and interest of the System in and to Revenues, and all rights to receive the same.
3.    The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in this Resolution and to the provisions of Sections 1301 and 1303.
4.    Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.
5.    Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

The Resolution's definition of "Revenues" included, among other things, "All Employers' Contributions."

could be found.

Security interests could be perfected by filing financing statements comporting with the requirements of Article 9 of the UCC, as adopted by the Commonwealth. In 2008, those requirements included, among other things, that a financing statement "contain[] a statement indicating the types, or describing the items, of collateral." P.R. Laws Ann. tit. 19, § 2152(1) (2008).

The Security Agreement specified that "[the System] shall cause UCC financing and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings." On or about June 24, 2008, and July 2, 2008,[4] two financing statements (the 2008 Financing Statements) related to the System's bonds, as described above, were filed with the P.R. Department of State. The 2008 Financing Statements each used a standard "Financing Statement" form provided by the P.R. Department of State, where such statements are located. Initial financing statements are sometimes referred to as "UCC-1" statements.

The 2008 Financing Statements described the collateral as "[t]he pledged property described in the Security Agreement

---

[4]     The listed dates -- June 24 and July 2 -- are the dates stamped on the documents by the filing officer. The same is true for the listed dates for the Financing Statement Amendments.

attached as Exhibit A hereto and by reference made a part thereof."
The Security Agreement, Exhibit A, was attached to each of the
2008 Financing Statements as filed but, as said, did not itself
describe the "Pledged Property" except as it purported to do by
reference to an unattached other document.    That is, the
Resolution, which contained the full definition of "Pledged
Property" and other key terms, was not attached.    The 2008
Financing Statements do not otherwise describe or define the
"Pledged Property" (meaning the collateral).    In short, the
documents filed with the P.R. Department of State described the
collateral only by stating that it was "Pledged Property" described
in a document that could only be found somewhere outside the P.R.
Department of State.

          Between the filing of the 2008 Financing Statements and
the filing of the Financing Statement Amendments in 2015 and 2016,
the Commonwealth repealed its earlier version of Article 9 of the
UCC and enacted a revised version, Law No. 21 of January 17, 2012,
2012 P.R. Laws 162 (codified at P.R Laws Ann. tit. 19, §§ 2211-
2409).   The updated law went into effect on January 17, 2013, one
year after its approval.   See P.R. Laws Ann. tit. 19, § 2211).
The new version of Article 9 made modest changes to the
requirements for financing statements, and made the effective life
of financing statements five years rather than ten years.

          On or about December 17, 2015, and January 16, 2016, the

four Financing Statement Amendments were filed.  These filings all used a standard "Financing Statement Amendment" form provided by the P.R. Department of State.  The Financing Statement Amendments describe the collateral as "[t]he Pledged Property and all proceeds thereof and all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference."  Unlike the 2008 Financing Statements, Exhibit A contained a full definition of "Pledged Property" drawn from the Resolution.  The Financing Statement Amendments provide, in the attached Exhibit A, that the debtor is the "Employees Retirement System of the Government of the Commonwealth of Puerto Rico."  That naming of the debtor is at issue in the argument concerning whether the Financing Statement Amendments sufficed to satisfy the filing requirements for perfection.[5]

The P.R. Department of State certified in March 2017 that a search of the Commonwealth's UCC records under the name "Employees Retirement System of the Government of the Commonwealth of Puerto Rico" revealed the 2008 Financing Statements and the Financing Statement Amendments.  A copy of a UCC search report from October 17, 2017, for a search performed by Wolters Kluwer on behalf of the Bondholders, indicates the same.  None of the 2008

---

[5]    The issue of the proper name of the System did not arise until February 28, 2014, when a translation of the 2013 amended Enabling Act was published.

Financing Statements and the Financing Statement Amendments had been removed from the P.R. Department of State's records as of October 2017.

After the filing of the 2008 Financing Statements and before the filing of the Financing Statement Amendments, the Commonwealth's legislature amended the Enabling Act in 2013. Law No. 3 of April 4, 2013, 2013 P.R. Laws 39 (codified at P.R. Laws Ann. tit 3, § 761 et seq.).  From the original Enabling Act in 1951 until 2014, the English translation of the Enabling Act, as codified, used "Employees Retirement System" as the first part of the name of the System, when translating the Spanish term "Sistema de Retiro de los Empleados."  Compare Law No. 447 of May 15, 1951, 1951 P.R. Laws 1298 (English, "Employees Retirement System") with id. at 1299 (Spanish, "Sistema de Retiro de Los Empleados").  The legislature had amended the Enabling Act numerous times before 2013, including changing the name of the System in 2004 by removing "and its Instrumentalities" and by replacing "Government of Puerto Rico" with "Government of the Commonwealth of Puerto Rico."  See P.R. Laws Ann. tit. 3, § 761 (2006).  But the English translation of the System as, in part, "Employees Retirement System," remained the same.  See P.R. Laws Ann. tit. 3, § 761 (2011); P.R. Laws Ann. tit. 3, § 761 (2006); P.R. Laws Ann. tit. 3, § 761 (1988).

The English language translation of the 2013 amended Enabling Act was published on February 28, 2014, more than ten

months after the 2013 Act's April 4, 2013, approval in Spanish and
about seven months after its effective date.[6]  As codified, the
translation refers to the System as both "Retirement System for
Employees of the Government of the Commonwealth of Puerto Rico"
and "Employees Retirement System of the Government of the
Commonwealth of Puerto Rico."  P.R. Laws Ann. tit. 3, §§ 761,
763(36).  In many sections, the translation of the Enabling Act
continues to use the prior version of the English name ("Employees
Retirement System of the Government of the Commonwealth of Puerto
Rico").  Such continuity in the translation carries over to the
"Statement of Motives" section and to the definition of the
shorthand "System," as well as to dozens of other sections.  In
Section 1-10, which describes how the System was "to be
designated," the translation uses the English formulation,
"Retirement System for Employees of the Government of the
Commonwealth of Puerto Rico" for the unchanged Spanish original,
"Sistema de Retiro de los Empleados del Gobierno del Estado Libre
Asociado de Puerto Rico."  Law No. 3 of April 4, 2013, 2013 P.R.
Laws 64.

     Months after the Financing Statement Amendments were

---

     [6]    Similar or lengthier gaps between the passage of laws
and the promulgation of their official translations have occurred
in the Commonwealth.  For example, the official English translation
of the 2004 amendment to the Enabling Act (passed on September 15,
2004), Law No. 296 of September 15, 2004, was certified and
published on March 13, 2007.

filed in late 2015 and early 2016, Congress enacted PROMESA, 48 U.S.C. § 2101 et seq., on June 30, 2016.  Among other things, PROMESA created the Oversight Board and granted the Board a range of powers over the Commonwealth's finances, see, e.g., id. §§ 2121-2129, including the general mandate to craft "a method [for the Commonwealth] to achieve fiscal responsibility and access to the capital markets," id. § 2121(a).

