# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.,*<br><br>                  Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                  Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS<br><br>(This court filing relates only to Case No. 17 BK 4780-LTS) |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

NATIONAL PUBLIC FINANCE GUARANTEE
CORPORATION, ASSURED GUARANTY
CORP., ASSURED GUARANTY MUNICIPAL
CORP., and SYNCORA GUARANTEE INC.,

      Movants,

          v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al*, and PUERTO RICO ELECTRIC POWER
AUTHORITY,

      Respondents.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al*, and PUERTO RICO ELECTRIC POWER
AUTHORITY,

      Movants on the Motion to Compel,

          v.

NATIONAL PUBLIC FINANCE GUARANTEE
CORPORATION, ASSURED GUARANTY
CORP., ASSURED GUARANTY MUNICIPAL
CORP., and SYNCORA GUARANTEE INC.,

      Respondents.

**REPLY IN FURTHER SUPPORT OF URGENT MOTION OF FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD, AS REPRESENTATIVE OF
DEBTOR, TO COMPEL PRODUCTION OF DOCUMENTS FROM MOVANTS
<u>RELATING TO THEIR MOTION FOR RELIEF FROM AUTOMATIC STAY</u>**

## **TABLE OF CONTENTS**

Table of Authorities ....................................................................................................... ii

Introduction ................................................................................................................ 1

Argument .................................................................................................................... 5

    I.   The Oversight Board Is Entitled to Production of Documents Insurers Possess
       Concerning the Valuation of Their Alleged Collateral in the PREPA Bonds ................... 5

        A.   The Relevance of Collateral Valuation Documents to the Receiver Motion Is
            Indisputable ........................................................................................................... 5

        B.   Insurers' Argument That Their Loss Reserve Information Does Not Reflect an
            Assessment of Collateral Value Flatly Defies the Governing Statute and Is Neither
            Credible Nor Binding on PREPA ............................................................................. 7

        C.   Loss Reserve Information Is Not Privileged ............................................................ 8

            1.   The Bank Examiner Privilege Does Not Apply ................................................. 8

            2.   Loss Reserve Information Is Not Protected by the Attorney-Client or Work
                Product Privileges and, in Any Event, Has Been Waived ................................... 11

        D.  There Is a "Compelling Need" for Information Concerning Collateral Valuation, So
            Insurers Must Produce What They Have or Face an Order of Preclusion .................. 15

Conclusion ................................................................................................................ 15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C**ASES**

*American S.S. Owners Mut. Prot. & Idem. Ass'n, Inc. v. Alcoa S.S. Co.*,
 No. 04 Civ. 4309 LAKJCF, 2006 WL 278131 (S.D.N.Y. Feb. 2, 2006) ...............................12

*Bank of China v. St. Paul Mercury Ins. Co.*,
 No. 03 Civ. 9797(RWS), 2004 WL 2624673 (S.D.N.Y. Nov. 18, 2004) .................................9

*Bryan Corp. v. ChemWerth, Inc.*,
 296 F.R.D. 31 (D. Mass. 2013) ..............................................................................................12

*Cavallaro v. United States*,
 284 F.3d 236 (1st Cir. 2002) ..................................................................................................11

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In
 re Fin. Oversight & Mgmt. Bd. for P.R.)*,
 899 F.3d 13 (1st Cir. 2018) .................................................................................................5, 7

*Harriman v. Hancock Cty.*,
 627 F.3d 22 (1st Cir. 2010) ....................................................................................................15

*In re Bankers Tr. Co.*,
 61 F.3d 465 (6th Cir. 1995) .....................................................................................................9

*In re Grand Jury Subpoena No. 2013R00691-009*,
 201 F. Supp. 3d 767 (W.D.N.C. 2016) ...................................................................................13

*In re Quigley Co., Inc.*,
 No. 04-15739 (SMB), 2009 WL 9034027 (Bankr. S.D.N.Y. Apr. 24, 2009) ........................14

*In re Steinhardt Partners, L.P.*,
 9 F.3d 230 (2d Cir. 1993) ........................................................................................................12

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of
 Governors of Fed. Reserve Sys.*,
 967 F.2d 630 (D.C. Cir. 1992) ..................................................................................................9

*Maine v. U.S. Dep't of the Interior*,
 298 F.3d 60 (1st Cir. 2002) ...............................................................................................13, 14

*Matrix Essentials, Inc. v. Quality King Distrib., Inc.*,
 No CV90-1070, 2006 WL 8435312 (E.D.N.Y. Jan. 12, 2006) ...............................................13

