# Exhibit JDM-6

### Examples of "Obstructive and Self-Justifying" Behavior as Quoted by Commission in CEPR-AP-2015-0001, Jan. 10, 2017 Order

| Pages(s) | Paragraph(s) | Section | Example of "Obstructive and Self-Justifying" Behavior as Quoted by Commission in Commission Order | Specific Objectionable Behavior |
|---|---|---|---|---|
| 8 | Executive Summary | Executive Summary | "Nor will we repeat-ever again-the experience of this FY2017 rate proceeding, in which PREPA's consultants offered a revenue requirement having no visible connection to actual department budgets." | Failure to produce evidence |
| 34-35 | 75.4-81 | The FY2017 Revenue Requirement | "[With respect to the calculation of a revenue requirement for FY2017,] ...the Commission's advisors, Smith and Dady, recommended a [revenue requirement equation that]... explicitly accounts for PREPA's dependence on ratepayers rather than capital markets to fund capital expenditures... The additional capital expenditures allowed in this model originate with ratepayers, not investors. If those amounts had originated with investors, then the ratepayer payments reflecting those amounts would be treated for accounting purposes as revenues. But because these funds originate with ratepayers, Smith and Dady recommend, and we agree, that these funds should be accounted for as "contribution in aid of construction." On PREPA's balance sheet, then, this customercontributed funding of capital expenditures should be an offset to PREPA's investment in plant. PREPA opposed this recommendation, arguing that revenues from customerfunded CapEx included on a dollar for dollar basis should be modeled as operating expense and accounted for as changes to net position, not as contributions in aid of construction... [However,]... the FERC Uniform System of Accounts ("USoA") requires utilities to follow a particular accounting system and provides specific accounts in which to input capital expenditures and operating expenses. Capital expenditures are treated as Construction Work in Progress (FERC USoA account 107) and eventually as Utility Plant in Service (FERC USoA account 101). In the case of customer funding of a plant (in the form of contributions toward that plant when the plant is initially being replaced or placed into service) is accounted for as credits to FERC USoA account 101, Plant in Service. We see no reason for PREPA to deviate from the accounting treatment of ratepayer funded capital expenditures provided in the FERC USoA... The Commission intends that this extraordinary ratemaking treatment [, in which ratepayers will fund FY2017 capital expenditures on a dolar-for-dollar basis,] will only continue to apply until PREPA's financial stability has been restored." | Obstructive argumentation |
| 38 | 90-91 | The FY2017 Revenue Requirement | "In contrast to spending declines on generation, transmission, distribution and customer service operations [from FY2010 to 2016], PREPA's spending on Administrative and General operations has been increasing. PREPA's non-labor A&G spending has increased by approximately $50 million since FY2010. Indeed, our consultants found that PREPA's spending last year on miscellaneous A&G-related expenses was more than its entire proposed budget for generation expenses. Documentation of and explanations for these increases were vague. At the Technical Hearing, PREPA's officials attributed some of this spending to the hiring of restructuring experts and to fees paid to bondholders who agreed to forbear from declaring PREPA in default (PREPA expects a reduction in restructuring costs this year). The Commission recognizes that such experts are costlier than employees, do not represent a permanent increase and are essential to PREPA's transformation. Still, in the future, PREPA must provide more transparency about its A&G costs." | Failure to produce evidence |
| 39 | 94 | The FY2017 Revenue Requirement | "As Drs. Fisher and Horowitz described it, [PREPA's total budget]... had multiple problems. First, the labor budget figure was not based on an analysis of system needs; it was based instead on assumptions about how many employees would remain with PREPA and how many would leave. It was as if the purpose of a revenue requirement was to pay employees rather than to provide service. Second, savings from improvements consisted of "hard coded" values-bare numbers for increases in disconnection fees; theft recoveries; and savings in automotive fleet and shops, procurement, inventory management, medical benefits and headcount. PREPA gave verbal explanations, but did not connect those explanations to actual numbers. Third, PREPA also used, but did not justify, an inflation figure of 1 %." | Plainly irrelevant evidence |
