1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF PUERTO RICO
2      _____
                                        )
3      In Re:                           )
                                        )
4      The Financial Oversight and      )
       Management Board For Puerto Rico )   No. 3:17-BK-3283(LTS)
5                                       )
       as representatives of            )   PROMESA Title III
6                                       )
       The Commonwealth of Puerto Rico, )
7      et al.,                          )   (Jointly Administered)
       Debtors                          )
8                                       )
       _____  )   _____
9                                       )
       In Re:                           )
10                                      )
       The Financial Oversight and      )
11     Management Board For Puerto Rico )   3:17-BK-4780(LTS)
                                        )
12     as representatives of            )   PROMESA Title III
                                        )
13     The Puerto Rico Electric Power   )
       Authority,                       )
14     Debtor                           )
                                        )
15     _____

16                               **HEARING**

17                 BEFORE THE HONORABLE JUDITH GAIL DEIN
                      UNITED STATES MAGISTRATE JUDGE
18

19                     United States District Court
                       1 Courthouse Way, Courtroom 18
20                     Boston, Massachusetts  02210
                       February 26, 2019
21

22                                      Kelly Mortellite
                                        Official Court Reporter
23                                      U.S. District Court
                                        1 Courthouse Way
24                                      Boston, MA  02210
                                        mortellite@gmail.com
25

1    A P P E A R A N C E S:

2

3        ROBERT S. BEREZIN, ESQ., Weil Gotshal & Manges, for
     National Public Finance Guarantee Corporation.

4        ELLEN M. HALSTEAD, ESQ., HOWARD R. HAWKINS, JR., ESQ. and
     WILLIAM J. NATBONY, ESQ., Cadwalader Wickersham & Taft, for
5    Assured Guaranty Municipal Corp.

6        MARGARET DALE, ESQ. and LAURA STAFFORD, ESQ. Proskauer
     Rose, for the Financial Oversight and Management Board for
7    Puerto Rico (FOMB).

8        ASHLEY PAVEL, ESQ., O'Melveny & Myers LLP, for interested
     party AAFAF.

9

10       ELIE J. WORENKLEIN, ESQ., Debevoise & Plimpton, LLC, for
     Syncora Guarantee Inc.

11       LUC DESPINS, ESQ., Paul Hastings LLP, for Official
     Committee of Unsecured Creditors.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              COURTROOM CLERK:  United States District Court for the

3    District of Massachusetts is now in session, the Honorable

4    Judge Dein presiding.  Today is Tuesday, February 26, 2019.

5    The matter of In Re: The Financial Oversight and Management

6    Board for Puerto Rico as representatives of Puerto Rico

7    Electric Power Authority, case number 17-BK-4780, will now be

8    heard.  Will the parties please identify themselves for the

9    record.

10             MS. DALE:  Your Honor, Margaret Dale for the Financial

11   Oversight Management Board as representative of the debtor

12   PREPA.

13             MS. STAFFORD:  Your Honor, Laura Stafford as

14   representative of the Financial Oversight and Management Board

15   as representative of PREPA.

16             MS. PAVEL:  Your Honor, Ashley Pavel of O'Melveny &

17   Myers on behalf of AAFAF.

18             MR. NATBONY:  Good afternoon.  William Natbony on

19   behalf of Assured Guaranty Municipal Corp., Assured Guaranty

20   Corp., and will also be speaking primarily on behalf of the

21   other insurers this afternoon.

22             MR. HAWKINS:  Okay.  Good afternoon, Your Honor.

23   Howard Hawkins from Cadwalader, also for Assured Guaranty.

24             MS. HALSTEAD:  Ellen Halstead of Cadwalader, also for

25   Assured.

1        MR. DESPINS:  Good morning, Your Honor.  Luc Despins

2    Paul Hastings, counsel for the Official Committee in the PREPA

3    case.

4        MR. WORENKLEIN:  Elie Worenklein from Debevoise &

5    Plimpton on behalf of Syncora Guarantee.

6        MR. BEREZIN:  Good afternoon, Your Honor.  Robert

7    Berezin for National Public Finance Guarantee Corp.

8        THE COURT:  Welcome, everybody.  Welcome, everybody

9    here in Boston and those in New York and Puerto Rico as well.

10    I will not repeat the instructions for appropriate behavior in

11    the courtroom.  You have it all memorized by now.

12        And I see that we did time it right today, that it's

13    not snowing, it's not windy.  Everybody flew in from wherever

14    they were supposed to be.  So hopefully we'll have an efficient

15    and productive afternoon here.

16        I'm going to ask counsel to just keep in mind, I

17    guess, to make sure that we follow what's been redacted and

18    unredacted.  It's kind of hard to keep track of that.  And I

19    assume that there are some people who are participating who

20    have actually not seen some of the unredacted declarations.  So

21    if you feel that the court is straying or if counsel is

22    straying, just make sure that that's known.

23        All right.  I will hear from the Oversight Board to

24    begin with, and I would like you to address, if you think it's

25    relevant, the fact that the newly filed expert reports, whether

1    that changes the argument at all.

2           MS. DALE:  Thank you, Your Honor.  Your Honor,

3    Margaret Dale, for the Financial Oversight and Management

4    Board.

5           First of all, Ms. Stafford and I are going to split

6    the argument.  I'm going to start with why the insurers should

7    be compelled to produce the loss reserve information that they

8    submitted to the New York regulator relating to the PREPA

9    bonds, including why loss reserves are relevant to collateral

10   valuation, and Ms. Stafford is going to address the privilege

11   arguments that the insurers have raised to block the disclosure

12   of loss reserve information.  That's how we're going to split

13   it up.

14          Just to address your first question regarding the

15   declarations that were filed yesterday, we took a very quick

16   look at them.  We don't think that they change this motion at

17   all.  There was no additional collateral valuation material

18   submitted with those declarations that relate to the value of

19   secured collateral on the date of the petition here and

20   thereafter.  There are some arguments made about collateral

21   value.  They again relate to claims of mismanagement

22   predominantly, but I don't think that they make any difference

23   with respect to this motion, Your Honor.

24          THE COURT:  Okay.  The other thing I would like, I

25   think the relevance argument is really very critical to me,

1    okay?

2            MS. DALE:  Sure.

3            THE COURT:  So we need to spend some time on that.

4            MS. DALE:  Yes, ma'am.

5            THE COURT:  And in your argument, addressing to the

6    extent you can, responding to the declarations, how they

7    describe how the reserves are created, your reply brief didn't

8    seem to take that head-on.  Okay?

9            MS. DALE:  Sure.  So Your Honor, the relevance of the

10   collateral valuation documents to the receiver motion we think

11   is indisputable.  And this relates to why we think the loss

12   reserve documents are important, because we think they are

13   relevant to collateral valuation.

14           The starting point is the First Circuit's decision on

15   the initial receiver motion.  There, that the court held that

16   in order to lift the automatic stay on the ground of lack of

17   adequate protection, the moving party must demonstrate the

18   value of its secured collateral on the petition date and that

19   the collateral is declining in value.

20           The insurers acknowledge this.  In paragraph 13 of

21   their opposition, they cite the First Circuit's decision

22   regarding, quote, "The importance of assessing the pre-petition

23   value of the bondholders' collateral (if any) and whether the

24   bondholders face a threat of uncompensated diminution in such

25   value."

1          THE COURT:  So you're not -- is it your argument that

2     the First Circuit has dictated that or you're just saying

3     that's one of the points that the First Circuit has suggested

4     that the reviewing court decide?

5          MS. DALE:  I think what we're saying is that that is

6     the standard upon which a motion for lack of adequate

7     protection has to meet.  So you have to prove that you had

8     secured collateral of some value on the petition date and that

9     it has diminished in value over time.  We think that that is

10    basically a burden that the movants here need to satisfy given

11    the motion that they have brought.  And that is why we think

12    this information that we're seeking now is critical.

13         THE COURT:  All right.  But the First Circuit raised a

14    number of suggested -- I guess what I'm saying is I don't think

15    the motion to compel is the place we would determine the

16    appropriate standard.

17         MS. DALE:  I agree with that.

18         THE COURT:  And I gather there would be a fight over

19    what the appropriate considerations are, maybe.

20         MS. DALE:  I'm not sure, because I did quote you from

21    their brief at page 13, so it seemed like at least we were on

22    the same page about what the First Circuit said.

