# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of

THE COMMONWEALTH OF PUERTO RICO *et al.,*

        Debtors.[1]

:   PROMESA
:   Title III
:
:   Case No. 17-BK-3283 (LTS)
:
:   (Jointly Administered)
:

----------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO,

        Debtor.

:   PROMESA
:   Title III
:
:   Case No. 17-BK-3566 (LTS)
:
:   **This filing relates only to Debtor**
:   **ERS and shall be filed in the lead**
:   **Case No. 17-BK-3283 (LTS) and**
:   **Case No. 17-BK-3566 (LTS)**
:

----------------------------------------------------------------------- x

## OMNIBUS OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CLAIMS ASSERTED BY HOLDERS OF BONDS ISSUED BY EMPLOYEES RETIREMENT SYSTEM OF GOVERNMENT OF PUERTO RICO

---

[1]   The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ..................................................................................................................2

I.      ERS AND ISSUANCE OF ERS BONDS.................................................................2

II.     ERS TITLE III CASE AND RELATED ADVERSARY PROCEEDINGS.....................6

JURISDICTION AND STATUTORY PREDICATE...................................................................8

RELIEF REQUESTED .........................................................................................................8

BASIS FOR RELIEF ...........................................................................................................8

I.      ERS BONDS ARE NULL AND VOID BECAUSE THEY WERE ISSUED
*ULTRA VIRES* ...................................................................................................8

      A.     Bonding Authority Of A Government Entity Must Be Expressly
Granted By Statute ..........................................................................9

      B.     Public Bond Offering Is Not A "Direct Placement of Debts".................12

      C.     Puerto Rico Legislative Assembly Knows How To Grant Bonding
Authority To A Government Entity......................................................14

      D.     Amendments To ERS Enabling Act Do Not "Confirm" That ERS
Bonds Were Authorized ....................................................................15

      E.     Unauthorized $3 Billion Public Bond Offerings Are Not A
"Harmless Irregularity" ....................................................................18

      F.     Bondholders Have No Unjust Enrichment Remedy................................20

II.     ERS BONDS CANNOT BE VALIDATED UNDER UCC 8-202 ..................................22

      A.     UCC 8-202 Is Inapplicable To Assertions Of Invalidity By The
Committee ......................................................................................23

      B.     Bondholders Were On Notice Of Invalidity...........................................25

NOTICE ..........................................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banco de La Republica de Colombia v. Bank of New York Mellon*,
  No. 10 Civ. 536 (AKH), 2013 WL 3871419 (S.D.N.Y. July 26, 2013) .................................24

*In re Blondheim Real Estate, Inc.*,
  91 B.R. 639 (Bankr. D.N.H. 1988) ...........................................................................................22

*Boyce v. Soundview Tech. Grp.*,
  464 F.3d 376 (2d Cir. 2006) .....................................................................................................12

*City of Brenham v. German-American Bank*,
  144 U.S. 173 (1892) .....................................................................................................10, 11, 17

*In re Fin. Oversight & Mgmt. Bd.*,
  297 F. Supp. 3d 261 (D.P.R. 2017) .............................................................................................8

*In re Fin. Oversight & Mgmt. Bd.*,
  590 B.R. 577 (D.P.R. 2018), *aff'd in part, vacated in part, rev'd in part*, No.
  18-1836, 2019 WL 364029 (1st Cir. Jan. 30, 2019) ...................................................................7

*Fullerton v. Cent. Lincoln People's Util. Dist.*,
  201 P.2d 524 (Or. 1948) ............................................................................................................11

*Hatton v. Mun. de Ponce*,
  134 D.P.R. 1001 (1994) .............................................................................................................21

*Merrill v. Town of Monticello*,
  138 U.S. 673 (1891) .............................................................................................................9, 10

*Moscato v. Technologies, Inc.*,
  No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2015) ....................................23

*Muscatine Lighting Co. v. Muscatine*,
  217 N.W. 468 (Iowa 1928) ........................................................................................................11

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
  14 P.R. Offic. Trans. 896 (1983) .........................................................................................20, 21

*In re PT-1 Commc's, Inc.*,
  304 B.R. 601 (Bankr. E.D.N.Y. 2004) ......................................................................................22

*In re Public Serv. Co. of N.H.*,
  129 B.R. 3 (Bankr. D.N.H. 1991) ..............................................................................................22

*Rathbone v. Bd. of Comm'rs,*
 73 F. 395 (D. Kan. 1896), *rev'd on other grounds*, 83 F. 125 (8th Cir. 1897)........................ 11

*Reed v. Cedar Rapids,*
 113 N.W. 773 (Iowa 1907) ............................................................................................. 11

*Rivera Torres v. Junta de Retiro Para Maestros,*
 502 F. Supp. 2d 242 (D.P.R. 2007) ................................................................................ 13

*Vázquez v. Morales,*
 114 P.R. Dec. 822 (1983) .............................................................................................. 18

*Zucht v. King,*
 260 U.S. 174 (1922) ........................................................................................................ 9

**Statutes**

Act of 1916, Ch. 448, 39 Stat. 726 ........................................................................................ 9

Act of Feb. 13, 1925, 43 Stat. 936 ........................................................................................ 9

Act 35-2007 ...................................................................................................................... 15

Act 46-1988 ........................................................................................................................ 3

Act 116-2011 .......................................................................................................... 1, 6, 15, 16

Act 46-1998 ...................................................................................................................... 15

Bankruptcy Code
 § 502 ............................................................................................................................... 8
 § 510(b) ................................................................................................................... 21, 22
 § 1109(b) ......................................................................................................................... 8

ERS Enabling Act ................................................................................................... *passim*

P.R. Civil Code, Art. 3, 31 L.P.R.A. § 3 .............................................................................. 18

P.R. LAWS ANN. 19
 § 451(25)-(26) ............................................................................................................... 25
 § 1751(a) ........................................................................................................................ 23

1995 P.R. LAWS 208, art. 8-201 ........................................................................................ 23

Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")
 § 301(a).............................................................................................................................. 8
 § 306(a).............................................................................................................................. 8
 § 307(a).............................................................................................................................. 8
 § 310 ................................................................................................................................. 8

U.C.C.
    § 1-202 ...................................................................................................... 25
    § 8-114 ...................................................................................................... 22
    § 8-202 ...........................................................................................22, 23, 25, 28

## Other Authorities

15 McQuillin Mun. Corp. § 43:22 (3d Ed.) ............................................................ 9

2 GELFAND, STATE AND LOCAL GOVERNMENT DEBT FINANCING § 12:42 (2d ed.) ....................... 19

8-201:11 [Rev] Substituted obligor, 8 Anderson UCC § 8-201:11 [Rev] (3rd. ed.) .................... 25

Bankruptcy Rule R. 3007 ............................................................................. 8

64A C.J.S. Mun. Corp. § 2182 ....................................................................... 9

*Direct Placement*, BLACK'S LAW DICTIONARY (10th ed.) ............................................. 12

Government of Puerto Rico: Puerto Rico Fiscal Agency and Financial Advisory
    Authority, Fiscal Plan for Puerto Rico (March 13, 2017), *available at*
    http://www.aafaf.pr.gov/assets/planfiscal13demarzo2017.pdf ................................................. 3

HFA Partners, *The Pros and Cons of Bank Direct Placements* (September 7,
    2011) *available at* https://w.w.w.hfapartners.com/104 ........................................................ 19

JOHN DOWNES & JORDAN ELLIOT GOODMAN, DICTIONARY OF FINANCE AND
    INVESTMENT TERMS 188 (Barron's Financial Guides, 8th ed. 2010) ..................................... 12

J.W. Madden, *One Supreme Court and the Writ of Certiorari,* 15 HASTINGS LAW
    J. 153 (1963) .................................................................................. 9

Puerto Rico Constitution Article VI, Section 9 .......................................................... 21

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors, including the Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement System of the Government of Puerto Rico ("ERS") (the "Committee"), hereby files this omnibus objection (the "Objection") to all claims asserted against ERS based on the approximately $3.1 billion of outstanding bonds issued by ERS in 2008 (the "ERS Bonds").[2] In support of this Objection, the Committee, which is the only official committee appointed in the ERS Title III case, respectfully states as follows:

## PRELIMINARY STATEMENT

1.     In 2008, ERS issued approximately $3 billion of ERS Bonds in underwritten public offerings.[3] The ERS Bonds were issued as part of the failed implementation of an ill-conceived "arbitrage" strategy ostensibly designed to rescue ERS from eventual insolvency. In 2011, the Puerto Rico Legislative Assembly stated that the issuance of the ERS Bonds "was **illegally made** by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System." Act 116-2011 at Statement of Motives (emphasis added).

