# **Exhibit 3**

NEW ISSUE – BOOK-ENTRY ONLY

# $300,202,930
# Employees Retirement System
# of the Government of the Commonwealth of Puerto Rico
# Senior Pension Funding Bonds, Series C

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") is a trust created by law in 1951 by the Legislature of the Commonwealth of Puerto Rico to provide pension and other benefits to retired employees of the government of the Commonwealth and its instrumentalities. These benefits are funded by contributions made monthly or twice a month to the System by the government of the Commonwealth and its instrumentalities ("Employer Contributions") and their employees, and by investment earnings. Government employers are currently required by law to make Employer Contributions to the System of at least 9.275% of their covered payroll.

The System has authorized the issuance of one or more series of bonds (the "Bonds") in order to increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability. On January 31, 2008, the System issued the first such series of Bonds, which consisted of $1,588,810,799.60 aggregate principal amount of Senior Pension Funding Bonds, Series A (the "Series A Bonds"). On June 2, 2008, the System issued the second of such series of Bonds, which consisted of $1,058,634,613.05 aggregate principal amount of Senior Pension Funding Bonds, Series B (the "Series B Bonds"). The System is now offering its Senior Pension Funding Bonds, Series C (the "Series C Bonds"). The System has pledged all Employer Contributions made after the date of issuance of the Series A Bonds to the payment of the Bonds. The System will invest the proceeds of the Bonds and use these investments and the earnings thereon to provide pension benefits to its beneficiaries.

**The Bonds are limited, non-recourse obligations of the System payable solely from and secured solely by a pledge of Employer Contributions made after the date of issuance of the Bonds. The Bonds are not payable from the investments made by the System with the proceeds of the Bonds or from any other assets of the System, or from employee contributions to the System. The Bonds are not an obligation of the Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions.**

The Series C Bonds will be registered under the Depository Trust Company's book-entry only system, and will be issued without coupons, in denominations of $5,000 principal amount (maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof. Purchasers of the Series C Bonds will not receive bond certificates.

The Series C Bonds will be offered as Term Bonds and Capital Appreciation Bonds. Interest on the Term Bonds will be payable monthly on the first day of each month, commencing on August 1, 2008. Interest on the Capital Appreciation Bonds will compound semiannually on each January 1 and July 1, commencing on January 1, 2009 and will be payable at maturity or redemption. The inside cover page of this Official Statement contains information on the maturities, interest rates and prices or yields of the Series C Bonds. The Series C Bonds may be redeemed by the System, commencing on July 1, 2018, as described herein.

Interest on the Series C Bonds is not excludable from the gross income of the recipients thereof under Section 103(a) of the United States Internal Revenue Code of 1986, as amended. Interest on the Series C Bonds is exempt from Puerto Rico income and property taxes. See "Tax Matters" beginning on page 46.

The System expects that the Series C Bonds will be available for delivery to DTC on or about June 30, 2008.

**Investing in the Series C Bonds involves risks. See "Investment Considerations" beginning on page 22 of this Official Statement for a discussion of certain factors that should be considered by prospective purchasers in evaluating an investment in the Series C Bonds.**

## UBS Financial Services Incorporated of Puerto Rico

| | | |
|---|---|---|
| **Popular Securities** | | **Santander Securities** |
| **BBVAPR MSD** | **Citi** | **Eurobank MSD** |
| **Lehman Brothers** | **Merrill Lynch & Co.** | **Oriental Financial Services Corporation** |
| **Samuel A. Ramírez & Co., Inc.** | **Scotia Capital** | **Wachovia Capital Markets, LLC** |

June 26, 2008

# $300,202,930
# Employees Retirement System
# of the Government of the Commonwealth of Puerto Rico
# Senior Pension Funding Bonds, Series C

### $2,202,930 Capital Appreciation Bonds

| Maturity July 1, | Initial Principal Amount | Maturity Amount | Yield to Maturity |
|---|---|---|---|
| 2030 | $2,202,930 | $9,000,000 | 6.50% |

### $298,000,000 Term Bonds

| Maturity July 1, | Principal Amount | Interest Rate | Price |
|---|---|---|---|
| 2028 | $110,000,000 | 6.15% | 100% |
| 2038 | 45,000,000 | 6.25% | 100 |
| 2043 | 143,000,000 | 6.30% | 100 |

No dealer, broker, sales representative or other person has been authorized by the System or the underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the System or the underwriters.  This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series C Bonds by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale.  The delivery of this Official Statement at any time does not imply that the information contained herein is correct as of any time subsequent to its date.  The information set forth herein has been obtained from the System and other sources that are believed to be reliable.  The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the System since the date hereof.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the Federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE SERIES C BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES C BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## FORWARD-LOOKING STATEMENTS

This Official Statement contains certain "forward-looking statements" concerning the System's operations, performance and financial condition, including its future economic performance, plans and objectives and the likelihood of success in developing and expanding its business.  These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the System.  The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements.  Actual results may differ materially from those expressed or implied by these forward-looking statements.

(This page intentionally left blank)

# TABLE OF CONTENTS

Page

SUMMARY STATEMENT ...................................................1
PLAN OF FINANCING ........................................................6
    Restrictions on Purchase of Non-PR Bonds By
        Puerto Rico Residents ...............................................7
THE SYSTEM ......................................................................7
    General...........................................................................7
    Governance ....................................................................8
    Management ...................................................................8
    Other Post-Employment Benefits .................................10
    Financial Statements ...................................................10
OTHER COMMONWEALTH PENSION SYSTEMS.........10
GOVERNMENT EMPLOYERS CONTRIBUTING TO
    THE SYSTEM.............................................................11
    Government Employers With Highest Covered
        Payroll....................................................................12
CONSOLIDATED RESOURCES OF THE
    COMMONWEALTH AND ITS
    INSTRUMENTALITIES..............................................16
USE OF PROCEEDS ..........................................................17
PROJECTED DEBT SERVICE COVERAGE....................17
PROJECTIONS WITH RESPECT TO COVERED
    PAYROLL AND PRINCIPAL UNDERLYING
    ASSUMPTIONS............................................................19
INVESTMENT CONSIDERATIONS...................................22
RECENT DEVELOPMENTS RELATING TO  THE
    COMMONWEALTH OF PUERTO RICO .................27
    Fiscal Year 2008 Projected Revenues And
        Expenditures ..........................................................28
    Fiscal Year 2009 Projected Revenues And
        Expenditures ..........................................................28
    Indictment Of Governor Of Puerto Rico.......................28
    Proposed Sales Tax And Excise Tax
        Changes..................................................................29
    Planning Board Revised Economic Growth
        Estimates................................................................29
    Additional Debt Issued Or Guaranteed By The
        Commonwealth .......................................................29
THE SERIES C BONDS ....................................................30
    General.........................................................................30
    Redemption..................................................................31
    Amendment Of Resolution ..........................................33
    Events Of Default And Remedies.................................34
    The Maturity Of The Bonds Is Not Subject
        To Acceleration For Any Reason, Including
        Non Payment Of Debt Service Of The Bonds
        Or Any Other Event Of Default.............................35
    Bondowners' Direction Of Proceedings .......................37
    Limitation On Rights Of Bondowners ..........................37
    Book Entry Only System .............................................38
    Definitive Bonds..........................................................38
SECURITY AND SOURCES OF PAYMENT FOR THE
    BONDS........................................................................39

Page

Bonds Are Limited, Non-Recourse Obligations of
    the System ............................................................. 39
The Legislature Of The Commonwealth Could
    Reduce The Employer Contribution Rate Or
    Make Other Changes In Existing Law That
    Adversely Affect The Amount Of Employer
    Contributions; Safeguards For Payment Of
    Employer Contributions To The System ............. 40
Bonds Are Issued Pursuant To Resolution ................... 41
Pledge Of Employer Contributions
    Pursuant To Security Agreement.......................... 41
Deposit Of Employer Contributions With
    The Fiscal Agent .................................................. 41
Funds And Accounts ..................................................... 41
Covenants Concerning Employer Contributions ......... 45
Limitation On Issuance Of Additional
    Senior Bonds ........................................................ 45
Limitation On Issuance Of Additional Subordinated
    Bonds.................................................................... 45
Issuance Of Additional Refunding Bonds .................... 46
Issuance Of Derivative Instruments.............................. 46
RATINGS ......................................................................... 46
TAX MATTERS ................................................................ 46
    Puerto Rico Taxation................................................... 47
    United States Federal Taxation.................................... 48
    Other Taxes ................................................................. 53
ERISA CONSIDERATIONS.............................................. 54
LEGAL MATTERS ........................................................... 54
LEGAL INVESTMENT .................................................... 54
GOVERNMENT DEVELOPMENT BANK....................... 54
UNDERWRITING ............................................................ 54
CONTINUING DISCLOSURE .......................................... 55
MISCELLANEOUS ........................................................... 57

APPENDIX I    –    GOVERMENT EMPLOYERS
        WITH HIGHEST COVERED
        PAYROLL.....................................I-1
APPENDIX II    –    FINANCIAL STATEMENTS OF
        THE SYSTEM, INCLUDING THE
        REPORT OF PARISSI P.S.C. ......II-1
APPENDIX III    –    ADDITIONAL INFORMATION
        RELATING TO THE SYSTEM ............... III-1
APPENDIX IV    –    GLOBAL INSIGHT REPORT ................. IV-1
APPENDIX V    –    GENERAL RESOLUTION .........................V-1
APPENDIX VI    –    SUPPLEMENTAL
        RESOLUTION ....................................... VI-1
APPENDIX VII    –    PROPOSED FORM OF OPINION
        OF BOND COUNSEL .......................VII-1
APPENDIX VIII    –    BOOK ENTRY SYSTEM......................VIII-1
APPENDIX IX    –    TABLE OF ACCRETED
        AMOUNTS .......................................... IX-1

(This page intentionally left blank)

## SUMMARY STATEMENT

This summary highlights information contained elsewhere in this Official Statement.  Prospective purchasers of the Series C Bonds should read the entire Official Statement, including the "Investment Considerations" section beginning on page 22 of this Official Statement.

### The Commonwealth of Puerto Rico

The Commonwealth of Puerto Rico (the "Commonwealth") is an island with an area of approximately 3,500 square miles and a population of over 3.5 million people located in the Caribbean, approximately 1,600 miles southeast of New York City.  It is a Commonwealth of the United States that came under U.S sovereignty in 1898 as a result of the Spanish-American War.  Puerto Ricans have been citizens of the United States since 1917.

As a Commonwealth, the United States and Puerto Rico share a common market and a common currency (the U.S. dollar).  The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states of the United States.  However, the people of Puerto Rico do not vote in U.S. national elections.  They are represented in the U.S. Congress by a non-voting Resident Commissioner.  Most U.S. taxes are not levied in Puerto Rico, and Puerto Rico residents do not pay U.S. income tax on income from Puerto Rico sources.

The Constitution of the Commonwealth provides for a republican form of government in which power is shared among an Executive, a Legislative and a Judicial branch.  The Commonwealth also constitutes a District within the United States Federal court system, and has its own United States District Court.

The Commonwealth's gross national product was $58.7 billion in fiscal year 2007 (preliminary, in current dollars) or $13,491 per capita (preliminary, in current dollars).  The economy of Puerto Rico is closely linked to that of the United States.  During fiscal year 2007, approximately 77% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 50% of Puerto Rico's imports.  The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services.

The Commonwealth is a frequent issuer in the United States municipal market.  As of May 7, 2008, Puerto Rico's public sector debt (including debt issued by government-owned utilities and other government instrumentalities) was $49.4 billion.

For a more detailed description of the Commonwealth, see the "Commonwealth Report," which is incorporated by reference in this Official Statement.

### The System

The System is a trust created by Act No. 447 of May 15, 1951 of the Legislature of Puerto Rico (as amended, the "Act").  The purpose of the System is to provide pension and other benefits to retired employees of the departments and agencies of the Commonwealth and its public corporations and municipalities (collectively referred to as "Government Employers").  These benefits are funded by contributions made to the System by the Government Employers ("Employer Contributions") and their employees, and by investment earnings.  The Act currently requires Government Employers to make Employer Contributions to the System of at least 9.275% of their payroll for employees covered by the System.  The current contribution rate has been in effect since February 1990; prior to that date,

1

Commonwealth departments, agencies and public corporations were required to make Employer Contributions of at least 8% of their payroll for employees covered by the System, while municipalities were required to make Employer Contributions of at least 7% of their payroll. The Commonwealth has not reduced the contribution rate at which Government Employers are required to contribute to the System since 1960.

As of June 30, 2007, the System had 176,837 participating employees employed by 210 Government Employers, and provided retirement benefits to 99,851 beneficiaries, which consist of retirees and spouses of deceased retirees. As of the same date, the System's net assets held in trust for pension plan benefits were $2.891 billion.

