# **Exhibit 7**

| NEW ISSUE – BOOK-ENTRY ONLY | RATINGS (see RATINGS herein): | Moody's: | Baa2 |
|---|---|---|---|
| | | S&P: | BBB- |
| | | Fitch: | BBB |

# $295,245,000
# PUERTO RICO AQUEDUCT AND SEWER AUTHORITY
### Revenue Bonds, Series 2012B (Senior Lien)

The Revenue Bonds, Series 2012B (Senior Lien) (the "Series B Bonds") of Puerto Rico Aqueduct and Sewer Authority (the "Authority"), the sole provider of public water and wastewater service in Puerto Rico, are being issued pursuant to a Master Agreement of Trust, dated as of March 1, 2008, as amended and restated as of February 15, 2012 (the "Trust Agreement"), with Banco Popular de Puerto Rico, trustee (the "Trustee"). The Series B Bonds will be issued to provide funds to be used by the Authority principally to repay or refinance certain outstanding indebtedness of the Authority. Concurrently with the issuance of the Series B Bonds, the Authority is issuing its $1,800,450,000 Revenue Bonds, Series 2012A Bonds (Senior Lien) (the "Series A Bonds" and, together with the Series B Bonds, the "2012 Senior Bonds") to provide funds to be used by the Authority principally to (i) repay or refinance certain outstanding indebtedness of the Authority, (ii) finance a portion of the Authority's capital improvement program for the five fiscal year period ending June 30, 2016, and (iii) fund the newly created Budgetary Reserve Fund. The Series A Bonds are being offered for sale in the United States tax-exempt markets pursuant to a separate Official Statement. The issuance of the Series B Bonds is not contingent upon the issuance of the Series A Bonds. Capitalized terms not otherwise defined in this Official Statement are defined in "Definition of Certain Terms" in the *Summary of the Trust Agreement and Summary of the Proposed Amendment to the Trust Agreement* included as *Appendix III*.

The 2012 Senior Bonds and any additional Senior Indebtedness (as defined herein on page 2) that the Authority has incurred or may incur from time to time under the Trust Agreement are payable solely from Authority Revenues as more fully described herein. The Trust Agreement generally establishes a gross lien on Authority Revenues as security for payment of debt service on Senior Indebtedness (including Senior Bonds) and Bonds (as defined herein on page III-3). The 2012 Senior Bonds will be secured on a parity in payment priority with the Authority's outstanding Senior Indebtedness (including Senior Bonds) and any additional Senior Indebtedness (including Senior Bonds) that may be incurred. The Trust Agreement also allows the Authority to issue Bonds and incur other obligations payable from such Authority Revenues but with a claim thereon subordinate to the claim of the Senior Indebtedness.

The Series B Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount and integral multiples thereof. The Series B Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series B Bonds on the records of The Depository Trust Company ("DTC") and its participants. Interest on the Series B Bonds will be payable on a monthly basis commencing on April 1, 2012. The Series B Bonds are subject to redemption at the option of the Authority, the earliest redemption date being July 1, 2015, as described herein. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series B Bonds. Prospective investors should consider the information set forth in RISK FACTORS AND INVESTMENT CONSIDERATIONS before investing.

In the opinion of Pietrantoni Méndez & Alvarez LLC, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Series B Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Series B Bonds will be exempt from United States federal income taxation to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. The Series B Bonds are not otherwise exempt from United States federal income taxation. See TAX MATTERS herein regarding certain other tax considerations.

**The Series B Bonds are not a debt of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any such municipalities or other political subdivisions, other than the Authority, shall be liable for the payment of the principal of or interest on said Bonds.**

The issuance of the Series B Bonds and their purchase by the Underwriters are subject to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel, and certain other conditions. Pietrantoni Mendez & Alvarez LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel, and Cancio Covas & Santiago, LLP, San Juan, Puerto Rico, will pass upon certain legal matters for the Authority. The Series B Bonds will be dated their date of delivery and are expected to be available for delivery through DTC on or about February 29, 2012.

