# **Exhibit 9**

NEW ISSUE - BOOK-ENTRY ONLY

# $2,184,860,553

# Puerto Rico Highways and Transportation Authority
### $250,000,000 Transportation Revenue Bonds (Series M)
### $1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N)
### $431,955,609.05 Highway Revenue Refunding Bonds (Series CC)

The Transportation Revenue Bonds (Series M) (the "Series M Bonds") and the Transportation Revenue Refunding Bonds (Series N) (the "Series N Bonds") are being issued by the Puerto Rico Highways and Transportation Authority (the "Authority") pursuant to Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"), for the purpose of financing various highway projects and refunding certain of the Authority's Transportation Revenue Bonds, respectively.  The Highway Revenue Refunding Bonds (Series CC) (the "Series CC Bonds") are being issued by the Authority pursuant to Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution") for the purpose of refunding certain of the Authority's Highway Revenue Bonds.

The Series M Bonds, the Series N Bonds, the outstanding bonds of the Authority previously issued under the 1998 Resolution, and any additional bonds that the Authority may from time to time issue under the 1998 Resolution (collectively, the "Transportation Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth of Puerto Rico (the "Commonwealth") on certain petroleum products; (ii) toll revenues of the Authority's traffic facilities that were not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) the 1968 Resolution Revenues (as described below) available after payment of debt service on the Authority's outstanding Highway Revenue Bonds (collectively, the "1998 Resolution Revenues").

The Series CC Bonds, the outstanding bonds of the Authority previously issued under the 1968 Resolution, and any additional bonds that the Authority may from time to time issue under the 1968 Resolution (collectively, the "Highway Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes, and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth; (ii) all toll revenues of the Authority's traffic facilities financed with Highway Revenue Bonds and any extensions and improvements thereto; and (iii) certain investment earnings (collectively, the "1968 Resolution Revenues").

All of the aforesaid revenues of the Authority that constitute taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor.

The Series M Bonds, the Series N Bonds and the Series CC Bonds (collectively, the "Bonds") will have the following characteristics:

- The Bonds will be dated their date of delivery.
- The Bonds will be registered under The Depository Trust Company's book-entry only system.  Purchasers of the Bonds will not receive definitive Bonds.
- The inside cover pages of this Official Statement contain information concerning the maturity schedule, interest rates and prices or yields of the Bonds.
- The Bonds will be issued as Fixed Rate Bonds, LIBOR Bonds, Capital Appreciation Bonds and CPI Bonds.  The interest rate on the Fixed Rate Bonds will be a fixed interest rate as set forth on the inside cover pages of this Official Statement.  The interest rate on the LIBOR Bonds will be equal to 67% of the Three-Month LIBOR Rate plus 0.53%, but will not be greater than the maximum rate permitted under Puerto Rico law (currently 12%), and will be reset quarterly.  Interest on the Capital Appreciation Bonds will accrue semi-annually at a fixed rate as set forth on the inside cover pages of this Official Statement but will be paid only at maturity.  The interest rate on the CPI Bonds will be based on changes in the Consumer Price Index plus a spread of 1.12%, but will not be greater than the maximum rate permitted under Puerto Rico law (currently 12%), and will be reset monthly.
- Interest on the Fixed Rate Bonds will be payable on each January 1 and July 1, commencing on July 1, 2007.  Interest on the CPI Bonds will be payable on the first Business Day of each month, commencing on July 2, 2007.  Interest on the LIBOR Bonds will be payable on each January 1, April 1, July 1 and October 1, commencing on July 1, 2007.  Interest on the Capital Appreciation Bonds will be payable only at maturity.
- The Bonds will be issued in denominations of $5,000 principal amount (or maturity amount, in the case of the Capital Appreciation Bonds) and integral multiples thereof.
- The scheduled payment of principal and interest on some of the Bonds when due will be guaranteed under insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, Financial Security Assurance Inc., Ambac Assurance Corporation and Assured Guaranty Corp., as indicated on the inside cover pages of this Official Statement.
- In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes under section 103 of the Internal Revenue Code of 1986, as amended (the "Code").  Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations.  Interest on the Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.  Bond Counsel is further of the opinion that the Bonds and interest thereon are exempt from state, Commonwealth and local income taxation.  See "Tax Matters" herein regarding certain other tax considerations.
- It is expected that settlement for the Bonds will occur on or about March 6, 2007.

