J3d2proF

```
1                        UNITED STATES DISTRICT COURT
                         DISTRICT OF PUERTO RICO
2       ------------------------------x
        In re:
3                                              PROMESA
                                               Title III
4
        THE FINANCIAL OVERSIGHT AND
5       MANAGEMENT BOARD FOR PUERTO RICO,

6       as representative of

7
                                               No. 17 BK 3283-LTS
8                                              (Jointly Administered)

9       THE COMMONWEALTH OF PUERTO
        RICO, et al.,
10
                       Debtors.
11
        ------------------------------x
12

13                                             New York, N.Y.
                                               March 13, 2019
14                                             9:46 a.m.

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2proF

1  Before:

2                          HON. LAURA TAYLOR SWAIN

3                                                   District Judge

4                          APPEARANCES

5  PROSKAUER ROSE LLP
        Attorneys for Financial Oversight and Management Board for
6  Puerto Rico
   BY:  MARTIN J. BIENENSTOCK, ESQ.
7       BRIAN S. ROSEN, ESQ.
        LAURA STAFFORD
8
   LUSKIN, STERN & EISLER LLP
9       Attorneys for FOMB Special Counsel
   BY:  MICHAEL LUSKIN, ESQ.
10
   PAUL HASTINGS LLP
11      Attorney for The Official Committee of Unsecured Creditors
   BY:  LUC DESPINS
12
   ROBBINS, RUSSELL ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
13      Attorneys for Ad Hoc Group of General Obligation
   Bondholders
14 BY:  MARK STANCIL

15 O'MELVENY & MYERS LLP
        Attorneys for The Puerto Rico Fiscal Agency and Financial
16 Advisory Authority
   BY:  PETER FRIEDMAN
17      SUZANNE UHLAND
        DIANA PEREZ
18

19

20

21

22

23

24

25

1              THE COURT:  *Buenos días.*  Please be seated.

2              (Case called)

3              THE COURT:  Again, *buenos días.*  Good morning.

4    Welcome to counsel, parties, and interested members of the

5    public and press here in New York and in San Juan and to the

6    telephonic participants as well.  We are here today for our

7    March omnibus hearing.

8              I remind you that, consistent with court and judicial

9    conference policies and the orders that have been issued, there

10   is to be no use of any electronic devices in the courtroom to

11   communicate with any person, source, or outside repository of

12   information, nor to record any part of the proceedings.  Thus,

13   all electronic devices must be turned off unless you are using

14   a particular device to take notes or to refer to notes or

15   documents already loaded on the device.  All audible signals,

16   including vibration features, must be turned off.  And no

17   recording or retransmission of the hearing is permitted by any

18   person, including but not limited to the parties or the press.

19             Anyone who is observed or otherwise found to have been

20   texting, e-mailing or otherwise communicating with a device

21   from a courtroom during the court proceeding will be subject to

22   sanctions, including but not limited to confiscation of the

23   device and denial of future requests to bring devices into the

24   courtroom.  And I do thank you all for your continued

25   compliance with these procedures.

1          I'll now call on counsel for the Oversight Board for a

2    status report.

3          MR. BIENENSTOCK:  Thank you.

4          THE COURT:  Good morning, Mr. Bienenstock.

5          MR. BIENENSTOCK:  Good morning.

6          Good morning, Judge Swain.  Martin Bienenstock of

7    Proskauer Rose for the Financial Oversight Board for Puerto

8    Rico.

9          The Court has requested a status report on certain

10   issues.  I plan to cover the issues concerning the status and

11   activities of the Oversight Board.  With me today are my

12   partner, Brian Rosen, who will cover the issues concerning

13   COFINA, and Michael Luskin of the Luskin & Stern firm will

14   cover the McKinsey issues that the Court has inquired about, if

15   that's OK with the Court.

16         THE COURT:  That's just fine.

17         MR. BIENENSTOCK:  Insofar as the status and activities

18   of the Oversight Board, as the Court is aware, the First

19   Circuit provided a 90-day period for the Oversight Board to

20   continue.  The Oversight Board has publicly announced, the

21   Court may have seen it, that it plans to file a petition for

22   certiorari of the First Circuit's decision on the appointments

23   clause.  It also plans to do the same thing in respect of the

24   First Circuit's ERS decision.

25         In tandem with the filing of the petition for

1    certiorari, there will likely be requests for stays from either

2    the First Circuit or the Supreme Court.  And so what happens

3    after the 90 days will likely be determined when those motions

4    for stays are filed and we'll all find out together what the

5    future holds.

6            In respect of the activities of the Oversight Board,

7    it's proceeding on all fronts at full speed while it's

8    authorized to do so.  So the Board is working with the governor

9    on the next Commonwealth fiscal plan and budget.  We are

10   responding to the governor's appeal of this Court's decision in

11   respect of the issues raised vis-a-vis whether things are

12   suggestions or requirements in the fiscal plan and related

13   issues.

14           Most importantly, the Board continues to monitor the

15   implementation of the structural reforms it has been building

16   into the fiscal plans and budgets which are designed to improve

17   the competitiveness of the economy and the business environment

18   so that Puerto Rico can attract new investments and improve its

19   economy going forward.

20           Additionally, your Honor, the Board is continuing to

21   negotiate with creditor groups of the Commonwealth, PREPA, and

22   other debtors and plans to prepare disclosure statements and

23   Title III plans of adjustment to the extent that it obtains

24   sufficient creditor support that such plans can be confirmed.

25           Unless the Court has additional questions, I would

1     turn things over now to Mr. Rosen to address the COFINA issues.

2            THE COURT:  Can you give us any sort of a temporal

3     sense of the board's expectations in connection with the filing

4     of one or more plans for other debtors?

5            MR. BIENENSTOCK:  Your Honor, we would like to be able

6     to file a plan for the Commonwealth by the end of April.  It

7     is -- we don't know now if that will be possible in respect of

8     how much creditor support we will have by that time.  But

9     notionally we would like to file a plan of adjustment by that

10    date.

11           There are other potential plans that may or may not be

12    possible by that date and if that date comes and goes we would

13    still proceed to try to garner support for confirmable plans of

14    adjustment.  And if the current oversight board, for whatever

15    reason, is replaced by a different board, it will be up to the

16    new board to either pick up where we left off or to make

17    changes, but we want to make as much progress as we can going

18    forward.

19           So if we don't make the end of April date we'll still

20    continue going forward as trying to put the plans of adjustment

21    into place as long as we're authorized to do so.

22           THE COURT:  So even if you go past April and you're

23    still in the 90-day window or that 90-day window is expanded,

24    you plan to continue apace with the effort to develop both

25    support and plan specifics?

1          MR. BIENENSTOCK:  Yes, your Honor.

2          We see a lot of downside and no upside to stopping the

3    progress on the plans of adjustment.  It is simply not healthy

4    for this amount of debt to be a cloud over the Commonwealth

5    going forward.  It has all kinds of uncertainty as to what the

6    obligations of different debtors are and how they will be

7    funded.  And the sooner the debt is put to rest, the faster we

8    believe the Commonwealth can go forward and improve on its

9    economy and investments, we think, would then be made that

10   would not be made now because of the uncertainty.

11         So that's why -- we don't think that terminating

12   efforts to restructure the debt or staying them helps anyone at

13   this point.

14         THE COURT:  Thank you, Mr. Bienstock.

15         Mr. Stancil.

16         MR. STANCIL:  Your Honor, I don't have anything to say

17   about COFINA.

18         THE COURT:  If you're going to say anything you -- if

19   it's brief, you can say it from that microphone; if not, you'll

20   have to say it from the podium, but I'm hoping it will be brief

21   in general.

22         MR. STANCIL:  Brief in general but podium worthy, if I

23   may.

24         THE COURT:  Thank you.

25         MR. STANCIL:  Good morning, your Honor.  Mark Stancil

1   on behalf of the GO ad hoc group.

2            I did want to just lay out what we think, from certain

3   creditors' perspectives, the status may be that may affect the

4   timing of where we go and how long it's going to take to get

5   there.

6            I heard Mr. Bienstock say that the sooner the debt is

7   put to rest the better.  We agree completely with that.  The

8   problem we have is I don't think the path that's being charted

9   is realistic.

10           The Oversight Board has declined to engage in certain

11  fiscal reforms or to require the Commonwealth to do them.  This

12  Court held that the Oversight Board has lots of tools.  And the

13  First Circuit has affirmed, as I understand it, this Court's

14  holding.  But the Board has abdicated.  And I would refer your

15  Honor to page 34 of the fiscal plan that's currently certified

16  for a list of those.  And they the total somewhere between,

17  depending upon assumptions -- this is the oversight board's

18  matter -- 53 to $101 billion of the life of the plan.  We

19  should be focusing on that process and how to get to that

20  process so that an actual consensual deal could be done.

21           What the Board has chosen is a Plan of Adjustment, it

22  sounds like, that is premised on litigation.  They've

23  handpicked a couple of creditors to litigate against, including

24  our clients, but there will be others.  In fact, there was an

25  objection filed last night by the UCC.  There will be

1    additional litigation.

2          With respect, your Honor, the idea of a Plan of

3    Adjustment by the end of April would be great if it were not

4    premised on what we think will be literally years of litigation

5    and tens and tens of millions of dollars in additional fees.

6          So from the creditors' perspective, we have no

7    engagement, no meaningful progress in this case.  And I just --

8    I feel like we have to let the Court know this, that what we're

9    headed down is more lawsuits and we should get off that path.

10         THE COURT:  Given that PROMESA puts the development

11   and particularly the proposal of a plan solely in the hands of

12   the Oversight Board, is there anything in particular that

13   you're advocating for here or calling on the Court to consider

14   or any action you are calling on the Court to consider?

15         MR. STANCIL:  Yes, your Honor.  There will be -- I

16   think this is in the nature of a status report, but there will

17   be two main avenues.

18         First is there will be additional litigation that we

19   will be asking the Court to entertain that will tee up both the

20   selective attack on certain bondholders.  And also -- and this

21   is critical -- whether the Oversight Board can ever confirm a

22   Plan of Adjustment in the absence of the reforms that even it

23   acknowledges need to be done and can be done.

24         So, in the course of this -- just as Mr. Bienenstock

25   is promising to deliver that, what we are hopeful is that if

1    they continue down this course, which we hope they won't, that

2    the Court will entertain promptly our requests to tee up what

3    we would call the other side of the legal case, which is

4    whether they can handpick certain bonds to go after, whether

5    they can -- whether those theories make any sense.

6            What we do not think will be proper, and what we're

7    going to urge the Court not to do, is to allow them sort of an

8    unlimited runway to push down these legal issues that we think

9    undermine their plan.  Whether they could confirm a

10   nonconsensual plan in the absence of their own state of

11   reforms, we think is a crucial, crucial legal issue that the

12   Court should resolve upfront instead of at the end of some

13   really messy and nasty confirmation battle.  And that's what

14   we'll be asking the Court to consider, in addition to the claim

15   objections and the other things that have been launched by the

16   Oversight Board.

17           THE COURT:  So I think I hear you fairly clearly

18   saying you are intending to engage aggressively what you

19   consider selective attacks on certain creditor constituencies

20   or outstanding holdings.  And I think I'm hearing that you

21   anticipate that if the Board proposes a plan that you consider

22   structurally unconfirmable there will be some, I'll say again,

23   aggressive means of engaging that.

24           If the Board -- is there a third path that you'd like

25   me to hear about in the event that the Board does not propose a

1  plan but instead continues in the midterm on the litigation

2  front?  Is there something else that you're asking me to

3  anticipate?

4       MR. STANCIL:  Yes, your Honor, with respect to the

5  claim objection in particular.

6       So, we don't think anything should be recharacterized.

7  I think that's clear.  I think the bonds are the bonds.

8       Just so the Court is aware.  They have chosen two

9  series of bonds that they would like to attack because they are

10 held by people that I respectfully submit are politically

11 unpopular.

12      THE COURT:  Between 2012 and 2014 GOs, correct?

13      MR. STANCIL:  Correct.  For reasons that I will not

14 belabor that the court, I'm sure we'll all come to regret

15 having to understand all these spreadsheets, that we think is

16 illogical to attack them at all but if you're going to attack

17 them, illogical to do it in the way that they've done it.

18      We think there needs to be a comprehensive effort to

19 address that.  So it isn't just the GO 2012s and 2014s.  Their

20 own logic, they would say, would have to attack PBA bonds.

21      THE COURT:  Which they have done in separate

22 litigation.

23      MR. STANCIL:  They have attacked leases between the

24 PBA and the GOs.

25      They say in their claim objection that the PBA should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    be recharacterized as direct issue debt of the Commonwealth.

