**Hearing Date and Time: April 1, 2019, at 2:30 p.m. (AST)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |  |
|---|---|---|
| ──────────────────────────── | ) | |
| In re: | ) | |
|  | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
|  | ) | Case No. 3:17-bk-03283 (LTS) |
| as representative of | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
|  | ) | |
| Debtors. | ) | |
|  | ) | |
| ──────────────────────────── | X | |
|  | ) | |
| In re: | ) | |
|  | ) | |
| THE FINANCIAL OVERSIGHT AND | ) | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | Title III |
|  | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
|  | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| ---------------------------------------------------------------- | x | |

## REPLY IN SUPPORT OF MOTION OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO TO COMPEL DISCOVERY

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.     The Discovery Is Relevant ......................................................................................... 3

II.    Respondents Are Required To Produce A Privilege Log That Provides The
Information Necessary To Assess Their Broad Claims Of Privilege .................................. 7

III.   There Is No Undue Or Unreasonable Burden ................................................................ 11

       A.    The Bondholders' Discovery Requests Are Not Unreasonably Burdensome .......... 11

       B.    The Court Should Compel ERS, The Commonwealth, And AAFAF To
Conduct A Search Of Documents Within An Appropriate Range Of Dates ............. 12

IV.   The Court Should Compel The Oversight Board To Produce Documents
Responsive To The Bondholders' Requests ................................................................... 13

V.    The Court Should Compel The Oversight Board To Designate A Deponent In
Response To The Bondholders' Deposition Subpoena ...................................................... 16

VI.   The Court Should Compel ERS And The Commonwealth To Provide Full And
Complete Responses To Interrogatory Nos. 1 And 2 ....................................................... 19

CONCLUSION ................................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Appleton Papers Inc. v. George A. Whiting Paper Co.*,
No. 08-C-16, 2009 WL 2870622 (E.D. Wis. Sept. 2, 2009).....................18

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
297 F.R.D. 55 (S.D.N.Y. 2013) ........................................................9

*Bhatia-Gautier v. Roselló-Nevares*,
Civil No. SJ2017CV00271 (P.R. Super. Ct. Mar. 16, 2018)...................11

*Brown v. Tax Ease Lien Serv., LLC*,
No. 3:15-CV-208-CRS, 2017 WL 6940735 (W.D. Ky. Aug. 21, 2017) ...............15

*Culebras Enters. Corp. v. Rivera-Rios*,
846 F.2d 94 (1st Cir. 1988)........................................................12

*Delaney v. Town of Abington*,
890 F.3d 1 (1st Cir. 2018)..........................................................15

*Dongguk Univ. v. Yale Univ.*,
270 F.R.D. 70 (D. Conn. 2010).....................................................18

*In re Fin. Oversight & Mgmt. Bd. for P. R.*,
295 F. Supp. 3d 66 (D.P.R. 2018)................................................9, 10

*In re N.E. Compounding Pharma., Inc. Prods. Liab. Litig.*,
No.13-2419-FDS, 2013 WL 6058483 (D. Mass. Nov. 13, 2013)...............16

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
281 F.R.D. 1 (D.D.C. 2011)........................................................20

*In re Stembridge*,
394 F.3d 383 (5th Cir. 2004) .......................................................17

*In re Subpoena Upon Nejame Law, P.A.*,
No. 16-cv-4619, 2016 WL 3125055 (N.D. Ill. June 3, 2016)...................15

*In re Textron, Inc. ERISA Litig.*,
No. 09-383ML, 2012 WL 12876091 (D.R.I. Apr. 11, 2012) ...................19

*La Pac. Corp. v. Money Mkt. 1 Inst'l Inv. Dealer*,
285 F.R.D. 481 (N.D. Cal. 2012)...................................................17

*Laracuente v. Chase Manhattan Bank*,
891 F.2d 17 (1st Cir. 1989)..........................................................6

*Mitchell Eng'g v. City & Cty. of S.F.*,
No. C 08-04022 SI, 2010 WL 455290 (N.D. Cal. Feb. 2, 2010)...............18

*Neelon v. Krueger*,
No. 12-cv-11198-IT, 2015 WL 1037992 (D. Mass. Mar. 10, 2015) ...........9

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rockstar Consortium US LP v. Google, Inc.*,
No. 14-91322-FDS, 2015 WL 5972422 (D. Mass. Oct. 14, 2015).........................................16

*Rogers v. Lodge*,
458 U.S. 613 (1982).........................................................................................................7

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988).......................................................................................................17

*Vazquez-Fernandez v. Cambridge Coll., Inc.*,
269 F.R.D. 150 (D.P.R. 2010) ......................................................................................14

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977)..........................................................................................................7

**STATUTES**

19 L.P.R.A. § 2106 .............................................................................................................4

19 L.P.R.A. § 2212 .............................................................................................................4

19 L.P.R.A. § 2265 .....................................................................................................4, 5, 13

48 U.S.C. § 2175 ..........................................................................................................13, 17

**OTHER AUTHORITIES**

8B Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* (3d ed. 2018) ........................................................14, 19

Fed. R. Civ. P. 26..........................................................................................................14, 15

Fed. R. Civ. P. 30..........................................................................................................17, 18

Fed. R. Civ. P. 33.................................................................................................................20

Fed. R. Civ. P. 37.................................................................................................................20

Fed. R. Civ. P. 45..........................................................................................................14, 15

Model Rules of Professional Conduct r. 3.7 (Am. Bar. Ass'n 2018) ...........................12

To the Chambers of the Honorable Judith G. Dein:

The Bondholders respectfully submit this reply in support of their *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Discovery*, Docket No. 5972 in Case No. 17-bk-03283 and Docket No. 402 in Case No. 17-bk-03566 (the "Motion to Compel"), and in response to the *Respondents' Opposition to Motion of Certain Creditors of the Employees Retirement System of the Government of Puerto Rico to Compel Discovery*, Docket No. 6001 in Case No. 17-bk-03283 and Docket No. 410 in Case No. 17-bk-03566 (the "Opp."). The Bondholders state as follows:

