# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- X
                                  :

In re:                              :
                                  :

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA<br>: Title III |
| | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
| | : |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : (Jointly Administered) |
| | : |
| Debtors.[1] | : |

---------------------------------------------------------------------- X
                                  :

| | |
|---|---|
| In re: | : |
| | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA<br>: Title III |
| | : |
| as representative of | : Case No. 17-BK-4780 (LTS) |
| | : |
| PUERTO RICO ELECTRIC POWER AUTHORITY | : **This filing relates only to**<br>: **Case No. 17-BK-4780 (LTS)** |
| | : |
| Debtor. | : |

---------------------------------------------------------------------- X

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND SYNCORA GUARANTEE INC. FOR RELIEF FROM AUTOMATIC STAY TO ALLOW MOVANTS TO SEEK APPOINTMENT OF RECEIVER

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ...................................................................................................3

    A.    At Most, Bondholders Have Security Interest With Respect To Net
    Revenues In Specified Funds ...............................................................3

        i.    Only Net Revenues Are Supposed To Be Deposited In Specified
        Funds .........................................................................................4

        ii.    Trust Agreement Grants Security Interest Only With Respect To
        Specified Funds .........................................................................5

    B.    Bondholders' Collateral, If Any, Is Not Decreasing In Value ..............7

ARGUMENT .........................................................................................................8

    A.    Bonds Are Not Secured By PREPA's Gross Revenues ........................9

    B.    Bankruptcy Code's Special Revenue Provisions Do Not Create New
    Rights..................................................................................................11

    C.    In Any Event, Movants Are Not Entitled To Adequate Protection With
    Respect To Future Revenues ..............................................................12

    D.    Covenants And Receivership Option Are Not Property Rights Entitled To
    Adequate Protection ..........................................................................14

    E.    There Is No Cause To Lift Automatic Stay.........................................18

    F.    *Sonnax* Factors Do Not Warrant Vacating Automatic Stay ................20

NOTICE ............................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.*
  *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  Nos. 18-1165, 18-1166, 2019 U.S. App. LEXIS 8981 (1st Cir. Mar. 26, 2019) ..................... 12

*Browning Ferris Indus. v. Union de Tronquistas, Local 901*,
  29 F. 3d 1 (1st Cir. 1994) ................................................................................. 10

*In re Century Inv. Fund VIII Ltd. Partnership*,
  155 B.R. 1002 (Bankr. E. D. Wis. 1989) ............................................................. 19

*In re City of Detroit*,
  504 B.R. 191 (Bankr. E.D. Mich. 2013) .............................................................. 15

*In re Continental Airlines, Inc.*,
  146 B.R. 536 (Bankr. Del. 1992) ....................................................................... 18

*Dimino v. Secretary of the Commonwealth*,
  695 N.E. 2d 659 (Mass. 1998) .......................................................................... 15

*First National Bank v. Maine Turnpike Authority*,
  136 A. 2d 699 (Me. 1957) ................................................................................ 15

*Franklin California Tax-Free Trust v. Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R.), *aff'd*, 805 F.3d 322 (1st Cir. 2015),
  *aff'd,* 136 S. Ct. 1938 (2016) ........................................................................... 16

*Grella v. Salem Five Cent Sav. Bank*,
  42 F. 3d 26 (1st Cir. 1994) ................................................................................. 8

*Jiminez v. Peninsular & Oriental Steam Navigation Co.*,
  974 F. 2d 221 (1st Cir. 1992) ............................................................................ 10

*Karim v. Bayview Loan Servicing, LLC (In re Karim)*,
  No. 17 A 00380, 2018 WL 1230561 (Bankr. N.D. Ill. Mar. 9, 2018) ..................... 13

*In re Las Vegas Monorail Co.*,
  429 B.R. 317 (Bankr. D. Nev. 2010) ............................................................ 10, 11

*Le Sannon Building Corp. v. Nathanson*,
  No. 92 CIV. 8716 (LAP), 1993 WL 330442 (S.D.N.Y. Aug. 23, 1993) ................ 19

# TABLE OF AUTHORITIES

### (continued)

**Page(s)**

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment*
   *& Allied Indus. Fund,*
   967 F. 2d 688 (1st Cir. 1992) .................................................. 10

*Marder v. Turner (In re Turner)*,
   161 B.R. 1 (Bankr. D Me. 1993) ........................................... 20, 21

*In re Markos Gurnee Partnership*,
   252 B.R. 712 (Bankr. N.D. Ill 1997) ....................................... 18

*Minn-Kota Farm Agency, Inc. v. Home Federal Sav. & Loan Ass'n*,
   1992 U.S. App. LEXIS 29605 (8th Cir. Nov. 11, 1992) ........................... 15, 18, 19

*In re Offerman Farms, Inc.*,
   67 B.R. 279 (Bankr. N.D. Iowa) ............................................ 16, 20

*Patterson v. Carey*,
   363 N.E. 2d 1146 (NY 1977) ............................................... 15

*In re Ridgemont Apartment Associates*,
   105 B.R. 738 (Bankr. N.D. Ga. 1989) ....................................... 19

*Sonnax Indus., Inc. v. Tri Component Prod. (In re Sonnax Indus., Inc.)*,
   907 F. 2d 1280 (2d Cir. 1990) ............................................ 8, 20

*United Savings Association of Texas v. Timbers of Inwood Forest Associates*,
   484 U.S. 365 (1988) ..................................................... *passim*

*United States Trust Com.v. New Jersey*,
   431 U.S. 1 (1977) ....................................................... 14

*United States v. Sec. Indus. Bank*,
   459 U.S. 70 (1982) ...................................................... 16

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

**Statutes**

11 U.S.C.
§ 361 ................................................................................................................ 17
§ 362(d) ........................................................................................................... 14
§ 362(d)(1) .............................................................................................. 8, 17, 19
§ 362(d)(2) ....................................................................................................... 19
§ 506 ................................................................................................................ 17
§ 542(b) ........................................................................................................... 20
§ 543(d) ........................................................................................................... 20
§ 552 ................................................................................................................ 12
§ 928 ......................................................................................................... 11, 12

Bankruptcy Reform Act of 1978 ........................................................................ 16

P.R. Laws Ann. tit. 19
§ 2212(a)(29) ..................................................................................................... 7
§ 2212(a)(74) .............................................................................................. 5, 12
§ 2233(b)(2) ................................................................................................ 5, 12

Puerto Rico Public Corporation Debt Enforcement and Recovery Act ................. 16

