**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OMNIBUS CONDITIONAL OBJECTION OF THE AD HOC GROUP OF
GENERAL OBLIGATION BONDHOLDERS TO CLAIMS FILED OR
ASSERTED BY THE PUBLIC BUILDINGS AUTHORITY, HOLDERS OF
PUBLIC BUILDINGS AUTHORITY BONDS, AND HOLDERS OF CERTAIN
<u>COMMONWEALTH GENERAL OBLIGATION BONDS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 2

RESERVATION OF RIGHTS AND CONDITIONAL NATURE OF OBJECTION .................. 7

BACKGROUND ..................................................................................................... 7

    A.   The Conditionally Challenged Claims................................................ 7

    B.   The Commonwealth's GO Bonds.................................................... 10

    C.   The PBA and the PBA Bonds........................................................ 10

    D.   The Selective Claim Objection and the PBA Adversary Proceeding................. 13

JURISDICTION AND STATUTORY PREDICATE ................................................... 17

RELIEF REQUESTED............................................................................................ 18

ARGUMENT ...................................................................................................... 19

    I.   If The Selective Claim Objection's Premises Are Accepted, The
       Commonwealth's Obligations With Respect To The PBA Bonds And The
       PBA Leases—Not Later-Issued GO Bonds—Would Be Invalidated......................... 19

       A.   If The PBA Is Determined To Be An Unconstitutional Evasion Of The
          Commonwealth's Debt Limit, Then Any Remedy For That Constitutional
          Violation Would Necessarily Fall On The PBA And Holders Of PBA
          Bonds ......................................................................................... 19

       B.   If The Commonwealth's Guaranty Of The PBA Bonds And The
          Commonwealth's Obligations Under The PBA Leases Would Require
          That The PBA Bonds Be Recharacterized As Direct Obligations Of The
          Commonwealth, Then Those Obligations Were *Ultra Vires* .............................. 22

       C.   If The PBA Leases Are Recharacterized As Disguised Financings, Then
          The PBA Leases And The Commonwealth's Guaranty Of The PBA
          Bonds Were *Ultra Vires* .................................................................... 24

    II.   Consistent Application Of The Selective Claim Objection's Logic Would
       Result In Invalidation Of GO Bond And PBA Bond Issuances Beginning As
       Early As Fiscal Year 2010 ............................................................................ 26

NOTICE............................................................................................................. 34

CONCLUSION.................................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashuelot Nat'l Bank v. Lyon Cty.*,
   81 F. 127 (C.C.N.D. Iowa 1897), *aff'd sub nom. Lyon Cty. v. Ashuelot Nat'l Bank of
   Keene*, 87 F. 137 (8th Cir. 1898) ................................................................................ 5

*Ayer v. Commissioner of Administration*,
   165 N.E.2d 885 (Mass. 1960) ...................................................................................... 20

*Bennett v. Commissioners of Rockingham Cty.*,
   92 S.E. 603 (N.C. 1917) ............................................................................................... 21

*Boll v. City of Ludlow*,
   29 S.W.2d 547 (Ky. 1930) .............................................................................................. 6

*Cincinnati, N.O. & T.P. Ry. Co. v. Kinman*,
   132 S.W.2d 735 (Ky. 1939) ............................................................................................ 6

*German Ins. Co. of Freeport v. City of Manning*,
   95 F. 597 (C.C.S.D. Iowa 1899) ..................................................................................... 5

*In re Constitutionality of Chapter 280, Oregon Laws 1975*,
   554 P.2d 126 (Or. 1976) ......................................................................................... 20, 21

**Constitution and Statues**

P.R. Const. art. VI, § 2 ............................................................................... 10, 14, 15, 23

P.R. Const. art. VI, § 8 ........................................................................................... 10

11 U.S.C.
   § 502 ............................................................................................................................. 17
   § 502(a) ......................................................................................................................... 18
   § 1109(b) ....................................................................................................................... 18

48 U.S.C.
   § 2161(a) ....................................................................................................................... 18
   § 2166(a) ....................................................................................................................... 17
   § 2167(a) ....................................................................................................................... 17
   § 2170 ............................................................................................................................ 18

13 L.P.R.A.
   § 56 ................................................................................................................................ 30
   § 82(a) ........................................................................................................................... 30
   § 82b(a) ......................................................................................................................... 30

## TABLE OF AUTHORITIES—Continued

**Page(s)**

§ 82b(c) ........................................................................................................ 30

22 L.P.R.A. § 901 *et seq.* ........................................................................... 10
 § 902 .......................................................................................................... 10
 § 903 .......................................................................................................... 12
 § 906(a) ...................................................................................................... 11
 § 906(a)(6) ................................................................................................. 25
 § 906(a)(8) ................................................................................................. 25
 § 906(a)(16) ............................................................................................... 13
 § 907a ............................................................................................. 13, 23, 26
 § 916 ............................................................................................... 12, 24, 25

## Other Authorities

1 John F. Dillon, *Commentaries on the Law of Municipal Corporations* (5th ed. 1911) .............. 5

Kobre & Kim LLP, *Final Investigative Report* (Aug. 20, 2018),
 https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf ................... 30

15 *McQuillin: The Law of Municipal Corporations* (3d ed. 2018) ................................................. 5

The Ad Hoc Group of General Obligation Bondholders (the "GO Group")[2] files this omnibus conditional objection (the "Conditional Objection") pursuant to Section 502 of Title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III cases by Section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101, *et seq.*, and Rule 3007 of the Federal Rules of Bankruptcy Procedure, made applicable to these Title III cases by Section 310 of PROMESA.  For the reasons set forth below, the GO Group conditionally requests entry of an order, substantially in the form attached hereto as **Exhibit A**, disallowing claims asserted against the Commonwealth of Puerto Rico (the "Commonwealth") on account of the Commonwealth's obligations under leases with the Puerto Rico Public Buildings Authority (the "PBA," and such leases, "PBA Leases") and the Commonwealth's guaranty of bonds issued by the PBA (the "PBA Bonds"), or in the alternative, disallowing claims asserted against the Commonwealth on account of Commonwealth general obligation bonds ("GO Bonds") and PBA Bonds issued beginning in fiscal year 2010 insofar as and to the extent that such issuances are determined to have violated the Commonwealth's constitutional debt limit.[3]

---

[2] Members of the GO Group file this motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

[3] The GO Group will be filing, contemporaneously with the filing of this Objection, a motion seeking entry of a procedures order providing for, among other things, broad notice of this Conditional Objection to potential holders of GO Bonds and PBA Bonds and procedures for parties in interest to participate in the litigation of the Conditional Objection, either in support or in opposition. The GO Group proposes that the deadline to file a substantive response to this Conditional Objection be suspended pending the Court's consideration of that motion, which should be heard at the April 24, 2019 omnibus hearing.

## INTRODUCTION

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and the Official Committee of Unsecured Creditors (the "UCC") have filed a claim objection selectively targeting $6 billion in GO Bonds issued by the Commonwealth in 2012 and 2014 (the "Selectively Challenged GO Bonds"). See Dkt. No. 4784 (the "Selective Claim Objection").[4] The core premise of the Selective Claim Objection is that the PBA has always been a sham intended to end-run the Commonwealth's constitutional borrowing limit. What were fraudulently advertised as bonds issued by the PBA, the Selective Claim Objection contends, were really direct, primary obligations of the Commonwealth, which hence should be retroactively counted against the Commonwealth's constitutional debt limit—something never done before in any state or territory. Perversely, the Selective Claim Objection seeks to invalidate not the PBA Bonds issued pursuant to this supposed decades-long fraud but instead the Selectively Challenged GO Bonds. Not only would the PBA Bonds bear no onus for this supposed artifice, they (and many other creditors) would receive a huge windfall at the expense of the Selectively Challenged GO Bonds.

In due course, our forthcoming response to the Selective Claim Objection will show that the Selective Claim Objection advances legal arguments that are unprecedented and wrong, and relies on factual premises that are demonstrably false. In addition to laying bare the Selective Claim Objection's legal and logical errors, our response will establish that its calculations of the Commonwealth's debt limit are incorrect, as is the retroactive total-invalidation remedy it seeks (which was not granted in any of the cases cited in the Selective Claim Objection). We will further

---

[4] The Selectively Challenged GO Bonds comprise the Public Improvement Refunding Bonds, Series 2012 A, issued by the Commonwealth on April 3, 2012 (the "2012 A GO Bonds"); the Public Improvement Refunding Bonds, Series 2012 B, issued by the Commonwealth on March 29, 2012 (the "2012 B GO Bonds"); and the General Obligation Bonds of 2014, Series A, issued by the Commonwealth on March 17, 2014 (the "2014 GO Bonds").

demonstrate that the Oversight Board and the UCC have chosen to squander what little is left of Puerto Rico's credibility with investors and to launch a multi-year feeding frenzy for litigators, rather than pursue the economic reforms that—by the Oversight Board's own admissions—would dramatically improve the Commonwealth's economic growth and facilitate a consensual resolution of this Title III proceeding.  But that reckoning is not the subject of this filing.

