*Hearing Date: April 24, 2019 at 9:30 a.m. (Atlantic Time)*
*Objection Deadline: April 9, 2019 at 4:00 p.m. (Atlantic Time)*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------- X
    :
In re:    :
    :
THE FINANCIAL OVERSIGHT AND    :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,    :  Title III
    :
    as representative of    :  Case No. 17-BK-3283 (LTS)
    :
THE COMMONWEALTH OF PUERTO RICO *et al.,*    :  (Jointly Administered)
    :
    Debtors.[1]    :
----------------------------------------------------------------- X

# MOTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO FOR ENTRY OF AN ORDER EQUITABLY TOLLING THE TIME PRESCRIBED BY 11 U.S.C. § 546 TO BRING CERTAIN AVOIDANCE ACTIONS

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................... 1

JURISDICTION AND VENUE ...................................................................... 4

STATUTORY PREDICATE.............................................................................. 4

FACTUAL BACKGROUND ........................................................................... 4

    I.      General Background ....................................................................... 4

    II.     Case Background ............................................................................ 5

    III.    Oversight Board's Diligent Exercise of its Duties............................ 9

        A.      Oversight Board's Objection to General Obligation Bond Claims
             and Avoidance Actions Related to General Obligation Bond
             Claims ................................................................................... 9

        B.      UCC and GO Bondholders Raise Additional Bond Challenges..........12

        C.      Extraordinary Circumstances Surrounding Identification of Avoidance
          Action Defendants ............................................................... 19

        D.      Extraordinary Circumstances Militating Against Cost Incurrence ....... 19

        E.      Oversight Board Diligence Concerning All Other Avoidance
          Actions.................................................................................20

RELIEF REQUESTED................................................................................... 22

ARGUMENT ................................................................................................. 22

    Extraordinary Circumstances Warrant Equitable Tolling................................ 22

    I.      The Oversight Board has Diligently Pursued its Rights Concerning
        Avoidance Actions............................................................................. 23

    II.     Extraordinary Circumstances Impede the Filing of Avoidance Actions .......... 27

    III.    Even if the Oversight Board Is Able to Obtain All Necessary Information to
        Timely File Avoidance Actions, Such Efforts Would Be Premature and
        Unnecessary. ..................................................................................... 31

i

NOTICE ........................................................................................................................ 33

CONCLUSION ........................................................................................................... 33

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aurelius Inv., LLC v. Puerto Rico*,
    915 F.3d 838 (1st Cir. 2019) ............................................................................... 4

*In re IFS Fin. Corp.*,
    02-39553, 2010 WL 4614293 (Bankr. S.D. Tex. Nov. 2, 2010) .......................... 24

*In re Infinity Bus. Group, Inc.*,
    10-06335-JW, 2011 WL 9375422 (Bankr. D.S.C. June 22, 2011) ....................... 32

*In re Int'l Admin. Services, Inc.*,
    408 F.3d 689 (11th Cir. 2005) ..................................................................... *passim*

*Jardin De Las Catalinas Ltd. P'ship v. Joyner*,
    766 F.3d 127 (1st Cir. 2014) ............................................................................. 27

*In re Malavet*,
    552 B.R. 24 (Bankr. D.P.R. 2016) ..................................................................... 23

*In re Margaux Texas Ventures, Inc.*,
    545 B.R. 506 (Bankr. N.D. Tex. 2014) ............................................................... 23

*In re Martin Levy Of Berlin D.M.D., P.C.*,
    416 B.R. 1 (Bankr. D. Mass. 2009) .................................................................... 23

*In re McKenzie*,
    08-16378, 2011 WL 6140516 (Bankr. E.D. Tenn. Dec. 9, 2011), *aff'd,* 1:11-
    CV-192, 2012 WL 4742708 (E.D. Tenn. Oct. 2, 2012), *aff'd*, 737 F.3d 1034
    (6th Cir. 2013) .................................................................................................. 31

*In re Myler*,
    477 B.R. 227 (Bankr. D. Utah 2012) (noting that requesting a 2004
    examination of the debtor indicates diligence) ................................................... 24

*Negron-Santiago v. San Cristobal Hosp.*,
    764 F. Supp. 2d 366 (D.P.R. 2011) ................................................................... 23

*Neverson v. Farquharson*,
   366 F.3d 32 (1st Cir. 2004) ......................................................................................27

*Neves v. Holder*,
   613 F.3d 30 (1st Cir. 2010) ......................................................................................23

*Pace v. DiGuglielmo*,
   544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ..........................................23

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
   136 S.Ct. 1938 (2016) (Sotomayor, J., dissenting) ....................................................5

*In re Solomon Dwek, et al.*,
   *Case No. 07-11757 (KCF) (Bankr. D.N.J. 2009)* ......................................24, 26, 28

**Statutes**

31 L.P.R.A. §§ 3491-3500 ...........................................................................................21

11 U.S.C. §§ 105(a) and 546 ..........................................................................................4

11 U.S.C. § 546 ................................................................................................... *passim*

48 U.S.C. §§ 2101-2241 .................................................................................................4

Bankruptcy Code Sections 105(a) and 926(a) ..............................................................20

Sections 544, 545, 547, and 548 of the Bankruptcy Code .............................................8

Sections 544, 547, 548, 550 of the Bankruptcy Code ....................................................1

Section 306(a) of the Puerto Rico Oversight, Management, and Economic
   Stability Act ..............................................................................................................4

**Other Authorities**

Bankruptcy Rule 2004 ...................................................................................... *passim*

Bankruptcy Rule 3007 ........................................................................................9, 10, 11

Federal Rule of Bankruptcy Procedure 2019 ...............................................................33

iii

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), respectfully submits this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), equitably tolling the time prescribed by 11 U.S.C. § 546 for the Oversight Board to bring avoidance and recovery actions related to the payments made on account of certain bonds issued by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System for the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority (the "PBA"). In support of this Motion, the Oversight Board respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.       Absent relief from this Court, the Oversight Board may be required to exercise rights to litigate all avoidance claims under sections 544, 547, 548, 550 of the Bankruptcy Code held by the Commonwealth and ERS not later than May 2, 2019 and May 20, 2019, respectively. The Oversight Board has been working diligently, on its own, and with the Oversight Board, AAFAF, and the UCC to identify and pursue valuable claims before they arguably expire. The Oversight Board and the UCC have likewise collaborated on, among other things, the Joint Claim Objection relating to certain GO Bonds, and have jointly contemplated the filing of Avoidance Actions to recover payments made on account of the Challenged Bonds. The Oversight Board has discussed this Motion with the UCC.

2.       The Commonwealth and its instrumentalities made billions of dollars in payments of principal and interest to purported holders of Challenged Bonds during the four-year lookback period prior to the commencement of these Title III Cases. To pursue avoidance and recovery of

---

[2]   Capitalized terms employed in this Preliminary Statement have the meanings ascribed to them below.

these payments, the Oversight Board must identify the holders of Challenged Bonds who received payments of purported principal and interest, which payments may be avoidable under PROMESA and the Bankruptcy Code, depending on the outcome of the Joint Claim Objection, the ERS Bond Objection, and the Ad Hoc Objection, respectively.

3.      Because Puerto Rico did not designate an indenture trustee to administer the Challenged Bonds, the Oversight Board must independently identify each beneficial holder of the Challenged Bonds, at the time of *each* payment date for *each* CUSIP for *each* of the Challenged Bonds.  At this time, the Oversight Board, together with the UCC, has been unable to complete this massive undertaking.

