# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

The Financial Oversight and Management Board
for Puerto Rico,

     as representative of

The Commonwealth of Puerto Rico, et al.,

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## STATEMENT OF POSITION OF THE LAWFUL CONSTITUTIONAL DEBT COALITION REGARDING OBJECTION TO CLAIMS FILED OR ASSERTED BY HOLDERS OF CERTAIN COMMONWEALTH GENERAL OBLIGATION BONDS

---

[1] The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

The Lawful Constitutional Debt Coalition (the "LCDC"),[2] hereby submits this Position Statement in connection with its Notice of Participation filed concurrently herewith pursuant to the *Initial Procedures for Resolving Omnibus Objection of (i) Financial Oversight and Management Board, Acting Through Its Special Claims Committee, and (ii) the Official Committee of Unsecured Creditors Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* (Dkt. No. 5143-2) (the "Initial Procedures").

## PBA BONDS ARE NOT DIRECT OBLIGATIONS OF THE COMMONWEALTH, BUT GO BONDS AND GUARANTEES ISSUED IN 2012 AND 2014 STILL VIOLATED THE EXPRESS LANGUAGE OF THE CONSTITUTIONAL DEBT LIMIT

### I.       The PBA and its Lawful Relationship with the Commonwealth

1.       Over 60 years ago, the Legislative Assembly of Puerto Rico by statute created the Public Buildings Authority ("PBA") as a public corporation charged with constructing, maintaining, and operating public facilities including schools, police and fire stations, and courthouses.[3] The PBA holds fee simple title to a large number of the properties in its portfolio, which it leases to tenants that include the Puerto Rico Department of Education, the Department

---

[2] The members of the LCDC and their respective holdings are set forth in the First Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019 (Dkt. 5807).

[3] 22 L.P.R.A. § 901, 902 (the "Enabling Act"). As a public corporation, the PBA is entirely separate from the Commonwealth government, with its own legal personality. Enabling Act § 902 (PBA constituted as a public "instrumentality" that is a "body corporate and politic with corporate franchise"); Complaint., *Fin. Oversight and Mgmt. Board for Puerto Rico v. Puerto Rico Pub. Build. Auth.*, Adv. Proc. 18-149 (Dkt. 1) ("Compl."), ¶ 21 ("instrumentalities" and "public corporations" are "not part of the Commonwealth's central government"). Consistent with this, the Legislative Assembly endowed the PBA with powers and capacities typical of independent, public entities, including the capacity to sue and be sued, to enter into and execute contracts, the power to acquire and dispose of property, and the authority to issue bonds to finance its activities. 22 L.P.R.A. § 906.

of Public Safety, Puerto Rico's Judicial Branch, and Puerto Rico's 78 Municipalities.[4]  For those

properties it does not own outright, the PBA holds rights or easements that allow it to lease or sub-

lease premises consistent with the Enabling Act.[5]  In total, the PBA reports 615 properties under

its jurisdiction[6] and capital assets totaling $3.7 billion.[7]  Over 1,000 PBA employees provide

maintenance, administrative, and operational services to its sizeable portfolio of buildings across

the island.[8]

    2.      The PBA's Enabling Act is valid under the law of Puerto Rico.[9]  Since its creation

by the Legislative Assembly in 1958, no Court has ever suggested that the PBA was unlawfully

created, or that it is a "sham" or an *alter ego* of the Commonwealth government.  In fact, courts

have concluded the opposite.[10]

---

[4] List of PBA properties and their respective tenants available at: https://data.pr.gov/Desarrollo-e-Infraestructura/Edificios-de-la-Autoridad-de-Edificios-P-blicos-AE/sw8z-xj2x.

[5] *See* Puerto Rico Public Buildings Authority, Resolution No. 468, Authorizing and Securing Government Facilities Revenue Bonds Guaranteed by the Commonwealth of Puerto Rico, adopted June 22, 1995.

[6] *See* note 2, *supra*.

[7] *See* 22 L.P.R.A. § 906; *see also* 1995 Resolution § 707; Public Buildings Authority, Basic Financial Statements for Fiscal Years Ended June 30, 2014 and 2013 and Independent Auditors' Report at 8, 15, *available* at http://www.gdb.pr.gov/investors_resources/documents/PBABasicFS-6-30-2014.pdf.

