**Objection Deadline: April 18, 2019, at 3:00 p.m. (AST)**
**Hearing Date and Time: April 24, 2019, at 2:00 p.m. (AST)**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | PROMESA |
| | ) | Title III |
| THE FINANCIAL OVERSIGHT AND | ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | Case No. 3:17-bk-03283 (LTS) |
| as representative of | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| Debtors. | ) | |
| ———————————————————— X | ) | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| Debtor. | ) | |
| -------------------------------------------------------------------- x | ) | |

# MOTION OF CERTAIN SECURED CREDITORS
# OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
# OF THE COMMONWEALTH OF PUERTO RICO
# TO COMPEL PRODUCTION OF DOCUMENTS IN PRIVILEGE LOG
# CATEGORIES 1 TO 4 [ATTORNEY-CLIENT PRIVILEGE,
# <u>ATTORNEY WORK PRODUCT, COMMON INTEREST]</u>

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 3

I.      Respondents Fail To Carry Their Burden As To Attorney Client Privilege And
        The Common Interest Doctrine ........................................................................... 4

        A.      Materials In Categories 1 To 4 Were Sent To Or From Non-Lawyer
                Bankers And Consultants So They Are Not Protected By Attorney-Client
                Privilege ................................................................................................... 4

        B.      The Common Interest Doctrine Cannot Protect Documents Sent To Or
                From Both ERS And The Other Respondents ........................................... 8

        C.      The Fraud Exception To Attorney Client Privilege Applies To Any
                Communications In Which ERS Cooperated In Any Transaction That
                Stripped ERS Of All Of Its Assets Rather Than Opposing It ............................ 11

II.     Respondents Have Not Met Their Burden With Respect To Their Claims For
        Attorney Work Product Protection ................................................................... 13

CONCLUSION............................................................................................................ 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*Aurora Loan Servs. v. Posner, Posner & Assocs., P.C.*,
499 F. Supp. 2d 475 (S.D.N.Y. 2007)...................................................................7

*Banco do Brasil, S.A. v. 275 Washington St. Corp.*,
No. 09-11343, 2012 WL 1247756 (D. Mass. Apr. 12, 2012).................................7

*Bank of Am., N.A. v. Terra Nova Ins. Co.*,
211 F. Supp. 2d 493 (S.D.N.Y. 2002).................................................................11

*Cavallaro v. United States*,
284 F.3d 236 (1st. Cir. 2002) .................................................................... *passim*

*Columbia Data Prods., Inc. v. Autonomy Corp.*,
No. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ...............6, 7, 14

*Corvello v. N.E. Gas Co.*,
243 F.R.D. 28 (D.R.I. 2007) ................................................................................7

*CSX Transp., Inc. v. ABC&D Recycling, Inc.*,
2016 WL 6561551 (D. Mass. Nov. 3, 2016) .......................................................13

*Dahl v. Bain Capital Partners*,
714 F. Supp. 2d 225 (D. Mass. 2010) ..................................................................7

*Data Gen. Corp v. Grumman Sys. Support Corp.*,
139 F.R.D. 556 (D. Mass. 1991)...................................................................14, 15

*Dorf & Stanton Commc'n, Inc. v. Molson Breweries*,
100 F.3d 919 (Fed. Cir. 1996).............................................................................7

*FDIC v. Ogden Corp.*,
202 F.3d 454 (1st Cir. 2000)................................................................................8

*FTC v. Boehringer Ingelheim Pharm., Inc.*,
778 F.3d 142 (D.C. Cir. 2015) ...........................................................................16

*Hilsinger Co. v. Eyeego, LLC*,
2015 WL 11120842 (D. Mass. Aug. 13, 2015) ....................................................8

*In re Berks Behavioral Health LLC*,
500 BR 711 (Bankr. E.D. Pa. 2013) ..............................................................10, 11

*In re Blier Cedar Co.*,
10 B.R. 993 (Bankr. D. Me. 1981).................................................................12, 13

*In re Campbell*,
248 B.R. 435 (Bankr. M.D. Fla. 2000) ...............................................................12

*In re Cumberland Inv. Corp.*,
120 B.R. 627 (Bankr. D.R.I. 1990).....................................................................12

## TABLE OF AUTHORITIES

(continued)

Page(s)

*In re Grand Jury Proceedings*,
    417 F.3d 18 (1st Cir. 2005) ................................................................................ 11

*In re Grand Jury Subpoena*,
    220 F.R.D. 130 (D. Mass. 2004) ......................................................................... 15

*In re Keeper of Records*,
    348 F.3d 16 (1st Cir. 2003) .................................................................................. 3

