UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

RECEIVED & FILED
2019 APR 15 PM 5:08

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

   as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

   Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

   as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

   Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

------------------------------------------------------------x

**[Responding to Docket 4417]**

**SUPPLEMENT TO RESPONSE AND OPPOSITION, OF INDIVIDUAL COFINA
SUBORDINATE BONDHOLDER RESIDING IN THE 50 STATES WHO PURCHASED AT
THE ORIGINAL OFFERING PRICES, TO COFINA'S THIRTEENTH OMNIBUS
OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

April 10, 2019

-i-

## TABLE OF CONTENTS

| | Page |
|---|---|
| Preliminary Statement | 1 |
| Supplemental Declaration | 1 |
| Previously undisclosed "Tax Exemption Implementation Agreement" | 1 |
| The "Final" Notice from the Trustee | 5 |
| Chaotic exchange process | 6 |
| Response from individual bondholders when they are provided actual notice and an opportunity to participate in proceedings that may affect them | 10 |
| Conclusion | 11 |

**SUPPLEMENT TO RESPONSE AND OPPOSITION, OF INDIVIDUAL COFINA SUBORDINATE BONDHOLDER RESIDING IN THE 50 STATES WHO PURCHASED AT THE ORIGINAL OFFERING PRICES, TO COFINA'S THIRTEENTH OMNIBUS OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

### Preliminary Statement

I timely filed a response and opposition to COFINA's Omnibus Objection on December 28, 2018. *See* Docket 4585. Additional support for my response and opposition appears in my previously-filed Supplement (Docket 4595); Second Supplement (Docket 4673); Hein declaration and exhibits thereto (Docket 4606-3 *et seq.*); Response to revised proposed findings of fact and conclusions of law (Docket 4911); Further Response (Docket 5041); and on the record of the January 16-17, 2019 hearing (*see* Exhibits 1 and 2 attached to Docket 5041). I object to COFINA's Thirteenth Omnibus Objection on, *inter alia*, the grounds set forth in my previously filed papers and the previous argument.

This Supplement is submitted to address developments subsequent to my prior filings.

### Supplemental Declaration

The attached Supplemental Declaration of Peter C. Hein attaches factual materials referenced herein.

### Previously undisclosed "Tax Exemption Implementation Agreement"

On or about February 14, 2019 Puerto Rico Fiscal Agency and COFINA posted an "Event Notice" on EMMA announcing that the Effective Date of the Third Amended Title III Plan had occurred on February 12, 2019 and that "on the Effective Date," Puerto Rico Fiscal Agency, COFINA and the FOMB and certain beneficial holders of the new COFINA bonds had executed a "Tax Exemption Implementation Agreement". A copy of this posted "Event Notice" (dated February 12, 2019) is annexed as the second page of Hein Supp. Decl. Exhibit A (handwritten page 2).

Pursuant to the Tax Exemption Implementation Agreement, the governmental parties are to use "reasonable best efforts" to pursue a private letter ruling or other determination from the IRS to the effect that interest on the series 2019A-2 and 2019B-2 bonds is excludable from gross income for federal income tax purposes. The governmental parties also agreed "upon the issuance of such IRS determination" to "offer all holders" of such bonds an "opportunity" to exchange such bonds for "new COFINA tax exempt bonds", to be issued at a yield 25 basis points *lower* than the bonds for which they were exchanged. Hein Supp. Decl. Ex. A at handwritten page 2.

The entry into this Tax Exemption Implementation Agreement highlights the incomplete and misleading nature of the disclosure statement docketed on November 26, 2018 (Docket#4364), following the November 20, 2018 hearing, and mailed to bondholders in December on a flash drive (which I received on December 17, 2018).

That disclosure statement stated that 11 new COFINA bonds (specifying year of maturity and interest or accretion rate) – there was nothing about 14 bonds – would be issued in exchange for the existing COFINA bonds. Docket#4364-page-20,23,25-26,168-169. Plan proponents sought to justify the discriminatory additional consideration made available only to Puerto Rico residents (and not even to tax exempt accounts owned by individuals in the 50 states) as supposedly benefiting everybody by maximizing the availability of tax exempt bonds to holders in the 50 states.

The disclosure statement said, "the proportion of COFINA Bonds that will be Tax-Exempt COFINA Bonds is uncertain and cannot be determined as of the date of this Disclosure Statement. The Commonwealth expects to cause an opinion of nationally recognized bond counsel addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds on the Effective Date" (Docket # 436-page-230-of-263). The disclosure statement also stated that "a private letter ruling has not been submitted to the Internal Revenue Service (the "IRS") and no written or other formal determination has been issued by the IRS" (Docket#4364-page-232-of-263).

