**Objection Deadline: April 19, 2019 at 6:00 p.m. (AST)**
**Hearing Date and Time: April 24, 2019 at 9:30 a.m. (AST)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
------------------------------------------------------------------------x
In re:                                          :
                                                :
THE FINANCIAL OVERSIGHT AND                     :
MANAGEMENT BOARD FOR PUERTO RICO,               :    PROMESA
                                                :    Title III
        as representative of                    :
                                                :    Case No. 17-BK-3283 (LTS)
THE COMMONWEALTH OF PUERTO RICO et al.,         :
                                                :    (Jointly Administered)
        Debtors.¹                               :
------------------------------------------------------------------------x
```

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS[2] FOR ORDER
AUTHORIZING COMMITTEE TO PURSUE CERTAIN CAUSES OF ACTION ON
BEHALF OF COMMONWEALTH AND GRANTING RELATED RELIEF**

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a
bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax
identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-
3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government
of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of
Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case
No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing
Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID:
8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last
Four Digits of Federal Tax ID: 3747).

[2]    The following creditors of the Debtors are co-movants with the Committee on this Motion: Doral Financial
Creditors' Trust; Service Employees International Union; and Tradewinds Energy Barceloneta, LLC, which
entities are all members of the Committee.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION, VENUE, AND STATUTORY BASES ............................................................ 7

BACKGROUND ......................................................................................................................... 8

I.      OVERSIGHT BOARD'S APPROACH TO DEBTOR CAUSES OF ACTION ............. 8

II.     OVERSIGHT BOARD'S PATTERN OF OBSTRUCTION OR NEGLECT
        WITH RESPECT TO INVESTIGATION OF COMMONWEALTH DEBT
        ISSUANCES........................................................................................................................ 9

        A.      July 2017 – August 2018: Oversight Board Blocks Committee's
                Investigative Efforts, Impeding Investigation of Causes of Action...................... 9

        B.      September 2018 Interlude – Oversight Board Approves Release of Former
                GDB Officers and Directors ................................................................................ 18

        C.      October 2018 – Present 2019: Oversight Board Finally Begins to
                Investigate Causes of Action, But Fails to Do So In Timely Fashion. ............... 19

        D.      Oversight Board Lulls Committee Into Believing Oversight Board Would
                Pursue Causes of Action ...................................................................................... 27

III.    COMMITTEE SHOULD BE AUTHORIZED TO CONTINUE
        INVESTIGATING AND, IF APPROPRIATE, PROSECUTE VALUABLE
        CAUSES OF ACTION ON COMMONWEALTH'S BEHALF ..................................... 28

RELIEF REQUESTED ............................................................................................................. 34

BASIS FOR RELIEF REQUESTED ........................................................................................ 34

I.      LEGAL STANDARD ................................................................................................... 34

II.     KOBRE & KIM SHOULD BE REQUIRED TO TURN OVER ALL
        DOCUMENTS AND WITNESS INTERVIEW NOTES .............................................. 37

NOTICE .................................................................................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Commerce Bank of Kansas City, N.A. v. Achtenberg,*
No. 90–0950–CV–W–6, 1993 WL 476510 (W.D. Mo. Nov 10, 1993) ...............................31

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,*
330 F.3d 548 (3d Cir. 2003)...........................................................................16, 35, 36

*Gen. Electric Credit Co. v. Murphy (In re Rodriguez),*
895 F.2d 725 (11th Cir. 1990) ...................................................................................31

*In re Gov't Dev. Bank for P.R.,*
Case No. 18-BK-1561-LTS (D.P.R. Oct. 9, 2018)............................................18, 31

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),*
555 F.3d 231 (6th Cir. 2009) .....................................................................................36

*In re iPCS, Inc.,*
297 B.R. 283 (Bankr. N.D. Ga. 2003) .......................................................................35

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,*
267 F.3d 340 (3d Cir. 2001)........................................................................................4

*Pope v. Haas & Wilerson, Inc. (In re Ala. State Fair Auth.),*
232 B.R. 252 (N.D. Ala. 1999)..................................................................................34

*Seitz v. Detweiler, Hershey & Associates (In re CitX Corp.),*
448 F.3d 672 (3d Cir. 2006)........................................................................................4

*Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.),*
457 B.R. 441 (Bankr. M.D.N.C. 2011)......................................................................31

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),*
503 B.R. 239 (Bankr. S.D.N.Y. 2013)......................................................................32

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),*
779 F.2d 901 (2d Cir. 1985)......................................................................................35

*VFB LLC v. Campbell Soup Co.,*
482 F.3d 624 (3d Cir. 2007)......................................................................................32

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**Statutes**

7 L.P.R.A. § 563 ................................................................................................................31

11 U.S.C.
   § 546(a) ......................................................................................................................2
   § 108(a) ......................................................................................................................2
   § 926(a) ....................................................................................................................34

48 U.S.C. § 2161(a) ...........................................................................................................34

GDB Enabling Act, 1948 P.R. Laws 17, § 15 ...................................................................31

2015 P.R. Laws 97 .............................................................................................................31

**Other Authorities**

S. Rep. No. 95-989 (1978) .................................................................................................35

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (the "Committee") and Committee members Doral Financial Creditors' Trust, Service Employees International Union, and Tradewinds Energy Barceloneta, LLC (collectively with the Committee, the "Movants") hereby file this motion (the "Motion"), pursuant to the Procedures Order (as defined below), paragraph 18 of the Stipulation (as defined below), and sections 105(a), 503(b), 926(a), 1103(c), and 1109(b) of Title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these Title III cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), requesting entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) appointing the Committee as trustee of the Commonwealth under section 926(a) of the Bankruptcy Code for the sole purpose of continuing to investigate and prosecute certain avoidance actions of the Commonwealth, (ii) granting the Committee derivative standing to continue to investigate and prosecute certain other related Commonwealth causes of action, and (iii) granting the Movants related relief, all as set forth below.  In support of this Motion, Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Movants appreciate the time and effort dedicated by the members of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), on a volunteer basis no less, to right the Debtors' ship.  As detailed below, however, it is now abundantly clear that their efforts have not extended to preserving and pursuing valuable causes of action relating to the issuance of billions of dollars of debt by the Commonwealth and its instrumentalities.  In light of this reality, Movants reluctantly ask this to Court intervene and appoint the Committee as trustee and grant the Committee derivative standing to continue investigating and, if appropriate,

prosecute causes of action relating to such debt issuances to ensure that valuable assets of the Commonwealth do not simply evaporate due to the Oversight Board's inaction.

2.      Nothing encapsulates better the approach of the Oversight Board with respect to the investigation of causes of action relating to debt issuances than the candid admission by the Oversight Board's chairman, Mr. José Carrión III, at the outset of these Title III cases—in his words, such an investigation would be "***a waste of time***."  In fact, throughout these Title III cases, the Oversight Board has alternated between slow-walking a proper investigation into potential causes of action relating to Puerto Rico's debt issuances, actively obstructing the Committee's own efforts to investigate the Debtors' prior conduct and indebtedness, and simply allowing causes of action to lapse by failing to anticipate and meet statutory deadlines.

3.      Whatever the reason for the Oversight Board's unwillingness and/or inability to assert Debtor causes of action, the consequence is the same.  When the statutes of limitation under sections 546(a)[1] and 108(a)[2] of the Bankruptcy Code expire, the Commonwealth will lose valuable claims.  The Committee, which has repeatedly warned against this eventuality, cannot allow this to happen.

---

[1]    *See* 11 U.S.C. 546(a).

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

[2]    Section 108(a) of the Bankruptcy Code provides that if applicable non-bankruptcy law fixes the time period within which the debtor may commence an action (and the period had not expired before the date of the petition), the trustee may only commence the action before the later of: (1) the end of such period, or (2) two years after the order for relief.  11 U.S.C. § 108(a).  Accordingly, the section operates to ensure that a trustee has at least two years from the filing of a petition to commence causes of action, even where state law provides for an earlier expiration, as long as the cause of action was not already time-barred on the petition date.

2

4.      Accordingly, and as further detailed below, Movants respectfully request that this Court appoint the Committee as trustee and grant the Committee derivative standing to continue to investigate and prosecute avoidance actions under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code ("Avoidance Actions") and related Commonwealth causes of action (together with the Avoidance Actions, the "Causes of Action") relating to issuances of Commonwealth General Obligation ("GO") bonds, PBA bonds, and ERS bonds.  The Causes of Action would be asserted against parties, including individuals, involved in these issuances and would consist of claims that the Oversight Board has advised the Committee it will not pursue.

5.      The Committee is best positioned to investigate and prosecute the Causes of Action because of its familiarity with the underlying facts and law.  Indeed, given that the deadline for the Commonwealth to assert the Causes of Action under sections 546(a) and 108(a) of the Bankruptcy Code is May 2, 2019 (the "Causes of Action Deadline"), the Committee is the **only** party realistically capable of prosecuting the Causes of Action.

6.      It bears noting, however, that the Oversight Board's Special Claims Committee has placed the Committee in an extremely difficult (if not impossible) position.  While the Special Claims Committee initially reported through its counsel that it would pursue a number of the Causes of Action, counsel did a sudden about-face just five days ago.  On March 29, 2019, the Court issued an order (as subsequently modified, the "Procedures Order")[3] establishing procedures under which the Oversight Board was directed to provide the Committee with a "preliminary" list of causes of action it would pursue and then a "final" list of such actions.  The Special Claims Committee provided its preliminary list to the Committee as required.  That

---

[3]    *Order Granting the Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I) Procedures with Respect to Disclosure of Avoidance Actions to be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)*, at 2-3 [Docket No. 6086].

