## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS |

## RESPONDENTS' OPPOSITION TO MOTION OF CERTAIN CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO TO COMPEL PRODUCTION OF DOCUMENTS IN PRIVILEGE LOG CATEGORIES 1-4 [ATTORNEY-CLIENT PRIVILEGE, ATTORNEY WORK PRODUCT, COMMON INTEREST]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 5

    I.    ERS'S PUBLIC PURPOSE AND FINANCIAL CRISIS ..................................... 5

    II.    MORATORIUM ACT AND PROMESA ......................................................... 6

    III.    AAFAF AND PENSION REFORM .............................................................. 7

    IV.    COMMON INTEREST UNDER PROMESA ..................................................... 8

ARGUMENT ....................................................................................................... 9

    I.    THE GOVERNMENT PARTIES HAVE MET THEIR BURDEN TO
ASSERT ATTORNEY-CLIENT PRIVILEGE AND COMMON
INTEREST............................................................................................... 9

        A.    ERS Shares a Common Interest with AAFAF and the
Commonwealth. .......................................................................... 9

        B.    The Government Parties' Non-Lawyer Advisors Are Encompassed
by the Attorney-Client Privilege. .............................................. 13

        C.    The Crime-Fraud Exception Does Not Apply Here. ................................ 16

    II.    THE GOVERNMENT PARTIES HAVE MET THEIR BURDEN TO
ASSERT ATTORNEY WORK PRODUCT PROTECTION. ........................... 18

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altair Global Credit Opportunities Fund (A), L.L.C. v. Garcia-Padilla*,
No. 16-cv-2696 (D.P.R. Sept. 21, 2016)..................................................... 19

*Banco do Brasil, S.A. v. 275 Washington St. Corp.*,
No. CIV.A. 09-11343-NMG, 2012 WL 1247756 (D. Mass. Apr. 12, 2012) .......................... 16

*Cavallaro v. United States*,
284 F.3d 236 (1st Cir. 2002)................................................................. 14, 15

*Columbia Data Prods., Inc. v. Autonomy Corp. Ltd.*,
No. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ................................ 14, 16

*Dahl v. Bain Capital Partners, LLC*,
714 F. Supp. 2d 225 (D. Mass. 2010) ........................................................ 16

*F.T.C. v. Boehringer Ingelheim Pharm., Inc.*,
778 F.3d 142 (D.C. Cir. 2015)............................................................... 20

*Gross v. Town of Cicero, Ill.*,
619 F.3d 697 (7th Cir. 2010) ............................................................... 10

*Hickman v. Taylor*,
329 U.S. 495 (1947)........................................................................ 19

*Horwitz-Matthews, Inc. v. City of Chicago*,
78 F.3d 1248 (7th Cir. 1996) .............................................................. 10

*Hunydee v. United States*,
355 F.2d 183 (9th Cir. 1965) .............................................................. 13

*In re Berks Behavioral Health LLC*,
500 B.R. 711 (Bankr. E.D. Pa. 2013) ....................................................... 13

*In re Blier Cedar Co., Inc.*,
10 B.R. 993 (Bankr. D. Me. 1981) .......................................................... 18

*In re Campbell*,
248 B.R. 435 (Bankr. M.D. Fla. 2000) ...................................................... 18

*In re Cumberland Inv. Corp.*,
120 B.R. 627 (Bankr. D.R.I. 1990) ......................................................... 18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  295 F. Supp. 3d 66 (D.P.R. 2018) ........................................................................... 16

*In re Grand Jury Proceedings*,
  417 F.3d 18 (1st Cir. 2005) ........................................................................... 16, 18

*In re Mortg. & Realty Tr.*,
  212 B.R. 649 (Bankr. C.D. Cal. 1997) ........................................................................... 12

*In re Richmond Unified School Dist.*,
  133 B.R. 221 (N.D. Cal. 1991) ........................................................................... 13

*In re St. Johnsbury Trucking Co., Inc.*,
  184 B.R. 446 (Bankr. D. Vt. 1995) ........................................................................... 18

*In re Tribune Co.*,
  No. 08-13141 KJC, 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ...................................... 13

*In re Warner*,
  87 B.R. 199 (Bankr. M.D. Fla. 1988) ........................................................................... 18

*Lluberes v. Uncommon Prods., LLC*,
  663 F.3d 6 (1st Cir. 2011) ........................................................................... 14

*Markel Am. Ins. Co. v. Diaz-Santiago*,
  674 F.3d 21 (1st Cir. 2012) ........................................................................... 18

*Mississippi Pub. Employees' Ret. Sys. V. Bos. Sci. Corp.*,
  649 F.3d 5 (1st Cir. 2011) ........................................................................... 19, 20

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*,
  No. CIV. CCB-03-3408, 2012 WL 4378160 (D. Md. Sept. 24, 2012) .................................... 13

*P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc.*,
  952 F. Supp. 84 (D.P.R. 1997) ........................................................................... 18

*Rivera v. Kmart Corp.*,
  190 F.R.D. 298 (D.P.R. 2000) ........................................................................... 15

*Schreibman v. Walter E. Heller & Co. of P.R.*,
  446 F. Supp. 141 (D.P.R. 1978) ........................................................................... 13

*State of Maine v. U.S. Dep't of Interior*,
  298 F.3d 60 (1st Cir. 2002) ........................................................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*TM Park Ave. Assoc. v. Pataki*,
  214 F.3d 344 (2d Cir. 2000) ................................................. 10

*U.S. v. Deloitte LLP*,
  610 F.3d 129 (D.C. Cir. 2010) ................................................. 19

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961) ................................................. 14

*United States v. Nelson*,
  712 F.3d 498 (11th Cir. 2013) ................................................. 10

*United States v. Textron Inc. & Subsidiaries*,
  577 F.3d 21 (1st Cir. 2009) ................................................. 19

*Wade v. Touchdown Realty Grp., LLC*,
  No. CV 17-10400-PBS, 2018 WL 575848 (D. Mass. Jan. 26, 2018) ................................................. 16

