# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- X
                                                    :

In re:                                           :
                                           :

THE FINANCIAL OVERSIGHT AND        :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,    :  Title III
                                           :

        as representative of                :  Case No. 17-BK-3283 (LTS)
                                         :

THE COMMONWEALTH OF PUERTO RICO *et al.,*  :  (Jointly Administered)
                                         :

        Debtors.[1]                      :
---------------------------------------------------------------------- X    **Re: ECF No. 6325**

## OBJECTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO AND ITS SPECIAL CLAIMS COMMITTEE TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER AUTHORIZING COMMITTEE TO PURSUE CERTAIN CAUSES OF ACTION ON BEHALF OF COMMONWEALTH AND GRANTING RELATED RELIEF

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); and (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................2

BACKGROUND .............................................................................................................8

    I.      The Committee Doggedly Pursues the Oversight Board's Exclusive Power ..........8

          A.     The Court Declines to Rule on the Committee's First Request..................8

          B.     The Committee's Renewed Requests Fare No Better.................................9

          C.     The Committee Renews its Motion Without Refining. .............................9

          D.     The Committee Attempts to Override Oversight Board Authority in GDB
                  Restructuring...........................................................................................10

          E.     The Committee and SCC Collaborate on 2004 Investigation...................11

    II.     The Committee and the Objectors' Recent Cooperative Process ........................13

          A.     Collaboration on a Wide Range of Title III Issues ...................................13

          B.     Collaboration on Joint Claim Objection and Other Matters .....................14

    III.    The Motion and the Asserted Valuable Claims ...................................................15

ARGUMENT .................................................................................................................17

    I.      Congress Prohibits this Court from Granting the Requested Relief Absent the
          Oversight Board's Consent, Which Is Not Given....................................................17

    II.     Even Under the Section 926 Standard Applicable Outside PROMESA, the
          Committee Has Not Met Its Burden to Show Cause Why a Trustee Should Be
          Appointed, or What a Trustee Could Accomplish.................................................20

    III.    The Committee Has Not Shown Cause to Grant Derivative Standing. ................22

          A.     The Committee Has Not Articulated, and Cannot Articulate, a Colorable
                  Claim that the Oversight Board Has Refused to Pursue...........................23

          B.     The Committee Has Not Shown that the Oversight Board's
                  Determination Not to Pursue Any Cause of Action Is Unjustifiable.........24

CONCLUSION...............................................................................................................25

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re City of Stockton*,
   486 B.R. 194 (Bankr. E.D. Cal. 2013) .................................................................19

*Holstein v. Sanitary & Improv. Dist. No. 7 (In re Sanitary & Improv. Dist. No. 7),*
   *96 B.R. 967 (Bankr. D. Neb. 1989)* .................................................................19

*Kittay v. Atlantic Bank of N.Y. (In re Glob. Serv. Grp.),*
   316 B.R. 451 (Bankr. S.D.N.Y. 2004) .................................................................7

*Morley v. Ontos, Inc. (In re Ontos, Inc.),*
   478 F.3d 427 (1st Cir. 2007) .................................................................18, 23, 25

*In re New York City Off-Track Betting Corp.,*
   No. 09-17121(MG), 2011 WL 309594 (Bankr. S.D.N.Y. 2011) (Glenn, J.) ....................21, 22

*New York Times Co. v. U.S. Dept. of Justice,*
   138 F. Supp. 3d 462, 472 (S.D.N.Y. 2015) ...........................................................17

*In re Pagnini,*
   No. 09-17144-WCH, 2010 WL 383941 (Bankr. D. Mass. Jan. 26, 2010) ............................25

*In re Pilavis,*
   233 B.R. 1 (Bankr. D. Mass. 1999) .................................................................25

*Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.),*
   429 B.R. 692 (Bankr. C.D. Cal. 2010) .................................................................20

*U.S. v. Whiting Pools,*
   462 U.S. 198 (1983) .................................................................18

*Unsec. Cred. Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),*
   779 F.2d 901 (2nd Cir. 1985) .................................................................23

**Statutes**

11 U.S.C. § 546 .................................................................13

48 U.S.C. 2121(a) .................................................................19

48 U.S.C. §§ 2161(a) .................................................................18

48 U.S.C. § 2165 .................................................................................................18, 19

*Chapter 9 of the Bankruptcy Code* ...................................................................... *passim*

*Bankruptcy Code Sections 105(a) and 926(a)* ...........................................................4

*Section 544 of the Bankruptcy Code* .....................................................................21

*Section 926 of the Bankruptcy Code, 926* ....................................................... *passim*

*Article 702 of the GDB Restructuring Act* ...........................................................11, 17

## Other Authorities

Bankruptcy Rule 3007 ............................................................................................6, 14

Fed. R. Civ. P. 11(b) .................................................................................................24

Fed. R. Evid. 408 ........................................................................................................3

S.Rep. No. 95–989, at 68 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 ..............21, 22

S.Rep. No. 95-989, at 68 ...........................................................................................21

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and its Special Claims Committee (the "SCC" and, together with the Oversight Board, the "Objectors"), respectfully submit this objection (the "Objection") to the *Motion of Official Committee of Unsecured Creditors for Order Authorizing Committee to Pursue Certain Causes of Action on Behalf of Commonwealth and Granting Related Relief* [ECF No. 6325] (the "Motion"), filed by the Official Committee of Unsecured Creditors and certain of its members (together, the "Committee")[2] seeking (i) the Committee's appointment as trustee of the Commonwealth to investigate and prosecute certain avoidance actions, (ii) derivative standing to investigate and pursue certain non-avoidance actions of the Commonwealth, and (iii) related relief. In support of the Objection, the Objectors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware from the recently filed Joint Stipulation,[3] the Oversight Board and the SCC have worked diligently with the Committee to develop a process to ensure that all interests of the Commonwealth are protected and that all viable claims and causes of action are actively pursued. Unfortunately, this has not been enough to satisfy the insatiable appetite of the Committee. Indeed, the Committee is forced to admit that the Objectors have spent a considerable amount of time and resources attempting to convince the Committee that all reasonably meritorious claims and causes of action belonging to the Commonwealth either will

---

[2]     The Motion was filed by the Official Committee of Unsecured Creditors together with three of its seven members Doral Financial Creditors' Trust, Service Employees International Union and Tradewinds Energy Barceloneta, LLC. Because the substance of the Motion concerns a request for the Committee to be given trusteeship and/or standing, and references communications between the Committee and the Objectors, reference is made herein to the Committee notwithstanding that additional parties co-signed the Motion.

