# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:                                                      :

                                                            :

THE FINANCIAL OVERSIGHT AND                                 :

MANAGEMENT BOARD FOR PUERTO RICO,                           :       PROMESA

                                                            :       Title III

            as representative of                   :

                                                            :       Case No. 17-BK-3283 (LTS)

THE COMMONWEALTH OF PUERTO RICO *et al.*,                   :

                                                            :       (Jointly Administered)

            Debtors.[1]                             :

-------------------------------------------------------------------x

## OMNIBUS REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF MOTION FOR ORDER AUTHORIZING COMMITTEE TO PURSUE CERTAIN CAUSES OF ACTION ON BEHALF OF COMMONWEALTH AND GRANTING RELATED RELIEF

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .......................................................................................................... 3

    I.     Procedures Order Requirements Are Clear............................................ 4

    II.    Preliminary List Included Additional Claims Against Underwriters ................... 5

    III.   Final List Also Included Additional Claims Against Underwriters...................... 6

    IV.   Causes of Action That Oversight Board Now Asserts It Will Pursue ................. 7

ARGUMENT ............................................................................................................... 8

    I.     Section 305 Of PROMESA Does Not Limit Court's Judicial Power To
          Decide Motion ............................................................................... 8

    II.    Section 303 Of PROMESA Also Does Not Implicitly Limit Court's
          Judicial Power To Decide Motion ...................................................... 18

    III.   Bankruptcy Code Section 926 Does Not Divest Court Of Power To Confer
          Derivative Standing ........................................................................ 18

    IV.   Oversight Board Is Abandoning Colorable Causes Of Action With
          Potentially Significant Value To Commonwealth And Its Creditors ................. 21

NOTICE..................................................................................................................... 31

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982)........................................................................................24

*In re Altair Airlines, Inc.,*
727 F.2d 88 (3d Cir. 1984)...............................................................................9

*Bailey v. Federal Intermediate Credit Bank,*
788 F.2d 498 (8th Cir. 1986), *cert. denied,* 479 U.S. 915 (1986)...........................19

*In re Blue Diamond Coal Co.,*
147 B.R. 720 (Bankr. E.D. Tenn. 1992), *aff'd,* 160 B.R. 574 (E.D. Tenn.
1993) .........................................................................................................9

*Chicago Title Ins. Co. v. Sherred Village Ass'n,*
544 F.Supp. 320 (D. Me. 1982), *aff'd,* 708 F.2d 804 (1st Cir.1983) .....................19

*In re City of Stockton,*
526 B.R. 35 (Bankr. E.D. Cal. 2015) ............................................................17, 18

*Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.),*
262 F.3d 96 (2d Cir. 2001).....................................................................11, 15, 20

*Dean v. Davis,*
242 U.S. 438 (1917)......................................................................................25

*FDIC v. Arrillaga Torrens,*
212 F.Supp.3d 312 (D.P.R. 2016)................................................................28, 29

*FDIC v. Caplan,*
874 F.Supp. 741 (1995) ................................................................................28

*Fin. Oversight & Mgmt. Bd. of P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re
Fin. Oversight & Mgmt. Bd. for P.R.),*
899 F.3d 13 (1st Cir. 2018)............................................................................10

*In re G.S.F. Corp.,*
938 F.2d 1467 (1st Cir.1991)..........................................................................13

*Herman & MacLean v. Huddleston,*
459 U.S. 375 (1983).....................................................................................19

*In re Hyde,*
334 B.R. 506 (Bankr. D. Mass. 2005) ..............................................................17

*Longview Fibre v. Rasmussen*,
  980 F.2d 1307 (9th Cir. 1992) ...................................................................................19, 20

*In re Morales*,
  No. 09-06663 ESL, 2012 WL 527174 (Bankr. D.P.R. Feb. 15, 2012)...................................17

*In re N.Y. City Off-Track Betting Corp.*,
  2001 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011)............................................................10

*Puerto Rico Elec. Power Auth. v. Vitol, Inc.*,
  No. CV 09-2242 (DRD), 2015 WL 13547856 (D.P.R. Aug. 26, 2015) ................................27

*Segarra-Miranda v. Perez-Padro*,
  482 B.R. 59 (D.P.R. 2012)...................................................................................................13

*State of Illinois, Dep't of Public Aid v. Schweiker*,
  707 F.2d 273 (7th Cir. 1983) ...............................................................................................19

*In re Vicente*,
  446 B.R. 26 (Bankr. D. Mass. 2011) ....................................................................................17

**Statutes**

7 L.P.R.A. § 552 ..........................................................................................................................29

11 U.S.C. § 1112(b)(3) ...............................................................................................................13

28 U.S.C. § 157(c)(2)..............................................................................................................12, 13

Bankruptcy Code
  Section 108(a).........................................................................................................................27
  Section 362(d)(1) ....................................................................................................................10
  Section 903..............................................................................................................................17
  Section 926................................................................................................................... *passim*

**Other Authorities**

Fed. R. Evid.
  Rule 408....................................................................................................................................5
  Rule 408(b) ...............................................................................................................................5

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (the

"Committee") and Committee members Doral Financial Corporation, acting through the Doral

Financial Creditors' Trust ("Doral"), Service Employees International Union ("SEIU"), and

Tradewinds Energy Barceloneta, LLC ("Tradewinds," and collectively with the Committee,

Doral and SEIU, the "Movants") hereby submit this omnibus reply (the "Reply") to the

Objections[1] and in support of the *Motion of Official Committee of Unsecured Creditors for*

*Order Authorizing Committee to Pursue Certain Causes of Action on Behalf of Commonwealth*

*and Granting Related Relief* [Docket No. 6325] (the "Motion").[2]  In support of this Reply,

Movants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Movants seek this Court's authority to pursue colorable and likely valuable

Causes of Action that the Oversight Board and Special Claims Committee (together, the FOMB

Objectors") unjustifiably refuse to bring.  Hiding behind section 305 of PROMESA, the FOMB

Objectors contend that this Court does not have jurisdiction even to consider the merits of the

Motion.  This contention must be disregarded because, as set forth below, the FOMB Objectors

consented to the Court's consideration of the Motion in the Stipulation and other pleadings.

---

[1]     The "Objections" are, collectively, the pleadings filed in response to the Motion by the Financial Oversight and
Management Board for Puerto Rico (the "Oversight Board") and its Special Claims Committee (together, the
"FOMB Objectors") [Docket No. 6418], the Puerto Rico Fiscal Agency and Financial Advisory Authority
("AAFAF") [Docket No. 6421], National Public Finance Guarantee Corporation ("National") [Docket No.
6424], the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree
Committee") [Docket No. 6425], Ambac Assurance Corporation ("Ambac") [Docket No. 6426], Assured
Guaranty Corp., Assured Guaranty Municipal Corp., and the Financial Guaranty Insurance Company
(collectively, "Assured") [Docket No. 6427], and Oppenheimer Funds ("Oppenheimer" and, together with the
FOMB Objectors, AAFAF, National, the Retiree Committee, Ambac, and Assured, the "Objectors") [Docket
No. 6428].

[2]     Capitalized terms not defined herein shall have the meanings ascribed thereto in the Motion.

2.      Further, the FOMB Objectors and other Objectors (a) attempt to discredit the
Causes of Action the Committee proposes to bring and (b) overstate the strength of potential
defenses.  As set forth below, the Committee has identified meritorious Causes of Action against
the GDB officers and directors and underwriters involved in saddling the already insolvent
Commonwealth with additional debt it had no realistic ability to repay.  While the underwriters
and others that earned fees or had their debt repaid benefitted from this additional debt offering,
the Commonwealth's residents and creditors have been harmed.  ***As the current Puerto Rico
Governor has recognized, the GDB-orchestrated practice of "scooping and tossing," i.e.,
paying off old debt with new debt,[3] functioned essentially as a "Ponzi scheme."[4]  In light of
this uncomfortable but undeniable reality, the Special Claims Committee's abandonment of
the Causes of Action is especially inexcusable***.

3.      Indeed, the Special Claims Committee cannot credibly contest the merits of the
Causes of Action, as it originally agreed to pursue them, only to change course at the last minute
without explanation.  Now attempting to blame the Committee, among others, for the emergency
the Oversight Board created, the FOMB Objectors and other Objectors attempt to portray the
Committee as litigious, overly aggressive, and partly responsible for the current predicament.[5]

---

[3]      *See* Kobre & Kim Report, at 71.

