**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>            Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>           Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS |

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ 1

TABLE OF AUTHORITIES ..................................................................................... 2

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

I.      ERS. ............................................................................................................... 3

II.     The ERS Bonds. ............................................................................................ 4

III.    The Commonwealth Decries the ERS Bonds as "Illegal". ....................... 10

IV.     ERS Commences A Title III Proceeding. .................................................. 11

RELIEF REQUESTED ........................................................................................... 11

BASIS FOR RELIEF REQUESTED ..................................................................... 12

I.      The ERS Bondholders Cannot Assert Claims Against the Commonwealth In Connection
        With the ERS Bonds. ................................................................................... 12

II.     The ERS Bondholders Improperly Assert Post-Petition Claims Against ERS And the
        Commonwealth. ........................................................................................... 27

III.    The 2008 ERS Bond Issuance Was *Ultra Vires*. ...................................... 28

        i.     The Term "Direct Placement" Excludes Bond Offerings Issued Through an
               Underwriter to the General Public. ................................................... 29

        ii.    Interpreting "Direct Placement" to Exclude Public Offerings is Consistent with the
               Purpose of the 1988 Amendment ...................................................... 34

IV.     Section 8-202 of the Uniform Commercial Code is Not Applicable to the ERS
        Bonds. ........................................................................................................... 35

V.      The ERS Bondholders Have No Enforceable Claims In Connection With The
        ERS Bonds. .................................................................................................. 38

VI.     The Court Should Disallow The ERS Bondholders' Claims To The Extent That They
        Allege A Security Interest In The Property Of the Commonwealth And Other
        Instrumentalities And Subdivisions, In ERS Property Other Than Pre-Petition Employer
        Contributions Or In Postpetition Assets. .................................................... 41

        i.     Employer Contributions Are Not "Special Revenues." ..................... 42

        ii.    Section 552(b) Is Inapplicable To The ERS' Bondholders Security Interest. ........... 45

CONCLUSION ....................................................................................................... 47

NOTICE .................................................................................................................. 48

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Allegre Villa v. United States*,
   60 Fed. Cl. 11 (Fed. Cl. 2004) .................................................................................20

*Anthony v. Jasper County*,
   101 U.S. 693 (1879) ................................................................................................36

*Bd. of Cnty. Sup'rs of Prince William Cnty. Va. v. United States*,
   48 F.3d 520 (Fed. Cir. 1995) ..................................................................................28

*Beecham v. United States*,
   511 U.S. 368 (1994) ................................................................................................33

*Botany Worsted Mills v. United States*,
   278 U.S. 282 (1929) ................................................................................................29

*Buchanan v. City of Litchfield*,
   102 U.S. 278 (1880) ................................................................................................38

*Buffalo Teachers Fed'n v. Tobe*,
   464 F.3d 362 (2d Cir. 2006) ...................................................................................21

*Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*,
   564 F. Supp. 1425 (W.D. Va. 1983), *aff'd*, 740 F.2d 961 (4th Cir. 1984) .............39

*California Nat. Bank v. Kennedy*,
   167 U.S. 362 (1897) ................................................................................................28

*Cherry v. Mayor & City Council of Baltimore City*,
   762 F.3d 366 (4th Cir. 2014) ..................................................................................23

*Citizens' Savings Bank v. Town of Greenburgh*,
   173 N.Y. 215 (1903) ...........................................................................................36, 37

*Claybrook v. Rockingham County Commissioners*,
   114 N.C. 453, 19 S.E. 593 (1894) ...........................................................................36

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) ..................................................................................37

*DeCosta v. Allstate Ins. Co.*,
   730 F.3d 76 (1st Cir. 2013) ......................................................................................40

*District Tp. Of Doon v. Cummins*,
   142 U.S. 366 (1892)................................................................................39

*Dixon County v. Field*,
   111 U.S. 83 (1884)..........................................................................39, 40

*Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations*,
   643 F.3d 16 (1st Cir. 2011)..................................................................20

*Fed. Crop Ins. Corp. v. Merrill*,
   332 U.S. 380 (1947)...........................................................................40

*Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*,
   604 F.3d 7 (1st Cir. 2010).................................................................21, 22

*Fogel v. Zell*,
   221 F.3d 955 (7th Cir. 2000) .............................................................27

*Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*,
   863 F.3d 718 (7th Cir. 2017) ..............................................................23

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984)..........................................................................21, 22

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984).............................................................................40

*Hornbuckle v. Toombs*,
   85 U.S. 648 (1873).............................................................................17

*In re Bronikowski*,
   569 B.R. 48 (Bankr. W.D.N.C. 2017)................................................19

*In re Calore Exp. Co., Inc.*,
   288 F. 3d 22 (1st Cir. 2002)...............................................................40

*In re Cnty. of Orange*,
   31 F. Supp. 2d 768 (C.D. Cal. 1998) .................................................28

*In re Cross Baking Co., Inc.*,
   818 F.2d 1027 (1st Cir. 1987).............................................................42

*In re Cty. of Orange*,
   179 B.R. 185 (Bankr. C.D. Cal. 1995)..........................................42, 45, 46, 47

*In re Green Corp.*,
   154 B.R. 819 (Bankr. D. Me. 1993)....................................................42

*In re Gucci*,
    126 F.3d 380 (2d Cir. 1997)...................................................................14

*In re Jefferson Cty.*,
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ..................................................44

*In re Mintz*,
    192 B.R. 313 (Bankr. D. Mass. 1996) ...................................................47

*In re Miranda Soto*,
    667 F.2d 235 (1st Cir. 1981).................................................................47

*In re Ortega*,
    No. 14-06449, 2014 WL 5488326 (Bankr. D.P.R. Oct. 29, 2014) .........19

*In re Pick & Save, Inc.*,
    478 B.R. 110 (Bankr. D.P.R. 2012)........................................................14

*In re Richmond Unified School District*,
    133 B.R. 221 (Bankr. N.D. Cal. 1991) .............................................17, 40

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961).............................................................................33

*Lacoquille Inv. Co. v. Town of Manalapan (In re Lacoquille Inv. Co.)*,
    44 B.R. 731 (Bankr. S.D. Fla.)..............................................................18

*Lagos v. U.S.*,
    138 S. Ct. 1684 (2018)....................................................................33, 34

*Litchfield v. Ballou*,
    114 U.S. 190 (1892).............................................................................39

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934).............................................................................47

*Lyda v. City of Detroit (In re City of Detroit)*,
    841 F.3d 684 (6th Cir. 2016) ..........................................................15, 16

*Maine Med. Ctr. v. Burwell*,
    841 F.3d 10 (1st Cir. 2016)...................................................................40

*Masso-Torrellas v. Municipality of Toa Alta*,
    845 F.3d 461 (1st Cir. 2017).................................................................20

*Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete*,
    125 F.3d 9 (1st Cir. 1997)................................................................24, 25

iv

*National Cas. Co. v. First State Ins. Group*,
    430 F.3d 492 (1st Cir. 2005) ................................................................ passim

*Office of Personnel Management v. Richmond*,
    496 U.S. 414 (1990) ......................................................................... 39

*Parkview Adventist Med. Ctr. v. United States*,
    842 F.3d 757 (1st Cir. 2016) ............................................................. 18

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
    91 F. Supp.3d 267, 290 (D.P.R. 2015) ................................................. 39

*Puerto Rico v. Sanchez Valle*,
    136 S. Ct. 1863 (2016) ...................................................................... 17

*Redondo Constr. Corp. v. Izquierdo*,
    662 F.3d 42 (1st Cir. 2011) ............................................................... 23

*Rivera Feliciano v. Sistema de Retiro del E.L.A., Assoc.*,
    111 B.R. 380 (Bankr. D.P.R. 1990) ..................................................... 47

*Ropico, Inc. v. City of New York*,
    425 F. Supp. 970 (S.D.N.Y. 1976) ...................................................... 21

*Seaver v. Klein-Swanson (In re Klein-Swanson)*,
    488 B.R. 628 (B.A.P. 8th Cir. 2013.) ................................................... 19

*Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project,
    Inc.*,
    135 S. Ct. 2507 (2015) ...................................................................... 33

*Town of Belleair v. Olds*,
    127 F.2d 838 (5th Cir. 1942) ............................................................. 39

*Town of Bloomfield v. Charter Oak Nat. Bank*,
    121 U.S. 121 (1887) ......................................................................... 28

*Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*,
    549 U.S. 443 (2007) .................................................................... 12, 47

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ........................................................................... 33

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*,
    633 F.3d 37, 41 (1st Cir. 2011) ...................................................... 22, 24

*Van Diest Supply Co. v. Shelby County State Bank*,
    425 F.3d 437 (7th Cir. 2005) ............................................................. 41

*Vt. Dep't of Pub. Serv. v. Mass. Mun. Wholesale Elec. Co.*,
 151 Vt. 73 (1988) ................................................................................................39

*Wein v. Carey*,
 41 N.Y.2d 498 (1977) ..................................................................................36, 38

*Westernbank P.R. v. Kachkar*,
 No. 07-1606, 2009 WL 6337949 (D.P.R. Dec. 10, 2009) ................................26, 27

*Whitman v. American Trucking Ass'ns*,
 531 U.S. 457 (2001) ............................................................................................32

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*,
 473 U.S. 172 (1985) ............................................................................................19

*Wiscovitch Rentas v. Molina González (In re Morales García)*,
 507 B.R. 32 (B.A.P. 1st Cir. 2014) ................................................................19, 40

*Yates v. U.S.*,
 135 S. Ct. 1074 (2015) ........................................................................................33

STATUTES

2 L.P.R.A. § 254 ...........................................................................................................5

3 L.P.R.A. §787(f) ......................................................................................................46

3 L.P.R.A. §§ 787f, 787g ..............................................................................................4

3 L.P.R.A. §§ 787q .......................................................................................................4

19 L.P.R.A. § 2265(b)(2) ............................................................................................41

31 L.P.R.A. § 13 ...........................................................................................................5

31 L.P.R.A. §§ 15-16 ..................................................................................................32

31 L.P.R.A. § 16 .........................................................................................................29

31 L.P.R.A. § 19 .........................................................................................................34

11 U.S.C. §362 ...........................................................................................................15

11 U.S.C. § 362(a)(3) .................................................................................................19

11 U.S.C. § 362(b) ......................................................................................................18

11 U.S.C. § 506(a)(1) .................................................................................................46

11 U.S.C. § 902(2) ............................................................................................43

11 U.S.C. § 928(a) ............................................................................................42

28 U.S.C. § 1491 ..............................................................................................19

48 U.S.C. §2161(a) ..........................................................................................15

48 U.S.C. §2165 ...............................................................................................15

48 U.S.C. § 2194(m)(1) ...................................................................................21

48 U.S.C. § 2195(a) .........................................................................................26

48 U.S.C. §2195(b) ..........................................................................................26

## OTHER AUTHORITIES

83 Fed. Reg. 44700, 44702 (Aug. 31, 2018) No. 34-83885 .........................31

Alexander D. Flachsbart, *Municipal Bonds in Bankruptcy: S 902(2) and the
   Proper Scope of "Special Revenues" in Chapter 9*, 72 Wash. & Lee L. Rev.
   955, 1032 n.217 (2015) ................................................................................43

64 Am.Jur.2d Public Securities and Obligations § 80 (2019) ........................37

Black's Law Dictionary (10th ed. 2014)........................................................30

E. Raymond Corey, *Direct Placement of Corporate Securities* (Harvard
   University Printing Office, 1951) ................................................................31

Federal Rules of Bankruptcy Procedure Rule 3007........................................1

Myer Feldman, "*Corey: Direct Placement of Corporate Securities*", 61 Yale L.J.,
   Art. 11 ..........................................................................................................31

Thomas R. Atkinson, *Trends in Corporate Bond Quality* 21 n.1 (1967) ......31

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF RETIRED
EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO,
PURSUANT TO BANKRUPTCY CODE SECTION 502 AND BANKRUPTCY
RULE 3007, TO CLAIMS FILED OR ASSERTED BY
HOLDERS OF ERS BONDS AGAINST ERS AND THE COMMONWEALTH**

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the

"**Retiree Committee**") hereby files this omnibus objection (the "**Objection**") pursuant to section

502 of title 11 of the United States Code (the "**Bankruptcy Code**"), made applicable to these Title

III cases by section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability

Act (48 U.S.C. §§ 2101-2241) ("**PROMESA**"), and Rule 3007 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), made applicable to these Title III cases by section 310 of

PROMESA, requesting entry of an order, substantially in the form attached hereto as **Exhibit A**,

disallowing all claims (the "**ERS Bondholder Claims**") asserted by holders or insurers

(collectively, "**ERS Bondholders**") of bonds ("**ERS Bonds**") issued by the Employees Retirement

System of the Government of the Commonwealth of Puerto Rico ("**ERS**").

