# EXHIBIT L

**GEOTEXT**
Translations

translations@geotext.com
www.geotext.com

STATE OF NEW YORK          )
                          )
                          )    ss
COUNTY OF NEW YORK         )


## CERTIFICATION


This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Law No. 106, dated August 23,

2017.


Lynda Green, Senior Managing Editor
Geotext Translations, Inc.


Sworn to and subscribed before me

this _12th_ day of _October_, 20_17_.


HOA WIN LY
Notary Public, State of New York
No. 01LY6323702
Qualified in New York County
Term Expires April 27, 2019


New York
t: +1.212.631.7432

Washington, D.C.
t: +1.202.828.1267

Chicago
t: +1.312.242.3756

Houston
t: +1.713.353.3909

San Francisco
t: +1.415.576.9500

London
t: +44.20.7553.4100

Paris
t: +33.1.42.68.51.47

Stockholm
t: +46.8.463.11.87

Frankfurt
t: +49.69.7593.8434

Hong Kong
t: +852.2159.9143

**(Senate Bill 603)**

# LAW NO. 106
# AUGUST 23, 2017

To establish the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," for the purpose of reforming the Puerto Rican Government Employee Retirement System, and the Teacher Retirement System, according to the economic and fiscal reality in Puerto Rico and the provisions of the Fiscal Plan for Puerto Rico, certified in accordance with the provisions of Public Law 114-187, known as the "Puerto Rico Oversight, Management and Economic Stability Act" or "PROMESA;" establish that the General Fund, via the "pay as you go" system, will take over the payments that the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement Systems are unable to make; order the three Retirement Systems to continue to meet their obligations to their beneficiaries and pensioners by contributing their available funds and the funds from the sale of their assets to the General Fund; establish the New Plan for Defined Contributions and provide for its administration; create the Retirement Board, delegate its powers and duties; amend Section 2 of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act;" amend Articles 1-1.04 and 4-101, repeal subsections 11 and 12 and renumber subsections 13, 14 and 15 as 11, 12 and 13, respectively, of Article 4-103 of Law No. 447 of May 15, 1951, as amended, known as the "Commonwealth of Puerto Rico Government Employee Retirement System Law;" amend Articles 1.1, 2.3 and repeal Articles 2.4, 2.5 and 2.6 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Law;" amend Section 1081.01 of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico;" repeal Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Law," guarantee the benefits for Pre-retirees and provide for employees that have requested such benefits to complete the process; authorize the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF) to design, implement and oversee an incentivized voluntary redundancy program for public servants in the Executive Branch; and other related purposes.

# STATEMENT OF LEGISLATIVE INTENT

Puerto Rico is currently experiencing an unprecedented financial and social crisis. This crisis arose, in part, due to the lack of spending controls, sustainable development measures and management information systems that would provide clarity and transparency in government management.

Case:17-03283-LTS Doc#:6482-3 Filed:04/23/19 Entered:04/23/19 15:58:32 Desc:
Case:17-00219-LTS Doc#:482-12 Filed:06/03/19 Entered:06/03/19 15:51:05 Desc:
Exhibit C Page 4 of 87

2

According to data provided by the Federal Department of the Treasury, Puerto Rico has experienced a cumulative economic contraction of 14.6% of the Gross State Product (real GSP) and is predicted to contract by an additional 3% over the next two years. Since the early 21st Century, the Puerto Rican Government has operated with a structural deficit that has been financed by issuing bonds and loans to the Government Development Bank. However, the serious financial situation cut off the Government's access to the financial markets, affecting its ability to obtain short- and long-term financing. As a result, the Government of Puerto Rico has lacked liquidity for more than a year. The previous Administration therefore used the refunds belonging to taxpayers, contractor payments, money from retirement funds and intragovernmental loans as replacement sources of liquidity to spend more than the available funds. The Government Development Bank has been in default of its obligations to bond holders since May 1, 2016, and no longer performs its function of providing the Government with liquidity. As if this were not enough, the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement System are insolvent.

As an example of the misguided government policies that led to this fiscal situation, note that from 2001 to 2008, government payroll costs increased by 64% and despite efforts to curb this problem, after a 33% reduction between 2009 and 2012, there was another substantial increase in the 2013-2016 four-year period. To finance this excessive expense, between 2000 and 2008, government debt increased by 134%. In addition, between 2013 and 2016, measures were implemented based on a policy of "first default, then tax, and then cut." This philosophy fostered continued excessive spending and the rejection of public policies that would have allowed the Puerto Rican Government to efficiently manage its fiscal affairs, all without having taken the necessary steps to achieve greater operational efficiency within the Government, or cutting excessive government spending. Moreover, while securities plunged and the economic debacle gained speed, the Central Government was unable to generate the necessary financial data to analyze and understand the depth of the problem and provide accurate information to the United States Congress and other entities with an interest in the matter. As a result of all of the foregoing, Puerto Rican Government debt, and that of its instrumentalities, was downgraded several times in a short period of time, triggering negative effects across all sectors of the economy.

This crisis has hit Puerto Rican families very hard. The greatest sacrifices have been demanded from the most vulnerable members of our society and have caused thousands of Puerto Ricans to abandon the Island for other parts of the United States in search of better opportunities. The resulting drop in population has become one of the challenges we are now facing on the road to recovery.

## Puerto Rico's Status as a Colony

Our colony status hinders our ability to meet and resolve this crisis, since we lack the sovereign authority that states have to regulate local affairs under the Tenth Amendment to the United States Constitution. "[t]o the United States Supreme Court, the [adoption of the Puerto Rican] Constitution did not represent a change in the fundamental basis of the constitutional relations between Puerto Rico and the United States. The Supreme Court continued to treat Puerto Rico as a political entity subject to the Territorial Clause of the Constitution of the United States." *See* The People of Puerto Rico v. Sánchez Valle et al., 192 D.P.R. 594, 631 (2015).

"[T]here was never a transfer of sovereignty, only a delegation of powers." Ibid. at p. 635. "That delegation of power does not constitute an irrevocable renunciation nor a termination of the power of Congress. The People of the United States granted Congress, through the Constitution, ample power to manage the territories. For this reason, the Congress cannot irrevocably renounce a power that was conferred on it by the People of the United States." Ibid. at p. 638.

Thus, "Congress can allow for the Commonwealth to remain as a political system indefinitely and, on the other hand, it has the constitutional authority to amend or revoke the powers exercised the Government of Puerto Rico to manage its internal affairs. In other words, Puerto Rico's internal government system is entirely subject to the political will and legal authority of Congress." Ibid. at p. 641.

The sad truth is that our colonial status places us in such a defenseless position that our United States citizenship, which the overwhelming majority of Puerto Ricans cherish, and which we have enjoyed since 1917, is not even guaranteed to us. The fact is that Congress has the legislative discretion to grant privileges to citizens born in the territories, including US citizenship, but this right can be revoked at any time. In fact, the Federal Government has argued in court that in the territories there is no right to citizenship, but it is rather a legislative grace on the part of Congress. *See, e.g.*, Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

With regard to the particular matter before us, as an example of the limitations imposed upon us by our colonial status, we note that states can avail themselves of the protections offered by the Federal Bankruptcy Code, but Puerto Rico was excluded from said statute and, given the fact that we lack full representation in Congress, there is little or nothing we can do about it. Nor can we legislate a local bankruptcy because the same federal law that fails to protect us occupies the field and preempts any local legislation. *See* Puerto Rico v. Franklin Cal. Tax-Free Tr. 136 S. Ct. 1938 (2016) (declaring unconstitutional the "Puerto Rico Public Corporation Debt Enforcement and Recovery Law," Law 71-2014, known colloquially as the "Recovery Law").

### The direct result of our colonial status: PROMESA

The policies of the past, and our defenseless colonial status, led the United States Congress to enact the law known as the "Puerto Rico Oversight, Management and Economic Stability Act," (known by its acronym, "PROMESA,") Pub. L. 114-187, and delegated broad powers to a Financial Oversight and Management Board (hereinafter, the "Oversight Board").

Once again, lacking full representation in Congress, said Act was passed without any real participation on the part of our people. Under PROMESA, Puerto Rico's ongoing fiscal planning activities, budget, legislative and executive actions, in addition to the debt restructuring, whether consensual or not, and the issue, securing, swapping, modification, buyback and redemption of debt are all subject to the oversight of the body created for said purpose.

Section 4 of PROMESA clearly provides that its provisions shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act. Thus, the United States Congress expressly manifested its intention that said Act should supersede any state law in conflict with PROMESA. This is also provided by Section 8 (2) of PROMESA, which provides that the Government of Puerto Rico may not enact, implement, or

enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board. As such, we are unable to enact any legislation that would invalidate PROMESA or undermine its provisions or scope.

At this juncture, we must stress that under the Tenth Amendment to our Federal Constitution, the Federal Government cannot impose on a State the sort of things the Federal PROMESA Act allows it to impose on territories. Congress was thus able to impose a Board on Washington D.C., which is not a state and is under Congress' direct jurisdiction. Similarly, the Board of the City of New York was created by its own state legislature and not Congress. Detroit, which is a city and not a state, participated in a voluntary bankruptcy proceeding. In short, we cannot lose sight of the fact that the current situation and the imposition of the Oversight Board is just another consequence of our colonial status that has constrained our development for more than five hundred years and remained completely unchanged following the adoption of the Puerto Rican Constitution in 1952, as authorized by Congress.

Regrettably, our status as a colony and consequent lack of political power exacerbates the fact that Congress has imposed a Federal Law on us that supersedes all local legislation, including our Constitution, without giving us the opportunity to vote on it or even vote for the President who approved it. This illustrates the fact that in order to get out of the economic quagmire we are in, we must resolve the problem of our political status. However, it is also an indisputable fact that we have to work within the parameters of PROMESA to begin Puerto Rico's economic and fiscal recovery.

On October 30, 2016, the Oversight Board designated the Government of Puerto Rico, the Government Employee Retirement System, Judiciary Retirement System, Teacher Retirement System, the University of Puerto Rico and 21 public corporations in Puerto Rico as "covered entities" subject to financial supervision under PROMESA. Section 405(b) of PROMESA imposed a temporary stay of any lawsuits or claims against the Government of Puerto Rico and its instrumentalities on various matters, in the hope that the Government of Puerto Rico, on its own behalf and on behalf of its instrumentalities, would enter into voluntary negotiations with their creditors to reorganize and settle the repayment of their debt obligations and simultaneously undertake a responsible restructuring of the Government of Puerto Rico and its instrumentalities that would realign the essential services required for the health, safety and wellbeing of the residents of Puerto Rico, with the timely repayment of its debt obligations. The stay expired on May 1, 2017. Following its expiration, this matter is already being aired in various federal venues including the Federal Court for the District of Puerto Rico.

After investing millions of dollars in specialized consulting services, in 2016 the previous Administration presented a deficient fiscal plan that was immediately rejected by the Oversight Board, as it failed to resolve the fiscal problems caused by the previous Administration.

## A New Government: Responsibility to the Oversight Board

As a result of all of the foregoing, when we took the reins of the Government on January 2, 2017, we inherited a cash deficit of more than $7.6 billion, as certified by the Federal Treasury and the Oversight Board. This was a Government without access to capital markets, with junk bond status, no liquidity, no transparency in public finances, with high government spending and debts totaling billions of dollars. Moreover, Governor Ricardo A. Rosselló Nevares was facing the colossal task of regaining credibility in the financial markets and with the Oversight Board.

It is our responsibility to guarantee a Government in which expenditures are based on actual revenue. That is why, since the start of our Administration, we have implemented a concerted plan to control government spending, reactivate our economy and facilitate the creation of more and better private sector jobs. On February 28, 2017, the Governor presented a complete, all encompassing, real Fiscal Plan, which at the same time is sensitive to the needs of our People and the most vulnerable among us. On March 13, 2017, the Oversight Board accepted and certified the Fiscal Plan, along with a series of contingencies that guarantee that there will be no layoffs of government employees or changes in the workday, maintaining our People's access to health care and protecting the pensions of our most vulnerable citizens. The Certified Fiscal Plan is the only alternative to avoid the layoff of public employees, elimination of the right to health care, to meet our obligations to pensioners, keep the Government running and be sufficient to avoid more stringent measures that are part of the contingencies of the Certified Fiscal Plan approved by the Oversight Board.

The validation of the Fiscal Plan is an acknowledgment of the credibility of the new Government. The changes we are putting into place will not be easy and will take time, but will also begin to yield results in the first two years of their implementation. Now it is up to us to implement the contingencies that the Fiscal Plan requires the Government to fulfill. We must ensure that we have sufficient access to liquid resources to avoid impacting the wages of government employees, the health care of our People or the income of our pensioners.

This Law seeks to safeguard the wellbeing of our pensioners and public servants, while faithfully implementing the Fiscal Plan certified by the Oversight Board. It is promulgated in order to adjust the legal and judicial framework so as to meet the requirements demanded by the Oversight Board in the Fiscal Plan approved under the Federal PROMESA Act. In view of the foregoing, by virtue of the reasoning power of the State and in accordance with Article II, Sections 18-19 and Article VI, Section 7-8 of the Constitution of Puerto Rico, this serious economic and fiscal emergency in Puerto Rico necessitates the passage of this Law so that the State can finance the pension benefits for public servants who have already retired and those that will do so in the future. We exercise this reasoning power of the State to take the necessary steps to comply with the Fiscal Plan and place Puerto Rico on the road to economic recovery. Implementing this Plan is a pressing need on the part of the State so as to maintain its operations and protect our most vulnerable citizens.

As defined by the Supreme Court of Puerto Rico, the reasoning power of the State is "that power inherent to the State that is used by the Legislature to prohibit or regulate certain

activities for the purpose of fostering or protecting the public peace, ethics, health and general wellbeing of the community, which may be delegated to the municipalities." Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Our High Court ruled that steps taken to deal with an emergency that are reasonable and necessary to advance important government interests are valid. See, Trinidad v. E.L.A. 188, D.P.R. 828 (2013) and Domínguez Castro v. E.L.A. supra, pp. 88-89. Similarly, the Supreme Court recognized the "precariousness of the economy as a reality that necessarily influences the definition of the scope of the government's action under the reasoning power of the State," and that in the exercise of said power, "the Legislature has broad authority to pass economic regulations aimed at promoting the wellbeing of the community." Domínguez Castro v. E.L.A. supra, p. 37. On behalf of the Court, Associate Justice Kolthoff Caraballo pointed out that like the rest of the world, our jurisdiction is "going through a very tumultuous economic and financial period. It would seem that the economies of countries around the world are intertwined and tied to the tail of a kite that just cannot get off the ground." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denied, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). Thus the Supreme Court recognized that it had to be aware of the current reality, which it termed "harsh and unfriendly." Faced with such a historic scenario, our Court deemed it necessary to aspire to altruism in the pursuit of "collective economic wellbeing, at the expense of individual wellbeing." This Court also reiterated the recognition of an economic crisis in our jurisdiction in Herrero et al. v. E.L.A. 179, D.P.R. 277 (2010) and stressed, in the context of providing a remedy that involved the disbursement of public funds to refund money to taxpayers, that it was not "unaware of the difficult state of public finances in our country." Ibid. at p. 309.

The Supreme Court upheld Law 3-2013, as amended, on the Puerto Rican Government Employee Retirement System in Trinidad Hernández v. E.L.A., supra, holding that the Legislature had exercised the reasoning power of the State to halt the insolvency of the Puerto Rican Government Employee Retirement System. The Supreme Court reasoned that "the statement of legislative intent ... shows that the measures adopted are necessary and reasonable to adequately address the financial crisis that is imperiling the actuarial solvency of this system." It added that "it certainly constitutes an important public interest since guaranteeing the economic solvency of the system benefits all of the Participants and addresses, in part, the financial crisis the Country is facing by protecting the wellbeing of all Puerto Ricans." Trinidad Hernández v. E.L.A. supra, p. 837. It concluded that the rule is constitutional "because, although it substantially impairs the contractual obligations in dispute, the measures taken are reasonable and necessary to salvage the actuarial soundness of the Retirement System and there are no less onerous measures to achieve that end." Ibid., p. 839.

Similarly, in Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico [Puerto Rico Teachers' Association v. Puerto Rican Teachers Retirement System], 190 D.P.R. 854 (2014), the Supreme Court passed judgment on the measures adopted by Law 160-2013 to resolve the crisis in the Teachers Retirement System and ruled that the Law did not advance the important State interest as required by our constitutional system in cases involving retirement system reform: that of guaranteeing the solvency of the system itself. It therefore ruled that Law 160-2013, insofar as the impairment of contractual obligations is concerned, is unreasonable and, therefore, unconstitutional. Ibid., p. 12. On that occasion, the Court emphatically stressed that measures passed will be considered constitutional if they are

reasonable and necessary "to advance its actuarial soundness and there are no less onerous measures to achieve that end." Ibid., p. 8.

Based on the legal framework set forth above, this Legislative Assembly believes that the measures taken in this Law are necessary and reasonable to adequately address the fiscal crisis and actuarial insolvency of the Retirement Systems for Puerto Rican Government Employees, the Judiciary and for Teachers. It also creates the legal framework that will facilitate compliance with the provisions and targets related to the Retirement Systems included in the Fiscal Plan certified by the Oversight Board in accordance with the Federal PROMESA Act. Said Plan establishes fiscal adjustments aimed at stabilizing Government finances in times when there is no access to the financial markets. If we do not implement these measures, Puerto Rico's economic and social wellbeing will suffer irreparable damage, and as such implementing this reform as part of the Fiscal Plan is a pressing interest of the State to protect the public interest.

## Government Restructuring

Furthermore, the Plan for Puerto Rico promoted by this Administration that was endorsed by the Puerto Rican People in the last general elections via the democratic exercise of the vote, proposes the implementation of a new government structure that would significantly reduce public spending and substantially improve function. Achieving this requires a conscientious assessment of the services provided by the Government, so as to determine which of these can be consolidated, delegated to the private sector, or eliminated because they are no longer necessary, all without involving government employee layoffs, but rather by mobilizing them in accordance with our citizens' need for services.

In keeping with the above, and as part of the first steps taken by this Administration to curtail the fiscal crisis by re-engineering the government structure, Law 8-2017 was enacted, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act." This Law makes the Government a Single Employer so that public servants become employees of the Government rather than of their various entities, thereby facilitating the best use of human resources where there is a pressing need via the mechanism of mobility, without any employees having to resign from their positions and start over at another government instrumentality. With the concept of mobility, we seek to reinforce the understanding of the balance between the workforce and the rendering of public services. In this way, we efficiently distribute Government human resources and create a streamlined government structure, based on continuously assessing needs and helping public servants to make the adjustments and adaptations required by the current fiscal crisis and future challenges.

## PROMESA and the Supremacy Clause

On the other hand, it is important to highlight the application and mandate that the United States Congress, by virtue of its plenary governing power over the Territory of Puerto Rico, imposed on us in enacting PROMESA, which creates the Oversight Board, tasked with approving and overseeing the execution of a Fiscal Plan for the economic stabilization of Puerto Rico, among other missions.

Said law enacted on May 4, 2016, contains the following supremacy clause:

Sec. 1 ''Puerto Rico Oversight, Management, and Economic Stability Act'' or ''PROMESA.'' (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act.** (Emphasis added).

Under Sec. 101 of PROMESA, the Oversight Board, at its sole discretion, may at any time designate any territorial instrumentality as a covered instrumentality subject to the obligations of said Act. At this time, the Oversight Board has designated all public corporations as covered entities. Moreover, under Section 205 of PROMESA, the Oversight Board may at any time submit recommendations to the Governor or the Legislature on actions that the territorial Government should take to ensure compliance with the Fiscal Plan or otherwise promote financial stability, economic growth, management responsibility and the efficient delivery of services. After such recommendations have been made, the Governor will be required to submit a statement indicating whether the Government will adopt the recommendation. Should it not adopt them, the Governor will have to explain to the President of the United States and to Congress the reasons why they were not adopted.

Note that PROMESA enjoys supremacy over any laws passed in the territory of Puerto Rico that are incompatible with the intent, responsibilities, missions and objectives of the federal law and the Oversight Board as the body in charge of implementing them.

Based on this legal framework, the Legislative Assembly believes that the measures taken in this Law are necessary and reasonable to adequately address the fiscal crisis and actuarial insolvency of the Retirement Systems and are a valid exercise of legislative power. Moreover, this Legislative Assembly is committed to faithful compliance with the Fiscal Plan certified by the Fiscal Oversight Board on March 13, 2017. Specifically, this law is rooted in the provisions on pension reform in the Fiscal Plan, as set forth below:



## Retirement Systems

The Puerto Rican Government Employees Retirement System, Puerto Rican Teachers Retirement System and the Puerto Rican Judiciary Retirement System (collectively, the "Retirement Systems") are facing a serious fiscal emergency, in that their liquid assets are about to run out and soon they will not have the necessary resources to cover their obligations to pensioners.

This crisis began decades ago and has become more acute as the years have gone by, culminating in the current emergency. In attempts to resolve it, the Government has reformed the Retirement Systems on several occasions. In one such attempt in 2000, under the Administration of Dr. Pedro Rosselló, the Government Employees Retirement System was reformed and a defined contribution system was established, better known as "Reform 2000," for public employees who began to make contributions as of January 1, 2000. In addition to this reform, which was positive for our public servants, the Administration of Dr. Pedro Rosselló injected hundreds of millions of dollars into the Puerto Rican Government Employees Retirement System to help alleviate the actuarial deficit.

During the Administrations of Governor Sila M. Calderón and Governor Anibal Acevedo Vilá, the fiscal health of the Retirement Systems continued to worsen. As an example, we can point to the dire consequences that the bond issues in 2008 had on the Puerto Rican Government Employees Retirement System.

Under the mandate of Governor Luis G. Fortuño Burset, contributions by employers to the Retirement Systems were increased to help fund them. Subsequently, another major reform was made to the Retirement Systems in 2013 to try to save them. However, this reform was

harmful to our public servants, because it significantly reduced their benefits, increased the retirement age and altered the conditions under which they can retire. As if that were not enough, the Administration of Governor Alejandro García Padilla committed to making additional contributions to the Retirement Systems through the establishment of the Uniform Additional Contribution to public corporations, among others, but it failed to comply, which continued to worsen the fiscal health of the Retirement Systems. That is, during the last four years, they reduced benefits to our public servants and did not meet the obligations of the Government to those Systems.

For multiple reasons, including inadequate contributions, the passage of special laws, early retirement programs, changes in Participants' life expectancy, failed investments, mismanagement, bond issues that did not turn a profit,[1] the different reforms did not work and were not sufficient to save the Retirement Systems. These Systems consequently remain on the edge of insolvency, which means that the payment of pensions to our retirees is seriously threatened if we do not act promptly. It is important to note that both the Central Government, and the Puerto Rican Government Employees Retirement System are currently undergoing a restructuring process under Title III of PROMESA.

Despite the fact that the reforms implemented in the past have not been effective, doing nothing is not an option. The wellbeing of public servants and our retirees is a priority for this Administration. However, the steps that the Government could take must be assessed and placed in the current historical context. As discussed above, Puerto Rico is experiencing the largest and most severe fiscal crisis in modern history. This has led the Federal Government to enact PROMESA and set up an Oversight Board for the Island. Under said law, a Fiscal Plan for the Government of Puerto Rico was certified, establishing the parameters to be followed to attain fiscal responsibility. Budgets passed from now on must be fully aligned with said certified Fiscal Plan. Otherwise, the Oversight Board has the power and authority to take corrective action. Our guiding principle will always be that the elected local Government should be the one to make decisions for Puerto Rico, as difficult as they may be. Leaving the decision-making authority in the hands of an entity that was not elected by the People is not an option.

This being the case, all available viable options for dealing with the current crisis in the Retirement Systems have been carefully analyzed. First, due to the imminent insolvency of the Retirement Systems, this Legislative Assembly considers it reasonable and necessary that the General Fund would assume responsibility to cover the payments that the Retirement Systems are unable to make to our pensioners. For this 2017-2018 fiscal year, the General Fund will be disbursing approximately $2 billion for the payments of Accumulated Pensions for our public servants (this represents a significant increase, given that before July 1, 2017, the Government just made annual employer contributions of about $660 million in contributions). This demonstrates the commitment of this Administration to our pensioners. To do otherwise would deprive our retirees of their pensions, with all the consequences this would involve for them, as well as for the Government and society in general.

---

[1] For a detailed discussion of this matter, see the three (3) reports submitted by the Public Service Retirement Systems Committee of the Puerto Rico House of Representatives regarding House Resolution 417 of 2009.

Case:17-03283-LTS Doc#:6482-12 Filed:04/23/19 Entered:04/23/19 15:50:32 Desc:
Case:17-00219-LTS Doc#:582-3 Filed:11/06/19 Entered:11/06/19 15:51:05 Desc:
Exhibit C Page 13 of 87

11

As such, this law establishes a "pay as you go" system whereby disbursements will continue to be made for all current pensions in the Retirement Systems, using resources from the General Fund, as contemplated in the certified Fiscal Plan, in addition to the transfers that the Retirement Systems will continue to make out of their available funds, and the proceeds from the liquidation of their assets. Secondly, due to the impact and heavy burden this will place on the available resources in the General Fund, this Legislative Assembly deems it necessary and reasonable to eliminate the employer contributions the Government is currently required to make to the Retirement Systems. Thirdly, this Legislative Assembly considers it necessary and reasonable to prospectively establish a New Plan for Defined Contributions, to be supported by the contributions made by public servants. In this way, we will safeguard the contributions that they make for their retirement. Thus, they will be able to enjoy a dignified retirement, without limiting the Central Government's ability to provide essential services to the citizens, or requiring the implementation of measures that would impact the most vulnerable. The groundwork for the new system of defined contributions began to be laid with the passage by the legislature of House Joint Resolutions 186, 187 and 188 in 2017.

Mindful of the state of emergency the Puerto Rican Government Employee Retirement Systems are in, which is affecting public servants at Central Government agencies, municipalities, public corporations, teachers and judges, this Legislative Assembly, in the exercise of the reasoning power of the State, adopts this reform aimed at protecting the pensions of public servants who contributed to the development of Puerto Rican society, while protecting the Government's ability to provide critical services to the citizens.

