# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | Case No. 3:17-bk-03283 (LTS) |
| as representative of | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ————————————————— | X | |
| | ) | |
| In re: | ) | |
| | ) | |
| THE FINANCIAL OVERSIGHT AND | ) | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | Title III |
| | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ------------------------------------------------------------------- | x | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF CERTAIN SECURED
CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO
TO COMPEL PRODUCTION OF DOCUMENTS IN PRIVILEGE LOG
CATEGORIES 1, 5 TO 7 [DELIBERATIVE PROCESS PRIVILEGE
<u>AND EXECUTIVE PRIVILEGE]</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.     Respondents Fail To Carry Their Burden As To The Deliberative Process
Privilege ................................................................................................................... 2

     A.     The Withheld Materials Are Postdecisional Because The Oversight
Board Dictated The Destruction Of ERS And The Transfer Of Its Assets .......... 2

     B.     Some Of The Withheld Materials Contain Segregable Factual
Information ................................................................................................. 3

     C.     Respondents Have Not Properly Invoked The Deliberative Process
Privilege ..................................................................................................... 5

II.    The Bondholders' Need for the Documents Outweighs Any Harm from
Disclosure ................................................................................................................ 6

III.   Respondents Waived Any Privilege For Materials Shared With Each Other .................. 8

IV.   Respondents Fail To Carry Their Burden As To The Executive Privilege ..................... 9

V.    Respondents' New Claims Of Attorney-Client Privilege And Work Product
Fail .......................................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Altair Glob. Credit Opportunities Fund (A), LLC v. United States,*
    138 Fed. Cl. 742 (2018) ...............................................................................................9

*Aurelius Inv., LLC v. Puerto Rico,*
    915 F.3d 838 (1st Cir. 2019) .......................................................................................9

*Bhatia Gautier v. Gobernador,*
    199 D.P.R. 59 (P.R. 2017) .................................................................................... *passim*

*Bhatia Gautier v. Gobernador,*
    Civil No. SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) ...........................8, 9, 10

*Cal. State Foster Parent Ass'n v. Wagner,*
    2008 WL 2872775 (N.D. Cal. July 23, 2008) ............................................................8

*Corporación Insular de Seguros v. García,*
    709 F. Supp. 288 (D.P.R. 1989) ................................................................................10

*EPA v. Mink,*
    410 U.S. 73 (1973) ....................................................................................................3, 4

*Fairholme Funds, Inc. v. United States,*
    128 Fed. Cl. 410 (2016) ...............................................................................................8

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    254 F.R.D. 35 (D. Mass. 2008) ...................................................................................8

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ..................................................................................10

*In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency,*
    145 F.3d 1422 (D.C. Cir. 1998) ..................................................................................8

*Jordan v. U.S. Dep't of Justice,*
    591 F.2d 753 (D.C. Cir. 1978) .................................................................................2, 3

*Marilley v. McCamman,*
    2012 WL 4120633 (N.D. Cal. Sept. 19, 2012) .........................................................8

*Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.,*
    819 F.2d 1181 (D.C. Cir. 1987) ...............................................................................4, 5

*Providence Journal Co. v. U.S. Dep't of Army,*
    981 F.2d 552 (1st Cir. 1992) .......................................................................................4

*Texaco P.R., Inc. v. Dep't of Consumer Affairs,*
    60 F.3d 867 (1st Cir. 1995) .........................................................................................2

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

P.R. Const. Article IV, § 4 ...............................................................................................................3

48 U.S.C. § 2141 ...............................................................................................................................3

48 U.S.C. § 2142 ...............................................................................................................................3

1.      The legal standard cannot be disputed. Puerto Rico's "evidentiary system demands a restrictive interpretation when determining the existence of a privilege." *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 89 (P.R. 2017) ("*Bhatia Gautier I*"). And, even if a privilege has been invoked properly, the government must still "present evidence and show the existence of [a] *compelling* interest of greater hierarchy than the values protected by [the] right of freedom of information of the citizens." *Id.* at 86 (emphasis added). Ignoring this high bar, Respondents continue to assert privilege to withhold documents at the heart of the Bondholders' case. Their privilege claims should be overruled for several reasons:

2.      *First*, as to the deliberative process privilege, many of the withheld documents contain *post*decisional and/or factual material that must be disclosed. And, despite their new protestations and excuses, Respondents did not properly invoke the privilege in the first place.

