```
 1                    UNITED STATES BANKRUPTCY COURT

 2                      DISTRICT OF PUERTO RICO

 3
     In Re:                      )      Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,                )      (Jointly Administered)
                                 )
 7   as representative of        )
                                 )
 8   The Commonwealth of         )
     Puerto Rico, et al.,        )      April 24, 2019
 9                               )
                 Debtors.        )
10
     _____
11
     In Re:                      )      Docket No. 3:17-BK-3566(LTS)
12                               )
                                 )      PROMESA Title III
13   The Financial Oversight and )
     Management Board for        )
14   Puerto Rico,                )      (Jointly Administered)
                                 )
15   as representative of        )
                                 )
16   Employees Retirement System )
     of the Government of the    )
17   Commonwealth of             )
     Puerto Rico,                )
18                               )
                 Debtor.         )
19
     _____
20

21

22

23

24

25
```

```
_____

In Re:                      )     Docket No. 3:17-BK-4780(LTS)
                            )
                            )     PROMESA Title III
The Financial Oversight and )
Management Board for        )
Puerto Rico,                )     (Jointly Administered)
                            )
as representative of        )
                            )
Puerto Rico Electric        )
Power Authority,            )
                            )
              Debtor.       )
_____

Employees Retirement        )     Docket No. 3:17-AP-213(LTS)
System of the Government of )
the Commonwealth of         )
Puerto Rico,                )
                            )     Re: 3:17-BK-3566(LTS)
              Plaintiff,    )
                            )
v.                          )
                            )
Altair Global Credit        )
Opportunities Fund (A),     )
LLC, et al.,                )
                            )
              Defendants.   )
_____


                    OMNIBUS HEARING

   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

             UNITED STATES DISTRICT COURT JUDGE

_____
```

```
 1   APPEARANCES:

 2   For The Commonwealth
     of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
 3                            Mr. Brian S. Rosen, PHV
                              Ms. Margaret A. Dale, PHV
 4                            Mr. Gregg M. Mashberg, Esq.
                                  Appearing in New York
 5
     For the U.S. Trustee
 6   Region 21:               Ms. Monsita Lecaroz Arribas, AUST

 7   For Official Committee
     of Unsecured Creditors:  Mr. Luc A. Despins, PHV
 8                            Mr. G. Alexander Bongartz, PHV

 9   For Puerto Rico Fiscal
     Agency and Financial
10   Advisory Authority:      Mr. Peter Friedman, PHV
                              Ms. Suzzanne Uhland, PHV
11                            Ms. Diana Perez, PHV

12   For Federal Oversight
     and Management Board
13   Special Claims
     Committee:               Mr. Edward S. Weisfelner, PHV
14                            Ms. Sunni P. Beville, PHV
     For Ad Hoc Group of
15   General Obligation
     Bondholders:             Mr. Mark T. Stancil, PHV
16
     For Ambac Assurance
17   Corporation:             Ms. Atara Miller, PHV
                              Mr. Grant R. Mainland, PHV
18
     For The Lawful
19   Constitutional Debt
     Coalition:               Mr. Susheel Kirpalani, PHV
20                                Appearing in New York

21   For Assured Guaranty
     Corporation and Assured
22   Guaranty Municipal
     Corporation:             Mr. Thomas J. Curtin, PHV
23

24

25
```

```
 1   APPEARANCES, Continued:

 2   For the Official
     Committee of Retired
 3   Employees of the
     Commonwealth of
 4   Puerto Rico:              Mr. Landon Raiford, PHV

 5   For the Puerto Rico
     Funds:                    Mr. Jason N. Zakia, PHV
 6
     For the QTCB Noteholder
 7   Group:                    Ms. Shannon B. Wolf, PHV

 8   For Plaintiffs Ann
     Catesby Jones and
 9   Jorge Valdes
     Llauger:                  Ms. Elizabeth A. Fegan, PHV
10
     For Andalusian:          Mr. Bruce Bennett, PHV
11
     For National Public
12   Finance Guarantee
     Corporation:             Mr. Gabriel A. Morgan, PHV
13                            Mr. Robert Berezin, PHV

14   For the Oppenheimer
     Funds, Inc.:             Mr. Thomas Moers Mayer, PHV
15
     For the Fee Examiner:    Ms. Katherine Stadler, PHV
16
     For Peter Hein:          Mr. Peter C. Hein, Pro Se
17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                              I N D E X

 2   WITNESSES:                                     PAGE

 3        None offered.

 4

 5   EXHIBITS:                                      PAGE

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                        San Juan, Puerto Rico

 2                                        April 24, 2019

 3                                        At or about 9:41 AM

 4                        *      *      *

 5          THE COURT:  Good morning.  Welcome, Counsel, parties

 6   in interest, and members of the public and press here in San

 7   Juan, those observing here and in New York, and the telephonic

 8   participants.  As always, it is good to be back in Puerto

 9   Rico.

10          I remind you that consistent with court and judicial

11   conference policies and the Orders that have been issued,

12   there is to be no use of any electronic devices in the

13   courtroom to communicate with any person, source, or outside

14   repository of information, nor to record any part of the

15   proceedings.  Thus, all electronic devices must be turned off

16   unless you are using a particular device to take notes or to

17   refer to notes or documents that are already on the device.

18          All audible signals, including vibration features,

19   must be turned off.  And no recording or retransmission of the

20   hearing is permitted to any person, including but not limited

21   to the parties, or the press, whether or not you are

22   physically in the courtroom.  Anyone who is observed or

23   otherwise found to have been texting, e-mailing or otherwise

24   communicating with a device from the courtroom during the

25   proceeding will be subject to sanctions, including but not
```

1    limited to confiscation of the device and the denial of future

2    requests to bring devices into the courtroom.

3         I would like to note that the Clerk of Court of the

4    Southern District of New York, Ruby Krajick, has joined us

5    here today, and we are so pleased that she has come to be at

6    today's hearing.

7         Last night the Court received and reviewed the Urgent

8    Motion of AAFAF, PREPA, the Oversight Board and Assured in

9    connection with the PREPA receiver motion seeking a further

10   one week adjournment of various deadlines.  I think it

11   expedient to hear any opposition to that motion -- and I

12   assume that if there's going to be opposition, it will be from

13   National -- to hear that today orally after the Fee Examiner's

14   presentation.  And for everyone's information, I'll say that

15   the available dates for an adjourned hearing on that motion

16   would be June 13th and 14th in connection with the June Omni,

17   or the following week in New York, because the two dates that

18   were proposed in the Urgent Motion are not available.

19        And so with that, I'll turn to the Oversight Board

20   for the status report.

21        Good morning, Mr. Bienenstock.

22        MR. BIENENSTOCK:   Good morning, Judge Swain, and

23   thank you.

24        In connection with the first item, the status report,

25   the Court inquired about the general status and activities of

1    the Oversight Board.  There are multiple components to those

2    activities.

3         First, there are ongoing discussions with the

4    government about the formulation and updating of fiscal plans

5    for the Commonwealth, PREPA, HTA, UPR and PRASA taking into

6    account the most up-to-date data available.  The Commonwealth

7    fiscal plan certification is expected on May 9, 2019.  The

8    Oversight Board also expects to certify the updated fiscal

9    plans for PREPA, HTA, UPR and PRASA in late May or early June

10   of 2019.

11        The budget process is on track, and the Board expects

12   to certify the 2020 budgets for the Commonwealth and

13   instrumentalities before the June 30 fiscal year end of the

14   current fiscal year.  The budget process will revert to the

15   Governor on May 10, and to the legislature, two weeks later.

16        Your Honor, among the most critical functions of the

17   Oversight Board is something that doesn't really occur in this

18   Court, but it's critical to the overall mission, and that is

19   the monitoring and moving along of the implementation of the

20   numerous measures in the Certified Fiscal Plan across all

21   government agencies, branches and public corporations.  The

22   Oversight Board's personnel, starting with its executive

23   director, spend a lot of time on that monumental task, which

24   is critical to obtaining the benefits of the reforms

25   contemplated in the fiscal plans.  So that is ongoing.

1          The third component of the activities of the Board

2     concerns the work with the government on PREPA's

3     transformation, which is proceeding on target.  And that is

4     also a critical component of the overall turn around and hope

5     for a sustainable economy.

6          On October 31, 2018, the P3 Authority issued its

7     request or issued really its instructions concerning

8     requirements and procedures for potential investors to

9     ultimately submit proposals.  The response deadline was

10    December 5, 2018.

11         On January 17, 2019, the P3 Authority announced

12    selection of four proponents to review and participate in the

13    RFP, Request For Proposal stage.  That stage commenced in

14    February, 2019.

15         It is anticipated that proposals pursuant to the RFP

16    will be submitted to the P3 committee in mid July 2019.  These

17    proposals will be evaluated by the Board, the P3 Authority and

18    AAFAF, and definitive documentation, including contracts, will

19    be distributed and negotiated.  The RFP process will likely

20    culminate in September, 2019.  Sign off is required by the

21    Board and AAFAF before going forward with the proposal.

22         It is anticipated that a concession or similar

23    transaction for the privatization of PREPA's transmission and

24    distribution system can be consummated by the second quarter

25    of 2020.  In addition, in respect to PREPA, Your Honor,

1    negotiations with the government, the Ad Hoc Group of Insured

2    PREPA Bondholders, and some of its major monoline insurers are

3    all ongoing, and I'm pleased to report, or the Board is

4    pleased to report that the negotiations are very promising at

5    this point.  And that has to do with the motion Your Honor

6    said you might hear I guess after the Fee Examiner's report.

7         In addition, moving aside from PREPA, negotiations

8    with the Statutory Retirees Committee and unions about a

9    Commonwealth Plan of Adjustment are proceeding and are also

10   very promising.  Your Honor, those negotiations cannot be

11   understated in their importance in the overall turnaround.  We

12   could have the best possible debt restructuring and yet fail

13   at our mission if the pension situation and the union

14   situation and contracts are not aligned for their mutual

15   benefit and the benefit of the Commonwealth, so that it can

16   have an establishable, positive economic recovery.

17        Your Honor doesn't see the unions too often in this

18   court, and we're happy to report we see them a lot across the

19   table.  And they've been very constructive.  And as I said,

20   the negotiations are very promising to arrive at a mutually

21   agreeable arrangement both for the workers, who are the

22   backbone of the Commonwealth, and for the Commonwealth's

23   economy going forward.

24        Negotiations with various blocks of Commonwealth debt

25   about a plan of adjustment are always proceeding and are in

1   different stages, but they're all somewhat positive.  We are

2   not negotiating with all holders of Commonwealth debt, and I

3   don't want to give the impression that a deal with the GO debt

4   is imminent, but different blocks, principals, Your Honor --

5   some debt holders we call cross holders, because they own more

6   than one type of debt.  And different blocks are negotiating,

7   and that's all in process.  And we're heartened by the

8   progress since the last Omnibus.

9       We've also had negotiations with the Statutory

10   Creditors Committee about its role in various claim objections

11   and avoidance actions, and to a large extent, have resolved

12   matters.  And some, as Your Honor knows, are on today's

13   agenda.

14       We've also made assessments of which public debt may

15   not be wholly or partially allowable.  And as Your Honor

16   knows, there are pending objections to the allowability of

17   certain of the debt based on the investigations that the Board

18   has conducted and the input of its various advisors.

19       And finally, Your Honor, there's been a continued

20   defense of the Oversight Board against all of the complaints,

21   motions and appeals that are matters of public record, that I

22   won't belabor the record further, because I think everyone's

23   familiar with them.  But they are obviously multitudinous and

24   require a lot of time.

25       The second item in Your Honor's instructions in

1  respect to the status report referred to status of mediation.

2  The Oversight Board has mediated with the Puerto Rico Judges'

3  Association about the treatment of their retirement benefits,

4  and those discussions, which are with the benefit of the

5  mediators, are ongoing.  Because of the confidentiality

6  agreement governing the mediations, I cannot report on what

7  happened when the mediators and the GO parties reconvened in

8  February, but based on my previous statements about ongoing

9  negotiations with various significant creditor groups, I can

10  say progress towards Commonwealth and PREPA plans of

11  adjustment is definitely being made, and that we, and I think

12  the creditors, keep the mediators apprised of how things are

13  shaping up.  And we discuss whether the more formal mediation

14  should become more active.  The Oversight Board has also

15  always supported the judicial mediation.

16       In terms of the anticipated next step for the

17  Oversight Board, Your Honor, the Oversight Board is trying to

18  bring to fruition all of the negotiations I've mentioned.  The

19  Board will be turning its attention to the certification of

20  fiscal plans and new budgets for the fiscal year beginning

21  July 1, 2019, so that will also occupy a lot of time between

22  now and June 30.

23       In respect to the Court's question about the

24  anticipated issuance of the First Circuit mandate, as I'm sure

25  the Court knows, the Oversight Board filed its petition for

13

```
 1   certiorari with the United States Supreme Court yesterday.  We
 2   anticipate imminently filing a motion with the First Circuit
 3   to stay its decision and the issuance of its mandate pending
 4   the Supreme Court's final determination of the issue.
 5           We hope the First Circuit will grant the stay.  If
 6   not, the Oversight Board anticipates requesting a stay from
 7   the United States Supreme Court.  There is also the
 8   possibility that President Trump will request the United
 9   States Senate to confirm seven board members, but we do not
10   speculate about whether or when that is likely.
11           Your Honor, subject to any comments or questions Your
12   Honor might have, that's the status report.
13           THE COURT:  Thank you.  I have no further questions
14   at this time.
15           Mr. Despins.
16           MR. DESPINS:  Good morning, Your Honor.
17           THE COURT:  Good morning.
18           MR. DESPINS:  Luc Despins with Paul Hastings on
19   behalf of the Committee.
20           So this will be very brief, just to say that, because
21   I want to make sure that the Court continues to know this,
22   that the Committee, despite what was said at the last hearing
23   and in discussions with counsel for the Oversight Board, the
24   Committee is not being included in the plan discussions.
25   We're -- I don't think we need to say more than that.  I just
```

1  wanted to make sure you understood that.

2          The only issue that concerns me, Your Honor, and it

3  didn't happen today but it's happened at prior hearings, is

4  the issue of referring to the mediation and what the mediators

5  are saying.  I thought it was very clear that that was really

6  prohibited.

7          At the hearing, the last Omnibus Hearing,

8  Mr. Bienenstock talked about the mediators including or not

9  including certain parties.  You know, that's totally

10 inappropriate.  And the last hearing in New York, Mr. Rosen

11 talked about the same thing, which is that mediators have

12 decided this or that.

13         I just don't know how to say this other than there's

14 only one Court, and that is this Court.  And we cannot have

15 references to decisions made by mediators.  The mediators are

16 trying to cut a deal on a plan.  It's wonderful.  They should

17 continue to do that.  But we cannot have people using that as

18 a sword or as a -- in court.

19         And I wanted to -- we didn't say anything last time

20 because there were a lot of things going on, but I want to

21 make sure the record is clear that the Committee believes any

22 reference to mediation, other than saying it's ongoing or not,

23 but any references to what the mediators are doing or decided

24 to do or not to do is not appropriate in the courtroom.

25         THE COURT:  I will just say that I heard

1  Mr. Bienenstock's remarks today, and I recall the remarks at

2  the earlier Omni as being discrete and at the level of things

3  are active or not active.  And it's certainly not my intent,

4  and the mediation team and I have undertaken not to use

5  mediation as a whipsaw with anybody.  And I don't hear myself

6  being invited to use it as a whipsaw with anybody.

7          Having said that, I am concerned and will continue to

8  be concerned that the mediation process, which is

9  sophisticated and available, be used robustly and

10 appropriately; and that we don't devolve into a litigation

11 only scenario that could be far less efficient and productive

12 than a scenario that involves people talking to each other and

13 trying to work things out sooner rather than later, because of

14 course time is of the essence and precious in this situation

15 that involves the life and future of Puerto Rico.

16         So I think I've made that obvious to everyone from

17 the first day.

18         MR. DESPINS:  Yes.

19         THE COURT:  Mediation's a key element, so I'm asking

20 is that element happening essentially --

21         MR. DESPINS:  Yes.

22         THE COURT:  -- when I ask for these status reports.

23 And I'm looking essentially for a yes or no type answer, and

24 that's what I feel I've gotten at a high level.

25         MR. DESPINS:  And the remarks made today were

1   perfectly within those boundaries.  I'm referring to remarks

2   made, for example, at the last hearing on Wednesday where, you

3   know, there was a discussion by Mr. Rosen about the mediators

4   didn't want this party involved or that party involved.

5        That's on the record.  I know that.  I heard that.

6   We cannot have that.  And that was my only point.  But the

7   remarks made today were perfectly appropriate, and we agree,

8   we support mediation.  We want to resolve things consensually,

9   and we want to be involved in that process.

10       Thank you, Your Honor.

11       THE COURT:  Thank you.

12       All right.  So let's move on to Item II on the

13  Agenda, the report from the Fee Examiner, which corresponds to

14  ECF entry number 6374 in the 3283 case.

15       Good morning, Ms. Stadler.

16       MS. STADLER:  Good morning, Judge.  Thank you.

17  We'll be very brief today.

18       We filed a supplemental report recommending 12

19  additional fourth interim applications, which covered June

20  through September of 2018.  Those recommendations we believe

21  are clear and uncontroversial, and we are asking the Court to

22  enter an Interim Order approving those applications.

23       And then there is also an Interim Order that one of

24  those applications is final, because the professional

25  submitting that application has completed his work on these

1    cases.

2         We are currently reviewing the applications for the

3    fifth interim period, which ran from October 2018 to January

4    2019.  We expect to report on those applications and the

5    issues raised there in the June Omnibus Hearing.  And I'm

6    happy to answer any questions you have for me or the Fee

7    Examiner.

8         THE COURT:  And I gather you're also asking that the

9    presumptive standard issue be carried over to the June Omni as

10   well?

11        MS. STADLER:   Yes, Judge.  We had very productive

12   discussions yesterday with some of the interested parties and

13   constituencies, and we expect to have a submission to the

14   Court in time to be considered at the June Omnibus.

15        THE COURT:  Thank you.

16        Well, I've reviewed the written submission carefully,

17   and with these additional remarks, I have no further

18   questions.  And I thank you and I thank the Fee Examiner for

19   your ongoing work on these matters.

20        The Court will enter an Order approving the fee

21   applications listed in Exhibit A to the motion and the final

22   fee application listed in Exhibit B to the motion.  And the

23   Court will consider the fee applications listed as part of

24   Exhibit C to the motion, as well as the additional presumptive

25   standards motion, at the June Omnibus hearing.

1          MS. STADLER:   Thank you, Judge.  With that, may we

2    be excused?

3          THE COURT:  Yes.  Thank you, Ms. Stadler.

4          MS. STADLER:   Thank you.

5          THE COURT:  So I would like to take up the PREPA

6    receiver motion time extension application now.  Is counsel

7    for National here?

8          Thank you.

9          MR. MORGAN:  Good morning, Your Honor.  Gabe Morgan

10   of Weil, Gotshal and Manges on behalf of National Public

11   Finance Guarantee Corporation.

12         THE COURT:  Good morning, Mr. Morgan.

13         MR. MORGAN:  If I could indulge Your Honor for a

14   slight delay in taking this matter up, we have counsel in New

15   York that will come to the courthouse there and be happy to

16   make their -- National does oppose the request, and so we'll

17   be happy to make the arguments against the requested extension

18   if we can have a little more time to have someone appear

19   there.

20         THE COURT:  That's fine.  Do you have a sense of --

21   so somebody has to come downtown to the courthouse?

22         MR. MORGAN:  Somebody has already left the office and

23   is heading downtown, so --

24         THE COURT:  All right.  So later in the morning?

25         MR. MORGAN:  That should work.  And I'm happy to

1    advise the Oversight Board's counsel once we have someone in

2    place, and they can work it back into the agenda.

3            THE COURT:  I'll look for a signal later then.

4            MR. MORGAN:  Thank you, Your Honor.

5            THE COURT:  So we'll go on to Item III on the Agenda,

6    the uncontested matters, which are the objections to the

7    individual claims.

8            And Mr. Rosen, I noticed a technical issue with

9    respect to these, and so I just want to front this.  As I read

10   Rule 3007(A)(1), an objection has to be noticed up 30 days

11   before the scheduled hearing date.  And since these seem to

12   have been noticed up more in consistency with the CMO, it was

13   only a 27-day period before today's date.  And so even though

14   there hasn't been an objection or any response in accordance

15   with the timetable in the Order, it seems to me prudent to

16   just formally adjourn these two out to the June Omni so that

17   we clearly have 30 days; and to require the Board to, within

18   seven days, provide notice to the claimants of the new hearing

19   date, and file an informative motion indicating that that

20   notice has been filed.

21           MR. ROSEN:  We'll do that, Your Honor.

22           I also wanted to take the opportunity just to give

23   you sort of a status update about the claims process.

24           THE COURT:  Great.

25           MR. ROSEN:  Because we've made some other comments

1  over time, and I just wanted you to be aware what was going

2  on.

3          Your Honor, as we indicated, there have been about

4  165,000 claims filed.  As the Court is aware, we filed, in

5  connection with COFINA, about 19 other omnibus objections and

6  other claim objections that the Court has already ruled upon.

7  And we filed additional omnibus claims objections, I think

8  approximately 15 more, within the last week or so that will be

9  scheduled for the June Omnibus Hearing date.

10         The two claims that you've just adjourned, Your

11  Honor, you know that I've talked about in the past 43 trillion

12  dollars worth of claims that have been filed against the

13  Commonwealth.  These two claims themselves account for 42 of

14  the 43 trillion in claims.  One is approximately 32 trillion

15  dollars, and the other is just shy of ten trillion dollars.

16  And of course they were filed with nothing supporting it, but

17  we'll deal with those as we get later on, Your Honor.

18         The other thing I wanted to brief the Court about is

19  -- because at the March Omnibus Hearing we talked about

20  filing, and having heard at this hearing ADR procedures, and

21  we have been working very, very closely with the

22  Administrative Office, Ms. Abdelmasieh, and getting those

23  procedures I believe more in line with what the Administrative

24  Office is thinking about and through whatever communications

25  they might be having with the Clerk of the Court, so we can

1    deal with those on an expedited basis, as well as a basis

2    which is going to be most convenient for the Court.

3           There are approximately ten -- well, there are tens

4    of thousands of claims which might have to be subject to the

5    ADR process, Your Honor, and we're just trying to come up with

6    something that works for all parties.  As part of that, we've

7    been working with the O'Melveny team, as well as the Unsecured

8    Creditors Committee, and passing back and forth initially

9    procedures.  And now we have to get to them the new procedures

10   that have been developed in connection with the Administrative

11   Office.

12          It is our hope, and I say hope, Your Honor, that we

13   will be in a position to file those within two weeks.  So they

14   will also be heard at the June Omnibus or even before that if

15   the Court has some time, because we would like to get the

16   claims reconciliation process moving sooner rather than later

17   because of the magnitude of the number of claims themselves.

18          We will also be filing, Your Honor, another Omnibus

19   Motion to modify some of the existing procedures that the

20   Court approved.  One, most notably, would be increasing the

21   number of claims which might be subject to an Omnibus

22   objection.  Again, if we were to continue down the path of 500

23   per Omnibus, we would be dealing with these claims probably

24   about ten years from now.  So in as much as -- and we've

25   worked this through with the Administrative Office, and they

1    have agreed that increasing the number to a much higher number

2    would be workable from the Court's perspective.

3            So again, we will file that, Your Honor, within the

4    next two weeks.

5            THE COURT:  Thank you for that update and ongoing

6    work.

7            MR. ROSEN:  Thank you.

8            MR. DESPINS:  Your Honor.

9            THE COURT:  Yes, Mr. Despins.

10           MR. DESPINS:  Your Honor, as Mr. Rosen just

11   described, there are extensive discussions going on with the

12   Administrative Office.  I don't know exactly what that is but

13   I suspect what they do.  The Committee is not involved in

14   that.  We've asked to be involved.  Not to be argumentative,

15   but if they have concerns about what we're proposing, we would

16   like to interface with them to see how we can work this out,

17   not through the filter of the debtor.

18           We would like to be able to communicate with them or

19   at least see what their concerns are, because there's been

20   extensive communications, as Mr. Rosen described.  And as far

21   as I know, I don't think there's any privilege to these

22   discussions.  I think we're -- we're not trying to be

23   argumentative here, but these issues of dealing with claims,

24   this is what the Committee is largely all about.

25           And we want to be part of the process to develop up

```
 1   these procedures rather than coming to court and saying, hey,

 2   we don't like those procedures for the following reasons.

 3   We'll never know if we could have proposed other procedures

 4   that would have met with someone else's approval.  And that's

 5   why we're asking to be involved in these discussions, Your

 6   Honor.  And that's it.

 7            THE COURT:  Well, the Administrative Office is

 8   filtering and channeling the concerns and understandings of

 9   the third branch as to what's feasible and what's workable.

10   So I'll say this:  If you have particular questions or a

11   particular proposal that you would like to ask the

12   Administrative Office to consider reacting to, you can request

13   that Mr. Rosen provide --

14            MR. DESPINS:  Okay.

15            THE COURT:  -- a document to the Administrative

16   Office.  And I can't speak for how they will manage that.  I

17   think they're not intending to convene, you know, meetings or

18   focus groups, and I'm not saying that in a flippant way.

19            MR. DESPINS:  No, of course not.

20            THE COURT:  But if you have something specific to be

21   transmitted --

22            MR. DESPINS:  Yes.

23            THE COURT:  -- as a request, you can transmit it

24   through Mr. Rosen, who I gather is the one directly --

25            MR. DESPINS:  Okay.
```

```
1              THE COURT:  -- in touch with the point person at the

2    AO.

3              MR. DESPINS:  We will do that, Your Honor.  Thank

4    you.

5              THE COURT:  Thank you.

6              All right.  So this takes us to the first contested

7    matter, which is the Motion for Approval of the Revised

8    Stipulation relating to joint prosecution of certain causes of

9    action, which is ECF number 6305 in the 3283 matter.  We've

10   allotted a total of 30 minutes for this motion, and I

11   understand that Mr. Despins will open.

12             And I understand that you had asked for ten minutes.

13   Do you want to reserve reply time?

14             MR. DESPINS:  Actually, Your Honor, let me preempt

15   that, because we had some discussions this morning just before

16   court that are still ongoing.  It involves a number of

17   parties, and we would ask, with Your Honor's indulgence, to

18   allow us to push that over to later on the agenda, which could

19   be productive.  I don't want to over promise, but it could be

20   productive.

21             THE COURT:  All right.  So you will let me know when

22   it's time to bring it back?

23             MR. DESPINS:  Yes, Your Honor.

24             THE COURT:  All right.  We will do that.  I'm making

25   a list of what's going to be on essentially second call.
```

1          MR. DESPINS:  And I know we're not in the state

2     court, but I think yes, that's what we're doing.

3          THE COURT:  In Bankruptcy Court in Brooklyn, we used

4     to have second call, also.

5          MR. DESPINS:  And, Your Honor, the same issue but a

6     different timing for the next motion.  This was the

7     Committee's motion to establish procedures to govern the

8     objection to the ERS bondholder claims.

9          THE COURT:  Yes.

10         MR. DESPINS:  Yesterday, I forget at what time,

11    three, four o'clock, the Retiree Committee filed their own

12    objection to the bondholders' claims.  So as a result of that,

13    it doesn't make sense for us to go forward to establish

14    procedures just for our objection, because then we may have to

15    do this twice.

16         So we need to table that, unfortunately, to --

17    hopefully it will be soon, in the next ten days or so, where

18    we would come back to Your Honor and say, okay, we have the

19    Retirees Committee objection.  Their objection is both on the

20    Commonwealth side and the ERS side, so we may have to deal

21    with that issue, but I don't think it makes sense to -- for

22    Your Honor to consider entering a Procedure Order for our

23    objection when there will be an objection right behind it that

24    would seek the same or a similar request.

25         And I think -- so unfortunately, I apologize, this

1   just happened yesterday -- that the best thing to do would be

2   to table that motion for now.

3          THE COURT:  Let me tell you this:  With respect to

4   your motion, after reviewing the papers, my strong inclination

5   was to adjourn your Procedures Motion to the June Omni and

6   consider it in coordination with the objection to the

7   continued existence of the Committee as such in ERS --

8          MR. DESPINS:  Okay.

9          THE COURT:  -- and so I was going to invite any

10   argument about that adjournment here but not entertain the

11   merits of the Procedures Motion.  So are you comfortable with

12   consenting to an adjournment, in light of all of these

13   circumstances, of your Procedures Motion to the June Omni?

14          MR. DESPINS:  Of course, Your Honor.

15          THE COURT:  Very well.  So that is adjourned to the

16   June Omni.  Thank you.  And I was referring to ECF number

17   5589, which was IV.2 of the Agenda.

18          And so the next item on the Agenda, Item IV.3, is the

19   GO Bondholders' Motion to Establish Procedures regarding an

20   Omnibus conditional objection to the claims of PBA

21   bondholders, which is ECF number 6104.

22          And, Mr. Stancil, I've been told that you intend to

23   open with a 22 and a half minute allocation out of the total

24   45 minutes.  Do you want to reserve anything for reply?

25          MR. STANCIL:  Yes, Your Honor.  May I reserve ten

1    minutes, please?

2            THE COURT:  All right.  So we'll set you up at 12 and

3    a half to start.

4            MR. STANCIL:  Thank you.  And I apologize that this

5    matter does, in fact, need to go forward.  I can't push this

6    one off.

7            Let me briefly explain, Your Honor.  Mark Stancil for

8    the Ad Hoc Group of GO Bondholders.  Let me start by very,

9    very briefly explaining what the selective claim objection

10   says and what the conditional claim objection that we have

11   filed says.

12           The selective claim objection has three main

13   premises.  One, the PBA, which has existed for 60 plus years,

14   is a sham, a sham designed to evade a constitutional debt

15   limit.  Two, despite that fact, that the PBA bonds are

16   actually not PBA bonds at all, but are, in fact, direct issue

17   debt of the Commonwealth.  Direct GO debt.  And three, that

18   the constitutional debt limit must be retroactively

19   recalculated.

20           Those are the three core premises.  But the selective

21   claim objection artificially circumscribes itself in three

22   critical ways primarily.  First, it assumes that the bonds

23   that are the product of the sham are actually entitled to the

24   windfall of being remade into GO bonds.

25           Secondly, it refuses even to ask -- even though it

1   says these are GO bonds, it refuses even to ask whether those

2   newly minted GO bonds are themselves passing muster under the

3   debt limit.  And third, it just stops its own analysis in

4   2012.

5        So what the conditional claim objection seeks to do,

6   it says, if you're going down this path, and we'll talk about

7   why that path is wrong headed, but if you're going down this

8   path, it cannot be artificially circumscribed.  And there is a

9   central reason why that is so, which is the selective claim

10  objection affects way more bonds than they singled out for

11  treatment in this first salvo.  We're just trying to make sure

12  everybody has notice and an opportunity to be heard.

13        Now, let me just explain why they've done this, and

14  then I'll move on to -- I'm sorry, Your Honor.  If you have a

15  question --

16        THE COURT:  I just have a question for you.  I gather

17  from your submissions that your constituency, as movants here,

18  actually don't subscribe to the legal theory underlying the

19  conditional objection.  And so given that, and given the state

20  of play at this point that there has been what you

21  characterize as selectivity in attacks on the PBA bond, how

22  could I properly recognize your constituency as having

23  standing to assert this objection that you disclaim, and what

24  purpose would be served in telling a broad swath of people

25  that, yeah, there's somebody that thinks there could be an

1    issue; not that they're going to press it, but you should kind

2    of know?  It seems unusual.

3         MR. STANCIL:  Well, what's unusual, Your Honor, is

4    the circumscribed nature of the claim objection, and that's a

5    feature of their approach.  But let me give you the "why"

6    answer and then I'll tell you the "what," the specific legal

7    rules that I believe conclusively answer Your Honor's

8    concerns.

9         The "why," it's important to understand why they

10   targeted certain bonds, and with respect, it's no secret to

11   anybody in this room.  The goal is to engineer a plan of

12   adjustment that justifies disparate treatment of selectively

13   challenged bonds and the as-yet unchallenged bonds.

14        It's an attempt to manipulate the plan process.  And

15   that's why we have certain groups naming themselves lawful

16   this or whatever.  It's an attempt to engineer a plan of

17   adjustment that justifies crushing one set of bonds, six

18   billion dollars in bonds because this plan needs a victim,

19   because the Board has failed to implement the reforms that it

20   itself has said could enable a consensual resolution.  So

21   that's why we are here.

22        Let me now go directly to Your Honor's question and

23   get right into what they've styled as a ripeness argument.

24   This is not unripe.  As a constitutional matter, I would

25   direct Your Honor to Rule 14 of the Federal Rules of Civil

1    Procedure, which I think is the perfect analog to explain why

2    this is not constitutionally premature or unripe or

3    hypothetical.

4            Under Rule 14, if in a regular civil proceeding, if

5    we were sued by, say, the Oversight Board for malfeasance, we

6    would say, well, we didn't do it; but if we are adjudged to be

7    liable, this third party over here is liable for the damages.

8    This happens every day, as Your Honor is aware, in Federal

9    Court.

10           And there is no suggestion, none whatsoever in those

11   circumstances that it's somehow hypothetical or unripe just

12   because you contest, the original defendant contests the

13   premise of the lawsuit against them.  That is no different

14   than what we have here.

15           We do not think the PBA is a sham, and most of the

16   people who will stand up against me today do not think the PBA

17   is a sham either.  But that fact, the fact that we don't agree

18   on the first premise of their argument does not mean that our

19   additional defenses are unripe or premature or that we lack

20   standing to present them.

21           We are a party in interest, and when alleged -- when

22   it has been alleged that our claims are invalid because PBA is

23   a sham, we have absolutely the right to turn and say, well, if

24   -- we disagree with your premise, but if you're right that

25   it's a sham, let us tell you what actually happens.  It's this

1    third party over here, for example, the PBA bondholders or

2    pre-2012 GO bondholders.  Those are the parties that would

3    have to suffer.

4            THE COURT:  But your papers seem to me to hedge it

5    even more than, you know, the standard pleading of an intent

6    to make a contribution claim or a claim over in the event of a

7    liability finding, because, as I recall, you say not only do

8    we think that theory is wrong, we might, for reasons of our

9    own, not even assert that even if we lose in the current

10   selectivity thing.

11           And I can understand that many people have interests

12   in different types of bonds, and so it might be that even in

13   the case that the Oversight Board prevails in the selective

14   objection, that the targets of the selective objection still

15   might not make this invalidity argument as to PBA or other

16   tranches of bonds.  Am I not reading you properly?

17           MR. STANCIL:  I don't think so, Your Honor.  And

18   maybe it will help if I can put maybe a concrete example of

19   what we're talking about, because I think that will show the

20   real nature of the argument.  Let's take the simplest example.

21   It's not the only example.

22           The simplest example of selectively here are PBA

23   bonds issued in between the first two -- the first series that

24   they have challenged and the second series that they've

25   challenged.  So by their logic, Puerto Rico was over the debt

1   limit after you recalculate all this stuff for however many

2   years.  In 2012, they were over the limit.  And then there are

3   PBA bonds issued, and then the 2014 bonds that they target.

4        Were they to try to invalidate our bonds by arguing

5   that the PBA bonds are actually GO bonds but the PBA bonds in

6   between those two GO bonds are not ever subject to the debt

7   limit, makes absolutely no sense.  So it's not a question of

8   whether we have to prevail or lose the claim objection and

9   seek contribution.  We are going to be defending the selective

10  claim objection with the logic of their own flawed

11  methodology.  There is absolutely no basis, zero, that we can

12  imagine for saying a PBA bond is a GO bond for recalculating

13  the debt but not a GO bond for whether it itself passes the

14  debt limit.

15       So that's the incoherent nature of their own

16  selectivity that we will absolutely be defending.  And why

17  does that matter to us?  Because you would have to approach

18  this sequentially, and this is not something they are willing

19  to do but this will absolutely be the case.

20       If a bond is invalid, say, from 2009 or 2010 or 2011,

21  then it's invalid.  It's gone.  So it no longer counts against

22  the debt limit for purposes of whether subsequent bonds, 2012,

23  2014 are invalid.

24       So when we come to Your Honor to defend the selective

25  claim objection, one of the many arguments you will hear from

1    us is, if they're right about -- with respect to all of this

2    crazy stuff about remaking PBA into this and that and

3    recalculating retroactively, if they are right, their own

4    logic requires them to start with invalidity years earlier.

5    And those bonds disappear, because you can't say these bonds

6    are invalid but they still count against the debt limit.

7            And so that's why we're saying this is all

8    interrelated.  So they're giving you a false choice, with

9    respect, Your Honor.  They're saying --

10           THE COURT:  Just one moment.

11           MR. STANCIL:  Yes.

12           THE COURT:  Please put down the sign.  Thank you.

13   You are welcome to be a spectator.

14           Thank you.

15           MR. STANCIL:  They're giving you a false choice, Your

16   Honor, about, well, we can get to this later if it comes to

17   it.  That's not correct.  What they're asking us to do and

18   asking Your Honor to participate in is a litigation of crucial

19   questions that will undoubtedly affect all of these other

20   bondholders.

21           Let me give you another example if I may.  Everybody

22   here, everybody in this courtroom is interested whether PBA is

23   a sham.  You've read the submissions.  And various people,

24   even people opposed to this motion argue vociferously it is

25   not a sham.

1          Well, what about the PBA bondholders that are not

2    here, the ones that we're intending to notice?  We're going to

3    litigate the selective claim objection.  And let's say Your

4    Honor were to determine that PBA is a sham.  We don't think

5    you'll get there, but let's say that you were to make that

6    ruling.  By everyone's admission, we can then defend and say,

7    well, if PBA's a sham, then the PBA bonds are invalid.

8          Then we're going to go to those PBA bondholders who

9    they're resisting bringing into this case and tell them, by

10   the way, your entity has been adjudged by Judge Swain to be a

11   sham and now we're here to litigate whether your bonds are

12   invalid or someone else's bonds are invalid.  Aren't they

13   entitled to say, wait, where was I when you litigated whether

14   PBA was a sham in the first place?

15         THE COURT:  Well, it seems to me that at the time

16   when that claim was actually articulated, whether as a defense

17   and put in play or somebody else comes along and articulates

18   it as an objection, you probably have necessary party

19   questions, you have due process questions, you have a who's

20   going to be bound and who deals with law of the case as

21   opposed to being directly bound; but at that point, there is a

22   concrete moment in time and a concretely identified issue that

23   the -- that can be considered in connection with notice and

24   participants and all that sort of thing.

25         MR. STANCIL:  Well, with respect, Your Honor, we

1    think that's incorrect.  That's why we filed it now.

2         In fact, in the Kentucky case that we cite to Your

3    Honor, this was an old 1939 case where they were debating the

4    validity of another bond and how it affected the debt limit

5    for this bond that was under adjudication.  And the Court

6    said, wait a minute.  You didn't give notice to the holders of

7    that old bond, and so I'm not going to decide here today that

8    your bond is valid because their bond is invalid.  So we are

9    doing exactly what we think is appropriate.

10        The question is here, you know, they have alleged

11   point blank PBA is a sham.  Every PBA bondholder is interested

12   in that question and has an interest.  And if they're not

13   bound by it, Your Honor, if we were to litigate that question,

14   for example, that they are somehow not bound by it, we would

15   be prejudiced because now there would be multiple bites at the

16   apple on that question.

17        I actually think there would be a question of virtual

18   representation, and they'd probably be bound by the parties'

19   litigation of it here.  I haven't looked at that exhaustively,

20   but I think that's a serious question.

21        THE COURT:  Isn't that a question as to whether the

22   intervention of certain bondholders that's been approved in

23   whatever it is, 18-149, is sufficient as opposed to --

24        MR. STANCIL:  Well, not with respect to fundamental

25   due process, Your Honor.  Either these -- these unnoticed GO

1   and PBA bondholders, either they don't get notice of this

2   proceeding and they're going to be bound by what we determine

3   in this case, and these questions have been presented, or

4   they're not going to get notice, or they will get notice and

5   they can come and participate.

6        It is pitched I think falsely as a -- we're trying to

7   duplicate this.  With respect, that's the product of their

8   overbroad theory.  We can't -- we can't control the fact that

9   they've alleged a theory that affects 12 billion dollars of

10  bonds when they've only wanted to single out six billion.

11       And I see that my initial time is maybe -- I can't

12  tell, but we're going over.

13       THE COURT:  You're counting up now, but I took five

14  minutes of it with your questions, so you can go until it says

15  five and a half minutes.

16       MR. STANCIL:  Thank you, Your Honor.

17       One point I'd really like to focus on is the

18  inconsistency of the UCC and the Oversight Board in this very

19  proceeding, and you'll hear it later today.  They are

20  determined to bring avoidance actions against various third

21  parties who are involved, they say, in the various bonds that

22  have been objected to.  And they specifically cite our

23  conditional claim objection.

24       So they believe that their causes of action against

25  the third parties who are alleged to be involved with the

1   bonds that we are objecting to, they believe those are ripe,

2   but they are saying that it's unripe or premature for us to

3   bring the claims on which, in other words, they're relying as

4   the premise for their avoidance action.  They cannot have it

5   both ways, Your Honor.

6           And I do want to point Your Honor specifically to a

7   First Circuit case that I think is directly on point and

8   frankly forecloses the logic that they are espousing here.

9   This is the *Lehman versus Revolution Portfolio* case that we

10  cite.  It's 166 F.3d 389.

11          And this was an instance in which the FDIC had been

12  sued by a borrower.  The FDIC had stepped into the shoes of a

13  failed bank.  A borrower had sued them on a foreclosure -- for

14  damages relating to foreclosure, and they had their defenses

15  against that claim.  And the FDIC also sued a third party

16  for -- because they basically had a contribution claim against

17  the third party guarantor of the loan.

18          And the third party argued, he said, well, you can't

19  bring me in yet.  You don't even know if you're liable to the

20  original plaintiff.  And critically he said, you, FDIC, you

21  have this statutory defense which, on the face of the opinion,

22  looked to be pretty much a dead bang winner for the FDIC.  And

23  he said, you should go and litigate whether you even have

24  liability to the original plaintiff before you can drag me in

25  as a third party.

1              And the courts rejected that and said, requiring a

2    District Court to determine the merits of all defenses

3    potentially available to the original defendant as a

4    precondition to allowing that defendant to file a third-party

5    complaint would frustrate the purpose of Rule 14.

6              That's exactly what we're doing here, Your Honor.  If

7    this were an adversary proceeding, I would be invoking Rule 14

8    by name, and that's the motion that we'd be filing.  They've

9    styled it as an Omnibus Claim Objection.

10             You have two choices, with respect, Your Honor.  One

11   is, we're going to start litigating questions that matter to

12   all these people they don't want noticed.  And the other

13   choice is, we're going to be litigating those very same

14   questions and giving notice to the people affected.  It's an

15   unfortunate choice, but the idea that this can be done later

16   is I believe incorrect.  It can't be done later without

17   prejudice to either us or to the unnoticed bondholders.

18             And as I said at the outset, Your Honor, it's being

19   done we think tactically to manipulate a plan of adjustment in

20   a way that is only going to make the plan of adjustment --

21   it's going to drag it right down into this litigation.  If

22   they want to go down this path and say that six billion

23   dollars of bonds are invalid, they need to stand by their own

24   logic, such that it is, and say, well, actually, it's 12

25   billion dollars of bonds that are invalid.

1          We don't think any bonds are invalid, but there's no

2   requirement under Article III, there's no Prudential Doctrine

3   that would require us to sit on our hands.  And with respect,

4   Your Honor, they've portrayed it as efficiency versus

5   confusion.  What will be confusing is to tell people two

6   months from now, surprise, we've already litigated questions

7   that matter quite a bit to you, and you only get to come back

8   into this process when we're halfway done.

9          I'll reserve if I may, Your Honor.

10         THE COURT:  Thank you.

11         MR. STANCIL:  Thank you.

12         THE COURT:  Mr. Despins, so I have you down for seven

13  minutes.

14         MR. DESPINS:  Yes, Your Honor.  And I'm going to rely

15  on Mr. Kirpalani's remarks regarding the justifiable -- or

16  whether there's a case in controversy here largely.  I just

17  want to address some big picture issues.

18         The first one is that this -- that the objection to

19  the GOs was based on some plan conspiracy.  I love it except

20  that, as I told you, we're not involved in the plan process,

21  so I don't know how we're involved in this conspiracy.  I'm

22  joking, but it's serious.  I don't know where there is coming

23  from.  I think that's certainly not from our point of view.

24         However, what he's saying essentially, what

25  Mr. Stancil's saying is that he's concerned about these other

1  bondholders that he does not represent somehow being bound by

2  his actions.  And he says, that's really awful.  We need to

3  give them notice.  We have to step back, Your Honor.

4      And that's the same thing regarding the objection

5  that they've articulated regarding the stipulation.  You know,

6  they don't want the case to go forward, or at least not the

7  way it's going.  And the point is if we create enough chaos

8  around various things, then the case cannot go forward.

9      And the Court should be really reluctant to entertain

10  the argument of someone saying, I don't hold these other bonds

11  but I'm really concerned about these poor people.  And I know

12  I will be able to make those arguments about sequential and

13  all that, I know I'll be able to make them in my proceeding,

14  but I'm concerned about these other people not being involved.

15  And in that regard, you know, I think that it's really arguing

16  the rights of others.

17      And in terms of Rule 14, and I'm really not an expert

18  on this, but I always understood that to be in the nature

19  of -- and Mr. Stancil, you know, described a part of the Rule

20  but not the entirety of it, which is if there's an accident

21  somehow, a plane crash or something like that, and I'm the

22  pilot, I'm getting sued, I'll say, I'm not negligent but if in

23  fact I'm held to be negligent, the manufacturer of the plane

24  is liable to me because there was a defect in manufacturing

25  the plane.  So they're liable to it, to Mr. Stancil's client.

1    But that part is not present here.

2           The other bondholders would not be liable to

3    Mr. Stancil's client.  They might suffer other consequences,

4    but they would not be liable.

5           So, you know, essentially, Your Honor, again,

6    Mr. Kirpalani is going to address issues regarding the case in

7    controversy issue and all that, but we believe that this

8    motion should not go forward because it's designed to create

9    chaos, which is not necessary.  And the point that he made

10   about we're being inconsistent, so -- I want to address that,

11   because the Oversight Board, I'm talking about the Special

12   Claims Committee now, has determined that they want to assert

13   certain claims.

14          Mr. Stancil is right in a kind of conditional

15   fashion.  You might say, well, that's not consistent, but

16   we're facing a totally different issue here.  There's a

17   Statute of Limitations, and that statute is about to expire.

18   And I want to be clear, and I think Mr. Weisfelner can confirm

19   this, there's no intention of prosecuting, meaning involving

20   all these people in the conditional part of this at all.  It's

21   just to toll the Statute of Limitation that these claims are

22   being filed.

23          This is not what Mr. Stancil is doing.  He could just

24   file as a production and say, hey, I'm on record.  That's our

25   position.  That's fine.  But yet he wants to bring everybody

1    else, which is going to be chaos.  So there's a huge

2    difference between the two.  We have no choice but to file

3    that complaint, because otherwise, these claims are gone.

4    That's not the same as this situation, Your Honor.

5         Thank you.

6         THE COURT:  Thank you.

7         And so now, Mr. Kirpalani from New York for five

8    minutes.

9         MR. KIRPALANI:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. KIRPALANI:  Thank you for allowing me to

12   participate from New York today.  For the record, Susheel

13   Kirpalani of Quinn Emanuel Urquhart & Sullivan on behalf of

14   the Lawful Constitutional Debt Coalition.

15        And just to orient the Court, our clients own over a

16   billion dollars of early vintage PBA bonds, as well as early

17   vintage GO bonds.  So to the extent that counsel for the Ad

18   Hoc GO Group is concerned that PBA bondholders are not

19   involved, we are here.

20        The Ad Hoc Group's opening motion is really where the

21   Court should start in determining what is the authority for

22   the Ad Hoc GO Group's relief.  And they cite four things in

23   the opening motion, starting in paragraph 15.  The first is

24   Rule 3007(d).  And why do they cite that Rule?  They actually

25   admit in their own opening motion that the Rule doesn't

1   support the relief that they seek, but what they quote and

2   what they say is that the Court has discretion to modify Rule

3   3007 and allow them to move forward with this rather unique

4   conditional claims objection.  So that's the first one.

5        The second one, paragraph 16 of the opening motion,

6   cites Section 105(a) of the Bankruptcy Code.  And for that,

7   they say the Court can use its equitable powers, again in its

8   discretion, to either protect the value of a debtor's

9   assets -- well, that's true but not really relevant here.  And

10  two, to facilitate orderly administration.  That's up to the

11  Court.  And that's in their opening papers.

12       The third and fourth things that they cite are two

13  cases, and that's also in their opening motion, a Ninth

14  Circuit case and a Second Circuit case.  Both of those cases

15  talk about how a Court has inherent discretion to decide how

16  to manage her docket.  And we would agree with all of that.

17  But by their own admission, what they're asking for is the

18  Court to exercise discretion.  And we would ask the Court and

19  urge the Court respectfully to use that discretion to deny

20  this conditional objection.

21       Respectfully, as we put forward in our papers, we do

22  not believe the Court has subject matter jurisdiction over

23  unripe, speculative, hypothetical proceedings.  The First

24  Circuit Court of Appeals just affirmed this Court's dismissal

25  of unripe proceedings commenced by the very same Ad Hoc GO

1  Group.

2         Mr. Stancil now comes to court and references Rule

3  14.  And I agree with Mr. Despins that that has absolutely no

4  analogy or application to a conditional objection such as the

5  one put forward.  That is applicable when there is a party

6  that has an injury in fact to them and they are trying to

7  insure that that injury can be remedied.  This is not the

8  issue that the GO Group is asking the Court to approve.

9         Not to mention, as Your Honor knows, the Federal

10  Rules of Civil Procedure do not confer Article III

11  jurisdiction.  It still needs to be a case or controversy

12  that's justiciable, and there needs to be standing by the

13  party seeking to bring it.

14         I would actually consider the conditional objection

15  much more of the kind that, you know, we see sometimes in New

16  York City, which is more of the street fighter style.  If I'm

17  going down, then I want to take some other people with me.

18  That's really what that objection is all about, and it's

19  rather transparent.

20         Here, Your Honor, in terms of the procedures that the

21  GO Group were actually involved in, in designing and having

22  approved by the Court, the Court hasn't even gotten to

23  adjudicate how it wishes to push forward on this Omnibus

24  objection.  All that has happened is that the Committee and

25  the Oversight Board filed an Omnibus objection and asked for

1   notices of participation, which we also filed.  And there's

2   been more than a thousand of them filed.

3         So now the Board and the Committee are trying to

4   determine what should we do next, how do we proceed.  There's

5   a process in place, and the Ad Hoc GO Group, as the Lawful

6   Constitutional Debt Coalition tends to do, too, will put

7   forward our views on how to phase this litigation.

8         Mr. Stancil wants to jump to the remedy, has even

9   come up with a novel -- you know, we can avoid the domino

10  effect by creating springing dominos perhaps down the road, so

11  if debt is invalid starting in 2012, somehow we can invalidate

12  the early -- kind of the early vintage of the invalid debt and

13  spring to life again late vintage clearly unlawful debt that

14  was issued in 2014.

15        It's a nice theory, and we'll hear about it I'm sure

16  in due course, but what we shouldn't do, Your Honor, is add

17  additional confusion.  I've thumbed through the various

18  notices of participation.  There's more than a thousand, as I

19  mentioned.  There are people who have noticed an intent to

20  participate who don't even own bonds.  They're confused enough

21  already.  We don't blame anyone.  It is complicated.  And

22  they're unsure how this relief might impact them.  But the Ad

23  Hoc GO Group wants to add to that chaos again, consistent with

24  the, if I'm going down, I want others to suffer as well.

25        We are awaiting word from the Committee and the

1    Oversight Board as to what's the appropriate procedure.  We do

2    think and we do have ideas on how to phase this out.

3         Your Honor is aware from our papers and from our

4    notice of participation, we do not believe the PBA is the

5    alter ego of the Commonwealth.  We do not believe the PBA is a

6    sham.  But that doesn't mean when we read the Constitution

7    that the Ad Hoc GO Group and the holders of other late vintage

8    GO bonds will not be invalidated.  They will, on the plain

9    text of the Puerto Rico Constitution.

10         But I'll close with this, Your Honor.  You only need

11    to imagine, could the Ad Hoc GO Group have filed their

12    objection on their own in the absence of the Board's and the

13    Committee's Omnibus objection?  How would that have read?  It

14    would say, we have an idea.  There is a reading of the

15    Constitution that we ourselves don't necessarily agree with,

16    but someone might, and hypothetically speaking, if the PBA

17    were the alter ego of the Commonwealth, then this is how that

18    would happen.  Your Honor, could you please adjudicate that

19    for us so we can continue this coffee conversation with our

20    friends?

21         It would take Your Honor a nanosecond to throw out

22    that pleading, and Your Honor should do likewise here.  It is

23    not cured by the GO Group trying to bootstrap its deficient

24    pleading to someone else's pleading who does have standing and

25    who is raising a ripe, albeit incorrect, objection.

1           There is a viable path forward, Your Honor.  Don't

2   listen to Ad Hoc GO Group's ominous predictions that we're

3   going down a road here, a rabbit hole that's not going to lead

4   to progress.  I beg to disagree with that and look forward to

5   showing you that down the road.

6           Thank you, Your Honor.

7           THE COURT:  Thank you, Mr. Kirpalani.

8           Do any of the other objectors wish to be heard before

9   Mr. Stancil returns for his reply?

10          Ms. Miller.  No?  Not Ms. Miller?

11          MS. MILLER:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MS. MILLER:  Apologies for the confusion.  Atara

14  Miller from Milbank on behalf of Ambac Assurance Corporation.

15          I want to make two small points that sort of were

16  referenced but not made directly.  And the first is that what

17  we're dealing with here with respect to the procedures motion

18  and the conditional objection really relates to three separate

19  actions.  The first one is the GO objection, or what the GO

20  Group has now called the selective objection.  Second is the

21  PBA adversary proceeding.  And then the third is now this

22  conditional objection.

23          And the way that the GOs have chosen to style their

24  conditional objection is to relate it back to those other two

25  separate and independent proceedings.  And so I think

1    fundamentally that is different from asserting a cross-claim,

2    a counterclaim, joining a claim for contribution, joining as a

3    necessary party someone else who may be responsible, because

4    what you're doing in that circumstance, which we agree is

5    plain vanilla, happens all the time, what you're doing there

6    is you're actually inviting people in to participate in the

7    litigation of the core issues that are the predicates to the

8    ultimate secondary claim or downstream claim for contribution

9    or for anything -- related action.

10          I want to make clear that when you look at the

11   relief, apart from thinking about it conceptually, when you

12   look at the actual proposed notice that the GO bondholders put

13   in, which is docket 6104-1, the Exhibit A is the Proposed

14   Order.  It proposes to give notice to the PBA bondholders only

15   of the conditional objection.  And it says the conditional

16   objection says that if these other cases go against us, then

17   we have this conditional objection.  We will be attacking the

18   validity of your bonds.  Tell us if you want to participate,

19   not in the predicate actions, but tell us if you want to

20   participate in this conditional objection.

21          That doesn't even cure procedurally the problem and

22   the defect that Mr. Stancil identified, which is that there is

23   a separate proceeding, here potentially two separate

24   proceedings, the determination of which may have an actual and

25   material impact on PBA bondholders' rights down the road

1   because of the consequences.

2          And I think Your Honor said in one of your questions,

3   which wasn't directly responded to, isn't that really maybe a

4   question about the sufficiency of intervention in the other

5   cases.  It is not a basis to have a separate conditional

6   claim.  It will not address or cure the problems that

7   Mr. Stancil's raising.

8          You know, the same issue came up, Your Honor may

9   recall, in connection with the Commonwealth-COFINA dispute,

10  and there were issues raised there by Mr. Stancil related to

11  certain attacks on the validity of the GO bonds in that

12  regard, and then counterclaims against the validity of the

13  COFINA bonds.  And we had the same debate about how do you

14  address it.

15         And ultimately, it is a law of the case issue that

16  parties are faced with all the time in complex litigations.

17  There may be a legal principle or a legal issue that may

18  affect multiple defendants that may be litigated against a

19  single defendant.  That defendant may lose.  The second

20  defendant -- it doesn't mean that it's unconstitutional to --

21  or that there's some procedural defect with applying that.

22  They'll be able to raise whatever arguments or defenses about

23  that, either distinguishing their facts from the facts that

24  were litigated, arguing about notice, or anything else down

25  the road.  And those are issues that Courts regularly address

1    and deal with in connection with complex matters where

2    multiple parties may be similarly affected by a similar legal

3    determination or holding.

4           So if for no other reason, we don't think that the

5    relief that they're asking for even addresses the issues that

6    they're raising.

7           THE COURT:  Thank you.

8           MS. MILLER:  Thank you.

9           THE COURT:  Did any other opponent wish to be heard?

10   Yes.

11          MR. CURTIN:  Good morning, Your Honor.  Tom Curtin

12   with Cadwalader on behalf of Assured Guaranty.

13          THE COURT:  Good morning, Mr. Curtin.

14          MR. CURTIN:  Good morning, Your Honor.

15          Your Honor, we understand why the GO Group filed the

16   conditional claim objection that they chose to file.  We

17   understand the reasons for it.  We agree with Mr. Stancil that

18   the claim objection that was filed is in fact discriminatory.

19   And if the Oversight Board prevails in its claim objection,

20   the so-called early vintage bonds will also be implicated and

21   subject to challenge.

22          However, Your Honor, we do not believe that the claim

23   objection is ripe for adjudication at this time.  The

24   Oversight Board's claim objection also faces ripeness issues

25   that we're going to have to address when we deal with

1   sequencing of that claim objection.  For example, the issue of

2   the PBA bonds and the PBA leases, and whether or not those are

3   actual leases.  That will have to be a predicate issue that is

4   decided before the claim objection is resolved for the

5   Oversight Board.

6           But this present claim objection suffers from similar

7   infirmities.  We believe, Your Honor, that the Court should

8   stay adjudication or consideration of the GO Group's

9   conditional claim objection until it is ripe for adjudication,

10  which will only be if and when the Oversight Board prevails in

11  its claim objection.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Good morning.

15          MS. WOLF:  Good morning, Your Honor.  My name is

16  Shannon Wolf, and I'm with Bracewell, LLP.  And I'm here on

17  behalf of the QTCB Noteholder Group.

18          THE COURT:  Good morning, Ms. Wolf.

19          MS. WOLF:  Good morning.

20          I just want to add, we do agree with Mr. Stancil on

21  one key point.  PBA is not a sham.  In -- our joint 12(c)

22  motion that is filed in connection with the PBA lease

23  adversary proceeding and is attached to our brief that we

24  filed in response to the conditional objection lays that out

25  pretty clearly.

1          But setting that aside, where we don't align is that

2     we do not believe that the conditional objection is ripe for

3     all the reasons that you've heard today.  The document speaks

4     for itself.  It is contingent.  It only materializes if the

5     Court makes certain findings or adopts certain premises in

6     connection with the Omnibus claim objection and also in

7     connection with the PBA lease adversary proceeding.

8          To the extent that the GO Group believes it is going

9     to raise defenses in response to the Omnibus claim objection

10    and that those defenses might, at some point in the future,

11    harm or impair the rights of unspecified bondholders who are

12    not yet participating in the proceedings in connection with

13    the Omnibus objection, if you look at the procedures in the

14    Omnibus objection, those procedures are flexible enough to

15    allow for late comers to participate.  If the situation does

16    arise that there are issues in the defenses that implicate

17    current non-participants, they can seek leave from Your Honor

18    to join in the litigation if that -- if it arises.

19         And finally, the judicial economy consideration here

20    is important, and the efficiency of proceeding in these cases

21    in an orderly fashion.  As was previously pointed out, the

22    language in the conditional objection and the notice

23    procedures is confusing.  It says, we might at some point need

24    to bring this conditional objection to your -- to your claim

25    that you have filed in the Title III cases if the Court makes

1    certain findings.

2           I'm not sure what I would do with that if I received

3    it in the mail.  I would not know.  Should I participate?  Do

4    I need to participate?  What if I don't participate?  What

5    does this mean?

6           There's no harm to the GO Group in deferring this, in

7    deferring consideration of the conditional claim objection.

8    In fact, it may be better for them.  It will be better for

9    everybody if it is deferred until a time that the facts and

10   the legal basis for it actually materialize.

11          If Your Honor has no further questions about our

12   brief or in connection with this, then I have nothing further.

13          THE COURT:  Thank you, Ms. Wolf.

14          MR. MORGAN:  Good morning, Your Honor.  Again, for

15   the record, Gabe Morgan of Weil on behalf of National.  I'll

16   be brief.

17          THE COURT:  Good morning.

18          MR. MORGAN:  I think our fellow opponents have

19   covered the ground well.  I just wanted to state for the

20   record we do not believe the PBA is a sham and also just echo

21   all the arguments that you heard over the past 15 or 20

22   minutes.  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          All right.  I think we're ready for Mr. Stancil

25   again.

1          MR. STANCIL:  It's nice to have so many friends, Your

2     Honor.  So I apologize --

3          THE COURT:  Treasure the moment.

4          MR. STANCIL:  I apologize in advance if this wines a

5     bit, but I'm just going to do my best to go sort of seriatim

6     through the objections.  I'll start with the punch line, which

7     is they're all wrong or if they're -- to the extent they've

8     made any headway, they're essentially conceding the points

9     that we have made.

10         Let me begin with Mr. Despins and the conspiracy.  He

11    may not be invited to it.  I will bet you my summer vacation,

12    and regrettably probably everybody's summer vacation, that the

13    plan of adjustment --

14         THE COURT:  What summer vacation?

15         MR. STANCIL:  Yes.  I will bet that we are all going

16    to be here with a plan of adjustment that says that the

17    selectively challenged bonds get way less than other bonds.

18    I'd love to be wrong, but I'll stand by that.

19         Mr. Despins says -- he mischaracterizes our argument

20    as feigned concern about other bondholders being bound.  He

21    has it 180 degrees backwards.  I'm concerned about other

22    bondholders impairing our defense by claiming they cannot be

23    bound.

24         So let me be crystal clear about that.  When we

25    defend the selective claim objection, and we will, not may, we

1  will defend the selective claim objection by saying PBA bonds

2  are invalid if the PBA is a sham.  PBA bonds are invalid if

3  the PBA bonds are disguised financings, that pre 2012 GO bonds

4  and PBA bonds are invalid if you adopt their cockamamie theory

5  of the Constitutional debt limit.

6         We will raise these defenses.  They will be raised

7  immediately, and they will directly affect the bonds that we

8  are trying to notice here.  And it's ironic because what we're

9  trying to do is effectively what Your Honor forced the UCC and

10  the Special Claims Committee to do when they filed the

11  selective claims objection, which was, we're not just going to

12  have a list of the top ten holders of these bonds.  We're

13  going to have to give notice to everybody that's affected.

14         Well, we're here to tell you who's really affected,

15  and that's what we're trying to do.  We absolutely are going

16  to present these defenses.  We believe Your Honor's

17  adjudication of them will foreclose other people's contention

18  to the contrary, subject obviously to appeal rights and the

19  like.  But it's not that we're, you know, feigning concern for

20  the bonds that we intend to invalidate if it comes to that.

21         With respect to the chaos argument, I think that's a

22  red herring.  What is chaotic is a partial attempt, and you'll

23  note in the claim objection they filed, they reserved their

24  right to go after other bonds.  And I've heard not a whit, not

25  one whisper, not a whiff about why we're wrong, about how the

1   logic of the claim objection doesn't apply to these other

2   bonds.

3          We all know it does.  And what most of the folks here

4   who are cross holders are waiting to see is, well, how sweet

5   is that deal in the plan adjustment, because I might be

6   willing to go along with the targeting of the selective bonds

7   if the pay off is good enough on the other side.  That's

8   really what's going on.

9          Let me talk about the limitations period.  I cannot

10  for the life of me figure out what that has to do with

11  ripeness.  The fact that he needs to file a claim before May

12  2nd doesn't make the claim ripe or unripe.  And let notice go

13  out to everybody who's a potential target of these avoidance

14  actions he intends to bring?  He's either conceding today that

15  that claim is ripe and therefore he can file an action to stop

16  the limitations period from running, or it's not.

17         So for my money, I would tell those folks not to toll

18  because he's telling the Court today that our conditional

19  claim objection is not ripe, and if it's not ripe for us to

20  bring it, it's not ripe for him to bring an avoidance action

21  based on it.  So I just don't know how to -- the fact that he

22  wants to bring it doesn't make a difference.

23         Mr. Kirpalani started with four things, with four

24  rules that he cited for the first time.  I'm just going to put

25  the simplest answer first.  Every single one of those

1    arguments, and I'm not fully sure I understood them, are

2    forfeited because they were not raised in his objection.  So I

3    don't --

4            THE COURT:  I think he said that those were sources

5    of authority you had cited, and he cited various paragraphs of

6    your opening brief.  And his argument was that --

7            MR. STANCIL:  Right.

8            THE COURT:  -- as authorities relied upon by you,

9    they are inapposite or ineffective or whatever.

10           MR. STANCIL:  Right.  He cannot do that for the first

11   time at oral argument.  If you don't like something that we

12   cited, if you don't like an argument that we make in our

13   motion, you can't fail to raise the counter-argument in your

14   objection and show up at oral argument and say, surprise.  I'm

15   sure he's wrong, and I'm happy to go back and brief why he's

16   wrong and why the -- the sources of authority, but this is

17   precisely why arguments can and are forfeited.

18           But what he's really trying to say, Your Honor, is

19   it's a matter of your discretion.  And that's really a tacit

20   concession that there is no constitutional ripeness here,

21   problem here at all.  He's saying, well, it's a matter of

22   discretion or prudence, not withstanding its ripeness, you

23   should delay it.  And that's abandoning the constitutional

24   ripeness that everyone at least took a swing at.

25           Let me rebut Mr. Kirpalani's misapplication of Rule

1  14.  He says, well, that's when you have an injury in fact and

2  you are then trying to get someone else to pay for it.  That

3  is conclusively rejected by the First Circuit case that I

4  cited to Your Honor.  There had been no injury in fact.  There

5  had been an allegation of injury and there was a third-party

6  counterclaim conditional on the original liability being

7  established.  So that's just flat out wrong.

8          And this gets to a point that, I'm not sure if it was

9  Mr. Kirpalani who made it, but I believe he said, could they

10  have brought this action, you know, before the selective claim

11  objection?  That's completely the wrong way to look at it.

12  What makes these arguments ripe is the selective claim

13  objection.

14          I think he's probably correct that we couldn't file a

15  declaratory judgment action that says if somebody challenges

16  our bonds on this theory, which we think is wrong but nobody's

17  done it, then we'd like a declaratory judgment that X and Y

18  and Z would happen.  I think he's probably right, but it isn't

19  what we have here.  We have a selective claim objection

20  seeking to invalidate six billion dollars in debt.

21          It's lengthy.  We've been at this for months.  We are

22  headed right into the battle.  There is nothing remote or

23  hypothetical or contingent about it.  We are here, and that's

24  what separates the hypothetical that he created from the facts

25  that are on the ground here.

1          Mr. Kirpalani said that we are jumping to the remedy.

2     That is wrong.  That is wrong.  We are -- this is a logical

3     predicate to various of the arguments.  The conditions that we

4     are -- the claim objection that we have raised is a logical

5     predicate to numerous arguments.

6          The selective claim objection, we started with those

7     three premises.  Number one is that the PBA is a sham.  Number

8     two is you can retroactively remake PBA bonds as GO bonds.

9     That's not the ultimate remedy.  That's step two in their

10    argument.  But that's where the conditional claim objection

11    says no, no, no, not so fast.  Those can't be -- you can't

12    make sham bonds into valid GO bonds and give the bonds made

13    out of the sham entity the windfall of not only being made

14    into super, you know, GO bonds, but then get the benefit of

15    invalidating subsequent GO bonds.

16         And just so Your Honor is clear how all the math will

17    work, and if we get to this point, we will have, I'm sorry to

18    tell you, spreadsheets upon spreadsheets that explain how the

19    debt limit was calculated correctly at each point in time.

20    But if the PBA bonds were a sham, we will argue, then they're

21    gone.  They don't have a claim against the Commonwealth.

22         THE COURT:  I understand that that's --

23         MR. STANCIL:  Right.  So it's not a remedy.  It's the

24    logic of whether our bonds are even going to trip the debt

25    limit.  So it's a liability.  These are threshold questions to

1    liability.

2            The confusing point has been made --

3            THE COURT:  I think I heard the wrong relief

4    requested argument, at least as articulated by Ms. Miller, as

5    being an invitation to join in a separate contested matter

6    that's denominated as a --

7            MR. STANCIL:  Yes.

8            THE COURT:  -- conditional objection rather than

9    offering some path directly into the Oversight Board's

10   objection to the 2012 and 2014 bonds, or a seat at the

11   litigation table in 18-149 is the wrong way at getting at what

12   she understands you're getting at, trying to get at.

13           MR. STANCIL:  Yes, Your Honor.  And I think that's a

14   fair concern, but let me tell you how I think it should be

15   addressed.  This was our best attempt to give notice to

16   everybody, because it actually is effective notice to all

17   affected parties, and it's as broad as possible.  But I've not

18   heard the Special Claims Committee -- well, we haven't heard

19   from them at all, but we haven't heard from them or the UCC

20   with respect to whether we're going to have the ability to

21   join necessary parties.

22           Will Mr. Despins stipulate that we'll have the rules

23   of adversary proceedings apply to his selective claim

24   objection?  I don't know.

25           THE COURT:  Well, whether he stipulates it or not,

1   you have an ability to make a necessary parties application or

2   motion to me, and I mentioned that in your first three minutes

3   of speaking when you were up first.

4          MR. STANCIL:  Yes.

5          THE COURT:  There are inflection points in these

6   litigation vehicles that still seem to me to be likely to be

7   more appropriate than this particular inflection point is.

8          MR. STANCIL:  I'm happy to hear that Your Honor will

9   be tentatively receptive to those --

10          THE COURT:  I didn't say I'd grant it, but --

11          MR. STANCIL:  I know.  I understand.  I tried to

12   hedge while locking you in as much as I thought I'd get away

13   with.  But I didn't hear Mr. Despins acknowledge that we can

14   do that.  I didn't hear any of my adversaries acknowledge that

15   we could do that.  And so you can't say here, well, this is

16   premature and rely on the fact that maybe we can do it later

17   and then come back and say, well, you can't do it later

18   either.  Well, we'll get to -- and this is weeks away, Your

19   Honor.

20          THE COURT:  You can't require your opponents to

21   commit not to oppose your motions.  Just --

22          MR. STANCIL:  Right.  But I can require them to be

23   logically consistent.  And what we're going to hear in three

24   weeks, Your Honor, when we start debating the procedural

25   proposals, and we'll be regrettably back here if we can't

1   resolve this, we're going to hear no, no, no.  We can't raise

2   these questions as to whether PBA bonds are sham bonds and

3   have to be invalidated.  We can't hear that until much, much

4   later.  We're not going to see that question.  And, Your

5   Honor, that's what's prejudicial to us.

6         And so this was to one of the final points made.

7   There's absolutely prejudice to us, Your Honor, because they

8   have circled the bonds that they'd like to target, and they've

9   said we're going to leave these, guys.  We're going to use

10  this as the justification for trying to impair one slice of

11  it, logically coherent or not.

12        And we're going to be in this position over and over

13  and over again in the sequencing of this case.  And that's why

14  we felt the only proper way was to come to Your Honor and say,

15  here's what we're going to say.  There's no mystery.

16  Everybody knows what it is.  Here's who it affects.  There's

17  no mystery.  Everybody knows.  Let's at least give proper

18  notice and give proper opportunity for people to participate.

19        I would like to respond to Mr. Kirpalani's point that

20  we're trying to take people down with us.  This is a

21  fundamental mischaracterization.  That's not correct.

22  Actually, if they go down this road, they go down instead of

23  us.  So if you can invalidate these bonds on this theory, you

24  have to do it according to their logic, starting as early as

25  2009, 2010.  And like I said, if these bonds go out, then the

1    other bonds do survive.  And that's really what's going on

2    here.

3           Last, Your Honor, if I may, it was suggested that --

4    I think by Ms. Miller that we would have law of the case for

5    some of these questions.  And then I believe I heard her start

6    to hedge and say, yeah, but people would have arguments about

7    whether that law of the case would actually apply there.

8    That's precisely the point that we're making.

9           We can tell you, because we're here, we know exactly

10   where we're going.  These are the questions that will be

11   litigated.  And you either are depriving the people who are

12   affected of notice and opportunity to be heard, or you're

13   giving them wiggle room to claim later that if these questions

14   don't turn out the way they want, that they're not bound by

15   them.  And that's deeply unfair to us, Your Honor.

16          THE COURT:  Well, the participation notice procedures

17   are queued up in the existing procedures as ways for people to

18   identify themselves as interested in being on special -- we

19   used to call them Listservs, and have the opportunity in some

20   way to have a voice in negotiations.  It's not a defendant

21   class action.  I mean, if you're talking about legally binding

22   every single member of a potential group, you don't just ask

23   them if they want to get a letter every once in a while.

24   There is a Rule 23 procedure, which I haven't been asked to

25   invoke in connection with these contested matters, and you

1    talk about complicated.

2          But again, it doesn't seem to me that what you're

3    proposing here is a vehicle for achieving what you're saying

4    you want to achieve, even leaving aside the ripeness or

5    hypotheticality issues that have been raised.

6          MR. STANCIL:  Respectfully, Your Honor, I disagree,

7    for two reasons.  The first is the procedure that we are

8    offering would give people the chance to voluntarily come in,

9    so it's better -- it's certainly better than nothing.  And

10   what they are proposing is nothing.

11         So in terms of who is bound and how effective these

12   initial proceedings will be and how binding they will be, more

13   notice is better than less notice even if it's not perfect.

14         But secondly, Your Honor, as I alluded to, I think

15   there will be substantial arguments on a virtual

16   representation theory.  I don't think anybody who's in front

17   of Your Honor certainly has any hope of not being bound

18   whether they are here with their GO hat on or their PBA hat

19   on.

20         I don't think any of those people have hope of not

21   being bound, but I think it will be a knock down drag out

22   fight as to whether we can go through what might be months,

23   years of litigation, and then have people come up and say,

24   well, Your Honor, I was never involved in these proceedings

25   and so I get a fresh bite at the apple.

1          The chaos here is kicking the can down the road until

2     we get to that point, Your Honor.  And I know it seems

3     daunting, but the fact that -- and it's been suggested that

4     these are confusing and no one knows what to make of it.  We

5     had no shortage of lawyers showing up here today to tell you

6     how they feel about this.  I think it will be as clear as we

7     can make it, what's really at stake with the selective claim

8     objection.

9          THE COURT:  Thank you.

10          MR. STANCIL:  Thank you, Your Honor.

11          THE COURT:  The Court will reserve decision on this

12     matter.

13          I'm told that the representative of National has

14     arrived in New York to speak to the PREPA Extension Motion and

15     that there is also an attorney, Mr. Mashberg, from Proskauer

16     to respond, to speak on behalf of Proskauer.

17          And so, for efficiency, is that Mr. Berezin?

18          MR. BEREZIN:  It is, Your Honor.

19          THE COURT:  All right.  Mr. Berezin, would you please

20     go first?  And good morning.  Thank you for coming down.

21          This is as to PREPA.

22          MR. BEREZIN:  Thank you, Your Honor.  Robert Berezin,

23     Weil, Gotshal & Manges, on behalf of National Public Finance

24     Guarantee.

25          Your Honor, the context for this latest extension

1    request is really critical to determine whether it should be

2    granted and the basis for National's deep concern over these

3    extensions.  The receiver motion presents an urgent question.

4    That question is whether PREPA needs a receiver immediately to

5    remedy gross mismanagement that continues to haunt PREPA, the

6    people of Puerto Rico, and all other creditor stakeholders of

7    PREPA.

8          All PREPA bondholders, Your Honor, and indeed all

9    stakeholders need this question answered and answered

10    immediately.  Otherwise, there will be at most the appearance

11    of plan progress in this case, because questions over

12    feasibility will continue to haunt this case.  We need to know

13    whether or not PREPA has to have a receiver.

14          We believe of course that PREPA absolutely needs a

15    receiver.  We are not bringing this motion and have not

16    brought this motion for short-term gain.  We have not brought

17    this motion for rate increases.  What we have done is brought

18    this motion to finally rid PREPA of the gross mismanagement

19    and undue political interference that has a long and sordid

20    history.  Nor is this extension, Your Honor, a short request.

21          These negotiations began almost a year ago, and from

22    the beginning, National, which is the largest creditor of

23    PREPA, has been systematically excluded from the negotiations.

24    Excluded precisely because it has insisted from the start that

25    any deal for PREPA, in order for it to be a lasting and

1    feasible deal, has to address the problems at PREPA.

2           So for all of that time, up until just about a month

3    ago, no negotiations whatsoever have occurred with National.

4    And it was only in the -- with the hope of negotiations

5    finally occurring with National, that National agreed to two

6    brief extensions.  Unfortunately, Your Honor, the problem of

7    the unfair process, from National's perspective, has

8    continued, and it has continued to be excluded.

9           In the meantime, it is clear that there is no reason

10   why the receiver motion and the various plan negotiations

11   cannot proceed in parallel.  And indeed, they must proceed in

12   parallel, for exactly the reasons I said earlier.  The fact is

13   --

14          THE COURT:  Mr. Berezin, may I interrupt you?

15          As I understand it, the motion that was made last

16   night would put the briefing out, briefing deadlines and

17   depositions out a week, and put the argument on your motion

18   out, by reason of my schedule, two weeks to possibly three

19   weeks.

20          They do intend, as I understand it, to bring a

21   separate motion to stay further the receiver Lift Stay

22   Application, but that would be something separate and I gather

23   is contingent on them actually achieving critical mass with

24   the RSA.  And so what we're talking about here is moving out

25   the timing for that short period of time, not the question of

1   whether the Lift Stay receivership motion should be stayed

2   entirely pending the processing of the RSA and plan.

3       MR. BEREZIN:  Your Honor, that's correct that the

4   extension that's been asked is a one-week extension, but what

5   is to prevent that one-week extension from becoming yet

6   another extension and another extension and another extension?

7       THE COURT:  Me.

8       MR. BEREZIN:  In the meantime, no progress is being

9   made.

10      THE COURT:  I'm hearing your argument today.  If I

11  end up granting the extension today, I will hear an even more

12  passionate argument if they ask me for another week.  And I do

13  have the responsibility of deciding when long is too long, and

14  I take that quite seriously.

15      And I realize the question of whether long is too

16  long is up before me today, and I'm hearing your argument on

17  that.  But what I'm saying is that my decision point is not a

18  forever point at this point.  It is another short extension.

19  So I don't need to hear today about what would happen if I

20  never let your motion go forward, because that's not the

21  decision that I'm making today.

22      MR. BEREZIN:  We understand, Your Honor.  And we do

23  appreciate your consideration of our objection, and we hope

24  that if any extension is granted, it will be limited.

25      THE COURT:  And before you leave the podium,

1    Mr. Berezin, if an extension were granted, what would be your

2    preference:  Staying here longer in connection with the June

3    Omni or addressing the hearing in New York the following week?

4              MR. BEREZIN:  The sooner the better for us, Your

5    Honor.

6              THE COURT:  So you'd be voting for in conjunction

7    with the Omni?

8              MR. BEREZIN:  That's correct, Your Honor.

9              THE COURT:  All right.  Thank you.

10             MR. BEREZIN:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             I will hear from Mr. Mashberg now.

13             MR. MASHBERG:  Yes, Your Honor.  Good morning.  It's

14   Gregg Mashberg from Proskauer Rose on behalf of the Oversight

15   Board.

16             I don't think I need to belabor the issues that have

17   been presented this morning, nor in the prior motions.  I'm

18   not going to get into the underlying issues of the Lift Stay

19   Motion and the Request for Receiver.  I don't think that's the

20   relevant point.

21             The relevant point is that a great deal of progress

22   has been made among the Oversight Board, PREPA, and Assured

23   and the Ad Hoc Bondholders, which will hopefully come to

24   fruition.  We hoped it would happen this week.  We hoped it

25   would happen last week.  We are very hopeful it will happen

1   next week, and that the next steps in this process can be

2   made.  That is, filing a 9019 and the Stay Motion that Your

3   Honor referenced.

4        We're doing this in the utmost good faith.  This is

5   hard stuff.  There are very difficult issues, and we've made

6   tremendous progress.  And we're very hopeful that it's all

7   going to come together next week.  I can't promise, but I'm

8   very, very hopeful that's exactly what will happen.

9        There have been many extensions granted prior to this

10  last month when we've been here seeking extensions because of

11  the negotiations on the RSA.  The motion was filed in October.

12  Another week is what we're talking about now.  And Your Honor

13  will certainly keep our feet to the fire.  If we were to come

14  back, I'm not saying that we would, but if we were to come

15  back, there's no question that Your Honor would preside over

16  any objection that National would make.  And we would have to

17  justify anything that we had to do.

18       But right now, Your Honor, all we are seeking is one

19  more week extension to extend all the deadlines that are

20  presently in existence.  So I'm not going to get into the

21  underlying issues in terms of the following stay motion and

22  what that's all about.  I'm not sure Your Honor wants to hear

23  that.  I could answer questions about that, but I don't think

24  that's what Your Honor wants to hear this morning.

25       So we believe that we need this one week, and we are,

1  fingers crossed, very hopeful that we will come back to the

2  Court next week and say that there is an RSA that has been

3  concluded.  If Your Honor has any questions, I'd be happy to

4  address them.

5          THE COURT:  I don't.  Thank you very much.

6          MR. MASHBERG:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Having heard these arguments, the motion which is

9  docket entry number 1203 in case 17-4780 is granted.  The

10  request for a one-week extension of each of the briefing

11  deadlines and the deposition period is granted.  And the

12  hearing on the Lift Stay Application is adjourned to June 13

13  to continue, if necessary, on June 14th in conjunction with

14  the Omni.

15          And an Order will be entered reflecting those

16  provisions.  If my chambers hasn't been provided with a Word

17  copy of the Proposed Order in conjunction with the Urgent

18  Motion, please do that promptly through the e-mail address.

19          All right.  So I think we can take one more matter

20  before lunch, which is the Oversight Board's tolling motion.

21  And that is number 6118 in the 3283 case, Agenda Item IV.4.

22          And I understand that my first speaker is

23  Mr. Weisfelner.

24          MR. WEISFELNER:  Yes.  Thank you.  And I think it's

25  still the morning.  Good morning, Your Honor.  Good morning,

1    Judge.

2            THE COURT:  Good morning.

3            MR. WEISFELNER:  Your Honor, as Your Honor has

4    indicated, this was the motion filed by the Oversight Board

5    and the Special Claims Committee back on the 2nd of April.

6            THE COURT:  Mr. Weisfelner, I have you down for 15

7    minutes.  Are you reserving time for reply?

8            MR. WEISFELNER:  I'll take three minutes.

9            THE COURT:  All right.  We'll clock you at 12 now,

10   and save three for reply.

11           MR. WEISFELNER:  Thank you, Judge.

12           THE COURT:  Thank you.

13           MR. WEISFELNER:  I think it's important to stress

14   that the target here or the issue here is the potential to

15   seek what I'll refer to as clawback of principal and interest

16   payments made on a whole series of bonds.  We have the bonds

17   that were subject to the joint objection, sometimes referred

18   to as the selective objection, that targeted the 2012 and 2014

19   GO bonds.  We have the objection filed by the Official

20   Creditors Committee that targets the ERS bonds.  And maybe we

21   have the conditional objection that targets a whole bunch of

22   other bonds.

23           The point is that we are looking at the potential for

24   billions of dollars in principal and interest payments on

25   challenge bonds during a four-year look back period alone.

1    And the cause of action to claw back, we all acknowledge, is

2    dependant on the outcome of the challenge to the bonds

3    themselves.

4         We ran into the problem that there is no indentured

5    trustee, or for that matter, a paying agent on either the 2012

6    or 2014 GO bonds, which was the subject of our objection.  And

7    it has become and proven to be quite a laborious process to

8    get the names of beneficial holders who actually received

9    periodic interest or principal payments.

10        Our discovery motion was granted, first in part and

11   then, as I understand it, ultimately by Magistrate Dein,

12   calling for production of the beneficial holders' names on a

13   rolling basis, to conclude before the running of the statute.

14   And I'm not sure -- I'll be corrected by one of our colleagues

15   if I'm wrong -- that focus is primarily on the GO bonds that

16   were the subject of our objection.

17        We've yet to get a good handle on the ERS bonds,

18   which do have a longer Statute of Limitations, to say nothing

19   of the additional bonds that are the subject of the

20   conditional objections.  And Your Honor, I understand why the

21   objectors, the bondholder groups that are here are opposing

22   the relief requested, because in many cases, their members

23   could have been the recipients of principal and interest

24   payments on these bonds, which again may be subject to

25   clawback if the underlying bonds are ultimately declared

1   invalid.

2           Your Honor, the case law, as our opponents have quite

3   rightly pointed out, require that, for an equitable tolling to

4   be granted, you need extraordinary circumstances, you need a

5   demonstration of diligence by the movants.  And the objectors

6   suggest that the Oversight Board and its Special Claims

7   Committee haven't demonstrated either extraordinary

8   circumstances or the requisite amount of diligence.

9           Your Honor, I beg to differ.  In the first place, I

10  think it's worth noting that the Special Claims Committee

11  retained my firm as counsel in November of last year.  And

12  since that point in time, when we were asked to assist the

13  Committee, the Special Claims Committee, to investigate

14  potential Commonwealth causes of action based on the Kobre &

15  Kim report, we were, I think, if I do say so myself, extremely

16  diligent, but we were diligent in the context of attempting to

17  prioritize the various work streams from the perspective of

18  the greatest potential value to the Commonwealth and its

19  interested parties.

20          So, in the first place, we asked for documents that

21  were on deposit with AAFAF.  I think to date we've probably

22  only got about 40 percent of the documents that we asked for,

23  and at that, we're looking at over 80,000 documents that, over

24  the course of the last five months, we've been analyzing.

25          We worked together with the UCC to peruse records and

1   identify what we commonly refer to as the garden variety

2   preferences and fraudulent conveyances.  These are payments

3   made within the 90-day or four-year period before the filing.

4           Again, we went to AAFAF to get the info, and it was a

5   staggering exercise.  1.2 million individual payments to over

6   141 thousand unique vendors, with a total dollar amount of

7   11.8 billion dollars of potential claims subject to avoidance

8   recovery.  That's only when the hard work began.

9           We had to back out governmental bodies, other

10  debtors, Commonwealth instrumentalities and agencies.  We

11  didn't want to run a circus where we were merely roundtripping

12  money from the recipient back to the Commonwealth, which would

13  have to come from the Commonwealth in any event.  But that

14  only got us down to about a thousand payments.

15          And then, between us and the Committee, who were the

16  original proponents of the 2004 investigation, we decided that

17  you have to have a cut-off, a dollar amount below which you're

18  not going to pursue recoveries.  And our initial cut-off was a

19  million dollars.  That brought us to 360 thousand payments, to

20  over a thousand vendors, and we were still targeting over nine

21  billion dollars of potential recoveries.

22          The amount of work that was then undertaken by both

23  the Committee, the Official Committee and the Special Claims

24  Committee, again was monumental.  We identified and reviewed

25  the payments based on a number of red flags.  Excessive

 1   payments that were made in a short period of time that greatly

 2   exceeded the amount of payments that were made to these same

 3   vendors over a longer period of time.  We looked at negative

 4   public information about the vendors.  We looked to see

 5   whether or not contracts had been registered on the

 6   Commonwealth's contract database.  I won't go through all of

 7   the issues.

 8         THE COURT:  I think that's a good illustrative

 9   sampling.

10         MR. WEISFELNER:  Okay.

11         THE COURT:  And I would like you to address the case

12   or controversy issue that was raised by some of the opponents.

13   And I think I'd like to sort of queue up that question by just

14   getting some precision as to what precisely you're seeking.

15         If I granted your requested relief, would it be that

16   future challenged bond avoidance defendants would be precluded

17   from raising the Statute of Limitations as an affirmative

18   defense?

19         MR. WEISFELNER:  They would, Your Honor.  However,

20   they would have the opportunity to argue that the equitable

21   tolling that was granted was improvidently granted.

22         So I guess the answer to your question is yes and no.

23   They'd be precluded from arguing that the Statute of

24   Limitations had expired, but I guess they'd be -- they would

25   be entitled to argue that equitable tolling didn't apply

1    either generally or specifically to their situation.  So yes,

2    they'd preserve that right.

3           THE COURT:  And why shouldn't it be that they can

4    raise or not raise the Statute of Limitations defense, and the

5    plaintiff entity, the debtor, have the responsibility at that

6    time to convince me that circumstances warranted equitable

7    tolling?

8           I'm just, frankly, not familiar with authority that

9    let's me shift the burden and make this blanket determination

10   as to unknown and as yet unsued defendants.

11          MR. WEISFELNER:  Well, again, Your Honor, I think

12   this goes back to the case law that underlies the whole

13   doctrine of equitable tolling.  Putting aside the diligence

14   issue -- and, Your Honor, I had pages of additional detail

15   about the amount of work that we and others have been doing in

16   this case to support that we have been as diligent as we can

17   under the circumstances.  The extraordinary circumstances that

18   we face is there is no reason to pursue the clawback,

19   principal and interest recoveries on potentially invalid

20   bonds, unless the bonds are declared invalid.

21          As some people predict -- and I'm not betting my

22   summer vacation on whether Mr. Stancil was right or wrong, but

23   there may very well be an opportunity for the Commonwealth,

24   through the Oversight Board, to attempt to resolve the issue

25   of the validity the bonds in the context of a plan of

1   reorganization.  If that were to happen, this litigation may

2   never occur, may occur in a much more limited fashion, may be

3   pursued by someone other than the Commonwealth under a plan of

4   reorganization where the claims are used as consideration for

5   getting to an ultimate deal.

6         Those are extraordinary circumstances, and in the

7   absence of a tolling agreement, an equitable toll, we would be

8   forced in our role as preserving claims, to commence actions

9   against literally thousands of recipients of principal and

10  interest payments, knowing all along that the likelihood of

11  having to hall them into court is dependant on any number of

12  future events occurring, and may never occur as a consequence

13  of a potential settlement.

14        What we're looking to do is preserve the resources of

15  the Commonwealth, so that we don't have to prophylactically

16  file as many complaints as we can, or as many jumbo

17  complaints, jumbo in the sense of how many defendants we're

18  talking about, as we can, all in less than a week, when

19  frankly, there are a lot of other focuses of our attention

20  that we think are much more meaningful in terms of either

21  preserving resources of the Commonwealth or generating

22  actually affirmative recoveries.

23        And again, I think the objections that you've heard

24  are coming from people that don't ever want to be exposed to

25  that, either as a --

```
1              THE COURT:  I certainly understand that.  But do you
2    have any precedent where this sort of -- recognition of this
3    sort of circumstance as an extraordinary circumstance?
4              The cases that you cited are single plaintiff cases
5    where an issue has been joined on the question of Statute of
6    Limitations.  And, you know, I just -- I don't see precedent
7    for this sort of vehicle.
8              MR. WEISFELNER:  And, Your Honor, I think, as
9    virtually everyone in this courtroom would agree, Puerto Rico
10   is sui generis.  And no, we have not identified any cases with
11   facts and circumstances that come close to the facts and
12   circumstances here.  We're only arguing by analogy.
13             THE COURT:  And generally, extraordinary
14   circumstances warranting equitable tolling are ones that are
15   created by the defendant in some way.  So what, if any, fault
16   on the part of these potential defendants contributed to these
17   extraordinary circumstances?
18             MR. WEISFELNER:  And the only thing I can point to,
19   Your Honor, and again, the word fault perhaps doesn't fit that
20   aptly, but the ability for us to ultimately trace who the
21   beneficial holder is, did, as part of the process, require us
22   to go to the street names.  And for a long time, before
23   Magistrate Judge Dein entered her Order, we were having a
24   difficult time with the streets in terms of complying with our
25   discovery requests in a timely fashion, giving us the
```

1 information without a whole bunch of provisions and bells and

2 whistles that protected the identity of the ultimate

3 beneficial holders, all of which we've agreed to comply with.

4 To this day, I will tell you that having spoken to

5 many of the street names, and not withstanding the entry of

6 the Order that we sought from Judge Dein, we are told that

7 there are any number of street names that simply will not be

8 able to comply with the deadline. Come whatever, you know,

9 damages or consequences they suffer, they literally can't get

10 it done, which means, in the absence of this tolling

11 agreement, our choices are going to be to name as many

12 beneficial holders as we possibly can, seek to amend our

13 Complaints as more information becomes available, all of which

14 seems to us, in the context of a unique situation, could be a

15 humongous waste of time, energy and Commonwealth resources on

16 claims and causes of action that may never get prosecuted but

17 the value of which we feel we have an obligation to preserve,

18 because we're talking about extraordinarily large dollar

19 amounts.

20 That's really all I had, Your Honor.

21 THE COURT: Thank you.

22 And so I have Mr. Bennett wishing to speak for five

23 minutes.

24 MR. BENNETT: Your Honor, I'm rising to speak just in

25 connection with the request in so far it effects ERS. And as

1    Your Honor recalls, when you go back to the original motion,

2    there was no reference separately to ERS at all.  And when we

3    got to the Reply, the argument of the Oversight Board was

4    somewhat repeated by Mr. Weisfelner.  It said, this is about

5    priorities.  This is only part of it that addressed the ERS.

6         The priorities they cited were activities in cases

7    other than the ERS case.  They talked about the COFINA

8    settlement.  They talked about other negotiations.  They

9    talked about the GDB.  And Mr. Weisfelner also stood up here

10   and said something about focuses of attention and

11   prioritization of effort after he was appointed in November

12   2018.

13        I have two points really in response to that.  One

14   relates to the point generally and one relates specifically to

15   ERS.  Let me talk about the point generally this way.  The

16   statute, PROMESA, does not say to the Board do A, do B, do C.

17   And if it did, if that was the statute we were dealing with,

18   it would be okay for the Board to pick and choose among

19   priorities, and however they came out would be fine.

20        Here's the statute we do have.  Do A before the

21   second anniversary of the petition date.  Do B and do C.  And

22   of course that's a vast oversimplification of a great big

23   statute.  But the point is, as to the commencement of certain

24   actions as distinguished from many other jobs assigned to the

25   Oversight Board, there was a deadline.  And the idea that

1    giving priority to many other things and running out of time

2    with respect to the one thing as to which the statute told the

3    Board this gets done by a particular date, that's actually not

4    a basis for equitably tolling a time period.  Particularly a

5    time period, by the way, that doesn't have an extension

6    provision.

7            I mean, Your Honor knows, I know that the drafters of

8    the Bankruptcy Code and the drafters of PROMESA, both being

9    relevant because we're dealing with an incorporated provision,

10   knew how to write a provision saying here's the deadline, you

11   can extend it with good cause, or some other standard.  And

12   that of course doesn't apply to the two-year Statute of

13   Limitations either.

14           I would also say there are very good reasons why that

15   is the case.  Many people are affected by bankruptcy cases.

16   Many people are entitled to go on with their lives and plan

17   things.  They're entitled to know at certain points in time

18   how they're going to be affected by certain proceedings.

19           This is not just a business point as to ERS bonds.

20   There are many that are held by retirees I understand.

21   Retirees are allowed to understand whether they should be

22   saving up money because they might have to pay it back or

23   whether they can go on with their lives.  So this is not an

24   irrational provision at all.

25           Now, as to ERS, there's been no cause for any

1  equitable tolling stated in this courtroom or any of the

2  papers at all, because in the case of ERS, we know that no

3  later than November 2017, the Oversight Board and AAFAF had

4  identified the idea that they were going to challenge the ERS

5  bonds.  We don't think much of that challenge, but it's been

6  hanging around in public in November 2017.  I don't know when

7  they first thought of it.

8          That, by the way, is about a year before

9  Mr. Weisfelner was even hired.  I don't understand why that

10  would support the idea of equitable tolling; that, oh, he got

11  hired in a year later and then he started doing things.

12          And by the way, we have no evidence about any of the

13  due diligence that was done about anything, except that we

14  know that it was selective and prioritized.  Once again,

15  intentional decisions as to what to do, what, when, as opposed

16  to unavoidable problems.

17          Mr. Weisfelner's effort to testify from the podium

18  doesn't solve that problem, nor does the fact that he may have

19  a stack of papers back at his office.  There wasn't a single

20  declaration filed by anybody.  There were lots of allegations

21  in motions that may or may not be capable of proof.  No one

22  made a single effort to prove them.

23          So back to ERS, nothing happened, based upon the

24  record between November 2017 and November 2018.  After 2018,

25  we don't know what happened, but we know choices were made and

1    they wound up in a difficult spot.  We know that, as to the

2    Board's lack of attention to this, it was distracted by things

3    going on in COFINA.  It may have been distracted by things

4    going on at GDB.  It may have been distracted by things going

5    on at the Commonwealth.  It did not mention a single thing

6    happening in the ERS case that was distracting their attention

7    from bringing actions timely in the ERS case.

8          And, oh, by the way, they found time to bring lots of

9    other litigation in the ERS case, but just for some reason,

10   not this.  And they want an extension forever.  It's two

11   separate cases -- or excuse me, there are multiple separate

12   cases, but it's between the Commonwealth and ERS, as we made

13   the point several times.

14         They are two completely separate cases.  The

15   Oversight Board is representative of both.  They have duties

16   to both.  They're supposed to comply with the law in both.

17   They're supposed to meet a deadline in the ERS case.  There is

18   nothing about what happened in the ERS case or, for that

19   matter, in the Commonwealth case that prevented them from

20   doing so.

21         Your Honor should not be granting a blanket

22   extension.  In fact, we would submit it is a totally lawless

23   request.  Thank you.

24         THE COURT:  Thank you.

25         And so I understand that Mr. Hein would like to be

 1  heard from New York.  Would Mr. Hein come to the podium?

 2          MR. HEIN:  Yes.  Thank you, Your Honor.

 3          THE COURT:  I'm going to set the clock for five

 4  minutes.

 5          MR. HEIN:  Yes.  Your Honor, there is no express

 6  statutory provision authorizing the tolling that's requested

 7  here that's been invoked.  FOMB asserts the Statute of

 8  Limitations needs to be equitably tolled because, to quote

 9  their Reply, quote, the total number of potential challenged

10  bond avoidance defendants is likely in the tens of thousands.

11          There is, I submit, Your Honor, nothing equitable

12  about tolling the Statute of Limitations to allow FOMB, the

13  UCC to hold threats of litigation over the heads of tens of

14  thousands of individual bondholders.  And individuals are a

15  target here.  A hedge fund that bought Puerto Rico bonds after

16  PROMESA was enacted and after Puerto Rico defaulted, they

17  didn't receive payment of interest.  It's individuals who

18  bought the bonds in good faith, based on Puerto Rico's

19  attestations pre-PROMESA, who received interest payments who

20  are being targeted here.

21          And I respectfully submit, Your Honor, there's

22  nothing equitable about the FOMB and the UCC spending money on

23  which these bondholders who bought pre-PROMESA should have a

24  first claim in their attempts not only to invalidate six

25  billion in bonds, but now to try to get the interest back and

1  recoup the interest.  There is I submit -- if equity means

2  anything, it means Puerto Rico cannot be permitted to start

3  suing people.  You talk about fault?  The only fault would be

4  believing Puerto Rico's attestations that it was in compliance

5  with its own laws and Constitution.  And I submit that does

6  not constitute fault justifying equitable tolling as a matter

7  of law.

8          One other consideration.  I've objected to the

9  failure to provide actual notice of this tolling motion to

10 bondholders.  Even though Puerto Rico, the FOMB, they have a

11 claims agent, Prime Clerk, they have the e-mails and addresses

12 of individuals who have filed claims or notices of

13 participation, yet they have not given a notice of this

14 motion.  I think that goes to lack of diligence and also to

15 lack of equity.

16         FOMB says, well, they've complied with the case

17 management procedures, but I submit that when they have failed

18 to do what simply could have been done through Prime Clerk,

19 that that invokes the considerations, the lack of diligence

20 and lack of equity I speak to.

21         I believe that all individuals are entitled to

22 advance notice before a motion of this nature is presented or

23 heard.  I think due process requires that.  And if time does

24 not permit notice, I submit the FOMB and UCC have no one to

25 blame but themselves.

1          And for the record, Your Honor, I also want to be

2     clear that I object to the discovery efforts that are

3     occurring.  The FOMB motion, docket 6413, was filed on April 8

4     without any objection deadline being specified.  And the next

5     thing I see is that, in fact, an Order's been granted entering

6     it.

7          I just want to be clear on the record that I object

8     to any revelation of any of my information to the FOMB or UCC

9     without actual advance notice being provided and an

10    opportunity to object.

11         Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Hein.

13         Did anyone else wish to be heard in opposition?

14         All right.  I don't see anyone else standing up, so

15    we're back to Mr. Weisfelner.

16         MR. WEISFELNER:  Your Honor, if I may, two points

17    with respect to Mr. Hein's argument, and then I want to

18    address the other objections that we heard from Mr. Bennett.

19         From Mr. Hein's perspective, if I could give due

20    process, sufficient notice of an equitable tolling motion, I

21    wouldn't need an equitable tolling motion because I'd use that

22    same list to just send out tolling agreements.  And if I

23    couldn't get tolling agreements, I'd use the same list to sue

24    them.

25         The other thing is that we have been talking to the

1    rest of the Board, as well as the Official Creditors

2    Committee, about some reasonable cut-off, some threshold of

3    receipt of funds in the form of principal and interest, if we

4    ever get there down the road, below which we would never

5    pursue those claims, because it just wouldn't be cost

6    effective.  And my guess is, from the perspective of

7    individual small bondholders, as opposed to institutional

8    holders, that will be welcome news if, again, we ever get to

9    that point.

10         Mr. Bennett seems to think that, you know, what

11   PROMESA tells you to do is focus on Statute of Limitations

12   that are about to expire.  That's all we've been doing is

13   we've only been looking at claims and causes of action and

14   preserving claims and causes of action that have a statute

15   that's expiring.

16         For example, we've done an inordinate amount of work

17   on third party claims, so-called underwriters and their

18   professional claims, which you'll hear a little more about

19   later today.  We've done and inordinate amount of work on the

20   garden variety preference claims which have a Statute of

21   Limitations.  And everything we've done has been with regard

22   to the Statute.

23         So we've looked at what PROMESA implies, focusing

24   first on statutes.  But within the claims that are subject to

25   the running of statutes, we had to prioritize in terms of what

1    would be cost effective, what would be a return to the

2    Commonwealth that made this action worth pursuing.

3        ERS has a separate issue.  It has a longer statute.

4    But here's the bottom line.  I think in connection with two of

5    the motions you've already heard today, or considered, and

6    that is procedures for the conditional objection, procedures

7    with regard to the Committee's objection, the clawback of

8    principal and interest claims, it seems to me that if you were

9    to grant the relief we're requesting, it ought to be for a

10   period of time that runs co-extensive with the amount of time

11   the parties have to come to you with a procedure, hopefully an

12   agreed upon procedure, for how are we going to litigate the

13   challenges to these bonds; how are we going to litigate the

14   challenges, if any, to the principal and interest on those

15   bonds; how are we going to effect appropriate due process

16   notice to everybody involved.

17       I think the whole notion of equitable tolling ought

18   to be co-extensive in terms of timing with that process.  So

19   I'm not asking for an open-ended, give us to the end of time

20   to figure out who our potential defendants are and then figure

21   out whether we ever want to sue them, but rather, let's put it

22   where it belongs.  And that's in the context of figuring out

23   how are we going to litigate in a constructive, meaningful,

24   intelligent, coordinated fashion the legal issues that we may

25   require Your Honor to pay attention to and resolve for us, if

1    we can't resolve them amongst ourselves with or without

2    mediation.

3          So for that reason, Your Honor, I want to make sure

4    that you understand our request for equitable tolling ought

5    not last forever, and we would suggest that it be made

6    co-extensive with the parties' obligation to come back to you

7    and explain how we collectively believe the whole question of

8    validity of underlying bonds ought to be litigated in what

9    order.

10          Thank you.  Unless you have any questions for me,

11   Judge.

12          THE COURT:  No.  Thank you.

13          MR. WEISFELNER:  Thank you.

14          THE COURT:  I just ask that everybody sit quietly for

15   a couple of minutes, because I think I can rule on this before

16   we break.

17          Before the Court is the motion of the Financial

18   Oversight and Management Board for an Order equitably tolling

19   the time prescribed by Section 546 to bring certain avoidance

20   actions.  That is docket entry number 6118 in Case No.

21   17-3283, and I'll refer to this motion as the Motion.

22          The Oversight Board requests entry of an Order

23   equitably tolling the time prescribed by Section 546 of Title

24   11 for the Oversight Board to bring avoidance and recovery

25   actions related to payments made on account of certain bonds

1    issued by the Commonwealth, ERS and the PBA.  The Court has

2    considered carefully all of the submissions, as well as all of

3    the arguments made in court today.

4         The Court is persuaded that it does not have subject

5    matter jurisdiction of the issue raised by the Oversight Board

6    because no case or controversy is presently before it.  The

7    Oversight Board's request for an ex parte, all encompassing

8    Order that would preclude unnamed challenged bond avoidance

9    defendants from asserting the statute of limitations of

10   Section 546 as an affirmative defense with respect to a

11   particular period of time, even if that's limited and

12   coordinated with procedural activity, is not something that I

13   am persuaded is within the Court's power to do.

14        Therefore, the Motion is denied without prejudice to

15   any party's position regarding the statute of limitations and

16   equitable tolling in the context of any particular adversary

17   proceeding or contested matter of which the Court does have

18   jurisdiction; and the Court will enter an Order accordingly.

19        Is there anything else short that we should take up

20   in the next eight minutes?  Can the stipulation come back as a

21   short matter or --

22        MR. DESPINS:  We have not had a chance to confer with

23   the parties because they are here in the courtroom, so I don't

24   think we can, Your Honor.

25        THE COURT:  All right.  Then there's a bonus eight

1    minutes on the lunch break.  We will resume at one o'clock.

2              Thank you.  Have a good lunch.

3              (At 11:51 AM, recess taken.)

4              (At 1:12 PM, proceedings reconvened.)

5              THE COURT:  And so would it be appropriate to start

6    with the stipulation?

7              MR. DESPINS:  Your Honor, on that, my colleague is

8    actually inputting some changes that I think would --

9              THE COURT:  So the answer is no, we should wait.

10             MR. DESPINS:  We're not yet there, Your Honor.  So

11   what we were thinking of doing, with Your Honor's permission,

12   is perhaps go over the motion, our Motion for Standing, which

13   is going to take a long time.  And go through, if Your Honor

14   wants to, the COFINA -- there's one claim objection, and then

15   there's a motion to appoint a committee of GO holders filed by

16   Mr. Hein that will allow this to --

17             THE COURT:  So you want another couple hours?

18             MR. DESPINS:  Not a couple of hours, Your Honor,

19   but a --

20             THE COURT:  Okay.  Good.  Then you're anticipating

21   your motion will take a little shorter than we've allocated,

22   and that's a great piece of news.  So that's fine.

23             So since you're at the podium, shall we go to Agenda

24   Item IV.5, which is your -- I think of it as your Section 926

25   Motion, but the motion for an order to pursue certain causes

1  of action on behalf of the Commonwealth, which I recognize

2  invokes not only Section 926 but other principles.

3     I have you down for opening remarks of 45 minutes.

4  How much of that is reply?

5     MR. DESPINS:  Your Honor, at least 15 minutes of that

6  is reply.  So what I would like, Your Honor, is that I will

7  not go over 30 minutes, but if I go less than that, I'd like

8  to keep the balance, the complete balance for reply.

9     THE COURT:  All right.  Well, we'll run the clock at

10  30 minutes.  We'll make a note of what, if anything, is left

11  of the 30 minutes, and then we'll proceed accordingly.

12     MR. DESPINS:  Thank you, Your Honor.

13     Your Honor, first, a few preliminary comments.  Your

14  Honor, we believe, the Committee believes this is a very

15  important issue for the case, because we're really dealing

16  with what we would describe as potential abandonment of causes

17  of action.  And there is no way around that reality because we

18  are so close to the expiration of the Statute of Limitations.

19  And remember, that Statute of Limitations is not only 506, but

20  108 of the Bankruptcy Code.

21     So if we had dealt with this two years ago, it would

22  be a totally different context, but we are dealing with it in

23  the context of potential abandonment.  And it's remarkable,

24  Your Honor, that if the Committee had not brought this motion

25  in March, that we wouldn't have heard a word about the

1    abandonment of these causes of action.

2            And I think it's important to first address an issue

3    that has been made by some objectors, that this is an issue of

4    vengeance or something like that.  And I want to debunk that

5    myth, because the Committee is not in the retribution

6    business.  We are in the collection business.  The goal here,

7    and the sole goal is to make the pie bigger for all creditors,

8    because we believe if the pie is bigger, we have a better

9    chance of getting better recoveries.

10           And I want to clarify this as well.  The fact that we

11   would be bringing those claims doesn't mean that we control

12   how they're disposed of in the plan.  The pie is bigger but

13   the pie will be distributed pursuant to a plan of adjustment.

14   It's not like we get to pocket these distributions because we

15   would be bringing those claims.  And frankly, that should be

16   everyone's goal, to make the pie bigger.

17           And there's no doubt that those claims are valuable,

18   Your Honor, because Ambac, which is a very sophisticated party

19   in this case, has stated the fact that they like the claims so

20   much that they want to grab the claims for themselves.  And of

21   course we don't think that should happen, because this should

22   be for the benefit of debtors generally, but that gives you a

23   sense of the value of those claims.

24           So in terms of how we're going to proceed today, Your

25   Honor, we're not going to address the technical issue of

 1   whether the Committee is a creditor and all that.   We've

 2   covered all that in our Reply.   The members of the Committee

 3   are here in the courtroom represented by counsel.   They have

 4   claims on file.   There's no doubt I think they're creditors.

 5   So if somebody raises that, I'll deal with that on reply.

 6          THE COURT:   And a formal joinder was filed offering

 7   up three individual members -- well, three members of the

 8   Committee that are entities, and one I gather is a PREPA

 9   creditor.   But you represented that the Doral entity and the

10   SEIU are Commonwealth creditors, so we have a creditor who is

11   a movant here.

12          MR. DESPINS:   Correct, Your Honor.

13          THE COURT:   So technical issue one crossed off.

14          MR. DESPINS:   Okay.   So in terms of how to proceed,

15   there are two phases.   The first one is Section 305 obviously.

16          So is Section 305 a bar to this motion?   And that is

17   divided in two issues, which is 926 and derivative standing

18   generally.   It's very clear, Your Honor, the Committee is not

19   limiting itself to derivative claims.   It wants to bring

20   avoidance actions as well that are available under Section --

21   or through Section 554 of the Bankruptcy Code.   And you can

22   see that from the Genovese outline that's attached to our

23   Reply.

24          And this is a good segue into my introduction of

25   special counsel for the Committee dealing with claims against

1    underwriters, Mr. John Arrastia from that firm who's here with

2    us today.

3        THE COURT:  Good afternoon.

4        I don't remember seeing any application for

5    authorization to retain special counsel.  Did I miss

6    something?

7        MR. DESPINS:  No, Your Honor.  We haven't filed it,

8    because they were just retained I would say last Tuesday or

9    something like that.  So I think that generally the practice

10   is that we have 30 days.  We don't intend to take 30 days, but

11   we have -- normally it's 30 days to file an application.  And

12   we will file that application.

13       And I'll talk in a minute about compensation for

14   them, because that goes to the heart of the issue of is there

15   a cost for the Commonwealth.  But I'll come back to that.

16       THE COURT:  Now I understand the framework in which

17   you're intending to work, and that is helpful to me.

18       MR. DESPINS:  Okay.  And I would say just two minutes

19   about this.  The Genovese firm, what they do for a living is

20   sue banks and broker-dealers.  That's practically all they do.

21       In the *Enron* case, they were co-counsel for the

22   plaintiffs against a number, dozens of banks and securities

23   firms, and they got a settlement of seven billion dollars

24   against these underwriters.  And they're already involved in

25   suing broker-dealers on the island as a result of the -- this

1   is on different theory, on behalf of individuals, but with

2   respect to claims against broker-dealers.  So they have a lot

3   of familiarity with what has happened here.

4        But in terms of the hearing and how we think it

5   should be staged, the first issue, 305.  The second issue,

6   Your Honor, if we survive on one or both of the 305 issues,

7   would be divided in two segments, which is is the Board

8   refusing to bring claims, and second, are the claims we're

9   bringing colorable.

10       And this is where I think, Your Honor, things would

11  be complicated logistically, because we have not, to date,

12  publicly disclosed the claims that the Oversight Board wants

13  to bring, because we're obviously -- the potential defendants

14  are listening to this hearing.  We don't want to damage any

15  such claims.  And we've also refrained from publicly

16  disclosing in detail the claims we would bring.  But you have

17  that, the Board has that --

18       THE COURT:  I've read the sealed filings, and I had

19  assumed that you would proceed by being oblique in your

20  references to sealed information in the confidence that I've

21  read the submissions that are currently sealed, at least in

22  advance of the statute of limitations date.

23       MR. DESPINS:  Correct, Your Honor.

24       So we'll try our best to navigate that as carefully

25  as possible, although when we get to that stage, it may be a

1    little more complicated.  But let me start with the first

2    part, which is Section 305, and the interplay first between

3    305 and 926.

4            I'm not sure this is really disputed by the Board,

5    that 305 cannot be a bar to 926, but to the extent it is --

6            THE COURT:  Maybe we can just by hand signal get an

7    indication from the Board's counsel, is the Board contending

8    that 305 is a barrier even to a 926 trustee designation?

9            MR. WEISFELNER:  No, Your Honor.

10            THE COURT:  All right.  Mr. Weisfelner has said no,

11    they're not making that argument.  So you don't need to

12    address that.

13            MR. DESPINS:  All right.  Let's move on to the second

14    issue, which is does 305 act as a bar to seek derivative

15    standing, and that's obviously a more involved analysis.

16            The first point, Your Honor, is that we don't believe

17    that 305 acts as a bar because under the current

18    circumstances, the Board is abandoning the claims that we're

19    seeking to pursue.  They're not pursuing them, and they will

20    expire on May 2nd.  And if that's the case, the Court is not

21    interfering with the property of the debtor.

22            It's like in the abandonment context where the

23    creditor can basically grab the assets that have been

24    abandoned and --

25            THE COURT:  But if you say that the Committee, the

1   Official Committee is taking up a claim, even if you accept

2   the notion for these purposes that it is or would be

3   abandoned, you're still looking at the Commonwealth's

4   resources to finance the pursuit and administration and

5   oversight of the claim; and so why isn't that interference?

6         MR. DESPINS:  So let me address that right now,

7   because let me -- there are a bunch of reasons why the

8   Committee went to the Genovese firm.  One of them is that they

9   sue banks on a contingency basis.  And the Board made a big

10  thing about this is going to be very costly, et cetera, et

11  cetera.  So let me put that on the table.  They would pursue

12  these claims that are described in the attachment they

13  prepared on a full contingency basis.

14        So therefore, you know, I think that addresses that

15  issue at least largely in the sense we wouldn't have any

16  involvement in that litigation against underwriters.

17        THE COURT:  Except obviously if you were appointed as

18  the -- your Committee was appointed as the plaintiff or

19  trustee, I would assume that there would at least be some

20  incremental cost by way of Committee counsel guiding this

21  litigation or is this just --

22        MR. DESPINS:  At that point, Committee counsel would

23  be -- on these issues would be the Genovese firm, not us.  But

24  yes, obviously we need to coordinate with the Committee.  We

25  need to get them organized and all that.  So obviously there

1    is some cost, but we're not talking about, from our point of

2    view, material cost in that regard, Your Honor.

3          So that's the first argument, which is they're

4    abandoning those claims.  It's not like GDB where they're

5    saying, hey, we're doing a settlement; we're using those

6    claims as part of a settlement.  They're not doing that.

7    They're just abandoning it.

8          And it's very important, Your Honor, to talk about

9    one issue.  It goes back to Ambac.  Ambac has said in their

10   response, we like those claims; they should be brought, but by

11   the way, if they're not brought, we will grab them under

12   Section 108(c) on or after May 2nd.

13         You may say, how is that possible.  It's a complex

14   analysis, and I'm not going to defend or advocate for them.

15   They'll speak for themselves.  But basically, under 108(c), if

16   an action could have been brought and the debtor abandons or

17   does not pursue it within the timeframe, there's a 30-day

18   period for creditors to bring that action.  And what they're

19   saying essentially, Ambac, is that, make my day in a sense,

20   you know.  Don't approve this.  We will grab this on the other

21   side.

22         I'm not representing them obviously, so I'm not going

23   to defend their position.  They can explain it better.  But

24   the point is there's going to be someone picking up those

25   claims anyway.

1          But let me turn to the --

2          THE COURT:  Well, and we can take this up with Ambac,

3   but I looked at 108(c), the provision that was cited, and

4   maybe I've got this wrong, but it seems to deal with

5   exceptions to the bankruptcy discharge of Chapter 7, 12, and

6   13 debtors and permits, under certain circumstances, a window

7   for pursuit of a claim against the debtor.  That's what it

8   seems to refer to.  So I don't really understand how that lets

9   Ambac pick it up.

10         MR. DESPINS:  Again, I'm not going to advocate for

11  them, but they have a theory under which they are -- if the

12  debtor does not pursue claims within the statutory time

13  period, that they have 30 days to pursue those claims.  But

14  that's in their pleading.  I'll let them assert that.

15         Let's get to the crux of the 305 slash derivative

16  standing issue, which is our contention, Your Honor, that

17  obviously the Board did not grant us derivative standing, but

18  that they consented to the Court deciding that issue.  And we

19  believe that that consent can be derived from multiple

20  documents in the case.  So --

21         THE COURT:  Could they have stopped you from making

22  an application to the Court for derivative standing?

23         MR. DESPINS:  No.  That's not our point, Your Honor.

24  In --

25         THE COURT:  Okay.  So I realize, in the stipulation,

1    there is a provision that says you can make this limited

2    motion, but so what you'll need to help me understand, as you

3    go through your textual analysis, is how agreeing that an

4    issue can be brought to a Court in the face of opposition to

5    the request for relief sought is somehow consent to the

6    granting of relief they couldn't have prevented being

7    requested in the first place.

8            MR. DESPINS:  And I will do that, Your Honor, but I

9    think that the difference here is not that they could have

10   precluded us, but in agreeing that we could bring that motion

11   without any reservation of rights regarding 305, they were

12   essentially consenting to your Court determining the issue.

13           And I want to be clear, it's clear from the

14   stipulation that the claims we were dealing with were not

15   avoidance action claims only.  Right.  It talks about

16   deepening insolvency claims, fraud claims, et cetera.  So it's

17   clearly outside of the 926 issue.  It says that in the

18   definition of additional claims.

19           And it's also clear that they understood, when they

20   were providing us with lists under your Court's Order, that

21   they were going way beyond 926.  They were providing claims

22   generally.

23           And on top of that, there were several joint motions

24   filed by us and by them that said that what we were dealing

25   with were causes of action of the Commonwealth generally, not

1 avoidance actions. While the first motion, I will grant you,

2 talked only about pursuing avoidance actions -- that's our

3 March 25th, I believe, motion. It clearly, if you remember

4 that in your Order, talked about avoidance actions only.

5 After that, it migrated to all causes of action of the

6 Commonwealth.

7 And in fact, the motion that was filed jointly the

8 day that the stipulation was signed clearly says that this

9 motion that we're -- that we're -- that you're hearing today

10 would be to appoint the Committee or to seek appointment of

11 the Committee to pursue causes of action generally, not

12 avoidance actions.

13 So the point there is if you put all that together,

14 the Board needed to say, but 305 is preserved. Otherwise,

15 what they were agreeing is that the motion really could not be

16 heard by the Court, because the Court has no power to really

17 consider the request because of 305.

18 THE COURT: But wouldn't they have to make that

19 argument to the Court? The Statute is not so self-executing.

20 MR. DESPINS: Well, no, because -- and that's the

21 point we're making in our brief. The Code sometimes uses the

22 term express consent, sometimes it uses consent, simple

23 consent; and courts have relied on that to find consent short

24 of express consent in situations like this.

25 For example, if a -- the automatic stay provision,

1    you're very familiar with it, where a hearing has to occur

2    within, I forget, 30 or 60 days, unless the party consents.

3    Courts have found that, for example, a party's request to

4    brief an issue may take them out of the -- they can be deemed

5    to have consented because of that.

6         There are many other instances where Courts have

7    compared the words express consent with consent and have ruled

8    that simple actions short of, I hereby consent, are sufficient

9    to confer consent.  And in a context such as this, where the

10   claims are listed, the claims are clearly not all 926 claims.

11   The majority of them are listed as non-926 claims.  And the

12   fact that the Board said that this motion -- they have agreed,

13   it says they agree that the motion can be filed without any

14   reservation of rights under 305, we believe is sufficient for

15   consent under 305.

16        In any event, we also rely on the abandonment

17   argument.  Even assuming, Your Honor, that you don't buy the

18   305 argument, that you have concerns about the potential

19   application of that in other contexts -- and by the way, I

20   would say if you look at the COFINA stipulation, it has

21   exactly the language that is not in the stipulation, about the

22   Board only conferring consent under 305 with respect to X, Y

23   and Z, and nothing else.  That's not in this stipulation.

24        So if you are concerned about the potential

25   application of what I'm saying to other instances in the case,

1    but you nevertheless think that these claims should be brought

2    because they have merit, I think that the Court has the

3    ability to convey that message.  For example, the same way you

4    conveyed it to us at the hearing last Wednesday to say, you

5    know what, there's a lot of moving parts here.  I am not

6    comfortable with these claims being abandoned by May 2nd.  I

7    think the Board and Committee should sit down and work out a

8    plan to bring those claims.

9         And I think, you know, like practically, what is the

10   Board going to do then?  Just say you can't make us do it, so

11   therefore, we won't do it?  I doubt that much very

12   practically.  So the issue is there are material claims that

13   are being abandoned, and they should be brought.

14        And now I turn to the issue of refusal to bring.  As

15   we said in the motion, there are multiple forms of refusal to

16   bring.  There's the obvious refusal to bring that we're

17   dealing with here, because some claims are identified and

18   they're not going to bring them.  Any claims sounding in

19   fraud, deepening insolvency will not be brought.  And no

20   claims are being brought against any individuals.  So former

21   directors and officers of GDB, not -- no claim being pursued.

22        So that's easy.  That's the refusal to bring.  But

23   there are other forms of refusal to bring, which is that --

24   and this brings me back to the issue you raised last

25   Wednesday.  I remember you were considering the stipulation.

1  You said, you know -- not in those terms, but essentially the

2  message was, I understand what you're doing.  I understand

3  there's going to be a lot of activity, but I'm expecting this

4  to dial down.  You didn't use those words, but the message was

5  this activity to dial down because you're just trying to

6  protect the Statute of Limitations now.  And I think the

7  general consensus is, we hear you.  We get that.

8        But this is completely different than that.  Why?

9  Because we're not dealing with claims against creditors which

10 can be resolved through all sorts of plan provisions in the

11 plan context.  These people that we want to sue are third

12 parties.  They have nothing to do with the case right now.

13       And refusal to bring also means, you know, to look at

14 the history here, which is there's a -- in the opinion of the

15 Committee counsel specializing in underwriter claims,

16 there's a -- there are substantial claims to be brought, with

17 substantial potential recoveries here.  And the Board's

18 approach to this is, let's get tolling agreements and let's

19 get a tolling Order or different -- you know, Equitable

20 Tolling Order.

21       That's not pursuing these claims.  These claims

22 should have been brought months and months ago, Your Honor.

23 So we believe this is also a form of not bringing those

24 claims.

25       It can't be that -- you know, no bank or underwriter

1    is going to settle based on a tolling agreement.  That's not

2    the way it works.  Mr. Arrastia could tell you more about

3    this, but the concept that these claims are being pursued is

4    not -- is really not right.

5         The other point I would -- that I would raise is that

6    there's no doubt that they're not pursuing the claims that are

7    listed in the Genovese outline.  And by the way, in that

8    outline, it lists every claim and it describes whether the

9    Board is bringing those claims or not.  But, and this is where

10   I'm -- I don't want to describe precisely, but -- the claims

11   they're bringing, but I would say that they are much more

12   limited in terms of types of claims, and therefore, in terms

13   of potential damages that could be obtained.

14        So I'll leave it at that if that's okay with Your

15   Honor.

16        THE COURT:  Yes.  And again, I have read those

17   submissions.

18        MR. DESPINS:  Okay.  At the end of the day, the Board

19   does not want to go where the facts lead them and even where

20   their claims lead them.  So again, I want to avoid mentioning

21   particular claims, but you'll see in what we call the final

22   final list, because there are two final lists, which is

23   Exhibit C to our Reply.

24        If you go through that list, you'll see that there

25   are fraudulent transfer claims asserted against some people

1    going back to -- I'm not going to say the year, but long

2    before 2014.  Let's just say that.

3             THE COURT:  Yes.  And again, I've read the

4    submission.

5             MR. DESPINS:  Okay.  So the point is, if you're going

6    to allege a fraudulent transfer claim, that means that the

7    debtor was insolvent back then.  And it's not like the debtor

8    was insolvent and became solvent again.  No.  It just went

9    downhill.

10            So when I said say the Board does not want go where

11   the facts take them, it's exactly that.  Meaning, how is it

12   going back to year X through 2014, they were in a certain

13   financial condition, and in 2014, somehow there's no argument

14   that people knew or should have known that it was completely

15   insolvent and that there was no ability to repay this, et

16   cetera, et cetera, as alleged in -- as more alleged in detail

17   in the Genovese submission.

18            That's the point that the Committee's making, is how

19   can it be that they can take these two opposite positions?

20   The claims that are listed in the Genovese outline, and

21   Mr. Arrastia can address any particular question you may have,

22   Your Honor, but they are colorable.  Not only that they stand

23   on their own, but also they're colorable because the Oversight

24   Board said that they were.

25            How?  Because through the providing of lists that

1  Your Honor directed them to provide, they essentially said

2  that.  Not anymore, but they said that.  So therefore, if

3  there's any purpose to this list that you Ordered, it has to

4  be that people cannot put something on the list and say just

5  kidding, you know, I was just showing you this but I had no

6  intention of bringing it.  Obviously, they are estopped from

7  challenging the colorability of those claims at this point.

8          And let's talk about the claims against individuals

9  now.  They say this is awful, et cetera, but it's clear the

10  Board does not want to sue any individual.  And we're talking

11  about former GDB officers.  And they include kind of a few

12  cheap shots about our motivation to do so, but the simple

13  answer, and this is coming from Mr. Arrastia, who does this

14  for a living, is that you always name the individuals as part

15  of the Complaint against the big banks, because, one, you want

16  to have a scope of discovery that's not limited to the

17  underwriters.  You want to get discovery from others.  But

18  also because this, the naming of those parties, could lead to

19  admissions or more than that vis-a-vis other co-defendants.

20          And the cost involved is de minimis in adding the

21  individual defendants, because they're going to draft the

22  Complaint that's going to describe the picture generally.

23  Adding the individual defendants does not add materially to

24  the cost of doing that.  And on top of that, they are doing

25  this on a contingency basis.  So you want to do that as a

1   matter of strategy.

2           And also, there may be a D&O policy.  We don't know

3   the details of that at this point, but there may be a D&O

4   policy.  But it is from a strategic point of view.  This is

5   how it's done, in the opinion of underwriters, special counsel

6   of the Committee, is the way it should be done.

7           And we cannot forget that two of the Board members,

8   current Board members, are some of these individuals.  I am

9   not saying, by the way, whether we would assert claims against

10  them or not, but the point is if you're not suing individuals,

11  they're getting a release on May 2nd.  So let's all make sure

12  we understand that reality.

13          And I would end the opening here by saying that, you

14  know, they criticized the Committee heavily for not putting

15  its money where it's mouth is.  And the point is the Genovese

16  firm has a lot of experience doing this.  They're willing to

17  do this on a contingency basis.  And yes, there will be

18  additional costs.  Certainly not by my firm, but in terms of

19  perhaps some expenses or things like that.  But the point is

20  that's not material compared to if you look at the potential

21  damages that are listed in the Genovese presentation, what the

22  estate might be recovering here if these claims are brought.

23          Thank you.

24          THE COURT:  Thank you.

25          So for oppositions, I have first listed Milbank for

1  five minutes.

2          MR. MAINLAND:  Yes, Your Honor.  Good afternoon, Your

3  Honor.  Grant Mainland of Milbank on behalf of Ambac Assurance

4  Corporation.

5          Your Honor, I want to be responsive to the question

6  you asked during the colloquy with Mr. Despins on the argument

7  we made in our brief as to Section 108(c) of the Bankruptcy

8  Code and why that's so important here, because a key premise

9  of Mr. Despins' application is that these claims will simply

10  disappear if they're not brought within the Statute of

11  Limitations governing claims by either the debtor or a trustee

12  of the debtor.

13          108(c), I will concede, is not a model of clarity,

14  but here is how we read 108(c) and why state law or

15  Commonwealth law of fraudulent conveyance actions revert to

16  creditors after the expiration of the applicable Statute of

17  Limitations.  108(c), and I'll flip to it, speaks not in terms

18  of an action against the debtor, but a civil action on a claim

19  against the debtor.

20          Recall that Section 362(a) of the Bankruptcy Code

21  stays claims to recover or actions to recover a claim against

22  the debtor.  And importantly, 102 -- I apologize for the

23  meandering references, though.  This is the reality of the

24  Bankruptcy Code.  102(2) defines a claim against the debtor to

25  include claims against property of the debtor.

1          So we read 108(c) and its reference to a claim

2   against an action on a claim against the debtor as

3   encompassing claims against third-party transferees to recover

4   the value of any transfers that are avoidable under state or

5   Commonwealth law fraudulent conveyance statutes.

6          We understand that this argument was made in the

7   *Lehman* bankruptcy, and that the debtor there and other

8   relevant parties stipulated to a tolling agreement that

9   incorporated an agreement that 108(c) does in fact return

10  state law fraudulent conveyance actions to creditors following

11  expiration of the stay.  And importantly -- or I'm sorry,

12  following expiration of the Statute of Limitations governing

13  the Trustee's claims.

14         And one other textual detail here that I think is

15  relevant is in 108(a), it refers to the time within which the

16  Trustee may commence an action.  108(c) just speaks more

17  generally in terms of the period of time that would be

18  extended essentially, and there's no reference to the Trustee.

19  So that's another reason why I think the only -- the correct

20  interpretation here is that that is referring to creditor

21  claims.  That's sort of the textual analysis and how we view

22  that.

23         Why don't I take a brief step back to explain sort of

24  how Ambac is uniquely situated here.  We, unlike other parties

25  and creditors, actually believe that at least many of these

1   claims have real viability.  And obviously we have limited

2   visibility into them, but at the high level they're described,

3   we view them as being, you know, a potential source of real

4   value for the Commonwealth.

5        The issue is that the UCC is simply the wrong entity.

6   And I think the fact that Mr. Despins had to spend half an

7   hour arguing about Section 305 -- well, Section 305 just

8   wouldn't be an issue here if creditors are bringing these

9   claims.  And that's because Section 305 has to do with

10  interference of the property of the debtor.  This would no

11  longer be, these claims would no longer be the property of the

12  debtor on the other end of the bankruptcy stay as it relates

13  to these claims.

14       926 is another issue where the Committee has real

15  issues about not being a creditor within the meaning of that

16  provision.  Obviously we don't have that issue.  We think

17  what's been referred to as *Aurelius* risk, or the possibility

18  that something may happen so-to-speak to the continued

19  existence of the Oversight Board, that could have

20  ramifications for any statutory committee that's litigating

21  causes of action on behalf of the debtor.  None of those are

22  issues if creditors are bringing those claims directly.  So

23  those are the key points I wanted to focus on.

24       There was one other exchange I think was relevant

25  during Mr. Despins' presentation regarding resources and the

1  sort of use of Commonwealth resources to pursue these claims

2  that I think also is another area where creditors pursuing

3  them sort of solves the issue.  You know, those would be

4  direct actions brought by individual creditors, not being

5  funded out of, you know, the assets of the debtor.

6       THE COURT:  And if the creditors were to bring these

7  after the expiry of the Statute of Limitations, they would be

8  bringing them for the benefit of whom?

9       MR. MAINLAND:  It's a very good question, Your Honor.

10  With respect to the avoidance claims, it's an interesting

11  species of claims in the sense that it would be a direct

12  action brought by a creditor as a plaintiff against the

13  third-party transferee.  But I think to the extent the

14  plaintiff is seeking avoidance of a transfer, that the

15  trans -- if that transfer is in fact avoided, I think it's

16  recovered on behalf of the Commonwealth for the benefit of all

17  creditors.

18       So in that sense, I guess I personally sort of think

19  of it as a quasi direct slash derivative claim.  I think the

20  actual recovery of the money itself functionally ends up being

21  derivative, but the action would be brought and funded

22  individually by a creditor.

23       THE COURT:  And so you don't see it as a situation in

24  which creditor A sues, gets made whole, and then somehow flips

25  whatever is left back to some receivership or some kind of

1    arrangement to be --

2         MR. MAINLAND:  I don't think that's a risk, because

3    the only way a creditor is getting actual value here is if

4    they're -- if they see it through.  And ultimately, the value

5    is, as Mr. Despins notes, sort of increasing the size of the

6    pie.  It's just that we'd be doing it without a lot of these

7    legal questions hanging over us in the way they are over the

8    Committee.

9         So unless there's anything further, I'll rest on our

10   pages.  Thank you.

11        THE COURT:  Thank you, Mr. Mainland.

12        MR. MOERS MAYER:  Your Honor, this is Tom Mayer in

13   New York.  I apologize for interrupting, but I'd spoken with

14   Novak about the possibility of our jumping the queue given my

15   own personal schedule, and I'd ask if that might be possible.

16   I don't have more than a few minutes.

17        THE COURT:  Please go ahead.  Thank you, Mr. Mayer.

18        MR. MOERS MAYER:  Oppenheimer Funds holds

19   approximately 500 million dollars of GOs, and the overwhelming

20   majority of these are old GOs.  So I don't think, in a

21   statistical manner, we are more likely to benefit than we are

22   to be harmed by any of these litigations.

23        That being said, we think the Committee is the wrong

24   entity to be a trustee, and we see absolutely no precedent or

25   authority for a committee, one, serving as a trustee, as we

1    said in our papers; or two, acting under *Cybergenics*, *STN* or

2    *Commodore* standing on behalf of a municipal debtor.  We know

3    of no case that has allowed that to happen.

4          I will link that back to the argument you were just

5    having in terms of Section 108(c).  And I was interested that

6    Ambac did not cite what 108(c) provides for.  108(c) provides

7    for the termination of the automatic stay under Section 922.

8    922 stays not only actions against the debtor but it stays

9    actions against individual offices of the debtor.

10         Now, as I stand here today, I have no idea who

11   Mr. Despins or the Committee wishes to sue, whether they are

12   currently officers of the debtor, whether they will be

13   officers after the next election, whether they will be

14   officers after the next round of governmental appointments by

15   this administration.  No one knows.

16         All of this gives point to Your Honor's question

17   about Section 305, and frankly, Section 303, as to whether it

18   is appropriate for a Committee to attempt to serve as trustee

19   under 926 and to serve as a plaintiff in the name and stead of

20   a governmental entity under the *Cybergenics* standards.  We've

21   made those arguments in our papers.

22         And that's all I have to say today.  I would ask that

23   those arguments also stand for our opposition to the

24   stipulation, because I will not be here to make an address at

25   that time.

1          THE COURT:  Thank you, Mr. Mayer.

2          Next we'll go to counsel from Cadwalader.

3          MR. CURTIN:  Good afternoon, Your Honor.  Tom Curtin

4     with Cadwalader on behalf of Assured Guaranty.

5          THE COURT:  Good afternoon.

6          MR. CURTIN:  Your Honor, we, along with other

7     creditors, have objected to the 926 motion proffered by the

8     UCC, and we have done so because it's without legal basis.

9     You've heard already why 926 does not apply as to the

10    stipulation.  I raised that at the last hearing.  That applies

11    equally here as well.

12         And 926 is the only basis, Your Honor, for which

13    non-consensual derivative standing can be granted, and it can

14    only be granted for creditors.  The UCC is not a creditor.

15    I'll get to that in a second.  But there's an additional

16    reason why the motion should be denied, because trustees can

17    only be appointed in Chapter Nine cases to pursue avoidance

18    actions.

19         There's a closed list of causes of action that are

20    put in 926(a).  There are specific sections of the Bankruptcy

21    Code that are cross-referenced therein, 544 through 550

22    specifically.  Those are avoidance causes of action.  Breach

23    of fiduciary duty claims, deepening insolvency claims, fraud

24    claims are not avoidance causes of action no matter how much

25    Mr. Despins wishes they are.  So, Your Honor, 926 does not

1   authorize the motion on that basis alone.

2          And then of course, Your Honor, there's the issue of

3   standing, whether or not the UCC is a creditor.  Mr. Despins

4   says this is a technical issue.  It's not a technical issue.

5   It's an issue of whether or not he's a proper movant here

6   today, and he's not.

7          THE COURT:  He filed the joinder.

8          MR. CURTIN:  Yes.  He actually filed the joinder.

9   I'm glad you mentioned that.  The joinder that was filed

10  earlier this week wasn't to this motion.  It wasn't even to

11  the urgent motion regarding the stipulation, and it wasn't

12  even to the stipulation.  It was to docket 5997, which was a

13  purely procedural motion.  It has nothing to do with what's

14  before you here today.  So they didn't join this.

15         And in fact, all we have is the footnote that's in

16  their motion that says that they're nominal co-movants. And

17  I'd actually like to turn to that, because -- I don't think I

18  need to belabor the point.  They're not a creditor.  They're

19  not.

20         So there are individual creditors that are listed in

21  that footnote.  One is Tradewinds.  Tradewinds is not a

22  creditor of the Commonwealth.  It filed only Proofs of Claim

23  against PREPA, so it has no standing to be here today.

24         Second is Doral Financial Creditors Trust.  Doral

25  Financial Creditors Trust, Your Honor, doesn't appear on the

1   claims register.  There may be other Doral entities that might

2   be creditors, but we don't know whether this particular entity

3   is a creditor of the Commonwealth.  And we need that in the

4   record before you here today, and they've failed to have done

5   so.

6          In addition, the 2019 statements of the UCC have not

7   been updated in over six months.  We need that to be updated

8   so we can have a full and accurate representation as to what

9   the nature and amount of the claims of Doral and other

10  creditors, purported creditors are on that committee.

11         And that leaves SEIU, Your Honor.  We mentioned in

12  our papers we don't believe there is sufficient evidence that

13  SEIU is a creditor.  It may be they are, but we just don't

14  have the evidence here before us today.  They haven't filed

15  any 2019 statements in this case.  The 2019 statements filed

16  by the UCC do not even attempt to disclose what the nature and

17  amount of their claims are.  And we need to know that to

18  determine whether or not they are creditors.

19         But if Your Honor is to determine that they are

20  creditors, the appropriate remedy I think here is to strike

21  the Committee as a movant from this and to allow SEIU and

22  other creditors to prosecute this motion.

23         THE COURT:  Well, 926 says that a creditor can move

24  for appointment of a trustee.  It certainly doesn't by its

25  literal terms say that the trustee then has to be a creditor.

1    So if I find that one of these proffered joining entities is a

2    creditor, why does that necessarily disqualify the UCC from

3    being the trustee?

4          MR. CURTIN:  I don't think it's necessarily the point

5    that it disqualifies them from being the trustee, Your Honor.

6    It disqualifies them from being a movant here today.  And I

7    think it should tell you everything as to who's the movant

8    here.

9          Mr. Despins is arguing this motion.  It's not the

10   individual creditors, to the extent they are creditors.  It is

11   the Committee, and the Committee is not a creditor.

12         I'd also note, Your Honor, just one additional point

13   I'd like to make.  In the Reply Brief, there is an assertion

14   made that unions are not required to comply with Rule 2019,

15   and there is a citation to a case from Tennessee from 1992

16   that said -- purportedly said that unions do not have to

17   comply with 2019.  That's obviously decided under the old

18   rule, which was amended in 2011 and brought in to encompass a

19   broad array of creditors and entities that purport to

20   represent creditors.

21         THE COURT:  I remember that amendment well.  I was

22   chairing the Rules Committee at the time.

23         MR. CURTIN:  And in fact, Your Honor, even before the

24   Rule was amended, there is a mountain of case law to say

25   unions are required to comply with 2019.  I'm happy to provide

 1  you with some cites here today, but --

 2          THE COURT:  Well, that's sort of going off topic.

 3          MR. CURTIN:  Sure.

 4          THE COURT:  If you can't get traction with

 5  Mr. Despins and want to make some sort of application for an

 6  order directing the Committee --

 7          MR. CURTIN:  Sure.

 8          THE COURT:  -- to report, you're welcome to do that,

 9  but let's not add that to the already full agenda today.

10          MR. CURTIN:  Sure.  We'll be happy to do so, Your

11  Honor.  Unless you have any other questions, I'll yield the

12  podium.

13          THE COURT:  No.  Thank you.

14          Let's see.  We've heard from Mr. Mayer already.  From

15  Weil.

16          MR. MORGAN:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MR. MORGAN:  Again, Gabe Morgan from Weil on behalf

19  of National.

20          Your Honor, as a starting point, I note that National

21  owns or insures approximately 1.1 billion of Commonwealth

22  debt, including general obligation and PBA bonds.  I should

23  also note that as far as we can tell, National is not a target

24  for the claims in dispute.  So the obvious question, why are

25  we objecting.

1          Well, in short, National firmly believes in the need

2     for good process and the need to ensure that the pursuit of

3     claims is in the best interest of the debtor and its

4     creditors, not a waste of resources.  The Committee's motion

5     was sweeping and overbroad in the relief it requested, again,

6     as far as we could tell.  In its own words, the Committee

7     referred to the motion as unavoidably preliminary.  And while

8     the Committee's Reply focuses on specific types of claims it

9     wishes to pursuant against specific types of parties, a

10    description of those claims is, quote, by no means definitive.

11    And the Committee continues to request an open-ended mandate

12    to investigate and bring any that the Oversight Board decides

13    not to pursue.

14          We submit that granting the Committee such a mandate

15    is inappropriate for three reasons.  First, the Committee's

16    failed to meet its burden.  And the parties have disagreed

17    about the appropriate standard to be applied here, but we

18    believe that the Court doesn't even need to reach that issue

19    today because the Committee's motion is deficient on its face

20    by any standard.

21          By seeking an open-ended mandate that does not refer

22    to specific claims, the Committee does not identify the claims

23    it wishes to pursue, and it makes it impossible for the Court

24    to determine whether granting the Committee standing to pursue

25    those particular claims is appropriate, whether derivatively

1    or as a trustee under Section 926.  In the absence of a

2    specific request, let alone evidence to support that request,

3    the Court should deny the motion.

4          The second reason, Your Honor, and as noted in our

5    papers, is that the motion needs to be evaluated in the

6    broader context of the Title III process.  Specifically, how

7    it could impact the dynamics of any plan negotiations.  If the

8    motion were to be granted and the Committee becomes the only

9    party that can settle the claims in question, whatever they

10   end up being, then the Oversight Board no longer has the

11   ability to settle and resolve those claims in connection with

12   the Title III Plan unless the Committee consents.  We don't

13   think that's an appropriate lever to give the Committee in the

14   context of the present motion.

15         And finally, Your Honor, setting aside the fair

16   question that Mr. Curtin addressed regarding whether the

17   Committee is eligible to be a movant or a Trustee under

18   Section 926, National doesn't think that the Committee is the

19   right party to be such a trustee or otherwise pursue these

20   claims under the circumstances.  The Committee purports to act

21   on behalf of all unsecured creditors, but as the Court well

22   knows, in -- the interests of trade creditors and unions, many

23   of whom have continued to be paid by the Commonwealth, often

24   diverge from the interests of the general obligation

25   bondholders who have a distinct right to be paid ahead of

1　other creditors from all available resources.

2　　　　And this creates a conflict for the Committee in

3　situations like this where the proceeds of the claims in

4　question would be available resources to be recovered for the

5　benefit of general obligation bondholders, not other

6　creditors. Given the conflict, we don't believe the Committee

7　is the appropriate party to pursue these claims.

8　　　　So for all of those reasons, as well as the ones

9　stated by other respondents, we believe that the right answer

10　is to deny the Committee's motion.

11　　　　THE COURT: Thank you, Mr. Morgan.

12　　　　Mr. Stancil.

13　　　　MR. STANCIL: Thank you, Your Honor. Very briefly,

14　we've filed a limited joinder on the Oppenheimer papers, and

15　we will largely rest on that. I think I would just reiterate

16　our position is that the Committee has not met its burden

17　under 926 or for derivative standing, and that should really

18　be the end of the matter.

19　　　　The Committee should stop proceeding on the basis of

20　what it deems to be the right way to run the case, or what's

21　expedient, or what they'd like to get done. They should be

22　required, like everybody else, to make a showing, rise or fall

23　on the showing, and then move on.

24　　　　It's almost impossible for us to deal with this when

25　we don't have anybody, of course, representing bondholders on

     1   the Committee, to have a committee not even -- not following

     2   the letter of the law.  I think that's really all we need, is

     3   just a sort of step-by-step approach through the legal

     4   framework.  No more.  No less.

     5            THE COURT:  Thank you.

     6            MR. STANCIL:  Thank you, Your Honor.

     7            THE COURT:  So I think that takes care of all -- oh,

     8   sorry.

     9            MR. RAIFORD:  Your Honor, if I may, Landon Raiford

    10   from Jenner & Block for the Retiree Committee.

    11            THE COURT:  Good afternoon, Mr. Raiford.

    12            MR. RAIFORD:  This is a little bit of a mess, I think

    13   everyone would agree.  And maybe just to piggyback off the

    14   comments that were just spoken, the Retiree Committee's

    15   approach, we try to take a little more practical approach,

    16   which means nobody may like it but it may be the right answer.

    17            And for the 926(a) claims, we would suggest the Court

    18   allow the UCC to bring the avoidance actions, but then require

    19   them to show, after they've filed the Complaints, that the

    20   Oversight Board refused to bring these actions and that that

    21   refusal is driven by an improper motive.  And that's typically

    22   in the legislative history, limited case law and 926.  It's

    23   kind of a traditional standard that's applied.  And this

    24   approach acknowledges the fact that the UCC has been put

    25   between a rock and a hard place, without ignoring or without

1    requiring them to go through the steps that normally we would

2    expect in a different context.

3           For the derivative standing, the Retiree Committee is

4    agnostic on that point, but I think what we would like is to

5    the extent the Court grants that part of the motion, to put

6    the same parameters I just spoke about in 926 on the

7    derivative standing.  And we can decide later whether the

8    Oversight Board's refused to bring the claims and whether that

9    refusal was in good faith or not.

10          And then maybe the last threshold would be some sort

11   of monetary threshold for the claims.  I think I heard earlier

12   in connection with the equitable tolling motion that there was

13   some discussion, at least for that, about bringing avoidance

14   actions that were one million dollars or more.  I know in our

15   papers, we had a higher threshold.  The number really doesn't

16   matter to me so much.  I think whatever the Court decides is

17   fair, we'll think is fair, but there should be some minimum

18   dollar amount that's at stake before we go in and start filing

19   hundreds and hundreds of adversary proceedings.

20          Thank you.

21          THE COURT:  Thank you, Mr. Raiford.

22          Mr. Weisfelner.

23          MR. WEISFELNER:  Yes, Your Honor.

24          THE COURT:  I keep giving you an extra syllable, and

25   I apologize for that.

1          MR. WEISFELNER:  Your Honor, may I know how much time

2     I have?

3          THE COURT:  Let's see.  20 minutes.

4          MR. WEISFELNER:  Thank you, Your Honor.

5          Your Honor, I'm not going to repeat the arguments

6     that you've heard about PROMESA and Section 305.  Suffice to

7     say that we think that's a show stopper with regard to the

8     grant of the relief being requested.

9          For the record, and I'll come back to this if I have

10    time, the notion that somehow we've accidentally, while we

11    were sleeping, consented to the relief being requested we

12    think is a stretch of both credibility and the imagination.

13    Here is my biggest concern, and I firmly believe in support

14    that Committee counsel bears the burden of proof in terms of

15    making a record here today, and in that regard, I think

16    they've failed.  But I will tell Your Honor that my concern

17    has always been that the underlying predicate for this motion

18    is, at worst, a gross distortion of the facts and

19    circumstances, or at best, it's an honest misunderstanding of

20    what it is that the Oversight Board, through it's Special

21    Claims Committee, in fact intends to do about the various

22    claims and causes of action that we think surround the bond

23    issuances that, in our judgment, severely injure the

24    Commonwealth of Puerto Rico.

25          Your Honor will recall that last week, in open court,

1   I offered to the Court and the parties on a confidential

2   basis, for I think obvious reasons, the final final chart

3   demonstrating the claims that we intend to bring against

4   specific defendants if we can't get tolling agreements.  And

5   just to summarize, we are going to sue approximately 27

6   underwriters, nine different law firms, five different

7   accounting firms.  And the theories of liability range from

8   breach of fiduciary duty; aiding and abetting a breach of

9   fiduciary duty; unjust enrichment; constructive, and it's

10  important to stress constructive, fraudulent transfer as

11  opposed to actual fraudulent transfer.  And as Your Honor

12  knows, once upon a time we included in the chart another

13  column called deepening insolvency but made sure that we

14  indicated, not as a separate claim or cause of action but

15  rather, a theory under which damages can be asserted.

16      Your Honor, I asked my litigators where they stood on

17  their draft Complaint, and I have it here.  It's up to 248

18  pages long, and as I said, asserts all of those claims against

19  all of those defendants.

20      I also asked for an analysis of the so-called -- I

21  don't remember if it was referred to as an Arrastia analysis

22  or an Exhibit E analysis by the Genovese firm --

23      THE COURT:  Yes.

24      MR. WEISFELNER:  And let me tell you what I find to

25  be so disingenuous about all this.  During the course of

1    deliberations, negotiations, discussions between the Special

2    Claims Committee on the one hand and the Creditors Committee

3    on the other hand, about what claims or causes of action ought

4    to be pursued on the Commonwealth's dime, we offered to

5    Mr. Despins the opportunity to personally address the members

6    of the Special Claims Committee and to tell us, or to tell

7    them what claims or causes of action do you have in mind that

8    you think we're improperly or impermissibly dropping.

9            And he got on the phone, to his credit, and he made

10   his pitch.  And it took a long time, and ultimately the

11   Special Claims Committee then deliberated on it.  At no time

12   did he say, you know, I'd like to have Mr. Arrastia, who is my

13   expert -- I mean, you know, he's got a burden of proof.  So he

14   trots in Mr. Arrastia, from I think Miami, who is now going to

15   stand here and tell you, I'm the expert on suing underwriters.

16   You don't know anything about my qualifications other than I

17   was somehow involved in the *Enron* suit, and I may have other

18   clients in this case, namely individual bondholders who are

19   also suing underwriters.

20           But the first time I heard the name Arrastia, the

21   first time I heard of this Genovese law firm was in the

22   responsive papers that were filed at nine o'clock at night --

23   was it Tuesday or Monday?  I'm losing track of the days.

24           In any event, I've had a detailed analysis of the

25   so-called Genovese analysis performed, and we're down to a

1    handful of differences of opinion.  And when I say this, I'm

2    not waiving my argument that the Committee has the burden of

3    proof of showing an improper refusal.  I don't have the burden

4    of proof of demonstrating to you that we made the right

5    decisions in terms of prosecutorial discretion.  But

6    nevertheless, let's go through the differences.

7         Number one, the Committee thinks we ought to be

8    pursuing people for an intentional fraudulent transfer.  We

9    are going to pursue people for constructive fraudulent

10   transfer.  I forgot, I should have sent Mr. Despins the book I

11   wrote on fraudulent transfers, understanding the difference

12   between constructive and actual.

13        In order to prevail on actual fraudulent transfers,

14   as Your Honor well knows, you have to plead and prove an

15   actual intent to hinder, delay and defraud.  Now, since we

16   don't have machinery that allows us to look into the minds of

17   people to figure out what their intent is, you quite rightly

18   do look at badges of fraud.  I don't know what they are.  We

19   looked for them.  We couldn't find them sufficient to allege

20   an actual fraudulent transfer.

21        But here's a more important issue.  What are the

22   differences in damages that one can achieve if you

23   successfully allege an actual fraudulent transfer to what you

24   would otherwise get if you successfully allege and prove a

25   constructive fraudulent transfer?  As far as we know,

1    undertaking a heavier burden so as to collect the same level

2    of damages doesn't make a lot of sense.

3           Number two, they want to talk about a conspiracy

4    count to engage in a fraudulent transfer.  Conspiracy to

5    engage in a fraudulent transfer.  Can't find that under New

6    York law, and we looked.  Can't find it under Puerto Rico law,

7    and we looked.  But I'll tell you what we did find under New

8    York law, a 2010 decision by the Supreme Court of the state in

9    *Bairiri versus Madison Realty*, 924 NYS 2d 307.  A conspiracy

10   to commit a tort, where the underlying tort is already pled,

11   should be dismissed.  Specifically, I'm quoting from the case,

12   where the substantive tort is already pled against the

13   parties, the conspiracy claim will be dismissed as

14   duplicative.

15          That's why, Your Honor, we exercised our

16   prosecutorial discretion in not taking up the Committee on its

17   offer to sue for conspiracy to engage in a fraudulent

18   transfer.

19          Number three, deepening insolvency.  Your Honor, it's

20   our belief and understanding, based on both New York and

21   Puerto Rico law, that deepening insolvency is not or at least

22   no longer qualifies as an independent tort.  Puerto Rico has

23   never recognized the doctrine of deepening insolvency as far

24   as we can tell.  But we do acknowledge it could be a measure

25   of damages, and we fully intend to pursue the concept of

1  deepening insolvency to the extent it will, in our judgment,

2  enhance value to be received.

3      Number four, the Committee tells us now that they

4  believe there is a good cause of action for breach of

5  contract.  The contract, they tell us, is the purchase

6  agreement.

7      Well, there's a problem with that, as far as we can

8  tell, because we've reviewed the purchase agreements for the

9  underlying bond issuances.  And, number one, the underwriters

10 expressly disavow any fiduciary duty to the Commonwealth.

11 Moreover, the underwriters, in the same purchase agreement,

12 are, by its terms, entitled to rely on the reps and warrantees

13 of the Commonwealth in connection with those issuances.

14     For those reasons, we in the Special Claims Committee

15 concluded that bringing a breach of contract action under the

16 purchase agreement was unlikely to result in a positive

17 result, give us better damage claims or worth the underlying

18 effort.

19     Number five, we have a difference of opinion as to

20 who could be liable for breach of fiduciary duty.  This goes

21 back to the breach of contract action in that every

22 underwriter in its purchase agreement expressly disavows any

23 fiduciary duty to the Commonwealth.

24     More significantly, we could only find one

25 underwriter, and the Committee knows who it is we're talking

1    about, and anybody that looked at our chart distributed for

2    attorneys' eyes only knows who we're talking about.  But only

3    one underwriter that we felt could be sued on this theory

4    because of the very special relationship that underwriter had

5    with the Commonwealth and with the GDB.  We couldn't find or

6    plead that with regard to the balance of the underwriters.

7         Number six, and the final topic where we appear to

8    have a disagreement is the notion of suing for breach of

9    fiduciary duty or aiding and abetting a breach of fiduciary

10   duty by individual GDB former officers and directors.

11        First of all, we are aware of the fact that former

12   officers and directors of GDB have immunity or, at a minimum,

13   a qualified immunity under Puerto Rican law.  Next, there

14   wasn't anybody in the Special Claims Committee that was

15   particularly interested in expending estate resources in order

16   to get liens on the homes and cars and first born children of

17   individuals.

18        As of a couple of days ago, we knew nothing about

19   available insurance.  What little insurance there may exist

20   has executions that no one's been able to work their way

21   through, and in any event, it's our understanding that

22   whatever insurance might otherwise be available is what's

23   commonly referred to as a wasting policy.  In other words,

24   defense costs come right off the top.

25        In point of fact, going back to the indemnity or at

1   least the qualified immunity that GDB officers and directors

2   have, someone told me today, so I'm not underscoring this, but

3   I did hear that typically the Commonwealth has the obligation

4   to come to the defense, i.e., pay the cost of defending

5   individuals that at one time were officers or directors of

6   GDB.

7          So what we heard from Mr. Despins is we think it's a

8   good idea to sue individuals, not withstanding the fact that

9   they may not have the wherewithal to make good on a judgment,

10  not withstanding the fact that they may have qualified

11  immunity, not withstanding the fact that the Commonwealth may

12  have to pay for their defense to the extent it doesn't come

13  out of whatever remaining insurance there is, because we're

14  going to get them to flip on other people as part of this

15  conspiracy theory.

16         Well, that ignores the fact that they would otherwise

17  be the subject of appropriate discovery in any Complaint that

18  we intend to file and can be pursued for whatever information

19  they've got.  Yeah, they're not going to be sued as named

20  individuals, so presumably we have less -- they'd have less

21  incentive to be truthful and provide whatever discovery we

22  reasonably seek.

23         My point here is that we keep hearing about

24  abandonment and refusal and letting claims and causes of

25  action slip by the wayside, or that we're otherwise only

1     intending -- only intending on suing these third parties,

2     underwriters and their lawyers and the accountants in order to

3     get back the prices that were paid to them in terms of

4     underwriting fees.  That's not true.

5          We intend to pursue these defendants, and we are not

6     limited by the amount of underwriting fees they earned.  We've

7     all read about and understand the concept of scoop and toss,

8     where newer bonds and the proceeds of those newer bonds were

9     used to pay off old debt, sometimes owed to the GDB, sometimes

10    debt that was held by underwriters that they couldn't

11    otherwise sell off to their syndicate.

12         Our damage theory will extend again to the scoop and

13    toss theories; it will extend to other theories that we've

14    heard, including the buyback of old bonds; and it will extend

15    to any original issued discount that the underwriters were the

16    beneficiaries of in connection with certain of the bond

17    offerings that, in some people's view, including the Special

18    Claims Committee, probably should not have ever been issued.

19         Now, Your Honor, I think you also need to understand

20    that the reality is we intend to sue, as I said before, a

21    whole bunch of underwriters, a whole bunch of lawyers, a whole

22    bunch of accountants.  And if you grant this motion, the best

23    you could hope for is that the Committee, through its brand

24    new special counsel, not yet retained, and they're going to do

25    it on a contingency basis, so we have nothing to worry about

1    -- they're going to sue the same defendants, surrounding the

2    same facts and circumstances, i.e., the issuance of the bonds,

3    but they've got different theories of exposure, different

4    theories of recovery, theories that we don't think adds

5    anything to the overall ability of the Commonwealth to realize

6    value.

7          Well, how is that going to work as a practical

8    matter?  Are we going to conduct depositions simultaneously?

9    Are we going to be able to engage in settlement discussions as

10   part of a plan of reorganization?

11         And I remind the Court, although the Court needs no

12   reminding, that another feature of PROMESA is the exclusivity

13   that's retained by the Commonwealth.  So now, before we can

14   engage in any kind of plan negotiations, do I have to bring in

15   the Committee's brand new special counsel to work with me?

16   Does it complicate the litigation going forward?  Does it make

17   it more difficult?

18         By the way, under a plan of reorganization, the

19   claims and causes of action against the underwriters -- if I

20   take a step back, when I first read through the Kobre & Kim

21   report and thought about potential claims against

22   underwriters, it always occurred to me that, wow, those claims

23   more directly ought to be attributed to or for the benefit of

24   bondholders who get all or any portion of their bonds

25   disallowed.  At that point, sometime in the future, they've

1    realized real damages as associated with their bond issuance.

2          Well, again, to the extent that the Commonwealth owns

3    these claims, and I think they do today, we do intend to

4    pursue them.  But part of the difficulty of affording the

5    Committee the opportunity to stand next to us is these claims

6    may very well be packaged up as part of a plan concept and

7    given to somebody as part of the give and take of plan

8    negotiations.  I'm not telling you it will happen, but it

9    certainly could happen.  And having the Committee involved

10   makes that not a terribly attractive alternative.

11         So to conclude, Your Honor, we think PROMESA is a

12   show stopper.  We think the Committee's failure to satisfy any

13   burden of proof that we have somehow abandoned or improperly

14   refused to bring these claims is a show stopper.  And as a

15   consequence, Your Honor, we think that this motion should be

16   denied.

17         Thank you.

18         THE COURT:  Thank you.

19         Mr. Friedman, I have you down for ten minutes.

20         MR. FRIEDMAN:  Thank you, Your Honor.  Peter Friedman

21   from O'Melveny and Myers on behalf of AAFAF.

22         I think within the first two sentences of the

23   Committee's argument, Mr. Despins mentioned the word

24   abandonment.  I think he then mentioned it about 13 or 14 more

25   times.  And it's almost like ships passing in the night.  Or

1   the thrust of our papers was, this isn't like any other

2   bankruptcy.  It's not like a Chapter 11.  It's not like a

3   Chapter Seven.  It's PROMESA.  It's Chapter Nine.  Congress

4   made it different.

5          You know, one of the ways it made it different was it

6   excluded Section 554 of the Bankruptcy Code, which is the

7   entire doctrine of abandonment.  Congress included Section

8   544, 546, 547, 548, parts of 549, 550, 551, 552, 553, skipped

9   over 554, and then went on to 555, 556, and 557, but also

10  excluded 558.  And what do those deal with, the omitted

11  sections?  Abandonment of estate property, because there is no

12  estate and because the property of a Commonwealth or Municipal

13  debtor is supposed to be left alone from interference.  And

14  558 also doesn't let anybody else assert -- the omission of

15  558 means that certain defenses that would otherwise be waived

16  by a debtor, which can be picked up by an estate, also doesn't

17  apply.

18         Congress was really careful here.  And so the notion

19  that somehow 305 can be overridden by a purported abandonment

20  is just wrong.  And so I think that eviscerates effectively

21  the entire argument for how 305 can be evaded by the

22  Committee, other than their consent argument, which I

23  vociferously agree with Mr. Weisfelner about the lack of merit

24  of that argument.

25         Your Honor, the deliberate exclusion of 554 is part

1    and parcel of the way we think that Chapter Nine and PROMESA

2    are different than Chapter 11.  We've cited multiple cases for

3    that, and there's really no response.  There simply is not a

4    concept of non-consensual derivative standing that can exist

5    given Section 305.

6            And I think, on top of that, Your Honor, the root of

7    derivative standing is basically Delaware corporate law or New

8    York State corporate law under *STN* or *Commodore*.  The

9    Committee cites not a single case under Puerto Rico law

10   suggesting that someone can stand in the shoes of the

11   government to pursue private causes of action.

12           Now, it kind of remarkably cites a case for the other

13   con -- sort of the opposite concept.  It cites *Snapp & Son*

14   *versus Puerto Rico, ex rel., Barez,* which is a Supreme Court

15   case, which is cited by the Committee for the position that

16   the Commonwealth has the power to bring a parens patriae

17   action on behalf of its residents.  Let's just take a step

18   back now and think that the Committee is asserting that it can

19   do that on behalf of the people of Puerto Rico.

20           Your Honor, parens patriae is -- the right to invoke

21   that is derived from one source, the elected legitimacy of a

22   government.  Now, here maybe it's too because Congress has

23   modified the governmental powers slightly under PROMESA, but

24   to give an Unsecured Creditors Committee the right to assert a

25   claim on behalf of the people of Puerto Rico, well exceeds any

1    acceptable view of what Congress has put into PROMESA.

2          Your Honor, the other points I want to make, one is

3    sort of in the nature of a reservation of rights.  And that

4    is, the Court asked at the beginning is anyone saying that 303

5    blocks an appointment under 926.

6          THE COURT:  Actually, I was saying 305 blocks an

7    appointment.

8          MR. FRIEDMAN:  305.  So my position is that in

9    certain circumstances, 303 might actually prevent 926 from

10    being invoked.  I don't think this is the case.  I can

11    certainly think of other circumstances where it would.  But

12    even if it doesn't, I think it's important to be mindful of

13    what Judge Glenn held in the *OTB* case, where Judge Glenn

14    noted, in declining to appoint a 926 trustee, that given that

15    the transfers at issue were made pursuant to New York state

16    law, it appears that appointing a trustee to avoid these

17    transfers may engender the very concerns alluded to in

18    Collier.

19          And in Collier, as I'm sure the Court knows, there

20    was an admonition that when -- that it would be an

21    interference with governmental powers to try to apply Section

22    926 to legally permitted transfers that had -- and as the

23    Court knows, some of these transactions were authorized under

24    state law.

25          That's not to say that there may not be a host of

1   other arguments with respect to validity or that creditors may

2   be able to pursue, but to use Bankruptcy Code powers I do

3   think conflicts in important ways with 303 and 305.

4          Your Honor, the other point I wanted to -- I feel

5   compelled to make, is one that we talked about in our GDB

6   papers a lot, and, you know, it is we think not really fair to

7   portray GDB as the puppet master of everything when in fact it

8   was the piggy bank for everything.

9          As we explained in our objection, GDB had a statutory

10  purpose to lend money to the government.  The government

11  frequently -- the rest of the government frequently leveraged

12  GDB's access to capital markets.  GDB, and I think it's in our

13  brief, in respect to the GDB matter, we cited a variety of

14  public documents that make clear that GDB effectively covered

15  operational deficits of the Commonwealth and its

16  instrumentalities.  HTA had significant annual operating

17  deficits that were protected by -- or that were funded by

18  HT -- that were funded by GDB.

19         And so, you know, GDB suffered a tremendous amount,

20  and its own creditors suffered a tremendous amount.  And the

21  notion that GDB is the root of all evil and terrible, even in

22  past administrations, just is not I don't think a fair

23  reflection of what a full record would show.

24         Now, Your Honor, the final points I just want to make

25  are, you know, there are a variety of legal doctrines that,

1    and particularly with respect to suing some of these entities,

2    are so far fetched, or at least have to overcome so many

3    hurdles, like the idea that equitable tolling exists for the

4    entirety of a governmental administration.  As far as I can

5    tell, no support for that legally, and I think it would work a

6    radical change in Puerto Rico law.

7         The doctrine of deepening insolvency, which

8    Mr. Weisfelner mentioned, we cited a case actually that the

9    only time it's been addressed by a Federal Court here in

10   Puerto Rico, the Court noted that not only had it never been

11   accepted but the Court further noted that there was a specific

12   statute in Puerto Rico which would likely undermine the

13   viability of that doctrine.

14        I think that's -- I want to see where we cited that

15   just so it's handy for the Court.

16        THE COURT:  I recall that it's --

17        MR. FRIEDMAN:  *Segara Miranda*.  The *Segara Miranda*

18   case, Your Honor, 452 BR 59, note six.

19        So I think, you know, these are all speculative

20   claims.  They potentially drain estate resources.  They tend

21   to tackle extremely novel issues of Puerto Rico law.  They

22   weren't abandoned.  And I think the Court should defer in this

23   instance to the judgment of the Oversight Board, which under

24   305 of PROMESA is really the last word on this issue.

25        So the other thing I would reserve rights on are

1    whatever theories Ambac seeks to pursue in the future, I think

2    we'll have to see how they apply and what the meaning of

3    108(c) is.

4            Thank you, Your Honor.

5            THE COURT:  Thank you.

6            I believe we now come back to Mr. Despins.

7            MR. DESPINS:  Okay.  So Your Honor, I will try to

8    address this Seriatim.  So starting with -- one issue was

9    raised about -- when I addressed this to the Genovese firm,

10   how did they get up to speed so quickly.  First of all, they

11   don't represent parties in this case.  That's not what I said.

12   They represent other parties suing broker-dealers, not in this

13   case, but based on what happened in Puerto Rico.  So that's a

14   non-issue.

15           But how did they get up to speed?  They represented a

16   Committee member for the last ten months, so they've been on

17   Committee calls.  They've been privy to the entire case

18   through us.  So what they generated is not something that was

19   generated, you know, based on nothing.  They had that

20   background.  And they have agreed, if this motion is granted,

21   to pursue these claims on a contingency basis.  And I think

22   that speaks volumes.

23           And the point about I was invited on this call with

24   the Oversight Board, well, that's absolutely true, but that's

25   the day on which we were told that the Oversight Board was no

1   longer bringing deepening insolvency and other claims.  So we

2   were caught completely flatfooted.  And actually, my first

3   statements to that group were, I'm not ready to give you a

4   presentation on this, because we were relying on the Special

5   Committee to bring those claims based on those lists that

6   you've seen, Your Honor.  And the firm of Genovese was hired

7   after that, when we were told that they were not bringing

8   those claims.

9        The argument that -- you know, we keep coming back to

10  the fact that we have no creditors.  Now, Doral Financial

11  Corporation, acting through the Doral Financial Creditor

12  Trust, whatever the name, is the creditor.  There's a Proof of

13  Claim.  There's a footnote in a Reply that lists that Proof of

14  Claim.  Same thing with SEIU.  We attached a reference to the

15  Proof of Claim itself.

16       So there is no issue that this was filed by

17  creditors, and there's no precedent for saying that a

18  Committee cannot be a trustee.  The argument that they cannot

19  be *STN* in a municipal case is debunked by the fact that we did

20  that.  In fact, Mr. Mayer signed a stipulation that Your Honor

21  signed which appointed the Committee as -- under *STN*.  It

22  cites the case.

23       Yes, you might say, well, Luc, Mr. Despins, that was

24  consensual.  We know that.

25       THE COURT:  You anticipated me.

1          MR. DESPINS:  But -- Your Honor, it was consensual,

2     but, Your Honor, the point is the principle of the appointment

3     was *STN*, and *STN* is not only consensual.  It can be also

4     contested, meaning you can be appointed under *STN* even as

5     contested standing.  The point is that the concept that *STN*

6     does not apply in a Municipal case is not accurate.  In fact,

7     we have a precedent here.

8          He also said, I don't know who he's going to sue, and

9     all that.  It's very clear.  We've said it.  It's former

10    officers and directors.

11         Now, Assured, Cadwalater, again, they say the UCC is

12    not a creditor.  It's as if they have not read the Reply,

13    because we addressed all these points.  So, you know, the

14    proof of claim by SEIU shows all the grievances that SEIU is

15    pursuing, monetary grievances against the Commonwealth.  It is

16    a creditor.  And obviously we'll look at the 2019 statements.

17         Now, National, they say the description of claim is

18    not definitive.  Well, the claims are described in detail in a

19    Genovese exhibit, Your Honor, so that's much more than you

20    have received from the Oversight Board.  Right now what we

21    have from the Oversight Board is a list of names and

22    checkmarks.  This analysis from Genovese is fairly detailed in

23    terms of the claims that are being prosecuted, including

24    fraudulent transfer claims.  People keep saying that we're not

25    pursuing fraudulent actions or we're not seeking to do that.

1  We are seeking to do that.

2          Now, going to Mr. Weisfelner's points.  He says no

3  waiver.  The point about no waiver, again, I don't think that

4  it needs to be a waiver.  I think the consent can be implied.

5  And the only reference to 305 in the stipulation, Your Honor,

6  is in paragraph three, and there's no other -- and it's a

7  positive one.  It says, to the extent 305 needs to be waived,

8  it is waived.

9          But there's no reference anywhere else about we're

10  reserving our rights under 305 when you're bringing that

11  motion.  So the combination of this plus the motions that were

12  filed I think should be sufficient to overcome the consent

13  argument, but in any event, consent -- 305 does not apply to

14  926.

15          In terms of deepening insolvency, Your Honor, now you

16  get a real sense of what we have to deal with.  Mr. Weisfelner

17  said point blank that in their final final list, they're

18  bringing deepening insolvency claims on a damages theory.

19  That's not the case, Your Honor.  Look at the final final

20  list.  It used to have that in the final list, but the final

21  final list doesn't contain any reference to deepening

22  insolvency.

23          And what that means is that this is an ever moving

24  target on the part of the Board.  Now they say they're doing

25  it, but it's not what their final final list says.

1          They have offered us to address the Special Claims

2    Committee.  We did that.  We could not involve Arrastia

3    because they had not been retained.  We didn't know the Board

4    was going to take that position.

5          Now, the lecture we got on intentional versus

6    constructive, he said that actual intent is intent to hinder,

7    delay and defraud.  Actually, it's "or" defraud not "and," and

8    that's a big difference, because in pari delicto issues, you

9    don't want to argue intention to defraud.  You want to argue

10   intent to hinder or delay, and that's what we're doing.

11         They say, what are the elements of fraud here?  We

12   listed them, insider transaction, insolvency.  They can't go

13   back and argue there's no insolvency.  The Board's already

14   taken the position that they were insolvent.  The fact that

15   there's no consideration or a lack of consideration going to

16   the Commonwealth, these are all factors that are badges of

17   fraud.  They're listed there, so I don't know why they want to

18   ignore those.

19         And the argument is why would you cause all the --

20   bring damage about asserting intentional fraud claims.  It's

21   because you can then assert conspiracy claims.  And they said,

22   oh, we've looked for a case under New York law on this issue,

23   could not find any.  It doesn't exist.  Wrong.

24         I cite, Your Honor, *In Re Allou Distributors*, 379

25   B.R. 5, jump cite 36, Bankruptcy, Eastern District of New

1    York, 2007.  The quote is, Courts in this Circuit have

2    similarly recognized the claim for conspiracy to commit a

3    fraudulent conveyance may be stated under New York law.

4         And when you get in that type of claim, Your Honor,

5    you're not talking about getting the fees back.  You're

6    talking about a whole different type of claim against the

7    third parties in terms of billions of dollars, not millions of

8    dollars.

9         Then the other arguments about suing individuals.

10   They say, again, they make this pronouncement, there is

11   immunity under Puerto Rico law.  In 2015, there is a law that

12   was adopted that said that there is immunity, but there's also

13   a principle of Puerto Rico law that says unless expressly

14   stated in the statute, a statute has no retroactive effect.

15        So this happened in 2014, a year before that statute

16   was adopted.  So therefore, there is no immunity for the 2014

17   acts.

18        Then they say, well, there will be claims against the

19   Commonwealth for indemnification.  These are pre-petition

20   claims.  They can take a number and get a few pennies on the

21   dollar, but it's not going to drain the coffers of the

22   Commonwealth unless the Commonwealth would actually want to

23   volunteer to pay those people.  And I don't know why they

24   would do that.

25        And then the idea, they say, well, it's really

1    because what they really want people to do, these individual

2    defendants, is to flip.  Well, that sounds very negative, but

3    in bankruptcy, this is done all the time.  What I mean by that

4    is often individuals are pursued and enter into confessions of

5    judgment with a non-recourse provision.

6          So this idea that we want to lien their cars or their

7    boats, that's offensive.  That's not what we're after.  But in

8    fact, there have been many precedents where there have been

9    settlements where an ex-CEO, for example, will enter into a

10   settlement agreement where there's no recourse to his or her

11   personal assets, but as part of that, there's an

12   acknowledgement that the following acts have taken place, or

13   that -- and that's key, and that's why it's important to

14   include these defendants.

15         Then he tells us that he's going to include scoop and

16   toss theories of liability.  That is nowhere in his final

17   final list.  And again, given that they've shifted so many

18   times on which claims they're going to bring, the Committee

19   has no comfort that they're actually going to bring these

20   types of claims, because that's never been mentioned to us

21   before.

22         And then the issue of interference, that we'll be

23   competing against each other.  Again, Your Honor, you have the

24   pen, and that means that you can say, I'm going to enter that

25   Order with very limited restrictions and that you shall confer

1    with the Board.  And in fact, if you did grant us standing, I

2    would guarantee you that the Board would add these claims the

3    next day or would join and allow us to join with their

4    Complaints.  So there's no interference.  So this argument

5    that there's interference, that's a red herring that they

6    would have to deal with -- there's a way to deal with that,

7    and the parties can be forced to cooperate.

8         Mr. Friedman talked about 554 not applying.  Yes, we

9    said that in our Replies.  It's not like novel to us.  But

10   it's the same concept, which is -- practically it's

11   abandonment.  It's as if there's a pot of cash and they are

12   saying, you know, we're going to burn that stuff, or well,

13   we'd like to grab it before you burn it.  And that's the same

14   concept.  It's not relying on 554 precisely.  The concept is

15   that there's no exercise of control over the asset because

16   it's being abandoned.  Not under 554, but practically

17   abandoned.  Abandoned means not pursued and not usable again,

18   because on May 2nd, those claims go away.

19        And he said, it's really shocking that the

20   Commonwealth would be giving rights or that the Court would be

21   giving the rights of the Commonwealth to the Committee.  The

22   Court does just that on a consensual basis, on COFINA, a

23   stipulation that was signed by O'Melveny.  So the point is

24   there's nothing from a precedent that is shocking on that

25   because we remain under supervision of the Court at all times.

1          The *OTB* case was a liquidation, and what the Court

2     said is that, I'm not going to allow these actions, these

3     avoidance actions to go forward, because the debtor remains

4     free to repay.  And that's fine.  But here the debtor would

5     not repay.

6          If Mr. Arrastia's firm obtained or was able to obtain

7     a settlement of X millions or billions of dollars, there's no

8     way the Commonwealth's going to say, let's give that back to

9     the defendants.  That's not going to happen.  So that's why

10    the 926 trustee motion was denied in *OTB*.

11         And then he said, they resent the fact that the GDB

12    is perceived or is described as a puppet master.  Look at

13    Kobre & Kim.  It says the GDB controlled all aspects of debt

14    offerings and preferred itself as a creditor.  It says that in

15    black and white in the Kobre & Kim report.  Not from us.

16    Don't rely on us.  It says that in there.  And that's exactly

17    what they did in the 2014 offering.

18         Then he mentions this case.  Yesterday there was a

19    District Court of Puerto Rico case that in a footnote,

20    footnote six, questions the vitality of deepening insolvency,

21    but not in terms he described.  What they said is that the

22    Supreme Court of Puerto Rico has never addressed the issue.

23    So it's not they ever rejected it.  And number two, the Judge

24    said, I could see an impediment or an argument that would

25    foreclose that.  Then he cites a statute that provides that

1    shareholders in a shareholder derivative suit have to comply

2    with certain factors.

3           That's not what we're dealing with here.  We're

4    talking about the entity itself bringing the claim.  So that

5    case has no real bearing on this.

6           And then I would end, Your Honor, with 926.  There's

7    no 305 that applies in 926, and paragraph one of the Genovese

8    outline outlines some very detailed fraudulent transfer claims

9    and -- that could be asserted against defendants and that are

10   not being asserted against defendants, and that would lead to

11   much higher recovery for damages, Your Honor.

12          And so, in closing, we think that the Court should

13   grant the motion, and could impose also some restrictions.  To

14   the extent the Court has concerns about, you know, the issues

15   of us pocketing the money somehow, there's this implication

16   that's going to make plan negotiations impossible.  I don't

17   know how they would be impossible, because -- only if maybe

18   there's a huge pot of money there and then people would say,

19   we want it, but that's a risk we take.  It doesn't belong to

20   the Unsecured Creditors, because we are the plaintiff in that

21   action, Your Honor.

22          Unless the Court has questions, I think that's all we

23   have.

24          THE COURT:  Thank you.  You've been quite

25   comprehensive.  Just before you leave the podium, I'm going to

1   call a ten-minute break in just a moment.  During that break,

2   I would be grateful if the parties who have made sealed

3   filings in connection with this motion and also sealed filings

4   in connection with the stipulation would consult and be

5   prepared to discuss with me today, at an appropriate time,

6   whether, when, and to what extent the sealed elements can be

7   unsealed.

8           When I issued the Procedures Order, I contemplated

9   the unsealing of the final final list on May 6, which is after

10  the May 2nd deadline.  There's a different mix of things

11  attached to the Reply brief here, and as I understand it,

12  certain lists keep changing, but I provided for the sealed

13  filing so that, of course, potential actions wouldn't be

14  matched to potential defendants on the public record before

15  lawsuits were filed.  But, you know, there's got to be some

16  point when that necessity has dissipated, and so I'd like to

17  at least get a sense of what you all have in mind and.  Then

18  I'll ask you to, you know, undertake to give me a joint

19  proposed stipulation on it.

20          So I just wanted to give you the heads up about that

21  and not lose that issue.  See you ten minutes.  Thank you.

22          (At 2:51 PM, recess taken.)

23          (At 3:08 PM, proceedings reconvened.)

24          MR. WEISFELNER:  Judge, with your permission?

25          THE COURT:  Just one second.

1          Yes, Mr. Weisfelner.

2          MR. WEISFELNER:  First, with respect to the

3  unsealing.  Your Honor, as Your Honor knows, a week from

4  tomorrow is the proverbial deadline for Commonwealth claims.

5  We intend to bring suit by that date, which suggests that

6  anything we've ever filed under seal could be released

7  thereafter, but we are hoping for tolling agreements.

8          So what I suggest, if it's okay with Your Honor, is

9  give us a week after that deadline, at which point we will

10  advise Your Honor, based on what tolling agreements we've

11  gotten by then, how to release the sealed information.

12          Again, we'd like as much in the public domain as we

13  can possibly afford, and the only redactions I think we'd be

14  in a position to make are in connection with people who have

15  signed tolling agreements.

16          THE COURT:  And that's fairly consistent with my

17  concept.  In my original Order, I'd given you until the

18  following Monday, May 6.  So this would be May 8th, and so you

19  might consider a redacted form of the list that takes out the

20  names of parties with which you have tolling agreements.  And

21  also whatever you propose to me in connection with the motion

22  we've just discussed should address the iterations, the

23  preliminary, and final, and final final and all that

24  iterations of the list --

25          MR. WEISFELNER:  Sure.

1          THE COURT:  -- that were separate --

2          MR. WEISFELNER:  Again, with the same caveat.  I have

3    no particular concern about whatever value Mr. Despins thinks

4    he gets out of a public disclosure of how my first list may

5    have been different from my second list, may have been

6    different from my third list, if he wants to disclose that,

7    for whatever it's worth.  But for the redactions, I think I'm

8    okay.

9          Your Honor, I have one --

10         THE COURT:  And so just to close the loop on this,

11   you'll give me a joint status report with either a stipulation

12   or specific proposal with any objections, if necessary,

13   regarding the unsealing of the sealed materials that were

14   filed in connection with these two motions?

15         MR. WEISFELNER:  So long as my team has a week from

16   the deadline to file everything, to catch their breath and

17   then get back to you, that would be fine.

18         THE COURT:  So joint status report by May 8th, and

19   actual filing of the newly redacted material by May 15th is

20   what you're asking?

21         MR. WEISFELNER:  I think that's fine.

22         THE COURT:  All right.  That's fine.

23         MR. WEISFELNER:  Your Honor, here's my other concern.

24   Again, the deadline, as Your Honor knows, to file these

25   Complaints is a week from tomorrow.  In contemplation of any

1    world in which the Committee's motion gets granted, we've

2    heard today, actually, I guess the night before last, for the

3    first time, that the Committee would otherwise intend to

4    retain special counsel to bring the claim that we're now being

5    told they're prepared to do on a contingency fee basis.

6          And you've heard Mr. Despins say that these claims

7    could be worth billions of dollars.  Well, I don't know about

8    you, Judge, but it seems to me that a contingency firm that

9    would seek, what, ten percent of a two billion dollar claim,

10    ten percent of a one billion dollar claim, that's an

11    employment application that I know the Financial Oversight

12    Board, if not AAFAF, would have an interest in looking at, not

13    -- to say nothing of all of the other creditors standing

14    behind me.

15          THE COURT:  Yes.

16          MR. WEISFELNER:  I'm not sure how it is that we get

17    this counsel retained when we've got less than a full ten days

18    to get all this done.  And I'm telling you now that if they

19    file the application, we're likely to object, because it's one

20    thing for the estate to realize the damages I think we're

21    capable of realizing in connection with the prosecution of our

22    Complaint.  We'll get paid the blended hourly rate that we

23    agreed to.  Mr. Despins seems to think, we have a huge savings

24    because we're going to do it on a contingency fee basis.

25    Well, that percentage, contingency that the Genovese firm

1  thinks they're going to earn would otherwise be available to

2  the Commonwealth and its creditors.

3        So we need to see the terms before it goes forward.

4  I thought I'd mentioned it, because it seems to me in any

5  universe where he gets the relief he wants, I don't know how

6  we're supposed to move forward from here to there, other than

7  now I hear him say he'll sign the Complaint in a timely

8  fashion.

9        THE COURT:  Well, and before Mr. Despins runs up,

10  these are points that are well taken and that we should keep

11  in mind as these cases go forward.  I'm ready to rule on the

12  motion, and so there's no need to have a little debate about

13  this right now.

14        MR. DESPINS:  Your Honor, it's not argument, just an

15  actual statement about the contingency --

16        THE COURT:  Okay.  Well, you need to be near a

17  microphone where people can hear you if it must be said right

18  now.

19        MR. DESPINS:  I just wanted to let you know that no

20  contingency agreement has been entered into.  The

21  understanding with them, because we were caught flatfooted, is

22  we would hire them with the same discount that applies to us

23  for the time between last week and May 2nd, if the Court were

24  to grant it.  And then the parties could look at what makes

25  sense for a contingency agreement or not, because you want to

1    be fully informed before entering into that.

2         That's all.  So no agreement regarding contingency

3    has been agreed to.  The work they did from last week to today

4    is based on a straight hours with the 20 percent reduction

5    that has applied to other professionals for the Committee.

6         THE COURT:  And which is also subject to the Court

7    examination --

8         MR. DESPINS:  Yes.

9         THE COURT:  -- and examination in the first instance

10   --

11        MR. DESPINS:  Yes, Your Honor.

12        THE COURT:  -- by the Fee Examiner and the principles

13   that we have been working on for the past several months with

14   respect to sub-retained professionals and others.

15        MR. DESPINS:  Yes, Your Honor.

16        THE COURT:  Thank you.

17        Before the Court is the *Motion of the Official*

18   *Committee of Unsecured Creditors for Order authorizing*

19   *Committee to pursue certain causes action on behalf of the*

20   *Commonwealth and granting related relief,* which is docket

21   entry number 6325 in case 17-3282.

22        In the Motion, the movants request entry of an Order

23   first appointing the Official Committee of Unsecured

24   Creditors, which I'll refer to as the Committee, as Trustee of

25   the Commonwealth under Section 926(a) of the Bankruptcy Code

1    for the purpose of prosecuting certain avoidance actions of

2    the Commonwealth; and two, granting the Committee derivative

3    standing to investigate and to prosecute other related

4    Commonwealth causes of action.

5         The Court has considered carefully all of the

6    submissions of the parties, as well as the arguments made in

7    court today.  For the reasons that I will now explain, the

8    motion is denied in its entirety.

9         Section 926(a) of the Bankruptcy Code, which is

10   incorporated and made applicable in these cases pursuant to

11   Section 301(a) of PROMESA, provides that if the debtor refuses

12   to pursue a cause of action under Section 544, 545, 547, 548,

13   549(a) or 550 of the Bankruptcy Code, then on request of a

14   creditor, the Court may appoint a trustee to pursue such cause

15   of action.

16        Turning first to the nature of the causes of action

17   that may be subject to derivative standing motions absent the

18   Board's consent, the Court finds that Section 926 is the only

19   mechanism that allows the Court to grant a third party

20   standing to bring a cause of action on behalf of a Title III

21   debtor.  The scope of Section 305 and the public policy

22   underlying PROMESA support this conclusion.

23        The Court finds unpersuasive the Committee's argument

24   that Section 305 does not apply in this case because the

25   property that is at issue, that is, the causes of action, is

1   property that the Commonwealth is effectively abandoning.  If

2   the Court were to grant the Committee non-consensual

3   derivative standing to pursue claims that the Board has

4   declined to assert, the Court would not only be second

5   guessing the Oversight Board's decision, but also potentially

6   obligating the Commonwealth to expend its own resources to

7   fund such litigation, and potentially complicating the Board's

8   exclusive authority in respect of plans of adjustment.  Nor is

9   the Committee's argument that the Oversight Board has

10  consented, for purposes of Section 305, to the Court

11  exercising its judicial power with respect to the Motion

12  availing.

13       The stipulation's provision stating that the UCC

14  could file the instant motion does not implicitly or

15  explicitly indicate that the Oversight Board has agreed that

16  the Court even has power to grant the relief sought in the

17  Motion to the extent it's outside of the scope of 926.  And

18  indeed, it is clear that the Oversight Board opposes the

19  Motion and contends that the Court has no authority to grant

20  it to the extent it extends outside 926.  And the Board

21  contends that the Court should not grant it to the extent it's

22  brought pursuant to Section 926.

23       The Court holds that absent the express consent of

24  the Oversight Board, PROMESA's statutory framework does not

25  allow the Court to grant derivative standing to a third party

1    to bring actions that are not expressly enumerated under

2    Section 926 of the Bankruptcy Code.

3           Turning now to Section 926, the Court must analyze

4    the circumstances of the case in determining whether the

5    appointment of a trustee is appropriate.  In determining which

6    standard to apply to this statutory provision, the Court finds

7    that cases that analyze the authority of a creditor's

8    committee to initiate adversary proceedings on behalf of the

9    estate are instructive.  See e.g., *In Re STN Enterprises,* 779

10   F.2d 901, at 904 (2d Cir. 1985).  See also, *In Re Sabine Oil &*

11   *Gas Corporation*, 547 B.R. 503, (Bankr. S.D.N.Y. 2016).

12          Generally, to obtain derivative standing, courts

13   require a creditor's committee to establish that, first, the

14   committee presents colorable claims for relief that, on

15   appropriate proof, would support a recovery; and two, that the

16   debtor, or in this case the Oversight Board, unjustifiably

17   failed to bring suit.

18          In determining whether a debtor's refusal to litigate

19   is justifiable, Courts in this circuit look at, among other

20   things, the costs and risks to the estate and the ability to

21   recover proceeds.  *In Re Pagnini*, number 09-17144-1-CH, 2010,

22   Westlaw 383941, (Bankr. D. Mass. Jan. 26, 2010).

23          In this case, it is important to consider the

24   legislative history of Section 926 and PROMESA's statutory

25   framework.  In the context of a municipal bankruptcy case, at

 1   least one Court has held that courts should be loathe to

 2   appoint a trustee given that the Court's limited powers in a

 3   Chapter Nine case are best understood as operating within the

 4   context of constitutional and federalism concerns.   *In Re New*

 5   *York City Off-track Betting Corporation*, number 09-17121-MG,

 6   2011, Westlaw 309594, at 1* (Bankr. S.D.N.Y. Jan. 25, 2011).

 7        Moreover, Collier warns that Courts should not permit

 8   a motion for a trustee to be used by creditors as a bargaining

 9   lever in negotiations over the plan, and the process should

10   not be taken out of the debtor's hands by the appointment of a

11   trustee to upset the delicate balance among competing

12   interests that must be preserved for successful plan

13   negotiation, formulation and solicitation.   7 Collier on

14   Bankruptcy ¶ 926.02.

15        Here, even the sealed element of the Committee's

16   motion does not proffer specific allegations against the

17   relevant parties and is insufficient to frame colorable claims

18   against the parties that Committee proposes to sue.   Moreover,

19   the Committee has also failed to establish that the Oversight

20   Board's decision not to pursue the causes of action is

21   unjustifiable.   The Committee has not demonstrated that the

22   potential ability to recover proceeds outweighs the costs and

23   risks to the debtor in the context of these complex Title III

24   restructuring proceedings.

25        Importantly, unlike commercial bankruptcies, the

1  restructuring cases of government entities, whether

2  municipalities in Chapter Nine or territorial governments

3  under PROMESA, involve a different set of statutorily

4  prescribed goals.  The goal is not merely to maximize the

5  recovery of creditors.  Rather, these restructuring cases

6  require a more holistic approach that focuses on the

7  continuation and future of a government and the political

8  entity.

9          In the context of PROMESA, the statutory intent is

10 clear.  Congress expressly designed PROMESA and entrusted the

11 Oversight Board to provide a method for a covered territory to

12 achieve fiscal responsibility and access to the capital

13 markets.

14         In advancing these goals, the Oversight Board is

15 designated, in the first instance, as the entity that needs to

16 make the critical judgments.  While the pursuit of

17 investigations and maximizing returns for creditors are

18 necessarily important elements of these judgments, they are

19 not the exclusive end point of the inquiry.

20         The needs, concerns and future of a political entity

21 that is the home of millions of citizens, as well as the

22 needs, concerns and rights of a broad range of parties in

23 interest, and the ability to impose a confirmable plan of

24 adjustment are implicated here.  The Oversight Board has been

25 given the responsibility of balancing and prioritizing the

1    relevant issues and concerns and is entitled to a measure of

2    deference in carrying out this responsibility.

3         The Committee's criticisms of the Oversight Board's

4    work and its proffer of assertions and inferences that the

5    Oversight Board is foregoing potentially lucrative litigation

6    provide insufficient justification for finding the Oversight

7    Board's exercise of authority so unreasonable as to warrant

8    the appointment of a trustee under Section 926.  And, as I've

9    explained earlier, there is no other PROMESA authority for a

10   non-consensual appointment.

11        I note, in closing, that it is ultimately the Board's

12   responsibility, if it is going to be successful in addressing

13   the goals of PROMESA, to earn the trust and confidence of all

14   of the constituencies, creditors, citizens and others who will

15   meet at the end of the day to have good reason to respect the

16   way in which the Oversight Board exercises its judgment and

17   who will have to live with the consequences of its exercise of

18   judgment.

19        The Motion is denied, and the Court will enter an

20   Order to that effect.  Thank you.

21        The next item on our Agenda is IV, Item six --

22   actually, are we ready for the stipulation or do we go on?

23        MR. DESPINS:  So I understand that a mark to show

24   changes was sent to your courtroom --

25        THE COURT:  I got three versions with three different

 1 | types of track changes.

 2 |         MR. BONGARTZ:  It was the last one, two minutes

 3 | ago.

 4 |         COURTROOM DEPUTY:  You have to tell me which one it

 5 | was.  I'm sorry.

 6 |         THE COURT:  Why don't you do this.  Why don't you

 7 | look at the one that is the one you want me to pay attention

 8 | to, and tell me what is redlined on page -- in paragraph

 9 | three.

10 |         MR. WEISFELNER:  May it please the Court --

11 |         MR. BONGARTZ:  I just sent it two minutes ago.  There

12 | were last minute revisions --

13 |         THE COURT:  What I have is from an hour ago.

14 |         MR. BONGARTZ:  And there is only one redline that I

15 | just sent two minutes ago.  The only redline --

16 |         COURTROOM DEPUTY:  So the e-mail that I got right now

17 | --

18 |         MR. BONGARTZ:  Yes.

19 |         COURTROOM DEPUTY:  -- is the one you want?

20 |         MR. BONGARTZ:  Yes.

21 |         COURTROOM DEPUTY:  Your Honor, I'm going to need a

22 | couple of minutes, because it's 20 pages each, this one.

23 |         THE COURT:  All right.  So that has to be printed out

24 | for me.  What I suggest is that we go to Item IV.6, which is

25 | the 13th Omnibus Objection, and Mr. Hein's Response, and also

1    Mr. Hein's procedural motion.  Sorry.

2              THE COURT:  Mr. Stancil.

3              MR. STANCIL:  Your Honor, I think most of the

4    creditors have not seen the latest version.  Could you zip

5    that around as well?

6              THE COURT:  So he's e-mailing around, not the Court.

7    Printing out 25 copies, the latter's not going to happen.

8              MR. STANCIL:  Understood.

9              THE COURT:  And so I will make an exception to the

10   rule about not using devices to communicate with other people

11   from the courtroom -- remember that rule -- for this

12   particular -- in response to this particular request.  Thank

13   you.

14             MR. WEISFELNER:  Your Honor, with your permission?

15             THE COURT:  Yes.

16             MR. WEISFELNER:  I'm going to leave.  My partner,

17   Sunni Beville, is here and otherwise up to speed on any issue

18   that may involve the Special Claims Committee.  Thank you,

19   Judge.

20             THE COURT:  Thank you, Mr. Weisfelner.  Safe

21   travel.

22             MR. WEISFELNER:  Thank you.

23             THE COURT:  All right.  Just give me one more second

24   to get my papers in order.

25             So this is docket entry 4417, Mr. Hein's Response to

1   COFINA's 13th Omnibus Objection to Claims.

2          MR. ROSEN:  Yes.

3          THE COURT:  Sorry.

4          MR. ROSEN:  I'm sorry.

5          THE COURT:  Hold on.

6          Okay.  So I have Mr. Hein in New York.  I have

7   Mr. Rosen.

8          MR. ROSEN:  Your Honor, this was our 13th Omnibus

9   Objection.  I don't know if you want me to go through any

10  aspects of it first, or let Mr. Hein state what his position

11  is and then we'll just respond.

12         THE COURT:  I think the latter.  The Omnibus

13  Objection was premised on the bond claims being duplicative of

14  the master bond claim filed by the Trustee, correct?

15         MR. ROSEN:  Correct, Your Honor, and you addressed

16  that at the March Omnibus when you granted with respect to

17  everyone but Mr. Hein.

18         THE COURT:  Yes.

19         MR. ROSEN:  Okay.

20         THE COURT:  So we've allocated 15 minutes on the

21  Agenda on this.  So, Mr. Hein, you have a total of eight of

22  those minutes.  Do you want to save any for reply?

23         MR. HEIN:  I'd like to save just a minute or two.

24  And I was not consulted by the FOMB's counsel on the timing

25  they put in the Reply.  That is the first time they've

1    actually made arguments beyond one sentence, and I would like
2    to be able to respond to the Reply.  I will be as brief and
3    succinct as I can.
4            THE COURT:  Thank you.  So we'll put you down for six
5    minutes for your first segment.
6            MR. HEIN:  Your Honor, the COFINA 13th Omnibus
7    Objection was expressly labeled non-substantive, and the only
8    reason COFINA gave for objecting to my claim was that my claim
9    was supposedly duplicative of one or more Master Proofs of
10   Claim filed by the Trustee.
11           The Omnibus presented no arguments specific to my
12   claim for why my claim was duplicative.  COFINA just repeated
13   the same conclusory sentence as -- to my claim as to hundreds
14   of others.
15           This Omnibus was made under 3007(b), which requires,
16   as is pertinent here, that an objection be based solely on the
17   limited grounds for an Omnibus objection allowed by that Rule,
18   3007(d)(1).  Pertinent here, the objection must be, quote,
19   based solely, unquote, on the ground that claim is, quote,
20   duplicate, close quote, of other claims.
21           And in a tacit recognition that COFINA can't meet
22   that narrow standard, they've actually asserted a number of
23   claims, including substantive claims, on reply.  And I submit
24   this is improper on multiple levels.  New grounds on reply are
25   not proper.  It's also improper to belatedly raise substantive

1   arguments on reply on a motion that was expressly captioned,

2   quote, non-substantive.

3       Third, the tactic violates 3007(d), which requires,

4   as pertinent here, that an Omnibus be based solely, closed

5   quote, on the grounds of being, quote, duplicate, closed

6   quote.

7       COFINA argues in Reply that I supposedly

8   misunderstand the nature of a claim, but COFINA's reference to

9   the definition of claim begs the question of what is, quote,

10  duplicate, closed quote.  Even on reply, COFINA does not cite

11  any statutory provision or case law to support its argument

12  first advanced on reply that a claim that asserts additional

13  causes of action is somehow a duplicate.

14      The dictionary definitions, because there's none in

15  chapter -- or Title XI that I saw, is -- duplicate is, one of

16  two or more identical things or something that is an exact,

17  quote, exact, close quote, copy of something else.  And the

18  COFINA Reply contradicts itself.  At page eight, COFINA

19  argues, it's immaterial that Hein believed he had additional

20  causes of action against COFINA and other entities beyond

21  those asserted by BNYM, but COFINA goes on to say, quote,

22  because, as a creditor, he could continue to assert those

23  claims even after his claims were disallowed, close quote.

24  The suggestion that I can continue to assert my claim I think

25  undermines COFINA's position in seeking disallowance.

1          Your Honor, COFINA also ignores that my claim was

2    first.  I filed my claim before BNYM filed any claims.

3    Nothing in the BNYM refers to my prior filed claim or purports

4    to override my prior filed claim.  COFINA cites to no law to

5    support the notion that Bank of New York Mellon had the

6    authority to somehow sub silencio override my claim.

7          And I think the proof of the pudding that the claim

8    is not a duplicate is apparent when you actually look at the

9    claim and the boxes checked.  On question six, do you have a

10   claim against a specific agency or department of the

11   Commonwealth of Puerto Rico?  BNYM checked no.  I checked yes,

12   and then provided an attachment with my grounds.  How can a

13   claim checking yes be a duplicate of a later filed claim that

14   checks no?  Fundamentally, BNYM did not assert my claims,

15   certainly did not advocate for my claims.

16         Turning to COFINA's new argument advanced for the

17   first time on reply that my claims beyond the Trustee's should

18   be subordinated.  Not only is this an improper new argument on

19   reply, it's a substantive argument.  It's not appropriate on a

20   supposed non-substantive motion.  It also has nothing to do

21   with whether a claim is a duplicate.

22         And I submit as well that it's not at all clear to me

23   that 510(b) applies.  The cases COFINA cites appear to involve

24   unsecured rescission damages or contribution claims arising

25   out of securities or securities transactions.  Even if,

1    hypothetically, my claim were subordinate under 510(b), that

2    would not justify the complete allowance -- excuse me, the

3    complete disallowance of my claim, which is what COFINA is

4    seeking on this application.

5         THE COURT:  And in that connection, I would just note

6    that class ten of the Confirmed COFINA Plan embraces claims

7    covered by Section 510(b).  And so it does -- it would seem

8    anomalous to disallow a claim to the extent it would fall into

9    a specific class in a plan.

10        MR. HEIN:  In any event, Your Honor, this is a

11   substantive point.  How can a point of substance be granted on

12   a non-substantive motion that is based on whether something is

13   a duplicate?  It's totally improper.

14        Finally, I want to address the new argument on reply

15   that supposedly my claim was discharged by confirmation.  This

16   was improperly raised for the first time on reply.  It's also

17   improperly a substantive claim.  And I submit, Your Honor, at

18   most what this would be is an argument for deferring,

19   deferring consideration of COFINA's objection to my claim

20   until after the resolution of my First Circuit appeal.

21        Thank you.

22        THE COURT:  Thank you.

23        Mr. Rosen.

24        MR. ROSEN:  Thank you, Your Honor.

25        Your Honor, what we have in front of you is a

1    creditor who is essentially refusing to acknowledge what the

2    Court has already done, which is to confirm the COFINA Plan, a

3    Plan that has gone effective in February of this year.

4            Mr. Hein filed five pleadings ostensibly responding

5    to the Omnibus Objection.  There was the Response, the

6    Supplement, the Second Supplement, the Third Supplement and

7    the April Supplement.  Only three of them actually vaguely

8    referred to the fact that the 13th Omnibus Objection had been

9    filed.  The balance of those, Your Honor, were just the

10   ongoing thoughts and musings of Mr. Hein with respect to the

11   confirmation process and how this Court failed to consider

12   what he believes to be his valid claims (sic) to confirmation

13   and consummation of the Plan.

14           THE COURT:  You mean his valid objections?

15           MR. ROSEN:  I'm sorry?

16           THE COURT:  You said what he believes to be his valid

17   claims.  I assume you mean --

18           MR. ROSEN:  I'm sorry.  His valid objections, Your

19   Honor.

20           Mr. Hein has filed an appeal of the confirmation

21   itself, and that appeal is subject to I believe, Your Honor, a

22   Motion to Dismiss which is currently pending.  And Mr. Hein

23   has asked for more time to respond to the Motion to Dismiss

24   before the First Circuit.

25           The fact of the matter is, Your Honor, that Mr. Hein

1   has filed a Proof of Claim that while on its face may include

2   more arguments as to the repayment of the bond claim, but it

3   in fact is the same bond claim that was the subject to the

4   CU -- or the CUSIPs that were subject to the 13th Omnibus and

5   included in the Bank of New York Mellon Proof of Claim.

6          And just because he has cited additional theories as

7   to why he should get paid more money, it's the same money,

8   Your Honor, that was allowed pursuant to the Bank of New York

9   Mellon claims, pursuant to the Confirmation Order, and it's

10  the same claims that Mr. Hein has already received payment on

11  pursuant to confirmation of the Plan.

12         He goes to the additional theories that he now has,

13  and, Your Honor, we did make note that if, in fact, his

14  theories are with respect to the purchase and sale of

15  securities, they would in fact be 510 subordinated claims.

16  And Your Honor is correct, they were class ten pursuant to the

17  Plan itself, and they would, pursuant to the Plan, even if

18  they were allowed, receive no distribution pursuant to the

19  Plan, because all of those claims, Your Honor, received no

20  distribution.  And all of those claims were subsequently then

21  discharged as part of the Plan process.

22         THE COURT:  But isn't it clear that the Master Claim

23  filed by the Bank of New York is a claim for payment in

24  respect of the terms of the security, and it didn't purport to

25  raise constitutional or any other theories or any other types

1   of claim for damages or fraud or anything else in respect of

2   the purchase and sale of those securities?  And so why should

3   I construe the Bank of New York Mellon's Master Claim as

4   entirely duplicative of and superceding Mr. Hein's claim?  Why

5   shouldn't -- you know, in addition to the arguments that

6   Mr. Hein has raised about substantive elements of this not

7   coming out and being articulated until the Reply, why

8   shouldn't I simply consider this duplicative objection to the

9   extent it concerns the element of Mr. Hein's claim that does

10   in fact map on to the Master Claim that says, here are these

11   CUSIP numbers; these bonds are entitled to consideration in

12   respect of the returns?

13         MR. ROSEN:  Your Honor, you are correct, it was a

14   claim with respect to the payment; and it did not go to the

15   multiple additional theories that Mr. Hein is advocating and

16   that he believes he included in his attachment to the Proof of

17   Claim.

18         I believe he attached -- I think the Court has the

19   benefit of that.  It's a two-page attachment where he goes

20   through the basis of the claim.  And, Your Honor, he does have

21   a reservation of rights in there, you are correct, with

22   respect to his constitutional arguments.  If in fact those are

23   the case, Your Honor, I believe they would still fall within

24   the gambit, though, of the additional class, the class ten

25   itself.

1          THE COURT:  So let me try to be clear.  If I'm going

2    to grant the Objection, the Omnibus Objection, it seems to me

3    that it should be granted only with respect to the bond

4    payment element of the Proof of Claim; and the question of

5    whether everything else is covered by class ten is something

6    on which there's obviously some disagreement today but --

7          MR. ROSEN:  Yes.

8          THE COURT:  -- isn't properly resolved within the

9    context of this particular duplicativeness objection.

10         MR. ROSEN:  That is correct, Your Honor.  You are

11   correct.

12         THE COURT:  And so would that be, you know, an

13   appropriately narrow and responsive solution to the problem

14   that we have in connection with this non-substantive

15   duplicative objection?

16         MR. ROSEN:  That would be a fine solution, Your

17   Honor.  I would also point out that all assets of COFINA were

18   distributed, so I'm not sure what, if anything, could be done

19   at this point in time, but I would like to note that for the

20   record.

21         THE COURT:  Yes.  I know that you're --

22         MR. ROSEN:  Pursuant to the Plan, everything is

23   gone.

24         THE COURT:  And you're arguing equitable mootness in

25   the First Circuit I read.

1              MR. ROSEN:  That is correct, Your Honor.

2              THE COURT:  Yes.

3              MR. ROSEN:  So your solution would be a fine solution

4     to this.  It would be getting rid of I guess all aspects of

5     Mr. Hein's claim but for that which you have articulated might

6     remain.

7              THE COURT:  Thank you.

8              MR. ROSEN:  Your Honor, that would be all I would

9     offer at this time then.

10             THE COURT:  Thank you.

11             Mr. Hein.

12             MR. HEIN:  Your Honor, as was pointed out, and as I

13    think I said in my opening remarks, I do have an appeal in the

14    First Circuit.  I don't think that ought to be prejudged.  And

15    respectfully, I don't think there is any reason to be

16    disallowing certainly all and, frankly, I don't think there's

17    any reason to disallow part of my claim while that appeal is

18    pending, nor is there any necessity of doing that now as

19    opposed to deferring it until the First Circuit rules.

20             And I think Mr. Rosen effectively I think is

21    acknowledging that when the -- I answer questions yes, and the

22    Trustee on his claim answers no, my claim is clearly not

23    duplicative.  And the points that he's raising are

24    fundamentally substantive and not appropriate on an objection

25    denominated non-substantive.

1          So I would urge Your Honor to take into account the

2     fact that I have an appeal and the lack of a necessity to rule

3     pending the ultimate resolution of that appeal.

4          THE COURT:  Thank you.

5          Give me just one moment.  Sorry.  Did --

6          MR. ROSEN:  No, Your Honor.  I was just going to

7     indicate I don't think the pendency of the appeal has anything

8     to do with respect to the existence of the 13th Omnibus

9     Objection.  I think they're totally distinct issues and can be

10    handled at this time.

11         THE COURT:  Thank you.

12         If you'll both just bear with me for a moment.  Thank

13    you.

14         Before the Court is Mr. Hein's response to the 13th

15    Omnibus Objection, which is denominated as non-substantive, to

16    duplicate bond claims.  And we are relating this to docket

17    entry number 4417.

18         The Motion, as originally articulated, seeks an Order

19    disallowing certain Proofs of Claim, including Mr. Hein's

20    Proof of Claim number 10701, on the basis that the Proofs of

21    Claim are duplicative of one or more Master Proofs of Claim

22    filed on behalf of holders of COFINA bonds.

23         The Bank of New York Mellon has filed a claim in

24    respect of the rights under the bond instrument, and the Court

25    finds that, not withstanding the differential in tick boxes,

1    Mr. Hein's claims, to the extent he seeks recovery under the

2    bond instrument, is duplicated by the Master Claim.  And they

3    should not both co-exist, and it is efficient to strike that

4    element of Mr. Hein's claim as duplicative.  I deny Mr. Hein's

5    request that I hold that determination pending the

6    determination of his appeal.

7         Mr. Hein did, in his Proof of Claim, assert claims

8    premised on other theories.  He asserts that his Proof of

9    Claim targets a broader set of rights than just payment of

10   COFINA bonds, including entitlement to all rights and claims

11   under applicable law, including the Constitutions of the

12   United States and Puerto Rico.  The Bank of New York Mellon

13   Claim did not purport to assert such claims, and so it would

14   be inappropriate to disallow that element of Mr. Hein's Claim

15   in response to the 13th Omnibus Objection.

16        Therefore, the Motion is granted as to the

17   duplicative bond payment rights under the instrument aspect of

18   Mr. Hein's Proof of Claim only, and the Omnibus Objection is

19   overruled as to the remainder of Mr. Hein's Claim.  And I will

20   direct the -- I am directing the Oversight Board to file on

21   presentment an amended form of order disallowing Mr. Hein's

22   Claim in part as duplicative.

23        MR. ROSEN:  We will do that, Your Honor.

24        If I could ask the Court's indulgence on one aspect.

25   The bones of what Mr. Hein is suggesting is included in

1     paragraph -- or the second and third paragraphs of paragraph

2     nine of his -- or section nine of his attachment to his Proof

3     of Claim, and they are just two sentences.

4          And, Your Honor, it would be very difficult for us to

5     address that in any proceeding without Mr. Hein putting a

6     little bit more meat on those two bones.  And so I would ask

7     the Court if we could set a timetable for Mr. Hein to

8     embellish his theories, so we could adequately respond and

9     object to those, because what we have now is incapable of an

10    adequate response.

11         THE COURT:  Mr. Hein?

12         MR. HEIN:  I guess, Your Honor, my suggestion would

13    be that maybe Mr. Rosen and I ought to have a discussion.  You

14    know, I think it would be useful for us to have a discussion.

15         THE COURT:  I agree with Mr. Hein, and if that

16    discussion isn't fruitful, I suppose you can always make a

17    subsequent objection to that remaining portion of the

18    individual claim as insufficiently documented or fleshed

19    out.

20         MR. ROSEN:  We'll do that, Your Honor.  Thank you.

21         THE COURT:  Thank you.

22         All right.  Now we will turn to Mr. Hein's Motion to

23    Appoint a Committee for individual and other modest-sized

24    bondholders.  That is ECF entry number 6128 in the 3283

25    docket.

1          Mr. Hein, you are the movant, and I will start you

2  off again with eight minutes in total.  Do you want to reserve

3  two of those?

4          MR. HEIN:  I would make the same request.  Again, I

5  wasn't consulted by the Oversight Board on the timing.

6          THE COURT:  I have determined that the timing is

7  reasonable, and so you have eight minutes.  How much time do

8  you want to use for your opening remarks?

9          MR. HEIN:  Six.

10          THE COURT:  Thank you.

11          MR. HEIN:  So, Your Honor, at the outset I wish to

12  confirm that Your Honor has the Reply that we served on April

13  16.  It's docket 6487.  My Reply is --

14          THE COURT:  Yes, I do.

15          MR. HEIN:  Okay.  Thank you.

16          THE COURT:  I have it, and I reviewed it at the time

17  you e-mailed the courtesy copy.  So I haven't just had it

18  since it hit the docket.

19          MR. HEIN:  Thank you, Your Honor.

20          The first three points in my motion seek measures to

21  level the playing field for participation by individuals such

22  as myself whose bonds are being attacked as invalid.  There is

23  no valid reason to prohibit pro se litigants from using the

24  Court's electronic filing system.

25          The First Circuit does this.  I've looked at the

 1  First Circuit Rules.  They're online.  Their user guide

 2  revised on February 13, 2018, page six, specifically allows

 3  pro se litigants the option of using its CM/ECF system.

 4          THE COURT:  Mr. Hein --

 5          MR. HEIN:  The District of Massachusetts, again,

 6  their administrative --

 7          THE COURT:  Mr. Hein, this is a court level decision

 8  under the policies of the judicial conference.  I am well

 9  aware that other courts, including the First Circuit, permit

10  pro ses to use ECF, sometimes subject to restrictions and

11  special approvals.

12          The potential volume of pro se filings is very

13  different court to court, and this court, the District of

14  Puerto Rico, has established in its administrative procedures,

15  and reflecting the particular rules and needs of this court,

16  that pro se filers are not permitted to file on ECF.

17          MR. HEIN:  Your Honor, I would also point out that,

18  and the Oversight Board has kind of alluded to the fact of,

19  well, I'm an attorney.  Well, it is not -- you have to be

20  admitted in the District of Puerto Rico to use the CM/ECF

21  system, and it is not -- it is not a simple and easy and

22  inexpensive matter for an attorney acting pro se to instead

23  appear pro hoc vice in the District of Puerto Rico.

24          The local Rule 83(A)(f) and the pro hoc vice

25  admission form requires that pro hoc attorneys associate with

1   local counsel, which local counsel must then attend all

2   proceedings, sign all pleadings.  Item three of the form

3   requires a specification of a client.  It clearly anticipates

4   attorneys with clients, not attorneys acting pro se.  They

5   also have a fee per pro hoc admission that is equivalent, I

6   believe, to their overall bar admission fee.

7          So I just want to be clear, I don't think that is a

8   practical option given the modest amounts that I and others

9   may have here.

10          THE COURT:  You don't think that's a practical --

11          MR. HEIN:  It's an issue --

12          THE COURT:  Mr. Hein, you don't think that's a

13   practical option given the hundreds of thousands of dollars

14   you say you have in this investment alone, and the -- and your

15   own personal situation?  You're saying that's impractical or

16   impossible for you?

17          MR. HEIN:  I think I would eat up fully any potential

18   delta in the recovery by the cost many fold.  It is simply not

19   practical.

20          I only have 100,000 par bond that is being challenged

21   as invalid.  And I object to that challenge, but, you know,

22   the delta between what one would get under any circumstance

23   and what incrementally one might get through pressing the

24   matter in litigation is not going to warrant any of those

25   expenditures, Your Honor.

1           If there is some technical issue with using the

2    Puerto Rico CM/ECF system under their local rules, I would

3    submit, Your Honor, that pro se litigants should be given an

4    e-mail address at Prime Clerk.  They can submit papers by

5    e-mail to Prime Clerk.  They're the notice agent for the

6    Commonwealth.  They serve papers for the Commonwealth.  They

7    could be the recipient to accept the papers by pro se

8    litigants and get them docketed.

9           And I think, Your Honor, having an efficient means

10   for pro se litigants to operate here is the only way Your

11   Honor is going to be able to adhere to the type of timetables

12   that seem to be contemplated in these cases.

13          Let me address my application for appointment of a

14   committee of individual bondholders.  As my Reply made clear,

15   I have not suggested adding individual bondholders to the UCC,

16   but I think in light of the attacks on validity, it is

17   essential to have an individual bondholder committee.

18          There are hundreds, I think probably over 15 hundred

19   individuals who have filed pro se notices.  The committee

20   would serve an important coordinating role.  In the

21   alternative, if there's going to be one committee for all

22   general obligation bondholders, there should be individual

23   representation on that committee, and it should be bondholders

24   who are defending the validity of all bonds, not picking and

25   choosing between slices to maneuver for their advantage.

1           There are -- the Oversight Board says, well, there

2      are these ad hoc groups already existing, but as we saw in the

3      COFINA situation, you have these ad hoc groups maneuvering to

4      further their particular individual slice as opposed to

5      operating for the benefit of all bondholders and defending the

6      validity and the recoveries for all.

7           If Your Honor is prepared to make legal rulings on

8      every issue that can be appealed if appropriate, so we have

9      definitive legal rulings, that's one thing; but if there's any

10     thought going down a negotiated path, as it occurred with

11     COFINA, I think it's apparent it's essential that there be a

12     committee that represents individual bondholders.  One cannot

13     count on the different larger groups to be fairly representing

14     individuals in a negotiation.

15          And then finally, if I may just make a final point,

16     Your Honor, the FOMB argues that whether someone bought at par

17     or whether someone bought at a discount should not be of legal

18     significance.  When you get into any negotiated environment, I

19     think, Your Honor, it makes a big difference whether someone

20     bought pre-PROMESA based on the representations and

21     attestations by Puerto Rico in an environment where your

22     rights as a bondholder could not be overridden by some vote,

23     versus bondholders who bought post PROMESA with awareness of

24     the default, with awareness of a change in the legal rubric

25     that is claimed here.

1          Thank you.

2          THE COURT:  Thank you.

3          Mr. Stancil.

4          MR. STANCIL:  Your Honor, may I take 60 seconds?  I

5     think we were the only party to file in support of Mr. Hein's

6     motion.

7          THE COURT:  Yes.

8          MR. STANCIL:  Just very briefly, Your Honor, we agree

9     most strenuously with Mr. Hein's alternative request, which is

10    appointment of a bondholder committee consisting of large and

11    small bondholders.  But if I could, just to underscore the

12    importance of a committee's coordinating function, but based

13    on what we were discussing earlier this morning with respect

14    to the multiplicity of parties and claims and bonds, I think

15    regardless of the fate of the motion we were arguing this

16    morning, this case will become more complicated as the weeks

17    and months progress, not less complicated.

18          And we believe a committee will serve a crucial

19    coordinating function, instead of having at every motion or

20    every hearing to try to organize the cavalcade of interested

21    pro se parties, potentially hundreds.  And they may not all be

22    pro se.  We may have plenty of people who are not in an ad hoc

23    group who want their own counsel to appear.  We think a

24    committee would bring that together.

25          We think it should have large and small on it.

1    That's preferred.  But we want to make that -- maybe the guy's

2    going to be fielding a lot of phone calls in the next few

3    weeks.  We think it would be very, very helpful.

4              THE COURT:  Thank you.

5              MR. STANCIL:  Thank you, Your Honor.

6              THE COURT:  And, Mr. Despins?  So there were seven

7    minutes left for everybody else.  So Mr. Stancil took a

8    minute, and between you and the Oversight Board, you have

9    three and the Oversight Board has three.

10             MR. DESPINS:  Okay.  I'll speak quickly, Your Honor.

11             The general principle, as we said in our Objection,

12   is that there should be one committee only, and that courts

13   really are reluctant to appoint additional committees,

14   especially when the creditors seeking that are secured

15   creditors, which is the position of Mr. Hein and of the GOs.

16             Only one party supported that request, which is the

17   GO Group, and of course they would be very happy to have the

18   Committee pick up their fees.  But here there's an issue about

19   what is the scope of this committee that they're talking

20   about.

21             First, you rejected a similar request early on in the

22   case, but, you know, basically, par buyers, not par buyers,

23   people who have been objected to, people who have not been

24   objected to, and then the committee would represent people

25   with respect to the objections, which is very unusual.

1    Meaning that if somebody objected to -- I'm trying to come up

2    with an example -- to vendors' claims in this case, I couldn't

3    appear to start defending the vendor claims.  So now we would

4    have a committee represent people in the context of an

5    objection for secured creditors.  That's really not

6    appropriate.

7           There is an information need, and I'll acknowledge

8    that.  We intend to deal with that when we come back to Your

9    Honor with respect to the procedures to be followed, because

10   we probably will need to change them.  But we believe that can

11   be dealt with.  Certainly as to what we call phase one of the

12   objection process, which we contemplate to be a very straight

13   issue of has the Constitution been -- the debt limit been

14   exceeded or not.

15          And there'll be like five or ten firms representing

16   the holders saying no, it was not exceeded.  So -- and we

17   believe in that context, there should be communications.  And

18   I think we can propose communications, and we could send --

19   propose to the Court communications the Committee could send

20   to the holders advising them of this two-phase process.

21          But we think it's premature at this phase to consider

22   this, because, as I said, we don't know the limits of this; we

23   don't understand exactly what it will lead to; but on top of

24   that, they're secured.

25          Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Rosen.

3          MR. ROSEN:  Yes, Your Honor.  I'll be very, very

4    brief.

5          Mr. Despins is correct, this Court has already

6    considered this very issue, Your Honor.  In July of 2017,

7    Mr. Stancil's group filed a motion seeking an Order directing

8    the U.S. Trustee to change the membership of the Committee,

9    and, excuse me, to include -- in the alternative, to include

10   additional members of GOs on that committee.  And the Court

11   entered an opinion, Your Honor, at that point denying the

12   motion in its entirety.

13         The fact of the matter is, Your Honor, that not only

14   in this case, but even to the COFINA situation that Mr. Hein

15   referred to, creditors have been very, very adequately

16   represented, and they continue to be adequately represented

17   every time that Mr. Stancil, Morrison Foerster Group, and

18   other groups representing the GO people stand up to be heard.

19         In the COFINA situation, which Mr. Hein continues to

20   talk about, that Plan was widely accepted, Your Honor, not

21   just by the larger hedge funds that he refers to, but also by

22   the small creditors themselves.  In fact, only three creditors

23   came in to oppose and object to confirmation of that Plan,

24   Your Honor.  So we believe, Your Honor, that the process that

25   was undertaken there and the representation of both senior and

1    junior bondholders was more than appropriate.

2         Here, Your Honor, in the Commonwealth case, and

3    Mr. Hein is looking for some additional representation in

4    connection with the ongoing claim objection that was

5    interposed by the Special Claims Committee and the Unsecured

6    Committee, Mr. Despins is correct.  There is going to be the

7    phase one, as he referred to it in his papers.  The question

8    of whether or not the claims or the bonds were issued in

9    violation of the constitutional debt limit.  That is an issue

10   that is going to be widely litigated.  It's going to be

11   subject to the procedures that the Court is going to outline.

12   It's going to be the same result for all of the holders,

13   modest, medium or large alike, Your Honor.

14        So we don't think that there needs to be any separate

15   representation, because we know that the issue is -- I think

16   as Mr. Stancil stated it in March at the Omnibus Hearing,

17   that's going to be aggressively litigated.  And that was

18   something that the Court picked up on in your comments when

19   you repeated what Mr. Stancil said.

20        So we think, Your Honor, that there's going to be

21   more than adequate representation on that point.  If Mr. Hein

22   wants to weigh in on those issues, he should be free to do so,

23   but we don't think the Commonwealth should be burdened with

24   the additional cost of another committee that's going to be

25   arguing the very issues that all of these people will be

1    arguing in a very complete and comprehensive manner, Your

2    Honor.

3              THE COURT:  Thank you.

4              MR. ROSEN:  Thank you.

5              THE COURT:  Mr. Hein.

6              MR. HEIN:  Thank you.  On the COFINA points, my

7    disagreement is clear in the written filings I've submitted.

8    I'm not going to repeat that.

9              But then there was the suggestion that, well, one

10   ought to be reluctant to appoint the requested committee

11   because these are secured creditors.  And yes, secured

12   creditors, creditors who were given Puerto Rico's pledge of an

13   irrevocable pledge, first claim, never defaulted attestations.

14   And at a time, certainly in my case, when one couldn't just

15   throw it up for a vote as to whether or not I get my principal

16   or interest.

17             And I submit, Your Honor, that costs here could

18   strictly be kept I think very modest, A, through coordination,

19   and B, by the Court scrutinizing fee applications.  And I

20   totally agree the Court should carefully scrutinize fee

21   applications here, but when the FOMB and UCC are spending the

22   large sums that I see being spent in attacking bondholders and

23   seeking to deprive them of their investments, I think it turns

24   logic on its head to say these bondholders, including

25   bondholders such as myself, who bought at a time when this was

1    attested to be an irrevocable pledge, first claim, never

2    defaulted, to have the people attacking us, basically have

3    unlimited funding to attack, and not to have a committee with

4    some modest funding to defend, I think, Your Honor, is a grave

5    injustice.

6         And if anyone's cost ought to be provided for

7    defense, it should be the general obligation secured

8    bondholders who do have that irrevocable pledge, first claim

9    on the Puerto Rico revenues.  Thank you.

10        THE COURT:  Thank you.

11        MR. STANCIL:  Your Honor, may I address the cost

12   point?  Because I think Mr. Despins was assuming we were going

13   to have our fees picked up by the committee.  It's not

14   correct.  I believe we'd still be doing quite a bit of the

15   lifting, but we'd be coordinating with a committee counsel.

16        So I do agree with Mr. Hein that, you know, unless

17   it's a large and small bondholder committee -- I think the

18   committee's cost would be relatively modest, but you'd get a

19   tremendous bang for the buck in terms of winnowing down the

20   presentations to the Court, the discussions, these sorts of

21   exchanges.  Thank you.

22        THE COURT:  Thank you.

23        I've considered very carefully the submissions and

24   arguments with respect to this motion, which is number 6128 in

25   17-3283.  The motion makes four requests for relief.  The

1    first two of which are closely related.

2         The Court is denying the motion, but will grant a

3    more limited form of relief as to one of Mr. Hein's requests.

4    I will now address each of the requests.

5         Mr. Hein's first request for relief asks that the

6    Court set aside the District of Puerto Rico's ordinary

7    policies and practices and allow pro se parties to register

8    for CM/ECF.  The second request is an alternative to the

9    first, requesting that the Court Order the debtors' claims and

10   noticing agent, Prime Clerk, to act as a docketing

11   intermediary for pro se parties and file documents that it

12   receives from such parties on the dockets of these Title III

13   cases.  Both of those requests are denied.

14        The District of Puerto Rico's Rules and the Court's

15   practices provide a means for all parties to participate in

16   these Title III cases, to protect their interests and ensure

17   that justice is done in a fair and efficient manner.  Parties

18   in interest who are represented by counsel in Puerto Rico or

19   who have counsel who have associated with Puerto Rico counsel

20   are able to use the CM/ECF system.

21        Pro se parties in interest can and regularly do

22   participate in these cases by providing paper filings to the

23   Clerk's Office in the District of Puerto Rico.  Like all other

24   parties in interest, Mr. Hein can make and has made his voice

25   heard in these cases through one of these methods.  And as he

1   himself has acknowledged, he has an option to retain local

2   counsel and apply for pro hoc vice admission to the court.

3   And that is an option, and he has a decision to make in that

4   regard.

5           While there is no doubt a burden involved in using

6   any of these options, they are fair and adequate means of

7   participation.  All parties are equally subject to the same

8   range of burdens, and Mr. Hein has not demonstrated cause to

9   depart from the ordinary practices of the court.

10          I would note that in the future, Mr. Hein, you don't

11  need to send paper courtesy copies of your filings to me in

12  the Southern District of New York courthouse.  Your e-mailed

13  courtesy copies suffice for the Court.  So the only paper copy

14  that you need to provide to the Court is the copy that you

15  transmit to the District of Puerto Rico for filing.  And to

16  the extent the CMO contemplates paper filings to other

17  constituencies that are comfortable with ECF, I would invite

18  you to let Mr. Hein know that.  So Mr. Hein's third request

19  for relief -- I'm sorry, comfortable with e-mail in addition

20  to ECF, because of the timing problem there.

21          So the third request for relief seeks permission for

22  pro se parties to register to monitor hearings by telephone.

23  The Participation Orders in these cases provide that only

24  attorneys who have filed Notices of Appearance may register to

25  listen in on proceedings via Court Solutions.  However,

1    Mr. Hein is an attorney and he's active in these cases in his

2    capacity as a pro se party in interest.  Under these

3    circumstances, I find it appropriate to permit Mr. Hein to

4    register for Court Solutions so that he may listen

5    telephonically to any of the proceedings in these cases

6    subject to any fees or other requirements to which all Court

7    Solutions users are ordinarily subject.  And the Court will

8    enter an Order granting this permission.

9         Mr. Hein is representing only himself in these

10   proceedings, and this ruling is particular to Mr. Hein.  It is

11   not general permission for all pro se parties to use Court

12   Solutions.

13        Mr. Hein's fourth request is for an appointment of an

14   official committee of holders of Commonwealth General

15   Obligation Bonds.  He requests that such a bondholder

16   committee be comprised of individuals who have holdings of

17   less than two and a half million dollars and who purchased

18   their bonds at or near the price at which they were originally

19   offered.  He has also suggested, as an alternative, a more

20   diverse I guess bondholder committee, and Mr. Stancil has

21   joined in a request for a large and small committee.

22        Section 1102(a) of the Code governs the formation of

23   committees of creditors and provides that the U.S. Trustee

24   shall appoint a committee as the U.S. Trustee deems

25   appropriate, and provides that a Court may also appoint

1  additional committees of creditors if necessary to assure

2  adequate representation of creditors.

3        A movant seeking appointment of an additional

4  committee must demonstrate that the committee is necessary for

5  adequate representation.  This is a high standard that is far

6  more onerous than if the statute merely required that a

7  committee be useful or appropriate.  See *In Re SunEdison Inc.,*

8  556 B.R. 94, at 103, Southern District of New York Bankruptcy,

9  2016.

10        In exercising their discretion, Courts also consider

11  practical considerations, like the complexity of the case and

12  the costs that would be associated with appointing additional

13  committees.  *In Re Wang Labs, Inc.*, 149 B.R. 1, at 2, (Bankr.

14  D. Mass. 1992).

15        In particular, Courts are sensitive to the reality

16  that appointment of additional committees is closely followed

17  by applications to retain lawyers and other professionals. *In*

18  *Re Wang Labs,* at 4.

19        The movant has not met his burden of demonstrating

20  that the appointment of the committee suggested is necessary,

21  and in any event, the Court is not persuaded that it should

22  exercise its discretion to order the appointment of such an

23  official bondholders committee.

24        There can be little question that these cases are

25  extraordinarily complex.  However, there already are numerous

1    parties, including bondholders and monoline insurers, as well

2    as ad hoc groups of bondholders with sophisticated counsel and

3    professionals that are aligned with the interests of General

4    Obligation Bondholders like Mr. Hein.

5         Mr. Hein argues that some of these groups do not have

6    precisely the same interests as bondholders who purchased

7    certain issuances of bonds, or who purchased bonds at their

8    initial offering prices, but the fact that some bondholder

9    groups have different interests than does Mr. Hein does not

10   mean that at least some of those other groups do not share

11   Mr. Hein's interest in defending the validity of the

12   particular issuances of General Obligation Bonds, and

13   maximizing the value of those bonds.

14        Furthermore, taking it to its logical conclusion, Mr.

15   Hein's rationale would require the Court to appoint committees

16   to represent the interests of subgroups of holders of

17   practically every type of debt issued by any of the Title III

18   debtors, and that outcome is just unworkable.  And expenses

19   associated with litigating issues relating to bond holdings do

20   not in and of themselves demonstrate that a committee is

21   necessary.  Indeed, it's the norm in American litigation that

22   parties bear their own expenses.

23        Underpinning the motion are several complaints about

24   aspects of the COFINA Plan of Adjustment and disclosures,

25   payments and distributions made in connection with the

1    Confirmed COFINA Plan.  The motion is not a proper vehicle for

2    relitigation of issues that the Court has already addressed in

3    connection with the COFINA Plan.

4            The Court, thus, will enter an Order denying

5    Mr. Hein's motion, except to the extent that he individually

6    is granted permission to register for listen only Court

7    Solutions telephonic participation in PROMESA proceedings.

8    Thank you.

9            And thank you again, Mr. Hein.

10           MR. HEIN:  Thank you.

11           THE COURT:  So this takes us to the Marrero

12   plaintiff's Motion for Relief from Stay.  That's ECF number

13   1074 in 4780.

14           Ms. Fegan.

15           MS. FEGAN:  Yes.  Good afternoon, Your Honor.

16           THE COURT:  You will have eight minutes as the

17   movant.  How much would you like to save to reply?

18           MS. FEGAN:  Just one minute to reply, Your Honor.

19           THE COURT:  All right.  Thank you.

20           MS. FEGAN:  Thank you.  My name is Elizabeth Fegan.

21   I represent millions of residents and businesses in Puerto

22   Rico who paid for their electricity bills with a fuel oil

23   surcharge on them.  It's a certified class that was certified

24   by Judge Garcia Gregory after almost four years of litigation.

25           That litigation included discovery.  It included

1    depositions.  It included multiple rounds of motions to

2    dismiss.  It even included an appeal to the First Circuit that

3    was rejected and sent back.

4            During the course of these proceedings, PREPA and 18

5    other defendants, non-debtor defendants, agreed to a

6    Stipulation to lift the stay as a result of these bankruptcy

7    proceedings, an Order to allow Judge Garcia Gregory to

8    consider class certification.

9            Judge Garcia granted our Motion for Class

10   Certification in the fall of 2018.  Immediately PREPA and the

11   other defendants moved to reinstate the stay before the notice

12   required by Federal Rule of Procedure 23 was issued to the

13   class to advise them that the class had been certified, to

14   advise them they were now bound by this Order, and to further

15   give them notice of their due process rights.

16           In seeking to lift the stay that's now in place in

17   our case, we are very mindful of the *Sonnax* factors, and

18   therefore, we've asked for limited relief.  We have asked for

19   relief from the stay, but we've agreed as follows:  One, it

20   would first be for the purposes of giving the due process

21   notice that the class is entitled to under Rule 23.  Two, we

22   would first and foremost seek discovery from the non-debtor

23   defendants.  These are some of the world's largest oil

24   companies, these are laboratories here in Puerto Rico that are

25   not part of these proceedings.

1          We would only seek discovery from PREPA to the extent

2     PREPA was the sole holder of the information, and we would

3     phase that discovery to ensure that we didn't come out of the

4     box with any kind of aggressive discovery against PREPA.

5     There's plenty to do with respect to the oil company

6     defendants and the laboratory defendants.

7          THE COURT:  PREPA suggests in its papers that the

8     defendants have not been so reticent in their projections of

9     their anticipated interactions with PREPA on the discovery

10    front or otherwise if the stay were lifted, even under the

11    conditions that you've proposed.

12         MS. FEGAN:  Your Honor, the District Court, both

13    Judge Garcia Gregory as well as the Magistrate Judge, have

14    been very active in phasing discovery in this case to reduce

15    the burdens on defendants.  In fact, they entered an Order

16    that's typically not entered anymore in class actions

17    bifurcating discovery between class and merits.  And in that

18    sense, they've already discussed with the parties the desire

19    to reduce the burden on the defendants, and I would assume

20    that sense would be heightened here if the stay was lifted to

21    ensure that there weren't burdens put on PREPA just for the

22    sake of those burdens.

23         In fact, many of the interactions that we would be

24    seeking are documents, by way of example, are documents that

25    the oil companies would already have.  The communications it

1    had with PREPA, we don't need to get those with PREPA.  We can

2    get them from the oil company defendants and the laboratories

3    that were doing the actual testing of the non-compliant fuel

4    oil.

5          But probably most significant here under the *Sonnax*

6    factors is the fact we have agreed that we will not seek to

7    collect any judgment from PREPA.  So really what we are

8    talking about is the burden of litigation or discovery that

9    PREPA would otherwise have to engage in anyway if it was a

10   Rule 2004 examination, or either way if we would have to get

11   notice to the class, as an example.  And those types of

12   burdens are not the burdens Courts look at when they talk

13   about lifting a stay under the *Sonnax* factors.

14         In fact, because we wouldn't be seeking to recover

15   any judgment from PREPA, it's actually a benefit to the other

16   creditors who are here in the courtroom, but also of PREPA

17   generally.

18         THE COURT:  But you'd be seeking a finding of

19   liability on the part of PREPA, and you don't have a way of

20   precluding cross-claims and other efforts to inflict pain on

21   PREPA, so wouldn't PREPA have an incentive and a need to

22   participate fully in the defense of the case even if you're

23   not proposing to try to collect directly from PREPA?

24         MS. FEGAN:  Your Honor, I'm not aware of any

25   cross-claims.  Our claim is a claim for racketeering under

```
 1    RICO.  There is joint and several liability among the
 2    defendants that are there.  I'm not aware of any claims that
 3    any of those defendants have asserted against PREPA, and I'm
 4    not aware of any Statute of Limitations in effect having been
 5    tolled.  But you are right, I can't prevent the other
 6    defendants from trying to inflict pain through the discovery
 7    process, but I'm very confident in the way that the District
 8    Court Judge and the Magistrate Judge have overseen discover to
 9    date, that they will be quite aware if something's being done
10    for an improper purpose or, frankly, if the documents or other
11    information that those defendants are trying to seek don't
12    reside in their hands already, which I think is a key part
13    that the District Court takes into account when managing its
14    discovery, the discovery processes before it.
15              THE COURT:  Thank you.
16              MS. FEGAN:  And I think the final Sonnax factor which
17    I would like to focus on is the balance of harms.  Here we
18    have a certified class that goes back to 2002.  It's from 2002
19    to April of 2016.  Obviously whether it's because of the
20    weather or because of time going by and witnesses forgetting
21    things, the more time that passes, the more prejudice there is
22    to our class, both in being able to obtain the documentary
23    evidence, as well as having access to witnesses, some of whom
24    have since passed away even during the course of this
25    litigation.
```

1    And so there is a prejudice that's occurring to the

2    millions of people that are in our class.  And if we balance

3    that against the prejudice to PREPA, which is really just the

4    litigation costs, which we agreed we would phase so that we

5    don't interfere with these ongoing proceedings, the balance of

6    harm is here, if the stay is not lifted, rests with the

7    class.

8         THE COURT:  Thank you.

9         MS. FEGAN:  Thank you.

10         MS. PEREZ:  Good afternoon, Your Honor.  Diana Perez

11    of O'Melveny and Myers on behalf of AAFAF.

12         THE COURT:  Good afternoon, Ms. Perez.

13         MS. PEREZ:  We have thoroughly addressed the

14    applicable *Sonnax* factors in our brief, and while I'm not

15    going to go through each factor here today, there are a few

16    points I'd like to highlight.

17         First is the status of the Marrero litigation.  As

18    you heard, this litigation has been pending since 2015.

19    However, it's undisputed that there is still much to do in

20    this case.  This case is far from trial ready.  As movants

21    themselves have said, this case is not even remotely close to

22    being trial ready.

23         Considering the status of the litigation, any harm to

24    movants would be minimal.  To address the point that movant's

25    counsel made, there have been litigation holds at PREPA since

 1   the start of this litigation.

 2           We'd also like to remind the Court that the First

 3   Circuit's ruling on the Rule 23(f) petition could be

 4   dispositive of this case.  If PREPA were required to conduct

 5   discovery on the class members and to issue notice to such

 6   members, it would incur significant and otherwise

 7   unrecoverable expenses.  If the class is decertified by the

 8   First Circuit, which we believe it likely will be, such

 9   discovery and notice may become moot.

10           Additionally, Your Honor, counsel to movants talked

11   about the burdens.  We'd like to talk about the burden to

12   PREPA.  It's incredibly illusory to say that discovery on

13   PREPA would be unlimited (sic), or that PREPA is a nominal

14   defendant.  PREPA and PREPA alone is going to bear the

15   majority of the discovery costs in this case.  PREPA is a

16   critical party to the action and is the sole repository, as

17   has been acknowledged by the District Court and the movants,

18   to the majority of the information that would be the subject

19   of discovery.

20           THE COURT:  You mean just in connection with class

21   noticing, or do you mean for the entire litigation?  Because

22   Ms. Fegan has represented that the labs and oil companies

23   should have duplicates of documents that are at PREPA.

24           MS. PEREZ:  With respect to both situations, Your

25   Honor.  With respect to the class certification, PREPA is the

1   only party that has access to that information.  With respect

2   to the actual litigation itself, as you correctly noted, the

3   non-debtor defendants have themselves said that they're going

4   to vigorously defend themselves and to seek full and complete

5   discovery from PREPA for any information as well.

6           So even if they say that the non-debtor defendants in

7   the first instance may have that information, the non-debtor

8   defendants are still going to come after PREPA, and PREPA'S

9   going to have to vigorously litigate.

10          THE COURT:  And I shouldn't take comfort in

11  Ms. Fegan's suggestion that Judge Garcia Gregory and the

12  Magistrate Judge will ride herd on excessive discovery

13  requests by co-defendants?

14          MS. PEREZ:  Your Honor, we think even if that does

15  happen, PREPA needs to vigorously defend itself in this

16  action.  Movant's counsel mentioned that they don't know of

17  any cross-claims.  However, there still may be cross-claims or

18  defense agreements in place right now.  Just because there is

19  no judgment being sought from PREPA does not mean that PREPA

20  is not going to vigorously litigate itself, doesn't mean that

21  PREPA is going to have to defend itself from the other

22  non-debtor defendants.  So the costs to PREPA are still going

23  to be immense, regardless of whether the non-debtor defendants

24  are going to be the parties that they're seeking judgment from

25  or the parties that they are going to be seeking discovery

1    from.

2         THE COURT:  Thank you.

3         MS. PEREZ:  As Your Honor has noted, PREPA will have

4    to use its very limited resources to gather the information

5    for the class notices and then prepare for the actual trial.

6    Depositions will need to be taken.  Pretrial motions will need

7    to be written.  And the eventual trial as well, which as I

8    have noted previously, is not even remotely close to

9    happening.

10         I'd like to just take a moment to discuss the scale

11   of evidence that we're talking about here.  This information

12   is immense.  We're talking about over one million potential

13   class members, 14 years of data, three thousand potential

14   shipments, 22 various supply contracts, nine different

15   suppliers, and three different laboratories.

16         PREPA would need to take evidence regarding every

17   shipment over those 14 years to determine which shipments

18   included non-compliant fuel, and then identify the customers

19   who used electricity from that fuel. Obtaining this customer

20   information alone will be a burdensome task for PREPA.

21         As PREPA changed its database in 2012, not all of the

22   client data was transferred when the new database was set up

23   in 2012.  There is a limited amount of pre-2012 information

24   that is electronically stored at PREPA.  The rest of these

25   documents are most likely stored in hard copy at one of

1   PREPA'S warehouses.

2          Lastly, Your Honor, I'd like to address a point that

3   movant's counsel raised regarding litigation costs, that

4   litigation costs should not be the subject of a stay.

5   Contrary to movant's assertion that there are no cases where

6   litigations costs have been considered in keeping the stay in

7   place, we have noted numerous cases in our Reply Brief where

8   litigation costs were considered by the Court and that because

9   the litigation costs would diminish the bankruptcy estate or

10  recoveries to creditors, that those costs actually prejudiced

11  additional creditors.

12         One of those cases, Your Honor, is *Rescap*, *In Re

13  Rescap*, 2012 W.L. 3860586, Bankruptcy, Southern District of

14  New York, August 8, 2012.  There the Court held that movants

15  must be treated as any other unsecured claims and litigate

16  their claims in this court along with other similarly situated

17  creditors.  The Court noted that the litigation costs there

18  would specifically diminish the bankruptcy estate to the

19  prejudice of other creditors.

20         In closing, Your Honor, I'd like to note, as you've

21  heard today, that PREPA is on the verge of one of its most

22  important achievements in this Title III case.  A PREPA RSA

23  will act as a building block for potential settlements with

24  other creditors, and ultimately, a plan of adjustment.

25         At this juncture of the case, the balance of the

1    equities and the burdens of harm favor keeping the automatic

2    stay in place with respect to the Marrero litigation, so that

3    PREPA can focus its limited resources on moving forward with

4    this restructuring, while avoiding spending time and money on

5    matters that will shortly become moot.

6            If the Court doesn't have any other questions, we

7    would rest.

8            THE COURT:  Thank you, Ms. Perez.

9            MS. PEREZ:  Thank you.

10           MS. FEGAN:  Your Honor, I have just three quick

11   points.  First, my co-counsel reminded me that the third-party

12   oil companies and the laboratory defendants can't sue or can't

13   bring a cross-claim against PREPA, so we're really just

14   talking about discovery issues.

15           Second, PREPA's already produced to us the

16   transactional data reflecting its customer databases.  We

17   would really just need the names.  So the idea that we're

18   talking about warehouses of data in order to send class notice

19   just doesn't hold water. We've already gone through this at

20   the class discovery phase.

21           And third, Your Honor, the arguments that my

22   colleague made about having to identify every oil shipment,

23   and identify every customer that took from every oil shipment,

24   those arguments have already been rejected by the Court.  The

25   Court in the first instance has noted that we -- and the

 1   Puerto Rico Senate Commission have found that the laboratory

 2   instruments were calibrated so that every shipment was -- that

 3   we would argue at trial, that every shipment was

 4   inappropriately tested.

 5         And second of all, all Puerto Rico residents bore the

 6   brunt of every overpayment.  It wasn't that if you combusted

 7   your electricity from a particular shipment, that you received

 8   the overcharge.  Those overcharges were spread out pro rata

 9   across all of Puerto Rico.

10         So these issues just aren't going to increase

11   discovery, because it's not going to be the focus of

12   discovery.  Thank you.

13         THE COURT:  Thank you.

14         I will reserve decision.

15         Now, give me just one moment.  I want to consult with

16   the court reporter and courtroom deputy.

17         (Discussion held off the record.)

18         THE COURT:  We will keep going until 5:30 in an

19   effort to get everything done.

20         So next on the list is the Motion in the *ERS v.* now

21   *Andalusian*, adversary, to Amend the Complaint.  That's

22   adversary 17-213, and it is ECF number 236 on that docket.

23         And we have a total of 20 minutes allocated, and I

24   understand that Ms. Dale has ten minutes in the first instance

25   for the movant.  How much do you want to reserve for reply?

 1          MS. DALE:  Two minutes, please.

 2          THE COURT:  Thank you.  So we'll put you down for

 3  eight and two.

 4          MS. DALE:  Thank you, Your Honor.

 5          Your Honor, Margaret Dale for the debtor from

 6  Proskauer Rose.

 7          Judge, the motion presents two issues to be decided.

 8  One is the request for the Court to adjudicate the undecided

 9  issue regarding Bankruptcy Code Section 552.  The second issue

10  is the debtor's request to amend the Complaint.

11          THE COURT:  Actually, may I just -- I'm going to stop

12  the clock on you and just try to propose a little structure

13  that maybe you can all sort of react to.  So, first of all, it

14  seems to me that the -- I know for sure the First Circuit

15  entered a judgment, it issued a decision, it entered a

16  judgment.  The rule on the statute, on cert, which is 28

17  U.S.C. 2101, doesn't require a judgment as the predicate for a

18  cert petition.  And because the First Circuit has already

19  ruled and entered a judgment, I don't see how any amended

20  complaint could vitiate a First Circuit decision and judgment.

21          And so it seems to me that a path through this

22  thicket could be to recognize that there's a First Circuit

23  petition and judgment on the lien issue.  And then as to the

24  amended complaint, if the parties would be prepared to

25  stipulate, not withstanding the new factual allegations in the

1   amended complaint, that Count VI and the remanded

2   counterclaims would be determined based solely on the closed

3   set of briefing prior to the First Circuit appeal, including

4   those 56-1 statements, and that there are no other material

5   facts, the existing briefing could be deemed directed to Count

6   VI of the new complaint.  And that aspect could go forward.

7   And then any further discovery and proceedings necessitated by

8   the new claims could be dealt with on their own track.

9          And I would of course need ERS to be clear about

10  whether ERS is contending that it believes that the need for

11  decision on the 552 issue is an impediment to maintaining the

12  current schedule for the ERS Adequate Protection Motion.  I

13  know I said a lot there, but I hope that it's helpful in

14  structuring.  And we'll put you back on the clock now.

15         MS. DALE:  Thank you, Your Honor.

16         We thought that with respect to the 552 issue, it

17  could be adjudicated now through the briefing that was

18  accomplished on the Motion for Summary Judgment when it was

19  part of the original Complaint.  We also thought that if the

20  Court -- if the Court wanted to allow the Motion to Amend, it

21  could be adjudicated as part of the new -- the amended, I

22  think it's Count VI, on the same briefing that was already

23  extant and the oral argument.

24         So we would be prepared to do it either way.  And I

25  believe we had made that overture already to our adversary.

1           THE COURT:  And either way, not withstanding the fact

2      that --

3           MS. DALE:  There are new allegations?

4           THE COURT:  -- there are new allegations?

5           MS. DALE:  Yes, ma'am.  Correct, Your Honor.  We

6      could do that either way.

7           And I think that's just -- and I think that the

8      bondholders are in agreement with that proposal, because they

9      did not point to any new allegations in the Complaint that

10     would change the nature of the 552 decision-making process.

11          So with respect, I would now then move to the Request

12     for Leave to Amend, Your Honor.  And just to address the

13     summary of the proposed amendment for a moment, the adversary

14     proceeding was initiated pursuant to the parties' stipulation

15     in response to the defendant's original Motion for Adequate

16     Protection, and it was an attempt to get the threshold issue

17     of perfection resolved quickly.

18          In light of the First Circuit's decision on that

19     threshold issue of perfection, there are issues that now

20     remain unresolved.  The parties need a determination regarding

21     the extent to which those asserted security interests attach

22     to ERS property.

23          So the proposed amendment seeks to add allegations

24     and claims explaining why the asserted security interests

25     either do not attach or did not remain attached to certain of

1    ERS property, including pre-2008 assets, funds that were not

2    employer contributions, and funds remitted back to ERS by the

3    fiscal agent.

4         The defendants do not contend that these issues have

5    been addressed by any court, and they do not -- these issues

6    have to be decided one way or the other.  We thought that it

7    would be most efficient to do it by way of an amendment to the

8    current adversary Complaint.  We could have chosen I think to

9    file a new adversary complaint and seek to consolidate them.

10   That did not seem to be a very efficient use of anyone's time

11   or effort.

12        Just one other point, Your Honor.  With respect to

13   the First Circuit's decision, the Proposed Amended Complaint

14   omits what was Count I of the original Complaint, and that was

15   intentional, because we had the decision of the First Circuit.

16   And that is what it is.

17        We have said to the defendants that subject to our

18   right to seek certiorari on that decision, that we'd be

19   willing to agree to a 54(b) judgment on that first count of

20   that Complaint.

21        THE COURT:  And so then you would contemplate

22   targeting the cert petition to a 54(b) judgment that I enter

23   here rather than directly predicating it on the First Circuit

24   decision and judgment?

25        MS. DALE:  We were, but I think we could do it either

1   way.  We had talked about a 54(b) judgment as a way to make it

2   very clean, that that count had been determined and stands

3   alone now for purposes of any further appeal.

4            THE COURT:  Okay.  I will hear what Mr. Bennett has

5   to say.

6            MS. DALE:  Okay.

7            THE COURT:  And I guess timetables would differ, too,

8   depending on what the predicate filing --

9            MS. DALE:  Your Honor, just turning quickly to the

10  liberal standard for leave to amend which has been met here,

11  Rule 15(a), it's, leave to amend shall be freely granted when

12  justice so requires.  We're seeking amendment to seek

13  resolution of issues that arose as a result of the First

14  Circuit's decision.

15           THE COURT:  The defendant's claim as to whether it's

16  substantial and extraordinary circumstances, or something like

17  that, because there was summary judgment motion practice and

18  discovery prior to the First Circuit decision, and we are 20

19  months into the case --

20           MS. DALE:  But, Your Honor, there's no futility being

21  argued here, and the bondholder's authority, it's -- I

22  don't -- it's not availing here.  The rule -- the bondholders

23  objected on the ground that we shouldn't -- you know, there

24  had been summary judgment.  There had been discovery.  But the

25  *Resolution Trust Corp versus Gold* decision that they cite

1   explains that, the Rule exists to prevent a futile amendment

2   sought, quote, at the 11th hour to fend off summary judgment,

3   end quote.  That's at 30 F.3d 251, and the jump cite is 254.

4           There's no allegation here that we were seeking to

5   fend off summary judgment, or any malintent whatsoever.  There

6   were certain issues that we thought we wanted to tee up very

7   quickly, and we did that.  And if the First Circuit decision

8   had been different, then this would all be moot.

9           Now, there are issues that need to be decided, and

10  they have not pointed to any prejudice, other than a claim

11  that this is going to take more time.  But we're willing to

12  talk about a discovery schedule for these additional claims,

13  and other than that, we're not seeking to move the Lift Stay

14  Motion.  I think there might be other reasons why that

15  schedule doesn't hold, but it's not because of this, our

16  amendment that we're seeking.

17          And that's really all I have, Your Honor.  I think

18  the motion should be granted given the liberal standard and

19  the failure of any claim of prejudice here.

20          THE COURT:  Thank you.

21          All right.  And so that is Mr. Zakia.

22          MR. ZAKIA:  Yes, Your Honor.

23          THE COURT:  I have you down for five minutes.

24          MR. ZAKIA:  I was a little stunned, because it's

25  probably the second time in my life somebody got my name right

1    the first time.

2              THE COURT:  I bet you say that to all the judges.

3              MR. ZAKIA:  The two times it's happened I do.

4              Your Honor, Jason Zakia of White and Case on behalf

5    of the Puerto Rico Funds.  If I could just articulate how Mr.

6    Bennett and I split this up and see if that works for the

7    Court.  I'm going to try to articulate our basis we're arguing

8    that the amendment should be -- leave to amend should be

9    denied in its entirety.  And then Mr. Bennett is going to

10   address some specific changes that I think that gets to Your

11   Honor's question about things like the judgment in the event

12   Your Honor is inclined to grant the leave.

13             I think Ms. Dale put her finger right on the

14   critical point.  It won't surprise the Court to learn I

15   disagree with the implication that she drew from it, but she

16   argues that the purpose of this entire adversary proceeding

17   was to deal with the threshold issue of perfection first.  And

18   that's simply not borne out either by the terms of the

19   Stipulation and Order that Your Honor signed at the beginning

20   of this adversary that set out exactly what it was supposed to

21   address.

22             And in fact, the Board cites at paragraph 25 of its

23   motion the critical provision, which says that the purpose of

24   the adversary is to address validity, priority, extent and

25   enforceability of the bondholders' liens.

 1            The new claims that are being asserted now go

 2    directly to the extent of the lien.  That is not something

 3    that was in any way bifurcated or which in any way they were

 4    prohibited from bringing when they filed their Complaint

 5    almost two years ago.  And in fact, they make this point in

 6    their papers.

 7            The argument that the Board makes in their motion is

 8    it was always anticipated that extension of liens is something

 9    that could be brought in this adversary, and so therefore,

10    it's okay that the amendment is being brought in this case.

11    And I think that argument misses a critical point, Your Honor.

12            Ms. Dale tried to distinguish some of the authority

13    we cited by talking about the fact that this amendment is not

14    being brought on the eve of trial or to avoid summary

15    judgment.  It's actually in the context of this case being

16    brought far later.  This is not the eve of trial.  It's not

17    the eve of summary judgment.  Your Honor resolved summary

18    judgment.  There's been an appeal, and we're back on remand.

19            And when the Board makes the point that if the

20    appeal had gone differently these new claims may have been

21    mooted, what I hear is if they win, the case can end; but if

22    they don't prevail on the claims they chose to complete --

23    they could have brought any claims on the extent of the liens.

24    They chose to bring the claims that they brought.  And for

25    them to say that they didn't prevail on the claims they chose

1   to bring, they now have the need and opportunity to amend

2   their Complaint to assert new claims, I don't know where that

3   ends, Your Honor.

4           Should Your Honor choose to grant this Leave to

5   Amend and we litigate those claims, and let's say Your Honor

6   agrees with us and rules against them, do they then amend to

7   add new claims because they've decided that the claims they

8   brought and they went on didn't moot those additional claims

9   they were going to bring?

10          THE COURT:  Well, some of the old claims were

11  dismissed without prejudice, and Ms. Dale is talking about

12  initiating a new complaint and then trying to reverse engineer

13  coordination anyway, so --

14          MR. ZAKIA:  I'm sorry, Your Honor.  I think the 552

15  argument is a little different than what I consider the new

16  claims.  The 552 argument, we would submit, and as we explain

17  in our papers, is before the Court because the identical

18  issues that were in their count that was dismissed were also

19  in our counterclaims.  So they are mirror claims and

20  counterclaims.

21          Those counterclaims I think are fairly included by

22  what was remanded by the First Circuit.  And Your Honor will

23  rule when Your Honor wants to rule, but there's no need for an

24  amended complaint to bring those claims back to life.

25          THE COURT:  True.

1          MR. ZAKIA:  Without any amendments, Your Honor can

2    rule on that issue whenever Your Honor sees fit.  And so I

3    think -- I'm sorry.

4          THE COURT:  I understand that.  I'm just saying that

5    the Board says okay, if you don't let me do it as an amendment

6    --

7          MR. ZAKIA:  Sure.

8          THE COURT:  -- I'm going to come with another

9    complaint and then move to consolidate and coordinate.  And

10   unless you're going to argue that there's some res judicata

11   principle that prevents them from doing it, aren't we talking

12   about a whole lot of transaction costs for not a lot of gain

13   here?

14         MR. ZAKIA:  Understood, Your Honor.  I'm sorry.  I

15   misunderstood your question the first time.  Now I understand.

16         I think Your Honor again puts your finger right on

17   the issue.  I think if they were to try to bring these claims

18   which they were free to bring in 2017 when they initiated this

19   lawsuit in a new case, Your Honor doesn't have to adjudicate

20   that here, but there would be claim splitting arguments that

21   would be I think a real issue that they would have to deal

22   with in that new case, because there's no reason it couldn't

23   have been brought in this proceeding.

24         So I don't think it's simply a form over substance

25   issue.  I think there are real substantial issues if they

1   chose to do it that way.

2           THE COURT:  Thank you for responding to my

3   question.

4           MR. ZAKIA:  Thank you, Your Honor.

5           MR. BENNETT:  Your Honor, very briefly, if I could

6   supplement the response just given.  If you take a look at the

7   Order that you entered, which is document number 170 I think

8   in the adversary proceeding, and it's in paragraph 6-A --

9           THE COURT:  I don't have that right in front of me,

10  so --

11          MR. BENNETT:  Would you like it?  I think we have

12  extra copies.

13          THE COURT:  Sure.

14          MR. BENNETT:  I brought plenty.

15          THE COURT:  Thank you.

16          MR. BENNETT:  So I don't know if it has the same

17  pagination.  It's document 170, seven of 19 on the top.  It's

18  page three of the actual stipulation.

19          Paragraph six, capital A, here's exactly what the

20  Oversight Board agreed to do and what Your Honor Ordered them

21  to do.  On or about July 21, 2017, ERS, through its

22  representatives, that's the Board, shall file an adversary

23  complaint with this Court seeking solely declaratory relief

24  regarding the validity, priority, extent and enforceability of

25  the liens.

1          They were supposed to bring these claims back then.

2    They agreed to.  They were Ordered to.  They didn't.

3    Mr. Zakia's right, the fact that they didn't probably is a

4    bar.  The amendment today is completely inappropriate.

5          Now, in the hopefully unlikely event that Your Honor

6    is going to permit the amendment, what I really need is the

7    cleanest and neatest possible record, because of the fact that

8    we have a case that went up on appeal to the First Circuit,

9    sounds like, although it hasn't been filed yet, there's going

10   to be an effort to take it to the Supreme Court.  And then

11   we're going to have further proceedings that could conceivably

12   go back to the First Circuit as well.

13         So first of all, let's deal with the status of the

14   First Circuit case.  Unlike the case with -- the *Aurelius* case

15   we've been talking about before, and the Oversight Board's

16   intent to obtain an extension or a delay of the mandate, a

17   stay of the mandate, in this case, the ERS First Circuit

18   appeal, the mandate issued.  They never saw an additional stay

19   beyond the initial 30 days.  So a mandate came down to this

20   Court.  So today we're entitled to the entry of judgment, and

21   we were frankly very distressed to see the Proposed Amended

22   Complaint didn't deal with that and just would make the claim

23   go away.

24         So what would we have?  Whenever someone looked at

25   the adversary file, they wouldn't see a judgment before

1    amendment.  They'd see an amendment and a claim that was up on

2    appeal to the First Circuit vanish into thin air.  That's not

3    the way the file ought to look.

4          Frankly, if Your Honor --

5          THE COURT:  Except the file includes the First

6    Circuit decision that says reversed on Count I, vacated and

7    remanded for further proceedings on the two counterclaims and

8    judgment entered on that, and the mandate.  So, and that's all

9    in the District Court file, too.

10          MR. BENNETT:  I'm not sure it did the very last thing

11    all by itself.  I think you have to do the last thing, which

12    is enter the summary judgment in conformity with the First

13    Circuit's Opinion.  That's all I'm asking for.

14          THE COURT:  Okay.

15          MR. BENNETT:  Is that before any amendment goes in

16    the file, that the existing count which says that the liens

17    are fully perfected -- we would just like to have an Order

18    entered before any amendment goes into the file.  That would

19    be our --

20          THE COURT:  All right.  If everyone is agreed to

21    doing that, that's fine with me, since the First Circuit did

22    enter a document captioned Judgment.

23          MR. BENNETT:  Okay.

24          THE COURT:  I'm not absolutely convinced that that's

25    necessary, but if everybody's cool with doing that, I'll sign

1   a 54(b).

2            MR. BENNETT:  Thank you.  And again, if the

3   amendment's going to be permitted here -- and again, it

4   shouldn't be.  This was a proceeding where there's a specific

5   agreement as to what the Complaint was supposed to say.  And

6   it was supposed to cover extent, and it was supposed to happen

7   back in July of 2017.  And the last time I looked, we're in

8   2019.

9            But in the unlikely event that there is going to be

10  an amendment, we think that too should be after Your Honor

11  decides the 552(b).  Why?  Because when someone goes back to

12  look at the file, and I hope it's not necessary, but it's

13  conceivable it could be, that your ruling on 552(b) comes

14  after the Complaint and the pleadings that relate to that

15  Order.  And if they want to make an amendment after that,

16  frankly, they should seek it then.

17           If you took a look, Your Honor, and I don't know if

18  you had time, I get that really listening just today, at the

19  markup of the Complaint, you'll see it's practically a new

20  complaint.  It's not as if this was a light touch.  And every

21  single -- every single paragraph that precedes the paragraph

22  relating to Section 552, the claim based on Section 552 is

23  incorporated into that.  So we have a little bit of a mess.

24           There are all kinds of work-arounds.  I prefer no

25  work-arounds.  I think in this instance the way the cases

1   read, we really have two choices here.  One is decide the 552

2   part of the Summary Judgment Motion today based upon the

3   existing record.  Worry about amending the Complaint later.

4   That's one.  Number two, if you amend the Complaint today, the

5   cases are clear, all prior motions are a nullity.  You do new

6   ones.

7         THE COURT:  Well --

8         MR. BENNETT:  It's okay with us if that's the way the

9   Court wants to proceed, because frankly, we've done the work

10  already.  And I went over all the paperwork on the plane

11  coming over just to make sure it's in order, and it kind of

12  is.

13        I will say for Your Honor, just so you know what

14  you're getting yourself into a little bit, because of the way

15  the cross-motions work, and you asked for supplemental

16  briefing, there are probably four or five briefs on each side

17  that you have to read as to opposed to just, you know, neater

18  packages.  But it's all there.

19        THE COURT:  I will need a definitive, agreed list on

20  the universe of record documents that you all agree is the

21  closed universe, that you want me to consider.  Whether I call

22  it Count III of the old Complaint or I enter an Order saying

23  that the motion is deemed directed to Count VI of the new

24  Complaint and any counterclaims that are substantially

25  identical to old two and three, I'm not going to go hunting

1  around and figure out for myself which ones you think are

2  relevant.  I need a nice thing in a frame.

3          MR. BENNETT:  Not a problem.  It doesn't at all

4  surprise me that you'd seek that.  But our view is, again, in

5  the unlikely event that you're prepared to permit an amendment

6  today, and you shouldn't, there should be a judgment first

7  before any amendment.  There should be a decision on 552

8  before any amendment.  That is the cleanest way to do it.  You

9  do an amendment afterwards.  Then we will not have a record

10  that is -- that is a work around or an effort to Jerry-rig

11  what the cases say is supposed to happen.  We'd like to stick

12  with kind of the rules that have developed and that are

13  enshrined in cases that are decided in the First Circuit.

14          THE COURT:  All right.  Well, I will tell you that I

15  am not entering an Order today, because there are all these

16  mechanical issues, but it is my intention to grant the Motion

17  for Leave to Amend.  And so what I would ask you all to do is

18  to promptly meet and confer to propose a procedure, timetable,

19  the elements of it.  And I tell you, it definitely has to

20  include an agreed, definitive statement of what I'm supposed

21  to be taking into account for the Summary Judgment on the

22  undecided issue, Count III type issues.

23          And if you can, you know, want to agree to a

24  sequential filing of the Amended Complaint so that you don't

25  start talking about discovery and proceedings triggered by

1    that until later, yeah, fine.  But give me some procedural

2    mechanism, and then if we can do that just by step, fine.  If

3    you need me to say -- to enter an Order specifically granting

4    this motion or speak at further length about why I'm

5    exercising my discretion to do this and find that the

6    situation and the First Circuit decision and other subsequent

7    events constitute sufficient evidence to meet even the higher

8    standard for amendment, if it's not just the Rule 15 standard,

9    yes, I can work something up.

10          But in the meantime, I think it's most important to

11   figure out how we are going to go forward.  So by the end of

12   next week, please give me a joint status report.

13          MR. BENNETT:  We'll do that, Your Honor.

14          THE COURT:  Thank you.

15          Ms. Dale, does that work for you, too?

16          MS. DALE:  Thank you.  Thank you very much, Your

17   Honor.  We'll get that to you.

18          THE COURT:  Okay.  Thank you.

19          All right.  So this -- even my computer just went on

20   strike and locked me out.  But I'm logging myself back in.  It

21   will take just a minute.

22          All right.  So I think the last thing we have is the

23   stipulation.

24          MR. DESPINS:  Your Honor, my understanding is that

25   your courtroom deputy has received from Mr. Bongartz a marked

1    to show changes from the one that was filed, so all the

2    changes, except that I don't have a hard copy to take you

3    through.

4              THE COURT:  Yeah, and I don't think I -- now I have a

5    hard copy.  Do we have an extra hard copy we can give to

6    Mr. Despins?

7              COURTROOM DEPUTY:  No, Your Honor.  I understood the

8    e-mailing was sufficient.  So do you want us to print a copy

9    off?

10             THE COURT:  Okay.  We thought you were going to work

11   on the basis of your e-mails.

12             MR. DESPINS:  We've already circulated to everyone by

13   e-mail.

14             THE COURT:  You don't have your iPad or something you

15   can use to look at your e-mail?

16             MR. DESPINS:  I'm going to use his computer.

17             THE COURT:  Good.  Thank you.

18             MR. DESPINS:  Okay.  Your Honor, I believe these

19   changes which are marked against the original version that was

20   filed with the Court have been agreed to, and they'll need to

21   confirm that, by all the monolines.  That means Ambac,

22   Assured, National, FGIC.

23             And so let me take you through this.  And the last --

24   just below the last "whereas" on page number three, we added

25   "subject to the terms hereof."  I don't think it's really

```
 1  material.
 2          The next changes are in paragraph two, Your Honor.
 3  And we added clarity at the request of the monolines.  And
 4  also the language that says, "upon entry of this stipulation,
 5  the Court finds that the claims or causes of action identified
 6  on the schedules have been described in sufficient detail on
 7  the record at the April 18th hearing."  And you'll stop me if
 8  I'm going too fast.
 9          THE COURT:  No.  I'm with you.
10          MR. DESPINS:  Okay.  Paragraph three, the monolines
11  wanted some language about the fact that members of the
12  special committees are appointed in this thing.  What if the
13  Oversight Board decides to revoke or, you know, they resign or
14  they're replaced, and all that?  So there's a mechanism where
15  it says, "subject to revocation or substitution thereof by the
16  Oversight Board at any time."
17          And we've deleted the Committee as sole trustee,
18  because now we have a feature where the Committee cannot file
19  subject claims.  We just have this provision that says that we
20  can add claims in an action together, which they can disavow,
21  if you will, by dropping a footnote saying we don't -- we're
22  not going to agree with that but we allow it to be included in
23  the same Complaint.
24          So there's no -- remember, there used to be that
25  subject?
```

1          THE COURT:  Yes.

2          MR. DESPINS:  So now that's gone.

3          THE COURT:  So no sole plaintiff adversary

4   proceedings?

5          MR. DESPINS:  Correct, Your Honor.

6          And footnote four, we've added COFINA.  That was --

7   you mentioned that at the last hearing.

8          And also we made clear that this does not apply to

9   issues between governmental entities.

10         THE COURT:  Yes.

11         MR. DESPINS:  Okay.  This is paragraph number -- it's

12  still three.  Carry over on the next page, just some defined

13  terms that are changed, but also there's a Court finding that

14  for the reasons stated on the record at the April 24 hearing,

15  that's of course assuming you would approve it, that there is

16  good cause for entry of the stipulation.  And we have deleted

17  the Committee as sole plaintiff, because now that's gone.

18         And the rest are all conforming changes by the

19  co-plaintiff.  The important portion is just at the end of

20  three, for -- the avoidance of doubt language is that, the

21  members of the Special Claims Committee are appointed as

22  co-Trustee and co-plaintiff with respect to the adversary

23  proceedings to the extent they remain members of the Board.

24  It's the same concept.  If you're retired or something, you

25  cannot stay on this -- on this as co-plaintiff or as

 1   co-trustee.  And also provides specifically that the Oversight

 2   Board can replace their own members --

 3            THE COURT:  Yes.

 4            MR. DESPINS:  -- in that role.

 5            On paragraph four, this is just a clarification that

 6   the causes of action will be -- the Complaint will be filed on

 7   or before the expiration of the Statute of Limitations.

 8            Paragraph five, same thing.  It says, "in the absence

 9   of a tolling agreement, there will be a lawsuit filed before

10   May 2nd."

11            Paragraph six, it provides -- this is what I would

12   call the Mr. Mayer issue.  Basically it says we can be a party

13   to any tolling agreement, but our remedies to stop an

14   extension of the tolling agreement or to try to terminate it

15   are covered by paragraph 11 and not by anything else.  So we

16   cannot block that other than with Your Honor's assistance, if

17   you were to give us that, pursuant to paragraph 11.  So that

18   resolves that issue.

19            Then we added, in the next paragraph, the Fee

20   Examiner issue, the language that the Fee Examiner wanted

21   regarding detailed staffing plans.

22            Then paragraph eight.  This is what we call the

23   safety valve provision.  And basically good cause is defined

24   to include a finding that Section 926 of the Code and/or

25   derivative standing requirements have been satisfied.  So

1    before good cause was not defined.  They insisted that we put

2    that in.  Don't like it, but we'll live with it.

3         Same thing on page -- paragraph ten.  Same concept.

4    Same for 11.  These are all provisions that say good cause is

5    defined to include those findings.

6         THE COURT:  Yes.

7         MR. DESPINS:  Paragraph 12, this is again to deal

8    with Mr. Mayer's issues.  We said that to the extent

9    reasonably practicable, the other co-plaintiff will be

10   involved in any settlement discussions.

11        And the paragraph 13, this is the subject claims,

12   that's been removed and basically replaced with this concept

13   that there's one action, that we can add claims in that action

14   but not in separate actions.  This is what this provides.

15        THE COURT:  Yes.

16        MR. DESPINS:  And this is all the -- you know 13, 14

17   are all conforming changes.  Sixteen.

18        THE COURT:  And I will just state for the record that

19   I did read the revised version that was filed I think on

20   Monday night that incorporated a lot of these concepts, and so

21   the fact that I'm saying yes and flipping the page doesn't

22   mean that I'm just taking Mr. Despins' word for it.  I did

23   read the earlier iteration of the revision.

24        MR. DESPINS:  And paragraph 16 is the same issue that

25   continues with regard to the members of the Board.  Basically

1   that they can be substituted in any manner.  Basically, this

2   is to provide that if they resign or -- they can't stay as

3   co-trustee or co-plaintiff if they are no longer involved.

4         We've deleted the beginning of paragraph seven

5   because that was purely historical.  And we've deleted the

6   entirety of paragraph 19.  Although we thought that we had

7   given them all the assurances that they needed, they preferred

8   that we take that out.  We still intend to do something like

9   that, but we don't need to say it.

10        THE COURT:  Yes.

11        MR. DESPINS:  Because that creates a lot of trauma.

12        And this paragraph 28 is new, and that's a key

13  paragraph.  This is the defendants -- remember I had said, you

14  asked me specifically on Wednesday whether defendants would be

15  somehow barred by this from raising defenses, and we said no,

16  they would not be.  So this is the language that's been agreed

17  to that basically says, a defendant in an adversary proceeding

18  can raise these issues, and so can the insurers, the monolines

19  that are involved in that adversary proceeding.

20        So they're not like free-wheeling agents, but if

21  they're involved in the adversary proceeding, they can raise

22  that issue.  And therefore, the issue of standing is preserved

23  for them.

24        And I believe, Your Honor, that's the entirety of all

25  the changes.  We made, frankly, 98 percent of all the changes

1    that they wanted.

2              THE COURT:  Thank you.

3              Is there anyone who wants to be heard further in

4    opposition to the proposed revised stipulation?

5              Ms. Miller.

6              MS. MILLER:  Your Honor, we don't strictly want to be

7    heard in opposition, but two small points of clarification.  I

8    think Mr. Despins accurately represented that Ambac, as well

9    as the other monolines, are in agreement with the stipulation

10   as drafted.

11             In describing the new paragraph 28, Mr. Despins said

12   that it gives defendants, as well as what he described as

13   monolines involved in the adversary proceeding the right to

14   raise the objections at that time.  I just want to make clear

15   that it's not necessarily monolines involved, which I think is

16   vague, but it is, as the language in the proposed stipulation

17   would provide, insurers that insure bonds that are subject to

18   the adversary proceeding.

19             And I'll say it, it was said many times before, and

20   consistent with the deletion of paragraph 19 and Mr. Despins'

21   statement that he continues to intend to present something

22   similar with respect to HTA, consistent with paragraph 22 and

23   the deletion -- 28 and the deletion of paragraph 19, we at

24   this point would object to a similar stipulation with respect

25   to HTA.  And I would intend to object to that and wanted to

1   make clear on the record that our consent to this negotiated

2   stipulation is not precedential in any future proceedings and

3   in particular, with respect to HTA.

4           THE COURT:  Yes.  Does anyone else wish to be heard?

5           Good afternoon.

6           MR. RIVERA:  Good afternoon, Your Honor.  Ramon

7   Rivera Morales.  I stand in representation as co-counsel to

8   Mr. Stancil for the Ad Hoc Group of GO Bondholders.  And my

9   mission this afternoon is to stand in opposition to the

10  stipulation for the same reasons that were raised in the

11  previous hearing and for the same reasons that are stated in

12  the objection filed.

13          And I just wanted to have that stated for the record,

14  Your Honor.

15          THE COURT:  Thank you.

16          Mr. Morgan.

17          MR. MORGAN:  Just one brief -- I would be remiss if I

18  didn't note that with respect to National, the reservation of

19  rights also extends to PREPA.  Ms. Miller referenced HTA, but

20  for us, it's HTA and PREPA.  So I wanted to put that for the

21  record.

22          THE COURT:  Thank you.

23          Anyone else?

24          (No response.)

25          THE COURT:  All right.  Give me a moment here.

1          MR. DESPINS:  Your Honor, technically the parties

2    need just to put an S slash on that document.  So I know

3    you're referring to it, but I just wanted to note technically

4    they need to do that.  The Oversight Board and --

5          THE COURT:  Yes.  Well, what I'm frankly pondering

6    now is the reasons that I will be stating on the record, since

7    I still have that line in the play under the revised

8    stipulation.  And I will be asking that an appropriate

9    Proposed Order that has with it a slash S version of the

10   stipulation be provided to me supplementally.  Okay?

11         MR. DESPINS:  Yes, Your Honor.

12         THE COURT:  All right.  So before the Court is the

13   Urgent Joint Motion for Entry of an Order Approving

14   Stipulation so on and so forth, document number 6305 in 3283.

15         The Court has considered carefully all of the

16   iterations of the stipulation, including the revision provided

17   to the Court this afternoon and discussed on the record of the

18   Proposed Stipulation.  The Court has considered all of the

19   objections that have been filed in the course of this motion

20   practice and the arguments made in court both on April 18th

21   and today.

22         For the reasons that follow, I overrule the remaining

23   objections, and I grant the Motion for approval of today's

24   revised form of the stipulation.  The bulk of the objections

25   concerned whether the movants had met their burden of

1    justifying the Court's approval of an arrangement whereby the

2    Committee has authority to prosecute causes of action for the

3    benefit of the Commonwealth.

4         The Motion calls upon two sources of such authority.

5    First, a line of cases that interprets various provisions of

6    the Bankruptcy Code, including Sections 105(a), 503(b)(3)(B),

7    1103(c) and 1109(b), to permit a debtor to consent to a grant

8    of standing of a committee -- to a committee to assert claims

9    for a debtor's benefit.  And second, Section 926(a) of the

10   Bankruptcy Code, which permits creditors to request that the

11   Court appoint a trustee to pursue certain avoidance type

12   causes of action that a debtor refuses to pursue.

13        The Court finds that movants have shown the necessity

14   and benefit of granting the Unsecured Creditors Committee and

15   members of the Oversight Board's Special Claims Committee

16   authority to pursue causes of action for the benefit of the

17   Commonwealth as provided in the revised Stipulation under

18   these unique circumstances.

19        The Commonwealth is currently faced with Statutes of

20   Limitation that expire on May 2nd, 2019, pursuant to Sections

21   108(a) and 506 -- 546(a) of the Code.  Additionally, in light

22   of the decision of the First Circuit in *Aurelius v.*

23   *Commonwealth of Puerto Rico*, 915 F.3d 838, First Circuit,

24   2019, the method of appointment of the current Oversight Board

25   has been determined to be unconstitutional, and the 90-day

1   stay period provided in that decision will expire on May 16 of

2   2019.

3           Accordingly, the Committee and the Oversight Board

4   are faced with a situation where even if the Oversight Board

5   were to commence these actions prior to May 2nd, its authority

6   to continue to prosecute the actions may expire or be

7   interrupted soon thereafter, presenting a risk of detriment to

8   the rights asserted in pending litigation by reason of the

9   Oversight Board's inability to act on behalf of the

10  Commonwealth.

11          Although Section 926(a)'s terms contemplate a request

12  by a creditor based upon a debtor's refusal to pursue a cause

13  of action, the Court is satisfied that the current

14  circumstances justify granting the Committee the power

15  contemplated by the revised Stipulation.  First, although the

16  Committee is not itself a creditor, it is composed of

17  creditors and represents the interests of creditors, and

18  indeed, Commonwealth creditors who are members of the

19  Committee have proffered through counsel that they would make

20  a formal Section 926 request if necessary.

21          Second, these unique circumstances present a

22  situation where the Oversight Board has decided to share its

23  responsibility to prosecute certain claims, and it has,

24  therefore, effectively refused to pursue the causes of action

25  to the extent that it has sought, by means of the motion, to

1    have the Committee share responsibility for prosecution of the

2    causes of action.  That refusal is a necessary and beneficial

3    refusal in light of the Statutes of Limitations and the

4    potential practical consequences of the end of the 90-day stay

5    of the *Aurelius* decision provided by the First Circuit.

6         Third, Section 926 contemplates a form of relief,

7    appointment of a trustee for the benefit of creditors and

8    other parties in interest, but does not necessarily provide

9    the only route to reach that form of relief when there is

10   consent.  The Court has concluded that the exceptional

11   circumstances that have been presented warrant the appointment

12   of parties who can act as trustees, along with the

13   representatives of the Oversight Board, with respect to

14   matters that are within the scope of Section 926.

15        The Court further concludes that the Oversight Board

16   can consent to a delegation of the powers it exercises on

17   behalf of the Commonwealth, thus conferring consensual

18   derivative standing under principles similar to those

19   contemplated by the *In Re STN Enterprises* line of cases.

20        The Oversight Board's determination, reflected in the

21   revised stipulation that co-plaintiff and co-trustee status is

22   necessary and beneficial to the Commonwealth under the current

23   circumstances, is sufficient to surmount the barrier of

24   PROMESA Section 305 and confer such status with the Court's

25   approval as to causes of action in addition to those

1   enumerated in Section 926.

2         The Court notes that the revised stipulation,

3   specifically in paragraph 28, preserves the opportunity of

4   defendants and adversaries and affiliated parties to challenge

5   standing in the context of particular adversary proceedings.

6   For the foregoing reasons, the remaining objections are

7   overruled and the motion is granted.

8         The movants are directed to submit a Word version of

9   the revised Stipulation with the Proposed Order approving it

10  to chambers, and the Court will thereafter enter an

11  appropriate Order.

12        And you'll get back to me on the unsealing.  We've

13  already set a timetable for that.

14        The remaining Agenda items have been adjourned to the

15  June Omnibus hearing as enumerated in the Agenda and as

16  further stated on the record here with respect to certain

17  additional items that were adjourned.  So that concludes

18  today's Agenda.  The next scheduled hearing date is the May

19  1st, 2019, hearing in Boston with a video connection to San

20  Juan.

21        I again offer effusive thanks to the staff of the

22  court here and in New York and my chambers colleagues for

23  their untiring and hard work in preparing for and conducting

24  today's hearing; I give the court reporter, who has stamina

25  that I can only begin to envy, for her keeping up with us

1    today; and the superb ongoing support of the administration of

2    these very complex cases.

3            If there is nothing else we need to address together,

4    I say keep well and safe travels to all.  Thank you.

5            (At 5:22 PM, proceedings concluded.)

6                              *      *      *

```
 1   U.S. DISTRICT COURT     )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 240 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain on April 24,

 8   2019.

 9

10

11

12   S/ Amy Walker

13   Amy Walker, CSR 3799

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 16 180:12
April 18th 227:7,
  234:20
April 24 228:14
April 24, 2019 1:16,
  6:2, 240:7
April 8 87:3
August 8, 2012
  206:14
December 5, 2018
  9:10
February 13, 2018
  181:2
February, 2019 9:14
January 17, 2019
  9:11
January 2019 17:3
July 1, 2019 12:21
July 2019 9:16
July 21, 2017 219:21
June 13 71:12
June 14th 71:13
June 30 8:13, 12:22
March 25th 103:3
May 10 8:15
May 15th 155:19
May 16 236:1
May 1st, 2019 238:18
May 2nd 56:11,
  98:20, 100:12,
  105:6, 110:11,
  150:18, 153:10,
  157:23, 236:5
May 2nd, 2019 235:20
May 2nd. 229:10
May 6 153:9, 154:18
May 8th 154:18,
  155:18
May 9, 2019 8:7
may, two 87:16
November 2017 83:3,
  83:6, 83:24
November 2018 81:11,
  83:24
October 2018 17:3
October 31, 2018 9:6
September, 2019 9:20
.4. 71:21

< 0 >
09-17121-MG 162:5
09-17144-1-CH 161:21

< 1 >
1 195:13
1* 162:6
1.1 121:21
1.2 75:5
100,000 182:20
102 111:22
102(2) 111:24
103 195:8
105(a 43:6, 235:6
10701 177:20
1074 197:13
108 93:20
108(a 112:15, 235:21
108(c 100:12,
  100:15, 101:3,
  111:7, 111:13,
  111:14, 111:17,
  112:1, 112:9,
  112:16, 116:5,
  116:6, 143:3
11 90:24, 229:15
11. 138:2, 139:2,
  229:17, 230:4
11.8 75:7
1102(a 194:22
1103(c 235:7
1109(b 235:7
11:51 92:3
11th 214:2
12 16:18, 27:2,
  36:9, 38:24, 72:9,
  101:5, 230:7
12(c 51:21
1203 71:9
13 101:6, 137:24,
  230:11, 230:16
13th 7:16, 165:25,
  167:1, 167:8,
  168:6, 172:8,
  173:4, 177:8,
  177:14, 178:15
14 29:25, 30:4,
  38:7, 40:17,

137:24, 205:13,
  205:17, 230:16
14. 38:5, 44:3, 58:1
141 75:6
149 195:13
14th 7:16
15 20:8, 53:21,
  72:6, 93:5,
  167:20, 183:18,
  225:8
15(a 213:11
15. 42:23
16 43:5, 230:24
165,000 20:4
166 37:10
17-213 208:22
17-3282. 158:21
17-3283 90:21
17-3283. 191:25
17-4780 71:9
17-AP-213(LTS 2:19
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:22,
  2:23
17-BK-4780(LTS 2:3
170 219:7, 219:17
18 198:4
18-149 35:23, 60:11
180 54:21
19 20:5, 219:17,
  232:20, 232:23
19. 231:6
1939 35:3
1985). 161:10
1992 120:15
1992). 195:14
1:12 92:4

< 2 >
2 195:13
20 53:21, 127:3,
  158:4, 165:22,
  208:23, 213:18
2002 201:18
2002. 201:18
2004 75:16, 200:10
2007. 148:1
2009 32:20, 62:25
2010 32:20, 131:8,

161:21
2010). 161:22
2010. 62:25
2011 32:20, 120:18,
  162:6
2011). 162:6
2012 32:2, 32:22,
  45:11, 55:3,
  60:10, 72:18,
  73:5, 205:21,
  206:13
2012. 28:4, 205:23
2014 32:3, 32:23,
  60:10, 72:18,
  73:6, 108:12,
  108:13, 148:15,
  148:16, 151:17
2014. 45:14, 108:2
2015 148:11
2015. 202:18
2016). 161:11
2016. 195:9, 201:19
2017 188:6, 218:18
2017. 222:7
2018 83:24
2018. 16:20, 198:10
2019 119:6, 119:15,
  120:14, 145:16,
  235:24
2019. 8:10, 120:17,
  120:25, 222:8,
  236:2
2020 8:12
2020. 9:25
2101 209:17
21: 3:11
22 26:23, 205:14,
  232:22
23 63:24, 198:12
23(f 203:3
23. 198:21
236 208:22
240 240:4
248 128:17
25 162:6, 166:7,
  215:22
251 214:3
254. 214:3
26 161:22
27 128:5

27-day 19:13
28 209:16, 231:12,
  232:11, 232:23,
  238:3
2:51 153:22
2d 131:9, 161:10
2nd 72:5


< 3 >
30 19:10, 19:17,
  24:10, 93:7,
  93:10, 93:11,
  96:10, 96:11,
  101:13, 104:2,
  214:3, 220:19
30-day 100:17
3007 43:3
3007(A)(1 19:10
3007(b 168:15
3007(d 42:24, 169:3
3007(d)(1 168:18
301(a 159:11
303 116:17, 140:4,
  140:9, 141:3
305. 97:5, 104:15,
  127:6, 139:5,
  140:8, 141:3
307. 131:9
309594 162:6
32 20:14
3283 16:14, 24:9,
  71:21, 179:24
3283. 234:14
36 147:25
360 75:19
362(a 111:20
379 147:24
3799 240:13
383941 161:22
3860586 206:13
389. 37:10
3: 1:6, 1:22, 2:3,
  2:19, 2:23
3:08 153:23


< 4 >
4. 195:18
40 74:22

42 20:13
43 20:11, 20:14
4417 166:25
4417. 177:17
45 26:24, 93:3
452 142:18
4780. 197:13


< 5 >
5 147:25
500 21:22, 115:19
503 161:11
503(b)(3)(b 235:6
506 93:19, 235:21
510 173:15
510(b 170:23, 171:1,
  171:7
54(b 212:19, 212:22,
  213:1, 222:1
544 117:21, 138:8,
  159:12
545 159:12
546 90:19, 90:23,
  91:10, 138:8
546(a 235:21
547 138:8, 159:12,
  161:11
548 138:8, 159:12
549 138:8
549(a 159:13
550 117:21, 138:8,
  159:13
551 138:8
552 138:8, 210:11,
  210:16, 211:10,
  217:14, 217:16,
  222:22, 223:1,
  224:7
552(b 222:11, 222:13
552. 209:9
553 138:8
554 95:21, 138:6,
  138:9, 138:25,
  150:8, 150:14,
  150:16
555 138:9
556 138:9, 195:8
557 138:9
558 138:14, 138:15

558. 138:10
5589 26:17
56-1 210:4
59 142:18
5997 118:12
5:22 239:5
5:30 208:18

< 6 >
6-A 219:8
60 27:13, 104:2,
  185:4
6104-1 48:13
6104. 26:21
6118 71:21, 90:20
6128 179:24, 191:24
6305 24:9, 234:14
6325 158:21
6374 16:14
6413 87:3
6487. 180:13

< 7 >
7 101:5, 162:13
779 161:9

< 8 >
80,000 74:23
83(a)(f 181:24
838 235:23

< 9 >
90-day 75:3, 235:25,
  237:4
901 161:10
9019 70:2
904 161:10
915 235:23
922 116:8
922. 116:7
924 131:9
926 92:24, 93:2,
  95:17, 98:5, 98:8,
  102:17, 104:10,
  113:14, 116:19,
  117:7, 117:9,
117:12, 117:25,
119:23, 123:18,
124:17, 126:6,
140:5, 140:9,
140:14, 140:22,
151:10, 152:7,
159:18, 161:2,
161:3, 161:24,
229:24, 236:20,
237:6
926(a 117:20,
125:17, 158:25,
159:9, 235:9
926(a) 236:11
926. 98:3, 102:21,
123:1, 125:22,
146:14, 152:6,
160:17, 160:20,
160:22, 164:8,
237:14, 238:1
926.02. 162:14
94 195:8
98 231:25
9:41 6:3

< A >
A. 3:6, 3:14, 4:18,
  4:24
AAFAF 7:8, 9:18,
  9:21, 74:21, 75:4,
  83:3, 137:21,
  156:12, 202:11
Abandoned 98:24,
  99:3, 105:6,
  105:13, 137:13,
  142:22, 150:16,
  150:17
abandoning 57:23,
  98:18, 100:4,
  100:7, 160:1
Abandonment 93:16,
  93:23, 94:1,
  98:22, 104:16,
  134:24, 137:24,
  138:7, 138:11,
  138:19, 150:11
abandons 100:16
Abdelmasieh 20:22
abetting 128:8,
133:9
ability 60:20, 61:1,
  79:20, 105:3,
  108:15, 123:11,
  136:5, 161:20,
  162:22, 163:23,
  240:5
able 22:18, 40:12,
  40:13, 49:22,
  80:8, 133:20,
  136:9, 141:2,
  151:6, 168:2,
  183:11, 192:20,
  201:22
absence 46:12, 78:7,
  80:10, 123:1,
  229:8
absent 159:17,
  160:23
absolutely 30:23,
  32:7, 32:11,
  32:16, 32:19,
  44:3, 55:15, 62:7,
  66:14, 115:24,
  143:24, 221:24
accept 99:1, 183:7
acceptable 140:1
accepted 142:11,
  188:20
access 141:12,
  163:12, 201:23,
  204:1
accident 40:20
accidentally 127:10
accomplished 210:18
accordance 19:14
according 62:24
Accordingly 91:18,
  93:11, 236:3
account 8:6, 20:13,
  90:25, 177:1,
  201:13, 224:21
accountants 135:2,
  135:22
accounting 128:7
accurate 119:8,
  145:6, 240:5
accurately 232:8
achieve 64:4,
  130:22, 163:12

achievements 206:22
achieving 64:3,
    67:23
acknowledge 61:13,
    61:14, 73:1,
    131:24, 172:1,
    187:7
acknowledged 193:1,
    203:17
acknowledgement
    149:12
acknowledges 125:24
acknowledging 176:21
across 8:20, 10:18,
    208:9
act 98:14, 123:20,
    192:10, 206:23,
    236:9, 237:12
acting 116:1,
    144:11, 181:22,
    182:4
active 12:14, 15:3,
    194:1, 199:14
activities 7:25,
    8:2, 9:1, 81:6
activity 91:12,
    106:3, 106:5
acts 98:17, 148:17,
    149:12
actual 48:12, 48:24,
    51:3, 86:9, 87:9,
    114:20, 115:3,
    128:11, 130:12,
    130:13, 130:15,
    130:20, 130:23,
    147:6, 155:19,
    157:15, 200:3,
    204:2, 205:5,
    219:18
Ad 3:28, 10:1, 27:8,
    42:17, 42:20,
    42:22, 43:25,
    45:5, 45:22, 46:7,
    46:11, 47:2,
    69:23, 184:2,
    184:3, 185:22,
    196:2, 233:8
add 45:16, 45:23,
    51:20, 109:23,
    121:9, 150:2,

211:23, 217:7,
    227:20, 230:13
added 226:24, 227:3,
    228:6, 229:19
Adding 109:20,
    109:23, 183:15
addition 9:25, 10:7,
    119:6, 174:5,
    193:19, 237:25
Additionally 203:10,
    235:21
addressed 60:15,
    81:5, 123:16,
    142:9, 143:9,
    145:13, 151:22,
    167:15, 197:2,
    202:13, 212:5
addresses 50:5,
    86:11, 99:14
addressing 69:3,
    164:12
adds 136:4
Adequate 179:10,
    189:21, 193:6,
    195:2, 195:5,
    210:12, 211:15
adequately 179:8,
    188:15, 188:16
adhere 183:11
adjourn 19:16, 26:5
adjourned 7:15,
    20:10, 26:15,
    71:12, 238:14,
    238:17
adjournment 7:10,
    26:10, 26:12
adjudged 30:6, 34:10
adjudicate 44:23,
    46:18, 209:8,
    218:19
adjudicated 210:17,
    210:21
adjudication 35:5,
    50:23, 51:8, 51:9,
    55:17
Adjustment 10:9,
    10:25, 12:11,
    29:12, 29:17,
    38:19, 38:20,
    54:13, 54:16,

56:5, 94:13,
    160:8, 163:24,
    196:24, 206:24
Administered 1:11,
    1:27, 2:8
administration
    43:10, 99:4,
    116:15, 142:4,
    239:1
administrations
    141:22
Administrative
    20:22, 20:23,
    21:10, 21:25,
    22:12, 23:7,
    23:12, 23:15,
    181:6, 181:14
admission 34:6,
    43:17, 181:25,
    182:5, 182:6,
    193:2
admissions 109:19
admit 42:25
admitted 181:20
admonition 140:20
adopt 55:4
adopted 148:12,
    148:16
adopts 52:5
ADR 20:20, 21:5
advance 54:4, 86:22,
    87:9, 97:22
advanced 169:12,
    170:16
advancing 163:14
advantage 183:25
adversaries 61:14,
    238:4
adversary 38:7,
    47:21, 51:23,
    52:7, 60:23,
    91:16, 126:19,
    161:8, 208:21,
    208:22, 210:25,
    211:13, 212:8,
    212:9, 215:16,
    215:20, 215:24,
    216:9, 219:8,
    219:22, 220:25,
    228:3, 228:22,

231:17, 231:19,
231:21, 232:13,
232:18, 238:5
advise 19:1, 154:10,
198:13, 198:14
advising 187:20
advisors 11:18
Advisory 3:19
advocate 100:14,
101:10, 170:15
advocating 174:15
affect 33:19, 49:18,
55:7
affected 35:4,
38:14, 50:2,
55:13, 55:14,
60:17, 63:12,
82:15, 82:18
affects 28:10, 36:9,
62:16
affiliated 238:4
affirmative 76:17,
78:22, 91:10
affirmed 43:24
afford 154:13
affording 137:4
afternoon 96:3,
111:2, 117:3,
117:5, 121:16,
121:17, 125:11,
197:15, 202:10,
202:12, 233:5,
233:6, 233:9,
234:17
afterwards 224:9
agencies 8:21, 75:10
Agency 3:18, 170:10
Agenda 11:13, 16:13,
19:2, 19:5, 24:18,
26:17, 26:18,
71:21, 92:23,
121:9, 164:21,
167:21, 238:14,
238:15, 238:18
agent 73:5, 86:11,
183:5, 192:10,
212:3
agents 231:20
aggressive 199:4
aggressively 189:17

agnostic 126:4
ago 66:21, 67:3,
93:21, 106:22,
133:18, 165:3,
165:11, 165:13,
165:15, 216:5
agree 16:7, 30:17,
43:16, 44:3,
46:15, 48:4,
50:17, 51:20,
79:9, 104:13,
125:13, 138:23,
179:15, 185:8,
190:20, 191:16,
212:19, 223:20,
227:22
agreeable 10:21
agreed 22:1, 67:5,
80:3, 89:12,
104:12, 143:20,
156:23, 158:3,
160:15, 198:5,
198:19, 200:6,
202:4, 219:20,
220:2, 221:20,
223:19, 224:20,
226:20, 231:16
agreeing 102:3,
102:10, 103:15
agreement 12:6,
78:7, 80:11,
107:1, 112:8,
112:9, 132:6,
132:11, 132:16,
132:22, 149:10,
157:20, 157:25,
158:2, 211:8,
222:5, 229:9,
229:13, 229:14,
232:9
agreements 87:22,
87:23, 106:18,
128:4, 132:8,
154:7, 154:10,
154:15, 154:20,
204:18
agrees 217:6
ahead 115:17, 123:25
aiding 128:8, 133:9
air 221:2

al 1:16, 2:29, 3:4
albeit 46:25
Alexander 3:15
align 52:1
aligned 10:14, 196:3
alike 189:13
allegation 58:5,
214:4
allegations 83:20,
162:16, 209:25,
211:3, 211:4,
211:9, 211:23
allege 108:6,
130:19, 130:23,
130:24
alleged 30:21,
30:22, 35:10,
36:9, 36:25,
108:16
allocated 92:21,
167:20, 208:23
allocation 26:23
allotted 24:10
Allou 147:24
allow 24:18, 43:3,
52:15, 85:12,
92:16, 119:21,
125:18, 150:3,
151:2, 160:25,
192:7, 198:7,
210:20, 227:22
allowability 11:16
allowable 11:15
allowance 171:2
allowed 82:21,
116:3, 168:17,
173:8, 173:18
allowing 38:4, 42:11
allows 130:16,
159:19, 181:2
alluded 64:14,
140:17, 181:18
almost 66:21,
124:24, 137:25,
197:24, 216:5
alone 72:25, 118:1,
123:2, 138:13,
182:14, 203:14,
205:20, 213:3
Altair 2:27

alter 46:5, 46:17
alternative 137:10,
    183:21, 185:9,
    188:9, 192:8,
    194:19
Although 97:25,
    136:11, 220:9,
    231:6, 236:11,
    236:15
Ambac 3:32, 47:14,
    94:18, 100:9,
    100:19, 101:2,
    101:9, 111:3,
    112:24, 116:6,
    143:1, 226:21,
    232:8
Amend 80:12, 208:21,
    209:10, 210:20,
    211:12, 213:10,
    213:11, 215:8,
    217:1, 217:5,
    217:6, 223:4,
    224:17
Amended 120:18,
    120:24, 178:21,
    209:19, 209:24,
    210:1, 210:21,
    212:13, 217:24,
    220:21, 224:24
amending 223:3
amendment 120:21,
    211:13, 211:23,
    212:7, 213:12,
    214:1, 214:16,
    215:8, 216:10,
    216:13, 218:5,
    220:4, 220:6,
    221:1, 221:15,
    221:18, 222:3,
    222:10, 222:15,
    224:5, 224:7,
    224:8, 224:9,
    225:8
amendments 218:1
American 196:21
among 8:16, 69:22,
    81:18, 161:19,
    162:11, 201:1
amongst 90:1
amount 74:8, 75:6,

75:17, 75:22,
    76:2, 77:15,
    88:16, 88:19,
    89:10, 119:9,
    119:17, 126:18,
    135:6, 141:19,
    141:20, 205:23
amounts 80:19, 182:8
Amy 240:12, 240:13
an injury 44:6, 58:1
analog 30:1
analogy 44:4, 79:12
analysis 28:3,
    98:15, 100:14,
    102:3, 112:21,
    128:20, 128:21,
    128:22, 129:24,
    129:25, 145:22
analyze 161:3, 161:7
analyzing 74:24
and/or 229:24
Andalusian 4:20,
    208:21
Ann 4:15
anniversary 81:21
announced 9:11
annual 141:16
anomalous 171:8
answer 15:23, 17:6,
    29:6, 29:7, 56:25,
    70:23, 76:22,
    92:9, 109:13,
    124:9, 125:16,
    176:21
answered 66:9
answers 176:22
anticipate 13:2
anticipated 9:15,
    9:22, 12:16,
    12:24, 144:25,
    199:9, 216:8
anticipates 13:6,
    182:3
anticipating 92:20
anybody 15:5, 15:6,
    29:11, 64:16,
    83:20, 124:25,
    133:1, 133:14,
    138:14
anyway 100:25,

200:9, 217:13
AO 24:2
apart 48:11
Apologies 47:13
apologize 25:25,
    27:4, 54:2, 54:4,
    111:22, 115:13,
    126:25
apparent 170:8,
    184:11
appeal 55:18,
    171:20, 172:20,
    172:21, 176:13,
    176:17, 177:2,
    177:3, 177:7,
    178:6, 198:2,
    210:3, 213:3,
    216:18, 216:20,
    220:8, 220:18,
    221:2
appealed 184:8
Appeals 11:21, 43:24
appear 18:18,
    118:25, 133:7,
    170:23, 181:23,
    185:23, 187:3
Appearance 66:10,
    193:24
APPEARANCES 3:1, 4:1
Appearing 3:8, 3:39
appears 140:16
apple 35:16, 64:25
applicable 44:5,
    111:16, 159:10,
    178:11, 202:14
Application 16:25,
    17:22, 18:6, 44:4,
    61:1, 67:22,
    71:12, 96:4,
    96:11, 96:12,
    101:22, 104:19,
    104:25, 111:9,
    121:5, 156:11,
    156:19, 171:4,
    183:13
applications 16:19,
    16:22, 16:24,
    17:2, 17:4, 17:21,
    17:23, 190:19,
    190:21, 195:17

applied 122:17,
  125:23, 158:5
applies 117:10,
  152:7, 157:22,
  170:23
apply 56:1, 60:23,
  63:7, 76:25,
  82:12, 117:9,
  138:17, 140:21,
  143:2, 145:6,
  146:13, 159:24,
  161:6, 193:2,
  228:8
applying 49:21,
  150:8
Appoint 92:15,
  103:10, 140:14,
  159:14, 162:2,
  179:23, 186:13,
  194:24, 194:25,
  196:15, 235:11
appointed 81:11,
  99:17, 99:18,
  117:17, 144:21,
  145:4, 227:12,
  228:21
appointing 140:16,
  158:23, 195:12
appointment 103:10,
  119:24, 140:5,
  140:7, 145:2,
  161:5, 162:10,
  164:8, 164:10,
  183:13, 185:10,
  194:13, 195:3,
  195:16, 195:20,
  195:22, 235:24,
  237:7, 237:11
appointments 116:14
appreciate 68:23
apprised 12:12
approach 29:5,
  32:17, 106:18,
  125:3, 125:15,
  125:24, 163:6
appropriate 14:24,
  16:7, 35:9, 46:1,
  61:7, 89:15, 92:5,
  116:18, 119:20,
  122:17, 122:25,

123:13, 124:7,
  134:17, 153:5,
  161:5, 161:15,
  170:19, 176:24,
  184:8, 187:6,
  189:1, 194:3,
  194:25, 195:7,
  234:8, 238:11
appropriately 15:10,
  175:13
Approval 23:4, 24:7,
  234:23, 235:1,
  237:25
approvals 181:11
approve 44:8,
  100:20, 228:15
approved 21:20,
  35:22, 44:22
Approving 16:22,
  17:20, 234:13,
  238:9
approximately 20:8,
  20:14, 21:3,
  115:19, 121:21,
  128:5
April 72:5, 172:7,
  201:19
aptly 79:20
area 114:2
argue 33:24, 59:20,
  76:20, 76:25,
  147:9, 147:13,
  208:3, 218:10
argued 37:18, 213:21
argues 169:7,
  169:19, 184:16,
  196:5, 215:16
arguing 32:4, 40:15,
  49:24, 76:23,
  79:12, 113:7,
  120:9, 175:24,
  185:15, 189:25,
  190:1, 215:7
argumentative 22:14,
  22:23
arise 52:16
arises 52:18
arising 170:24
arose 213:13
around 9:4, 40:8,

83:6, 93:17,
  166:5, 166:6,
  224:1, 224:10
arrangement 10:21,
  115:1, 235:1
Arrastia 96:1,
  107:2, 108:21,
  109:13, 128:21,
  129:12, 129:14,
  129:20, 147:2,
  151:6
array 120:19
Arribas 3:11
arrive 10:20
arrived 65:14
Article 39:2, 44:10
articulate 215:5,
  215:7
articulated 34:16,
  40:5, 60:4, 174:7,
  176:5, 177:18
articulates 34:17
artificially 27:21,
  28:8
as-yet 29:13
aside 10:7, 52:1,
  64:4, 77:13,
  123:15, 192:6
asks 192:5
aspect 178:17,
  178:24
aspects 151:13,
  167:14, 176:4,
  196:24
assert 28:23, 31:9,
  41:12, 101:14,
  110:9, 138:14,
  139:24, 147:21,
  160:4, 169:22,
  169:24, 170:14,
  178:7, 178:13,
  217:2, 235:8
asserted 107:25,
  128:15, 152:9,
  152:10, 168:22,
  169:21, 201:3,
  211:21, 211:24,
  216:1, 236:8
asserting 48:1,
  91:9, 139:18,

147:20
assertion 120:13,
    206:5
assertions 164:4
asserts 85:7,
    128:18, 169:12,
    178:8
assessments 11:14
asset 150:15
assets 43:9, 98:23,
    114:5, 149:11,
    175:17, 212:1
assigned 81:24
assist 74:12
assistance 229:16
associate 181:25
associated 137:1,
    192:19, 195:12,
    196:19
Association 12:3
assume 7:12, 99:19,
    172:17, 199:19
assumed 97:19
assumes 27:22
assuming 104:17,
    191:12, 228:15
Assurance 3:32,
    47:14, 111:3
assurances 231:7
assure 195:1
Assured 3:41, 3:42,
    7:8, 50:12, 69:22,
    117:4, 145:11,
    226:22
Atara 3:33, 47:13
attach 211:21,
    211:25
attached 51:23,
    95:22, 144:14,
    153:11, 174:18,
    211:25
attachment 99:12,
    170:12, 174:16,
    174:19, 179:2
attack 191:3
attacked 180:22
attacking 48:17,
    190:22, 191:2
attacks 28:21,
    49:11, 183:16

attempt 29:14,
    29:16, 55:22,
    60:15, 77:24,
    116:18, 119:16,
    211:16
attempting 74:16
attempts 85:24
attend 182:1
attention 12:19,
    78:19, 81:10,
    84:2, 89:25, 165:7
attestations 85:19,
    86:4, 184:21,
    190:13
attested 191:1
attorney 65:15,
    181:19, 181:22,
    194:1
attorneys 133:2,
    181:25, 182:4,
    193:24
attractive 137:10
attributed 136:23
audible 6:18
Aurelius 113:17,
    220:14, 235:22,
    237:5
AUST 3:11
authorities 57:8
Authority 2:13,
    3:19, 9:6, 9:11,
    9:17, 42:21, 57:5,
    57:16, 77:8,
    115:25, 160:8,
    160:19, 161:7,
    164:7, 164:9,
    170:6, 213:21,
    216:12, 235:2,
    235:4, 235:16,
    236:5
authorization 96:5
authorize 118:1
authorized 140:23
authorizing 85:6,
    158:18
automatic 103:25,
    116:7, 207:1
available 7:15,
    7:18, 8:6, 15:9,
    38:3, 80:13,

95:20, 124:1,
    124:4, 133:19,
    133:22, 157:1
availing 160:12,
    213:22
avoid 45:9, 107:20,
    140:16, 216:14
avoidable 112:4
avoidance 11:11,
    36:20, 37:4,
    56:13, 56:20,
    75:7, 76:16,
    85:10, 90:19,
    90:24, 91:8,
    95:20, 102:15,
    103:1, 103:2,
    103:4, 103:12,
    114:10, 114:14,
    117:17, 117:22,
    117:24, 125:18,
    126:13, 151:3,
    159:1, 228:20,
    235:11
avoided 114:15
avoiding 207:4
awaiting 45:25
aware 20:1, 20:4,
    30:8, 46:3,
    133:11, 181:9,
    200:24, 201:2,
    201:4, 201:9
awareness 184:23,
    184:24
away 61:12, 61:18,
    150:18, 201:24,
    220:23
awful 40:2, 109:9

< B >
B. 4:13
backbone 10:22
background 143:20
backwards 54:21
badges 130:18,
    147:16
Bairiri 131:9
balance 93:8, 133:6,
    162:11, 172:9,
    201:17, 202:2,

202:5, 206:25
balancing 163:25
bang 37:22, 191:19
Bank 37:13, 106:25,
  141:8, 170:5,
  173:5, 173:8,
  173:23, 174:3,
  177:23, 178:12
Bankr 161:11,
  161:22, 162:6,
  195:13
bankruptcies 162:25
banks 96:20, 96:22,
  99:9, 109:15
bar 95:16, 98:5,
  98:14, 98:17,
  182:6, 220:4
Barez 139:14
bargaining 162:8
barred 231:15
barrier 98:8, 237:23
based 11:17, 12:8,
  39:19, 56:21,
  74:14, 75:25,
  83:23, 85:18,
  107:1, 131:20,
  143:13, 143:19,
  144:5, 154:10,
  158:4, 168:16,
  168:19, 169:4,
  171:12, 184:20,
  185:12, 210:2,
  222:22, 223:2,
  236:12
Basically 37:16,
  98:23, 100:15,
  139:7, 186:22,
  191:2, 229:12,
  229:23, 230:12,
  230:25, 231:1,
  231:17
basis 21:1, 32:11,
  49:5, 53:10, 66:2,
  73:13, 82:4, 99:9,
  99:13, 109:25,
  110:17, 117:8,
  117:12, 118:1,
  124:19, 128:2,
  135:25, 143:21,
  150:22, 156:5,

156:24, 174:20,
  177:20, 215:7,
  226:11
battle 58:22
bear 177:12, 196:22,
  203:14
bearing 152:5
bears 127:14
became 108:8
become 12:14, 73:7,
  185:16, 203:9,
  207:5
becomes 80:13, 123:8
becoming 68:5
beg 47:4, 74:9
began 66:21, 75:8
begin 54:10, 238:25
beginning 12:20,
  66:22, 140:4,
  215:19, 231:4
begs 169:9
behind 25:23, 156:14
belabor 11:22,
  69:16, 118:18
belatedly 168:25
belief 131:20
believed 169:19
believes 14:21,
  52:8, 93:14,
  122:1, 172:12,
  172:16, 174:16,
  210:10
believing 86:4
bells 80:1
belong 152:19
belongs 89:22
below 75:17, 88:4,
  226:24
beneficial 73:8,
  73:12, 79:21,
  80:3, 80:12,
  237:2, 237:22
beneficiaries 135:16
benefit 10:15, 12:4,
  59:14, 94:22,
  114:8, 114:16,
  115:21, 124:5,
  136:23, 174:19,
  184:5, 200:15,
  235:3, 235:9,

235:14, 235:16,
  237:7
benefits 8:24, 12:3
BENNETT 4:20, 80:22,
  80:24, 87:18,
  88:10, 213:4,
  215:6, 215:9,
  219:5, 219:11,
  219:14, 219:16,
  221:10, 221:15,
  221:23, 222:2,
  223:8, 224:3,
  225:13
BEREZIN 4:25, 65:17,
  65:18, 65:19,
  65:22, 67:14,
  68:3, 68:8, 68:22,
  69:1, 69:4, 69:8,
  69:10
best 10:12, 26:1,
  54:5, 60:15,
  97:24, 122:3,
  127:19, 135:22,
  162:3, 240:5
bet 54:11, 54:15,
  215:2
better 53:8, 64:9,
  64:13, 69:4, 94:8,
  94:9, 100:23,
  132:17
Betting 77:21, 162:5
Beville 3:27, 166:17
beyond 102:21,
  168:1, 169:20,
  170:17, 220:19
Bienenstock 3:4,
  7:21, 7:22, 14:8,
  15:1
bifurcated 216:3
bifurcating 199:17
big 39:17, 81:22,
  99:9, 109:15,
  147:8, 184:19
bigger 94:7, 94:8,
  94:12, 94:16
biggest 127:13
billion 29:18, 36:9,
  36:10, 38:22,
  38:25, 42:16,
  58:20, 75:7,

75:21, 85:25,
96:23, 121:21,
156:9, 156:10
billions 72:24,
148:7, 151:7,
156:7
bills 197:22
binding 63:21, 64:12
bit 39:7, 54:5,
125:12, 179:6,
191:14, 222:23,
223:14
bite 64:25
bites 35:15
black 151:15
blame 45:21, 86:25
blank 35:11, 146:17
blanket 77:9, 84:21
blended 156:22
Block 125:10,
206:23, 229:16
blocks 10:24, 11:4,
11:6, 140:5, 140:6
BNYM 169:21, 170:2,
170:3, 170:11,
170:14
boats 149:7
bodies 75:9
bond 28:21, 32:12,
32:13, 32:20,
35:4, 35:5, 35:7,
35:8, 76:16,
85:10, 91:8,
127:22, 132:9,
135:16, 137:1,
167:13, 167:14,
173:2, 173:3,
175:3, 177:16,
177:24, 178:2,
178:17, 182:20,
196:19
bondholder 25:8,
35:11, 73:21,
183:17, 184:22,
185:10, 191:17,
194:15, 194:20,
196:8, 213:21
bones 178:25, 179:6
Bongartz 3:15,
165:2, 165:11,

165:14, 165:18,
165:20, 225:25
bonus 91:25
book 130:10
bootstrap 46:23
bore 208:5
born 133:16
borne 215:18
borrower 37:12,
37:13
Boston 238:19
bottom 89:4
bought 85:15, 85:18,
85:23, 184:16,
184:17, 184:20,
184:23, 190:25
bound 34:20, 34:21,
35:13, 35:14,
35:18, 36:2, 40:1,
54:20, 54:23,
63:14, 64:11,
64:17, 64:21,
198:14
boundaries 16:1
box 199:4
boxes 170:9, 177:25
BR 142:18
Bracewell 51:16
branch 23:9
branches 8:21
brand 135:23, 136:15
Breach 117:22,
128:8, 132:4,
132:15, 132:20,
132:21, 133:8,
133:9
break 90:16, 92:1,
153:1
breath 155:16
Brian 3:5
Brief 13:20, 16:17,
20:18, 51:23,
53:12, 53:16,
57:6, 57:15, 67:6,
103:21, 104:4,
111:7, 112:23,
120:13, 141:13,
153:11, 168:2,
188:4, 202:14,
206:7, 233:17

briefing 67:16,
71:10, 210:3,
210:5, 210:17,
210:22, 223:16
briefly 27:7, 27:9,
124:13, 185:8,
219:5
briefs 223:16
bringing 34:9,
66:15, 84:7,
94:11, 94:15,
97:9, 106:23,
107:9, 107:11,
109:6, 113:8,
113:22, 114:8,
126:13, 132:15,
144:1, 144:7,
146:10, 146:18,
152:4, 216:4
brings 105:24
broad 28:24, 60:17,
120:19, 163:22
broader 123:6, 178:9
broker-dealers
96:20, 96:25,
97:2, 143:12
Brooklyn 25:3
Bruce 4:20
brunt 208:6
buck 191:19
budget 8:11, 8:14
budgets 8:12, 12:20
building 206:23
bulk 234:24
bunch 72:21, 80:1,
99:7, 135:21,
135:22
burden 77:9, 122:16,
124:16, 127:14,
129:13, 130:2,
130:3, 131:1,
137:13, 193:5,
195:19, 199:19,
200:8, 203:11,
234:25
burdened 189:23
burdens 193:8,
199:15, 199:21,
199:22, 200:12,
203:11, 207:1

burdensome 205:20
burn 150:12, 150:13
business 82:19, 94:6
businesses 197:21
buy 104:17
buyback 135:14
buyers 186:22

< C >
C. 4:32, 81:16,
    81:21
Cadwalader 50:12,
    117:2, 117:4
Cadwalater 145:11
calculated 59:19
calibrated 208:2
call 11:5, 24:25,
    25:4, 63:19,
    107:21, 143:23,
    153:1, 187:11,
    223:21, 229:12,
    229:22
called 47:20, 128:13
calling 73:12
calls 143:17, 186:2,
    235:4
capable 83:21,
    156:21
capacity 194:2
capital 141:12,
    163:12, 219:19
captioned 169:1,
    221:22
care 125:7
careful 138:18
carefully 17:16,
    91:2, 97:24,
    159:5, 190:20,
    191:23, 234:15
carried 17:9
Carry 228:12
carrying 164:2
cars 133:16, 149:6
cash 150:11
CAT 4:49
catch 155:16
Catesby 4:16
caught 144:2, 157:21
cause 73:1, 82:11,

82:25, 128:14,
    132:4, 147:19,
    159:12, 159:14,
    159:20, 193:8,
    228:16, 229:23,
    230:1, 230:4,
    236:12
cavalcade 185:20
caveat 155:2
central 28:9
cert 209:16, 209:18,
    212:22
Certainly 15:3,
    39:23, 64:9,
    64:17, 70:13,
    79:1, 110:18,
    119:24, 137:9,
    140:11, 170:15,
    176:16, 187:11,
    190:14
Certification 8:7,
    12:19, 198:8,
    198:10, 203:25
Certified 8:20,
    197:23, 198:13,
    201:18
certify 8:8, 8:12,
    240:4
certiorari 13:1,
    212:18
cetera 99:10, 99:11,
    102:16, 108:16,
    109:9
chairing 120:22
challenge 50:21,
    72:25, 73:2, 83:4,
    83:5, 182:21,
    238:4
challenged 29:13,
    31:24, 31:25,
    54:17, 76:16,
    85:9, 91:8, 182:20
challenges 58:15,
    89:13, 89:14
challenging 109:7
chambers 71:16,
    238:10, 238:22
chance 64:8, 91:22,
    94:9
change 142:6,

184:24, 187:10,
    188:8, 211:10
changed 205:21,
    228:13
changes 92:8,
    164:24, 165:1,
    215:10, 226:1,
    226:2, 226:19,
    227:2, 228:18,
    230:17, 231:25
changing 153:12
channeling 23:8
chaos 40:7, 41:9,
    42:1, 45:23,
    55:21, 65:1
chaotic 55:22
Chapter 101:5,
    117:17, 138:2,
    138:3, 139:1,
    139:2, 162:3,
    163:2, 169:15
characterize 28:21
chart 128:2, 128:12,
    133:1
cheap 109:12
checked 170:9,
    170:11
checking 170:13
checkmarks 145:22
checks 170:14
children 133:16
choice 33:8, 33:15,
    38:13, 38:15, 42:2
choices 38:10,
    80:11, 83:25,
    223:1
choose 81:18, 217:4
choosing 183:25
chose 50:16, 216:22,
    216:24, 216:25,
    219:1
chosen 47:23, 212:8
Cir 161:10
circled 62:8
circulated 226:12
circumscribed 28:8,
    29:4
circumscribes 27:21
circumstance 48:4,
    79:3, 182:22

circumstances 26:13,
    30:11, 74:4, 74:8,
    77:6, 77:17, 78:6,
    79:11, 79:12,
    79:14, 79:17,
    98:18, 101:6,
    123:20, 127:19,
    136:2, 140:9,
    140:11, 161:4,
    194:3, 213:16,
    235:18, 236:14,
    236:21, 237:11,
    237:23
circus 75:11
citation 120:15
cite 35:2, 36:22,
    37:10, 42:22,
    42:24, 43:12,
    116:6, 147:24,
    147:25, 169:10,
    213:25, 214:3
cited 56:24, 57:5,
    57:12, 58:4, 79:4,
    81:6, 101:3,
    139:2, 139:15,
    141:13, 142:8,
    142:14, 173:6,
    216:13
cites 43:6, 121:1,
    139:9, 139:12,
    139:13, 144:22,
    151:25, 170:4,
    170:23, 215:22
citizens 163:21,
    164:14
City 44:16, 162:5
Civil 29:25, 30:4,
    44:10, 111:14
claimants 19:18
claimed 184:25
claiming 54:22
clarification 229:5,
    232:7
clarify 94:10
clarity 111:13,
    227:3
Class 63:21, 171:6,
    171:9, 173:16,
    174:24, 175:5,
    197:23, 198:8,

198:9, 198:13,
    198:21, 199:16,
    199:17, 200:11,
    201:18, 201:22,
    202:2, 202:7,
    203:5, 203:7,
    203:20, 203:25,
    205:5, 205:13,
    207:18, 207:20
claw 73:1
clawback 72:15,
    73:25, 77:18, 89:7
clean 213:2
cleanest 220:7,
    224:8
clear 14:5, 14:21,
    16:21, 41:18,
    48:10, 54:24,
    59:16, 65:6, 67:9,
    87:2, 87:7, 95:18,
    102:13, 102:19,
    109:9, 141:14,
    145:9, 160:18,
    163:10, 170:22,
    173:22, 175:1,
    182:7, 183:14,
    190:7, 210:9,
    223:5, 228:8,
    232:14, 233:1
clearly 19:17,
    45:13, 51:25,
    102:17, 103:3,
    103:8, 104:10,
    176:22, 182:3
Clerk 7:3, 20:25,
    86:11, 86:18,
    183:4, 183:5,
    192:10, 192:23
client 40:25, 41:3,
    182:3, 205:22
clients 42:15,
    129:18, 182:4
clock 72:9, 85:3,
    93:9, 209:12,
    210:14
close 46:10, 79:11,
    93:18, 155:10,
    168:20, 169:17,
    169:23, 202:21,
    205:8

closed 117:19,
    169:4, 169:5,
    169:10, 210:2,
    223:21
closely 20:21,
    192:1, 195:16
closing 152:12,
    164:11, 206:20
CM/ECF 181:3,
    181:20, 183:2,
    192:8, 192:20
CMO 19:12, 193:16
co-counsel 96:21,
    207:11, 233:7
co-defendants
    109:19, 204:13
co-exist 178:3
co-extensive 89:10,
    89:18, 90:6
co-movants 118:16
co-plaintiff 228:19,
    228:22, 228:25,
    230:9, 231:3,
    237:21
co-trustee 228:22,
    229:1, 231:3,
    237:21
Coalition 3:38,
    42:14, 45:6
cockamamie 55:4
Code 43:6, 82:8,
    93:20, 95:21,
    103:21, 111:8,
    111:20, 111:24,
    117:21, 138:6,
    141:2, 158:25,
    159:9, 159:13,
    161:2, 194:22,
    209:9, 229:24,
    235:6, 235:10,
    235:21
coffee 46:19
coffers 148:21
coherent 62:11
colleague 92:7,
    207:22
colleagues 73:14,
    238:22
collect 131:1,
    200:7, 200:23

collection 94:6
collectively 90:7
Collier 140:18,
    140:19, 162:7,
    162:13
colloquy 111:6
colorability 109:7
colorable 97:9,
    108:22, 108:23,
    161:14, 162:17
column 128:13
combination 146:11
combusted 208:6
comers 52:15
comes 33:16, 34:17,
    44:2, 55:20,
    222:13
comfort 149:19,
    204:10
comfortable 26:11,
    105:6, 193:17,
    193:19
coming 23:1, 39:22,
    65:20, 78:24,
    109:13, 144:9,
    174:7, 223:11
commence 78:8,
    112:16, 236:5
commenced 9:13,
    43:25
commencement 81:23
comments 13:11,
    19:25, 93:13,
    125:14, 189:18
commercial 162:25
Commission 208:1
commit 61:21,
    131:10, 148:2
committees 186:13,
    194:23, 195:1,
    195:13, 195:16,
    196:15, 227:12
Commodore 116:2,
    139:8
commonly 75:1,
    133:23
Commonwealth-cofina
    49:9
communicate 6:13,
    22:18, 166:10

communicating 6:24
communications
    20:24, 22:20,
    187:17, 187:18,
    187:19, 199:25
companies 198:24,
    199:25, 203:22,
    207:12
company 199:5, 200:2
compared 104:7,
    110:20
compelled 141:5
compensation 96:13
competing 149:23,
    162:11
Complaints 11:20,
    78:16, 78:17,
    80:13, 125:19,
    150:4, 155:25,
    196:23
complete 93:8,
    171:2, 171:3,
    190:1, 204:4,
    216:22
completed 16:25
completely 58:11,
    84:14, 106:8,
    108:14, 144:2,
    220:4
complex 49:16, 50:1,
    100:13, 162:23,
    195:25, 239:2
complexity 195:11
compliance 86:4
complicate 136:16
complicated 45:21,
    64:1, 97:11, 98:1,
    185:16, 185:17
complicating 160:7
complied 86:16
comply 80:3, 80:8,
    84:16, 120:14,
    120:17, 120:25,
    152:1
complying 79:24
component 9:1, 9:4
components 8:1
composed 236:16
comprehensive
    152:25, 190:1

comprised 194:16
computer 225:19,
    226:16
con 139:13
concede 111:13
conceding 54:8,
    56:14
conceivable 222:13
conceivably 220:11
concept 107:3,
    131:25, 135:7,
    137:6, 139:4,
    139:13, 145:5,
    150:10, 150:14,
    154:17, 228:24,
    230:3, 230:12
concepts 230:20
conceptually 48:11
concern 54:20,
    55:19, 60:14,
    66:2, 127:13,
    127:16, 155:3,
    155:23
concerned 15:7,
    15:8, 39:25,
    40:11, 40:14,
    42:18, 54:21,
    104:24, 234:25
concerning 9:7
concerns 9:2, 14:2,
    22:15, 22:19,
    23:8, 29:8,
    104:18, 140:17,
    152:14, 162:4,
    163:20, 163:22,
    164:1, 174:9
concession 9:22,
    57:20
conclude 73:13,
    137:11
concluded 71:3,
    132:15, 237:10
concluded. 239:5
concludes 237:15,
    238:17
conclusion 159:22,
    196:14
conclusively 29:7,
    58:3
conclusory 168:13

concrete 31:18,
    34:22
concretely 34:22
condition 108:13
conditions 59:3,
    199:11
conduct 136:8, 203:4
conducted 11:18
conducting 238:23
confer 44:10, 91:22,
    104:9, 149:25,
    224:18, 237:24
conference 6:11,
    181:8
conferring 104:22,
    237:17
confessions 149:4
confidence 97:20,
    164:13
confident 201:7
confidential 128:1
confidentiality 12:5
confirm 13:9, 41:18,
    172:2, 180:12,
    226:21
confirmable 163:23
Confirmation 171:15,
    172:11, 172:12,
    172:20, 173:9,
    173:11, 188:23
Confirmed 171:6,
    197:1
confiscation 7:1
conflict 124:2,
    124:6
conflicts 141:3
conforming 228:18,
    230:17
conformity 221:12
confused 45:20
confusing 39:5,
    52:23, 60:2, 65:4
confusion 39:5,
    45:17, 47:13
Congress 138:3,
    138:7, 138:18,
    139:22, 140:1,
    163:10
conjunction 69:6,
    71:13, 71:17

consensual 29:20,
    144:24, 145:1,
    145:3, 150:22,
    237:17
consensually 16:8
consensus 106:7
consent 101:19,
    102:5, 103:22,
    103:23, 103:24,
    104:7, 104:8,
    104:9, 104:15,
    104:22, 138:22,
    146:4, 146:12,
    146:13, 159:18,
    160:23, 233:1,
    235:7, 237:10,
    237:16
consented 101:18,
    104:5, 127:11,
    160:10
consenting 26:12,
    102:12
consents 104:2,
    123:12
consequence 78:12,
    137:15
consequences 41:3,
    49:1, 80:9,
    164:17, 237:4
consider 17:23,
    23:12, 25:22,
    26:6, 44:14,
    103:17, 154:19,
    161:23, 172:11,
    174:8, 187:21,
    195:10, 198:8,
    217:15, 223:21
consideration 51:8,
    52:19, 53:7,
    68:23, 78:4, 86:8,
    147:15, 171:19,
    174:11
considerations
    86:19, 195:11
considered 17:14,
    34:23, 89:5, 91:2,
    159:5, 188:6,
    191:23, 206:6,
    206:8, 234:15,
    234:18

Considering 105:25,
    202:23
consistency 19:12
consistent 6:10,
    41:15, 45:23,
    61:23, 154:16,
    232:20, 232:22
consisting 185:10,
    240:4
consolidate 212:9,
    218:9
Conspiracy 39:19,
    39:21, 54:10,
    131:3, 131:4,
    131:9, 131:13,
    131:17, 134:15,
    147:21, 148:2
constituencies
    17:13, 164:14,
    193:17
constituency 28:17,
    28:22
constitute 86:6,
    225:7
Constitution 46:6,
    46:9, 46:15, 86:5,
    187:13
Constitutional 3:37,
    27:14, 27:18,
    29:24, 42:14,
    45:6, 55:5, 57:20,
    57:23, 162:4,
    173:25, 174:22,
    189:9
constitutionally
    30:2
Constitutions 178:11
constructive 10:19,
    89:23, 128:9,
    128:10, 130:9,
    130:12, 130:25,
    147:6
construe 174:3
consult 153:4,
    208:15
consulted 167:24,
    180:5
consummated 9:24
consummation 172:13
contain 146:21

contemplate 187:12,
    212:21, 236:11
contemplated 8:25,
    153:8, 183:12,
    236:15, 237:19
contemplates 193:16,
    237:6
contemplation 155:25
contend 212:4
contending 98:7,
    210:10
contends 160:19,
    160:21
contention 55:17,
    101:16
contest 30:12
contested 24:6,
    60:5, 63:25,
    91:17, 145:4,
    145:5
contests 30:12
context 65:25,
    74:16, 77:25,
    80:14, 89:22,
    91:16, 93:22,
    93:23, 98:22,
    104:9, 106:11,
    123:6, 123:14,
    126:2, 161:25,
    162:4, 162:23,
    163:9, 175:9,
    187:4, 187:17,
    216:15, 238:5
contexts 104:19
contingency 99:9,
    99:13, 109:25,
    110:17, 135:25,
    143:21, 156:5,
    156:8, 156:24,
    156:25, 157:15,
    157:20, 157:25,
    158:2
contingent 52:4,
    58:23, 67:23
continuation 163:7
continue 14:17,
    15:7, 21:22,
    46:19, 66:12,
    71:13, 169:22,
    169:24, 188:16,

    236:6
Continued 4:1,
    11:19, 26:7, 67:8,
    113:18, 123:23
continues 13:21,
    66:5, 122:11,
    188:19, 230:25,
    232:21
contract 76:6,
    132:5, 132:15,
    132:21
contracts 9:18,
    10:14, 76:5,
    205:14
contradicts 169:18
Contrary 55:18,
    206:5
contributed 79:16
contribution 31:6,
    32:9, 37:16, 48:2,
    48:8, 170:24
contributions 212:2
control 36:8, 94:11,
    150:15
controlled 151:13
controversy 39:16,
    41:7, 44:11,
    76:12, 91:6
convene 23:17
convenient 21:2
conversation 46:19
convey 105:3
conveyance 111:15,
    112:5, 112:10,
    148:3
conveyances 75:2
conveyed 105:4
convince 77:6
convinced 221:24
cool 221:25
cooperate 150:7
coordinate 99:24,
    218:9
coordinated 89:24,
    91:12
coordinating 183:20,
    185:12, 185:19,
    191:15
coordination 26:6,
    190:18, 217:13

copies 166:7,
    193:11, 193:13,
    219:12
copy 71:17, 169:17,
    180:17, 193:13,
    193:14, 205:25,
    226:2, 226:5,
    226:8
core 27:20, 48:7
Corp 213:25
corporate 139:7,
    139:8
Corporation 3:33,
    3:42, 3:44, 4:24,
    18:11, 47:14,
    111:4, 144:11,
    161:11, 162:5
corporations 8:21
Correct 33:17,
    58:14, 62:21,
    68:3, 69:8, 95:12,
    97:23, 112:19,
    167:14, 167:15,
    173:16, 174:13,
    174:21, 175:10,
    175:11, 176:1,
    188:5, 189:6,
    191:14, 211:5,
    228:5
corrected 73:14
correctly 59:19,
    204:2
corresponds 16:13
cost 88:5, 89:1,
    96:15, 99:20,
    100:1, 100:2,
    109:20, 109:24,
    134:4, 182:18,
    189:24, 191:6,
    191:11, 191:18
costly 99:10
costs 110:18,
    133:24, 161:20,
    162:22, 190:17,
    195:12, 202:4,
    203:15, 204:22,
    206:3, 206:4,
    206:6, 206:8,
    206:9, 206:10,
    206:17, 218:12

Count 33:6, 131:4,
   184:13, 210:1,
   210:5, 210:22,
   212:14, 212:19,
   213:2, 217:18,
   221:6, 221:16,
   223:22, 223:23,
   224:22
counter-argument
   57:13
counterclaim 48:2,
   58:6
counterclaims 49:12,
   210:2, 217:19,
   217:20, 217:21,
   221:7, 223:24
counting 36:13
counts 32:21
couple 90:15, 92:17,
   92:18, 133:18,
   165:22
course 15:14, 20:16,
   23:19, 26:14,
   45:16, 66:14,
   74:24, 81:22,
   82:12, 94:21,
   118:2, 124:25,
   128:25, 153:13,
   186:17, 198:4,
   201:24, 210:9,
   228:15, 234:19
courtesy 180:17,
   193:11, 193:13
courthouse 18:15,
   18:21, 193:12
COURTROOM 6:13,
   6:22, 6:24, 7:2,
   14:24, 33:22,
   79:9, 83:1, 91:23,
   95:3, 164:24,
   165:4, 165:16,
   165:19, 165:21,
   166:11, 200:16,
   208:16, 225:25,
   226:7
Courts 38:1, 49:25,
   103:23, 104:3,
   104:6, 148:1,
   161:12, 161:19,
   162:1, 162:7,

181:9, 186:12,
   195:10, 195:15,
   200:12
cover 222:6
covered 16:19,
   53:19, 95:2,
   141:14, 163:11,
   171:7, 175:5,
   229:15
crash 40:21
crazy 33:2
create 40:7, 41:8
created 58:24, 79:15
creates 124:2,
   231:11
creating 45:10
credibility 127:12
Credit 2:27, 129:9
critical 8:16, 8:18,
   8:24, 9:4, 27:22,
   66:1, 67:23,
   163:16, 203:16,
   215:14, 215:23,
   216:11
critically 37:20
criticisms 164:3
criticized 110:14
cross 11:5, 56:4
cross-claim 48:1,
   207:13
cross-claims 200:20,
   200:25, 204:17
cross-motions 223:15
cross-referenced
   117:21
crossed 71:1, 95:13
crucial 33:18,
   185:18
crushing 29:17
crux 101:15
crystal 54:24
CSR 240:13
CU 173:4
culminate 9:20
cure 48:21, 49:6
cured 46:23
current 8:14, 31:9,
   52:17, 98:17,
   110:8, 210:12,
   212:8, 235:24,

236:13, 237:22
currently 17:2,
   97:21, 116:12,
   172:22, 235:19
Curtin 3:44, 50:11,
   50:13, 50:14,
   117:3, 117:6,
   118:8, 120:4,
   120:23, 121:3,
   121:7, 121:10,
   123:16
CUSIP 174:11
Cusips 173:4
customer 205:19,
   207:16, 207:23
customers 205:18
cut 14:16
cut-off 75:17,
   75:18, 88:2
Cybergenics 116:1,
   116:20


< D >
D&O 110:2, 110:3
D. 161:22, 195:14
DALE 3:6, 208:24,
   209:1, 209:4,
   209:5, 210:15,
   211:3, 211:5,
   212:25, 213:6,
   213:9, 213:20,
   215:13, 216:12,
   217:11, 225:15,
   225:16
damage 97:14,
   132:17, 135:12,
   147:20
damages 30:7, 37:14,
   80:9, 107:13,
   110:21, 128:15,
   130:22, 131:2,
   131:25, 137:1,
   146:18, 152:11,
   156:20, 170:24,
   174:1
data 8:6, 205:13,
   205:22, 207:16,
   207:18
database 76:6,

205:21, 205:22
databases 207:16
date 19:11, 19:13,
  19:19, 20:9,
  74:21, 81:21,
  82:3, 97:11,
  97:22, 154:5,
  201:9, 238:18
dates 7:15, 7:17
daunting 65:3
day 15:17, 30:8,
  80:4, 100:19,
  103:8, 107:18,
  143:25, 150:3,
  164:15
days 19:10, 19:17,
  19:18, 25:17,
  96:10, 96:11,
  101:13, 104:2,
  129:23, 133:18,
  156:17, 220:19
de 109:20
dead 37:22
deadline 9:9, 80:8,
  81:25, 82:10,
  84:17, 87:4,
  153:10, 154:4,
  154:9, 155:16,
  155:24
deadlines 7:10,
  67:16, 70:19,
  71:11
deal 11:3, 14:16,
  20:17, 21:1,
  25:20, 50:1,
  50:25, 56:5,
  66:25, 67:1,
  69:21, 78:5, 95:5,
  101:4, 124:24,
  138:10, 146:16,
  150:6, 187:8,
  215:17, 218:21,
  220:13, 220:22,
  230:7
dealing 21:23,
  22:23, 47:17,
  81:17, 82:9,
  93:15, 93:22,
  95:25, 102:14,
  102:24, 105:17,

106:9, 152:3
deals 34:20
dealt 93:21, 187:11,
  210:8
debate 49:13, 157:12
debating 35:3, 61:24
Debtors 1:18, 75:10,
  94:22, 101:6,
  192:9, 196:18
debunk 94:4
debunked 144:19
decertified 203:7
decide 35:7, 43:15,
  126:7, 223:1
decided 14:12,
  14:23, 51:4,
  75:16, 120:17,
  209:7, 212:6,
  214:9, 217:7,
  224:13, 236:22
decides 122:12,
  126:16, 222:11,
  227:13
deciding 68:13,
  101:18
decision 13:3,
  65:11, 68:17,
  68:21, 131:8,
  160:5, 162:20,
  181:7, 193:3,
  208:14, 209:15,
  209:20, 210:11,
  211:18, 212:13,
  212:15, 212:18,
  212:24, 213:14,
  213:18, 213:25,
  214:7, 221:6,
  224:7, 225:6,
  235:22, 236:1,
  237:5
decision-making
  211:10
decisions 14:15,
  83:15, 130:5
declaration 83:20
declaratory 58:15,
  58:17, 219:23
declared 73:25,
  77:20
declined 160:4

declining 140:14
deemed 104:4, 210:5,
  223:23
deems 124:20, 194:24
deep 66:2
deepening 102:16,
  105:19, 117:23,
  128:13, 131:19,
  131:21, 131:23,
  132:1, 142:7,
  144:1, 146:15,
  146:18, 146:21,
  151:20
deeply 63:15
default 184:24
defaulted 85:16,
  190:13, 191:2
defect 40:24, 48:22,
  49:21
defend 32:24, 34:6,
  54:25, 55:1,
  100:14, 100:23,
  191:4, 204:4,
  204:15, 204:21
defendant 30:12,
  38:3, 38:4, 49:19,
  49:20, 63:20,
  79:15, 203:14,
  211:15, 213:15,
  231:17
defending 32:9,
  32:16, 134:4,
  183:24, 184:5,
  187:3, 196:11
defense 11:20,
  34:16, 37:21,
  54:22, 76:18,
  77:4, 91:10,
  133:24, 134:4,
  134:12, 191:7,
  200:22, 204:18
defenses 30:19,
  37:14, 38:2,
  49:22, 52:9,
  52:10, 52:16,
  55:6, 55:16,
  138:15, 231:15
defer 142:22
deference 164:2
deferred 53:9

deferring 53:6,
    53:7, 171:18,
    171:19, 176:19
deficient 46:23,
    122:19
deficits 141:15,
    141:17
defined 228:12,
    229:23, 230:1,
    230:5
defines 111:24
definitely 12:11,
    224:19
definition 102:18,
    169:9
definitions 169:14
definitive 9:18,
    122:10, 145:18,
    184:9, 223:19,
    224:20
defraud 130:15,
    147:7, 147:9
degrees 54:21
Dein 73:11, 79:23,
    80:6
Delaware 139:7
delay 18:14, 57:23,
    130:15, 147:7,
    147:10, 220:16
delegation 237:16
deleted 227:17,
    228:16, 231:4,
    231:5
deletion 232:20,
    232:23
deliberate 138:25
deliberated 129:11
deliberations 129:1
delicate 162:11
delicto 147:8
delta 182:18, 182:22
demonstrate 195:4,
    196:20
demonstrated 74:7,
    162:21, 193:8
demonstrating 128:3,
    130:4, 195:19
demonstration 74:5
denial 7:1
denied 91:14,

117:16, 137:16,
    151:10, 159:8,
    164:19, 192:13,
    215:9
denominated 60:6,
    176:25, 177:15
deny 43:19, 123:3,
    124:10, 178:4
denying 188:11,
    192:2, 197:4
depart 193:9
department 170:10
dependant 73:2,
    78:11
depending 213:8
deposit 74:21
deposition 71:11
Depositions 67:17,
    136:8, 198:1,
    205:6
deprive 190:23
depriving 63:11
DEPUTY 165:4,
    165:16, 165:19,
    165:21, 208:16,
    225:25, 226:7
derivative 95:17,
    95:19, 98:14,
    101:15, 101:17,
    101:22, 114:19,
    114:21, 117:13,
    124:17, 126:3,
    126:7, 139:4,
    139:7, 152:1,
    159:2, 159:17,
    160:3, 160:25,
    161:12, 229:25,
    237:18
derivatively 122:25
derived 101:19,
    139:21
describe 93:16,
    107:10, 109:22
described 22:11,
    22:20, 40:19,
    99:12, 113:2,
    145:18, 151:12,
    151:21, 227:6,
    232:12
describes 107:8

describing 232:11
description 122:10,
    145:17
designated 163:15
designation 98:8
designed 27:14,
    41:8, 163:10
designing 44:21
desire 199:18
despite 13:22, 27:15
detail 77:14, 97:16,
    108:16, 112:14,
    145:18, 227:6
detailed 129:24,
    145:22, 152:8,
    229:21
details 110:3
determination 13:4,
    48:24, 50:3, 77:9,
    178:5, 178:6,
    211:20, 237:20
determine 34:4,
    36:2, 38:2, 45:4,
    66:1, 119:18,
    119:19, 122:24,
    205:17
determined 36:20,
    41:12, 180:6,
    210:2, 213:2,
    235:25
determining 42:21,
    102:12, 161:4,
    161:5, 161:18
detriment 236:7
develop 22:25
developed 21:10,
    224:12
device 6:16, 6:17,
    6:24, 7:1
devices 6:12, 6:15,
    7:2, 166:10
devolve 15:10
dial 106:4, 106:5
Diana 3:21, 202:10
dictionary 169:14
differ 74:9, 213:7
difference 42:2,
    56:22, 102:9,
    130:11, 132:19,
    147:8, 184:19

differences 130:1,
  130:6, 130:22
differential 177:25
differently 216:20
difficult 70:5,
  79:24, 84:1,
  136:17, 179:4
difficulty 137:4
diligence 74:5,
  74:8, 77:13,
  83:13, 86:14,
  86:19
diligent 74:16,
  77:16
dime 129:4
diminish 206:9,
  206:18
Direct 27:16, 27:17,
  29:25, 114:4,
  114:11, 114:19,
  178:20
directed 109:1,
  210:5, 223:23,
  238:8
directing 121:6,
  178:20, 188:7
directly 23:24,
  29:22, 34:21,
  37:7, 47:16, 49:3,
  55:7, 60:9,
  113:22, 136:23,
  200:23, 212:23,
  216:2
director 8:23
directors 105:21,
  133:10, 133:12,
  134:1, 134:5,
  145:10
disagree 30:24,
  47:4, 64:6, 215:15
disagreed 122:16
disagreement 133:8,
  175:6, 190:7
disallow 171:8,
  176:17, 178:14
disallowance 169:25,
  171:3
disallowed 136:25,
  169:23
disallowing 176:16,

  177:19, 178:21
disappear 33:5,
  111:10
disavow 132:10,
  227:20
disavows 132:22
discharge 101:5
discharged 171:15,
  173:21
disclaim 28:23
disclose 119:16,
  155:6
disclosed 97:12
disclosing 97:16
disclosure 155:4
disclosures 196:24
discount 135:15,
  157:22, 184:17
discover 201:8
discrete 15:2
discretion 43:2,
  43:8, 43:15,
  43:18, 43:19,
  57:19, 57:22,
  130:5, 131:16,
  195:10, 195:22,
  225:5
discriminatory 50:18
discuss 12:13,
  153:5, 205:10
discussed 154:22,
  199:18, 234:17
discussing 185:13
Discussion 16:3,
  126:13, 179:13,
  179:14, 179:16,
  208:17
discussions 8:3,
  12:4, 13:23,
  13:24, 17:12,
  22:11, 22:22,
  23:5, 24:15,
  129:1, 136:9,
  191:20, 230:10
disguised 55:3
disingenuous 128:25
Dismiss 172:22,
  172:23, 198:2
dismissal 43:24
dismissed 131:11,

  131:13, 217:11,
  217:18
disparate 29:12
disposed 94:12
dispositive 203:4
dispute 49:9, 121:24
disputed 98:4
disqualifies 120:5,
  120:6
disqualify 120:2
dissipated 153:16
distinct 123:25,
  177:9
distinguish 216:12
distinguished 81:24
distinguishing 49:23
distortion 127:18
distracted 84:2,
  84:3, 84:4
distracting 84:6
distressed 220:21
distributed 9:19,
  94:13, 133:1,
  175:18
distribution 9:24,
  173:18, 173:20
distributions 94:14,
  196:25
Distributors 147:24
District 1:3, 2:35,
  2:36, 7:4, 38:2,
  147:25, 151:19,
  181:5, 181:13,
  181:20, 181:23,
  192:6, 192:14,
  192:23, 193:12,
  193:15, 195:8,
  199:12, 201:7,
  201:13, 203:17,
  206:13, 221:9,
  240:1, 240:2,
  240:7
diverge 123:24
diverse 194:20
divided 95:17, 97:7
Docket 1:6, 1:22,
  2:3, 2:19, 43:16,
  48:13, 71:9, 87:3,
  90:20, 118:12,
  158:20, 166:25,

177:16, 179:25,
180:13, 180:18,
208:22
docketed 183:8
docketing 192:10
dockets 192:12
Doctrine 39:2,
77:13, 131:23,
138:7, 142:7,
142:13
doctrines 141:25
document 23:15,
52:3, 219:7,
219:17, 221:22,
234:2, 234:14
documentary 201:22
documentation 9:18
documented 179:18
documents 6:17,
74:20, 74:22,
74:23, 101:20,
141:14, 192:11,
199:24, 201:10,
203:23, 205:25,
223:20
doing 14:23, 25:2,
35:9, 38:6, 41:23,
48:4, 48:5, 70:4,
77:15, 83:11,
84:20, 88:12,
92:11, 100:5,
100:6, 106:2,
109:24, 110:16,
115:6, 146:24,
147:10, 176:18,
191:14, 200:3,
218:11, 221:21,
221:25
dollar 75:6, 75:17,
80:18, 126:18,
148:21, 156:9,
156:10
dollars 20:12,
20:15, 29:18,
36:9, 38:23,
38:25, 42:16,
58:20, 72:24,
75:7, 75:19,
75:21, 96:23,
115:19, 126:14,

148:7, 151:7,
182:13, 194:17
dollars. 148:8,
156:7
domain 154:12
domino 45:9
dominos 45:10
done 28:13, 38:15,
38:16, 38:19,
39:8, 58:17,
66:17, 80:10,
82:3, 83:13,
86:18, 88:16,
88:19, 88:21,
110:5, 110:6,
117:8, 119:4,
124:21, 149:3,
156:18, 172:2,
175:18, 192:17,
201:9, 208:19,
223:9
Doral 95:9, 118:24,
119:1, 119:9,
144:10, 144:11
doubt 94:17, 95:4,
105:11, 107:6,
193:5, 228:20
downhill 108:9
downstream 48:8
downtown 18:21,
18:23
dozens 96:22
draft 109:21, 128:17
drafted 232:10
drafters 82:7, 82:8
drag 37:24, 38:21,
64:21
drain 142:20, 148:21
drew 215:15
driven 125:21
dropping 129:8,
227:21
due 34:19, 35:25,
45:16, 83:13,
86:23, 87:19,
89:15, 198:15,
198:20
duplicate 36:7,
168:20, 169:5,
169:10, 169:13,

169:15, 170:8,
170:13, 170:21,
171:13, 177:16
duplicated 178:2
duplicates 203:23
duplicative 131:14,
167:13, 168:9,
168:12, 174:4,
174:8, 175:15,
176:23, 177:21,
178:4, 178:17,
178:22
duplicativeness
175:9
During 6:24, 72:25,
111:6, 113:25,
128:25, 153:1,
198:4, 201:24
duties 84:15
duty 117:23, 128:8,
128:9, 132:10,
132:20, 132:23,
133:9, 133:10
dynamics 123:7

< E >
e-mail 71:18,
165:16, 183:4,
183:5, 193:19,
226:13, 226:15
e-mailed 180:17,
193:12
e-mailing 6:23,
166:6, 226:8
e-mails 86:11,
226:11
earlier 15:2, 33:4,
67:12, 118:10,
126:11, 164:9,
185:13, 230:23
early 8:9, 42:16,
45:12, 50:20,
62:24, 186:21
earn 157:1, 164:13
earned 135:6
Eastern 147:25
easy 105:22, 181:21
eat 182:17
ECF 16:14, 24:9,

26:16, 26:21,
179:24, 181:10,
181:16, 193:17,
193:20, 197:12,
208:22
echo 53:20
economic 10:16
economy 9:5, 10:23,
52:19
Edward 3:26
effect 45:10, 89:15,
148:14, 164:20,
201:4
effective 60:16,
64:11, 88:6, 89:1,
172:3
effectively 55:9,
138:20, 141:14,
160:1, 176:20,
236:24
effects 80:25
efficiency 39:4,
52:20, 65:17
efficient 15:11,
178:3, 183:9,
192:17, 212:7,
212:10
effort 81:11, 83:17,
83:22, 132:18,
208:19, 212:11,
220:10, 224:10
efforts 87:2, 200:20
effusive 238:21
ego 46:5, 46:17
eight 91:20, 91:25,
167:21, 169:18,
180:2, 180:7,
197:16, 209:3
eight. 229:22
Either 30:17, 35:25,
36:1, 38:17, 43:8,
49:23, 56:14,
61:18, 63:11,
73:5, 74:7, 77:1,
78:20, 78:25,
82:13, 111:11,
155:11, 200:10,
210:24, 211:1,
211:6, 211:25,
212:25, 215:18

elected 139:21
election 116:13
Electric 2:12
electricity 197:22,
205:19, 208:7
electronic 6:12,
6:15, 180:24
electronically
205:24
element 15:19,
15:20, 162:15,
174:9, 175:4,
178:4, 178:14
elements 147:11,
153:6, 163:18,
174:6, 224:19
eligible 123:17
Elizabeth 4:18,
197:20
Emanuel 42:13
embellish 179:8
embraces 171:6
Employees 1:31,
2:19, 4:5
employer 212:2
employment 156:11
enable 29:20
enacted 85:16
encompass 120:18
encompassing 91:7,
112:3
end 8:13, 68:11,
89:19, 107:18,
110:13, 113:12,
123:10, 124:18,
152:6, 163:19,
164:15, 214:3,
216:21, 225:11,
228:19, 237:4
ends 114:20, 217:3
energy 80:15
enforceability
215:25, 219:24
engage 131:4, 131:5,
131:17, 136:9,
136:14, 200:9
engender 140:17
engineer 29:11,
29:16, 217:12
enhance 132:2

enough 40:7, 45:20,
52:14, 56:7
enrichment 128:9
Enron 96:21, 129:17
enshrined 224:13
ensure 122:2,
192:16, 199:3,
199:21
enter 16:22, 17:20,
91:18, 149:4,
149:9, 149:24,
164:19, 194:8,
197:4, 212:22,
221:12, 221:22,
223:22, 225:3,
238:10
entered 71:15,
79:23, 157:20,
188:11, 199:15,
199:16, 209:15,
209:19, 219:7,
221:8, 221:18
entering 25:22,
87:5, 158:1,
224:15
Enterprises 161:9,
237:19
entertain 26:10,
40:9
entire 138:7,
138:21, 143:17,
203:21, 215:16
entirely 68:2, 174:4
entirety 40:20,
142:4, 159:8,
188:12, 215:9,
231:6, 231:24
entities 95:8,
119:1, 120:1,
120:19, 142:1,
163:1, 169:20,
228:9
entitled 27:23,
34:13, 76:25,
82:16, 82:17,
86:21, 132:12,
164:1, 174:11,
198:21, 220:20
entitlement 178:10
entity 34:10, 59:13,

77:5, 95:9, 113:5,
115:24, 116:20,
119:2, 152:4,
163:8, 163:15,
163:20
entrusted 163:10
Entry 16:14, 71:9,
80:5, 90:20,
90:22, 158:21,
158:22, 166:25,
177:17, 179:24,
220:20, 227:4,
228:16, 234:13
enumerated 161:1,
238:1, 238:15
environment 184:18,
184:21
envy 238:25
equally 117:11,
193:7
Equitable 43:7,
74:3, 76:20,
76:25, 77:6,
77:13, 78:7,
79:14, 83:1,
83:10, 85:11,
85:22, 86:6,
87:20, 87:21,
89:17, 90:4,
91:16, 106:19,
126:12, 142:3,
175:24
equitably 82:4,
85:8, 90:18, 90:23
equities 207:1
equity 86:1, 86:15,
86:20
equivalent 182:5
especially 186:14
espousing 37:8
Esq 3:7
essence 15:14
essential 183:17,
184:11
essentially 15:20,
15:23, 24:25,
39:24, 41:5, 54:8,
100:19, 102:12,
106:1, 109:1,
112:18, 172:1

Establish 25:7,
25:13, 26:19,
161:13, 162:19
establishable 10:16
established 58:7,
181:14
estate 110:22,
133:15, 138:11,
138:12, 138:16,
142:20, 156:20,
161:9, 161:20,
206:9, 206:18
estopped 109:6
et 1:16, 2:29, 3:4,
99:10, 102:16,
108:15, 108:16,
109:9
evade 27:14
evaded 138:21
evaluated 9:17,
123:5
eve 216:14, 216:16,
216:17
event 31:6, 75:13,
104:16, 129:24,
133:21, 146:13,
171:10, 195:21,
215:11, 220:5,
222:9, 224:5
events 78:12, 225:7
eventual 205:7
Everybody 28:12,
33:21, 33:22,
41:25, 53:9,
54:12, 55:13,
56:13, 60:16,
62:16, 62:17,
89:16, 90:14,
124:22, 186:7,
221:25
everyone 7:14,
11:22, 15:16,
34:6, 57:24, 79:9,
94:16, 125:13,
167:17, 221:20,
226:12
everything 88:21,
120:7, 141:7,
141:8, 155:16,
175:5, 175:22,

208:19
evidence 83:12,
119:12, 119:14,
123:2, 201:23,
205:11, 205:16,
225:7
evil 141:21
eviscerates 138:20
ex 91:7, 139:14
ex-ceo 149:9
exact 169:16, 169:17
exactly 22:12, 35:9,
38:6, 63:9, 67:12,
70:8, 104:21,
108:11, 151:16,
187:23, 215:20,
219:19
examination 158:7,
158:9, 200:10
Examiner 4:30, 7:13,
10:6, 16:13, 17:7,
17:18, 158:12,
229:20
example 16:2, 31:1,
31:18, 31:20,
31:21, 31:22,
33:21, 35:14,
51:1, 88:16,
103:25, 104:3,
105:3, 149:9,
187:2, 199:24,
200:11
exceeded 76:2,
187:14, 187:16
exceeds 139:25
Except 39:19, 83:13,
99:17, 197:5,
221:5, 226:2
exception 166:9
exceptional 237:10
exceptions 101:5
Excessive 75:25,
204:12
exchange 113:24
exchanges 191:21
Excluded 66:23,
66:24, 67:8,
138:6, 138:10
exclusion 138:25
exclusive 160:8,

163:19
exclusivity 136:12
excuse 84:11, 171:2,
    188:9
excused 18:2
executions 133:20
executive 8:22
exercise 43:18,
    75:5, 150:15,
    164:7, 164:17,
    195:22
exercised 131:15
exercises 164:16,
    237:16
exercising 160:11,
    195:10, 225:5
exhaustively 35:19
Exhibit 17:21,
    17:22, 17:24,
    48:13, 107:23,
    128:22, 145:19
EXHIBITS 5:8
exist 133:19, 139:4,
    147:23
existed 27:13
existence 26:7,
    70:20, 113:19,
    177:8
existing 21:19,
    63:17, 184:2,
    210:5, 221:16,
    223:3
exists 142:3, 214:1
expect 17:4, 17:13,
    126:2
expected 8:7
expecting 106:3
expects 8:8, 8:11
expedient 7:11,
    124:21
expedited 21:1
expend 160:6
expending 133:15
expenditures 182:25
expenses 110:19,
    196:18, 196:22,
    203:7
experience 110:16
expert 40:17,
    129:13, 129:15

expiration 93:18,
    111:16, 112:11,
    112:12, 229:7
expire 41:17, 88:12,
    98:20, 235:20,
    236:1, 236:6
expired 76:24
expiring 88:15
expiry 114:7
explain 27:7, 28:13,
    30:1, 59:18, 90:7,
    100:23, 112:23,
    159:7, 217:16
explained 141:9,
    164:9
explaining 27:9,
    211:24
explains 214:1
explicitly 160:15
exposed 78:24
exposure 136:3
express 85:5,
    103:22, 103:24,
    104:7, 160:23
expressly 132:10,
    132:22, 148:13,
    161:1, 163:10,
    168:7, 169:1
extant 210:23
extend 70:19, 82:11,
    135:12, 135:13,
    135:14
extended 112:18
extends 160:20,
    233:19
Extension 18:6,
    18:17, 65:14,
    65:25, 66:20,
    68:4, 68:5, 68:6,
    68:11, 68:18,
    68:24, 69:1,
    70:19, 71:10,
    82:5, 84:10,
    84:22, 216:8,
    220:16, 229:14
extensions 66:3,
    67:6, 70:9, 70:10
extensive 22:11,
    22:20
extra 126:24,

219:12, 226:5
extraordinarily
    80:18, 195:25
extraordinary 74:4,
    74:7, 77:17, 78:6,
    79:3, 79:13,
    79:17, 213:16
extremely 74:15,
    142:21
eyes 133:2


< F >
F.2d 161:10
F.3d 37:10, 214:3,
    235:23
face 37:21, 77:18,
    102:4, 122:19,
    173:1
faced 49:16, 235:19,
    236:4
faces 50:24
facilitate 43:10
facing 41:16
factor 201:16,
    202:15
factors 147:16,
    152:2, 198:17,
    200:6, 200:13,
    202:14
facts 49:23, 53:9,
    58:24, 79:11,
    107:19, 108:11,
    127:18, 136:2,
    210:5
factual 209:25
fail 10:12, 57:13
failed 29:19, 37:13,
    86:17, 119:4,
    122:16, 127:16,
    161:17, 162:19,
    172:11
failure 86:9,
    137:12, 214:19
fair 60:14, 123:15,
    126:17, 141:6,
    141:22, 192:17,
    193:6
fairly 145:22,
    154:16, 184:13,

217:21
faith 70:4, 85:18,
   126:9
fall 124:22, 171:8,
   174:23, 198:10
false 33:8, 33:15
falsely 36:6
familiar 11:23,
   77:8, 104:1
familiarity 97:3
far 15:11, 22:20,
   80:25, 121:23,
   122:6, 130:25,
   131:23, 132:7,
   142:2, 142:4,
   195:5, 202:20,
   216:16
fashion 41:15,
   52:21, 78:2,
   79:25, 89:24,
   157:8
fast 59:11, 227:8
fate 185:15
fault 79:15, 79:19,
   86:3, 86:6
favor 207:1
FDIC 37:11, 37:12,
   37:15, 37:20,
   37:22
feasibility 66:12
feasible 23:9, 67:1
feature 29:5,
   136:12, 227:18
features 6:18
February 12:8, 172:3
Federal 3:23, 29:25,
   30:8, 44:9, 142:9,
   198:12
federalism 162:4
Fee 4:30, 7:13,
   10:6, 16:13, 17:6,
   17:18, 17:20,
   17:22, 17:23,
   156:5, 156:24,
   158:12, 182:5,
   182:6, 190:19,
   190:20, 229:19,
   229:20
feel 15:24, 65:6,
   80:17, 141:4

fees 135:4, 135:6,
   148:5, 186:18,
   191:13, 194:6
feet 70:13
FEGAN 4:18, 197:14,
   197:15, 197:18,
   197:20, 199:12,
   200:24, 201:16,
   202:9, 203:22,
   204:11, 207:10
feigned 54:20
feigning 55:19
fellow 53:18
felt 62:14, 133:3
fend 214:2, 214:5
fetched 142:2
few 93:13, 109:11,
   115:16, 148:20,
   186:2, 202:15
FGIC 226:22
fiduciary 117:23,
   128:8, 128:9,
   132:10, 132:20,
   132:23, 133:9
field 180:21
fielding 186:2
fifth 17:3
fight 64:22
fighter 44:16
figure 56:10, 89:20,
   130:17, 224:1,
   225:11
figuring 89:22
filers 181:16
filing 13:2, 20:20,
   21:18, 38:8, 70:2,
   75:3, 126:18,
   153:13, 155:19,
   180:24, 193:15,
   213:8, 224:24
filings 97:18,
   153:3, 181:12,
   190:7, 192:22,
   193:11, 193:16
filter 22:17
filtering 23:8
final 13:4, 16:24,
   17:21, 62:6,
   107:21, 107:22,
   128:2, 133:7,

141:24, 146:17,
   146:19, 146:20,
   146:21, 146:25,
   149:16, 149:17,
   153:9, 154:23,
   184:15, 201:16
Finally 11:19,
   52:19, 66:18,
   67:5, 123:15,
   171:14, 184:15
Finance 4:23, 18:11,
   65:23, 99:4
Financial 1:9, 1:25,
   2:6, 3:18, 90:17,
   108:13, 118:24,
   118:25, 144:10,
   144:11, 156:11
financings 55:3
find 103:23, 120:1,
   128:24, 130:19,
   131:5, 131:6,
   131:7, 132:24,
   133:5, 147:23,
   194:3, 225:5
finding 31:7, 164:6,
   200:18, 228:13,
   229:24
findings 52:5, 53:1,
   230:5
finds 159:18,
   159:23, 161:6,
   177:25, 227:5,
   235:13
fine 18:20, 41:25,
   81:19, 92:22,
   151:4, 155:17,
   155:21, 155:22,
   175:16, 176:3,
   221:21, 225:1,
   225:2
finger 215:13,
   218:16
fingers 71:1
fire 70:13
firm 74:11, 96:1,
   96:19, 99:8,
   99:23, 110:16,
   110:18, 128:22,
   129:21, 143:9,
   144:6, 151:6,

156:8, 156:25
firmly 122:1, 127:13
firms 96:23, 128:6,
  128:7, 187:15
Fiscal 3:17, 8:4,
  8:7, 8:8, 8:13,
  8:14, 8:20, 8:25,
  12:20, 163:12,
  212:3
fit 79:19, 218:2
five 36:13, 36:15,
  42:7, 74:24,
  80:22, 85:3,
  111:1, 128:6,
  132:19, 172:4,
  187:15, 214:23,
  223:16, 229:8
flags 75:25
flat 58:7
flatfooted 144:2,
  157:21
flawed 32:10
fleshed 179:18
flexible 52:14
flip 111:17, 134:14,
  149:2
flippant 23:18
flipping 230:21
flips 114:24
focus 23:18, 36:17,
  73:15, 88:11,
  113:23, 201:17,
  207:3, 208:11
focuses 78:19,
  81:10, 122:8,
  163:6
focusing 88:23
Foerster 188:17
fold 182:18
folks 56:3, 56:17
follow 234:22
followed 187:9,
  195:16
following 7:17,
  23:2, 69:3, 70:21,
  112:10, 112:12,
  125:1, 149:12,
  154:18
follows 198:19
FOMB 85:7, 85:12,

85:22, 86:10,
  86:16, 86:24,
  87:3, 87:8,
  167:24, 184:16,
  190:21
footnote 118:15,
  118:21, 144:13,
  151:19, 151:20,
  227:21, 228:6
forced 55:9, 78:8,
  150:7
foreclose 55:17,
  151:25
forecloses 37:8
foreclosure 37:13,
  37:14
foregoing 164:5,
  238:6
foremost 198:22
forever 68:18,
  84:10, 90:5
forfeited 57:2,
  57:17
forget 25:10, 104:2,
  110:7
forgetting 201:20
forgot 130:10
form 88:3, 106:23,
  154:19, 178:21,
  181:25, 182:2,
  192:3, 218:24,
  234:24, 237:6,
  237:9
formal 12:13, 95:6,
  236:20
formally 19:16
formation 194:22
former 105:20,
  109:11, 133:10,
  133:11, 145:9
forms 105:15, 105:23
formulation 8:4,
  162:13
forth 21:8, 234:14
forward 9:21, 10:23,
  25:13, 27:5, 40:6,
  40:8, 41:8, 43:3,
  43:21, 44:5,
  44:23, 45:7, 47:1,
  47:4, 68:20,

136:16, 151:3,
  157:3, 157:6,
  157:11, 207:3,
  210:6, 225:11
found 6:23, 84:8,
  104:3, 208:1
four 9:12, 25:11,
  42:22, 56:23,
  132:3, 191:25,
  197:24, 223:16,
  228:6, 229:5
four-year 72:25,
  75:3
fourth 16:19, 43:12,
  194:13
frame 162:17, 224:2
framework 96:16,
  125:4, 160:24,
  161:25
Frankly 37:8, 77:8,
  78:19, 94:15,
  116:17, 176:16,
  201:10, 220:21,
  221:4, 222:16,
  223:9, 231:25,
  234:5
fraud 102:16,
  105:19, 117:23,
  130:18, 147:11,
  147:17, 147:20,
  174:1
fraudulent 75:2,
  107:25, 108:6,
  111:15, 112:5,
  112:10, 128:10,
  128:11, 130:8,
  130:9, 130:11,
  130:13, 130:20,
  130:23, 130:25,
  131:4, 131:5,
  131:17, 145:24,
  145:25, 148:3,
  152:8
free 151:4, 189:22,
  218:18
free-wheeling 231:20
freely 213:11
frequently 141:11
fresh 64:25
Friedman 3:19,

137:19, 137:20, 140:8, 142:17, 150:8
friends 46:20, 54:1
front 19:9, 64:16, 171:25, 199:10, 219:9
fruitful 179:16
fruition 12:18, 69:24
frustrate 38:5
fuel 197:22, 200:3, 205:18, 205:19
full 99:13, 119:8, 121:9, 141:23, 156:17, 204:4
fully 57:1, 131:25, 158:1, 182:17, 200:22, 221:17
function 185:12, 185:19
functionally 114:20
functions 8:16
Fund 2:28, 85:15, 160:7
fundamental 35:24, 62:21
Fundamentally 48:1, 170:14, 176:24
funded 114:5, 114:21, 141:17, 141:18
funding 191:3, 191:4
Funds 4:10, 4:28, 88:3, 115:18, 188:21, 212:1, 212:2, 215:5
futile 214:1
futility 213:20
future 7:1, 15:15, 52:10, 76:16, 78:12, 136:25, 143:1, 163:7, 163:20, 193:10, 233:2

< G >
G. 3:15
Gabe 18:9, 53:15,

121:18
Gabriel 4:24
gain 66:16, 218:12
gambit 174:24
Garcia 197:24, 198:7, 198:9, 199:13, 204:11
garden 75:1, 88:20
Gas 161:11
gather 17:8, 23:24, 28:16, 67:22, 95:8, 205:4
gave 168:8
GDB 81:9, 84:4, 100:4, 105:21, 109:11, 133:5, 133:10, 133:12, 134:1, 134:6, 135:9, 141:5, 141:7, 141:9, 141:12, 141:13, 141:14, 141:18, 141:19, 141:21, 151:11, 151:13
General 3:29, 7:25, 106:7, 121:22, 123:24, 124:5, 183:22, 186:11, 191:7, 194:11, 194:14, 196:3, 196:12
Generally 77:1, 79:13, 81:14, 81:15, 94:22, 95:18, 96:9, 102:22, 102:25, 103:11, 109:22, 112:17, 161:12, 200:17
generated 143:18, 143:19
generating 78:21
generis 79:10
Genovese 95:22, 96:19, 99:8, 99:23, 107:7, 108:17, 108:20, 110:15, 110:21, 128:22, 129:21, 129:25, 143:9,

144:6, 145:19, 145:22, 152:7, 156:25
gets 58:8, 82:3, 114:24, 155:4, 156:1, 157:5, 215:10
getting 20:22, 40:22, 60:11, 60:12, 76:14, 78:5, 94:9, 110:11, 115:3, 148:5, 176:4, 223:14
Given 28:19, 86:13, 115:14, 124:6, 137:7, 139:5, 140:14, 149:17, 154:17, 162:2, 163:25, 182:8, 182:13, 183:3, 190:12, 214:18, 219:6, 231:7
gives 94:22, 116:16, 232:12
giving 33:8, 33:15, 38:14, 63:13, 79:25, 82:1, 126:24, 150:20, 150:21, 198:20
glad 118:9
Glenn 140:13
Global 2:27
goal 29:11, 94:6, 94:7, 94:16, 163:4
goals 163:4, 163:14, 164:13
Gold 213:25
Gos 39:19, 47:23, 115:19, 115:20, 186:15, 188:10
Gotshal 18:10, 65:23
gotten 15:24, 44:22, 154:11
govern 25:7
governing 12:6, 111:11, 112:12
Government 1:32, 2:20, 8:4, 8:21, 9:2, 10:1, 139:11,

139:22, 141:10,
141:11, 163:1,
163:7
governmental 75:9,
116:14, 116:20,
139:23, 140:21,
142:4, 228:9
governments 163:2
Governor 8:15
governs 194:22
grab 94:20, 98:23,
100:11, 100:20,
150:13
Grant 3:34, 13:5,
61:10, 89:9,
101:17, 103:1,
111:3, 127:8,
135:22, 150:1,
152:13, 157:24,
159:19, 160:2,
160:16, 160:19,
160:21, 160:25,
175:2, 192:2,
215:12, 217:4,
224:16, 234:23,
235:7
granted 66:2, 68:24,
69:1, 70:9, 71:9,
71:11, 73:10,
74:4, 76:15,
76:21, 87:5,
117:13, 117:14,
123:8, 143:20,
156:1, 167:16,
171:11, 175:3,
178:16, 197:6,
198:9, 213:11,
214:18, 238:7
granting 68:11,
84:21, 102:6,
122:14, 122:24,
158:20, 159:2,
194:8, 225:3,
235:14, 236:14
grants 126:5
grateful 153:2
grave 191:4
Great 19:24, 69:21,
81:22, 92:22
greatest 74:18

greatly 76:1
gree 224:23
Gregg 3:7, 69:14
Gregory 197:24,
198:7, 199:13,
204:11
grievances 145:14,
145:15
gross 66:5, 66:18,
127:18
ground 53:19, 58:25,
168:19, 213:23
grounds 168:17,
168:24, 169:5,
170:12
Group 3:28, 4:13,
10:1, 27:8, 42:18,
42:20, 42:22,
44:1, 44:8, 44:21,
45:5, 45:23, 46:7,
46:11, 46:23,
47:2, 47:20,
50:15, 51:8,
51:17, 52:8, 53:6,
63:22, 144:3,
185:23, 186:17,
188:7, 188:17,
233:8
groups 12:9, 23:18,
29:15, 73:21,
184:2, 184:3,
184:13, 188:18,
196:2, 196:5,
196:9, 196:10
Guarantee 4:23,
18:11, 65:24,
150:2
guarantor 37:17
Guaranty 3:41, 3:43,
50:12, 117:4
guess 10:6, 76:22,
76:24, 88:6,
114:18, 156:2,
176:4, 179:12,
194:20, 213:7
guessing 160:5
guide 181:1
guiding 99:20
guy 186:1
guys 62:9

< H >
half 26:23, 27:3,
36:15, 113:6,
194:17
halfway 39:8
hall 78:11
hand 98:6, 129:2,
129:3
handful 130:1
handle 73:17
handled 177:10
hands 39:3, 162:10,
201:12
handy 142:15
hanging 83:6, 115:7
happen 14:3, 46:18,
58:18, 68:19,
69:24, 69:25,
70:8, 78:1, 94:21,
113:18, 116:3,
137:8, 137:9,
151:9, 166:7,
204:15, 222:6,
224:11
happened 12:7, 14:3,
26:1, 44:24,
83:23, 83:25,
84:18, 97:3,
143:13, 148:15,
215:3
happening 15:20,
84:6, 205:9
happens 30:8, 30:25,
48:5
happy 10:18, 17:6,
18:15, 18:17,
18:25, 57:15,
61:8, 71:3,
120:25, 121:10,
186:17
hard 70:5, 75:8,
125:25, 205:25,
226:2, 226:5,
238:23
harm 52:11, 53:6,
202:6, 202:23,
207:1
harmed 115:22

harms 201:17
Hastings 13:18
hat 64:18
haunt 66:5, 66:12
he'll 157:7
head 190:24
headed 28:7, 58:22
heading 18:23
heads 85:13, 153:20
headway 54:8
hear 7:11, 7:13,
   10:6, 15:5, 32:25,
   36:19, 45:15,
   61:8, 61:13,
   61:14, 61:23,
   62:1, 62:3, 68:11,
   68:19, 69:12,
   70:22, 70:24,
   88:18, 106:7,
   134:3, 157:7,
   157:17, 213:4,
   216:21
hearing. 227:7
hearings 14:3,
   193:22
heart 96:14
heartened 11:7
heavier 131:1
heavily 110:14
hedge 31:4, 61:12,
   63:6, 85:15,
   188:21
heightened 199:20
held 40:23, 82:20,
   135:10, 140:13,
   162:1, 206:14,
   208:17
help 31:18, 102:2
helpful 96:17,
   186:3, 210:13
herd 204:12
hereby 104:8
hereof. 226:25
herring 55:22, 150:5
high 15:24, 113:2,
   195:5
higher 22:1, 126:15,
   152:11, 225:7
highlight 202:16
hinder 130:15,

147:6, 147:10
hire 157:22
hired 83:9, 83:11,
   144:6
historical 231:5
history 66:20,
   106:14, 125:22,
   161:24
hit 180:18
Hoc 3:28, 10:1,
   27:8, 42:18,
   42:20, 42:22,
   43:25, 45:5,
   45:23, 46:7,
   46:11, 47:2,
   69:23, 181:23,
   181:24, 181:25,
   182:5, 184:2,
   184:3, 185:22,
   193:2, 196:2,
   233:8
Hold 40:10, 85:13,
   167:5, 178:5,
   207:19, 214:15
holder 79:21, 199:2
holders 11:2, 11:5,
   35:6, 46:7, 55:12,
   56:4, 73:8, 73:12,
   80:3, 80:12, 88:8,
   92:15, 177:22,
   187:16, 187:20,
   189:12, 194:14,
   196:16
holding 50:3
holdings 194:16,
   196:19
holds 115:18,
   160:23, 202:25
hole 47:3
holistic 163:6
home 163:21
homes 133:16
honest 127:19
Honorable 2:35,
   240:6
hope 9:4, 13:5,
   21:12, 64:17,
   64:20, 67:4,
   68:23, 135:23,
   210:13, 222:12

hoped 69:24
hopeful 69:25, 70:6,
   70:8, 71:1
hopefully 25:17,
   69:23, 89:11,
   220:5
hoping 154:7
host 140:25
hour 113:7, 165:13,
   214:2
hourly 156:22
hours 92:17, 92:18,
   158:4
HT 141:18
HTA 8:5, 8:9,
   141:16, 232:22,
   232:25, 233:3,
   233:19, 233:20
huge 42:1, 152:18,
   156:23
humongous 80:15
hundred 183:18
hundreds 126:19,
   168:13, 182:13,
   183:18, 185:21
hunting 223:25
hurdles 142:3
hypothetical 30:3,
   30:11, 43:23,
   58:23, 58:24
hypotheticality 64:5
hypothetically
   46:16, 171:1


< I >
idea 38:15, 46:14,
   81:25, 83:4,
   83:10, 116:10,
   134:8, 142:3,
   148:25, 149:6,
   207:17
ideas 46:2
identical 169:16,
   217:17, 223:25
identified 34:22,
   48:22, 75:24,
   79:10, 83:4,
   105:17, 227:5
identify 63:18,

75:1, 122:22,
205:18, 207:22,
207:23
identity 80:2
ignore 147:18
ignores 134:16,
170:1
ignoring 125:25
II 16:12
III 1:8, 1:24, 2:5,
19:5, 39:2, 44:10,
52:25, 123:6,
123:12, 159:20,
162:23, 192:12,
192:16, 196:17,
206:22, 223:22,
224:22
illusory 203:12
illustrative 76:8
imagination 127:12
imagine 32:12, 46:11
immaterial 169:19
Immediately 55:7,
66:4, 66:10,
198:10
immense 204:23,
205:12
imminent 11:4
imminently 13:2
immunity 133:12,
133:13, 134:1,
134:11, 148:11,
148:12, 148:16
impact 45:22, 48:25,
123:7
impair 52:11, 62:10
impairing 54:22
impediment 151:24,
210:11
impermissibly 129:8
implement 29:19
implementation 8:19
implicate 52:16
implicated 50:20,
163:24
implication 152:15,
215:15
implicitly 160:14
implied 146:4
implies 88:23

importance 10:11,
185:12
important 29:9,
52:20, 72:13,
93:15, 94:2,
100:8, 111:8,
128:10, 130:21,
140:12, 141:3,
149:13, 161:23,
163:18, 183:20,
206:22, 225:10,
228:19
Importantly 111:22,
112:11, 162:25
impose 152:13,
163:23
impossible 122:23,
124:24, 152:16,
152:17, 182:16
impractical 182:15
impression 11:3
improper 125:21,
130:3, 168:24,
168:25, 170:18,
171:13, 201:10
improperly 129:8,
137:13, 171:16,
171:17
improvidently 76:21
in. 225:20, 230:2
inability 236:9
inapposite 57:9
inappropriate 14:10,
122:15, 178:14,
220:4
inappropriately
208:4
Inc. 4:28, 195:7,
195:13
incapable 179:9
incentive 134:21,
200:21
inclination 26:4
inclined 215:12
include 109:11,
111:25, 149:14,
149:15, 173:1,
188:9, 224:20,
229:24, 230:5
included 13:24,

128:12, 138:7,
173:5, 174:16,
178:25, 197:25,
198:1, 198:2,
205:18, 217:21,
227:22
includes 221:5
including 6:18,
6:20, 6:25, 9:18,
14:8, 14:9,
121:22, 135:14,
135:17, 145:23,
168:23, 177:19,
178:10, 178:11,
181:9, 190:24,
196:1, 210:3,
212:1, 234:16,
235:6
incoherent 32:15
inconsistency 36:18
inconsistent 41:10
incorporated 82:9,
112:9, 159:10,
222:23, 230:20
incorrect 35:1,
38:16, 46:25
increase 208:10
increases 66:17
increasing 21:20,
22:1, 115:5
incredibly 203:12
incremental 99:20
incrementally 182:23
incur 203:6
indemnification
148:19
indemnity 133:25
indentured 73:4
independent 47:25,
131:22
indicate 160:15,
177:7
indicated 20:3,
72:4, 128:14
indicating 19:19
indication 98:7
individual 19:7,
75:5, 85:14, 88:7,
95:7, 109:10,
109:21, 109:23,

114:4, 116:9,
118:20, 120:10,
129:18, 133:10,
149:1, 179:18,
179:23, 183:14,
183:15, 183:17,
183:22, 184:4,
184:12
individually 114:22,
197:5
individuals 85:14,
85:17, 86:12,
86:21, 97:1,
105:20, 109:8,
109:14, 110:8,
110:10, 133:17,
134:5, 134:8,
134:20, 148:9,
149:4, 180:21,
183:19, 184:14,
194:16
indulge 18:13
indulgence 24:17,
178:24
ineffective 57:9
inexpensive 181:22
inferences 164:4
infirmities 51:7
inflection 61:5,
61:7
inflict 200:20,
201:6
info 75:4
information 6:14,
7:14, 76:4, 80:1,
80:13, 87:8,
97:20, 134:18,
154:11, 187:7,
199:2, 201:11,
203:18, 204:1,
204:5, 204:7,
205:4, 205:11,
205:20, 205:23
informative 19:19
informed 158:1
inherent 43:15
initial 36:11,
64:12, 75:18,
196:8, 220:19
initially 21:8

initiate 161:8
initiated 211:14,
218:18
initiating 217:12
injure 127:23
injury 44:7, 58:4,
58:5
injustice 191:5
inordinate 88:16,
88:19
input 11:18
inputting 92:8
inquired 7:25
inquiry 163:19
insider 147:12
insisted 66:24,
230:1
insolvency 102:16,
105:19, 117:23,
128:13, 131:19,
131:21, 131:23,
132:1, 142:7,
144:1, 146:15,
146:18, 146:22,
147:12, 147:13,
151:20
insolvent 108:7,
108:8, 108:15,
147:14
instance 37:11,
142:23, 158:9,
163:15, 204:7,
207:25, 208:24,
222:25
instances 104:6,
104:25
instant 160:14
instead 62:22,
181:22, 185:19
institutional 88:7
instructions 9:7,
11:25
instructive 161:9
instrument 177:24,
178:2, 178:17
instrumentalities
8:13, 75:10,
141:16
instruments 208:2
insufficient 162:17,

164:6
insufficiently
179:18
insurance 133:19,
133:22, 134:13
insure 44:7, 232:17
Insured 10:1
insurers 10:2,
196:1, 231:18,
232:17
insures 121:21
intelligent 89:24
intend 26:22, 55:20,
67:20, 96:10,
128:3, 131:25,
134:18, 135:5,
135:20, 137:3,
154:5, 156:3,
187:8, 231:8,
232:21, 232:25
intending 23:17,
34:2, 96:17, 135:1
intends 56:14,
127:21
intent 15:3, 31:5,
45:19, 130:15,
130:17, 147:6,
147:10, 163:9,
220:16
intention 41:19,
109:6, 147:9,
224:16
intentional 83:15,
130:8, 147:5,
147:20, 212:15
interactions 199:9,
199:23
interest 6:6, 30:21,
35:12, 72:15,
72:24, 73:9,
73:23, 77:19,
78:10, 85:17,
85:19, 85:25,
86:1, 88:3, 89:8,
89:14, 122:3,
156:12, 163:23,
190:16, 192:18,
192:21, 192:24,
194:2, 196:11,
237:8

interested 17:12,
    33:22, 35:11,
    63:18, 74:19,
    116:5, 133:15,
    185:20
interesting 114:10
interests 31:11,
    123:22, 123:24,
    162:12, 192:16,
    196:3, 196:6,
    196:9, 196:16,
    211:21, 211:24,
    236:17
interface 22:16
interfere 202:5
interference 66:19,
    99:5, 113:10,
    138:13, 140:21,
    149:22, 150:4,
    150:5
interfering 98:21
Interim 16:19,
    16:22, 16:23, 17:3
intermediary 192:11
interplay 98:2
interposed 189:5
interpretation
    112:20
interprets 235:5
interrelated 33:8
interrupt 67:14
interrupted 236:7
interrupting 115:13
intervention 35:22,
    49:4
introduction 95:24
invalid 30:22,
    32:20, 32:21,
    32:23, 33:6, 34:7,
    34:12, 35:8,
    38:23, 38:25,
    39:1, 45:11,
    45:12, 55:2, 55:4,
    74:1, 77:19,
    77:20, 180:22,
    182:21
invalidate 32:4,
    45:11, 55:20,
    58:20, 62:23,
    85:24

invalidated 46:8,
    62:3
invalidating 59:15
invalidity 31:15,
    33:4
investigate 74:13,
    122:12, 159:3
investigation 75:16
investigations
    11:17, 163:17
investment 182:14
investments 190:23
investors 9:8
invitation 60:5
invite 26:9, 193:17
invited 15:6, 54:11,
    143:23
inviting 48:6
invoke 63:25, 139:20
invoked 85:7, 140:10
invokes 86:19, 93:2
invoking 38:7
involve 147:2,
    163:3, 166:18,
    170:23
involved 16:4, 16:9,
    22:13, 22:14,
    23:5, 36:21,
    36:25, 39:20,
    39:21, 40:14,
    42:19, 44:21,
    64:24, 89:16,
    96:24, 98:15,
    109:20, 129:17,
    137:9, 193:5,
    230:10, 231:3,
    231:19, 231:21,
    232:13, 232:15
involvement 99:16
involves 15:12,
    15:15, 24:16
involving 41:19
ipad 226:14
ironic 55:8
irrational 82:24
irrevocable 190:13,
    191:1, 191:8
island 96:25
issuance 12:24,
    13:3, 136:2, 137:1

issuances 127:23,
    132:9, 132:13,
    196:7, 196:12
issued 6:11, 9:6,
    9:7, 31:23, 32:3,
    45:14, 91:1,
    135:15, 135:18,
    153:8, 189:8,
    196:17, 198:12,
    209:15, 220:18
Item 7:24, 11:25,
    16:12, 19:5,
    26:18, 71:21,
    92:24, 164:21,
    165:24, 182:2
items 238:14, 238:17
iteration 230:23
iterations 154:22,
    154:24, 234:16
itself 27:21, 29:20,
    32:13, 52:4,
    95:19, 114:20,
    144:15, 151:14,
    152:4, 169:18,
    172:21, 173:17,
    174:25, 204:2,
    204:15, 204:20,
    204:21, 221:11,
    236:16
IV 71:21, 164:21
IV.2 26:17
IV.3 26:18
IV.5 92:24
IV.6 165:24


< J >
J. 3:4, 3:44
Jan. 161:22, 162:6
Jason 4:10, 215:4
Jenner 125:10
Jerry-rig 224:10
jobs 81:24
John 96:1
join 52:18, 60:5,
    60:21, 118:14,
    150:3
joinder 95:6, 118:7,
    118:8, 118:9,
    124:14

joined 7:4, 79:5,
    194:21
joining 48:2, 120:1
Joint 24:8, 51:21,
    72:17, 102:23,
    153:18, 155:11,
    155:18, 201:1,
    225:12, 234:13
Jointly 1:11, 1:27,
    2:8, 103:7
joking 39:22
Jones 4:16
Jorge 4:17
Juan 6:1, 6:7,
    238:20
Judge 2:35, 2:36,
    7:22, 16:16,
    17:11, 18:1,
    34:10, 72:1,
    72:11, 79:23,
    80:6, 90:11,
    140:13, 151:23,
    153:24, 156:8,
    166:19, 197:24,
    198:7, 198:9,
    199:13, 201:8,
    204:11, 204:12,
    209:7, 240:7
Judges 12:2, 215:2
judgments 163:16,
    163:18
judicata 218:10
judicial 6:10,
    12:15, 52:19,
    160:11, 181:8
July 188:6, 222:7
jumbo 78:16, 78:17
jump 45:8, 147:25,
    214:3
jumping 59:1, 115:14
juncture 206:25
June 7:16, 8:9,
    16:19, 17:5, 17:9,
    17:14, 17:25,
    19:16, 20:9,
    21:14, 26:5,
    26:13, 26:16,
    69:2, 238:15
junior 189:1
jurisdiction 43:22,

44:11, 91:5, 91:18
justice 192:17,
    213:12
justiciable 44:12
justifiable 39:15,
    161:19
justification 62:10,
    164:6
justifies 29:12,
    29:17
justify 70:17,
    171:2, 236:14
justifying 86:6,
    235:1


< K >
Katherine 4:30
keep 12:12, 70:13,
    93:8, 126:24,
    134:23, 144:9,
    145:24, 153:12,
    157:10, 208:18,
    239:4
keeping 206:6,
    207:1, 238:25
Kentucky 35:2
kept 190:18
key 15:19, 51:21,
    111:8, 113:23,
    149:13, 201:12,
    231:12
kicking 65:1
kidding 109:5
Kim 74:15, 136:20,
    151:13, 151:15
kind 29:1, 41:14,
    44:15, 45:12,
    109:11, 114:25,
    125:23, 136:14,
    139:12, 181:18,
    199:4, 223:11,
    224:12
kinds 222:24
Kirpalani 3:38,
    39:15, 41:6, 42:7,
    42:9, 42:11,
    42:13, 47:7,
    56:23, 57:25,
    58:9, 59:1, 62:19

knock 64:21
knowing 78:10
known 108:14
knows 11:12, 11:16,
    12:25, 44:9,
    62:16, 62:17,
    65:4, 82:7,
    116:15, 123:22,
    128:12, 130:14,
    132:25, 133:2,
    140:19, 140:23,
    154:3, 155:24
Kobre 74:14, 136:20,
    151:13, 151:15
Krajick 7:4


< L >
labeled 168:7
laboratories 198:24,
    200:2, 205:15
laboratory 199:6,
    207:12, 208:1
laborious 73:7
Labs 195:13, 195:18,
    203:22
lack 30:19, 84:2,
    86:14, 86:15,
    86:19, 86:20,
    138:23, 147:15,
    177:2
Landon 4:7, 125:9
language 52:22,
    104:21, 227:4,
    227:11, 228:20,
    229:20, 231:16,
    232:16
large 11:11, 80:18,
    185:10, 185:25,
    189:13, 190:22,
    191:17, 194:21
largely 22:24,
    39:16, 99:15,
    124:15
larger 184:13,
    188:21
largest 66:22,
    198:23
lasting 66:25
Lastly 206:2

late 8:9, 45:13,
  46:7, 52:15
later 8:15, 15:13,
  18:24, 19:3,
  20:17, 21:16,
  24:18, 33:16,
  36:19, 38:15,
  38:16, 61:16,
  61:17, 62:4,
  63:13, 83:3,
  83:11, 88:19,
  126:7, 170:13,
  216:16, 223:3,
  225:1
latest 65:25, 166:4
latter 166:7, 167:12
Laura 2:35, 240:7
Lawful 3:36, 29:15,
  42:14, 45:5
lawless 84:22
laws 86:5
lawsuit 30:13,
  218:19, 229:9
lawsuits 153:15
lawyers 65:5, 135:2,
  135:21, 195:17
lays 51:24
lead 47:3, 107:19,
  107:20, 109:18,
  152:10, 187:23
learn 215:14
lease 51:22, 52:7
leases 51:2, 51:3
least 22:19, 40:6,
  57:24, 60:4,
  62:17, 93:5,
  97:21, 99:15,
  99:19, 112:25,
  126:13, 131:21,
  134:17, 142:2,
  153:17, 162:1,
  196:10
Leave 52:17, 62:9,
  68:25, 107:14,
  152:25, 166:16,
  211:12, 213:10,
  213:11, 215:8,
  215:12, 217:4,
  224:17
leaves 119:11

leaving 64:4
Lecaroz 3:11
lecture 147:5
left 18:22, 93:10,
  114:25, 138:13,
  186:7
legal 28:18, 29:6,
  49:17, 50:2,
  53:10, 89:24,
  115:7, 117:8,
  125:3, 141:25,
  184:7, 184:9,
  184:17, 184:24
legally 63:21,
  140:22, 142:5
legislative 125:22,
  161:24
legislature 8:15
legitimacy 139:21
Lehman 37:9, 112:7
lend 141:10
length 225:4
lengthy 58:21
less 15:11, 54:17,
  64:13, 78:18,
  93:7, 125:4,
  134:20, 156:17,
  185:17, 194:17
letter 63:23, 125:2
letting 134:24
level 15:2, 15:24,
  113:2, 131:1,
  180:21, 181:7
levels 168:24
lever 123:13, 162:9
leveraged 141:11
liability 31:7,
  37:24, 58:6,
  59:25, 60:1,
  128:7, 149:16,
  200:19, 201:1
liable 30:7, 37:19,
  40:24, 40:25,
  41:2, 41:4, 132:20
liberal 213:10,
  214:18
lien 149:6, 209:23,
  216:2
liens 133:16,
  215:25, 216:8,

216:23, 219:25,
  221:16
life 15:15, 45:13,
  56:10, 214:25,
  217:24
Lift 67:21, 68:1,
  69:18, 71:12,
  198:6, 198:16,
  214:13
lifted 199:10,
  199:20, 202:6
lifting 191:15,
  200:13
light 26:12, 183:16,
  211:18, 222:20,
  235:21, 237:3
likelihood 78:10
likely 9:19, 13:10,
  61:6, 85:10,
  115:21, 142:12,
  156:19, 203:8,
  205:25
likewise 46:22
limit 27:15, 27:18,
  28:3, 32:1, 32:2,
  32:7, 32:14,
  32:22, 33:6, 35:4,
  55:5, 59:19,
  59:25, 187:13,
  189:9
Limitation 41:21,
  235:20
Limitations 41:17,
  56:9, 56:16,
  73:18, 76:17,
  76:24, 77:4, 79:6,
  82:13, 85:8,
  85:12, 88:11,
  88:21, 91:9,
  91:15, 93:18,
  93:19, 97:22,
  106:6, 111:11,
  111:17, 112:12,
  114:7, 201:4,
  229:7, 237:3
limited 6:20, 7:1,
  68:24, 78:2,
  91:11, 102:1,
  107:12, 109:16,
  113:1, 124:14,

125:22, 135:6,
149:25, 162:2,
168:17, 192:3,
198:18, 205:4,
205:23, 207:3
limiting 95:19
limits 187:22
line 20:23, 54:6,
89:4, 234:7,
235:5, 237:19
link 116:4
liquidation 151:1
list 24:25, 55:12,
87:22, 87:23,
107:22, 107:24,
109:3, 109:4,
117:19, 145:21,
146:17, 146:20,
146:21, 146:25,
149:17, 153:9,
154:19, 154:24,
155:4, 155:5,
155:6, 208:20,
223:19
listed 17:21, 17:22,
17:23, 104:10,
104:11, 107:7,
108:20, 110:21,
110:25, 118:20,
147:12, 147:17
listen 47:2, 193:25,
194:4, 197:6
listening 97:14,
222:18
lists 102:20, 107:8,
107:22, 108:25,
144:5, 144:13,
153:12
Listservs 63:19
literal 119:25
literally 78:9, 80:9
litigants 180:23,
181:3, 183:3,
183:8, 183:10
litigate 34:3,
34:11, 35:13,
37:23, 89:12,
89:13, 89:23,
161:18, 204:9,
204:20, 206:15,

217:5
litigated 34:13,
39:6, 49:18,
49:24, 63:11,
90:8, 189:10,
189:17
litigating 38:11,
38:13, 113:20,
196:19
litigations 49:16,
115:22, 206:6
litigators 128:16
little 18:18, 88:18,
92:21, 98:1,
125:12, 125:15,
133:19, 157:12,
179:6, 195:24,
209:12, 214:24,
217:15, 222:23,
223:14
live 164:17, 230:2
lives 82:16, 82:23
living 96:19, 109:14
Llauger 4:18
LLC 2:29
LLP 51:16
loan 37:17
loathe 162:1
local 181:24, 182:1,
183:2, 193:1
locked 225:20
locking 61:12
logging 225:20
logic 31:25, 32:10,
33:4, 37:8, 38:24,
56:1, 59:24,
62:24, 190:24
logical 59:2, 59:4,
196:14
logically 61:23,
62:11
logistically 97:11
long 66:19, 68:13,
68:15, 68:16,
79:22, 92:13,
108:1, 128:18,
129:10, 155:15
longer 32:21, 69:2,
73:18, 76:3, 89:3,
113:11, 123:10,

131:22, 144:1,
231:3
Look 19:3, 47:4,
48:10, 48:12,
52:13, 58:11,
72:25, 104:20,
106:13, 110:20,
130:16, 130:18,
145:16, 146:19,
151:12, 157:24,
161:19, 165:7,
170:8, 200:12,
219:6, 221:3,
222:12, 222:17,
226:15
looked 35:19, 37:22,
76:3, 76:4, 88:23,
101:3, 130:19,
131:6, 131:7,
133:1, 147:22,
180:25, 220:24,
222:7
looking 15:23,
72:23, 74:23,
78:14, 88:13,
99:3, 156:12,
189:3
loop 155:10
lose 31:9, 32:8,
49:19, 153:21
losing 129:23
lot 8:23, 10:18,
11:24, 12:21,
14:20, 78:19,
97:2, 105:5,
106:3, 110:16,
115:6, 131:2,
141:6, 186:2,
210:13, 218:12,
230:20, 231:11
lots 83:20, 84:8
love 39:19, 54:18
Luc 3:14, 13:18,
144:23
lucrative 164:5
lunch 71:20, 92:1,
92:2

< M >

M. 3:7
ma'am 211:5
machinery 130:16
Madison 131:9
Magistrate 73:11,
    79:23, 199:13,
    201:8, 204:12
magnitude 21:17
mail 53:3
main 27:12
Mainland 3:34,
    111:2, 111:3,
    114:9, 115:2,
    115:11
maintaining 210:11
major 10:2
majority 104:11,
    115:20, 203:15,
    203:18
malfeasance 30:5
malintent 214:5
manage 23:16, 43:16
Management 1:10,
    1:26, 2:7, 3:24,
    86:17, 90:18
managing 201:13
mandate 12:24, 13:3,
    122:11, 122:14,
    122:21, 220:16,
    220:17, 220:18,
    220:19, 221:8
maneuver 183:25
maneuvering 184:3
Manges 18:10, 65:23
manipulate 29:14,
    38:19
manner 115:21,
    190:1, 192:17,
    231:1
manufacturer 40:23
manufacturing 40:24
map 174:10
March 20:19, 93:25,
    167:16, 189:16
Margaret 3:6, 209:5
Mark 3:30, 27:7,
    164:23
marked 225:25,
    226:19
markets 141:12,

163:13
markup 222:19
Marrero 197:11,
    202:17, 207:2
Martin 3:4
MASHBERG 3:7, 65:15,
    69:12, 69:13,
    69:14, 71:6
Mass 67:23, 161:22,
    195:14
Massachusetts 181:5
Master 141:7,
    151:12, 167:14,
    168:9, 173:22,
    174:3, 174:10,
    177:21, 178:2
matched 153:14
material 48:25,
    100:2, 105:12,
    110:20, 155:19,
    210:4, 227:1
materialize 53:10
materializes 52:4
materially 109:23
materials 155:13
math 59:16
matter 18:14, 24:7,
    24:9, 27:5, 29:24,
    32:17, 38:11,
    39:7, 43:22,
    57:19, 57:21,
    60:5, 65:12,
    71:19, 73:5,
    84:19, 86:6, 91:5,
    91:17, 91:21,
    110:1, 117:24,
    124:18, 126:16,
    136:8, 141:13,
    172:25, 181:22,
    182:24, 188:13
matters 11:12,
    11:21, 17:19,
    19:6, 50:1, 63:25,
    207:5, 237:14
maximize 163:4
maximizing 163:17,
    196:13
Mayer 4:28, 115:12,
    115:17, 115:18,
    117:1, 121:14,

144:20, 229:12,
    230:8
mean 30:18, 46:6,
    49:20, 53:5,
    63:21, 82:7,
    94:11, 129:13,
    149:3, 172:14,
    172:17, 196:10,
    203:20, 203:21,
    204:19, 204:20,
    230:22
meandering 111:23
Meaning 41:19,
    108:11, 113:15,
    143:2, 145:4,
    187:1
meaningful 78:20,
    89:23
means 80:10, 86:1,
    86:2, 106:13,
    108:6, 122:10,
    125:16, 138:15,
    146:23, 149:24,
    150:17, 183:9,
    192:15, 193:6,
    226:21, 236:25
meantime 67:9, 68:8,
    225:10
measure 131:24,
    164:1
measures 8:20,
    180:20
meat 179:6
mechanical 224:16
mechanism 159:19,
    225:2, 227:14
mediated 12:2
Mediation 12:1,
    12:13, 12:15,
    14:4, 14:22, 15:4,
    15:5, 15:8, 15:19,
    16:8, 90:2
mediations 12:6
mediators 12:5,
    12:7, 12:12, 14:4,
    14:8, 14:11,
    14:15, 14:23, 16:3
medium 189:13
meet 84:17, 122:16,
    164:15, 168:21,

224:18, 225:7
meetings 23:17
Mellon 170:5, 173:5,
   173:9, 174:3,
   177:23, 178:12
member 63:22, 143:16
members 6:6, 13:9,
   73:22, 95:2, 95:7,
   110:7, 110:8,
   129:5, 188:10,
   203:5, 203:6,
   205:13, 227:11,
   228:21, 228:23,
   229:2, 230:25,
   235:15, 236:18
membership 188:8
mention 44:9, 84:5
mentioned 12:18,
   45:19, 61:2,
   118:9, 119:11,
   137:23, 137:24,
   142:8, 149:20,
   157:4, 204:16,
   228:7
mentioning 107:20
mentions 151:18
merely 75:11, 163:4,
   195:6
merit 105:2, 138:23
merits 26:11, 38:2,
   199:17
mess 125:12, 222:23
message 105:3,
   106:2, 106:4
met 23:4, 124:16,
   195:19, 213:10,
   234:25
method 163:11,
   235:24
methodology 32:11
methods 192:25
Miami 129:14
microphone 157:17
mid 9:16
migrated 103:5
Milbank 47:14,
   110:25, 111:3
Miller 3:33, 47:10,
   47:11, 47:13,
   47:14, 50:8, 60:4,

63:4, 232:5,
   232:6, 233:19
million 75:5, 75:19,
   115:19, 126:14,
   194:17, 205:12
millions 148:7,
   151:7, 163:21,
   197:21, 202:2
mind 129:7, 153:17,
   157:11
mindful 140:12,
   198:17
minds 130:16
minimal 202:24
minimis 109:20
minimum 126:17,
   133:12
minted 28:2
minute 26:23, 35:6,
   96:13, 165:12,
   167:23, 186:8,
   197:18, 225:21
Miranda 142:17
mirror 217:19
misapplication 57:25
mischaracterization
   62:21
mischaracterizes
   54:19
mismanagement 66:5,
   66:18
misses 216:11
mission 8:18, 10:13,
   233:9
misunderstand 169:8
misunderstanding
   127:19
misunderstood 218:15
mix 153:10
model 111:13
modest 182:8,
   189:13, 190:18,
   191:4, 191:18
modest-sized 179:23
modified 139:23
modify 21:19, 43:2
MOERS 4:28, 115:12,
   115:18
moment 33:10, 34:22,
   54:3, 153:1,

177:5, 177:12,
   205:10, 208:15,
   211:13, 233:25
Monday 129:23,
   154:18, 230:20
monetary 126:11,
   145:15
money 56:17, 75:12,
   82:22, 85:22,
   110:15, 114:20,
   141:10, 152:15,
   152:18, 173:7,
   207:4
monitor 193:22
monitoring 8:19
monoline 10:2, 196:1
monolines 226:21,
   227:3, 227:10,
   231:18, 232:9,
   232:13, 232:15
Monsita 3:11
month 67:2, 70:10
months 39:6, 58:21,
   64:22, 74:24,
   106:22, 119:7,
   143:16, 158:13,
   185:17, 213:19
monumental 8:23,
   75:24
moot 203:9, 207:5,
   214:8, 217:8
mooted 216:21
mootness 175:24
Morales 233:7
MORGAN 4:24, 18:9,
   18:12, 18:13,
   18:22, 18:25,
   19:4, 53:14,
   53:15, 53:18,
   121:16, 121:18,
   124:11, 233:16,
   233:17
Morrison 188:17
motions 11:21,
   61:21, 69:17,
   83:21, 89:5,
   102:23, 146:11,
   155:14, 159:17,
   198:1, 205:6,
   223:5

motivation 109:12
motive 125:21
mountain 120:24
mouth 110:15
Movant 95:11, 118:5,
    119:21, 120:6,
    120:7, 123:17,
    180:1, 195:3,
    195:19, 197:17,
    202:24, 204:16,
    206:3, 206:5,
    208:25
movants 28:17, 74:5,
    158:22, 202:20,
    202:24, 203:10,
    203:17, 206:14,
    234:25, 235:13,
    238:8
move 16:12, 28:14,
    43:3, 98:13,
    119:23, 124:23,
    157:6, 211:11,
    214:13, 218:9
moved 198:11
moving 8:19, 10:7,
    21:16, 67:24,
    105:5, 146:23,
    207:3
multiple 8:1, 35:15,
    49:18, 50:2,
    84:11, 101:19,
    105:15, 139:2,
    168:24, 174:15,
    198:1
multiplicity 185:14
multitudinous 11:23
Municipal 3:43,
    116:2, 138:12,
    144:19, 145:6,
    161:25
municipalities 163:2
musings 172:10
muster 28:2
mutual 10:14
mutually 10:20
Myers 137:21, 202:11
myself 15:5, 74:15,
    180:22, 190:25,
    224:1, 225:20
mystery 62:15, 62:17

myth 94:5


< N >
N. 4:10
name 38:8, 51:15,
    80:11, 109:14,
    116:19, 129:20,
    144:12, 197:20,
    214:25
named 134:19
namely 129:18
names 73:8, 73:12,
    79:22, 80:5, 80:7,
    145:21, 154:20,
    207:17
naming 29:15, 109:18
nanosecond 46:21
narrow 168:22,
    175:13
National 4:22, 7:13,
    18:7, 18:10,
    18:16, 53:15,
    65:13, 65:23,
    66:2, 66:22, 67:3,
    67:5, 67:7, 70:16,
    121:19, 121:20,
    121:23, 122:1,
    123:18, 145:17,
    226:22, 233:18
nature 29:4, 31:20,
    32:15, 40:18,
    86:22, 119:9,
    119:16, 140:3,
    159:16, 169:8,
    211:10
navigate 97:24
near 157:16, 194:18
neater 223:17
neatest 220:7
necessarily 46:15,
    120:2, 120:4,
    163:18, 232:15,
    237:8
necessary 34:18,
    41:9, 48:3, 60:21,
    61:1, 71:13,
    155:12, 195:1,
    195:4, 195:20,
    196:21, 221:25,

222:12, 236:20,
    237:2, 237:22
necessitated 210:7
necessity 153:16,
    176:18, 177:2,
    235:13
needed 103:14, 231:7
needs 29:18, 44:11,
    44:12, 56:11,
    66:4, 66:14, 85:8,
    123:5, 136:11,
    146:4, 146:7,
    163:15, 163:20,
    163:22, 181:15,
    189:14, 204:15
negative 76:3, 149:2
negligent 40:22,
    40:23
negotiated 9:19,
    184:10, 184:18,
    233:1
negotiating 11:2,
    11:6
negotiation 162:13,
    184:14
Negotiations 10:1,
    10:4, 10:7, 10:10,
    10:20, 10:24,
    11:9, 12:9, 12:18,
    63:20, 66:21,
    66:23, 67:3, 67:4,
    67:10, 70:11,
    81:8, 123:7,
    129:1, 136:14,
    137:8, 152:16,
    162:9
nevertheless 105:1,
    130:6
newer 135:8
newly 28:2, 155:19
news 88:8, 92:22
Next 12:16, 22:4,
    25:6, 25:17,
    26:18, 45:4, 70:1,
    70:7, 71:2, 87:4,
    91:20, 116:13,
    116:14, 117:2,
    133:13, 137:5,
    150:3, 164:21,
    186:2, 208:20,

225:12, 227:2,
228:12, 229:19,
238:18
nice 45:15, 54:1,
224:2
night 7:7, 67:16,
129:22, 137:25,
156:2, 230:20
Nine 75:20, 117:17,
128:6, 129:22,
139:1, 162:3,
163:2, 179:2,
205:14
Nine. 138:3
Ninth 43:13
No. 1:6, 1:22, 2:3,
2:19, 62:1, 76:22,
90:12, 90:20,
101:23, 108:8,
121:13, 170:11,
227:9
nobody 58:16, 125:16
nominal 118:16,
203:13
non-926 104:11
non-compliant 200:3,
205:18
non-consensual
117:13, 139:4,
160:2, 164:10
non-debtor 198:5,
198:22, 204:3,
204:6, 204:7,
204:22, 204:23
non-issue 143:14
non-participants
52:17
non-recourse 149:5
non-substantive
168:7, 169:2,
170:20, 171:12,
175:14, 176:25,
177:15
None 5:5, 5:10,
30:10, 113:21,
169:14
Nor 6:14, 66:20,
69:17, 83:18,
160:8, 176:18
norm 196:21

normally 96:11,
126:1
notably 21:20
note 7:3, 55:23,
93:10, 120:12,
121:20, 121:23,
142:18, 164:11,
171:5, 173:13,
175:19, 193:10,
206:20, 233:18,
234:3
noted 123:4, 140:14,
142:10, 142:11,
204:2, 205:3,
205:8, 206:7,
206:17, 207:25
Noteholder 4:12,
51:17
notes 6:16, 6:17,
115:5, 238:2
Nothing 20:16,
53:12, 58:22,
64:9, 64:10,
73:18, 83:23,
84:18, 85:11,
85:22, 104:23,
106:12, 118:13,
133:18, 135:25,
143:19, 150:24,
156:13, 170:3,
170:20, 239:3
noticed 19:8, 19:10,
19:12, 38:12,
45:19
Notices 45:1, 45:18,
86:12, 183:19,
193:24, 205:5
noticing 192:10,
203:21
noting 74:10
notion 89:17, 99:2,
127:10, 133:8,
138:18, 141:21,
170:5
Novak 115:14
novel 45:9, 142:21,
150:9
November 74:11
nowhere 149:16
nullity 223:5

numbers 174:11
numerous 8:20, 59:5,
195:25, 206:7
NYS 131:9


< O >
o'clock 25:11, 92:1,
129:22
O'melveny 21:7,
137:21, 150:23,
202:11
object 87:2, 87:7,
87:10, 156:19,
179:5, 182:21,
188:23, 232:24,
232:25
objected 36:22,
86:8, 117:7,
186:23, 186:24,
187:1, 213:23
objecting 37:1,
121:25, 168:8
objections 11:10,
11:16, 19:6, 20:5,
20:6, 20:7, 54:6,
73:20, 78:23,
87:18, 155:12,
172:14, 172:18,
186:25, 232:14,
234:19, 234:23,
234:24, 238:6
objectors 47:8,
73:21, 74:5, 94:3
obligating 160:6
Obligation 3:29,
80:17, 90:6,
121:22, 123:24,
124:5, 134:3,
183:22, 191:7,
194:15, 196:4,
196:12
oblique 97:19
observed 6:22
observing 6:7
obtain 151:6,
161:12, 201:22,
220:16
obtained 107:13,
151:6

Obtaining 8:24,
  205:19
obvious 15:16,
  105:16, 121:24,
  128:2
Obviously 11:23,
  55:18, 95:15,
  97:13, 98:15,
  99:17, 99:24,
  99:25, 100:22,
  101:17, 109:6,
  113:1, 113:16,
  120:17, 145:16,
  175:6, 201:19
occupy 12:21
occur 8:17, 78:2,
  78:12, 104:1
occurred 67:3,
  136:22, 184:10
occurring 67:5,
  78:12, 87:3, 202:1
October 70:11
Off-track 162:5
offensive 149:7
offer 131:17, 176:9,
  238:21
offered 5:5, 5:10,
  128:1, 129:4,
  147:1, 194:19
offering 60:9, 64:8,
  95:6, 151:17,
  196:8
offerings 135:17,
  151:14
Office 18:22, 20:22,
  20:24, 21:11,
  21:25, 22:12,
  23:7, 23:12,
  23:16, 83:19,
  192:23
officers 105:21,
  109:11, 116:12,
  116:13, 116:14,
  133:10, 133:12,
  134:1, 134:5,
  145:10
offices 116:9
Official 3:13, 4:3,
  72:19, 75:23,
  88:1, 99:1,

158:17, 158:23,
  194:14, 195:23,
  240:14
often 10:17, 123:23,
  149:4
Oil 161:10, 197:22,
  198:23, 199:5,
  199:25, 200:2,
  200:4, 203:22,
  207:12, 207:22,
  207:23
old 35:3, 35:7,
  115:20, 120:17,
  135:9, 135:14,
  217:10, 223:22,
  223:25
ominous 47:2
omission 138:14
omits 212:14
omitted 138:10
Omni 7:16, 15:2,
  17:9, 19:16, 26:5,
  26:13, 26:16,
  69:3, 69:7, 71:14
Once 19:1, 63:23,
  83:14, 128:12
one-week 68:4, 68:5,
  71:10
one. 146:7, 223:4
onerous 195:6
ones 34:2, 79:14,
  124:8, 223:6,
  224:1
ongoing 8:3, 8:25,
  10:3, 12:5, 12:8,
  14:22, 17:19,
  22:5, 24:16,
  172:10, 189:4,
  202:5, 239:1
online 181:1
open 24:11, 26:23,
  127:25
open-ended 89:19,
  122:11, 122:21
opening 42:20,
  42:23, 42:25,
  43:5, 43:11,
  43:13, 57:6, 93:3,
  110:13, 176:13,
  180:8

operate 183:10
operating 141:16,
  162:3, 184:5
operational 141:15
Opinion 37:21,
  106:14, 110:5,
  130:1, 132:19,
  188:11, 221:13
Oppenheimer 4:27,
  115:18, 124:14
opponent 50:9
opponents 53:18,
  61:20, 74:2, 76:12
Opportunities 2:28
opportunity 19:22,
  28:12, 62:18,
  63:12, 63:19,
  76:20, 77:23,
  87:10, 129:5,
  137:5, 217:1,
  238:3
oppose 18:16, 61:21,
  188:23
opposed 33:24,
  34:21, 35:23,
  83:15, 88:7,
  128:11, 176:19,
  184:4, 223:17
opposes 160:18
opposing 73:21
opposite 108:19,
  139:13
opposition 7:11,
  7:12, 87:13,
  102:4, 116:23,
  232:4, 232:7,
  233:9
oppositions 110:25
option 181:3, 182:8,
  182:13, 193:1,
  193:3
options 193:6
oral 57:11, 57:14,
  210:23
orally 7:13
Ordered 109:3,
  219:20, 220:2
orderly 43:10, 52:21
Orders 6:11, 193:23
ordinarily 194:7

ordinary 192:6,
  193:9
organize 185:20
organized 99:25
orient 42:15
original 30:12,
  37:20, 37:24,
  38:3, 58:6, 75:16,
  81:1, 135:15,
  154:17, 210:19,
  211:15, 212:14,
  226:19
originally 177:18,
  194:18
ostensibly 172:4
OTB 140:13, 151:1,
  151:10
others 40:16, 45:24,
  77:15, 109:17,
  158:14, 164:14,
  168:14, 182:8
Otherwise 6:23,
  42:3, 66:10,
  103:14, 123:19,
  130:24, 133:22,
  134:16, 134:25,
  135:11, 138:15,
  156:3, 157:1,
  166:17, 199:10,
  200:9, 203:6
ought 89:9, 89:17,
  90:4, 90:8, 129:3,
  130:7, 136:23,
  176:14, 179:13,
  190:10, 191:6,
  221:3
ourselves 46:15,
  90:1
outcome 73:2, 196:18
outline 95:22,
  107:7, 107:8,
  108:20, 152:8,
  189:11
outlines 152:8
outset 38:18, 180:11
outside 6:13,
  102:17, 160:17,
  160:20
outweighs 162:22
overall 8:18, 9:4,

10:11, 136:5,
  182:6
overbroad 36:8,
  122:5
overcharge 208:8
overcharges 208:8
overcome 142:2,
  146:12
overpayment 208:6
overridden 138:19,
  184:22
override 170:4,
  170:6
overrule 234:22
overruled 178:19,
  238:7
overseen 201:8
oversimplification
  81:22
overture 210:25
overwhelming 115:19
owed 135:9
own 11:5, 25:11,
  28:3, 31:9, 32:10,
  32:15, 33:3,
  38:23, 42:15,
  42:25, 43:17,
  45:20, 46:12,
  86:5, 108:23,
  115:15, 122:6,
  141:20, 160:6,
  182:15, 185:23,
  196:22, 210:8,
  229:2
owns 121:21, 137:2

< P >
P. 3:27
P3 9:6, 9:11, 9:16,
  9:17
packaged 137:6
packages 223:18
PAGE 5:3, 5:8,
  165:8, 169:18,
  181:2, 219:18,
  226:24, 228:12,
  230:3, 230:21
pages 77:14, 115:10,
  128:18, 165:22,

240:4
pagination 219:17
Pagnini 161:21
paid 123:23, 123:25,
  135:3, 156:22,
  173:7, 197:22
pain 200:20, 201:6
paper 192:22,
  193:11, 193:13,
  193:16
papers 26:4, 31:4,
  43:11, 43:21,
  46:3, 83:2, 83:19,
  116:1, 116:21,
  119:12, 123:5,
  124:14, 126:15,
  129:22, 138:1,
  141:6, 166:24,
  183:4, 183:6,
  183:7, 189:7,
  199:7, 216:6,
  217:17
paperwork 223:10
par 182:20, 184:16,
  186:22
paragraphs 57:5,
  179:1
parallel 67:11,
  67:12
parameters 126:6
parcel 139:1
parens 139:16,
  139:20
pari 147:8
parte 91:7
partial 55:22
partially 11:15
participants 6:8,
  34:24
participate 9:12,
  33:18, 36:5,
  42:12, 45:20,
  48:6, 48:18,
  48:20, 52:15,
  53:3, 53:4, 62:18,
  192:15, 192:22,
  200:22
participating 52:12
Participation 45:1,
  45:18, 46:4,

63:16, 86:13, 180:21, 193:7, 193:23, 197:7
particular 6:16, 23:10, 23:11, 61:7, 82:3, 91:11, 91:16, 107:21, 108:21, 119:2, 122:25, 155:3, 166:12, 175:9, 181:15, 184:4, 194:10, 195:15, 196:12, 208:7, 233:3, 238:5
Particularly 82:4, 133:15, 142:1
partner 166:16
parts 105:5, 138:8
party 16:4, 30:7, 30:21, 31:1, 34:18, 37:15, 37:17, 37:18, 37:25, 44:5, 44:13, 48:3, 88:17, 91:15, 94:18, 104:2, 104:3, 123:9, 123:19, 124:7, 159:19, 160:25, 185:5, 186:16, 194:2, 203:16, 204:1, 229:12
passed 201:24
passes 32:13, 201:21
passing 21:8, 28:2, 137:25
passionate 68:12
past 20:11, 53:21, 141:22, 158:13
path 21:22, 28:6, 28:7, 28:8, 38:22, 47:1, 60:9, 184:10, 209:21
patriae 139:16, 139:20
Paul 13:18
pay 56:7, 58:2, 82:22, 89:25, 134:4, 134:12, 135:9, 148:23,

165:7
paying 73:5
payment 85:17, 173:10, 173:23, 174:14, 175:4, 178:9, 178:17
payments 72:16, 72:24, 73:9, 73:24, 75:2, 75:5, 75:14, 75:19, 75:25, 76:1, 76:2, 78:10, 85:19, 90:25, 196:25
pen 149:24
pendency 177:7
pending 11:16, 13:3, 68:2, 172:22, 176:18, 177:3, 178:5, 202:18, 236:8
pennies 148:20
pension 10:13
per 21:23, 182:5
perceived 151:12
percent 74:22, 156:9, 156:10, 158:4, 231:25
percentage 156:25
PEREZ 3:21, 202:10, 202:12, 202:13, 203:24, 204:14, 205:3, 207:8, 207:9
perfect 30:1, 64:13
perfected 221:17
perfection 211:17, 211:19, 215:17
perfectly 16:1, 16:7
performed 129:25
perhaps 45:10, 79:19, 92:12, 110:19
period 17:3, 19:13, 56:9, 56:16, 67:25, 71:11, 72:25, 75:3, 76:1, 76:3, 82:4, 82:5, 89:10, 91:11, 100:18, 101:13, 112:17, 236:1

periodic 73:9
permission 92:11, 153:24, 166:14, 193:21, 194:8, 194:11, 197:6
permit 86:24, 162:7, 181:9, 194:3, 220:6, 224:5, 235:7
permits 101:6, 235:10
permitted 6:20, 86:2, 140:22, 181:16, 222:3
person 6:13, 6:20, 24:1
personal 115:15, 149:11, 182:15
personally 114:18, 129:5
personnel 8:22
perspective 22:2, 67:7, 74:17, 87:19, 88:6
persuaded 91:4, 91:13, 195:21
Pertinent 168:16, 168:18, 169:4
peruse 74:25
Peter 3:19, 4:32, 137:20
petition 12:25, 81:21, 203:3, 209:18, 209:23, 212:22
phase 45:7, 46:2, 187:11, 187:21, 189:7, 199:3, 202:4, 207:20
phases 95:15
phasing 199:14
phone 129:9, 186:2
PHV 3:4, 3:5, 3:6, 3:14, 3:15, 3:19, 3:20, 3:21, 3:26, 3:27, 3:30, 3:33, 3:34, 3:38, 3:44, 4:7, 4:10, 4:13, 4:18, 4:20, 4:24, 4:25, 4:28, 4:30

physically 6:22
pick 81:18, 101:9,
    186:18
picked 138:16,
    189:18, 191:13
picking 100:24,
    183:24
picture 39:17,
    109:22
pie 94:7, 94:8,
    94:12, 94:13,
    94:16, 115:6
piece 92:22
piggy 141:8
piggyback 125:13
pilot 40:22
pitch 129:10
pitched 36:6
place 19:2, 34:14,
    45:5, 74:9, 74:20,
    102:7, 125:25,
    149:12, 198:16,
    204:18, 206:7,
    207:2
plain 46:8, 48:5
Plaintiff 2:24,
    37:20, 37:24,
    77:5, 79:4, 99:18,
    114:12, 114:14,
    116:19, 152:20,
    197:12, 228:3,
    228:17
Plaintiffs 4:15,
    96:22
plane 40:21, 40:23,
    40:25, 223:10
plans 8:4, 8:9,
    8:25, 12:10,
    12:20, 160:8,
    229:21
play 28:20, 34:17,
    234:7
playing 180:21
plead 130:14, 133:6
pleading 31:5,
    46:22, 46:24,
    101:14
pleadings 172:4,
    182:2, 222:14
Please 27:1, 33:12,

46:18, 65:19,
    71:18, 115:17,
    165:10, 209:1,
    225:12
pleased 7:5, 10:3,
    10:4
pled 131:10, 131:12
pledge 190:12,
    190:13, 191:1,
    191:8
plenty 185:22,
    199:5, 219:14
plus 27:13, 146:11
PM 92:4, 153:22,
    153:23, 239:5
pocket 94:14
pocketing 152:15
podium 68:25, 83:17,
    85:1, 92:23,
    121:12, 152:25
point. 10:5, 16:6,
    51:21, 68:18,
    69:20, 88:9,
    109:7, 118:18,
    171:11, 189:21,
    215:14
pointed 52:21, 74:3,
    176:12, 214:10
points 47:15, 54:8,
    61:5, 62:6, 81:13,
    82:17, 87:16,
    113:23, 140:2,
    141:24, 145:13,
    146:2, 157:10,
    176:23, 180:20,
    190:6, 202:16,
    207:11, 232:7
policies 6:11,
    181:8, 192:7
policy 110:2, 110:4,
    133:23, 159:21
political 66:19,
    163:7, 163:20
pondering 234:5
poor 40:11
Portfolio 37:9
portion 136:24,
    179:17, 228:19
portray 141:7
portrayed 39:4

position 21:13,
    41:25, 62:12,
    91:15, 100:23,
    124:16, 139:15,
    140:8, 147:4,
    147:14, 154:14,
    167:10, 169:25,
    186:15
positions 108:19
positive 10:16,
    11:1, 132:16,
    146:7
possibility 13:8,
    113:17, 115:14
possible 10:12,
    60:17, 97:25,
    100:13, 115:15,
    220:7
possibly 67:18,
    80:12, 154:13
post 184:23
pot 150:11, 152:18
potentially 38:3,
    48:23, 77:19,
    142:20, 160:5,
    160:7, 164:5,
    185:21
Power 2:13, 91:13,
    103:16, 139:16,
    160:11, 160:16,
    236:14
powers 43:7, 139:23,
    140:21, 141:2,
    162:2, 237:16
ppoint 190:10
practicable 230:9
practical 125:15,
    136:7, 182:8,
    182:10, 182:13,
    182:19, 195:11,
    237:4
practically 96:20,
    105:9, 105:12,
    150:10, 150:16,
    196:17, 222:19
practice 96:9,
    213:17, 234:20
practices 192:7,
    192:15, 193:9
PRASA 8:5, 8:9

pre 55:3
pre-2008 212:1
pre-2012 31:2,
    205:23
pre-petition 148:19
pre-promesa 85:19,
    85:23, 184:20
precedent 79:2,
    79:6, 115:24,
    144:17, 145:7,
    150:24
precedential 233:2
precedents 149:8
precedes 222:21
precious 15:14
precisely 57:17,
    63:8, 66:24,
    76:14, 107:10,
    150:14, 196:6
precision 76:14
preclude 91:8
precluded 76:16,
    76:23, 102:10
precluding 200:20
precondition 38:4
predicate 48:19,
    51:3, 59:3, 59:5,
    127:17, 209:17,
    213:8
predicates 48:7
predicating 212:23
predict 77:21
predictions 47:2
preempt 24:14
prefer 222:24
preference 69:2,
    88:20
preferences 75:2
preferred 151:14,
    186:1, 231:7
prejudged 176:14
prejudice 38:17,
    62:7, 91:14,
    201:21, 202:1,
    202:3, 206:19,
    214:10, 214:19,
    217:11
prejudiced 35:15,
    206:10
prejudicial 62:5

preliminary 93:13,
    122:7, 154:23
premature 30:2,
    30:19, 37:2,
    61:16, 187:21
premise 30:13,
    30:18, 30:24,
    37:4, 111:8
premised 167:13,
    178:8
premises 27:13,
    27:20, 52:5, 59:7
PREPA'S 204:8, 206:1
prepare 205:5
prepared 99:13,
    153:5, 156:5,
    184:7, 209:24,
    210:24, 224:5
preparing 238:23
prescribed 90:19,
    90:23, 163:4
present 30:20, 41:1,
    51:6, 55:16,
    123:14, 232:21,
    236:21
presentation 7:14,
    110:21, 113:25,
    144:4
presentations 191:20
presented 36:3,
    69:17, 86:22,
    168:11, 237:11
presenting 236:7
presently 70:20,
    91:6
presentment 178:21
presents 66:3,
    161:14, 209:7
preserve 77:2,
    78:14, 80:17
preserved 103:14,
    162:12, 231:22
preserves 238:3
preserving 78:8,
    78:21, 88:14
preside 70:15
President 13:8
press 6:6, 6:21,
    29:1
pressing 182:23

presumably 134:20
presumptive 17:9,
    17:24
Pretrial 205:6
pretty 37:22, 51:25
prevail 32:8,
    130:13, 216:22,
    216:25
prevails 31:13,
    50:19, 51:10
prevent 68:5, 140:9,
    201:5, 214:1
prevented 84:19,
    102:6
prevents 218:11
previous 12:8,
    233:11
previously 52:21,
    205:8
price 194:18
prices 135:3, 196:8
primarily 27:22,
    73:15
Prime 86:11, 86:18,
    183:4, 183:5,
    192:10
principal 72:15,
    72:24, 73:9,
    73:23, 77:19,
    78:9, 88:3, 89:8,
    89:14, 190:15
principals 11:4
principle 49:17,
    145:2, 148:13,
    186:11, 218:11
principles 93:2,
    158:12, 237:18
print 226:8
printed 165:23
Printing 166:7
prior 14:3, 69:17,
    70:9, 170:3,
    170:4, 210:3,
    213:18, 223:5,
    236:5
priorities 81:5,
    81:6, 81:19
prioritization 81:11
prioritize 74:17,
    88:25

prioritized 83:14
prioritizing 163:25
priority 82:1,
  215:24, 219:24
private 139:11
privatization 9:23
privilege 22:21
privy 143:17
Pro 4:32, 180:23,
  181:3, 181:10,
  181:12, 181:16,
  181:22, 181:23,
  181:24, 181:25,
  182:4, 182:5,
  183:3, 183:7,
  183:10, 183:19,
  185:21, 185:22,
  192:7, 192:11,
  192:21, 193:2,
  193:22, 194:2,
  194:11, 208:8
probably 21:23,
  34:18, 35:18,
  54:12, 58:14,
  58:18, 74:21,
  135:18, 183:18,
  187:10, 200:5,
  214:25, 220:3,
  223:16
problem 48:21,
  57:21, 67:6, 73:4,
  83:18, 132:7,
  175:13, 193:20,
  224:3
problems 49:6, 67:1,
  83:16
procedural 49:21,
  61:24, 91:12,
  118:13, 166:1,
  225:1
procedurally 48:21
Procedure 25:22,
  30:1, 44:10, 46:1,
  63:24, 64:7,
  89:11, 89:12,
  198:12, 224:18
Procedures 9:8,
  20:20, 20:23,
  21:9, 21:19, 23:1,
  23:2, 23:3, 25:7,

25:14, 26:5,
  26:11, 26:13,
  26:19, 44:20,
  47:17, 52:13,
  52:14, 52:23,
  63:16, 63:17,
  86:17, 89:6,
  153:8, 181:14,
  187:9, 189:11
proceed 45:4, 67:11,
  93:11, 94:24,
  95:14, 97:19,
  223:9
proceeding 6:25,
  9:3, 10:9, 10:25,
  30:4, 36:2, 36:19,
  38:7, 40:13,
  47:21, 48:23,
  51:23, 52:7,
  52:20, 91:17,
  124:19, 179:5,
  211:14, 215:16,
  218:23, 219:8,
  222:4, 231:17,
  231:19, 231:21,
  232:13, 232:18
proceeds 124:3,
  135:8, 161:21,
  162:22
processes 201:14
processing 68:2
produced 4:48,
  207:15
product 27:23, 36:7
production 41:24,
  73:12
productive 15:11,
  17:11, 24:19,
  24:20
professional 16:24,
  88:18
professionals 158:5,
  158:14, 195:17,
  196:3
proffer 162:16,
  164:4
proffered 117:7,
  120:1, 236:19
progress 11:8,
  12:10, 47:4,

66:11, 68:8,
  69:21, 70:6,
  185:17
prohibit 180:23
prohibited 14:6,
  216:4
projections 199:8
PROMESA 1:8, 1:24,
  2:5, 81:16, 82:8,
  85:16, 88:11,
  88:23, 127:6,
  136:12, 137:11,
  138:3, 139:1,
  139:23, 140:1,
  142:24, 159:11,
  159:22, 160:24,
  161:24, 163:3,
  163:9, 163:10,
  164:9, 164:13,
  184:23, 197:7,
  237:24
promise 24:19, 70:7
promising 10:4,
  10:10, 10:20
promptly 71:18,
  224:18
pronouncement 148:10
Proof 83:21, 127:14,
  129:13, 130:3,
  130:4, 137:13,
  144:12, 144:13,
  144:15, 145:14,
  161:15, 170:7,
  173:1, 173:5,
  174:16, 175:4,
  177:20, 178:7,
  178:8, 178:18,
  179:2
Proofs 118:22,
  168:9, 177:19,
  177:20, 177:21
proper 62:14, 62:17,
  62:18, 118:5,
  168:25, 197:1
properly 28:22,
  31:16, 175:8
property 98:21,
  111:25, 113:10,
  113:11, 138:11,
  138:12, 159:25,

160:1, 211:22,
212:1
prophylactically
78:15
proponents 9:12,
75:16
Proposal 9:13, 9:21,
23:11, 155:12,
211:8
proposals 9:9, 9:15,
9:17, 61:25
propose 154:21,
187:18, 187:19,
209:12, 224:18
Proposed 7:18, 23:3,
48:12, 48:13,
71:17, 153:19,
199:11, 211:13,
211:23, 212:13,
220:21, 232:4,
232:16, 234:9,
234:18, 238:9
proposes 48:14,
162:18
proposing 22:15,
64:3, 64:10,
200:23
prosecute 119:22,
159:3, 235:2,
236:6, 236:23
prosecuted 80:16,
145:23
prosecuting 41:19,
159:1
prosecution 24:8,
156:21, 237:1
prosecutorial 130:5,
131:16
Proskauer 65:15,
65:16, 69:14,
209:6
protect 43:8, 106:6,
192:16
protected 80:2,
141:17
Protection 210:12,
211:16
prove 83:22, 130:14,
130:24
proven 73:7

proverbial 154:4
provide 19:18,
23:13, 86:9,
109:1, 120:25,
134:21, 163:11,
164:6, 192:15,
193:14, 193:23,
231:2, 232:17,
237:8
provided 71:16,
87:9, 153:12,
170:12, 191:6,
234:10, 234:16,
235:17, 236:1,
237:5
provides 116:6,
151:25, 159:11,
194:23, 194:25,
229:1, 229:11,
230:14
providing 102:20,
102:21, 108:25,
192:22
provision 82:6,
82:9, 82:10,
82:24, 85:6,
101:3, 102:1,
103:25, 113:16,
149:5, 160:13,
161:6, 169:11,
215:23, 227:19,
229:23
provisions 71:16,
80:1, 106:10,
230:4, 235:5
prudence 57:22
prudent 19:15
Prudential 39:2
Public 4:22, 6:6,
8:21, 11:14,
11:21, 18:10,
65:23, 76:4, 83:6,
141:14, 153:14,
154:12, 155:4,
159:21
publicly 97:12,
97:15
pudding 170:7
punch 54:6
puppet 141:7, 151:12

purchase 132:5,
132:8, 132:11,
132:16, 132:22,
173:14, 174:2
purchased 194:17,
196:6, 196:7
purely 118:13, 231:5
purport 120:19,
173:24, 178:13
purported 119:10,
138:19
purportedly 120:16
purports 123:20,
170:3
purpose 28:24, 38:5,
109:3, 141:10,
159:1, 201:10,
215:16, 215:23
purposes 32:22,
99:2, 160:10,
198:20, 213:3
Pursuant 9:15,
94:13, 122:9,
140:15, 159:10,
160:22, 173:8,
173:9, 173:11,
173:16, 173:17,
173:18, 175:22,
211:14, 229:17,
235:20
pursued 78:3,
105:21, 107:3,
129:4, 134:18,
149:4, 150:17
pursuing 89:2,
98:19, 103:2,
106:21, 107:6,
114:2, 130:8,
145:15, 145:25
pursuit 99:4, 101:7,
122:2, 163:16
push 24:18, 27:5,
44:23
put 31:18, 33:12,
34:17, 43:21,
44:5, 45:6, 48:12,
56:24, 67:16,
67:17, 89:21,
99:11, 103:13,
109:4, 117:20,

125:24, 126:5,
140:1, 167:25,
168:4, 199:21,
209:2, 210:14,
215:13, 230:1,
233:20, 234:2
puts 218:16
Putting 77:13,
110:14, 179:5


< Q >
QTCB 4:12, 51:17
qualifications
129:16
qualified 133:13,
134:1, 134:10
qualifies 131:22
quarter 9:24
quasi 114:19
questions 13:11,
13:13, 17:6,
17:18, 23:10,
33:19, 34:19,
36:3, 36:14,
38:11, 38:14,
39:6, 49:2, 53:11,
59:25, 62:2, 63:5,
63:10, 63:13,
66:11, 70:23,
71:3, 90:10,
115:7, 121:11,
151:20, 152:22,
176:21, 207:6
queue 76:13, 115:14
queued 63:17
quick 207:10
quickly 143:10,
186:10, 211:17,
213:9, 214:7
quietly 90:14
Quinn 42:13
quite 39:7, 68:14,
73:7, 74:2,
130:17, 152:24,
191:14, 201:9
quote 43:1, 85:8,
85:9, 122:10,
148:1, 168:18,
168:19, 168:20,

169:2, 169:5,
169:6, 169:9,
169:10, 169:17,
169:21, 169:23,
214:2, 214:3
quoting 131:11


< R >
R. 3:34
rabbit 47:3
racketeering 200:25
radical 142:6
Raiford 4:7, 125:9,
125:11, 125:12,
126:21
raise 49:22, 52:9,
55:6, 57:13, 62:1,
77:4, 107:5,
168:25, 173:25,
231:18, 231:21,
232:14
raised 17:5, 49:10,
55:6, 57:2, 59:4,
64:5, 76:12, 91:5,
105:24, 117:10,
143:9, 171:16,
174:6, 206:3,
233:10
raises 95:5
raising 46:25, 49:7,
50:6, 76:17,
176:23, 231:15
ramifications 113:20
Ramon 233:6
ran 17:3, 73:4
range 128:7, 163:22,
193:8
rata 208:8
rate 66:17, 156:22
Rather 15:13, 21:16,
23:1, 43:3, 44:19,
60:8, 89:21,
128:15, 163:5,
212:23
rationale 196:15
Re 1:6, 1:22, 2:3,
2:23, 27:16,
147:24, 161:9,
161:10, 161:21,

162:4, 186:13,
195:7, 195:13,
195:18, 206:12,
237:19
reach 122:18, 237:9
react 209:13
reacting 23:12
read 19:9, 33:23,
46:6, 46:13,
97:18, 97:21,
107:16, 108:3,
111:14, 112:1,
135:7, 136:20,
145:12, 175:25,
223:1, 223:17,
230:19, 230:23
reading 31:16, 46:14
ready 53:24, 144:3,
157:11, 164:22,
202:20, 202:22
real 31:20, 113:1,
113:3, 113:14,
137:1, 146:16,
152:5, 218:21,
218:25
reality 93:17,
110:12, 111:23,
135:20, 195:15
realize 68:15,
101:25, 136:5,
156:20
realized 137:1
realizing 156:21
Realty 131:9
reason 28:9, 50:4,
67:9, 67:18,
77:18, 84:9, 90:3,
112:19, 117:16,
123:4, 164:15,
168:8, 176:15,
176:17, 180:23,
218:22, 236:8
reasonable 88:2,
180:7
reasonably 134:22,
230:9
reasons 23:2, 31:8,
50:17, 52:3, 64:7,
67:12, 82:14,
99:7, 122:15,

124:8, 128:2,
132:14, 159:7,
214:14, 228:14,
233:10, 233:11,
234:6, 234:22,
238:6
rebut 57:25
recalculate 32:1
recalculated 27:19
recalculating 32:12,
33:3
Recall 15:1, 31:7,
49:9, 111:20,
127:25, 142:16
recalls 81:1
receipt 88:3
receive 85:17,
173:18
received 7:7, 53:2,
73:8, 85:19,
132:2, 145:20,
173:10, 173:19,
208:7, 225:25
Receiver 7:9, 18:6,
66:3, 66:4, 66:13,
66:15, 67:10,
67:21, 69:19
receivership 68:1,
114:25
receives 192:12
receptive 61:9
recess 92:3, 153:22
recipient 75:12,
183:7
recipients 73:23,
78:9
recognition 79:2,
168:21
recognize 28:22,
93:1, 209:22
recognized 131:23,
148:2
recommendations
16:20
recommending 16:18
reconciliation 21:16
reconvened 12:7
reconvened. 92:4,
153:23
record. 208:17

recorded 4:48
recording 6:19
records 74:25
recoup 86:1
recourse 149:10
recover 111:21,
112:3, 161:21,
162:22, 200:14
recovered 114:16,
124:4
recoveries 75:18,
75:21, 77:19,
78:22, 94:9,
106:17, 184:6,
206:10
recovering 110:22
recovery 10:16,
75:8, 90:24,
114:20, 136:4,
152:11, 161:15,
163:5, 178:1,
182:18
red 55:22, 75:25,
150:5
redacted 154:19,
155:19
redactions 154:13,
155:7
redline 165:14,
165:15
redlined 165:8
reduce 199:14,
199:19
reduction 158:4
refer 6:17, 72:15,
75:1, 90:21,
101:8, 122:21,
158:24
reference 14:22,
81:2, 112:1,
112:18, 144:14,
146:5, 146:9,
146:21, 169:8
referenced 47:16,
70:3, 233:19
references 14:15,
14:23, 44:2,
97:20, 111:23
referred 12:1,
72:17, 113:17,

122:7, 128:21,
133:23, 172:8,
188:15, 189:7
referring 14:4,
16:1, 26:16,
112:20, 234:3
refers 112:15,
170:3, 188:21
reflected 237:20
reflecting 71:15,
181:15, 207:16
reflection 141:23
reforms 8:24, 29:19
refrained 97:15
refusal 105:14,
105:15, 105:16,
105:22, 105:23,
106:13, 125:21,
126:9, 130:3,
134:24, 161:18,
236:12, 237:2,
237:3
refused 125:20,
126:8, 137:14,
236:24
refuses 27:25, 28:1,
159:11, 235:12
refusing 97:8, 172:1
regard 40:15, 49:12,
88:21, 89:7,
100:2, 127:7,
127:15, 133:6,
193:4, 230:25
regarding 26:19,
39:15, 40:4, 40:5,
41:6, 91:15,
102:11, 113:25,
118:11, 123:16,
155:13, 158:2,
205:16, 206:3,
209:9, 211:20,
219:24, 229:21
regardless 185:15,
204:23
Region 3:11
register 119:1,
192:7, 193:22,
193:24, 194:4,
197:6
registered 76:5

regrettably 54:12,
  61:25
regular 30:4
regularly 49:25,
  192:21
reinstate 198:11
reiterate 124:15
rejected 38:1, 58:3,
  151:23, 186:21,
  198:3, 207:24
rel. 139:14
relate 47:24, 222:14
related 48:9, 49:10,
  90:25, 158:20,
  159:3, 192:1
relates 47:18,
  81:14, 113:12
relating 24:8,
  37:14, 177:16,
  196:19, 222:22
relationship 133:4
relatively 191:18
release 110:11,
  154:11
released 154:6
relevant 43:9,
  69:20, 69:21,
  82:9, 112:8,
  112:15, 113:24,
  162:17, 164:1,
  224:2
relied 57:8, 103:23
Relief 42:22, 43:1,
  45:22, 48:11,
  50:5, 60:3, 73:22,
  76:15, 89:9,
  102:5, 102:6,
  122:5, 127:8,
  127:11, 157:5,
  158:20, 160:16,
  161:14, 191:25,
  192:3, 192:5,
  193:19, 193:21,
  197:12, 198:18,
  198:19, 219:23,
  237:6, 237:9
relitigation 197:2
reluctant 40:9,
  186:13, 190:10
rely 39:14, 61:16,

104:16, 132:12,
  151:16
relying 37:3, 144:4,
  150:14
remade 27:24
remain 150:25,
  176:6, 211:20,
  211:25, 228:23
remainder 178:19
remaining 134:13,
  179:17, 234:22,
  238:6, 238:14
remains 151:3
remake 59:8
remaking 33:2
remand 216:18
remanded 210:1,
  217:22, 221:7
remarkable 93:23
remarkably 139:12
remarks 15:1, 15:25,
  16:1, 16:7, 17:17,
  39:15, 93:3,
  176:13, 180:8
remedied 44:7
remedies 229:13
remedy 45:8, 59:1,
  59:9, 59:23, 66:5,
  119:20
remember 93:19,
  96:4, 103:3,
  105:25, 120:21,
  128:21, 166:11,
  227:24, 231:13
remind 6:10, 136:11,
  203:2
reminded 207:11
reminding 136:12
remiss 233:17
remitted 212:2
remote 58:22
remotely 202:21,
  205:8
removed 230:12
reorganization 78:1,
  78:4, 136:10,
  136:18
repay 108:15, 151:4,
  151:5
repayment 173:2

repeat 127:5, 190:8
repeated 81:4,
  168:12, 189:19
replace 229:2
replaced 227:14,
  230:12
Replies 150:9
report 7:20, 7:24,
  10:3, 10:4, 10:6,
  10:18, 12:1, 12:6,
  13:12, 16:13,
  16:18, 17:4,
  74:15, 121:8,
  136:21, 151:15,
  155:11, 155:18,
  225:12
Reporter 208:16,
  238:24, 240:14
reports 15:22
repository 6:14,
  203:16
represent 40:1,
  120:20, 143:11,
  143:12, 186:24,
  187:4, 196:16,
  197:21
representation
  35:18, 64:16,
  119:8, 183:23,
  188:25, 189:3,
  189:15, 189:21,
  195:2, 195:5,
  233:7
representations
  184:20
representative 1:13,
  1:29, 2:10, 65:13,
  84:15
representatives
  219:22, 237:13
represented 95:3,
  95:9, 143:15,
  188:16, 192:18,
  203:22, 232:8
representing 100:22,
  124:25, 184:13,
  187:15, 188:18,
  194:9
represents 184:12,
  236:17

reps 132:12
requested 18:17,
    60:4, 73:22,
    76:15, 85:6,
    102:7, 122:5,
    127:8, 127:11,
    190:10
requesting 13:6,
    89:9, 192:9
requests 7:2, 79:25,
    90:22, 191:25,
    192:3, 192:4,
    192:13, 194:15,
    204:13
require 11:24,
    19:17, 39:3,
    61:20, 61:22,
    74:3, 79:21,
    89:25, 125:18,
    161:13, 163:6,
    196:15, 209:17
required 9:20,
    120:14, 120:25,
    124:22, 195:6,
    198:12, 203:4
requirement 39:2
requirements 9:8,
    194:6, 229:25
requires 33:4,
    86:23, 168:15,
    169:3, 181:25,
    182:3, 213:12
requiring 38:1,
    126:1
requisite 74:8
res 218:10
Rescap 206:12,
    206:13
rescission 170:24
resent 151:11
reservation 102:11,
    104:14, 140:3,
    174:21, 233:18
reserve 24:13,
    26:24, 26:25,
    39:9, 65:11,
    142:25, 180:2,
    208:14, 208:25
reserved 55:23
reserving 72:7,

146:10
reside 201:12
residents 139:17,
    197:21, 208:5
resign 227:13, 231:2
resisting 34:9
Resolution 29:20,
    171:20, 177:3,
    213:13, 213:25
resolve 16:8, 62:1,
    77:24, 89:25,
    90:1, 123:11
resolved 11:11,
    51:4, 106:10,
    175:8, 211:17,
    216:17
resolves 229:18
resources 78:14,
    78:21, 80:15,
    99:4, 113:25,
    114:1, 122:4,
    124:1, 124:4,
    133:15, 142:20,
    160:6, 205:4,
    207:3
Respectfully 43:19,
    43:21, 64:6,
    85:21, 176:15
respond 62:19,
    65:16, 167:11,
    168:2, 172:23,
    179:8
responded 49:3
respondents 124:9
responding 172:4,
    219:2
Response 9:9, 19:14,
    51:24, 52:9,
    81:13, 100:10,
    139:3, 165:25,
    166:12, 166:25,
    172:5, 177:14,
    178:15, 179:10,
    211:15, 219:6
response. 233:24
responsibility
    68:13, 77:5,
    163:12, 163:25,
    164:2, 164:12,
    236:23, 237:1

responsible 48:3
responsive 111:5,
    129:22, 175:13
rest 88:1, 115:9,
    124:15, 141:11,
    205:24, 207:7,
    228:18
restrictions 149:25,
    152:13, 181:10
restructuring 10:12,
    162:24, 163:1,
    163:5, 207:4
rests 202:6
result 25:12, 96:25,
    132:16, 132:17,
    189:12, 198:6,
    213:13
resume 92:1
retain 96:5, 156:4,
    193:1, 195:17
retained 74:11,
    96:8, 135:24,
    136:13, 147:3,
    156:17
reticent 199:8
Retired 4:4, 228:24
Retiree 25:11,
    125:10, 125:14,
    126:3
Retirees 10:8,
    25:19, 82:20,
    82:21
Retirement 1:31,
    2:19, 12:3
retransmission 6:19
retribution 94:5
retroactive 148:14
retroactively 27:18,
    33:3, 59:8
return 89:1, 112:9
returns 47:9,
    163:17, 174:12
revelation 87:8
revenues 191:9
reverse 217:12
reversed 221:6
revert 8:14, 111:15
review 9:12
reviewed 7:7, 17:16,
    75:24, 132:8,

180:16
reviewing 17:2, 26:4
Revised 24:7, 181:2,
    230:19, 232:4,
    234:7, 234:24,
    235:17, 236:15,
    237:21, 238:2,
    238:9
revision 230:23,
    234:16
revisions 165:12
revocation 227:15
revoke 227:13
Revolution 37:9
RFP 9:13, 9:15, 9:19
Rican 133:13
rid 66:18, 176:4
ride 204:12
rightly 74:3, 130:17
rights 40:16, 48:25,
    52:11, 55:18,
    102:11, 104:14,
    140:3, 142:25,
    146:10, 150:20,
    150:21, 163:22,
    174:21, 177:24,
    178:9, 178:10,
    178:17, 184:22,
    198:15, 233:19,
    236:8
ripe 37:1, 46:25,
    50:23, 51:9, 52:2,
    56:12, 56:15,
    56:19, 56:20,
    58:12
ripeness 29:23,
    50:24, 56:11,
    57:20, 57:22,
    57:24, 64:4
rise 124:22
rising 80:24
risk 113:17, 115:2,
    152:19, 236:7
risks 161:20, 162:23
Rivera 233:6, 233:7
road 45:10, 47:3,
    47:5, 48:25,
    49:25, 62:22,
    65:1, 88:24
Robert 4:25, 65:22

robustly 15:9
rock 125:25
role 11:10, 78:8,
    183:20, 229:4
rolling 73:13
room 29:11, 63:13
root 139:6, 141:21
Rose 69:14, 209:6
round 116:14
rounds 198:1
roundtripping 75:11
route 237:9
RSA 67:24, 68:2,
    70:11, 71:2,
    206:22
rubric 184:24
Ruby 7:4
ruled 20:6, 104:7,
    209:19
Rules 29:7, 29:25,
    44:10, 56:24,
    60:22, 120:22,
    176:19, 181:1,
    181:15, 183:2,
    192:14, 217:6,
    224:12
ruling 34:6, 194:10,
    203:3, 222:13
rulings 184:7, 184:9
run 75:11, 93:9,
    124:20
running 56:16,
    73:13, 82:1, 88:25
runs 89:10, 157:9


< S >
S. 3:5, 3:26
S/ 240:12
Sabine 161:10
Safe 166:20, 239:4
safety 229:23
sake 199:22
sale 173:14, 174:2
salvo 28:11
sampling 76:9
San 6:1, 6:6, 238:19
sanctions 6:25
satisfied 229:25,
    236:13

satisfy 137:12
save 72:10, 167:22,
    167:23, 197:17
saving 82:22
savings 156:23
saw 169:15, 184:2,
    220:18
scale 205:10
scenario 15:11,
    15:12
schedule 67:18,
    115:15, 210:12,
    214:12, 214:15
scheduled 19:11,
    20:9, 238:18
schedules 227:6
scoop 135:7, 135:12,
    149:15
scope 109:16,
    159:21, 160:17,
    186:19, 237:14
scrutinize 190:20
scrutinizing 190:19
Se 4:32, 180:23,
    181:3, 181:12,
    181:16, 181:22,
    183:3, 183:7,
    183:10, 183:19,
    185:21, 192:7,
    192:11, 192:21,
    193:22, 194:2,
    194:11
se. 182:4, 185:22
seal 154:6
sealed 97:18, 97:20,
    97:21, 153:2,
    153:3, 153:6,
    153:12, 154:11,
    155:13, 162:15
seat 60:10
Second 9:24, 11:25,
    24:25, 25:4,
    31:24, 43:5,
    43:14, 47:20,
    49:19, 81:21,
    97:5, 97:8, 98:13,
    117:15, 118:24,
    123:4, 153:25,
    155:5, 160:4,
    166:23, 172:6,

179:1, 192:8,
207:15, 208:5,
209:9, 214:25,
235:9, 236:21
secondary 48:8
Secondly 27:25,
64:14
seconds 185:4
secret 29:10
Sections 117:20,
138:11, 235:6,
235:20
secured 186:14,
187:5, 187:24,
190:11, 191:7
securities 96:22,
170:25, 173:15,
174:2
security 173:24,
211:21, 211:24
seeing 96:4
seek 25:24, 32:9,
43:1, 52:17,
72:15, 80:12,
98:14, 103:10,
134:22, 156:9,
180:20, 198:22,
199:1, 200:6,
201:11, 204:4,
212:9, 212:18,
213:12, 222:16,
224:4
seeking 7:9, 44:13,
58:20, 70:10,
70:18, 76:14,
98:19, 114:14,
122:21, 145:25,
146:1, 169:25,
171:4, 186:14,
188:7, 190:23,
195:3, 198:16,
199:24, 200:14,
200:18, 204:24,
204:25, 213:12,
214:4, 214:13,
214:16, 219:23
seeks 28:5, 143:1,
177:18, 178:1,
193:21, 211:23
seem 19:11, 31:4,

61:6, 64:2, 171:7,
183:12, 212:10
seems 19:15, 29:2,
34:15, 65:2,
80:14, 88:10,
89:8, 101:4,
101:8, 156:8,
156:23, 157:4,
175:2, 209:14,
209:21
seen 144:6, 166:4
sees 218:2
Segara 142:17
segment 168:5
segments 97:7
segue 95:24
SEIU 95:10, 119:11,
119:13, 119:21,
144:14, 145:14
selection 9:12
selective 27:9,
27:12, 27:20,
28:9, 31:13,
31:14, 32:9,
32:24, 34:3,
47:20, 54:25,
55:1, 55:11, 56:6,
58:10, 58:12,
58:19, 59:6,
60:23, 65:7,
72:18, 83:14
selectively 29:12,
31:22, 54:17
selectivity 28:21,
31:10, 32:16
self-executing
103:19
sell 135:11
Senate 13:9, 208:1
send 87:22, 187:18,
187:19, 193:11,
207:18
senior 188:25
sense 18:20, 25:13,
25:21, 32:7,
78:17, 94:23,
99:15, 100:19,
114:11, 114:18,
131:2, 146:16,
153:17, 157:25,

199:18, 199:20
sensitive 195:15
sent 130:10, 164:24,
165:11, 165:15,
198:3
sentence 168:1,
168:13
sentences 137:22,
179:3
separate 47:18,
47:25, 48:23,
49:5, 60:5, 67:21,
67:22, 84:11,
84:14, 89:3,
128:14, 155:1,
189:14, 230:14
separately 81:2
separates 58:24
September 16:20
sequencing 51:1,
62:13
sequential 40:12,
224:24
sequentially 32:18
Seriatim 54:5, 143:8
series 31:23, 31:24,
72:16
serious 35:20, 39:22
seriously 68:14
serve 116:18,
116:19, 183:6,
183:20, 185:18
served 28:24, 180:12
serving 115:25
ses 181:10
set 27:2, 29:17,
85:3, 163:3,
178:9, 179:7,
192:6, 205:22,
210:3, 215:20,
238:13
setting 52:1, 123:15
settle 107:1, 123:9,
123:11
settlement 78:13,
81:8, 96:23,
100:5, 100:6,
136:9, 149:10,
151:7, 230:10
settlements 149:9,

206:23
seven 13:9, 19:18, 39:12, 96:23, 186:6, 219:17, 231:4
Seven. 138:3
several 84:13, 102:23, 158:13, 196:23, 201:1
severely 127:23
shall 92:23, 149:25, 194:24, 213:11, 219:22
sham 27:14, 27:23, 30:15, 30:17, 30:23, 30:25, 33:23, 33:25, 34:4, 34:7, 34:11, 34:14, 35:11, 46:6, 51:21, 53:20, 55:2, 59:7, 59:12, 59:13, 59:20, 62:2
Shannon 4:13, 51:16
shaping 12:13
share 196:10, 236:22, 237:1
shareholder 152:1
shareholders 152:1
shift 77:9
shifted 149:17
shipment 205:17, 207:22, 207:23, 208:2, 208:3, 208:7
shipments 205:14, 205:17
ships 137:25
shocking 150:19, 150:24
shoes 37:12, 139:10
short 66:20, 67:25, 68:18, 76:1, 91:19, 91:21, 103:23, 104:8, 122:1
short-term 66:16
shortage 65:5
shorter 92:21
shortly 207:5

shots 109:12
shouldn't 45:16, 77:3, 174:5, 174:8, 204:10, 213:23, 222:4, 224:6
show 31:19, 57:14, 125:19, 127:7, 137:12, 137:14, 141:23, 164:23, 226:1
showing 47:5, 65:5, 109:5, 124:22, 124:23, 130:3
shown 235:13
shows 145:14
shy 20:15
sic 172:12, 203:13
side 25:20, 56:7, 100:21, 223:16
Sign 9:20, 33:12, 157:7, 182:2, 221:25
signal 19:3, 98:6
signals 6:18
signed 103:8, 144:20, 144:21, 150:23, 154:15, 215:19
significance 184:18
significant 12:9, 141:16, 200:5, 203:6
significantly 132:24
silencio 170:6
similar 9:22, 25:24, 50:2, 51:6, 186:21, 232:22, 232:24, 237:18
similarly 50:2, 148:2, 206:16
simple 103:22, 104:8, 109:12, 181:21
simplest 31:20, 31:22, 56:25
simply 80:7, 86:18, 111:9, 113:5, 139:3, 174:8, 182:18, 215:18,

218:24
simultaneously 136:8
single 36:10, 49:19, 56:25, 63:22, 79:4, 83:19, 83:22, 84:5, 139:9, 222:21
singled 28:10
sit 39:3, 90:14, 105:7
situated 112:24, 206:16
situation 10:13, 10:14, 15:14, 42:4, 52:15, 77:1, 80:14, 114:23, 182:15, 184:3, 188:14, 188:19, 225:6, 236:4, 236:22
situations 103:24, 124:3, 203:24
Six 29:17, 36:10, 38:22, 58:20, 85:24, 119:7, 133:7, 151:20, 164:21, 168:4, 170:9, 180:9, 181:2, 219:19, 229:11
six. 142:18
Sixteen 230:17
size 115:5
skipped 138:8
slash 101:15, 114:19, 234:2, 234:9
sleeping 127:11
slice 62:10, 184:4
slices 183:25
slight 18:14
slightly 139:23
slip 134:25
small 47:15, 88:7, 185:11, 185:25, 188:22, 191:17, 194:21, 232:7
Snapp 139:13
so-called 50:20, 88:17, 128:20,

129:25
so-to-speak 113:18
sole 94:7, 199:2,
  203:16, 227:17,
  228:3, 228:17
solely 168:16,
  168:19, 169:4,
  210:2, 219:23
solicitation 162:13
solution 175:13,
  175:16, 176:3
Solutions 193:25,
  194:4, 194:7,
  194:12, 197:7
solve 83:18
solvent 108:8
solves 114:3
Somebody 18:21,
  18:22, 28:25,
  34:17, 58:15,
  95:5, 137:7,
  187:1, 214:25
somehow 30:11,
  35:14, 40:1,
  40:21, 45:11,
  102:5, 108:13,
  114:24, 127:10,
  129:17, 137:13,
  138:19, 152:15,
  169:13, 170:6,
  231:15
someone 18:18, 19:1,
  23:4, 34:12,
  40:10, 46:16,
  46:24, 48:3, 58:2,
  78:3, 100:24,
  134:2, 139:10,
  184:16, 184:17,
  184:19, 220:24,
  222:11
sometime 136:25
sometimes 44:15,
  72:17, 103:21,
  103:22, 135:9,
  181:10
somewhat 11:1, 81:4
Son 139:13
Sonnax 198:17,
  200:5, 200:13,
  201:16, 202:14

soon 25:17, 236:7
sooner 15:13, 21:16,
  69:4
sophisticated 15:9,
  94:18, 196:2
sordid 66:19
Sorry 28:14, 59:17,
  112:11, 125:8,
  165:5, 166:1,
  167:3, 167:4,
  172:15, 172:18,
  177:5, 193:19,
  217:14, 218:3,
  218:14
sort 19:23, 34:24,
  47:15, 54:5,
  76:13, 79:2, 79:3,
  79:7, 112:21,
  112:23, 114:1,
  114:3, 114:18,
  115:5, 121:2,
  121:5, 125:3,
  126:10, 139:13,
  140:3, 209:13
sorts 106:10, 191:20
sought 80:6, 102:5,
  160:16, 204:19,
  214:2, 236:25
sounding 105:18
sounds 149:2, 220:9
source 6:13, 113:3,
  139:21
sources 57:4, 57:16,
  235:4
Southern 7:4,
  193:12, 195:8,
  206:13
speaker 71:22
speaking 46:16, 61:3
speaks 52:3, 111:17,
  112:16, 143:22
specializing 106:15
species 114:11
specific 23:20,
  29:6, 117:20,
  122:8, 122:9,
  122:22, 123:2,
  128:4, 142:11,
  155:12, 162:16,
  168:11, 170:10,

171:9, 215:10,
  222:4
Specifically 36:22,
  37:6, 77:1, 81:14,
  117:22, 123:6,
  131:11, 181:2,
  206:18, 225:3,
  229:1, 231:14,
  238:3
specification 182:3
specified 87:4
spect 210:6
spectator 33:13
speculate 13:10
speculative 43:23,
  142:19
speed 143:10,
  143:15, 166:17
spend 8:23, 113:6
spending 85:22,
  190:21, 207:4
spent 190:22
split 215:6
splitting 218:20
spoke 126:6
spoken 80:4, 115:13,
  125:14
spot 84:1
spread 208:8
spreadsheets 59:18
spring 45:13
springing 45:10
stack 83:19
STADLER 4:30, 16:15,
  16:16, 17:11,
  18:1, 18:3, 18:4
staff 238:21
staffing 229:21
stage 9:13, 97:25
staged 97:5
stages 11:1
staggering 75:5
stake 65:7, 126:18
stakeholders 66:6,
  66:9
stamina 238:24
stand 30:16, 38:23,
  54:18, 108:22,
  116:10, 116:23,
  129:15, 137:5,

139:10, 188:18,
233:7, 233:9
standard 17:9, 31:5,
82:11, 122:17,
122:20, 125:23,
161:6, 168:22,
195:5, 213:10,
214:18, 225:8
standards 17:25,
116:20
stands 213:2
start 27:3, 27:8,
33:4, 38:11,
42:21, 54:6,
61:24, 63:5,
66:24, 86:2, 92:5,
98:1, 126:18,
180:1, 187:3,
203:1, 224:25
started 56:23, 59:6,
83:11
starting 8:22,
42:23, 45:11,
62:24, 121:20,
143:8
State 25:1, 28:19,
53:19, 111:14,
112:4, 112:10,
131:8, 139:8,
140:15, 140:24,
167:10, 230:18
stated 83:1, 94:19,
124:9, 148:3,
148:14, 189:16,
228:14, 233:11,
233:13, 238:16
statement 157:15,
224:20, 232:21
statements 12:8,
119:6, 119:15,
144:3, 145:16,
210:4
States 1:1, 2:36,
13:1, 13:7, 13:9,
178:12, 240:7
stating 160:13,
234:6
statistical 115:21
status 7:20, 7:24,
7:25, 12:1, 13:12,

15:22, 19:23,
155:11, 155:18,
202:17, 202:23,
220:13, 225:12,
237:21, 237:24
Statutes 88:24,
88:25, 112:5,
235:19, 237:3
statutorily 163:3
Statutory 10:8,
11:9, 37:21, 85:6,
101:12, 113:20,
141:9, 160:24,
161:6, 161:24,
163:9, 169:11
stayed 68:1
Staying 69:2
stays 111:21, 116:8
stead 116:19
stenography 4:48
step 12:16, 40:3,
59:9, 112:23,
136:20, 139:17,
225:2
step-by-step 125:3
stepped 37:12
steps 70:1, 126:1
stick 224:11
stipulate 60:22,
209:25
stipulated 112:8
stipulates 60:25
STN 116:1, 139:8,
144:19, 144:21,
145:3, 145:4,
145:5, 161:9,
237:19
stood 81:9, 128:16
stop 56:15, 124:19,
209:11, 227:7,
229:13
stopped 101:21
stopper 127:7,
137:12, 137:14
stops 28:3
stored 205:24,
205:25
straight 158:4,
187:12
strategic 110:4

strategy 110:1
streams 74:17
street 44:16, 79:22,
80:5, 80:7
streets 79:24
strenuously 185:9
stress 72:13, 128:10
stretch 127:12
strictly 190:18,
232:6
strike 119:20,
178:3, 225:20
strong 26:4
structure 209:12
structuring 210:14
stuff 32:1, 33:2,
70:5, 150:12
stunned 214:24
style 44:16, 47:23
styled 29:23, 38:9
sub 170:6
sub-retained 158:14
subgroups 196:16
submission 17:13,
17:16, 108:4,
108:17
submissions 28:17,
33:23, 91:2,
97:21, 107:17,
159:6, 191:23
submit 9:9, 84:22,
85:11, 85:21,
86:1, 86:5, 86:17,
86:24, 122:14,
168:23, 170:22,
171:17, 183:3,
183:4, 190:17,
217:16, 238:8
submitted 9:16,
190:7
submitting 16:25
subordinate 171:1
subordinated 170:18,
173:15
subscribe 28:18
subsequent 32:22,
59:15, 179:17,
225:6
subsequently 173:20
substance 171:11,

218:24
substantial 64:15,
    106:16, 106:17,
    213:16, 218:25
substantially 223:24
substantive 131:12,
    168:23, 168:25,
    170:19, 171:11,
    171:17, 174:6,
    176:24
substituted 231:1
substitution 227:15
successful 162:12,
    164:12
successfully 130:23,
    130:24
succinct 168:3
sue 87:23, 89:21,
    96:20, 99:9,
    106:11, 109:10,
    116:11, 128:5,
    131:17, 134:8,
    135:20, 136:1,
    145:8, 162:18,
    207:12
sued 30:5, 37:12,
    37:13, 37:15,
    40:22, 133:3,
    134:19
sues 114:24
suffer 31:3, 41:3,
    45:24, 80:9
suffered 141:19,
    141:20
suffers 51:6
Suffice 127:6,
    193:13
sufficiency 49:4
sufficient 35:23,
    87:20, 104:8,
    104:14, 119:12,
    130:19, 146:12,
    225:7, 226:8,
    227:6, 237:23
suggest 74:6, 90:5,
    125:17, 154:8,
    165:24
suggested 63:3,
    65:3, 183:15,
    194:19, 195:20

suggesting 139:10,
    178:25
suggestion 30:10,
    169:24, 179:12,
    190:9, 204:11
suggests 154:5,
    199:7
sui 79:10
suing 86:3, 96:25,
    110:10, 129:15,
    129:19, 133:8,
    135:1, 142:1,
    143:12, 148:9
suit 129:17, 152:1,
    154:5, 161:17
Sullivan 42:13
summarize 128:5
Summary 210:18,
    211:13, 213:17,
    213:24, 214:2,
    214:5, 216:14,
    216:17, 221:12,
    223:2, 224:21
summer 54:11, 54:12,
    54:14, 77:22
sums 190:22
Sunedison 195:7
Sunni 3:27, 166:17
super 59:14
superb 239:1
superceding 174:4
supervision 150:25
Supplement 172:6,
    172:7, 219:6
supplemental 16:18,
    223:15
supplementally
    234:10
suppliers 205:15
supply 205:14
support 16:8, 43:1,
    77:16, 83:10,
    123:2, 127:13,
    142:5, 159:22,
    161:15, 169:11,
    170:5, 185:5,
    239:1
supported 12:15,
    186:16
supporting 20:16

suppose 179:16
supposed 84:16,
    84:17, 138:13,
    157:6, 170:20,
    215:20, 220:1,
    222:5, 222:6,
    224:11, 224:20
supposedly 168:9,
    169:7, 171:15
Supreme 13:1, 13:4,
    13:7, 131:8,
    139:14, 151:22,
    220:10
surcharge 197:23
surmount 237:23
surprise 39:6,
    57:14, 215:14,
    224:4
surround 127:22
surrounding 136:1
survive 63:1, 97:6
Susheel 3:38, 42:12
suspect 22:13
sustainable 9:5
Suzzanne 3:20
Swain 2:35, 7:22,
    34:10, 240:7
swath 28:24
sweeping 122:5
sweet 56:4
swing 57:24
sword 14:18
syllable 126:24
syndicate 135:11
System 1:31, 2:20,
    9:24, 180:24,
    181:3, 181:21,
    183:2, 192:20
systematically 66:23


< T >
T. 3:30
table 10:19, 25:16,
    26:2, 60:11, 99:11
tacit 57:19, 168:21
tackle 142:21
tactic 169:3
tactically 38:19
taken. 92:3, 153:22

talked 14:8, 14:11,
    20:11, 20:19,
    81:7, 81:8, 81:9,
    103:2, 103:4,
    141:5, 150:8,
    203:10, 213:1
talks 102:15
target 9:3, 32:3,
    56:13, 62:8,
    72:14, 85:15,
    121:23, 146:24
targeted 29:10,
    72:18, 85:20
targeting 56:6,
    75:20, 212:22
targets 31:14,
    72:20, 72:21,
    178:9
task 8:23, 205:20
Taylor 2:35, 240:7
team 15:4, 21:7,
    155:15
technical 19:8,
    94:25, 95:13,
    118:4, 183:1
technically 234:1,
    234:3
tee 214:6
telephone 193:22
telephonic 6:7,
    197:7
telephonically 194:5
tells 88:11, 132:3,
    149:15
ten 20:15, 21:3,
    21:24, 24:12,
    25:17, 26:25,
    55:12, 137:19,
    143:16, 153:21,
    156:9, 156:10,
    156:17, 171:6,
    173:16, 174:24,
    175:5, 187:15,
    208:24
ten-minute 153:1
ten. 230:3
tend 142:20
tends 45:6
Tennessee 120:15
tens 21:3, 85:10,

85:13
tentatively 61:9
term 103:22
terminate 229:14
termination 116:7
terrible 141:21
terribly 137:10
territorial 163:2
territory 163:11
tested 208:4
testify 83:17
testing 200:3
text 46:9
texting 6:23
textual 102:3,
    112:14, 112:21
thanks 238:21
themselves 20:13,
    21:17, 28:2,
    29:15, 63:18,
    73:3, 86:25,
    94:20, 100:15,
    188:22, 196:20,
    202:21, 204:3,
    204:4
theories 128:7,
    135:13, 136:3,
    136:4, 143:1,
    149:16, 173:6,
    173:12, 173:14,
    173:25, 174:15,
    178:8, 179:8
theory 28:18, 31:8,
    36:8, 36:9, 45:15,
    55:4, 58:16,
    62:23, 64:16,
    97:1, 101:11,
    128:15, 133:3,
    134:15, 135:12,
    146:18
there'll 187:15
thereafter 154:7,
    236:7, 238:10
therein 117:21
thereof 227:15
They'll 49:22,
    100:15, 226:20
They've 10:19,
    28:13, 29:23,
    31:24, 36:9,

36:10, 38:8, 39:4,
    40:5, 54:7, 62:8,
    86:16, 119:4,
    125:19, 127:16,
    134:19, 136:3,
    136:25, 143:16,
    143:17, 149:17,
    167:25, 168:22,
    199:18, 217:7
thicket 209:22
thin 221:2
thinking 20:24,
    48:11, 92:11
thinks 28:25, 130:7,
    155:3, 157:1
Third 9:1, 23:9,
    28:3, 30:7, 31:1,
    36:20, 36:25,
    37:15, 37:17,
    37:18, 37:25,
    43:12, 47:21,
    88:17, 106:11,
    135:1, 148:7,
    155:6, 159:19,
    160:25, 169:3,
    172:6, 179:1,
    193:18, 193:21,
    207:21, 237:6
third-party 38:4,
    58:5, 112:3,
    114:13, 207:11
Thomas 3:44, 4:28
thoroughly 202:13
though 19:13, 27:25,
    86:10, 111:23,
    174:24
thoughts 172:10
thousand 45:2,
    45:18, 75:6,
    75:14, 75:19,
    75:20, 205:13
thousands 21:4,
    78:9, 85:10,
    85:14, 182:13
threats 85:13
three 25:11, 27:12,
    27:17, 27:20,
    27:21, 47:18,
    59:7, 61:2, 61:23,
    67:18, 72:8,

72:10, 95:7,
122:15, 131:19,
146:6, 164:25,
172:7, 180:20,
182:2, 186:9,
188:22, 205:13,
205:15, 207:10,
219:18, 223:25,
226:24, 227:10,
228:20
three. 165:9, 228:12
threshold 59:25,
88:2, 126:10,
126:11, 126:15,
211:16, 211:19,
215:17
throw 46:21, 190:15
thrust 138:1
thumbed 45:17
tick 177:25
time. 227:16
timeframe 100:17
timely 79:25, 84:7,
157:7
timetable 19:15,
179:7, 224:18,
238:13
timetables 183:11,
213:7
timing 25:6, 67:25,
89:18, 167:24,
180:5, 180:6,
193:20
Title 1:8, 1:24,
2:5, 52:25, 90:23,
123:6, 123:12,
159:20, 162:23,
169:15, 192:12,
192:16, 196:17,
206:22
together 70:7,
74:25, 103:13,
185:24, 227:20,
239:3
toll 41:21, 56:17,
78:7
tolled 85:8, 201:5
Tom 50:11, 115:12,
117:3
tomorrow 154:4,

155:25
took 36:13, 57:24,
129:10, 186:7,
207:23, 222:17
top 55:12, 102:23,
109:24, 133:24,
139:6, 187:23,
219:17
topic 121:2, 133:7
tort 131:10, 131:12,
131:22
toss 135:7, 135:13,
149:16
total 24:10, 26:23,
75:6, 85:9,
167:21, 180:2,
208:23
totally 14:9, 41:16,
84:22, 93:22,
171:13, 177:9,
190:20
touch 24:1, 222:20
towards 12:10
trace 79:20
track 8:11, 129:23,
165:1, 210:8
traction 121:4
trade 123:22
Tradewinds 118:21
traditional 125:23
tranches 31:16
trans 114:15
transaction 9:23,
147:12, 218:12
transactional 207:16
transactions 140:23,
170:25
Transcript 4:48,
240:4
transcription 240:5
transfer 107:25,
108:6, 114:14,
114:15, 128:10,
128:11, 130:8,
130:10, 130:20,
130:23, 130:25,
131:4, 131:5,
131:18, 145:24,
152:8
transferee 114:13

transferees 112:3
transferred 205:22
transfers 112:4,
130:11, 130:13,
140:15, 140:17,
140:22
transformation 9:3
transmission 9:23
transmit 23:23,
193:15
transmitted 23:21
transparent 44:19
trauma 231:11
travel 166:21
travels 239:4
Treasure 54:3
treated 206:15
treatment 12:3,
28:11, 29:12
tremendous 70:6,
141:19, 141:20,
191:19
trial 202:20,
202:22, 205:5,
205:7, 208:3,
216:14, 216:16
tried 61:11, 216:12
triggered 224:25
trillion 20:11,
20:14, 20:15
trip 59:24
trots 129:14
True 43:9, 135:4,
143:24, 217:25,
240:5
Trump 13:8
Trust 118:24,
118:25, 144:12,
164:13, 213:25
trustees 117:16,
237:12
truthful 134:21
try 32:4, 85:25,
97:24, 125:15,
140:21, 143:7,
175:1, 185:20,
200:23, 209:12,
215:7, 218:17,
229:14
trying 12:17, 14:16,

15:13, 21:5,
22:22, 28:11,
36:6, 44:6, 45:3,
46:23, 55:8, 55:9,
55:15, 57:18,
58:2, 60:12,
62:10, 62:20,
106:5, 187:1,
201:6, 201:11,
217:12
ttention 84:6
Tuesday 96:8, 129:23
turn 7:19, 9:4,
30:23, 63:14,
101:1, 105:14,
118:17, 179:22
turnaround 10:11
turned 6:15, 6:19
Turning 12:19,
159:16, 161:3,
170:16, 213:9
turns 190:23
twice 25:15
two-page 174:19
two-phase 187:20
two-year 82:12
two. 42:2, 167:23
type 11:6, 15:23,
148:4, 148:6,
183:11, 196:17,
224:22, 235:11
types 31:12, 107:12,
122:8, 122:9,
149:20, 165:1,
173:25, 200:11
typically 125:21,
134:3, 199:16


< U >
UCC 36:18, 55:9,
60:19, 74:25,
85:13, 85:22,
86:24, 87:8,
113:5, 117:8,
117:14, 118:3,
119:6, 119:16,
120:2, 125:18,
125:24, 145:11,
160:13, 183:15,

133:4
Uhland 3:20
ultimate 48:8, 59:9,
78:5, 80:2, 177:3
ultimately 9:9,
49:15, 73:11,
73:25, 79:20,
115:4, 129:10,
164:11, 206:24
unavoidable 83:16
unavoidably 122:7
unchallenged 29:13
unconstitutional
49:20, 235:25
uncontested 19:6
uncontroversial
16:21
undecided 209:8,
224:22
underlies 77:12
underlying 28:18,
69:18, 70:21,
73:25, 90:8,
127:17, 131:10,
132:9, 132:17,
159:22
undermine 142:12
undermines 169:25
Underpinning 196:23
underscore 185:11
underscoring 134:2
understanding
130:11, 131:20,
133:21, 157:21,
225:24
understandings 23:8
understands 60:12
understated 10:11
Understood 14:1,
40:18, 57:1,
102:19, 162:3,
166:8, 218:14,
226:7
undertake 153:18
undertaken 15:4,
75:22, 188:25
undertaking 131:1
underwriter 106:15,
106:25, 132:22,
132:25, 133:3,

133:4
underwriters 88:17,
96:1, 96:24,
99:16, 109:17,
110:5, 128:6,
129:15, 129:19,
132:9, 132:11,
133:6, 135:2,
135:10, 135:15,
135:21, 136:19,
136:22
underwriting 135:4,
135:6
undisputed 202:19
undoubtedly 33:19
undue 66:19
unfair 63:15, 67:7
unfortunate 38:15
Unfortunately 25:16,
25:25, 67:6
union 10:13
unions 10:8, 10:17,
120:14, 120:16,
120:25, 123:22
unique 43:3, 75:6,
80:14, 235:18,
236:21
uniquely 112:24
United 1:1, 2:36,
13:1, 13:7, 13:8,
178:12, 240:6
universe 157:5,
223:20, 223:21
unjust 128:9
unjustifiable 162:21
unjustifiably 161:16
unknown 77:10
unlawful 45:13
Unless 6:16, 77:20,
90:10, 104:2,
115:9, 121:11,
123:12, 148:13,
148:22, 152:22,
191:16, 218:10
Unlike 112:24,
162:25, 220:14
unlikely 132:16,
220:5, 222:9,
224:5
unlimited 191:3,

203:13
unnamed 91:8
unnoticed 35:25,
    38:17
unpersuasive 159:23
unquote 168:19
unreasonable 164:7
unrecoverable 203:7
unresolved 211:20
unripe 29:24, 30:2,
    30:11, 30:19,
    37:2, 43:23,
    43:25, 56:12
unsealed 153:7
unsealing 153:9,
    154:3, 155:13,
    238:12
Unsecured 3:14,
    21:7, 123:21,
    139:24, 152:20,
    158:18, 158:23,
    170:24, 189:5,
    206:15, 235:14
unspecified 52:11
unsued 77:10
unsure 45:22
until 36:14, 51:9,
    53:9, 62:3, 65:1,
    67:2, 154:17,
    171:20, 174:7,
    176:19, 208:18,
    225:1
untiring 238:23
unusual 29:2, 29:3,
    186:25
unworkable 196:18
up-to-date 8:6
update 19:23, 22:5
updated 8:8, 119:7
updating 8:4
UPR 8:5, 8:9
upset 162:11
urge 43:19, 177:1
Urgent 7:7, 7:18,
    66:3, 71:17,
    118:11, 234:13
Urquhart 42:13
usable 150:17
useful 179:14, 195:7
user 181:1

users 194:7
uses 103:21, 103:22
using 6:16, 14:17,
    100:5, 166:10,
    180:23, 181:3,
    183:1, 193:5
utmost 70:4


< V >
v. 2:25, 208:20,
    235:22
vacated 221:6
vacation 54:11,
    54:12, 54:14,
    77:22
vague 232:16
vaguely 172:7
Valdes 4:17
valid 35:8, 59:12,
    172:12, 172:14,
    172:16, 172:18,
    180:23
validity 35:4,
    48:18, 49:11,
    49:12, 77:25,
    90:8, 141:1,
    183:16, 183:24,
    184:6, 196:11,
    215:24, 219:24
valuable 94:17
value 43:8, 74:18,
    80:17, 94:23,
    112:4, 113:4,
    115:3, 115:4,
    132:2, 136:6,
    155:3, 196:13
valve 229:23
vanilla 48:5
vanish 221:2
variety 75:1, 88:20,
    141:13, 141:25
various 7:10, 10:24,
    11:10, 11:18,
    12:9, 33:23,
    36:20, 36:21,
    40:8, 45:17, 57:5,
    59:3, 67:10,
    74:17, 127:21,
    205:14, 235:5

vast 81:22
vehicle 64:3, 79:7,
    197:1
vehicles 61:6
vendor 187:3
vendors 75:6, 75:20,
    76:3, 76:4, 187:2
vengeance 94:4
verge 206:21
version 166:4,
    226:19, 230:19,
    234:9, 238:8
versions 164:25
versus 37:9, 39:4,
    131:9, 139:14,
    147:5, 184:23,
    213:25
VI 210:1, 210:6,
    210:22, 223:23
via 193:25
viability 113:1,
    142:13
viable 47:1
vibration 6:18
vice 181:23, 181:24,
    193:2
victim 29:18
video 238:19
view 39:23, 100:2,
    110:4, 112:21,
    113:3, 135:17,
    140:1, 224:4
views 45:7
vigorously 204:4,
    204:9, 204:15,
    204:20
vintage 42:16,
    42:17, 45:12,
    45:13, 46:7, 50:20
violates 169:3
violation 189:9
virtual 35:17, 64:15
virtually 79:9
vis-a-vis 109:19
visibility 113:2
vitality 151:20
vitiate 209:20
vociferously 33:24,
    138:23
voice 63:20, 192:24

volume 181:12
volumes 143:22
voluntarily 64:8
volunteer 148:23
vote 184:22, 190:15
voting 69:6

< W >
wait 34:13, 35:6,
  92:9
waiting 56:4
waived 138:15,
  146:7, 146:8
waiver 146:3, 146:4
waiving 130:2
Walker 240:12,
  240:13
Wang 195:13, 195:18
wanted 14:1, 14:19,
  19:22, 20:1,
  20:18, 36:10,
  53:19, 113:23,
  141:4, 153:20,
  157:19, 210:20,
  214:6, 227:11,
  229:20, 232:1,
  232:25, 233:13,
  233:20, 234:3
wants 41:25, 45:8,
  45:23, 56:22,
  70:22, 70:24,
  92:14, 95:19,
  97:12, 155:6,
  157:5, 189:22,
  217:23, 223:9,
  232:3
warehouses 206:1,
  207:18
warns 162:7
warrant 164:7,
  182:24, 237:11
warranted 77:6
warrantees 132:12
warranting 79:14
waste 80:15, 122:4
wasting 133:23
water 207:19
ways 27:22, 37:5,
  63:17, 138:5,

141:3
wayside 134:25
weather 201:20
Wednesday 16:2,
  105:4, 105:25,
  231:14
week 7:10, 7:17,
  20:8, 67:17,
  68:12, 69:3,
  69:24, 69:25,
  70:1, 70:7, 70:12,
  70:19, 70:25,
  71:2, 78:18,
  118:10, 127:25,
  154:3, 154:9,
  155:15, 155:25,
  157:23, 158:3,
  225:12
weeks 8:15, 21:13,
  22:4, 61:18,
  61:24, 67:18,
  67:19, 185:16,
  186:3
weigh 189:22
Weil 18:10, 53:15,
  65:23, 121:15,
  121:18
Welcome 6:5, 33:13,
  88:8, 121:8
Westlaw 161:22,
  162:6
whatever 20:24,
  29:16, 35:23,
  49:22, 57:9, 80:8,
  114:25, 123:9,
  126:16, 133:22,
  134:13, 134:18,
  134:21, 143:1,
  144:12, 154:21,
  155:3, 155:7
whatsoever 30:10,
  67:3, 214:5
Whenever 218:2,
  220:24
whereas 226:24
whereby 235:1
wherewithal 134:9
whiff 55:25
whipsaw 15:5, 15:6
whisper 55:25

whistles 80:2
whit 55:24
White 151:15, 215:4
whole 72:16, 72:21,
  77:12, 80:1,
  89:17, 90:7,
  114:24, 135:21,
  148:6, 218:12
wholly 11:15
whom 114:8, 123:23,
  201:23
widely 188:20,
  189:10
wiggle 63:13
willing 32:18, 56:6,
  110:16, 212:19,
  214:11
win 216:21
windfall 27:24,
  59:13
window 101:6
wines 54:4
winner 37:22
winnowing 191:19
wish 47:8, 50:9,
  87:13, 180:11,
  233:4
wishes 44:23,
  116:11, 117:25,
  122:9, 122:23
wishing 80:22
within 16:1, 19:17,
  20:8, 21:13, 22:3,
  75:3, 88:24,
  91:13, 100:17,
  101:12, 104:2,
  111:10, 112:15,
  113:15, 137:22,
  162:3, 174:23,
  175:8, 237:14
Without 38:16, 80:1,
  87:4, 87:9, 90:1,
  91:14, 102:11,
  104:13, 115:6,
  117:8, 125:25,
  179:5, 217:11,
  218:1
withstanding 57:22,
  80:5, 134:8,
  134:10, 134:11,

177:25, 209:25,
211:1
WITNESSES 5:3,
201:20, 201:23
Wolf 4:13, 51:15,
51:16, 51:18,
51:19, 53:13
wonderful 14:16
Word 45:25, 71:16,
79:19, 93:25,
137:23, 142:24,
230:22, 238:8
words 37:3, 104:7,
106:4, 122:6,
133:23
work 9:2, 15:13,
16:25, 17:19,
18:25, 19:2, 22:6,
22:16, 59:17,
74:17, 75:8,
75:22, 77:15,
88:16, 88:19,
96:17, 105:7,
133:20, 136:7,
136:15, 142:5,
158:3, 164:4,
223:9, 223:15,
224:10, 225:9,
225:15, 226:10,
238:23
work-arounds 222:24,
222:25
workable 22:2, 23:9
worked 21:25, 74:25
workers 10:21
working 20:21, 21:7,
158:13
works 21:6, 107:2,
215:6
world 156:1, 198:23
Worry 135:25, 223:3
worst 127:18
worth 20:12, 74:10,
89:2, 132:17,
155:7, 156:7
wound 84:1
wow 136:22
write 82:10
written 17:16,
190:7, 205:7

wrote 130:11


< X >
XI 169:15


< Y >
year 8:13, 8:14,
12:20, 66:21,
74:11, 83:8,
83:11, 108:1,
108:12, 148:15,
172:3
years 21:24, 27:13,
32:2, 33:4, 64:23,
93:21, 197:24,
205:13, 205:17,
216:5
Yesterday 13:1,
17:12, 25:10,
26:1, 151:18
yield 121:11
yourself 223:14


< Z >
Zakia 4:10, 214:21,
214:22, 214:24,
215:3, 215:4,
217:14, 218:1,
218:7, 218:14,
219:4, 220:3
zero 32:11
zip 166:4