# EXHIBIT F

**NEW ISSUE - BOOK-ENTRY ONLY**
See "Book-Entry Only System" under THE BONDS

| RATINGS: | Moody's: | Baa1 |
|---|---|---|
| See RATINGS | Fitch: | BBB+ |
| | S&P: | BBB |

**$756,449,000**

# Puerto Rico Public Buildings Authority
## Government Facilities Revenue Bonds, Series R
### (Qualified School Construction Bonds – Issuer Subsidy)
### Guaranteed by the Commonwealth of Puerto Rico

The Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) (the "Bonds") are being issued by Puerto Rico Public Buildings Authority (the "Authority") pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended, and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution"). The Bonds are designated as "Qualified School Construction Bonds," as defined in Section 54F of the Internal Revenue Code of 1986, as amended (the "Code"). The Authority has made the irrevocable election pursuant to Section 6431 of the Code to receive from the federal government credit payments in an amount equal to the lesser of the amount of the interest payable on the Bonds or the amount of interest payable if determined at the applicable credit rate announced by the United States Department of the Treasury on the date of sale of the Bonds (the "Interest Subsidy Payments") as more fully described herein.

Concurrently with the issuance of the Bonds, the Authority is issuing its $303,945,000 aggregate principal amount of Government Facilities Revenue Bonds, Series S (the "Series S Bonds"). The Series S Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Bonds are being sold solely in Puerto Rico and their issuance is not contingent upon the issuance of the Series S Bonds.

The Bonds, the Series S Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution are payable from, and are secured by a pledge of, the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth"). The Authority will also pledge, as additional security for the payment of the Bonds, moneys on deposit in the Series R Advance Deposit Account described herein. The Authority will also pledge, as additional security for the payment of interest on the Bonds, moneys on deposit in the Series R Interest Subsidy Account described herein. For information regarding certain risks applicable to the Interest Subsidy Payments, see "Interest Subsidy Payments for Qualified School Construction Bonds" under SECURITY.

**The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of the Commonwealth such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.**

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- Interest on the Bonds will be payable quarterly on each January 1, April 1, July 1 and October 1, beginning on January 1, 2012.

- The Bonds are subject to extraordinary optional redemption and extraordinary mandatory redemption prior to maturity as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates and yields of the Bonds.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Foley & Lardner LLP, Miami, Florida, Bond Counsel, and certain other conditions.

- In the opinion of Pietrantoni Méndez & Alvarez LLP, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Bonds will be exempt from United States Federal income taxation to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. The Bonds are not otherwise exempt from United States Federal income taxation. See TAX MATTERS herein.

- Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Bonds will occur on or about August 24, 2011.

## Popular Securities

| | | |
|---|---|---|
| **BofA Merrill Lynch** | **Santander Securities Corporation** | **UBS Financial Services Incorporated of Puerto Rico** |
| **Barclays Capital** | **BBVAPR MSD** | **Citigroup** | **FirstBank Securities** |
| **Oriental Financial Services** | **Ramirez & Co., Inc.** | **Raymond James** | **Scotia MSD** |

August 10, 2011

**$756,449,000**
**Puerto Rico Public Buildings Authority**
**Government Facilities Revenue Bonds, Series R**
**(Qualified School Construction Bonds – Issuer Subsidy)**
**Guaranteed by the Commonwealth of Puerto Rico**

| Maturity July 1 | Amount | Interest Rate | Price | CUSIP[*] |
|---|---|---|---|---|
| 2028 | $455,524,000 | 5.65% | 100.00 | 745235 M57 |
| 2028 | 94,425,000 | 5.65 | 100.00 | 745235 M73 |
| 2028 | 56,500,000 | 5.65 | 100.00 | 745235 M65 |
| 2028[†] | 150,000,000 | 5.70 | 100.00 | 745235 M81 |

---

[*] Copyright, American Bankers Association. CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP number listed above is being provided solely for the convenience of bondholders. The Authority and the Underwriters do not make any representation with respect to such number or undertake any responsibility for its accuracy. The CUSIP number is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

[†] Not reoffered.

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth or incorporated herein by reference has been obtained from the Public Buildings Authority (the "Authority"), the Commonwealth, and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Bonds referred to herein and may not be reproduced or used, in whole or in part, for any other purpose. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority or the 1995 Fiscal Agent.

The Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Bonds in accordance with applicable provisions of laws of the states in which Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof. Neither these states nor any of their agencies have passed upon the merits of the Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Authority does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

INTRODUCTION................................................. 1

RECENT DEVELOPMENTS............................... 4
  Commonwealth's Fiscal Imbalance............................ 4
  Preliminary Employment Data for Fiscal Year
    2011............................................................ 4
  Fiscal Year 2012 Government Budget ...................... 5
  Preliminary Results for Fiscal Year 2011 ................ 5
  Tax Reform.................................................... 6
  Financial Condition of Retirement Systems ............... 7
  Local Incentives for Rum Producers ...................... 9
  Recent Rating Actions ........................................ 9

PLAN OF FINANCING ................................... 10
  The Bonds .................................................... 10
  Use of Proceeds .............................................. 11

THE BONDS ............................................... 11
  Description of the Bonds .................................... 11
  Designation of the Bonds as Qualified School
    Construction Bonds ...................................... 11
  Redemption Provisions...................................... 12
  Book-Entry Only System .................................. 13
  Discontinuance of the Book-Entry Only System ....... 15

SECURITY .................................................. 15
  Commonwealth Guaranty .................................... 16
  Opinion of the Secretary of Justice of the
    Commonwealth ............................................ 16
  Lease Agreements ............................................ 17
  Pledge of the Commonwealth to Pay or Advance
    Rentals...................................................... 19
  Additional Bonds.............................................. 19
  Interest Subsidy Payments for Qualified School
    Construction Bonds ...................................... 19

PROVISIONS RELATING TO PUBLIC DEBT OF
  THE COMMONWEALTH.................................. 21
  Public Sector Debt............................................ 21
  Payment of Public Debt...................................... 22
  Payment Record .............................................. 22
  Debt Limitation .............................................. 22
  Commonwealth Guaranteed Debt .......................... 25

THE AUTHORITY ........................................ 26
  General ........................................................ 26
  Powers ........................................................ 26
  Management .................................................. 26

PROGRAMS AND FACILITIES OF THE
  AUTHORITY .............................................. 27
  Office Buildings Program.................................... 28

**Page**

  School Buildings Program .................................. 28
  Health Facilities Program .................................. 29
  Correctional Facilities Program ........................... 29
  Other Facilities............................................... 29

DEBT OF THE AUTHORITY AND DEBT
  SERVICE REQUIREMENTS.......................... 30
  Debt............................................................ 30
  Debt Service Requirements.................................. 30

SUMMARY OF CERTAIN PROVISIONS OF THE
  1995 BOND RESOLUTION............................ 31
  Revenues...................................................... 32
  1995 Sinking Fund........................................... 32
  1995 Redemption Account .................................. 32
  1995 Construction Fund..................................... 34
  Additional Bonds............................................. 34
  Investment of Funds in 1995 Construction Fund,
    1995 Bond Service Account and 1995
    Redemption Account ...................................... 35
  Series R Advance Deposit Account........................ 36
  Payment by Lessees of Series R Advance Deposit
    Amounts..................................................... 37
  Series R Advance Deposit Amounts ...................... 37
  Series R Interest Subsidy Account......................... 38
  General Covenants ........................................... 38
  Modifications................................................. 39
  Notice of Default ............................................ 40

TAX MATTERS ............................................ 40

UNDERWRITING .......................................... 43

LEGAL INVESTMENT.................................... 43

LEGAL MATTERS ........................................ 43

GOVERNMENT DEVELOPMENT BANK FOR
  PUERTO RICO............................................ 44

RATINGS.................................................... 44

CONTINUING DISCLOSURE............................ 44
  Continuing Disclosure Undertaking........................ 44
  Prior Continuing Disclosure Non-Compliance .... 47

MISCELLANEOUS.......................................... 47

APPENDIX I – Proposed Form of Opinion of
  Bond Counsel .......................................... I-1

APPENDIX II – Proposed Form of Opinion of Special
  Puerto Rico Tax Counsel................................ II-1

[This Page Intentionally Left Blank]

$756,449,000
**Puerto Rico Public Buildings Authority**
**Government Facilities Revenue Bonds, Series R**
**(Qualified School Construction Bonds – Issuer Subsidy)**
**Guaranteed by the Commonwealth of Puerto Rico**

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Public Buildings Authority (the "Authority") of $756,449,000 aggregate principal amount of its Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) (the "Bonds"). The proceeds of the Bonds will be used to pay part of the cost of constructing, renovating, remodeling and/or improving approximately 100 public schools. See PLAN OF FINANCING.

Concurrently with the issuance of the Bonds, the Authority is issuing $303,945,000 aggregate principal amount of its Government Facilities Revenue Bonds, Series S (the "Series S Bonds"). The proceeds of the Series S Bonds will be used to repay certain advances made to the Authority by Government Development Bank for Puerto Rico ("Government Development Bank") under line of credit facilities to (a) pay of interest due January 1 and July 1, 2011 on certain bonds issued under the 1995 Bond Resolution and the 1970 Bond Resolution (each as defined below), and (b) pay a portion of the construction costs of certain buildings and facilities leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth. The Series S Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Bonds are being sold only in Puerto Rico and their issuance is not contingent upon the issuance of the Series S Bonds.

The Bonds will be issued pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution"), particularly as supplemented by a Resolution adopted by the Authority on August 10, 2011 (the "Bond Resolution"). The Bonds are designated as "Qualified School Construction Bonds" pursuant to Section 54F of the Internal Revenue Code of 1986, as amended (the "Code"). The Authority has irrevocably elected pursuant to Section 6431 of the Code to receive from the federal government credit payments in an amount equal to the lesser of the amount of interest payable on the Bonds or the amount of interest payable if determined at the applicable credit rate announced by the United States Department of the Treasury (the "U.S. Treasury") on the date of sale of the Bonds in lieu of receipt by investors of tax credits as provided by the Code.

Immediately prior to the issuance of the Bonds, the Authority will have outstanding $2,951,222,115 aggregate principal amount of its Government Facilities Bonds (as defined herein) (calculated by excluding all accretion on any existing capital appreciation bonds and convertible capital appreciation bonds) issued under the 1995 Bond Resolution. The fiscal agent under the 1995 Bond Resolution is U.S. Bank National Association (the "1995 Fiscal Agent"). In the past, the Authority has issued Public Buildings Authority Public Education and Health Facilities Bonds under Resolution No. 158, adopted by the Authority on February 14, 1978, as amended (the "1978 Bond Resolution"), none of which are currently outstanding, and Public Buildings Authority Revenue Bonds under Resolution No. 77, adopted by the Authority on November 16, 1970, as amended (the "1970 Bond Resolution"), of which an aggregate principal amount of approximately $37.3 million are currently outstanding. The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds issued under the 1995 Bond Resolution and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any bonds issued under the 1970 Bond Resolution or 1978 Bond Resolution. See SECURITY herein.

The Bonds, the Series S Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution (collectively, the "Government Facilities Bonds") are payable from and are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth"). The Authority will also pledge, as security for the payment of the Bonds, moneys on deposit in the Series R Advance

Deposit Account described herein. See "Series R Advance Deposit Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. The Authority will covenant to deposit the credits received from the federal government under the Qualified School Construction Bonds program, to the extent received by the Authority (the "Interest Subsidy Payments"), immediately upon receipt into the Series R Interest Subsidy Account for application as provided in the Bond Resolution. The Authority will also pledge, as additional security for the payment of interest on the Bonds, moneys on deposit in the Series R Interest Subsidy Account described herein. See "Series R Interest Subsidy Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. There can be no assurance that the Bonds will qualify as "Qualified School Construction Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. See "Interest Subsidy Payments for Qualified School Construction Bonds" under SECURITY. The Bonds are further guaranteed by the good faith, credit and taxing power of the Commonwealth.

This Official Statement includes the cover page, the inside cover page, the appendices hereto and the following documents, which have been filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") at http://emma.msrb.org and are incorporated herein by reference:

(1)     the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth ("Treasury Department") (the "Commonwealth's Annual Financial Report"), which was filed with the MSRB through EMMA on April 29, 2011. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Employees Retirement System, Teachers Retirement System and Judiciary Retirement System (the "Retirement Systems") whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors;

(2)     the Commonwealth Financial Information and Operating Data Report, dated April 30, 2011 (the "Commonwealth Report"), included as Appendix I to the Official Statement, dated June 29, 2011, relating to $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011, $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E, which was filed with the MSRB through EMMA. The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth; and

(3)     the basic financial statements of the Authority as of and for the fiscal year ended June 30, 2010, which have been audited by Ortiz, Rivera, Rivera & Co., San Juan, Puerto Rico, certified public accountants, as stated in their report dated September 28, 2010, accompanying such financial statements (the "Authority's 2010 Financial Statements"), which were filed with the MSRB through EMMA on February 4, 2011.

