# EXHIBIT H

NEW ISSUE - BOOK-ENTRY ONLY
See "Book-Entry Only System" under THE BONDS

RATINGS: Moody's: Baa1
See RATINGS    Fitch: BBB+
S&P: BBB

**$121,528,000**

# Puerto Rico Public Buildings Authority,
## Government Facilities Revenue Bonds, Series T
## (Qualified Zone Academy Bonds – Direct Payment)
## Guaranteed by the Commonwealth of Puerto Rico

The Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) (the "Bonds") are being issued by Puerto Rico Public Buildings Authority (the "Authority") pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended, and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution"). The Bonds are designated as "Qualified Zone Academy Bonds" pursuant to the provisions of Section 54E of the Internal Revenue Code of 1986, as amended (the "Code"). The Authority has made the irrevocable election to have Section 6431(f) of the Code apply to the Bonds. As a result, the Authority will be entitled to receive from the federal government cash payments in an amount equal to the lesser of the amount of the interest payable on the Bonds or the amount of interest payable on the Bonds if determined at the applicable credit rate announced by the United States Department of the Treasury on the date of sale of the Bonds (the "Interest Subsidy Payments") as more fully described herein. The Holders of the Bonds will <u>not</u> be entitled to receive any tax credits with respect thereto. The Bonds are being sold solely in Puerto Rico.

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution are payable from, and are secured by a pledge of, the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth"). The Authority will also pledge, as additional security for the payment of the Bonds, moneys on deposit in the Series T Advance Deposit Account described herein. The Authority will also pledge, as additional security for the payment of interest on the Bonds, moneys on deposit in the Series T Interest Subsidy Account described herein. For information regarding certain risks applicable to the Interest Subsidy Payments, see "Interest Subsidy Payments for Qualified Zone Academy Bonds" under SECURITY.

**The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of the Commonwealth such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.**

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery. The Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 and any multiple of $1,000 in excess thereof.

- The Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Bonds on the records of The Depository Trust Company and its participants.

- Interest on the Bonds will be payable on August 1, 2012, on October 1, 2012 and quarterly thereafter on each January 1, April 1, July 1 and October 1.

- The Bonds are subject to extraordinary optional redemption and extraordinary mandatory redemption prior to maturity as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates and yields of the Bonds.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Foley & Lardner LLP, Miami, Florida, Bond Counsel, and certain other conditions.

- In the opinion of Pietrantoni Méndez & Alvarez LLC, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Bonds will be exempt from United States Federal income taxation to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. The Bonds are not otherwise exempt from United States Federal income taxation. See TAX MATTERS herein.

- Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Bonds will occur on or about December 22, 2011.

Santander Securities                    UBS FS Puerto Rico

December 19, 2011

**$121,528,000**
**Puerto Rico Public Buildings Authority,**
**Government Facilities Revenue Bonds, Series T**
**(Qualified Zone Academy Bonds – Direct Payment)**
**Guaranteed by the Commonwealth of Puerto Rico**

| Maturity July 1 | Amount | Interest Rate | Price | CUSIP[*] |
|---|---|---|---|---|
| 2030 | $121,528,000 | 5.60% | 100.00 | 745235Q20 |

---

[*] Copyright, American Bankers Association. CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. The CUSIP number listed above is being provided solely for the convenience of bondholders. The Authority and the Underwriters do not make any representation with respect to such number or undertake any responsibility for its accuracy. The CUSIP number is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth or incorporated herein by reference has been obtained from the Public Buildings Authority (the "Authority"), the Commonwealth, and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Bonds referred to herein and may not be reproduced or used, in whole or in part, for any other purpose. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority or the 1995 Fiscal Agent.

The Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Bonds in accordance with applicable provisions of laws of the states in which Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof. Neither these states nor any of their agencies have passed upon the merits of the Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Authority does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

# TABLE OF CONTENTS

**Page**

**Page**

INTRODUCTION............................................................... 1

OVERVIEW OF THE FISCAL CONDITION OF THE
COMMONWEALTH OF PUERTO RICO................... 3

Commonwealth Economic Conditions........................ 3
Fiscal Imbalance and Fiscal Stabilization Plan ................ 3
Results for Fiscal Year 2009 ..................................... 4
Results for Fiscal Year 2010 ..................................... 5
Preliminary Results for Fiscal year 2011 ..................... 5
Budget for Fiscal Year 2012 ..................................... 6
Preliminary General Fund Revenues for the First Four
Months of Fiscal Year 2012 ................................. 6
Preliminary General Fund Expenditures for the First
Three Months of Fiscal Year 2012 and Projected
Fiscal Year 2012 Deficit .................................... 6
Unfunded Pension and Non-Pension Post-Employment
Benefit Obligations and Funding Shortfalls of the
Retirement Systems ......................................... 7
Economic Development Plan ................................... 9
Tax Reform ...................................................... 9
Local Incentives for Rum Producers ......................... 11
Ratings of Commonwealth General Obligation Bonds .... 11

PLAN OF FINANCING ................................................ 12

The Bonds ....................................................... 12
Use of Proceeds ................................................ 12

THE BONDS ........................................................... 12

Description of the Bonds....................................... 12
Designation of the Bonds as Qualified Zone Academy
Bonds ........................................................ 13
Qualified Zone Academy Bonds Requirements .............. 13
Redemption Provisions ......................................... 15
Book-Entry Only System ...................................... 16
Discontinuance of the Book-Entry Only System.............. 18

SECURITY ............................................................ 18

Commonwealth Guaranty ...................................... 19
Opinion of the Secretary of Justice of the
Commonwealth ............................................. 19
Lease Agreements .............................................. 20
Pledge of the Commonwealth to Pay or Advance Rentals 22
Additional Bonds ............................................... 22
Interest Subsidy Payments for Qualified Zone Academy
Bonds ........................................................ 22

PROVISIONS RELATING TO PUBLIC DEBT OF THE
COMMONWEALTH ........................................... 24

Public Sector Debt ............................................. 24
Payment of Public Debt ........................................ 25
Payment Record ................................................ 25
Debt Limitation ................................................ 25
Commonwealth Guaranteed Debt ............................. 27

THE AUTHORITY .................................................... 28

General .......................................................... 28
Powers........................................................... 28
Management ..................................................... 29

PROGRAMS AND FACILITIES OF THE AUTHORITY . 30

Office Buildings Program ...................................... 30
School Buildings Program ..................................... 30
Health Facilities Program ..................................... 31
Correctional Facilities Program............................... 32
Other Facilities................................................. 32

DEBT OF THE AUTHORITY AND DEBT SERVICE
REQUIREMENTS ............................................. 32

Debt ............................................................. 32
Debt Service Requirements .................................... 32

SUMMARY OF CERTAIN PROVISIONS OF THE 1995
BOND RESOLUTION........................................ 35

Revenues ........................................................ 35
1995 Sinking Fund ............................................. 35
1995 Redemption Account ..................................... 35
1995 Construction Fund ....................................... 37
Additional Bonds ............................................... 38
Investment of Funds in 1995 Construction Fund, 1995
Bond Service Account and 1995 Redemption
Account ...................................................... 38
Series R Advance Deposit Account ........................... 39
Payment by Lessees of Series R Advance Deposit
Amounts .................................................... 40
Series R Advance Deposit Amounts .......................... 41
Series R Interest Subsidy Account ............................ 41
Series T Advance Deposit Account ........................... 41
Payment by Lessees of Series T Advance Deposit
Amounts .................................................... 43
Series T Advance Deposit Amounts........................... 43
Series T Interest Subsidy Account ............................ 43
General Covenants ............................................. 44
Modifications ................................................... 45
Notice of Default............................................... 45

TAX MATTERS ....................................................... 45

UNDERWRITING ..................................................... 48

LEGAL INVESTMENT ............................................... 48

LEGAL MATTERS .................................................... 48

GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO ............................................... 48

RATINGS .............................................................. 48

CONTINUING DISCLOSURE ........................................ 49

Continuing Disclosure Undertaking .......................... 49
Prior Continuing Disclosure Non-Compliance................ 51

MISCELLANEOUS ................................................... 52

APPENDIX I – Audited Financial Statements for the
Fiscal Year ended June 30, 2011 ....................... I-1

APPENDIX II – Proposed Form of Opinion of
Bond Counsel .............................................. II-1

APPENDIX III – Proposed Form of Opinion of Special
Puerto Rico Tax Counsel.................................. III-1

**$121,528,000**
# Puerto Rico Public Buildings Authority,
## Government Facilities Revenue Bonds, Series T
## (Qualified Zone Academy Bonds – Direct Payment)
## Guaranteed by the Commonwealth of Puerto Rico

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Public Buildings Authority (the "Authority" or "PBA") of $121,528,000 aggregate principal amount of its Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) (the "Bonds"). The proceeds of the Bonds will be used to pay part of the cost of renovating and rehabilitating certain public schools. See PLAN OF FINANCING. The Bonds are being sold only in Puerto Rico. Interest on the Bonds is not generally exempt from federal income taxation, except to certain Puerto Rico bondholders as described in TAX MATTERS herein.

The Bonds will be issued pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution"), particularly as supplemented by a Resolution adopted by the Authority on December 19, 2011 (the "Bond Resolution"). The Bonds are designated as "Qualified Zone Academy Bonds" pursuant to the provisions of Section 54E of the Internal Revenue Code of 1986, as amended (the "Code"). The Authority has irrevocably elected to have Section 6431(f) of the Code apply to the Bonds. As a result, the Authority will be entitled to receive from the federal government cash payments in an amount equal to the lesser of the amount of interest payable on the Bonds or the amount of interest payable on the Bonds if determined at the applicable credit rate announced by the United States Department of the Treasury (the "U.S. Treasury") on the date of sale of the Bonds (the "Interest Subsidy Payments"). Holders of the Bonds will not be entitled to receive any tax credits with respect thereto.

Immediately prior to the issuance of the Bonds, the Authority will have outstanding $4,048,931,115 aggregate principal amount of its Government Facilities Bonds (as defined herein) (calculated by excluding all accretion on any existing capital appreciation bonds and convertible capital appreciation bonds) issued under the 1995 Bond Resolution. The fiscal agent under the 1995 Bond Resolution is U.S. Bank National Association (the "1995 Fiscal Agent"). In the past, the Authority has issued Public Buildings Authority Public Education and Health Facilities Bonds under Resolution No. 158, adopted by the Authority on February 14, 1978, as amended (the "1978 Bond Resolution"), none of which are currently outstanding, and Public Buildings Authority Revenue Bonds under Resolution No. 77, adopted by the Authority on November 16, 1970, as amended (the "1970 Bond Resolution"), of which an aggregate principal amount of approximately $37.3 million are currently outstanding. The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds issued under the 1995 Bond Resolution and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any bonds issued under the 1970 Bond Resolution or 1978 Bond Resolution. See SECURITY herein.

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution (collectively, the "Government Facilities Bonds") are payable from and are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth"). The Authority will also pledge, as security for the payment of the Bonds, moneys on deposit in the Series T Advance Deposit Account described herein. See "Series T Advance Deposit Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. The Authority will covenant to deposit the Interest Subsidy Payments received from the federal government under the Qualified Zone Academy Bonds program, to the extent received by the Authority, immediately upon receipt into the Series T Interest Subsidy Account for application as provided in the Bond Resolution. The Authority will also pledge, as additional security for the payment of interest

on the Bonds, moneys on deposit in the Series T Interest Subsidy Account described herein. See "Series T Interest Subsidy Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. There can be no assurance that the Bonds will qualify as "Qualified Zone Academy Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. See "Interest Subsidy Payments for Qualified Zone Academy Bonds" under SECURITY. The Bonds are further guaranteed by the good faith, credit and taxing power of the Commonwealth.

This Official Statement includes the cover page, the inside cover page, the appendices hereto and the following documents, which have been filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") at http://emma.msrb.org and are incorporated herein by reference:

(1)   the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth ("Treasury Department") (the "Commonwealth's Annual Financial Report"), which was filed with the MSRB through EMMA on April 29, 2011. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Employees Retirement System, Teachers Retirement System and Judiciary Retirement System (the "Retirement Systems") whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors; and

(2)   the Commonwealth Financial Information and Operating Data Report, dated December 6, 2011 (the "Commonwealth Report"), included as *Appendix I* to the Official Statement, dated December 8, 2011, relating to $437,645,000 Puerto Rico Public Finance Corporation, 2011 Series B Bonds (Commonwealth Appropriation Bonds), which was filed with the MSRB through EMMA. The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2011, the year-to-date results of fiscal year 2012, the budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth.

Any Official Statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report, or other document, that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be a part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth and the Authority have entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under their existing continuing disclosure undertakings, the Commonwealth and the Authority are obligated to file on or before May 1 in each year updates, in the case of the Commonwealth, of its financial, operational and macroeconomic information and, in the case of the Authority, of its financial and operational information, in each case through the end of the prior fiscal year. The Commonwealth and the Authority comply with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report and the Authority's audited financial statements for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, upon a written or oral request by such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22d Floor, New York, NY 10020, telephone number (212) 333-0364, or to Vice President – General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Report and the Commonwealth's Annual Financial Report may be obtained by accessing http://emma.msrb.org or by visiting the website of Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB") at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

**OVERVIEW OF THE FISCAL CONDITION
OF THE COMMONWEALTH OF PUERTO RICO**

As further discussed below and in the Commonwealth Report, the Commonwealth faces a number of fiscal challenges. This section presents an overview of such fiscal challenges and the steps taken by the Commonwealth to address some of them. The Commonwealth's ability to meet its future budget needs depends in part on its ability to increase revenues and decrease expenditures. There is no assurance that the Commonwealth will be able to increase its revenues or reduce expenditures in the amount required. The topics discussed herein are discussed in more detail in the Commonwealth Report. Purchasers of the Bonds should read the Commonwealth Report in its entirety.

**Commonwealth Economic Conditions**

Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see THE ECONOMY in the Commonwealth Report. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

**Fiscal Imbalance and Fiscal Stabilization Plan**

Since 2000, the Commonwealth has experienced an imbalance between its General Fund total revenues and expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. See "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in the Commonwealth Report. In January 2009, the Government of Puerto Rico ("Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act 7"), sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses,

including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) certain financial measures.

The Government estimates that the fiscal stabilization plan's operating expense reduction measures have resulted in annual savings of approximately $837 million, and that the tax revenue enforcement measures, and the temporary and permanent revenue raising measures (not including the effect of the tax reform and the temporary excise tax described below) resulted in additional revenues of $420 million during fiscal year 2011.

The principal financial measure taken has been a bond issuance program through the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of its sales and use tax. The proceeds from the COFINA bond issuance program (such proceeds are deposited in an account referred to herein as the "Stabilization Fund" managed by GDB) have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and will be used in fiscal year 2012 to cover operating expenses included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. During fiscal year 2012, COFINA expects to issue approximately $2 billion of revenue bonds payable from sales and use tax collections transferred to COFINA, the proceeds of which will be mainly used to finance a portion of the government's operating expenses for fiscal year 2012, refund outstanding debt obligations payable from Commonwealth appropriations, and refund certain COFINA bonds.

Another financial measure taken has been the restructuring of a portion of the Commonwealth's debt service on the Commonwealth's general obligation bonds and on bonds of the Authority that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on Authority bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, the Authority also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by the Authority. The Fiscal Plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in the Commonwealth Report.

During fiscal year 2012, the Government expects to refinance approximately $537.4 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed bonds of the Authority.

**Results for Fiscal Year 2009**

General Fund total revenues for fiscal year 2009 were $7.583 billion (this amount excludes approximately $126.7 million of revenues attributable to the electronic and traditional lotteries, which for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund), representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the Government also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, resulted in approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from

proceeds of COFINA bond issues and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan.

**Results for Fiscal Year 2010**

General Fund total revenues for fiscal year 2010 were $7.593 billion (this amount excludes approximately $122.8 million of revenues attributable to the electronic and traditional lotteries, which for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund), representing an increase of $9.8 million from fiscal year 2009 revenues. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were $10.369 billion (which included $173 million of expenditures related to a Government local stimulus program), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded General Fund total revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal year 2010 were approximately $9.691 billion and exceeded General Fund total revenues (excluding other financing sources) by $2.098 billion, or 27.6%. The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

**Preliminary Results for Fiscal Year 2011**

Preliminary General Fund total revenues for fiscal year 2011 (from July 1, 2010 to June 30, 2011) were $8.165 billion (this amount includes approximately $101.9 million of revenues attributable to the electronic and traditional lotteries), an increase of $449.3 million, or 5.8%, from $7.716 billion of total revenues for the same period in the prior fiscal year (this amount includes approximately $122.8 million of revenues attributable to the electronic and traditional lotteries), and an increase of $31 million from the revised estimate of total revenues, which took into account the effect of the tax reform discussed below under "Tax Reform."

The increase in General Fund total revenues is mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.8 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform (discussed below under "Tax Reform"). This increase was partially offset by a decrease of $407 million and $18.5 million in collections from income tax on individuals and entertainment machine licenses, respectively. The decrease in individual income taxes is due to the tax relief provided to individual taxpayers as part of the tax reform and to current economic conditions. The Government had expected that the decrease in General Fund net revenues as a result of the tax relief provided to taxpayers as part of the tax reform would be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. For fiscal year 2011, the first five monthly excise tax payments (from February through June 2011) amounted to $677.6 million, which was consistent with the Government's projection of collections from the temporary excise tax. The Government's expectations with respect to the impact of the tax reform on fiscal year 2011 revenues were met.

For more information on the tax reform and Act No. 154, see "Tax Reform" below and "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in the Commonwealth Report.

Preliminary General Fund total expenses for fiscal year 2011 amounted to $9.153 billion, which excludes $638.7 million of debt service amounts that were refinanced, and exceeded General Fund total revenues (excluding other financing sources) by $988 million, or 12.1%. The difference between preliminary revenues and expenses for fiscal year 2011 was covered principally by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

**Budget for Fiscal Year 2012**

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for General Fund total revenues of $9.260 billion.  The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (up $969.0 million), sales and use taxes (up $125.0 million), non-resident withholding taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues.  The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds which are expected to be refinanced during fiscal year 2012.  See "Fiscal Imbalance and Fiscal Stabilization Plan" above.  The budgeted total expenditures for fiscal year 2012 are $110 million, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1.109 billion, or 10.7%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2 million).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

**Preliminary General Fund Revenues for the First Four Months of Fiscal Year 2012**

Preliminary General Fund revenues for the first four months of fiscal year 2012 (from July 1, 2011 to October 31, 2011) were $2.284 billion, an increase of $148.1 million, or 6.9%, from $2.136 billion of revenues for the same period in the prior fiscal year and a decrease of $32.8 million, or 1.4%, from the revised estimate of revenues of $2.317 billion.  The increase in General Fund revenues for the first four months of fiscal year 2012, compared to the same period in the prior fiscal year, is mainly due to the collection of $650.2 million from the new temporary excise tax under Act No. 154, which was not in effect during the first four months of fiscal year 2011. This increase was partially offset by decreases in collections from the following: (i) income taxes from individuals of $208.3 million, (ii) corporate income taxes of $84.9 million, (iii) taxes withheld from non-residents of $81.9 million and (iv) property taxes of $108.3 million.  The reduction in collections from property taxes is due to the phase out of the special property tax imposed on residential and commercial real estate in fiscal year 2009 as part of the temporary revenue raising measures included in the fiscal stabilization plan. The reduction in income taxes was expected and is largely due to the tax reform implemented in January 2011

**Preliminary General Fund Expenditures for the First Three Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit**

Preliminary General Fund total expenses (on a cash basis) for the first three months of fiscal year 2012 amounted to $1.858 billion, which is $13.5 million, or 1%, lower than $1.872 billion of budgeted expenditures for the same period.  The lower expenditures are mainly due to timing differences in disbursements for general

government expenditures of $29.4 million, safety and protection of $6.3 million and welfare of $4.5 million. These lower expenditures were partially offset by increased expenditures in health of $26 million and transportation and communication of $2.4 million. The difference between preliminary revenues and expenditures for the first three months of fiscal year 2012 was covered principally by funds on deposit in the Stabilization Fund and the issuance of tax revenue anticipation notes by the Commonwealth.

The deficit for fiscal year 2012 is projected to be approximately $610 million, which excludes approximately $691.2 million of debt service payments on Commonwealth general obligation bonds and Commonwealth guaranteed PBA bonds that will be refinanced. In addition, the Office of Management and Budget ("OMB") has indicated that the sectors of health and safety carry risk of budget overruns for fiscal year 2012 as they are undergoing operational changes that were not considered during the preparation of the budget for that fiscal year.

## Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $693 million, $268 million and $6.5 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems. As a result of the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System adopted in July 2011, as described below, the Administrator of the Retirement Systems projects that the period before depletion of the assets of these two systems will be extended by three to four years.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

7

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $123.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of its multi-year fiscal imbalances previously mentioned, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition. One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act No. 96"). On June 23, 2011, in accordance with Act No. 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of PRIFA, were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 114 of July 5, 2011 and Act No. 116 of July 6, 2011 ("Act 116"). These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $6.3 million, $12.8 million and $19.7 million in fiscal years 2012, 2013 and 2014, respectively.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowers the maximum amount of those loans from $15,000 to $5,000. This change is expected to gradually improve the Employees Retirement System's liquidity.

For a more detailed discussion of the financial situation of the Retirement Systems, see RETIREMENT SYSTEMS in the Commonwealth Report.

**Economic Development Plan**

The Government developed the Strategic Model for a New Economy, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the Government enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The Government also enacted Acts No. 82 and 83 of July 19, 2010, which provided a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the Government adopted a comprehensive tax reform (described below) that takes into account the Commonwealth's current financial situation.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the Government engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Government published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. As of September 30, 2011, the Government had completed the concession of toll roads PR-22 and PR-5 and had short-listed proponents for the procurement process leading to the award of an administrative concession for the Luis Muñoz Marín International Airport and school infrastructure projects.

The Government has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects. See "Fiscal Stabilization and Economic Reconstruction − Economic Reconstruction Plan" under THE ECONOMY in the Commonwealth Report.

**Tax Reform**

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled

group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The collections for the first nine monthly excise tax payments (from February through October 2011) were $1.325 billion. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. It is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues – Tax Reform" and "Major Sources of General Fund Revenues – Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth Report.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") each month to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 of 2011 ("Act 1") replaced Act 178 with identical provisions. The Legislative Assembly of Puerto Rico recently approved a bill that would require the Government to provide incentives of not less than 46% to rum producers whose local rum producing operation include fermentation, distillation and treatment of effluents.

As permitted under Act 1 of 2011, the Government has entered into a definitive agreement with two rum producers and is currently in negotiations with other producers to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of total revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

**Ratings of Commonwealth General Obligation Bonds**

On August 8, 2011, Moody's Investors Service ("Moody's") lowered its rating on the Commonwealth unenhanced general obligation bonds to "Baa1" with a negative outlook from "A3". This rating action was a result of Moody's review of the Commonwealth's rating, which had been placed on watchlist on May 3, 2011. In taking this rating action, Moody's stated the downgrade reflects the continued financial deterioration of the severely underfunded retirement systems, continued weak economic trend, and weak finances, with a historical trend of funding budget gaps with borrowings. Moody's negative outlook reflects the stress the Commonwealth will face in the next few years as it continues to address the underfunding of the retirement systems from an already weak financial and economic position. On April 19, 2010, Moody's had rated the Commonwealth's unenhanced general obligation debt "A3," which was three gradations above the previous "Baa3" rating, as a result of its recalibration of certain U.S. municipal bond issues and issuers.

On August 8, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), reaffirmed its "BBB" rating of the Commonwealth's unenhanced general obligation bonds. On March 7, 2011, S&P had raised its rating on the Commonwealth's unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measures that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years, in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

## PLAN OF FINANCING

### The Bonds

The Authority will use the proceeds of the Bonds to pay part of the cost of renovating and rehabilitating certain public schools. See "School Buildings Program" under PROGRAMS AND FACILITIES OF THE AUTHORITY. Because the Bonds are designated as "Qualified Zone Academy Bonds" under Sections 54A, 54E and 6431 of the Code, their proceeds may be applied only for qualified purposes under Sections 54A and 54E of the Code. For a summary of the principal requirements under the Qualified Zone Academy Bonds program, see "Qualified Zone Academy Bonds Requirements" under THE BONDS.

The Authority has covenanted to provide notice of its final expenditure of the proceeds of the Bonds as a Notice of Material Event as part of its continuing disclosure obligations.

### Use of Proceeds

The proceeds of the Bonds are expected to be used as follows:

| Sources | |
|---|---|
| Par Amount of the Bonds | $121,528,000.00 |
| Total | $121,528,000.00 |
| **Uses** | |
| 1995 Construction Fund | $120,254,630.22 |
| Underwriters' discount and estimated legal, printing and financing expenses | 1,273,369.78 |
| Total | $121,528,000.00 |

## THE BONDS

### Description of the Bonds

The Bonds will be issued in book-entry only form as registered bonds without coupons, will be dated their date of delivery, and will bear interest at the rate and will mature on the date set forth on the inside cover page of this Official Statement. Principal of and interest on the Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months. Interest on the Bonds will be payable on August 1, 2012, October 1, 2012 and quarterly thereafter on each January 1, April 1, July 1 and October 1. The Bonds will be issued in fully registered form, in denominations of $5,000 and any multiple of $1,000 in excess thereof and, when issued, will initially be

registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Bonds.

The Authority has elected to issue the Bonds with a single maturity, and to pay all principal of the Bonds on such maturity date. The Authority has also agreed in the Bond Resolution to (i) establish and maintain the Series T Advance Deposit Account and the Series T Interest Subsidy Account, which are separate and distinct accounts from all other funds and accounts of the Authority, (ii) make annual deposits in the Series T Advance Deposit Account in the years and in the amounts set forth in the table appearing in "Series T Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION, (iii) deposit the Interest Subsidy Payments in the Series T Interest Subsidy Account, and (iv) invest the moneys on deposit in the Series T Advance Deposit Account at a rate not in excess of the permitted sinking fund yield under Section 54A(d)(5) of the Code.

### Designation of the Bonds as Qualified Zone Academy Bonds

The Authority will designate the Bonds as Qualified Zone Academy Bonds pursuant to the provisions of Section 54E of the Code. The Authority will also irrevocably elect to have Section 6431(f) of the Code apply to the Bonds, thus constituting the Bonds as "specified tax credit bonds". As a result, interest on the Bonds will be included in federal gross income of owners of the Bonds (other than those owners exempt from federal income tax on such income as described in *Appendix III*), and owners of the Bonds will not be entitled to any federal tax credits otherwise applicable to Qualified Zone Academy Bonds.

