# EXHIBIT E

**NEW ISSUE - BOOK-ENTRY ONLY**

**RATINGS:**  **Moody's: Ba2**
See RATINGS  **S&P: BB+**
**Fitch: BB**

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$3,500,000,000**
# COMMONWEALTH OF PUERTO RICO
## General Obligation Bonds of 2014, Series A

**Dated: Date of Delivery**                                                                       **Due: July 1, 2035**

The General Obligation Bonds of 2014, Series A (the "Bonds") are issuable as registered bonds without coupons in denominations of $100,000 and any multiple of $5,000 in excess thereof. See "General" under THE BONDS herein for a description of certain events affecting the denominations of the Bonds. The Bonds will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book-Entry Only System" under THE BONDS herein and in Appendix IV. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2014. The Bonds are subject to redemption prior to maturity as set forth herein.

**A purchase of the Bonds involves significant risks. Prospective purchasers should read this Official Statement in its entirety and consider the information set forth in RISK FACTORS, beginning on page 5, prior to purchasing any of the Bonds. A purchase of the Bonds is suitable only for purchasers that can bear the risks of price declines, limited liquidity and the possible failure to pay debt service described in this Official Statement.**

A portion of the proceeds of the Bonds will be used to repay bonds or notes purchased, or related liquidity facilities provided, by certain of the underwriters. See USE OF PROCEEDS herein.

**The Bonds are general obligations of the Commonwealth of Puerto Rico (the "Commonwealth"). The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources. The Constitution of Puerto Rico empowers a holder of bonds and notes evidencing public debt, including the Bonds, to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of, and interest on, public debt when due.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain matters will be passed upon for the Commonwealth by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as Disclosure Counsel, and for the Underwriters by their counsel Sidley Austin LLP, New York, New York, and O'Neill & Borges LLC, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 17, 2014.

| BARCLAYS | MORGAN STANLEY | RBC CAPITAL MARKETS |
|---|---|---|
| **BofA Merrill Lynch** | **Goldman, Sachs & Co.**    **J.P. Morgan** | **Ramirez & Co., Inc.** |
| **FirstBank PR Securities** | **Jefferies**    **Mesirow Financial, Inc.** | **Oriental Financial Services** |
| **Popular Securities** | **Santander Securities** | **UBS FS Puerto Rico** |

March 11, 2014

**$3,500,000,000**
## COMMONWEALTH OF PUERTO RICO
**General Obligation Bonds of 2014, Series A**

8% Term Bonds due July 1, 2035 – Price 93% CUSIP[*] 74514LE86

---

[*] Copyright, American Bankers Association. CUSIP numbers have been assigned by an organization not affiliated with the Commonwealth. These data are not intended to create a database and do not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy of such numbers.

# Government of Puerto Rico

### Governor

ALEJANDRO GARCÍA PADILLA

### Members of the Cabinet

INGRID VILA BIAGGI
*Chief of Staff*

| | | |
|---|---|---|
| DAVID BERNIER RIVERA<br>*Secretary of State* | CÉSAR R. MIRANDA RODRÍGUEZ<br>*Designated Secretary of Justice* | MELBA ACOSTA FEBO<br>*Secretary of the Treasury* |
| RAFAEL ROMÁN MELÉNDEZ<br>*Secretary of Education* | VANCE THOMAS RIDER<br>*Secretary of Labor and<br>Human Resources* | ANA RIUS ARMENDÁRIZ<br>*Secretary of Health* |
| MYRNA COMAS PAGÁN<br>*Secretary of Agriculture* | MIGUEL TORRES DÍAZ<br>*Secretary of Transportation<br>and Public Works* | ALBERTO BACÓ-BAGUÉ<br>*Secretary of Economic<br>Development and Commerce* |
| IDALIA COLÓN RONDÓN<br>*Secretary of Family Affairs* | RUBÉN RÍOS-PAGÁN<br>*Secretary of Housing* | CARMEN GUERRERO PÉREZ<br>*Secretary of Natural and<br>Environmental Resources* |
| NERY ADAMES SOTO<br>*Secretary of<br>Consumer Affairs* | RAMÓN ORTA RODRÍGUEZ<br>*Secretary of Sports and Recreation* | JOSÉ R. NEGRÓN FERNÁNDEZ<br>*Secretary of Corrections<br>and Rehabilitation* |

---

*Legislative Officers*

EDUARDO BHATIA GAUTIER
President, Senate

JAIME PERELLÓ BORRÁS
Speaker, House of
Representatives

*Fiscal Officers*

CARLOS RIVAS QUIÑONES
Director, Office of
Management and Budget

JOSÉ V. PAGÁN BEAUCHAMP
Acting President,
Government Development
Bank for Puerto Rico

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at prices lower than the public offering price appearing on the inside cover page and said offering prices may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than the Commonwealth, is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Commonwealth or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has not been a change in the affairs of the Commonwealth since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as a part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from, and summaries and explanations of, provisions of laws, resolutions, the Bonds and other documents herein do not purport to be complete.  Reference is made to said laws, resolutions, the Bonds and other documents for a full and complete statement of their provisions.  Copies of the above are available for inspection at the offices of Government Development Bank for Puerto Rico or the Registrar (as defined herein).

The Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act.  The registration or qualification of the Bonds in accordance with applicable provisions of laws of the jurisdictions in which the Bonds have been registered or qualified and the exemption from registration or qualification in other jurisdictions cannot be regarded as a recommendation thereof.  Neither these jurisdictions nor any of their agencies have passed upon the merits of the Bonds or the accuracy or completeness of this Official Statement.  Any representation to the contrary may be a criminal offense.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements contained in this Official Statement do not reflect historical facts but represent forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth.  In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes," and similar expressions are intended to identify forward-looking statements.  All estimates, projections, expectations, intentions, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.

The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth.  However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information.  Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth.

iv

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT ...................................................................................................... 1
THE COMMONWEALTH OF PUERTO RICO ................................................................................ 4
RISK FACTORS ................................................................................................................................... 5
    Risks Related to the Commonwealth's Financial and Fiscal Condition ......................................... 5
    Risks Related to the Commonwealth's Economy .......................................................................... 14
    Risks Related to the Bonds ............................................................................................................. 15
RECENT DEVELOPMENTS ............................................................................................................. 19
    Commonwealth Economic Data ..................................................................................................... 19
    Preliminary General Fund Revenues for the First Eight Months of Fiscal Year 2014 ................. 19
    Variable Rate Debt Obligations and Interest Rate Exchange Agreements ..................................... 20
    GDB Funding and Liquidity ........................................................................................................... 21
    Litigation ......................................................................................................................................... 22
    Subsidy Payments Related to the Federal Excise Taxes Imposed on Rum ................................... 23
USE OF PROCEEDS .......................................................................................................................... 24
    General ............................................................................................................................................ 24
    Sources and Uses of Funds ............................................................................................................. 24
    Transactions with Underwriters ..................................................................................................... 24
    Possible Future Transactions .......................................................................................................... 25
THE BONDS ....................................................................................................................................... 26
    General ............................................................................................................................................ 26
    Book-Entry Only System ............................................................................................................... 26
    Authorization .................................................................................................................................. 26
    Redemption ..................................................................................................................................... 27
    Notice of Redemption; Effect of Redemption ............................................................................... 27
    Certain Provisions of the Bonds and the Bond Resolution related to the Commonwealth's Pledge of its Good
        Faith, Credit and Taxing Power and the Priority Norms ........................................................... 28
    Governing Law, Jurisdiction and Venue ........................................................................................ 30
    Special Fund for the Bonds (General Obligation) Debt Service ..................................................... 30
    Payment Record .............................................................................................................................. 31
    Constitutional Debt Limitation ...................................................................................................... 31
    Maturity Limitation ........................................................................................................................ 32
DEBT OF THE COMMONWEALTH ................................................................................................ 32
    Public Sector Debt .......................................................................................................................... 32
    Debt Service Requirements for Commonwealth General Obligation Bonds and
        Commonwealth Guaranteed Debt .............................................................................................. 34
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ................................................... 36
LITIGATION ...................................................................................................................................... 36
TAX MATTERS ................................................................................................................................. 36
    Discount Bonds ............................................................................................................................... 37
LEGAL MATTERS ............................................................................................................................ 37
LEGAL INVESTMENT ...................................................................................................................... 38
UNDERWRITING .............................................................................................................................. 38
RATINGS ............................................................................................................................................ 38
CONTINUING DISCLOSURE ........................................................................................................... 39
    Continuing Disclosure Undertaking ............................................................................................... 39
    Prior Continuing Disclosure Non-Compliance .............................................................................. 42
MISCELLANEOUS ............................................................................................................................ 43

Appendix I – Quarterly Report of the Commonwealth of Puerto Rico, dated February 18, 2014 ............................ I-1

Appendix II – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated October 18, 2013 ...................................................................................................... II-1

Appendix III – Proposed Form of Opinion of Bond Counsel ................................................................. III-1

Appendix IV – Book-Entry Only System ............................................................................................. IV-1

v

(This page intentionally left blank)

$3,500,000,000
## COMMONWEALTH OF PUERTO RICO
### General Obligation Bonds of 2014, Series A

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the appendices, and all documents expressly incorporated herein by reference, provides certain information in connection with the sale of $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A (the "Bonds").

**A purchase of the Bonds involves significant risks. Prospective purchasers should read this Official Statement in its entirety and all other information incorporated by reference herein and should consider the information set forth in RISK FACTORS, beginning on page 5, prior to purchasing any of the Bonds.**

The Bonds are being issued under the provisions of Act No. 34-2014 of the Legislative Assembly of Puerto Rico, approved on March 4, 2014 (the "Act"), and other acts of the Legislative Assembly referred to in the Act, and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico (the "Governor") on March 11, 2014.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of, and interest on, the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources. The Constitution of Puerto Rico empowers a holder of bonds and notes evidencing public debt, including the Bonds, to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on public debt when due. The Commonwealth has previously irrevocably pledged its good faith, credit and taxing power for the prompt payment of the principal of and interest on its outstanding Public Improvement Bonds and Public Improvement Refunding Bonds, all of which are general obligation bonds, and certain bonds and notes of certain of its instrumentalities guaranteed by the Commonwealth. References herein to general obligation bonds or general obligation debt mean bonds or debt to which the Commonwealth has irrevocably pledged its good faith, credit and taxing power. For certain risks associated with the Bonds, see "Risks Related to the Bonds" under RISK FACTORS.

The Commonwealth will use the proceeds of the Bonds to (i) repay amounts due to Government Development Bank for Puerto Rico ("GDB") under certain lines of credit extended to the Commonwealth and Puerto Rico Public Buildings Authority ("PBA"), (ii) refund certain of its outstanding general obligation variable rate demand bonds, (iii) pay, either directly or through reimbursement to the Commonwealth, certain termination payments due under interest rate exchange agreements, (iv) repay certain outstanding obligations on behalf of, and issued by, Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym), (v) provide for the payment of interest on a portion of the Bonds, and (vi) pay the costs of issuing the Bonds. A portion of the proceeds of the Bonds will be used to repay bonds or notes purchased, or credit facilities provided, by certain of the underwriters. See USE OF PROCEEDS herein.

This Official Statement includes the Commonwealth's Quarterly Report, dated February 18, 2014 (the "Quarterly Report"), the Commonwealth's Financial Information and Operating Data Report, dated October 18, 2013 (the "Commonwealth Report" and, together with the Quarterly Report, the "Updated Commonwealth Report"), and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2012, dated September 16, 2013, prepared by the Treasury Department of the Commonwealth (the "Commonwealth's Annual Financial Report" and, together with the Updated Commonwealth Report, the "Reports"). The Quarterly Report and the Commonwealth Report are included herein as Appendices I and II, respectively. The Commonwealth's Annual Financial Report is incorporated by reference herein.

The Updated Commonwealth Report contains important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund (which is the primary operating fund of the Commonwealth), the results for fiscal year 2012 and preliminary results for fiscal year 2013, the partial year results for fiscal year 2014 and the projected fiscal year 2014 deficit, the General Fund budget for fiscal year 2014, the debt of the Commonwealth's public sector, the financial situation of the Commonwealth's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report and the Quarterly Report were filed on October 18, 2013 and February 18, 2014, respectively, by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org).   The Updated Commonwealth Report, included as appendices hereto, should be read in its entirety and in conjunction with the information included under the heading RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2012, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes an emphasis of matter paragraph regarding the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2012), dated September 16, 2013, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.   The Commonwealth's Annual Financial Report was filed on September 16, 2013 with the MSRB through EMMA (http://emma.msrb.org).

Deloitte & Touche LLP, the Commonwealth's former independent auditor, has not reviewed or approved, and is not associated with, this Official Statement.  The report of Deloitte & Touche LLP relating to the Commonwealth's basic financial statements for the fiscal year ended June 30, 2012, which is a matter of public record, is incorporated by reference in this Official Statement, however, Deloitte & Touche LLP has not performed any procedures on such basic financial statements since the date of such report (September 16, 2013), and has not performed any procedures on any other financial information of the Commonwealth, including without limitation any of the information contained in this Official Statement, and has not been asked to consent to the inclusion of its report, or otherwise be associated with this Official Statement.

KPMG LLP, the independent auditor for the year ended June 30, 2013, has not been engaged to perform and has not performed, any procedures on the financial statements included in this Official Statement. KPMG LLP also has not performed any procedures relating to this Official Statement.

Any statement contained in a Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any Report filed after the date of such Report and prior to the date of this Official Statement modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds.   Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file (1) within 305 days after the end of each fiscal year updates of its financial, operational and macroeconomic information through the end of the immediately preceding fiscal year and (2) information concerning the occurrence of certain events specified in the Rule ("event filings").   Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report, files the Commonwealth's Annual Financial Report and files information as to the occurrence of certain events through its event filings.   Although the Commonwealth has filed all such reports and event filings, these filings were made after the 305-day deadline in 2009, 2010 and 2013 (and also in certain years before that period) in the case of its annual report filings and after the ten business day deadline in the case of certain event filings, and therefore did not comply with the undertakings. For more information regarding the Commonwealth's non-compliance with its continuing disclosure obligations, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE herein.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth's Annual Financial Report incorporated herein by reference.   Requests should be directed to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at http://www.gdbpr.com.   No information on the Government Development Bank's website is deemed to be part of, or incorporated by reference in, this Official Statement.

## THE COMMONWEALTH OF PUERTO RICO

Puerto Rico's constitutional status is that of a commonwealth of the United States. The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote (except in House committees and sub-committees of which the Resident Commissioner is a member). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income sourced in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010 and 3,615,086 in 2013 (estimate), compared to 3,808,610 in 2000.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2012 (which ended on June 30, 2012), the Commonwealth's gross national product (in current dollars) was $69.462 billion (preliminary), and personal income per capita (in current dollars) was $16,934 (preliminary).

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury of the Commonwealth (the "Treasury Department"), the Office of Management and Budget of the Commonwealth ("OMB") and GDB. The Treasury Department is responsible for collecting most of the Commonwealth's revenues, overseeing the preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. GDB is the fiscal agent and financial advisor to the Commonwealth and its agencies, instrumentalities and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Reports. The Reports should be read in their entirety and in conjunction with the information included under the headings RISK FACTORS and RECENT DEVELOPMENTS herein.

# RISK FACTORS

*A purchase of the Bonds involves significant risks. Prospective purchasers should carefully consider the risk factors set forth below regarding a purchase of the Bonds, as well as all other information contained or incorporated by reference into this Official Statement (including the Reports). The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Bonds and does not necessarily reflect the relative importance of various factors. Additional risks and uncertainties not currently known by the Commonwealth, or that the Commonwealth does not currently consider to be material, or that are generally applicable to all states and governmental instrumentalities, also may materially and adversely affect the financial condition of the Commonwealth and its ability to repay the Bonds. Moreover, while some of the risks described below may also affect the Commonwealth's instrumentalities, this Official Statement does not attempt to identify all the risks associated with each instrumentality. Prospective investors are advised to consider the following risk factors, among others, and to review the other information contained or incorporated by reference into this Official Statement in evaluating an investment in the Bonds. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the Bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

## Risks Related to the Commonwealth's Financial and Fiscal Condition

### *The Commonwealth may be unable to honor its obligation to pay debt service on the Bonds.*

The Commonwealth and its instrumentalities face a number of fiscal and economic challenges that, either individually or in the aggregate, could adversely affect the Commonwealth's ability to pay debt service on the Bonds when due. While the Bonds enjoy certain protections afforded by the Constitution of Puerto Rico, under certain circumstances some of the risk factors identified in this Official Statement, either individually or in combination with other risks described herein or other factors not described herein, may result in the Commonwealth being unable to honor its obligation to pay the principal of and interest on the Bonds in full or in a timely manner.

For more information regarding the fiscal and economic condition of the Commonwealth and its instrumentalities, see the Updated Commonwealth Report.

### *Actions by the rating agencies, such as the recent downgrades of the Commonwealth's credit ratings to non-investment grade, could raise the Commonwealth's cost of borrowing, which could affect the Commonwealth's ability to borrow in the future and may have other adverse effects on the Commonwealth's financial condition.*

During the first two weeks of February 2014, the credit ratings of the Commonwealth's general obligation bonds were lowered to "Ba2" by Moody's Investors Service ("Moody's"), "BB+" by Standard & Poor's Rating Services ("S&P"), and "BB" by Fitch Ratings ("Fitch"), each of which is non-investment grade. S&P kept the Commonwealth's ratings on "CreditWatch" with negative implications, while each of Moody's and Fitch assigned a negative outlook on the Commonwealth's ratings.

The market for non-investment grade securities is smaller and less liquid than the market for investment grade securities. As a result, it is possible that there may not be sufficient demand for the Commonwealth to issue any future bonds or notes in the amounts required by the Commonwealth or that the cost to the Commonwealth of borrowing could be substantially higher than if it were able to issue more highly-rated securities.

In addition, changes in the Commonwealth's credit ratings could affect its relationships with creditors and other business counterparties.  For example, certain of the Commonwealth's short-term financings, variable rate debt obligations and mandatory tender bonds include provisions that permit the acceleration of such debt instruments based on the downgrade of the Commonwealth's ratings below investment grade.  Moreover, the Commonwealth's interest rate exchange agreements include provisions that permit the counterparties to either request additional collateral or terminate the agreements based on the downgrade of the Commonwealth's ratings below investment grade.  The Commonwealth recently optionally terminated certain of its interest rate exchange agreements and in connection therewith made aggregate termination payments of approximately $23.8 million to a counterparty.  To date, however, the Commonwealth has not been required to post collateral in connection with any of its interest rate exchange agreements, and the Commonwealth's counterparties have not accelerated any debt obligations or terminated any interest rate exchange agreements as a result of such downgrades.  If the counterparties entitled to accelerate debt obligations or terminate the remaining interest rate exchange agreements exercise their respective rights, there is no assurance that the Commonwealth would be able to honor all such obligations as they come due.  As set forth under "Variable Rate Demand Obligations and Interest Rate Exchange Agreements" under RECENT DEVELOPMENTS and under USE OF PROCEEDS, a portion of the proceeds of the Bonds will be used to repay all but $126.7 million in aggregate principal amount of these outstanding debt obligations (the remainder of which are not subject to acceleration) and make termination payments pursuant to all but one of these outstanding interest rate exchange agreements.

For a more detailed discussion of the effect of the downgrades on the Commonwealth, see the information included in the Quarterly Report under the headings "Recent Credit Rating Downgrades of Bonds of the Commonwealth and its Instrumentalities" and "Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivative Contracts."

***The Commonwealth's liquidity has been adversely affected by recent events, and it may be unable to meet its short-term obligations.***

The liquidity of the Commonwealth has been adversely affected by the ratings downgrades described above, by the significant increase in credit spreads for obligations of the Commonwealth and its instrumentalities, by the limited market access experienced by the Commonwealth and its instrumentalities during the second half of 2013, and by a significant reduction of liquidity in the local Puerto Rico capital markets.  As a result, the Commonwealth has relied more heavily on short-term financings and interim loans from GDB and other private lenders, which reliance has constrained its liquidity and increased its near-term refinancing risk.  These factors have also resulted in delays in the repayment by the Commonwealth and its instrumentalities of outstanding GDB lines of credit, which delays may limit GDB's ability to continue providing liquidity to the Commonwealth.

Under current market conditions, in part as a result of the recent ratings downgrades discussed above, the Commonwealth may have limited capital market access.  If the Commonwealth does not have sufficient access to the capital markets or alternative sources of financing to satisfy its liquidity needs, it may not be able to honor all of its obligations as they come due.

See the information included in the Quarterly Report under the headings "Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivative Contracts" and "Liquidity of Government Development Bank."

*If the Commonwealth is unable to obtain sufficient funds from this and other future debt offerings, it may not have sufficient liquidity to meet its obligations as they come due.*

The Commonwealth intends to access the capital markets with one or more offerings of bonds or notes, including this offering, to refinance existing debt, repay other obligations and improve its short-term liquidity position.  In order to achieve these objectives, the Commonwealth needs to receive a substantial amount of proceeds from these offerings.  The Commonwealth also intends to balance its General Fund budget for fiscal year 2015.  However, there is no assurance that a balanced budget will, in fact, be adopted or, if adopted, that it will be successfully implemented.  There is also no assurance that revenue or expense measures implemented to balance the General Fund budget will be recurring in nature or that they will be sustainable.

*GDB, the principal source of short-term liquidity for the Commonwealth, has been adversely affected by recent events and it may be unable to provide necessary financing to the Commonwealth.*

GDB serves as the principal source of short-term liquidity for the Commonwealth and its instrumentalities.  Similar to the Commonwealth, GDB's credit rating was recently lowered to non-investment grade.  During February of 2014, Moody's lowered its credit rating to "Ba2" and maintained its negative outlook while S&P lowered its credit rating to "BB" and maintained its "CreditWatch" with negative implications.

GDB's liquidity has been adversely affected by, among other things, some of the same factors that have affected the Commonwealth's liquidity that are described above under "*The Commonwealth's liquidity has been adversely affected by recent events and it may be unable to meet its short-term obligations.*" The liquidity of GDB could also be affected by obligations that may become due in the near future and during the next fiscal year, in part as a result of the Commonwealth's and GDB's credit rating downgrades. Although GDB has previously assisted the Commonwealth in satisfying its obligations, GDB is not legally required to provide such assistance and there is no assurance that it will be able to continue to provide such assistance in the future.  To the extent that GDB financing is unavailable, the Commonwealth may be required to find other sources of funding in order to meet its obligations.  There is no assurance that the Commonwealth will be able to access other sources of financing or funding sufficient at any one time to meet its obligations as they come due.  For a more detailed discussion of GDB's liquidity, see the information contained in the Quarterly Report under the heading "Liquidity of Government Development Bank."

GDB's fiscal and financial condition depends to a large extent on the repayment of loans made to the Commonwealth and its instrumentalities.  GDB may be adversely affected by the inability of the Commonwealth and certain of its instrumentalities that have loans from GDB to fully repay those loans when due.  If certain of the Commonwealth's instrumentalities are unable to overcome the risks described below under "*Significant financial and fiscal challenges facing the Commonwealth's instrumentalities may adversely affect the Commonwealth's financial and fiscal condition,*" GDB's financial and fiscal condition may be adversely affected, its balance sheet impaired and its solvency could be threatened.

On March 5, 2014, GDB made publicly available a projection of its liquidity through June 30, 2015.  This projection is subject to the assumptions and disclaimers detailed and discussed therein.  The Underwriters did not participate in the preparation of the projection, and it is not incorporated by reference into this Official Statement.  A copy of GDB's liquidity projection may be obtained through EMMA at http://emma.msrb.org as a voluntary filing related to debt securities issued by GDB or by visiting GDB's website at http://www.gdbpr.com.  No information on GDB's website is deemed to be part of, or is incorporated by reference in, this Official Statement.

*Significant financial and fiscal challenges facing the Commonwealth's instrumentalities may adversely affect the Commonwealth's financial and fiscal condition.*

The Commonwealth's instrumentalities also face significant financial and fiscal challenges. The Commonwealth recently announced that its instrumentalities would be required to achieve self-sufficiency in the near future. To the extent certain instrumentalities do not attain self-sufficiency, such instrumentalities may need to seek relief under existing Commonwealth law (including laws relating to the appointment of a receiver for certain instrumentalities as permitted under their enabling legislation) or under laws which could be enacted in the future regarding insolvency, reorganization, moratorium and similar laws affecting creditors' rights. Moreover, certain of these instrumentalities offer basic and essential services to the population of Puerto Rico. To the extent that any of these instrumentalities is unable to continue to provide such essential services, the Commonwealth may be required to divert available Commonwealth resources to ensure that such services continue to be provided. To the extent Commonwealth resources are diverted to such essential services, there is no assurance that the Commonwealth will have sufficient revenues to pay debt service on general obligation debt, including the Bonds, when due.

*The Commonwealth's very high level of debt may affect the performance of the economy and government revenues.*

The Commonwealth's very high level of debt and the resulting required allocation of revenues to service this debt have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has been required to finance, further increasing the amount of its debt. More recently, the Commonwealth's high level of debt, among other factors, has adversely affected its credit ratings and its ability to obtain financing at favorable interest rates. The Commonwealth expects that its ability to finance future budget deficits will be severely limited, and, therefore, that it will be required to reduce the amount of resources that fund other important governmental programs and services in order to balance its budget. While the Commonwealth may seek to reduce or entirely eliminate the practice of financing deficits or debt service, there is no assurance that budgetary balance will be achieved and, if achieved, that such budgetary balance will be based on recurring revenues or expense reductions or that the revenue or expense measures undertaken to balance the budget will be sustainable on an indefinite basis. Moreover, the effort to achieve budgetary balance may adversely affect the performance of the Commonwealth's economy which, in turn, may adversely affect governmental revenues.

See the information included in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – High Level of Debt." See also the information included in the Commonwealth Report under DEBT.

*If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights.*

The Commonwealth has been facing a number of fiscal and economic challenges in recent years due, among other factors, to continued budget deficits, a prolonged economic recession, high unemployment, population decline and high levels of debt and pension obligations. In recent months, the widening of credit spreads for the Commonwealth's public sector debt and the recent downgrades of the Commonwealth's credit ratings and those of many of its instrumentalities to non-investment grade by Moody's, S&P and Fitch has put further strain on the Commonwealth's liquidity and may affect access to both the capital markets and private sources of financing, as well as the borrowing cost of any such funding.

8

If the Commonwealth's financial condition does not improve, it may lack sufficient resources to fund all necessary governmental programs and services as well as meet debt service obligations. In such event, it may be forced to take emergency measures. Although no specific contingency plans have been adopted to address any such situation, GDB, as fiscal agent to the Commonwealth, together with its financial and legal advisors, is evaluating alternative courses of action. These could include administrative measures that give effect to the "priority norms" established by law for the disbursement of public funds when available Commonwealth resources are insufficient to cover all appropriations (see the information contained in the Commonwealth Report under the heading "Financial Control and Adjustment Procedures" under BUDGET OF THE COMMONWEALTH OF PUERTO RICO, which sets forth the constitutional and statutory order of disbursement of public funds in such a situation of insufficiency of resources).

The Commonwealth is not currently eligible to seek relief under Chapter 9 of the United States Bankruptcy Code. In the future, however, new legislation could be enacted by the United States Congress or by the Legislative Assembly that would entitle the Commonwealth to seek the protection of a statute providing for restructuring, moratorium and similar laws affecting creditors' rights. This could affect the rights and remedies of the holders of general obligation bonds and notes of the Commonwealth, including the Bonds, and the enforceability of the Commonwealth's obligation to make payments on such general obligation bonds and notes.

For more information regarding the Commonwealth's financial and economic challenges, see the information included in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth." See also the information included in the Commonwealth Report under the headings THE ECONOMY, DEBT, RETIREMENT SYSTEMS, PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES, and BUDGET OF THE COMMONWEALTH OF PUERTO RICO.

*The Commonwealth may be unable to reduce its fiscal year 2014 deficit and balance its General Fund budget for fiscal year 2015.*

The Commonwealth's ability to reduce its fiscal year 2014 General Fund deficit and to achieve a balanced budget by fiscal year 2015 depends on a number of factors, some of which are not wholly within its control, including the performance of the Commonwealth's economy, that actual collections of taxes meet the Treasury Department's projections, and the government's ability to reduce and control governmental expenditures, particularly in areas such as education and healthcare where expenses have in the past exceeded the budget.

For fiscal year 2015, the Commonwealth will face additional cost pressures, including higher compensation expenses under existing collective bargaining agreements, incremental pension plan contributions, higher debt service costs, and formula-based budget allocations. In the absence of corrective measures, OMB estimates that these "cost escalators" would add $850 million or more to the budget, excluding interest on the Bonds, a portion of which the Commonwealth expects to be capitalized for fiscal year 2015. See USE OF PROCEEDS. These estimates are preliminary, since the budget formulation process is ongoing. Therefore, in order to achieve a balanced budget for fiscal year 2015, unless revenues increase above fiscal year 2014 revenues, the Commonwealth would need to (i) offset these cost escalators and (ii) reduce appropriations by an additional amount equal to the amount of the fiscal year 2014 deficit (originally $820 million and subsequently reduced to $650 million). Assuming revenues for fiscal year 2015 do not increase relative to fiscal year 2014 revenues, this would require expense reductions of $1.50 billion or more in fiscal year 2015. Some of these measures could face opposition from affected constituencies, will be politically difficult to propose, adopt and implement, and

will adversely affect the Commonwealth's economy, putting further strain on the Commonwealth's tax revenues and economic development.

The Commonwealth has frequently failed to meet its revenue and expense projections, and its accounting, payroll and fiscal oversight information systems and processes have deficiencies that significantly affect its ability to forecast expenditures. Thus, there can be no assurance that the Commonwealth will be able to collect the projected revenues or achieve the required spending cuts for fiscal year 2015 and achieve a balanced General Fund budget. See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – High Budget Deficits." See also the information contained in the Commonwealth Report under the heading "Overview of Economic and Fiscal Condition" under INTRODUCTION.

*After the issuance of the Bonds, the Commonwealth may not have sufficient capacity under constitutional debt limitations to continue financing its operations with general obligation debt.*

If the Commonwealth issues the Bonds in an aggregate principal amount approximately equal to the amount authorized by the Act, the Commonwealth expects that its capacity to incur additional general obligation debt will be significantly reduced as a result of the limits imposed by the Constitution of Puerto Rico on the issuance of general obligation debt. As a result, the Commonwealth may be unable to issue general obligation debt in the future to finance capital improvement projects, provide working capital, and meet short-term obligations. Although the Commonwealth could seek to issue debt for which the good faith, credit and taxing power of the Commonwealth is not pledged, there may not be sufficient demand for such debt. Such debt is typically rated lower than the Commonwealth's general obligation debt and the Commonwealth's ability to issue such debt in the capital markets or to private lenders is uncertain. The inability to issue general obligation debt may affect the Commonwealth's ability to make required investment in infrastructure and, thus, adversely affect economic activity in the Commonwealth. For more information regarding the requirements of the Constitution of Puerto Rico in connection with the issuance of general obligation bonds, see "Constitutional Debt Limitation" under THE BONDS herein.

*The Commonwealth may continue to pledge its good faith, credit and taxing power to guarantee bonds and notes issued by certain of its instrumentalities.*

According to opinions provided by the Secretary of Justice of the Commonwealth, bonds and notes of certain instrumentalities that are guaranteed by the good faith, credit and taxing power of the Commonwealth ("Guaranteed Obligations") are considered public debt and enjoy the same priority of payment protection that is afforded to bonds and notes issued by the Commonwealth for which its good faith, credit and taxing power has been pledged ("Direct Obligations"). As of December 31, 2013, there were outstanding $5.6 billion of Guaranteed Obligations and $10.2 billion of Direct Obligations. After the issuance of the Bonds and the refunding of the Refunded Bonds, the amount of Direct Obligations outstanding will increase to $13.3 billion. The Commonwealth may continue to pledge its good faith, credit and taxing power to guarantee additional bonds and notes issued by certain of its instrumentalities.

The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if (a) the sum of (i) the total amount payable in any fiscal year on account of principal of and interest on all the Direct Obligations already issued and (ii) the amount paid by the Commonwealth in the next preceding fiscal year on account of Guaranteed Obligations exceeds (b) 15% of the average of the total annual internal resources of the Commonwealth for the two preceding fiscal years. Accordingly, debt service payable on Guaranteed Obligations is not taken into consideration for purposes of the debt limit unless the Commonwealth is required to pay such debt service pursuant to its guarantee and the Commonwealth may continue to guarantee bonds and notes issued by its instrumentalities as long as the 15% limitation is not exceeded.

After the issuance of the Bonds, the Commonwealth has statutory authority to provide additional guarantees until the 15% limitation is reached. As of March 1, 2014, the Commonwealth was authorized to guarantee approximately $4.6 billion of PBA obligations, of which approximately $4.2 billion aggregate principal amount is currently outstanding, and $2 billion of obligations of GDB and certain instrumentalities, of which approximately $377 million is currently outstanding.

*The Constitution of Puerto Rico may be amended to increase the debt limit and allow the Commonwealth to incur additional general obligation debt.*

Although the Constitution of Puerto Rico provides holders of general obligation debt certain protections, the Constitution of Puerto Rico may be amended to modify the provisions regarding public debt, such as raising the debt limit. Although amending the Constitution of Puerto Rico may be difficult (it requires the approval of at least two-thirds of the members of the House of Representatives and the Senate, and the approval of a majority of voters in a referendum of qualified voters), an amendment of this nature could be proposed and, if proposed, could be approved. As a result of an amendment of this nature, the Commonwealth could be authorized to incur general obligation debt, or guarantee bonds and notes of instrumentalities, in excess of the current debt limit. No assurance can be given, as a result, that the Constitutional debt limit will remain at its current level.

*The Commonwealth may not be able to make the necessary General Fund budget adjustments to pay interest on the Bonds.*

A portion of the proceeds from the issuance of the Bonds will be used to pay interest on the Bonds. As a result, the Commonwealth General Fund budget will include minimal appropriations for the payment of interest on the Bonds during fiscal years 2014 and 2015. Beginning in fiscal year 2016, the Commonwealth will be required to begin paying interest on the Bonds from its General Fund, which amount will be significant. There is no assurance that the Commonwealth will be able to make the necessary adjustments in its General Fund budget in order to be able to pay interest on the Bonds when due.

*If the Commonwealth is unable to obtain financing through the issuance of tax and revenue anticipation notes, it may not have sufficient resources to maintain its operations.*

The majority of the Commonwealth's General Fund revenues is received in the second half of the Commonwealth's fiscal year (January 1 through June 30). Expenditures from the General Fund occur more evenly throughout the fiscal year. The Commonwealth customarily addresses this timing difference by making use of internal revenues and by issuing short-term notes in the capital markets or to private financial institutions. Internal revenues consist principally of excise taxes and income taxes, a significant portion of which are received during the second half of the fiscal year, and sales and use taxes, which are received once the amounts due to COFINA have been transferred. External borrowing to cover this intra-year cash flow imbalance is typically done with tax and revenue anticipation notes that are payable later in the fiscal year in which they are issued. Due to the Commonwealth's financial challenges, it is uncertain whether private financial institutions will participate in the Commonwealth's tax and revenue anticipation note program for fiscal year 2015 or any subsequent fiscal year or whether the Commonwealth will be able to issue such notes in the capital markets. To the extent the Commonwealth is unable to sell its tax and revenue anticipation notes to private financial institutions or access the capital markets therefor, GDB may be asked to finance a greater portion of the Commonwealth's cash flow needs. There is no assurance that GDB will be able to finance the Commonwealth's tax and revenue anticipation note program in the amounts required by the Commonwealth. For a discussion of risks associated to GDB's liquidity, see "*GDB, the principal source of short-term liquidity for the*

*Commonwealth, has been adversely affected by recent events and it may be unable to provide necessary financing to the Commonwealth*" above.

To the extent that GDB financing is not available, the Commonwealth may be unable to timely fund its operations during fiscal year 2015 or during any subsequent fiscal year. This may require the Commonwealth to adopt some of the emergency measures described above in "*If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights*" above.

### The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of the Commonwealth's tax revenues.

The special temporary excise tax imposed by Act 154-2010, as amended ("Act 154"), has become one of the Commonwealth's principal sources of tax revenues. For fiscal years 2012 and 2013, the revenues produced by Act 154 represented 21.6% and 19.7%, respectively, of the Commonwealth's General Fund revenues. During fiscal year 2013, the special temporary excise tax was paid by 27 groups of affiliated taxpayers, of which six groups accounted for approximately 75% of collections. To the extent that any of these groups of affiliated taxpayers reduces or moves its operations to a different jurisdiction, the Commonwealth's tax base would be reduced and its revenues would be adversely affected. Also, any action by the U.S. Treasury Department to reduce or eliminate the federal income tax credit available with respect to the special temporary excise tax may adversely affect the Commonwealth's revenues.

In addition, after December 31, 2017, the special temporary excise tax will no longer apply and will be replaced by the "modified source of income rule" under Act 154. There is no assurance that the level of tax collection under the "modified source of income rule" will be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154. To the extent the Commonwealth is unable to replace these tax revenues with revenues under the "modified source of income rule," it may not have sufficient revenues to fully fund its operations. This may require the Commonwealth to adopt some of the emergency measures described above in "*If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights.*"

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Tax Revenues" and the information contained in the Commonwealth Report under the heading "Major Sources of General Fund Revenues – Act 154" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES.

### A reduction of federal grants may significantly affect the Commonwealth's ability to provide many important services and may force the Commonwealth to allocate resources that would otherwise be used to pay debt service to the provision of such essential services.

Each fiscal year, the Commonwealth receives a significant amount of grant funding from the U.S. government. A significant portion of these funds is utilized to cover operating costs of those Commonwealth's educational, social services and healthcare programs that are subsidized by the U.S. government. If the aggregate amount of federal grant funds transferred to the Commonwealth were to be reduced, the Commonwealth would have to make reductions to these federally-supported programs or fund these programs from the General Fund. Reductions in federal funding would have an adverse impact on the Commonwealth's economy and on efforts to reduce its General Fund budget deficit. In addition, since the per capita income of the residents of Puerto Rico is substantially lower than those of the 50 states, a high percentage of the population of the Commonwealth benefits from these government

12

programs. As a result, the impact on the Puerto Rico economy of any reduction in federal grant funds for such governmental programs would be greater than on the 50 states. Moreover, to the extent the Commonwealth is required to divert resources to continue providing essential services primarily funded through federal funds, the Commonwealth may be unable to honor its other obligations as they come due.

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Federal Grants" and the information contained in the Commonwealth Report under the heading "Components of General Fund Expenditures – Federal Grants" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES.

*The Commonwealth's education costs represent a very high percentage of its budgetary expenditures, and the Commonwealth has had difficulty controlling such costs.*

The budget appropriation for the Commonwealth's Department of Education represents 25% of the total General Fund budget for fiscal year 2014. Historically, the Department of Education has experienced inadequate cost control mechanisms and produced annual operating expense overruns. Due to the considerable size of the Department of Education budget, the Commonwealth's ability to achieve a balanced General Fund budget depends on its ability to continue to monitor and control Department of Education expenditures. The Commonwealth's accounting, payroll and fiscal oversight information systems have deficiencies that have significantly affected its ability to control Department of Education expenditures. There is no assurance that the Department of Education budget estimates for fiscal year 2014 will be achieved or that the Commonwealth will be able to implement sufficient cost and expenditure controls at the Department of Education in order to prevent future budget overruns.

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Education Costs."

*The Commonwealth's healthcare costs represent a very high percentage of its budgetary expenditures, and the Commonwealth may be unable to continue to fund such healthcare costs.*

One of the largest components of the Commonwealth's budget is healthcare, which is principally provided through the "Mi Salud" program. The "Mi Salud" program is principally funded through non-recurring federal funds provided pursuant to the American Affordable Care Act ("AACA"), as well as recurring Medicaid and Children's Health Insurance Program funds, which in the case of the Commonwealth are capped at a level lower than those applicable to the states. Upon exhaustion of the non-recurring AACA funds, currently estimated to occur sometime in 2019, and absent Congressional action to renew the AACA funding, the amount of federal funds available for "Mi Salud" will revert to the recurring capped Commonwealth Medicaid and Children's Health Insurance Program allocations, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility is reduced significantly. Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures. Although the Commonwealth intends to intensify its efforts to have AACA funding renewed by Congress, it is not possible to predict the likelihood that such efforts will succeed. To the extent these efforts are unsuccessful, it is unlikely that the Commonwealth would be able to assume a significant portion of the projected deficit. If the Commonwealth is unable to reduce these healthcare costs, it may be required to adopt some of the emergency measures described above in "*If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights.*"

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Health Care."

*The Commonwealth's retirement systems have a significant unfunded actuarial accrued liability and a very low funding ratio, and recent reforms do not address these problems.*

A significant component of the Commonwealth's budget is the cost of its retirement systems (the "Retirement Systems"). The three principal pension systems of the Commonwealth (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) have a significant unfunded actuarial accrued liability and a very low funding ratio. Although the Commonwealth enacted legislation in 2013 and 2014 that reforms the Retirement Systems, these reforms were designed to address the Commonwealth's cash flow needs and "pay-as-you-go" requirements. As a result, the Retirement Systems will continue to have a large unfunded actuarial accrued liability and a low funding ratio. Moreover, it is anticipated that, as a result of these reforms and legislation enacted in 2011, the Commonwealth will have to provide significant additional annual funding to meet the systems' annual pension obligations. These funding requirements place an additional demand on the Commonwealth's need to raise revenues, reduce expenditures, or both. There is no assurance that the General Fund will be able to make any additional annual contributions to the Retirement Systems, including the increasing employer contributions required by these reforms. To the extent the Commonwealth is unable to make such contributions, the Retirement Systems' condition may continue to deteriorate.

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Pension Costs" and the information contained in the Commonwealth Report under RETIREMENT SYSTEMS.

*The constitutionality of the Teachers Retirement System reform has been challenged and the reform could be declared unconstitutional by the Puerto Rico Supreme Court.*

The constitutionality of the recently enacted amendments to the Teachers Retirement System is currently being challenged in court. There is no assurance that the constitutionality of the reform to the Teachers Retirement System will be upheld. For more information regarding the challenge to the Teachers Retirement System pension reform, see "Litigation – Pension Reform" in the Quarterly Report.

**Risks Related to the Commonwealth's Economy**

*The Commonwealth's economy has been contracting and, absent future real growth, may be unable to sustain the Commonwealth's outstanding debt.*

The Commonwealth's gross national product has contracted in real terms every year except one year since fiscal year 2007. For fiscal year 2014, gross national product is projected to decline by 0.8%. This persistent contraction has had an adverse effect on employment and tax revenues, and has significantly contributed to General Fund budget deficits in those fiscal years. Factors that can adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, the loss of patent protection of several products manufactured in Puerto Rico and global economic and trade conditions. There is no certainty that the measures being taken by the Commonwealth to grow its economy will produce the level of increase in economic activity required to generate sufficient tax revenues to resolve the structural budget deficits that have affected the Commonwealth and to enable the Commonwealth to continue to meet all of its debt service obligations, including the Bonds, when due. The failure by the Commonwealth to increase revenues, together with other factors discussed herein, may affect the Commonwealth's ability to continue to provide services at their current level and pay debt service on its

general obligations, including the Bonds.  This could force the Commonwealth to adopt some of the emergency measures described above in "*If the Commonwealth's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights.*"

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – The Commonwealth's Economy" and the information contained in the Commonwealth Report under THE ECONOMY.

*If the population of the Commonwealth continues to decline, the Commonwealth's economy will be adversely affected and may not produce sufficient tax revenues to sustain the Commonwealth's outstanding debt.*

Changes in population have had, and may continue to have, an impact on economic growth and on the growth of tax revenues.  According to United States Census Bureau, the population of Puerto Rico decreased by 2.2% from 2000 to 2010, and by an estimated 3.0% from 2010 to 2013, driven primarily by migration to the United States mainland.  Reductions in population, particularly of working age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short and medium term.  In addition, the average age of the population of Puerto Rico is increasing, partly due to a reduction in birth rate, but primarily as a result of the migration of younger persons to the United States mainland.  This phenomenon is likely to increase the demand for health and other services upon the Commonwealth, and the cost to the Commonwealth of providing such services, thus imposing limitations on the Commonwealth's ability to achieve a balanced budget and improve its financial condition.

See the information contained in the Quarterly Report under the heading "Summary of Principal Fiscal and Economic Challenges of the Commonwealth – Demographic Trends."

*The Commonwealth's macroeconomic data may not accurately reflect the performance of the economy of Puerto Rico.*

The Puerto Rico Planning Board ("Planning Board") recently acknowledged the existence of certain significant deficiencies in the deflators of some of the gross national product components.  As a result, the historical rate of change in gross national product at constant prices (real gross national product change) could have been either overstated or understated for several years.  These deficiencies have also led to the delay in the publication of periodic economic data in order to provide the Planning Board with sufficient time to determine the particular deficiencies included in the calculation of the "deflators" and the procedures to fix such deficiencies.  It is still too early to determine how these deficiencies have affected, or will affect, Puerto Rico's macroeconomic data.  Until such time as these revisions are finalized and fully applied to Puerto Rico's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflect the performance of the economy of Puerto Rico.

**Risks Related to the Bonds**

*Bondholders may face delays enforcing their remedies under the Bonds, and the availability of some remedies is not certain.*

The Constitution of Puerto Rico provides that public debt of the Commonwealth, including the Bonds, constitutes a first claim over available Commonwealth resources, and that the Secretary of the Treasury can be judicially required by bondholders to allocate funds to the payment of the public debt, including the Bonds, if available Commonwealth resources are insufficient to cover all budgeted

appropriations.  The Bond Resolution provides that the holders of the Bonds may bring an action against the Secretary of the Treasury, in accordance with the Constitution of Puerto Rico, to compel the Secretary of the Treasury to apply available Commonwealth resources first to the payment of the public debt, including the Bonds, in accordance with the Constitutional priority provisions.  The Bond Resolution also provides that the right to bring an action against the Secretary of the Treasury, as described above, and any other remedies that may be available to holders of Commonwealth general obligation bonds, are the only remedies available to the holders of the Bonds.  Public policy considerations relating to the safety and well-being of the residents of the Commonwealth, as well as procedural matters, could result in delays in, or limitations on, the judicial enforcement of any such remedies, and in limitations on the effectiveness of such remedies.  The remedies available to bondholders are dependent on judicial actions, which are often subject to substantial discretion and delay.

The Bond Resolution also provides, in accordance with the Constitution of Puerto Rico and the Act, that the good faith, credit and taxing power of the Commonwealth are pledged to the payment of the Bonds.  Since the Commonwealth has never failed to make a debt service payment on any general obligation bond when due, the Puerto Rico Supreme Court has never had the opportunity to rule on whether bondholders have the right to compel the Legislative Assembly of the Commonwealth to increase taxes in the event that available Commonwealth resources are insufficient to pay the Bonds, or to rule on how such right, if determined to exist, could be enforced.

Certain other statutory provisions affecting the rights of bondholders have never been tested.  For example, although certain revenues assigned to Puerto Rico Highways and Transportation Authority ("Highways Authority"), Puerto Rico Infrastructure Financing Authority ("PRIFA") and Puerto Rico Convention Center District Authority ("PRCCDA") are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt, their availability for such purpose is subject to there being no other available Commonwealth resources.  It is not certain what steps a general obligation bondholder would be required to take or what proof such bondholder would be required to produce to compel the diversion of such funds from any such instrumentality to the payment of public debt, or how the necessary available Commonwealth resources would be thereafter allocated to each such instrumentality.

### There is no collateral securing the Bonds, and the Bonds cannot be accelerated upon a default.

The Bonds are not secured by a lien on any physical asset of the Commonwealth.  The maturity of the Bonds cannot be accelerated in the event that the Commonwealth fails to pay any installment of interest on or principal of the Bonds when due.

### Holders of the Commonwealth's general obligation debt may not attach the Commonwealth's property.

The Constitution of Puerto Rico provides that public property and funds of the Commonwealth shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law.  The Act provides that the Commonwealth may not waive its sovereign immunity with respect to public property located in the Commonwealth.  Further, the Puerto Rico Supreme Court has determined that Commonwealth property cannot be attached or garnished in an attempt to enforce a judicial order, as it could undermine the Commonwealth's ability to operate and use its property for a public purpose.

*Although the Bond Resolution provides that the laws of the State of New York apply to the Bonds and the Commonwealth consents to any action or proceeding arising out of the Bonds or the Bond Resolution being brought in New York state and federal courts located in Manhattan, any such court may decline to hear the suit if it concludes that other applicable law prevents it from hearing such suit.*

In accordance with the Act, the Secretary of the Treasury has provided in the Bond Resolution, and the Secretary of Justice has approved, that the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or the Bond Resolution, and that any such actions shall be brought only in New York courts or U.S. federal courts sitting, in either case, in the Borough of Manhattan, The City of New York, New York, or Commonwealth courts or U.S. federal courts sitting in San Juan, Puerto Rico. No assurance can be given that any litigation brought by a bondholder will be accepted by or, once accepted, be continued in a New York court or U.S. federal court located in New York if the particular court determines by law that it does not have jurisdiction over the Commonwealth or that the case should be removed to a court in Puerto Rico, as being more suitable on grounds of judicial fairness to the parties involved.

*Although the Bond Resolution provides that the laws of the State of New York apply to the Bonds, it is unclear how a court would apply New York law in the context of the Bonds and to what extent a judgment from a New York court may be enforced in Puerto Rico*

In accordance with the Act, the Secretary of the Treasury has provided in the Bond Resolution, and the Secretary of Justice has approved, that the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or the Bond Resolution. The Commonwealth has not previously issued general obligation bonds that are governed by the laws of any jurisdiction other than the Commonwealth. Accordingly, there can be no assurance given as to how a court would apply New York law to a claim brought for the enforcement of the Commonwealth's obligations under the Bonds.

Even if the bondholders were to obtain a judgment from a New York court or U.S. federal court located in New York, there is no assurance that the issuing court will have the power to enforce the terms of the judgment against the Commonwealth. For example, if a judgment is issued by a New York court against the Secretary of the Treasury directing the Secretary to apply available Commonwealth revenues, as described above under "*Bondholders may face delays enforcing their remedies under the Bonds, and the availability of some remedies is not certain*," and the Secretary of the Treasury does not honor the judgment within any time limits set by the issuing court, the bondholders will likely be required to bring a subsequent lawsuit in Puerto Rico seeking to have the Puerto Rico court to order the Secretary of the Treasury to comply with the terms of the other court's judgment.

Although a judgment from a New York court should be given effect in Puerto Rico pursuant to the full faith and credit clause of the U.S. Constitution, such a judgment must meet certain minimum requirements before a Puerto Rico court will give it effect. There can be no assurance that any judgment from a New York court will satisfy the requirements for a Puerto Rico court to give effect to such judgment.

On the basis of the foregoing and in light of the fact that there is no precedent for the inclusion in general obligation bonds of the submission by the Commonwealth to both the governing law of the State of New York and the jurisdiction of its courts sitting in Manhattan (or the federal courts sitting in Manhattan) in connection with such bonds, as well as the fact that a court has considerable discretion in the exercise of its powers, there is no assurance that the inclusion of the choice of law and jurisdiction provisions contained in the Bond Resolution and in the Bonds will provide any benefit to, or alternatively, will not work to the detriment of, the holders of the Bonds.

*A purchase of the Bonds is suitable only for purchasers that can bear the risks associated with the potential limited liquidity and price declines of the Bonds.*

There is no assurance that the secondary market for the Commonwealth's bonds will provide the holders of the Bonds with sufficient liquidity for their investment or that such secondary market will continue through the final maturity of the Bonds.  The Underwriters are not obligated to maintain a market for the Bonds, and any such market making may be discontinued at any time at the sole discretion of the Underwriters.

Debt obligations of the Commonwealth and its instrumentalities have experienced significant price declines.  The market price of the Bonds will be determined by factors such as relative supply of, and demand for, the Bonds, general market and economic conditions in Puerto Rico, the United States and globally, and other factors beyond the Commonwealth's or the Underwriters' control.  The risk of illiquidity may be exacerbated as a result of additional downgrades to the Commonwealth's credit ratings or as a result of market or other factors.

A purchase of the Bonds is suitable only for purchasers that can bear the risks associated with the potential limited liquidity and price declines of the Bonds.

*The Commonwealth has not complied with its continuing disclosure obligations on a timely basis, and failure to comply may limit the Commonwealth's access to the capital markets.*

In the past, the Commonwealth has failed to comply with its continuing disclosure obligations on a timely basis.  For example, the Commonwealth has failed to file the Commonwealth's Annual Financial Report before the 305-day deadline in three of the past five years.  Although the Commonwealth has implemented certain procedures to ensure timely compliance with its continuing disclosure obligations, there is no assurance that these procedures will be effective in ensuring timely compliance.  Moreover, the Commonwealth's failure to comply with its continuing disclosure obligations on a timely basis could limit its access to the capital markets, because underwriters for Commonwealth bonds must be able to reasonably determine that the Commonwealth will comply with its continuing disclosure obligations before underwriting any future offerings of Commonwealth debt.

See "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE herein.

*The Commonwealth's former auditors have not been engaged to perform any procedures on the Commonwealth's Annual Financial Report, which is incorporated by reference into this Official Statement.*

The Commonwealth's former independent auditors were not asked to, and did not, review this Official Statement.  In addition, the Commonwealth did not request the consent of its former independent auditors to incorporate by reference its report, dated September 16, 2013, into this Official Statement. Accordingly, the Commonwealth's former independent auditors did not perform any "subsequent event" procedures relating to such basic financial statements, which procedures are designed to identify events occurring between the date of their report and the date of this Official Statement that require adjustment to, or disclosure in, such basic financial statements.  Prospective purchasers of the Bonds will not enjoy the benefit of the performance of these procedures, if any.

## RECENT DEVELOPMENTS

This section supplements certain information with respect to the Commonwealth appearing in the Updated Commonwealth Report and should be read in conjunction therewith.

### Commonwealth Economic Data

*Economic Activity Index.* The Government Development Bank – Economic Activity Index ("EAI") is a coincident indicator of ongoing economic activity that is published on a monthly basis by GDB and generated using only four variables: total payroll employment, cement sales, gasoline consumption, and electric power generation. The publication of the EAI for January and February 2014, however, has been delayed due to the annual revision of regional employment data performed by the United States Bureau of Labor Statistics. As a result, the employment data for January and February 2014 will not be available until approximately the end of March 2014. Due to the importance of employment data in the EAI, GDB does not have the necessary information to generate the EAI for January and February 2014. GDB expects to publish the EAI for both January and February 2014 promptly after the revised employment data is made available by the Bureau of Labor Statistics.

### Preliminary General Fund Revenues for the First Eight Months of Fiscal Year 2014

Preliminary General Fund revenues for the first eight months of fiscal year 2014 (July 2013 through February 2014) were $5.295 billion, an increase of approximately $491 million, or 10.2%, from the same period of the prior fiscal year. These revenues are approximately $96 million, or 1.8%, more than the revised projected revenues for this period. The increase in revenues during this period is primarily due to legislative measures adopted since January 2013. For a description of the Treasury Department's revision of its budgeted revenues, see the Quarterly Report under the heading "Preliminary General Fund Revenues for the First Seven Months of Fiscal Year 2014" under Fiscal Condition.

Preliminary corporate income tax collections for the first eight months of fiscal year 2014 were $1.051 billion, an increase of approximately $484 million, or 85.5%, from the same period of the prior fiscal year. These revenues are approximately $23 million, or 2.2%, more than the revised projected revenues for this period. Preliminary individual income tax collections for the first eight months of fiscal year 2014 were $1.184 billion, a decrease of approximately $47.6 million, or 3.9%, from the same period of the prior fiscal year. These revenues, however, are approximately $16.6 million, or 1.4%, more than the revised projected revenues for this period. Preliminary collections from withholdings from non-residents were $594.5 million, a decrease of $29.8 million, or 4.8%, from the same period of the prior fiscal year. These revenues, however, are approximately $34 million, or 6.1%, more than the revised projected revenues for this period. If approximately $110 million in advance payments received during February 2013 were excluded, collections from withholdings from non-residents during the first eight months of fiscal year 2014 would have been approximately $80 million more than during the same period of the prior fiscal year.

Preliminary sales and use tax collection received by the General Fund for the first eight months of fiscal year 2014 were approximately $594.5 million, an increase of approximately $5.7 million, or 3.3%, from the same period of the prior fiscal year. These revenues are approximately $3.5 million, or 1.9%, less than the revised projected revenues for this period.

Preliminary collections for the special temporary excise tax under Act 154 for the first eight months of fiscal year 2014 were approximately $1.215 billion, an increase of approximately $39 million, or 3.3%, from the same period of the prior fiscal year. These revenues are approximately $6.3 million, or 0.56%, more than the revised projected revenues for this period.

For a description of certain factors affecting tax collections, see the information contained in the Quarterly Report under the heading "Preliminary General Fund Revenues for the First Seven Months of Fiscal Year 2014" under Fiscal Condition.

**Variable Rate Debt Obligations and Interest Rate Exchange Agreements**

Over the past several years, the Commonwealth has been reducing its exposure to variable rate debt and interest rate exchange agreements, due to the risks of expiring liquidity and credit facilities associated with the majority of this debt and the potential early acceleration or termination rights that could be exercised by lenders, credit facility providers or swap counterparties as a result of downgrades of the Commonwealth's credit rating with respect to its general obligation debt. The Commonwealth has been refunding this variable rate debt, and terminating the associated interest rate exchange agreements, with the proceeds of long-term fixed rate debt. The issuance of the Bonds enables the Commonwealth to continue this strategy as described below.

On February 25, 2014, the Commonwealth optionally terminated seven interest rate exchange agreements with an aggregate notional amount of approximately $581.2 million, of which $424.6 million in aggregate notional amount was a basis swap. Two of the terminated interest rate exchange agreements, in the total notional amount of $29.8 million, related to variable rate general obligation bonds of the Commonwealth (the "Variable Rate GOs") that will be refunded through the issuance of the Bonds, and the others, in the aggregate notional amount of $126.7 million, related to Variable Rate GOs that are not subject to redemption prior to maturity and will not be refunded through the issuance of the Bonds. The Commonwealth currently does not have any agreement in effect to mitigate against increases in the rates of interest on such non-callable Variable Rate GOs.

As of February 28, 2014, the Commonwealth was a party to interest rate exchange agreements with an aggregate notional amount of approximately $1.280 billion, consisting of $431 million in notional amount of synthetic fixed rate interest rate exchange agreements hedging specific series of Variable Rate GOs, and approximately $849.2 million in notional amount of basis swaps that do not hedge Variable Rate GOs. Goldman Sachs Bank USA, an affiliate of Goldman Sachs & Co., an underwriter of the Bonds, is the counterparty to the Commonwealth in the remaining basis swap and the parties, which have separate undeclared additional termination events against each other, executed a standstill agreement with respect to the basis swap that expires on March 14, 2014. At February 28, 2014, these interest rate exchange agreements had an aggregate negative mark-to-market valuation of $101.3 million.

As described in more detail under USE OF PROCEEDS, a portion of the proceeds of the Bonds will be used to repay all but $126.7 million of the Variable Rate GOs and, either directly or indirectly, make termination payments in the aggregate amount of approximately $90.16 million pursuant to the termination of all but one of the interest rate exchange agreements. As a result, after the issuance of the Bonds, the refunding of the Refunded Bonds and the termination of all but one of the interest rate exchange agreements, the basis swap with Goldman Sachs Bank USA will be the Commonwealth's only remaining interest rate exchange agreement and approximately $126.7 million in aggregate principal amount of non-callable Variable Rate GOs will be the only variable rate bonds outstanding. Some of the underwriters of the Bonds hold, or were original purchasers of, certain of these obligations to be refunded and are counterparties to the Commonwealth under certain of these agreements to be terminated.

For additional information regarding the Commonwealth interest rate exchange agreements and derivatives agreements, see the information contained in the Quarterly Report under the heading "Interest Rate Exchange Agreements" under DEBT and the information contained in the Commonwealth Report under the heading "Interest Rate Exchange Agreements" under DEBT.

**GDB Funding and Liquidity**

*Overview of Funding and Liquidity.* GDB's funding and liquidity objectives are to maintain liquidity to fund its existing asset base and to maintain an appropriate amount of cash and high quality liquid assets to meet its obligations and fund new loans in accordance with its mission. GDB's cash and liquid assets are referred to herein as its "liquidity resources."

GDB's primary sources of funding consist of (i) public fund deposits, which are GDB's lowest cost source of funding, (ii) senior notes issued by GDB in the bond market with maturities ranging from 2014 through 2027, and (iii) repurchase agreements. The following table sets forth a breakdown of GDB's (excluding its subsidiaries) total funding by source as of January 31, 2014.

| Funding Source | Amount | % |
|---|---|---|
| Public Deposits | $ 4,541,675,000 | 42.7 |
| Private Deposits | 42,105,000 | 0.4 |
| Bonds and Notes | 5,037,120,000 | 47.4 |
| Repurchase Agreements | 1,009,810,000 | 9.5 |
| Total | $10,630,710,000 | |

As of January 31, 2014, GDB's average cost of funding was 2.57% and the average life of its liabilities was 2.47 years. Of the $5.0 billion of outstanding bonds and notes, approximately $320 million and $481 million mature during fiscal years 2014 and 2015, respectively.

GDB's Enabling Act requires it to maintain a reserve of 20% of its liabilities on account of demand deposits. Such amount can be invested in investment instruments with maturities of up to 90 days.

*Liquidity Resources.* As of January 31, 2014, GDB's liquidity resources were $2.2 billion, or 17.0% of GDB's assets (excluding its subsidiaries). GDB's liquidity resources consisted of $261 million of cash and deposits placed with banks, $117 million of federal funds sold and securities purchased under agreements to resell, and $1.85 billion in investment securities. The investment securities portfolio constitutes an important source of liquidity for GDB, which may be realized through either sales of securities or repurchase agreements. The investment securities portfolio consisted of approximately $1.2 billion in U.S. Treasury and U.S. agency securities, $386 million in government-sponsored mortgage backed securities and collateralized mortgage obligations, and $262 million in other securities. Nearly all of the investment securities were classified among the three highest rating categories. As of January 31, 2014, the expected average life of the investment securities portfolio was 2.26 years and approximately $1.2 billion, or 64%, matures in less than one year. Of the $1.85 billion investment securities portfolio, approximately $1.0 billion was pledged to secure or repay borrowings of GDB, consisting of securities sold under agreements to repurchase.

GDB's liquidity resources include, as of January 31, 2014, approximately $205 million of deposits made to a special fund with respect to the Commonwealth's general obligation bonds (the "Redemption Fund"), which funds are held by GDB in trust and invested in GDB time deposits pending their disbursement for the payment of debt service, and approximately $210 million of debt service reserves or sinking fund deposits made by PREPA, which funds are invested in GDB time deposits. Except for debt service reserve fund deposits, the entire amount of these funds is disbursed at or prior to the end of each fiscal year. GDB's liquidity resources as of January 31, 2014 also include $127.8 million of funds classified as "restricted assets," mostly consisting of proceeds from the issuance of tax-exempt GDB notes that have to be used for certain qualifying purposes. During the period from the date of this

Official Statement through June 30, 2015, GDB expects to use approximately $96.8 million of these moneys to fund qualified disbursements under lines of credit extended by GDB to the Commonwealth and certain public corporations, and $25.0 million to pay principal on maturing GDB notes.

Cash and investment securities held by GDB decreased by approximately $500 million as of January 31, 2014 compared to December 31, 2013. Such decrease arose primarily from the sale of investment securities, the proceeds of which were used principally to finance GDB's loan portfolio disbursements (including draws on letters of credit), to make scheduled payments of debt service on GDB bonds and notes, to make disbursements from the Redemption Fund for the Commonwealth's general obligation bonds (the interest on which is due each January 1 and July 1), to make disbursements of PREPA sinking fund deposits and to fund the repurchase of participation agreements with respect to GDB loans during this period.

## Litigation

### Reform of the Judiciary Retirement System

On February 21, 2014, the Puerto Rico Supreme Court upheld the constitutionality of Act No. 162-2013 ("Act 162"), which reformed the Judiciary Retirement System, but only with respect to judges appointed on or after December 24, 2013, the date Act 162 was enacted. As a result, judges appointed before the approval of Act 162 will continue to enjoy their prior retirement benefits. For judges appointed on or after the approval of Act 162, the Puerto Rico Supreme Court interpreted Act 162 as creating two benefits regimes, one for judges appointed between December 24, 2013 and June 30, 2014, as to whom a modified benefits regime applies, and one for judges appointed on or after July 1, 2014, as to whom all provisions of Act 162 apply. The Puerto Rico Supreme Court based its decision on the protection enjoyed by judges as to changes in their compensation under Sections 10 and 11 of Article VI of the Constitution of Puerto Rico. As a result, this decision may not be relevant to the pending challenge to the reform of the Teachers Retirement System.

### Carlos Morales Feliciano v. Honorable Alejandro Garcia Padilla

Several officers of the Commonwealth are defendants in a class action lawsuit filed in 1979 in the United States District Court for the District of Puerto Rico by various inmates who alleged that their constitutional rights were being violated because of overcrowding and lack of adequate healthcare in the island's correctional system. In 1980, the United States District Court issued a preliminary injunction and required the defendants to provide additional capacity for the cells of the correctional facilities and to improve the healthcare services available to inmates. Fines in the amount of approximately $280 million were assessed against the defendants in order to assure compliance with the space and healthcare requirements imposed by the United States District Court. Of the fines imposed, $150 million have been paid by the Commonwealth. The Commonwealth expects to address a portion of the remainder of the assessed but uncollected fines by setting aside $20 million for this purpose and by asking the court to credit against such remaining fines the $80 million estimated cost of a Correctional Medical Center. The court will consider how to proceed with respect to the remaining fines in light of the Commonwealth's actions to comply with its orders.

To date, the court is still addressing matters related to the injunctive relief requested by the defendants. The court, however, has ordered the parties to discuss and evaluate the possibility of a settlement agreement of plaintiffs' damages claims. Notwithstanding the parties' exchange of initial settlement offers, in which the Commonwealth rejected the plaintiffs' settlement offer of $375 million, the court has retained an expert mediator on class action settlement negotiations to help the parties reach

an agreement.   At this time, the Commonwealth believes that any settlement agreement will take the form of an in-kind compensation rather than any payment by the Commonwealth of monetary damages.

## Subsidy Payments Related to the Federal Excise Taxes Imposed on Rum

In December 2010, the Commonwealth entered into an agreement with a rum producer whereby it agreed to transfer to the rum producer, as a subsidy, a portion of the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth pursuant to the United States Internal Revenue Code with respect to the shipments of rum to the United States mainland made by such producer. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES and "Other Public Corporations – Infrastructure Financing Authority" under DEBT in the Commonwealth Report. As of March 1, 2014, the Commonwealth was in arrears with respect to the payment of this subsidy as a result of the withholding of a portion of the above federal excise taxes by the United States Treasury Department in connection with a claim made by the United States Army Corps of Engineers related to the Commonwealth's unpaid share of construction costs of the Cerrillos Dam and Reservoir and the Portuguese–River and Bucana–River Projects, which withholding resulted in the Commonwealth not receiving the portion of the federal excise taxes from which the subsidy was payable. See "Recent Developments – Offset of Federal Funds" under INTRODUCTION in the Commonwealth Report for an explanation of this situation.   The exact amount owed is currently subject to ongoing discussion.  The Commonwealth believes the amount owed in relation to the federal funds offset is approximately up to $67 million. The parties have agreed to meet in order to resolve this and other matters relating to the interpretation and implementation of the subsidy agreement (matters which, due to certain capital expense reimbursements, may increase the overall amount owed by the Commonwealth to the rum producer by approximately $35 million), but a meeting date has not yet been set. As a result, the Commonwealth may be required to make a partial payment before the end of this fiscal year and pay the remaining amount during subsequent fiscal years, as the federal excise taxes expected to be received during the remainder of fiscal year 2014 are not expected to cover the amount owed.  These subsidy payments are not taken into account in the Commonwealth's current estimate of federal excise taxes expected to be received by the General Fund during the remainder of fiscal year 2014. At this time, the impact on the fiscal year 2014 budget of any subsidy payments to be made is uncertain, but should not exceed $67 million.

## USE OF PROCEEDS

### General

The Bonds are being issued for the purpose of: (i) repaying certain of the GDB lines of credit extended to the Commonwealth and PBA; (ii) repaying certain bond anticipation notes issued by COFINA (the "COFINA BANs"); (iii) refinancing certain of the Commonwealth's outstanding general obligation bonds (the "Refunded Bonds") as set forth below; (iv) paying, either directly or through reimbursement to the Commonwealth, termination amounts under certain interest rate exchange agreements; (v) providing for a portion of the payment of interest on the Bonds through July 1, 2016; and (vi) paying expenses related to the issuance and sale of the Bonds.

### Refunded Bonds

| Series of Refunded Bonds | Principal Amount or Amortization Requirement Refunded | Maturity Date (July 1) | Redemption Date |
|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2003 C-5-1 | $  44,905,000 | 2021 | March 17, 2014 |
| Public Improvement Refunding Bonds, Series 2003 C-5-2 | 188,710,000 | 2020 | April 10, 2014 |
| Public Improvement Refunding Bond, Series 2003 C-6-1 | 98,695,000 | 2025 | March 17, 2014 |
| Public Improvement Refunding Bond, Series 2003 C-6-2 | 98,690,000 | 2025 | March 17, 2014 |
| Public Improvement Refunding Bonds, Series 2007A-2 | 14,915,000 | 2029 | April 10, 2014 |
| Public Improvement Refunding Bonds, Series 2007A-3 | 14,925,000 | 2029 | March 17, 2014 |

The Secretary of the Treasury will deposit a portion of the net proceeds of the Bonds required to refund in full the Refunded Bonds to be redeemed after the delivery date of the Bonds and to repay in full the COFINA BANs in an escrow fund with an escrow agent to be selected by the Commonwealth. The net proceeds of the Bonds deposited in the escrow fund will be held uninvested and will be used to pay the principal and any premium of and interest on the Refunded Bonds and the COFINA BANs through their respective redemption dates.

### Sources and Uses of Funds

| | |
|---|---|
| Sources: | |
| Principal amount of the Bonds................................................................... | $3,500,000,000 |
| Original Issue Discount............................................................................. | (245,000,000) |
| Total Sources ........................................................................... | $3,255,000,000 |
| | |
| Uses: | |
| Repayment of GDB lines of credit and deposit to Redemption Fund................ | $1,896,072,196 |
| Repayment of COFINA BANs ................................................................... | 342,365,760 |
| Refinancing of the Refunded Bonds* ......................................................... | 466,574,005 |
| Termination amounts for certain interest rate exchange agreements† .............. | 90,417,100 |
| Payment of interest on the Bonds.............................................................. | 422,749,408 |
| Underwriting discount, legal, printing and other financing expenses................ | 36,821,531 |
| Total Uses ............................................................................... | $3,255,000,000 |

_____
*   Includes capitalized fees.
†   Includes fees related to the termination of the interest rate exchange agreements.

### Transactions with Underwriters

Barclays Bank PLC, the parent company of Barclays Capital Inc., which is acting as representative of the Underwriters, has issued a letter of credit to the Commonwealth providing credit and liquidity support for approximately $188.7 million of the Refunded Bonds. Barclays Capital Inc. also was the original purchaser of the COFINA BANs and Barclays Bank PLC and its affiliates and

subsidiaries have credit exposure to such notes, which notes will be repaid with a portion of the proceeds of the Bonds.

The Commonwealth will use Bond proceeds to make termination payments, either directly or indirectly by reimbursing GDB for amounts borrowed under certain lines of credit the proceeds of which were previously utilized to make a termination payment, on interest rate exchange agreements with Morgan Stanley Capital Services LLC, FMS Wertmanagement AöR, The Bank of New York Mellon, and Merrill Lynch Capital Services, Inc. Morgan Stanley Capital Services LLC and Merrill Lynch Capital Services, Inc., are affiliated entities of Morgan Stanley and BofA Merrill Lynch, respectively, underwriters of the Bonds. The aggregate amount of the termination payments is approximately $90.16 million, of which Merrill Lynch Capital Services, Inc. and Morgan Stanley Capital Services LLC will receive approximately $13.1 million and $24 million, respectively. After the termination of all of these interest rate exchange agreements, the Commonwealth will have approximately $126.7 million of Variable Rate GOs outstanding as to which it has not mitigated against increases in the rates of interest (for which any increase in interest rates is tied to the consumer price index). In addition, after the termination of these interest rate exchange agreements, the basis swap with Goldman Sachs Bank USA will be the Commonwealth's only remaining interest rate exchange agreement outstanding.

J.P. Morgan Chase Bank, National Association, an affiliate of an underwriter of the Bonds, has provided a liquidity facility for approximately $14.9 million in aggregate principal amount of the Refunded Bonds. J.P. Morgan Chase Bank, National Association, also holds approximately $59.8 million in aggregate principal amount of the Refunded Bonds that will be repaid with a portion of the proceeds of the Bonds.

Banco Santander Puerto Rico, an affiliate of Santander Securities LLC, an underwriter of the Bonds, and Oriental Bank, an affiliate of Oriental Financial Services, an underwriter of the Bonds, each holds approximately $98.7 million in aggregate principal amount of the Refunded Bonds that will be repaid with a portion of the proceeds of the Bonds.

**Possible Future Transactions**

The Commonwealth expects COFINA to issue bonds in calendar year 2014 in order to take advantage of the additional capacity provided by recent legislation increasing the pledged sales tax and the sales and use tax allocable to the Commonwealth. The Commonwealth also expects the Municipal Finance Corporation, which was recently created by Act No. 19-2014, to issue bonds in calendar year 2014 in order to refinance certain municipal loans held by GDB.

## THE BONDS

The following is a summary of certain provisions of the Bonds. Reference is hereby made to the Bonds and the Bonds Resolution, each in their entirety, for detailed provisions of the Bonds.

### General

The Bonds will be dated, bear interest at such rate, be payable at such times, and mature on the date and in the principal amount set forth on the inside cover page of this Official Statement. The Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds. The Bond Resolution provides that the Bonds shall be issued in the minimum denomination of $100,000 and any integral multiple of $5,000 in excess thereof; provided, however, that upon receipt by the Registrar from the Secretary of the Treasury of written evidence from any of Fitch, Moody's or S&P that the Bonds have been rated "BBB-," "Baa3," or "BBB-," or higher, respectively, then the minimum denomination for the Bonds shall be $5,000 (the "Authorized Denominations").

### Book-Entry Only System

Appendix IV to this Official Statement contains information concerning DTC (as defined therein) and DTC's book-entry only system. The information contained in Appendix IV to this Official Statement has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof. All terms used in this Section "Book-Entry Only System," but not defined in this Official Statement shall have the respective meanings given such terms in Appendix IV.

The Commonwealth cannot and does not give any assurances that DTC or DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest on the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

Neither the Commonwealth nor the Registrar or any agent of the Commonwealth or the Registrar will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal of and interest (including redemption premium) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Book-Entry Only System* in Appendix IV.

### Authorization

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. The Act was adopted by the Legislative Assembly pursuant to this power. Bonds may be issued under the Act in an aggregate principal amount not to exceed $3.5 billion.

In accordance with the Act, the Secretary of the Treasury adopted and the Governor approved the Bond Resolution, with the approval of the Secretary of Justice as to certain matters described below. See "Certain Provisions of the Bonds, the Bond Resolution and Applicable Law" below.

## Redemption

The Bonds are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 20 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2020, either in whole or in part (and if in part, in such order of amortization requirement as directed by the Secretary of the Treasury), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The Bonds are subject to redemption to the extent of the amortization requirements set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2021, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

| Year | Amortization Requirements | Year | Amortization Requirements |
|------|---------------------------|------|---------------------------|
| 2021 | $ 15,900,000 | 2029 | $245,900,000 |
| 2022 | 74,000,000 | 2030 | 263,700,000 |
| 2023 | 158,200,000 | 2031 | 299,200,000 |
| 2024 | 176,200,000 | 2032 | 427,400,000 |
| 2025 | 137,900,000 | 2033 | 360,000,000 |
| 2026 | 88,900,000 | 2034 | 458,700,000 |
| 2027 | 177,200,000 | 2035[*] | 428,700,000 |
| 2028 | 188,100,000 | | |

[*]  Maturity

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for the Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

## Notice of Redemption; Effect of Redemption

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 20-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to

mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice and the corresponding redemption shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date. In addition, the Registrar shall give notice as soon as practicable after the proposed redemption date in the same manner as notices of redemption are given of the failure of the Commonwealth to make the required deposit.

If less than all the Bonds are to be redeemed or paid prior to maturity, the specific amortization requirements of the Bonds to be redeemed shall be selected by the Commonwealth, and then within an amortization requirement, (a) if DTC is acting as securities depository for the Bonds at the time of such redemption, any redemption of less than all the Bonds shall be effected by DTC on a pro rata pass through distribution of principal basis in accordance with DTC's rules and procedures, and if the DTC operational arrangements do not allow for redemption on a pro rata pass-through distribution of principal basis, the Bonds will be selected for redemption in accordance with DTC procedures, by lot, and neither the Commonwealth nor the Registrar shall have any responsibility to ensure that DTC or its Participants properly select such Bonds for redemption, and (b) if DTC is not acting as securities depository for the Bonds at the time of such redemption, any redemption of less than all the Bonds shall be effected by the Registrar among the registered owners of the Bonds on a pro-rata basis, subject to minimum Authorized Denominations.

It is the Commonwealth's intent that redemption allocations made by DTC be made on a pro rata pass-through distribution of principal basis as described above. However, neither the Commonwealth nor the underwriters can provide any assurance that DTC, DTC's direct and indirect participants or any other intermediary will allocate the redemption of Bonds on such basis or whether in the case of an individual beneficial owner, the principal amount of such owner's Bonds is reduced by a percentage much greater or lesser than the overall percentage of Bonds redeemed in part. In addition, if the DTC operational arrangements do not allow for the redemption of the Bonds on a pro rata pass-through distribution of principal basis as discussed above, then the Bonds will be selected for redemption, in accordance with DTC procedures, by lot.

## Certain Provisions of the Bonds and the Bond Resolution related to the Commonwealth's Pledge of its Good Faith, Credit and Taxing Power and the Priority Norms

In accordance with the Act, the Bonds and the Bond Resolution provide that the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable from any funds available to the Commonwealth, which funds are appropriated as a continuous appropriation, without the need for the Legislative Assembly to make specific appropriations for such purposes.

The Bonds and the Bond Resolution provide that the Bonds constitute public debt, as described in Section 8 of Article VI of the Constitution ("Section 8"). Section 8 provides that public debt of the Commonwealth constitutes a first claim on "available resources" of the Commonwealth. Public debt

28

includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its instrumentalities.

The Bond Resolution provides that if the Commonwealth does not pay any installment of principal of or interest on the Bonds when due, a bondholder may bring suit against the Secretary of the Treasury to require application of available Commonwealth resources, including surplus, to the payment of such installment of principal or interest, as applicable, in accordance with the provisions of Section 2 of Article VI of the Constitution. The Bond Resolution provides that this right to bring an action against the Secretary and any other remedies that may be available to holders of the Commonwealth's general obligation bonds are the only remedies available to the holders of the Bonds in the event that the Commonwealth fails to make a payment on the Bonds when due. The Bonds are not subject to acceleration in the event of such nonpayment. See "Risks Related to the Bonds" under RISK FACTORS for a discussion of certain factors that may affect the availability of this remedy to the bondholders.

Commonwealth statutory law establishes certain "priority norms" relating to the disbursement of public funds, which law recognizes the Constitutional first priority of debt service on the public debt, including the Bonds. The law establishes the order of priorities as follows: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations, including the Bonds, and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

Pursuant to certain Commonwealth statutes, certain taxes and fees imposed by Commonwealth law are not considered "available resources" of the Commonwealth for purposes of the Constitutional provisions relating to the payment of public debt, or are available to pay public debt only if all other available Commonwealth resources are insufficient to pay such public debt.

The most significant of these is Act 91-2006, as amended ("Act 91"), which allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA. Act 91 provides that the Dedicated Sales Tax Fund created by such law, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA, do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Commonwealth Constitution and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. The validity of this legislative allocation, however, has not been challenged in or ruled upon by any court.

The Commonwealth has also assigned certain revenues to the Highways Authority, PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to the Highways Authority; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation provides that the assigned taxes and fees are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt, their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose. Since the Commonwealth has never defaulted on its public debt and has never had to apply amounts allocated to the Highways Authority, PRIFA or PRCCDA to the payment of its public debt, it is not clear how a bondholder would be able to establish that all other

available Commonwealth resources would be insufficient for such purpose, and therefore require the application of such revenues to the payment of public debt. Nothing in the Constitution or in applicable law expressly requires the Highways Authority, PRIFA or PRCCDA to return to the Commonwealth funds already transferred to it, even if other available resources of the Commonwealth are insufficient for the payment of public debt.

## Governing Law, Jurisdiction and Venue

The Bonds and the Bond Resolution are governed by and are to be construed in accordance with the laws of the State of New York, except with respect to authorization (or in the case of the Bond Resolution, adoption) and execution of the same by the Commonwealth, which shall be governed by the laws of the Commonwealth.

Pursuant to the Bond Resolution, a bondholder may bring an action to enforce the provisions of the Bonds and the Bond Resolution only in New York courts or U.S. federal courts sitting, in either case, in the Borough of Manhattan, The City of New York, New York, or Commonwealth courts or U.S. federal courts sitting in either case in San Juan, Puerto Rico, and any appellate court from any thereof (the "applicable courts").

Pursuant to the Bond Resolution, the Commonwealth has waived immunity from the jurisdiction of the applicable courts only in a suit brought to compel the Secretary of the Treasury to comply with the provisions of Sections 2 and 8 of Article VI of the Constitution of Puerto Rico with respect to its obligations on the Bonds, or to enforce other remedies with respect to the Bonds available to the holders thereof under the Bond Resolution, as described above under the caption "Certain Provisions of the Bonds and the Bond Resolution related to the Commonwealth's Pledge of its Good Faith, Credit and Taxing Power and the Priority Norms." The Bond Resolution provides that such waiver constitutes a limited and specific waiver by the Commonwealth solely for the purposes of the Bonds, and under no circumstance shall it be construed as a general waiver by the Commonwealth or a waiver with respect to proceedings unrelated to the exercise of remedies pursuant to the Bond Resolution.

## Special Fund for the Bonds (General Obligation) Debt Service

Act No. 83-1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Redemption Fund for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39-1976, as amended ("Act 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein in such month, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its good faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by GDB. Act 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. On March 6, 2014, the Redemption Fund was fully funded.

In the past, GDB has invested a portion of the funds on deposit in the Redemption Fund in GDB time deposits as authorized by Act 39. Upon the issuance of the Bonds, GDB, as trustee, intends to invest

capitalized interest on the Bonds to be deposited in the Redemption Fund in investments permitted by Act 39 that are rated in one of the three highest rating categories (without regard to any gradations within such categories) ("Permitted Investments") or in deposits (including GDB deposits) collateralized by Permitted Investments, in each case that mature (or can be redeemed by the holder) no later than the date when the moneys must be applied to the payment of debt service. Beginning on July 1, 2014, all moneys on deposit in the Redemption Fund will be invested in Permitted Investments or in deposits (including GDB deposits) collateralized by Permitted Investments. Moneys on deposit in the Redemption Fund are held for the benefit of all holders of general obligation bonds.

Act 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of instrumentalities issued after the date of its adoption and guaranteed by the Commonwealth.

### Payment Record

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

### Constitutional Debt Limitation

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by bonds and notes to which the good faith and credit of the Commonwealth has been pledged shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.

Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages (a portion of which have been assigned to PRIFA) and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, taxes and license fees allocated to the Highways Authority and taxes allocated to PRCCDA, are currently not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of general obligation and guaranteed debt service if certain conditions described above are met. If the Commonwealth were to determine that these revenues should be included as "internal revenues" for purposes of calculating the debt limit, the debt limit would increase. In addition, the portion of the Commonwealth sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" of the Commonwealth under the above cited Constitutional provisions relating to public debt.

The following table sets forth the calculation of the Constitutional debt limit after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds. The calculation is based on the assumptions that variable rate bonds bear interest at the maximum legal rate of 12% per annum. Any potential termination payment (which is a good faith and credit obligation of the Commonwealth) payable by the Commonwealth (which would be based on the then applicable mark-to-market value) upon

termination of the applicable interest rate exchange agreement is not included in the calculation of the 15% constitutional debt limitation, because it is not a payment of principal of or interest on general obligation debt of the Commonwealth (although the exclusion of such amounts from the debt limit has to this point never been ruled upon by any court).

| | | |
|---|---|---|
| 1. | Future maximum annual debt service for the Commonwealth's outstanding general obligation debt (after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds) | $1,161,777,697 |
| 2. | Amounts paid by the Commonwealth in the fiscal year ended June 30, 2013 on account of bonds or notes guaranteed by the Commonwealth | 17,315,000 |
| 3. | Sub-Total | $1,179,092,697 |
| 4. | Average of the adjusted internal revenues for the fiscal year ended June 30, 2012 and preliminary internal revenues for the fiscal year ended June 30, 2013 | $8,307,097,000 |
| 5. | Percentage obtained by dividing the amount in (3) by the amount in (4) | 14.2% |

As of December 31, 2013, the Port of the Americas Authority ("POA") had bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds") outstanding in the principal amount of $224.1 million, which are held by GDB. The Commonwealth currently makes payments of debt service on the POA Guaranteed Bonds and expects to make all payments on the POA Guaranteed Bonds under the good faith and credit guaranty of the Commonwealth. During fiscal year 2013, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $17.3 million, which amount is included in item (2) above.

**Maturity Limitation**

The Constitution of Puerto Rico provides that bonds and notes of the Commonwealth shall not mature later than 30 years from their date of issuance, except that bonds and notes for housing facilities may mature up to 40 years from their date of issuance.

## DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the debt of the Commonwealth and its instrumentalities outstanding as of December 31, 2013. The table also shows the debt as adjusted for the issuance of the Bonds and the refinancing of the Refunded Bonds. The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report. This table includes debt primarily payable from Commonwealth or municipal taxes, Commonwealth appropriations, and rates charged by instrumentalities for services or products, as well as debt payable from other sources, some of which is set forth in footnote 6 below. Excluded from the table is debt that, if included, would result in double counting, including but not limited to $793 million of outstanding bonds issued by Puerto Rico Municipal Finance Agency to finance its purchase of bonds issued by Puerto Rico municipalities, as well as $5.04 billion of GDB notes outstanding not guaranteed by the Commonwealth.

### Commonwealth of Puerto Rico
### Public Sector Debt
### (in millions)

| | December 31, 2013 | As Adjusted by the Issuance of the Bonds |
|---|---|---|
| Good faith and credit bonds issued by the Commonwealth | $10,247 | $13,383[1] |
| Bonds and notes guaranteed by the Commonwealth's good faith and credit [2] | 5,614 | 5,614 |
| SUBTOTAL - GOOD FAITH AND CREDIT BONDS AND NOTES | 15,861 | 18,997 |
| Debt supported by Commonwealth appropriations or taxes | 4,080 | 3,827[3] |
| Tax and Revenue Anticipation Notes [4] | 1,075 | 1,075 |
| SUBTOTAL - DEBT PAYABLE FROM GENERAL FUND | $21,016 | $23,899 |
| Bonds and notes payable from sales tax revenues (COFINA) | $15,557 | $15,224 |
| Debt issued by the Commonwealth and its instrumentalities | 26,197 | 24,541[5] |
| Debt issued by municipalities | 4,112 | 4,112 |
| Pension Funding Bonds (payable from employer contributions to ERS) [6] | 2,948 | 2,948 |
| Other limited obligation debt and non-recourse debt [7] | 2,072 | 2,072 |
| SUBTOTAL - OTHER PUBLIC SECTOR DEBT | 50,886 | 48,897 |
| TOTAL PUBLIC SECTOR DEBT | $71,902 | $72,796 |

Totals may not add due to rounding.

[1] Includes approximately $96.9 million of debt issued by the Treasury Department to GDB which is secured by a pledge of the Commonwealth's good faith and credit and is expected to be repaid with revenues of the Commonwealth or proceeds of a future bond issue. This debt had been previously included under "Debt issued by the Commonwealth and its instrumentalities."

[2] Consists of $690 million of bonds issued by Puerto Rico Aqueduct and Sewer Authority ("PRASA"), $479 million of Puerto Rico State Revolving Fund loans made to PRASA under various federal water laws, $224.6 million of bonds issued by the POA (which are held by GDB), and $4.221 billion of PBA bonds. Excludes (in order to avoid double counting) $267 million of GDB bonds payable from available moneys of GDB and $110 million of GDB senior guaranteed notes Series 2013B, the proceeds of which have been principally used to fund loans to the Commonwealth, instrumentalities, agencies and municipalities, which loans are included in the table in the corresponding line.

[3] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes $1.090 billion of bonds issued by the Public Finance Corporation, $2.126 billion of appropriation debt notes issued by the instrumentalities and agencies (including $68 million of bonds issued by PBA), $572.7 million of notes issued by the Treasury Department (such debt is excluded from the Public Corporations Debt Table) and $37.1 million of bonds issued by the Mental Health and Anti-Addiction Services Administration.

[4] Includes $175 million in revolving notes purchased by GDB and $900 million in notes purchased by private entities.

[5] Excludes (in order to avoid double counting) $4.8 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, instrumentalities, agencies and municipalities, which loans are included in the table in the corresponding line, and excludes a note for $67.2 million of PBA. Includes $104.3 million in notes issued by PBA.

[6] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds. The Commonwealth does not guarantee such bonds. Employer contributions made to the Employees Retirement System by the central government and its agencies and therefore payable from the General Fund currently represent approximately 59% of such total employer contributions. The balance of these contributions is made by the instrumentalities and the municipalities.

[7] Includes the following: (i) $1.2 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; (ii) $151.1 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); (iii) $307.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Puerto Rico Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; (iv) $141.3 million of Special Facilities Revenue Bonds issued by the Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; (v) $155 million of Special Facilities Bonds issued by the Puerto Rico Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; (vi) $70.8 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and (vii) approximately $18 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

Source: Government Development Bank

**Debt Service Requirements for Commonwealth General Obligation Bonds and Commonwealth Guaranteed Debt**

The following tables set forth the debt service requirements for bonds issued or guaranteed by the Commonwealth or payable from General Fund appropriations.  Debt service requirements for each fiscal year include principal and interest due on July 1 immediately following the close of such fiscal year.  In the case of variable rate bonds, the interest shown in the tables below is calculated at the maximum legal rate of 12%, consistent with how the Commonwealth determines the maximum amount of debt that it may incur in accordance with the constitutional limit.

The following table sets forth (i) the debt service requirements on the Commonwealth's general obligation bonds outstanding on December 31, 2013 excluding the Refunded Bonds, (ii) the debt service requirements on the Bonds, and (iii) the total debt service requirements on the Commonwealth's general obligation bonds, after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds.

**Commonwealth of Puerto Rico**
**Debt Service Requirements for**
**General Obligation Bonds**

| Fiscal Year Ending June 30 | Outstanding Bonds Debt Service[*] | The Bonds | | | Total |
|---|---|---|---|---|---|
| | | Principal | Interest[†] | | |
| 2014 | $  838,313,627 | | $  2,945,056 | | $  841,258,683 |
| 2015 | 883,734,818 | | 10,194,425 | | 893,929,243 |
| 2016 | 956,777,697 | | 205,000,000 | | 1,161,777,697 |
| 2017 | 881,685,132 | | 280,000,000 | | 1,161,685,132 |
| 2018 | 818,799,188 | | 280,000,000 | | 1,098,799,188 |
| 2019 | 840,224,437 | | 280,000,000 | | 1,120,224,437 |
| 2020 | 864,647,823 | | 280,000,000 | | 1,144,647,823 |
| 2021 | 717,806,226 | $  15,900,000 | 280,000,000 | | 1,013,706,226 |
| 2022 | 660,416,404 | 74,000,000 | 278,728,000 | | 1,013,144,404 |
| 2023 | 581,696,991 | 158,200,000 | 272,808,000 | | 1,012,704,991 |
| 2024 | 575,915,794 | 176,200,000 | 260,152,000 | | 1,012,267,794 |
| 2025 | 627,867,118 | 137,900,000 | 246,056,000 | | 1,011,823,118 |
| 2026 | 687,333,269 | 88,900,000 | 235,024,000 | | 1,011,257,269 |
| 2027 | 605,711,718 | 177,200,000 | 227,912,000 | | 1,010,823,718 |
| 2028 | 608,463,108 | 188,100,000 | 213,736,000 | | 1,010,299,108 |
| 2029 | 565,331,439 | 245,900,000 | 198,688,000 | | 1,009,919,439 |
| 2030 | 566,708,959 | 263,700,000 | 179,016,000 | | 1,009,424,959 |
| 2031 | 551,873,573 | 299,200,000 | 157,920,000 | | 1,008,993,573 |
| 2032 | 447,089,593 | 427,400,000 | 133,984,000 | | 1,008,473,593 |
| 2033 | 548,174,695 | 360,000,000 | 99,792,000 | | 1,007,966,695 |
| 2034 | 477,735,235 | 458,700,000 | 70,992,000 | | 1,007,427,235 |
| 2035 | 543,968,686 | 428,700,000 | 34,296,000 | | 1,006,964,686 |
| 2036 | 465,093,294 | - | - | | 465,093,294 |
| 2037 | 464,623,295 | - | - | | 464,623,295 |
| 2038 | 507,318,334 | - | - | | 507,318,334 |
| 2039 | 506,846,991 | - | - | | 506,846,991 |
| 2040 | 566,373,999 | - | - | | 566,373,999 |
| 2041 | 565,901,044 | - | - | | 565,901,044 |
| 2042 | 4,609,389 | - | - | | 4,609,389 |
| 2043 | 1,882,313 | - | - | | 1,882,313 |
| Total | $17,932,924,189 | $3,500,000,000 | $4,227,243,481 | | $25,660,167,670 |

Totals may not add due to rounding.

[*]   General Obligation Bonds debt service is calculated assuming any outstanding Variable Rate GOs (approximately $126.7 million aggregate principal amount will be outstanding after the issuance of the Bonds and the refunding of the Refunded Bonds) bear interest at the maximum allowable rate per annum under Puerto Rico law (12%) and includes a $31.7 million General Services Administration line of credit and a $324.8 million GDB line of credit granted to the Treasury Department.  Excludes the Refunded Bonds.

[†]   Net of interest capitalized through July 1, 2016.

Source:  Government Development Bank

The following table sets forth (i) the debt service requirements on the Commonwealth's general obligation bonds after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds; (ii) the debt service requirements on all PBA bonds guaranteed by the Commonwealth; (iii) the debt service requirements on all other debt guaranteed by the Commonwealth; (iv) the total debt service requirements of debt described in items (i), (ii) and (iii); (v) the debt service requirement on all Commonwealth appropriation bonds, which are not guaranteed by the Commonwealth; and (vi) the total debt service requirements on all debt included in the table.

### Debt Service Requirements for Bonds Issued or Guaranteed by the Commonwealth and Publicly-Issued Commonwealth Appropriation Bonds
### (in thousands)

| Fiscal Year Ending June 30 | General Obligation (G.O.) Bonds[1] | PBA Guaranteed Debt | Other Guaranteed Debt[2] | Total G.O. and Guaranteed Debt | Publicly Issued Appropriation Bonds[3] | Total G.O., Guaranteed and Publicly Issued Appropriation Debt |
|---|---|---|---|---|---|---|
| 2014 | $ 841,259 | $ 312,131 | $ 110,233 | $ 1,263,622 | $ 15,758 | $ 1,279,380 |
| 2015 | 893,929 | 313,257 | 121,581 | 1,328,767 | 36,683 | 1,365,451 |
| 2016 | 1,161,778 | 313,004 | 381,558 | 1,856,340 | 93,656 | 1,949,996 |
| 2017 | 1,161,685 | 313,043 | 107,554 | 1,582,282 | 85,782 | 1,668,063 |
| 2018 | 1,098,799 | 281,101 | 144,702 | 1,524,602 | 85,665 | 1,610,268 |
| 2019 | 1,120,224 | 280,894 | 129,898 | 1,531,017 | 85,552 | 1,616,569 |
| 2020 | 1,144,648 | 281,564 | 135,031 | 1,561,243 | 85,462 | 1,646,705 |
| 2021 | 1,013,706 | 304,046 | 101,484 | 1,419,237 | 85,344 | 1,504,580 |
| 2022 | 1,013,144 | 303,075 | 100,880 | 1,417,100 | 85,220 | 1,502,320 |
| 2023 | 1,012,705 | 286,730 | 101,044 | 1,400,479 | 85,085 | 1,485,564 |
| 2024 | 1,012,268 | 288,448 | 103,990 | 1,404,706 | 84,884 | 1,489,590 |
| 2025 | 1,011,823 | 285,892 | 103,373 | 1,401,088 | 85,205 | 1,486,293 |
| 2026 | 1,011,257 | 272,673 | 103,094 | 1,387,025 | 85,101 | 1,472,125 |
| 2027 | 1,010,824 | 273,518 | 100,438 | 1,384,780 | 84,982 | 1,469,762 |
| 2028 | 1,010,299 | 1,000,141 | 97,837 | 2,108,277 | 223,979 | 2,332,256 |
| 2029 | 1,009,919 | 206,612 | 92,912 | 1,309,444 | 212,727 | 1,522,171 |
| 2030 | 1,009,425 | 362,782 | 86,317 | 1,458,523 | 103,243 | 1,561,766 |
| 2031 | 1,008,994 | 233,648 | 81,696 | 1,324,337 | 103,246 | 1,427,583 |
| 2032 | 1,008,474 | 215,143 | 79,549 | 1,303,166 | 83,409 | 1,386,575 |
| 2033 | 1,007,967 | 215,036 | 78,332 | 1,301,334 | - | 1,301,334 |
| 2034 | 1,007,427 | 214,925 | 72,647 | 1,294,999 | - | 1,294,999 |
| 2035 | 1,006,965 | 228,469 | 39,799 | 1,275,232 | - | 1,275,232 |
| 2036 | 465,093 | 214,808 | 39,076 | 718,977 | - | 718,977 |
| 2037 | 464,623 | 200,521 | 38,732 | 703,876 | - | 703,876 |
| 2038 | 507,318 | 186,389 | 38,551 | 732,258 | - | 732,258 |
| 2039 | 506,847 | 188,509 | 38,510 | 733,866 | - | 733,866 |
| 2040 | 566,374 | 190,220 | 37,001 | 793,595 | - | 793,595 |
| 2041 | 565,901 | 190,218 | 16,446 | 772,565 | - | 772,565 |
| 2042 | 4,609 | 133,552 | 16,498 | 154,660 | - | 154,660 |
| 2043 | 1,882 | - | 15,608 | 17,490 | - | 17,490 |
| 2044 | - | - | 14,316 | 14,316 | - | 14,316 |
| 2045 | - | - | 13,056 | 13,056 | - | 13,056 |
| 2046 | - | - | 12,038 | 12,038 | - | 12,038 |
| 2047 | - | - | 11,133 | 11,133 | - | 11,133 |
| 2048 | - | - | 8,422 | 8,422 | - | 8,422 |
| 2049 | - | - | 6,263 | 6,263 | - | 6,263 |
| 2050 | - | - | 5,671 | 5,671 | - | 5,671 |
| 2051 | - | - | 4,396 | 4,396 | - | 4,396 |
| 2052 | - | - | 2,191 | 2,191 | - | 2,191 |
| 2053 | - | - | 1,104 | 1,104 | - | 1,104 |
| | $25,660,168 | $8,090,350 | $2,792,960 | $36,543,477 | $1,810,981 | $38,354,459 |

[1] General Obligation Bonds debt service is calculated assuming any outstanding Variable Rate GOs (approximately $126.7 million aggregate principal amount will be outstanding after the issuance of the Bonds and the refunding of the Refunded Bonds) bear interest at the maximum allowable rate per annum under Puerto Rico law (12%) and includes a $31.7 million General Services Administration line of credit and a $324.8 million GDB line of credit granted to the Treasury Department.

[2] Includes $690 million of bonds issued by PRASA, $479 million of Puerto Rico State Revolving Fund loans made to PRASA under various federal water laws, the POA Guaranteed Bonds, $267 million of GDB bonds payable from available moneys of GDB and $110 million of GDB senior guaranteed notes Series 2013B.

[3] Reflects debt issued by the Public Finance Corporation.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, GDB has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, GDB participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by GDB to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth and its instrumentalities. Certain of the Underwriters or their affiliates participate in other financial transactions with GDB and its subsidiaries and affiliates.

In addition to its role as the Commonwealth's financial advisor, GDB has traditionally provided interim financing to the Commonwealth and its instrumentalities in anticipation of their refinancing such indebtedness in the bond market and also, in certain instances, provides long-term financing to such entities. GDB's loans to the Commonwealth and its instrumentalities have, among other purposes, financed their respective operating deficits and working capital needs, capital improvement programs, collateral posting requirements under swap and hedging agreements, and mandatory prepayments and maturities of financial obligations. As a result of this lending function, GDB serves as the principal source of short-term liquidity for the Commonwealth, its agencies, instrumentalities and municipalities.

For a discussion of certain risks associated with GDB, see RISK FACTORS.

## LITIGATION

As of the date hereof, to the knowledge of the officers of the Treasury Department with responsibility over the issuance of the Bonds, there is no litigation of any nature pending or threatened against the Commonwealth to restrain or enjoin the issuance, sale, execution or delivery of the Bonds or the application of the proceeds thereof as described in this Official Statement, or in any way contesting or affecting the validity of the Bonds or any proceedings of the Commonwealth taken with respect to the issuance or sale of the Bonds.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

**Discount Bonds**

Under the Code, the difference between the principal amount of the Bonds and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Bonds was sold is original issue discount. Original issue discount on the Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owners of such Bonds in each year, as described below, is, however, included in the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption TAX MATTERS in the year of accrual. Consequently, Beneficial Owners of Bonds should be aware that the accrual of original issue discount in each year may result in additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Bonds will accrue over the terms of such Bonds based on the constant yield method, compounded semiannually (or over a shorter permitted compounding interval selected by the Beneficial Owner). Original issue discount accruing during the period a Beneficial Owner holds such Bond will increase the adjusted basis in such Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Bonds and with respect to the state and local tax consequences of owning and disposing of Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix III* to this Official Statement. Certain matters will be passed upon for the Commonwealth by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as disclosure counsel, and for the Underwriters by Sidley Austin LLP, New York, New York and by O'Neill & Borges LLC, San Juan, Puerto Rico.

Each of Sidley Austin LLP and O'Neill & Borges, LLC, counsel to the underwriters, from time to time acts as counsel to the Commonwealth or its instrumentalities, including GDB.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and, as required by law, will be approved investments for insurance companies to qualify them to do business in Puerto Rico.

## UNDERWRITING

Barclays Capital Inc., as representative on behalf of the Underwriters (the "Representative"), has agreed, subject to certain conditions, that the Underwriters will, jointly and severally, purchase the Bonds from the Commonwealth at an aggregate discount of $28,130,460.67 from the initial offering price of the Bonds set forth on the inside cover hereof. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering price. The offering price may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and its instrumentalities.

Certain of the Underwriters have entered into distribution agreements with other broker-dealers (some of which have not been designated by the Commonwealth as Underwriters) for the distribution of the Bonds at the initial public offering price. Such agreements generally provide that the relevant Underwriter will share a portion of its underwriting compensation with such broker-dealers.

## RATINGS

The Bonds have been assigned ratings of "Ba2" by Moody's, "BB+" by S&P, and "BB" by Fitch. S&P also confirmed that the Commonwealth's ratings remain on "CreditWatch" with negative implications, while each of Moody's and Fitch confirmed the negative outlook on the Commonwealth's ratings.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds. Any explanation of the significance of such ratings must be obtained from the respective rating agency. The Commonwealth has provided information to the rating agencies in addition to the information that is included in this Official Statement.

There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market price of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. The Bond Resolution does not include a covenant by the Commonwealth to maintain a specific rating with respect to the Bonds.

For an explanation of the limitations inherent in ratings, see "*Actions by the rating agencies, such as the recent downgrade of the Commonwealth's credit ratings to non-investment grade, could raise the Commonwealth's cost of borrowing, which could affect the Commonwealth's ability to borrow in the future and may have other adverse effects on the Commonwealth's financial condition*" under RISK FACTORS.

## CONTINUING DISCLOSURE

### Continuing Disclosure Undertaking

In accordance with the Rule, the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1.  to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2013, with the MSRB through EMMA, core financial information and operating data for such fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.  to file in a timely manner, not in excess of ten business days after the occurrence of any of the following events with respect to the Bonds, with the MSRB through EMMA, notice of the occurrence of such event:

    a.  principal and interest payment delinquencies;

    b.  non-payment related defaults, if material;

    c.  unscheduled draws on debt service reserves reflecting financial difficulties;

    d.  unscheduled draws on credit enhancements reflecting financial difficulties;

    e.  substitution of credit or liquidity facility providers, or their failure to perform;

    f.  adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

    g.  modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

    h.  Bond calls, if material;

39

i.    defeasances;

j.    release, substitution, or sale of property securing repayment of the Bonds, if material;

k.    rating changes;

l.    tender offers;

m.   bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.    the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.    the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event 2 (h).  The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

Event 2 (m).  According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. Under the Bond Resolution, the Commonwealth has also agreed to file with EMMA notice of the replacement of its agent for service of process concurrently with any such replacement.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances. Although the Commonwealth has filed all the reports and financial statements required to be filed, some of these filings have been made after the Commonwealth's 305-day filing deadline (May 1 or, in a leap year, April 30).

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2008 were filed on August 19, 2009, after the Commonwealth's filing deadline because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were filed on October 25, 2010, after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2012 were filed on September 16, 2013, after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented component units to finalize their audited financial statements.

The Commonwealth Report for the fiscal year ended June 30, 2008, containing the information described in paragraph 1(ii) above, was filed on June 5, 2009, after the Commonwealth's filing deadline.

The Commonwealth Report for the fiscal year ended June 30, 2012, containing the information described in paragraph 1(ii) above, was filed on May 17, 2013, after the Commonwealth's filing deadline.

During the past five years, on a number of occasions the Commonwealth has failed to file event notices for rating changes respecting certain outstanding general obligation bonds when such changes are due to changes in the ratings of bond insurers or other credit or liquidity facility providers. On October 1, 2013, the Commonwealth filed an event notice reflecting historical rating changes of various bond insurers and showing the rating change history each time the rating of each bond insurer that insured the Commonwealth's public improvement bonds was changed. Although the notice identified each general obligation bond maturity outstanding as of March 1, 2013 that was insured by one or more of the bond insurers, it did not reflect all general obligation bond maturities that were outstanding when the bond insurers' ratings changed if such maturities were defeased prior to March 1, 2013.

The Commonwealth follows certain procedures designed to ensure full and timely compliance with all continuing disclosure obligations in the future. Such procedures include: (i) the assignment of additional resources from local and national audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit; (iii) regular meetings between Treasury Department and GDB personnel in order to track the progress of all component unit financial statements and provide assistance, when necessary, to ensure timely filing of the financial statements; and (iv) as necessary, regular meetings between Treasury Department, GDB and component unit personnel to ascertain progress and compliance with the completion deadlines. While these procedures allowed the Commonwealth to comply with the filing deadline for the Commonwealth's Annual Financial Report in 2010 and 2011, the Commonwealth failed to comply with this requirement due to certain delays caused

by the government's transition process after the 2012 election.  See "*The Commonwealth has not complied with its continuing disclosure obligations on a timely basis*" under RISK FACTORS.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Quarterly Report and the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Quarterly Report (*Appendix I*), the Commonwealth Report (*Appendix II*), the proposed form of opinion of Bond Counsel (*Appendix III*) and a description of the DTC Book-Entry Only System (*Appendix IV*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents.  The information pertaining to DTC was supplied by DTC.  The information contained under the heading UNDERWRITING was obtained from the Representative.

This Official Statement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By: _____/s/ Melba Acosta Febo_____

Secretary of the Treasury

(This page intentionally left blank)

APPENDIX I

# COMMONWEALTH OF PUERTO RICO

## QUARTERLY REPORT DATED FEBRUARY 18, 2014

(This page intentionally left blank)

## Table of Contents

Page No.

Introduction.................................................................................................................. I-1

Forward-Looking Statements........................................................................................ I-1

Recent Credit Rating Downgrades of Bonds of the Commonwealth and its Instrumentalities...... I-3

Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its
Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivative Contracts... I-4

Liquidity of Government Development Bank ................................................................. I-6

Summary of Principal Fiscal and Economic Challenges of the Commonwealth ........................... I-7

Special Investor Considerations Regarding Emergency Measures and Insolvency Risks ........... I-17

Fiscal Condition........................................................................................................... I-18

Recent Legislation ...................................................................................................... I-20

Proposed Legislation................................................................................................... I-23

Economic Conditions................................................................................................... I-23

Economic Development Initiatives............................................................................... I-24

Debt............................................................................................................................. I-26

Litigation..................................................................................................................... I-37

(This page intentionally left blank)

# COMMONWEALTH OF PUERTO RICO
## QUARTERLY REPORT
### February 18, 2014

## Introduction

This Quarterly Report is dated as of February 18, 2014, and is intended to update certain information included in the Commonwealth's Financial Information and Operating Data Report dated October 18, 2013 (the "Commonwealth Report"). This Quarterly Report should be read in conjunction with the information contained in the Commonwealth Report. Unless otherwise stated, the information included herein is current as of December 31, 2013. The Commonwealth of Puerto Rico (the "Commonwealth") is not updating the Commonwealth Report in its entirety. Therefore, there could be changes to the information set forth in the Commonwealth Report that are not reflected in this Quarterly Report. You should not assume that the information in this Quarterly Report and the Commonwealth Report is accurate as of any date other than the respective dates as of which such information is presented in such reports.

The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Quarterly Report to a particular fiscal year are to the year in which such fiscal year ends.

The Commonwealth Report and this Quarterly Report provide an overview of the fiscal and economic condition of the Commonwealth. Although the Commonwealth Report and this Quarterly Report discuss information about certain public instrumentalities, the Commonwealth Report and this Quarterly Report do not, and are not intended to, provide detailed information as to the financial condition of each of the public corporations and instrumentalities.

## Forward-Looking Statements

The information included in this Quarterly Report contains certain "forward-looking" statements. These forward-looking statements may relate to the fiscal and economic condition, economic performance, plans, or objectives of the Commonwealth and its instrumentalities. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These forward-looking statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth and certain of its instrumentalities that are difficult to predict. The economic and financial condition of the Commonwealth and its instrumentalities is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's or its instrumentalities' projections.

The projections set forth in this Quarterly Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the officers of the Commonwealth and its instrumentalities responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth and certain of its instrumentalities. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Quarterly Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Quarterly Report, which is solely the product of the Commonwealth and certain of its instrumentalities, and the independent auditors assume no responsibility for its content.

(vi)     Bond anticipation notes of Puerto Rico Highways and Transportation Authority ("PRHTA") in an aggregate principal amount of $400 million, which were directly purchased by a financial institution, and which matures on September 1, 2015.  On February 12, 2014, the PRHTA amended the documents to its $400 million bond anticipation notes, limiting the holder's right to accelerate and waiving covenant defaults due to the downgrades. Principal set-asides will continue as originally scheduled.

(vii)    VRDOs of PRHTA in an aggregate principal amount of approximately $200 million supported by a liquidity facility that expires on May 27, 2014, but that could be subject to acceleration as a result of the downgrade. The provider of the liquidity facility may cause the mandatory tender of the bonds and, thereafter, require the immediate repayment of the amounts disbursed under the liquidity facility.

(viii)   Bond anticipation notes of COFINA in an aggregate principal amount of approximately $333.3 million, which are due on September 30, 2014. These bond anticipation notes have not been impacted by the recent downgrades.

(ix)     Revolving line of credit of Puerto Rico Electric Power Authority ("PREPA") in an aggregate principal amount of $250 million (of which approximately $249.5 million was outstanding as of January 31, 2014) due to commercial banks, with a final maturity date of October 7, 2014, but currently subject to acceleration.

(x)      Revolving line of credit of PREPA in an aggregate principal amount of $550 million (of which approximately $513.7 million was outstanding as of January 31, 2014), due to commercial banks, with a final maturity date of August 15, 2014.

(xi)     Bond anticipation notes of Puerto Rico Aqueduct and Sewer Authority ("PRASA") in an aggregate principal amount of $150 million, which are due on March 31, 2015. These bond anticipation notes have not been impacted by the recent downgrades.

In addition, the interest rates on certain bonds and notes will increase as a result of the credit downgrades, to rates ranging from 10% to 12.0%. The Commonwealth currently intends to refinance the outstanding General obligation VRDOs ($469 million) and the COFINA bond anticipation notes ($333 million) with the proceeds of an upcoming general obligation bond market transaction.

In addition to the possible acceleration of debt instruments described above, the credit rating downgrades have triggered "additional termination events" under interest rate exchange ("swap") and other derivative agreements relating to outstanding bonds and notes of the Commonwealth and certain of its public corporations, making them now subject to termination at the option of the applicable counterparty. See *Debt – Interest Rate Exchange Agreements,* below.  The swap and other derivative agreements currently subject to termination have a negative mark-to-market valuation of $333.5 million as of February 14, 2014.   The Commonwealth or its relevant public corporations currently have $142 million of collateral posted to the counterparties under these swap and derivative agreements. If any such agreements were terminated, they would likely be terminated at their then current mark-to-market valuations (net of collateral posted), plus cost, which could differ substantially from the mark-to-market

**Recent Credit Rating Downgrades of Bonds of the Commonwealth and its Instrumentalities**

On February 4, 2014, Standard & Poor's Ratings Services ("S&P") lowered its rating on the general obligation bonds of the Commonwealth from "BBB-" to "BB+," which is a non-investment grade rating. S&P also lowered its rating on the bonds of Government Development Bank for Puerto Rico ("GDB") to "BB," one notch below the Commonwealth's general obligation rating, and lowered its rating on the bonds of several other Commonwealth issuers. S&P maintained its "AA-" and "A+" ratings on the senior and subordinate bonds of Puerto Rico Sales Tax Financing Authority ("COFINA"). S&P kept all of these ratings on "CreditWatch" with negative implications, and noted that further downgrades are possible.

On February 7, 2014, Moody's Investors Service ("Moody's") lowered its rating on the general obligation bonds of the Commonwealth two notches, from "Baa3" to "Ba2," which is a non-investment grade rating. Moody's also lowered its rating on the bonds of several other Commonwealth issuers to "Ba2," including GDB. Moody's maintained a "negative" outlook on all these bonds.

On February 10, 2014, Fitch Ratings ("Fitch") lowered its rating on the general obligation bonds of the Commonwealth by two notches from "BBB-" to "BB", which is a non-investment grade rating. Fitch also lowered its ratings on the bonds of several other Commonwealth issuers. Fitch maintained its "AA-" and "A+" ratings on COFINA's senior and subordinate bonds. Fitch removed the downgraded bonds from Rating Watch negative but maintained its Rating Outlook negative on these bonds.

The following table sets forth the ratings of the Commonwealth and certain of its public corporations after giving effect to the recent downgrades:

|  | S&P | Moody's | Fitch |
|---|---|---|---|
| Commonwealth of Puerto Rico (General Obligations) | BB+ | Ba2 | BB |
| Government Development Bank | BB | Ba2 |  |
| COFINA |  |  |  |
| Senior Lien | AA- | Baa1 | AA- |
| First Subordinate Lien | A+ | Baa2 | A+ |
| PR Electric Power Authority | BBB | Ba2 | BBB- |
| PR Highways and Transportation Authority |  |  |  |
| Highway Revenue Bonds | BB+ | Ba1 |  |
| Transportation Revenue Bonds | BB+ | Ba2 |  |
| Subordinate Transportation Revenue Bonds | BB+ | Baa3 |  |
| PR Aqueduct and Sewer Authority |  |  |  |
| Revenue Bonds | BB+ | Ba2 | BBB- |
| Guaranteed Bonds | BB+ | Ba2 | BB |
| PR Public Buildings Authority | BB+ | Ba2 | BB |
| PR Employees Retirement System | BB | Ba2 | BB |
| PR Public Finance Corporation (Commonwealth Appropriation Bonds) | BB | Ba3 |  |

These credit rating downgrades could result in the acceleration of certain Commonwealth and public corporation obligations or the termination of certain credit and liquidity facilities that support certain Commonwealth and public corporation obligations. The downgrades also resulted in additional collateral postings and termination events under certain derivatives

agreements.  A more detailed description of the impacts of the credit rating downgrades is set forth below.

**Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivative Contracts**

Certain short-term obligations of the Commonwealth and its instrumentalities mature pursuant to their terms during the next fiscal year.  Furthermore, as a result of the previously described credit rating downgrades, certain obligations of the Commonwealth and its instrumentalities could become due in the near future if the lenders or counterparties exercise acceleration or termination rights.  The most significant of such maturing, accelerable or terminable obligations are listed below.  The list set forth below does not include scheduled debt service on medium and long-term obligations of the Commonwealth and its instrumentalities (including GDB).  In addition, the list does not identify individual loans or lines of credit that are part of GDB's loan portfolio.

(i)     Tax and revenue anticipation notes (the "2014 TRANS") issued by the Commonwealth in an aggregate principal amount of $1.1 billion (including $200 million held by GDB and outstanding as of February 14, 2014) which are payable from income taxes collected during fiscal year 2014 and mature on June 2014. Three equal principal installments are due on the 2014 TRANS on each of April, May and June of 2014.

(ii)    General obligation bonds of the Commonwealth that are variable rate demand obligations ("VRDOs") in an aggregate principal amount of approximately $188.7 million supported by a letter of credit that expires on June 21, 2014, but that could be subject to acceleration as a result of the downgrade. The bonds are also secured by a bond insurance policy; the letter of credit provider may cancel the bond insurance policy and then direct a mandatory tender of the bonds and require the immediate repayment of the amounts disbursed under the letter of credit.

(iii)   General obligation VRDOs of the Commonwealth in an aggregate principal amount of approximately $14.9 million supported by a liquidity facility that expires on May 1, 2014 and, to the extent that the facility expires and is not replaced, the bonds would be payable over a five (5) year period.

(iv)    General obligation VRDOs of the Commonwealth in an aggregate principal amount of approximately $242.6 million that have been directly purchased by banking institutions, and are subject to optional tender for purchase by the banking institutions on thirty (30) days' notice as a result of the downgrade. The bonds are subject to mandatory tender at the expiration of the current interest rate periods on May 1, 2014 ($44,905,000) and June 1, 2014 ($197,655,000).

(v)     General obligation VRDOs of the Commonwealth in an aggregate principal amount of approximately $14.9 million which have been directly purchased by banking institutions, and are subject to optional tender for purchase on seven (7) days' notice. If not accelerated, the bonds are subject to mandatory tender for purchase in accordance with their terms on June 1, 2014.

valuations. The Commonwealth and the relevant public corporation would also be subject to interest rate risk on the underlying variable rate bonds.

To date, none of the counterparties has exercised any tender, acceleration, put or termination right, and the Commonwealth, GDB and the affected public corporations are currently engaged in discussions with swap counterparties, bondholders and credit and liquidity facility providers in order to obtain waivers or modifications of certain of these requirements to mitigate the adverse impacts of the downgrades. For example, the $400 million PRHTA bond anticipation notes have been amended to limit the right to accelerate the bonds as a result of the downgrades. Similarly, the Commonwealth and PREPA have entered into 30-day standstill agreements with swap counterparties with respect to approximately $1.35 billion in notional amount of certain basis swaps. Negotiations with respect to waivers, amendments and/or extensions with respect to the PREPA revolving lines of credit are at an advanced stage. There can be no assurance at this time, however, as to the final outcome of such discussions or the nature or extent of the relief provided, if any, with respect to the acceleration, tender, put or termination rights described above. Such negotiations may be unsuccessful or, even if they are successful, future events may trigger other acceleration, termination, tender or put rights. While the Commonwealth and GDB do not currently expect, absent further adverse developments, that the Commonwealth and the public corporations will be required to fund the total amount of these obligations in the near term, there can be no assurance that the Commonwealth and the public corporations will not be required to fully fund such obligations and, if required to do so, that sufficient funds will be available to fund them.

## Liquidity of Government Development Bank

GDB has traditionally served as interim lender to the Commonwealth and its instrumentalities in anticipation of the issuance of long-term bonds and notes by such entities in the municipal bond market. GDB has also provided financing to the Commonwealth and its instrumentalities to finance their respective budget deficits, to post collateral under swap agreements and to meet mandatory payments of obligations. As a result of this lending function, GDB serves as the principal source of short-term liquidity for the Commonwealth and its public corporations and instrumentalities.

Loans to the Commonwealth and its instrumentalities constitute a significant portion of GDB's assets. As a result, conditions that adversely affect the ability of the Commonwealth and its instrumentalities to raise cash (including access to the bond market) and repay their interim and other loans to GDB also have an adverse effect on GDB's liquidity and financial condition. Similarly, conditions that adversely affect the ability of GDB to raise cash (including access to the bond market) or otherwise finance its loan portfolio also have an adverse effect on the Commonwealth and its instrumentalities, as GDB's ability to continue providing interim and deficit financing to the Commonwealth and its instrumentalities is reduced.

One challenge that GDB faces is limited liquidity. The liquidity position of GDB has been adversely affected by, among other factors, the significant increase in credit spreads for obligations of the Commonwealth and its instrumentalities during 2013, by the limited market access experienced by the Commonwealth and certain of its public corporations during the second half of calendar year 2012 and calendar year 2013, by a significant reduction of liquidity in the local Puerto Rico capital markets, and more recently by the credit downgrades described above. These factors have resulted in delays in the repayment by the Commonwealth and its

instrumentalities of their loans to GDB and, at the same time, caused the Commonwealth and its instrumentalities to rely more heavily on short-term financing and interim loans from GDB and other lenders.   The short-term financings from GDB extended to the Commonwealth or instrumentalities in the past 120 days include: (i) a loan to the Commonwealth to repay $543 million of Commonwealth bond anticipation notes, (ii) the repurchase from commercial banks of $240 million in participations of loans to the Commonwealth, and (iii) $140 million to fund draws on GDB letters of credit securing bonds issued by Puerto Rico Infrastructure Financing Authority on behalf of Puerto Rico Ports Authority that were not remarketed.

As described in the prior section, the liquidity of GDB could also be affected by obligations that may become due in the near future and during the next fiscal year, in part as a result of the downgrades. Although GDB has previously assisted the Commonwealth and its instrumentalities in satisfying obligations similar to those listed above, GDB is not legally required to provide such assistance and there is no assurance that it will be able to continue to provide such assistance to any or all of these governmental entities.   To the extent that GDB financing is unavailable, the Commonwealth and its instrumentalities may be required to find other sources of funding in order to meet their obligations.   There is no assurance that the Commonwealth and its instrumentalities will be able to access other sources of financing or funding sufficient at any one time to meet their obligations as they come due.

The Commonwealth needs to obtain significant additional funding before the end of the fiscal year in order to repay interim loans and other obligations that are owing to GDB, and therefore allow GDB to continue serving as liquidity provider to the Commonwealth and its public corporations. Although the Commonwealth intends to access the capital markets in the near term, its ability to do so and the terms of any such financing are uncertain.

***Financial Condition of GDB.***  GDB's assets as of December 31, 2013 included $2.722 billion in cash and investment securities, including $673.1 million in money market funds. As of such date, GDB also had $1.236 billion in securities sold under agreements to repurchase. GDB's enabling act requires the maintenance of a minimum legal reserve of not less than 20% of its demand deposit liabilities, which reserve can be invested in investment instruments with maturities of up to 90 days.

## Summary of Principal Fiscal and Economic Challenges of the Commonwealth

The following summary of the principal fiscal and economic challenges of the Commonwealth is not exhaustive. Additional risks and uncertainties not currently known by the Commonwealth or that the Commonwealth currently deems to be immaterial, or that are generally applicable to all states and governmental instrumentalities, also may materially adversely affect the financial condition of the Commonwealth. Moreover, while some of the fiscal and economic challenges described below also affect the public corporations, the Commonwealth Report and this Quarterly Report do not, and are not intended to, provide a list of the particular challenges and risks facing each of the public corporations.

*Significant Short-Term Liabilities.* For a discussion of the significant short-term liabilities of the Commonwealth and its instrumentalities, please refer to the discussion under *Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivate Contracts* above.

*Limited Liquidity.* For a discussion of GDB's liquidity position, please refer to the discussion under *Liquidity of Government Development Bank* above.

*High Level of Debt.* As of December 31, 2013, the Commonwealth had outstanding a total of $21.016 billion aggregate principal amount of bonds and notes issued or guaranteed by the Commonwealth or payable from General Fund appropriations, equivalent to approximately 30.3% of the Commonwealth's gross national product for fiscal year 2012. (See table under *"Debt – Trends of Public Sector Debt"* below.) Debt service on these bonds and notes for fiscal year 2014 ($1.233 billion) represented approximately 12.8% of the revised General Fund budget for fiscal year 2014 ($9.600 billion). The total outstanding public sector debt of the Commonwealth, its instrumentalities, and municipalities was $71.902 billion as of December 31, 2013, equivalent to approximately 103.5% of the Commonwealth's gross national product for fiscal year 2012 ($69.462 billion). The Commonwealth's high level of debt and the resulting required allocation of revenues to service such debt constrain the Commonwealth's flexibility to direct resources to other governmental programs or priorities, and reduce the ability of the government to adjust fiscal policy to achieve policy objectives.

In addressing its fiscal imbalance, the Commonwealth has been financing a significant portion of its annual General Fund debt service. The Commonwealth cannot continue this practice indefinitely and expects to eliminate it by fiscal year 2015. Thus, unless the fiscal imbalance is resolved, the Commonwealth may be unable to sustain the current level of government services while continuing to honor its debt obligations. During the next nine fiscal years, the annual debt service payable from the Commonwealth's General Fund will exceed $1.1 billion per fiscal year. See the table under *Debt Service Requirements for Commonwealth General Obligation Bonds, Appropriation Bonds and Guaranteed Debt.*

In addition to the above, from time to time public corporations and other instrumentalities have had to rely on the General Fund to make payments on debt incurred with GDB or third parties to finance their operating deficits. This practice also affects the liquidity and available resources of the General Fund.

*Budget Deficits.* For more than a decade, the Commonwealth has experienced significant General Fund budget deficits. The table on page 10 of the Commonwealth Report sets forth the amount of these deficits during the last five fiscal years. These deficits, including the payment of a portion of the Commonwealth's debt service obligations, have been covered principally with the net proceeds of bonds issued by COFINA and Commonwealth general obligation bonds, with interim financings provided by GDB and, in some cases, with extraordinary one-time revenue measures.

The fiscal year 2014 approved budget was configured with an $820 million deficit, expected to be covered with $575 million in general obligation debt service refundings and $245 million in new deficit financing from GDB. On February 3, 2014, Governor Garcia Padilla announced that his administration would reduce the fiscal year 2014 deficit to $650 million by proposing legislation to reduce fiscal year 2014 appropriations by $170 million. In addition, the

Governor announced his commitment to recommend to the legislature the approval of a balanced budget for fiscal year 2015. On February 5, 2014 legislation was submitted to the Legislative Assembly to reduce fiscal year 2014 appropriations by $170 million.

This legislation would authorize the Director of the Office of Management and Budget ("OMB") to make adjustments to the approved appropriations for the amount of $170 million. OMB currently expects that the reduction in appropriations for the fiscal year 2014 will be implemented as follows: (i) elimination of $77 million from certain reserve and contingency accounts under the custody of OMB that are no longer deemed necessary; (ii) reduction of $29 million in certain program or special appropriations which, in OMB's judgment, may be adjusted because they are not a programmatic priority, or because the expenditures may be covered by other sources by the custodial agency, including non-General Fund sources or prior year carryover appropriations; and (iii) reduction of approximately $64 million in the operating budgets of central government agencies, excluding the Department of Education and certain autonomous entities. The reduction in agency budgets will vary from agency to agency according to their respective financial situations. On a weighted average basis, the overall reduction in appropriations totals approximately 2% of the approved budget. OMB will use the flexibility provided in the recently filed legislation, if approved, to determine the final distribution of the adjustments. Certain of the appropriation reduced, currently estimated by OMB at $16 million, may be charged against the Budgetary Support Fund, a nonrecurring fund created in fiscal year 2014, whose authorized appropriations would be reduced by an equivalent amount. OMB will use the flexibility provided in the recently file legislation, if approved, to determine the final distribution of the adjustments.

The Commonwealth's ability to meet its revised budget for the remainder of fiscal year 2014 and to achieve a balanced budget by fiscal year 2015 depends on a number of factors, some of which are not wholly within its control, including the performance of the economy, that actual collections of taxes meet the projections, and the government's ability to reduce and control governmental expenditures, particularly in areas such as education and healthcare where expenses have in the past consistently exceeded the budget. The Commonwealth has frequently failed to meet its revenue and expense projections, and its accounting, payroll and fiscal oversight information systems have deficiencies that significantly affect its ability to forecast expenditures.

In addition to eliminating the budget deficit from the prior fiscal year, the Government will have to address certain cost escalators in fiscal year 2015, currently estimated by OMB to include: (i) $173 million in incremental costs from collective bargaining agreements and legislated labor benefits; (ii) $132 million in incremental, formula-based appropriations for the judicial branch, the University of Puerto Rico and the municipalities; (iii) $126 million in higher operating subsidy requirements for public corporations such as the Medical Services Administration, the Health Insurance Administration, the Metropolitan Bus Authority, and the Maritime Transit Authority, which are currently running deficits and may not have the capacity to fully fund their operations; (iv) $125 million in additional debt service requirements due to incremental principal payments on Commonwealth general obligation bonds, higher scheduled debt service payments on loans made by GDB that are paid from legislative appropriations, and higher expected interest payments for the tax and revenue anticipation notes; (v) $64 million in programmatic or recurring appropriations (such as those related to the police reform settlement agreement with the United States Government) which were assigned in fiscal year 2014 to non-recurring special funds, such as the Science and Technology Fund and the Budgetary Support

Fund; (vi) $46 million in additional employer pension plan contributions pursuant to Acts 114-2011, 116-2011, and 3-2013; (vii) $38 million in incremental General Fund appropriations; and (viii) $38 million in higher water utility payments from increased rates. OMB currently estimates that total cost escalators for fiscal year 2015 will be in the range of $700 million to $800 million.

These cost escalators are expected to be partially offset by a number of anticipated cost reductions, particularly a lower starting employee headcount, fewer anticipated sick and vacation leave payments, and carryover funds from unused appropriations. However, in order to achieve the Governor's expressed commitment to eliminate the budget deficit in fiscal year 2015, OMB expects that many of the cost escalators may need to be significantly reduced or eliminated, and that significant additional budget cuts may be required. Potential corrective actions include: (i) legislation to significantly reduce or eliminate the cost escalators; (ii) additional reductions in special appropriations due to policy prioritization; (iii) use of sources other than General Fund revenues from fiscal year 2015 to cover non-recurring expenses; (iv) corrective actions to reduce the cost structure or improve the revenue sources of subsidized public corporations (such as the Medical Services Administration); (vi) reductions in operating expense appropriations, particularly contracts and purchased services, among others; and (vii) additional austerity measures.

All of the budget information regarding fiscal year 2015 set forth above is preliminary and subject to change. The budget process is at a very early stage and estimates of cost escalators, reductions and corrective measures may vary significantly. Useful expense and headcount data are still being collected, and the budgetary analysis at the individual agency level remains pending. Additionally, revenue projections from the Puerto Rico Treasury Department for fiscal year 2015 are not yet available. Until such revenue projections are provided, a final determination between the expense reduction and revenue enhancement measures needed to balance the budget in fiscal year 2015 cannot be made.  The incremental debt service appropriations arising from debt issuance by the Commonwealth not yet executed by February 15, 2014, is not included in the above-listed cost escalators and in the Governor's commitment to balance the budget by fiscal year 2015; further adjustments may be necessary in subsequent fiscal years to cover the incremental debt service arising from transactions occurring after that date.

Some of the measures needed to balance the budget may require additional legislation in order to raise revenues or implement significant expense cuts, and such legislation could face significant opposition from the individuals, businesses, and other constituencies affected, as well as from elected officials. There is no assurance that these measures, if enacted, will be successfully implemented or succeed in eliminating the budget deficit.

*The Commonwealth's Economy.*  The Commonwealth's gross national product has contracted (in real terms) every year except one since fiscal year 2007. For fiscal year 2014, the Puerto Rico Planning Board projects a decline of 0.8% in real gross national product. The Economic Activity Index published by GDB, which is a coincident indicator of ongoing economic activity but does not measure the real GNP annual growth rates, showed a cumulative reduction of 4.3% for the twelve months of calendar year 2013 compared to the same period of 2012. See, *Economic Activity Index* below. This contraction may have had an adverse effect on employment and could have an adverse effect on Commonwealth tax revenues and, consequently, on the Commonwealth's ability to achieve a balanced budget.

To achieve economic growth, the Commonwealth must attract additional local and foreign investment. The Commonwealth's plans in this regard are discussed in "**Economic Growth**" in the Commonwealth Report and under *Economic Development Initiatives* below.

One of the factors that continues to adversely affect the Commonwealth's ability to attract investment from the United States and increase economic activity is the elimination in 2006 of significant federal tax incentives applicable to United States companies doing business in Puerto Rico. Other factors that can adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy on the island, the loss of patent protection of several products manufactured in Puerto Rico, increasing competitiveness by other jurisdictions and global economic conditions. Thus, there is no certainty that the measures being taken by the Commonwealth to grow the economy will produce the level of increase in economic activity required to produce sufficient tax revenues over the short, medium and long-term to resolve the structural budget deficits that have affected the Commonwealth and allow it to support its outstanding debt. The failure by the Commonwealth to increase revenues, together with other factors discussed below, may affect the Commonwealth's ability to continue to meet its debt service obligations and provide government services at their current level.

*Tax Revenues.* As a result of the economic recession that has affected the Commonwealth since fiscal year 2007 and an income tax reduction program adopted in fiscal year 2011 to promote economic activity, the Commonwealth's revenues have decreased since fiscal year 2007. As discussed below, the special excise tax imposed by Act 154-2010, as amended ("Act 154"), has become one of the Commonwealth's principal sources of tax revenues. For fiscal years 2012 and 2013, the revenues produced by Act 154 represented 21.6% and 19.7%, respectively, of the Commonwealth's total General Fund revenues. For fiscal year 2014, it is estimated that Act 154 revenues will represent 20.3% of total General Fund revenues. Thus, any change that results in a reduction in the level of Act 154 revenues will have a significant impact on the Commonwealth's ability to reach and sustain a balanced budget.

Factors that can cause a reduction in the level of Act 154 revenues include a reduction in the level of local economic activity of the corporations that pay the Act 154 taxes, which might occur as a result of general economic conditions or factors affecting individual companies, any difficulties in the transition, after December 31, 2017, from the Act 154 temporary excise tax to the modified source of income rule under Act 154, and any action by the U.S. Treasury Department to reduce or eliminate the federal income tax credit available with respect to the Act 154 temporary excise tax. For a discussion of Act 154, see *Act 154* under **Major Sources of General Fund Revenues** in the Commonwealth Report.

The legislative measures adopted by the Commonwealth since January 2013, described under **Major Sources of General Fund Revenues** in the Commonwealth Report, were originally projected to increase tax revenues for fiscal year 2014 by approximately $1.66 billion when compared to the level of projected revenues absent such measures. This original amount included, among other things, (i) an additional $279 million which results from having the temporary excise tax at 4% for the full fiscal year (in fiscal year 2013 seven months had a tax rate of 3.75% and five months a tax rate of 2.75%); (ii) an additional $498 million from the new corporate gross sales tax ("*patente nacional*"); (iii) an additional $259 million resulting in part from the broadening of the sales and use tax base and $50 million from related enforcement actions; (iv) $270 million from the increase in the corporate income tax rates; (v) $20 million

from limits on the use of net operating losses in the calculation of the corporate alternative minimum tax; (vi) $66 million from measures affecting individual income taxes; and (vii) $217 million from measures affecting lotteries, casinos, government contracts, cigarette taxes, freezing of tax credits and insurance premium taxes. As explained further below, although the Treasury Department has recently revised estimates of some of these individual revenue items, the Treasury Department's aggregate General Fund net revenues estimated for fiscal year 2014 (approximately $9.525 billion) remain the same.

As of February 17, 2014, preliminary General Fund Revenues from the first seven months of fiscal year 2014 have exceeded aggregate General Fund revenues for the same period in fiscal year 2013 by approximately $539.3 million. Consequently, General Fund revenues for the remaining five months of fiscal year 2014 must exceed the aggregate General Fund revenues for the same period in fiscal year 2013 by at least $483.7 million to reach the total $1.023 billion increase in General Fund revenues estimated for fiscal year 2014. The total General Fund revenues for fiscal year 2013 ($8.502 billion) included approximately $718 million from non-recurring sources.

The Commonwealth's projections for tax revenues involve many assumptions, the effects of which are beyond the control of the Commonwealth, such as the impact of external factors and events on the economy that may, in turn, affect tax revenues. The projections also require the forecasting of new revenue measures with no historical collections experience. In the past, the Commonwealth's projections of tax revenues have differed materially from what the Commonwealth has been able to achieve. As a result, there is no assurance that the Commonwealth will achieve its tax revenue projections and, to the extent the Commonwealth fails to achieve such projections, the Commonwealth may need to implement further expenditure reductions or revenue enhancing measures in order to meet its obligations as they come due.

*Demographic Trends*. Changes in population will also have an impact on future economic growth and the growth of tax revenues. According to United States Census Bureau, the population of Puerto Rico decreased by 2.2% from 2000 to 2010, and by 3.0% from 2010 to 2013, driven primarily by migration to the United States mainland. Reductions in population, particularly of working age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short and medium-term. Moreover, if economic conditions deteriorate, the rate of migration could increase and could accelerate the depth and scope of the negative effect on the economy. In addition, the average age of the population of Puerto Rico is increasing, primarily as a result of the migration of younger workers to the United States mainland. This phenomenon is likely to increase the demand upon the government for health and other services and the cost to the government of providing such services; thus providing pressure for increasing government expenditures in the face of limited government revenues.

*Federal Grants.* Each fiscal year, the Commonwealth receives a significant amount of grant funding from the U.S. government. In fiscal year 2013, the Commonwealth received $4.58 billion in federal grant funds. See *Federal Grants* under **Components of General Fund Expenditures** in the Commonwealth Report. A significant portion of these funds is utilized to cover operating costs of the Commonwealth's educational, social services and health programs that are subsidized by the U.S. government. If the aggregate amount of federal grant funds transferred to the Commonwealth were to be reduced, the Commonwealth would have to make significant reductions in some of these government programs or fund these programs from the

General Fund.  Such reductions would have an adverse impact on the economy and on the Commonwealth's efforts to reduce its budget deficit by reducing the Commonwealth's tax revenues. In addition, since the per capita income of the residents of Puerto Rico is substantially lower than that of the 50 states, a high percentage of the population of the Commonwealth benefits from these government programs.  As a result, the impact on the Puerto Rico economy of any reduction in federal grant funds for such government programs would be greater than on the 50 states.

Another important factor is that certain federally funded programs are funded on a per-capita basis and a reduction in the number of beneficiaries due to demographic trends or changes in program parameters could result in a lower amount of federal funds. For instance, the Department of Education has experienced a substantial reduction in student enrollment in recent years which is expected to continue for the foreseeable future. Such reduction has been and will continue to be accompanied by a corresponding reduction in federal funding for some educational grants.  To the extent that the cost saving opportunities presented by the reduction in the number of students are not fully realized due to local policy or management issues, the net budgetary effect on the Department of Education of the reduction in student enrollment could be negative. See *Education Costs* below.

*Health Care.*   The Commonwealth, through its Health Insurance Administration ("PRHIA"), provides health insurance coverage to approximately 1.63 million qualifying (generally low-income) residents of Puerto Rico through the "Mi Salud" program. Of these, approximately 1.37 million individuals are considered part of the "federal population" whose cost is subject to matching federal funding and 260,000 individuals are considered part of the "Commonwealth population" whose cost is fully funded by the Commonwealth.

The cost of "Mi Salud" is significant: for fiscal year 2014, $2.383 billion has been budgeted, of which $885 million is paid from the General Fund, representing approximately 9.1% of General Fund expenditures, approximately $1.16 billion is paid from federal funds, and the balance is being paid from municipal and other funding sources.  For fiscal year 2014, PRHIA currently projects a shortfall of $60 million with actual revenues projected at $2.355 billion and actual expenses projected at $2.415 billion. Cost-saving measures under consideration or presently underway to address this deficit include, among others: (i) improving oversight of the third-party administrator; (ii) fraud prevention; (iii) changes to federal poverty limits; (iv) migration within sub-groups of participants (for example from Medicaid to Medicare, or from the Commonwealth population to the Federal population); and (v) continued improvements to the prescription rebates program.

The federal funds currently used for "Mi Salud" include non-recurring funds provided pursuant to the American Affordable Care Act ("AACA"), as well as recurring Medicaid funds, which in the case of the Commonwealth are capped while the funds received by the 50 states are not capped. The non-recurring AACA federal funds drawn for "Mi Salud" during fiscal year 2014 are projected to be $720 million, while the recurring capped Medicaid funds are projected to be approximately $288 million.  Additional recurring federal funds for "Mi Salud" available from the federal Children's Health Insurance Program (CHIP) for fiscal year 2014 are projected to be $148 million and $40 million for the prescription drug program.

Upon exhaustion of the non-recurring AACA funds, currently estimated to occur sometime in 2019, and absent congressional action to renew the AACA funding, the amount of federal funds available for "Mi Salud" will revert to the recurring capped Commonwealth Medicaid and CHIP allocations, resulting in significantly higher requirements of Commonwealth funding. Assuming that the availability of AACA funds is not renewed through Congressional action, PRHIA has developed three scenarios, with two varying key drivers: growth in insured population and growth in health care costs (i.e., insurance premium pricing). The following table illustrates the "Mi Salud" deficit (in millions) over the next eight years and AACA funds' depletion dates under such different scenarios, assuming flat revenues (i.e., no incremental General Fund appropriations or additional fee income from municipalities or others). The MAP (Medical Assistance Program) growth rate is the rate at which the regular Medicaid cap on recurring funding is assumed to grow.

| Assumptions | | | Commonwealth Fiscal Year | | | | | | | | AACA Depletion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Population Growth | Premium Growth | MAP Growth | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | |
| 0% | 0% | 2% | (60.3) | (127.0) | (127.0) | (127.0) | (127.0) | (230.3) | (926.4) | (920.1) | August , 2019 |
| 1% | 3% | 2% | (60.3) | (133.5) | (187.1) | (242.7) | (300.7) | (952.1) | (1,469.6) | (1,582.9) | April, 2019 |
| 2% | 5% | 2% | (60.3) | (140.1) | (234.8) | (336.3) | (445.0) | (1,560.6) | (1,950.3) | (2,188.9) | January, 2019 |

The above projections assume that no corrective actions are taken beyond what is necessary to maintain the underlying assumptions. According to PRHIA, absent corrective action, the high growth scenarios are more probable. As the depletion date approaches, depending on indications with respect to the probability of congressional AACA funds renewal, the Commonwealth can take a variety of steps including, among others, measures to reduce coverage, limit eligible beneficiaries, reduce premium costs and increase revenues. However, federal regulations may prohibit or limit the application of these measures to the federal population of "Mi Salud".

As the above table shows, the fiscal stability of "Mi Salud" is one of the largest budgetary challenges facing the Commonwealth, especially if the availability of AACA funds is not renewed or Medicaid funds are not significantly increased. In light of the current disparity in the treatment that the Commonwealth receives compared with other mainland jurisdictions with respect to the cap imposed on Medicaid matching funds, it is expected that the Commonwealth will intensify its efforts in seeking to have AACA funding renewed by Congress for "Mi Salud". However, it is not possible to predict the likelihood that such efforts will succeed, and the Commonwealth will continue evaluating the fiscal structure of the program taking into consideration the current federal funding depletion estimates. To the extent these efforts are unsuccessful, it is unlikely that the Commonwealth would be able to assume a significant portion of the projected deficit.

PRHIA commenced recently a request for proposal ("RFP") process for Mi Salud with the approval of the Center for Medicare and Medicaid Services. The RFP will integrate the physical and mental health services through a managed care organization model for the period from July 1, 2014 to June 30, 2017. PRHIA expects that this process will result in a program with lower operating costs, higher quality of services and stringent auditing procedures of the selected carriers.

In September 2013, the Governor announced the implementation of a Universal Access Program ("UAP") to provide affordable health insurance to the uninsured population with income levels that do not qualify for "Mi Salud". Under the new UAP, administered by PRHIA,

beneficiaries with income levels that are too high for "Mi Salud", but too low to afford private insurance, will receive a limited coverage that meets Essential Health Benefit standards under the AACA. Beneficiaries would be responsible for up to 40% of the premium costs of the new UAP. The average cost to the Commonwealth per beneficiary is estimated by PRHIA at $60 per member per month, in comparison with the $150 per member per month estimated for fiscal year 2015 for the regular "Mi Salud" program.

In order to fund the UAP, the Commonwealth will ask the federal government to increase the maximum income for eligibility for Medicaid under "Mi Salud" from $400 per month to $550 per month. This "federalization" of approximately 76,000 Commonwealth "Mi Salud" beneficiaries will make the Commonwealth eligible for federal Medicaid reimbursement with respect to those beneficiaries. The additional federal funding would then be invested in the UAP, leading to a deficit-neutral implementation in the near term. The scenarios set forth previously, including cost margins, AACA depletion date, and breakdown of insured population by type, already consider the estimated impact of the implementation of the new UAP program. The increase in the "Mi Salud" eligibility level is scheduled to go into effect in late February or March of 2014.

In January 2014, the Commonwealth received a letter from the Center for Medicaid and Medicare Services of the U.S. Department of Health and Human Services indicating that "Mi Salud" is eligible for an enhanced matching percentage in excess of the current Medicaid match. Although accepting this option would materially improve the near term financial outlook of "Mi Salud" – leading to near term surpluses – it would also materially advance the depletion date of AACA funds. No policy decision has been made to accept this option as of February 15, 2014.

***Education Costs.*** The budget appropriation for the Commonwealth's Department of Education ("DOE") represents 25% of the total General Fund budget for fiscal year 2014. Historically, the Department of Education has suffered from inadequate cost control mechanisms and produced annual budget overruns.

After the August 2013 hiring cycle for the new school year, the DOE faced a projected deficit in its General Fund budget for fiscal year 2014 – the direct Commonwealth appropriations plus the Commonwealth portion of the *Schoolwide* mixed federal-state funds pool – of $162 million. This forecast did not consider the availability of $58 million in carryforward surplus funds. In response to this situation, OMB and DOE developed a corrective fiscal work plan. The plan included the implementation of a special procedure for hiring review, and a number of recurring and non-recurring actions. These included (i) reorganization of school security (particularly the nighttime shift); (ii) reallocation of certain school dining and other employees to the federally funded program; (iii) reduction in liquidation of excess sick leave to a maximum of 5 days; (iv) maintaining lower payroll due to lower headcount than initially projected; (v) payment of retirement sick and vacation leave through an existing line of credit from OMB approved for these purposes; (vi) transferring federal funding into the *Schoolwide* mixed federal-state pool; (vii) payroll reductions from unauthorized absences resulting from work stoppage; and (viii) renegotiation of certain real estate lease agreements.

As of January 31, 2014, according to the DOE, the forecasted deficit not including measures still pending execution totaled $74 million. However, the implementation of all actions described above would reduce the deficit to $9 million. After taking into consideration the application of the $58 million carryforward surplus to certain non-recurring expenses and to

the payment of certain proposed contingencies currently under review, such as debt from the prior fiscal year and potential special education services and transportation overruns, it is currently estimated that the DOE will finish fiscal year 2014 with a $3 million surplus.

Due to the considerable size of the DOE budget, the Commonwealth's ability to achieve budgetary balance depends on its ability to continue to monitor and control DOE expenditures. There is no certainty that the DOE budget estimates for fiscal year 2014 will be achieved or that the DOE would not incur budget overruns in the future.

*Pension Costs.* A significant component of the Commonwealth's budget is the cost of its retirement systems (especially the Commonwealth's Government Employees Retirement System ("Employees Retirement System") and the Commonwealth's Teachers Retirement System ("Teachers Retirement System") which are much larger than the Commonwealth's Judiciary Retirement System ("Judiciary Retirement System")). The three principal pension systems of the Commonwealth are severely underfunded. See **RETIREMENT SYSTEMS** in the Commonwealth Report and *Recent Legislation* below. Although the Commonwealth enacted legislation in 2013 and 2014 that reforms these retirement systems by, among other measures, reducing benefits, increasing employee contributions, and replacing most of the defined benefit elements of the system with a defined contribution system, it is anticipated that the Commonwealth will have to provide additional annual funding (above the statutorily prescribed contributions) to meet the systems' annual funding obligations. At present, it is projected that the additional annual contribution required to be made by the employers in the Employees Retirement System through fiscal year 2032 is approximately $140 million, of which approximately $78 million is allocable to the central government and will be funded from the General Fund, and the balance of which is allocable to the municipalities and participating public corporations. In the case of the Teachers Retirement System, the required additional employer annual contribution will be fully funded from the General Fund, and it is currently estimated at $30 million for fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042. These funding requirements may place an additional demand on the Commonwealth's need to raise revenues, reduce expenditures, or do both. These estimates will need to be revised after the pension reform changes have been fully implemented and the Employees Retirement System and the Teachers Retirement System have accounted for the actual number of employees who have opted or will opt for early retirement in anticipation of the pension reforms, which may be materially higher than the numbers assumed by the Systems when preparing such estimate. To the extent the assumptions used to estimate the effect of these reforms on the General Fund are not realized, the General Fund may be adversely affected as it may have to use additional resources to meet these obligations.

The constitutionality of the recently enacted amendments to the Teachers Retirement System and the Judiciary Retirement System are currently being challenged in court. In January 2014, the Puerto Rico Supreme Court stayed the effectiveness of the amendments to the Teachers Retirement System pending the completion of an evidentiary hearing before a Special Master appointed by the Court. On February 7, 2014, the Special Master issued its report and on February 11, 2014, the Puerto Rico Supreme Court issued an order granting both parties until March 3, 2014, to file briefs on the constitutionality of the amendments. In 2013, the Puerto Rico Supreme Court upheld the constitutionality of similar (although not identical) amendments enacted to the Employees Retirement System, the largest of the three systems. There is no assurance that the constitutionality of the reform to the Teachers Retirement System will be upheld and, if upheld, that it will produce the expected cost savings.

Given current projections which consider a stable level of teachers when compared to fiscal year 2012, the changes in the Teachers Retirement System's pension benefit structure are expected to result in approximately $3.7 billion in present value savings (calculated on the basis of basic pension benefit disbursements reduction from fiscal year 2015 through fiscal year 2050, assuming a 5.95% discount rate).

Notwithstanding the reforms of the Employees Retirement System and the Teachers Retirement System, which were designed to address the Commonwealth's cash flow needs and "pay-as-you-go" requirements, both Systems will continue to have a large unfunded actuarial accrued liability and a low funding ratio.

*Return of ARRA Funds*. As part of the American Recovery and Reinvestment Act of 2009 ("ARRA"), in 2009 the United States Congress adopted the Making Work Pay Credit ("MWPC") to provide refundable tax credits of up to $400 (or $800 if joint filers) to working individuals for taxable years 2009 and 2010. In order to provide the tax credit to residents of Puerto Rico, the United States Treasury paid the Puerto Rico Treasury Department approximately $1.2 billion. The Commonwealth was to return the balance of ARRA funds not spent as of December 31, 2013. As of December 31, 2013, the balance owed to the United States Treasury was $349 million, including $300 million that was not spent on MWPC and $49 million in overpayments made to certain taxpayers. The Commonwealth has reached an agreement with the United States Treasury to return the fund balance of $300 million in monthly installments of $25 million beginning on February 3, 2014 until the balance has been repaid. Thereafter, the Commonwealth will make two additional monthly payments of $25 million and $24 million, respectively, to cover the MWPC related overpayments. These funds, which are currently on deposit with GDB, constitute a portion of GDB's current funding sources. The withdrawal of these funds as provided or at a faster rate may have a negative effect on GDB's liquidity position.

## Special Investor Considerations Regarding Emergency Measures and Insolvency Risks

As discussed above, the Commonwealth has been experiencing a number of fiscal and economic challenges in recent years due, among other factors, to continued budget deficits, a prolonged economic recession, high unemployment, population declines and high levels of debt and pension obligations. Some of these factors have also affected the financial condition of several of the public corporations. In recent months, lower credit ratings and the widening of credit spreads for the Commonwealth's public sector debt have delayed the Commonwealth's plan of financing, including plans to finance the budget deficit for fiscal year 2014. This, in turn, has adversely affected the liquidity position of GDB, as the liquidity needs of the central government and public corporations have been financed internally by GDB or through short-term financings from other lenders. The recent downgrade of the public sector debt to non-investment grade status by Moody's, S&P and Fitch has put further strain on the Commonwealth's and the public corporation's liquidity situation and may affect access to the bond market and other sources of financing, as well as the cost of any such funding. See *Summary of Principal Fiscal and Economic Challenges of the Commonwealth* above.

The Commonwealth intends to access the bond market with one or more transactions to refinance existing debt. It also intends to adjust its budget in a manner that will eliminate its current General Fund deficit by fiscal year 2015 and provide for future balanced fiscal operations. If the Commonwealth is unable to successfully access bond market or obtain

I-17

alternative sources of financing, or if the adjustment measures stall or prove insufficient to address the Commonwealth's fiscal problems, then the financial condition of the Commonwealth may deteriorate further and its options to improve its fiscal health may be limited.  A similar result could occur at one or more of the public corporations if they are unable to eliminate their operational deficits and access financing sources.

Under current law, the Commonwealth and its public corporations are not eligible to seek relief under Chapter 9 of the United States Bankruptcy Code, which is the only chapter under which a "municipality" can seek relief thereunder.   In the event, however, that the Commonwealth or some of its public corporations were to lack sufficient resources to fund governmental services as well as meet debt service obligations, the Commonwealth or such public corporations may be forced to take emergency measures to address this situation.  While no specific contingency plan has been adopted to address any such situation, GDB, which acts as fiscal agent to the Commonwealth and its instrumentalities, is evaluating alternative courses of action.  These could include, at the central government level, administrative measures that give effect to the "priority norms" established by law for the disbursement of public funds when available resources are insufficient to cover all appropriations (see **Financial Control and Adjustment Procedures under Budget of the Commonwealth of Puerto Rico** in the Commonwealth Report, which sets forth the Constitutional and statutory order of disbursement of public funds in such an insufficiency situation), or, if necessary, more severe measures.  The Commonwealth and the public corporations could also seek relief under existing Commonwealth law or under laws enacted in the future regarding insolvency, reorganization, moratorium and similar laws affecting creditors' rights, which could affect the rights of the holders of bonds and notes of the Commonwealth and its public corporations and the enforceability of the obligations to make payments on such bonds and notes.

**Fiscal Condition**

***Preliminary General Fund Revenues for the First Seven Months of Fiscal Year 2014.*** Preliminary General Fund revenues for the first seven months of fiscal year 2014 (July through January of 2014) were $4.625 billion, an increase of $539.3 million, or 13.2%, from the same period of the prior fiscal year.  These revenues are approximately $39 million, or 0.85%, more than the revenues budgeted for this period. The increase in revenues during this period is primarily due to legislative measures adopted since January 2013.

Preliminary sales and use tax collections for the first seven months of fiscal year 2014 were $737.5 million, an increase of $40.8 million, or 5.9%, from the same period of the prior fiscal year. These sales tax collections are approximately $91 million, or 11%, less than the amount originally budgeted for this period. Of the total annual amount budgeted (originally $1. 514 billion and now $1.274 billion), $644 million was allocated to pay COFINA debt service.

The Commonwealth believes that its original estimate of $9.525 billion in total General Fund revenues continues to be accurate, although it recently revised its estimates of certain individual revenue items after the experience of the first six months of the fiscal year.  The most significant revisions are a projected reduction in sales and use taxes of the central government from $865 million to $614 million (a reduction of $251 million), and a projected reduction in individual income taxes from $2.088 billion to $2.004 billion (a reduction of $84 million), which would be offset by a projected increase in corporate taxes from $2.123 billion to $2.513 billion (an increase of $390 million).

The primary reasons for the results in sales and use tax collections for the first six months of fiscal year 2014 when compared to the original budget and the corresponding revisions to the budget include (i) the total sales of some previously exempted sectors decreased after they became taxable in July 2013, (ii) some businesses that qualified for exemption before the tax law changed but became taxable thereafter were already paying the tax due to their failure to obtain exemption certificates, (iii) the sources of information used since 2006 to estimate collection have proven inadequate, (iv) administrative determinations made after the law was amended that have reduced collections, (v) delays in the implementation of the newly enacted measures, and (vi) tax evasion.

The primary reasons for the results in corporate tax collections for the first six months of fiscal year 2014 when compared to the original budget and the corresponding revisions to the budget include (i) the original estimate was prepared using a 2010 database which understated corporate income tax payments given that income reported by corporations during 2010 was lower than income reported in 2011 and 2012, (ii) certain estimated tax payments that had been anticipated had not been included in the original budget, as a cautionary measure to cover potential revenue shortfall, and (iii) a large number of corporations did not pay their December estimated tax payments or paid much lower amounts than what was due while awaiting the conclusion of a lawsuit challenging the constitutionality of the corporate gross sales tax (the case was dismissed on December 31, 2013).

***Preliminary General Fund Expenses for the First Six Months of Fiscal Year 2014.*** For the first six months of fiscal year 2014, OMB estimates that General Fund expenses were below the budgeted appropriations by approximately $57 million, primarily as a result of a decline in payroll expenses (which were, for the same time period 2% below budget and 6% below the prior fiscal year), and the implementation of a fiscal improvement program at the Department of Education.

Prior to the filing of the amendment to reduce the budget by $170 million, OMB projected that the remainder of the fiscal year would result in a $30 million overspending at the agencies, leaving a net $27 million surplus in operating expenses. With the new legislation and the corresponding adjustments, OMB expects to achieve an additional $43 million in operating expense savings to meet the amended budget, assuming continued successful implementation of the DOE corrective action plan. These savings would be combined with the approximately $100 million in reductions to special appropriations previously described to reach the total proposed reduction of $170 million.

The above estimate assumes a $9 million DOE deficit as previously described and does not consider for fiscal year 2014 expenses charged to sources that are not General Fund appropriations, including prior year carryover General Fund special appropriations regardless of whether such prior year appropriations are being drawn by the original custodial agencies within the original intent of the appropriation, or whether they were transferred to OMB to cover contingencies and other expenses, recurring or non-recurring. In preparing its estimates, OMB takes into account individual agency projections, but adjusts such agency projections according to its judgment. The deficit figures do not include the forecasted deficits of public corporations that receive operating or program subsidies from the General Fund, such as the Maritime Transit Authority, the PRHIA, the Public Buildings Authority, the Metropolitan Bus Authority, and the Medical Services Administration.

I-19

**Recent Legislation**

*Adoption of Comprehensive Reforms of Teachers Retirement System and Judiciary Retirement System.* On December 24, 2013, the Governor signed into law Act 160-2013 ("Act 160") and Act 162-2013 ("Act 162"), which enacted comprehensive reforms of the Teachers Retirement System and the Judiciary Retirement System. These retirement systems, together with the Employees Retirement System, constitute the three largest public employee retirement systems that are funded primarily with budget appropriations from the General Fund. As discussed in the Commonwealth Report, the Commonwealth enacted a comprehensive reform of the Employees Retirement System in April of 2013.

As in the case of the reform adopted for the Employees Retirement System, the reform of the Teachers Retirement System freezes the retirement benefits that participants will have accrued under the current defined benefit system as of July 31, 2014, and thereafter replaces this defined benefit system going forward with a defined contribution plan. The retirement age for participants that are employed as of July 31, 2014 is increased to 55 years of age, if they have completed 30 years of service, or 60 years of age, if they have completed at least five years of service. Participants who would have completed 30 years of service from August 1, 2014 through June 30, 2016 will be eligible to retire as of July 31, 2014 and to receive 70% of their average salary as of December 24, 2013, provided that if they have not reached 55 years of age, employee and employer contributions will have to continue until they reach such age. Participants joining the program on or after August 1, 2014, will be eligible to retire when reaching 62 years of age, if they have completed at least five years of service and have contributed more than $10,000 in their individual accounts. The employee contribution to the Teachers Retirement System, including for existing employees, is increased from 9% to 10% of salary. The employee contribution will be revised and increased gradually to approximately 14% in fiscal year 2021. The employer contribution, which has been increasing annually pursuant to legislation enacted in 2011, will continue to increase in accordance with that legislation until it reaches 19.75% of salary in fiscal year 2022, and will increase further to 20.525% thereafter. Effective August 1, 2014, the employer contributions will not fund the employee's individual accounts, but will instead be used to fund the frozen defined benefit plan. The law also reduces or eliminates certain benefits granted to existing and future retirees under special laws, and provides for additional annual contributions from the General Fund to the system of $30 million in fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042.

The reform of the Judiciary Retirement System establishes a new hybrid retirement system for judges appointed after July 1, 2014, which includes both a defined benefit and a defined contribution component. The legislation also increases employee contributions by judges appointed on or before June 30, 2014 by 2.0% of salary, and establishes that those appointed after July 1, 2014 must contribute 12% of their salary. The legislation also eliminates the Christmas, summer and prescription medicines bonuses that were granted pursuant to separate laws.

The reforms of the Teachers Retirement System and the Judiciary Retirement System, together with the additional contributions described above, are projected, based on actuarial assumptions, to eliminate the need for additional "pay-as-you-go" contributions from the General Fund.

The constitutionality of Act 160 and Act 162 are currently being challenged in several lawsuits brought by participants of the Teachers Retirement System and the Judiciary Retirement System. With respect to Act 160, the Puerto Rico Supreme Court appointed a Special Master to conduct an evidentiary hearing on the facts and suspended the effectiveness of Act 160 pending final resolution at the constitutional challenge. On February 7, 2014, the Special Master issued its report and on February 11, 2014 the Puerto Rico Supreme Court issued an order granting both parties until March 3, 2014 to file briefs on the constitutionality of Act 160. The Commonwealth believes that Act 160 and Act 162 are constitutional and intends to forcefully defend their constitutionality in all forums. In June 2013, the Puerto Rico Supreme Court upheld the constitutionality of similar (but not identical) legislation that reformed the Employees Retirement System after it was also challenged by participants of that system.

*Changes to Sales and Use Tax Rates and Creation of Municipal Financing Corporation*. Pursuant to Act 40-2013 and Act 18-2014, effective February 1, 2014, the municipal sales and use tax was reduced from 1.5% to 1.0%, the Commonwealth sales and use tax was increased from 5.5% to 6.0%, and the minimum amount of the Commonwealth sales and use tax available to COFINA was increased. The increase in the Commonwealth sales and use tax is expected to result in an approximately 9% increase in revenues available for COFINA debt service and coverage.

Act 19-2014, adopted together with Act 18-2014, creates the Municipal Financing Corporation ("COFIM" by its Spanish acronym). COFIM is authorized to issue bonds and use other financing mechanisms to pay or refinance, directly or indirectly, all or a portion of the municipalities debt obligations payable from the municipal sales and use tax. COFIM will receive, on an annual basis, the first collections attributable to the 1.0% municipal sales and use tax until the greater of 0.3% of the municipal sales and use tax or the "base amount" established in the statute is deposited annually in COFIM. The base amount for fiscal year 2015 is $65.5 million and increases by 1.5% every fiscal year. Amounts remaining after all transfers have been made to COFIM, and any amounts transferred to COFIM not necessary to pay COFIM's annual debt service, will be made available to the municipalities for operating expenses (the "COFIM Surplus"). COFIM expects to issue bonds principally in order to refinance municipal sales and use tax-backed loans granted to municipalities by GDB. There are currently approximately $550 million sales and use tax-backed loans granted to the municipalities by GDB. However, certain municipalities have elected to opt-out of a possible refinancing of their loans which could reduce the amount of loans on GDB's books that are refinanced pursuant to COFIM. Notwithstanding the opt-out by certain municipalities (the "Opt-Out Municipalities"), the first collections attributable to the 1.0% municipal sales and use tax of the Opt-Out Municipalities will continue to flow through COFIM, and consequently will not impact the debt service coverage ratio attributable to the financing structure whereby COFIM will first receive an amount not less than the "base amount" prior to the transfer of collections attributable to the 1.0% municipal sales and use tax of *all* municipalities prior to such collections being made available for municipal operating expenses (including those of the Opt-Out Municipalities).

Act 18-2014 also creates the Municipal Administration Fund ("MAF"), which is intended to provide the municipalities with the economic benefit of the municipal sales and use tax collections lost as a result of the reduction from 1.5% to 1.0% in the municipal sales and use tax rate that occurred concomitantly with the increase from 5.5% to 6.0% in the Commonwealth's sales and use tax rate. The MAF will be funded from the first moneys due to the Secretary of the Treasury from the Commonwealth's sales and use tax once all required deposits have been made

to COFINA (the "Transfer Date") up to an amount equal to the equivalent of 8.33% of all collections from the Commonwealth's sales and use tax to the Transfer Date, and thereafter, on a pro-rata basis with the transfer of sales and use tax collections to the General Fund. Total deposits to the MAF in any fiscal year will equal the amount attributable to 0.5% of the Commonwealth sales and use tax for the current fiscal year. Amounts on deposit in the MAF will be for the benefit of the municipalities, and may be used to continue funding the Municipal Redemption Fund, the Municipal Development Fund and the Municipal Improvements Fund, which were previously funded from the collections attributable to 0.5% of the municipal sales and use tax. In addition, GDB is required to make certain advances to the municipalities during the fiscal year in order to address any monthly cash shortfall caused by timing delays as a result of the lag in availability of operational funds to the municipalities caused by interposing the COFIM and COFINA funding requirements prior to making such funds available to the municipalities. Such advances by GDB would be payable from the COFIM Surplus and the amount to be received by the MAF. Finally, to the extent the amount of Commonwealth sales and use tax collections available for deposit into the MAF during any fiscal year is less than the amount attributable to 0.5% of the Commonwealth sales and use tax for such fiscal year, the Commonwealth's General Fund is required to cover any such shortfall.

In addition, Act 117-2013 amended the mechanism for collection of the sales tax from certain merchants after July 1, 2014, which is expected to improve collections. After such date, importers will be required to pay the tax on the imported merchandise and will be able to claim a credit for sales tax collected on subsequent resale of the merchandise.

***Reform of GDB's Lending Practices, Financing Capacity and Oversight Powers of Public Funds.*** Recently enacted Act 24-2014 prohibits GDB, subject to certain limited exceptions, from making loans to public corporations payable from future increases in rates, taxes or other charges. In essence, each public corporation seeking financing from GDB must demonstrate sufficient approved revenue streams to cover debt service on any GDB loan. As an exception, GDB is permitted to grant emergency loans in those cases where the Board of Directors of GDB determines that essential public services could be affected. These loans, however, are limited to an aggregate amount not to exceed 10% of the gross income of such government entity during the previous two fiscal years up to a limit of $50 million. GDB is also permitted to grant loans to government entities that are deemed to be not capable of repaying any principal or interest amount owed to bondholders or financial entities other than GDB. Act 24-2014 is intended to impose fiscal discipline on the public corporations, while preserving GDB's balance sheet.

In addition, such legislation (i) increases from $550 million to $2 billion the amount of GDB obligations that can be guaranteed by the full faith and credit of the Commonwealth to provide GDB with greater flexibility in its role of granting interim financing to public corporations and agencies (such guarantee can also be extended before September 1, 2014, at the discretion of the Treasury Secretary and GDB, to certain other governmental obligations guaranteed by GDB), (ii) grants GDB the ability to exercise additional oversight over certain public funds deposited at private financial institutions and grants GDB the legal authority, subject to an entity's ability to request waivers under certain specified circumstances, to require such public funds (other than funds of the Legislative Branch, the Judicial Branch, the University of Puerto Rico, governmental pension plans, municipalities and certain other independent agencies) to be deposited at GDB, which is expected to result in a more efficient management of public resources and (iii) provides a process through which OMB may assume, on behalf of the

I-22

Commonwealth, the repayment from budgetary appropriations (commencing fiscal year 2017) of certain obligations owed by governmental agencies or public corporations to GDB, up to a maximum amount of $500 million.

## Proposed Legislation

*Creation of New Integrated Transportation Authority.* Other recently proposed legislation, which the Commonwealth expects will be approved by the Legislative Assembly shortly, would create the Mass Transit Authority ("MTA") by merging the mass transportation assets currently held by PRHTA, including the "Tren Urbano," the Metropolitan Bus Authority, and the Maritime Transportation Authority. The legislation provides an eight-year transition period during which the General Fund may provide annual funds of up to $30 million to MTA to support its operations. In addition, traffic fines and certain collections from the Department of Transportation and Public Works that are currently deposited into the General Fund would be transferred to MTA. The Commonwealth believes that the creation of this new MTA will result in operational and budgetary efficiencies and a better quality mass transportation service. The transfer the Tren Urbano's assets and operating expenses to MTA is expected to improve PRHTA's financial results.

*Change in Governance Structure of the Puerto Rico Highways and Transportation Authority.* Recently proposed legislation, which the Commonwealth expects will be approved by the Legislative Assembly shortly, would change the governance structure at the PRHTA by establishing a board of directors. The board of directors would be composed of three private citizens and four public officials, including the GDB President, the Treasury Secretary and the Secretary of Transportation and Public Works. Presently, the PRHTA is governed by a single public official, the Secretary of Transportation and Public Works.

*Reduction of Energy Costs.* Several bills have been filed at the Legislative Assembly that address energy costs in Puerto Rico. One bill supported by the Governor proposes to restructure the Telecommunications Regulatory Board (the "TRB") into the Energy and Telecommunications Commission, which will be responsible for all energy and telecommunications regulatory matters. This new entity would also be responsible for all tariff-related issues. Another bill supported by the President of the Senate proposes to create a regulatory agency that will approve or reject energy rates for all energy producers in Puerto Rico and would be responsible for opening up Puerto Rico's energy market to competition. Both proposals aim to substantially reduce Puerto Rico's energy costs.

*Issuance of General Obligation Bonds.* Recently proposed legislation, which the Commonwealth expects will be approved by the Legislative Assembly shortly, would authorize the Treasury Secretary to issue up to $3.5 billion in Commonwealth general obligation bonds. The proceeds of this bond issue may be used to pay, finance or refinance outstanding debt of the Commonwealth, including appropriation debt with GDB, among other uses.

## Economic Conditions

*Gross National Product.* According to the Puerto Rico Planning Board's latest projections, made in October of 2013, it is estimated that Puerto Rico's real gross national product for fiscal year 2013 neither grew nor declined when compared to the prior fiscal year. Puerto Rico's real gross national product for fiscal year 2014 is currently forecasted to decline by 0.8%. The Planning Board is expected to publish a new forecast in March of 2014 for fiscal

years 2014 and 2015, with the revised figures for fiscal year 2012 and the preliminary estimates for fiscal year 2013.

*Employment.* During the first six months of fiscal year 2014, total employment fell by 2.0% as compared to the same period for the prior fiscal year, and the unemployment rate averaged 14.8% compared to 14.2% for the same period of the prior fiscal year. According to the Establishment Survey, total payroll non-farm employment decreased by 4.3% during the first six months of fiscal year 2014. This reduction is partially attributable to attrition and to the changes to the Employees Retirement System, as more than 46% of the total employment reductions experienced during this period corresponded to decreases in state and local government employment.

*Economic Activity Index.* GDB's Economic Activity Index (the "EAI") for December of 2013 reflected a 5.2% reduction compared to December of 2012. The average cumulative value for the twelve months of calendar year 2013 showed a reduction of 4.3% compared to the same period of 2012. The average cumulative value for the first six months of fiscal year 2014 showed a reduction of 5.4% compared to the same period of fiscal year 2013. The EAI is a coincident indicator of ongoing economic activity but it does not measure the real GNP annual growth rates. Since the EAI is generated with only four variables (total payroll employment, cement sales, gasoline consumption, and electric power generation), it is more volatile than the real GNP figures. This means that both increments and declines reflected in the EAI amplify the corresponding movements of the real GNP.

## Economic Development Initiatives

*Manufacturing and Knowledge Services.* Puerto Rico Industrial Development Company's recent outreach initiatives have resulted in the following positive developments:

- $265 million in investments and expansions by three medical devices manufacturers that are expected to create 700 new jobs.

- $200 million investment by a pharmaceutical manufacturer to streamline its manufacturing processes in Puerto Rico.

- 400 new committed jobs from a pharmaceutical manufacturer.

- 700 new committed jobs from the knowledge services and information technology industries.

- Over 100 new contracts negotiated by the Puerto Rico Industrial Development Company ("PRIDCO") during calendar year 2013 to create 10,049 new jobs in the aggregate related to different manufacturing sectors, including biopharma, construction and engineering, medical devices, knowledge services, aerospace electronics and information technology.

Based on the above and other ongoing negotiations, the PRIDCO expects to negotiate contract to create 8,697 jobs in these industries during the 2014 calendar year.

*Tourism.* The Puerto Rico Tourism Company has focused its recent efforts on expanding Puerto Rico's air and maritime access given its importance for both tourism and trade growth and in the launching of its new destination advertising campaign. Recent developments include:

- Southwest Airlines entered the Puerto Rico market, substituting its subsidiary AirTran with routes to Baltimore, Atlanta, Fort Lauderdale, Tampa and Orlando. The entry of Southwest resulted in an upgrade of aircraft, generating 33% more passengers during 2013-2014.

- Avianca Airlines, a Colombian flag-carrier began flying from Bogotá to San Juan three times a week and an economic impact of $150 million is expected during its first year of operation.

- JetBlue launched a direct nonstop service between Chicago O'Hare International Airport (ORD) to San Juan's Luis Muñoz Marín International Airport ("LMM"), which represents 150 available seats daily, an economic impact of over $40 million annually to the Puerto Rico economy.

- The move of Seabourne Airlines headquarters to Puerto Rico is expected to create 400 new jobs in addition to the relocation of its headquarters. Seaborne has started service from LMM to La Romana, Dominican Republic. Additional routes have started in 2014, including to St. Kitts and Nevis, Punta Cana (Dominican Republic) and St. Maarten.

- Cruise ship traffic is currently estimated to increase 14% in fiscal year 2014 (1,181,594 passengers). For fiscal year 2015, an additional 20% is currently projected in cruise passengers (1,412,376). This increase is partly attributable to Royal Caribbean's Jewel of the Seas use of San Juan as its year-round homeport, and to increased transit calls from Carnival, Royal Caribbean and Celebrity Cruise Lines. Additionally, MSC Cruises has increased visits to the Island and Princess Cruise will restart visits to San Juan in early summer 2014, while Disney will homeport in San Juan during Sept-Oct 2014.

- $7 million in improvements at Pier 3 of the San Juan Harbor will soon be completed which will make it possible to accommodate the very large Quantum of the Seas and even larger Oasis-class vessels.

- Over 6,500 new rooms in financial, permits or construction phases. The construction of these new rooms is expected to create approximately 2,661 jobs.

- Establishment of the Bed & Breakfast Program in order to promote the creation of small businesses. The first official B&B, Casa Sol in Old San Juan, was inaugurated in 2013. Many more are being evaluated to be integrated in the program.

*Jobs Now Act.* Since the enactment of the Jobs Now Act in February of 2013, 587 businesses have been granted incentive decrees with an aggregate commitment to create 9,684 new jobs.

On February 5, 2014, the Governor announced that his administration will accelerate the infrastructure investment plan by pursuing $800 million in infrastructure investments, including public-private partnerships, that have been identified and by accelerating agency reviews of infrastructure investment plans. The Governor also stated that his Administration will continue to diversify and strengthen the economy by growing targeted sectors, such as the pharmaceutical, aerospace and tourism sectors, and attracting new investments.

**Debt**

*Public Sector Debt.* The following table presents a summary of public sector debt as of December 31, 2013. This table includes debt primarily payable from Commonwealth or municipal taxes, Commonwealth appropriations, and rates charged by public corporations for services or products, as well as debt payable from other sources, some of which is set forth in footnote 6 below. Excluded from the table is debt that if included would result in double counting, including but not limited to $793 million of outstanding bonds issued by Puerto Rico Municipal Finance Agency to finance its purchase of bonds issued by Puerto Rico municipalities as well as $4.8 billion of GDB notes outstanding.

**Commonwealth of Puerto Rico**
**Public Sector Debt**
**(in millions)**

| | December 31, 2013 |
|---|---|
| Full faith and credit bonds and notes issued by the Commonwealth | $10,215 |
| Bonds and notes guaranteed by the Commonwealth's full faith and credit [1] | 5,646 |
| SUBTOTAL - FULL FAITH AND CREDIT BONDS AND NOTES | 15,861 |
| | |
| Debt supported by Commonwealth appropriations or taxes [2] | 4,080 |
| Tax and Revenue Anticipation Notes [3] | 1,075 |
| SUBTOTAL - DEBT PAYABLE FROM GENERAL FUND | $21,016 |
| | |
| Bonds and notes payable from sales tax revenues (COFINA) | $15,557 |
| Debt issued by public corporations and other instrumentalities [4] | 26,197 |
| Debt issued by municipalities | 4,112 |
| Pension Funding Bonds (payable from employer contributions to ERS) [5] | 2,948 |
| Other limited obligation debt and non-recourse debt [6] | 2,072 |
| SUBTOTAL - OTHER PUBLIC SECTOR DEBT | 50,886 |
| | |
| TOTAL PUBLIC SECTOR DEBT | **$71,902** |

Totals may not add due to rounding.

[1] Consists of $690 million of bonds issued by the PRASA, $479 million of Puerto Rico State Revolving Fund loans made to PRASA under various federal water laws, $224.6 million of bonds issued by Port of the Americas Authority (which are held by the GDB), $31.7 million of General Services Administration notes, and $4.221 billion of Puerto Rico Public Building Authority ("PBA") bonds. Excludes (in order to avoid double counting) $267 million of GDB bonds payable from available moneys of GDB and $110 million of GDB senior guaranteed notes Series 2013B, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities, which loans are included in the table.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes $1.090 billion of bonds issued by the Public Finance Corporation, $2.126 billion of appropriation debt notes issued by the public corporations and agencies (including $68 million of bonds issued by PBA), $825.7 million of notes issued by the Treasury Department (such debt is excluded from the Public Corporations Debt Table) and $37.1 million of bonds issued by the Mental Health and Anti-Addiction Services Administration.

[3] Includes $175 million in revolving notes purchased by GDB and $900 million in notes purchased by private entities.

[4] Excludes (in order to avoid double counting) $4.8 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities, which loans are included in the table, and excludes a note for $67.2 million under other lines. Includes $279.1 million in bonds issued by PBA and $1.91 billion of debt issued by the Treasury Department which is expected to be repaid with revenues of the Commonwealth or proceeds of a future bond issue (such debt is excluded from the Outstanding Debt of Public Corporations Table below).

[5] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from the employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds. The Commonwealth does not guarantee such bonds. Employer contributions made to the Employees Retirement System by the central government and its agencies and therefore payable from the General Fund currently represent approximately 59% of such total employer contributions. The balance of these contributions is made by the public corporations and the municipalities.

[6] Includes the following: (i) $1.2 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; (ii) $151.6 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); (iii) $307.8 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Puerto Rico Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; (iv) $141.3 million of Special Facilities Revenue Bonds issued by PRHTA, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; (v) $155 million of Special Facilities Bonds issued by the Puerto Rico Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; (vi) $70.8 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and (vii) approximately $18 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds.  The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

***Debt Service Requirements for Commonwealth General Obligation Bonds, Appropriation Bonds and Guaranteed Debt.*** The following table presents the debt service requirements for outstanding Commonwealth general obligation bonds (which are supported by the full faith and credit of the Commonwealth), Commonwealth appropriation bonds (which are not supported by the full faith and credit of the Commonwealth), Puerto Rico Public Buildings Authority ("PBA") bonds guaranteed by the Commonwealth, and other bonds guaranteed by the Commonwealth as of December 31, 2013.   Under the column "Other Guaranteed Debt," the table includes the following debt, which is guaranteed by the Commonwealth's full faith, credit and taxing power: (i) $224.6 million Port of the Americas Authority ("PAA") Guaranteed Bonds, which are being paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds; (ii) $690 million of bonds issued by PRASA; and (iii) $31.7 million of General Services Administration Notes.   The "Other Guaranteed Debt" column excludes $478.7 million of Puerto Rico State Revolving Fund Loans made to PRASA and incurred under various federal water laws, which loans are guaranteed by the Commonwealth.  Debt service on these PRASA loans and on the $690 million in bonds identified in item (ii) is currently being paid by PRASA and the Commonwealth has not made payments on this debt under its guarantee since 2005.  The table excludes $267 million of GDB bonds and $110 million of GDB Senior Guaranteed Notes Series 2013B, all of which are guaranteed by the Commonwealth but are payable from available moneys of GDB. The amounts paid by the Commonwealth under the PAA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements. The constitutional debt limit, however, is determined assuming the interest rate on outstanding variable rate bonds is 12% per annum.

The newly enacted Act 24-2014 increases the amount of GDB obligations that can be guaranteed by the full faith and credit of the Commonwealth from $550 million to $2 billion.  To the extent GDB issues a significant amount of Commonwealth guaranteed notes, the amounts shown in the table below may increase significantly.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

## Puerto Rico Obligations Debt Service Requirement
### (In thousands)

| Fiscal Year Ending June 30 | General Obligation Bonds Principal | General Obligation Bonds Interest[1] | Appropriation Bonds[3] Principal | Appropriation Bonds Interest | PBA Guaranteed Bonds Principal | PBA Guaranteed Bonds Interest[2] | Other Guaranteed Debt Principal | Other Guaranteed Debt Interest | Total |
|---|---|---|---|---|---|---|---|---|---|
| 07/01/14 | 376,453 | 452,436 | | 15,758 | 76,760 | 235,371 | 13,851 | 50,923 | 1,221,552 |
| 07/01/15 | 407,055 | 458,976 | | 36,683 | 82,000 | 231,257 | 16,577 | 50,057 | 1,282,606 |
| 07/01/16 | 425,640 | 514,202 | 36,285 | 57,371 | 86,125 | 226,879 | 17,370 | 49,262 | 1,413,135 |
| 07/01/17 | 371,192 | 494,245 | 29,455 | 56,347 | 90,905 | 222,138 | 17,930 | 48,369 | 1,330,559 |
| 07/01/18 | 327,015 | 476,221 | 30,450 | 55,215 | 66,235 | 214,866 | 18,576 | 47,475 | 1,236,053 |
| 07/01/19 | 475,981 | 444,584 | 31,590 | 53,962 | 69,645 | 211,249 | 19,132 | 46,547 | 1,352,691 |
| 07/01/20 | 534,935 | 413,609 | 32,855 | 52,607 | 74,140 | 207,424 | 18,796 | 44,769 | 1,379,992 |
| 07/01/21 | 403,150 | 387,619 | 34,215 | 51,129 | 100,800 | 203,246 | 22,882 | 43,540 | 1,247,809 |
| 07/01/22 | 350,690 | 369,002 | 35,705 | 49,515 | 106,150 | 196,925 | 24,829 | 42,174 | 1,176,358 |
| 07/01/23 | 273,615 | 352,547 | 37,330 | 47,755 | 95,930 | 190,800 | 26,609 | 40,732 | 1,066,760 |
| 07/01/24 | 272,545 | 339,291 | 39,305 | 45,779 | 103,255 | 185,193 | 31,736 | 38,901 | 1,057,636 |
| 07/01/25 | 291,470 | 325,956 | 41,095 | 44,110 | 106,545 | 179,347 | 33,569 | 36,987 | 1,060,993 |
| 07/01/26 | 366,935 | 310,442 | 43,420 | 41,681 | 99,920 | 172,753 | 35,513 | 34,960 | 1,107,650 |
| 07/01/27 | 308,600 | 290,578 | 45,855 | 39,127 | 106,365 | 167,153 | 37,552 | 32,837 | 1,030,190 |
| 07/01/28 | 329,780 | 274,016 | 191,735 | 32,244 | 838,959 | 161,182 | 39,722 | 30,537 | 1,900,475 |
| 07/01/29 | 305,180 | 255,981 | 192,255 | 20,472 | 92,955 | 113,657 | 42,009 | 28,122 | 1,053,047 |
| 07/01/30 | 316,925 | 239,508 | 91,000 | 12,243 | 249,164 | 113,618 | 44,458 | 25,552 | 1,095,036 |
| 07/01/31 | 319,000 | 223,069 | 96,150 | 7,096 | 134,591 | 99,057 | 47,037 | 22,850 | 951,553 |
| 07/01/32 | 231,220 | 206,538 | 82,260 | 1,149 | 128,570 | 86,573 | 49,777 | 19,943 | 808,936 |
| 07/01/33 | 345,450 | 193,865 | | | 135,375 | 79,661 | 52,693 | 16,883 | 826,986 |
| 07/01/34 | 293,885 | 175,463 | | | 142,570 | 72,355 | 55,764 | 13,640 | 756,919 |
| 07/01/35 | 375,975 | 160,079 | | | 162,575 | 65,894 | 26,159 | 12,229 | 804,321 |
| 07/01/36 | 318,145 | 139,305 | | | 156,625 | 58,183 | 26,847 | 10,722 | 711,534 |
| 07/01/37 | 336,405 | 121,248 | | | 150,550 | 49,971 | 28,010 | 9,162 | 696,906 |
| 07/01/38 | 398,575 | 102,245 | | | 144,455 | 41,934 | 29,389 | 7,512 | |
| 07/01/39 | 421,130 | 79,691 | | | 154,450 | 34,059 | 30,998 | 5,784 | 727,840 |
| 07/01/40 | 505,180 | 55,640 | | | 164,585 | 25,635 | 31,217 | 4,020 | 788,041 |
| 07/01/41 | 532,625 | 28,194 | | | 173,810 | 16,408 | 12,426 | 3,523 | 767,483 |
| 07/01/42 | | | | | 126,890 | 6,662 | 12,975 | 3,003 | 150,050 |
| 07/01/43 | | | | | | | 12,605 | 2,490 | 15,608 |
| 07/01/44 | | | | | | | 11,826 | 2,016 | 14,316 |
| 07/01/45 | | | | | | | 11,040 | 1,603 | 13,056 |
| 07/01/46 | | | | | | | 10,436 | 1,199 | 12,038 |
| 07/01/47 | | | | | | | 9,935 | 801 | 11,133 |
| 07/01/48 | | | | | | | 7,621 | 573 | 8,422 |
| 07/01/49 | | | | | | | 5,690 | 388 | 6,263 |
| 07/01/50 | | | | | | | 5,284 | 213 | 5,671 |
| 07/01/51 | | | | | | | 4,183 | 65 | 4,396 |
| 07/01/52 | | | | | | | 2,126 | 13 | 2,191 |
| 07/01/53 | | | | | | | 1,091 | | 1,104 |
| | 10,214,750 | 7,884,749 | 1,090,740 | 720,241 | 4,220,899 | 3,869,451 | 946,237 | 876,002 | 29,823,069 |

Totals may not add due to rounding. Interest payments on certain variable rate general obligation bonds are calculated at their effective fixed rate after giving effect to related interest rate exchange agreements but excluding any support costs from third parties or the fixed spread on Mandatory Tender FRNs. Under the column "Other Guaranteed Debt," the table includes the following debt, which is deemed guaranteed by the Commonwealth: (i) $254.3 million Port of the Americas Authority ("PAA") Guaranteed Bonds, which are being paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds; (ii) $690 million of bonds issued by PRASA, which is guaranteed by PRASA; and (iii) $31.7 million of General Services Administration Notes. The "Other Guaranteed Debt" column excludes $478.7 million of Puerto Rico State Revolving Fund Loans made to PRASA and incurred under various federal water laws, which bonds are guaranteed by the Commonwealth. Debt service on these PRASA loans and on the $690 million in bonds identified in item (ii) is currently being paid by PRASA and the Commonwealth has not made payments on this debt in fiscal year 2015. The table excludes $267 million of GDB bonds and $110 million of GDB Senior Guaranteed Notes Series 2013B, all of which are guaranteed through the issuance of Commonwealth general obligation bonds in the following amounts: $97.0 million in fiscal year 2014 and $73.9 million in fiscal year 2015.

(1) The figures for interest have been reduced by the interest that was capitalized through the issuance of bonds.
(2) The figures for interest have not been reduced by subsidy payments due on certain Qualified Zone Academy Bonds and Qualified School Construction Bonds.
(3) Consists of debt issued by the Public Finance Corporation. Excludes $2.126 billion of appropriation debt issued by public corporations and agencies: $625.7 million of debt issued by the Treasury Department and $511 million of bonds issued by the Mental Health and Anti-Addiction Services Administration.

Source: Government Development Bank for Puerto Rico and Treasury Department.

***Variable Rate Bonds and Mandatory Tender Bonds.*** As discussed in greater detail in the Commonwealth Report, the Commonwealth and various public corporations have outstanding variable rate bonds consisting of (i) variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds"), (ii) variable rate bonds and notes that have been purchased directly from the Commonwealth by certain financial institutions which provide for periodic interest rate changes based on a LIBOR or SIFMA index and which are subject to mandatory tender on certain dates prior to their maturities ("Mandatory Tender FRNs"), and (iii) other bonds and notes which provide for periodic interest rate changes based on a LIBOR rate or a particular index, but which are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged substantially all of their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers. If such agreements were to be terminated due to the recent credit rating downgrades, the Commonwealth and such public corporations would no longer have protection against changes in market interest rates on such variable rate obligations. See ***Interest Rate Exchange Agreements,*** below.

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of December 31, 2013. Variable rate debt shown under the column heading "Other Variable Debt" below consists of bonds that are not subject to optional or mandatory tender, the interest rate on which bonds is tied to various indices (e.g., CPI bonds or LIBOR bonds). This table does not include approximately $400 million in PRHTA Bond Anticipation Notes.

### Variable Rate Debt Breakdown
#### (as of December 31, 2013)

| | VRDO Bonds | Mandatory Tender FRNs | Other Variable Rate Debt | Total |
|---|---|---|---|---|
| Commonwealth (General Obligation) | $203,625,000 | $257,215,000 | $126,725,000 | $587,565,000 |
| PREPA | — | — | 411,825,000 | 411,825,000 |
| PRHTA | 200,000,000 | — | 447,025,000 | 647,025,000 |
| COFINA | — | — | 136,000,000 | 136,000,000 |
| Total | $403,625,000 | $257,215,000 | $1,121,575,000 | $1,782,415,000 |

The following table shows the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit or liquidity facilities.

### VRDO Related Credit Facility Expiration Dates

| | Amount | Expiration Date |
|---|---|---|
| Commonwealth (General Obligation) | $203,625,000 | May 1, 2014 and June 21,2014 |
| PRHTA | $200,000,000 | May 27, 2014 |
| Total | $403,625,000 | |

As of December 31, 2013, the Commonwealth had outstanding $257.2 million of Mandatory Tender FRNs and PBA had $129 million of fixed rate bonds guaranteed by the Commonwealth that are subject to mandatory tender for purchase prior to maturity (collectively,

the "Mandatory Tender Bonds"). The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds or, in some cases, the bonds would become subject to higher interest rates and an accelerated amortization schedule. In addition, certain of the Commonwealth's FRN obligations (but not PBA's) are subject to optional tender on seven and 30-day notice in the event of a downgrade of the Commonwealth. See *Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivate Contracts* above.

The following table shows, as of December 31, 2013, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

### Mandatory Tender FRNs Breakdown
(as of December 31, 2013)

|  | Mandatory Tender Bonds | Type | Mandatory Tender Date |
|---|---|---|---|
| Commonwealth (General Obligation) | $ 44,905,000 | Variable | May 1, 2014 |
|  | 14,925,000 | Variable | June 1, 2014 |
|  | 197,385,000 | Variable | June 1, 2014 |
| Public Buildings Authority | 129,225,000 | Fixed | July 1, 2017 |
| Total | $386,440,000 |  |  |

As discussed previously, the Commonwealth has entered into interest rate exchange agreements with respect to all Mandatory Tender FRNs. In the event the Commonwealth cannot remarket these bonds on their mandatory tender dates as variable rate bonds, the Commonwealth may have to terminate the associated interest rate exchange agreements, if not terminated earlier due to the credit rating downgrades, as discussed below. As of February 14, 2014, the estimated mark-to-market value of all interest rate exchange agreements with respect to the Mandatory Tender FRNs was negative $41.5 million. (See "Recent Credit Rating Downgrades of Bonds of the Commonwealth and its Instrumentalities" above and "-Collateral Requirements and Additional Termination Events" below).

*Interest Rate Exchange Agreements.* As discussed in greater detail in the Commonwealth Report, the Commonwealth and various public corporations are parties to various interest rate exchange agreements or swaps executed in order to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith, and to certain "basis swaps" that do not hedge specific variable rate debt.

For the first six months of fiscal year 2014, the Commonwealth received $3.6 million from its counterparties under its basis swaps, net of the Commonwealth's payments to the counterparties, and PREPA received $4.3 million from its counterparties under its basis swaps, net of PREPA's payments to the counterparties.

The Commonwealth and the public corporations have been reducing their swap exposure since fiscal year 2009. The aggregate notional amount of the swaps for the Commonwealth and the public corporations as of December 31, 2013 was $4.1 billion.

The table below shows the aggregate notional amount, as of December 31, 2013, of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

### Swap Portfolio Breakdown
### Notional Amount
(as of December 31, 2013)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $587,565,000 | $1,273,777,500 | $1,861,342,500 |
| Electric Power Authority | 411,825,000 | 1,000,000,000 | 1,411,825,000 |
| Highways and Transportation Authority | 647,025,000 | — | 647,025,000 |
| Sales Tax Financing Corporation | 136,000,000 | — | 136,000,000 |
| Total | $1,782,415,000 | $2,273,777,500 | $4,056,192,500 |

The following table shows, as of February 14, 2014, the net mark-to-market value of all outstanding interest rate exchange agreements. The mark-to-market value of all such agreements of the Commonwealth and the public corporations was negative as of such date. Thus, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

### Swap Portfolio Mark-to-Market Valuation
(as of February 14, 2014)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | ($80,314,192) | ($49,504,204) | ($129,818,396) |
| PREPA | ($62,315,623) | ($32,031,162) | ($94,346,785) |
| PRHTA | ($123,201,157) | — | ($123,201,157) |
| COFINA | ($46,285,547) | — | ($46,285,547) |
| Total | ($312,116,520) | ($81,535,367) | ($393,651,886) |

*Collateral Requirements and Additional Termination Events*. Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. As a result of the credit rating downgrades, PRHTA has posted approximately $70 million in additional collateral, which was funded through GDB. To date, the Commonwealth has not been required to post any collateral, and PREPA has not been required to post additional collateral. In addition, as a result of the downgrades, almost all of the interest rate exchange agreements of the Commonwealth, PREPA and PRHTA are now subject to termination at the option of the applicable counterparty. If any such agreements were to be terminated, the Commonwealth, PREPA or PRHTA, as applicable, would then be subject to variable rate interest risk on any corresponding variable rate indebtedness. Also, if such agreements were to be terminated they would likely be terminated at their then current mark-to-market valuations, plus cost, which could differ substantially from the mark-to-market valuations set forth in the table above due to market conditions at the time of

termination. Any collateral posted at the time of the terminations could be used to effectively offset a like-amount of liquidity needed to fund the termination payments. To date, the aggregate amount of collateral posted is approximately $142 million. No terminations have occurred to date and the Commonwealth, GDB and the affected public corporations are currently engaged in discussions with the counterparties in order to waive or modify the agreements and/or termination requirements to mitigate the adverse impacts of the downgrades. To date, the Commonwealth and PREPA have entered into 30-day standstill agreements with respect to approximately $1.35 billion in notional amount of certain basis swaps, and currently the Commonwealth, PRHTA and PREPA expect to terminate other agreements in the near future. See *Maturity of Certain Short-Term Debt Obligations of the Commonwealth and its Instrumentalities; Effect of Downgrade on Certain Debt Obligations and Derivate Contracts* above.

  *Trends of Public Sector Debt.* The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the past five fiscal years ended June 30, 2013 and for the six months ended December 31, 2013 (except for the gross national product numbers for fiscal year 2013 that are not yet available). As of December 31, 2013, outstanding short-term debt, relative to total debt, was 9%. Total public sector debt for fiscal year 2012 shown in the table below represented 93.2% of nominal gross national product for fiscal year 2012.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross National Product**
**(dollars in millions)**

| June 30, | Public Sector Debt | | | | | Gross National Product[1] | |
|---|---|---|---|---|---|---|---|
| | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Amount | Rate of Increase |
| 2009 | $48,332 | $4,648[4] | $52,980 | 8.8% | 13.0% | $63,618 | 1.5% |
| 2010 | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 64,295 | 1.1 |
| 2011 | 54,804 | 4,380 | 59,184 | 7.4 | 4.2 | 65,567 | 2.0 |
| 2012 | 60,780 | 3,981 | 64,760 | 6.2 | 9.5 | 69,462 | 5.9 |
| 2013 | 60,115 | 4,843 | 64,957 | 7.0 | 0.3 | N/A | N/A |
| Dec. 31 2013 | 60,346 | 6,536 | 66,882 | 9.0 | 2.9 | | |

Totals may not add due to rounding.

[1] In current dollars.
[2] Does not include debt totaling $5.1 billion consisting of (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 5, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

*Source:* Government Development Bank

  The following table shows the trend of public sector debt by major category for the past five fiscal years ended June 30, 2013 and for the six months ended December 31, 2013.

**Commonwealth of Puerto Rico**
**Public Sector Debt by Major Category**
**(dollars in millions)**

| June 30 | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2009 | $9,382 | $557 | $9,939 | $2,691 | $306 | $2,997 | $36,259 | $3,785 | $40,044 | $48,332 | $4,648 | $52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| 2011 | 10,199 | 164 | 10,363 | 3,204 | 333 | 3,537 | 41,401 | 3,883 | 45,284 | 54,804 | 4,380 | 59,184 |
| 2012 | 11,578 | 266 | 11,844 | 3,515 | 357 | 3,872 | 45,687 | 3,358 | 49,045 | 60,780 | 3,981 | 64,760 |
| 2013 | 11,838 | 491 | 12,329 | 3,501 | 381 | 3,882 | 44,776 | 3,970 | 48,746 | 60,115 | 4,843 | 64,957 |
| Dec. 31, 2013 | 11,741 | 1,566 | 13,307 | 3,497 | 616 | 4,113 | 45,108 | 4,354 | 49,462 | 60,346 | 6,536 | 66,882 |

Totals may not add due to rounding.

(1)    Does not include the Senior Pension Funding bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt."

(2)    Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt."

(3)    Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

*Source*: Government Development Bank

The following table sets forth the total debt service (principal and interest) relating to the $57.3 billion aggregate principal outstanding of bonds and notes of the Commonwealth and its public corporations and instrumentalities (excluding GDB) for the next five fiscal years (as of December 31, 2013). These amounts do not include debt service on (i) the $13.9 billion aggregate outstanding principal amount of loans and lines of credit held by GDB and other financial institutions, (ii) the fiscal year 2014 TRANS, or (iii) the general obligation bonds that the Commonwealth is currently contemplating issuing.

**Commonwealth of Puerto Rico and its Instrumentalities**
**Five Year Bond and Note Debt Service Schedule**

| Five Year Ended June 30, | Total debt service (In millions) |
|---|---|
| 2014 | $3,500 |
| 2015 | $3,674 |
| 2016 | $3,875 |
| 2017 | $3,836 |
| 2018 | $3,753 |

*Public Corporations.* The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2013 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Bonds and notes listed under the columns labeled "With Guaranty" are guaranteed by the Commonwealth. Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, sources other than Commonwealth appropriations or taxes or revenues of public corporations, or from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for amounts on deposit in debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the Commonwealth Report.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**December 31, 2013**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $690,334 | $3,409,149 | $4,099,483 | $478,736 | $203,941 | $682,677 | $1,169,070 | $3,613,900 | $4,782,160 |
| Convention Center District Authority | - | 418,805 | 418,805 | - | 151,369 | 151,369 | - | 570,174 | 570,174 |
| Electric Power Authority | - | 8,526,710 | 8,526,710 | - | 817,974 | 817,974 | - | 9,344,684 | 9,344,684 |
| Highway and Transportation Authority | - | 4,824,727[1] | 4,824,727 | - | 2,109,898 | 2,109,898 | - | 6,934,625 | 6,934,625 |
| Housing Finance Authority | - | 104,254[2] | 104,254 | - | 158,234 | 158,234 | - | 262,488 | 262,488 |
| Industrial Development Company | - | 181,080 | 181,080 | - | 87,325 | 87,325 | - | 268,405 | 268,405 |
| Infrastructure Financing Authority[3] | - | 2,063,993 | 2,063,993 | - | 47,253 | 47,253 | - | 2,111,246 | 2,111,246 |
| Port of the Americas Authority | 224,633 | - | 224,633 | - | 1,200 | 1,200 | 224,633 | 1,200 | 225,833 |
| Ports Authority[4] | - | - | - | - | 254,974 | 254,974 | - | 254,974 | 254,974 |
| Public Buildings Authority | 4,220,899 | - | 4,220,899 | - | 346,287 | 346,287 | 4,220,899 | 346,287 | 4,567,186 |
| Public Finance Corporation | - | 1,090,740[5] | 1,090,740 | - | - | - | - | 1,090,740 | 1,090,740 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 15,223,821 | 15,223,821 | - | 333,300 | 333,300 | - | 15,557,121 | 15,557,121 |
| University of Puerto Rico | - | 488,885[6] | 488,885 | - | 83,664 | 83,664 | - | 572,549 | 572,549 |
| General Services Administration | | | | 31,660 | | 31,660 | 31,660 | | 31,660 |
| Others[7] | - | - | - | - | 2,888,341 | 2,888,341 | - | 2,888,341 | 2,888,341 |
| Total[8] | $5,135,866 | $36,332,164 | $41,468,030 | $510,396 | $7,483,760 | $7,994,156 | $5,646,262 | $43,816,734 | $49,462,996 |

[1]   Excludes $151.1 million of Special Facilities Revenue Bonds issued by PRHTA, which are payable by a private party from net toll revenues collected from the Teodoro Moscoso Bridge.

[2]   Excludes the $161.2 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from HUD; and $307.8 million of Housing Finance Authority Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD.

[3]   Includes (i) $37.1 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement and (ii) $329.2 million of Revenue Bonds (Ports Authority Project), Series 2011, which are limited obligations of the Infrastructure Financing Authority payable solely from loan payments made by the Puerto Rico Ports Authority.

[4]   Excludes $155.4 million of Special Facilities Revenues Bonds issued by the Puerto Rico Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5]   Payable primarily from Commonwealth appropriations.

[6]   Excludes $70.8 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7]   Includes lines of credit from GDB.

[8]   Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes the debt listed in footnote 6 of the Public Sector Debt table above.

*Source:*   Government Development Bank

**Litigation**

The following section provides an update to the information set forth under LITIGATION in the Commonwealth Report. This section should be read in conjunction with the information included under **LITIGATION** in the Commonwealth Report.

*Pension Reform.* Certain teachers and members of the Judiciary have brought suits challenging the constitutionality of Act 160 and Act 162, which reformed the Puerto Rico Teachers Retirement System and the Judiciary Retirement System, respectively.

On January 8, 2014 a teachers' association filed a lawsuit alleging that Act 160 is unconstitutional as applied to them. On January 14, 2014, the Puerto Rico Supreme Court issued a temporary restraining order staying the effect of Act 160 until the Supreme Court rules on the constitutionality issue. An evidentiary hearing was scheduled for January 27, 2014. On that same date the Supreme Court appointed a Special Master to conduct the evidentiary hearing. On January 31, 2014 the parties agreed to submit the case through the presentation of sworn statements and documents, without holding a hearing. On February 7, 2014, the Special Master issued a report with a summary of uncontested facts. On February 11, 2014, the Supreme Court issued an order granting both parties until March 3, 2014, to file briefs on the constitutionality of Act 160.

On December 30, 2013 a judges association filed a complaint in the Commonwealth of Puerto Rico's Court of First Instance, San Juan Part, alleging that Act 162 is unconstitutional because it allegedly violates the principle on judicial independence and retroactively makes changes to the Judiciary Retirement System. On January 15, 2014, the Puerto Rico Supreme Court held an argumentative hearing. The case is pending of resolution.

*Act for the Redistribution and Adjustment of the Tax Burden.* As part of the tax measures adopted by Act 40-2013, the law enacted a new gross sales tax or "*patente nacional*" to provide additional funds to the Commonwealth. A lawsuit was filed by a commercial trade association alleging that Act 40 is unconstitutional as applied to its members. On December 31, 2013, the trial court dismissed the complaint. On January 17, 2014, the Puerto Rico Supreme Court rejected the plaintiffs' petition for certification. On February 13, 2014, plaintiffs filed an appeal with the San Juan-Guayama Regional Panel of the Puerto Rico Court of Appeals and a motion in aid of jurisdiction requesting a stay of the effectiveness of Act 40 and the deadline to request certain exemptions under that law. On February 14, 2014 the Court of Appeals denied the motion in aid of jurisdiction and stated that the appeal would be decided promptly.

*Vaquería Tres Monjitas, Inc. et al v. Ramírez et al.* Plaintiffs alleged in their complaint that the price rates set by the Administrator of ORIL did not afford local dairy processors Suiza Dairy and Vaquería Tres Monjitas the opportunity to make the reasonable profit to which they were constitutionally entitled. The parties reached a settlement agreement on October 29, 2013. Among other things, the Commonwealth, through certain of its instrumentalities, agreed to contribute the following amounts to certain regulatory accrual payments to be made pursuant to the settlement agreement: $50 million by December 31, 2015, $15 million by December 31, 2016 and $15 million by December 31, 2017.

I-37

After numerous motions, hearings and appeals, the settlement agreement took effect on November 6, 2013. The case is now closed although the court will retain jurisdiction in order to tend to any matter of compliance or breach of compliance regarding the settlement agreement.

APPENDIX II

# COMMONWEALTH OF PUERTO RICO
## Financial Information and Operating Data Report
### October 18, 2013

(This page intentionally left blank)

# TABLE OF CONTENTS

|  | Page |
|---|---|
|  | II-1 |
| INTRODUCTION | II-1 |
| General | II-1 |
| Forward-Looking Statements | II-2 |
| Recent Developments | II-8 |
| Overview of Economic and Fiscal Condition | II-14 |
| Geographic Location and Demographic Trends | II-15 |
| Relationship with the United States | II-15 |
| Governmental Structure | II-15 |
| Principal Officers Responsible for Fiscal Matters | II-17 |
| Political Trends | II-18 |
| THE ECONOMY | II-18 |
| General | II-24 |
| Fiscal Stabilization | II-30 |
| Economic Growth | II-37 |
| Employment and Unemployment | II-39 |
| Economic Performance by Sector | II-53 |
| Higher Education | II-54 |
| Tax Incentives | II-54 |
| Industrial Incentives Program | II-58 |
| DEBT | II-58 |
| Public Sector Debt | II-62 |
| Debt Service Requirements for Commonwealth General Obligation Bonds, Appropriation Bonds and Certain Guaranteed Debt | II-64 |
| Interest Rate Exchange Agreements | II-66 |
| Variable Rate Bonds and Mandatory Tender Bonds | II-69 |
| Ratings of Commonwealth General Obligation Bonds | II-69 |
| Commonwealth Guaranteed Debt | II-70 |
| Trends of Public Sector Debt | II-72 |
| PUBLIC CORPORATIONS | II-74 |
| Government Development Bank for Puerto Rico | II-76 |
| Other Public Corporations | II-87 |
| INSURANCE MATTERS | II-87 |
| RETIREMENT SYSTEMS | II-113 |
| POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS | II-116 |
| COMMONWEALTH AUDITED FINANCIAL STATEMENTS | II-116 |
| General | II-116 |
| Prior Non-Compliance with Continuing Disclosure Obligations | II-117 |
| PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES |  |

Summary and Management's Discussion of General Fund Results ......................................II-118

Major Sources of General Fund Revenues ..................................................................II-122

Administrative Measures to Increase Collections of Income, Sales, and Excise Taxes and
    Property Taxes .................................................................................................II-132

Transfers to General Obligation Redemption Fund.....................................................II-134

Components of General Fund Expenditures ...............................................................II-136

BUDGET OF THE COMMONWEALTH OF PUERTO RICO .................................................II-136

Office of Management and Budget.........................................................................II-136

Budgetary Process...............................................................................................II-137

Financial Control and Adjustment Procedures ........................................................II-138

Appropriations ...................................................................................................II-140

Budget for Fiscal Year 2013 .................................................................................II-141

Budget for Fiscal Year 2014 .................................................................................II-144

Differences between Budget and Basic Financial Statements.........................................II-144

LITIGATION............................................................................................................II-144

## COMMONWEALTH OF PUERTO RICO
### Financial Information and Operating Data Report
### October 18, 2013

## INTRODUCTION

**General**

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of June 30, 2013, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's officers responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have

they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Report, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

**Recent Developments**

*Adoption of Comprehensive Reform of Commonwealth Employees Retirement System and Decision by the Commonwealth Supreme Court Upholding the Constitutionality of Act 3*

On April 4, 2013, the Governor signed into law Act 3-2013 ("Act 3"), which adopted a comprehensive reform of the Employees Retirement System of the Commonwealth of Puerto Rico and its instrumentalities ("Employees Retirement System"), the largest of the three public retirement systems that are funded primarily with budget appropriations from the Commonwealth's General Fund.

Prior to the enactment of Act 3, it was anticipated that (i) the net assets of the Employees Retirement System would have been depleted during fiscal year 2014 and that its gross assets, which do not take into consideration the liability relating to the outstanding pension bond obligations of the Employees Retirement System, would have been depleted by fiscal year 2019, and (ii) the cash funding shortfall during the period between fiscal year 2019 and fiscal year 2043 would have totaled, on average, $905 million per year, which the Commonwealth and the other participating employers would have been required to contribute. With the enactment of Act 3, the gradual increase in the statutory employer contribution rates enacted in 2011 and the additional annual contributions from the participating employers (which include the municipalities and certain public corporations) required by Act 32-2013 ("Act 32") to be made from fiscal year 2014 through fiscal year 2033, it is projected that the gross assets of the Employees Retirement System will no longer be depleted. This additional contribution (which will be approximately $120 million in fiscal year 2014) will be determined on an annual basis based on actuarial studies to be performed by the Employees Retirement System's actuaries.

On June 24, 2013, the Puerto Rico Supreme Court upheld the constitutionality of Act 3 after it was challenged in several lawsuits brought by participants of the Employees Retirement System.

For more information regarding Act 3 and the financial condition of the Commonwealth retirement systems, see "RETIREMENT SYSTEMS."

*Federal Government Shutdown*

Certain programs and operating expenses of the Commonwealth of Puerto Rico and its instrumentalities are funded by the federal government. The approved budget for Fiscal Year 2014 includes approximately $6.5 billion in federal funding for diverse programs, primarily directed at the social welfare of the population, including nutrition, health care and housing assistance.

On October 1, 2013 the United States Government commenced an organized shutdown of many of its operations due to the absence of legislative appropriations to maintain the federal government funded.   The Commonwealth believes, based on guidance issued by federal sponsoring agencies, discussions with the United States Office of Management and Budget, and internal contingency planning, that federal spending authority for the operation of federal programs for the Commonwealth, combined with federal and state carryover, surplus or current fiscal year funding, is sufficient for the continued, uninterrupted operation of federal programs for the month of October. However, the Government's ability to forecast the budgetary or liquidity impact of the federal government shutdown beyond the month of October is limited.

At this point, the Commonwealth's ability to forecast the budgetary or liquidity impact of the federal government shutdown beyond the month of October is limited. However, due to the relatively high reliance on federal funding and the effect of federal funding reimbursement cycles, the Commonwealth may be disproportionally affected by an extended delay in the approval of the necessary federal legislative appropriations.

*New Revenue Raising Measures for the Commonwealth's General Fund*

The current Commonwealth administration, which came into office in January of 2013, has sponsored the enactment of various tax laws designed to generate additional revenues to allow the Commonwealth to meet its obligations and reduce its fiscal deficit.

In February 2013, the Commonwealth amended Act 154-2012 ("Act 154"), which imposes an excise tax on the acquisition of certain manufacturing products produced and services rendered in Puerto Rico, in order to extend the effective period of the excise tax until December 31, 2017 and reset the excise tax rate to a fixed 4% commencing on July 1, 2013. It is projected that for fiscal year 2014, revenues from Act 154 will amount to $1.956 billion and constitute approximately 20.5% of the total revenues of the General Fund. See "Major Sources of General Fund Revenues-Act 154" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

In June 2013, the Commonwealth made significant changes to many of its tax laws to broaden the tax base and increase its revenues. These included: the increase of certain income taxes and the limitation of certain deductions applicable to corporations; an increase in the taxes paid by self-employed professionals; a limitation on mortgage interest deductions; a moratorium on certain tax credits; an increase in the excise tax on cigarettes and other tobacco derivatives; an additional 1% tax on insurance underwriting premiums; the imposition of the sales and use tax on certain business to business transactions; the elimination of certain exemptions to the sales and use tax on purchases made by certain entities; and the elimination of the resellers certificate exempting resellers from paying sales and use tax on their purchasers and its substitution with a new credit system for such taxes paid.

For more information on the new tax laws, see "Major Sources of General Fund Revenues" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*New Revenue Raising Measures for Public Corporations*

The current administration has taken steps to help certain public corporations become self-sufficient entities capable of operating without budgetary subsidies or deficit financings from the GDB.

On July 15, 2013, the Puerto Rico Aqueduct and Sewer Authority ("PRASA") implemented a sixty percent water rate increase (on average) that is expected to allow the corporation to cover all of its expenses and debt service. The rate increase is projected to increase operating revenues for fiscal year 2014 by approximately $344 million, or 44%, over fiscal year 2013. For fiscal year 2015 and beyond, the increase in operating revenues is projected at $444 million (as compared to fiscal year 2013), as the rate adjustment will cover an entire fiscal year. Further water rate increases are not expected to be necessary at least until fiscal year 2017. As a result, in contrast to prior years, the Commonwealth does not anticipate having to appropriate funds to PRASA for its operational expenses.

On June 25, 2013, the Commonwealth enacted Act 30-2013 ("Act 30") and Act 31-2013 ("Act 31") to provide approximately $270 million in additional revenues to the Puerto Rico Highway and Transportation Authority ("PRHTA"). Pursuant to these laws, (i) PRHTA will receive the motor vehicle license fee revenues received in prior fiscal years by the Commonwealth Treasury Department, which currently amount to approximately $62.5 million per year (for the avoidance of doubt, such amount was not included as revenue in the budget for fiscal year 2014), (ii) the tax on petroleum products received by PRHTA was increased from $3.00 per barrel to $9.25 per barrel, which is currently estimated to result in approximately $189 million in additional annual revenue, and (iii) PRHTA will receive the first $20 million in annual cigarette excise tax revenues collected by the Commonwealth Treasury Department. The new revenues have allowed PRHTA to begin repaying its outstanding lines of credit with the GDB and provide additional revenues to fund operational expenses.

*New COFINA Legislation*

On October 9, 2013, the Governor signed into law legislation to increase from 2.75% to 3.50% the portion of the Commonwealth sales and use tax transferred to the Sales Tax Financing Corporation ("COFINA") and expand the permitted uses of COFINA bond proceeds to, among others, refinance Bond Anticipation Notes ("BANs") and other lines of credit used to help finance the Commonwealth's deficit for fiscal years 2013 and 2014. Bonds issued by COFINA are currently the most cost effective source of long term financing available to the Commonwealth.

For more information regarding COFINA, see "Other Public Corporations-*Sales Tax Financing Corporation"* under PUBLIC CORPORATIONS.

*Implementation of Universal Health Care Access*

On September 30' 2013, the Governor of Puerto Rico notified the Secretary of the United States Department of Health and Human Services ("HHS") that the Commonwealth had elected not to implement a Health Insurance Exchange pursuant to the provisions of the Patient Protection

and American Affordable Care Act ("AACA"). Instead, the Commonwealth will implement a new affordable health care plan for individuals who do not qualify for the existing "Mi Salud" public health insurance program. The new program will allow individuals with income levels of $10,000 to $25,000 per year to qualify for a new subsidized health insurance plan ("UAP"). The newly eligible beneficiaries would receive Essential Health Benefits, as defined by AACA, at the "Bronze" level. While the monthly fee for the UAP would be fully covered by funds from the Commonwealth Health Insurance Services Administration ("PRHIA"), the beneficiary would contribute approximately 40% of the cost of coverage through deductibles, copayments and other cost-limiting or sharing mechanisms. PRHIA estimates that the per-member cost of the new plan, due to differences in coverage and cost sharing-arrangements, would be approximately 55% lower than for beneficiaries of Mi Salud.

The funding for the UAP would be obtained by raising the Medicaid poverty income eligibility level from $400 per month to $550 per month. This would cause approximately 76,000 current beneficiaries of Mi Salud that are currently covered 100% with PRHIA funds to become eligible for Medicaid federal reimbursement. Based on these estimates, the required replenishment or renewal date for AACA funds would move forward from March 2019 to January 2019. For additional information regarding the Commonwealth's compliance with the AACA see "Health Insurance Administration – PRHIA" under PUBLIC CORPORATIONS).

*Preliminary General Fund revenues and expenses for the first three months of fiscal year 2014*

*Revenues.* Preliminary General Fund revenues for the first three months of fiscal year 2014 (July, August and September of 2013) were $1,698.8 million, an increase of $88.0 million, or 5.4%, from $1,610.8 million in revenues for the same period in the prior fiscal year. These revenues are approximately $10.4 million, or 0.6%, more than the revenues of $1,688.4 million budgeted for the first three months of fiscal year 2014.

Preliminary sales and use tax collections for the first three months of fiscal year 2014 were $305.3 million, an increase of $15.9 million, or 5.5%, from the sales and use tax collections $289.4 million for the first three months of the prior fiscal year. These sales tax collections are approximately $4.7 million, or 1.6%, more than the sales tax collections of $300.6 million budgeted for the first three months of fiscal year 2014.

*Expenses.* Payroll expenses chargeable to the Commonwealth's General Fund payroll accounts for the first three months of the 2014 fiscal year, totaled $583.9 million, equivalent to $33 million or 5.3% below the same period for the prior fiscal year. With respect to the approved fiscal year 2014 budget, the first three months were $3.6 million or 0.6% under budget. The decrease in payroll expenses is principally attributed to the increased rate of attrition produced by the enactment of Act 3.

For the months of July, August and September, the Office of Management and Budget ("OMB") estimates that General Fund actual expenses were in line with the budgeted appropriations. In terms of year-end forecast, however, the Department of Education has estimated overspending, if uncorrected, based on hiring that occurred in August for the beginning of the school year. As a result, OMB has implemented short term hiring control measures which include

a hiring freeze, on-site OMB employees, and a direct veto at the system level of payroll additions. In addition, with OMB support, the Department of Education has prepared a corrective action plan that includes quantified, substantial measures in the payroll, transportation, security and services accounts. OMB believes that such plan, combined with the use of a carry forward reserve, application of contingency account appropriations, surpluses from other agencies, would neutralize the initially estimated overspending projection, and that no General Fund overspending forecast is currently warranted.

*Offset of Federal Funds*

In April 2011, the Commonwealth received a notification from the United States Army Corps of Engineers ("USACE") establishing the Commonwealth's share of the construction costs of the Cerrillos Dam and Reservoir and the Portuguese-River and Bucana-River Projects and the repayment schedule therefor. According to USACE's notification, the Commonwealth's allocated share of construction costs plus accrued and projected interest through June 30, 2046 amounted to approximately $598 million. The USACE notification also required the payment of $190.6 million in accordance with such repayment schedule. On October 10, 2012, due to nonpayment of this amount, the USACE placed this debt into the United States Treasury Department Offset Program. As a result, the United States Treasury Department withheld $157.8 million in federal funds through May 13, 2013, which funds would have otherwise been directed to certain Commonwealth agencies and instrumentalities, and offset them against the moneys owed to USACE.

On May 15, 2013, the Secretary of the Treasury of the Commonwealth requested the USACE an immediate stay of the Offset Program and the waiver of certain penalties. The Secretary also proposed a new payment plan consisting of 32 annual payments of $7.08 million and a final payment of $6.97 million in 2046, for a total of $233.5 million, including interest. This payment, together with the $157.8 million previously withheld from the Commonwealth would amount to a total payment of $391.3 million.

Although the requested stay of the Offset Program was granted, the Commonwealth has yet to be notified that its offer has been accepted. The Commonwealth is confident that a final agreement with respect to this matter will be reached soon.

*Outstanding short term financings*

As of October 10, 2013, the Commonwealth and its instrumentalities had entered into the following short term financings payable between December 1, 2013 and August 28, 2015, all of which are intended to be refinanced with long-term financings if market conditions allow:

(i)     the Commonwealth has approximately $543 million outstanding in BANs, $400 million due on December 1, 2013 and $143 million due on December 31, 2013, the net proceeds of which were used to repay previous financings from the GDB and to refinance Commonwealth debt;

(ii)    GDB has sold to certain commercial banks participations in certain lines of credit extended by the GDB to the Commonwealth, which participations have an

outstanding balance of approximately $243 million and are due on December 31, 2013;

(iii)   Puerto Rico Highways and Transportation Authority has $400 million outstanding in BANs, the net proceeds of which were used to repay amounts owed under various GDB lines of credit, and which are due between December 1, 2014 and September 1, 2015;

(iv)   COFINA has approximately $333 million outstanding in BANs issued to complete the funding for the Commonwealth's operating budget for fiscal year 2013, which mature on September 30, 2014; and

(v)   Puerto Rico Infrastructure Financing Authority has approximately $96.8 million outstanding in revenue bonds due on November 15, 2013 (originally due in June 2013), which were sold in a private placement. Such bonds are secured by a standby GDB note due on December 15, 2013, guaranteed by the Commonwealth.

The Commonwealth and its instrumentalities believe that they have various financing alternatives, including the rollover of certain of these financings, in the event that GDB determines that market conditions are not favorable for the issuance of long-term debt.

In addition, as of October 11, 2013, the Commonwealth has $1.2 billion outstanding in Tax and Revenue Anticipation Notes ("TRANs"), which include $300 million in revolving TRANs purchased by the GDB and which are payable from income taxes collected during the current fiscal year. Certain of the Commonwealth's agencies and instrumentalities may enter into other short-term financings in the ordinary course of business to finance working capital and other short-term needs.

*Ratings of Certain Commonwealth Bonds*

On October 3, 2013, Moody's Investors Service ("Moody's") affirmed its rating of "Baa3" on the Commonwealth's general obligation bonds and maintained its negative outlook. On March 20, 2013, Fitch, Inc. lowered its rating on the Commonwealth's general obligation bonds from "BBB+" to "BBB-" with a negative outlook On March 13, 2013, Standard & Poor's Rating Services ("S&P") lowered its rating on the Commonwealth's general obligation bonds from "BBB" to "BBB-" with a negative outlook.

On October 3, 2013 Moody's lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series from "Aa3" to "A2", and affirmed its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, First Subordinate Series at "A3". Moody's changed its outlook on both COFINA Senior Series Bonds and First Subordinate Series Bonds from stable to negative. On September 30, 2013, S&P maintained the current ratings of "AA-" and "A+" on the Commonwealth's COFINA Sales Tax Revenue Bonds Senior Series and First Subordinate Series, respectively, and lowered its outlook from stable to negative for such bonds.

The ratings and outlooks described above reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

## Overview of Economic and Fiscal Condition

### Economic Condition

*Gross National Product.*  Puerto Rico's economy is closely linked to the United States economy; around 71% of Puerto Rico's exports go to the United States and 42% of the imports come from the United States.  In recent fiscal years, however, the performance of Puerto Rico's economy has not been consistent with the performance of the United States economy.  Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006.  For fiscal years 2007, 2008, 2009, 2010 and 2011 Puerto Rico's real gross national product contracted by 1.2%, 2.9%, 3.8%, 3.6% and 1.6%, respectively, while the United States real gross national product grew at rates of 1.7% and 2.5% during fiscal years 2007 and 2008, respectively, contracted by 3.4% during fiscal year 2009, and grew by 0.5% and 2.5% during fiscal years 2010 and 2011.  For fiscal year 2012 Puerto Rico's gross national product grew by 0.1%, while the United States' gross national product grew by 2.1%.  According to the Puerto Rico Planning Board's latest projections, made in April 2013, it is projected that Puerto Rico's real gross national product for fiscal year 2013 decreased by 0.4%.  Puerto Rico's real gross national product for fiscal year 2014 is currently forecasted to grow by 0.2%. The Planning Board is expected to publish a new forecast in October 2013.

*Employment.*  According to the Household Survey, total employment fell by 1.1% in fiscal year 2012 and by 0.6% in fiscal year 2013.  The unemployment rate for fiscal year 2012 and for fiscal year 2013 was 15.2% and 14.0%, respectively.  According to the Establishment Survey, total payroll employment grew by 0.8% in fiscal year 2012 and fell by 0.7% in fiscal year 2013.  For the first two months of fiscal year 2014 year-over-year total payroll employment decreased by 4.2%, while total employment according to the Household Survey for the same period decreased by 2.3%.  The Household Survey figures were recently revised significantly to adjust them to the results of the population census of 2010.

*Economic Activity Index.*  For fiscal year 2013, the Government Development Bank– Economic Activity Index (the "EAI") showed a year-over-year reduction of 0.9%, compared to fiscal year 2012. The EAI for August 2013 reflected a 5.4% reduction compared to August 2012. The average cumulative value for the eight months of calendar year 2013 (January to August 2013) showed a reduction of 3.7% compared to the same period of 2012. The EAI is a coincident indicator of ongoing economic activity but it does not measure the real GNP annual growth rates. Since the EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the EAI amplify the corresponding movements of the real GNP. For a more detailed discussion of the EAI, see "General" under THE ECONOMY. The employment figures of the Establishment Survey were revised in March 2013 by the Bureau of Labor Statistics as part of the annual benchmark revision and such revision changed considerably the intra-annual behavior of the EAI for fiscal year 2012. For example, the latest benchmark revision added 18,400 jobs, which represented an increase of nearly 2% from what had

been previously reported for 2012 (previous changes did not reach the magnitude of 1%). This major revision could be related to the higher economic activity from public works due to the electoral cycle. The payroll employment revision had two major effects; it raised the employment base for 2012 and, therefore, it accentuates the employment reductions observed in 2013. Moreover, the recent changes in the Employees Retirement System resulted in more retirements of state and local employees. Approximately 40% of the total payroll employment reductions experienced from June to August corresponded to decreases in state and local government employment.

*Fiscal Condition*

Since 2000, the Commonwealth has faced a number of fiscal challenges, including an imbalance between its General Fund revenues and expenditures. This imbalance reached its highest historical level of $2.864 billion in fiscal year 2009, when revenues were $7.825 billion and expenditures were $10.689 billion. Since then, the Commonwealth has been able to reduce its deficit every year, except fiscal year 2012, through various measures designed to increase revenues and reduce expenses. For fiscal year 2013, according to preliminary results, the Commonwealth was able to reduce the deficit to $1.290 billion. The budget for fiscal year 2014 contemplates a further reduction of the deficit to $820 million, which will be financed by a refinancing of $575 million of general obligation debt service payments and $245 million of new borrowings. Although the Commonwealth continues to pursue deficit reduction policies, the Commonwealth's ability to continue to reduce its deficit will depend in part on its ability to continue increasing revenues and reducing expenditures, which in turn depends on several factors, including improvements in economic conditions.

The table below shows total revenues from taxes, licenses and other internal or external sources (which does not include financing proceeds), total expenditures (including debt service payments) and the resulting deficit for the last five fiscal years. Total revenues and expenditures include certain non-recurring revenues and expenditures from temporary measures. Accordingly, the amount of the Commonwealth's "structural deficit," or the difference between recurring revenues and expenditures, is higher than the amount shown below. Depending on what revenues and expenditures are considered "recurring," such difference may be significant.

Revenues include (i) total revenues of the General Fund (shown in footnote 1), (ii) revenues from the electronic and traditional lotteries (shown in footnote 2) that are available to the General Fund, and (iii) revenues from the 1.03% property tax collected by the Municipal Collections Revenue Center (shown in footnote 2) which by law must be used to pay general obligation bonds of the Commonwealth. Other revenues may also be included as indicated in the footnotes to the table.

Expenditures include (i) total expenditures of the General Fund (shown in footnote 6), (ii) the transfer of rental payments made by the Commonwealth to the Public Buildings Authority for properties leased by the Government (shown in footnote 7), (iii) debt service payments for the Commonwealth's general obligation bonds (shown in footnote 8), and (iv) debt service payments for the Commonwealth appropriation bonds (shown in footnote 8). The totals for items (ii) and (iii) include debt service of $159.6 million, $517.8 million, $638.7 million, $839.8 million and

$884.79 for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively, on the Commonwealth's general obligation bonds and the Commonwealth-guaranteed bonds of Public Buildings Authority refinanced through the issuance of refunding bonds.

### Deficit
Fiscal Years ended June 30,
(in millions)

| Fiscal Year | Total Revenues[1] [2] | Total Expenditures[6][7][8] | Deficit |
|---|---|---|---|
| 2009 | $7,825 | $10,689[9] | $(2,864) |
| 2010 | $8,032[3] | $10,756[10] | $(2,724) |
| 2011 | $8,343[4] | $10,144 | $(1,801) |
| 2012 | $8,783 | $11,158 | $(2,375) |
| 2013* | $8,697[5] | $9,987 | $(1,290) |

*Preliminary and unaudited; subject to change.
[1] Includes General Fund total revenues of $7.583 billion, $7.593 billion, $7.994 billion, $8.573 billion and $8.198 billion for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively, as presented in the "Statement of Revenues and Expenditures- Budget Basis- General Fund" in the Comprehensive Annual Financial Report ("CAFR") of the Commonwealth (except for fiscal year 2013 revenues which are preliminary and unaudited).
[2] Includes (i) revenues attributable to the electronic and traditional lotteries of $126.7 million, $122.8 million, $101.9 million, $94.0 million and $63.2 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively, and (ii) revenues from the 1.03% property tax of $115.2 million, 114.7 million, $122.2 million, $116.0 million and $117.0 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.
[3] Includes $201.0 million from the sale of securities in the Puerto Rico Infrastructure Authority corpus account.
[4] Includes approximately $125.3 million of moneys transferred to the General Fund during fiscal year 2011from the Puerto Rico Sales Tax Financing Corporation, consisting principally of Sales and Use Tax Collections remaining after providing debt service on its bonds for that fiscal year.
[5] Includes (i) $240 million in excess funds transferred from the Redemption Fund to the General Fund and (ii) $78 million of excess funds transferred from the Puerto Rico Sales Tax Financing Corporation to the General Fund.
[6] Includes General Fund total expenditures of $9.927 billion, $9.640 billion, $9.075 billion, $9.911 billion and $8.723 billion for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively, as presented in the "Statement of Revenues and Expenditures- Budget Basis- General Fund" in the CAFR for each fiscal year (except for fiscal year 2013 expenditures which are preliminary and unaudited).
[7] Includes the transfer of rental payments made by the Commonwealth to the Public Buildings Authority for properties leased by the Government of $330.4 million, $250.7 million, $267.1 million, $331.0 million and $383.0 million, for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively.
[8] Includes (i) debt service for general obligation bonds of $413.6 million, $865.3 million, $801.8 million, $849.0 million and $865.0 million for fiscal years 2009, 2010, 2011, 2012 and 2013, respectively, and (ii) debt service for appropriations bonds of $18.0 million, $66.9 million and $15.8 million for fiscal years 2009, 2012 and 2013, respectively.
[9] Does not include approximately $442 million of non-recurring expenses related to prior fiscal years, which have been included as part of total expenditures for fiscal year 2009 in the Fiscal Condition section of prior Commonwealth Reports.
[10] Does not include approximately $50 million of non-recurring expenses related to prior fiscal years, which have been included as part of the total expenditures for fiscal year 2010 in the Fiscal Condition section of prior Commonwealth Reports.

*Source*: Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Department of the Treasury and Government Development Bank.

The Commonwealth has undertaken various initiatives with a view to reduce and eventually eliminate the deficit restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth general obligation bonds.

The current administration, which commenced its term in January 2013, implemented the following measures to increase revenues and reduce the deficit for fiscal year 2013: (i) an initiative that resulted in the collection of $235 million in advance payments of non-resident withholding tax related to manufacturing patents; (ii) the transfer of $240 million in excess funds in the Redemption Fund to the General Fund; (iii) the implementation of a tax amnesty program which encouraged taxpayers with older tax liabilities to pay such obligations, which resulted in immediate cash collections of $98 million and payment plans for an additional $176 million; and (iv) the elimination of $140 million in projected excess expenditures. These and other measures reduced the projected deficit for fiscal year 2013 from a January 2013 estimate of $2.213 billion to a June 30, 2013 estimate of $1.290 billion.

On June 30, 2013, the Commonwealth legislature approved a budget for fiscal year 2014 that reduces to $820 million the General Fund deficit for such year by enhancing the revenue base of the General Fund and reducing reliance on deficit financing and debt service restructurings. The estimated $820 million deficit for fiscal year 2014 constitutes a reduction of approximately 36% from the deficit for fiscal year 2013 ($1,290 million), and a reduction of approximately 65% from the deficit for fiscal year 2012 ($2,375 million). For additional information regarding the current administration's fiscal stabilization measures see "Fiscal Stabilization" under THE ECONOMY.

Prior administrations have also sought to address the budget deficit through expense reduction measures and various revenue raising measures. For example, the prior Administration adopted Act No. 7-2009 ("Act 7"), which included (i) a reduction in payroll, which is the main component of government expenditures, and other expenses, and the reorganization of the Executive Branch; (ii) a combination of revenue raising measures and additional tax enforcement measures; and (iii) certain financial measures.

In fiscal year 2009, the Commonwealth allocated an additional portion of its sales and use tax to the Puerto Rico Sales Tax Financing Corporation ("COFINA") in order to issue revenue bonds to repay debt and finance operating expenses. As of June 30, 2013, COFINA had $15.224 billion of revenue bonds outstanding.

*Budget for Fiscal Year 2014.* The approved budget for fiscal year 2014 provides for General Fund total resources and total expenditures of $9.770 billion. General Fund resources include $245 million in deficit financing and $575 million in general obligation debt service refinancing.

The principal changes in the fiscal year 2014 budgeted central Government revenues compared to fiscal year 2013 preliminary results are accounted mainly by the projected collections from sales and use taxes (up $312.2 million attributed mostly to the elimination of various exemptions to the application of sales and use taxes), corporate income tax (up $836.5 million), withholding taxes on non-residents (down $162.9 million), excise taxes on motor vehicles and

accessories (up $21.2 million), projected increases in excise tax under Act 154 (up $278.8 million), and personal income taxes (up $8.7 million).

The budget for fiscal year 2014 provides for General Fund total expenditures of $9.770 billion, which include $3.384 billion for education, $1.388 billion for health, $437 million for welfare, $1.562 billion for public safety and protection, and $3 billion for other expenses.

The approved budget expenditures for fiscal year 2014 represent an increase of $687 million when compared to the budget for fiscal year 2013. The main changes are incremental retirement system contributions of $202 million, primarily attributed to the pension reform adopted pursuant to Act 3; incremental appropriations for debt service, including principal and interest, of $292 million; incremental appropriations of $77 million to the University of Puerto Rico pursuant to legislation restoring the prior UPR appropriation formula; incremental appropriations to the Department of Education of $121 million; and a net reduction of $4 million in appropriations for all other General Fund expense items. These figures include as debt service a $40 million appropriation relating to the assumption by the Commonwealth of existing municipal obligations payable from the sales and use tax.

The budget increase of $121 million for the Department of Education was intended to partially offset the unavailability for fiscal year 2014 of certain non-recurring sources of funds which covered recurring expenses in fiscal year 2013; these include a $105 million carryforward surplus reserve and a decline, estimated at the time of budget configuration, of $80 million in available federal funding, both from from lower balances in applicable federal funds surplus reserves and cuts in the Federal Fiscal Year 2014 Budget proposed by the President.

The current budget includes non-General Fund sources to cover contingencies (including lawsuits), technology projects and capital improvements. These include a $100 million future debt issuance for the Capital Improvements Fund; a $100 million appropriation for the Science and Technology Fund to be funded from the proceeds of a special 50% tax imposed on a $200 million dividend distribution to be made by the consortium of insurance companies that provide mandatory car insurance; and a $96.5 million appropriation for the Budgetary Support Fund funded by contributions from accumulated surplus in certain public corporations and surplus balances in special state funds accumulated from revenue-producing activities by Commonwealth central government agencies. OMB considers that out of the $296.5 million in appropriations just described, approximately $60 million represents ongoing recurring programs or administrative costs of the Commonwealth.

For more information regarding the budget for fiscal year 2014, see "Budget for Fiscal Year 2014" under BUDGET OF THE COMMONWEALTH OF PUERTO RICO.

*Preliminary Results for Fiscal Year 2013.* Preliminary General Fund total revenues for fiscal year 2013 are expected to be approximately $8.697 billion. This total includes (i) $8.502 billion in General Fund revenues (consisting of $8.198 billion of operating revenues, $63.2 million of revenues from the electronic and traditional lotteries that are available to the General Fund, and $240 million in excess funds transferred from the Redemption Fund), (ii) $117 million of revenues

from property taxes that are available to pay general obligation bonds, and (iii) $78 million of excess funds transferred from COFINA.

Preliminary General Fund total expenses for fiscal year 2013 are expected to be approximately $9.987 billion, consisting of $8.723 in operating expenditures, $383 million in PBA rental payments and $880.8 million of other financing uses (mostly debt service). These expenditures include $775 million of debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds which were expected to be refinanced (but which are included in the deficit projected for fiscal year 2013). This represents a decrease of $1.17 billion in expenditures from fiscal year 2012.

Expenditures for fiscal year 2013 are based on preliminary budget accounting results. The final settlement for certain agencies that have autonomous accounting systems, including the synchronization with the central accounting system and the final reconciliation with payroll, has not occurred. However, the Office of Management and Budget does not anticipate an aggregate overdraft versus appropriations for fiscal year 2013.

Certain recurring expenses for fiscal year 2013 were funded from non-General Fund sources, including a $105 million carry-forward surplus reserve from prior years from the Department of Education, and $31 million in excess sick-leave liquidations for the Puerto Rico Police.

*Results for Fiscal Year 2012.* General Fund total revenues for fiscal year 2012 were $8.783 billion. This total includes (i) $8.668 billion in General Fund revenues (consisting of $8.573 billion of operating revenues and $94.0 million of revenues from the electronic and traditional lotteries that are available to the General Fund) and (ii) $116 million of revenues from property taxes that are available to pay general obligation bonds. This represents an increase of $440 million, or 5.3%, from fiscal year 2011. The increase in General Fund revenues for fiscal year 2012, compared to fiscal year 2011, was mainly due to an increase of approximately $1.2 billion in excise tax revenues under Act 154 which was in effect for its first full fiscal year. This increase was partially offset by a decrease in income taxes of approximately $353 million and a decrease of approximately $200 million from the expiration of the special property tax.

General Fund total expenses for fiscal year 2012 amounted to $11.158 billion, consisting of $9.911 billion of operating expenditures, $331 million in rent payments to the PBA, and $915.9 million of other financing uses (mostly debt service). These expenses were $1.014 billion, or 10%, higher than the total expenses for fiscal year 2011. The difference between revenues and expenses for fiscal year 2012 of $2.375 billion was covered with the proceeds from COFINA bonds of $952 million, $839.8 million of debt restructuring, and other financing sources including lines of credit from the GDB payable from appropriations.

*Results for Fiscal Year 2011.* General Fund total revenues for fiscal year 2011 were $8.343 billion. This total includes (i) $8.158 billion in General Fund revenues (consisting of $7.994 billion of operating revenues and $101.9 million of revenues from the electronic and traditional lotteries that are available to the General Fund), (ii) $122.2 million of revenues from property taxes that are available to pay general obligation bonds, and (iii) $125.3 million of excess funds

transferred from COFINA.  This represents an increase of $311 million, or 3.9%, from fiscal year 2010.

The increase in General Fund total revenues for fiscal year 2011, compared to fiscal year 2010, were mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.6 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted in Act 154 as part of the tax reform (discussed below under "2011 Tax Reform"), which the Government began collecting in February of 2011.  This increase was partially offset by a decrease of $406.5 million in collections from income tax on individuals as a result of such tax reform and current economic conditions.

General Fund total expenses for fiscal year 2011 were $10.144 billion, consisting of $9.075 billion of operating expenditures, $267 million in PBA rental payments and $801.8 million of other financing uses (principally debt service payments).  Total expenditures of $10.144 billion exceeded General Fund total revenues by $1.801 billion, or 21.6%.  The difference between revenues and expenses for fiscal year 2011 was covered principally from proceeds of COFINA bonds.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $8.032 billion. This total includes (i) $7.716 billion in General Fund revenues (consisting of $7.593 billion of operating revenues and $122.8 million of revenues from the electronic and traditional lotteries that are available to the General Fund), (ii) $114.7 million of revenues from property taxes that are available to pay general obligation bonds, and (iii) $201.0 million from the sale of securities of the Puerto Rico Infrastructure Financing Authority corpus account. This represents an increase of $207 million, or 2.6%, from fiscal year 2009. The increase in General Fund revenues for fiscal year 2010, compared to fiscal year 2009, was mainly due to $227 million from the special temporary property tax.

Total expenditures for fiscal year 2010 were $10.756 billion (which included $173 million of expenditures related to a Commonwealth stimulus program); consisting of (i) $9.640 billion of operating expenditures, (ii) $250.7 million in PBA rental payments and (ii) $865.3 million of general obligations debt service payments.  Total expenditures exceeded General Fund total revenues by $2.724 billion, or 33.9%. The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

## Geographic Location and Demographic Trends

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City.  It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, its capital and largest city, was 381,931 in 2010, compared to 434,374 in 2000.

**Relationship with the United States**

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government, Congress enacted Public Law 600, authorizing Puerto Rico to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the United States Congress, and subsequently approved by the President of the United States.

The United States and the Commonwealth share a common defense, market and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States under the same conditions as decisions from state courts. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officers Responsible for Fiscal Matters**

*Alejandro J. García Padilla* was sworn in as Governor of Puerto Rico on January 2, 2013. From 2009 until becoming Governor, Mr. García Padilla served as an elected senator in the Senate

of the Commonwealth of Puerto Rico. Prior to that, Mr. García Padilla was an attorney in the private sector. From 2005 to 2007, Mr. García Padilla was Secretary of the Commonwealth's Department of Consumer Affairs. Mr. García Padilla was a professor at the School of Law of the Inter American University of Puerto Rico from 2000 to 2002. Mr. García Padilla clerked for the Commonwealth's Court of Appeals from 1997 to 1999. He holds a bachelor's degree in Political Science and Economy from the University of Puerto Rico and a Juris Doctor from the Inter American University School of Law.

*Melba Acosta Febo* was designated Secretary of the Treasury Department effective January 2, 2013 and confirmed by the Senate of the Commonwealth on February 25, 2013. Ms. Acosta was subsequently also appointed on March 1, 2013 as Chief Public Financial Officer of the Commonwealth of Puerto Rico. Before these appointments, Ms. Acosta was Director of OMB and Chief Information Officer from 2001 to 2004, and Chief of Staff of the Municipality of San Juan from 1997 to December 2000. In the private sector, Ms. Acosta worked as an attorney with McConnell Valdés from 1995 to 1997 and from 2010 to 2012. She served as Executive Vice President, Chief Operating Officer, and Chief Financial Officer of RG Financial Corporation and its bank subsidiary, RG Premier Bank, from 2004 to 2010. In addition, she served as Tax Consultant with Price Waterhouse from 1988 to 1990. Ms. Acosta is a certified public accountant and an attorney-at-law. She holds a bachelor's degree in Accounting from the School of Business Administration of the University of Puerto Rico, an MBA from the Harvard Graduate School of Business Administration and a Juris Doctor from the School of Law of the University of Puerto Rico. She is a member of the Boards of Directors of the Puerto Rico Art Museum, the Luis Muñoz Marín Foundation and GDB. Previously, she was a member of the Board of Directors of United Funds.

*Carlos D. Rivas Quiñones* was appointed Director of OMB in January of 2013. Mr. Rivas returned to public service after having been General Manager of UPM Group and Principal with Advent Morro Equity Partners. Prior to his tenure with UPM Group, he was Executive Director of the Puerto Rico Housing Finance Authority from 2005 to 2008. Mr. Rivas' private sector experience includes serving as an associate with McKinsey & Company and with Davis Polk & Wardwell. Mr. Rivas' experience in public service includes serving as a Deputy Advisor on Economic Development and as Executive Aide to the Governor and the Chief of Staff, focusing on public finance, economic development and budget issues. Mr. Rivas holds a law degree from Stanford University and a bachelor's degree in Economics from Princeton University.

*José V. Pagán Beauchamp* was designated Acting President of the Government Development Bank for Puerto Rico on July 17, 2013. At the time of his appointment, he was Executive Vice President for Financing a position he has held since July 1, 2013. Immediately before that he had been Senior Advisor to the President since January 22, 2013. Mr. Pagán Beauchamp has worked in the areas of public and private financing, investment banking, corporate finances, accounting, insurance, financial consulting and project management. During his professional career he previously held key executive positions in investment banks, municipal bond underwriters, insurance companies and consulting firms, such as: Citibank, Salomon Smith Barney, The First Boston Corporation, MAPFRE, Ernst & Whinney, and Truenorth. In public service, he previously served as GDB Senior Executive Vice President for Financing from 2001 to 2002, and Executive Vice President for Financing in 1992. In academia, he worked as Director of

the Business Administration Department of the Sacred Heart University. Mr. Pagán Beauchamp holds an M.B.A. in Finance from the New York University Graduate School of Business Administration, a B.A. in Engineering and Applied Sciences from Yale University, as well as a master's degree in Computer Science from the Polytechnic University of Puerto Rico.

**Political Trends**

For many years, there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continued relationship between Puerto Rico and the United States have prevailed in elections for many years.

|                                | 1996  | 2000  | 2004  | 2008  | 2012  |
|--------------------------------|-------|-------|-------|-------|-------|
| Popular Democratic Party       | 44.5% | 48.6% | 48.4% | 41.3% | 47.7% |
| New Progressive Party          | 51.1% | 45.7% | 48.2% | 52.8% | 47.1% |
| Puerto Rico Independence Party | 3.8%  | 5.2%  | 2.7%  | 2.0%  | 2.5%  |
| Others, Blank or Void          | -     | 0.5%  | 0.6%  | 3.9%  | 2.6%  |

With the results of the 2012 election, the Popular Democratic Party gained control of the Executive Branch and the Legislative Branch. The current membership of the Senate and House of Representatives by political party is as follows:

|                                | Senate | House |
|--------------------------------|--------|-------|
| Popular Democratic Party       | 18     | 28    |
| New Progressive Party          | 8      | 23    |
| Puerto Rico Independence Party | 1      | 0     |
| Total                          | 27     | 51    |

The next general election (gubernatorial, municipal and legislative) in Puerto Rico will be held in November 2016.

# THE ECONOMY

## General

Puerto Rico's economy experienced a considerable transformation during the second half of the twentieth century, from an agriculture-based economy to an industrial one. Factors contributing to this transformation included government-sponsored economic development programs, major tax incentives, increases in the level of federal transfer payments, and the relatively low cost of borrowing. During some of these years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices.

In more recent years, the continuous contraction of the manufacturing sector, partially due to the long-term effects of the end of the federal tax incentives under Section 936 of the U.S. Internal Revenue Code, significant oil price increases, and the budgetary pressures on government finances, have resulted in a general contraction in the economy.

Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. For fiscal years 2007, 2008, 2009, 2010 and 2011, the real gross national product contracted by 1.2%, 2.9%, 3.8%, 3.6% and 1.6%, respectively. For fiscal year 2012, preliminary reports indicate that the real gross national product grew by only 0.1%. The Puerto Rico Planning Board currently projects a decrease in real gross national product of 0.4% for fiscal year 2013 and an increase of 0.2% for fiscal year 2014. The Planning Board's forecast for fiscal year 2014 took into account the estimated effect of the projected growth of the United States economy, tourism activity, personal consumption expenditures, federal transfers to individuals and an increase of investment in construction. The Planning Board is expected to publish a revision of this forecast in October 2013.

In fiscal year 2012, aggregate personal income was $62.3 billion ($59.4 billion in 2005 prices) and personal income per capita was $16,934 ($15,995 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total United States federal transfer payments to individuals amounted to $16.0 billion in fiscal year 2012 and $15.6 billion in fiscal year 2011. Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and United States Civil Service retirement pensions were $11.3 billion, or 70.4% of the transfer payments to individuals in fiscal year 2012 ($10.9 billion, or 70%, in fiscal year 2011). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

Total average annual employment (as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey") decreased during the last decade. From fiscal year 2000 to fiscal year 2013, total employment decreased at an average annual rate of 0.9%, from 1,150,291 to 1,029,019. A reduction in total employment began in the fourth quarter of fiscal year 2007 and has continued consistently through fiscal year 2013 due to the current recession and contractionary fiscal adjustment measures.

During the first two months of fiscal year 2014, total employment fell at an average rate of 2.3% as compared to the same period for the prior fiscal year. The Household Survey numbers are the numbers used for the computation of the employment and participation rates. However, the Establishment Survey numbers are the numbers used to measure employment across the various sectors of the economy. According to the Establishment Survey, payroll non-farm employment decreased by 4.2% during the first two months of fiscal year 2014. This reduction is partially attributable to attrition and to the changes to the Employees Retirement System, as approximately 40% of the total employment reductions experienced from June to August of 2013 corresponded to decreases in central and municipal government employment.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of the phase out of Section 936 of the United States Internal Revenue Code and an increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. At the present time, almost 90% of manufacturing is generated by chemical and electronic products. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the Puerto Rico gross national product for fiscal years 2008 through 2012, compared to the annual percentage increase in real gross national product in the United States. Note that there are some differences between the previously reported figures of Puerto Rico's gross national product and the current figures set forth below due to the recent revision of several components of the gross national product, which included changes since fiscal year 2001. Therefore, growth rates and figures before fiscal year 2001 are not wholly comparable with the amounts reported afterwards.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**
**(dollar amounts in $ millions)**

|  | 2008 | 2009 | 2010 | 2011 | 2012[1] |
|---|---|---|---|---|---|
| Gross national product (PR) (current prices)[2] | $62,703 | $63,618 | $64,295 | $65,567 | $69,462 |
| Real gross national product (PR) (2005 prices) | $52,908 | $50,883 | $49,065 | $48,280 | $48,317 |
| Annual percentage increase (decrease) in real gross national product (PR) (2005 prices) | (2.9)% | (3.8)% | (3.6)% | (1.6)% | 0.1% |
| Annual percentage increase (decrease) in real gross national product (United States) (2005 prices) | 2.5% | (3.4)% | 0.5% | 2.5% | 2.1% |

[1]    Preliminary.
[2]    In current dollars. 2008-2011 revised figures.
*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

    The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2012, approximately 70.9% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 42.6% of Puerto Rico's imports. In fiscal year 2012, Puerto Rico experienced a positive merchandise trade balance of $12.3 billion.

    The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since fiscal year 2001, and the forecast of the growth rate for fiscal years 2013 and 2014.



Estimate for Puerto Rico from the Puerto Rico Planning Board (Apr-2013).
** Estimate for U.S. from IHS-Global Insight (Sep-2013).
*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2012 shown in this Report are preliminary until the revised figures for fiscal year 2012 and the preliminary figures for fiscal year 2013 are released, and the forecast for fiscal year 2014 is revised.

Certain information regarding current economic activity is available in the form of the EAI, a coincident indicator of ongoing economic activity. This index, shown in the following graph and published by GDB since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product.

However, the EAI does not measure the real GNP annual growth rates. Since the GDB-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the GDB-EAI amplify the corresponding movements of the real GNP.

The EAI for August 2013 was 123.8, a 5.4% reduction compared to August 2012. The average cumulative value for the first two months of fiscal year 2014 (July to August 2013) showed a reduction of 5.2% compared to the same period of fiscal year 2013. For fiscal year 2013, the EAI showed a reduction of 0.9%, compared to the corresponding figure for fiscal year 2012. The average growth rate of the index for fiscal year 2012 was 0.1%, after a reduction of 2.9% for fiscal year 2011. The previously published figures of this index were reflecting a slight contraction (-0.2%) for fiscal year 2012, while the current index shows a slight increase (0.1%) for the same fiscal year. This is due to a major revision on the total non-farm employment numbers recently published by the Bureau of Labor Statistics, and to the recent changes to the Employees Retirement System (see the section *Employment and Unemployment* below).



*Economic Forecast for Fiscal Years 2013 and 2014*

In April 2013, the Planning Board released its revised gross national product forecast for fiscal year 2013 and its gross national product forecast for fiscal year 2014. The gross national product forecast for fiscal year 2013 was revised downward from a projected growth of 1.1% to a decline of -0.4%, both in constant dollars. This revision took into account the estimated effects on the Puerto Rico economy of the United States budget sequestration, the end of the federal ARRA funds, the impact of the initial phase of the tax reform, the recent initiatives to promote private employment creation, and the end of the Commonwealth stimulus plan. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the United States economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2014 projects an increase in gross national product of 0.2% in constant dollars. The Planning Board's forecast for fiscal year 2014 took into account the estimated effect of the projected growth of the United States economy, tourism activity, personal consumption expenditures, federal transfers to individuals and an increase of investment in construction. The Planning Board is expected to publish a revision of this forecast in October 2013.

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2013 averaged 1,029,019, a decrease of 0.6% compared to the previous fiscal year; and the unemployment rate averaged 14.0%.

*Fiscal Year 2012*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2012 indicate that real gross national product increased 0.1% (an increase of 5.9% in current dollars) over fiscal year 2011. Nominal gross national product was $69.5 billion in fiscal year 2012 ($48.3 billion in 2005 prices), compared to $65.6 billion in fiscal year 2011 ($48.3 billion in 2005 prices). Aggregate personal income increased from $61.6 billion in fiscal year 2011 ($50.0 billion in 2005 prices) to $62.3 billion in fiscal year 2012 ($49.7 billion in 2005 prices), and personal income per capita increased from $16,611 in fiscal year 2011 ($13,496 in 2005 prices) to $16,934 in fiscal year 2012 ($13,513 in 2005 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2012 averaged 1,035,465, a decrease of 1.1% compared to the previous fiscal year; and the unemployment rate averaged 15.2%, one percentage point below the reported rate for fiscal year 2011.

Among the variables that contributed to the small growth in gross national product were the continuous contraction of the manufacturing sector and the increase in the average price of West Texas Intermediate (WTI) oil, which went up from $89.4 per barrel in fiscal year 2011 to $95.0 per barrel in fiscal year 2012, an increase of 6.3%. After the financial crisis in the United States which had significant direct consequences in the local economy, the historically low interest rates have not been enough incentive to jumpstart private investment or to counteract other external factors.

*Fiscal Year 2011*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2011 indicate that real gross national product decreased 1.6% (an increase of 2.0% in current dollars) over fiscal year 2010. Nominal gross national product was $65.6 billion in fiscal year 2011 ($48.3 billion in 2005 prices), compared to $64.3 billion in fiscal year 2010 ($49.1 billion in 2005 prices). Aggregate personal income increased from $60.0 billion in fiscal year 2010 ($49.6 billion in 2005 prices) to $61.6 billion in fiscal year 2011 ($50.0 billion in 2005 prices), and personal income per capita increased from $16,078 in fiscal year 2010 ($13,287 in 2005 prices) to $16,611 in fiscal year 2011 ($13,496 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2011 averaged 1,046,719, a decrease of 28,200, or 2.6%, from the previous fiscal year. The unemployment rate for fiscal year 2011 was 16.2%, a slight reduction from 16.3% for fiscal year 2010.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors and the increase in the average price of West Texas Intermediate (WTI) oil, which went up from $75.2 per barrel in fiscal year 2010 to $89.4 per barrel in fiscal year 2011, a rise of 18.9%. Although the continuation of the difficulties associated with the financial crisis kept short-term interest rates at historically low levels, such low interest rates did not translate into a significant improvement in the construction sector due in part to the high level of inventory of residential housing units.

**Fiscal Stabilization**

During the period from 2009 to 2012, the Commonwealth sought to reduce the General Fund deficit primarily by reducing operating expenses and by enacting temporary revenue increasing measures. The Commonwealth reduced payroll expenses during this period principally through incentivized voluntary resignations and workday reduction programs, an involuntary layoff plan, and a temporary suspension of certain provisions of laws, collective bargaining agreements, and other agreements.

Notwithstanding efforts by the past administration to reduce the deficit, significant short and long-term challenges remained. When the current administration came into office the projected deficit for fiscal year 2013 was approximately $2.213 billion, as of January 31, 2013, according to internal estimates by the Commonwealth Treasury Department. Several of the Commonwealth's largest and most important public corporations, including the Puerto Rico Aqueduct and Sewer Authority and the Puerto Rico Highway and Transportation Authority, were under severe financial strain. The net assets of the Employees Retirement System were expected to be depleted by fiscal year 2014 and it was anticipated to have an average cash funding shortfall of $905 million per year during the period between fiscal year 2019 and fiscal year 2043.

During the past nine months, the Commonwealth has begun the implementation of a comprehensive fiscal stabilization plan (the "Fiscal Plan") in order to protect its credit and investment grade ratings. This Fiscal Plan, formulated to address the short and long-term fiscal challenges inherited by the new administration, is designed to achieve a balanced budget on or

before fiscal year 2016, turn the Commonwealth's public corporations into self-sufficient enterprises, and address structural problems that threaten the Commonwealth's long-term fiscal stability. The following is a description of the Fiscal Plan initiatives already undertaken by the new administration or to be undertaken in the next few months.

## Reducing the Projected Deficit for Fiscal Year 2013

Upon taking office, the new administration faced a projected deficit of approximately $2.213 billion as of January 31, 2013. While the budget for fiscal year 2013 originally included $333 million in deficit financing and $775 million in debt service restructurings, as of January 31, 2013, the Treasury Department projected a revenue shortfall of approximately $965 million and excess spending of approximately $140 million. The new administration implemented a corrective action plan to reduce the projected deficit for fiscal year 2013, including: (i) an initiative that resulted in the collection of $235 million in advance payments of non-resident withholding tax related to manufacturing patents; (ii) the transfer of $240 million in excess funds in the Redemption Fund to the General Fund; (iii) the implementation of a tax amnesty program which encouraged taxpayers with older tax liabilities to pay such obligations, which resulted in immediate cash collections of $98 million and payment plans for an additional $176 million; and (iv) the elimination of $140 million in projected excess expenditures through recurring and non-recurring actions, including the freezing of accounts, transfer of non-General Fund balances to cover leave liquidations, and others. As of June 2013, the projected revenue shortfall had been reduced from $965 million to $247 million. The remaining shortfall is expected to be reduced or eliminated through (i) the sale of old tax receivables ($128 million) and new tax receivables ($199 million) and (ii) two closing agreements with pharmaceutical companies expected to be finalized in October 2013 ($98 million).

The above measures have reduced the projected deficit for fiscal year 2013 from the January 2013 estimate of $2.213 billion to the current estimate of $1.290 billion as of June 30, 2013.

## Reducing the Deficit for Fiscal Year 2014

On June 30, 2013, the legislature approved a budget for fiscal year 2014 that reduces to $820 million the General Fund deficit by enhancing its revenue base and reducing reliance on deficit financing and debt service restructurings. The estimated $820 million deficit for fiscal year 2014 constitutes a reduction of approximately 36% from the deficit for fiscal year 2013 ($1,290 million), and a reduction of approximately 65% from the deficit for fiscal year 2012 ($2,375 million).

As part of the efforts to close the General Fund's structural deficit, on February 28, 2013, the Commonwealth amended Act 154 to extend the duration of the excise tax until December 31, 2017 and reset the excise tax rate at a fixed 4% commencing on July 1, 2013. The excise tax was originally scheduled to apply for a period of six years (ending on December 31, 2016) and was set at 4% for calendar year 2011, declining every year until reaching 1% in 2016.  For more information on Act 154, see "Major Sources of General Fund Revenues-Act 154" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

Furthermore, the approved budget for fiscal year 2014 also contemplates revenue increases as compared to the preliminary revenues for fiscal year 2013 from sales and use taxes (up $312.2 million attributed mostly to the elimination of various exemptions to the application of sales and use taxes), corporate income tax (up $836.5 million), withholding taxes on non-residents (down $162.9 million), excise taxes on motor vehicles and accessories (up $21.2 million), projected increases in excise tax under Act 154 (up $278.7 million), and personal income taxes (up $8.7 million).

*Comprehensive Reform of Employees Retirement System*

On April 4, 2013, the Governor of Puerto Rico signed into law Act 3 which adopted a comprehensive reform of the Employees Retirement System, the largest of the three public retirement systems that are funded primarily with budget appropriations from the Commonwealth's General Fund. The other two retirement systems are the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System") and the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"). See "RETIREMENT SYSTEMS" for a description of the three retirement systems.

Act 3, which became effective on July 1, 2013, made the following changes to the Employees Retirement System: (i) it froze and grandfathered the benefits that had accrued through June 30, 2013 of those participants who were covered by the Employees Retirement System's defined benefit formula (those who joined the Employees Retirement System prior to January 1, 2000, whose retirement benefits accrued at a rate of 1.5% or 2.0% per year of creditable service) (the "Defined Benefit Employees"); (ii) beginning on July 1, 2013, the retirement benefits accruing on and after such date for Defined Benefit Employees will be calculated based on a defined contribution formula, similar to the "System 2000" formula currently applicable to employees who joined the Employees Retirement System on or after January 1, 2000, with all such benefits being paid in the form of a lifetime annuity rather than a lump sum payment (upon retirement, the employee will receive (a) the benefits accrued through June 30, 2013 based on the defined benefit formula plus (b) the contributions made by the employee after June 30, 2013); (iii) defined contribution benefits accrued pursuant to System 2000 will also be paid in the form of a lifetime annuity rather than a lump sum payment; (iv) it eliminated the so called "merit pension", which provided to participants who joined the Employees Retirement System prior to April 1, 1990 after attaining 30 years of service, a retirement benefit of 65% (if less than 55 years of age) or 75% (if age 55 or greater) of the average salary earned during the highest 36 months of employment; (v) it increased the retirement age for various groups of participants; (vi) it increased the employee contribution to the Employees Retirement System from 8.275% to 10% of compensation; (vii) it eliminated or reduced various retirement benefits previously granted by special laws; (viii) it increased the minimum pension from $400 to $500 per month for current retirees; and (ix) it eliminated or modified other benefits, such as disability and survivor benefits.

For many years, the financial condition of the three Commonwealth retirement systems has been one of the principal fiscal challenges facing Puerto Rico. Although certain measures had been implemented in recent years to address the recurring solvency issue of the retirement systems, such as the enactment in 2011 of a gradual increase in the statutory rate for employer

contributions to the Employees Retirement System and the Teachers Retirement System, the retirement systems were projected to run out of cash within the next ten years unless a more comprehensive reform was adopted. As of June 30, 2012, the date of the latest actuarial valuations of the three retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $26.4 billion, $10.3 billion and $358.0 million, respectively, and their funded ratios were 4.5%, 17.0% and 14.1%, respectively.

Prior to the enactment of Act 3, it was anticipated that the gross assets of the Employees Retirement System would be depleted by fiscal year 2019 and that the cash funding shortfall during the period between fiscal year 2019 and fiscal year 2043 would be, on average, $905 million per year, which the Commonwealth and the other government employers would have been required to fund on a pay-as-you-go basis. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of municipalities and participating public corporations.

In addition to Act 3, to further improve the liquidity and solvency of the System, the Commonwealth enacted Act 32, which provides for incremental annual contributions from the participating employers (which includes the municipalities and certain public corporations) beginning in fiscal year 2014 and up to fiscal year 2033. This incremental contribution, which is in addition to the increase in the statutory rates of employer contributions enacted in 2011, will be determined on an annual basis based on actuarial studies to be performed by the System's actuaries. An appropriation for such additional contribution of $120 million is included in the Commonwealth's budget for fiscal 2014. However, the accelerated pace of retirements that occurred as a result of Act 3 may require higher appropriations in the future than the one made for fiscal year 2014.

Based on current census data, expectations of market conditions and other actuarial information provided by the consulting actuaries, the changes instituted by Act 3, along with the annual contributions to be received from the Commonwealth during the next twenty years, as provided by Act 32, should be sufficient to cover the Employees Retirement System's current and future obligations.

The constitutionality of Act 3 was upheld by the Puerto Rico Supreme Court after it was challenged in several lawsuits brought by participants of the Employees Retirement System.

For more information regarding Act 3 and the situation of the Commonwealth retirement systems, see "RETIREMENT SYSTEMS."

*Reforming the Public Corporations*

Since January 2013, significant steps have been taken to turn certain public corporations of the Commonwealth into self-sufficient entities capable of operating without budgetary subsidies from the Commonwealth or deficit financings from the GDB. Among the main measures taken are the following:

- *Puerto Rico Aqueduct and Sewer Authority ("PRASA").* On July 15, 2013, PRASA implemented a sixty percent water rate increase (on average) that is expected to allow the corporation to cover all of its expenses and debt service. The rate increase is projected to increase operating revenues for fiscal year 2014 by approximately $344 million, or 44 %, over fiscal year 2013. For fiscal year 2015 and beyond, the increase in operating revenues is projected at $444 million (as compared to fiscal year 2013), as the rate adjustment will cover an entire fiscal year. Further water rate increases are not expected be necessary at least until fiscal year 2017. As a result, in contrast to prior years, the Commonwealth does not anticipate having to appropriate funds to PRASA for its operational expenses.

- *Puerto Rico Highway and Transportation Authority ("PRHTA").* On June 25, 2013, the Commonwealth enacted Act 30 and Act 31 to provide approximately $270 million in additional annual revenues to PRHTA. Pursuant to these laws, (i) PRHTA will receive the motor vehicle license fee revenues previously received by the Commonwealth Treasury Department, which currently amount to approximately $62.5 million per year, (ii) the tax on petroleum products received by the PRHTA was increased from $3.00 per barrel to $9.25 per barrel, which is currently estimated to result in approximately $189 million in additional annual revenue, and (iii) PRHTA will receive the first $20 million in annual cigarette excise tax revenues collected by the Commonwealth Treasury Department. These new revenue measures will also allow PRHTA to repay lines of credit outstanding with the GDB and provide additional revenues to fund operational expenses.

- *Puerto Rico Ports Authority ("PRPA")* – In February of 2013, the fiscal position of the PRPA was strengthened by the execution of a forty-year lease agreement with Aerostar Airport Holdings, LLC (Aerostar), pursuant to which Aerostar will finance, operate, maintain and improve the Luis Muñoz Marín International Airport, the busiest airport in the Caribbean. As a result of this transaction, on February 27, 2013, the PRPA received from Aerostar a lump-sum payment of $615 million, $402 million of which were used to retire 43% of the outstanding debt of the PRPA. The PRPA will also receive an estimated $552 million in revenue sharing over the life of the lease.

- *Puerto Rico Electric Power Authority ("PREPA")* – In order to ensure PREPA's long term fiscal stability, PREPA has implemented a set of cost reduction measures that include reductions in the number of employees and healthcare benefits, limits on overtime and miscellaneous expenses, and implementing enhanced budget controls and expenses in each of three operational areas of the business. These measures, which PREPA began implementing in 2009, have resulted in recurring annual savings of

approximately $125 million. PREPA also expects other cost reduction initiatives for fiscal year 2014, such as further reductions in overtime, materials and administrative expenses, to result in additional annual savings of approximately $15 million. On August 21, 2013, PREPA issued $673,145,000 in Power Revenue Bonds to fund its capital improvement program, including the continuation of the conversion to natural gas of existing oil-fired generating units, which is expected to enable PREPA to improve its operating efficiency.

*OMB Spending Controls*

OMB maintains significant institutional spending controls including but not limited to, review of contracts for professional and purchased services at the Commonwealth agencies to ensure compliance with austerity policies and appropriation limits; authorization of individual personnel transactions for budgetary impact; and approval of several of various agency transactions with budgetary impact, such as rent or lease agreements.

Payroll expenses chargeable to the Commonwealth's General Fund for the months of July, August and September, the first three months of the 2014 fiscal year, totaled $583.9 million, equivalent to $33 million or 5.3% below the same period for the prior fiscal year. With respect to the approved fiscal year 2014 budget, the first three months were $3.6 million or 0.6% under budget. However, the totality of year-over-year payroll savings does not constitute a year-to-date budget surplus on the payroll account due to contingencies and budget assumptions.

The decrease in payroll expenses has been driven by a substantial reduction in headcount due, among others, to increased attrition due to the enactment of pension reform under Act 3. Reserve contingencies of more than $130 million have been set aside, both through legislative appropriation and OMB administrative action, in the General Fund budget to cover the liquidation of sick leave and vacation leave of the recently retired employees. These payroll figures exclude those teachers chargeable to the school wide mixed state-federal funding pool, which is not classified as payroll, whose salaries represent close to 10.5% of the General Fund budget, and whose expense accounting lags and has not transcurred yet for the current fiscal year. In addition, they exclude the payroll of autonomous entities such as the University of Puerto Rico, the Judicial Branch, and other smaller agencies, which receive fixed monthly payments, totaling approximately $1,410 million, or 14.4% of the General Fund budget. OMB expects that some retired employees, particularly those that provide direct services such as nurses and social workers, will have to be replaced over the course of the fiscal year.

*Comprehensive Reform of Teachers Retirement System*

Act 3 did not address the underfunded condition of the Teachers Retirement System. The Commonwealth is evaluating alternatives for a comprehensive reform to the Teachers Retirement System in order to allow the system to cover all of its future obligations as they become due while eliminating the projected pay-as-you go burden of the system on the General Fund. The Commonwealth expects to present a comprehensive reform package this fiscal year.

*Achieving a Balanced Budget by Fiscal Year 2016; Reducing the Deficit by at least Half by Fiscal Year 2015*

The budget for fiscal year 2014 contemplates a deficit of $820 million, which the Commonwealth expects to finance with $575 million in general obligation debt service refundings and $245 million in new deficit financing. The Commonwealth aims to submit a proposed budget for fiscal year 2015 that contains no additional deficit financing and significantly reduces the amount of debt service refundings. Additional information with respect to the proposed fiscal year 2015 budget is expected to be presented in the next several months.

*Improve Governmental Efficiency*

The Commonwealth is committed to expense reduction, beyond immediate tactical controls, through strategic initiatives directed at government efficiency. In particular, OMB believes that there are three main opportunities. First, the creation of a centralized federal funds monitoring office with the objective of increasing the amount and effectiveness of federal funds utilization by agencies of the Commonwealth, through improved procurement, agency capability building and optimized loss mitigation. Second, the implementation of a robust and systemic upgrade of Commonwealth budget, accounting and payroll information systems, to integrate entities and concepts, such as the Department of Education and the Department of Health, to improve reporting and business intelligence. Third, a comprehensive re-engineering effort focused on government organization, human capital, and cost efficiency, covering the core administrative functions of the government such as real estate, transportation, purchasing, utilities, payroll and services. With respect to the final point, the Government has signed an Executive Order to ensure multi-sector (including legislative and private sector) input and commitment to the initiatives

**Economic Growth**

Since January 2013, recognizing the urgency to reignite the economy, the new Commonwealth administration has been actively working to attract investment, create jobs and rethink how to best deploy available resources. The Government favors initiatives that promote sustainable economic growth and job creation, while accelerating the transition to a knowledge-based and innovation driven economy, focused mainly in the development of human capital and intellectual property, thus diversifying Puerto Rico's economic base.

*Sector Initiatives*

The Government's outreach efforts are directed at increasing awareness of Puerto Rico's competitive advantages for businesses and investors in sectors where the Commonwealth has natural or structural competitive advantages. This outreach program has prioritized the following industry sectors: manufacturing, knowledge services, and tourism.

*Manufacturing.* Puerto Rico has been a strong manufacturing center for many decades. One of the administration's main goals is to bolster Puerto Rico's strong manufacturing base by aggressively growing key segments within this sector by (i) retaining existing pharmaceutical operations and pursuing opportunities in the emerging generic pharmaceuticals and biologics

markets, (ii) capturing new opportunities and moving up the value chain in medical devices manufacturing, and (iii) tapping growth opportunities in the emerging bio-agriculture R&D.

- *Retaining Existing BioPharma Operations.* Puerto Rico is a proven high-quality pharma manufacturing location, with a large reservoir of physical, intellectual, and human capital built over its 60 years as a world-class manufacturing destination. Twelve of the top twenty biopharmaceutical companies currently operate in Puerto Rico and seven of the top ten biopharmaceutical products sold in the world are manufactured in Puerto Rico. Puerto Rico offers low manufacturing costs compared to the mainland U.S. or other Western countries and a sophisticated industrial manufacturing base. Furthermore, increased concern and scrutiny brought on by quality and infrastructure challenges in other low-cost locations has sparked a renewed interest in proven, high quality locations such as Puerto Rico. Biopharma manufacturing currently represents approximately 25% of Puerto Rico's Gross National Product and approximately 17,000 people work in this sector.

- *Target on Medical Devices Manufacturing.* Puerto Rico already has a strong medical device manufacturing presence with 50% of pacemakers and defibrillators sold in the U.S. manufactured in Puerto Rico. As the global medical devices market grows, the current administration seeks to build on the existing presence to consolidate Puerto Rico's position as a global manufacturing destination for the medical technology sector. This is expected to be accomplished by leveraging Puerto Rico's competitive advantages including its vast life sciences experience, tax incentives, convenient location, status as a U.S. jurisdiction, and extensive talent pool. The Puerto Rico Industrial Development Company ("PRIDCO") believes that Industry trends favor Puerto Rico's competitive position because of industry consolidation which leads to larger facilities and manufacturing network optimization, as well as the Affordable Care Act excise tax on medical devices which highlights the importance of Puerto Rico's tax incentives.

- *Tapping opportunities in Bio-Agriculture R&D.* A combination of supportive government policies, including fast-tracking permitting, and natural benefits such as four harvests a year, have already made Puerto Rico a leading player in the growing area of bio-agriculture, in which traditional crops are improved through genetic modification. Many leading companies are already established in Puerto Rico; in addition to crop testing, many of these companies have built additional R&D facilities in Puerto Rico to support their efforts.

The administration's outreach initiatives have already resulted in the following positive developments as of September 2013:

- a $137 million 3-year military apparel contract which is expected to create 2,200 jobs.

- a $250 million expansion of an existing medical devices manufacturer which is expected to create 350 jobs.

- a $9 million contract with a medical devices manufacturer which is expected to create 200 new jobs.

- eighty-four new contracts negotiated by PRIDCO with a commitment to create 7,500 new jobs in the aggregate related to different manufacturing sectors including: biopharma, construction & engineering, medical devices, knowledge services, aerospace electronics and information technology.

- continued improvement in Puerto Rico's global competiveness as evidenced in the recent World Economic Forum's Global Competitive Report for 2013 with Puerto Rico's ranking improving from 31 to 30 and number 1 in Latin America and inclusion in Future Brands's Country Brand Index for Latin America, ranking 10 out of 21 countries

*Knowledge Services.* Puerto Rico also provides a compelling value proposition as a nearshoring destination, focused on the Americas. Puerto Rico has one of the most highly educated workforces in Latin America with strong bilingual skills and a close cultural affinity to the United States, which translates into a high quality service offering for companies. Puerto Rico's cost structure is competitive with other Latin American locations, particularly after incentives are taken into account. Puerto Rico's status as a U.S. jurisdiction is especially advantageous in certain sectors (such as Aerospace and Defense) because companies located in Puerto Rico comply with "U.S. soil" requirements while providing a significant cost advantage over the U.S. mainland, allowing them access to markets competitors cannot reach (e.g. Federal Government contracting). Overall, Puerto Rico represents a significant opportunity for companies to "outsource" to a lower cost destination, while remaining in the U.S. and benefiting from the U.S. legal system and infrastructure. The administration's goal is to establish Puerto Rico as a worldwide Knowledge Process Outsourcing ("KPO") hub, by providing knowledge services to clients worldwide, with focus on the Americas and the United States.

Successful initiatives in this sector since January of 2013 have included: (i) $1 million investment in machinery and equipment for a development center to support technology implementation which is expected to create 300 new jobs, (ii) $1 million investment in the knowledge services outsourcing sector which is expected to create 200 new jobs, and (iii) an alliance between a global IT global leader and a local partner which is expected to create 400 new jobs in the software development field.

*Tourism.* Puerto Rico has focused its recent efforts on expanding its air and maritime access, given its importance for both tourism and trade growth. Efforts are focused on the following strategic priorities: (i) achieving direct air access to Latin America (currently all connections are via Miami or Panama); (ii) recuperating access routes lost to the departure of American Eagle, (iii) expanding access to the US West Coast, and (iv) restarting growth in cruise passenger arrivals.

During the past few months, there has been significant progress in all of the above areas. The arrival of Southwest Airlines in April opens the doors to tap into its strength in the US West Coast as a potential for future growth. In July, Puerto Rico established its first direct connection to Colombia in 12 years, with the start of a non-stop route to Bogota via Avianca Airlines, with connections to other Latin American countries. The key Caribbean routes have been reestablished with new openings from Jet Blue (Santiago and Punta Cana), LIAT, Winnair (St. Maarten), and Seaborne (Dominica, Martinique). Cruise passenger arrivals have increased 84% in August 2013 versus the same period last year, and scheduled visits for 2014 are expected to increase by an additional 15%. Recent legislation regarding cruise industry incentives should help continue this growth. In addition, work is expected to begin in the coming months on the necessary improvements to Pier 3 that will allow the new Quantum and Oasis mega-class ships to arrive in Puerto Rico starting in December 2014.

The December 2012 opening of the Ritz Carlton Reserve at Dorado Beach, the first Reserve for the Ritz in the Americas, has helped position Puerto Rico as a luxury destination in the Caribbean. New luxury accommodations projects being contemplated in the short term are expected to help continue developing this market, such as the Vanderbilt in San Juan, Capella in Humacao, Four Seasons in Fajardo, and the JW Marriott in Dorado. Additionally, the recent purchase of the largest marina in the Caribbean, Puerto del Rey in Fajardo by U.S. investors is expected to boost tourism in the east coast area with additional on-site hotel and condo-hotel developments, retail space and a yacht club for increased economic and job-creation activity.

*Jobs Act*

With the purpose of boosting employment and promoting the creation of small and medium enterprises, the Jobs Now Act was adopted in February 2013. Its objective is to create jobs by eliminating certain hurdles that delay and impede the establishment of new businesses or expanding existing businesses in Puerto Rico, allow better access to capital, and providing incentives under agreements between certain eligible businesses and the Government of Puerto Rico through the Puerto Rico Commerce and Export Company. The benefits provided under the law include, among others, partial reimbursement of salaries paid to certain persons previously unemployed, nominal rents on buildings owned by PRIDCO, two year property tax exemption for previously vacant buildings, a preferential income tax rate for the first two years of operation, full municipal license tax and personal property tax exemption for first two years of operation, an extended carryover period for net operating losses incurred during the first two years of operations and an energy credit per incremental job to be used against the electricity bill. The law also establishes an expedited permitting process for establishing eligible businesses. The Economic Development Bank is ordered to give priority to loan applications submitted by eligible businesses and to create programs to guarantee private financing to such eligible entities. Since the enactment of the Jobs Now Act, over 348 businesses have been granted an incentive decree with a pledge for the creation of over 5,990 new jobs.

*Energy Policy*

The Commonwealth is committed to diversifying its energy sources with the aim of lowering energy costs. To that aim, the Puerto Rico Electric Power Authority ("PREPA") recently

completed the conversion to natural gas of its Costa Sur plant with plans to convert to natural gas its Aguirre plant and build a liquefied natural gas port by 2015. The Government's goal is to increase the use of natural gas for power generation to 50% by 2015 and to 70% by 2017.

PREPA is conducting two separate efforts for the development of natural gas delivery solutions. In order to provide natural gas to its Aguirre power complex, which is PREPA's largest facility, PREPA entered into a Memorandum of Understanding ("MOU") with Excelerate Energy Limited Partnership ("Excelerate"), an liquefied natural gas ("LNG") transportation, floating regasification and storage provider, in order to, among other things, undertake the permitting for the Aguirre Offshore GasPort, an LNG import facility and pipeline to bring natural gas to the Aguirre power complex. PREPA and Excelerate are currently negotiating certain definitive agreements based on a Term Sheet that was executed in 2012. On April 17, 2013, Excelerate filed the FERC permit application and is currently applying for all necessary permits, clearances, and licenses relating to the construction and operation of the Aguirre Offshore GasPort. Excelerate has expressed that it expects to receive the FERC authorization and other permits to construct the Aguirre Offshore GasPort during 2014 and anticipates requesting authorization to commence construction approximately one month after receiving FERC's authorization. If the permits are timely obtained, the facility would be in service during 2015. Meanwhile, in order to transport natural gas to the San Juan and Palo Seco generating plants, PREPA and the Public-Private Partnerships Authority will be conducting a procurement process to evaluate different solutions and choose a feasible, cost effective and timely delivery alternative. The procurement process is expected to be completed during fiscal year 2014, with the goal of completing the infrastructure to receive, store and regasify natural gas by April 2017.

The other principal component of the Commonwealth's fuel diversification strategy is the development of renewable energy generation. In July of 2010, the Commonwealth enacted legislation focused on reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse renewable-energy technologies. This legislation seeks to lower energy costs, reduce energy-price volatility, and establish environmentally sustainable energy production through a reduction in ecologically harmful emissions. It creates a Renewable Portfolio Standard, recognizing many sources of renewable energy that utilize various technologies, and setting a target of 12% renewable energy production by 2015 and 15% by 2020, and a requirement for retail energy providers to establish a plan to reach 20% renewable energy production by 2035.

The legislation also provides incentives for the construction and use of renewable energy sources, and creates a Green Energy Fund through which the Commonwealth will co-invest $290 million in renewable energy projects over the next ten years. These initiatives are intended to address energy prices in Puerto Rico and provide a means for attracting investment in the energy sector. The fund will provide reimbursements for the installation of renewable energy generating equipment of up to 40% for residential and small businesses, and up to 50% for medium sized businesses and industries. This funding initiative will also provide access to Renewable Energy Certificates ("RECs") to help finance renewable energy projects at a utility scale level. A REC is a personal asset that is marketable and negotiable. It can be bought, sold, assigned, and transferred between individuals for any lawful purpose, and as a whole, indivisible asset, it is equivalent to one Megawatt-hour of electricity generated by a source of sustainable or alternative renewable energy.

During fiscal years 2012 and 2013, 370 renewable energy projects were approved, of which 90 projects were completed. Between July and September of 2013, 62 projects were completed with Green Energy Fund incentives, representing an investment of more than $11 million and the creation of approximately 100 professional and technical jobs in the areas of design and construction.

*Public-Private Partnerships*

The Government recognizes that public-private partnerships ("PPPs") represent an important tool for economic development.

On June 8, 2009, the Legislative Assembly approved Act No. 29 ("Act 29"), which established the legal framework for the establishment of PPPs in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. Act 29 created the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding PPPs.

As part of the Government's PPPs initiative, the PPP Authority and the Highways and Transportation Authority completed in 2011 the procurement for a concession of toll roads PR-22 and PR-5 (the "Toll Roads"). They selected Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas"), a consortium comprised of Goldman Sachs Infrastructure Partners and Abertis Infraestructuras, as the winning proponent based on a bid of $1.080 billion. As a result of this transaction, the Highways and Transportation Authority received a lump-sum payment of $1.136 billion and a commitment from Metropistas to invest $56 million in immediate improvements during the first three years of the concession and $300 million in capital improvements and construction during the term of the contract, and to comply with world-class operating standards.

To modernize public school facilities throughout the island and improve academic performance, the PPP Authority launched a special program in order to modernize and build a selected number of public schools throughout Puerto Rico. At least one school in each municipality is benefiting from this program. The Government expects this project will impact nearly 50,000 students, 2,000 teachers and various communities and create 14,000 jobs throughout Puerto Rico's 78 municipalities. The Government has funded this project with the proceeds of Qualified School Construction Bonds (QSCB) issued by PBA in the aggregate principal amount of $756 million. As of June 2013, the PPP Authority had awarded approximately $632 million in contracts for a total of 53 schools completed and 28 schools in progress.

In February of 2013, the PPP Authority and the PRPA consummated a lease agreement with Aerostar Airport Holdings, LLC ("Aerostar"), a partnership formed between Grupo Aeropuertuario de Sureste S.A.B. de C.V. ("ASUR") and Highstar Capital IV, to finance, operate, maintain and improve the Luis Muñoz Marín International Airport ("Airport"), the busiest airport in the Caribbean with over 8 million passengers per year. The primary objectives of the PPP Authority and the PRPA were: (i) maximizing the upfront value for the Airport, (ii) improving the Airport's safety standards, service levels and quality, (iii) maintaining and improving the quality of

service to travelers as well as achieving a higher level of customer satisfaction, and (iv) creating a world-class gateway to Puerto Rico while increasing the Puerto Rico's profile as a destination in the Caribbean, in order to positively impact the development of the tourism industry and overall economic prospects in Puerto Rico.  As a result of this transaction, on February 27, 2013, the PRPA received from Aerostar a lump-sum payment of $615 million and will receive an estimated $552 million in revenue sharing over the life of the lease. It is estimated that Aerostar will invest $1.4 billion in the Airport during the life of the lease, including approximately $267 million in immediate improvements, and will comply with world-class operating standards.  Following the successful completion of this transaction, as mentioned above, there has been an increase in air routes with the arrival of Southwest Airlines, a new direct route to Bogotá, Colombia through Avianca Airlines and expanded Caribbean air services via Seabourne, among other routes.

The PPP Authority is currently evaluating projects for the development and construction of new infrastructure facilities.  These projects include a rail transportation system from Caguas to San Juan, the extension of the PR-22 Highway from Hatillo to Aguadilla, conversion to natural gas of certain PREPA power plants and correctional facilities, among others.

*Strategic projects*

The Commonwealth is also targeting strategic/regional projects that are expected to generate investments in various regions of Puerto Rico in order to foster a balanced economic development.

In the northern region, Science City represents a critical effort to move Puerto Rico to the forefront of science, technology and research and development. It seeks to leverage Puerto Rico's competitive advantages in the knowledge-based sectors.  Legislation enacted in 2011 expanded the benefits of investing in, and performing, science and technology research and development activities in the newly denominated "Science District", through the inclusion of such activities as eligible for tax exemption under the Economic Incentives Act (as defined below).  See "Tax Incentives – Industrial Incentives Program" under THE ECONOMY.

The Science District will include the existing University of Puerto Rico (UPR) Medical Sciences Campus, the UPR Rio Piedras Campus, the new Biomedical Sciences Laboratory, and the soon-to-be-constructed Comprehensive Cancer Center. At the center of the Science District will be new laboratory and commercial space on the site of the former Rio Piedras State Penitentiary ("Oso Blanco").

Over the next several years, the Puerto Rico Science Trust will oversee two major initiatives to realize the full potential of the Science District. Specifically, the Trust will:

- complete preparation of the Oso Blanco site and secure a private "anchor tenant" to begin development of laboratory and commercial space.

- actively market and expand programs to fund Puerto Rican investors and entrepreneurs, such as funding for companies applying for Small Business Innovation Research (SBIR) awards, research grants and in-kind support for

individual researchers and inventors, and tax exemptions for companies that pursue research at local universities.

In the eastern region of Puerto Rico, the Roosevelt Roads project entails the redevelopment of the old Roosevelt Roads navy facility in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. The site of the former Roosevelt Roads Naval Station represents an unparalleled opportunity for the development of an integrated tourism, living, and commercial destination. With 8,720 acres of prime waterfront property, close proximity to attractions such as Vieques, Culebra, El Yunque, and San Juan, and improvements including a major airfield and deep-water port, Roosevelt Roads represents a large-scale development opportunity. Development on the site would also contribute greatly to the economic growth of eastern Puerto Rico by providing construction jobs and attracting more tourists to the wider area.

The Government, through the Roosevelt Roads Local Redevelopment Authority ("LRA"), intends to develop the site by searching for and entering into agreements with a master developer or other private parties. Negotiations are already underway to begin operating the on-site marina, hospital, and recycling plant and the LRA will launch an RFQ / RFP process this fall for the development of the light industrial, academic, eco-tourism, and commercial marina zones.

The LRA anticipates that development of Roosevelt Roads will create at least 1,500 to 2,000 jobs over the next five years, with the potential of up to 25,000 jobs over a longer-term horizon.

In the western region of Puerto Rico, the Commonwealth is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub. The PRPA is well on their way to finalize a redevelopment master plan in order to convert the international airport facilities into a regional maintenance, repair and overhaul ("MRO") and cargo hub. To this end, the PRPA completed the process and the Aguadilla airport has been designated as a Free Trade Zone providing huge competitive advantages for companies operating under this structure. Complex negotiations are underway with several MRO companies as well with several freight forwarders. The plan will include the creation of a comprehensive aeronautics/aerospace cluster leveraging the University of Puerto Rico's Mayagüez Campus and major aeronautics firms operating in the west/northwest corridor.

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2013 averaged 1,029,019, a decrease of 0.6% compared to the previous fiscal year; and the unemployment rate averaged 14.0%. During the first two months of fiscal year 2014, total employment averaged 1,009,800, a 2.3% reduction with respect to the same period of the prior year, and the unemployment rate averaged 14.8% compared to 15.2% for the same period of the prior year.

The following table presents annual statistics of employment and unemployment for fiscal year 2009 through fiscal year 2013. These employment figures are based on the Household

Survey, which includes self-employed individuals and agricultural employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agricultural employment in Puerto Rico represented 1.6% of total employment in fiscal year 2013.

### Commonwealth of Puerto Rico
### Employment and Unemployment
### (persons age 16 and over, in thousands)

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[1] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2009 | 1,325 | 1,144 | 181 | 13.7% |
| 2010 | 1,285 | 1,075 | 210 | 16.3% |
| 2011 | 1,249 | 1,047 | 202 | 16.2% |
| 2012 | 1,221 | 1,035 | 185 | 15.2% |
| 2013 | 1,196 | 1,029 | 167 | 14.0% |

Totals may not add due to rounding.
[1]   Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

These Household Survey figures above are different from the ones published previously, due to the fact that the Department of Labor finally published the revision of this survey which takes into account the new population numbers from the Census of 2010. Every decade, with every population census, employment and unemployment data are revised retroactively to consider population trends. Given that the Census of 2010 reported for the first time a population reduction in Puerto Rico, employment and unemployment data suffered a downward revision. As an example, for fiscal years 2011 and 2012 total employment figures were 30,300 and 49,700 employees below the previously published numbers. Similarly, for the same years, the number of unemployed persons was lower by 1,700 and by 5,400 from the numbers reported earlier. As a result, the unemployment rate has been declining slowly, and simultaneously the levels of total employment and unemployment have decreased.

Another employment measurement comes from the Establishment Survey, which is used to gauge employment across different economic sectors. The Establishment Survey measures only non-farm payroll employment, i.e., does not include self-employed nor agricultural workers. Employment coming from this survey (henceforth, payroll employment) is corrected every year (specifically, every March) with a benchmark revision. From calendar year 2006 to calendar year 2011 the revisions implied additions or subtractions of around 4,400 jobs (the highest addition was in 2008 with 5,300 jobs, and the highest subtraction corresponded to 2009 with 6,500 less jobs). Nevertheless, the latest benchmark revision added 18,400 more jobs, which represented an increase of nearly 2% from what had been previously reported for 2012 (previous changes did not reach the magnitude of 1%). This major revision could be related to the higher economic activity

from public works due to the electoral cycle. This explanation seems to be validated by the increase in jobs in construction and services, which were significant during 2012, according to the benchmark revision. The payroll employment revision had two major effects: it raised the employment base for 2012 and, therefore, it accentuated the employment reductions observed in 2013.

Moreover, the recent changes to the Employees Retirement System resulted in more retirements of state and local employees. Approximately 40% of the total payroll employment reductions experienced from June to August corresponded to decreases in state and local government employment. This recent behavior cannot be explained only by the usual attrition of public employment.

Finally, since total non-farm payroll employment is one of the components of the EAI, the latest benchmark revision implied a major change on the behavior of the index, increasing the level of the index for calendar year 2012 by more than 1%. The increase of the base for 2012 accentuates the reductions observed in 2013.

## Economic Performance by Sector

From fiscal year 2008 to fiscal year 2012, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2008 to 2012.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012**[1] |
| Manufacturing | $40,234 | $43,872 | $46,577 | $46,832 | $46,114 |
| Service[2] | 42,405 | 40,642 | 41,408 | 43,128 | 43,811 |
| Government[3] | 8,762 | 9,047 | 8,350 | 8,216 | 8,278 |
| Agriculture | 519 | 567 | 822 | 796 | 818 |
| Construction[4] | 2,031 | 1,777 | 1,518 | 1,462 | 1,471 |
| Statistical discrepancy | (312) | 480 | (294) | (238) | 543 |
| Total gross domestic product[5] | $93,639 | $96,386 | $98,381 | $100,196 | $101,034 |
| Less: net payment abroad | (30,936) | (32,768) | (34,087) | (34,629) | (31,573) |
| Total gross national product[5] | $62,703 | $63,618 | $64,295 | $65,567 | $69,462 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industry presented here, as in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System ("NAICS") for fiscal years 2009 to 2013.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Economic Sector [1]**
**(number of employees)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013[2]** |
| Natural resources and construction | 49,067 | 35,942 | 31,792 | 34,992 | 32,908 |
| Manufacturing | | | | | |
| Durable goods | 39,242 | 34,792 | 33,900 | 33,283 | 32,967 |
| Non-durable goods | 57,483 | 53,533 | 51,767 | 50,175 | 44,558 |
| Sub-total | 96,725 | 88,325 | 85,667 | 83,458 | 77,525 |
| Trade, transportation, warehouse, and Utilities | | | | | |
| Wholesale trade | 33,267 | 32,533 | 31,983 | 31,467 | 31,133 |
| Retail trade | 127,492 | 126,233 | 128,017 | 128,117 | 127,708 |
| Transportation, warehouse, and utilities | 15,692 | 14,550 | 14,333 | 14,567 | 14,083 |
| Sub-total | 176,450 | 173,317 | 174,333 | 174,150 | 172,925 |
| Information | 20,217 | 18,783 | 18,733 | 18,650 | 19,458 |
| Finance | 48,492 | 45,808 | 43,708 | 44,425 | 44,975 |
| Professional and business | 103,333 | 102,508 | 105,592 | 108,800 | 109,492 |
| Educational and health | 109,992 | 111,333 | 114,108 | 117,550 | 118,067 |
| Leisure and hospitality | 70,933 | 70,850 | 71,150 | 72,633 | 75,183 |
| Other services | 20,117 | 18,758 | 17,925 | 17,558 | 17,900 |
| Government [3] | 300,708 | 276,533 | 260,033 | 258,458 | 256,067 |
| Total non-farm | 996,033 | 942,158 | 923,042 | 930,675 | 924,500 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

Although the data from the Payroll Survey is revised annually, the calendar year 2012 revision presented major changes not observed during the previous five years. For example, for calendar year 2010 the benchmark revision of the Payroll Survey implied an average reduction of 2,842 employees with respect to previously reported numbers for that year. Furthermore, for calendar year 2011 the annual benchmark revision implied an average increase of 4,067 employees with respect to earlier reports. From calendar years 2006 to 2011 the standard deviation of the revisions was around 4,400 employees, meaning that a revision could add or subtract 4,400 employees, on average. Nevertheless, the benchmark revision of calendar year 2012 implied an addition of 18,433 employees. This average increase affects previous interpretations of the behavior of the labor market, and had effects on other composed variables, like the GDB-EAI.

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2012 manufacturing generated $46.1 billion, or 45.6%, of gross domestic product. During fiscal year 2013, payroll employment for the manufacturing sector was 77,525, a decrease of 7.1% compared with fiscal year 2012. For the first two months of fiscal year 2014, manufacturing employment averaged 74,600, a reduction of 7.7% (or 6,300 employees) from the same time period of the previous fiscal year. Most of Puerto Rico's manufacturing output is exported to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2013, however, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.5% of the average mainland United States rate.

In the last three decades, industrial development in Puerto Rico has been relatively capital intensive and dependent on skilled labor. This gradual shift in emphasis from labor intensive to capital intensive industrial development is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Commonwealth governments. Federal legislation enacted in 1996, however, which amended Section 936 of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the scope of the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under THE ECONOMY and "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2008 to 2012.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Manufacturing Sector
### (at current prices, in millions)

|  | 2008 | 2009 | 2010 | 2011 | 2012 [1] |
|---|---|---|---|---|---|
| Food | $ 822 | $ 977 | $ 868 | $ 862 | $ 813 |
| Beverage and Tobacco Products | 1,243 | 1,209 | 1,358 | 1,092 | 1,116 |
| Textile Mills & Product Mills | 15 | 12 | 11 | 11 | 11 |
| Apparel | 252 | 270 | 283 | 276 | 264 |
| Leather and Allied Products | 20 | 18 | 22 | 25 | 26 |
| Wood Products | 22 | 20 | 19 | 17 | 18 |
| Paper | 66 | 63 | 45 | 56 | 57 |
| Printing and Related Support Activities | 119 | 100 | 115 | 121 | 118 |
| Petroleum and Coal Products | 95 | 347 | 353 | 367 | 348 |
| Chemical | 29,339 | 30,380 | 32,527 | 32,872 | 31,555 |
| Plastics and Rubber Products | 118 | 108 | 111 | 101 | 104 |
| Nonmetallic Mineral Products | 218 | 148 | 123 | 114 | 115 |
| Primary Metals | 151 | 145 | 200 | 174 | 173 |
| Fabricated Metal Products | 248 | 207 | 175 | 170 | 179 |
| Machinery | 234 | 174 | 233 | 228 | 246 |
| Computer and Electronic Products | 4,463 | 7,037 | 7,479 | 7,400 | 8,042 |
| Electrical Equipment, Appliances and Components | 657 | 654 | 677 | 724 | 750 |
| Transportation Equipment | 78 | 72 | 75 | 79 | 84 |
| Furniture and Related Products | 56 | 48 | 37 | 36 | 36 |
| Miscellaneous | 2,019 | 1,882 | 1,865 | 2,108 | 2,058 |
| Total gross domestic product of manufacturing sector [2] | $ 40,234 | $ 43,872 | $ 46,577 | $ 46,832 | $ 46,114 |

(1)  Preliminary.
(2)  Totals may not add due to rounding.

*Source:  Planning Board*

The following table presents annual statistics of average manufacturing employment by industry based on the NAICS for fiscal years 2009 to 2013.

## Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group
### (number of employees)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 3,058 | 2,492 | 2,133 | 2,042 | 2,042 |
| Fabricated metal products | 4,908 | 4,042 | 3,625 | 3,600 | 3,517 |
| Computer and electronic | 7,042 | 5,733 | 5,967 | 5,200 | 5,000 |
| Electrical equipment | 5,867 | 5,058 | 5,042 | 5,100 | 5,075 |
| Miscellaneous manufacturing | 11,975 | 11,675 | 11,633 | 11,767 | 11,758 |
| Other durable goods manufacturing | 6,392 | 5,792 | 5,500 | 5,575 | 5,575 |
| Total -- durable goods | 39,242 | 34,792 | 33,900 | 33,283 | 32,967 |
| **Non-durable goods** | | | | | |
| Food manufacturing | 11,383 | 11,592 | 11,908 | 11,467 | 11,258 |
| Beverage and tobacco products manufacturing | 3,133 | 3,275 | 3,000 | 2,508 | 2,192 |
| Apparel manufacturing | 9,825 | 8,808 | 8,775 | 9,692 | 6,408 |
| Chemical manufacturing | 25,042 | 22,392 | 21,033 | 19,975 | 18,967 |
| Plastics and rubber products | 1,967 | 1,908 | 1,750 | 1,608 | 1,575 |
| Other non-durable goods manufacturing | 6,133 | 5,558 | 5,300 | 4,925 | 4,158 |
| Total – non-durable goods | 57,483 | 53,533 | 51,767 | 50,175 | 44,558 |
| Total manufacturing employment | 96,725 | 88,325 | 85,667 | 83,458 | 77,525 |

Totals may not add due to rounding.
[1]  Preliminary.

*Source*:  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 39,800 from fiscal year 2005 to fiscal year 2013. For fiscal years 2009, 2010, 2011, 2012 and 2013, manufacturing employment decreased by 7.0%, 8.7%, 3.0%, 2.6% and 7.1%, respectively.  For the first two months of fiscal year 2014, average employment in the sector declined by 6,300 jobs, or 7.7%, compared to the same period of the previous year.  Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy.  There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and the increase of global competition. Puerto Rico's manufacturing sector continues to face increased international competition.  As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented

products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2012, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.2%, while payroll employment in this sector decreased at an average annual rate of 0.4%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15.5% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The service sector ranks second to manufacturing in its contribution to gross domestic product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2012, the service sector generated $43.8 billion, or 43.4%, of gross domestic product. Trade, professional and business support, and education and health, experienced growth, while transportation and warehousing, information, finance, and other services experienced reductions in fiscal year 2012, as measured by gross domestic product at current prices. Service-sector employment decreased from 565,242 in fiscal year 2007 to 558,000 in fiscal year 2013 (representing 60.4% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2013 represents an increase of 0.8% compared to the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of July 31, 2013, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System, and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of December 31, 2012 were $68.1 billion, as compared to $70.8 billion as of December 31, 2011. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks, including the assumption of all of the deposits. Considering the magnitude of the consolidations, the amount of jobs lost to date as a result of these consolidations has not been significant. The Government expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA"), the United States Securities and Exchange Commission and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $35.2 billion as of December 31, 2012, as compared to $33.9 billion on December 31, 2011. Another relevant component of the financial sector in Puerto Rico is the investment company industry. According to the OCFI, local investment companies had recorded assets under management of $17.3 billion as of December 31, 2012. Assets under management by local investment companies may have decreased significantly as a result of the recent volatility in secondary market prices of bonds of the Commonwealth and its instrumentalities.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as "cooperativas"). IBEs are licensed financial businesses that conduct offshore banking transactions. As of December 31, 2012, there were 30 IBEs (including units of commercial banks) operating in Puerto Rico, with total assets of $36.5 billion, a decrease from $43.9 billion in total assets as of December 31, 2011. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $8.2 billion in assets as of December 31, 2012, an increase from $7.8 billion as of December 31, 2011.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2008 to 2012.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012[(1)] |
| Wholesale trade | $ 2,951 | $ 2,846 | $ 2,993 | $ 2,975 | $ 2,943 |
| Retail trade | 4,569 | 4,467 | 4,473 | 4,625 | 4,693 |
| Transportation and warehousing | 978 | 895 | 941 | 931 | 905 |
| Utilities | 2,118 | 1,967 | 1,982 | 2,010 | 1,854 |
| Information | 2,363 | 2,426 | 2,646 | 2,597 | 2,559 |
| Finance and insurance | 7,120 | 5,105 | 5,241 | 5,261 | 4,754 |
| Real Estate and rental | 13,098 | 13,660 | 13,785 | 14,868 | 16,011 |
| Professional and business | 3,184 | 3,009 | 3,083 | 3,313 | 3,415 |
| Education and health | 3,786 | 4,106 | 4,015 | 4,242 | 4,341 |
| Leisure and hospitality | 1,875 | 1,773 | 1,860 | 1,920 | 1,936 |
| Other services | 363 | 390 | 390 | 386 | 399 |
| Total[(2)] | $42,405 | $40,642 | $41,408 | $43,128 | $43,811 |

[(1)] 2008-2011 revised figures and 2012 preliminary.
[(2)] Totals may not add due to rounding.
*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2009 to 2013.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013**[1] |
| Wholesale trade | 33,267 | 32,533 | 31,983 | 31,467 | 31,133 |
| Retail trade | 127,492 | 126,233 | 128,017 | 128,117 | 127,708 |
| Transportation, warehouse and utilities | 15,692 | 14,550 | 14,333 | 14,567 | 14,083 |
| Information | 20,217 | 18,783 | 18,733 | 18,650 | 19,458 |
| Finance | 48,492 | 45,808 | 43,708 | 44,425 | 44,975 |
| Professional and business | 103,333 | 102,508 | 105,592 | 108,800 | 109,492 |
| Educational and health | 109,992 | 111,333 | 114,108 | 117,550 | 118,067 |
| Leisure and hospitality | 70,933 | 70,850 | 71,150 | 72,633 | 75,183 |
| Other services | 20,117 | 18,758 | 17,925 | 17,558 | 17,900 |
| Total[2] | 549,533 | 541,358 | 545,550 | 553,767 | 558,000 |

[1]   Preliminary.
[2]   Totals may not add due to rounding.
*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2012, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 2,097,100, an increase of 9.4% over the number of persons registered during fiscal year 2011. The average occupancy rate in tourist hotels during fiscal year 2012 was 70.5%, an increase of 2.2% from the prior fiscal year. Also, during fiscal year 2012, the average number of rooms available in tourist hotels increased by 2.5% to 11,786 rooms compared to fiscal year 2011.

During the first ten months of fiscal year 2013, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,793,100, an increase of 5.5% over the number of persons registered during the same period of fiscal year 2012. The average occupancy rate in tourist hotels during the first ten months of fiscal year 2013 was 72.4%, an increase of 3.9% from the prior fiscal year. Also, during the first ten months of fiscal year 2013, the average number of rooms available in tourist hotels increased by 1.8% to 11,951 rooms compared to the same period of fiscal year 2012.

In terms of employment, this sector has shown a behavior that appears not totally consistent with the registration figures presented in the previous paragraphs. According to the Payroll Survey, employment in the leisure and hospitality sector was 72,633 for fiscal year 2012, an increase of 2.1% over employment for fiscal year 2011, a growth rate significantly smaller than the growth rates of tourist hotel registrations for the same time period (9.4%). Moreover, for fiscal year 2013, employment in this sector increased by 3.5% to 75,183 compared to the same period of

the prior fiscal year, which is still a smaller rate than the average growth rate observed for the first ten months on the tourist hotel registrations (5.5%). Similarly, for the first two months of the 2014 fiscal year, the leisure and hospitality sector employment remains stable, averaging 75,750 employees, an increase of 1.7%, compared to the same period for the prior year. These figures could imply a significant improvement on the labor productivity of this sector during fiscal years 2012 and 2013.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world. Recent data indicates that cruise arrivals are on the rise with cruise passenger arrivals increasing by 84% in August 2013 versus same period year ago, and scheduled visits for 2014 increasing by 15%.

### Commonwealth of Puerto Rico
### Tourism Data[1]
### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 1,905,503 | 4,415,262 |
| 2010 | 1,349,449 | 1,193,549 | 1,836,157 | 4,379,155 |
| 2011 | 1,408,536 | 1,165,758 | 1,639,379 | 4,213,673 |
| 2012[5] | 1,507,984 | 1,127,842 | 1,561,103 | 4,196,929 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2008 | $1,526.3 | $194.3 | $1,814.3 | $3,535.0 |
| 2009 | $1,464.4 | $173.7 | $1,537.7 | $3,175.8 |
| 2010 | $1,541.8 | $171.4 | $1,497.5 | $3,210.7 |
| 2011 | $1,618.9 | $169.3 | $1,354.6 | $3,142.8 |
| 2012[5] | $1,706.9 | $167.7 | $1,318.3 | $3,192.9 |

[1]  Only includes information about non-resident tourists registering in tourist hotels.  They are counted once even if registered in more than one hotel.
[2]  Includes visitors in guesthouses.
[3]  Includes cruise ship visitors and transient military personnel.
[4]  Includes visitors in homes of relatives, friends, and in hotel apartments.
[5]  Preliminary.
*Sources:*  Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the largest convention center in the Caribbean, which is the centerpiece of a 100-acre private development that includes hotels, restaurants, office space, and housing.  The convention center district is being developed at a total cost of $1.3 billion in a

public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1 million attendees. A 500-room hotel located next to the convention center commenced operations in November of 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the 20th century, providing the basic infrastructure and services necessary for the modernization of Puerto Rico.

In fiscal year 2012, the government (federal, state and local) accounted for $8.3 billion, or 8.2%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 256,100 workers (federal, state and local), or 27.7% of total, non-farm, payroll employment in fiscal year 2013. In fiscal year 2009, state and municipal government employment averaged 285,600. During fiscal year 2010, state and municipal government employment decreased by 25,700 jobs, or 9.0%. According to the Payroll Survey, the distribution of the job reductions during fiscal year 2010 was 20,700 jobs in the state government (including public corporations) and approximately 5,000 jobs in municipal government. During fiscal year 2011, state and municipal government employment decreased further by 14,900 jobs, or 5.7%, compared to fiscal year 2010. According to the Payroll Survey, the decrease was attributable to a reduction of 12,500 jobs in the state government and approximately 2,400 jobs in municipal government. Subsequently, during fiscal year 2012, state and municipal government employment also decreased, but considerably less; by 1,000 jobs, or 0.4%, when compared to fiscal year 2011. The reduction was comprised of a decrease of close to 1,200 jobs in the state government, or a 0.7% decrease, and a concurrent 200 jobs increase, or 0.4%, in municipal government employment. During fiscal year 2013, total government employment (federal, state and local) decreased to 256,100, or by 0.9% when compared to the previous fiscal year total of 258,500. This average reduction of 2,400 jobs consists of an average decrease of 2,400 jobs, or 1.3%, in state government offset by an average increase of 200 jobs, or 0.4%, in municipal government employment and a decrease of 200 jobs, or 1.2%, in federal government, respectively. During the first two months of fiscal year 2014, government employment has decreased further to a total amount of 239,200, or by 6.1% compared to the same period from the previous fiscal year. The reductions have occurred in the state and municipal government employment sectors and are related to the recent changes to the Employees Retirement System which prompted the voluntary departure of employees which qualified for retirement but were still employed. For more information regarding the situation of the Commonwealth retirement systems, see "RETIREMENT SYSTEMS."

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including, Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa. Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayagüez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, Patillas and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The Airport receives over 8 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the United States mainland. San Juan has also become a hub for intra-Caribbean service. While the main hubs in the United States mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America. On February 27, 2013, the PRPA closed a long term lease of the Luis Munoz Marin International Airport with Aerostar Holdings, LLC ("Aerostar") pursuant to a public-private partnership transaction. It is estimated that Aerostar will invest $1.4 billion in the Airport during the life of the lease, including a commitment to invest approximately $267 million in immediate improvements and comply with world-class operating standards. For more information regarding the Aerostar transaction, see "Economic Development Program – Public-Private Partnerships" under Fiscal Stabilization and Economic Growth.

Regarding other airports, Rafael Hernández Airport in Aguadilla is served by JetBlue and Spirit and has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport is served by JetBlue and has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

Puerto Rico's major cities are connected by a modern highway system, which, as of December 31, 2012, totaled approximately 4,647 miles, and 12,740 miles of local streets and adjacent roads. The highway system comprises 392 miles of primary system highways, which are the most important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 233 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,064 miles of tertiary highways and roads serving local, intra-regional traffic. On September 22, 2011, the PPP Authority and the Highways and Transportation Authority completed the procurement for a concession of toll roads PR-22 and PR-5. See "Economic Growth – Public-Private Partnerships" under Fiscal Stabilization and Economic Growth.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by

population. Managed by the Authority of the Port of Ponce, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase is still pending. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it can make significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. From its peak in fiscal year 2000 to fiscal year 2012, real construction investment declined at an average annual rate of 5.9%. Construction investment started to decrease significantly in fiscal year 2005, as a consequence of the recessionary economic conditions in Puerto Rico. During the last five fiscal years (from fiscal year 2007 to 2012) real construction investment decreased at an average annual rate of 7.3%. The Planning Board forecasts an increase in construction investment of 1.8% in real terms for fiscal year 2013, and of 4.9% for fiscal year 2014.

Public investment has been an important component of construction investment. During fiscal year 2012, approximately 59.0% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools, water projects, and other public infrastructure projects. The end of federal ARRA funds is also expected to negatively affect public investment in construction during fiscal year 2014.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. During the first ten months of fiscal year 2011 (the most recent data available), the total value of construction permits decreased further by 15.7%. The numbers and values of construction permits have become extremely outdated (the last observation available is April 2011), and the Planning Board has stopped publishing them. Cement sales, on the other hand, declined by 26.3% in fiscal year 2010 and by 5.0% in 2011, reaching levels not seen in almost three decades. In fiscal year 2012 they increased by 7.3%, but during fiscal year 2013, however, cement sales decreased again by 12.0% from the same time period of the previous fiscal year. During the first two months of fiscal year 2014, cement sales have decreased by 14.9% compared to the same period in fiscal year 2013.

Average payroll employment in the construction sector during fiscal year 2013 was 32,908, a reduction of 6.0% from fiscal year 2012. During the first two months of fiscal year 2014, payroll employment in the construction sector averaged 28,150 jobs, a significant decrease of 22.8% compared to the same period in fiscal year 2013.

On September 2, 2010, the Commonwealth enacted Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to Act 132, the Commonwealth provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided by Act 132 (as subsequently amended) were effective from September 1, 2010 through October 31, 2011. Certain permanent incentives are also available for rental housing. On November 1, 2011, the Commonwealth approved Act 216, which provided incentives similar to the ones available under Act 132 but gradually reduced those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216 (as subsequently amended) were effective from November 1, 2011 to June 30, 2013, with certain reductions after December 31, 2011 and June 30, 2012. New incentives were also available for property that constituted the seller's principal residence, as defined in Act 216.

*Agriculture*

Agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2012, gross income from agriculture was $784.5 million at current prices, which diminished slightly by 0.7% as compared with fiscal year 2011. In terms of gross domestic product, agriculture generated a level of production of $817.8 million at current prices in fiscal year 2012, an increase of 2.8% compared to fiscal year 2011. According to the Household Survey, the number of people employed in this sector has remained stable during the past three years, at close to 17,000 employees.

The Commonwealth government supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects. The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, and stimulating the consumption of locally produced agricultural products.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 14,791,224 | 54.5% |
| 2001 | 430,880[3] | 184,126 | 42.7% | 27,992,652[3] | 15,312,289 | 54.7% |
| 2002 | 428,065[3] | 190,776 | 44.6% | 28,480,708[3] | 15,927,987 | 55.9% |
| 2003 | 423,338[3] | 199,842 | 47.2% | 28,916,746[3] | 16,611,711 | 57.4% |
| 2004 | 417,141[3] | 206,791 | 49.6% | 29,302,179[3] | 16,911,481 | 57.7% |
| 2005 | 408,044[3] | 208,032 | 51.0% | 29,441,546[3] | 17,272,044 | 58.7% |
| 2006 | 398,586[3] | 209,547 | 52.6% | 29,602,839[3] | 17,487,475 | 59.1% |
| 2007 | 389,640[3] | 225,402 | 57.8% | 29,808,025[3] | 17,758,870 | 59.6% |
| 2008 | 384,751[3] | 227,546 | 59.1% | 30,194,274[3] | 18,248,128 | 60.4% |
| 2009 | 379,500[3] | 235,618 | 62.1% | 30,530,346[3] | 19,102,814 | 62.6% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,427,711 | 67.7% |
| 2011 | 376,652[3] | 250,192 | 66.4% | 31,067,478[3] | 21,016,202 | 67.7% |
| 2012 | 376,373[3] | 250,011 | 66.4% | 31,359,915[3] | 20,994,313 | 67.0% |

[1]   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]   Based on census population as of April 1 of the stated year.
[3]   Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2010-2011 was approximately 61,722 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2010-2011 of approximately 188,470 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by United States Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008 (the "Economic Incentives Act").

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing and laboratories for research and development, and originally included certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Individual Investors Act and Export Services Act*

On January 17, 2012, the Legislative Assembly of Puerto Rico approved new legislation to promote the economic development of Puerto Rico: (i) Act No. 22, also known as the Act to Promote the Relocation of Individual Investors to Puerto Rico (the "Individual Investors Act), and (ii) Act No. 20, also known as the Act to Promote the Exportation of Services (the "Export Services Act"), which supersedes the provisions of the Economic Incentives Act that provide benefits to designated services performed for markets outside of Puerto Rico.

The Individual Investors Act seeks to attract new residents to Puerto Rico by providing total exemption from Puerto Rico income taxes on passive income realized or accrued after such individuals become bona fide residents of Puerto Rico. The Individual Investors Act applies to any individual investor that becomes a Puerto Rico resident on or before the taxable year ending on December 31, 2035, provided that such individual was not a resident of Puerto Rico at any time during the 15-year period preceding the effective date of the Individual Investors Act. This relocation is expected to result in new local investments in real estate, services, and other

consumption products, and in capital injections to the Puerto Rico banking sector, all of which would stimulate the economy of Puerto Rico.

The Export Services Act seeks to establish and develop in Puerto Rico an international export services center. This act seeks to encourage local service providers to expand their services to persons outside of Puerto Rico, promote the development of new businesses in Puerto Rico and stimulate the inbound transfer of foreign service providers to Puerto Rico. The Export Services Act also creates a special fund for the continuous development of new tax incentives that will promote export services and the establishment of new businesses in Puerto Rico. The Export Services Act applies with respect to any entity with a bona fide office or establishment located in Puerto Rico that is or may be engaged in an eligible service.  Service providers operating under a tax exemption decree issued under the Export Services Act will enjoy various Puerto Rico tax incentives during the term of such decree, such as a 4% flat income tax rate on export services income and 100% tax-exempt dividend distributions.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83-2010 ("Act 83"), also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale.  The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the assembly and installation of machinery and equipment for the production of green energy, and the leasing of property used for the production of green energy (not including financing leases).

Companies qualifying under the Green Energy Incentives Act can avail themselves of the following tax benefits: a preferential income tax rate of 4% on income derived from eligible activities and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies.  In addition, the Green Energy Incentives Act grants a 90% exemption from property taxes, a 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and a 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities. In order to enjoy these tax benefits, an eligible business must request and obtain a grant of tax exemption, which is a contract between the Commonwealth and the exempt business, and has a term of 25 years.

Under the Green Energy Incentives Act, companies can repatriate or distribute their earnings and profits derived from the eligible activities free of Puerto Rico income taxes.  Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Green Energy legislation also provides incentives for the construction and use of renewable energy sources, and creates a Green Energy Fund through which the Commonwealth will co-invest $290 million in renewable energy projects over the next ten years. These initiatives are intended to address energy prices in Puerto Rico and provide a means for attracting investment

in the energy sector. The fund will provide reimbursements for the installation of renewable energy generating equipment of up to 40% for residential and small businesses, and up to 50% for medium sized businesses and industries. This funding initiative will also provide access to Renewable Energy Certificates ("RECs") to help finance renewable energy projects at a utility scale level. A REC is a personal asset that is marketable and negotiable. It can be bought, sold, assigned, and transferred between individuals for any lawful purpose, and as a whole, indivisible asset, it is equivalent to one Megawatt-hour of electricity generated by a source of sustainable or alternative renewable energy.

During fiscal years 2012 and 2013, 370 renewable energy projects were approved, of which 90 projects were completed. Between July and September of 2013, 62 projects were completed with Green Energy Fund incentives, representing an investment of more than $11 million and the creation of approximately 100 professional and technical jobs in the areas of design and construction.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island.  The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years.  The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects.  The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Puerto Rico Tourism Development Fund ("TDF") as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects.  To date, TDF has provided direct loans and guaranteed loans and bonds in the aggregate amount of approximately $1.5 billion for 28 tourism projects representing 5,448 new hotel rooms and a total investment of approximately $2.5 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. Most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico have converted part or all of their operations to CFCs.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their United States affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Incentives Act, in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the United States Treasury Department announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. The Ways and Means Committee of the House of Representatives has also held recent hearings and released a tax policy white paper that puts forth certain proposed changes to the U.S. Code to combat base erosion and profit shifting by U.S. and foreign multinational corporations. While these initiatives are not directed at Puerto Rico, several of them could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The Commonwealth is developing policy responses to the United States government to seek to safeguard Puerto Rico's economic growth and development plans.

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 8 of Article VI of the Commonwealth Constitution provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. For purposes of the Constitution, however, "public debt" includes only general obligation bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Attorney General of the Commonwealth, also any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. It does not include other obligations of the Commonwealth or obligations of public instrumentalities that are not guaranteed by the Commonwealth. As explained below, the portion of the Sales Tax allocated to COFINA is not considered "available Commonwealth resources" under the Constitution.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid

by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter, "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.  Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the Sales Tax allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

As of June 30, 2013 future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in the fiscal year ending on June 30, 2016 (based on the assumption that variable rate bonds bear interest at the maximum rate of 12% per annum).  This amount *plus* the amount paid by the Commonwealth ($17,315,000) totals $1,006,546,968, which is of bonds or notes guaranteed by the Commonwealth, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2012 and 2013.  If the interest on the variable rate outstanding bonds described above was calculated using the effective fixed interest rate payable by the Commonwealth after taking into consideration the interest rate exchange agreements entered into in respect thereof, the future maximum annual debt service for the Commonwealth outstanding general obligations debt would be $948,635,824 in fiscal year 2020 and the percentage referred to in the preceding sentence would be 11.94%.  The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned interest rate swap agreements is not included in the calculation of the 15% constitutional debt limitation.  For a discussion of the Commonwealth's obligations under its interest rate exchange agreements, see "Interest Rate Exchange Agreements" below.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation.  In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of June 30, 2013, Port of the Americas Authority ("PAA") had outstanding bonds guaranteed by the Commonwealth (the "PAA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $220.0 million.  The Commonwealth has

begun to make payments of debt service on the PAA Guaranteed Bonds and expects to make all payments on the PAA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2013, the Commonwealth made payments under its guaranty of the PAA Guaranteed Bonds of $17.1 million. See "Commonwealth Guaranteed Debt" below.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth (other than refunding bonds) is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of June 30, 2013. This table includes debt primarily payable from Commonwealth or municipal taxes, Commonwealth appropriations and rates charged by public corporations for services or products, as well as debt payable from other sources, some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $821.9 million of outstanding bonds (as of June 30, 2013) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities. The table does not include $673 millon of bonds issued by PREPA on August 15, 2013.

**Commonwealth of Puerto Rico**
**Public Sector Debt**
**(in millions)**

|  | June 30, 2013 |
|---|---|
| Full faith and credit bonds and notes issued by the Commonwealth | $10,599 |
| Bonds and notes guaranteed by the Commonwealth's full faith and credit [1] | 5,634 |
| SUBTOTAL- FULL FAITH AND CREDIT BONDS AND NOTES | 16,233 |
|  |  |
| Debt supported by Puerto Rico appropriations or taxes[2] | 4,043 |
| Tax and Revenue Anticipation Notes[3] | --- |
| SUBTOTAL- DEBT PAYABLE FROM GENERAL FUND | $20,276 |
|  |  |
| Bonds and notes payable from sales tax revenues (COFINA) | $15,224 |
| Debt issued by public corporations and other instrumentalities[4] | 25,575 |
| Debt issued by municipalities | 3,882 |
| Pension Funding Bonds (payable from employer contributions to ERS)[5] | 2,948 |
| Other limited obligation debt and non-recourse debt[6] | 2,138 |
| SUBTOTAL- OTHER PUBLIC SECTOR DEBT | 49,767 |
|  |  |
| TOTAL PUBLIC SECTOR DEBT | $70,043 |

Totals may not add due to rounding.

[1] Consists of $651 million of bonds issued by Aqueduct and Sewer Authority, $470 million of State Revolving Fund Loans incurred under various federal water laws, $220.4 million of bonds issued by Port of the Americas Authority and $4,293.5 million of PBA bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation bonds.

[3] Does not include approximately $1.2 billion in Tax and Revenue Anticipation Notes ("TRANs") issued during fiscal year 2014, $300 million of which are revolver notes placed with the GDB. The TRANs usually have a pledge of, and are payable from, all taxes and revenues received by the General Fund starting on March 31 of the relevant fiscal year through June 30 of such fiscal year, together with any taxes and revenues collected after the issuance of the TRANs and on deposit in the General Fund on April 1 of such fiscal year, after any required transfers from the General Fund to the payment of the general obligation bonds and notes.

[4] Excludes $4.7 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities. Excludes also $673.1 million in Power Revenue Bonds issued by PREPA in August 2013. Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included in the table.

[5] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds. The Commonwealth does not guarantee such bonds. Employer contributions made to the Employees Retirement System by the central government and its agencies and therefore payable from the General Fund currently represent approximately 59% of such total employer contributions. The balance of these contributions is made by the public corporations and the municipalities.

[6] Includes the following: (i) $1.2 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement;(ii) $161.2 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); (iii) $319.9 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; iv) $145.9 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge ; (v) $155  million  of  Special Facilities Bonds issued by PRPA, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; (vi) $72.7 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and (vii) approximately $39.1 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

## Debt Service Requirements for Commonwealth General Obligation Bonds, Appropriation Bonds and Certain Guaranteed Debt

The following table presents the debt service requirements for Commonwealth general obligation and appropriation bonds outstanding and PBA bonds guaranteed by the Commonwealth as of June 30, 2013. This table, however, does not include (i) payments made by the Commonwealth on $220.4 million PAA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds; (ii) $651 million of bonds issued by Aqueduct and Sewer Authority which are guaranteed by the Commonwealth; and (iii) $469 million of State Revolving Fund Loans incurred under various federal water laws. Debt service on items (ii) and (iii) is currently being paid by PRASA and the Commonwealth has not made payments on this debt under its guarantee since 2005.The table also excludes $267 million of GDB bonds guaranteed by the Commonwealth but payable from available moneys of GDB. The amounts paid by the Commonwealth under the PAA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

## Commonwealth Debt Service Requirements
### (In thousands)

| Fiscal Year Ending June 30 | General Obligation Bonds | | PBA Bonds | | Appropriation Bonds[3] | | Total |
|---|---|---|---|---|---|---|---|
| | Principal | Interest[1] | Principal | Interest[2] | Principal | Interest | |
| 2013 | $384,235 | $448,619 | $72,595 | $243,651 | - | $15,758 | $1,164,858 |
| 2014 | 376,453 | 452,614 | 76,760 | 235,371 | - | 15,758 | 1,156,955 |
| 2015 | 407,055 | 459,154 | 82,000 | 231,257 | - | 36,683 | 1,216,149 |
| 2016 | 425,640 | 514,381 | 86,125 | 226,879 | $36,285 | 57,371 | 1,346,681 |
| 2017 | 371,192 | 494,423 | 90,905 | 222,138 | 29,435 | 56,347 | 1,264,439 |
| 2018 | 327,015 | 476,400 | 66,235 | 214,866 | 30,450 | 55,215 | 1,170,181 |
| 2019 | 475,981 | 444,721 | 69,645 | 211,249 | 31,590 | 53,962 | 1,287,148 |
| 2020 | 534,935 | 413,701 | 74,140 | 207,424 | 32,855 | 52,607 | 1,315,661 |
| 2021 | 403,150 | 387,665 | 100,800 | 203,246 | 34,215 | 51,129 | 1,180,205 |
| 2022 | 350,690 | 369,002 | 106,150 | 196,925 | 35,705 | 49,515 | 1,107,988 |
| 2023 | 273,615 | 352,547 | 95,930 | 190,800 | 37,330 | 47,755 | 997,977 |
| 2024 | 272,545 | 339,291 | 103,255 | 185,193 | 39,105 | 45,779 | 985,168 |
| 2025 | 291,470 | 325,956 | 106,545 | 179,347 | 41,095 | 44,110 | 988,523 |
| 2026 | 366,935 | 310,442 | 99,920 | 172,753 | 43,420 | 41,681 | 1,035,150 |
| 2027 | 308,600 | 290,578 | 106,365 | 167,153 | 45,855 | 39,127 | 957,678 |
| 2028 | 329,780 | 274,016 | 838,959 | 161,182 | 191,735 | 32,244 | 1,827,916 |
| 2029 | 305,180 | 255,981 | 92,955 | 113,657 | 192,255 | 20,472 | 980,501 |
| 2030 | 316,925 | 239,508 | 249,164 | 113,618 | 91,000 | 12,243 | 1,022,457 |
| 2031 | 319,000 | 223,069 | 134,591 | 99,057 | 96,150 | 7,096 | 878,963 |
| 2032 | 231,220 | 206,538 | 128,570 | 86,573 | 82,260 | 1,149 | 736,310 |
| 2033 | 345,450 | 193,865 | 135,375 | 79,661 | | | 754,351 |
| 2034 | 293,885 | 175,463 | 142,570 | 72,355 | | | 684,273 |
| 2035 | 375,975 | 160,079 | 162,575 | 65,894 | | | 764,522 |
| 2036 | 318,145 | 139,505 | 156,625 | 58,183 | | | 672,459 |
| 2037 | 336,405 | 121,248 | 150,550 | 49,971 | | | 658,174 |
| 2038 | 398,575 | 102,245 | 144,455 | 41,934 | | | 687,209 |
| 2039 | 421,130 | 79,691 | 154,450 | 34,059 | | | 689,330 |
| 2040 | 505,180 | 55,640 | 164,585 | 25,635 | | | 751,040 |
| 2041 | 532,625 | 28,194 | 173,810 | 16,408 | | | 751,037 |
| 2042 | | | 126,890 | 6,662 | | | 133,552 |
| | $10,598,985 | $8,334,534 | $4,293,494 | $4,113,102 | $1,090,740 | $735,999 | $29,166,853 |

Totals may not add due to rounding.  Interest payments on certain variable rate general obligation bonds are calculated at their effective fixed rate after giving effect to related interest rate exchange agreements. Table does not include (i) payments made by the Commonwealth on $220.4 million PAA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds; (ii) $651 million of bonds issued by PRASA which are guaranteed by the Commonwealth; (iii) $469 million of State Revolving Fund Loans incurred under various federal water laws; (iv) $267 million of GDB bonds guaranteed by the Commonwealth but payable from available moneys of GDB; and (v) short-term notes and other borrowings to be refinanced with long term debt.  Debt service on items (ii) and (iii) is currently being paid by PRASA and the Commonwealth has not made payments on this debt under its guarantee since 2005. Debt service on item (iv) is currently being paid by GDB and the Commonwealth has never had to make payments under its guarantee.

[1]   The figures for interest have been reduced by the interest that was capitalized through the issuance of Commonwealth general obligation bonds in the following amounts: $97.0 million in fiscal year 2014 and $73.9 million in fiscal year 2015.
[2]   The figures for interest have not been reduced by the credit payment of the Qualified Zone Academy Bonds and Qualified School Construction Bonds of Series R and T.
[3]   Consists of debt issued by the Public Finance Corporation. In contrast to general obligation debt and PBA debt listed herein, this debt is not guaranteed by the full faith credit and taxing power of the Commonwealth.

Sources:  Government Development Bank for Puerto Rico and Treasury Department

**Interest Rate Exchange Agreements**

*General.* The Commonwealth and various public corporations are parties to various interest rate exchange agreements or swaps. Except for the basis swaps discussed below, the purpose of all of the interest rate exchange agreements currently in place is to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith. Historically, when the Commonwealth or a public corporation has issued variable rate bonds, it has entered into an interest rate exchange agreement with a counterparty pursuant to which the Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to match the variable rate payable on the bonds (a "synthetic fixed rate swap"). In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate payments on the bonds and, thus, provided the counterparty does not default, the Commonwealth or the public corporation is left with a net fixed rate payment to the counterparty. The purpose of these swaps was to lower the all-in cost of borrowing below what could have been achieved by issuing fixed rate bonds.

*Basis Swaps.* The Commonwealth and PREPA are also parties to agreements ("basis swaps"), entered into in June 2006 and March 2008, respectively, pursuant to which they are making payments on a specified notional amount based on a short-term interest rate index published by the Securities Industry and Financial Markets Association ("SIFMA") and are receiving from their counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate ("LIBOR") plus a specified fixed rate payment (the "basis annuity"). The basis swaps are the only interest rate exchange agreements that do not hedge specific variable rate debt. For fiscal years 2012 and 2013, the Commonwealth received $9.8 million and $7.5 million, respectively, from its counterparties under the basis swap, net of the Commonwealth's payments to the counterparties, and PREPA received $11.1 million and $9.1 million, respectively, from its counterparty under the basis swap, net of PREPA's payments to the counterparty. In October 2012, the Commonwealth terminated, at no cost, $424.6 million of its basis swap. In addition, (i) in January 2012, PREPA received approximately $265,000 in connection with the unwinding of $225 million of notional amount of the basis swap; (ii) in May 2012, PREPA assigned $600 million in notional amount of its basis swap to two highly rated counterparties in order to further diversify its counterparty exposure (PREPA sold to each dealer the right to convert the basis annuity to a straight percentage of three-month LIBOR); and (iii) in April 2013 and June 2013, PREPA terminated $100 million in notional amount and $50 million in notional amount, respectively, of the basis swap.

*Risks.* By using derivative financial instruments, the Commonwealth exposes itself, among other risks, to credit risk (based on the counterparty's ability to perform under the terms of the agreement), market risk (based on the changes in the value of the instrument resulting from changes in interest rates and other market factors) and, in the case of basis swaps, basis risk (based on changes to the correlation between different indexes used in connection with a derivative and the variable rate debt they hedge). GDB, as fiscal agent, regularly monitors the exposure of the Commonwealth and the public corporations under the interest rate exchange agreements and

attempts to minimize the risks. To minimize some of the credit risk, the Commonwealth and the public corporations enter into agreements with highly-rated counterparties. The outstanding interest rate exchange agreements are with ten different counterparties, all of which, except one, are rated in one of the three highest rating categories by either Moody's or S&P. In addition, most of the agreements contain requirements of posting collateral by the counterparties based on certain valuation thresholds and credit ratings.

During fiscal years 2009 through 2013, in order to reduce the risks associated with the swap portfolio, the Commonwealth and the public corporations terminated approximately $4.9 billion of swaps. The aggregate notional amount of the swaps for the Commonwealth and the public corporations has decreased from $9.2 billion as of June 30, 2008, to $4.1 billion as of June 30, 2013, an aggregate decrease of 55%.

*Notional Amounts.* The table below shows the aggregate notional amount, as of June 30, 2013, of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

**Swap Portfolio Breakdown**
**Notional Amount**
(as of June 30, 2013)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $587,565,000 | $1,273,777,500 | $1,861,342,500 |
| Electric Power Authority | 411,825,000 | 1,000,000,000 | 1,411,825,000 |
| Highways and Transportation Authority | 647,025,000 | — | 647,025,000 |
| Sales Tax Financing Corporation | 136,000,000 | — | 136,000,000 |
| Total | $1,782,415,000 | $2,273,777,500 | $4,056,192,500 |

*Market Value.* Generally, the interest rate exchange agreements may be terminated by the Commonwealth or the public corporations at any time at their then current market values. The agreements may also be terminated upon the occurrence of certain credit events. If a termination occurs due to a credit event, the Commonwealth or the public corporations may be obligated to pay to the applicable swap counterparty an amount based on the terminating swap's market value, which may be substantial, or vice versa, with other termination costs being paid by the defaulting party. The mark-to-market value of the swaps fluctuates with interest rates and other market conditions. The Commonwealth's obligations under the interest rate exchange agreements are secured by the full faith, credit and taxing power of the Commonwealth but do not constitute "public debt" under the Commonwealth Constitution which has a first claim on available Commonwealth resources.

The following table shows, as of June 30, 2013, the net mark-to-market value of all outstanding interest rate exchange agreements. The mark-to-market value of all swaps of the Commonwealth and the public corporations was negative as of June 30, 2013. Thus, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

## Swap Portfolio Mark-to-Market Valuation
(as of June 30, 2013)

|  | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $(92,840,070) | $(22,480,767) | $(115,320,837) |
| Electric Power Authority | (70,970,521) | (7,611,687) | (78,582,208) |
| Highways and Transportation Authority | (142,417,740) | — | (142,417,740) |
| Sales Tax Financing Corporation | (55,711,062) | — | (55,711,062) |
| Total | $(361,939,393) | $(30,092,454) | $(392,031,847) |

*Collateral Requirements.* Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. In accordance with these requirements, the Highways and Transportation Authority had posted collateral of $41.5 million to its swap counterparties as of June 30, 2013, and PREPA was required to post collateral of $31.1 million as of the same date. If the mark-to-market value of the swap portfolio deteriorates or the credit ratings of the Commonwealth or the public corporations are lowered, the collateral posting obligations contained in the agreements may require further deliveries of collateral. As of September 30, 2013, a one-notch downgrade of current credit ratings for the Commonwealth general obligations, PREPA and PRHTA, would have required delivery of additional collateral of approximately $75.9 million, $39.2 million and $124.8 million, respectively. In the case of the Commonwealth general obligations, if the downgrade continues for 90 days, two of the swaps for a total of approximately $34.2 million may be terminated. Further downgrades could trigger termination events under the interest rate exchange agreements.

## Variable Rate Bonds and Mandatory Tender Bonds

*Variable Rate Bonds.* The Commonwealth and various public corporations have outstanding variable rate bonds, consisting of (i) variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds"), (ii) variable rate bonds and notes that have been purchased directly from the Commonwealth by certain financial institutions which provide for periodic interest rate changes based on the LIBOR or SIFMA index and which are subject to mandatory tender on certain dates prior to their maturities ("Mandatory Tender FRNs"), and (iii) other bonds and notes which provide for periodic interest rate changes based on the LIBOR rate or a particular index, but which are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged substantially all of their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers. Pursuant to these agreements, the Commonwealth and the public corporations receive a variable rate payment expected to approximate the interest cost of the variable rate bonds, and pay a fixed rate. See "Interest Rate Exchange Agreements."

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of June 30, 2013.

## Variable Rate Debt Breakdown
### (as of June 30, 2013)

|  | VRDO Bonds | Mandatory Tender FRNs | Other Variable Rate Debt | Total |
|---|---|---|---|---|
| Commonwealth (General Obligation) | $203,625,000 | $257,215,000 | $126,725,000 | $587,565,000 |
| Electric Power Authority | — | — | 411,825,000 | 411,825,000 |
| Highways and Transportation Authority | 200,000,000 | — | 447,025,000 | 647,025,000 |
| Sales Tax Financing Corporation | — | — | 136,000,000 | 136,000,000 |
| Total | $403,625,000 | $257,215,000 | $1,121,575,000 | $1,782,415,000 |

*VRDO Bonds.* The VRDO Bonds bear a floating interest rate adjusted at specified intervals, such as daily or weekly (each, a "remarketing date") and provide investors the option to tender or put the bonds at par on each remarketing date. The tendered bonds are then resold by a remarketing agent in the secondary market to other investors. The VRDO Bonds are secured by letters of credit or other liquidity or credit facilities ("credit/liquidity facilities") that provide for the payment of the purchase price payable upon the tender of the bonds. The credit/liquidity facilities expire prior to the final maturity of the bonds. If, upon the expiration or termination of any credit/liquidity facility with respect to a series of VRDO Bonds, the Commonwealth or the applicable public corporation is unable to renew or replace such facility with an alternate credit/liquidity facility, the VRDO Bonds of such series are subject to mandatory tender for purchase by the credit/liquidity facility provider and generally become subject to higher interest rates and accelerated amortization schedules pursuant to the terms of each expiring credit/liquidity facility.

The United States financial market crisis that begun in 2008 has resulted in a significant reduction in the availability of credit and liquidity facilities to support VRDO Bonds, and a related increase in the price of these facilities when they can be obtained. Thus, if the Commonwealth and the public corporations are not able to renew or rollover the expiring credit/liquidity facilities with respect to VRDO Bonds, or are not able to do so at an acceptable price, the Commonwealth and the public corporations would have to refinance the VRDO Bonds or otherwise obtain financing for such bonds in order to avoid the higher interest rates and accelerated amortization schedules set forth in the expiring credit/liquidity facility.

In addition, since there are interest rate exchange agreements with respect to all VRDO Bonds, if the Commonwealth or the applicable public corporation cannot renew or replace a credit/liquidity facility upon its expiration or remarket the related series of bonds successfully upon their mandatory tender as variable rate bonds, the Commonwealth or the applicable public corporation may have to terminate the interest rate exchange agreements associated with such series of VRDO Bonds.  Termination of the applicable interest rate exchange agreement may result, depending on then current interest rate levels and market conditions, in the payment of a termination amount, which may be substantial, by the Commonwealth or the applicable public corporation to compensate the counterparty for its economic losses.  As of June 30, 2013, the mark-to-market value of all the interest rate exchange agreements with respect to VRDO Bonds was negative $35.2 million for the Commonwealth and negative $38.6 million for the public corporations.  See "Interest Rate Exchange Agreements – Market Value."

The following table shows, by fiscal year, the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit/liquidity facilities.

**VRDO Bonds Rollover**
(by Fiscal Year)

|  | 2014 |
|---|---|
| Commonwealth (General Obligation) | $203,625,000 |
| Highways and Transportation Authority | $200,000,000 |
| Total | $403,625,000 |

*Mandatory Tender FRNs and Mandatory Tender Fixed Rate Bonds.*  As of June 30, 2013, the Commonwealth had outstanding $257.2 million of Mandatory Tender FRNs and PBA had $129.2 million of fixed rate bonds guaranteed by the Commonwealth that were subject to mandatory tender for purchase prior to maturity (collectively, the "Mandatory Tender Bonds").  The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds.  If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds or, in some cases, the bonds would become subject to higher interest rates and an accelerated amortization schedule.

The following table shows, as of June 30, 2013, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

### Mandatory Tender Bonds Breakdown
(as of June 30, 2013)

| | Mandatory Tender Bonds | Type | Mandatory Tender Date |
|---|---|---|---|
| Commonwealth (General Obligation) | | | |
| | $ 44,905,000 | Variable | May 1, 2014 |
| | 14,925,000 | Variable | June 1, 2014 |
| | 197,385,000 | Variable | June 1, 2014 |
| Public Buildings Authority | 129,225,000 | Fixed | July 1, 2017 |
| Total | $386,440,000 | | |

As discussed previously, the Commonwealth has entered into interest rate exchange agreements with respect to all Mandatory Tender FRNs. In the event the Commonwealth cannot remarket these bonds on their mandatory tender dates as variable rate bonds, the Commonwealth may have to terminate the associated interest rate exchange agreements. As of June 30, 2013, the mark-to-market value of all interest rate exchange agreements with respect to the Mandatory Tender FRNs was negative $47.6 million.

### Ratings of Commonwealth General Obligation Bonds

The Commonwealth's general obligation and appropriation debt is currently rated "Baa3" with a negative outlook by Moody's, "BBB-" with a negative outlook by Fitch, and "BBB-" with a negative outlook by S&P. These ratings and outlooks reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

### Commonwealth Guaranteed Debt

As of June 30, 2013, $4.293 billion of Commonwealth guaranteed bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). Maximum annual debt service on these bonds is $961 million in fiscal year 2028, assuming the receipt of the issuer subsidy from the federal government on the $756,449,000 Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) and the $121,528,000 Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment), and $1.0 billion in fiscal year 2028 without taking into consideration said subsidy, with their final maturity being July 1, 2042. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of June 30, 2013, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of June 30, 2013, GDB held approximately $220.4 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The proceeds from these bonds have been used to continue the development of the Port of the Americas. As of August 1, 2013, payments of $95.1 million under the Commonwealth guaranty have been required to pay interest and principal on these bonds. While the responsibility for the development and operation

of the Port of the Americas was transferred from the Port of the Americas Authority to the Authority of the Port of Ponce in December 2011, the Port of the Americas Authority retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under the guarantee. See "Other Public Corporations—Port of the Americas Authority" under "Public Corporations" below.

As of June 30, 2013, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $1.119 billion. This amount consisted of $284.8 million in revenue bonds sold to the public, $365.8 million in bonds issued to the United States Department of Agriculture, Rural Development, and $468.6 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under "Public Corporations" below.

During fiscal years 2011 and 2012, the Commonwealth made subsidy payments to PRASA for its operational expenses in the amounts of $105 million and $70.2 million, respectively. After the 2012 Series Bonds issuance by PRASA, which established a budgetary reserve fund of $180 million, the Commonwealth does not anticipate having to appropriate additional funds to PRASA for its operational expenses.

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2013 (except for the gross national product numbers for fiscal year 2013 that are not yet available). As of June 30, 2013, outstanding short-term debt, relative to total debt, was 7.0%. Total public sector debt for fiscal year 2012 shown the table below represented 93.2% of gross national product for fiscal year 2012.

### Commonwealth of Puerto Rico
### Public Sector Debt and Gross National Product
### (dollars in millions)

| June 30, | Public Sector | | | | | Gross National Product[1] | |
|---|---|---|---|---|---|---|---|
| | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Amount | Rate of Increase |
| 2009 | $48,332 | $4,648[4] | $52,980 | 8.8% | 13.0% | $63,618 | 1.5% |
| 2010 | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 64,295 | 1.1 |
| 2011 | 54,804 | 4,380 | 59,184 | 7.4 | 4.2 | 65,567 | 2.0 |
| 2012 | 60,780 | 3,981 | 64,760 | 6.2 | 9.5 | 69,462 | 5.9 |
| 2013 | 60,115 | 4,843 | 64,957 | 7.0 | 0.3 | - | - |

Totals may not add due to rounding.
[1] In current dollars.
[2] Does not include debt totaling $5.1 billion consisting of (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

*Source:* Government Development Bank

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2013.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)

| June 30 | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2009 | $9,382 | $557 | $9,939 | $2,691 | $306 | $2,997 | $36,259 | $3,785 | $40,044 | $48,332 | $4,648 | $52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| 2011 | 10,199 | 164 | 10,363 | 3,204 | 333 | 3,537 | 41,401 | 3,883 | 45,284 | 54,804 | 4,380 | 59,184 |
| 2012 | 11,578 | 266 | 11,844 | 3,515 | 357 | 3,872 | 45,687 | 3,358 | 49,045 | 60,780 | 3,981 | 64,760 |
| 2013 | 11,838 | 491 | 12,329 | 3,501 | 381 | 3,882 | 44,776 | 3,970 | 48,746 | 60,115 | 4,843 | 64,957 |

Totals may not add due to rounding.
[1] Does not include the Senior Pension Funding bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt."
[2] Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt."
[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

*Source:* Government Development Bank

The following table sets forth the total debt service (principal and interest) of the Commonwealth and all its public corporations and instrumentalities (excluding GDB) for the next five fiscal years (as of August 31, 2013):

### Comonwealth of Puerto Rico and its Instrumentailities
### Five Year Debt Service Schedule

| Fiscal year Ended June 30, | Total debt service (In millions) |
|---|---|
| 2014 | $3,442 |
| 2015 | $3,615 |
| 2016 | $3,817 |
| 2017 | $3,778 |
| 2018 | $3,695 |
| Total | $18,348 |

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of June 30, 2013 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**June 30, 2013**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $650,592 | $3,422,055 | $4,072,647 | $469,744 | $89,835 | $559,579 | $1,120,336 | $3,511,890 | $4,632,226 |
| Convention Center District Authority | - | 428,650 | 428,650 | - | 146,773 | 146,773 | - | 575,423 | 575,423 |
| Electric Power Authority | - | 8,048,485 | 8,048,485 | - | 760,914 | 760,914 | - | 8,809,399 | 8,809,399 |
| Highway and Transportation Authority | - | 5,012,702[1] | 5,012,702 | - | 2,045,130 | 2,045,130 | - | 7,057,832 | 7,057,832 |
| Housing Finance Authority | - | 110,063[2] | 110,063 | - | 153,437 | 153,437 | - | 263,500 | 263,500 |
| Industrial Development Company | - | 188,065 | 188,065 | - | 87,325 | 87,325 | - | 275,390 | 275,390 |
| Infrastructure Financing Authority[3] | - | 2,099,888 | 2,099,888 | - | 43,219 | 43,219 | - | 2,143,107 | 2,143,107 |
| Port of the Americas Authority | 220,392 | - | 220,392 | - | - | - | 220,392 | - | 220,392 |
| Ports Authority | - | -[4] | - | - | 215,389 | 215,389 | - | 215,389 | 215,389 |
| Public Buildings Authority | 4,293,494 | - | 4,293,494 | - | 336,144 | 336,144 | 4,293,494 | 336,144 | 4,629,638 |
| Public Finance Corporation | - | 1,090,740[5] | 1,090,740 | - | - | - | - | 1,090,740 | 1,090,740 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 15,223,821 | 15,223,821 | - | 333,300 | 333,300 | - | 15,557,121 | 15,557,121 |
| University of Puerto Rico | - | 488,885[6] | 488,885 | - | 86,999 | 86,999 | - | 575,884 | 575,884 |
| Others[7] | - | - | - | - | 2,700,293 | 2,700,293 | - | 2,700,293 | 2,700,293 |
| Total[8] | $5,164,478 | $36,113,354 | $41,277,832 | $469,744 | $6,998,758 | $7,468,502 | $5,634,222 | $43,112,111 | $48,746,334 |

[1] Excludes $145.9 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

[2] Excludes the $161.2 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from HUD; and $319.9 million of Housing Finance Authority Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD.

[3] Includes $37.8 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement. Also includes $329.2 million of Revenue Bonds (Ports Authority Project), Series 2011, which are limited obligations of the Infrastructure Financing Authority payable solely from loan payments made by the PRPA.

[4] Excludes $155.4 million of Special Facilities Revenues Bonds issued by the PRPA, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5] Payable primarily from Commonwealth appropriations.

[6] Excludes $72.7 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7] Includes lines of credit with GDB.

[8] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.2 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, 2005 and 2008 which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below. Excludes also (i) $673,145,000 in Power Revenue Bonds issued by the Electric Power Authority on August 21, 2013, and (ii) $400 million in Bond Anticipation Notes issued by the Highway and Transportation Authority in July 2013.

*Source:* Government Development Bank

## Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to, and fiscal agent for, the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with PRASA, PREPA, the Highway and Transportation Authority, the PRPA, the Health Insurance Administration and the Medical Services Administration, the Metropolitan Bus Authority and the Maritime Transportation Authority. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of September 30, 2013, GDB (excluding its blended component units) had total assets of $12.4 billion and total liabilities of $10.2 billion.

On December 13, 2012, Moody's lowered GDB's rating to "Baa3" with a negative outlook. On March 14, 2013, S&P lowered GDB's rating to "BBB-" with a negative outlook. These ratings and outlooks reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

As of September 30, 2013, $5.0 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $4.7 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of, and interest on, specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of September 30, 2013.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of June 30, 2013, the Perpetual Trust had repaid $139.6 million of its line of credit and had an outstanding balance of $360.4 million and an interest balance of $210,235. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover their operating expenses, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and

financial condition may have an adverse effect on GDB's financial condition and liquidity. A material reduction on the GDB's ability to act as lender and promoter of economic growth would have a material effect on the Commonwealth, its public corporations and municipalities.

As of September 30, 2013, GDB had outstanding loans to the Commonwealth in the aggregate principal amount of $2.7 billion, outstanding loans to, and bonds of, the public corporations in the aggregate principal amount of $4.2 billion (of which loans to PRHTA represented $1.7 billion), and outstanding loans to the municipalities in the aggregate principal amount of $2.0 billion.

As of September 30, 2013, the approximate market value of GDB's investment portfolio was approximately $2.4 billion.

GDB has several subsidiaries that perform various functions.  The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.*  Puerto Rico Housing Finance Authority (formerly known as Housing Finance Corporation) provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs.  It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency, which was dissolved in 2002 and its powers transferred to the Housing Finance Authority. As of June 30, 2013, the Housing Finance Authority's total outstanding principal balance of loans to the private sector for development of housing projects targeted to low and moderate income families was $187.1 million.  The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $178.1 million as of the same date.

The Housing Finance Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions.  As of June 30, 2013, $788 million of these bonds were outstanding.

As of June 30, 2013, the Housing Finance Authority had total notes and bonds outstanding of $491.6 million (including $153.4 million of debt outstanding under GDB lines of credit and $338.2 million in bonds issued to fund certain payments under its mortgage subsidy programs for low and moderate income families). As of June 30, 2013, the Housing Finance Authority had total unrestricted net assets of $275.3 million.

*Puerto Rico Tourism Development Fund.*  Puerto Rico Tourism Development Fund ("TDF") was created in September 1993 to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects.  TDF can provide guarantees to interim and permanent financings.  In certain transactions, TDF can act as direct lender and provide preferred equity capital.  As of June 30, 2013, TDF had $557 million in guarantees and $187.6 million in loans, net of loan loss reserves of

$188.7 million. It also had $23.2 million in cash and $153.0 million in marketable securities. TDF estimates that at as of June 30, 2013, it had a significant equity deficiency.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") was created in November 1992 for the purpose of investing and trading in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to TDF, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of June 30, 2013, the Capital Fund had assets of $201,000, consisting principally of money market investments.

*Puerto Rico Development Fund.* Puerto Rico Development Fund (the "Development Fund") was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. As of June 30, 2013, the Development Fund had assets of $20.6 million, including $10.6 million in loans to private entities, $6.4 million in interest bearing accounts, and $3.6 million in preferred shares of various private entities.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The bond trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools and the Department of Health and PRASA, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. As of June 30, 2013, PFC had $1.1 billion aggregate principal amount of limited obligation bonds outstanding.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* The Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 58% of the Commonwealth's population, respectively.

PRASA reported an operating loss of $136.8 million for fiscal year 2012, compared to operating losses of $39.6 million and $58.3 million for fiscal years 2011 and 2010, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

On July 3, 2013 PRASA's Board of Directors approved a rate adjustment which became effective on July 15, 2013. The rate increase is projected to increase operating revenues for fiscal year 2014 by approximately $344 million, or 44%, over fiscal year 2013. For fiscal year 2015 and

beyond, the increase in operating revenues is projected at $444 million (as compared to fiscal year 2013), as the rate adjustment will cover an entire fiscal year. The rate adjustment is expected to be sufficient to cover all expenses and debt service of the corporation until at least fiscal year 2017.

As of June 30, 2013, PRASA's total debt was $4.6 billion, including approximately $89.8 million of outstanding indebtedness with GDB. On December 13, 2012, Moody's lowered the rating on PRASA's senior debt to "Ba1". On March 26, 2013, S&P lowered its rating on PRASA's senior debt to "BB+." On April 18, 2013, Fitch lowered its rating on such debt to "BBB-."

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

On April 28, 2006, PRASA entered into a consent decree with the United States Environmental Protection Agency ("EPA") that requires PRASA to implement system wide remedial measures at all of the wastewater treatment plants operated by PRASA. The EPA consent decree establishes deadlines for compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between PRASA and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. PRASA agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the systems it owns and operates, to finance its expansion for new users and to implement remedial measures required by the consent decree between PRASA and the EPA and the settlement agreement with the DOH. Funds for this investment will be provided through a combination of revenues from PRASA, financing transactions, federal grants and other sources. PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the consent decree and the settlement agreement. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

*Children's Trust.* The Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to the Children's Trust all of its rights, title and interests under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic

contribution payments to be made by the participating cigarette manufacturers under such Master Settlement Agreement.

As of June 30, 2013, the Children's Trust had outstanding senior and subordinate Tobacco Settlement Asset backed Bonds in the principal amount of $1.2 billion, which were issued in 2002, 2005 and 2008 to pay certain capital expenditures, to make grants to third parties, to pay certain expenses of the Commonwealth, to fund a Liquidity Reserve account and to pay costs of issuance. These bonds and any other additional senior bonds issued by the Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement.   To date, all principal and interest payments required to be made by the Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.*   The Convention Center District Authority was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center, and designated private parcels located within the Convention Center District in San Juan.   The convention center opened on November 17, 2005. The Convention Center District Authority also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum.   As of June 30, 2013, the Convention Center District Authority's debt was $428.7 million in outstanding bonds issued in March 2006 to finance the Convention Center and payable from a portion of a hotel room tax.   As of June 30, 2013, the Convention Center District Authority also had outstanding indebtedness to GDB of approximately $148 million related to the financing of the Coliseum.

*Electric Power Authority.*   The Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported a reduction in net assets of $346.2 million and $272.4 million during fiscal years 2012 and 2011, respectively.   The total debt of PREPA was $8.8 billion as of June 30, 2013.  This debt includes outstanding bonds of $8.0 billion and interim financing for operations of $761 million.  PREPA's senior debt is rated Baa3, BBB and BBB- by Moody's, S&P and Fitch, respectively.

On August 21, 2013, PREPA issued $673,145,000 Power Revenue Bonds, Series 2013A which proceeds will be used to finance PREPA's capital improvements program.

In order to reduce its dependency on fuel oil, reduce the cost of electricity, and comply with Mercury and Air Toxic Standards, PREPA is pursuing a fuel diversification strategy. PREPA has entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil. PREPA has also signed power purchase agreements for sixty-three renewable energy projects. Four of the renewable energy projects are already in commercial operation and the rest of the projects are in various stages of development, most still being subject to obtaining financing and permitting. Approximately 32% of PREPA's current energy generation is purchased from these privately owned plants.

The principal component of PREPA's fuel diversification strategy is the conversion of most of PREPA's existing oil-fired generating units to dual fuel units that can burn either fuel oil (Bunker C) or natural gas and the development of the necessary natural gas transportation and delivery infrastructure. PREPA has already completed the conversion of the largest generating units of the Costa Sur power plant, representing approximately 14% of PREPA's total dependable generating capacity. PREPA is able to receive natural gas at Costa Sur power plant through an existing pipeline from EcoElectrica LNG terminal and pursuant to a Sale and Purchase Agreement with Gas Natural Electricidad SDG, S. A.

PREPA's capital improvement program for fiscal years 2014 through 2018 includes an estimated cost of $80.2 million, which with the previous years' investment would be enough to complete the conversion to dual fuel of several of its generating units. PREPA commenced burning natural gas at its Costa Sur power plant in April 2012. In order to be able to burn natural gas at other facilities, however, PREPA has to develop the associated natural gas delivery infrastructure. PREPA plans to start burning natural gas at its Aguirre power plant and its northern generating plants by April 2015 and April 2017, respectively.

On July 1, 2013, the Commonwealth enacted Act 50 ("Act 50"). Act 50 establishes a preferential "all in" rate for the sale of electricity to PRASA. The preferential rate, however, is capped at 750 million kilowatt hours per fiscal year. In addition, Act 50 grants PREPA the power to revoke or modify the preferential rate if deemed necessary and prudent, following the processes provided in the applicable laws and the public policy established in Act 50, or when determined necessary to meet its obligations under the trust indenture for its bonds.

*Health Insurance Administration.* The Health Insurance Administration ("PRHIA") was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the Commonwealth selected, through a bidding process, different private health insurance companies for the eight designated regions of the island and paid such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covered the entire island. On October 1, 2010, the Commonwealth implemented "Mi Salud," which is the health program that replaced the prior Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. Approximately 1.6 million persons were covered by the system during fiscal year 2013.

On July 2013, the Executive Director of the PRHIA announced the cancellation of Humana's contract effective on September 30, 2013. Humana administered three regions, with approximately 515,000 insured, of the "Mi Salud" program. On July 1, 2013, the PRHIA and Triple-S Salud, Inc. ("Triple-S") entered into an agreement pursuant to which Triple-S will administer the provision of healthcare services to the insured in the eight regions previously administered by MCS HMO (five regions) and Humana (remaining three regions). Pursuant to the agreement, Triple-S will act as a third party administrator and will be compensated based on a per member per month administrative fee. In contrast to the agreements with MCS HMO and Humana,

the Commonwealth has been financially responsible and bears the risk for the provision of services to the insured persons in the eight regions administered by Triple-S.

The total cost of the health insurance program was $2.335 billion for fiscal year 2013, $2.182 billion for fiscal year 2012, $2.017 billion for fiscal year 2011, and $1.962 billion for fiscal year 2010. During fiscal year 2013, the General Fund covered $882 million of the total cost of the health insurance program. The remaining $1.360 billion were paid from federal, municipal, internal and other sources. As of June 30, 2013, the PRHIA had outstanding indebtedness to GDB and private financial institutions of $183.3 million, consisting of loans used to pay amounts owed to suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

The Commonwealth budget for "Mi Salud" totals $2.383 billion for this current fiscal year 2014. The approved budget includes an appropriation of $885 million from General Fund, an increase of $2.9 million over the prior year, while the remaining $1.49 billion will be paid from federal funds, municipal, and other sources. Currently, the PRHIA projects a shortfall of $110 million when comparing the budgeted amount with the latest expense projections. While PRHIA is a public corporation whose programs are funded by multiple sources which include fee income, municipal contributions, federal funding, and Commonwealth contributions, past funding shortfalls have required credit facilities payable from General Fund appropriations. Cost-saving measures under consideration include improved oversight of third-party administrators; fraud prevention; changes to federal poverty limits; migration within sub-groups of beneficiaries (for example, from Medicaid to Medicare or from Commonwealth-funded to Medicaid-funded); and other expense control measures. The federal funds portion of the health insurance program is being partially covered by non-recurring American Affordable Care Act ("AACA") funds, as well as with the capped recurring Medicaid Commonwealth allocation. The federal funds contribution to the health insurance program for fiscal year 2014 is projected at $1.136 billion, while the Commonwealth cap for Medicaid is approximately $300 million. Additional federal funds for Mi Salud available for the federal CHIP (Children's Health Insurance Program) for fiscal year 2014 are projected at $160 million. Upon exhaustion of AACA funds, currently estimated sometime in early 2019 if the current utilization rate persists, federal contributions may revert to the recurring capped Medicaid Commonwealth allocation, resulting in higher requirements of Commonwealth funding, changes in the health program risk model, reductions in number of beneficiaries or scope of services provided, or other revenue-enhancing or cost reduction measures.

On September 30, 2013, the Governor of Puerto Rico notified the Secretary of the United States Department of Health and Human Services ("HHS") that the Commonwealth had elected to not implement a Health Insurance Exchange pursuant to the provisions of the AACA. In lieu thereof, the Commonwealth notified HHS of its decision to implement a new affordable health care plan for individuals who do not qualify for the existing Mi Salud public health insurance program. The new program will allow individuals with income levels of $10,000 to $25,000 per year to qualify for a new subsidized health insurance plan (the "UAP"). The newly eligible beneficiaries would receive Essential Health Benefits as defined by ACA, at the Bronze level. While the monthly fee for the UAP would be fully covered by funds from the PRHIA, the beneficiary would contribute approximately 40% of the cost of coverage through deductibles, copayments and other cost-limiting or sharing mechanisms. PRHIA estimates that the per-member

cost of the new plan, due to differences in coverage and cost sharing-arrangements, would be approximately 55% lower than for beneficiaries of Mi Salud.

The funding for the UAP would be obtained by raising the Medicaid poverty income eligibility level from $400 per month to $550 per month. This would cause approximately 76,000 current beneficiaries of Mi Salud that are currently covered 100% with PRHIA funds, to become eligible for Medicaid federal reimbursement.

Additionally, the Commonwealth has entered into contracts with seven Medicare Advantage organizations for the provision of health coverage to approximately 275,000 dual eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

*Highways and Transportation Authority.* The Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA and federal and Commonwealth grants.

PRHTA reported a net operating loss of $517.2 million for fiscal year 2012, compared to a net operating loss of $530.8 million for fiscal year 2011 and $445.3 million for fiscal year 2010. As of June 30, 2013, PRHTA's total debt was $7.1 billion, consisting of $5 billion of bonds and $2.0 billion of GDB financings.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

On June 25, 2013, the Commonwealth enacted Acts 30 and 31 to provide additional revenues to PRHTA. Pursuant to these laws, (i) PRHTA will receive the motor vehicle license fee revenues previously received by the Commonwealth Treasury Department which currently amount to approximately $62.5 million in additional annual revenue, (ii) the tax on petroleum products was increased from $3.00 per barrel to $9.25 per barrel which is currently estimated to result in approximately $189 million in additional annual revenue, and (iii) PRHTA will receive the first $20 million in annual cigarette excise tax revenues collected by the Commonwealth Treasury Department.

On August 29, 2013, PRHTA issued $400,000,000 in bond anticipation notes, which proceeds were used to repay amounts owed under various GDB lines of credit.

PRHTA's Highway Revenue Bonds are rated Baa2 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated Baa3 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan.  It was constructed under several design/build contracts and is being privately operated.  The cost of the project was $2.4 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds.  Tren Urbano commenced operations in June 2005.  The current annual operation and maintenance cost of the Tren Urbano is approximately $55 million.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon.  The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues.  The concession is for a term of 35 years, subject to earlier termination or extension.   The bridge opened for traffic in February 1994.   In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds.  Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

On September 22, 2011, PRHTA and the PPP Authority awarded to Metropistas a concession for the operation of toll roads PR-22 and PR-5.  In connection with the establishment of the concession, PRHTA defeased, redeemed or purchased approximately $873.1 million aggregate principal amount of its bonds.  See "Public-Private Partnerships – Fiscal Stabilization and Economic Growth" under THE ECONOMY.

*Industrial Development Company.*  The Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers.  PRIDCO reported consolidated change in net assets of $13.1 million for fiscal year 2012, compared to consolidated change in net assets of $7.0 million for fiscal year 2011.  Rentals derived from the leasing of specified facilities of PRIDCO are pledged to the payment of PRIDCO's revenue bonds.  As of June 30, 2013, PRIDCO's total debt was $361.8 million, including approximately $87.3 million from GDB financings and the outstanding debt of Puerto Rico Industrial Investment Corporation, a subsidiary of PRIDCO.  PRIDCO's general purpose revenue bonds are rated Baa1 (stable) and BBB- by Moody's and S&P, respectively.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.* Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies.  The

bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of June 30, 2013, approximately $1.04 billion of AFICA bonds were outstanding.

*Infrastructure Financing Authority.* The Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by such entities.

As of June 30, 2013, PRIFA's total debt was $2.1 billion. This debt includes bonds outstanding of $2.1 billion and interim financing for capital improvements of $43.2 million. PRIFA's outstanding bonds include $329.2 million of limited obligations bonds, the proceeds of which were loaned to the PRPA and are payable solely from loan payments to be made by the PRPA. PRIFA's Special Tax Revenue Bonds are rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the U.S. Code. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. PRIFA is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of the Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account was being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

As part of the Commonwealth's actions to address in part the financial condition of the Employees Retirement System, the Commonwealth enacted Act 96. On June 23, 2011, in accordance with Act 96, $162.5 million of funds on deposit in the Corpus Account were

contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. PRIFA also invested $165.0 million of funds on deposit in the Corpus Account in capital appreciation bonds of COFINA maturing annually on August 1, 2045 through 2050 and accreting interest at 7%.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also is responsible for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* The Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date, no such payments have been required. As of June 30, 2013, MFA had $821.9 million of bonds outstanding.

*Port of the Americas Authority.* Up to the approval of Act 240 of December 12, 2011, the Ports of the Americas Authority ("PAA") was responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. With the approval of said Act 240, the Authority of the Port of Ponce was created with the exclusive jurisdiction of the Port of the Americas.

PAA was authorized to issue bonds guaranteed by the Commonwealth, in a maximum aggregate principal amount of $250 million, for the development of the Port of the Americas. GDB was authorized by law to purchase said bonds of PAA. As of June 30, 2013, GDB held approximately $220.4 million of PAA's outstanding guaranteed bonds. While the responsibility for the development and operation of the Port of the Americas was transferred from PAA to the Authority of the Port of Ponce, PAA retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under the guarantee.

*PRPA.* The PRPA owns the major airport and seaport facilities in Puerto Rico. Until February 27, 2013, the PRPA also operated all these facilities. On that date, the PRPA transferred the operation of the Commonwealth's principal airport to a private consortium consisting of Grupo Aeroportuario del Sureste and Highstar Capital pursuant to a 40-year lease agreement. As a result of the transaction, the PRPA received a $615 million upfront payment, of which it used $176.7 million to repay the PRIFA limited obligation bonds described above under "Infrastructure Financing Authority." The PRPA derives revenues from a variety of sources, including charges on airplane fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. The PRPA had operating losses of $26.5 million and $18.4 million during

fiscal years 2012 and 2011, respectively.  As of June 30, 2013, after giving effect to the redemption of the PRIFA bonds referred to above, the PRPA had outstanding indebtedness of $329.2 million.

*Public Buildings Authority.*  PBA is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth.  Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty.  PBA is authorized by law to have outstanding at any one time up to $4.7 billion of bonds guaranteed by the Commonwealth. On June 21, 2012, PBA issued $582,345,000 principal amount of its Government Facilities Revenue Bonds, Series U. The proceeds of such bonds were used to refund outstanding bonds and to repay advances made by GDB under a line of credit.  As of June 30, 2013, PBA had $4.293 billion principal amount of bonds outstanding (not including accretion of interest on capital appreciation bonds) and $336.1 million outstanding under its line of credit with GDB.  PBA debt is rated Baa3 by Moody's, BBB- by S&P, and BBB- by Fitch.

*Sales Tax Financing Corporation.*  COFINA was originally created in 2006 for the purpose of financing the payment of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.  In 2009, the Legislative Assembly of the Commonwealth expanded the purposes for which COFINA was created and increased from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion of the Commonwealth sales and use tax that is transferred to COFINA.  COFINA was then authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Commonwealth, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund. As of June 30, 2013, COFINA had approximately $15.2 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds).

On October 9, 2013, an amendment to the COFINA legislation was signed into law which increases from 2.75% to 3.50% the portion of the Commonwealth sales and use tax transferred to COFINA and expands the permitted uses of COFINA bond proceeds to include, among others, the refinancing of BANs and the financing of the Commonwealth's deficit for fiscal years 2013, 2014 and 2015.

COFINA's Sales Tax Revenue Bonds are rated A2, AA- and AA- by Moody's, S&P and Fitch, respectively, and its Sales Tax Revenue Bonds, First Subordinate Series, are rated A3, A+ and A+ by Moody's, S&P and Fitch, respectively.

On April 30, 2013, COFINA issued $333,300,000 in Bond Anticipation Notes ("BANs") in order to complete the funding for the Commonwealth's operating budget for fiscal year 2013. The BANs, which mature on September 30, 2014, will be repaid from new financings.

*Special Communities Perpetual Trust.* The Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. The Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB made a special capital contribution to the Perpetual Trust of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. As of June 30, 2013, the Perpetual Trust had disbursed most of its funds and its line of credit with GDB had an outstanding balance of $360.4 million. The line of credit is payable from legislative appropriations.

*University of Puerto Rico.* The University of Puerto Rico (the "University"), with approximately 57,475 students at the beginning of academic year 2012-2013, is the largest institution of higher education in Puerto Rico. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been financed mainly by revenue bonds. As of June 30, 2013, the University's total debt was $575.9 million (excluding $16.3 million owed by the University's Medical Services), consisting of $488.9 million of bonds and $87 million of loans. The University's debt is rated Ba1 and BBB- (negative outlook) by Moody's and S&P, respectively.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds (of which $72.7 million were outstanding as of June 30, 2013) are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2010, the Board of Trustees of the University approved a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University. This stabilization fee was imposed to address the University's fiscal difficulties and was expected to increase annual revenues by approximately $40 million. The imposition of the stabilization fee resulted in student-led strikes that lasted approximately two months, which in turn caused the Middle States Commission on Higher Education (the "Commission"), the regional accreditation entity of the eleven units that comprise the University system, to place on probation ten of the University's units. The ten affected units remained fully accredited while on probation. After a Monitoring Report submitted by the ten affected units in September 2010 and subsequent evaluation visits, in June 2011 the Commission lifted probation and reaffirmed accreditation of seven of the ten affected units and in November 2011 lifted

probation and reaffirmed accreditation of the three remaining units. In January 2013, the Board of Trustees of the University announced that if the exclusion pursuant to Act 7 of certain revenue sources from the basis upon which the UPR appropriation formula is calculated was eliminated, the stabilization fee would not be necessary. Due to the restoration of the original UPR formula basis, the Board of Trustees has approved elimination of the stabilization fee.

*Other public corporations.* Public corporations not described above have outstanding debt in the aggregate amount of $1.9 billion as of June 30, 2013. Debt service on $1.2 billion of such outstanding debt is being paid from legislative appropriations. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by PREPA and PRASA, whose properties are insured through arrangements and policies obtained by the respective entities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System, the Teachers Retirement System, the Judiciary Retirement System, the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System cover employees of the University and PREPA, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951, as amended ("Act 447"). Prior to the recent amendments made by Act 3 (discussed below), the Employees Retirement System was a hybrid defined benefit plan consisting of different benefit structures. Members who had entered the Employees Retirement System before January 1, 2000 participated in a defined benefit program. Members who began to participate prior to April 1, 1990 ("Act 447 Participants") were entitled to the highest benefits structure, while those who began to participate on or after April 1, 1990 ("Act 1 Participants") were subject to a longer

vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("Act 1 of 1990").

In 1999, Act 447 was amended to close the defined benefit program for new participants and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Prior to the amendment made by Act 3, under the System 2000 benefits structure, a participant was entitled to receive a lump-sum payment, which could be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed in cash by such participant. Act 3 amended the law to eliminate the lump sum distribution and substitute it for a life term annuity payable to the System 2000 Participant. This amendment was intended to alleviate the cash flow needs of the Employees Retirement System. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions for System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined contribution structure of System 2000, as amended by Act 3, will be paid from the same pool of assets of the Employees Retirement System. To the extent the assets of the Employees Retirement System are insufficient to cover all retirement benefits due to retired employees, the employees contributions made by the System 2000 Participants might not be available to be paid as retirement benefits to such participants.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined benefit pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

As previously mentioned, Act 3 constitutes a comprehensive reform of the Employees Retirement System. This reform was necessary to address the growing funding shortfalls which threatened the long term solvency of the Employees Retirement System. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below. The provisions of Act 3 and its projected impact on the funding shortfalls are discussed below.

*Governance.* Governance of the Employees Retirement System and the Judiciary Retirement System is vested in a Board of Trustees, which sets policy and oversees the operations consistent with applicable laws. There are eleven members of the Board, as follows: the Puerto

Rico Secretary of the Treasury (or her appointee), the President of GDB (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Commonwealth (or his appointee), as *ex officio* members; three members appointed to three-year terms by the Governor of the Commonwealth, two of whom must be members of the Employees Retirement System or the Judiciary Retirement System, with at least ten years of credited service; and a member who is a pensioner of the Employees Retirement System or the Judiciary Retirement System. The other two members will be the President of the Federation of Mayors and the President of the Association of Mayors. The Board is also responsible for appointing the Administrator of the Employees Retirement System and the Judiciary Retirement System.

Governance of the Teachers Retirement System is also vested in a Board of Trustees. There are nine members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or her appointee), the President of GDB (or his appointee) and the Puerto Rico Secretary of Education (or his appointee), as *ex officio* members; one member who is the President of a teacher's organization, or his representative designated by the Governor of the Commonwealth, with the advice and consent of the Senate, for a term of four years; three teachers of the Teachers Retirement System, one of which shall represent active teachers and two of which shall represent retired teachers, each appointed by the Governor of the Commonwealth, with the advice and consent of the Senate, for a term of four years; one member who is the President of the collective bargaining unit for teachers pursuant to Puerto Rico law (or his appointee); and a member who represents the public interest, appointed by the Governor of the Commonwealth, with the advice and consent of the Senate, for a term of four years. The Board is also responsible for appointing an Executive Director of the Teachers Retirement System.

*Covered Employees.* The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University and PREPA) and municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied.

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2013.

**Participant Data**
**(as of June 30, 2013)**

| | Active Members[1] | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[2] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| Act 447 Participants | 24,067 | 79,098 | 13,703 | 13,613 | 7,219 | 137,700 |
| Act 1 Participants | 44,460 | 7,823 | 2,231 | | 3,439 | 57,953 |
| System 2000 Participants | 64,807 | – | 37 | – | – | 64,844 |
| **Total** | 133,334 | 86,921 | 15,971 | 13,613 | 10,658 | 260,497 |
| **Teachers Retirement System** | 41,973 | 32,626 | 2,239 | 3,131 | 738 | 80,707 |
| **Judiciary Retirement System** | 364 | 348 | 0 | 59 | 47 | 818 |

[1] The data for active members of the Employees Retirement System is as of March 31, 2013.
[2] Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.

The Commonwealth central government (consisting of departments and agencies) is not the only employer participating in the Employees Retirement System. The municipalities and most public corporations participate as employers as well with respect to their employees. The assets contributed by the Commonwealth central government and all other employers, however, are invested together and not otherwise segregated. As of March 31, 2013, the central government was responsible for making contributions with respect to 79,302 active members of the Employees Retirement System, or 59.5% of total active members (consisting of 15,220 Act 447 Participants, 29,151 Act 1 Participants and 34,931 System 2000 Participants). Municipalities were responsible for 31,728, or 23.8%, active members (consisting of 4,373 Act 447 Participants, 9,110 Act 1 Participants and 18,245 System 2000 Participants). Public corporations were responsible for 22,297, or 16.7%, active members (consisting of 4,474 Act 447 Participants, 6,199 Act 1 Participants and 11,624 System 2000 Participants).

*Funding Requirements.* The Commonwealth central government is responsible for approximately 59% of total employer contributions to the Employees Retirement System, and the other 41% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% of total employer contributions to the Judiciary and Teachers Retirement Systems. Retirement and related benefits provided by the Retirement Systems, and required contributions to the Retirement Systems by employers and employees, are determined by law rather than by actuarial requirements. The Commonwealth is ultimately responsible for any funding deficiency with respect to central government employees in the three Retirement Systems.

As of July 1, 2011, after the adoption of Act 116 of July 6, 2011 ("Act 116"), the statutory employer contribution for the Employees Retirement System increased from a minimum of 9.275% to a minimum of 10.275% of covered payroll, and will continue to increase annually until fiscal year 2021. The employer contribution rate for fiscal year 2014 is 12.275%. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below. Covered payroll is the compensation regularly paid to active employees on which contributions to the Retirement Systems are computed and is generally equivalent to their annual salary. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the Retirement

System, plus administrative costs, and (ii) the contributions that employees are required to make to the Retirement System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

Required employee contributions for the Employees Retirement System vary according to how the individual employee's retirement benefits are coordinated with social security benefits. Act 3 increased the employee contribution from 8.275% to 10% of covered payroll.

As of July 1, 2011, after the adoption of Act 114 of July 5, 2011 ("Act 114"), the statutory employer contribution for the Teachers Retirement System increased from 8.5% to 9.5% of covered payroll, and will continue to increase annually until fiscal year 2021. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below. The statutory employee contribution for the Teachers Retirement System is 9.0% of covered payroll. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and the employee contribution is 8% of covered payroll.

The Constitution of the Commonwealth provides that, in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used to pay public debt before being used for other purposes. Public debt of the Commonwealth includes general obligation bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Attorney General of the Commonwealth, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. See DEBT. Furthermore, Puerto Rico law provides "priority norms" for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, as follows: first, the payment of the interest on, and amortization requirements for, public debt (Commonwealth general obligation and guaranteed debt); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain and certain commitments to protect the name, credit and good faith of the Commonwealth government; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes. Thus, according to these priority norms, contributions by the Commonwealth to the Retirement Systems expressly fall within the third priority. These priority norms do not apply to employer contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not "available resources" of the Commonwealth.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each Retirement System also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2012 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems. Act 3 amended

the various laws providing some of these System Administered Pension Benefits to reduce some of the amounts payable to existing retirees while eliminating the benefits for all future retirees (those retiring after June 30, 2013).

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been recovered by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. As of July 2013, the Teacher's Retirement System has received four installments. The final installment should be received in July 2014.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2013, the market value of the Employees Retirement System's investment portfolio was $3.853 billion, compared to $4.192 billion as of June 30, 2012. As of June 30, 2013 the investment portfolio was comprised of approximately 22% of equity investments, 40% of fixed income securities, 20% of internally managed mortgage and personal loans portfolio, 16% of short-term cash equivalents (excluding receivables), and 2% of other investments. The decrease in value of the investment portfolio since June 30, 2012 principally reflects the continued use of investment portfolio assets and the sale of a portion of the personal loan portfolio to pay current benefits as discussed below. Total assets as of June 30, 2013 and June 30, 2012 were $4.046 billion and $4.480 billion, respectively, and the total net assets for such periods were $711 million and $1.237 billion, respectively. See the Statements of Plan Net Assets and Changes in Plan Net Assets below.

As of June 30, 2013 the market value of the Teachers Retirement System's investment portfolio was $1.875 billion, compared to $2.048 billion as of June 30, 2012. As of June 30, 2013, the investment portfolio was comprised of approximately 28% of equity investments, 49% of fixed income securities, 22% of internally managed mortgage and personal loans portfolio, and 1% of other investments. The decrease in value of the investment portfolio since June 30, 2012 principally reflects the continued use of investment portfolio assets to pay current benefits as

discussed below. Total assets as of June 30, 2013 and June 30, 2012 were $1.978 billion and $2.297 billion, respectively, and total net assets for such periods were $1.908 billion and $2.099 billion, respectively. See Statements of Plan Net Assets and Changes in Plan Net Assets below.

As of June 30, 2013, the market value of the Judiciary Retirement System's investment portfolio was $63.3 million, compared to $62.6 million as of June 30, 2012. As of June 30, 2013, the investment portfolio was comprised of approximately 57% of equity investments, 35% of fixed income securities, 1% of internally managed mortgage and personal loans portfolio, and 7% of short-term cash equivalents (excluding receivables). The increase in value of the investment portfolio since June 30, 2012 reflects the increased proportion invested in equity assets, which have had a superior performance in the stated period. Total assets as of June 30, 2013 and June 30, 2012 were $63.6 million and $62.9 million, respectively, and total net assets for such periods were $59 million and $58 million, respectively. See Statements of Plan Net Assets and Changes in Plan Net Assets below

All the figures provided above for the fiscal year 2013 are preliminary and unaudited.

*Actuarial Valuations of the Retirement Systems.*   Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems began conducting annual actuarial valuations effective June 30, 2009. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2012.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System, as well as other financial information, are available on the website of the Administration of the Retirement Systems at www.retiro.pr.gov. Informational copies of the actuarial valuation report of the Teachers Retirement System, as well as other financial information, are available at the website of the Teachers Retirement System at www.srm.pr.gov. No information contained on these websites is deemed incorporated herein by reference.

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which

generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislative Assembly.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal years 2009 and 2012 was lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of the Retirement Systems for fiscal years 2010 and 2011, however, was higher than the assumed investment return used to prepare the actuarial valuations.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 9.8%, negative 15.9% and negative 18.0%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively. For fiscal year 2011, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 16.0%, 21.5% and 20.5%, respectively. For fiscal year 2012, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 5.1%, 2.0% and 2.5%, respectively.

The June 30, 2012 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method, with an assumed investment return of 6% per year, in the case of the Employees Retirement System, and 6.1% per year, in the case of the Judiciary Retirement System, and yearly salary increases of 3% per year. The actuarial valuations of the Employees Retirement System and the Judiciary Retirement System as of June 30, 2011 had assumed investment returns per year of 6.4% and 6.6%, respectively. Under the "projected unit credit" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected

service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service.

The June 30, 2012 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 5.95% per year and yearly salary increases of 3.5%. The actuarial valuation of the Teachers Retirement System as of June 30, 2011 had assumed investment returns of 6.4% per year. Under the "entry age normal" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Retirement Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

**Funding Status**
**Actuarial Valuations as of June 30, 2012**
**(in millions)**

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,237 | $27,646 | $26,409 | 4.5% | $3,570 | 739.6% |
| Teachers Retirement System | 2,099 | 12,351 | 10,252 | 17.0 | 1,293 | 792.8 |
| Judiciary Retirement System | 59 | 416 | 358 | 14.1 | 33 | 1,081.9 |
| Total | $3,395 | $40,413 | $37,018 | 8.4% | $4,896 | 756.1% |

[1] The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.
[2] The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.
[3] The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.
[4] The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.
[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.
[6] The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System. Totals may not add due to rounding.

Source: Actuarial valuation reports as of June 30, 2012 for each of the Retirement Systems.

**Historical Funding Status[1]**
**Actuarial Valuations as of the Indicated Fiscal Years**
**(in millions)**

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | $2,892 | $16,770 | $13,878 | 17.2% | $4,246 | 326.8% |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 21,370 | 19,703 | 7.8 | 3,818 | 516.1 |
| 2011 | 1,724 | 25,457 | 23,734 | 6.8 | 3,666 | 647.3 |
| 2012 | 1,237 | 27,646 | 26,409 | 4.5 | 3,570 | 739.7 |
| **Teachers Retirement System** | | | | | | |
| 2007 | $3,163 | $7,756 | $4,593 | 40.8% | $1,370 | 335.3% |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| 2011 | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| 2012 | 2,099 | 12,351 | 10,252 | 17.0 | 1,293 | 792.8 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | $81 | $259 | $177 | 31.5% | $31 | 566.6% |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| 2011 | 64 | 383 | 319 | 16.7 | 32 | 1002.2 |
| 2012 | 59 | 416 | 358 | 14.1 | 33 | 1081.9 |

[1] Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.
Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last four fiscal years.

## Schedule of Employer Contributions
## to Retirement Systems
## (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2010 | $1,460 | $534 | $926 | 36.6% |
| 2011 | 1,735 | 702 | 1,033 | 40.5 |
| 2012 | 2,019 | 590 | 1,429 | 29.2 |
| 2013 | 2,193 | 641 | 1,552 | 29.2 |
| **Teachers Retirement System** | | | | |
| 2010 | 477 | 166 | 311 | 34.8 |
| 2011 | 528 | 161 | 367 | 30.6 |
| 2012 | 659 | 175 | 484 | 26.4 |
| 2013 | 737 | 186 | 551 | 25.2 |
| **Judiciary Retirement System** | | | | |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.9 |
| 2012 | 34 | 11 | 23 | 34.1 |
| 2013 | 39 | 11 | 28 | 29.5 |
| **Total** | | | | |
| 2010 | 1,965 | 711 | 1,254 | 36.2 |
| 2011 | 2,293 | 874 | 1,419 | 38.1 |
| 2012 | 2,712 | 776 | 1,936 | 28.6 |
| 2013 | 2,969 | 838 | 2,131 | 28.2 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2012.
[2] The actual employer contributions for fiscal year 2013 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the actuarial valuations as of June 30, 2012.
[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.
Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2012 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

The Commonwealth recognized that, based on the then current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems was expected to continue to increase indefinitely into the future instead of being amortized, and that future scheduled contributions at the then current funding rates would not be sufficient to make future benefit payments when due. It recognized that additional funding from the Commonwealth would ultimately be necessary to cover such unfunded obligation. It was estimated that the Commonwealth would be responsible for approximately 62% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the three Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls and Issuance of Pension Obligation Bonds.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These

shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the Retirement System's assets.

During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), with interest rates ranging from 5.85% to 6.55%, for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds are limited, non-recourse obligations of the Employees Retirement System payable solely from, and secured solely by, the employer contributions. The maturity of the Pension Bonds is not subject to acceleration for any reason including non-payment of debt service on the bonds. As of June 30, 2013, approximately $2.9 billion of the Pension Bonds remain outstanding. The purpose of this offering was to increase the assets of the System available to invest and pay benefits.

The table below shows the funding shortfalls for each of the last four fiscal years and the projected funding shortfall for the following five fiscal years for each of the Retirement Systems. The funding shortfalls for fiscal years 2010, 2011 and 2012 are based on the audited financial statements for the Retirement Systems for those years and the funding shortfalls for fiscal years 2013 through 2018 are based on the actuarial valuation report as of June 30, 2012. The projected funding shortfalls for the Employees Retirement System for fiscal year 2014 thru 2018 reflect the impact of the amendments made by Act 3.

## Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[3] | Net Funding Shortfall[5] |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2010 | $727 | $(1,102) | $(375) |
| 2011 | 671[2] | (1,183) | (512) |
| 2012 | 689 | (1,528) | (839) |
| 2013 | 744 | (1,550) | (806) |
| 2014 | 1,043[4] | (1,567) | (524) |
| 2015 | 1,101[4] | (1,589) | (488) |
| 2016 | 1,160[4] | (1,607) | (447) |
| 2017 | 1,234[4] | (1,622) | (388) |
| 2018 | 1,307[4] | (1,632) | (325) |
| **Teachers Retirement System** | | | |
| 2010 | 249 | (499) | (250) |
| 2011 | 236 | (545) | (309) |
| 2012 | 247 | (572) | (325) |
| 2013 | 253 | (587) | (334) |
| 2014 | 275 | (606) | (331) |
| 2015 | 299 | (627) | (329) |
| 2016 | 323 | (651) | (328) |
| 2017 | 353 | (678) | (325) |
| 2018 | 384 | (705) | (321) |
| **Judiciary Retirement System** | | | |
| 2010 | 13 | (19) | (6) |
| 2011 | 13 | (19) | (6) |
| 2012 | 12 | (21) | (9) |
| 2013 | 13 | (22) | (9) |
| 2014 | 13 | (23) | (10) |
| 2015 | 13 | (24) | (11) |
| 2016 | 14 | (25) | (11) |
| 2017 | 14 | (26) | (12) |
| 2018 | 15 | (27) | (12) |

---

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits, except as described under footnote 4 below.  For fiscal years 2012 through 2016, estimated payroll is assumed to grow 3% annually and employer contributions include the rate increases provided for by Act 114 and Act 116.

[2] Excludes $162.5 million contributed to the Employees Retirement System on June 23, 2011 and invested in COFINA bonds pursuant to Act 96.

[3] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2010 and 2011 in the amounts of $188 million and $189 million, respectively, and for fiscal years 2012 through 2018, debt service of $167 million per year.

[4] Includes $140 million additional annual contribution and savings generated by the System from the difference between receiving the $2,000 per retiree contribution as required under Act 3 and paying $1,500 per retirees to cover certain System Administered Pension Benefits.

[5] Does not include interest income from asset investment. Totals may not add due to rounding.

Source: Information obtained from each of the Retirement Systems, Employees Retirement System projections made by Milliman, and the June 30, 2012 actuarial valuation reports.

The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants, administrative expenses and debt service are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income for a period of time, even after taking into account the increases in employer contributions provided for by Act 116, as described below and the amendments made by Act 3.  After the enactment of Act 3, the Employees Retirement System

expects to have a decreasing annual funding shortfall (after payment of debt service on the Pension Bonds) and this positive trend is expected to continue, as shown in the table above. Based on the Employees Retirement System's funding and disbursement projections made prior to the enactment of Act 3 (which reflected continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2011 stated that the Employees Retirement System was being rapidly defunded and projected that its net assets (total assets minus the Pension Bonds and other liabilities) would be depleted by fiscal year 2014 and its gross assets would be depleted by fiscal year 2019. This meant that during the period from fiscal year 2014 through fiscal year 2019, benefits were expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits or debt service on the pension obligation bonds. With the enactment of Act 3 and the incremental annual contributions from the General Fund required by Act 32 beginning in fiscal year 2014 and up to fiscal year 2033, it is projected that the gross assets will no longer be depleted. This incremental contribution will be determined on an annual basis based on actuarial studies to be performed by the System's actuaries.

The Teachers Retirement System has also covered funding shortfalls during the last decade through the sale of investment portfolio assets. For fiscal year 2014, the Teachers Retirement System expects to have a funding shortfall of approximately $331 million, even after taking into account the increases in employer contributions provided for by Act 114, as described below. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2012 states that the Teachers Retirement System is being gradually defunded and projects that its net and gross assets will be depleted by fiscal year 2021.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. For fiscal year 2013, the Judiciary Retirement System expects to have a funding shortfall of approximately $9 million, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2012 states that the Judiciary Retirement System is being defunded and projects that its net and gross assets will be depleted by fiscal year 2019.

In the case of the Teachers Retirement Systems and the Judiciary Retirement Systems, if the level of contributions to those systems and the level of benefits were to remain unchanged, the funding deficiencies are expected to continue to be covered with the investment income from, and the sale of, assets of such systems, thus continuing to deplete such assets. Based on the actuarial valuation reports, for the period from fiscal year 2014 to fiscal year 2021, the average annual funding deficiency is projected to be approximately $323 million for the Teachers Retirement System and approximately $12 million for the Judiciary Retirement System. Once the assets of those systems are depleted, the funding deficiency would have to be covered by the employers. As indicated above, it is estimated that the Commonwealth would have to cover substantially all of the funding deficiency of the Teachers Retirement System and the Judiciary Retirement System.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations (including the assumed investment rate of return), as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.  Act 3 was enacted in response to these recommendations with respect to the Employees Retirement System.

*Factors That Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*  Among the factors that have contributed most significantly to the deterioration of the Employees Retirement System are the following: (i) the inadequacy of the historical funding levels for the Retirement Systems; (ii) the enactment of special laws increasing pension benefits without providing the required funding source; (iii) the adoption of early retirement programs that were not adequately funded and that reduced the amount of contributions to the Retirement Systems; (iv) the increase in life expectancy in Puerto Rico; (v) the increase in the maximum amount of permitted personal loans to members; and (vi) the issuances of Pension Obligation Bonds by the Employee Retirement System.

Since their inception, the Retirement Systems have been inadequately funded by the government and the participating employees. On several occasions during the past decades, the Government has increased benefits without raising employer and employee contributions and failing to provide alternate methods to fund these increased benefits.

The Government has also approved several "Special Laws" granting additional benefits on top of those provided under Act 447 and Act 1. These benefits include: (i) a summer bonus; (ii) a medication bonus; (iii) a Christmas bonus; (iv) contributions to medical plans; (v) merit pensions; and (vi) cost of living adjustments (COLAs), among others. Although most of the benefits granted under the Special Laws are supposed to be funded by the General Fund or the other participating government employers, in fact these benefits are often not adequately funded.

The Government has also adopted various early retirement programs since 1994 to reduce the Government workforce. Although these measures reduced payroll expenses, which are a substantial portion of General Fund expenses, early retirement programs also reduced the Retirement Systems' revenues because they caused a decrease in employer and employee contributions. These programs were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the same funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality.

Another factor that contributed to the deterioration of the Retirement Systems was the increase in the average life expectancy in Puerto Rico and the United States from 59.5 years for men and 62.4 years for women in 1950 to 78 in 2008. This has caused retired employees to receive benefits for more years than originally expected.

Another cause for the current situation of the Employees Retirement Systems is its personal loan program. The Employees Retirement System offers and manages a program that offers personal loans, mortgage loans and loans for cultural travels for retirement plan participants. Participants may obtain up to $5,000 in personal loans for any use. In 2007, the System increased this amount to $15,000, which reduced the cash in the System by approximately $600 million between 2007 and 2010. This deficit has been covered by funds from the System itself and has required the liquidation of assets that would have otherwise been available to make pension payments. Due to the amount of personal loans originated during recent years, the System's loan portfolio now has a significant amount of illiquid assets. In an effort to improve the situation, in 2011, the Board of Trustees of the Employees Retirement System lowered the maximum loan amount back to $5,000 and, in 2012, it approved the sale of approximately $315 million in loans. With a balance of $539 million as of June 30, 2013, personal loans are equivalent to approximately 76% of the Employees Retirement System's net assets.

Finally, in 2008, the Employees Retirement System issued $2.9 billion in pension obligation bonds ("POBs"). The purpose of this offering was to increase the assets of the System available to invest and pay benefits. Unlike some other U.S. jurisdictions that have used this strategy, POBs are obligations of the Employees Retirement System itself and government employer contributions constitute the repayment source for the bonds.

*Impact of Funding Shortfall on the Commonwealth*.   The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems.   The depletion of the assets available to cover retirement benefits would require the Commonwealth and other participating employers to cover such funding deficiency. Due to its multi-year fiscal imbalances previously mentioned, however, the Commonwealth has been unable to make the actuarially recommended contributions to the Retirement Systems. If the measures taken or expected to be taken by the current Commonwealth administration fail to address the Retirement Systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the Retirement Systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the Retirement Systems' assets and a significant increase in the unfunded actuarial accrued liability.   Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth could have difficulty funding the annual required contributions if the measures taken or expected to be taken to reform the retirement systems do not have the expected effect. There may also be limitations on the Commonwealth's ability to change certain pension rights afforded to participants in the Retirement Systems.

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.*  In recent years the Retirement Systems have been evaluating measures to improve their financial solvency.  In order to maintain their long-term fiscal integrity and their ability to pay required benefits to their members, the Retirement Systems recognized that a combination of some or all of the following were necessary: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement

Systems. Because of the multi-year fiscal imbalances mentioned above, the Commonwealth was unable to make the actuarially recommended contributions to the Retirement Systems.

As a result of the work of various commissions and task forces established by the Commonwealth, in recent years several bills were submitted to, and evaluated by, the Legislative Assembly to address in part the Retirement Systems' financial condition. One of such bills was enacted as Act 96. On June 23, 2011, in accordance with Act 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The Commonwealth also enacted Act 114 and Act 116. These Acts provide an increase in employer contributions to the Employees Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employees Retirement System and the Teachers Retirement System would receive approximately $110 million and $40 million, respectively, in additional employer contributions during fiscal year 2014, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $76 million per fiscal year) to approximately $489 million and $192 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2014 were included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provided that the increases for fiscal years 2012, 2013 and 2014 would be paid for by the Commonwealth from the General Fund budget, representing approximately $20.3 million, $45 million and $72.5 million in fiscal years 2012, 2013 and 2014, respectively.

The tables below show the projected additional contributions to the Employees Retirement System and the Teachers Retirement System as a result of Act 114 and Act 116, based on the expected payroll assumptions used in the actuarial reports as of June 30, 2012.

## Projected Additional Employer Contributions
### Employees Retirement System
#### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2013 | 9.275% | 2.000% | 11.275% | $3,570 | $331 | $71 | $403 |
| 2014 | 9.275% | 3.000% | 12.275% | 3,659 | 339 | 110 | 449 |
| 2015 | 9.275% | 4.000% | 13.275% | 3,750 | 348 | 150 | 498 |
| 2016 | 9.275% | 5.000% | 14.275% | 3,844 | 357 | 192 | 549 |
| 2017 | 9.275% | 6.250% | 15.525% | 3,940 | 365 | 246 | 612 |
| 2018 | 9.275% | 7.500% | 16.775% | 4,039 | 375 | 303 | 678 |
| 2019 | 9.275% | 8.750% | 18.025% | 4,140 | 384 | 362 | 746 |
| 2020 | 9.275% | 10.000% | 19.275% | 4,244 | 394 | 424 | 816 |
| 2021 | 9.275% | 11.250% | 20.525% | 4,350 | 403 | 489 | 893 |

## Projected Additional Employer Contributions
### Teachers Retirement System
#### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2013 | 8.50% | 2.00% | 10.50% | $1,293 | $110 | $26 | $136 |
| 2014 | 8.50% | 3.00% | 11.50% | 1,338 | 114 | 40 | 154 |
| 2015 | 8.50% | 4.00% | 12.50% | 1,385 | 118 | 55 | 173 |
| 2016 | 8.50% | 5.00% | 13.50% | 1,434 | 122 | 72 | 194 |
| 2017 | 8.50% | 6.25% | 14.75% | 1,484 | 126 | 93 | 219 |
| 2018 | 8.50% | 7.50% | 16.00% | 1,536 | 131 | 115 | 246 |
| 2019 | 8.50% | 8.75% | 17.25% | 1,589 | 135 | 139 | 274 |
| 2020 | 8.50% | 10.00% | 18.50% | 1,645 | 140 | 165 | 304 |
| 2021 | 8.50% | 11.25% | 19.75% | 1,703 | 145 | 192 | 336 |

A fourth bill with respect to the Employees Retirement System was enacted as Act No. 196 of September 18, 2011, which authorized the Employees Retirement System to sell or pledge personal and mortgage loans in its portfolio. This bill also set up a loan program for members of the Employees Retirement System through certain financial institutions, while also limiting the amount of employee contributions that a member can pledge as collateral for a loan.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowered the maximum amount of those loans from $15,000 to $5,000. This change is expected to improve gradually the Employees Retirement System's liquidity.

On July 2, 2010, the Commonwealth enacted Act 70 ("Act 70"), which is designed to reduce government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria who opted for early retirement by December 31, 2012 receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. As of June 30, 2013, approximately 5,846 employees participated of the benefits provided by these provisions of Act 70.

*Act 3.* Notwithstanding all of the above legislative and administrative measures directed at addressing the funding shortfall of the Retirement Systems, the funding situation of the Employees Retirement System presented a serious long term challenge that required more urgent and sweeping changes to improve the financial health and long term solvency of the Employees Retirement System. With that objective in mind, on April 4, 2013, the new administration of Governor Alejandro Garcia Padilla succeeded in enacting Act 3.

The most important aspects of the changes effected by Act 3 are the following:

1. In the case of active employees who are Act 447 Participants and Act 1 Participants, all retirement benefits accrued through June 30, 2013 will be frozen, and thereafter all future benefits will accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity.

2. The retirement age for Act 447 Participants will be gradually increased from age 58 to age 61.

3. The retirement age for current System 2000 Participants is gradually increased from age 60 to age 65.

4. The retirement age for new employees is increased to age 67, except for new state and municipal police officers, firefighters, and custody officers, which will be age 58.

5. The employee contribution will be increased from 8.275% to 10%.

6. In the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity.

7.     With respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus is eliminated.  Future retirees will not receive any post-employment benefits.

8.     Disability benefits will be eliminated and substituted by a mandatory disability insurance policy.

9.     Survivor benefits will be  modified.

*Statements of Plan Net Assets and Changes in Plan Net Assets*.  The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2010, 2011, 2012 and 2013.

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statements of Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
**(in thousands)**

| | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CASH AND SHORT TERM INVESMENTS** | | | | |
| Cash and Cash Equivalents | $80,928 | $143,364 | $220,852 | $54,175 |
| Cash with Fiscal Agent | 124,574 | 59,250 | | |
| Collateral for Security Lending | 167,500 | 54,870 | 134,319 | 110,931 |
| Deposits with GDB: | | | | |
| Unrestricted | 55,324 | 113,313 | 51,396 | 51,446 |
| Restricted | 30,838 | 233,931 | 411,946 | 741,082 |
| Restricted Cash Bonds | 165,894 | 166,436 | 170,653 | 172,226 |
| Total Cash and Short Term Investment | 625,058 | 771,164 | 989,166 | 1,29,860 |
| | | | | |
| **SECURITIES LENDING, COLLATERAL INVESTED** | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 1,314,407 | 1,370,694 | 814,408 | 563,454 |
| Stocks | 860,516 | 793,330 | 1,582,242 | 1,492,386 |
| Private Equity Investments | 61,842 | 57,371 | 65,457 | 55,307 |
| COFINA investment | 229,819 | 245,339 | | |
| Total Investments | 2,466,584 | 2,466,733 | 2,462,107 | 2,111,147 |
| | | | | |
| **LOANS TO PLAN MEMBERS** | | | | |
| Mortgage | 153,539 | 152,666 | 148,156 | 141,588 |
| Personal | 538,504 | 724,122 | 1,048,984 | 1,018,498 |
| Cultural Trips | 64,902 | 75,308 | 75,197 | 63,729 |
| PEC | 3,257 | 2,961 | 3,044 | 2,340 |
| Total Loans to Plan Members | 760,202 | 955,057 | 1,275,381 | 1,226,155 |
| Investment in PRTA Holdings | | | | |
| Total cash, investments and loans to plan members | 3,851,844 | 4,192,955 | 4,726,654 | 4,467,162 |
| | | | | |
| **RECEIVABLES:** | | | | |
| Employers | 111,154 | 111,975 | 184,152 | 273,139 |
| General Fund | 4,519 | 12,697 | 6,147 | 11,222 |
| Judiciary Retirement System | 2,096 | 1,344.63 | 881.00 | 19,138 |
| Investment Sales | 1,220 | 87,261 | 9,546 | 12,189 |
| Accrued Interest | 11,494 | 13,044 | 7,594 | 6,597 |
| Dividends Receivable | | | 4,595 | 3,893 |
| Other | 17,015 | 12,387 | | |
| Total Receivables | 147,498 | 238,709 | 212,915 | 326,178 |
| | | | | |
| CAPITAL ASSETS | 10,910 | 11,195 | 8,951 | 8,964 |
| OTHER ASSETS | 5,069 | 5,375 | 6,375 | 7,224 |
| Prepaid Bond Cost | 29,981 | 31,077 | 32,172 | 33,267 |
| Construction in Progress | 472 | 472 | | |
| Total assets | 4,045,774 | 4,479,783 | 4,987,067 | 4,842,795 |
| **LIABILITIES** | | | | |
| Book overdraft | | | 62,843 | 22,933 |
| Short Term Obligations | | | | |
| Payables for securities lending | 167,500 | 54,870 | 134,319 | 110,931 |
| Funds of Mortgage Loans and Guarantee | | | | |
| Insurance Reserve for Loans | 8,065 | 8,351 | 9,596 | 8,964 |
| Investment Purchases | 85 | 82,384 | 1,854 | 5,277 |
| Accounts Payable and Accrued Liabilities | 10,149 | 27,718 | 12,923 | 12,250 |
| Line of Credit | | | | |
| Bonds Payable | 3,051,189 | 3,026,593 | 3,003,482 | 2,981,775 |
| Other Liabilities | 71,400 | 28,457 | 24,363 | 21,798 |
| Bonds Interest Payable | 13,877 | 13,877 | 13,876 | 13,876 |
| Accounts Payable Law 70 | 12,140 | | | |
| Total Liabilities | 3,334,405 | 3,242,251 | 3,263,256 | 3,177,804 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits | $711,369 | $1,237.532 | $1,723,811 | $1,664,991 |

Totals may not add due to rounding.

*Preliminary, unaudited numbers

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statements of Changes in Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
**(in thousands)**

| | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer: | $ 419,281 | $399,913 | $349,207 | $381,243 |
| Participating employees | 317,650 | 316,178 | 322,008 | 345,265 |
| Other Special Laws | 191,054 | 192,539 | 170,369 | 171,843 |
| Early Retirement | | 812 | 305 | 3,399 |
| Special Laws 127 | 35 | | 17,000 | 17,000 |
| COFINA Investment | | | 162,500 | |
| Total Contributions | 928,020 | 909,442 | 1,021,389 | 918,750 |
| | | | | |
| Investment (loss) Income: | | | | |
| Realized Gain or Loss | 52,078 | 263,992 | 472,076 | 148,173 |
| Unrealized Gain or Loss | 58,798 | (164,981) | 67,838 | 67,838 |
| Dividend Income | 204 | 2,095 | 7,344 | 10,663 |
| Interest Income | 127,398 | 165,082 | 172,783 | 179,585 |
| Total | 238,478 | 266,188 | 652,203 | 406,259 |
| | | | | |
| Less Investment Expense: | 3,140 | 684 | 6,483 | (7,649) |
| Insurance Premium | | | | 31,783 |
| Other Income | 12,777 | 24,728 | 49,257 | 31,783 |
| Total Additions | 1,176,135 | 1,199,674 | 1,716,366 | 1,349,143 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 1,219,835 | 1,170,749 | 1,133,926 | 1,047,965 |
| Special Laws 127 | | | 17,000 | 17,000 |
| Benefits under Special Laws | 191,054 | 192,539 | 170,369 | 171,843 |
| Death Benefits | 9,904 | 13,604 | 7,932 | 12,968 |
| Refunds of Contributions: | | | | |
| Employers | 970 | 1,228 | 992 | 1,469 |
| Participating Employees | 49,302 | 51,000 | 90,203 | 43,677 |
| Personal Loans Adjustment | | | | |
| Law 70 | 74 | | | |
| Other Expenses | 9,701 | 15,770 | 13,199 | 10,255 |
| Administrative Expenses | 29,226 | 50,327 | 34,583 | 33,063 |
| Interest on Bonds | 192,230 | 190,737 | 189,342 | 188,055 |
| Total Deductions | 1,702,296 | 1,685,954 | 1,657,546 | 1,526,295 |
| | | | | |
| Net (decrease) Increase | (526,161) | (486,280) | 58,820 | (177,152) |
| Net Assets Held in Trust for Pension Benefits | | | | |
| Beginning of the Year | 1,237,531 | 1,723,811 | 1,664,991 | 1,842,143 |
| End of Year | $711,370 | $1,237,531 | $1,723,811 | $1,664,991 |

Totals may not add due to rounding.
*Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
**(in thousands)**

| | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $54,534 | $321,635 | $97,269 | $24,019 |
| Cash with fiscal agent | 967 | 12,925 | 110 | - |
| Collateral for Security Lending | 47,258 | 20,528 | 70,938 | 48,673 |
| Cash deposited with GDB | 3,298 | 3,295 | 3,291 | 3,288 |
| Total Cash | 106,057 | 358,837 | 171,608 | 75,980 |
| Investments at fair value: | | | | |
| Bonds and notes | 862,063 | 682,728 | 591,769 | 397,109 |
| Stocks | 524,129 | 729,967 | 1,211,084 | 1,295,232 |
| Total investment at fair value | 1,386,192 | 1,412,695 | 1,802,853 | 1,692,341 |
| Other investments: | | | | |
| Mortgage notes acquired from third parties | | | | |
| Private equity investments | 19,102 | 19,221 | 25,630 | 26,683 |
| Total investments | 1,405,294 | 1,431,916 | 1,828,483 | 1,719,024 |
| Loans to plan members: | | | | |
| Mortgage | 146,917 | 135,698 | 128,312 | 119,937 |
| Personal | 262,239 | 266,303 | 276,692 | 288,463 |
| Cultural trips | 1,877 | 1,811 | 1,660 | 1,481 |
| Total loans to plan members | 411,032 | 403,812 | 406,664 | 409,881 |
| Total investments and loans | 1,816,326 | 1,835,728 | 2,235,147 | 2,128,905 |
| Accounts receivable: | | | | |
| Receivables for investments sold | 57 | 38,743 | 2,230 | 332 |
| Accrued interest and dividends receivable | 7,861 | 7,603 | 3,982 | 4,584 |
| Other | 27,648 | 34,404 | 44,883 | 56,085 |
| Total accounts receivable | 35,566 | 80,750 | 51,185 | 61,001 |
| Property and equipment, net | 19,335 | 20,885 | 22,204 | 22,970 |
| Other assets | 661 | 832 | 472 | 832 |
| Total Assets | 1,977,945 | 2,296,578 | 2,480,616 | 2,289,688 |
| **LIABILITIES** | | | | |
| Investments purchased | 65 | 153,714 | 1,701 | 2,722 |
| Payable for securities lending | 47,258 | 20,528 | 70,938 | 48,673 |
| Cash overdraft in cash with fiscal agent | - | - | - | 2,199 |
| Accounts payable | 2,101 | 2,150 | 1,530 | 1,476 |
| Accrued expenses | 13,560 | 14,087 | 13,321 | 6,184 |
| Escrow fund of mortgage loans and guarantee insurance reserve for loans to plan members | 6,410 | 5,773 | 6,322 | 5,763 |
| Other liabilities | 792 | 1,110 | 941 | 694 |
| Total liabilities | 70,186 | 197,362 | 94,753 | 67,711 |
| **Net Assets Held in Trust for Pension Benefits** | $1,907,758 | $2,099,216 | $2,385,863 | $2,221,977 |

Totals may not add due to rounding.
*Preliminary, unaudited numbers

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
(in thousands)

| | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Participating Employees | $119,162 | $121,773 | $123,297 | $129,888 |
| Employer | 133,369 | 123,614 | 112,071 | 118,127 |
| Contributions transferred from other systems** | 1,680 | 1,476 | 828 | 1,265 |
| Special | 54,123 | 53,405 | 47,753 | 46,572 |
| Total contributions | 308,334 | 300,268 | 283,949 | 295,852 |
| Investment income: | | | | |
| Interest income | 71,206 | 56,306 | 57,008 | 61,303 |
| Dividend income | 2,693 | 4,342 | 6,915 | 10,111 |
| Net appreciation (depreciation) in fair value of investments | 85,926 | (20,134) | 421,923 | 203,265 |
| Total investment income | 159,825 | 40,514 | 485,846 | 274,679 |
| Less investment expense | (2,843) | (3,361) | (4,682) | (4,735) |
| Net investment income | 156,981 | 37,153 | 481,164 | 269,944 |
| Other income | 1,015 | 1,374 | 968 | 53,771 |
| Total additions | $466,330 | $338,795 | $766,081 | $619,567 |
| **DEDUCTIONS:** | | | | |
| Benefit paid to participants: | | | | |
| Annuities and death benefits | 601,120 | 547,955 | 513,874 | 470,683 |
| Special benefits | 27,162 | 48,492 | 48,286 | 47,870 |
| Refunds of contributions | 7,666 | 5,220 | 8,465 | 7,847 |
| Administrative expenses | 21,840 | 23,775 | 31,570 | 28,783 |
| Total deductions | 657,788 | 625,442 | 602,195 | 555,183 |
| Net increase in net assets held in trust pension benefits | (191,458) | (286,647) | 163,886 | 64,384 |
| **Net assets held in trust for pension benefits** | | | | |
| Beginning of year | 2,099,216 | 2,385,863 | 2,221,977 | 2,157,593 |
| **End of year** | $1,907,759 | $2,099,216 | $2,385,863 | $2,221,977 |

Totals may not add due to rounding.
*Preliminary, unaudited numbers

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
**(in thousands)**

| | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and Investments: | | | | |
| Cash and Cash Equivalents | $1,663 | $11,543 | $6,409 | $4,007 |
| Cash Deposited with GDB or Treasury Department: | 915 | 745 | 1,011 | 28 |
| Unrestricted | | | | |
| Collateral from Securities Lending | 2,058 | 1,088 | 3,218 | 1 |
| Total Cash | 4,636 | 13,376 | 10,638 | 4,037 |
| | | | | |
| Receivables: | | | | |
| Accrued Interest | 191 | 255 | 263 | 271 |
| Investment Sales | | | - | 41 |
| Other | 27 | 27 | 27 | 27 |
| Total receivables | 218 | 282 | 290 | 339 |
| | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 22,016 | 30,524 | 39,954 | 25,973 |
| Stocks | 36,338 | 18,730 | 22,136 | 50,275 |
| Total Investments | 58,354 | 48,730 | 62,090 | 76,248 |
| | | | | |
| Loans and Interest Receivable from Members: | | | | |
| Mortgage | 281 | 4 | 17 | 20 |
| Personal | 56 | 383 | 750 | 702 |
| Cultural Trips | 3 | 81 | 78 | 47 |
| Total Loans to Plan Members | 340 | 471 | 844 | 769 |
| Total cash, investments and loans to plan members | 63,548 | 62,859 | 73,863 | 81,393 |
| | | | | |
| **LIABILITIES** | | | | |
| Due to Treasury Department | | 1,604 | 5,560 | 5,842 |
| Due to the Employees Retirement System | 1,884 | 1,345 | 881 | 19,138 |
| Collateral from Securities lending | 2,058 | 1,088 | 3,218 | |
| Escrow Funds to plan Members and Guarantee Insurance | 65 | 65 | 66 | 63 |
| Investment Purchases | 413 | | 2 | 868 |
| Other Liabilities | | 170 | 161 | 72 |
| Total Liabilities | 4,420 | 4,271 | 9,888 | 25,983 |
| **Net Assets Held in trust for Pension Benefits** | **$59,128** | **$58,588** | **$63,975** | **$55,410** |

Totals may not add due to rounding.

*Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets**
**As of June 30, 2010, 2011, 2012 and 2013**
**(in thousands)**

|  | 2013* | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $10,034 | $10,088 | $9,966 | $10,021 |
| Participating employees | 2,825 | 2,943 | 2,789 | 3,104 |
| Special Laws | 1,944 | 500 | 629 | 629 |
| Total Contributions | 14,803 | 13,531 | 13,384 | 13,754 |
| Investment Income: | | | | |
| Realized Gain or Loss | 1,926 | 7,354 | 12,928 | 5,644 |
| Unrealized Gain | 3,870 | (6,837) | | 1,741 |
| Dividend Income | | 7 | 176 | 211 |
| Interest Income | 953 | 1,361 | 1,352 | 1,284 |
| Total | 6,749 | 1,885 | 14,456 | 8,880 |
| Less Investment Expense | 72 | (166) | (162) | (164) |
| Other Income | 2 | 18 | 10 | 804 |
| Net Investment Income | 6,679 | 1,736 | 14,628 | 9,520 |
| Total Additions | 21,482 | 15,266 | 27,688 | 23,274 |
| **DEDUCTIONS:** | | | | |
| Annuities | 18,509 | 19,395 | 18,627 | 17,268 |
| Benefits Under Special Laws | 1,944 | 679 | | 629 |
| Refunds to Participating Employees | | 63 | | -- |
| Administrative Expenses | 488 | 516 | 496 | 533 |
| Total Deductions | 20,941 | 20,654 | 19,123 | 18,430 |
| Net Increase | 541 | (5,387) | 8,565 | 4,844 |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 58,588 | 63,975 | 55,410 | 50,566 |
| **End of Year** | **$59,129** | **$58,588** | **$63,975** | **$55,410** |

Totals may not add due to rounding.
*Preliminary, unaudited numbers.

# POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

The Commonwealth also provides non-pension post-employment benefits that include a medical insurance plan contribution. These benefits, which in the case of the Employees Retirement System amounted to $250 million for fiscal year 2012 (of which $95 million are attributed to a medical insurance plan) and $257 million for fiscal year 2013 (of which $101 million are attributed to a medical insurance plan), are funded by each employer on a pay-as-you-go basis from the General Fund, which means that the Commonwealth does not pre-fund or otherwise establish a reserve or other pool of assets against these post-employment expenses. These post-employment benefits are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2012, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.9 billion.

Act 3 eliminated all the non-pension post-employment system benefits to future retirees of the Employees Retirement System and reduced some of the benefits paid to current retirees of the Employees Retirement System. Act 3 did not change the medical insurance plan contribution for current retirees which amounts to up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2009 | - | $1,633 | $1,633 | 0% | $4,293 | 38.0% |
| 2010 | - | 1,699 | 1,699 | 0 | 3,818 | 44.5 |
| 2011 | - | 1,758 | 1,758 | 0 | 3,666 | 48.0 |
| 2012 | - | 2,121 | 2,121 | 0 | 3,570 | 59.4 |
| **Teachers Retirement System** | | | | | | |
| 2009 | - | 750 | 750 | 0 | 1,418 | 52.9 |
| 2010 | - | 694 | 694 | 0 | 1,370 | 50.7 |
| 2011 | | 706 | 706 | 0 | 1,320 | 53.5 |
| 2012 | - | 797 | 797 | 0 | 1,293 | 61.7 |
| **Judiciary Retirement System** | | | | | | |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010 | - | 6 | 6 | 0 | 32 | 18.1 |
| 2011 | - | 6 | 6 | 0 | 32 | 18.3 |
| 2012 | - | 7 | 7 | 0 | 33 | 19.9 |

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

II-114

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits, other than pensions administered by each of the Retirement Systems, for the last five fiscal years.

### Schedule of Employer Contributions to Retirement Systems
### on Account of Post-Employment Benefits Other Than Pensions
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2009 | $112 | $87 | $25 | 77.7% |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 129 | 94 | 35 | 72.3 |
| 2012 | 134 | 95 | 39 | 70.8 |
| 2013 | 155 | 113 | 42 | 72.9 |
| **Teachers Retirement System** | | | | |
| 2009 | 38 | 28 | 10 | 73.2 |
| 2010 | 42 | 28 | 14 | 66.9 |
| 2011 | 40 | 32 | 8 | 79.1 |
| 2012 | 41 | 37 | 4 | 90.0 |
| 2013 | 46 | 35 | 11 | 77.0 |
| **Judiciary Retirement System** | | | | |
| 2009 | 0.4 | 0.3 | 0.1 | 61.4 |
| 2010 | 0.5 | 0.3 | 0.2 | 60.4 |
| 2011 | 0.5 | 0.3 | 0.2 | 58.6 |
| 2012 | 0.6 | 0.3 | 0.3 | 56.3 |
| 2013 | 0.6 | 0.3 | 0.3 | 50.2 |
| **Total** | | | | |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 169.5 | 126.3 | 43.2 | 74.5 |
| 2012 | 175.6 | 132.3 | 43.3 | 75.3 |
| 2013 | 201.6 | 148.3 | 53.3 | 73.6 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2012.

[2] The actual employer contributions for fiscal year 2013 are based on the expected pay-as-you-go amounts for the post-employment benefits, other than pensions, as set forth in the actuarial valuations as of June 30, 2012.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

## COMMONWEALTH AUDITED FINANCIAL STATEMENTS

**General**

For fiscal year 2012, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated September 16, 2013 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2012). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The CAFR for fiscal year 2012, which includes the basic financial statements of the Commonwealth for fiscal year 2012, was filed by the Commonwealth with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System ("EMMA") on September 16, 2013, which is after the Commonwealth's May 1 deadline, established in its continuing disclosure undertakings pursuant to Rule 15c2-12 of the Securities and Exchange Commission. The Commonwealth was unable to finalize its audited financial statements for fiscal year 2012 on time due to (i) delays in the audit of such financial statements as a result of the government transition process, (ii) the adoption of new government accounting pronouncements, (iii) the restatement of the financial statements of the PRPA, a discretely presented component unit of the Commonwealth, and (iv) the failure of the University of Puerto Rico, a discretely presented component unit of the Commonwealth, to finalize its audited financial statements. These discretely presented component units of the Commonwealth are generally separate legal entities that are part of the Commonwealth's financial reporting entity under government accounting standards. The Commonwealth is evaluating the implementation of measures to ensure future timely filings of its audited financial statements.

**Prior Non-Compliance with Continuing Disclosure Obligations**

The Commonwealth has entered into several continuing disclosure undertakings in accordance with SEC Rule 15c2-12 in connection with its bond issuances. Although the Commonwealth has filed all the reports and financial statements required to be filed, some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.

The Commonwealth's audited financial statements for the fiscal years ended June 30, 2006, 2007 and 2008 were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were also filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units of the Commonwealth.

The Commonwealth Reports for the fiscal years ended June 30, 2008 and June 30, 2012, were filed after the Commonwealth's filing deadline.

In 2011 and 2012, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal years 2010 and 2011.

The Commonwealth had recently established certain policies and procedures that it believed would ensure full and timely compliance with its continuing disclosure obligations. Such policies and procedures included: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent of the Commonwealth, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

In light of the Commonwealth's continuing difficulties in the timely filing of the CAFR and the Commonwealth Report notwithstanding the establishment of the policies and procedures described above, the Commonwealth is reviewing how to improve such policies and procedures to ensure timely compliance in the future with its continuing disclosure obligations.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

**Summary and Management's Discussion of General Fund Results**

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2009, 2010, 2011, 2012 and 2013.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal year 2014 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2009 | 2010 | 2011 | 2012 | 2013[13] |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Income Taxes: | | | | | |
| Individuals | $2,648,261 | $2,593,598 | $2,187,080 | $2,129,434 | $2,079,285 |
| Corporations | 1,375,596 | 1,682,321 | 1,677,345 | 1,460,354 | 1,286,506 |
| Partnerships | 1,839 | 1,688 | 3,249 | 1,333 | 756 |
| Withheld from non-residents | 1,081,739 | 830,352 | 1,000,428 | 890,761 | 982,896 |
| Tollgate taxes | 19,372 | 15,034 | 12,607 | 27,678 | 8,903 |
| Interest | 11,738 | 9,902 | 6,985 | 6,807 | 5,425 |
| Dividends | 48,663 | 29,774 | 26,756 | 35,087 | 34,064 |
| Total income taxes | 5,187,208 | 5,162,669 | 4,914,450 | 4,551,454 | 4,397,835 |
| Sales and use tax | 797,194 | 540,348 | 531,837 | 540,026 | 552,778 |
| Commonwealth excise taxes: | | | | | |
| Alcoholic beverages | 277,401 | 284,796 | 280,963 | 292,614 | 282,335 |
| Foreign (Act 154) | - | - | 677,566 | 1,875,823 | 1,677,291 |
| Cigarettes | 129,429 | 182,501 | 201,965 | 172,155 | 185,309 |
| Motor vehicles | 310,920 | 350,764 | 364,170 | 386,468 | 410,831 |
| Other excise taxes | 86,874 | 77,978 | 77,649 | 77,504 | 71,534 |
| Total Commonwealth excise taxes | 804,624 | 896,039 | 1,602,312 | 2,804,564 | 2,627,300 |
| Property taxes | 1,011 | 227,812 | 246,619 | 44,438 | 34,035 |
| Inheritance and gift taxes | 5,064 | 3,617 | 3,101 | 5,465 | 1,834 |
| Licenses | 96,423 | 95,768 | 81,381 | 76,646 | 80,835 |
| Other: | | | | | |
| Traditional lottery | 51,480 | 42,826 | 46,165 | 38,225 | 24,322 |
| Electronic lottery | 75,213 | 80,006 | 55,690 | 56,163 | 38,876 |
| Miscellaneous non-tax revenues | 284,436 | 314,754 | 346,580 | 240,857 | 498,541[12] |
| Total Other | 411,129 | 437,586 | 448,435 | 335,245 | 561,739 |
| Total revenues from internal sources | 7,302,653 | 7,363,839 | 7,828,135 | 8,357,838 | 8,256,356 |
| Revenues from non-Commonwealth sources: | | | | | |
| Federal excise taxes[1] | 404,265 | 352,301 | 330,181 | 302,308 | 245,879 |
| Customs | 3,269 | - | - | 7,739 | - |
| Total revenues from non-Commonwealth sources | 407,534 | 352,301 | 330,181 | 310,047 | 245,879 |
| Total revenues | 7,710,187 | 7,716,140 | 8,158,316 | 8,667,885 | 8,502,235 |
| Other Income (refunds)[2] | (247,975) | (125,151)[8] | (267,105) | (206,384) | (208,000) |
| (Transfer) Refunding to Redemption Fund[3][11] | (607,305) | (447,312) | (722,456) | (745,201) | (748,000) |
| Proceeds of notes and other borrowings[4][6][13] | 3,982,893 | 2,375,000 | 2,968,286 | 2,746,192 | 2,476,251 |
| Repayment of notes and other borrowings[5][7][10] | (3,782,705) | (2,155,634) | (2,269,645) | (2,203,510) | (1,440,638) |
| Receipt of COFINA Bond Proceeds[9] | 3,192,516 | 2,688,173 | 1,551,965 | 952,615 | 410,979 |
| **Total Resources** | 10,247,611 | 10,051,212 | 9,419,361 | 9,211,597 | 8,992,827 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,422,469 | 3,581,751 | 3,505,673 | 4,378,425 | 3,580,752 |
| Personal services | 5,273,590 | 4,995,454 | 4,643,299 | 4,326,542 | 4,133,567 |
| Other services | 859,323 | 822,019 | 746,755 | 903,825 | 819,528 |
| Materials and supplies | 109,386 | 85,906 | 72,663 | 148,593 | 78,164 |
| Equipment purchases | 51,204 | 44,381 | 60,257 | 101,303 | 45,482 |
| Capital outlays and other debt service | 211,498 | 110,850 | 46,822 | 52,520 | 65,507 |
| Prior year disbursements | - | - | - | - | - |
| Total expenditures | 9,927,470 | 9,640,361 | 9,075,469 | 9,911,208 | 8,723,000 |
| **Total resources less expenditures** | $320,141 | $410,851 | $343,892 | $(699,611) | $269,827 |
| **Ending cash balance** | $(345,715) | $ 65,136 | $409,028 | $(290,583) | $ (20,756) |

(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rum in foreign markets.
(2) Consists of transfers of rental payments to PBA, net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(3) Consists of amounts to pay principal of, and interest on, general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(6) Includes proceeds of $432.6 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2011 A, 2011 B and 2012 A, which were privately placed.
(7) Includes approximately $233 million for payment of Public Improvement Refunding Bonds Series 2011 C and 2011 D paid with transfers from COFINA.
(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.
(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund.
(10) Includes payment of refunded bonds of $394.5 million.
(11) Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(12) Includes $240 million transferred from the Redemption Fund to the General Fund, for excess of derivative instruments collaterals not required in accordance with the derivative instruments agreements
(13) Preliminary, unaudited and subject to change.

Source: Treasury Department

*General Fund Preliminary Revenues for Fiscal Year 2013 Compared to Fiscal Year 2012*

Preliminary General Fund total revenues are expected to be approximately $8.697 billion. This total includes (i) $8.502 billion in General Fund revenues (consisting of $8.198 billion of operating revenues, $63.2 million of revenues from the electronic and traditional lotteries that are available to the General Fund, and $240 million transferred from the Redemption Fund), (ii) $117 million of revenues from property taxes that are available to pay general obligation bonds, and (iii) $78 million of excess funds transferred from COFINA.

The $8.697 billion in General Fund total revenues for fiscal year 2013 represents a decrease of $86 million, or 0.9%, from fiscal year 2012 General Fund total revenues. The major changes from fiscal year 2012 were: (i) decreases in income taxes from corporations of $173.8 million, or 12%, (ii) an increase of $92.1 million in taxes withheld from non-residents, (iii) a decrease of $198.5 million from the excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, and (iv) an increase of $257.6 million in miscellaneous non tax revenues, mostly related to the transfer of approximately $240 million in excess funds in the Redemption Fund to the General Fund.

General Fund total expenses (on a cash basis) for fiscal year 2013 amounted to $9.987 billion, consisting of $8,723 million of operational expenses, $383 million in rent payments to PBA and $880.8 million of other financing uses (mostly debt service payments).

*General Fund Revenues for Fiscal Year 2012 Compared to Fiscal Year 2011*

General Fund total revenues for fiscal year 2012 were $8.783 billion. This total includes (i) $8.668 billion in General Fund revenues (consisting of $8.573 billion of operating revenues and $94.0 million of revenues from the electronic and traditional lotteries that are available to the General Fund) and (ii) $116 million of revenues from property taxes that are available to pay general obligation bonds.

The $8.783 billion in General Fund total revenues for fiscal year 2012 represents an increase of $440 million, or 5.3%, from fiscal year 2011 revenues. The major changes from fiscal year 2011 were: (i) decreases in income taxes from corporations of $216.9 million, or 12.9%, (ii) a decrease of $109.7 million in taxes withheld from non-residents, (iii) a decrease of $202.1 million in the temporary special property tax, (iv) a decrease of $113.6 million in non-tax revenues, and (iv) an additional $1.198 billion from the excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154.

General Fund total expenses for fiscal year 2012 amounted to $11.158 billion, consisting of $9.911 billion of operating expenditures, $331 million in rent payments to the PBA, and $915.9 million of other financing uses (mostly debt service). These expenses were $1.014 billion or 10% higher than the total expenses for fiscal year 2011.

*General Fund Revenues for Fiscal Year 2011 Compared to Fiscal Year 2010*

General Fund total revenues for fiscal year 2011 were $8.343 billion. This total includes (i) $8.158 billion in General Fund revenues (consisting of $7.994 billion of operating revenues and $ 101.9 million of revenues from the electronic and traditional lotteries that are available to the General Fund), (ii) $122.2 million of revenues from property taxes that are available to pay general obligation bonds, and (iii) $125.3 million of excess funds transferred from COFINA.

The $8.343 billion in total General Fund revenues for fiscal year 2011 represents an increase of $311 million, or 3.9%, from fiscal year 2010 revenues. The major changes from fiscal year 2010 were: (i) decreases in income taxes from individuals of $406.5 million or 15.7%, resulting from the implementation of the tax reform, (ii) an increase of $170.1 million in taxes withheld from non-residents, and (iii) an additional $677.6 million from the excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154.

General Fund total expenses (on a cash basis) for fiscal year 2011 were $10.144 billion, consisting of $9.075 billion of operating expenditures, $267 million in PBA rental payments and $801.8 million of other financing uses (principally debt service payments).

*General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009*

General Fund total revenues for fiscal year 2010 were $8.032 billion. This total includes (i) $7.716 billion in General Fund revenues (consisting of $7.593 billion of operating revenues and $122.8 million of revenues from the electronic and traditional lotteries that are available to the General Fund), (ii) $114.7 million of revenues from property taxes that are available to pay general obligation bonds, and (iii) $201.0 million from the sale of securities of the Puerto Rico Infrastructure Authority corpus account.

The $8.032 billion in total General Fund revenues for fiscal year 2010 represents an increase in revenues of $207 million, or 2.6%, from fiscal year 2009. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the revenue raising measures implemented as part of the Commonwealth's fiscal stabilization measures. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009.

Total expenditures for fiscal year 2010 were $10.756 billion (which included $173 million of expenditures related to a Commonwealth stimulus program); consisting of (i) $9.640 billion of operating expenditures, (ii) $250.7 million in PBA rental payments and (ii) $865.3 million of other financing uses (principally debt service payments).

**Major Sources of General Fund Revenues**

Various laws were recently enacted as part of the new administration's fiscal plan to obtain the necessary revenues to correct the Commonwealth's fiscal imbalance. The discussion below includes the effect of these new laws in the various tax revenue sources.

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Puerto Rico Internal Revenue Code of 2011, enacted as Act 1 of 2011 (as amended, the "2011 Code"), which applies to taxable years commencing after December 31, 2010. See "2011Tax Reform" below. The 2011 Code was recently amended by various laws intended to increase revenues. Many of the provisions of the 2011 Code are identical to the equivalent provisions of the PR Code. Thus, unless otherwise noted, the discussion below refers to the provisions of both the PR Code and the 2011 Code.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals, with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000. Under the 2011 Code, the highest income tax bracket gradually increases every year from taxable year 2011 through taxable year 2015 from $60,000 to $67,250 and then increases to $121,500 for taxable years commencing with taxable year 2016. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under the 2011 Code. After January 1, 2016, the top individual rate is lowered to 30%. However, certain requirements must be satisfied in order for tax benefits under the 2011 Code to enter into effect for taxable years starting after December 31, 2013. See "2011Tax Reform" below. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at a rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at a rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for a tax rate of 10%.

With respect to income taxes for individuals, the recently enacted Act 40 of June 30, 2013 ("Act 40") included the following measures:

(i)     self-employed individuals with gross income in excess of $200,000 are subject to a 2% surtax on their gross income from self-employment.

(ii)    individuals with income subject to alternate basic tax in excess of $500,000, will have their alternative basic tax rate increased from 20% to 24% ;

(iii)  the total deduction for mortgage interest on residential property is now limited to the lower of the amount of interest paid, 30% of the individual's adjusted gross income, or $35,000.

*Corporations.* Puerto Rico corporations are subject to tax on income from all sources; foreign corporations that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the 2011 Code originally provided that for taxable years commencing after December 31, 2010, the highest corporate income tax rate would be lowered to 30% for net taxable income in excess of $2,500,000 (which could be lowered to 25% for taxable years starting after December 31, 2013, subject to certain conditions) instead of the 39% top rate for net taxable income in excess of $300,000 provided under the PR Code. Pursuant to Act 40, the maximum corporate income tax rate is reset at 39% for net taxable income in excess of $300,000. Pursuant also to Act 40, the alternative minimum tax is set to the greater of (i) the amount produced by applying a minimum rate of 30% to the alternative minimum net income plus a special additional tax on gross receipts ranging from .20% to .85% for corporations with gross income in excess of $1,000,000, or (ii) subject to certain exceptions, the amount produced by applying a 2% excise tax on the purchases from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $10 million or more during any of three preceding taxable years, plus 20% of expenses paid to related parties that are not subject to Puerto Rico income tax, plus the special tax on gross receipts ranging from .20% to .85%. In the case of financial businesses, this special tax on gross receipts is 1% and represents an additional tax instead of a component of the alternative minimum tax computation.

Gains realized from the sale or exchange of a capital asset, if held for more than six months, remains taxed at a maximum regular income tax rate of 15%. Dividends received by Puerto Rico corporations and partnerships from foreign corporations engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations, and paid to corporations and partnerships, qualifies for a special tax rate of 10%.

Resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business are generally subject to a branch profits tax. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

In general, corporations, and the partners of partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act, are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations, and the partners of partnerships operating under a new grant of tax exemption issued under the Tourism Development Act of 2010, are subject to a maximum tax rate of 39% on their taxable income, after applying the 90%

exemption granted under the Tourism Development Act of 2010, which results in a maximum effective tax rate of 3.9% on their net tourism development income.

Interest from Puerto Rico sources paid by Puerto Rico resident borrowers to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid by Puerto Rico resident borrowers to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year, made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding. In addition, Act 48 of June 30, 2013 ("Act 48") provides for a special contribution of 1.5% on payments received from the Commonwealth, its municipalities, instrumentalities and agencies pursuant to contracts for professional services commencing on July 1, 2013.

In sum, with respect to income taxes for corporations, the recently enacted Act 40 of 2013 included the following measures:

(i)     corporations will have their surtax exemption reduced from $750,000 to $25,000 and the surtax exemption must be allocated among members of a controlled group of corporations.

(ii)    corporations will have their surtax rates reinstated to pre 2011 levels ranging from 5% to 19% for a maximum corporate income tax rate of 39% on net income in excess of $300,000.

(iii)   the carryover for net operating losses is extended from 10 years to 12 years for losses incurred in taxable years commencing after December 31, 2004 and before January 1, 2013. The carryover for net operating losses incurred after December 31, 2012 will remain at 10 years but the deduction for such losses is limited to 90% of the net income of the year in which the deduction is claimed regardless of the year in which the loss is incurred.

(iv)    51% of the payments or transfers to related parties not engaged in trade or business in Puerto Rico or to the payor's home office that are not subject to tax in Puerto Rico, such as payments for services rendered outside of Puerto Rico, will be disallowed as deductions unless the payments are subject to tax in Puerto Rico.

(v)     corporations with gross income in excess of $1,000,000 will be subject to a special additional tax on gross receipts as part of their alternative minimum tax ("AMT") computation ranging from .20% to .85%. Corporations with grants

under various tax exemption statutes, agricultural businesses and non-profit entities, are exempt from this special tax.

(vi)    Financial businesses are subject to the special additional tax on gross receipts of 1% in addition to the regular income tax. However, a credit of .5% may be claimed in subsequent years.

Act 40 also made substantial changes in the method of computing the net income subject to AMT in the case of corporations, such as (a) providing that the AMT will be the highest of the regular tax or several alternative computations, (b) increasing the AMT book income adjustment from 50% to 60%, and (c) decreasing the net operating loss deduction for AMT purposes from 90% to 80% of the alternative minimum tax income.

With respect to pass-through entities, Act 40 provides that payments to nonresident partners, shareholders or members owning 50% or more of interest in such pass-through entities will also be disallowed as deductions if payments are not subject to tax in Puerto Rico. These disallowances will not apply to entities with tax exemption grants under the various Commonwealth tax incentives laws. Also, the Secretary of Treasury has the authority to waive the disallowances for other taxpayers. In addition, pass-through entities will be required also to pay the special additional tax on gross receipts at the entity level and report the amount also to the partners, stockholders or members so that they can include their distributable share of this special additional tax on their AMT calculations.

*2011 Tax Reform*

The 2011 tax reform focused on reducing taxes, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform was originally projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The reduction in income tax revenues resulting from the implementation of the tax reform was expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures was expected to be revenue positive but there was no assurance that sufficient revenues would be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform. As a result, the 2011 Code conditioned the implementation of the tax reductions applicable to individuals for taxable years commencing after December 31, 2013 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

*Act 154*

Act 154 was enacted, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Commonwealth. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010. The Commonwealth estimates that this excise tax affects mostly foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics.

Act 154 provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico, and taxable in Puerto Rico with respect to a portion of the taxpayer's income, where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of $75 million or more in any of the preceding three taxable years, and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, and will instead be subject to the excise tax in lieu of any income tax. The excise tax is based on the value of the personal property or services acquired. The excise tax was originally scheduled to apply for a period of six years and was set at 4% for calendar year 2011, declining every year until reaching 1% in 2016. For the reasons explained below, on February 28, 2013, the Commonwealth amended Act 154 to set the excise tax at a fixed 4% and extend its application until 2017.

On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions.

At the time of adoption of Act 154, the Commonwealth expected to raise approximately $1.4 billion from the excise tax during the first year of implementation and $5.6 billion for the six year period that the excise tax was originally intended to be in place. Although the amounts collected under Act 154 have met the initial projections, such revenue has not been sufficient to fully offset the reduction in tax revenues from other sources. As a result, on February 28, 2013 the Commonwealth amended Act 154 to extend the period of the excise tax until December 31, 2017 and reset the excise tax rate to a fixed 4% commencing on July 1, 2013

While the Commonwealth expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their United States federal income tax liabilities, it is uncertain how this tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

In connection with the expansion of the taxation of foreign persons by Act 154, the Commonwealth obtained a legal opinion regarding the creditability of the excise tax for United

States federal income tax purposes. The opinion concludes that the aforementioned excise tax should be creditable against United States federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax will more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service ("IRS") issued Notice 2011-29 addressing the creditability of the excise tax imposed by Act 154. Notice 2011-29 provides that the provisions of the excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903 of the United States Internal Revenue Code of 1986, as amended. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Commonwealth's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provided certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets. The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription drugs, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw material in a manufactured good, whether or not bound for export. Act 117 also contained various exemptions from the Sales Tax for certain specific items and for certain kinds of transactions such as business to business services and sales.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91 of 2006, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department originally reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated revenues for the General Fund of approximately $543.2 million for fiscal year 2012 and generated approximately $552.8 million for fiscal year 2013 according to preliminary unaudited numbers for fiscal year 2013.

Act 40 made the following changes to the Sales Tax:

(i)     the daily rental of motor vehicles is subject to the Sales Tax unless it qualifies under the business to business services exemption.

(ii)    the business to business services exemption to the Sales Tax was amended to exclude various transactions such as bank service charges to commercial clients, collection services, security and armored services, cleaning services, laundry services, repair and maintenance of real and personal property (not capitalizable), telecommunication services, and waste disposal services. These services will qualify for the business to business services exemption if performed by related parties.

(iii)   the resellers exemption certificate is limited for sales after July 31, 2013 to eligible resellers that mainly sell to businesses that purchase articles exempt from the Sales Tax or for export. This date was administratively extended to August 15, 2013. Commencing August 16, 2013, sales to non-eligible resellers will be subject to the 6% of the Sales Tax payable to the Treasury Department but a reseller credit mechanism will be available to such non-eligible resellers limited to 70% of the Commonwealth Sales Tax paid by the reseller for each month. This credit may be increased to 100% once a demand deposit account is established by

the taxpayer in Puerto Rico. Pursuant to administrative interpretation, the sales to resellers will continue to be exempt from the 1% of the sales tax payable to the municipalities. Also, pursuant to an administrative ruling, wholesalers that meet certain requirements will be entitled to a Sales Tax collection waiver.

(iv)   the exemption for purchases made by universities and higher education institution is repealed.

(v)   the exemption for purchases made by cooperatives is repealed.

(vi)   the exemption for purchases made by hospitals is limited.

(vii)   the exemption for purchases during the back to school tax holiday period is limited. Textbooks and notebooks are will be exempt from the Sales Tax all year round. Other school supplies such as uniforms will be subject to two tax holiday periods, one in July and another in January. Electronic items such as televisions and computers are no longer considered items covered by the back to school holiday.

(viii)   the Municipal Sales Tax is reduced from 1.5% to 1% effective December 1, 2013 for a total Sales Tax of 6.5% instead of 7%. The decrease in the Sales Tax may be postponed or reversed upon further study by the Government.

The elimination or limitation of the various exemptions explained above, will broaden the tax base of the Sales Tax and permit a reduction of the Sales Tax from a 7% to 6.5%.

In addition, (i) Act 40 also requires the establishment of a plan to control and monitor, the collection and deposit of the Sales Tax to increase the Sales Tax revenues of the Commonwealth; (ii) Act 42 of 2013 amended the 2011 Code to broaden the nexus rules used to determine when a merchant will be considered to be engaged in the sale of taxable items in Puerto Rico for purposes of the Sales Tax; and (iii) Act 46 of 2013 requires the declaration and payment of the Sales Tax on imported goods at the time of their entry into Puerto Rico. This requirement does not apply to goods imported for resale.

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles, heavy equipment, boats and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages, the increase ranged between $0.30 and $0.70 per standard gallon. The 2011 Code incorporated most of the increases made by Act 7, but provided an increase in the tax applicable to concentrated wine must (from $4.48 to $7.00 per gallon), while reducing the tax payable with respect to champagne from concentrated wine must (from $4.48 to $2.25 per gallon). Motorcycles, all-terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10% under the 2011 Code.

Act 41 of 2013 increased the excise tax applicable to cigarettes from $11.15 to $16.15 per hundred cigarettes effective July 1, 2013, and to $17.00 per hundred cigarettes effective July 1, 2015. Act 41-2013 also imposes a new tax on smokeless tobacco of $1.00 per pound for chewing tobacco and $3.02 per pound for powdered tobacco ("snuff") or other products derived from tobacco.

Act 40 of 2013 imposes a special 1% tax for taxable years commencing after December 31, 2012, on premiums earned after June 30, 2013 by insurance companies authorized to do business in Puerto Rico. Annuities and premiums for Medicare Advantage, Medicaid and Mi Salud programs are excluded.

Act 48 of 2013 imposed a special tax of 1.5% of the value of contracts for professional and consulting services, including advertising, legal, public relations, communications and lobbying services executed by the Government or any of its agencies, instrumentalities, public corporations and the legislative and judicial branches. This tax is not creditable or deductible for income tax purposes.

Act 31 of 2013 reduced the tax on gas oil or diesel oil from $.08 to $.04 per gallon and increased the tax on crude oil products and hydrocarbons from $3.00 per barrel dependent on the price of crude oil to a fixed $9.25 per barrel subject to adjustment for inflation every four years.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax applied during fiscal years 2010, 2011 and 2012. The additional real property tax, which was collected by the Treasury Department, amounted to 0.591% of such properties' appraised value as determined by the CRIM. The 2011 Code eliminated this additional real property tax for fiscal year 2012.

Act 40 of 2013 provides that the Sales Tax paid by a reseller is excluded from the valuation of inventory for personal property tax purposes.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2009 to 2013.

### Commonwealth of Puerto Rico
### Assessed Valuations and Real and Personal Property Taxes
### (Commonwealth and Municipalities Combined)
### (in thousands)

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections |
|---|---|---|---|---|---|
| 2009 | $28,903,996 | $1,032,570 | $634,040 | $244,411 | $878,451 |
| 2010 | 175,025,782 | 1,093,769 | 666,429 | 269,857 | 936,286 |
| 2011 | 187,293,462 | 1,152,718 | 712,706 | 225,280 | 937,986 |
| 2012 | 197,624,523 | 1,164,156 | 677,709 | 288,484 | 966,193 |
| 2013* | 191,139,478 | 1,141,443 | 677,988 | 277,855 | 955,844 |

[1]  Valuation set as of July 1 of each fiscal year.
*  Preliminary, unaudited numbers.

*Source:*  Municipal Revenues Collection Center.

## Other Taxes and Revenues

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts. Act 30 of 2013 approved the transfer to the Highways and Transportation Authority of the portion of $25 currently allocated to the General Fund from the $40 or more charged as annual motor vehicle registration fees.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

## Revenues from Non-Commonwealth Sources

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth. Since 1999, however, the United States Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. For fiscal year 2012, the total excise taxes on rum shipments returned to the Commonwealth was $400.5 million, of which $302.3 million went to the General Fund.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Previously, all rum used in Captain Morgan products sold in the United States was procured through a supply contract with Serrallés Distillery ("Serrallés") in Puerto Rico which expired on December 31, 2011. The

Commonwealth estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease, unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and to preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178 of December 1, 2010 ("Act 178") was enacted, which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act 1 of 2011 replaced Act 178 and contains identical provisions.

As permitted under Act 1 of 2011, the Commonwealth entered into a definitive agreement with three rum producers and is currently in negotiations with other producers to provide them a series of subsidies and incentives, by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2013 the Treasury Department allocated $75.4 million of total revenues from the federal excise tax on rum shipments for these incentives. The amount of the payments during fiscal year 2013 was affected by the federal offset of federal funds related to a debt with the USACE. See "Recent Developments-Federal Offset Program" under INTRODUCTION for an explanation of this situation.

## Administrative Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to increase tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosure agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, and the use of technological solutions to improve collections. The Treasury Department has also integrated its databases and established a tax intelligence project to identify tax evasion and improve its audit selection process.

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its Sales Tax

enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto"). The Treasury Department implemented this new point of sale system in phases between December of 2010 and December of 2012. All qualifying merchants were required to register for participation in the point of sale system program on or prior to April 30, 2011. As of September 30, 2013, 225,037 locations had registered in the program and 102,316 of such locations will be required to acquire and use the new point of sale system.

The Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Sales Tax through the implementation of various enforcement and compliance programs. Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed the integration of its general computer systems with the Sales Tax database in order to better detect non-compliance. Such integration has allowed the Treasury Department to compare the electronic information provided by the transactional database and the data contained in the tax returns repository. Such comparison offers the Treasury Department with detailed information about which merchants reflect taxable transactions but are either (i) not duly submitting the corresponding sales and use tax return; (ii) submitting erroneously prepared tax returns – returns with less sales volume transactions than the information provided by the transactional database; (iii) merely submitting with no payment as the law requires; (iv) or merchants not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department created a task force consisting of fiscal auditors and agents from the Consumer Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Consumer Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Evasion Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the Sales and Use Tax Bureau. As a result of these initiatives, as of June 28, 2013, Treasury issued notices to merchants requiring the filing of 304,731 monthly Sales Tax returns. Treasury collected tax for $5,400,000 from the filing of 89,851 returns (29.4%) affecting 63,216 merchants. Furthermore, Treasury collected a tax for $1,800,000 for insufficiency for a total collection in the amount of 7,200,000.

In addition to the above, the new administration is pursuing the automatic collection of the Sales Tax through a direct deposit process directly from point of sale services providers. The Secretary of the Treasury has hired an expert consultant in the technology of point of sales systems and devices with the specific assignment of having this new collection methodology operational as soon as possible. Such initiative is already in the design and planning phase and is expected to be operational within the next 12 to 18 months. Also, Treasury designed and developed a standardize selection process focused on merchants that have been affected by the enactment of Act 40-2013 to verify compliance with SUT, licenses, and IVU loto program. The design and development process was divided in two groups: (1) merchants that are affected by the business to business provisions and (2) any other merchants. On July 2, 2013, Treasury issued Circular Letter 13-04 to clarify application of the elimination of the business to business

exemption for certain services.  Treasury implemented the initiative at the beginning of August 2013 by visiting the selected merchants to orientate on Circular Letter 13-04.

Treasury identified that taxpayers were incorrectly using the resellers exemption certificates negatively affecting the Sales Tax collection. Act 40 eliminated the resellers exemption certificates, which have been cancelled as of August 16, 2013.  As such, new processes are being implemented to allow a credit for tax payment in resale businesses as provided on Act 40 on the Sales Tax monthly tax return.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of, and interest on, general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions.  It also includes items for, or included in, court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost.  In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of, and interest on, non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law required to be reimbursed to the General Fund.

*Federal Grants*

The Commonwealth receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth are estimated to be $4.646 billion for fiscal year 2012, a decrease of $378 million, or 8%, from fiscal year 2011. Federal grants for fiscal year 2013 are projected at $4.499 billion, which is consistent with the level for fiscal year 2012. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2009 through 2012 are actual figures. The figures for fiscal year 2013 are the amounts included in the adopted budget.

**The Commonwealth of Puerto Rico**
**Federal Grants\***
**(in thousands)**

| | 2009 | 2010 | 2011 | 2012 | 2013[(1)] |
|---|---|---|---|---|---|
| Education | $1,813,455 | $1,270,589 | $1,364,393 | $1,080,342 | $1,016,958 |
| Social Services | 2,453,605 | 2,481,447 | 2,431,381 | 2,400,747 | 2,416,049 |
| Health | 583,190 | 655,060 | 472,983 | 475,671 | 463,887 |
| Labor and Human Resources | 277,127 | 138,425 | 225,090 | 97,317 | 89,043 |
| Crime | 64,155 | 29,459 | 35,826 | 34,895 | 44,740 |
| Housing | 416,667 | 534,987 | 340,728 | 399,983 | 420,876 |
| Drug and Justice | 53,067 | 21,628 | 21,968 | 25,995 | 17,513 |
| Agriculture and Natural Resources | 114,920 | 25,501 | 14,960 | 16,206 | 11,814 |
| Contributions to Municipalities | 47,656 | 60,559 | 52,087 | 43,698 | 28,348 |
| Other | 67,017 | 73,813 | 64,219 | 70,499 | 70,822 |
| TOTAL | $5,890,859 | $5,291,468 | $5,023,635 | $4,645,503 | $4,580,050 |

\* Does not include grants received by agencies whose accounting systems are not centralized at the Treasury Department.
[(1)]Budget.
*Source:  Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

### Office of Management and Budget

OMB's primary role is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies.  In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1.  The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of total resources, capital improvements, and operating expenses of the central government for the ensuing fiscal year.  The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies.  Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total resources estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and

submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying additional resources to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last fiscal years, the Legislative

Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficit. As of June 30, 2013, the balance in the Budgetary Fund was $4.8 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of June 30, 2013, the Emergency Fund had $2.9 million available to be borrowed from GDB. Joint Resolution No. 60 of July 1, 2011 authorized the conversion of this loan into a revolving line of credit with the same authorized limit of $150 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)   *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.* These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)   *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

(iii)   *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)   *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

(v)   *Other Funds.* Appropriations may be made from time to time from non-recurring surplus funds extractions or dividends from control government agency special funds, public corporations or other sources.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources

for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

For fiscal year 2011, approximately 25% of the General Fund was committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to PBA, and debt service on the direct debt of the Commonwealth (excluding debt service that was refinanced, as discussed below). This proportion remained stable in fiscal years 2012 and 2013, remaining at 25% in fiscal year 2013.

For fiscal year 2009, over 64% of the controllable funds portion of the General Fund was committed for the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). This percentage has decreased gradually and OMB estimates that it will continue to decrease in fiscal year 2014, based on a year over year payroll for the July and August 2014 period compared to July and August 2013.

The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2013 and 2014. The following expenses are categorized as controllable in the table: utility payments to public corporations and all contributions to the government retirement systems, including, among others, regular payroll contributions, Act 70 annuities, incremental Act 114 and Act 116 payroll contributions, voluntary additional appropriations and special laws. The increase in rent payments shown in the table below corresponds to the planned payment in full by PBA of its debt service, and the corresponding effect on rent estimated to the General Fund. During prior fiscal years 2012 and 2013, PBA refinanced its debt service, leading to substantially lower rent payments. See "Recent Measures to Address Fiscal Condition and Promote Economic Growth" under "THE ECONOMY".

### Expenses Breakdown for the General and Stabilization Funds
### (in millions)

|  | 2013 * | 2014** |
|---|---|---|
| **Non-Controllable Expenses** |  |  |
| Mandated Expenses (Formula) |  |  |
| Contributions to Municipalities | $ 363 | $ 361 |
| University of Puerto Rico | 757 | 834 |
| Judicial Branch | 343 | 349 |
| Rent Payments to Public Buildings Authority | 208 | 385 |
| General Obligation Debt Service | 148 | 162 |
| Other Debt Service | 417 | 479 |
| Total of Non-Controllable Expenses | $2,236 | $2,570 |
| Percent of Total General Fund Expenses | 25% | 26% |
|  |  |  |
| **Controllable Expenses** | $6,847 | $7,200 |
| Payroll and Related Costs[1] [2] | $4,018 | $3,948 |
| Payroll as a Percentage of Controllable Expenses | 59% | 51% |
|  |  |  |
| **Total General & Stabilization Funds Expenses** | $9,083 | $9,770 |

* Preliminary
** Estimated based on FY14 Approved Budget
(1)  Excludes University of Puerto Rico and the Judicial Branch.
(2)  Includes the school wide Program teachers payroll appropriated in the Non-Distributed Allocations expense category.
*Source:  Office of Management and Budget*

## Budget for Fiscal Year 2013

The following table presents a summary of the adopted Commonwealth's central government budget for the fiscal year ending June 30, 2013.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2013**
**(in thousands)**

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ 0 | - | $ 116,843 | $ 116,843 |
| Personal income taxes | 2,107,000 | - | - | 2,107,000 |
| Retained non-resident income tax | 942,000 | - | - | 942,000 |
| Corporate income taxes | 1,623,000 | - | - | 1,623,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 7,000 | - | - | 7,000 |
| 17% withholding tax on interest | 7,000 | - | - | 7,000 |
| 10% withholding tax on dividends | 27,000 | - | - | 27,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 691,000 | - | - | 691,000 |
| Excise taxes: | | - | | |
| Alcoholic beverages | 290,000 | - | - | 290,000 |
| Foreign (Act 154) | 1,750,000 | - | - | 1,750,000 |
| Motor vehicles and accessories | 400,000 | - | - | 400,000 |
| Cigarettes | 173,000 | - | - | 173,000 |
| Other (excise taxes) | 78,000 | - | 740,426 | 818,426 |
| Licenses | 79,000 | - | - | 79,000 |
| Miscellaneous non-tax revenues: | | - | | |
| Contributions from lottery fund | 43,000 | - | - | 43,00 |
| Electronic lottery | 65,000 | - | - | 65,000 |
| Registration and document certification fees | 168,000 | - | - | 168,000 |
| Other | 70,000 | - | 335,788 | 405,788 |
| Total revenues from internal sources | 8,527,000 | - | 1,193,057 | 9,720,057 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 219,000 | - | - | 219,000 |
| Federal grants[1] | 0 | - | 4,606,108 | 4,606,108 |
| Customs | 4,000 | - | - | 4,000 |
| Total revenues from non-Commonwealth sources | 223,000 | - | 4,606,108 | 4,829,108 |
| Total revenues | 8,750,000 | - | 5,799,165 | 14,549,165 |
| Other: | | | | |
| Balance from previous year | 0 | - | 735,006 | 735,006 |
| COFINA Stabilization Fund | 332,700 | - | - | 332,700 |
| Bonds authorized | 0 | - | - | 0 |
| Total other sources | 332,700 | - | 735,006 | 1,067,706 |
| Total resources | 9,082,700 | - | 6,534,171 | 15,616,871 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 901,948 | - | 49,473 | 951,421 |
| Education | 3,076,357 | - | 1,356,121 | 4,432,478 |
| Health | 1,373,089 | - | 499,454 | 1,872,543 |
| Welfare | 437,747 | - | 2,623,224 | 3,060,971 |
| Economic development | 157,413 | - | 102,654 | 260,067 |
| Public safety and protection | 1,526,716 | - | 115,847 | 1,642,563 |
| Transportation and communication | 144,912 | - | 52,212 | 197,124 |
| Housing | 18,975 | - | 383,318 | 402,293 |
| Contributions to municipalities | 400,664 | - | 567 | 401,231 |
| Special pension contributions | 489,558 | - | 0 | 489,558 |
| Debt service | 148,437 | - | 116,843 | 265,280 |
| Other debt service (appropriations) | 406,884 | - | 745,595 | 1,152,479 |
| Total appropriations – current expenses | 9,082,700 | - | 6,045,308 | 15,128,008 |
| Capital improvements | 0 | - | 115,274 | 115,274 |
| Total appropriations | 9,082,700 | - | 6,160,582 | 15,243,282 |
| Year-end balance | 0 | - | 373,589 | 373,589 |
| Total appropriations and year-end balance | $9,082,700 | - | $6,534,171 | $15,616,871 |

Totals may not add due to rounding.
(1)  Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
 *Sources: Treasury Department and Office of Management and Budget*

**Budget for Fiscal Year 2014**

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2014.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2014**
**(in thousands)**

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $        0 | - | $   113,526 | $   113,526 |
| Personal income taxes | 2,088,000 | - | - | 2,088,000 |
| Retained non-resident income tax | 820,000 | - | - | 820,000 |
| Corporate income taxes | 2,123,000 | - | - | 2,089,000 |
| Partnership income taxes | 1,000 | - | - | 1,000 |
| Tollgate taxes | 4,000 | - | - | 4,000 |
| 17% withholding tax on interest | 6,000 | - | - | 6,000 |
| 10% withholding tax on dividends | 37,000 | - | - | 37,000 |
| Inheritance and gift taxes | 3,000 | - | - | 3,000 |
| Sales and use taxes | 865,000 | - | - | 899,000 |
| Excise taxes: | | | - | |
| Alcoholic beverages | 284,000 | - | - | 284,000 |
| Foreign (Act 154) | 1,956,000 | - | - | 1,956,000 |
| Motor vehicles and accessories | 432,000 | - | - | 432,000 |
| Cigarettes | 186,000 | - | - | 186,000 |
| Other (excise taxes) | 140,000 | - | 653,616 | 793,616 |
| Licenses | 14,000 | - | - | 14,000 |
| Miscellaneous non-tax revenues: | | | - | |
| Contributions from lottery fund | 19,000 | - | - | 19,000 |
| Electronic lottery | 101,000 | - | - | 101,000 |
| Registration and document certification fees | 100,000 | - | - | 100,000 |
| Other | 124,000 | - | 474,909 | 598,909 |
| Total revenues from internal sources | 9,303,000 | - | 1,242,051 | 10,545051 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 222,000 | - | - | 222,000 |
| Federal grants[1] | 0 | - | 4,599,017 | 4,599,017 |
| Customs | 0 | - | - | 0 |
| Total revenues from non-Commonwealth sources | 222,000 | - | 4,599,017 | 4,821,017 |
| Total revenues | 9,525,000 | - | 5,841,068 | 15,366,068 |
| Other: | | | | |
| Balance from previous year | 0 | - | 373,589 | 373,589 |
| Reconstruction Fund (Financing) | 245,000 | - | - | 245,000 |
| Bonds authorized | 0 | - | - | 0 |
| Total other sources | 245,000 | - | 373,589 | 618,589 |
| Total resources | 9,770,000 | - | 6,214,657 | 15,984,657 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 963,665 | - | 69,908 | 1,033,573 |
| Education | 3,383,997 | - | 1,252,719 | 4,636,716 |
| Health | 1,387,641 | - | 492,499 | 1,880,140 |
| Welfare | 437,261 | - | 2,628,994 | 3,066,255 |
| Economic development | 162,452 | - | 113,759 | 276,211 |
| Public safety and protection | 1,561,793 | - | 111,368 | 1,673,161 |
| Transportation and communication | 137,734 | - | 59,642 | 197,376 |
| Housing | 20,233 | - | 408,991 | 429,224 |
| Contributions to municipalities | 444,620 | - | 567 | 445,187 |
| Special pension contributions | 691,354 | - | 0 | 691,354 |
| Debt service | 162,237 | - | 113,526 | 275,763 |
| Other debt service (appropriations) | 417,013 | - | 679,831 | 1,096,844 |
| Total appropriations – current expenses | 9,770,000 | - | 5,931,804 | 15,701,804 |
| Capital improvements | 0 | - | 123,720 | 123,720 |
| Total appropriations | 9,770,000 | - | 6,055,524 | 15,825,524 |
| Year-end balance | 0 | - | 159,133 | 159,133 |
| Total appropriations and year-end balance | $9,770,000 | - | $6,214,657 | $15,984,657 |

Totals may not add due to rounding.
(1)  Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
   *Sources:  Treasury Department and Office of Management and Budget*

The budget for fiscal year 2014 provides for total resources of $15.985 billion, of which $9.770 billion are General Fund resources.  General Fund resources include $245 million in deficit financing to be provided by GDB or third party lenders.

The principal changes in the fiscal year 2014 budgeted General Fund revenues compared to the fiscal year 2013 budget are accounted mainly by the projected collections from the Sales Tax (up $208.0 million attributed mostly to the elimination of various exemptions to the application of the Sales Tax), corporate income tax (up $466.0 million), withholding taxes on non-residents (down $122.0 million), alcoholic beverage taxes (down $6.0 million), excise taxes on motor vehicles and accessories (up $32.0 million), projected increases in excise tax under Act 154 (up $206 million), and personal income taxes (down $19.0 million).

The budget for fiscal year 2014 provides for total expenditures of $15.985 billion (of which $9.770 billion correspond to the General Fund), consisting of $4.637 billion for education, $3.066 billion for welfare, $1.673 billion for public safety and protection, and $6.609 billion for other expenses, expecting a $159 million year-end balance. The increase in proposed budget General Fund expenses for fiscal year 2014 totals $688.0 million. The main drivers of this increase are incremental debt service, additional contributions to government employee retirement systems, increases in funding pursuant to the University of Puerto Rico appropriation formula due to legislation approved which changes the basis for formula calculation; and an increase in the budget to the Department of Education which operated partially during Fiscal Year 2013 with a non-recurring, carry-forward surplus reserve from prior fiscal years.

Proposed incremental debt service from the General Fund of $59 million contemplates $34 additional general obligation and $19 additional in TRANS and other debt. Additional PBA debt service of $171.3 million in order to reduce reliance on debt restructuring and $40 million in certain municipal obligations previously payable from municipal share of the Sales Tax have not been categorized as debt, but have been included in each agency's budget.

Proposed incremental retirement system contributions from the General Fund of $202 million includes proposed additional appropriations of $120 million for increasing the liquidity and solvency of the Employees Retirement System, in excess of those appropriations provided for by Act 3 and an additional $20 million for municipal retirees benefits; an additional $46 million for the required 1% additional employer payroll contribution to  the Employees Retirement System and the Teachers Retirement System pursuant to Act 114 and Act 116; an additional $37 million to increase annuity payments for employees retired during Fiscal Year 2013 pursuant to Act 70; and net decrease of $21 million payable from the General Fund for special laws payable to the Employees Retirement System and the Teachers Retirement System, after implementation of the 2013 pension reform under Act 3.

Proposed incremental appropriation to the Department of Education from the General Fund of $120 million – net of higher rent payments to the PBA and other special appropriations– substitutes funding of Fiscal Year 2013 expenses which were partially funded by a non-recurring, carry-forward reserve of prior year surpluses totaling $105 million; and which reinforces Commonwealth funding in light of declining levels of federal funding of approximately $80 million. Proposed appropriations to the University of Puerto Rico increased $77 million due to legislation which, among other changes, restored certain revenue sources which had been excluded by Act 7.

## Differences between Budget and Basic Financial Statements

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)    The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)    Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)    Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

*General.* The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation (5,282 cases) excluding the litigation mentioned in the following paragraphs, as of June 30, 2013, the Commonwealth is currently estimating $2.7 billion for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed exceed $7.6 billion; however, the ultimate specific liability cannot be presently determined, especially because of the nature of labor claims, where the awards for unpaid salaries are calculated by the agencies. The Commonwealth believes that most of the claims are excessive or frivolous, for which the ultimate liability compared with the amounts currently estimated would not be that significant.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997, when the Commonwealth first became a participant in the Medicaid Program. Since the beginning of the case, the Commonwealth admitted the noncompliance with the WAP requirement and that the only controversy is the total amount owed. To that effect, and after several appeals, five partial judgments have been entered in this case. One of the aforementioned partial judgments is still pending appeal in the Commonwealth Court of Appeals. The approximate amounts owed under this judgment total $110.38 million in favor of 16 centers and $1.33 million owed to the Commonwealth by one of the centers.

At this time, there are four partial judgments that are final, having been denied appeal by the Puerto Rico Supreme Court, for a total amount of $28,210,042.72. The court ordered the Commonwealth to budget these amounts for fiscal year 2013-2014, although partial payments may be made throughout the year according to the order's specifications.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction entered against two of the FQHCs and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings.

Recently, the Court entered a preliminary injunction as to the remaining 15 health centers, and granted a request by the Department of Health for Eleventh Amendment sovereign immunity. The plaintiff FQHCs immediately filed an appeal regarding the issue of Eleventh Amendment sovereign immunity.

Meanwhile, the Department of Health filed a counter appeal regarding the Court's interpretation of certain components of the wraparound formula that must be used under the preliminary injunction to calculate wraparound payments owed to the plaintiffs. The Court has appointed a Special Master to receive the evidence and present recommendations on the amounts owed by the Commonwealth. Plaintiffs claim for a Prospective Payment System (PPS) for the

wraparound payments.  In order to properly establish the PPS the parties are litigating the Base Rate of cost per visit for the computation of said payment.  This base rate is submitted for the consideration of the Special Master and later a determination from the Court.  The other issue before the Special Master and the Court is the eligible population upon which a payment of the costs is required by law.

The Department has already made approximately $40 million in uncontested wraparound payments owed under the injunction. However, the Court granted the Department's request for a stay pending appeal regarding payment of an additional $29 million that are owed under the Court's wraparound formula. This sum has already been consigned with the Court pending appeal or otherwise deposited in specially earmarked accounts, amount that must be increased by the Department close to the difference between the amounts owed under the Court's formula and the Department's formula since the consignment.

There are additional costs related to the litigations of both cases, in particular, those referring to the services of the Special Master Cesar Cintrón Vázquez, CPA, Esq.  In the state case, the Commonwealth is responsible for the totality of the amounts billed as per the order of the court.  In the federal case, the Commonwealth is responsible for half the amounts billed as per the order of the court.

As of June 30, 2013, this legal contingency has an estimated exposure of $650 million.

*Special Education Students.*  The Commonwealth is also a defendant in a class action initiated in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached.  The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January 2006.  In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student.  As of December 31, 2012, there were 121,339 students registered in the Special Education Program, but this number changes frequently since new claims are filed constantly.  Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise.  Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs.  Still pending before the court are individual claims for damages regarding the failure to provide adequate services. In 2005, the Court of First Instance denied damages for the class as a whole.  Plaintiffs appealed and, in October 2005, the Court of Appeals sustained the instance court, concluding that every member of the class must come forward and prove their individual damages within the case.  The Commonwealth's strategy is to defend vigorously each case.

At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2013, this legal contingency has an estimated exposure of $650 million.

*Police Institutional Reform.* The Commonwealth is a defendant in a lawsuit presented by the United States Department of Justice ("USDOJ") alleging a pattern of civil rights violations and excessive use of force by the officers of the Police Department of Puerto Rico. In July 17, 2013, the parties signed a settlement agreement which include a deep institutional reform of the Police Department, to be implemented in the next 10 years.

Although the USDOJ's claim does not include damages, the institutional reform will require an investment of at least $600 million. The USDOJ is aware of the implementation costs, and it is willing to sign and submit a joint agreement providing that the Commonwealth allocate $20 million in the first year and the USDOJ $9-20 million, from the USDOJ Assets Forfeiture Fund, specifically, from the equitable sharing payments made to the Commonwealth of Puerto Rico for its assistance to the federal government in forfeiture cases. On July 17, 2013, the court entered a conditional judgment dismissing the claim, but retained jurisdiction to assure compliance through the Technical Compliance Advisor.

*Pension Reform.* As has been the case with each comprehensive pension reform measure enacted in the United States, certain public employees have brought suit challenging the constitutionality of pension reform in Puerto Rico.

As of May 14, 2013, the main case filed against Law 3 involved sixty-eight (68) employees of the Office of the Comptroller of the Commonwealth of Puerto Rico, who filed a Complaint on May 8, 2013, in the Commonwealth of Puerto Rico's Court of First Instance, San Juan Part, alleging that Law 3 is unconstitutional as applied to them. The Complaint alleged that plaintiffs had certain acquired rights under Act 447 and that Law 3 violates the Contract Clause because, although the solvency of the System is a compelling state interest, the State has not shown that the enactment of the law was necessary to promote that interest, nor that there were not less onerous means to advance or achieve that interest.

The Commonwealth of Puerto Rico argued that the constitutional attack of Law 3 and the claims were meritless. By June 30, 2013, the Puerto Rico Supreme Court had upheld the constitutionality of Act 3 and all the related complaints were already dismissed and the appeals denied.

*Wage Claims.* The Commonwealth is also a defendant in a suit instituted in 2007 by over 3,000 employees from Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions claiming that wages in the total amount of $85,000,000.00 are owed to them. The plaintiffs claim for loss of earnings due to the failure of compliance by the agency of the equal payment for equal work under different laws. The plaintiffs claim that they have been adversely affected by reason of the agencies failure to revise the scales of remuneration each time the federal minimum wage changed.

On July 10, 2007, the number of plaintiffs increased through an amended complaint that was filed. On July 20, 2007, the defendants filed a motion seeking dismissal of the complaint as amended. Said dismissal was denied. A second petition for summary judgment filed by defendants was also denied by the Court on May 12, 2012. The case is pending to be posted for pre-trial conference and trial.

As of June 30, 2013, this legal contingency has an estimated exposure of $85 million plus an undetermined amount for interest.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

APPENDIX III

## PROPOSED FORM OF OPINION OF BOND COUNSEL

GT GreenbergTraurig

[Closing Date]

Secretary of the Treasury of the
   Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:   $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A

Dear Madam Secretary:

We have acted as bond counsel to the Commonwealth of Puerto Rico (the "Commonwealth") in connection with the issuance of $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A (the "Bonds"). In such capacity we have examined Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended ("Act No. 33"), Act No. 242-2011 of the Legislative Assembly of Puerto Rico, approved December 13, 2011 ("Act No. 242"), Act No. 45-2013 of the Legislative Assembly of Puerto Rico, approved June 30, 2013 ("Act No. 45"), and Act No. 34-2014 of the Legislative Assembly of Puerto Rico, approved March 4, 2014 ("Act No. 34" and together with Act No. 33, Act No. 242, and Act No. 45, the "Acts"), and such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth (the "Secretary"), approved by the Governor of the Commonwealth, and consented to by the Secretary of Justice of the Commonwealth as to certain matters therein, on March 11, 2014 (the "Bond Resolution"). We also have examined one of the Bonds as executed and authenticated.

The Bonds are issued pursuant to the Acts and the Bond Resolution. The Bonds mature on July 1, 2035 and bear interest at the rate of 8% per annum, all as set forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Bond Resolution.

Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Bond Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

Based on the foregoing, we are of opinion that, under existing law:

1.      The Acts are valid.

2.      Said proceedings have been validly and legally taken.

3.      The Acts and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged.

4.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Bond Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,

Greenberg Traurig, LLP

## BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. Because the aggregate principal amount of the only maturity of the Bonds exceeds $500 million, one Bond will be issued with respect to each $500 million of principal amount of such maturity, and an additional Bond will be issued with respect to any remaining principal amount of such maturity.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be

requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bond Resolution and the Bonds. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC will select the particular Bonds to be redeemed by a pro rata pass through distribution of principal basis, if in compliance with DTC's rules and procedures, and if not in such compliance, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar, on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, definitive Bonds are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event also, definitive Bonds will be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

(This page intentionally left blank)