PROMESA incorporated by reference certain provisions of the Bankruptcy Code, id. § 2161(a), including the "strong-arm" provision at 11 U.S.C. § 544(a).[7]  That provision "set[s] out the

---

[7]      Section 544(a) provides:

The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by —
      (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
      (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

circumstances under which a trustee" may permissibly "pursue avoidance" of certain interests.  Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 888 (2018).

Pursuant to Section 301(c)(7) of PROMESA, the Oversight Board is the "trustee" as that term is defined in the Bankruptcy Code (except under one circumstance that is not relevant here, see 11 U.S.C § 926).  48 U.S.C. § 2161(c)(7).  PROMESA also provides that "Subchapters III and VI shall apply with respect to debts, claims, and liens . . . created before, on, or after [June 30, 2016]."  Id. § 2101(b)(2).

PROMESA's enactment triggered an automatic temporary stay, under Section 405, on creditors' remedies against the Commonwealth and its property.  Id. § 2194(a)-(b).  The Bondholders moved to lift that stay, but that motion was denied by the district court.  See Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 510 (1st Cir. 2017).  This court vacated the district court's decision in part and remanded for further proceedings, id. at 516, and

---

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a).

- 22 -

expressed general concerns with the protection afforded for the Bondholders' property, id. at 511-12.

On remand, the System and the Bondholders entered into the January 2017 Stipulation, in order to resolve Altair Global Credit Opportunities Fund (A), LLC v. García-Padilla, No. 16-cv-2696. The January 2017 Stipulation required, in relevant part, that "Employers' Contributions (as defined in the ERS Bond Resolutions) received by the ERS during the pendency of the stay imposed pursuant to [PROMESA] § 405 shall be transferred by the ERS to [a segregated account] for the benefit of the holders of the ERS bonds."

On May 3, 2017, the Oversight Board filed a petition under Title III of PROMESA on behalf of the Commonwealth. On May 21, 2017, the Oversight Board filed a Title III petition on behalf of the System, which triggered an automatic stay of litigation against the System. The Bondholders moved to lift the stay, and the parties entered into a Joint Stipulation that resolved the Bondholders' motion. The Joint Stipulation stated that an adversary proceeding would be filed by the System on or before July 21, 2017, and limited the scope of the proceeding to the "validity, priority, extent and enforceability" of the Bondholders' claimed security interest and the System's rights regarding employer contributions received during May 2017, as well as relevant counterclaims by the Bondholders.

On July 21, 2017, the System, through the Oversight
Board, brought this case in federal district court against the
Bondholders, seeking declarations about the status, scope, and
validity of the Bondholders' claimed security interest in the
"Pledged Property," and about the System's compliance with the
January 2017 Stipulation. See In re: Fin. Oversight & Mgmt. Bd.
for P.R., 590 B.R. at 583.[8]   The Bondholders asserted nine
counterclaims, requesting declarations concerning their asserted
security interest as well as an alleged violation of the January
2017 Stipulation.

The parties both moved for summary judgment. Id. The
System sought judgment in its favor on its four claims; the
Bondholders sought the dismissal of all of the System's claims as
well as judgment in their favor on all of their counterclaims.
Id.

On August 17, 2018, the district court granted the
System's motion for summary judgment in part and denied the
Bondholders' cross-motion in its entirety. Id. at 599-600. The

---

[8]   In other litigation before the commencement of the
System's Title III case, the System had stated that at least some
of the Bondholders had "valid and enforceable liens in over
hundreds of millions of dollars of ERS revenue." Respondent
Employees Retirement System of the Government of Puerto Rico's
Brief in Opposition to Motion for Relief from the PROMESA Automatic
Stay at 10, Altair Global Credit Opportunities Fund (A), LLC. v.
Garcia Padilla, Case No. 3:16-cv-02696-FAB (D.P.R. Oct. 26, 2016).
The district court noted this acknowledgment. In re: Fin.
Oversight & Mgmt. Bd. for P.R., 590 B.R. at 587.

district court held that any security interest the Bondholders
might possess had not been perfected by the 2008 Financing
Statements, because those Statements did not contain an adequate
description of the collateral as required under Article 9 in 2008.
Id. at 589 (citing P.R. Laws Ann. tit. 19, § 2152(1) (2008)).   The
district court then determined that the Financing Statement
Amendments did not perfect the Bondholders' security interest,
because they did not identify the debtor by its correct legal name,
which the court determined was the RSE name, as the court felt was
required by the version of Article 9 operative in 2015 and 2016.
Id. at 592 (citing P.R. Laws Ann. tit. 19, § 2322(a)(1)).

        Starting from the determination that the Bondholders'
interest was unperfected when the Title III case began, the
district court then held that the Oversight Board, as trustee,
could avoid the liens under the strong-arm provision at 11 U.S.C.
§ 544(a), which PROMESA incorporates, see 48 U.S.C. § 2161(a).   In
re: Fin. Oversight & Mgmt. Bd. for P.R., 590 B.R. at 592-98.   That
is, Commonwealth law did not prevent a hypothetical creditor from
obtaining a judgment lien against the System's assets at the time
when the Title III case commenced.   Id. at 594.   The district court
thus invalidated the Bondholders' interests pursuant to Section
544(a).   The district court then held that the System did not
violate the January 2017 Stipulation because the adversary
proceedings were limited to claims or counterclaims related to

employer contributions received during May of 2017, and the System's obligation to transfer such funds to a segregated account clearly ended with the PROMESA stay on May 1, 2017. Id. at 599.

Following a joint response to an order to show cause as to why the Bondholders' counterclaims One through Four "ought not to be dismissed for failure to state a claim upon which relief may be granted," the district court dismissed the Bondholders' counterclaims with prejudice on September 5, 2018.

The Bondholders timely appealed, and this court granted motions to consolidate these appeals.

II.

This case comes on summary judgment. In reviewing grants of summary judgment, "we take as true the facts documented in the record below, resolving any factual conflicts or disparities in favor of the nonmovant." Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007). Nearly all of the operative facts are undisputed here, and the grant of summary judgment turns primarily on interpretations of law, which this court reviews de novo, or mixed questions of law and fact, for which "we employ a degree-of-deference continuum, providing non-deferential plenary review for law-dominated questions and deferential review for fact-dominated questions." Johnson v. Bos. Pub. Sch., 906 F.3d 182, 191 (1st Cir. 2018) (internal quotation marks omitted).