*Mullins v. Dep't of Labor of P. R.*,
 269 F.R.D. 172 (D.P.R. 2010) ................................................................................................11

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   No 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) ............................................12

*Progressive Cas. Ins. Co. v. Fed. Deposit Ins. Co.*,
   298 F.R.D. 417 (N.D. Iowa 2014) ............................................................................11

*Rivera v. Kmart Corp.*,
   190 F.R.D. 298 (D.P.R. 2000) ..................................................................................11

*Saint-Jean v. Emigrant Mortg. Co.*,
   11-CV-2122 (SJ), 2016 WL 11430775 (E.D.N.Y. May 24, 2016) ..............................9

*Schreib v. Am. Family Mut. Ins. Co.*,
   304 F.R.D. 282 (W.D. Wash. 2014) ..........................................................................14

*United States v. Mass. Inst. of Tech.*,
   129 F. 3d 681 (1st Cir. 1997) ....................................................................................12

*United States v. Richey*,
   632 F.3d 559 (9th Cir. 2011) .....................................................................................14

*United States v. Textron Inc. & Subsidiaries*,
   577 F.3d 21 (1st Cir. 2009) .................................................................................13, 14

*W Holding Co., Inc. v. Chartis Ins. Co. of P. R.*,
   300 F.R.D. 48 (D.P.R. 2014) .....................................................................................11

*Wal-Mart P. R., Inc. v. Zaragoza-Gomez*,
   152 F. Supp. 3d 67 (D.P.R. 2016) .............................................................................15

STATUTES

11 U.S.C. § 362(d) ...............................................................................................................2

NY Pub Off L § 87(2) .......................................................................................................10

NY Ins. L § 6903(b)(1) .......................................................................................................8

11 NYCRR § 241.3(a) ......................................................................................................10

Fed. R. Civ. P. 26(b) ...........................................................................................................6

Fed. R. Civ. P. 37(c)(1) .....................................................................................................15

Fed. R. Evid. 502(a) .......................................................................................................8, 12

To the Honorable United States Magistrate Judge Judith G. Dein:

The Financial Oversight and Management Board (the "Oversight Board"), as representative of debtor Puerto Rico Electric Power Authority ("PREPA") pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*, codified at 48 U.S.C. §§ 2101-2241 ("PROMESA"), respectfully submits this reply in further support of its urgent motion [ECF No. 1066] (the "Urgent Motion") to compel Assured Guaranty Municipal Corporation and Assured Guaranty Corporation (both together, "Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Incorporated ("Syncora," and together with Assured and National, "Insurers"), to produce documents concerning their alleged collateral at various times relevant to the *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce their Statutory Right to Have a Receiver Appointed* [ECF No. 975] (the "Receiver Motion").

## **INTRODUCTION**

1.     The Oversight Board filed this Urgent Motion with one goal—to obtain relevant information regarding the Insurers' valuation of their alleged collateral before, as of, and after the Petition Date, which the First Circuit's Remand Decision mandated this Court assess in determining the Receiver Motion.  Since serving its discovery last year, the Oversight Board has repeatedly asked the Insurers to identify and value their collateral, and they repeatedly have failed to do so.  The Insurers' erroneous legal argument in their opposition ("Opp.") that PREPA's *covenants* related to *future* revenues constitute collateral entitled to adequate protection is not implicated by this motion.  *See* Opp. ¶ 11.  This motion focuses instead on obtaining all available relevant information in the Insurers' possession as to the threshold issue for the Receiver Motion, *i.e.*, whether there was any of PREPA's property in existence on the

Petition Date subject to a security interest (not PREPA's contractual obligations in respect to future revenues) that has diminished in value and the extent of any such diminution. The Oversight Board believes there was not, and, beyond their argument that PREPA's promises and covenants are collateral, Insurers have failed to plead or produce documents demonstrating collateral value at any time, let alone the extent of any diminution. Because these facts (or lack thereof) are critical to the outcome of the Receiver Motion, the Oversight Board is entitled to discovery of all relevant evidence.

2.      Insurers' loss reserve information is obviously relevant to collateral value. PREPA's bonds are nonrecourse. There is no source of recovery other than property of PREPA subject to a valid security interest in favor of bondholders. The Insurers' loss reserves are a direct indication of the value of their collateral; indeed, they constitute their measure of the collateral shortfall. This information is directly relevant to this dispute and the Oversight Board is entitled to it.

3.      Moreover, if the Insurers based their loss reserves on the purported value of PREPA's covenants, and not, or only partially, on the value of net revenues or other property, that is relevant too. Whatever techniques and theories the Insurers deployed to formulate their loss reserves will be probative of whether collateral value for purposes of Bankruptcy Code section 362(d) has diminished and is adequately protected.