| 39-40 | 95-99 | The FY2017 Revenue Requirement | "Instead of allocating dollars according to the activities and costs of each area, PREPA's consultants simply allocated to each area that percentage of the proposed FY2017 total that matched its fraction of the FY2014 total... As Drs. Fisher and Horowitz explained, there is no reason to think that each area's spending in FY2014 was the appropriate amount for that year; let alone that the FY2014 percentages would bear any resemblance to FY2017 needs. Among other things, the ratio of labor to non-labor expenditures in each area will vary between the two years. Moreover, the assumption that savings from performance improvements would be spread across its functional areas in the same proportions as identified above has no basis in facts or logic. It was not clear whether PREPA views these area amounts as binding budgets for each of the functional areas, or whether these numbers were intended simply to fill cells in the revenue requirement spreadsheet. PREPA's consultants acknowledged that their method may not relate in any way to PREPA's actual budgeting process. Drs. Fisher and Horowitz described their frustrating-and frustrated-efforts to gather informational support for these numbers. Vague verbal explanations, work-papers from the wrong years, and circular references prevailed. As they stated: "We are unable to conclude with certainty that PREPA's budget as presented reflects its actual planned operational and maintenance activities in its various functional areas, because we have absolutely no evidence to that effect pertaining to either FY2017 or FY2016." During the Technical Hearing, PREPA's finance director revealed that PREPA does in fact have a bottom-up, by-directorate operations expense budget for FY2017, independent of its by-area allocation of operational expenses in the revenue requirement." | Plainly irrelevant evidence |
| 42 | 106 | The FY2017 Revenue Requirement | "...PREPA's finance director explained that PREPA routinely reallocates funds during the year depending on changing circumstances. This practice makes it very difficult for us to determine actual expected spending levels." | Failure to produce evidence |
| 44-47 | 116-121 | The FY2017 Revenue Requirement | "PREPA submitted testimony by Dr. Larry Kaufmann. This submission purported to be a "benchmarking" study showing that PREPA's costs were not too high. Dr. Kaufmann compared PREPA's operational expenses (less fuel and purchased power spending) to those of several "peer" utilities... Dr. Kaufmann's submittal is not responsive to the question the Commission proceeding must answer: whether PREPA's proposed revenue requirement and accompanying rates are just and reasonable, given its obligation to plan and operate a safe and reliable electric system. Indeed, had PREPA spent the money it needed to achieve this result, its costs might well have been far above the levels of its "peers." Dr. Kaufmann's analysis, based on data from years 2008 through 2014, made no adjustment for quality of service. Even if we assume that PREPA's spending through 2014 was fully sufficient for its needs (an assumption which Drs. Fisher and Horowitz disproved), PREPA's costs in the past two years do not represent the spending necessary to operate a safe and reliable system. Comparing the costs of a utility whose performance is poor with the costs of utilities whose performance is good is the ultimate apples-to-oranges error. As Drs. Fisher and Horowitz explained, Duke Florida-one of the "peer" utilities identified by Dr. Kaufmann-reported an adjusted SAIDI goal of approximately 80 minutes per year for 2015. PREPA's SAIDI in 2013 (a year comfortably within Dr. Kaufmann's period of analysis) was, on average, 51 minutes per month . In other words, PREPA's system is approximately eight times less reliable (based on this metric alone) than Duke Florida's. So what if their costs were comparable? ...When asked [whether there is] any proposition that needs to be in the Commission's final order for which [Dr. Kaufmann's] submission would be evidentiary support-his answer was a version of "No." It is not clear to us that the mismatch between Dr. Kaufmann's submission and what this Commission needed was his fault. He was retained by PREPA's consultant Ralph Zarumba, who testified he sought to address public and media concerns that PREPA's costs were too high. Dr. Kaufmann produced the study he was hired to produce... We do find fault with those who decided to retain him: Mr. Zarumba, and the attorneys for PREPA who made the decision to submit Dr. Kaufmann's testimony. It is the attorney's responsibility to submit only material that will be useful to the Commission... Because of this serious error in litigation thinking, the Commission requires that PREPA propose to the Commission guidelines for judging the usefulness of testimony before PREPA incurs the costs to prepare and submit it." | Plainly irrelevant evidence |
| 48 | 125 and footnote 106 | The FY2017 Revenue Requirement | "...Commission Advisors Fisher and Horowitz have recommended that $16 million for certain maintenance contracts be reclassified from Capital Expenditures to Generation Expense.... PREPA opposed this reclassification arguing that such treatment adds a level of complication and potential misrepresentation of how these costs will ultimately be reflected on the books of PREPA... As previously stated, PREPA is required to follow the FERC USoA for Electric Utilities... PREPA should not be capitalizing current period maintenance." | Obstructive argumentation |