23         So, as we said, the insurers have put the value of

24    their collateral on center stage through the proceeding that

25    they commenced to lift the stay.  The threshold issue here is

1    whether there was any PREPA property in existence on the

2    submission date subject to a security interest that has

3    diminished in value and then the extent of any diminution.  If

4    they can't make that showing, if the insurers can't make that

5    showing, we think that they can't meet the threshold issue on

6    the lift-stay motion, and we should not be put to the expense

7    and time of the discovery and the hearing on the lift-stay

8    motion.

9            Today what we're here for is the insurers' failure to

10   produce documents that we say comply with the First Circuit's

11   directive.  They have not identified in their lift-stay motion

12   the value of the collateral on the petition date that they say

13   is diminishing.  They have failed in discovery to produce any

14   documents to that effect, and they have failed in response to

15   this motion to do so.  There's no description of the collateral

16   in existence on the petition date.  There are no Bates numbers

17   that have been provided to us as to any responsive documents.

18   We see general, vague generalities about collateral in what we

19   understand their answer to be to the First Circuit directive,

20   which we don't think is a fair answer, but their answer is that

21   the collateral is a contractual pledge of an income stream,

22   PREPA's revenues after the petition date, which they allege is

23   being impaired because of the alleged mismanagement at PREPA.

24           We think that's wrong as a matter of law, but that's

25   not the issue that we're here today about.  The issue that

1    we're here today about, saying it again, is the obligation to

2    produce documents that identify and value the collateral

3    existing on the petition date.

4         THE COURT:  So you've all identified the collateral,

5    though, as being the revenue stream.

6         MS. DALE:  We have not.  That is what the --

7         THE COURT:  So what do you say that the collateral is?

8         MS. DALE:  We say that the collateral -- it's

9    complicated, Your Honor, and we certainly will get to this in

10   the opposition to lift-stay motion.  But we think secured

11   collateral is actually only monies on deposit in a particular

12   fund pursuant to the trust agreement.  It's called the sinking

13   fund.  And we will explain all of this, but we believe that is

14   the only secured collateral that the insurers had on the

15   petition date, July 2, 2017, and that money is still there.  So

16   our argument is you're completely secured, there's been no

17   diminution in the value of your security collateral.

18        THE COURT:  So for discovery purposes, though, that's

19   information that you have, right?

20        MS. DALE:  Correct.

21        THE COURT:  You have access to the account, and that's

22   not something that you would expect the movants to produce

23   documents on?

24        MS. DALE:  Unless they had non-privileged documents.

25   We've given them documents relating to that information, so

1   they might be giving it back to us in discovery.  But yeah,

2   that is information that we or PREPA would have.

3           THE COURT:  Okay.

4           MS. DALE:  But that's just our side of the argument,

5   Your Honor.  Their argument is their collateral is -- I don't

6   know.  They haven't really completely identified very carefully

7   what they claim their secured collateral is.  And that's part

8   of what we were doing in discovery, was trying to pin them down

9   as to what collateral do you say was secured as of the petition

10  date, what was its value as of the petition date, what was the

11  value as of the date you brought the lift-stay motion, so we

12  can decide whether we agree that you need adequate protection

13  or you are adequately protected.

14          As I said, we didn't come, we didn't start this

15  discovery looking for loss reserve information, Your Honor.  We

16  started this discovery with document request number 1, which is

17  Exhibit A to our moving papers, seeking documents showing as of

18  June 30, 2017 and afterwards the value of your collateral, as

19  that term is used in the lift-stay motion and the draft

20  complaint.  And each of the insurers said we'll produce to you

21  non-privileged information responsive to request number one,

22  essentially.

23          And then over time we were asking them, where are the

24  documents that reflect the valuation of your collateral.  And

25  after months of not getting any documents responsive to that,

1    we pursued the production of the loss reserve documents, which

2    was request number 21 to our discovery request, because we

3    think that's the only place now where we're going to be able to

4    get some indication of how they were valuing their collateral.

5         So let me answer your first question to me, which was

6    discuss the relevance of loss reserve information to collateral

7    valuation and then how the declarants sort of describe it, how

8    they arrive at their loss reserve information that we're

9    seeking.

10        So while on the one hand the insurers claim that loss

11   reserves are completely irrelevant to collateral valuation, on

12   the other, they concede that the loss reserves have probative

13   value, and that is their opposition, paragraph 1.  They contend

14   that the probative value is minimal.  But again, that is simply

15   their view, and we think that -- well, we don't know because we

16   haven't seen them, so we're hard pressed.

17        And in this respect, Your Honor, it may be that an in

18   camera inspection is another way to sort of -- for the court to

19   look at this.  Loss reserves are by definition the measure of

20   what the insurers need to put aside to satisfy existing

21   insurance obligations net of their collateral.  That is the

22   definition of loss reserves.  So we're hard pressed to think

23   how loss reserve information that they supplied to their

24   regulator cannot at least reflect that in some way.  And again,

25   as I said --

```
 1              THE COURT:  So they've described to you how they've

 2    set it up.  They've described to you in general terms and more

 3    specific terms in the declaration how the loss reserve is

 4    created and the assumptions that are made which, to paraphrase,

 5    I think I can go into, that you're not -- that PREPA is not

 6    paying anything right now.  Let's start with that.  And that

 7    they need to have enough money to reserve for PREPA not paying

 8    for X amount of time.  And the question of how much time that

 9    is is their estimate of how long the Title III will take.

10    That's one portion of it, all right?

11              MS. DALE:  Yeah.

12              THE COURT:  So accepting that they said to you that's

13    part of what we're doing, why do you think that that

14    reflects --

15              MS. DALE:  Yes, I get it.

16              THE COURT:  -- the collateral?

17              MS. DALE:  I'm sorry if I'm going to repeat myself.

18    Two reasons.  One, because they indicate in their opposition

19    that the loss reserve information has probative value here.

20              THE COURT:  You need to understand what that probative

21    value is.

22              MS. DALE:  Exactly.  Aren't we in a position, as the

23    debtor's representative here, to be able to evaluate that for

24    ourselves?

25              And as I said, secondly, the New York law, the New
```

1    York insurance law -- this is at page 8 of our reply brief --

2    requires that insurers, quote, "maintain loss reserves net of

3    collateral."  So they tell us that they're submitting this

4    information to their regulators quarterly, regularly.  So are

5    they saying that they're not -- you know, that they're not

6    following what the mandate is for what they're supposed to be

7    submitting?

8            I haven't seen the information, Your Honor.  I've

9    attached as Exhibit A or Appendix A to our reply brief, we put

10   the publicly filed portion of the publicly filed financial

11   statement of MBIA, National's parent, just to show that they do

12   put out loss reserve information publicly.  I know that in the

13   declarations they said we don't do it down to the level of each

14   credit or each bond that they're insuring, but they do give

15   that information to their regulator.

16           And so is it just numbers?  What is it that they're --

17   how are those numbers of what the loss reserve -- under all

18   these scenarios, how are those numbers disclosing potentially

19   privileged input or advice?  If it's just numbers, we don't

20   think that's privileged information, and we don't think that a

21   number is going to disclose any kind of privilege of what went

22   into that number.  Ms. Stafford is going to discuss the

23   privilege issues more.

24           THE COURT:  What does that do for you?  What does that

25   do for you if they gave you a number without an explanation?

1         MS. DALE:  Well, I don't know, but it might be helpful

2    for us to understand because we think that we know what PREPA,

3    what the secured -- the value of their secured collateral was

4    on a certain date.  We think we know that.  We have an opinion

5    about that.  We say it's the money that was in the sinking

6    fund.  They don't agree with us.  So we'd like to understand

7    how are they looking at it?  What are they valuing?  What do

8    they think is the secured property of PREPA that they're

9    entitled to adequate protection on?  That's the whole lift-stay

10   motion that we're going through an awful lot of discovery and

11   depositions and briefing on for a full-blown hearing in May.

12   And I think this collateral valuation issue is like the

13   threshold issue for that motion.

14        So they haven't given us any collateral valuation

15   information.  Maybe they should be precluded then from

16   supplying anything going forward if you determine that we're

17   not entitled to this information in the loss reserves, and the

18   record will be where the record will be.  And that will be the

19   end of that.

20        THE COURT:  So the expert reports that they produced

21   included some financial information about the revenues and

22   expenses that were anticipated.  It sounds to me like what they

23   put forward, at least in this morning in my brief reading was,

24   we're going to argue that the fiscal plan should be implemented

25   or that PREPA says that the fiscal plan should be implemented

1    and PREPA can't do it with its current management and that we

2    will accept, for at least present purposes, PREPA's analysis as

3    to the benefits of that fiscal plan.  You know, and then they

4    have an analysis as to the savings or the benefits of

5    implementing the fiscal plan.