---

[2]     In Appendix I hereto, the Committee has identified certain holders of ERS Bonds based on a summary review of (i) disclosures of ERS Bond holdings in the most recent verified statements filed pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure by certain groups of bondholders and (ii) proofs of claim in an amount exceeding $5 million filed against ERS and categorized by Prime Clerk (the Debtors' claims agent) as "Bond" claims. The claims identified in Appendix I total more than $2.1 billion, which represents approximately 69% of the approximately $3.1 billion of ERS Bonds outstanding. The Committee will be filing, contemporaneously with the filing of this Objection, a motion seeking entry of a procedures order providing for, among other things, broad notice of this Objection to potential holders of ERS Bonds and procedures for parties in interest to participate in the litigation of the Objection, either in support or in opposition. The Committee proposes that the deadline to file a substantive response to this Objection be suspended pending the Court's consideration of that motion, which should be heard at the April 24, 2019 omnibus hearing. This Objection is not directed at the claims to which the Committee is objecting separately (but on identical grounds) in the contemporaneous objection filed by Casillas, Santiago & Torres LLP.

[3]     This original principal amount does not include accretion on capital appreciation bonds, which will amount to an additional $1 billion of principal at maturity.

2.      As previously raised by the Puerto Rico Fiscal Agency and Financial Advisory

Authority ("AAFAF") and other government parties in ERS-related adversary proceedings, the

issuance of the ERS Bonds was "illegally made" in that the ERS Bonds were issued *ultra vires*.

ERS's statutory "authorization to incur debt" is limited to "**seek[ing] a loan** from any financial

institution of the Government of the Commonwealth of Puerto Rico or the Federal Government

of the United States of America or through **the direct placement of debts**."  (emphasis added).

A government entity such as ERS has no inherent power to issue bonds to the public, and any

such power must be expressly granted by statute.  Furthermore, as commonly understood in the

finance world, a "direct placement of debts" means a private placement, not a public offering.

Indeed, whenever the Puerto Rico Legislative Assembly has granted bonding authority to a

Commonwealth instrumentality (both before and after it authorized ERS in 2008 to "seek

loans"), it has done so expressly and specified that the bonds may be sold publicly or privately.

3.      Because the ERS Bonds were issued *ultra vires*, they are null and void, and the

bondholders have no remedy against ERS.  Accordingly, all claims asserted against ERS based

on the ERS Bonds must be disallowed in their entirety.

## BACKGROUND

## I.      ERS AND ISSUANCE OF ERS BONDS

4.      ERS is a retirement and benefit system created by Act 447-1951 of the Puerto

Rico Legislative Assembly (as amended, the "ERS Enabling Act") and is both a trust and an

instrumentality of the Commonwealth.  ERS was created to provide pension and other benefits to

retired employees of the Commonwealth and its instrumentalities and municipalities

(collectively, the "Government Employers").  These benefits were to be funded from, among

other sources, contributions from the Government Employers as required by the ERS Enabling

Act ("Employer Contributions").

2

5.      When first created in 1951, ERS had no borrowing power.  In 1988, the ERS

Enabling Act was amended to include the following "authorization to incur debt":

> The Board of Trustees may authorize the Administrator to **seek a loan**
> from any financial institution of the Government of the Commonwealth of
> Puerto Rico or the Federal Government of the United States of America or
> **through the direct placement of debts**, securing said debt with the assets
> of the System.

Act 46-1988, § 1 (emphasis added).

6.      In 2008, ERS issued three series of ERS Bonds in underwritten public offerings.[4]

As of February 2017, the aggregate outstanding principal amount of the ERS Bonds (including

accretion on capital appreciation bonds) was approximately $3,156,000,000.[5]

7.      The ERS Bonds were issued as "limited, non-recourse obligations of [ERS],

payable solely from and secured solely by Employer Contributions made after the date of

issuance of the Bonds and funds on deposit with the Fiscal Agent in the various accounts

established thereunder."[6]

8.      The ERS Bonds were issued for the stated purposes of (i) increasing the funds

available to ERS to pay pension benefits to certain of its beneficiaries by using a portion of the

proceeds of the ERS Bonds to pay those benefits and (ii) reducing ERS's unfunded accrued

actuarial pension liability by adding the remaining portion of the proceeds of the ERS Bonds to

---

[4]   Official Statement, dated January 29, 2008, for ERS Senior Pension Funding Bonds, Series A (the "ERS Series
A Official Statement"), at cover page, Ex. 1; Official Statement, dated May 28, 2008, for ERS Senior Pension
Funding Bonds, Series B (the "ERS Series B Official Statement"), at cover page, Ex. 2; Official Statement,
dated June 26, 2008, for ERS Senior Pension Funding Bonds, Series C (the "ERS Series C Official Statement"),
at cover page, Ex. 3.  All citations to exhibits (Ex._) in this Objection are exhibits to the *Declaration of James
R. Bliss In Support of Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by
Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico.*

[5]   Government of Puerto Rico: Puerto Rico Fiscal Agency and Financial Advisory Authority, Fiscal Plan for
Puerto Rico, at 26 (March 13, 2017) *available at* http://www.aafaf.pr.gov/assets/planfiscal13demarzo2017.pdf.

[6]   ERS Series A Official Statement, at cover page, 2, 23, and 37, Ex. 1; ERS Series B Official Statement, at cover
page, 2, 22, and 38, Ex. 2; ERS Series C Official Statement, at cover page, 2, 22, and 39, Ex. 3.

the assets that were invested by ERS for the benefit of participating employees, retirees, and beneficiaries.[7]  More specifically, but not expressly disclosed in the Official Statements for the ERS Bond offerings, the proceeds of the ERS Bonds were supposed to be used to fund investments as part of a go-for-broke "arbitrage" strategy ostensibly designed to close the gap between ERS's pension obligations and its available sources of payment.[8]  In short, the strategy was to make up for ERS's perpetual lack of adequate funding by issuing $7 billion of bonds and investing the proceeds in the hope that the income on the investments would exceed the cost of the debt service by an amount sufficient to eliminate ERS's ever-growing funding deficit before ERS finally ran out of money.[9]

9.      As detailed in an October 2010 report of Conway MacKenzie, Inc. ("Conway"), this ill-conceived strategy failed at the outset because ERS failed to issue the full $7 billion of bonds necessary for the strategy to have any hope of success, and most of the proceeds from the issued ERS Bonds ended up being used as an "expensive, temporary solution" for funding ERS's current pension obligations.[10]  Thus, the ERS Bonds were issued as part of the "flawed execution of a failed strategy."[11]

10.     Conway was retained by ERS and the Government Development Bank of Puerto Rico ("GDB") to "identify, analyze, and summarize the key events and decisions that have

---

[7]    ERS Series A Official Statement, at cover page, 2, and 6, Ex. 1; ERS Series B Official Statement, at cover page, 2, and 6, Ex. 2; ERS Series C Official Statement, at cover page, 2, and 6, Ex. 3.

[8]    Kobre & Kim LLP, Final Investigative Report, dated August 20, 2018 (the "Kobre & Kim Final Investigative Report"), at 186 (reporting findings on ERS and the circumstances surrounding the issuance of the ERS Bonds).