**Plan of financing**

The System has authorized the issuance of Bonds from time to time in order to increase the funds currently available to pay benefits under the System's largest benefit plan, a defined benefit plan that has been closed to new participants since December 31, 1999, and to reduce the unfunded accrued actuarial pension liability of this benefit plan. As of June 30, 2005, which is the latest date as of which an actuarial report for the System exists, the System had $2.328 billion in net assets available for plan benefits while its accrued actuarial liabilities amounted to $12.284 billion, resulting in a $9.956 billion unfunded accrued actuarial liability and a corresponding funding ratio of 19%. In order to reduce the plan's unfunded actuarial accrued liability, the System will add the proceeds from the sale of the Bonds to the assets that are invested for the benefit of participating employees, retirees and beneficiaries. By increasing the funds currently available to pay benefits under this closed defined benefit plan, the System anticipates that it will be able to fund benefit payments for a longer period than its existing assets would allow it to do without an increase in the percentage of payroll that Government Employers are required to contribute to the System.

The Series C Bonds will be offered exclusively in Puerto Rico. The System may in the future offer additional Bonds in other jurisdictions outside Puerto Rico ("Non-PR Bonds"). If the System offers Non-PR Bonds, such Bonds would contain provisions that would prohibit their purchase by residents of Puerto Rico, including corporations or other business organizations organized under the laws of Puerto Rico or engaged in trade or business in Puerto Rico ("Puerto Rico Residents"). In the event any Non-PR Bond were to be held by a Puerto Rico Resident, the System would have the right to require such Puerto Rico Resident to return any interest received by such Puerto Rico Resident on account of such Non-PR Bond.

**Bonds are limited, non-recourse obligations of the System**

The Bonds are limited, non-recourse obligations of the System, payable solely from and secured solely by a pledge of Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, and from funds held on deposit with the Fiscal Agent mentioned below. The Bonds are not payable from contributions made to the System by participating employees, or from the assets acquired with the proceeds of the Bonds, or from Employer Contributions released by the Fiscal Agent to the System after funding of required reserves, or from any other assets of the System. The Bonds are not a debt of the Commonwealth of Puerto Rico or any of its other political subdivisions or instrumentalities.

2

**Government Employers contributing to the System**

A total of 210 Government Employers currently make Employer Contributions to the System. These can be divided generally into three categories: agencies and departments of the central government, public corporations, and municipalities. The table below shows the number of Government Employers within each category, the number of participating employees, and the aggregate amount of Employer Contributions for each such category for the fiscal year ended June 30, 2007. Employer Contributions exclude approximately $69 million paid by Government Employers in connection with early retirement programs implemented during fiscal year 2007.

| Classification | Government* Employers | Participating* Employees | Total Employer Contributions For Fiscal Year 2007 |
|---|---|---|---|
| Central Government [1] | 84 | 92,802 | $186,015,082 |
| Public Corporations [2] | 48 | 47,839 | 133,143,747 |
| Municipalities | 78 | 36,196 | 55,235,260 |
| *Total* | *210* | *176,837* | *$374,394,089* |

Source: Employees Retirement System

(*) As of June 30, 2007.

(1) Excludes the Police Department

(2) Includes the Police Department, which is an agency of the central government, because the department makes its Employer Contributions directly, rather than through the Puerto Rico Treasury Department.

See Appendix I to this Official Statement for a list of the 44 Government Employers with the highest level of covered payroll, which accounted for 80% of total Employer Contributions in fiscal year 2007, their respective number of participating employees, covered payroll, average salary, and share of Employer Contribution for such fiscal year.

Government Employers are funded from several sources: Commonwealth income and other taxes deposited in the Commonwealth's General Fund, funds provided by the Federal government, internally generated funds (in the case of public corporations) and other sources.

In fiscal year 2007, the top 10 Government Employers, in terms of covered payroll, accounted for approximately 53% of all Employer Contributions.

**Employer Contributions**

The Act currently requires Government Employers to contribute to the System at least 9.275% of their covered payroll. (The Act provides that any difference between this minimum contribution and the amount required to maintain the System fully funded on an actuarial basis also constitutes an obligation of the Government Employers.) For purposes of the Act, covered payroll includes the payroll of all employees of a Government Employer other than its irregular and transitory employees, and other than the employees who are covered by one of the Commonwealth's other retirement systems. The Puerto Rico Treasury Department makes these contributions on behalf of the agencies and departments of the central government and certain public corporations at about the same time payroll checks are processed, currently monthly or twice a month. The remaining public corporations and the municipalities pay their Employer Contributions to the System directly, also at about the same time payroll checks are processed, currently twice a month.

The System normally receives approximately 95% of Employer Contributions within 15 days of the date due and in excess of 98% of Employer Contributions within the year the contribution is due. The Act grants the System the authority to compel payments from Government Employers and provides that failure to remit the Employer Contributions on time constitutes a misdemeanor.  Over the past two years, six Government Employers (four municipalities and two public corporations) have consistently failed to make their Employer Contributions to the System in a timely manner.  For the fiscal year ended June 30, 2007, these six Government Employers' aggregate unpaid obligations totaled approximately $5.5 million, or 1.5% of all Employer Contributions due. The System continues to pursue the collection of outstanding amounts and to ensure that future payments are made in a timely manner.

Employer Contributions received by the System will be deposited by the System with the Fiscal Agent once a month on the last Business Day of the month.

**Projections and assumptions with respect to future Employer Contributions**

The projected level of annual Employer Contributions presented in this Official Statement is based on a model prepared by Global Insight (USA), Inc. ("Global Insight"), which both the System and Global Insight believe to be based on reasonable assumptions.  Global Insight's model, the assumptions on which the model is based, and certain alternative scenarios considered in the Global Insight report, are discussed under "Projections with Respect to Covered Payroll and Principal Underlying Assumptions." Global Insight's full report is included as Appendix IV.  The debt service coverage projections presented in this Official Statement are based on Global Insight's baseline scenario, which projects that annual covered payroll will reach $39.5 billion by 2059 from its 2007 level of $4.0 billion.  The Global Insight report also discusses alternative less likely scenarios, under which annual covered payroll could be as low as $32.0 billion or as high as $63.7 billion by 2059.  These projections may not materialize.  If actual annual covered payroll is materially lower than projected, the System may not have sufficient funds to pay the full amount due with respect to the Bonds.

**Authorizing Resolution**

The Series C Bonds will be issued pursuant to a general resolution (the "General Resolution"), adopted by the Board of Trustees of the System on January 24, 2008, and a supplemental resolution (the "Supplemental Resolution" and together with the General Resolution, the "Resolution"), adopted by the Board of Trustees of the System on June 26, 2008.

The Bank of New York will act as fiscal agent under the Resolution (the "Fiscal Agent").  Copies of the General Resolution and the Supplemental Resolution are set forth in Appendices V and VI, respectively.

**Absence of public market**

Since the Series C Bonds are a new issue of securities, there is currently no secondary market for the Series C Bonds, and there can be no assurance that a secondary market will develop, or if it does develop, that it will provide holders of the Bonds ("Bondholders") with liquidity for their investment or that it will continue for the life of the Series C Bonds.

**Ratings**

The Series C Bonds have received a rating of "Baa3" on the U.S. Municipal Scale and "A1" on the Global Scale from Moody's Investors Services Inc. ("Moody's"), a U.S. public finance rating of "BBB-" from Standard & Poor's Rating Services, and a U.S. public finance rating of "BBB-" from Fitch

Ratings Services ("Fitch").  According to Moody's, its municipal ratings measure the intrinsic ability and willingness of an entity to pay its debt service.  Moody's global scale ratings, on the other hand, measure "expected loss," defined as the probability of default times the amount of the loss upon default.  Fitch's ratings on U.S. public finance debt securities measure credit quality relative to other U.S. public finance debt securities.  According to Fitch, loss rates of most Fitch-rated U.S. public finance debt securities have historically been significantly lower, and are expected to continue to be significantly lower, than other debt instruments rated comparably by Fitch on its international ratings scale.  See "Ratings."

**Additional Bonds**

The System may issue additional series of Bonds under the Resolution subject to compliance with projected debt service coverage tests and certain other conditions.  The System may also issue refunding Bonds to achieve debt service savings without complying with these coverage tests.

**Tax consequences**

In the opinion of Fiddler González & Rodríguez, PSC, bond counsel, interest on the Series C Bonds is not excludable from the gross income of recipients thereof under Section 103(a) of the United States Internal Revenue Code of 1986, as amended (the "Code").  Interest on the Series C Bonds is exempt from Puerto Rico income and property taxes.  For a more detailed description of the United States and Puerto Rico tax considerations relating to the Series C Bonds, see "Tax Matters" beginning on page 46.  Bond counsel will not opine as to the tax consequences of ownership or disposition of the Series C Bonds under the laws of any other jurisdiction, and purchasers of the Series C Bonds should consult their tax advisors as to such tax consequences.

**ERISA Considerations**

The Employees Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code generally prohibit certain transactions between an "employee benefit plan" as defined in and subject to ERISA, a "plan" (such as a tax-qualified retirement plan or an individual retirement account or an individual retirement annuity) as defined in and subject to Section 4975(e)(1) of the Code, certain entities deemed to be holding the assets of such an "employee benefit plan" or "plan" (collectively, "Plans") and persons who, with respect to a Plan, are fiduciaries or other "parties in interest" within the meaning of ERISA or "disqualified persons" within the meaning of the Code.  All fiduciaries of Plans, in consultation with their advisors, should carefully consider the impact of ERISA and the Code on an investment in any Series C Bonds.

**Investment Considerations**

See "Investment Considerations" beginning on page 22 for a discussion of certain factors that should be considered by prospective purchasers in evaluating an investment in the Series C Bonds.

## PLAN OF FINANCING

One of the principal fiscal challenges that the Commonwealth has faced in recent decades is the funding of its public employee retirement systems. The System is the largest of the Commonwealth's five public employee retirement systems with 276,688 participating employees, retirees and beneficiaries as of June 30, 2007. The System had $2.328 billion in net assets available for plan benefits and an accrued actuarial liability of $12.284 billion, resulting in an unfunded accrued actuarial liability of $9.956 billion as of June 30, 2005, the latest date as of which an actuarial report for the System exists, and a funding ratio of 19%.

As the number of retirees and the costs of retirement benefits have increased, the unfunded accrued actuarial liability of the Commonwealth's retirement systems has increased. From fiscal year 1991 to fiscal year 2005, the unfunded accrued actuarial liability increased from $3.568 billion to $9.956 billion. In order to reduce the growth of its pension liability, the Commonwealth closed the System's defined benefit plan to new participants, effective on December 31, 1999. Government employees that became participants of the System after this date participate only in a defined contribution plan that is funded solely by employee contributions. Although Government Employers are required to continue to make Employer Contributions with respect to all participating employees, whether these employees participate in the defined benefit plan or in the defined contribution plan, all Employer Contributions are used to fund benefits provided to beneficiaries of the defined benefit plan. The System's benefit disbursements during fiscal years 2003 to 2007 exceeded the sum of contributions and investment income for those years.

The System performs an actuarial valuation every two years. Set forth below is a schedule showing the unfunded accrued actuarial liability of the System for the fiscal years ended June 30, 2001, 2003 and 2005. The 2007 actuarial valuation has not been finalized. The System expects the 2007 actuarial valuation to be finalized on or about August 2008. The System's current estimate projects that the 2007 accrued actuarial liability could range from $14.3 billion to $14.7 billion, resulting in an unfunded actuarial liability of approximately $11.4 billion to $11.8 billion.

| ($ millions) | 2001 | 2003 | 2005 |
|---|---|---|---|
| Unfunded Accrued Actuarial Liability | $7,453 | $9,244 | $9,956 |

Source: Employees Retirement System, Actuarial Valuation Reports 2001, 2003 and 2005.

The System has authorized the issuance of Bonds from time to time to increase the funds currently available to pay benefits under the closed defined benefit plan, and to reduce the unfunded accrued actuarial pension liability of the System under this defined benefit plan. In order to achieve this, the System plans to issue Bonds from time to time in one or more series and add the net proceeds from the sale of such Bonds to the funds that are currently being invested for the benefit of the participating employees. Because the Bonds are not payable from or secured by these invested assets, the System's unfunded actuarial accrued liability will be reduced by the full amount of the net proceeds of the Bonds. By increasing the funds currently available to pay benefits under this closed defined benefit plan, the System anticipates that it will be able to fund benefit payments for a longer period than its existing assets would allow it to do without an increase in the percentage of payroll that Government Employers are required to contribute to the System.

The net yield of the System's assets may increase or decrease over time regardless of this transaction, but could decrease as a result of the issuance of Bonds in the event that the System is unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the Bonds. Although

this may reduce the amount of funds available to the System to pay retirement benefits, it will not directly affect the pledge of Employer Contributions to the holders of the Bonds.

**Restrictions on purchase of Non-PR Bonds by Puerto Rico Residents**

The Series C Bonds will be offered exclusively in Puerto Rico. The System may in the future offer Bonds in other jurisdictions outside Puerto Rico ("Non-PR Bonds"). Non-PR Bonds may not be purchased under any circumstances by residents of Puerto Rico, including corporations or other business organizations organized under the laws of Puerto Rico or engaged in trade or business in Puerto Rico ("Puerto Rico Residents"). In the event any Non-PR Bond is held by a Puerto Rico Resident, the System shall have the right to require such Puerto Rico Resident to return any interest received by such Puerto Rico Resident on account of such Non-PR Bond.