### BofA Merrill Lynch

| Popular Securities | Santander Securities | UBS FS Puerto Rico |
|---|---|---|
| Barclays Capital | BBVAPR MSD | Citigroup | FirstBank PR Securities |
| Oriental Financial Services | Ramirez & Co. Inc. | Raymond James | Scotia MSD |

February 15, 2012

**$295,245,000**
**PUERTO RICO AQUEDUCT AND SEWER AUTHORITY**
**Revenue Bonds, Series 2012B (Senior Lien)**

| Maturity Date July 1 | Principal Amount | Interest Rate | Price | CUSIP* |
|---|---|---|---|---|
| 2014 | $31,035,000 | 3.35% | 100.00 | 745160RT0 |
| 2016 | 33,665,000 | 3.92 | 100.00 | 745160RU7 |
| 2018 | 36,705,000 | 4.45 | 100.00 | 745160RV5 |
| 2020 | 40,255,000 | 4.90 | 100.00 | 745160RW3 |
| 2023 | 46,470,000 | 5.00 | 100.00 | 745160RY9 |

$107,115,000   5.35% Term Bonds due July 1, 2027   - Price 100.00   CUSIP* 745160RX1

---

\*   Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

**In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series B Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series B Bonds to certain dealers and dealer banks and others at prices lower than the public offering prices stated on the inside cover page and said offering prices may be changed from time to time by the Underwriters.**

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Aqueduct and Sewer Authority (the "Authority"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Authority or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Authority since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series A Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, the Trust Agreement, the Series A Bonds and other documents herein do not purport to be complete. Reference is made to said laws, Trust Agreement, the Series B Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority or the Trustee.

**The Series B Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Series B Bonds in accordance with applicable provisions of laws of the states in which Series B Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof. Neither these states nor any of their agencies have passed upon the merits of the Series B Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.**

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Authority does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

The projections set forth in this Official Statement, if any, and in the Commonwealth Financial Information and Operating Data Report, dated December 6, 2011, which is incorporated by reference to this Official Statement, were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's and the Authority's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth and the Authority. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein or in any document incorporated by reference, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement and in the Commonwealth Financial Information and Operating Data Report, dated December 6, 2011, which is incorporated by reference to this Official Statement, which is solely the product of the Commonwealth and the Authority, and the independent auditors assume no responsibility for its content.

System Indebtedness. If at any time after such a declaration and before the entry of a final judgment or decree in any suit, action or proceeding instituted on account of such default or before the completion of the enforcement of any other remedy under the Trust Agreement, the principal of all Bonds and Other System Indebtedness that have matured or been called for redemption pursuant to any sinking fund provision and all arrears of interest have been paid and any other Events of Default which may have occurred have been remedied, then the Trustee may, by written notice to the Authority, rescind or annul such declaration and its consequences. No such rescission or annulment shall extend to or affect any subsequent default or impair any right consequent thereon. Senior Subordinate Indebtedness may not be accelerated if any Senior Indebtedness is Outstanding. Subordinate Indebtedness may not be accelerated if any Senior Indebtedness or Senior Subordinate Indebtedness are Outstanding. See *Summary of the Trust Agreement and Summary of the Proposed Amendment to the Trust Agreement* in *Appendix III*.

**Proposed Amendment to Trust Agreement**

In addition to the amendments approved by the Authority and incorporated into the Trust Agreement, the Authority is proposing an additional amendment to the Trust Agreement.

The amendment to the Trust Agreement would increase from 25% to a majority, the percentage of the aggregate principal amount of Senior Indebtedness (or if no Senior Indebtedness is then Outstanding, of Senior Subordinate Indebtedness) required to declare the entire unpaid principal of the Bonds due and payable upon the written notice to the Authority and, thereupon, the entire unpaid principal of the Bonds shall forthwith become due and payable. As a result, the threshold for holders of the Bonds to exercise this remedy in the event of an occurrence and continuance of certain Events of Default will be higher and will be more difficult to satisfy.

Section 9.02(e) of the Trust Agreement specifically authorizes the purchasers of Bonds, whether purchasing as underwriters or otherwise, upon such purchase, to consent to amendments to the Trust Agreement with the same effect as a consent given by the Holder of such Bonds. The amendment is expected to become effective upon the issuance of the 2012 Senior Bonds on February 29, 2012, upon receiving the consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representative of and on behalf of the Underwriters and holder of a majority of the aggregate principal amount of the Bonds Outstanding. See *Summary of the Trust Agreement and Summary of the Proposed Amendment to the Trust Agreement* in *Appendix III*.

## THE SERIES B BONDS

**General**

The Series B Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption."