**The Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivisions, other than the Authority, is liable thereon.**

# Citigroup

| Goldman, Sachs & Co. | | RBC Capital Markets |
|---|---|---|
| Banc of America Securities LLC | BBVAPR MSD | JP Morgan |
| Lehman Brothers | Merrill Lynch & Co. | Morgan Stanley |
| Popular Securities | Raymond James & Associates, Inc. | Samuel A. Ramirez & Co. |
| Santander Securities | UBS Investment Bank | Wachovia Bank, National Association |

February 15, 2007

$2,184,860,553
# Puerto Rico Highways and Transportation Authority

### $250,000,000 Transportation Revenue Bonds (Series M)

#### $75,490,000 Serial Bonds (Fixed Rate Bonds)

| Maturity July 1, | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|
| 2008 | $2,385,000 | 4% | 3.75% |
| 2009 | 2,480,000 | 4 | 3.82 |
| 2010 | 2,580,000 | 4 | 3.88 |
| 2011 | 2,685,000 | 4 | 3.93 |
| 2012 | 2,790,000 | 5 | 3.97 |
| 2013 | 2,930,000 | 5 | 3.99 |
| 2014 | 3,080,000 | 4 | 4.02 |
| 2015 | 3,200,000 | 4 | 4.06 |
| 2016 | 3,330,000 | 4 | 4.09 |
| 2017 | 3,460,000 | 4 | 4.12 |
| 2018 (1) | 2,545,000 | 5 | 4.16 |
| 2018 | 1,055,000 | 4 1/8 | 4.16 |
| 2019 | 3,770,000 | 4 1/8 | 4.19 |
| 2020 (1) | 3,745,000 | 5 | 4.21 |
| 2020 | 180,000 | 4.20 | 4.21 |
| 2021 (1) | 4,120,000 | 5 | 4.23 |
| 2022 (1) | 4,220,000 | 5 | 4.25 |
| 2022 | 105,000 | 4 ¼ | 4.25 |
| 2023 (1) | 3,180,000 | 5 | 4.28 |
| 2023 | 1,365,000 | 4 ¼ | 4.28 |
| 2024 (1) | 4,515,000 | 5 | 4.30 |
| 2024 | 245,000 | 4.30 | 100% |
| 2025 (1) | 4,895,000 | 5 | 4.32 |
| 2025 | 100,000 | 4.30 | 4.32 |
| 2026 (1) | 5,045,000 | 5 | 4.34 |
| 2026 | 200,000 | 4.30 | 4.34 |
| 2027 (1) | 4,800,000 | 5 | 4.36 |
| 2027 | 705,000 | 4.30 | 4.36 |
| 2037 | 1,780,000 | 4 ½ | 100% |

#### $174,510,000 Term Bonds (Fixed Rate Bonds)

$31,915,000  5%  Term Bonds due on July 1, 2032 – yield 4.38% (1)
$38,955,000  5%  Term Bonds due on July 1, 2037 – yield 4.41% (1)
$103,640,000  5%  Term Bonds due on July 1, 2046 – yield 4.49% (1)

(1)    Priced to the first call date on July 1, 2017

**$1,502,904,943.95 Transportation Revenue Refunding Bonds (Series N)**

**$593,265,000 Serial Bonds (Fixed Rate Bonds)**

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2021 | $ 18,995,000 | 5 ½% | 4.27% |
| 2022 | 9,795,000 | 5 ½ | 4.30 |
| 2023 | 10,320,000 | 5 ½ | 4.33 |
| 2024 | 21,420,000 | 5 ½ | 4.35 |
| 2025 | 25,480,000 | 5 ½ | 4.37 |
| 2026 | 26,865,000 | 5 ½ | 4.39 |
| 2029 | 51,580,000 | 5 ½ | 4.43 |
| 2030 (A) | 66,520,000 | 5 ¼ | 4.18 |
| 2031 (A) | 92,540,000 | 5 ¼ | 4.19 |
| 2032 (M) | 97,580,000 | 5 ¼ | 4.20 |
| 2033 (M) | 83,875,000 | 5 ¼ | 4.21 |
| 2034 (AS) | 88,295,000 | 5 ¼ | 4.31 |

**$445,290,000 Term Bonds (Fixed Rate Bonds)**

$181,500,000   5 ¼% Term Bonds Due July 1, 2036 – yield 4.32% (AS)
$263,790,000   5 ¼ % Term Bonds Due July 1, 2039 – yield 4.25% (F)