2    But they never calculate whether under their own logic, which I

3    grant you is flawed, but under their own logic, whether the PBA

4    bonds themselves would be counted against the debt limit.

5            So my point is to let your Honor know that you've seen

6    the tip of an iceberg.  We would love to avoid the whole thing

7    because we don't think years of litigation is the right way to

8    resolve this.  But in the absence of political will to do what

9    they need to do and the board's unwillingness to use its tools

10   under PROMESA to force those things, which it absolutely has

11   the authority to do those, we're headed down a path that is not

12   90 days.  It is years of litigation.  It will be only good for

13   the lawyers, your Honor.  That's why I think it's incumbent on

14   us to advise the Court that there's another side of this story

15   that, unfortunately, we're committed to now that the Board has

16   chosen this path.

17           THE COURT:  When you speak in terms of tools, you're

18   speaking of issues including economic assumptions and steps

19   that you see as viable for forcing structural changes that are

20   contemplated by the fiscal plan but have not legally been taken

21   up and implemented by the Commonwealth?

22           MR. STANCIL:  It's a little more complicated, your

23   Honor.

24           THE COURT:  I imagine it is.

25           MR. STANCIL:  I apologize.

1          There are other reforms that the Board has itself said

2     should be done -- again, page 34 of the current version -- but

3     the government refused to do.  And then we have this big

4     litigation about other ways that even if they can't pass

5     legislation for the Commonwealth, they can encourage, coerce,

6     you know, nudge the AAFAF, the governor and the legislature to

7     do.  They've largely abdicated those efforts.

8          Consideration for resolving this case successfully is

9     on the table.  It is there.  If you look at the current fiscal

10    plan, it goes out for a while and then falls off a cliff.  If

11    you look at even the governor's fiscal plan proposed recently,

12    same idea.  It goes fine for a while and then falls off a

13    cliff.

14         If you go down the list of those reforms -- there are

15    additional ones that we would propose if we get to that stage

16    of the litigation -- the ones that the Board has proposed, they

17    cure the cliff.  They are all out-year reforms.

18         So if the Board would put the effort -- and I

19    understand it's challenging, but if the Board would put the

20    politicians and the process through its paces, as the First

21    Circuit and this Court has said they can, we would be out of

22    this -- we would all be out of this much sooner, much better

23    for the people of Puerto Rico, much better for every

24    constituent on my side, on the other side in this case.  But,

25    instead, we're going to spend hundred million dollars, two

1    hundred million dollars more in fees over the next two or three

2    years.

3              That's where we're headed with litigation.  We have no

4    choice because we can't get them to come to the table with

5    these reforms in mind.

6              So I'm sorry to be the bearer of bad news but that's

7    where we're headed.  It's not our choice.  It's not our

8    preference.  But that's where we're going.

9              THE COURT:  Thank you.

10             MR. STANCIL:  Thank you, your Honor.  I appreciate the

11   opportunity.

12             THE COURT:  Mr. Bienenstock, did you wish to respond?

13             MR. BIENENSTOCK:  Sure.

14             Thank you, your Honor for the opportunity and I'll be

15   very brief.

16             First, Mr. Stancil has assumed a lot about the future

17   and I can't say that any of his assumptions are correct.

18   Particularly, we have previously said to your Honor that there

19   are some dating issues.  One of them involves -- at least one

20   involves the GOs and that's whether their priority under Puerto

21   Rico law is enforceable under the Plan of Adjustment that we

22   have said we might want to look for ways to tee up early.  So

23   Mr. Stancil may be pleasantly surprised to find that we want to

24   embrace the gating issues, not to avoid them, because they are

25   necessary to be resolved.  We all know they have to be resolved

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    before a plan can be confirmed.

2             Second, the Board tried to cause the repeal of Law 80

3    which makes a dramatic difference in the surplus that the

4    Commonwealth can generate, and that surplus is not a surplus

5    that simply benefits creditors.  It lifts all boats, your

6    Honor.  It lifts the economy.  It generates futures for people

7    in Puerto Rico.

8             It is a shame, and this is perhaps one thing that we

9    agree with Mr. Stancil on and he agrees with us, it is a

10   terrible thing that the government has persisted, and I think

11   the First Circuit's recent decision affirming your Honor in

12   respect of dismissal of the legislature's complaint, makes

13   clear in its factual recitations how much is lost by not

14   repealing Law 80.

15            We are not aware of a method to force that.

16   Mr. Stancil made several references to our tool box and that

17   the Board is not using them.  I invite him, off channel, to

18   tell us exactly what he has in mind.  Because if there is a way

19   of accomplishing that that we have overlooked, we will give him

20   credit and embrace it and get things done.  The Board is trying

21   its utmost to improve the economy and cause the government to

22   make the changes that are necessary for a sustainable economy

23   going forward.

24            So as far as objecting to claims, your Honor, it is

25   the duty of any debtor to object to claims that should not be

 1    allowable.  Objections can also be negotiated.  I think

 2    Mr. Stancil is aware of that.  If there is $200 million of

 3    litigation, it will be because perhaps his clients don't want

 4    to negotiate it.  But we are willing to negotiate all of those

 5    things.  What we cannot do is simply ignore what a lot of solid

 6    law firms have and other professionals have determined are

 7    valid infirmities or at least very potentially valid

 8    infirmities in certain claims and it is our responsibility to

 9    take them up.  And claims, whether they be GO or anyone else

10    we're agnostic; if a claim should not be allowable, we have a

11    duty to do something about it.

12         So my hope is that we will get back to the table with

13    Mr. Stancil's clients as well as others that we continue to

14    negotiate with and we won't have the years of litigation and

15    costs that he's predicting.  And we will do our best to try to

16    avoid that as well.

17         THE COURT:  Thank you.

18         Mr. Friedman.

19         MR. FRIEDMAN:  Yes, your Honor.  Peter Friedman on

20    behalf of AAFAF.

21         Your Honor, first of all, as you know, the governor

22    supported reforms with respect to Law 80 as well; frankly, went

23    out substantially to try to reach an agreement with the

24    Oversight Board in connection with that.  And it's just not

25    accurate to portray that the government is somehow being

1  intransigent or intractable with respect to reforms.  The newly

2  released fiscal plan discusses extensively in Section 12,

3  important reforms, cost-saving measures the government is

4  committed to in order to bring financial responsibility and

5  reform to Puerto Rico.

6      The government has made, I think, substantial efforts

7  with respect to transparency, with respect to cost controls,

8  with respect to revenue reforms, and with respect to reaching

9  consensus with other creditors, Title VI, GDB and Title III of

10  COFINA.  So it's completely inaccurate to portray the

11  government as somehow being intransigent or not being committed

12  to meaningful reform.

13      The government, obviously, has different priorities

14  than bondholders.  I'm skeptical when bondholders say that

15  their positions and immense recoveries to them are necessarily

16  in the best interests to the people of Puerto Rico.  That's the

17  governor's job is to represent the best interests in the people

18  of Puerto Rico.  And that's what he's going to continue to do.

19  Thank you, your Honor.

20      THE COURT:  Thank you, Mr. Friedman.

21      Mr. Rosen.

22      I'm sorry.  Mr. Despins.

23      MR. DESPINS:  It's OK to talk after Mr. Rosen.

24      THE COURT:  All right.  Mr. Rosen got up first.  So

25  then you're after that.  Thank you.

1        MR. ROSEN:  Good morning, your Honor.  Brian Rosen,

2   Proskauer Rose, on behalf of the Oversight Board.

3        Your Honor, you had asked that there be a discussion

4   with respect to the press reports or at least the distribution

5   of the COFINA assets pursuant to the Plan of Adjustment.  And

6   so I am here to do that.

7        But I'd also like to make note, your Honor, that in

8   the courtroom from BAML we have Mr. Ed Sisk and Mr. Jorge

9   Rodriguez who are here just for this purpose.  There they are

10  in the back row.

11       And also from Prime Clerk, your Honor, Mr. Shai

12  Waisman and Ms. Christina Pullo who are here just for that

13  purpose as well.  They are in the front row.

14       THE COURT:  Good morning.

15       MR. ROSEN:  If I could ask your Honor after I conclude

16  my remarks and any questions that you may have that you may

17  want them to address if they could be relieved because they are

18  here for solely this purpose.

19       THE COURT:  Yes.

20       MR. ROSEN:  Thank you, your Honor.

21       Your Honor, pursuant to the plan, as you know, you

22  entered an order first on February 4 and then on February 5

23  confirming the COFINA Plan of Adjustment.  The plan went

24  defective the following week, your Honor.  And pursuant to

25  Sections 1.84 and Article 19 of the plan, COFINA was -- its

1    role was to be the disbursing agent pursuant to the plan.  And

2    it was required to deliver the plan consideration, which was

3    new COFINA bonds and cash to distribute to the Bank of New York

4    Mellon as the trustee and the paying agent with respect to the

5    existing securities.

6            Your Honor, we put together -- and actually I want to

7    give credit to Ms. Uhland and her staff.  They put together a

8    little demonstrative that I'm told if I put it on this here it

9    will show up in Puerto Rico.

10           THE COURT:  It's supposed to and it should also show

11   on the large screen in the audience section here and on the

12   screens in the jury box.  So, yes.

13           It's the correct orientation now and I can see it.

14           MR. ROSEN:  Thank you, your Honor.

15           The purpose of this is just to show you how the

16   consideration flowed pursuant to the plan and to the various

17   people.

18           Bank of New York was then required, your Honor, to

19   deliver to the record owner, which is DTC, the Depository Trust

20   Company, on the effective date.  And all of those transactions

21   happened, your Honor.

22           THE COURT:  So the black print isn't super visible at

23   least on my copy.  So if we can just be clear for everyone that

24   you have under COFINA is delivering the bonds to BNY Mellon and

25   then BNY Mellon is delivering the new bonds and prefiscal year

1    '19 cash to DTC.

2                MR. ROSEN:  That's correct, your Honor.

3                If you recall, pursuant to the interpleader orders,

4    the cash was with Bank of New York Mellon in segregated

5    accounts.  So they then took that pursuant to the plan and

6    passed that along to DTC.

7                THE COURT:  That's much better.  Thank you, Ms. Ng.

8                MR. ROSEN:  So, your Honor, after much discussion and

9    preparation for the effective date, DTC was provided

10   instructions for the further distribution of those assets,

11   those -- that consideration to its participants.  Those are,

12   your Honor, direct brokers, nominees.  And they were then --

13   that was designed to then result in a further distribution to

14   the beneficial holders, the beneficial owners that would

15   receive their pro rata share of the class distributions

16   pursuant to the plan.

17               It is our understanding, your Honor, that to the

18   extent that individual beneficial holders did not receive the,

19   quote, exact amounts that were projected by the plan, that was

20   a function of the fact that the COFINA bond prices traded down

21   subsequent to the issuance, resulting in potentially less cash

22   available when fractional shares of the bonds then that were in

23   the hands of the brokers and the nominees were liquidated by

24   those people to provide cash consideration to bondholders.

25               So, your Honor, if I could just backup then and go

1    through some of the mechanics of the plan so it becomes very

2    clear.

3            Specifically, your Honor, under the plan, holders in

4    class one, the senior COFINA bonds and the class five, the

5    junior COFINA bonds, they were entitled to receive their

6    applicable pro rata share of the new bonds and cash.  And that

7    was made up of what we referred to or was defined in the plan

8    to be Section 103 cash.  That was defined in, I believe, your

9    Honor, Section 1.161 of the plan and the COFINA cash available

10   for distributions.

11           The bonds, as you may recall, your Honor, were broken

12   up into 14 different bond issuances, each having separate

13   CUSIPs with varying coupons and maturities.  And pursuant to

14   the prospective indentures were required to be issued to the

15   actual holders in denominations of one thousand with,

16   obviously, the bottom one thousand being the minimum

17   denomination.

18           So each bondholders' recovery, your Honor, because it

19   was pro rata share, was a strip of those 14 different CUSIPs or

20   those 14 different bonds.

21           Your Honor, because the recovery is a percentage of

22   the plan's par value of those bonds -- and we believe, your

23   Honor, based upon what we know of the market, they have a

24   market value of about 90 cents on the dollar right now -- the

25   recovery for a typical bondholder would likely include a

1   fractional bond for each of the bondholders' 14 CUSIPs.

2           And fractional bonds, your Honor, are a common feature

3   in bond markets.  And while it was not expressly set out in the

4   plan, DTC and brokers, they generally maximized the recoveries

5   to each of their beneficial holders, your Honor, from

6   fractional bonds through a process called market action.  And

7   that is where the bondholders' fractional shares are pooled by