## INTRODUCTION

1.      The thrust of Respondents' opposition is that the Bondholders are not entitled to *any* discovery into how and why the Bondholders' once-oversecured $3 billion claims against ERS somehow, according to Respondents, became unsecured claims. Respondents argue that the passage of Joint Resolution 188 and Act 106 effectuated this change by substituting the new "Pay-Go" system for the old ERS, but strenuously oppose the Bondholders' efforts to learn the background, implementation, and operation of the two laws. Instead, Respondents throw out a blanket of generalized objections, claiming burden, privilege, and other problems. Yet none of these are valid, and Respondents should not be permitted to stonewall discovery. The District Court ordered discovery precisely so it could assess the merits of the Stay Relief Motion, and without discovery, the Bondholders will be seriously hampered in proving their case.

2.      Respondents raise four principal rationales as excuses for refusing to give discovery. *First*, they argue that discovery concerning Joint Resolution 188 and Act 106 is irrelevant to the Stay Relief Motion. But it is Respondents themselves who raised Joint Resolution 188 and Act 106 in opposing the Stay Relief Motion, so their bald claims of irrelevance cannot be believed.

- 1 -

Moreover, it is black-letter law that a lien follows its collateral, wherever that collateral may go. Given that the new Pay-Go system and the old ERS bear an uncanny resemblance, the Bondholders are entitled to discovery to prove their point that the so-called Pay-Go fees are actually just another name for their collateral. Respondents further argue that discovery is unnecessary because the meaning of Joint Resolution 188 and Act 106 turn on statutory text alone. But the statutory text does not answer the factual question whether Pay-Go fees are the same as the employer contributions ERS used to receive. Moreover, Respondents' arguments regarding Joint Resolution 188 and Act 106 ignore that these laws effectuated an enormous transfer of property from ERS to the Commonwealth while both entities were in Title III proceedings. The laws therefore raise significant questions about intent and effect that go far beyond ordinary statutory interpretation.

3.      *Second*, Respondents contend that the discovery the Bondholders seek is privileged, while simultaneously refusing to produce an adequate privilege log to substantiate their privilege claims. Respondents cannot have it both ways. They cannot refuse even to search for documents on their own say-so. Rather, if they are to withhold information as privileged, they must produce an adequate privilege log to allow the Bondholders and the Court to test their claims of privilege.

4.      *Third*, Respondents say it is simply too burdensome to conduct electronic discovery, providing an inflated estimate of the cost of that discovery that, even if true, pales in comparison to the more than $3 billion at stake in this litigation.

5.      *Finally*, Respondents contend that it is duplicative for the Bondholders to request discovery on the same topics from ERS, the Commonwealth, AAFAF, and the Board. But there is nothing duplicative about requesting relevant discovery from different entities that may possess it. And despite repeatedly complaining about the overlapping requests, Respondents never once argue that the responsive documents or information will be duplicative; only that the requests are.

- 2 -

## ARGUMENT

**I.    The Discovery Is Relevant.**

6.    The drumbeat of Respondents' opposition is that the discovery the Bondholders have served is not relevant to the Stay Relief Motion. *See* Opp. ¶¶ 1–4, 6–8, 11, 20–22, 34, 36, 38–44, 52–55, 61–62, 67–68, 71, 75. In particular, Respondents argue that *any* discovery concerning Joint Resolution 188 and Act 106 is irrelevant because, at bottom, this is a question of statutory construction than can be resolved by looking at the plain language of the two laws. Opp. ¶¶ 2, 6, 34, 39, 42, 44. This is obviously wrong on several levels.

7.    At the outset, nothing is more clear than the fact that it is the Board itself that has put these laws at issue. The centerpiece of the Board's opposition to the Stay Relief Motion is that:

> there is no diminution in collateral caused by the automatic stay (*i.e.*, because (i) ERS remitted funds to the Fiscal Agent from the Prepetition Segregated Account for payment to the ERS Bondholders and (ii) the ERS Bondholders' asserted collateral—Employers' Contributions— were eliminated by law after July 1, 2017) . . . .

Opp. ¶ 47.[1] Certainly where, as here, it is the Board who has made these laws the central issue, it cannot credibly say—as it now does—that discovery concerning those laws is *per se* irrelevant.

8.    Respondents' broader argument is that, even if Joint Resolution 188 and Act 106 are themselves relevant, evidence about the drafting, passage, and implementation of those laws cannot be. But this, too, is wrong because it ignores fundamental tenets of bankruptcy law and the law of secured transactions. Respondents' theory of the case is that, although the Bondholders once had security interests in collateral (the "Pledged Property"), those security interests disappeared once Joint Resolution 188 and Act 106 were passed. The security interests evaporated,

---

[1] *See also* Debtor's Opp'n to Mot. of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay at 12, Docket No. 292 in Case No. 17-bk-03566 (The automatic stay is "not at issue" because "Movants are complaining about legislation by the Commonwealth creating a new pension system that does not generate Employers' Contributions.").

Respondents say, because the bulk of the Pledged Property—employer contributions and the right to receive the same—no longer belongs to ERS, because employer contributions are now called "Pay-Go fees" and paid to the Commonwealth. Since ERS no longer receives employer contributions, there is no longer any collateral and, so the logic goes, there is nothing that could be diminished in value.

9.    Standing in the way of this bootstrap argument is the Uniform Commercial Code, enacted by the Puerto Rico legislature. Uniform Commercial Code § 9-315 provides that

> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and

> (2) a security interest attaches to any identifiable proceeds of collateral.