U.C.C.
§ 9-102(a)(29) .................................................................................................... 7
§ 9-102(a)(74) .................................................................................................... 5
§ 9-203(b) ................................................................................................... 5, 12

**Other Authorities**

3 *Collier on Bankruptcy* ............................................................................... 9, 17

U.S. Const. amend. XIV ..................................................................................... 16

U.S. Const. art. 1, § 10 ...................................................................................... 15

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (the

"Committee") hereby objects to the *Motion of National Public Finance Guarantee Corporation,*

*Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for*

*Relief From the Automatic Stay to Allow Movants to Seek Appointment of Receiver* (the

"Motion") [Dkt No. 975] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Movants[2] argue that they are entitled to relief from the automatic stay to seek the

appointment of a receiver because they hold a security interest in collateral that lacks adequate

protection.  They cannot come close to making this showing.  The only assets of the Puerto Rico

Electric Power Authority ("PREPA") that even arguably secure PREPA's Bonds, approximately

$8.3 billion of which remain outstanding, are the approximately $33 million on deposit in certain

funds created pursuant to the Trust Agreement (defined below).  The amounts in these funds

have not diminished since the commencement of PREPA's Title III case.  In fact, the funds have

increased in value since that time because they have been earning interest.  Thus, any property

interest Movants hold in these funds is more than adequately protected.

2.      Despite Movants' efforts to create an extensive factual record and their

identification of four purported expert witnesses, **the resolution of this dispute begins and ends**

**with the plain language of the Trust Agreement**.  Movants contend that the Bondholders have

a "continuing lien on PREPA's current and future pledged revenues" [3] and that certain covenants

in the Trust Agreement (the "Covenants") and the Bondholders' right to seek a receivership (the

---

[2]      Movants are National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty
Municipal Corp., and Syncora Guarantee Inc., which are monoline insurers that insured PREPA's bonds (the
"Bonds") for the benefit of the holders of the Bonds (the "Bondholders").

[3]      Mot. at 3.

"Receivership Option") are "property rights" entitled to adequate protection.[4] The Trust

Agreement and the law are to the contrary. As discussed below, the Bondholders do not have a

security interest with respect to all of PREPA's revenues. Rather, the only security interest

purportedly granted by the Trust Agreement (leaving aside whether that security interest is

perfected) is with respect to the amounts, if any, on deposit in four specific funds, each as

defined in the Trust Agreement; namely, the "Sinking Fund"[5] (which is held in three separate

accounts), the "Reserve Maintenance Fund," the "Self-insurance Fund," and the "Capital

Improvement Fund" (collectively, the "Specified Funds").[6] All PREPA Revenues[7] are supposed

to be first deposited in the General Fund.[8] It is only PREPA's **Net Revenues**[9] that are supposed

to be transferred to the Specified Funds pursuant to the Trust Agreement. Accordingly, all

---

[4] Mot. at 25-31.

[5] The Trust Agreement defines the "Sinking Fund" as "the Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund, a special fund created and designated by the provisions of Section 507 of this Agreement." Trust Agreement at 29.

[6] *See* Section 507(h) of the Trust Agreement between PRASA and U.S. Bank N.A., as Successor Trustee, dated as of January 1, 1974, as amended and supplemented through August 1, 2011, attached as Exhibit A to the *Objection of Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. to the Urgent Joint Motion of Financial Oversight and Management Board for Puerto Rico, and the Puerto Rich Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C0 Modifying the Automatic Stay, (D) Scheduling a Final Hearing and (E) Granting Related Relief* [Dkt. No. 585] (the "Trust Agreement"). This particular document is not actually a legally operative agreement but rather a composite of the original Trust Agreement (the "Original Trust Agreement") and its numerous amendments and supplements. Such composites are created for the sake of convenience to show an agreement in its amended and supplemented form, thus avoiding the need to review each amendment and supplement and keep track of how it changed or supplemented the agreement. The Original Trust Agreement can be found using the following link: http://www.gdb-pur.com/investors_resources/documents/2012-04-23-PRElectricPowerAuth01a-FIN.pdf.

[7] The Trust Agreement defines "Revenues" (in relevant part) as "**all moneys received by [PREPA]** in connection with or as a result of its ownership or operation of the System . . . ." Trust Agreement at 24 (emphasis added). Given that the definition of Revenues requires actual receipt, Movants have no basis for claiming a security interest with respect to any of PREPA's rights to payment, whether such rights to payment are due or to become due.

[8] The Trust Agreement defines the "General Fund" as "the Puerto Rico Electric Power Authority General Fund, a special fund created and designated by the provisions of Section 503 of this Agreement." Trust Agreement at 20.

[9] The Trust Agreement defines "Net Revenues" for any particular period as "the amount of the excess of the Revenues for such period over the Current Expenses for such period." Trust Agreement at 21.

deposits in the Specified Funds are of PREPA's Net Revenues, not its gross revenues as Movants

contend.  If PREPA operates at a deficit, there are, by definition, no Net Revenues to be

deposited in the Specified Funds.[10]

3.       Faced with the unambiguous terms of the Trust Agreement, Movants introduce a

novel legal theory, asserting that they hold property interests in the Covenants and the

Receivership Option and that such interests are entitled to adequate protection.  This theory runs

headlong into basic principles of contract and property law.  While a promise may create an

obligation to the promisee, it does not give the promisee a property interest in any property of the

promisor.  Moreover, every case Movants cite in support of their novel theory is either (a)

completely inapplicable to a case under PROMESA or the Bankruptcy Code, (b) factually

inapposite, or (c) no longer good law, having been effectively overruled by the Supreme Court's

decision in *United Savings Association of Texas v. Timbers of Inwood Forest Associates,* 484

U.S. 365 (1988).

4.       Accordingly, and as set forth more fully below, Movants are not entitled to relief

from the automatic stay, and the Motion should be denied.

## BACKGROUND

### A.       At Most, Bondholders Have Security Interest With Respect To Net Revenues In Specified Funds

5.       All of the Bonds at issue are governed by the Trust Agreement, which sets forth

all of the rights and obligations of PREPA and the Bondholders with respect to the Bonds.  The

Trust Agreement establishes a series of funds into which revenues of PREPA are supposed to

---

[10]     The only other amounts in, or that are supposed to be deposited in, each Specified Fund are the interest and other investment earnings on such Specified Fund.  *See* Trust Agreement, § 601 ("Obligations and Time Deposits so purchased as an investment of moneys in any such Fund or Account shall be deemed at all times to be part of such Fund or Account.  The interest accruing thereon and any profit realized from such investment shall be credited to such Fund or Account and any loss resulting from such investment shall be charged to such Fund or Account.").

flow.  These include the General Fund, into which all PREPA Revenues are supposed to be

deposited, and the Specified Funds, into which Revenues are supposed to be deposited after the

payment of PREPA's Current Expenses[11] and the funding of certain reserves for the payment of

such expenses (resulting in the deposit of Net Revenues).  The Trust Agreement creates, at most,

a security interest with respect to the amounts (if any) on deposit in the Specified Funds.