Rather, this Conditional Objection assumes that certain premises of the Selective Claim Objection are correct, and further assumes that the Selective Claim Objection's arguments could be applied retroactively against bonds issued several years ago, despite the fact and legal import of the Commonwealth's extensive contrary pronouncements.  Based on these assumptions, this Conditional Objection explains why the correct and only remedy would be to invalidate all claims asserted against the Commonwealth based on or relating to the PBA Bonds and PBA Leases, or, failing that, to invalidate all PBA Bonds and GO Bonds that fall within the Selective Claim Objection's "logic."  The sole remedy would not be to invalidate only the Selectively Challenge GO Bonds.

First, a determination that the PBA structure is a "sham" to "circumvent" the Puerto Rico Constitution's debt limit (Selective Claim Objection ¶ 5) would *not* transform the PBA Bonds issued in that sham into direct-issued debt of the Commonwealth (let alone bestow a huge windfall on them by invalidating GO Bonds directly issued by the Commonwealth and having nothing to do with the PBA).  To the contrary, the consequence of such a constitutional transgression would be to *invalidate the unconstitutional obligation itself—i.e.*, to invalidate the Commonwealth's guaranty of the PBA Bonds and its obligations under the PBA Leases.  Moreover, the Selective Claim Objection mistakenly assumes that the Puerto Rico Legislative Assembly *authorized* the Commonwealth to issue direct, full faith and credit obligations in respect of the PBA.  The

Commonwealth was not authorized to do so and indeed was expressly prohibited from doing so. Accordingly, if the PBA Bonds would otherwise be recharacterized as direct, primary obligations of the Commonwealth, those obligations would be *ultra vires* and hence (on the Selective Claim Objection's logic) unenforceable and disallowed.

Second, even if the PBA Bonds were somehow counted against the debt limit as direct obligations of the Commonwealth, the resulting recalculations would show that as many as 16 series of GO Bonds and PBA Bonds not targeted by the Selective Claim Objection (roughly *$4.4 billion* face amount) exceeded the debt limit, and hence (according to the Selective Claim Objection's logic) would be invalid. Those 16 series of bonds are as follows:

| Bond Series (as defined below) | Date of Issuance | Approx. Face Amount Outstanding |
|---|---|---|
| Series P PBA Bonds | July 1, 2009 | $330.9 million |
| Series K PBA Bonds | July 1, 2009 (remarketed) | $50 million |
| 2009 A GO Bonds | September 17, 2009 | $3.4 million |
| 2007 A-4 GO Bonds | September 17, 2009 (remarketed) | $93.8 million |
| Series Q PBA Bonds | October 28, 2009 | $152.5 million |
| 2009 B GO Bonds | November 17, 2009 | $372.7 million |
| 2009 C GO Bonds | December 16, 2009 | $210.3 million |
| 2011 A GO Bonds | February 17, 2011 | $356.5 million |
| 2011 C GO Bonds | March 17, 2011 | $442 million |
| 2011 GO Bonds | July 12, 2011 | $304 million |
| 2011 D GO Bonds | July 12, 2011 | $50.7 million |
| 2011 E GO Bonds | July 12, 2011 | $245.9 million |
| Series R PBA Bonds | August 24, 2011 | $756.4 million |
| Series S PBA Bonds | August 24, 2011 | $303.9 million |

| Bond Series (as defined below) | Date of Issuance | Approx. Face Amount Outstanding |
|---|---|---|
| Series T PBA Bonds | December 22, 2011 | $121.5 million |
| Series U PBA Bonds | June 21, 2012 | $576.7 million |

There is no defensible basis for applying the Selective Claim Objection's logic selectively by targeting only the Selectively Challenged GO Bonds while immunizing and bestowing a huge windfall on other bonds to which the same logic would apply.

Procedurally, the Oversight Board and UCC's Selective Claim Objection should be litigated only in conjunction with this Conditional Objection, because the merits of the two are highly intertwined.  For example, it is impossible to calculate the debt limit upon issuance of any series of Selectively Challenged GO Bonds without knowing whether (and to what degree) earlier series of GO Bonds or PBA Bonds are invalid and unenforceable.  That is because, when calculating a governmental issuer's debt limit, "invalid and void obligations . . . are not to be included." 15 *McQuillin: The Law of Municipal Corporations* § 41:40 (3d ed. 2018).[5]  Thus, the filing of the Selective Claim Objection inevitably entails an inquiry into whether, on the Selective Claim Objection's own logic, *prior* bond issuances must be treated as invalid and cannot be included in the calculation of the constitutional debt limit.  This Conditional Objection will provide

---

[5] See also 1 John F. Dillon, *Commentaries on the Law of Municipal Corporations* § 205, 397 (5th ed. 1911) ("If the city has issued any *obligations which are invalid* and cannot be enforced against it in the hands of the owners, these obligations are not to be considered [in calculating the debt limit.]"); *German Ins. Co. of Freeport, v. City of Manning*, 95 F. 597, 600-01 (C.C.S.D. Iowa 1899): *Ashuelot Nat'l Bank v. Lyon Cty,* 81 F. 127, 129-30 (C.C.N.D. Iowa 1897), *aff'd sub nom. Lyon Cty. v. Ashuelot Nat'l Bank of Keene*, 87 F. 137 (8th Cir. 1898).  Invalid obligations are properly excluded from the calculation of the issuer's debt limit even if they were believed to be valid at the time of a bond issuance, and "were afterwards paid and their validity not questioned." *McQuillan*, *supra*, § 41:40.

other potentially affected bondholders notice and an opportunity to participate in litigation regarding the validity of the bonds they hold.[6]

This Conditional Objection thus reflects the reality that the holders of many billions of GO Bonds and PBA Bonds that are not explicitly targeted by the Selective Claim Objection are nonetheless vitally interested in the many issues raised by it, since many of those non-targeted bonds will necessarily suffer adverse consequences if the key premises of the Selective Claim Objection were adopted. As a matter of fundamental fairness, as well as practical necessity, it is appropriate that both objections be litigated together.

It is unfortunate and reckless that the Oversight Board and the UCC have chosen this extreme path. Having done so, however, they cannot be allowed to wield such a cudgel arbitrarily against some bondholders, while concurrently negotiating to exempt bonds that must be invalidated if the Selective Claim Objection's flawed logic were adopted. We are all in this misguided exercise together.

---

[6] Cf. *Cincinnati, N.O. & T.P. Ry. Co. v. Kinman*, 132 S.W.2d 735, 736 (Ky. 1939) (reversing and remanding judgment that had validated new bonds on the ground that certain previously incurred debt was in fact void, where holders of the prior debt had not been joined in the action). If retroactive re-testing of the Commonwealth's debt limit were appropriate, it would necessarily be applied to each issuance of bonds in chronological order, such that the invalidation of a given series of bonds (or a portion thereof) would cause it to be disregarded in the application of the debt limit to subsequent series. In performing this analysis, moreover, the Court would be required to give effect to any bond issuance to the extent that it could have been issued in compliance with the debt limit. See, *e.g.*, *Boll v. City of Ludlow*, 29 S.W.2d 547, 548 (Ky. 1930) (holding that, "where the people vote for a bond issue in excess of the limit fixed by . . . the Constitution, . . . bonds within the constitutional limit may be issued"). Because the results of this sequential calculation may well depend on factual discovery that has yet to take place and legal determinations that this Court has not yet made (and indeed will likely never be required to make), this Conditional Claim Objection takes the maximally conservative approach, in terms of providing notice to potentially affected claimholders, by conditionally objecting to each series of bonds that would be targeted by the logic of the Selective Claim Objection if taken to its logical conclusion.

6

**RESERVATION OF RIGHTS AND CONDITIONAL NATURE OF OBJECTION**

The GO Group reserves the right to raise additional objections to claims asserted against the Commonwealth other than those addressed herein, whether on the ground that such claims are unenforceable against the Commonwealth as a consequence of a violation of the Commonwealth's Constitution or statutes, or any other basis.  In addition, the GO Group reserves the right to object to the claims addressed herein on grounds other than those set forth in this Conditional Objection, including through the filing of an amended Conditional Objection.  For example, the GO Group does not concede that holders of PBA Bonds hold valid claims against the Commonwealth even setting aside the Selective Claim Objection's assertion that the PBA is a sham.

Moreover, the GO Group emphasizes the conditional nature of this Conditional Objection, which proceeds by *assuming* that the Oversight Board and UCC will be able to establish that the PBA constitutes an unlawful scheme to evade the Puerto Rico Constitution's debt limit, that the PBA Bonds can validly be recharacterized as direct obligations of the Commonwealth, and that it would be permissible to impose a remedy for such violations on bondholders retroactively.  The GO Group disputes each of those premises, and the arguments herein about what conclusions and remedies would logically follow from the Selective Claim Objection's premises should not be understood as an endorsement of any of them.  Nor should the GO Group's reliance on any of the case law cited in the Selective Claim Objection be understood as a concession that these cases were correctly decided or that they have any application with respect to the Commonwealth's debt limit or the PBA structure.