4.      The Oversight Board has acted promptly to appoint a special committee and retain professionals to discharge its duty under PROMESA to, among other things, investigate and pursue potential viable claims and causes of action.  Claims Counsel to the Oversight Board promptly requested, and has been and is reviewing, among other things:

i.      The 600-page Final Report outlining, but not recommending or describing in detail, certain litigation claims, not including avoidance claims under the Bankruptcy Code;

ii.     Approximately 80,000 documents provided so far that support the facts and legal analysis contained in the Final Report, representing only 40% of the 200,000 documents believed to exist;

iii.    Records of tens of thousands of transfers by the Title III debtors to third parties during the four-year avoidance period prior to the Petition Dates;

iv.     Securities Position Reports similar to, but not adequately substituting for, the approximately five hundred and ninety-six (596) reports

2

requested by the Oversight Board to provide insight into bond payments to financial institutions on behalf of beneficial holders[3]; and

v.   Hundreds of notices of participation filed in connection with the Joint Claim Objection evidencing current holders of the Challenged GO Bonds and the complications in providing due process to bondholders in these unusual circumstances.

5.      At the time of this filing, requested documents continue to trickle in. Nonetheless, the Oversight Board continues to review and assess potential claims and causes of action and is assembling appropriate pleadings to preserve valuable claims.  As a result of these efforts, the Oversight Board is prepared to file hundreds of complaints to preserve potential Avoidance Actions and to seek consensual tolling of, or otherwise pursue, potential third party claims relating to Puerto Rico's financial crisis.  However, it simply has been unable to confirm the identity of all appropriate Challenged Bond Avoidance Defendants, given an apparent lack of any central record-keeping to track exactly which bondholders received payments on which dates, and in what amounts.

6.      It is not equitable to deprive the bankruptcy estates, and thus the Commonwealth and its legitimate creditors, of material value simply because a statute of limitations expires before the Oversight Board's best efforts reveal appropriate defendants for its litigation claims. Moreover, it is not equitable to force the Oversight Board and Challenged Bond Avoidance Defendants to incur significant costs to litigate these claims—which will almost certainly include negotiation and litigation of procedures to guarantee due process, which procedures must themselves interlock with procedures in the related Joint Claim Objection litigation and related procedural orders expected to be obtained—before diligence is concluded and litigation

---

3    The 596 reports do not include requests that have been made, or may be made, with respect to the ERS Bonds, the PBA Bonds and earlier issuances of the GO Bonds that are not, at this time, subject to the pending Joint Claim Objection.

establishes, or not, the legal basis for the avoidance and recovery of payments made on account of the Challenged Bonds. The Oversight Board thus respectfully requests that the Court equitably toll the statute of limitations as applied to the Commonwealth *solely* with respect to the Challenged Bonds Avoidance Actions so that such litigation, if necessary, may be brought later on, when both the underlying claims and the identity of the appropriate defendants may be concretely established.

## JURISDICTION AND VENUE

7.     The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction over this matter pursuant to section 306(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[4]

8.     Venue is proper pursuant to PROMESA § 307(a).

## STATUTORY PREDICATE

9.     The Oversight Board brings this Motion pursuant to 11 U.S.C. §§ 105(a) and 546, each as incorporated into PROMESA § 301(a).

## FACTUAL BACKGROUND

### I.  General Background

10.     "Serious economic downfall…has ailed the Commonwealth of Puerto Rico since the turn of the 21st Century." *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 843 (1st Cir. 2019).

11.     In June of 2015, the Governor of Puerto Rico declared that the Commonwealth was "unable to meet its $72 billion public debt obligation," underscoring the severity of the island's financial crisis. *Id.* (citing  Michael Corkery & Mary Williams Walsh, Puerto Rico's

---

4     PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

Governor Says Island's Debts Are "Not Payable", N.Y. Times (June 28, 2015),
https://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islands-
debts-are-not-payable.html).

12. Although the Commonwealth attempted to exercise independent authority to
restructure and renegotiate its debts, the United States Supreme Court held that it lacked
authority to do so, thus effectively requiring Congress to intervene to prevent a humanitarian
crisis. *See Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S.Ct. 1938, 1950 (2016)
(Sotomayor, J., dissenting) (describing that "vital public services will be imperiled, including the
utilities' ability to provide safe drinking water, maintain roads, and operate public transportation"
as a result of Puerto Rico's fiscal crisis).

13. In June 2016, Congress enacted PROMESA to, among other things, permit the
Commonwealth to restructure its debts in a manner analogous to Chapter 9 of the Bankruptcy
Code. *See* PROMESA § 301 (incorporating provisions of the Bankruptcy Code). PROMESA
empowers the Oversight Board to act as the representative of Puerto Rico and its agencies and
instrumentalities as debtor entities, assuming the role ordinarily granted to a chapter 9 debtor or
trustee. *See* PROMESA §§ 301, 315.

14. Under PROMESA, the Oversight Board's central purpose is "to provide a method
for a covered territory to achieve fiscal responsibility and access to the capital markets."
PROMESA § 101(a).

## II.   <u>Case Background</u>

15. On May 3, 2017 (the "<u>Commonwealth Petition Date</u>"), the Oversight Board
initiated a Title III debt adjustment proceeding on behalf of the Commonwealth (the
"<u>Commonwealth Title III Case</u>"). On May 21, 2017 (the "<u>ERS Petition Date</u>," and together with

5

the Commonwealth Petition Date, the "Petition Dates"), the Oversight Board initiated a Title III

debt adjustment proceeding on behalf of ERS (the "ERS Title III Case").  Concurrently therewith

or shortly thereafter, the Oversight Board filed several other Title III cases on behalf of certain

other Commonwealth government instrumentalities (together with the Commonwealth Title III

Case and the ERS Title III Case, the "Title III Cases").

16.     Since the Petition Dates, the Oversight Board has worked tirelessly to accomplish

its purpose under PROMESA.  To this end, the Oversight Board effected the out-of-court

restructuring of the Government Development Bank of Puerto Rico ("GDB"), which settled at

least $2.45 billion in claims against the GDB.  *See Findings Of Fact, Conclusions Of Law, And*

*Order Approving Qualifying Modification For The Government Development Bank For Puerto*

*Rico Pursuant To Section 601(m)(1)(D) Of The Puerto Rico Oversight, Management, And*

*Economic Stability Act*, Case No. 18-1561 (D.P.R. 2018), ECF No. 270; *see also* Press Release,

Oversight Board Authorizes Government Development Bank to Restructure Debts Under Title

VI of PROMESA, July 14, 2017.

17.     Additionally, the Oversight Board finalized a plan of adjustment in the Title III

case of the Puerto Rico Sales Tax Financing Corporation ("COFINA"), which restructured all

$17.6 billion of COFINA debt, which debt, represented twenty-four percent of the

Commonwealth's total bonded debt.  *See Amended Order And Judgment Confirming The Third*

*Amended Title III Plan Of Adjustment Of Puerto Rico Sales Tax Financing Corporation*, Case

No. 17-3283, ECF No. 5055.

18.     Cognizant of the Commonwealth's overwhelming debt burden and complex

financial affairs, and the potential for humanitarian disaster upon default by the

Commonwealth's numerous departments, agencies, and instrumentalities, the Oversight Board

also exercised its investigatory powers under PROMESA section 104(o) to implement a Special

Investigation Committee shortly after the Petition Dates.  It charged the committee with

investigating, among other issues, causes of the financial crisis facing the Commonwealth and its

instrumentalities.

19.     The Special Investigation Committee retained Kobre and Kim (the "Independent

Investigator") to examine the complex economic history of the Commonwealth.  To this end, the

Independent Investigator conducted an investigation including:

> (i) a review of the factors contributing to Puerto Rico's fiscal
> crisis, including changes in the economy, expansion of spending
> commitments and entitlement programs, changes in the federal
> funding it receives, and its reliance on debt to finance a structural
> budget deficit; (ii) a review of Puerto Rico's debt, the general use
> of proceeds, the relationship between the debt and Puerto Rico's
> structural budget deficit, the range of its debt instruments, and how
> Puerto Rico's debt practices compare to the debt practices of states
> and large municipal jurisdictions; and (iii) a review of Puerto
> Rico's debt issuance, disclosure, and selling practices, including its
> interpretation of Puerto Rico's constitutional debt limit.