[8] *See* Gloria Ruiz Kuilan, *Edificios Públicos comienza la operación para remozar las escuelas*, EL NUEVO DIA (June 17, 2017), *available (in Spanish only) at* https://www.elnuevodia.com/noticias/locales/nota/edificiospublicos comienzalaoperacionpararemozarlasescuelas-2332034/.

[9] *E.g.*, *Brau v. ELA de Puerto Rico*, 2014 TSPR 26, 190 P.R. Dec. 315, 337, (P.R. 2014); *Partido Socialista Puertorriqueño v. ELA de Puerto Rico*, 7 P.R. Offic. Trans. 653, 727, (P.R. 1978), *modified Partido Independentista Puertorriqueño v. CEE*, 20 P.R. Offic. Trans. 607,  (P.R. 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of unconstitutionality is based, specifically mentioning the constitutional provisions involved and the legal precedents supporting its assignment.").

[10] *See, e.g., Soto-Padro v. Pub. Bldg. Auth.*, 747 F. Supp. 2d 319, 329 (D.P.R. 2010), *aff'd sub nom. Soto-Padro v. Pub. Bldgs. Auth.*, 675 F.3d 1 (1st Cir. 2012) (holding that the PBA was not an arm of the state entitled to immunity under the Eleventh Amendment to the U.S. Constitution).

3.      PBA issued bonds ("PBA Bonds") to finance the construction and maintenance of its buildings.  The Commonwealth also guaranteed the payment of principal and interest on PBA Bonds through guarantees issued in favor of holders of PBA Bonds.  The practice of guaranteeing PBA Bonds began in 1968, ten years after the PBA's creation.[11]

4.      The PBA derives its revenues from the rent paid by its tenants.  Numerous government facilities owned by the PBA are leased to the Commonwealth and various divisions, departments, and instrumentalities of the Commonwealth government for essential government functions.[12]  The rental payments under the PBA leases are expressly intended to be used to pay principal and interest on the PBA Bonds and to cover other specified expenses of the landlord. Indeed, the leases openly and appropriately define a portion of the rental payments as "Debt Service Rent."

5.      Accordingly, each fiscal year, the Commonwealth pays rent to the PBA in an amount sufficient to cover certain of the PBA's expenses, including the amounts necessary to pay the principal and interest owed on the PBA Bonds.[13]  These rent payments fluctuate from year to year based on the amount of principal and interest that is owed on the PBA Bonds, and all rent received by the PBA in any fiscal year is allocated first to pay PBA Bond debt service.[14]  In fiscal

---

[11]   Act No. 17-1968; Compl. ¶ 16 n.7.

[12]   *Id.*; *see, e.g.*, June 8, 2012 PBA Official Stmt. at 15 ("[T]he [PBA] enters into lease agreements . . . with various departments . . . of the Commonwealth . . . .").  Third parties, including the federal government, also lease property from the PBA.

[13]   *See, e.g., id.* at 17 ("The reduction in the [PBA's] debt service payment requirements for fiscal year 2012 will result in a commensurate decrease in the required rental payments for such fiscal year."); December 22, 2011 Master Sublease Agreement between PBA and Puerto Rico Department of Education at 2 (describing rentals as including "such annual amount or amounts . . . necessary to pay the principal of . . . and the interest on all Bonds under the Bond Resolution as the same become due and payable").