*In re St. Johnsbury Trucking Co.*,
    184 B.R. 446 (Bankr. D. Vt. 1995) .................................................................... 12

*In re Warner*,
    87 B.R. 199 (Bankr. M.D. Fla. 1988) ................................................................ 12

*Ken's Foods, Inc. v. Ken's Steak House, Inc.*,
    213 F.R.D. 89 (D. Mass. 2002) ...................................................................... 9, 10

*Lluberes v. Uncommon Prods., LLC*,
    663 F.3d 6 (1st Cir. 2011) ..................................................................................... 5

*Marx v. Kelly, Hart & Hallman, P.C.*,
    929 F.2d 8 (1st Cir. 1991) ..................................................................................... 4

*Mullins v. Dep't of Labor of P.R.*,
    269 F.R.D. 172 (D.P.R. 2010) ........................................................................... 14

*Reed v. Baxter*,
    134 F.3d 351 (6th Cir. 1998) ............................................................................. 11

*Schreibman v. Walter E. Heller & Co. of P.R.*,
    446 F. Supp. 141 (D.P.R. 1978) ........................................................................ 11

*Stix Prods., Inc. v. United Merchs. & Mfg., Inc.*,
    47 F.R.D. 334 (S.D.N.Y. 1969) ........................................................................ 15

*United States v. Constr. Prods. Research, Inc.*,
    73 F.3d 464 (2nd Cir. 1996) ................................................................................. 7

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ..................................................................... 5, 6, 7, 8

*United States v. Textron Inc.*,
    577 F.3d 21 (1st Cir. 2009) ........................................................................... 13, 14

*W Holding Co. v. Chartis Ins. Co. of P.R.*,
    300 F.R.D. 48 (D.P.R. 2014) ...................................................................... 1, 13, 14

*Wade v. Touchdown Realty Grp., LLC*,
    No. 17-10400, 2018 WL 575848 (D. Mass. Jan. 26, 2018) ................................. 7

*Warren v. Rojas*,
    2011 U.S. Dist. LEXIS 163726 (D. Mass. Feb. 17, 2011) ................................. 4

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Willemijn Houdstermaatschaapij BV v. Apollo Comput. Inc.*,
  707 F. Supp. 1429 (D. Del. 1989) .............................................................................16

**STATUTES**

3 L.P.R.A. § 761 .............................................................................................................9

3 L.P.R.A. § 775 .............................................................................................................9

3 L.P.R.A. § 786-5 (2010) ........................................................................................9, 10

48 U.S.C. § 2170 ............................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7026 ..................................................................................................1

Fed. R. Bankr. P. 7037 ..................................................................................................1

Fed. R. Bankr. P. 9014 ..................................................................................................1

Fed. R. Civ. P. 26 ....................................................................................1, 13, 15, 16

Fed. R. Civ. P. 37 ..........................................................................................................1

Fed. R. Civ. P. 45 ..........................................................................................................1

To the Chambers of the Honorable Judith G. Dein:

Pursuant to Fed. R. Bankr. P. 7026, 7037, and 9014, and Fed. R. Civ. P. 26, 37, and 45, made applicable by 48 U.S.C. § 2170, the Bondholders move to compel the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Commonwealth of Puerto Rico (the "Commonwealth"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (together, "Respondents") to produce materials wrongly withheld under the attorney-client privilege, the attorney work product doctrine, and the common-interest doctrine.

## INTRODUCTION

1.       From the outset of these discovery proceedings, Respondents made it no secret that they intended to broadly invoke privileges. Accordingly, the Bondholders asked the Court to impose standards for privilege logs, which the Court did. On April 11 and 12, Respondents then served categorical privilege logs indicating that they had withheld 509 responsive documents, falling into seven broad categories, based on assertions of various privileges. As the Court directed at the telephonic status conference on April 12, the Bondholders submit this motion to compel documents from four of those categories; a second motion to compel will be filed tomorrow with respect to the remaining three categories as well as the executive privilege claims in Category 1.

2.       It is settled law that the parties claiming privilege bear the burden of justifying their claims. *W Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 51 (D.P.R. 2014). Because Respondents have not substantiated their privilege claims, the Court should order the production of the documents in Categories 1 to 4 of Respondents' privilege log.

3.       *First*, Respondents' log reveals that the documents allegedly protected by attorney-client privilege in each of Categories 1 to 4 were shared extremely broadly—to hundreds of recipients, including many non-lawyer, non-law firm advisors. Dissemination to these third parties prevented the privilege from forming and waived any privilege that might otherwise have formed.