Nothing was said in the disclosure statement about (i) the prospect of a "Tax Exemption Implementation Tax Agreement," or (ii) the prospect of bondholders being required to accept a lower interest rate – below those listed in the disclosure statement – in order to receive tax exempt

-2-

bonds. Nor did FOMB and COFINA update the disclosures sent to bondholders in December to disclose the fact (now revealed in the posting dated February 12, 2019) that COFINA had requested a private letter ruling on December 14, 2018 (*see* Hein Supp. Decl. Ex. A, Recital "E", handwritten page 3). Nor that even though a request for a private letter ruling would be made, Plan proponents would rush to consummate without waiting for the IRS to issue it. Compare Docket#4364-pages-232-to-248-of-263.

The revelations post-Plan confirmation underscore the misleading and incomplete nature of the disclosures and the unfair treatment of modest-size holders in the 50 states:

- Whereas the disclosure statement referenced receipt of 11 new COFINA bonds with specified maturities and interest rates in exchange for existing COFINA bonds, what was received was an even more splintered collection of bond fragments consisting of 14 new bonds (or cash in lieu) – three of which were issued as taxable securities.
- While COFINA had requested a private letter ruling or closing agreement with the IRS on or about December 14, 2018 (Hein Supp. Decl. Ex. A, Recital "E") – a fact first disclosed in the tax implementation agreement dated February 12, 2019 – Plan proponents did not wait for the IRS to issue its determination. Instead of clarifying the tax exempt status before asking COFINA holders to vote on the plan, or at least before consummation of the Plan, Plan proponents barreled ahead to consummation.

Now, even if the IRS determines that the securities qualified for tax-exempt status all-along, holders will not receive tax exempt bonds at the interest rates promised in the disclosure statement. Rather, holders will have to give up part of the coupon interest rate in order to exchange for tax-exempt bonds. There was nothing said about this in the disclosure statement.

The failure to accurately and candidly describe the federal tax consequences to investors before they voted – including by a supplement to the disclosure statement, if necessary, mailed (or at least emailed) to all holders before the vote – is particularly troubling since disclosure of potential material Federal tax consequences is specifically required by 11 U.S.C. 1125(a)(1), which requires disclosure of "potential material Federal tax consequences of the plan to ... a hypothetical investor

typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

Here, at the time an investor received the disclosure statement on a flash drive on December 17, 2018 – as I did – the private letter ruling had already been requested on December 14, 2018, but was not disclosed. And presumably the turgid "Tax Exemption Implementation Agreement" dated February 12, 2019 was not conceived of, drafted and signed by multiple parties on the same day that the Plan was consummated, yet this "Tax-Exemption Implementation Agreement" was not disclosed before consummation.

Moreover, it appears that approximately 40.5% of the senior bonds and 9.9% of the junior bonds were originally issued as taxable securities, presumably purchased by investors who did not pay federal income taxes, either because they were residents of Puerto Rico or because they were exempt from payment of federal income taxes (such as a retirement account). *See* Hein Supp. Decl. Ex. J (Decl. of Mark Elliott and attachment 3 thereto). Instead of simply distributing taxable securities to the holders who originally chose to purchase taxable securities, Plan proponents chose to issue a significant proportion of the tax-exempt securities to *all* holders – including those who had elected to buy taxable securities in the first place – and then sought to justify the bonus to Puerto Rico institutions and individuals on the theory they were agreeing to take taxable securities (which is what they likely had bought in the first instance in most instances).

Ultimately – but never disclosed in the disclosure statement – 14 different securities, 3 of which were taxable, were issued to investors in the 50 states who originally bought only tax exempt securities. At the same time, a senior bondholder who had purchased taxable senior bonds gets a distribution comprised of roughly 78% tax exempt securities. So this sleight-of-hand on the taxable status of what would be distributed further tilted the consideration to the seniors who negotiated the Plan, and to Puerto Rico institutions and investors, to the detriment of the modest-sized subordinated holders in the 50 states. Conversely, the few mainland investors who did hold some taxable COFINA bonds in tax exempt accounts (e.g., retirement accounts), and who could have benefited from electing to receive one CUSIP of taxable bonds plus 2% of par bonus cash, were denied the

-4-

opportunity to make that election since it was only available to Puerto Rico institutions and individuals.