preliminary list indicated that the Special Claims Committee would be pursuing a number of the

Causes of Action.  In the ensuing meet and confer, the Special Claims Committee, through its

counsel, "doubled down" on this representation, stressing that causes of action relating to the

bond issuances would also be brought against individuals.  On April 12, 2019,[4] counsel provided

the final list required pursuant to the Procedural Order, which confirmed that a number of the

Causes of Action would be pursued.

7.      The Special Claims Committee represented through its counsel that it would

assert claims based on, among other theories, deepening insolvency against the various parties

involved in Puerto Rico's debt offerings.[5]  The Special Claims Committee's counsel further

stated that it would allow the Committee to join in litigation against these parties to pursue such

claims against them.  As the meet and confer period continued, however, counsel for the Special

Claims Committee gradually reversed course.  First, counsel advised the Committee that the

Special Claims Committee would not, after all, bring claims against any individuals.  Next,

counsel revealed that ████████████████████████████████████

████████████████████████████████████████████████

██████.  Finally, the Special Claims Committee reneged on its offer to allow the Committee to

bring such claims.  Notwithstanding these setbacks, the Committee continued its discussions

with the Oversight Board and its Special Claims Committee.

---

[4]    The Committee agreed to extend the deadline for final lists from April 10, 2019 to April 12, 2019.

[5]    Deepening insolvency has been recognized as a standalone cause of action.  *See, e.g.*, *Official Comm. of
Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 344 (3d Cir. 2001) (recognizing a cause of action for
deepening insolvency).  The essence of a deepening insolvency claim is that the defendant, typically a
professional such as an auditor or an underwriter, was culpably involved in prolonging a debtor's life and/or
increasing its debt burden by facilitating its incurrence of unrepayable debt.  Some courts, including the Third
Circuit, have held that a cause of action for deepening insolvency requires a showing of fraud.  *See, e.g.*, *Seitz v.
Detweiler, Hershey & Associates (In re CitX Corp.)*, 448 F.3d 672, 681 (3d Cir. 2006) (holding that allegations
of fraud are required to plead a cause of action for deepening insolvency).

8.     On April 16, 2019, the Oversight Board, the Special Claims Committee, and the

Committee submitted to the Court a motion [Docket No. 6305] to approve a stipulation (the

"Stipulation") regarding the joint prosecution of certain causes of action.  While the Committee

is pleased to have reached this agreement with the Oversight Board and the Special Claims

Committee, the claims contemplated in the Stipulation ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

9.     The parties were unable, however, to reach agreement regarding the pursuit of

what are perhaps the most critical causes of action in these Title III cases, namely claims against

the various participants in the bond issuances (including individuals) that would expose their

improper conduct.[6]  It appears that the Oversight Board does not intend to pursue any claims that

would shine a light on misconduct of some of these participants, including claims for negligence

and deepening insolvency against underwriters.

10.     When confronted with the Oversight Board's about-face, the Committee

requested, in the alternative, that the Oversight Board consent to the Committee's appointment to

pursue the Causes of Action on its own (subject to a meet and confer process and the potential

for Court intervention in the event of unresolvable differences—concepts that already exist in

paragraph 13 of the Stipulation).  Counsel for the Oversight Board's Special Claims Committee

---

[6]     In particular, the Committee understands that (a) the Special Claims Committee will not pursue any claims
against any individuals involved in Puerto Rico's bond issuances, and (b) ████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

initially accepted but ultimately rejected this request.  Nevertheless, and notwithstanding the

Stipulation, the Oversight Board and the Special Claims Committee agreed in paragraph 18 of

the Stipulation that "the Committee may seek, by motion to the Court, to be appointed as

trustee/plaintiff to pursue Additional Claims."  "Additional Claims" is defined in the Stipulation

as "Commonwealth claims or causes of action . . .  in addition to those to be asserted by the

Oversight Board or the Special Claims Committee, related to or with respect to the offerings of

the Commonwealth's GO bonds, PBA bonds, and ERS bonds against the [parties involved in

such offerings], including on theories of fraudulent transfer, fraud, breach of fiduciary duty,

and/or deepening insolvency."  This Motion is the very motion contemplated in paragraph 18 of

the Stipulation.

11.    In sum, the Oversight Board's Special Claims Committee waited until

approximately two weeks before the Causes of Action Deadline to advise the Committee that it

intended to abandon certain valuable Causes of Action (some of which it had previously

represented it would pursue) and then declined the Committee's request to be appointed to

pursue these Causes of Action.  Faced with this abrupt and unexpected turn of events, the

Movants had no choice but to file this Motion requesting authorization for the Committee to

pursue the Causes of Action on the Commonwealth's behalf.[7]

12.    In many ways, the foregoing progression of events serves as the capstone on the

Oversight Board's approach throughout these Title III cases with respect to the investigation and

prosecution of claims relating to Puerto Rico's debt issuances.  At best, the Causes of Action are

not a priority for the Oversight Board because it is overwhelmed by other pressing issues.  At

worst, the Oversight Board has been obstructing attempts to conduct a proper investigation.

---

[7]    The basis for certain Causes of Action abandoned by the Oversight Board is described later in this Motion.

Because the Oversight Board cannot be relied upon to take appropriate steps to preserve and, if necessary, pursue valuable Causes of Action for the benefit of the Commonwealth and its creditors, the Committee should be appointed as trustee under section 926 of the Bankruptcy Code and otherwise be granted derivative standing to pursue the Causes of Action on the Commonwealth's behalf, free from the Oversight Board's continued obstruction and interference.

13.     In addition, the Court should grant the Movants related relief as set forth below. Kobre & Kim LLC ("Kobre & Kim"), the law firm hired by the Oversight Board as its "independent investigator," has refused to provide counsel for the Oversight Board's Special Claims Committee with unfettered access to the documents and interview notes that it collected and prepared while "investigating" the Debtors' pre-Title III conduct.  This obstruction cannot be allowed to continue.  If the Court grants the principal relief sought herein, it should also direct Kobre & Kim to share immediately with the Committee all of its investigative work product. Given the Oversight Board's insistence that the Kobre & Kim process was the most efficient process for investigating these issues, it would be shocking, to say the last, if that process turned out to have been a complete waste of recourses.

## JURISDICTION, VENUE, AND STATUTORY BASES

14.     The Court has subject matter jurisdiction over this matter pursuant to section 306(a) of PROMESA.

15.     Venue is proper pursuant to section 307(a) of PROMESA.

16.     The statutory bases for the relief requested herein are sections 105(a), 503(b), 926(a), 1103(c), and 1109(b) of the Bankruptcy Code.

## BACKGROUND

### I.   Oversight Board's Approach to Debtor Causes of Action

> "*If someone wants to audit the debt it can be done by the private sector . . . **I think that it is a waste of time**.*"
>
> -- José Carrión III, Fajardo, Puerto Rico, June 24, 2017[8]

17.     The above statement by Oversight Board Chairman Carrión succinctly encapsulates the Oversight Board's approach with respect to the investigation and prosecution of the Causes of Action on behalf of the Debtors in these Title III cases.  As his statement makes clear, the issue of investigating the Causes of Action has not been a meaningful priority for the Oversight Board, despite the opportunity for the Debtors to recover significant value for themselves and their creditors.

18.     Instead of doing what every estate fiduciary in bankruptcy should do, *i.e.*, aggressively attempt to recover value for the benefit of the debtors and their creditors, the Oversight Board has neglected—intentionally or not—to investigate and aggressively prosecute causes of action.  It has even gone so far as to obstruct the Committee's efforts to conduct its own, independent investigation.  Perhaps most tellingly, since its appointment more than two and a half years ago, the Oversight Board has **not conducted even a single deposition under oath of any individual or entity involved in the Commonwealth's bond issuance process**.

---

[8]     *See Omnibus Reply of Official Committee of Unsecured Creditors to Various Objections and Responses to Committee Motion for Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program with Respect to Certain Causes of Puerto Rico Financial Crisis*, (the "Omnibus Reply"), Ex. B [Docket No. 1080] (certified translation of NOTICEL, Carrión sobre la auditoría: "es una pérdida de tiempo," June 24, 2017 (available at http://www.noticel.com/noticia/204703/carrion-sobre-la-auditoria-es-una-perdida-de-tiempo-video html) (linking to video of interview with Carrión) ("Si alguien quiere auditar la deuda la puede hacer el sector privado . . . Yo pienso que es una pérdida de tiempo.").

II.     **Oversight Board's Pattern of Obstruction or Neglect With Respect to Investigation of Commonwealth Debt Issuances**.

19.     It is important to review the numerous instances of the Oversight Board's obstruction or neglect with respect to Commonwealth debt issuances.  No single incident, taken in isolation, conveys the entire story.  When viewed in the aggregate, however, they provide a compelling demonstration of why this Motion should be granted.

A.      July 2017 – August 2018: Oversight Board Blocks Committee's Investigative Efforts, Impeding Investigation of Causes of Action

20.     The Committee entered the Title III cases eager to pursue investigations that could result in the prosecution of valuable causes of action.  But the Oversight Board blocked the Committee's efforts by launching its own year-long "investigation" expressly designed *not* to uncover any valuable claims.