**Statutes**

3 L.P.R.A. § 761 ................................................. 5, 11

3 L.P.R.A. § 761, *et seq.* (2016) ................................................. 5

48 U.S.C. § 2163 ................................................. 17

7 L.P.R.A. § 552(A) ................................................. 7

Act 106-2017 § 2.1(b) ................................................. 8

Act 106-2017 § 2.4(e) ................................................. 8

Act 21-2016 § 108 ................................................. 6

Act 21-2016 § 201(a) ................................................. 6

Act 21-2016 § 602 ................................................. 7

Act 21-2016 § 602(b) ................................................. 7

Act 21-2016, pt. II.A ................................................. 7

Act 2-2017 § 16 ................................................. 7

Act 2-2017 § 5(a) ................................................. 2, 7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Act 2-2017 § 8(m) .......................................................................................................... 9

Act 2-2017 § 8(o) .......................................................................................................... 9

Act 2-2017 § 8(q) ..................................................................................................... 2, 7

Act 305-1999 .................................................................................................................. 5

Act 3-2013 ...................................................................................................................... 6

J.R. 188 § 4 ..................................................................................................................... 8

PROMESA § 101(a) .................................................................................................. 3, 8

PROMESA § 201 .................................................................................................. 7, 8, 9

PROMESA § 202 ..................................................................................................... 7, 9

PROMESA § 315 ............................................................................................................ 7

PROMESA § 405(m)(6) ................................................................................................. 7

PROMESA § 405(n) ....................................................................................................... 7

**Other Authorities**

Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and
   Senate (Dec. 20, 2016) *available at*
   https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task
   %20Force%20on%20Economic%20Growth%20in%20Puerto%20Rico%20Releases%
   20Final%20Report.pdf .................................................................................................... 6

March 2017 Fiscal Plan (*available at*
   https://drive.google.com/file/d/10PXYyW7dF7wayWpBvdIvZjKtHOLQU0cp/view) ............. 9

Minutes for the September 30, 2016 Meeting of the Financial Oversight and Management
   Board for Puerto Rico (October 14, 2016) *available at*
   https://oversightboard.pr.gov/documents/) ................................................................... 8

# PRELIMINARY STATEMENT[2]

1.      The Motion to Compel relies on a false premise—that ERS's interests conflict with those of its fiscal agent AAFAF and the Commonwealth government of which ERS is an instrumentality—and therefore there can be no common interest among them protecting privileged communications concerning pension reform.  Nothing could be further from the truth.

2.      Consistent with its statutory mandate, ERS shares a common interest with AAFAF and the Commonwealth in supporting pension reform efforts that safeguard pension payments to retirees.  The Puerto Rico Legislature established ERS in 1951 as a trust to administer pension payments and other benefits to public employees.  ERS's sole purpose under its enabling act is to serve the public interest by paying Government retirees' pensions.  Unfortunately, due to ongoing financial problems, ERS could no longer meet its obligations.  To address this problem, AAFAF worked with the Commonwealth and ERS to create a new pay-as-you-go pension system ("PayGo").  Unlike the prior failing and underfunded system, PayGo ensures that ERS will meet its obligations to retirees and serve the public interest.  Under PayGo, the Commonwealth makes monthly pension payments out of its Treasury Fund, and public employers reimburse the Commonwealth for the benefits paid to each employer's respective retirees.  Since ERS no longer

---

[2] As used in this opposition, (i) "AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority; (ii) "AAFAF Enabling Act" means the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017; (iii) "Act 106" means Act No. 106 of August 23, 2017; (iv) "Commonwealth" means the Commonwealth of Puerto Rico; (v) "Debtors" means ERS and the Commonwealth; (vi) "ERS" means the Employees Retirement System for the Government of the Commonwealth of Puerto Rico; (vii) "ERS Bondholders" mean holders of pension funding bonds issued by ERS; (viii) "Oversight Board" means the Financial Oversight and Management Board for Puerto Rico; (ix) "FRBP" means the Federal Rules of Bankruptcy Procedure; (x) "FRCP" means the Federal Rules of Civil Procedure; (xi) "Joint Resolution 188" or "J.R. 188" mean Joint Resolution for Other Allocations for Fiscal Year 2017-2018; (xii) "Motion" means Motion of Certain Creditors of the Employees Retirement System of the Government of Puerto Rico to Compel Discovery, 17-3566-LTS, ECF No. 402 (D.P.R. Mar. 21, 2019); (xiii) "PROMESA" means the Puerto Rico Oversight, Management, and Economic Stability Act; (xiv) "Respondents" means ERS, the Commonwealth, AAFAF, and the Oversight Board; (xv) "Government Parties" means ERS, the Commonwealth, and AAFAF; (xvi) "Stay Motion" means the Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay, No. 17-3566-LTS, ECF No. 289 (D.P.R. July 3, 2018); and (xvii) "Collazo Decl." means Declaration of Luis Collazo Rodriguez in Opposition to Movants' Motion to Compel Production of Documents in Privilege Log Categories 1-4.

shoulders the massive financial burden of paying pensions, ERS no longer needs the employer contributions the Legislature had provided under the old regime.  The decision to transition from the old pension system to the PayGo system advanced the interests of ERS, the Commonwealth, and the people of Puerto Rico.

3.      Movants nevertheless contend that ERS's interests' "conflict" with those of the Commonwealth because they allege that ERS was contractually obligated to oppose legislation, such as PayGo, that could adversely affect ERS's bondholders.  This is not only contrary to ERS's Legislature-mandated mission to benefit the public but also fails to acknowledge that ERS (like any other contractual party) may choose to breach a contractual provision.  Thus, the fact that ERS advanced its statutory purpose of serving the island's public employees rather than follow a contract with creditors does not mean it did not have a common interest with AAFAF and the Commonwealth in supporting pension reform.