[3]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

be filed before the expiration of applicable statutes of limitation or preserved by agreements (or possible court order) to toll any applicable statutes of limitation.

2.      Confidential settlement discussions, which the Committee now flagrantly reveals in an improper[4] and biased manner,[5] were laborious and marked by the Objectors' full transparency regarding their intentions and deliberative thought processes. Now, having taken full advantage of this settlement process, the Committee baldly asserts that the Objectors have somehow improperly refused to pursue certain undefined and vague claims and causes of action.

3.      Notwithstanding the Committee's failure to show that its Motion is in any party's best interest, the Motion fails on a fundamental gating issue. PROMESA absolutely prohibits the Court from interfering with the property of the Commonwealth without the consent of the Oversight Board. This is "notwithstanding any power of the court" granted by elements of the Bankruptcy Code that are incorporated into PROMESA. Litigation claims held by the Commonwealth are property of the Commonwealth. The Commonwealth simply has not consented, and will not consent, to allow the Committee the right to pursue any claims except as provided in the Joint Stipulation. Thus, respectfully, this Court cannot permit the Committee to pursue any other claims.

4.      Moreover, the Motion should fail on a second gating issue. The Committee previously requested and obtained authority from the Court for expedited briefing of a "motion to appoint a trustee under section 926(a) of the Bankruptcy Code," which section explicitly limits

---

4    The Motion contains numerous references to and characterizations of statements made by both the Committee and the Objectors in the context of efforts to consensually resolve the pending dispute regarding the 926 Procedural Motion (defined below) in clear violation of Fed. R. Evid. 408. Indeed, in comments to the Court at the hearing on the Joint Stipulation on April 18, 2019, counsel to the Committee repeatedly described such communications with the SCC as settlement communications.

5    The Committee spends a great deal of ink complaining that it was somehow misled by last-minute changes in position articulated by SCC counsel during negotiations. Aside from violating the sanctity of settlement discussions, see above, the Committee's recitation of facts appears intentionally misleading. As Committee counsel well knows, any position that SCC's counsel may have suggested its client might approve was, in all cases, subject to the SCC's ultimate determination.

any such trustee's authority to pursue Avoidance Actions.[6]   The Commitee now has filed its Motion to obtain standing to pursue causes of action that are <u>not</u> Avoidance Actions.   To be clear, the Motion requests (a) trusteeship and/or derivative standing to pursue what appear to be tort claims, and (b) compulsory discovery from Kobre & Kim.   Neither of those requests conforms to any logical understanding of a "Section 926 Motion," *which is a defined term in the Committee's 926 Procedural Motion that applies only to section 926 of the Bankruptcy Code*.[7] With the Oversight Board, the SCC and the Committee having stipulated and agreed to become co-trustees and co-plaintiffs as to every matter that a section 926 trustee could be permitted to pursue, the Committee's filing of a "Section 926 Motion" that in fact pursues relief unrelated to section 926 of the Bankruptcy Code is, quite frankly, unseemly.

5.     Moreover, the Motion purportedly has been filed by the Committee and three of its committee members.   These co-movants have never approached either the Oversight Board or the SCC to assert that any claims should be pursued and, specifically, have never come forward to address whatever claims they wish for the Committee to pursue.   Of course, this leads one to question the openness of the process.   The Committee admits that by adding its own members as co-signers, it is making an end-run around the requirement of section 926 that such motions be brought by a "creditor," not a committee.[8]   The distinction is technical, but also material.   That is, by requiring creditors to file such motions, section 926 ensures that a party whose

---

[6]   *See Order Granting the Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I) Procedures with Respect to Disclosure of Avoidance Actions to Be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)* [ECF No. 6086, as subsequently amended] (the "<u>926 Procedural Order</u>"), granting the *Urgent Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Code Sections 105(a) and 926(a) and Bankruptcy Rule 9006, Establishing (I) Procedures with Respect to Disclosure of Avoidance Actions to Be Asserted by Oversight Board, and (II) Expedited Briefing Schedule for Potential Request to Appoint Trustee Under Bankruptcy Code Section 926(a)* [ECF No. 5997] (the "<u>926 Procedural Motion</u>").

[7]   926 Procedural Motion, ¶3.

[8]   926 Procedural Motion, ¶3, fn. 4.

4

professional fees are not being paid by the estate accepts some cost and risk in seeking to undermine a sovereign.  In this case, the circumstances that have given rise to the Motion create the distinct impression of having been composed exclusively by the Committee's professionals on the Commonwealth's dime.

6.      Regardless, it is hard to imagine how the Court could grant the requested relief because the Committee has failed to provide the Court or the Objectors with a clear idea of what claims it seeks to assert if granted the relief it has requested.  No draft complaint or even bullet-point summary was prepared and attached to the Motion listing exactly what claims the Committee seeks to bring.  Neither a specific party nor a theory of recovery is fully articulated.

7.      Significantly, and as demonstrated below, despite the Committee's failure in the Motion to clearly articulate the precise claims it wishes to bring now, the broad outlines of those claims were hinted at in the Motion and identified by the Committee during negotiations leading to the Joint Stipulation.  Those novel claims, as outlined by the Committee, are by no means new.  Very similar theories were raised repeatedly by the Committee in connection with the GDB restructuring process.  Ironically, this belies the Committee's contention that it somehow did not have time to prepare and articulate its claims properly in the Motion.  The Committee's vague theories have been considered in the past and were carefully considered anew by the Objectors throughout extensive settlement discussions.  Bottom line, and as will be further discussed below, these theories were properly rejected because of the SCC's conclusion that the pursuit of such claims would not be in the best interests of the Commonwealth.