[4]      *See* Public Broadcasting Service, Frontline, How Banks Responded to "Blackout in Puerto Rico" (May 1, 2018)
(available at https://www.pbs.org/wgbh/frontline/article/how-banks-responded-to-blackout-in-puerto-rico/); *see
also* Laura Sullivan, *How Puerto Rico's Debt Created a Perfect Storm Before the Storm*, National Public Radio
(May 2, 2018)  https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-aperfect-storm-
before-the-storm ("Looking back, Rosselló said at this point in the financial crisis it seemed like 'the
government of Puerto Rico was run as a big Ponzi scheme.'").

[5]      For example, National complains that allowing the Committee to pursue the Causes of Action will "give the
Committee undue leverage in plan negotiations."  National Obj. ¶ 1.  National's concern is unfounded.  The
Committee represents the interests of all general unsecured creditors of the Commonwealth, and these creditors
stand to benefit from any recoveries resulting from the Causes of Action because this would make the
proverbial "pie" bigger for all creditors.  Maximizing such recoveries is the Committee's sole motivation for
filing the Motion and seeking authorization to pursue the Causes of Action on the Commonwealth's behalf.
Making the "pie" bigger has nothing to do with the issue of how such "pie" will be shared among creditors
under a plan of adjustment.

The fact is, however, that the FOMB Objectors repeatedly thwarted any thorough investigation of Puerto Rico's debt issuances.  Having done so, the FOMB Objectors should not be allowed to stop the Committee from investigating and prosecuting the Causes of Action they have chosen to abandon.[6]

## **BACKGROUND**

4.    The FOMB Objectors reject the notion that they ever acted with anything less than the utmost due diligence.  They instead criticize the Committee for seeking to conduct its own investigation.  Specifically, they contend that the Committee's discovery requests were too broad and that Judge Dein correctly sided with the Oversight Board in refusing to rule on those requests.[7] But neither the Committee nor Judge Dein is responsible for the deficiencies in the Oversight Board's investigation.  The fact that Judge Dein sustained the Oversight Board's objections to the Committee's discovery requests after the Oversight Board made several representations to her that its own exclusive investigation could be beneficial for the Debtors does not help the Oversight Board's cause—it actually does the opposite by demonstrating the Oversight Board's success in limiting the Committee's proposed investigation.

5.    The Special Claims Committee also misrepresents key facts by denying that its counsel officially represented to Committee counsel that the Special Claims Committee would bring the same meritorious deepening insolvency claims against underwriters that the Committee now seeks standing to pursue and by suggesting that such representation was a protected settlement offer.  The record on these points must be corrected.

---

[6]    Neither is the Oversight Board's Tolling Motion the solution to the current predicament, as the Retiree Committee asserts in its Objection.  The Tolling Motion only seeks to toll the statute of limitations with respect to avoidance actions against bondholders (of certain challenged bonds) whose identity is not known.

[7]    *See* FOMB Obj. ¶¶ 15-22.

6.     The Special Claims Committee asserts that, "before the Joint Stipulation was executed [on April 16, 2019], the SCC's counsel only ever discussed with the Committee's counsel the claims that counsel *might* recommend their clients prosecute . . . ."[8]  This is not true.[9]  In fact, the Special Claims Committee told the Committee, in both the preliminary and final lists it provided pursuant to the Procedures Order (and which are not part of settlement discussions), that it *would pursue* additional claims against underwriters and other parties involved in Puerto Rico's debt issuances, including the deepening insolvency claims the Committee now seeks authority to pursue.  *While the Court obviously cannot force the Oversight Board itself to prosecute such claims based on the final list, the consequence for the Oversight Board should be obvious: it cannot now argue that such claims are not colorable.*

## I.     Procedures Order Requirements Are Clear

7.     The Committee filed the Procedures Motion to compel the Oversight Board to disclose a definitive list of the claims it would bring before the Causes of Action Deadline.  The Committee requested this relief to ensure it would have sufficient time to file a motion for standing to pursue any meritorious claims the Oversight Board unjustifiably refused to bring.

8.     The Court granted the Procedures Motion, requiring the Oversight Board to (i) "disclose a preliminary list of all potential Avoidance Actions related to the Commonwealth, including designations of which Avoidance Actions the Oversight Board intends to pursue on behalf of the Commonwealth, to the Committee by April 5, 2019 at 5:00 p.m. (Atlantic Standard Time)," and (ii) "thereafter provide to the Committee its final list of Commonwealth Avoidance Actions, including the aforementioned designations, by April 10, 2019 at 2:00 p.m. (Atlantic

---

8     *See* FOMB Obj. ¶ 29 (emphasis added).

9     If it were true, it would be a shocking acknowledgment by the FOMB Objectors that they deliberately violated this Court's order requiring them to provide a final list of Causes of Action by no later than April 10, 2019—a deadline which was later extended by the Court to April 12, 2019, with the consent of the parties.  *See* Docket No. 6172.

Standard Time)."[10]  The Committee later agreed to extend the deadline for the final list to April

12, 2019 at noon (Atlantic Standard Time).[11]

9.      Contrary to the FOMB Objectors' contentions, neither of these lists was related to

settlement discussions.  The Court did not order the Oversight Board to "offer" a list of causes of

action to the Committee as part of a settlement negotiation; rather, it ordered the Oversight Board

to send the Committee a definitive list—first in preliminary form and later in final form—of the

Causes of Action that it *would pursue*.  Accordingly, the lists and any related communications

are plainly not subject to Federal Rule of Evidence 408[12] or any other similar rule or protection.

To the contrary, it was always contemplated that the lists would be disclosed in any subsequent

standing motion filed by the Committee.  The purpose of the lists was to give the Court a clear

presentation of the differences between the parties as to which claims to bring.

## II.      Preliminary List Included Additional Claims Against Underwriters

10.      On April 5, 2019, the Committee received two preliminary lists—one from the

Oversight Board and another from its Special Claims Committee.  The Special Claims

Committee's preliminary list, attached hereto as **Exhibit A**, included claims against underwriters

for deepening insolvency in connection with the issuance of the 2014 GO bonds.

11.      The Special Claims Committee asserts that, because this list was only

"preliminary," the inclusion of a particular Cause of Action did not mean that the Special Claims

---

[10]    *See* Procedures Order at 2.

[11]    Docket No. 6172.

[12]    Even if the lists and related communications were exchanged as part of settlement discussions (which they were not), Rule 408 would not prevent their disclosure.  Rule 408 prevents a party from admitting settlement discussions into evidence for the purpose of proving another party's liability but not for other reasons, such as "negating a contention of undue delay."  Fed. R. Evid. 408(b).  Here, the lists and related communications can be used to show, among other things, just how little time the Committee and its professionals have had—and, therefore, how quickly they have worked—to prepare the Motion and finish analyzing the Causes of Action after learning that the Special Claims Committee was no longer going to pursue the Causes of Action.

Committee had determined that the Cause of Action had merit.  There are two problems with this assertion.

12.    <u>First</u>, it is simply not believable that, by April 5, 2019—less than one month before the Causes of Action Deadline—the Oversight Board had not finished analyzing the merits of potential claims against the underwriters of the debt issuances that led to Puerto Rico's fiscal crisis.  It should be obvious to anyone that such potential claims are among the most important Causes of Action for the Oversight Board to investigate.

13.    <u>Second</u>, the purpose of the preliminary list was to give the Committee some assurance that the listed claims would be pursued prior to the Causes of Action Deadline.  This would allow the Committee, in the meet and confer sessions that followed, to focus on discussing ***additional*** meritorious causes of action that did not appear on the initial list.  In other words, the intent was that the FOMB Objectors could be convinced (or not) by the Committee to add causes of action to the preliminary lists, but not subtract from such lists.

## III.    <u>Final List Also Included Additional Claims Against Underwriters</u>

14.    In any event, the Special Claims Committee's final list provided to the Committee on April 12, 2019, attached hereto as **<u>Exhibit B</u>**, also included claims against underwriters for deepening insolvency, this time reaching back to the 2009 GO bond issuances.  It was not until ***after*** its delivery of the final list that the Special Claims Committee reversed course and told the Committee that it was no longer pursuing such claims.