## INTRODUCTION

1.      The ERS Bond Resolution, which is the operative document that created the ERS

Bonds, severely restricts the sources of funds that are available to repay the ERS Bonds. It states:

*"[t]he Commonwealth shall not be liable for the [ERS] Bonds or any Ancillary Facility. [N]either

any [ERS] Bond nor any Ancillary [ERS] Bond Facility shall constitute a debt of the

Commonwealth* within the meaning of any constitutional provision, or a pledge of the good faith

and credit of the Commonwealth or the taxing power of the Commonwealth, and *the

Commonwealth shall not be liable to make any payment thereon.*" (Ex. B, Pension Funding Bond

Resolution, at App. VI at VI-1, § 201 (emphasis added).) The ERS Series A Bonds Offering

Statement made the same point, stating in bold:

> **The Bonds are limited, non-recourse obligations of [ERS]
> payable solely from and secured solely by a pledge of Employer
> Contributions made after the date of issuance of the Bonds. The
> Bonds are not payable from the investments made by [ERS]
> with the proceeds of the Bonds or from any other assets of
> [ERS], or from employee contributions to [ERS]. The Bonds are
> not an obligation of the Commonwealth of Puerto Rico or any
> of its other instrumentalities or political subdivisions.**

(Ex. C, ERS Series A Bonds Offering Statement at 1.)

2.      Despite these clear statements eliminating any recourse against the Commonwealth
and severely limiting the source of funds that ERS may use to repay the ERS Bonds, the ERS
Bondholders have filed over $3.1 billion in claims against *both* the Commonwealth and ERS,
alleging that they have a claim to all of the remaining funds that ERS holds and an interest in any
monies that the Commonwealth uses or intends to use to fund pensions. The ERS Bondholders'
claims against the Commonwealth are without merit because the operative contract expressly
states that no such claims exist. Because there is no contractual basis for a claim in the first place,
the ERS Bondholders also have no claim to any of the Commonwealth's property. The ERS
Bondholders' claims against ERS are equally without merit, both because (i) the ERS Bondholders
allege a right to collateral that is not provided under the operative documents or provided by law,
and (ii) ERS issued the ERS Bonds illegally, making them *ultra vires* and unenforceable.

3.      Previously, the Unsecured Creditors Committee filed an objection to the ERS
Bondholders' proofs of claim filed in the ERS Title III case only. (Case No. 17-3238, Dkt. 5580.)
By this Objection, the Retiree Committee objects not only to the proofs of claim filed in the ERS
Title III case, but also objects to the claims the ERS Bondholders have filed in the Commonwealth
Title III case. The Retiree Committee further objects to these proofs of claims to the extent they
allege "secured" claims against ERS property other than "employer contributions" or allege

2

"secured" claims against any property of the Commonwealth or any of its instrumentalities or political subdivisions.[2]

4.     The Retiree Committee, which represents the Commonwealth's 167,000 government retirees—the holders of the single largest claim against the Commonwealth—likely have the most to lose if the ERS Bondholders' claims stand. The majority of these 167,000 retirees—approximately 120,000—previously received their pensions through ERS. Many of those retirees also claim an interest in ERS's remaining funds based on contributions they made towards their pensions when actively employed. The Retiree Committee and its constituents thus arguably are the group most directly impacted by the ERS Bondholders' claims.

## BACKGROUND

### I.     ERS.

5.     In 1951, the Commonwealth established ERS, a statutory pension trust, as an "agency of the Government of Puerto Rico" for the economic well-being of the Commonwealth's public employees. *See also* Act No. 447-1941 (codified, as amended, at P.R. LAWS ANN. tit. 3 §§ 761-788 (the "**ERS Enabling Act**")). Control over ERS (within the legislative grant of authority) resides with the ERS Board of Trustees, which, generally speaking, sets policy and oversees ERS's operations, including the appointment of the ERS Administrator.

6.     Since ERS's formation, the Commonwealth, various governmental employers and employees have contributed to ERS to fund pensions for the benefit of the Commonwealth's active and retired public employees.

---

[2] Before the UCC filed its Objection, the Retiree Committee attempted to work with the UCC on filing a joint objection, but the UCC declined to wait for the Retiree Committee's comments. The Retiree Committee is committed to ensuring that duplication of effort is avoided and that the Objections are handled efficiently.

7.     As of the commencement of ERS's Title III case, ERS was required to be funded by contributions from both employers and employees, the amounts of which are determined by statute. For fiscal year 2017, for example, employers were required to make periodic contributions to ERS equivalent to 15.525% of the compensation regularly received by eligible employees. *See* 3 L.P.R.A. §§ 787f, 787g. At the commencement of its Title III case, ERS provided retirement benefits to approximately 120,000 retirees and their beneficiaries.

8.     Over the years, actual employer contributions to ERS were significantly less than what would be actuarially recommended relative to ERS's pension liabilities. In 2013, the Commonwealth enacted Act 32-2013 which obligated the Commonwealth and other governmental employers to begin making an "Additional Uniform Contribution" starting in fiscal year 2013-2014. 3 L.P.R.A. §§ 787q The Additional Uniform Contributions were intended to alleviate ERS's shortfall and were critical to ERS's ability to make payments when due. However, many governmental entities failed to pay the Additional Uniform Contributions. As a result, as of the petition date, ERS was drastically underfunded and the Commonwealth was predicting that ERS would soon run out of money to pay pensioners.

## II.     The ERS Bonds.

9.     When ERS was created in 1951, it had no borrowing power. ERS's sole source of funding came from the contributions made by employers and employees and from the investment of ERS assets. Act 447-1951. By 1987, however, largely due to the inadequacy of the employer contributions being made, ERS had an actuarial deficit of approximately $2.6 billion—a deficit that was "increase[ing] annually because the disbursement on account of benefits exceeds the income of contributions." Act 46-1988 (Statement of Motives).

10.     In response to this growing fiscal problem, the Commonwealth amended the ERS Enabling Act in 1988 to "broaden the investment and loan capacity" of ERS while maintaining

4

"certain administrative and control parameters." Act 46-1988 (the "**1988 Amendment**"). The 1988 Amendment provided ERS, for the first time, a limited ability to borrow money. In pertinent part, the 1988 Amendment provided:

> The Board of Trustees may authorize the Administrator [of ERS] to seek a loan from any financial institution of the Government[, from] the Commonwealth of Puerto Rico or [from] the Federal Government of the United States of America[,] *or through the direct placement of debts*, securing said debt with the assets of the System. The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.

(*Id.* at § 7(d) (emphasis added).)[3]

11.     To be clear, this authorization was a risky gambit. If ERS were to borrow funds for the payment of benefits, then ERS would have to earn interest on the investment of the loan proceeds (or, more accurately, that portion of the proceeds not used to pay benefits and loan fees) at a significantly higher rate than the interest and other fees and expenses associated with the borrowed funds. It was an arbitrage play that added leverage and risk to the pension system.

12.     For approximately twenty years after the 1988 Amendment, ERS funded itself (albeit at a deficit) through the following means: (a) employer contributions; (b) employee contributions; (c) a security lending program "whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and irrevocable bank letters of credit"; (d) lines of credit with financial institutions; (e) repo agreements; (f) investment income from the investment of ERS's assets; (g) the sale of ERS assets; and (h) the income earned from a loan program that made loans to ERS participants. (*See, e.g.,*

---

[3] The official English translation of section 7(d) appears to have been misinterpreted from the original Spanish text. Specifically, the English translation omitted commas after "financial institution of the Government" and "United States of America." Additionally, the English translation incorrectly translated "del" in the Spanish text to mean "of the" as opposed to the correct translation which is "from." Since the 1988 Amendment was originally drafted in Spanish, the Spanish version of the statute prevails over any inconsistency in the English version. *See* 2 L.P.R.A. § 254; 31 L.P.R.A. § 13.

Ex. D, Commonwealth of P.R., Comprehensive Annual Financial Report Fiscal Year Ended June 30, 2006 at 84.)

13.     By the turn of the century, however, ERS's financial predicament quickly was approaching a crisis point. By June 30, 2005, ERS could only fund 19% of its $12.2 billion actuarial liabilities. (*See* Ex. E, Commonwealth of P.R., Financial Information and Operating Data Report, 60 (May 15, 2009).) In response, several investment banks suggested the Commonwealth issue pension obligation bonds ("**POBs**") to address ERS's underfunding. (Investigator's Report at 204). As originally envisioned, the POBs would be structured like any other general obligation bond of the Commonwealth: the Commonwealth would issue the bonds; interest would be payable from the Commonwealth's general treasury; and the bond obligations would be secured by the Commonwealth's full faith, credit, and taxing power (*i.e.*, constitutional debt). (Investigator's Report at 204.) ERS would receive the proceeds from the bond sales. (*Id*.)

14.     As with all general obligation bonds, the initially proposed POBs required legislative authorization. That authorization never came. In 2005, the Senate approved a bill that would have authorized the POBs and increased the statutory levels of employee and employer contributions, but the bill never was brought to a vote by the House of Representatives. (Investigator's Report at 204.)

15.     Unable to obtain legislative approval of the general obligation POBs, ERS began looking at alternatives. Initially, and beginning in November 2006, ERS considered setting up a structure whereby ERS would assign its right to employer contributions to a grantor trust and that trust would issue bonds secured by those contributions and transmit the bond proceeds back to ERS. (Investigator's Report at 204.)

16.     By April 2007, however, ERS had moved away from this structure and instead decided that ERS would issue its own bonds and do so without obtaining legislative authority. As noted by the Independent Investigator, a "fundamental risk" of issuing POBs as an obligation of ERS, and not, as originally intended, an obligation of the Commonwealth, is that the "pension system may end up decreasing its overall funding level if it fails to commit a sufficient portion of bond proceeds to be invested." (Investigator's Report at 202.) As mentioned above, it also runs the risk of simply not realizing investment returns sufficient to cover the interest, fees and other expenses of the borrowed funds. The inherent risk of such an arbitrage strategy helps explain why it does not appear that POBs structured to have the pension system itself be the borrower (as opposed to the pension plan sponsors) have been utilized anywhere else in the United States to fund pension obligations.[4]

17.     ERS planned to issue a total of $7 billion in ERS Bonds, but not all at once. Instead, ERS decided to make an initial offering of approximately $1.7 billion exclusively for the Puerto Rico market, with a larger $3 billion global issuance thereafter, and a final local issuance of up to an additional $3 billion. (Investigator's Report at 209.)

18.     On January 24, 2008, the ERS Board approved the ERS Bond Resolution, which authorized the issuance of $1.6 billion in ERS Bonds. (Investigator's Report at 210.) The ERS Bond Resolution purported to grant bondholders a security interest in certain "Pledged Property" of ERS, including future employer (but not employee) contributions received by ERS. (Ex. B, Pension Funding Bond Resolution, at App. VI at VI-1, VI-36, § 201, §501.)