In short, this Law ensures that the pensioners of Puerto Rico will receive the pensions that, with so much sacrifice and effort, they were able to obtain by giving their best years to the service of the People of Puerto Rico. The General Fund of Puerto Rico will assume the full payment of these pensions, after the liquidation of the assets of the Retirement Systems, with more than two (2) billion dollars earmarked for this commendable effort. In the spirit of solidarity and gratitude, the current Puerto Rican workforce will not allow our retirees to be deprived of their basic needs and a better quality of life. The present legislation is an example of putting collective interests above the interests of the individual and of being loyal to larger and nobler causes than their own. With self-denial and sacrifice, the Government of Puerto Rico shall spare no resources to guarantee the pensions of our already retired. Our debt to them is an indispensable commitment.

On the other hand, with this legislation, we have imposed parameters and controls on the administrators of the retirement funds of current Participants and public servants. We cannot allow Participants to fall victim to retirement fund administrators with no experience and no constraints imposed by law that could put the investments of our valuable public servants at risk. In addition, we have established stringent penalties and sanctions on the heads of public agencies or officials who fail to comply with their ministerial duties to promptly remit contributions to the accounts of the Participants. Today, more than ever, we cannot allow the poor performance of ministerial duties to jeopardize the dignified retirement of thousands of public employees and other employees covered by the three Retirement Systems. Furthermore, no person, whether

natural or legal, shall have legal immunity in the face of an intentional or negligent act that puts the future sustenance of thousands of public servants at risk.

For all of the reasons mentioned above, we recognize and take on the great challenges facing our retirement systems through a public policy that will guarantee and defend the pensions that are accrued today, at all costs. Furthermore, a new system of defined contributions is created, which will give Participants a cause of action to defend their contributions and in which the requirements of extensive experience and competence will be imposed on the administrators of the investments of our public servants.

## BE IT DECREED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:

## CHAPTER 1 - GENERAL PROVISIONS

**Section 1.1** This Act is to be known as the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants."

**Section 1.2** – Primacy of this Law.

This Act is enacted in the exercise of the reasoning power of the State, and by the constitutional authority vested in the Legislative Assembly in Article II, Sections 18 and 19 of the Constitution of Puerto Rico, to pass laws for the protection of the life, health and wellbeing of the People, and in cases of serious emergencies when the health, public safety or essential government services are clearly in jeopardy, and under Sections 7 and 8 of Article VI of the Constitution of Puerto Rico. For this reason, this Act will enjoy supremacy over any other State law.

**Section 1.3** Declaration of a State of Emergency with regard to the Retirement Systems.

It is hereby determined and declared that the Puerto Rican Government Employees Retirement System, the Puerto Rican Judiciary Retirement System and the Puerto Rican Teachers Retirement System are in a state of financial emergency. As a result of this state of financial emergency, it is estimated that by August 2017 the Government Employees Retirement System will have no liquid funds with which to meet its obligations. The Teachers Retirement System is likewise expected to run out of liquid funds in September 2017 and the Judiciary Retirement System will run out of liquid funds by February 2018.

The financial situation of these three government Retirement Funds in Puerto Rico was one of the reasons why the Federal Government passed the Law known as the "Puerto Rico Oversight, Management, and Economic Stability Act," Pub. L. 114-187 (PROMESA). Said Act puts in place, among other things, measures to help the Government of Puerto Rico and its instrumentalities attain fiscal responsibility and access to capital markets. On March 13, 2017, the Fiscal Oversight Board created by PROMESA approved and certified the Fiscal Plan for the Government of Puerto Rico.

On May 21, 2017, the Fiscal Oversight Board, acting on behalf of the Government of Puerto Rico, filed a petition to allow the Puerto Rican Government Employees Retirement System to avail itself of the protections offered by Title III of PROMESA. The filing of the petition under Title III of PROMESA triggered a process of restructuring the obligations of said system under the oversight of the United States District Court for the District of Puerto Rico. Given this situation, reasonable and necessary steps must immediately be taken to ensure that the pensioners continue to receive their pensions, the individual contributions of our public servants, and the future of the same, are protected.

Several attempts were made in the past to reform the three Retirement Systems. Said measures were unsuccessful and ultimately insufficient, which has led these systems to virtual insolvency. Moreover, given the severe fiscal crisis Puerto Rico is currently experiencing, the Government is prevented from shoring up the three Retirement Systems. It is therefore necessary and reasonable that the Accumulated Pension Payment Account, which will largely be supported by the General Fund, should take over the payments that the three Retirement Systems cannot make, using the "pay as you go" mechanism. The three Retirement Systems must continue to meet their obligations to their beneficiaries by contributing their available funds and the proceeds from the liquidation of their assets to the General Fund, except for the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated. Employer contributions and similar contributions made to the three Retirement Funds will also be eliminated due to the burden it would place on the General Fund to both make the payments to the pensioners while simultaneously disbursing said contributions, as established in House Joint Resolutions 186, 187 and 188 of 2017. Moreover, as a corrective measure, contributions made by public servants will have to be segregated and a new Defined Contribution Plan established that will secure the future of our public servants. In this way, we are taking steps that consonant with our fiscal reality that do not affect the Government's ability to deliver essential services to the citizens.

**Section 1.4** – Public Policy.

It is hereby declared to be the public policy of the Government of Puerto Rico to protect the pensions of all public service retirees who participated in the three aforementioned Retirement Systems. Thus, as of July 1, 2017, in accordance with House Joint Resolution 188 of 2017, as certified by the Fiscal Oversight Board, on July 13, 2017, the Government of Puerto Rico became the direct payer of our retirees' pensions. Due to the burden this places on the General Fund, which is estimated to run in the billions of dollars per year, the employer contributions being made until now to the three Retirement Systems were eliminated, as was the Uniform Additional Contribution in accordance with the provisions of House Joint Resolutions 186, 187 and 188 of 2017. The Retirement Systems shall contribute their available funds and the net proceeds from the sale of their assets to the General Fund to help pay the Accumulated Pensions, except for the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated. After the Retirement Systems exhaust their resources, the Accumulated Pensions Payment Account, in large part supported by the General Fund, as provided herein, shall take over and guarantee the payment of the Accumulated Pensions as set forth herein. The foregoing notwithstanding, the Municipalities, Legislative Branch, Public Corporations, the Government

and the Court Administration shall be required to pay the "Pay-Go" Fee, according to each one to support the Accumulated Pensions Payment Account.

It is also declared to be public policy to protect our public servants' futures. With this Law, we ensure that they will have a retirement that is dignified and free of uncertainty by segregating their personal contributions, guaranteeing them and establishing a new defined contribution plan, in trusts or a similar instrument, which will allow them to protect and guarantee their contributions in separate accounts.

**Section 1.5** Applicability of this Law to the Retirement Systems.

This Law shall apply to the Puerto Rican Government Employees Retirement System and the Puerto Rican Teachers Retirement System. In relation to the Judiciary Retirement System, only Chapter 2, except as provided in Section 2.6 of this Law, which establishes the "Pay as you Go" as set forth below, shall apply. Furthermore, the Judiciary Retirement System must adhere to all the provisions of said Chapter in relation to the Retirement Systems.

**Section 1.6** Definitions.

The following words and terms, when used or referred to in this Law, shall have the following meanings, unless context clearly indicates otherwise. The tenses used herein shall also include the future, and the masculine gender shall also include the feminine, except where such an interpretation would be absurd. Singular shall include the plural and vice versa.

(a)     **AAFAF**: Puerto Rico Fiscal Agency and Financial Advisory Authority created by Law 2-2017.

(b)     **Retirement System Administrators**: the Administrator of the Puerto Rican Government Employees Retirement System as established by Law No. 447 of May 15, 1951, as amended, and the Executive Director of the Puerto Rican Teachers Retirement System, as established by Law 160-2013.

(c)     **Owed Contributions**: amounts that the Government, Municipalities or Public Corporations and other entities considered employers under any of the Retirement Systems covered by this law owe to the Retirement Systems, the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan.

(d)     **Individual Contributions:** sums that have been or will be withheld from the basic remuneration received by the Participant, that are to be credited to their Defined Contributions Account, as defined in Section 1.6(u).

(e)     **Beneficiary:** any person who receives any pension, annuity or benefit, as set forth herein.

(f)     **Administrative Fee:** a fee that the Retirement Board, or its appointee, may charge and collect, to be paid by the Government, the Judicial Branch, Legislative Branch, Public Corporations, and other entities considered employers under the Puerto Rican Government Employee Retirement System and the Teachers Retirement System, in

accordance with this Law to finance the operations of the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, except the Municipalities.

(g) **"Pay-Go" Fee:** a fee to be established and imposed by the AAFAF and paid by the Government, the Municipalities, Judicial Branch, Legislative Branch and the Public Corporations, and other entities considered employers under the Puerto Rican Government Employee Retirement System and the Teachers Retirement System, in accordance with Chapter 2 of this Law. The fee shall be collected by the Secretary of the Treasury or his or her appointee, as set forth herein.

(h) **Code:** Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

(i) **Defined Contributions Account:** account in trust, separate from general assets and Government accounts, to be created after July 1, 2017 in the name of each Participant as set forth in Chapter 3 herein.

(j) **Accumulated Pensions Payment Account:** account in trust, separate from general assets and Government accounts, designed to pay the Accumulated Pensions for the Puerto Rican Government Employee Retirement System, the Teacher Retirement System and Judiciary Retirement Systems under a "pay as you go" system as set forth in Chapter 2 of this Law. The account in trust will be centralized and segregated from general assets and Government accounts by the Treasury Department and dedicated solely and exclusively to the purposes set forth herein, and subject to the terms and conditions set out herein.

(k) **Public Enterprise or Corporation:** all government instrumentalities of the Government of Puerto Rico that have been created or may be created in the future. This shall not include, however, those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Retirement Board, do not have a clear employer-employee relationship with the Government of Puerto Rico. Any public servant or employee that participated in the Retirement Systems and later became an officer or employee of a subsidiary enterprise of any public enterprise or corporation without any interruption of service, shall retain the same rights and privileges as a Participant, even if said subsidiary is not covered by the three Retirement Systems.

(l) **Administrative Body:** person or legal entity selected by the Retirement Board to manage the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan. The Administrative Body must be a recognized company with at least ten (10) years of experience in the administration of retirement plans, which has a good reputation in the financial industry and which contractually guarantees the Government that it will generate savings of at least twenty-five percent (25%) of the current operating expenses incurred in operating the Retirement Systems. This does not preclude the Government or any of its instrumentalities from assuming and exercising the functions of the Administrative Body, if it is deemed necessary and appropriate, always taking into consideration the best interests of the Participants, Retirees and Beneficiaries and the protection and guarantee of the balance of their Individual Contributions.

(m)     **Government of Puerto Rico or Government:** the Government of Puerto Rico and all of its departments, divisions, bureaus, offices, and agencies, for the purposes of this definition, to include the Puerto Rican Department of Education. For the purposes of this Law, this term includes other governmental or non-governmental bodies, whose employees currently contribute to Retirement Systems.

(n)     **Retirement Board:** board created under the provisions of Chapter 4 herein.

(o)     **Teacher:** a professional who teaches in a classroom, Directors of schools and any other titles or categories of teachers that currently exist or may exist in the future in the nomenclature of the Department of Education of the Government of Puerto Rico, alternate officers, and those employees or officers who avail themselves of the benefits of Law 160-2013, in accordance with the provisions of said law, provided they hold a valid certification to work as teachers.

(p)     **New Defined Contribution Plan:** new plan for defined contributions in which the Participants will participate, as provided in Chapter 3 herein.

(q)     **Participants:** active employees of the Government of Puerto Rico, Teachers and members of the Teachers Retirement System, Municipal employees, and the employees of Public Corporations, with the exception of employees of the University of Puerto Rico and the Electric Power Authority. In addition, it includes those employees who work or who have worked within a Public Private Partnership and any member of the Puerto Rican Government Employee Retirement System that has made contributions to said System and these contributions have not been reimbursed. This term includes former employees of the Government of Puerto Rico who left public service and were not reimbursed for their contributions and/or any accrued benefit up to the date of separation.

(r)     **Accumulated Pension:** annuity, benefit or defined benefit to which Participants will be entitled upon retiring from service based on the contributions and rules applicable to their respective Retirement Systems, calculated as of the moment this Act takes effect.

(s)     **Pensioner:** a person who receives a pension or annuity in accordance with the provisions of this Act or those created by the various Retirement Systems.

(t)     **Pre-retiree:** Any person enrolled in the Voluntary Pre-retirement Program created by Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Law."

(u)     **Remuneration:** gross cash compensation earned by an employee. When calculating remuneration, all bonuses paid in excess of wages, such as payment for overtime hours, will be excluded.

(v)     **Retirement Systems:** the Puerto Rican Government Employees Retirement System as established by Law No. 447 of May 15, 1951, as amended, and the Puerto Rican Teachers Retirement System, as established by Law 160-2013.

(w)     **Judiciary Retirement System:** the Judiciary Retirement System, created by Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act."

## CHAPTER 2 – ACCOUNT FOR THE PAYMENT OF PENSIONS ACCUMULATED BY THE RETIREMENT SYSTEMS

**Section 2.1** – Accumulated Pensions Payment Account.

The Accumulated Pensions Payment Account is hereby created under the auspices of the Treasury Department, which will be kept in a trust fund separate from the general assets and accounts of the Government, which will operate under a "pay as you go" system for the payment of the Pensions Accumulated by the Retirement Systems, including the Judiciary Retirement System, as of the time this Law takes effect. As of July 1, 2017, the Accumulated Pension payments made by the Retirement Systems must be disbursed from the funds deposited into this account, which must come from the following sources:

(a)     The net liquid proceeds from the liquidation of Retirement System assets, including those of the Judiciary Retirement System, in accordance with House Joint Resolution 188 of 2017, as approved in accordance with PROMESA, except for the segregated funds in the Teachers Retirement System Defined Contribution Program established by Law 160-2013, as amended, and the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated, in accordance with current Retirement System Obligations;

(b)     "Pay-Go" Fee determined and imposed by the AAFAF on the Government, the Municipalities, the Legislative Branch, Court Administration and Public Corporations and other covered entities. This fee shall be equal to the amount actually paid to Pensioners and Beneficiaries from each covered entity. The Secretary of the Treasury or the person or entity appointed by the latter shall have the authority to collect the "Pay-Go" Fee. In the case of the Municipalities, the administrative charges of the "pay as you go" scheme shall not be included in the calculation of the "Pay-Go" Charge. Regardless of the payment of the "Pay-Go" Fee by the employer, the disbursement of the benefits of all Pensioners and Beneficiaries are guaranteed by the General Fund through the "pay as you go" scheme, with the responsibility of the entities to remit the payment of the said Fee in compliance with its obligations under this Law remaining;

(c)     Puerto Rican Government budget expenditure allocations, the special allocations to finance shortfalls in the payment of pensions and special laws passed for such purposes;

(d)     Donations, bequests and any other contribution made by any public or private entity to the account, by virtue of any other law;

(e)     Funds from twenty-five percent (25%) of the initial payment or periodic payments of Public Private Partnership contracts, as established in subsection (e) of Section 17 of Law 29-2009, as amended, known as the "Private Public Partnership Law," as determined from time to time; and

(f)     Other funds and revenue that the Legislative Assembly may allocate for these purposes.

The Management and Budget Office may withhold from any of the allocations to the agencies of the Government of Puerto Rico the amounts necessary for the payment of the "Pay-Go" Fee, whenever it determines that this withholding is necessary to ensure compliance with this obligation by the covered entities. Furthermore, each government entity must record the funds necessary for the payment of the "Pay-Go" Fee every year in its general expenditure budget.

In the case of Participants, Beneficiaries or Pensioners whose employer ceases or has ceased to exist, those who move or have moved to a Public Private Partnership and those whose employer will, for some reason, not pay the "Pay-Go" Fee, their pensions, as well as all pensioners of the Retirement Systems, shall be guaranteed by the Government through the "pay as you go" system.

**Section 2.2** – List of Accumulated Pensions.

(a)    A list will be kept and updated of each Participant, Beneficiary and Pensioner of the Retirement Systems that will reflect in detail the amount due each one as an Accumulated Pension in accordance with the respective Retirement Systems until the date that this Law enters into effect. It shall detail, without this being understood as a limitation, the accumulated benefit to which the Participant is entitled, the employment history and the contributions made, according to each applicable retirement law in which the Participant, Beneficiary or Pensioner contributed. Based on the content of said list, the corresponding payments on the Accumulated Pensions will be made to those who are entitled to payment in accordance with the payment terms applicable until such time as this Law enters into effect, and in accordance with the Retirement Systems to which each of the Participants, Beneficiaries or Pensioners belongs. However, the provisions regarding the list of Accumulated Pensions for judges contributing to the Judiciary Retirement System and teachers and members of the Teachers Retirement System who are contributing under the provisions of Law 91-2004 will be followed for informational purposes only since they will continue to contribute under their respective systems as they were doing prior to the enactment of this Law.

(b)    Retirement System Administrators, including the Judiciary Retirement System, in coordination with the AAFAF, shall be required to produce the list described in subsection (a) above as follows:

1.    Within sixty (60) days of the passage of this Law they shall produce a list of all the Beneficiaries and Pensioners in all three Retirement Systems; and

2.    Within one hundred eighty (180) days of the passage of this Law they shall produce a list of all Participants, including the Accumulated Pension for each from all three Retirement Systems at the time this Law takes effect, and the payment terms of the same. The three Retirement Systems must take all necessary steps to ensure that the list contains true and exact information with respect to each Participant, Beneficiary and Pensioner.

3. After the list is produced, each Participant, Beneficiary and Pensioner will be notified of the content thereof via efficient and reliable means (it may include a notification by mail, accessibility to information through a portal on the AAFAF website or the creation of the Retirement Board for these purposes, the publication of a legal notice in a widely-circulated newspaper and, where appropriate, for the active Participants, personal notification), and they shall in turn have forty-five (45) days, beginning on the notification date, to present reliable evidence to the Retirement System Administrators that any of the information contained in the list is incorrect or inaccurate. Copies of personnel records, copies of retirement records, pay slips, W-2 forms, copies of returns, certifications by employers or any combination thereof, among other official documents, shall be understood as reliable evidence, without being understood as a limitation. The Government, Municipalities, Judicial Branch, Legislative Branch, Public Corporations and Retirement Systems shall, as part of their ministerial duty, diligently produce the documents requested by a Participant, Beneficiary or Pensioner in order to provide evidence regarding any inaccuracies contained in the list. If a requested document is not available, a certification must be issued stating this circumstance. AAFAF can serve as a facilitator in obtaining these documents and establish mechanisms to receive and promptly process applications received for these purposes. The delay of an entity in producing the information requested shall not adversely affect the Participant and shall not affect the calculation of the aforementioned forty-five (45) days. It shall be understood that the term of forty-five (45) days shall not run as long as a request for reliable evidence before a governmental entity is pending and it is not produced, or it is certified that it does not exist or is not available. The Retirement System Administrators shall analyze any evidence so presented and provide written notice of their decision to the Participant. If a Participant, Beneficiary or Pensioner does not present to the Retirement System Administrators any reliable evidence that the information contained in the list is incorrect within the aforementioned period, said information shall be understood to be true and exact and as such the corrected list shall not be subject to revision.

4. If a Participant, Beneficiary or Pensioner is dissatisfied with the Retirement System Administrators' decision under the preceding subsection, he or she must submit an application for reconsideration within twenty (20) days of the notification of the decision of the Retirement System Administrators. If no such application is submitted, the decision will become final and firm.

5. If a Participant, Beneficiary or Pensioner disagrees with the final decision of the Retirement System Administrators, or if the Administrators fail to issue their decision within ninety (90) days of having received the application for reconsideration, they may file an appeal with the Retirement Board within thirty (30) days from the date of notification or the time when the aforementioned term of ninety (90) days elapses. If no such appeal is filed, the decision will become final and firm.

6. The Retirement Board shall have a period of ninety days (90) to issue a determination on any appeal submitted by a Participant, Beneficiary or Pensioner. In the event that the Board does not express its views on the matter within that period, or if a Participant, Beneficiary or Pensioner is dissatisfied with the final decision of the

Retirement Board, he or she may file a motion for judicial review with the Court of Appeals in accordance with Court of Appeals Regulations to review the administrative decisions.

(c)     Nothing in this Section shall be construed to interfere in any way with any procedure or claim under the "Puerto Rico Oversight, Management, and Economic Stability Act" ("PROMESA"), Public Law 114-187.

**Section 2.3** – Payment Terms of the Accumulated Pensions.

The payment terms of the Accumulated Pensions of each Participant, Beneficiary or Pensioner shall be calculated in accordance with the terms set forth in the statutes of their respective Retirement Systems at the time this Law enters into effect. Payment terms for disability pensions, death benefits, payments to beneficiaries, reimbursement of contributions, and any sums owed or benefits of a similar nature, shall also be calculated based on the terms set forth in the statutes of the respective Retirement Systems at the time this Law enters into effect. Those employees who, at the time this Law is approved, are in the process of applying for disability benefits or any other benefits, they may conclude said process according to the provisions set out in the applicable law in force at the time the process was initiated.

**Section 2.4** – Accumulated Pensions.

(a)     When this Law enters into effect, the benefits of the Accumulated Pensions of the Retirement System Participants who began working before the Law took effect will be preserved and guaranteed by the Government.

(b)     Those Participants who, at the time this Law enters into effect, are entitled to retire and receive some sort of pension and/or annuity under the provisions applicable to their respective Retirement Systems may retire at any later date and will be entitled to receive the Accumulated Pension they are due, as calculated under the provisions applicable to their respective Retirement Systems up to the time this Law enters into effect, in the terms set forth therein.

(c)     As of the time this Law enters into effect, Participants will not accumulate any additional benefits for years of service, compensation or any other reason, in the Retirement Systems. For the purpose of calculating their pension or retirement benefits in their respective Retirement System, Participants will not receive recognition for services for which no contributions were made after this Law enters into effect; they may not transfer contributions or return contributions for periods worked at or prior to the time this Law enters into effect. Those employees who have contributed or are actively contributing to another retirement system not covered by this Law, may request the transfer of contributions to their retirement system of origin or to which they are entitled at the time of retirement, as long as fiscal resources so allow, according to the Certified Fiscal Plan.

(d)   As of July 1, 2017, Participants will no longer make any individual contributions or payment to the Accumulated Pensions Payment Account or any additional contributions to their respective Retirement Systems.

(e)   As of July 1, 2017, the Government of Puerto Rico, Public Corporations, Municipalities, Legislative Branch, Judicial Branch and other covered entities shall no longer be required to make employer contributions, including the Uniform Additional Contribution, and the Teacher's Justice Uniform Contribution, to the Accumulated Pensions Payment Account or the Retirement Systems, but they will be required to pay the applicable "Pay-Go" Fee, as applicable to each one based on the parameters established in this Law.

**Section 2.5 –** Compensation for Owed Contributions.

Payments made to the Accumulated Pensions Payment Account will be deducted from the Contributions Owed and any other debt that, as of the effective date of this Law, is held by governmental entities and other entities covered by the Retirement Systems, including the Government, the Municipalities, Public Corporations, the Legislative Assembly and the Court Administration, as applicable.

**Section 2.6 –** Special Provisions.

Without prejudice to the provisions of this Law, it is hereby provided, as an exception, that teachers who are contributing to the Teachers Retirement System under the provisions of Law 91-2004, as amended, known as the "Teachers Retirement System Act of the Commonwealth of Puerto Rico," shall continue to make contributions in accordance with the provisions of said statute. The Accumulated Pensions of said teachers shall be calculated based on the terms and conditions set forth in said law. Similarly, it is hereby provided that the Accumulated Pensions of judges who are contributing to the Judiciary Retirement System and those who are newly enrolled in the Judiciary Retirement System, having been appointed after this Law enters into effect, shall continue to contribute under the provisions of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act," applicable to each judge. It is expressly provided that said Accumulated Pensions, and the payment terms thereof, shall not be affected or modified in any way by the provisions of this Law. However, the individual contributions made by these teachers, members of the Teachers Retirement System and judges will remain as they were prior to the enactment of this Law and will be deposited into the Accumulated Pensions Payment Account as determined by the Retirement Board.

Those teachers, members of the Teachers Retirement System and judges who wish to participate in the New Defined Contribution Plan may do so voluntarily, as determined by the Retirement Board. In said event, in addition to their current individual contribution, they must make the contribution described in Section 3.4 of this Law.

**CHAPTER 3.- DEFINED CONTRIBUTION PROGRAM**

**Section 3.1 –** New Defined Contribution Plan.

(a)    A New Defined Contribution Plan is hereby created, to consist of the establishment of a trust fund, which will not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act," which will contain an individual account for each Participant in the Retirement Systems that becomes part of said program, as provided in this Chapter. Contributions made to the New Defined Contribution Plan by each Participant will be credited to the individual accounts, in addition to the return on investment in accordance with Section 3.6 herein. The benefit related to these contributions that will be provided to each Participant when they leave public service, either due to retirement or for any other reason, will depend on the total contributions made to their accounts in the New Defined Contribution Plan since the time this Law enters into effect, or the date on which the Participant joined the Defined Contribution Plan, and their rate of return.

(b)    The following persons shall participate in the New Defined Contribution Plan:

(1)    All active Participants in the Retirement Systems as of the time this Law takes effect, with the exception of those teachers and members of the Teachers Retirement System who are contributing under the provisions of Law 91-2004 and the judges who are contributing under the Judiciary Retirement System who will not become part of the New Defined Contribution Plan and shall instead continue to contribute to their respective Retirement Systems as they have been doing to date, except as provided for in Section 2.6.

(2)    All Participants who enter public service for the first time on or after the date this Law is enacted.

(3)    Participation in the new Defined Contribution Plan shall be optional for the Governor of Puerto Rico, all Cabinet Members, Heads of Government Agencies and Instrumentalities, assistants and advisors to the Governor, members of Committees and Boards appointed by the Governor, members of the Legislative Assembly, employees and officers of the Legislative Assembly, the Office of Legislative Services, the Capitol Superintendent's Office and the Comptroller of Puerto Rico.

(4)    Participation in the New Defined Contribution Plan shall be optional for the employees of the departments, divisions, bureaus, offices, agencies, public corporations and instrumentalities of the Government of Puerto Rico who work and reside outside of Puerto Rican territory.