3.      *Second*, whatever interests Respondents might have in keeping their deliberations secret are outweighed by the Bondholders' need for evidence showing what happened to the multi-billion dollar revenue stream that the Commonwealth several times admitted collateralized the ERS Bonds. The Bondholders have demonstrated why this evidence is relevant and material and why they have no other means of obtaining it. By contrast, Respondents do not come close to demonstrating the compelling interest required to withhold the documents, relying instead on bald assertions of harm and the generic claim that discovery would "chill" intragovernmental discourse.

4.      *Third*, Respondents, who obviously had adverse interests, waived any privilege when they shared materials among each other, and particularly with ERS.

5.      *Fourth*, Puerto Rico's narrow executive privilege does not protect documents shared with any public employees, let alone outside advisors. Moreover, the executive privilege is qualified and can be overcome upon a showing of need, which the Bondholders have made.

6.     *Fifth*, Respondents cannot seriously defend their new, and facially defective, attorney-client privilege claims. As the Bondholders have pointed out before, Respondents have failed to satisfy their burden in claiming the attorney-client privilege.

## ARGUMENT

## I.     Respondents Fail To Carry Their Burden As To The Deliberative Process Privilege.

7.     Respondents' Opposition ignores the fact that Puerto Rico law is hostile to their claims of deliberative process privilege and places high barriers on their ability to invoke it. The Puerto Rico Supreme Court has held that because "the right of … citizens" "to have access to public information [is] a fundamental right of constitutional rank," claims of privilege by the government "must be scrutinized with particular zealousness." *Bhatia Gautier I*, 199 D.P.R. at 80, 86. "When claiming the confidentiality of official information, it is the *government* that has to prove *in a precise and unequivocal manner* the applicability of the privilege." *Id.* (emphasis added).

### A.     The Withheld Materials Are Postdecisional Because The Oversight Board Dictated The Destruction Of ERS And The Transfer Of Its Assets.

8.     It is settled law that *post*decisional materials—those that "explain[] or justify[] a decision already made"—are not protected by the deliberative process privilege. *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995); *see also, e.g.*, *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) ("[A] communication promulgating or implementing an established policy [is] not privileged."). Respondents nonetheless invoke the privilege over postdecisional materials explaining or carrying out decisions made by the Oversight Board no later than March 13, 2017. Mot. ¶¶ 13–19.

9.     Respondents claim that the March 13, 2017 certified fiscal plan "is a high-level" document with "only one slide on pension reform policy," while Joint Resolution 188 and Act 106 "include nearly 50 pages of detailed legislation." Opp. ¶ 12. But even the limited public record

shows this is false. When on March 13, 2017, the Oversight Board certified the revised fiscal plan, it included far more than "one slide" on pension reform, *id.*; the Board attached a *mandatory* amendment demanding that the Commonwealth (a) "liquidat[e] [ERS's] assets," (b) transfer the proceeds to the Commonwealth, and (c) "[s]witch to [a] pay-as-you-go model," diverting employer contributions from ERS to the Commonwealth itself. Mot. ¶ 17. Once the Board made this decision, Respondents could not take a different course: PROMESA prohibits Puerto Rico's Governor from submitting a budget (as he is constitutionally required to do, P.R. Const. art. IV, § 4) until the Oversight Board has certified a fiscal plan, 48 U.S.C. § 2141(c), and once the Board has certified a plan, the Commonwealth and its entities have no choice but to comply, *see id.* § 2142. Thus, once the Oversight Board required the Governor to include in his budget the mandatory amendment liquidating ERS's assets and transferring its assets to the Commonwealth, the die was cast. There was nothing more to deliberate about. The subsequent passage of Joint Resolution 188 and Act 106 simply "implement[ed] an established policy." *Jordan*, 591 F.2d at 774.