Any Official Statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report, or any new or revised Commonwealth Report or

Commonwealth's Annual Financial Report, or other document, that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be a part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth and the Authority have entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under their existing continuing disclosure undertakings, the Commonwealth and the Authority are obligated to file on or before May 1 in each year updates, in the case of the Commonwealth, of its financial, operational and macroeconomic information and, in the case of the Authority, of its financial and operational information, in each case through the end of the prior fiscal year. The Commonwealth and the Authority comply with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report and the Authority's audited financial statements for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, upon a written or oral request by such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22d Floor, New York, NY 10020, telephone number (212) 333-0364, or to Vice President – General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Report, the Commonwealth's Annual Financial Report and the Authority's 2010 Financial Statements may be obtained by accessing http://emma.msrb.org or by visiting the website of Government Development Bank for Puerto Rico ("Government Development Bank") at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Fiscal Imbalance

Since 2000, the Commonwealth has experienced an imbalance between recurring government revenues and total expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. The current administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. For fiscal year 2010, total expenditures of $10.369 billion exceeded total revenues (excluding other financing sources) of $7.593 billion by $2.775 billion; if debt service amounts that were refinanced during fiscal year 2010 are excluded, however, total expenditures were approximately $9.691 billion and exceeded total revenues (excluding other financing sources) by $2.098 billion. It is estimated that the deficit for fiscal year 2011 will be approximately $1.0 billion (excluding the debt service amounts due in fiscal year 2011 that were refinanced during such fiscal year, as described below).   See "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report.

In order to address the fiscal imbalance, the Government of Puerto Rico (the "Government") has taken multiple steps, including the implementation of a multi-year Fiscal Stabilization Plan (the "Fiscal Plan"). The Fiscal Plan included operating expense reduction measures (which the Government estimates have resulted in annual savings of approximately $837 million), tax revenue enforcement measures, temporary and permanent revenue raising measures (which the Government estimates will result in additional revenues of $420 million during fiscal year 2011) and financial measures. The principal financial measure taken has been the bond issuance program of the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds of the COFINA bond issuance program (which are deposited in an account referred to as the "Stabilization Fund" managed by Government Development Bank) have been used to repay existing government debt (including debts with Government Development Bank), finance operating expenses for fiscal years 2008 through 2011 (including costs related to the implementation of the expense reduction measures of the Fiscal Plan), and fund an economic stimulus plan.

Another financial measure has been the restructuring of a portion of the Commonwealth's debt service. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on the Commonwealth guaranteed bonds issued by Public Buildings Authority ("PBA"). During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, the Authority used a line of credit from Government Development Bank to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds. This line of credit is being refinanced with the proceeds of the Series S Bonds. During fiscal year 2012, the Government expects to refinance approximately $537.4 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $153.8 million of interest to accrue during such fiscal year on the Commonwealth guaranteed Authority bonds. The Fiscal Plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in the Commonwealth Report.

### Preliminary Employment Data for Fiscal Year 2011

On July 22, 2011, the Department of Labor and Human Resources of the Commonwealth released preliminary employment data for fiscal year 2011. According to the Household Survey, total employment for fiscal year 2011 averaged 1,077,000, a decrease of 26,000, or 2.4%, from 1,103,000 for the previous fiscal year. The unemployment rate for fiscal year 2011 was 15.9%, compared to 16.0% for fiscal year 2010. The unemployment rate for June 2011 was 15.2%, compared to 16% for June 2010.

**Fiscal Year 2012 Government Budget**

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed Authority bonds which are expected to be refinanced during fiscal year 2012. See "Commonwealth's Fiscal Imbalance" above. The budgeted total expenditures for fiscal year 2012 are $126 million, or 1.4%, higher than budgeted total expenditures of $9.134 billion for fiscal year 2011, and $1.109 billion, or 10.7%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2 million).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

On July 7, 2011, the Secretary of Health of the Commonwealth announced the cancellation of the contract through which MCS HMO administered five regions, with approximately 850,000 insureds, of the Government's health insurance program, "Mi Salud." For a discussion of the health program, see "Other Public Corporations – Health Insurance Administration" under PUBLIC CORPORATIONS in the Commonwealth Report. Although MCS HMO will continue to render services to covered insureds during a 90 day transition period, the government is currently evaluating alternatives to assure continued services to the affected insureds. The Government is also evaluating the impact, if any, of this termination on the budget of the health insurance program for fiscal year 2012.

**Preliminary Results for Fiscal Year 2011**

Preliminary General Fund net revenues for fiscal year 2011 (from July 1, 2010 to June 30, 2011) were $8.165 billion, an increase of $474.5 million, or 6.2%, from $7.691 billion of net revenues for the same period in the prior fiscal year, and an increase of $31 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed below under "Tax Reform."

The increase in General Fund net revenues is mainly due to an increase of $170.1 million in withholdings from non-residents and the collection of $677.8 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform. This increase was partially offset by a decrease of $376.7 million, $18.5 million, and $17.5 million in collections from income tax on individuals, entertainment machine licenses, and non-tax revenues, respectively. The decrease in individual income taxes is due to the tax relief provided to individual

taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first five monthly excise tax payments (from February through June 2011) amounted to $108.7 million, $125.8 million, $172.5 million, $130.2 million, and $140.4 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

For more information on the tax reform and Act No. 154, see "Tax Reform" below and "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in the Commonwealth Report.

**Tax Reform**

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate average annual savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The Treasury Department recently announced that preliminary collections for the first five monthly excise tax payments (from February through June

2011) were $108.7 million, $125.8 million, $172.5 million, $130.2 million, and $140.4 million, respectively. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Therefore, it is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth Report.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with Government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding

shortfalls.  The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $7.8 million, respectively.  As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018.  The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies.  It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution.  These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated.  Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.  If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability.  Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.  For more information regarding the retirement systems, see RETIREMENT SYSTEMS in the Commonwealth Report.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems.  The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition.  One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act No. 96").  On June 23, 2011, in accordance with Act No. 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%.  The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 116 of July 6, 2011 ("Act 116") and provides an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years.  As a result of these increases, the Employee Retirement System and the Teachers

8

Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $7 million in fiscal year 2012. Act 116 did not include the division of the Employees Retirement System into three separate systems corresponding to the central government, public corporations and municipalities as had been proposed under the bill submitted by the Governor (House Bill 3407).

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") each month to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Destilería Serrallés, Inc. ("Serrallés") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act No. 178 and contains identical provisions.

As permitted under Act No. 1, the Government has entered into a definitive agreement with two rum producers and is currently in negotiations with other producers to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of General Fund revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

**Recent Rating Actions**

On August 8, 2011, Moody's Investors Service ("Moody's") lowered its rating on the Commonwealth unenhanced general obligation bonds to "Baa1" with a negative outlook from "A3" and assigned such rating to the

Bonds and the Series S Bonds. This rating action was a result of Moody's review of the Commonwealth's rating, which had been placed on watchlist on May 3, 2011. In taking this rating action, Moody's stated the downgrade reflects the continued financial deterioration of the severely underfunded retirement systems, continued weak economic trend, and weak finances, with a historical trend of funding budget gaps with borrowings. Moody's negative outlook reflects the stress the Commonwealth will face in the next few years as it continues to address the underfunding of the retirement systems from an already weak financial and economic position. On April 19, 2010, Moody's had rated the Commonwealth's unenhanced general obligation debt "A3," which was three gradations above the previous "Baa3" rating, as a result of its recalibration of certain U.S. municipal bond issues and issuers.

On August 8, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), reaffirmed its rating of the Commonwealth's unenhanced general obligation bonds. On March 7, 2011, S&P had raised its rating on the Commonwealth's unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measures that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years, in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On August 8, 2011, Fitch, Inc. ("Fitch") assigned a rating of "BBB+" with a stable outlook to the Bonds. This is the first time Fitch assigns a rating to bonds issued by the Puerto Rico Public Buildings Authority. Fitch noted that this rating, which is the same as Fitch's rating for the Commonwealth's unenhanced general obligation bonds, is due to the Commonwealth guarantee of the Bonds. On January 19, 2011, Fitch had assigned a "BBB+" rating to the Commonwealth's unenhanced general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

## PLAN OF FINANCING

### The Bonds

The Authority will use the proceeds of the Bonds to pay part of the cost of constructing, renovating, remodeling and/or improving approximately 100 public schools and acquiring land together with equipment, furnishings, landscaping and other site improvements (including demolition of existing structures) and all necessary appurtenances thereto. These public schools are part of the Government's "Schools for the 21st Century" program. See "School Buildings Program" under PROGRAMS AND FACILITIES OF THE AUTHORITY. Because the Bonds are designated as "Qualified School Construction Bonds" under Sections 54A, 54F and 6431 of the Code, their proceeds may be applied only for qualified purposes under Sections 54A and 54F of the Code. Section 54F of the Code requires that the "Available Project Proceeds" of "Qualified School Construction Bonds," such as the Bonds, be applied solely to the construction, rehabilitation or repair of a public school facility, or the acquisition of land out which such a facility is to be constructed. The term "Available Project Proceeds" means the proceeds from the sale of the issue plus investment earnings thereon minus issuance costs financed by the issue. Not more than 2% of the proceeds may be used to finance issuance costs. IRS Notice 2009-35, released April 3, 2009, which specified the allocations for "Qualified School Construction Bonds," also provided that bond proceeds may be expended for "costs of acquisition of equipment to be used in such portion or portions of the public school facility that is being constructed, rehabilitated or repaired" with the proceeds of the related "Qualified School Construction Bonds." The Authority expects to expend the proceeds of the sale of the Bonds within thirty-six months following their date of delivery.

The Authority has covenanted to provide notice of its final expenditure of the proceeds of the Bonds as a Notice of Material Event as part of its continuing disclosure obligations.

## Use of Proceeds

The proceeds of the Bonds are expected to be used as follows:

**Sources**

| | |
|---|---|
| Par Amount of the Bonds | $756,449,000 |
| Total | $756,449,000 |

**Uses**

| | |
|---|---|
| 1995 Construction Fund | $748,156,868 |
| Underwriters' discount and estimated legal, printing and financing expenses | 8,292,132 |
| Total | $756,449,000 |

## THE BONDS

### Description of the Bonds

The Bonds will be issued in book-entry only form as registered bonds without coupons, will be dated their date of delivery, and will bear interest at the rate and will mature on the date set forth on the inside cover page of this Official Statement. Principal of and interest on the Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months. Interest on the Bonds will be payable quarterly on each January 1, April 1, July 1 and October 1, commencing on January 1, 2012. The Bonds will be issued in fully registered form, in denominations of $5,000 and any multiple of $1,000 in excess thereof and, when issued, will initially be registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Bonds.

The Authority has elected to issue the Bonds with a single maturity, and to pay all principal of the Bonds on such maturity date. The Authority has also agreed in the Bond Resolution to (i) establish and maintain the Series R Advance Deposit Account and the Series R Interest Subsidy Account, which are separate and distinct accounts from all other funds and accounts of the Authority, (ii) make annual deposits in the Series R Advance Deposit Account in the years and in the amounts set forth in the table appearing in "Series R Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION, (iii) deposit the Interest Subsidy Payments in the Series R Interest Subsidy Account, and (iv) invest the moneys on deposit in the Series R Advance Deposit Account at a rate not in excess of the permitted sinking fund yield under Section 54A(d)(5) of the Code.

### Designation of the Bonds as Qualified School Construction Bonds

The Authority will issue the Bonds as "Qualified School Construction Bonds" pursuant to certain provisions of the American Recovery and Reinvestment Act of 2009 (the "Recovery Act") and will designate them as such pursuant to Section 54F of the Code. The Authority will elect under Section 6431(f) of the Code to designate the Bonds as "Specified Tax Credit Bonds" and receive a credit from the U.S. Treasury equal to the lesser of (i) the interest to be paid on the Bonds, or (ii) the amount of interest payable at the applicable credit rate determined under Section 54A(b)(3) of the Code (an "Interest Subsidy Payment"); provided the Authority makes certain required filings in accordance with applicable federal rules pertaining to the Interest Subsidy Payment. The Interest Subsidy Payments are expected to be paid within 45 days of receipt by the IRS of IRS Form 8038-CP with respect to each Interest Payment Date identifying the amount of interest to be paid. Each such form 8038-CP may be filed no more than 90 days prior to the relevant Interest Payment Date. The Authority has covenanted to (i) comply with the requirements to assure eligibility of the Authority for receipt of the Interest Subsidy Payments and (ii) to deposit all Interest Subsidy Payments immediately upon receipt into the Series R Interest Subsidy Account. The Authority will be responsible for timely filing of the IRS Form 8038-CP. Depending on the timing, an Interest Subsidy Payment may be received before or after the corresponding interest payment date.