Subject to continued compliance by the Authority with the federal income tax requirements that apply to Qualified Zone Academy Bonds, the Authority will be entitled to receive cash payments from the U.S. Treasury ("refundable tax credits") equal to the lesser of (1) 100% of the interest payable on each Bond or (2) the amount or interest that would have been payable on such Bond if such interest were determined at the applicable tax credit rate determined on the date of issuance of the Bonds under Section 54A(b)(3) of the Code. To receive the refundable tax credits, the Authority is required to make certain filings (currently Form 8038-CP) with the Internal Revenue Service not less than 45 days nor more than 90 days before each interest payment date that the Authority expects to receive the refundable tax credit. Failure to timely file the required form could result in the delay or denial of receipt of the refundable tax credit.

Payment of refundable tax credits are treated as overpayments of tax that are subject to offset against amounts that may be owed to the United States or its agencies by the Authority or the Commonwealth. Also it is possible that the refundable tax credit payments could be reduced or discontinued or that the timing of their receipt could be changed as a result of changes in the federal law.

The refundable tax credits received are pledged to pay the Bonds, but their receipt is not a condition of payment of any portion of the principal of or interest on the Bonds. The Authority is obligated to make payments of principal of and interest on the Bonds whether or not it receives refundable tax credits.

### Qualified Zone Academy Bonds Requirements

Numerous different federal income tax requirements apply to Qualified Zone Academy Bonds including, among other things, a requirement that 100% of "available project proceeds" be expended on certain qualified purposes, a requirement of a private business contribution to the program financed with the bonds, a requirement that a local education agency approve the issuance of the bonds, a maturity restriction and a volume cap restriction. This section summarizes certain requirements of Qualified Zone Academy Bonds.

*Allocation of National Volume Limitation*. A national limitation on the amount of bonds that may be designated as Qualified Zone Academy Bonds applies for each calendar year under Section 54E(c) of the Code. The annual national limitation is allocated among the states by the Secretary of the Treasury. The Commonwealth has received an allocation of the national limitation for calendar years 2009 and 2010, which have an expiration date of December 31, 2011 and 2012, respectively. On September 6, 2010 and October 28, 2011, the Authority received an allocation of $61,753,000 and $59,775,000 from the 2009 and 2010 Commonwealth allocation, respectively.

*100% of the Available Project Proceeds Test.* Section 54(e)(4) of the Code generally requires that 100% of the "available project proceeds" of an issue of Qualified Zone Academy Bonds must be used for any "qualified purpose" under Section 54E(d)(3) of the Code with respect to a "qualified zone academy" under Section 54E(d)(1) of the Code which is established by an eligible local education agency. In addition, the issuer must reasonably expect, as of the issue date, that (i) at least 100% of the available project proceeds will be spent for qualified purposes of the issue within three years from the issue date, unless the Internal Revenue Service extends such period upon the issuer's request and meeting certain requirements, and (ii) a binding commitment with a third party to spend at least 10% of the available project proceeds of the issue within six months from the issue date. For these purposes, "available project proceeds" means the excess of the sale proceeds of the Bonds over the issuance costs financed with proceeds of the Bonds (to the extent that such costs do not exceed two percent of such sale proceeds) and investment proceeds on such excess.

To the extent that less than 100% of the available project proceeds are expended by the close of the three-year period (or the extended period), the issuer is required to redeem all of the nonqualified Qualified Zone Academy Bonds (the amount of which is determined in the same manner as under Section 142 of the Code) within 90 days after the end of such period.

*Qualified Purposes.* "Qualified Purposes" for uses of proceeds of Qualified Zone Academy Bonds with respect to a qualified zone academy under Section 54E(d)(3) of the Code include rehabilitating or repairing the public school in which the academy is established, providing equipment for use at such academy, developing course materials for education to be provided at such academy, and training teachers and other school personnel in such academy. Qualified Purposes generally do not include construction expenditures.

*Qualified Zone Academy.* A "qualified zone academy" under Section 54E(d)(1) of the Code includes any public school or academic program within a public school which is established by and operated under the supervision of an eligible local education agency to provide education or training below the post-secondary level if the four requirements described below are met. First, the public school or program must be designed in cooperation with business to enhance the academic curriculum, increase graduation and employment rates, and better prepare students for the rigors of college and the increasingly complex workforce. Second, students in the public school or program must be subject to the same academic standards and assessments as other students educated by the local education agency. Third, the comprehensive education plan of such public or program is approved by the eligible local education agency. Fourth, either, (i) the public school is located in an empowerment zone or enterprise community (with this determination of whether the public school is located in such a zone or community being made on a one-time basis as of the issue date of the Qualified Zone Academy Bonds); or (ii) there is a reasonable expectation as of the issue date of the Qualified Zone Academy Bonds that at least 35% of the students attending the school or program will be eligible for free or reduced-cost lunches under the school lunch program established under the national School Lunch Act. The academic program established by the Department of Education in connection with the private business contribution described below and the qualified purposes financed with proceeds of the Bonds is the "qualified zone academy" with respect to the Bonds.

*10% Private Business Contribution Requirement.* The 10% private business contribution requirement under Section 54E(b) of the Code requires that the eligible local education agency which established the qualified zone academy have "written commitments" from eligible private entities to make "qualified contributions" having present value as of the issue date of the Qualified Zone Academy Bonds of at least 10% of the proceeds of the issue.

The issuer of Qualified Zone Academy Bonds must certify that it has "written assurance" that the private business contribution requirement will be met. The Department of Education has entered into an agreement with Intel Corporation, pursuant to which the Department of Education will receive private contributions having an aggregate present value as of the issue date of the Bonds of not less than 10% of the proceeds of the Bonds.

*Local Education Agency Approval.* Under Section 54E(a)(3) of the Code, the issuer of Qualified Zone Academy Bonds also must certify that it has the written approval of the "eligible local education agency" within the meaning of Section 9101 of the Elementary and Secondary Education Act of 1965 for the bond issuance. The Department of Education is the "eligible education agency" with respect to the Bonds.

In addition, the Davis-Bacon Act (40 U.S.C. § 3141 et seq.) applies to projects financed with proceeds of Qualified Zone Academy Bonds. Under the Davis-Bacon Act, among other requirements, contractors and subcontractors performing work on construction contracts in excess of $2,000 for such project are required to pay their laborers and mechanics not less than the prevailing wage rates and fringe benefits for similar projects in the area, as determined by the Secretary of Labor.

The Authority has covenanted to be in compliance with all the above requirements of the Qualified Zone Academy Bonds program.

**Redemption Provisions**

*Extraordinary Optional Redemption.* The Bonds shall be subject to redemption, at the option of the Authority, prior to their maturity date, in whole or in part, on the date designated by the Authority, upon the occurrence of an Extraordinary Event (defined below), at a redemption price equal to the principal amount of the Bonds to be redeemed, plus accrued interest thereon to the redemption date, without premium. An "Extraordinary Event" will have occurred if (i) the Authority determines that (a) a material adverse change has occurred to Sections 54E or 6431 of the Code or any other related Code provision or (b) any guidance has been published by the IRS or the United States Treasury with respect to such section or sections or (c) any legislation is enacted which impacts the receipt of the Interest Subsidy Payments or (d) any other determination is made by the IRS or the United States Treasury or any court of competent jurisdiction, which determination is not the result of any act or omission by the Authority to satisfy the requirements of the Code to receive the Interest Subsidy Payments from the United States Treasury, pursuant to which the Interest Subsidy Payments from the United States Treasury are reduced or eliminated; or (ii) the United States Treasury fails to make a Interest Subsidy Payment to which the Authority is entitled and such failure is not caused by any action or inaction by the Authority.

*Extraordinary Mandatory Redemption.* The Bonds shall be subject to extraordinary mandatory redemption, prior to their stated maturity date, in whole or in part, on the date designated by the Authority, within ninety (90) days after December 22, 2014, at a redemption price equal to the principal amount of the Bonds called for redemption plus accrued interest thereon to the redemption date, without premium, to the extent that less than 100% of the available project proceeds of the Bonds (being the excess of the proceeds from the sale of the Bonds over issuance costs with respect to the issuance of the Bonds to the extent such as costs do not exceed 2% of such proceeds, plus the proceeds from any investment of such excess) are not expended for qualified purposes by the end of the three-year expenditure period beginning on the date of issuance of the Bonds (or, if an extension of the period for expenditure has been granted by the Internal Revenue Service, then by the close of the extended period), from such unexpended available project proceeds of the Bonds. Such redemption shall occur within 90 days of the end of such three-year period or extended period; provided, however, that the Authority may rescind such extraordinary mandatory redemption and the notice thereof on any date prior to the date of such redemption by causing written notice that the Authority has cured the conditions that caused the Bonds to be subject to such redemption to be given to the owners of the Bonds called for redemption, given in the same manner in which notice of such redemption was originally given.

*Notice of Redemption.* At least 30 days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described under the caption "Book-Entry Only System" under THE BONDS, by first-class mail, postage prepaid, to the registered owners of the Bonds to be redeemed. Each notice of redemption shall contain, among other things, the CUSIP identification number of the Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the 1995 Fiscal Agent, interest on the Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the 1995 Bond Resolution, Bonds or portions of Bonds which have been duly called for redemption, or with respect to which irrevocable instructions to call for redemption have been given, and for the payment of the principal of and the accrued interest on which sufficient moneys or

Government Obligations (as defined in the 1995 Bond Resolution) shall be held in separate trust for the owners of such Bonds or portions thereof to be redeemed, shall not be deemed to be outstanding under the 1995 Bond Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the accrued interest thereon from said separate trust and to receive Bonds (of the same series and maturity) for any unredeemed portion of such Bonds.

*Selection of Bonds to be Redeemed.* If less than all of the Bonds of any one maturity and series shall be called for redemption, the particular Bonds or portions thereof to be redeemed shall be selected by the 1995 Fiscal Agent in such manner as it, in its discretion, may determine to be appropriate and fair; except that so long as the book-entry only system shall remain in effect, the selection of the Bonds to be redeemed shall be determined as provided under the caption "Book-Entry Only System" under THE BONDS.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from sources (including DTC) that the Authority believes to be reliable, but none of the Authority, the 1995 Fiscal Agent or the Underwriters takes any responsibility for the accuracy of such information.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each maturity of each series of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such maturity.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity, corporate and municipal debt, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participant's accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants," and together with the Direct Participants, the "Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the SEC. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, principal payments and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1995 Fiscal Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC, the 1995 Fiscal Agent, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, principal and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1995 Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1995 Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive will be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered to DTC.

*The Authority, the 1995 Fiscal Agent and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of the principal of or premium, if any, or interest on any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant. The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.*

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: (i) principal of and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1995 Fiscal Agent in New York, New York; (ii) interest on the Bonds will be payable on August 1, 2012, October 1, 2012 and quarterly thereafter on each January 1, April 1, July 1 and October 1 by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1995 Fiscal Agent as of the close of business on the record date therefor as set forth in the 1995 Bond Resolution (March 15, June 15, September 15 and December 15); (iii) the Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple of $1,000 in excess thereof, and (iv) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust office of the 1995 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such registration, transfer or exchange.

For every registration or transfer of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## SECURITY

All Government Facilities Bonds will be secured equally and ratably by a pledge of rentals of the facilities leased by the Authority (the "Leased Facilities"). The Leased Facilities will not be mortgaged or otherwise encumbered to secure any Government Facilities Bonds. The Enabling Act provides that the good faith and credit of the Commonwealth are pledged for the payment of rentals under any lease agreement with any department, agency or instrumentality of the Commonwealth and to the making of advances by the Secretary of the Treasury to the Authority of any unpaid portion of rentals payable to the Authority by any department, agency or instrumentality of the Commonwealth. The Enabling Act also provides that the good faith and credit of any municipality entering into a lease agreement with the Authority are pledged for the payment of any rentals thereunder.

The Authority will also pledge, as additional security for the payment of the Bonds, moneys on deposit in the Series T Advance Deposit Account described herein. See "Series T Advance Deposit Account; Payment by Lessees of Series T Advance Deposit Amounts; and Series T Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. The Authority will covenant to deposit the Interest Subsidy Payments immediately upon receipt into the Series T Interest Subsidy Account for application as provided in the Bond Resolution. The Authority will also pledge, as additional security for the payment of interest on the Bonds, moneys on deposit in the Series T Interest Subsidy Account described herein. See "Series T Interest Subsidy Account" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION. There can be no assurance that the Bonds will qualify as "Qualified Zone Academy Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. See "Interest Subsidy Payments for Qualified School Zone Academy Bonds" below.

The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Treasury such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.

The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution, or any Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution.

**Commonwealth Guaranty**

As provided in Act No. 17 of the Legislative Assembly of Puerto Rico, approved on April 11, 1968, as amended (the "Guaranty Act"), the Commonwealth guarantees, among other things, the payment of the principal of and interest on the Government Facilities Bonds. The Guaranty Act, which was amended by Act No. 128 of July 12, 2011, to increase the amount of the guaranty from $3,325,000,000 to $4,325,000,000, provides:

The Government of Puerto Rico hereby guarantees payment of the principal and the interest on bonds outstanding at any given time, in an aggregate principal amount not exceeding $4,325,000,000 issued from time to time by the Public Buildings Authority for any of its purposes authorized by its Enabling Act. The bonds covered by this guaranty shall be those specified by the Authority with the consent and approval of Government Development Bank for Puerto Rico, including, but not limited to, the "Qualified School Construction Bonds" or other bonds, including federal tax credit bonds under Section 54A of the United States Internal Revenue Code of 1986, as amended, and a statement of such guaranty shall be set forth on the face of such bonds. If at any time the revenues or income and any other moneys of the Authority, pledged for the payment of the principal and interest on such bonds, are not sufficient for the payment of such principal and interest when they come due, nor to maintain the reserve fund for the bonds that the Authority has pledged to maintain, the Secretary of Treasury shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficiency in the amount required for the payment of such principal and interest, and to bring said reserve fund to the required maximum agreed by the Authority, and shall direct that the sums thus withdrawn be applied to such payment and purpose. For purposes of this Article, those bonds that have been redeemed, canceled or refunded and provision for payment of which has been made by means of a special reserve, a guaranteed investment contract or other acceptable collateral shall not be deemed as outstanding. The good faith, credit and taxing power of the Commonwealth are hereby pledged to make the payments described in the above paragraph.

The Bonds have been specified by the Authority in the Bond Resolution to be guaranteed by the Commonwealth under the Guaranty Act.  Following the issuance of the Bonds, the Authority will have $4,170,459,115 aggregate principal amount of bonds outstanding covered by the Guaranty Act, consisting of $37,315,000 of bonds issued under the 1970 Bond Resolution and $4,133,144,115 of bonds issued under the 1995 Bond Resolution, calculated in each case by excluding the accretion on capital appreciation bonds and convertible capital appreciation bonds. See DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS herein.

To date, no payments have ever been required under the Guaranty Act.

**Opinion of the Secretary of Justice of the Commonwealth**

Prior to the delivery of the Bonds, the Secretary of Justice of the Commonwealth will have rendered his opinion to the Authority to the effect that:

1.      The Authority is lawfully authorized to specify up to $4,325,000,000 aggregate principal amount of bonds of the Authority outstanding at any one time, issued for any of its authorized purposes, to be covered by the guaranty of the Commonwealth under the Guaranty Act, and the Commonwealth will be obligated to pay the principal of and the interest on the bonds so specified to be covered by said guaranty, if and to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to make such payments as the same become due;

2.      Any amounts required to be paid by the Commonwealth under said guaranty will constitute "public debt" in the meaning of Section 8 of Article VI of the Puerto Rico Constitution (the "Constitution"), and will accordingly be entitled to the same priority of payment under such Section as the direct bonded indebtedness of the Commonwealth;

3.    The Secretary of the Treasury can be required in a court of justice under the provisions of Section 2 of Article VI of the Constitution to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Constitution, including any payments required to be made under said guaranty, at the suit of any holder of bonds issued by the Authority and guaranteed pursuant to the Guaranty Act; and

4.    The Commonwealth guaranty of the Bonds constitutes a general obligation of the Commonwealth to which its good faith, credit and taxing power are pledged.

**Lease Agreements**

In accordance with the provisions of the 1995 Bond Resolution, the Authority enters into lease agreements (the "Lease Agreements") with various departments, agencies, instrumentalities and municipalities of the Commonwealth with respect to the Leased Facilities. The Lease Agreements require the corresponding lessees to pay to the Authority annual rentals in substantially equal monthly installments. The rentals are calculated by taking into account the following factors:

(1)    the interest on and principal of (including any amortization requirements of) and redemption premium, if any, on Government Facilities Bonds issued to finance or refinance such Leased Facilities,

(2)    any amounts necessary to pay the general administrative expenses of the Authority related to the Leased Facilities, and

(3)    any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

The Lease Agreements may also require the lessees to pay certain amounts on account of the principal of and interest on outstanding notes issued to provide interim financing for the initial development and construction of the Leased Facilities.

Each Lease Agreement with respect to a facility or facilities terminates when the Government Facilities Bonds (as well as any notes issued to provide interim financing) which were issued to finance or refinance the acquisition or construction of such facility or facilities have been paid in full. All Lease Agreements provide for the adjustment of rentals so that the total amounts payable will be sufficient to meet the required debt service charges. The Lease Agreements related to the schools financed with the proceeds of the Bonds provide (i) that the annual rental payments are adjusted downward to reflect the portion of the interest payment on the Bonds that is covered by the Interest Subsidy Payments, (ii) for the adjustment upwards of the rental payments in the event the Authority does not receive, in whole or in part, the Interest Subsidy Payments so that the total amount of rent payable will be sufficient to meet the required debt service on the Bonds, and (iii) for the payment of an allocable portion of the Series T Advance Deposit Amounts in addition to rentals to pay the principal of and interest on the Bonds. Each Lease Agreement provides that the obligation of the lessee to pay rentals is absolute and unconditional.

Under the 1995 Bond Resolution, the Authority is required to forward, upon receipt, the portion of the rental payment from the lessees corresponding to the debt service payments on the Bonds (as well as any notes issued to provide interim financing) to the 1995 Fiscal Agent. During recent fiscal years, the Authority experienced delays in rental payments, as the Commonwealth experienced growing budget deficits through fiscal year 2009. Given the budgetary constraints of the Commonwealth, in recent fiscal years OMB did not propose, and, as a result, the Legislative Assembly did not appropriate, sufficient funds to provide the Authority with the aggregate amount of rental payments provided for in the Lease Agreements. Consequently, OMB was unable to instruct the Treasury Department to forward to Government Development Bank the full amount of rental payments payable under the Lease Agreements. Nevertheless, OMB has always instructed the Treasury Department to forward to Government Development Bank sufficient funds to pay all interest on and principal of (including any amortization requirements) and redemption premium, if any, on Government Facilities Bonds, as well as a portion of general and administrative expenses of the Authority related to the Leased Facilities. No funds have been provided, however, to replenish or

maintain the reserve for the replacement of major items of equipment comprising a portion of such Leased Facilities. As of December 1, 2011, no funds were on deposit for such reserve.

In an effort to reduce the frequency and length of delays in the receipt of rental payments by the Authority, on December 7, 2001, the Authority entered into an Inter-Agency Agreement (the "Inter-Agency Agreement") with Government Development Bank, OMB and the Treasury Department pursuant to which OMB instructs the Treasury Department to forward funds necessary to pay rentals under Lease Agreements to Government Development Bank by the 10th day of each month, which funds are, in turn, deposited in a special account of the Authority at Government Development Bank. The Inter-Agency Agreement covers rental payments whose source is the General Fund, which includes agencies, departments or instrumentalities that are linked to the central accounting system managed by the Treasury Department. Such amounts represent approximately 85% of all rental payments received by the Authority under the Lease Agreements. The portion of such rentals that is used to pay debt service on the Authority's bonds is kept in the special account of the Authority at Government Development Bank for delivery to the respective fiscal agents. The remainder is forwarded to the Authority to cover its general and administrative expenses related to the Leased Facilities, as well as any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

In 2009, OMB and Government Development Bank established a five-year plan for the repayment of accumulated debt owed by departments, agencies and instrumentalities of the Commonwealth to certain public corporations, including the Authority. Pursuant to this plan, OMB scheduled and the Legislative Assembly appropriated for fiscal years 2010, 2011, and 2012 approximately $51.0 million, $60.3 million, and $38.7 million, respectively, for the amortization of overdue rent to the Authority, and has agreed to continue requesting annual General Fund appropriations for the payment of such debt.

In fiscal years 2010 and 2011, the Authority collected 93% and 98%, respectively, of its current rent. As described above, the delays and shortfalls in rental payments have not affected the Authority's ability to pay its debt service and there have been no defaults or delays in the payment of principal or interest on any indebtedness of the Authority. To address the delays and shortfalls in the payment of rent, the Authority continues to undertake certain fiscal measures, including:

- Ensuring that the Legislative Assembly appropriates sufficient funds in the Commonwealth's proposed budgets to provide the Authority with the adequate amount of rental payments, as proposed by OMB.

- Implementing various Executive Orders issued by the Governor during the second half of fiscal year 2009 calling for the implementation of measures of austerity, fiscal control and expense reduction, including salary reduction of non-career employees and agency heads, salary freezes, ban on new positions, and the elimination of vacant positions. No salary increases are expected to be granted to the Authority's employees until fiscal year 2013.

- Developing and implementing various operating expense reduction measures, including the implementation of energy reduction, transportation, communication and security services cost savings initiatives, consolidation of office space to obtain additional rental income, and renegotiation of services contracts (which has thus far resulted in approximately a 30% annual reduction in services contracts costs). A new facility model with energy, technology and space utilization efficiencies is expected to result in approximately annual energy savings of approximately $2.3 million and annual technology savings of approximately $250,000.

- Implementing a cost reduction initiative in connection with labor union agreements, which includes reductions in the cost of the medical plan, bonus, vacation and sick leave licenses, among others. This initiative is expected to generate savings of approximately $13.5 million in the three-year period commencing in fiscal year 2010.

- Implementing effective and consistent collection methods for past due rentals and entering into payment plans with lessees.

In addition, the Authority is expecting ten-year projected savings of approximately $18 million in payroll expenses due to the implementation of the incentive, retirement and retraining program for eligible government employees created by Act No. 70, as approved by the Legislature on July 2, 2010 ("Act No. 70"). In fiscal years 2011 and 2012, the Authority expects annual savings of $866,277 and $1,913,787, respectively, as a result of Act No. 70.

As part of the measures adopted by the Commonwealth to address its financial condition, the Authority is expected to refinance approximately $153.8 million of interest to accrue during fiscal year 2012. The reduction in the Authority's debt service payment requirements for fiscal year 2012 would result in a commensurate decrease in the required rental payments for such fiscal year. Pending completion of the Authority's refinancing of a portion of its fiscal year 2012 debt service requirement, the Authority has secured a line of credit facility with Government Development Bank in the amount of $153.8 for the payment of such debt service requirements.

For further information regarding certain provisions required by the 1995 Bond Resolution to be included in each Lease Agreement in respect of facilities financed or refinanced by the Bonds, see SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION.

## Pledge of the Commonwealth to Pay or Advance Rentals

Under the 1995 Bond Resolution, the Authority has covenanted that if any department, agency, instrumentality or municipality fails to pay any rent when due, the Authority will promptly notify the Secretary of Treasury.

As provided in the Enabling Act, the good faith and credit of the Commonwealth are pledged for the payment of the rent payable under any Lease Agreement with the Authority executed by any of the Commonwealth's departments, agencies, instrumentalities, or public corporations. The Enabling Act also provides that if any rent payable to the Authority by any department, agency, instrumentality or public corporation under a Lease Agreement is not paid when due, the Commonwealth shall advance the unpaid balance to the Authority. The Commonwealth pledges its good faith and credit to the making of such advances. Any advances so made are required to be reimbursed by the particular department, agency, instrumentality or public corporation involved.

Payments or advances of rentals by the Commonwealth, as described above, are subject to annual appropriations by the Legislative Assembly, which appropriations are legally required to be made. However, the obligation to make such appropriations is not legally enforceable in view of the sovereign immunity of the Commonwealth and, unlike the obligation to make payments under the guaranty of the Bonds, the obligation to pay or advance rentals does not constitute "public debt" within the meaning of Section 8 of Article VI of the Constitution.

### Additional Bonds

Under and in accordance with the provisions and restrictions of the 1995 Bond Resolution, the Authority may issue additional Government Facilities Bonds from time to time to finance additional government facilities or complete the construction of existing government facilities or to refund any bonds issued under the 1995 Bond Resolution, the 1970 Bond Resolution or the 1978 Bond Resolution. Although the Authority reserves the right to issue additional Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution, since the adoption of the 1995 Bond Resolution, the Authority has only issued additional bonds under the 1995 Bond Resolution.

## Interest Subsidy Payments for Qualified Zone Academy Bonds

The term "Interest Subsidy Payments" means each of the payments of refundable tax credits in respect of the Bonds from the U.S. Treasury actually received by the Authority or the 1995 Fiscal Agent on behalf of the Authority pursuant to Section 6431(f) of the Code and a filing with the IRS. The Authority has covenanted to file, or cause to be filed, on or before 45 days prior to each Interest Payment Date, Form 8038-CP with the IRS (or such

other appropriate form as the IRS shall direct) relating to the Interest Subsidy Payment to be received with respect to the Bonds for such Interest Payment Date.

The Authority cannot predict whether the Interest Subsidy Payments will be received by the Authority or the 1995 Fiscal Agent on behalf of the Authority. The Interest Subsidy Payments are characterized in the Code as refundable tax credits that are generally treated as overpayments of tax that are subject to being credited against liabilities in respect of internal revenue tax and offset against outstanding debts to the United States. Before disbursing the Interest Subsidy Payments, the IRS compares the payment information with delinquent debtor information in its database. The IRS treats state and local governments as one entity/debtor regardless of the type of federal payment or the type of outstanding debt. As a result, Interest Subsidy Payments may be subject to reduction or offset by the IRS to the extent the Authority or the Commonwealth owes payments of any kind to the United States. Federal law imposes certain requirements for qualification of the Bonds as "Qualified Zone Academy Bonds." There can be no assurance that the Bonds will qualify as "Qualified Zone Academy Bonds" or as to the receipt, or timing of receipt, of the Interest Subsidy Payments. In the event that all or a portion of the Bonds lose their status as "Qualified Zone Academy Bonds," the Authority may lose all or a portion of the Interest Subsidy Payment pursuant to Section 6431(f) of the Code. The Authority's obligation to timely make debt service payments on the Bonds is not abated or offset by the failure to receive the Interest Subsidy Payments.

## PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of September 30, 2011.  The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report.

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

|  | September 30, 2011 |
|---|---|
| GENERAL FUND RELATED DEBT |  |
| Direct full faith and credit obligations | $ 9,772 |
| Puerto Rico guaranteed debt[1] | 5,312 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,880 |
| Tax and Revenue Anticipation Notes[3] | 650 |
| Pension Obligation Bonds[4] | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,562 |
|  |  |
| Sales Tax Debt | $13,765 |
| Public corporations and agencies[5] | 23,111 |
| Municipal debt | 3,400 |
| Limited obligations/non-recourse debt[6] | 2,385 |
|  | $42,661 |
|  |  |
| TOTAL PUBLIC SECTOR DEBT | $65,223 |

---

\*   Totals may not add due to rounding.