We first consider perfection by the 2008 Financing Statements on their own, and then in conjunction with the later Financing Statement Amendments, before briefly considering avoidance under PROMESA. We then address the dismissal of two of the Bondholders' counterclaims and the alleged violation of the January 2017 Stipulation.

A.   Perfection by the 2008 Financing Statements

The Bondholders argue that the initial 2008 Financing Statements perfected their security interest. Under the former version of Article 9 operative in 2008,

> [a] financing statement is sufficient if it [1] gives the names of the debtor and the secured party, [2] is signed by the debtor, [3] gives an address of the secured party from which information concerning the security interest may be obtained, [4] gives a mailing address of the debtor and [5] contains a statement indicating the types, or describing the items, of collateral.

P.R. Laws Ann. tit. 19, § 2152(1) (2008). There is no dispute that the 2008 Financing Statements met the first four requirements at the time they were filed, and so those elements are not considered here. We also stress that the validity of the underlying Security Agreement is not at issue. Security agreements are private contracts between parties and do not have the same public notice purpose as financing statements. See Webb Co. v. First City Bank (In re Softalk Publ'g Co., Inc.), 856 F.2d 1328, 1330 (9th Cir. 1988). Instead, our discussion is limited only to

whether the 2008 Financing Statements "contain[] a statement indicating the types, or describing the items, of collateral," as required by the then-existing statute.  See P.R. Laws Ann. tit. 19, § 2152(1) (2008).

The Bondholders argue that we should adopt a lenient understanding of the collateral description requirement, such that the mere reference in the Security Agreement to the definition of "Pledged Property" contained in a separate document, the Resolution, constituted a sufficient description, even though the Resolution, and thus its description of "Pledged Property," was not attached to the 2008 Financing Statements.  The Bondholders cite a number of cases to argue that incorporation by reference is appropriate in this situation.  They argue this is in part because the collateral description in a financing statement is, in their view, only "a starting point" in providing notice to an interested party.  John Deere Co. of Balt. v. William C. Pahl Constr. Co., 34 A.D.2d 85, 88 (N.Y. App. Div. 1970).

The System, joined by the Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Committee") by reference in its brief, counters that the UCC's goals, like public notice, require a strict rule that interested parties should not face the burden and potential risks of further searching for a collateral description not found within or appended to a financing statement.

We clear away some arguments which are beside the point.

- 28 -

It is not helpful for the parties to use terms such as "liberal" or "strict" construction of Article 9.  And it is likely that on some facts, incorporation by reference was permissible under the version of Article 9 operative in the Commonwealth when the 2008 Financing Statements were filed.  That principle is not really at issue.  On the facts on this record, we, like the district court, conclude that the 2008 Financing Statements were insufficient to perfect the security interest under P.R. Laws Ann. tit. 19, § 2152(1) (2008).[9]  There has been no literal compliance with this rule, and this provision should be interpreted consonant with the goals of the UCC.

Our holding of an insufficient collateral description depends heavily on the facts, where a) the collateral is not

---

[9]    The Bondholders do not cite controlling authority on this issue.  In Chase Bank of Fla., N.A. v. Muscarella, 582 So. 2d 1196 (Fla. Dist. Ct. App. 1991), part of the collateral -- the "Partnership Interest" -- was listed in the financing statement itself, see id. at 1197, and so we agree that the "[Muscarella] opinion does not stand for the proposition that it is sufficient for a financing statement to merely refer to the underlying security agreement and thereby incorporate by reference that document's collateral description."  First Midwest Bank v. Reinbold (In re: I80 Equip., LLC), 591 B.R. 353, 361 (Bankr. C.D. Ill. 2018).  In Int'l Home Prod., Inc. v. First Bank of P.R., Inc., 495 B.R. 152 (D.P.R. 2013), the referenced document was attached to the financing statement rather than filed or accessible only elsewhere.  Id. at 160 n.8.
    And the citation to John Deere is inapposite here, because the reference in that case to a "starting point for investigation" does not refer to a description of collateral.  34 A.D.2d at 88.

described, even by type(s), in the 2008 Financing Statements or attachments; b) the 2008 Financing Statements do not tell interested parties where to find the referenced document (the Resolution) which contains the fuller collateral description; and c) the Resolution is not at the UCC filing office.

First, the 2008 Financing Statements do not describe even the type(s) of collateral, much less the items, at issue. Cf. Elf Atochem N. Am., Inc. v. Celco, Inc., 927 P.2d 355, 363 (Ariz. Ct. App. 1996) (finding sufficient a financing statement that described the collateral as "equipment," as further described in two specific but unattached sales orders). They also do not attach the document (the Resolution) referenced as describing the collateral. Nor do those facts alone define the issue before us. In addition, the referenced document -- the Resolution -- was held in a different location from the UCC filing office, and the 2008 Financing Statements (including the attached Security Agreement) contain no indication of the referenced document's location or how to find it.

This total combination of facts undercuts several key goals of the UCC and its filing system. These goals include fair notice to other creditors and the public of a security interest. See UCC § 9-502 cmt. 2;[10] Wheeling & Lake Erie Ry. Co. v. Keach (In

---

[10]   "UCC Official Comments do not have the force of law, but are nonetheless the most useful of several aids to interpretation

<u>re: Montreal, Me. & Atl. Ry., Ltd.</u>), 799 F.3d 1, 11 (1st Cir. 2015)
("[A] primary goal of both Article 9 and . . . perfection rules is
to ensure that other creditors have notice of [a] security
interest."); <u>In re Softalk Publ'g Co.</u>, 856 F.2d 1328, 1330 (9th
Cir. 1988) ("The [UCC] financing statement serves to give notice
to other creditors or potential creditors that the filing creditor
might have a security interest in certain assets of the named
debtor."); <u>In re Cushman Bakery</u>, 526 F.2d 23, 28 (1st Cir. 1975)
(stating that "the system of notice filing is designed to . . .
apprise creditors that the secured party may have a security
interest in the collateral described in the financing
statement").[11]  Article 9 was also meant to facilitate the expansion
of commercial practices.  <u>See</u> P.R. Laws Ann. tit. 19, § 401(2).[12]

---

and construction of the [UCC]."  <u>JOM, Inc.</u> v. <u>Adell Plastics, Inc.</u>,
193 F.3d 47, 57 n.6 (1st Cir. 1999) (internal quotation marks
omitted).