4.      The first paragraph of the Insurers' objection to the instant motion claims loss reserves are irrelevant, but concedes they have probative value. That the Insurers claim the probative value is "minimal" is simply their view and advocacy. They have conceded the point. To further evade disclosure, the Insurers contend loss reserves established in the course of litigation are irrelevant. But, the Insurers prepared loss reserves before this litigation existed.

And, it is PREPA's right to discount other loss reserves prepared by the Insurers during the litigation. That argument is unavailable to the Insurers to discount their own admissions. But, their argument is also self-defeating to them. The Insurers are unabashedly contending they prepared loss reserves for their regulator which should not be taken at face value because they prepared them during litigation. If the Insurers allowed the existence of the litigation they started to influence their loss reserves, there is even less reason for them not to be produced, as the Insurers are intimating they were made for litigation!

5.      The Insurers' other argument that their loss reserves shared with their regulator are confidential (discussed at length below), fails on its face. The Insurers have put the value of their collateral on center stage in this instant dispute they commenced contending their collateral value is diminishing and is not adequately protected. They cannot ask this Court in a public forum to assess collateral value, while simultaneously contending their methods of determining loss reserves for their regulator are off limits.

6.      This disclosure dispute is not, and has never been, restricted to loss reserves. Insurers' feigned ignorance regarding the scope of the Oversight Board's motion is belied by the statements of their own declarants, and statements in the Urgent Motion. *See*, *e.g.*, Rosenblum Decl. (ECF No. 1084, Ex. 7) ¶ 5 (quoting Urgent Motion at ¶ 23); Bergonzi Decl. (ECF No. 1084, Ex. 9) ¶ 5. This tactic should be seen for what it is—an effort to dodge the reality that if the loss reserve information does not reflect any loss exposure, Insurers are adequately protected. The value of their collateral would be in excess of the outstanding amount of their insured bonds, undermining the relief they request in the Receiver Motion. Conversely, if the loss reserve information indicates potential loss at various points in time, it may inform diminution in collateral value, or lack thereof, since the Petition Date. In all events, Insurers' methodology in

calculating their loss reserves may cast light on whether, as it appears, they predicate collateral value *solely* on the contractual revenue stream, rather than validly encumbered property rights in existence on the Petition Date as the Remand Decision contemplated.  Under any of these circumstances, loss reserve information is relevant to the central fact issue in this dispute.

7.      The loss reserve documents are not only relevant, they are critical.  These documents are the only documents that Insurers have admitted to possessing that—despite protests to the contrary—are likely to provide an indication of how Insurers' internal documents characterize and assess the value of the collateral allegedly securing the PREPA bonds before, at the time of, or following the filing of the Title III petition.

8.      Opaque assertions by the Insurers that they have "produced documents sufficient to show the value of their collateral and its threatened diminution," or that as-yet-undisclosed expert declarations "will further address collateral valuation" (Opp. ⁋ 21), are belied by the obvious point that if Insurers had such evidence they would have identified it, either as pleaded in the Receiver Motion, or included in their Opposition to the Urgent Motion.  Tellingly, beyond generalizations, they fail even now to explain how their collateral value has been diminishing, other than to assert repeatedly that their contractual interest in PREPA's revenue stream has been impaired due to mismanagement.  But that argument does not meet the First Circuit's standard to establish a basis to lift the stay, and certainly does not constitute a defense against production of relevant information in discovery.

9.      Insurers' double-talk on the subject of collateral value evidence is what led to the dispute over loss reserves in the first place.  Insurers pledged to produce documents sufficient to show the value of their collateral (*see* Urgent Motion, Ex. A at 7-8), but despite repeated requests, including during the parties' last meet and confer, Insurers have yet to proffer a single

Bates number supporting that assertion.  Insurers also promised to search for "actuarial, accounting, or other aggregate estimates of likely payouts" related to the PREPA policies, and based on that understanding, the Oversight Board agreed it would defer its request for the loss reserve information, but never waived its right to later seek it.  Opp. Ex. 6 at 4.  So when Insurers later claimed there were no such documents concerning "actuarial, accounting, or other aggregate estimates of likely payouts," it should have been no surprise that discovery negotiations would return to the subject of loss reserves.  As further demonstrated below, that loss reserve information is not privileged, and even if it were, disclosure here is appropriate.

10.     Finally, the Insurers hang themselves on their own argument that materials produced during litigation are not reliable, because they have failed to produce any valuation documents while they argue their declarants will, during the litigation, provide valuations.