| 59-60 | Directive 3 and footnote 132 | The FY2017 Revenue Requirement | "In the upcoming performance proceeding, the Commission will require PREPA to recommend to the Commission at least three firms to conduct a management performance review specifically relating to fuel purchase costs. PREPA opposed the performance review process stating that such a review will inherently impose burdens and costs and the costs ultimately would be borne by customers. The Commission notes that an independent management performance review can produce significant cost savings from improvements, which are typically greater than the cost incurred in the review process." | Obstructive argumentation |
| 64 | 175-176 | The FY2017 Revenue Requirement | "When asked for work orders or contracts for engineering, procurement and construction ("EPC") for projects, PREPA responded: "PREPA does not have electronic systems configured to be able to assess automatically which work orders are associated with a particular [capital expenditure] project; most of this information is on paper records. And those paper records are not organized by project in a central location. Further answering, the process of preparing the [capital expenditure] budgets start in PREPA's transmission and distribution districts, generating plants, customer service offices, among others." ...This dispersion of information meant that PREPA could not provide sufficient documentation explaining a project, justifying its expense, how the estimate was generated, or even the project's value to customers." | Failure to produce evidence |
| 72 | 205 | The FY2017 Revenue Requirement | "In its IRP decision, the Commission ordered PREPA to pursue permitting and start a competitive bidding process for the repowering of the Aguirre 1 and 2 CC units with new, dual-fuel capable turbines. Neither the repowering nor the planning or permitting costs for the repowering are part of PREPA's petition for a FY2017 rate increase." | Failure to produce evidence |

| Pages(s) | Paragraph(s) | Section | Example of "Obstructive and Defensive" Behavior as Reported by Commission in Commission Order | Specific Objectionable Behavior |
|---|---|---|---|---|
| 76 | Directive 9 and footnote 172 | The FY2017 Revenue Requirement | "PREPA shall submit a summary of the expenditures necessitated by the fire and outage occurring in September 2016... PREPA opposes this requirement, arguing that the fire did not affect the revenue requirement in the current test year and that the Commission can investigate the costs in a future reconciliation proceeding. PREPA is missing the point, emphasized throughout this Part Two and articulated procedurally in Part Four: The Commission intends to avoid situations in which PREPA incurs costs first, then tells the Commission in a reconciliation proceeding that the Commission has no choice but to approve them because they have already been incurred. To protect consumers, the Commission must reserve its powers to evaluate costs before they are incurred. PREPA must not view the reconciliation process as allowing it to incur costs without accountability." | Obstructive argumentation |
| 78-79 | 225-227 | The FY2017 Revenue Requirement | "On September 27, 2016, the Commission in the instant rate proceeding required PREPA to re-file its revenue requirement exhibits and testimony to, among other things, reflect the $15 million cap on AOGP spending... PREPA's revised revenue requirement did not make the required adjustment. PREPA argued, among other things, that "even if AOGP and the other generation projects in the north are not approved, PREPA's other significant investments would have to be made rapidly." PREPA concluded that it "has no reason to believe that these alternative investments would be any less expensive than the investments currently reflected in its three year business plan." This argument was unaccompanied by supporting evidence. The Commission therefore will retain the $15 million cap." | Failure to produce evidence |
| 79 | 228-229 | The FY2017 Revenue Requirement | "PREPA has argued that preventing progress on AOGP risks incurring EPA fines. This argument is nearly synonymous with an argument that AOGP is the only option for satisfying MATS, such that rejecting AOGP make EPA fines certain. The Commission rejects that argument because it is unsupported by facts... The Fisher-Horowitz Report states (at 131): "[I]n the time that PREPA committed internally to the AOGP project it increasingly sidelined viable alternatives, including MATS-compliant new generation, environmental controls on existing generation, increased renewable penetration, a focus on smaller distributed generation, or the completion of a south coast gas pipeline. PREPA has presented little or no evidence that those options are not still viable."" | Failure to produce evidence |
| 80 | Directive (iii) and footnote 182 | The FY2017 Revenue Requirement | "PREPA shall not sign a Limited Notice to Proceed or a Final Notice to Proceed at AOGP until it has submitted, and the Commission has approved, the AOGP Economic Analysis; or until the Commission resolves the Reconsideration under review." ...PREPA in its brief opposes this requirement on grounds that it is an issue pending in the IRP case." | Obstructive argumentation |