6            That's how they're presenting their lift-stay motion.

7    I think it requires experts.  They've given you their experts.

8    They've given you their analysis.  Where I'm kind of stuck is I

9    think you're just presenting different standards for when is a

10   receiver appropriate, and I think you fight that out in

11   connection with the lift-stay motion.

12           MS. DALE:  We're trying to fight that out in

13   connection with the lift-stay motion, but I think that we're

14   entitled to discovery of how they value their collateral,

15   whatever they think it is.

16           THE COURT:  But that's not what they're arguing.

17           MS. DALE:  But that's the -- sorry.

18           THE COURT:  You're arguing, you're saying this is

19   something that you could argue, we don't think that's the right

20   standard, or, we think the collateral is just this one account,

21   so this is the information that we have.  But if the movants --

22   I'm sorry, but this is where I'm stuck, I'll be honest with

23   you.  If this is where the movants are not saying, they're not

24   saying we have X number of revenue, we had X number of net

25   revenues on day 1 and on day 15 we had this and on day 60 we

 1    had that.  It's not what they're arguing.  So why do you --

 2    one, why do you get that information if they're not arguing it.

 3    And two, they've also told you that that number isn't part of

 4    their loss reserve calculation.

 5         MS. DALE:  Your Honor, the termination of the

 6    lift-stay motion for a lack of adequate protection, there is a

 7    standard that is applied.  And while the insurers can argue

 8    that mismanagement is a cause of diminution and the like, that

 9    is not what the law requires them to show.

10         It requires, as I started this out, with a valuation

11    of collateral on the date that the filing occurs and then some

12    valuation thereafter, probably on the date of the motion that

13    they made, to show that, you know, we used to have a million

14    dollars and now we only have $500,000 because this has been

15    dissipated and we need that more protection around the million

16    that we were supposed to have at the beginning.  That's the

17    standard.

18         So we don't agree -- I know we're on different -- sort

19    of different levels here about what we're arguing.  But why

20    isn't the Oversight Board as PREPA's representative entitled to

21    discovery into what we believe to be the correct standard to

22    the extent that they have materials that reflect the value in

23    dollar terms of the collateral that was securing their bonds?

24    We should have it.  If they say they have nothing, there's

25    nothing, it's whatever you gave us, but we don't have anything

1   independent, then I think that the order that we were looking

2   for, some indication that that will be where the record will

3   be, and that will be the end of it.

4           But we don't believe -- because they've identified

5   that -- and I apologize for repeating myself.  But they've

6   identified that this has some value, some probative value, they

7   indicated, and the whole raison d'etre of loss reserves is to

8   figure out how much collateral do you have and what other

9   monies are you going to have to put on top of that so that you

10  can satisfy your obligations.  So it just seems -- it just

11  seems inconsistent to us that the way they're valuing their

12  loss reserves gives absolutely -- you know, no element of that

13  has anything to do with how they're valuing their collateral.

14          THE COURT:  Do you agree, though, that -- can I talk?

15  Am I allowed to talk?

16          COURTROOM CLERK:  They're just having --

17          THE COURT:  Nobody can hear me?  So exciting.

18          COURTROOM CLERK:  So I think Chris is coming up.

19          THE COURT:  All right.  Well, we'll have to take a

20  minute once he comes up.  But do you agree that the

21  declarations that were filed say that the value of the

22  collateral is not part of the loss reserve?

23          MS. DALE:  I think that very clearly they say that.

24          THE COURT:  Okay.

25          MS. DALE:  If you don't have any other questions, I

1    would either take a break until we have the audio fixed, or Ms.

2    Stafford is ready to address the second part of the argument.

3            THE COURT:  Actually, I want to continue this before

4    we get to privilege.  So let's do it that way.  But why don't

5    we wait one minute.  I don't have anything that important to

6    say, but they apparently want to hear me say it.

7            COURTROOM CLERK:  Apologies.

8            THE COURT:  Is he on his way?

9            COURTROOM CLERK:  Yes, he should be.

10           MR. NATBONY:  I'll await your signal, Your Honor.

11   Thank you.

12           THE COURT:  I think so.  They can hear you.  They can

13   hear him?

14           COURTROOM CLERK:  Yes.

15           THE COURT:  So why don't you talk, and I'll wave at

16   you.

17           COURTROOM CLERK:  He's on his way up.

18           THE COURT:  Might as well get started.

19           MR. DESPINS:  I'm just wondering, Your Honor, the

20   Committee is supporting the Board on this, so I'm happy to go

21   after, but typically we would go --

22           MR. NATBONY:  That's fine with me, Your Honor.

23           THE COURT:  I thought you weren't talking.

24           MR. DESPINS:  We filed an affirmative motion.

25           THE COURT:  I'm not going to get there.  If you want

```
 1   to let him go --

 2            MR. NATBONY:  That's fine, Your Honor.

 3            MR. DESPINS:  Your Honor, I'll be very brief.  Luc

 4   Despins with Paul Hastings on behalf of the Committee.  The

 5   Committee supports the Oversight Board on this motion.

 6            I think it's important to set the legal stage, and I

 7   think you started doing that, which is, to lift the stay, you

 8   either have to -- you have to show cause, which can include a

 9   decline in value of the collateral.  But then there's kind of a

10   preclusion issue, which is, if they're going after cause but

11   not for diminution of value of their collateral, they have to

12   say that and say, Your Honor, that's all we're doing.  We're

13   saying mismanagement.  We're saying that the only thing that's

14   important is mismanagement and we're going to put all our eggs

15   in that basket, and that's okay.  They can do that.

16            But if they also want to allege diminution of value of

17   collateral then the question is if they have documents, and

18   I'll get to whether they do or not, but if they have documents

19   that show the value of collateral on the petition date, any

20   diminution and increase since then, that is clearly is relevant

21   and should be produced.  What I think they're saying is that

22   our documents really don't address that at all, so trust us on

23   that, you don't need them.  Well, that's not the way it's

24   played.  From a burden point of view, these loss reserve

25   calculations are easy to produce.  They're not voluminous.
```

 1    They can limit them to professional eyes only.  There are all

 2    sorts of protections they can get.

 3         THE COURT:  Let me just see, is whoever is listening,

 4    can you hear me now?

 5         MR. DESPINS:  It doesn't appear so.

 6         THE COURT:  I feel like I'm on my cell phone.

 7         COURTROOM CLERK:  They said not yet.

 8         THE COURT:  Not yet.  You can continue.

 9         MR. DESPINS:  So basically I think I was done.  The

10    point is that if there's -- there's not the tremendous burden

11    to produce this.  They can get all sorts of protections against

12    the disclosure of this, but clearly in a deposition of their

13    expert, the Board will want to ask them, So tell me about these

14    loss reserves.  What is the implied diminution of value or not

15    in there?  And the expert can say, There is nothing in there

16    about the value of collateral.  I would find that bizarre, but

17    that's possible.

18         But in terms of taking their declarations as gospel

19    when the critical issue may be whether there's been a

20    diminution or not in the collateral, I think we -- the court

21    should not authorize that.  But if they want to come up here

22    and say, We're saying cause but not because of diminution of

23    collateral, solely because there's mismanagement of this

24    enterprise, then I think that they may be right, that we have

25    no entitlement to see their loss reserves, but I don't think

1    that they will say that.

2         THE COURT:  Well, we'll find out.  But let me ask you

3    also, do you agree that the declarations do say that the loss

4    reserve does not involve an analysis of the collateral, the

5    value of the collateral, of the diminution of value?

6         MR. DESPINS:  I'll be candid, Your Honor.  I looked at

7    those declarations late last night.  I think the intent of

8    those declarations is that.

9         THE COURT:  You're not pointing me to something that

10   says I have concern about this.

11        MR. DESPINS:  No, I cannot do that.  But what I would

12   say is that's for a deposition, these would be appropriate

13   questions to ask them as to how is it that you're able to

14   comply with your statutory duties to report on your net

15   position, net of your collateral, and not have anything in

16   there at all regarding the value of the collateral.  That would

17   be a fair question to ask.

18        Thank you, Your Honor.

19        MR. NATBONY:  Thank you, Your Honor.  And good

20   afternoon.  William Natbony on behalf of the insurers.