[9]    Id. at 197-207.

[10]   Conway Mackenzie, Inc., Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico, at 16 (2010), Ex. 10.

[11]   Id. at 15.

created the current financial crisis of the ERS."[12]  One of the "key events and decisions"

identified by Conway was the issuance of the ERS Bonds.

11.     After a thorough investigation, Conway concluded, among other things, that:

- "Given the financial leverage that it imposed upon [ERS], the proposed [ERS Bond] transaction was a very risky and speculative transaction, such that if certain assumptions failed to materialize, [ERS] could be forced to bear higher costs and/or face increased liquidity requirements."[13]

- "[T]hese risks were not fully understood or vetted by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized.  Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the [ERS Bond] transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care."[14]

- "[S]everal warning signs existed concerning market conditions, principally [the underwriter's] inability to issue the [ERS Bonds] in the global market, that should have given ERS management, Board of Trustees and GDB Board of Directors probable cause to either postpone the bond transaction or request additional due diligence be performed."[15]

- "[T]his occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of [ERS.  This lack of understanding is not reasonable [and] may not fall within the general standards of fiduciary responsibilities expected [of] a Board of Trustees."[16]

- "[There was] no basis for the initial assumption made that such a strategy would improve the funded status of the ERS."[17]

- "The [ERS Bond] transaction has negatively impacted the ERS and the Government, in general.  Rather than addressing [ERS's] long-term funding problems, the [ERS Bond] transaction merely provided a short-term temporary measure to address

---

[12]   *Id*. at 2.

[13]   *Id*. at 12.

[14]   *Id*.

[15]   *Id*. at 13.

[16]   *Id*. at 14.

[17]   *Id*.

[ERS's] liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of [ERS]. The short-term liquidity fix is costly and these costs may be realized for decades to come."[18]

12.     Tellingly, the issuance of ERS bonds was not the initial plan. Rather, in 2006, legislation was proposed to authorize the issuance of Commonwealth general obligation ("GO") bonds and use of the proceeds to fund an "arbitrage" strategy for ERS. The proposed legislation died in the House of Representatives. Only then did a public bond offering by ERS become the ostensible solution to ERS's drastic underfunding.[19]

13.     In 2011, the Puerto Rico Legislative Assembly stated that the issuance of the ERS Bonds "was **illegally made** by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."[20]

## II.     ERS TITLE III CASE AND RELATED ADVERSARY PROCEEDINGS

14.     On May 21, 2017, the Financial Management and Oversight Board ("FOMB") approved and certified the filing of a PROMESA Title III petition for ERS. [Case No. 17-BK 3566-LTS, Dkt. No. 1].

15.     On July 27, 2017, certain ERS bondholders filed parallel adversary proceedings in the Commonwealth and ERS Title III cases challenging the constitutionality of the so-called "Pay-Go" legislation whereby ERS was transformed into a "pay-as-you-go" system in which

---

[18]     *Id*. at 15. The Committee recognizes that the Kobre & Kim Final Investigative Report draws different conclusions with respect to the diligence and level of understanding of the ERS decision-makers, but the report nonetheless concludes that the ERS Bonds were issued as part of a failed strategy that proved detrimental to ERS. Kobre & Kim Final Investigative Report at 202-04, 215, and 552-57.

[19]     *Id*. at 204.

[20]     Act 116-2011 at Statement of Motives (emphasis added).

benefits are paid out of the Commonwealth's general fund (the "ERS Adversary Proceedings").
[Case No. 17-BK 3283-LTS, Adv. Proc. No. 17-219-LTS, Dkt. No. 1 (Commonwealth Title III
complaint); Case No. 17-BK-3566-LTS, Adv. Proc. No. 17-220-LTS, Dkt. No. 1 (ERS Title III
complaint)].

16.     The FOMB moved to dismiss the bondholders' claims on various grounds.
AAFAF and certain other government defendants joined the FOMB's motion and moved to
dismiss the claims on additional grounds, including that the ERS bonds were issued *ultra vires*
(and are therefore null and void) because ERS's statutory authority to borrow through "the direct
placement of debts" did not include public bond offerings, as "direct placement" is a standard
term meaning a private sale of securities directly to institutional investors.  *Government
Defendants' Joinder and Supplemental Memorandum of Law in Support of Motion to Dismiss
Plaintiffs' Amended and Supplemented Complaint Pursuant to Fed. R. Civ. P. 12 (b)(6)*, Case
No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 44, at 11-14.

17.     The ERS bondholders opposed this argument, taking the position that "direct
placement" means debt issued directly by ERS as opposed to debt issued by ERS utilizing a
conduit structure.  *Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss*, Case No.
17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 50 (the "Bondholders' Brief"), at 18-20.

18.     The Court never reached this issue because it was mooted by the Court's ruling
(which was reversed by the First Circuit) in a prior-filed adversary proceeding that the ERS
bondholders did not have a perfected security interest in Employer Contributions because, for a
variety of reasons, the UCC financing statements filed with respect to that security interest were
ineffective.  *See In re Fin. Oversight & Mgmt. Bd.*, 590 B.R. 577, 598 (D.P.R. 2018), *aff'd in
part, vacated in part, rev'd in part*, Case No. 18-1836, 2019 WL 364029 (1st Cir. Jan. 30, 2019)

(holding that the ERS bondholders' security interest was perfected by the filing of UCC

financing statements).

## JURISDICTION AND STATUTORY PREDICATE

19.     The Court has jurisdiction over this Objection pursuant to section 306(a) of

PROMESA.  Venue is proper in this district pursuant to section 307(a) of PROMESA.

20.     The statutory predicate for the relief sought herein is section 502 of the

Bankruptcy Code, as incorporated by section 301(a) of PROMESA, and Bankruptcy Rule 3007,

as incorporated by section 310 of PROMESA.

21.     The Committee is a "party in interest" pursuant to section 1109(b) of the

Bankruptcy Code, as incorporated by section 301(a) of PROMESA.  *See In re Fin. Oversight &*

*Mgmt. Bd.*, 297 F. Supp. 3d 261, 264 (D.P.R. 2017) ("Pursuant to 11 U.S.C. § 1109(b), a

provision of the Bankruptcy Code that was expressly incorporated by PROMESA, '[a] party in

interest, including . . . a creditors' committee . . . may raise and may appear and be heard on any

issue in a case under this chapter.'").

## RELIEF REQUESTED

22.     The Committee respectfully requests entry of an order, substantially in the form

attached hereto as Exhibit A, disallowing all claims based on the ERS Bonds.

## BASIS FOR RELIEF

## I.     ERS BONDS ARE NULL AND VOID BECAUSE THEY WERE ISSUED *ULTRA VIRES*

23.     All claims based on the ERS Bonds should be disallowed because the bonds were

issued *ultra vires* and, therefore, the bonds are null and void and the bondholders have no

remedy against ERS.

A. **Bonding Authority Of A Government Entity Must Be Expressly Granted By Statute**

24.     Under the traditional rule reflected in the weight of the case law, the authority of a municipal entity to issue "negotiable bonds" for sale to the public must be expressly granted by the legislature and cannot be implied from a general power to borrow money or incur debts. *See generally* 15 McQuillin Mun. Corp. § 43:22 (3d Ed.) ("[A]uthority to issue bonds can be enforced only by language which leaves no reasonable doubt of an intention to grant it, and . . . if the intention of a statute to authorize the issuance of bonds is doubtful, the doubt will be resolved against the authority to issue the bonds"); *id*. at § 43:20 ("If there is no express provision authorizing the issuance of bonds, the question then arises whether there is implied power. This question is answered somewhat differently in the various states, although the general rule is that there is no authority to issue bonds unless it has been expressly conferred."); 64A C.J.S. Mun. Corp. § 2182 ("The power to issue negotiable bonds may not be implied from the right to borrow money or to contract an indebtedness, but there is authority to the contrary.").