## THE SYSTEM

**General**

The System is a trust created by the Legislature of Puerto Rico in 1951 pursuant to the Act to provide retirement and disability annuities, death benefits, and loans to Puerto Rico's public employees. Persons eligible to become members of the System (the "Members") include: (i) all persons holding regular employment positions in any executive department, agency, administration, board, commission, committee, office or instrumentality of the Executive Branch of the Government of the Commonwealth; (ii) all members and regular employees of the Legislative Branch of the Government of the Commonwealth; (iii) all officers and regular employees of the municipalities of the Commonwealth; and (iv) all officers and regular employees of most public corporations. As of June 30, 2007, the System had 276,688 Members, 99,851 of which were retirees and beneficiaries currently receiving benefits and 176,837 of which were current active participating employees.

The System administers two separate retirement plans: a defined benefit plan and a defined contribution plan. In the defined benefit plan, participants are entitled to retirement benefits which are defined and determinable. Members who entered the System on or before December 31, 1999 participate in the defined benefit plan. The purpose of this financing is to increase funds available to pay beneficiaries of the defined benefit plan. The defined contribution plan, on the other hand, is a retirement plan that provides for an individual account for each participant of the plan and for benefits based solely upon the amounts contributed to such participant account. Members who entered the System on or after January 1, 2000 participate in the defined contribution plan.

As of June 30, 2007, the System had total assets of $2.931 billion, total liabilities (not including actuarial liabilities) of $40 million, and net assets held in trust for pension benefits of $2.891 billion. For the fiscal year ended June 30, 2007, the System's net assets held in trust for pension benefits increased by approximately $350 million. This includes the net effect of employer, employee and special contributions of $799 million, net investment income of $434 million, benefits paid of $832 million, and administrative expenses of $29 million.

The System has the authority to transact all of its business, invest its funds and hold its securities and other properties in its own name. The Act authorizes the System to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets.

**Governance**

Control of the governance and operation of the System is vested in the Board of Trustees (the "Board"), which sets policy and oversees the operations consistent with applicable laws. The members of the Board include the Puerto Rico Secretary of the Treasury (or his appointee), the President of Government Development Bank for Puerto Rico (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Government of Puerto Rico (or his appointee), as *ex officio* members, and three Members appointed to three year terms by the Governor of Puerto Rico, two of whom must be Members of the System or the Judiciary Retirement System, with at least ten years of credited service. The other member is a pensioner of the System or the Judiciary Retirement System. The Board is also responsible for appointing the Administrator of the System (the "Administrator").

The Board currently consists of the following members:

| Name | Term Expires | Occupation |
|---|---|---|
| Jorge Irizarry Herrans (Chairman) | Ex-officio | President, Government Development Bank for Puerto Rico |
| Angel Castillo Rodríguez (Vice Chairman) | Ex-officio | Commissioner of Municipal Affairs of Puerto Rico |
| Rosa Castro Sierra (Secretary) | September 8, 2009 | Executive Assistant to the Secretary for Management and Development of the Housing Development and Improvement Administration of Puerto Rico |
| Angel Ortíz García | Ex-officio | Acting Secretary of the Treasury of Puerto Rico |
| Marta Vera Ramírez | Ex-officio | Director, Office of Human Resources of the Commonwealth of Puerto Rico |
| Roberto Aquino García | August 1, 2008 | Chairman of the Board, Puerto Rico Retirees Association |
| Roberto Santiago Cancel | October 1, 2008 | Auxiliary Inspector, Inspector for Cooperatives of Puerto Rico |

**Management**

Minia González-Alvarez is the Acting Administrator of the System. Ms. González was appointed by the Board as Acting Administrator on January 31, 2008, effective February 1, 2008. Prior to her appointment, Ms. González was Acting General Counsel, Senior Vice President and Compliance Director of Government Development Bank for Puerto Rico ("Government Development Bank") from 2001 through January 31, 2008. Ms. González was also Assistant Executive Director of Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority from 2001 through January 31, 2008.

Ms. González received a Bachelor's degree in Business Administration from the University of Puerto Rico and a law degree from the Inter American University. Ms. Gonzalez's experience in the public sector also includes tenures at Puerto Rico Housing Finance Corporation, a subsidiary of

Government Development Bank, where she served in various positions since 1988, including the position of Executive Director, and as legal counsel at the Puerto Rico Department of Housing.

As Acting Administrator, Ms. González is responsible for the daily operations of the System. Among her duties are adopting actuarial guidelines for the operation of the System, compiling statistical data to perform periodical actuarial valuations and making recommendations to the Board as to the investment of the System's assets.

Other principal officers of the System include the following:

Roberto Rivera Cruz is the Deputy Administrator of the System. Mr. Rivera was appointed to this position in March 2008. Mr. Rivera also served as the Deputy Administrator of the System from September 2002 through June 2006. Prior to his tenures at the System, Mr. Rivera served as Executive Assistant Manager of the Employment and Training Enterprises Corporation (2001-2002), Budget Director of the Carolina Municipality (1995-2001) and Assistant to the Department of Consumer Affairs. Mr. Rivera has also worked in the private industry. From 1994 through 1995, Mr. Rivera worked as Financial Comptroller of Ital-Americas Food Corp. Mr. Rivera received a Bachelor's degree in Arts with a major in Economics and Accounting and a Master's degree in Arts with a major in Economics from the University of Puerto Rico, Río Piedras Campus.

José Luis Villafañe is one of two Auxiliary Administrators of the System. Mr. Villafañe was appointed to this position in July 2006. Prior to his appointment as Auxiliary Administrator, Mr. Villafañe served as the System's Comptroller from September 2005 through June 2006. He also served as the Operational Auditing Manager of the Office of Management and Budget of the Commonwealth of Puerto Rico (2005) and as Internal Audit Director and Director of the Office of the Comptroller and Ethics Affairs of the Puerto Rico Department of Education (2001-2005). Mr. Villafañe received a Bachelor's degree as well as a Master's degree in Business Administration with a major in accounting from the Metropolitan University, San Juan campus.

Lydia V. Santiago is an Auxiliary Administrator of the System. Ms. Santiago was appointed to this position in July 2005. Prior to her appointment as Auxiliary Administrator, Ms. Santiago worked as an advisor to the Puerto Rico Senate. Ms. Santiago served as a legislative advisor in 2000, and from 2001 through 2005 worked as an advisor to Senator Antonio Fas Alzamora, former President of the Puerto Rico Senate (2000-2004). Ms. Santiago received a Juris Doctor degree from the School of Law of the Catholic University in Ponce.

Luis I. García López is the Chief Investment Officer and Director of Actuarial Studies and Investments of the System. Mr. García was appointed to this position in November 2007. Prior to his appointment, Mr. García worked as special assistant to the System's Administrator in actuarial and investment matters. Mr. García, who has over 15 years of experience in the financial industry, has also worked as a trust officer for Banco Popular de Puerto Rico, investment consultant for Wilshire and Associates and portfolio manager for several insurance companies in Puerto Rico and abroad. Mr. García received a Bachelor's degree in Business Administration with a major in finance and a minor in economics from the University of Puerto Rico, Mayagüez Campus.

Marilyn Cuevas Silvagnoli, Esq. is the Director of Legal Affairs of the System. Ms. Cuevas was appointed to this position in December 2002. Prior to this appointment, Ms. Cuevas served in various public positions, including as a Special Assistant to the Administrator. Her experience in the public sector includes tenures at the Puerto Rico Justice Department (1980-1985); the Puerto Rico Tourism Company (1985-1986; 1989-1993); the Personnel Administration System, where Ms. Cuevas served two

terms as Examination Officer II (from 1986 through 1989 and from 1993 through 2001); and the Puerto Rico Appellate Court (1993), where she served as a clerk.  Ms. Cuevas received a Juris Doctor degree from the School of Law of the Interamerican University of Puerto Rico.  She is admitted to practice in local and federal courts in the Commonwealth.

The administrative offices of the System are located at 437 Ponce de Leon Ave., 15th Floor, Hato Rey, Puerto Rico 00918.

**Other post-employment benefits**

Commencing with fiscal year 2008, which began on July 1, 2007, the Commonwealth will be required, pursuant to Government Accounting Standards Board ("GASB") Statement Number 45, to calculate and record for financial accounting purposes the cost of non-pension post-retirement benefits provided to former government employees using actuarial principles, in substantially the same way that it calculates and records pension benefits provided to such employees.  These benefits currently include, per employee, an annual $100 reimbursement to cover pharmaceutical costs, a $100 per month reimbursement to cover medical insurance premiums, an annual Christmas bonus of $600, a bonus of $100 payable each July, and various death and disability benefits for certain employees of the Police Department, the Firefighters Corp, the Administration of Correctional Facilities, the Puerto Rico National Guard and the Treasury Department.  Currently, the Commonwealth records these costs on a cash basis.  Although this required calculation will not have a cash impact on the Commonwealth beyond what it currently pays, it will be reflected in the financial statements of the Commonwealth and may highlight the long term costs of providing these benefits.

**Financial Statements**

The audited financial statements of the System for the fiscal year ended June 30, 2007 are included as Appendix II.  Certain additional information relating to the System is included in Appendix III.

### OTHER COMMONWEALTH PENSION SYSTEMS

In addition to the System, the Commonwealth has four other public employee retirement systems: (i) the retirement system of the Electric Power Authority, which is funded by that public corporation from its revenues, (ii) the University of Puerto Rico's retirement system, which is funded by that public corporation from its revenues (a significant portion of which come from the central government), (iii) the Judiciary Retirement System, which is administered by the System and is funded by the central government, and (iv) the Teachers Retirement System, which is also funded by the central government. The most significant of these in terms of number of participants and funding ratio is the Teachers Retirement System, with 77,500 participants, and an unfunded accrued actuarial liability of $4.59 billion as of June 30, 2007, and a corresponding funding ratio of 41%.

The Commonwealth Report includes tables that present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of the System and the Judiciary Retirement System for fiscal years 2006 and 2007 and the six-month period ended December 31, 2007 and of the Teachers Retirement System for fiscal years 2005, 2006 and 2007.

### GOVERNMENT EMPLOYERS CONTRIBUTING TO THE SYSTEM

Currently, there are 210 Government Employers that are required by the Act to contribute to the System for the benefit of their employees.  These are classified by the System into three categories on the basis of whether their Employer Contributions are made by the Treasury Department or by the Government Employer itself: (i) agencies and departments of the central government (excluding the Police Department), which make their Employer Contributions through the Treasury Department, (ii) public corporations and the Police Department (an agency of the central government), which make their Employer Contributions directly, and (iii) municipalities, which also make their Employer Contributions directly.  These represented 50%, 35% and 15%, respectively, of total Employer Contributions in fiscal year 2007.

The following table shows Employer Contributions, net of contributions made in connection with early retirement programs, for the five-year period ended June 30, 2007.

| Entities | 2002-03 | 2003-04 | 2004-05 | 2005-06 | 2006-07 |
|---|---|---|---|---|---|
| Central Government* | $148,685,232 | $162,144,517 | $189,659,899 | $190,910,430 | $186,015,082 |
| Public Corporations* | 109,536,054 | 114,512,908 | 127,349,701 | 135,429,468[1] | 133,143,747[2] |
| Municipalities | 47,056,500 | 48,141,754 | 54,906,625 | 56,537,016 | 55,235,260[3] |
| Total | $305,277,786 | $324,799,179 | $371,916,225 | $382,876,914 | $374,394,089[4] |

Source: Employees Retirement System.

(1) Excludes (i) $15 million contributed by PRIDCO, (ii) $284,000 contributed by the Puerto Rico Trade and Export Corporation, and (iii) $211,242 contributed by several public corporations, in connection with the implementation of early retirement programs.  For further discussion on PRIDCO's early retirement program, see pages 20 and 21 of the System's Audited Financial Statements as of and for the years ended June 30, 2007 and 2006, a copy of which has been attached hereto as Appendix II.

(2) Excludes (i) $18,936,295 contributed by PRIDCO in connection with an early retirement program approved and implemented during fiscal year 2006 and (ii) $23,100,627 contributed by the Puerto Rico Tourism Company in connection with an early retirement program approved and implemented during fiscal year 2007.

(3) Excludes $27 million contributed by the Municipality of San Juan in connection with an early retirement program approved and implemented during fiscal year 2007.

(4) The decrease in Employer Contributions in fiscal year 2007 from fiscal year 2006 is attributed primarily to: (i) the implementation of early retirement programs by several government instrumentalities, and (ii) a reduction in the number of participating employees of over 4,000 during the period.

(*) Even though the Police Department is an agency of the central government and not a public corporation, the System has historically accounted for the Employer Contributions made by the Police Department as Employer Contributions made by public corporations.  This table reflects that custom and includes the Police Department with public corporations.

Participating Government Employers are funded from several sources: Commonwealth income and other taxes deposited in the Commonwealth's General Fund, funds provided by the Federal government, internally generated funds (in the case of public corporations) and other sources.