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series B Bonds. The Series B Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series B Bond certificate will be issued for each stated maturity of the Series B Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES B BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES B BONDS (OTHER THAN UNDER THE CAPTION TAX MATTERS) SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES B BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Series B Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series B Bonds on DTC's records. The ownership interest of each actual purchaser of each Series B Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series B Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series B Bonds, except in the event that use of the book-entry system for the Series B Bonds is discontinued.

To facilitate subsequent transfers, the Series B Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series B Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series B Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series B Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series B Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series B Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series B Bonds documents. For example, Beneficial Owners of Series B Bonds may wish to ascertain that the nominee holding the Series B Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series B Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series B Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus

Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series B Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Series B Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee, on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority takes no responsibility for the accuracy thereof.

NONE OF THE AUTHORITY, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES B BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES B BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Series B Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Series B Bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Series B Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Series B Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Trustee in San Juan, Puerto Rico; (iii) interest on the Series B Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Authority maintained by the Trustee; (iv) the Series B Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Series B Bonds will be registrable and the Series B Bonds may be exchanged at the corporate office of the Trustee in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Redemption**

*Optional Redemption*

The Series B Bonds maturing after July 1, 2015 may be redeemed at the option of the Authority prior to maturity, upon not less than 30 days prior notice, either in whole, or in part, in such order of maturity as directed by the Authority, from any available moneys, but not from moneys held by the Trustee in respect of a Sinking Fund Requirement, on any date not earlier than July 1, 2015, at the principal amount of the Series B Bonds to be redeemed, plus accrued interest to the redemption date, without premium.

*Sinking Fund Requirements*

The Series B Term Bonds maturing July 1, 2027 shall be redeemed in part on July 1, 2026, and each July 1 thereafter in the principal amounts equal to the respective Sinking Fund Requirements (less the principal amount of any Series B Term Bonds retired by purchase) from moneys in the Senior Sinking Fund Account at par plus accrued interest in the years and amounts set forth below:

| Year | **Annual Sinking Fund Requirements for Series B Bonds due July 1, 2027** |
|---|---|
| 2026 | $53,535,000 |
| 2027 | 53,580,000* |

* Final maturity.

If the amount of the Series B Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Series B Bonds for such fiscal year, the amortization requirement for such Series B Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Authority shall determine.

**Notice of Redemption**

At least thirty (30) days prior to any redemption, notice thereof will be sent by registered or certified mail or overnight express delivery to the Holder of each Series B Bond to be redeemed at the address as it appears on the registration books kept by the Trustee and all organizations registered with the Securities and Exchange Commission (the "SEC") as securities depositories and to the MSRB. If less than all of the Series B Bonds of any one maturity are called for redemption, the particular Series B Bonds or portions thereof to be redeemed will be selected by the Trustee by such method as it deems fair, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of such Series B Bonds, and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participants, as the case may be, in its sole discretion deems fair and appropriate. Each notice of redemption shall contain, among other things, the CUSIP identification number and the number of the Series B Bonds (or portion thereof) being called for redemption, the redemption date and price and the address at which Series B Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to registered owner of any Series B Bond will not affect the validity of the proceedings for the redemption of any other Series B Bond. Any defect in such notice or the failure so to mail any such notice to any such national information service will not affect the effectiveness of a call for redemption. Notices of optional redemption are permitted under the Trust Agreement to be given with the condition that the effectiveness of such optional redemption is dependent upon the Trustee having in its possession on the date of redemption moneys sufficient to enable it to pay the applicable redemption price on the corresponding Series B Bonds and in the absence of such possession by the Trustee, such redemption will not take place.

**Purchase of Bonds**

The Authority may purchase or cause to be purchased any Bonds of any particular Series or maturity in lieu of redemption of such Bonds (in which event any Bonds so purchased shall be cancelled and shall cease to bear interest pursuant to the provisions of the Trust Agreement) or for any other purpose pursuant to written instructions given by the Authority to the Trustee. Such purchases shall be made in such manner as directed by the Authority. The Authority or the Trustee shall pay the purchase price of such Bonds together with accrued interest thereon from such funds as may be available therefor pursuant to the Trust Agreement, any Supplemental Agreement, or as otherwise may be made available by the Authority.

# THE AUTHORITY

The Authority is a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth. The Authority owns and operates the public water supply and wastewater systems of the Commonwealth. The executive offices of the Authority are located at 604 Barbosa Avenue, Hato Rey, Puerto Rico 00916. The telephone number is (787) 620-2277.