**$17,324,943.95 Capital Appreciation Bonds**

| Maturity July 1, | Initial Principal Amount | Maturity Amount | Yield |
|---|---|---|---|
| 2019 | $ 5,736,793.40 | $ 9,890,000 | 4.47% |
| 2020 | 11,588,150.55 | 20,935,000 | 4.49% |

**$57,965,000 CPI Bonds**

| Maturity July 1, | Principal Amount | Rate | Price |
|---|---|---|---|
| 2027 (A) | $28,545,000 | CPI* | 100% |
| 2028 (A) | $29,420,000 | CPI* | 100% |

**$389,060,000 LIBOR Bonds**

$155,620,000  LIBOR-Based Interest Rate Bonds Due July 1, 2041 – price 100% (L)(M)
$233,440,000  LIBOR-Based Interest Rate Bonds Due July 1, 2045 – price 100% (L)(A)

(A)   Insured by Ambac Assurance Corporation

(AS)   Insured by Assured Guaranty Corp.

(F)   Insured by Financial Guaranty Insurance Company

(M)    Insured by MBIA Insurance Corporation

(L)   The LIBOR Bonds will bear interest from their date of delivery at a per annum rate for each period equal to (a) 67% of the Three-Month LIBOR Rate for such period plus (b) a per annum spread equal to 0.53%; provided that the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

*   For a description of the CPI Rate and its calculation, see Appendix VII – Provisions Applicable to CPI Bonds.

### $431,955,609.05 Highway Revenue Bonds (Series CC)

#### $308,965,000 Serial Bonds (Fixed Rated Bonds)

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2012 | $ 1,020,000 | 5% | 3.96% |
| 2013 | 1,070,000 | 5 | 3.99 |
| 2014 | 1,125,000 | 5 | 4.01 |
| 2015 | 1,180,000 | 5 | 4.05 |
| 2016 | 19,330,000 | 5 | 4.07 |
| 2028 | 34,545,000 | 5 ½ | 4.38 |
| 2029 | 36,445,000 | 5 ½ | 4.40 |
| 2030 | 38,445,000 | 5 ½ | 4.41 |
| 2031 | 40,565,000 | 5 ½ | 4.42 |
| 2032 (FS) | 42,790,000 | 5 ¼ | 4.20 |
| 2033 (FS) | 45,045,000 | 5 ¼ | 4.21 |
| 2034 (FS) | 47,405,000 | 5 ¼ | 4.22 |

#### $102,410,000 Term Bonds (Fixed Rate Bonds)

$102,410,000  5 ¼%  Term Bonds Due July 1, 2036 – yield 4.23% (FS)

#### $20,580,609.05 Capital Appreciation Bonds

| Maturity July 1, | Initial Principal Amount | Maturity Amount | Yield |
|---|---|---|---|
| 2017 | $ 836,191.80 | $ 1,305,000 | 4.36% |
| 2018 | 798,229.35 | 1,305,000 | 4.39 |
| 2019 | 761,558.85 | 1,305,000 | 4.42 |
| 2020 | 727,080.75 | 1,305,000 | 4.44 |
| 2021 | 693,894.60 | 1,305,000 | 4.46 |
| 2022 | 659,425.00 | 1,300,000 | 4.48 |
| 2023 | 627,835.00 | 1,300,000 | 4.51 |
| 2024 | 598,416.00 | 1,300,000 | 4.53 |
| 2025 | 570,154.00 | 1,300,000 | 4.55 |
| 2026 | 543,023.00 | 1,300,000 | 4.57 |
| 2027 | 13,764,800.70 | 34,545,000 | 4.58 |

(FS)    Insured by Financial Security Assurance Inc.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person, in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority since the date hereof.

The Underwriters have provided the following sentence for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS, THE OUTSTANDING TRANSPORTATION REVENUE BONDS AND THE OUTSTANDING HIGHWAY REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning Financial Guaranty Insurance Company ("FGIC"), MBIA Insurance Corporation ("MBIA"), Financial Security Assurance Inc. ("FSA"), Ambac Assurance Corporation ("Ambac") and Assured Guaranty Corp. ("Assured") contained under the caption "Bond Insurance" and Appendices VIII, IX, X, XI AND XII, respectively, none of the information in this Official Statement has been supplied or verified by FGIC, MBIA, FSA, Ambac or Assured. FGIC, MBIA, FSA, Ambac and Assured make no representation or warranty, express or implied, as to the accuracy or completeness of such information, the validity of the Bonds, or the tax exempt status of the interest on the Bonds.