8   the nominee or by the -- the participant and they are sold into

9   the market.  And then the cash that is generated from the sales

10  of those fractional shares is then divided among the

11  bondholders according to the respective fractional bonds that

12  they otherwise would have received.

13          So, your Honor, in order to maximize the recovery for

14  the bondholders, the fractional shares, the plan also set aside

15  $25 million from the approximately $12 million dollars in total

16  recovery that was going out.  And this 25 was defined in the

17  plan as rounding amount cash.  The disclose statement talked

18  about the risk factor associated with the potential pooling and

19  sale.  But this $25 million then was supposed to be divided up

20  and added to the distributions to take into account the

21  fractional shares.

22          Your Honor, all of this took place.  And what made its

23  way into the marketplace, your Honor, was the fact that people

24  were writing articles on day one of the distribution.  And what

25  happens in the market place is you have to allow all of these

1    pieces to work.  It takes more than one day for the process to

2    conclude.  And people's accounts were subsequently added to

3    with additional bonds and additional cash.

4         Because there was perhaps some confusion on DTC's part

5    and its participants, we even had subsequent conversations with

6    DTC, and I believe the call that I participated on had over one

7    hundred DTC participants, where there were further instructions

8    provided to DTC and its participants.

9         All of this, your Honor, caused the market to quiet.

10   And all of this allowed ultimately, your Honor, for people's

11   accounts to be topped up and to receive the distributions that

12   they were going to get pursuant to the plan.

13        The problem is, your Honor -- and that includes, your

14   Honor, the accrued interest which started from, I believe it

15   was August 1 of last year, because pursuant to the plan we had,

16   day-to-day, if you will, when the new bonds were going to start

17   accruing, and we even provided cash to all the people who were

18   receiving the bonds pursuant to the plan.

19        So, your Honor, the point is that the articles, the

20   Twitter, whatever it may be, when it started, it started on day

21   one.  And it didn't allow the process to conclude.  And had it

22   been allowed to conclude without reporting, the reports,

23   obviously, the way they ultimately were done, would be that

24   everybody received what they were entitled to receive pursuant

25   to the plan or within pennies of it based upon the trading that

1   took place with the sale of the fractional shares going down

2   slightly.

3           But, your Honor, the noise as we know it has quieted

4   down.  We don't know of anyone who is still voicing any

5   concerns with respect to the distributions that were talked

6   about initially in those articles.  And we believe that

7   everything has been done, certainly by COFINA as a disbursing

8   agent, pursuant to the plan and has been done according to the

9   exact terms and conditions of the plan.

10          Your Honor, if you have any questions, as I said, I do

11  have representatives from both BAML and Prime Clerk who both

12  assisted in the distribution of the COFINA assets.

13          THE COURT:  I would just like to, again, ask you to

14  underscore what I understand is your bottomline.  Your

15  bottomline is that your representation is that your

16  understanding is that the COFINA bondholders through this

17  process of topping up and market action and things that had

18  taken place subsequent to the initial --

19          MR. ROSEN:  The first day.

20          THE COURT:  -- the initial day that the bondholders

21  have received the amount for substantially the amounts that

22  were predicted in connection with the plan and that the plan

23  undertook to provide to the bondholders.

24          (Counsel confer)

25          MR. ROSEN:  Your Honor, the answer to your question is

1   yes.  COFINA passed everything down through DTC to the

2   participants.

3           Again, if there was any modification, as you noted

4   there in the end, it would have been in the subsequent

5   distribution to the beneficial holder due to the fractional

6   shares and having to take that market action and causing it to

7   be off a few cents here and there.

8           I don't know if you want to add more.  I think that's

9   it.

10          So the answer is yes to your question, your Honor.

11          THE COURT:  Thank you, Mr. Rosen.

12          MR. ROSEN:  Thank you, your Honor.  Again if I can ask

13   that Prime Clerk and BAML people be released.

14          THE COURT:  Yes.  Thank you all for attending this

15   morning and you may leave.  Thank you.

16          So, Mr. Despins, you wish to speak?

17          MR. DESPINS:  Good morning, your Honor.

18          THE COURT:  Good morning.

19          MR. DESPINS:  Luc Despins on behalf of the Official

20   Committee.

21          The first thing I wanted to say is that how critical

22   and important these status conferences are because without

23   those you see, it's not obvious, you see only five percent of

24   really what's going on in the case because you only see what's

25   filed and there's a lot of work going on in the background.

1           THE COURT:  That is why they always start with status

2    reports and we hold them regularly.

3           MR. DESPINS:  So we really appreciate the fact that

4    we're able to be heard in that context, your Honor.

5           I'll start with the more narrow and then I'll go to

6    the broader issues.

7           So, as you know, the committee has been supportive of

8    the oversight board and I would say 98 percent or 99 percent of

9    all matters to date.  We enjoy a very good relationship with

10   the professionals for the board and so we're having constant

11   discussion with them.

12          Nevertheless, there are issues that are of concern to

13   the committee.  So let me address the more narrow one first.

14   You will recall that in January of last year we, in the context

15   of the bar date, said it's really critical that there be an ADR

16   process for many reasons, one of them, I'm sure you'll

17   appreciate, which is your Honor does not want to spend the next

18   how many years going through the thousands of claims that are

19   based on Puerto Rico law filed by trade creditors in Puerto

20   Rico.  That's one reason, but that's not the main reason.  The

21   main reason is that the ADR process is critical because it

22   makes no difference to the creditors if there's a plan

23   confirmed tomorrow unless they can get money.  And the

24   government also wants that because they want the creditors to

25   have the money on the island to spend it, etc., etc.

1    So we raised that at that time and I remember your

2    Honor was fairly generally supportive of the concept.

3    THE COURT:  I said I was looking forward to seeing the

4    proposal and I was truthful and I'm truthful now.

5    MR. DESPINS:  So in November we discussed this issue

6    in court again.  And you said:  Am I going to get this for a

7    hearing in January?  And the answer was yes.  Not from us but

8    from the Oversight Board.

9    We're now in March and it's obvious -- I mean I don't

10   know how to say this, but res ipsa loquitur.  It doesn't take a

11   year-and-a-half to do this.  And for some reason that has not

12   progressed to where it should be.

13   We've had discussions, discussions ongoing.  But in

14   the meantime we should be liquidating those claims through this

15   ADR process right now.  But that's not going to happen now for

16   several months given where we are.  So that's a really -- a

17   parochial concern but a very important concern to the process.

18   So that's the more specific.

19   The next issue is the plan process.  And you said

20   several things when Mr. Stancil spoke that were -- I'm glad you

21   made those statements because it focuses our presentation

22   today.  And I'm going to use PREPA as an example.  As you know,

23   PREPA is the utility company.  And we are the official

24   committee for PREPA.

25   There is no other way to say this but the committee is

1    systematically excluded from plan negotiations that are

2    ongoing, that have been ongoing -- by the way, that's not

3    mediation -- that are ongoing since August of last year.  And,

4    in fact, in August the board announced publicly that they had

5    reached an agreement in principle regarding the treatment of

6    some secured bonds.  The committee had no idea about that, had

7    never been told that this was being negotiated.  And we're

8    completely caught by surprise.

9           In a normal Chapter 11 case that would be cause

10   determined exclusively right then and there for failure to

11   involve the committee in that process.  But of course there is

12   no -- there is permanent exclusivity in the PROMESA statute.

13          But that doesn't change one section of the code, which

14   is Section 1103.  And it says that one of the duties of the

15   committee is to be involved in the plan formulation process.

16   And courts have dealt with this generally, 99 percent of the

17   time -- in the context of exclusivity, I'll grant you that --

18   where if the committee comes in and says:  Hey, we're being

19   excluded.  And the court will say:  I will grant you an

20   extension but you need to include the committee.  I grant it,

21   it's in that context, that it is often raised.  But it is not

22   only in that context.

23          In fact, there are some cases where a court has

24   compelled the debtor to meet and confer with the committee,

25   which is kind of ridiculous that you have to get to that point,

1    to meet and confer with the committee regarding the sale of the

2    company's business because the debtor refused to do that.

3            So what's happening, I want to be very precise, in

4    PREPA is that they announced that deal in August.  We, of

5    course, expressed shock and anger about that.  And it took us

6    until January of this year to get the various exchanges of back

7    and forth between the board and the PREPA secured creditors.

8    But to this day they refuse to include us in the negotiation

9    process, meaning --

10           THE COURT:  And so you mean you have been given access

11   to records of past communications but you're not involved in

12   active communications?

13           MR. DESPINS:  Correct.  I will give you an example.

14           I am not saying that's the case now.  It's just an

15   example.

16           If today the Board is making a counteroffer -- I'm not

17   saying they are -- if they are making today a counteroffer to

18   those bondholders, we're not seeing that until after it's made.

19   So we have no ability to communicate to the board to say:  Wait

20   a minute.  This doesn't make sense for the following reason.

21           And you might say:  Why is he raising this now?

22   What's the -- other than complaining?  Because what I don't

23   want is six months from now, or I don't know how long it will

24   take for PREPA, but I don't want to be at the confirmation

25   hearing where we're complaining about the fact that the

1    committee was not involved in that process, for your Honor or

2    somebody else to say:  Wait a minute.  This guy was in court

3    all along.  He heard all these status reports.  He never said a

4    word about it.

5         And so that's what we're saying.  We think it is not

6    appropriate at all for an official committee to be excluded

7    from the plan formulation and negotiation process.  And, in

8    fact, when Mr. Bienenstock said that he might have a plan by

9    the end of April in the Commonwealth case, I mean I had a mild

10   panic attack when I heard that.  I just -- if they have that,

11   that means they have a draft plan which we've never seen,

12   never -- and so, your Honor, I know we typically and especially

13   in district court you have to file pleadings if you want to

14   seek relief from the court to be heard, etc., etc.  We

15   understand that.

16        But this is a status conference.  Your Honor under 105

17   has all sorts of powers to direct certain things to happen.

18   But the committee has a statutory right, and the law is clear

19   that 1103, it's not only that the committee can be involved in

20   plan formulation but the debtor has a corresponding duty to

21   include the committee as a fiduciary in plan formulation.

22        So if the committee is not involved in that plan

23   formulation, it cannot serve its function, and it doesn't help

24   to say for the board after:  We did cut a deal with so and so,

25   you can see the results of that.  That's not the way it's

1    supposed to work.  We're supposed to be there side by side with

2    them.  And we don't have a veto.  I want to be clear.  They may

3    disregard our positions, but we need to be involved in the plan

4    formulation process which means the ability to comment real

5    time on negotiations.

6              THE COURT:  As you know, one of my general principles

7    of case management is that I don't expect to be asked to take

8    action that hasn't first been processed offline.  So, have you

9    confronted the Oversight Board with these issues?  Do you have

10   any understanding of what the Oversight Board's perspective is

11   on this before I ask Mr. Bienenstock or Mr. Rosen?

12             MR. DESPINS:  We have been consistently complaining

13   about being excluded from the PREPA negotiations.  As recently

14   as a month ago I sent an e-mail that went unresponded to,

15   unanswered to that specific question.  The board -- well I

16   shouldn't say that.  The professionals for the Oversight Board

17   know that the committee is displeased about not being included

18   in that process and that we should be included not after the

19   fact when they make an offer but rather before they make the

20   offer, in the process, and we should be involved in the

21   documentation.

22             Again, if there's any contemplation of a plan in the

23   Commonwealth by April, that's just around the corner, there has

24   to be a plan drafted somewhere.  I can't believe the committee

25   has not seen that.  So I -- yes, we've repeatedly said to the

1    professionals of the Oversight Board, I'm using PREPA as an

2    example, how displeased the committee is about not being

3    included in the process and that we should be.

4            Yes, your Honor.

5            THE COURT:  Thank you, Mr. Despins.

6            Mr. Bienenstock.

7            MR. BIENENSTOCK:  Thank you.

8            Thank you, your Honor.  Martin Bienenstock, Proskauer,

9    for the Oversight Board.

10           Much of what I'm about to say, and I'll keep it brief,