19 L.P.R.A. § 2265(a); *see also* 19 L.P.R.A. § 2106(2) (2008). "Proceeds" include, *inter alia*, "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral," "whatever is collected on, or distributed on account of, collateral," or "rights arising out of collateral." 19 L.P.R.A. § 2212(64). This time-worn rule—that a lien follows the collateral and any proceeds of collateral regardless of where the collateral is moved or where the proceeds are found—stands on no less a footing than Joint Resolution 188 and Act 106. Nothing in PROMESA, Joint Resolution 188, or Act 106 purports to alter, amend, or preempt U.C.C. § 9-315.

10.    Thus, the Bondholders, with ample statutory and case law support, have maintained that their perfected liens continue in the Pledged Property, wherever it has been diverted, and any and all proceeds.[2] It makes no difference what new name the Puerto Rico Legislature assigned to

---

[2] *See e.g.*, Pls.' Br. in Opp'n to Defs.' Mots. to Dismiss at 6, Docket No. 50 in Case Nos. 17-ap-219 and 17-ap-220 ("[T]he so-called "'Pay-Go' Fee" is nothing new."); *id.* at 6-7 ("Under Act 106, the entities that must pay the "'Pay-Go' Fee" are the same employers previously obligated to make contributions to ERS . . . ."); *id.* at 7 ("[T]he "contributions" are the same: Both systems require employers to contribute enough to cover the cost of paying pensions (notwithstanding that employers regularly failed to meet that obligation)."); Am. and Suppl. Adversary Compl. at 29–31, Docket No. 39 in Case Nos. 17-ap-219 and 17-ap-220.

the stream of employer contributions; present and future employer contributions are employer

contributions, no matter what they may be called, and the Bondholders' liens extend to them.

11.     It seems obvious that the new so-called "Pay-Go fee" is nothing but the old ERS

employer contributions barely disguised in new attire: the same employers are paying about the

same amounts to fund the same retirement benefits for the same beneficiaries. Respondents strain

to argue (Opp. ¶¶ 2, 3, 14–15, 19, 40, 69), that these are two separate and entirely different things,

and when they do, they fail to mention that the Pay-Go fees were created in the same piece of

legislation that purportedly terminated employer contributions. Thus, even if the Pay-Go fees were

not just employer contributions in the hands of a transferee, they still would be proceeds of the

employer contributions. It is clear that this is a central factual issue in the Stay Relief Motion, so

discovery into the background, circumstances, and implementation of the Pay-Go system is

appropriate, necessary, and unquestionably relevant. Only discovery will reveal whether the

Pledged Property was subject to a "sale, lease, license, exchange, or other disposition" under

Puerto Rico law, or whether the new "Pay-Go Fee" constitutes "identifiable proceeds" of the

Bondholders' collateral. 19 L.P.R.A. § 2265(a). Neither Joint Resolution 188 nor Act 106 say

anything on these points. But information and materials in the unique possession of the Board,

ERS, AAFAF, and the Commonwealth will certainly cast light on them. Put differently, it would

be inconceivable that these bodies would transfer billions of dollars from ERS to the

Commonwealth, have the already-insolvent Commonwealth assume billions in pension

obligations, and re-wire some of the circuitry for assessment, collection, and transmittal of further

billions in employer contributions without studying the matter, looking at alternatives, and

considering how pension payments would continue to be made. The reality is that any suggestion

that Joint Resolution 188 and Act 106 preclude application of U.C.C. § 9-315 is not supported by

anything in those laws. The ferociousness with which Respondents dispute every effort to take discovery and their breathtaking claims of privilege to prevent inquiry into any other source of information concerning Joint Resolution 188 and Act 106 suggest that they, too, know the damage this evidence will do to their case.

12.     Discovery concerning Joint Resolution 188 and Act 106 is relevant for yet another reason: Those laws were enacted in an obvious effort to undermine the Bondholders' perfected security interests. Respondents contend that the parties' disagreement over Joint Resolution 188 and Act 106 involves "a garden-variety statutory interpretation question, and legislative history would be relevant only if the laws were ambiguous." Opp. ¶ 6. In support, Respondents cite a case involving the construction of a provision of the federal bankruptcy code, *Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 23 (1st Cir. 1989)—a case with no resemblance to this one. Unlike the issues in *Laracuente*, the issues posed by Joint Resolution 188 and Act 106 go far beyond the ordinary questions of statutory interpretation that typically concern the objective effect of a law.

13.     Joint Resolution 188 was promulgated on June 30, 2017, about a month after ERS and the Commonwealth filed their Title III petitions. Act 106 was passed two months later. These statutes were enacted at the urging of, and with the direct involvement of, the Oversight Board. *See* Motion to Compel ¶¶ 24–26. And the statutes had the principal, if not the sole, purpose and effect of purporting to strip the Bondholders of their perfected liens. *See id.* The statutes are thus not ordinary legislation. They are instead post-petition acts by bankruptcy debtors, at the apparent urging of a bankruptcy trustee purporting to represent both debtors, seemingly attempting to transfer the Bondholders' security interests from one debtor to the other.

14.     Where the question at issue goes beyond what a statute means and asks whether a legislature has done something unlawful, evidence of the legislative process is often relevant. *Cf.,*

*e.g*, *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("proof that a discriminatory purpose has been a motivating factor in the [legislature's] decision" is relevant to a claim that zoning was racially discriminatory); *Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("[D]etermining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (quoting *Arlington Heights*, 429 U.S. at 266)). Thus, in the context of statutes that seem to have been enacted for the purpose of unlawfully stripping the Bondholders of their perfected liens, evidence from Respondents of the negotiations and communications that produced those statutes is directly relevant. And here, of course, non-legislators (including Respondents) played an outsized role in drafting Joint Resolution 188 and Act 106 in connection with the Oversight Board's fiscal plans.

15.      As set forth below, the discovery the Bondholders served was directed to these issues. Since the heart of the Oversight Board's opposition to the Stay Relief Motion is that Pay-Go fees are not Pledged Property, it is proper to inquire into such things as how the Pay-Go system was conceived, what was considered specifically when it came to employer contributions, how the Pay-Go fees were structured, and how the Bondholders' collateral has been handled.