<blockquote>i. <u>Only Net Revenues Are Supposed To Be Deposited In Specified Funds</u></blockquote>

6. PREPA's gross revenues are supposed to flow first into the General Fund.

Specifically, section 503 of the Trust Agreement provides that "Revenues, other than income

from investment made under the provisions of this Agreement, will be deposited as received in

the name of [PREPA] with a qualified depository or depositories to the credit of the General

Fund and applied in accordance with the provisions of this Article."  Pursuant to section 505 of

the Trust Agreement, PREPA "covenants that moneys in the General Fund will be used first for

the payment of the Current Expenses of the System."  As discussed below in section "D" of the

Argument, PREPA's covenants, including its covenants to transfer moneys to certain specified

funds, are mere promises in which the Bondholders have no property interest eligible for

adequate protection.

7. Amounts remaining in the General Fund after the payment of Current Expenses

and the funding of certain reserves for the payment of such expenses are supposed to be

transferred to the "Revenue Fund."  Trust Agreement, § 506.  If certain conditions are met,

---

[11] The Trust Agreement defines "Current Expenses" as "[PREPA's] reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fees and expenses of the Trustee [and] the Paying Agents[,] . . .  legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by [PREPA] under . . . this Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of [PREPA] and applicable in the circumstances but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund and the Capital Improvement Fund . . . ." Trust Agreement at 17.

PREPA is supposed to cause moneys in the Revenue Fund to be deposited in a specified order in (a) three accounts comprising the "Sinking Fund"[12] established and held by the trustee (the "Trustee") under the Trust Agreement, (b) the "Reserve Maintenance Fund," (c) the "Self-insurance Fund," and, ultimately, (d) the "Capital Improvement Fund."[13]  Trust Agreement, § 507.  These four Specified Funds contain only PREPA's Net Revenues and investment earnings on those amounts.

        ii.      <u>Trust Agreement Grants Security Interest Only With Respect To Specified Funds</u>

8.       For a creditor to be secured, there must be a security agreement that creates or provides for a security interest.  *See* §§ 9-102(a)(74) and 9-203(b) of the Uniform Commercial Code as in effect in Puerto Rico (the "<u>U.C.C.</u>"), P.R. Laws Ann. tit. 19, §§ 2212(a)(74) and 2233(b)(2).  Here, this is the beginning and end of the analysis.

9.       The "Now, Therefore" paragraph of the Trust Agreement states that PREPA "has pledged and does hereby pledge to the Trustee the revenues of the System . . . and other moneys **to the extent provided in this Agreement** as security for payment of the bonds and the interest and the redemption premium, if any, thereon . . . ."  Trust Agreement at 11-12 (emphasis added).  Thus, the Bondholders have, at most, a security interest with respect to PREPA's revenues only **to the extent** the Trust Agreement provides for such a security interest.

10.      Only one section of the Trust Agreement grants a security interest directly rather than to "the extent provided" elsewhere in the Trust Agreement.  That is section 507(h), which states that:

---

[12]   The three separate accounts comprising the Sinking Fund are the "Bond Service Account," the "Reserve Account," and the "Redemption Account."

[13]   There are additional funds not pertinent to the Motion in which PREPA is supposed to deposit moneys before depositing moneys from the Revenue Funds into the Self-insurance Fund.  *See* Trust Agreement, § 507(g) (". . . to the credit of the Self-insurance Fund . . . such amount, if any, of any balance remaining after making the deposits under clauses (a), (b),(c), (d), (e) and (f).").

> The moneys in the [Specified Funds] shall be held . . . in trust, separate
> and apart from all other funds of the Authority, and shall be applied as
> hereinafter provided with respect to such Funds and, pending such
> application, **shall be subject to a lien and a charge in favor of the
> holders of the bonds** issued and outstanding under this Agreement and
> for the further security of such holders until paid out or transferred as
> herein provided.

Trust Agreement, § 507(h) (emphasis added).[14]

11.     The Trust Agreement contains no other direct grant of a security interest in favor
of the Bondholders, and thus there is no grant of a security interest with respect to PREPA's
gross revenues securing the Bonds.[15]  Had the intention been to grant the Bondholders a security
interest with respect to PREPA's gross revenues, the Bondholders would have been granted a
security interest with respect to the General Fund.  They were not.

12.     Consistent with the language of the Trust Agreement, the legal opinion required
in connection with each issuance of the Bonds (the "Opinion of Counsel") was that "this
Agreement creates a legally valid and effective pledge of the **Net Revenues** . . . and of the
moneys, securities and funds held or set aside under this Agreement as security for the bonds,
subject to the application thereof to the purposes and on the conditions permitted by this
Agreement."  Trust Agreement at 22 (emphasis added).  Had the Bonds been secured by a
security interest with respect to PREPA's gross revenues, a legal opinion as to the validity of
such a security interest would certainly have been required.  It was not.

---

[14]   Movants also point to section 701 of the Trust Agreement as support for their claim that the Bonds are secured
by PREPA's gross revenues, but they do not quote the entire provision.  The quoted language states that the Bonds
are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof . . .
."  The complete provision states that the Bonds "will be payable solely from the Revenues and said Revenues
are hereby pledged to the payment thereof **in the manner and to the extent [hereinabove] particularly
specified**."  Trust Agreement, § 701 (emphasis added).  *See also* footnote 18 below.

[15]   Consistent with the limited nature of the Bondholders' security interest, if the Trustee or the Bondholders (with
the requisite majority) were to obtain a judgment against PREPA, the amounts on deposit in the Specified Funds
are the only assets from which the judgment could be satisfied.  Trust Agreement, § 804.

13.     The offering documents for the Bonds disclose that the Bonds are secured solely by, and payable solely from, "Net Revenues."  For example, the Official Statement, dated April 12, 2012, for PREPA's Power Revenue Bonds, Series 2012A and Power Refunding Bonds, Series 2012B (the "PREPA Offering Statement"), states in the opening paragraph on its cover page:  "The Bonds, the outstanding bonds previously issued under the Trust Agreement and any additional bonds that the Authority may from time to time issue under the Trust Agreement are payable **solely from Net Revenues** (as described herein) of the Authority's electric generation, transmission and distribution system."[16] (emphasis added).