**BACKGROUND**

A.    **The Conditionally Challenged Claims**

For the reasons set forth in Part I of the Argument (pp. 19-26, *infra*), the GO Group conditionally objects to all claims against the Commonwealth based on or relating to (i) all

7

outstanding series of PBA Bonds, or (ii) the PBA Leases.

In the alternative, for the reasons set forth in Part II of the Argument (pp. 26-33, *infra*), the GO Group conditionally objects to all claims against the Commonwealth based on or relating to the following GO Bonds and PBA Bonds issued in or after fiscal year 2010.

***GO Bonds:***

1. Public Improvement Refunding Bonds, Series 2009 A (the "2009 A GO Bonds"), issued in the aggregate face amount of $3,425,000 on September 17, 2009.[7]

2. Public Improvement Refunding Bonds, Series 2007 A-4 ("2007 A-4 GO Bonds"), remarketed in the aggregate face amount of $93,835,000 on September 17, 2009.[8]

3. Public Improvement Refunding Bonds, Series 2009 B (the "2009 B GO Bonds"), issued in the aggregate face amount of $372,685,000 on November 17, 2009.[9]

4. Public Improvement Refunding Bonds, Series 2009 C (the "2009 C GO Bonds"), issued in the aggregate face amount of $210,250,000 on December 16, 2009.[10]

5. Public Improvement Refunding Bonds, Series 2011 A (the "2011 A GO Bonds"), issued in the aggregate face amount of $356,520,000 on February 17, 2011.[11]

6. Public Improvement Refunding Bonds, Series 2011 C (the "2011 C GO Bonds"), issued in the aggregate face amount of $442,015,000 on March 17, 2011.[12]

---

[7] See Official Statement, dated September 11, 2009, for Public Improvement Refunding Bonds, Series 2009 A (the "2009 A GO Official Statement") at 1 (Exhibit 1). All citations to exhibits (Exhibit __) refer to the exhibits to the *Declaration of Donald Burke* filed in support of this Conditional Objection.

[8] See Official Statement, dated September 11, 2009, for Public Improvement Refunding Bonds, Series 2007 A-4 (the "2007 A-4 GO Official Statement") at 1 (Exhibit 2).

[9] See Official Statement, dated November 4, 2009, for Public Improvement Refunding Bonds, Series 2009 B (the "2009 B GO Official Statement") at 1 (Exhibit 3).

[10] See Official Statement, dated December 3, 2009, for Public Improvement Refunding Bonds, Series 2009 C (the "2009 C GO Official Statement") at 1 (Exhibit 4).

[11] See Official Statement, dated February 10, 2011, for Public Improvement Refunding Bonds, Series 2011 A (the "2011 A GO Official Statement") at 1 (Exhibit 5).

[12] See Official Statement, dated March 10, 2011, for Public Improvement Refunding Bonds, Series 2011 C (the "2011 C GO Official Statement") at 1 (Exhibit 6).

7.      Public Improvement Bonds of 2011 (the "2011 GO Bonds"), issued in the aggregate face amount of $304,000,000 on July 12, 2011.[13]

8.      Public Improvement Refunding Bonds, Series 2011 D (the "2011 D GO Bonds"), issued, concurrently with the 2011 GO Bonds and the 2011 E GO Bonds (defined below), in the aggregate face amount of $52,190,000 on July 12, 2011.[14]

9.      Public Improvement Refunding Bonds, Series 2011 E (the "2011 E GO Bonds"), issued, concurrently with the 2011 GO Bonds and the 2011 D GO Bonds, in the aggregate face amount of $245,915,000 on July 12, 2011.[15]

*PBA Bonds:*

1.      Government Facilities Revenue Refunding Bonds, Series P, issued in the aggregate face amount of $330,935,000 on July 1, 2009 (the "Series P PBA Bonds").[16]

2.      Government Facilities Revenue Refunding Bonds, Series K, remarketed in the aggregate face amount of $50,000,000 on July 1, 2009 (the "Series K PBA Bonds").[17]

3.      Government Facilities Revenue Refunding Bonds, Series Q, issued in the aggregate face amount of $152,540,000 on October 28, 2009 (the "Series Q PBA Bonds").[18]

4.      Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy), issued in the aggregate face amount of $756,449,000 on August 24, 2011 (the "Series R PBA Bonds").[19]

---

[13] See Official Statement, dated June 29, 2011, for Public Improvement Bonds of 2011, Public Improvement Refunding Bonds, Series 2011 D, and Public Improvement Refunding Bonds, Series 2011 E (the "2011 DE GO Official Statement") at 1 (Exhibit 7).

[14] See 2011 DE GO Official Statement at 1 (Exhibit 7).

[15] See 2011 DE GO Official Statement at 1 (Exhibit 7).

[16] See Official Statement, dated June 26, 2009, for PBA Government Facilities Revenue Refunding Bonds, Series P (the "Series P PBA Official Statement") at 1 (Exhibit 8).

[17] See Official Statement, dated June 26, 2009, for PBA Government Facilities Revenue Refunding Bonds, Series K Term Bonds due July 1, 2027 (the "Series K PBA Official Statement") at 1 (Exhibit 9).

[18] See Official Statement, dated October 16, 2009, for PBA Government Facilities Revenue Refunding Bonds, Series Q (the "Series Q PBA Official Statement") at 1 (Exhibit 10).

[19] See Official Statement, dated August 10, 2011, for PBA Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) (the "Series R PBA Official Statement") at 1 (Exhibit 11).

5.      Government Facilities Revenue Bonds, Series S, issued in the aggregate face
amount of $303,945,000 on August 24, 2011 (the "Series S PBA Bonds").[20]

6.      Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds
– Direct Payment), issued in the aggregate face amount of $121,528,000 on
December 22, 2011 (the "Series T PBA Bonds").[21]

7.      Government Facilities Revenue Refunding Bonds, Series U, issued in the aggregate
face amount of $582,345,000 on June 21, 2012 (the "Series U PBA Bonds").[22]

## B.      The Commonwealth's GO Bonds

As of the filing of the Commonwealth's Title III case, the Commonwealth had outstanding
approximately $12.546 billion in face amount of GO Bonds, which were issued directly by the
Commonwealth and are backed by a pledge of the Commonwealth full faith, credit, and taxing
power.  As "public debt" within the meaning of the Puerto Rico Constitution, these GO Bonds
benefit from a first-priority claim and lien on all of the Commonwealth's "available resources,"
P.R. Const. art. VI, § 8, as well as a constitutionally enshrined mandamus remedy that effectuates
bondholders' property rights in the Commonwealth's available resources, *id.* art. VI, § 2.

## C.      The PBA and the PBA Bonds

1.  The PBA was created pursuant to Act No. 56 of the Legislative Assembly of Puerto
Rico, approved June 19, 1958 (as amended, the "PBA Enabling Act") (codified at 22 L.P.R.A.
§ 901 *et seq.*).  To fulfill its statutory purpose of constructing, maintaining, and operating public
facilities, the PBA was established as an independent public corporation that is separate and
distinct from the Commonwealth's government.  See 22 L.P.R.A. § 902.

---

[20] See Official Statement, dated August 10, 2011, for PBA Government Facilities Revenue
Bonds, Series S (the "Series S PBA Official Statement") at 1 (Exhibit 12).

[21] See Official Statement, dated December 19, 2011, for PBA Government Facilities Revenue
Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) (the "Series T PBA Official
Statement") at 1 (Exhibit 13).

[22] See Official Statement, dated June 8, 2012, for PBA Government Facilities Revenue
Refunding Bonds, Series U (the "Series U PBA Official Statement") at 1 (Exhibit 14).

The PBA Enabling Act also enumerates the PBA's statutory powers, which are consistent

with that statutory purpose.  As relevant here, they include the following authority:

> (6) ***To acquire any kind of property and rights thereon*** in any lawful manner,
> including, without being limited to, the acquisition by purchase, either by
> agreement or through the exercise of the power of eminent domain, lease, bequest,
> legacy or gift, ***and to possess, keep, lease, pledge, mortgage or otherwise
> encumber, assign, and exploit any venture or part thereof***.

> (8) ***To acquire, possess and use at any time and in the manner indicated in clause
> (6) of this subsection, any real or personal or mixed property***, whether corporeal
> or incorporeal or any interest thereon, deemed necessary or convenient to carry out
> the purposes of the Authority, ***and to assign or lease the same in whole or in part,
> as lessor, or to exchange any property thus acquired or any interest thereon***.