(such activities, the "Investigation").  *See id. Motion of the Independent Investigator for an*

*Order: (I) Establishing Procedures for Resolving any Confidentiality Dispute in Connection with*

*Publication of the Independent Investigator's Final Report; (II) Relieving the Independent*

*Investigator from Certain Discovery Obligations; (IV) Exculpating the Independent Investigator*

*in Connection with the Investigation and Publication of the Final Report: and (V) Granting*

*Related Relief,*  ECF No. 3427 (Independent Investigator motion describing purview).

20.     The Investigation was massive.  It concluded in August 2018 when the

Independent Investigator published an approximately 600-page Final Report, supported by

hundreds of witness interviews and a review of 200,000 documents (about 2,000,000 pages)

received from numerous parties.  *See id*.; *Notice of the Independent Investigator Regarding*

*Publication of Final Report*, ECF No. 3774 (Independent Investigator notice describing final report).

21.    Within a few days of receiving the published Final Report, the Oversight Board executed a unanimous written consent appointing the independent Special Claims Committee to pursue claims resulting from the findings of the Investigation.  *See* Press Release, Oversight Board Establishes Special Claims Committee To Pursue Findings Of Debt Investigation Report, August 29, 2018.  The Oversight Board then issued a Request for Proposals for counsel to the newly formed committee.

22.    On November 28, 2018, the Oversight Board, acting by and through its Special Claims Committee, retained Brown Rudnick LLP as counsel to the Special Claims Committee to assist the Special Claims Committee in the investigation of potential claims that might arise from conduct described in the Final Report ("Claims Counsel").  Additionally, in February 2019, the Special Claims Committee retained a financial advisory firm to assist Claims Counsel in its investigation of potential claims.

23.    The Final Report was not intended to identify Avoidance Actions[5] and other potential claims the Commonwealth and its instrumentalities might hold against individuals and entities involved in the Commonwealth's financial transactions.  Rather, the Final Report outlined the necessary informative and analytical background which would serve as a springboard for the Special Claims Committee to identify actionable claims that the Commonwealth and its instrumentalities might hold relating to the Commonwealth's financial crisis.

---

[5]    Causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code.

III.    **Oversight Board's Diligent Exercise of its Duties**

24.    Immediately after its retention, Claims Counsel began investigating and testing the conclusions in the Final Report to determine and recommend whether there were viable causes of action that the Oversight Board could assert.

**A.    Oversight Board's Objection to General Obligation Bond Claims
and Avoidance Actions Related to General Obligation Bond Claims**

25.    During Claims Counsel's analysis of the Final Report—in particular, the practices related to the Commonwealth government's interpretation of the Puerto Rico Constitution's debt limit provision—Claims Counsel advised the Special Claims Committee that there were serious legal infirmities to several Commonwealth of Puerto Rico General Obligation Bonds (the "GO Bonds").

26.    Based on Claim Counsel's advice, the Oversight Board, in discharge of its duties under PROMESA, and acting by and through the Special Claims Committee, joined the Official Committee of Unsecured Creditors (the "UCC") in commencing litigation contending that several 2012 and 2014 issuances of GO Bonds (the "First Challenged GO Bonds")[6] violated Puerto Rico's constitutional debt limit, and that claims by purported holders of the First Challenged GO Bonds for principal and interest should be disallowed. *See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 4784 (the "Joint Claim Objection").

---

6    In paragraph eleven of the Joint Claim Objection (as defined in this Motion), the Oversight Board and the UCC reserved their right "to raise additional objections to the validity of *other* issuances of GO bonds." *See* ECF No. 4784 at ¶ 11 (emphasis added).

9

27.     The filing of the Joint Claim Objection was not a simple task; rather, it was replete with procedural obstacles.  The GO Bonds are unlike typical municipal bond issuances in that there is no indenture trustee to represent the interests of the GO bondholders.  Because the GO Bonds do not have an indenture trustee, holders of GO Bonds are not required to file a proof of claim in the Commonwealth Title III Case.  *See id.*; *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof,* ECF No. 2521.

28.     Accordingly, providing procedural due process (including but not limited to appropriate notice) to all potential purported holders of the First Challenged GO Bonds regarding the Joint Claim Objection required that the UCC and Oversight Board propose a robust procedure by which all purported holders of First Challenged GO Bonds could be notified of the Joint Claim Objection and have an opportunity to respond to the Joint Claim Objection.  *See Urgent Motion of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Requesting Related Relief,* ECF No. 4788 (the "Initial Procedures Motion;" the procedures contained therein, the "Procedures").

29.     Several purported holders of First Challenged GO Bonds objected to the Procedures Motion.  *See Response and Objection to Docket 4788 and 4789, FOMB's Purported Urgent Motion of Individual Bondholder Residing in the 50 States Who Purchased in 2012 at the Original Offering Price,* ECF No. 4913 (objection by individual investor); *Joint Objection to the Motion of the Special Claims Committee and Official Committee of Unsecured Creditors to*

10

*Establish Omnibus Objection Procedures Regarding Certain GO Bonds;* ECF No. 4923 (objection by the Constitutional Debtholder Group, Commonwealth Bondholder Group, Assured Guaranty Corp., and Assured Guaranty Municipal Corp.); *Objection of the Oppenheimer Funds to Urgent Motion of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Objection to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds,* ECF No. 4924 (objection by Oppenheimer Funds); *Joinder by Autonomy Capital to the Joint Objection to the Motion of the Special Claims Committee and Official Committee of Unsecured Creditors to Establish Omnibus Objection Procedures Regarding Certain GO Bonds,* ECF No. 4925 (objection by Autonomy Capital (Jersey) LP).

30. The Court granted the Initial Procedures Motion with modifications to the initially proposed Procedures. *See Order, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, Establishing Initial Procedures with Respect to Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Granting Related Relief,* ECF No. 5143. Pursuant to the approved Procedures, (1) the Depository Trust and Clearing Corporation ("DTC") must post a notice of the Joint Claim Objection in its legal notification system; (2) a notice of the Joint Claim Objection must be published in several English-language and Spanish-language newspapers; and (3) the affected purported holders of Challenged Bonds are identified by the thirty-seven (37) CUSIPs identified in the Joint Claim Objection. Furthermore, the Procedures establish that purported holders of Challenged Bonds have sixty (60) days from the

11

date of this Court's order granting the Initial Procedures Motion by which to file a Notice of Participation, which must provide, among other facts, whether the purported holder of the Challenged Bonds opposes the Joint Claim Objection. As of the time of this filing, approximately eight hundred and thirty (830) Notices of Participation have been filed; more arrive each day.

**B. UCC and GO Bondholders Raise Additional Bond Challenges**

31. After the filing of the Joint Claim Objection, the UCC and an ad hoc group of general obligation bondholders (the "Ad Hoc GO Bondholders") filed similar challenges to additional issuances of bonds by the Commonwealth and its instrumentalities.

32. On March 12, 2019, the UCC filed the *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico* [sic], ECF No. 5580 (the "ERS Bond Objection"), contending that ERS issued approximately $3.5 billion of bonds *ultra vires*, and thus that such bonds (the "ERS Bonds") are null and void.

33. On April 2, 2019, a group of holders of First Challenged GO Bonds filed the *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 6099 (the "Ad Hoc Objection"), contending that, should the Court accept various factual and legal premises contained in the Joint Claim Objection, the Court should find on similar grounds that certain series of Public Building Authority Bonds ("PBA Bonds") and additional GO Bonds

(the "Second Challenged GO Bonds") were also null and void.[7]  Hereinafter, the Second

Challenged GO Bonds shall together with the First Challenged GO Bonds be referenced as the

"Challenged GO Bonds;" and the Challenged GO Bonds together with the PBA Bonds and ERS

Bonds shall collectively be referred to as the "Challenged Bonds."[8]

### C.  Extraordinary Circumstances Surrounding Identification of Avoidance Action Defendants

34.    Simultaneous with the Joint Claim Objection, the Oversight Board and the UCC

recognized that, to the extent successful in the Joint Claim Objection (and to the extent that other

bond issuances could be null and void), the Oversight Board would have grounds to avoid and

recover—or "claw back" payments on the Challenged Bonds.  In sum, the Oversight Board

asserts that, to the extent that the First Challenged GO Bonds were legally null, the

Commonwealth had no legal obligation to make payments to purported holders.  Thus, it

received no reasonably equivalent value in return for payments of purported principal and

interest.  Moreover, any such payments may have been issued at a time when the Commonwealth

was insolvent, and otherwise may have satisfied the legal standard to plead, among other causes

of action, causes of action in the nature of constructive fraudulent transfer.  Similarly, these same

"claw back" causes of action could also apply to the other Challenged Bonds (collectively, the

"Challenged Bonds Avoidance Actions").