[14]   *See* 22 L.P.R.A. § 916 ("[R]ent payable to the Authority . . . shall be reasonable and sufficient, taking into consideration the amounts needed by the Authority to . . . pay the interest, principal, and amortization requirements of the bonds issued by the Authority for financing such a building"; "All or any

year 2011 (ending June 30, 2011), the PBA owed in excess of $250 million for principal and interest, and the Commonwealth paid a portion of this principal and interest as Debt Service Rent.[15]

## II.     The Constitutional Debt Limit

6.     Three years after the PBA was established, and before the Commonwealth began guaranteeing PBA Bonds, the Puerto Rico Constitution was amended to prohibit the Commonwealth of Puerto Rico from directly issuing bonds backed by the Commonwealth's full faith, credit, and taxing power if the sum of (i) the amount of principal and interest due on the bonds proposed to be issued together with all similar "***direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds***" previously issued by the Commonwealth and still outstanding, payable in any fiscal year, plus (ii) any amounts paid by the Commonwealth in the fiscal year immediately preceding the then current fiscal year "***for principal and interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth***," exceeds 15 percent of the average annual revenues deposited into the Treasury of Puerto Rico over the two previous years (the "Constitutional Debt Limit").[16]

---

part of the rents payable to the Authority under any such contracts may be committed by the Authority for the payment of the principal and interest of any bonds issued by the Authority."); 1995 Bond Resolution at 4 ("The term "Debt Service Rentals" shall mean the rentals required to be paid by the lessees of the government facilities under Lease Agreements on account of the principal of (including the Amortization Requirements for term bonds and the premiums, if any, for the redemption of bonds) and interest on all bonds."); *id.* § 502 ("[N]otwithstanding any contrary provision in any Lease Agreement or any contrary designation or instruction from any lessee, all rentals received by the Authority pursuant to any Lease Agreement shall be deemed to be Debt Service Rentals to the extent of the amounts then due and payable as Debt Service Rentals under such Lease Agreement . . . .").

[15]     *See* 2014 Financial Information and Operating Data Report, Oct. 30, 2014, at 104 ("General Fund budgetary expenditures for fiscal year 2011 were $10.065 billion, consisting of $9.075 billion of budgetary operating expenditures, $267 million in PBA rental payments and $722 million of transfers out for debt service payments on general obligation bonds.")

[16]     P.R. CONST. Art. VI, § 2 (emphasis added).

The same limitation was also imposed for any guarantee to be validly given by the Commonwealth.[17]

### III.   The GO Bonds and GO Guarantees Issued in 2012 and 2014 Violate the Plain Text (and Logic) of the Constitution

7.     The Commonwealth was able to issue GO Bonds and GO Guarantees in 2012 and 2014 only because it did not include the payments that the Commonwealth made to the PBA in the prior fiscal year for principal or interest on PBA Bonds when determining whether it had debt capacity in 2012 and 2014.  The plain language (in both English and Spanish) of the Constitutional Debt Limit makes clear, however, that any payments made in the preceding fiscal year by the Commonwealth for debt service on PBA Bonds should have been included.  These payments were indisputably "paid by the Commonwealth for principal and interest on account of outstanding obligations evidenced by bonds guaranteed by the Commonwealth."  The Commonwealth paid its rent to the PBA, a portion of which was used as expressly required to service the principal and interest owed on the PBA Bonds—***bonds that were guaranteed by the Commonwealth***.

8.     A portion of the payments made by the Commonwealth in the fiscal year prior to each of the 2012 and 2014 bond issuances were indisputably made "on account of" (read, because of, owing to, due to, as a consequence of, etc.) principal and interest then owing on the PBA Bonds.  Thus, under the plain language of Puerto Rico's Constitution, because the Commonwealth guaranteed the PBA Bonds, the Commonwealth's payments in the prior fiscal year for principal or interest on PBA Bonds should have been included in the determination of the Constitutional Debt Limit.  The text chosen by the framers of the 1961 amendment makes perfect sense in

---

[17]   *Id.* ("the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.").

determining how much full faith and credit debt the island can issue.  The first prong takes into account future payments on all "direct obligations" bonds (which are knowable based on a projected debt schedule), and the second prong requires the Commonwealth to consider whether it actually paid any debt service on bonds that it guaranteed with its full faith and credit and therefore was obligated to pay from its general fund revenues one way or another.

9.      It would make no sense to consider payments made for debt service on the PBA Bonds only in the event that the Commonwealth failed to pay its rent and thus "voluntarily triggered" its guarantee.  Not only would that be inconsistent with the text of the Constitutional Debt Limit, it is illogical and contrary to the purpose of the limit to begin with, which was to appropriately stress test the ability to issue additional direct obligations bonds in light of the financial reality at the time.  Whether a public corporation's debt service is paid by the Commonwealth on account of guaranteed bonds because the issuer had insufficient own-source revenues, or whether it was paid because the Commonwealth itself provided a portion of the required revenues to the public corporation for that purpose, the second prong of the Constitutional Debt Limit is implicated.