4.      *Second*, Respondents invoke the common-interest doctrine for Categories 1 to 3, but according to their privilege log, documents in those categories were sent to and from ERS and the other Respondents. Because ERS and the other Respondents do not—and cannot—share a common legal interest with respect to the subject matter of the documents, the common-interest doctrine does not apply.

5.      *Third*, documents in which ERS sought or received legal advice to enable the diversion of the Bondholders' collateral, whether through PayGo or otherwise, fall under the fraud exception to the attorney-client privilege and are therefore not protected.

6.      *Fourth*, though Respondents claim work-product protection over Categories 1 to 3, they fail to make any showing whatsoever that those documents were prepared specifically for use in litigation, rather than for other purposes.

## **BACKGROUND**

7.      The Court is familiar with these discovery proceedings concerning the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* (Dkt. 289 in Case No. 17-bk-03566) (the "Stay Relief Motion").[1] In connection with their Stay Relief Motion, the Bondholders sought discovery from Respondents regarding, *inter alia*, the conception, drafting, enactment, and implementation of Joint Resolution 188 and Act 106, and the creation of the PayGo system. On April 1, 2019, the Court overruled Respondents' broad relevance objections and ordered Respondents to produce documents and an adequate privilege log.

---

[1] The Bondholders incorporate the background in the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Discovery* (Dkt. No. 402 in Case No. 17-bk-03566) and *Reply in Support of Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Discovery* (Dck. No. 422 in Case No. 17-bk-03566).

8.      Respondents produced a categorical privilege log on April 11, and an amended log and supporting appendix on April 12. Exs. B, C. They withheld seven categories of documents— 509 in total. This motion addresses the first four categories, which Respondents claim are protected by the attorney-client privilege, the attorney work product doctrine, or both, along with the common-interest doctrine:

| Category | Number of Documents | Senders or Recipients | Description | Asserted Privilege |
|---|---|---|---|---|
| Category 1 | 119 | 78 | Confidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in connection with anticipated and ongoing litigation with ERS bondholders. | Attorney-Client Privilege Attorney Work Product Executive Privilege Common Interest |
| Category 2 | 156 | 80 | Confidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in connection with pension reform proposals, including conversion to PayGo, the PayGo fee structure, legal theories regarding potential litigation, and treatment of benefits. | Attorney Client Privilege Attorney Work Product Common Interest |
| Category 3 | 69 | 84 | Confidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in connection with PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees. | Attorney Client Privilege Attorney Work Product Common Interest |
| Category 4 | 95 | 28 | Confidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice concerning draft pension reform legislation including circulating and commenting on interim drafts and analyses of Joint Resolution 188 and Act 106. | Attorney Client Privilege Common Interest |

## ARGUMENT

9.      As the parties asserting claims of privileges, Respondents have the burden of establishing their applicability to the contested documents as well as the burden of showing that that the privileges have not been waived. *In re Keeper of Records*, 348 F.3d 16, 22 (1st Cir. 2003).

Courts thus reject privilege claims when a party fails to provide a log that contains sufficient information to establish the basis for the privilege. *See, e.g., Warren v. Rojas,* 2011 U.S. Dist. LEXIS 163726, at *9–10 (D. Mass. Feb. 17, 2011). Respondents' bare-bones privilege log does not come close to providing "sufficient information to allow the court to rule intelligently on the privilege claim." *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991).

## I. Respondents Fail To Carry Their Burden As To Attorney Client Privilege And The Common Interest Doctrine.

10.     Respondents claim attorney-client privilege and the application of the common-interest doctrine. The First Circuit has explained that the attorney-client privilege applies:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st. Cir. 2002). The common-interest doctrine "is not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." *Id.* at 250. It "prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications." *Id.* Again, Respondents "bear the burden of establishing that the attorney-client privilege" applies, *id.* at 246, a burden they have not met.

### A. Materials In Categories 1 To 4 Were Sent To Or From Non-Lawyer Bankers And Consultants So They Are Not Protected By Attorney-Client Privilege.