Notably, there were Puerto Rico institutions (e.g., various Puerto Rico fund entities including First Puerto Rico funds (apparently associated with Santander) and Puerto Rico funds (apparently associated with UBS) who held COFINA securities and were Consummation Cost parties. *See, e.g.,* Docket#1057,3776; Docket#4364-2-page-57,63-64,70-73. It appears these entities received:

- Their share of consummation costs computed as 2% of "the aggregate face amount" of COFINA bond claims minus $1 billion "that will be allocated to on-island investors who choose to accept taxable bonds." Docket#4364-page-112-of-263. This amounted to about 3.52% par of their holdings. (The aggregate bond claims totaled $17.6 billion; $17.6-$1 billion = $16.6 billion x 2% = $332 million Consummation Costs; since Consummation Cost parties held $10 billion of $17.6 billion, each received consummation costs equivalent to 2% x 17.6/10 = 3.52% par of their holdings. Docket#4364-page-113-of-263).

- In addition, if a Puerto Rico institution elected the taxable option – even if they had originally bought taxable bonds – they could receive another 2% of par (Docket#4364-page-120,123), for a total of 5.52% of par that would alone increase a Puerto Rico institution's recovery on subordinates by 10%.

### The "Final" Notice from the Trustee

On February 12, 2019 BNY Mellon posted on EMMA a "final" notice. A copy of this notice is attached as Hein Supp. Decl. Exhibit B.[1]

---

[1] To my knowledge this notice was not actually sent to all COFINA bondholders, not even COFINA bondholders who had filed claims and provided email addresses or mailing addresses. Rather it appears that BNY Mellon simply requested "depositories, custodians and other intermediaries receiving this notice" to transmit it to beneficial owners. I did not receive the trustee's notice or the accompanying "Distribution Notice" directly in the regular course from either of the brokers who held my COFINA bonds. Rather I – like I suspect other modest sized COFINA bondholders in the 50 states – had to obtain the notice through EMMA or Prime Clerk or by affirmatively requesting it from a broker. The only post-consummation notice I received in the regular course by mail was a

-5-

This "final" notice underscores that the Trustee – who served as trustee for both the senior and the subordinate COFINA bonds, and did not object to Plan confirmation on behalf of modest-sized subordinate bondholders in the 50 states who were disadvantaged by the Plan – has not submitted and asserted all of the claims, and all of the responses and objections to confirmation, that were described in my Claim No. 10701 and in my previously filed papers. The Trustee noted in its "final" notice that, pursuant to the previously entered Order Granting Interpleader, the Trustee had advised that it would not be making any payment on the Bonds from the Pledged Sales Tax received by the Trustee until the Court entered a further order directing the timing of distributions and identifying the recipients of such funds. *Id.* at 2. The Trustee explained that pursuant to the Plan "COFINA is causing the Trustee to distribute and deliver Cash and COFINA Bonds ...." and that "the Trustee is acting in reliance upon the distribution instructions received from COFINA." *Id.* at 3. The Trustee notes that "[t]he Distribution Allocations were determined by COFINA and Prime Clerk, and the Trustee neither has nor assumes any responsibility for determining the Distribution Allocations". *Id.* at 3-4. The Trustee emphasized that "this notice is the final communication Bondholders will receive from the Trustee". *Id.* at 4.

As previously noted, the only reason provided in the Omnibus Objection for denying my claim is the assertion that my claim is supposedly "duplicative of one or more master proofs of claim filed by the trustee of these bond(s)." Since my Claim No. 10701 is not duplicative, for this reason alone the Thirteenth Omnibus Objection cannot be granted. *See* Docket 4585-pages-39-to-40-of-43 and Docket 5041-pages-3-to-4-of-10.

### Chaotic exchange process

Not only were modest-sized COFINA subordinated bondholders in the 50 states unfairly disadvantaged by the terms of the COFINA plan, but in addition modest-sized holders in the 50 states have been victimized by a chaotic forced exchange of their original COFINA subordinate

---

copy of a four-page Notice of Entry of Order Confirming the Third Amended Title III Plan, a copy of Docket #5104, which was mailed to me by my broker in March.

-6-

bonds. An individual originally holding *one* bond CUSIP has had that bond involuntarily exchanged into *14* fragments of bonds (or cash in lieu of bonds), all with different CUSIPs; new bond allocations have been rounded down in the course of the exchange process (adversely impacting in a material way a modest-sized holder); fractional bonds have been involuntarily liquidated at distressed prices without the consent of bondholders; and taxable bonds have been issued to individuals in the 50 states who originally only purchased tax exempt bonds.