1.      *Oversight Board's Inaction Prompts Committee to File July 2017 Rule 2004 Motion*

21.     The Oversight Board was appointed in August 2016 and proceeded to take *no action* at all to investigate Debtor causes of action for an entire year.  Concerned that valuable time was being lost, in July 2017 the Committee (which was formed only a month earlier) filed its initial Bankruptcy Rule 2004 motion (the "July 2017 Motion") seeking information relating to, among other things, potential causes of action and "potential improprieties and misconduct relating to the structuring, issuance, underwriting and selling of the Commonwealth's debt which may have impacted the value of the Commonwealth's Estate."[9]

22.     The July 2017 Motion outlined a proposed discovery program targeting significant "potential bad actors" that, based on publicly available information, were identified as

---

[9]     *Motion of Official Committee of Unsecured Creditors for Order under Bankruptcy Rule 2004, Authorizing Discovery Program with Respect to Certain Causes of Puerto Rico Financial Crisis* ¶ 33 [Docket No. 706], July 21, 2017.

profiting from the financial transactions (and potential conflicts of interest) that led to Puerto

Rico's financial crisis.[10]  The Committee's July 2017 Motion and its subsequent briefing

emphasized that discovery from these institutions could, and should, commence immediately—

beginning with a set of tailored discovery requests proposed by the Committee.

23.     The Oversight Board's reaction to the Committee's motion was telling.  Instead of

cooperating with the Committee, the Oversight Board attempted to "occupy the field" (and thus

exclude the Committee) by announcing, the day before its response to the July 2017 Motion was

due, its own "investigation" into the Commonwealth's bond issuing practices.  The Oversight

Board then used that "investigation" to argue that the Committee should be excluded from

participating because, under PROMESA, the Oversight Board was the only proper party to

conduct such an investigation.[11]  Transparently, the Oversight Board announced its own

investigation, not because it was committed to the investigation of causes of action, but because

it wanted to defeat the Committee's motion by claiming exclusive jurisdiction over any

investigations.

> 2.     *Oversight Board Responds to Committee's Motion by Commencing Its Own Investigation*

24.     Initially, the Oversight Board's "investigation" was to be led by the purportedly

independent four-member "special" investigative committee that initially included Chairman

Carrión, notwithstanding his close family ties to Banco Popular, one of the targets of the

Committee's proposed investigation.[12]  Committee counsel brought this glaring conflict to the

---

[10]   *See id.* ¶¶ 21, 23 (listing entities and individual "John Does").

[11]   *See Objection of Debtors to Motion of Official Committee of Unsecured Creditors for Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program with Respect to Certain Causes of Puerto Rico Financial Crisis* [Docket No. 859], Aug, 3, 2017.

[12]   *See* Omnibus Reply ¶ 2, (noting that "Chairman José Carrión III, is a scion of the family that founded Banco Popular, the son of a former Popular Inc. board member, a relative of the current Executive Chairman of the Board of Popular Inc., and the founder of an insurance firm which has received millions per year in

attention of the Oversight Board, which was apparently unaware of this family connection.  Only then was Carrión removed from the special investigative committee, for the stated purpose of "eliminat[ing] any distractions" due to his "family's ties to Banco Popular."[13]  In addition, the Oversight Board issued a request for proposal that omitted from the scope of its investigation any of the individuals and entities who may have breached duties to the Commonwealth, due to conflicts of interest or otherwise.[14]

       25.     In its reply brief filed at the time, the Committee raised serious concerns about the Oversight Board's conduct, emphasizing, among other things, that the Oversight Board had "***not*** conducted (or even commenced) any investigation despite the passage of almost a year since it was formed"[15] and that the Oversight Board's proposed "investigation" was not "well thought out" and was plainly nothing more than a defensive reaction to the July 2017 Motion.[16]  The Committee also posited that the Oversight Board's failure to undertake a serious investigation was as a result of the disabling conflicts of interest between certain Oversight Board members and investigation targets Santander, Banco Popular, and the Government Development Bank of

---

commissions from Popular Inc.") (citing Matthias Rieker, WALL STREET JOURNAL, *Puerto Rico Bank Family Members Lose Claim (*Feb. 3,2014) (https://www.wsj.com/articles/puerto-rico-bank-family-members-lose-claim-1391443238), and Popular, Inc. 2007 Proxy Statement (https://www.sec.gov/Archives/edgar/data/763901/000095014407002272/g05906def14a).

[13]   *See id*. ¶ 3 (citing FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Press Release – Oversight Board Issues Request for Proposal for Independent Investigation Team (August 16, 2017) (https://juntasupervision.pr.gov/wpcontent/uploads/wpfd/49/59948024bacaf.pdf) (the "August 16 Press Release").

[14]   See *id.* ¶ 7 (citing FINANCIAL OVERSIGHT &MANAGEMENT BOARD FOR PUERTO RICO, Request for Proposal – Independent Investigation Team (August 16, 2017) (available at https://juntasupervision.pr.gov/wpcontent/uploads/wpfd/50/59947faa9f94b.pdf) (the "August 16 RFP").

[15]   *Id.* ¶ 23.

[16]   *Id.* ¶ 4.

11

Puerto Rico ("GDB")—conflicts that were effectively admitted by the Oversight Board when it
excluded two additional conflicted members from the special investigation committee.[17]

26.    At the August 22, 2017 hearing on the July 2017 Motion, Judge Judith Dein
recognized the Committee's broad statutory grant of authority to pursue a Rule 2004
investigation.[18]  But based on representations by the Oversight Board that it would retain an
"independent" investigator, the Court ordered the parties to meet and confer as to whether any
investigation topics could be "spun off" and handed directly to the Committee.[19]

3.    *Oversight Board Refuses to Involve Committee in Any Aspect of
Investigative Process*

27.    Unfortunately, as the Committee informed the Court in its September 12, 2017
status report (the "September 2017 Status Report"),[20] the meet and confer process revealed that
the Oversight Board was more focused on excluding the Committee from any investigatory role
than in actually pursuing a diligent investigation.  Indeed, despite the Court's directions, the
Oversight Board refused to "spin off" any investigation topics for the Committee to pursue.[21]
Moreover, the work plans submitted to the Committee by Kobre & Kim were largely silent on
the particulars of the Oversight Board's planned investigation—in stark contrast to the
Committee's July 2017 Motion, which (i) identified the parties most likely culpable in the events
leading to Puerto Rico's financial crisis, (ii) outlined the various concerns with those entities, and

---

[17]    *Id* ¶¶ 23-25. ("The members of the investigative Committee were David A. Skeel, Jr., Arthur J. González, and
Ana J. Matosantos").

[18]    Aug. 22, 2017 Hr'g Tr. at 72:22-24 ("I think we all agree that the UCC 2004 investigation is authorized by
PROMESA, within my discretion.").

[19]    Aug. 22, 2017 Hr'g Tr. at 89:17 - 90:1.

[20]    *Informative Motion of Official Committee of Unsecured Creditors and Status Report Regarding Discovery
Discussions, Renewed Request for Authorization of Discovery Under Bankruptcy Rule 2004, and Agreed Notice
to Conduct Hearing on Motion at October 4, 2017 Omnibus Hearing* [Docket No. 1284], Sept. 12, 2017.

[21]    *Id.* ¶ 17.

Case:17-03283-LTS   Doc#:6325   Filed:04/17/19   Entered:04/17/19 09:05:20   Desc: Main
Document   Page 17 of 45

(iii) requested judicial authorization for specific document requests which had already been

served on those entities.[22]

>    4.    *Committee Warns that Kobre & Kim Investigation Is Not Designed to Lead to Timely Prosecution of Causes of Action*

28.    The Oversight Board's fundamental approach—slow-walking the investigative

process while shutting out the Committee—was again evident as Kobre & Kim began its

"investigation" in the fall of 2017.  In its November 3, 2017 Status Report (the "November 2017

Status Report"),[23] the Committee raised concerns about the fact that the Kobre & Kim

investigation was expressly ***not*** directed at identifying culpable third parties or potential claims.

In the words of Kobre & Kim's lead lawyer, his firm was "not getting paid to sue anyone" and

"not getting paid to find or set causes of action" but was instead focused on "what went wrong

and what can be done differently in the future, with the focus always being on restoring Puerto

Rico's access to the capital markets."[24]

>    5.    *Oversight Board Continues to Block Committee's Involvement*

29.    Following the announcement of the Kobre & Kim investigation, the Oversight

Board continued to block the Committee from pursuing its own investigation on the ground that

Kobre & Kim should be allowed to complete its investigation first.  At the omnibus hearing on

November 15, 2017, Magistrate Judge Dein denied the July 2017 Motion without prejudice,

indicating that it was "premature" and that "the [Kobre & Kim] should be given the opportunity

to conduct this investigation . . . ."[25]  At that point, based on representations made by Kobre &

---

[22]    *Id.* ¶¶ 10-11.

[23]    *Status Report of Official Committee of Unsecured Creditors Regarding Creditors' Committee's Bankruptcy Rule 2004 Motion* [Docket No. 1626.], Nov. 3, 2017.

[24]    *Id.* ¶ 16.

[25]    Nov. 15, 2017 Hr'g Tr. at 72:21; 73:1-2.  The court indicated that the Committee could renew the motion with a more targeted request.  *Id.* at 82:25-83:1.  An order denying the July 2017 Motion without prejudice was entered on November 17, 2017 [Docket No. 1827].