4.      Movants also contend that AAFAF somehow could not serve as agent for both the Commonwealth and ERS simultaneously.  Setting aside that there is no conflict between the Commonwealth's and ERS's interests, this argument misapprehends AAFAF's role as the statutory fiscal agent for *all* Government entities in Puerto Rico's bankruptcy.  AAFAF was created "for the purpose of acting as fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico and to assist such entities in facing the serious fiscal and economic crisis that Puerto Rico is currently undergoing."  *See* AAFAF Enabling Act, 5(a). AAFAF is the only government entity authorized to renegotiate, restructure, and reach agreements with creditors in connection with public debt or any other debt issued by any government entity. *Id.* at § 8(q).  AAFAF's role is to coordinate the restructuring of the Commonwealth Government's debts and to ensure a consistent approach that will best benefit the people of Puerto Rico.

5.     AAFAF cannot fulfill this role in insolation.  Instead, AAFAF must take into consideration the interconnected effects of how restructuring one government entity will affect other parts of the Government.  To facilitate pension reform and other changes that require the involvement of Puerto Rico's Legislature, AAFAF advises the Executive Branch and acts on behalf of the Commonwealth, public corporations, and instrumentalities to advance the collective interests of Puerto Rico's people.  Nothing about this arrangement is a conflict unless one accepts the premise that one set of creditors' interests must trump the shared public interests of government entities like ERS, the Commonwealth, and AAFAF.

6.     Movants also maintain that the involvement of non-legal financial advisors waives attorney-client privilege even for documents that provide, request, or discuss legal advice from in-house or outside counsel (as is the case for the documents in categories 1-4 challenged by Movants).  The use of such advisors is essential to the complex job of determining how best to restructure the debt of the Commonwealth, ERS and other entities in order to restore Puerto Rico's fiscal responsibility and access to capital markets.  *See* PROMESA § 101(a).  Analyzing the interconnected legal, financial, actuarial, and other consequences of the restructuring efforts cannot be done by lawyers alone and that work cannot be done effectively without preserving the confidentiality of counsel's communications with advisors.  If Movants were correct, they would strip privilege in any complex restructuring like this that involves many advisors and foreclose the frank, difficult discussions necessary to do such work.

7.     Movants also argue that ERS was somehow engaged in a "fraud" such that the attorney-client privilege should not apply.  Yet Movants provide no evidence of fraud or explanation of how that could have occurred given that the actions leading to Movants' alleged harm consisted of legislation of which Movants were fully aware.  Nor can the effects of this

3

legislation constitute fraudulent conveyances under the Bankruptcy Code.  Because PROMESA Section 303 reserves the Puerto Rico government's power to pass legislation like PayGo, the transfers were not unauthorized under the Bankruptcy Code.  Nor have Movants proffered evidence that the consideration ERS received—being relieved of the obligation to pay all retirees' pensions—was somehow inadequate.  Belying Movants' assertion that anything criminal or fraudulent occurred, Movants did not try to enjoin PayGo's implementation, which occurred openly through the democratic process.

8.    Movants are equally off-base in arguing that the Government Parties' attorney work product claims are defective.  Most of the documents in categories 1-3 of the log contain materials created in anticipation of litigation or for litigation but that also serve restructuring purposes.  The attorney work product immunity embraces such dual-purpose documents.  Movants are well aware that during the entire relevant period here—February to October 2017—litigation was either actually occurring or imminent.  Movants are among the most litigious of Puerto Rico's creditors and launched contested proceedings in 2016 that led to two stipulations among the parties in January and April of 2017.  Against the backdrop of this actual litigation plus the anticipated Title III filing in May 2017 and subsequent litigation, it would have been unreasonable *not* to anticipate and prepare for litigation.  AAFAF, the Commonwealth, and ERS's communications served dual purposes—to advance pension reform and to defend pension reform against the Bondholders' expected (and actual) challenges.

9.    Finally, Movants have not met their burden to compel the production of hundreds of communications with in-house counsel and outside counsel.  Courts rarely force such disclosure, and there is nothing in this record that would warrant it.  Because Movants insisted on an extremely abbreviated discovery schedule, the Government Parties reviewed over 6000 documents and

prepared a categorical privilege log in very little time.  The Government Parties also produced a detailed appendix with more than 180 entries describing the affiliations and roles of the individuals listed on the privilege logs.  Movants provided no such appendix for their logs.  The Government Parties also produced an individual log in less than two days.  Given the tight schedule and the narrow scope of this lift stay proceeding, the Government Parties' logging efforts were more than sufficient.  No disclosure of privilege communications should be ordered.

## BACKGROUND

### I.   ERS'S PUBLIC PURPOSE AND FINANCIAL CRISIS

10.   ERS's Legislature-mandated purpose is to serve the economic well-being of Puerto Rico's public employees.  *See* Act No. 447-1951 (codified, as amended, at 3 L.P.R.A. §§ 761–788(the "ERS Enabling Act")).  In 1951, the Puerto Rico Legislature established ERS as a trust to administer the payment of pensions and other benefits to officers and employees of the Commonwealth government, members and employees of Puerto Rico's Legislature, and officers and employees of public corporations and municipalities.  *See* 3 L.P.R.A. § 761.  Under Act 447, all government employees whose retirement benefits were administered by ERS were to receive defined benefits calculated based on a statutory formula that considered factors including the employee's salary and years of service.  *See* 3 L.P.R.A. § 761, *et seq.* (2016).  Until the passage of Joint Resolution 188 and Act 106, ERS discharged those duties by making pension payments to public employees.  Collazo Decl. ¶ 3.

11.   By 1999, ERS's defined benefit plan was significantly underfunded.  As of June 30, 1998, ERS was in "critical condition with an actuarial deficit that exceed[ed] five point nine billion dollars, according to the projections of [ERS's] actuaries."  *See* Act 305 of September 24, 1999, Statement of Legislative Intent, ("Act 305-1999").  Act 305-1999 was one of the first attempts to reform the retirement system and sought to address underfunding by establishing a

defined contribution model for new employees hired on or after January 1, 2000 and for current employees who elected to transfer from the existing defined benefit plan.  Collazo Decl. ¶ 4.  But ERS's financial system and the health of Puerto Rico's public employee retirement and pension system continued to deteriorate.  *Id*. ¶ 5.  In 2013, the Legislature adopted additional measures, a new comprehensive ERS reform, to address ERS's dire financial situation.  *See* Act 3 of April 4, 2013 ("Act 3-2013").