8.      While the Committee would like to have this Court believe that the SCC is somehow abandoning "valuable causes of action relating to the issuance of billions of dollars of

debt"[9] and that the SCC wants to avoid "shin[ing] a light on misconduct,"[10] that is far from the truth, and the Committee knows it. In fact, as the Committee was advised in black and white, the SCC intend to pursue on behalf of the Oversight Board claims against dozens of parties including underwriters, bond counsel, disclosure counsel, tax counsel, swap counterparties, auditors, and remarketing agents for their respective roles in issuing bonds that are the subject to contentions of being null and void.[11] Furthermore, these parties will be pursued under many legal theories including breach of fiduciary duty, aiding and abetting such breaches, professional malpractice/negligence, unjust enrichment and/or fraudulent transfer.[12] Given the scope and magnitude of the claims and causes of action that the SCC has advised the Committee it will pursue, it is difficult to understand exactly what the Committee hopes to gain by bringing additional claims (which they have not defined) on theories that are purely speculative. Rather, the Committee appears to be hoping to pressure individuals to implicate other parties in the hope that some real claim or cause of action eventually will come to light.

9.      As best as the Objectors can discern, the Committee has long favored actual fraud and conspiracy-based claims, seeking recovery for deepening insolvency as a stand-alone cause of action against many of the same institutions that the SCC has already committed to pursue as

---

[9]   Motion, ¶1.

[10]  Motion, ¶9.

[11]  *See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 4784 (the "Joint Claim Objection"); *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico* [sic], ECF No. 5580 (the "ERS Bond Objection"); *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds*, ECF No. 6099 (the "Conditional Objection").

[12]  A schedule listing these claims has been submitted to the Court for *in camera* review and sent to objecting parties to the Joint Stipulation for "attorneys' eyes only" review.

well as certain unnamed individuals.[13]  Again, these same or similar theories were raised in the past by the Committee which, it should be noted, has done nothing to investigate the merits of its theories in the many months since they were first articulated.

10.     In the end, the Objectors do not believe the Committee's theories are colorable or that their prosecution would be cost-effective or yield greater recoveries for the Commonwealth than the claims the Objectors already intend to pursue.

11.     The Committee spends almost 21 pages of its 42 page brief re-hashing a now familiar refrain: it was somehow stifled in its ability to independently pursue claims or, alternatively, force the Objectors to advise it regarding claims they intend to pursue.[14]  Many of the Committee's time-worn complaints were rejected by Magistrate Judge Dein in the past.[15]

12.     Most recently, the Objectors gave the Committee a full download of the claims the SCC intends to bring, consenting to add the Committee as co-plaintiff and co-trustee. Despite the spirit of compromise that is reflected in the Joint Stipulation, ultimately, the Objectors could not conclude that the theories of liability espoused by the Committee were sound and the Objectors were not prepared to allow the Committee to expend estate resources on claims that it does not believe are likely to enhance recoveries for the Commonwealth.

13.     For all the reasons set forth above and elaborated on below, the Objectors respectfully request that the Motion be denied.

---

13   *See* Motion, ¶7, fn. 5.  The Committee cites Third Circuit cases holding that "deepening insolvency" is a cause of action requiring a showing of fraud.  Courts in other jurisdictions have held that deepening insolvency is not a valid cause of action, and/or is at most a theory of damages.  *See, e.g.*, *Kittay v. Atlantic Bank of N.Y. (In re Glob. Serv. Grp.)*, 316 B.R. 451, 459 (Bankr. S.D.N.Y. 2004) ("[O]ne seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and increased its debt").

14   *See* below, Background § I.

15   *Id.*

## BACKGROUND

### I.     The Committee Doggedly Pursues the Oversight Board's Exclusive Power

14.     From the beginning, the Committee's actions in this case have been marked by criticism of the Oversight Board's, and later, the SCC's attempts to bring economic stability to the Commonwealth.

#### A.     The Court Declines to Rule on the Committee's First Request.

15.     In July 2017, shortly after its appointment, the Committee issued a blanket discovery request for materials concerning the "causes of the Puerto Rico financial crisis, and in particular the role of public and private financial institutions in the structuring, underwriting, repackaging, and selling of [Puerto Rico's] debt obligations." *See Motion Of Official Committee Of Unsecured Creditors For Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect To Certain Causes Of Puerto Rico Financial Crisis*, ECF No. 706 (the "First Request"), 1.

16.     The Committee's supposed "Discovery Program" was so broad that it would have been nearly impossible to fashion a coherent production of documents. *See Interim Order In Respect Of Rule 2004 Motion Of Official Committee Of Unsecured Creditors* [ECF No. 1163]. Unsurprisingly, Judge Dein responded, "I don't know how to get my head around it," and declined to rule.[16]

17.     At the time, the Oversight Board had already committed to an investigation, which PROMESA section 104 specifically empowers it to do, and to employ an independent investigator to conduct such investigation.  *See Objection of Debtors to Motion of Official Committee of Unsecured Creditors for Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program with Respect to Certain Causes of Puerto Rico Financial Crisis*

---

[16]   August 22, 2017 Hr'g Tr. at 10:1-11.

[ECF No. 859] at ¶1.   Accordingly, the Oversight Board agreed to resolve the dispute by retaining an investigator and meeting and conferring with the Committee regarding the investigatory process.  *See Interim Order In Respect Of Rule 2004 Motion Of Official Committee Of Unsecured Creditors* [ECF No. 1163] at ¶ 3.  Since that time, the Oversight Board and the Committee have engaged in a sometimes-collaborative process of analysis and litigation.