15.    The FOMB Objectors now contend that even the final list delivered pursuant to the Procedures Order was a work in progress.[13]  The Special Claims Committee attempted this maneuver when it delivered the list to Committee counsel "with a full reservation of . . . rights to

---

[13]    *See* FOMB Obj. ¶ 39.

add or remove potential causes of action and/or defendants" and by calling the Causes of Action

against underwriters and other third parties "potential causes of action."  Immediately upon

receiving this list, however, Committee counsel, in writing, reminded counsel for the Special

Claims Committee that the Procedures Order required the Special Claims Committee to provide

a *final* list of the Causes of Action it had committed to bring.  Counsel for the Special Claims

Committee responded:  "[i]n the absence of a stip[ulation], you can consider our list final."

Obviously, the parties do not have a stipulation as to the claims on the list; otherwise, the

Committee would not have filed the Motion.  Thus, the Special Claims Committee represented

that the list of claims it provided on April 12—which included claims for deepening insolvency

going all the way back to 2009—was its final list.

## IV.    Causes of Action That Oversight Board Now Asserts It Will Pursue

16.     Notwithstanding the hard deadline set by the Procedures Order and counsel's

assertion that the list was "final," the Special Claims Committee revised its list after April 12.

The Special Claims Committee is now offering yet another "final" list, which is attached hereto

as **Exhibit C**.

17.     This list shows that the Special Claims Committee is pursuing some, but not all,

of the meritorious Causes of Action that exist against underwriters and other advisors in

connection with GO bonds.  In this regard, several important categories of claims are noticeably

absent.  First, the Oversight Board will not be pursuing deepening insolvency claims against *any*

party, notwithstanding its earlier commitments to do so.  Second, the Oversight Board will not be

suing underwriters for breach of fiduciary duty,[14] breach of contract, or professional malpractice

or negligence, even though these are some of the most obvious claims.  Third, the Oversight

---

[14] ████████████████████████████████████████████

████████████████████

Board will not be pursuing *any* claims against any individuals, including the former GDB

officers and directors who orchestrated the Commonwealth GO bond issuances. 

18.     As set forth below, neither the Oversight Board nor the Special Claims

Committee (let alone any other Objector) offer a cogent explanation as to why potentially

valuable claims should not be pursued for the benefit of all of Puerto Rico's creditors.

Meanwhile, one key Objector, Ambac, supports the prosecution of the Causes of Action.[15]

## ARGUMENT

### I.     Section 305 Of PROMESA Does Not Limit Court's Judicial Power To Decide Motion

19.     The FOMB Objectors, hiding behind section 305 of PROMESA, argue that this

Court lacks jurisdiction to consider Movants' request for the Committee to pursue the valuable

Causes of Action that have, for all intents and purposes, been abandoned.  For several reasons, as

detailed below, section 305 of PROMESA does not limit this Court's power to decide the

Motion.  For one, it is undisputed that section 926 of the Bankruptcy Code is not subject to the

limitations in section 305, and, therefore, the Court is free to consider Movants' request for the

Committee to be appointed as trustee to pursue avoidance actions.[16]  As shown by the outline

---

[15]   Other Objectors also do not challenge the merits of the Causes of Action that the Committee seeks to bring.  *See* Retiree Committee Obj.; Assured Obj.

[16]   Assured contends that Movants are not entitled to relief under Bankruptcy Code section 926 because Doral, SEIU and Tradewinds are not creditors of the Commonwealth.  Assured Obj. ¶¶ 10-12.  Assured is wrong. While Tradewinds is a creditor of PREPA, both Doral and SEIU filed proofs of claim against and are creditors of the Commonwealth.  *See* Proof of Claim No. 370 (Doral Financial Corporation); Proof of Claim No. 21,351 (Service Employees International Union).  Among other things, SEIU's proof of claim lists (and attaches supporting documentation related to) nearly 200 grievances against the Commonwealth that were resolved and

attached hereto as **Exhibit D**, the Committee's newly-retained special counsel to assert claims against underwriters has, building on the Committee' analysis to date, identified, in one week's time, valuable claims to pursue against underwriters.

20.     Nor does section 305 of PROMESA limit this Court's judicial power to decide the request for derivative standing as it relates to Causes of Action other than Avoidance Actions. For one, the FOMB Objectors have consented, for purposes of Section 305, to the Court's consideration of the Motion.  In any event, section 305 does not apply to property that the Commonwealth is abandoning.

      A.      <u>Section 305 Of PROMESA Does Not Limit Court's Judicial Power To Decide Request For Appointment Of Trustee Under Bankruptcy Code Section 926 To Pursue Avoidance Actions</u>

21.     It is undisputed that section 305 of PROMESA does not prohibit the Court from deciding the Committee's request to pursue Avoidance Actions as trustee under section 926 of the Bankruptcy Code.  Indeed, the Oversight Board previously acknowledged (in a brief that is incorporated into its objection to the Motion) that section 926 of the Bankruptcy Code is an exception to the limitation on the Court's power under section 305 of PROMESA.[17]

22.     Moreover, to read section 305 of PROMESA as prohibiting the Court from appointing a trustee under section 926 of the Bankruptcy Code would render the latter section

---

liquidated by settlement or arbitration award yet were not paid.  It has long been established that unions with claims for unpaid wages or benefits are creditors and thus eligible to serve on a creditors committee. *See In re Altair Airlines, Inc.*, 727 F.2d 88 (3d Cir. 1984).  Assured is also wrong in its assertion that SEIU had an obligation to file a Rule 2019 statement. *See In re Blue Diamond Coal Co.*, 147 B.R. 720, 727 (Bankr. E.D. Tenn. 1992) (Rule 2019 filing by union "not required" because "Union is not treated as an agent filing multiple claims"), *aff'd*, 160 B.R. 574 (E.D. Tenn. 1993).

[17]    *See Objection of Financial Oversight and Management Board to Official Committee of Unsecured Creditors' Motion for Order Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief with Respect to Restructuring of Government Development Bank for Puerto Rico* ¶ 31 [Docket No. 3959], Sept. 21, 2018 (the "<u>Oversight Board's GDB Objection</u>") (Oversight Board cannot be displaced "with the limited exception of Bankruptcy Code section 926").  Paragraphs 31 through 64 of the Oversight Board's GDB Objection are expressly incorporated into the Oversight Board's objection to the Motion here.  FOMB Obj. ¶ 47.

mere surplusage.[18]  The same would be true for section 317 of PROMESA, which expressly

provides for the payment of the fees of a section 926 trustee in a Title III case.  Given that

section 926 is predicated on the Oversight Board *refusing* to pursue avoidance actions, it would

make no sense for Congress to have incorporated that section into Title III of PROMESA, just so

the Oversight Board could always defeat a section 926 motion by *refusing* to allow the Court to

consider such a motion.  In other words, because section 926 is predicated on the Oversight

Board's refusal to take action, it must prevail over section 305 of PROMESA.

> B.    Section 305 Of PROMESA Does Not Limit Court's Judicial Power To Decide
> Request For Derivative Standing To Pursue Causes Of Action

23.    To the extent that the Committee seeks derivative standing to pursue Causes of

Action that are not Avoidance Actions, section 305 of PROMESA also poses no bar to the Court

deciding the Motion.  This is for two reasons.  First, to the extent the Motion is subject to section

305 of PROMESA, the Oversight Board previously consented to the Court exercising its judicial

power with respect to the Motion.  Second, in any event, the Motion does not implicate section

305 of PROMESA, because Movants are not asking the Court to "interfere with . . . any property

or revenues of the debtor."  If granted derivative standing, the Committee would merely pursue

claims that the Commonwealth had effectively abandoned (by allowing the statute of limitations

expire).

---

[18]    *In re N.Y. City Off-Track Betting Corp.*, 2001 WL 309594, *6 (Bankr. S.D.N.Y. Jan. 25, 2011) ("[The]
contention that section 904 [*i.e.*, the section 305 equivalent in chapter 9 cases] prohibits a court from appointing
a trustee without the consent of the debtor renders section 926 mere surplusage.  Section 926 explicitly
anticipates and is intended to address those scenarios in which the debtor does not consent to the pursuit of
[avoidance actions].").  More generally, express statutory rights for the benefit of creditors, such as the right to
request the appointment of a trustee under section 926, should not be vitiated by section 305 of PROMESA.
*See Fin. Oversight & Mgmt. Bd. of P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt
Bd. for P.R.)*, 899 F.3d 13, 20 (1st Cir. 2018) (noting that section 305 of PROMESA should not be read so
broadly so as to "effectively wipe out" creditors' statutory rights under section 362(d)(1) of the Bankruptcy
Code).

       i.       *Oversight Board Consented, For Purposes Of Section 305, To Court Exercising Judicial Power With Respect To Committee's Motion*

24.      Even if section 305 of PROMESA applied to the specific Causes of Action at issue (and, as detailed below, it does not), the Court's judicial powers are not limited by that section because the Oversight Board ***consented***, for purposes of section 305, to the Court exercising its judicial power with respect to the Committee's Motion.