---

[4] The Retiree Committee understands that there are jurisdictions with statutes that authorize a pension system to be the borrower of POBs, -- for example, the Texas Municipal Retirement System (Texas Government code § 855.105). It does not appear, however, that the Texas Municipal Retirement System or any other pension system has used such authority to issue POBs.

19.    On January 29, 2008, ERS issued its first series of ERS Bonds totaling approximately $1.6 billion (the "**ERS Series A Bonds**"). (Investigator's Report at 210.) As planned, the ERS Series A Bonds were sold only in the local Puerto Rico market. (*Id.*)

20.    Not surprisingly, given the fact the Commonwealth legislature declined to issue the POBs, the ERS Bond documents all made clear that the ERS Bonds were not obligations of the Commonwealth or any of its instrumentalities or subdivisions. The ERS Series A Bonds Offering Statement was very clear concerning the limited nature of ERS's obligations under the bonds and the fact that the Commonwealth was not liable for the bonds in any way. Specifically, the first page of the ERS Series A Bonds Offering Statement provided in bold:

> **The Bonds are limited, non-recourse obligations of [ERS] payable solely from and secured solely by a pledge of Employer Contributions made after the date of issuance of the Bonds. The Bonds are not payable from the investments made by [ERS] with the proceeds of the Bonds or from any other assets of [ERS], or from employee contributions to [ERS]. The Bonds are not an obligation of the Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions.**

(Ex. C, ERS Series A Bonds Offering Statement at 1.) Repeatedly throughout the Offering Statement, ERS made the same point, stating *at page 2*: "[t]he Bonds are not a debt of the Commonwealth of Puerto Rico or any of its other political subdivisions or instrumentalities"; *at page 23*: "[t]he Bonds are not an obligation of the Commonwealth or any of its instrumentalities or political subdivisions, other than [ERS]"; and *at page 37*: "[t]he Bonds are not obligations, general, special or otherwise, of the Commonwealth, do not constitute a debt of the Commonwealth or any of its other political subdivisions or instrumentalities, and are not payable out of any moneys of the Commonwealth other than future Employer Contributions."

21.    The Bond Resolution supporting the ERS Series A Bonds, which was the contract that created the ERS Bonds (and all subsequent ERS Bonds) also was clear that:

> *[t]he Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth* within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or the taxing power of the Commonwealth, and *the Commonwealth shall not be liable to make any payment thereon,* nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property, and the Bonds and each Ancillary Bond Facility shall contain a statement of the foregoing effect.

(Ex. B, Pension Funding Bond Resolution, at App. VI at VI-1, § 201 (emphasis added).)

22.     ERS hoped to issue a global ERS Bond offering shortly after the ERS Series A Bonds were issued. That hope never materialized, as ERS was unable to find a bond price outside of Puerto Rico that was acceptable to ERS. (Investigator's Report at 211.)

23.     In May 2008, faced with an unreceptive market outside of Puerto Rico, ERS issued its second series of bonds for approximately $1 billion (the "**ERS Series B Bonds**") only to Puerto Rico-based purchasers (Investigator's Report at 212.) The ERS Series B Bonds Offering Statement contained the same language disclaiming any liability of the Commonwealth for the ERS Bonds that was found in the ERS Series A Bonds Offering Statement. (Ex. F, ERS Series B Bonds Offering Statement at 1, 2, 22, 38.)

24.     Finally, in June 2008, ERS issued the third round of ERS Bonds for approximately $300 million (the "**ERS Series C Bonds**" and together with the ERS Series A Bonds and the ERS Series B Bonds, the "**ERS Bond Issuance**") and again sold them only to Puerto Rico purchasers. (Investigator's Report at 213.) The ERS Series C Bonds were the last ERS Bonds issued and contained the same language disclaiming any liability of the Commonwealth for the ERS Bonds that was found in the ERS Series A Bonds Offering Statement and ERS Series B Bonds Offering Statement. (Ex. G, ERS Series C Bonds Offering Statement at 1, 2, 22, 39.)

### III.    The Commonwealth Decries the ERS Bonds as "Illegal".

25.    The ERS Bond Issuance did not prove to be the panacea ERS hoped for and ERS sank further and further into the financial abyss. As Conway MacKenzie, Inc. noted in its October 2010 report—a report requested by the ERS Administrator—the ERS Bond Issuance was highly risky, poorly understood, and issued in the face of numerous economic warning signs. (*See generally* Ex. H, Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, at 16 (2010).)

26.    On July 6, 2011, the Legislative Assembly approved and Governor Fortuño signed into law Act No. 116-2011, which made several changes to the ERS Enabling Act. Most pertinent to this Objection were the following changes to the provision of the ERS Enabling Act governing ERS's ability to incur debts:

> The Board of Trustees may authorize the Administrator [of ERS] to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America. *Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System. For the direct placement of debts secured with assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. This voting shall be detailed in the minutes of the Board by recording therein the number of votes in favor, against, and/or abstained. If the placement is made without such consent, it shall not be valid or binding on the System. In the event that an amendment is introduced in the Legislative Assembly to provide for the placement of direct debt secured with the assets of the System, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment. It is hereby clarified for future generations that the Retirement System made a Bond Issue amounting to three billion dollars, which bears between 6.25% and 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years. Such Bond Issue was made even though the System had been undergoing a cash flow deficit for several years. Such action has significantly contributed to the financial crisis of the System.* The interest accrued by these

obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.

Act No. 116-2011 § 7(d) (emphasis added).

27.     The "Statement of Motives" included in the legislation stated that the changes were made because the ERS Bonds were "illegally made … even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representative for deeming it detrimental to the System" and "so badly structured that, rather than yielding profits … [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System." Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431, 1436.

**IV.     ERS Commences A Title III Proceeding.**

28.     On May 21, 2017, the Financial Management and Oversight Board approved and certified ERS's petition under Title III of PROMESA. (Dkt. 1.) As of February 2017, the aggregate outstanding principal amount of the ERS Bonds was approximately $3,156,000,000. (Government of Puerto Rico: Puerto Rico Fiscal Agency and Financial Advisory Authority, Fiscal Plan for Puerto Rico (March 13, 2017), at 26.)

29.     In June 2017, the Legislative Assembly passed legislation that replaced the Commonwealth's pension system with a "pay-as-you-go system" whereby pension obligations to the Commonwealth's retirees are made directly from the Commonwealth's general fund, and no employer contributions are made to ERS. (Act of 2017, No. 106.)

30.     In their proofs of claim, the ERS Bondholders allege that they have fully secured claims against both the Commonwealth and ERS. (*See, e.g.*, Exhibits I and J hereto.)

**RELIEF REQUESTED**

31.     By this Objection, the Retiree Committee seeks the disallowance of the ERS Bondholder Claims in their entirety pursuant to section 502(b)(1) of the Bankruptcy Code.  These

11

claims are void and unenforceable claims against the Commonwealth because there is absolutely

no contractual basis for the ERS Bondholders' to hold claims against the Commonwealth and all

such claims have been waived or are without merit.  Further, the claims are void against both the

Commonwealth and ERS because the claims arise from illegal, *ultra vires* transactions. In addition,

because the ERS Bondholders do not hold a claim against the Commonwealth they have no basis

to assert a secured claim against any Commonwealth assets. Finally, even if the ERS Bondholder

Claims are not void, the ERS Bondholders' asserted secured claim against ERS's property is

limited to only employer contributions in ERS's hands as of its petition date that are identifiable

and segregable from other ERS assets; a showing that the ERS Bondholders have not and will not

be able to make.

**BASIS FOR RELIEF REQUESTED**

32.    Section 502(b)(1) of the Bankruptcy Code provides for the disallowance of any

claim that "is unenforceable against the debtor and property of the debtor, under any agreement or

applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C.

§ 502(b)(1). "This provision is most naturally understood to provide that, with limited exceptions,

any defense to a claim that is available outside of the bankruptcy context is also available in

bankruptcy." *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443,

450 (2007). For the reasons explained below, each and every ERS Bondholder Claim should be

disallowed in its entirety.

**I.    The ERS Bondholders Cannot Assert Claims Against the Commonwealth In
Connection With the ERS Bonds.**

33.    The ERS Bondholders cannot assert claims against the Commonwealth because

"[t]he [ERS] Bonds are not an obligation of the Commonwealth of Puerto Rico or any of its other

instrumentalities or political subdivisions." (Ex. C, ERS Series A Bonds Offering Statement at 1;

*see also* Ex. B, Pension Funding Bond Resolution, at App. VI at VI-1, § 201 ("[t]he
Commonwealth shall not be liable for the [ERS] Bonds or any Ancillary Bond Facility").) The
ERS Bondholders acquired their ERS Bonds understanding that they would never be able to collect
on those Bonds against the Commonwealth and that their sole source of recovery was limited to
collecting from ERS and then only from employer contributions received by ERS. Consequently,
the ERS Bondholders can possess no claim against the Commonwealth even in the unlikely event
the ERS Bond Issuance is found to be valid and enforceable and all such claims should be
disallowed.

34.    Despite this clear contractual bar to asserting claims against the Commonwealth,
the ERS Bondholders have nonetheless attempted to advance such claims, based on a variety of
theories, including: (a) the Commonwealth's alleged failure to satisfy its contribution
requirements; (b) the Commonwealth's alleged violation of the ERS automatic stay; (c) the
Commonwealth's alleged taking of the ERS Bondholders' property without just compensation;
(d) the Commonwealth's alleged violation of the contracts clauses of the U.S. and Puerto Rico
Constitutions; (e) the Commonwealth's unjust enrichment; (f) the Commonwealth's alleged
violation of Section 407 of PROMESA; and (g) the Commonwealth's alleged violation of a
Stipulation. (*See* Ex. J, Select ERS Bondholders' Proofs of Claim (Commonwealth) at ¶¶ 21-29.)
Each of these arguments is without merit.

35.    *First*, the ERS Bondholders contend that the Commonwealth's alleged failure to
satisfy its contribution requirements to ERS gives rise to a claim in their favor. (*See* Ex. J, Select
ERS Bondholders' Proofs of Claim (Commonwealth) at ¶ 27.) To support this proposition, the
ERS Bondholders point to section 1102 of the Bond Resolution, "Remedies" and claim that this
gives them the right to bring "suit, action or proceeding to enforce all rights of the Bondowners,

13

including the right to collect or require [ERS] to collect Revenues adequate to carry out the covenants, agreement and assignment with respect thereto contained in this Resolution…." (Ex. B, Pension Funding Bond Resolution, at App. VI, § 1102(1)(i).)

36.     This argument is a non-starter because the ERS Bond Resolution is clear that only the "Fiscal Agent" has the power to bring such a "suit, action or proceeding." (Ex. B, Pension Funding Bond Resolution, App. VI, § 1102(1).) In fact, the Bond Resolution expressly provides that "[n]o Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under the Resolution" unless (i) the ERS Bondholder provides the Fiscal Agent notice of the default; (ii) at least 25% in the principal amount of the ERS Bonds asks the Fiscal Agent to exercise its powers under § 1102(1); and (iii) the Fiscal Agent declines to do so. (*Id.*)

37.     There is no evidence that these steps were undertaken prior to the Commonwealth's or ERS's Title III filings, and thus no ERS Bondholder had standing to pursue such a claim at the time these Title III cases commenced. Consequently, the ERS Bondholders can assert no valid claim against the Commonwealth for the Commonwealth's pre-petition failure to submit sufficient employer contributions. *In re Gucci*, 126 F.3d 380, 388-89 (2d Cir. 1997) ("The Bankruptcy Code defines a creditor as an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. Because Design Studio's putative claim arose after the bankruptcy petition was filed, it is not a creditor"); *In re Pick & Save, Inc.*, 478 B.R. 110, 117 (Bankr. D.P.R. 2012) (holding that a claim arises only "when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed") (internal citations omitted).