(5)    Any public enterprise or corporation whose employees do not participate in the Retirement Systems at the time this Law is enacted, may, by resolution adopted by their Board of Directors or supreme governing body, as the case may be, join the New Defined Contribution Plan created by this Law. The Retirement Board shall establish the requirements and procedures for joining the New Defined Contribution Plan.

**Section 3.2** – Transferring to the Plan.

As of the time this Law enters into effect, all active Participants who are enrolled in the Retirement Systems, regardless of the date of their first Government appointment, shall become part of the new Defined Contribution Plan, except as provided by Section 3.1(b)(1) herein.

**Section 3.3** – Establishment of Contribution Accounts for the New Defined Contribution Plan.

(a)     The individual contributions made by the Participants shall be funneled to a New Defined Contribution Plan, in which a Defined Contribution Account shall be set up and maintained, in trust, separate from the general assets and accounts of the Government, as an individual account for each Participant, and credited and debited as set forth in this Chapter. The individual contributions and funds in each Defined Contribution Account shall be the exclusive property of the corresponding Participant, shall not be subject to any class of contribution, or embargo and shall be exempt from the singular or collective action of the creditors of the Participant, with the debts of the Participants with the Retirement Systems, the employer and the Government excluded from this exemption.

(b)     The accounts of those Participants in the Defined Contributions Program in the Teachers Retirement System that have balances accumulated in said plan at the time this Law takes effect will immediately be transferred to their respective Defined Contribution Accounts.

(c)     Between the time this Law is enacted and the time the Retirement Board contracts the services of an Administrative Entity to manage the New Defined Contribution Plan, and said Administrative Entity begins to perform its functions under the contract signed for said purpose, the Secretary of the Treasury shall have the authority and power to collect and deposit into a trust fund, which will not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act," which will be separated from the general assets and accounts of the Government, with the Individual Contributions made by Participants under his or her supervision. After the Administrative Entity begins to provide its services, the Secretary of the Treasury will transfer to it the funds from the Individual Contributions to be deposited into each Participant's Defined Contribution Account. The Administrative Entity shall establish a trust for such purposes, which shall not be subject to the provisions of Law 219-2012, as amended, known as the "Trust Act." Any amount that has been segregated as of July 1, 2017 will be treated in the same way as described in this subsection.

(d)     The income and earnings accrued in each Defined Contribution Account shall be exempt from all class of contributions, taxes, charges or fees as long as they are maintained in the Defined Contribution Accounts. The distributions of the Defined Contribution Accounts shall be subject to taxation for the Participant or Beneficiary, in accordance with the provisions of Section 1081.01(b) of the Code as a distribution of an exempt trust under the provisions of Section 1081.01(a) of the Code and said distributions shall be subject to the exceptions of taxation, tax withholdings and the filing of disclosure statements provided in Section 1081.01 (b) of the Code.

**Section 3.4** – Contributions by Participants in the New Defined Contribution Plan.

As of the date this Law takes effect, all Participants in the Retirement Systems will be required to contribute at least eight point five percent (8.5%) of their monthly remuneration to their Defined Contribution Account. They may voluntarily contribute additional sums, as permitted by the Code. When this Law takes effect, Participants in the New Defined

Contribution Plan will have the right to adjust their current contribution to the Retirement Systems to the minimum authorized by this Section. The Participants in the New Plan for Defined Contributions may change the percentage they wish to contribute to said Plan from time to time, but it may never be less than the minimum required herein.

**Section 3.5** – Employer Contributions, Penalties.

All employers of Participants in the New Defined Contribution Plan shall have the following obligations:

(1) **Obligation to Withhold and Transfer Contributions** – All employers of Participants in the New Defined Contribution Plan shall withhold from the Participant's wages the contributions required under Section 3.4 of this Law and immediately transfer them to the New Defined Contribution Plan for deposit into the Defined Contribution Account. The Secretary of the Treasury or any employer paymaster is hereby authorized to perform the withholding, even if the wages to be paid to the Participant are reduced to less than any legally-prescribed minimum wage as a result of said withholding. The Retirement Board will establish the form and manner in which the contributions will be remitted.

(2) **Penalties and Special Measures regarding Owed Contributions** – Employers who fail to remit the Individual Contributions of Participants in the New Defined Contribution Plan and/or the "Pay-Go" Fees as provided herein within the established time period, as well as any other remittance related to the Participants, shall be subject to the following corrective measures:

a. The Retirement Board, or its appointee, or the Administrative Entity shall submit a written request, accompanied by an official debt certification:

  i. For employers in default to transfer the Contributions Owed.

  ii. For the Secretary of the Treasury to offset and/or make adjustments to the accounts, obligations and advance payments that the Treasury Department must send to the defaulting employer, and transfer the sums constituting the Contributions Owed to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, as applicable.

  iii. For the Center for the Collection of Municipal Revenue (CRIM) to send, within seven (7) days of the written notice, the sums constituting the Contributions Owed by the Municipal employer, to the New Defined Contribution Plan and/or the Accumulated Contribution Payment Account; any unencumbered balance of the property taxes and other revenue that the Municipalities are entitled to receive under Law No. 80-1991, as amended, known as the "Center for the Collection of Municipal Revenue Act." As of the date this Law takes effect, a senior lien will automatically and permanently be created on said unencumbered balance in favor of the Retirement Board and/or the Administrative Entity to collect the Contributions Owed, without the need for any other act, possession or control of the same.

iv. The Management and Budget Office may withhold from any of the allocations to the agencies of the Government of Puerto Rico the amounts needed for the payment of the "Pay-Go" Fee, when it determines that this withholding is necessary to ensure compliance with this obligation by the entities concerned.

b. The Retirement Board or the Administrative Entity shall send written notice to any Office Holder, or Head of an Agency, Public Enterprise or Municipality, or other covered entity that ceases to withhold employee contributions and/or ceases to send the corresponding amounts for each purpose to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account. Said defect must be cured within no more than ten (10) working days of said notice. In the event that an Office Holder or Head or any official bearing responsibility of an Agency, Public Enterprise, Municipality or covered entity knowingly and without just cause ceases to make the corresponding payments to the New Defined Contribution Plan and/or the Accumulated Pensions Payment Account, it shall be committing a misdemeanor subject to a six (6) month prison term or five thousand dollar ($5,000) fine, or both, at the Court's discretion. Said fine will be paid by the Office Holder or Head or any official bearing responsibility of the Agency, Public Enterprise or Municipality out of its own funds. The Government of Puerto Rico and its instrumentalities shall not provide legal representation to the official in the legal proceeding to put this provision into effect.

c. Each Beneficiary, Participant or Pensioner shall have a personal collection action against each Office Holder or Agency Head, Budget or Finance Director, or any official bearing responsibility, of the Government, Public Enterprise or Municipality to claim the contributions owed as from the date that this Law enters into effect and demand that they be properly paid. The Government shall ensure that said contributions are made and, if funds are to be disbursed for the payment of the corresponding amounts owed as from the date that this Law enters into effect, an action for collection or reimbursement shall be filed against the Office Holder or Agency Head, Budget or Finance Director or any official bearing responsibility who has failed to remit said payments. The Government of Puerto Rico and its instrumentalities shall not provide legal representation to the official in these proceedings. This provision shall enjoy supremacy over any other statute. The provisions of this subsection shall not be understood as excluding or releasing the Government, Public Corporations, Municipalities or other covered entities from their responsibility and ministerial duty to pay the contributions owed in a timely manner, as provided for in this Law. The Participant shall have the option to initiate the corresponding action for collection against the Government, according to the regulations established by the Board for these purposes.

**Section 3.6** – Credits to the Defined Contribution Account, Return on Investment and Rights to the Defined Contribution Account.

    (a) Credits.- The following shall be credited to the Defined Contribution Account of each Participant in the New Defined Contribution Plan:

        (1) Participant's Individual Contribution. Individual contributions made by the Participant in the New Defined Contribution Plan as required by this Law shall be credited as soon as they are remitted by the employer.

        (2) Return on Investment. The return on investment shall be subject to the investments selected by the Participant, based on his or her preferences and risk profile. Participants will be offered various diversified investment options, to be determined by the Retirement Board. Among these alternatives, at least one option will be provided to guarantee all the individual contributions made by the Participant, preserving the principal thereof. The said option shall be automatically selected if the employee does not choose another option of its choice. The Participant shall have the option to choose another alternative from those offered from time to time. Basic and reasonable management fees shall be borne by the Puerto Rican Government. However, the return on investment shall be credited to the account of each Participant and will be net of the additional or extraordinary management fees, as determined by the Retirement Board, making sure that they are reasonable. Periodically, and at least once a year, Participants must be provided with reports of the Activity in their Defined Contribution Account, either with a paper statement or a statement in an accessible format on a Government website.

        (3) Transfers of any balances from the Teachers Retirement System's Defined Contribution Program that have accumulated since August 1, 2014, as applicable.

        (4) Balances segregated as of July 1, 2017 under House Joint Resolutions 186, 187 and 188 of 2017.

    (b) Rights to the Defined Contribution Accounts.- Participants in the New Defined Contribution Plan shall have erga omnes ownership of the balances in their Defined Contribution Accounts.

**Section 3.7** – Debits against the Defined Contribution Account.

The following shall be debited against the Defined Contribution Account set up for each Participant in the New Defined Contribution Plan: those sums used for the payment of benefits or to make a lump sum distribution to a given Participant, as decreed by the Retirement Board. After the entire balance of a Defined Contribution Account has been distributed, the account will cease to exist.

**Section 3.8** – Benefits upon Leaving Public Service.

Case:17-03283-LTS Doc#:6482-12 Filed:04/23/19 Entered:04/23/19 15:58:32 Desc:
Case:17-00219-LTS Doc#:59-3 Filed:11/06/19 Entered:11/06/19 15:53:05 Desc:
Exhibit C  Page 29 of 87

27

In the event a Participant leaves public service, his or her Defined Contribution Account may remain in the New Defined Contribution Plan, be transferred to a qualified Defined Contribution Plan exempt under Section 1081.01 (a) of the Code, or the Participant may request the disbursement of the balance, subject to the payment of applicable taxes, according to the Code, payable at the time of disbursement of the funds and the regulations established by the Retirement Board for this purpose.

**Section 3.9** – Death Benefits.

(a) Death of Participant in Active Service. – Upon the death of a Participant in active service who had a balance available in his or her Defined Contribution Account, said balance will be disbursed to the Beneficiaries designated by the Participant in writing, duly acknowledged and filed, or by his or her heirs, in the event no such designation was made, subject to the same requirements set forth in subsection (b) below.

(b) Death of a Retiree.- In situations in which a pensioner dies without having exhausted the balance of all of his or her Defined Contribution Plan, his or her designated Beneficiaries, or heirs, in the event there is no designated Beneficiary, may file a written request, presenting a declaration of heirs or will, and any other document established by the Board, for the disbursement of said balance in a lump sum payment, subject to any withholding or tax in accordance with the law or with the code.

## CHAPTER 4 – RETIREMENT BOARD AND ADMINISTRATIVE ENTITY

**Section 4.1** – Retirement Board of the Government of Puerto Rico.

(a) The Retirement Board of the Government of Puerto Rico is hereby created as a new body of the Government of Puerto Rico, independent and separate from all others, which must be appointed within the term of sixty (60) days from approval of this Law and which is to consist of thirteen (13) members, as described below:

1. The Executive Director of the AAFAF, who shall also serve as the Chairman of the Committee, in his or her absence, it may be represented by an AAFAF official appointed by him or her;

2. The Secretary of the Treasury, or his or her representative;

3. The Director of the Office of Management and Budget, or his or her representative;

4. The Director of the Office of Management and Transformation of Human Resources in the Government of Puerto Rico, or his or her representative;

5. One (1) teacher representative of the Department of Education, who will be an active teacher of the Department of Education, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post;

6. One (1) representative of the public corporations, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post;

7. One (1) representative from the Judicial Branch, appointed by the full court of the Supreme Court of Puerto Rico, who shall serve at the latter's discretion;

8. The President of the Federation of Mayors, or his or her representative;

9. The President of the Association of Mayors of Puerto Rico, or his or her representative; and

10. Four (4) representatives of the public interest, appointed by the Governor for a term of five (5) years, who shall remain in office until a successor is appointed and takes up the post. One (1) of these representatives of the public interest shall be a Pensioner of the Teachers Retirement System, one (1) shall be a Pensioner of the Puerto Rican Government Employees Retirement System, one (1) representative of the members of the Puerto Rican Police who shall be appointed by the Governor, in consultation with bona fide organizations representing that sector and duly authorized by law and one (1) shall be freely selected by the Governor;

The persons designated under subsections (5) and (6) shall serve for an initial term of two (2) years. The persons designated under subsection (10) shall serve an initial term of three (3) years. As the initial term of each of these members expires, their successors shall be appointed in accordance with the provisions of this Section. Members of the Retirement Board shall serve ad honorem.

(b) The persons selected to occupy the posts appointed by the Governor and the full court of the Supreme Court of Puerto Rico shall have knowledge and experience in the administration and operation of financial systems or in human resources management and be of good moral character.

(c) Seven (7) members of the Retirement Board shall constitute a quorum for resolving any matter put before it for consideration and all resolutions adopted by the committee must be approved by the majority of those members. The members may attend said meetings by videoconference, telephone or similar means.

(d) The Retirement Board shall pass regulations establishing the necessary provisions for its operation and compliance with this Law, including the duties and functions of its members.

(e) The Retirement Board may appoint an Executive Director, set his or her salary and establish his or her powers, authority and duties, as well as employ the necessary personnel to carry out its functions under this Law.

(f) Law 1-2012, as amended, known as the "2011 Puerto Rico Government Ethics Act," shall apply to all members of the Retirement Board, except Chapter V of said Act.

**Section 4.2** – Powers, Authority and Duties of the Retirement Board.

For the purpose of performing its duties as provided by this Law, the Retirement Board shall have the following powers, duties and authority:

(a) To act as the supreme governing body of the Retirement Systems. As such, the Board shall have and exercise all the powers, duties and authority granted to the Boards of Trustees of the Retirement Systems. When this Law enters into effect, these powers and authority will automatically be permanently transferred to the Retirement Board. Consequently, the Boards of Trustees of the Retirement Systems shall be dissolved when this Law takes effect. Any reference to the Boards of Trustees of the Retirement Systems shall be understood to refer to the Retirement Board. All provisions and regulations adopted by the Boards of Trustees of the Retirement Systems shall remain in effect following the enactment of this Law until amended or modified by the Retirement Board and any reference in those regulations to the Boards of Trustees of the Retirement Systems shall be understood to refer to the Retirement Board. All of the foregoing is subject to the provisions of Chapter 7 of this Law. Furthermore, the Retirement Board shall have and exercise all the powers, duties and authority necessary for the administration and management of the New Defined Contribution Plan and the supervision of any Administrative Entity, including the power to establish the rules and requirements for receiving benefits under the New Defined Contribution Plan.

(b) Contract via a competitive selection process the services of one or more Administrative Entities to manage the Accumulated Pensions Payment Account and/or the New Defined Contribution Plan. The selection process for said entity or entities will involve the mechanism of "request for proposals" under the rules established by the Retirement Board, safeguarding the best interests of the Government and the Participants, in accordance with the best industry standards. Any reference to the Administrators of the Retirement Systems shall be understood to refer to the Administrative Entities. All provisions and regulations adopted by the Retirement System Administrators shall remain in effect after this Law is enacted until they are amended or modified by the Administrative Entities or the Retirement Board. All of the foregoing is subject to the provisions of Chapter 7 of this Law.

(c) Adopt all rules, regulations, standards and procedures for its organization and operation, and for the implementation of this Law.

(d) Collect withholdings in addition to the Participants' Individual Contributions up to a maximum of 0.25%, which is what is currently withheld according to their respective Retirement Systems to pay for other benefits such as disability insurance.

(e) Establish and collect an Administration Fee to be calculated based on the expenses incurred in operating and administering the Accumulated Pensions Payment Account and the new Defined Contribution Plan.

(f) Establish, implement and oversee the best practices of prudence, integrity, diligence and rules applicable to the New Defined Contribution Plan, with regard to its operation, Participants' rights, administrator responsibilities, fiduciary duties and any other applicable rule contained in the "Employee Retirement Income Security Act," Public Law 93-406, of September 2, 1974 or any other analogous or relevant statute.

(g) Enter into reasonable and appropriate agreements, memoranda of understanding and documents, including trust incorporation deeds, that are necessary and convenient to implement the provisions of this Law, taking into account the current economic and fiscal situation of the Government of Puerto Rico.

(h) Appoint whatever commissions, boards or committees it considers necessary to best achieve the objectives of this Law.

(i) File suit and be sued, even in the name of the Retirement Systems.

(j) Exercise all the powers necessary for compliance with this Law and with the regulations adopted pursuant to the same.

## CHAPTER 5 – TRANSITORY PROVISIONS

**Section 5.1** – Transition Period.

(a) Until such time as the Retirement Board is duly constituted with the quorum required by this Law, the Executive Director of the AAFAF shall have and exercise all the powers corresponding to the Retirement Board, including making the relevant decisions in relation to the creation of the Defined Contribution Plan and the structuring of the "pay as you go" program, as set forth in this Law or in any other applicable statute.

(b) The Retirement System Administrators shall continue to perform their functions, discharging their duties and shall be required to provide all necessary support to the Retirement Board and the AAFAF during the implementation of this Law, until such time as the AAFAF certifies via a Resolution adopted by its Board of Directors that the transition ordered by this Law is complete, which must take place on or before December 31, 2017. However, said date may be extended for a reasonable time if necessary by resolution of the AAFAF. As of said date, all the powers, duties and authority of the Retirement System Administrators will be permanently transferred to the Administrative Entities, the Executive Director of the Retirement Board or other person determined by the Retirement Board.

(c) Retirement System Administrators must take all necessary steps to liquidate their assets and transfer the proceeds to the General Fund and/or the Accumulated Pensions Payment Account, as applicable, except the headquarters building of the Teachers Retirement System, known as the Capital Center Building, North Tower, located in Hato Rey, Puerto Rico, which will not have to be liquidated; transfer the Participants' and Pensioners' files, including their balances, to the Retirement Board, coordinate the movement of their employees in accordance with Law 8-2017, as amended,

known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," and other applicable provisions. As of the time this Law takes effect, the AAFAF shall have all the necessary powers and authority in conjunction with the Retirement System Administrators to take the necessary steps to adjust the operation of the Retirement Systems for purposes of compliance with the provisions of this Law and the Certified Fiscal Plan, so that the orderly transition can take place. Details should be provided to the employees of both the Retirement Systems and those career employees of the Boards of Trustees of said Systems about the mobility plans, the new headquarters and other pertinent information within the period of thirty (30) days prior to the expiration of the term for transition, in order to avoid any uncertainty regarding the changes proposed.

(d) The Retirement Board, in coordination with and with the assistance and resources of the Retirement System Administrators, shall formulate and implement an education campaign addressed to the Participants, Pensioners and Beneficiaries regarding the provisions contained herein.

(e) The Retirement System Administrators, as well as Retirement System employees, shall continue to carry out their duties during the transition period.

**Section 5.2** – Retirement System Employees.

The Office of Administration and Transformation of Human Resources of the Government of Puerto Rico, the Office of Management and Budget and the AAFAF shall establish a plan to move the employees of the Retirement Systems to other agencies and instrumentalities of the Government of Puerto Rico, in compliance with the provisions of Law 8-2017, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," or in accordance with the procedure established for said purpose via regulations, procedures, circulars, etc. However, employees shall continue to carry out their duties during the transition period established herein, as determined by the Board.

Transferred employees shall retain their salaries and all vested rights in accordance with applicable laws, rules and regulations that are compatible with the provisions of Law 26-2017, known as the "Fiscal Plan Compliance Act."

**Section 5.3** – Transfer of Property and Equipment.

The Retirement Board shall have the authority to administer and dispose of all property and equipment owned by the Retirement Systems.

CLAUSE 6. AMENDMENT CLAUSES

**Section 6.1** – Section 2 of Law No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act" is hereby amended so that it shall read as follows:

"Section 2. – Definitions.

The terms and phrases as used in this Law shall have the meanings ascribed to them below, except as context clearly requires otherwise:

Case:17-03283-LTS Doc#:6482-12 Filed:04/23/19 Entered:04/23/19 15:50:32 Desc:
Case:17-00219-LTS Doc#:59-3 Filed:11/08/19 Entered:11/08/19 15:53:05 Desc:
Exhibit C Page 34 of 87

32

(1) Administrator – Shall mean the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

...

(9) Board – Shall mean the Retirement Board created via the "Law to Guarantee Payment to our Pensioners and Establish a New Defined Contributions Plan for Public Servants."

..."

**Section 6.2** – Section 1-1.04 of Law No. 447 of May 15, 1951, as amended, is hereby amended so that it shall read as follows:

"Section 1-1.04. -Definitions.

The following terms and phrases as used in this Law shall have the meanings ascribed to them below, except as context clearly requires otherwise:

1) Board. – Shall mean the Retirement Board created via the "Law to Guarantee Payment to our Pensioners and Establish a New Defined Contributions Plan for Public Servants."

2) Administrator. – Shall mean the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

..."

**Section 6.3** – Section 4-101 of Law No. 447 of May 15, 1951, as amended, is hereby amended so that it shall read as follows:

"Section 4-101. – Administration,

The System created by this Law shall be considered a trust. Any change to the benefits structure involving an increase in the amount of the annuity or other benefits must be substantiated with prior actuarial studies determining their cost and the corresponding legislation shall provide for the financing thereof.

The System created by this Law shall be organized as a body of the Government of Puerto Rico, independent and separate from all others. The Retirement Board shall not be subject to the provisions of Plan 3-2011, as amended, known as the "General Services Administration Reorganization Plan of 2011," or to the "Organic Law of the Government Office of Management and Budget," and shall be governed by Law 8-2017, as amended, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act."

The Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," shall be responsible for ensuring that the provisions of this Law are implemented."

**Section 6.4** – Subsections 11 and 12 are repealed and clauses 13, 14 and 15 are renumbered as 11, 12 and 13, respectively, of Section 4-103 of Law No. 447 of May 15, 1951, as amended.

**Section 6.5 –** Section 1.1 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Act," shall read as follows:

"Section 1.1. Definitions.

The following words and terms, when used or referred to in this Law, shall have the following meanings, unless context clearly indicates otherwise. The tenses used herein shall also include the future, and the masculine gender shall also include the feminine, except where such an interpretation would be absurd. Singular shall include the plural and vice versa.

(a)      ...

..

(f) Executive Director – the person or entity that the Retirement Board, created via the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public Servants," selects to perform the functions of System Administrator.

...

(k) Board of Trustees. – the Retirement Board, created by the "Law to Guarantee Payment to our Pensioners and Establish a New Plan for Defined Contributions for Public      Servants."

..."

**Section 6.6 –** Section 2.3 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Government Teachers Retirement System," is hereby amended so that it shall read as follows:

"Section 2.3. – System Board of Trustees.

The powers and authority of the System and the responsibility for establishing the administrative organization and proper functioning of the same shall be vested in the Retirement Board, created through the "Law to Guarantee the Payment to Our Pensioners and Establish a New Plan of Defined Contributions for Public Servants."

**Section 6.7 –** Sections 2.4, 2.5 and 2.6 of Law 160-2013, as amended, known as the "Commonwealth of Puerto Rico Teachers Retirement System Act," are hereby repealed and Sections 2.7 and 2.8 shall be renumbered as 2.4 and 2.5 respectively.

**Section 6.8 –** Paragraphs (3), (8), (9), (11) and (14) of part (a) and parts (b) and (d) of Section 1081.01 of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," are hereby amended so that they shall read as follows:

"Section 1081.01.- Employee Trusts.

(a) Exemption.- A trust organized under the laws of Puerto Rico as part of an employer's retirement plan, profit sharing plan, stock incentives or pensions for the exclusive benefit of its employees residing in Puerto Rico or who render services primarily in Puerto Rico, and their beneficiaries; and a trust organized under the laws of Puerto Rico or that is considered a domestic trust under the United States Internal Revenue Code of 1986, as amended, or any

successor legal provision, that forms a part of an employer's retirement plan, profit sharing, stock incentive or pensions, for the exclusive benefit of its employees residing in Puerto Rico or employees residing in Puerto Rico and the United States and their beneficiaries, and that with respect to their participants and beneficiaries in the United States, meets the qualification requirements under Section 401(a) of the United States Internal Revenue Code, as amended (hereinafter referred to for the purposes of this Section as the "Federal Code") shall not be taxable under this Subchapter and no other provision of this Subchapter shall be applicable with respect to said trust or the beneficiaries thereof, subject to the terms and operation thereof meeting the following qualification requirements.-

(1)     ...

(2)     ...

(3)     if the trust, or two (2) or more trusts, or the trust or trusts and the annuity plan or plans are designed by the employer as part of a plan that meets the minimum requirements for coverage set forth in this paragraph.

(A)     ...

(B)     ...

(C)     ...

(D)     ...

(E)     Special Rule for Qualified Plans in the United States. If the trust is organized in the United States and with respect to all of its participants, including those who are residents of Puerto Rico, for one year of the plan the retirement plan meets the coverage requirements under Section 410(b) of the Federal Code, it shall be understood that for that same year the plan itself meets the requirements under Section 1081.01(a)(3), provided the plan has been duly certified by the Secretary as a qualified plan under this section.

(F)     Exclusion of Government Plans.- The coverage requirements under Section 1081.01(a)(3) shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(4)     ...

(5)     ...

(6)     ...

(7)     ...

(8)     In the case of any plan that provides contributions or benefits to employees, all or some of which are employee-owners (as defined in paragraph (e)) a trust that forms a part of said plan shall constitute a qualified trust under this Section only if it meets the requirements under

paragraph (f). With regard to the loss of exemption in the case of employee trusts under certain circumstances, *see* Sections 1102.06 and 1102.07.

(9)     The plan must also be in compliance with any applicable provisions of the Federal "Employee Retirement Income Security Act of 1974," known as "ERISA."

(10)     ...

(11)     For tax years beginning after January 1, 2012, a trust does not constitute an exempt trust under paragraph (a) of this Section if the plan of which the trust is a part grants benefits or payouts to a participant in excess of the following parameters:

(A)     ...