10.     Respondents claim that this would "elevate" the fiscal plan "to a status superior to the acts of the Puerto Rico Legislative Assembly" and render the "Board a supra-governmental authority." Opp. ¶ 10. This misses the point. Whatever may be the constitutional and statutory complexities of PROMESA (which are being, and have been, extensively litigated elsewhere), the public record here is unambiguous: the Oversight Board demanded that the Governor include the ERS-killing provisions in his budget, and the Governor did exactly that. The time for "deliberations" had come and gone and, with it, any basis to claim the predecisional privilege.

### B.     Some Of The Withheld Materials Contain Segregable Factual Information.

11.     Respondents may not withhold "purely factual material," even purely factual material "contained in deliberative memoranda [but] severable from its context." *EPA v. Mink*,

410 U.S. 73, 88 (1973). Yet Respondents admit that they have done just that. They claim privilege over matters that are obviously factual. Mot. ¶¶ 21, 23 (collecting examples).

12.     Respondents concede that "many of the withheld documents contain facts," but they insist that, because those facts were allegedly "assembled and developed for the sole purpose of facilitating the … deliberative process," they are somehow protected. Opp. ¶ 17. This, of course, is silly. *Every* fact within an otherwise deliberative document is presumably intended to "facilitate" discussion—why else would it be there? The test is whether "reve[aling]" the factual material "undoubtedly would divulge the substance of the related recommendatory sections." *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 562 (1st Cir. 1992). Respondents do not even try to answer this question. Their Opposition never explains, for example, how revealing "pension related inflows and outflows for FY2018" would necessarily reveal the *deliberations* to which those facts supposedly relate. And the accompanying declarations provide no help, either. Rather, they flatly assert—with no specificity—that "[a]ny factual information in these documents was prepared to facilitate deliberations" and that "[s]uch facts are intertwined with the deliberative material." Mahmud Decl. ¶ 7; Rodriguez Decl. ¶ 5; Pabón Decl. ¶ 6. That is not enough, particularly given the high bar for invoking the deliberative process privilege in Puerto Rico.

13.     Respondents also suggest that the standard here should be the one used to adjudge work product claims. Thus, they continue, any document prepared before deliberations may be withheld entirely by analogy to the "selection and compilation of documents by counsel," which "reveal[s] important aspects of [the attorney's] understanding of the case." Opp. ¶ 17 (quoting *Sporck v. Peil*, 759 F.2d 312, 316 (3rd Cir. 1985) (second alteration in original). This fails, of course, for the simple reason that these are two separate and distinct privileges, covering different people, serving different purposes, and protecting different things. *See Martin v. Office of Special*

*Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1187 (D.C. Cir. 1987) (unlike the "deliberative process privilege," "[t]he work-product privilege simply does not distinguish between factual and deliberative material."). And that, in turn, is why the work product doctrine is separately defined in Rule 26(b)(3). Respondents' argument would make the predecisional privilege almost absolute, despite the countless decisions holding that it is both a narrow privilege and a qualified one.

### C.   Respondents Have Not Properly Invoked The Deliberative Process Privilege.

14.   Finally, even after multiple attempts, Respondents still cannot meet the basic requirements of invoking the deliberative process privilege. Mot. ¶¶ 24–26. At the threshold, they did not file a *contemporaneous* declaration, which ensures that the decision to withhold comes from government officials, not their lawyers. Opp. ¶¶ 19–20. Their formulaic declarations prove why contemporaneous ones are required: the declarations repeat (in so many words) the descriptions from Respondents' privilege logs, combined with catchphrases associated with the deliberative process privilege. *See, e.g.*, Pabón Decl. ¶¶ 4–6; Rodriguez Decl. ¶¶ 4–5; Mahmud Decl. ¶¶ 4–5. Indeed, Respondents' declarations even contain statements transparently designed to respond to arguments the Bondholders made *after* the privilege was invoked, demonstrating again that counsel—not government officials—are driving this train. *E.g.*, Rodriguez Decl. ¶ 4 ("Deliberation and decision-making by ERS continued after the certification of the March 13, 2017 fiscal plan."); Pabón Decl. ¶ 4 (similar); Mahmud Decl. ¶ 4 (similar). Finally, the declarations by different officials are identical in several respects. *Compare* Pabón Decl. ¶ 6, *with* Mahmud Decl. ¶ 7, and Rodriguez Decl. ¶ 5; Rodriguez Decl. ¶ 4, *with* Pabón Decl. ¶ 4, and Mahmud Decl. ¶ 4; Pabón Decl. ¶ 7, *with* Mahmud Decl. ¶ 10; Pabón Decl. ¶ 6, *with* Mahmud Decl. ¶ 7.[1]