Section 54F of the Code provides that the total amount of qualified school construction bonds that may be issued nationally in calendar year 2009 and calendar year 2010 is limited to $11.0 billion for each year. The U.S. Treasury authorized the Commonwealth to issue up to $376,055,000 and $380,394,000 aggregate principal amount

of "Qualified School Construction Bonds" in calendar years 2009 and 2010, respectively. The Commonwealth delegated the authorization to issue "Qualified School Construction Bonds" to the Authority by means of Executive Order No. 2010-054 signed by the Governor on October 5, 2010. As permitted by Section 54F of the Code, the Authority has carried forward its authorization to issue up to $756,449,000 aggregate principal amount of "Qualified School Construction Bonds" to subsequent calendar years. The Bonds are the first issuance of qualified school construction bonds under the Authority's authorization.

Federal law imposes certain requirements for qualification of the Bonds as "Qualified School Construction Bonds." There can be no assurance that the Bonds will qualify as "Qualified School Construction Bonds." No assurances are provided that the Authority will receive any Interest Subsidy Payments from the IRS with respect to the Bonds. The Interest Subsidy Payments are characterized in the Code as refundable tax credits that are generally treated as overpayments of tax that are subject to being credited against liabilities in respect of internal revenue tax and offset against outstanding debts to the United States. Before disbursing the Interest Subsidy Payments, the IRS compares the payment information with delinquent debtor information in its database. The IRS treats state and local governments as one entity/debtor regardless of the type of federal payment or the type of outstanding debt. As a result, Interest Subsidy Payments may be subject to reduction or offset by the IRS to the extent the Authority or the Commonwealth owes payments of any kind to the United States. Also, there can be no assurance that future changes in the law will not reduce or eliminate those credits with respect to the Bonds. The Authority's obligation to make debt service payments on the Bonds is not abated or offset by the failure to receive the Interest Subsidy Payments described above.

## Redemption Provisions

*Extraordinary Optional Redemption.* The Bonds shall be subject to redemption, at the option of the Authority, prior to their maturity date, in whole or in part, on the date designated by the Authority, upon the occurrence of an Extraordinary Event (defined below), at a redemption price equal to the principal amount of the Bonds to be redeemed, plus accrued interest thereon to the redemption date, without premium. An "Extraordinary Event" will have occurred if the Authority determines that (a) a material adverse change has occurred to Section 54F or 6431 of the Code or (b) any guidance has been published by the IRS or the United States Treasury with respect to such section or sections or (c) any legislation is enacted which impacts the receipt of the Interest Subsidy Payments or (d) any other determination is made by the IRS or the United States Treasury or any court of competent jurisdiction, which determination is not the result of any act or omission by the Authority to satisfy the requirements of the Code to receive the Interest Subsidy Payments from the United States Treasury, pursuant to which the Interest Subsidy Payments from the United States Treasury are reduced or eliminated.

*Extraordinary Mandatory Redemption.* The Bonds shall be subject to extraordinary mandatory redemption, in whole or in part, on, August 24, 2014, at a redemption price equal to the principal amount of the Bonds called for redemption plus accrued interest thereon to the redemption date, without premium, in an amount equal to the unexpended proceeds of the sale of the Bonds then held by the Authority, but only to the extent that the Authority fails to expend all of the proceeds of the Bonds for certain qualified purposes as required by Section 54F of the Code within three years of issuance thereof and no extension of the period for expenditure has been granted by the IRS.

*Notice of Redemption.* At least 30 days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described under the caption "Book-Entry Only System" under THE BONDS, by first-class mail, postage prepaid, to the registered owners of the Bonds to be redeemed. Each notice of redemption shall contain, among other things, the CUSIP identification number of the Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the 1995 Fiscal Agent, interest on the Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the 1995 Bond Resolution, Bonds or portions of Bonds which have been duly called for redemption, or with respect to which irrevocable instructions to call for redemption have

been given, and for the payment of the principal of and the accrued interest on which sufficient moneys or Government Obligations (as defined in the 1995 Bond Resolution) shall be held in separate trust for the owners of such Bonds or portions thereof to be redeemed, shall not be deemed to be outstanding under the 1995 Bond Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the accrued interest thereon from said separate trust and to receive Bonds (of the same series and maturity) for any unredeemed portion of such Bonds.

*Selection of Bonds to be Redeemed.* If less than all of the Bonds of any one maturity and series shall be called for redemption, the particular Bonds or portions thereof to be redeemed shall be selected by the 1995 Fiscal Agent in such manner as it, in its discretion, may determine to be appropriate and fair; except that so long as the book-entry only system shall remain in effect, the selection of the Bonds to be redeemed shall be determined as provided under the caption "Book-Entry Only System" under THE BONDS. If during any fiscal year the total principal amount of term Bonds retired by purchase or redemption exceeds the amortization requirement for such term Bonds for such year, the amortization requirements for such term Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from sources (including DTC) that the Authority believes to be reliable, but none of the Authority, the 1995 Fiscal Agent or the Underwriters takes any responsibility for the accuracy of such information.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each maturity of each series of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such maturity.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity, corporate and municipal debt, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participant's accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants," and together with the Direct Participants, the "Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the SEC. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of

13

ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, principal payments and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1995 Fiscal Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC, the 1995 Fiscal Agent, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, principal and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1995 Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1995 Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive will be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered to DTC.

*The Authority, the 1995 Fiscal Agent and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of*

the principal of or premium, if any, or interest on any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant. The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: (i) principal of and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1995 Fiscal Agent in New York, New York; (ii) interest on the Bonds will be payable on each January 1, April 1, July 1 and October 1 by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1995 Fiscal Agent as of the close of business on the record date therefor as set forth in the 1995 Bond Resolution (March 15, June 15, September 15 and December 15); (iii) the Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple of $1,000 in excess thereof, and (iv) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust office of the 1995 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such registration, transfer or exchange.

For every registration or transfer of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## SECURITY

All Government Facilities Bonds will be secured equally and ratably by a pledge of rentals of the facilities leased by the Authority (the "Leased Facilities"). The Leased Facilities will not be mortgaged or otherwise encumbered to secure any Government Facilities Bonds. The Enabling Act provides that the good faith and credit of the Commonwealth are pledged for the payment of rentals under any lease agreement with any department, agency or instrumentality of the Commonwealth and to the making of advances by the Secretary of Treasury Department to the Authority of any unpaid portion of rentals payable to the Authority by any department, agency or instrumentality of the Commonwealth. The Enabling Act also provides that the good faith and credit of any municipality entering into a lease agreement with the Authority are pledged for the payment of any rentals thereunder.

The Authority will also pledge, as additional security for the payment of the Bonds, moneys on deposit in the Series R Advance Deposit Account described herein. See "Series R Advance Deposit Account; Payment by Lessees of Series R Advance Deposit Amounts; and Series R Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. The Authority will covenant to deposit the Interest Subsidy Payments immediately upon receipt into the Series R Interest Subsidy Account for application as provided in the Bond Resolution. The Authority will also pledge, as additional security for the payment of interest on the Bonds, moneys on deposit in the Series R Interest Subsidy Account described herein. See "Series R Interest Subsidy Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. There can be no assurance that the Bonds will qualify as "Qualified School Construction Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. See "Interest Subsidy Payments for School Construction Bonds" below.

The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Treasury such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.

The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution, or any Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution.

**Commonwealth Guaranty**

As provided in Act No. 17 of the Legislative Assembly of Puerto Rico, approved on April 11, 1968, as amended (the "Guaranty Act"), the Commonwealth guarantees, among other things, the payment of the principal of and interest on the Government Facilities Bonds. The Guaranty Act, which was amended by Act No. 128 of July 12, 2011, to increase the amount of the guaranty from $3,325,000,000 to $4,325,000,000, provides:

The Government of Puerto Rico hereby guarantees payment of the principal and the interest on bonds outstanding at any given time, in an aggregate principal amount not exceeding $4,325,000,000 issued from time to time by the Public Buildings Authority for any of its purposes authorized by its Enabling Act. The bonds covered by this guaranty shall be those specified by the Authority with the consent and approval of Government Development Bank for Puerto Rico, including, but not limited to, the "Qualified School Construction Bonds" or other bonds, including federal tax credit bonds under Section 54A of the United States Internal Revenue Code of 1986, as amended, and a statement of such guaranty shall be set forth on the face of such bonds. If at any time the revenues or income and any other moneys of the Authority, pledged for the payment of the principal and interest on such bonds, are not sufficient for the payment of such principal and interest when they come due, nor to maintain the reserve fund for the bonds that the Authority has pledged to maintain, the Secretary of Treasury shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficiency in the amount required for the payment of such principal and interest, and to bring said reserve fund to the required maximum agreed by the Authority, and shall direct that the sums thus withdrawn be applied to such payment and purpose. For purposes of this Article, those bonds that have been redeemed, canceled or refunded and provision for payment of which has been made by means of a special reserve, a guaranteed investment contract or other acceptable collateral shall not be deemed as outstanding. The good faith, credit and taxing power of the Commonwealth are hereby pledged to make the payments described in the above paragraph.

The Bonds have been specified by the Authority in the Bond Resolution to be guaranteed by the Commonwealth under the Guaranty Act. Following the issuance of the Bonds and the Series S Bonds, the Authority will have $4,048,931,115 aggregate principal amount of bonds outstanding covered by the Guaranty Act, consisting of $37,315,000 of bonds issued under the 1970 Bond Resolution and $4,011,616,115 of bonds issued under the 1995 Bond Resolution, calculated in each case by excluding the accretion on capital appreciation bonds and convertible capital appreciation bonds. See DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS herein.

To date, no payments have ever been required under the Guaranty Act.

**Opinion of the Secretary of Justice of the Commonwealth**

Prior to the delivery of the Bonds, the Secretary of Justice of the Commonwealth will have rendered his opinion to the Authority to the effect that:

1. The Authority is lawfully authorized to specify up to $4,325,000,000 aggregate principal amount of bonds of the Authority outstanding at any one time, issued for any of its authorized purposes, to be covered by the guaranty of the Commonwealth under the Guaranty Act, and the Commonwealth will be obligated to pay the principal of and the interest on the bonds so specified to be covered by said guaranty, if and to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to make such payments as the same become due;

2. Any amounts required to be paid by the Commonwealth under said guaranty will constitute "public debt" in the meaning of Section 8 of Article VI of the Puerto Rico Constitution (the "Constitution"), and will accordingly be entitled to the same priority of payment under such Section as the direct bonded indebtedness of the Commonwealth;

3.      The Secretary of the Treasury can be required in a court of justice under the provisions of Section 2 of Article VI of the Constitution to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Constitution, including any payments required to be made under said guaranty, at the suit of any holder of bonds issued by the Authority and guaranteed pursuant to the Guaranty Act; and

4.      The Commonwealth guaranty of the Bonds constitutes a general obligation of the Commonwealth to which its good faith, credit and taxing power are pledged.

**Lease Agreements**

In accordance with the provisions of the 1995 Bond Resolution, the Authority enters into lease agreements (the "Lease Agreements") with various departments, agencies, instrumentalities and municipalities of the Commonwealth with respect to the Leased Facilities. The Lease Agreements require the corresponding lessees to pay to the Authority annual rentals in substantially equal monthly installments. The rentals are calculated by taking into account the following factors:

(1)      the interest on and principal of (including any amortization requirements of) and redemption premium, if any, on Government Facilities Bonds issued to finance or refinance such Leased Facilities,

(2)      any amounts necessary to pay the general administrative expenses of the Authority related to the Leased Facilities, and

(3)      any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

The Lease Agreements may also require the lessees to pay certain amounts on account of the principal of and interest on outstanding notes issued to provide interim financing for the initial development and construction of the Leased Facilities.

Each Lease Agreement with respect to a facility or facilities terminates when the Government Facilities Bonds (as well as any notes issued to provide interim financing) which were issued to finance or refinance the acquisition or construction of such facility or facilities have been paid in full. All Lease Agreements provide for the adjustment of rentals so that the total amounts payable will be sufficient to meet the required debt service charges. The Lease Agreements related to the schools financed with the proceeds of the Bonds provide (i) that the annual rental payments are adjusted downward to reflect the portion of the interest payment on the Bonds that is covered by the Interest Subsidy Payments, (ii) for the adjustment upwards of the rental payments in the event the Authority does not receive, in whole or in part, the Interest Subsidy Payments so that the total amount of rent payable will be sufficient to meet the required debt service on the Bonds, and (iii) for the payment of an allocable portion of the Series R Advance Deposit Amounts in addition to rentals to pay the principal of and interest on the Bonds.  Each Lease Agreement provides that the obligation of the lessee to pay rentals is absolute and unconditional.