(1)   Consists of $666 million of bonds issued by Aqueduct and Sewer Authority, $423 million of State Revolving Fund Loans incurred under various federal water laws, $212 million of bonds issued by Port of the Americas Authority and $4.012 billion of PBA bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

(2)   Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

(3)   Includes related short-term financings.

(4)   Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

(5)   Excludes $5.4 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities.  Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included the table.

(6)   Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $343.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008, and $100 million of Housing Revenue Bonds, Series 2008, issued the Puerto Rico Housing Finance Authority; $149.1 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $74.6 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.5 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:*   Government Development Bank for Puerto Rico

**Payment of Public Debt**

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first lien on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and, according to opinions rendered by the Secretary of Justice of Puerto Rico, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. Any such guaranty payments, including guaranty payments under the Guaranty Act, are equal in their claim on such available Commonwealth revenues to claims for the payment of debt service on general obligation bonds and notes of the Commonwealth.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of public debt. See "Major Sources of General Fund Revenues—Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES in the Commonwealth Report.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two

fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited constitutional provisions relating to the public debt.

### Variable Rate Bonds and Swap Agreements

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In March 2011, the Commonwealth issued its $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (the "Series 2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of September 30, 2011.

As of September 30, 2011, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2011 Swap Bonds, bear interest at 12% per annum. This amount ($981,295,893) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $997,815,893, is equal to 13.15% of $7,587,526,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2010 and preliminary internal revenues for the fiscal year ended June 30, 2011. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 11.87%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See PUBLIC CORPORATIONS in the Commonwealth Report. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. Government Development Bank, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

**Commonwealth Guaranteed Debt**

As of November 1, 2011, $4.049 billion of Commonwealth guaranteed bonds of PBA were outstanding. Maximum annual debt service on these bonds (assuming the principal amount due at maturity is not refunded and

the receipt of the issuer subsidy from the federal government, as discussed in footnote 4 on page 33) is $993.1 million in fiscal year 2028, with their final maturity being July 1, 2041. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of September 30, 2011, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of September 30, 2011, GDB held approximately $212 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The Port of the Americas Authority is authorized to issue and GDB is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. Payments of $60.7 million under the Commonwealth guaranty have been required to pay interest and principal on these bonds. See "Other Public Corporations—Port of the Americas Authority" under PUBLIC CORPORATIONS in the Commonwealth Report.

As of September 30, 2011, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $1.089 billion. This amount consisted of $285 million in revenue bonds sold to the public, $381 million in bonds issued to the United States Department of Agriculture, Rural Development, and $423 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. The Commonwealth, however, has been making certain subsidy payments to PRASA for its operational expenses. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under PUBLIC CORPORATIONS in the Commonwealth Report.

## THE AUTHORITY

### General

The Authority, a body corporate and politic constituting an instrumentality of the Commonwealth exercising public and essential governmental functions, was created on June 19, 1958 by the Enabling Act. Under the Enabling Act, the primary functions of the Authority are to design and construct office buildings, quarters, courts, warehouses, shops, schools, health facilities, social welfare facilities and related facilities for lease to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The executive offices of the Authority are located at Roberto Sánchez Vilella Government Center, North Building, 6th Floor, De Diego Avenue, San Juan, Puerto Rico 00940, telephone number (787) 722-0101.

On May 12, 2011, the Governor submitted to the Legislative Assembly a bill to reorganize the Authority. According to the bill, the Authority would be renamed as the Corporation of Schools and Public Properties (the "Corporation") and all rights, powers, obligations and assets of the Office for the Improvement of Public Schools ("OMEP" by its Spanish acronym) (affiliated with the Department of Education) would be transferred to the Corporation. As a result of the reorganization, the Corporation would have all rights, powers, obligations and assets of both the Authority and OMEP and would be in a better position to conserve and maintain public schools. This bill is currently pending consideration by the Legislative Assembly and there can be no assurance that this bill will be enacted or, if enacted, that it will be enacted in the form proposed.

### Powers

The Authority has broad powers under the Enabling Act, including among others:

- to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers;

- to acquire any kind of properties and rights therein in any lawful manner, including, without limitation, acquisition by purchase, either by agreement or through the exercise of the power of eminent domain, lease or bequest, and to possess, lease, use and operate any properties or facilities;

- to prepare plans, projects and cost estimates for the construction, improvement or repair of any property or facility;

- to contract with any Commonwealth department, agency, instrumentality, public corporation or official, or with any private person or entity with regard to the administration of any properties or facilities of the Authority;

- to borrow money and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds by pledge, mortgage, assignment or deed of trust of all or any of its properties, revenues or income; and

- to do all acts necessary or convenient to carry out the powers granted to it.

**Management**

The Enabling Act provides that the Authority shall be governed by a Governing Board (the "Board") composed of seven members.  The Secretary of the Department of Education of Puerto Rico (the "Department of Education"), the Secretary of the Department of Transportation and Public Works, and the President of Government Development Bank serve as ex officio members of the Board, and the other four members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico for staggered six-year terms.  At present, there is one vacancy on the Board.

The current members of the Board of the Authority, their occupations and the expiration of terms as Board members are:

| Members of the Board | Occupation | Expiration of Term |
|---|---|---|
| Edward Moreno | Acting Secretary of Education | Ex-officio |
| Rubén Hernández Gregorat | Secretary of Transportation and Public Works | Ex-officio |
| Juan Carlos Batlle Hernaiz | President of Government Development Bank | Ex-officio |
| Reynaldo Encarnación | Engineer | December 2012 |
| Nilda Muñoz Vissepó | Attorney | December 2016 |
| Luis Ortiz Segura | Attorney | July 2016 |

Eduardo Rivera Cruz has been the Executive Director of the Authority since January 25, 2011.  Before his appointment, from 2009 to January 24, 2011, Mr. Rivera held the position of General Manager of OMEP, which is affiliated to the Department of Education, in charge of the maintenance of more than 1,100 schools island-wide and responsible for creating and implementing the public policies and procedures in OMEP's seven regions.  During the same period of time, he was also the President of the Department of Education's Bid Board, responsible for the Bid Board management, operation and supervision.  From January 2001 to December 2008, Mr. Rivera held the position of Bid Board Director and Alternate Member at the Department of Education, where he was responsible for its current administrative structure and for revising and analyzing rules and regulations.  Prior to joining the Department of Education, Mr. Rivera served as Director of the Purchases, Bids and Contracts Office for the Puerto Rico Volunteer Youth Corps.  He has a Bachelor's Degree in Business Administration from the University of Puerto Rico, with two majors, one in management and another in marketing.

The Authority's financial management team is comprised of its Controller, Legal Director, the Director of Administration and the Director of Project Development:

Wanda Acevedo Torres, CPA, the Authority's Controller, has over 16 years experience within the governmental accounting fields. She has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is an active member of the Puerto Rico Society of Certified Public Accountants.

Leonardo J. Torres Berríos, Esq., the Authority's Legal Director, has over 19 years experience within the governmental and private corporate law and real estate fields. He has a Bachelor's Degree in Business Administration from the University of Puerto Rico and a Juris Doctor degree from the Inter American University of Puerto Rico School of Law.

Ismael Zayas González, P.E., the Authority's Acting Director of Administration, has over 17 years experience within the governmental construction and project management fields. He has a bachelor's degree in Science of Civil Engineering from the University of Puerto Rico, Mayaguez Campus and a master in engineering management from Polytechnic University of Puerto Rico.

Arch. Astrid Díaz, the Authority's Acting Director of Project Development, has over 14 years experience within the field of governmental planning and development of construction projects. She has a master degree in Architecture from the University of Puerto Rico.

# PROGRAMS AND FACILITIES OF THE AUTHORITY

As of September 30, 2011, the Authority has an approximately $381 million Four-Year Capital Improvement Program (the "CIP"), which reflects the Authority's construction priorities for fiscal year 2010 through fiscal year 2014. The CIP includes office buildings, school buildings, health facilities, correctional facilities, and other facilities, as described below. A portion of the facilities were financed with revenue bonds issued and currently outstanding under the 1995 Bond Resolution (collectively, the "Outstanding Government Facilities Bonds"). The remainder of the costs of the CIP will be paid for through interim financings, future bond issues (subject to the limitations of the Guaranty Act) and Commonwealth appropriations.

## Office Buildings Program

Under its office buildings program, the Authority has completed construction of 207 office buildings (including police stations, courthouses, and related parking facilities), amounting to approximately 6.8 million square feet of rentable space, for the use of and lease to various departments, agencies and instrumentalities of the Commonwealth. As of September 30, 2011, the estimated total cost of construction completed under the office buildings program was approximately $588 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

As of September 30, 2011, the Authority has under planning and construction one office building, five fire station, one parking building for office center and improvements to 76 office buildings, at an estimated total cost of $156 million.

The currently outstanding Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of the rentals of public buildings and related facilities financed by such bonds. In addition, these obligations are secured by a pledge of the Commonwealth to pay or advance rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Revenue Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the office buildings program.

## School Buildings Program

Under its school buildings program, the Authority has completed the construction of 376 school building projects, amounting to approximately 20.3 million square feet of rentable space, all of which have been leased to the Department of Education. As of September 30, 2011, the estimated total cost of construction completed under the

school buildings program was $2.519 billion, which was provided principally by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

As of September 30, 2011, the Authority has under planning and construction 11 new school buildings and improvements to 151 school buildings amounting to approximately 1 million square feet of rentable space to be leased to the Department of Education. The estimated total cost of construction of such school buildings and improvements is $805 million.

The currently outstanding Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds. In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the school buildings program.

The Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector. Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while PRIFA serves as procurement and construction manager. The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, science labs, art centers, among other things.

The net proceeds from the Bonds will be used to finance a school rehabilitation program that is part of a multi-agency undertaking to improve and repair approximately 50 public schools throughout Puerto Rico (the "Rehabilitation Program"). The scope of the Rehabilitation Program is primarily targeted at structural repairs and improvements (as opposed to new construction) of public school buildings whereby each eligible school is allocated a budget of approximately $2 million. More than 25,000 students will benefit from the much-needed structural repairs under the Rehabilitation Program. Such repairs and improvements may include repairs to sidewalks, roofs, curbs, gazebos, recreational facilities and drainage systems; repair or replacement of doors, windows, plumbing and light fixtures; updates to A/C, fire protection and electrical systems; and general structural repairs to ensure that the facilities comply with applicable building codes. The Rehabilitation Program is led by the Authority in collaboration with the Department of Education, while PRIFA serves as procurement and construction manager.

**Health Facilities Program**

Under its health facilities program, the Authority completed construction of 18 health facilities, amounting to approximately 1.5 million square feet of rentable space, all of which has been leased to the Department of Health. As of September 30, 2011, the estimated total cost of construction completed and owned by the Authority was $203 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution.

The currently outstanding Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of rentals of public education and health facilities financed by such bonds. In addition, they are secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Public Education and Health Facilities Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the health facilities program.

**Correctional Facilities Program**

In 1994, the Department of Corrections, in cooperation with the Authority, began a program to provide for the construction, operation and maintenance of new Commonwealth correctional facilities to be leased to the Department of Corrections by the Authority. These facilities were constructed as part of the Commonwealth's effort to alleviate overcrowding in its correctional system and achieve compliance with certain federal court mandated minimum inmate living space requirements. The Authority has completed the construction of 8 correctional facilities amounting to approximately 1.7 million square feet of rentable space at an approximate cost of $287 million, which facilities are operated by the Department of Corrections.

**Other Facilities**

The Authority also constructs office buildings, schools and health facilities that are financed by a combination of federal grants and Commonwealth appropriations. The Authority is also empowered to undertake construction on behalf of and as an agent for other public agencies of the Commonwealth.

Under the Enabling Act, the Authority is also empowered to construct social welfare facilities. Any such facilities that may be constructed can be financed by bonds of the Authority under the 1995 Bond Resolution. The Authority has not issued any bonds or other obligations to finance such facilities.

## DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS

**Debt**

The following table sets forth the outstanding debt of the Authority:

| | As of November 1, 2011[1] | As Adjusted[2] |
|---|---|---|
| Bonds outstanding under the 1970 Bond Resolution | $   37,315,000 | $   37,315,000 |
| Bonds outstanding under the 1995 Bond Resolution | 4,011,616,115 | 4,133,144,115 |
| Total bonded debt[3] | $4,048,931,115 | $4,170,459,115 |

[1]   Calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance. These amounts do not reflect Government Development Bank's interim financing of the Authority's CIP.

[2]   Reflects the outstanding debt of the Authority after giving effect to the issuance of the Bonds (calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds from their respective dates of issuance).

[3]   Totals may not add due to rounding.

The letter of credit issued by The Bank of Nova Scotia acting through its San Juan branch, which the Authority caused to be deposited to the credit of the reserve account under the 1970 Bond Resolution, expired on July 15, 2011 (the "BNS Reserve Account Letter of Credit"). Pending the negotiation and issuance of a new letter of credit, the Authority has deposited $5,511,975 in cash to the credit of the 1970 Bond Resolution reserve account. There can be no assurance that a new letter of credit will be obtained by the Authority for such purposes or that the terms of any such letter of credit will be substantially similar to the terms of the BNS Reserve Account Letter of Credit. No reserve account is established under the 1995 Bond Resolution.

**Debt Service Requirements**

Debt service requirements of the Authority for the bonds outstanding under the 1970 and 1995 Bond Resolutions, after taking into account the issuance of the Bonds, as shown in the following table, consist in any fiscal year of the sum of the amounts required to pay (i) the interest that is payable on October 1, January 1 and April 1 in such fiscal year and July 1 in the following fiscal year, (ii) the principal of serial bonds that is payable on July 1 in the following fiscal year, and (iii) the amortization requirements for term bonds that are payable on July 1 in the following fiscal year.

Because of the limitations imposed by the IRS on Qualified Zone Academy Bonds, the Bonds cannot have a maturity exceeding 19 years. The total debt service column below reflects the full principal amount of the Bonds due on July 1, 2030, their maturity date. On such maturity date, the Authority expects that moneys on deposit in the Series T Advance Deposit Account (consisting of the Series T Advance Deposit Amounts and investment earnings thereon) will equal approximately $61.7 million, or approximately 50.7% of the principal amount of the Bonds. The Authority expects to refinance the difference between the amounts on deposit in the Series T Advance Deposit Account and the principal amount of the Bonds remaining after a principal payment of approximately $5.2 million is made in fiscal year 2030 for an additional term of approximately 11 years, in order to finance the improvements being financed with the Bonds during a total term of approximately 30 years.

The pro-forma debt service requirements for the Bonds shown in the table below adjust the actual debt service on the Bonds to reflect, instead of the principal amount of the Bonds due at maturity (i) the Series T Advance Deposit Amounts required to be deposited to the credit of the Series T Advance Deposit Account in fiscal years 2020 through 2030, (ii) in fiscal year 2030, a principal payment of approximately $5,215,000, and (iii) for fiscal years 2031 through 2042, annual debt service on refunding bonds issued in 2030 to refinance the difference between the principal amount of the Bonds remaining after a principal payment of approximately $5,215,000 in fiscal year 2030 and the amount expected to be on deposit to the credit of the Series T Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 11 years, an interest rate of 6.75% and level debt service.

On August 24, 2011, the Authority issued its Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds -- Issuer Subsidy) in the principal amount of $756,449,000 (the "Series R Bonds"). In connection with the issuance of the Series R Bonds, the Authority created the Series R Advance Deposit Account in which it agreed to make annual deposits of an amount specified in the authorizing bond resolution. The Authority elected to issue the Series R Bonds with a single maturity.

The pro-forma debt service requirements for the Series R Bonds shown in the table below adjust the actual debt service requirements on the Series R Bonds to reflect, instead of the principal amount of the Series R Bonds due at maturity, (i) the Series R Advance Deposit Amounts required to be deposited to the credit of the Series R Advance Deposit Account in fiscal years 2019 through 2028, (ii) in fiscal year 2029, a principal payment of $31,540,524, and (iii) for fiscal years 2030 through 2042, annual debt service on refunding bonds issued in 2029 to refinance the difference between the principal amount of the Series R Bonds remaining after a principal payment of $31,540,524 in fiscal year 2029 and the amount expected to be on deposit to the credit of the Series R Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 13 years, an interest rate of 6.75% and level debt service.

## Puerto Rico Public Buildings Authority
### Debt Service Requirements

| Fiscal Year Ending June 30, | Total Debt Service on Bonds Outstanding under 1970, 1978 and 1995 Bond Resolutions[1] | Debt Service of the Series R Bonds[2] | Debt Service of the Series T Bonds[3] | Total Debt Service | Pro-Forma Debt Service of the Series R Bonds[4] | Pro-Forma Debt Service of the Series T Bonds[5] | Pro-Forma Total Debt Service[4][8] |
|---|---|---|---|---|---|---|---|
| 2012 | $ 266,280,632 | $ 8,450,036 | - | $274,730,668 | $ 8,450,036 | | $274,730,668 |
| 2013 | 249,012,082 | 9,908,837 | $ 1,352,910 | 260,273,829 | 9,908,837 | $1,352,910 | 260,273,829 |
| 2014 | 248,853,869 | 9,908,837 | 887,154 | 259,649,860 | 9,908,837 | 887,154 | 259,649,860 |
| 2015 | 248,698,782 | 9,908,837 | 887,154 | 259,494,773 | 9,908,837 | 887,154 | 259,494,773 |
| 2016 | 248,446,719 | 9,908,837 | 887,154 | 259,242,710 | 9,908,837 | 887,154 | 259,242,710 |
| 2017 | 248,487,769 | 9,908,837 | 887,154 | 259,283,760 | 9,908,837 | 887,154 | 259,283,760 |
| 2018 | 216,542,432 | 9,908,837 | 887,154 | 227,338,423 | 41,449,361 | 887,154 | 258,878,947 |
| 2019 | 213,732,482 | 9,908,837 | 887,154 | 224,528,473 | 41,449,361 | 887,154 | 256,068,997 |
| 2020 | 217,109,294 | 9,908,837 | 887,154 | 227,905,285 | 41,449,361 | 6,102,154 | 264,660,809 |
| 2021 | 239,591,782 | 9,908,837 | 887,154 | 250,387,773 | 41,449,361 | 6,102,154 | 287,143,297 |
| 2022 | 238,617,275 | 9,908,837 | 887,154 | 249,413,267 | 41,449,361 | 6,102,154 | 286,168,790 |
| 2023 | 223,854,463 | 9,908,837 | 887,154 | 234,650,454 | 41,449,361 | 6,102,154 | 271,405,978 |
| 2024 | 223,910,907 | 9,908,837 | 887,154 | 234,706,898 | 41,449,361 | 6,102,154 | 271,462,422 |
| 2025 | 226,234,288 | 9,908,837 | 887,154 | 237,030,279 | 41,449,361 | 6,102,154 | 273,785,803 |
| 2026 | 224,701,661 | 9,908,837 | 887,154 | 235,497,653 | 41,449,361 | 6,102,154 | 272,253,176 |
| 2027 | 225,543,616 | 9,908,837 | 887,154 | 236,339,608 | 41,449,361 | 6,102,154 | 273,095,131 |
| 2028 | 225,819,444 | 766,357,837[6] | 887,154 | 993,064,436 | 51,806,497 | 6,102,154 | 283,728,096 |
| 2029 | 226,267,525 | - | 887,154 | 227,154,679 | 40,551,721 | 6,102,154 | 272,921,400 |
| 2030 | 226,183,125 | - | 122,415,154[7] | 348,598,280 | 40,491,280 | 6,102,154 | 272,776,560 |
| 2031 | 226,601,851 | - | - | 226,601,851 | 40,426,941 | 7,236,953 | 274,265,745 |
| 2032 | 226,490,501 | - | - | 226,490,501 | 40,357,034 | 7,418,263 | 274,265,797 |
| 2033 | 226,382,094 | - | - | 226,382,094 | 40,283,417 | 7,417,713 | 274,083,223 |
| 2034 | 226,270,986 | - | - | 226,270,986 | 40,205,508 | 7,419,613 | 273,896,107 |
| 2035 | 239,813,439 | - | - | 239,813,439 | 40,121,371 | 7,417,613 | 287,352,422 |
| 2036 | 226,157,995 | - | - | 226,157,995 | 40,031,581 | 7,420,700 | 273,610,276 |
| 2037 | 98,090,863 | - | - | 98,090,863 | 39,936,174 | 7,417,188 | 145,444,224 |
| 2038 | 83,956,513 | - | - | 83,956,513 | 39,833,696 | 7,421,063 | 131,211,271 |
| 2039 | 86,079,138 | - | - | 86,079,138 | 39,724,117 | 7,420,300 | 133,223,555 |
| 2040 | 87,786,700 | - | - | 87,786,700 | 39,607,752 | 7,418,550 | 134,813,002 |
| 2041 | 87,783,900 | - | - | 87,783,900 | 39,484,239 | 7,419,125 | 134,687,264 |
| Total[8] | $6,253,302,122 | $923,440,428 | $137,962,535 | $7,314,705,085 | $1,045,349,157 | $155,226,614 | $7,453,877,893 |

(1) These figures do not include debt service on the Series R Bonds.

(2) These figures are reduced by the Qualified School Construction Bond interest subsidy expected to be received from the United States government, which is equal to $28,061,106.04 for the fiscal year ending June 30, 2012 and $32,905,531.52 for each fiscal year thereafter until the fiscal year ending June 30, 2028. Interest Subsidy Payments with respect to the Series R Bonds are subject to offset in the same manner as the Bonds and are subject to continued compliance with federal income tax requirements that apply to Qualified School Construction Bonds.

(3) These figures are reduced by the Qualified Zone Academy Bond subsidy, expected to be received from the United States government, which is equal to $9,025,580.74 for the fiscal year ending June 30, 2013 and $5,918,413.60 for each fiscal year thereafter until the fiscal year ending June 30, 2030. Interest Subsidy Payments are subject to offset in the manner described therein and are subject to continued compliance with federal income tax requirements that apply to Qualified Zone Academy Bonds.

(4) Adjusted to reflect, instead of the principal amount of the Bonds due at maturity (i) the Series R Advance Deposit Amounts required to be deposited to the credit of the Series R Advance Deposit Account in fiscal years 2019 through 2028, (ii) in fiscal year 2029, a principal payment of $31,540,524, and (iii) for fiscal years 2030 through 2042, annual debt service on refunding bonds issued to refinance the difference between the principal amount of the Bonds remaining after the principal payment of $31,540,524 in fiscal year 2029 and the amount expected to be on deposit to the credit of the Series R Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 13 years, an interest rate of 6.75% and level debt service.

(5) Adjusted to reflect, instead of the principal amount of the Bonds due at maturity (i) the Series T Advance Deposit Amounts required to be deposited to the credit of the Series T Advance Deposit Account in fiscal years 2020 through 2029, (ii) in fiscal year 2030, a principal payment of $5,215,000, and (iii) for fiscal years 2030 through 2041, annual debt service on refunding bonds issued to refinance the difference between the principal amount of the Bonds remaining after the principal payment of $5,215,000 in fiscal year 2030 and the amount expected to be on deposit to the credit of the Series T Advance Deposit Account on the maturity date of the Bonds, assuming that such refunding bonds would have a term of 11 years, an interest rate of 6.75% and level debt service.

(6) Reflects the principal amount of the Bonds assuming such principal amount is not refinanced as described in footnote 4 above.

(7) Reflects the principal amount of the Bonds assuming such principal amount is not refinanced as described in footnote 5 above.

(8) Totals may not add due to rounding.

## SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION

The following statements are brief summaries of certain provisions of the 1995 Bond Resolution. Such statements do not purport to be complete and reference is made to the 1995 Bond Resolution, copies of which are available for examination at the office of the 1995 Fiscal Agent. **For the purposes of this summary, the terms "Bond" or "Bonds" shall refer to the Government Facilities Revenue Bond or Bonds and the term "Series T Bonds" shall refer to the Series T Bonds to which this Official Statement relates**.

### Revenues

The Authority covenants that each Lease Agreement which it enters into for any government facilities financed or refinanced under the 1995 Bond Resolution ("Authority Facilities") will require the Lessee thereunder to pay rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the interest on all Bonds issued by the Authority for the financing or refinancing of the Authority Facilities covered by such Lease Agreement, the principal of all such Bonds which are serial Bonds and the amortization requirements and redemption premium for any such Bonds which are term Bonds ("1995 Debt Service Rentals"). (Section 701). All 1995 Debt Service Rentals received from the leasing of Authority Facilities are pledged as hereinafter provided.

### 1995 Sinking Fund

A special fund is created by the 1995 Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds Sinking Fund" (the "1995 Sinking Fund"). Two separate accounts are created in the 1995 Sinking Fund, namely, the "1995 Bond Service Account" and the "1995 Redemption Account." (Section 502).

The Authority covenants that all 1995 Debt Service Rentals will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the following accounts in the following order:

(1)    To the 1995 Bond Service Account, such amount thereof as may be required to make the amount then to the credit of the 1995 Bond Service Account equal to the amount of interest then due and payable and the interest which will accrue up to the next interest payment date on all Bonds of each series then outstanding and the principal of all serial Bonds, if any, which will become due and payable within the next ensuing twelve months;

(2)    To the 1995 Redemption Account, such amount of the balance remaining after making the deposit under paragraph (1) above as may be required to make the amounts so deposited in the then current fiscal year equal to the amortization requirements, if any, for such fiscal year for the term Bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of Bonds if such principal amount of Bonds should be redeemed on the next redemption date from moneys in the 1995 Sinking Fund; and

(3)    The balance, if any, shall be deposited to the credit of the 1995 Bond Service Account. (Section 502).

The requirements specified in paragraphs (1) and (2) above shall be cumulative. (Section 502).

### 1995 Redemption Account

Moneys in the 1995 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)    Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1995 Sinking Fund. The 1995 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1995 Bond Service Account and the purchase price from the 1995 Redemption Account, but no such purchase shall

be contracted for within the period of 45 days next preceding any interest payment date on which such Bonds are subject to call for redemption under the provisions of the 1995 Bond Resolution.

(b)      Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall call for redemption on each date on which Bonds are subject to redemption from moneys which are in the 1995 Sinking Fund on the 45th day prior to such redemption date such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1995 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than 30 days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and from the 1995 Redemption Account and set aside in separate accounts the respective amounts required for paying the principal of and redemption premium, if any, and the interest on the Bonds so called for redemption.