    [11]   Several of the cases cited by the Bondholders consider
security agreements rather than financing statements.  <u>E.g.</u> <u>Nolden</u>
v. <u>Plant Reclamation</u> (<u>In the matter of Amex-Protein Dev. Corp.</u>),
504 F.2d 1056 (9th Cir. 1974); <u>Greenville Riverboat, LLC</u> v. <u>Less,
Getz & Lipman, P.L.L.C.</u>, 131 F. Supp. 2d 842 (S.D. Miss. 2000).
As noted, security agreements are private contracts that do not
have the same public notice purpose as financing statements.  <u>See</u>
<u>In re Softalk Publ'g Co.</u>, 856 F.2d 1328, 1330 (9th Cir. 1988).

    [12]   Where a referenced document is not in the UCC records
and its location is not listed in the financing statement itself
(nor how to find it), an interested party must do additional
searching at its own expense to determine the collateral at issue.
This remains true even where the extrinsic document is publicly
available elsewhere: The interested party still has to search
beyond where the initial financing statement has been filed, and
do so without any guidance.  It may not have been difficult for

Here, as said, the 2008 Financing Statements do not describe even the type(s) of collateral; instead, they describe the collateral only by reference to an extrinsic document located outside the UCC filing office, and that document's location is not listed in the financing statement. This at best gives an interested party notice about an interest in <u>some</u> undescribed collateral, but does not adequately specify <u>what</u> collateral is encumbered. That is, an interested party knowing nothing more than this does not have "actual knowledge" and has not "received a notice," <u>see</u> P.R. Laws Ann. tit. 19, § 451(25)(a)-(b) (2008), of the collateral at issue. Requiring interested parties to contact debtors at their own expense about encumbered collateral, with no guarantee of a timely or accurate answer, would run counter to the notice purpose of the UCC.[13]  <u>See, e.g.</u>, <u>In re Quality Seafoods,</u>

---

interested parties to find the Resolution here, but no party disputes that additional searching would have been necessary.

Interested parties doing such a search could well have justifiable concerns about the extrinsic referenced document. How, for example, would an interested party know whether a description of collateral in the extrinsic document is the latest operative version (rather than a superseded version), whether that document is complete, or whether the document found on another website or at another location is authentic rather than doctored in some way? Forcing interested parties to undertake additional work and expense merely to find a basic collateral description cuts against the goal of expansion of commercial practices.

[13]   <u>In re Cushman Bakery</u> did not determine that further inquiry by interested parties regarding the specific encumbered collateral was required under Article 9, but instead stated only that "further inquiry from the parties concerned [would] be necessary to disclose the <u>complete state of affairs</u>" around a

Inc., 104 B.R. 560, 561 (Bankr. D. Mass. 1989).

        The UCC filing requirements are clear.  See Uniroyal,
Inc. v. Universal Tire & Auto Supply Co., 557 F.2d 22, 23 (1st
Cir. 1977).  It would not have been difficult whatsoever for the
2008 Financing Statements to provide proper notice.  The Resolution
could simply have been attached to these filings, as the Security
Agreement was.   Instead, as they stand, the 2008 Financing
Statements would leave a reasonable creditor or interested party
with doubts as to the collateral at issue.  We do not interpret
the former UCC provision in a way contrary to its purposes, above
all notice, and so the description of collateral in the 2008
Financing Statements was insufficient.

        Having resolved the logically antecedent question
concerning the first UCC filings, we turn to the amendment issues.

B.   Lapse of 2008 Financing Statements

        The System and the Committee argue that the 2008
Financing Statements could not later satisfy the requirements for
perfection, by amendment, because the 2008 Financing Statements
had lapsed by the time the Financing Statement Amendments were
filed in 2015 and 2016.  The Commonwealth's enactment of a revised
Article 9, they argue, shortened the effective time period of an
initial financing statement from ten years to five years.  Compare

_____

transaction.  526 F.2d at 28-29 (emphasis added).

P.R. Laws Ann. tit. 19, § 2335(a) (five years) with id. § 2153(2)

(2008) (ten years). Here, the Financing Statement Amendments were

filed about seven and a half years after the 2008 Financing

Statements. Because lapsed financing statements are ineffective,

see P.R. Laws Ann. tit. 19, § 2335(c), the Committee argues that

the Amendments filed by the Bondholders could not have cured the

deficiencies as to the collateral description in the 2008 Financing

Statements. In support of their view, the System and the Committee

primarily point to a transition provision, the "Savings clause,"

in the revised Article 9, which states that "[e]xcept as otherwise

provided in this subchapter, this act applies to a transaction or

lien within its scope, even if the transaction or lien was entered

into or created before this act takes effect." Id. § 2402(a).

        This argument on lapse fails for several reasons. First,

as to retroactivity, this Savings clause is not intended to apply

to the separate provision that shortened the life of financing

statements on its effective date. The Commonwealth's Law 17 of

2014, which clarified that the effective time period of financing

statements was five years, does not contain a statement concerning

retroactivity. See Law No. 17 of January 16, 2014. And as a

textual matter, we would expect that a provision intended to apply

retroactively to financing statements would directly mention

financing statements, particularly given the Commonwealth's long-

standing requirement that a law must "expressly so decree" in order

- 34 -

to have retroactive effect.  P.R. Laws Ann. tit. 31, § 3.

Second, the P.R. Department of State, where UCC filings
are made, considered the amendment to the time period "for the
life of an initial financing statement" and concluded that the
decrease to five years "cannot be retroactive."  P.R. Dept. of
State, Circular 2014-01, <u>Clarifications on Term for Filing
Continuing Financing Statements Based on Law 17-2014</u> (Jan. 24,
2014) (English trans.).  That is, "for initial financ[ing]
statements filed on or before January 15, 2014, [the] term is ten
(10) years."  <u>Id.</u> [14]  Though this Circular does not have the force
of law, it is informative on this issue.  Consistent with this
Circular, the Filing Office did not refuse to accept the Financing
Statement Amendments, as it would have been required to do if the
2008 Financing Statements had lapsed.  <u>See</u> P.R. Laws Ann. tit. 19,
§ 2336(b)(3)(B)(ii).

Third, our conclusion comports with P.R. Laws Ann. tit.
31, § 3, the general provision of the Commonwealth's Civil Code,
which states that "[i]n no case shall the retroactive effect of a
law operate to the prejudice of rights acquired under previous

---

[14]     At oral argument, counsel for the System suggested that
the P.R. Department of State's Circular applied only to perfected
interests.  This is incorrect.  The Circular refers to "initial
financing statements" in bold text on both pages and does not limit
its determination regarding retroactive effect to previously
perfected interests.

legislative action."[15]    Acceptance of the System's position would run afoul of this provision.    The enactment of the old Article 9 into Commonwealth law was clearly a legislative action.    Applying the five-year rule retroactively would harm the rights of creditors holding perfected security interests through initial financing statements that were between five and ten years old on January 16, 2014, the effective date of the modified rule.    See id. tit. 19, § 2335(a).    Nothing in the law on the effective time limit for financing statements suggests treating financing statements differently depending on perfection, and instead refers broadly to "a filed financing statement" and the "date of filing," id. (emphasis added).    So, the bar on retroactivity protects all filers in the time period at issue (which includes the Bondholders in this case).