## **ARGUMENT**

### **I.  The Oversight Board Is Entitled to Production of Documents Insurers Possess Concerning the Valuation of Their Alleged Collateral in the PREPA Bonds**

#### A.  The Relevance of Collateral Valuation Documents to the Receiver Motion Is Indisputable

11.     The Remand Decision left no question that a party moving for relief from the automatic stay on the ground of lack of adequate protection must demonstrate the prepetition value of its collateral and the threat of uncompensated diminution of that value.  *Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13, 23 (1st Cir. 2018).  With this standard in mind, the Oversight Board unquestionably has the right to obtain from Insurers all documents probative of collateral value before, at the time of, and following PREPA's Title III petition.

12.     Insurers' assertions concerning the Oversight Board's prior statements on the subject of "revenues" as collateral do not change the discoverability of the information the

5

Oversight Board seeks here.  Critically, Insurers admit in the Receiver Motion their alleged

security interest is in PREPA's *net revenues*.  *See* Receiver Motion at 23, n.102 & 26.  Insurers'

belated attempt to walk back those statements in their Opposition by pointing to various

unrelated filings that provide a general overview of the financial structure concerning the

PREPA bonds (*see* Opp. ¶ 23 n.9) is of no help to them, not for the Receiver Motion and

certainly not with respect to this discovery dispute.  These statements neither change the

unambiguous language of the Trust Agreement, nor alter the liberal standard of discoverable

information that defines the inquiry on this motion to compel.  *See* Fed. R. Civ. P. 26(b).  The

Oversight Board has never conceded the Insurers' collateral has diminished,[2] and it is entitled to

discover information within Insurers' possession, custody, or control that bears on this issue.  In

the proper context, the Oversight Board will demonstrate, as a matter of law, covenants to pay in

the future are not collateral entitled to adequate protection.

13.     While Insurers claim they have produced all documents they have on the subject

of collateral valuation, their documents and argument relating to the effect of PREPA's alleged

mismanagement on their purported interest in PREPA's future revenue stream do not constitute

evidence of collateral value on the Petition Date.  *See* Opp. ¶ 35.  Purported evidence of

PREPA's mismanagement is not the same as evidence of diminishing collateral value, which the

First Circuit ruled would require establishing at least a starting value as of the Petition Date and

---

[2] Insurers cite to an unrelated adversary proceeding by "Insurers" in which such insurers "specifically
alleged facts demonstrating that, based on the Oversight Board's own fiscal plan, even after payment of
Current Expenses, there were sufficient revenues remaining to pay debt service on PREPA's bonds"
(citing Adv. Proc. No. 17-00232-LTS, ECF No. 1 ¶¶ 75-77).  But that April 28, 2017 fiscal plan—which
was based on revenue and expense projections prior to Hurricanes Maria and Irma—demonstrated that
projected Current Expenses of $3.5 billion would exceed the projected $3.32 billion in revenue and
therefore net revenues would be negative.  The same adversary complaint acknowledged that "the 2018
Budget provides that all $3.1 billion of Revenues will be used to cover expenses listed in the 2018
Budget, the 2018 Budget does not include any amounts for debt service on the Bonds, indicating that
Revenues will not be used to cover any debt service in Fiscal Year 2018."  ECF No. 1 ¶ 70.

uncompensated diminution from that point. *Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at

23. Thus, even if Insurers could prove mismanagement, that is a *non sequitur* to establishing

PREPA's net revenues, much less that they have diminished post-petition.

14.    Having found zero documents in Insurers' production identifying collateral value

as of the Petition Date, and absent Insurers' direct concession they have no such valuation

documents (other than their legally infirm argument their contractual rights constitute collateral),

the loss reserve documents appear to be the only potential source of this essential information.

This is the reason the Oversight Board has continued to press to obtain the documents.

15.    Insurers cannot now complain that being compelled to produce such information

does not meet the Rule 26 requirement that discovery be "proportional to the needs of the case."

Determination of the collateral value question has been put at issue by the Remand Decision and

by the Insurers in the Receiver Motion. Insurers' own representations suggest that the loss

reserve information is the only information they possess that might bear on that subject. None of

the cases Insurers cite (Opp. ¶¶ 36-37) suggests that proportionality shields such information

from disclosure. And Insurers' citations regarding the irrelevance of loss reserves to disputes

concerning insurance coverage and allocation of defense costs (Opp. ¶ 38) have no bearing on

the relevance of loss reserves here.