| 107 | Directive and footnote 228 | The FY2017 Revenue Requirement | "As required by the Trust Indenture, PREPA shall retain a Consulting Engineer, different from the one previously engaged. Before recruiting the Consulting Engineer, PREPA shall submit to the Commission a description of the duties and the required qualifications." ...In its brief, PREPA "opposes this recommendation being part of this rate review, which involves a Trust Agreement matter, and which is inappropriate based on the record and law and unnecessary here." The Commission is imposing this requirement independent of whether it remains in the Trust Agreement. This requirement is not merely a "Trust Agreement" matter; it is a matter of protecting consumers from excess costs, poor financial and operational decision making. deteriorating infrastructure and the myriad of other problems discussed throughout this order. For PREPA's revenue requirement to be just and reasonable, there must be an independent entity reviewing and reporting on its operations, regularly and transparently." | Obstructive argumentation |
| 114 | 325 | Revenue Allocation and Rate Design for FY2017 | "The Commission is fully committed to setting rates that are guided by a COSS in which we have confidence. But the gaps in data and the numerous subjective and debatable judgments in PREPA's COSS, leave us without confidence that the filed COSS describes cost causation accurately. For the Commission to express confidence in PREPA's COSS would imply it would accept a future COSS with the same flaws. That is not the signal the Commission wishes to send." | Failure to produce evidence |
| 133 | 381 | Revenue Allocation and Rate Design for FY2017 | "The Commission was disappointed to discover that the language for the riders on energy efficiency, load retention discount and other purposes, prepared by expensive consultants at ratepayer expense, contain multiple errors, resulting from a hasty copying of language from the existing fuel cost rider. PREPA shall fix all these errors in the compliance filing and avoid exposing ratepayers to the costs of such avoidable errors." | Failure to produce evidence |
| 151 | 448 | Procedures for Establishing Revenue Requirements and Rates After FY2017 | "PREPA's witnesses testified that the current budgeting process aims to obtaining Board approval by the June preceding a new fiscal year. Budgets emerge from the departments and get approved by the Executive Director between March and April of the fiscal year prior to the one in which the budget will go into effect To set revenue requirements in the preceding October, as Dr. Hemphill proposed, is to set revenue requirements without a budget. To set revenue requirements in the succeeding October would be setting them after the budget already has been approved and gone into effect-too late to prevent imprudent costs. By failing to synchronize budgets and revenue requirements, Dr. Hemphill's proposal fails in its putative purpose: to empower the Commission to discipline PREPA's spending." | Failure to produce evidence |
| 151 | 450 and footnote 313 | Procedures for Establishing Revenue Requirements and Rates After FY2018 | "The Commission is committed to creating a rate-setting process that provides PREPA the revenues it needs to operate efficiently and pay its bondholders timely. But the Commission is equally committed to fixing a situation in which budgets are disconnected from revenue requirements. PREPA's sponsorship of Dr. Hemphill's testimony did not help solve the problem. This Order does... Among Dr. Hemphill's FRM examples were ones used in Illinois and at the Federal Energy Regulatory Commission. These examples are not useful to the Commission. The Illinois statute applies to investor-owned utilities (which PREPA is not), and includes a penalty against their profits (which PREPA does not have)... The FERC method, like that of Illinois, applies to investor-owned utilities, not publicly-owned utilities." | Plainly irrelevant evidence |
| 160 | 478-479 | The Corporate Structure of PREPA | "Mr. Hill explained that his "[r]epeated attempts [ ... ] to obtain basic annual financial information regarding the subsidiaries of PREPA Holdings (income statements, balance sheets, cash flow statements) [ ... ] were unsuccessful." PREPA did supply consolidated financial data for one year and some data regarding charges to PREPA by the PREPA Holdings companies, but it never supplied annual historical financial data for each of the subsidiaries of PREPA Holdings as requested. Mr. Ramos asserted that PREPA has no control of the income statements, cash flow statements, and balance sheets of any of the PREPA Holdings subsidiaries. This statement is not credible. PREPA is the sole shareholder of the company that owns these companies. PREPA has control. It has the power to direct its subsidiaries to take the actions PREPA wants-or not to." | Failure to produce evidence |