21        I just want to start because I think Your Honor has

22   recognized this is a discovery motion.  It's not a motion on

23   the adequacy or the proof of the merits of the ultimate claims

24   that will be decided by Judge Swain on the lift-stay motion.

25   This is a discovery motion on a limited issue, and the insurers

1    have consistently told FOMB that any valuation documents they

2    have in their possession were either produced or discussed in

3    detail in the insurers' expert reports, including the ones that

4    were served yesterday, or I might add, Your Honor, in PREPA's

5    own possession, part of the collateral valuation here are

6    revenues of PREPA, and PREPA's own documents that they have

7    produced and that they have in their own possession have -- so

8    part of it is what they already have and what they said to them

9    they provided to us.

10         The insurers fully responded to the document requests

11   and told them that there's nothing else to produce, but they

12   want loss reserve information.  And we've told them time and

13   time again that the loss reserve information is either

14   irrelevant because it doesn't contain the collateral valuations

15   that they're looking for or that they're privileged.

16         What's happening I think here, Your Honor, is

17   essentially they don't like the fact that they didn't see X or

18   Y documents, and now they're trying to engage in basically a

19   fishing expedition to try and get what is the most sensitive

20   and essential financial information that an insurer has, which

21   is these loss reserves.

22         THE COURT:  Before we go there, though, counsel has

23   argued that you've taken the position that it is somewhat

24   probative, the loss reserves.  Is it or isn't it?

25         MR. NATBONY:  No, it's not probative to collateral

1    value at all.  I mean, we've put in three declarations, Your

2    Honor.  And they are unchallenged, by the way -- I mean, by not

3    only in any reply papers, which Your Honor noted, also here in

4    the admissions before Your Honor.  And these made very clear

5    that the PREPA-based loss reserves were calculated without

6    undertaking any valuation of PREPA's collateral.  And if you

7    look at the numbers and the other stuff that's in there, you

8    don't get a collateral value from those numbers.

9         So their entire motion is basically based on

10   speculation because they don't know how they calculated it.  We

11   as the insurers know, we've put in detailed declarations.  So

12   rather, as we've said to Your Honor and as we put in the

13   declarations, these loss reserves are calculated by reference

14   to percentage probabilities of various litigation and

15   settlement scenarios that were developed in consultation with

16   in-house and external counsel.

17        I won't go yet into the privilege issue because I know

18   you want to deal with relevance first.  But essentially, the

19   only valuation that is going on here is outcomes in litigation

20   and settlement.  Not collateral value.

21        There really is no compelling need here for the FOMB

22   to have these sensitive documents.  When Your Honor asked them,

23   What is it going to do for you, I mean, what you heard was, I

24   really don't know.  And I think the only compelling need here,

25   Your Honor, is to avoid what would be a dangerous precedent of

1    requiring disclosure of this kind of particularly sensitive

2    information without any real justification.

3         Loss reserve documents and information are sensitive

4    information.  To obtain these documents at this time would give

5    the FOMB a rare and unprecedented peek at the inner workings of

6    the innermost thoughts of the insurers and their counsel in the

7    midst of litigation about probability of success, percentages

8    of success, percentages of potential recovery, willingness to

9    settle, possible settlement ranges.  So you did hear someone

10   say you could, you know, potentially put "For attorneys' eyes

11   only," but this is the whole point.  You don't want that

12   information out there, you don't want that information,

13   particularly because of the sensitivity of the issues.  Other

14   creditors participate in these proceedings.

15        So I think the short answer here is from the important

16   perspective of relevance and proportionality alone, before even

17   getting to the various privilege issues, the motion should be

18   denied, and it should be denied because of the fact that the

19   very documents that they admit that they're seeking have no

20   relevance to the collateral value issue that they talked about.

21        THE COURT:  So what is your response to the statement

22   that says you're going to have to prove the collateral value at

23   different dates?

24        MR. NATBONY:  Well, the short answer here today is

25   that's an issue for them to raise before Judge Swain in

1   whatever motion they want to make.  It's not part of the

2   discovery motion here.  However, to go a step further, the

3   documents that are talking about collateral, you've basically

4   got several types of collateral.  You've got the revenue

5   stream.  You've also got the covenants that we've talked about.

6   Those are going to be legal issues, how do you prove them, how

7   do you prove lack of protection or lack of adequate protection.

8   Many of the documents that we have you've already put in an

9   expert report that Your Honor looked at that talked about

10  diminution, but you also have all these documents that PREPA

11  themselves have produced.  And these are documents that talk

12  about revenue, they talk about expenses, they talk about

13  revenue stream.  But these aren't documents that are in our

14  files that we have to produce.  These are documents that are in

15  their own files.

16          So when it comes to producing and when it comes to

17  proving lack of adequate protection, when it comes to proving

18  the existence of collateral on various different dates, we have

19  that information through PREPA's own documents and through our

20  experts.  So we will be able to do it.  The question is do we

21  do it today?  No.  This is a discovery motion, Your Honor.  And

22  it's really limited on the loss reserve issue, and I urge the

23  court to deny it.

24          THE COURT:  So are you prepared to say that any

25  presentation that you make in connection with the motions on

1    the value of the collateral would be limited to the documents

2    in PREPA's possession or have been identified in the expert

3    reports?

4              MR. NATBONY:  Well, I'm not willing to stipulate to

5    anything, Your Honor.  I can say that we have told them time

6    and time again, and I'll continue the representation, which is

7    whatever documents we have with respect to the value of

8    collateral we've either produced already, are either in PREPA's

9    own possession or in the documents they've produced to us, or

10   are part of expert reports.

11             THE COURT:  Well, if you've produced them already in a

12   mass of documents, I think you need to identify them as to

13   which ones you believe reflect the value of collateral.

14   Because what they're saying is you've produced none.

15             MR. NATBONY:  Well, again, Your Honor --

16             THE COURT:  I don't know.

17             MR. NATBONY:  Again, we've produced schedules, we've

18   produced a lot of documents that they've produced to us.  But I

19   can tell Your Honor and we've represented to them and will

20   continue to represent that there's nothing else to produce,

21   period.

22             So you've got a motion that by their own admission

23   says what we're seeking here today are loss reserves, and

24   you've got an admission that loss reserves, they don't know why

25   they're asking for them.  You also have three declarations that

1    say, okay, they're not related, it's not a valuation of

2    collateral, has no valuations of collateral in them.  That's

3    the motion that's before Your Honor.

4          THE COURT:  Well, the reason that they say they've

5    brought it up is that you brought it up, that you're the ones

6    that said, All right, we don't have anything but loss reserve

7    documents, information, that could be he responsive, and we're

8    not giving you that.

9          MR. NATBONY:  Well, we never told them that loss

10   reserve documents would be responsive.  And just to correct the

11   record, you know, what happened here is they said to us, We're

12   not looking for loss reserve documents, we're not looking for

13   your loss reserve documents, we don't want them, we don't want

14   opinions of counsel, we don't want any mental impressions of

15   what your counsel are advising you.  And then when they looked

16   at the production and they said, Okay, I don't really see

17   anything that I like or that I want, so now let's go after loss

18   reserves.  So that's kind of what's happened.

19          So, you know, I think the answer of we brought it up,

20   I'm not sure that's really the accurate record.  But again, I

21   will say everything that we've produced, you know, I mean,

22   everything that we have with respect to the issues they've

23   asked for, we have given them.  There's nothing left to give.

24          THE COURT:  All right.  Then the other question that

25   they raise was if you are required by law to set a loss reserve

1    that is your exposure less your collateral or that indicates

2    that collateral is a relevant factor, how do you file loss

3    reserve information without having the collateral?

4         MR. NATBONY:  Thank you for your question, Your Honor.

5         THE COURT:  I never know if that's a good statement or

6    a bad statement.

7         MR. NATBONY:  It's a fine statement.  I have a

8    response for you, Your Honor, and I have I think three points

9    to make.

10        First, what we provided to the insurers and what

11   they've attached as exhibits are aggregate reserves, not the

12   PREPA-specific reserves that you're talking about.  And the

13   declarations that you have before Your Honor talk about the

14   PREPA-specific reserves which are at issue here and how they

15   are calculated.  And in any event, they cite to I guess

16   insurance law 6903(b)(1), and under that law, there's a

17   specific definition of collateral.