25.     This was the rule ultimately adopted by the U.S. Supreme Court in the days when municipal bond cases came before the Court on a regular basis.[21] In *Merrill v. Town of Monticello*, 138 U.S. 673 (1891), the Court addressed the question: "Does the implied power to borrow money or contract a loan carry with it a farther implication of power to issue funding

---

[21]   It is no surprise that the Supreme Court's case law on this subject dates from the late 19th century. At that time, most of the Supreme Court's docket was comprised of diversity cases, and those cases turned on state, rather than federal, law. *See generally* https://www.fjc.gov/history/courts/jurisdiction-appellate. Thereafter, a series of changes to the Court's jurisdiction dramatically diminished the Court's state law docket: the congressional grant of federal question jurisdiction in 1875 (which firmly established the Court's role in resolving questions regarding federal statutes); the creation of the federal circuit courts in 1891 (which increased the number of federal-law direct appeals to the Court); the Act of 1916, Ch. 448, 39 Stat. 726 (which expanded the Court's discretion to deny state law cases); the so-called Judge's Bill of 1925, Act of Feb. 13, 1925, 43 Stat. 936 (which again expanded the Supreme Court's *certiorari*, or discretionary, jurisdiction); and the Court's own decision in *Zucht v. King,* 260 U.S. 174 (1922), in which the Court declared that it would deny review by writ of error from state courts unless federal constitutional questions "substantial in character" were presented. *See* J.W. Madden, *One Supreme Court and the Writ of Certiorari,* 15 HASTINGS LAW J. 153, 155-57 (1963).

negotiable bonds, for that amount, and sell them in open market, as commercial paper?"  *Id*. at

686.  The Court answered in the negative, holding that "[i]t [did] not follow that, because the

town of Monticello had the right to contract a loan, it had, therefore, the right to issue negotiable

bonds and put them on the market as evidences of such loan."  *Id*. at 691.  Rather, "[t]o borrow

money, and to give a bond or obligation therefor which may circulate in the market as a

negotiable security, freed from any equities that may be set up by the maker of it, are, in their

nature and in their legal effect, essentially different transactions."  *Id*.

26.     The Court further explained that:

> the power to borrow money, or to incur indebtedness, carries with it the
> power to issue the usual evidences of indebtedness, by the corporation, to
> the lender or other creditor.  Such evidences may be in the form of
> promissory notes, warrants and, perhaps, most generally, in that of a bond.
> **But there is a marked legal difference between the power to give a
> note to a lender for the amount of money borrowed, or to a creditor
> for the amount due, and the power to issue for sale, in open market, a
> bond, as a commercial security, with immunity, in the hands of a bona
> fide holder for value, from equitable defences** [sic].

*Id*. at 687 (emphasis added).

27.     The following year, in *City of Brenham v. German-American Bank*, 144 U.S. 173

(1892), the U.S. Supreme Court held that:

> [t]here is nothing in the charter of the [City of Brenham] which gives it
> any power to issue negotiable, interest-bearing bonds of the character of
> those involved in the present case.  The only authority in the charter that is
> relied upon is the power given to borrow, for general purposes, not
> exceeding $15,000 on the credit of the city . . . That in exercising its
> power to borrow not exceeding $15,000 on its credit, for general purposes,
> the city could give to the lender, as a voucher for the repayment of the
> money, evidence of indebtedness in the shape of non-negotiable paper, is
> quite clear; **but that does not cover the right to issue negotiable paper
> or bonds, unimpeachable in the hands of a bona fide holder . . . It is
> easy for the legislature to confer upon a municipality, when it is
> constitutional to do so, the power to issue negotiable bonds; and,
> under the well-settled rule that any doubt as to the existence of such**

**power ought to be determined against its existence, it ought not to be
held to exist in the present case**.

*Id*. at 181-82 (emphasis added).

28.     Having so held, the Court took the opportunity to expressly overrule certain of its

prior decisions insofar as they stood for contrary principles.  *Id*. at 187; *see also Rathbone v. Bd.

of Comm'rs*, 73 F. 395, 399 (D. Kan. 1896) ("The rule of law in relation to the issue of

negotiable bonds is that, whenever the power to issue is called in question, the authority to issue

must be clearly shown, and will not be deduced from uncertain inferences, and can only be

conferred by language which leaves no reasonable doubt of an intention to confer it."), *rev'd on

other grounds*, 83 F. 125 (8th Cir. 1897).

29.     The courts of various states have also adopted or endorsed the express

authorization rule with respect to negotiable bonds.  *See, e.g.*, *Fullerton v. Cent. Lincoln

People's Util. Dist.*, 201 P.2d 524, 529-30 (Or. 1948) (holding that a municipal corporation's

"general power to issue, sell and assume evidences of indebtedness" under the relevant statute

did not imply the power to issue negotiable bonds); *Muscatine Lighting Co. v. Muscatine*, 217

N.W. 468, 471 (Iowa 1928) ("[A]uthority for the issuance of negotiable bonds by a municipality

must be found in express language of [the] statute . . . [and thus the power to] borrow money for

any object in [the city's] discretion . . . confer[red] no authority to issue negotiable bonds"); *Reed

v. Cedar Rapids*, 113 N.W. 773, 775 (Iowa 1907) ("'May a municipal corporation issue

negotiable bonds without express authority from the Legislature so to do?'  That question seems

to be foreclosed by our previous cases . . . [holding that] in the absence of express authority, a

city has no power to issue long-time negotiable bonds, no matter for what purpose the issue is

proposed.").

30.     As set forth above, the ERS Enabling Act contained no express grant of authority to issue bonds, let alone an express grant of authority to issue bonds to the public.  Moreover, the ERS Bonds were issued only after the Legislative Assembly refused to authorize the issuance Commonwealth GO bonds to raise funds for ERS.  The issuance of $3 billion of ERS Bonds as part of the "failed execution of a flawed [arbitrage] strategy" dramatically underscores the wisdom of the general rule that government entities are deemed to have only the powers expressly granted to them by the legislature.

### B.    Public Bond Offering Is Not A "Direct Placement of Debts"

31.     "Direct placement" is a term of art meaning a private sale of securities directly to investors (typically institutions).  *See Direct Placement*, BLACK'S LAW DICTIONARY (10th ed.) ( "direct placement" of debt means "[t]he sale by a company, such as an industrial or utility company, of an entire issue of securities directly to a lender (such as an insurance company or group of investors), instead of through an underwriter"); *see also* JOHN DOWNES & JORDAN ELLIOT GOODMAN, DICTIONARY OF FINANCE AND INVESTMENT TERMS 188 (Barron's Financial Guides, 8th ed. 2010) ("Direct Placement" is the "direct sale of securities to one or more professional investors . . . [a]lso called private placement"); *Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 380 n.3 (2d Cir. 2006) ("private placement" means a sale "directly to an institutional investor").

32.     In the ERS Adversary Proceedings, the bondholders asserted that a federal district court in the District of Puerto Rico had already concluded, in an unrelated case not decided under PROMESA, that the "direct placement of debts" includes "the power to issue bonds to the public."  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 50, at 18.  This was a mischaracterization of the case, which did not result in any such holding.

Indeed, the meaning of "the direct placement of debts" was not at issue and was not even addressed, much less analyzed.

33. The case, *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), involved a federal age discrimination claim against the Puerto Rico Teacher's Retirement System ("TRS"), and the issue before the court was whether TRS was an "arm of the Commonwealth" for Eleventh Amendment immunity purposes. *Id*. at 246. The court held that it was not. *Id*. at 259.