11

**Government Employers with Highest Covered Payroll**

The table below shows the 10 Government Employers with the highest covered payroll as of June 30, 2007.  The table sets forth (i) whether the entity is an agency or department of the central government, a public corporation, or a municipality, (ii) the total number of covered employees, (iii) the covered payroll, (iv) Employer Contributions for fiscal year 2007, and (v) the share of total Employer Contributions represented by such instrumentality.

| Entity | Classification | Participating Employees | Covered Payroll ($000) | FY 2007 Employer Contribution ($000) | % of Total Employer Contributions |
|---|---|---|---|---|---|
| Police Department | Central Government | 21,318 | $ 567,547 | $ 52,639 | 14.1% |
| Education Department[1] | Central Government | 26,027 | 452,461 | 41,966 | 11.2 |
| Correctional Facilities Administration | Central Government | 8,678 | 208,876 | 19,373 | 5.2 |
| State Insurance Fund Corporation | Public Corporation | 4,129 | 204,904 | 19,315 | 5.2 |
| Health Department | Central Government | 7,178 | 177,556 | 16,468 | 4.4 |
| Administration of Court Facilities[2] | Central Government | 4,971 | 124,113 | 11,511 | 3.1 |
| Municipality of San Juan | Municipality | 6,326 | 112,036 | 10,431[3] | 2.8 |
| Treasury Department | Central Government | 3,606 | 101,201 | 9,386 | 2.5 |
| Justice Department | Central Government | 2,519 | 93,713 | 8,692 | 2.3 |
| Aqueduct and Sewer Authority | Public Corporation | 5,413 | 82,972 | 7,712 | 2.1 |
| Sub-total | | 90,165 | $2,125,379 | $197,493 | 52.8% |
| Other Government Employers | | 86,672 | $1,898,854 | $176,901 | 47.2% |
| Total | | 176,837 | $4,024,233 | $374,394[4] | 100.0% |

Source: Employees Retirement System

(1)     Education Department employees who participate in the System are those who are not teachers.  Teachers participate in the Teachers Retirement System.

(2)     Judges are not Members of the System but of the Judiciary Retirement System.

(3)     Excludes $27 million contributed by the Municipality of San Juan in connection with an early retirement program approved and implemented during fiscal year 2007.

(4)     Excludes (i) $18.9 million contributed by PRIDCO, (ii) $23.1 million contributed by the Puerto Rico Tourism Company, and (iii) $27 million contributed by the Municipality of San Juan, all in connection with the implementation of early retirement programs.

The uses of funds for the consolidated resources include payment of payroll and related costs, debt service payments, and capital improvements, among others. The estimated payroll and related costs are $8.45 billion or 31% of the consolidated revenue sources projected for fiscal year 2008.

## USE OF PROCEEDS

The net proceeds from the sale of the Series C Bonds, after deducting underwriting commissions and offering expenses and funding reserves, will be added to the System's pool of invested assets, which will be used to pay retirement benefits to the beneficiaries of the System's defined benefit plan.  The following table sets forth the estimated sources and uses of bond proceeds:

**Sources:**

| | |
|---|---|
| Initial Principal Amount of the Series C Bonds | $300,202,930.00 |
| Total Sources | $300,202,930.00 |

**Uses:**

| | |
|---|---|
| Transfer to System to fund retirement benefits | $285,037,106.65 |
| Deposit into Senior Bond Debt Service Reserve Account | 9,148,607.98 |
| Underwriting discount and cost of issuance | 6,017,215.37 |
| Total Uses | $300,202,930.00 |

## PROJECTED DEBT SERVICE COVERAGE

The table labeled "Projected Debt Service Coverage of Series C Bonds" below sets forth, for each Bond Year until the last maturity of the Series C Bonds, (i) the projected Employer Contributions calculated on the basis of Global Insight's baseline scenario, (ii) the total debt service requirements for the outstanding Bonds (currently the Series A Bonds and the Series B Bonds), (iii) the principal and interest requirements for the Series C Bonds, (iv) the total debt service for the outstanding Bonds and the Series C Bonds, and (v) the projected debt service coverage ratio for the outstanding Bonds and the Series C Bonds, which is the ratio of projected Employer Contributions to principal and interest requirements for each such Bond Year.  A "Bond Year" is the period from July 2 to July 1 of the following calendar year.

The System may issue additional Senior Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Senior Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 140% in each Bond Year.  The System may also issue additional Subordinated Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 125% in each Bond Year.

The table below does not take into consideration any additional Bonds that may be issued by the System.  If market conditions are favorable, the System anticipates issuing additional Senior Bonds during calendar year 2008.

17

**Projected Debt Service Coverage of Series C Bonds**

| Bond Year | Projected Employer Contribution | Debt Service for all outstanding Bonds | Debt Service for the Series C Bonds Principal | Interest | Total Debt Service | Projected Debt Service Coverage Ratio |
|---|---|---|---|---|---|---|
| 2008 | $ 377,473,118 | $ 44,282,110 | - | - | $ 44,282,110 | 8.52x |
| 2009 | 375,483,438 | 147,932,490 | - | $18,638,129 | 166,570,619 | 2.25x |
| 2010 | 394,815,892 | 147,932,490 | - | 18,586,500 | 166,518,990 | 2.37x |
| 2011 | 417,794,500 | 147,932,490 | - | 18,586,500 | 166,518,990 | 2.51x |
| 2012 | 443,570,389 | 147,932,490 | - | 18,586,500 | 166,518,990 | 2.66x |
| 2013 | 470,805,968 | 147,932,490 | - | 18,586,500 | 166,518,990 | 2.83x |
| 2014 | 502,270,429 | 147,932,490 | - | 18,586,500 | 166,518,990 | 3.02x |
| 2015 | 533,805,265 | 147,932,490 | - | 18,586,500 | 166,518,990 | 3.21x |
| 2016 | 564,731,307 | 147,932,490 | - | 18,586,500 | 166,518,990 | 3.39x |
| 2017 | 597,186,308 | 147,932,490 | - | 18,586,500 | 166,518,990 | 3.59x |
| 2018 | 631,541,758 | 147,932,490 | - | 18,586,500 | 166,518,990 | 3.79x |
| 2019 | 667,518,521 | 147,932,490 | - | 18,586,500 | 166,518,990 | 4.01x |
| 2020 | 705,555,478 | 147,932,490 | - | 18,586,500 | 166,518,990 | 4.24x |
| 2021 | 745,294,753 | 197,932,490 | - | 18,586,500 | 216,518,990 | 3.44x |
| 2022 | 786,458,844 | 215,007,490 | - | 18,586,500 | 233,593,990 | 3.37x |
| 2023 | 829,190,425 | 220,912,490 | - | 18,586,500 | 239,498,990 | 3.46x |
| 2024 | 873,053,308 | 136,232,490 | $18,700,000 | 18,586,500 | 173,518,990 | 5.03x |
| 2025 | 918,329,886 | 136,232,490 | 22,000,000 | 17,436,450 | 175,668,940 | 5.23x |
| 2026 | 965,050,463 | 136,232,490 | 29,150,000 | 16,083,450 | 181,465,940 | 5.32x |
| 2027 | 1,013,838,531 | 136,232,490 | 36,300,000 | 14,290,725 | 186,823,215 | 5.43x |
| 2028 | 1,063,207,381 | 413,482,490 | 3,850,000 | 12,058,275 | 429,390,765 | 2.48x |
| 2029 | 1,114,573,728 | 415,637,490 | 100,000 | 11,821,500 | 427,558,990 | 2.61x |
| 2030 | 1,167,577,737 | 268,857,490 | 2,742,930 | 18,612,320 | 290,212,740 | 4.02x |
| 2031 | 1,222,085,765 | 364,547,490 | 100,000 | 11,781,500 | 376,428,990 | 3.25x |
| 2032 | 1,277,929,604 | 248,529,240 | 3,420,000 | 11,775,250 | 263,724,490 | 4.85x |
| 2033 | 1,335,662,274 | 255,317,490 | 4,320,000 | 11,561,500 | 271,198,990 | 4.93x |
| 2034 | 1,394,500,771 | 400,286,490 | 100,000 | 11,291,500 | 411,677,990 | 3.39x |
| 2035 | 1,455,661,008 | 253,496,240 | 11,940,000 | 11,285,250 | 276,721,490 | 5.26x |
| 2036 | 1,518,095,961 | 312,785,990 | 2,160,000 | 10,539,000 | 325,484,990 | 4.66x |
| 2037 | 1,582,243,455 | 300,323,240 | 7,920,000 | 10,404,000 | 318,647,240 | 4.97x |
| 2038 | 1,647,945,838 | 287,860,490 | 14,400,000 | 9,909,000 | 312,169,490 | 5.28x |
| 2039 | 1,715,825,021 | 309,817,740 | 28,600,000 | 9,009,000 | 347,426,740 | 4.94x |
| 2040 | 1,786,450,339 | 149,484,200 | 28,600,000 | 7,207,200 | 185,291,400 | 9.64x |
| 2041 | 1,859,554,456 | 91,719,700 | 28,600,000 | 5,405,400 | 125,725,100 | 14.79x |
| 2042 | 1,935,173,602 | 89,391,600 | 28,600,000 | 3,603,600 | 121,595,200 | 15.92x |
| 2043 | 2,013,323,675 | 49,513,500 | 28,600,000 | 1,801,800 | 79,915,300 | 25.19x |
| 2044 | 2,094,137,802 | 49,513,500 | - | - | 49,513,500 | 42.29x |
| 2045 | 2,177,653,758 | 49,513,500 | - | - | 49,513,500 | 43.98x |
| 2046 | 2,263,902,850 | 49,513,500 | - | - | 49,513,500 | 45.72x |
| 2047 | 2,353,018,333 | 49,513,500 | - | - | 49,513,500 | 47.52x |
| 2048 | 2,444,940,053 | 49,513,500 | - | - | 49,513,500 | 49.38x |
| 2049 | 2,539,879,155 | 49,513,500 | - | - | 49,513,500 | 51.30x |
| 2050 | 2,637,775,323 | 49,513,500 | - | - | 49,513,500 | 53.27x |

18

| Bond Year | Projected Employer Contribution | Debt Service for all outstanding Bonds | Debt Service for the Series C Bonds | | Total Debt Service | Projected Debt Service Coverage Ratio |
|---|---|---|---|---|---|---|
| | | | Principal | Interest | | |
| 2051 | 2,738,773,514 | 49,513,500 | - | - | 49,513,500 | 55.31x |
| 2052 | 2,842,926,433 | 49,513,500 | - | - | 49,513,500 | 57.42x |
| 2053 | 2,950,235,182 | 49,513,500 | - | - | 49,513,500 | 59.58x |
| 2054 | 3,060,837,860 | 49,513,500 | - | - | 49,513,500 | 61.82x |
| 2055 | 3,174,702,827 | 232,713,500 | - | - | 232,713,500 | 13.64x |
| 2056 | 3,291,988,111 | 217,200,850 | - | - | 217,200,850 | 15.16x |
| 2057 | 3,412,779,476 | 203,020,400 | - | - | 203,020,400 | 16.81x |
| 2058 | 3,536,943,940 | 235,501,200 | - | - | 235,501,200 | 15.02x |

The projected Employer Contributions set forth above are based on a model prepared by the System's consultant, Global Insight, which is set forth in Appendix IV, and which projects the total covered payroll of Government Employers through 2059. The principal assumptions and economic variables on which the model is based are described below under "Projections with Respect to Covered Payroll and Principal Underlying Assumptions." Although the System believes that these assumptions are reasonable, the System cannot guarantee that Employer Contributions will in fact be as projected. Prospective purchasers of the Series C Bonds should read the report in its entirety.

If future Employer Contributions are less than projected by an amount greater than the margin provided by the projected debt service coverage ratio at the time of issuance of any Bonds, the System will not receive sufficient funds to pay debt service on the Bonds. Employer Contributions could be less than projected for several reasons, the most significant of which are discussed under "Investment Considerations" below.

## PROJECTIONS WITH RESPECT TO COVERED PAYROLL AND PRINCIPAL UNDERLYING ASSUMPTIONS

The projected level of Employer Contributions that is used in the debt service coverage projections for the Bonds set forth in the preceding section is based on a model prepared by the System's consultant, Global Insight. Both the System and Global Insight believe that the model is based on reasonable assumptions. The complete text of the Global Insight report is set forth in Appendix IV, and should be read in its entirety.

Global Insight is an economic forecasting firm formed in 2001 through the combination of two firms: Data Resources, Inc. (founded in 1968) and Wharton Econometric Forecasting Associates (founded in 1963). Global Insight has over 3,800 clients in industry, finance, and government, revenues in excess of $95 million, 600 employees, and 23 offices in 13 countries covering North and South America, Europe, Africa, the Middle East, and Asia. Some of the data used by Global Insight to prepare this model, specifically information on the Commonwealth's main retirement systems and on its government structure, was provided by a Puerto Rico consulting firm.