## Powers

The Authority has broad powers under the Act, including the power to make contracts, to acquire properties by any lawful means, to exercise eminent domain, to hold, operate and administer its properties, to borrow money and issue bonds for any of its corporate purposes, to secure the payment of its bonds and all other obligations by pledge of its revenues, to determine, revise, charge and collect rates, fees, rentals and other charges for the use of its facilities and to have complete control and supervision of its properties and activities.

## Management

The Governing Board of the Authority (the "Board") is composed of nine members, five of whom are private citizens (the "Independent Directors") appointed by the Governor of Puerto Rico and confirmed by the Senate; two of whom are ex-officio members in their capacity as Executive Director of the Electric Power Authority and President of the Planning Board; and two of whom are ex-officio members in their capacity as Executive Directors of the organizations representing Mayors of the Municipalities of the Commonwealth. Members of the Board who are not ex-officio members serve staggered, five-year terms. The members of the Board are:

| Members | Occupation | Term Ends |
| --- | --- | --- |
| Mr. Edgardo Fábregas Castro | Independent Director; Interim Board Chairman | June 30, 2014 |
| Mr. Otoniel Cruz Carrillo | Executive Director, Electric Power Authority | Ex-Officio |
| Eng. Bernardino Feliciano Ruiz | Independent Director | June 30, 2014 |
| Ms. Carmen Ana Culpeper Ramírez | Independent Director | June 30, 2015 |
| Mr. Reinaldo Paniagua Látimer | Executive Director of the Federation of Mayors | Ex-Officio |
| Mr. Jaime García García | Executive Director of the Association of Mayors | Ex-Officio |
| Mr. Rubén Flores Marzán | President of Planning Board | Ex-Officio |
| Aura González Ríos, Esq. | Independent Director | June 30, 2013 |
| Carlos Dávila Torres, CPA | Independent Director | June 30, 2013 |

The Board is responsible for making or approving all major decisions taken by the Authority, including overall institutional policies, the Authority's strategies and programs, executive and key management manpower recruitments and removals, approval of union contracts, professional services contracts beyond the limits accorded to the Executive President, and all contract changes that are beyond the limits accorded to the Executive President.

The Board is assisted by an Internal Audit Unit which is responsible for conducting internal audits for the Board, and by a Board Secretary, who maintains Board records, among other responsibilities.

The Board appoints the Executive President, who is the chief executive officer of the Authority responsible for its day-to-day operations. The appointment is for a six-year term. In addition, under the Act, the operations of the Authority are divided into five geographical regions and are run by regional executive directors who report to the Executive President and are also subject to six-year terms. Set forth below are brief biographical descriptions of the Executive President and certain members of the Authority's senior management staff.

**Eng. José Ortiz Vázquez**, Executive President, was appointed to that position in January 2007. Prior to his appointment, he was the Authority's Executive Director for Infrastructure since 2004. Before that he worked in the manufacturing industry, having served as Engineering Director for multinational firms including Colgate-

Palmolive and Unilever. In November 2011, Mr. Ortiz was appointed Chairman of the Governing Board of Puerto Rico Electric Power Authority. He holds a Bachelor's Degree in Electrical Engineering from the Mayagüez Campus of the University of Puerto Rico and a Master's Degree in Business Administration from the University of Turabo.

**Eng. Eufemio Toucet**, Executive Vice President and Interim Executive Director for the Metro Region, assumed such positions in February 2009 and January 2012, respectively. Prior to his appointment as Executive Vice President, he was the Authority's Executive Director for the East Region since 2005. Before joining the Authority, Mr. Toucet worked for Cemex de Puerto Rico, Inc. as Executive Director of Ready Mix, for four years. Prior to that, he was President and General Manager of Storage Technology, Ponce, Puerto Rico, and Plant Manager of Digital Equipment Corporation, San Germán, Puerto Rico. Mr. Toucet obtained a Bachelor's Degree in Industrial Engineering from the University of Puerto Rico, Mayagüez Campus.

**Eng. Alberto Lázaro,** Executive Director for Infrastructure, assumed such position in January 2007 after having served as the Authority's Director of Engineering for two years. Prior to that, he served as Deputy Secretary for Puerto Rico Department of Natural and Environmental Resources for two years and as an environmental engineer consultant in the private sector for seven years, involved with planning, design, construction, management, and operation of water and sewer facilities. He holds a Bachelor's Degree in Civil Engineering from Cornell University and a Master's Degree in Environmental Engineering from the Massachusetts Institute of Technology.