The Assured Bond Insurance Policy is not covered by any insurance or guaranty fund established under New York, California, Connecticut or Florida insurance law.

*Assured Guaranty Corp.*

Assured is a Maryland-domiciled insurance company regulated by the Maryland Insurance Administration and licensed to conduct financial guaranty insurance business in forty-nine states, the District of Columbia and Puerto Rico. Assured commenced operations in 1988. Assured is a wholly owned, indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO." AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, structured finance and mortgage markets. Neither AGL nor any of its shareholders is obligated to pay any debts of Assured or any claims under any insurance policy issued by Assured.

Assured is subject to insurance laws and regulations in Maryland and in New York (and in other jurisdictions in which it is licensed) that, among other things, (i) limit Assured's business to financial guaranty insurance and related lines, (ii) prescribe minimum solvency requirements, including capital and surplus requirements, (iii) limit classes and concentrations of investments, (iv) regulate the amount of both the aggregate and individual risks that may be insured, (v) limit the payment of dividends by Assured, (vi) require the maintenance of contingency reserves, and (vii) govern changes in control and transactions among affiliates. Certain state laws to which Assured is subject also require the approval of policy rates and forms.

Assured's financial strength is rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., "AAA" by Fitch, Inc. and "Aa1" by Moody's Investors Service, Inc. Each rating of Assured should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by Assured. Assured does not guaranty the market price of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

*Capitalization of Assured Guaranty Corp.*

As of December 31, 2005, Assured had total admitted assets of $1,140,661,558 (audited), total liabilities of $844,915,840 (audited), total surplus of $295,745,718 (audited) and total statutory capital (surplus plus contingency reserves) of $854,790,565 (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 2006, Assured had total admitted assets of $1,214,267,268 (unaudited), total liabilities of $942,146,442 (unaudited), total surplus of $272,120,826 (unaudited) and total statutory capital (surplus plus contingency reserves) of $897,674,981 (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. The Maryland Insurance Administration recognizes only statutory accounting practices for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the Maryland Insurance Code, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. No consideration is given by the Maryland Insurance Administration to financial statements prepared in accordance with accounting principles generally accepted in the United States ("GAAP") in making such determinations.

The following documents are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

- The consolidated balance sheets of Assured as of December 31, 2005 and December 31, 2004 and the related consolidated statements of operations and comprehensive income, of shareholder's equity and of cash flows for each of the three years in the period ended December 31, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Annual Report on Form 10-K of AGL for the fiscal year ended December 31, 2005 (which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 2, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended March 31, 2006, respectively, and the related consolidated statements of operations and comprehensive income and cash flows for the three months ended March 31, 2006 and March 31, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2006 (which was filed by AGL with the SEC on May 10, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended June 30, 2006, respectively**,** and the related consolidated statements of operations and comprehensive income for the three and six months ended June 30, 2006 and June 30, 2005, and the statements of cash flows for the six months ended June 30, 2006 and June 30, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2006 (which was filed by AGL with the SEC on August 8, 2006);

- The unaudited consolidated balance sheet and statement of shareholder's equity of Assured as of and for the period ended September 30, 2006, respectively, and the related consolidated statements of operations and comprehensive income for the three and nine months ended September 30, 2006 and September 30, 2005, and the statements of cash flows for the nine months ended September 30, 2006 and September 30, 2005, prepared in accordance with GAAP, included as Exhibit 99.1 to the Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2006 (which was filed by AGL with the SEC on November 7, 2006); and

- The Current Reports on Form 8-K filed by AGL with the SEC on April 12, 2006, May 9, 2006, August 22, 2006, October 10, 2006, November 9, 2006, December 13, 2006, December 18, 2006 and December 20, 2006, as they relate to Assured, are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Any statement contained in a document incorporated herein by reference or contained herein under the heading "BOND INSURANCE – The Assured Bond Insurance Policy" shall be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any subsequently filed document which is incorporated by reference herein also modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

All consolidated financial statements of Assured included in documents filed by AGL with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this Official Statement and prior to the termination of the offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such consolidated financial statements.