11   may be news to the Court because we haven't discussed some of

12   these things before.  But I don't think much of what I'm going

13   to say is news to Mr. Despins which makes his remarks somewhat

14   surprising to me this morning.

15           Number one, there have been more negotiations of the

16   Oversight Board with members of Mr. Despins's committee than

17   with any other group in this case.  So the notion that the

18   Oversight Board has ignored the committee is just completely

19   wrong for starters.  The union negotiations that affect work

20   rules, freezes, all -- affect billions of dollars of savings

21   and tradeoffs have been with members of his committee.  And if

22   those members -- well I don't know what their relationship is

23   with the committee professionals or the other members but the

24   committee has definitely not been ignored.

25           In respect to PREPA, as Mr. Despins conceded, the

1    announcement that he heard was an understanding, an RSA with

2    secured claim holders; not the unsecured claim holders for

3    which the committee is a representative.

4         And at Mr. Despins's request, which he made to me in

5    San Juan I think at the last omnibus hearing there, the last

6    one or the one before that, I made sure at his request that he

7    was given the documents he advised the Court this morning that

8    he did have, which were the offers and counteroffers between

9    the Oversight Board and the group of security claim holders

10   that announce their RSA with the Oversight Board.

11        As Mr. Despins also mentioned, we speak all the time

12   and we speak very candidly.  And I have been grateful to

13   Mr. Despins that we've been able to have these conversations.

14   And a lot of them don't go any further than the two of us, so

15   he knows exactly what's going on and hopefully that can

16   continue.  But, it's not as if there's been any effort by the

17   Oversight Board to keep the Committee in the dark.

18        Now, insofar as the plan that I said earlier we

19   would --

20        THE COURT:  I'm sorry.  If I can just ask you a

21   question.  I think -- my impression on a sort of macro level of

22   what Mr. Despins was saying was that he has a position or an

23   expectation that the UCC qua UCC as an entity should have a

24   place at the table in any negotiation of economic rights that

25   would be baked into a plan.

1          Mr. Despins, would you just speak into the microphone

2     in front of you say yes, no, or you're totally off, Judge.

3          MR. DESPINS:  You're exactly right.  And -- can you

4     hear me?

5          THE COURT:  I can hear you but keep it brief, please.

6          MR. DESPINS:  So the fact that the unions are being

7     dealt with or being --

8          THE COURT:  I'm sorry.  The mics apparently don't feed

9     into the system from that table.  And so you started out

10    saying, "you're right, Judge."  So I'll take that as, "You're

11    roughly right, Judge," and ask Mr. Bienenstock to contextualize

12    in that respect his comments about having had discussions with

13    unions about union matters and having briefed Mr. Despins on

14    certain matters which didn't sound to me like an acceptance of

15    the notion that the UCC should be in the room where any

16    economically significant negotiations are happening.

17         MR. BIENENSTOCK:  OK.  We have not bought off on that

18    in total.  For instance, your Honor, the ERS creditors won in

19    the First Circuit as far as their security interests, as I

20    mentioned before.  We plan to file a petition for certiorari

21    because we think your Honor's decision was correct.  But in

22    terms of how much money we have to set aside for a secured

23    claim, that's -- if it turns out that we have to treat them as

24    secured, we didn't think that the UCC whose constituency are

25    the unsecured claimants really gets involved in a negotiation

1   of a secured claim.

2           In my conversations with Mr. Despins we usually cover

3   the waterfront and probably not in a lot of detail for each of

4   these negotiations.  But when it comes to negotiating what will

5   be available for general unsecured claim holders in the case,

6   the committee will be front and center as far as the board is

7   concerned and they will be very much involved.  But when we

8   have to negotiate deals with each secured creditor, it hasn't

9   been my experience in any Chapter 11 case that you bring in the

10  representative of the unsecured claim holders to help you with

11  the secured claim holders.  And that seems to be what

12  Mr. Despins is asking for.

13          These are all very complicated.  They have a lot of

14  parameters that we have to deal with.  And if they -- I doubt

15  we would actually do the deal without telling them first and

16  getting their input.

17          But as far as negotiating it, as an example, your

18  Honor, at the last mediation, without any input from us, the

19  committee was not invited to certain parts by the mediators.

20  We didn't urge that or not urge it.  It was the mediators'

21  decision.  And I think it's sort of consistent with what I'm

22  saying which is negotiations between the board and secured

23  claim holders and the like or claim holders in special

24  positions don't really require an extra party at the table.

25          If your Honor would like us to change that, obviously

1    we will do whatever your Honor asks.  But we think we've

2    proceeded efficiently and we've kept the committee advised of

3    where we're going.

4            And if I had an ultimate plan that I had in mind that

5    we were going to propose by the end of April, I would have

6    shared it with Mr. Despins.  It doesn't exist yet because it

7    depends primarily on impaired accepting classes and how much

8    money do we have to go around once we have to set aside money

9    perhaps for ERS creditors and others.  And we have to finish

10   that before we get to distributing the money to the unsecured

11   claim holders, at which point the committee would be a primary

12   negotiator at the table.

13           THE COURT:  What I'm asking at this point is that

14   there be a revisitation of this issue offline and clarity as to

15   what the Oversight Board believes the protocol ought to be

16   vis-a-vis the UCC and involvement in particular pieces of what

17   is admittedly an extremely complicated puzzle.  To the extent

18   Mr. Despins is not satisfied with that and wants to queue up an

19   application to me for a different or further or more powerful

20   seat at a table or whatever, he will need to be very clear

21   about that and the legal grounds for and the purpose of that in

22   relation to the position that the Oversight Board is taking.

23   But I am not, beyond that direction to be in communication

24   about that and have clarity as between yourselves and

25   Mr. Despins having to decide what battles he wants to fight,

1    when and where, and about what, I am not making any particular

2    direction.

3            MR. BIENENSTOCK:  Thank you, your Honor.

4            THE COURT:  Thank you.

5            Mr. Rosen.

6            MR. ROSEN:  Your Honor, if I may.

7            Your Honor, I rise only to address the first part of

8    Mr. Despins's comments with respect to the ADR.

9            Your Honor, Mr. Despins is correct in one regard and

10   totally wrong in another.  We've been working on this process

11   for a very long period of time.  We, in connection with

12   O'Melveny and even Paul Hastings, developed an ADR procedure

13   that we continue to work on and tweak as time goes on,

14   including last week I received comments from Mr. Despins's

15   office with some changes to the process that he would like.

16   And at the same time, your Honor, as I believe your chambers

17   may know, we've been working with the administrative office and

18   Ms. Abdelmasieh on some provisions that she thinks would be

19   appropriate for inclusion in the ADR procedures.

20           We are hoping to get that on file and for

21   consideration by the Court at the April 24 omnibus hearing, but

22   that continues to be refined, your Honor, and we continue to

23   work on a motion that we have circulated to the committee

24   itself to get their feedback.

25           As I said, your Honor, we anticipate that we should

1    file that with the Court in time to be heard a month from now.

2               THE COURT:  Thank you.

3               Mr. Despins has a skeptical look on him so he can go

4    to the podium.

5               MR. DESPINS:  Again, that's symptomatic of the

6    problems.  We've asked to be included in the discussions with

7    the office -- I forget the exact title -- because there are

8    issues about selection, about how do we deal with who, if it's

9    not your Honor, who would be handling this process.  And we

10   have asked repeatedly to be involved in that.  That has not

11   happened.

12              The draft motion that was sent to us doesn't have

13   anything about ADR and, actually, that's what we said.  If

14   there is no ADR we cannot -- basically it provided for a

15   process to object to claims generally.  And we said the Court

16   is not going to get involved in the merits of these objections

17   without an ADR process.  So to say that that motion can be

18   received containing an ADR process is just not accurate.  It's

19   going to be responded saying it needs to contain in the ADR

20   process.

21              So we're happy to resolve it.  But the point is we've

22   been at this for a year and three months.  It's just, you know,

23   as I said, res ipsa loquitur.  Somehow it's not getting done.

24              THE COURT:  So, Mr. Rosen and Mr. Despins will also

25   have another conversation after this.

1           MR. ROSEN:  We will, your Honor.

2           And just to be clear once we have --

3           THE COURT:  I have to repeat.  I think that's a dead

4    microphone.  So Mr. Rosen said:  "We will, your Honor," and is

5    heading to the podium.

6           MR. ROSEN:  I apologize, your Honor.  I just have to

7    make the record clear.  Every time that we do receive comments

8    from the administrative office and we revise the procedures

9    that they are requesting, we provide a copy of that to

10   Mr. Despins's office.

11          So he doesn't have to be on every phonecall but he

12   gets the benefit of the conversations that were had.  I can't

13   have Mr. Despins sitting next to me in my office when someone

14   calls and say I can't talk to you because I have to find him.

15   We do provide him with the benefit of all of the work product

16   that is generated, your Honor.

17          THE COURT:  And my general understanding of the nature

18   of those discussions is that they go to what is feasible in

19   terms of procedure and role of members of the judiciary

20   potentially and powers of different types of members of the

21   judiciary and how that might be pulled together in aid of an

22   ADR process that's an alternative to an adjudicative process or

23   something that works alongside an adjudicative process.

24          MR. ROSEN:  That is correct, your Honor.  We had

25   discussions with, first, the mediation team and then the

1    administrative office at the same time to try and figure out

2    what was the best way to do this and what they told me were the

3    requirements to try to do this.

4          So, I believe now what we've included in the latest

5    version of these procedures is the process that the AO believes

6    is appropriate subject, obviously, to your review and your

7    input in telling us that it's right or wrong or one of those

8    other alternatives you gave to Mr. Despins earlier.

9          So, yes, your Honor we're getting close to it and we

10   are hoping to get it before the Court shortly.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J3d2pro2

1          THE COURT:  Thank you.

2          And while you are up there, may I make one of the

3    request of you, which goes back to the COFINA presentation?

4          MR. ROSEN:  Yes, your Honor.

5          THE COURT:  Would you just file as an informative

6    motion the demonstrative that you displayed so that the record

7    is complete from this hearing.

8          MR. ROSEN:  Absolutely, your Honor.  We will do that.

9          THE COURT:  Thank you.

10         I believe Mr. Luskin?

11         MR. LUSKIN:  Yes, your Honor.  Good morning.  Michael

12   Luskin, Luskin, Stern & Eisler, for the board.

13         I am here to report, first, I think, as the court

14   knows, we filed our report on the McKinsey matter on February

15   18, and the board immediately turned to the task of reviewing

16   and implementing the recommendations, and it is really about

17   those that I wanted to brief the court.  That is the new news.

18   I think the report speaks for itself.

19         The recommendations -- there were eight of them in the

20   report -- are being implemented under the direction of the

21   board's general counsel and ethics advisor, and they are being

22   implemented across the board.  It will affect all of the

23   board's third-party vendors.

24         Very briefly, they are, first, with respect to

25   affiliate disclosure, the board's forms and certifications are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2pro2

1    being revised to include vendor affiliates.  So in the McKinsey

2    case, that would mean a description disclosure about their

3    investment business MIO.

4              THE COURT:  Just before you go on, I have read the

5    report -- I am sure 99 percent of the people here have -- but

6    am I correct in recalling that the report concludes that there

7    was no noncompliance with any rules or requests that were in

8    place at the time of the retentions, but that there is now a

9    set of recommendations by way of better practices and things

10   that the report recommends be put in place going forward, and

11   that's what you are describing now?

12             MR. LUSKIN:  That is absolutely correct, your Honor.

13   Given my time allotment on the agenda, I didn't plan on going

14   through the report itself, but your Honor is absolutely

15   correct.

16             THE COURT:  I thought it would be good to have a

17   baseline in terms of talking about the recommendations.

18             MR. LUSKIN:  And I appreciate it.  That is correct.

19   They did comply.  But, again, hindsight is perfect.  It would

20   have been nice to have known, and what the recommendations

21   really are addressed to is making sure that, going forward, we

22   will know.

23             So the first one is addressed to the description of a

24   particular vendor's affiliates, if relevant.  In McKinsey's

25   case, they have an investment bond MIO, as we all know.  Yes,

J3d2pro2