## II.      Respondents Are Required To Produce A Privilege Log That Provides The Information Necessary To Assess Their Broad Claims Of Privilege.

16.      Even though Respondents claim that they have not yet conducted any electronic discovery, they announce that they have already decided to interpose claims of privilege to most of the discovery the Bondholders have served. Opp. ¶ 8. At the same time, they see no need to provide a privilege log sufficiently detailed to allow the Bondholders and the Court to meaningfully challenge those privilege claims. So far, the Bondholders have received only one, fragmentary privilege log, and it is clearly deficient for the reasons set forth in the Motion to Compel. And, here, Respondents are especially disingenuous. In the same breath, they assert that

- 7 -

Respondents "have every intention of complying" with their obligations to produce competent privilege logs, and then go on to say that these logs will be ones "just as AAFAF has already done." Opp. ¶ 31. Clearly, left to their own devices, Respondents' privilege logs will be no different than the log we already have. In fact, they ask the Court to excuse them from even "reviewing and logging potentially thousands of documents" going forward. Opp. ¶ 8.

17.      Respondents should not so easily be excused from their duties on such flimsy grounds. *First*, Respondents incorrectly claim that the only privilege issue that is "ripe for review" is whether AAFAF's privilege log, produced on March 15, 2019, is sufficient. This is little more than an effort to derail the schedule Judge Swain has set for the Stay Relief Motion. This matter is before the Court on an expedited briefing and discovery schedule under § 362(e) of the Bankruptcy Code, with a final hearing on the Bondholders' Stay Relief Motion set for May 21, 2019. The District Court's scheduling order provides for two rounds of motions to compel. Sooknanan Dec. ¶ 26. This first round is to resolve questions about the scope of discovery, including the adequacy of privilege logs. Indeed, the District Court set a deadline of April 10, 2019, for the "service of supplemental privilege logs, if so ordered" by this Court at the upcoming April 1, 2019, hearing. *Id.* The second round is to adjudicate, *inter alia*, challenges to any claims of privilege. *Id.* The Bondholders cannot meaningfully challenge, and the Court cannot realistically adjudge, Respondents' extensive claims of privilege unless Respondents produce a sufficiently detailed privilege log. This Motion thus challenges the one inadequate privilege log Respondents already produced, and it asks that the Court clarify the requirements for privilege logs that are to come. Respondents' opposition to this reasonable request is nothing short of gamesmanship. It is an effort to force a third round of motions to compel after (and if) Respondents produce their privilege logs, so they can then argue for yet another extension of the District Court's expedited schedule on the

- 8 -

Stay Relief Motion, or force the Bondholders to abandon any opportunity to test Respondents' claims of privilege.

18.   *Second*, although Respondents defend AAFAF's March 15, 2019, log as fully compliant with the requirements this Court previously identified, *see In re Fin. Oversight & Mgmt. Bd. for P. R.*, 295 F. Supp. 3d 66, 71 (D.P.R. 2018), the log is obviously grossly deficient.[3]

a.   **The basis for withholding information.** Respondents claim that the log identifies and explains the grounds for withholding the documents. But for 11 of the 13 entries, the privilege basis is broad and identical: "Attorney Client; Attorney Work Product; Deliberative Process." Opp. at 12–13. Such across-the-board claims of three commingled privileges are meaningless, especially in light of the accompanying descriptions of the withheld documents, which are wholly inadequate.

b.   **A sufficient description to permit the recipient to evaluate the claim of privilege.** Respondents make no effort to explain how the descriptions enable the Bondholders or the Court to make the necessary assessments.

(1) For the claims of deliberative process privilege, the descriptions do not contain "a description of the decision to which the documents relate"; "the date of the decision"; "the subject-matter of the documents in issue"; "the nature of the opinions and analyses offered"; "the roles of the agency employees who authored or received the withheld documents"; and "the number of employees among whom the documents were circulated." *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 297 F.R.D. 55, 60 (S.D.N.Y. 2013).

(2) For the claims of attorney-client privilege, the descriptions do not indicate whether "legal advice of any kind is sought"; whether that legal advice was sought "from a professional legal adviser in his capacity as such"; whether "the communications relat[ed] to that purpose"; whether the communications were "made in confidence"; whether the communications were made "by the client"; whether those communications are, at the client's "instance permanently protected"; whether that permanent protection extends to "disclosure by himself or by the legal adviser"; and whether the protection has been "waived" in any way. *Neelon v. Krueger*, No. 12-cv-11198-IT, 2015 WL 1037992, at *3 (D. Mass. Mar. 10, 2015).

---

[3] Respondents complain that the Bondholders devoted several pages in the Motion to Compel to legal authorities without producing the March 15, 2019, log. Opp. ¶ 27. This is an unfair and misleading accusation even by Respondents' standards. The reason the log could not be appended was that AAFAF had designated it "as 'Confidential' subject to an order entered in Adv. Proc. No. 17-213 (Docket No. 60)," meaning that it could not be attached to a public filing. As Respondents well know, this was disclosed in the Bondholders' moving declaration. *See* Sooknanan Dec. ¶ 29 n.2.

c. **A list of all persons sending and receiving the documents.** Respondents concede that "the recipients are not identified" in AAFAF's log, Opp. ¶ 28, despite the Court's holding that "the privilege log *shall include* . . . [a] list of all persons sending *and receiving* documents." 295 F. Supp. 3d at 71 (emphasis added). Respondents say that recipient identification is not necessary because these are "internal hard copy or loose draft documents" that do not list recipients. Opp. ¶ 28. But without *any* type of description of the nature or type of communication, the Bondholders are left to speculate why no recipient is listed for a particular entry.