14.     In short, the Bondholders have a security interest solely with respect to Net Revenues, if any, on deposit in the Specified Funds.[17]

**B.     Bondholders' Collateral, If Any, Is Not Decreasing In Value**

15.     According to Movants, approximately $8.3 billion of the principal amount of the Bonds is outstanding.  Mot. at 1.  According to the summary of PREPA bank and time deposits, which is on page 8 of the March 6, 2019 13-Week Cash Flow Update (http://www.aafaf.pr.gov/assets/13-week-cash-flow-update-03-06-2019.pdf), (i) approximately $16.47 million is on deposit with the Trustee, and (ii) approximately $16.5 million is on deposit with Citibank in the Reserve Maintenance Fund.  Thus, even assuming that (a) all of the amounts on deposit with the Trustee are collateral for the Bonds and (b) the Bondholders have control of

---

[16]   The PREPA Offering Statement can be found using the following link:  http://www.gdb-pur.com/investors_resources/documents/2012-04-23-PRElectricPowerAuth01a-FIN.pdf.

[17]   The Committee does not concede that the Bondholders' security interest with respect to the amounts on deposit in the Specified Funds has been properly perfected.  To the extent the Reserve Maintenance Fund, the Self-insurance Fund, and the Capital Improvement Fund are held by PREPA in deposit account(s) within the meaning of section 9-102(a)(29) of the U.C.C., P.R. Laws Ann. tit. 19, § 2212(a)(29), the Bondholders' security interest with respect to the amounts on deposit in those funds is perfected only if the Bondholders have control of the deposit account(s) within the meaning of section 9-104 of the U.C.C., P.R. Laws Ann. tit. 19, § 2214. Movants did not submit any evidence that the Bondholders have control of the relevant account(s) (e.g., a control agreement or evidence that the secured party has become the depositary bank's customer with respect to the relevant account(s)) in support of the Motion or their prior motion for appointment of a receiver [Dkt. No. 74].

7

the Citibank account, there would be, at most, $32.97 million of collateral securing the $8.3

billion in outstanding principal of the Bonds.

16.     Because (as indicated in the 13-Week Cash Flow Reports) the moneys in the

Specified Funds are deposited in interest-bearing accounts, the Bondholders' collateral, if any, is

not decreasing in value.  On the contrary, the value of the Bondholders' collateral is increasing.[18]

As a result, and as set forth more fully below, the Bondholders are not entitled to adequate

protection.

## **ARGUMENT**

17.     Movants cannot satisfy their burden of establishing "cause" for lifting the

automatic stay.  *See Sonnax Indus., Inc. v. Tri Component Prod. (In re Sonnax Indus., Inc.)*, 907

F. 2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the

movant.").  While this is a shifting burden, if Movants cannot "make an initial showing of cause,

. . . the court should deny relief without requiring any showing from the debtor that it is entitled

to continued protection."  *Id.*  And because Movants claim that their purported security interest

in PREPA property is not adequately protected because the property is diminishing in value, they

must, at the very least, establish that the Bondholders have a perfected security interest in that

property.  *See Grella v. Salem Five Cent Sav. Bank*, 42 F. 3d 26, 34 (1st Cir. 1994) (Even though

a motion for relief from the automatic stay is a summary proceeding, "[c]ertainly a court may

take into account any matter that bears directly on the debtor's equity, or that clearly refutes a

---

[18]     For example, according to the October 3, 2018 report, there was approximately $16.42 million in the Reserve
Maintenance Fund as of September 28, 2018.  *See* October 3, 2018 13-Week Cash Flow Update, at 8,
http://www.aafaf.pr.gov/assets/13-week-cash-flow-update-10-03-2018.pdf.  Thus, during the approximately five
(5) months between the October 3, 2018 and March 6, 2019 reports, the Reserve Maintenance Fund increased
by a little over $90,000.  Similarly, the December 5, 2018 report (the first such report reflecting the amounts on
deposit with the Trustee) shows $16,394,116.21 on deposit with the Trustee as of November 30, 2018 versus
the $16,475,908.03 on deposit with the Trustee as of March 1, 2019 — an $81,792 increase in value.  *See*
December 5, 2018 13-Week Cash Flow Update, at 8, http://www.aafaf.pr.gov/assets/13-week-cash-flow-
update-12-05-2018.pdf.

creditor's claim to the property."); 3 *Collier on Bankruptcy*, ¶ 362.07 ("[I]f stay relief is sought

by a party purporting to be a creditor, at a minimum there should be a showing that the party has

a claim against the debtor or property of the estate.").

### A. Bonds Are Not Secured By PREPA's Gross Revenues

18.    Movants assert that they have a lien on all "revenues of the system."  They base

this assertion on a provision in the "Now, Therefore" paragraph of the Trust Agreement stating

that PREPA "hereby pledge[s] to the Trustee the 'revenues of the System' to secure the Bonds."

Mot. at 26 (misquoting Trust Agreement at 11-12).[19]  However, they omit the remainder of this

provision, which makes clear that any such pledge is only "to the extent provided in this

Agreement."  Trust Agreement at 11-12.[20]

19.    Thus, Movants ask this Court to (a) ignore the fact that any security interest

granted in the "Now, Therefore" paragraph of the Trust Agreement is only "to the extent

provided" in the operative provisions of the Trust Agreement and (b) ignore the only operative

provision of the Trust Agreement that purports to grant a security interest, as well as the

definitions of Net Revenues, Opinion of Counsel, Revenues, and Sinking Fund.  Indeed,

Movants' interpretation of the Trust Agreement violates one of the cardinal rules of contract

---

[19]    Movants also cite to section 701 of the Trust Agreement, under which PREPA covenants to pay principal,
interest, and premium from "Revenues, and said Revenues are hereby pledged to the payment thereof in the
manner and to the extent **hereinafter** particularly specified."  *See* Mot. at 22 n.101 (emphasis added).  The
Original Trust Agreement states in section 701 that "said Revenues are hereby pledged to the payment thereof
in the manner and to the extent **hereinabove** particularly stated."  *See* Original Trust Agreement, § 701
(emphasis added).  Because there is no granting language after section 701, "hereinafter" is obviously a
scrivener's error in the Trust Agreement, which, as mentioned above, is an unofficial composite of the Original
Trust Agreement and its numerous amendments and supplements.  In the Original Trust Agreement, the word is "hereinabove," not "hereinafter" and that was not
changed in any of the nineteen supplements to the Original Trust Agreement.  The Original Trust Agreement
and its supplements and amendments were annexed as Exhibit A to the *Declaration of John T. Duffey in
Support of Objection of U.S. Bank National Association, in its Capacity as PREPA Bond Trustee, to Pan
American Grain Co., Inc.'s Motion for Relief from Stay to Execute Setoff* [Dkt. No. 992].