> (10) ***To borrow money, make and issue bonds of the Authority for any of its
> corporate purposes***, and to guarantee the payment of its bonds and of any and all
> of its other obligations by pledge, mortgage, assignment or trust indenture of
> properties of the Authority and on all or any of its revenues, income, fees, receipts
> and interest in contracts, leases (traditional, financial or of any other type) or
> subleases.  The Authority is also authorized to obtain any facility that increases its
> capacity to borrow money or to issue debts or which increases its liquidity with
> respect to any bonds in the manner in which the Authority deems advantageous.
> The exercise of these duties shall be subject or [sic] that the Public Buildings
> Authority obtains in writing the advice and consent of the Government
> Development Bank for Puerto Rico.

> (11) ***To make and issue bonds for the purpose of consolidating, reimbursing,
> purchasing, paying or redeeming any bonds or obligations, issued or subrogated
> by the Authority, which are in circulation; or any bonds or obligations whose
> principal and interest are payable in whole or in part from its revenues***. The
> exercise of these duties shall be subject to the Public Buildings Authority obtaining
> in writing the advice and consent of the Government Development Bank for Puerto
> Rico.

22 L.P.R.A. § 906(a) (emphasis added).

In a separate provision, the PBA Enabling Act also sets forth the PBA's statutory "duties."

Those duties include the following:

> ***The Authority shall make or direct the preparation of plans and designs of
> buildings*** for schools, health facilities, offices, headquarters, courts, warehouses,
> workshops and any other physical facilities related to government services…. ***The
> Authority may own, finance, acquire, dispose of, lease, sublease, sell, transfer,
> design, develop, build, operate, maintain, repair, replace, administer, market,***

11

> ***improve and promote, by itself or by means of contracts with third parties, the use
> of the space in said facilities*** or parts thereof; but such leases shall be with the
> Commonwealth or any of the departments, agencies, instrumentalities, authorities,
> public corporations or municipalities of the Commonwealth of Puerto Rico.
> Provided, however, That the Authority may execute contracts with private entities
> concerning the ownership, financing, acquisition, leasing, subleasing, sale, transfer,
> design, development, construction, operation, maintenance, repair, replacement,
> administration, marketing, improvement, promotion or any other type of disposal
> of the facilities of the Authority. . . .

22 L.P.R.A. § 903 (emphasis added).

To fulfill its statutory duties, the PBA has entered into the PBA Leases with the
Commonwealth, its departments, agencies, and instrumentalities, various municipalities and other
tenants (including private lessees and the United States government).  The PBA has largely
financed the design, construction, and improvement of these facilities by issuing the PBA Bonds.
Approximately $4 billion face amount in PBA Bonds remain outstanding, with the overwhelming
majority having been issued pursuant to Resolution No. 468, adopted by the PBA on June 22,
1995, as amended and supplemented, and a much smaller amount (roughly $37 million face
amount outstanding) issued pursuant to Resolution No. 77, adopted by the PBA on November 16,
1970.  A portion of the rents payable under the PBA Leases is, in turn, the primary source of
repayment for the PBA Bonds.

The Commonwealth has pledged its full faith and credit for the payment of "rent" under
any "lease contract" between the PBA and any department, agency, instrumentality, authority, or
public corporation of the Commonwealth, and has agreed to "advance" any such "rent" if unpaid
when due.  22 L.P.R.A. § 916.[23]  This undertaking by the Commonwealth does not apply to the

---

[23] Under the PBA Enabling Act, the "good faith and credit" of any lessee municipality is
pledged for the payment of rent under any "lease contract" between the PBA and such
municipality.  22 L.P.R.A. § 916.

12

PBA's leases with other tenants, such as municipalities, the federal government, and private entities.

In addition, the Commonwealth has conditionally guaranteed the PBA Bonds, by providing that, "[i]f at any time the revenues or income and any other monies of the [PBA], pledged for the payment of the principal of and interest on such bonds, are not sufficient for the payment of such principal and interest at their maturity date," the Commonwealth's Secretary of the Treasury "shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficit in the amount required for the payment of such principal and interest."  22 L.P.R.A. § 907a.  The Commonwealth has pledged its good faith, credit, and taxing power to make payments on this guaranty.  *Id.*  The PBA Enabling Act is absolutely clear, however, that the PBA and the Commonwealth lack authority to incur direct obligations on behalf of the Commonwealth: "[T]he Authority shall have no power whatsoever at any time or in any manner to pledge the credit . . . of the Commonwealth of Puerto Rico . . . ; neither shall the Commonwealth of Puerto Rico . . . be liable for the payment of the principal of or interest on any bonds issued by the Authority."  22 L.P.R.A. § 906(a)(16).

### D.    The Selective Claim Objection and the PBA Adversary Proceeding

1.    On January 14, 2019, the Oversight Board and the UCC filed the Selective Claim Objection, in which they object to the three series of Selectively Challenged GO Bonds, which were issued in 2012 and 2014.  See Selective Claim Objection ¶¶ 22-32.  The Selective Claim Objection contends that the Selectively Challenged GO Bonds were issued at a time when the Commonwealth's constitutional debt service limit had been exceeded, and that the Selectively Challenged GO Bonds are therefore void.  *Id.* ¶¶ 61-62.  In making this argument, the Selective Claim Objection primarily contends that the debt limit should be recalculated to include all present and future debt service on the PBA Bonds.  *Id.* ¶¶ 63-86.

13

In advancing that position, the Oversight Board and the UCC ignore the plain text of the Puerto Rico Constitution's debt limit provisions, which painstakingly distinguish between bonds issued directly by the Commonwealth (such as the GO Bonds) and those guaranteed by the Commonwealth (such as the PBA Bonds). As explained below, each time the debt limit is tested— *i.e.*, on the issuance date for pertinent debts—debt service on direct-issued Commonwealth GO Bonds is counted for every year into the future, whereas debt service on the Commonwealth-guaranteed debts is counted only to the extent it has actually been paid by the Commonwealth as guarantor and only for the immediately preceding year.

Article VI, Section 2 of the Constitution provides:

> [N]o *direct obligations* of the Commonwealth for money *borrowed directly* by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be *issued by the Commonwealth* if the total of
>
>> (i) the amount of *principal of and interest on such bonds and notes*, together with the amount of principal of and interest on all such bonds and notes theretofore *issued by the Commonwealth* and then outstanding, *payable* in any fiscal year and
>>
>> (ii) any amounts *paid* by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes *guaranteed* by the Commonwealth,
>
> shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

P.R. Const. art. VI, § 2 (emphases added). The same provision sets forth a distinct test for guaranteed obligations:

> [T]he Commonwealth *shall not guarantee* any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

14

*Id.* (emphasis added).

Accordingly, the debt-limit calculation applicable to each issuance of bonds or notes representing ***direct obligations of the Commonwealth*** (for money borrowed directly by the Commonwealth) requires that, as of the date of that issuance, the sum of (a) the principal and interest on the new bonds or notes, together with scheduled principal and interest on other "such" bonds and notes already outstanding (*i.e.*, issued directly by the Commonwealth for money borrowed directly by it), payable in any fiscal year *plus* (b) amounts actually paid by the Commonwealth on account of guaranteed debt in the fiscal year immediately prior to such issuance date, not exceed 15% of average internal revenues over the two fiscal years immediately prior to such issuance date.

The calculation for each ***new guaranty by the Commonwealth*** requires, as of the date such guaranty is given, that the sum of (a) amounts payable on such direct obligations of the Commonwealth (for money directly borrowed by the Commonwealth) in any future fiscal year plus (b) amounts actually paid by the Commonwealth on account of Commonwealth-guaranteed debt in the prior fiscal year, not exceed the 15% of average revenues cap.

In both calculations, debt service on bonds guaranteed by the Commonwealth is taken into account only to the extent that the Commonwealth ***actually paid on those guaranties*** in the prior fiscal year. Debt service owed in the future by an issuer of Commonwealth-guaranteed debt—such as the PBA—is not taken into account under any scenario.

The Selective Claim Objection nonetheless maintains that, because the PBA Bonds are guaranteed by the Commonwealth and serviced in part with rental payments that the Commonwealth has agreed to pay or advance in the event of non-payment, the PBA Bonds are "just as much direct obligations of the Commonwealth as any GO bond issued by the

15

Commonwealth itself." Selective Claim Objection ¶ 2.[24] This contention—belied by the wording of the constitutional debt limit provisions—rests on the assertion that the PBA is a "transparent sham[] designed to circumvent" the Commonwealth's "constitutional debt limits." *Id.* ¶ 5. Rather than contending that the remedy for this sham should be to invalidate any Commonwealth obligation to the PBA or its bondholders, the Selective Claim Objection maintains that all debt service on the PBA Bonds—even if not payable for many years—must be included in each calculation of the constitutional debt limit, to the exclusive detriment of holders of GO Bonds issued in 2012 and 2014. *Id.* ¶ 86. The Selective Claim Objection contends that, once all PBA debt service is so taken into account, the debt limit calculation for each issuance of Selectively Challenged GO Bonds would exceed the 15% limit. *Id.* ¶ 63-64. Thus, according to the Selective Claim Objection, the bonds issued pursuant to the alleged sham should not only be immunized but indeed should receive a windfall at the expense of bonds not issued through the sham.