35.    The Oversight Board has left no stone unturned in its efforts to identify potential

defendants to the Challenged Bonds Avoidance Actions.  As of the time of this filing, its efforts

---

[7]  The validity of the PBA lease structure was also challenged as part of the *Complaint for Declaratory Relief and Disallowance of Administrative Rent Claims* by the Oversight Board and UCC at ECF. No. 1 in  Adv. Proc. 18-149-LTS.

[8]  *See* above footnote 5.  The definition of Challenged Bonds in this Motion includes any additional GO Bond issuances which the Oversight Board, pursuant to its reservation of rights, seeks to add to the Joint Claim Objection.

have not resulted in the information necessary to identify the ultimate recipients of such potentially avoidable transfers ("Challenged Bond Avoidance Defendants").

36.    As explained above, the Challenged Bonds have no indenture trustee.  The Oversight Board has engaged in numerous discussions and made numerous inquiries to third-party professionals involved in the issuances of the Challenged Bonds, the Oversight Board's bankruptcy counsel and financial advisors, and counsel and financial advisers to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").  Unfortunately, these parties have not been able to provide the information necessary to identify all of the Challenged Bond Avoidance Defendants.

37.    The Oversight Board is not working alone.  In continuation of their collaborative effort regarding the Joint Claim Objection, the Oversight Board and the UCC are coordinating to identify the ultimate recipients of such potentially avoidable transfers.  The UCC's professionals have assisted in compiling lists of CUSIPs and payment dates necessary to identify Challenged Bond Avoidance Defendants once source data can be obtained, and in investigating potential sources for the data itself.  The Oversight Board and the UCC have been in near-daily contact regarding these efforts and the necessity for the Oversight Board to seek the relief requested in this Motion.

38.    Furthermore, the Oversight Board and the UCC have joined efforts in examining the payment history of the debtors requested by the UCC in its *Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery of Title III Debtors, Other Than COFINA, Concerning Potential Avoidance Actions*, ECF No. 4373 (the "2004 Examination"), which motion was granted by this Court in December 2018. *See id.; Order Granting Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy*

*Rule 2004, Authorizing Discovery of Title III Debtors, Other than COFINA, Concerning Potential Avoidance Actions*, ECF No. 4484.  The 2004 Examination production is a history of hundreds of thousands of prepetition payments made by the Commonwealth, contained in voluminous Excel files.  None of the information in the 2004 Examination production, which information has been delivered on a piecemeal basis since Decembers 2018, has allowed the Oversight Board to identify the Challenged Bond Avoidance Defendants.

39.     Simultaneous with its collaboration with the UCC, the Special Claims Committee's Claims Counsel requested access to the document depository underlying the Final Report (the "<u>Document Depository</u>") immediately after its retention in November 2018 in accordance with this Court's *Order Approving Motion of the Independent Investigator for an Order: (I) Establishing Procedures for Resolving any Confidentiality Dispute in Connection with Publication of the Independent Investigator's Final Report; (II) Approving the Disposition of Certain Documents and Information; (III) Relieving the Independent Investigator from Certain Discovery Obligations; (IV) Exculpating the Independent Investigator in Connection with the Investigation and Publication of the Final Report; and (V) Granting Related Relief* (the "<u>Exit Plan Order</u>") at ECF No. 3744.

40.     Since securing access to approximately 84,000 documents in the Document Depository (with access to other documents pending), Claims Counsel has vigorously searched for, among other things, information regarding payments and holder identities for the Challenged Bonds.  Claims Counsel continues to examine these documents, thus far without success as to the identity of recipients of payments to the Challenged Bonds or any leads as to where a comprehensive record of that information might reside.

15

41.     Based on the information available to the Oversight Board, it appears that, when

the Commonwealth and its instrumentalities made payments on the Challenged Bonds, it

transferred the funds to DTC, which transferred the payments to various participant financial

institutions likely holding bonds on behalf of purported beneficial holders (the "Participant

Holders").[9]  The Participant Holders then likely transferred all, or a portion of, the payments to

its customers.[10]

42.     Accordingly, the Oversight Board has begun coordinating with DTC, via Prime

Clerk in compliance with a recommended procedure, to obtain bond payment records.  The

Oversight Board has been informed that DTC may not maintain a database of historical payment

records.

43.     Rather, DTC is willing and able to provide, for a fee, "Security Position Reports"

showing the participant holders of bonds on any given Friday.  In other words, the Oversight

Board is able to understand from these reports *not* how much money was paid to whom, but only

which financial institutions held the bonds on the Friday preceding and/or following the

payments.

44.     Nevertheless, the Oversight Board has requested these reports and will use the

resulting data, to the extent required to do so to preserve and prosecute its claims, by

approximating the amounts paid to Participant Holders on various payment dates based on

---

[9]    It is possible that the Participant Holders were beneficial holders or otherwise served as "initial transferees" of
bond payments for purposes of the Bankruptcy Code, and thus may be Challenged Bond Avoidance
Defendants.  The Oversight Board reserves all rights to timely allege claims and causes of action against the
Participant Holders.

[10]   The Oversight Board will be prepared to file a motion pursuant to Federal Rule of Bankruptcy Procedure 2004
and 1007(i) for the examination of any entities believed to have records or any information that can lead to the
identity of the potential defendants to the Challenged Bonds Avoidance Actions if such a motion is warranted.
As of the filing of this Motion, the Oversight Board cannot file such a motion because it does not have the
requisite Participant Holder information necessary to direct the examination to the proper entities.

information contained in Security Position Reports.[11]   Moreover, as necessary, the Oversight Board will begin contacting Participant Holders to obtain their payment records to identify the information required to file Challenged Bonds Avoidance Actions.  The Oversight Board expects these inquiries to be fruitful.

45.     To be clear, requesting the Security Position Reports is no small task.  For any given CUSIP of any Challenged Bond, the Oversight Board must order a Security Position Report for *each date* the CUSIP is believed to have been paid within the applicable lookback period for a constructive fraudulent transfer.  By way of example, as discussed above, there are thirty-seven (37) CUSIPS currently subject to the Joint Claim Objection, some of which CUSIPs were paid semi-annually whereas others were paid monthly.[12]

46.     The Oversight Board has ordered five hundred and ninety-six (596) Security Position Reports.  As of the time of this filing, approximately a week after issuing the order, the Oversight Board is attempting to confirm with Prime Clerk that DTC received the order.[13]

47.     It is not clear when the Security Position Reports will be delivered.[14]  Once the reports are delivered, the Oversight Board will require time to review and analyze each of the

---

[11]   The Oversight Board has requested Security Position Reports only with respect to the First Challenged GO Bonds.  The Oversight Board will request Security Position Reports as to the other Challenged Bonds as quickly as possible under the circumstances.

[12]   There are an additional three First Challenged GO Bond CUSIPs that were not subject to the Joint Claim Objection but nevertheless may form the basis for Challenged Bonds Avoidance Actions.  These CUSIPS represent series of GO Bonds that matured and were satisfied prior to the Commonwealth Petition Date, thus not forming the basis for any claims against the Commonwealth estate.