10.      The Commonwealth's failure to comply with this Constitutional mandate resulted in the issuance of approximately $6.7 billion of purported full faith and credit GO bonds and guarantees in 2012 and 2014 that violated the express terms of the Constitutional Debt Limit.[18]

---

[18]  The Lawful Constitutional Debt Coalition ("LCDC") reserves all claims, causes of action, rights, and remedies that may arise out of the issuance of the 2012 and 2014 GO bonds and guarantees.

Whether or not such GO bonds and guarantees have any allowable claim,[19] they clearly are not entitled to any lawful priority under Commonwealth law.[20]

### IV.  Bonds and Guarantees Issued in Contravention of the Constitutional Debt Limit

11.  PBA was validly created and PBA Bonds are undeniably constitutional, serving important public purposes over the past 60 years.  Although PBA Bonds are not "direct obligations of the Commonwealth for money borrowed directly by the Commonwealth," and therefore do not count for the first prong of the debt service margin, they are guaranteed bonds and accordingly had significance with respect to the second prong when the Commonwealth paid any part of the PBA's debt service in the fiscal year preceding a proposed issuance.  When the Constitutional Debt Limit is applied as plainly written, the Commonwealth lacked constitutional authority to issue the following general obligations bonds:

| Public Improvement Refunding Bonds, Series 2012 B | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2013 | $55,605,000 | 2.25% | 74514LZS9 |
| 2014 | 69,990,000 | 2.95% | 74514LZT7 |
| 2015 | 67,300,000 | 3.25% | 74514LZU4 |
| 2016 | 56,170,000 | 3.65% | 74514LZV2 |
| 2017 | 27,385,000 | 3.90% | 74514LZW0 |
| 2018 | 51,925,000 | 4.10% | 74514LZX8 |
| 2019 | 20,160,000 | 4.25% | 74514LZY6 |
| 2020 | 17,125,000 | 4.40% | 74514LZZ3 |
| 2033 | 49,610,000 | 5.30% | 74514LA23 |
| **Total** | **$415,270,000** | | |

---

[19]   The LCDC submits that any disputes concerning the appropriate remedy, if any, for holders of unlawful 2012 and 2014 GO bonds and guarantees should be deferred until after an appropriate court determines the proper construction of the Commonwealth Constitution—a pure question of Commonwealth law.

[20]   *See* PROMESA § 201(b)(1)(N) (requiring only that a certified fiscal plan "respect the relative *lawful priorities* or lawful liens, as may be applicable, *in the constitution*, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016") (emphasis added).

### Public Improvement Refunding Bonds, Series 2012 A

| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
|---|---|---|---|
| 2020 | $10,000,000 | 4.00% | 74514LA31 |
| 2020 | 35,345,000 | 5.00% | 74514LC47 |
| 2021 | 49,400,000 | 4.00% | 74514LA49 |
| 2021 | 52,895,000 | 5.00% | 74514LC54 |
| 2022 | 32,110,000 | 4.13% | 74514LA56 |
| 2022 | 21,285,000 | 5.00% | 74514LC62 |
| 2022 | 20,000,000 | 4.00% | 74514LD46 |
| 2023 | 7,290,000 | 4.38% | 74514LC70 |
| 2023 | 68,500,000 | 5.25% | 74514LA64 |
| 2023 | 5,000,000 | 4.13% | 74514LD53 |
| 2024 | 10,000,000 | 4.00% | 74514LC88 |
| 2024 | 11,050,000 | 5.25% | 74514LA72 |
| 2024 | 5,000,000 | 4.13% | 74514LD61 |
| 2025 | 22,030,000 | 4.50% | 74514LA80 |
| 2025 | 5,000,000 | 4.25% | 74514LD79 |
| 2026 | 60,000,000 | 5.50% | 74514LD38 |
| 2026 | 4,455,000 | 4.50% | 74514LC96 |
| 2026 | 69,740,000 | 5.50% | 74514LA98 |
| 2027 | 17,945,000 | 5.50% | 74514LB 22 |
| 2027 | 11,520,000 | 4.25% | 74514LD87 |
| 2028 | 64,795,000 | 5.75% | 74514LB30 |
| 2029 | 6,665,000 | 5.00% | 74514LB48 |
| 2030 | 7,000,000 | 4.75% | 74514LB97 |
| 2031 | 7,335,000 | 4.75% | 74514LB55 |
| 2032 | 7,685,000 | 5.00% | 74514LC21 |
| 2033 | 27,400,000 | 5.00% | 74514LC39 |
| 2035 | 322,925,000 | 5.00% | 74514LD20 |
| 2037 | 263,540,000 | 5.13% | 74514LB63 |
| 2039 | 459,305,000 | 5.50% | 74514LB71 |
| 2041 | 632,975,000 | 5.00% | 74514LB89 |
| **Total** | **$2,318,190,000** | | |