11.     Respondents identify over 200 senders and recipients of documents in Categories 1 to 4. These include dozens of employees of banks, consulting firms, accountants, and other non-legal advisors. The non-lawyer firms whose non-lawyer employees are named include:

| | | |
|---|---|---|
| Ankura Consulting Group, Inc. (FOMB Advisor) | Business advisory firm | Categories 2, 3 |

- 4 -

| Bank of America Merrill Lynch (AAFAF Advisor) | Financial advisor | Categories 1, 2, 3 and 4 |
|---|---|---|
| Bluhaus Capital, LLC (AAFAF Advisor) | Business and financial consulting firm | Categories 1, 2, and 3 |
| Conway MacKenzie, Inc. (AAFAF Advisor) | Financial advisor | Category 2 |
| Ernst & Young LLP (FOMB Advisor) | Financial advisor | Category 2 |
| IBM (AAFAF and/or Fortaleza Advisor) | Unknown | Category 1 |
| McKinsey & Company, Inc. (FOMB Advisor) | Management consultant | Categories 1, 2, 3, and 4 |
| Pension Trustee Advisors (ERS Advisor) | Pension consultant | Category 2 |
| Rothschild Global Advisory (AAFAF Advisor) | Financial advisor and investment bank | Categories 1, 2, and 3 |

12. By definition, these communications cannot be attorney-client communications, since the employees of these non-legal advisors are neither the attorney (they are not lawyers) nor the client (they are not receiving legal advice). And as the First Circuit has explained, "[f]or a communication to be covered by the attorney-client privilege, the communication must be made in confidence" and "not be waived. The presence of third parties during an attorney-client communication is often sufficient to undermine the 'made in confidence' requirement, or to waive the privilege." *Cavallaro*, 284 F.3d at 246 (citations omitted). Absent an exception, then, the fact that third parties received the materials means the privilege never arose or has been waived. *Id.*

13. To avoid this inescapable conclusion, Respondents evidently rely on an exception called the "*Kovel* doctrine" that applies to "third parties employed to assist a lawyer in rendering legal advice." *Id.* at 247; *see also United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). The First Circuit has never recognized the *Kovel* doctrine. *Cavallaro*, 284 F.3d at 240 ("Assuming *arguendo* that this circuit would adopt the *Kovel* rule, we conclude that the documents are not privileged."); *see also Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 n.20 (1st Cir. 2011). But even if the

doctrine applies in this Circuit, it is extremely narrow and Respondents have not met their burden of showing that it applies here.

14.     For the *Kovel* exception to apply as the First Circuit construed it in *Cavallaro*, "three separate elements must be met." *Columbia Data Prods., Inc. v. Autonomy Corp.*, No. 11-12077-NMG, 2012 WL 6212898, at \*14 (D. Mass. Dec. 12, 2012). *First*, "the third-party communications must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* at \*15; *see also Cavallaro*, 284 F.3d at 247–48 (same). This is a very high standard—it is not enough that the third-party's involvement be "useful and convenient," rather it "must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Columbia Data Prods.*, 2012 WL 6212898, at \*15; *see also Cavallaro*, 284 F.3d at 249 (same). *Second*, the third party must play "an interpretive role. In other words, the third party's communication must serve to translate information between the client and the attorney." *Columbia Data Prods.*, 2012 WL 6212898, at \*15. "The exception does not apply where the lawyer merely obtains information from the third party in order to give advice to the client." *Id. Third*, "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice." *Id.* "[I]f the advice sought is the [third party's] rather than the lawyer's, no privilege exists." *Id.*

15.     Respondents' privilege log makes no effort, and offers no facts, sufficient to carry its heavy burden to show that any of these three elements—much less all three—is met. Instead, Respondents simply list the non-lawyer third parties in the "Aggregate Sender/Recipient List" for each category and say no more. And in the separate appendix identifying each sender/recipient, Respondents provide no details that could support the application of *Kovel*. Instead, they simply label the third parties' roles in nondescript terms: "AAFAF Advisor," "FOMB Advisor,"

"Actuarial Advisor," and the like. Respondents therefore entirely fail to show (1) that the third

parties' involvement was "necessary, or at least highly useful, in facilitating the legal advice," (2)

that legal counsel was "relying on [the third parties] to translate or interpret information between

the lawyers and" the client, or (3) that the purpose of including the third parties was to facilitate

legal advice by the lawyers, rather than financing, accounting, or consulting advice by the non-

lawyer advisors. *See id.* at \*15–16.[2]

16.     Thus, just as in *Columbia Data Products*, Respondents' failure to satisfy any of the

elements required for the application of the *Kovel* exception means that documents shared with the

non-lawyer third parties are not privileged. *Id.* at \*14–16. *See also, e.g.*, *Wade v. Touchdown Realty*

*Grp., LLC*, No. 17-10400, 2018 WL 575848, at \*3 (D. Mass. Jan. 26, 2018) (holding *Kovel*

inapplicable and documents not privileged where "there is no evidence that [the third party] was

needed to help translate any communications between the [clients] and their attorney, and he

clearly was not hired for such a purpose"); *Banco do Brasil, S.A. v. 275 Washington St. Corp.*, No.