Attached to the "final" notice of BNY Mellon as trustee dated February 12, 2019, as Annex A, is a "Distribution Notice". Hein Supp. Decl. Ex. B handwritten page 7 *et seq*. This Distribution Notice, in turn, attached turgid spreadsheets that reference the new securities and/or cash to be received in the "mandatory exchange" of the original COFINA bonds. *See* Hein Supp. Decl. Ex. B, handwritten page 9 *et seq*.

To say that the "distribution notice" is turgid is an understatement. This reflects the fact that someone who had one CUSIP bond before the exchange was now supposed to end up with 14 CUSIP fragments of bonds (or cash in lieu of bonds) after the exchange.

As is also evident from the distribution notice, the holders of Class 5 were to receive only minimal distributions of "COFINA cash" with almost all of the "COFINA cash" that had been held in trust for COFINA bondholders going to holders of the senior securities (or others, including Puerto Rico institutions or individuals and the Commonwealth).

Significant confusion by custodians, brokers and investors followed the rush to proceed with the mandatory exchange, so as to consummate the Plan. In my case, I am still trying to get my distributions straightened out. My experience with one 250,000 par CAB bond purchased at the original offering price in 2011, and held at one broker before the exchange, highlights the chaotic situation that resulted from confirming the COFINA Plan, to the further detriment of individual investors like me. Whereas pre-exchange I had *one* $250,000 par bond, following the exchange there have been literally *50* individual transactions in my account related to the mandated exchange of my one $250,000 par CAB bond. *See* Hein Supp. Decl. Ex. I.

-7-

Originally fractional bonds were distributed to me; then they were liquidated (without my consent and over my objection) and I received supposed "cash in lieu" payments. Illustrating the problems with forced sales, the supposed "fair market value" of one 516 bond piece, per COFINA's March 2019 notice, was a price of $98.1. Yet it appears my 516 bond piece was involuntarily liquidated at a price of $95.63. I have been totally forced-sale out of 6 of 14 CUSIPs. *See* Hein Supp. Decl. Ex. I.

All rounding on Exhibit I was "down." Even one fraction of "995" was rounded down to zero, rather than up to 1,000. *See* Hein Supp. Decl. Ex. I. The disclosure statement said there would be "rounding" cash, creating the impression that rounding cash – not forced sales – would be used to give holders 1,000 "round" increments. Docket #4364-page-128-of-263. The Plan mailed to bondholders defined "Rounding Amount Cash," as "The amount of Cash necessary, up to a maximum [$25,000,000.00], for distribution to holders … in the form of rounding amounts to ensure that all holders receive their Pro Rate Share of CIBs [current interest bonds], in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond." (Docket # 4363-page-31-of-92) But it appears rounding cash was just issued pro rata and not used for rounding, at least not for individual investors. So major institutions who had large positions and no rounding issue got virtually all of the rounding cash. Individuals were forced-out, often at distressed prices.

This forced, involuntary liquidation was particularly detrimental to individuals with modest holdings because EMMA's low-to-high spreads on the new COFINA bonds immediately following issuance were as wide as 17+ points (or an over 20% difference between high and low), per EMMA publicly available price data. *See* 2/19/19 high-low spreads on Exhibit F, handwritten page 5, a collection of EMMA pricing data for transactions following the exchange. Realistically, individual investors are likely the ones getting prices at the "low" end of the range for the modest quantities of bonds most individuals transact.

Even the "round" positions I was issued are essentially illiquid. Positions of 1,000 or 3,000 or 5,000, or even 10,000 or 13,000 are not likely to be liquid in the future in a market where

secondary market transactions need to be at least $100,000 – and more likely as much as $1,000,000 – to get decent pricing. *See* Hein Supp. Decl. Ex. J (attaching Mark Elliott Declaration)

My total proceeds from this forced exchange of my 250,000 par CAB (at 2/19/19 EMMA "low" prices, the likely attainable prices for an individual), are about $27,321 (which included $563 of post-8/1/18 interest on new COFINA bonds). (Even at the COFINA supposed fair market value prices as of 2/19/19, which I do not believe I could realize, my total proceeds are only $28,224.12.) The $27,321 represents only **47.6%** of the accreted value on my January 31, 2019 account statement of $57,280 (which should be the relevant number for comparison, since these bonds were fully secured). But even if one uses the accreted value on the May 5, 2017 Title III filing date, the $26,758.15 received (netting out post-8/1/18 interest) was only **50.5%** of the accreted value of $52,990.97 on my April 30, 2017 statement. All of these numbers are materially lower than the "estimated" or "projected" recovery of 56.414% referenced in the disclosure statement (which many individuals may have interpreted as a 56.414% recovery on their accreted value as of the date of consummation, as opposed to two years earlier, on May 5, 2017). (Docket 4364-page-49&121-of-263.)