Kim and the Oversight Board, the Court and the Committee were under the impression that the investigation would be completed and a report would be filed by, at the latest, April 2018.[26]  In addition, counsel for the Oversight Board represented to the Court that the Committee would be able to "ride shotgun" and have a "significant ability to review documents" produced to Kobre & Kim.[27]

30.     This representation was not accurate.  In the months following the November 15, 2017 hearing, instead of allowing the Committee to "ride shotgun" in its investigation, Kobre & Kim "played hardball" with the Committee over the terms of its non-disclosure agreement, insisting on a number of provisions that sidelined the Committee by heavily restricting its access to documents.[28]

### 6.     Committee Files Renewed Rule 2004 Motion

31.     By April 2018, Kobre & Kim had missed its targeted deadline for completing its final report, advising the Court on April 5, 2018 that a "realistic time frame for the preparation and delivery of a final investigation report is during the summer of 2018."[29]  In light of Kobre &

---

[26]   In the October 30, 2017 Interim Report, Kobre & Kim represented that its work had begun immediately after being hired by the Oversight Board on September 1, 2017, and that its review could be completed within 200 days of retention, *i.e.* at the latest by March 20, 2018.  *Independent Investigator's First Interim Report* (Oct. 30, 2017) ¶ 3, https://drive.google.com/file/d/1l8dlm6776iFN7voR-mIn-RZp1oIANauL/view.  During the November 15, 2017 hearing, the Oversight Board's counsel stated:  "From September 1, 200 days takes us into late March.  Let's assume that it goes a little longer than that into April.  By April, the investigation, at least based on current projections, will be completed and a report will be produced."  Nov. 15, 2017 Hr'g Tr. at 59:22-60:1.

[27]   Nov. 15, 2017 Hr'g Tr. at 62: 4 and 24.

[28]   *See Omnibus Reply in Support of Renewed Motion of Creditors' Committee Seeking Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect to Certain Causes Of Puerto Rico Financial Crisis Beginning on August 15, 2018* (the "Reply in Support of Renewed Motion") ¶ 5 [Docket No. 3183], May 30, 2018,

[29]   *See Independent Investigator's Second Interim Report* (April 5, 2018) ("Second Interim Report") ¶ 6, https://drive.google.com/file/d/1vQwUucUMJ1579DQ3UoSkvIQsXdLo1jqi/view.  In the Second Interim Report, Kobre & Kim claimed that "evidence-recovery and review issues that have arisen in the aftermath of Hurricanes Irma and Maria," justified its failure to meet its own target notwithstanding that the initial target was proposed six weeks after the Hurricanes and the bulk of the documents to be reviewed were on the mainland. *Id.* ¶ 6.

Kim's slow progress, and given the scale of the potential claims and causes of action the Committee would need to evaluate, the Committee filed a renewed Rule 2004 motion on May 15, 2018 (the "Renewed Motion").[30]  The Oversight Board opposed the Renewed Motion on the grounds that the Committee should continue to wait for Kobre & Kim to finish its investigation.

32.    As before, the Committee raised concerns about timing, pointing out that eight months had passed since Kobre & Kim was retained, two years had passed since the Oversight Board was appointed, and that the May 2019 deadline for avoidance actions was the "most pressing issue here."[31]  The Court (Judge Dein) agreed, stating at the June 6, 2018 omnibus hearing:  "*I accept the concern of the May 2019 date.  I think that that's real.*"[32]

33.    The Committee also raised concerns about the nature of Kobre & Kim's investigation, including that interviews with witnesses were voluntary and unsworn "fireside chats" held without the benefit of, among other things, any meaningful internal documents or emails.[33]  Indeed, according to public statements by former governor Aníbal Acevedo Vilá, interviewees were told that they were just participating in a "conversation," not "any kind of investigation to say who's to blame."[34]

---

[30]    *Renewed Motion of Creditors' Committee Seeking Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program with Respect to Certain Causes of Puerto Rico Financial Crisis Beginning on August 15, 2018* [Docket No. 3066];. Reply in Supp. of Renewed Mot. ¶ 1.

[31]    Reply in Supp. of Renewed Mot. ¶ 25.

[32]    June 6, 2018 Hr'g Tr. at 109:8-9 (emphasis added).

[33]    Reply in Supp. of Renewed Mot. ¶ 12.

[34]    Reply in Supp. of Renewed Mot., Ex. 1 (certified translation of OMNY Radio, Sobre la Mesa, May 18, 2018, https://omny fm/shows/sobre-la-mesa/sobre-la-mesa-viernes-18-de-mayo-de-2018).

34.     In the end, by order entered July 25, 2018, the Court (Judge Dein) denied certain of the Committee's requests but held the Renewed Motion open "such that requests may be made pursuant to it after the publication of the Independent Investigator's report."[35]

7.     *Release of Kobre & Kim Report Fails to Advance Causes of Action*

35.     On August 20, 2018, ***353 days*** after it was retained, Kobre & Kim issued its Final Investigative Report (the "Kobre & Kim Report")[36] which was inadequate in a number of significant aspects.[37]  As the Committee noted at the time, the Kobre & Kim Report did not address the likelihood of success of any claim, and did not address the question of whether any avoidance actions could be maintained by any of the Debtors.[38]  Indeed, these issues were carved out of the investigation, and thus Kobre & Kim did not seek or obtain "comprehensive discovery" relating to prepetition transfers because "[w]e have not been tasked" with this analysis and because Kobre & Kim lacked a "solvency analysis."[39]  ***Of course, given that Kobre & Kim reported to certain "independent" members of the Oversight Board, they were well aware, long before the issuance of the Kobre & Kim Report in August 2018, that the report***

---

[35]   *See* Order ¶ 3 [Docket No. 3698], June 25, 2018; *see also* June 6, 2018 Hr'g Tr. at 98:22-99:3 ("What I don't want to do, though, is end up in September with a discussion about what has been produced and what has not been produced.  . . .  But that's really a critical concern to me at the moment, because there seems to be shifting representations as to what's been available and what has not been available.").

[36]   FINANCIAL OVERSIGHT &MANAGEMENT BOARD FOR PUERTO RICO, Independent Investigator, *Final Investigative Report* (Aug. 20, 2018) (https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf).

[37]   *See Creditors' Committee's Information Motion Regarding Kobre & Kim Final Report* (the "Informative Motion") [Docket No. 3866].

[38]   "The Report also provides a discussion and survey of potential causes of action that the Independent Investigator identified that may arise from the facts learned through the investigation.  ***That discussion is not intended to provide an exhaustive or definitive list and analysis of causes of action that may be available to investors, creditors, debtors, regulators and other parties.  Indeed, we do not opine on the likelihood of success of any cause of action.***"  Kobre & Kim Report at 30 (emphasis added).

[39]   Kobre & Kim Report, at 535; *see id*. at 502, 504.  A solvency analysis is not necessary to analyze the viability of certain Avoidance Actions, e.g., actual fraudulent conveyance claims under Bankruptcy Code sections 544 and 548 and avoidance of certain statutory liens pursuant to Bankruptcy Code section 545.  Further, with respect to any challenge to a transfer made within 90 days before the Title III filing on the grounds that such transfer was a preference, insolvency is presumed pursuant to section 547(f) of the Bankruptcy Code.

***would not address avoidance actions at all***.  ***But they took no corrective action to address this***

***issue***.  Further, the Kobre & Kim Report avoided the question of whether private financial

institutions should be held liable for their interactions with the Title III Debtors.  And while the

Kobre & Kim Report provides a compendium-like overview of various types of claims that often

arise in bankruptcy cases, it did not engage in any serious application of the facts to those legal

standards.[40]

36.     In addition, there are a number of other aspects of the Kobre & Kim Report that

made it highly unsuitable for the purpose of preparing causes of action.  Among other things, the

Kobre & Kim Report's overall approach was to exonerate parties (for example, by volunteering

conclusions and presumptions that give the impression there was no wrongdoing),[41] subjects of

the Kobre & Kim Report were allowed to remain anonymous,[42] interviews were not conducted

under oath or transcribed,[43] and the Kobre & Kim Report almost never cited to specific

documents.[44]  Finally, the documents made available to the Committee pursuant to Kobre &

Kim's "Exit Plan Order" did not allow a thorough review of the Causes of Action.

37.     In short, the Kobre & Kim investigation, which cost more than $16 million,[45] did

not materially advance any Causes of Action.  Having controlled the investigation and set its

parameters, the Oversight Board must accept some responsibility for this failure.

---

[40]   Informative Mot. ¶ 6.

[41]   *Id.* ¶ 10.

[42]   *Id.* ¶ 19.

[43]   *Id.* ¶ 12.

[44]   *Id.* ¶ 20.

[45]   *PROMESA Board Claims Committee to Weigh Causes of Action; Review to Include Analyzing Validity of Debt Issuances*, Reorg Research (Sept. 18, 2018), 18:20 PM, https://new reorg-research.com/data/documents/20180918/5ba1569645207.pdf (reporting that Kobre & Kim attorney's statement that "current cost of Kobre & Kim's probe had reached $16 million").

B.      September 2018 Interlude – Oversight Board Approves Release of Former GDB
        Officers and Directors

38.     After the release of the Kobre & Kim Report, the parties spent a brief but intense

period in September of 2018 focused heavily on issues surrounding the restructuring of GDB.  In

an episode emblematic of larger trends, the Oversight Board, even before the release of the

Kobre & Kim Report, had approved a GDB restructuring that would have released *former* GDB

officials who were at the epicenter of Puerto Rico's financial crisis.