12.    These reform efforts failed to arrest ERS's financial decline.  Collazo Decl. ¶ 6.  As the Congressional Task Force on Economic Growth in Puerto Rico ("Task Force") found in its report to Congress, as of June 30, 2015, ERS was "in a negative funded position" and "at risk of becoming insolvent."  *See* Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and Senate (Dec. 20, 2016) *available at* https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task%20Force%20on%20Economic%20Growth%20in%20Puerto%20Rico%20Releases%20Final%20Report.pdf.  The Task Force further reported that as of June 30, 2015, ERS has a "net pension liability of $33.2 billion with a funded ratio of [negative] 1.8 percent."  *Id.*

## II.    MORATORIUM ACT AND PROMESA

13.    Responding to the liquidity crisis at ERS, on April 6, 2016, Governor García Padilla signed the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 (the "Moratorium Act").  The Moratorium Act authorized the Governor to prioritize essential government services over the financial obligations of the Commonwealth and its instrumentalities by imposing a moratorium on debt service payments.  Moratorium Act §§ 108, 201(a).

14.    The Moratorium Act also created AAFAF for the initial purpose of taking over the fiscal responsibilities of the Government Development Bank for Puerto Rico ("GDB").  At the time, GDB (which, unlike AAFAF, was a debt issuer) faced its own significant fiscal crisis and

6

could not satisfy its debt service obligations.  *See* Moratorium Act, pt. II.A.  This fiscal crisis threatened GDB's ability to effectively carry out its duties as fiscal agent, financial advisor, and reporting agent of the Commonwealth and its agencies, instrumentalities, municipalities, and political subdivisions.  *See* 7 L.P.R.A. § 552(A).  To ensure that essential government functions would be carried out unimpeded by the fiscal crisis, the Moratorium Act transferred GDB's duties as fiscal agent, financial advisor, and reporting agent to AAFAF.  *See* Moratorium Act § 602.  AAFAF was also granted the authority to "oversee all matters related to the restructuring or adjustment" of certain covered obligations, as designated by the Governor.  *Id.* § 602(b).

15.     On June 30, 2016, Congress enacted PROMESA to provide the Commonwealth with the tools necessary to address Puerto Rico's fiscal crisis and ensure future access to the capital markets.  *See* PROMESA §§ 405(m)(6), 405(n).  Among other things, PROMESA established the Oversight Board, which is tasked with certifying a fiscal plan, approving the Commonwealth's proposed budgets, filing Title III petitions on behalf of covered entities, and acting as the debtor representative in Title III proceedings.  *See id.* §§ 201, 202, and 315.

## III.     AAFAF AND PENSION REFORM

16.     On January 18, 2017, the Puerto Rico Legislature expanded AAFAF's role and designated it as the only government entity authorized to renegotiate, restructure, and reach agreements with creditors in connection with public debt or any other debt issued by any governmental entity.  AAFAF Enabling Act § 8(q).  The AAFAF Enabling Act makes clear that AAFAF was created "for the purpose of acting as fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico and to assist such entities in facing the serious fiscal and economic crisis that Puerto Rico is currently undergoing."  *Id.* § 5(a).  AAFAF is afforded a seat on the Board of each covered entity, including ERS.  *Id.* § 16.

17.     Consistent with its statutory mandate, AAFAF has been working closely with both ERS and the Commonwealth to support their respective Title III restructurings and all related proceedings, including litigation.  Collazo Decl. ¶ 7.  AAFAF advises the entities it represents and coordinates among the different government stakeholders to further the island-wide restructuring efforts necessary to achieve PROMESA's dual goals of achieving fiscal responsibility and access to the capital markets.  *See* PROMESA § 101(a).

18.     When the Rosselló administration took office in January 2017, it moved to address the financial crisis at ERS through the help of AAFAF.  AAFAF began working on pension reforms to ensure the continued payment of benefits to retirees.  Those efforts ultimately led to Joint Resolution 188 (signed on June 25, 2017) and Act 106 (signed on August 23, 2017).  Together, these laws reformed Puerto Rico's retirement systems by having covered employers assume the pension obligations corresponding to their respective pensioners.  Employers must reimburse, through PayGo fees, the Commonwealth for the actual amount of the payments the Commonwealth has advanced to the employers' current pensioners.  Because ERS would no longer be responsible for paying benefits, Act 106 eliminated employers' obligations to contribute to ERS.  *See* Act 106 §§ 2.1(b), 2.4(e); J.R. 188 § 4.  *See* Collazo Decl. ¶ 9.

## IV.     COMMON INTEREST UNDER PROMESA

19.     Under PROMESA, ERS, AAFAF, the Commonwealth, and the Oversight Board must work together and have shared interests regarding pension reforms.  *Id.* ¶ 11.  These reforms affect the finances and fiscal plans of the Commonwealth and ERS.  Since ERS was designated as a covered entity by the Oversight Board (in October 2016), ERS must formulate a fiscal plan for Oversight-Board certification.  *See* PROMESA Section 201; Minutes for the September 30, 2016 Meeting of the Financial Oversight and Management Board for Puerto Rico (October 14, 2016) *available at* https://oversightboard.pr.gov/documents/.  PROMESA requires the Governor and the

8

Commonwealth government to participate in this process.  PROMESA §§ 201 and 202.  As the
Governor's representative, AAFAF has the authority to compel any governmental entity to comply
with the fiscal plan, and to take action on behalf of any governmental entity to ensure compliance.
*See* AAFAF Enabling Act §§ 8(m) and (o).