### B.   The Committee's Renewed Requests Fare No Better.

18.   In September and again in November 2017, the Committee renewed the First Request, arguing that allowing the Committee to launch its own duplicative and costly investigation was necessary due to a lack of transparency and robustness. *See Informative Motion Of Official Committee Of Unsecured Creditors And Status Report Regarding Discovery Discussions, Renewed Request For Authorization Of Discovery Under Bankruptcy Rule 2004, And Agreed Notice To Conduct Hearing On Motion At October 4, 2017 Omnibus Hearing* [ECF No. 1284]; *Status Report Of Official Committee Of Unsecured Creditors Regarding Creditors' Committee's Bankruptcy Rule 2004 Motion* [ECF No. 1626].

19.   Again, Judge Dein refused to grant relief, explaining that "[p]art of my problem is I feel like you're a moving target. Your initial papers said you wanted to find out the causes of the Puerto Rico economic conditions, and now you say that's outrageous, we would certainly never do anything that broad."[17]  The Committee was again shut down.  *See Order*, ECF No. 1827.

### C.   The Committee Renews its Motion Without Refining.

20.   A few months later, the Committee renewed its July 2017 motion, but for reasons unknown, refused to limit the scope of its proposed "Discovery Program." *See Renewed Motion Of Creditors' Committee Seeking Entry Of Order, Under Bankruptcy Rule 2004, Authorizing*

---

17   November 15, 2017 Hr'g Tr. at 54:9-13

*Discovery Program With Respect To Certain Causes Of Puerto Rico Financial Crisis Beginning On August 15, 2018*, ECF No. 3066 (the "Renewed Motion").

21.     Notably, at the time of the Renewed Motion, the Committee had already begun receiving access to the documents that formed the basis of the eventual Kobre & Kim Report, and Judge Dein's primary concern with the Renewed Motion was that the Committee already had access to documents that could allow it to find information that it sought through discovery. Accordingly, if the Committee wanted to conduct its own investigation, it needed to "fairly identify" and "target" the investigation and what documents were needed.[18]

22.     The Court allowed the Renewed Motion to remain open, but did not address the relief requested. *See Order*, ECF No. 3698.

> **D.     The Committee Attempts to Override Oversight Board Authority in GDB Restructuring.**

23.     Shortly thereafter, as GDB neared consensual restructuring, the Committee embarked upon a new mission to undermine the Oversight Board by seeking derivative standing to pursue litigation belonging to the Commonwealth. *See Official Committee of Unsecured Creditors' Motion for Order Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief with Respect to Restructuring of Government Development Bank for Puerto Rico*, ECF No. 3881. Notably, and as is customary when seeking derivative standing in a Chapter 11 context, the Committee simultaneously filed a complaint alleging specific claims it intended to pursue if granted standing. *Complaint*, Adv. Pro. No. 18-00101-LTS, ECF No. 1.

24.     Numerous parties objected to the standing motion; among them, the Oversight Board, which filed the *Objection of Financial Oversight and Management Board to Official*

---

[18]   June 6, 2018 Hr'g at 130:3-15

*Committee of Unsecured Creditors' Motion for Order Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief with Respect to Restructuring of Government Development Bank for Puerto Rico* [Case No. 17-03283, ECF No. 3959] (the "Standing Objection"). Therein, the Oversight Board argued again that PROMESA does not allow for derivative standing and only permits limited trusteeship by a third party with the Oversight Board's consent. GDB and AAFAF[19] additionally clarified that, notwithstanding the Committee's statements to the contrary, GDB would be released by terms of restructuring, but its former officers and directors would not. *Informative Motion Regarding Releases Under Article 702 of the GDB Restructuring Act*, Case No. 18-01561, ECF No. 151.

26. Ultimately the Committee backed down rather than force the standing issue. *See Informative Motion Regarding Stipulation Resolving the Objection of the Official Committee of Unsecured Creditors of All Title III Debtors (Other than COFINA) to the Approval Application*, Adv. Pro. No. 18-01561-LTS, ECF No. 182.

### E. The Committee and SCC Collaborate on 2004 Investigation.

26. On November 27, 2018, the Committee filed its *Motion Of Official Committee Of Unsecured Creditors For Order, Under Bankruptcy Rule 2004, Authorizing Discovery Of Title Iii Debtors, Other Than COFINA, Concerning Potential Avoidance Actions* [Case No. 03282-LTS, ECF No. 4373], requesting the production of documents concerning potential avoidance actions that may be prosecuted by the Debtors or by a trustee appointed by the Court pursuant to section 926.

27. The Oversight Board did not oppose the motion, but made abundantly clear that it disagreed:

---

[19] The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"). *See* Motion, ¶39.

> "[T]he Oversight Board neither shares the Committee's view of events leading to
> the [m]otion nor the Committee's portrayal of the Oversight Board's investigation
> to date. For present purposes, there is no reason to consume the Court's time
> explaining each inaccuracy…the Oversight Board notes it has diligently pursued
> its congressionally mandated role to investigate Puerto Rico's bond issuances
> under PROMESA section 104(o) and its Special Claims Committee has already
> commenced its investigation into potential causes of action the Oversight Board
> may bring, where appropriate, before May 2019."

*Debtors' Response To Motion Of Official Committee Of Unsecured Creditors, Under Bankruptcy Rule 2004, Authorizing Discovery Of Title Iii Debtors, Other Than COFINA, Concerning Potential Avoidance Actions*, ECF No. 4468, ¶2.

28.    The Court granted the order with the Oversight Board's consent, requiring the Committee and the SCC to coordinate regarding analysis of the information received.  *See Order Granting Motion Of Official Committee Of Unsecured Creditors For Order, Under Bankruptcy Rule 2004, Authorizing Discovery Of Title III Debtors, Other Than COFINA, Concerning Potential Avoidance Actions*, ECF NO. 4484.  The Oversight Board and the SCC have been coordinating with the Committee with respect to preparation of avoidance actions, using the documents produced in accordance with the consent order, since that time.