25.      In this regard, it is important to clarify a critical distinction that both the FOMB Objectors and AAFAF try to obfuscate.  Whether the Oversight Board consented to granting the Committee derivative standing is ***separate*** from whether the FOMB Objectors consented, for purposes of Section 305 of PROMESA, to the Motion being considered by the Court.  This is not splitting hairs.  The first type of consent relates to the legal theory under which Movants are seeking relief (*i.e.*, derivative standing based on the debtor's unjustifiable refusal) while the second type of consent concerns the judicial power of the Court to decide the relief sought.  Here, Movants do not dispute that the FOMB Objectors did not consent to the Committee pursuing the Causes of Action derivatively on behalf of the Commonwealth, as permitted under *Commodore*[19] and its progeny.  In fact, Movants contend that the FOMB Objectors are not justified in failing to pursue, or refusing to grant the Committee derivative standing to pursue, the Causes of Action.[20]

26.      By contrast, the FOMB Objectors ***did*** consent, for purposes of section 305 of PROMESA, to the Court exercising judicial power over a dispute between the Committee and the Oversight Board as to which claims or causes of action should be pursue.  In particular, in paragraph 18 of the Stipulation, the Oversight Board "agreed that, notwithstanding the

---

[19]   *See Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 262 F.3d 96 (2d Cir. 2001) (setting forth test for consensual grant of derivative standing).

[20]   *See* Mot. ¶¶ 83-84.

11

Stipulation, the ***Committee may seek, by motion to the Court, to be appointed as***

***trustee/plaintiff to pursue the Additional Claims***" subject to an agreed-upon briefing schedule.[21]

The "Additional Claims" expressly included causes of action beyond avoidance actions; namely,

"Commonwealth claims or causes of action . . . related to or with respect to the offerings of the

Commonwealth GO bonds, PBA bonds, and ERS bonds against the Financial Party Targets,

including fraudulent transfer, ***fraud, breach of fiduciary duty, and/or deepening insolvency***."[22]

27.      The Stipulation also makes clear that the Oversight Board's agreement to allow

the Committee to file its Motion constitutes the requisite consent for purposes of section 305 of

PROMESA.  Specifically, paragraph 3 of the Stipulation provides that "[s]olely to the extent, if

any, that section 305 of PROMESA serves as a limitation on judicial power over the authority

delegated to the Committee (subject to the terms of this Stipulation), ***the Oversight Board***

***hereby consents***."[23]  The Oversight Board's agreement that the Committee may file a motion to

be appointed as trustee/plaintiff to pursue the Additional Claims is one of those rights conferred

to the Committee by the Stipulation, and, therefore, the agreement constitutes the necessary

consent, for purposes of section 305 of PROMESA, to this Court ruling on the Motion.

28.      Even if the foregoing somehow did not rise to the level of consent, the Oversight

Board's consent can certainly be implied from other pleadings and facts.  In this regard, it is

important to note that language in section 305 of PROMESA only uses the word "consent," not

"***express consent***."  As courts have made clear, the absence of the word "express" in a similar

jurisdictional provision, 28 U.S.C. § 157(c)(2) (allowing parties to consent to the bankruptcy

---

[21]    For purposes of the Oversight Board's agreement, it is of no import that the Court has not yet entered the
Stipulation.  The Oversight Board specifically agreed that "[p]ending approval of this Stipulation by the Court,
each of the Parties agrees it is and will be bound by this Stipulation."  Stipulation ¶ 1.

[22]    Stipulation ¶ 18 (emphasis added).

[23]    Stipulation ¶ 3.

court entering a final judgment in non-core proceedings), means that when interpreting a section which merely uses the word "consent" (rather than the words "express consent"), such consent may be implied from the actions or inaction of the parties.[24]  In *Segarra-Miranda v. Perez-Padro*, the Puerto Rico District Court explained that:

> some subsections of § 157 explicitly require that consent be expressed—for example, under § 157(e), a bankruptcy judge may hold a jury trial "with the ***express consent*** of all the parties"— while § 157(c)(2) nowhere does, referring instead to the "consent of all the parties involved." Therefore, the Trustee's proposition also runs afoul of the oft-quoted maxim that "when Congress uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."[25]

Likewise, the absence of the word "express" in section 305 of PROMESA reflects the Congress's intent not to require express consent and to allow consent to be implied from the actions or inactions of the Oversight Board.  Similarly, other provisions of the Bankruptcy Code also use the phrase "expressly consent" rather than simply "consent" as section 305 of PROMESA does.[26]

29.    The actions of the Oversight Board and the Special Claims Committee speak volumes.  First, nothing in the Stipulation suggests that the Oversight Board was in any way objecting to the Court exercising judicial power with respect to the Motion, a filing expressly contemplated by the Stipulation itself.  Indeed, the Stipulation contains no limitation whatsoever regarding the Oversight Board's consent under section 305.  This stands in contrast with the

---

[24]    *See In re G.S.F. Corp.*, 938 F.2d 1467, 1477 (1st Cir.1991) (holding that express consent is not required under 11 U.S.C. § 157(c)(2) for entry of final judgment by a bankruptcy court in related/non-core proceedings and implying consent based on the actions of the parties).

[25]    *Segarra-Miranda v. Perez-Padro*, 482 B.R. 59, 68 (D.P.R. 2012) (emphasis added) (implying consent to the entry of a final judgment by the bankruptcy court where chapter 7 trustee failed to object despite opportunity to do so).

[26]    *See, e.g.*, 11 U.S.C. § 1112(b)(3) ("The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant ***expressly consents*** to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.") (emphasis added).

other notable stipulation entered into by the Oversight Board in these Title III cases relating to
the conferral of derivative standing; namely, the stipulation appointing the Commonwealth
Agent and COFINA Agent to litigate and/or settle the Commonwealth-COFINA dispute.[27]  That
stipulation expressly provided that the Oversight Board did ***not*** give any consents under section
305 of PROMESA, except for the one paragraph of the stipulation conferring derivative
standing.[28]  The Stipulation here contains no such limitation.

30.    Moreover, the FOMB Objectors have known for some time now (and at least
since April 5, 2019) that the Committee would file a motion to pursue causes of actions beyond
avoidance actions (depending, of course, on the outcome of the discussions with respect to the
Stipulation).  It is true that the Court's Procedures Order (as initially entered on March 29, 2019)
only required the Oversight Board to disclose a preliminary and final list of avoidance actions.[29]
However, by April 5, 2019, and consistent with parties' discussions at the time, the Oversight
Board disclosed a preliminary list (which was of course produced pursuant to the Court's
Procedures Order) ***that was not limited to avoidance actions***.  The expanded scope of the
parties' meet and confer is further evidenced by several motions—filed ***jointly*** by the Oversight
Board, the Special Claims Committee, and the Committee—that sought to extend the briefing
schedule with respect to the Committee's "Section 926 Motion."

31.    While it is true that the "Section 926 Motion" was defined in the Committee's
procedures motion as a motion to appoint a trustee under section 926 of the Bankruptcy Code,[30]
the joint extension motions repeatedly described the "Section 926 Motion" in much broader

---

[27]   *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the
"Commonwealth-COFINA Stipulation") [Docket No. 996], Aug. 10, 2017.

[28]   *Id.* ¶ 11.

[29]   Procedures Order at 2.

[30]   Procedures Motion ¶ 3.