38.     *Second*, the ERS Bondholders contend that the Commonwealth violated the ERS automatic stay when it passed Joint Resolution 188 and Act 106 which enacted Paygo as the method of paying pensions because the laws require ERS to liquidate its assets and "divert[s]" future payments away from ERS to the Commonwealth.   (*See* Ex. J, Select ERS Bondholders' Proofs of Claim (Commonwealth) at ¶ 21.) The ERS Bondholders lack any statutory basis on which to make a claim for monetary damages based on a stay violation because section 362(k)(1) only allows "individuals" to make claims for damages arising from an alleged stay violation. See 48 U.S.C. §2161(a) incorporating 11 U.S.C. §362. On information and belief, most of the ERS bondholders are not individuals.

39.     But even if some ERS Bondholders are individuals, section 305 of PROMESA preempts this claim. It provides:

> Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with –
>
> (1) Any of the political or governmental powers of the debtor [the Commonwealth];
>
> (2) Any of the property or revenues of the debtor; or
>
> (3) The use or enjoyment by the debtor of any income-producing property.

PROMESA § 305(1), 48 U.S.C. § 2165.

40.     Section 305 was modeled on the near-identical language in section 904 of the Bankruptcy Code, which deprives federal courts of any power to interfere with a municipal debtor's political or governmental powers, or property or revenues, during a Chapter 9 case without the debtor's consent. *See, e.g.*, *Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 695-96 (6th Cir. 2016). The scope of section 904's preemptive power defeats any argument that

that a government's exercise of its powers violates the automatic stay in a case where the governmental entity is the debtor and the same is true under section 305 of PROMESA.

41.     In *Lyda* for example, the Sixth Circuit affirmed a bankruptcy court's dismissal of a complaint seeking injunctive and declaratory relief directing Detroit not to terminate residential customers' water service for non-payment. 841 F.3d at 695-96. The Sixth Circuit held that the bankruptcy court lacked jurisdiction to decide the dispute because such an order would necessarily interfere with the city's governmental powers, its property and revenues, and its use and enjoyment of income-producing property. *Id.* The Sixth Circuit explained, "[b]ecause § 904 prohibits the bankruptcy court from awarding the relief sought, notwithstanding the constitutional dimension of their injuries, plaintiffs failed to state a claim upon which relief can be granted." *Id.* at 698. Stressing section 904's breadth, the Sixth Circuit explained:

> In the overall construct, § 904 performs the role of the clean-up hitter in baseball. Its preambular language "[n]otwithstanding any power of the court, ... the court may not, by any stay, order, or decree, in the case or otherwise ..." is so comprehensive that it can only mean that a federal court can use no tool in its toolkit—no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order—to interfere with a municipality regarding political or government power, property or revenues ... As a practical matter, the § 904 restriction functions as an anti-injunction statute—and more.

*Id.* at 695-96 (citations, quotations, and emphasis removed; first two ellipses in original).

42.     Like section 904 of the Bankruptcy Code, section 305 of PROMESA ensures that the governmental debtor—here, the Commonwealth and ERS—have the exclusive authority to decide how to govern and provide public services during debt restructuring. Section 305 of PROMESA accomplishes that goal by allowing the Commonwealth and its governmental instrumentalities to exercise sole discretion over the use of governmental property and revenues. Just as section 904 of the Bankruptcy Code is a "keystone in the constitutional arch between federal bankruptcy power and state sovereignty," *Lyda*, 841 F.3d at 695 (citations and quotations omitted),

section 305 of PROMESA protects against judicial interference with the Commonwealth's use of its political and governmental powers.  Indeed, the case for preemption under section 305 of PROMESA is equally as strong as that under § 904 of the Bankruptcy Code. When Congress regulates territories, the Territories Clause of the United States Constitution requires territorial laws or constitutions to yield. "U.S. territories ... are not sovereigns distinct from the United States." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1873 (2016). As a result, "the powers" that territorial governments "exercise are delegations from Congress" under the Territories Clause, *id.* at 1873 n.5, and are "subject … to the right of Congress to revise, alter, and revoke at its discretion," *Hornbuckle v. Toombs*, 85 U.S. 648, 655-56 (1873).  In light of Congress's complete control and authority over the territories, section 305 of PROMESA evidences a clear Congressional intent to *permit* Puerto Rico to exercise its governmental and political powers free from judicial supervision or interference.

43.    As a court explained in *In re Richmond Unified School District*, 133 B.R. 221 (Bankr. N.D. Cal. 1991), the reason for this bar is because "Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor." *Id*. at 225. "A municipal unit cannot liquidate its assets to satisfy its creditors totally and finally. Therefore, the primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims." H.R. REP. NO. 95–595, at 263 (1977). For a governmental entity to do that it must be free to exercise its political and governmental powers free from creditor interference as well. Thus, section 305 of PROMESA, like section 904 of the Bankruptcy Code, permits the Commonwealth and ERS to exercise their political and governmental powers and bars creditors from asking this Court to place limitations on their governing decisions.

17

44.     The claims the ERS Bondholders assert are in direct conflict with section 305 of PROMESA. The relief they seek in their claims would render the Commonwealth and ERS unable to continue implementing Joint Resolution 188 and Act 106, legislation passed by the Puerto Rico Legislature and signed by the Governor for the very purpose of assuring that pension payments to retirees are not disrupted. This is precisely the type of interference with government powers, property, and revenues that section 305 (like section 904) is intended to preclude.

45.     Even if this claim of stay violation is not pre-empted, there is no stay violation here. Section 362(b)(4) of the Bankruptcy Code excepts from the automatic stay "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory powers." 11 U.S.C. § 362(b); *see Lacoquille Inv. Co. v. Town of Manalapan (In re Lacoquille Inv. Co.)*, 44 B.R. 731, 733 (Bankr. S.D. Fla.) (applying section 362(b)(4) to dismiss a claim that the enactment of a town ordinance violated the automatic stay). The First Circuit has instructed that to evaluate whether the police power exception applies: "We ask whether the governmental action is designed primarily to protect the public safety and welfare. If so, the government action ... is exempt." *Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 763 (1st Cir. 2016) (citations and quotations omitted). Here, the budget resolution implemented through Joint Resolution 188 and Act 106 both state on their face that it is intended to "safeguard[]" pensions for Government retirees." Thus, Joint Resolution 188 and Act 106 are exercises of the Commonwealth's and ERS's police and regulatory powers and are therefore excepted from the stay.

46.     In addition, Joint Resolution 188 and Act 106 do not implicate the automatic stay because ERS does not have a cognizable property interest in any future employer payments to retirees. Property of a debtor's estate does not include potential funds a debtor may receive in the

future. *See Wiscovitch Rentas v. Molina González (In re Morales García)*, 507 B.R. 32, 43 (B.A.P. 1st Cir. 2014); *In re Ortega*, No. 14-06449, 2014 WL 5488326, at \*3 (Bankr. D.P.R. Oct. 29, 2014). ERS has no cognizable right to future employer contributions, if any, or future payments to retirees under Paygo as ERS's receipt of employer contributions was always subject to the will of the Puerto Rican government. At best, before the passage of Joint Resolution 188 and Act 106, ERS had a mere expectation of receiving future contributions, but "a debtor's expectation or hope of receiving something in the future is not a property right and would not become property of the estate." *In re Bronikowski*, 569 B.R. 48, 52 (Bankr. W.D.N.C. 2017). Simply put, a debtor has "a contingent interest in nothing" when its future receipt of property is based on the exercise of another party's discretion. *Seaver v. Klein-Swanson (In re Klein-Swanson)*, 488 B.R. 628, 633 (B.A.P. 8th Cir. 2013.) Thus, the automatic stay is not implicated because an expectancy of future payments is not property that the automatic stay would protect. *See* 11 U.S.C. § 362(a)(3) (protecting "property of the estate").

47. ***Third***, the ERS Bondholders Claims allege that they have a takings claim against the Commonwealth. (*See* Ex. J, Select ERS Bondholders' Proofs of Claim (Commonwealth) at ¶ 23.) Because the ERS Bondholders have not been denied compensation for the takings they allege, their takings claims under the Fifth Amendment and Puerto Rico's constitution should be dismissed. "[T]aking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U.S.C. § 1491." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985). Similarly, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just

compensation." *Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations*, 643 F.3d 16, 20 (1st Cir. 2011) (quoting *Williamson Cty..*, 473 U.S. at 195).

48.     The ERS Bondholders cannot maintain a Takings Clause claim because they also retain a contract claim against ERS, a government agency. The First Circuit has repeatedly stated that "actions such as contract termination or detention of property under the contract that would constitute a simple breach of contract when a non-governmental entity is involved do not become a constitutional violation simply because the contracting party is a [governmental entity]." *Masso-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017); *see also Allegre Villa v. United States*, 60 Fed. Cl. 11, 18 (Fed. Cl. 2004) ("When a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking"). Joint Resolution 188 does not purport to deprive the ERS Bondholders of their right to assert a breach of contract claim against ERS, a governmental agency, in its Title III case.

49.     But even to the extent the ERS Bondholders had a protectable property interest, Joint Resolution 188 and Act 106 do not "take" those interests. Courts have routinely indicated that government actions are less likely to be a taking when, like Joint Resolution 188 and Act 106, they were taken to address fiscal emergencies. In the *New Haven Inclusion Cases*, secured bondholders in a public railroad asserted that the railroad's reorganization proceedings had diminished the value of their liens on the railroad's property. 399 U.S. 392 (1970). Though the Supreme Court did "not doubt" that the reorganization process had "imposed a substantial loss upon the bondholders," it saw "no constitutional bar to that result." *Id.* at 491. Subsequent courts have held that to resolve budgetary emergencies, governments may impair property and contractual interests that they may not have been permitted to impair in the absence of such an

emergency. *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) (wage reductions for employees in midst of city's budget crisis was not a taking); *Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 977 (S.D.N.Y. 1976) ("[T]o fulfill its primary obligation to protect the well-being of its citizens in times of emergency, a sovereign may take action which constitutes some taking of property without being required to pay compensation.").

50.     Those cases apply here. Joint Resolution 188 states that it was intended to address the "lack of liquidity and insolvency" in the pension systems. (Ex. K, Joint Resolution 188.) Joint Resolution 188 further recognized that Puerto Rico's "profound and severe fiscal crisis" prevented the government from taking other steps to reform the pension systems. (*Id.*) Similarly, Act 106 provides in its Statement of Legislative Intent, "Puerto Rico is currently experiencing an unprecedented financial and social crisis. … This crisis has hit Puerto Rican families very hard. The greatest sacrifices have been demanded from the most vulnerable members of our society …." (Ex. L, Act 106, at 1-2.)  Congress expressly found that Puerto Rico's present financial crisis is an emergency. 48 U.S.C. § 2194(m)(1). Thus, the ERS Bondholders, like the secured creditors in the *New Haven Inclusion Cases*, having "invested their capital in a public [entity] that does owe an obligation to the public," should be viewed as having "assumed the risk that in any depression or any reorganization the interest of the public would be considered as well as theirs." 399 U.S. at 491-92. Their takings claims should be rejected.