(B)     In the case of a defined contribution plan, the annual contributions made by the employer and other additions in relation to a participant, not including contributions transferred from another qualified retirement plan, cannot exceed:

(i)     the applicable limit for determining the tax year under Section 415(c) of the Federal Code, as adjusted by the Federal Internal Revenue Service, or

(ii)     one hundred percent (100%) of the compensation paid to the participant by the employer during the calendar or plan year, at the employer's discretion. The participant's compensation shall include the contributions made by a participant into a qualified plan under a cash or deferred contributions arrangement for that year.

(C)     …

(12)     ...

(13)     …

(14)     Employers' Association

(A)     …

(B)     …

(C)     Exclusion of Government Plans. – The employer aggregation requirements under Section 1081.01(a)(13) shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(15)     …

(b)     Taxes Payable by Beneficiaries

(1)     In general, the amount actually distributed or placed at the disposal of any participant or beneficiary by an employee trust exempt under Section 1081.01(a) shall be taxable

for said participant or beneficiary in the year in which it was so distributed or placed at their disposal and the rules of Section 1031.01(b)(11)(A) were applied to it as though it were an annuity whose price or consideration is the amount of voluntary contributions made by the participant, excluding any investment gains attributable to the same and those amounts on which the participant previously paid income tax in Puerto Rico.

(A) Full Distributions made prior to January 1, 2018.- If the entire amount of the benefits under the trust with regard to a participant is paid or placed at the participant's disposal or that of his or her beneficiary within a single tax year, as a result of the participant leaving public service for any reason, or the termination of the plan (hereinafter referred to for the purposes of this paragraph as a "full distribution"), the amount of said distribution, in excess of the amount contributed by the participant, on which the participant paid taxes, shall be considered a long-term capital gain subject to a tax rate of twenty percent (20%). Without prejudice to the foregoing, in the case of full distributions made by a trust as part of a pension plan, profit sharing plan or stock incentive or stock purchase plan for employees, if:

(i) the trust is established under the laws of the Government of Puerto Rico, or has a trustee that resides in Puerto Rico and uses said trustee as a paymaster; and

(ii) At least ten percent (10%) of all the assets in the trust attributable to participants residing in Puerto Rico, calculated based on the average balance of the investments in the trust during the plan year in which the distribution is made and each one of the two plan years prior to the distribution date have been invested with registered investment firms organized under the Laws of Puerto Rico and taxable under Section 1112.01 of the Code, fixed or variable annuities issued by a domestic insurance company or a foreign insurance company that for three calendar years prior to the date of the distribution derived more than eighty percent (80%) of their gross income from Puerto Rican sources, deposits into interest-bearing accounts at commercial and mutualist, cooperative, savings associations authorized by the Federal Government or the Government of Puerto Rico or at any other banking organization based in Puerto Rico, including but not limited to certificates of deposit or any other property that based on regulations or circulars the Secretary qualifies as property located in Puerto Rico, then the amount of said distribution in excess of the amount contributed by the participant on which the latter paid taxes, shall be considered a long-term capital gain subject to the ten percent (10%) rate. In the case of defined contribution plans in which a separate account is maintained for each participant or beneficiary, the requirement to invest in "property located in Puerto Rico" in relation to the assets credited to the account of the participant or beneficiary may be met. In the case of transfers from a qualified plan under part (a) of this Section (the transferring plan) to another qualified plan under part (a) of this Section, the requirement to invest in property located in Puerto Rico under this subsection (B) with respect to the transferring plan must be met, taking into consideration the period of time the transferring plan or the account of the participant in the transferring plan met the investment requirement set forth in this subsection (B). The Secretary may via regulations, circular, administrative decision or final resolution determine the way in which the requirement to invest in Puerto Rico will be met.

(B)     Total Distributions made after December 31, 2017.- If the entire amount of the benefits under the trust with regard to a participant is paid or placed at the participant's disposal or that of his or her beneficiary within a single tax year, as a result of the participant leaving public service for any reason, or the termination of the plan (hereinafter referred to for the purposes of this paragraph as a "full distribution"), the amount of said distribution, in excess of the amount contributed by the participant, on which the participant paid taxes, shall be considered ordinary income subject to the types of contributions described in Section 1021.01. However, in the case of total distributions with respect to which the obligation to withhold at the source has been met as set forth in Section 1081.01(b)(3)(A), in addition to the deposit obligations under Section 1081.01(b)(4), instead of the tax rates provided under Section 1021.01, the twenty percent (20%) rate shall apply. However, if the requirements set forth in clauses (i) and (ii) of subsection (A) above are met, the ten percent (10%) rate will apply.

(C)     Other Distributions.- If any part of the benefits under the trust with respect to a participant are paid or placed at the disposal of the participant or his or her beneficiary via an option or form of payment or distribution that is not a full distribution or nontaxable loan, the amount of said payment or distribution, insofar as it exceeds the amount contributed by the participant, which the participant already paid taxes on, and if applicable the exempt income under Section 1031.02(a)(13), shall be considered ordinary income subject to the tax rates set forth in Section 1021.01.

(2)     Exception and Special Rule.-

(A)     The participant or beneficiary may elect to have the provisions of paragraph (1) above not to apply to that portion or to the entire full distribution that the plan of which the exempt trust is a part transfers directly or that the participant contributes to an individual retirement account or annuity under the provisions of Section 1081.02, to an individual retirement account that is non-deductible under the provisions of Sections 1081.03 or to a qualified retirement plan under the provisions of part (a) of this Section for the benefit of said participant or beneficiary no more than sixty (60) days after having received said payment or distribution. In the case of a transfer to a non-deductible individual retirement account, the exception to which this paragraph refers shall only apply to those distributions described in Section 1081.03(d)(5)(A). The foregoing notwithstanding, contributions by transfers to non-deductible individual retirement accounts are subject to taxation under Section 1081.03(d)(5) and for the purposes of this paragraph, in order to meet the criteria for the same it shall be sufficient to contribute to the non-deductible individual retirement account an amount equal to the total amount received from the qualified trust by a participant or beneficiary less the tax withheld as set forth in Section 1081.03(d)(5) as provided therein.

(B)　…

(3)　Obligation to deduct and withhold.-

　　　(A)　Total distributions.- Any person acting in any capacity that makes total distributions payable with regard to any participant or beneficiary shall deduct and withhold from said distributions, made prior to January 1, 2018, an amount equal to twenty percent (20%) of the amount of the same in excess of the amounts contributed by the participant to the plan on which the latter has paid taxes. Said deduction and withholding shall be ten percent (10%) if the trust meets the criteria set forth in subsections (A) and (B) of paragraph (1) of this part. With the proviso that, for total distributions made after December 31, 2017, the contribution to be withheld shall be ten percent (10%). For distributions made prior to January 1, 2018, employers whose employees participate in the plan or the plan administrator shall certify to the person making such distributions from the trust that the requirement to invest in "property located in Puerto Rico" has been met. Upon receipt of said certification issued by the employer, the person making such distributions from the trust shall not be responsible for the payment of any tax, interest or penalties in the event this requirement has not been met, but he or she shall be responsible for deducting and withholding the ten percent (10%).

　　　(B)　…

　　　(C)　…

　　　(D)　…

　　　(E)　…

　　　　　(i)　…

　　　　　(ii)　…

(4)　Obligation to pay or deposit taxes deducted or withheld.- Anyone required to deduct and withhold any tax under the provisions of paragraph (3) and to pay said tax to the Secretary shall pay the amount of the tax that was deducted and withheld at the Internal Revenue Collection Offices of the Puerto Rican Department of the Treasury, deposit said tax in any of the depository banking institutions designated to receive public funds that have been authorized by the Secretary to receive said tax contribution, or deposit it via electronic means as instructed by the Secretary via regulations, administrative decision, circular or informative bulletin of a general nature. The tax must be paid or deposited no later than the 15th day of the month after the date on which the distribution was made.

(5)　…

(6)　…

(7)　…

(8)     Penalty.- In the event any person fails to deposit the taxes deducted and withheld under paragraph (3) within the time frame established by paragraph (4) of this part (b), said person shall be subject to a penalty of two percent (2%) of the amount of the shortfall if the omission is for thirty (30) days or less and two percent (2%) for each additional thirty (30) day period or fraction thereof while the omission persists, without exceeding a total of twenty-four percent (24%). For the purposes of this paragraph, the term "shortfall" means the excess amount of tax that ought to have been deposited over the amount, if any, of tax that was deposited on or before the due date. For the purposes of this paragraph, the omission shall not be deemed to persist after the date on which the tax is paid.

(9)     …

(10)    …

(c)     …

(d)     Cash or Deferred Contribution Arrangement

(1)     …

(2)     …

(3)     Share Request and Rules Governing Discrimination

(A)     …

…

(F)     Exclusion of Government Plans.- The rules governing discrimination in Section 1081.01 (d)(3), including the tax imposed in Section 1081.01(d)(6)(D), shall not apply to retirement plans established by the Government of Puerto Rico, the United States Government or their respective municipalities, agencies, instrumentalities and public corporations.

(4)     Other requirements.

(A)     Benefits other than matched contributions shall not be conditional upon the choice to defer.- Any employer cash or deferred payment agreement shall not be considered a qualified cash or deferred contribution agreement if any other benefit established by the employer is directly or indirectly conditional upon the employee's choice to have the employer make contributions under the plan rather than receiving them in cash. The foregoing does not apply to any matching contribution made based on said choice.

(5)     …

(6)     …

(7)     …

…

(e)    …

    ….”


# CHAPTER 7 – FINAL PROVISIONS

**Section 7.1** – Voluntary Pre-retirement Program.

(a)    Law 211-2015, as amended, known as the "Voluntary Pre-retirement Program Act" is hereby repealed. However, all rights and obligations created under this statute are guaranteed.

(b)    The Pre-retirees who are participating in the Voluntary Pre-retirement Program at the time that this Law is enacted shall continue to benefit from it according to the provisions established under Law 211-2015, as amended.

(c)    Requests for Pre-retirement, in accordance with the Voluntary Pre-retirement Program duly submitted by the Participants on the date of approval of this Law, will continue the ordinary procedure. The review mechanisms, as provided in Law 211-2015, as amended, and any other applicable statute will be guaranteed.

(d)    Participants whose Pre-retirement benefits have previously been approved by the Office of Management and Budget, according to the provisions of Law 211-2015, as amended, shall be guaranteed the benefits of the Program.

**Section 7.2** – Preservation of Benefits.

Except as otherwise expressly provided herein, the right to receive the Accumulated Pensions, the retirement age and other benefits provided by special laws, shall not be affected by this statute and shall be guaranteed by the Government

**Section 7.3** – Incentive Programs, Opportunities and Retraining for public servants.

The AAFAF is hereby authorized to design, implement, and oversee incentivized public service voluntary separation programs, volunteer programs involving opportunities outside of public service for government employees in the Executive Branch for any employee that so requests who meets the requirements set forth in internal regulations not subject to Law 38-2017, known as the "Government of Puerto Rico Uniform Administrative Procedure Act." They may include, among other incentives, retraining programs, tax breaks up to the amount of the employee's tax liability for a certain period and/or tax breaks for private sector entities or persons who recruit and/or offer benefits to said government employees. These tax break programs will be established and implemented by the internal decision of the Secretary of the Department of the Treasury. In designing and implementing such a program, care must be taken to remain in compliance with the Fiscal Plan certified under PROMESA. The authority delegated to the AAFAF shall not include the establishment of early retirement programs or windows.

**Section 7.4** – Regulation.

All regulations, orders, resolutions, circulars, and other administrative documents governing the operation of the Retirement Systems that are in effect at the time this Law takes effect, provided they are

consonant with it, shall remain valid until they are expressly altered, modified, amended, repealed, or replaced.

The AAFAF and the Department of the Treasury are hereby authorized to establish the necessary regulations and procedures to use the powers granted under this Law to safeguard the best interests of the Participants, Beneficiaries, and Retirees. The powers granted in this Section include the authority to take any necessary steps to ensure an orderly transition, in accordance with the provisions of this Law.

**Section 7.5** – Applicability of the Uniform Securities Act.

The interest of any Participant in the New Defined Contribution Plan shall not constitute a security for the purposes of Law No. 60 of June 18, 1963, as amended, known as the "Uniform Securities Act."

**Section 7.6** – Loan Programs.

All loan programs of any nature that the Retirement Systems may have had in place at the time this Law takes effect are hereby suspended. Loans that have already been granted shall be governed by the laws under which they were granted, with the proviso that the Retirement Board and the AAFAF are authorized to outsource such programs and everything related to the servicing thereof.

**Section 7.7** – Matching the Defined Contribution Account.

The AAFAF is hereby granted the authority to determine that the fiscal situation of the Government has stabilized and that based on the condition of the treasury, upon the Governor's recommendation and in coordination with the Retirement Board, it will be possible to allocate a certain amount in the budget for the purpose of matching Participant contributions to the Defined Contribution Account. This determination must be made in accordance with the certified Fiscal Plan and the provisions of PROMESA.

**Section 7.8** – Liability.

No natural or legal person, including officials of the Puerto Rico Government, Public Corporations and Municipalities, who carry out duties under or arising from this Law, shall enjoy immunity that frees him or her from personal liability for failure to comply with his or her duties imposed by this Law. This provision shall prevail over any other legal provision, whether special or general.

**Section 7.9** – Municipalities.

For municipalities, the calculation of the amount to be paid shall be made excepting the uniform additional contribution.

**Section 7.10** – Supremacy.

The provisions of this Law and any rules or regulations adopted in accordance herewith shall prevail over any other legal provision, regulation, or rule that is not in harmony with the former.

**Section 7.11** – Severability.

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law were to be annulled or declared

unconstitutional, the decision, order or judgment to such effect will neither affect, impair nor invalidate the remainder of this Law. The effect of any such order shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law so annulled or declared unconstitutional. If the application to a person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law, were to be annulled or declared unconstitutional, decision, order or judgment to such effect will neither affect nor invalidate the application of the remainder of this Law to such persons or circumstances to which it may be validly applied. It is the express and unequivocal intent of this Legislative Assembly that the courts of law enforce the provisions and application of this Law to the greatest possible extent, even if any of its parts is annulled, invalidated, affected, or declared unconstitutional, or even if the application thereof to any person or circumstance is annulled, invalidated, or declared unconstitutional.

**Section 7.12** – Effect.

This Law will take effect immediately upon passage; however, the provisions that are so indicated herein shall have retroactive effect.

**(P. del S. 603)**

# LEY NUM. 106
# 23 DE AGOSTO DE 2017

Para establecer la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos", a los fines de reformar el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros, de acuerdo a la realidad económica y fiscal de Puerto Rico y a las disposiciones del Plan Fiscal para Puerto Rico, certificado conforme a las disposiciones de la Ley Pública 114-187, conocida como *"Puerto Rico Oversight, Management, and Economic Stability Act"* o *"PROMESA"*, por sus siglas en inglés; establecer que el Fondo General, a través del sistema de *"pay as you go"*, asuma los pagos que el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros y el Sistema de Retiro para la Judicatura no puedan realizar; disponer que los tres Sistemas de Retiro sigan cumpliendo con sus obligaciones hacia sus beneficiarios y pensionados aportando al Fondo General sus fondos disponibles y los fondos provenientes de las liquidaciones de sus activos; establecer el Nuevo Plan de Aportaciones Definidas y proveer para su administración; crear la Junta de Retiro, delegarle facultades y deberes; enmendar el Artículo 2 de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura"; enmendar los Artículos 1-1.04 y 4-101, derogar los incisos 11 y 12 y renumerar los incisos 13, 14 y 15 como 11, 12 y 13, respectivamente, del Artículo 4-103 de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, conocida como "Ley del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico"; enmendar los Artículos 1.1, 2.3 y derogar los Artículos 2.4, 2.5 y 2.6 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico"; enmendar la Sección 1081.01 de la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico"; derogar la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Preretiro Voluntario", garantizar los beneficios a los Preretirados y proveer para que empleados que hayan solicitado dichos beneficios pueda concluir el trámite; autorizar a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico a diseñar, implementar y fiscalizar un programa de separación incentivada del servicio público de los empleados de la Rama Ejecutiva; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

Actualmente, Puerto Rico atraviesa una crisis fiscal y social sin precedentes. Esta crisis fue causada, en parte, porque faltaron controles sobre el gasto, medidas de desarrollo sustentable y sistemas de información gerencial que promuevan claridad y transparencia en la gestión gubernamental.

Según datos provistos por el Departamento del Tesoro Federal, Puerto Rico sufre una contracción económica cumulativa de 14.6 % en el Producto Estatal Bruto (PEB real) con una

predicción de una contracción adicional de 3 % para los próximos dos años. Desde principios del Siglo XXI, el Gobierno de Puerto Rico ha operado con un déficit estructural que ha sido financiado con emisiones de bonos y préstamos al Banco Gubernamental de Fomento. No obstante, la grave situación fiscal cerró el acceso del Gobierno a los mercados financieros, afectando su capacidad de obtener financiamiento a corto y a largo plazo. A consecuencia de ello, hace más de un año que el Gobierno de Puerto Rico carece de liquidez. La pasada Administración utilizó los fondos de reintegros que pertenecían a los contribuyentes, de los pagos de los contratistas, el dinero de los pensionados y préstamos intragubernamentales, para sustituir las fuentes de liquidez y hacer gastos mayores a los fondos disponibles. El Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016, y desde entonces no cumple su rol de proveer liquidez al Gobierno. Como si fuera poco, los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, para Maestros y para la Judicatura están insolventes.

Como ejemplo de las políticas erradas de administración pública que nos trajeron a la presente situación fiscal, puede destacarse que desde el año 2001 al 2008 ocurrió un aumento de 64 % en los gastos de la nómina gubernamental y, a pesar de los avances para atender este problema luego de una reducción de 33 % entre los años 2009 y 2012, hubo otro aumento sustancial en el cuatrienio 2013-2016. Para financiar ese gasto desmedido, entre los años 2000 y 2008 la deuda pública aumentó en 134 %. Por otro lado, las medidas implantadas entre los años 2013 y 2016 fueron bajo la filosofía de "primero impago, luego impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. Esto, sin haberse concretado las acciones necesarias para lograr una mayor eficiencia operacional en el Gobierno, ni recortes al excesivo gasto gubernamental. Además, mientras se precipitaban los valores y la debacle económica, el Gobierno Central fue incapaz de generar la información financiera necesaria para analizar y comprender la profundidad del problema y presentar información certera ante el Congreso de los Estados Unidos, y ante otras entidades con interés en el asunto. A raíz de todo lo antes expuesto, se materializaron varias degradaciones consecutivas de las clasificaciones de la deuda del Gobierno de Puerto Rico y sus instrumentalidades en un periodo de tiempo corto, lo que ha desencadenado un impacto adverso a través de todos los sectores de la economía.

Esta crisis ha golpeado fuertemente a las familias puertorriqueñas. Los sacrificios más severos han recaído sobre los más vulnerables en nuestra sociedad y ha provocado que miles de puertorriqueños abandonen la Isla hacia otras jurisdicciones de Estados Unidos en busca de mejores oportunidades. La consecuente reducción poblacional se ha convertido en uno de los retos para encaminarnos hacia la recuperación.

## La Situación Colonial en Puerto Rico

La situación colonial afecta nuestra capacidad para afrontar y resolver esta crisis pues carecemos de los poderes soberanos que tiene un estado para regular sus asuntos locales bajo la Enmienda X de la Constitución de los Estados Unidos. "[P]ara el Tribunal Supremo Federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un ente político sujeto a la cláusula territorial de la Constitución Federal."

Véase <u>Pueblo v. Sánchez Valle y otros, 192</u> D.P.R. 594, 631 (2015). "[N]unca hubo una cesión de soberanía, lo que hubo fue una delegación de poderes." *Id.* a la pág. 635. "Esa delegación de poder no constituye una renuncia irrevocable ni una terminación del poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio de la Constitución, un poder amplio para administrar los territorios. Por esa razón, el Congreso no puede renunciar de manera irrevocable a un poder que le fue conferido por el Pueblo de Estados Unidos". *Id.* a la pág. 638.

Así pues, "el Congreso puede permitir que el Estado Libre Asociado permanezca como sistema político de forma indefinida, o por el contrario, tiene la autoridad constitucional para enmendar o revocar los poderes de administración interna que ejerce el Gobierno de Puerto Rico. Dicho de otro modo, el sistema de gobierno que rige internamente en Puerto Rico está sujeto por completo a la voluntad política y la autoridad legal del Congreso." *Id.* a la pág. 641.

La triste realidad es que la situación colonial nos coloca en un estado de indefensión tal, que ni la ciudadanía americana que atesoramos la abrumadora mayoría de los puertorriqueños y que disfrutamos desde el año 1917, está garantizada. En ese sentido, el Congreso tiene la discreción legislativa para conceder privilegios a los ciudadanos nacidos en los territorios, incluyendo la ciudadanía americana, pero ese derecho puede ser revocado en cualquier momento. De hecho, el Gobierno Federal ha sostenido ante los tribunales que en los territorios no existe un derecho a la ciudadanía, sino que se trata, más bien, de una gracia legislativa del Congreso. Véase, por ejemplo, <u>Tuaua v. United States</u>, 788 F.3d 300, (D.C. Cir. 2015).

En cuanto al asunto particular que nos ocupa, como ejemplo de las limitaciones que la situación colonial nos impone, tenemos que señalar que los estados pueden obtener las protecciones del Código de Quiebras Federal, pero Puerto Rico fue excluido de dicho estatuto y, por no tener representación plena en el Congreso, es poco o nada lo que podemos hacer al respecto. Tampoco podemos legislar una quiebra local pues la misma ley federal que no nos protege ocupa el campo y previene la legislación local. *Véase* <u>Puerto Rico v. Franklin Cal. Tax-Free Tr.</u>, 136 S. Ct. 1938 (2016) (declarando inconstitucional la "Ley para el Cumplimento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico", Ley 71-2014, conocida coloquialmente como la "Ley de Quiebra Criolla").

### El resultado directo de nuestra situación colonial: PROMESA

Las políticas del pasado, junto a nuestra indefensión colonial, llevaron al Congreso de los Estados Unidos a promulgar la ley denominada *"Puerto Rico Oversight, Management, and Economic Stability Act"* ("PROMESA", por sus siglas en inglés), Ley Pública 114-187, y delegó amplísimos poderes en una Junta de Supervisión Fiscal (en adelante "Junta de Supervisión").

Nuevamente, por no tener representación plena en el Congreso, dicha Ley se aprobó sin una verdadera participación de nuestro Pueblo. Conforme a PROMESA, las continuas acciones de planificación fiscal, las acciones presupuestarias, legislativas y ejecutivas de Puerto Rico, así como las reestructuraciones de deuda, consensuales o no, y la emisión, garantía, intercambio, modificación, recompra o redención de deuda están sujetas a supervisión del ente creado a esos fines.

La Sección 4 de PROMESA dispone claramente que sus disposiciones prevalecerán sobre cualquier disposición específica o general de las leyes territoriales, estatales o reglamentos territoriales o estatales que sea incompatible con esta Ley. De esta manera, el Congreso de los

Estados Unidos de forma expresa, hizo manifiesta su intención de que dicha Ley desplazaría cualquier legislación estatal que choque con PROMESA. Esto queda igualmente reconocido en la Sección 8(2) de PROMESA, la cual establece que el Gobierno de Puerto Rico no puede adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos de PROMESA, según lo determine la Junta de Supervisión. Así pues, estamos imposibilitados de promulgar legislación que deje sin efecto a PROMESA, o que menoscabe sus disposiciones y su alcance.

En esta coyuntura, precisa resaltar que, bajo la Décima Enmienda de nuestra Constitución Federal, el Gobierno Federal, no puede imponerle a un estado lo que la Ley Federal PROMESA permite para los territorios. Por eso el Congreso pudo imponer una Junta a Washington, DC, que no es estado, y que está bajo la jurisdicción directa del Congreso. Del mismo modo, la Junta que operó en la ciudad de New York fue una creación de su propia legislatura estatal y no del Congreso. Detroit, que es una ciudad y no un estado, participó de un proceso voluntario de quiebra. En fin, no puede perderse de vista que la situación que atravesamos y la imposición de la Junta de Supervisión es otra de las consecuencias de nuestra situación colonial que ha limitado nuestro desarrollo por más de quinientos años y que no tuvo cambio alguno con la adopción de la Constitución de Puerto Rico en el año 1952, según autorizada por el Congreso.

Lamentablemente, nuestra situación colonial y consustancial carencia de poderes políticos, exacerba la realidad de que nos han impuesto una ley federal que es suprema a toda legislación local, incluso nuestra Constitución, sin que tuviéramos la oportunidad de votar sobre la misma, ni votar por el Presidente que la aprobó. Esto pone de manifiesto que para poder salir del atolladero económico en el que nos encontramos es imprescindible solucionar el problema del estatus político. Sin embargo, también es un hecho irrefutable que tenemos que trabajar dentro de los parámetros de PROMESA para iniciar la recuperación económica y fiscal de Puerto Rico.

El 30 de octubre de 2016, la Junta de Supervisión designó al Gobierno de Puerto Rico, al Sistema de Retiro de los Empleados del Gobierno, al Sistema de Retiro para la Judicatura, al Sistema de Retiro para Maestros, a la Universidad de Puerto Rico y 21 corporaciones públicas de Puerto Rico como "entidades cubiertas", sujetas a supervisión fiscal a tenor con PROMESA. La Sección 405(b) de PROMESA impuso una paralización temporera de los litigios y las reclamaciones contra el Gobierno de Puerto Rico y sus instrumentalidades sobre distintos asuntos, con la esperanza de que el Gobierno de Puerto Rico, a nombre propio y a nombre de sus instrumentalidades, estableciera negociaciones voluntarias con sus acreedores para reorganizar y transigir el repago de sus obligaciones de deuda y simultáneamente emprendiera una reestructuración responsable del Gobierno de Puerto Rico y sus instrumentalidades que reajuste los servicios esenciales requeridos para la salud, seguridad y bienestar de los residentes de Puerto Rico con el repago puntual de sus obligaciones de deuda. El término de esa paralización venció el 1 de mayo de 2017. Luego de vencido este término, ya este asunto se está ventilando en diferentes foros federales, incluyendo el Tribunal Federal para el Distrito de Puerto Rico.