---

[1] This is not Respondents' only procedural error. For instance, they have not explained why 35 previously undisclosed senders and recipients were added to their first log. And they now attempt to assert the deliberative process privilege over "loose" documents that apparently were never sent to or received by anyone, *see* Opp. ¶ 21, without ever explaining how such documents could play into anyone's decision-making process.

## II.   The Bondholders' Need for the Documents Outweighs Any Harm from Disclosure.

15.     More fundamentally, the deliberative process privilege must give way if, as here, the "balance of interests" favors disclosure. *Bhatia Gautier I*, 199 D.P.R. at 88.

16.     *First*, Respondents insist that they prevail under the balancing test because the Bondholders have not explained how the withheld documents will shed light on whether their "collateral (if any)" is threatened by the stay. Opp. ¶ 22. Respondents already lost this fight. Respondents claim that the Bondholders are not entitled to relief from the stay because, after Joint Resolution 188 and Act 106, they have no collateral that could be diminished in value. But the Bondholders intend to show that the Bondholders' liens remain in place, because the new PayGo fees are simply the old ERS employer contributions in disguise. As the Court ruled at the April 1 hearing, in order to "follow[] the [Bondholders'] security interest," the Court and the Bondholders "need to understand … whether we're talking about the same funds or not." Tr. 33. The Bondholders are thus "entitled to figure out" how the laws in question "c[a]me to be"—"are we talking about the same funds, not the same funds, and where did they end up." Tr. 33.

17.     *Second*, Respondents argue that the Bondholders do not need the withheld materials because Respondents already have provided documents "that encompass the same general subjects and date range," such as a presentation discussing the "transition to pension reform" and a "spreadsheet with information related to employer contributions and pension reform." Opp. ¶ 23. This is manifestly false. The dismantling of ERS and the creation of the PayGo system was a multi-billion dollar undertaking that we know (from Respondents' document-by-document log) involved dozens of people from ERS, AAFAF, the Commonwealth and the Oversight Board, not to mention a small army of economists, actuaries, accountants, and consultants. Yet the smattering of documents produced so far is notable mostly for what is missing. In large part, Respondents' production consists of bank records and financial statements, government circulars and other

- 6 -

public documents, presentations describing the new PayGo system, spreadsheets showing the payments due from employers, and correspondence about the winding down of ERS. Perez Decl. ¶¶ 2–3. Inexplicably missing are documents that were undoubtedly created in the course of inventing the PayGo system. Certainly, based on the public records, there were communications between the Commonwealth and the Oversight Board about the Commonwealth's early fiscal plans that would have left ERS intact. There also must be documents in Respondents' files explaining why an entirely new structure was used, instead of simply modernizing the system ERS had in place for over 60 years, as it appears the Commonwealth itself wanted to do. Nor could it have gone without discussion whether ERS could not be resuscitated simply by increasing the level of employer contributions to levels sufficient to meet pension obligations (which, they say, is precisely how PayGo works). And, surely, this group also considered why it was necessary to dismantle ERS and confiscate all of its assets. Similarly, there must have been debate on whether it was necessary to divert the stream of employer contributions altogether to the Commonwealth instead of continuing to use ERS as the conduit for receiving the money. One suspects as well that there are documents where Respondents and their consultants commented on the fact that a felicitous side effect of this new system—if not its main purpose—was to divert the flow of employer contributions away from the Fiscal Agent, eviscerate the Bondholders' collateral, and improve Respondents' bargaining position in the impending PROMESA case.