Under the 1995 Bond Resolution, the Authority is required to forward, upon receipt, the portion of the rental payment from the lessees corresponding to the debt service payments on the Bonds (as well as any notes issued to provide interim financing) to the 1995 Fiscal Agent. During recent fiscal years, the Authority experienced delays in rental payments, as the Commonwealth experienced growing budget deficits through fiscal year 2009. Given the budgetary constraints of the Commonwealth, in recent fiscal years OMB did not propose, and, as a result, the Legislative Assembly did not appropriate, sufficient funds to provide the Authority with the aggregate amount of rental payments provided for in the Lease Agreements. Consequently, OMB was unable to instruct the Treasury Department to forward to Government Development Bank the full amount of rental payments payable under the Lease Agreements. Nevertheless, OMB has always instructed the Treasury Department to forward to Government Development Bank sufficient funds to pay all interest on and principal of (including any amortization requirements) and redemption premium, if any, on Government Facilities Bonds, as well as a portion of general and administrative expenses of the Authority related to the Leased Facilities. No funds have been provided, however, to replenish or

maintain the reserve for the replacement of major items of equipment comprising a portion of such Leased Facilities. As of June 30, 2011, no funds were on deposit for such reserve.

In an effort to reduce the frequency and length of delays in the receipt of rental payments by the Authority, on December 7, 2001, the Authority entered into an Inter-Agency Agreement (the "Inter-Agency Agreement") with Government Development Bank, the Puerto Rico Office of Management and Budget ("OMB") and the Treasury Department pursuant to which OMB instructs the Treasury Department to forward funds necessary to pay rentals under Lease Agreements to Government Development Bank by the 10th day of each month, which funds are, in turn, deposited in a special account of the Authority at Government Development Bank. The Inter-Agency Agreement covers rental payments whose source is the General Fund, which includes agencies, departments or instrumentalities that are linked to the central accounting system managed by the Treasury Department. Such amounts represent approximately 85% of all rental payments received by the Authority under the Lease Agreements. The portion of such rentals that is used to pay debt service on the Authority's bonds is kept in the special account of the Authority at Government Development Bank for delivery to the respective fiscal agents. The remainder is forwarded to the Authority to cover its general and administrative expenses related to the Leased Facilities, as well as any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

In 2009, OMB and Government Development Bank established a five-year plan for the repayment of accumulated debt owed by departments, agencies and instrumentalities of the Commonwealth to certain public corporations, including the Authority. Pursuant to this plan, OMB scheduled and the Legislative Assembly appropriated for fiscal years 2010, 2011, and 2012 approximately $51.0 million, $60.3 million, and $38.7 million, respectively, for the amortization of overdue rent to the Authority, and has agreed to continue requesting annual General Fund appropriations for the payment of such debt.

In fiscal years 2010 and 2011, the Authority collected 93% and 98%, respectively, of its current rent. As described above, the delays and shortfalls in rental payments have not affected the Authority's ability to pay its debt service and there have been no defaults or delays in the payment of principal or interest on any indebtedness of the Authority. To address the delays and shortfalls in the payment of rent, the Authority continues to undertake certain fiscal measures, including:

- Ensuring that the Legislative Assembly appropriates sufficient funds in the Commonwealth's proposed budgets to provide the Authority with the adequate amount of rental payments, as proposed by OMB.

- Implementing various Executive Orders issued by the Governor during the second half of fiscal year 2009 calling for the implementation of measures of austerity, fiscal control and expense reduction, including salary reduction of non-career employees and agency heads, salary freezes, ban on new positions, and the elimination of vacant positions. No salary increases are expected to be granted to the Authority's employees until fiscal year 2013.

- Developing and implementing various operating expense reduction measures, including the implementation of energy reduction, transportation, communication and security services cost savings initiatives, consolidation of office space to obtain additional rental income, and renegotiation of services contracts (which has thus far resulted in approximately a 30% annual reduction in services contracts costs). A new facility model with energy, technology and space utilization efficiencies is expected to result in approximately annual energy savings of approximately $2.3 million and annual technology savings of approximately $250,000.

- Implementing a cost reduction initiative in connection with labor union agreements, which includes reductions in the cost of the medical plan, bonus, vacation and sick leave licenses, among others. This initiative is expected to generate savings of approximately $13.5 million in the three-year period commencing in fiscal year 2010.

- Implementing effective and consistent collection methods for past due rentals and entering into payment plans with lessees.

In addition, the Authority is expecting ten-year projected savings of approximately $18 million in payroll expenses due to the implementation of the incentive, retirement and retraining program for eligible government employees created by Act No. 70, as approved by the Legislature on July 2, 2010 ("Act No. 70"). In fiscal years 2011 and 2012, the Authority expects annual savings of $866,277 and $1,913,787, respectively, as a result of Act No. 70.

As part of the measures adopted by the Commonwealth to address its financial condition, the Authority is expected to refinance approximately $153.8 million of interest to accrue during fiscal year 2012. The reduction in the Authority's debt service payment requirements for fiscal year 2012 would result in a commensurate decrease in the required rental payments for such fiscal year. Pending completion of the Authority's refinancing of a portion of its fiscal year 2012 debt service requirement, the Authority has secured a line of credit facility with Government Development Bank in the amount of $153.8 for the payment of such debt service requirements.

For further information regarding certain provisions required by the 1995 Bond Resolution to be included in each Lease Agreement in respect of facilities financed or refinanced by the Bonds, see SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION.

## Pledge of the Commonwealth to Pay or Advance Rentals

Under the 1995 Bond Resolution, the Authority has covenanted that if any department, agency, instrumentality or municipality fails to pay any rent when due, the Authority will promptly notify the Secretary of Treasury.

As provided in the Enabling Act, the good faith and credit of the Commonwealth are pledged for the payment of the rent payable under any Lease Agreement with the Authority executed by any of the Commonwealth's departments, agencies, instrumentalities, or public corporations. The Enabling Act also provides that if any rent payable to the Authority by any department, agency, instrumentality or public corporation under a Lease Agreement is not paid when due, the Commonwealth shall advance the unpaid balance to the Authority. The Commonwealth pledges its good faith and credit to the making of such advances. Any advances so made are required to be reimbursed by the particular department, agency, instrumentality or public corporation involved.

Payments or advances of rentals by the Commonwealth, as described above, are subject to annual appropriations by the Legislative Assembly, which appropriations are legally required to be made. However, the obligation to make such appropriations is not legally enforceable in view of the sovereign immunity of the Commonwealth and, unlike the obligation to make payments under the guaranty of the Bonds, the obligation to pay or advance rentals does not constitute "public debt" within the meaning of Section 8 of Article VI of the Constitution.

## Additional Bonds

Under and in accordance with the provisions and restrictions of the 1995 Bond Resolution, the Authority may issue additional Government Facilities Bonds from time to time to finance additional government facilities or complete the construction of existing government facilities or to refund any bonds issued under the 1995 Bond Resolution, the 1970 Bond Resolution or the 1978 Bond Resolution. Although the Authority reserves the right to issue additional Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution, since the adoption of the 1995 Bond Resolution, the Authority has only issued additional bonds under the 1995 Bond Resolution.

## Interest Subsidy Payments for Qualified School Construction Bonds

The term "Interest Subsidy Payments" means each of the payments of refundable tax credits in respect of the Bonds from the U.S. Treasury actually received by the Authority or the 1995 Fiscal Agent on behalf of the Authority pursuant to Section 6431(f) of the Code and a filing with the IRS. The Authority has covenanted to file,

or cause to be filed, on or before 45 days prior to each Interest Payment Date, Form 8038-CP with the IRS (or such other appropriate form as the IRS shall direct) relating to the Interest Subsidy Payment to be received with respect to the Bonds for such Interest Payment Date.

The Authority cannot predict whether the Interest Subsidy Payments will be received by the Authority or the 1995 Fiscal Agent on behalf of the Authority. The Interest Subsidy Payments are characterized in the Code as refundable tax credits that are generally treated as overpayments of tax that are subject to being credited against liabilities in respect of internal revenue tax and offset against outstanding debts to the United States. Before disbursing the Interest Subsidy Payments, the IRS compares the payment information with delinquent debtor information in its database. The IRS treats state and local governments as one entity/debtor regardless of the type of federal payment or the type of outstanding debt. As a result, Interest Subsidy Payments may be subject to reduction or offset by the IRS to the extent the Authority or the Commonwealth owes payments of any kind to the United States. Federal law imposes certain requirements for qualification of the Bonds as "Qualified School Construction Bonds." There can be no assurance that the Bonds will qualify as "Qualified School Construction Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. In the event that all or a portion of the Bonds lose their status as "Qualified School Construction Bonds," the Authority may lose all or a portion of the Interest Subsidy Payment pursuant to Section 6431(f) of the Code. The Authority's obligation to timely make debt service payments on the Bonds is not abated or offset by the failure to receive the Interest Subsidy Payments.

## PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of June 30, 2011. The table should be read in conjunction with the information set forth under DEBT in *Appendix I*.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

| | June 30, 2011 |
|---|---|
| GENERAL FUND RELATED DEBT | |
| Direct full faith and credit obligations | $9,682 |
| Puerto Rico guaranteed debt[1] | 4,296 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,840 |
| Tax and Revenue Anticipation Notes[3] | - |
| Pension Obligation Bonds[4] | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $20,766 |
| | |
| Sales and Use Tax (COFINA) debt | $13,765 |
| Public corporations and agencies | 23,819 |
| Municipal Debt | 3,537 |
| Limited Obligations/non-recourse debt [5] | 2,389 |
| TOTAL PUBLIC SECTOR DEBT | $64,276 |

---

\*   Totals may not add due to rounding.
[1]   Consists of $598 million of bonds issued by Aqueduct and Sewer Authority, $413.4 million of State Revolving Fund Loans incurred under various federal water laws, $214.5 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of Government Development Bank bonds payable from available moneys of Government Development Bank.
[2]   Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.
[3]   Includes related short-term financings.
[4]   Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.
[5]   Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $624 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $74.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

**Payment of Public Debt**

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first lien on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and, according to opinions rendered by the Secretary of Justice of Puerto Rico, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. Any such guaranty payments, including guaranty payments under the Guaranty Act, are equal in their claim on such available Commonwealth revenues to claims for the payment of debt service on general obligation bonds and notes of the Commonwealth.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of public debt. See "Major Sources of General Fund Revenues—Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES in the Commonwealth Report.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two

fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited constitutional provisions relating to the public debt.

### Variable Rate Bonds and Swap Agreements

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In March 2011, the Commonwealth issued its $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (the "Series 2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of March 31, 2011.

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2011 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($981,295,893) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $997,815,893, is equal to 13.15% of $7,587,526,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2010 and preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 11.87%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See PUBLIC CORPORATIONS in the Commonwealth Report. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. Government Development Bank, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

**Commonwealth Guaranteed Debt**

As of June 30, 2011, $3.070 billion of Commonwealth guaranteed bonds of the Authority were outstanding. Maximum annual debt service on these bonds is $251.2 million in fiscal year 2011, with their final maturity being July 1, 2039. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of June 30, 2011, $267 million of Commonwealth guaranteed bonds of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of June 30, 2011, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $214.5 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal years 2010 and 2011, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million and $16.5 million, respectively. See "Commonwealth Guaranteed Debt" under DEBT in the Commonwealth Report.

As of June 30, 2011, the aggregate outstanding principal amount of obligations of Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed by the Commonwealth was $1.012 billion. This amount consisted of $284.8 million in revenue bonds sold to the public, $313.6 million in bonds issued to the United States Department of Agriculture, Rural Development, and $413.4 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under PUBLIC CORPORATIONS in the Commonwealth Report.

# THE AUTHORITY

## General

The Authority, a body corporate and politic constituting an instrumentality of the Commonwealth exercising public and essential governmental functions, was created on June 19, 1958 by the Enabling Act. Under the Enabling Act, the primary functions of the Authority are to design and construct office buildings, quarters, courts, warehouses, shops, schools, health facilities, social welfare facilities and related facilities for lease to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The executive offices of the Authority are located at Roberto Sánchez Vilella Government Center, North Building, 6th Floor, De Diego Avenue, San Juan, Puerto Rico 00940, telephone number (787) 722-0101.

On May 12, 2011, the Governor submitted to the Legislative Assembly a bill to reorganize the Authority. According to the bill, the Authority would be renamed as the Corporation of Schools and Public Properties (the "Corporation") and all rights, powers, obligations and assets of the Office for the Improvement of Public Schools ("OMEP" by its Spanish acronym) (affiliated with the Department of Education) would be transferred to the Corporation. As a result of the reorganization, the Corporation would have all rights, powers, obligations and assets of both the Authority and OMEP and would be in a better position to conserve and maintain public schools. This bill is currently pending consideration by the Legislative Assembly and there can be no assurance that this bill will be enacted or, if enacted, that it will be enacted in the form proposed.