(c)      Moneys in the 1995 Redemption Account shall be applied by the 1995 Fiscal Agent in each fiscal year to the purchase or redemption of Bonds of each series then outstanding in the following order:

*first,* the term Bonds of each such series to the extent of the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and if the amount available in such fiscal year shall not be equal thereto, then, in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding, plus the applicable premium, if any;

*second,* any balance then remaining shall be applied to the purchase of any Bonds whether or not such Bonds shall be subject to redemption in accordance with paragraph (a) above;

*third,* any balance then remaining shall be applied to the redemption of term Bonds of each such series in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and

*fourth,* after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of such series originally issued under the provisions of the 1995 Bond Resolution. (Section 504).

The term "Principal and Interest Requirement" for any fiscal year, as applied to the Bonds of any series under the 1995 Bond Resolution, shall mean the sum of:

(a)      the amount required to pay the interest on all outstanding Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year;

(b)      the amount required to pay the principal of all outstanding serial Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year; and

(c)      the amortization requirement for the term Bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(i)      in the case of Capital Appreciation Bonds, the Accreted Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of the principal or amortization requirements in accordance with the above provisions;

(ii)      in the case of Capital Appreciation and Income Bonds, the Appreciated Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of principal or amortization requirements in accordance with the above provisions;

(iii)     the interest rate on Bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the average rate of interest per annum on such Bonds for the preceding twelve months or such shorter period that such Bonds shall have been outstanding, or if such Bonds had not been outstanding prior to the date of calculation, the rate of interest on such Bonds on the date of calculation;

(iv)     in the case of Bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such Bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for amortization requirements and principal payments shall be used; provided, however, that if on the date of calculation the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in (or specified in the agreement authorizing the issuance of) the letter of credit or insurance policy or similar credit or liquidity facility;

(v)     in the case of Bonds the maturity of which may be extended by and at the option of the holder thereof or the Authority, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended; and

(vi)     in the case of Bonds (A) which are expected to be repaid from the proceeds of Bonds or other indebtedness or (B) on which interest is payable periodically and for which 25% or more of the principal amount matures during any one year and for which no amortization requirements have been established, the debt service requirements on the Bonds may be excluded and in lieu thereof the Bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status to that of such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Bonds and issued by issuers having a credit rating, by Moody's or any successors thereto or Standard & Poor's or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities. (Section 101).

Notwithstanding the foregoing, if the Authority has notified the 1995 Fiscal Agent that an interest rate swap agreement is in effect in respect of any Bonds, then for all purposes of the above paragraphs, except for the purpose of determining the required deposits to the 1995 Sinking Fund pursuant to Section 502 of the 1995 Bond Resolution, the interest rate on such Bonds shall be the interest rate calculated with reference to such interest rate swap agreement; and if such rate calculated with reference to such interest rate swap agreement is a variable rate, the interest rate on such Bonds (except for the purpose specified above in this sentence) shall be the average interest rate calculated with reference to such interest rate swap agreement for the preceding twelve months or such shorter period that the interest rate swap agreement has been in effect, or if such interest rate swap agreement had not been in effect prior to the dates of calculation, the interest rate calculated with reference to such interest rate swap agreement on the date of calculation. (Section 101).

**1995 Construction Fund**

The balance of proceeds of Bonds issued under Section 208 of the 1995 Bond Resolution available for payment of construction costs is required to be deposited to the credit of the Construction Fund under the 1995 Bond Resolution (the "1995 Construction Fund") and applied to the payment of the cost of the Initial Facilities, Additional Facilities, Improvements and uncompleted Facilities for which such Bonds were issued. (Section 208).

Payments from the 1995 Construction Fund shall be disbursed by check signed by the Treasurer of the Authority or by any officer or employee of the Authority designated by resolution of the Authority. (Section 402). Any balance remaining in the 1995 Construction Fund from time to time after the completion of the Authority Facilities and Improvements theretofore financed by the Authority may, at the option of the Authority, be deposited to the credit of the 1995 Redemption Account or the 1995 Bond Service Account. (Section 404).

The proceeds of the Series T Bonds on deposit in the 1995 Construction Fund shall not be disbursed without the prior written approval of Government Development Bank.

**Additional Bonds**

Additional Bonds may be issued from time to time to provide funds to pay all or any part of any remaining costs of the Initial Facilities or to pay all or any part of the cost of any Additional Facilities or Improvements to Authority Facilities financed under the 1995 Bond Resolution or any uncompleted part of the Initial Facilities or Additional Facilities or Improvements, and to pay any notes or other obligations of the Authority therefore issued, or to repay any advances made from any source, to finance such costs; provided that no such Bonds shall be issued unless under the then existing law such Bonds may be specified by the Authority to be covered by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such Bonds by resolution. Before any such Additional Bonds may be issued, there must be filed with the 1995 Fiscal Agent, among other things, a certificate signed by the Executive Director of the Authority stating that on the basis of all Lease Agreements or amendments or supplements thereto, as executed and delivered or as expected to be executed and delivered, the 1995 Debt Service Rentals, as calculated by the Authority will be sufficient and timely to pay the principal of; and the redemption premium, if any, and interest on, such Bonds and all Bonds then outstanding. (Section 208).

Refunding bonds, including crossover refunding bonds, may be issued by the Authority at any time or times for the purpose of providing funds for refunding at or prior to their maturity or maturities all or any part of (i) the outstanding Bonds of any series, or (ii) the outstanding debt of the Authority incurred to finance Authority Facilities as defined in the 1970 Bond Resolution or in the 1978 Bond Resolution, in either case including the payment of any redemption premium prior thereto; provided that no such refunding bonds shall be issued unless under the then existing law such bonds may be specified by the Authority to be covered (as of the crossover date with respect to crossover refunding bonds) by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such refunding bonds by resolution. (Section 209).

**Investment of Funds in 1995 Construction Fund, 1995 Bond Service Account and 1995 Redemption Account**

The 1995 Bond Resolution provides for the following types of investments:

(a)     Government Obligations which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, (ii) obligations (including participation certificates) issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal. Home Loan Banks, the Farm Credit System, Federal National Mortgage Association and the Student Loan Marketing Association, (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above or (iv) below and which obligations are not subject to redemption prior to the date on which the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and which municipal obligations are rated in the highest category (without regard to any gradation within such category) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii) and (iii) above held by a national banking association or bank (including the 1995 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligation described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

(b)     Investment Obligations which are (i) Government Obligations, (ii) obligations of any state or territory of the United States of America which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, (iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1995 Fiscal Agent), any trust company or any savings and loan association (including any investment in pools of such bankers' acceptances, certificates, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, national banking association, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or

38

(B) collateralized at all times by such securities as are described in clause (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1995 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties, (iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth of Puerto Rico or any national banking association (including the 1995 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any or more of the securities described in clause (i) or (ii) above, in which securities the 1995 Fiscal Agent has a perfected first security interest and such securities are held free and clear of claims by third parties, or if not so secured, meets the rating requirements set forth in clause (vii) below, (v) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within such categories) by both Moody's or any successors thereto, and Standard & Poor's or any successors thereto, (vi) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to gradations within such category) and (a) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and meets the requirements of Section 852(a) of said Code for the calendar year; (b) invests all of its assets in Government Obligations or in Investment Obligations described in clause (ii) above; and (c) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1995 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to any gradations within such category), and (vii) any other investment obligations which are rated, which are issued by issuers which are rated, or which are backed by letters of credit or lines of credit the provider of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto or which are collateralized by such Investment Obligations. (Section 101).

Moneys held in the 1995 Construction Fund, the 1995 Bond Service Account and the 1995 Redemption Account shall, as nearly as practicable, be invested and reinvested in Investment Obligations, which mature, or are subject to redemption by the holder thereof at the option of such holder not later than the dates when the moneys held for the credit thereof will be required for the purposes intended. (Section 602).

### Series R Advance Deposit Account

*Creation.*  A special fund was created by the bond resolution authorizing the Series R Bonds (the "Series R Bond Resolution") designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Advance Deposit Account" (the "Series R Advance Deposit Account").  The moneys in the Series R Advance Deposit Account must be held in trust under the Series R Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Series R Bond Resolution and, pending such application, are subject to a lien and charge in favor of the holders of the Series R Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Series R Advance Deposit Amounts.*  The Authority covenanted that all Series R Advance Deposit Amounts (as defined below in "Series R Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION) received under Lease Agreements relating to Authority Facilities financed by the issuance of the Series R Bonds will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the Series R Advance Deposit Account.

*Investment of Moneys in Series R Advance Deposit Account.*  Moneys held for the credit of the Series R Advance Deposit Account must, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit

of such Account will be required for the purposes intended, and not later than the stated maturity date of the Series R Bonds.

*Application of Moneys in Series R Advance Deposit Account.*  Moneys held for the credit of the Series R Advance Deposit Account must be applied to the purchase, redemption or retirement of the Series R Bonds as follows:

*first,* at the written direction of the Authority, the 1995 Fiscal Agent must endeavor to purchase the Series R Bonds then outstanding, whether or not such Series R Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal amount of such bonds.  The 1995 Fiscal Agent shall pay the interest accrued on such the Series R Bonds to the date of delivery thereof from any moneys in the 1995 Bond Service Account or the Series R Interest Subsidy Account, as applicable, and the purchase price from the Series R Advance Deposit Account but no such purchase shall be contracted for within the period of forty-five (45) days next preceding the maturity date of the Series R Bonds;

*second,* at the written direction of the Authority, the 1995 Fiscal Agent must call for redemption on each day on which the Series R Bonds are subject to redemption from moneys which are in the 1995 Bond Service Account, the Series R Interest Subsidy Account and the Series R Advance Deposit Account on the forty-fifth day prior to such redemption date such amount of the Series R Bonds then subject to redemption as will exhaust the Series R Advance Deposit Account as nearly as possible.  Such redemption must be made in accordance with the provisions of the 1995 Bond Resolution.  Not less than thirty (30) days before the redemption date the 1995 Fiscal Agent must withdraw from the 1995 Bond Service Account and in the Series R Interest Subsidy Account, as applicable, and from the Series R Advance Deposit Account and set aside in separate accounts the respective amounts required for paying the principal of and interest on the Series R Bonds so called for redemption; and

*third,* on the stated maturity date of the Series R Bonds, the 1995 Fiscal Agent shall transfer the balance remaining on deposit in the Series R Advance Deposit Account to the 1995 Bond Service Account, for application to the payment of principal of the Series R Bonds maturing on such date.

*Pledge of Moneys in Series R Advance Deposit Account.*  Subject to the terms and conditions set forth in the Series R Bond Resolution, moneys held for the credit of the Series R Advance Deposit Account is held in trust and disbursed by the 1995 Fiscal Agent for (a) the payment of the principal of the Series R Bonds on their stated maturity date or (b) the payment of the purchase or redemption price of the Series R Bonds before maturity, and such moneys are hereby pledged to and charged with such payments.

## Payment by Lessees of Series R Advance Deposit Amounts

The Authority covenanted that all Lease Agreements which it enters into for the leasing of any Authority Facilities financed by the Series R Bonds will, subject to the provisions of the Bond Resolution, require the lessee or lessees of such facilities to pay (i) rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the principal of and interest on all Series R Bonds as the same shall become due and payable and (ii) additional amounts constituting an allocable portion of the Series R Advance Deposit Amounts.

**Series R Advance Deposit Amounts**

Notwithstanding that the Series R Bonds are not subject to mandatory sinking fund redemption prior to their stated date of maturity and no amortization requirements have been established with respect to the Series R Bonds, commencing on July 1, 2018, the Authority is required to make annual deposits into the Series R Advance Deposit Account, from amounts received by the Authority under the Lease Agreements relating to the Authority Facilities financed by the Series R Bonds, on the dates and in the amounts set forth in the following table (the "Series R Advance Deposit Amounts").

| July 1 | Series R Advance Deposit Amount |
|--------|--------------------------------|
| 2018 | $31,540,524 |
| 2019 | 31,540,524 |
| 2020 | 31,540,524 |
| 2021 | 31,540,524 |
| 2022 | 31,540,524 |
| 2023 | 31,540,524 |
| 2024 | 31,540,524 |
| 2025 | 31,540,524 |
| 2026 | 31,540,524 |
| 2027 | 31,540,524 |

**Series R Interest Subsidy Account**

*Creation.* A special fund was created by the Series R Bond Resolution designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) Interest Subsidy Account" (the "Series R Interest Subsidy Account"). The moneys in the Series R Interest Subsidy Account must be held in trust under the Series R Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Bond Resolution and, pending such application, shall be subject to a lien and charge in favor of the holders of the Series R Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Series R Interest Subsidy Payments.* The Authority covenanted that all Series R Interest Subsidy Payments will be immediately deposited upon receipt with the Fiscal Agent to the credit of the Series R Interest Subsidy Account.

*Investment of Moneys in Series R Interest Subsidy Account.* Moneys held for the credit of the Series R Interest Subsidy Account shall, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit of such Account will be required for the purposes intended, and not later than the next date on which interest on the Series R Bonds shall become due and payable.

*Application of Moneys in Series R Interest Subsidy Account.* Moneys held for the credit of the Series R Interest Subsidy Account shall be applied to the payment of interest on the Series R Bonds on the next succeeding interest payment date on which interest shall be due and payable on the Series R Bonds.

*Pledge of Moneys in Series R Interest Subsidy Account.* Subject to the terms and conditions set forth in the Series R Bond Resolution, moneys held for the credit of the Series R Interest Subsidy Account must be held in trust and disbursed by the 1995 Fiscal Agent for the payment of interest on the Series R Bonds as the same shall become due and payable, and such moneys are hereby pledged to and charged with such payments.

**Series T Advance Deposit Account**

*Creation.* A special fund is created by the Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment)

Advance Deposit Account" (the "Series T Advance Deposit Account"). The moneys in the Series T Advance Deposit Account shall be held in trust under the Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Bond Resolution and, pending such application, shall be subject to a lien and charge in favor of the holders of the Series T Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Series T Advance Deposit Amounts.* The Authority covenants that all Series T Advance Deposit Amounts (as defined below in "Series T Advance Deposit Amounts" under SUMMARY OF CERTAIN PROVISIONS OF THE 1995 RESOLUTION) received under Lease Agreements relating to Authority Facilities financed by the issuance of the Series T Bonds will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the Series T Advance Deposit Account.

*Investment of Moneys in Series T Advance Deposit Account.* Moneys held for the credit of the Series T Advance Deposit Account shall, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit of such Account will be required for the purposes intended, and not later than the stated maturity date of the Series T Bonds.

*Application of Moneys in Series T Advance Deposit Account.* Moneys held for the credit of the Series T Advance Deposit Account shall be applied to the purchase, redemption or retirement of the Series T Bonds as follows:

> *first,* at the written direction of the Authority, the 1995 Fiscal Agent shall endeavor to purchase the Series T Bonds then outstanding, whether or not such Series T Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal amount of such bonds. The 1995 Fiscal Agent shall pay the interest accrued on such Series T Bonds to the date of delivery thereof from any moneys in the 1995 Bond Service Account or the Series T Interest Subsidy Account, as applicable, and the purchase price from the Series T Advance Deposit Account but no such purchase shall be contracted for within the period of forty-five (45) days next preceding the maturity date of the Series T Bonds;

> *second,* at the written direction of the Authority, the 1995 Fiscal Agent shall call for redemption on each day on which the Series T Bonds are subject to redemption from moneys which are in the 1995 Bond Service Account, the Series T Interest Subsidy Account and the Series T Advance Deposit Account on the forty-fifth day prior to such redemption date such amount of the Series T Bonds then subject to redemption as will exhaust the Series T Advance Deposit Account as nearly as possible. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than thirty (30) days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and in the Series T Interest Subsidy Account, as applicable, and from the Series T Advance Deposit Account and set aside in separate accounts the respective amounts required for paying the principal of and interest on the Series T Bonds so called for redemption; and

> *third,* on the stated maturity date of the Series T Bonds, the 1995 Fiscal Agent shall transfer the balance remaining on deposit in the Series T Advance Deposit Account to the 1995 Bond Service Account, for application to the payment of principal of the Bonds maturing on such date.

*Pledge of Moneys in Series T Advance Deposit Account.* Subject to the terms and conditions set forth in the Bond Resolution, moneys held for the credit of the Series T Advance Deposit Account shall be held in trust and disbursed by the 1995 Fiscal Agent for (a) the payment of the principal of the Series T Bonds on their stated maturity date or (b) the payment of the purchase or redemption price of the Series T Bonds before maturity, and such moneys are hereby pledged to and charged with such payments.

**Payment by Lessees of Series T Advance Deposit Amounts**

The Authority covenants that all Lease Agreements which it enters into for the leasing of any Authority Facilities financed by the Series T Bonds will, subject to the provisions of the Bond Resolution, require the lessee or lessees of such facilities to pay (i) rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the principal of and interest on all Series T Bonds as the same shall become due and payable and (ii) additional amounts constituting an allocable portion of the Series T Advance Deposit Amounts.

**Series T Advance Deposit Amounts**

Notwithstanding that the Bonds are not subject to mandatory sinking fund redemption prior to their stated date of maturity and no amortization requirements have been established with respect to the Series T Bonds, commencing on July 1, 2020, the Authority shall make annual deposits into the Series T Advance Deposit Account, from amounts received by the Authority under the Lease Agreements relating to the Authority Facilities financed by the Series T Bonds, on the dates and in the amounts set forth in the following table (the "Series T Advance Deposit Amounts").

| July 1 | Series T Advance Deposit Amount |
|---|---|
| 2020 | $5,215,000 |
| 2021 | 5,215,000 |
| 2022 | 5,215,000 |
| 2023 | 5,215,000 |
| 2024 | 5,215,000 |
| 2025 | 5,215,000 |
| 2026 | 5,215,000 |
| 2027 | 5,215,000 |
| 2028 | 5,215,000 |
| 2029 | 5,215,000 |

**Series T Interest Subsidy Account**

*Creation.* A special fund is hereby created by the Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) Interest Subsidy Account" (the "Series T Interest Subsidy Account"). The moneys in the Series T Interest Subsidy Account shall be held in trust under the Bond Resolution by the 1995 Fiscal Agent and applied as provided in the Bond Resolution and, pending such application, shall be subject to a lien and charge in favor of the holders of the Series T Bonds issued and outstanding under the 1995 Bond Resolution.

*Deposit of Interest Subsidy Payments.* The Authority covenants that all Interest Subsidy Payments will be immediately deposited upon receipt with the Fiscal Agent to the credit of the Series T Interest Subsidy Account.

*Investment of Moneys in Series T Interest Subsidy Account.* Moneys held for the credit of the Series T Interest Subsidy Account shall, as nearly as may be practicable, be continuously invested and reinvested by the 1995 Fiscal Agent at the direction of the Authority in Investment Obligations which shall mature, or which shall be subject to redemption at the option of the holder thereof, not later than the dates when the moneys held for the credit of such Account will be required for the purposes intended, and not later than the next date on which interest on the Series T Bonds shall become due and payable.

*Application of Moneys in Series T Interest Subsidy Account.* Moneys held for the credit of the Series T Interest Subsidy Account shall be applied to the payment of interest on the Series T Bonds on the next succeeding interest payment date on which interest shall be due and payable on the Series T Bonds.

*Pledge of Moneys in Series T Interest Subsidy Account.* Subject to the terms and conditions set forth in the Bond Resolution, moneys held for the credit of the Series T Interest Subsidy Account shall be held in trust and

43

disbursed by the 1995 Fiscal Agent for the payment of interest on the Series T Bonds as the same shall become due and payable, and such moneys are hereby pledged to and charged with such payments.

**General Covenants**

The Authority covenants that it will not agree to any amendment, modification or termination of any Lease Agreements of any Authority Facilities (or exercise any right it may have to rescind the lease of any lessee of space in any Authority Facilities) which would reduce the amounts of rental payments below the amounts required by Section 701 of the 1995 Bond Resolution or postpone the times of making such rental payments or which would otherwise materially and adversely affect the security of the bondholders (Section 702), that it will not create or suffer to be created any lien or charge upon the Authority Facilities or any part thereof or upon the 1995 Debt Service Rentals therefrom, other than the liens and charges created or permitted under the 1995 Bond Resolution (Section 705), and that each Lease Agreement will provide that the obligation of the lessee to pay timely the required rentals thereunder shall be absolute and unconditional. (Section 709).

The Authority covenants that it will not dispose of or encumber any Authority Facilities, unless (a) the Authority determines that notwithstanding such disposition or encumbrance, total rents under each Lease Agreement will be sufficient to provide the sums required under Section 701 of the 1995 Bond Resolution, and (b) the Authority will receive as the price for any such disposition (but not an encumbrance), together with any other available moneys, the total amount of the 1995 Debt Service Rentals which would otherwise have been payable by the lessees of such Authority Facilities during the remaining term of the related Lease Agreements plus such additional amounts as will be necessary to pay the fees and expenses of the 1995 Fiscal Agent and all other expenses in connection with the application of the proceeds of such sale to the payment of the principal of and interest on outstanding Bonds issued by the Authority under the 1995 Bond Resolution including any redemption premiums. The proceeds of any such disposition (other than an encumbrance) shall be promptly deposited in the 1995 Redemption Account. (Section 708).

The Authority may also from time to time dispose of or encumber any fixtures or movable property in connection with the Authority Facilities or any materials used in connection therewith, if the Authority determines that such articles are no longer needed or useful in connection with the construction or operation or maintenance of the Authority Facilities and the proceeds thereof (other than an encumbrance) shall be applied to the replacement of the property so disposed of or at the option of the Authority shall be deposited to the credit of the 1995 Redemption Account. (Section 708).

Each Lease Agreement is required to provide that it may not be assigned or otherwise transferred in whole or in part by either party (unless the conditions set forth under the 1995 Bond Resolution for a termination of such Lease Agreement have been met), and will provide that all or any part of the Authority Facilities covered by such Agreement may be subleased as a whole or in part by the lessee if, among other things the following conditions have been met: (a) the sublessee under the sublease shall be a department, agency or instrumentality of the Commonwealth unless the Authority shall have obtained an opinion of nationally recognized bond counsel that such sublease will not cause interest on any Bonds to be includable in gross income of the owners thereof for federal income tax purposes (other than Bonds, such as the Series T Bonds, for which such interest is intended not to be excludable in gross income for such purposes); (b) such lessee shall acknowledge in writing that it shall continue to remain liable for the payment of all rentals under such Lease Agreement; and (c) there shall have been delivered to the Authority and such lessee (i) if the sublessee is a department of the Commonwealth, a certificate signed by the Secretary or an Assistant Secretary of such department stating that on the basis of budgeted appropriations for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to timely pay all rentals which will be due and payable during such fiscal year, or (ii) if the sublessee is an agency or instrumentality of the Commonwealth, a certificate signed by the chief executive officer of the sublessee stating that on the basis of budgeted appropriations and/or estimate revenues for the sublessee for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to pay timely all rentals which will be due and payable during such fiscal year. (Section 710).

The Authority covenants that it will cause audits to be made of its books and accounts by an independent firm of certified public accountants chosen by the Authority. Reports of such audits shall, among other things, set forth the findings of such certified public accountants as to whether the moneys received by the Authority under the

1995 Bond Resolution have been applied in accordance with the provisions thereof. Copies of such reports shall be filed with the 1995 Fiscal Agent and shall be mailed by the Authority to each bondholder who shall have filed his name and address with the Secretary of the Authority for such purpose. (Section 712).

**Modifications**

The Authority may adopt resolutions supplemental to the 1995 Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission or to correct any inconsistent provisions or errors in the 1995 Bond Resolution; provided such action shall not adversely affect the interests of the bondholders, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders, or to add to the conditions, limitations and restrictions on the issuance of Bonds, or to add to the covenants and agreements of the Authority in the 1995 Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority. (Section 901).

The holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1995 Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1995 Bond Resolution; provided, however, that nothing contained in the 1995 Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, (c) the creation of a lien upon or a pledge of 1995 Debt Service Rentals other than the liens and pledges created by or pursuant to the 1995 Bond Resolution, (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 902). No supplemental resolution may, however, change, amend or modify the rights or obligations of the 1995 Fiscal Agent under the 1995 Bond Resolution without the written consent of the 1995 Fiscal Agent. (Section 904).

**Notice of Default**

In the event that (i) on the second business day prior to the date on which a payment of interest, principal, or premium, if any, is due on any Bond there is not an amount sufficient in such account or fund as the 1995 Fiscal Agent may draw upon for the payment on such due date of such interest, principal, or premium, or (ii) the Authority shall default in the due and punctual making of any 1995 Sinking Fund deposit required by Section 502 of the 1995 Bond Resolution, the 1995 Fiscal Agent shall promptly give written notice of such insufficiency or default, as the case may be, to the Authority, the Secretary of Treasury and Government Development Bank. In the event that the Authority shall default in the due and punctual performance of any other covenants or agreements in the Bonds or the 1995 Bond Resolution and the 1995 Fiscal Agent shall have knowledge of, or is notified of, such default, and the Authority shall fail to correct such default within 30 days after notice thereof to the Authority by the 1995 Fiscal Agent, the 1995 Fiscal Agent shall promptly give notice of such default to the Secretary of Treasury and Government Development Bank. (Section 804).

The 1995 Bond Resolution and the Bonds do not provide for acceleration of the maturities of the Bonds in the event of a default thereunder or in any other circumstances and do not provide that the bondholders may require the 1995 Fiscal Agent to take any action on their behalf.

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Méndez & Alvarez LLC, counsel to the Underwriter and Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Bonds by Puerto Rico residents.

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set**

forth in this discussion. **You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the IRS or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained. Moreover, this section is not to be construed as a substitute for careful tax planning. Prospective investors are urged to consult their own tax advisors with specific reference to their own tax situations, including the application and effect of other tax laws and any possible changes in the tax laws after the date of this official statement.

In the opinion of Pietrantoni Méndez & Alvarez LLC, under the provisions of the Acts of Congress and the laws of Puerto Rico in force as of the date of issuance of the Bonds:

1.  Interest on the Bonds is:

    (a)  exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the PR Code and Article 8 of the Enabling Act;

    (b)  excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book income" of a corporation for purposes of computing the alternative minimum tax imposed by Section 1022.03(a) of the PR Code;

    (c)  exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

    (d)  exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it excludes from the "adjusted net book income" of a corporation for purposes of the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which is a section that does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which has been approved by the Legislative Assembly and is pending the Governor's signature, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 2(b) above, we assume that the AMT treatment provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may be required to be included in the "adjusted net book income" of a corporation and, therefore, may be subject to Puerto Rico alternative minimum tax.

2.  The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3.  The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4.  The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

5. Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the bonds with eligible funds, as such term is defined in the Acts.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Bonds.

IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Bonds.

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, in the opinion of Pietrantoni Méndez & Alvarez LLC:

1. Interest or original issue discount on the Bonds owned by an individual is excludable from the gross income of the individual for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue discount is to be recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business within the United States by such individual under the US Code.

2. Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3. United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such individual, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside of Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) each of the ten years preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Special Puerto Rico Tax Counsel's opinion is limited to the above, and Special Puerto Rico Tax Counsel has not expressed any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds. Such opinion is based upon Special Puerto Rico Tax Counsel's

reliance upon the continued accuracy of the representations, warranties and covenants made by the Obligated Group and the Authority in the Loan Agreement.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

## UNDERWRITING

Santander Securities LLC ("Santander Securities") and UBS Financial Services Incorporated of Puerto Rico have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $665,591.38 from the initial offering price of the Bonds set forth on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## LEGAL MATTERS

The proposed form of opinions of Foley & Lardner LLP, Miami, Florida, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "Baa1" by Moody's, "BBB+" by Fitch and "BBB" by S&P.

The ratings reflect only the respective opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Authority, the Commonwealth, the 1995 Bond Resolution, the Bonds and other relevant information. No application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that any ratings obtained will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies if, in the judgment of

any or all, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or any of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

**Continuing Disclosure Undertaking**

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Commonwealth and the Authority have covenanted to the following for the benefit of the Beneficial Owners (generally the tax owners of the Bonds):

1. The Commonwealth will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited annual financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case of the type included or incorporated by reference in this Official Statement;

2. The Authority will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2011, with the MSRB through EMMA, (i) the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) other financial information or operating data regarding the Authority included herein; and

3. The Authority will file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of failure of the Commonwealth to comply with clause 1 above and of the Authority to comply with clause 2 above, and notice of any of the following events with respect to the Bonds:

    a.    principal and interest payment delinquencies;

    b.    non-payment related defaults, if material;

    c.    unscheduled draws on debt service reserves reflecting financial difficulties;

    d.    unscheduled draws on credit enhancements reflecting financial difficulties;

    e.    substitution of credit or liquidity facility providers, or their failure to perform;

    f.    adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

    g.    modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

    h.    Bond calls, if material;

    i.    defeasances;

    j.    release, substitution, or sale of property securing repayment of the Bonds, if material;

    k.    rating changes;

    l.    tender offers;

    m.    bankruptcy, insolvency, receivership, or similar proceeding of the Authority or the Commonwealth;

    n.    the consummation of a merger, consolidation or acquisition involving the Authority or the Commonwealth or the sale of substantially all of the assets of the Authority or the

Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

o.      the appointment of a successor or additional trustee, or the change of name of a trustee, if material; and

p.      final expenditure of the proceeds of the Bonds.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 3 (c), (e), (m) and (n) are not applicable to the Bonds or the Authority.

Events (d) and (e).  The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (h).  The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under THE BONDS, (ii) the only other issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the holders of the Bonds as required under the terms of the Bonds, and (iv) public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC; even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

Event (m).  According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific performance of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a

reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Authority or the Commonwealth; or

(2)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Covenants have been made in order to assist the Underwriters in complying with the Rule.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth

Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1995 Bond Resolution, the Lease Agreements with respect to the facilities that are to be financed or refinanced in whole or in part by the Bonds, the various Acts, and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions. Appended to, and constituting a part of, this Official Statement is the audited financial statement of the Authority for the fiscal year ended June 30, 2011 (*Appendix I*), the proposed form of opinions of Foley & Lardner LLP, Bond Counsel *(Appendix II)*, and the proposed form of opinions of Pietrantoni Méndez & Alvarez LLC, Special Puerto Rico Tax Counsel *(Appendix III)*.

The information set forth under the heading PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH and in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information set forth in this Official Statement, except the information appearing under the heading PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH, UNDERWRITING and "Book-Entry Only System" under THE BONDS, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to "Book-Entry Only System" was supplied by DTC.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement will be filed with the MSRB.

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**

By:   _____/s/ Eduardo Rivera Cruz_____
              Executive Director

APPENDIX I

## AUDITED FINANCIAL STATEMENTS
## OF THE AUTHORITY FOR THE FISCAL YEAR ENDED JUNE 30, 2011



BASIC FINANCIAL STATEMENTS AND
REQUIRED AND OTHER SUPPLEMENTARY
INFORMATION

Public Buildings Authority
Years Ended June 30, 2011 and 2010
With Report of Independent Auditors

ERNST & YOUNG

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and Required and Other Supplementary Information

Years Ended June 30, 2011 and 2010

# Contents

Report of Independent Auditors .................................................................. 1
Management's Discussion and Analysis.......................................................... 3

Basic Financial Statements

Balance Sheets.................................................................................... 16
Statements of Revenues, Expenses and Changes in Net Assets.......................... 18
Statements of Cash Flows ....................................................................... 19
Notes to Financial Statements .................................................................. 21

Required Supplementary Information

Schedule of Funding Progress for Postemployment Healthcare Benefits ................... 57

Other Supplementary Information

Schedule of Bond Sinking Fund Accounts ..................................................... 58
Schedule of Operating Cash Accounts ......................................................... 59
Schedule of Operating Rental Revenues and Receivables..................................... 60
Schedule of Capital Improvements Program Compared to Budget............................ 61



Ernst & Young LLP
1000 Scotiabank Plaza
273 Ponce de León Avenue
San Juan, PR 00917-1951

Tel: 787 759 8212
Fax: 787 753 0808
www.ey.com

## Report of Independent Auditors

The Board of Directors of
Public Buildings Authority

We have audited the accompanying balance sheet of the Public Buildings Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2011, and the related statements of revenues, expenses and changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Public Buildings Authority as of June 30, 2010, were audited by other auditors whose report dated September 28, 2010, expressed an unqualified opinion on those statements. Those financial statements were restated and reissued dated November 15, 2011.

We conducted our audit in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Authority's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the 2011 financial statements referred to above present fairly, in all material respects, the financial position of the Public Buildings Authority at June 30, 2011, and the changes in its net assets and its cash flows for the year then ended in conformity with U.S. generally accepted accounting principles.

The management's discussion and analysis and schedule of funding progress for postemployment healthcare benefits on pages 3 to 15 and page 57 are not a required part of the basic financial statements, but are supplementary information required by the Governmental Accounting Standards Board. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

1111-1306759

1

A member firm of Ernst & Young Global Limited

**ΞIJ ERNST & YOUNG**

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The other supplementary information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the 2011 basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the 2011 basic financial statements taken as a whole.

In accordance with *Government Auditing Standards*, we have also issued our report dated December 15, 2011, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

*Ernst & Young LLP*

December 15, 2011

Stamp No. 2614136
affixed to
original of
this report.

2

A member firm of Ernst & Young Global Limited

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis

### Years Ended June 30, 2011 and 2010

Following is an overview and analysis of the financial activities of the Public Buildings Authority (the Authority) for the fiscal years ended June 30, 2011 and 2010. This discussion and analysis is designed to assist the reader in focusing on the significant financial issues and activities and to identify any significant changes in financial position. It is intended to serve as an introduction to the Authority's financial statements, which are comprised of the basic financial statements and the notes to financial statements. We encourage readers to consider the information presented here in conjunction with the financial statements taken as a whole.

The *Statement of Net Assets* presents information on all of the Authority's assets and liabilities with the difference between the two reported as net assets. Over time, increases or decreases in net assets may serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating. Net assets increase when revenues exceed expenses. Increases to assets, without a corresponding increase to liabilities, result in increased net assets, which also indicate an improved financial position.

The *Statement of Revenues, Expenses and Changes in Net Assets* presents information showing how the Authority's net assets are reported as soon the underlying event occur, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods.

The *Statement of Cash Flows* reports cash receipts, cash payments, and net changes in cash resulting from operations, non-capital financing activities, capital and related financing activities, and investing activities.

The notes to the financial statements provide additional information that is essential to the full understanding of the data provided in the basic financial statements.

In addition to the basic financial statements and accompanying notes, various schedules present certain information concerning changes in bonds sinking funds accounts, activity at operating cash accounts, detail of rental operating revenues and receivable, and summary of capital improvements programs compared to budget.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Highlights**

- The Authority's net assets decreased by $168,793,902 (162.0%) on June 30, 2011 and by $15,989,301 (13.3%) on June 30, 2010. For the year ended June 30, 2011, the Authority reported an operating loss of $12,865,997; however, this loss was mainly due to a reduction in rent revenue caused by a Scoop & Toss transaction where a significant portion of bond interest payment was covered by a line of credit. This transaction has the effect to reduce the debt service component paid by the client agencies.

- The Authority's operating income decreased from $128.1 million for year ended June 30, 2010 to an operating loss of $12.9 million for year ended June 30, 2011. That decrease was mainly due to the same reason mentioned above.

**Overview of the Financial Statements**

*Statements of Net Assets* – Following is condensed financial information of the statements of net assets of the Authority.

**Analysis of 2011 and 2010**

| | 2011 | 2010 | Change In Dollars | Percentage |
|---|---|---|---|---|
| Current assets | $ 86,989,991 | $ 57,301,917 | $ 29,688,074 | 51.8% |
| Capital assets | 2,989,269,976 | 2,895,140,953 | 94,129,023 | 3.0% |
| Other noncurrent assets | 529,421,301 | 618,188,831 | (88,767,530) | (14.4)% |
| Total assets | $3,605,681,268 | $3,570,631,701 | $ 35,049,567 | 1.0% |
| | | | | |
| Current liabilities | $ 268,433,570 | $ 341,589,392 | $ (73,155,822) | (21.4)% |
| Noncurrent liabilities | 3,401,864,336 | 3,124,865,045 | 276,999,291 | 8.9% |
| Total liabilities | 3,670,297,906 | 3,466,454,437 | 203,843,469 | 5.9% |
| | | | | |
| Net assets (deficit): | | | | |
| Invested in capital assets, net of related debt | 37,267,277 | 13,664,857 | 23,602,420 | 172.7% |
| Restricted | 67,019,252 | 38,117,890 | 28,901,362 | 73.9% |
| Unrestricted | (168,903,167) | 52,394,517 | (221,297,684) | (321.0)% |
| Total net assets (deficit) | (64,616,638) | 104,177,264 | (168,793,902) | (162.0)% |
| Total liabilities and net assets | $3,605,681,268 | $3,570,631,701 | $ 35,049,567 | 1.0% |

4

1111-1306759

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

### Analysis of 2010 and 2009

|  | 2010 | 2009 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| Current assets | $   57,301,917 | $   154,346,458 | $  (97,044,541) | (62.9)% |
| Capital assets | 2,895,140,953 | 2,868,073,813 | 27,067,140 | 0.9% |
| Other noncurrent assets | 618,188,831 | 538,968,222 | 79,220,609 | 14.7% |
| Total assets | $3,570,631,701 | $3,561,388,493 | $      9,243,208 | 0.3% |
|  |  |  |  |  |
| Current liabilities | $   341,589,392 | $   448,404,052 | $(106,814,660) | (23.8)% |
| Noncurrent liabilities | 3,124,865,045 | 2,992,817,876 | 132,047,169 | 4.4% |
| Total liabilities | 3,466,454,437 | 3,441,221,928 | 25,232,509 | 0.7% |
|  |  |  |  |  |
| Net assets: |  |  |  |  |
| Invested in capital assets, net of related debt | 13,664,857 | 148,935,233 | (135,270,376) | (90.8)% |
| Restricted | 38,117,890 | 770,500 | 37,347,390 | 4,847.2% |
| Unrestricted | 52,394,517 | (29,539,168) | 81,933,685 | (177.4)% |
| Total net assets | 104,177,264 | 120,166,565 | (15,989,301) | (13.3)% |
| Total liabilities and net assets | $3,570,631,701 | $3,561,388,493 | $      9,243,208 | 0.3% |

### Analysis of Net Assets at June 30, 2011 and 2010

The total net assets at June 30, 2011, compared to prior year, had a decrease of 162.0%. This was caused by a reduction in rent revenue due to a decrease in the debt service rental invoicing.

When compared June 30, 2011 with June 30, 2010, there was a decrease in current liabilities of 21.4%. This decrease was the net effect of a reclassification to noncurrent liabilities due to various lines of credit to be paid with a Series S issuance, a decrease in accounts payable, and an increase in due to other government agencies, related to the Schools for the 21st Century Program. During the year ended June 30, 2011, the Authority disbursed $20 million to the Puerto Rico Electric Power Authority as partial payment of the $36.4 million in arrears owed to the utility agency as of June 30, 2010. The Authority has continued to pay its current utility expenses.

Other non-current assets show a decrease of 14.4% mainly driven by the decrease in rent receivable, related to a $38.5 million commitment for past due receivable.

1111-1306759

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Analysis of Net Assets at June 30, 2010 and 2009

The total net assets at June 30, 2010, compared to prior year, had a decrease of 13.3%. The decrease in balance is mainly the result of increase in interest on bonds and notes and increase in the amortization of bond issuance costs. In addition, for the fiscal year ended June 30, 2009, the Authority recognized a gain on sale of real estate in the amount of $29.7 million. No such event occurred during fiscal year 2010.

The decrease in current assets when compared June 30, 2010 with June 30, 2009, is mainly the result of collections of the rent revenue related with fiscal year 2009-10.  For fiscal year 2009-10, the Authority collected 93% of the contractual amount, as compared to 65% for prior fiscal year.

When compared June 30, 2010 with June 30, 2009, there was a decrease in current liabilities of 23.8%. This decrease was due to payments made to suppliers and to other governmental entities, principally for utility expenses. During the year ended June 30. 2010, the Authority disbursed $25 million to the Puerto Rico Electric Power Authority as partial payment of the $57.9 million in arrears owed to the utility agency as of June 30, 2009. The Authority has continued to pay its current utility expenses. It is expected that the remaining fees owed to the Puerto Rico Electric Power Authority will be substantially paid during fiscal year 2011.

Other non-current assets shows an increase of 14.7% mainly had driven by the increase in bonds sinking funds.

### Statements of Revenues, Expenses and Changes in Net Assets

| | 2011 | 2010 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| Operating revenues – rent revenue | $212,814,430 | $332,316,169 | $(119,501,739) | (36.0)% |
| Non-operating revenues: | | | | |
| Contributions from P.R. Sales Tax Financing Corporation | 5,639,813 | 12,857,123 | (7,217,310) | (56.1)% |
| Interest income | 157,348 | 185,753 | (28,405) | (15.3)% |
| Intergovernmental | 10,350,978 | 15,752,411 | (5,401,433) | (34.3)% |
| Float interest, service charges, and others | 2,626,535 | – | 2,626,535 | 100.0% |
| Other income | – | 3,439,660 | (3,439,660) | (100.0)% |
| Total revenues | 231,589,104 | 364,551,116 | (132,962,012) | (36.5)% |

6

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

### Management's Discussion and Analysis (continued)

### Statements of Revenues, Expenses and Changes in Net Assets (continued)

| | 2011 | 2010 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| *Balances brought forward* | **231,589,104** | 364,551,116 | (132,962,012) | (36.5)% |
| | | | | |
| Operating expenses: | | | | |
| Salaries and employee benefits | **82,009,762** | 90,085,812 | (8,076,050) | (9.0)% |
| Depreciation | **67,387,667** | 66,266,227 | 1,121,440 | 1.7% |
| Utilities | **22,504,298** | 20,257,372 | 2,246,926 | 11.1% |
| Repairs and maintenance | **20,652,645** | 6,633,985 | 14,018,660 | 211.3% |
| Termination benefits | **13,409,606** | — | 13,409,606 | 100.0% |
| Security services | **3,528,225** | 7,596,315 | (4,068,090) | (53.6)% |
| Rent and insurance | **7,260,485** | 8,207,208 | (946,723) | (11.5)% |
| Settlement of legal claim and other contingencies | **1,549,216** | 1,994,334 | (445,118) | (22.3)% |
| General and administrative | **7,378,523** | 3,163,865 | 4,214,658 | 133.2% |
| Total operating expenses | **225,680,427** | 204,205,118 | 20,350,809 | 10.5% |
| | | | | |
| Non-operating expenses: | | | | |
| Interest on bonds and notes, net of capitalized interest | **167,711,431** | 159,806,600 | 4,904,831 | 3.1% |
| Float interest, service charges, and others | **—** | 2,235,078 | ( 2,235,078) | (100.0)% |
| Amortization of deferred loss on bond defeseance | **7,462,637** | 7,270,561 | 192,076 | 2.6% |
| Amortization of bond issuance costs | **2,505,609** | 4,407,052 | (1,901,443) | (43.1)% |
| Loss on disposition of capital assets | **22,902** | 2,616,008 | (2,593,106) | (99.1)% |
| Total non-operating expenses | **174,702,579** | 176,335,299 | (1,632,720) | (1.0)% |
| Total expenses | **400,383,006** | 380,540,417 | 19,842,589 | 5.2% |
| Change in net assets | **(168,793,902)** | (15,989,301) | (152,804,601) | 955.7% |
| | | | | |
| Net assets at beginning of year | **104,177,264** | 120,166,565 | (15,989,301) | (13.3)% |
| Net assets (deficit) at end of year | **$ (64,616,638)** | $104,177,264 | $(168,793,902) | (162.0)% |

### Analysis of Fiscal Years 2011 and 2010

For fiscal years 2011 and 2010, operating revenues were approximately $212.8 million and $332.3 million, respectively. This change resulted in a 36% decrease of the rental income. The decrease was mainly due to a reduction in the debt service rental invoicing.

7

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

### Analysis of Fiscal Years 2011 and 2010 (continued)

For the year ended June 30, 2011, the operating expenses increased compared to prior year ended June 30, 2010. The main reason for increase was due to the net effect of increase in repairs and maintenance and general and administrative due to the School Summer Program 2010, that is required to perform the necessary improvements as painting, trimming, fumigating, among others, in order that the schools be in good condition for the beginning of the semester. Decrease in salaries and employee benefits, increase in termination benefits due to the enacted Act No. 70 for voluntary employment termination program, and a decrease in security services. Note the Authority followed GASB No. 47, *Accounting for Termination Benefits*. Non-operating expenses for the year ended June 30, 2011 increased due to increase on bond interest and notes and the decrease of intergovernmental income.

### Statements of Revenues, Expenses and Changes in Net Assets

| | 2010 | 2009 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| Operating revenues – rent revenue | $332,316,169 | $326,119,053 | $ 6,197,116 | 1.9% |
| Non-operating revenues: | | | | |
| Gain on sale of real estate | – | 29,699,209 | (29,699,209) | (100.0)% |
| Contributions from P.R. Sales Tax Financing Corporation | 12,857,123 | – | 12,857,123 | 100.0% |
| Interest income | 185,753 | 2,075,925 | (1,890,172) | (91.1)% |
| Intergovernmental | 15,752,411 | 15,902,637 | (150,226) | 0.9% |
| Float interest, service charges, and others | – | 2,468,655 | (2,468,655) | (100.0)% |
| Other income | 3,439,660 | – | 3,439,660 | 100.0% |
| Interest on swaps | – | 2,502,145 | (2,502,145) | (100.0)% |
| Total revenues | 364,551,116 | 378,767,624 | (14,216,508) | (3.8)% |
| | | | | |
| Operating expenses: | | | | |
| Salaries and employee benefits | 90,085,812 | 92,040,210 | (1,954,398) | (2.1)% |
| Depreciation | 66,266,227 | 66,153,843 | 112,384 | 0.2% |
| Utilities | 20,257,372 | 20,431,222 | (173,850) | (0.9)% |
| Repairs and maintenance | 6,633,985 | 10,104,829 | (3,470,844) | (34.3)% |
| Security services | 7,596,315 | 14,099,069 | (6,502,754) | (46.1)% |
| Rent and insurance | 8,207,208 | 8,157,327 | 49,881 | 0.6% |
| Settlement of legal claim and other contingencies | 1,994,334 | 1,335,400 | 658,934 | 49.3% |
| General and administrative | 3,163,865 | 2,636,638 | 527,227 | 20.0% |
| Total operating expenses | 204,205,118 | 214,958,538 | (10,753,420) | (5.0)% |

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Analysis of Fiscal Years 2011 and 2010 (continued)**

**Statements of Revenues, Expenses and Changes in Net Assets (continued)**

|  | 2010 | 2009 | Change | |
|---|---|---|---|---|
|  |  |  | In Dollars | Percentage |
| *Balances brought forward* | 204,205,118 | 214,958,538 | (10,753,420) | (5.0)% |
| Non-operating expenses: |  |  |  |  |
| Interest on bonds and notes, net of capitalized interest | 159,806,600 | 156,391,048 | 3,415,552 | 2.2% |
| Float interest, service charges, and others | 2,235,078 | — | 2,235,078 | 100.0% |
| Amortization of deferred loss on bond defeseance | 7,270,561 | 7,270,561 | — | 0.0% |
| Amortization of bond issuance costs | 4,407,052 | 631,140 | 3,775,912 | 598.3% |
| Loss on disposition of capital assets | 2,616,008 | 93,725 | 2,522,283 | 2691.2% |
| Total non-operating expenses | 176,335,299 | 164,386,474 | 11,948,825 | 7.3% |
| Total expenses | 380,540,417 | 379,345,012 | 1,195,405 | 3.2% |
| Change in net assets | (15,989,301) | (577,388) | (15,411,913) | 2669.2% |
| Net assets at beginning of year | 120,166,565 | 120,743,953 | (577,388) | (0.5)% |
| Net assets at end of year | $104,177,264 | $120,166,565 | $(15,989,301) | (13.3)% |

**Analysis of Fiscal Years 2010 and 2009**

For fiscal years 2010 and 2009, operating revenues were approximately $332.3 million and $326.1 million, respectively. This change resulted in a 1.9% increase of the rental income. The increase was mainly due to increase in debt service requirements.

For the year ended June 30, 2010, the net operating expenses decreased compared to prior year ended June 30, 2009. The main reason for decrease was due to decrease in salary and employee benefits. Also, there was a decrease in security services. Non-operating expenses for the year ended June 30, 2010 increased due to increase on interest on bonds and notes and the amortization of bond issuance costs.

# Public Buildings Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Capital Assets**

Capital assets as of June 30, 2011 and 2010 were as follows:

|  | June 30 | | Change |
|---|---|---|---|
|  | **2011** | **2010** |  |
| Capital assets being depreciated | $ **3,533,911,730** | $ 3,445,719,899 | $ 88,191,831 |
| Accumualted depreciation and amortization | **(971,832,713)** | (904,855,207) | (66,977,506) |
|  | **2,562,079,017** | 2,540,864,692 | 21,214,325 |
| Land | **130,730,944** | 130,735,879 | (4,935) |
| Construction in progress | **296,460,015** | 223,540,382 | 72,919,633 |
| Capital assets, net | $ **2,989,269,976** | $ 2,895,140,953 | $ 94,129,023 |

|  | June 30 | | Change |
|---|---|---|---|
|  | **2010** | **2009** |  |
| Capital assets being depreciated | $ 3,445,719,899 | $ 3,324,016,558 | $ 121,703,341 |
| Accumualted depreciation and amortization | (904,855,207) | (839,082,347) | (65,772,860) |
|  | 2,540,864,692 | 2,484,934,211 | 55,930,481 |
| Land | 130,735,879 | 118,756,957 | 11,978,922 |
| Construction in progress | 223,540,382 | 264,382,645 | (40,842,263) |
| Capital assets, net | $ 2,895,140,953 | $ 2,868,073,813 | $ 27,067,140 |

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets (continued)**

*June 30, 2011 and 2010*

The Authority's investment in capital assets as of June 30, 2011 and 2010 amounted to approximately $3.0 billion and $2.9 billion, respectively, net of accumulated depreciation. Capital assets include land, land improvements, construction in progress, buildings, equipment, furniture, and vehicles. Most buildings consist of governmental facilities that are leased to the Commonwealth's agencies and public corporations. For more information, please refer to Note 8 of the basic financial statements.

During the years ended June 30, 2011 and 2010, the Authority invested approximately $157 million and $83 million, respectively, for the construction of buildings that will then be leased to the Commonwealth. This construction activity was financed through interim lines of credit with the Governmental Development Bank (GDB) and the proceeds of the bonds issuances. The rent revenue generated by these buildings is pledged first for the payment of long-term debt.

*June 30, 2010 and 2009*

The Authority's investment in capital assets as of June 30, 2010 and 2009 amounted to approximately $2.9 billion for both years, net of accumulated depreciation. Capital assets include land, land improvements, construction in progress, equipment, furniture, and vehicles. Most buildings consist of governmental facilities that are leased to the Commonwealth's agencies and public corporations. For more information, please refer to Note 8 of the basic financial statements.

During the years ended June 30, 2010 and 2009, the Authority invested approximately $83 million and $90 million, respectively, for the construction of buildings that will then be leased to the Commonwealth. This construction activity was financed through interim lines of credit with the Governmental Development Bank (GDB) and the proceeds of the bonds issuances. The rent revenue generated by these buildings is pledged first for the payment of long-term debt.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Debt Administration**

Long-term debt at June 30, 2011 and 2010 was as follows:

| Bonds Payable | June 30 | | | | Change | |
|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | | |
| Revenue bonds | $ | 37,315,000 | $ | 43,380,000 | $ | (6,065,000) |
| Public education and health | | – | | 32,585,000 | | (32,585,000) |
| Government facilities | | 3,032,224,085 | | 3,078,424,085 | | (46,200,000) |
| Total bonds | | 3,069,539,085 | | 3,154,389,085 | | (84,850,000) |
| | | | | | | |
| Add (deduct): | | | | | | |
| Bond discounts | | (25,272,894) | | (26,454,183) | | 1,181,289 |
| Deferred loss on bonds deferred | | (142,673,870) | | (151,563,716) | | 8,889,846 |
| Accreted value on bonds outstanding | | 30,341,471 | | 26,197,997 | | 4,143,474 |
| Bond premiums | | 76,268,664 | | 84,785,495 | | (8,516,831) |
| Total bonds | $ | 3,008,202,456 | $ | 3,087,354,678 | $ | (79,152,222) |

# Public Buildings Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Debt Administration (continued)

|  | June 30 | | Change |
|  | 2011 | 2010 |  |
|---|---|---|---|
| Bonds payable | $ 3,008,202,456 | $ 3,087,354,678 | $ (79,152,222) |
| Borrowings under line of credit | 415,182,000 | 165,749,102 | 249,432,898 |
| Long-term debt outstanding | 3,423,384,456 | 3,253,103,780 | 170,280,676 |
|  |  |  | — |
| Other long-term liabilities: |  |  | — |
| Due to contractors | 40,568,111 | 40,954,604 | (386,493) |
| Advances from other governmental agencies | 3,024,596 | 1,949,596 | 1,075,000 |
| Compensated absences | 12,146,386 | 12,019,413 | 126,973 |
| Contingencies | 10,026,514 | 9,419,778 | 606,736 |
| Other postemployment benefit obligations | 5,910,172 | 3,127,048 | 2,783,124 |
| Voluntary termination benefits | 13,409,606 | — | 13,409,606 |
| Due to Commonwealth | 1,683,808 | 1,683,808 | — |
| Total other long-term liabilities | 86,769,193 | 69,154,247 | 17,614,946 |
| Total long-term obligations | 3,510,153,649 | 3,322,258,027 | $ 187,895,622 |
| Less: |  |  |  |
| Current portion | 108,289,313 | 197,392,982 |  |
| Long-term obligations, less current portion | $ 3,401,864,336 | $ 3,124,865,045 |  |

The Authority's long-term debt increased by $170.3 million from $3.253 million as of June 30, 2010 to $3.423 million as of June 30, 2011.