The 2008 Financing Statements had not lapsed when the Financing Statement Amendments were filed about seven and a half years later, because the ten-year rule applied to the 2008 Financing Statements.

---

[15]    As a general matter, the Supreme Court of the Commonwealth of Puerto Rico has suggested, considering this law, that it is "highly desirable that . . . [a] new rule will have prospective effect; especially, when contractual or property rights are at stake." Almodóvar v. Róman, 125 P.R. Offic. Trans. 218 (P.R. 1990).

C.    Perfection by the Financing Statement Amendments in
      Conjunction with the 2008 Financing Statements

        We next consider whether the Financing Statement
Amendments cured defects in the initial Statements, when these
filings are read together. See, e.g., P.R. Laws Ann. tit. 19,
§ 2404(3)(B); see also Miami Valley Prod. Credit Ass'n v. Kimley,
536 N.E.2d 1182, 1186 (Ohio Ct. App. 1987) ("We are willing to
treat the two financing statements as a single financing statement
. . . ."). We do not reach the Bondholders' alternative argument
that the Financing Statement Amendments independently perfected
their security interest, since we determine that the Financing
Statement Amendments cured defects in the 2008 Financing
Statements. Similarly, we do not reach the Bondholders' argument
that Section 2323 allows the use of "other name[s]" of a debtor,
see P.R. Laws Ann. tit. 19, § 2323(b)(1), as this would require a
broader consideration of aspects of Article 9 that are beyond the
necessary scope of this case.

        Article 9 contemplates situations where a financing
statement amendment "cures" an earlier financing statement by
fixing outdated or incorrect information in the financing
statement, such as after a name change by a debtor. See, e.g.,
id. § 2327(c). Under Article 9, "[a] security interest . . . (3)
becomes perfected . . . (B) when the applicable requirements for
perfection are satisfied." Id. § 2404(3)(B). As to these

- 37 -

"applicable requirements," a financing statement is sufficient only "if it: (1) Provides the name of the debtor; (2) provides the name of the secured party or a representative of the secured party, and (3) indicates the collateral covered by the financing statement." Id. § 2322(a). We now consider the Bondholders' compliance with these requirements in the 2008 Financing Statements and the Financing Statement Amendments.

    1.   <u>Name of the Secured Party and Collateral Description</u>

The Financing Statement Amendments sufficiently provide the name of the secured party's agent in Exhibit A: "The Bank of New York Mellon, as Fiscal Agent," as required under Section 2322(a)(2).[16] No party disputes this clear point.

As to the collateral description requirement, under the new Article 9, a collateral description of personal property is sufficient "whether or not it is specific, if it reasonably identifies what is described," id. § 2218(a), but a "[s]upergeneric description [is] not sufficient," id. § 2218(c). One of the "[e]xamples of reasonable identification," id. § 2218(b), under Article 9 is a "[s]pecific listing" of the collateral, id. § 2218(b)(1).

Here, the Financing Statement Amendments described the collateral as "[t]he Pledged Property and all proceeds thereof and

_____

[16]    The 2008 Financing Statements also properly list the Secured Party as "The Bank of New York, as fiscal agent[.]"

all after-acquired property as described more fully in Exhibit A attached hereto and incorporated by reference." Exhibit A, in turn, contained a detailed definition of "Pledged Property."[17] Each of the relevant capitalized terms in the definition of "Pledged Property" -- "Revenues," "Funds," "Accounts," "Subaccounts," "Fiscal Agent," "Debt Service Reserve Account," and "Resolution" -- is also defined in Exhibit A. The definition of "Pledged Property" satisfied one of the "[e]xamples of reasonable identification" by providing a "[s]pecific listing" of the collateral. Id. It therefore suffices as a description of collateral.

   2.   Name of the Debtor

      We now turn to the key question of whether the Financing Statement Amendments contain a sufficient "name of the debtor." Article 9 contains different requirements for the names of registered organizations and for the names of individuals. A "[r]egistered organization" is defined, in part, as "an organization organized solely under the law of a single state or the United States by the filing of a public organic record with, the issuance of a public organic record by, or the enactment of legislation by the state or United States." Id. § 2212(a)(71). The System is a registered organization because it is an

_____

   [17]   The full definition of "Pledged Property" is the same as in the Resolution, and is reproduced in note 3, supra.

organization formed and organized by the Commonwealth's enactment
of legislation: the 1951 Enabling Act.    When a debtor is a
registered organization,

> [a] financing statement sufficiently provides
> the name of the debtor . . . only if the
> financing statement provides the name that is
> stated to be the registered organization's
> name on the public organic record most
> recently filed with or issued or enacted by
> the registered organization's jurisdiction of
> organization which purports to state, amend,
> or restate the registered organization's name.

Id. tit. 19, § 2323(a)(1).   Though a financing statement that
"provides only the debtor's trade name does not sufficiently
provide the name of the debtor," id. § 2323(c), an otherwise
sufficient financing statement, containing a correct name of the
debtor, is "not rendered ineffective by the absence of . . . [a]
trade name or other name of the debtor," id. § 2323(b).[18]

_____

[18]    Article 9 also provides a safe harbor provision for minor
errors or omissions: "A financing statement substantially
satisfying the requirements of this subchapter is effective, even
if it has minor errors or omissions, unless the errors or omissions
make the financing statement seriously misleading."  P.R. Laws
Ann. tit. 19, § 2326(a).  For a name,

> if a search of the records of the filing office
> under the debtor's correct name, using the
> filing office's standard search logic, if any,
> would disclose a financing statement that
> fails sufficiently to provide the name of the
> debtor in accordance with § 2323 (a) of this
> title, the name provided does not make the
> financing statement seriously misleading.

Id. § 2326(c).