   B.    Insurers' Argument That Their Loss Reserve Information Does Not Reflect an
         Assessment of Collateral Value Flatly Defies the Governing Statute and Is Neither
         Credible Nor Binding on PREPA

16.    Insurers repeatedly concede loss reserves require an assessment of the amounts

each insurer must set aside to satisfy its estimated insurance obligations. *See*, *e.g.*, Opp. ¶ 6,

n.6. It is implausible to suggest such assessments would be made, or could accurately be made,

without any consideration whatsoever of the value of the collateral. Indeed, the extent to which

claims are under- or over-secured by the value of the collateral is fundamental to such

assessment.  The PREPA bonds are nonrecourse obligations, payable solely from collateral.

Trust Agreement at Sec. 701.  It does not pass the straight-face test to suggest potential loss

outcomes could be formulated in the absence of collateral valuation.

17.     Indeed, the New York law applicable to each Insurer evidences the clear

connection between the loss reserve calculation and collateral.  Specifically, Section 6903 of the

New York Insurance Law mandates the methodology pursuant to which financial guarantee

corporations, like Insurers here, shall "maintain loss reserves, *net of collateral . . . .*"  NY Ins. L §

6903(b)(1) (emphasis added).  Insurers could not possibly assess the extent to which such loss

reserves meet this standard in the absence of making a collateral value determination, including

specifying exactly what type of collateral they are assessing.  Moreover, even if any of the

information Insurers disclosed to the regulators were protected by the attorney-client and/or

work-product privileges (a notion the Oversight Board disputes, as set forth below), by

disclosing their individualized loss reserves regarding PREPA to the New York Department of

Financial Services ("NYDFS"), Insurers made a knowing and intentional waiver of those

privileges and in fairness should be deemed to have waived those privileges with respect to the

entire subject matter of their PREPA loss reserves.  Fed. R. Evid. 502(a) (selective intentional

waiver of privilege waives as to the entire subject matter).  As a result, Insurers must now

disclose all documents and information concerning their PREPA loss reserve assessments.

C.  Loss Reserve Information Is Not Privileged

1.     *The Bank Examiner Privilege Does Not Apply*

18.     As a threshold matter, the Insurers fail to acknowledge that PREPA is not

requesting communications and determinations authored by the regulators.  To whatever extent

the regulators' own statements and directives are privileged is not at issue here.  Rather, PREPA

8

has only requested the loss reserves and other valuation information formulated by the Insurers

and their employees and consultants.  As shown below, these formulations are not only for the

Insurers' regulators.  They, or close variations of them, are essential to preparation of Insurers'

public financial statements.  Insurers also ignore a fundamental point about the asserted "bank

examiner" privilege:  it does not belong to Insurers; it belongs to the regulators.  *See, e.g.*, *Bank

of China v. St. Paul Mercury Ins. Co.*, No. 03 Civ. 9797(RWS), 2004 WL 2624673, at *4

(S.D.N.Y. Nov. 18, 2004) (bank examination privilege is a "qualified privilege [that] belongs to

the regulatory authority and not to the banks that it regulates"); *Saint-Jean v. Emigrant Mortg.

Co.*, 11-CV-2122 (SJ), 2016 WL 11430775, at *5 (E.D.N.Y. May 24, 2016) (same).

19.     For the first time in their Opposition, Insurers admit that NYDFS has declined to

assert the privilege.  *See* Opp. ¶ 23 n.8.  As a result, the privilege cannot be asserted with respect

to anything Insurers submitted to NYDFS.

20.     Even if this were not the case, Insurers fail to acknowledge that the "bank

examiner" privilege is both narrow and qualified:  it does not protect "[p]urely factual material,"

and it must bend to good cause.  *In re Bankers Tr. Co.*, 61 F. 3d 465, 471 (6th Cir. 1995); *see

also In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed.

Reserve Sys.*, 967 F.2d 630, 634-35 (D.C. Cir. 1992).  Therefore, even if the NYDFS were to

invoke the bank examiner privilege, that would not end the Court's inquiry.  Rather, the Court

would need to consider additional factors (including relevance, the availability of other evidence,

and the seriousness of the litigation, *see In re Bankers Trust Co.*, 61 F. 3d at 472), each of which

militates against the privilege, to determine whether to grant protection to Insurers' loss reserves.