18        And collateral, for the purposes of that provision, as

19   I understand it -- and Your Honor, they just put this in their

20   reply papers which we received on Friday, so this is my first

21   opportunity to respond to that.  But our understanding is when

22   you look at section 6901(g), that defines collateral, it

23   doesn't include bond collateral.  It includes specific things

24   like cash letters of credit and certain investments.  So it's

25   not to include things like rate covenants and pledges of

1    revenues.

2          But in any event, the bottom line is the loss reserves

3    were calculated the way they were calculated.  And the

4    declarations that are before Your Honor remain unchallenged as

5    to that process.

6          THE COURT:  Okay.

7          MR. NATBONY:  Thank you, Your Honor.  I'll reserve on

8    the privilege issues for a more appropriate time.

9          THE COURT:  Thank you.  Before you go, more

10   representation from the movants.

11         MR. BEREZIN:  Thank you, Your Honor.  Again, Robert

12   Berezin on behalf of National.

13         I just wanted to, on the relevance point, drive one

14   thing home because Your Honor's first question to the Oversight

15   Board's counsel was right on target, which was, what is the

16   relevance of the loss reserves to collateral value.  And

17   counsel went on to explain exactly the way it's explained in

18   their papers, that the Oversight Board views collateral as

19   being exactly the net revenues that exist just before and then

20   on the petition date, and then you need to show a diminution of

21   that value to this date.  And that is their view of collateral.

22         Okay.  So when we say the word "collateral," I just

23   want to be clear that that's what the Oversight Board is

24   talking about.  And the question is are the loss reserves

25   relevant to that definition of collateral.  That's what we're

1    here for.  And the declarations are very specific that loss

2    reserves do not cover a finite period of time, meaning the

3    before, on the petition date to this point.  They cover the

4    entire life of the bonds.  So interest and principal due over

5    the entire life of the bonds.  For National, the end point is

6    2035.

7         So you take this huge number of all the insured bonds

8    over their life, how much does PREPA owe over that whole

9    period, interest and principal.  And then we go through the

10   process of deciding what do we think is going to happen in the

11   Title III in the negotiations with the Oversight Board.  Do we

12   think we're going to have the deal that's been made public with

13   the ad hoc bondholder group.  Okay, that's a factor.  Do we

14   think -- how are we going to do before Judge Swain in the First

15   Circuit and Supreme Court if it ever comes to that.  What do we

16   think?  And we come up with it.

17        What they will never is see or derive in any way,

18   shape or form from our loss reserves is how much did PREPA have

19   in its bank accounts at a particular point in time because

20   that's not what loss reserves are.  And there's only one set of

21   declarations before this court.  They are sworn-to declarations

22   by officers of these companies.  They're detailed and specific.

23   That ends the inquiry.

24        These loss reserves are irrelevant.  And the harm and

25   undue burden under proportionality is obvious.  It will disrupt

 1    and undermine the mediation process that has been established

 2    by this court.  It will undermine the litigation process by

 3    giving unfair insight to the Oversight Board's lawyers exactly

 4    in the manner that the work product doctrine forbids.  It is

 5    period, end of sentence, over before you ever get to privilege

 6    on that basis.

 7         THE COURT:  The only question that I have is, even if

 8    you don't accept the Oversight Board's definition of

 9    collateral, do you have a definition of collateral that is

10    reflected in the loss reserves?  Do you know what I mean?

11         MR. BEREZIN:  Yes, yes, Your Honor.  And the answer is

12    no.  Because in our view, as we've articulated in the expert

13    reports and in our papers, we refer to something under PROMESA

14    that referred to the special revenue provisions of PROMESA.

15    And we believe that PREPA's -- the lien that PREPA granted in

16    its revenues constitutes special revenues, and we believe that

17    special revenues are special.  They're different.  Congress

18    protected them specifically.

19         So unlike, as counsel has referred to, the tests that

20    I think dicta, the First Circuit referred to, those are the

21    traditional non-special revenue liens.  For example, I'm a

22    creditor.  There's a debtor.  I have a lien on their building,

23    their apartment building or something.  And the question is,

24    well, how much is that lien worth on the petition date, how

25    much is in the bank accounts if that's what's secured, and then

1    has it been diminished in value through mismanagement of the

2    apartment building.

3            Very different animal when you're talking about

4    special revenues because outside of special revenues, a secured

5    creditor's lien is established.  The value of that lien is

6    established as of the date of the filing of the bankruptcy.

7    Now, you can come back and maybe modify that value on the time

8    of a plan of adjustment, but special revenue goes on ad

9    infinitum.  It's a totally different animal.  So we have a

10   totally different view of collateral.  Loss reserves don't

11   relate to them either.  We're taking the total amount owed and

12   then we're applying litigation and settlement calculus to

13   figure out what the reserve amount should be.

14           THE COURT:  Anybody else on this side of the room?

15           MR. WORENKLEIN:  No.  We're relying on Assured's and

16   National's arguments.

17           MS. DALE:  Well, we just think that it's pretty

18   unbelievable that sophisticated insurers like this are telling

19   us that they haven't valued the collateral themselves, but they

20   certainly have said that in open court and in these

21   declarations, and that is where this record will be.

22           I just wanted to raise the issue that counsel raised.

23   We originally weren't looking for loss reserve information

24   because, as I told you at the beginning, they said they would

25   give us collateral valuation documents in response to document

1    request number 1.  And then when we didn't have anything, we

2    continued to press on that, and we said, Will you look for

3    collateral valuation documents that -- sorry -- that relate or

4    reflect actuarial accounting or other aggregate estimates of

5    likely payouts.  This was during the meet and confer process.

6    And they said, yeah, yeah, we'll go search for them.  We said,

7    okay, go search for those and we'll pull back on the loss

8    reserve information.  And then they came back and said, well,

9    there's nothing non-privileged.  There's no non-privileged

10   actuarial accounting or other aggregate estimates of their

11   likely payouts on the PREPA bonds.  So we came back to the loss

12   reserves for that reason because we had thought maybe we could

13   make some kind of deal.

14        The other tissue I would raise, Your Honor, is in the

15   National declarant, Mr. Bergonzi's declaration at paragraph 21,

16   I'm not going to read it because again this was redacted, but,

17   Your Honor, I think you should take a look at Mr. Bergonzi's

18   declaration in paragraph 21, in particular what has been

19   redacted, because it seems to indicate that the information

20   that at least National provides to the New York State

21   Department of Financial Services does not include some of the

22   privileged information that might be going into these scenarios

23   and other ways that they develop this information.  That's not

24   then --

25        THE COURT:  That's why I asked you what the number

1    would --

2          MS. DALE:  Help.  But I think a number would help us.

3    It might give us some indication of where their -- they just

4    told us that they think this is special revenue bonds and they

5    have now some kind of lien, you know, into the future.  Okay,

6    that's new information.  And so what -- you know, how are they

7    valuing their liens into the future.  I mean --

8          THE COURT:  I don't think that's new information.

9          MS. DALE:  Well, understood, Your Honor.  Their

10   argument has always been that they have the collateral -- the

11   covenant package is part of their collateral.  I didn't mean to

12   suggest that that was like --

13         THE COURT:  They have also said that it extends

14   through time, the amount continues.  It's not set as of the

15   date of the filing.  And I think, as counsel has just explained

16   it, the loss reserves are in a generic way everything we could

17   possibly owe, less, assuming that nothing is paid by PREPA and

18   then how much can we get out of PREPA due to settlement options

19   or fiscal plan options or whatever options they are, but

20   they're not based on a fixed amount.

21         MS. DALE:  Understood.  But generally loss reserve

22   information over time would be reflective of whether the entity

23   thought they were over-collateralized or under-collateralized,

24   and you can see changes in loss reserves as having an impact on

25   collateral.

1          THE COURT:  My guess is if PREPA was paying something

2    over the time that that would be a valid argument, but given as

3    of now they're not paying anything, I can't imagine that that's

4    a factor that's changed other than settlement.  I mean, that

5    makes sense to me, I guess is what I'm saying.  When they

6    explain how they've set the loss reserves, it makes sense to me

7    in the context of where we are, the Title III, the insurance

8    world, whatever.  And I haven't seen anything from your side

9    that says this is a ridiculous way to do loss reserves.  You

10   know, I don't see it, and it sort of makes sense to me.

11          But I do hear you that says, Well, they should be

12   limited in this world then.  You know, we've asked for this six

13   ways to Sunday.  When it comes to the motion, we shouldn't be

14   hit with a different calculation that we haven't seen in some

15   form, right?