34. One of the multiple factors in the analysis was "[w]hether [TRS] has the power to sue, be sued, and enter contracts in its own name and right." *Id.* at 253. TRS, which has the same authorization to incur debt as ERS (including through "the direct placement of debts"), "concede[d] that it is allowed to enter into contracts, make loans, issue bonds, and invest its funds . . . ." *Id.* at 254-55. Another factor was "[w]hether the Commonwealth of Puerto Rico has legally or practically obligated itself to pay [TRS's] indebtedness." *Id*. at 249. In analyzing this factor, the court stated that "[o]n the one hand, [TRS] has the capacity to issue bonds; on the other hand, at least at first glance, it seems that the contributions of the Commonwealth to [TRS] are not a trivial amount." *Id.* at 258. Neither TRS's concession nor the court's statement was made in reference to the language of the ERS Enabling Act's debt authorization, which was quoted for the unrelated proposition that interest on TRS's debt obligations is tax-exempt. *Id*. at 256. In any event, the court said nothing about TRS having the authority to issue bonds "to the public."

35. The bondholders also argued in the ERS Adversary Proceedings that "[t]he key modifier *directa* ('direct') appeared in numerous other locations in [the ERS Enabling Act] as it existed at the time of the bond issuances, and each time referred to direct obligations (*i.e.*, debt

13

issued and backed by a governmental entity itself), rather than indirect obligations (*i.e.*, debt

issued by a government-sponsored entity)."  Bondholders' Brief, Case No. 17-BK-3566, Adv.

Proc. Case No. 17-219-LTS, Dkt. No. 50, at 18-20.  However, the statute authorizes "the direct

placement of debts," not "the placement of direct debts."  As used in the term "the direct

placement of debts," the word "direct" does not modify the obligation but rather the manner of

its placement.

36.     The bondholders also pointed to the provision in the ERS Enabling Act that

"[s]ecurities shall not be acquired [by ERS] through private placings."  *Id*. (citing 3 L.P.R.A. §

779(b)(2)(A)(ii)).  According to the bondholders, this shows that, when the Puerto Rico

Legislative Assembly wanted to refer to a private placement, it used the word "private" rather

than "direct."  *Id*.  As set forth above, however, the terms "private placement" and "direct

placement" are synonymous in the finance world, and no such conclusion can be drawn from this

single use of a synonymous term.

C.    **Puerto Rico Legislative Assembly Knows How To Grant Bonding Authority
To A Government Entity**

37.     Perhaps most compelling, whenever the Puerto Rico Legislative Assembly has

granted bonding authority to a Commonwealth instrumentality, both before and after ERS was

authorized to incur private placement debt, it has done so expressly—using the word "bonds,"

specifying that the bonds may be sold publicly or privately, and granting such authority as an

addition to a general grant of authority to borrow money or incur debts.  The relevant statutory

provisions are excerpted in Appendix II hereto.  Thus, the Puerto Rico Legislative Assembly

knew how to say "bonds" and knew the difference between a public bond offering and a direct

placement of debts.  Indeed, the fact that the Puerto Rico Legislative Assembly has invariably

granted bonding authority in express terms strongly indicates that it has always operated under

14

the general rule of express statutory authorization (without which a government entity is
powerless to issue bonds).

      **D.**      <u>**Amendments To ERS Enabling Act Do Not "Confirm" That ERS Bonds
Were Authorized**</u>

      38.      In the ERS Adversary Proceedings, the bondholders argued that amendments to
the ERS Enabling Act before and after the ERS Bonds were issued "confirm that the Legislature
authorized ERS to issue the ERS Bonds when it granted ERS the power to 'borrow from any
financial institution[, from] the Government of the Commonwealth of Puerto Rico or the federal
government of the United States, or through the direct placement of debts."  Bondholders' Brief,
Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 50, at 20-23.

      39.      In support of this argument, the bondholders pointed to a statement in Act 35-
2007 (the "<u>2007 Amendment</u>"), which amended the ERS Enabling Act to increase certain ERS
pension benefits, that the "funds needed to cover the cost increase in the minimum amount of the
pensions of the pensioners of the Central Government shall proceed from the resources obtained
*through the issue of bonds* of the Employees of the Government and the Judicature Retirement
Systems Administration."  *Id*. at 21 (citing Act 35-2007 § 5) (emphasis in original).  According
to the bondholders, "[t]he fact that the Legislature directed ERS to issue bonds without providing
specific authorization to do so confirms that the then-existing language in the ERS Enabling Act
permitted ERS to issue bonds, as it subsequently did in 2008."  *Id*.

      40.      But this supposedly confirming "fact" is not a fact at all.  The Puerto Rico
Legislative Assembly cannot "direct" ERS to issue bonds.  Any determination to issue bonds
must be made by the ERS Board of Trustees.  Act 116-2011, § 7(d) ("The Board of Trustees may
authorize the Administrator . . . .");  Act 46-1998, § 1 ("The Board of Trustees may authorize the
Administrator . . . .").   The reference in the statement of motives to future bond proceeds was an

obvious attempt to justify additional pension increases at a time when ERS was already woefully underfunded.  In any event, the 2007 Amendment said nothing about an issuance of bonds **in a public offering**.

41.     The bondholders then pointed to Act 116-2011, which they claimed was significant for three reasons.  First, they claimed that the statement in the 2011 Amendment that "Bond Issues are hereby prohibited as part of the direct placement of debts " is "an acknowledgement that the phrase 'direct placement of debts' includes the power to issue bonds." *Id*. at 21-22.  Second, the bondholders claimed that "if . . . ERS never had the authority to issues bonds under the Enabling Act, then this statutory language would be superfluous."  *Id*. at 22.  On the contrary, when read in light of the Puerto Rico Legislative Assembly's statement that the ERS Bond issuances were "illegally made," the evident purpose of this language was to clarify that the issuance of bonds (or at least publicly offered bonds such as the ERS Bonds) was not, and had never been, part of "the direct placement of debts."  *See* Act 116-2011 at Statement of Motives.

42.     Third, the bondholders claimed that the 2011 Amendment "assumes [the ERS Bonds'] continuing validity . . . [because it] provides that the 'interest accrued on these obligations [the ERS Bonds] shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico'—which makes sense only if ERS had authority to issue those bonds in the first place."  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 50, at 22 (quoting Act 116-2011 § 7(d)).  This is simply not the case.  As an initial matter, the tax-exemption language in the 2011 Act, which was a holdover from the 1988 Amendment in which the incurrence of debt was first authorized, applies to any authorized obligations of ERS, not just obligations arising from "the direct placement of debts."

Furthermore, as the U.S. Supreme Court held in *City of Brenham v. German-American Bank*,

144 U.S. 173, 188 (1892), such a tax exemption provision "cannot [be] regard[ed] . . . as

recognizing the validity of the bonds in question," and "[w]hatever that provision may mean, it

cannot include bonds unlawfully issued."

43.     Finally, the bondholders pointed to what they claimed are references to the ERS

Bonds in Act 3-2013 (the "2013 Amendment"), which amended the ERS Enabling Act to

decrease certain pension benefits in yet another futile attempt to address ERS's catastrophic

underfunding.  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt.

No. 50, at 22-23.  In fact, the referenced statements appear only in the statement of motives, not

in the act itself.

44.     Specifically, the statement of motives includes a statement that "[a]lthough the

bond issue enabled an injection of funds which extended 5 to 6 years the life of the System's

assets, the [ERS] is under the obligation to repay these bonds from the employer contributions it

receives."  Act 3-2013 at Statement of Motives.  The statement of motives also includes a

statement that the "debt has a repayment term of almost 50 years, during which [ERS] shall pay

approximately $6 billion in interest, in addition to repaying its principal, which amount is equal

to approximately 4 years of benefit payments to retired persons."  *Id*.

45.     According to the bondholders, this shows that, "even *after* the Legislature

amended the ERS Enabling Act in 2011 to remove ERS's authority to issue bonds, the

Legislature assumed and reaffirmed the validity and enforceability of the ERS Bonds it had

already issued."  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt.