The Global Insight model, together with Global Insight's long term forecast of Puerto Rico's economy, projects the total number of government employees that will participate in the System (referred to in the model as total employment in the "ERS participating sector") and their average wages from fiscal year 2008 through fiscal year 2059, and consequently projects the total covered payroll of such employees (which is equal to the total number of employees multiplied by their average wage). By

19

multiplying total covered payroll by the current contribution rate of 9.275%, the System can then project total Employer Contributions.

**Global Insight's baseline scenario**

Global Insight's baseline scenario projects that between fiscal years 2007 and 2059 the average annual growth rate of the covered payroll will be approximately 4.5%, increasing from its current level of $4.0 billion in 2007 to $7.6 billion in 2020, $19.3 billion in 2040, and $39.5 billion in 2059.

Global Insight's model uses four explanatory variables that Global Insight found to be effective in predicting total employment and average wages in the ERS participating sector, which are then used to calculate total covered payroll.  These four variables are total government employment and real gross national product, which are used to predict total employment in the ERS participating sector, and labor productivity and the unemployment rate, which are used to predict average wages in the ERS participating sector.  Global Insight's model for total employment in the ERS participating sector has an R-square in excess of 0.82, which means that it explains more than 82% of the variation in total employment in the ERS participating sector over the 1989 to 2006 period.  Global Insight's model for average wages in the ERS participating sector has an R-square in excess of 0.77, which means that it explains more than 77% of the variation in average wages in the ERS participating sector over the 1989 to 2006 period.

Global Insight's model projects that total employment in the ERS participating sector will increase on average for the next 50 years by 1.0% per year, from its current level of 176,837 employees in fiscal 2007 to a total of 284,970 employees by the year 2059.  As discussed below, this increase, which is driven by growth in real gross national product, is the result of a growth in population of 0.2% per year, an increase in the labor participation rate from 47.0% of the population to 62.5% by 2059, a reduction in unemployment from 10.4% to 3.6%, a reduction in government employment as a percentage of total employment from 24% of the total to 19.2% by 2059, and an increase in employment in the ERS participating sector as a percentage of total government employment, from 58% of the total to 69% by 2059.

With respect to average wages in the ERS participating sector, the model projects that average wages, which are driven by labor productivity and the unemployment rate, will increase by an average of 3.5% per year for the next 50 years, from their fiscal year 2007 average of $22,757 per employee to $138,665 per employee by 2059.

The values of the four explanatory variables in Global Insight's model are forecasted by Global Insight's macroeconomic model for Puerto Rico, which is in turn fed by Global Insight's U.S. macroeconomic model.   Some of the principal forecasts and assumptions of Global Insight's macroeconomic model for Puerto Rico are the following:

▪   Puerto Rico's gross national product will increase in real terms (after deducting inflation) by approximately 2.0% per year for the next 50 years, from its current growth level of minus 1.8% in 2007 (which means that the economy contracted) to minus 2.4% in 2008, to a peak of approximately 3.7% in 2013, then decreasing to approximately 2.5% in 2020, 1.7% in 2040, and 1.5% in 2059.  Real gross national product growth in Global Insight's macroeconomic model for Puerto Rico is driven by labor productivity, demographic trends, fixed capital formation and growth in the U.S. economy, which is in turn determined by Global Insight's U.S. macroeconomic model.

20

- Puerto Rico's population will increase on average for the next 50 years by 0.2% per year, from the current level of 3.94 million people to a peak of 4.37 million people by the year 2044, and down slightly to 4.34 million people by 2059. Puerto Rico's projected population is taken from the United Nations Population Estimates and Projections.

- The percentage of the working age population that will be part of the labor force will increase from its current level of 47.0% to 62.5% by 2059.

- The unemployment rate will decrease from its current level of 10.4% of the labor force to 3.6% of the labor force by 2059.

- Government spending as a percentage of Puerto Rico's gross national product will remain constant near 18%.

- Employment in the government sector as a percentage of total employment will continue to decrease, from its current level of 24% to 19.2% by 2059.

- Employment in the ERS participating sector as a percentage of total government employment will increase, from its current level of 58% to 69% by 2059.

- Puerto Rico's tax structure and tax rates will remain constant.

- Inflation will average 2.3% per year, remaining high in the near term, trending down gradually over the medium term as global oil prices stabilize, and converging to the United States level in the long term.

**Alternative "take-off" scenario**

Global Insight contemplated four alternative scenarios that project higher and lower growth rates for covered payroll. Under the first alternative scenario, a marked increase in investment results in higher labor productivity and an acceleration of real economic growth over the medium and long term. In this "take off" scenario, annual real gross national product growth, after declining in 2007 and 2008, reaches 5.0% by 2011, peaks at 6.0% in 2017, and decelerates gradually to approximately 2.0% by 2059. As government efficiency and private investment increase, the government is able to undergo a significant restructuring and reduce government employment by 4.9% over the next five years. Government employment then remains unchanged until 2020, and increases thereafter at an average rate of 0.13% per year. However, the reduction in government employment is more than offset by higher government wages, which reach an average of $307,312 by 2059, and covered payroll reaches $63.7 billion by 2059.

**Alternative low inflation scenario**

Under the second alternative scenario, inflation in Puerto Rico, which is currently higher than in the U.S., converges more rapidly to U.S. levels than under the baseline case. As a result, covered payroll reaches only $33.6 billion in 2059.

**Alternative significant government downsizing scenario**

Under the third alternative scenario, the government undergoes a major downsizing (without the benefit of higher economic growth). Employment in the public sector as a percentage of total employment in the Commonwealth is reduced more rapidly, decreasing from its current level to a level similar to that of the 50 states of the United States (14% of total employment) within the next ten years. In this alternative scenario, covered payroll reaches $32.0 billion by 2059.

**Alternative employment in the ERS participating sector as a percentage of government employment remains constant scenario**

Finally, under the fourth alternative scenario, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth remains constant at its current level of approximately 58%, instead of increasing to 69% by year 2059 as in the base case scenario. In this alternative scenario, covered payroll reaches $33.1 billion by 2059.

## INVESTMENT CONSIDERATIONS

*Investors should carefully consider the following factors and other information in this Official Statement before deciding to invest in the Series C Bonds.*

**The Bonds are limited, non-recourse obligations of the System**

The Bonds are limited, non-recourse obligations of the System payable solely from and secured solely by Employer Contributions made after the date of issuance of the Bonds. The Bonds are not payable from or secured by any other assets of the System. The Bonds are not an obligation of the Commonwealth or any of its instrumentalities or political subdivisions, other than the System. In the event that Employer Contributions are less than the amounts required to pay debt service on the Bonds, the System will not be required to pay such debt service from its other assets, and bondholders may not receive the full amount due on the Bonds. The maturity of the Bonds is not subject to acceleration for any reason including non-payment of debt service of the Bonds.

The Act requires Government Employers to make the Employer Contributions that are the source of payment for the Bonds. If Government Employers fail to make their required Employer Contributions on time, or contribute less than the amount required, the Resolution requires the System to pursue all available legal remedies to collect such Employer Contributions as soon as possible. The System may, however, be unable to collect the full amount due or may not collect it in time to avoid a shortfall in the amount available to pay the Bonds. This may cause delays in the payment of interest on or principal of the Bonds, or ultimately result in the inability of the System to pay the Bonds.

**Employer Contributions may not increase as projected, in which case the System may not have sufficient funds to pay the Bonds**

The projected debt service coverage ratio of the Bonds shown above in the tables under the heading "Projected Debt Service Coverage of the Bonds" is based on a model prepared by Global Insight, the System's consultant.  The model projects the amount of government payroll for the next 50 years, which when multiplied by the current contribution rate of 9.275% (which the System assumes will remain in effect during the 50-year term of the Bonds), produces a projected level of Employer Contributions. The ratio between this projected level of Employer Contributions and the debt service requirements of the Bonds is the projected debt service coverage ratio of the Bonds.  This means that projected Employer Contributions are expected to exceed debt service on the Bonds by at least the margin reflected by this ratio in each year.

The System may issue additional Senior Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Senior Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 140% in each Bond Year.  The System may also issue additional Subordinated Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 125% in each Bond Year.

If future Employer Contributions are less than projected by an amount greater than the margin provided by the projected debt service coverage ratio at the time of issuance of any Bonds, the System will not receive sufficient funds to pay debt service on the Bonds.  Employer Contributions could be less than projected for several reasons, some of which affect the projected number of participating employees, others that affect the projected level of wages, and others that affect both.  Some of these reasons relate to demographic trends.  Others relate to broad macroeconomic factors, some of which are specific to Puerto Rico, and some of which relate to the U.S. economy and the global economy.  Still others relate to the attitudes of the population of Puerto Rico, the results of political elections, and public policy decisions. Many of these factors are interrelated.  Some of these factors are discussed below.

***The economy of Puerto Rico may not grow as contemplated in the Global Insight projections.*** The growth rate of Puerto Rico's gross national product is one of the measures of economic performance. The economic activity has an impact on both: total employment and the average wages.  The Global Insight model projects that the Puerto Rico economy will grow at an average rate of 2.0% per year in real terms (i.e., after adjusting for inflation), over the next 50 years.  The Puerto Rico economy has grown at an average rate of 2.5% per year in real terms during the past 25 years.  During this period, the annual growth rate has been as high as 4.4% (in 1988) and as low as a contraction of 2.6% (in 1983).  During the prior six years, the average annual compound growth rate has been 0.9%.  Many factors can affect the performance of the economy in Puerto Rico, some of which relate specifically to Puerto Rico, and some of which are external in nature.  These include the price of oil, which has adversely affected the Puerto Rico economy in recent years (Puerto Rico is highly dependent on oil for its energy needs), the availability of local and foreign capital, competition from other jurisdictions, the level of interest rates, the performance of the United States economy, tax rates, the level of government regulation, currency exchange rates, and the occurrence of natural disasters such as earthquakes or hurricanes.  If the growth rate of the Puerto Rico economy is less than projected, government revenues could be lower than projected, which could adversely affect government payroll.  This would reduce the amount of funds available to pay debt service on the Bonds.

*Government employment as a percentage of total employment may be less than projected.*  In Global Insight's base case scenario, government employment as a percentage of total employment decreases from the current level of approximately 24% of total employment to approximately 19.2% by the year 2059.  However, a number of factors could result in a smaller government sector as a percentage of the total economy, which could have an impact on the total number of employees in the ERS participating sector.  In an alternative scenario of the Global Insight model, which involves a significant government downsizing without the benefit of higher economic growth, employment in the public sector as a percentage of total employment in the Commonwealth is reduced more rapidly than in the base case scenario.  In this alternative scenario, government employment as a percentage of total employment decreases from its current level to a level similar to that of the 50 states of the United States (14% of total employment) within the next ten years.  In this alternative scenario, covered payroll reaches only $32.0 billion by 2059, instead of the $39.5 billion projected by the base case scenario.

One factor that may have an impact on the size of the government sector is Puerto Rico's current fiscal situation.  Puerto Rico has had budget deficits for the last several years.  The two principal political parties have publicly stated their commitment to remedy this situation.  Among the measures that are contemplated is a reduction in the number of central government employees, primarily through attrition.  The current government administration has stated its commitment to this policy, and total government employment has declined by 0.5% over the last two fiscal years.  Act No. 103 of May 25, 2006, also known as the "Fiscal Reform Act," sets forth as the public policy of the Commonwealth, among other goals, the reduction of central government spending and the reduction of the number of central government jobs without causing the layoff of regular employees or increasing the actuarial liability of the retirement systems.

Several other factors, including factors that cannot be predicted at this time, could affect the size of the government sector as a percentage of the total economy.

A reduction in government employment as a percentage of total employment would not necessarily result in lower covered payroll if the reduction in employment is offset by higher wages (as in Global Insight's alternative "take-off" scenario).  However, unless higher economic growth produces such higher wages, a smaller government sector would result in lower Employer Contributions.

*The percentage of government employees that are participating in the System may not increase as projected*.  In Global Insight's base case scenario, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth continues its historical upward trend, increasing from its current level of 58% to 69% by year 2059.  But this may not happen.  In an alternative scenario of the Global Insight model, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth remains constant at its current level.  In this alternative scenario, covered payroll reaches only $33.1 billion by 2059, instead of the $39.5 billion projected by the base case scenario.

*Inflation could be lower than projected by the Global Insight base case scenario.*   The base case scenario of the Global Insight model projects that inflation in Puerto Rico will remain high in the near term, will trend down gradually over the medium term as global oil prices stabilize, and will converge to the United States level in the long term.  (United States and Puerto Rico inflation rates were similar during the periods from 1980 – 1989 and 1991 – 1993, at which time they started to diverge, with the Puerto Rico inflation level higher than that of the United States.)  But inflation in Puerto Rico may converge to the U.S. level more quickly than projected.  In one alternative scenario projected by Global Insight, inflation in Puerto Rico converges more rapidly to United States levels and the inflation

differential is eliminated over the next ten years.  In this scenario, covered payroll reaches only $33.6 billion in fiscal year 2059, instead of the $39.5 billion projected by the base case scenario.