**Efraín Acosta Reboyras**, Executive Director of Administration and Finance, was appointed to such position in April 2004, after working for two years with Ondeo de Puerto Rico (a subsidiary of Suez Environment). Prior to that, he served as Deputy Executive Director of Finance for Puerto Rico Industrial Development Company. Before joining the government, Mr. Acosta worked in various senior financial and accounting positions in the private sector for companies such as 3M, Bacardi Corporation, Haskins & Sells and ITT Corporation. Mr. Acosta holds a Bachelor's Degree in Business Administration from the University of Puerto Rico and has pursued his Masters of Business Administration degree from Interamerican University of Puerto Rico.

**Raquel Matos, Esq.**, General Legal Counsel, assumed such position in November 2006 after having served as the Authority's Internal Auditor for almost two years. Prior to that, she served as Legal Counsel to the Office of the Comptroller of the Commonwealth for two years. Ms. Matos holds a Juris Doctor from the University of Puerto Rico School of Law and a Bachelor's Degree in Business Administration, with a major in accounting, from the University of Puerto Rico, Río Piedras Campus. She is also a CPA.

**José E. Nieves Maldonado**, Human Resources and Labor Relations Director, was appointed to such position in November 2009. Mr. Nieves joined the Authority in August 1980 and has occupied different management positions within the Human Resources and Labor Relations Department. He holds a Bachelor's Degree in Labor Relations from University of Puerto Rico, Río Piedras Campus.

**Eng. José Capeles**, Executive Director of Environmental Compliance and Quality Control, was appointed to such position in February 2007, after having served as the Authority's Deputy Executive Director for Infrastructure since 2004. Prior to that, he served as Vice President of Compliance and Planning for the Authority, directing and administering the private operator's service contract related obligations. Mr. Capeles joined the public sector in 2001 after 25 years of service in various technical and executive management positions for multinational manufacturing and marketing firms, including Sunoco and Enron. He holds a Bachelor's Degree in Chemical Engineering from the University of Puerto Rico, Mayagüez Campus, and has taken several post-graduate courses, including an Executive Business Program from Dartmouth College, New Hampshire.

**Eng. Doriel I. Pagán Crespo,** Executive Director for the North Region, was appointed to that position in May 2011. Prior to her appointment, she served as Regional Executive Sub-Director for the North Region for a year and a half. Ms. Pagán joined the Authority in 1992, and has occupied different positions within the Compliance and Quality Control Department. Prior to joining the Authority, she worked for Johnson & Johnson Company in San Germán, Puerto Rico, for two years. Ms. Pagán was recognized by the College of Engineers and Surveyors of Puerto Rico as "Woman of Avant-garde." She obtained her Bachelor's Degree in Chemical Engineering from the University of Puerto Rico, Mayagüez Campus in 1991.

**Eng. Francisco Martínez Castello**, Executive Director for the East Region, was appointed to such position in November 2011, after having served as the Authority's Executive Director for the West Region for two years. Prior to that, he served as the Guayama Operational Area Director and as Director of the Infrastructure Department for the West and East Region. Mr. Martínez worked with Ondeo de Puerto Rico and Compañía de Aguas de Puerto Rico. He holds a Bacherlor's Degree in Mechanical Engineer from the University of Puerto Rico, and a Master's Degree in Business Administration, with a major in management, from the Pontifical Catholic University of Puerto Rico.

**Eng. Julio Víctor Pérez**, Executive Director for the South Region, was appointed to that position in January 2009. He has over twenty nine years of experience in the management, operation, maintenance, and construction of water and wastewater systems. Mr. Pérez received his Bachelor's Degree in Electrical Engineering fromthe University of Puerto Rico, Mayagüez Campus.

**Eng. Joel Lugo Rosa**, Interim Executive Director for the West Region, was appointed to such position in December 2011, after having served as Executive Sub-Director for West Region since January 2009. Prior to that, he served as Auxiliary Infrastructure Director for West Region from 2006. Mr. Lugo joined the Authority in 1998 as field engineer for the Infrastructure Department. He holds a Bachelor's Degree in Civil Engineering from the University of Puerto Rico, and is currently pursuing a Master's Degree in Civil Engineering with a concentration in Water Resources and Environmental Engineering from the University of Puerto Rico.