Copies of the consolidated financial statements of Assured incorporated by reference herein and of the statutory financial statements filed by Assured with the Maryland Insurance Administration are available upon request by contacting Assured Guaranty at 1325 Avenue of the Americas, New York, New York 10019 or by calling Assured Guaranty at (212) 974-0100.

Assured makes no representation regarding the Assured Insured Bonds or the advisability of investing in the Assured Insured Bonds. In addition, Assured makes no representation regarding, nor does it accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding Assured supplied by Assured and presented under the heading "BOND INSURANCE – The Assured Bond Insurance Policy."

**Certain Rights of the Bond Insurers**

As provided in the insurance agreements to be entered into by the Authority and the 1968 Fiscal agent and the 1998 Fiscal Agent, as applicable, for the benefit of each of FGIC, MBIA, FSA, Ambac and Assured, concurrently with the delivery of their respective bond insurance policies, as long as FGIC, MBIA, FSA, Ambac and Assured shall not be in default on their respective obligations under the bond insurance policies, FGIC, MBIA, FSA, Ambac and Assured shall be deemed to be the owner of the Bonds insured by each of them for purposes of, among other things (1) taking remedial actions under the 1968 Resolution and the 1998 Resolution and (2) the giving of consents to the execution of any supplemental resolution to the 1968 Resolution or the 1998 Resolution.

### SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

**Pledged Revenues**

The Series M Bonds, the Series N Bonds, and any other Senior Transportation Revenue Bonds issued under the 1998 Resolution are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund, which includes the 1998 Senior Bond Service Account, the

1998 Senior Bond Redemption Account, and the 1998 Senior Bond Reserve Account. Under certain circumstances described below, unencumbered moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account.

The Series CC Bonds and any other Highway Revenue Bonds issued under the 1968 Resolution are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Sinking Fund, which includes the 1968 Bond Service Account, the 1968 Redemption Account and the 1968 Reserve Account.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by the Commonwealth and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended ("Act No. 34"), which amended Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "Puerto Rico Internal Revenue Code"); (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues, as defined below, prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on deposit to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues"), and after said repeal and cancellation, all 1968 Resolution Revenues. The 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum products imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority, as discussed below.

Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund.

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by the Puerto Rico Internal Revenue Code (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund. 1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds.

**Flow of Funds Under 1968 Resolution and 1998 Resolution**

The following chart illustrates the flow of 1968 Resolution Revenues and 1998 Resolution Revenues into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to the summaries of the 1968 Resolution and the 1998 Resolution in Appendix III and Appendix IV, respectively, which should be read in conjunction herewith.

## Flow of Funds Under the 1968 and 1998 Resolutions



---

(1) Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.
(2) Certain Authority operation and maintenance expenses are paid from the 1998 Construction Fund.

Upon receipt of any moneys constituting 1968 Resolution Revenues, including moneys in the Special Fund constituting 1968 Resolution Revenues received from the Department of the Treasury (see "Special Fund" below), the Authority is required under the 1968 Resolution to deposit such moneys in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account. Any remaining 1968 Resolution Revenues (other than investment earnings) are deposited into the 1968 Construction Fund. Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund, which Excess 1968 Resolution Revenues must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described below.

Upon receipt of any moneys constituting 1998 Resolution Revenues (other than investment earnings), including moneys in the Special Fund constituting 1998 Resolution Revenues received from the Department of the Treasury, the Authority is required under the 1998 Resolution to deposit such moneys into the 1998 Revenue Fund. In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and deposit to the 1998 Senior Bond Reserve Account the amount necessary, if any, to replenish the 1998 Senior Bond Reserve Account. Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) first into the accounts within the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds and then, into the 1998 Subordinated Bond Reserve Fund, as required. Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of its authorized purposes, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution. Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited monthly into the 1998 Revenue Fund for application as described above.

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

**1998 Senior Bond Reserve Account**

The 1998 Resolution establishes a 1998 Senior Bond Reserve Account, the moneys in which are to be applied to the payment of interest on the Senior Transportation Revenue Bonds, and maturing principal of serial Senior Transportation Revenue Bonds whenever moneys in the 1998 Senior Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Senior Bond Redemption Account to satisfy any Amortization Requirements for the term Senior Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. The 1998 Resolution provides, however, that before the moneys in the 1998 Senior Bond Reserve Account are used to cover any insufficiency in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account, the 1998 Fiscal Agent shall cover such insufficiency by first withdrawing from the 1998 Construction Fund any unencumbered 1998 Resolution Revenues deposited therein and, to the extent such moneys are insufficient to cover said deficiency, by withdrawing moneys on deposit in the 1998 Subordinated Bond Service Account and 1998 Subordinated Bond Redemption Account.