```
1    it would have been nice to have known and to have had a
2    description of it at the outset.  Going forward, the
3    recommendation is that all vendors will have to make such
4    disclosures about their affiliates, lines of business,
5    corporate organization, and so on.
6              Likewise, the interested party list that was used by
7    the board on day one -- and just to remind everyone, day one,
8    this was long before the PROMESA proceedings.  This was in the
9    fall of 2016.  There was a board with no staff, with no
10   computer system, with really nothing.  They put together the
11   interested party list.  It's been expanded some.  But one of
12   our major recommendations is that a full-blown interested party
13   list be developed that include not only the Commonwealth and
14   its various agencies and departments and other
15   instrumentalities, but also major creditors, major litigants,
16   other parties in interest, investors, insurers, the monoline
17   insurers, litigation parties that come to light as new
18   adversaries get filed.  And that's being done.  That is a
19   fairly laborious task, but it is one that is familiar to
20   professionals working in this field and it is being done.
21             Our third and fourth recommendations had to do with
22   the direct and indirect relationships.  In particular what we
23   were looking at, of course, were investments.  It doesn't
24   always involve investments.  A direct relationship could be a
25   vendor having a contract with a Commonwealth department which
```

J3d2pro2

1    would be a conflict with its work for the board.

2              But of course with the McKinsey investigation it

3    involved direct investments.  There was a time when McKinsey

4    had direct investment in Puerto Rico public debt, since

5    disposed of, and it did and does and presumably will continue

6    to have indirect investments through third-party funds over

7    which it has no discretion and no control, and that's not an

8    unfamiliar structure.  The difference in McKinsey's case is

9    that there is common ownership at the very top of the

10   investment vehicle or the investment business.

11             And treatment of how to deal with direct and indirect

12   investments, whether they are investments or -- excuse me, how

13   to deal with direct and indirect relationships, whether they

14   are contract relationships or investment relationships, will

15   depend, first, on the quality and scope of the conflict check.

16   If we are dealing with appropriately broad lists of parties and

17   interested parties to cross check, then we will be able to

18   analyze the hits, how many hits are they, what are they, are

19   they direct, are they indirect, and how can they be dealt with,

20   and that will be done on a case-by-case basis.  It will vary.

21   I think the search for a vendor like McKinsey is clearly more

22   extensive than the search that would be involved for a more

23   routine vendor providing some kind of service to the board.

24             Our fifth recommendation was that vendors' public

25   filings or their affiliates' public filings be included as part

J3d2pro2

1     of the process.  I think that we all know from the press

2     reports on McKinsey that it was through public filings that

3     investigators, reporters, and others were able to connect the

4     dots and go from proofs of claim filed in the PROMESA Title III

5     case to forms ADB, the advisory forms filed with the SEC, and

6     other public filings and figure out that, yes, it is possible

7     or likely that McKinsey or someone else had an investment in

8     Puerto Rico public debt.

9              We have recommended that the burden be placed on the

10    vendors to make those disclosures right at the outset to the

11    board -- here are our public findings, this is what they show,

12    this is what they don't show, they are either relevant or

13    not -- so that we don't have to hunt around for them.

14             Our sixth recommendation was, again, as appropriate,

15    to have vendors who do have or are likely to have conflicts or

16    the appearance of conflicts make full disclosures of the

17    practices and policies, the written policies and procedures

18    they have in place, to ensure that affiliate lines of business

19    or indirect conflicts don't actually present a disabling

20    conflict.

21             In McKinsey's case, that forms a large part of my

22    report.  We describe the policies and procedures.  They are

23    extensive.  And I don't think McKinsey is unique in that

24    regard.  I think many large institutions have similar policies

25    and implement them and enforce them as McKinsey does.  And I

J3d2pro2

1   think that, certainly in McKinsey's case, they have gone a long

2   way, really all the way, to providing the comfort to the board

3   that there are no conflicts, that the barriers are intact, and

4   that there are no violations.

5          The final two recommendations are really sort of

6   housekeeping procedural.  It is important that vendors update

7   their conflict checks and disclosures.  The board is

8   implementing a semiannual update process that will also require

9   *ad hoc* realtime updates if something material comes to light.

10  So that is being put in place.

11         And, finally, as I have mentioned, the board is in the

12  process of reviewing and revising all of the relevant contracts

13  and policies and vendor certifications that it has in place.

14  This is an ongoing process with the board now.  I think that

15  there will be a formal presentation of all this work to the

16  board for its formal adoption, and so that will all be part of

17  the public record.

18         I know your Honor is going to ask for a timeline, and

19  I can't really give you a clear answer.  I can tell you they

20  are working on this now.  I think this will probably be -- the

21  contract review and implementation, I'm sure, will be done in

22  the next month or so.  I think implementing the broader list of

23  interested parties is a process, just given the sheer number of

24  them.  It is one thing for me to say that we should check

25  proofs of claim on file.  There are 165,000 of them.  So

J3d2pro2

1   clearly some discretion and common sense is going to have to be

2   applied, and that may take a little longer to figure out how

3   best to organize those searches.

4           THE COURT:  Would you expect generally to have either

5   completed or made substantial progress on the major structural

6   components of these recommendations within the next, let's call

7   it, 90 days.

8           MR. LUSKIN:  Oh, absolutely, your Honor, yes.  I'm

9   hopeful even shorter than that, but certainly 90 days, yes.

10          THE COURT:  Thank you very much.

11          MR. LUSKIN:  Okay.  So if I may be excused, unless the

12  Court has any questions?

13          THE COURT:  I have no further questions at this time.

14  Thank you, Mr. Luskin.

15          MR. LUSKIN:  Thank you very much, your Honor.

16          THE COURT:  So I think that concludes the status

17  reports and commentary thereon, and I would now turn to the

18  report of the Fee Examiner, Ms. Stadler.

19          I'm sorry, Mr. Stancil.

20          MR. STANCIL:  Might those not involved be excused?  We

21  would like to stop the meter running, if we could.

22          THE COURT:  Yes, you may.

23          MR. STANCIL:  Thank you.

24          THE COURT:  So just to be clear, what remains on the

25  agenda are Fee Examiner issues and objections to claims, many

1    of which are uncontested, some of which are contested.  So if

2    anyone would like to leave the courtroom now, you may do so.

3          Thank you all for attending.  Be well.

4          (Pause)

5          THE COURT:  All right.  Thank you, Ms. Stadler.

6          MS. STADLER:  Good morning, Judge.  The Fee Examiner,

7    Brady Williamson, and I, as counsel, Katherine Stadler, of

8    Godfrey & Kahn, are here today, first, to recommend a group of

9    fourth interim fee applications for the court's approval

10   covering the period from June 1st through September 30 of 2018.

11   We reiterate the observations and recommendations in the report

12   filed last week, Docket No. 5409 and ask the court to approve

13   on an interim basis the applications set forth in Exhibit A to

14   that report.

15         I am happy to answer any questions about the fourth

16   interim applications or any other pending fee application.

17         THE COURT:  I have reviewed the report, including the

18   amended report that was filed yesterday or the day before.  I

19   have no questions.  I appreciate the care that has gone into

20   the preparation of the recommendations and all of the

21   discussions underlying the recommendations.  So having had no

22   objection to the recommendations, I approve the recommended

23   disbursements as outlined in I think it is Exhibit A to the Fee

24   Examiner's report.  I understand that we have been provided

25   with a proposed order consistent with those recommendations,

J3d2pro2

 1   and I will enter it.

 2              MS. STADLER:  Thank you, Judge.

 3              THE COURT:  And also, for clarity, I grant the

 4   application to put over to the April omni the recommendations

 5   as to presumptive practices and the request to put the

 6   applications listed in Exhibit C to the Fee Examiner's report

 7   also over to the April omni at least in the first instance.

 8              MS. STADLER:  Thank you, Judge.

 9              If there are no further questions, I have nothing else

10   to add.  Thank you.

11              THE COURT:  All right.  Thank you.  Thank you,

12   Mr. Williamson, for attending as well.

13              So now I think we are turning to the uncontested claim

14   objections.  Ms. Stafford.

15              MS. STAFFORD:  That's correct, your Honor.  Laura

16   Stafford for the Financial Oversight Management Board, from

17   Proskauer Rose.  I am here to address the uncontested COFINA

18   claim objections as well as the first nine of the contested

19   claim objections, and I will defer to my colleague Mr. Rosen to

20   handle the 10th through 13th contested objections.

21              I am happy to address the uncontested objections in

22   whatever manner the Court feels most appropriate.  I can give a

23   brief overview of each of them or I can handle it however your

24   Honor would prefer.

25              THE COURT:  I think, for efficiency's sake, I have

J3d2pro2

1    reviewed them and also reviewed the summary information

2    provided in the agenda.  I have no further questions.  Nothing

3    has been filed challenging them.  So if you would like to make

4    a single motion for grant of those uncontested claims

5    objections that are listed, I think, as items 1 through 31 in

6    Section III of the agenda, I think that would cover your

7    universe, and that would be acceptable to me.

8            MS. STAFFORD:  That's perfect, your Honor.

9            And I did just want to note for the Court that several

10   of those objections were withdrawn last night pursuant to

11   withdrawals of the claims that were the subject of those

12   objections.

13           And with respect to the seventeenth omnibus objection,

14   which also was uncontested, as a result of other claim

15   withdrawals, we will submit an amended schedule of claims

16   subject to that objection to the court.

17           THE COURT:  All right.  So I am not sure that my

18   numbering is exactly right, because I think I have numbering

19   that pulled out withdrawn ones or something like that.

20           So the uncontested claim objections that have not been

21   withdrawn or amended are granted, or sustained, and will you

22   simply contact my chambers to make sure that we have an order

23   consistent with that ruling that we can enter?

24           MS. STAFFORD:  Of course.

25           THE COURT:  Thank you.

1           MS. STAFFORD:  Moving on to the contested claim

2     objections, the first of these was the sixth omnibus objection,

3     and this was an objection to a number of deficient claims that

4     failed to provide a basis for asserting liability against

5     COFINA or any of the other Title III debtors.  We received a

6     number of responses to this objection and, as of the time that

7     we filed the agenda, there were 26 responses or amended

8     responses that were still pending.  Eight responses have been

9     withdrawn since the time of the filing of the agenda, and I

10    believe the court has already entered orders withdrawing those

11    responses.

12          We did receive an additional withdrawal form from an

13    additional claimant, which we are happy to file with the court,

14    withdrawing another response, and that was the response filed

15    by Ms. Hedwig Auletta, at ECF number 4980.

16          We did receive an additional response withdrawal, but

17    because it requested that we agree that the claimant owned

18    certain bonds issued by the GDB, which the Oversight Board is

19    not authorized to do, we are unfortunately unable to file that

20    one as it was provided to us.

21          The remaining responses I am happy to address, again,

22    your Honor in whatever fashion you prefer.  The majority of

23    them were --

24          THE COURT:  I would like you to go through them one by

25    one in summary, and so you can get quickly to the bottom line

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2pro2

1     of them being duplicative or whatever and the very clear reason

2     for that.

3          MS. STAFFORD:  Sure.  And I am happy to do that in the

4     order that they are listed on the agenda.

5          THE COURT:  That would be helpful.

6          MS. STAFFORD:  So the first of those was a response

7     filed by Jorge Catala Monge, and that claim was in his response

8     he provided information regarding a CUSIP number that's covered

9     by a master proof of claim.

10         The second response on the agenda filed by --

11         THE COURT:  Okay.  So we will do it item by item.

12         So the documentation establishes that Mr. Monge's

13    claim is duplicative of the master proof of claim, and so that

14    the objection to that claim is granted and it is disallowed.  I

15    will enter an appropriate order.  That is claim 5933.  Is that

16    correct?

17         MS. STAFFORD:  That's correct.

18         THE COURT:  So now Peter Leavitt and Olga Stavros

19    Leavitt.

20         MS. STAFFORD:  Peter Leavitt and Olga Stavros also

21    provided documentation regarding a CUSIP number that's listed

22    on the master proof of claim in response.

23         THE COURT:  That objection is sustained and the claim

24    will be disallowed.

25         MS. STAFFORD:  The next response was filed by Linda

J3d2pro2

1   Bird, and it was -- withdrawal was already filed, and I believe
2   already ordered by the court.
3            THE COURT:  Very well.
4            MS. STAFFORD:  The same is true with respect to
5   Mr. Lowery and Ms. Ocampo's claim, claim number 6923.  A
6   response withdrawal was filed and I believe already ordered by
7   the court.
8            THE COURT:  Yes.
9            MS. STAFFORD:  The same with respect to the response
10  filed by Linda Kaye with respect to claim number 4084.  A
11  response withdrawal form was filed and I believe already
12  ordered by the court.
13           THE COURT:  Yes.
14           MS. STAFFORD:  The same with respect to the response
15  filed by Keith Gambino with respect to claim number 2054.  A
16  withdrawal form was filed and already ordered by the court.
17           THE COURT:  Yes.
18           MS. STAFFORD:  With respect to the next item, José R.
19  Criado and Josefina del Valle's response with respect to claim
20  number 15865, that response contained documentation regarding a
21  bond issued by the Puerto Rico Public Finance Corporation,
22  which is not COFINA or any of the other Title III debtors.
23           THE COURT:  So there is no evidence that they have any
24  claim against any debtor entity.
25           MS. STAFFORD:  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2pro2

1          THE COURT:  That objection is sustained, and the claim

2     will be disallowed.

3          MS. STAFFORD:  The next item on the agenda with

4     respect to the response filed by Miriam Sanchez Lebron, and

5     this is also related to an item that will appear later in the

6     agenda under letter W, this claimant filed a large number of

7     documents, including a number of family history documents,

8     regarding her -- the marriage of some of her family members, a

9     certain birth certificate records and other family records for

10    her family members, as well as a large amount of documentation

11    regarding cases filed in Commonwealth local courts and a large

12    number of maps which claimant believes asserts liability

13    against COFINA with respect to her alleged ownership in lands

14    on which pharmaceutical companies have been built.  None of

15    these documents provide any basis for liability -- for

16    asserting liability against COFINA, which doesn't purport to

17    own any of the land or any of the pharmaceutical companies on

18    which that land was built.

19         THE COURT:  Is there any indication in the

20    documentation that has been filed that there would be a basis

21    for any claim against the Commonwealth or other current debtor

22    entities?

23         MS. STAFFORD:  There is not, your Honor.

24         THE COURT:  And the disallowance of the claim as

25    against COFINA would not be determinative of whether any other

J3d2pro2

1    parts of the Puerto Rico government or its affiliates might

2    have some liability to Ms. Sanchez Lebron or her family?

3         MS. STAFFORD:  That is correct, and Ms. Sanchez Lebron

4    filed claims against several of the other debtors as well,

5    which we will deal with at an appropriate time.

6         THE COURT:  I understand that Ms. Sanchez Lebron is or

7    was in the San Juan courtroom.  Does Ms. Sanchez Lebron wish to

8    be heard on this?  Is that Ms. Sanchez Lebron?  So if you are

9    going to speak, please go to the podium where the microphone

10   is.

11        MS. SANCHEZ LEBRON (through an interpreter):  Shall I

12   start?

13        THE COURT:  Yes, *buenos dias*.

14        MS. SANCHEZ LEBRON (through an interpreter):  Good

15   morning, Honorable Judge Swain.  My name is Miriam Sanchez

16   Lebron, and I am here to top object on the decision to

17   eliminate me from COFINA's claim.  I understand that I have no

18   direct relationship to COFINA, but I do have an indirect one.

19   And I also have a direct relationship to the Commonwealth, to

20   the PREPA, with the Department of Public Works and Highway

21   Authority, and the Public Employees Retirement System.

22        Given that the evidence that I have submitted is real,

23   given that my grandfather Eladio Lebron was the owner of the

24   properties, which include buildings, roads, schools, let me

25   see, the schools, parks, and other important parts in Puerto

J3d2pro2

1   Rico, such as arenas, stadiums.

2            And I have been requesting said evidence from the

3   Department of Justice for more than two decades, given that my

4   mother, who was the person who received the inheritance, and

5   once she died -- since she died, I have been pressing for

6   resolutions from the Department of Justice, and I have been

7   requesting these things for more than ten years.  And now all

8   of this evidence that I have sent to you, it concerns some

9   research to which I have access and I was able to get

10  information.  As a result of that investigation or some

11  research I conducted, trying to get information from the

12  Department of Justice of Puerto Rico, and as such I am claiming

13  my family's rights, which belong to Eladio Lebron, my

14  grandfather, and Juana Lebron Perez, my mother.  And I

15  understand that I should not be excluded from my petition,

16  given that there are -- five of these agencies are directly

17  related to my case.  And my only relation to COFINA is not

18  direct, it is indirect, but there is a relationship.

19           THE COURT:  What is the nature of that relationship,

20  that indirect relationship to COFINA, please?

21           MS. SANCHEZ LEBRON (through an interpreter):  Well,

22  what happens is that in Puerto Rico there are several

23  pharmaceutical companies and companies which are currently

24  built on land that belonged to my grandfather, and I understand

25  that, from there, that's where bonds were issued and that we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2pro2

1    have not received one penny from the value of those lands.

2              THE COURT:  Thank you.  At this point I am going to

3    ask Ms. Stafford to respond.

4              MS. STAFFORD:  Sure.  COFINA -- the claimant has

5    asserted liability with respect to -- against COFINA with

6    respect to lands on which pharmaceutical companies and other

7    buildings have been built.  COFINA doesn't own or assert any

8    ownership interest over any of the lands with respect to which

9    Ms. Lebron asserts a claim, and so we respectfully submit that

10   there is still no basis for a claim that has been asserted

11   against COFINA.

12             Ms. Lebron does retain claims against --

13             THE COURT:  A little slower.

14             MS. STAFFORD:  Sorry.

15             Ms. Lebron does retain claims against multiple other

16   Title III debtors; and if she wishes to reraise these

17   arguments, there we are happy to deal with them at the

18   appropriate time.

19             THE COURT:  Ms. Sanchez Lebron, the information that

20   you have provided here about the indirect relationship, as you

21   put it, with COFINA is not sufficient to persuade me that you

22   have a claim against COFINA, and today I am dealing just with

23   the matter of the claim against COFINA.  And so I find that the

24   objection to your claim against COFINA is a valid objection,

25   and I sustain it, and the claim will be disallowed as against

J3d2pro2

1   COFINA.

2          You have filed claims against other debtor entities,

3   and this does not prevent you from pursuing those claims.  I

4   would advise you to seek the help of an attorney to make clear

5   the nature of your claim.  And to the extent you are going

6   forward, you will need at least to be able to identify

7   particular properties to particular debtor entities and explain

8   why it is you feel there is money owing from those properties,

9   that they weren't properly sold or whatever happened in the

10  past was not sufficient.  That will need to be clearer for the

11  debtors and for the court, and that will be helpful as we go

12  forward.

13         So I thank you for coming to court and for listening

14  to my ruling, and I hope that you understand it, and I wish you

15  a good day.  Thank you.

16         MS. SANCHEZ LEBRON (through an interpreter):  Thank

17  you.  Thank you.

18         MS. STAFFORD:  Before we return to the items on the

19  agenda, the Fee Examiner and Fee Examiner's counsel would

20  request to be excused if that's all right.

21         THE COURT:  Yes.  Thank you for coming.  And

22  Mr. Despins, as well.

23         MR. DESPINS:  Thank you.

24         THE COURT:  We can continue.

25         MS. STAFFORD:  Great.

J3d2pro2

1          The next item on the agenda is a response filed by

2     Lorenzo Dragoni with respect to claim number 29295.  We

3     received a response withdrawal form with respect to that claim,

4     and I understand your Honor has already entered an order with

5     respect to this one.

6          THE COURT:  Yes.

7          MS. STAFFORD:  The same is true with respect to the

8     next item on the agenda.  The response filed by Carmen

9     Cebollero de Dragoni, a response withdrawal form was filed and

10     already acted upon by your Honor.

11          THE COURT:  Yes.

12          MS. STAFFORD:  The next item on the agenda, the answer

13     and opposition to objection to claim filed by Edilberrto

14     Berrios Perez and Ariadne Febles Gordian, we did receive --

15     this is the one for which we received a response withdrawal

16     form requesting that we acknowledge a claim that had been filed

17     and ownership of funds held by these claimants with respect to

18     the Government Development Bank.  Unfortunately, we are unable

19     to enter that because we are not able to represent anything

20     with respect to their ownership or GDB bonds.  But because the

21     response does not assert any liability against COFINA, we

22     respectfully request the objection be granted with respect to

23     this claim.

24          THE COURT:  The objection is sustained as to the claim

25     against COFINA, and so the claim against COFINA will be

J3d2pro2