19. *Third*, although the Bondholders initially requested document-by-document privilege logs to permit them to assess the validity of Respondents' claims of privilege, it is simply untrue that the Bondholders "steadfastly opposed Respondents' right to provide categorical privilege logs." Opp. ¶ 32 & n.10. To the contrary, at the meet-and-confer on March 18, 2019, when Respondents advised that they reserved the right to produce categorical privilege logs, the Bondholders noted only that those logs must provide sufficient information for the Bondholders to evaluate any claim of privilege. Sooknanan Dec. ¶ 32(b). The Bondholders even provided legal authorities for their position. Third Sooknanan Dec. ¶ 5.

20. *Fourth,* Respondents claim that they are "well aware of their obligations and have every intention of complying with them, just as AAFAF has already done." Opp. ¶ 31. This, of course, is self-contradictory since AAFAF's log does not comply with these very obligations. More fundamentally, it shows that this is far from a "speculative, hypothetical dispute." *Id.* Respondents have all but admitted that they do not intend to produce an adequate privilege log, notwithstanding the overwhelming authority cited in the Motion to Compel (which Respondents do not bother to address). Particularly given the fact that it is Respondents who have moved Joint Resolution 188 and Act 106 to center stage, the Bondholders should not be forced to litigate significant privilege issues related to "potentially thousands of documents" (Opp. ¶ 8), in ignorance.

21. *Finally*, Respondents ignore that Puerto Rico law is hostile to claims of executive privilege and deliberative process privilege, and places a high burden on a party seeking to invoke

those privileges. *See Bhatia-Gautier v. Roselló-Nevares*, Civil No. SJ2017CV00271, at 14 (P.R. Super. Ct. Mar. 16, 2018). For this reason, claims of executive and deliberative process privilege must be adequately logged. When "claiming the confidentiality of official information," "the government must accurately and unequivocally prove the applicability of the privilege." *Id.* "[T]he *government may not invoke the privilege in a generalized manner*," and "the courts must be careful not to lightly grant any request for confidentiality by The State." *Id.* at 14–15 (emphasis in original).

## III.   There Is No Undue Or Unreasonable Burden.

### A.   The Bondholders' Discovery Requests Are Not Unreasonably Burdensome.

22.     Much of Respondents' opposition is given over to generalized complaints about the burdens imposed by the Bondholders' discovery requests. In truth, Respondents have yet to actually produce any more than a smattering of documents, most of which are publicly-available materials or general accounting records. Nevertheless, Respondents—who themselves served broad and burdensome discovery—not only argue that it is unfair to make them comply with their discovery obligations, but also now contend, at the eleventh hour, that the Court should relieve them from having to provide electronic discovery at all. Opp. ¶ 43. Despite Respondents' efforts to cast the Bondholders as unreasonable and overbearing, on all but a single point (range of dates), the parties have resolved the scope and details of discovery searches by agreement.

23.     In any event, Respondents' claims of burden are hard to take seriously. *First*, the Stay Relief Motion involves over $3 billion, and its resolution will be critical to the underlying Title III cases. The Bondholders' position has twice been supported by the First Circuit, and the law is on their side here as well. Where amounts of this magnitude are involved—and where the opposition to the Stay Relief Motion centers on actions Respondents took to defeat valid, perfected liens—it is neither unfair nor unreasonable to compel Respondents to provide discovery.

24.      *Second*, Respondents argue that electronic discovery would be unduly burdensome because it would cost approximately $170,000. Opp. ¶ 43. This is both misleading and meritless. Respondents identified 6,174 documents with direct hits using the agreed-upon search terms, and 23,514 documents with hits including "family." Third Sooknanan Dec. ¶ 4. During a meet-and-confer call on March 18, 2019, the Bondholders agreed that Respondents would initially review direct hits (*i.e.*, 6,174 documents), and review family hits only for documents that were responsive. *Id.* Respondents' estimate of $170,000 for reviewing roughly 23,000 documents is vastly overstated, since Respondents will not have to review anywhere near that many documents. And for all the protestations Respondents make when it comes to the costs of compliance, the Bondholders, too, have been subjected to great costs as a result of Respondents' broad discovery.

25.      *Third*, Respondents say they face "an even more onerous burden" because they suspect that any search "will likely capture almost exclusively privileged documents." Opp. ¶ 43. But this is no basis for refusing to search for responsive documents in the first place. Respondents must conduct a competent search and produce a competent privilege log. *See supra* Part II.

### B. The Court Should Compel ERS, The Commonwealth, And AAFAF To Conduct A Search Of Documents Within An Appropriate Range Of Dates.

26.      The Bondholders submitted two declarations establishing that communications about efforts to evade the Bondholders' liens by tinkering with the mechanisms used to make pension payments extend at least as far back as April 27, 2016. Respondents make no effort to rebut this fact, instead quibbling about whether the declarants can now participate as trial counsel.[4]

---

[4] Respondents argue that Mr. Bennett and Mr. Cunningham cannot be counsel for the Bondholders at the final hearing on the Stay Relief Motion under Rule 3.7 of the Model Rules of Professional Conduct because they submitted declarations in support of the Motion to Compel. Opp., at 18 n.11. By its plain terms, though, Rule 3.7 does not apply when "the testimony relates to an uncontested issue," Model Rules of Professional Conduct r. 3.7(a)(1) (Am. Bar. Ass'n 2018)), and this is an issue Respondents do not contest. Respondents' reliance on *Culebras Enters. Corp. v. Rivera-Rios*, 846 F. 2d 94, 97 (1st Cir. 1988), is misplaced, since that case involved attorneys who were also plaintiffs in the litigation.

- 12 -

And they do not otherwise offer any evidence that casts doubt on the Bondholders' good faith basis for requesting a search beginning on June 30, 2016. As discussed above, the idea that changing the way pensions are paid could serve as a vehicle to defeat perfected security interests is one that Respondents conceived of, and they have put questions about their Pay-Go scheme at the heart of this dispute. Much—if not most—of the funding for Pay-Go comes from the stream of employer contributions that constitute the Bondholders' collateral, and the Bondholders believe that the record will show that the so-called "Pay-Go fees" are simply the employer contributions following a "sale, lease, license, exchange, or other disposition" or "identifiable proceeds" of those employer contributions under U.C.C. § 9-315, 19 L.P.R.A. § 2265(a). The origins of the Pay-Go system are certainly relevant and there is nothing unreasonable about having Respondents produce documents from the time when the Commonwealth and its advisers began working on ways to pay pension benefits other than through ERS—which had been the payer of benefits for more than 60 years.