[20]    The full provision of the Trust Agreement cited to by Movants states in pertinent part:  "[PREPA] has executed
and delivered this Agreement and has pledged and does hereby pledge to the Trustee the revenues of the System
. . . and other moneys **to the extent provided in this Agreement** as security for payment of the bonds and the
interest and the redemption premium, if any, thereon . . . ."  Trust Agreement at 11-12 (emphasis added).

construction — that contracts should be interpreted in such a way as not to render provisions

"meaningless" or mere "surplusage."  *See Jiminez v. Peninsular & Oriental Steam Navigation*

*Co.*, 974 F. 2d 221, 223 (1st Cir. 1992) ("In construing contract language, we endeavor to render

no term meaningless.") (citations omitted); *see also Browning Ferris Indus. v. Union de*

*Tronquistas, Local 901*, 29 F. 3d 1, 2 (1st Cir. 1994) (same); *Manchester Knitted Fashions, Inc.*

*v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F. 2d 688, 694 (1st Cir. 1992) ("[A]

contract is to be interpreted in a manner which gives reasonable effect to its terms and

conditions.").

20.     Reading the Trust Agreement in its entirety, there can be no doubt that the

"extent" of the security interest granted under the Trust Agreement is with respect to the Net

Revenues (if any) on deposit in the Specified Funds.  While Movants acknowledge (as they

must) that their security interest allows for the payment of "current operating expenses before

debt service," they ignore the fact that operating expenses are paid from the Revenues deposited

in the General Fund, with respect to which the Bondholders have no security interest.  If the

intention was for the Bondholders to have a security interest with respect to PREPA's gross

revenues, the Trust Agreement would have granted them a security interest in the General Fund,

and the Opinion of Counsel would have been required to address the validity of that security

interest.  There is no such security interest and no such Opinion of Counsel because the

Bondholders' security interest is solely with respect to the Net Revenues (if any) on deposit in

the Specified Funds.

21.     The case of *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010),

is squarely on point.  In the context of a debtor's request to use cash collateral, the bankruptcy

court had to determine whether bonds issued to finance a monorail project were secured by the

gross revenues or the net revenues of the monorail project.  Unlike here, the gross revenues were

required to be deposited in accounts maintained by the indenture trustee.[21]  Nevertheless,

because the documents granted a security interest in "net revenues" as opposed to all revenues,

the bankruptcy court held that the bonds were secured only by net revenues.  In so holding, the

court concluded that:

> [T]he Indenture cannot be read to mean what the bondholders wish they
> could have or should have negotiated; this court can read it only as it is
> written.  And that means that no security interest attaches in any of [the
> debtor's] revenues until the earlier of:  (i) possession or control of the
> revenues by the Trustee; or (ii) after payment of Operation and
> Maintenance Costs, with a balance remaining.  Until the security interest
> attaches, the [indenture trustee] cannot hold an interest as required by
> Section 363(a) for such property to be cash collateral.

429 B.R. at 339-340.  Just as the indenture trustee in *Las Vegas Monorail* had no security interest

with respect to the monorail's gross revenues, the Bondholders here have no  security interest

with respect to the gross revenues of PREPA.  Bluntly stated, Movants are asking this Court to

rewrite the Trust Agreement to grant the Bondholders a security interest they wish they had but

plainly do not.

### B.    Bankruptcy Code's Special Revenue Provisions Do Not Create New Rights

22.    Movants contend that section 928 of the Bankruptcy Code, which provides (in

pertinent part) that "special revenues acquired by the debtor after the commencement of the case

shall remain subject to any lien resulting from any security agreement entered into by the debtor

before the commencement of the case," means that "Movants retain a continuing lien on

PREPA's current and future revenues."  Mot. at 30 n.134.  This is wrong.  Section 928 does not

create any security interest in favor of the Bondholders.  The section merely prevents any pre-

---

[21]    Prior to the bankruptcy, the *Las Vegas Monorail* debtor had diverted gross revenues to an account on which the
        indenture trustee had no lien.  429 B.R. at 325.

existing security interest in post-petition "special revenues" from being cut off by Bankruptcy

Code section 552.  *See Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin.*

*Oversight & Mgmt. Bd. for P.R.)*, Nos. 18-1165, 18-1166, 2019 U.S. App. LEXIS 8981, at *11

(1st Cir. Mar. 26, 2019) ("Section 928(a) simply provides that consensual prepetition liens on

special revenues will remain in place after the filing of the petition, despite the fact that Section

552(a) generally protects property acquired after the petition from being subject to prepetition

liens").  In simple terms, section 928 does not transform a Net Revenue pledge into a gross

revenue pledge.  At most, the quoted language from section 928 means that the Bondholders

retain their security interest with respect to post-petition Net Revenues (if any) on deposit in the

Specified Funds (assuming that their security interest is perfected).

23.    Movants are thus not entitled to stay relief based on Bankruptcy Code section

928.

**C.    In Any Event, Movants Are Not Entitled To Adequate Protection With
Respect To Future Revenues**

24.    Even if the Bondholders had a security interest with respect to Net Revenues (or

all Revenues) and not just any amounts on deposit in the Specified Funds, Movants would still

not be entitled to adequate protection with respect to "future Revenues of the system."  *Cf.* Mot.

at 22.  The Bondholders do not have (and, indeed, cannot have) an existing security interest in

revenues that might or might not be generated in the future.