The Selective Claim Objection also contends that, even if debt service on PBA Bonds is not included in the debt limit calculation, the 2014 GO Bonds would have exceeded the constitutional debt limit because the debt limit should be recalculated to include capitalized interest payments on the GO Bonds. Selective Claim Objection ¶¶ 87-90. The Selective Claim Objection does not dispute that these capitalized interest payments were funded from the proceeds of the 2014 GO Bonds (see *id.* ¶ 87) and that, as a result, they would not burden the Commonwealth's future revenue-raising capacity. Rather, the Selective Claim Objection contends that the source of

---

[24] The Selective Claim Objection specifically contends that the Commonwealth's obligation to pay or advance rent due under the PBA Leases would be sufficient to convert the PBA Bonds into direct obligations of the Commonwealth, even if the Commonwealth had not guaranteed the PBA Bonds. See Selective Claim Objection ¶ 86.

payment can never influence whether a required payment is properly taken into account for purposes of the constitutional debt limit. *Id.* ¶ 88.[25]

Members of the GO Group are substantial holders of the Selectively Challenged GO Bonds, and therefore expect to participate in defending against the Selective Claim Objection's attack on the validity of the Selectively Challenged GO Bonds.

2. On December 21, 2018, the Oversight Board and the UCC filed an adversary proceeding against the PBA (the "PBA Adversary Proceeding"). See Adversary Complaint, Dkt. No. 1 in Adv. Proc. 18-149-LTS. In their complaint, the Board and the UCC seek to recharacterize the PBA Leases as disguised financing arrangements, pursuant to which the Commonwealth effectively borrowed from the PBA, rather than leased properties from it. See *id.* ¶¶ 1-3, 39-43. 47. According to the complaint's allegations, "the [PBA] Leases are not arm's length rental transactions designed to grant the Public Occupants temporary use of the PBA Facilities; rather, the sole purpose of the [PBA] Leases is to provide a vehicle for the Commonwealth to repay the PBA Bonds through the Lessees' purported 'rent' payments." *Id.* ¶ 1.

## JURISDICTION AND STATUTORY PREDICATE

This Court has jurisdiction over this Conditional Objection pursuant to Section 306(a) of PROMESA, 48 U.S.C. § 2166(a). Venue is proper in this district pursuant to Section 307(a) of PROMESA, 48 U.S.C. § 2167(a).

The statutory predicate for the relief requested herein is Section 502 of the Bankruptcy Code, 11 U.S.C. § 502, made applicable to these Title III cases by Section 301(a) of PROMESA,

---

[25] The UCC, but not the Oversight Board, also challenges the Selectively Challenged GO Bonds on the ground that they facilitated what the UCC characterizes as constitutionally forbidden "deficit financing." See Selective Claim Objection ¶¶ 91-98.

48 U.S.C. § 2161(a), and Bankruptcy Rule 3007, made applicable by Section 310 of PROMESA, 48 U.S.C. § 2170.

As an ad hoc committee composed of Commonwealth creditors, the GO Group has standing to pursue this Conditional Objection as a "party in interest" in the Commonwealth's Title III case.  See 11 U.S.C. § 502(a) ("A claim . . . is deemed allowed, unless a party in interest . . . objects."); *id.* § 1109(b) ("A party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter"); 48 U.S.C. § 2161(a) (incorporating these provisions).  Moreover, the GO Group unquestionably has standing to pursue this Conditional Objection because, for the reasons explained above, the arguments asserted herein are integral to the GO Group's defense of the Selective Claim Objection, which directly targets GO Bonds held by members of the GO Group.

## RELIEF REQUESTED

By this Conditional Objection, the GO Group conditionally requests entry of an order, substantially in the form attached hereto as Exhibit A, (i) disallowing claims asserted against the Commonwealth based on or relating to the PBA Leases or the PBA Bonds (including the Commonwealth's covenant to pay or advance rent due on the PBA Leases and the Commonwealth's guaranty of the PBA Bonds), or, failing that, (ii) disallowing claims asserted against the Commonwealth based on or relating to 16 additional series of GO Bonds and PBA Bonds issued beginning in fiscal year 2010 insofar as and to the extent that such issuances are determined to have violated the constitutional debt limit.

18

## ARGUMENT

I.     **If The Selective Claim Objection's Premises Are Accepted, The Commonwealth's Obligations With Respect To The PBA Bonds And The PBA Leases—Not Later-Issued GO Bonds—Would Be Invalidated**

A.     **If The PBA Is Determined To Be An Unconstitutional Evasion Of The Commonwealth's Debt Limit, Then Any Remedy For That Constitutional Violation Would Necessarily Fall On The PBA And Holders Of PBA Bonds**

The core premise of the Selective Claim Objection is that the PBA is a "transparent sham[] designed to circumvent" the Commonwealth's "constitutional debt limit." Selective Claim Objection ¶ 5; see also, *e.g.*, *id.* ¶ 66 (describing the PBA's "purpose" as "circumvention of [the] constitutional debt limit[]"); *id.* ¶ 68 (referring to "public building authorities as a debt limit evasion device"). Without prejudice to the GO Group disputing that premise and other contentions in its response to the Selective Claim Objection, for present purposes we address the consequence thereof for bonds and claims other than the Selectively Challenged GO Bonds.

According to the Selective Claim Objection, the proper remedy for the constitutional infirmity purportedly resulting from this alleged fraud would be to treat the PBA Bonds as valid direct obligations of the Commonwealth and count every year's scheduled debt service thereon in the calculation of the Commonwealth's constitutional debt limit. Selective Claim Objection ¶ 86. On that basis, the Selective Claim Objection seeks to invalidate the Selectively Challenged GO Bonds, which were actually issued directly by the Commonwealth. Thus, the Selective Claim Objection seeks to immunize the PBA Bonds that are the very instrument through which the massive fraud was purportedly perpetrated and the constitutional infirmity purportedly created; to penalize some GO Bonds that were, if anything, victims of the fraud; *and* thereby to bestow a huge windfall on the PBA Bonds and other creditors.

There is no basis for this perverse result. Rather, if the Selective Claim Objection is correct that a constitutional infirmity results from a fraud perpetrated through the PBA structure, and that

19

the remedy for such a constitutional violation would be retroactive invalidation of debts, the only claims against the Commonwealth that should be invalidated are those created through the fraudulent and constitutionally infirm structure—that is, claims against the Commonwealth asserted by or on behalf of (i) the holders of PBA Bonds (including any related guaranties) and (ii) the PBA itself (*e.g.*, the Commonwealth's obligation to pay or advance rent due under the PBA Leases).

That conclusion follows directly from case law featured prominently in the Selective Claim Objection itself.  Consider, for example, *Ayer v. Commissioner of Administration*, 165 N.E.2d 885 (Mass. 1960) (cited at Selective Claim Objection ¶¶ 69-75).  The court in that case concluded that the Massachusetts State Office Building Association was designed to evade constitutional restrictions on the incurrence of debt, reasoning that the "creation of the Association to execute the 'contract of lease' is merely one phase of an integrated plan of which the substantial result is constitutional evasion."  *Id.* at 892.  Thus, the court held that the statute creating the Association was "void upon its face," *id.*, and entered an injunction prohibiting government officials "from expending money, incurring obligations, or doing any act pursuant thereto," *id.* at 893.  Applied here, that logic would establish that the PBA itself is unconstitutional, and that all claims against the Commonwealth relating to the PBA or its bonds would be invalidated.

The same is true of *In re Constitutionality of Chapter 280, Oregon Laws 1975*, 554 P.2d 126 (Or. 1976) (cited at Selective Claim Objection ¶¶ 76-79).  There, the court held that the Oregon Building Authority Act was unconstitutional because, among other reasons, the Authority "lack[ed] . . . any real substance."  *Id.* at 131.  The court concluded that its "holding that for constitutional purposes we are going to look through the dummy corporation and that the bonds [issued by that corporation] are the debts of the state is sufficient to *invalidate the entire scheme*."