13   The Oversight Board's order to DTC may have been complicated, in part, by the Oversight Board's request for DTC to honor the discount advertised on DTC's website concerning Security Position Reports for municipal bonds.  The discount, if applied, would reduce fees by 85% and save the estates approximately $60,000.  The Oversight Board received an initial indication from Prime Clerk that the discount might not apply; it thus requested confirmation of pricing prior to execution of the order and generation of an invoice.

14   On April 2, 2019, hours prior to the filing of this Motion, the Oversight Board received a message from Prime Clerk indicating that the reports would be delivered on or about April 5, 2019.  It is not clear how reliable this projection may be.

nearly six hundred reports to identify payments likely made to each of potentially dozens of Participant Holders made, per report.  In other words, identifying at best a *fraction* of the Challenged Bond Avoidance Defendants will entail analyzing approximately 6,000 – 15,000 payments implied by a review of 596 documents.[15]  Even if the reports can be delivered minutes after the filing of this Motion (which is not expected), the Oversight Board's professionals face an extraordinary challenge in conducting the appropriate analysis to determine if Participant Holders made payments to their respective customers, and if so, to obtain the customer name, amounts paid and on what dates such payments were made as to each Challenged Bond in order to identify the appropriate Challenged Bond Avoidance Defendants.

48.    Moreover, as the ERS Bond Objection and Ad Hoc Objection were filed only recently (the Ad Hoc Objection only hours before the filing of this motion), and not by the Oversight Board, the Oversight Board has only just begun the process of obtaining similar payment records with respect to the ERS Bonds, PBA Bonds, and Second Challenged GO Bonds, including tabulating the CUSIPs and payment dates for the other Challenged Bonds in order to request potentially hundreds more Security Position Reports.  While the ERS Bonds and PBA Bonds were administered through fiscal agents, with whom the Oversight Board has had some contact during these Title III Cases, it is not yet certain whether it will still be required to go through the same exercise as required for the Challenged GO Bonds.

---

[15]    In other words, the Security Position Reports are expected to identify approximately 10-25 Participant Holders for each CUSIP on the Friday after each of the 596 First Challenged GO Bond CUSIP payment dates, which will thus imply a total of 6,000-15,000 payments to Participant Holders.  The Oversight Board has reason to believe that some or all of the Participant Holders were also beneficial holders and thus Challenged Bond Avoidance Defendants. However, the Participant Holders also likely transferred portions of the payments to their customers, which customers—not identified in the Security Position Reports—would also be Challenged Bond Avoidance Defendants.

49. The statute of limitations within which to bring Challenged Bonds Avoidance Actions relating to GO Bonds and PBA Bonds expires on May 2, 2019 pursuant to 11 U.S.C. § 546(a)(1), and the statute expires on May 20, 2019 with respect to actions relating to the ERS Bonds. In sum, at the time of this filing, it appears likely that the statute of limitations will expire before the Oversight Board can reliably identify all appropriate Challenged Bond Avoidance Defendants, despite its best efforts.

### D. Extraordinary Circumstances Militating Against Cost Incurrence

50. The Oversight Board also remains cognizant that the exercise of filing potentially hundreds of Challenged Bonds Avoidance Actions would be extraordinarily complicated, and might prove unnecessary.

51. The Oversight Board is mindful of the costs of litigation, both to the Commonwealth and respondents. Indeed, with respect to the Joint Claim Objection, the Court appreciated the need for broad notice procedures and provision of significant time for individual and institutional purported bondholders to understand legal documents and retain counsel, as shown by the Procedures approved by the Court following significant negotiation and briefing.

52. The Challenged Bonds Avoidance Actions would no doubt complicate the Procedures with respect to the Joint Claim Objection, the ERS Bond Objection, and the Ad Hoc Objection—indeed, the Ad Hoc Go Bondholders filed a separate request to establish procedures for resolution of its Ad Hoc Objection.[16] The Oversight Board expects that many Challenged Bond Avoidance Defendants are already burdened with responding to these objections, and may

---

[16] *See Motion of the Ad Hoc Group of General Obligation Bondholders, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Omnibus Conditional Objection to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, at ECF No. 6104.

be burdened with an additional layer of cost not only in responding to the contemplated litigation but in understanding the relationships between the various pieces of litigation and fashioning procedural measures to ensure due process and efficient resource allocation to adjudicate coextensive legal issues. Other Challenged Bond Avoidance Defendants may have to retain counsel for the first time and grapple with the complex legal and factual allegations, much as respondents to the Joint Claim Objection have been doing for the past several months.

53.     This effort and cost may not be necessary. The Challenged Bonds Avoidance Actions would be premised in large part on the arguments raised in the Joint Claim Objection and ERS Bond Objection.[17] If this Court finds that the Challenged Bonds were issued validly *after* the Oversight Board files hundreds of Challenged Bonds Avoidance Actions, potentially hundreds of defendants would have been required to incur litigation costs for ultimately meritless litigation. Likewise, the Oversight Board would have irrevocably spent estate resources better allocated elsewhere in the interests of the Commonwealth and legitimate creditors.

### E. Oversight Board Diligence Concerning All Other Avoidance Actions

54.     The Oversight Board anticipates filing potentially several hundred Avoidance Actions unrelated to the Challenged Bonds.[18] These actions are the result of collaboration with the UCC and both parties' professionals to collect and review tens of thousands of payment records, assess potential claims and prepare and file complaints prior to the May 2, 2019 deadline.[19]

---

[17] The Ad Hoc Objection is likewise premised in large part on arguments raised in the Joint Claim Objection.

[18] The Oversight Board is continuing its diligence with respect to Avoidance Actions, and thus, cannot accurately state how many Avoidance Actions it will determine to pursue.

[19] The Oversight Board's identification and pursuit of these, and other, Avoidance Actions will be disclosed to the UCC pursuant to the *Order Granting the Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I)*

55.     Notably, the UCC's 2004 Examination initially included only two years of prepetition payment history for all Title III debtors.  At the Special Claims Committee's insistence, however, the scope of the 2004 Examination was expanded to include a total of four years of payment history to capture the longer statute of limitations provided in Puerto Rico's correlative to constructive fraudulent transfer law.[20]

56.     The Oversight Board is also prepared to file potentially several hundred Avoidance Actions on behalf of all other Title III debtors.  These debtors, too, produced voluminous files of prepetition transfers, which the Special Claims Committee, Claims Counsel, and their financial advisers are analyzing.

57.     In addition, as previously noted, Claims Counsel continues to review those portions of the Document Depository to which it has access in order to assess potential claims that may be asserted against third parties related to Puerto Rico's financial crisis.  However, obtaining limited access to the Document Depository has involved the negotiation of numerous non-disclosure agreements and electronic permission protocols.  Notwithstanding looming statute of limitation deadlines (including but not limited to the section 546 deadline in May 2019) and Claims Counsel's diligence, Claims Counsel was not able to secure any access to the database until March 2019, and even today only has access to a limited degree.  To be clear: the Oversight Board's Special Claims Committee was unable to secure *any* access to the Document Depository—which contains research collected in the Investigation commissioned and funded by the Oversight Board itself—until six months after the issuance of the Final Report and four

---

*Procedures with Respect to Disclosure of Avoidance Actions to Be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)*, at ECF No. 6086, and the timeline for disclosures prescribed therein.

[20] Also known as a "Paulian Action" pursuant to Puerto Rico civil code and applicable case law.  *See* 31 L.P.R.A. §§ 3491-3500.

months after retaining Claims Counsel.  Nonetheless, Claims Counsel will be seeking tolling
agreements with potential defendants and, in the event tolling agreements may not be reached,
will otherwise be prepared to commence actions against third parties prior to the May 2 statute of
limitations.

## RELIEF REQUESTED

58.     By this Motion, the Oversight Board seeks the entry of an order: (i) extending the
two-year statute of limitations in section 546 of the Bankruptcy Code, *solely* as it pertains to
claims for avoidance and recovery of payments on  account of any Challenged Bonds, until a
date not less than 90 days following the date that a ruling on the Joint Claim Objection, ERS
Bond Objection, and/or Ad Hoc Objection, as applicable, becomes final and unappealable; or (ii)
in the alternative, extending the statute of limitations by not less than 90 days to permit the
Oversight Board sufficient time to identify the appropriate Challenged Bond Avoidance
Defendants.