### General Obligation Bonds of 2014, Series A

| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
|---|---|---|---|
| 2035 | $3,500,000,000 | 8.00% | 745 I 4LE86 |
| **Total** | **$3,500,000,000** | | |

8

12.     Similarly, the Commonwealth lacked constitutional authority to guarantee the following public corporation bonds:

| Government Facilities Revenue Refunding Bonds, Series U | | | |
|---|---|---|---|
| Maturity Date July 1 | Principal Amount | Interest Rate | CUSIP |
| 2014 | $460,000 | 4.00% | 745235S51 |
| 2015 | 1,760,000 | 4.00% | 745235R45 |
| 2016 | 4,830,000 | 5.00% | 745235R52 |
| 2017 | 4,920,000 | 5.00% | 745235R60 |
| 2018 | 5,020,000 | 5.00% | 745235R78 |
| 2019 | 2,605,000 | 3.89% | 745235S69 |
| 2019 | 2,120,000 | 5.00% | 745235R86 |
| 2020 | 10,225,000 | 5.00% | 745235R94 |
| 2021 | 4,800,000 | 5.00% | 745235S28 |
| 2022 | 4,850,000 | 5.00% | 745235S36 |
| 2023 | 2,080,000 | 5.25% | 745235S44 |
| 2042 | 538,675,000 | 5.25% | 745235R37 |
| **Total** | **$582,345,000** | | |

13.     Similarly, the Commonwealth lacked constitutional authority to guarantee the following obligations:

| Other Commonwealth Guaranteed Debt (After March 2012) | | |
| --- | --- | --- |
| Issuing Entity | Principal Amount ($MM) | Original Issuance Date |
| PRIFA BANs | $78.1 | 3/17/2015 |
| Port of the Americas Authority | 233.6 | 12/31/2014 |
| **Total** | **$311.7** | |

DATED:  April 11, 2019

Respectfully submitted,

REICHARD & ESCALERA

**By :**  */s/ Rafael Escalera*
     **Rafael Escalera**
     USDC No. 122609
     escalera@reichardescalera.com

     **Sylvia M. Arizmendi**
     USDC-PR 210714
     arizmendis@reichardescalera.com

     **Carlos R. Rivera-Ortiz**
     USDC-PR 303409
     riverac@reichardescalera.com

     **Gustavo A. Pabón-Rico**
     USDC-PR 231207
     pabong@reichardescalera.com

     255 Ponce de León Avenue
     MCS Plaza, 10th Floor
     San Juan, Puerto Rico 00917-1913

QUINN   EMANUEL   URQUHART   &   SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**K. John Shaffer** (*pro hac vice*)
johnshaffer@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Matthew Scheck** (*pro hac vice*)
matthewscheck@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Darren M. Goldman** (*pro hac vice*)
darrengoldman@quinnemanuel.com

**Zachary Russell** (*pro hac vice*)
zacharyrussell@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional Debt Coalition*

11

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record.

*/s/Carlos R. Rivera-Ortiz*
USDC-PR 303409