09-11343, 2012 WL 1247756, at \*7–8 (D. Mass. Apr. 12, 2012) (similar); *Dahl v. Bain Capital*

*Partners*, 714 F. Supp. 2d 225, 229 (D. Mass. 2010) (documents sent to financial advisor not

privileged where client sought "advice based on [advisor's] 'financial expertise and industry

experience,'" rather than assistance understanding legal advice).

17.     Moreover, even if Respondents could show that *some* of the non-lawyer third

parties meet *Cavallaro*'s high standard, they cannot show that *all* of them do, as would be

necessary for privilege to attach. *Cavallaro*, 284 F.3d at 246. Respondents have offered nothing to

show, for example, that Blauhaus Capital, Rothschild & Co., Bank of America Merrill Lynch, and

---

[2] *See also Dorf & Stanton Commc'n, Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir. 1996) (attorney-client privilege waived where the privilege log did not set forth the basis for the privilege); *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473-74 (2nd Cir. 1996); *Corvello v. N.E. Gas Co.*, 243 F.R.D. 28, 33–35 (D.R.I. 2007); *Aurora Loan Servs. v. Posner, Posner & Assocs., P.C.*, 499 F. Supp. 2d 475, 478 (S.D.N.Y. 2007).

IBM were all "nearly indispensable" to AAFAF's receipt of legal advice about ERS litigation (Category 1). Nor can they show that AAFAF needed advice from Ernst & Young Puerto Rico, McKinsey & Company, and Pension Trustee Advisors in order to understand legal advice about the conversion to PayGo (Category 2). The same also is true with respect to Categories 3 and 4.

18.     Respondents' invocation of the common-interest doctrine does not alter this result:

> The common-interest doctrine prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications, for instance, a codefendant. *The doctrine does not extend to prevent waiver when an accountant*, not within the *Kovel* doctrine, is made privy to the attorney-client communications.

*Id.* at 250 (emphasis added). That is because a non-lawyer third-party advisor "does not share an interest in receiving legal advice from the lawyer and cannot logically be said to have an interest in common with the represented party or parties." *Id.* Thus, if the elements for the *Kovel* exception are not met, a party "cannot resurrect the privilege by" invoking the common-interest doctrine. *Id.*

**B.     The Common Interest Doctrine Cannot Protect Documents Sent To Or From Both ERS And The Other Respondents.**

19.     The documents in Categories 1 to 3 are not privileged for another reason: They were sent to, or received by, ERS, the Commonwealth, and AAFAF, and ERS does not share a common legal interest with those parties with respect to the subject matter of the documents.

20.     For purposes of the common-interest doctrine, "[t]he term 'common interest' typically entails an identical (or nearly identical) legal interest as opposed to a merely similar interest. Thus, the proponent of the exception must establish cooperation in fact toward the achievement of a common objective." *FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000). It is Respondents' burden, as "the proponent of the privilege," to "establish 'cooperation in fact toward the achievement of a common [legal] objective.'" *Hilsinger Co. v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015). In doing so, they must also "establish that they agreed

to engage in a joint effort and to keep the shared information confidential from outsiders." *Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 93 (D. Mass. 2002).

21.     Although ERS is an instrumentality of the Commonwealth, it was created by legislation as an independent, self-governing trust, with an independent Board of Trustees responsible for setting policy and overseeing operations. *See* 3 L.P.R.A. §§ 761, 775. ERS's responsibilities included collecting employer contributions from the Commonwealth and other agencies advised by AAFAF and paying pension benefits. *See* 3 L.P.R.A. §786-5 (2010).

22.     Throughout the period covered by the privilege log, the Commonwealth and many other AAFAF-advised agencies owed ERS large sums of money in past-due employer contributions, which ERS had the express power to collect. Bond Resolution §§501, 1102 (Ex. D). With respect to any proposals, like PayGo, to deprive ERS of employer contributions, ERS and the other Respondents therefore had a fundamentally adverse relationship, not a common interest.

23.     Confirming this adversity, in 2008 ERS committed itself to take *the Bondholders*' side in any pension reform debate touching on the Bondholders' interests. In exchange for the billions of dollars it raised by selling ERS Bonds, ERS promised:

> The System shall *oppose any attempt by the Legislature of the Commonwealth* to reduce the Employers' Contribution Rate or *to make any* other *change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders*. Such opposition shall include delivering written position papers to the Legislature of the Commonwealth, appearing before Legislative committees, and contacting individual legislators and other government officials to make legislators and other governmental officials aware that such reductions in the Employers' Contribution Rate or other changes may adversely affect the ability of the System to comply with its obligations and may ultimately have an adverse effect on the credit of the Commonwealth.