In a second case, I have had approximately *95* individual transactions in my account as a result of the mandatory exchange of the *one* $250,000 par amount coupon bond I held with a second broker; I still have not confirmed whether what I have been distributed is in fact correct.

The extreme confusion and chaos that has ensued in the exchange process is highlighted by the fact that BNY Mellon asserted in its notice that "COFINA is causing the Trustee to distribute and deliver Cash and COFINA Bonds" and "the Trustee is acting in reliance upon the distribution instructions received from COFINA". Hein Supp. Decl. Ex. B at 3. But the Puerto Rico Fiscal Agency posted its own "Note from Dissemination Agent," stating it was posting the February 12, 2019 notice from BNY Mellon as trustee "at the request of the Trustee" but that "[t]he attached notice does not reflect the views or the input of AAFAF or COFINA" and that questions should be "directed to the Trustee". *See* Hein Supp. Decl. Exhibit C.

-9-

As confusion continued, on February 21, 2019 the Puerto Rico Fiscal Agency posted another "Note from Dissemination Agent" stating that it was attaching an additional notice – a "Supplemental Notice of Distribution to Holders" dated February 21, 2019 – that was "prepared by Prime Clerk and posted on the Prime Clerk website on February 21, 2019." The Puerto Rico Fiscal Agency went on to emphasize that this "notice does not reflect the views or the input of [COFINA] or [the Puerto Rico Fiscal Agency]". A copy of the Puerto Rico Fiscal Agency's February 21, 2019 "Note," with the attached "Supplemental Notice of Distribution to Holders" posted on February 21, 2019, is at Hein Supp. Decl. Ex. D.

Even after the Supplemental Notice of Distribution the chaos and confusion has continued.

Other illustrative problems with the COFINA exchange are discussed in Hein Supp. Decl. Exhibits G and H. As a consequence, modest-sized holders in the 50 states have received materially less in value than even the unfair amounts the disclosure statement had said would be forthcoming.

### Response from individual bondholders when they are provided actual notice and an opportunity to participate in proceedings that may affect them

Literally hundreds of individuals have, acting pro se, filed notices of participation in response to the notice mailed to them in February 2019 alerting them to the fact that their rights might be affected by a challenge to the validity of their general obligation bonds. *See, e.g.*, Docket#5214-5219,5231-5233,5235,5253-5257,5262-5263,5272,5275-5288,5293-5310,5313,5316-5327,5329-5333,5335-5346,5348-5375,5377-5379,5381-5383,5388,5390,5399,5401-5402,5404-5407,5410,5412-5413,5415-5424,5428-5429,5431-5432,5442-5443,5447,5459-5480,5483-5561,5563-5571,5573-5576,5579,5583,5602-5603,5605-5626,5631-5640,5642-5652,5657-5686,5688-5698,5708,5718-5742,5744-5774,5826-5875,5877-5890,5892-5905,5906(filed 3/18/19-1st of two 5906 docket entries),5907-5915,5918,5919,5921-5933,5935,5941-5955,5965(5 separate notices),5984(39 separate notices),5992(21 separate notices),5993(32 separate notices),6013(50 separate notices),6025(50 separate notices),6034(50 separate notices),6035(15 separate

-10-

notices),6049(24 separate notices),6069(13 separate notices),6079(4 separate notices),6083,6090(40),6091(40),6095(38),6107(50),6108(50),6114(51),6121(24),6127(7),6131(50).

No similar notice had been sent – *prior* to the confidential settlement and mediation process occurring, which then lead to the Commonwealth-COFINA settlement and the Plan being agreed in that confidential process – providing individual COFINA bondholders notice and a practical means to participate in that confidential process. There is every reason to believe, based on the recent response of individual general obligation bondholders, that had such a notice been sent many individual COFINA bondholders, including subordinate COFINA bondholders in the 50 states, would have sought to participate in any proceeding that could affect their rights. The result of advance notice being sent in the general obligation case underscores that providing a notice only after settlements are struck and a plan is crafted through a confidential process is no substitute for providing advance notice, and a meaningful opportunity to participate, before the process begins.

## Conclusion

The Court should deny COFINA's Thirteenth Omnibus Objection to individual claim No. 10701.

Dated: April 10, 2019

Respectfully Submitted,

*/s/ Peter C. Hein*

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY 10023
petercheinsr@gmail.com