39.     Despite its generally exonerative approach, the Kobre & Kim Report revealed

highly troubling conduct by the GDB and its *former* officers, directors, employees, agents, or

representatives.[46]  As a result, the Committee initially objected to the then-pending restructuring

of GDB contemplated by GDB and AAFAF and approved by the Oversight Board because the

proposed restructuring would have resulted in the global release of the Debtors' claims against

former GDB officers and directors.[47]

40.     While the Oversight Board later "clarified" that the release only applied to

*current* officials, the record shows that, prior to this "clarification," the release was intended to

apply to both *current and former* GDB officials.[48]  By all appearances, it was only after the

Committee raised its voice that the Oversight Board required GDB and AAFAF to limit the

release to current GDB officers and directors only.  This episode is another illustration of the

Oversight Board's lack of interest or focus in pursuing the Causes of Action.  Now, of course, if

---

[46]   As the Committee noted at the time, the Kobre & Kim Report "highlights the need for further investigation and
      should work to discourage any efforts to prematurely provide global releases."  Informative Mot. ¶ 13.

[47]   The Committee filed several pleadings in the Title III cases and in the GDB Title VI case in which it raised its
      concerns in connection with the proposed restructuring of GDB, which concerns were subsequently resolved
      pursuant to a stipulation. *See Stipulation Resolving the Objection of the Official Committee of Unsecured
      Creditors of All Title III Debtors (Other than COFINA) to the Approval Application*, *In re Gov't Dev. Bank for
      P.R.,* Case No. 18-BK-1561-LTS (D.P.R. Oct. 9, 2018) [Docket No. 187].

[48]   By its terms, the source of this release, the GDB Restructuring Act, Section 702, would apply to "any officers,
      directors, employees, agents and other representatives" of GDB.

18

the Motion is not granted, these former GDB officers and directors stand to receive the same

release that the Oversight Board said was not intended several months ago.

     C.     <u>October 2018 – Present 2019: Oversight Board Finally Begins to Investigate
Causes of Action, But Fails to Do So In Timely Fashion.</u>

     41.     After a three month delay following the publication of the Kobre & Kim Report,

the Oversight Board finally began the process of analyzing the Causes of Action.  This belated

effort has proven to be too little, too late.  Indeed, the events of the last few months demonstrate

conclusively that the Committee was, unfortunately, correct all along.  The Committee's

predictions regarding the dangers of the Oversight Board's indifference to properly investigating

the Causes of Action have proven accurate (to the Committee's great dismay).

        *1.*     *Oversight Board Issues RFP for Special Claims Counsel*

     42.     On October 24, 2018, over two months after the Kobre & Kim Report was made

public, the Oversight Board's Special Claims Committee issued a Request for Proposal (the

"<u>RFP</u>") for counsel ("<u>Claims Counsel</u>") to assist the Oversight Board's Special Claims

Committee in its review of the Kobre & Kim Report.[49]  ***Once again, it is worth pointing out that
the members of the Special Claims Committee knew, or should have known, months before
(and long before the release of the Kobre & Kim Report) that they would need to retain
counsel to investigate and prosecute the Causes of Action, particularly avoidance actions,
because the Kobre & Kim Report was not going to address such actions, but they did not take
any action on that front until it was, practically, too late***.  The RFP provides that the "scope of

the work" to be completed by Claims Counsel is to "further consider potential claims that might

arise from the conduct described in the Report," and will include "(i) review and assessment of

the [Kobre & Kim] Report and the factual materials that form the basis of the [Kobre & Kim]

---

[49]    RFP, https://drive.google.com/file/d/1d073bWZXbsDu5YkFplmYVr_mfT0byWh-/view.

Report, (ii) legal research as necessary to advise the [Special Claims] Committee regarding potential causes of action and (iii) initiation of any litigation arising from the conduct described and/or referrals to prosecutorial or regulatory bodies."[50]

> 2.   *Committee's Bankruptcy Rule 2004 Investigation Regarding Avoidance Actions and Oversight Board's Retention of Claims Counsel*

43.    Once again concerned by the slow pace of the investigation, the Committee filed a Rule 2004 motion on November 27, 2018 (the "November 2018 Motion") seeking discovery with respect to transfers of property valued at $3 million or more within two years prior to the Petition Date.[51]   The Committee advised that, while "[t]he Committee, at the Court's direction, has already adopted a 'wait-and-see' approach for more than 18 months," the Committee needed to commence an investigation given that "now only five months remain until the statute of limitation expires with respect to most of the Debtors' Avoidance Actions."[52]   The Court granted the Committee's motion by order dated December 14, 2018 (the "Rule 2004 Order").[53]

44.    On November 29, 2018 (two days after the Committee filed the November 2018 Motion), the Oversight Board announced that it had selected Brown Rudnick LLP as Claims Counsel to assist the Special Claims Committee.   Since then, the Committee's professionals have worked extensively with Claims Counsel to attempt to bring counsel "up to speed" as to the Causes of Action.

---

[50]   RFP, at 2.

[51]   *Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery of Title III Debtors, Other Than COFINA, Concerning Potential Avoidance Actions* [Docket No. 4373].

[52]   *Id.* ¶ 6.

[53]   *Order Granting Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery of Title III Debtors, Other than COFINA, Concerning Potential Avoidance Actions* [Docket No. 4484].

45.     Thus, the Oversight Board, appointed in August 2016, did not begin examining
potential claims with any seriousness (and not at all, with respect to avoidance actions relating to
debt issuances) until the very end of November 2018 and then did so by employing a new law
firm that (through no fault of its own, obviously) had to "catch up" with the assistance of the
Committee's professionals with the Causes of Action Deadline looming.  This chronology is, to
put it bluntly, shocking, especially when considering that the Oversight Board had previously
obstructed any Committee investigation by arguing that only the Oversight Board had the
authority under PROMESA to conduct an investigation.[54]

### 3.     Committee's Procedures Motion

46.     After the Rule 2004 Order was entered, the Committee continued to work with the
Oversight Board's Claims Counsel to coordinate efforts in connection with investigating causes
of action.  In January 2019, the Committee's advisors convened a meeting with the various
advisors to the Oversight Board and AAFAF to discuss the status of the Oversight Board's
preparation for asserting the Causes of Action prior to the May 2, 2019 Causes of Action
Deadline.  During that meeting, the Committee's counsel discussed, among other things, the
importance of identifying and serving all potential defendants in advance of the Causes of Action
Deadline.  The Committee's advisors left the meeting with the clear understanding that the
Oversight Board's advisors would coordinate among themselves to expeditiously review and
pursue meritorious claims, including by identifying all appropriate defendants in a timely
fashion.

47.     In view of the upcoming Causes of Action Deadline and the Committee's growing
unease, on March 21, 2019, Committee counsel advised the Oversight Board that the Committee

---

[54] See Oversight Board objection to July 2017 Mot. [Docket No. 859], Aug. 3, 2017.

could not wait indefinitely for confirmation from the Oversight Board as to which causes of

action it would pursue against which defendants.  Though counsel to the Oversight Board

expressed willingness to continue a dialogue, the Oversight Board would not commit to a

timeframe that would provide the Committee sufficient time to evaluate causes of action that the

Oversight Board would not pursue.

48.      On March 25, 2019, the Committee filed its motion to establish procedures for

disclosure of causes of action and an expedited briefing schedule for a potential request to

appoint a trustee (the "Procedures Motion").[55]  In opposing the Procedures Motion, the Oversight

Board asserted that the requested relief would interfere with the Oversight Board's and Claims

Counsel's purported investigation of causes of action and that the parties need not address any

such procedures until the April 24, 2019 omnibus hearing, notwithstanding the upcoming May 2

Causes of Action Deadline.[56]  The fact that the Oversight Board even argued that the

identification of the Causes of Action could wait until approximately the week before the May 2

Causes of Action Deadline demonstrates the Oversight Board's lackadaisical attitude toward

pursuing the Causes of Action.

49.      On March 29, 2019 the Court entered the Procedures Order granting the

Procedures Motion.[57]  Under the terms of the Procedures Order, (i) the Oversight Board was

---

[55]  *Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I) Procedures with Respect to Disclosure of Avoidances Actions to be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)* [Docket No. 5997].

[56]  *Response of the Financial Oversight and Management Board for Puerto Rico to Urgent Motion of Official Committee of Unsecured Creditors for Order Establishing (I) Procedures with Respect to Disclosure of Avoidance Actions to be Asserted by the Oversight Board and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)* (the "Objection to Procedures Motion") [Docket No. 6073].

[57]  *Order Granting the Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I) Procedures with Respect to Disclosure of Avoidance Actions to be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)* [Docket No. 6086].

required to disclose a preliminary list of all potential avoidance actions the Oversight Board

would pursue on behalf of the Commonwealth by April 5, 2019, (ii) counsel for the Committee

and Oversight Board were to meet and confer regarding the preliminary list and anticipated

allocation of litigation responsibilities, and (iii) the Oversight Board was to provide a final list of

avoidance actions it would pursue by April 10, 2019.  If necessary, the Committee had until

April 12, 2019 at 5:00 p.m. (Atlantic Standard Time) to file its motion seeking the appointment

of a trustee.  Subsequently, the parties requested, and the Court approved,[58] an extension of the

Oversight Board's deadline to provide a final list and the Committee's deadline to file a motion

to April 12, 2019 at 12:00 p.m. and April 15, 2019 at 9:30 a.m., respectively.  The Committee's

deadline to file its motion was subsequently further extended, with the consent of the Oversight

Board, to April 17, 2019.[59]

### 4. Oversight Board's Tolling Motion

50.    In recent weeks, the Oversight Board has filed two motions that further illustrate

the gravity of the current situation: (i) a motion (the "Tolling Motion") for equitable tolling of

the Section 546 deadlines in connection with avoidance actions against certain bondholders[60]

based on the Oversight Board's inability to obtain information identifying bondholders' who

received avoidable transfers, and (ii) a related urgent motion seeking disclosure of lists of

---

[58]   *Order Extending Briefing Schedule with Respect to Potential Motion by Official Committee of Unsecured Creditors Seeking Appointment of Trustee to Pursue Causes of Action* [Docket No. 6172].