20.     Given ERS's massive unfunded pension liabilities and the need to safeguard
retirement benefits, the Commonwealth's first fiscal plan included provisions for pension reform
and the possible conversion to a pay-as-you-go system.  The fiscal plan noted that, although
switching to PayGo model would require a substantial initial expense of approximately $989
million in fiscal year 2018, the long-term effect of the PayGo model and the progressive reduction
of retirement benefits over time would protect the Commonwealth's lowest income earners while
reducing unsustainable pension costs.  *See* March 2017 Fiscal Plan at 10, 13 and 21, *available at*
https://drive.google.com/file/d/10PXYyW7dF7wayWpBvdIvZjKtHOLQU0cp/view.               By
reducing the costs of the pension system, the Commonwealth could unlock this value to invest in
other areas of the economy to promote its overall restructuring.  Through the fiscal plan process,
ERS, the Commonwealth, AAFAF, and the Oversight Board have a shared common interest in
addressing Puerto Rico's debt crisis and serving the public's interest.  *See* Collazo Decl. ¶ 12.

## ARGUMENT

**I.      THE GOVERNMENT PARTIES HAVE MET THEIR BURDEN TO ASSERT
ATTORNEY-CLIENT PRIVILEGE AND COMMON INTEREST.**

### A.      ERS Shares a Common Interest with AAFAF and the Commonwealth.

22.     Movants contend that ERS, AAFAF, and the Commonwealth cannot share
privileged communications (including communications with O'Melveny & Myers, which
represents these entities) because they do not share a common interest.  Mot. ¶ 19.  Movants argue
that a "conflict" arises because of covenants in the ERS Bond Resolution contractually obligating

ERS to oppose pension reform legislation adverse to the bondholders' interests.  As a result, Movants say, all attorney-client privileged communications among ERS, AAFAF, and the Commonwealth related to pension reform, the implementation of PayGo, and even litigation with the ERS Bondholders must be produced.  Mot. ¶ 25.  Movants are wrong.

23.     ERS's Title III case is not a traditional corporate bankruptcy.  ERS's authority, like that of the Commonwealth and AAFAF, is derived from the people's sovereign power.  The duties of these government entities are owed to the public, whose health, welfare, and safety must always be paramount, regardless of a public entity's solvency or insolvency.  *See, e.g.*, *United States v. Nelson*, 712 F.3d 498, 509 (11th Cir. 2013) (holding that public official owed fiduciary duty to the public "to make governmental decisions in the public's best interest," even though the official was not paid for his work and worked only part time); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010) (finding that "public officer occupies a fiduciary relationship to the political entity on whose behalf he serves").

24.     Creditors of public entities, by contrast, are merely contractual counterparties, whose rights are confined to the terms of the indentures and who are protected by the remedies provided under Puerto Rico or federal law.  Public entities may treat government creditors (including bondholders) as normal contractual counterparties—including by breaching contractual obligations when the public interest requires.  *See TM Park Ave. Assoc. v. Pataki*, 214 F.3d 344, 348-49 (2d Cir. 2000) ("The state, like any private party, must be able to breach contracts . . . ."). *See also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) ("[W]hen a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contract; it is committing a breach of contract.").

10

25.     Movants cite nothing that bars ERS from breaching a contract and paying damages for a breach if it believes it necessary to take actions it deems in the public's interest.  ERS has the power to act at all times for the benefit of the public—not individual creditors—in accordance with its statutory and public policy mandate.  To the extent there is conflict between contractual rights and the public good, public officials must make decisions based on public policy.  ERS creditors have neither a contractual or statutory right to interfere with those decisions or take over the management of public entities, which must always be subject to oversight and accountability by the elected branches and the public.

26.     Here, it is undisputed that ERS is a government entity that serves the public.  From its inception, ERS's purpose and duty has been to benefit public employees, the most important of which was ensuring the flow of pension payments to retirees.  *See* 3 L.P.R.A § 761.  Nothing in the ERS Enabling Act requires ERS to (i) maintain the prior pension system instead of converting to a PayGo system under which retirees' employers pay the pensions (rather than ERS) or (ii) prioritize creditor interests over the public interest when performing its statutory responsibilities. Collazo Decl. ¶ 15.  ERS shared a common interest with AAFAF and the Commonwealth in responding to the financial crisis and safeguarding pension benefits, as well as defending against litigation by the bondholders.  Collazo Decl. ¶¶ 8, 10-14.  The creation of the PayGo system ensured an adequate supply of funding to pay pension benefits and also alleviated the huge financial burden on ERS—giving ERS and the Commonwealth a common legal interest in ensuring that the obligation to pay pensions was fulfilled.  Alleviating ERS of the obligation to pay pensions also ended the need for additional funding sources, like employer contributions, for ERS.  This is consistent with ERS's role as a government entity that exists—not for its own benefit or the bondholders' benefit—but for the public's benefit.  *Id.* ¶ 10.  ERS also has a common interest

11

with the Commonwealth and their shared fiscal agent, AAFAF, to restructure ERS's debts in a manner that benefits the public of Puerto Rico.  Movants simply ignore ERS's obligation to restructure its debt that began with the Moratorium Act and continued under the Fiscal Plan Compliance Act and PROMESA.  *Id.* ¶ 15.

27.     ERS fully intended to keep confidential its attorney-client communications with AAFAF and the Commonwealth regarding litigation with the bondholders, pension reform, and PayGo implementation.  The communications were also intended to further the parties' shared interests on these topics and disclosure would be prejudicial to ERS in current and future litigation, as well as its Title III restructuring.  *Id.* ¶ 14, Mahmud Decl. ¶ 10.

28.     Apart from the terms of the Bond Resolution, Movants have no other evidence of an "inherent" conflict.  Although Movants reference a tolling agreement between ERS and the Commonwealth, Mot. ¶ 25, ERS and the Commonwealth do not agree that there is any basis for the claims or concede that there is any conflict of interest that would justify prioritizing the interests of one group of creditors over the public's interest.  *See* Collazo Decl. ¶ 15.  As stated in the stipulation, the agreement exists because "[c]ertain holders of ERS bonds represented by the counsel set forth in Paragraph 1 hereof (the "Bondholders") allege that ERS possesses avoidance claims against the Commonwealth in connection with certain postpetition transfers."  Case No. 17-03566, Dkt. 376.