29.    Notably, although Kobre & Kim's report had been released on August 20, 2018, pursuant to this Court's order, the Committee did not at that time request access to documents or information supporting the report.

II.     **The Committee and the Objectors' Recent Cooperative Process**

A.     **Collaboration on a Wide Range of Title III Issues**

30.     The Objectors incorporate herein by reference the statements of fact contained in their *Motion of the Financial Oversight and Management Board of Puerto Rico for Entry of an Order Equitably Tolling the Time Prescribed by 11 U.S.C. § 546 to Bring Certain Avoidance Actions* [ECF No. 6118] (the "Equitable Tolling Motion").

31.     As related in pleadings filed in connection with the Equitable Tolling Motion, since the Petition Dates in the Title III Cases, the Objectors have worked and continue to work tirelessly to accomplish the Oversight Board's purpose under PROMESA.  They have been effectuating the Fiscal Plan and budget process, certified under Title VI of PROMESA a consensual restructuring of GDB and confirmed and consummated a COFINA Title III plan of adjustment, commissioned the investigation and report by Kobre & Kim, formed the SCC to evaluate claims based on the Kobre & Kim Report and, together with the Committee, filed a formal claims objection to billions of dollars in unlawful debt, are negotiating a global restructuring for the Commonwealth and have identified and prepared hundreds of litigation actions against potentially thousands of defendants, seeking to recover billions of dollars for the Commonwealth.

32.     Where possible and appropriate, these actions were undertaken with full transparency to, and in a spirit of cooperation with, the Committee.

33.     To that end, over the past three weeks, the Objectors have spent scores of hours consulting with the Committee, and responding to its demands for ever greater transparency—and control—in the process.

34.     In the end, the Committee and the Objectors *agreed on*, among other things: (a) parameters for diligence concerning avoidance claims; (b) preliminary motions necessary to

complete such diligence; (c) parameters for determining which avoidance claims to bring, and (d) detailed schedules of avoidance claims to be brought.

## B.    Collaboration on Joint Claim Objection and Other Matters

35.    The Oversight Board, in discharge of its duties under PROMESA, and acting by and through the SCC, joined the Committee in commencing litigation contending that several 2012 and 2014 issuances of GO Bonds violated Puerto Rico's constitutional debt limit, and that claims by purported holders of the Challenged Bonds for principal and interest should be disallowed.  See Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, ECF No. 4784 (the "Joint Claim Objection").

36.    Simultaneous with the Joint Claim Objection, the SCC and the Committee recognized that, to the extent successful in the Joint Claim Objection, the Oversight Board would have grounds to avoid and recover—or "clawback" payments on the GO Bonds.  For this reason, the Committee is supportive of the relief sought in the Equitable Tolling Motion and the *Urgent Motion Of The Financial Oversight And Management Board Of Puerto Rico For Entry Of An Order Under Bankruptcy Rules 1007(I) And 2004 Authorizing Discovery And Compelling Disclosure Of Lists Of Security Holders*, ECF No. 6143.

37.    In addition, the Oversight Board and the Committee are joint plaintiffs in an action to recharacterized purported lease obligations of the Puerto Rico Building Authority as disguised financings.  *See* Adv. Pro. No. 18-00149 (LTS).

38.     The Committee now expresses its disappointment with the SCC that, during cooperative efforts over the past two weeks, it was somehow "lulled" into complacency, and implies that the Committee is now somehow prejudiced by unfair acts.

39.     Notwithstanding that communications took place within confidential settlement discussions, all such discussions were expressly contingent on approval by the members of the SCC.  To be clear, before the Joint Stipulation was executed, the SCC's counsel only ever discussed with the Committee's counsel the claims that counsel might recommend their clients prosecute, and there was no indication of authority to represent otherwise.

40.     Nor was there a representation that the SCC or its counsel had concluded that the claims subject to this Motion were "valuable and meritorious."  *See* Motion, ¶62 ("The Oversight Board had already recognized that these claims are valuable and meritorious").  To the contrary, counsel to the SCC expressed material concerns that, to the extent articulated, the Committee's requested claims would be subject to strong defenses, and thus that pursuit of the claims might be fiscally irresponsible.

### III.     The Motion and the Asserted Valuable Claims

41.     According to the Motion, "the Committee believes that the Commonwealth likely has meritorious claims against parties involved in the Commonwealth's issuance of $3.5 billion of GO bonds in March 2014 (the "2014 Go Bonds")."  Motion, ¶65.  To be clear, the Objectors have committed, in writing, to bring claims against dozens of professionals for their actions relating to the 2014 GO Bonds and other debt issuances.

42.     The Committee implies in the Motion that additional claims against individual officers and directors of GDB and one or more specific underwriters should be brought.  Motion, ¶65.  The Committee does not articulate the legal theories behind such claims or explain how the Commonwealth might collect on such claims.  Rather, it has vaguely indicated it hopes to

squeeze individuals to implicate other parties using the ability to prosecute litigation even with weak factual and legal premises.  Likewise, the Committee implies that there may be valuable claims relating to material false disclosures in connection with debt issuances by the Commonwealth.  *See* Motion, ¶¶65-69.  It is unclear how the Commonwealth would possess such claims, which seem, instead, to belong to purchasers of the securities at issue.

43.     All told, the Motion loosely alleges fraud. See Motion at ¶¶ 72-73.  But, stripped of its rhetoric, the allegations set forth by the Committee do not rise to the level of a fraud claim.  In this respect, the Objectors would be remiss to not point out that the U.S. Securities & Exchange Commission (the "SEC") conducted an extensive investigation which included interviews of Puerto Rican officials about issues surrounding the 2014 GO bond issuance.  In April 2018, the SEC closed that investigation without taking any enforcement action against Puerto Rican officials or underwriters.  *See SEC ends probe into Puerto Rico's $3.5 billion 2014 bond issuance*:  sourceshttps://www.reuters.com/article/us-puertorico-debt-sec/sec-ends-probe-into-puerto-ricos-3-5-billion-2014-bond-issuance-sources-idUSKBN1HH05C   (last   accessed April 18, 2019).