14

terms and thus as seeking relief beyond avoidance actions.  For example, the very first extension

motion described it as a motion "to be filed by the Committee with respect to *causes of action*

related to the Commonwealth"[31] and as a motion "seeking the appointment of a trustee to assert

*causes of action* related to the Commonwealth." [32]  Likewise, the Court's order granting the

extension request provided that the Committee's potential motion would cover "causes of action

related to the Commonwealth."[33]  Similarly, the extension motions noted that the meet and

confer process covered "the Debtors' potential causes of action"[34] and requested an extension of

the FOMB Objectors' time to submit its final list of "causes of action related to the

Commonwealth,"[35] which request was granted by the Court.[36]  In fact, on April 16, 2019, the

Court entered an order [Docket No. 6319], upon a *joint motion* by the Oversight Board, the

Special Claims Committee, and the Committee, approving a briefing schedule for a "Limited

Motion," which was defined in the joint motion as the Committee's motion "to be appointed to

pursue certain Commonwealth claims or causes of action, namely the Additional Claims (as

defined in paragraph 18 of the Stipulation)."[37]

---

[31]   *Urgent Joint Motion of Official Committee of Unsecured Creditors and Financial Oversight and Management Board, for Itself and Acting Through Its Special Claims Committee, to Extend Briefing Schedule With Respect to Potential Motion by Official Committee of Unsecured Creditors Seeking Appointment of Trustee to Pursue Causes of Action* ¶ 2 [Docket No. 6170] April 10, 2019 (the "First Extension Motion") (emphasis added).

[32]   *Id.* ¶ 3 (emphasis added).

[33]   *Order Extending Briefing Schedule with Respect to Potential Motion by Official Committee of Unsecured Creditors Seeking Appointment of Trustee to Pursue Causes of Action* ¶ 3 [Docket No. 6172] (the "First Extension Order").

[34]   First Extension Motion ¶ 2.

[35]   *Id.* ¶ 3.

[36]   First Extension Order ¶ 2.

[37]   *Urgent Joint Motion for (A) Expedited Consideration of Urgent Joint Motion for Entry of Order Approving Stipulation and Agreed Order by and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Debtor Causes of Action, (B) Pending Approval of Stipulation, Further Extension of Briefing Schedule With Respect to Potential Omnibus Motion of Official Committee of Unsecured Creditors to Be Appointed to Pursue Commonwealth Causes of Action, and (C) Approval of Briefing Schedule with Respect to Limited Motion by Official Committee of Unsecured Creditors to Be Appointed to Pursue Certain Commonwealth Claims* at 2 [Docket No. 6308].

32.     This all stands in contrast to the original Procedures Order, which was expressly limited to avoidance actions.  The FOMB Objectors thus fully understood that any potential motion by the Committee pursuant to the Stipulation had expanded beyond avoidance actions. At no time did the FOMB Objectors raise any objection to the Committee's filing of such a motion or reserve their rights under section 305 of PROMESA.

33.     Further, as detailed in the Stipulation, the Committee requested that the Special Claims Committee consent to the Committee being appointed as sole trustee/plaintiff with respect to the Additional Claims (*i.e.*, the *Commodore* consent that the Oversight Board had granted with respect to the appointment of the Committee as a co-plaintiff/co-trustee under the Stipulation).  Although the Special Claims Committee "declined to consent to this request,"[38] it clearly did so only for purposes of derivative standing, not because either it or the Oversight Board had an objection to the Committee filing the Motion.

34.     In short, the FOMB Objectors understood all along that the "Section 926 Motion" had grown to include claims beyond avoidance actions that are not subject to section 926 of the Bankruptcy Code.  Against that backdrop, the FOMB Objectors agreed to allow the Committee to bring a motion to pursue the Additional Claims.  This agreement constitutes consent (whether express or implied) for purposes of section 305 of PROMESA to have this Court hear and decide the Motion.  Accordingly, section 305 is no bar to the Court exercising its judicial power to hear and decide the merits of the Committee's Motion with respect to its request for derivative standing.

---

[38]    Stipulation ¶ 18.

      ii.     *Committee Is Not Asking Court To Interfere With Commonwealth Property*

35.     In any event, the Committee is not asking the Court to interfere with Commonwealth property. Section 305 of PROMESA prohibits this Court from interfering with a debtor's (i) "political or governmental powers," (ii) "property or revenues," or (iii) "use or enjoyment" of "any income producing property." None of these prohibitions concern property that the Commonwealth has effectively abandoned, like the Causes of Action that will disappear once the May 2, 2019 Cause of Action Deadline has passed. Nor is this anything like a debtor's release of claims (such as the releases granted by Debtors in connection with the GDB restructuring) because, in that case, the debtor is (presumably) receiving value for the release. In abandoning causes of action (by letting the statutes of limitation expire), the Commonwealth is receiving no consideration at all.

36.     Moreover, in the chapter 7 and chapter 11 contexts, once property is abandoned it is no longer property of the estate or subject to the automatic stay.[39] For that reason, property may be, under proper circumstances, abandoned to creditors.

37.     By granting the Committee derivative standing, the Court would merely be allowing the Committee to pursue claims that the Commonwealth has discarded. The Commonwealth cannot seriously claim a property interest in Causes of Action that, come May 3, 2019, will disappear forever.

---

[39]   *See In re Morales,* No. 09-06663 ESL, 2012 WL 527174, at *7 (Bankr. D.P.R. Feb. 15, 2012) ("After a property is abandoned and outside of the estate, the automatic stay is no longer applicable to it by operation of law."); *In re Vicente*, 446 B.R. 26, 29–30 (Bankr. D. Mass. 2011) (upon abandonment, "automatic stay imposed against the Debtor's Property by section 362(a)(2) and section 362(a)(3) terminated . . ."); *In re Hyde*, 334 B.R. 506, 512 (Bankr. D. Mass. 2005) "[Section 362(c)] provides that the stay against property terminates when the property is no longer property of the estate.").

## II.   Section 303 Of PROMESA Also Does Not Implicitly Limit Court's Judicial Power To Decide Motion

38.    AAFAF seeks to reserve its rights to contend that Movants' pursuit of the Causes of Action violates section 303 of PROMESA, which provides, in pertinent part, that:

> Subject to the limitations set forth in titles I and II of this Act, this title does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, . . .

39.    In the only decision to interpret the phrase "political or governmental powers" in section 903 of the Bankruptcy Code, from which PROMESA section 303 is derived, the bankruptcy court held that "[the] 'political or governmental' powers [reserved to the debtor] relate to basic requirements of government and political polity and exclude financial and employment relations."[40]  Thus, the "political or governmental powers" referenced in section 903 of the Bankruptcy Code and section 303 of PROMESA cannot extend, for example, to "financial relations between the state and its municipalities,"[41] actions of underwriters in connection with debt issuances, or former GDB officers and directors who acted against the best interests of the Commonwealth.

## III.   Bankruptcy Code Section 926 Does Not Divest Court Of Power To Confer Derivative Standing

40.    The FOMB Objectors and AAFAF argue that, in PROMESA as in chapter 9, section 926 of the Bankruptcy Code constitutes the sole basis for derivative standing.  This is wrong.  In fact, the applicability of section 926 in a Title III case establishes, as a first principle, that the power of the Puerto Rico Government and the Oversight Board over a Title III Debtor's property is not absolute and not inherently incompatible with derivative standing, as the Court

---

[40]    *See In re City of Stockton*, 526 B.R. 35, 54 (Bankr. E.D. Cal. 2015) (subsequent history omitted).

[41]    *Id.*

can appoint a trustee to pursue avoidance claims at the request of a creditor.  Furthermore,

section 926 contemplates that a trustee may be appointed to pursue an avoidance claim that is

opposed by the debtor.[42]

41.     Moreover, section 926 does not preclude the Court from conferring derivative

standing on a creditor or creditors' committee in the exercise of its equitable powers.  The causes

of action listed in section 926 are not inherently different from, but, in fact, are interlinked with

the additional causes of action the Committee is seeking to pursue on the Commonwealth's

behalf.  And just as a court has the discretion to grant or refuse a request for the appointment of a

trustee under section 926, this Court has similar discretion to grant or refuse a request for

derivative standing.  Indeed, this Court previously conferred, by stipulation, derivative standing

in the Title III context when it authorized the Committee to act on the Commonwealth's behalf in

the Commonwealth-COFINA dispute, and the FOMB Objectors are proposing to do exactly the

same through the Stipulation.[43]  Both of these stipulations effectively preclude the FOMB

Objectors from arguing that section 926 is the exclusive "portal" for derivative standing.

42.     The FOMB Objectors and AAFAF argue, however, that section 926 should be

interpreted as an example of the principle of *expressio unius est exclusio alterius*—that because

Congress incorporated section 926 into PROMESA, it must have intended to strip the Title III

court of the equitable power a bankruptcy court would otherwise have to grant derivative

---

[42]   *See* 6 Collier on Bankruptcy ¶ 926.02 (16th ed. 2018) ("The reason for section 926(a) derives from the possible
reluctance of a debtor to bring an action . . . [which] may arise from the fact that . . . the debtor actually favors
the transfer rather than opposes it.").