51.     Moreover, even if the ERS Bondholders could assert a taking, Joint Resolution 188 and Act 106 satisfies the "public use" test: as long as "the exercise of the eminent domain power is *rationally related* to a *conceivable* public purpose," the "public use" test is satisfied. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954). As the First Circuit has recognized, this standard of review is "necessarily deferential." *Fideicomiso*

21

*De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 18 (1st Cir. 2010). Here the public purpose is not merely "conceivable"—it is obvious. *Haw. Hous. Auth.*, 467 U.S. at 241. Joint Resolution 188 states that several prior unsuccessful attempts "to reform the three Retirement Systems" have led "to a lack of liquidity and insolvency in the systems." (Ex. K, Joint Resolution 188, at 2.) "[T]he profound and severe fiscal crisis" has prevented the government "from shoring up the three Retirement Systems." (*Id.*) Thus, Joint Resolution 188 established a "pay as you go system as a new method for safeguarding pensions for Government retirees." (*Id.*) Act 106 provides that it "seeks to safeguard the wellbeing of our pensioners and public servants." (Ex. L, Act 106, at 5.) Puerto Rico has done nothing more than transfer the ERS's assets to the Commonwealth to more efficiently administer the new retirement pension system it has constructed. In analogous circumstances, the First Circuit has held that it was undoubtedly a "public use" for Puerto Rico to transfer dilapidated lands from a quasi-private trust back to the Commonwealth to rehabilitate and manage those lands more efficiently. *Fideicomiso De La Tierra*, 604 F.3d at 18.

52.     Further, for the reasons set forth below, because the ERS Bondholders' have no security interest, and thus no property interest, in post-petition employer contributions, even if the enactment of Joint Resolution 188 and Act 106 could be a taking, it is not a taking here.

53.     ***Fourth***, the ERS Bondholders' claims based upon the contracts clause should also be rejected. (Ex. J, Select ERS Bondholders' Proofs of Claim (Commonwealth) at ¶ 24.) "Contracts Clause claims are analyzed under a two-pronged test." *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011). "The first question is whether the state law has [] operated as a substantial impairment of a contractual relationship. If the contract was substantially impaired, the court next turns to the second question

and asks whether the impairment was reasonable and necessary to serve an important government purpose." *Id.* (internal citations and quotations omitted.)

54.     The ERS Bondholders do not satisfy the "substantial impairment" prong, which requires them to "show more than a breach [of a contract]; it must show that the defendants have somehow impaired its ability to obtain a remedy for a demonstrated breach." *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011). Put differently, under the Contracts Clause, "a contract is impaired only when the legislation destroys *both* the obligation to perform on the contract *and* the obligation to pay damages for nonperformance." *Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*, 863 F.3d 718, 722 (7th Cir. 2017) (emphasis in original). "If the plaintiffs retain the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause." *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014).

55.     Here, as a preliminary matter, the ERS Bondholders Claims do not allege that the ERS Bond Resolution requires the participating employers to guarantee that any level of employer contributions will be made, or that the ERS Bond Resolution provides any remedy for a reduction or cessation in employer contributions.  The ERS Bondholders fail to make this allegation because the facts are just the opposite. The ERS Offering Statement specifically provided that "*[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions*," (Ex. B, Pension Funding Bond Resolution, at 26, 27 (emphasis in original)), and noted that circumstances that might cause the Legislature to take such actions included "*severe financial stress affecting one or more of the Government Employers,*" (*id.* at 37 (emphasis supplied).). Thus, the ERS Bond

23

Resolution requires ERS only to pay the ERS Bondholders from available funds, and does not impose on ERS a contractual obligation to maintain a sufficient level of funds.

56.     In any event, the ERS Bondholders fail to allege that Joint Resolution 188 and Act 106 impair *both* contractual obligations *and* remedies. The ERS Bondholders Claims only allege that these laws impair ERS's contractual obligations, not their remedies. (Ex. J, ERS Bondholders' Claims at ¶ 24.)  Nothing in Joint Resolution 188 or Act 106 purport to change the terms of the ERS Bondholder Resolution or deprives the ERS Bondholders of their right to assert a claim *against ERS* in its Title III case—which they did by filing the ERS Bondholders' Claims.

57.     Further, even if the Court considers the second prong, which it need not in light of the fact that there is no substantial impairment, it should still reject the Contracts Clause claims because Joint Resolution 188 and Act 106 are "reasonable and necessary to serve an important government purpose"—the continued payment of pension benefits to the Commonwealth's retirees. In evaluating the second prong of a Contracts Clause claim, the First Circuit has cautioned that, "[a]lthough apparently absolute on its face, '[t]he Contract Clause's prohibition of any state law impairing the obligation of contracts must be accommodated to the State's inherent police power to safeguard the vital interests of its people.'" *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete*, 125 F.3d 9, 14 (1st Cir. 1997) (second alteration in original) (quoting *Energy Reserves Grp. v. Kan. Power & Light,* 459 U.S. 400, 410 (1983)). The First Circuit has explained that the analysis for this prong involves two inquiries: "the reasonableness inquiry asks whether the law is reasonable in light of the surrounding circumstances, and the necessity inquiry focuses on whether [Puerto Rico] impose[d] a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United Auto.*, 633 F.3d at 45-46 (alterations in original, quotations removed). "Some factors to consider in analyzing these

24

questions include: whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *Id.* at 46 (quotations removed).

58.     Here, Joint Resolution 188 and Act 106 easily satisfy the *United Automobile* factors. They were plainly passed as an emergency measure in response to the historic financial crisis in Puerto Rico. Joint Resolution 188 explicitly states that it was intended to address the "lack of liquidity and insolvency" in the pension systems. Joint Resolution 188 and Act 106 further recognized that Puerto Rico's "profound and severe" and "unprecedented financial and social crisis" prevented the government from taking other steps to reform the pension systems. (Ex. K, Joint Resolution; Ex. L, Act 106, at 1.) The legislation is reasonable in light of the surrounding circumstances, as it is designed to ensure that the more than 167,000 former government employees have pensions to support their families at time when poverty and unemployment are catastrophically high in Puerto Rico.  Finally, the legislation satisfies the remaining factors—Joint Resolution 188 was passed in connection with an annual budget for fiscal year 2017-2018 and certified Fiscal Plan that contemplate and include reductions in payroll and operating expenses.  Joint Resolution and Act 106 require active employees themselves to shoulder the burden of making certain payments into the PAYGO system. (Ex. K, Joint Resolution; Ex. L, Act 106, at 21-27.) In short, the ERS Bondholders cannot maintain a Contracts Clause claim.

59.     ***Finally***, the ERS Bondholders allege claims for violation of section 407 of PROMESA and unjust enrichment, and a number of other undeveloped theories. All of these claims are based upon the theory that Joint Resolution 188 and Act 106 which enacted Paygo took something from the ERS Bondholders. (*See* Ex. J, Select ERS Bondholders' Proofs of Claim

25

(Commonwealth) at ¶¶ 25-26, 29.) As an initial matter, section 407 by its terms only would apply if ERS transferred something to the Commonwealth in violation of an applicable law and thus by its own terms could not prevent the Commonwealth from enacting Joint Resolution 188 and Act 106 or give rise to a claim in favor the ERS Bondholders against the Commonwealth. Section 407 provides that "if any property of any territorial instrumentality of Puerto Rico is transferred *in violation of applicable law*...." 48 U.S.C. § 2195(a). The ERS Bondholders claims do not allege a transfer by ERS or cite the law that would forbid such transfer. Further, because the automatic stay of Title III is in effect here, the ERS Bondholders have no standing to assert a claim based on PROMESA section 407. 48 U.S.C. § 2195(b).

60.     The ERS Bondholders cannot show that Joint Resolution 188 or Act 106 unjustly enriched the Commonwealth or ERS. Under Puerto Rico law, to state a claim for unjust enrichment a claimant must allege: (1) the occurrence of an enrichment; (2) a correlative loss; (3) a connection between the loss and the enrichment; (4) absence of cause to justify the enrichment; and (5) lack of a legal provision which precludes application of an enrichment without cause. *Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC/BJM), 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009), *report and recommendation adopted*, 2010 WL 1416521 (D.P.R. Mar. 31, 2010).

61.     The ERS bondholders have not alleged the most basic element of unjust enrichment—the "occurrence of an enrichment"—because Joint Resolution and 188 and Act 106 were intended to benefit "pensioners and public servants," not ERS and the Commonwealth. (*See* Select ERS Bondholders' Proofs of Claim (Commonwealth) at ¶ 25.) Joint Resolution 188 states on its face that its purpose is to implement "a new method for safeguarding pensions for Government retirees" (Ex. K, Joint Resolution 188, at 2) and Act 106 provides that it "seeks to safeguard the wellbeing of [] pensioners and public servants." (Ex. L, Act 106, at 5.) The ERS

Bondholder Claims allege no facts (as opposed to conclusions) that make it plausible that this stated purpose is not accurate. Indeed, the Commonwealth is not enriched at all, as it is assuming the obligations to pay directly all pensions previously administered by ERS, JRS, and TRS.

62.     Moreover, as *Westernbank* explains, the unjust enrichment doctrine "applies only when there is no applicable statute" or contract between the parties: "we are really talking of unjust enrichment when the laws have not foreseen a situation where a transfer of property occurs, which cannot ... be rationally explained by the prevalent body of laws." 2009 WL 6337949, at *29 (emphasis removed; internal citations and quotations omitted; ellipsis in original). Here, the liquidation of ERS and transfer of funds to the Commonwealth for distribution through the PAYGO system occurred under Joint Resolution 188 and Act 106, and the ERS Bondholders have an applicable contract: the ERS Bond Resolution.

63.     The Court should disallow all ERS Bondholders' Claims against the Commonwealth.

## II.     The ERS Bondholders Improperly Assert Post-Petition Claims Against ERS And the Commonwealth.

64.     It is axiomatic that a proof of claim only may assert claims that arise based on pre-petition conduct. *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000). "A 'creditor' in bankruptcy is anyone who has a 'claim' against the bankrupt estate that arose (so far as bears on this case) no later than the filing of the voluntary petition in bankruptcy." *Id.* Many of the ERS Bondholders, however, added numerous post-petition claims against the Commonwealth and ERS in their proofs of claim. To use but one example, Altair Global Credit Opportunities Fund (A), LLC proofs of claim include alleged administrative expense claims as well many claims arising from the post-petition adoption of the current PayGo system. (Ex. I, Select ERS Bondholders' Proof of Claim (ERS) at ¶¶ 14-19, 21, 23-26, 29; Ex. J, Select Bondholders' Proof of Claim (Commonwealth of

P.R.) at ¶¶ 14-19, 21, 23-26, 29.) Because post-petition claims cannot properly be asserted in a proof of claim, all post-petition claims should be disallowed.

### III.  The 2008 ERS Bond Issuance Was *Ultra Vires*.

65.     The 2008 ERS Bond Issuance was *ultra vires*. As creatures of statute, ERS and similar government instrumentalities can only exercise powers that are conferred upon them by the legislature. *See, e.g., Town of Bloomfield v. Charter Oak Nat. Bank*, 121 U.S. 121, 132 (1887) ("The borough and the town are confessedly inferior corporations. They act not by any inherent right of legislation, like the legislature of the state; but their authority is delegated, and their powers, therefore, must be strictly pursued"); *accord Bd. of Cnty. Sup'rs of Prince William Cnty. Va. v. United States*, 48 F.3d 520, 523-24 (Fed. Cir. 1995). When a governmental entity acts beyond the scope of the powers conferred on it by the legislature, those acts are *ultra vires* and are "wholly void, and of no legal effect." *California Nat. Bank v. Kennedy*, 167 U.S. 362, 368 (1897); *Town of Bloomfield*, 121 U.S. at 132 ("Within the limits of their charter their acts are valid, without it they are void") (internal citations omitted); *In re Cnty. of Orange*, 31 F. Supp. 2d 768, 774 (C.D. Cal. 1998) (as applied to governmental entities, the *ultra vires* doctrine applies to acts "beyond powers conferred upon [the governmental entity] by law").