Luego de invertir millones de dólares en consultores especializados, la pasada Administración presentó en el año 2016 un plan fiscal deficiente, que fue rechazado por la Junta de Supervisión de forma inmediata, pues no resolvía los problemas fiscales provocados por la pasada Administración.

### Un Nuevo Gobierno: Responsabilidad ante la Junta de Supervisión

Como resultado de todo lo anterior, cuando asumimos las riendas del Gobierno el 2 de enero de 2017, encontramos un déficit en caja de más de $7,600 millones, según certificado por el Tesoro Federal y la Junta de Supervisión. Se trataba de un Gobierno sin acceso a los mercados de capital, con un crédito de categoría chatarra, sin liquidez, sin transparencia en las finanzas públicas, con un gasto gubernamental exagerado y con deudas de miles de millones de dólares. Además, el gobernador Ricardo A. Rosselló Nevares, enfrentaba la titánica tarea de recuperar la credibilidad ante los mercados financieros y ante la Junta de Supervisión.

Es nuestra responsabilidad garantizar un Gobierno donde los gastos respondan a la realidad de los ingresos. Por eso, desde comienzos de la presente Administración, hemos estado implementando un plan concertado para controlar el gasto gubernamental, reactivar nuestra economía y facilitar las condiciones para la creación de más y mejores empleos en el sector privado. El 28 de febrero de 2017, el Gobernador presentó un Plan Fiscal completo, abarcador, real y, a la vez, sensible a las necesidades de nuestro Pueblo y de los más vulnerables. El 13 de marzo de 2017, la Junta de Supervisión aceptó y certificó el Plan Fiscal, acompañado de una serie de contingencias que garantizan que no habrá despidos de empleados públicos, sin afectar la jornada laboral, manteniendo el acceso a servicios de salud a nuestro Pueblo y protegiendo las pensiones de los más vulnerables. El Plan Fiscal Certificado es la única alternativa para evitar el despido de empleados públicos, la eliminación del derecho a la salud, cumplir con los pensionados, manteniendo un Gobierno operacional y que cumpla con los parámetros para evitar medidas más severas que son parte de las contingencias del Plan Fiscal Certificado aprobadas por la Junta de Supervisión.

La validación del Plan Fiscal representa un reconocimiento a la credibilidad del nuevo Gobierno. Los cambios que estamos encaminando no serán fáciles y tomarán tiempo, pero también tendrán sus resultados en los primeros dos años de su implementación. Ahora nos compete ejecutar las contingencias que el Plan Fiscal le requieren al Gobierno cumplir. Debemos asegurar que tengamos el dinero accesible y líquido para no afectar el salario de los empleados públicos, la salud del Pueblo y los ingresos de los pensionados.

Esta Ley persigue salvaguardar el bienestar de nuestros pensionados y servidores públicos, mientras damos fiel cumplimiento al Plan Fiscal Certificado por la Junta de Supervisión. La misma se promulga para atemperar el marco legal y jurídico para poder cumplir con las exigencias que nos hiciera la Junta de Supervisión en el Plan Fiscal aprobado en virtud de la Ley Federal PROMESA. En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, ante la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico, se hace necesaria la aprobación de la presente Ley para que el Estado pueda financiar los beneficios de pensión de los servidores públicos que ya se acogieron al retiro o que lo harán en el futuro. Ejercemos este poder de razón de Estado para tomar las medidas necesarias para dar cumplimiento al Plan Fiscal y colocar a Puerto Rico en el camino de la recuperación económica. Cumplir con este Plan constituye un interés apremiante del Estado para mantener sus operaciones y proteger a los más vulnerables.

Según definido por el Tribunal Supremo de Puerto Rico, el poder de razón de Estado es "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar

ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Nuestro más Alto Foro dispuso que eran válidas las medidas tomadas para atender una emergencia que sean necesarias y razonables para adelantar el interés gubernamental importante. Véase, Trinidad v. E.L.A., 188 D.P.R. 828 (2013) y Domínguez Castro v. E.L.A., *supra*, págs. 88-89. De igual forma, el Tribunal Supremo reconoció "la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado" y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad". Domínguez Castro v. E.L.A., *supra*, pág. 37. Por voz del Juez Asociado, señor Kolthoff Caraballo, el Tribunal llamó la atención a que tanto nuestra jurisdicción como el resto del mundo "vive momentos muy convulsos en el aspecto económico y financiero. Parecería que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) *certiorari* denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). De ese modo, el Tribunal Supremo reconoció que debía ser consciente que existía una realidad que describió como "dura y antipática". Confrontado con tal escenario histórico, nuestro Tribunal estimó que resultaba necesario aspirar a un interés altruista en el que se persiguió el "bienestar económico colectivo, a expensas del bienestar individual." Además, este Tribunal reiteró el reconocimiento en torno a una crisis económica en nuestra jurisdicción en el caso Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010) y destacó, en el contexto de la provisión de un remedio que implicaba desembolso de fondos públicos a fin de restituir dinero a contribuyentes, que no estaba "ajeno al difícil estado de las finanzas públicas en nuestro país". *Id.* a la pág. 309.

El Tribunal Supremo validó la Ley 3-2013, según enmendada, sobre el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico en el caso Trinidad Hernández v. E.L.A., *supra*, entendiendo que la Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico. El Tribunal Supremo razonó que "de la exposición de motivos... se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema". Añadió que, "ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus Participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños". Trinidad Hernández v. E.L.A., *supra*, pág. 837. Concluyó que la norma es constitucional "porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 839.

Del mismo modo, en el caso Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), el Tribunal Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-2013 para solventar la crisis del Sistema de Retiro para Maestros y determinó que la Ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. Por ello, resolvió que la Ley 160–2013, en lo que respecta al

menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias "para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 8.

Usando como base el marco legal antes discutido, esta Asamblea Legislativa entiende que las medidas que se toman en esta Ley, son necesarias y razonables para atender de forma adecuada la crisis fiscal e insolvencia actuarial que enfrentan los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, para la Judicatura y para Maestros. Así mismo, se trata de la creación del marco legal que permitirá cumplir con las disposiciones y metas relacionadas a los Sistemas de Retiro incluidas en el Plan Fiscal certificado por la Junta de Supervisión de conformidad con la Ley Federal PROMESA. Dicho Plan establece ajustes de índole fiscal para estabilizar las finanzas del Gobierno en tiempos que no existe acceso al mercado financiero. De no implementar estas medidas, el bienestar social y económico de Puerto Rico sufrirá daños irreparables por lo que implementar esta reforma como parte del Plan Fiscal constituye un interés apremiante del Estado para velar por el bienestar del interés público.

### Reestructuración Gubernamental

Por otro lado, el Plan para Puerto Rico que impulsa esta Administración y que fue refrendado por el Pueblo de Puerto Rico en las pasadas elecciones generales por medio del ejercicio democrático del voto, propone implementar una nueva estructura de gobierno que baje significativamente el gasto público y mejore sustancialmente sus funciones. Para lograr esto, se requiere la evaluación concienzuda de los servicios que provee el Gobierno, a fin de determinar cuáles pueden ser consolidados, delegados al sector privado o eliminados porque ya no son necesarios. Todo ello, sin que conlleve despidos de empleados públicos, sino la movilización de los mismos, acorde con la necesidad de servicios de nuestros ciudadanos.

Cónsono con lo anterior y, como parte de las primeras medidas tomadas por esta Administración para atajar la crisis fiscal mediante la reingeniería de la estructura gubernamental, se aprobó la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico". Esta Ley, convierte al Gobierno en un Empleador Único para que los funcionarios públicos pasen a ser empleados del Gobierno y no de sus diferentes entidades, permitiendo así la mejor utilización de los recursos humanos donde exista una necesidad apremiante mediante el mecanismo de movilidad, sin que el empleado tenga que renunciar al puesto que ocupa y comenzar de nuevo en otra instrumentalidad gubernamental. Mediante la movilidad, se pretende reforzar el entendimiento de lo que significa el equilibrio entre la fuerza laboral y la prestación de servicios públicos. De esta manera, obtenemos una distribución eficiente del recurso humano del Gobierno y creamos una estructura gubernamental ágil, basada en la evaluación continua de necesidades y ayudando a los servidores públicos a realizar los ajustes y adaptaciones requeridas por la actual crisis fiscal y los retos futuros.

### PROMESA y la Cláusula de Supremacía

Por otra parte, es importante recalcar la aplicación y el mandato que el Congreso de los Estados Unidos de América, en virtud de sus poderes plenarios sobre el Territorio de Puerto Rico, nos impuso cuando aprobó PROMESA que crea la Junta de Supervisión a la cual, dentro

de una serie de encomiendas, le confirió la de aprobar y supervisar la ejecución de un Plan Fiscal para la estabilización económica de Puerto Rico.

Dicha norma aprobada el 4 de mayo de 2016, establece una cláusula de supremacía que citamos:

Sec. 1 ''Puerto Rico Oversight, Management, and Economic Stability Act'' or ''PROMESA''. (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act**. (Énfasis nuestro).

Conforme al Art. 101 de PROMESA, la Junta de Supervisión, a su plena discreción, en el momento que considere apropiado, podrá designar a cualquier instrumentalidad territorial como una instrumentalidad territorial cubierta y sujeta a las obligaciones de la referida Ley. Al momento, la Junta de Supervisión ha designado todas las corporaciones públicas como entidades cubiertas. Por otro lado, conforme al Artículo 205 de PROMESA, la Junta de Supervisión podrá someter en cualquier momento recomendaciones al Gobernador o a la Legislatura sobre acciones que el Gobierno territorial deba tomar para garantizar el cumplimiento del Plan Fiscal o para promover de alguna otra manera la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios. Hechas las recomendaciones, el Gobernador tendrá que someter una declaración indicando si el Gobierno adoptará la recomendación. Si no la adopta, el Gobernador deberá explicar al Presidente de los Estados Unidos y al Congreso sus razones para no adoptarlas.

Recordemos que PROMESA goza de supremacía sobre cualquier legislación del territorio de Puerto Rico incompatible con los motivos, responsabilidades, encomiendas y objetivos que tiene la norma federal y la Junta de Supervisión como ente encargado de su ejecución.

Usando como base este marco legal, esta Asamblea Legislativa está convencida que las medidas que se toman en esta Ley son necesarias y razonables para atender de forma adecuada la crisis fiscal y solvencia actuarial de los Sistemas de Retiro y representan un ejercicio legislativo válido. Además, esta Asamblea Legislativa está comprometida con cumplir fielmente con el Plan Fiscal certificado por la Junta de Supervisión Fiscal el pasado 13 de marzo de 2017. En particular, esta legislación está anclada en las disposiciones sobre reforma de pensiones incluidas en el Plan Fiscal, según se expone a continuación:



PENSION REFORM

### Segmentation of the defined contribution structure will protect the retirement savings of government employees

Pension Reform Measures, $MM

| Reform Measures | Initiative | 2018 Impact |
|---|---|---|
| **Contribution Segregation and New Benefit Plans** | ▪ Switch to pay-as-you-go model, segregate prospective employee contributions, facilitate Social Security enrollment and improve investment alternatives | $0 |
| **Adjust Retirement Benefits** | ▪ Protect benefits for lowest pension income earners. Progressive strategy to reduce retirement benefit costs including other post-employment benefits. | $0 |

## Los Sistemas de Retiro

El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros del Gobierno de Puerto Rico y el Sistema de Retiro para la Judicatura de Puerto Rico (en conjunto "los Sistemas de Retiro") confrontan una grave emergencia fiscal, toda vez que sus activos líquidos están próximos a terminarse y próximamente los mismos no tendrán los recursos necesarios para pagar sus obligaciones con los pensionados.

Esta crisis comenzó hace décadas y se ha agravado con el pasar de los años, hasta llegar a la emergencia actual. Para intentar resolver la misma, el Gobierno ha reformado los Sistemas de Retiro en varias ocasiones. Entre éstas, en el año 2000, bajo la Administración del Dr. Pedro Rosselló, se reformó el Sistema de Retiro de los Empleados del Gobierno y se estableció un plan de contribución definida, mejor conocido como "Reforma 2000", para los empleados públicos que comenzaron a cotizar a partir del 1 de enero de 2000. Además de esa reforma, la cual fue positiva para nuestros servidores públicos, la Administración del Dr. Pedro Rosselló le inyectó al Sistema de Retiro de los Empleados del Gobierno de Puerto Rico cientos de millones de dólares para ayudar a paliar el déficit actuarial.

Durante las Administraciones de la gobernadora Sila M. Calderón y el gobernador Aníbal Acevedo Vilá, la salud fiscal de los Sistemas de Retiro continuó empeorando. A modo de ejemplo, podemos mencionar las nefastas consecuencias que tuvieron para el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico las emisiones de bonos que se realizaron en el año 2008.

Bajo el mandato del gobernador Luis G. Fortuño Burset, se aumentaron las aportaciones patronales a los Sistemas de Retiro para ayudar a solventar los mismos. Posteriormente, en el 2013, se hizo otra reforma significativa a los Sistemas de Retiro para intentar salvarlos. Esa reforma fue nefasta para nuestros servidores públicos, pues redujo significativamente sus beneficios, aumentó la edad de retiro y alteró las condiciones bajo las cuales éstos se pueden

retirar. Como si fuera poco, la Administración del gobernador Alejandro García Padilla se comprometió a hacer aportaciones adicionales a los Sistemas de Retiro a través del establecimiento de la Aportación Adicional Uniforme a las corporaciones públicas, entre otras, pero incumplieron, lo que continuó empeorando la salud fiscal de los Sistemas de Retiro. Es decir, durante el cuatrienio pasado, le redujeron beneficios a nuestros servidores públicos y no se cumplieron con las obligaciones del Gobierno a dichos Sistemas.

Debido a múltiples razones, entre éstas: aportaciones inadecuadas, aprobación de leyes especiales, programas de retiro temprano, cambios en la expectativa de vida de los Participantes, inversiones fallidas, mala administración, emisiones de bonos que no resultaron en beneficios,[1] las distintas reformas no funcionaron y no fueron suficientes para salvar a los Sistemas de Retiro. Consecuentemente, en estos momentos se encuentran al borde de la insolvencia, lo que significa que el pago de las pensiones a nuestros retirados está seriamente amenazado si no actuamos con prontitud. Es menester mencionar que tanto el Gobierno Central, como el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico se encuentran actualmente en un proceso de reestructuración bajo el Título III de PROMESA.

A pesar de que las reformas que se han hecho no han sido efectivas, dejar de actuar no es una opción. El bienestar de los servidores públicos y de nuestros retirados es una prioridad para esta Administración. No obstante, las medidas que puede tomar el Gobierno deben evaluarse y enmarcarse en el contexto histórico por el que atravesamos. Como se indicó anteriormente, Puerto Rico atraviesa por la crisis fiscal más grande y severa en su historia moderna. Ello llevó al Gobierno Federal a aprobar PROMESA y a establecer una Junta de Supervisión para la Isla. Conforme a dicho estatuto, se certificó un Plan Fiscal para el Gobierno de Puerto Rico, el cual establece los parámetros a seguirse para alcanzar la responsabilidad fiscal. Los presupuestos aprobados de ahora en adelante deben estar totalmente alineados con dicho Plan Fiscal certificado. De lo contrario, la Junta de Supervisión tiene el poder y la autoridad de tomar medidas correctivas. Nuestro norte siempre será que sea el Gobierno local electo quien tome las decisiones por Puerto Rico, por difíciles que sean. Dejar el poder decisional en manos de una entidad que no fue electa por el Pueblo no es una opción.

Dentro de ese cuadro, se han analizado con sumo detenimiento las alternativas disponibles y viables para atender la crisis actual de los Sistemas de Retiro. Primero, debido a la insolvencia inminente de los mismos, esta Asamblea Legislativa considera razonable y necesario que el Fondo General asuma la responsabilidad y pague las cantidades que los Sistemas de Retiro no puedan asumir para hacer los pagos correspondientes a nuestros pensionados. Para este año fiscal 2017-2018, el Fondo General estará desembolsando aproximadamente $2,000 millones para el pago de las Pensiones Acumuladas de nuestros servidores públicos (esto representa un aumento significativo, pues antes del 1 de julio de 2017, el Gobierno apenas realizaba aportaciones patronales anuales de alrededor de $660 millones en aportaciones). Esto demuestra el compromiso de esta Administración con nuestros pensionados. De lo contrario, nuestros retirados se quedarían desprovistos de sus pensiones, con las consecuencias que ello supone para ellos, así como para el Gobierno y la sociedad en general.

---

[1] Para una discusión en detalle sobre este asunto, véase los tres (3) informes presentados por la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico con relación a la Resolución de la Cámara 417 de 2009.

A esos fines, se establece mediante esta legislación el sistema conocido en inglés como *"pay as you go"*, a través del cual se continuarán realizando los desembolsos para todas las pensiones actuales de los Sistemas de Retiro utilizando para ello los fondos del Fondo General, según contemplado en el Plan Fiscal certificado, así como las transferencias que continuarán haciendo los Sistemas de Retiro de sus fondos disponibles, así como del producto de la liquidación de sus activos. Segundo, debido al impacto y carga tan grande que lo anterior supone sobre los fondos disponibles en el Fondo General, esta Asamblea Legislativa entiende necesario y razonable eliminar las aportaciones patronales que el Gobierno viene obligado a hacer a favor de los Sistemas de Retiro en este momento. Tercero, esta Asamblea Legislativa considera necesario y razonable establecer prospectivamente un Nuevo Plan de Aportaciones Definidas, el cual se nutrirá con las aportaciones que realicen los servidores públicos. Así, salvaguardamos las aportaciones que estos realizan para su retiro. De esta forma, éstos podrán gozar de un retiro digno, sin que esto limite la capacidad del Gobierno Central de proveer servicios esenciales a la ciudadanía, ni requiera la implantación de medidas que afecten a los más vulnerables. Las bases para ese nuevo sistema de aportaciones definidas comenzaron a establecerse con la aprobación por esta Legislatura de las Resoluciones Conjuntas de la Cámara 186, 187 y 188 de 2017.

Consciente del estado de emergencia que atraviesan los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico, que afecta a los servidores públicos en las agencias del Gobierno Central, los municipios, las corporaciones públicas, los maestros y los jueces, esta Asamblea Legislativa, en el ejercicio del poder de razón del Estado, adopta la presente reforma en aras de proteger las pensiones de los servidores públicos que aportaron al desarrollo de la sociedad puertorriqueña, al tiempo que protegemos la capacidad del Gobierno de proveer servicios esenciales a la ciudadanía.

En síntesis, mediante esta Ley se salvaguarda que los pensionados de Puerto Rico reciban las pensiones que con tanto sacrificio y esfuerzo lograron obtener al entregar sus mejores años al servicio del Pueblo de Puerto Rico. El Fondo General de Puerto Rico asumirá el pago total de dichas pensiones, luego de la liquidación de los activos de los Sistemas de Retiro, teniéndose que destinar más de dos (2) billones de dólares para dicho encomiable esfuerzo. En un espíritu de solidaridad y agradecimiento, la actual fuerza laboral de Puerto Rico no permitirá que nuestros retirados queden desprovistos de sus necesidades básicas y no puedan tener una mejor calidad de vida. La presente legislación es un ejemplo de anteponer los intereses colectivos sobre los individuales y de tener lealtades a causas más grandes y nobles que las propias. Con abnegación y sacrificio, el Gobierno de Puerto Rico no escatimará recursos para garantizar las pensiones de nuestros ya retirados. Nuestra deuda hacia ellos es un compromiso ineludible.

Por otra parte, mediante esta legislación, le hemos impuesto parámetros y controles a los administradores de los fondos de retiro de los actuales Participantes y servidores públicos. No podemos permitir que los Participantes sean víctimas de administradores de fondos de retiro sin experiencia y sin delimitaciones impuestas por ley que puedan poner en riesgo las inversiones de nuestros tan valiosos servidores públicos. Además, hemos establecido penalidades y sanciones rigurosas contra los jefes de agencia o funcionarios públicos que no cumplan con sus deberes ministeriales de remitir a tiempo las aportaciones a las cuentas de los Participantes. Hoy más que nunca, no podemos permitir que el deficiente descargo de funciones ministeriales ponga en riesgo el digno retiro de miles de empleados públicos y otros empleados cobijados por los tres Sistemas de Retiro. Por otro lado, ninguna persona, natural o jurídica, tendrá inmunidad ante la

ley sobre algún acto intencional o negligencia que ponga en riesgo el sustento futuro de miles de servidores públicos.

Por todo lo antes esbozado, reconocemos y asumimos los grandes retos que enfrentan nuestros sistemas de retiro mediante una política pública que garantizará y defenderá las pensiones que hoy se devengan, a toda costa. También, se crea un nuevo sistema de aportaciones definidas, el cual le dará causas de acción a los Participantes para defender sus aportaciones y donde se le impondrá requisitos de vasta experiencia y competencia a los administradores de las inversiones de nuestros servidores públicos.

**DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:**

**CAPÍTULO 1 - DISPOSICIONES GENERALES**

**Artículo 1.1 -** Esta Ley se conocerá como la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos".

**Artículo 1.2 -** Primacía de esta Ley.

Esta Ley se aprueba en el ejercicio del poder de razón del Estado, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el Artículo II, Secciones 18 y 19 de la Constitución de Puerto Rico, de aprobar leyes en protección de la vida, la salud y el bienestar del Pueblo, así como en casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales, así como al amparo de la Secciones 7 y 8 del Artículo VI de la Constitución de Puerto Rico. Por esta razón, esta Ley tendrá supremacía sobre cualquier otra ley estatal.

**Artículo 1.3 -** Declaración de Estado de Emergencia de los Sistemas de Retiro.

Por la presente se determina y declara que el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para la Judicatura del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros del Gobierno de Puerto Rico se encuentran en un estado de emergencia financiera. A consecuencia de este estado de emergencia financiera, se estima que para agosto de 2017 el Sistema de Retiro de los Empleados del Gobierno no tendrá fondos líquidos para cumplir con sus obligaciones. Del mismo modo, se estima que el Sistema de Retiro para Maestros quedará sin fondos líquidos en septiembre de 2017 y que el Sistema de Retiro para la Judicatura no tendrá fondos líquidos suficientes para febrero de 2018.

La situación financiera de estos tres Sistemas de Retiro gubernamentales en Puerto Rico fue una de las razones para que el Gobierno Federal aprobara la Ley conocida como "*Puerto Rico Oversight, Management, and Economic Stability Act*", Pub. L. 114-187 (PROMESA). Dicha Ley establece, entre otras cosas, medidas para asistir al Gobierno de Puerto Rico y sus instrumentalidades a alcanzar la responsabilidad fiscal y acceder a los mercados de capital. El 13 de marzo de 2017, la Junta de Supervisión Fiscal creada por PROMESA, aprobó y certificó el Plan Fiscal para el Gobierno de Puerto Rico.

El 21 de mayo de 2017, la Junta de Supervisión Fiscal, en representación del Gobierno de Puerto Rico, presentó una petición para que el Sistema de Retiro de Empleados del Gobierno de

Puerto Rico se acogiera a las protecciones del Título III de PROMESA. Con la presentación de la petición bajo el Título III de PROMESA, se inició un proceso de restructuración de las obligaciones de dicho sistema bajo la supervisión del Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico. Ante esta situación, de forma inmediata se deben tomar medidas razonables y necesarias para asegurar que los pensionados continúen recibiendo sus pensiones, se protejan las aportaciones individuales de nuestros servidores públicos y se proteja el futuro de los mismos.

Ya en el pasado se intentó reformar en varias ocasiones estos tres Sistemas de Retiro. Las medidas tomadas no funcionaron y resultaron insuficientes, lo que ha llevado a que los mismos se encuentren virtualmente insolventes. Además, debido a la actual grave crisis fiscal que enfrenta Puerto Rico, el Gobierno se ve impedido de solventar los tres Sistemas de Retiro. Por consiguiente, resulta necesario y razonable que la Cuenta para el Pago de las Pensiones Acumuladas, la cual se nutrirá en gran medida del Fondo General, a través del mecanismo de *"pay as you go"*, asuma los pagos que los tres Sistemas de Retiro no puedan realizar. Los tres Sistemas de Retiro deben seguir cumpliendo con sus obligaciones hacia sus beneficiarios aportando al Fondo General sus fondos disponibles y los fondos provenientes de las liquidaciones de sus activos, exceptuando el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar. De igual forma, se eliminan las aportaciones patronales, y aportaciones análogas, que se realizan a los tres Sistemas de Retiro debido al peso que supone sobre el Fondo General realizar los pagos correspondientes a los pensionados y desembolsar simultáneamente dichas aportaciones, conforme se estableció en la Resoluciones Conjuntas de la Cámara Núm. 186, 187 y 188 de 2017. Además, como medida correctiva, se tienen que segregar y proteger las aportaciones de los servidores públicos y establecer un Nuevo Plan de Aportaciones Definidas que asegure el futuro de nuestros servidores públicos. De esta forma, se toman medidas que se ajustan a la realidad fiscal que vivimos y que no afectan la capacidad del Gobierno de proveer servicios esenciales a la ciudadanía.

**Artículo 1.4 -** Política Pública.

Se declara como política pública del Gobierno de Puerto Rico la protección de las pensiones de todos los retirados del servicio público que fueron Participantes en los tres Sistemas de Retiro mencionados anteriormente. Por ello, a partir del 1 de julio de 2017, conforme a la Resolución Conjunta de la Cámara Núm. 188 de 2017, según certificada por la Junta de Supervisión Fiscal el 13 de julio de 2017, el Gobierno de Puerto Rico se convirtió en el pagador directo de las pensiones de nuestros retirados. Ante el peso que ello supone sobre el Fondo General, el cual se estima en miles de millones de dólares al año, se eliminaron las aportaciones patronales que se realizaban hasta ese momento a los tres Sistemas de Retiro, así como la Aportación Adicional Uniforme, conforme a lo dispuesto en la Resoluciones Conjuntas de la Cámara Núm. 186, 187 y 188 de 2017. Los Sistemas de Retiro deberán aportar sus fondos disponibles y el producto neto de la liquidación de sus activos al Fondo General para ayudar al pago de las Pensiones Acumuladas, exceptuando el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar. Una vez los Sistemas de Retiro agoten sus activos, la Cuenta para el Pago de las Pensiones Acumuladas, la cual se nutrirá en gran medida del Fondo General, según dispuesto en esta Ley, asumirá y garantizará el pago de las Pensiones Acumuladas conforme se establece en esta Ley. No obstante, los Municipios, la Rama

Legislativa, las Corporaciones Públicas, el Gobierno y la Administración de los Tribunales estarán obligados a pagar el Cargo "Pay-Go" según corresponde a cada uno para nutrir la Cuenta para el Pago de las Pensiones Acumuladas.