18.    These are not idle questions. As we have said before, answers to them go directly to a central issue in the Stay Relief Motion. For if there is no good explanation why the time-worn ERS system was thrown out in favor of a largely identical new PayGo system, then the inescapable conclusion will be that Respondents had ulterior motives. The fact that a main feature of PayGo was to divert the flow of employer contributions—relabeled "PayGo fees"—around the

Bondholders' collateral package is strongly probative of the fact that the old ERS employer contributions and the new PayGo fees are one and the same. It is also probative of the further conclusions that the Bondholders' liens continue to attach to the PayGo fees and that the value of their collateral is being diminished by the Commonwealth's monthly dissipation of those monies.

19.     *Finally*, Respondents seek refuge in the boilerplate assertion that disclosing the documents would "chill discussions." Opp. ¶ 24. Court after court has held that the general interest in keeping deliberations hidden cannot trump a litigant's need for information going to the heart of its claim against the government. *See, e.g.*, *In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*, 145 F.3d 1422 (D.C. Cir. 1998) (ordering disclosure of documents related to whether the government caused a fraudulent conveyance); *Fairholme Funds, Inc. v. United States*, 128 Fed. Cl. 410 (2016) (ordering disclosure of documents related to whether the government took shareholders' property); *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35 (D. Mass. 2008) (ordering disclosure of documents showing the government's knowledge). Indeed, courts have repeatedly ordered disclosure of materials *connected with the legislative process* in such cases. *See, e.g.*, *Bhatia Gautier v. Gobernador*, Civil No. SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) (ordering disclosure of the draft fiscal plan submitted by the Governor to the Oversight Board); *Marilley v. McCamman*, 2012 WL 4120633, at *2–3 (N.D. Cal. Sept. 19, 2012) (ordering disclosure of "draft enrolled bill reports, draft bill analyses, a final bill analysis, and a draft proposed amendment" prepared by an executive agency); *Cal. State Foster Parent Ass'n v. Wagner*, 2008 Wl 2872775, at *1, 4–6 (N.D. Cal. July 23, 2008) (ordering disclosure of "six legislative analyses" prepared by the Department of Social Services).

## III.   Respondents Waived Any Privilege For Materials Shared With Each Other.

20.     Even if the withheld materials were privileged, Respondents have waived privilege over documents shared with each other, and particularly those shared with ERS. Mot. ¶¶ 35–37.

21.     Respondents insist that "the Commonwealth and ERS share a common interest regarding safeguarding pension benefits." Opp. ¶ 27. But as the Bondholders explained in addressing Respondents' attorney-client privilege claims, ERS is a separate, independent legal entity, created specifically to occupy a creditor position vis-à-vis the Commonwealth. *See* ¶¶ 13–19, Dkt. No. 462 in Case No. 17-3566. At the time of ERS's Title III filing, the Commonwealth owed ERS more than half a billion dollars in unpaid employer contributions. *Id.* In fact, one feature of PayGo was to relieve the Commonwealth of these overdue obligations to ERS. Although ERS and the Commonwealth may have had a *common objective* in negotiating that transaction, that does not translate to a *common interest* for privilege purposes. ERS and the other Respondents are obviously adverse parties, even if it were true that they were trying to work out their differences.

22.     Respondents have also waived privilege with respect to any document shared among them because each has distinct, adverse legal interests. Mot. ¶ 36. Respondents admit that they "may have differing interests in certain aspects of the fiscal plans, budgets, or other policy matters," but insist that they may still share privileged materials because they are all part of Puerto Rico's government. Opp. ¶ 28. Puerto Rico courts have said otherwise. In *Bhatia Gautier II*, for example, the court ordered the Governor to disclose a draft fiscal plan sent to the Oversight Board in part *because of* the Board's distinct legal status. *See Bhatia Gautier II*, at 22. (Respondents do not even mention *Bhatia Gautier II*, let alone explain how it is consistent with their arguments.) Moreover, the First Circuit has rejected the argument that the Board is a part of the Puerto Rico government. *See Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856–59 (1st Cir. 2019); *see also Altair Glob. Credit Opportunities Fund (A), LLC v. United States*, 138 Fed. Cl. 742, 761–64 (2018).