## Powers

The Authority has broad powers under the Enabling Act, including among others:

- to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers;

- to acquire any kind of properties and rights therein in any lawful manner, including, without limitation, acquisition by purchase, either by agreement or through the exercise of the power of eminent domain, lease or bequest, and to possess, lease, use and operate any properties or facilities;

- to prepare plans, projects and cost estimates for the construction, improvement or repair of any property or facility;

- to contract with any Commonwealth department, agency, instrumentality, public corporation or official, or with any private person or entity with regard to the administration of any properties or facilities of the Authority;

- to borrow money and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds by pledge, mortgage, assignment or deed of trust of all or any of its properties, revenues or income; and

- to do all acts necessary or convenient to carry out the powers granted to it.

## Management

The Enabling Act provides that the Authority shall be governed by a Governing Board (the "Board") composed of seven members. The Secretary of the Department of Education of Puerto Rico (the "Department of Education"), the Secretary of the Department of Transportation and Public Works, and the President of Government Development Bank serve as ex officio members of the Board, and the other four members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico for staggered six-year terms. At present, there is one vacancy on the Board.

The current members of the Board of the Authority, their occupations and the expiration of terms as Board members are:

| Members of the Board | Occupation | Expiration of Term |
|---|---|---|
| Jesús M. Rivera Sánchez ............... | Secretary of Education | Ex-officio |
| Rubén Hernández Gregorat ........... | Secretary of Transportation and Public Works | Ex-officio |
| Juan Carlos Batlle Hernaiz ............ | President of Government Development Bank | Ex-officio |
| Reynaldo Encarnación .................... | Engineer | December 2012 |
| Nilda Muñoz Vissepó ..................... | Attorney | December 2016 |
| Luis Ortiz Segura............................ | Attorney | July 2016 |

Eduardo Rivera Cruz has been the Executive Director of the Authority since January 25, 2011. Before his appointment, from 2009 to January 24, 2011, Mr. Rivera held the position of General Manager of OMEP, which is affiliated to the Department of Education, in charge of the maintenance of more than 1,100 schools island-wide and responsible for creating and implementing the public policies and procedures in OMEP's seven regions. During the same period of time, he was also the President of the Department of Education's Bid Board, responsible for the Bid Board management, operation and supervision. From January 2001 to December 2008, Mr. Rivera held the position of Bid Board Director and Alternate Member at the Department of Education, where he was responsible for its current administrative structure and for revising and analyzing rules and regulations. Prior to joining the Department of Education, Mr. Rivera served as Director of the Purchases, Bids and Contracts Office for the Puerto Rico Volunteer Youth Corps. He has a Bachelor's Degree in Business Administration from the University of Puerto Rico, with two majors, one in management and another in marketing.

The Authority's financial management team is comprised of its Controller, Legal Director, the Director of Administration and the Director of Project Development:

Wanda Acevedo Torres, CPA, the Authority's Controller, has over 16 years experience within the governmental accounting fields. She has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is an active member of the Puerto Rico Society of Certified Public Accountants.

Leonardo J. Torres Berríos, Esq., the Authority's Legal Director, has over 19 years experience within the governmental and private corporate law and real estate fields. He has a Bachelor's Degree in Business Administration from the University of Puerto Rico and a Juris Doctor degree from the Inter American University of Puerto Rico School of Law.

Ida Ivelisse Laguna Pagán, MBA, the Authority's Director of Administration, has over 18 years experience within the private finance, administrative and project management fields. She has a Bachelor's Degree in Business Administration from the University of Puerto Rico and a Master's Degree in management from the University of Phoenix.

Arch. Lilliam Almeyda, the Authority's Director of Project Development, has over 25 years experience within the governmental planning and developing construction projects. She has a bachelor's degree in Architecture from the University of Detroit-Mercy, and is an active member of the Puerto Rico Architects and Landscape Architects Association.

## PROGRAMS AND FACILITIES OF THE AUTHORITY

As of June 30, 2011, the Authority has an approximately $381 million Four-Year Capital Improvement Program (the "CIP"), which reflects the Authority's construction priorities for fiscal year 2010 through fiscal year 2014. The CIP includes office buildings, school buildings, health facilities, correctional facilities, and other facilities, as described below. A portion of the facilities were financed with revenue bonds issued and currently outstanding under the 1995 Bond Resolution (collectively, the "Outstanding Government Facilities Bonds"). The remainder of the costs of the CIP will be paid for through interim financings, future bond issues (subject to the limitations of the Guaranty Act) and Commonwealth appropriations.

**Office Buildings Program**

Under its office buildings program, the Authority has completed construction of 321 office buildings (including police stations, courthouses, and related parking facilities), amounting to approximately 7.5 million square feet of rentable space, for the use of and lease to various departments, agencies and instrumentalities of the Commonwealth.  As of June 30, 2011, the estimated total cost of construction completed under the office buildings program was approximately $555 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

As of June 30, 2011, the Authority has under planning and construction one police facility, five fire stations, one parking building for office center and improvements to 77 office buildings, at an estimated total cost of $158 million.

The currently outstanding Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of the rentals of public buildings and related facilities financed by such bonds.  In addition, these obligations are secured by a pledge of the Commonwealth to pay or advance rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act.  The Authority reserves the right to issue additional Revenue Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the office buildings program.

**School Buildings Program**

Under its school buildings program, the Authority has completed the construction of 436 school building projects, amounting to approximately 23 million square feet of rentable space, all of which have been leased to the Department of Education.  As of June 30, 2011, the estimated total cost of construction completed under the school buildings program was $2.54 billion, which was provided principally by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

As of June 30, 2011, the Authority has under planning and construction 8 new school buildings and improvements to 44 school buildings amounting to approximately one million square feet of rentable space, all of which has been leased to the Department of Education.  The estimated total cost of construction of such school buildings and improvements is $223 million.

The currently outstanding Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds.  In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act.  The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the school buildings program.

The Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector.  Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while the Puerto Rico Infrastructure Financing Authority serves as procurement and construction manager.  The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, science labs, art centers, among other things.  The proceeds of the Bonds will be used to finance the rehabilitation, renovation or construction of approximately 100 public schools under this program.  The Authority expects to finance the rehabilitation, renovation or construction of the remaining public schools through a future issuance of bonds also designated as "Qualified School Constructions Bonds."

**Health Facilities Program**

Under its health facilities program, the Authority completed construction of 18 health facilities, amounting to approximately 1.5 million square feet of rentable space, all of which has been leased to the Department of Health. As of June 30, 2011, the estimated total cost of construction completed and owned by the Authority was $203 million, which was provided mainly by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution.

The currently outstanding Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds. In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the health facilities program.

**Correctional Facilities Program**

In 1994, the Department of Correction and Rehabilitation (the "Department of Correction"), in cooperation with the Authority, began a program to provide for the construction, operation and maintenance of new Commonwealth correctional facilities to be leased to the Department of Correction by the Authority. These facilities were constructed as part of the Commonwealth's effort to alleviate overcrowding in its correctional system and achieve compliance with certain federal court mandated minimum inmate living space requirements. The Authority has completed the construction of 9 correctional facilities at an approximate cost of $287 million, which facilities are operated by the Department of Correction.

**Other Facilities**

The Authority also constructs office buildings, schools and health facilities that are financed by a combination of federal grants and Commonwealth appropriations. The Authority is also empowered to undertake construction on behalf of and as an agent for other public agencies of the Commonwealth.

Under the Enabling Act, the Authority is also empowered to construct social welfare facilities. Any such facilities that may be constructed can be financed by bonds of the Authority under the 1995 Bond Resolution. The Authority has not issued any bonds or other obligations to finance such facilities.

## DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS

**Debt**

The following table sets forth the outstanding debt of the Authority:

| | As of July 1, 2011[1] | As Adjusted[2] |
|---|---|---|
| Bonds outstanding under the 1970 Bond Resolution | $    37,315,000 | $    37,315,000 |
| Bonds outstanding under the 1995 Bond Resolution | 2,951,222,115 | 4,011,616,115 |
| Total bonded debt[3] | $2,988,537,115 | $4,048,931,115 |

---

(1)  Calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance. These amounts do not reflect Government Development Bank's interim financing of the Authority's CIP.

(2)  Reflects the outstanding debt of the Authority after giving effect to the issuance of the Bonds and the Series S Bonds (calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance).

(3)  Totals may not add due to rounding.

The letter of credit issued by The Bank of Nova Scotia acting through its San Juan branch, which the Authority caused to be deposited to the credit of the reserve account under the 1970 Bond Resolution, expired on July 15, 2011 (the "BNS Reserve Account Letter of Credit"). Pending the negotiation and issuance of a new letter of credit, the Authority has deposited $5,511,975 in cash to the credit of the 1970 Bond Resolution reserve account. There can be no assurance that a new letter of credit will be obtained by the Authority for such purposes or that the terms of any such letter of credit will be substantially similar to the terms of the BNS Reserve Account Letter of Credit. No reserve account is established under the 1995 Bond Resolution.

**Debt Service Requirements**

Debt service requirements of the Authority for the bonds outstanding under the 1970 and 1995 Bond Resolutions, after taking into account the issuance of the Series S Bonds and the Bonds, as shown in the following table, consist in any fiscal year of the sum of the amounts required to pay (i) the interest that is payable on October 1, January 1 and April 1 in such fiscal year and July 1 in the following fiscal year, (ii) the principal of serial bonds that is payable on July 1 in the following fiscal year, and (iii) the amortization requirements for term bonds that are payable on July 1 in the following fiscal year.

Because of the limitations imposed by the IRS on "Qualified School Construction Bonds," the Bonds cannot have a maturity exceeding 17 years. The total debt service column below reflects the full principal amount of the Bonds due on July 1, 2028, its maturity date. On such maturity date, the Authority expects that moneys on deposit in the Series R Advance Deposit Account (consisting of the Series R Advance Deposit Amounts and investment earnings thereon) will equal approximately $373.5 million, or 49.4% of the principal amount of the Bonds. The Authority expects to refinance the difference between the amounts on deposit in the Series R Advance Deposit Account and the principal amount of the Bonds remaining after a principal payment of $31,540,524 in fiscal year 2029 for an additional term of approximately 13 years in order to finance the improvements being financed with the Bonds during a total term of approximately 30 years.

The pro-forma debt service requirements shown in the table below adjust the actual debt service requirements on the Bonds to reflect, instead of the principal amount of the Bonds due at maturity (i) the Series R Advance Deposit Amounts required to be deposited to the credit of the Series R Advance Deposit Account in fiscal years 2019 through 2028, (ii) in fiscal year 2029, a principal payment of $31,540,524, and (iii) for fiscal years 2030 through 2042, annual debt service on bonds issued to refinance the difference between the principal amount of the Bonds remaining after a principal payment of $31,540,524 in fiscal year 2029 and the amount expected to be on deposit to the credit of the Series R Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 13 years, an interest rate of 6.75% and level debt service.