As of June 30, 2011 and 2010, the Authority has outstanding bonds payable of $3.008 billion and $3.087 billion, respectively. The balance is net of unamortized bond discounts, bond premium, deferred loss on bonds refunding, and bonds issuance costs. For more information, please refer to Note 12 of the basic financial statements.

13

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Other Currently Known Facts**

As discussed in Note 19, the Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector. Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while the Puerto Rico Infrastructure Financing Authority serves as procurement and construction manager. The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, sciences labs, art centers, among other things.

The Authority is issuing its $756,449,000 aggregate principal amount of Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds-Issuer Subsidy) (the "Series R Bonds"). The proceeds of the Series R Bonds will be used to finance the rehabilitation, renovation or construction of at least 100 public schools under this program. The Authority expects to finance the rehabilitation, renovation or construction of the remaining public schools through a future issuance of bonds also designated as "Qualified School Construction Bonds".

Concurrently with the issuance of the Bonds, on August 24, 2011 the Authority issued its $303,945,000 aggregate principal amount of Government Facilities Revenue Bonds, Series S Guaranteed by the Commonwealth of Puerto Rico. The bonds are being issued to (i) repay certain advances made to the Authority by Government Development Bank under line of credit facilities to (a) pay interest due January 1 and July 1, 2011 on certain bonds issued under the 1995 Bond Resolution and the 1970 Bond Resolution, and (b) pay a portion of the construction costs of certain buildings and facilities leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth; and (ii) pay costs of issuance the bonds. The Government Facilities Revenue Bonds, Series S, repay the lines of credit principals by the amounts of $147.8 million, $162.2 million and $122 million, and accrued interest of $16 million.

In July 2011, the Authority repaid the accrued interest for the line of credit of $98,000,000 with annual rate equal to 1.50%. The accrued interest paid at July 30, 2011 was in the amount of $309,490.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Request for Information**

This financial report is designed to provide a general overview of the Authority's finances for all those interested parties. Questions concerning any of the information provided in this report or request for additional financial information should be addressed to the Comptroller's Office, Public Buildings Authority, PO Box 41029, San Juan, PR 00940-1029.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheets

|  | June 30 | |
|  | 2011 | 2010 |
|  |  | *(As restated)* |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 34,701,282 | $ 35,784,524 |
| Rent receivable | 51,758,194 | 21,114,617 |
| Other receivables, net | 530,515 | 402,776 |
| Total current assets | 86,989,991 | 57,301,917 |
| | | |
| Noncurrent assets: | | |
| Restricted cash and cash equivalents: | | |
| Bond sinking funds | 176,103,008 | 161,424,843 |
| Cash to be deposited in bond sinking funds | 52,709,263 | 43,171,585 |
| Construction funds | 61,243,055 | 72,661,525 |
| Funds for construction of facilities for other governmental agencies | 3,796,605 | 4,965,135 |
| School Renovation Fund | 305,136 | 305,136 |
| Rent receivable | 88,916,621 | 187,517,907 |
| Due from Commonwealth | 92,903,697 | 92,903,697 |
| Notes receivable from other governmental agency | 7,734,568 | 7,734,568 |
| Land and buildings under construction for other governmental agencies | 350,381 | 150,390 |
| Prepaid insurance on bonds | 25,832,818 | 27,089,162 |
| Deferred charges | 16,442,311 | 17,181,045 |
| Capital assets, net | 2,989,269,976 | 2,895,140,953 |
| Property held for sale | 3,083,838 | 3,083,838 |
| Total noncurrent assets | 3,518,691,277 | 3,513,329,784 |
| Total assets | $ 3,605,681,268 | $ 3,570,631,701 |

*(Continued)*

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheets (continued)

| | June 30 | |
| | 2011 | 2010 |
| | | *(As restated)* |
| **Liabilities and net assets (deficit)** | | |
| Liabilities: | | |
| Current liabilities: | | |
| Borrowings under credit line | $              — | $    95,749,102 |
| Accounts payable | 2,937,387 | 9,751,490 |
| Due to other governmental agencies | 53,981,733 | 44,788,746 |
| Accrued expenses | 19,820,263 | 4,556,671 |
| Compensated absences, current portion | 3,158,060 | 3,041,471 |
| Bonds payable | 81,001,970 | 84,850,000 |
| Interest payable | 82,218,575 | 85,099,503 |
| Other advances | 1,186,299 | — |
| Due to contractors | 20,966,664 | 13,363,228 |
| Other post-employment benefits obligation, current portion | 1,072,275 | 389,181 |
| Voluntary termination benefits | 2,090,344 | — |
| Total current liabilities | 268,433,570 | 341,589,392 |
| | | |
| Noncurrent liabilities: | | |
| Borrowings under credit line | 415,182,000 | 70,000,000 |
| Bonds payable | 2,927,200,486 | 3,002,504,678 |
| Due to contractors, including retainage | 19,601,447 | 27,591,376 |
| Advances from other governmental agencies | 3,024,596 | 1,949,596 |
| Compensated absences | 8,988,326 | 8,977,942 |
| Contingencies | 10,026,514 | 9,419,778 |
| Other post-employment benefits obligation | 4,837,897 | 2,737,867 |
| Voluntary termination benefits | 11,319,262 | — |
| Due to Commonwealth | 1,683,808 | 1,683,808 |
| Total noncurrent liabilities | 3,401,864,336 | 3,124,865,045 |
| Total liabilities | 3,670,297,906 | 3,466,454,437 |
| | | |
| Commitments | | |
| | | |
| Net assets (deficit): | | |
| Investment in capital assets, net of related debt | 37,267,277 | 13,664,857 |
| Restricted | 67,019,252 | 38,117,890 |
| Unrestricted | (168,903,167) | 52,394,517 |
| Total net assets (deficit) | (64,616,638) | 104,177,264 |
| Total liabilities and net assets (deficit) | $ 3,605,681,268 | $ 3,570,631,701 |

*See accompanying notes.*

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Revenues, Expenses and Changes in Net Assets

| | Year Ended June 30 | |
|---|---|---|
| | 2011 | 2010 |
| | | *(As restated)* |
| Operating revenue: | | |
| Rent revenue | $ 212,814,430 | $ 332,316,169 |
| | | |
| Operating expenses: | | |
| Salaries and employee benefits | 82,009,762 | 90,085,812 |
| Depreciation | 67,387,667 | 66,266,227 |
| Utilities | 22,504,298 | 20,257,372 |
| Repairs and maintenance | 20,652,645 | 6,633,985 |
| Voluntary termination benefits | 13,409,606 | — |
| Security services | 3,528,225 | 7,596,315 |
| Rent and insurance | 7,260,485 | 8,207,208 |
| Settlement of legal claim and other contingencies | 1,549,216 | 1,994,334 |
| General and administrative | 7,378,523 | 3,163,865 |
| Total operating expenses | 225,680,427 | 204,205,118 |
| Operating (loss) income | (12,865,997) | 128,111,051 |
| | | |
| Nonoperating revenues (expenses): | | |
| Contributions from Puerto Rico Sales Tax Financing Corporation | — | 12,857,123 |
| Interest income | 157,348 | 185,753 |
| Intergovernmental | 15,990,791 | 15,752,411 |
| Float interest, service charges, and other | 2,626,535 | (2,235,078) |
| Interest on bonds and notes | (164,711,431) | (159,806,600) |
| Other income | — | 3,439,660 |
| Amortization of deferred loss on bond defeasance | (7,462,637) | (7,270,561) |
| Amortization of bond issuance costs | (2,505,609) | (4,407,052) |
| Loss on disposition of capital assets | (22,902) | (2,616,008) |
| Total nonoperating expenses, net | (155,927,905) | (144,100,352) |
| Change in net assets | (168,793,902) | (15,989,301) |
| | | |
| Net assets at beginning of year | 104,177,264 | 120,166,565 |
| Net assets (deficit) at end of year | $ (64,616,638) | $ 104,177,264 |

*See accompanying notes.*

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows

| | Year Ended June 30 | |
|---|---|---|
| | 2011 | 2010 |
| | | *(As restated)* |
| **Operating activities** | | |
| Receipts from tenants covering debt service and operating | $   280,644,400 | $   371,633,295 |
| Payments to employees and related benefits | (74,898,233) | (88,275,962) |
| Payments to suppliers for goods and services | (48,246,723) | (63,396,547) |
| Payments for claims | (942,480) | — |
| Net cash provided by operating activities | 156,556,964 | 219,960,786 |
| | | |
| **Noncapital related financing activities** | | |
| Non-operating revenue | 12,346,056 | 13,758,077 |
| Net cash provided by noncapital related financing activities | 12,346,056 | 13,758,077 |
| | | |
| **Capital and related financing activities** | | |
| Capital expenditures | (162,855,807) | (103,830,190) |
| Repayment of bonds | (84,850,000) | (384,290,000) |
| Borrowings under credit lines | 255,072,711 | 86,299,955 |
| Interest paid | (170,769,505) | (149,008,328) |
| Net advances to governmental agencies | 1,075,000 | (1,060,194) |
| Proceeds from bonds issue | — | 483,475,000 |
| Payment on credit lines | (5,639,813) | (106,092,158) |
| Payment of bonds issue costs | — | (6,094,056) |
| SWAP termination payments | — | (28,395,000) |
| Contribution from Puerto Rico Sales Tax Financing Corporation | 5,639,813 | 12,857,123 |
| Other advances | 1,186,299 | — |
| Net cash used in capital and related financing activities | (161,141,302) | (196,137,848) |
| | | |
| **Investing activities** | | |
| Interest collected | 2,783,883 | 78,759 |
| Net cash provided by investing activities | 2,783,883 | 78,759 |
| Net increase in cash and cash equivalents | 10,545,601 | 37,659,774 |
| | | |
| Cash and cash equivalents at beginning of year | 318,313,232 | 280,653,458 |
| Cash and cash equivalents at end of year | $   328,858,833 | $   318,313,232 |

*(Continued)*

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Statements of Cash Flows (continued)

| | Year Ended June 30 | |
| | 2011 | 2010 |
|---|---:|---:|
| | | *(As restated)* |
| **Reconciliation to cash and cash equivalents presented in the balance sheet** | | |
| Unrestricted | $ 34,701,282 | $ 35,784,524 |
| Bonds sinking funds | 176,103,008 | 161,424,843 |
| Cash to be deposited in bond sinking funds | 52,709,263 | 43,171,585 |
| Construction funds | 61,243,055 | 72,661,525 |
| Restricted for the School Renovation Fund | 305,136 | 305,136 |
| Other restricted cash and cash equivalents | 484 | 484 |
| Funds for construction of facilities for other governmental agencies | 3,796,605 | 4,965,135 |
| | $ 328,858,833 | $ 318,313,232 |
| | | |
| **Reconciliation of operating (loss) income to net cash provided by operating activities** | | |
| Operating (loss) income | $ (12,865,997) | $ 128,111,051 |
| Adjustments to reconcile operating (loss) income to net cash provided by operating activities: | | |
| Depreciation | 67,387,667 | 66,266,227 |
| Loss on disposition of capital assets | 22,902 | 2,616,008 |
| Decrease (increase) in operating assets: | | |
| Rent receivable | 67,957,709 | 54,943,558 |
| Other receivables | (127,739) | 5,360,385 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | (7,200,596) | (14,052,628) |
| Due to other governmental agencies | 9,192,987 | (21,991,630) |
| Other post-employment benefits obligation | 2,783,124 | 3,127,048 |
| Voluntary termination benefits | 13,409,606 | — |
| Claims | 606,736 | 1,994,334 |
| Accrued expenses | 15,390,565 | (6,413,567) |
| Net cash provided by operating activities | $ 156,556,964 | $ 219,960,786 |
| | | |
| **Summary of noncash transactions** | | |
| Accretion of bonds payable | $ 4,143,474 | $ 11,787,756 |

*See accompanying notes.*

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements

June 30, 2011 and 2010

## 1. Reporting Entity

The Public Buildings Authority (the Authority) is a component unit of the Commonwealth of Puerto Rico (the Commonwealth), created on June 19, 1958 by Act No. 56, as amended, of the Legislature of Puerto Rico (the Enabling Act). The Authority designs, constructs, administers, and provides maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops, and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The annual rent for each leased building is based on the amounts needed by the Authority to cover the payment of:

a) principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings;
b) operating and maintenance expenses of the buildings, including a reasonable proportional share of administrative expenses, excluding depreciation;
c) cost of equipment replacement and extraordinary repairs.

Components (b) and (c), described above, are subject to escalation to permit the Authority to recover the investment incurred. Amounts due from departments and governmental agencies of the Commonwealth may be subject to periodic revisions and/or adjustments based on the availability of funds at the Commonwealth level.

The Enabling Act provides that the full faith and credit of the Commonwealth is pledged for the payment of rent under any lease agreement executed pursuant to the Enabling Act with any department of the Commonwealth. The Enabling Act also provides that the Department of the Treasury of the Commonwealth of Puerto Rico (the Treasury Department) will make advances to the Authority for any unpaid portion of rent payable to the Authority by any agency or instrumentality of the Commonwealth that has entered into lease agreements with the Authority. Such advances are recorded as a reduction of accounts receivable since the responsibility of reimbursement belongs to the agency in accordance to the Enabling Act.

## 2. Summary of Significant Accounting Policies

### Basis of Accounting

The financial statements are presented on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles. Under this method, revenues are recognized when earned, regardless of when received, and expenses are recognized when incurred, regardless of when paid.

1111-1306759

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

**Basis of Presentation**

The financial statements are presented as an enterprise fund and conform to the provisions of Governmental Accounting Standards Board Statement No. 34, *Basic Financial Statements – and Management's Discussion and Analysis – for the State and Local Governments*, (GASB 34). GASB 34, as amended, establishes standards for external financial reporting for all state and local governmental entities, which includes a statement of net assets (or balance sheet), a statement of revenues, expenses and changes in net assets, and a statement of cash flows. It requires the classification of net assets into three components: invested in capital assets, net of related debt; restricted; and unrestricted, described as follows:

- *Invested in capital assets, net of related debt* – Consists of capital assets, net of accumulated depreciation reduced by the outstanding balance of any bonds, mortgage notes or other borrowings that are attributable to the acquisition, construction or improvement of those assets. Significant unspent related debt proceeds at year-end, the portion of the debt attributable to the unspent proceeds, is not included in the calculation of invested in capital assets, net of related debt. Rather, that portion of the debt is included in the same net assets component as the unspent proceeds.

- *Restricted* – This component of net assets consists of constraints placed on net assets use through external constraints imposed by creditors (such as through covenants), contributors or law or regulations of other governments or constraints imposed by law through constitutional provision or enabling legislation.

- *Unrestricted* – This component of net assets consists of net assets that do not meet the definition of "restricted" or "invested in capital assets, net of related debt."

As permitted by GASB Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that use Proprietary Fund Accounting*, the Authority has elected to apply all Financial Accounting Standards Board Statements and Interpretations, issued after November 30, 1989, that does not conflict with those issued by GASB.

22

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Actual results may differ from those estimates.

### Future Adoption of Accounting Standards

GASB has issued the following accounting standards that the Authority has not yet adopted:

| GASB Statement | | Adoption required in fiscal year |
|---|---|---|
| 57 | OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans | 2012 |
| 60 | Accounting and Financial Reporting for Service Concession Arrangements | 2012 |
| 61 | Accounting and Financial Reporting Entity: Omnibus-an amendment of GASB Statements No. 14 and No. 34 | 2013 |
| 62 | Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements | 2013 |
| 63 | Financial Reporting of Deferred Outflows of Resources, Deferred Inflows od Resources, and Net Position | 2013 |
| 64 | Derivative Instruments: Application of Hedge Accounting Termination Provisions - an amendment of GASB Statement No. 53 | 2012 |

The impact of these standards has not yet been determined.

### Effects of New Pronouncements

In June 2010, GASB issued Statement No. 59, *Financial Instruments Omnibus*. The objective of this Statement is to update and improve existing standards regarding financial reporting and disclosure requirements of certain financial instruments and external investment pools for which significant issues have been identified in practice. The Authority adopted the provisions of GASB Statement No. 59 during the year ended June 30, 2011. The adoption of GASB Statement No. 59 had no impact on the Authority.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Fair Value of Financial Instruments

The carrying amounts reported in the balance sheets for cash and cash equivalents and receivables, approximate fair value due to their short-term duration. Amounts deposited in bond sinking funds and construction funds are carried at fair value. The carrying amount of bonds payable approximates fair value since interest rates on such debt approximate the rates currently available in the market for other debt with similar terms and remaining maturities.

### Cash Equivalents

Cash equivalents include all highly liquid instruments with maturities of three months or less at the time of acquisition. If such instruments are included in restricted assets, they are considered cash equivalents for purposes of the statements of cash flows. The Commonwealth requires that public funds deposited in commercial banks must be fully collateralized for the amount deposited in excess of federal depository insurance.

### Custodial Credit Risk

This is the risk, in the event of a bank failure, that the government's deposits may not be returned to it.

### Allowance for Doubtful Accounts

The allowance for doubtful accounts is an amount that management believes will be adequate to absorb possible losses on existing receivables, excluding debt service rentals and maintenance charges that may become uncollectible based on evaluations of the collectability of each balance. Because of uncertainties inherent in the estimation process, management's estimate of losses in the receivables outstanding and the related allowance may change in the near term. As of June 30, 2011 and 2010, the allowance for doubtful accounts for other receivables amounted to approximately $17.3 million for both years.

24

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Allowance for Doubtful Accounts (continued)

Law No. 97, Article 15, of May 15, 2006, establishes that any rent to be paid to the Authority during any fiscal year by any department, agency or public corporation of the Commonwealth of Puerto Rico under the conditions of a rental contract in accordance of the dispositions of Law No. 56 of June 19, 1958, as amended, the Commonwealth of Puerto Rico will advance to the Authority the amount not paid due from rent. This law requires to the Secretary of the Treasury Department to make an advance of any available funds committed by the good faith and credit of the Commonwealth. In case of the rent to be paid to the Authority by any municipality this law requires to the Municipal Revenue Collection Center to make payments to the Authority from any property tax collection.

### Investments

The Authority is authorized to invest in Puerto Rico and U.S. government obligations or in obligations guaranteed by the Puerto Rico or U.S. governments or its agencies or instrumentalities. The Authority invests in certificates of deposit with financial institutions rated AA or AAA by Moody's Investor Services. Pursuant to the Investment Guidelines for the Commonwealth, adopted by the Governmental Development Bank for Puerto Rico (GDB), the Authority may invest in obligations of the Commonwealth, obligations of the United States, certificates of deposit, commercial paper, bankers' acceptances, or in pools of obligations of the municipalities of Puerto Rico, among others. Monies in the sinking funds can only be invested in direct obligations of the United States government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

### Restricted Assets and Liabilities Payable from Restricted Assets

Restricted assets represent the amounts deposited by the Authority to provide for the amortization of bonds payable and related interest costs and cash available in the related construction fund.

When both restricted and unrestricted resources are available for a specific use, it is the Authority's policy to use restricted resources first, then unrestricted resources as they are needed.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Capital Assets

Capital assets are recorded at cost. The construction costs include indirect administrative costs and interest costs allocated during the construction period. Capital assets are assets with an individual cost of more than $100 and a useful life in excess of five (5) years. As of June 30, 2011 and 2010, property (excluding cost of land, equipment and construction in progress) with a total cost of $3,520 million and $3,432 million, respectively, is leased to other governmental agencies.

Expenditures for major renewals and betterments that extend the useful life of the assets are capitalized and normal repairs and maintenance are expensed when incurred. Depreciation is determined using the straight-line method, over the estimated useful lives of the assets, is as follows:

| | |
|---|---|
| Buildings | 50 years |
| Equipment and automobiles | 5-10 years |

During the year ended June 30, 2011, the Authority evaluated its capital assets for impairment and did not determine any material impairment amount.

### Property Held for Sale

Capital assets that have been identified to be for sale are presented net of accumulated depreciation and net of the incidental cost to dispose or sell such assets.

### Amortization of Discount, Premium and Bond Issuance Costs on Bonds Payable

Discount, premium and bond issuance costs on bonds payable are amortized over the term of the bond, based on the straight-line method, which approximates the effective interest method.

### Operating Revenues and Expenses

Operating revenues and expenses are those that result from the Authority's operations. All leases are deemed to be operating leases. Accordingly, rent revenue is recognized as operating revenue over the term of the lease. Rent revenue is pledged as collateral for the repayment of the Authority's revenue bonds.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 2. Summary of Significant Accounting Policies (continued)

### Operating Revenues and Expenses (continued)

Non-operating revenues include activities that have the characteristics of non-exchange transactions that are defined as non-operating revenues by GASB Statement No. 9, *Reporting Cash Flows of Proprietary and Nonexpendable Trust Funds and Governmental Entities That Use Proprietary Fund Accounting*, and GASB Statement No. 34, such as state appropriations and investment income.

### Risk Financing

The Authority carries commercial insurance to cover casualty, theft, claims and other loss. The current insurance policies have not been cancelled or terminated. The Authority has not settled any claims in excess of its insurance coverage during the past three years. The Authority also pays premiums for workers compensation insurance to another component unit of the Commonwealth.

### Compensated Absences

Compensated absences are accrued when earned by the employees. Employees may carry forward their vacation and sick leave as permitted by statute and may receive a cash payment from the Authority upon termination of employment.

### Reclassifications

Certain reclassifications have been made to the June 30, 2010 financial statements to conform them to current year presentation.

## 3. Net Assets

Restricted assets at June 30, 2011 and 2010 include $66.3 million and $38.1 million, respectively, which have been appropriated principally to comply with long-term principal and interest debt services requirements.

27

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

### 3. Net Assets (continued)

As of June 30, 2011, the Authority is in a net deficit position. The Authority faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession. During fiscal year ended June 30, 2011, the Authority collected approximately $60.4 million related to a second partial payment of rent in arrears due to the Authority, principally by agencies of the Government of Puerto Rico. Also, during the current fiscal year, management continued its policy of strict fiscal and budgetary control and economic measures. In addition, the Authority intends to improve its government office facilities in order to retain existing tenants and attract new agencies and instrumentalities.

### 4. Cash, Restricted Cash, and Deposits

At June 30, 2011 and 2010, the Authority maintained cash deposited at the Governmental Development Bank for Puerto Rico (GDB), of $87 million and $90 million, respectively, a component unit of the Commonwealth; therefore the collateralization requirement does not apply.

The Authority had the following depository accounts in commercial banks. All deposits are carried at cost plus accrued interest.

| Depository Account | Bank Balance At June 30, 2011 | Book Balance At June 30, 2011 |
|---|---|---|
| Insured | $   500,000 | $   500,000 |
| Unrestricted, but collateralized held in the Authority's name | 10,125,197 | 6,130,347 |
| Total deposits | $10,625,197 | $6,630,347 |

Restricted cash consist of the following:

a. Bond sinking funds,
b. Cash to be deposited in sinking funds,
c. Construction funds,
d. Funds for construction of facilities for other governmental entities, and
e. School renovation funds.

28

# Public Buildings Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 4. Cash, Restricted Cash, and Deposits (continued)

**Bond Sinking Funds**

The bond sinking funds under Bond Resolutions No. 158 and No. 468 as of June 30, 2011 and 2010, consist of cash and money market funds carried at fair value, as follows:

| Description | Bond Service Account | |
|---|---|---|
| | 2011 | 2010 |
| Resolution No. 158 – Public Education and Health Facilities | $          – | $ 33,507,223 |
| Resolution No. 468 – Governmental Facilities – Money Market Funds | 176,103,008 | 127,917,620 |
| | $176,103,008 | $161,424,843 |

Each bond sinking fund consists of three (3) separate accounts designated as a "Bond Service Account", a "Reserve Account" and a "Redemption Account", except under Resolution No. 468, which has no Reserve Account in its Sinking Fund. Revenues received from debt service rentals with respect to the facilities financed under Bond Resolutions No. 158 and No. 468 are deposited with their respective Fiscal Agents for the credit of such accounts in the following order:

- to the Bond Service Account, in such amount as may be required to make the amount equal to the amount of interest then due and payable and the interest, which will become due and payable within the next ensuing six months on all bonds of each series then outstanding and the principal of all serial bonds, if any, which will become payable within the next ensuing twelve months;

- to the Redemption Account, in such amount as may be required to make the amounts so deposited in the current fiscal year equal to the amortization requirement, if any, for such fiscal year for the term bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of bonds if such principal amount of bonds should be redeemed on the next redemption date from monies in their respective Bond Sinking Funds; and

- the remaining balance, if any, is deposited to the credit of the Reserve Account, except under Resolution No. 468, where such balance is deposited to the credit of the Bond Service Account.

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 4. Cash, Restricted Cash, and Deposits (continued)

### Bond Sinking Funds (continued)

Bond Resolution No. 158 requires that monies be invested and reinvested in investment obligations, repurchase agreements or time deposits fully secured by investment obligations; as those terms are defined therein.

Bond Resolution No. 468 requires that monies be invested and reinvested in government obligations, bankers' acceptances, certificates or time deposits of any Commonwealth's approval bank or national banking association; repurchase or reverse repurchase agreements or any other investment, which are rated in one of the three highest rating categories.

### Cash to be Deposited in Bond Sinking Funds

These funds represent the funds deposited to be transferred to the bond sinking fund accounts with the fiscal agents. Funds available at June 30, 2011 and 2010 amounted to $52,709,263 and $43,171,585, respectively.

### Construction Funds

Construction funds are created for the purpose of providing resources for the payment of all or any part of the remaining cost of the Initial Facilities, as defined, or for payment of all or any part of the cost to the Authority of any Additional Facilities or Improvements, as defined, in accordance with the Bond Resolutions. As of June 30, 2011 and 2010, construction funds aggregate $61,243,055 and $72,661,525, respectively.

### Funds for the Construction of Facilities for Other Governmental Entities

Funds for the construction of facilities for other governmental entities represent the balance of the funds received less the amounts invested in the construction of said facilities. The properties constructed through this arrangement belong to the individual agencies and not to the Authority. Upon completion of each project, the Authority settles with the agency either by returning remaining funds or billing for the excess costs over the funds received. Funds available at June 30, 2011 and 2010 amounted to approximately $3.8 million and $5.0 million, respectively.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 4. Cash, Restricted Cash, and Deposits (continued)

### School Renovation Funds

These funds represent the balance received under federal financial assistance programs, as a sub-recipient of the Commonwealth of Puerto Rico Department of Education. These funds are restricted to be used for projects related to school renovation and are subject to compliance requirements applicable to this federal program. At June 30, 2011 and 2010, the balance of these funds amounted to approximately $305 thousand for both years.