Like the 2008 Financing Statements, Exhibit A to the
Financing Statement Amendments stated the name of the debtor as
"Employees Retirement System of the Government of the Commonwealth
of Puerto Rico."  The 2008 Financing Statements also stated the
"[e]ntity name" of the debtor as "Employees Retirement System of
the Government of the Commonwealth of Puerto Rico."  The System
and the Committee argue that, as of February 28, 2018, this became
the incorrect name because, in their view, the English translation
of the 2013 amendment to the Enabling Act changed the System's
English name.  Id. tit. 3, § 761.  The English translation of that
Act states that "[a] retirement and benefit system to be designated
as the 'Retirement System for Employees of the Government of the
Commonwealth of Puerto Rico' . . . is hereby created."  Law No. 3
of April 4, 2013, 2013 P.R. Laws 64.  In the System's view, the
2013 amendment to the Enabling Act is the relevant "public organic
record most recently filed with or issued or enacted by the
registered organization's jurisdiction of organization."  P.R.
Laws Ann. tit. 19, § 2323(a)(1).  The System argues that Section
1-101, codified at P.R. Laws Ann. tit. 3, § 761, alone is the
section which "state[s]" the name of the System under Section
2323(a)(1), and so concludes that the RSE name is the name for
Article 9 purposes.  That is, the System argues that it is
irrelevant that other sections of the Act use "Employees Retirement
System," see, e.g., id. § 763(36), because only Section 1-101 of

- 41 -

the translation "purports to state, amend, or restate the
registered organization's name," id. tit. 19, § 2323(a)(1).  Even
if this were a translation error, the System argues, "that
erroneous translation would nevertheless constitute [the System's]
name for Article 9 purposes."  The System argues that any UCC
filing (whether a financing statement or financing statement
amendment) under "Employees Retirement System of the Government of
the Commonwealth of Puerto Rico" does not state the correct name.
On this view, because a search under the correct name --
"Retirement System for Employees of the Government of the
Commonwealth of Puerto Rico" -- would not find such a UCC filing,
use of the ERS name is seriously misleading.  P.R. Laws Ann. tit.
19, § 2326(c).

        The Bondholders make numerous arguments in opposition
regarding the sufficiency of the name used, some statutory and
some focused on the System's own conduct. We do not detail those
arguments further, but deal with them in our analysis.

        We resolve the merits of this matter on the record, which
is adequate.  Both the 2008 Financing Statements and the Financing
Statement Amendments were filed in English.  And so we look to the
2014 English translation of the Enabling Act to determine whether
the Financing Statement Amendments comply with the UCC's reference
to the "public organic record most recently . . . enacted by the
[System's] jurisdiction of organization which purports to state,

amend, or restate the [System's] name." P.R. Laws Ann. tit. 19,
§ 2323(a)(1). The "to be designated as" language codified at
Section 761 does not mean that no other portion of the statute
"state[s]" the name of the System for UCC purposes. The System
misconstrues the relevant UCC provision here, by suggesting that
only the first section of the Enabling Act "purports to state,
amend, or restate the registered organization's name," id. tit.
19, § 2323(a)(1), because that section uses the following
language: "A retirement and benefit system to be designated as the
'Retirement System for Employees of the Government of the
Commonwealth of Puerto Rico,' . . . is hereby created." Id. tit.
3, § 761. The requirement is that a filer "provide the name that
is stated" in the "public organic record . . . which purports to
state, amend, or restate the registered organization's name." Id.
(emphasis added). The latter clause, starting with "which
purports," plainly modifies "public organic record." So, it does
not follow that only one of many clauses in the statute must be
all that can be considered when determining what "name . . . is
stated" in the "public organic record."[19]    Instead, this UCC

---

[19]    The System's argument by analogy to the UCC's provision,
P.R. Laws Ann. tit. 19, § 2323(a)(4), regarding an individual's
name on a driver's license, is unpersuasive. The System argues
that since an incorrect name on a driver's license must be used as
the party's name in a sufficient UCC filing, if the filing is made
in the same state as the driver's license was issued, the RSE name
must be used here (whether or not it is a correct name). This
argument by analogy is necessarily premised on the view that the

provision directs focus to the entire "public organic record which
purports to state, amend, or restate the registered organization's
name." Id. The fact that Section 1-101 of the English translation
of the amended Enabling Act uses "Retirement System for Employees
of the Government of the Commonwealth of Puerto Rico" does not end
the inquiry.

The official English translation, on its face,
repeatedly translates the exact same Spanish name in two different
ways.[20] Both "Retirement System for Employees" and "Employees
Retirement System," are used, seemingly interchangeably,
throughout the translated Act as codified. No provision of the
Act states, nor even suggests, that the ERS name is used as a trade

---

2013 amended Act states only the RSE name, whether or not it is a
translation error. If, as we conclude, the amended Act states the
ERS name as a name for the System, a searcher can still rely only
on official records and there is no issue about a searcher having
to use an "incorrect" name.

More generally, the requirement for an individual with
a driver's license issued in the state is not relevant here, where
we consider a registered organization that is created and
designated by statute.

[20]    The Spanish language at issue did not change in the 2013
amendment to the Enabling Act. The language translated as "to be
designated as the 'Retirement System for Employees,'" is "que se
denominará 'Sistema de Retiro de Los Empleados." Compare Law No.
3 of April 4, 2013, 2013 P.R. Laws 39 with id. (Spanish). This is
the same Spanish language used after the last amendment to the
Enabling Act in 2004. P.R. Leyes Ann. tit. 3, § 761 (2005). And
indeed, the portion of the Spanish corresponding to the first part
of the name of the System -- "Sistema de Retiro de Los Empleados"
-- was the same in the original Enabling Act of 1951, and was
translated there as "Employees Retirement System." Compare Law
No. 447 of May 15, 1951, 1951 P.R. Laws 1298 with id. at 1299.

name or nickname rather than an official, legal name.[21]  We do not
agree with the System that one English name (the RSE name) is
official and the other (the ERS name) is merely a trade name, which
would be insufficient.

The System's argument that the "to be designated" clause
in Section 1-101 alone must control fails for a number of reasons.
The numerous clauses using the ERS name are hardly trivial.  It is
true that "Retirement System for Employees" is used three times in
the translated Act, as codified.  Id. §§ 761, 763(1), 779.[22]  But
"Employees Retirement System" is used far more often: by our count,
more than thirty-five times in the Act as codified.  Perhaps most
importantly, "Employees Retirement System" is used in the primary
definition of "[s]ystem."  Id. § 763(36) ("System [s]hall mean the
Employees Retirement System of the Government of the Commonwealth
of Puerto Rico.").  Other uses of the ERS name include in the
heading of Section 1-101, id. § 761, as well as the headings of

_____

[21]    We do not need to decide whether a translation error
occurred in this instance.  We do note that in the relevant portion
of the Spanish version of the Act, the Spanish preposition most
commonly translated as "for" -- para -- is not used.  See
University of Cambridge, Spanish-English Dictionary,
http://dictionary.cambridge.org/dictionary/spanish-english,
"para."