21.     Furthermore, having submitted their purportedly privileged information to the

New York regulators, it no longer enjoys the protection of privilege.  The Insurers cannot make

their loss reserve formulations privileged by sending them to their regulator.  Loss reserves have

to be computed for many purposes, such as the issuance of the Insurers' financial statements

(*i.e.*, balance sheets and income statements).  The Insurers' liabilities cannot be determined for

purposes of their balance sheets without formulations of loss reserves.  The Insurers cannot

insulate these formulations from discovery.  Contrary to Insurers' assertions, nothing in Section

87(2) of New York's Public Officers Law "explicitly protects [loss reserve information] shared

with a regulator as trade secrets, and bars the state from disclosing that information" (Opp. ⁋ 50),

nor does that provision say the loss reserve information at issue here is "***not*** subject to disclosure

through 'public records requests'" (Opp. ⁋ 53).  Rather, the statute states, as a general matter,

"[e]ach agency *shall*, in accordance with its published rules, make available for public inspection

and copying *all* records" before setting forth certain circumstances in which the "agency *may*

deny access to records or portions thereof . . . ."  N.Y. Pub. Off. L. § 87(2) (emphasis added).

Notably, the Insurance Regulations of NYDFS similarly provide "all records produced shall be

available for public inspection and copying" unless an exception applies.  11 NYCRR § 241.3(a).

There can be no dispute the general policy of New York favors public disclosure of such records

unless an exception is established.  Insurers' claimed reliance on the trade secrets exception is

misplaced, as it conflates the notion of privilege with a trade secret.  They are not the same.[3]

22.     As an example, National's corporate parent, MBIA, Inc., publicly reports its

liabilities, inclusive of "Loss and loss adjustment expense reserves."  To arrive at an aggregate

expense reserve, MBIA, Inc. had to add up the individual loss reserves from each of its material

exposures.  *See* Appendix A.  It is *impossible* that National does not have documents reflecting

---

[3] The Maryland Insurance Commissioner's assertion of the privilege would at most shield from disclosure
only the information exchanged between Assured and Maryland.  In any event, neither Maryland law nor
the Maryland regulator's assessment are binding on this Court.  *See* Urgent Motion at ⁋⁋ 38-39.

these calculations under its possession, custody, or control.  And, the documents used for its

financial statements do not become privileged by sending them to a regulator.

> 2.      *Loss Reserve Information Is Not Protected by the Attorney-Client or Work Product Privileges and, in Any Event, Has Been Waived*

23.      Insurers' argument that their loss reserve information is categorically protected by

attorney-client privilege and by the work product doctrine (Opp. ¶¶ 23-38) also fails.[4]  As noted,

loss reserves are critical to the Insurer's accounting statements and cannot be immunized from

discovery by sending them to a regulator.  Insurers' assertions of privilege do not establish either

that their loss reserves contain confidential attorney-client communications for the purpose of

obtaining legal advice, or that they were prepared "because of" litigation.  *Cavallaro v. United

States*, 284 F.3d 236, 245 (1st Cir. 2002) (describing elements of attorney-client privilege); *W

Holding Co., Inc. v. Chartis Ins. Co. of P. R.*, 300 F.R.D. 48, 50 (D.P.R. 2014) (work product

attaches to documents "prepared *because of* litigation").[5]  It would be the reverse of common

sense and fairness to assume information produced for public financial statements and regulators

is influenced by the existence of litigation, especially litigation the Insurers opted to commence.

24.      Insurers' declarants concede loss reserve calculations serve a primarily business

function, are required by law for reporting to regulators, and are prepared *irrespective* of

---

[4] Indeed, the very cases cited in Insurers' Opposition prove that no such categorical protection exists. *See, e.g.*, *Progressive Cas. Ins. Co. v. Fed. Deposit Ins. Co.*, 298 F.R.D. 417, 426 (N.D. Iowa 2014) (ruling some reserve information was discoverable and ordering its production); *see also Rivera v. Kmart Corp.*, 190 F.R.D. 298, 303-04 (D.P.R. 2000) (ordering attorney memorandum produced because litigant's case relied, in part, on contents of communication).

[5] As cases Insurers cite make clear, "work product protection does not attach to documents that were 'prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" *Id*. (quoting *Maine v. U.S. Dep't of the Interior*, 298 F.3d 60, 68 (1st Cir. 2002)); *see also Mullins v. Dep't of Labor of P. R.*, 269 F.R.D. 172, 174 (D.P.R. 2010) ("Even if prepared by lawyers and reflecting legal thinking, '[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes are not under the qualified immunity provided by this subdivision.'").

litigation or the threat of litigation.  *See* Bergonzi Decl. ¶ 20 (regular reporting of loss reserves to

regulatory agencies is a statutory and regulatory requirement); Rosenblum Decl. ¶ 19 (same);

Hoffman Decl. (ECF No. 1084, Ex. 10) ¶ 24 (same).