16          MS. DALE:  Thank you.

17          THE COURT:  I'll hear you on the privilege.

18          MS. DALE:  Yes, thank you.

19          MS. STAFFORD:  Good afternoon, Your Honor.  Laura

20   Stafford, and I'll be addressing the privilege and work product

21   issues, including the privilege waiver.

22          I'll address three points.  First, that the loss

23   reserve documents that are at issue here are not privileged;

24   second, that even if they were privileged, any privilege

25   attached to them would have been waived; and third, that even

1  if privilege has not been waived, under the circumstances the

2  privilege must bend to the Oversight Board's need for these

3  documents.

4       And three privileges have been asserted here.  I'll

5  start with the bank examiner privilege, and I'll address it

6  just briefly because it doesn't apply, frankly, to the vast

7  majority of documents that are at issue.  To date, the New York

8  Department of Financial Services has decided not to assert that

9  privilege, which means there's no viable claim that either

10  National or Syncora's documents are subject to that privilege,

11  and any documents that Assured submitted to New York but did

12  not submit to Maryland would likewise not be protected by the

13  privilege.

14       Maryland's assertion also does not bind the court, and

15  the court owes no deference to that determination.  So if the

16  court chooses, you may override the Maryland assertion of

17  privilege over any documents belonging to Assured which were

18  submitted to Maryland.

19       Moving on to the attorney-client privilege, Your

20  Honor, the insurers' own declarants admit that these loss

21  reserve calculations serve primarily a business purpose, are

22  required by law and have nothing to do with litigation or any

23  threat of litigation.  The insurers themselves acknowledge

24  they're required to create these documents for submission to

25  their regulators and for the creation of the insurers' own

1    balance sheets.  As you saw in Appendix A to our motion, they

2    are a regulatory requirement that the insurers have been

3    obligated to prepare since well before the Title III case.  And

4    just because an attorney was involved in preparing them doesn't

5    mean that a document prepared otherwise in the ordinary course

6    of business is now a privileged document.

7         Furthermore, the insurer's submissions don't

8    demonstrate that the documents submitted by the insurers to

9    their regulators actually reveal anything about the substance

10   of counsel's opinions or advice or reveal anything about the

11   actual back and forth discussions with counsel, including

12   counsel's own analyses.

13        And that's the point that my colleague was raising a

14   few moments ago with respect to the declaration that National

15   has admitted.  It doesn't appear that certain information that

16   National might argue is privileged was ever actually submitted

17   to the regulators at all.  In any event, I think you mentioned

18   a couple of times that these appear to be numbers, and whether

19   or not we think there's any probative value to those numbers,

20   it's difficult for us to understand how a number could possibly

21   disclose privilege.

22        THE COURT:  I'm assuming you want more than the

23   numbers if you could get it.

24        MS. STAFFORD:  Of course, but we don't frankly

25   understand what these documents are and what they look like.

1    And if they are simply numbers, then we certainly don't

2    understand how they're privileged.  If they're numbers and

3    calculations, we're not sure we understand how those could be

4    privileged either.  But depending on what they are and what

5    they look like, that may be something that Your Honor may need

6    to look at in camera.  We don't understand how, based on what

7    they've described them to us as or what we understand them to

8    be could possibly be privileged on their face.

9         THE COURT:  Well, would you agree -- assume with me

10   that it's a description that says, We think that the Title III

11   will last X number of years based on advice of counsel, and we

12   have the following four claims against PREPA, and as a result

13   of which, we will recover X, Y and Z over the next 20 years.

14   Let's assume that's what it looks like.  How does that fit in

15   with your argument on attorney-client?

16        MS. STAFFORD:  Well, we still think these are prepared

17   primarily for business purposes, and therefore simply because

18   they include these discussions that doesn't convert them

19   magically into privileged documents.

20        To the extent that there are actual -- and I think

21   that's something that would be need to looked at in camera,

22   whether there's any material in there that would potentially

23   include any privileged material, but we do think that because

24   these are business documents basically don't reflect that type

25   of attorney-client privilege information.

1           I'll move on to the work product doctrine.  That,

2      again, the declarants concede that these business documents are

3      required for regulatory purposes and are prepared as part of

4      standard business functions.  And they can't establish that

5      these business-oriented documents are required -- which they

6      are required to prepare for regulatory purposes were prepared

7      in anticipation of or because of litigation.

8           And that gets us to the First Circuit's test for work

9      product doctrine, which has been laid out in Textron, as we

10     mentioned in our papers.  In order for the work product

11     doctrine to attach, a document must be prepared because of

12     litigation.  It can't be a document that serves primarily a

13     business function.  And these documents are simply not prepared

14     for any sort of litigation purpose.  They're prepared for a

15     regulatory purpose, as we discussed.  And frankly, they would

16     be required, if there had been no Title III filing, if there

17     had been no automatic stay, they would still be obligated to

18     create these same loss reserve documents that we seek.

19          THE COURT:  Do you think the standard under the First

20     Circuit is different than other places?  Do you think Textron

21     is different?

22          MS. STAFFORD:  I do think it's different than some of

23     the other cases they cited in their brief that found that those

24     loss reserves may be work product protected, and I think in the

25     First Circuit where this because-of test is required, the

1  documents that are created for the purpose of litigation can

2  have a work product protection, but documents that are prepared

3  to serve a business function, such as the tax reserves that

4  were at issue in Textron, are very similar to the documents

5  that are at issue here, where these documents are being

6  prepared for the purpose of a business function, for the

7  purpose of meeting a regulatory requirement, setting aside

8  money that will be disclosed on balance sheets to investors as

9  well.

10      So moving on to the issue of waivers, as the second

11  issue I was planning to discuss.  Notwithstanding any of these

12  issues as to whether or not a privilege applies, the insurers

13  waived any privilege they might have over these documents by

14  sharing their loss reserve materials with third parties, here,

15  the regulators.

16      With respect to the attorney-client privilege, it's of

17  course black letter law that privilege waiver occurs when a

18  privileged communication or document is disclosed to a third

19  party.  Disclosure of these alleged privileged materials is

20  totally inconsistent with maintenance of attorney-client

21  confidentiality.  And I think this goes back to the question

22  you were asking earlier about whether or not, if we assume that

23  these materials include some sort of analysis of the outcome of

24  Title III litigation, how many months or years it may last,

25  even if that did include some amount of privileged material, by

1    disclosing it to their regulators that privilege was waived.

2         And the same goes for the work product doctrine,

3    which, disclosure of these loss reserves to the regulators also

4    waives their privilege.  Work product protection is waived if

5    disclosure substantially increases an opportunity for a

6    potential adversary to obtain information.  And that's exactly

7    what happened here.

8         These materials, by being disclosed to the regulators,

9    are exposed to a number of potential adversaries, at least the

10   insurance regulators themselves are potential adversaries,

11   particularly the case with respect to the New York regulator

12   who has apparently declined to assert the bank examination

13   privilege.

14        And second, documents held by the New York Department

15   of Financial Services are subject to the New York Public

16   Officers Law's general policy that public documents shall be

17   available for public inspection and copying.

18        THE COURT:  Well, they argue that they would fall

19   within an exception.

20        MS. STAFFORD:  They argue that they would, but there's

21   no evidence to indicate that they actually would -- that if a

22   public record request was filed, that they would actually be

23   entitled to that protection.  They don't make out an argument

24   anywhere in their papers that these are trade secret documents

25   that would be protected from disclosure.

1          So I'll move on to my final point, which is that even

2     if Your Honor decides that these documents are privileged and

3     that the privilege was not waived, the work product protection

4     should be overcome.  And this really takes us back to the

5     issues that we were talking about earlier.

6          This is -- the insurer's calculation of collateral

7     value is really in our view key to the lift-stay motion.  And

8     according to the insurers, the only documents in existence that

9     they have that address how they value their collateral are the

10    loss reserve calculation documents.  If they don't have

11    anything but these loss reserve documents and they won't

12    produce them, in our view that in and of itself is a basis to

13    deny the motion.

14         So in our view, we have a compelling need for this

15    information simply because we have no other way of

16    understanding how they are valuing their collateral.  We are

17    entitled to have some understanding of what they're doing to

18    value that collateral.

19         So the only alternative in our view is that if these

20    are the only documents they have and they won't let us have

21    access to them, then we think the proper course, Your Honor,

22    would be to preclude them from attempting to proffer evidence

23    of the value of their collateral on the petition date and

24    seeking to justify lifting the stay.  Unless you have any

25    further questions --

1          THE COURT:  Thank you.  Not yet.  Mr. Despins, do you

2     want to be heard on privilege?