No. 50, at 22-23 (emphasis in original).  In reality, however, these statements show nothing more

than that a legislature will seize on any available justification for objectionable actions.  Just as

the future availability of bond proceeds served as a justification for highly imprudent pension

benefit **increases** in the 2007 Amendment, the existence of the ERS Bonds offered a convenient

justification for highly unpopular pension benefit **decreases** in the 2013 Amendment.

46.     Needless to say, none of these amendments to the ERS Enabling Act amounted to

a legislative ratification or validation of the ERS Bond issuances.  Under Puerto Rico law, any

such retroactive validation or ratification would have to have been express.  P.R. Civil Code, Art.

3, 31 L.P.R.A. § 3 (official translation) ("Laws shall not have a retroactive effect unless they

expressly so decree."); *see also Vázquez v. Morales*, 114 P.R. Dec. 822 (1983) (holding that the

intention for a law to have retroactive effect must be expressly stated or clearly emerge from the

statute).  Nor could any language in a statement of motives retroactively validate or ratify the

ERS Bonds, as such statements are not part of the law and have no legal force or effect.

### E.     Unauthorized $3 Billion Public Bond Offerings Are Not A "Harmless Irregularity"

47.     Another argument advanced by the bondholders in the ERS Adversary

Proceedings was that, at most, ERS's issuance of the ERS Bonds in public offerings (as opposed

to private placements) was the type of "harmless irregularity" to which the *ultra vires* doctrine

does not apply.  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt.

No. 50, at 23-25.  Characterizing the "harmless irregularity" as "ERS's use of an underwriter" to

issue the bonds, the bondholders liken this "harmless irregularity" to "the failure to post adequate

notice . . . , to follow all statutory procedures . . . , or to sell bonds for cash rather than credit,"

citing examples of such "harmless irregularities" from the case law.  *Id*. at 25.

48.     This is not a valid comparison.  There are substantive differences between private

placements and public offerings that render an unauthorized issuance of public bonds more than

just a "harmless irregularity" consisting in a failure to follow procedural or formalistic

requirements.  Among other things, a private placement: (i) involves the purchase of bonds for

investment (and not for resale) by a limited number of sophisticated institutional purchasers; (ii)

eliminates underwriting fees and expenses (which are the single largest component of issuance

costs in public offerings); (iii) eliminates rating agency presentations and fees (because a private

placement does not require a credit rating); (iv) frequently eliminates the need for a debt service

reserve fund (thereby lowering the amount of the bonds and eliminating the risk of negative

arbitrage on the investment of the fund); (v) requires less comprehensive financial and

transaction disclosure (because there is no need for the protection of unsophisticated retail

purchasers); (vi) affords the issuer the ability to negotiate directly with the purchasers at the

outset (thereby permitting the issuer to limit covenants and other terms to those that meet the

purchaser's requirements without being unduly restrictive from the issuer's standpoint); and (vii)

affords the issuer the ability to negotiate directly with the purchasers in the event a waiver,

amendment, or restructuring becomes necessary (which is infeasible in the case of bonds offered

publicly to a large number of purchasers).  Overall, a private placement is quicker, easier, and

less expensive to execute than a public offering.  *See, e.g.*, 2 GELFAND, STATE AND LOCAL

GOVERNMENT DEBT FINANCING § 12:42 (2d ed.); HFA Partners, *The Pros and Cons of Bank

Direct Placements* (September 7, 2011) *available at* https://w.w.w.hfapartners.com/104.

Accordingly, the differences between the two types of debt offerings are material and can be

critical to a government issuer.

49.     Furthermore, as set forth above, U.S. Supreme Court cases addressing municipal

bonding authority recognized a fundamental distinction between negotiable bonds sold in the

open market for fund-raising purposes and bonds issued, for example, as payment for services

rendered or as evidence of a bank loan.

F.   **Bondholders Have No Unjust Enrichment Remedy**

50.   The bondholders also argued in the ERS Adversary Proceedings that, even if the

issuances were invalid, "the ERS Bonds are enforceable in equity" because the bondholders

would have an equitable remedy of unjust enrichment.  Bondholders' Brief, Case No. 17-BK-

3566, Adv. Proc. No. 17-219-LTS, Dkt. No. 50, at 25.  This argument is a *non sequitur*.  Even

assuming the bondholders were entitled to a remedy of unjust enrichment, the effect of such a

remedy would not be to render the ERS Bonds "enforceable."  Rather, the bondholders would

have, at most, an unsecured claim for whatever enrichment of ERS was found to be unjust.  And

for the reasons discussed below, the bondholders would have no such claim.

51.   The bondholders' sole authority for their unjust enrichment argument was the

Puerto Rico Supreme Court's decision in *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 14 P.R.

Offic. Trans. 896 (1983), in which the Court held that the "unjust enrichment doctrine is

applicable, within certain situations, to administrative bodies" when "among other circumstances

. . . some statutory formalities have not been observed which may easily be corrected or could

have been executed with due advice."  *Id*. at 900, 903-04.

52.   Contrary to the bondholders' characterization, this case is not "on all fours" with

the case of ERS.  Bondholders' Brief, Case No. 17-BK-3566, Adv. Proc. No. 17-219-LTS, Dkt.

No. 50, at 25.  As an initial matter, the suit was "not directed to enforce [the] 'collective

bargaining agreement'" that was allegedly *ultra vires* but rather a clause "which can be taken

alone dealing with an agreement to improve the health services of . . . employees," and "[t]he

facts in [the] case [did] not even show that the agreement regarding the health services is an act

*ultra vires*."  *Plan Bienestar Salud*, 14 P.R. Offic. Trans. at 903.  Moreover, for the reasons set

forth above, an unauthorized issuance of approximately $3 billion of public bonds cannot fairly

be regarded as a mere failure to observe "some statutory formalities" that "may easily be corrected or could have been executed with due advice." *See id.* at 904.

53.    Moreover, Puerto Rico law is clear that equitable remedies such as unjust enrichment are not available against the government when affording such a remedy would undermine an important public policy of the Commonwealth embodied in statutory or constitutional law.[22]  Here, affording the ERS bondholders an unjust enrichment remedy would undermine the important public policy that Commonwealth instrumentalities should not incur unauthorized debt that must be repaid from public funds.  As mandated by Article VI, Section 9 of the Puerto Rico Constitution, any expenditure of public funds must be for a public purpose and "pursuant to law."   Any remaining assets of ERS are comprised largely of Employer Contributions and Commonwealth appropriations, which are public funds, and, far from being issued "pursuant to law," the ERS Bonds issuances were "illegally made."

54.    In any event, any unjust enrichment claim would fail for at least two additional reasons.  First, it would be entirely incongruous if the ERS bondholders, as holders of limited, **non-recourse** bonds secured solely by Employer Contributions and funds in specified accounts,[23] had an unjust enrichment remedy against ERS, effectively giving them recourse to ERS's unpledged assets.

55.    Second, section 510(b) of the Bankruptcy Code provides that any "claim arising from rescission of a purchase or sale of a security of the debtor . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated" to all claims of equal or greater

---

[22]   *See, e.g., Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1010 (1994) (holding that a medical equipment supplier could not recover as unjust enrichment the value of equipment delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts).

[23]   ERS Series A Official Statement, at cover page, 2, 23, and 37, Ex. 1; ERS Series B Official Statement, at cover page, 2, 22, and 38, Ex. 2; ERS Series C Official Statement, at cover page, 2, 22, and 39. Ex. 3.

priority.  11 U.S.C. § 510(b).  Accordingly, even if the ERS bondholders had remedies against

ERS as a result of the invalidity of their bonds (they do not), any and all claims asserted against

ERS in connection with those remedies would be automatically subordinated by operation of

section 510(b).  *See In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988)

(section 510(b) is meant to subordinate claims for "recovery *other than* the simple recovery of an

unpaid debt upon an instrument" such that a "security-holder alleging fraud in the purchase of

the security" should not "share on the resulting fraud claim on an equal basis with general

unsecured creditors") (emphasis in the original).  Furthermore, section 510(b) is a "strict

liability" provision in that its mandatory subordination provision applies to any claim, even

where there is no "allegation of fraud."  *See In re Public Serv. Co. of N.H.*, 129 B.R. 3, 5-6

(Bankr. D.N.H. 1991) (holding that "the language of 510(b) is broad enough to include breach of

contract and related actions as well"); *see also In re PT-1 Commc's, Inc.*, 304 B.R. 601, 610

(Bankr. E.D.N.Y. 2004) (subordinating claims alleging breach of contract, breach of fiduciary

duty, unjust enrichment, and tortious interference).