***The population of Puerto Rico may not increase as projected.***  One of the components of the projected growth of employment in the ERS participating sector is population growth.  The Global Insight model assumes in its projections that the population of Puerto Rico will increase from approximately 3.9 million in 2007 to approximately 4.3 million by 2059, an increase of 0.2% per year.  If the population of Puerto Rico does not grow as projected, the number of government employees, and as a result covered payroll, may not grow as projected.  Puerto Rico already has over 1,000 inhabitants per square mile, one of the highest population densities in the world.  Most residents of Puerto Rico are United States citizens by birth and hence have unrestricted access to the United States mainland.  As a result, the population of Puerto Rico may not grow as projected or may decrease, which could result in lower government employment and hence in lower Employer Contributions.

***Government revenues may decrease, resulting in forced reductions in payroll; there may be a reduction in the demand for government services, or in the number of people required to provide these services.***  The tax and other revenues of the government of Puerto Rico may decrease for a number of reasons, including a reduction in tax rates as a result of taxpayer pressure leading to legislative action or otherwise, other reasons related to the factors discussed above, and other reasons that may not be anticipated, particularly considering the 50-year term of the Bonds.  Any such reduction could eventually require a reduction in government expenses, including payroll expenses, which represent a significant percentage of government expenses in Puerto Rico.  In addition, the demand for many of the services currently provided by the government may decrease, or an increase in employee productivity may make it possible to provide the same services with fewer employees.  If any of these things happen, government employment and government payroll may be lower than projected, and hence there could be lower Employer Contributions than projected to pay debt service on the Bonds.

***The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.***  The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders.  In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act.  Therefore, the Legislature could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System.  If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected.  It is impossible to predict at this time the conditions that could cause the Legislature of Puerto Rico to reduce the Employer Contribution rate, but those conditions could include situations (i) where the System's unfunded accrued liability has been reduced or eliminated, which could lead the Legislature to the conclusion (if it did not take into consideration the need to pay the Bonds) that additional Employer Contributions are not required, or (ii) where there is severe financial stress affecting one or more of the Government Employers.

**Public Debt of the Commonwealth Must be Paid Before Employer Contributions of Central Government Agencies and Departments**

The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used to pay public debt before being used for other purposes. Public debt, which as of May 7, 2008 amounted to $49.4 billion, includes $10.9 billion in bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth with respect to bonds and notes guaranteed by the Commonwealth, and includes bonds and notes issued by its public corporations. The $49.4 billion excludes certain bonds and notes payable from available moneys of GDB. The Bonds do not constitute public debt. This Constitutional restriction does not apply to Employer Contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not "available resources" of the Commonwealth.

**The Remedies that the Fiscal Agent May Pursue May be Limited**

The remedies available to the Fiscal Agent and the holders of the Bonds upon an Event of Default do not include the right to declare all amounts immediately due and payable and are in many respects dependent upon regulatory and judicial actions which are often subject to discretion and delay. Such remedies may also not be readily available or may be limited, and the legal opinions rendered in connection with this financing will be qualified to the extent that enforceability of provisions of the Bonds and the Resolution are affected by such limitations, including as such enforceability may be limited by insolvency or other laws generally affecting creditors' rights.

**A redemption may adversely affect the return of bondholders on the Bonds**

The System may choose to redeem some or all of the Series C Bonds, or some of the Series C Bonds may be redeemed to satisfy sinking fund requirements, at times when prevailing interest rates are lower than when the Series C Bonds were issued. If this happens, Bondholders may not be able to reinvest the proceeds received in a comparable security at an effective interest rate as high as that of the Bonds.

**The market value of the Bonds may be affected by a negative change in the ratings of the Bonds**

The ratings initially assigned to the Series C Bonds may be lowered or withdrawn. Such rating changes could adversely affect the value of and market for the Bonds.

**Absence of secondary market for the Bonds**

There is currently no secondary market for the Series C Bonds, and there can be no assurances that a secondary market will develop, or if it does develop, that it will provide Bondholders with liquidity for their investment or that it will continue for the life of the Series C Bonds. The Underwriters do not have a legal obligation to maintain a market for the Series C Bonds.

**Risks related to hedging transactions**

The System may enter into interest rate swap agreements and other derivative transactions to hedge its exposure to interest rate changes and may enter into currency swap agreements in the event it issues Bonds denominated in other currencies. If the counterparties to these agreements fail to perform

26

their obligations, the System may be exposed to unanticipated interest rate changes and currency fluctuations that may reduce the amount of funds available to pay debt service on the Bonds.

## RECENT DEVELOPMENTS RELATING TO
## THE COMMONWEALTH OF PUERTO RICO

Currently, approximately 64% of Employer Contributions are made by agencies or departments of the Commonwealth's central government, and are funded in part from the central government's General Fund.  The financial condition of the central government is, therefore, relevant to an evaluation of the risks associated with an investment in the Series C Bonds.  For that reason, this Official Statement incorporates by reference (i) the Commonwealth's Financial Information and Operating Data Report, dated January 2, 2008 (the "Commonwealth Report"), which is included as an appendix to the Official Statement for the Commonwealth's Public Improvement Refunding Bonds, Series 2008 C, dated April 25, 2008, and (ii) the Commonwealth's Comprehensive Annual Financial Report for the fiscal year ended June 30, 2006, as amended (the "Commonwealth's Annual Financial Report"), prepared by the Department of the Treasury of Puerto Rico, which report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2006 (the "Commonwealth Financial Statements"), which have been audited by KPMG LLP, independent auditors, as stated in their report dated August 1, 2007, accompanying such financial statements.  KPMG LLP did not audit the financial statements of the Public Buildings Authority's capital project fund or The Children's Trust special revenue fund (major funds), and certain activities, funds, and component units separately identified in its report.  Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and its opinions, insofar as they relate to the amounts included for activities, funds, and component units, separately identified in its report, are based solely on the reports of the other auditors.  The report of KPMG LLP contains an explanatory paragraph referring to the Commonwealth's adoption of Governmental Accounting Standards Board (GASB) Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for the Insurance Recoveries*, as of June 30, 2006.  The Official Statement that includes the Commonwealth Report and the Commonwealth's Annual Financial Report were filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR").

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with each NRMSIR and the Municipal Securities Rulemaking Board, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other documents containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document.  Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement.  Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

This section supplements and amends the information appearing in the Commonwealth Report and should be read in conjunction therewith.

**Fiscal Year 2008 Projected Revenues and Expenditures**

As discussed in greater detail in the Commonwealth Report, the General Fund budget for fiscal year 2008 is $9.227 billion. General Fund revenues for the ten-month period ending on April 30, 2008 totaled $7.002 billion, which is $42 million less than the Department of the Treasury's estimate for that period. This amount includes $3.726 billion in revenues from individual and corporate income taxes, $923 million from non-resident withholding taxes, $715 million from excise taxes and $755 million of sales tax revenues. The Commonwealth currently anticipates that for the full fiscal year 2008, General Fund revenues will total $8.671 billion, while total expenditures will roughly equal the budgeted amounts of expenditures. The difference between revenues and expenses for fiscal year 2008 will be covered by a recovery of approximately $287 million more in federal funds (already received) than had been budgeted, $150 million from the sale of certain government properties, approximately $60 million in delinquent income tax receivables, cash flow savings resulting from certain refunding transactions, and certain cash management procedures, which include delaying payments to certain vendors for a short period of time (carrying them over into the next fiscal year). The federal funds recovery represented reimbursement of amounts advanced by the Commonwealth's Department of Education during fiscal years 2006 and 2007. Expenditures relating to the Health Insurance Program could exceed their budgeted amounts. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize this possibility.

**Fiscal Year 2009 Projected Revenues and Expenditures**

On March 13, 2008, the Governor submitted a proposed General Fund budget for fiscal year 2009 of $9.488 billion, or approximately $261 million more than the estimated expenditures for fiscal year 2008 of $9.227 billion. The increase in expenditures over fiscal year 2008 is mainly due to University of Puerto Rico, judiciary and municipal formula increases and salary increases mandated by law or collective bargaining agreements. An additional $42.3 million is budgeted for the State Election Commission. The General Fund revenue projection for fiscal year 2009 is $8.488 billion, a decrease of $183 million, or 2.1%, from estimated net revenues for fiscal year 2008 of $8.671 billion. The Commonwealth's budgeted expenditures for fiscal year 2009 of $9.488 billion exceed projected revenues of $8.488 by approximately $1 billion. The Commonwealth's economic team is working together to enforce spending control measures that have been established to attempt to minimize the budget risk. In addition, the Governor has proposed two special measures which are expected to generate close to $1 billion in fiscal year 2009. These measures consist of a tax receivables financing and a concession agreement for operation of the lottery. Legislation authorizing these two measures was submitted by the Governor to the Legislature along with the budget. On June 25, 2008, the Legislature adopted a series of bills approving a General Fund budget for fiscal year 2009 of $9.488 billion. In connection with the budget approval and in order to cover the approximately $1 billion difference between approved expenditures and projected revenues, the Legislature also approved legislation creating a trust to enable a securitization structure using such tax receivables and authorizing the issuance of limited special obligations of the Commonwealth payable from and collateralized with tax receivables. The Legislature did not approve the legislation proposed by the Governor relating to the concession agreement for the operation of the lottery. The series of bills adopted by the Legislature approving the General Fund budget are subject to the Governor's review and final approval.

**Indictment of Governor of Puerto Rico**

On March 27, 2008, the Governor of Puerto Rico and several other individuals were named in federal grand jury indictments relating to the use of political contributions and campaign funds during the period when the Governor was Resident Commissioner in Washington, D.C. The Governor has denied any wrongdoing and has stated his intention to remain in his position and present his defense. It is not

expected that such developments will have any impact on the fiscal affairs of the Commonwealth or on the payment of any obligations issued by the Commonwealth.

**Proposed Sales Tax and Excise Tax Changes**

On February 6, 2008, the Governor, in his State of the Commonwealth address, proposed suspending a portion of the current sales and use tax, for a reduction from 7% to 2.5%, and re-instituting a revamped excise tax on goods imported into Puerto Rico to help stimulate the Commonwealth's economy.  The proposal will require passage of legislation to become law, and includes provisions that will continue the earmarking of sales tax revenues equal to 1% of the total sales tax rate to the Dedicated Sales Tax Fund and other mechanisms currently in place to ensure the security for the outstanding bonds of the Puerto Rico Sales Tax Financing Corporation ("COFINA").  See "Tax Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures,* "Government Development Bank for Puerto Rico – Sales Tax Financing Corporation" under *Public Corporations* and "Public Sector Debt" under *Debt* in the Commonwealth Report.  On February 7, 2008, the Governor stated that any proposal from his administration would not impair the rights of bondholders and that he will veto any counter-proposal from the Legislature of Puerto Rico that would constitute a possible impairment of the rights of bondholders. On February 7, 2008, Standard & Poor's Ratings Service ("S&P") placed the COFINA bonds on CreditWatch Negative and Fitch Ratings Ltd. ("Fitch") placed the same bonds on Rating Watch.  On March 14, 2008, the Governor submitted to the Legislature a proposed bill establishing the conditions for suspending the collection of the 4.5% sales and use tax (which is the portion of the total sales and use tax to be collected for the General Fund), establishing and funding a debt service reserve fund for the benefit of the COFINA bonds and re-instituting the revamped excise tax.  Said bill has been structured to safeguard the rights of COFINA bondholders and is aimed at preserving the current rating of the COFINA bonds.  This action is expected to be revenue neutral for the General Fund.  The legislation proposed by the Governor was not approved by the Legislature.

**Planning Board Revised Economic Growth Estimates**

On February 21, 2008, the Planning Board, as part of its final review of fiscal year 2007 economic statistics, indicated that it expected to reduce the 2007 economic growth rate to -1.8% from - 1.4% and that the forecast for fiscal years 2008 and 2009 will be lowered on account of the projected length of the current recession.  The factors that influenced the Board's fiscal year 2007 indication included reductions in retail sales, private investment (especially in the construction sector) and government investment.  Price increases in certain key areas such as energy and raw materials contributed to the Board's numbers as well.

During March 2008, the Planning Board confirmed its reduction of the fiscal year 2007 economic growth rate to -1.8% from -1.4%, and projected that the economic growth rate for the fiscal year ending June 30, 2008 will be -2.1% and the economic growth rate for the fiscal year ending June 30, 2009 will be 2.1%.

**Additional Debt Issued or Guaranteed by the Commonwealth**

On May 7, 2008, the Commonwealth issued $1,099,125,000 aggregate principal amount of its Public Improvement Refunding Bonds, Series 2008 A, 2008 B and 2008 C.  These bonds were issued for the purpose of (i) reducing the Commonwealth's market risk associated with certain types of variable rate products, including auction rate securities and variable rate demand obligations insured by monoline bond insurers that have recently been downgraded by the rating agencies, and (ii) realizing debt service savings.

On March 18, 2008, Puerto Rico Aqueduct and Sewer Authority issued $159,055,000 of Revenue Refunding Bonds, 2008 Series A, and $125,700,000 of Revenue Refunding Bonds, 2008 Series B, guaranteed by the Commonwealth of Puerto Rico.  Although these bonds were not issued by the Commonwealth, the payment of principal of and interest on said bonds is guaranteed by the Commonwealth.