As stated in the Consulting Engineer's Report, the Consulting Engineer believes that the Authority's current management structure is adequately developed and consistent with those found at similar United States utilities of equivalent size.

The Authority has organized its service area into five regions to decentralize the management and administration of many operational matters. Regional executive directors, serving terms of six years and reporting to the Executive President, are responsible for administration and operation of water and wastewater facilities within each region. The Authority's management has taken and is continuing to take steps to strengthen the operation and management of the Authority. These steps include improved billing and collection procedures (including mobile and remote meter readings to reduce the number of estimated bills being produced), consolidation and computerization of the planning process for capital improvement projects, upgrading of laboratory personnel and facilities, organization of the Pretreatment Area to manage the Authority's pretreatment program, and improved handling of personnel grievances within the Human Resources Area.

**Employees and Labor Relations**

The Authority had 4,919 regular and temporary employees as of June 30, 2011, as compared with 5,001 as of June 30, 2010 and 5,575 as of June 30, 2009. At June 30, 2011, 3,657 employees were represented by two unions, the Independent Authentic Union (the "UIA" by its Spanish acronym) and the Hermandad de Empleados Profesionales de la Autoridad de Acueductos y Alcantarillados (the "HIEPAAA"), the largest of which is the UIA with 3,490 members.

The Authority's relations with its unionized employees have at times been contentious. For example, a prolonged work stoppage occurred in 2004, and lasted 84 days. Since that time, multi-day labor stoppages have occurred periodically. Recently, the Authority and the UIA entered into a new collective bargaining agreement that will be in effect from January 1, 2012 through December 31, 2015. The new collective bargaining agreement contains, among other things, certain retroactive and future economic agreements in the areas of payroll and benefit expenses that are included in the Authority's budget projections.

In 2009, the Puerto Rico Labor Relations Board made a final determination regarding the scope of the UIA's collective bargaining agreement that expired in 2003 and found that the collective bargaining agreement was in existence and reinstated its effects through December 2008. As a result of this decision, the Authority was required to retroactively recognize the existence of certain employment terms that the Authority had ceased to apply from 2003 through 2008. As a result of the retroactive application of these employment terms, the Authority negotiated the payment of approximately $34.2 million to UIA members to be paid in three installments during fiscal years 2012 and 2013.

With respect to the HIEPAAA, their collective bargaining agreement expired in 2009, however, it is automatically renewed for one-year periods. A new collective bargaining agreement is currently being negotiated between the Authority and the HIEPAAA.

Pending negotiation and execution a new collective bargaining agreement with the HIEPAAA, the management of the Authority believes that current labor relations are satisfactory.

**Pension Benefits**

*The information set forth below with respect to the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Employees Retirement System"), and other information referenced as being provided by the Employees Retirement System, has been obtained from the Employees Retirement System. The Employees Retirement System is responsible for conducting actuarial valuations of the benefit plan. The Authority has not reviewed the actuarial valuation or verified the accuracy of the data used by the Employees Retirement System for the actuarial valuations. The Authority and the Employees Retirement System intend to review the actuarial valuation and the Authority's census data.*

Substantially all of the employees of the Authority are covered by the Employees Retirement System, a multi-employer hybrid defined benefit plan consisting of different benefit structures. The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico and the Puerto Rico Electric Power Authority) and municipalities, except for those employees that are covered by two other retirement systems of the Commonwealth.

The Employees Retirement System faces a number of financial difficulties, as reflected in its large and growing unfunded actuarial accrued liability ("UAAL") and historical funding shortfalls, which are expected to continue. As of June 30, 2010, the date of the latest actuarial valuation of the Employees Retirement System, the UAAL of the Employees Retirement System was $17.8 billion and the funded ratio was 8.5%. Based on the current statutory employer and member funding requirements and disbursement projections (which reflect continued funding shortfalls), the UAAL of the Employees Retirement System is expected to continue growing instead of being amortized. The Employees Retirement System is in the process of preparing the actuarial valuation as of June 30, 2011. The Employees Retirement Systems expects that, mainly as a result of a decrease in the assumed investment return to be used in the actuarial valuation as of June 30, 2011, the UAAL of the Employees Retirement System will increase to approximately $21.5 billion and the funded ratio will decrease to approximately 7.4%. These estimates, however, are preliminary and could change as part of the Employees Retirement System's review of the actuarial valuation as of June 30, 2011.