The Authority covenants to accumulate and maintain in the 1998 Senior Bond Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Senior Transportation Revenue Bonds and 10% of the original principal amount of each Series of Senior Transportation Revenue Bonds outstanding (the "1998 Senior Bonds Reserve Requirement").

On October 31, 2006, approximately $273,772,901 was on deposit in the 1998 Senior Bond Reserve Account. The 1998 Senior Bonds Reserve Requirement will be $279,435,487 upon the issuance of the Series M Bonds and Series N Bonds and the refunding of the 1998 Resolution Refunded Bonds, and such amount will be on deposit in the 1998 Senior Bond Reserve Account following the issuance of the Series M Bonds and Series N Bonds. The 1998 Resolution permits any increase in the Senior Bonds Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1998 Senior Bonds Reserve Requirement.

30

Excess moneys in the 1998 Senior Bond Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Transportation Facilities or outstanding Senior Transportation Revenue Bonds to be refunded or may be transferred to the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, or the 1998 Construction Fund, as directed by the Authority.

**1968 Reserve Account**

The 1968 Resolution establishes the 1968 Reserve Account, the moneys in which are to be applied to the payment of interest on the Highway Revenue Bonds and maturing principal of serial Highway Revenue Bonds whenever moneys in the 1968 Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account to satisfy any Amortization Requirements for the term Highway Revenue Bonds whenever 1968 Resolution Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the 1968 Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Highway Revenue Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "1968 Reserve Requirement").

On October 31, 2006, approximately $155,877,411 was on deposit in the 1968 Reserve Account ($1,690,473 less than the 1968 Reserve Requirement as a result of a reduction in the market value of the investments in such account). The 1968 Reserve Requirement will be $137,356,109 upon the issuance of the Series CC Bonds and the refunding of the 1968 Resolution Refunded Bonds, after giving effect to the adoption of the 1968 Variable Rate Supplement described below under "Proposed 1968 Supplemental Resolutions." Such amount will be on deposit in the 1968 Reserve Account following the issuance of the Series CC Bonds. The 1968 Resolution allows the Authority to use a letter of credit or insurance policy to fund the 1968 Reserve Requirement.

Excess moneys in the 1968 Reserve Account are transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority.

**Replenishment of 1968 and 1998 Reserve Accounts**

Under the Puerto Rico Internal Revenue Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

**Commitment Not to Reduce Taxes and Fees**

The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described below), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such fees remain pledged to the payment of such obligations.

**Special Fund for Deposit of Taxes and Fees Allocated to the Authority**

Under the Puerto Rico Internal Revenue Code and Act No. 9, the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the

31

Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fees allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to the Commonwealth's debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and *Debt* in the Commonwealth Report.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used first to pay public debt before being used for other purposes. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. However, under the Puerto Rico Internal Revenue Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not considered available Commonwealth resources.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt; nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in the Commonwealth Report.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Official Statement, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement. Moneys in the Commonwealth Redemption Fund may also be applied to the payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.

Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth have been invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's Investors Service and Standard & Poor's Ratings Services), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments"). Since the bonds being refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's currently outstanding general obligation debt is $768,843,245 in the fiscal year ending June 30, 2020 (based on certain assumptions). This amount is equal to 9.48% of $8,113,386,000, which is the average of the adjusted internal revenues of the Commonwealth for the two fiscal years ended June 30, 2006.

Information about the Commonwealth public sector debt and debt service requirements for the Commonwealth's general obligation bonds and the Commonwealth's guaranteed debt appear in *Debt* in the Commonwealth Report.

**The Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.**

**Additional Bonds under the 1998 Resolution and the 1968 Resolution**

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution. The Series M Bonds and Series N Bonds are being issued as Senior Transportation Revenue Bonds.

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

*Highway Revenue Bonds*. The Authority may not issue additional Highway Revenue Bonds under the 1968 Resolution except bonds maturing no later than July 1, 2036, which are issued to refund outstanding Highway Revenue Bonds in order to achieve debt service savings. The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" in "APPENDIX III – SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION."