```
1    disallowed.  Since the GDB is not a debtor in this proceeding,

2    I have no authority to direct GDB to do anything, so that part

3    of the application is denied for lack of jurisdiction.

4              MS. STAFFORD:  Thank you, your Honor.

5              The next response was filed by Hedwig Auletta

6    regarding claim number 17116.  We received a response

7    withdrawal form.  We have not had -- we have not had an

8    opportunity to submit it to your Honor just yet.  I am happy to

9    provide it in an informative motion to the court.

10             THE COURT:  I would be grateful for that.  Thank you.

11             MS. STAFFORD:  Sure.

12             The next item on the agenda, the response of Maria

13   Emelia Casasnovas to this -- this claimant also provided

14   documentation which indicated that her -- a CUSIP number

15   associated with this claim was covered by a master proof of

16   claim.

17             THE COURT:  So the objection is sustained and the

18   claim is disallowed as duplicative.

19             MS. STAFFORD:  The next item on the agenda is response

20   of Maria Emelia Casasnovas and Javier Garcia Garrido was also

21   provided documentation regarding a CUSIP number covered by a

22   master proof of claim.

23             THE COURT:  The objection is sustained and the claim

24   is disallowed as duplicative.

25             MS. STAFFORD:  The next item the response filed by
```

J3d2pro2

1    Carlos A. Costas.  This claimant provided documentation

2    regarding a contra-CUSIP number which, pursuant to the

3    flowchart that Mr. Rosen presented earlier, is linked to an

4    original CUSIP number which is on the master proof of claim.

5             THE COURT:  I just have a question about the mechanics

6    of that.

7             So how is it that the December 2018 account statement,

8    which would precede the confirmation of the plan and the

9    implementation of the plan, include an updated contra-CUSIP

10   number?  If you could just help me to be comfortable with the

11   matching up of these numbers, please.

12            MS. STAFFORD:  So we matched the numbers on the basis

13   of a document provided by a Prime Clerk which identified the

14   contra-CUSIP numbers and the corresponding original CUSIP

15   numbers.  I am not entirely clear on why the December 2018

16   statement would include a contra-CUSIP number, but I am happy

17   to provide a supplemental information to the court about that.

18            THE COURT:  Would you please do that so that we can

19   close the loop and have a clear record.

20            MS. STAFFORD:  Of course.

21            The next item on the agenda is the Casasnovas Balado

22   and Lolita Gandarilla claim.  This claimant also provided

23   documentation regarding a CUSIP number that is covered by a

24   master proof of claim.

25            THE COURT:  The objection is sustained and the claim

J3d2pro2

1    is disallowed as duplicative.

2             MS. STAFFORD:  The next two items relate to a response

3    filed by Casasnovas and Trinidad Nieves, and these are also

4    contra-CUSIP claimants that provided information regarding a

5    contra-CUSIP number, and if your Honor has the same concern

6    about the dates, I am happy to provide supplemental information

7    about that as well.

8             THE COURT:  Yes.  Please do that.

9             MS. STAFFORD:  With respect to the next item, Marini

10   Quesada filed a response, V. Marini filed a response --

11            THE COURT:  So Q and R are identical --

12            MS. STAFFORD:  I believe --

13            THE COURT:  -- with Casanovas and Trinidad Nieves.

14            MS. STAFFORD:  Yes.  I believe one was an amended

15   version of a previous filing.

16            THE COURT:  Thank you.  So those will both be covered

17   by the supplement, and we will dispose of those at the same

18   time.

19            MS. STAFFORD:  Thank you.

20            So Item S on the agenda, the Marini Quesadas have also

21   provided documentation regarding a CUSIP number that's

22   duplicative of a master proof of claim.

23            THE COURT:  And so the amended response is in

24   subsection Z?

25            MS. STAFFORD:  That is correct, your Honor.

J3d2pro2

1          THE COURT:  And so they are both duplicative.

2          MS. STAFFORD:  Yes.

3          THE COURT:  And so I grant the -- I sustain the

4    objection as to items S and Z as duplicative of the master

5    proof of claim and will enter an order accordingly.

6          MS. STAFFORD:  Item T, your Honor, regards a response

7    filed by Rafael Rodriguez Quintana.  This response was also

8    withdrawn, and I believe your Honor has already entered an

9    order to that effect.

10         THE COURT:  Yes.

11         MS. STAFFORD:  The next response was filed by

12   Margarita Guzman de Vincenty.  This claimant also provided

13   documentation of a CUSIP number that was covered by a master

14   proof of claim.

15         THE COURT:  The objection is sustained and the claim

16   is disallowed as duplicative.

17         MS. STAFFORD:  The next item is a response filed by

18   Carlos Ifarraguerri Gomez.  This individual provided

19   documentation regarding a mutual fund investment which is

20   either duplicative, to the extent they are claiming liability

21   associated with bonds purchased by the mutual fund, bonds

22   issued by COFINA that were purchased by the mutual fund or

23   there is no basis for a claim against COFINA to the extent the

24   claimant asserts liability on the basis of the mutual fund's

25   investments in other issuers' bonds.

J3d2pro2

1            THE COURT:  So just so that I understand, his

2   documentation shows that he is a mutual fund investor.  To the

3   extent any of those mutual funds actually holds COFINA bonds,

4   the mutual fund would be the appropriate claimant, and so he

5   has provided no evidence of a valid direct claim as against

6   COFINA?

7            MS. STAFFORD:  Correct, your Honor.

8            THE COURT:  The objection to the claim is sustained

9   and the claim is disallowed for lack of an individual interest

10  in COFINA securities.

11           MS. STAFFORD:  Item W on the agenda I believe we have

12  already dealt with, that is the submission of additional

13  evidence by Miriam Sanchez Lebron.

14           THE COURT:  Yes.

15           MS. STAFFORD:  Item X on the agenda is a number of

16  claims filed by the UBS Trust Company.  These claims were all

17  duplicative of a master proof of claim of CUSIP numbers

18  identified on the master proof of claim, and I believe the

19  response itself notes that to the extent the plan is -- becomes

20  effective which, as your Honor knows, it has, then there would

21  be no need for these responses anymore.

22           THE COURT:  And so should I disallow them as

23  duplicative or moot or -- I imagine you have to get rid of them

24  on the books somehow.

25           MS. STAFFORD:  Right.

J3d2pro2

1      THE COURT:  So is disallowing them as duplicative

2   sufficient and effective here?

3      MS. STAFFORD:  Yes.

4      THE COURT:  All right.  The objection is sustained and

5   the UBS claims are disallowed as duplicative.

6      MS. STAFFORD:  Item Y on the agenda is the amended

7   answer of Carlos Ifarraguerri Gomez, and that amended answer

8   continued to provide documentation regarding mutual funds and

9   is related to item V, which we addressed a few moments ago.

10      THE COURT:  And so both V and Y are disallowed for

11   lack of an individual interest in COFINA securities.

12      MS. STAFFORD:  And I believe Z we dealt with in

13   connection with addressing the Marini Quesada response on item

14   S.

15      THE COURT:  Yes.

16      MS. STAFFORD:  That concludes the sixth omnibus

17   objection, your Honor, as to which no other responses were

18   filed.

19      THE COURT:  Thank you.  And we will just make sure

20   that we have orders that match up, and so if we have any issues

21   with what we have, aside from the supplemental material, I

22   guess we will reach out to you.

23      MS. STAFFORD:  Perfect.  Thank you, your Honor.

24      Moving on to the seventh omnibus objection as to

25   claims, this objection sought to reclassify 27 proofs of claim

J3d2pro2

1     that have been filed in the wrong case; and, upon review of

2     COFINA's books and records, it was determined that any

3     liability, if such liability exists, should be asserted against

4     other debtors.

5          One response was filed by Francisco Toro de Osuna.  In

6     connection with that response, documentation was filed

7     demonstrating evidence of a CUSIP number for a bond issued by

8     COFINA which was covered by a master proof of claim.  Our

9     claims reconciliation agent, Alvarez & Marsal, reached out to

10    this individual, and I understand that he sent in a form return

11    on his COFINA claim in the last week.  I don't believe it has

12    been processed as of yet.

13         THE COURT:  So just one moment, because I did have a

14    question here.  So as I understand it, he originally provided

15    CUSIP information relating to PREPA, but then --

16         MS. STAFFORD:  That's correct, your Honor, and then

17    subsequently filed a UBS account statement that included

18    documentation of a claim against COFINA.

19         THE COURT:  Okay.  My note here says that the UBS

20    account statement indicated COFINA debt, but also PREPA and ERS

21    debt and GDB debt, but of course GDB is not a debtor.  Your

22    position is that the COFINA claim is duplicative of the master

23    proof of claim so should be disallowed as duplicative.  Are you

24    looking still to reclassify the claim insofar as it is

25    supported by documentation of PREPA and ERS holdings?

J3d2pro2

1          MS. STAFFORD:  Yes, your Honor.  I understand that he

2     has filed claims against those other debtor as well, but we are

3     happy to have those -- the claim as it was filed against COFINA

4     reclassified to the extent it demonstrates evidence of those,

5     and we will deal with the -- those claims against ERS and PREPA

6     at the appropriate time.

7          THE COURT:  All right.  I think the order that we

8     received speaks only to the disallowance of the COFINA claim,

9     so will you submit an updated order --

10          MS. STAFFORD:  Of course.

11          THE COURT:  -- that deals with the reclassification as

12     well?

13          MS. STAFFORD:  Of course.

14          THE COURT:  Great.

15          MS. STAFFORD:  Next, moving on to the twelfth omnibus

16     objection, this omnibus objection sought to disallow in their

17     entirety 500 proofs of claim which assert liabilities

18     associated with one or more bonds issued by COFINA that are

19     duplicative of a master proof of claim.  Three responses were

20     pending as of the time we filed the agenda.  Two of those

21     responses have since been withdrawn or we have received

22     withdrawal forms, and I believe we have not yet submitted them

23     to the court, but we are happy to do so.

24          THE COURT:  Good.  Which ones are those?

25          MS. STAFFORD:  That would be the B and C on the

J3d2pro2

1    agenda, the responses filed by the Cooperativa de Jayuya and

2    Cooperativa de Caribe.

3              THE COURT:  Very good.  And so that is --

4              MS. STAFFORD:  That leaves us with response A.

5              THE COURT:  Yes, Bracero Torres?

6              MS. STAFFORD:  Yes.  And Mr. Bracero Torres's response

7    does not address the substance of COFINA's objection that his

8    claim is duplicative.  It simply alleges Mr. Bracero Torres's

9    displeasure with the plan of adjustment itself.

10             THE COURT:  And your documentation indicates that in

11   fact the claim is duplicative.

12             MS. STAFFORD:  That's correct.

13             THE COURT:  So the objection is sustained and the

14   Bracero Torres claim is disallowed as duplicative of a master

15   proof of claim.

16             MS. STAFFORD:  Thank you, your Honor.  We will be

17   submitting new schedules for the court with respect to this

18   omnibus objection as well because, as a result of certain claim

19   withdrawals, there are claims that no longer need to be covered

20   by this objection.

21             THE COURT:  Very good.

22             MS. STAFFORD:  With respect to the thirteenth omnibus

23   objection, this objection sought to disallow in their entirety

24   500 proofs of claim which assert liabilities associated with

25   one or more bonds issued by COFINA, which are duplicative of a

1   master proof of claim.  There are a number of filings on our

2   agenda that are related to this omnibus objection.  Four of

3   them were filed by Peter Hein, and his response has been

4   adjourned to the April omnibus hearing.

5          There were two joinders filed by the GMS Group to the

6   Hein filings but, upon review of those joinders, they relate

7   only to the portion of Mr. Hein's filings that addressed his

8   objections to the COFINA plan of adjustment.  They don't

9   actually address the thirteenth omnibus objection at all.  The

10  GMS group hasn't filed a proof claim against COFINA and is not

11  listed as a claimant on the thirteenth omnibus objection, and

12  so we would request the court strike the GMS Group's joinder to

13  the extent it sought to join the thirteenth omnibus objection

14  as to claims.

15         THE COURT:  That is granted.  Have you given us a

16  proposed order doing that or --

17         MS. STAFFORD:  I believe so, but we will verify and

18  make sure that everything is appropriate with the clerks.

19         THE COURT:  Very good.

20         MS. STAFFORD:  There is an additional withdrawal that

21  we have received with respect to Farmacia La Ventana, who is

22  the next item on the agenda.  I believe that that has been

23  submitted to the court and, if not, I will be happy to submit

24  it.

25         THE COURT:  All right.  If you will just -- so that

J3d2pro2

1   has been withdrawn?

2              MS. STAFFORD:  A response withdrawal form was

3   received, your Honor.

4              THE COURT:  So if you will just follow up and make

5   sure that we deal with that appropriately.

6              MS. STAFFORD:  Of course.

7              THE COURT:  Thank you.

8              MS. STAFFORD:  The remainder of the claims --

9              THE COURT:  So there were two Farmacia La Ventana

10  responses.

11             MS. STAFFORD:  Yes.  I believe there was one answer,