## IV.    The Court Should Compel The Oversight Board To Produce Documents Responsive To The Bondholders' Requests.

27.     The Oversight Board provides no justification for its blanket refusal to provide documents in response to four of six categories in the Bondholders' narrow document subpoena.[5]

28.     *First*, the Board argues that the documents are irrelevant because only the "legal effect of the text of" Joint Resolution 188 and Act 106 matters. Opp. ¶ 55. But as explained above,

---

[5] The Oversight Board contends that the document subpoena was "untimely." Opp. at 24 n. 15. This contention borders on bad faith. As the Oversight Board knows, the Bondholders served requests for production of documents on the Commonwealth, ERS, and AAFAF on February 27, 2019. *See* Sooknanan Dec. ¶ 5 & Ex. A–C. Those requests requested production of documents not only from each entity, but also from its "representatives." *Id.* The requests therefore included the Oversight Board, which is "the representative of the debtor[s]," including the Commonwealth and ERS, under Title III. 48 U.S.C. §2175(b). And the requests were served on counsel for the Oversight Board, which is—of course—also counsel for the Commonwealth and ERS. *See* Third Sooknanan Dec. ¶ 2. But on Sunday, March 3, counsel for the Oversight Board informed counsel for the Bondholders that the Oversight Board would not search its own documents in response to these requests, and asked the Bondholders to serve a subpoena on the Oversight Board instead. *See id.* The Bondholders did so the next day. The subpoena was therefore an accommodation to the Oversight Board, as requested by the Board's counsel. The Board cannot now contend that the subpoena was untimely.

*supra* Part I, the Stay Relief Motion does not rest on the text of those statutes alone; the information

these requests seek is directly relevant to the application of U.C.C. § 9-315 and otherwise.

29.      *Second*, the Board argues that the document requests are duplicative of the requests

to the Commonwealth, ERS, and AAFAF. But the Board shows only that the *requests* are the same;

it does not argue that the *responsive documents* are the same. Opp. ¶¶ 56–58. The Bondholders

requested, and are entitled to, relevant documents in the Oversight Board's possession. Absent

some showing that all responsive documents in the Board's possession are also in the possession

of the Commonwealth, ERS, or AAFAF—and the Oversight Board offers none—the only way

that the Bondholders will get the Oversight Board's documents is via this subpoena to the Board.

30.      *Third*, the Board contends that the document requests seek "presumptively

privileged information." Opp. ¶ 59. But there is never a *presumption* of privilege. Rather, Rule

26(b)(5)(A) requires that a party that "withholds information otherwise discoverable by claiming

that the information is privileged" must "describe the nature of the documents, communications,

or tangible things not produced or disclosed—and do so in a manner that, without revealing

information itself privileged or protected, will enable other parties to assess the claim." "Under the

specificity requirement, the objecting party must be specific enough in its objections to support its

privilege. . . ." *Vazquez-Fernandez v. Cambridge Coll.*, Inc., 269 F.R.D. 150, 160 (D.P.R. 2010).

Thus, "the party relying on privilege needs to provide significant backup information." 8B Charles

Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2213 (3d ed. 2018). The

Oversight Board still has provided none. And Puerto Rico law imposes high barriers to even

asserting a claim of executive privilege or deliberative process privilege. *See supra* ¶ 21.

31.      As support for this supposed "presump[tion of] privilege[]," the Oversight Board

cites only Federal Rule of Civil Procedure 45(d)(3)(A)(iii). Opp. ¶ 26. But that rule says only that

a court "must quash or modify a subpoena" that "requires disclosure of privileged or other protected matter." Rule 45 does not impose a presumption of privilege. To the contrary, under Rule 45(d)(3)(A)(iii), "[t]he burden to demonstrate that a privilege applies rests with the party resisting discovery." *Delaney v. Town of Abington*, 890 F.3d 1, 12 (1st Cir. 2018). Thus, Rule 26(b)(5)(A)'s privilege-log requirements remain fully applicable when a non-party resists enforcement of a subpoena under Rule 45(d)(3)(A)(iii). *See, e.g.*, *Brown v. Tax Ease Lien Serv., LLC*, No. 3:15-CV-208-CRS, 2017 WL 6940735, at *3 (W.D. Ky. Aug. 21, 2017) (consideration of the "claim of privilege is subject to the requirements of Rule 26(b)(5), which clearly requires that a party . . . describe the nature of the documents withheld and do so in a manner that will enable the requesting party to assess the validity of the claim"); *In re Subpoena Upon Nejame Law, P.A.*, No. 16-cv-4619, 2016 WL 3125055, at *3 (N.D. Ill. June 3, 2016) (party's one-paragraph, conclusory assertion of privilege amounts to a "blanket claim of privilege" that is "unacceptable"; "some of the requested documents may be privileged" and the party "can submit an appropriate privilege log consistent with Federal Rule of Civil Procedure 26(b)(5)(A)" (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983))). Thus, even if the Board believes its responsive documents are privileged, that provides no basis to refuse entirely to search for documents. Rather, the Board "can submit an appropriate privilege log consistent with Federal Rule of Civil Procedure 26(b)(5)(A)." *In re Subpoena Upon Nejame Law, P.A.*, 2016 WL 3125055, at *3.