25.    While a security agreement can designate after-acquired property as security for

an obligation, no security interest attaches to such property until the debtor acquires rights in the

property.  *See* U.C.C. § 9-203(b)(2), P.R. Laws Ann. tit. 19, §§ 2212(a)(74) and 2233(b)(2) ("[A]

security interest is enforceable against the debtor and third parties with respect to collateral only

if . . . the debtor has rights in the collateral . . . .").  This follows from the fundamental maxim of

secured transactions law that one cannot give what one does not have (or, as usually expressed in Latin, "*nemo dat quod non habet*").  PREPA's future revenue is not currently property of PREPA.  Although PREPA might have a hope, a wish, or a dream of future revenue, or even an expectation of receiving it, none of those things rise to the level of an existing property interest in which PREPA could grant a security interest.  Indeed, such potential future revenue is not the identifiable property of anyone at the present time.  Because a security interest is an interest in property, it cannot exist unless the property itself exists.  As the bankruptcy court put it in *Karim v. Bayview Loan Servicing, LLC (In re Karim)*, No. 17 A 00380, 2018 WL 1230561, at *199 (Bankr. N.D. Ill. Mar. 9, 2018), "[a] lien can only bind property that is in existence; liens do not subsist where there is no property to be bound . . . ."  (internal quotation marks and citations omitted).

26.     Moreover, as discussed above, an undersecured creditor is entitled to adequate protection only for post-petition diminution in the value of its collateral.  Here, Movants are not claiming that the value of PREPA's future revenues, whatever they might be, is lower today than it was on the petition date.  On the contrary, their claim is that the appointment of a receiver will increase the value of PREPA's future revenues relative to the petition date value, since, as of the petition date (and continuing today), PREPA was (and is) being mismanaged.

27.     This is a fundamentally different claim that has nothing to do with adequate protection as contemplated by the Bankruptcy Code.  Any mismanagement of PREPA's electric energy system might very well have impaired (and continue to impair) the potential value of PREPA's future revenues, but the purpose of adequate protection is to protect against **decreases** in value, not to **increase** the value of the creditor's collateral by remedying value-impairing conditions **that existed as of the petition date**.  If, as Movants contend, PREPA is being

13

mismanaged, that was just as true as of the petition date as it is now.  Whatever else their

security interest covers, the Bondholders do not have a security interest in the competency of

PREPA's management.

### D.   Covenants And Receivership Option Are Not Property Rights Entitled To Adequate Protection

28.     Movants attempt to expand their "collateral package" by arguing that it includes

the Covenants and the Receivership Option, which they characterize as "the essential

infrastructure of the revenue pledged."  Mot. at 27-30.  This argument is nonsensical.  A security

interest is a lien on an **asset** of the debtor, not on a **liability** of the debtor.  While a debtor might

have property rights in contractual promises **made to the debtor by others,** and thus the ability

to grant a security interest in such property, a debtor does not have property rights in its own

obligations.  The Covenants to which Movants refer are not **property** of PREPA that can be

pledged as security; they are **promises** by PREPA that, like payment of the Bonds, are secured

by the Net Revenues (if any) on deposit in the Specified Funds.  Movants are not entitled to

adequate protection separate and apart from whatever rights they have with respect to their

purported security interest in PREPA's property, which is only with respect to the Net Revenues

(if any) on deposit in the Specified Funds — nothing more.[22]

29.     Contrary to Movants' characterizations, the Covenants are not property for

purposes of section 362(d) of the Bankruptcy Code.  Indeed, Movants' only cites on this point

are to non-bankruptcy cases.  For example, Movants cite *dicta* in *United States Trust Com.v.*

*New Jersey*, 431 U.S. 1 (1977), where the issue was whether a state's impairment of its

---

[22]   Movants cite state law cases recognizing the ability of a government body to make covenants in aid of bonds backed by that body's revenues and that such covenants are part of the "collateral package."  Mot. at 27-28. There is no dispute that such covenants are integral to municipal bond financings and help provide contractual assurance of repayment, but that does not make such covenants "property rights" under state law or the Bankruptcy Code or in any way suggest that the debtor can grant a security interest in such covenants.

14

contractual obligations to bondholders violated the Contract Clause of the United States

Constitution (Article 1, § 10), not whether the contractual obligations would be deemed a

"property right" entitled to adequate protection in the event of a bankruptcy.  *See id.* at 21

("Having thus established that the repeal impaired a contractual obligation of the States, we turn

to the question whether that impairment violated the *Contract Clause.*") (emphasis added).[23]

Similarly, *First National Bank v. Maine Turnpike Authority*, 136 A. 2d 699 (Me. 1957), *Dimino*

*v. Secretary of the Commonwealth*, 695 N.E. 2d 659 (Mass. 1998), and *Patterson v. Carey,* 363

N.E. 2d 1146 (NY 1977), involved retroactive legislation impacting the value of bondholders'

security interests in toll revenues.  None of these cases involved a determination of property or

contract rights in the bankruptcy context.

   30. Similarly, the decisions Movants cite in support of their "property right" theory

with respect to the Receivership Option are mischaracterized or have been effectively overruled.

For example, the court in *Minn-Kota Farm Agency, Inc. v. Home Federal Sav. & Loan*

*Association*, 978 F.2d 1264 (8th Cir. 1992) (reported as Table Case at 1992 U.S. App. LEXIS

34211), did not hold that "[the] mortgagee's right to compel the mortgagor to insure the

property, and pay taxes, was part of the bundle of rights determining adequate protection."  Mot.

at 29.  The court merely found that the lender's interest in its collateral (an apartment building)

was not adequately protected because real estate taxes were not being paid (unpaid taxes become

priming liens against the property) and because there was no insurance (which meant the lender's

collateral could be destroyed or impaired).  These failures by the debtor to protect the value of

---

[23]   The Contract Clause has no application in federal bankruptcy cases. *See In re City of Detroit,* 504 B.R. 191, 231-232 (Bankr. E.D. Mich. 2013) ("The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts.  It has been long understood that bankruptcy law entails impairment of contracts.") (internal citations omitted).

the collateral entitled the lender to adequate protection. Here, there has been no such failure, as the Bondholders' collateral is still sitting untouched in interest-bearing accounts.

31. Movants' reliance on *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R.), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd,* 136 S. Ct. 1938 (2016), is equally misplaced. While the lower court in that case held that the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act") violated the Takings Clause of the Fifth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment) because it eliminated the Bondholders' Receivership Option,[24] this decision was not in the context of the Bankruptcy Code, which draws a sharp distinction between contract rights and property rights. Contract rights of creditors can be impaired, but creditors' property rights are entitled to protection. *See United States v. Sec. Indus. Bank*, 459 U.S. 70 (1982). [25]

32. *In re Offerman Farms, Inc.*, 67 B.R. 279 (Bankr. N.D. Iowa), also relied upon by Movants,[26] is no longer good law. There, the bankruptcy court found that the "right to file a foreclosure petition and request the appointment of a receiver to collect rents and profits . . . is a right subject to adequate protection." *Id.* at 282. For all intents and purposes, *Offerman* was

---

[24] *Franklin California Tax-Free Trust* was affirmed solely on the grounds that the Recovery Act was preempted by the Bankruptcy Code and was void pursuant to the Supremacy Clause of the U.S. Constitution. *See* 805 F.3d at 332-333; *aff'd,* 136 S. Ct. 1938 (2016).