20

*Id.* at 132-33 (emphasis added).  Thus, the "purported leases" entered into with the state under the challenged law were "held invalid."  *Id.* at 137.  Applied here, the court's holding that "the entire scheme" must be invalidated upon a finding of a constitutional violation would result in invalidation of the Commonwealth's obligations relating to the PBA Leases and its guaranty of the PBA Bonds, not in treating those bonds as valid and bestowing a windfall on them to the detriment of later-issued GO Bonds, as the Selective Claim Objection proposes to do without citing *any* authority in support.[26]

The UCC *endorsed* the same position in its role as Commonwealth Agent in the Commonwealth-COFINA litigation:  "If the purpose of a statute is to create a financing structure of which the substantial result is constitutional evasion, it is unconstitutional and void."  Second Amended Complaint, Dkt. No. 221 in Adv. Proc. 17-257-LTS, at ¶ 145; see also *id.* ¶ 154 (alleging that COFINA's enabling legislation was "unconstitutional on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority"); *id.* ¶ 155 (same allegations with respect to purported transfer of SUT revenues to COFINA); see also *id.* ¶ M of Prayer for Relief section (seeking declaration that "the purported transfer is unconstitutional on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority").  The UCC reiterated this position throughout the course of the litigation.  See UCC's Motion for Summary Judgment, Dkt. No. 322 in Adv. Proc. No. 17-257-LTS, at 34.  The UCC thus argued that "the entirety of the Act 91 structure . . . effected a constitutional evasion," and that, as a consequence, "the entire structure is invalid."  UCC's Omnibus Reply Memorandum in Support of Motion for Summary Judgment, Dkt. No. 400 in Adv. Proc. 17-257-LTS, at 27 n.19; *id.* at 28 n.20 ("If this court finds that Act 91

---

[26] See also, *e.g.*, *Bennett v. Commissioners of Rockingham Cty.*, 92 S.E. 603, 605 (N.C. 1917) (holding that "when an essential portion" of bond issuance structure is found to be invalid on grounds of unconstitutionality, "the *entire scheme must fail*") (emphasis added).

enabled the Commonwealth to evade the constitutional debt provisions, then no aspect of the COFINA structure . . . has an independent, constitutional purpose.").  It explained that the "[t]he appropriate result following a finding that Act 91 is unconstitutional is to invalidate the entire structure . . . ."  *Id.* at 28; see also UCC's Reply Brief in Support of Motion to File Revised Second Amended Complaint, Dkt. No. 218 in Adv. Proc. 17-257-LTS, at 1 (arguing that the purported transfer of SUT revenues to COFINA was subject to challenge because it was "integral to this evasion of the Puerto Rico constitution").

Put simply, the UCC was right then and is wrong now.  If the Selective Claim Objection is otherwise correct, the only claims against the Commonwealth that should be invalidated are those owed to the PBA and the holders of the PBA Bonds.

> **B.**    **If The Commonwealth's Guaranty Of The PBA Bonds And The Commonwealth's Obligations Under The PBA Leases Would Require That The PBA Bonds Be Recharacterized As Direct Obligations Of The Commonwealth, Then Those Obligations Were *Ultra Vires***

If, as the Selective Claim Objection contends, the Commonwealth's guaranty of the PBA Bonds would require that the PBA Bonds be recharacterized as direct obligations of the Commonwealth, then the incurrence of the guaranty was *ultra vires* because no statute authorized the PBA or the Commonwealth to incur such direct obligations of the Commonwealth.  Moreover, because the Selective Claim Objection alleges that the Commonwealth's covenant to pay or advance rent due on the PBA Leases is itself sufficient to convert the PBA Bonds into direct obligations of the Commonwealth, the Commonwealth's rental obligations would likewise be *ultra vires* if the Selective Claim Objection's arguments were credited.

1. No statute authorized the Commonwealth to incur direct obligations to holders of PBA Bonds.  Rather, the PBA Enabling Act authorizes the Commonwealth only to guarantee bonds issued by the PBA:  "The Government of Puerto Rico hereby guarantees the payment of the

principal of and interest on outstanding bonds . . . issued from time to time by the Public Buildings

Authority for any of its purposes authorized by §§ 901 et seq. of this title." 22 L.P.R.A. § 907a.

Not only does the statute limit the Commonwealth to guaranteeing the PBA debt, it prescribes that

the Commonwealth's guaranty is expressly conditional—*i.e.*, the Commonwealth is responsible

as guarantor only "[i]f at any time the revenues or income and any other monies of the [PBA],

pledged for the payment of the principal of and interest on such bonds, are not sufficient for the

payment of such principal and interest at their maturity date." *Id.* Moreover, the PBA Enabling

Act is absolutely clear that the PBA and the Commonwealth lack authority to incur direct

obligations on behalf of the Commonwealth: "[T]he Authority shall have no power whatsoever at

any time or in any manner to pledge the credit . . . of the Commonwealth of Puerto Rico . . . ;

neither shall the Commonwealth of Puerto Rico . . . be liable for the payment of the principal of

or interest on any bonds issued by the Authority." 22 L.P.R.A. § 906(a)(16).

Under the Puerto Rico Constitution, "[t]he power of the Commonwealth of Puerto Rico to

contract and to authorize the contracting of debts shall be exercised as determined by the

Legislative Assembly" (subject to the restrictions imposed by the constitutional debt limit). P.R.

Const. art. VI, § 2. Without legislative authorization, any direct obligation would be *ultra vires*.

And under the Selective Claim Objection's position that any obligation issued in excess of the

Commonwealth's legal authority is "null and void" for all purposes (Selective Claim Objection

¶ 99), a conclusion that the Commonwealth's guaranty of the PBA Bonds converts them into

forbidden direct obligations would necessarily require that the guaranty be invalidated.[27]

---

[27] On March 12, 2019, the UCC filed an omnibus objection to claims asserted by holders of
bonds issued by the Commonwealth's Employees Retirement System ("ERS"). See Dkt. No.
5580. The UCC's objection contends that the bonds issued by ERS were *ultra vires* because ERS
lacked statutory authorization to issue bonds to the public through underwriters. See *id.* ¶ 2. The
UCC therefore contends that, "[b]ecause the ERS Bonds were issued *ultra vires*, they are null and

2.  The same conclusion extends to the Commonwealth's covenant to pay or advance rent due under the PBA Leases between the PBA and any "department, agency, instrumentality, authority or public corporation of the Commonwealth."  22 L.P.R.A. § 916.  According to the Oversight Board and the UCC, the Commonwealth's obligation to pay or advance rent would be sufficient on its own to make the PBA Bonds direct obligations of the Commonwealth.  See Selective Claim Objection ¶ 86 ("Even if the Commonwealth had not explicitly guaranteed the bonds, it did so implicitly by guaranteeing the rents . . . .").

If so, the Commonwealth's obligation to pay or advance rent would likewise be invalid, because it would otherwise illegally convert the PBA Bonds into direct Commonwealth obligations.  In that event, neither the PBA nor holders of the PBA Bonds would have an allowable claim against the Commonwealth relating to the Commonwealth's obligation to pay or advance rent under the PBA Leases.

### C.    If The PBA Leases Are Recharacterized As Disguised Financings, Then The PBA Leases And The Commonwealth's Guaranty Of The PBA Bonds Were *Ultra Vires*

In their complaint in the PBA Adversary Proceeding, the Oversight Board and the UCC allege that the PBA Leases "are not 'true leases,' but, rather, disguised financing transactions." Adversary Complaint, Dkt. No. 1 in Adv. Proc. 18-149-LTS, at ¶ 2.  In other words, the Board and the UCC argue that the PBA Leases are not leases at all, but rather debts the Commonwealth issued directly to the PBA.

---

void, and the bondholders have no remedy against ERS."  *Id.* ¶ 3.  The same logic would require invalidation of the Commonwealth's guaranty obligations with respect to the PBA Bonds insofar as the PBA Bonds are recharacterized as direct obligations of the Commonwealth—that is, a form of obligation that the Commonwealth lacked statutory authorization to incur.

If so, it would necessarily follow that those Commonwealth debts (disguised as obligations to pay or advance rent) and the Commonwealth's guaranty of the PBA Bonds would be *ultra vires* and thus invalid on the Selective Claim Objection's logic.

1. No Commonwealth statute authorizes the Commonwealth to take on a debt to the PBA. Rather, the PBA Enabling Act authorizes the Commonwealth to enter into "leases" with the PBA and to pay or advance "rent" owed by certain leases under "lease contracts" with the PBA. See 22 L.P.R.A. §§ 906(a)(6), (8), 916. There is no legislative authorization for the Commonwealth to enter into any other obligation to the PBA. If the Oversight Board and the UCC are correct that no such lease exists, any debt purportedly issued by Commonwealth to the PBA was unauthorized.

Moreover, as noted above (see p. 3, *supra*), the PBA Enabling Act prohibits the PBA and the Commonwealth from issuing direct debt of the Commonwealth. Thus, if the PBA Leases are recharacterized as disguised financings, the Commonwealth's ostensible obligations to pay or advance "rent" thereunder would be *ultra vires* and thus invalid under the Selective Claim Objection's logic.

More particularly, the PBA Enabling Act provides that the Commonwealth covenants to pay or advance "rent" that is due under any "lease contract" between the PBA and "any department, agency, instrumentality, authority or public corporation of the Commonwealth." 22 L.P.R.A. § 916. The Commonwealth is not authorized to agree to repay a debt or to take on any financial obligation other than paying or advancing rent due under a lease with the PBA. Thus, if the PBA Leases are recharacterized as disguised financings, those financing transactions would be *ultra vires* and thus invalid. In that scenario, any claims asserted by either the PBA or any holder of PBA Bonds in connection with rent due under the PBA Leases would not be allowable.