## ARGUMENT

### Extraordinary Circumstances Warrant Equitable Tolling

59.     The Oversight Board respectfully suggests it should be entitled to equitable
tolling of the two-year statute of limitations in section 546 of the Bankruptcy Code as to
avoidance and recovery of payments of principal and interest on the Challenged Bonds.  Since its
inception, the Oversight Board has been diligently pursuing its rights as the representative of the
Commonwealth and other debtors. Unfortunately, extraordinary circumstances stand in the way
of the Oversight Board's ability to exercise its rights, and the Oversight Board is now concerned
that preserving its rights and potentially valuable litigation claims would require incurrence of
prohibitive and unnecessary costs both by the Commonwealth and potential litigation defendants.

**I.   The Oversight Board has
Diligently Pursued its Rights Concerning Avoidance Actions.**

60.    Since the Petition Dates, the Oversight Board has diligently pursued its rights on
behalf of the Commonwealth and other instrumentalities to uncover potential causes of action.

61.    Section 546(a) of the Bankruptcy Code provides: "[a]n action or proceeding under
544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of — (1) the later
of — (A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or
election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such
appointment or such election occurs before the expiration of the period specified in subparagraph
(A); or (2) the time the case is closed or dismissed."  11 U.S.C. § 546(a).

62.    Section 546 articulates a statute of limitations that may be tolled on equitable
grounds.  *In re Int'l Admin. Services, Inc.*, 408 F.3d 689, 699 (11th Cir. 2005) (citing *In re
Rodriguez*, 283 B.R. 112, 116–18 (Bankr. E.D.N.Y. 2001)); *see In re Malavet*, 552 B.R. 24, 32
(Bankr. D.P.R. 2016) (referring to Section 546 of the Bankruptcy Code as a "statute of
limitations"); *In re Margaux Texas Ventures, Inc.*, 545 B.R. 506, 526 (Bankr. N.D. Tex. 2014)
(noting that section 546 of the Bankruptcy Code "is without a doubt a statute of limitations"); *see
also In re Martin Levy Of Berlin D.M.D., P.C.*, 416 B.R. 1, 7 (Bankr. D. Mass. 2009) (collecting
the clear majority of cases which hold that section 546 of the Bankruptcy Code "is a true statute
of limitations and does not serve as a jurisdictional bar.")

63.    "For those statutes of limitation to which equitable tolling applies, a litigant who
seeks tolling must establish at least two elements: (1) that he has been pursuing his rights
diligently, and (2) that some extraordinary circumstances stood in his way." *Pace v.
DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *cf. Negron-Santiago
v. San Cristobal Hosp.*, 764 F. Supp. 2d 366, 371 (D.P.R. 2011); *see also Neves v. Holder*, 613

F.3d 30, 36 n. 5 (1st Cir. 2010) (quoting *Jobe v. INS*, 238 F.3d 96, 100 (1st Cir. 2001))
(articulating additional factors for inquiry consistent with *Pace*).

64.     Where a trustee "works long and hard to discover all the intricacies" of a debtor's
assets and prepetition financial affairs, a trustee exercises the requisite diligence warranting
equitable tolling with respect to a potential avoidance or related action.  *See Int'l Admin.*, 408
F.3d at 708 (noting that trustee hired forensic accountant to piece together the debtor's complex
"jigsaw puzzle of transfers"); *see also In re Myler*, 477 B.R. 227, 235 (Bankr. D. Utah 2012)
(noting that requesting a 2004 examination of the debtor indicates diligence); *In re IFS Fin.
Corp.*, 02-39553, 2010 WL 4614293 at *5 (Bankr. S.D. Tex. Nov. 2, 2010) (suggesting that
trustee had exercised diligence in initiating avoidance actions where trustee had filed over 100
avoidance actions).

65.     Indeed, the trustee's diligence must be substantial to justify equitable tolling.  For
instance, in one New Jersey case, a trustee moved for an order equitably tolling the two-year
statute of limitations in section 546 of the Bankruptcy Code as to unknown defendants for one
year.  From the inception of the case, the trustee, concurrently with the creditor's committee,
"conducted an aggressive investigation of the Debtors' pre-petition activities involving hundreds
of millions of dollars in pre-petition transfers . . . and other fraudulent activities involving
numerous persons, entities, and banking institutions." *In re Solomon Dwek*, et al., Case No. 07-
11757 (KCF) (Bankr. D.N.J. 2009), *Application in Support of the Chapter 11 Trustee's Motion
for Entry of an Order Equitably Tolling the Time Prescribed by 11 U.S.C. § 546 for the Trustee
to Bring Avoidance Actions and Time Prescribed by 11 U.S.C. § 108 for the Trustee to Bring Any
Action Under Applicable Nonbankruptcy Law Which Did Not Expire Prior to the Petition Date,*
ECF No. 3699-1 at ¶ 9.

24

66.     To conduct his investigation, the trustee in *Dwek*, diligently gathered "hundreds of thousands of documents relating to the Debtors' businesses, manag[ed] all the residential and commercial properties, institut[ed] numerous adversary proceedings, analyz[ed] more than $1 billion in claims filed against the various estates, and actively market[ed] [several of the Debtors' properties]." *Id*. at ¶ 13.  The court granted the relief for good cause shown.  *Id. Order Equitably Tolling the Time Prescribed by 11 U.S.C. § 546 for the Chapter 11 Trustee to Bring Avoidance Actions and Time Prescribed by 11 U.S.C. § 108 for the Trustee to Bring Any Action Under Applicable Nonbankruptcy Law Which Did Not Expire Prior to the Petition Date,* at ECF No. 3790.

67.     Here, the Oversight Board has exercised material diligence to warrant equitable tolling of the section 546 statute of limitations.

68.     Similar to the trustee in *International Administrative Services*, the Oversight Board has "worked long and hard to discover all of the intricacies" of the Commonwealth's debt issuances, economic history, and four-years' worth of prepetition transfers.  To obtain the proper context to the possible causes of action it could assert, the Oversight Board commissioned the Investigation.  The Investigation, by itself, was a massive feat in understanding, distilling, and identifying decades of debt issuance practices.  In turn, the 600-page Final Report was the culmination of a year's work in reviewing millions of pages and conducting hundreds of interviews.

69.     The Oversight Board's diligence did not end with the Final Report.  The merits of the Final Report notwithstanding, it provided only an analytical outline of potential causes of action which the Oversight Board might hold, and did not identify potential Avoidance Actions. The Oversight Board, in the exercise of its fiduciary duties under the Bankruptcy Code and

consistent with its purpose under PROMESA, appointed the independent Special Claims Committee to assess and pursue, among other things, Avoidance Actions.

70. The Special Claims Committee acted promptly on its mandate when, in conjunction with the UCC, it filed the Joint Claim Objection upon Claims Counsel's recommendation. It is worth noting that Claims Counsel researched legal and factual issues surrounding the First Challenged GO Bonds, issued its recommendation to the Special Claims Committee, and collaborated in preparing the Joint Claim Objection over a period of only six weeks following its retention, which period fell over the December and January holidays.

71. In addition to the Joint Claim Objection and analysis of the Final Report, the Special Claims Committee has deployed substantial efforts through Claims Counsel to review the documents in the Document Depository to assist it in identifying meritorious causes of actions. The Document Depository houses several thousands of pages of AAFAF documents, underwriters' documents, bond counsel's documents, and others. Claims Counsel continues to conduct a full-time primary review of these documents, reporting to and coordinating with teams of other attorneys conducting simultaneous secondary reviews specific to different Title III debtors, bond issuances, and categories of investigation.