Bond Resolution § 709 (emphasis added).

24.     The Bond Resolution compelled ERS to vigorously oppose any pension-reform proposal that would negatively affect the Bondholders. And PayGo clearly "ha[d] . . . a material

adverse effect on Bondholders"—on Respondents' own theory, it obliterated the employer contributions that secured the next fifty years' of payments on ERS's debt. Accordingly, ERS's obligations were clear: it had to "oppose any attempt *by the Legislature of the Commonwealth*"— the governing body of one of the other Respondents—"to make" the changes that gave rise to the PayGo system. Indeed, ERS even had to "deliver[] written position papers to the Legislature," "appear[] before Legislative committees," and "contact[] individual legislators and other government officials" to "make [them] aware" that changes would "adversely affect the ability of the System to comply with its obligations" and "ultimately have an adverse effect on the credit of the Commonwealth." *Id.*

25.     Against this background, it is obvious that there can be no "common legal interest" between ERS and the other Respondents with respect to pension reform proposals or the implementation of PayGo (the subjects of Categories 2 and 3, respectively). Respondents offer no evidence that they ever "agreed to engage in a joint effort" with ERS "and to keep the shared information confidential from outsiders." *Ken's Foods*, 213 F.R.D. at 93. To the contrary, ERS had a contractual duty to *oppose* pension reform that reduced or eliminated employer contributions or otherwise harmed the Bondholders. And because the litigation against the ERS Bondholders that is the subject of Category 1 concerns precisely those same topics, ERS and the other Respondents cannot share a common legal interest with respect to that litigation, either. Indeed, because of (and confirming) their adversity, the Commonwealth and ERS have entered into a tolling agreement to preserve ERS's legal claims against the Commonwealth. *See* Dkt. No. 5271 in Case No. 17-03283 and Dkt. No. 376 in Case No. 17-03566.

26.     The common-interest doctrine does not apply where there is an "inherent conflict between" the parties of this sort. *See In re Berks Behavioral Health LLC*, 500 BR 711, 723 (Bankr.

- 10 -

E.D. Pa. 2013) (no common interest due to "the inherent conflict between the Debtor's primary duty and [a bankruptcy bidder's] purported interest"); *see also Reed v. Baxter*, 134 F.3d 351, 357–58 (6th Cir. 1998) (no common interest for privilege purposes between city counselor and the city executives whose behavior the counselor was investigating). Moreover, courts have held that the debtor-creditor relationship involves an "inherent conflict of interest" which is not overcome even if the creditor and debtor "seek similar relief" with respect to some claims. *Schreibman v. Walter E. Heller & Co. of P.R.*, 446 F. Supp. 141, 143–44 (D.P.R. 1978); *see also Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 496–97 (S.D.N.Y. 2002). The conflict between the Commonwealth and ERS is a textbook example of such a hopeless conflict of interest.

### C.   The Fraud Exception To Attorney Client Privilege Applies To Any Communications In Which ERS Cooperated In Any Transaction That Stripped ERS Of All Of Its Assets Rather Than Opposing It.

27.   ERS's involvement in "pension reform proposals, including conversion to PayGo, the PayGo fee structure, legal theories regarding potential litigation, and treatment of benefits" (Category 2) and "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees" (Category 3) raises further issues. The attorney-client privilege does not apply where "the client sought or employed legal representation in order to commit or facilitate a . . . fraud." *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005). Thus, documents are not privileged if (1) the client "was engag[ed] in (or was planning) . . . fraudulent activity when the attorney-client communications took place; and (2) . . . the communications were intended by the client to facilitate or conceal the . . . fraudulent activity." *Id*. "[I]t is very hard for an adversary unaided to show that the privileged communications were themselves corrupt," so "something less than a mathematical (more likely than not) probability" suffices to overcome the privilege. *Id.* at 23. "[I]t is enough . . . that there is a reasonable basis to believe that the lawyer's services were used by the client to foster . . . fraud." *Id.*