[59]   *Order Further Extending Briefing Schedule with Respect to Potential Motion by Official Committee of Unsecured Creditors Seeking Appointment of Trustee to Pursue Causes of Action* [Docket No. 6285].

[60]   *Motion of the Financial Oversight and Management Board of Puerto Rico for Entry of an Order Equitably Tolling the Time Prescribed By 11 U.S.C. § 546 to Bring Certain Avoidance Actions* [Docket No. 6118].

security holders.[61]  The Committee does not oppose the relief requested in these motions, and

filed an informative motion supporting the disclosure of lists of security holders.[62]

51.     Nevertheless, the Tolling Motion reveals some of the issues that stymied the

Oversight Board's investigation of the Causes of Action.  Specifically, the Tolling Motion

reveals that, as part of Claims Counsel's investigation, it requested access to the depository

containing documents obtained by Kobre & Kim during its investigation, which ended up

involving "the negotiation of numerous non-disclosure agreements and electronic permission

protocols" to obtain even limited access to the database.[63]  As a result, "[n]otwithstanding

looming statute of limitation deadlines . . . and Claims Counsel's diligence, *Claims Counsel was*

*not able to secure any access to the database until March 2019, and even today only has access to*

*a limited degree*."[64]  Indeed, the Oversight Board admitted:

> To be clear: the Oversight Board's Special Claims Committee was unable
> to secure **any** access to the Document Depository—which contains
> research collected in the Investigation commissioned and funded by the
> Oversight Board itself—until six months after the issuance of the Final
> Report and four months after retaining Claims Counsel.[65]

Although the Kobre & Kim investigation and the Kobre & Kim Report were heralded by the

Oversight Board's Special Claims Committee as a roadmap for Claims Counsel to follow in

investigating and prosecuting claims, Claims Counsel was not given access to the Kobre & Kim

documents for months and never obtained access to witness interview notes at all.  No one, including

the Committee, was told about this lack of access until March 2019.

---

[61]  *Urgent Motion of the Financial Oversight and Management Board of Puerto Rico for Entry of an Order Under
Bankruptcy Rules 1007(i) and 2004 Authorizing Discovery and Compelling Disclosure of Lists of Security
Holders* [Docket No. 6143].

[62]  *Statement of Official Committee of Unsecured Creditors In Support of Urgent Motion of Financial Oversight
and Management Board of Puerto Rico for Entry of Order Under Bankruptcy Rules 1007(i) and 2004
Authorizing Discovery and Compelling Disclosure of Lists of Security Holders* [Docket No. 6144]

[63]  Tolling Mot. ¶¶ 40, 57.

[64]  *Id*. ¶ 57 (emphasis added).

[65]  *Id.* (emphasis in original).

5. *Oversight Board's Letter to Congress*

52.     The Oversight Board's failure to timely pursue certain of the Causes of Action

has apparently also caught the attention of six U.S. Senators and seventeen members of the U.S.

House of Representatives.  These members of Congress inquired, in an April 1, 2019 letter (the

"April 1 Letter"), attached hereto as **Exhibit B**, as to the status of the Oversight Board's efforts

"to pursue any legal claims against banks, advisors or other parties to recover fees associated

with $6 billion debt issued since 2012."

53.     In its April 11, 2019 response, attached hereto as **Exhibit C** (the "Letter to

Congress"), the Oversight Board congratulates itself on forming the Special Claims Committee

and retaining Kobre & Kim, but conveniently omits the various facts described above, which

show the full picture.  In a particularly ironic statement, the Letter to Congress asserts that the

Tolling Motion and tolling agreements sent to potential litigation targets are examples of the

Oversight Board's diligence in pursuing claims, while at the same time conceding that the

Oversight Board is otherwise "unlikely to complete [its investigation] before the two-year

anniversary of the Title III petition for the Commonwealth" due to its lack of diligence.

6. *Stipulation on Joint Prosecution of Certain Causes of Action*

54.     Following the Oversight Board's and the Special Claims Committee's disclosure

of the preliminary list of causes of action on April 5, 2019, as required by the Procedures Order,

the parties met and conferred extensively to discuss, among other things, the Debtors' potential

causes of action against certain litigation targets and the allocation of litigation responsibilities.

As a result of the meet and confer process, the parties have agreed to a framework to pursue

certain causes of action, as set forth in the Stipulation.

55.     While the Committee is pleased to have reached this agreement with the

Oversight Board, the Stipulation is limited in scope.  In particular, claims contemplated by the

25

Stipulation █████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████   The Oversight Board

and its Special Claims Committee have no issue with pursuing these actions.

56.    When it comes to bringing the claims that would expose third parties for their

improper conduct, however, the Oversight Board's approach is quite different.  The Committee

was informed five days ago that (i) the Oversight Board's Special Claims Committee will not

pursue any claims against any individuals involved in Puerto Rico's bond issuances and (ii)█

██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████    In other words, the Oversight Board will not pursue any of the meritorious claims

that would shine a light on the misconduct of the various underwriters and other participants in

bond issuances, including claims for breach of fiduciary duty of loyalty, deepening insolvency,

fraud or professional negligence.[66]

57.    In light of this highly relevant development, the Committee requested that, as part

of the Stipulation, the Oversight Board consent to the Committee being appointed as sole

trustee/plaintiff to commence adversary proceedings or lawsuits to pursue the Causes of Action

(with a meet and confer process and the potential for Court intervention in case the parties could

---

[66] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████

not resolve their disagreements) that the Oversight Board would not pursue.  The Oversight

Board's Special Claims Committee initially accepted but ultimately rejected this request.

     D.     <u>Oversight Board Lulls Committee Into Believing Oversight Board Would Pursue
Causes of Action</u>

58.     Consistent with the Procedures Order, the Oversight Board and its Special Claims

Committee provided the Committee with two sets of lists of their avoidance actions: a

preliminary list on April 5, 2019, and a purported final list on April 12, 2019.   Notably, the

preliminary list that the Committee received from the Special Claims Committee on April 5

specifically listed claims against underwriters, advisors, and other third parties involved in the

Commonwealth's 2014 bond issuance, including claims for deepening insolvency.  The list

contained no claims against individuals.

59.     On Monday, April 8, 2019, advisors for the Committee, the Oversight Board, and

its Special Claims Committee met and conferred to discuss the preliminary lists and the division

of responsibility for pursuing identified claims.  During this meeting, the Committee raised at

least two concerns specific to the identified third-party claims: (i) that the Special Claims

Committee's list of such claims did not include claims against any individuals, including GDB

officers and directors, for their role in debt offerings; and (ii) that the list did not include claims

against third parties involved in the 2012 GO bond issuances.  Counsel for the Special Claims

Committee responded to these concerns by assuring the Committee that it would pursue the

claims against individuals and that the list would be expanded to cover earlier bond issuances.

Counsel then went a step further, stating that the Special Claims Committee would permit the

Committee to join in litigation against the individuals and other third parties and assert broad

claims against those parties as a result of their misconduct.

27

60.    Commencing on April 12, the Special Claims Committee reversed course as to claims against individuals, informing the Committee that no such claims would be pursued by the Oversight Board.  Initially, the Oversight Board suggested that the Committee could pursue those claims with the Oversight Board's consent, but it has since retreated from that position. The Special Claims Committee reiterated, however, that it would still be pursuing claims against other third parties, including deepening insolvency claims.

61.    During the weekend of April 13, however, in a sudden reversal of course, counsel for the Special Claims Committee informed the Committee that ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. Moreover, as noted above, the Oversight Board's Special Claims Committee also declined to allow the Committee to bring these claims on behalf of the Commonwealth, including causes of action sounding in fraud.

62.    This last-minute development left the Committee and its constituents in an extremely difficult, if not impossible position.  With less than three weeks remaining before Causes of Action Deadline, the Committee had no choice but to file this Motion, asking for permission to pursue the valuable Causes of Action against the third parties that bear responsibility for the Commonwealth's fiscal crisis.  The Oversight Board had already recognized that these claims are valuable and meritorious.  Its sudden refusal to pursue them is not justifiable.

## III.    <u>Committee Should Be Authorized to Continue Investigating and, If Appropriate, Prosecute Valuable Causes of Action on Commonwealth's Behalf</u>

63.    Typically, a party seeking derivative standing will attach a draft complaint to its motion to give the court a sense of the claims it proposes to bring.  Here, this is simply

impossible because it was only five days ago that the Oversight Board's Special Claims Committee, through its counsel, suddenly informed the Committee that it would not be pursuing any claims against individuals.  This was followed the next day by an equally sudden about-face with respect to claims against underwriters and other participants in Puerto Rico's debt offerings.  Accordingly, the Committee also seeks authorization to continue its investigation with full access to Commonwealth documents and information.