29.     Movants also ignore that parties can have shared common interests in some issues even if their interests diverge elsewhere.  *See, e.g.*, *In re Mortg. & Realty Tr.*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) ("The common interest privilege does not require a complete unity of interests among the participants.") (citing *Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965)); *In re Tribune Co.*, No. 08-13141 KJC, 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3,

2011) ("[T]he community of interest privilege can apply to parties whose interests are not totally in accord."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. CIV. CCB-03-3408, 2012 WL 4378160, at \*2 (D. Md. Sept. 24, 2012) (applying common interest where parties had a shared interest in reorganization plan approval despite being in competition for funds that would be distributed).

30.    Finally, Movants' bankruptcy cases are inapposite and do not concern facts similar to this case or involve government entities with duties to the public.  *See In re Berks Behavioral Health LLC*, 500 B.R. 711, 721-23 (Bankr. E.D. Pa. 2013) (no common interest between an individual bidder and a debtor company); *Schreiman v. Walter E. Heller & Co. of P.R.*, 446 F. Supp. 141, 143–44 (D.P.R. 1978) (debtors' non-lawyer president could not represent debtor in bankruptcy proceeding because he also purported to represent himself as a creditor).  *Compare In re Richmond Unified School Dist.*, 133 B.R. 221, 226 (N.D. Cal. 1991) (irrelevant whether or not a public entity has a conflict of interest in municipal bankruptcy because Chapter 9 was "drafted to assure that application of the federal bankruptcy power would not infringe upon the sovereignty powers and rights of the states, including, presumably, states alleged to have a conflict of interest. In recognizing this concept, Congress has included in Section 903 a reaffirmation that Chapter 9 does not limit or impair the power of the states to control municipalities[.]").

## B.    The Government Parties' Non-Lawyer Advisors Are Encompassed by the Attorney-Client Privilege.

31.    Movants argue that any communications sent or received by non-lawyer advisors in the documents in Categories 1-4 are not covered by the attorney-client privilege notwithstanding the presence of in-house and outside counsel. Mot. ¶ 12.  That is not the law.

32.    The First Circuit has recognized that the attorney-client privilege extends to agents: "If the communication contains only client confidences made in pursuit of legal advice—or legal

advice based on such client confidences—that communication, if intended to remain confidential, should be covered by the privilege, **regardless of whether it came from the client, his attorney, or an agent of either one.**" *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011) (emphasis added). This is consistent with *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), which does not require "three separate elements," as Movants claim. Mot. ¶ 14 (citing *Columbia Data Products*, No. 11-12077-NMG, 2012 WL 6212898, at *14 (D. Mass. Dec. 12, 2012)). The test reduces to one issue—whether the advisor is "necessary, or at least highly useful" to the dispensation of legal advice. *Cavallaro v. United States*, 284 F.3d 236, 247 (1st Cir. 2002).

33.     Here, the Government Parties' privilege log and appendix satisfy their burden—especially in light of the expedited discovery schedule—to show that the communications with advisors were made confidentially in connection with legal advice where **"**necessary, or at least highly useful, for the effective consultation between the client and the lawyer." *Lluberes,* 63 F.3d at 24. The documents in categories 1-4 all include confidential communications "providing, requesting and/or discussing legal advice" on specified topics and involving both in-house and outside counsel. In total, the log lists more than 60 lawyers in the aggregate sender/recipient fields for these documents. Advisors are also identified on the log itself, along with a lengthy appendix with more than 180 entries detailing the client affiliation and title or role for each person.[3] In contrast, Movants provided no appendix to describe the hundreds of people in their privilege logs, let alone any description of what role non-legal advisors played.

34.     Given the scale and complexity of one of the biggest court-administered

---

[3] The appendix gives the name of each person, the entity with whom that person is associated, and each person's title or role. For example, the appendix lists over 60 attorneys, both in-house and outside counsel, from various entities, and explains for whom each individual provided legal advice. The appendix does the same for non-legal advisors. The appendix shows the reasonable and good faith effort the Government Parties took to identify every person listed in the April 12, 2019 categorical privilege log and the April 14, 2019 individual privilege log.

restructurings in U.S. history, it is necessary, wholly expected, and commonplace for counsel to communicate with non-legal advisors in this context. *See Cavallaro*, 284 F.3d at 247 (privilege extends to an attorney's agents because "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others."). Specifically, the use of advisors with non-legal expertise, like the financial advisors (Rothschild, Bank of America, Bluhaus, Ernst & Young, and McKinsey) and actuarial advisors cited by Movants (Pension Trustee Advisors), is necessary—and certainly "highly useful"—for counsel to provide legal advice related to pension reform, PayGo, and debt restructuring, all of which have financial components, as well as consequences for potential and actual litigation with bondholders. *See* Collazo Decl. ¶ 14, Mahmud Decl. ¶¶ 8-9.

35.     Such communications with counsel and advisors were intended to be kept confidential. *See* Collazo Decl. ¶ 14, Mahmud Decl. ¶ 10. Maintaining privilege over these communications is essential for counsel's day-to-day assistance on Puerto Rico's massive restructuring. The Government Parties and their counsel would not be able to communicate openly and freely if communications with advisors were not within the scope of the attorney-client privilege. *See, e.g.*, *Rivera v. Kmart Corp.*, 190 F.R.D. 298, 302 (D.P.R. 2000) (purpose of the privilege is "to encourage candid and free communication between clients and attorneys and not discourage clients from revealing potentially damaging information to their attorney."). Any other finding would discourage open and frank conversations with advisors over the far-reaching consequences of financial restructuring decisions that will impact millions of people. Especially given the expedited discovery schedule, the information in the Government Parties' appendix and privilege log is sufficient to justify the claim of attorney-client privilege. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 295 F. Supp. 3d 66, 71 (D.P.R. 2018) (Dein, M.J.) (log needs to contain "(i)

15

the basis for withholding each category of documents; (ii) a sufficient description of the subject matter of the category of documents to permit Movants to evaluate the claim of privilege; (iii) the date range for the set of documents in each category; and (iv) an aggregate list of all persons sending and receiving documents in each category.").