44.     The Committee implies that GDB itself should be a target of litigation, notwithstanding that GDB has been released of all liability.  *See* Motion ¶¶70-75; Act 109-2017 of the Puerto Rico Legislative Assembly, Art. 702 (releasing GDB of all liability).  Similarly, nowhere in the Motion does the Committee mention that any of the targets of its theories might have valid defenses that were discussed in detail by the Committee and the SCC during settlement negotiations.

45.     Nowhere in the Motion does the Committee state that it believes the Commonwealth would have an ability to *collect* material amounts in damages from any of its

contemplated targets, or that revenge is an appropriate motive for a bankruptcy trustee to expend estate resources in litigation.

## ARGUMENT

46.     The Motion should be denied on a number of grounds, beginning with the fact that the Court is statutorily prohibited by PROMESA from granting the relief requested. However, even if the Court were to consider the Motion under a standard of cause applicable outside PROMESA, the Committee has failed to meet that standard by refusing to articulate exactly what causes of action it wishes to bring and how the Objectors have unjustifiably failed to prosecute such claims.[20]

## I.     Congress Prohibits this Court from Granting the Requested Relief Absent the Oversight Board's Consent, Which Is Not Given.

47.     The Objectors incorporate herein by reference the legal arguments contained in the Standing Objection, ¶¶31-64. Section 305 of PROMESA, 48 U.S.C. § 2165, provides that "[n]otwithstanding any power of the court, unless the Oversight Board consents or the plan so

---

[20]   The Motion requests that that the Court order Kobre & Kim to turn over to the UCC all documents collected by Kobre & Kim in its investigation and all of its witness interview notes (the "K&K Investigative Materials"). That request should be denied for a host of reasons, including the following. First, as a threshold matter, the basis for the relief sought in the Motion is that the Special Claims Committee has apparently decided not to prosecute certain legal claims. That there is a disagreement over which legal theories should be advanced in litigation pursued on behalf of the Title III debtors has no relationship with the content of the K&K Investigative Materials, and the Committee does not even attempt to argue there is a connection between the two. Kobre & Kim's principal mandate was to find and report on the facts, and it was certainly not charged with resolving disputes over legal theories that may support particular claims. Indeed, Kobre & Kim's final report, which is over 600 pages long, clearly states that "[f]urther analysis and gathering of evidence by other stakeholders, with mandates different or broader than ours, will inform whether any potential causes of action or legal remedies identified in this Report can and should be pursued and, if so, in what manner and against whom." Independent Investigator's Final Investigative Report at 30. Second, the K&K Investigative Materials, and particularly interview notes, are attorney work product, reflecting counsel's mental impressions about statements made during the interviews. See *New York Times Co. v. U.S. Dept. of Justice*, 138 F. Supp. 3d 462, 472 (S.D.N.Y. 2015) (witness statements "are work product when they reveal an attorney's strategic impressions and mental processes"). There is no legal basis, and the UCC has not advanced any, to compel Kobre & Kim to waive that work product protection. Third, the Motion fails to even identify anything the UCC believes would be in the K&K Investigative Materials (that the UCC does not already have access to) that would assist the UCC in prosecuting the claims they are seeking to bring. The salient facts unearthed during the investigation all made their way into Kobre & Kim's 600-page report. Indeed, reporting on those facts was central to Kobre & Kim's mandate as independent investigator, and Kobre & Kim obviously had no interest in withholding, nor did it have any incentive to withhold, important facts or findings from the report.

provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—(1) any of the political or governmental powers of the debtor; [or] (2) any of the property or revenues of the debtor."   Moreover, PROMESA makes the Oversight Board the sole representative of the Debtors, and excludes provisions of the Bankruptcy Code such as sections 363 and 1104, which permit chapter 11 creditors to supersede a debtor's governance and use of its property.  *See* 48 U.S.C. §§ 2161(a) (incorporating provisions of Bankruptcy Code), 2175 (Oversight Board as sole representative).

48.   The Commonwealth's causes of action are the Commonwealth's property.  *See* 48 U.S.C. § 2161(a) (incorporating various provisions of the Bankruptcy Code into PROMESA, not including section 541); 2161(c)(5) (defining "property of the estate" as used in the Bankruptcy Code as "property of the debtor"); *Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427, 431-32 (1st Cir. 2007) (avoidance actions, like litigation claims arising pre-petition, are property of the estate); *see also U.S. v. Whiting Pools*, 462 U.S. 198, 204-05 (1983) ("property of the estate" to be interpreted broadly, including "property made available" to the debtor by the Bankruptcy Code).

49.   Permitting a non-debtor to take control of litigation belonging to the debtor is an interference with the debtor's property for two reasons: (a) the cause of action itself is the debtor's property, and the debtor has unique interests in litigation relating to its governance capability and relationships with stakeholders, and (b) to the extent the litigation cost may be borne by the debtor from the debtor's property, the debtor is in the best position to make use of resources necessary to bring such litigation.  This latter consideration is especially troubling here, because the Committee, if permitted to bring litigation on its own, would incur professional fees to be paid by the Commonwealth.  The Committee is not offering to take any risks of its

18

own; rather, it is asking for the Court to determine that it is better than the Oversight Board at overseeing the Commonwealth's finances.

50.     It is emphatically and exclusively the duty of the Oversight Board to oversee the Commonwealth's finances for the benefit of all taxpayers and legitimate creditors.  *See* 48 U.S.C. 2121(a) (describing Oversight Board purpose to "achieve fiscal responsibility" for Title III debtors), 2121(b)(2) (describing Constitutional basis for enactment of PROMESA).  This would be true of a debtor in chapter 9 of the Bankruptcy Code, and it is even more true and more relevant under PROMESA.  *Compare* 48 U.S.C. § 2165 ("court may not…interfere") *with In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013) (holding the Court in chapter 9 context cannot "prevent a chapter 9 debtor from spending its money for any reason, even foolishly or in a manner that disadvantages…creditors" without consent) and *Holstein v. Sanitary & Improv. Dist. No. 7 (In re Sanitary & Improv. Dist. No. 7)*, 96 B.R. 967, 972 (Bankr. D. Neb. 1989) (holding that in chapter 9, "[t]he debtor is free to use its property and the bankruptcy court cannot approve or disapprove such use") and *Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010) ("[A] debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property.").