[43]   *See* Commonwealth-COFINA Stipulation ¶ 2.  Contrary to the FOMB Objectors' argument, it is simply
irrelevant that the derivative standing in that instance was based on the consent of the Oversight Board.  The
equitable remedy of derivative standing has been granted by the Court—notwithstanding section 926.  There is
no principled reason why derivative standing should not be available in the absence of such consent, as long as
section 305 poses no bar (as is the case when, as here, the Oversight Board consents to the Court hearing and
deciding a motion for derivative standing).

standing in appropriate circumstances.[44]  But where this principle of statutory construction

applies, it is merely "'a product of logic and common sense,' properly applied *only when it*

*makes sense as a matter of legislative purpose*."[45]  As the court in *Longview Fibre Co. v.*

*Rasmussen* explained:

> [The] principle describes what we usually mean by a particular
> manner of expression, but does not prescribe how we must
> interpret a phrase once written.  Understood as a descriptive
> generalization about language rather than a prescriptive rule of
> construction, the maxim usefully describes a common syntactical
> implication.  'My children are Jonathan, Rebecca and Seth' means
> 'none of my children are Samuel.'  Sometimes there is no negative
> pregnant: 'get milk, bread, peanut butter and eggs at the grocery'
> probably does not mean 'do not get ice cream.'[46]

Applying the ***maxim*** to deprive courts of the power to grant a creditors' committee derivative

standing when equity requires would make no sense.

43.    Finally, the FOMB Objectors argue that the absence of precedent for non-926

derivative standing in the chapter 9 context is of great significance.[47]  But as the Court is well

aware, relative to chapters 7 and 11, there have been very few chapter 9 cases in which the issue

might have arisen.  And while the Committee is unaware of any such precedent (obviously other

---

[44]    AAFAF Obj. ⁋ 14; Oversight Board's GDB Obj. ⁋ 42.

[45]    *Longview Fibre v. Rasmussen*, 980 F.2d 1307, 1312-13 (9th Cir. 1992) (emphasis added).  *See also Herman &
MacLean v. Huddleston*, 459 U.S. 375, 387 n. 23 (1983) (rejecting application of the *expressio unius* principle
and holding that the availability of an express remedy under one section of the Securities Act of 1933 did not
preclude maintenance of an action under another section of act in light of the act's purposes); *Bailey v. Federal
Intermediate Credit Bank*, 788 F.2d 498, 500 (8th Cir. 1986) (holding that the list in 12 U.S.C. § 2072 of 21
powers vested in intermediate credit banks was not exclusive; banks also had the implicit power to remove the
officer of a production credit association), *cert. denied*, 479 U.S. 915 (1986); *State of Illinois, Dep't of Public
Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983) ("Not every silence is pregnant"; holding that an agency's
decision of disallowance was subject to judicial review in district court even though Congress said nothing
about judicial review in the statute section relating to disallowances while specifically providing for appellate
review in another section relating to agency determinations of plan nonconformity); *Chicago Title Ins. Co. v.
Sherred Village Ass'n*, 544 F.Supp. 320, 326 (D. Me. 1982) (holding that the enumeration of certain prior
liens—taxes, assessments, water rates—in 12 U.S.C. § 1713(g) did not indicate that Congress intended for other
unspecified prior liens go unrecognized), *aff'd*, 708 F.2d 804 (1st Cir.1983).

[46]    *Longview Fibre*, 980 F.2d at 1313.

[47]    Oversight Board's GDB Obj. ⁋ 31.

than the Commonwealth-COFINA stipulation and the Stipulation), it is also unaware of any

precedent—and the FOMB Objectors and AAFAF cite none—holding that a bankruptcy court

has no equitable power to confer derivative standing apart from section 926.  The absence of

case law is just that—an absence; not an indication that such relief is not available.

## IV.   Oversight Board Is Abandoning Colorable Causes Of Action With Potentially Significant Value To Commonwealth And Its Creditors

44.    This Court can grant the Committee standing to pursue the Causes of Action

because the FOMB Objectors "unjustifiably failed to bring suit or abused [their] discretion in not

suing" the potential defendants identified by the Committee and the FOMB Objectors during

their meet and confer sessions.[48]

45.    The FOMB Objectors agree with the Committee that (as they put it) "very bad

things happened with some past issuances."[49]  That is why, they say, they have "committed, in

writing, to bring claims against dozens of professionals for their actions relating to the 2014 GO

Bonds and other debt issuances."[50]  The FOMB Objectors then proceed to construct a strawman

version of the causes of action they are abandoning.  They purport to read the Motion as

implying that "there may be valuable claims relating to material false disclosures in connection

with debt issuances by the Commonwealth."[51]  "All told," as they would have it, "the Motion

loosely alleges fraud."[52]  This allows them to feign perplexity at "how the Commonwealth would

possess such claims, which seem, instead, to belong to purchasers of the securities at issue." [53]

---

[48]   *See Commodore Int'l*, 262 F. 3d at 99 (quoting *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985)).

[49]   FOMB Obj. ¶ 64.

[50]   *Id*. ¶ 41.

[51]   *Id*. ¶ 47.

[52]   *Id*. ¶ 43.

[53]   *Id*. ¶ 42.

46.     Going one step farther in this misdirection, they contend that, "stripped of its
rhetoric, the allegations set forth by the Committee do not rise to the level of a fraud claim,"
pointing out that, according to news reports, the SEC had dropped an investigation into whether
Puerto Rico officials and the underwriters of the 2014 GO Bond issuance misled investors as to
the Commonwealth's financial picture.[54]  This, of course, has nothing to do with the any Causes
of Action belonging to the Commonwealth.  Indeed, for example, the failure to disclose the
retention of bankruptcy advisors while at the same time conducting a public offering for bonds
may or may not create SEC disclosure liability issues, but such failure to disclose could also
constitute a badge of fraud for fraudulent transfer purposes.

47.     The Objectors also purport to read the Motion as implying that "GDB itself
should be a target of litigation, notwithstanding that GDB has been released of all liability."[55]
Having challenged the GDB's restructuring, including on the issue of releases, the Committee is
obviously well aware that GDB has been released of any liability to the Commonwealth.[56]
Given the Committee's obvious awareness of this fact, it is inappropriate for the Objectors to
pretend that they read the Committee's Motion as implying that claims should be brought against
GDB itself.  The Objectors fail to acknowledge that these claims, although released against
GDB, can also form the basis of claims against third parties.  These are described in the outline
attached hereto as **Exhibit D**.

48.     Indeed, the Committee was explicit in the Motion that such Causes of Action,
which belong to the Commonwealth, not bondholders (which goes without saying), would be

---

[54]   *Id.* ¶ 43.

[55]   *Id.* ¶ 44.

[56]   *See, e.g.*, *Complaint of Official Committee of Unsecured Creditors of All Title III Debtors, (Other than
COFINA) for Declaratory Judgment with Respect to GDB Restructuring*, Sept. 6, 2018, [Docket No. 1 in Case
No. 18-00101-LTS].

asserted against GDB officers and directors, not GDB itself, as well as against underwriters and potentially other parties involved in the 2014 GO Bond issuance.[57]

49.     Granted, the Motion was unavoidably preliminary (given the Oversight Board's very recent change in position) in describing the basis for Causes of Action other than those the Objectors have committed to bring.  The Committee is now able to provide a more specific, but by no means definitive, description of these Causes of Action, which go well beyond those on the FOMB Objectors' lists.  ***The FOMB Objectors are bringing no Causes of Action against GDB officers and directors,*** ███████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████.[58]  By not bringing any Causes of Action against the GDB officers and directors who, as the FOMB Objectors agree, were running the show when "very bad things happened," the FOMB Objectors are effectively granting them the very releases that the FOMB tried to grant them as part of the GDB restructuring, including releases of individuals who moved through the "revolving door" between GDB and various banks—***two of whom are currently members of the Oversight Board***.  A list of some of these individuals is attached hereto as **Exhibit E**.

A.     Commonwealth Causes Of Action Against GDB Officers And Directors

50.     Based on its investigation to date, the Committee believes that the Commonwealth has a good faith basis to bring causes of action for breach of fiduciary duty against the GDB officers and directors who orchestrated the 2014 GO Bond offering.

---

[57]   Motion ¶ 65.

[58]   In that regard, it is worth noting that the FOMB Objectors have, to date, only shown to the Court and parties in interest a list of names of defendants labeled with various theories of liability—nothing more.