66.     As noted above, ERS had no power to incur any debt prior to 1988 because nothing in the ERS Enabling Act prior to that time authorized ERS to do so. *See* Act No. 447-1941; *Town of Bloomfield*, 121 U.S. at 132. And, from its inception in 1951 through 1988, ERS acted in conformity with this fact. Prior to the 1988 Amendment, ERS had never undertaken debt financing; instead, ERS was funded entirely from employer/employee contributions and returns from the investment of ERS assets.

67.     While the 1988 Amendment did permit ERS to enter into debt financing, that ability was limited. Specifically, the 1988 Amendment authorized ERS to incur debt in four ways: (1)

obtaining a loan from a financial institution; (2) obtaining a loan from the Government of the

Commonwealth of Puerto Rico; (3) obtaining a loan from the federal government of the United

States; or (4) through the direct placement of debt. *See* Act 46-1988, § 7(d). The 1988 Amendment

did not empower ERS to incur debt any other way and thus no other method of incurring debt was

authorized. *See Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) ("When a statute

limits a thing to be done in a particular mode, it includes the negative of any other mode") (citing

*Raleigh & G. R.R. Co. v. Reid*, 80 U.S. 269 (1872)).

68.     The 2008 ERS Bond Issuance does not fit within any of these four permissible

categories. The first three categories are plainly inapplicable because the 2008 ERS Bond Issuance

did not involve a loan from a financial institution, the Puerto Rican government, or the U.S. federal

government.

69.     Therefore, the 2008 ERS Bond Issuance was *ultra vires* unless it constituted a

"direct placement of debt." It did not.

### i.     The Term "Direct Placement" Excludes Bond Offerings Issued Through an Underwriter to the General Public.

70.     The phrase "direct placement" is a financial term of art that is widely understood

to exclude bond offerings issued through an underwriter to the general public and under applicable

Puerto Rican law the term "direct placement of debt" must be interpreted in accordance with that

understanding.  *See* 31 L.P.R.A. § 16. Specifically Puerto Rican law provides that "[t]echnical

terms and phrases used in the arts and sciences shall be interpreted according to their received

meaning and acceptation with the experts and authorities in the science, art or profession to which

they refer." *Id.*

71.     The following selection of financial and legal dictionary definitions demonstrate

that a "direct placement" has two distinguishing features: (1) the lack of an underwriter or other

financial intermediary; and (2) the solicitation of a limited group of investors, rather than the general public:

| Dictionary | Definition of "Direct Placement" |
|---|---|
| Black's Law Dictionary (10th ed. 2014) | "The sale by a company, such as an industrial or utility company, of an entire issue of securities directly to a lender (such as an insurance company or group of investors), ***instead of through an underwriter***." |
| Dictionary of Finance and Investment Terms (10th Ed. 2018) | "Direct sale of securities to one or more professional investors. Such securities may nor may not be registered with the Securities and Exchange Commission. They may be bonds, private issues of stock, . . . or other sophisticated instruments. These investments typically require large minimum purchases, often in the millions of dollars. Direct placements offer higher potential returns ***than many publicly offered securities*** . . . Buyers of direct placements are large, sophisticated financial institutions, including insurance companies, banks, mutual funds, foundations, and pension funds that are able to evaluate such offerings. ***Also called private placement.***"<br><br>*(See also* "Direct Financing") ("Where securities are sold directly to institutional lenders or investors and the cost of underwriting is being avoided, ***the terms direct placement and private placement are interchangeably used***.") |
| The New York Times Dictionary of Money and Investing (2002) | "Selling a new issue ***not by offering it for sale publicly***, but by placing it with one of several institutional investors. ***Also known as a private placement***." |
| David I. Scott, Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor (2003) | "The sale of a new security issue to a limited number of large buyers ***rather than to the general public***." |
| The Farlex Financial Dictionary (2009) | "The sale of a new issue to a few large institutional investors without registering with the SEC. A private placement is exempt from SEC registration, subject to certain restrictions, because ***it is not offered to the general public***." |

72.    Decades of finance, banking, and investment literature similarly reflect this understanding of "direct placement." For example, in his 1967 book *Trends in Corporate Bond Quality*, economist Thomas R. Atkinson explained (in the chapter entitled "*Direct Placements Versus Public Offerings*") that "[t]he National Bureau of Economic Research now uses the term "direct placement" to indicate bonds *not marketed to the general public*."  Thomas R. Atkinson, *Trends in Corporate Bond Quality* 21 n.1 (1967). Similarly, Professor E. Raymond Corey of Harvard University stated that the term arises because the securities "are directly placed in the sense that they are not first sold to intermediate owners (e.g., investment bankers) who have purchase with the intent reselling" and are also alternatively referred to as "private placements." (emphasis removed). E. Raymond Corey, *Direct Placement of Corporate Securities* (Harvard University Printing Office, 1951) (emphasis omitted). Myer Feldman, one of Professor Corey's contemporaries, suggested that "[direct placement] might, more meaningfully, be defined as the method of obtaining funds *without resorting to a public offering of securities*. Such a definition would place the direct placement in its proper perspective as *the other side of the coin from public offerings*." Myer Feldman, "*Corey: Direct Placement of Corporate Securities*", 61 Yale L.J., Art. 11, Issue 3 (1952) (emphasis added).

73.    This historic understanding of "direct placement" remains intact today. For example, in announcing the October 2018 amendments to its disclosure regulations for municipal securities, the SEC noted that "[b]eginning in 2009, issuers and obligated persons have increasingly used *direct placements as an alternative to public offerings of municipal securities*." (Amendments to Municipal Securities Disclosure, Exchange Act Release No. 34-83885, 83 Fed. Reg. 44700, 44702 (Aug. 31, 2018) (emphasis added). From these materials, it is clear that—from its "general and popular use" and "received meaning and acceptance" among finance experts—the

term "direct placement" excludes public bond offerings made through an underwriter. *See* 31
L.P.R.A. §§ 15-16.

74.    Here, the 2008 ERS Bond Issuance fails both hallmarks of a direct placement
because it: (1) used an underwriter (UBS); and (2) was issued generally to the public of the
Commonwealth. The fact that the 2008 ERS Bond Issuance was not a direct placement renders the
2008 ERS Bond Issuance *ultra vires* and void.

75.    Previously, certain ERS Bondholders suggested an alternative interpretation,
arguing that under the 1988 Amendment, ERS was authorized to issue bonds (or incur debt in any
manner) so long as the underlying debt is a direct obligation of ERS and ERS is not simply a
conduit to another obligee. (Pls' Br. in Opp. to Defs' Motions to Dismiss, No. 17-BK-3566
(D.P.R.) (E.C.F. 50)). That interpretation is incorrect.

76.    *First*, it simply ignores the fact that the term "direct placement" has a well-
established meaning in finance; a meaning that directly contradicts the ERS Bondholders' open-
ended interpretation. And if the legislature had wished such an interpretation, it surely would have
done so in a more direct manner—not by using a well-established term of art denoting an entirely
separate concept in public finance. *See, e.g., Whitman v. American Trucking Ass'ns*, 531 U.S. 457,
468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme
in vague terms or ancillary provisions— it does not, one might say, hide elephants in mouseholes").
There is a real-world example that confirms this. The Texas Municipal Retirement System has
broad legislative authorization to not only "incur indebtedness" but also "issue and sell negotiable
promissory notes or negotiable bonds of the retirement system." (Texas Gov. Code §855.105(a)(1),
(4).) This is the type of expansive language one would expect to find if the goal is to allow a

pension system to generally issue bonds and is in contrast to the specific and limiting language used in the ERS Enabling Act.

77.     *Second*, such a reading renders the rest of section 7(d) superfluous. If "direct placement of debt" authorizes ERS to incur debt through any available means (so long as it is ERS that is incurring the debt), then that grant would render superfluous section 7(d)'s other debt-incurring authorizations such as ERS borrowing from a financial institution, the Commonwealth, or the federal government, since those debts incurred by ERS would be subsumed in the definition of "direct placement of debt." *See, e.g., Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307-08 (1961) ("we will not adopt a strained reading which renders one part a mere redundancy"); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause sentence, or word shall be superfluous, void, or insignificant").

78.     *Third*, and relatedly, the ERS Bondholders' reading violates the principle of statutory interpretation of *noscitur a sociis* ("it is known by its associates"). Courts apply *noscitur a sociis* to "avoid ascribing to one word a meaning so broad that it is inconsistent with accompanying words, thus giving unintended breadth to [legislative acts]." *Jarecki*, 367 U.S. at 307; *accord Lagos v. U.S.*, 138 S. Ct. 1684, 1688-89 (2018); *accord Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2535-36 (2015); *Yates v. U.S.*, 135 S. Ct. 1074, 1085 (2015); *National Cas. Co. v. First State Ins. Group*, 430 F.3d 492, 499 (1st Cir. 2005). The phrase "through the direct placement of debts" is the last in a series of clauses that describe the scope of ERS's ability to incur debts. The preceding three clauses plainly serve to limit that ability. The bondholder's proffered reading, however, would then expand the power to incur debt that the other clauses in the series limited. That cannot be correct. *See Beecham*

*v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well"); *Lagos*, 138 S. Ct. at 1688-89 ("Thus, if we look to *noscitur a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the company they keep, we find here both the presence of company that suggests limitation and the absence of company that suggests breadth").

### ii. Interpreting "Direct Placement" to Exclude Public Offerings is Consistent with the Purpose of the 1988 Amendment.

79.     While it is not necessary to go beyond the plain meaning of the ERS Enabling Act to see that ERS only could issue private bond placements and without the use of an underwriter, that conclusion also is supported by the underlying purpose of the 1988 Amendment. 31 L.P.R.A. § 19 ("The most effectual and universal manner of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit thereof, or the cause or motives which induced its enactment").

80.     As noted in the Statement of Motives accompanying the 1988 Amendment, at that time, the Legislative Assembly was faced with the fact that ERS was running at an ever-increasing actuarial deficit, and that "[i]f this deterioration is not corrected, the moment could arrive when [ERS] will not have sufficient resources to meet its obligations." Consequently, the "purpose of [the 1988 Amendment was] to broaden the investment and loan capacity of [ERS] in such a way that it may achieve its main objective of increasing its income." The General Assembly, however, was not willing to give ERS an unlimited ability to incur debt. Instead, the 1988 Amendment contained "certain administrative and control parameters" to try to ensure that "[t]he authorized transactions shall be carried out carefully and with foresight for investment purpose and not for speculation, using the criteria that judicious, reasonable and experienced men exercise in the

handling of their own matters and furthermore, observing the principle of maintaining an adequate

balance between the expectation of risks and yields." (1988 Amendment, Statement of Motives.)

81.     The above statements demonstrate that the Legislature was concerned with two

distinct, but related, concepts: applying some degree of liberality to ERS's ability to incur debt but

placing restrictions on that ability to ensure prudent debt-incurring practices in order to protect the

Commonwealth's retirees.

82.     Limiting ERS's ability to issue bonds to direct placements (as correctly understood)

alone is in line with those principles. As the SEC has explained, there are significant advantages

of direct placements over public offerings:

> According to the [Municipal Securities Rulemaking Board], direct
> placements, when used as an alternative to public offerings, could provide
> potential advantages for issuers, such as, as among other things, lower
> interest and transaction costs, reduced exposure to bank regulatory capital
> requirements, simpler execution process, greater structuring flexibility, no
> requirement for a rating or offering document, and direct interaction with
> the lender instead of multiple bondholders.

(SEC Release No. 34-83885 at 22.) For this additional reason, the Court should reject the ERS

Bondholders expansive definition of "direct placement of debt."