Igualmente, se declara como política pública proteger el futuro de nuestros servidores públicos. Mediante esta Ley nos aseguramos que éstos puedan tener un retiro digno, libre de incertidumbre, segregando sus aportaciones personales, garantizando las mismas y estableciendo un nuevo plan de aportaciones definidas, en fideicomiso o instrumento similar que les permitirá proteger y garantizar sus aportaciones en cuentas separadas.

**Artículo 1.5 –** Aplicabilidad de esta Ley a los Sistemas de Retiro.

Esta Ley será de aplicación al Sistema de Retiro de los Empleados de Gobierno de Puerto Rico y al Sistema de Retiro para Maestros de Puerto Rico. Con relación al Sistema de Retiro para la Judicatura, únicamente le serán de aplicación las disposiciones del Capítulo 2, exceptuando lo dispuesto en el Artículo 2.6, de esta Ley que establecen el sistema "*Pay as you Go*", sujeto a lo que se dispone más adelante. Asimismo, el Sistema de Retiro para la Judicatura deberá cumplir con todo lo dispuesto en dicho Capítulo con relación a los Sistemas de Retiro.

**Artículo 1.6 -** Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación a menos que del contexto surja claramente otro significado. Los tiempos usados en el presente incluyen también el futuro, y el género masculino incluye el femenino, salvo en aquellos casos que tal interpretación resultase absurda. El número singular incluye el plural y el plural el singular.

(a) **AAFAF:** la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico creada por la Ley 2-2017.

(b) **Administradores de los Sistemas de Retiro:** el Administrador del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico según establecido por la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, y el Director Ejecutivo del Sistema de Retiro para Maestros de Puerto Rico, según establecido por la Ley 160-2013.

(c) **Aportaciones Adeudadas:** cantidades que el Gobierno, los Municipios, las Corporaciones Públicas y otras entidades consideradas patronos bajo cualquiera de los Sistemas de Retiro cobijados por esta Ley le adeuden a los Sistemas de Retiro, a la Cuenta para el Pago de las Pensiones Acumuladas y/o al Nuevo Plan de Aportaciones Definidas.

(d) **Aportaciones Individuales:** aquellas cantidades que se hayan descontado o se descontarán de la retribución base percibida por el Participante, para ser acreditadas a su Cuenta de Aportaciones Definidas, según definidas en el Artículo 1.6(u).

(e) **Beneficiario:** toda persona que recibe cualquier pensión, anualidad o beneficio, según dispuesto en esta Ley.

(f) **Cargo Administrativo:** cargo que podrá establecer y cobrar la Junta de Retiro, o su designado, y que deberán pagar el Gobierno, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y aquellas otras entidades consideradas patrono bajo los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros de conformidad con esta Ley para financiar las operaciones del Nuevo Plan de

Aportaciones Definidas y/o la Cuenta para el Pago de las Pensiones Acumuladas; excepto los Municipios.

(g) **Cargo "Pay-Go":** cargo que establecerá e impondrá la AAFAF y que deberán pagar el Gobierno, los Municipios, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y aquellas otras entidades consideradas patrono bajo los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico y el Sistema de Retiro para Maestros de conformidad al Capítulo 2 de esta Ley. Este cargo será cobrado por el Secretario de Hacienda o su designado, de acuerdo a lo establecido en esta Ley.

(h) **Código:** la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico".

(i) **Cuenta de Aportaciones Definidas:** cuenta en fideicomiso, separado de los activos generales y cuentas del Gobierno, que se creará a partir del 1 de julio de 2017 a nombre de cada Participante, conforme a lo establecido en el Capítulo 3 de esta Ley.

(j) **Cuenta para el Pago de las Pensiones Acumuladas:** cuenta en fideicomiso, separado de los activos generales y cuentas del Gobierno, designada para pagar las Pensiones Acumuladas por el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, el Sistema de Retiro para Maestros y el Sistema de Retiro para la Judicatura bajo el esquema de "*pay as you go*", según establecido en el Capítulo 2 de esta Ley. Esta cuenta, en fideicomiso, estará centralizada y segregada de los activos generales y cuentas del Gobierno, a cargo del Departamento de Hacienda y se dedicará única y exclusivamente a los fines dispuestos en esta Ley, y sujeto los términos y condiciones establecidos en ésta.

(k) **Empresa o Corporación Pública:** toda instrumentalidad gubernamental del Gobierno de Puerto Rico que haya sido creada o que en el futuro se cree. No incluirá, sin embargo, aquellas empresas subsidiarias de instrumentalidades gubernamentales cuyos empleados, a juicio de la Junta de Retiro, no tuvieran una clara relación de empleado y patrono con el Gobierno de Puerto Rico. Cualquier funcionario o empleado que fuere Participante en los Sistemas de Retiro y pasare o hubiere pasado a ser funcionario o empleado de una empresa subsidiaria de cualquier empresa o corporación pública sin que haya interrupción en el servicio, continuará gozando de los mismos derechos y privilegios como Participante, aunque dicha empresa subsidiaria no esté cubierta por los tres Sistemas de Retiro.

(l) **Entidad Administradora:** persona o entidad jurídica seleccionada por la Junta de Retiro para administrar la Cuenta para el Pago de las Pensiones Acumuladas y/o el Nuevo Plan de Aportaciones Definidas. La Entidad Administradora deberá ser una empresa reconocida, con al menos diez (10) años de experiencia en la administración de planes de retiro, que goce de buena reputación en la industria financiera y que garantice al Gobierno contractualmente que logrará generar un ahorro de al menos veinticinco por ciento (25 %) de los gastos operacionales actuales incurridos en operar los Sistemas de Retiro. Ello, no descarta que el Gobierno o alguna de sus instrumentalidades asuma y ejerza las funciones de la Entidad Administradora, de entenderse necesario y apropiado, siempre tomando en consideración los mejores intereses de los Participantes, Retirados y Beneficiarios y la protección y garantía del balance de sus Aportaciones Individuales.

(m) **Gobierno de Puerto Rico o Gobierno:** el Gobierno de Puerto Rico y todos sus departamentos, divisiones, negociados, oficinas, agencias y dependencias, para fines de esta definición, incluye el Departamento de Educación de Puerto Rico. Para fines de esta Ley, este término incluye otras entidades gubernamentales o no gubernamentales, cuyos empleados cotizan actualmente en los Sistemas de Retiro.

(n) **Junta de Retiro:** junta creada al amparo de las disposiciones del Capítulo 4 de esta Ley.

(o) **Maestro:** profesional que enseña en los salones de clase, los Directores de escuela y demás denominaciones y categoría de maestros que existan o puedan existir dentro de la nomenclatura del Departamento de Educación del Gobierno de Puerto Rico, el Secretario de Educación y funcionarios alternos, y aquellos otros empleados o funcionarios que se acojan a los beneficios de la Ley 160-2013, de acuerdo con las disposiciones de la misma, siempre que posean un certificado válido para trabajar como maestros.

(p) **Nuevo Plan de Aportaciones Definidas:** nuevo plan de aportaciones definidas del que participarán los Participantes, según establecido en el Capítulo 3 de esta Ley.

(q) **Participantes:** empleados activos del Gobierno de Puerto Rico, los Maestros y miembros del Sistema de Retiro para Maestros, los empleados de los Municipios, y los empleados de las Corporaciones Públicas, excepto los empleados de la Universidad de Puerto Rico y la Autoridad de Energía Eléctrica. Además, incluye a aquellos empleados que pasen o hayan pasado a laborar dentro de una Alianza Público Privada y todo aquel miembro del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico que haya realizado aportaciones a dicho Sistema y éstas no se le hayan reembolsado. Este término incluye a los ex empleados del Gobierno de Puerto Rico que se separaron del servicio público y que no se le reembolsaron sus aportaciones y/o cualquier beneficio acumulado hasta la fecha de separación.

(r) **Pensión Acumulada:** anualidad, beneficio o beneficio definido, al cual el Participante tendría derecho al momento de retirarse del servicio a tenor con las aportaciones y reglas aplicables a sus respectivos Sistemas de Retiro, computadas hasta el momento en que entre en vigor la presente Ley.

(s) **Pensionado:** toda persona que reciba una pensión o anualidad de acuerdo con las disposiciones de esta Ley o de las que crean los diferentes Sistemas de Retiro.

(t) **Prerretirado:** toda persona acogida al programa de Prerretiro Voluntario creado mediante la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Prerretiro Voluntario".

(u) **Retribución:** recompensa bruta y en efectivo que devenga un empleado. Al computar la retribución se excluirá toda bonificación concedida en adición al salario, así como todo pago por concepto de horas extraordinarias de trabajo.

(v) **Sistemas de Retiro:** el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico según establecido por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, y el Sistema de Retiro para Maestros de Puerto Rico, según establecido por la Ley 160-2013.

(w) **Sistema de Retiro para la Judicatura:** El Sistema de Retiro para la Judicatura, creado mediante la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura".

## CAPÍTULO 2 - CUENTA PARA EL PAGO DE LAS PENSIONES ACUMULADAS POR LOS SISTEMAS DE RETIRO

**Artículo 2.1** - Cuenta para el Pago de las Pensiones Acumuladas.

Se crea, bajo la custodia del Departamento de Hacienda, la Cuenta Para el Pago de las Pensiones Acumuladas, la cual será mantenida en un fondo de fideicomiso separado de los activos generales y cuentas del Gobierno, la cual funcionará bajo un esquema de "*pay as you go*" para el pago de las Pensiones Acumuladas por los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, al momento en que entre en vigor la presente Ley. A partir del 1 de julio de 2017, los pagos de las Pensiones Acumuladas de los tres Sistemas de Retiro se deben desembolsar de los fondos depositados en dicha cuenta, la cual se debe nutrir de las siguientes fuentes:

(a) El producto neto líquido de las liquidaciones de los activos de los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, conforme a la Resolución Conjunta de la Cámara 188-2017, según aprobada conforme a PROMESA, excepto los fondos segregados del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros establecido mediante la Ley 160-2013, según enmendada, y el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar, de conformidad con las obligaciones actuales de los Sistemas de Retiro;

(b) El Cargo "*Pay-Go*" que determine e imponga la AAFAF al Gobierno, los Municipios, la Rama Legislativa, la Administración de Tribunales, las Corporaciones Públicas y otras entidades cubiertas. Este cargo será equivalente a la cantidad en efecto pagada a los Pensionados y Beneficiarios provenientes de cada entidad cubierta. El Secretario de Hacienda o la persona o entidad que éste designe estará autorizado a cobrar el Cargo "*Pay-Go*". En el caso de los Municipios, los cargos administrativos del esquema "*pay as you go*" no serán incluidos en el cómputo del Cargo "*Pay-Go*". Independientemente del pago del Cargo "*Pay-Go*" por parte del patrono, el desembolso de los beneficios de todos los Pensionados y Beneficiarios están garantizados por el Fondo General a través del esquema "*pay as you go*", subsistiendo la responsabilidad de las entidades de remitir el pago de dicho Cargo en cumplimiento con sus obligaciones bajo esta Ley;

(c) Las asignaciones en el presupuesto de gastos del Gobierno de Puerto Rico, las asignaciones especiales para financiar las deficiencias para el pago de las pensiones y las leyes especiales aprobadas a estos fines;

(d) Las donaciones, legados y cualquier otra aportación que cualquier entidad, pública o privada, haga a esta cuenta en virtud de cualquier otra ley;

(e) Fondos provenientes del veinticinco por ciento (25 %) del pago inicial o pagos periódicos de contratos de Alianza Público Privada, según establecido en el inciso (e) del Artículo 17 de la Ley 29-2009, según enmendada, conocida como la "Ley de Alianzas Público Privadas", según se determine de tiempo en tiempo; y

(f) Otros fondos e ingresos que la Asamblea Legislativa destine para estos propósitos.

La Oficina de Gerencia y Presupuesto podrá retener cualquiera de las asignaciones a las agencias del Gobierno de Puerto Rico, las cantidades necesarias para el pago del Cargo "*Pay-Go*", cuando determine que esta retención es necesaria para asegurar el cumplimiento con esta

obligación por parte de las entidades cubiertas. Además, cada entidad gubernamental deberá consignar cada año en su presupuesto general de gastos los fondos necesarios para el pago del Cargo "*Pay-Go*".

En el caso de Participantes, Beneficiarios o Pensionados cuyo patrono deje o haya dejado de existir, aquéllos que pasen o hayan pasado a una Alianza Público Privada y aquellos cuyo patrono, por alguna razón, no pagare el Cargo "*Pay-Go*", sus pensiones, al igual que todos los pensionados de los Sistemas de Retiro, estarán garantizadas por el Gobierno a través del sistema "*pay as you go*".

**Artículo 2.2 -** Registro de las Pensiones Acumuladas.

(a) Se creará y mantendrá un registro de cada Participante, Beneficiario y Pensionado de los Sistemas de Retiro que reflejará detalladamente las cantidades que le corresponde a cada uno como Pensión Acumulada según sus respectivos Sistemas de Retiro hasta la fecha en que entre en vigor la presente Ley. Detallará, sin que esto se entienda como una limitación, el beneficio acumulado al que tiene derecho el Participante, el historial de empleo y las aportaciones realizadas, de acuerdo a cada ley de retiro aplicable en la cual cotizó el Participante, Beneficiario o Pensionado. De acuerdo a lo contenido en el registro, se emitirán los pagos correspondientes de las Pensiones Acumuladas a las que tienen derecho, conforme a los términos de pago aplicables hasta el momento en que entre en vigor la presente Ley y de acuerdo a los Sistemas de Retiro a los que pertenezcan cada uno de los Participantes, Beneficiarios o Pensionados. No obstante, lo relativo al registro de la Pensión Acumulada para los jueces que cotizan bajo el Sistema de Retiro para la Judicatura y los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando bajo las disposiciones de la Ley 91-2004, se harán para fines informativos, ya que estos continuarán cotizando bajo sus respectivos sistemas como lo hacían antes de la aprobación de la presente Ley.

(b) Los Administradores de los Sistemas de Retiro, incluyendo el Sistema de Retiro para la Judicatura, en coordinación con la AAFAF, estarán obligados a producir el registro mencionado en el inciso (a) de este Artículo de la siguiente forma:

1. En un término de sesenta (60) días a partir de la aprobación de esta Ley deberán producir un listado de todos los Beneficiarios y Pensionados de los tres Sistemas de Retiro; y

2. En un término no mayor de ciento ochenta (180) días a partir de la aprobación de esta Ley deberán producir un registro de todos los Participantes, que incluya la Pensión Acumulada a cada uno por los tres Sistemas de Retiro al momento en que entre en vigor la presente Ley y los términos de pago de la misma. Los tres Sistemas de Retiro deberán tomar todas las medidas necesarias para garantizar que el registro contenga información fiel y exacta respecto a cada Participante, Beneficiario y Pensionado.

3. Una vez se produzca el registro, se le notificará a cada Participante, Beneficiario y Pensionado el contenido del mismo utilizando un método certero, eficaz e idóneo (podrá incluir una notificación por correo postal, accesibilidad a la información a través de un portal en la página de Internet de la AAFAF o la que cree la Junta de Retiro a estos fines, la publicación de un edicto en un periódico de circulación

general y, en los casos que sea apropiado para los Participantes activos, notificación personal), quienes a su vez, tendrán un término de cuarenta y cinco (45) días, a partir de la fecha de notificación, para presentarle a los Administradores de los Sistemas de Retiro evidencia fehaciente que demuestre que la información contenida en el registro es incorrecta o inexacta. Se entenderá como evidencia fehaciente, sin que esto se entienda como una limitación, copias de expedientes de personal, copias de expediente de retiro, talonarios de pago, formularios W-2, copias de planillas, certificaciones por parte de los patronos o cualquier combinación de éstos, entre otros documentos oficiales. El Gobierno, los Municipios, la Rama Judicial, la Rama Legislativa, las Corporaciones Públicas y los Sistemas de Retiro deberán, como parte de su deber ministerial, producir diligentemente los documentos solicitados por parte de un Participante, Beneficiario o Pensionado para efectos de proveer evidencia sobre cualquier inexactitud contenida en el registro. De no estar disponible algún documento solicitado, se deberá emitir una certificación que así lo haga constar. La AAFAF podrá servir de facilitador en la obtención de dichos documentos y establecer mecanismos para recibir y tramitar con prontitud las solicitudes recibidas a tales fines. La demora de una entidad de producir la información que le sea solicitada no afectará negativamente al Participante y no afectará tampoco el cómputo de los cuarenta y cinco (45) días antes mencionados. Se entenderá que el término de cuarenta y cinco (45) días no discurrirá mientras una solicitud de evidencia fehaciente ante una entidad gubernamental y ésta no sea producida o se certifique que ésta no existe o no está disponible. Los Administradores de los Sistemas de Retiro deberán analizar la evidencia presentada y notificar al Participante su decisión respecto al asunto, por escrito. Si un Participante, Beneficiario o Pensionado no le presenta a los Administradores de los Sistemas de Retiro evidencia fehaciente de que la información contenida en el registro es incorrecta dentro del término provisto en este inciso, se entenderá que dicha información es fiel y exacta, por lo que la corrección del registro no será revisable.

4. Si un Participante, Beneficiario o Pensionado queda insatisfecho con la determinación de los Administradores de los Sistemas de Retiro bajo el inciso anterior, deberá presentar una solicitud de reconsideración dentro de un término de veinte (20) días contados a partir de la notificación de la decisión de los Administradores de los Sistemas de Retiro. De no presentarse la reconsideración, la determinación advendrá final y firme.

5. Si un Participante, Beneficiario o Pensionado no está de acuerdo con la decisión final de los Administradores de los Sistemas de Retiro, o si éstos no emiten su determinación dentro de noventa (90) días de haber recibido la solicitud de reconsideración, podrán presentar una apelación a la Junta de Retiro dentro de un término de treinta (30) días contados a partir de la notificación o del momento en que transcurra el término antes mencionado de noventa (90) días. De no presentarse la apelación, la determinación advendrá final y firme.

6. La Junta de Retiro tendrá un periodo de noventa días (90) para emitir una determinación sobre cualquier apelación presentada por un Participante,

Beneficiario o Pensionado. En la eventualidad de que la Junta no se exprese al respecto en dicho periodo o si un Participante, Beneficiario o Pensionado queda insatisfecho con la determinación final de la Junta de Retiro, podrá presentar un recurso de revisión judicial ante el Tribunal de Apelaciones conforme el Reglamento del Tribunal de Apelaciones para la revisión de decisiones administrativas.

(c) Nada de lo dispuesto en este Artículo deberá entenderse como que interfiere de forma alguna con cualquier procedimiento o reclamo bajo el *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA", por sus siglas en inglés), Ley Pública 114-187.

**Artículo 2.3. -** Términos de Pago de las Pensiones Acumuladas.

Los términos de pago de las Pensiones Acumuladas de cada Participante, Beneficiario o Pensionado serán computados según los términos dispuestos en los estatutos de sus respectivos Sistemas de Retiro al momento en que entre en vigor la presente Ley. Los términos de pago de las pensiones por incapacidad, pagos de beneficio por muerte, pago a beneficiarios, pagos por concepto de reembolso de aportaciones, y cualquier cantidad adeudada o beneficio de similar naturaleza, también serán computados según los términos dispuestos en los estatutos de los respectivos Sistemas de Retiro al momento en que entre en vigor la presente Ley. Aquellos empleados que al momento de aprobarse esta Ley se encuentren tramitando una solicitud de beneficios por incapacidad o cualquier otro beneficio, podrán concluir dicho trámite según establecido en la ley aplicable vigente al momento de comenzar dicho trámite.

**Artículo 2.4. -** Pensiones Acumuladas.

(a) Al entrar en vigor esta Ley, se preservarán y garantizarán por el Gobierno los beneficios de las Pensiones Acumuladas de los Participantes de los Sistemas de Retiro que comenzaron a trabajar antes de entrar en vigor la presente Ley.

(b) Aquellos Participantes que al momento de entrar en vigor la presente Ley tengan derecho a retirarse y recibir algún tipo de pensión y/o anualidad bajo las disposiciones aplicables a sus respectivos Sistemas de Retiro, podrán retirarse en cualquier fecha posterior y tendrán derecho a recibir la Pensión Acumulada que le corresponda, según calculada bajo las disposiciones aplicables a sus respectivos Sistemas de Retiro hasta el momento de entrar en vigor la presente Ley y en los términos allí contemplados.

(c) A partir del momento en que entre en vigor la presente Ley, el Participante no acumulará beneficios adicionales, sea por años de servicio, compensación o cualquier otra razón, en los Sistemas de Retiro. Para propósitos del cómputo de su pensión o beneficios de retiro en su respectivo Sistema de Retiro, no recibirá reconocimiento por servicios no cotizados posterior al momento de la vigencia de la presente Ley, no podrá transferir aportaciones o devolver aportaciones por periodos trabajados en o antes del momento en que entre en vigor la presente Ley. Aquellos empleados que hayan cotizado o estén activamente cotizando en otro sistema de retiro no cubierto por la presente Ley, podrán solicitar la transferencia de aportaciones a su sistema de retiro de origen o a aquel al que tengan derecho al momento de retirarse, siempre y cuando los recursos fiscales lo permitan, conforme al Plan Fiscal Certificado.

(d) A partir del 1 de julio de 2017, el Participante no hará aportaciones individuales ni pagos a la Cuenta para el Pago de las Pensiones Acumuladas, ni aportaciones adicionales a sus respectivos Sistemas de Retiro.

(e) A partir del 1 de julio de 2017, el Gobierno de Puerto Rico, las Corporaciones Públicas, los Municipios, la Rama Legislativa, la Rama Judicial y otras entidades cubiertas no vendrán requeridas a realizar aportaciones patronales, incluyendo la Aportación Adicional Uniforme y la Aportación Uniforme de Justicia Magisterial, a la Cuenta para el Pago de las Pensiones Acumuladas ni a los Sistemas de Retiro, pero vendrán obligados a satisfacer el Cargo "*Pay-Go*" que les sea aplicable, según corresponde a cada uno a base de los parámetros establecidos en esta Ley.

**Artículo 2.5. -** Compensación por Aportaciones Adeudadas.

Los pagos que se realicen de la Cuenta para el Pago de las Pensiones Acumuladas se deducirán de las Aportaciones Adeudadas y cualquiera otra deuda que a la fecha de vigencia de esta Ley tengan las entidades gubernamentales y otras entidades cubiertas con los Sistemas de Retiro, incluyendo el Gobierno, los Municipios, las Corporaciones Públicas, la Asamblea Legislativa y la Administración de los Tribunales, respectivamente.

**Artículo 2.6. -** Disposiciones especiales.

No obstante lo dispuesto en esta Ley, se dispone, a modo de excepción, que los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando al Sistema de Retiro para Maestros bajo las disposiciones de la Ley 91-2004, según enmendada, conocida como la "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", continuarán cotizando conforme a las disposiciones del referido estatuto. Las Pensiones Acumuladas de dichos maestros y miembros del Sistema de Retiro para Maestros serán las que se computen a base de los términos y condiciones dispuestos en dicha Ley. Del mismo modo, se dispone que las Pensiones Acumuladas de los jueces que se encuentran cotizando y aquellos de nuevo ingreso al Sistema de Retiro para la Judicatura que sean nombrados luego de la vigencia de esta Ley, se continuarán computando conforme a las disposiciones de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como la "Ley de Retiro de la Judicatura", aplicable a cada juez. Se dispone expresamente que dichas Pensiones Acumuladas, así como los términos de pago de las mismas, no serán afectadas o modificadas de forma alguna por las disposiciones de esta Ley. No obstante, las aportaciones individuales de estos maestros, de los miembros del Sistema de Retiro para Maestros y de los jueces se mantendrán tal como existían antes de la aprobación de la presente Ley y se depositarán en la Cuenta para el Pago de las Pensiones Acumuladas, conforme lo establezca la Junta de Retiro.

Aquellos de estos maestros, miembros del Sistema de Retiro para Maestros y jueces que deseen participar del Nuevo Plan de Aportaciones Definidas podrán hacerlo voluntariamente, según lo determine la Junta de Retiro. Para ello, además de su actual aportación individual, deberán realizar la aportación dispuesta en el Artículo 3.4 de esta Ley.

**CAPÍTULO 3 - PROGRAMA DE APORTACIONES DEFINIDAS**

**Artículo 3.1. -** Nuevo Plan de Aportaciones Definidas.

(a) Se crea el Nuevo Plan de Aportaciones Definidas, el cual consiste en el establecimiento de un fondo de fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos", que contendrá una cuenta

22

individual para cada Participante de los Sistemas de Retiro que pase a formar parte de dicho programa, según dispuesto en este Capítulo. Se acreditarán a las cuentas individuales las aportaciones al Nuevo Plan de Aportaciones Definidas de cada Participante y la rentabilidad de inversión de conformidad con el Artículo 3.6 de esta Ley. El beneficio relacionado a estas aportaciones que se le proveerá a cada Participante luego de su separación del servicio, ya sea por retiro o por otra causa, dependerá de la totalidad de las aportaciones al Nuevo Plan de Aportaciones Definidas acumuladas en su cuenta a partir del momento en que entre en vigor la presente Ley, o la fecha en que el Participante ingresó al Plan de Aportaciones Definidas y la rentabilidad de éstas.

(b) Las siguientes personas participarán en el Nuevo Plan de Aportaciones Definidas:

(1) Todo Participante activo de los Sistemas de Retiro al momento de entrar en vigor esta Ley; con excepción de los maestros y miembros del Sistema de Retiro para Maestros que se encuentran cotizando bajo las disposiciones de la Ley 91-2004 y los jueces que cotizan bajo el Sistema de Retiro para la Judicatura, quienes no formarán parte del Nuevo Plan de Aportaciones Definidas y, en cambio, continuarán cotizando a sus referidos Sistemas de Retiro como hasta el momento, salvo lo dispuesto en el Artículo 2.6.