## IV.   Respondents Fail To Carry Their Burden As To The Executive Privilege.

23.     The executive privilege is a narrow privilege that protects only "communications between the [Governor] and his respective subordinates, counselors or assistants." *Bhatia Gautier*

*I*, 199 D.P.R. at 89. AAFAF, an independent government entity, and its third party advisors not even employed by the Puerto Rico government (*e.g.*, Elias Sanchez Sifonte) are not protected by the privilege. Respondents argue for an expansion of the executive privilege to communications between the Governor and "public employees." Opp. ¶ 29. But Respondents' two cases do not support that argument. *See Bhatia Gautier I*, 199 D.P.R. at 89 (the executive privilege extends to the Governor's "subordinates, counselors or assistants"); *Bhatia-Gautier II*, at 22 (finding on remand that the privilege did not protect communications with a separate public entity); *Corporación Insular de Seguros v. García*, 709 F. Supp. 288, 295–96 (D.P.R. 1989) (finding "no support or call for a state secrets executive privilege"); *see also In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("the privilege should not extend to staff . . . in executive branch agencies").

24.     In any event, Respondents do not dispute that the executive privilege is qualified and the Court must "weigh the conflicting interests" in determining whether materials should be disclosed. *Bhatia Gautier I*, 199 D.P.R. at 90. As discussed above, Respondents' claims of executive privilege are outweighed by the Bondholders' need for this evidence. *Supra* ¶¶ 15–19.

## V.     Respondents' New Claims Of Attorney-Client Privilege And Work Product Fail.

25.     Finally, rather than defend the 81 new attorney-client privilege claims, Respondents say only that the new claims "should come as no surprise" because their logs "were produced in roughly a week, on the abbreviated schedule Movants demanded." Opp. ¶ 32. Respondents were required to complete their privilege logs on this schedule because they did *nothing* for almost five weeks after the Bondholders served discovery. Respondents' carelessly-prepared privilege logs and haphazard claims of privilege are not the Bondholders' fault. Respondents cannot claim privilege as a matter of convenience without substantiating their claims. [2]

---

[2] For the Court's convenience, the Addendum to this brief provides the relevant document numbers for each argument.

## **CONCLUSION**

For the reasons above and in the Motion, the Court should compel Respondents to produce all documents withheld under the deliberative process and executive privileges. In the alternative, and at a minimum, the Court should review a selection of the documents *in camera*.

In San Juan, Puerto Rico, today April 26, 2019.

*/s/ Alfredo Fernández-Martínez*
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

*/s/ Bruce Bennett*
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Cheryl T. Sloane

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

**ADDENDUM**

| Argument | Document Nos. |
|---|---|
| Post-decisional materials | 20–22, 24–123 |
| Factual information | 1, 5, 7–10, 12–17, 20, 22, 24, 27–30, 32–33, 35–45, 47–49, 51, 54–60, 65–66, 85–86, 105, 122 |
| No Contemporaneous Affidavit | 1–22, 24–123 |
| Unidentified Senders/Recipients | 3–4, 10, 13–14, 16–17, 20, 22, 29, 32, 34, 48, 59, 65–66, 77, 79, 81, 83, 87, 88, 105, 110, 116–117, 120–121 |
| No Author or Recipient | 72, 107–108, 112 |
| Substantial Need | 1–123 |
| Waiver | 12–14, 16–17, 20–22, 32, 35–36, 48, 51, 65–66, 89, 114–115 |
| No Executive Privilege for AAFAF | 12, 22–23, 74, 78, 82, 84, 100, 104, 110, 116–118, 123 |
| No Executive Privilege for Third Parties | 12, 22, 78, 118 |
| Not Described as Lawyer on Categorical Log | 12, 22, 78, 118 |
| No Legal Advice | 13–17, 22, 24, 49, 51, 54–60, 87 |
| No Lawyer | 87, 88 |
| Non-lawyer third party | 13–14, 16–17, 21–22, 51 |