## Puerto Rico Public Buildings Authority
## Debt Service Requirements

| Fiscal Year Ending June 30, | Total Debt Service on Bonds Outstanding under 1970, 1978 and 1995 Bond Resolutions | Debt Service of the Series R Bonds[1] | Debt Service of the Series S Bonds | Total Debt Service | Pro-Forma Debt Service of the Series R Bonds[2] | Pro-Forma Total Debt Service[2] |
|---|---|---|---|---|---|---|
| 2012 | $ 251,233,838 | $ 5,972,827 | $ 15,046,795 | $ 272,253,460 | $ 5,972,827 | $ 272,253,460 |
| 2013 | 231,367,632 | 9,908,837 | 17,644,450 | 258,920,919 | 9,908,837 | 258,920,919 |
| 2014 | 231,209,419 | 9,908,837 | 17,644,450 | 258,762,706 | 9,908,837 | 258,762,706 |
| 2015 | 231,054,332 | 9,908,837 | 17,644,450 | 258,607,619 | 9,908,837 | 258,607,619 |
| 2016 | 230,802,269 | 9,908,837 | 17,644,450 | 258,355,556 | 9,908,837 | 258,355,556 |
| 2017 | 230,843,319 | 9,908,837 | 17,644,450 | 258,396,606 | 9,908,837 | 258,396,606 |
| 2018 | 198,897,982 | 9,908,837 | 17,644,450 | 226,451,269 | 9,908,837 | 226,451,269 |
| 2019 | 196,088,032 | 9,908,837 | 17,644,450 | 223,641,319 | 41,449,361 | 255,181,843 |
| 2020 | 199,464,844 | 9,908,837 | 17,644,450 | 227,018,131 | 41,449,361 | 258,558,655 |
| 2021 | 221,947,332 | 9,908,837 | 17,644,450 | 249,500,619 | 41,449,361 | 281,041,143 |
| 2022 | 183,472,825 | 9,908,837 | 55,144,450 | 248,526,112 | 41,449,361 | 280,066,636 |
| 2023 | 198,366,263 | 9,908,837 | 25,488,200 | 233,763,300 | 41,449,361 | 265,303,824 |
| 2024 | 183,472,707 | 9,908,837 | 40,438,200 | 233,819,744 | 41,449,361 | 265,360,268 |
| 2025 | 211,571,088 | 9,908,837 | 14,663,200 | 236,143,125 | 41,449,361 | 267,683,649 |
| 2026 | 205,089,711 | 9,908,837 | 19,611,950 | 234,610,498 | 41,449,361 | 266,151,022 |
| 2027 | 211,239,166 | 9,908,837 | 14,304,450 | 235,452,453 | 41,449,361 | 266,992,977 |
| 2028 | 211,567,494 | 9,908,837 | 14,251,950 | 235,728,281 | 41,449,361 | 267,268,805 |
| 2029 | 211,569,325 | 758,926,209[3] | 14,698,200 | 985,193,734 | 51,806,497 | 278,074,022 |
| 2030 | 211,565,925 | - | 14,617,200 | 226,183,125 | 40,551,721 | 266,734,846 |
| 2031 | 211,565,651 | - | 15,036,200 | 226,601,851 | 40,491,280 | 267,093,131 |
| 2032 | 211,564,301 | - | 14,926,200 | 226,490,501 | 40,426,941 | 266,917,442 |
| 2033 | 211,565,894 | - | 14,816,200 | 226,382,094 | 40,357,034 | 266,739,128 |
| 2034 | 211,566,786 | - | 14,704,200 | 226,270,986 | 40,283,417 | 266,554,403 |
| 2035 | 227,221,739 | - | 12,591,700 | 239,813,439 | 40,205,508 | 280,018,947 |
| 2036 | 211,566,295 | - | 14,591,700 | 226,157,995 | 40,121,371 | 266,279,366 |
| 2037 | 70,614,163 | - | 27,476,700 | 98,090,863 | 40,031,581 | 138,122,444 |
| 2038 | 57,361,063 | - | 26,595,450 | 83,956,513 | 39,936,174 | 123,892,687 |
| 2039 | 57,364,938 | - | 28,714,200 | 86,079,138 | 39,833,696 | 125,912,834 |
| 2040 | - | - | 87,786,700 | 87,786,700 | 39,724,117 | 127,510,817 |
| 2041 | - | - | 87,783,900 | 87,783,900 | 39,607,752 | 127,391,652 |
| 2042 | - | - | - | - | 39,484,239 | 39,484,239 |
| Total[4] | $5,521,214,333 | $923,440,428 | $732,087,795 | $7,176,742,556 | $1,052,780,785 | $7,306,082,915 |

(1) These figures are reduced by the Qualified School Construction Bond subsidy, which is equal to $28,061,106.04 for the fiscal year ending June 30, 2012 and $32,905,531.52 for each fiscal year thereafter until the fiscal year ending June 30, 2028.

(2) Adjusted to reflect, instead of the principal amount of the Bonds due at maturity (i) the Series R Advance Deposit Amounts required to be deposited to the credit of the Series R Advance Deposit Account in fiscal years 2019 through 2028, (ii) in fiscal year 2029, a principal payment of $31,540,524, and (iii) for fiscal years 2030 through 2042, annual debt service on bonds issued to refinance the difference between the principal amount of the Bonds remaining after the principal payment of $31,540,524 in fiscal year 2029 and the amount expected to be on deposit to the credit of the Series R Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 13 years, an interest rate of 6.75% and level debt service.

(3) Reflects the principal amount of the Bonds assuming such principal amount is not refinanced as described in footnote 2 above.

(4) Totals may not add due to rounding.

## SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION

The following statements are brief summaries of certain provisions of the 1995 Bond Resolution. Such statements do not purport to be complete and reference is made to the 1995 Bond Resolution, copies of which are available for examination at the office of the 1995 Fiscal Agent. For the purposes of this summary, the terms "Bond" or "Bonds" shall refer to the Government Facilities Revenue Bond or Bonds and the term "Series R Bonds" shall refer to the series of Bonds to which this Official Statement relates.

**Revenues**

The Authority covenants that each Lease Agreement which it enters into for any government facilities financed or refinanced under the 1995 Bond Resolution ("Authority Facilities") will require the Lessee thereunder to pay rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the interest on all Bonds issued by the Authority for the financing or refinancing of the Authority Facilities covered by such Lease Agreement, the principal of all such Bonds which are serial Bonds and the amortization requirements and redemption premium for any such Bonds which are term Bonds ("1995 Debt Service Rentals"). (Section 701). All 1995 Debt Service Rentals received from the leasing of Authority Facilities are pledged as hereinafter provided.

**1995 Sinking Fund**

A special fund is created by the 1995 Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds Sinking Fund" (the "1995 Sinking Fund"). Two separate accounts are created in the 1995 Sinking Fund, namely, the "1995 Bond Service Account" and the "1995 Redemption Account." (Section 502).

The Authority covenants that all 1995 Debt Service Rentals will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the following accounts in the following order:

(1)     To the 1995 Bond Service Account, such amount thereof as may be required to make the amount then to the credit of the 1995 Bond Service Account equal to the amount of interest then due and payable and the interest which will accrue up to the next interest payment date on all Bonds of each series then outstanding and the principal of all serial Bonds, if any, which will become due and payable within the next ensuing twelve months;

(2)     To the 1995 Redemption Account, such amount of the balance remaining after making the deposit under paragraph (1) above as may be required to make the amounts so deposited in the then current fiscal year equal to the amortization requirements, if any, for such fiscal year for the term Bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of Bonds if such principal amount of Bonds should be redeemed on the next redemption date from moneys in the 1995 Sinking Fund; and

(3)     The balance, if any, shall be deposited to the credit of the 1995 Bond Service Account. (Section 502).

The requirements specified in paragraphs (1) and (2) above shall be cumulative. (Section 502).

**1995 Redemption Account**

Moneys in the 1995 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1995 Sinking Fund. The 1995 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1995 Bond Service Account and the purchase price from the 1995 Redemption Account, but no such purchase shall be contracted for within the period of 45 days next preceding any interest payment date on which such Bonds are subject to call for redemption under the provisions of the 1995 Bond Resolution.

(b)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall call for redemption on each date on which Bonds are subject to redemption from moneys which are in the 1995 Sinking Fund on the 45th day prior to such redemption date such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1995 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be

made in accordance with the provisions of the 1995 Bond Resolution. Not less than 30 days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and from the 1995 Redemption Account and set aside in separate accounts the respective amounts required for paying the principal of and redemption premium, if any, and the interest on the Bonds so called for redemption.

(c)   Moneys in the 1995 Redemption Account shall be applied by the 1995 Fiscal Agent in each fiscal year to the purchase or redemption of Bonds of each series then outstanding in the following order:

*first,* the term Bonds of each such series to the extent of the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and if the amount available in such fiscal year shall not be equal thereto, then, in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding, plus the applicable premium, if any;

*second,* any balance then remaining shall be applied to the purchase of any Bonds whether or not such Bonds shall be subject to redemption in accordance with paragraph (a) above;

*third,* any balance then remaining shall be applied to the redemption of term Bonds of each such series in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and

*fourth,* after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of such series originally issued under the provisions of the 1995 Bond Resolution. (Section 504).

The term "Principal and Interest Requirement" for any fiscal year, as applied to the Bonds of any series under the 1995 Bond Resolution, shall mean the sum of:

(a)   the amount required to pay the interest on all outstanding Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year;

(b)   the amount required to pay the principal of all outstanding serial Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year; and

(c)   the amortization requirement for the term Bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(i)   in the case of Capital Appreciation Bonds, the Accreted Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of the principal or amortization requirements in accordance with the above provisions;

(ii)   in the case of Capital Appreciation and Income Bonds, the Appreciated Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of principal or amortization requirements in accordance with the above provisions;

(iii)   the interest rate on Bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the average rate of interest per annum on such Bonds for the preceding twelve months or such shorter period that such Bonds shall have been outstanding, or if such Bonds had not been outstanding prior to the date of calculation, the rate of interest on such Bonds on the date of calculation;

(iv)   in the case of Bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such Bonds is payable

from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for amortization requirements and principal payments shall be used; provided, however, that if on the date of calculation the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in (or specified in the agreement authorizing the issuance of) the letter of credit or insurance policy or similar credit or liquidity facility;

(v)     in the case of Bonds the maturity of which may be extended by and at the option of the holder thereof or the Authority, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended; and

(vi)     in the case of Bonds (A) which are expected to be repaid from the proceeds of Bonds or other indebtedness or (B) on which interest is payable periodically and for which 25% or more of the principal amount matures during any one year and for which no amortization requirements have been established, the debt service requirements on the Bonds may be excluded and in lieu thereof the Bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status to that of such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Bonds and issued by issuers having a credit rating, by Moody's or any successors thereto or Standard & Poor's or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities. (Section 101).

Notwithstanding the foregoing, if the Authority has notified the 1995 Fiscal Agent that an interest rate swap agreement is in effect in respect of any Bonds, then for all purposes of the above paragraphs, except for the purpose of determining the required deposits to the 1995 Sinking Fund pursuant to Section 502 of the 1995 Bond Resolution, the interest rate on such Bonds shall be the interest rate calculated with reference to such interest rate swap agreement; and if such rate calculated with reference to such interest rate swap agreement is a variable rate, the interest rate on such Bonds (except for the purpose specified above in this sentence) shall be the average interest rate calculated with reference to such interest rate swap agreement for the preceding twelve months or such shorter period that the interest rate swap agreement has been in effect, or if such interest rate swap agreement had not been in effect prior to the dates of calculation, the interest rate calculated with reference to such interest rate swap agreement on the date of calculation. (Section 101).

**1995 Construction Fund**

The balance of proceeds of Bonds issued under Section 208 of the 1995 Bond Resolution available for payment of construction costs is required to be deposited to the credit of the Construction Fund under the 1995 Bond Resolution (the "1995 Construction Fund") and applied to the payment of the cost of the Initial Facilities, Additional Facilities, Improvements and uncompleted Facilities for which such Bonds were issued. (Section 208).

Payments from the 1995 Construction Fund shall be disbursed by check signed by the Treasurer of the Authority or by any officer or employee of the Authority designated by resolution of the Authority. (Section 402). Any balance remaining in the 1995 Construction Fund from time to time after the completion of the Authority Facilities and Improvements theretofore financed by the Authority may, at the option of the Authority, be deposited to the credit of the 1995 Redemption Account or the 1995 Bond Service Account. (Section 404).

The proceeds of the Series R Bonds on deposit in the 1995 Construction Fund shall not be disbursed without the prior written approval of Government Development Bank.

**Additional Bonds**

Additional Bonds may be issued from time to time to provide funds to pay all or any part of any remaining costs of the Initial Facilities or to pay all or any part of the cost of any Additional Facilities or Improvements to Authority Facilities financed under the 1995 Bond Resolution or any uncompleted part of the Initial Facilities or

Additional Facilities or Improvements, and to pay any notes or other obligations of the Authority therefore issued, or to repay any advances made from any source, to finance such costs; provided that no such Bonds shall be issued unless under the then existing law such Bonds may be specified by the Authority to be covered by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such Bonds by resolution. Before any such Additional Bonds may be issued, there must be filed with the 1995 Fiscal Agent, among other things, a certificate signed by the Executive Director of the Authority stating that on the basis of all Lease Agreements or amendments or supplements thereto, as executed and delivered or as expected to be executed and delivered, the 1995 Debt Service Rentals, as calculated by the Authority will be sufficient and timely to pay the principal of; and the redemption premium, if any, and interest on, such Bonds and all Bonds then outstanding. (Section 208).

Refunding bonds, including crossover refunding bonds, may be issued by the Authority at any time or times for the purpose of providing funds for refunding at or prior to their maturity or maturities all or any part of (i) the outstanding Bonds of any series, or (ii) the outstanding debt of the Authority incurred to finance Authority Facilities as defined in the 1970 Bond Resolution or in the 1978 Bond Resolution, in either case including the payment of any redemption premium prior thereto; provided that no such refunding bonds shall be issued unless under the then existing law such bonds may be specified by the Authority to be covered (as of the crossover date with respect to crossover refunding bonds) by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such refunding bonds by resolution. (Section 209).