### 5. Rent Receivable

This balance represents the amount due from Commonwealth agencies and instrumentalities determined in accordance with the corresponding rent contracts. In accordance with the provisions of the Enabling Act, the Secretary of the Treasury of the Commonwealth may make advances on behalf of certain agencies and instrumentalities lessees and make payments on behalf of certain department lessees. Minimum lease rentals for the following five years are as follows:

| Year Ending June 30, | Minimum Lease Rentals |
|---|---|
| 2012 | $385,790,523 |
| 2013 | $386,119,946 |
| 2014 | $386,537,756 |
| 2015 | $386,382,669 |
| 2016 | $386,130,606 |

Minimum lease rentals are revised every July 1st based on, among other things, debt service requirements for the particular year. At June 30, 2011 and 2010, the Authority reclassified approximately $89 million and $187 million, respectively, of the rent receivables as a noncurrent asset because collection will not be received during the next 12-month period.

On September 24, 2010, the Treasury Department transferred $60.4 million to the Authority for the payment of debts from agencies of the Commonwealth of Puerto Rico related to rent due as of June 30, 2009.

31

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 6. Notes Receivable from Other Governmental Agency

On July 23, 2004, the Authority entered into a note receivable agreement with the Department of Education (Institute of Technology in Ponce), for the payment of construction costs aggregating $12,256,705 to be collected into a thirty-two (32) years period plus interest at 2.81%. Subsequent to the signing of the agreement, the Authority credited $4,522,137 of the total balance as agreed with the Puerto Rico Office of Management and Budget. Future minimum collections, during the remaining term of the note, after the application of the credit of $4,522,137, are as follows:

| Year Ending June 30, | Principal | Interest |
|---|---|---|
| 2012 | $        — | $   869,364 |
| 2013 | — | 217,341 |
| 2014 | — | 217,341 |
| 2015 | — | 217,341 |
| 2016 | — | 217,341 |
| 2017-2021 | 597,547 | 1,074,004 |
| 2022-2026 | 2,040,590 | 865,140 |
| 2027-2031 | 2,348,025 | 557,705 |
| 2032-2036 | 2,701,780 | 203,953 |
| 2037-2038 | 46,626 | 1,803 |
| Total | $7,734,568 | $4,441,333 |

As of June 30, 2011, the Department of Education is not in compliance with the agreement.

### 7. Transaction with the Commonwealth of Puerto Rico

### Due from Commonwealth

The amount due from the Commonwealth of Puerto Rico represents the approximate costs of certain construction projects that have been either suspended or cancelled unilaterally by the Commonwealth during planning stages and, therefore, the funds must be returned and deposited in the corresponding bond sinking, construction, or reserve accounts, as deemed appropriate by the bond indentures.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

### 7. Transaction with the Commonwealth of Puerto Rico (continued)

#### Due from Commonwealth (continued)

The Puerto Rico's Office of Management and Budget (OMB) recognized that, subject to certain audit requirements by the OMB, this account shall be recognized as a liability by the Commonwealth. Accordingly, the Authority has recognized this amount as amount due from the Commonwealth as, in the opinion of the Authority's management; these costs will be recovered from future appropriations from the Commonwealth. Nevertheless, OMB has not appropriated any funds to reimburse the Authority and, since the timing of the collection cannot be readily determined, this amount is presented as a noncurrent asset.

#### Contributions from the Puerto Rico Sales Tax Financing Corporation

On May 13, 2006, the Legislature of the Commonwealth approved Act No. 91 and created the Puerto Rico Sales Tax Financing Corporation (the Tax Financing Corporation). Act No. 91 was amended by Act No. 291 of December 26, 2006 and by Act No. 56 of July 6, 2007.

On July 31, 2007, December 20, 2007 and June 26, 2008, the Puerto Rico Sales Tax Financing Corporation (known as COFINA for its Spanish acronym), a component unit of the Commonwealth, issued its Sales Tax Revenue Bonds Series 2007A and B, Series 2007C and Series 2009A, respectively, to refinance certain of Bonds outstanding issued by certain of the Commonwealth's agencies and component units (including the Authority).

During the year ended June 30, 2010, the Tax Financing Corporation contributed $12.8 million for the payment of principal and interest due on lines of credits. Such transaction has been reflected as a contribution from the Puerto Rico Sales Tax Financing Corporation in the Statements of Revenues, Expenses and Changes in Net Assets for the year ended June 30, 2010.

#### Due to Commonwealth

The balance of $1.7 million as of June 30, 2011 and 2010, respectively, represents excess of advances received from other governmental agencies for rent charges over construction costs incurred for government agencies projects.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 8. Capital Assets

Capital assets activity for the years ended June 30, 2011 and 2010 were as follows:

| | Year Ended June 30, 2011 | | | |
| | Beginning Balance | Additions | Reductions | Ending Balance |
|---|---|---|---|---|
| Capital assets, not being depreciated: | | | | |
| Land | $   130,735,879 | $          — | $        (4,935) | $   130,730,944 |
| Construction in progress | 223,540,382 | 156,947,129 | (84,027,496) | 296,460,015 |
| Total capital assets, not being depreciated | 354,276,261 | 156,947,129 | (84,032,431) | 427,190,959 |
| | | | | |
| Capital assets, being depreciated: | | | | |
| Buildings | 3,431,836,076 | 183,748,668 | (95,330,936) | 3,520,253,808 |
| Equipment and automobiles | 13,883,823 | 310,141 | (536,042) | 13,657,922 |
| | 3,445,719,899 | 184,058,809 | (95,866,978) | 3,533,911,730 |
| Less accumulated depreciation for: | | | | |
| Buildings | (892,621,471) | (67,025,195) | 260 | (959,646,406) |
| Equipment and automobiles | (12,233,736) | (362,472) | 409,901 | (12,186,307) |
| | (904,855,207) | (67,387,667) | 410,161 | (971,832,713) |
| Total capital assets, being depreciated, net | 2,540,864,692 | 116,671,142 | (95,456,817) | 2,562,079,017 |
| Capital assets, net | $2,895,140,953 | $273,618,271 | $(179,489,248) | $2,989,269,976 |

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 8. Capital Assets (continued)

|  | Year Ended June 30, 2010 | | | |
|---|---|---|---|---|
|  | Beginning Balance | Additions | Reductions | Ending Balance |
| Capital assets, not being depreciated: | | | | |
| Land | $ 118,756,957 | $ 11,978,922 | $ — | $ 130,735,879 |
| Construction in progress | 264,382,645 | 83,163,146 | (124,005,409) | 223,540,382 |
| Total capital assets, not being depreciated | 383,139,602 | 95,142,068 | (124,005,409) | 354,276,261 |
| Capital assets, being depreciated: | | | | |
| Buildings | 3,309,831,178 | 124,005,409 | (2,000,511) | 3,431,836,076 |
| Equipment and automobiles | 14,185,380 | 163,548 | (465,105) | 13,883,823 |
|  | 3,324,016,558 | 124,168,957 | (2,465,616) | 3,445,719,899 |
| Less accumulated depreciation for: | | | | |
| Buildings | (826,829,394) | (65,792,077) | — | (892,621,471) |
| Equipment and automobiles | ( 12,252,953) | (503,730) | 522,947 | (12,233,736) |
|  | (839,082,347) | (66,295,807) | 522,947 | (904,855,207) |
| Total capital assets, being depreciated, net | 2,484,934,211 | 57,873,150 | (1,942,669) | 2,540,864,692 |
| Capital assets, net | $2,868,073,813 | $153,015,218 | $(125,948,078) | $2,895,140,953 |

Total interest costs capitalized during the years ended June 30, 2011 and 2010 aggregates to approximately $13.1 million and $10 million, respectively. Total general and administrative expenses capitalized during the years ended June 30, 2011 and 2010, aggregates to approximately $5.2 million and $2.2 million, respectively.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 9. Property Held for Sale

The Authority identified certain properties for sale, as part of its efforts to increase liquidity. The amount shown of $3 million as of June 30, 2011 and 2010, respectively, was reclassified from capital assets as property held for sale and is recorded at cost or net book value. No costs of disposal have been estimated as these properties consist of real estate and the Authority believes that the net realizable amount will exceed the current book value of the property held for sale.

## 10. Land and Buildings under Construction and Advances from Other Governmental Agencies

Land and buildings under construction for other governmental agencies as of June 30, 2011 and 2010 were as follow:

|  | June 30, 2011 | | | |
|  | 2010 | Increase | Decrease | 2011 |
|---|---|---|---|---|
| Construction in progress | $150,390 | $ 209,291 | $ (9,300) | $350,381 |

|  | June 30, 2010 | | | |
|  | 2009 | Increase | Decrease | 2010 |
|---|---|---|---|---|
| Construction in progress | $152,282 | $1,075,000 | $(1,076,892) | $150,390 |

Advances from other governmental entities at June 30, 2011 and 2010 amounted to approximately $3.0 million and $1.9 million, respectively. These amounts represent funds received from several agencies and municipalities for the construction of projects.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 11. Due to Other Governmental Entities

Due to other governmental entities as of June 30, 2011 and 2010 were as follow:

| Description | 2011 | 2010 |
|---|---|---|
| Puerto Rico Infrastructure Financing Authority | $35,073,867 | $    — |
| Puerto Rico Electric Power Authority | 12,826,215 | 36,431,608 |
| Puerto Rico Aqueduct and Sewer Authority | 3,148,272 | 3,203,582 |
| Employees' Retirement System | 1,862,953 | 2,729,169 |
| Puerto Rico Department of Labor | 616,704 | 1,975,570 |
| Puerto Rico Land Authority | 335,304 | 335,304 |
| Board of Environmental Quality | 57,625 | — |
| General Services Administration | 27,468 | 100,964 |
| Municipality of San Juan | 16,746 | — |
| Puerto Rico Land Administration | 12,549 | 12,549 |
| Treasury Department of Puerto Rico | 2,390 | — |
| Municipality of Caguas | 1,530 | — |
| Department of Transportation and Public Works | 110 | — |
| Total | $53,981,733 | $44,788,746 |

# Public Buildings Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 12. Bonds Payable

Bonds payable as of June 30, 2011 and 2010 were as follow:

| Description | 2011 | 2010 |
|---|---|---|
| Office Buildings Bonds: | | |
| Serial Bonds, maturing through 2010, with interest rates ranging from 4.50% to 6.90% | $ – | $ 6,065,000 |
| Term Bonds, maturing through 2021, with interest rates ranging from 5.50% to 6.00% | 37,315,000 | 37,315,000 |
| | 37,315,000 | 43,380,000 |
| Public Education and Health Facilities Bonds: | | |
| Serial Bonds, maturing through 2010, with interest rates ranging from 4.50% to 6.60% | – | 32,585,000 |
| | – | 32,585,000 |
| Government Facilities Revenue Bonds: | | |
| Serial Bonds maturing through 2027, with interest rates ranging from 3.00% to 6.75% | 996,410,000 | 1,042,610,000 |
| Term Bonds maturing through 2039, with interest rates ranging from 3.00% to 5.75% | 1,954,930,000 | 1,954,930,000 |
| Capital Appreciation Bonds, maturing through 2031, with interest rates ranging from 3.75% to 5.50% | 111,225,556 | 107,082,082 |
| | 3,062,565,556 | 3,104,622,082 |
| Total bonds outstanding | 3,099,880,556 | 3,180,587,082 |
| Less: Bond discounts | (25,272,894) | (26,454,183) |
| Deferred loss on bonds defeased | (142,673,870) | (151,563,716) |
| Plus: Bond premiums | 76,268,664 | 84,785,495 |
| Net bonds payable | 3,008,202,456 | 3,087,354,678 |
| Less: Current portion | (81,001,970) | (84,850,000) |
| Bonds payable, noncurrent portion | $2,927,200,486 | $3,002,504,678 |

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 12. Bonds Payable (continued)

Aggregate maturities of sinking funds' amortization requirements on bonds, (excluding discounts and premiums), accreted value on bonds and related interest payments in future years are as follows:

| Year ending June 30, | Principal | Interest |
|---|---|---|
| 2012 | $     81,001,970 | $   163,671,494 |
| 2013 | 78,580,449 | 159,823,235 |
| 2014 | 74,135,000 | 155,261,025 |
| 2015 | 77,920,000 | 151,199,375 |
| 2016 | 81,945,000 | 146,910,800 |
| 2017-2021 | 384,305,000 | 660,011,477 |
| 2022-2026 | 445,140,000 | 540,311,403 |
| 2027-2031 | 638,245,691 | 390,804,592 |
| 2032-2036 | 848,370,975 | 199,594,691 |
| 2037-2040 | 359,895,000 | 27,615,811 |
| Principal outstanding and interest | 3,069,539,085 | 2,595,203,903 |
| Add (deduct): Bond discounts | (25,272,894) | |
| Deferred loss on bonds defeased | (142,673,870) | |
| Accreted value on bonds outstanding | 30,341,471 | |
| Bonds premiums | 76,268,664 | |
| Net bonds payable | 3,008,202,456 | |
| Less: Current portion | (81,001,970) | |
| Bonds payable, noncurrent portion | $2,927,200,486 | $2,595,203,903 |

1111-1306759

# Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 12. Bonds Payable (continued)

Activity of bonds payable during the years ended June 30, 2011 and 2010 are as follows:

| | Year Ended June 30, 2011 | | | | |
| | 2010 | Issuances/ Accretion | Payments/ Decreases | 2011 | Current Portion |
|---|---|---|---|---|---|
| **Office Building Bonds:** | | | | | |
| Serial Bonds | $ 6,065,000 | $ — | $ (6,065,000) | $ — | $ — |
| Terms Bonds | 37,315,000 | — | — | 37,315,000 | — |
| | 43,380,000 | — | (6,065,000) | 37,315,000 | — |
| **Public Education and Health Facilities Bonds:** | | | | | |
| Serial Bonds | 32,585,000 | — | (32,585,000) | — | — |
| | 32,585,000 | — | (32,585,000) | — | — |
| **Government Facilities Revenue Bonds:** | | | | | |
| Serial Bonds | 1,042,610,000 | — | (46,200,000) | 996,410,000 | 81,001,970 |
| Terms Bonds | 1,954,930,000 | — | — | 1,954,930,000 | — |
| Capital Appreciation Bonds | 107,082,082 | 4,143,474 | — | 111,225,556 | — |
| | 3,104,622,082 | 4,143,474 | (46,200,000) | 3,062,565,556 | 81,001,970 |
| Total bonds outstanding | 3,180,587,082 | 4,143,474 | (84,850,000) | 3,099,880,556 | 81,001,970 |
| Less: Bonds discounts | (26,454,183) | — | 1,181,289 | (25,272,894) | — |
| Deferred loss on bond defeased | (151,563,716) | — | 8,889,846 | (142,673,870) | — |
| Plus: Bonds premiums | 84,785,495 | — | (8,516,831) | 76,268,664 | — |
| Total bonds payable, net | $3,087,354,678 | $ 4,143,474 | $(83,295,696) | $3,008,202,456 | $81,001,970 |

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 12. Bonds Payable (continued)

| | Year Ended June 30, 2010 | | | | |
|---|---|---|---|---|---|
| | 2009 | Issuances/ Accretion | Payments/ Decreases | 2010 | Current Portion |
| Office Building Bonds: | | | | | |
| Serial Bonds | $    11,800,000 | $           – | $   (5,735,000) | $     6,065,000 | $  6,065,000 |
| Terms Bonds | 37,315,000 | – | – | 37,315,000 | – |
| | 49,115,000 | – | (5,735,000) | 43,380,000 | 6,065,000 |
| Public Education and Health Facilities Bonds: | | | | | |
| Serial Bonds | 66,015,000 | – | (33,430,000) | 32,585,000 | 32,585,000 |
| | 66,015,000 | – | (33,430,000) | 32,585,000 | 32,585,000 |
| Government Facilities Revenue Bonds: | | | | | |
| Serial Bonds | 958,880,000 | 123,975,000 | (40,245,000) | 1,042,610,000 | 46,200,000 |
| Term Bonds | 1,900,310,000 | 409,500,000 | (354,880,000) | 1,954,930,000 | – |
| Capital Appreciation Bonds | 98,061,979 | 11,787,756 | (2,767,653) | 107,082,082 | – |
| | 2,957,251,979 | 545,262,756 | (397,892,653) | 3,104,622,082 | 46,200,000 |
| Total bonds outstanding | 3,072,381,979 | 545,262,756 | (437,057,653) | 3,180,587,082 | 84,850,000 |
| Less: Bonds discounts | (22,789,583) | (4,776,955) | 1,112,355 | (26,454,183) | – |
| Deferred loss on bond defeased | (138,693,597) | (20,173,169) | 7,303,050 | (151,563,716) | – |
| Plus: Bonds premiums | 102,194,283 | – | (17,408,788) | 84,785,495 | – |
| Total bonds payable, net | $3,013,093,082 | $520,312,632 | $(446,051,036) | $3,087,354,678 | $84,850,000 |

The maturities of bonds payable are funded by debt service rental revenue collected from the lessees. The bonds are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, and instrumentalities of the Commonwealth.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 12. Bonds Payable (continued)

The good faith and credit of the Commonwealth are pledged for the payment or advance of such rentals. The payment of principal and interest on the bonds is further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of Puerto Rico such sums as may be necessary to cover any deficiency in the amount required for the payment of principal and interest on the bonds, in an aggregate principal amount not exceeding $4,325 million.

The Authority's bonds payable are subject to the arbitrage rebate regulations issued by the Internal Revenue Service of the United States of America that require rebate to the federal government of excess investment earnings on tax-exempt debt proceeds if the yield on those earnings exceeds the effective yield on the related tax-exempt debt issued. Excess earnings must be rebated every five years or upon maturity of the debt, whichever is earlier. Arbitrage calculations resulted in no liability as of June 30, 2011.

### Defeased and Refunding Bonds

In prior years, the Authority defeased certain revenue bonds by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old debts. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the statements of net assets. As of June 30, 2011 and 2010, approximately $742 million and $940 million of bonds outstanding, respectively are considered defeased.

In July 1, 2009, the Authority issued $331 million Government Facilities Revenue Refunding Bonds, Series P. The proceeds from the issuance were used to advance refund $297 million Government Facilities Revenue Refunding Bonds, Series K, make swap termination payments of $28.4 million and pay cost of issuance of $4.7 million. On the same date, the Authority converted $50 million principal amount of its Government Facilities Revenue Refunding Bonds, Series K, from a LIBOR-based rate to a fixed rate and remarketed such bonds. As a result of the transaction, the Authority recognized a loss on defeasance of $22 million which has been deferred and will be amortized over the life of the old debt.

On October 16, 2009, the Authority issued $152,540,000 aggregate principal amount of Government Facilities Revenue Refunding Bonds, Series Q, guaranteed by the Commonwealth of Puerto Rico. The bonds are being issued to refund interest (but not principal) of certain bonds issued by the Authority under the 1995 Resolution.

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 13. Other Long-Term Liabilities

Other long-term liabilities at June 30, 2011 and 2010 are composed of the following:

| | Year Ended June 30, 2011 | | | | |
| | Beginning Balance | Increases | Payments/ Decreases | Ending Balance | Current Portion |
|---|---|---|---|---|---|
| Borrowings under lines of credit | $165,749,102 | $255,072,711 | $ (5,639,813) | $415,182,000 | $ — |
| Due to contractors, including retainage | 40,954,604 | 81,346,403 | (81,732,896) | 40,568,111 | 20,966,664 |
| Advances from governmental agencies | 1,949,596 | 2,150,000 | (1,075,000) | 3,024,596 | — |
| Compensated absences | 12,019,413 | 3,820,136 | (3,693,163) | 12,146,386 | 3,158,060 |
| Contingencies | 9,419,778 | 1,549,215 | (942,479) | 10,026,514 | — |
| Other post-employment benefits obligation | 3,127,048 | 2,783,124 | — | 5,910,172 | 1,072,275 |
| Termination benefits | — | 13,409,606 | — | 13,409,606 | 2,090,344 |
| Due to Commonwealth | 1,683,808 | — | — | 1,683,808 | |
| Total other long-term liabilities | $234,903,349 | $360,131,195 | $(93,083,351) | $501,951,193 | $ 27,287,343 |

| | Year Ended June 30, 2010 | | | | |
| | Beginning Balance | Increases | Payments/ Decreases | Ending Balance | Current Portion |
|---|---|---|---|---|---|
| Borrowings under lines of credit | $185,541,305 | $ 86,299,955 | $(106,092,158) | $165,749,102 | $ 95,749,102 |
| Due to contractors, including retainage | 49,642,149 | 79,294,102 | (87,981,647) | 40,954,604 | 13,363,228 |
| Advances from governmental agencies | 3,009,790 | 6,343,602 | (7,403,796) | 1,949,596 | — |
| Compensated absences | 13,948,924 | — | (1,929,511) | 12,019,413 | 3,041,471 |
| Contingencies | 9,435,534 | 1,994,334 | (2,010,090) | 9,419,778 | — |
| Other post-employment benefits obligation | — | 3,127,048 | — | 3,127,048 | 389,181 |
| Due to Commonwealth | 3,649,359 | — | (1,965,551) | 1,683,808 | — |
| Total other long-term liabilities | $265,227,061 | $177,059,041 | $(207,382,753) | $234,903,349 | $112,542,982 |

# Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements (continued)

### 13. Other Long-Term Liabilities (continued)

**Borrowings under Lines of Credit**

Borrowings under lines of credit at June 30, 2011 and 2010 are composed of the following:

| | June 30, 2011 | | | | |
|---|---|---|---|---|---|
| | **Principal** | | **Interest** | | **Total** |
| $ | **121,666,308** | $ | **9,193,034** | $ | **130,859,342** |
| | **12,252,525** | | **710,000** | | **12,962,525** |
| | **69,124,076** | | **134,408** | | **69,258,484** |
| | **4,065,174** | | **309,490** | | **4,374,664** |
| | **147,779,119** | | **4,030,734** | | **151,809,853** |
| | **14,516,024** | | **210,332** | | **14,726,356** |
| | **30,911,320** | | **279,456** | | **31,190,776** |
| $ | **400,314,546** | $ | **14,867,454** | $ | **415,182,000** |

| | June 30, 2010 | | | | |
|---|---|---|---|---|---|
| | **Principal** | | **Interest** | | **Total** |
| $ | 81,997,800 | $ | 3,452,598 | $ | 85,450,398 |
| | 5,917,399 | | 202,419 | | 6,119,818 |
| | 70,000,000 | | — | | 70,000,000 |
| | 4,065,174 | | 113,712 | | 4,178,886 |
| $ | 161,980,373 | $ | 3,768,729 | $ | 165,749,102 |

On May 2, 2008, the Authority executed two Loan Agreements with GDB for the interim financing of its Capital Improvement Program in an amount not to exceed $226 million, bearing interest at 6.0%. The loans are due on October 31, 2011 and will be payable from the proceeds of the next bond issuance of the Authority divided into $209 million on a tax-exempt basis and $16.9 million on a taxable basis.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

### 13. Other Long-Term Liabilities (continued)

#### Borrowings under Lines of Credit (continued)

The Authority maintains a line of credit with GDB for $75 million, bearing interest at a fixed interest rate of 7%. The line is collateralized with two of the Authority's properties. The proceeds were used to finance the Authority's operational expenses. Payments of principal and interest will be appropriate from the Commonwealth of Puerto Rico's general budget pursuant to the provisions of the Resolution No. 387 of December 21, 2005. The loan is due on June 30, 2018. During the fiscal years ended June 30, 2011 and 2010, payments of principal and interest due of $875,924 and $5,000,000 and $4,763,889 and $7,857,123, respectively, were made by the Puerto Rico Sales Tax Financing Corporation.

On April 27, 2009, GDB provide to the Authority a non-revolving credit facility in the maximum principal amount of $98,500,000 bearing interest on the unpaid principal amount of each advance at a fluctuating annual rate equal to 1.50% over and above the Prime Rate or at such other rate determined by GDB. The proceeds of the Facility will be used exclusively for the payment of certain amounts due by the Authority to its suppliers and service providers. All such payments shall be subject to the prior approval of GDB and shall be disbursed directly to the suppliers and service providers. The loan is due on June 30, 2011 and will be payable from all funds generated by the PBA and any other properties owned and pledged to GDB.

On July 9, 2010 the Authority executed a loan agreement with GDB for the financing of the interest component of certain of its outstanding revenue and revenue refunding bonds in an aggregate principal amount not to exceed $36,944,781. The loan shall mature on such date as GDB may determine but in no event later than June 30, 2012 and will be payable from the proceeds of the issuance of revenue bonds to be issued by the Authority under Section 209 of Resolutions No. 468 and No. 158. The loan bears interest at a rate of interest per annum equal to the Prime Rate (as determined by the Lender) plus 150 basis points; provided that such interest shall not be less than six percent (6%). On September 22, 2010, the loan agreement was amended to provide an increase in the loan amount of $12,314,927 for a new loan balance of $49,259,708. On November 29, 2010 a second amendment to the loan agreement occurred in order to increase the amount of the loan by $98,519,416 from $ 49,258,708 to $147,779,124.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 13. Other Long-Term Liabilities (continued)

### Borrowings under Lines of Credit (continued)

On August 18, 2010, GDB provide to the Authority a non-revolving credit facility in the maximum principal amount of $93,627,486 bearing interest at a fluctuating annual rate equal to Prime plus 1.50 percent, provided that such interest shall not be less than six percent (6%), or at such other rate determined by GDB. The proceeds of the Facility will be used for construction projects development. The loan is due on June 30, 2012 and will be payable from the proceeds of the future bond issuance of the Authority.

On October 21, 2010 the Authority executed a loan agreement with GDB for the financing of the projects costs, under the Inter-Departmental Agreement, until such time as the Authority issues the Qualified School Construction Bonds (the QSCBs) in an aggregate principal amount not to exceed $160,000,000. The loan shall mature and all outstanding principal of and interest on the loan shall be due and payable on August 31, 2011, and will be payable from the proceeds of the issuance of the QSCBs or from any other funds available to the Authority. The loan shall bear interest at a rate of interest per annum equal to the Prime Rate  (as determined by the Lender) plus 150 basis points; provided that such interest shall not be less than six percent (6%) per annum nor greater than twelve percent (12%) per annum. On April 4, 2011, the loan agreement was amended to provide an increase in the loan amount of $561,600,000 for a new loan balance of $721,600,000.

The Authority, in conjunction with the Puerto Rico Public Partnerships Authority (the P3 Authority), the Puerto Rico Department of Education, the Puerto Rico Department of Transportation and Public Works, and the Puerto Rico Infrastructure Financing Authority, is undertaking a significant and expansive modernization project for the Puerto Rico's Public Schools, known as the Schools for the 21st Century.

### Due to Contractors, including Retainage

This amount represents the remaining balance due to contractors for projects under construction. Normally, the contractors submit progress billings for projects in progress and the Authority pays these invoices, except for the retainage portion. This withholding is used as a guarantee that the Contractor will complete the project in accordance with contract requirements.