[22]    It is not clear that the use in Section 779 refers to
the same System, though we assume it does.  This provision in
English describes the "Retirement System of the Employees of the
Government and its Instrumentalities," P.R. Laws Ann. tit 3, §
779, rather than "Retirement System for Employees of the Government
of the Commonwealth of Puerto Rico," id. § 761.

many other sections, <u>see id.</u> §§ 761a, 762, 763, 764, 765, 765a,
766, 766a, 766b, 766c, 766d, 768, 768a, 769, 769a, 770, 770a, 771,
772, 773, 774, 775, 776, 777, 778, 779, 779a, 779b, 779c, 781a,
782, 783, 784, 785, 786, 786a, 786b, 787, 788.

　　　　The System and the Committee have offered no explanation
as to why, when both terms are used, the ERS name should be
disregarded.  It is difficult to discern why "Retirement System
for Employees" is used instead of "Employees Retirement System" in
the particular places where the RSE name is used.  Nothing about
the context suggests that one or the other should be used, and the
underlying Spanish is the same.

　　　　We think a reasonable creditor would be familiar with
the Commonwealth law that, in a case of a discrepancy between the
English and Spanish, when the legislation originated in Spanish
"the Spanish text shall be preferred to the English."  P.R. Laws
Ann. tit. 31, § 13; <u>see</u> <u>Republic Sec. Corp.</u> v. <u>P.R. Aqueduct &</u>
<u>Sewer Auth.</u>, 674 F.2d 952, 956 (1st Cir. 1982) ("[I]n cases of
discrepancy 'the Spanish text shall be preferred.'").  Further, we
see no evidence that the legislature of the Commonwealth intended
to change the English name of the System to the RSE name and
abandon the ERS name.  We would expect to see a clear statement
expressing a desire to change the translation, and there is no
such statement.  This expectation is only reinforced by Section
13, described above.

The legislature provided a Statement of Motives to the 2013 amendment, which identified, for example, the fiscal crisis in Puerto Rico, the causes of the crisis, and the need to act promptly.  Law No. 3 of April 4, 2013, 2013 P.R. Laws 39-64.  And the legislature then explained "[e]ach one of the amendments," id. at 58, such as the "[i]ncrease in the employee contribution [rate]," id. at 59.  There is no explanation in this section that the 2013 amendment was meant to change the name of the System. Earlier name changes, including in 2004, demonstrate generally that the legislature understands how to change the System's name when it wants to do so.

It is also significant that the RSE name referenced in the "to be designated" clause differs from prior longstanding official uses.  From 1951 through 2012, translated versions of the Enabling Act used only "Employees Retirement System" in the first section.  See, e.g., Law No. 447 of May 15, 1951, 1951 P.R. Laws 1298; P.R. Laws Ann. tit. 3, § 761 (1988); id. (2006), id. (2011). It is only the translation of the 2013 amendment which breaks this consistent pattern.  Of course, a long-standing name of an organization or agency that is named by statute can be changed by statute.  Here, though, the legislature did change the System's name several times, including changing the name of the System in 2004 by removing "and its Instrumentalities" ("y sus Instrumentalidades") from the end of the System's name and by

- 47 -

replacing "Government of Puerto Rico" with "Government of the
Commonwealth of Puerto Rico" ("Gobierno del Estado Libre Asociado
de Puerto Rico").  Law No. 296 of September 15, 2004, § 1-101;
P.R. Laws Ann. tit. 3, § 761 (2006).  But, with each of these
changes, the "Employees Retirement System" part of the name
remained the same.  Our conclusion that there was no legislative
intent to change the System's name is also bolstered by post-2014
legislative action.  Years after the 2014 translation of the
amended Enabling Act, the official translation of the Puerto Rico
Financial Emergency and Fiscal Responsibility Act of 2017 referred
to the System in part as "the Employees Retirement System."  P.R.
Laws Ann. tit. 3, § 9433(r).

Further, the ERS name is the name consistently used by
the System itself, including in court filings, before and after
the translation of the amended Act in 2014.  There are many
examples of this; we list only a few.  In its complaint in this
case, the System referred to itself as "the Employees Retirement
System of the Government of the Commonwealth of Puerto Rico" or
"ERS."  The System referred to itself in the same way in its Answer
to Defendant's Counterclaims.  The System did not mention
"Retirement System for Employees" or "RSE" in either document.

Independently, in its Title III Petition form, dated May
21, 2017, the ERS name was used under "Debtor's name."  In the box
on the Title III form asking for "[a]ll other names Debtor used in

the last five years [-] Include any assumed names, trade names,
and doing business as names," only a Spanish name was listed,
"Adminstracion de los Sistemas de Retiro de los Empleados del
Gobierna y la Judicatura," with no mention of "Retirement System
for Employees."    Further, the System made no statement that
"Employees Retirement System" was being used as a trade name.
Again, these are only a few of the many times that the System held
itself out as the "Employees Retirement System" around the time of
and <u>after</u> the translation of the amended Enabling Act was in
effect.    The district court determined, and the System now argues,
that the System used the ERS name simply as a trade name after
2014.    <u>See</u> <u>In re: Fin. Oversight & Mgmt. Bd. for P.R.</u>, 590 B.R. at
592.    We disagree.

        Finally, there is no doubt that the ERS name was the
official and only name of the System for over sixty years.    So,
any putative creditors would have had to search under that name to
find prior liens even if the System's name did change in 2014.
<u>See</u> P.R. Laws Ann. tit. 19, § 2327(c) (providing that a secured
party owning a lien on the debtor's property acquired prior to a
name change is not required to file a new financing statement).
This observation adds further support to the central proposition
that any putative creditor who read the 2014 translation of the
Enabling Act would conclude that, given the inconsistent use of
both the ERS and RSE names, it should at the very least search

under the long-standing ERS name.

All of these reasons lead us to conclude that "Employees Retirement System of the Government of the Commonwealth of Puerto Rico" remained a valid name for UCC purposes when the Financing Statement Amendments were filed.[23]  In our view, a searcher, whether another creditor or merely an interested party, would conclude that a search under the ERS name was required.  Similarly, a reasonable filer would have concluded that the ERS name was a correct name for the debtor for UCC purposes.

Because the Financing Statement Amendments used "Employees Retirement System of the Government of the Commonwealth of Puerto Rico," they contained an appropriate name of the debtor under the Commonwealth's Article 9.  See P.R. Laws Ann. tit. 19, §§ 2322(a), 2323(a)(1), 2404(3)(B).  Taken together with the 2008 Financing Statements, the Financing Statement Amendments met the requirements for perfection as of December 17, 2015.  See id. § 2322(a).