25.     In any event, any privilege has been waived because the information was

submitted to Insurers' regulators.  *United States v. Mass. Inst. of Tech.*, 129 F. 3d 681, 687 (1st

Cir. 1997) (disclosure of work product to "potential adversary" waives protection); *American*

*S.S. Owners Mut. Prot. & Idem. Ass'n, Inc. v. Alcoa S.S. Co.*, No. 04 Civ. 4309 LAKJCF, 2006

WL 278131, at *2 (S.D.N.Y. Feb. 2, 2006) (noting that disclosure of otherwise privileged

information to the New York Insurance Department, the predecessor of NYDFS, would waive

privilege)[6]; *see also* Fed. R. Evid. 502(a) (intentional disclosure of work product protected

information may waive privilege as to entire subject matter).  Contrary to Insurers' argument,

disclosure of their loss reserves to their regulators is "inconsistent with keeping it from an

adversary."  *Compare Bryan Corp. v. ChemWerth, Inc.*, 296 F.R.D. 31, 38-40 (D. Mass. 2013)

(disclosure to long-time third-party consultant for FDA regulatory matters did not waive work

product protection), *and Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No 06 Civ.

5797, 2010 WL 935317, at *1 (S.D.N.Y. Mar. 12, 2010) (disclosure to SEC pursuant to

confidentiality agreement containing non-waiver provision did not waive work product

protection), *with In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) (voluntary

---

[6] The NYDFS "supervises" insurance companies, and "registers, approves, authorizes and de-authorizes"
them to conduct business in New York.  (https://www.dfs.ny.gov/about/whowesupervise.htm, last visited
Feb. 17, 2019.)  In light of its stated mission, the relationship between the Insurers and the NYDFS is
undoubtedly adversarial at times.

disclosure to regulator waived work product protection), *and Matrix Essentials, Inc. v. Quality King Distrib., Inc.*, No CV90-1070, 2006 WL 8435312, at *3 (E.D.N.Y. Jan. 12, 2006) (same).[7]

26.    Nor does the work product doctrine apply.  That protection only "protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party."  *Maine v. U.S. Dep't of the Interior*, 298 F. 3d 60, 66 (1st Cir. 2002); *In re Grand Jury Subpoena No. 2013R00691-009*, 201 F. Supp. 3d 767, 772 (W.D.N.C. 2016) ("Documents prepared in anticipation of litigation contrast with 'materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes,' the latter of which do not enjoy the protection of work product.") (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992)).

27.    As the First Circuit has explained, the fact that material was prepared by an attorney is not determinative of whether work product protection applies.  *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 29-30 (1st Cir. 2009).  "It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated."  *Id*.  As a result, even if materials were prepared by attorneys on a subject that later might be litigated, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by [work product protection]."  *Id*. (quoting Fed. R. Civ. P. 26 advisory committee's note (1970)).  It would be preposterous for the Insurers to contend

---

[7] National's declarant represents that it has not disclosed to regulators the details of its projected litigation and settlement scenarios (Bergonzi Decl. ¶ 11).  If so, that contradicts Insurers' argument that the loss reserve information shared with the regulators is subject to privilege in the first place, as well as their categorical privilege logs which assert attorney-client and work product privilege with respect to information shared with their regulators.

the loss reserves they develop for their public financial statements are not prepared in the ordinary course of business.[8]

28.    When the purpose of a document is unclear or when it serves multiple purposes, it "should be deemed prepared for litigation and within the scope of the Rule if, 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'" *Maine*, 298 F. 3d at 68 (quoting *United States v. Adlman*, 134 F. 3d 1194, 1197-98 (2d Cir. 1998)); *In re Quigley Co., Inc.*, No. 04-15739 (SMB), 2009 WL 9034027, at *6 (Bankr. S.D.N.Y. Apr. 24, 2009) (applying same standard in bankruptcy context).  Critical to this determination is whether the document would have existed in substantially similar form but for the litigation.  *Id.* at 70 (citing *Adlman*, 134 F. 3d at 1202); *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011); *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 286 (W.D. Wash. 2014).[9]

29.    In sum, Insurers cannot seriously contend their loss reserves would not exist but for the Title III litigation.  Nor have Insurers established their loss reserve calculations pre- and post-Title III litigation are of a "substantially [dis]similar form" than what they prepare in the ordinary course of business.  As such, Insurers' loss reserve information fails to satisfy the "because of" test adopted in the First Circuit and is not protected by the work product doctrine.[10]

---

[8] Just as National publishes a balance sheet showing loss reserves, Assured does too.  Its latest quarterly filing (https://www.snl.com/Cache/395706139.pdf?IID=4090916&FID=395706139&O=3&OSID=9, last visited February 22, 2019) includes under the heading "Liabilities and shareholders' equity" an "unearned premium reserve" and "loss and loss adjustment expense reserve."