3          MR. DESPINS:  Not on this issue, Your Honor.  Thank

4     you.

5          MR. NATBONY:  Thank you, Your Honor.

6          So Mr. Berezin will handle attorney-client privilege.

7     I'm going to handle, if it's all right with Your Honor, work

8     product and the bank examiner privilege and the waiver on work

9     product.

10         So again, it's unchallenged here that the loss reserve

11    information is directly tied to and the result of input from

12    in-house and outside attorneys concerning litigation risk and

13    settlement possibilities.  The fact that PREPA-related reserves

14    may also serve a business purpose is really of no consequence

15    because as the cases have recognized, including Textron and at

16    least three other cases in the district of Puerto Rico since

17    Textron, the Westernbank case, the Mullins case, and W. Holding

18    case, each of those talks about documents having the ability to

19    have dual purposes.

20         And in fact, when you're talking about loss reserves,

21    when you suddenly come into a process where there is

22    anticipated litigation or actual litigation, and this has been

23    going on at least since 2014 when there was anticipated

24    litigation over PREPA's looming defaults and repudiation of its

25    payment obligations, but certainly since 2017, which is when

1    they're asking for these documents, there has been anticipated

2    litigation, you know, so that the reserves themselves, when

3    they are calculated even by reference to the litigations, must

4    be being prepared in anticipation of litigation.

5            So when you're talking about 10 percent, 15 percent of

6    success probability, when you're talking about what is the

7    percentage possibility of RSA being moved forward, what is the

8    possibility of settlement negotiations and settlement ranges,

9    so I think if you look, Your Honor, at the Schreib case in

10   particular, and that's cited at page 20 of our brief, that is

11   consistent with Textron and Westernbank and all the other cases

12   that say, even if you've got a document that let's say serves a

13   business purpose, when you've got that litigation or that

14   anticipated litigation that comes your way, the purpose of the

15   document essentially changes.  And when you look at -- you

16   know, when you're talking about loss reserves that are actually

17   referring to the litigations, you know, that in our view means

18   that it's not the same document in essentially the same form

19   that it was before because it now, by necessity, has to account

20   for the changed circumstances.

21           THE COURT:  Textron dealt with handing the IRS the

22   blueprint for how to sue them, right?

23           MR. NATBONY:  Except -- I'm sorry, Your Honor.  Go

24   ahead.

25           THE COURT:  No.  So distinguish this from Textron.

```
1              MR. NATBONY:  When you read Textron, it's very clear

2    that the court found that there was no evidence of litigation

3    purpose within the documents, and there was no actual or

4    threatened litigation at the time.  That's very different than

5    what you have here.

6              Here you've got a situation where you have clearly

7    anticipated litigation because of PREPA not meeting its

8    obligations.  And then of course since 2017 and since the Title

9    III, you have actual litigation.  So that I think is the

10   difference.  And even Textron admits that there can be

11   instances when you have dual purposes.  But they didn't find it

12   there.  They didn't find it.  They clearly found a lack of

13   evidence and no evidence.  You certainly have no evidence --

14   you certainly don't have no evidence here.

15             So if I may turn to waiver, Your Honor, at least as to

16   work product, the First Circuit is pretty clear in Blattman,

17   and I don't think there's any dispute as to the standard.  My

18   colleague talked about work product protection being waived

19   only when disclosure substantially increases the opportunity

20   for potential adversaries to obtain the information.  We agree

21   with that standard.

22             But here, the information wasn't provided to an

23   adversary as part of any adversary proceeding or with any

24   anticipation that the regulators would disclose such

25   information to any third parties.  In fact, it was the
```

1    opposite.  Instead, confidentiality was ensured by law.

2          Now, they don't talk about the Maryland statute, but

3    of course the Maryland statute on its face is crystal clear.

4    No subpoena, no FOIA, nothing, that the documents that are

5    there are going to be preserved in confidence.  And in New

6    York, we've obviously put before Your Honor the trade secret

7    exception.  But one thing they haven't addressed, the other

8    side, is section 1504(c) of the insurance law, which was in all

9    three declarations before Your Honor, ignored by them in their

10   brief, in their reply brief.  But that basically prohibits

11   disclosure by the New York Department of Financial Services of

12   reports without prior written consent of the regulated insurer.

13   And there are exceptions for public policy, but the regulators

14   have never, you know, in the pattern exercised that

15   prerogative.

16         So when you talk about the Maryland statute, which is

17   2-209 for Assured, when you talk about the trade secret

18   exception in New York and section 1504(c) of the insurance law,

19   you know, these prevent disclosure by the regulatory agencies.

20   Plus, the insurers here have also expressly and affirmatively

21   preserved confidentiality in a number of ways.  When they

22   provide the documents, as the declarations indicate, they will

23   put legends on it and things like that about the

24   confidentiality.  And also there's an expected confidentiality

25   that each of the insurers has attested to based on the pattern

1    of dealing with the regulators over time.

2         So here, there is no evidence that the insurers

3    anticipated, expected or affirmatively anticipated any

4    disclosure by the regulators and, in fact, reasonably and based

5    on the law of the states, had an appropriate belief that there

6    would be no disclosure.

7         THE COURT:  Do you distinguish between the actual

8    numbers and the analysis?  I'm envisioning that what you do is

9    you submit to the regulator some explanatory material, and it

10   varies among the different insurers.  But does your argument on

11   work product distinguish between the actual number and an

12   explanation?

13        MR. NATBONY:  It does not.  It applies to both the

14   number and to any explanatory materials, for a specific reason.

15   And as Mr. Berezin said, when you look at what we're talking

16   about for loss reserves, that is, right, taking a number that

17   says, okay, this is the potential payment stream, and we're

18   going to, let's say the payment stream is a billion dollars,

19   all right?  And the reserve is 500 million.  Well, what does

20   that tell you?  They know what the potential amount is of the

21   liability.  They have the insurance policies.  They have the

22   schedule of payments.  So all of a sudden they don't -- it's

23   not as if the number doesn't tell them anything.  It does.  All

24   of a sudden they've got a number of 50 percent there.  So that

25   tells them, okay, well, their mindset is at 50 percent.  So

1    they're still able to peer into the thoughts of why is it 50

2    percent and not 60 percent?  Why is it 50 percent and not 40

3    percent?  So no, I don't make a distinction between the two.

4            Lastly, Your Honor, just on the bank examiner

5    privilege, at least with respect to Assured and Maryland, they

6    don't spend much time on that and I think rightly so.  Maryland

7    has clearly done so, clearly asserted the privilege.

8            THE COURT:  Do you agree, though, that it's the

9    examiner's privilege?

10            MR. NATBONY:  That is what the law says, Your Honor.

11            THE COURT:  And New York has not asserted it.

12            MR. NATBONY:  They have chosen not to become involved

13    in this proceeding.

14            THE COURT:  I understand that's what they do.

15            MR. NATBONY:  I would -- I would hesitate to say that

16    they -- you know, they have affirmatively said they are not

17    asserting any privilege, because I think that's different, but

18    they have chosen not to become involved in this proceeding at

19    this time.  Different than Maryland.  And of course the reason

20    for the bank examiner privilege is so that insurers can be

21    encouraged to engage in a free and candid exchange of

22    information.  That should not be disturbed here, Your Honor.

23            THE COURT:  All right.  But you can't assert that on

24    behalf of New York?

25            MR. NATBONY:  No, Your Honor, I cannot.

1           THE COURT:  Thank you.

2           MR. NATBONY:  Thank you, Your Honor.

3           MR. BEREZIN:  Thank you, Your Honor.  Robert Berezin

4    again for National Public Finance Guarantee.

5           I'm just going to briefly cover internal documents.

6    We haven't talked about that that much.  And it's never really

7    been clear to me whether the Oversight Board is seeking

8    internal documents or just the documents that were disclosed,

9    but I thought it was worth mentioning just in case they are.

10   Every argument we've made so far today about why the

11   external -- what I'll call external reserve documents shouldn't

12   be produced apply equally as to the internal documents, and

13   that goes to the waiver issue.

14          So for attorney-client privilege, to the extent that

15   there are -- not every single document, internal reserve

16   document is covered by the attorney-client privilege, but for

17   those that reflect communications from counsel, those would be

18   privileged, attorney-client privileged.  There's no exception

19   to the attorney-client privilege.  There's no weighing of it.