## II.    ERS BONDS CANNOT BE VALIDATED UNDER UCC 8-202

56.    Section 8-202 of the UCC provides for the validation of defectively issued

government securities purchased for value and "without notice" of the defect if certain

conditions are satisfied.  A bondholder has the burden proving eligibility for validation under

UCC 8-202.[24]  Thus, any ERS bondholder invoking UCC 8-202 must prove, among other things,

---

[24]    Section 8-114 of the UCC provides that "in an action on a certificated security against the issuer: . . . [i]f it is
shown that a defense or defect exists, the plaintiff has the burden of establishing that the plaintiff or some
person under whom the plaintiff claims is a person against whom the defense or defect cannot be asserted."
UCC § 8-114(4).  Although the section refers to actions "against" an issuer, "section [8-114] should be read as
requiring that any party claiming bona fide purchaser status has the burden of establishing such status, even
where he is a defendant."  7 Hawkland UCC Series § 8-105:6 (discussing the relevant portion of old section 8-
105, which is now in section 8-114).

that the Committee is an "issuer" of the ERS Bonds for UCC 8-202 purposes and that such

bondholder purchased its ERS Bonds "without notice" of their invalidity.

### A.    UCC 8-202 Is Inapplicable To Assertions Of Invalidity By The Committee

57.    By its terms, UCC 8-202 applies only to assertions of invalidity by an "issuer" of

the securities in question, and the Committee cannot be deemed an "issuer" of the ERS Bonds

within the meaning of the UCC.

58.    Section 8-201(a) of the UCC provides that "[w]ith respect to an obligation on or a

defense to a security, an 'issuer' includes a person that":

> (1)    places or authorizes the placing of its name on a security
> certificate, other than as authenticating trustee, registrar, transfer agent, or
> the like, to evidence a share, participation, or other interest in its property
> or in an enterprise, or to evidence its duty to perform an obligation
> represented by the certificate;
>
> (2)    creates a share, participation, or other interest in its property or in
> an enterprise, or undertakes an obligation, that is an uncertificated
> security;
>
> (3)    directly or indirectly creates a fractional interest in its property, if
> the fractional interest is represented by a security certificate; or
>
> (4)    becomes responsible for, or in place of, another person described
> as an issuer in this section.

1995 P.R. LAWS 208, art. 8-201(a), as amended, P.R. LAWS ANN. 19 § 1751(a).

59.    The Committee is not an "issuer" under subsections (1), (2), or (3), and thus the

only question is whether it is an "issuer" under subsection (4), *i.e.*, whether the Committee has

become "responsible for, or in the place of," ERS as "issuer" of the ERS Bonds. Clearly, it has

not.

60.    The court's decision in *Moscato v. Technologies, Inc.*, No. 04 Civ. 2487(GBD),

2005 WL 146806 (S.D.N.Y. Jan. 21, 2015), is instructive. There, the plaintiff alleged that the

defendants—including the issuers of certain stock and shares, the stock transfer company, and

the issuers' common director—had violated certain obligations of Article 8 relating to the

issuance of the plaintiff's shares.  The court dismissed the claims under Article 8 as against the

issuers' director because the director "very clearly [was] not the issuer."  *Id*. at *4.  The court

explained that an issuer "is the person responsible for the performance of the obligations

represented by a security," which is "usually the enterprise that places its name on the security

certificate as an indication that the security represents debt of that enterprise."  *Id*.; *see also*

*Banco de La Republica de Colombia v. Bank of New York Mellon*, No. 10 Civ. 536 (AKH), 2013

WL 3871419 (S.D.N.Y. July 26, 2013) (noting that the definition of "issuer" under the UCC

reflects the "economic reality" of a securities offering).

      61.      The case of *Banco de La Republica de Colombia v. Bank of New York Mellon*,

No. 10 Civ. 536 (AKH), 2013 WL 3871419 (S.D.N.Y. July 26, 2013), also focuses on ultimate

responsibility for the performance of a debt security.  There, the court held that, where an

investment fund existed as a special purpose vehicle for the sole purpose of issuing and selling

debt securities as a nominee for its parent company, the parent was the issuer under section 8-

201(a)(4).  *Id*. at *6.  In so holding, the court noted that the "definition of 'issuer' under the

U.C.C. . . . reflects the economic reality" of a securities offering.  *Id*.

      62.      Consistent with this analysis, commentators have emphasized that section 8-

201(a)(4) is concerned with parties obligated to perform on an issuance.  Hawkland on the UCC,

a leading treatise, explains that section 8-201(a)(4) applies when Corporation A takes control of

Corporation B and becomes (for purposes of Article 8) the issuer of securities issued by

Corporation B.  7A Hawkland UCC Series § 8-201:3 [Rev].  Another leading treatise, Anderson

on the UCC, similarly explains that a person is treated as an issuer under (a)(4) if the person

"assumes the obligation of" an issuer, "whether by succession in interest or by novation."  8-

201:11 [Rev] Substituted obligor, 8 Anderson UCC § 8-201:11 [Rev] (3rd. ed.).  Of course, the

Committee has not assumed any obligation of ERS with respect to the ERS Bonds.

     **B.**     **Bondholders Were On Notice Of Invalidity**

     63.     Any ERS bondholder that invokes UCC 8-202 as a defense to the Committee's

assertion of invalidity (assuming UCC 8-202 applies at all) must prove that it purchased its ERS

Bonds without notice of the defect in their issuance (*i.e.*, that they were issued *ultra vires*).

Section 1-202 of the UCC provides the following with respect to "notice" and "knowledge":

> (25) Notice.  A person has 'notice' of a fact when:
>
> > (a) he has actual knowledge of it; or
> >
> > (b) he has received a notice or notification of it, or
> >
> > (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.
> >
> > A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it.  'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know.  The time and circumstances under which a notice or notification may cease to be effective are not determined by §§ 401 et seq. of this title.
>
> (26) A person 'notifies' or 'gives' a notice of notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.  A person 'receives' a notice or notification when:
>
> > (a) it comes to his attention, or
> >
> > (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

P.R. LAWS ANN. 19 § 451(25)-(26).

     64.     Given that "direct placement" is a standard finance term meaning a private

placement and not a public offering, any ERS bondholder that purchased with notice of the

statutory debt authorization language was on notice of the bonds' invalidity, as that bondholder

was on notice that ERS did not have the power to issue bonds to the public.[25]  In addition, every

ERS bondholder that purchased its ERS Bonds after the 2011 Amendment with knowledge of the

Puerto Rico Legislative Assembly's statement that the issuances were "illegally made" was

similarly on notice of the defect.

65.     Indeed, in stating that the ERS Bond issuances were "illegally made," the Puerto

Rico Legislative Assembly was essentially saying that, having failed to obtain legislative

authorization for the issuance of Commonwealth GO bonds to fund an "arbitrage" strategy as

originally planned, ERS went ahead and issued the ERS Bonds despite ERS's lack of bonding

authority.  Thus, any bondholder with knowledge of this statement (made more than eight years

ago) had "reason to know" of the ERS Bonds' invalidity.