## THE SERIES C BONDS

**General**

The following summary is qualified by reference to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively.  Capitalized terms not defined below are defined in the Resolution.

The Resolution authorizes the issuance of Senior Bonds and Subordinated Bonds.  The Series C Bonds are Senior Bonds.

The Series C Bonds will be dated their date of delivery and will be issued as term bonds (the "Term Bonds") and as capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of the Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Series C Bonds will accrue, or compound (in the case of the Capital Appreciation Bonds), from their date of delivery. Interest on the Term Bonds will be payable monthly on the first day of each month, commencing on August 1, 2008.  Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal of the Capital Appreciation Bonds on each January 1 and July 1, commencing on January 1, 2009 (each, a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption.  The principal amount of the Capital Appreciation Bonds on each Compounding Date (also referred to as their "Accreted Amount") is set forth in Appendix IX.  Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Accreted Amount thereof.

The Series C Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount (or maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof.  The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described in Appendix VIII.  Bond certificates will not be delivered to purchasers of the Series C Bonds.  Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants.  See "Book entry system" on Appendix VIII.

(ix)     if Bonds of such Series are Adjustable Rate Bonds, Capital Appreciation Bonds, Convertible Capital Appreciation Bonds or Bonds hedged or to be hedged by a Qualified Hedge, or the Supplemental Resolution authorizes a Qualified Hedge on Bonds previously issued, to add provisions specifying the method of calculating the Accrued Payment Obligation with respect to such Bonds, for purposes of the Debt Service Reserve Requirement and the additional Bonds tests;

(x)     to provide such provisions with respect to Subordinated Bonds as are necessary and desirable, *provided*, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(xi)     to provide for a security interest on the Pledged Property for the payment and as security for Credit Facilities, Liquidity Facilities and Qualified Hedges; or

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect.

In addition, the System may amend the Resolution and modify the rights and obligations of the System and of the Owners of the Bonds by a Supplemental Resolution, with the written consent (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Accreted Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Accreted Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Accreted Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Fiscal Agent without its written consent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  A Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Fiscal Agent may, but shall not be obligated to, determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution, and any such determination if reasonable and in good faith shall be binding and conclusive on the System and all Owners of Bonds.

**Events of Default and Remedies**

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto in the Currency in which such Bond, Parity Obligation or Subordinate Obligation is payable, after the same shall have become due, whether at maturity or upon call for redemption or otherwise; or

(ii)      There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) above; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to the System by the Fiscal Agent or any Beneficiary.  If prior to the expiration of the above mentioned 30-day period, the System shall request in writing an extension of time and the System shall certify in such request that the failure stated in the notice cannot be remedied within such 30-day period, then such 30-day period shall be extended for an additional 30 days if corrective action has been instituted by the System and is being diligently pursued.

Upon the occurrence of an Event of Default, the Fiscal Agent may, and upon the written request of the Owners of not less than 25% in principal amount of the Outstanding Bonds shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies as the Fiscal Agent, being advised by counsel, shall deem most effectual to protect and enforce such rights:

(i)      by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the System to collect Revenues adequate to carry out the covenants, agreements and assignments with respect thereto contained in the Resolution and to require the System to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)      by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged and assigned under the Resolution;

(iii)      by action or suit in equity, to require the System to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property pledged and assigned under the Resolution as shall be within its control; and

(iv)      by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

**The maturity of the Bonds is not subject to acceleration for any reason, including non payment of debt service of the Bonds or any other Event of Default.**

In the enforcement of any remedy under the Resolution, the Fiscal Agent shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming and at any time remaining, due from the System for principal, Redemption Price, interest or otherwise for Bonds under any provision of the General Resolution or the Supplemental Resolution or of or on the Bonds, and unpaid with interest on overdue payments, to the extent permitted by law, at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under the Bonds, without prejudice to any other right or remedy of the Fiscal Agent or of the Bondowners, and to recover and enforce judgment or decree against the System for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

After making provision for the payment of any reasonable expenses of the Fiscal Agent and its agents and attorneys necessary in the opinion of the Fiscal Agent to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Fiscal Agent and its agents and attorneys in the performance

of their duties under the Resolution, in the event that the funds held by the Fiscal Agent shall be insufficient for the payment of interest and principal or Accreted Amount or Redemption Price then due on the Bonds in the Currency or Currencies in which such Bonds are payable, respectively, and other amounts payable as described in clauses FIRST through SEVENTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Fiscal Agent and any moneys or other property distributable in respect of the System's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST:  to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Ancillary Bond Facility;

SECOND:  to the payment to the Persons entitled thereto of all installments of interest on the Senior Bonds and the interest component of Parity Obligations then due, and thereafter, in the order such installments are due, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Parity Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of the Parity Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and the Parity Obligations;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Senior Bonds and the unpaid principal component of Parity Obligations, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH:  to the payment to the Persons entitled thereto of all installments of interest on the Subordinated Bonds and the interest component of Subordinate Obligations then due, and thereafter, in the order such installments are due, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference, except as to any difference in the respective rates of interest specified in such Bonds and Subordinate Obligations, and then to the payment of any interest due and payable after maturity on such Bonds and the interest component of Subordinate Obligations, ratably, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds and Subordinate Obligations;

FIFTH: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Subordinated Bonds and the unpaid principal component of Subordinate Obligations for the Subordinated Bonds, which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such Bonds and the principal component of Subordinate Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

SIXTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the System under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

SEVENTH: to the payment to the Persons entitled thereto of amounts payable by the System under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clauses FIRST through SIXTH of this paragraph.

## Bondowners' Direction of Proceedings

Except as otherwise provided in the Resolution, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Fiscal Agent, to direct the method of conducting remedial proceedings to be taken by the Fiscal Agent, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, and that the Fiscal Agent shall have the right to decline to follow any such direction which in the opinion of the Fiscal Agent would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Fiscal Agent in personal liability.

## Limitation on Rights of Bondowners

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Fiscal Agent written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Fiscal Agent after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Fiscal Agent a reasonable opportunity either to proceed to exercise the powers granted under the Resolution or under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Fiscal Agent reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Fiscal Agent shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared under the Resolution in every such case to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law.

No one or more Owners of the Bonds or other Beneficiary secured under the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in the Resolution shall affect or impair the right of any Bondowner to enforce the payment of the principal (or Accreted Amount, if any) of and interest on such Owner's Bonds or the obligation of the System to pay the principal (or Accreted Amount, if any) of and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Each Owner of any Bond by such Bondowner's acceptance thereof shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Fiscal Agent for any action taken or omitted by it as Fiscal

Agent, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the preceding limitation shall not apply to any suit instituted by the Fiscal Agent, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds then Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

**Book Entry Only System**

The information contained in Appendix VIII to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the System and the Underwriters believe to be reliable, but neither the System nor the Underwriters take responsibility for the accuracy thereof.

The System cannot and does not give any assurances that DTC or DTC direct or indirect Participants will distribute to the Beneficial Owners of the Series C Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series C Bonds; (ii) confirmation of ownership interest in the Series C Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series C Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the System nor the Fiscal Agent or any agent of the System or the Fiscal Agent will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series C Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series C Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series C Bonds. See Appendix VIII - Book-Entry System.

**Definitive Bonds**

In the event the System determines that it is in the best interest of the Beneficial Owners that they be able to obtain Series C Bond certificates, the System may notify DTC and the Fiscal Agent, whereupon DTC will notify the Participants, of the availability through DTC of the Series C Bond certificates, subject to DTC procedures. In such event, the System shall issue, and the Fiscal Agent shall transfer and exchange, Series C Bond certificates as requested by DTC and any other Series C Bond owners in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series C Bonds at any time by giving notice to the System and the Fiscal Agent and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depositary), the System and the Fiscal Agent shall be obligated to deliver Series C Bond certificates as described in the General Resolution. In the event Series C Bond certificates are issued, the provisions of the General Resolution shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal and Redemption Price of and interest on such certificates. Whenever DTC requests the System and the Fiscal Agent to do so, the Fiscal Agent and the System will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the Series C Bonds to any DTC Participant

having Series C Bonds credited to its DTC account or (ii) to arrange for another securities depositary to maintain custody of certificates evidencing the Series C Bonds.

Upon surrender by DTC of the definitive Series C Bonds and instructions for registration, the System will issue the definitive Bonds, and thereafter the Fiscal Agent will recognize the registered holders of the definitive Series C Bonds as Bondholders under the Resolution.

The Fiscal Agent will make payments of principal of and interest on the Series C Bonds directly to Bondholders in accordance with the procedures set forth in the Resolution. The Fiscal Agent will make interest payments and principal payments to Bondholders in whose names the definitive Series C Bonds were registered at the close of business on the related record date. The Fiscal Agent will make payments by check mailed to the address of the Bondholder as it appears on the register maintained by the Fiscal Agent or in such other manner as may be provided in the Resolution, except that certain payments will be made by wire transfer as described in the Resolution. The Fiscal Agent will make the final payment on any Series C Bond (whether definitive Series C Bonds or registered in the name of Cede & Co.), however, only upon presentation and surrender of the Series C Bond on the final payment date at the office or agency that is specified in the notice of final payment to Bondholders.

Definitive Series C Bonds will be transferable and exchangeable at the offices of the transfer agent and registrar, which initially will be the Fiscal Agent. There will be no service charge for any registration of transfer or exchange, but the transfer agent and registrar may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

The following summary is qualified by reference to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively.

### Bonds are Limited, Non-Recourse Obligations of the System

The Bonds are limited, non-recourse obligations of the System, payable solely from and secured solely by Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, and funds on deposit with the Fiscal Agent in the various accounts established under the Resolution. The Bonds are not general obligations of the System and are not payable from contributions made to the System by participating employees, or from the assets acquired with the proceeds of the Bonds, or from Employer Contributions released by the Fiscal Agent to the System after funding of required reserves, or from any other assets of the System. The Bonds are not obligations, general, special or otherwise, of the Commonwealth, do not constitute a debt of the Commonwealth or any of its other political subdivisions or instrumentalities, and are not payable out of any moneys of the Commonwealth other than future Employer Contributions.

The Employer Contributions are those contributions that Government Employers must contribute to the System pursuant to the Act. The Act requires that Employer Contributions cover the difference between (i) the benefits provided by the System to its beneficiaries, plus administrative costs, and (ii) the contributions that employees are required to make to the System. The Act further provides that the employers must contribute every year at least 9.275% of the wages and salaries paid to their employees.

**The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions; Safeguards for Payment of Employer Contributions to the System**

The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders.  In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act.  Therefore, the Legislature could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System.  If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected.

The following factors may, however, provide some protection to Bondholders:

▪   In a 1987 case dealing with the retirement system of the University of Puerto Rico, the Puerto Rico Supreme Court ruled that government retirement system participants have a contractual vested right to their pension benefits on account of their employment and participation in the retirement system.  The Court further ruled that as a result, the Legislature may not alter public employees' pension rights unless the proposed amendments are reasonable and promote the actuarial solvency of the retirement system.  In its decision, the Court upheld amendments that established a minimum retirement age, increased employee contributions, and reduced the pension benefits received by participants who retired before a certain age, because these were reasonable and necessary to save the actuarial solvency of the system, which at the time was in a "serious actuarial crisis."  Although the case dealt with the ability of the government to affect the retirement benefits and not with their funding or the rights of bondholders, and, therefore, Bondholders may not have standing under the holding of this case to challenge any proposed amendment to the Act that adversely affects Bondholders, Bondholders may benefit indirectly from the actions of System participants in the event the Legislature proposes to reduce Employer Contributions and System participants challenge such proposed reduction on the basis of the above ruling.

▪   The System is required under the Resolution to uphold, enforce and defend its rights to receive the current statutorily required Employer Contributions under the Act.  If the Legislature attempts to decrease Employer Contributions, the System must use its best efforts to prevent the adoption of such decrease and to challenge in court legislation that reduces statutorily required Employer Contributions that the System feels is contrary to applicable law including, but not limited to, the Commonwealth's Constitution and the rulings of the Puerto Rico Supreme Court.

▪   Although the Legislature is not legally required to take into account the System's opposition to any proposed amendment to the Act, the Legislature has never taken any action that had the effect of impairing the ability of a Puerto Rico government instrumentality to pay its debt, and has always appropriated funds required to pay debt service, even if not legally obligated to do so.

▪   The Legislature has not reduced the Employer Contribution rate since 1960, and the last employer increase occurred in 1990, which contribution rate is still in effect.

The Act provides the System with special powers to compel employers to make required contributions to the System.  The System has the power to notify and require employers to make required contributions or show cause why they are prevented from making them.  The head of an agency, the mayor of a municipality or the head of a public corporation that is a participating employer and does not comply with these requests is guilty of a felony punishable by imprisonment.

In addition, the System is authorized to suspend pre-retirement benefits (loans) to a participating employer's employees if its Employer Contributions are three months past due.

## Bonds are Issued Pursuant to Resolution

The Series C Bonds are being issued pursuant to the to the General Resolution and the Supplemental Resolution, copies of which are set forth in Appendices V and VI, respectively. The Resolution appoints The Bank of New York as Fiscal Agent, with certain duties and responsibilities relating to the authentication and payment of the Series C Bonds, the deposit of future Employer Contributions in the various funds and accounts established under the Resolution, and other matters.