Because the statutory employer and member contributions are not adequate to fund the System's benefits, the System's assets are being rapidly depleted and, as a result, the currently scheduled future contributions will not be adequate to accumulate sufficient assets to make future benefit payments when due. Based on the assumptions used in the actuarial valuation as of June 30, 2010, the Employees Retirement System would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds issued by the Employees Retirement System) by fiscal year 2014 and its gross assets by fiscal year 2019. This means that during the period from fiscal year 2014 through fiscal year 2019, benefits are expected to be paid from the proceeds of the pension obligation bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits to members, to refund member balances or to pay debt service on the pension obligation bonds. As a result of the gradual increases in employer contributions provided for by Act 116 of July 6, 2011 ("Act 116"), as described below, and other matters considered in the actuarial valuation report being prepared as of June 30, 2011, the Employees Retirement System expects that the new actuarial valuation will project that the Employees Retirement System will deplete its net assets by fiscal year 2015 and its gross assets by fiscal year 2022.

The Employees Retirement System is funded from contributions by the employers (the Commonwealth, public corporations, including the Authority, and municipalities), contributions by the employees and investment income. Act 116 provided for an increase in employer contributions of 1% of payroll in each of the next five fiscal years and by 1.25% of payroll in each of the following five fiscal years. As of July 1, 2011, after the adoption of Act 116, the statutory employer contribution for the employers (including the Authority) increased from a minimum

32

of 9.275% to a minimum of 10.275% of payroll. By fiscal year 2021, the total employer contribution rate will be 20.525% of payroll. The employer contribution rate of 9.275% had been in effect since February 1990. These contribution rates are statutorily established rates that do not reflect actuarially recommended contribution rates or rates that are intended to fully pre-fund the present value of future benefits.

For a detailed discussion of the funding requirements and benefit structure of the Employees Retirement System, as well as its financial and actuarial situation, funding shortfalls, and efforts to address its financial solvency, see RETIREMENT SYTEMS in the Commonwealth Report.

The enabling act of the Employees Retirement System requires that the contributions of each employer cover the difference between (i) the benefits provided by the Employees Retirement System to its employees who are members of the System, plus administrative costs, and (ii) the contributions that its employees are required to make to the Employees Retirement System. This requirement, however, has not been adhered to and the level of employer contributions has historically been limited to the minimum statutory rate. The enabling act further provides that any resulting deficiency in the employer contribution is an obligation of the employer.

As a participating employer in the Employees Retirement System, the Authority has been making employer contributions based on the minimum statutory rate (currently 10.275% of covered payroll). The Authority's total employer contributions for the fiscal years ended June 30, 2011, 2010 and 2009 amounted to approximately $12.4 million, $14.0 million and $14.7 million, respectively. As a result of Act 116, the Authority's contributions are projected to increase annually by an average of $2.4 million per fiscal year, to a total of approximately $37.7 million by fiscal year 2021. For fiscal year 2012, the Authority's estimated employer contribution is $15.4 million. As stated above, these contributions do not reflect actuarially recommended contribution rates and, as described above, contributions at this level are expected to result in a depletion of the gross assets of the Employees Retirement System.

Because the current funding requirements will not be sufficient to make future benefit payments when due and the Authority is ultimately responsible for any funding deficiency with respect the Authority's members participating in the Employees Retirement System, additional funding from the Authority and other sponsoring employers will ultimately be necessary to make benefit payments to the Employee Retirement System's participants. Under current law, once the System's assets are depleted, the Authority will be obligated to make contributions to the Employees Retirement System in an amount sufficient to cover the deficiency between the Authority's employee contributions and all benefit payments relating to its retirees, as well as a portion of the administrative costs of the System. This additional funding obligation may adversely affect the Authority's ability to generate sufficient Authority Revenues to meet its operating expense requirements after the payment of debt service on the Bonds. In addition, its ability to continue funding its capital improvement program to improve the Systems and comply with its regulatory requirements may also be adversely affected. The Employees Retirement System estimates that, for fiscal year 2011, benefit payments to the Authority's members in the Employees Retirement System were approximately $81.5 million, and the Authority's employees contributed approximately $9.5 million.