**Proposed 1968 Supplemental Resolutions**

The Authority proposes to adopt a supplemental resolution (the "1968 Variable Rate Supplement") when the consent of the owners of two-thirds in aggregate principal amount of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will permit the 1968 Fiscal Agent to treat Variable Rate Bonds (as defined in the 1968 Resolution) as having an assumed fixed interest rate equal to the latest five-year or one-year (if higher) average of the historical interest rates on such bonds or based upon certain commonly used interest rate indices for the purpose of calculating Principal and Interest Requirements (as defined in the 1968 Resolution).

The Authority proposes to adopt another supplemental resolution (the "Parity Lien Supplement") when the consent of the owners of 100% of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will provide, among other things, for certain modifications to the amendment provisions of the 1968 Resolution, including a reduction of the 66-2/3% consent requirement for certain amendments to a majority. In addition, the Authority will be permitted to grant a parity lien on 1968 Resolution Revenues to secure reimbursement agreements with the providers of any credit facility or liquidity facility securing Highway Revenue Bonds.

**Consent of Purchasers of Series CC Bonds**

By purchasing the Series CC Bonds, the owners of such bonds will have consented to and approved, for themselves and future owners of such bonds, the adoption of the proposed supplemental resolutions. The underwriters of the Bonds, as initial purchasers of the Bonds, will also execute a consent to the adoption of the proposed supplemental resolutions. Upon the issuance of the Series CC Bonds and the refunding of the 1968 Resolution Refunded Bonds, the owners of 68.98% in respect of the 1968 Variable Rate Supplement and 68.98% in respect of the Parity Lien Supplement of the aggregate principal amount of the Highway Revenue Bonds outstanding will have consented to the adoption of the respective proposed supplemental resolutions. Since the consents received after the issuance of the Series CC Bonds will exceed the percentage required for the adoption of the Variable Rate Supplement, the Authority expects to adopt the Variable Rate Supplement after the issuance of the Series CC Bonds.

## THE AUTHORITY

**General Description**

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. The Authority is a separate entity from the Department of Transportation and Public Works for purposes of financing and constructing Puerto Rico's transportation system, but since 1971, the Secretary of Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority has adopted a long-term master plan for development of the transportation infrastructure necessary to foster and sustain Puerto Rico's economic growth and a five-year Construction Improvement Program to implement that plan. (The current Construction Improvement Program covers the period from fiscal year 2007, which began on July 1, 2006, through fiscal year 2011). As required by the 1968 Resolution and the 1998 Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Construction Improvement Program.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes and other obligations. The Authority plans and manages the construction of all major projects relating to Puerto Rico's transportation system, undertakes major repairs and maintains the toll highways. The Department maintains Puerto Rico's highway system, other than the toll highways, and undertakes construction of smaller projects.

The Authority classifies its highways and roads within the following categories: primary, primary urban, secondary, and tertiary. As of December 31, 2006, the Commonwealth had 4,620 miles of highways and 11,328 miles of local streets and roads. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include the Luis A. Ferré (PR-52), De Diego (PR-22), PR-53, Eastern Corridor (PR-66), PR-5 and Martínez Nadal (PR-20) toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads and public housing development roads serving local, intra-regional traffic.

In August 1990, the Authority Act was amended to empower the Authority to enter into concession agreements, subject to approval by a government board of adjudications, with private parties for the design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, could be financed by such private parties by the imposition of tolls or otherwise. To date, the only highway facility subject to a private concession agreement is the Teodoro Moscoso Bridge, which is operated by Autopistas de Puerto Rico y Compañía, S.E.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multi-modal transportation system for the Commonwealth to alleviate traffic congestion. Pursuant to this power, the Authority undertook the planning, design, construction and operation of Tren Urbano, a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal 2005. It consists of approximately 17 km. of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey, sixteen stations and a maintenance and storage facility. Also, the Authority initially purchased 74 passenger rail cars. The total cost of this initial phase was approximately $2.419 billion, of which $685.7 million has been paid with funds provided by the federal government. Tren Urbano was constructed under seven separate design/build contracts. Siemens Transit Team ("Siemens") was the contractor under the largest of these contracts, which included: (i) the design and construction of two stations and a 2.6 km. test track; (ii) the design, procurement and installation of all systems for the project, such as the trackway, the train control system, and the communications system; (iii) the design and manufacturing of the vehicles; (iv) the design and construction of the maintenance and storage facility; (v) the responsibility for design and construction coordination among the several contractors; and (vi) operating Tren Urbano for a period of five years, with an additional five-year option exercisable by the Authority.