12  either an amended answer or a redacted answer, that was

13  provided.

14             THE COURT:  Okay.  So that's F and G.

15             MS. STAFFORD:  F and G.

16             THE COURT:  All right.  So now we come to Del Valle

17  Martinez?

18             MS. STAFFORD:  Yes and Mr. Del Valle Martinez has

19  submitted a response which provides information regarding a

20  CUSIP number that is covered by a master proof of claim.

21             THE COURT:  The objection to claim is sustained and

22  that claim is disallowed as duplicative.

23             MS. STAFFORD:  And with respect to the next item on

24  the agenda, the response filed by Margarita Guzman de Vincenty,

25  this response also provided documentation regarding a CUSIP

J3d2pro2

1  number that is duplicative of a master proof of claim.

2          THE COURT:  The objection is sustained and the claim

3  is disallowed as duplicative.

4          MS. STAFFORD:  Thank you, your Honor.

5          With respect to the fourteenth omnibus objection,

6  which also seeks to disallow in their entirety 500 proofs of

7  claim which assert liabilities associated with one or more

8  bonds issued by COFINA which are duplicative of a master proof

9  of claim, there is one response still pending that was filed by

10 Mr. Del Valle Rivera and Mr. Martinez.  This response also

11 submitted documentation regarding a CUSIP number which is

12 covered by a master proof of claim.

13         THE COURT:  The objection is sustained and the claim

14 is disallowed as duplicative.

15         MS. STAFFORD:  With respect to the fifteenth omnibus

16 objection, which also seeks to disallow in their entirety 500

17 proofs of claim which assert liabilities associated with one or

18 more bonds issued by COFINA that are duplicative of a master

19 proof of claim, there were two responses pending as of the time

20 we filed the agenda.  The first of those responses, which was

21 filed by the Puerto Rico Funds, has -- we have stipulated to

22 the withdrawal of those claims.

23         THE COURT:  All right.  That stipulation has been

24 approved by the court already?

25         MS. STAFFORD:  That is correct.

J3d2pro2

1           THE COURT:  Thank you.

2           MS. STAFFORD:  The response of Doris Zoe Pons-Pagan

3     provided documentation regarding a CUSIP number which is

4     covered by the master proof of claim.

5           THE COURT:  That objection is sustained and the claim

6     is disallowed as duplicative.

7           MS. STAFFORD:  Thank you, your Honor.

8           And with respect to this objection as well, your

9     Honor, we will submit amended schedules to the court to reflect

10    the withdrawal of certain claims.

11          THE COURT:  Thank you.

12          MS. STAFFORD:  The sixteenth omnibus objection seeks

13    to disallow in their entirety 243 proofs of claim which assert

14    liabilities associated with one or more bonds issued by COFINA

15    that are duplicative of a master proof of claim.  There were

16    two responses pending as of the time we filed the agenda.  One

17    was filed by the Puerto Rico funds, and that response was also

18    withdrawn pursuant to the stipulation your Honor entered

19    recently.

20          THE COURT:  And so that is dealt with?

21          MS. STAFFORD:  That has been dealt with, yes.

22          And the next response was filed by Reinaldo Vincenty

23    Perez.  That response was also withdrawn yesterday by the

24    claimant.

25          THE COURT:  So if we haven't yet entered an order, you

J3d2pro2

1    will make sure that we have the right paperwork and we will

2    enter an order.

3            MS. STAFFORD:  Of course, your Honor.

4            And we will file amended schedules with respect to

5    that objection as well.

6            THE COURT:  Very good.

7            MS. STAFFORD:  And turning to the eighteenth omnibus

8    objection, which also sought to disallow in their entirety

9    proofs of claim which did not assert -- did not provide

10   documentation sufficient to provide a basis for liability

11   against COFINA, there was one response outstanding with respect

12   to this claim.  That response was withdrawn yesterday, and so

13   the remainder of the objection is uncontested.  And we are

14   happy to provide your Honor with updated schedules and an

15   appropriate order.

16           THE COURT:  Thank you.  I will look forward to that.

17   It is granted, and I will look forward to the updated schedules

18   and orders.

19           MS. STAFFORD:  Thank you, your Honor.

20           And lastly, your Honor, the ninteenth omnibus

21   objection as to claims, we seek to disallow in their entirety

22   55 proofs of claim which asserted liabilities against COFINA

23   based on alleged ownership interest in mutual funds.  There was

24   one response filed by Ms. Helvia Cruz Ybarra and an amended

25   response filed shortly thereafter.  This response provided

J3d2pro2

1    documentation regarding a mutual fund and, as we have discussed

2    earlier, the documentation regarding a mutual fund does not

3    assert liability against COFINA.

4            THE COURT:  The objection is sustained and the claim

5    is disallowed as indirect.

6            MS. STAFFORD:  And I will turn it over to Mr. Rosen,

7    unless you have any questions.

8            THE COURT:  No.  Thank you.

9            MR. ROSEN:  Still good morning, your Honor.

10           THE COURT:  Good morning, and moving along.

11           MR. ROSEN:  Yes, your Honor, and I will try to be

12   brief.

13           Your Honor, the next four items on the agenda are

14   actually linked.  They are the claims that were filed by

15   Cooperativa de Ahorro y Credito del Valenciano, and I will just

16   say the last part of each one, Credito de Rincon, Credito Dr.

17   Manuel Zeno Gandia, and Credito de Juana Diaz.

18           Your Honor, we filed an objection to each of these

19   claims because they were, like many of the others that you have

20   already heard, duplicative of the master proof of claim that

21   was filed by Bank of New York Mellon.

22           There was also a component of each of these claims

23   that attempted to assert a claim for damages associated with

24   the purchase and sale of securities.  And as the court is well

25   aware, pursuant to the plan, that was class ten, that was

J3d2pro2

 1  subordinated to all creditors, and they received no

 2  distributions pursuant to the plan.

 3          I will say -- and subsequent to our filing of these

 4  objections, the four claimants filed amended proofs of claim.

 5  They attempted to say -- and these were done very recently,

 6  your Honor.  They attempted to say that this is for bonds above

 7  and beyond the master proof of claim by Bank of New York

 8  Mellon.  Unfortunately, they did not include any information,

 9  any CUSIP information, and there is nothing that would justify

10  any claim or any bond claim against COFINA.  And we are -- as

11  your Honor is well aware, there are no additional bonds that

12  COFINA ever issued other than those which were the subject of

13  the plan, the senior and junior COFINA bonds.

14          There was also, in the response that was filed, an

15  effort to, yet again, litigate a component of the plan.  Your

16  Honor, if you recall, at the confirmation hearing, there was an

17  argument or an objection to put forth by the *cooperativas* in

18  connection with the release that is being provided pursuant to

19  the plan, and there was a request at that time, your Honor,

20  that we scale back the release so that it did not apply to any

21  third parties.  And so, your Honor, we did do that.  We

22  included that in the proposed form of order, and it was

23  expressly -- there was express reference in your form of order

24  as to the continuation of that adversary proceeding that had

25  been filed by the *cooperativas* against third parties, but that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3d2pro2

1   COFINA and reorganized COFINA would be entitled to the

2   discharge that was provided pursuant to the plan.

3           One of the claims that was filed, and it is the second

4   one, your Honor, which is the proof of claim of Cooperativa de

5   Ahorro y Credito de Rincon, attempts to yet again raise that

6   issue with respect to the release.  And this is not the second

7   time this is raised, your Honor.  It is actually the third time

8   this is raised.  Because subsequent to the court's entry of the

9   confirmation order, there was a motion for reconsideration

10  filed by the *cooperativas*, and the court asked us to brief

11  those issues, and the court indicated that it would take those

12  matters under submission.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J3D9PRO3

1          MR. ROSEN:  (Continuing) So I'm not going to address

2     it now because I believe that's already firmly in front of the

3     Court, not only their motion but our response, and the Court

4     did not provide for any further reply to be filed.

5          THE COURT:  Correct.

6          MR. ROSEN:  So, your Honor, what we have as far as I

7     can tell, your Honor, then is an amended and superseded claim

8     that attempts, I guess, by definition, would agree that the

9     original objection should be allowed, wiping out the original

10    claim.  But to the extent that the proof of claim, as amended,

11    attempts to assert claims which were not included in any

12    capacity in the original proof of claim, they would have been

13    filed in violation of the bar date order itself, which would

14    have required all proofs of claim be filed by a date certain.

15    And as you are well aware, your Honor, amendments to proofs of

16    claim have to relate to the original subject of the proof of

17    claim that was filed.

18         So here what we have is arguably a proof of claim that

19    relates to some bond that we don't know exists that has

20    provided any piece of information that would be in violation of

21    the bar date order.

22         To the extent that any component of the claims remains

23    with respect to the Section 510(b), your Honor, again, we

24    believe that those claims received no distributions pursuant to

25    the plan.  We would like to get rid of those claims off the

J3D9PRO3

1    registry of the court.

2              THE COURT:  So, is it clear on the face of the claims

3    that they fall within that class, the 510(b) class?  Because if

4    so, it seems to me it's a claim that's dealt with by the plan.

5    And striking a claim that corresponds to a class within the

6    plan is a bit anomalous.

7              MR. ROSEN:  That's correct, your Honor.

8              In fact, this was a discussion that was had at the

9    confirmation hearing where counsel actually understood that it

10   was something that was treated on a subordinated basis pursuant

11   to Class 10 of the plan.

12             So that's why we were a little bit surprised to see

13   the reincarnation of this pursuant to the motion for

14   reconsideration and then, in the response that was filed, to

15   the objection to the claim itself.

16             So, your Honor, these four claims as far as we submit

17   are to be dismissed or, excuse me, the objections should be

18   granted in their entirety because of either they are relating

19   back to the master proof of claim.  If they were, in fact,

20   amended to relate to something else, they provided no

21   information, no documentation that would support any additional

22   bond claims against COFINA and, in any event, they would be in

23   violation of the bar date order.

24             And with respect to the 510 class, your Honor, as you

25   indicated, it's already treated pursuant to the plan.

J3D9PRO3

1          Lastly, with respect to the release, your Honor,

2     that's I believe, your Honor, already under submission to the

3     Court.

4          THE COURT:  All right.  So, you have made lots of

5     different potential pathways here.  Have you given me a

6     proposed order?  If you haven't, what are your top two grounds?

7          It seems to me the simplest would be untimely and

8     failure to document any additional claims as against COFINA and

9     then the 510(b) part takes care of itself because of the plan.

10          MR. ROSEN:  Your Honor, if you would allow us, we'll

11     submit that form of order to the Court.

12          THE COURT:  Thank you.

13          And that order will be entered in relation to each of

14     these four *Cooperativa* claims.

15          MR. ROSEN:  Thank you, your Honor.  So that would take

16     care of items 10 through 13 on the agenda, your Honor.

17          THE COURT:  And so that takes us to the end of the

18     agenda.

19          MR. ROSEN:  Yes, your Honor.

20          THE COURT:  Thank you.

21          I think that this brings us to end of this omni.  So

22     the next date that I have on my calendar, at least as of now,

23     is a hearing next Friday on the motion of certain ERS

24     bondholders for relief from the automatic stay, but there was a

25     scheduling joint motion last night.  So can you update me on

J3D9PRO3

1    that?

2         MR. ROSEN:  Yes, your Honor.  We've been working with

3    the ERS bondholders in connection with their motion for

4    adequate protection.  There are many discovery issues that are

5    attendant to that motion.  The parties continue to try and

6    resolve those issues.  In the absence of that understanding,

7    it's something that will obviously be referred to Magistrate

8    Dein.

9         I believe the parties have agreed to what a schedule

10   might be.  Your Honor, I apologize.  I don't remember whether

11   it was going to be April 24 or even subsequent to that or

12   whether it was going to be based upon Magistrate Dein's

13   decision and the discovery that would have to be generated as a

14   result of her determination.

15        But the parties have agreed that March 22 would come

16   off the calendar.

17        THE COURT:  All right.  It is good to know that

18   because I have been holding next week in anticipation of lots

19   of filings and a hearing.  So I gather from last night's filing

20   that there will be a revised scheduling proposal filed I think

21   tomorrow and so shall I assume that that will include notice

22   that the parties are asking me to release the dates in next

23   week and will be providing some other timeframe.

24        MR. ROSEN:  That is my understanding, your Honor.

25   Yes.

J3D9PRO3