32.    *Fourth*, the Oversight Board contends that the requests "impose an undue burden." Opp. ¶¶ 60–66. But this contention, and its six sub-contentions, *see id.*, is just a rehash of the same flawed arguments addressed above. The Oversight Board complains "[f]irst" that the information sought is irrelevant, *id.* ¶ 62, "[s]econd" that the Bondholders do not need it because it is irrelevant, *id.* ¶ 63, "[t]hird that the request is too broad because it is irrelevant, *id.* ¶ 64, and "[f]ourth" that

the request seeks materials with "no probative value," *id.* ¶ 65. That, of course, is one argument and not four, but more importantly it is wrong. *See supra* Part I. The Oversight Board then argues "[f]ifth" that the documents are "duplicative" of the requests to the Commonwealth and ERS, Opp. ¶ 65, and "[s]ixth" that they are "the exact same requests" made of the Commonwealth and ERS, *id.* ¶ 66. Again, this is wrong, because only the subpoena to the Oversight Board will lead to discovery of documents in the Oversight Board's possession. *See supra* ¶ 29.

33.     Missing from these "six" arguments for "undue burden" is any concrete evidence of *burden*. As the Oversight Board's own case explains, "[t]he non-party resisting discovery . . . cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting on compliance." *Rockstar Consortium US LP v. Google, Inc.*, No. 14-91322-FDS, 2015 WL 5972422, at *5 (D. Mass. Oct. 14, 2015). As a result, "assertions of a burden without specific estimates of staff hours needed to comply are typically rejected." *In re N.E. Compounding Pharma., Inc. Prods. Liab. Litig.*, No.13-2419-FDS, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013). The Oversight Board's "mere assertion that compliance would be burdensome" is inadequate to support its undue burden objection. *Rockstar Consortium*, 2015 WL 5972422, at *5.

## V.     The Court Should Compel The Oversight Board To Designate A Deponent In Response To The Bondholders' Deposition Subpoena.

34.     The Oversight Board also provides no justification for its blanket refusal to designate a deponent in response to the Bondholders' deposition subpoena.

35.     *First*, the Oversight Board again begins by contesting the relevance of the deposition topics. Opp. ¶¶ 68–69. But the Board's arguments fail to show that the narrow topics designated in the subpoena are irrelevant to the Stay Relief Motion.

     a.  **Topics 1 and 2.** The Oversight Board contends that the issues in the Stay Relief Motion are limited to diminution in value "*as a result of*" the automatic stay. But

that is wrong as a matter of law—the relevant question for purposes of the Stay Relief Motion is whether there has been diminution in value "during the term of the stay"—a causal showing need not be made. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988); *see also, e.g.*, *In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004) ("[T]he code specifically ensures the protection of a secured creditor's assets against any decrease in value from the beginning of the automatic stay, and, because the stay is instituted the moment the petition is filed, the protection from depreciation also begins at that moment."). Thus, the collateral's value before and during the pendency of the automatic stay is directly relevant to the Stay Relief Motion, and that is what Topics 1 and 2 concern. The Bondholders do not seek "expert value analysis from the Oversight Board," Opp. ¶ 68—they seek to probe the Oversight Board's own evidence of value. And the fact that "Respondents dispute that there was 'dissolution' of ERS," Opp. ¶ 68, is beside the point and only underlines the Bondholders' need for this discovery, so that the Oversight Board's designee can explain what happened to ERS, according to the Oversight Board, at a deposition.

b. **Topics 3 and 4.** The Oversight Board argues again that the events surrounding the enactment of Joint Resolution 188 and Act 106 are irrelevant. *See supra* Part I.

c. **Topics 5 and 6.** The Oversight Board asserts that "Movants have not established an interest in Pay-Go fees as collateral." Opp. ¶ 68. But this, of course, is one of the very factual issues the parties are litigating. The fact that the Oversight Board disagrees with the Bondholders does not immunize it from discovery on the matter. The relevant standard is set by U.C.C. § 9-315, and its application may well be affected by the information sought.

d. **Topics 7 and 8 (which the Oversight Board calls "Topics 8 and 9").** The Oversight Board takes the position that the Bondholders should ask ERS and the Commonwealth about their own document requests. Opp. ¶ 68. Although the Bondholders already have done so, it is appropriate to also ask this of the Oversight Board because the Board is the statutory representative of ERS and the Commonwealth in these proceedings. 48 U.S.C. § 2175(b). The Board presumably had a role in preparing ERS's and the Commonwealth's discovery responses and therefore is an appropriate subject of discovery on that point.

36.     *Second*, the Board argues that the deposition topics are cumulative of the topics for the depositions of the Commonwealth and ERS. But as the Bondholders explained, a Rule 30(b)(6) deposition witness "testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity." *La Pac. Corp. v. Money Mkt. 1 Inst'l Inv. Dealer*, 285 F.R.D. 481, 487 (N.D. Cal. 2012). Thus,

parties are entitled to depose a Rule 30(b)(6) witness even if other deponents have already addressed the same topics, because the Rule 30(b)96) witness's "testimony is the testimony of the corporation itself, and for that reason alone it may not be duplicative." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 2870622, at *2 (E.D. Wis. Sept. 2, 2009).

37.    The Board dismisses these cases as irrelevant because they involved, and rejected, the argument that an entity's deposition was duplicative of an individual witness. But that is beside the point. The decisions confirm that parties are entitled to obtain "the testimony of the corporation" via a Rule 30(b)(6) deposition. *Id.* at *2. The fact that other witnesses will provide the testimony on behalf of other parties is irrelevant. Here, there may be responsive, relevant information that is solely within the Board's possession, and not the other entities, a proposition the Board notably does not deny. Because the deposition is of a different entity, with potentially different knowledge, it is not duplicative. *See Mitchell Eng'g v. City & Cty. of S.F.*, No. C 08-04022 SI, 2010 WL 455290, at *1 (N.D. Cal. Feb. 2, 2010) ("Even if the general topics to be addressed at the 30(b)(6) deposition will overlap to some extent, the questions asked and the answers given might not.").[6]