[25] In *Security Industrial Bank*, the Supreme Court considered whether the Bankruptcy Reform Act of 1978 applied retroactively to avoid liens on certain property in violation of the Takings Clause. Ultimately, the Court sidestepped the constitutional issue by holding that the statute only applied prospectively. In characterizing the Government's arguments in favor of the retroactive application of the statute, the Court stated: "The Government apparently contends . . . that because cases . . . defined 'property' for purposes of the Due Process Clause sufficiently broadly to include rights which at common law would have been deemed contractual, traditional property rights are entitled to no greater protection under the [T]aking [C]lause". 459 U.S. at 75. The Court disagreed with the Government's contention, holding that "the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral." *Id.* at 75.

[26] Mot. at 29, 32.

overruled by *Timbers*, in which the Supreme Court held that, read in combination, Bankruptcy

Code sections 362(d)(1), 361, and 506 make clear that "the 'interest in property' protected by §

362(d)(1) **does not** include a secured party's right to immediate foreclosure." *Timbers*, 484 U.S.

at 371 (emphasis added).[27]

33.     Relying on general statements in the legislative history of sections 361 and

362(d)(1), the *Timbers* petitioner, like Movants here, claimed that it was entitled to adequate

protection to ensure that it received the "benefit of their bargain."  484 U.S. at 379-380; Mot. at

33.  The Supreme Court disagreed, holding that "[s]uch generalizations are inadequate to

overcome the plain textual indication in §§ 506 and 362(d)(2) of the Code that Congress did not

wish the undersecured creditor to receive interest on his collateral during the term of the stay."

484 U.S. at 380.

34.     As recognized in *Collier on Bankruptcy*, the Supreme Court in *Timbers* was

resolving a split between (a) appellate courts holding that undersecured creditors were entitled to

lost opportunity costs resulting from delay in foreclosure and (b) appellate courts holding that

"only the creditor's interest in the value of the underlying property needed to be protected, rather

than the value of all the creditor's rights."  3 *Collier on Bankruptcy* ¶ 361.02.  The Court

resolved the split by holding that "undersecured creditors are not entitled to compensation" for

"delay in foreclosing."  *Id.*

35.     There is no reason Movants should be in a better position than the *Timbers*

petitioner simply because they are seeking appointment of a receiver rather than attempting to

---

[27]     *Timbers* is best known for the holding that undersecured creditors are not entitled to interest.  The "interest"
requested in that case was to compensate the creditor for the delay in its ability to foreclose on its collateral.
Whether an undersecured creditor is entitled to such compensation for delay in pursuing its state law and
contractual right to foreclose was the precise question on which *certiorari* was granted.  484 U.S. at 369.  In
other words, the Court determined that the right to foreclose an interest in property is not a property interest in
addition to whatever lien the creditor has against the debtor's property.

foreclose. Any such distinction between default remedies is a distinction without a difference. The critical question is whether an undersecured creditor has a property right in its remedies (in addition to its interest in the underlying collateral) that is entitled to adequate protection. Under the reasoning of *Timbers*, the answer is "no."

36.     An undersecured creditor has a right to adequate protection only if its collateral "is depreciating during the term of the stay," not because of its inability to exercise remedies. *Timbers*, 484 U.S. at 370. *See also In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr. N.D. Ill 1997) ("[T]he Supreme Court [in *Timbers*] has determined that 'adequate protection' is intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate, rather than to compensate the creditor for the delay imposed by the bankruptcy in its ability to pursue nonbankruptcy remedies (like foreclosure) against the property.") (internal citations omitted); *In re Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. Del. 1992) ("[The] Supreme Court held [in *Timbers*] that undersecured creditors are not entitled to compensation for the delay in foreclosure attributable to the automatic stay . . . Post-*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.") (internal citations omitted). Here, the Bondholders' collateral is appreciating, not depreciating, in value. Movants are therefore not entitled to relief from the automatic stay or to adequate protection.

### E.     There Is No Cause To Lift Automatic Stay

37.     Movants also contend that PREPA's mismanagement of its electric energy system alone constitutes "cause" for automatic stay relief. Mot. at 32-34. Once again, Movants rely on wholly inapposite cases. For example, in *Minn-Kota Farm Agency, Inc.*, the court did **not** find the debtor guilty of mismanagement but found only that the debtor's cash flow was insufficient

to properly maintain the collateral.[28]  *Minn-Kota Farm Agency, Inc. v. Home Federal Sav. &*

*Loan Ass'n*, 1992 U.S. App. LEXIS 29605, at **3-4 (8th Cir. Nov. 11, 1992).  Likewise, there

was no finding of mismanagement in *In re Century Inv. Fund VIII Ltd. Partnership*, 155 B.R.

1002 (Bankr. E. D. Wis. 1989),[29] or in *In re Ridgemont Apartment Associates,* 105 B.R. 738

(Bankr. N.D. Ga. 1989).  In those cases, the secured creditor was not seeking relief from the

automatic stay for cause under Bankruptcy Code section 362(d)(1).  Rather, the secured creditor

was seeking relief under section 362(d)(2) because the debtor had no equity in the property

subject to the lien and the prospect of a confirmable plan of reorganization was bleak at best.

*See Century Inv. Fund,* 155 B.R. at 1004, 1007 ("The parties agreed that the debtor has no equity

in the property" and "[t]he debtor's outlook for reorganization while remaining in possession is

more problematic"); *Ridgemont Apartment Assoc.,* 105 B.R. at 739 ("By order entered August

11, 1988, the court found that the debtor had no equity in the property because its value was less

than the combined liens of [its secured creditors]" and later "denied the debtor's first amended

plan of reorganization" and granted relief from the automatic stay).[30]

38.     Movants also mischaracterize the two cited decisions where a receiver was

appointed or where the creditor argued that its right to obtain a receiver was pertinent to its

request for adequate protection.  In *Le Sannon Building Corp. v. Nathanson,* No. 92 CIV. 8716

(LAP), 1993 WL 330442 (S.D.N.Y. Aug. 23, 1993), the receiver had been appointed **prior** to the

---

[28]   If a debtor's financial problems are characterized as "mismanagement" and as such constitute "cause" for relief from the automatic stay, there would be very little point to the automatic stay.