25

2.   The same holds true of the Commonwealth's conditional guaranty of the PBA Bonds. The PBA Enabling Act does not contain open-ended authorization for the Commonwealth to guarantee bonds issued by the PBA.   To the contrary, it authorizes the Commonwealth to conditionally guarantee bonds "issued from time to time by the Public Buildings Authority *for any of its purposes authorized by [the PBA Enabling Act]*."   22 L.P.R.A. § 907a (emphasis added). Nothing in the PBA Enabling Act authorized the PBA to issue bonds to raise funding to facilitate financing transactions with Commonwealth, rather than for the PBA's acquisition and improvement of properties to be *leased* to government agencies.

Accordingly, in the absence of true leases, there is no legislative basis for the Commonwealth to guarantee the PBA Bonds, which would have been issued to facilitate financing transactions with the Commonwealth, rather than to finance properties to be leased.   The Commonwealth's guaranty of the PBA Bonds would therefore be *ultra vires* and hence invalid.

## II.   Consistent Application Of The Selective Claim Objection's Logic Would Result In Invalidation Of GO Bond And PBA Bond Issuances Beginning As Early As Fiscal Year 2010

As the foregoing discussion demonstrates, the correct remedy for the recharacterization sought by the Selective Claim Objection (assuming arguendo that any retroactive remedy would be appropriate at all) is to invalidate and disallow all claims against the Commonwealth asserted by or on behalf of the PBA and its bondholders.   If the Court were to reject this categorical invalidation of all such claims arising from the PBA structure and instead adopted the Selective Claim Objection's contention that the PBA Bonds should be counted in the debt limit calculations as if they were GO Bonds, that calculation methodology would have to be applied consistently to all GO Bonds and PBA Bonds.   The Selective Claim Objection, however, inexplicably fails to challenge other issuances of GO Bonds and PBA Bonds that, on the Selective Claim Objection's own logic, are indistinguishable from the Selectively Challenged GO Bonds.   As we explain below,

26

applying the Selective Claim Objection's own logic would require that GO Bonds and PBA Bonds issued as early as fiscal year 2010 be invalidated (again, assuming arguendo that the Selective Claim Objection is correct that such retroactive invalidation is an appropriate remedy).

A.  In seeking to establish that the Commonwealth's constitutional debt limit was first exceeded with the 2012 B GO Bonds issued on March 29, 2012, the Selective Claim Objection replicates the constitutional debt limit calculation using internal revenue figures and debt service schedules from the Official Statements for the 2012 B GO Bonds and previously issued PBA Bonds as if they were direct obligations of the Commonwealth.  See Selective Claim Objection ¶ 64.  It asserts that, when re-tested in this manner, the debt limitation for the 2012 B GO Bonds and the remaining issuances of Selectively Challenged GO Bonds would exceed the 15% limit. *Id.*[28]

The Selective Claim Objection fails to apply its calculation methodology to other issuances of bonds that would exceed the 15% debt limit under those calculations.  But if that methodology is correct with respect to the Selectively Challenged GO Bonds, it must also be correct for all other bonds to which the debt limit applies.  Under the Selective Claim Objection's logic, moreover, the same calculation would have to be applied to each issuance of PBA Bonds.  If debt service on PBA Bonds must be counted towards the debt limit when GO Bonds are issued, because the PBA Bonds are recharacterized as direct obligations of the Commonwealth for money borrowed directly by

---

[28]  Aside from including debt service on PBA Bonds, the Selective Claim Objection's calculations of the constitutional debt limit in connection with the Selectively Challenged GO Bonds are incomplete or erroneous in multiple other respects.  To state the obvious, our recounting of the Selective Claim Objection's debt limit calculations should not be understood as an endorsement of them in any respect.  The errors not addressed herein may result in (i) additional reasons why the bonds conditionally objected to herein should be invalidated and (ii) additional reasons why bonds not objected to herein should also be invalidated.  The GO Group reserves the right to raise such errors in response to the Selective Claim Objection, in further filings in connection with this Conditional Objection, and in additional objections to claims.

the Commonwealth (see Selective Claim Objection ¶ 86), then issuances of PBA Bonds must likewise be subjected to the debt limit as though they were direct obligations.

Extending the Selective Claim Objection's methodology to additional bond issuances leads to the conclusion that the Commonwealth first exceeded the 15% debt limit with the 2011 C GO Bonds issued on March 17, 2011, rather than with the 2012 B GO Bonds, as the Selective Claim Objection alleges.  According to financial reports publicly released by the Commonwealth, the average internal revenues for the prior two fiscal years was approximately $7.333 billion at the time the 2011 C GO Bonds were issued in fiscal year 2011.[29]  After giving effect to that issuance, the maximum combined debt service for GO Bonds and PBA Bonds in any fiscal year, as reflected in the Official Statement for the 2011 C GO Bonds and the Official Statement for the immediately preceding issuance of PBA Bonds, was approximately $1.109 billion due in 2012.[30]  Thus, the constitutional debt limit calculation, according the Selective Claim Objection's methodology, was approximately 15.1% ($1.109 billion divided by $7.333 billion).   On the Selective Claim Objection's logic, this would require invalidation of the 2011 C GO Bonds.

---

[29] Hacienda, General Fund Net Revenues Report dated August 13, 2018 (average of $7.302 billion for fiscal year 2009 and $7.363 billion for fiscal year 2010) (Exhibit 15).  The Official Statements for each issuance of GO Bonds report the internal revenues figures used to calculate the debt limit at the time of the issuance.  See, *e.g.*, 2011 C GO Official Statement at 22 (Exhibit 6).  Those figures, however, are preliminary and subject to adjustment.  For that reason, we use the updated figures set forth in the Commonwealth's General Fund Net Revenues reporting.

[30] See 2011 C GO Official Statement at 22 & 26 (debt service on GO Bonds of $847.4 million in 2012, and $10.5 million paid on account of Commonwealth guaranteed bonds in prior fiscal year) (Exhibit 6); Series Q PBA Official Statement at 25 (debt service on PBA Bonds of $251.2 million in 2012) (Exhibit 10).

When the same calculations are performed consistently for subsequently issued GO Bonds and PBA Bonds, the following bonds—having a total face amount outstanding in excess of $2.2 billion—were issued in excess of the 15% debt limit.[31]

| Bond Series | Date of Issuance | Debt Limit Calculation |
|---|---|---|
| 2011 C GO Bonds | March 17, 2011 | 15.13% |
| Series R PBA Bonds | August 24 ,2011 | 15.26% |
| Series S PBA Bonds | August 24, 2011 | 15.26% |
| Series T PBA Bonds | December 22, 2011 | 15.34% |
| Series U PBA Bonds | June 21, 2012 | 16.38% |

Thus, accepting the Selective Claim Objection's challenges to the Selectively Challenged GO Bonds would necessarily lead to the invalidation of these further issuances of GO Bonds and PBA Bonds.

B.  Even that conclusion is incomplete, however, because the Selective Claim Objection fails to account for certain additional debt service obligations that, while excluded from the debt service schedules underlying the Selective Claim Objection's calculations, would necessarily be required to be included if the Selective Claim Objection's positions on the operation of the debt limit were to be accepted.   In particular, the debt service schedules reported in the Official

---

[31] If re-tested using the internal revenue figures reported in the applicable Official Statement, the 2011 GO Bonds, 2011 D GO Bonds, and 2011 E GO Bonds issued on July 12, 2011 would also exceed the 15% debt limit if debt service on PBA Bonds is included.  But the internal revenue figures reported in that Official Statement were for fiscal years 2009 and 2010—the appropriate years to consult for bonds issued in fiscal year 2011, when the Official Statement was published— whereas the bonds were in fact issued in fiscal year *2012*.  See 2011 DE GO Official Statement 23 (Exhibit 7).  If the bonds are re-tested using the average internal revenue figure appropriate for fiscal year 2012 (*i.e.*, the average of the internal revenue figures for fiscal years 2010 and 2011), the inclusion of debt service on the PBA Bonds would not cause them to have exceeded the 15% limit.

Statements treat variable interest rate GO Bonds in a way that is inconsistent with the Selective
Claim Objection's account of the constitutional debt limit.