72. Furthermore, the Special Claims Committee has made frequent and numerous inquiries to other professionals involved in the Title III cases in order to obtain reports, financial data, presentations, and other materials necessary for the Special Claims Committee to assert its causes of action. For example, in connection with the Joint Claim Objection and in connection with Claims Counsel's analysis of the PBA's legal and bond structure, Claims Counsel has made inquiries to AAFAF and its advisors on numerous occasions to understand the assumptions and conclusions of several of its PBA reports.

73.     Similar to *Dwek*, concurrently with the Oversight Board's efforts concerning the Joint Claim Objection and in cooperation with the UCC and each parties' respective financial advisers, the Oversight Board has been examining a voluminous four-year history of the Commonwealth 's and other debtors' prepetition payments.  The delivery of these records has been piecemeal. Nonetheless, as a result of these efforts and the Oversight Board's insistence that a four-year, rather than two-year, payment history be reviewed, the Oversight Board has identified a preliminary list of potential Avoidance Actions which the Oversight Board is considering pursuing.  Before the statute of limitations expires, the Oversight Board anticipates filing potentially several hundred Avoidance Actions as a result of its diligence.

74.     The Oversight Board has met its burden to show that it has exercised substantial diligence to assert potential Avoidance Actions and other related third party causes of action.

## II. <u>Extraordinary Circumstances Impede the Filing of Avoidance Actions.</u>

75.     Despite the Oversight Board's diligence, extraordinary circumstances stand in the way of the Oversight Board timely filing avoidance and recovery actions against appropriate Challenged Bond Avoidance Defendants, i.e., recipients of payments on the Challenged Bonds.

76.     The doctrine of equitable tolling requires that extraordinary circumstances not of the plaintiff's own contrivance prevent it from timely filing litigation.  *See Jardin De Las Catalinas Ltd. P'ship v. Joyner*, 766 F.3d 127, 135 (1st Cir. 2014) (where the plaintiffs "delay in bringing suit was of their own contrivance," extraordinary circumstances do not warrant equitable tolling); *Int'l Admin*., 408 F. 3d at 702; *Neverson v. Farquharson*, 366 F.3d 32, 42 (1st Cir. 2004).

77.     In *International Administrative Services*, the Eleventh Circuit found that extraordinary circumstances prevented the trustee from timely asserting avoidance actions

where, despite the trustee's diligence in discovering the intricacies of the debtor's assets and hiring a forensic accountant to piece together the debtor's transfers, "[t]he case was replete with discovery violations, mostly in the form of the Debtor and its associates' refusals to supply the Trustee with critical and important documentation." *Int'l Admin.*, 408 F.3d at 702. Further, the Eleventh Circuit found that it could have been malpractice for the trustee to file an avoidance action without the information contained in the documents. *Id*.

78.     Similarly, in *Dwek*, extraordinary circumstances prevented the trustee from timely asserting avoidance actions against unknown defendants because the trustee was (i) unable to conduct a thorough 2004 examination of the debtor, where the United States Attorney obtained an ex parte order from the bankruptcy court delaying the 2004 examination of the debtor; (ii) the debtor had sparse records of financial transactions, "including potentially fraudulent transfers," and the documents that existed were in the FBI's possession; and (iii) the trustee secured turnover of the documents from the FBI, but the turnover had been delayed after the debtor asserted that some documents were privileged. Case No. 07-11757 (KCF) (Bankr. D.N.J. 2009), ECF Nos. 3699-1 at ¶¶ 16-19, 3790.

79.     Here, similar to *International Administrative Services* and *Dwek*, extraordinary circumstances not contrived by the Oversight Board have prevented it from uncovering foundational information necessary to initiate an avoidance and recovery action against unknown holders of the Challenged Bonds. Despite its best efforts, the Oversight Board does not have the information needed to file the Challenged Bonds Avoidance Actions. Indeed, having only recently received the Ad Hoc Objection, the Oversight Board has had no time or ability even to request such information as to the PBA Bonds or the Second Challenged GO Bonds.

28

80.     This Court's experience with the Joint Claim Objection and the attendant Initial Procedures Motion has given it a glimpse of the extraordinary circumstances concerning the identification of purported holders of Challenged Bonds.  Had the Oversight Board and the UCC not proposed, negotiated and litigated a rigorous notice procedure, the purported holders of Challenged GO Bonds stood to force the Commonwealth to repay potentially unconstitutional debts, with the Commonwealth having never had its day in court, simply because the lack of an indenture trustee ironically impeded due process for *bondholders* in establishing unconstitutionality.   Fortunately, this Court recognized the importance of the Joint Claim Objection and established the Procedures.  Similarly, purported current and former holders of Challenged Bonds now stand to retain funds potentially unlawfully transferred away from estate coffers, simply because the identity of the recipients of payments made on account of the Challenged Bonds is a procedural and practical quagmire.

81.     Such an inequitable result cannot stand.  The Oversight Board did not anticipate that it would largely be unable to obtain records regarding the hundreds of millions of dollars paid to purported holders of Challenged Bonds.

82.     Although the extraordinary diligence efforts of the Oversight Board have been documented repeatedly in this Motion, the Oversight Board reiterates that this situation is not its own making.  In brief:

   i.     The Oversight Board did not exist until after the Challenged Bonds were issued, and has never been responsible for any issuer's record-keeping practices or its decision not to appoint a paying agent or indenture trustee;

   ii.    The Oversight Board acted promptly to commission the Investigation and Final Report;

   iii.   Following publication of the Final Report, the Oversight Board acted promptly to appoint the Special Claims Committee, which in turn acted

promptly to retain appropriate professionals to investigate litigation claims;

iv.     Claims Counsel acted promptly to secure access to diligence documents supporting the Final Report and obtain other payment records and diligence information, a process which has taken many months despite best efforts;

v.      Since securing access to the Document Depository, Claims Counsel has vigorously searched for, among other things, information regarding payments and holder identities for the Challenged GO Bonds. Claims Counsel continues to examine these documents, thus far without success as to the identity of recipients of payments to the Challenged GO Bonds;

vi.     The Special Claims Committee acted promptly to secure access to the UCC 2004 Examination production materials which were believed to provide a comprehensive payment history for each debtor, has reviewed thousands of prepetition transfers and voluminous excel files, and has concluded that the materials do not identify all beneficial holders of bonds paid during the applicable lookback periods;

vii.    The Oversight Board has made simultaneous inquiries to AAFAF, the Oversight Board's bankruptcy counsel, AAFAF's financial advisers, the UCC's counsel and financial advisers, and countless other parties, none of which have been able to identify payment recipients for all of the Challenged Bonds;

viii.   The Oversight Board is working with Prime Clerk and DTC to obtain the Securities Position Reports believed to provide information about the Participant Holders that received payments on account of the First Challenged Bonds GO during the relevant time periods. At the time of this filing, Claims Counsel has requested approximately five hundred and ninety-six reports through Prime Clerk, which it has not received and will require time to review;

ix.     Based on Securities Position Reports received for different purposes, the Oversight Board has already begun contacting entities it reasonably believes to be Participant Holders, so as to identify beneficial holders of First Challenged GO Bonds who received payments in respect of purported principal and interest, so far without success; and

x.      The Oversight Board only recently received the ERS Bond Objection and Ad Hoc Objection, which were prepared by other parties. As a result, the Oversight Board has only recently begun the significant diligence necessary to identify beneficial holders of the other Challenged Bonds.

83.     Challenged Bond Avoidance Defendants should not escape the reach of a bankruptcy trustee's strong-arm powers, and retain funds rightfully belonging to the Commonwealth under its constitution and applicable federal statute, merely because record-keeping impediments prevent the Oversight Board from identifying them. The Oversight Board has met its burden to show that extraordinary circumstances stand in the way of timely filing avoidance and recovery actions against the Challenged Bond Avoidance Defendants.