28.     Courts thus reject privilege claims where a client sought legal advice for purposes of unlawfully "hinder[ing] the enforcement of a security interest" and carrying out a "fraudulent transfer" in bankruptcy. *In re Blier Cedar Co.*, 10 B.R. 993, 999–1000 & n.14 (Bankr. D. Me. 1981); *see also, e.g.*, *In re Campbell*, 248 B.R. 435, 440 (Bankr. M.D. Fla. 2000) (fraud exception applies where requesting party "raises sufficient inference that [certain] transfers may have been fraudulent" under the Bankruptcy Code); *In re Cumberland Inv. Corp.*, 120 B.R. 627, 630–31 (Bankr. D.R.I. 1990) (similar); *In re Warner*, 87 B.R. 199 (Bankr. M.D. Fla. 1988) (similar). And because "the principle served by both the attorney-client privilege and the [fraud] exception is that communications in furtherance of some sufficiently malignant purpose will not be protected," courts "look to substance, not form" in applying the exception. *In re St. Johnsbury Trucking Co.*, 184 B.R. 446, 456 (Bankr. D. Vt. 1995). As a result, "not just technical . . . frauds are excluded from the attorney-client privilege"; "many kinds of wrongdoing that do not qualify as civil fraud in the strict sense" are also covered. *Id.*

29.     Here, Respondents' privilege log, however sparse, demonstrates that ERS communicated with AAFAF, the Oversight Board, and other entities about "pension reform proposals, including conversion to PayGo" and about "PayGo implementation." The log even expressly claims that ERS, AAFAF, the Oversight Board, and others shared a "Common Interest" in those proposals. Thus, if it is to be believed, the log concedes that the legal advice ERS sought with respect to these categories of documents was to facilitate the creation of the PayGo system, the resultant transfer of employer contributions away from ERS to the Commonwealth, and the diversion of the Bondholders' collateral. Putting to one side the fact that ERS covenanted not to do this very thing, the intentional and carefully-planned dissipation of the Bondholders' property was an unalloyed effort to "hinder[] the enforcement of a security interest" and carry out a

- 12 -

"fraudulent transfer" in bankruptcy. *In re Blier Cedar Co.*, 10 B.R. at 999–1000 & n.14; *see supra*

¶¶ 21–24. Because the fraud exception to the attorney-client privilege applies, Respondents'

privilege claims must be overruled.

## II.   Respondents Have Not Met Their Burden With Respect To Their Claims For Attorney Work Product Protection.

30.      Respondents also claim work-product protection as to Categories 1 to 3. But the

category descriptions in Respondents' log entirely fail to address, much less adequately

substantiate, the requirements for such protection. The Court should therefore Respondents' claims.

31.      Work-product protection is governed by Rule 26(b)(3)(A), which provides that

"[o]rdinarily, a party may not discover documents and tangible things that are prepared in

anticipation of litigation or for trial." As the First Circuit has explained, however, "[i]t is not enough

to trigger work product protection that the *subject matter* of a document relates to a subject that

might conceivably be litigated . . . . Nor is it enough that the materials were prepared by lawyers

or represent legal thinking." *United States v. Textron Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (en banc).

Similarly, "[w]ork product protection does not extend to documents that . . . would have been

created in essentially similar form irrespective of the litigation." *Id.* at 30. Rather, materials must

be have been "prepared for *use in* litigation, whether the litigation was underway or merely

anticipated." *Id.* at 29 (emphasis added); *see also, e.g.*, *CSX Transp., Inc. v. ABC&D Recycling,

Inc.*, 2016 WL 6561551, at *3 (D. Mass. Nov. 3, 2016) ("The [work product] doctrine only protects

against disclosure of materials actually prepared for litigation or trial.").

32.      Courts therefore reject work-product protection where the withholding party fails

to show that the documents were specifically intended for use in litigation. *See, e.g.*, *W Holding

Co.*, 300 F.R.D. at 51 (where, "aside from the fact that the subject matter of the document pertains

to then-existing litigation, [the withholding party] has not offered specific facts, evidence, or any

other proof to show that the memorandum was prepared because of litigation," the party "has failed to carry its burden of showing that the privilege applies to" the withheld document); *Columbia Data Prods.*, 2012 WL 6212898, at *12 (rejecting work-product protection for documents where the evidence showed that entity was engaged for a factual investigation rather than "to provide expert advice in anticipation of litigation"); *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 175–76 (D.P.R. 2010) (withholding party failed to show that "internal investigation report" prepared by an agency's "Legal Affairs Division" was work-product, where the party had not "offered facts, evidence or any other proof to support its contention" that the report was entitled to work product protection).

33.    Respondents' privilege log does not meet this high standard.  In fact, it does no more than mechanically recite that the withheld documents are

> "[c]onfidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in connection with": (1) "anticipated and ongoing litigation with ERS Bondholders," (2) "pension reform proposals, including conversion to PayGo, the PayGo fee structure, legal theories regarding potential litigation, and treatment of benefits," and (3) "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees."