64.     Despite being placed in this impossible position, the Committee is able to describe, preliminarily, the basis for claims against individuals, underwriters, and other debt offering participants.  Indeed, the Committee previously outlined some of these issues in the context of the GDB restructuring.  The Committee even began sharing its analysis with counsel for the Oversight Board's Special Claims Committee before they were formally retained.

65.     Based on the information currently available, the Committee believes that the Commonwealth likely has meritorious claims against parties involved in the Commonwealth's issuance of $3.5 billion of GO bonds in March 2014 (the "2014 GO Bonds").  These parties include the officers and directors of GDB, who controlled every meaningful aspect of the Commonwealth's bond issuances,[67] and Banco Popular, which advised GDB's officers and directors against the 2014 GO Bond issuance but then participated in underwriting the bonds, earning substantial fees in the process.[68]

66.     In January 2014, just two months before the 2014 GO Bonds were issued, GDB engaged Proskauer and Cleary, both of which have high-profile bankruptcy and restructuring

---

[67]   Kobre & Kim Report, at 71 (characterizing GDB as a "traffic cop" that "intermediated all of the [Title III Debtors'] bond issuances," deciding "which of the Puerto Rico-Related Entities would issue their bonds [] and when" and selecting underwriters and counsel).

[68]   *Id.* at 542.

practices, without publicly disclosing this fact.[69]  The engagement letter with Proskauer was signed by the head of Proskauer's bankruptcy and restructuring group.  In February 2014, GDB also engaged Millco, a well-known restructuring firm.

67.     Although Proskauer, Cleary, and Millco were all engaged prior to the 2014 GO Bond issuance, the Proskauer and Cleary engagements were not made public until ***after*** the bonds were issued.[70]

68.     On June 28, 2014, just three months after the 2014 GO Bond issuance, the Commonwealth passed the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act"), a bankruptcy statute that Proskauer and Cleary helped draft.[71]  The Recovery Act was held invalid, first by the District Court in February 2015, then by the First Circuit in July 2015, and ultimately by the U.S. Supreme Court in June 2016.  In June 2015, just days before the First Circuit handed down its decision, then Governor García Padilla declared Puerto Rico's approximately $72 billion in debt "unpayable."[72]

69.     The costs of issuance for the 2014 GO Bonds totaled nearly $8.7 million (net of an underwriters' fee of $28.1 million).[73]  Although not disclosed in the Official Statement, the non-public closing memorandum reveals that more than $7.1 million (approximately 82%) of that amount was used to pay an unexplained "GDB Fee."  On top of these costs, the 2014 GO Bonds were issued with a massive original issue discount of $245 million.[74]

---

[69]   *Id.* at 103.

[70]   *Id.* at 106.

[71]   *Id.* at 538.

[72]   *Id.* at 44.

[73]   Official Statement, dated March 11, 2014, for Series 2014 GO Bonds (the "2014 GO Official Statement"), at 38 and 24.

[74]   *Id.* at 24.

70.     More than half of the 2014 GO Bond net proceeds (approximately $1.6 billion)
were used to repay debts owed to GDB by the Commonwealth and the PBA.[75]  As detailed in the
Kobre & Kim Report, GDB abused its position as a lender to the Title III Debtors by increasing
their debt load in a way that benefitted GDB relative to other creditors of the Commonwealth.[76]
But GDB's officers and directors at that time may have had another, more personal reason for
orchestrating a bond issuance to pay off debts owed to GDB; namely, GDB's officers and
directors were facing potential criminal liability under the GDB Enabling Act for allowing GDB
to accept deposits while insolvent.[77]  As the Oversight Board conceded in GDB's Title VI case,
GDB was insolvent in 2014.[78]

71.     The transfers of 2014 GO Bond Proceeds to GDB also appear to have been
constructively fraudulent.  Specifically:

- These transfers were clearly made for GDB's benefit.

- The Commonwealth did not receive reasonably equivalent value in exchange for
  these transfers.  As numerous courts have recognized, a parent entity does not
  receive reasonably equivalent value for transfers made to an insolvent entity that
  it controls, because such transfers do not increase the parent's equity value in its
  subsidiary.[79]  Here, GDB and PBA were both undercapitalized, if not insolvent, at
  the time of the transfers.

---

[75]   *Id.*

[76]   Kobre & Kim Report, at 72 ("GDB's provision of short-term cash injections to certain Puerto Rico-Related
Entities while they waited to access the capital markets appears to have increased the debt load of certain Puerto
Rico-Related Entities, in a way that arguably had the effect of benefitting GDB as creditor relative to others.").

[77]   *See* GDB Enabling Act, 1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3 (providing for criminal
penalties, including imprisonment for up to five years, for officer and directors who allow GDB to accept
deposits while insolvent); *see also* 2015 P.R. Laws 97 (amending GDB Enabling Act to remove such criminal
penalties).  The current version of the statute can be found at 7 L.P.R.A. § 563.

[78]   *Objection of Financial Oversight and Management Board for Puerto Rico as the Administrative Supervisor of
the Government Development Board for Puerto Rico to the Official Committee of Unsecured Creditors' Notice
of Intention to Object to Qualifying Modification for Government Development Bank*, at 2 n.4, *In re Gov't Dev.
Bank for P.R.*, Case No. 18-BK-1561-LTS (D.P.R. Sept. 1, 2018) [Docket No. 111].

[79]   *See Gen. Electric Credit Co. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 728 (11th Cir. 1990) (holding that a
parent company's payments on an insolvent subsidiary's loan were not in exchange for reasonably equivalent
value when the parent received no economic benefit); *Commerce Bank of Kansas City, N.A. v. Achtenberg*, No.
90–0950–CV–W–6, 1993 WL 476510, *4 (W.D. Mo. Nov 10, 1993) (finding that the subsidiary's insolvency at

- The Commonwealth was also, at a minimum, undercapitalized, if not insolvent, at the time of the 2014 GO Bond issuance.  In this regard, it is no defense that the Commonwealth was able to access the capital markets with a GO issuance in 2014.  Courts have rejected such a "market test" defense where, as here, the true financial condition of the issuer was not disclosed to the investing public.[80]  As pointed out in the Kobre & Kim Report, GDB officials expressed doubt regarding the truthfulness of certain GDB statements made by GDB at the time of the 2014 GO Bond issuance.[81]

72.      Actual fraudulent transfer claims (or claims for aiding and abetting such fraudulent transfers or claims based on the same facts) could also be asserted.  Importantly, actual fraudulent intent does not require a showing of criminal intent to defraud.  Indeed, no showing of intent to defraud is required; an intent to hinder or delay creditors is sufficient.  Moreover, the requisite intent can be demonstrated through certain "badges of fraud."

73.      Here, several badges of fraud are present, including that (i) the transfer was made to or for the benefit of an "insider," (ii) the Commonwealth did not fully disclose the extent of its financial distress and the retention of bankruptcy counsel by GDB prior to the 2014 GO Bond issuance, (iii) the Commonwealth was, at a minimum, undercapitalized, if not insolvent at the time, and (iv) the transfer occurred in connection with the incurrence of substantial debt ($3.5 billion of additional GO bonds).

74.      Insofar as the 2014 GO Bond issuance served primarily to effect a fraudulent transfer of Commonwealth property, and if for no other reason, the issuance should never have

---

the time of the transaction "erased any presumption of reasonably equivalent value"); *Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. 441, 445 (Bankr. M.D.N.C. 2011) (finding that transfers to an insolvent subsidiary are not entitled to a presumption of indirect benefit going to reasonably equivalent value).

[80]  *See*, *e.g.*, *Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox Inc.*), 503 B.R. 239, 300 (Bankr. S.D.N.Y. 2013) (finding that "the assumption of market efficiency" in connection with an IPO was "overcome" by omissions in the IPO disclosures related to significant environmental liabilities); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("**Absent some reason to distrust it**, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (emphasis added) (internal quotation omitted).  Here, as discussed above, the market did not know that GDB had hired bankruptcy counsel to draft a bankruptcy statute several months before the 2014 GO Bond issuance.  Kobre & Kim Report at 106.

[81]  Kobre & Kim Report, at 105 ("[A] then-high ranking official within GDB suggested [in an internal email] that the [GDB] spokeperson's statement was 'false' and should be reframed").

32

occurred and thus any fees paid in connection with the issuance should be recovered on similar fraudulent transfer theories.

75.     Aside from the more than $1.6 billion in payments to GDB, more than $466 million in net proceeds of the 2014 GO Bonds were used to refund GO bonds issued in prior years, while more than $90 million in net proceeds were used to pay associated swap termination amounts.[82]  Approximately $256 million of the refunded bonds were owned by the refunded bonds' underwriters or their affiliates, which provided credit enhancement or liquidity support for nearly all of the remaining $210 million of refunded bonds.[83]  The underwriters or their affiliates also received approximately $37 million (41%) of the swap termination amounts paid from the bond proceeds.[84]  Had the 2014 GO Bonds not been issued before the Commonwealth entered Title III, the underwriters and their affiliates would have been among the GO bondholder claimants in these Title III cases and would have had, at best, unsecured claims for the termination value of their swaps.  Instead, they were paid in full and/or relieved entirely of their credit exposure to the tune of at least $500 million.

76.     In short, the 2014 GO Bond issuance may very well have deepened the Commonwealth's insolvency while cashing out the underwriters and propping up GDB's balance sheet through fraudulent transfers, even as GDB was engaging high-level professionals to deal with the inevitable insolvency of some or all of Puerto Rico.  The Committee believes that, under these circumstances, the Commonwealth likely has meritorious claims that the Oversight Board has unjustifiably refused to pursue.