36.     Movants' cases are inapposite because each involves the use of third-party advisors in situations nowhere near as complex as pension reform and debt restructuring for an island of more than three million people.  Nor were the non-lawyers' roles in those cases so intertwined with the legal advice as it is here.  *See Columbia Data Prods., Inc.*, 2012 WL 6212898, at *1 (breach of contract case involving software license agreement); *Wade v. Touchdown Realty Grp., LLC*, No. CV 17-10400-PBS, 2018 WL 575848, at *1 (D. Mass. Jan. 26, 2018) (civil fraud case based on purchase of a home); *Banco do Brasil, S.A. v. 275 Washington St. Corp.*, No. CIV.A. 09-11343-NMG, 2012 WL 1247756, at *1 (D. Mass. Apr. 12, 2012) (breach of contract case involving a commercial lease); *Dahl v. Bain Capital Partners, LLC*, 714 F. Supp. 2d 225, 227 (D. Mass. 2010) (antitrust case involving leveraged buyout of companies).

### C.     The Crime-Fraud Exception Does Not Apply Here.

37.     No basis exists to apply the crime-fraud exception here.  First, the crime-fraud exception cannot apply to legal advice concerning legislation, which is neither criminal nor fraudulent.  The exception applies only when the party "present[s] evidence: (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; *and* (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity."  *In re Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005) (internal alterations omitted) (emphasis in original).  The legislation at issue here was open and public in keeping with ordinary due process requirements.  Although Movants are unhappy with the legislation's consequences, that does not render the legislation fraudulent or

criminal.

38.     Movants tacitly concede as much when they argue that there is not an actual crime
or fraud at issue, but an alleged *fraudulent transfer* under the Bankruptcy Code.  Mot. ¶ 28.  Even
assuming that a fraudulent transfer could somehow suffice to invoke the crime-fraud privilege
exception, Joint Resolution 188 and Act 106 were not fraudulent transfers.  This is because (i)
Bankruptcy Code Section 549 (for post-petition transfers) does not apply to authorized transfers;
and (ii) the transfers occurred under legislation authorized by PROMESA section 303, which "does
not limit or impair" the Commonwealth's "political or governmental powers" to "control, by
legislation or otherwise, the territory or any territorial instrumentality thereof."  48 U.S.C. § 2163.
*See also* Memorandum Order Denying Motion of Official Committee of Unsecured Creditors for
Entry of An Order Enforcing the Automatic Stay, No. 17-03283-LTS, Dkt. No. 3941 at 5–6
(D.P.R. Sept. 18, 2018) ("The commencement of a Title III case does not strip a governmental
entity of the power to exercise substantial independence in its decision-making.").  In enacting this
PROMESA section, Congress recognized that provisions of the Bankruptcy Code that it
incorporated into Title III cannot be invoked to hinder governmental powers.  And, as discussed
above, there was sufficient consideration for the asset transfers because ERS was relieved of the
burden of pension payments under the PayGo reforms.

39.     Second, Movants confuse a breach of contract with fraud.  Mot. ¶ 29.  Whatever
obligations to which the ERS Bond Resolution may bind ERS may be bound (assuming the bonds
are not *ultra vires*) are contractual in nature.[4]  Seeking advice on the consequences of legislation

---

[4] AAFAF and the Official Committee of Unsecured Creditors have challenged the validity of the ERS bonds on the
grounds that the ERS Enabling Act did not authorize ERS to issue bonds to the public and therefore the bonds are
*ultra vires* and unenforceable.  *See* Government Defendants' Joinder and Reply to ERS Bondholders' Omnibus
Opposition to Motion to Dismiss Plaintiffs' Amended and Supplemented Complaint Pursuant to Fed. R. Civ. P.
12(b)(6), No. 17-0219-LTS, ECF No. 62, at 4 (D.P.R. Jan. 14, 2018); Omnibus Objection of Official Committee of

that may affect contractual obligations does not make the pursuit of such advice criminal or

fraudulent.  *Compare Markel Am. Ins. Co. v. Diaz-Santiago*, 674 F.3d 21, 31 (1st Cir. 2012)

("[T]he elements of a cause of action for breach of contract under Puerto Rico law include 1) a

valid contract and 2) a breach by one of the parties to the contract.") *with P.C.M.E. Commercial,*

*S.E. v. Pace Membership Warehouse, Inc.*, 952 F. Supp. 84, 92 (D.P.R. 1997) (explaining that

fraud under Puerto Rico law requires a showing of "deceit").

40.    Third, even assuming that the crime-fraud exception could apply here, Movants

have failed to meet their burden to "present evidence" that ERS was engaged in fraudulent activity.

*See In re Grand Jury Proceedings*, 417 F.3d at 23.  Presenting evidence of fraud is "reasonably

demanding: neither speculation nor evidence that shows only a distant likelihood of corruption is

enough."  *Id.*; *see also In re Warner*, 87 B.R. 199, 202 (Bankr. M.D. Fla. 1988) (explaining that

"mere allegations or suspicions of fraud are not enough" to meet the moving party's burden of

demonstrating a prima facie case of fraud).  Movants have made no such showing.[5]

## II.    THE GOVERNMENT PARTIES HAVE MET THEIR BURDEN TO ASSERT ATTORNEY WORK PRODUCT PROTECTION.

41.    Movants argue that the Government Parties' work-product assertion is defective

because the privilege log does not indicate that "the documents were prepared specifically 'for use

---

Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of
Government of Puerto Rico, No. 17-3566-LTS, ECF No. 381, ¶ 3 (D.P.R. Mar. 12, 2019).