51.     For this Court to substitute a particular creditor or constituency's judgment for that of the Oversight Board in the exercise of its duties—again, a power this Court does not have—would be to undermine the Oversight Board and the intentions of Congress in enacting PROMESA.

52.     Accordingly, and to reiterate, when Congress enacted PROMESA it limited the ability of this Court to subjugate the decision-making authority of the Oversight Board to that of creditors with respect to the use of the Commonwealth's own property.  It is hard to imagine a

more direct and explicit limitation on this Court's authority in regard to this Motion than a directive from Congress stating that the Court "may not" do exactly what the Committee is asking it to do.

53. To be clear: the Oversight Board does not consent to the use of Commonwealth property in the manner requested by the Committee. For this reason alone, respectfully, the Motion must be denied.

## II. Even Under the Section 926 Standard Applicable Outside PROMESA, the Committee Has Not Met Its Burden to Show Cause Why a Trustee Should Be Appointed, or What a Trustee Could Accomplish.

54. Section 926(a) of the Bankruptcy Code provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action." In enacting section 926, Congress anticipated that it would be useful to provide creditors recourse in the event that elected officials, having approved voidable payments shortly prior to a chapter 9 bankruptcy filing, refuse to pursue avoidance of the same payments in fear of political consequences. *See* S.Rep. No. 95–989, at 68 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5795. Moreover, Congress may have considered that because actions under section 544 of the Bankruptcy Code would not have belonged to a chapter 9 debtor outside of bankruptcy, but rather to such municipal debtor's creditors, it would not undermine the debtor's sovereignty to allow the same creditors the opportunity to pursue the same claims—and no others—during the bankruptcy.

55. As a threshold matter, section 926 would only permit the Court to appoint a trustee to pursue avoidance actions. Thus, the trustee would not be authorized to pursue tort claims for damages such as those implicitly referred to in the Motion. Regardless, the Committee cites no authority regarding the standard of cause to appoint a trustee under section

926 or the limits of a court's discretion to do so.  However, *In re New York City Off-Track Betting Corp.*, No. 09-17121(MG), 2011 WL 309594, *4 (Bankr. S.D.N.Y. 2011) (Glenn, J.) provides that "[c]ourts should be loath to appoint a trustee given that the court's limited powers in a chapter 9 case are best understood as operating within the context of constitutional and federalism concerns."  In *Off-Track Betting Corp.*, the Court noted that the debtor was a corporation, not a governing body, and that it was no longer operational.  *Id.* at *3.  Nevertheless, the court held that "this case raises the same sovereignty concerns as any other chapter 9 case.  It is not the province of the Court to differentiate…" and refused to appoint a trustee.

56.     In its analysis, the court quoted the very same passage of the legislative record concerning section 926 as the Committee cites in its motion, S.Rep. No. 95-989, at 68.  *See id.* *5, Motion ¶81.  That passage states a concern, ignored by the Committee, that a debtor might not pursue avoidance actions because as noted above, "it might be very awkward for those same officials [who filed a chapter 9 petition] to turn around and demand the return of payments following the filing of the petition."  S.Rep. No. 95–989, at 68 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5795.

57.     This policy is clearly not relevant here, for many reasons, including but not limited to the following:

- The petitions were filed by the Oversight Board, not the elected officials who made or facilitated any payments to the parties the Committee now wishes to pursue.

- The Oversight Board appointed the SCC to avoid conflicts between its membership and potential litigation targets.

- The litigation contemplated by the Committee appears not to be in the nature of avoidance, as previously noted.

- The litigation targets contemplated by the Committee are no longer serving in the same capacities and neither the SCC nor the Commonwealth has any overriding interest in preserving good relations with them.

21

58.     In other words, even if section 926 were applicable to this situation at all—and it
is not—none of the policies supporting appointment of a trustee militate in favor of appointment
here.

59.     Furthermore, the Objectors note that, for the reasons stated in more detail below,
appointment of a trustee would be inappropriate because the causes of action identified (to
whatever insufficient extent) by the Committee to be pursued are not colorable in the view of the
SCC and have no value to the Commonwealth.  *See Off-Track Betting Corp.*, 2011 WL 309594
at *5 (denying motion because, among other things, avoidance actions to be pursued lacked
value in light of defendants' clear and strong defenses relating to state law mandating payments
proposed to be avoided and recovered).

### III.     The Committee Has Not Shown Cause to Grant Derivative Standing.

60.     In the Motion, the Committee requests derivative standing to pursue litigation
under a standard applicable under certain chapters of the Bankruptcy Code.  As expressed above,
the Court has no authority to grant the requested relief pursuant to any provision of the
Bankruptcy Code, much less outside of section 926, absent consent of the Oversight Board.[21]

61.     Regardless, the Committee correctly notes that outside PROMESA and chapter 9
of the Bankruptcy Code, courts may confer derivative standing to pursue claims held by the
estate where a creditor (a) presents a colorable claim for relief and (b) demonstrates that the
debtor unjustifiably failed to bring suit.  *See Ontos*, 478 F.3d at 431; *cf. Cybergenics*, 330 F.3d at
579; *Unsec. Cred. Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d

---

[21]   In its Motion, the Committee reminds the Court that it does have authority to grant the Committee derivative
standing, and has done so in the past.   Motion, ¶84 (citing *Order Approving Procedure to Resolve
Commonwealth-COFINA Dispute*, ¶2 [ECF No. 996] (the "COFINA Order")).  The Objectors do not disagree; however,
they note that the Court previously conferred derivative standing with the express consent of the Oversight Board.  COFINA
Order, ¶2.

901, 905 (2nd Cir. 1985).  As provided below, the Committee has not met its burden as to either

element of this standard.

> **A.      The Committee Has Not Articulated, and Cannot Articulate, a Colorable Claim that the Oversight Board Has Refused to Pursue.**

62.      Customarily, when a committee or creditor requests derivative standing to pursue

a cause of action, it not only describes the cause of action to the court but attaches a draft copy of

a complaint so that the court may itself determine whether such causes of action are colorable.

The Committee has not done so here.

63.      The Committee has already filed a motion with the Court stating its commitment

to attach its name to a wide variety of causes of action against parties involved in

Commonwealth bond issuances.  As the Committee and the Objectors have discussed on several

occasions, each of them has an ethical obligation not to make such a commitment unless each,

independently, understands the support for such claims and can articulate the basis to do so, at

the very least in compliance with Fed. R. Civ. P. 11(b).  It is unclear why the Committee is

comfortable committing to put forward specific allegations against some parties, but here refuses

to provide similar specificity as to other allegations relating to the same facts and transactions.

64.      To be clear: to the extent identifiable from the Motion, the Committee appears to

be alleging actual (not constructive) fraud against entities and individuals.  Fraud claims must be

pled with particularity.  Nothing in the Motion is more particular than its assertion that very bad

things happened with some past issuances—an assertion with which the Objectors agree, which

is why, again, dozens of causes of actions against responsible parties will be pursued pursuant to

the Joint Stipulation.  But the Objectors will not commit, and will not subject themselves to an

order of this Court requiring them, to bring fraud claims on alleged facts that simply cannot be

23

supported in the SCC's view and would be nothing but a waste of the limited resources of the Commonwealth.

65.     Moreover, the Motion discloses no consideration of applicable defenses, which were discussed by the Objectors and the Committee in detail as to many related claims.  Many putative defendants, including and particularly the individuals referenced by the Committee, may have strong defenses.  Without previewing such defenses in detail for the benefit of any analogously situated defendants, such defenses may be in the nature of *in pari delicto* and statute of limitations.  As the Committee likewise well knows, both it and the Objectors have ethical duties to consider the viability of these defenses before expending Commonwealth resources prosecuting claims.

66.     Moreover, the Committee implies it wishes to pursue actions against parties on the basis of material false disclosures in connection with securities issuances, which causes of action do not belong to the Commonwealth.  As noted above, the SEC conducted an investigation into the same issues the Committee wishes to investigate and upon which to premise causes of action and concluded not to recommend enforcement actions.

### B.     The Committee Has Not Shown that the Oversight Board's Determination Not to Pursue Any Cause of Action Is Unjustifiable.

67.     Much as the Committee has refused to justify bringing any claims by itself, it has not shown that the Objectors' refusal to do so would be unjustifiable.

68.     In determining whether a bankruptcy trustee's refusal to litigate is justifiable, courts in this jurisdiction look at the costs and risks to the estate and the ability to recover proceeds.  *See In re Pagnini*, No. 09-17144-WCH, 2010 WL 383941 (Bankr. D. Mass. Jan. 26, 2010) (derivative standing not justified where trustee reasonably determines litigation offers no benefit to estate based on trustee's ability to recover proceeds thereof) (referencing approval of

24

standard in *Ontos*, 478 F.3d at 431); *In re Pilavis*, 233 B.R. 1, 3-4 (Bankr. D. Mass. 1999) (derivative standing justified in no-asset case in which creditor offers to litigate at own expense and risk) (citing *STN Enter.*, 779 F.2d at 904).

69.     Unlike the *Pilavis* case, cited above, the Committee is not offering to take on litigation risks and expenses at zero net cost to the Commonwealth.  Rather, as previously noted, it is asking the Court to substitute its own judgment of the value and viability of certain claims— claims which, again, it cannot articulate with particularity, and in open defiance of the Oversight Board's exclusive authority to make such determinations of value on behalf of the Commonwealth.

70.     In addition, the SCC is concerned that prosecution of the Committee's desired claims will impact and intersect with the SCC's stronger, more viable claims against third parties and add confusion and expense to prosecution.

<u>**CONCLUSION**</u>

71.     For the reasons set forth herein, this Court should deny the Committee's Motion and grant such further relief as the Court deems just and proper.

Dated: April 19, 2019

/s/ *Edward S. Weisfelner*
**BROWN RUDNICK LLP**
Edward S. Weisfelner, Esq. (*Pro Hac Vice*)
Angela M. Papalaskaris, Esq. (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
eweisfelner@brownrudnick.com
apapalaskaris@brownrudnick.com

Stephen A. Best, Esq. (*Pro Hac Vice*)
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
sbest@brownrudnick.com

Sunni P. Beville, Esq. (*Pro Hac Vice*)
Jeffrey L. Jonas, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Special Claims Committee of*
*the Financial Oversight and Management*
*Board for Puerto Rico, as representative of*
*the Commonwealth of Puerto Rico*

and

/s/ *Kenneth C. Suria*
**ESTRELLA, LLC**
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Special Claims*
*Committee of the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the Commonwealth of*
*Puerto Rico*
63376156

/s/ *Jeffrey W. Levitan*
Martin J. Bienenstock (Pro Hac Vice)
Brian S. Rosen (Pro Hac Vice)
Jeffrey W. Levitan (Pro Hac Vice)
Stephen L. Ratner (Pro Hac Vice)
Timothy W. Mungovan (Pro Hac Vice)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York
Tel: (212) 969-3000
Fax: (212) 969-2900
mbienenstock@proskauer.com
brosen@proskauer.com
jlevitan@proskauer.com
sratner@proskauer.com
tmungovan@proskauer.com

*Attorneys to the Financial Oversight*
*and Management Board for Puerto Rico, as*
*representative of the Commonwealth of Puerto*
*Rico*