51.     There can be no dispute that GDB's officers and directors owe fiduciary duties to the Commonwealth and to the people of Puerto Rico.  Before its duties were assumed by AAFAF in April 2016, GDB served as the Commonwealth's financial advisor, including with respect to the Commonwealth's GO bond offerings.[59]  Accordingly, GDB occupied a position of trust and confidence vis-à-vis the Commonwealth and owed the Commonwealth concomitant fiduciary duties, as did GDB's officers and directors.  Presumably on account of its financial advisory role, GDB was paid an undisclosed fee in connection with the 2014 GO Bond offering.

52.     In addition, as AAFAF explained in a June 24, 2017 informative motion, "Puerto Rico's public officials and AAFAF [as GDB's successor] are public servants whose ultimate and most sacred duties are to the health, safety and welfare of the people of Puerto Rico."[60]  Thus, in the words of AAFAF, "[p]ublic officials [like GDB officers and directors] generally have fiduciary duties to the public to serve with the highest fidelity and make decisions in the public's best interest."[61]

53.     As set forth in the Motion,[62] there is substantial evidence that GDB's officers and directors breached their duties of care and loyalty to the Commonwealth and the people of Puerto Rico by orchestrating the issuance of the 2014 GO Bonds under circumstances where (i) GDB had already engaged bankruptcy and restructuring firms, (ii) $1.6 billion of the 2014 GO Bond proceeds were used to repay debts owed to GDB by the Commonwealth and the PBA, which protected the GDB's officers and directors from potential criminal liability for allowing GDB to

---

[59]   *See AAFAF's Informative Motion on Behalf of the Debtor Entities Regarding Governance and Conflict-of-Interest Issues*, ¶ 1, June 24, 2017 [Docket No. 451].

[60]   *Id*. 1-2.

[61]   *Id*. ¶ 8.  Because GDB officers and directors owe fiduciary duties to the people of Puerto Rico and not just to the Commonwealth itself, causes of action for breach of those duties can be also brought by the Commonwealth *in parens patriae*.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 608 (1982) (holding that the Commonwealth had the power to bring a *parens patriae* action on behalf of its residents).

[62]   Motion ¶¶ 65-77.

accept deposits while insolvent, and (iii) hundreds of millions of dollars of proceeds were used to eliminate the exposure of underwriters by refunding previously issued GO bonds owned by the underwriters or their affiliates (or with respect to which they provided letters of credit or a liquidity facility) and by paying termination amounts on swaps they had entered into with the Commonwealth in connection with those bonds.[63]

54.     Indeed, as noted above, the Special Claims Committee's final claims list indicated that it would be asserting causes of action for deepening insolvency with respect to GO bond issuances going back as far as 2009.  If, as the Special Claims Committee and its counsel apparently concluded, the Commonwealth was already insolvent at that time, it is impossible to believe that GDB's officers and directors did not know that the 2014 GO Bond issuance would only deepen the Commonwealth's insolvency. ███████████████████████████ ███████████████████████████████

55.     Moreover, in using 2014 GO Bond proceeds to pay off GDB lines of credit extended to the Commonwealth and the PBA, GDB was placing the Commonwealth deeper into insolvency while paying off the debt of another entity (the PBA), which was also insolvent insofar as the Commonwealth is virtually its exclusive source of revenue.  But even the repayment of an antecedent debt of the Commonwealth itself, if done in contemplation of bankruptcy, is "an element upon which fraud [in the transfer of debtor property] may be predicated."[64]

---

[63]   *Id.* ¶ 75.

[64]   *Dean v. Davis*, 242 U.S. 438, 444 (1917) ("[W]here the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element up which fraud may be predicated.  The *fact* that the money advanced is actually used to pay a debt does not necessarily establish good faith"; affirming lower court's decisions that the debtor mortgaged his property with the purpose and intent of hindering, delaying, or defrauding his creditors).

B.    Commonwealth Causes Of Action Against Underwriters

56.    Just one week ago, in response to the FOMB Objectors' sudden about-face, the Committee retained special counsel to focus on Causes of Action against underwriters and their affiliates.  Building on the analysis undertaken by the Committee to date, counsel has already identified, in a short time, a number of Causes of Action as described in **Exhibit D** hereto—and more than a week remains before a complaint must be filed.

C.    *In Pari Delicto* And Statute Of Limitations Are Not "Strong" Defenses

57.    The FOMB Objectors criticize the Committee for "[not] mention[ing] that any of the targets of its theories might have valid defenses that were discussed in detail by the Committee and the SCC during settlement negotiations."[65]  Purportedly reluctant to preview their arguments for "analogously situated defendants," the FOMB Objectors hint that the potential defenses purportedly discussed "in detail" with the Committee "may be in the nature of *in pari delicto* and statute of limitations."[66]  They then instruct the Committee on its "ethical duties to consider the viability of these defenses before expending Commonwealth resources prosecuting claims."[67]  Interestingly, the FOMB Objectors are silent as to whether some of the causes of action they intend to bring could be faced with similar defenses.

58.    The Committee has considered these potential defenses and believes that, to the extent they apply at all, they do not constitute "strong defenses" to the causes of action the Committee proposes to bring.

---

[65]    FOMB Obj. ¶ 44.

[66]    *Id*. ¶ 65.

[67]    *Id*.

26

59.     The term *in pari delicto* means "[e]qually at fault."[68]  As stated, for example, in the Official Statement for the 2014 GO Bonds, GDB acted as the Commonwealth's "financial advisor" with respect to its GO bond offerings.  Thus, GDB and its officers and directors occupied a position of trust and confidence with respect to the Commonwealth, which relied on their authority and expertise in financial matters.  Almost by definition, the Commonwealth could not be at equal or greater fault for the "very bad things that happened" with respect to the 2014 GO Bond issuance, especially when the circumstances suggest that the issuance was orchestrated by GDB's officers and directors to prop up GDB's balance sheet and de-risk their selected underwriters through fraudulent transfers of the bond proceeds.

60.     Furthermore, Puerto Rico courts treat *in pari delicto* as a type of equitable defense similar to unclean hands.[69]  These same courts hold that equitable defenses generally cannot be asserted against the Commonwealth, particularly in cases involving public funds, as this case obviously does.[70]

61.     Even if *in pari delicto* could be asserted against the government, to prevail on *in pari delicto* under Puerto Rico law, a defendant must show intentional fraud.[71]  There is no evidence that the Commonwealth defrauded GDB's officers and directors,[72] and an intent to hinder or delay does not give rise to *in pari delicto* issues.

---

[68]   Black's Law Dictionary (10th ed. 2014).

[69]   *See Cruz v. Lopez*, 17 D.P.R. 42, 47 (1911).

[70]   *See Quiles v. Del Valle*, 167 D.P.R. 458, 473 (2006).

[71]   *González v. Ortiz*, 17 D.P.R. 593 (1911) (requiring showing of fraud for *in pari delicto* defense).

[72]   In the few cases that have applied *in pari delicto* to instrumentalities of the Commonwealth (but not the Commonwealth itself), the instrumentalities were acting in a purely private, commercial capacity.  *See, e.g.*, *Transystem v Autoridad de los Puertos de Puerto Rico*, KLAN0901326, 2009 PR App. LEXIS 3952 (P.R. Appellate Tribunal, Oct. 20, 2009) (concerning an invalid contract between Transystem and the Port Authority of Puerto Rico); *Puerto Rico Elec. Power Auth. v. Vitol, Inc.*, No. CV 09-2242 (DRD), 2015 WL 13547856, at *3 (D.P.R. Aug. 26, 2015) (concerning an effort by PREPA to rescind or nullify certain contracts by Vitol).

62.     With regard to statutes of limitation, PROMESA incorporates section 108(a) of the Bankruptcy Code, which provides that "[i]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief [*i.e.*, the petition date]."  Accordingly, the Commonwealth has only until May 2, 2019 (the day before the two year-year anniversary of the petition date) to bring any Cause of Action that was not already time-barred when the petition was filed (unless the applicable limitation period extends beyond that date).  That is why time has been of the essence—a concept that seems to have escaped the FOMB Objectors and some of the other Objectors.[73]

63.     The 2014 GO Bonds were issued on March 17, 2014, just over three years prior to the petition date.  Thus, if the limitation period applicable to a particular claim is longer than three years, the claim was not time-barred as of the petition date and the Commonwealth has until the Causes of Action Deadline to bring it.  But even if the limitation period applicable to a particular claim is three years or less, it was tolled under the civil law doctrine of *contra non valentem agree no currit prascriptio*, which is recognized in Puerto Rico and which holds that statutes of limitation do not run against a party unable to act.[74]

---

[73]   The Committee specifically mentioned the section 108(a) limitations period in its reply [Docket No. 6081] in support of the Procedures Motion as providing a basis for the relief sought by the Procedures Motion.

[74]   *Rodriguez-Aviles v. Rodriguez-Beruff*, 117 D.P.R. 616, 620 (1986), *citing* III R.M. Salvat, *Tratado de derecho civil argentino; Obligaciones en general* 437, Buenos Aires, Tip. Ed. Argentina (6th ed. 1956) (holding that statutes of limitations do not run against minors).

64.     In Louisiana, the principal civil law jurisdiction in the United States, and one to which Puerto Rico courts often turn, one federal court has applied the *contra non valentem* doctrine to preserve claims for breaches of fiduciary duty that would otherwise have been barred by the statute of limitations.[75]  As explained in that case, *contra non valentem* tolled the statute of limitations for a bank when it is unable to act against its individual board members.[76]

65.     The doctrine of *contra non valentem* is thus similar to the federal common law doctrine of "adverse domination," which "reserves the viability of cases against the board members until the alleged malefactors were no longer in control of the board."[77]  While courts in Puerto Rico have not themselves recognized the adverse domination doctrine, they have noted that "the fundamental concerns underlying the adverse domination doctrine are not foreign to Puerto Rico law."[78]

66.     The officers and directors of GDB are political appointees of the Puerto Rico Governor.[79]  Just as a bank or corporation cannot be expected to sue its officers and directors when they control the board, until the Title III cases were commenced and the FOMB assumed the role of trustee, it would be completely unrealistic to expect that causes of action would be brought against GDB's officers and directors or their selected underwriters.  Thus, under the *contra non valentem* doctrine, any applicable limitations period was tolled at least until 2017.

---

[75]   *See FDIC v. Caplan*, 874 F.Supp. 741 (1995).

[76]   *See id*. at 747.  The doctrine of *contra non valentem* is thus similar to the federal common law doctrine of "adverse domination," which "reserves the viability of cases against the board members until the alleged malefactors were no longer in control of the board."  *See FDIC*, 874 F.Supp. at 745.  While courts in Puerto Rico have not themselves recognized the adverse domination doctrine, they have noted that "the fundamental concerns underlying the adverse domination doctrine are not foreign to Puerto Rico law."  *FDIC v. Arrillaga Torrens*, 212 F.Supp.3d 312, 334 (D.P.R. 2016).

[77]   *See FDIC*, 874 F.Supp. at 745.

[78]   *FDIC v. Arrillaga Torrens*, 212 F. Supp. 3d at 334.

[79]   7 L.P.R.A. § 552.

D.    Collectability Is Not A Serious Concern

67.    Finally, the FOMB Objectors take issue with the fact that "[n]owhere in the
Motion does the Committee state that it believes the Commonwealth would have an ability to
collect material amounts in damages from any of its contemplated targets, or that revenge is an
appropriate motive for a bankruptcy trustee to expend estate resources in litigation."[80]  The
notion that the Committee is acting out of "revenge" does not merit a response, although the
anger of Puerto Rico residents over the lack accountability for the "very bad things that
happened" is certainly justified.

68.    As for collectability, the FOMB Objector's concerns ring hollow.  It is the
Committee's understanding that GDB's officers and directors are the beneficiaries of customary
insurance policies that would cover any judgment (up to policy limits).  For years, the
Committee has been attempting to obtain the policies from AAFAF and through its Rule 2004
discovery requests, but to no avail.  With regard to the GO bond underwriters, which are major
investment banks, the Committee is not aware of any reason for concern, and the FOMB
Objectors do not specify any.

69.    Thus, the FOMB Objectors' are unjustifiably refusing to pursue valuable Causes
of Action which offer a substantial recovery for the Commonwealth's Creditors.  Accordingly,
the Objections should be overruled and the Motion granted.

E.    Objections To Movants' Requests For Kobre & Kim Report Materials Are
Misguided And Without Merit

70.    AAFAF and the FOMB Objectors take issue with the Committee's request for
greater access to Kobre & Kim Report documents.  Their objections should be overruled.  As an
initial matter, it is not true that the Committee already has access to these materials.  While the

---

[80]    FOMB Obj. ¶ 45.

Committee does have access to the report itself and some related documents, it by no means has

full access.  In particular, the Committee has never received Kobre & Kim's interview notes,

which may be key in developing Causes of Action against certain individuals and entities.

Indeed, as noted in the Committee's Informative Motion, dated September 5, 2018, issued after

the release of the Kobre & Kim report, the report is replete with reference to statements made by

witnesses, without identifying such witnesses; this is exactly the type of source material that the

Committee needs to be able to access.

71.     It is also important to recognize that the Committee is only seeking access to these

documents in the event the Court also grants the Committee's request for standing to pursue the

Causes of Action.  If the Committee is granted such standing, it would use the requested

documents to help formulate claims.  It is difficult to understand why the Objectors would not be

supportive of this request.  If the Committee is granted standing to pursue the Causes of Action,

then all parties in interest, the Objectors included, should want the Committee to have as much

supporting documentation as possible to maximize its chances of success.

72.     Accordingly, if the Court grants the Committee standing to pursue the Causes of

Action, it should also order access to the requested Kobre & Kim documents.

## **NOTICE**

73.     Notice of this Reply has been provided to the following entities, or their counsel,

if known: (i) the U.S. Trustee; (ii) the Office of the United State Attorney for the District of

Puerto Rico; (iii) the Oversight Board; (iv) AAFAF; (v) the official committee of retirees; (vi)

the insurers of the bonds issued or guaranteed by the Debtors; (vii) counsel to certain ad hoc

groups of holders of bonds issued or guaranteed by the Debtors; (viii) all parties that filed

Objections to the Motion and (ix) all parties that have filed a notice of appearance in the above-

captioned Title III cases.

WHEREFORE, the Movants respectfully request that this Court grant the Motion, enter

an order substantially in the form attached as Exhibit A to the Motion granting the relief

requested, and grant such other and further relief as this Court deems just and proper.


Dated:  April 22, 2019

*/s/ Luc A. Despins*
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
nicholasbassett@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*[81]

- and -

*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*

---

[81]   Paul Hastings LLP does not represent the Committee with respect to the statements in this Reply regarding underwriters or their affiliates.

*/s/ John Arrastia*
John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Proposed Special Counsel to the Official Committee of
Unsecured Creditors with Respect to Claims Against
Underwriters and Their Affiliates*


*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Special Counsel to the Official Committee of
Unsecured Creditors with Respect to Claims Against
Underwriters and Their Affiliates*

/s/ John Arrastia
John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Counsel to Tradewinds Energy Barceloneta, LLC*


/s/ Javier Vilariño
Javier Vilariño, Esq. USDC - PR 223503
VILARIÑO & ASSOCIATES, LLC
1519 Ponce de Leon Ave
First Bank Building, Suite 513
San Juan, PR 00909
Tel: 787-565-9894
jvilarino@vilarinolaw.com

*Local Counsel to Tradewinds Energy Barceloneta,
LLC*


/s/ Peter D. DeChiara
Richard M. Seltzer, Esq.
Peter D. DeChiara, Esq.
Marie B. Hahn, Esq.
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
Tel.: (212) 563-4100
Fax: (646) 473-8216
rseltzer@cwsny.com
pdechiara@cwsny.com
mhahn@cwsny.com

*Counsel to the Service Employees International Union*


34

*/s/ Miguael Simonet-Sierra*
Miguel Simonet-Sierra, Esq.
MONSERRATE, SIMONET & GIERBOLINI, LLC
101 Ave. San Patricio
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
Tel.: (787) 620-5300
msimonet@msglawpr.com

*Local Counsel to the Service Employees International
Union*


*/s/ Juan C. Salichs*
SALICHS POU & ASSOCIATES PSC
P.O. Box 195553
San Juan, PR 00919-5553
Attn: Juan C. Salichs
USDC-PR Bar No. 211610
Telephone: 787-449-6000
Email: jsalichs@splawpr.com

*Counsel to Doral Financial Corporation acting
through Doral Financial Creditors' Trust*

35