**IV.     Section 8-202 of the Uniform Commercial Code is Not Applicable to the ERS Bonds.**

83.     While the UCC Objection asserts that the ERS Bonds cannot be validated under

section 8-202 of the Uniform Commercial Code, (Case No. 17-3283, Dkt. 5580 at 22-28), it fails

to make a fundamental argument—that section 8-202 of the Uniform Commercial Code does not

supplant the common law distinction between *ultra vires* acts versus merely irregular exercises of

35

valid power. In other words, section 8-202 of the Uniform Commercial Code cannot save a bond

issuance where, as here, the issuer never had the power to issue the bonds in the first place. [5]

84.    Under common law, courts refused to validate *ultra vires* bond issuances even as

to *bona fide* purchasers for value. As the New York Court of Appeals explained in *Citizens'*

*Savings Bank v. Town of Greenburgh*, 173 N.Y. 215, 223 (1903), "there can be no bona fide holder

of bonds, within the meaning of the law applicable to negotiable paper which have been issued

without authority, and, as all persons are chargeable with knowledge of the statute, they must see

to it that the statute has been complied with before they can with absolute safety take the bonds."

(internal citation and quotation marks omitted). In *Claybrook v. Rockingham County*

*Commissioners*, 114 N.C. 453, 19 S.E. 593, 595 (1894), the Supreme Court of North Carolina

court made the same point, noting that when there is a plain violation of the statute conferring the

authority to issue bonds, "a purchaser of the bonds takes them with notice, and there can be no

such thing as an innocent holder."

85.    In contrast, when courts historically applied principles of estoppel to validate

defective bond issuances, they did so only when the defect stemmed from an irregularity in the

*exercise* of a *valid* power—not when *no* power existed in the first place. As the United States

Supreme Court held in *Anthony v. Jasper County*, 101 U.S. 693, 697 (1879), "*[i]f the power exists*

*in the municipality*, the *bona fide* holder is protected against mere irregularities in the manner of

its execution, but if there is a want of power, no legal liability can be created." (emphasis added).

In *Wein v. Carey*, 41 N.Y.2d 498, 501 (1977), a New York Court of Appeals held that "a distinction

must be made between lack of patent authority to issue securities, by reason of which securities

---

[5] The UCC Objection also addresses and rebuts several other arguments the ERS Bondholders previously
made to explain why their claims should survive despite the *ultra vires* nature of the ERS Bond Issuance.
(*See generally*, Case No. 17-3283, Dkt. 5580 at ¶¶32-49; 56-70.) The Retiree Committee is in general
agreement with the UCC on these points, and incorporates those arguments here by reference.

may be wholly void, and latent infirmities, such as lack of underlying preconditions, whether of substance or form, which may render public securities subject only to remedies not enforceable against bona fide holders for value[.]" *Accord Town of Greenburgh*, 173 N.Y. at 223. ("Other cases, involving the validity of issues of town bonds denote an obvious distinction which must exist between jurisdictional defects . . . and irregularities in the manner in which the commissioners had exercised their power to dispose of the bonds.").

86.     This distinction stems from a basic principle of constitutional governance: a public actor possesses only those powers affirmatively ceded directly or indirectly by the people. *See, e.g.,* 64 Am.Jur.2d Public Securities and Obligations § 80 (2019). "When power is granted by law to counties, districts, or municipalities to issue bonds or notes, the exercise of the power must be in accord with the grant. The power of a municipality to issue bonds must be exercised in the particular manner specified, if one is specified. Where a power is granted and the method of its exercise prescribed, the prescribed method excludes all others and must be followed." *Id.*

87.     Section 8-202 does not purport to change the historical dichotomy between bond issuances where the issuer lacked the power to issue the bonds at all (unsalvageable) and those where the issuer incorrectly implemented its power to issue bonds (a problem that, in some instances, can be remedied). Just the opposite. Official Comment 3 to § 8-202 of the Uniform Commercial Code explains that section 8-202(b) codifies this traditional distinction. *See* UCC § 8-202, Official Comment 3 (citing *Anthony*, 101 U.S. 693; *Town of South Ottawa v. Perkins*, 94 U.S. 260 (1876)). When common law principles are codified, "the common law remains not only good law, but a valuable touchstone for interpreting the statute, unless [the legislature] explicitly states that it intends to supplant the common law." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 553 (4th Cir. 2004) (citing *Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494,

501 (1986)) (emphasis omitted). Thus, while section 8-202(b) reflects the common law distinction between *ultra vires* acts versus irregular exercises of valid power, it does not supplant it.

88.     Nor does section 8-202 control whether a defective bond issuance is an *ultra vires* act or merely an irregular exercise of valid power. *See Wein*, 41 N.Y.2d at 490 (citing § 8-202 as a manifestation of the common law distinction, but noting that it not determinative because it is "subject to constitutional limitations"). Likewise, section 8-202 does not constitute the requisite grant of authority. If section 8-202 retroactively empowered public actors to issue bonds, there would be no reason for the legislature to grant and delineate bonding authority in the first place. That cannot be the law. The Uniform Commercial Code cannot create a governmental power that does not otherwise exist.

89.     For the reasons set forth *supra* in section III, the 2008 Bond Issuance was not just a harmless irregularity in the exercise of a valid power; it was an attempt to exercise a power that did not exist at all. Thus, just as the Bondholders cannot rely on equitable doctrines under common law to validate the *ultra vires* ERS Bonds, they cannot rely on section 8-202 of the Uniform Commercial Code to do so either.

## V.     The ERS Bondholders Have No Enforceable Claims In Connection With The ERS Bonds.

90.     Since the 2008 Bond Issuance was *ultra vires*, the ERS Bonds are void *ab initio*, and the ERS Bondholder Claims are not enforceable. The U.S. Supreme Court, the Puerto Rico Supreme Court, and numerous other courts have long refused to enforce *ultra vires* bond issuances. Starting with the seminal decision, *Buchanan v. City of Litchfield*, 102 U.S. 278, 288 (1880), where the United States Supreme Court held that "there would seem to be no escape from the conclusion that the bonds are void for want of legal authority to issue them at the time they were issued" to the Puerto Rico Supreme Court's decision in *Humacao Lumber Company v. American Surety*

*Company of New York*, 59 D.P.R. 165, 168-69 (1941), unauthorized bond issuances are void and unenforceable. *Accord District Tp. Of Doon v. Cummins*, 142 U.S. 366, 374 (1892); *Dixon County v. Field*, 111 U.S. 83, 97 (1884); *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp.3d 267, 290 (D.P.R. 2015); *Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*, 564 F. Supp. 1425, 1429 (W.D. Va. 1983), *aff'd*, 740 F.2d 961 (4th Cir. 1984); *Town of Belleair v. Olds*, 127 F.2d 838, 839-40 (5th Cir. 1942); *Vt. Dep't of Pub. Serv. v. Mass. Mun. Wholesale Elec. Co.*, 151 Vt. 73, 91 (1988).

91.     Nor do the ERS Bonds give rise to unjust enrichment or similar equitable claims. As the United States Supreme Court explained in *Litchfield v. Ballou*, 114 U.S. 190, 193 (1892), "[i]f this prohibition is worth anything it is as effectual against the implied as the express promise, and is as binding in a court of chancery as a court of law." *Cummins*, 142 U.S. at 374. "The nonenforcement of illegal contracts is a matter of common public interest . . . . Validity cannot be given to an illegal contract through any principle of estoppel." *Vt. Dep't of Pub. Serv.*, 151 Vt. at 91 (quoting *Sherwood & Roberts-Yakima, Inc. v. Leach*, 67 Wash. 2d 630, 639 (1965)). The same is true under Puerto Rico law. In *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682 (1987), the court refused to apply equitable estoppel or unjust enrichment to enforce a municipality's *ultra vires* contract because equitable enforcement would "violate the public policy set down in the Municipal Law." Similarly, in *Hatton v. Municipio de Ponce*, 134 D.P.R. 1001 (1994), the court refused to apply unjust enrichment to enforce a municipal contract made in violation of bidding regulations.

92.     Two public policy considerations support barring equitable claims premised on *ultra vires* bond issuances. *First*, public funds must be protected against unauthorized appropriations. In *Office of Personnel Management v. Richmond*, 496 U.S. 414, 416 (1990) the

United States Supreme Court refused to apply principles of equitable estoppel to obligate the government to make disability payments in excess of regulatory authorization. *In re Calore Exp. Co., Inc.*, 288 F. 3d 22, 39 n.7 (1st Cir. 2002), the First Circuit cited *Richmond* for the proposition that "courts may rarely, if ever, apply the doctrine of equitable estoppel against the government— and never to require the government to pay public funds contrary to a statutory appropriation." *Accord DeCosta v. Allstate Ins. Co.*, 730 F.3d 76, 83-84 (1st Cir. 2013) (enforcing insurance payout that would be in violation of flood insurance regulations would usurp Congress); *Morales*, 119 D.P.R. at 682 (refusing to apply equitable principles to enforce ultra vires contract because "[t]o decide otherwise is to promote gross noncompliance by public officers of the laws and regulations that govern their actions").

93.     *Second*, "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 n.17 (1984); *accord Las Marias v. Municipio San Juan*, 159 D.P.R. 868 (2003) ("the private entity that remains idle and renders services without requiring convincing proof that the government complied with its duty runs the risk of having to take responsibility for its own losses"). Recitals in the bonds or other representations to the contrary do not absolve counterparties from conducting their own due diligence. *See, e.g., Dixon Cty.*, 111 U.S. at 97 ("[T]he [county] is not estopped by the recitals in the bonds to deny their validity"); *accord Maine Med. Ctr. v. Burwell*, 841 F.3d 10, 19 (1st Cir. 2016) (oral statements that intermediary had authority to enter settlement agreements did not make the agreements enforceable against the government because the representation "cannot cloak the intermediary with authority that it does not have"). In sum, because the ERS Bonds are *ultra vires*

40

and void, no ERS Bondholder can assert a claim in connection with the issuance or performance

of the ERS Bonds.

**VI.    The Court Should Disallow The ERS Bondholders' Claims To The Extent That They Allege A Security Interest In The Property Of The Commonwealth And Other Instrumentalities And Subdivisions, In ERS Property Other Than Pre-Petition Employer Contributions Or In Postpetition Assets.**

94.    Even if the 2008 Bond Issuance was not *ultra vires*, the ERS Bondholders' claims

are almost entirely, or entirely, unsecured. As an initial matter, the Court should find that because

the ERS Bondholders do not have a contractual basis to assert a claim against the Commonwealth,

the ERS Bondholders also cannot assert a secured claim in any Commonwealth property.

95.    With respect to ERS property, the ERS Bondholders should be limited to asserting

a claim against employer contributions received prepetition by ERS, and they should be required

to trace the funds held by ERS to prepetition employer contributions. *See* 19 L.P.R.A. § 2265(b)(2);

*see also Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 440 (7th Cir. 2005).

ERS's property as of the petition date consisted of not only employer contributions, but also assets

that the ERS Bondholders plainly do not have a claim over, including employee contributions,

employee loan repayments, investments and investment proceeds, Additional Uniform

Contributions, and assets acquired before the ERS Bonds were issued in 2008. If the ERS

Bondholders cannot trace ERS assets to prepetition employer contributions (and it appears that

they cannot), then the ERS Bondholders have no enforceable lien in ERS assets. *Id.*

96.    Further, the Court should find that the ERS bondholders do not hold a security

interest in any post-petition employer contributions made to ERS because their liens were cut off

by operation of section 552 of the Bankruptcy Code and PROMESA upon the commencement of

ERS's Title III case. As a general rule, under section 552(a) of the Bankruptcy Code, "property

acquired by the estate or by the debtor after the commencement of the case is not subject to any

lien resulting from any security agreement entered into by the debtor before the commencement
of the case." 11 U.S.C. § 552(a); *see In re Cty. of Orange*, 179 B.R. 185, 194 (Bankr. C.D. Cal.
1995); *In re Green Corp.*, 154 B.R. 819, 821 (Bankr. D. Me. 1993) ("Prepetition security interests,
even 'floating' liens and liens with 'after acquired property' provisions, do not extend to property
acquired by the debtor after the bankruptcy filing").

97.     The purpose of §552(a) is "to prevent a creditor's pre-petition security interest in
'after-acquired property' (a 'floating lien') … from attaching to property acquired by the estate or
debtor-in-possession after the filing of a bankruptcy petition."  *In re Cross Baking Co., Inc.*, 818
F.2d 1027, 1029 (1st Cir. 1987). Therefore, under section 552(a), even if the 2008 Bond Issuance
was valid, the ERS Bondholders' security interest only attaches to the employer contributions ERS
held on the date it filed for bankruptcy (subject to tracing, as necessary) and would not extend to
any employer contributions or any other asset ERS obtained post-petition.

### i.     Employer Contributions Are Not "Special Revenues."

98.     The ERS Bondholders have previously argued that the future employer
contributions are "special revenues," and entitled to exemption from section 552 under section
928, which states:

> Notwithstanding section 552(a) of this title and subject to subsection (b) of
> this section, special revenues acquired by the debtor after the
> commencement of the case shall remain subject to any lien resulting from
> any security agreement entered into by the debtor before the
> commencement of the case.

11 U.S.C. § 928(a).

99.     "Special revenues" are defined as:

> (A) receipts derived from the ownership, operation, or disposition of projects
> or systems of the debtor that are primarily used or intended to be used primarily
> to provide transportation, utility, or other services, including the proceeds of
> borrowings to finance the projects or systems;

(B) special excise taxes imposed on particular activities or transactions;

(C) incremental tax receipts from the benefited area in the case of tax-increment financing;

(D) other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions; or

(E) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property, sales, or income taxes (other than tax-increment financing) levied to finance the general purposes of the debtor.

11 U.S.C. § 902(2).

100.    The ERS Bondholders have argued that the employer contributions are "special revenues" for two reasons: (i) they are "revenues derived from particular functions" of ERS "to collect and pay out pension payments"; and (ii) because ERS is a "system." (Adv. No. 17-00213, Dkt. 94, at 25-26.) This argument construes "special revenues" too broadly. It would make "special revenues" out of any governmental function's receipts because every governmental entity receives and disburses payments, whether for pensions or otherwise.

101.    Congress did not intend such a broad construction. The legislative history suggests that Congress introduced the Bankruptcy Code's protection of "special revenues" with a focus on "revenue bonds," which "are usually backed by and repaid only from the revenues generated from the physical asset built with the money raised by the bond offering." Alexander D. Flachsbart, *Municipal Bonds in Bankruptcy: S 902(2) and the Proper Scope of "Special Revenues" in Chapter 9*, 72 Wash. & Lee L. Rev. 955, 1032 n.217 (2015) (quoting H.R. Rep. No. 100-1105, 100th Cong., 2d Sess. 4 (1988)). Consequently, "special revenues" includes only revenues pledged to secure financing that is used to create the pledged revenue. The legislative history confirms this limitation. The Senate Report describes the kinds of revenues to which the definition would apply: "[r]evenue bonds are issued to finance projects or programs, and the revenues from such a project or program are pledged to repay the bonds." S. Rep. No. 100-506, 100th Cong. 2d Sess. 4-5, 13 (1988); *see*

43

*generally* H.R. Rep. No. 100-1105, at 6-7 (describing the categories of special revenue bonds as resulting from financing the project that generates the revenues).

102.   Moreover, the limited case law on this issue supports this more limited definition as the cases considering "special revenues" have each involved revenues derived from a particular asset. *See, e.g.*, *In re Jefferson Cty.*, 474 B.R. 228, 263 (Bankr. N.D. Ala. 2012) (revenues of country sewer system are "special revenues" under 902(2)(A)).

103.   With this background in place, it is clear that the employer contributions cannot be considered "special revenues" because the ERS Bonds were not issued to provide financing to create the employer contributions. *First*, nothing in the offering documents or the Bond Resolution purport that the ERS Bonds are special revenue bonds.  That is not surprising given that there is no physical asset generating revenue.

104.   *Second*, the ERS Bondholders' claim that they fall under section 902(2)(A)'s protection of revenues derived from a municipal's "ownership, operation, or disposition" of a revenue-generating "project or system" plainly fails because the types of projects or systems that meet this criteria typically include "water, sewage, waste, or electric systems" and "toll highway or bridge or other projects or systems which impose user fees." Flachsbart, at 998 (2015); *see also* Collier on Bankruptcy ¶902.03[1] (16th 2017) ("[t]he kinds of projects or systems included within this category are transportation or utility systems.)" The employer contributions, however, are not revenues or proceeds generated by a project or system of the debtor and ERS does not provide services to the population. Instead, they are simply contributions received from third parties made to the debtor pursuant to statute.

105.   The ERS Bondholders' argument that they also fall under section 902(2)(D)'s protection of "other revenues or receipts derived from particular functions of the debtor, whether

or not the debtor has other functions" fares no better. The legislative history suggests this category of special revenues should receive a narrow construction. "The House and Senate Reports suggest that the phrase 'particular functions' includes minor revenue-raising capabilities—like 'regulatory fees and stamp taxes imposed for the recording of deeds'—that should qualify as special revenues." Flachsbart, 72 Wash. & Lee L. Rev. at 998. The employer contributions received by ERS are not derived from particular functions "of the debtor," ERS; they are derived from the employment of employees by the Commonwealth and its instrumentalities and the statutory imposition of an obligation to remit such contributions on account of the employment of such employees.

### ii. Section 552(b) Is Inapplicable To The ERS' Bondholders Security Interest.

106.    The ERS Bondholders have also attempted to avoid the operation of section 552(a) with the argument that they are protected under section 552(b), which allows secured creditors to retain an interest in the "proceeds, product, offspring, rent or profits" of property subject to a lien if "(1) the parties entered into a pre-petition security agreement and (2) the security interest extends to pre-petition property of the debtor and proceeds of such property." *In re Cty. of Orange*, 179 B.R. at 194. Specifically, the ERS Bondholders have argued that they fall under §552(b) because ERS, at the time it filed for bankruptcy, had a statutory right to receive future employer contributions and that right constitutes an "account" or "general intangible" under the Uniform Commercial Code and "[i]t is well settled that the payment or collection of an account or a general intangible constitutes proceeds of such account or general intangible ..." (Adv. Pro. 17-00213, Dtk. 94 ¶47.)

107.    This argument is incorrect for two reasons. *First*, a security interest cannot attach to anything greater than the debtor's own rights. *See* U.C.C. § 9-203(b)(2) (a security interest is

enforceable against the debtor and third parties with respect to the collateral only if: . . . the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"); *see also* 11 U.S.C. § 506(a)(1) ("a secured claim [is secured] to the extent of the value of such creditor's interest in the estate's interest in such property"). Post-petition employer contributions therefore cannot constitute the proceeds of prepetition collateral unless ERS had a categorical right to receive employer contributions prepetition. It did not; if all employees stopped working at the outset of the case, ERS could not have compelled employers to make contributions on their behalf. ERS's pre-petition "right" to future employer contributions only would extend to employer contributions that were already due at the petition date because the employees already had performed the work that gives rise to the pension obligation but had not yet been paid as of the petition date  *See* 3 L.P.R.A. §787(f). And such a right, as against the Commonwealth, would be nothing more than an unsecured prepetition claim of ERS in the Commonwealth's Title III cases. ERS, however, had no "right" to future employer contribution that were not yet payable because the employee had not yet performed the work that would give rise to the underlying pension obligation.

108.    An apt comparison to this case is the decision in *County of Orange* where the municipal debtor issued hundreds of millions of dollars in bonds secured by certain future tax and other general revenues. 179 B.R. at 185. Specifically, the underlying security agreement created "a first lien and charge against the first monies received by the County," and local law provided that the lien "shall be payable from the first moneys received by the local agency from, such pledged moneys." *Id.* at 193. The court held that §552(b) did not apply because "[n]either the [security agreement] nor the [ordinance] make any reference to pre-petition property of the County. Section 552(b)(1), therefore, does not except the pledged revenues … from the application

of §552(a)." *Id.* at 193-94. So too here. The ERS Bondholders' lien is, by and large, limited to employer contributions actually received. It does not extend to an underlying asset that produced the employer contributions (for example, the employers or the employees' labor), but only to the contributions themselves. Thus, it is a "floating lien" on future revenue—precisely the type of security interest cut off by section 552(a).

109.    *Second*, the First Circuit has held that liens based on future earnings do not survive a bankruptcy filing under §552. In *In re Miranda Soto*, 667 F.2d 235, 237 (1st Cir. 1981), the court held that "[t]here is nothing in the [Bankruptcy] [C]ode that suggests, even faintly, that assignments of future earnings may create a lien that will withstand bankruptcy." The seminal decision, *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934), makes the same point. *Accord Rivera Feliciano v. Sistema de Retiro del E.L.A., Assoc.*, 111 B.R. 380, 384 (Bankr. D.P.R. 1990) ("Thus, Mrs. Edelstein's assignment of wage contributed to the pension fund could only create a valid lien in bankruptcy encumbering her contributions derived from pre-petition wages, regardless of when the assignee could have had access to said contributions); *In re Mintz*, 192 B.R. 313 (Bankr. D. Mass. 1996) (holding that amounts paid by partnership for earnings made after the individual debtor filed for bankruptcy were not proceeds of bank's pre-petition security interest in debtor's rights to receive distributions form the partnership). Such rights to future earnings (or based on future earnings) are more appropriately seen as after-acquired property instead of proceeds and therefore are not protected under §552(b).

## CONCLUSION

110.    For all of the foregoing reasons, the ERS Bonds are not enforceable under applicable law. The ERS Bondholder Claims must therefore be disallowed in their entirety against both the Commonwealth and ERS. *See* 11 U.S.C. § 502(b)(1); *Travelers*, 549 U.S. at 450. Alternatively, if the Court concludes the ERS Bonds are not *ultra vires*, the Court should

nonetheless hold that the ERS Bondholders claims against the Commonwealth and any of its property are void because they have no contractual basis.  As to ERS, the Court should hold that the ERS Bondholders are limited to asserting claims only against employer contributions held by ERS as of the petition date, and only to the extent such contributions are identifiable and segregable.

## NOTICE

111.    Notice of this Objection has been provided to the following entities, or their counsel, if known: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Puerto Rico; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (iv) the UCC; (v) the insurers of the bonds issued or guaranteed by the Debtors; (vi) counsel to certain *ad hoc* groups of holders of bonds issued or guaranteed by the Debtors; (vii) holders of ERS Bonds who are parties to any group that has filed a statement under  Bankruptcy Rule 2019; (viii) the holders of ERS Bonds identified on Appendix I to the UCC's Objection; (ix) The Bank of New York Mellon, N.A., as Fiscal Agent for the ERS Bonds; (x) DTC; and (xi) all parties that have filed a notice of appearance in the above-captioned Title III cases.

112.    The Retiree Committee also notes that the UCC, in connection with its objection to certain of the claims filed by ERS Bondholders, also filed the *Motion of Official Committee of Unsecured Creditors, Under Bankruptcy Code Sections 105(a) and 502 and Bankruptcy Rule 3007, Establishing Procedures with Respect to Objections to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico and Requesting Related Relief* (Case No. 17-3283, ECF No. 5589) that seeks an Order establishing procedures with respect to its objection. A hearing on that motion is scheduled for April 24, 2019. The Retiree Committee supports the UCC's motion but requests that this Objection also be governed by the procedures approved by this Court.

Dated: April 23, 2019

JENNER & BLOCK LLP

By:
*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)


Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Respectfully submitted,

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:
*/s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
hector.mayol@bennazar.com
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*