(2) Todo Participante que ingrese al servicio público por primera vez en o después de la aprobación de la presente Ley.

(3) La participación en el Nuevo Plan de Aportaciones Definidas será opcional para el Gobernador de Puerto Rico, para todos los Secretarios de Gobierno, Jefes de Agencia e Instrumentalidades Públicas, los ayudantes y asesores del Gobernador, los miembros de Comisiones y Juntas nombrados por el Gobernador, los miembros de la Asamblea Legislativa, los empleados y funcionarios de la Asamblea Legislativa, de la Oficina de Servicios Legislativos y de la Superintendencia del Capitolio y para el Contralor de Puerto Rico.

(4) La participación en el Nuevo Plan de Aportaciones Definidas será opcional para los empleados de los departamentos, divisiones, negociados, oficinas, dependencias, corporaciones públicas, e instrumentalidades del Gobierno de Puerto Rico que trabajen y residan fuera de los límites territoriales de Puerto Rico.

(5) Cualquier empresa o corporación pública cuyos empleados no participen de los Sistemas de Retiro al momento de aprobarse la presente Ley, podrá, mediante resolución adoptada por su Junta de Directores o máximo organismo rector, según sea el caso, unirse al Nuevo Plan de Aportaciones Definidas creado por esta Ley. La Junta de Retiro establecerá los requisitos y procedimientos con los que se deberán cumplir para unirse al Nuevo Plan de Aportaciones Definidas.

**Artículo 3.2 -** Transferencia al Plan.

A partir del momento en que entre en vigor la presente Ley, todos los Participantes activos que son parte de la matrícula de los Sistemas de Retiro, independientemente de la fecha de su primer nombramiento en el Gobierno, pasarán a formar parte del Nuevo Plan de Aportaciones Definidas, excepto lo dispuesto en el Artículo 3.1(b)(1).

**Artículo 3.3 -** Establecimiento de Cuentas de Aportaciones para el Nuevo Plan de Aportaciones Definidas.

(a) Las aportaciones individuales de los Participantes serán dirigidas a un Nuevo Plan de Aportaciones Definidas, en el cual se establecerá y mantendrá una Cuenta de Aportaciones Definidas, en fideicomiso, separado de los activos generales y cuentas del Gobierno, individual para cada Participante, la cual será acreditada y debitada de conformidad con este Capítulo. Las aportaciones individuales y fondos en cada Cuenta de Aportaciones Definidas serán de la exclusiva propiedad del Participante correspondiente, no estarán sujetos a contribución de clase alguna, ni a embargo y quedan exentos de la acción singular o colectiva de los acreedores del Participante, exceptuando de esta exención las deudas de los Participantes con los Sistemas de Retiro, del patrono y del Gobierno.

(b) Las cuentas de los Participantes del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros que al momento en que entre en vigor la presente Ley tengan balances acumulados en ese plan, serán transferidas inmediatamente a sus respectivas Cuentas de Aportación Definida.

(c) Durante el periodo de tiempo que transcurra entre la aprobación de esta Ley y el momento en que la Junta de Retiro contrate los servicios de una Entidad Administradora para manejar el Nuevo Plan de Aportaciones Definidas, y dicha Entidad Administradora comience a descargar sus funciones conforme al contrato que se otorgue a esos fines, el Secretario de Hacienda tendrá la autoridad y facultad para recaudar y depositar en un fondo de fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos", que será separado de los activos generales y cuentas del Gobierno, bajo su custodia las Aportaciones Individuales de los Participantes. Una vez comience a ofrecer sus servicios la Entidad Administradora, el Secretario de Hacienda le transferirá los fondos de las Aportaciones Individuales para ser depositados en las Cuentas de Aportaciones Definidas de cada Participante. La Entidad Administradora establecerá para tales fines un fideicomiso, que no estará sujeto a las disposiciones de la Ley 219-2012, según enmendada, conocida como la "Ley de Fideicomisos". Cualquier cantidad que se haya segregado a partir del 1 de julio de 2017 se tratará de igual forma a lo dispuesto en este inciso.

(d) Los ingresos y ganancias devengados en cada Cuenta de Aportaciones Definidas estarán exentos de toda clase de contribuciones, impuestos, arbitrios o cargas mientras se mantengan en las Cuentas de Aportaciones Definidas. Las distribuciones de las Cuentas de Aportaciones Definidas estarán sujetas a tributación para el Participante o Beneficiario de conformidad con las disposiciones de la Sección 1081.01(b) del Código como una distribución de un fideicomiso exento bajo las disposiciones de la Sección 1081.01(a) del Código y dichas distribuciones estarán sujetas a las excepciones de tributación, retenciones contributivas y radicación de declaraciones informativas provistas en dicha Sección 1081.01(b) del Código.

**Artículo 3.4** - Aportaciones de los Participantes del Nuevo Plan de Aportaciones Definidas.

A partir de la vigencia de la presente Ley, todo Participante en los Sistemas de Retiro tendrá que aportar obligatoriamente a su Cuenta de Aportaciones Definidas un mínimo de ocho punto cinco por ciento (8.5 %) de su retribución mensual, hasta el tope que establece el Código. Además, podrá aportar de forma voluntaria cantidades adicionales, según lo permita el Código.

Al entrar en vigor esta Ley, los Participantes del Nuevo Plan de Aportaciones Definidas tendrán el derecho de ajustar su actual aportación a los Sistemas de Retiro al mínimo autorizado por este Artículo. Los Participantes del Nuevo Plan de Aportaciones Definidas podrán variar el porciento que desean aportar a dicho Plan de tiempo en tiempo, pero nunca podrá ser menos del porciento mínimo requerido por esta Ley.

**Artículo 3.5 -** Obligaciones del Patrono, Sanciones.

Todo patrono de un Participante del Nuevo Plan de Aportaciones Definidas tendrá las siguientes obligaciones:

(1) **Obligación de Deducir y Transferir las Aportaciones -** Todo patrono de un Participante del Nuevo Plan de Aportaciones Definidas deberá deducir del salario del Participante las aportaciones que se disponen en el Artículo 3.4 de esta Ley y transferirlas de inmediato al Nuevo Plan de Aportaciones Definidas para ser depositadas en la Cuenta de Aportación Definida. Se autoriza al Secretario de Hacienda o a cualquier oficial pagador del patrono a realizar los descuentos, aunque el salario que hubiere que pagarse al Participante como resultado de estos descuentos quede reducido a menos de cualquier mínimo prescrito por ley. La Junta de Retiro establecerá la forma y manera en que se remitirán las aportaciones.

(2) **Penalidad y Medidas Especiales sobre Aportaciones Adeudadas -** Todo patrono que no remita las Aportaciones Individuales de los Participantes del Nuevo Plan de Aportaciones Definidas y/o los Cargos "*Pay-Go*", según dispuesto en esta Ley, dentro del término establecido para ello, así como cualquier otra remesa relacionada a los Participantes, estará expuesto a las siguientes medidas correctivas:

a. La Junta de Retiro, su designado o la Entidad Administradora solicitará por escrito, y acompañado por una certificación oficial de deuda:

   i. A los patronos deudores, la transferencia de las Aportaciones Adeudadas.

   ii. Al Secretario de Hacienda, que realice cualquier compensación y/o ajuste entre las cuentas, obligaciones y anticipos que Hacienda debe remitir al patrono deudor, y transfiera las cantidades de las Aportaciones Adeudadas al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, según corresponda.

   iii. Al Centro de Recaudación de Ingresos Municipales (CRIM), que remese, dentro de los siete (7) días siguientes a la notificación por escrito, al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, las cantidades de las Aportaciones Adeudadas por el patrono Municipal, del remanente no comprometido de las contribuciones sobre el valor de la propiedad y demás ingresos que los Municipios tengan derecho a recibir de conformidad a la Ley 80-1991, según enmendada, conocida como "Ley del Centro de Recaudación de Ingresos Municipales". A partir de

la vigencia de esta Ley, automática y permanentemente, se constituye un gravamen legal preferencial sobre dicho remanente no comprometido en favor de la Junta de Retiro y/o la Entidad Administradora para el cobro de las Aportaciones Adeudadas, sin la necesidad de cualquier otro acto, posesión o control sobre los mismos.

iv. La Oficina de Gerencia y Presupuesto podrá retener cualquiera de las asignaciones a las agencias del Gobierno de Puerto Rico, las cantidades necesarias para el pago del Cargo "*Pay-Go*", cuando determine que esta retención es necesaria para asegurar el cumplimiento con esta obligación por parte de las entidades concernidas.

b. La Junta de Retiro o la Entidad Administradora deberá notificar por escrito a todo Titular o Jefe de una Agencia, Empresa Pública, Municipio y otra entidad cubierta que dejare de retener a sus empleados las aportaciones y/o que dejare de remitir al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas las cantidades correspondientes por cada concepto. Dicha deficiencia notificada deberá subsanarse en un término no mayor a diez (10) días laborables. En caso de que el Titular, Jefe o cualquier funcionario con responsabilidad de una Agencia, Empresa Pública, Municipio, o entidad cubierta, a sabiendas, y sin causa justificada, dejare de hacer los pagos correspondientes al Nuevo Plan de Aportaciones Definidas y/o a la Cuenta para el Pago de las Pensiones Acumuladas, incurrirá en delito menos grave y se le impondrá una pena de reclusión de seis (6) meses o pena de multa de cinco mil dólares ($5,000) o ambas penas, a discreción del Tribunal. Dicha multa la pagará el Titular, Jefe de Agencia o cualquier funcionario con responsabilidad, Empresa Pública o Municipio con su propio pecunio. El Gobierno de Puerto Rico y sus instrumentalidades no le brindarán representación legal al funcionario en el procedimiento judicial para poner en vigor esta disposición.

c. Cada Beneficiario, Participante o Pensionado tendrá una acción personal de cobro contra cada Titular, Jefe de Agencia, Director de Presupuesto o Finanzas o cualquier funcionario con responsabilidad, del Gobierno, Empresa Pública o Municipio para reclamar las aportaciones adeudadas a partir de la vigencia de esta Ley y exigir que las mismas sean pagadas según correspondan. El Gobierno velará por la realización de dichas aportaciones y, si tuviese que desembolsar fondos para el pago de las cantidades correspondientes adeudadas a partir de la vigencia de esta Ley, se instará, sin espacio a discreción, una acción de cobro o reembolso contra el Titular o Jefe de Agencia, Director de Presupuesto o Finanzas o cualquier funcionario con responsabilidad que haya dejado de remitir dichos pagos. El Gobierno de Puerto Rico y sus instrumentalidades no le brindarán representación legal al funcionario en estos procedimientos. Esta disposición tendrá supremacía sobre cualquier otro estatuto. Las disposiciones de este inciso no se entenderán como que excluyen o liberan al Gobierno, las Corporaciones Públicas, los Municipios u otras entidades cubiertas de su responsabilidad y deber ministerial de pagar las aportaciones adeudadas a tiempo, según se dispone en

esta Ley. El Participante tendrá la opción de incoar la acción correspondiente de cobro contra el Gobierno, según la reglamentación que establezca la Junta a estos efectos.

**Artículo 3.6 -** Créditos a la Cuenta de Aportaciones Definidas, Rentabilidad de Inversión y Derechos sobre la Cuenta de Aportaciones Definidas.

(a) Créditos.- Se acreditarán a la Cuenta de Aportaciones Definidas de cada Participante del Nuevo Plan de Aportaciones Definidas las siguientes partidas:

(1) Aportación Individual del Participante.- Las aportaciones individuales hechas por el Participante del Nuevo Plan de Aportaciones Definidas, según requiere esta Ley, se acreditarán una vez sean remitidas por el patrono.

(2) Rentabilidad de Inversión.- La rentabilidad de inversión estará sujeta a la elección de inversiones del Participante, según su preferencia y su perfil de riesgo. Se le proveerán a los Participantes varias alternativas de inversión diversificadas entre sí, según determine la Junta de Retiro. Entre estas alternativas, se proveerá al menos una opción que garantice la totalidad de las aportaciones individuales realizadas por el Participante, preservando el principal de los mismos. Dicha opción será automáticamente seleccionada si el empleado no escogiese otra opción de su preferencia. El Participante tendrá la opción de escoger otra alternativa de las ofrecidas de tiempo en tiempo. Los gastos de manejo (*"management fees"*) básicos y razonables serán sufragados por el Gobierno de Puerto Rico. No obstante, la rentabilidad de la inversión será acreditada a la cuenta de cada Participante y será neta de los gastos de manejo adicionales o extraordinarios, según determine la Junta de Retiro, asegurándose este que los mismos sean razonables. Se le deberá proveer a los Participantes periódicamente, y por lo menos una vez al año, informes de la actividad de su Cuenta de Aportaciones Definidas, sea en papel o en formato accesible en un portal de internet del Gobierno.

(3) Las transferencias de balances del Programa de Aportaciones Definidas del Sistema de Retiro para Maestros acumulados desde el 1 de agosto de 2014, según aplicables.

(4) Los balances segregados a partir del 1 de julio de 2017, conforme las Resoluciones Conjuntas de la Cámara 186, 187 y 188 de 2017.

(b) Derechos Sobre la Cuenta de Aportaciones Definidas.- Los Participantes del Nuevo Plan de Aportaciones Definidas tendrán derecho de propiedad *erga omnes* sobre los balances de su Cuenta de Aportaciones Definidas.

**Artículo 3.7 -** Débitos a la Cuenta de Aportaciones Definidas.

Se debitará de la Cuenta de Aportaciones Definidas que se establezca para cada Participante del Nuevo Plan de Aportaciones Definidas aquellas sumas utilizadas para el pago de beneficios o para hacer una distribución global al Participante correspondiente, según provea la Junta de Retiro. Una vez se distribuya el balance total de la Cuenta de Aportaciones Definidas, la misma cesará de existir.

**Artículo 3.8 -** Beneficios a la Separación del Servicio.

En caso de que el Participante se separe del servicio público, su Cuenta de Aportación Definida puede permanecer en el Nuevo Plan de Aportaciones Definidas, puede ser transferida a un plan de aportaciones definidas cualificado exento bajo la Sección 1081.01(a) del Código, o el Participante puede solicitar el desembolso del balance, sujeto al pago de los impuestos aplicables, según el Código, pagaderos al momento del desembolso de los fondos y a la reglamentación que la Junta de Retiro establezca a estos efectos.

**Artículo 3.9** - Beneficios por Muerte.

(a) Muerte de Participante en Servicio Activo. - A la muerte de un Participante que esté prestando servicios y que tuviere un balance disponible en su Cuenta de Aportación Definida, dicho balance será desembolsado a los Beneficiarios que el Participante hubiere designado por orden escrita debidamente reconocida y presentada, o por sus herederos, si tal designación no hubiere sido hecha, sujetas a los mismos requisitos establecidos en el inciso (b) posterior.

(b) Muerte de un Retirado.- En aquellos casos en que fallezca un pensionado sin antes haber agotado el balance de su Cuenta de Aportación Definida, sus Beneficiarios designados o los herederos del Participante, en caso de no existir Beneficiario designado, podrán solicitar por escrito, presentando una declaratoria de herederos o testamento, y cualquier otro documento que establezca la Junta, el desembolso de dicho balance en un pago global, sujeto a cualquier deducción o impuesto correspondiente por ley o por el Código.

## CAPITULO 4 - JUNTA DE RETIRO Y ENTIDAD ADMINISTRADORA

**Artículo 4.1** - Junta de Retiro del Gobierno de Puerto Rico.

(a) Se crea la Junta de Retiro del Gobierno de Puerto Rico, como un nuevo organismo del Gobierno de Puerto Rico, independiente y separado de otros, el cual deberá ser designado dentro del término de sesenta días (60) de aprobada esta Ley y estará integrado por trece (13) miembros, según se detalla a continuación:

1. El Director Ejecutivo de la AAFAF, quien, además, será su Presidente. En su ausencia, lo podrá representar un funcionario de la AAFAF designado por éste;

2. El Secretario del Departamento de Hacienda, o su representante;

3. El Director de la Oficina de Gerencia y Presupuesto, o su representante;

4. El Director de la Oficina de Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico, o su representante;

5. Un (1) representante de los maestros del Departamento de Educación, quien será un maestro activo del Departamento de Educación, designado por el Gobernador por un término de cinco (5) años, quien ejercerá sus funciones hasta que se nombre un sucesor y éste tome posesión del cargo;

6. Un (1) representante de las corporaciones públicas, designado por el Gobernador por un término de cinco (5) años, quien ejercerá sus funciones hasta que se nombre un sucesor y éste tome posesión del cargo;

7. Un (1) representante de la Rama Judicial, designado por el Pleno del Tribunal Supremo de Puerto Rico, quien servirá a la discreción del mismo.

8. El Presidente de la Federación de Alcaldes, o su representante;

9. El Presidente de la Asociación de Alcaldes de Puerto Rico, o su representante; y

10. Cuatro (4) representantes del interés público, designados por el Gobernador por un término de cinco (5) años, quienes ejercerán sus funciones hasta que se nombre un sucesor y éste tome posesión del cargo. Uno (1) de estos representantes del interés público será un maestro Pensionado del Sistema de Retiro para Maestros, uno (1) será un Pensionado del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, uno (1) será un representante de los miembros de la Policía de Puerto Rico quien será nombrado por el Gobernador, en consulta con organizaciones *bona fide* que representen dicho sector y estén debidamente autorizadas por ley y uno (1) será de libre selección por parte del Gobernador.

Las personas designadas conforme a los incisos (5) y (6) servirán por un término inicial de dos (2) años. Las personas designadas conforme al inciso (10) servirán por un término inicial de tres (3) años. Según expire el término inicial de cada uno de estos miembros, sus sucesores serán nombrados conforme con lo dispuesto en este Artículo. Los miembros de la Junta de Retiro servirán *ad honorem*.

(b) Las personas seleccionadas para ocupar las posiciones designadas por el Gobernador y el Pleno del Tribunal Supremo de Puerto Rico deberán contar con conocimiento y experiencia en la administración y funcionamiento de sistemas financieros o en la administración de recursos humanos y deberán gozar de buena reputación moral.

(c) Siete (7) miembros de la Junta de Retiro constituirán quórum para resolver cualquier asunto ante su consideración y toda resolución adoptada por el mismo deberá ser aprobada por mayoría de los presentes. Los miembros podrán asistir a dichas reuniones mediante mecanismos de videoconferencias, llamadas telefónicas o métodos similares.

(d) La Junta de Retiro establecerá por reglamento aquellas disposiciones necesarias para su funcionamiento y cumplimiento con esta Ley, incluyendo las funciones y deberes de sus integrantes.

(e) La Junta de Retiro podrá nombrar un Director Ejecutivo, y además fijar su sueldo y establecer sus poderes, facultades y deberes, así como emplear el personal necesario para desempeñar sus funciones bajo esta Ley.

(f) La Ley 1-2012, según enmendada, conocida como la "Ley de Ética Gubernamental de Puerto Rico de 2011", le será de aplicación a todos los miembros de la Junta de Retiro, exceptuado el Capítulo V de dicha Ley.

**Artículo 4.2 -** Poderes, Facultades y Deberes de la Junta de Retiro.

A los fines de llevar a cabo los deberes que dispone esta Ley, la Junta de Retiro tendrá los siguientes poderes, deberes y facultades:

(a) Fungir como el máximo ente rector de los Sistemas de Retiro. A esos fines, la Junta tendrá y ejercerá todos los poderes, deberes y facultades conferidos a las Juntas de

Síndicos de los Sistemas de Retiro. Al entrar en vigor esta Ley, estos poderes y facultades se transferirán automática y permanentemente a la Junta de Retiro. Consecuentemente, las Juntas de Síndicos de los Sistemas de Retiro quedarán disueltas al entrar en vigor esta Ley. Cualquier referencia a las Juntas de Síndicos de los Sistemas de Retiro se entenderá que se refiere a la Junta de Retiro. Todos las disposiciones y reglamentos adoptados por las Juntas de Síndicos de los Sistemas de Retiro continuarán en vigor luego de la aprobación de esta Ley hasta que estos sean enmendados o modificados por la Junta de Retiro y cualquier referencia en estos reglamentos a las Juntas de Síndicos de los Sistemas de Retiro se entenderá que es una referencia a la Junta de Retiro. Todo lo anterior estará sujeto a las disposiciones del Capítulo 7 de esta Ley. Además, la Junta de Retiro tendrá y ejercerá todos los poderes, deberes y facultades necesarios para la administración y manejo del Nuevo Plan de Aportaciones Definidas y la supervisión de cualquier Entidad Administradora, incluyendo la facultad para establecer las reglas y requisitos para recibir los beneficios bajo el Nuevo Plan de Aportaciones Definidas.

(b) Contratar mediante procesos competitivos los servicios de una o varias Entidades Administradoras para administrar la Cuenta para el Pago de las Pensiones Acumuladas y/o el Nuevo Plan de Aportaciones Definidas. El proceso de selección de dicha entidad y/o entidades se realizará bajo el mecanismo de solicitud de propuestas "*request for proposals*" bajo las reglas que establezca la Junta de Retiro, velando por los mejores intereses del Gobierno y los Participantes, de forma cónsona con los mejores estándares de la industria. Cualquier referencia a los Administradores de los Sistemas de Retiro se entenderá que se refiere a las Entidades Administradoras. Todas las disposiciones y reglamentos adoptados por los Administradores de los Sistemas de Retiro continuarán en vigor luego de la aprobación de esta Ley hasta que estos sean enmendados o modificados por las Entidades Administradoras o la Junta de Retiro. Todo lo anterior estará sujeto a las disposiciones del Capítulo 7 de esta Ley.

(c) Adoptar todas las reglas, reglamentos, normas y procedimientos para su organización y funcionamiento; y para la implementación de esta Ley.

(d) Cobrar las deducciones adicionales a las Aportaciones Individuales de los Participantes hasta el máximo de 0.25 % que es lo que actualmente se les descuenta según sus respectivos Sistemas de Retiro para sufragar otros beneficios, tales como seguros por incapacidad.

(e) Establecer y cobrar un Cargo Administrativo, el cual se computará a base de los gastos en los que se incurra para operar y administrar la Cuenta para el Pago de las Pensiones Acumuladas y el Nuevo Plan de Aportaciones Definidas.

(f) Establecer, implantar y fiscalizar las mejores prácticas de prudencia, lealtad, diligencia, y reglas aplicables al Nuevo Plan de Aportaciones Definidas, en cuanto a su operación, derechos de los Participantes, responsabilidades de los administradores, deberes fiduciarios y cualquier otra norma aplicable del "*Employee Retirement Income Security Act*", Public Law 93–406, del 2 de septiembre de 1974 o de otro estatuto análogo o pertinente.

(g) Suscribir los acuerdos razonables y apropiados, memoriales de entendimiento y documentos, incluyendo escrituras de constitución de fideicomiso, que sean necesarios y

30

convenientes para implementar las disposiciones de esta Ley, tomando en consideración la actual situación económica y fiscal del Gobierno de Puerto Rico.

(h) Nombrar aquellas comisiones, juntas y comités que estime necesarios para el mejor logro de los objetivos de esta Ley.

(i) Demandar y ser demandado, incluso a nombre de los Sistemas de Retiro.

(j) Llevar a cabo todos los poderes necesarios para cumplir con esta Ley y con los reglamentos que se adopten conforme a la misma.

## CAPÍTULO 5- DISPOSICIONES TRANSITORIAS

**Artículo 5.1 -** Periodo de Transición.

(a) Mientras la Junta de Retiro no esté constituida debidamente conforme al *quorum* requerido por esta Ley, el Director Ejecutivo de la AAFAF tendrá y ejercerá todos los poderes correspondientes a la Junta de Retiro, incluyendo tomar las decisiones pertinentes en relación a la creación del Nuevo Plan de Aportaciones Definidas y la estructuración del programa "*pay as you go*", según dispuestos en esta Ley o en cualquier otro estatuto aplicable.

(b) Los Administradores de los Sistemas de Retiro continuarán ejerciendo sus funciones, descargando sus deberes y tendrán la obligación de brindarle todo el apoyo necesario a la Junta de Retiro y a la AAFAF durante la implementación de esta Ley, hasta la fecha en que la AAFAF certifique mediante Resolución de su Junta de Directores que se ha completado la transición ordenada por esta Ley, la cual deberá ser en o antes del 31 de diciembre de 2017. No obstante, esa fecha se podrá prorrogar por un término razonable de ser necesario, mediante resolución de AAFAF. A partir de esa fecha, todos los poderes, deberes y facultades de los Administradores de los Sistemas de Retiro se transferirán permanentemente a las Entidades Administradoras, al Director Ejecutivo de la Junta de Retiro o la persona que la Junta de Retiro determine.

(c) Los Administradores de los Sistemas de Retiro deberán realizar todas las gestiones necesarias para la liquidación de sus activos y transferencia al Fondo General y/o la Cuenta para el Pago de las Pensiones Acumuladas, según aplicable, excepto el edificio sede del Sistema de Retiro para Maestros, conocido como el Edificio Capital Center, Torre Norte, ubicado en Hato Rey, Puerto Rico, el cual no se tendrá que liquidar; la transferencia de los expedientes de los Participantes y pensionados, incluyendo sus balances, a la Junta de Retiro, la coordinación para la movilidad de sus empleados conforme a la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", y otras disposiciones aplicables. Al entrar en vigor esta Ley, la AAFAF tendrá todas las facultades y poderes necesarios para, en colaboración con los Administradores de los Sistemas de Retiro, llevar a cabo las gestiones necesarias para ajustar las operaciones de los Sistemas de Retiro a lo dispuesto en esta Ley y al Plan Fiscal Certificado, de forma que se pueda cumplir con la transición ordenada. Se deberán ofrecer los detalles a los empleados, tanto de los Sistemas de Retiro como aquellos empleados de carrera de las Juntas de Síndicos de dichos Sistemas, sobre los planes de movilidad, nueva sede y demás información concerniente dentro del periodo de treinta

(30) días previo al vencimiento del término para la transición, esto en aras de evitar cualquier incertidumbre ante los cambios propuestos.

(d) La Junta de Retiro, en coordinación y con la asistencia y recursos de los Administradores de los Sistemas de Retiro, deberán formular e implementar una campaña de educación dirigida a los Participantes, Pensionados y Beneficiarios respecto a las disposiciones de esta Ley.

(e) Los Administradores de los Sistema de Retiro, al igual que los empleados de los Sistemas de Retiro, continuarán ejerciendo sus funciones durante el periodo de transición.

**Artículo 5.2 -** Empleados de los Sistemas de Retiro.

La Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico, la Oficina de Gerencia y Presupuesto y la AAFAF establecerán un plan para efectuar la movilidad de los empleados de los Sistemas de Retiro a otras agencias e instrumentalidades del Gobierno de Puerto Rico, a tenor con las disposiciones de la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico" o según los procedimientos que se establezcan para esos fines mediante reglamentos, procedimientos, cartas circulares, entre otros. No obstante, los empleados continuarán ejerciendo sus funciones durante el periodo de transición que por esta Ley se establece, según sea determinado por la Junta.

Los empleados transferidos conservarán sus salarios y todos los derechos adquiridos conforme a las leyes, normas y reglamentos que les sean aplicables, y que sean compatibles con lo dispuesto en la Ley 26-2017, conocida como "Ley de Cumplimiento con el Plan Fiscal".

**Artículo 5.3 -** Transferencia de Equipo y Propiedad.

La Junta de Retiro tendrá la facultad de administrar y disponer de todo el equipo y la propiedad de los Sistemas de Retiro.

## CAPÍTULO 6 –CLÁUSULAS ENMENDATORIAS

**Artículo 6.1 –** Se enmienda el Artículo 2 de la Ley Núm. 12 de 19 de octubre de 1954, según enmendada, conocida como "Ley de Retiro de la Judicatura", para que lea como sigue:

"Artículo 2. – Definiciones.

Los términos o frases según se usan en esta Ley tendrán los significados que a continuación se expresan, salvo cuando el contexto indique claramente otro significado:

(1) Administrador – Significará la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…

(9) Junta – Significará la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

…"

**Artículo 6.2** – Se enmienda el Artículo 1-1.04 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, para que lea como sigue:

"Artículo 1-1.04. – Definiciones.

Los siguientes términos y frases, según se usan en esta Ley tendrán los significados que a continuación se expresan, salvo cuando el contexto indique claramente otro significado:

1) Junta. – Significará la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

2) Administrador. – Significará la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…"

**Artículo 6.3** - Se enmienda el Artículo 4-101 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, para que lea como sigue:

"Artículo 4-101. – Administración.

El Sistema creado por esta Ley se considerará un fideicomiso. Cualquier cambio en la estructura de beneficios que conlleve un aumento en el importe de la anualidad u otros beneficios deberá estar sustentado con estudios actuariales previos donde se determine su costo y la legislación correspondiente proveerá para su financiamiento.

El Sistema creado por esta Ley se organizará como un organismo del Gobierno de Puerto Rico, independiente y separado de otros. La Junta de Retiro no estará sujeta a las disposiciones del Plan 3-2011, según enmendado, conocido como "Plan de Reorganización de la Administración de Servicios Generales de 2011", ni de la "Ley Orgánica de la Oficina de Gerencia y Presupuesto del Gobierno", y se regirán por la Ley 8-2017, según enmendada, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico".

La Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos", será responsable de ver que se pongan en vigor las disposiciones de esta Ley."

**Artículo 6.4** – Se derogan los incisos 11 y 12 y se renumeran los incisos 13, 14 y 15 como 11, 12 y 13, respectivamente, del Artículo 4-103 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada.

**Artículo 6.5** – Se enmienda el Artículo 1.1 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

"Artículo 1.1. – Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación a menos que del contexto surja claramente otro significado. Los tiempos usados en el presente incluyen también el futuro, y el

género masculino incluye el femenino, salvo en aquellos casos que tal interpretación resultase absurda. El número singular incluye el plural y el plural el singular.

(a) …

…

(f)   Director Ejecutivo.-la persona o la entidad que la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos", designe para ejercer las funciones de Administrador del Sistema.

…

(k)   Junta de Síndicos.-la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas Para los Servidores Públicos".

…"

**Artículo 6.6** - Se enmienda el Artículo 2.3 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

"Artículo 2.3. – Junta de Síndicos del Sistema.

Los poderes y facultades del Sistema y la responsabilidad de establecer la organización administrativa y buen funcionamiento del mismo recaerá sobre la Junta de Retiro, creada mediante la "Ley para Garantizar el Pago a Nuestros Pensionados y Establecer un Nuevo Plan de Aportaciones Definidas para los Servidores Públicos".

**Artículo 6.7** - Se derogan los Artículos 2.4, 2.5 y 2.6 de la Ley 160-2013, según enmendada, conocida como "Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", y se renumeran los Artículos 2.7 y 2.8 como 2.4 y 2.5, respectivamente.

**Artículo 6.8 -** Se enmiendan los párrafos (3), (8), (9), (11) y (14) del apartado (a) y los apartados (b) y (d) de la Sección 1081.01 de la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico", para que lea como sigue:

"Sección 1081.01.- Fideicomisos de Empleados.

(a)   Exención.- Un fideicomiso organizado bajo las leyes de Puerto Rico que forme parte de un plan de retiro de un patrono, de participación en ganancias, bonificación en acciones o pensiones, para el beneficio exclusivo de sus empleados residentes en Puerto Rico o que rindan servicios principalmente en Puerto Rico, y de los beneficiarios de éstos y un fideicomiso organizado bajo las leyes de Puerto Rico o que sea considerado un fideicomiso doméstico bajo el Código de Rentas Internas de los Estados Unidos de 1986, según enmendado, o cualquier disposición legal sucesora, que forme parte de un plan de retiro de un patrono, de participación en ganancias, bonificación en acciones o pensiones, para el beneficio exclusivo de sus empleados residentes en Puerto Rico o empleados residentes en Puerto Rico y Estados Unidos y de los beneficiarios de éstos y que, con respecto a sus participantes y beneficiarios de los Estados Unidos, cumpla con los requisitos de cualificación de la Sección 401(a) del Código de Rentas Internas de los Estados Unidos, según enmendado (en adelante referido para propósitos de esta Sección como el "Código Federal") no será tributable bajo este Subcapítulo y ninguna otra

34

disposición de este Subcapítulo será aplicable con respecto a dicho fideicomiso o a sus beneficiarios, sujeto a que en sus términos y operación cumpla con los siguientes requisitos de cualificación.-

    (1)    …

    (2)    …

    (3)    si el fideicomiso, o dos (2) o más fideicomisos, o el fideicomiso o fideicomisos y el plan o planes de anualidades son designados por el patrono como parte de un plan que cumpla con los requisitos mínimos de cubierta dispuestos en este párrafo.

    (A)    …

    (B)    …

    (C)    …

    (D)    …

    (E)    Regla Especial para Planes Cualificados en los Estados Unidos.- Si el fideicomiso está organizado en los Estados Unidos y, con respecto a todos sus participantes, incluyendo aquellos que son residentes de Puerto Rico, para un año del plan, el plan de retiro cumple con los requisitos de cubierta de la Sección 410(b) del Código Federal, se entenderá que para ese mismo año del plan el mismo cumple con los requisitos de esta Sección 1081.01(a)(3), siempre y cuando el plan haya sido debidamente certificado por el Secretario como un plan cualificado bajo esta sección.

    (F)    Exclusión de Planes de Gobierno. - Los requisitos de cubierta de la Sección 1081.01(a)(3) no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

    (4)    …

    (5)    …

    (6)    …

    (7)    …

    (8)    En el caso de cualquier plan que provee aportaciones o beneficios para empleados, todos o algunos de los cuales son empleados-dueños (según se definen en el apartado (e)) un fideicomiso que forme parte de dicho plan constituirá un fideicomiso cualificado bajo esta Sección solamente si el mismo reúne los requisitos del apartado (f). Para la pérdida de la exención en el caso de fideicomisos de empleados, bajo ciertas circunstancias, véanse las Secciones 1102.06 y 1102.07.

    (9)    El plan deberá también cumplir con las disposiciones que le sean aplicables de la Ley Federal de Seguridad en el Ingreso por Retiro ("*Employee Retirement Income Security Act of 1974*", conocida como "*ERISA*", por sus siglas en inglés).

    (10)    …

(11)    Para los años contributivos comenzados a partir del 1 de enero de 2012, un fideicomiso no constituirá un fideicomiso exento bajo el apartado (a) de esta Sección si el plan del cual el fideicomiso es parte concede beneficios o aportaciones con respecto a un participante en exceso de los siguientes límites -

(A)    …

(B)    En el caso de un plan de aportaciones definidas, las aportaciones anuales del patrono y del participante y otras adiciones en relación a un participante, sin incluir aportaciones transferidas de otro plan de retiro cualificado, no pueden exceder de lo menor de:

(i)    el límite aplicable para determinado año contributivo bajo la Sección 415(c) del Código Federal, según ajustado por el Servicio de Rentas Internas Federal, o

(ii)    cien por ciento (100 %) de la compensación del participante pagada por el patrono durante el año natural o el año del plan, según seleccionado por el patrono. La compensación del participante incluye las aportaciones que el participante hace a un plan cualificado bajo un acuerdo de aportaciones en efectivo o diferidas para ese año.

(C)    …

(12)    …

(13)    …

(14)    Agrupación de Patronos.-

(A)    …

(B)    …

(C)    Exclusión de Planes de Gobierno. - Los requisitos de agregación de patronos de la Sección 1081.01(a)(13) no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

(15)    …

(b)    Tributación del Beneficiario.-

(1)    En general.- La cantidad realmente distribuida o puesta a disposición de cualquier participante o beneficiario por un fideicomiso de empleados exentos según la Sección 1081.01(a) será tributable a dicho participante o beneficiario en el año en el cual sea así distribuida o puesta a su disposición y le aplicarán las reglas de la Sección 1031.01(b)(11)(A) como si fuera una anualidad cuyo precio o consideración es el monto de las aportaciones voluntarias hechas por el participante, excluyendo las ganancias de inversión atribuibles a las mismas, y aquellas cantidades sobre las cuales el participante previamente pagó contribuciones sobre ingresos de Puerto Rico.

(A)    Distribuciones Totales efectuadas antes del 1 de enero de 2018.- Si la totalidad de los beneficios bajo el fideicomiso con respecto a un participante es

pagada o puesta a la disposición del participante o su beneficiario dentro de un solo año contributivo de éste debido a la separación del servicio del participante por cualquier razón, o la terminación del plan (en adelante referida para propósitos de este apartado como una "distribución total"), el monto de dicha distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste, será considerado como una ganancia de capital a largo plazo sujeta a una tasa de veinte por ciento (20 %). No obstante lo anterior, en el caso de distribuciones totales realizadas por un fideicomiso que forme parte de un plan de pensiones, participación en ganancias, de bonificación en acciones o de adquisición de acciones para empleados, si:

(i) el fideicomiso está organizado bajo las leyes del Gobierno de Puerto Rico, o tiene un fiduciario residente de Puerto Rico y utiliza a dicho fiduciario como agente pagador; y

(ii) al menos un diez por ciento (10 %) del total de los activos del fideicomiso atribuibles a los participantes residentes de Puerto Rico, computado a base del balance promedio de las inversiones del fideicomiso durante el año del plan durante el cual se realiza la distribución y cada uno de los dos años del plan precedentes a la fecha de la distribución, han estado invertidos en compañías inscritas de inversión organizadas bajo las leyes de Puerto Rico y sujetas a tributación bajo la Sección 1112.01 del Código, anualidades fijas o variables emitidas por una compañía de seguros doméstica o una compañía de seguros extranjera que durante los tres años calendarios anteriores a la fecha de la distribución derivó más del ochenta por ciento (80 %) de sus ingresos brutos de fuentes de Puerto Rico, depósitos en cuentas que devenguen intereses en bancos comerciales y mutualistas, cooperativas, asociaciones de ahorro autorizadas por el Gobierno Federal o por el Gobierno de Puerto Rico o en cualquier otra organización de carácter bancario radicada en Puerto Rico, incluyendo, pero no limitado a, certificados de depósito, o cualquier otra propiedad que mediante reglamento o carta circular el Secretario cualifique como propiedad localizada en Puerto Rico, entonces el monto de dicha distribución en exceso del monto aportado por el participante, que haya sido tributado por éste, será considerado como una ganancia de capital a largo plazo sujeta a una tasa de diez por ciento (10 %). En el caso de planes de aportación definida donde se mantiene una cuenta separada para cada participante o beneficiario, se podrá cumplir con el requisito de inversión en "propiedad localizada en Puerto Rico" en relación con los activos acreditados a la cuenta del participante o beneficiario. En el caso de transferencias de un plan cualificado bajo el apartado (a) de esta Sección (el plan cedente) a otro plan cualificado bajo el apartado (a) de esta Sección, se cumplirá con el requisito de inversión en "propiedad localizada en Puerto Rico" de este inciso (B) con respecto al plan cedente tomando en consideración el período de tiempo durante el cual el plan cedente, o la cuenta del participante en el plan cedente, cumplió con el requisito de inversión de este inciso (B). El Secretario podrá mediante reglamento, carta circular, determinación administrativa o acuerdo final

disponer la manera en que se cumplirá con el requisito de inversión en Puerto Rico.

(B) Distribuciones Totales efectuadas después del 31 de diciembre de 2017.- Si la totalidad de los beneficios bajo el fideicomiso con respecto a un participante es pagada o puesta a la disposición del participante o su beneficiario dentro de un solo año contributivo de éste debido a su separación del servicio del participante por cualquier razón, o la terminación del plan (en adelante referida para propósitos de este apartado como una "distribución total"), el monto de dicha distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste, será considerado como ingreso ordinario sujeto a los tipos contributivos provistos en la Sección 1021.01. Sin embargo, en el caso de distribuciones totales con respecto a las cuales se ha cumplido con las obligaciones de retención en el origen de la Sección 1081.01(b)(3)(A) y de depósito de la Sección 1081.01(b)(4), en lugar de los tipos contributivos provistos en la Sección 1021.01, aplicará la tasa del veinte por ciento (20 %). No obstante, si se cumplen los requisitos dispuestos en las cláusulas (i) y (ii) del inciso (A) de este párrafo, aplicará la tasa de diez por ciento (10 %).

(C) Otras Distribuciones.- Si cualquier parte de los beneficios bajo el fideicomiso con respecto a un participante son pagados o puestos a disposición del participante o su beneficiario mediante una opción o forma de pago o distribución que no es una distribución total o un préstamo no tributable, el monto de dicho pago o distribución, en la cantidad que exceda el monto aportado por el participante, que ya haya sido tributado por éste y, de ser aplicable, la exención de ingreso de la Sección 1031.02(a)(13), será considerado como ingreso ordinario sujeto a los tipos contributivos provistos en la Sección 1021.01.

(2) Excepción y regla especial.-

(A) A elección del participante o beneficiario, las disposiciones del párrafo (1) de este apartado no aplicarán a aquella porción o a la totalidad de una distribución total que el plan del cual el fideicomiso exento forma parte transfiera directamente o que el participante aporte a una cuenta o anualidad de retiro individual bajo las disposiciones de la Sección 1081.02, a una cuenta de retiro individual no deducible bajo las disposiciones de la Sección 1081.03 o a un plan de retiro cualificado bajo las disposiciones del apartado (a) de esta Sección para beneficio de dicho participante o beneficiario no más tarde de los sesenta (60) días después de haber recibido dicho pago o distribución. En el caso de una transferencia a una cuenta de retiro individual no deducible, la excepción a la cual se refiere este párrafo sólo aplicará a aquellas distribuciones descritas en la Sección 1081.03(d)(5)(A). No obstante lo anterior, las aportaciones por transferencias a cuentas de retiro individual no deducibles estarán sujetas a la tributación dispuesta en la Sección 1081.03(d)(5) y, para propósitos de este párrafo se considerará que se cumple con los requisitos del mismo si se aporta a la cuenta de retiro individual no deducible una cantidad igual a la cantidad total recibida del fideicomiso cualificado por el participante o beneficiario reducida por la contribución dispuesta en dicha Sección 1081.03(d)(5) que haya sido retenida, según allí se dispone.

(B)      ...

(3)      Obligación de deducir y retener.-

(A)      Distribuciones totales.- Toda persona, cualquiera que sea la capacidad en que actúe, que efectúe distribuciones totales pagaderas con respecto a cualquier participante o beneficiario deberá deducir y retener de dichas distribuciones, efectuadas antes del 1 de enero de 2018, una cantidad igual al veinte (20%) por ciento del monto de las mismas en exceso de las cantidades aportadas por el participante al plan que hayan sido tributadas por éste. Esta deducción y retención será de diez por ciento (10 %) si el fideicomiso cumple con los requisitos dispuestos en los incisos (A) y (B) del párrafo (1) de este apartado. Disponiéndose que, para distribuciones totales efectuadas luego del 31 de diciembre de 2017, la contribución que deberá ser retenida será de diez por ciento (10 %).  Para distribuciones efectuadas antes del 1 de enero de 2018, el patrono cuyos empleados participan en el plan o el administrador del plan deberá certificarle a la persona que efectúe las distribuciones del fideicomiso que se ha cumplido con el requisito de inversión en "propiedad localizada en Puerto Rico". Una vez se reciba la certificación emitida por el patrono, la persona que efectúe las distribuciones del fideicomiso no será responsable del pago de contribución, intereses o penalidades en caso de que no se haya cumplido con este requisito, pero será responsable de deducir y retener el diez por ciento (10 %).

(B)      …

(C)      ...

(D)      ...

(E)      …

(i)      …

(ii)      ….

(4)      Obligación de pagar o depositar contribuciones deducidas o retenidas.- Toda persona que venga obligada a deducir y retener cualquier contribución bajo las disposiciones del párrafo (3) y a entregar en pago de dicha contribución al Secretario deberá pagar el monto de la contribución así deducida y retenida en las Colecturías de Rentas Internas de Puerto Rico del Departamento de Hacienda, depositarla en cualesquiera de las instituciones bancarias designadas como depositarias de fondos públicos que hayan sido autorizadas por el Secretario a recibir tal contribución, o depositarla utilizando medios electrónicos sujeto a lo que establezca el Secretario mediante reglamento, determinación administrativa, carta circular o boletín informativo de carácter general.  La contribución deberá ser pagada o depositada no más tarde del decimoquinto (15to.) día del mes siguiente a la fecha en que se efectuó la distribución.

(5)      ...

(6)      ...

(7)      ...

(8)      Penalidad.-  En caso de que cualquier persona dejare de depositar las

contribuciones deducidas y retenidas bajo el párrafo (3) dentro del término establecido por el párrafo (4) de este apartado (b), se impondrá a tal persona una penalidad del dos por ciento (2 %) del monto de la insuficiencia si la omisión es por treinta (30) días o menos y dos por ciento (2 %) por cada período o fracción del período adicional de treinta (30) días mientras subsista la omisión, sin que exceda de veinticuatro por ciento (24 %) en total. Para fines de este párrafo, el término "insuficiencia" significa el exceso del monto de la contribución que debió ser depositada sobre el monto, si alguno, de la misma que fue depositada en o antes de la fecha prescrita para ello. Para fines de este párrafo, la omisión no se considerará continuada después de la fecha en que la contribución sea pagada.

        (9)   …

        (10)  …

(c)     …

(d)     Acuerdo de Aportaciones en Efectivo o Diferidas.-

        (1)   …

        (2)   …

        (3)   Solicitud de participación y normas de discriminación.-

           (A)   …

           …

           (F)   Exclusión de Planes de Gobierno.- Las normas de discriminación de la Sección 1081.01(d)(3), incluyendo la contribución impuesta en la Sección 1081.01(d)(6)(D), no han de aplicar a aquellos planes de retiro establecidos por el Gobierno de Puerto Rico, el Gobierno de los Estados Unidos, y sus respectivos municipios, agencias, instrumentalidades y corporaciones públicas.

        (4)   Otros requisitos.-

           (A)   Beneficios que no sean las aportaciones pareadas no se condicionarán a la elección para diferir.- Un acuerdo de aportaciones en efectivo o diferidas de cualquier patrono no se considerará como un acuerdo cualificado de aportaciones en efectivo o diferidas si cualquier otro beneficio establecido por el patrono está condicionado directa o indirectamente a la elección por el empleado para que el patrono le efectúe o no aportaciones bajo el plan en vez de recibirlas en efectivo. La oración anterior no aplica a ninguna aportación pareada efectuada por razón de dicha elección.

        (5)   …

        (6)   …

        (7)   …

           …

(e)     …

…."

# CAPÍTULO 7 - DISPOSICIONES FINALES

**Artículo 7.1 -** Programa de Preretiro Voluntario.

(a) Se deroga la Ley 211-2015, según enmendada, conocida como "Ley del Programa de Preretiro Voluntario". No obstante, se garantizan todos los derechos y obligaciones creados al amparo de dicho estatuto.

(b) Aquellos Preretirados que se encuentran participando del Programa de Preretiro Voluntario al momento de aprobarse la presente Ley, continuarán disfrutando del mismo de acuerdo a las disposiciones establecidas bajo la Ley 211-2015, según enmendada.

(c) Las solicitudes de Preretiro, conforme al Programa de Preretiro Voluntario que hayan presentado debidamente los Participantes a la fecha de aprobación de esta Ley, continuarán el trámite ordinario. Se garantizarán los mecanismos de revisión, según dispuestos en la Ley 211-2015, según enmendada, y cualquier otro estatuto aplicable.

(d) Se les garantizará a los Participantes cuyos beneficios de Preretiro hayan sido previamente aprobados por la Oficina de Gerencia y Presupuesto, de acuerdo a lo dispuesto en la Ley 211-2015, según enmendada, el acogerse a los beneficios de dicho Programa.

**Artículo 7.2 -** Preservación de beneficios.

Salvo por lo que se dispone expresamente en esta Ley, el derecho a recibir las Pensiones Acumuladas, la edad de retiro y otros beneficios dispuestos por leyes especiales, no se verá afectado por este estatuto, y se garantizan por el Gobierno

**Artículo 7.3 -** Programa de Incentivos, Oportunidades y Readiestramiento para los servidores públicos.

Se faculta a la AAFAF a diseñar, implementar y fiscalizar programas de separación voluntaria incentivada del servicio público, programas voluntarios de oportunidades fuera del servicio público para empleados públicos de la Rama Ejecutiva, para el empleado que así lo solicite y cumpla con los requisitos establecidos mediante reglamentación interna no sujeta a la Ley 38-2017, conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico". Los mismos podrán incluir, entre otros incentivos, programas de readiestramiento, beneficios contributivos hasta el monto de la responsabilidad contributiva del empleado para determinado periodo y/o beneficios contributivos a entidades o personas del sector privado que recluten y/o ofrezcan beneficios a estos empleados públicos. Estos programas de beneficios contributivos serán establecidos e implementados por el Departamento de Hacienda. Al diseñar e implementar dicho programa, se deberá velar por el cumplimiento con el Plan Fiscal certificado conforme a PROMESA. La facultad aquí delegada a la AAFAF no incluirá el establecimiento de programas o ventanas de retiro temprano.

**Artículo 7.4 -** Reglamentación.

Todos los reglamentos, órdenes, resoluciones, cartas circulares y demás documentos administrativos que gobiernan la operación de los Sistemas de Retiro que estén vigentes al entrar esta Ley en vigor, siempre que sean cónsonos con la misma, continuarán vigentes hasta tanto los mismos sean expresamente alterados, modificados, enmendados, derogados o sustituidos.

41

Se faculta a la AAFAF y al Departamento de Hacienda a establecer la reglamentación y los procedimientos necesarios para la ejecución de las facultades concedidas por virtud de esta Ley de tal forma que se salvaguarden los mejores intereses de los Participantes, Beneficiarios y Retirados. Las facultades concedidas por este Artículo incluyen la autoridad de tomar cualquier medida necesaria para garantizar una transición ordenada, conforme a las disposiciones de esta Ley.

**Artículo 7.5 -** Aplicabilidad de la Ley Uniforme de Valores.

El interés de cualquier Participante en el Nuevo Plan de Aportaciones Definidas no constituirá un valor para propósitos de la Ley Núm. 60 de 18 de junio de 1963, según enmendada, conocida como la "Ley Uniforme de Valores".

**Artículo 7.6 -** Programas de Préstamos.

Por la presente se suspenden todos los programas de préstamos, por todos los conceptos, que tengan los Sistemas de Retiro al entrar en vigor esta Ley. Los préstamos ya otorgados se regirán por lo dispuesto por las leyes bajo las cuales fueron otorgados, disponiéndose que la Junta de Retiro y la AAFAF estarán facultados para externalizar estos programas, así como todo lo relacionado al servicio de los mismos.

**Artículo 7.7 -** Pareo a la Cuenta de Aportaciones Definidas.

Se autoriza a la AAFAF, tras hacer una determinación de que la situación fiscal del Gobierno se ha estabilizado y que la condición del fisco lo permite, a recomendar al Gobernador, en coordinación con la Junta de Retiro, que se incluya en el presupuesto una cantidad para parear las aportaciones de los Participantes a las Cuentas de Aportaciones Definidas. Esta determinación deberá hacerse de conformidad al Plan Fiscal certificado y a las disposiciones de PROMESA.

**Artículo 7.8 –** Responsabilidad.

Ninguna persona natural o jurídica, incluyendo funcionarios del Gobierno de Puerto Rico, las Corporaciones Públicas y los Municipios, que ejerza funciones al amparo o que emanan de esta Ley gozará de inmunidad alguna que le libere de responsabilidad personal por el incumplimiento con sus deberes impuestos por esta Ley. Esta disposición prevalecerá sobre cualquier otra disposición de ley, sea esta especial o general.

**Artículo 7.9 –** Municipios.

Para los municipios, el cómputo de la cantidad a pagar se hará exceptuando la contribución adicional uniforme.

**Artículo 7.10 -** Supremacía.

Las disposiciones de esta Ley y los reglamentos o normas que se adopten de conformidad con la misma, prevalecerán sobre cualquier otra disposición de ley, reglamento o norma que no estuviere en armonía con los primeros.

**Artículo 7.11 -** Separabilidad.

Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará,

perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas personas o circunstancias en las que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

**Artículo 7.12 -** Vigencia.

Esta Ley comenzará a regir inmediatamente luego de su aprobación, no obstante, tendrán vigencia retroactiva aquellas disposiciones de esta Ley que así lo indican.