## Investment of Funds in 1995 Construction Fund, 1995 Bond Service Account and 1995 Redemption Account

The 1995 Bond Resolution provides for the following types of investments:

(a)     Government Obligations which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, (ii) obligations (including participation certificates) issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal. Home Loan Banks, the Farm Credit System, Federal National Mortgage Association and the Student Loan Marketing Association, (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above or (iv) below and which obligations are not subject to redemption prior to the date on which the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and which municipal obligations are rated in the highest category (without regard to any gradation within such category) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii) and (iii) above held by a national banking association or bank (including the 1995 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligation described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

(b)     Investment Obligations which are (i) Government Obligations, (ii) obligations of any state or territory of the United States of America which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, (iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1995 Fiscal Agent), any trust company or any savings and loan association (including any investment in pools of such bankers' acceptances, certificates, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, national banking association, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1995 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties, (iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or

the Commonwealth of Puerto Rico or any national banking association (including the 1995 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any or more of the securities described in clause (i) or (ii) above, in which securities the 1995 Fiscal Agent has a perfected first security interest and such securities are held free and clear of claims by third parties, or if not so secured, meets the rating requirements set forth in clause (vii) below, (v) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within such categories) by both Moody's or any successors thereto, and Standard & Poor's or any successors thereto, (vi) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to gradations within such category) and (a) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and meets the requirements of Section 852(a) of said Code for the calendar year; (b) invests all of its assets in Government Obligations or in Investment Obligations described in clause (ii) above; and (c) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1995 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to any gradations within such category), and (vii) any other investment obligations which are rated, which are issued by issuers which are rated, or which are backed by letters of credit or lines of credit the provider of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto or which are collateralized by such Investment Obligations. (Section 101).

Moneys held in the 1995 Construction Fund, the 1995 Bond Service Account and the 1995 Redemption Account shall, as nearly as practicable, be invested and reinvested in Investment Obligations, which mature, or are subject to redemption by the holder thereof at the option of such holder not later than the dates when the moneys held for the credit thereof will be required for the purposes intended. (Section 602).

**Series R Advance Deposit Account**

*Creation.* A special fund is created by the Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Advance Deposit Account" (the "Series R Advance Deposit Account"). The moneys in the Series R Advance Deposit Account shall be held in trust under the Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Bond Resolution and, pending such application, shall be subject to a lien and charge in favor of the holders of the Series R Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Series R Advance Deposit Amounts.* The Authority covenants that all Series R Advance Deposit Amounts (as defined below in "Series R Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION) received under Lease Agreements relating to Authority Facilities financed by the issuance of the Series R Bonds will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the Series R Advance Deposit Account.

*Investment of Moneys in Series R Advance Deposit Account.* Moneys held for the credit of the Series R Advance Deposit Account shall, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit of such Account will be required for the purposes intended, and not later than the stated maturity date of the Series R Bonds.

*Application of Moneys in Series R Advance Deposit Account.* Moneys held for the credit of the Series R Advance Deposit Account shall be applied to the purchase, redemption or retirement of the Series R Bonds as follows:

*first,* at the written direction of the Authority, the 1995 Fiscal Agent shall endeavor to purchase the Series R Bonds then outstanding, whether or not such Series R Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal amount of such bonds. The 1995 Fiscal Agent shall pay the interest accrued on such the Series R Bonds to the date of delivery thereof from any moneys in the 1995 Bond Service Account or the Series R Interest Subsidy Account, as applicable, and the purchase price from the Series R Advance Deposit Account but no such purchase shall be contracted for within the period of forty-five (45) days next preceding the maturity date of the Series R Bonds;

*second,* at the written direction of the Authority, the 1995 Fiscal Agent shall call for redemption on each day on which the Series R Bonds are subject to redemption from moneys which are in the 1995 Bond Service Account, the Series R Interest Subsidy Account and the Series R Advance Deposit Account on the forty-fifth day prior to such redemption date such amount of the Series R Bonds then subject to redemption as will exhaust the Series R Advance Deposit Account as nearly as possible. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than thirty (30) days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and in the Series R Interest Subsidy Account, as applicable, and from the Series R Advance Deposit Account and set aside in separate accounts the respective amounts required for paying the principal of and interest on the Series R Bonds so called for redemption; and

*third,* on the stated maturity date of the Series R Bonds, the 1995 Fiscal Agent shall transfer the balance remaining on deposit in the Series R Advance Deposit Account to the 1995 Bond Service Account, for application to the payment of principal of the Series R Bonds maturing on such date.

*Pledge of Moneys in Series R Advance Deposit Account.* Subject to the terms and conditions set forth in the Bond Resolution, moneys held for the credit of the Series R Advance Deposit Account shall be held in trust and disbursed by the 1995 Fiscal Agent for (a) the payment of the principal of the Series R Bonds on their stated maturity date or (b) the payment of the purchase or redemption price of the Series R Bonds before maturity, and such moneys are hereby pledged to and charged with such payments.

**Payment by Lessees of Series R Advance Deposit Amounts**

The Authority covenants that all Lease Agreements which it enters into for the leasing of any Authority Facilities financed by the Series R Bonds will, subject to the provisions of the Bond Resolution, require the lessee or lessees of such facilities to pay (i) rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the principal of and interest on all Series R Bonds as the same shall become due and payable and (ii) additional amounts constituting an allocable portion of the Series R Advance Deposit Amounts.

**Series R Advance Deposit Amounts**

Notwithstanding that the Series R Bonds are not subject to mandatory sinking fund redemption prior to their stated date of maturity and no amortization requirements have been established with respect to the Series R Bonds, commencing on July 1, 2018, the Authority shall make annual deposits into the Series R Advance Deposit Account, from amounts received by the Authority under the Lease Agreements relating to the Authority Facilities financed by the Series R Bonds, on the dates and in the amounts set forth in the following table (the "Series R Advance Deposit Amounts").

| July 1 | Series R Advance Deposit Amount |
|--------|--------------------------------|
| 2018 | $31,540,524 |
| 2019 | 31,540,524 |
| 2020 | 31,540,524 |
| 2021 | 31,540,524 |
| 2022 | 31,540,524 |
| 2023 | 31,540,524 |
| 2024 | 31,540,524 |
| 2025 | 31,540,524 |
| 2026 | 31,540,524 |
| 2027 | 31,540,524 |

**Series R Interest Subsidy Account**

*Creation.* A special fund is hereby created by the Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Interest Subsidy Account" (the "Series R Interest Subsidy Account"). The moneys in the Series R Interest Subsidy Account shall be held in trust under the Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Bond Resolution and, pending such application, shall be subject to a lien and charge in favor of the holders of the Series R Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Interest Subsidy Payments.* The Authority covenants that all Interest Subsidy Payments will be immediately deposited upon receipt with the Fiscal Agent to the credit of the Series R Interest Subsidy Account.

*Investment of Moneys in Series R Interest Subsidy Account.* Moneys held for the credit of the Series R Interest Subsidy Account shall, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit of such Account will be required for the purposes intended, and not later than the next date on which interest on the Series R Bonds shall become due and payable.

*Application of Moneys in Series R Interest Subsidy Account.* Moneys held for the credit of the Series R Interest Subsidy Account shall be applied to the payment of interest on the Series R Bonds on the next succeeding interest payment date on which interest shall be due and payable on the Series R Bonds.

*Pledge of Moneys in Series R Interest Subsidy Account.* Subject to the terms and conditions set forth in the Resolution, moneys held for the credit of the Series R Interest Subsidy Account shall be held in trust and disbursed by the 1995 Fiscal Agent for the payment of interest on the Series R Bonds as the same shall become due and payable, and such moneys are hereby pledged to and charged with such payments.

**General Covenants**

The Authority covenants that it will not agree to any amendment, modification or termination of any Lease Agreements of any Authority Facilities (or exercise any right it may have to rescind the lease of any lessee of space in any Authority Facilities) which would reduce the amounts of rental payments below the amounts required by Section 701 of the 1995 Bond Resolution or postpone the times of making such rental payments or which would otherwise materially and adversely affect the security of the bondholders (Section 702), that it will not create or suffer to be created any lien or charge upon the Authority Facilities or any part thereof or upon the 1995 Debt Service Rentals therefrom, other than the liens and charges created or permitted under the 1995 Bond Resolution (Section 705), and that each Lease Agreement will provide that the obligation of the lessee to pay timely the required rentals thereunder shall be absolute and unconditional. (Section 709).

The Authority covenants that it will not dispose of or encumber any Authority Facilities, unless (a) the Authority determines that notwithstanding such disposition or encumbrance, total rents under each Lease Agreement will be sufficient to provide the sums required under Section 701 of the 1995 Bond Resolution, and (b) the Authority will receive as the price for any such disposition (but not an encumbrance), together with any other available moneys, the total amount of the 1995 Debt Service Rentals which would otherwise have been payable by the lessees of such Authority Facilities during the remaining term of the related Lease Agreements plus such additional amounts as will be necessary to pay the fees and expenses of the 1995 Fiscal Agent and all other expenses in connection with the application of the proceeds of such sale to the payment of the principal of and interest on outstanding Bonds issued by the Authority under the 1995 Bond Resolution including any redemption premiums. The proceeds of any such disposition (other than an encumbrance) shall be promptly deposited in the 1995 Redemption Account. (Section 708).

The Authority may also from time to time dispose of or encumber any fixtures or movable property in connection with the Authority Facilities or any materials used in connection therewith, if the Authority determines that such articles are no longer needed or useful in connection with the construction or operation or maintenance of the Authority Facilities and the proceeds thereof (other than an encumbrance) shall be applied to the replacement of the property so disposed of or at the option of the Authority shall be deposited to the credit of the 1995 Redemption Account. (Section 708).

Each Lease Agreement is required to provide that it may not be assigned or otherwise transferred in whole or in part by either party (unless the conditions set forth under the 1995 Bond Resolution for a termination of such Lease Agreement have been met), and will provide that all or any part of the Authority Facilities covered by such Agreement may be subleased as a whole or in part by the lessee if, among other things the following conditions have been met: (a) the sublessee under the sublease shall be a department, agency or instrumentality of the Commonwealth unless the Authority shall have obtained an opinion of nationally recognized bond counsel that such sublease will not cause interest on any Bonds to be includable in gross income of the owners thereof for federal income tax purposes (other than Bonds for which such interest is intended not to be excludable in gross income for such purposes); (b) such lessee shall acknowledge in writing that it shall continue to remain liable for the payment of all rentals under such Lease Agreement; and (c) there shall have been delivered to the Authority and such lessee (i) if the sublessee is a department of the Commonwealth, a certificate signed by the Secretary or an Assistant Secretary of such department stating that on the basis of budgeted appropriations for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to timely pay all rentals which will be due and payable during such fiscal year, or (ii) if the sublessee is an agency or instrumentality of the Commonwealth, a certificate signed by the chief executive officer of the sublessee stating that on the basis of budgeted appropriations and/or estimate revenues for the sublessee for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to pay timely all rentals which will be due and payable during such fiscal year. (Section 710).

The Authority covenants that it will cause audits to be made of its books and accounts by an independent firm of certified public accountants chosen by the Authority. Reports of such audits shall, among other things, set forth the findings of such certified public accountants as to whether the moneys received by the Authority under the 1995 Bond Resolution have been applied in accordance with the provisions thereof. Copies of such reports shall be filed with the 1995 Fiscal Agent and shall be mailed by the Authority to each bondholder who shall have filed his name and address with the Secretary of the Authority for such purpose. (Section 712).

**Modifications**

The Authority may adopt resolutions supplemental to the 1995 Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission or to correct any inconsistent provisions or errors in the 1995 Bond Resolution; provided such action shall not adversely affect the interests of the bondholders, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders, or to add to the conditions, limitations and restrictions on the issuance of Bonds, or to add to the covenants and agreements of the Authority in the 1995 Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority. (Section 901).

The holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1995 Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1995 Bond Resolution; provided, however, that nothing contained in the 1995 Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, (c) the creation of a lien upon or a pledge of 1995 Debt Service Rentals other than the liens and pledges created by or pursuant to the 1995 Bond Resolution, (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 902). No supplemental resolution may, however, change, amend or modify the rights or obligations of the 1995 Fiscal Agent under the 1995 Bond Resolution without the written consent of the 1995 Fiscal Agent. (Section 904).

**Notice of Default**

In the event that (i) on the second business day prior to the date on which a payment of interest, principal, or premium, if any, is due on any Bond there is not an amount sufficient in such account or fund as the 1995 Fiscal Agent may draw upon for the payment on such due date of such interest, principal, or premium, or (ii) the Authority shall default in the due and punctual making of any 1995 Sinking Fund deposit required by Section 502 of the 1995 Bond Resolution, the 1995 Fiscal Agent shall promptly give written notice of such insufficiency or default, as the case may be, to the Authority, the Secretary of Treasury and Government Development Bank. In the event that the Authority shall default in the due and punctual performance of any other covenants or agreements in the Bonds or the 1995 Bond Resolution and the 1995 Fiscal Agent shall have knowledge of, or is notified of, such default, and the Authority shall fail to correct such default within 30 days after notice thereof to the Authority by the 1995 Fiscal Agent, the 1995 Fiscal Agent shall promptly give notice of such default to the Secretary of Treasury and Government Development Bank. (Section 804).

The 1995 Bond Resolution and the Bonds do not provide for acceleration of the maturities of the Bonds in the event of a default thereunder or in any other circumstances and do not provide that the bondholders may require the 1995 Fiscal Agent to take any action on their behalf.

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Mendez & Alvarez LLP, counsel to the Underwriters and Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Bonds by Puerto Rico residents.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the IRS or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained. Moreover, this section is not to be construed as a substitute for careful tax planning. Prospective investors are urged to consult their own tax advisors with specific reference to their own tax situations, including the application and effect of other tax laws and any possible changes in the tax laws after the date of this official statement.

In the opinion of Pietrantoni Mendez & Alvarez LLP, under the provisions of the Acts of Congress and the laws of Puerto Rico in force as of the date of issuance of the Bonds:

1.      The Bonds, a transfer of the bonds, and the income resulting therefrom, including gain realized upon a sale of the Bonds, are exempt from income taxes imposed by Puerto Rico under Article 8(b) of the Act.

2.      Interest on the Bonds is:

(a)      exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico (the "PR Code") and Article 8(b) of the Act;

(b)      exempt from Puerto Rico alternative minimum taxes under Section 1022.04(b)(2) of the PR Code;

(c)      exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

(d)      exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 2(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it exempts from the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which is currently pending approval by the Legislative Assembly of Puerto Rico, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 2(b) above, we assume that the AMT exemption provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may not be exempt from Puerto Rico alternative minimum taxes.

3.      The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

4.      The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

5.      The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05(g) of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

6.      Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the Bonds with eligible funds, as such term is defined in the Acts.

7.      Interest on the Bonds is not excluded from the gross income of the recipient thereof for United States federal income tax purposes under Section 103(a) of the US Code.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount is treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Bonds.

IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Bonds.

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, in the opinion of Pietrantoni Mendez & Alvarez LLP:

1.       Interest or original issue discount on the Bonds is excludable from the gross income of the recipient thereof for United States federal income tax purposes under Section 933 of the US Code if the recipient is a bona fide resident of Puerto Rico during the entire taxable year in which such interest is derived

2.       Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.       United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the IRS on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the seller and (iii) the individual has been a resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) the ten year period preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Special Puerto Rico Tax Counsel's opinion is limited to the above, and Special Puerto Rico Tax Counsel has not expressed any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.   Such opinion is based upon Special Puerto Rico Tax Counsel's reliance upon the continued accuracy of the representations, warranties and covenants made by the Obligated Group and the Authority in the Loan Agreement.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

## UNDERWRITING

The Underwriters, represented by Popular Securities, Inc. ("Popular Securities"), have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $7,587,632 from the initial offering prices of the Bonds set forth on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing Bonds into investment trusts) and institutional purchasers at prices lower or yields higher than such public offering prices or yields, and such offering prices or yields may be changed, from time to time, by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup"), an underwriter of the Bonds, and Morgan Stanley & Co. LLC ("Morgan Stanley"), have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

J.P. Morgan Securities LLC ("JPMS") has entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## LEGAL MATTERS

The proposed form of opinions of Foley & Lardner LLP, Miami, Florida, Bond Counsel, is set forth in *Appendix I* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "Baa1" by Moody's, "BBB+" by Fitch and "BBB" by S&P.

The ratings reflect only the respective opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Authority, the Commonwealth, the 1995 Bond Resolution, the Bonds and other relevant information. No application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that any ratings obtained will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies if, in the judgment of any or all, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or any of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

**Continuing Disclosure Undertaking**

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Commonwealth and the Authority have covenanted to the following for the benefit of the Beneficial Owners (generally the tax owners of the Bonds):

1.      The Commonwealth will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited annual financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case of the type included or incorporated by reference in this Official Statement;

2.      The Authority will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, (i) the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) other financial information or operating data regarding the Authority included herein; and

3.      The Authority will file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of failure of the Commonwealth to comply with clause 1 above and of the Authority to comply with clause 2 above, and notice of any of the following events with respect to the Bonds:

      a.      principal and interest payment delinquencies;

      b.      non-payment related defaults, if material;

      c.      unscheduled draws on debt service reserves reflecting financial difficulties;

d.     unscheduled draws on credit enhancements reflecting financial difficulties;

e.     substitution of credit or liquidity facility providers, or their failure to perform;

f.     adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

g.     modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

h.     Bond calls, if material;

i.     defeasances;

j.     release, substitution, or sale of property securing repayment of the Bonds, if material;

k.     rating changes;

l.     tender offers;

m.     bankruptcy, insolvency, receivership, or similar proceeding of the Authority or the Commonwealth;

n.     the consummation of a merger, consolidation or acquisition involving the Authority or the Commonwealth or the sale of substantially all of the assets of the Authority or the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

o.     the appointment of a successor or additional trustee, or the change of name of a trustee, if material; and

p.     final expenditure of the proceeds of the Bonds.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 3 (c), (e), (m) and (n) are not applicable to the Bonds or the Authority.

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under THE BONDS, (ii) the only other issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the holders of the Bonds as required under the terms of the Bonds, and (iv) public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC; even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

Event (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the

supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific performance of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if.

(1)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Authority or the Commonwealth; or

(2)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Covenants have been made in order to assist the Underwriters in complying with the Rule.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1995 Bond Resolution, the Lease Agreements with respect to the facilities that are to be financed or refinanced in whole or in part by the Bonds, the various Acts, and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions. Appended to, and constituting a part of, this Official Statement is the proposed form of opinions of Foley & Lardner LLP, Bond Counsel *(Appendix 1)*.

The information set forth under the heading PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH and in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications

of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information set forth in this Official Statement, except the information appearing under the heading PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH, UNDERWRITING and "Book-Entry Only System" under THE BONDS, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to "Book-Entry Only System" was supplied by DTC.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement will be filed with the MSRB.

PUERTO RICO PUBLIC BUILDINGS AUTHORITY

By: _____/s/ Eduardo Rivera Cruz_____
Executive Director

APPENDIX I

## PROPOSED FORM OF OPINION OF BOND COUNSEL



**FOLEY & LARDNER LLP**

**ATTORNEYS AT LAW**

ONE BISCAYNE TOWER
2 SOUTH BISCAYNE
BOULEVARD SUITE 1900
MIAMI, FL 33131-2132
305.482.8400 TEL
305.482.8600 FAX
foley.com

[Closing Date]

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Re:   $756,449,000 Puerto Rico Public Buildings Authority
      Government Facilities Revenue Bonds, Series R,
      (Qualified School Construction Bonds – Issuer Subsidy)
      Guaranteed by the Commonwealth of Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), of its $756,449,000 aggregate principal amount of Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Guaranteed by the Commonwealth of Puerto Rico (the "Bonds"). We have also examined Act No. 17 of the Legislature of Puerto Rico, approved April 11, 1968, as amended (the "Guaranty Act"), providing for the guaranty by the Commonwealth of the payment of the principal of and interest on a principal amount of bonds outstanding at any one time of the Authority, not exceeding $4,325,000,000, specified by the Authority to be covered by such guaranty, to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.

The Bonds are being issued under and secured by Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Resolution") and a supplemental resolution thereto fixing the terms of the Bonds, adopted by the Authority on August 10, 2011 (the "Bond Resolution" and together with the 1995 Resolution, the "Resolution"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are being issued to provide funds to pay all or part of the cost of certain government facilities and improvements of such facilities as more particularly described in the Resolution.

The Authority is authorized to issue additional bonds for the purpose of paying all or a part of the cost of government facilities and improvements of such facilities and refunding bonds for refunding any bonds issued by the Authority under the provisions of the 1995 Resolution, under Resolution No. 77, adopted by the Authority on November 16, 1970, as supplemented, or under Resolution No. 158, adopted by the Authority on February 14, 1978, as supplemented, only upon the terms and conditions set forth in the Resolution, and such bonds, when issued, shall, with all the Bonds, be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the Resolution, to the extent provided in the Resolution.

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple of $1,000 in excess thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) the Enabling Act, (ii) the Guaranty Act, (iii) certified copies of the proceedings of the Authority authorizing the issuance of the Bonds (iv) the 1995 Resolution, (v) the Bond Resolution and (vi) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Enabling Act is valid.

2.      The Guaranty Act is valid.

3.      The proceedings of the Authority in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      The Authority has properly specified the Bonds to be covered by the guaranty of the Commonwealth under the Guaranty Act.

5.      The Enabling Act and such proceedings show lawful authority of the issuance and sale of the Bonds by the Authority.

6.      The good faith and credit of the Commonwealth are pledged for the payment of any amounts required to be paid by the Commonwealth pursuant to said guaranty.

7.      As authorized by the Enabling Act and by said proceedings, the 1995 Resolution and the Bond Resolution have each been duly adopted by the Authority.

8.      The Bonds have been duly authorized, executed and delivered by the Authority and constitute legal, valid, binding and enforceable obligations of the Authority payable from and secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

9.      Interest on the Bonds is not excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code and will be fully subject to Federal income taxation; this opinion is not intended or provided by Bond Counsel to be used and cannot be used by an owner of the Bonds for the purpose of avoiding penalties that may be imposed on the owner of such Bonds.  The opinion set forth in this paragraph is provided to support the promotion or marketing of the Bonds.  Each owner of the Bonds should seek advice based on its particular circumstances from an independent tax advisor.

10.      The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

Except as stated in paragraphs 9 and 10 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken or omitted with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

APPENDIX II

## PROPOSED FORM OF OPINION OF SPECIAL PUERTO RICO TAX COUNSEL

[Closing Date]

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have acted as Special Puerto Rico Tax Counsel in connection with the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), of its $756,449,000 aggregate principal amount of Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Guaranteed by the Commonwealth of Puerto Rico (the "Bonds"). As such counsel, we have examined the Enabling Act and a record of proceedings relating to the issuance of the Bonds. We have also examined Act No. 17 of the Legislature of Puerto Rico, approved April 11, 1968, as amended (the "Guaranty Act"), providing for the guaranty by the Commonwealth of the payment of the principal of and interest on a principal amount of bonds outstanding at any one time of the Authority, not exceeding $4,325,000,000, specified by the Authority to be covered by such guaranty, to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.

The Bonds are being issued under and secured by Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Resolution") and a supplemental resolution thereto fixing the terms of the Bonds, adopted by the Authority on August 10, 2011 (the "Bond Resolution" and together with the 1995 Resolution, the "Resolution"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

From such examination and based on the provision of the laws of Puerto Rico and the United States as now in force, and having regard to legal questions we deem relevant, we are of the opinion that:

1.    The Bonds, a transfer of the Bonds, and the income resulting therefrom, including gain realized upon a sale of the Bonds, are exempt from income taxes imposed by Puerto Rico under Article 8(b) of the Act.

2.    Interest on the Bonds is:

   (a)    exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico, Act No. 1 of the Legislature of Puerto Rico, approved January 31, 2011 (the "PR Code"), and Article 8(b) of the Act;

   (b)    exempt from Puerto Rico alternative minimum taxes under Section 1022.04(b)(2) of the PR Code;

   (c)    exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

   (d)    exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 2(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it exempts from the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist

II-1

in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which is currently pending approval by the Legislative Assembly of Puerto Rico, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 2(b) above, we assume that the AMT exemption provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may not be exempt from Puerto Rico alternative minimum taxes.

3.  The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

4.  The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

5.  The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05(g) of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments.

6.  Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the bonds with eligible funds, as such term is defined in the Acts.

7.  Interest on the Bonds is not excluded from the gross income of the recipient thereof for United States federal income tax purposes under Section 103(a) of the United States Internal Revenue Code of 1986, as amended (the "US Code").

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Bonds.

**IRS Circular 230 Disclosure:  The following tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on a taxpayer by the Internal Revenue Service.  This tax discussion was written in connection with the promotion or marketing of the Bonds.  Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.**

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, it is our opinion that:

1.  Interest or original issue discount on the Bonds is excludable from the gross income of the recipient thereof for United States federal income tax purposes under Section 933 of the US Code

if the recipient is a bona fide resident of Puerto Rico during the entire taxable year in which such interest is derived.

2.  Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.  United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the seller and (iii) the individual has been a resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) the ten year period preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

This opinion is limited to the above, and we do not express any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Authority and the holders from time to time of the Bonds and may not be relied upon by any other person.

Respectfully submitted,

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]



Printed by: ImageMaster