Normally the retainage will be paid upon completion and acceptance of the projects, as determined by the Authority's engineers.

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

### 13. Other Long-Term Liabilities (continued)

#### Advances from Other Governmental Entities

This amount represents the balance of the amounts advanced by other governmental entities, mainly for the construction of facilities that will be owned by these entities. These projects include appropriations from the Commonwealth to finance the construction of facilities by these agencies, which in turn request the Authority to carry out the construction and the administration of the construction process. Upon acceptable completion, the project is completed and is taken over by the corresponding agency. The assets are not owned by the Authority.

#### Compensated Absences

This amount represents the accrued compensated absences of the Authority. These are absences for which employees will be paid, such as vacation and sick leave.

#### Contingencies

This amount represents the Authority's estimates of possible legal and contractual settlements arising from normal litigation procedures. The estimated amount was based on the corresponding number of legal cases currently underway and based upon the advice and consent of the Authority's legal division and its external legal advisors. Actual amount to be settled may be materially different from the amount accrued. (Refer to Note 18.)

#### Other Post-Employment Benefits Obligation

This amount represents the Authority's liability for its retirement healthcare benefits under the Healthcare Benefit Plan to Retirees. See Note 15 for additional information.

#### Termination Benefits

This amount represents the Authority's liability related to a program that provides benefits for early retirement or economic incentives for voluntary employment termination to certain eligible employees. See Note 16 for additional information.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 14. Employee Retirement Plan

The Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities (the System) is a cost sharing multiple-employer defined-benefit pension plan sponsored by, and reported as a component unit of, the Commonwealth. The System was created under Act No. 447 (the Act) approved on May 15, 1951, as amended, and became effective on January 1, 1952. All regular appointed and temporary employees of the Authority under age fifty-five (55) at the date of employment become plan participants of the System.

The System provides retirement, death, and disability benefits. Retirement benefits depend upon age at retirement and number of years of credited service. Benefits generally vest after ten (10) years of plan participation. Retirement benefits are determined by the application of stipulated benefit ratios to the member's average compensation. Average compensation is computed based on the highest thirty-six (36) months of compensation recognized by the System. The annuity, for which a plan member is eligible, is limited to a minimum of $300 per month and a maximum of 75 percent of the average compensation.

Contribution requirements, which are established by law and not actuarially determined, are as follows:

| | |
|---|---|
| Commonwealth | 9.275% of applicable payroll |
| Employees: | |
| Hired on or before March 31, 1990 | 5.775% of monthly gross salary up to $550 and 8.275% of monthly gross salary over $550 |
| Hired on or after April 1, 1990 | 8.275% of monthly gross salary |

On September 24, 1999, an amendment to the Act, which created the System, was enacted with the purpose of establishing a defined contribution plan (System 2000) effective January 1, 2000. Employees participating in the defined benefit plan (the traditional plan) at December 31, 1999, had the option to either stay in the traditional plan or transfer to System 2000. Persons employed on or after January 1, 2000 are only allowed to become members of System 2000.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 14. Employee Retirement Plan (continued)

System 2000 is a hybrid defined contribution plan, also known as a cash balance plan. Under this new plan there is a pool of pension assets, which are invested by the System, together with those of System 2000 benefit plan. The Commonwealth does not guarantee benefits at retirement age. The annuity is based on a formula which assumes that each year the participants' contribution (with a minimum of 8.275% of the participants' salary up to a maximum of 10%) will be invested in an account which will either: (1) earn a fixed rate based on the two-year Constant Maturity Treasury Notes, (2) earn a rate equal to 75% of the return of the System's investment portfolio (net of management fees), or (3) earn a combination of alternatives. Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. Disability pensions are not granted under System 2000. The employers' contributions (9.275% of the employee's salary) are used to fund the traditional plan. System 2000 reduces the retirement age from sixty-five (65) years to sixty (60) years for those employees who joined the current plan on or after January 1, 2000.

Total employee and employer contributions for the years ended June 30, 2011 and 2010 are as follows:

|  | 2011 | 2010 |
|---|---|---|
| Traditional Plan: |  |  |
| Employer | $2,504,483 | $3,029,461 |
| Employee | $2,207,449 | $2,702,834 |
| System 2000: |  |  |
| Employer | $1,639,132 | $1,712,308 |
| Employee | $1,468,458 | $1,527,692 |

49

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

**14. Employee Retirement Plan (continued)**

The System issued financial reports that include their basic financial statements and required supplementary information. Those reports may be obtained by writing to the System's administrator at 437 Ponce de León Avenue, Hato Rey, Puerto Rico 00918. Activity of accrued pension costs, included within accrued expenses, during the years ended June 30, 2011 and 2010 are as follows:

| Description | 2011 | 2010 |
|---|---|---|
| Beginning balance | $    894,839 | $    995,658 |
| Increase | 32,977,650 | 10,458,198 |
| Decrease | (19,441,880) | (10,559,017) |
| Ending balance | $ 14,430,609 | $    894,839 |

**15. Other Post-Employment Benefits**

**Plan Description**

The Authority provides retirement healthcare benefits under the Healthcare Benefit Plan to Retirees (the Plan) pursuant to collective bargain agreements. The Plan is administered by the Authority. Benefits consist of a maximum monthly payment (annuity) to cover medical expenses. Based on the Plan's features and functionality, and for the purpose of the actuarial valuation, it has been identified as a single –employer defined benefit healthcare plan. Participants groups covered are employees under Collective Labor Agreement with "Unión Independiente de Empleados de la Autoridad de Edificios Públicos" (UIEAEP), employees under Collective Labor Agreement with "Unión de Empleados de Oficina y Profesionales de la Autoridad de Edificios Públicos" (UEOP) and the Authority's management employees. All employees with at least 10 years of rendered service within the Authority are eligible for the healthcare benefit upon retirement age. Normal retirement is as follows:

For those employees by the Authority before March 30, 1990, normal retirement age would be:

- 30 years of service.

For employees employed by the Authority after March 30, 1990, normal retirement age would be at:

- 10 years of service and 65 years old.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 15. Other Post-Employment Benefits (continued)

The benefit is paid in case of permanent disability of the retiree until death. Also, the benefit is paid in case an active employee gets disable until death. The obligation ends in case of death after retirement.

The Authority follows GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Post-employment Benefits Other than Pensions*, for its other post-employment benefits and requires the calculation and recording of the net other post-employment benefit (OPEB) obligations. The net OPEB obligation is, in general, the cumulative difference between the actuarial required contribution and the actual contributions at the valuation date.

*Description of the other post-employment benefits provided* – In addition to providing the pension benefits described in Note 14 above, the Authority provides a defined dollar contribution to partially cover medical insurance cost to eligible retired employees. The Authority contribution is limited to $200 monthly per eligible retired employees up to a period of thirty-six months (twelve months for managerial employees). This benefit is included in the Collective Bargain Agreement and it will be effective until May 2013 and will be re-evaluated when the agreement is up for renewal on May 2013. Under this level of benefits provided, the risk of medical cost increases resides with the retiree and, therefore, results in a lower OPEB liability for the Authority.

*Membership* – As of June 30, 2011 and 2010, the number of active employees and retirees amounted to 1,422 and 1,251, respectively.

The following table shows the components of the Authority's annual OPEB cost for the years ended June 30, 2011 and 2010, the amount actually contributed to the plan and the Authority's net OPEB obligation at June 30, 2011 and 2010:

|  | 2011 | 2010 |
|---|---|---|
| Normal cost | $1,431,775 | $1,376,707 |
| Amortization of unfunded actuarial accrued liability | 2,197,465 | 1,950,853 |
| Annual required contribution | $3,629,240 | $3,327,560 |
| OPEB contributions made during fiscal year | $1,072,275 | $ 389,181 |
| Percentage of expense contributed | 30% | 12% |

51

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 15. Other Post-Employment Benefits (continued)

The net OPEB obligation change for the years ended June 30, 2011 and 2010 is as follows:

|  | 2011 | 2010 |
|---|---|---|
| Change in net OPEB obligation |  |  |
| Net OPEB obligation | $ 3,127,048 | $ — |
| Total annual OPEB costs | 3,172,305 | 3,316,318 |
| Actual benefit payments | (389,181) | (189,270) |
| Net OPEB obligation | $ 5,910,172 | $ 3,127,048 |

OPEB costs components for the years ended June 30, 2011 and 2010 are as follows:

|  | 2011 | 2010 |
|---|---|---|
| Annual OPEB Costs |  |  |
| ARC for fiscal year | $ 3,327,560 | $ 3,316,318 |
| Interest on Net OPEB Obligation | 93,811 | — |
| ARC Amortization Adjustment | (249,066) | — |
| Total Annual OPEB Costs | $ 3,172,305 | $ 3,316,318 |

As of June 30, 2011 and 2010, the actuarial accrued liability for benefits amounted to $25.6 million and $23.1 million, respectively, all of which was unfunded. The covered payroll (annual payroll of active employees covered by the plan) was approximately $59 million and $62.9 million during the years ended June 30, 2011 and 2010, respectively, and the ratio of the unfunded actuarial accrued liability to the covered payroll was 43.4% and 36.7%, respectively.

The projection of future benefit payments for an ongoing plan involves estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare costs trend. Amounts determined regarding the funded status of the plan and annual required contributions of the employer are subject to continuous revisions as actual results are compared with past expectations and new estimates are made about the future.

Projections of benefits for financial reporting purposes are based on the plan and include the types of benefits provided at the time of valuation and the historical pattern of benefit costs paid by the employer to date. The methods and assumptions used include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 15. Other Post-Employment Benefits (continued)

The amortization method of the initial unfunded actuarial accrued liability is the level dollar for a period of 30 years-closed. The amortization method for the gain or loss is the level dollar for a period of 15 years-closed.

The valuation date was July 1, 2011 and the Projected Unit Credit Cost Method was used. The actuarial assumptions were based on a set of assumptions supplied by the Authority. Turnover rates were based on service and age-related turnover. A discount rate of 3.0% was used. This rate is the best actuarial estimate of expected long-term experience and is in accordance with guidelines for selection of these rates under GASB 45. The healthcare trend rates are based on the actuarial knowledge of the general healthcare environment and the specific coverage offered by the Authority.

## 16. Voluntary Termination Benefits

On July 2, 2010, the Commonwealth enacted Act No. 70 to establish a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined, including employees of the Authority.  Act No. 70 was a voluntary selection for the public corporations, such as the Authority, and established that early retirement benefits will be provided to eligible employees that have completed between 20 to 29 years of credited of service in the Retirement System, between 48 and 55 year of age, and will consist of biweekly benefits of a 50 % of each employee' salary, as defined. In this early retirement benefit program, the Authority will make the employee and the employer contributions to the Retirement System and pay the corresponding pension until the employee complies with the requirements of age and 30 years of credited service in the Retirement System. Economic incentives are available to eligible employees who have at least 30 years of credited service in the Retirement System who have attained the age for retirement. Economic incentives will consist of a lump-sum payment of six months of salary based on employment years. For eligible employees that choose the economic incentives and have at least 30 years of credited service in the Retirement System and the age for retirement or have the age for retirement, the Authority will make the employee and the employer contributions to the Retirement System for a five year period. Additionally, eligible employees that choose to participate in the early retirement benefit program or that choose the economic incentive and have at least 20 years of credited service in the Retirement System are eligible to receive health plan coverage for up to 12 months in a health plan selected by management of the Authority.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

**16. Voluntary Termination Benefits (continued)**

The financial impact resulting for the benefits granted to participants on this program was the recognition within the Authority's financial statements of a liability of $13.4 million in the balance sheet as of June 30, 2011 and a charge of approximately $13.4 million in the statement of revenues, expenses and changes in net assets for the year ended June 30, 2011. At June 30, 2011, unpaid long-term benefits granted on this program were discounted at 1.85% and 2.35% depending on the employee voluntary termination benefits selected.

**17. Commitments**

The Authority has entered into various contracts with outside contractors for the construction of buildings and other facilities. The Authority records the liability for these contracts as progress billings are received, based on completed work. The uncompleted portion of these contracts is approximately $72.7 million as of June 30, 2011 and 2010.

**18. Contingent Liabilities**

The Authority is a defendant and/or co-defendant in various lawsuits for alleged breach of contracts and other actions arising in the ordinary course of business. There are two cases which area considered material. Even though arbitration was required, they involved issues of law which are being considered in judicial review.

In the first case, an Arbitration Panel awarded "Target" $2.6 million for anticipated earnings for the cancellation of a construction contract of a public school in the Municipality of Dorado. It is the contention of the Authority that the cancellation of the contract was lawfully executed and that anticipated earnings cannot be recognized against Government instrumentalities and Government agencies, which have the right and obligation of managing its necessities and priorities while protecting public funds. Judicial review is pending.

In the second case, an Arbitration Panel awarded "Target" $1.2 million for anticipated earnings for the cancellation of a construction contract of a public school in the Municipality of Carolina. The same defense as above was presented, but due to the comments of a member of the Arbitration Panel, where his prejudicial state of mind against the Authority's legal defense accidentally became part of the record, the Authority requested his impeachment and disqualification before its final decision. All controversies and legal contentions are pending in judicial review.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

## 18. Contingent Liabilities (continued)

Recently, Appellate Court recognized the Authority's legal arguments in another case not related to "Target". Anticipating earnings was not recognized against the Authority for cancellation of construction contract. Rule of law is included in the Authority's arguments requesting judicial review of arbitration proceedings.

Management, based on the advice of the legal counsel, has recorded reserves to cover for possible liabilities related to these cases. These reserves are recorded as part of the contingencies in the accompanying balance sheets.

## 19. Subsequent Events

The Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector. Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while the Puerto Rico Infrastructure Financing Authority serves as procurement and construction manager. The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, sciences labs, art centers, among other things.

The Authority has issued its $756,449,000 aggregate principal amount of Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds-Issuer Subsidy) (the "Series R Bonds"). The proceeds of the Series R Bonds will be used to finance the rehabilitation, renovation or construction of at least 100 public schools under this program. The Authority expects to finance the rehabilitation, renovation or construction of the remaining public schools through a future issuance of bonds also designated as "Qualified School Construction Bonds".

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements (continued)

**19. Subsequent Events (continued)**

Concurrently with the issuance of the Series R Bonds, on August 24, 2011 the Authority issued
its $303,945,000 aggregate principal amount of Government Facilities Revenue Bonds, Series S
Guaranteed by the Commonwealth of Puerto Rico. The bonds are being issued to (i) repay
certain advances made to the Authority by Government Development Bank under line of credit
facilities to (a) pay interest due January 1 and July 1, 2011 on certain bonds issued under the
1995 Bond Resolution and the 1970 Bond Resolution, and (b) pay a portion of the construction
costs of certain buildings and facilities leased by the Authority to various departments, agencies,
instrumentalities and municipalities of the Commonwealth; and (ii) pay costs of issuance the
bonds. The Government Facilities Revenue Bonds, Series S, repay the lines of credit principal in
the amounts of $147.8 million, $16.2 million and $122 million, and accrued interest of $16
million.

In July 2011, the Authority repaid the accrued interest for the line of credit of $98,500,000 with
annual rate equal to 1.50%. The accrued interest paid at July 30, 2011, was in the amount of
$309,490.

# Required Supplementary Information

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Funding Progress for Postemployment Healthcare Benefits

Year Ended June 30, 2011

| Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Liability | Funded Ratio | Annual Covered Payroll | Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| 30/06/2009 | $ — | $ 23,078,962 | $ 23,078,962 | —% | $ 64,275,952 | 38.1% |
| 30/06/2010 | $ — | $ 24,497,806 | $ 24,497,806 | —% | $ 62,901,044 | 36.7% |
| 30/06/2011 | $ — | $ 25,618,770 | $ 25,618,770 | —% | $ 59,056,613 | 43.4% |

*See accompanying independent auditors' report.*

1111-1306759

# Other Supplementary Information

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Schedule of Bond Sinking Funds Accounts

### Year Ended June 30, 2011

| | 2011 Total | Bond Service Account |
|---|---|---|
| **Public Education and Health Facilities Bonds** | | |
| *Balance at June 30, 2010* | $ 33,507,223 | $ 33,507,223 |
| Receipts: | | |
| Transfers from other accounts | **14,595** | **14,595** |
| Disbursements: | | |
| Payment of bonds principal and interest | **(33,521,818)** | **(33,521,818)** |
| *Balance at June 30, 2011* | $ — | $ — |
| | | |
| **Governmental Facilities Bonds** | | |
| *Balance at June 30, 2010* | $ 127,917,620 | $ 127,917,620 |
| Receipts: | | |
| Transfers from other accounts | **580,000** | **580,000** |
| Transfers from GDB Loan | **251,668,227** | **251,668,227** |
| Disbursements: | | |
| Payment of bonds interest | **(72,622,790)** | **(72,622,790)** |
| Payment of bonds principal and interest | **(122,847,970)** | **(122,847,970)** |
| Other disbursements: | | |
| Serie E | **(96,667)** | **(96,667)** |
| Capitalized interest | **(8,495,412)** | **(8,495,412)** |
| *Balance at June 30, 2011* | **$ 176,103,008** | **$ 176,103,008** |

# Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Schedule of Operating Cash Accounts

### Year Ended June 30, 2011

| Description | Banco Popular de Puerto Rico | Government Development Bank for Puerto Rico |
|---|---:|---:|
| **Balance as of June 30, 2010** | $ (17,684) | $ 67,171,585 |
| Deposits: | | |
| Rent collected | 25,267,763 | 227,514,350 |
| Investments | (6,658,244) | — |
| Interest | — | 72,590 |
| Disbursements: | | |
| For current expenses, transfers to bond service acounts and others | — | — |
| Service charges | (17,349,967) | (223,397,233) |
| Debt services payable | (8,753) | — |
| Insurance payment | — | (11,300,562) |
| | — | (7,351,467) |
| **Balance as of June 30, 2011** | $ 1,233,115 | $ 52,709,263 |
| | (A) | (B) |

(A) Balance included in cash and cash equivalents in the accompanying balance sheet,
   *as unrestricted* .

(B) Balance included in cash and cash equivalents in the accompanying balance sheet,
   *as restricted*

59

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Operating Rental Revenues and Receivables

Year Ended June 30, 2011

| | Rental Revenues Year Ended June 30, 2011 | Receivables as of June 30, 2011 |
|---|---|---|
| **Office Buildings** | | |
| Debt service rentals - bonds | $  29,274,815 | $              — |
| Operating, administrative and equipment replacement reserve rentals | 59,895,681 | 39,393,187 |
| Total office buildings | 89,170,496 | 39,393,187 |
| | | |
| **Public Education Buildings** | | |
| Debt service rentals - bonds | 65,018,758 | — |
| Operating, administrative and equipment replacement reserve rentals | 34,526,694 | 68,169,193 |
| Total public education buildings | 99,545,452 | 68,169,193 |
| | | |
| **Health Facilities** | | |
| Debt service rentals - bonds | 21,600,819 | — |
| Operating, administrative and equipment replacement reserve rentals | 2,497,663 | 33,112,435 |
| Total health facilities | 24,098,482 | 33,112,435 |
| Total | $  212,814,430 | $  140,674,815 |

60

1111-1306759

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Capital Improvements Program Compared to Budget

Year Ended June 30, 2011

|  | Actual | Budget |
|---|---|---|
|  |  | *(Unaudited)* |
| Educational facilities | $ 104,472,965 | $ 460,617,422 |
| Police facilities | 8,362,058 | 7,180,258 |
| Offices buildings | 24,435,469 | 85,691,277 |
| Courthouses | 1,765,491 | 3,872,693 |
| Firehouses | 502,765 | 2,628,509 |
| Penintentiaries | — | 1,426,548 |
| Authority's equipment | 310,141 | — |
| Total | $ 139,848,889 | $ 561,416,707 |

61

Ernst & Young LLP

Assurance | Tax | Transactions | Advisory

**About Ernst & Young**

Ernst & Young's a global leader in insurance,
tax, transaction and advisory services.
Worldwide, our 141,000 people are united by
our shared values and an unwavering commitment to
quality. We make a difference by helping our people, our
clients and our wider communities achieve their potential.

For more information, please visit www.ey.com

Ernst & Young refers to the global organization
of member firms of Ernst & Young Global Limited,
each of which is a separate legal entity.
Ernst & Young Global Limited, a UK company
limited by guarantee, does not provide services
to clients. This Report has been prepared by
Ernst & Young LLP, a client-serving member firm
located in the United States.



[This page intentionally left blank.]

**APPENDIX II**

## PROPOSED FORM OF OPINION OF BOND COUNSEL



**FOLEY & LARDNER LLP**

**ATTORNEYS AT LAW**

ONE BISCAYNE TOWER
2 SOUTH BISCAYNE
BOULEVARD SUITE 1900
MIAMI, FL 33131-2132
305.482.8400 TEL
305.482.8600 FAX
foley.com

December 22, 2011

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Re: $121,528,000 Puerto Rico Public Buildings Authority
Government Facilities Revenue Bonds, Series T,
(Qualified Zone Academy Bonds – Direct Payment)
Guaranteed by the Commonwealth of Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), of its $121,528,000 aggregate principal amount of Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) Guaranteed by the Commonwealth of Puerto Rico (the "Bonds"). We have also examined Act No. 17 of the Legislature of Puerto Rico, approved April 11, 1968, as amended (the "Guaranty Act"), providing for the guaranty by the Commonwealth of the payment of the principal of and interest on a principal amount of bonds outstanding at any one time of the Authority, not exceeding $4,325,000,000, specified by the Authority to be covered by such guaranty, to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.

The Bonds are being issued under and secured by Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Resolution") and a supplemental resolution thereto fixing the terms of the Bonds, adopted by the Authority on December 19, 2011 (the "Bond Resolution" and together with the 1995 Resolution, the "Resolution"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are being issued to provide funds to pay all or part of the cost of certain government facilities and improvements of such facilities as more particularly described in the Resolution.

The Authority is authorized to issue additional bonds for the purpose of paying all or a part of the cost of government facilities and improvements of such facilities and refunding bonds for refunding any bonds issued by the Authority under the provisions of the 1995 Resolution, under Resolution No. 77, adopted by the Authority on November 16, 1970, as supplemented, or under Resolution No. 158, adopted by the Authority on February 14, 1978, as supplemented, only upon the terms and conditions set forth in the Resolution, and such bonds, when issued, shall, with all the Bonds, be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the Resolution, to the extent provided in the Resolution.

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple of $1,000 in excess thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

BOSTON
BRUSSELS
CHICAGO
DETROIT

JACKSONVILLE
LOS ANGELES
MADISON
MIAMI

MILWAUKEE
NEW YORK
ORLANDO
SACRAMENTO

SAN DIEGO
SAN DIEGO/DEL MAR
SAN FRANCISCO
SHANGHAI

SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
WASHINGTON, D.C.

**≣FOLEY**

FOLEY & LARDNER LLP

As Bond Counsel we have examined (i) the Enabling Act, (ii) the Guaranty Act, (iii) certified copies of the proceedings of the Authority authorizing the issuance of the Bonds, (iv) the 1995 Resolution, (v) the Bond Resolution and (vi) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.    The Enabling Act is valid.

2.    The Guaranty Act is valid.

3.    The proceedings of the Authority in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.    The Authority has properly specified the Bonds to be covered by the guaranty of the Commonwealth under the Guaranty Act.

5.    The Enabling Act and such proceedings show lawful authority of the issuance and sale of the Bonds by the Authority.

6.    The good faith and credit of the Commonwealth are pledged for the payment of any amounts required to be paid by the Commonwealth pursuant to said guaranty.

7.    As authorized by the Enabling Act and by said proceedings, the 1995 Resolution and the Bond Resolution have each been duly adopted by the Authority.

8.    The Bonds have been duly authorized, executed and delivered by the Authority and constitute legal, valid, binding and enforceable obligations of the Authority payable from and secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

9.    Interest on the Bonds is not excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code and will be fully subject to Federal income taxation; this opinion is not intended or provided by Bond Counsel to be used and cannot be used by an owner of the Bonds for the purpose of avoiding penalties that may be imposed on the owner of such Bonds. The opinion set forth in this paragraph is provided to support the promotion or marketing of the Bonds. Each owner of the Bonds should seek advice based on its particular circumstances from an independent tax advisor.

10.    The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

Except as stated in paragraphs 9 and 10 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken or omitted with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights

II-2

**FOLEY**

FOLEY & LARDNER LLP

heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

[This page intentionally left blank.]

**APPENDIX III**

**PROPOSED FORM OF OPINION OF SPECIAL PUERTO RICO TAX COUNSEL**

[Closing Date]

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have acted as Special Puerto Rico Tax Counsel in connection with the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56-1958 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), of its $121,528,000 aggregate principal amount of Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment) Guaranteed by the Commonwealth of Puerto Rico (the "Bonds"). As such counsel, we have examined the provisions of the Internal Revenue Code for a New Puerto Rico, Act No. 1-2011 of the Legislature of Puerto Rico, approved January 31, 2011, as amended (the "PR Code") and of the United States Internal Revenue Code of 1986, as amended (the "US Code").

From such examination and based on the provision of the laws of Puerto Rico and the United States as now in force, and having regard to legal questions we deem relevant, we are of the opinion that:

1. Interest on the Bonds is:

    (a) exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the PR Code and Article 8 of the Enabling Act;

    (b) excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book income" of a corporation for purposes of computing the alternative minimum tax imposed by Section 1022.03(a) of the PR Code;

    (c) exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

    (d) exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it excludes from the "adjusted net book income" of a corporation for purposes of the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which is a section that does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which has been approved by the Legislative Assembly and is pending the Governor's signature, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 2(b) above, we assume that the AMT treatment provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may be required to be included in the "adjusted net book income" of a corporation and, therefore, may be subject to Puerto Rico alternative minimum tax.

2.  The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3.  The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4.  The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

5.  Interest on the Bonds constitutes industrial development income under Section 2(j) of the Economic Incentives for the Development of Puerto Rico Act, or under analogous provisions of similar prior acts (collectively referred to as the "Acts"), when received by a holder of a grant of tax exemption issued under any of the Acts that acquired the bonds with eligible funds, as such term is defined in the Acts.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Section 1033.17(a)(10) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense related to an investment in the Bonds.

**IRS Circular 230 Disclosure:  The following tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on a taxpayer by the Internal Revenue Service.  This tax discussion was written in connection with the promotion or marketing of the Bonds.  Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.**

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, it is our opinion that:

1.  Interest or original issue discount on the Bonds owned by an individual is excludable from the gross income of the individual for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue discount is to be recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business within the United States by such individual under the US Code.

2.  Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico or by any foreign corporation for purposes of the US Code is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

III-2

3.  United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such individual, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside of Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) each of the ten years preceding the year of the sale.  In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

This opinion is limited to the above, and we do not express any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Authority and the holders from time to time of the Bonds and may not be relied upon by any other person.

Respectfully submitted,

274203