---

[23]    Even were we to accept that "[t]he majority of cases decided under . . . Article 9 are unforgiving of even minimal errors [for the name of the debtor]," In re John's Bean Farm of Homestead, Inc., 378 B.R. 385, 391 (Bankr. S.D. Fla. 2007), a filing under the ERS name is not such an error.  The situation here is clearly unlike, for example, a filer misspelling the name of a tractor seller as "Roger" rather than "Rodger."  See Pankratz Implement Co. v. Citizens Nat. Bank, 130 P.3d 57, 59 (Kan. 2006).

D.   Avoidance under PROMESA

Because we determine that the Bondholders satisfied Article 9's perfection requirements before the passage of PROMESA on June 30, 2016, we do not consider whether PROMESA would allow retroactive avoidance of underperfected liens.[24]  The debtors do not argue that the strong-arm provision of the Bankruptcy Code, incorporated by reference in PROMESA, would allow them to avoid the Bondholders' interest if the interest is perfected.

And as a "basic tenet of the law of secured transactions," a "perfected security interest prevails over a subsequent lien creditor."  Ledford v. Easy Living Furniture, 52 B.R. 706, 710 (Bankr. S.D. Ohio 1985); accord Gen. Elec. Credit Corp. v. Nardulli & Sons, Inc., 836 F.2d 184, 189 (3d Cir. 1988) (holding that because the parties filed correctly and perfected their security interest, "their rights as lienholders are superior to those of the trustee as a hypothetical lienholder under 11 U.S.C. § 544").  Commonwealth law recognizes this rule of priority by implication, in stating that a judicial creditor's lien is

---

[24]    Similarly, we need not consider the System's argument that the Bondholders' security interest was always inferior to subsequent perfected security interests and judicial liens under the UCC, see P.R. Laws Ann. tit. 19, §§ 2219(a)(1), 2212(52), 2267(a)(2)(A), because this argument is necessarily premised on the Bondholders having only an unperfected security interest.  The System does not argue that the UCC would grant priority over a previously perfected lien, and the statutory text is clear on this issue.  Id. § 2267(a)(2)(A).

superior to a prior <u>unperfected</u> security interest.  <u>See</u> P.R. Laws
Ann. tit. 19, § 2267(a)(2)(A).    "Where a creditor has an
<u>unperfected</u> lien on a debtor's property, the Bankruptcy Code
empowers a trustee to avoid and preserve the lien for the benefit
of the estate."  <u>DiGiacomo</u> v. <u>Traverse</u> (<u>In re Traverse</u>), 753 F.3d
19, 26 (1st Cir. 2014) (emphasis added).

E.    <u>The Bondholders' Counterclaims</u>

          The Bondholders also appeal the dismissal of their
second and third counterclaims, both requests for declaratory
judgment.  Counterclaim Two sought a declaration stating that the
"Bondholders hold valid, enforceable, attached, perfected, first
priority liens on and security interest in the Pledged Property
whether ERS became entitled to collect such property before or
after the commencement of ERS's Title III case."  Counterclaim
Three sought a declaration stating that "because the employer
contributions constitute 'special revenues,' [Bondholders']
security interests in and liens on employer contributions received
by the [System] after the Petition Date remain enforceable pursuant
to 11 U.S.C. § 928(a)."  The Bondholders argue that the district
court did not adequately address arguments for these
counterclaims.

          As to Counterclaim Two, the Bondholders acknowledged in
the district court that the "[11 U.S.C.] section 552 issues need
not be reached in light of the Summary Judgment Decision," and did

not provide "any reason that the remaining aspects of Count Two
should be resolved differently from the Claims resolved by the
Summary Judgment Decision."    As to Counterclaim Three, the
Bondholders stipulated that "in light of the Summary Judgement
decision [the Bondholders] are unable to identify any need for the
[district court] to reach the alternative arguments."

Because we find the 2008 Financing Statements effective
as amended, we remand to the district court for further
consideration of the dismissals of these counterclaims in light of
this opinion.

F.    Violation of the January 2017 Stipulation

Finally, the Bondholders argue that ERS violated the
January 2017 Stipulation between the parties, and the district
court erred in determining that no violation occurred (or that it
was beyond the scope of the proceeding).    Specifically, they assert
that the System violated that Stipulation because it requires that,
"[t]o the extent that ERS receives any Commonwealth central
government Employers' contributions, unless otherwise agreed in
writing by the undersigned parties, such contributions shall be
retained in the Segregated Account pending further order of the
Court."    The System points out that a Joint Stipulation between
the parties in this case limited claims or counterclaims on
employer contributions only to those received during May 2017.

Even assuming the Bondholders have not waived this

argument,[25] it fails.  The Joint Stipulation shows that the parties
agreed that the scope of the adversary proceedings at the district
court would include "ERS's rights with respect to employer
contributions received <u>during the month of May 2017</u>," and beyond
some other stipulated claims and counterclaims, "no other claims
may be made by either side" (emphasis added).  So only the
contributions during the month of May 2017 are properly at issue
here.  But as the district court correctly noted, <u>In re: Fin.
Oversight & Mgmt. Bd. for P.R.</u>, 590 B.R. at 599, the Bondholders
conceded in their Answer and Counterclaims below that "ERS was
obligated to place Employers' Contributions into the Segregated
Account only for the duration of the [PROMESA] Section 405 Stay,"
and the Section 405 stay expired as of May 1, 2017.  The Bondholders
have not explained how their argument concerning the alleged
violation of the January 2017 Stipulation survives these
admissions, taking into account the stipulated scope of the
adversary proceedings.  The district court correctly dismissed the
Bondholders' claim regarding an alleged violation of the January
2017 Stipulation.

---

[25]    Neither opening brief from the Bondholders makes a full
argument concerning the alleged violation of the January 2017
Stipulation.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st
Cir. 1990) ("It is not enough merely to mention a possible argument
in the most skeletal way, leaving the court to do counsel's work,
create the ossature for the argument, and put flesh on its
bones.").

III.

We _affirm_ the district court's holding that the 2008 Financing Statements did not perfect the Bondholders' security interest in the "Pledged Property."  We determine that the Bondholders met the requirements for perfection beginning on December 17, 2015, and so _reverse_ the district court.  PROMESA's incorporation of the Bankruptcy code does not allow for the avoidance of perfected liens, and so we _vacate_ the district court's holding that the Bondholders' security interest can be avoided under PROMESA.  Concerning the district court's dismissal of the Bondholders' second and third counterclaims with prejudice, we _vacate and remand_ to the district court for further consideration in light of this opinion.  We _affirm_ the district court's dismissal of the Bondholders' claim regarding the January 2017 Stipulation.  No costs are awarded.