[9] Insurers' attempt to distinguish *United States v. Textron Inc. & Subsidiaries* is completely off base.  That case is directly on point here, where there is a contention that materials have been prepared for a dual purpose, and it reaffirms the standard in the First Circuit that "work product protection does not extend to 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'"  577 F.3d 21, 30 (1st Cir. 2009).

[10] In any event, submission of the materials to the regulators waives any privilege.  *See supra* at 11-12.

14

D.     There Is a "Compelling Need" for Information Concerning Collateral Valuation,
So Insurers Must Produce What They Have or Face an Order of Preclusion

30.     As the Oversight Board previously demonstrated, even privileged information

may be required to bend to the "compelling needs" of the litigation in appropriate circumstances.

Urgent Motion ‖ 41.  Per the Remand Decision, collateral value is the lynchpin of the Receiver

Motion; if loss reserve information is the only source of this information, then it is subject to

production.  This is true even if a privilege applies.  *Wal-Mart P. R., Inc. v. Zaragoza-Gomez*,

152 F. Supp. 3d 67, 70 (D.P.R. 2016) (balancing factors and finding that good cause required

disclosure of documents subject to the bank examination privilege).

31.     Insurers' attempt to manufacture some untoward motivation behind the Oversight

Board's request for documents reflecting collateral valuation should be rejected.  It is a patent

attempt to avoid disclosure on the critical issue before the Court on the Receiver Motion.[11]

Insurers cannot be allowed to avoid discovery requirements with generalized references to their

production or promises to disclose information in future expert declarations.  It has been more

than three months since Insurers served their responses to the Oversight Board's document

requests.  If Insurers will not produce the information, then mandatory preclusion of any

evidence Insurers might in the future seek to disclose on the subject of collateral valuation is

warranted.  Fed. R. Civ. P 37(c)(1); *Harriman v. Hancock Cty.*, 627 F.3d 22, 30 (1st Cir. 2010)

(affirming preclusion of evidence belatedly disclosed).

## **CONCLUSION**

32.     The Oversight Board's motion to compel should be granted.

---

[11] Moreover, the Oversight Board has been in negotiations with the ad hoc group of PREPA bondholders
for months concerning a consensual deal to restructure PREPA's bond debt.  The preliminary
Restructuring Support Agreement reflecting the economics of the deal has been public for months.  Some
of the Insurers may choose to join that deal.  In any event, all of this goes to show that the Insurers' cries
of foul play are no more than lawyer argument.

Dated: February 22, 2019

**PROSKAUER ROSE LLP**

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Gregg M. Mashberg (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
        ebarak@proskauer.com
        mdale@proskauer.com
        gmashberg@proskauer.com

-and-

Paul V. Possinger (*pro hac vice*)
70 W. Madison St., Suite 3800
Chicago, IL 60602
Tel:  (312) 962-3550
Fax:  (312) 962-3551
Email:  ppossinger@proskauer.com

-and-

Hermann D. Bauer
**O'NEILL & BORGES, LLC**
250 Munoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email:  hermann.bauer@oneillborges.com

*Attorneys for The Financial Oversight
and Management Board for Puerto Rico,
as representative of The Commonwealth
of Puerto Rico and the Puerto Rico
Electric Power Authority*

16

# APPENDIX A

Information taken from MBIA, Inc., quarterly balance sheet as of September 30, 2018,[*] which provides in pertinent part:

| Liabilities and Equity | As of 9/30/18 | As of 12/31/17 |
|---|---|---|
| Liabilities: | | |
| Unearned premium revenue | 609 | 752 |
| Loss and loss adjustment expense reserves | 1,033 | 979 |
| Long-term debt | 2,218 | 2,121 |
| Medium-term notes (includes financial instruments carried at fair value of $123 and $115) | 738 | 765 |
| Investment agreements | 314 | 337 |
| Derivative liabilities | 173 | 262 |
| Other liabilities | 196 | 165 |
| Liabilities of consolidated variable interest entities: | | |
| Variable interest entity notes (includes financial instruments carried at fair value of $709 and $1,069) | 1,960 | 2,289 |
| **Total liabilities** | **7,241** | **7,670** |

---

[*] Retrieved at:  https://investor.mbia.com/investor-relations/press-releases/press-release-details/2018/MBIA-Inc-Reports-Third-Quarter-2018-Financial-Results/default.aspx.  Last visited February 22, 2019.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

<u>/s/ Hermann D. Bauer</u>

Hermann D. Bauer