20   It's absolute.

21          THE COURT:  Let me just understand the record, though.

22   You are not claiming the privilege on internal documents

23   reflecting the value of collateral?

24          MR. BEREZIN:  No, no, Your Honor.  I'm talking about

25   loss reserves.

```
 1              THE COURT:  So this argument goes to the loss reserve.

 2              MR. BEREZIN:  I'm sorry, Your Honor.  Absolutely.

 3    Loss reserves.  We do not have documents reflecting the value

 4    of the revenues.  I'm talking about the internal documents.

 5    No.  This relates to loss reserve documents.

 6              THE COURT:  And you're not claiming privilege on any

 7    such documents that reflect the collateral?  You're not

 8    withholding documents?

 9              MR. BEREZIN:  Absolutely not, Your Honor.  To the

10    extent that we have documents that reflect the value of

11    collateral, those documents would have been produced.  I think

12    the issue here is that they would like to see the amounts that

13    existed as of the petition date, how much revenue is in there.

14    And we don't have those documents.  Certainly it makes sense

15    that we wouldn't be permitted to suddenly spring on them

16    documents from our files showing amounts of net revenue or

17    revenue that PREPA had on the petition date.  We don't have

18    those documents or we would have produced them.  Or we do have

19    them, they provided them to us, and they're part of the agreed

20    record.

21              So it's as far as our own internal documents, we do

22    not have them.  We did not create documents showing PREPA's

23    revenue or net revenue on a certain particular date.  And if we

24    did, we would have produced them.

25              So back to the attorney-client privilege or internal
```

1    documents, those documents are privileged, and they should

2    remain attorney-client privileged.  There's no question about

3    that.  As far as waiver -- the same arguments apply on the work

4    product that counsel made, again, putting aside work product,

5    proportionality, it's just a no-brainer that these kinds of

6    documents, internal documents that reflect loss reserves should

7    not be subject to production.

8            The one thing special on the work product side, and I

9    guess the attorney-client side, is that they weren't -- these

10   are internal documents.  They by definition weren't disclosed

11   to anyone.  So there's really no argument at all for waiver.

12   The one argument you see or hear I think a little today and in

13   their papers is sort of an at-issue waiver argument.  And that

14   is sort of sprinkled in there.  And I think the argument goes

15   something like, Well, you've brought this motion to lift the

16   stay.  We believe that such a motion would be denied on its

17   face if you can't show a dollar value in bank accounts.  You're

18   not producing those documents, and therefore you -- and you may

19   have some documents that don't relate to that but relate to

20   loss reserves.  That's an at-issue waiver.  You put those

21   documents at issue.

22           Clearly we have never put our loss reserves at issue.

23   We've never cited them.  We've never discussed them.  We've

24   never referenced them, and we never will.  So they were not put

25   at issue.

1    And as far as the subject matter waiver, there's no

2   shield/sword disclosure going on here.  Again, because we

3   haven't put loss reserves at issue, they do not have anything

4   to do with collateral the way they view it or the way we view

5   it, and therefore there's no at-issue waiver or any other type

6   of waiver.

7    THE COURT:  Are you claiming attorney-client for the

8   documents that were produced to the regulators, as opposed to

9   work product?

10    MR. BEREZIN:  I don't believe so, Your Honor.  I

11   believe work product.

12    THE COURT:  I was having a hard time on that one.

13    MR. BEREZIN:  That's work product, Your Honor.

14    THE COURT:  He's passing you notes.  Do you want to

15   read them?

16    MR. NATBONY:  Thank you for your help, Your Honor.

17    MR. BEREZIN:  I will state for the record that

18   counsel --

19    THE COURT:  Hope you write clearly.

20    So let me tell you where I am.  I think the privilege

21   issues are quite difficult here, actually.  And I don't have an

22   easy answer to them.  I don't think -- I think as the record

23   now stands that there's no evidence that any documents have

24   been withheld that relate to the value of collateral.  I think

25   that the movants have established that the loss reserves do not

1    reflect in any way the value of collateral.  So I'm going to

2    duck the other issues because I don't think I need to reach

3    them.

4         But that having been said, we should make sure that

5    the record is clear so that you don't get to the motion stage

6    and there are documents that people are fighting about.  So

7    does it make sense -- and this is a dialogue, all right -- does

8    it make sense to enter an order that says:  One, if it hasn't

9    been produced, you can't use it in connection with the pending

10   motions.  And I think that's sort of a given.  If it hasn't

11   been identified or produced without good cause, you can't use

12   them in connection with the motion; and two, does it make sense

13   to say to the movants you have to -- to the extent that you are

14   depending on any documents, internal documents to establish the

15   collateral value, you identify them, even if you've produced

16   them already.

17        I'm not asking you to go through and say which of the

18   PREPA documents, but if your documents are relevant to

19   establishing collateral value, I think they ought to be

20   identified somewhere along the line here and not be just buried

21   in a stack of documents.

22        So let me ask PREPA.  Does that help narrow or at

23   least define the record, Mr. Despins?

24        MR. DESPINS:  Briefly, Your Honor.  I just want to say

25   that the Committee's view on this is as follows:  Of course

1    they won't use the documents they don't want to produce because

2    they don't want to produce them because they're bad.  If you

3    believe them, they are relevant.  But it's very important to

4    understand, there's been no probing of this.  They give us

5    declarations.  How -- is there a deposition of these

6    declarations?  No, there's no deposition.  So we're taking the

7    declaration as face value.  And based on that, we're excluding

8    all those documents.  So to us, the remedy of saying they won't

9    be able to use those documents is not really the right remedy.

10        THE COURT:  You haven't challenged the veracity of

11   these in any way.

12        MR. DESPINS:  How could we, Your Honor?  Because we

13   don't have the loss reserves -- they're talking about a

14   document we don't have.  There's no --

15        THE COURT:  So nowhere in these papers do you request

16   a deposition.  Is that what you're asking for?

17        MR. DESPINS:  As far as the Committee is concerned, we

18   didn't see the unredacted version of these declarations until

19   last night because we've been asking for them for a while now

20   and they refused to produce them to us until last night, so

21   that's why we couldn't ask for anything.  But it is bizarre to

22   say that no evidence has been produced.  How can we produce it?

23   We don't know what the documents say.  There's no ability to

24   question --

25        THE COURT:  I'm sorry.  You don't have the unredacted

```
 1   declarations?

 2             MR. DESPINS:  They had them.

 3             THE COURT:  They do.

 4             MS. DALE:  We do.

 5             MS. DESPINS:  But we didn't.

 6             THE COURT:  Well, you didn't read them until last

 7   night anyway.

 8             MR. DESPINS:  That's because they were not provided to

 9   us until last night, Judge.

10             THE COURT:  I will say if PREPA had them --

11             MR. DESPINS:  Okay.  But I just -- to have the remedy

12   that those documents will not be used by them is really not --

13             THE COURT:  I hear you.

14             MR. NATBONY:  Might I make the following suggestion,

15   Your Honor?  That the parties take Your Honor's comments and

16   try to negotiate an order to present to Your Honor.  And if we

17   can't, then we'll --

18             THE COURT:  Does that help or hurt?

19             MS. DALE:  I'm happy to try to do that, Your Honor.

20             THE COURT:  Okay.  And let me ask you this -- and do

21   you need a detailed written order on this?  If you need me to

22   write something complicated because you plan on appealing it,

23   let me know.  Otherwise, I'm just going to stick on the

24   record --

25             MS. DALE:  We will let you know.  We will let you know
```

```
 1   very quickly if we need something more.  And can we just have a

 2   timeline in which we'll try to do this and get back to the

 3   court?  Because we have depositions actually starting soon.  So

 4   can we do that by the end of the week, or Monday?

 5            MR. NATBONY:  Yes.

 6            MS. DALE:  End of the week, Your Honor?

 7            THE COURT:  That would be fine.

 8            MR. NATBONY:  And I'm presuming we'll be able to work

 9   something out.  If not, we'll let Your Honor know and submit --

10            THE COURT:  If not, submit your separate versions, and

11   I'll do something.

12            MR. NATBONY:  Thank you, Your Honor, very much.

13            THE COURT:  Okay.  Is there anything further?

14            MS. DALE:  Not for me, Your Honor.

15            THE COURT:  Safe travels, everyone.

16            MR. NATBONY:  Thank you, Your Honor.

17            (Adjourned, 3:22 p.m.)

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter to the best of my skill and ability.

9                    Dated this 27th day of February, 2019.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25