66.     Moreover, the disclosures in connection with the ERS Bond offerings were highly

unusual in ways that any sophisticated investor would have recognized as raising serious "red

flags."  In particular, it is customary in municipal bond offerings for the official statement to

disclose that the bonds are being issued pursuant to the issuer's enabling legislation or any other

statute expressly authorizing the issuance of bonds.   It is also customary for the official

statement's description of the issuer to expressly state that the issuer has the power to issue

bonds.  Finally, where the source of payment for the bonds includes tax revenues or other funds

generated by a government entity other than the issuer, it is customary for the other government

entity to covenant, for the benefit of the bondholders, not to impair that source of payment and

for the official statement to disclose that non-impairment covenant.

---

[25]    The Official Statements for the ERS Bonds set forth the statutory debt authorization language. *See, e.g.*, Series
C Official Statement, at 7, Ex. 3.

67.     Here, the "black box" summaries in the Official Statements for the ERS Bond offerings make no mention of ERS having statutory authority to issue bonds.  Instead, the summaries merely state that the "Bonds will be issued pursuant to [the bond resolution]."[26]  Nor do the descriptions of ERS in the Official Statements expressly state that ERS has bonding authority.  The descriptions simply reiterate the language of the ERS Enabling Act, stating that "[t]he Act authorizes the System to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets."[27]

68.     Finally, under "Investment Considerations" and "Security and Sources of Payment for the Bonds," the Official Statements include the cryptic disclosure that "[t]he Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to the Bondholders."[28]  This non-specific disclosure of bonding authority and the absence of a bond non-impairment covenant are highly unusual.

69.     By contrast, the official statements for other Puerto Rico bond offerings include the customary disclosures.  For example, the official statements for other Puerto Rico bond offerings disclose that the bonds are being issued pursuant to particular legislative

---

[26] `  *See, e.g.,* ERS Series C Official Statement, at 4, Ex. 3.

[27]    *See, e.g.,* ERS Series C Official Statement, at 7, Ex. 3.

[28]    ERS Series A Official Statement, at 26, 37, Ex. 1; ERS Series B Official Statement, at 25, 38, Ex. 2; ERS Series C Official Statement, at 25, 40, Ex. 3.

authorization.[29]  In addition, as set forth more fully in Appendix III hereto, these other official

statements expressly state that the issuer has the authority to issue bonds.[30]  Finally, where non-

impairment covenants are relevant, the official statements for other Puerto Rico bond offerings,

unlike the official statements for the ERS Bonds, describe explicit non-impairment covenants

meant to protect the source of payment for bondholders.[31]

70.     The Committee will seek appropriate discovery as to any ERS Bondholder that

invokes UCC 8-202 and claims to have purchased its ERS Bonds "without notice" of the defect

in their issuance.

---

[29]   *See, e.g.*, Official Statement, dated March 11, 2004, for Commonwealth General Obligation Bonds of 2014, Series A, at 1, Ex. 4 ("**The Bonds are being issued under the provisions of [Specified Act] of the Legislative Assembly (the 'Act**') and other acts of the Legislative Assembly referred to in the Act, and pursuant to a resolution authorizing the issuance of the Bonds …."); Official Statement, dated February 1, 2012, for GDB Senior Notes, 2012 Series A (Taxable) (the "GDB 2012 Official Statement"), at III-1, Ex. 5 ("The **Notes are issued pursuant to [the GDB Enabling Act]** and resolution adopted by the Executive Committee of the Board of Directors of [GDB] …."); Official Statement, dated September 19, 2006, for PRIFA Special Tax Revenue Bonds, Series 2006 (the "PRIFA 2006 Official Statement"), at 1, Ex.6 ("The … **Bonds are being issued pursuant to the [Enabling Act]**, a Trust Agreement, and a resolution of the Board of Directors of the Authority ….") (emphasis added).

[30]   *See, e.g.*, GDB 2012 Official Statement, at 23, Ex. 5 ("Government Development Bank has the power, among other things, **to borrow money, to issue bonds, notes, debentures, and other obligations** ….") (emphasis added); Official Statement, dated February 15, 2012, for PRASA Revenue Bonds, Series 2012B (Senior Lien), at 29, Ex. 7 ("The Authority has broad powers under the Act, including **the power … to borrow money and issue bonds for any of its corporate purposes**, to secure the payment of its bonds and all other obligations by pledge of its revenues ….") (emphasis added); Official Statement, dated August 15, 2013, for PREPA Power Revenue Bonds, Series 2013A, at 28, Ex. 8 ("The Authority has broad powers under the Act, including, among others: … **to borrow money and to issue bonds for any of its corporate purposes**; to secure the payment of its bonds and all other obligations by pledge of its revenues ….") (emphasis added).

[31]   GDB 2012 Official Statement, at cover page, 1, Ex. 5 ("[N]o amendment to [GDB's enabling act] or to any other law of the Commonwealth **may impair any of its outstanding obligations or commitments**.") (emphasis added); PRIFA 2006 Official Statement, at 25, Ex. 6 ("Pursuant to the Enabling Act, **the Commonwealth has pledged to all holders of the … Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders** until the … Bonds and the interest thereon are fully met and discharged.") (emphasis added); Official Statement, dated February 15, 2007, for Highways and Transportation Authority Revenue Bonds (Series M), Transportation Revenue Refunding Bonds (Series N), and Highway Revenue Refunding Bonds (Series CC), at 31, Ex. 9 ("The Commonwealth has agreed and committed … that it will not [reduce, or reduce below a specified level, certain Commonwealth taxes and motor vehicle licenses fees which, together with revenues generated by the Highways and Transportation Authority, are sources of payment for the HTA Bonds] until all obligations secured by a pledge [of such taxes and fees] are fully paid.").

## NOTICE

71.     Notice of this Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (iv) the Official Committee of Retirees; (v) the insurers of the bonds issued or guaranteed by the Debtors; (vi) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; (vii) holders of ERS Bonds who are parties to any group that has filed a statement under Bankruptcy Rule 2019; (viii) the holders of ERS Bonds identified on Appendix I to this Objection;[32] (ix) The Bank of New York Mellon, N.A., as Fiscal Agent for the ERS Bonds; (x) DTC; and (xi) all parties that have filed a notice of appearance in the above-captioned Title III cases.

*[remainder of page intentionally left blank]*

---

[32] According to the claims registry maintained by Prime Clerk, approximately 900 proofs of claim have been filed asserting bond-based claims against ERS.  Many of these claims are based on bonds other than ERS Bonds.  However, given the sheer volume of claims, it would be cost-prohibitive to review and analyze the approximately 900 proofs of claim to determine which ones, in fact, assert claims based on holdings of ERS Bonds.  The Committee, therefore, limited its review to proofs of claim alleging more than $5 million of bond debt.

WHEREFORE, the Committee respectfully requests that the Court enter an order substantially in the form attached hereto granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated:  March 12, 2019   */s/ Luc A. Despins*

      PAUL HASTINGS LLP
      Luc A. Despins, Esq. *(Pro Hac Vice)*
      James R. Bliss, Esq. *(Pro Hac Vice)*
      James B. Worthington, Esq. *(Pro Hac Vice)*
      G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
      200 Park Avenue
      New York, New York 10166
      Telephone:  (212)318-6000
      lucdespins@paulhastings.com
      jamesbliss@paulhastings.com
      jamesworthington@paulhastings.com
      alexbongartz@paulhastings.com

      *Counsel to Official Committee of Unsecured Creditors for all Title III Debtors*

      - and -

      */s/ Juan J. Casillas Ayala*

      CASILLAS, SANTIAGO & TORRES LLC
      Juan J. Casillas Ayala, Esq., USDC - PR 218312
      Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
      Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
      Ericka C. Montull-Novoa, Esq., USDC - PR 230601
      El Caribe Office Building
      53 Palmeras Street, Ste. 1601
      San Juan, Puerto Rico 00901-2419
      Telephone:  (787)523-3434
      jcasillas@cstlawpr.com
      dbatlle@cstlawpr.com
      aaneses@cstlawpr.com
      emontull@cstlawpr.com

      *Local Counsel to Official Committee of Unsecured Creditors for all Title III Debtors*