Capitalized terms not defined herein shall have the meaning ascribed to them in the General Resolution and the Supplemental Resolution.

## Pledge of Employer Contributions Pursuant to Security Agreement

As provided in the Resolution, the System entered into a Security Agreement with the Fiscal Agent for the benefit of the Bondholders, pursuant to which the System will pledge to the Fiscal Agent, and will grant to the Fiscal Agent a security interest in, Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Resolution.

The Resolution and the Security Agreement constitute a contract between the System and the Fiscal Agent, on behalf of the owners of the Bonds. The pledge, covenants and agreements of the System set forth in the Resolution and the Security Agreement shall be for the equal benefit, protection and security of the owners of all the Bonds, regardless of time or times of their issuance or maturity, and shall be of equal rank, without preference, priority or distinction of any of the Bonds over any other Bond, except as expressly provided in or permitted by the Resolution. The pledge by the System of the Pledged Funds, which consist of all Employer Contributions that are made after January 31, 2008, which was the date of issuance of the first series of Bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefit of the owners of the Bonds, is irrevocable so long as any Bonds are outstanding under the terms of the Resolution.

## Deposit of Employer Contributions with the Fiscal Agent

The System has agreed to deposit all Employer Contributions made after January 31, 2008, which was the date of issuance of the first series of Bonds, with the Fiscal Agent on the last Business Day of each month.

## Funds and Accounts

The Resolution creates the Project Fund, and within such Fund it creates the Capitalized Interest Account, the Revenue Account, the Senior Bonds Debt Service Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account, the Subordinated Bonds Debt Service Reserve Account, the General Reserve Account, and the Redemption Account. All accounts and subaccounts created pursuant to the Resolution and the monies held in such accounts or subaccounts are pledged to the payment of the Bonds.

**Revenue Account.**  All Revenues, including the Employer Contributions, shall be deposited in the Revenue Account.  After payment to the Fiscal Agent of all amounts payable to the Fiscal Agent, amounts on deposit from time to time in the Revenue Account shall be used to make the following payments and deposits or for the following purposes in the following order:

first, to the Senior Bonds Debt Service Account, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount, until the amount on deposit in the Senior Bonds Debt Service Account shall equal the Accrued Payment Obligation (as defined below) related to all Senior Bonds and Parity Obligations;

second, to the Senior Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Senior Bonds, which is equal to 50% of the average Accrued Payment Obligation of the Senior Bonds as of the first Business Day of each Bond Year for each of the five Bond Years following the year on which the deposit is being made;

third, if there are Subordinated Bonds outstanding, to the Subordinated Bonds Debt Service Account, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount until the amount on deposit in the Subordinated Bonds Debt Service Account shall equal the Accrued Payment Obligation related to all Subordinated Bonds and Subordinate Obligations;

fourth, if there are Subordinated Bonds outstanding, to the Subordinated Bonds Debt Service Reserve Account, the amount required to cause the amount on deposit therein to be equal to the Debt Service Reserve Requirement related to the Subordinated Bonds, which is equal to 50% of the average Accrued Payment Obligation of the Subordinated Bonds for each of the five Bond Years following the year on which the deposit is being made;

fifth,  to the payment of Operating Expenses, which include reasonable out-of-pocket expenses of the System related to the issuance of the Bonds (including, without limitation, the out-of pocket costs of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, and insurance premiums, deductibles and retention payments), legal fees, fees and expenses incurred for professional consultants and fiduciaries, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility; and

sixth, to the General Reserve Account, all Employer Contributions remaining after the deposits required by subparagraphs first to fifth above have been made in full.  A portion of the funds held in the General Reserve Account will be released to the System after the end of each Bond Year, free and clear of the lien of the Resolution and the Security Agreement, upon the satisfaction of the following conditions: (i) during the Bond Year, there has been no withdrawal from any Debt Service Reserve Account to fund the Debt Service Account for any Class of Bonds; (ii) the balance in the Debt Service Account for each Class of Bonds is not less than the amount required to pay in full the next principal and interest obligation due on each Class of Bonds; (iii) the balance in the Debt Service Reserve Account for each Class of Bonds is not less than the Debt Service Reserve Requirement for such Class of Bonds; (iv) there are no outstanding amounts due to the Fiscal Agent under the Resolution or any Supplemental Resolution; and (v) on the last Business Day of the Bond Year,  the balance in the General Reserve Account is not less than ten percent (10%) of the next Bond Year's Accrued Payment Obligation (net of capitalized interest) for all Outstanding Bonds. (Only amounts in excess of this 10% may be released to the System.)

 "Accrued Payment Obligation" shall mean, with respect to any Class of Bonds and the related Parity Obligations and Subordinate Obligations, and for any Bond Year, as of any date, the aggregate of

the Principal Installments of and interest on such Bonds, and the principal and interest components of such related Parity Obligations and Subordinate Obligations, due and unpaid during such Bond Year (or, in the case of Debt Service Account deposits, for Bonds with scheduled payments due more frequently than semi-annually, the current Bond Year and the first three months of the following Bond Year, and for all other Bonds, the current Bond Year); *provided* that in the case of Bonds that are not fixed rate Bonds or Bonds that are not denominated in U.S. dollars, the interest shall be based on the Assumed Interest Rate.  For purposes of this definition, principal, interest or other obligations for the payment of which the Fiscal Agent shall hold in escrow sufficient funds in a separate account (including the Capitalized Interest Account and any escrow for the payment of Bonds that are defeased as provided in this Resolution) shall not be taken into consideration.

**Senior Bonds Debt Service Account.**   The Fiscal Agent shall pay out of the interest subaccount in the Senior Bonds Debt Service Account, to the Persons entitled thereto, (i) the interest on the Senior Bonds as and when due and payable, and (ii) the interest component of the Parity Obligations related to the Senior Bonds, at the times, in the manner and on the terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent.  In addition, the Fiscal Agent shall pay out of the principal subaccount in the Senior Bonds Debt Service Account, to the Persons entitled thereto, (i) each Principal Installment due on the Senior Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of Parity Obligations related to the Senior Bonds, at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent.

In the event of the refunding of any Senior Bonds, the Fiscal Agent shall, upon the written direction of the System to the Fiscal Agent, withdraw from the Senior Bonds Debt Service Account all or any portion of the amounts accumulated therein with respect to the Senior Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Senior Bonds being refunded shall be deemed to have been paid.

**Senior Bonds Debt Service Reserve Account.** At the time any Senior Bonds are delivered pursuant to the Resolution or any Supplemental Resolution, the System shall pay into the Senior Bonds Debt Service Reserve Account from the proceeds of the Senior Bonds or other available funds, an amount equal to the aggregate of the Debt Service Reserve Requirements established in the Resolution for the Outstanding Senior Bonds, after giving effect to any Senior Bonds Reserve Account Cash Equivalent, which is defined as a letter of credit, insurance policy, surety, guarantee or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or investment securities in the Debt Service Reserve Account, calculated immediately after the delivery of such Bonds.  The Senior Bonds Debt Service Reserve Amount is equal to 50% of the average Accrued Payment Obligation (net of capitalized interest) of the Senior Bonds as of the first Business Day of each Bond Year for each of the five Bond Years following the year on which the deposit is being made.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the Senior Bonds Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to the Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Senior Bonds and the principal and interest components of the Parity Obligations related to the Senior Bonds.

**Subordinated Bonds Debt Service Account.**   In the event the System issues Subordinated Bonds, the Fiscal Agent shall pay out of the interest subaccount in the Subordinated Bonds Debt Service Account, to the Persons entitled thereto, (i) the interest on the Subordinated Bonds as and when due and payable, and (ii) the interest component of the Subordinate Obligations related to the Subordinated Bonds, at the times, in the manner and on the terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent.  In addition, the Fiscal Agent shall pay out of the principal subaccount in the Subordinated Bonds Debt Service Account, to the Persons entitled thereto, (i) each Principal Installment due on the Subordinated Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, and (ii) the principal component of the Subordinate Obligations related to the Subordinated Bonds, at the times, in the manner and on the other terms and conditions as determined by the System and set forth in written directions of the System to the Fiscal Agent.  Amounts in the Subordinated Bonds Debt Service Account are available to pay debt service on the Senior Bonds if funds in the Senior Bond Debt Service Account, the Senior Bonds Debt Service Reserve Account and the General Reserve Account are insufficient therefor.

In the event of the refunding of any Subordinated Bonds, the Fiscal Agent shall, upon the written direction of the System to the Fiscal Agent, withdraw from the Subordinated Bonds Debt Service Account all or any portion of the amounts accumulated therein with respect to the Subordinated Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Subordinated Bonds being refunded shall be deemed to have been paid.

**Subordinated Bonds Debt Service Reserve Account.** At the time any Subordinated Bonds are delivered pursuant to the Resolution, the System shall pay into the Subordinated Bonds Debt Service Reserve Account from the proceeds of the Subordinated Bonds or other available funds, an amount equal to the aggregate of the Debt Service Reserve Requirements established in the Resolution for the Outstanding Subordinated Bonds, after giving effect to any Subordinated Bonds Reserve Account Cash Equivalent, which is defined as a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Fiscal Agent as a substitute for the deposit of cash and/or Investment Securities in the Subordinated Bonds Debt Service Reserve Account.  The Subordinated Bonds Debt Service Reserve Amount is equal to 50% of the average Accrued Payment Obligation (net of capitalized interest) of the Subordinated Bonds for each of the five Bond Years following the year in which the deposit is being made.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the Subordinated Bonds Debt Service Reserve Account shall be applied, to the extent other funds (including, but not limited to any amounts in the General Reserve Account) are not available therefor pursuant to the Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Subordinated Bonds and the principal and interest components of the Subordinate Obligations related to the Subordinated Bonds.

Amounts in the Subordinated Bonds Debt Service Reserve Account are available to pay debt service on the Senior Bonds if funds in the Senior Bond Debt Service Account, the Senior Bond Debt Service Reserve Account and the General Reserve Account are insufficient therefor.

**General Reserve Account.**   There shall be transferred from the Revenue Account, after all deposits to the Senior Bonds Debt Service Account, the Senior Bonds Debt Service Reserve Account, the Subordinated Bonds Debt Service Account, and the Subordinated Bonds Debt Service Reserve Account

have been made and operating expenses have been paid to the Fiscal Agent, all excess moneys into the General Reserve Account.

Except as otherwise provided by any Supplemental Resolution, amounts on deposit in the General Reserve Account shall be applied, to the extent funds are not available therefor in the Debt Service Account or Debt Service Reserve Account of any particular class of Bonds, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related class and the principal and interest components of Parity Obligations related to that class of Bonds. Funds in the General Reserve Account may also be used to pay Subordinate Obligations.

**Covenants Concerning Employer Contributions**

In the Resolution, the System covenants that it will diligently take all action necessary to collect Employer Contributions when due and will pursue all remedies provided by the Act and other applicable law to collect Employer Contributions.

In order to reduce the risk of any adverse change to the Act, the Resolution contains the System's covenant to oppose any reduction in the Employer Contributions rate or any other change in the Act that would have a material adverse effect on Bondholders.

**Limitation on Issuance of Additional Senior Bonds**

The System may issue, from time to time, one or more Series of additional Senior Bonds, which are payable from and secured by the Pledged Property on a parity with the Series A Bonds, the Series B Bonds, the Series C Bonds and any additional Senior Bonds that may be subsequently issued, upon satisfaction of the requirements of the Resolution before such issuance. No additional Senior Bonds may be issued unless the Fiscal Agent receives (i) a report from a nationally recognized independent economic consultant, dated no earlier than 12 months from the date of issuance of the additional Bonds, identifying the projected Employers' Contributions for each Bond Year through the final Maturity of all outstanding Senior Bonds, including the Senior Bonds then proposed to be issued; and (ii) a certificate of an authorized officer of the System certifying that, after taking into consideration the issuance of the additional Senior Bonds proposed to be issued, the projected Employers' Contributions in every Bond Year are equal to or greater than 140% of the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, in such year.

**Limitation on Issuance of Additional Subordinated Bonds**

The System may issue, from time to time, one or more Series of Subordinated Bonds, which are payable from and secured by the Pledged Property on a subordinated basis with the Series A Bonds, the Series B Bonds, the Series C Bonds and any other Senior Bonds that may be subsequently issued, upon satisfaction of the requirements of the Resolution before such issuance. No Subordinated Bonds may be issued unless the Fiscal Agent receives (i) a report from an independent economic consultant, dated no earlier than 12 months from the date of issuance of the additional Bonds, identifying the projected Employers' Contributions for each Bond Year through the final Maturity all outstanding Bonds, including the Subordinated Bonds then proposed to be issued; and (ii) a certificate of an authorized officer of the System certifying that, after taking into consideration the issuance of the additional Subordinated Bonds proposed to be issued, the projected Employers' Contributions in every Bond Year are equal to or greater than 125% of the Accrued Payment Obligation due on all Bonds, including such additional Subordinated Bonds, in such year.