The actuarial valuation report as of June 30, 2010 allocates to the participating public corporations $5.1 billion of the total actuarial accrued liability of $19.5 billion. The Employees Retirement System estimates that as of June 30, 2011, in connection with the new actuarial valuation being performed, the actuarial accrued liability of the participating public corporations will be approximately $6.1 billion of an estimated total actuarial accrued liability of $23.3 billion. The Employees Retirement System estimates that, as of June 30, 2011, approximately $1.2 billion of the actuarial accrued liability allocated to the public corporations corresponds to the Authority's participants in the System and that, if the Authority were required to make contributions at the actuarially recommended rates, the contributions for fiscal year 2011 would have been approximately $88.4 million. As stated above, however, the Authority has not reviewed or verified the actuarial valuation or the accuracy of the data used for these actuarial estimates. The Authority and the Employees Retirement System intend to review the Authority's census data and, because actuarial valuations are dependent, among other things, on the data supplied, it is possible that as a result of such review the estimate of the Authority's actuarial liabilities and actuarially recommended contributions could vary.

The Employees Retirement Systems has been evaluating measures to improve its financial solvency. Ultimately, the Commonwealth, which as the principal participating employer is required to cover a significant

amount of the funding deficiency of the Employees Retirement System, will have to implement significant reforms in order to maintain the long-term fiscal integrity of the Employees Retirement Systems and its ability to pay required benefits to members. Given the funding status of the Employees Retirement System, these reforms may have to include, among other things, further increases to the employer contributions over the next several years by all participating employers, including the Authority, and changes in the allocations of those contributions among the employers. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" under RETIREMENT SYTEMS in the Commonwealth Report.

**Other Post-Employment Benefits**

In addition to the pension benefits, the Authority provides non-pension post-employment benefits under a Healthcare Benefits Plan to Retirees that consist of a fixed maximum monthly payment to cover medical expenses for retired employees meeting the service eligibility requirements. Based on this Plan's features, it is treated as a single-employer defined benefit healthcare plan. These benefits are funded by the Authority on a "pay-as-you-go basis," which means that there is no reserve or pool of assets against the benefit expenses that the Authority may incur in future years. For fiscal year 2011, the Authority paid $2.5 million for these non-pension post-employment benefits for its eligible retirees. For fiscal year 2012, these benefits are also expected to amount to $2.5 million.

In accordance with the provisions of GASB Statement No. 45, the Authority is required to quantify and disclose its obligations to pay non-pension post employment benefits to current and future retirees. The most recent actuarial valuation report for these benefits, as of June 30, 2009, reflects a UAAL of $56.4 million with respect to these benefits, and the funding ratio is 0% since, as mentioned previously, these benefits are funded on a "pay-as-you-go basis."

**Fiscal Oversight Agreement**

Under the Existing FOA, the Authority agreed to implement a comprehensive expense reduction program, including certain fiscal oversight controls, subject to laws and existing agreements of the Authority, and provide Government Development Bank with certain financial information and operating data, as well as other financial information reasonably requested by Government Development Bank. In connection with the issuance of the 2012 Senior Bonds, the Authority, Government Development Bank, and the Commonwealth will enter into the Fiscal Oversight Agreement, which will amend and restate the Existing FOA and establish a new Budgetary Reserve Fund. The Fiscal Oversight Agreement is intended to allow the Authority to become self sufficient and to protect and improve the credit rating of the Authority, so that the Authority may obtain adequate financing to fund its capital expenditure requirements and operate the Systems in an efficient and reliable manner and in compliance with applicable laws and regulations and other regulatory requirements.

The Fiscal Oversight Agreement, among other things, requires the Authority to provide certain financial and operational information to Government Development Bank on a regular basis. Additionally, the Fiscal Oversight Agreement requires that the Authority provide Government Development Bank a draft of its Annual Budget, capital expenditure budget and Disbursement Schedule no later than April 15 of each year and final copies of these budgets and schedule be delivered to Government Development Bank no later than June 30 of each year. The Fiscal Oversight Agreement provides that an independent third-party consulting engineering firm may assist Government Development Bank in reviewing and analyzing the Authority's reports and budgets and enforcing the Fiscal Oversight Agreement.

The Fiscal Oversight Agreement also establishes a new Budgetary Reserve Fund, held by Government Development Bank in trust for the Authority, which will be funded initially with a portion of the proceeds of the Series A Bonds. For more information regarding the Budgetary Reserve Fund created by the Fiscal Oversight Agreement, see "Budgetary Reserve Fund" under SECURITY FOR THE BONDS.