**Organization**

To carry out its responsibilities to develop the Commonwealth's transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, the office of the Senior Deputy Executive Director, who assists the Executive Director in the overall management of the Authority, and the offices of three Deputy Executive Directors, each of whom reports to the Executive Director and the Deputy Executive Director. The Deputy Executive Director for Infrastructure oversees the Planning Area, which is responsible for the development of the Construction Improvement Program as well as long-term planning, the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects, the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects, and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Deputy Executive Director for Administration and Finance oversees the Finance Area, which is responsible for the financial affairs of the Authority, including budgetary services, the Administration Area, which provides administrative support to the Authority, and the Information Technologies Area, which oversees computer operations. The Deputy Executive Director for Traffic and Toll Operations oversees all aspects of the operation, maintenance, and repair of the toll highways. Most construction, renovation and improvement of highway facilities is performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Authority's organic law, as amended in 1971, provides that the powers and duties of the Authority shall be exercised by the Secretary of Transportation and Public Works, who replaced the Board of Directors of the Authority pursuant to the 1971 amendment to the Authority's organic law. The Authority also has an Executive Director, who oversees the Authority's day-to-day operations. As of February 15, 2007, Dr. Gabriel Alcaraz Emmanuelli, Ph.D. was both the Secretary of Transportation and Public Works and the Executive Director of the Authority. He was originally appointed to these positions in 2005.

35

On February 21, 2007, Mr. Alcaraz resigned, for personal reasons, as Secretary of Transportation and Public Works and Executive Director of the Authority, effective as of February 28, 2007. The Governor of Puerto Rico has announced that Mr. Fernando Pont, who is the current Under Secretary of Transportation and Public Works, will be the Acting Secretary pending the nomination of a new Secretary by the Governor and the confirmation of such nominee by the Puerto Rico Senate. In accordance with the Authority's by-laws, Mr. Jose Hernandez Borges, the current Senior Deputy Executive Director of the Authority, will assume the role of Acting Executive Director of the Authority pending the appointment of a new Executive Director.

Other principal officers of the Authority include the following:

| **Name** | **Position** | **Date of Appointment** |
|---|---|---|
| Jose Hernández Borges | Senior Deputy Executive Director | August 2006 |
| Tomás Montalvo Torres | Deputy Executive Director for Infrastructure | August 2006 |
| Norberto Mass Bernard | Deputy Executive Director for Administration and Finance | February 2001 |
| Felipe Luyanda Andino | Deputy Executive Director for Traffic and Toll Operations | June 2003 |

The administrative offices of the Authority are in the Roberto Sanchez Vilella Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. Its mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007. Its telephone number is (787) 721-8787.

**Consultants**

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent traffic engineers to carry out certain responsibilities under the 1968 Resolution and the 1998 Resolution. These include an annual evaluation of the Authority's master plan and Construction Improvement Program for capital improvements and the maintenance activities of the Department and the Authority with respect to Puerto Rico's highway system.

The Authority employs HLB Morales Padillo & Co.-PSC as independent accountants responsible for auditing the Authority's books and accounts.

**Employee Relations**

As of July 2006, the Authority employed 3,040 persons, of whom 215 were senior management officials, 1,262 were professionals and office workers, and 1,563 were technicians and laborers. Of the total number of employees, 2,543 were permanent employees and 497 were temporary employees. The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of Puerto Rico labor law, permitting the Authority's employees to engage in collective bargaining. An independent union, representing approximately 1,348 of the Authority's 2,543 permanent employees, has been certified for collective bargaining purposes. The new collective bargaining agreement of the Authority was executed in 2006. The collective bargaining agreement is effective as of July 1, 2006 and expires on June 30, 2010.

**Pending Legislation Affecting the Authority**

The following bills have been introduced in the Puerto Rico Legislature. If ultimately enacted into law, these bills could affect the Authority.

Senate Bill 885, introduced in the Puerto Rico Senate on August 10, 2005, and sponsored by several members of the New Progressive Party, was approved by the Senate on September 12, 2005. The proposed bill would assign to the Authority additional vehicle registration fee revenues estimated by the bill's sponsors to be equal to the amount of additional toll revenues resulting from the 2005 toll increase. However, the intent of the bill is to make such toll