```
1          THE COURT:  That's good news from my work management
2    point of view.  And I'm glad to hear that you are working on
3    working out the discovery issues and I assume in discussions
4    about other issues as well.
5          MR. ROSEN:  There have been several parties who have
6    sought to intervene in that motion for adequate protection so
7    the creditors committee is involved.  It is AAFAF.  It is the
8    board, the ERS bondholders, and I believe also the retiree
9    committee has sought to intervene.  So there are many people
10   who are involved and we're trying to coordinate among all of
11   them.
12         THE COURT:  Thank you for that.
13         For the record I thank the -- so our next scheduled
14   hearing then will be the April omni in San Juan.
15         I thank the court staff in New York, San Juan, and
16   Boston for all of their continued successful and wonderful
17   efforts in support of these matters and in making these
18   multicity hearings go smoothly.  And I thank counsel.
19         MR. ROSEN:  Thank you, your Honor.
20         THE COURT:  And I think that that takes us to the end
21   of this hearing.  So keep well.
22         MR. ROSEN:  Thank you, your Honor.  Have a nice day.
23         (Adjourned)
24
25
```

J3D9PRO3

1  UNITED STATES DISTRICT COURT)

2                                    ) ss.
   OF PUERTO RICO                    )

3

4                        REPORTER'S CERTIFICATE

5

6          I, Karen Gorlaski, do hereby certify that the above

7  and foregoing pages, consisting of the preceding 81 pages

8  constitutes a true and accurate transcript of our stenographic

9  notes and is a full, true, and complete transcript of the

10 proceedings to the best of our ability.

11         Dated this 13 day of March, 2019.

12         S/Karen Gorlaski _____

13           Karen Gorlaski, RMR, CRR

14         Official Court Reporters

15         500 Pearl Street

16         New York, NY 10007

17         212-805-0320

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J3D9PRO3

1  UNITED STATES DISTRICT COURT)

2                                          ) ss.
   OF PUERTO RICO                          )

3

4                         REPORTER'S CERTIFICATE

5

6          I, Kristen Carannante, do hereby certify that the

7  above and foregoing pages, consisting of the preceding 81 pages

8  constitutes a true and accurate transcript of our stenographic

9  notes and is a full, true, and complete transcript of the

10 proceedings to the best of our ability.

11         Dated this 13 day of March, 2019.

12         S/Kristen Carannante _____

13         Kristen Carannante, RMR, CRR

14         Official Court Reporters
           500 Pearl Street
15         New York, NY 10007
           212-805-0320

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300