38.    *Third*, the Oversight Board asserts that three of the topics seek "presumptively privileged" information. Opp. ¶ 74. But there is no presumption of privilege, *supra* ¶ 31—the Oversight Board has the burden to show specific support for its privilege claims, and it has not met that burden. Moreover, privilege provides no justification for refusing to appear for a deposition. Rather, the objection "must be asserted when a question seeking privileged material is asked, and

---

[6] The Oversight Board also argues that in *Dongguk University v. Yale University*, 270 F.R.D. 70, 74 (D. Conn. 2010), the court quashed or limited some deposition topics. Opp. ¶ 73. But the court did so only where the requesting party already had what the court viewed as ample information on that topic *from that same entity*. *See Dongguk Univ*, 270 F.R.D. at 75–76. And even there, the court was clear that it would consider a renewed motion to compel if further discovery called the sufficiency of the existing record into question. *See id.* Here, the Oversight Board's blanket objections mean that to-date, the Bondholders have no discovery at all from the Oversight Board on the topics in the deposition subpoena. Moreover, the Oversight Board has not asserted that any of the topics concern issues that only exist in complete, self-explanatory documentary form, much less offered to produce such documents.

the questioner may explore the propriety of the objection with questions going to the availability

of the privilege." Wright & Miller, *supra*, § 2016.1; Motion to Compel ¶ 58.

39. *Fourth*, the Board again offers "six" factors to show that a deposition would be an

undue burden. Opp. ¶ 75. The factors are identical to—and no better than—those offered to support

the Board's objections to the document subpoena. *See supra* ¶¶ 28–33.

## VI. The Court Should Compel ERS And The Commonwealth To Provide Full And Complete Responses To Interrogatory Nos. 1 And 2.

40. The Bondholders made five arguments in the Motion to Compel (at ¶¶ 67–75), with

respect to ERS's and the Commonwealth's failure to provide complete responses to interrogatories.

Respondents ignore two, and they fail to provide any support in responding to the other three.

41. *First*, although Respondents accuse the Bondholders of "complain[ing] at length

about ERS and the Commonwealth's privilege objections," they tacitly admit that the Bondholders

are right in challenging their blanket assertions of privilege. Opp. ¶ 49 n.13. For avoidance of

doubt, the Court should overrule those objections.

42. *Second*, Respondents argue that the Commonwealth need not respond to

Interrogatory No. 1 because it is duplicative and seeks information uniquely within ERS's

possession. Opp. ¶ 48. This defies common sense. Interrogatory No. 1 served on ERS seeks ERS's

contention; Interrogatory No. 1 served on the Commonwealth seeks the Commonwealth's

contention.[7] These interrogatories are obviously not duplicative. Indeed, as the Commonwealth

itself notes, it is a separate legal entity from ERS, and it has professed ignorance of ERS's specific

---

[7] Any argument that Interrogatory No. 1 is not a "contention" interrogatory fails for two reasons. *First*, the opposition itself describes it as a contention interrogatory. Opp. ¶ 47 (explaining what ERS "contends" in response to Interrogatory No. 1). *Second*, Interrogatory No. 1 asks what the Commonwealth "maintains"—a term that denotes a contention interrogatory. *See, e.g.*, *In re Textron, Inc. ERISA Litig.*, No. 09-383ML, 2012 WL 12876091, at *2 (D.R.I. Apr. 11, 2012) (finding that "a reasonable reading" of the interrogatories at issue was that they are permissible contention interrogatories, particularly where the interrogatories used terms such as "maintain").

contentions in the Stay Relief Motion itself. *Id.* ¶¶ 10, 48. The Commonwealth cannot seriously object to the interrogatory because information regarding the *Commonwealth's contention* is in *ERS's possession*. Perhaps the Commonwealth's point is that its contention is the same as ERS's, but if so, it can say so. Until it does, the Bondholders have no way to know whether these separate legal entities do or do not take the same position.

43.     *Third*, Respondents assert, without support, that Interrogatory No. 2 seeks a "legal conclusion." Opp. ¶ 49. In fact, two of Respondents' three cases *overruled* objections to interrogatories—like Interrogatory No. 2—that explore the responding party's legal theory by posing questions that apply the facts of the case to applicable law. Opp. ¶ 51 (citing *Anderson v. Werholtz*, No. 07-3275-EFM, 2009 WL 392673, at *1 (D. Kan. Feb. 17, 2009); *O'Brien v. Int'l Bhd. Of Elec. Workers*, 443 F. Supp. 1182, 1187–88 (N.D. Ga. 1977)). And the third case may no longer be good law after the amendment to Fed. R. Civ. P. 33, which "permits such an obviously legitimate contention inquiry." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 281 F.R.D. 1, 4 (D.D.C. 2011) (questioning *U.S. v. Md. & Va. Milk Prod. Ass'n*, 22 F.R.D. 300 (D.D.C. 1958)).

44.     *Finally*, ERS's response to Interrogatory No. 1 continues to be insufficient. ERS argues that it made its position clear: "ERS contends that there has been and will be no diminution." Opp. ¶ 47. But ERS's response does not actually say this. In fact, the terms "diminution" or "value" (or any derivations thereof) appear nowhere in ERS's response. Motion to Compel ¶ 75. If it is ERS's position that there is no diminution in value *because*, *e.g.*, the Bondholders hold a security interest in the Pay-Go fees, then ERS should say as much. Until then, ERS's response is evasive and incomplete, and should be treated as a failure to answer at all. *See* Fed. R. Civ. P. 37(a)(4).

## **CONCLUSION**

For the foregoing reasons, the Court should overrule Respondents' objections, order Respondents to serve competent privilege logs, and grant the Motion to Compel in all respects.

In San Juan, Puerto Rico, today March 27, 2019.

By:

/s/ Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
James M. Gross (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com
jgross@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Beth Heifetz (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
bheifetz@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon
Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree-Forrest Multi-Strategy, LLC
(Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P.,
Oaktree Value Opportunities Fund, L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez
José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Cheryl T. Sloane
John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*