[29]   Ironically, in *Century Inv. Fund,* the Court found that the pledged "property is insured and is being maintained," which, according to Movant's interpretation of *Minn-Kota*, means that there was no mismanagement. *Century Inv. Fund,* 155 B.R. at 1008.

[30]   Assuming that the Bondholders have a perfected security interest with respect to the amounts on deposit in the Specified Funds, PREPA would have no equity in such amounts given the $8 billion of outstanding Bonds.  But Movants are not seeking stay relief under Bankruptcy Code section 362(d)(2) with respect to the Specified Funds.  Movants are seeking control over all of PREPA's assets for "cause" under Bankruptcy Code section 362(d)(1).

bankruptcy filing, and the District Court merely determined that the bankruptcy court acted

within its discretion in allowing the receiver to continue pursuant to Bankruptcy Code section

543(d).[31]  In *Offerman Farms,* which, as discussed above, is no longer good law, the court held

that that the creditor was entitled to adequate protection for the delay in its exercise of

foreclosure and receiver appointment rights caused by the automatic stay.  67 B.R. at 282.  There

was no finding of mismanagement, and no receiver was appointed.

39.     Finally, Movants contend that their purported entitlement to "the benefit of their

bargain" constitutes grounds for the vacating the automatic stay.  (Mot. at 33 n.140).  This

contention is meritless and should be disregarded in light of *Timbers* and its progeny for the

reasons discussed above.

### F.     *Sonnax* Factors Do Not Warrant Vacating Automatic Stay

40.     Movants argue that the *Sonnax* factors – "impact of the stay on the parties" and

the "balance of harms" – justify stay relief.  Mot. at 34.  Rehashing their mismanagement

allegations, Movants argue that PREPA's creditors would benefit if a receiver were appointed

and that PREPA would not be harmed.  In support of this argument, Movants cite *Marder v.*

*Turner (In re Turner*), 161 B.R. 1 (Bankr. D Me. 1993).  There, the movants, who leased a parcel

of property from the debtor, obtained a judgment against the debtors' entire property after the

debtors were held to have made material representations regarding their compliance with

environmental laws in connection with that lease and the sale of a business to the movants.  161

B.R. at 2.  As a result of the judgment and other indebtedness, the debtors had no equity in the

leased property.  Applying the "balancing of harms" test, the bankruptcy court ultimately lifted

---

[31]     Generally, a custodian of a debtor's property must turnover such property to the trustee after a bankruptcy filing
and file an accounting of the property with the court.  11 U.S.C. § 542(b).  Pursuant to section 543(d) of the
Bankruptcy Code, the bankruptcy court can excuse a custodian from such requirements if creditors "would be
better served by permitted a custodian to continue in possession, custody, or control of such property."

the automatic stay, finding that the stay harmed the movants because the property continued to

violate environmental regulations and the state had ordered movants to remediate the property.

*Id.* at 3.  Conversely, lifting the stay did not harm the debtors because they had not demonstrated

that they could cure the defaults under the lease relating to the environmental problems with the

property.  *Id.* at 3.  Thus, "[b]ecause of their inability to effectively assume the Lease,

termination of the automatic stay would not harm the Debtors."  *Id.*

      41.    Unlike in *Marder*, where the collateral was worth nothing to the debtors and their

unsecured creditors because the debtors had no equity in the property and could not assume the

lease to create value, the Bondholders here are undersecured by more than $8 billion.  Their

security interests are only with respect to the Net Revenues (if any) on deposit in the Specified

Funds, and a portion of the security interests might not even be perfected if the Bondholders do

not have control of certain accounts.  Accordingly, if a receiver were appointed, a third party

would have control over property of significant value to every other creditor, thus hindering

creditors' and PREPA's ability to propose a viable plan of adjustment.

      42.    Furthermore, Movants' contention that creditors would not be harmed because the

Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") will remain

in place is belied by the fact that the receiver would "exercise its duties and powers under the

supervision of the court of competent jurisdiction in the Receiver Litigation."  Mot. at 25.

Requiring the Oversight Board and the Committee to participate in yet another litigation would

place additional burdens on PREPA's limited resources.

      43.    Finally, the real reason the Movants want a receiver appointed is that (contrary to

their assertions) their purported security interest is only with respect to the Net Revenues (if any)

on deposit in the Specified Funds.  While attempting to shore up the Bondholders' security is an

understandable goal, unsecured creditors would be better served by a plan of adjustment that addresses both management issues and distributions to creditors.

44.     This Court should not allow the process to be hijacked by undersecured creditors whose collateral is not diminishing in value and who are thus not entitled to adequate protection under *Timbers*.  The Motion should be denied.

## <u>NOTICE</u>

45.     Notice of this Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Financial Oversight and Management Board for Puerto Rico, (iv) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (v) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico; (vi) the insurers of the bonds issued or guaranteed by the Debtors; (vii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; (viii) the Movants; and (ix) all parties that have filed a notice of appearance in the above-captioned Title III cases.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Committee respectfully requests that the Court deny the Motion and

grant such other and further relief as the Court deems just and proper.

Dated: March 27, 2019          */s/ Luc A. Despins*          ,

                              PAUL HASTINGS LLP
                              Luc A. Despins, Esq. *(Pro Hac Vice)*
                              James R. Bliss, Esq. *(Pro Hac Vice)*
                              Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
                              G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                              200 Park Avenue
                              New York, New York 10166
                              Telephone: (212)318-6000
                              lucdespins@paulhastings.com
                              jamesbliss@paulhastings.com
                              nicholasbassett@paulhastings.com
                              alexbongartz@paulhastings.com

                              *Counsel to Official Committee of Unsecured Creditors for
                              all Title III Debtors*

                                     - and -

                              */s/ Juan J. Casillas Ayala*          ,

                              CASILLAS, SANTIAGO & TORRES LLC
                              Juan J. Casillas Ayala, Esq., USDC - PR 218312
                              Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
                              Alberto J. E. Aneses Negron, Esq., USDC - PR 302710
                              Ericka C. Montull-Novoa, Esq., USDC - PR 230601
                              El Caribe Office Building
                              53 Palmeras Street, Ste. 1601
                              San Juan, Puerto Rico 00901-2419
                              Telephone: (787)523-3434
                              jcasillas@cstlawpr.com
                              dbatlle@cstlawpr.com
                              aaneses@cstlawpr.com
                              emontull@cstlawpr.com
                              *Local Counsel to Official Committee of Unsecured
                              Creditors for all Title III Debtors*