Pursuant to Commonwealth statute, when the Commonwealth performs the constitutional
debt limit calculation, it generally calculates future interest payments due on any variable-rate GO
Bonds by using the lesser of (i) the maximum interest rate allowed by law, and (ii) the maximum
interest rate provided for by the particular bonds at issue. See 13 L.P.R.A. § 82b(c); see also 13
L.P.R.A. § 56 (establishing maximum legal rate of 12%). In some instances, however, the
Commonwealth has asserted that it entered into interest rate swap agreements with certain financial
institutions in order to hedge its exposure to interest rate fluctuations.[32] If such swap agreements
were in place, the Commonwealth was authorized by statute to calculate the constitutional debt
limit not at the maximum permissible rate but rather at the effective fixed rate it was required to
pay on the interest rate swap agreement—that is, the fixed rate that would synthetically result from
combining (i) the interest the Commonwealth is required to pay to bondholders under the terms of
the bonds and (ii) the payments the swap counterparties are required to make to the
Commonwealth, or *vice versa*, under the terms of their swap contracts. See 13 L.P.R.A. § 82b(a).
Consistent with that statutory authorization, the debt service schedules used in the Selective Claim
Objection's calculation methodology rely on the fixed rate attributable to the swap agreements,
rather than the variable rate on the underlying GO Bonds.[33]

---

[32] See, *e.g.*, 2009 C GO Official Statement at 14-15 (describing various interest rate swap
agreements outstanding as of December 2009) (Exhibit 4); 13 L.P.R.A. § 82(a) (authorizing the
Secretary of the Treasury to execute interest rate swap agreements). In this manner, the
Commonwealth was effectively able to pay a fixed rate of interest while still paying bondholders
a variable rate of interest. See Kobre & Kim LLP, *Final Investigative Report* 417 (Aug. 20, 2018)
(summarizing operation of swap agreements), https://drive.google.com/open?id=19-
lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

[33] See Official Statement, dated March 7, 2012, for Public Improvement Refunding Bonds,
Series 2012 B (the "2012 B GO Official Statement") at 17 n.* (noting that schedule "[i]ncludes

On the logic of the of the Selective Claim Objection, however, the statute authorizing the Commonwealth to use the effective fixed rate of interest generated by its swap agreement is unconstitutional and cannot be given effect in the debt limit calculation. The Selective Claim Objection insists that capitalized interest payments must be included in the constitutional debt limit calculation for the 2014 GO Bonds, despite the economic reality that such payments were funded in advance from the proceeds of the 2014 GO Bonds issuance and thus did not constitute a burden on the Commonwealth's future revenue-raising capacity. See pp. 16-17, *supra*. According to the Selective Claim Objection (at ¶ 88), the "Debt Service Limit calculation does not depend on the source of payment for the debt service." Thus, because the Commonwealth's swap contracts did not alter the debt service the Commonwealth was scheduled to pay to bondholders on its variable-rate GO Bonds, the Selective Claim Objection's logic dictates that interest due on the underlying bonds be included in the debt limit calculation. Moreover, the Selective Claim Objection is premised on the notion that bondholders could *not* rely on the unquestioned understanding— reflected in longstanding Commonwealth statutes—that PBA Bonds are guaranteed obligations, not direct obligations of the Commonwealth. If the statutes governing the PBA and its bonds can be set aside so easily, there is no principled reason for failing to apply the same logic to the statutory treatment of the Commonwealth's swap agreements.

If the Commonwealth's debt limit calculations are recalculated to include both debt service due on PBA Bonds and the maximum interest rate payable on all variable-rate GO Bonds, as dictated by the Selective Claim Objection's logic, the Commonwealth breached the 15% limit at least as early as the Series P PBA Bonds issued on July 1, 2009. At that time, the Commonwealth's

---

the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements") (Exhibit 16).

average internal revenues for the two prior fiscal years was approximately $7.650 billion.[34] After giving effect to the issuance of the Series P PBA Bonds, the maximum combined debt service due for GO Bonds and PBA Bonds was at least $1.17 billion in fiscal year 2016.[35] Thus, the constitutional debt limit calculation was approximately 15.30%, requiring invalidation of the Series P PBA bonds on the Selective Claim Objection's logic.

When the same calculations are performed consistently for subsequently issued GO Bonds and PBA Bonds, the following bonds—having a total face amount outstanding of approximately $4.4 billion—were issued in excess of the 15% debt limit.[36]

---

[34] Hacienda, General Fund Net Revenues Report dated September 18, 2013 (average of $7.997 billion for fiscal year 2008 and $7.303 billion for fiscal year 2009) (Exhibit 17). In the Official Statement for the Series P PBA Bonds, the reported debt limit calculations were made as though the bonds were being issued when the Official Statement was published, but the bonds were not issued until the ensuing fiscal year. See Series P PBA Official State at 12-13 (reporting average internal revenue figures for fiscal year 2007 and fiscal year 2008) (Exhibit 8). The calculation shown above corrects for this error by using revenue figures for the appropriate fiscal years.

[35] See Series P PBA Official Statement at 12-13, 19 ($948 million for GO Bonds and $222.3 million for PBA Bonds in fiscal year 2016) (Exhibit 8). This figure for debt service on GO Bonds reflects incremental debt service associated with GO Bonds that were refunded with bond proceeds that were then invested in assets that were not eligible for a legal defeasance of the refunded bonds under Puerto Rico law. See id. at 12-13. Accordingly, those bonds remained outstanding, id., and (according to the Selective Claim Objection's logic) should continue to be counted toward the debt limit.

[36] As with the Series P PBA Bonds, the Official Statements for the Series K PBA Bonds remarketed on July 1, 2009, and the 2011 GO Bonds, 2011 D GO Bonds, and 2011 E GO Bonds issued on July 12, 2011, included debt limit calculations as if the bonds were being issued when the Official Statements were published, but the bonds were not issued until the ensuing fiscal year. The debt limit calculations in the chart above correct for this error. In the case of the 2011 GO Bonds, 2011 D GO Bonds, and 2011 E GO Bonds, this requires not only adjusting the Commonwealth's average internal revenue figures to account for the appropriate fiscal year, but also including the $16.5 million that the Commonwealth paid on account of its guaranties of bonds in fiscal year 2011, rather than the $10.5 million paid by the Commonwealth on such guaranties in fiscal year 2010. See PBA Series R Official Statement at 24 (Exhibit 11); 2011 DE GO Official Statement at 23 (Exhibit 7).

| Bond Series | Date of Issuance | Debt Limit Calculation |
|---|---|---|
| Series P PBA Bonds | July 1, 2009 | 15.30% |
| Series K PBA Bonds | July 1, 2009 (remarketed) | 15.30% |
| 2009 A GO Bonds | September 17, 2009 | 15.31% |
| 2007 A-4 GO Bonds | September 17, 2009 (remarketed) | 15.31% |
| Series Q PBA Bonds | October 28, 2009 | 15.43% |
| 2009 B GO Bonds | November 17, 2009 | 15.72% |
| 2009 C GO Bonds | December 16, 2009 | 15.89% |
| 2011 A GO Bonds | February 17, 2011 | 16.01% |
| 2011 C GO Bonds | March 17, 2011 | 16.36% |
| 2011 GO Bonds | July 12, 2011 | 16.18% |
| 2011 D GO Bonds | July 12, 2011 | 16.18% |
| 2011 E GO Bonds | July 12, 2011 | 16.18% |
| Series R PBA Bonds | August 24, 2011 | 16.54% |
| Series S PBA Bonds | August 24, 2011 | 16.54% |
| Series T PBA Bonds | December 22, 2011 | 16.55% |
| Series U PBA Bonds | June 21, 2012 | 16.85% |

\*   \*   \*

For all of these reasons, the Selective Claim Objection's logic cannot possibly be cabined to the Selectively Challenged GO Bonds that the Oversight Board and the UCC have selectively chosen to challenge.  To the contrary, accepting the Selective Claim Objection's premises would require the invalidation of all GO Bonds and PBA Bonds beginning with the Series P PBA Bonds issued on July 1, 2009.  The GO Group therefore conditionally objects to all claims asserted against the Commonwealth based on or relating to such bonds.

**NOTICE**

Notice of this Conditional Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Oversight Board, (iv) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (v) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico; (vi) insurers of bonds issued or guaranteed by the Commonwealth; (vii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Commonwealth; (viii) Cede & Co., as depository for GO Bonds and PBA Bonds; (ix) DTC; (x) the PBA; (xi) U.S. Bank Trust National Association and U.S. Bank National Association, as fiscal agents for the PBA Bonds, and (xii) all parties that have filed a notice of appearance in the above-captioned Title III cases.

**CONCLUSION**

For the foregoing reasons, the GO Group conditionally requests entry of an order, substantially in the form attached hereto as Exhibit A, (i) disallowing claims asserted against the Commonwealth based on or relating to the PBA Leases or the PBA Bonds (including the Commonwealth's covenant to pay or advance rent due on the PBA Leases and the Commonwealth's guaranty of the PBA Bonds), or, failing that, (ii) disallowing claims asserted against the Commonwealth based on or relating to 16 additional series of GO Bonds and PBA Bonds issued beginning in fiscal year 2010 insofar as and to the extent that such issuances are determined to have violated the constitutional debt limit.

Dated: April 2, 2019

Respectfully submitted,

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Lawrence S. Robbins
Lawrence S. Robbins
Mark T. Stancil
Gary A. Orseck
Kathryn S. Zecca
Donald Burke
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Email: lrobbins@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*