### III. Even if the Oversight Board Is Able to Obtain All Necessary Information to Timely File Avoidance Actions, <u>Such Efforts Would Be Premature and Unnecessary.</u>

84.     Diligence and extraordinary circumstances notwithstanding, the propriety of equitable tolling should be determined on a case-by-case basis. *In re McKenzie*, 08-16378, 2011 WL 6140516, at *30 (Bankr. E.D. Tenn. Dec. 9, 2011), *aff'd,* 1:11-CV-192, 2012 WL 4742708 (E.D. Tenn. Oct. 2, 2012), *aff'd*, 737 F.3d 1034 (6th Cir. 2013) (citations omitted) (noting that "there is more to be weighed in this case than a failure to conduct due diligence on the part of the trustee" and granting equitable tolling where trustee failed diligence test, but trustee showed defendant misled him).

85.     The Oversight Board's efforts to discover the identity of purported holders of Challenged Bonds could be a futile exercise and a waste of estate resources in light of the ongoing litigation required to support the relevant avoidance and recovery claims, the outcome of which litigation is currently uncertain.  To be clear, any potential avoidance and recovery action related to payments on account of the Challenged Bonds would be premised on a final judgment that the Challenged Bonds were invalid when issued and thus null and void.  Unless and until the Court so holds, no avoidance and recovery action contemplated herein could succeed.

86.     Given this uncertainty, at this time, any avoidance and recovery action by the Oversight Board to recover payments made on account of the Challenged Bonds invites litigation which will deplete estate resources without sufficient cause.  Even if the Oversight Board can identify the appropriate Challenged Bond Avoidance Defendants, requiring the Oversight Board (and, thus, the Commonwealth) to incur significant expenses to do so, and to prosecute the Avoidance Actions, would be premature.  Similarly premature resource expenditures would be required of individual and institutional defendants and the Court. The Procedures related to the Joint Claim Objection, and the negotiation and litigation preceding their approval, highlight the significant effort required from all parties merely to ensure due process, let alone litigate substantive issues.

87.     Such a potentially wasteful expenditure is at odds with the Oversight Board's purpose "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a); *cf. In re Infinity Bus. Group, Inc.*, 10-06335-JW, 2011 WL 9375422, at *4 (Bankr. D.S.C. June 22, 2011), *supplemented*, CA 10-06335-JW, 2011 WL 9375725 (Bankr. D.S.C. July 15, 2011) (holding that wasteful litigation should be stayed to allow trustee time to file complaint expected to raise the same issues as pending litigation).

88.     The Oversight Board respectfully submits that in the extraordinary circumstances presented by these allegedly void Challenged Bonds and the related, unusual and potentially valuable avoidance and recovery actions, equity compels tolling the statute of limitations for prosecution of the Challenged Bonds Avoidance Actions until such time as both the legal basis and the appropriate defendants for such actions may be more firmly established.

**NOTICE**

89.      The Oversight Board has provided notice of this Motion to: (i): the Chambers of the Honorable Laura Taylor Swain; (ii) the Office of the United States Trustee for Region 21; (iii) AAFAF; (iv) counsel for AAFAF; (v) counsel for the Oversight Board; (vi) Counsel for the Creditors' Committee; (vii) Counsel for the Retiree Committee; (viii) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims in COFINA's Title III case; (ix) counsel to any other statutory committee appointed in these Title III Cases; (x) counsel to any ad hoc bondholder group which has filed a Federal Rule of Bankruptcy Procedure 2019 statement in these Title III Cases; (xi) counsel to Bank of New York Mellon as agent with respect to the ERS Bonds; (xii) counsel to U. S. Bank Trust National Association, Banco Popular de Puerto Rico, Bank of New York, and U.S. Bank as agents with respect to the PBA Bonds; (xiii) counsel to the Ad Hoc GO Bondholders; and (xiv) counsel to any Participant Holders already identified or believed to be identified.

**CONCLUSION**

WHEREFORE, the Oversight Board respectfully requests that this Court enter an order: (i) granting this Motion in its entirety; (ii) extending the deadline set forth in section 546 of the Bankruptcy Code, as pertaining to claims for avoidance and recovery of payments on  account of any Challenged Bonds in the four-year period preceding the applicable Petition Dates, until a date not less than 90 days following the date that a ruling on the Joint Claim Objection, ERS Bond Objection, and/or Ad Hoc Objection, as applicable, becomes final and unappealable; and (iii) granting such relief at the Court deems just and appropriate under the circumstances.  In the alternative to the relief requested in (i)-(iii), the Oversight Board requests that this Court enter an

order: (i) granting this Motion in part; and (ii) extending the deadline set forth in section 546 of

the Bankruptcy Code as by 90 days as to such claims.

*[Remainder of page intentionally left blank]*

Dated: April 2, 2019

/s/ Edward S. Weisfelner
BROWN RUDNICK LLP
Edward S. Weisfelner, Esq. (*Pro Hac Vice*)
Angela M. Papalaskaris, Esq. (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
eweisfelner@brownrudnick.com
apapalaskaris@brownrudnick.com

Stephen A. Best, Esq. (*Pro Hac Vice*)
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
Tel: (202) 536-1700
sbest@brownrudnick.com

Sunni P. Beville, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and
Management Board, acting through the
Special Claims Committee*

and

/s/ Kenneth C. Suria
ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial Oversight and
Management Board, acting through the
Special Claims Committee*

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
O'NEILL & BORGES LLC
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
hermann.bauer@oneillborges.com

and

/s/ Brian S. Rosen
Martin J. Bienenstock (*Pro Hac Vice*)
Brian S. Rosen (*Pro Hac Vice*)
Stephen L. Ratner (*Pro Hac Vice*)
Timothy W. Mungovan (*Pro Hac Vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York
Tel: (212) 969-3000
Fax: (212) 969-2900
mbienenstock@proskauer.com
brosen@proskauer.com
sratner@proskauer.com
tmungovan@proskauer.com

*Bankruptcy Counsel to the Financial Oversight
and Management Board for Puerto Rico, as
representative of the Commonwealth of Puerto
Rico*

35

# **Exhibit A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

```
--------------------------------------------------------------------- X
                                                    :
In re:                                              :
                                                    :
THE FINANCIAL OVERSIGHT AND                         :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                   :  Title III
                                                    :
        as representative of                        :  Case No. 17-BK-3283 (LTS)
                                                    :
THE COMMONWEALTH OF PUERTO RICO et al.,             :  (Jointly Administered)
                                                    :
        Debtors.[1]                                 :
--------------------------------------------------------------------- X
```

## [PROPOSED] ORDER EQUITABLY TOLLING THE TIME PRESCRIBED BY 11 U.S.C. § 546 TO BRING CERTAIN AVOIDANCE ACTIONS

Upon the motion dated April 2, 2019 (the "Motion")[2] of the Oversight Board, acting through its Special Claims Committee, pursuant to section 546 of the Bankruptcy Code, made applicable to this proceeding by section 301(a) of the Puerto Rico Opportunity Management and Economic Stability Act of 2016 ("PROMESA"), 48 U.S.C. § 2161(a); and the Court having jurisdiction over this matter under 28 U.S.C. 1331, and under section 306(a)-(b) of PROMESA, 48 U.S.C. §2166(a)-(b); and venue being proper under section 307(a) of PROMESA, 48 U.S.C. § 2167(a); and due and proper notice of the Motion having been provided, and it appearing that no

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Capitalized terms not defined in this Order shall have the meanings ascribed to them in the Motion.

other or further notice need be provided; and the Court having reviewed the Motion and opposition thereto and having heard the statements of counsel at the hearing held before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby

      **ORDERED** that this Motion is granted; and it is further

      **ORDERED** that the statute of limitations in section 546 of the Bankruptcy Code as applied to the Oversight Board's efforts to file actions for avoidance and recovery of payments made on account of Challenged Bonds is hereby extended to and includes a date not less than 90 days following the date that a ruling on the Joint Claim Objection, ERS Bond Objection, or Ad Hoc Objection, as applicable to any such Challenged Bonds, becomes final and unappealable.

Dated: _____, 2019

_____
                    Honorable Laura Taylor Swain
                    United States District Judge

00376612.1