At most, those descriptions assert that "the *subject matter* of [the] document[s] relates to" the present litigation, which is not enough. *Textron Inc.*, 577 F.3d at 29. Nowhere does the log say, much less "offer[] specific facts, evidence, or any other proof to show," *W Holding Co.*, 300 F.R.D. at 51, that the documents were prepared specifically "for *use in* litigation" rather than for other purposes, as the law requires. *Textron Inc.*, 577 F.3d at 29 (emphasis added). Respondents have therefore not met their burden to invoke the work-product doctrine for Categories 1 to 3.

34.    And there are further deficiencies as well. Documents shared with adversaries are not entitled to work-product protection, and as explained above, *supra* ¶ 25, ERS and the other Respondents are adverse with respect to the subject matter of these documents.  *See, e.g.*, *Data*

- 14 -

*Gen. Corp v. Grumman Sys. Support Corp.*, 139 F.R.D. 556, 558 (D. Mass. 1991) ("Since the policy behind work product immunity is to bolster the adversarial system, disclosure of a document to an adversary is fundamentally inconsistent with this policy.").

35.     Moreover, the description for Category 2 says that the documents relate to "pension reform proposals, including conversion to PayGo, the PayGo fee structure, legal theories regarding potential litigation, and treatment of benefits." Obviously, materials about "pension reform proposals," "conversion to PayGo," "the PayGo fee structure," and "treatment of benefits" do not, on their face, satisfy Rule 26(b)(3)(A)'s requirement for "documents . . . prepared in anticipation of litigation." These are instead routine planning and analytical materials having nothing to do with litigation *per se*. And Respondents' addition of the words "legal theories regarding potential litigation" do not cure the problem, since—in this litigious day and age—any litigation must be pending or readily identifiable, and not just "potential." *See, e.g.*, *Stix Prods., Inc. v. United Merchs. & Mfg., Inc.*, 47 F.R.D. 334, 337 (S.D.N.Y. 1969); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 146–47 (D. Mass. 2004). In order to rely upon the work-product doctrine to withhold these items, Respondents must clearly identify the litigation in question, demonstrate why they believed—at the time the materials were prepared—that the litigation was probable, and show how these materials would relate to it.

36.     Category 3—documents concerning "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees"—is even weaker. Though Respondents seek to invoke the work-product doctrine to withhold these materials, they make no mention of pending, threatened, or even anticipated litigation. Obviously, Rule 26(b)(3)(A) does not protect them.

37.     Finally, the work-product doctrine is a qualified privilege that can be overcome upon a showing of need. Fed. R. Civ. P. 26(b)(3)(A)(ii). The Bondholders have again and again

- 15 -

demonstrated that evidence about "pension reform proposals," "conversion to PayGo," "the PayGo fee structure," and "treatment of benefits" (Category 2), as well as "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees" (Category 3), are at the heart of the Stay Relief motion and that only Respondents are in possession of these critical materials. *See, e.g.*, Dkt. No. 422 in Case No. 17-bk-03566, at 3–7. Respondents' productions of unprivileged documents have contained few, if any, documents shedding meaningful light on these subjects and what happened to the Bondholders' collateral. Respondents therefore have a "substantial need" for the purportedly protected documents, and no "substantial[ly] equivalent" contemporaneous evidence of Respondents' actions is available. Fed. R. Civ. P. 26(b)(3)(A)(ii). The Court should order their production even if it concludes that they include attorney work product. *See, e.g.*, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 157–58 (D.C. Cir. 2015) (ordering production of work product where it "provide[d] unique information about" a party's intent in entering a challenged settlement that could not be otherwise obtained).

## CONCLUSION

For the reasons set forth above, this Court should compel Respondents to produce all documents in Categories 1 to 4 of their privilege log.[3]

---

[3] Respondents have steadfastly refused to produce a document-by-document privilege log, or even materially improve the deficient privilege logs they have served. As a result, Respondents are now confined to the record they created, and they should not be allowed to make after-the-fact amendments. It would be inequitable to permit Respondents to force the Bondholders to object to privilege claims on a blanket basis, yet then allow Respondents to litigate those claims document-by-document. *See, e.g.*, *Willemijn Houdstermaatschaapij BV v. Apollo Comput. Inc.*, 707 F. Supp. 1429, 1443 (D. Del. 1989) (compelling document production where the party "could easily have ascertained the standard of particularity expected" because allowing a supplemental log "now would encourage dilatory discovery practices").

In San Juan, Puerto Rico, today April 15, 2019.

By:

_/s/ Alfredo Fernández-Martínez_
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

_/s/ Bruce Bennett_
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
James M. Gross (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com
jgross@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Beth Heifetz (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
bheifetz@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company,  Glendon
Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P.,
Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez
José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Cheryl T. Sloane
John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*