---

[82]   2014 GO Official Statement, at 24.

[83]   *Id*. at 25.

[84]   *Id*.

33

77.     Given the facts described in this Motion regarding the meet and confer process, the Committee's investigation is not complete.  Therefore, additional claims may be identified as the investigation continues.  The Committee should be allowed to complete its investigation and prosecute any meritorious Causes of Action it identifies.

## RELIEF REQUESTED

78.     The Committee respectfully requests entry of an order appointing the Committee as trustee under section 926 of the Bankruptcy Code and otherwise granting the Committee derivative standing to continue investigating and, if necessary, prosecute the Causes of Action on the Commonwealth's behalf, free from the Oversight Board's continued obstruction and interference.  In addition, to assist the Committee in its prosecution of the Causes of Action, the Committee respectfully requests an order requiring Kobre & Kim to provide the Committee with access to the documents and interview notes that it collected and prepared while investigating the Debtors' pre-Title III conduct.

## BASIS FOR RELIEF REQUESTED

### I.     Legal Standard

79.     Section 926 provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of [the Bankruptcy Code], then on request of a creditor, the court may appoint a trustee to pursue such cause of action." 11 U.S.C. § 926(a); see 48 U.S.C. § 2161(a) (incorporating section 926(a) into PROMESA).  Where appointment of a trustee is warranted, "the court is given unfettered discretion in determining whom to appoint as a trustee." 6 Collier on Bankruptcy ¶ 926.02[3].

80.     The section provides a remedy to creditors where a recalcitrant debtor has failed to pursue an avoidance action.  *See Pope v. Haas & Wilerson, Inc. (In re Ala. State Fair Auth.)*, 232 B.R. 252, 268 (N.D. Ala. 1999) (noting that the two-year limitations period puts "some

onus" on creditors to determine what preferential transfers have been made and "push" the

debtor to pursue such transfers or, alternatively, request appointment of a trustee.)

81.     The appointment of a trustee is particularly appropriate where a debtor declines to

pursue avoidance actions on account of potential political ramifications or other extraneous

interests.  As the legislative history indicates, section 926(a) was enacted, in part, out of concern

that a municipal debtor might make payments to certain creditors due to political pressure or a

desire to maintain good relations and then fail to pursue avoidance of such transfers post-

petition.  S. Rep. No. 95-989 (1978).[85]

82.     The refusal to bring a cause of action can take many forms.  A debtor can outright

refuse to bring a cause of action, it can bring a cause of action but then not prosecute it, or it can

bring only weak causes of action or simply allow causes of action to become time-barred.  Here,

the Commonwealth has both refused to bring certain Causes of Action and, with respect to

certain potential defendants, has limited the Causes of Action it is willing bring.

83.     Relatedly, courts may confer derivative standing where a trustee or debtor has

unjustifiably failed to litigate a colorable claim of the estate or has otherwise abused its

discretion in failing to act.  *See, e.g., Unsecured Creditors Comm. of Debtor STN Enters., Inc. v.
Noyes* (*In re STN Enters.*), 779 F.2d 901, 904 (2d Cir. 1985); *Official Comm. Of Unsecured
Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 579 (3d Cir.
2003);[86]

---

[85]   "This section [928 (now section 926)] is necessary because a municipality might, by reason of political pressure or desire for future good relations with a particular creditor or class of creditors, make payments to such creditors in the days preceding the petition to the detriment of all other creditors. No change in the elected officials such a city would automatically occur upon filing of the petition, and it might be very awkward for those same officials to turn around and demand the return of the payments following the filing of the petition. Hence, the need for a trustee for such purpose."

[86]   *See also In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("It would appear to the Court that an equally important 'result,' which the Code has been designed to obtain, is the recovery and collection of estate property, including the prosecution of causes of action held by the debtor that may result in an increase in the

84.     A court's authority to confer derivative standing derives from sections 105(a), 503(b), 1103(c), and 1109(b) of the Bankruptcy Code,[87] all of which are incorporated into PROMESA.  "The ability to confer derivative standing . . . is a straightforward application of bankruptcy courts' equitable powers"[88] which are most valuable when the system breaks down, *e.g.*, when a trustee or debtor-in-possession has failed to maximize the value of the estate.  A bankruptcy court's equitable powers are most valuable in such circumstances because the court is "able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."[89]  Indeed, this Court previously conferred derivative standing in the Title III context, having authorized the Committee to act on the Commonwealth's behalf in the Commonwealth-COFINA dispute.[90]

85.     Here, the Oversight Board has unjustifiably failed to pursue the valuable Causes of Action.  As discussed above, the record could not be clearer that the Oversight Board has rarely, if ever, adequately discharged its responsibilities with respect to Causes of Action.  Despite the Committee's attempts to push the Oversight Board to act, it has decided to allow valuable Causes of Action to evaporate.  Unless this Court appoints the Committee as trustee under section 926(a) and grants the Committee derivative standing to pursue the Causes of Action, that is exactly what will happen.

---

amount of money available for distribution to creditors. To that aim, if a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.")

[87]   *See, e.g.* Cybergenics, 330 F.3d at 559-67.

[88]   *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 242 (6th Cir. 2009); Cybergenics, 330 F.3d at 568 (same).

[89]   Cybergenics, 330 F.3d at 568

[90]   *See* Stipulation *and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* ¶ 2 [Docket No. 996].

II.    **Kobre & Kim Should Be Required to Turn Over All Documents and Witness**
**Interview Notes**

1.    It appears that even the Oversight Board, which retained Kobre & Kim, is unable

to obtain certain documents collected by that firm or any of the firm's interview notes.  As set

forth in the Tolling Motion, Kobre & Kim has refused to make documents readily available to

the Special Claims Committee.  That recalcitrance should not be allowed to continue.

2.    While the Movants are cognizant of certain confidentiality issues, there is no

reason an order cannot be entered that granting appropriate privacy protections.  If this Court is

prepared to grant the Committee's requested relief, it should also grant the Committee full and

unfettered access to all documents collected by Kobre & Kim and all of the firm's interview

notes.

## NOTICE

3.    Notice of this Motion has been provided to the following entities, or their counsel,

if known: (i) the U.S. Trustee; (ii) the Office of the United State Attorney for the District of

Puerto Rico; (iii) the Oversight Board; (iv) AAFAF; (v) the official committee of retirees;

(vi) the insurers of the bonds issued or guaranteed by the Debtors; (vii) counsel to certain ad hoc

groups of holders of bonds issued or guaranteed by the Debtors; and (viii) all parties that have

filed a notice of appearance in the above-captioned Title III cases.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that this Court enter an order substantially in the form attached hereto as Exhibit A granting the relief requested herein, and granting the Committee such other relief as this Court deems just and proper.


Dated:  April 17, 2019

*/s/ Luc A. Despins*
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
nicholasbassett@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*[91]

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*

---

[91]   Paul Hastings LLP does not represent the Committee with respect to the statements in this Motion regarding underwriters or their affiliates.

*/s/ John Arrastia*

John H. Genovese, Esq. (*pro hac vice* pending)
John Arrastia, Esq. (*pro hac vice* pending)
Jesus M. Suarez, Esq. (*pro hac vice* pending)
Mariaelena Gayo-Guitian (*pro hac vice* pending)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Proposed Conflicts Counsel to the Official Committee
of Unsecured Creditors with Respect to Claims Against
Underwriters and Their Affiliates*


*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Conflicts Counsel to the Official Committee of
Unsecured Creditors with Respect to Claims Against
Underwriters and Their Affiliates*

*/s/ John Arrastia*
John H. Genovese, Esq. (*pro hac vice* pending)
John Arrastia, Esq. (*pro hac vice* pending)
Jesus M. Suarez, Esq. (*pro hac vice* pending)
Mariaelena Gayo-Guitian (*pro hac vice* pending)
GENOVESE JOBLOVE & BATTISTA, P.A.
100 SE 2nd Street, Suite 4400
Miami, FL 33131
Telephone: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Counsel to Tradewinds Energy Barceloneta, LLC*


*/s/ Javier Vlarino*
Javier Vilariño, Esq., USDC - PR 223503
VILARIÑO & ASSOCIATES, LLC
1519 Ponce de Leon Ave
First Bank Building, Suite 513
San Juan, PR 00909
Telephone: 787-565-9894
jvilarino@vilarinolaw.com

*Local Counsel to Tradewinds Energy Barceloneta,
LLC*


*/s/ Peter D. DeChiara*
Richard M. Seltzer, Esq.
Peter D. DeChiara, Esq.
Marie B. Hahn, Esq.
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
Tel.: (212) 563-4100
Fax: (646) 473-8216
rseltzer@cwsny.com
pdechiara@cwsny.com
mhahn@cwsny.com

*Counsel to the Service Employees International Union*

40

*/s/ Miguel Simonet-Sierra*
Miguel Simonet-Sierra, Esq.
MONSERRATE, SIMONET & GIERBOLINI, LLC
101 Ave. San Patricio
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
Tel.: (787) 620-5300
msimonet@msglawpr.com

*Local Counsel to the Service Employees International Union*


*/s/ Juan C. Salichs*
SALICHS POU & ASSOCIATES PSC
P.O. Box 195553
San Juan, PR 00919-5553
Attn: Juan C. Salichs
USDC-PR Bar No. 211610
Telephone: 787-449-6000
Email: jsalichs@splawpr.com

*Counsel to the Doral Financial Creditors' Trust*

41