[5] None of Movants' cited cases call for a different result.  *See In re Grand Jury Proceedings*, 417 F.3d at 19
(applying crime-fraud exception when attorney directed client to commit perjury before a grand jury); *In re
Cumberland Inv. Corp.*, 120 B.R. 627, 630 (Bankr. D.R.I. 1990) (applying crime-fraud exception "in a case that has
proven to be proliferate with misconduct, mismanagement, bad faith, willful disobedience of [Bankruptcy] Code
requirements and specific Court orders, and much more"); *In re Campbell*, 248 B.R. 435, 440 (Bankr. M.D. Fla.
2000) (applying crime-fraud exception to debtor who made several questionable transfers prior to filing for
bankruptcy); *In re Warner*, 87 B.R. at 202 (applying crime-fraud exception to a debtor's pre-bankruptcy transfer of
money into exempt assets owned by debtor's wife); *In re Blier Cedar Co., Inc.*, 10 B.R. 993, 999 (Bankr. D. Me.
1981) (applying crime-fraud exception where "clear statements and implications of the documents coupled with
pertinent testimonial evidence lead the court to conclude that" a party engaged in a "wrongful act"); *In re St.
Johnsbury Trucking Co., Inc.*, 184 B.R. 446, 458 (Bankr. D. Vt. 1995) (applying crime-fraud exception where the
record strongly suggested that a party and its counsel engaged in fraud on the court by filing a counterclaim for an
objectively improper purpose).

in litigation' rather than for other purposes…."  Mot. ¶ 33.  There is no such requirement.

42.     Work product encompasses documents "which are called into existence for the purpose—but not necessarily the sole purpose—of assisting the deponent or his legal advisers in any actual or anticipated litigation."  *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 26 (1st Cir. 2009) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 n.9 (1947)).  The protection also extends to dual-purpose documents that were used for another purpose in addition to being prepared in connection with litigation.  *See Mississippi Pub. Employees' Ret. Sys. v. Bost. Sci. Corp.*, 649 F.3d 5, 31 n.24 (1st Cir. 2011) ("[A]n attorney's work product does not lose protection merely because it is also 'intended to inform a business decision influenced by the prospects of the litigation.'") (citing *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 68 (1st Cir. 2002)).

43.     Here, the Government Parties have met their burden to assert work product. Categories 1-3 include documents prepared both for litigation and restructuring, which does not strip them of work-product protection.  *See U.S. v. Deloitte LLP,* 610 F.3d 129, 138 (D.C. Cir. 2010) (under the "because of" work-product test "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status").  As Movants are aware, during the time period encompassed by these categories, February to October 2017, the parties were both in litigation and reasonably anticipated further litigation.[6]  On September 21, 2016, certain bondholders moved to lift the initial PROMESA Section 405 stay asserting their alleged security interests in certain property of ERS lacked adequate protection.  *Altair Global Credit Opportunities Fund (A), L.L.C. v. Garcia-Padilla*, Case No. 16-cv-02696 (D.P.R. Sept. 21, 2016).  That litigation led to an appeal before the First Circuit and eventually two stipulations, one on January 17, 2017, and another on April 11, 2017.  The Section 405 Stay expired on May 1,

---

[6] Documents in category 1 span from 2/5/17 to 10/1/17, the documents in category 2 span from 2/13/17 to 9/15/17, and the documents in category 3 span from 2/2/17 to 9/30/17.

2017, which was soon followed by the filing of ERS's Title III case on May 21, 2017.  Since then, Movants have filed numerous contested motions and proceedings.

44.      Against this backdrop of constant litigation, Movants' complaint about the detail in categories 1-3 does not pass muster.  Category 1 lists over 30 outside counsel and explicitly states that it encompasses communications "in connection with anticipated and ongoing litigation with ERS bondholders."  Reforms over the pension system were expected to and have in fact led to litigation, as this stay proceeding evidences.  Likewise, category 2 lists over 20 outside counsel and states that it contains communications regarding "legal theories regarding potential litigation."

45.      The only real complaint Movants have is that category 3 does not explicitly use the term "litigation" in the description.  That, however, is not required to assert work product protection—rather, the requirement is that the underlying documents themselves must be prepared in anticipation of or in connection with litigation.  *Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 31 n.24.  And even if "litigation" were a required word, such a quibble could be corrected easily.  Movants also argue in passing that documents in categories 1-3 were shared among "adversaries," Mot. ¶ 34, when in fact, as discussed, ERS shared a common interest with those it communicated regarding litigation, pension reform, and PayGo.

46.      As for "substantial need," Movants nowhere come close to meeting the high burden for disclosure of counsel's work product.  Mot. ¶ 37.  To do so, Movants must "demonstrate[] that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself."  *F.T.C. v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 155 (D.C. Cir. 2015).  Movants have not attempted to satisfy those requirements with any evidence.  Generalizations that a party "needs" attorney work product are not sufficient to require disclosure.

20

## CONCLUSION

For the foregoing reasons, Movants' Motion to Compel should be denied.

Dated: April 18, 2019
     San Juan, Puerto Rico

_/s/ William J. Sushon_

John J. Rapisardi
Suzzanne Uhland
Peter Friedman
William J. Sushon
(Admitted _Pro Hac Vice_)
**O'MELVENY & MYERS LLP**
Seven Times Square
New York, New York 10036
(212) 326-2000
jrapisardi@omm.com
suhland@omm.com
pfriedman@omm.com
wsushon@omm.com

Elizabeth L. McKeen
(Admitted _Pro Hac Vice_)
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: (787) 294-9508
Fax: (787) 294-9519
emckeen@omm.com

_Co-Attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory
Authority_

/s/ _Luis C. Marini-Biaggi_

Luis C. Marini-Biaggi
USDC No. 222301
lmarini@mpmlawpr.com

Carolina Velaz-Rivero
USDC No. 300913
cvelaz@mpmlawpr.com

**MARINI PIETRANTONI MUÑIZ LLC**
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, Puerto Rico 00917
Tel: (787) 705-2171
Fax: (787) 936-7494

_Co-Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority_