# EXHIBIT I

**NEW ISSUE - BOOK-ENTRY ONLY**
See "Book-Entry Only System" under THE BONDS

| | RATINGS: | Moody's: | Baa1 |
|---|---|---|---|
| | See RATINGS | S&P: | BBB |
| | | Fitch: | BBB+ |

**$582,345,000**

# Puerto Rico Public Buildings Authority
## Government Facilities Revenue Refunding Bonds, Series U
### Guaranteed by the Commonwealth of Puerto Rico

The Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series U (the "Bonds") are being issued by the Puerto Rico Public Buildings Authority (the "Authority") pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended, and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Bond Resolution"). U.S. Bank National Association serves as fiscal agent under the 1995 Bond Resolution.

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution are payable from, and are secured by a pledge of, the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth").

**The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of the Commonwealth such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.**

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.
- The Bonds will be registered under The Depository Trust Company's book-entry only system.  Purchasers of the Bonds will not receive definitive Bonds.
- Interest on the Bonds will be payable semiannually on each January 1 and July 1, beginning on January 1, 2013.
- The Bonds are subject to redemption prior to maturity as described herein.
- The inside cover page contains information concerning the maturity schedule, interest rates and yields of the Bonds.
- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Sidley Austin LLP, Bond Counsel, and certain other conditions.
- In the opinion of Sidley Austin LLP, Bond Counsel, under existing federal laws and regulations, interest on the Bonds (except the Bonds maturing July 1, 2019 and bearing interest at the rate of 3.885% per annum (CUSIP No. 745235S69)) will be exempt from federal income taxation, and the Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. Interest on the Bonds maturing July 1, 2019 and bearing interest at the rate of 3.885% per annum (CUSIP No. 745235S69) will be includable in the gross income of the owners thereof for federal income tax purposes.  See TAX MATTERS, beginning on page 35 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Bonds, a description of certain rules that must be complied with to preserve the federal tax exemption of interest, and other tax considerations.
- O'Neill & Borges LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.
- It is expected that settlement for the Bonds will occur on or about June 21, 2012.

### Goldman, Sachs & Co.

| | | |
|---|---|---|
| **BMO Capital Markets** | | **RBC Capital Markets** |

| | | | |
|---|---|---|---|
| **Barclays** | **BofA Merrill Lynch** | **Citigroup** | **Jefferies** |
| **J.P. Morgan** | **Morgan Stanley** | **Ramirez & Co. Inc.** | **Raymond James | Morgan Keegan** |

**Wells Fargo Securities**

| | | | |
|---|---|---|---|
| **BBVAPR MSD** | **FirstBank PR Securities** | **Oriental Financial Services** | **Popular Securities** |
| **Santander Securities** | **Scotia MSD** | **UBS FS Puerto Rico** | **VAB Financial** |

June 8, 2012

**$582,345,000**
**Puerto Rico Public Buildings Authority**
**Government Facilities Revenue Refunding Bonds, Series U**
**Guaranteed by the Commonwealth of Puerto Rico**

**$41,065,000 Serial Bonds**

| Maturity July 1 | Principal Amount | Interest Rate | Yield | CUSIP* |
|---|---|---|---|---|
| 2014 | $ 460,000 | 4.00% | 1.820% | 745235S51 |
| 2015 | $ 1,760,000 | 4.00% | 2.070% | 745235R45 |
| 2016 | $ 4,830,000 | 5.00% | 2.420% | 745235R52 |
| 2017 | $ 4,920,000 | 5.00% | 2.860% | 745235R60 |
| 2018 | $ 5,020,000 | 5.00% | 3.190% | 745235R78 |
| 2019 | $ 2,120,000 | 5.00% | 3.530% | 745235R86 |
| 2020 | $10,225,000 | 5.00% | 3.980% | 745235R94 |
| 2021 | $ 4,800,000 | 5.00% | 4.200% | 745235S28 |
| 2022 | $ 4,850,000 | 5.00% | 4.350% | 745235S36 |
| 2023 | $ 2,080,000 | 5.25% | 4.500%† | 745235S44 |

**$538,675,000 5.25% Term Bond due July 1, 2042 - Yield 5.375% (CUSIP* 745235R37)**

**$2,605,000 3.885% Taxable Serial Bond due July 1, 2019 – Price 100% (CUSIP* 745235S69)**

---

\*   Copyright, American Bankers Association.  CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a Standard & Poor's Financial Services LLC company.  The CUSIP numbers listed above are being provided solely for the convenience of bondholders. The Authority and the Underwriters do not make any representation with respect to such numbers or undertake any responsibility for their accuracy.  The CUSIP numbers are subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

†   Priced at the stated yield to the July 1, 2022 optional redemption date at a redemption price of 100% of the principal amount thereof.

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market prices of the Bonds at a level above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Bonds to certain dealers and dealer banks and others at prices lower than the public offering price stated on the inside cover page and said offering prices may be changed from time to time by the Underwriters.

The information set forth or incorporated herein by reference has been obtained from the Public Buildings Authority (the "Authority"), the Commonwealth, and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Bonds referred to herein and may not be reproduced or used, in whole or in part, for any other purpose. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Authority or the 1995 Fiscal Agent.

The Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Bonds in accordance with applicable provisions of laws of the jurisdictions in which Bonds have been registered or qualified and the exemption from registration or qualification in other jurisdictions cannot be regarded as a recommendation thereof. Neither these jurisdictions nor any of their agencies have passed upon the merits of the Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Authority does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or events, conditions or circumstances on which such statements are based, occur.

The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Authority's and the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Authority or the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Authority's nor the Commonwealth's independent auditors, nor any other financial information. Neither the Authority's nor the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Authority's nor the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Authority or the Commonwealth, as the case may be, and the independent auditors assume no responsibility for its content.

iii

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................. 1

RECENT DEVELOPMENTS ........................... 3

OVERVIEW OF ECONOMIC AND FISCAL
    CONDITION OF THE
    COMMONWEALTH .................................. 3
Economic Condition ..................................... 3
Fiscal Condition .......................................... 4
Economic Development Plan ......................... 7
Tax Reform ................................................. 7

PLAN OF FINANCING ................................... 8
The Bonds .................................................. 8
Use of Proceeds ........................................ 10

THE BONDS ................................................ 10
Description of the Bonds ............................. 10
Redemption Provisions ............................... 10
Book-Entry Only System ............................ 12
Discontinuance of the Book-Entry Only
    System ................................................ 13

SECURITY .................................................. 14
Commonwealth Guaranty ........................... 14
Opinion of the Secretary of Justice of the
    Commonwealth ..................................... 15
Lease Agreements ..................................... 15
Pledge of the Commonwealth to Pay or
    Advance Rentals .................................. 17
Additional Bonds ...................................... 18

PROVISIONS RELATING TO PUBLIC DEBT
    OF THE COMMONWEALTH ..................... 19
Public Sector Debt .................................... 19
Payment of Public Debt .............................. 20
Payment Record ........................................ 20
Debt Limitation ......................................... 20
Commonwealth Guaranteed Debt ................. 21

THE AUTHORITY ........................................ 22
General ..................................................... 22
Powers ..................................................... 23
Management .............................................. 23

PROGRAMS AND FACILITIES OF THE
    AUTHORITY .......................................... 24
Office Buildings Program ............................ 24
School Buildings Program ........................... 25
Health Facilities Program ........................... 25
Correctional Facilities Program ................... 25
Other Facilities ......................................... 26

**Page**

DEBT OF THE AUTHORITY AND DEBT
    SERVICE REQUIREMENTS ....................... 26
Debt ......................................................... 26
Debt Service Requirements ......................... 26

SUMMARY OF CERTAIN PROVISIONS OF
    THE 1995 BOND RESOLUTION ................. 29
Revenues .................................................. 29
1995 Sinking Fund ..................................... 29
1995 Redemption Account ........................... 29
1995 Construction Fund .............................. 31
Additional Bonds ...................................... 32
Investment of Funds in 1995 Construction
    Fund, 1995 Bond Service Account and
    1995 Redemption Account ...................... 32
General Covenants ..................................... 33
Modifications ............................................ 34
Notice of Default ....................................... 35

TAX MATTERS ........................................... 35

UNDERWRITING ......................................... 41

LEGAL INVESTMENT .................................. 43

LEGAL MATTERS ....................................... 43

VERIFICATION OF MATHEMATICAL
    COMPUTATIONS ................................... 43

GOVERNMENT DEVELOPMENT BANK
    FOR PUERTO RICO ............................... 43

RATINGS ................................................... 44

CONTINUING DISCLOSURE ......................... 44
Continuing Disclosure Undertaking ............. 44
Prior Continuing Disclosure Non-Compliance .... 46

MISCELLANEOUS ....................................... 47

APPENDIX I – Commonwealth Report dated
    June 8, 2012 ...................................... I-1

APPENDIX II – Audited Financial Statements of
    the Authority for the Fiscal Year Ended June
    30, 2011 .......................................... II-1

APPENDIX III – Proposed Form of Opinion of
    Bond Counsel .................................... III-1

**$582,345,000**
# Puerto Rico Public Buildings Authority
## Government Facilities Revenue Refunding Bonds, Series U
### Guaranteed by the Commonwealth of Puerto Rico

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Public Buildings Authority (the "Authority") of $582,345,000 aggregate principal amount of its Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series U (the "Bonds"). The proceeds of the Bonds will be used to (i) refund in whole the Authority's Series J Bonds; (ii) refund a portion of the Authority's Series D and Series G Bonds (together with the Series J Bonds, the "Refunded Bonds"); (iii) repay certain advances made to the Authority by Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB") under a line of credit; (iv) pay capitalized interest on the Bonds through July 1, 2013, and (v) pay expenses related to the issuance and sale of the Bonds. See PLAN OF FINANCING. As set forth in TAX MATTERS below, interest on the Bonds other than the Bonds maturing on July 1, 2019 and bearing interest at the rate of 3.885% per annum (the "Tax-exempt Bonds") is excluded from the gross income of the holders thereof for federal income tax purposes. Interest on the Bonds maturing on July 1, 2019 and bearing interest at the rate income of 3.885% per annum (the "Taxable Bonds") will be included in the gross income of the holders thereof for federal income tax purposes.

The Bonds will be issued pursuant to Act No. 56 of the Legislative Assembly of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Bond Resolution"), particularly as supplemented by a Resolution adopted by the Authority on June 8, 2012 (the "Bond Resolution").

Immediately prior to the issuance of the Bonds, the Authority will have outstanding $4.2 billion aggregate principal amount of its Government Facilities Bonds (as defined herein) (calculated by excluding all accretion on any existing capital appreciation bonds and convertible capital appreciation bonds) issued under the 1995 Bond Resolution. The fiscal agent under the 1995 Bond Resolution is U.S. Bank National Association (the "1995 Fiscal Agent"). In the past, the Authority has issued Public Buildings Authority Public Education and Health Facilities Bonds under Resolution No. 158, adopted by the Authority on February 14, 1978, as amended (the "1978 Bond Resolution"), none of which are currently outstanding, and Public Buildings Authority Revenue Bonds under Resolution No. 77, adopted by the Authority on November 16, 1970, as amended (the "1970 Bond Resolution"), of which an aggregate principal amount of approximately $37.3 million is currently outstanding. The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds issued under the 1995 Bond Resolution and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth") are not available to be applied to the payment of any bonds issued under the 1970 Bond Resolution or 1978 Bond Resolution. See SECURITY herein.

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution (collectively, the "Government Facilities Bonds") are payable from and are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth.

The Bonds are further guaranteed by the good faith, credit and taxing power of the Commonwealth.

This Official Statement includes the cover page, the inside cover page, the appendices hereto and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2011 (the "Commonwealth's Annual Financial Report"), prepared by the Department of the Treasury of the Commonwealth (the "Treasury Department"), which report was filed on April 30, 2012 with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") at http://emma.msrb.org and is incorporated herein by reference. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2011, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes an emphasis of matter

paragraph regarding the unfunded actuarial accrued liability and funded ratio of the Employees Retirement System, Teachers Retirement System and Judiciary Retirement System (the "Retirement Systems") as of June 30, 2011), dated April 27, 2012, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

*Appendix I* hereto is the Commonwealth's Financial Information and Operating Data Report, dated June 8, 2012 (the "Commonwealth Report"). The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2011, preliminary results for the first nine months of fiscal year 2012, the projected fiscal year 2012 deficit, the budget for fiscal year 2012 and the proposed budget for fiscal year 2013, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety and in conjunction with this Official Statement, including RECENT DEVELOPMENTS and OVERVIEW OF ECONOMIC AND FISCAL CONDITION OF THE COMMONWEALTH herein.

*Appendix II* hereto includes the basic financial statements of the Authority as of and for the fiscal year ended June 30, 2011 (the "Authority's 2011 Financial Statements"), which have been audited by Ernst & Young LLP, San Juan, Puerto Rico, certified public accountants, as stated in their report dated December 15, 2011, accompanying such financial statements.

Any Official Statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report, or other document, that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be a part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, upon a written or oral request by such person, a copy of the Commonwealth's Annual Financial Report incorporated herein by reference. Requests for such document should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, NY 10020, telephone number (212) 333-0364, or to Vice President – General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

The Commonwealth and the Authority have entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under their existing continuing disclosure undertakings, the Commonwealth and the Authority are obligated to file on or before May 1 in each year updates, in the case of the Commonwealth, of its financial, operational and macroeconomic information and, in the case of the Authority, of its financial and operational information, in each case through the end of the prior fiscal year. Pursuant to these continuing disclosure undertakings, the Commonwealth files annual updates of the Commonwealth Report and files the Commonwealth's Annual Financial Report, and the Authority files its audited financial statements for the preceding fiscal year. Although the Commonwealth has filed all such reports, these filings were made after the May

2

1 deadline between 2006 and 2010 (and also in certain years before that period), and, therefore, did not comply with its undertakings. In 2011 and 2012, the Commonwealth complied with its continuing disclosure undertakings relating to fiscal years 2010 and 2011, respectively, by filing the Commonwealth Report and the Commonwealth's Annual Financial Report before the filing deadline. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Authority has made all of its required filings within the time limits set for its undertakings.

A copy of the Commonwealth's Annual Financial Report may be obtained by accessing http://emma.msrb.org or by visiting the website of Government Development Bank for Puerto Rico ("GDB") at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## RECENT DEVELOPMENTS

### Recent Rating Action

On June 6, 2012, Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC company ("S&P"), affirmed its "BBB" rating on the Commonwealth of Puerto Rico's general obligation debt and revised its outlook on the Commonwealth of Puerto Rico's general obligation debt ratings from stable to negative. The outlook of the "BBB" rating on the Commonwealth guaranteed bonds of the Authority was also revised by S&P from stable to negative.

For additional information on the ratings of the general obligation bonds of the Commonwealth, see "Overview of Economic and Fiscal Condition - Ratings of Commonwealth General Obligation Bonds" under INTRODUCTION in the Commonwealth Report. For additional information on the ratings of the Bonds, see RATINGS herein.

### Preliminary General Fund Revenues for the First Ten Months of Fiscal Year 2012

Preliminary General Fund net revenues for the first ten months of fiscal year 2012 (from July 1, 2011 to April 30, 2012) were $6.846 billion, an increase of $455 million, or 7.1%, from $6.391 billion of net revenues for the same period in the prior fiscal year. These revenues represent 79% of budgeted revenues of $8.650 billion for the fiscal year, and are $141 million, or 2.0%, less than budgeted for the period.

Preliminary sales and use tax collections for the first ten months of fiscal year 2012 were $954 million, an increase of $27 million, or 2.9%, from the sales and use tax collections for the same period in the prior fiscal year.

## OVERVIEW OF ECONOMIC AND FISCAL CONDITION OF THE COMMONWEALTH

### Economic Condition

*Gross National Product.* Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. For fiscal years 2007, 2008, 2009, 2010 and 2011 Puerto Rico's real gross national product decreased by 1.2%, 2.9%, 3.8%, 3.4% and 1.5%, respectively. According to the latest projections of the Puerto Rico Planning Board (the "Planning Board") made in April 2012, real gross national product for fiscal years 2012 and 2013 is expected to increase by 0.9% and 1.1%, respectively.

*Employment.* According to the Household Survey, total employment fell by 2.3% in fiscal year 2011 and grew by 0.5% in the first ten months of fiscal year 2012. The unemployment rate for fiscal year 2011 and for the first ten months of fiscal year 2012 was 15.9% and 15.2%, respectively. According to the Establishment Survey, total payroll employment fell by 2.0% in fiscal year 2011 and was virtually unchanged, decreasing by 0.2%, during the first ten months of fiscal year 2012. April 2012 year-over-year total payroll employment decreased by 0.7%.

*Economic Activity Index.*  The Government Development Bank – Economic Activity Index (the "EAI") prepared by GDB declined 2.7% in fiscal year 2011, after declining 5.6% for fiscal year 2010.  For the first nine months of fiscal year 2012, the EAI showed a year-over-year decline of 0.4%, compared to a decline of 2.9% for the same period of fiscal year 2011.  For the third quarter of fiscal year 2012 (January 2012 through March 2012), the EAI increased 0.3%, when compared to the third quarter of fiscal year 2011, which increase represents the first quarterly positive growth rate since the third quarter of fiscal year 2006 (January 2006 to March 2006).

## Fiscal Condition

*Fiscal Imbalance.*  Since 2000, the Commonwealth has faced a number of fiscal challenges, including an imbalance between its General Fund total revenues and expenditures.  The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion.  The following table shows total revenues from non-financing sources (which are revenues from taxes, licenses and other internal or external sources received by virtue of existing laws, but excluding proceeds from financings), total expenditures (including debt service payments) and the ensuing imbalance for the last three fiscal years.  Total revenues and expenditures, as shown in the table, include non-recurring revenues from temporary revenue raising measures taken by the Commonwealth to address this fiscal imbalance and non-recurring expenditures resulting from the implementation of various expense-reduction measures.  Accordingly, the amount of the Commonwealth's so called "structural deficit," or the difference between recurring government revenues and recurring expenditures, may exceed the amount of the deficit shown below.  Depending on the assumptions made as to what should be considered "recurring" for purposes of this computation, such difference may be significant.

Revenues from the electronic and traditional lotteries (shown in footnote 1 to the table below) are available to the General Fund, but for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund.

**Deficit**
Fiscal Years ended June 30,
(in millions)

|  | Total Revenues[1] | Total Expenditures | Deficit |
|---|---|---|---|
| 2009 | $7,583 | $10,890[3] | $(3,306) |
| 2010 | $7,593 | $10,369[3] | $(2,775) |
| 2011 | $8,056[2] | $ 9,897[3] [4] | $(1,841) |

[1] Excludes General Fund revenues attributable to the electronic and traditional lotteries in the amount of $126.7 million, $122.8 million and $101.9 million for fiscal years 2009, 2010 and 2011, respectively.

[2] Includes approximately $103.0 million of moneys transferred to the General Fund during fiscal year 2011 from the Puerto Rico Sales Tax Financing Corporation consisting principally of sales and use tax collections remaining after providing for debt service on its bonds for that fiscal year.

[3] Includes debt service of $159.6 million, $517.8 million and $638.7 million for fiscal years 2009, 2010 and 2011, respectively, on the Commonwealth's general obligation bonds and guaranteed bonds of the Authority that were refinanced through the issuance of refunding bonds.

[4] Excludes approximately $123 million of non-recurring expenses that had been budgeted for fiscal year 2010 but were incurred in fiscal year 2011 principally related to the fiscal stabilization plan described below.

*Source*: Commonwealth of Puerto Rico Comprehensive Annual Financial Report and Department of the Treasury.

In January 2009, the Government of Puerto Rico (the "Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds.  This plan included certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the government to reduce the deficit.  These measures are discussed in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in the Commonwealth Report.

As shown in the table above, during the last three fiscal years, the Commonwealth has been able to reduce the deficit by both increasing its revenues and reducing its expenditures. The Commonwealth's ability to continue reducing the deficit will depend in part on its ability to continue increasing revenues and reducing expenditures, which in turn depends on a number of factors, including improvements in general economic conditions.

For more detailed information with respect to the revenues and expenses of the Commonwealth's General Fund for fiscal years 2009 through 2011, see "Summary and Management's Discussion of General Fund Results" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENSES in the Commonwealth Report.

*Preliminary Results for the First Nine Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit.* Preliminary General Fund net revenues for the first nine months of fiscal year 2012 (from July 1, 2011 to March 31, 2012) were $5.639 billion, an increase of $599 million, or 11.9%, from $5.040 billion of net revenues for the same period in the prior fiscal year. These revenues represent 65% of budgeted revenues of $8.650 billion for the fiscal year, and are $78 million, or 1.4%, less than budgeted for the period.

The increase in General Fund net revenues is mainly due to the collection of $1.379 billion under a new temporary excise tax enacted pursuant to Act 154 of October 25, 2010 ("Act 154"), which amount exceeds the Government's projection of collections from the excise tax during this period. The increase in Act 154 excise tax collections was partially offset by (i) decreases in individual income tax collections of $146 million, corporate income tax collections of $63 million, and withholdings from non-residents of $77 million, all of which were primarily a result of the tax relief provided to individual and corporate taxpayers as part of the tax reform, (ii) a decrease of $172 million in property taxes as a result of the March 2011 expiration of the 2009 temporary special property tax imposed on residential and commercial real estate as part of the fiscal stabilization plan, and (iii) decreases in miscellaneous non-tax revenues, excise taxes on tobacco products and other items due to current economic conditions. These results are consistent with the Government's expectation that the decrease in General Fund net revenues as a result of the implementation of the tax reform would be more than offset by the temporary excise tax imposed on certain foreign persons by Act No. 154.

Preliminary sales and use tax collections for the first nine months of fiscal year 2012 were $855.9 million, an increase of $20.5 million, or 2.5%, from the sales and use tax collections for the same period in the prior fiscal year. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund.

Preliminary General Fund total expenses (on a cash basis) for the first nine months of fiscal year 2012 amounted to $6.191 billion. This amount excludes an estimated $223 million in expenses related to the Department of Education Schoolwide Program that have not yet been registered in the central government accounting system. If these Schoolwide Program expenses had been included, preliminary General Fund total expenses (on a cash basis) for the first nine months of fiscal year 2012 would have amounted to $6.414 billion, or 69% of budgeted expenditures for fiscal year 2012, which are $9.260 billion.

The deficit for fiscal year 2012 is projected to be approximately $610 million, excluding principal and interest payments on Commonwealth general obligation bonds and Commonwealth guaranteed bonds of the Authority that were refinanced through GDB financings, which financings were, or are expected to be, repaid from the proceeds of the Commonwealth general obligation bonds and bonds of the Authority. The Office of Management and Budget ("OMB") has indicated that no budget overruns are anticipated and that total expenses for fiscal year 2012 are not expected to exceed the budgeted amount of $9.260 billion.

*Budget for Fiscal Year 2012.* The fiscal year 2012 budget (adopted in July of 2011) provides for General Fund total revenues and other resources and total expenditures of $9.260 billion. The budgeted General Fund total revenues and other resources of $9.260 billion include estimated revenues of $8.650 billion and $610.0 million in additional resources from proceeds of COFINA bond issues and other sources. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds of the Authority which have been, or are expected to be, refinanced during fiscal year 2012.

*Proposed Budget for Fiscal Year 2013.* On April 24, 2012, the Governor submitted to the Legislature a proposed budget for fiscal year 2013. The proposed budget provides for General Fund total revenues and other

resources (including proceeds from COFINA) and total expenditures of $9.083 billion, which is $177 million, or 1.9%, lower than projected General Fund total revenues and other resource and total expenditures of $9.260 billion for fiscal year 2012. General Fund total revenues and other resources in the proposed budget include estimated revenues of $8.750 billion and $333 million of additional resources from COFINA and other sources, compared to $8.650 billion of projected revenues and $610 million of additional resources from COFINA and other sources for fiscal year 2012. The additional resources of $333 million to cover the fiscal year 2013 deficit consist of the release of approximately $233 million deposited in a contingency fund created in 2010 to cover potential collateral postings on the Commonwealth's outstanding swap portfolio and an additional $100 million from the projected issuance of COFINA capital appreciation bonds. The release of moneys from the contingency fund results from the significant reduction in the Commonwealth's outstanding swap portfolio (from $9.2 billion as of June 30, 2008 to $4.6 billion as of March 31, 2012) due to the refinancing of variable rate debt and mandatory tender bonds and the termination of the associated swaps.

During fiscal year 2013, the Government expects to refinance approximately $575 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $170 million of principal due in and interest to accrue during such fiscal year on Commonwealth guaranteed Authority bonds.

The fiscal year 2013 proposed expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds of the Authority in the aggregate amount of $745 million, which are expected to be refinanced during fiscal year 2013. The fiscal year 2013 proposed expenditures also exclude certain expenditures that were due in fiscal year 2013 related to central government accounts payable with public corporations that were being paid through a multi-year payment plan established in calendar year 2009 but that are expected to be paid during fiscal year 2012 from available moneys resulting from the refinancing of approximately $148.3 million of debt service on the Commonwealth's general obligation bonds in excess of the $537.7 million originally contemplated as part of the fiscal year 2012 budget. This payment eliminates the accounts payable to Puerto Rico Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority under the multi-year payment plan and substantially reduces the amounts remaining to be paid under the plan.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.*

As of June 30, 2011, the date of the latest actuarial valuations of the three Government-funded retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $23.7 billion, $9.1 billion and $319 million, respectively, and the funded ratios were 6.8%, 20.8% and 16.7%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $693 million, $268 million and $6.5 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls, and considering the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2020; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2022; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2019. The estimated years for depletion of the assets could vary depending on how

6

actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $125.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to those used in calculating pension benefits. Based on the latest actuarial valuations, as of June 30, 2011, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.7 billion.

Because of its multi-year fiscal imbalances previously mentioned, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems and the measures being taken by the Government to address the situation of the retirement systems, see RETIREMENT SYSTEMS in the Commonwealth Report.

**Economic Development Plan**

The Government has developed the Strategic Model for a New Economy, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the Government enacted legislation which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development, and legislation which provided a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies.

The Government has also enacted legislation establishing a clear public policy and legal framework for the establishment of public-private partnerships ("PPP") to finance and develop infrastructure projects and operate and manage certain public assets. The Government has already completed the concession of toll roads PR-22 and PR-5 and has short-listed proponents for the procurement process leading to the award of an administrative concession of the Luis Muñoz Marín International Airport and school infrastructure projects.

**Tax Reform**

Commencing in 2010, the Commonwealth enacted comprehensive tax reform legislation directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system

7

and reducing tax evasion through enhanced tax compliance measures. The first phase was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if certain expense control, revenue and gross domestic product targets are met.

The Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax enacted pursuant to Act 154 imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax, which was also adopted under Act 154. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expected to raise approximately $1.4 billion from the excise tax during the first year of implementation of the excise tax and expects to raise $5.6 billion for the six-year period that the excise tax is in place. Act 154 may have a long-term impact on local manufacturing activity.

The first monthly excise tax payment was due in February 2011. For fiscal year 2011 (from February 2011 through June 2011), the collections from the excise tax were $677.6 million. For the first nine months of fiscal year 2012, the collections from the excise tax were $1.379 billion. These amounts have exceeded the Government's projection of collections from the excise tax and are consistent with the Government's expectation that the revenues therefrom would be sufficient to offset the reduction in income tax revenues expected from other aspects of the tax reform.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in the Commonwealth Report.

## PLAN OF FINANCING

**The Bonds**

The Authority will use the proceeds of the Bonds to (i) refund in whole the Authority's Series J Bonds; (ii) refund a portion of the Authority's Series D and Series G Bonds; (iii) repay certain advances made to the Authority by Government Development Bank under a line of credit; (iv) pay capitalized interest on the Bonds through July 1, 2013; and (v) pay expenses related to the issuance and sale of the Bonds.

The principal amounts, maturities and redemption dates of the Refunded Bonds are set forth in the table on the following page:

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date | Redemption Date | Redemption Price | CUSIP |
|---|---|---|---|---|---|---|
| Series D Bonds | | | | | | |
| | $ 3,000,000 | 5.000% | 07/01/2016 | 07/11/2012 | 100% | 745235QM6 |
| | $ 3,000,000 | 5.000 | 07/01/2017 | 07/11/2012 | 100% | 745235QN4 |
| | $ 3,000,000 | 5.000 | 07/01/2018 | 07/11/2012 | 100% | 745235QP9 |
| | $ 8,000,000 | 5.125 | 07/01/2020 | 07/11/2012 | 100% | 745235QR5 |
| | $ 2,475,000 | 5.125 | 07/01/2021 | 07/11/2012 | 100% | 745235QS3 |
| | $ 2,410,000 | 5.125 | 07/01/2022 | 07/11/2012 | 100% | 745235C90 |
| | $ 2,085,000 | 5.125 | 07/01/2024(1) | 07/11/2012 | 100% | 745235D24 |
| Series G Bonds | | | | | | |
| | $ 1,540,000 | 5.250% | 07/01/2013 | 07/11/2012 | 100% | 745235SM4 |
| | $ 1,620,000 | 5.250 | 07/01/2014 | 07/11/2012 | 100% | 745235SN2 |
| | $ 1,705,000 | 5.250 | 07/01/2015 | 07/11/2012 | 100% | 745235SP7 |
| | $ 1,795,000 | 5.250 | 07/01/2016 | 07/11/2012 | 100% | 745235SQ5 |
| | $ 1,890,000 | 5.250 | 07/01/2017 | 07/11/2012 | 100% | 745235SR3 |
| | $ 1,990,000 | 5.250 | 07/01/2018 | 07/11/2012 | 100% | 745235SS1 |
| | $ 2,095,000 | 5.250 | 07/01/2019 | 07/11/2012 | 100% | 745235ST9 |
| | $ 2,205,000 | 5.250 | 07/01/2020 | 07/11/2012 | 100% | 745235SU6 |
| | $ 2,320,000 | 5.250 | 07/01/2021 | 07/11/2012 | 100% | 745235SV4 |
| | $ 2,440,000 | 5.000 | 07/01/2026(2) | 07/11/2012 | 100% | 745235SW2 |
| | $ 1,580,000 | 5.000 | 07/01/2026(3) | 07/11/2012 | 100% | 745235SW2 |
| Series J Bonds | | | | | | |
| | $ 85,580,000 | 5.000% | 07/01/2028 | 07/01/2012 | 100% | 745235VS7 |
| | $250,000,000 | 5.000 | 07/01/2036 | 07/01/2012 | 100% | 745235VT5 |

(1)    Amount shown is the amortization requirement for the fiscal year ending June 30, 2023.
(2)    Amount shown is the amortization requirement for the fiscal year ending June 30, 2022.
(3)    Amount shown is a portion of the amortization requirement for the fiscal year ending June 30, 2023.

The proceeds of the Bonds to be utilized to pay the principal of and interest on the Refunded Bonds will be deposited in an escrow fund (the "Escrow Fund") with the 1995 Fiscal Agent acting as escrow agent. The proceeds of the Bonds deposited in the Escrow Fund will either be held uninvested in cash or invested in non-callable direct obligations of the United States, the principal and interest on which will be sufficient, with any uninvested moneys in the Escrow Fund, to pay the principal of and interest due on the Refunded Bonds on their redemption dates. The sufficiency of the amount so deposited, with investment earnings thereon, to pay the principal of and interest on the Refunded Bonds will be verified by Samuel Klein and Company, Certified Public Accountants, as verification agent. See VERIFICATION OF MATHEMATICAL COMPUTATIONS.

**Use of Proceeds**

The proceeds of the Bonds are expected to be used as follows:

**Sources**

| | |
|---|---|
| Par Amount of the Bonds | $582,345,000.00 |
| Net original issue discount | (6,845,991.40) |
| Debt service account for Refunded Bonds | 9,549,056.25 |
| Total | $585,048,064.85 |

**Uses**

| | |
|---|---|
| Deposit into Escrow Fund for Refunded Bonds | $390,343,476.14 |
| Repayment of Government Development Bank Line of Credit | 157,923,275.05 |
| Capitalized Interest | 31,122,878.77 |
| Underwriters' discount and estimated legal, printing and financing expenses | 5,658,434.89 |
| Total | $585,048,064.85 |

## THE BONDS

**Description of the Bonds**

The Bonds will be issued in book-entry only form as registered bonds without coupons, will be dated their date of delivery, and will bear interest at the rates and will mature on the dates set forth on the inside cover page of this Official Statement. Interest on the Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months and will be payable semiannually on each January 1 and July 1 commencing on January 1, 2013. The Bonds will be issued in denominations of $5,000 or any multiple thereof and, when issued, will initially be registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Bonds. See "Book-Entry Only Systems" below.

**Redemption Provisions**

*Optional Redemption.* The Bonds shall be subject to redemption at the option of the Authority, from any moneys that may be available for that purpose (other than moneys deposited in the 1995 Sinking Fund in respect of an amortization requirement), on July 1, 2022, or any date thereafter, in whole or in part (and if in part, in such order of maturity as determined by the Authority), at a redemption price equal to 100% of the principal amount of the Bonds to be redeemed, together with accrued interest thereon to the date fixed for redemption without premium. Any such redemption shall be made in the manner and under the terms and conditions provided in the 1995 Bond Resolution.

*Mandatory Redemption.* The Term Bond maturing July 1, 2042 shall be redeemed upon 30 days notice in part as set forth below in the principal amounts equal to their amortization requirements (less the principal amount of any such Bonds retired by purchase) from moneys in the 1995 Sinking Fund, at a price equal to the principal amount to be redeemed plus accrued interest to the date fixed for redemption, as follows and otherwise subject to adjustments as provided in the 1995 Bond Resolution:

**Amortization Requirements for Term Bond Due July 1, 2042**

| Year | Amortization Requirement |
|------|--------------------------|
| (July 1) | |
| 2037 | $  74,150,000 |
| 2038 | $  78,045,000 |
| 2039 | $  82,140,000 |
| 2040 | $  86,455,000 |
| 2041 | $  90,995,000 |
| 2042* | $126,890,000 |

\* Final Maturity.

*Notice of Redemption.* At least 30 days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described under the caption "Book-Entry Only System" under THE BONDS, by first-class mail, postage prepaid, to the registered owners of the Bonds to be redeemed. Each notice of redemption shall contain, among other things, the CUSIP identification number of the Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of redemption may state that the redemption to be effected is conditioned upon the receipt by the 1995 Fiscal Agent on or prior to the redemption date of moneys sufficient to pay the principal of and premium, if any, and interest on the Bonds to be redeemed and that if such moneys are not so received, such notice shall be of no force or effect and such Bonds shall not be required to be redeemed. In the event that such notice contains such a condition and moneys sufficient to pay the principal of and premium, if any, and interest on such Bonds are not received by the 1995 Fiscal Agent on or prior to the redemption date, the redemption shall not be made and the 1995 Fiscal Agent shall within a reasonable time thereafter give notice, in the manner in which the notice of redemption was given, that such moneys were not so received.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the 1995 Fiscal Agent, interest on the Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the 1995 Bond Resolution, Bonds or portions of Bonds which have been duly called for redemption, or with respect to which irrevocable instructions to call for redemption have been given, and for the payment of the principal of and the accrued interest on which sufficient moneys or Government Obligations (as defined in the 1995 Bond Resolution) shall be held in separate trust for the owners of such Bonds or portions thereof to be redeemed, shall not be deemed to be outstanding under the 1995 Bond Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the accrued interest thereon from said separate trust and to receive Bonds (of the same series and maturity) for any unredeemed portion of such Bonds.

*Selection of Bonds to be Redeemed.* If less than all of the Bonds of any one maturity and series shall be called for redemption, the particular Bonds or portions thereof to be redeemed shall be selected by the 1995 Fiscal Agent in such manner as it, in its discretion, may determine to be appropriate and fair; except that so long as the book-entry only system shall remain in effect, the selection of the Bonds to be redeemed shall be determined as provided under the caption "Book-Entry Only System" under THE BONDS. If during any fiscal year the total principal amount of term Bonds retired by purchase or redemption exceeds the amortization requirement for such term Bonds for such year, the amortization requirements for such term Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from sources (including DTC) that the Authority believes to be reliable, but none of the Authority, the 1995 Fiscal Agent and the Underwriters takes any responsibility for the accuracy of such information.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. If, however, the aggregate principal amount of any maturity exceeds $500 million, one Bond will be issued with respect to each $500 million in principal amount and an additional Bond will be issued with respect to any remaining principal amount of such maturity.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has an S&P rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, defaults, and proposed amendments to the Bonds documents.

For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the 1995 Fiscal Agent and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, principal payments and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1995 Fiscal Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC, the 1995 Fiscal Agent, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, principal and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1995 Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1995 Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive Bonds will be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered to DTC.

*The Authority, the 1995 Fiscal Agent and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of the principal of or premium, if any, or interest on any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant. The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.*

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: (i) principal of and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1995 Fiscal Agent in New York, New York; (ii) interest on the Bonds will be payable semiannually on each January 1 and July 1 by check mailed to the addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1995 Fiscal Agent as of the close of business on the record date therefor as set forth in the 1995 Bond Resolution (June 15 and December 15); (iii) the Bonds will be issued only as registered bonds without coupons in denominations of $5,000 or any multiple thereof, and (iv) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust

office of the 1995 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such registration, transfer or exchange.

For every registration or transfer of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## SECURITY

All Government Facilities Bonds will be secured equally and ratably by a pledge of rentals of the facilities leased by the Authority (the "Leased Facilities"). The Leased Facilities will not be mortgaged or otherwise encumbered to secure any Government Facilities Bonds. The Enabling Act provides that the good faith and credit of the Commonwealth are pledged for the payment of rentals under any lease agreement with any department, agency or instrumentality of the Commonwealth and to the making of advances by the Secretary of Treasury Department to the Authority of any unpaid portion of rentals payable to the Authority by any department, agency or instrumentality of the Commonwealth. The Enabling Act also provides that the good faith and credit of any municipality entering into a lease agreement with the Authority are pledged for the payment of any rentals thereunder.

The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Treasury such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith, credit and taxing power of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.

The rentals received in respect of the Leased Facilities financed by any Government Facilities Bonds and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any Public Buildings Authority Public Education and Health Facilities Bonds issued under the 1978 Bond Resolution, or any Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution.

### Commonwealth Guaranty

As provided in Act No. 17 of the Legislative Assembly of Puerto Rico, approved on April 11, 1968, as amended (the "Guaranty Act"), the Commonwealth guarantees, among other things, the payment of the principal of and interest on the Government Facilities Bonds. The Guaranty Act provides:

The Government of Puerto Rico hereby guarantees payment of the principal and the interest on bonds outstanding at any given time, in an aggregate principal amount not exceeding $4,325,000,000 issued from time to time by the Public Buildings Authority for any of its purposes authorized by its Enabling Act. The bonds covered by this guaranty shall be those specified by the Authority with the consent and approval of Government Development Bank for Puerto Rico, including, but not limited to, the "Qualified School Construction Bonds" or other bonds, including federal tax credit bonds under Section 54A of the United States Internal Revenue Code of 1986, as amended, and a statement of such guaranty shall be set forth on the face of such bonds. If at any time the revenues or income and any other moneys of the Authority, pledged for the payment of the principal and interest on such bonds, are not sufficient for the payment of such principal and interest when they come due, nor to maintain the reserve fund for the bonds that the Authority has pledged to maintain, the Secretary of Treasury shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficiency in the amount required for the payment of such principal and interest, and to bring said reserve fund to the required maximum agreed by the Authority, and shall direct that the sums thus withdrawn be applied to such payment and purpose. For purposes of this Article, those bonds that have been redeemed, canceled or refunded and provision for payment of which has been made by means of a special reserve, a guaranteed investment contract or other acceptable collateral shall not be deemed as outstanding. The good faith, credit and taxing power of the Commonwealth are hereby pledged to make the payments described in the above paragraph.

The Bonds have been specified by the Authority in the Bond Resolution to be guaranteed by the Commonwealth under the Guaranty Act, and GDB has given its consent and approval. Following the issuance of the Bonds, the refunding of the Refunded Bonds and the expected payment on July 1, 2012 of $75.6 million principal amount of Government Facilities Bonds (as to which the 1995 Fiscal Agent has sufficient funds on deposit under the 1995 Bond Resolution in trust for their payment and which Government Facilities Bonds are considered no longer outstanding under the 1995 Bond Resolution), the Authority will have $4.296 billion aggregate principal amount of bonds outstanding covered by the Guaranty Act, consisting of $37.3 million of bonds issued under the 1970 Bond Resolution and $4.259 billion of bonds issued under the 1995 Bond Resolution, calculated in each case by excluding the accretion on capital appreciation bonds and convertible capital appreciation bonds. See DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS herein.

To date, no payments have ever been required under the Guaranty Act.

**Opinion of the Secretary of Justice of the Commonwealth**

Prior to the delivery of the Bonds, the Secretary of Justice of the Commonwealth will have rendered his opinion to the Authority to the effect that:

1.      The Authority is lawfully authorized to specify up to $4,325,000,000 aggregate principal amount of bonds of the Authority outstanding at any one time, issued for any of its authorized purposes, to be covered by the guaranty of the Commonwealth under the Guaranty Act, and the Commonwealth will be obligated to pay the principal of and the interest on the bonds so specified to be covered by said guaranty, if and to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to make such payments as the same become due;

2.      Any amounts required to be paid by the Commonwealth under said guaranty will constitute "public debt" in the meaning of Section 8 of Article VI of the Puerto Rico Constitution (the "Constitution"), and will accordingly be entitled to the same priority of payment under such Section as the direct bonded indebtedness of the Commonwealth;

3.      The Secretary of the Treasury can be required in a court of justice under the provisions of Section 2 of Article VI of the Constitution to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Constitution, including any payments required to be made under said guaranty, at the suit of any holder of bonds issued by the Authority and guaranteed pursuant to the Guaranty Act; and

4.      The Commonwealth guaranty of the Bonds constitutes a general obligation of the Commonwealth to which its good faith, credit and taxing power are pledged.

**Lease Agreements**

In accordance with the provisions of the 1995 Bond Resolution, the Authority enters into lease agreements (the "Lease Agreements") with various departments, agencies, instrumentalities and municipalities of the Commonwealth with respect to the Leased Facilities. The Lease Agreements require the corresponding lessees to pay to the Authority annual rentals in substantially equal monthly installments. The rentals are calculated by taking into account the following factors:

(1)      the interest on and principal (including any amortization requirements) of and redemption premium, if any, on Government Facilities Bonds issued to finance or refinance such Leased Facilities,

(2)      any amounts necessary to pay the general administrative expenses of the Authority related to the Leased Facilities, and

(3)      any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities (the "Replacement Reserve").

Certain Lease Agreements also require the lessees to pay certain amounts on account of the principal of and interest on outstanding notes issued to provide interim financing for the initial development and construction of the Leased Facilities.

Each Lease Agreement with respect to a facility terminates when the Government Facilities Bonds (as well as any notes issued to provide interim financing) issued to finance or refinance the acquisition or construction of such facility have been paid in full. All Lease Agreements provide for the adjustment of rentals so that the total amounts payable will be sufficient to meet the required debt service charges. Each Lease Agreement provides that the obligation of the lessee to pay rentals is absolute and unconditional.

Under the 1995 Bond Resolution, the Authority is required to forward, upon receipt, the portion of the rental payment from the lessees corresponding to the debt service payments on the Bonds (as well as any notes issued to provide interim financing) to the 1995 Fiscal Agent.

In an effort to reduce the frequency and length of delays in the receipt of rental payments by the Authority, on December 7, 2001, the Authority entered into an Inter-Agency Agreement (the "Inter-Agency Agreement") with Government Development Bank, OMB and the Treasury Department pursuant to which OMB instructs the Treasury Department to forward funds necessary to pay rentals under Lease Agreements to Government Development Bank by the 10th day of each month, which funds are, in turn, deposited in a special account of the Authority at Government Development Bank. The Inter-Agency Agreement covers rental payments whose source is the General Fund, which includes agencies, departments or instrumentalities that are linked to the central accounting system managed by the Treasury Department. Such amounts represent approximately 85% of all rental payments received by the Authority under the Lease Agreements. The portion of such rentals that is used to pay debt service on the Authority's bonds is kept in the special account of the Authority at Government Development Bank for delivery to the relevant fiscal agents. The remainder is forwarded to the Authority to cover its general and administrative expenses related to the Leased Facilities, as well as any amounts necessary to provide and maintain the Replacement Reserve.

During recent fiscal years, as a result of budgetary constraints of the Commonwealth, OMB did not propose, and as a result the Legislative Assembly did not appropriate, sufficient funds to provide the Authority the total amount of rental payments due under the Lease Agreements. Consequently, OMB was unable to instruct the Treasury Department to forward to Government Development Bank the full amount of such rental payments. Nevertheless, OMB has always instructed the Treasury Department to forward to Government Development Bank sufficient funds to pay all interest on and principal (including any amortization requirements) of and redemption premium, if any, on Government Facilities Bonds, as well as a portion of general and administrative expenses of the Authority related to the Leased Facilities. Recently also, no funds have been deposited by the Authority in the Replacement Reserve. However, commencing in fiscal year 2012, the Authority began making deposits to such reserve.

In 2009, OMB and Government Development Bank established a five-year plan for the repayment of accumulated debt owed by departments, agencies and instrumentalities of the Commonwealth to certain public corporations, including the Authority. Pursuant to this plan, OMB scheduled and the Legislative Assembly appropriated for fiscal years 2010, 2011, and 2012 approximately $51.0 million, $60.3 million, and $38.7 million, respectively, for the amortization of overdue rent owed to the Authority and has agreed to continue requesting annual General Fund appropriations for the payment of such debt. The proposed 2013 budget includes an appropriation to substantially reduce the remaining amount of the overdue rent.

In fiscal years 2010 and 2011, the Authority collected 93% and 98%, respectively, of its current rent. During the first nine months of fiscal year 2012, the Authority has collected 92% of its current rent. As described above, the delays and shortfalls in rental payments have not affected the Authority's ability to pay its debt service and there have been no defaults or delays in the payment of principal of or interest on any indebtedness of the Authority. To address the delays and shortfalls in the payment of rent, the Authority continues to undertake certain fiscal measures, including:

- Ensuring that the Legislative Assembly appropriates sufficient funds in the Commonwealth's proposed budgets to provide the Authority with the adequate amount of rental payments, as proposed by OMB.

- Implementing various Executive Orders issued by the Governor during the second half of fiscal year 2009 calling for the implementation of austerity, fiscal control and expense reduction measures, including salary reduction of non-career employees and agency heads, salary freezes, ban on new positions, and the elimination of vacant positions. No salary increases were granted to the Authority's employees in fiscal years 2010 or 2011 and no salary increases have been granted in fiscal year 2012.

- Developing and implementing various operating expense reduction measures, including the implementation of energy reduction, transportation, communication and security services cost savings initiatives, consolidation of office space to obtain additional rental income, and renegotiation of services contracts (which has thus far resulted in approximately a 30% annual reduction in services contracts costs).

- Implementing a cost reduction initiative in connection with labor union agreements, which initiative includes reductions in the cost of the medical plan, bonus, vacation and sick leave eligibility, among others. This initiative has generated aggregate savings of approximately $13.5 million between fiscal years 2010 and 2012.

- Implementing effective and consistent collection methods for past due rentals and entering into payment plans with lessees.

In addition, the Authority is expecting ten-year projected savings of approximately $18 million in payroll expenses due to the implementation of the incentive, retirement and retraining program for eligible government employees created by Act No. 70, as approved by the Legislature on July 2, 2010 ("Act No. 70"). In fiscal years 2011 and 2012, the Authority has generated aggregate savings of approximately $2.8 million as a result of Act No. 70.

As part of the measures adopted by the Commonwealth to address its financial condition, the Government Development Bank granted the Authority a line of credit, payable from the proceeds of the Bonds, to refund approximately $153.8 million of interest accrued during fiscal year 2012 on its Government Facilities Bonds. The reduction in the Authority's debt service payment requirements for fiscal year 2012 will result in a commensurate decrease in the required rental payments for such fiscal year.

For further information regarding certain provisions required by the 1995 Bond Resolution to be included in each Lease Agreement in respect of facilities financed or refinanced by the Bonds, see SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION.

**Pledge of the Commonwealth to Pay or Advance Rentals**

Under the 1995 Bond Resolution, the Authority has covenanted that if any department, agency, instrumentality or municipality fails to pay any rent when due, the Authority will promptly notify the Secretary of Treasury.

As provided in the Enabling Act, the good faith and credit of the Commonwealth are pledged for the payment of the rent payable under any Lease Agreement with the Authority executed by any of the Commonwealth's departments, agencies, instrumentalities, or public corporations. The Enabling Act also provides that if any rent payable to the Authority by any department, agency, instrumentality or public corporation under a Lease Agreement is not paid when due, the Commonwealth shall advance the unpaid balance to the Authority. The Commonwealth pledges its good faith and credit to the making of such advances. Any advances so made are required to be reimbursed by the particular department, agency, instrumentality or public corporation involved.

Payments or advances of rentals by the Commonwealth, as described above, are subject to annual appropriations by the Legislative Assembly, which appropriations are legally required to be made. However, the obligation to make such appropriations is not legally enforceable in view of the sovereign immunity of the Commonwealth and, unlike the obligation to make payments under the guaranty of the Bonds, the obligation to pay or advance rentals does not constitute "public debt" within the meaning of Section 8 of Article VI of the Constitution.

**Additional Bonds**

Under and in accordance with the provisions and restrictions of the 1995 Bond Resolution, the Authority may issue additional Government Facilities Bonds from time to time to finance additional government facilities or complete the construction of existing government facilities or to refund any bonds issued under the 1995 Bond Resolution, the 1970 Bond Resolution or the 1978 Bond Resolution. Although the Authority reserves the right to issue additional Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution, since the adoption of the 1995 Bond Resolution, the Authority has only issued additional bonds under the 1995 Bond Resolution.

## PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of March 31, 2012.  The table should be read in conjunction with the information set forth under DEBT in the Commonwealth Report including the information under "Debt Service Requirements for Commonwealth General Obligation Bonds."  The table does not take into consideration the following debt issued after March 31, 2012: (1) $2,318,190,000 Public Improvement Refunding Bonds, Series 2012A (General Obligation Bonds) issued by the Commonwealth on April 3, 2012, which proceeds were used to, among other things, refund approximately $1.2 billion of Commonwealth general obligation bonds and repay approximately $654.7 million of GDB lines of credit, and (ii) $630,110,000 Power Revenue Bonds, Series 2012A and $19,890,000 Power Revenue Bonds, Series 2012B, issued by Puerto Rico Electric Power Authority ("PREPA") on May 1, 2012, which proceeds were used to, among other things, refund approximately $21.3 million of outstanding bonds issued by PREPA and repay approximately $161.9 million of GDB lines of credit.

**Commonwealth of Puerto Rico**
**Public Sector Debt\***
**(in millions)**

|  | As of March 31, 2012 |
|---|---|
| GENERAL FUND RELATED DEBT | |
| Direct full faith and credit obligations | $ 9,833 |
| Puerto Rico guaranteed debt[1] | 5,483 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,819 |
| Tax and Revenue Anticipation Notes[3] | 900 |
| Pension Obligation Bonds[4] | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,983 |
| | |
| Sales Tax debt | $15,224 |
| Public corporations and agencies[5] | 25,147 |
| Municipal debt | 3,658 |
| Limited obligations/non-recourse debt[6] | 2,263 |
| TOTAL PUBLIC SECTOR DEBT | $69,275 |

---

\*  Totals may not add due to rounding.
[1]  Consists of $658 million of bonds issued by Aqueduct and Sewer Authority, $440 million of State Revolving Fund Loans incurred under various federal water laws, $214.8 million of bonds issued by Port of the Americas Authority and $4.170 billion of the Authority's bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.
[2]  Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation bonds.
[3]  Includes related short-term financings.
[4]  Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of such bonds.
[5]  Excludes $6.3 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities.  Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included in the table.
[6]  Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $170.8 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); $331.9 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; $149 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $74.6 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.6 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

**Payment of Public Debt**

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first lien on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and, according to opinions rendered by the Secretary of Justice of Puerto Rico, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. Any such guaranty payments, including guaranty payments under the Guaranty Act, are equal in their claim on such available Commonwealth revenues to claims for the payment of debt service on general obligation bonds and notes of the Commonwealth.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of public debt. See "Major Sources of General Fund Revenues—Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES in the Commonwealth Report.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account

of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.  Section 2 of Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" for purposes of the constitutional provisions relating to public debt.

As of May 15, 2012, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in fiscal year 2016 (based on the assumption that variable rate bonds issued by the Commonwealth bear interest at their actual rate per annum through July 1, 2012 (to the extent already determined) and thereafter at the maximum legal rate of 12% per annum).  The amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth was $16,520,000.  The sum of these two amounts, which is $1,005,751,968, is equal to 13.24% of the average of the adjusted internal revenues for fiscal years 2010 and 2011, which is $7,595,987,000.  If the interest on certain outstanding variable rate bonds is calculated using the fixed interest rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the future maximum annual debt service for the Commonwealth outstanding general obligation debt would be $947,895,697 in fiscal year 2020 and the percentage referred to in the preceding sentence would be 12.70%.  Potential termination payments payable by the Commonwealth upon termination of these interest rate exchange agreements are not included in the calculation of the 15% constitutional debt limitation.  These terminations payments are full faith and credit obligations of the Commonwealth and are calculated on the basis of their mark-to-market value.  For a discussion of the Commonwealth's obligations under its variable bonds and interest rate exchange agreements, see "Variable Rate Bonds and Mandatory Tender Bonds" and "Interest Rate Exchange Agreements" under DEBT in the Commonwealth Report.

As provided above, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is therefore required to make such payments under its guarantee, in which case such debt service would be included in the calculation of the 15% constitutional debt limitation.

The Commonwealth's policy has been and continues to be to prudently manage the level of its debt within the constitutional limitation.

Debt issued by the Commonwealth's municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license and sales and use taxes. Debt issued by the Commonwealth's public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations earned from its services or products. See PUBLIC CORPORATIONS in the Commonwealth Report. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Debt of the Commonwealth is issued pursuant to legislation.  Debt of any municipality is issued pursuant to an ordinance adopted by its municipal legislature. Debt of the public corporations is issued in accordance with their enabling statutes. Government Development Bank, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

**Commonwealth Guaranteed Debt**

As of March 31, 2012, $4.170 billion of Commonwealth guaranteed bonds of the Authority were outstanding (not including accretion of interest on capital appreciation bonds).  Maximum annual debt service on

these bonds (assuming the principal amount due at maturity on the Authority's Qualified School Bonds (see "Debt Service Requirements" below) is not refunded) is $993.1 million in fiscal year 2028, assuming the receipt of the issuer subsidy from the federal government on such Qualified School Bonds, and $1.032 billion without taking into consideration said subsidy, with their final maturity being July 1, 2041. No payments under the Commonwealth guaranty have been required to date for any of the Authority's bonds.

As of March 31, 2012, $267 million of Commonwealth guaranteed bonds of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of March 31, 2012, the Government Development Bank held approximately $214.8 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth (the "POA Guaranteed Bonds"). The proceeds from these bonds have been used to continue the development of the Port of the Americas. Payments of $43.4 million under the Commonwealth guaranty have been required to pay interest and principal on these bonds, and the Commonwealth expects to make all remaining payments on the POA Guaranteed Bonds under its good faith and credit guaranty. During fiscal year 2011 and fiscal year 2012, the Commonwealth made payments under the guaranty of $16.5 million and $17.3 million, respectively. While the responsibility for the development and operation of the Port of the Americas was transferred from the Port of the Americas Authority to the Authority of the Port of Ponce in December 2011, the Port of the Americas Authority retained the liability for the POA Guaranteed Bonds, which are expected to be paid by the Commonwealth under the guaranty. See "Other Public Corporations- Port of the Americas Authority" under PUBLIC CORPORATIONS in the Commonwealth Report.

As of March 31, 2012, the aggregate outstanding principal amount of obligations of Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed by the Commonwealth was $1.098 billion. This amount consisted of $285 million in revenue bonds sold to the public, $373 million in bonds issued to the United States Department of Agriculture, Rural Development, and $440 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. The Commonwealth, however, has been making certain subsidy payments to PRASA for its operational expenses. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under PUBLIC CORPORATIONS in the Commonwealth Report.

## THE AUTHORITY

### General

The Authority, a body corporate and politic constituting an instrumentality of the Commonwealth exercising public and essential governmental functions, was created on June 19, 1958 by the Enabling Act. Under the Enabling Act, the primary functions of the Authority are to design and construct office buildings, quarters, courts, warehouses, shops, schools, health facilities, social welfare facilities and related facilities for lease to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The executive offices of the Authority are located at Roberto Sánchez Vilella Government Center, North Building, 6th Floor, De Diego Avenue, San Juan, Puerto Rico 00940, telephone number (787) 722-0101.

On May 12, 2011, the Governor submitted to the Legislative Assembly a bill to reorganize the Authority. According to the bill, the Authority would be renamed as the Corporation of Schools and Public Properties (the "Corporation") and all rights, powers, obligations and assets of the Office for the Improvement of Public Schools ("OMEP" by its Spanish acronym) (affiliated with the Department of Education) would be transferred to the Corporation. As a result of the reorganization, the Corporation would have all rights, powers, obligations and assets of both the Authority and OMEP and would be in a better position to conserve and maintain public schools. The proposed bill is not expected to be enacted into law during 2012.

The audited financial statements of the Authority for the fiscal year ended June 30, 2011 are included in *Appendix II*.

**Powers**

The Authority has broad powers under the Enabling Act, including among others:

- to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers;

- to acquire any kind of properties and rights therein in any lawful manner, including, without limitation, acquisition by purchase, either by agreement or through the exercise of the power of eminent domain, lease or bequest, and to possess, lease, use and operate any properties or facilities;

- to prepare plans, projects and cost estimates for the construction, improvement or repair of any property or facility;

- to contract with any Commonwealth department, agency, instrumentality, public corporation or official, or with any private person or entity with regard to the administration of any properties or facilities of the Authority;

- to borrow money and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds by pledge, mortgage, assignment or deed of trust of all or any of its properties, revenues or income; and

- to do all acts necessary or convenient to carry out the powers granted to it.

**Management**

The Enabling Act provides that the Authority shall be governed by a Governing Board (the "Board") composed of seven members. The Secretary of the Department of Education of Puerto Rico (the "Department of Education"), the Secretary of the Department of Transportation and Public Works, and the President of Government Development Bank serve as ex officio members of the Board, and the other four members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico for staggered six-year terms. At present, there is one vacancy on the Board.

The current members of the Board of the Authority, their occupations and the expiration of terms as Board members are:

| Members of the Board | Occupation | Expiration of Term |
|---|---|---|
| Edward Moreno | Acting Secretary of Education | Ex-officio |
| Rubén Hernández Gregorat | Secretary of Transportation and Public Works | Ex-officio |
| Juan Carlos Batlle Hernaiz | President of Government Development Bank | Ex-officio |
| Reynaldo Encarnación | Engineer | December 2012 |
| Nilda Muñoz Vissepó | Attorney | December 2016 |
| Luis Ortiz Segura | Attorney | July 2016 |

Eduardo Rivera Cruz has been the Executive Director of the Authority since January 25, 2011. From 2009 to his appointment as Executive Director, Mr. Rivera held the position of General Manager of OMEP, which is affiliated with the Department of Education, in charge of the maintenance of more than 1,100 schools island-wide and responsible for creating and implementing the public policies and procedures in OMEP's seven regions. During this period, he was also the President of the Department of Education's Procurement Board, responsible for the Procurement Board management, operation and supervision. From January 2001 to December 2008, Mr. Rivera held the position of Bid Board Director and Alternate Member at the Department of Education, where he was responsible for its current administrative structure and for revising and analyzing rules and regulations. Prior to joining the Department of Education, Mr. Rivera served as Director of the Purchases, Procurements and Contracts

Office for the Puerto Rico Volunteer Youth Corps. He has a Bachelor's Degree in Business Administration from the University of Puerto Rico, with two majors, one in management and another in marketing.

The Authority's financial management team is comprised of its Controller, Legal Director, the Director of Administration and the Director of Project Development:

Wanda Acevedo Torres, CPA, the Authority's Controller, has over 16 years of experience within the governmental accounting fields. She has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is an active member of the Puerto Rico Society of Certified Public Accountants.

Leonardo J. Torres Berríos, Esq., the Authority's Legal Director, has over 19 years of experience within the governmental and private corporate law and real estate fields. He has a Bachelor's Degree in Business Administration from the University of Puerto Rico and a Juris Doctor degree from the Inter American University of Puerto Rico School of Law.

Ismael Zayas González, P.E., the Authority's Acting Director of Administration, has over 17 years of experience within the governmental construction and project management fields. He has a Bachelor's degree in Science of Civil Engineering from the University of Puerto Rico, Mayaguez Campus and a Master's degree in engineering management from Polytechnic University of Puerto Rico.

Arch. Astrid Díaz, the Authority's Acting Director of Project Development, has over 14 years of experience within the field of governmental planning and development of construction projects. She has a Master's degree in Architecture from the University of Puerto Rico.

## PROGRAMS AND FACILITIES OF THE AUTHORITY

The Authority has an approximately $381 million Four-Year Capital Improvement Program (the "CIP"), which reflects the Authority's construction priorities for fiscal year 2010 through fiscal year 2014. The CIP includes office buildings, school buildings, health facilities, correctional facilities, and other facilities, as described below. A portion of the facilities were financed with revenue bonds issued and currently outstanding under the 1995 Bond Resolution (collectively, the "Outstanding Government Facilities Bonds"). The remainder of the costs of the CIP will be paid for through interim financings, future bond issues (subject to the limitations of the Guaranty Act) and Commonwealth appropriations.

**Office Buildings Program**

Under its office buildings program, the Authority has completed construction of 207 office buildings (including police stations, courthouses, and related parking facilities) with approximately 6.8 million square feet of rentable space, for the use of and lease to various departments, agencies and instrumentalities of the Commonwealth. The estimated total cost of construction completed under the office buildings program is currently in excess of $580 million, which was provided principally by the Authority through the issuance of Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

The Authority's current plans include the construction of several police, fire and parking facilities, and improvements to several office buildings, at an estimated total cost in excess of $150 million.

The currently outstanding Public Buildings Authority Revenue Bonds issued under the 1970 Bond Resolution and Government Facilities Bonds issued under the 1995 Bond Resolution are secured by a pledge of the rentals of public buildings and related facilities financed by such bonds. In addition, these obligations are secured by a pledge of the Commonwealth to pay or advance rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act. The Authority reserves the right to issue additional Revenue Bonds and Government Facilities Bonds to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the office buildings program.

**School Buildings Program**

Under its school buildings program, the Authority has completed the construction of 376 school building projects with approximately 20.3 million square feet of rentable space, all of which have been leased to the Department of Education.  The estimated total cost of construction completed under the school buildings program is currently in excess of $2.5 billion, which was provided principally by the Authority through the issuance of Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution.

The Authority's current plans include the construction of 11 new school buildings and improvements to 151 school buildings with approximately 1 million square feet of rentable space, all of which will be leased to the Department of Education.  The estimated total cost of construction of such school buildings and improvements is approximately $805 million.

The Authority may issue additional bonds under the 1995 Bond Resolution and secure them by a pledge of rentals of public education facilities financed by such bonds.  In addition, they can be secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act.  The Authority reserves the right to issue Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the school buildings program.

The Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector.  Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while the Puerto Rico Infrastructure Financing Authority serves as procurement and construction manager.  The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, science labs, art centers, among other things.

**Health Facilities Program**

Under its health facilities program, the Authority has completed construction of 18 health facilities with approximately 1.5 million square feet of rentable space, all of which has been leased to the Department of Health.  The estimated total cost of construction completed and owned by the Authority was approximately $203 million, which was provided mainly by the Authority through the issuance of Public Education and Health Facilities Bonds under the 1978 Bond Resolution.

The Authority may issue additional bonds under the 1995 Bond Resolution and secure them by a pledge of rentals of health facilities financed by such bonds.  In addition, the bonds can be secured by a pledge of the Commonwealth to pay rentals under the Enabling Act and the Commonwealth guaranty of bonds issued by the Authority under the Guaranty Act.  The Authority reserves the right to issue Public Education and Health Facilities Bonds under the 1978 Bond Resolution and Government Facilities Bonds under the 1995 Bond Resolution to provide for the payment of any then outstanding notes issued in connection with or the cost of construction of any facilities included in the health facilities program.

**Correctional Facilities Program**

In 1994, the Department of Correction and Rehabilitation (the "Department of Correction"), in cooperation with the Authority, began a program to provide for the construction, operation and maintenance of new Commonwealth correctional facilities to be leased to the Department of Correction by the Authority.  These facilities were constructed as part of the Commonwealth's effort to alleviate overcrowding in its correctional system and achieve compliance with certain federal court mandated minimum inmate living space requirements.  The Authority has completed the construction of eight correctional facilities with approximately 1.7 million square feet

of rentable space at a cost of approximately $287 million, which facilities are operated by the Department of Correction.

## Other Facilities

The Authority also constructs office buildings, schools and health facilities that are financed by a combination of federal grants and Commonwealth appropriations.  The Authority is also empowered to undertake construction on behalf of and as an agent for other public agencies of the Commonwealth.

Under the Enabling Act, the Authority is also empowered to construct social welfare facilities.  Any such facilities that may be constructed can be financed by bonds of the Authority under the 1995 Bond Resolution.  The Authority has not issued any bonds or other obligations to finance such facilities.

### DEBT OF THE AUTHORITY AND DEBT SERVICE REQUIREMENTS

## Debt

The following table sets forth the outstanding debt of the Authority:

| | As of March 31, 2012[1] | As Adjusted to Reflect the Issuance of the Bonds and the Refunding of the Refunded Bonds[2] |
|---|---|---|
| Bonds outstanding under the 1970 Bond Resolution | $37,315,000 | $37,315,000 |
| Bonds outstanding under the 1995 Bond Resolution | $4,133,144,115 | $4,259,178,667 |
| Total bonded debt[3] | $4,170,459,115 | $4,296,493,667 |

_____

[1]  Calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds.  These amounts do not reflect Government Development Bank's interim financing of the Authority's Capital Improvement Plan.

[2]  Reflects the outstanding debt of the Authority after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds (calculated by excluding all interest accretion on outstanding capital appreciation bonds and convertible capital appreciation bonds).  The "As Adjusted" amount of outstanding Government Facilities Bonds under the 1995 Bond Resolution was reduced by $75.6 million to reflect the expected payment on July 1, 2012 of Government Facilities Bonds due on that date because the 1995 Fiscal Agent currently holds in trust for those bonds amounts sufficient to pay their principal and interest to such date and such Government Facilities Bonds are considered no longer outstanding under the 1995 Bond Resolution.

[3]  Totals may not add due to rounding.

## Debt Service Requirements

Debt service requirements of the Authority for the bonds outstanding under the 1970 and 1995 Bond Resolutions, after taking into account the issuance of the Bonds and the refunding of the Refunded Bonds, as shown in the following table, consist in any fiscal year of the sum of the amounts required to pay (i) the interest that is payable on January 1 in such fiscal year and July 1 in the following fiscal year, (ii) the principal of serial bonds that is payable on July 1 in the following fiscal year, and (iii) the amortization requirements for term bonds that are payable on July 1 in the following fiscal year.

In 2011, the Authority issued its Series R Qualified School Construction Bonds (the "Series R Bonds") and its Series T Qualified Zone Academy Bonds (the "Series T Bonds," and collectively with the Series R Bonds, the "Qualified School Bonds") in the principal amounts of $756,449,000 and $121,528,000, respectively.  In connection with the issuance of the Qualified School Bonds, the Authority created certain advance deposit accounts in which it agreed to make annual deposits of an amount specified in the authorizing bond resolution.  The Authority elected to issue the Qualified School Bonds with a single maturity.  The first column of the table below shows the actual debt

service requirements of the outstanding bonds of the Authority (excluding the Refunded Bonds) reduced by the amount of federal subsidy expected to be received by the Authority on the Qualified School Bonds.  The second column of the table below shows the actual debt service requirements of the outstanding bonds of the Authority (excluding the Refunded Bonds) reduced by the amount of federal subsidy expected to be received by the Authority on the Qualified School Bonds and adjusting the debt service of the Qualified School Bonds to reflect, instead of the principal amount of the Qualified School Bonds due at maturity, the advance deposit amounts required to be deposited to the credit of the advance deposit accounts, certain minimum principal payments, and annual debt service on refunding bonds issued to refinance the difference between the principal amount of such Qualified School Bonds remaining after such payment and the amount expected to be on deposit to the credit of the advance deposit accounts on the maturity date of the Qualified School Bonds, assuming that such refunding bonds would have an interest rate of 6.75%, level debt service and either (i) a 13-year term in the case of the refunding bonds to refund the Series R Bonds, or (ii) an 11-year term in the case of the refunding bonds to refund the Series T Bonds.  The fourth column of the table below shows the sum of the totals in the second column (with the corresponding adjustments mentioned above) and the third column.

**Puerto Rico Public Buildings Authority**
**Debt Service Requirements**

| Fiscal Year Ending June 30, | (1) Debt Service on Outstanding Bonds of the Authority, excluding Refunded Bonds[1] | (2) Pro Forma Debt Service on Outstanding Bonds of the Authority, excluding Refunded Bonds[1] | (3) Debt Service on the Series U Bonds | (4) Pro Forma Total Debt Service[1] |
|---|---|---|---|---|
| 2013 | $243,051,892 | $243,051,892 | $31,262,833 | $274,314,726 |
| 2014 | 242,428,774 | 242,428,774 | 30,877,892 | 273,306,666 |
| 2015 | 242,273,736 | 242,273,736 | 32,159,492 | 274,433,228 |
| 2016 | 239,021,186 | 239,021,186 | 35,159,092 | 274,180,278 |
| 2017 | 239,211,474 | 239,211,474 | 35,007,592 | 274,219,066 |
| 2018 | 207,415,361 | 238,955,885 | 34,861,592 | 273,817,477 |
| 2019 | 207,754,886 | 239,295,410 | 34,315,592 | 273,611,002 |
| 2020 | 203,131,686 | 239,887,210 | 39,608,388 | 279,495,597 |
| 2021 | 231,549,936 | 268,305,460 | 33,672,138 | 301,977,597 |
| 2022 | 230,769,074 | 267,524,597 | 33,482,138 | 301,006,735 |
| 2023 | 217,436,774 | 254,192,297 | 30,469,638 | 284,661,935 |
| 2024 | 221,344,074 | 258,099,597 | 28,280,438 | 286,380,035 |
| 2025 | 218,787,455 | 255,542,979 | 28,280,438 | 283,823,416 |
| 2026 | 205,568,693 | 242,324,216 | 28,280,438 | 270,604,654 |
| 2027 | 206,413,618 | 243,169,141 | 28,280,438 | 271,449,579 |
| 2028 | 933,037,018 | 223,700,678 | 28,280,438 | 251,981,115 |
| 2029 | 172,413,593 | 218,180,313 | 28,280,438 | 246,460,751 |
| 2030 | 328,582,656 | 252,760,935 | 28,280,438 | 281,041,373 |
| 2031 | 205,367,259 | 253,031,153 | 28,280,438 | 281,311,591 |
| 2032 | 186,862,513 | 234,637,810 | 28,280,438 | 262,918,247 |
| 2033 | 186,755,194 | 234,456,324 | 28,280,438 | 262,736,761 |
| 2034 | 186,644,450 | 234,269,571 | 28,280,438 | 262,550,008 |
| 2035 | 200,188,483 | 247,727,466 | 28,280,438 | 262,007,904 |
| 2036 | 186,527,775 | 233,980,056 | 28,280,438 | 262,260,494 |
| 2037 | 98,090,863 | 145,444,225 | 102,430,438 | 247,874,662 |
| 2038 | 83,956,513 | 131,211,271 | 102,432,563 | 233,643,834 |
| 2039 | 86,079,138 | 133,223,554 | 102,430,200 | 235,653,754 |
| 2040 | 87,786,700 | 134,813,002 | 102,432,850 | 237,245,852 |
| 2041 | 87,783,900 | 134,867,264 | 102,433,963 | 237,121,277 |
| 2042 | | | 133,551,725 | 133,551,725 |
| **Total[2]** | $6,386,234,672 | $6,525,407,478 | $1,384,233,809 | $7,909,641,287 |

[1] Debt Service on Qualified School Bonds is adjusted as described in the paragraph immediately preceding the table.
[2] Totals may be not add due to rounding.

## SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION

The following statements are brief summaries of certain provisions of the 1995 Bond Resolution. Such statements do not purport to be complete and reference is made to the 1995 Bond Resolution, copies of which are available for examination at the office of the 1995 Fiscal Agent. For the purposes of this summary, the terms "Bond" or "Bonds" shall refer to the Government Facilities Revenue Bond or Bonds and the term "Series U Bonds" shall refer to the series of Bonds to which this Official Statement relates.

### Revenues

The Authority covenants that each Lease Agreement which it enters into for any government facilities financed or refinanced under the 1995 Bond Resolution ("Authority Facilities") will require the Lessee thereunder to pay rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the interest on all Bonds issued by the Authority for the financing or refinancing of the Authority Facilities covered by such Lease Agreement, the principal of all such Bonds which are serial Bonds and the amortization requirements and redemption premium for any such Bonds which are term Bonds ("1995 Debt Service Rentals"). (Section 701). All 1995 Debt Service Rentals received from the leasing of Authority Facilities are pledged as hereinafter provided.

### 1995 Sinking Fund

A special fund is created by the 1995 Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds Sinking Fund" (the "1995 Sinking Fund"). Two separate accounts are created in the 1995 Sinking Fund, namely, the "1995 Bond Service Account" and the "1995 Redemption Account" (Section 502).

The Authority covenants that all 1995 Debt Service Rentals will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the following accounts in the following order:

(1)     To the 1995 Bond Service Account, such amount thereof as may be required to make the amount then to the credit of the 1995 Bond Service Account equal to the amount of interest then due and payable and the interest which will accrue up to the next interest payment date on all Bonds of each series then outstanding and the principal of all serial Bonds, if any, which will become due and payable within the next ensuing twelve months;

(2)     To the 1995 Redemption Account, such amount of the balance remaining after making the deposit under paragraph (1) above as may be required to make the amounts so deposited in the then current fiscal year equal to the amortization requirements, if any, for such fiscal year for the term Bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of Bonds if such principal amount of Bonds should be redeemed on the next redemption date from moneys in the 1995 Sinking Fund; and

(3)     The balance, if any, shall be deposited to the credit of the 1995 Bond Service Account. (Section 502).

The requirements specified in paragraphs (1) and (2) above shall be cumulative. (Section 502).

### 1995 Redemption Account

Moneys in the 1995 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1995 Sinking Fund. The 1995 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the

1995 Bond Service Account and the purchase price from the 1995 Redemption Account, but no such purchase shall be contracted for within the period of 45 days next preceding any interest payment date on which such Bonds are subject to call for redemption under the provisions of the 1995 Bond Resolution.

(b)      Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall call for redemption on each date on which Bonds are subject to redemption from moneys which are in the 1995 Sinking Fund on the 45th day prior to such redemption date such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1995 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than 30 days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and from the 1995 Redemption Account and set aside in separate accounts the respective amounts required for paying the principal of and redemption premium, if any, and the interest on the Bonds so called for redemption.

(c)      Moneys in the 1995 Redemption Account shall be applied by the 1995 Fiscal Agent in each fiscal year to the purchase or redemption of Bonds of each series then outstanding in the following order:

first, the term Bonds of each such series to the extent of the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and if the amount available in such fiscal year shall not be equal thereto, then, in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding, plus the applicable premium, if any;

second, any balance then remaining shall be applied to the purchase of any Bonds whether or not such Bonds shall be subject to redemption in accordance with paragraph (a) above;

third, any balance then remaining shall be applied to the redemption of term Bonds of each such series in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and

fourth, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of such series originally issued under the provisions of the 1995 Bond Resolution. (Section 504).

The term "Principal and Interest Requirement" for any fiscal year, as applied to the Bonds of any series under the 1995 Bond Resolution, shall mean the sum of:

(a)      the amount required to pay the interest on all outstanding Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year;

(b)      the amount required to pay the principal of all outstanding serial Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year; and

(c)      the amortization requirement for the term Bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(i)      in the case of Capital Appreciation Bonds, the Accreted Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of the principal or amortization requirements in accordance with the above provisions;

(ii)      in the case of Capital Appreciation and Income Bonds, the Appreciated Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of principal or amortization requirements in accordance with the above provisions;

(iii)      the interest rate on Bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the average rate of interest per annum on such Bonds for the preceding twelve months or such shorter period that such Bonds shall have been outstanding, or if such Bonds had not been outstanding prior to the date of calculation, the rate of interest on such Bonds on the date of calculation;

(iv)      in the case of Bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such Bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for amortization requirements and principal payments shall be used; provided, however, that if on the date of calculation the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in (or specified in the agreement authorizing the issuance of) the letter of credit or insurance policy or similar credit or liquidity facility;

(v)      in the case of Bonds the maturity of which may be extended by and at the option of the holder thereof or the Authority, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended; and

(vi)      in the case of Bonds (A) which are expected to be repaid from the proceeds of Bonds or other indebtedness or (B) on which interest is payable periodically and for which 25% or more of the principal amount matures during any one year and for which no amortization requirements have been established, the debt service requirements on the Bonds may be excluded and in lieu thereof the Bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status to that of such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Bonds and issued by issuers having a credit rating, by Moody's or any successors thereto or Standard & Poor's or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities. (Section 101).

Notwithstanding the foregoing, if the Authority has notified the 1995 Fiscal Agent that an interest rate swap agreement is in effect in respect of any Bonds, then for all purposes of the above paragraphs, except for the purpose of determining the required deposits to the 1995 Sinking Fund pursuant to Section 502 of the 1995 Bond Resolution, the interest rate on such Bonds shall be the interest rate calculated with reference to such interest rate swap agreement; and if such rate calculated with reference to such interest rate swap agreement is a variable rate, the interest rate on such Bonds (except for the purpose specified above in this sentence) shall be the average interest rate calculated with reference to such interest rate swap agreement for the preceding twelve months or such shorter period that the interest rate swap agreement has been in effect, or if such interest rate swap agreement had not been in effect prior to the dates of calculation, the interest rate calculated with reference to such interest rate swap agreement on the date of calculation. (Section 101).

**1995 Construction Fund**

The balance of proceeds of Bonds issued under Section 208 of the 1995 Bond Resolution available for payment of construction costs is required to be deposited to the credit of the Construction Fund under the 1995 Bond Resolution (the "1995 Construction Fund") and applied to the payment of the cost of the Initial Facilities, Additional Facilities, Improvements and uncompleted Facilities for which such Bonds were issued. (Section 208).

Payments from the 1995 Construction Fund shall be disbursed by check signed by the Treasurer of the Authority or by any officer or employee of the Authority designated by resolution of the Authority. (Section 402). Any balance remaining in the 1995 Construction Fund from time to time after the completion of the Authority

Facilities and Improvements theretofore financed by the Authority may, at the option of the Authority, be deposited to the credit of the 1995 Redemption Account or the 1995 Bond Service Account. (Section 404).

The proceeds of the Series U Bonds on deposit in the 1995 Construction Fund shall not be disbursed without the prior written approval of Government Development Bank.

**Additional Bonds**

Additional Bonds may be issued from time to time to provide funds to pay all or any part of any remaining costs of the Initial Facilities or to pay all or any part of the cost of any Additional Facilities or Improvements to Authority Facilities financed under the 1995 Bond Resolution or any uncompleted part of the Initial Facilities or Additional Facilities or Improvements, and to pay any notes or other obligations of the Authority therefore issued, or to repay any advances made from any source, to finance such costs; provided that no such Bonds shall be issued unless under the then existing law such Bonds may be specified by the Authority to be covered by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such Bonds by resolution. Before any such Additional Bonds may be issued, there must be filed with the 1995 Fiscal Agent, among other things, a certificate signed by the Executive Director of the Authority stating that on the basis of all Lease Agreements or amendments or supplements thereto, as executed and delivered or as expected to be executed and delivered, the 1995 Debt Service Rentals, as calculated by the Authority will be sufficient and timely to pay the principal of; and the redemption premium, if any, and interest on, such Bonds and all Bonds then outstanding. (Section 208).

Refunding bonds, including crossover refunding bonds, may be issued by the Authority at any time or times for the purpose of providing funds for refunding at or prior to their maturity or maturities all or any part of (i) the outstanding Bonds of any series, or (ii) the outstanding debt of the Authority incurred to finance Authority Facilities as defined in the 1970 Bond Resolution or in the 1978 Bond Resolution, in either case including the payment of any redemption premium prior thereto; provided that no such refunding bonds shall be issued unless under the then existing law such bonds may be specified by the Authority to be covered (as of the crossover date with respect to crossover refunding bonds) by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such refunding bonds by resolution. (Section 209).

**Investment of Funds in 1995 Construction Fund, 1995 Bond Service Account and 1995 Redemption Account**

The 1995 Bond Resolution provides for the following types of investments:

(a)      Government Obligations which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, (ii) obligations (including participation certificates) issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal. Home Loan Banks, the Farm Credit System, Federal National Mortgage Association and the Student Loan Marketing Association, (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above or (iv) below and which obligations are not subject to redemption prior to the date on which the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and which municipal obligations are rated in the highest category (without regard to any gradation within such category) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii) and (iii) above held by a national banking association or bank (including the 1995 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligation described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

(b)      Investment Obligations which are (i) Government Obligations, (ii) obligations of any state or territory of the United States of America which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any

successors thereto and Standard & Poor's or any successors thereto, (iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1995 Fiscal Agent), any trust company or any savings and loan association (including any investment in pools of such bankers' acceptances, certificates, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, national banking association, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1995 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties, (iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth of Puerto Rico or any national banking association (including the 1995 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any or more of the securities described in clause (i) or (ii) above, in which securities the 1995 Fiscal Agent has a perfected first security interest and such securities are held free and clear of claims by third parties, or if not so secured, meets the rating requirements set forth in clause (vii) below, (v) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within such categories) by both Moody's or any successors thereto, and Standard & Poor's or any successors thereto, (vi) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to gradations within such category) and (a) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and meets the requirements of Section 852(a) of said Code for the calendar year; (b) invests all of its assets in Government Obligations or in Investment Obligations described in clause (ii) above; and (c) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1995 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to any gradations within such category), and (vii) any other investment obligations which are rated, which are issued by issuers which are rated, or which are backed by letters of credit or lines of credit the provider of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto or which are collateralized by such Investment Obligations. (Section 101).

Moneys held in the 1995 Construction Fund, the 1995 Bond Service Account and the 1995 Redemption Account shall, as nearly as practicable, be invested and reinvested in Investment Obligations, which mature, or are subject to redemption by the holder thereof at the option of such holder not later than the dates when the moneys held for the credit thereof will be required for the purposes intended. (Section 602).

**General Covenants**

The Authority covenants that it will not agree to any amendment, modification or termination of any Lease Agreements of any Authority Facilities (or exercise any right it may have to rescind the lease of any lessee of space in any Authority Facilities) which would reduce the amounts of rental payments below the amounts required by Section 701 of the 1995 Bond Resolution or postpone the times of making such rental payments or which would otherwise materially and adversely affect the security of the bondholders (Section 702), that it will not create or suffer to be created any lien or charge upon the Authority Facilities or any part thereof or upon the 1995 Debt Service Rentals therefrom, other than the liens and charges created or permitted under the 1995 Bond Resolution (Section 705), and that each Lease Agreement will provide that the obligation of the lessee to pay timely the required rentals thereunder shall be absolute and unconditional. (Section 709).

The Authority covenants that it will not dispose of or encumber any Authority Facilities, unless (a) the Authority determines that notwithstanding such disposition or encumbrance, total rents under each Lease Agreement

will be sufficient to provide the sums required under Section 701 of the 1995 Bond Resolution, and (b) the Authority will receive as the price for any such disposition (but not an encumbrance), together with any other available moneys, the total amount of the 1995 Debt Service Rentals which would otherwise have been payable by the lessees of such Authority Facilities during the remaining term of the related Lease Agreements plus such additional amounts as will be necessary to pay the fees and expenses of the 1995 Fiscal Agent and all other expenses in connection with the application of the proceeds of such sale to the payment of the principal of and interest on outstanding Bonds issued by the Authority under the 1995 Bond Resolution including any redemption premiums. The proceeds of any such disposition (other than an encumbrance) shall be promptly deposited in the 1995 Redemption Account. (Section 708).

The Authority may also from time to time dispose of or encumber any fixtures or movable property in connection with the Authority Facilities or any materials used in connection therewith, if the Authority determines that such articles are no longer needed or useful in connection with the construction or operation or maintenance of the Authority Facilities and the proceeds thereof (other than an encumbrance) shall be applied to the replacement of the property so disposed of or at the option of the Authority shall be deposited to the credit of the 1995 Redemption Account. (Section 708).

Each Lease Agreement is required to provide that it may not be assigned or otherwise transferred in whole or in part by either party (unless the conditions set forth under the 1995 Bond Resolution for a termination of such Lease Agreement have been met), and will provide that all or any part of the Authority Facilities covered by such Agreement may be subleased as a whole or in part by the lessee if, among other things the following conditions have been met: (a) the sublessee under the sublease shall be a department, agency or instrumentality of the Commonwealth unless the Authority shall have obtained an opinion of nationally recognized bond counsel that such sublease will not cause interest on any Bonds to be includable in gross income of the owners thereof for federal income tax purposes (other than Bonds for which such interest is intended not to be excludable in gross income for such purposes); (b) such lessee shall acknowledge in writing that it shall continue to remain liable for the payment of all rentals under such Lease Agreement; and (c) there shall have been delivered to the Authority and such lessee (i) if the sublessee is a department of the Commonwealth, a certificate signed by the Secretary or an Assistant Secretary of such department stating that on the basis of budgeted appropriations for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to timely pay all rentals which will be due and payable during such fiscal year, or (ii) if the sublessee is an agency or instrumentality of the Commonwealth, a certificate signed by the chief executive officer of the sublessee stating that on the basis of budgeted appropriations and/or estimate revenues for the sublessee for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to pay timely all rentals which will be due and payable during such fiscal year. (Section 710).

The Authority covenants that it will cause audits to be made of its books and accounts by an independent firm of certified public accountants chosen by the Authority. Reports of such audits shall, among other things, set forth the findings of such certified public accountants as to whether the moneys received by the Authority under the 1995 Bond Resolution have been applied in accordance with the provisions thereof. Copies of such reports shall be filed with the 1995 Fiscal Agent and shall be mailed by the Authority to each bondholder who shall have filed his name and address with the Secretary of the Authority for such purpose. (Section 712).

**Modifications**

The Authority may adopt resolutions supplemental to the 1995 Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission or to correct any inconsistent provisions or errors in the 1995 Bond Resolution; provided such action shall not adversely affect the interests of the bondholders, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders, or to add to the conditions, limitations and restrictions on the issuance of Bonds, or to add to the covenants and agreements of the Authority in the 1995 Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority. (Section 901).

The holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1995 Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering,

amending, adding to or rescinding any of the terms and provisions contained in the 1995 Bond Resolution; provided, however, that nothing contained in the 1995 Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, (c) the creation of a lien upon or a pledge of 1995 Debt Service Rentals other than the liens and pledges created by or pursuant to the 1995 Bond Resolution, (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 902). No supplemental resolution may, however, change, amend or modify the rights or obligations of the 1995 Fiscal Agent under the 1995 Bond Resolution without the written consent of the 1995 Fiscal Agent. (Section 904).

**Notice of Default**

In the event that (i) on the second business day prior to the date on which a payment of interest, principal, or premium, if any, is due on any Bond there is not an amount sufficient in such account or fund as the 1995 Fiscal Agent may draw upon for the payment on such due date of such interest, principal, or premium, or (ii) the Authority shall default in the due and punctual making of any 1995 Sinking Fund deposit required by Section 502 of the 1995 Bond Resolution, the 1995 Fiscal Agent shall promptly give written notice of such insufficiency or default, as the case may be, to the Authority, the Secretary of Treasury and Government Development Bank. In the event that the Authority shall default in the due and punctual performance of any other covenants or agreements in the Bonds or the 1995 Bond Resolution and the 1995 Fiscal Agent shall have knowledge of, or is notified of, such default, and the Authority shall fail to correct such default within 30 days after notice thereof to the Authority by the 1995 Fiscal Agent, the 1995 Fiscal Agent shall promptly give notice of such default to the Secretary of Treasury and Government Development Bank. (Section 804).

The 1995 Bond Resolution and the Bonds do not provide for acceleration of the maturities of the Bonds in the event of a default thereunder or in any other circumstances and do not provide that the bondholders may require the 1995 Fiscal Agent to take any action on their behalf.

## TAX MATTERS

### *Tax-exempt Bonds*

#### General

The Internal Revenue Code of 1986, as amended (the "Code") includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, which must continue to be satisfied by the Authority after the issuance of the Tax-exempt Bonds in order that interest on the Tax-exempt Bonds not be included in gross income for federal income tax purposes. The failure to meet these requirements by the Authority may cause interest on the Tax-exempt Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Authority has covenanted that it will comply, with the requirements of the Code in order to maintain the exclusion from gross income of interest on the Tax-exempt Bonds for federal income tax purposes.

In the opinion of Sidley Austin LLP, Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, based on existing law, interest on the Tax-exempt Bonds will not be includable in gross income for federal income tax purposes. Interest on the Tax-exempt Bonds will not be a specific preference item for purposes of the federal individual or corporate alternative minimum tax. Interest on the Tax-exempt Bonds owned by a corporation will, however, be included in the calculation of the corporation's federal alternative minimum tax liability. The Code contains other provisions that could result in tax consequences, upon which Bond Counsel renders no opinion, as a result of ownership of such Tax-exempt Bonds or the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income. No opinion is expressed as to the effect of any change to any document pertaining to the Tax-exempt Bonds or of any action taken or not taken where such change is made or action is taken or not taken without the approval of Bond Counsel or in reliance upon the advice of counsel other than Bond Counsel with respect to the exclusion from gross income of the interest on the Tax-exempt Bonds for federal income tax purposes.

Bond Counsel is further of the opinion that under the provisions of the Acts of Congress now in force, the Tax-exempt Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

**Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the Tax-exempt Bonds over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of Tax-exempt Bonds of that maturity was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond will be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

Original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, a beneficial owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although it has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bond of that maturity is sold to the public may be determined according to rules that differ from those described above. A beneficial owner of a Discount Bond should consult its tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess of the tax basis of a Tax-exempt Bond to a purchaser (other than a purchaser who holds such Tax-exempt Bond as inventory, stock in trade, or for sale to customers in the ordinary course of business) who purchases such Tax-exempt Bond as part of the initial offering and at the applicable initial offering price as set forth or derived from information set forth on the inside cover page hereof over the amount payable at maturity of such Tax-exempt Bond is "Bond Premium." Bond Premium is amortized over the term of such Tax-exempt Bond for federal income tax purposes. No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Tax-exempt Bond. An owner of such Tax-exempt Bond is required to decrease his adjusted basis in such Tax-exempt Bond by the amount of amortizable Bond Premium attributable to each taxable year such Tax-exempt Bond is held. A beneficial owner of such Tax-exempt Bond should consult its tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Tax-exempt Bond.

**Other**

Ownership of tax-exempt obligations such as the Tax-exempt Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Tax-exempt Bonds should consult their tax advisors as to the applicability and impact of any collateral consequences.

### Information Reporting and Backup Withholding

Interest paid on tax-exempt obligations is subject to information reporting in a manner similar to interest paid on taxable obligations. While this reporting requirement does not, by itself, affect the excludability of interest from gross income for federal income tax purposes, the reporting requirement causes the payment of interest on the Tax-exempt Bonds to be subject to backup withholding if such interest is paid to beneficial owners that (a) are not "exempt recipients," and (b) either fail to provide certain identifying information (such as the beneficial owner's taxpayer identification number) in the required manner or have been identified by the IRS as having failed to report all interest and dividends required to be shown on their income tax returns. Generally, individuals are not exempt recipients, whereas corporations and certain other entities are exempt recipients. Amounts withheld under the backup withholding rules from a payment to a beneficial owner are allowed as a refund or credit against such beneficial owner's federal income tax liability so long as the required information is furnished to the IRS.

### Future Developments

Future or pending legislative proposals, if enacted, regulations, rulings or court decisions may cause interest on the Tax-exempt Bonds to be subject, directly or indirectly, to federal income taxation or to state, Commonwealth or local income taxation, or may otherwise prevent beneficial owners from realizing the full current benefit of the tax status of such interest. Legislation or regulatory actions and future or pending proposals may also affect the economic value of the federal or state tax exemption or the market value of the Tax-exempt Bonds. Prospective purchasers of the Tax-exempt Bonds should consult their tax advisors regarding any future, pending or proposed federal or state tax legislation, regulations, rulings or litigation as to which Bond Counsel expresses no opinion.

For example, based on a proposal by the President, the Senate Majority Leader introduced a bill, S. 1549 (the "Proposed Legislation"), which, if enacted, would subject interest on bonds that is otherwise excludable from gross income for federal income tax purposes, including interest on the Tax-exempt Bonds, to a tax payable by certain bondholders that are individuals, estates or trusts with adjusted gross income in excess of thresholds specified in the Proposed Legislation in tax years beginning after December 31, 2012. The Proposed Legislation would also provide special rules for such bondholders that are also subject to the alternative minimum tax. It is unclear if the Proposed Legislation will be enacted, whether in its current or an amended form, or if other legislation that would subject interest on the Tax-exempt Bonds to a tax or cause interest on the Tax-exempt Bonds to be included in the computation of a tax, will be introduced or enacted. Prospective purchasers should consult their tax advisors as to the effect of the Proposed Legislation, if enacted, in its current form or as it may be amended, or such other legislation on their individual situations.

### *Taxable Bonds*

### Federal Income Tax Considerations

### Circular 230 Notice

Any discussion of U.S. federal tax issues set forth in this Official Statement relating to the Taxable Bonds was written in connection with the promotion and marketing of the transactions described in this Official Statement. Such discussion is not intended or written to be legal or tax advice with respect to the Taxable Bonds to any person, and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties. Each investor should seek advice based on its particular circumstances from an independent tax advisor.

**General**

      The following is a summary of the principal U.S. federal income tax consequences of the purchase, ownership and disposition of the Taxable Bonds. This discussion does not purport to be a complete analysis of all the potential tax consequences of such purchase, ownership and disposition and is based on the Internal Revenue Code of 1986, as amended (the "Code"), treasury regulations, administrative rulings and judicial decisions in effect as of the date hereof. Those authorities are subject to change, possibly with retroactive effect. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular investor in light of that investor's individual circumstances or to certain types of investors subject to special treatment under the U.S. federal income tax laws (including persons whose functional currency is not the U.S. dollar, entities classified as partnerships for U.S. federal income tax purposes, life insurance companies, regulated investment companies, real estate investment trusts, dealers in securities or currencies, banks, tax-exempt organizations or persons holding Taxable Bonds in a tax-deferred or tax-advantaged account, traders in securities that elect to use a mark-to-market method of accounting for securities holdings, persons who hold Taxable Bonds as part of a hedging, straddle, integrated, conversion or constructive sale transaction, persons who have ceased to be U.S. citizens or to be taxed as resident aliens or persons liable for the alternative minimum tax), and does not discuss any aspect of state, local or foreign tax laws, other than as set forth under "State, Commonwealth and Local Income Taxation" below. This discussion applies only to U.S. holders and non-U.S. holders (each defined below) of Taxable Bonds who purchase their Taxable Bonds in the initial offering at the initial offering price, and who hold their Taxable Bonds as capital assets. This discussion does not address any tax consequences applicable to a holder of an equity interest in a holder of Taxable Bonds. In particular, this discussion does not address any tax consequences applicable to a partner in a partnership holding Taxable Bonds. If a partnership holds Taxable Bonds, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and the activities of the partnership. Thus, a person who is a partner in a partnership holding Taxable Bonds should consult his or her tax advisor.

      This summary only addresses Taxable Bonds with the features described herein.

      **Prospective purchasers are urged to consult their tax advisors with respect to the U.S. federal and other tax consequences of the purchase, ownership and disposition of the Taxable Bonds before determining whether to purchase the Taxable Bonds. In addition, prospective purchasers are urged to consult their tax advisors regarding recent changes to the Code enacted by Congress.**

      In this discussion, the term "U.S. Holder" means a beneficial owner of Taxable Bonds that is, for U.S. federal income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (b) the trust properly elected to be treated as a United States person. As used herein, the term "non-U.S. Holder" means a beneficial owner Taxable Bonds that is not a U.S. Holder.

**U.S. Holders**

      *Interest on Taxable Bonds*

      Payments of interest on the Taxable Bonds will be included in gross income for U.S. federal income tax purposes by a U.S. Holder as ordinary income at the time the interest is paid or accrued in accordance with the U.S. Holder's regular method of accounting for tax purposes.

      *Market Discount*

      If a U.S. Holder purchases a Taxable Bond for an amount that is less than its stated redemption price at maturity, such U.S. Holder will be treated as having purchased such Taxable Bond at a "market discount," unless the

amount of such market discount is less than a specified de minimis amount. For this purpose, the "stated redemption price at maturity" of a Taxable Bond should generally equal its stated principal amount.

Under the market discount rules, a U.S. Holder is required to treat any partial principal payment on, or any gain realized on the sale, exchange, retirement or other disposition of, a Taxable Bond as ordinary income to the extent of the lesser of (i) the amount of such payment or realized gain, or (ii) the amount of market discount that has not previously been included in gross income and is treated as having accrued on such Taxable Bond at the time of such payment or disposition. Market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of such Taxable Bond, unless the U.S. Holder elects to accrue market discount on the basis of a constant yield method.

A U.S. Holder may be required to defer the deduction of all or a portion of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry a Taxable Bond with market discount until the maturity of such Taxable Bond or certain earlier dispositions, because a current deduction is only allowed to the extent the interest expense exceeds an allocable portion of market discount. A U.S. Holder may elect to include market discount in income currently as it accrues (on either a ratable or constant yield basis), in which case the rules described above regarding the treatment as ordinary income or gain upon the disposition of such Taxable Bond and upon the receipt of certain cash payments and regarding the deferral of interest deductions will not apply. Generally, such currently included market discount is treated as ordinary interest for U.S. federal income tax purposes. Such an election will apply to all debt instruments acquired by the U.S. Holder on or after the first day of the first taxable year to which such election applies, and may be revoked only with the consent of the IRS.

*Premium*

If a U.S. Holder purchases a Taxable Bond for an amount that is greater than the sum of all amounts payable on such Taxable Bond after the purchase date, other than payments of qualified stated interest, such U.S. Holder will be considered to have purchased such Taxable Bond with "amortizable bond premium" equal in amount to such excess. A U.S. Holder may elect to amortize such premium using a constant yield method over the remaining term of such Taxable Bond and may offset interest otherwise required to be included in respect of such Taxable Bond during any taxable year by the amortized amount of such premium for the taxable year. Any election to amortize bond premium applies to all taxable debt instruments held or acquired by the U.S. Holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS.

*Election to Use Constant Yield Method for all Interest, Discount and Premium*

U.S. Holders may generally, upon election, include in income all interest (including stated interest, original issue discount, de minimis original issue discount, market discount, de minimis market discount, and unstated interest, as adjusted by any amortizable bond premium or acquisition premium) that accrues on a debt instrument by using the constant yield method applicable to original issue discount, subject to certain limitations and exceptions. If this election is made with respect to a debt instrument having market discount then the holder will be treated as having made the market discount election with respect to all other debt instruments as described under "Market Discount." Similarly, if this election is made with respect to a debt instrument having amortizable premium, then the holder will be treated as having made the premium amortization election with respect to all other debt instruments as described under "Premium." The constant yield election may be revoked only with the consent of the IRS.

*Disposition of Taxable Bonds*

Except as discussed above, upon the sale, exchange, redemption or retirement of a Taxable Bond, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange, redemption or retirement (other than amounts representing accrued and unpaid interest) of such Taxable Bond and such U.S. Holder's adjusted tax basis in such Taxable Bond. A U.S. Holder's adjusted tax basis in a Taxable Bond generally will equal such U.S. Holder's initial investment in the Taxable Bond increased by any accrued market discount (if the U.S. Holder has included such market discount in income) and decreased by the amount of any payments, other than qualified stated interest payments, received and amortizable bond premium taken with respect to such Taxable Bond. Such gain or loss generally will be long term capital gain or loss if the

Taxable Bond has been held by the U.S. Holder at the time of disposition for more than one year. If the U.S. holder is an individual, long term capital gain may be subject to reduced rates of taxation. The deductibility of capital losses is subject to certain limitations.

*Medicare Tax*

Recently enacted legislation will impose an additional 3.8% tax on the net investment income (which includes interest, original issue discount and gains from a disposition of a Taxable Bond) of certain individuals, trust and estates, for taxable years beginning after December 31, 2012. Prospective investors in the Taxable Bonds should consult their tax advisors regarding the possible applicability of this tax to an investment in the Taxable Bonds.

**Non-U.S. Holders**

A non-U.S. holder who is an individual or corporation (or an entity treated as a corporation for U.S. federal income tax purposes) holding Taxable Bonds on its  behalf will not be subject to U.S. federal income tax on payments of principal of, or premium (if any), or interest on the Taxable Bonds, unless the non-U.S. holder is a direct or indirect 10% or greater shareholder of the Authority, a controlled foreign corporation related to the Authority or a bank receiving interest described in section 881(c)(3)(A) of the Code. To qualify for the exemption from taxation, the Withholding Agent, as defined below, must have received a statement from the individual or corporation that:

- is signed under penalties of perjury by the beneficial owner of the Taxable Bonds,

- certifies that the owner is not a U.S. holder, and

- provides the beneficial owner's name and permanent residence address.

A "Withholding Agent" is the last U.S. payor (or non-U.S. payor who is a qualified intermediary, U.S. branch of a foreign person or withholding foreign partnership) in the chain of payment prior to payment to a non-U.S. holder (that itself is not a Withholding Agent). Generally, this statement is made on an IRS Form W-8BEN, which is effective for the remainder of the year of signature and three full calendar years thereafter, unless a change in circumstances makes any information on the form incorrect. Notwithstanding the preceding sentence, a Form W-8BEN with a U.S. taxpayer identification number will remain effective until a change in circumstances makes any information on the form incorrect, provided the Withholding Agent reports at least annually to the beneficial owner on IRS Form 1042-S. The beneficial owner must inform the Withholding Agent within 30 days of any change and furnish a new Form W-8BEN. A non-U.S. holder of Taxable Bonds that is not an individual or corporation (or an entity treated as a corporation for U.S. federal income tax purposes) holding Taxable Bonds on its  behalf may have substantially increased reporting requirements. In particular, in the case of Taxable Bonds held by a foreign partnership or foreign trust, the partners or beneficiaries rather than the partnership or trust will be required to provide the certification discussed above, and the partnership or trust will be required to provide certain additional information.

A non-U.S. holder of Taxable Bonds whose income from such Taxable Bonds is effectively connected with the conduct of a U.S. trade or business generally will be taxed as if the holder were a U.S. holder (and, if the non-U.S. holder of Taxable Bonds is a corporation, possibly subject to a branch profits tax at a 30% rate or lower rate as may be prescribed by an applicable tax treaty), provided the holder furnishes to the Withholding Agent an IRS Form W-8ECI.

Certain securities clearing organizations, and other entities that are not beneficial owners may be able to provide a signed statement to the Withholding Agent. In that case, however, the signed statement may require a copy of the beneficial owner's Form W-8BEN.

Generally, a non-U.S. holder will not be subject to U.S. federal income tax on any capital gain recognized on retirement or disposition of Taxable Bonds, unless the non-U.S. holder is an individual who is present in the

United States for 183 days or more in the taxable year of the retirement or disposition of such Taxable Bonds, and that gain is derived from sources within the United States. Certain other exceptions may apply, and a non-U.S. holder in these circumstances should consult his tax advisor.

The Taxable Bonds will not be includible in the estate of a non-U.S. holder unless the decedent was a direct or indirect 10% or greater shareholder of the Authority or, at the time of the decedent's death, income from such Taxable Bonds was effectively connected with the conduct by the decedent of a trade or business in the United States.

### Information Reporting and Backup Withholding

Information reporting requirements, on IRS Form 1099, generally apply to (i) payments of principal of and interest on Taxable Bonds to a noncorporate U.S. Holder within the United States or by a U.S. paying agent or other U.S. intermediary, including payments made by wire transfer from outside the United States to an account maintained in the United States, and (ii) payments to a noncorporate U.S. Holder of the proceeds from the sale of Taxable Bonds effected by a U.S. broker or agent or at a U.S. office of a broker.

Backup withholding may apply to these payments if the U.S. Holder fails to provide an accurate taxpayer identification number or certification of exempt status or otherwise fails to comply with the backup withholding rules. Compliance with the identification procedures described in the preceding section will establish an exemption from backup withholding for those non-U.S. holders who are not exempt recipients.

### State, Commonwealth and Local Income Taxation

Under the provisions of the Acts of Congress now in force, the Taxable Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

## UNDERWRITING

The Underwriters, represented by Goldman Sachs & Co. ("Goldman Sachs"), have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $3,808,729.45 from the initial offering prices of the Bonds set forth on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing Bonds into investment trusts) and institutional purchasers at prices lower or yields higher than such public offering prices or yields, and such offering prices or yields may be changed, from time to time, by the Underwriters.

The Underwriters and their affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, market making, brokerage, and other financial and non-financial services and activities. Certain of the Underwriters and their affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively trade securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the Authority (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the Authority. The Underwriters and their affiliates may also communicate independent investment recommendations, market commentary or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of BMO Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), respectively, each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their allocations of Bonds.

Goldman, Sachs and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

On April 2, 2012, Raymond James Financial, Inc. ("RJF"), the parent company of Raymond James acquired all the stock of Morgan Keegan & Company, Inc. ("Morgan Keegan") from Region Financial Corporation. Morgan Keegan and Raymond James are each registered broker-dealers. Both Morgan Keegan and Raymond James

are wholly-owned subsidiaries of RJF and, as such, are affiliated broker-dealer companies under the common control of RJF, utilizing "Raymond James | Morgan Keegan" as their trade name. It is anticipated that the businesses of Raymond James and Morgan Keegan will be combined. Raymond James has entered into a distribution arrangement with Morgan Keegan for the distribution of the Bonds at the original issue prices. Such arrangement generally provides that Raymond James will share a portion of its underwriting compensation or selling concession with Morgan Keegan.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## LEGAL MATTERS

The proposed form of opinion of Sidley Austin LLP, Bond Counsel, is set forth in *Appendix III* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by their counsel, O'Neill & Borges LLC, San Juan, Puerto Rico.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Samuel Klein and Company, Certified Public Accountants, as verification agent, will verify, from the information provided to it, the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, if any, to be held in escrow, will be sufficient to pay, when due, the principal and interest on the Refunded Bonds, and (2) the computations of yield on both the securities, if any, and the Bonds contained in such schedules by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "Baa1" (negative outlook) by Moody's, "BBB" (negative outlook) by S&P and "BBB+" (stable outlook) by Fitch.

The ratings reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency. Such rating agencies were provided with materials relating to the Authority, the Commonwealth, the 1995 Bond Resolution, the Bonds and other relevant information, some of which materials and information do not appear in this Official Statement. No application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

Generally, rating agencies base their ratings on the information and materials furnished to them and on investigations, studies and assumptions made by the rating agencies. There is no assurance that any ratings obtained will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by any or all of such rating agencies if, in the judgment of any or all, circumstances so warrant. The Underwriters have undertaken no responsibility either to bring to the attention of the owners of the Bonds any proposed revision or withdrawal of the ratings of the Bonds or to oppose any such proposed revision or withdrawal. The Authority has, however, undertaken as part of its continuing disclosure obligation (see CONTINUING DISCLOSURE below) to file with the MSRB through EMMA all rating changes relating to the Bonds. Any such downward revision or withdrawal of such ratings, or any of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

### Continuing Disclosure Undertaking

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Commonwealth and the Authority have covenanted to the following for the benefit of the Beneficial Owners (generally the tax owners of the Bonds):

1. The Commonwealth will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2012, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited annual financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case of the type included or incorporated by reference in this Official Statement;

2. The Authority will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2012, with the MSRB through EMMA, (i) the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) other financial information or operating data regarding the Authority included herein; and

3. The Authority will file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of failure of the Commonwealth to comply with clause 1 above and of the Authority to comply with clause 2 above, and notice of any of the following events with respect to the Bonds:

    a.    principal and interest payment delinquencies;

    b.    non-payment related defaults, if material;

    c.    unscheduled draws on debt service reserves reflecting financial difficulties;

    d.    unscheduled draws on credit enhancements reflecting financial difficulties;

    e.    substitution of credit or liquidity facility providers, or their failure to perform;

f.      adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

g.      modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

h.      Bond calls, if material;

i.      defeasances;

j.      release, substitution, or sale of property securing repayment of the Bonds, if material;

k.      rating changes;

l.      tender offers;

m.      bankruptcy, insolvency, receivership, or similar proceeding of the Authority or the Commonwealth;

n.      the consummation of a merger, consolidation or acquisition involving the Authority or the Commonwealth or the sale of substantially all of the assets of the Authority or the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.      the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

Events (c), (m) and (n) are not applicable to the Bonds, the Authority (other than event (n) which is applicable to the Authority), or the Commonwealth.

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under THE BONDS, (ii) the only other issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the holders of the Bonds as required under the terms of the Bonds, and (iv) public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC; even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

Event (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the

Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of a particular undertaking shall be limited to a right to obtain specific performance of the Authority's or the Commonwealth's obligations hereunder, as the case may be.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if.

(1)      the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Authority or the Commonwealth; or

(2)      all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Covenants have been made in order to assist the Underwriters in complying with the Rule.

**Prior Continuing Disclosure Non-Compliance**

The Authority has made similar continuing disclosure undertakings in connection with prior bond issuances and has complied with all such undertakings during the preceding five fiscal years.

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances. Although the Commonwealth has filed all the reports and financial statements required to be filed, some of these filings have been made after the Commonwealth's May 1 filing deadline.

The Commonwealth's audited financial statements for the fiscal years ended June 30, 2006, 2007 and 2008 were filed after the filing deadlines, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal

year ended June 30, 2009 were also filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline.  Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011 and 2012, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal years 2010 and 2011.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1995 Bond Resolution, the Lease Agreements with respect to the facilities that are to be financed or refinanced in whole or in part by the Bonds, the various Acts, and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions. Appended to, and constituting a part of, this Official Statement are the Commonwealth Report (*Appendix I*), the audited financial statements of the Authority for fiscal year ended June 30, 2011 (*Appendix II*), and the proposed form of opinion of Sidley Austin LLP, Bond Counsel *(Appendix III)*.

The information set forth under the headings RECENT DEVELOPMENTS, OVERVIEW OF ECONOMIC AND FISCAL CONDITION OF THE COMMONWEALTH and PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH in this Official Statement and the information in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information set forth in this Official Statement, except the information appearing under the headings RECENT DEVELOPMENTS, OVERVIEW OF ECONOMIC AND FISCAL CONDITION OF THE COMMONWEALTH, PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH, UNDERWRITING, and "Book-Entry Only System" under THE BONDS, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to "Book-Entry Only System" was supplied by DTC.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement will be filed with the MSRB.

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**

/s/      Eduardo Rivera Cruz
Executive Director

APPENDIX I

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**June 8, 2012**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

    General ................................................................................................................ 1
    Forward-Looking Statements............................................................................. 1
    Overview of Economic and Fiscal Condition ................................................... 2
    Geographic Location and Demographic Trends ............................................... 15
    Relationship with the United States .................................................................. 16
    Governmental Structure .................................................................................... 16
    Principal Officers Responsible for Fiscal Matters .......................................... 17
    Political Trends ................................................................................................. 18

THE ECONOMY ...................................................................................................... 18

    General .............................................................................................................. 18
    Fiscal Stabilization and Economic Reconstruction.......................................... 24
    Employment and Unemployment ..................................................................... 34
    Economic Performance by Sector ..................................................................... 35
    Higher Education ............................................................................................... 50
    Tax Incentives ................................................................................................... 52

DEBT ....................................................................................................................... 56

    Public Sector Debt ............................................................................................ 56
    Debt Service Requirements for Commonwealth General Obligation Bonds ... 60
    Interest Rate Exchange Agreements ................................................................. 62
    Variable Rate Bonds and Mandatory Tender Bonds ........................................ 64
    Ratings of Commonwealth General Obligation Bonds .................................... 66
    Commonwealth Guaranteed Debt .................................................................... 66
    Trends of Public Sector Debt ............................................................................ 68

PUBLIC CORPORATIONS...................................................................................... 69

    Government Development Bank for Puerto Rico .............................................. 70
    Other Public Corporations ................................................................................ 73

INSURANCE MATTERS ......................................................................................... 83

RETIREMENT SYSTEMS ....................................................................................... 83

POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS ........................... 109

COMMONWEALTH AUDITED FINANCIAL STATEMENTS ............................. 112

    General.............................................................................................................. 112
    Prior Non-Compliance with Continuing Disclosure Obligations .................... 112

PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES ................ 113

    Summary and Management's Discussion of General Fund Results................... 114
    Major Sources of General Fund Revenues ....................................................... 117

Administrative Measures to Increase Collections of Income, Sales, and Excise
    Taxes and Property Taxes ........................................................................ 127
Transfers to General Obligation Redemption Fund ........................................ 130
Components of General Fund Expenditures ................................................... 130

BUDGET OF THE COMMONWEALTH OF PUERTO RICO ................................ 132

Office of Management and Budget ................................................................ 132
Budgetary Process ....................................................................................... 132
Financial Control and Adjustment Procedures .............................................. 133
Appropriations ............................................................................................ 134
Budget for Fiscal Year 2012 ........................................................................ 137
Proposed Budget for Fiscal Year 2013 ......................................................... 139
Differences between Budget and Basic Financial Statements ......................... 140

LITIGATION ................................................................................................... 141

# INDEX OF DEFINED TERMS

1998 Tax Incentives Act ............................52
Act 1 of 1990 ...........................................83
Act 1 of 2009 ...........................................27
Act 1 of 2011 ...........................................13
Act 1 Participants ....................................83
Act 104 ...................................................141
Act 114 ......................................................11
Act 116 ......................................................11
Act 117 ...................................................123
Act 132 .....................................................30
Act 154 ........................................................7
Act 178 ...................................................127
Act 218 ...................................................130
Act 3 ...................................................28, 79
Act 447 .....................................................83
Act 447 Participants ................................83
Act 7 ...........................................................4
Act 70 .....................................................101
Act 73 .......................................................26
Act 82 .......................................................71
Act 83 .......................................................53
Act 91 of 1966 .......................................134
Act 91 of 2004 .........................................84
Act 91 of 2006 .........................................27
Act 96 .......................................................11
AFICA ................................................59, 78
AMT ......................................................120
ARRA ........................................................12
basic swaps ...............................................62
Basic System Pension Benefits ................87
basis annuity ............................................62
BEA ...........................................................21
Budgetary Fund .....................................134
CAFR ..........................................................7
Capital Fund ............................................73
CFCs .........................................................55
CMI ...........................................................97
COFINA ......................................................4
Commonwealth ..........................................1
Commonwealth Sales Tax ......................123
Corpus Account ........................................11
credit/liquidity facilities .........................65
CRIM ......................................................125

DEDC .......................................................30
Development Fund ...................................73
Diageo ....................................................126
DOH .........................................................74
EAI .......................................................2, 21
Economic Plan .........................................24
Electric Power Authority Retirement
    System ..................................................83
Emergency Fund ....................................134
EMMA ....................................................112
Employees Retirement System ................83
EPA ...........................................................74
FAA ...........................................................48
FDIC .........................................................42
Federal Stimulus ......................................29
FINRA .......................................................43
Fiscal Board .............................................26
Fiscal Plan ................................................24
Fitch ....................................................15, 74
GASB 34 .................................................112
GDB ............................................................3
Government Development Bank .................3
Green Energy Incentives Act ...................53
Household Survey ....................................19
Housing Finance Authority ......................72
IBEs ..........................................................43
internal revenues .....................................56
IRS ............................................................14
Judiciary Retirement System ...................83
LIBOR .......................................................62
Local Stimulus .........................................29
Mandatory Tender Bonds.........................66
Mandatory Tender FRNs ..........................64
MFA ..........................................................79
Moody's ....................................................15
MSRB ......................................................112
Municipal Sales Tax ...............................123
NAICS .......................................................38
NIPA ..........................................................21
non-career employees ..............................25
notes ...................................................56, 69
OCFI .........................................................42
OMB ...........................................................8

PAA .......................................................... 57
PAA Guaranteed Bonds ............................. 57
Payroll Survey ........................................... 34
PBA .......................................................... 4
Perpetual Trust .......................................... 71
PFC ........................................................... 73
Planning Board ........................................... 2
Ports Authority .......................................... 33
PPP .......................................................... 12
PR Code .................................................... 117
PRASA ....................................................... 5
PRCDA ...................................................... 46
PREPA .................................................. 5, 75
PRHTA ...................................................... 77
PRIDCO ..................................................... 78
PRIFA ............................................... 6, 11, 78
Puerto Rico ................................................. 1
remarketing date ........................................ 65
Retirement System ..................................... 83
Retirement Systems .................................... 83
S&P ........................................................... 15
Sales Tax ................................................... 123
Section 936 Corporations ........................... 55
SIFMA ....................................................... 62
Stabilization Fund ....................................... 4
synthetic fixed rate swap ............................ 62
System 2000 ............................................... 84
System 2000 Participants ............................ 84
System Administered Pension Benefits ...... 87
TDF .......................................................... 72
Teachers Retirement System ....................... 83
Tourism Development Act ........................... 54
Treasury Department ................................... 7
U.S. Code ................................................... 39
UAAL ........................................................ 89
University ................................................... 82
University Retirement System .................... 83
USVI .......................................................... 126
VRDO Bonds ............................................. 64

# COMMONWEALTH OF PUERTO RICO
## Financial Information and Operating Data Report
### June 8, 2012

## INTRODUCTION

**General**

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of March 31, 2012, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association

with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Report, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

## Overview of Economic and Fiscal Condition

### Economic Condition

*Gross National Product.* Puerto Rico's economy is closely linked to the United States economy. In recent fiscal years, however, the performance of Puerto Rico's economy has not been consistent with the performance of the United States economy. Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. For fiscal years 2007, 2008, 2009, 2010 and 2011 Puerto Rico's real gross national product decreased by 1.2%, 2.9%, 3.8%, 3.4% and 1.5%, respectively, while the United States real gross national product grew at rates of 1.7% and 2.5% during fiscal years 2007 and 2008, respectively, contracted by 3.5% during fiscal year 2009, and grew by 0.4% and 2.9% during fiscal years 2010 and 2011. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections made in April 2012, which take into account the preliminary results for fiscal year 2011, the estimated effect on the Puerto Rico economy of the Government's tax reform enacted in fiscal year 2011, the significant increase in public and private construction and fixed investment, and other economic factors, it is projected that the real gross national product for fiscal year 2012 will increase by 0.9%. The real gross national product for fiscal year 2013 is forecasted to grow by 1.1%.

*Employment.* According to the Household Survey, total employment fell by 2.3% in fiscal year 2011 and grew by 0.5% in the first ten months of fiscal year 2012. The unemployment rate for fiscal year 2011 and for the first ten months of fiscal year 2012 was 16.0% and 15.2%, respectively. In April 2012, the unemployment rate fell to 14.8%. According to the Establishment Survey, total payroll employment fell by 2.0% in fiscal year 2011 and was virtually unchanged, decreasing by 0.2%, during the first ten months of fiscal year 2012. April 2012 year-over-year total payroll employment decreased by 0.7%.

*Economic Activity Index.* The Government Development Bank – Economic Activity Index (the "EAI") prepared by the GDB reflected a reduction of 2.7% in fiscal year 2011, after a reduction of 5.6% for fiscal year 2010. For the first nine months of fiscal year 2012, the EAI showed a year-over-year reduction of 0.4%, compared to a reduction of 2.9% for the same period of fiscal year 2011. For the third quarter of fiscal year 2012 (January 2012 through March 2012), the EAI showed a year-over-year increase of 0.3%, which represents the first quarterly positive growth rate since the third quarter of fiscal year 2006 (January 2006 to March 2006).

### Fiscal Condition

*Fiscal Imbalance.* Since 2000, the Commonwealth has faced a number of fiscal challenges, including an imbalance between its General Fund total revenues and expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. The following table shows total revenues from non-

financing sources (which are revenues from taxes, licenses and other internal or external sources received by virtue of existing laws, but excluding proceeds from financings), total expenditures (including debt service payments) and the ensuing imbalance for the last three fiscal years. Total revenues from non-financing sources, as shown in the table, includes revenues from temporary revenue raising measures taken by the Commonwealth to address this fiscal imbalance, some of which are described in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY below. Such temporary revenues should not be considered "recurring" revenues beyond the applicable period of such measures. Similarly, total expenditures, as shown in the table, includes expenditures of a non-recurring nature as a result of the implementation of various expense-reduction measures also described in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY below. Accordingly, the amount of the Commonwealth's so called "structural deficit," or the difference between recurring government revenues and recurring expenditures, may differ from the amount of the deficit shown below. Depending on the assumptions made as to what should be considered "recurring" for purposes of this computation, such difference may be significant.

Revenues from the electronic and traditional lotteries (shown in footnote 1 to the table) are available to the General Fund, but for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund.

**Deficit**
Fiscal Years ended June 30,
(in millions)

|  | Total Revenues[1] | Total Expenditures | Deficit |
|---|---|---|---|
| 2009 | $7,583 | $10,890 | $(3,306) |
| 2010 | $7,593 | $10,369[3] | $(2,775) |
| 2011 | $8,056[2] | $ 9,897[3][4] | $(1,841) |

[1] Excludes General Fund revenues attributable to the electronic and traditional lotteries in the amount of $126.7 million, $122.8 million and $101.9 million for fiscal years 2009, 2010 and 2011, respectively.

[2] Includes approximately $103.1 million of moneys transferred to the General Fund during fiscal year 2011 from the Puerto Rico Sales Tax Financing Corporation consisting principally of sales and use tax collections remaining after providing for debt service on its bonds for that fiscal year.

[3] Includes debt service of $159.6 million, $517.8 million and $638.7 million for fiscal years 2009, 2010 and 2011, respectively, on the Commonwealth's general obligation bonds and guaranteed bonds of Public Buildings Authority that was refinanced through the issuance of refunding bonds.

[4] Excludes approximately $123 million of non-recurring expenses that had been budgeted for fiscal year 2010 but were incurred in fiscal year 2011 principally related to the fiscal stabilization plan described below.

*Source*: Commonwealth of Puerto Rico Comprehensive Annual Financial Report and Department of the Treasury.

Prior to fiscal year 2009, the Commonwealth bridged such deficit through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one-time measures such as the use of derivatives and borrowings collateralized with government owned real estate and uncollected General Fund revenues.

In January 2009, the Government of Puerto Rico (the "Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds. This plan included certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the government to reduce the deficit. These measures are briefly discussed below and are discussed in greater detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

As shown in the table above, during the last three fiscal years, the Commonwealth has been able to reduce the deficit by both increasing its revenues and reducing its expenditures. The Commonwealth's ability to continue reducing the deficit will depend in part on its ability to continue increasing revenues and reducing expenditures, which in turn depends on a number of factors, including improvements in general economic conditions.

*Fiscal Stabilization Plan.* The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act 7"), sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) certain financial measures.

The Government estimates that the fiscal stabilization plan's operating expense reduction measures have resulted in annual savings of approximately $837 million, and that the tax revenue enforcement measures, and the temporary and permanent revenue raising measures have resulted in additional revenues of $420 million during fiscal year 2011.

The principal financial measure taken has been a bond issuance program through the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of its sales and use tax. The proceeds from the COFINA bond issuance program (such proceeds are deposited in an account (referred to herein as the "Stabilization Fund") managed by GDB) have been used to repay existing government debt (including debts with GDB), finance government operating expenses for fiscal years 2008 through 2012, including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. During fiscal year 2012, COFINA issued approximately $1.9 billion of revenue bonds payable from sales and use tax collections transferred to COFINA, the proceeds of which were mainly used to finance a portion of the government's operating expenses for fiscal year 2012, refund outstanding debt obligations payable from Commonwealth appropriations, and refund certain outstanding COFINA bonds.

Another financial measure taken has been the restructuring of a portion of the debt service on the Commonwealth's general obligation bonds and on bonds of the Public Buildings Authority ("PBA") that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2010, the Commonwealth refinanced

$512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on PBA bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by PBA.

During fiscal year 2012, the Government expected to refinance approximately $537.7 million of debt service on the Commonwealth's general obligation bonds, consisting of approximately $449.9 million of interest to accrue during such fiscal year and approximately $87.8 million of principal due in such fiscal year. Given favorable market conditions, the Government refinanced an additional $148.3 million of principal due in such fiscal year to provide additional budgetary relief, allowing the Government to redirect the use of moneys that would have been used for such principal payments. The Government expects to use the available moneys resulting from this additional refinancing to pay during fiscal year 2012 outstanding accounts payable of the central Government with several public corporations, such as PBA, the Puerto Rico Electric Power Authority ("PREPA") and the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), corresponding to fiscal year 2008, which did not have a source of repayment and as to which multi-year payment plans were established during calendar year 2009. These payables resulted from the Government not budgeting for certain rent payments and other services provided during fiscal year 2008. These additional amounts expected to be paid in fiscal year 2012 will pre-pay the amounts that would have been due in fiscal year 2013 pursuant to the multi-year payment plans.

The Government also expects to refinance during fiscal year 2012 approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

During fiscal year 2013, the Government expects to refinance approximately $575 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $170 million of principal due in and interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

The fiscal stabilization plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Results for Fiscal Year 2009.* General Fund total revenues for fiscal year 2009 were $7.583 billion ($7.710 billion if you include approximately $126.7 million of revenues from the electronic and traditional lotteries that are available to the General Fund, but which for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund). General Fund total revenues (including revenues from the lotteries) for fiscal year 2009 decreased by $648.8 million, or 7.8%, from fiscal year 2008. Total expenditures for fiscal year 2009 were $10.890 billion (consisting of $9.927 billion of total expenditures and $962 million of other financing uses, principally debt service payments) representing an increase of approximately $1.402 billion, or 14.8%, from original budgeted

expenditures and exceeded General Fund total revenues (including revenues from the lotteries, but excluding other financing sources) by $3.180 billion, or 41.2%.

During fiscal year 2009, the Government faced an aggregate cash shortfall of $1.153 billion that, when added to the General Fund deficit, represented approximately $4.333 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of COFINA bond issues and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan. See "Fiscal Stabilization and Economic Reconstruction – Fiscal Stabilization Plan" under THE ECONOMY.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion ($7.716 billion if you include approximately $122.8 million of revenues from the lotteries). General Fund total revenues (including revenues from the lotteries) for fiscal year 2010 increased by $6.0 million, or 0.1%, from fiscal year 2009. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were $10.369 billion (which included $173 million of expenditures related to a Government local stimulus program described below in "Fiscal Stabilization and Economic Reconstruction – Economic Reconstruction Plan" under THE ECONOMY), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses (principally debt service payments). Total expenditures of $10.369 billion exceeded General Fund total revenues (including revenues from the lotteries, but excluding other financing sources) by $2.653 billion, or 34.4%. Excluding the debt service amounts that were refinanced, as discussed above, total expenditures for fiscal year 2010 were approximately $9.692 billion and exceeded General Fund total revenues (including revenues from the lotteries, but excluding other financing sources) by $1.976 billion, or 25.6%. The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Results for Fiscal Year 2011.* General Fund total revenues for fiscal year 2011 were $8.056 billion ($8.158 billion if you include approximately $101.9 million of revenues from the lotteries). General Fund total revenues for fiscal year 2011 include approximately $103.1 million of moneys transferred to the General Fund during fiscal year 2011 from COFINA, consisting principally of sales and use tax collections remaining after providing for debt service on the COFINA bonds for that fiscal year. General Fund total revenues (including revenues from the lotteries) for fiscal year 2011 increased by $442 million, or 5.7%, from fiscal year 2010.

General Fund total revenues of $8.056 billion ($8.158 billion including the lotteries) include certain post-audit adjustments made by the Department of the Treasury (the "Treasury Department") to the Commonwealth's audited financial statements for fiscal year 2011 included in the Comprehensive Annual Financial Report of the Commonwealth ("CAFR"). These adjustments, which are deemed not material, consist of a reduction in revenues of $40.4 million, or less than 1%, from those reported in the CAFR.

The increase in General Fund total revenues for fiscal year 2011, compared to fiscal year 2010, were mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.6 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act 154") as part of the tax reform (discussed below under "Tax Reform"), which the Government began collecting in February 2011. This increase was partially offset by a decrease of $406.5 million in collections from income tax on individuals as a result of the tax relief provided to individual taxpayers as part of the tax reform and current economic conditions. These results are consistent with the Government's projection that the decrease in General Fund net revenues as a result of the tax relief provided to taxpayers as part of the tax reform would be offset by the temporary excise tax imposed on certain foreign persons by Act 154.

General Fund total expenses for fiscal year 2011 were $10.020 billion, consisting of $9.075 billion of total expenditures and $945 million of other financing uses (principally debt service payments). Total expenditures of $10.020 billion exceeded General Fund total revenues (including revenues from the lotteries and moneys transferred from COFINA) by $1.862 billion, or 22.8%. Total expenditures of $10.020 billion include (i) $638.7 million of debt service on the Commonwealth's general obligation bonds and guaranteed bonds of PBA that were refinanced through the issuance of refunding bonds and (ii) approximately $123 million of non-recurring expenses that had been budgeted for fiscal year 2010 but were incurred in fiscal year 2011 principally related to the fiscal stabilization plan. Excluding the debt service that was refinanced and such non-recurring expenses, General Fund total expenses for fiscal year 2011 were $9.258 billion and exceeded General Fund total revenues (including revenues from the lotteries and moneys transferred from COFINA, but excluding other financing sources) by $1.100 billion, or 13.5%. The difference between revenues and expenses for fiscal year 2011 was covered principally from proceeds of COFINA bonds.

*Adopted Budget for Fiscal Year 2012.* On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for General Fund total revenues and other resources and total expenditures of $9.260 billion. The budgeted General Fund total revenues and other resources of $9.260 billion include estimated revenues of $8.650 billion and $610.0 million in additional resources from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds which were refinanced or are expected to be refinanced during fiscal year 2012. See "Fiscal Stabilization Plan" above.

*Preliminary Results for the First Nine Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit.* Preliminary General Fund net revenues for the first nine months of fiscal year 2012 (from July 1, 2011 to March 31, 2012) were $5.639 billion, an increase of $599 million, or

11.9%, from $5.040 billion of net revenues for the same period in the prior fiscal year. These revenues represent 65% of budgeted revenues of $8.650 billion for the fiscal year, and $78 million, or 1.4%, less than the budget for the period.

The increase in General Fund net revenues is mainly due to the collection of $1.379 billion as a result of the Act 154 excise tax, which amount exceeds the Government's projection of collections from the excise tax during this period. For the comparable period of fiscal year 2011, collections from the Act 154 excise tax were $235 million, since Government began collecting the same in February 2011. The increase in Act 154 excise tax collections was partially offset by (i) a decrease in collections of $146 million from income tax on individuals, $63 million from income tax on corporations, and $77 million from withholdings from non-residents, all of which were primarily a result of the tax relief provided to individual and corporate taxpayers as part of the tax reform, (ii) a decrease of $172 million in property taxes as a result of the expiration in March 2011 of the special property tax imposed on residential and commercial real estate in fiscal year 2009 as part of the temporary revenue raising measures included in the fiscal stabilization plan, and (iii) decreases in miscellaneous non-tax revenues, excise taxes on tobacco products and other items due to current economic conditions. These results are consistent with the Government's expectation that the decrease in General Fund net revenues as a result of the implementation of the tax reform would be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154.

Preliminary sales and use tax collections for the first nine months of fiscal year 2012 were $855.9 million, an increase of $20.5 million, or 2.5%, from the sales and use tax collections for the same period in the prior fiscal year. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund. See "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

Preliminary General Fund total expenses (on a cash basis) for the first nine months of fiscal year 2012 amounted to $6.191 billion. This amount excludes an estimated $223 million in expenses related to the Department of Education Schoolwide Program that have not yet been registered in the central government accounting system. These expenses must be allocated by school according to the matching formula approved by the United States federal government before they are reflected in the central government accounting system. If the expenses related to the Department of Education Schoolwide Program are included, preliminary General Fund total expenses (on a cash basis) for the first nine months of fiscal year 2012 amounted to $6.414 billion, or 69% of budgeted expenditures for fiscal year 2012, which are $9.260 billion.

The deficit for fiscal year 2012 is projected to be approximately $610 million, excluding certain principal and interest payments on Commonwealth general obligation bonds and Commonwealth guaranteed PBA Bonds that were refinanced through GDB financings, which financings were, or are expected to be, repaid from the proceeds of Commonwealth general obligation bonds and PBA Bonds. See "Fiscal Stabilization Plan" above. This deficit is the same amount that had been budgeted at the beginning of the fiscal year. The Office of Management and Budget ("OMB") has indicated that no budget overruns are anticipated and that total expenses for fiscal year 2012 are not expected to exceed the budget of $9.260 billion.

*Preliminary General Fund Revenues for the First Ten Months of Fiscal Year 2012.* Preliminary General Fund net revenues for the first ten months of fiscal year 2012 (from July 1, 2011 to April 30, 2012) were $6.846 billion, an increase of $455 million, or 7.1%, from $6.391 billion of net revenues for the same period in the prior fiscal year. These revenues represent 79% of budgeted revenues of $8.650 billion for the fiscal year, and are $141 million, or 2.0%, less than budgeted for the period.

Preliminary sales and use tax collections for the first ten months of fiscal year 2012 were $954 million, an increase of $27 million, or 2.9%, from the sales and use tax collections for the same period in the prior fiscal year.

*Proposed Budget for Fiscal Year 2013.* On April 24, 2012, the Governor submitted to the Legislature a proposed budget for fiscal year 2013. The proposed budget provides for General Fund total revenues and other resources and total expenditures of $9.083 billion (including proceeds from COFINA), which is $177 million, or 1.9%, lower than projected General Fund total revenues and other resources and total expenditures of $9.260 billion for fiscal year 2012. General Fund total revenues and other resources in the proposed budget includes estimated revenues of $8.750 billion and $333 million of additional resources from COFINA and other sources, compared to $8.650 billion of projected revenues and $610 million of additional resources from COFINA bond issues for fiscal year 2012. Additional resources of $333 million to cover fiscal year 2013 deficit consists of the release of approximately $233 million deposited in a contingency fund created in 2010 to cover potential collateral postings on the Commonwealth's outstanding swap portfolio and an additional $100 million from the projected issuance of COFINA capital appreciation bonds. The release of moneys from the contingency fund results from the significant reduction in the Commonwealth's outstanding swap portfolio (from $9.2 billion as of June 30, 2008 to $4.6 billion as of March 31, 2012) due to the refinancing of variable rate debt and mandatory tender bonds and the termination of the associated swaps.

The fiscal year 2013 proposed expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds in the aggregate amount of $745 million, which are expected to be refinanced during fiscal year 2013. The fiscal year 2013 proposed expenditures also exclude certain expenditures that were due in fiscal year 2013 related to central government accounts payable with public corporations that were being paid through a multi-year payment plan established in calendar year 2009 but that are expected to be paid during fiscal year 2012 from available moneys resulting from the refinancing of approximately $148.3 million of debt service on the Commonwealth's general obligation bonds in excess of the $537.7 million originally contemplated as part of the fiscal year 2012 budget. This payment eliminates the amounts payable to PREPA and PRASA under the multi-year payment plan and substantially reduces the amounts remaining to be paid under the plan. See "Fiscal Stabilization Plan" above.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.*

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three

Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2011, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $23.7 billion, $9.1 billion and $319 million, respectively, and the funded ratios were 6.8%, 20.8% and 16.7%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $693 million, $268 million and $6.5 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls, and considering the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2020; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2022; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2019. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $125.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2011, the

aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.7 billion.

Because of its multi-year fiscal imbalances previously mentioned, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability.   Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.  For more information regarding the retirement systems, see RETIREMENT SYSTEMS.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems.  The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition.  One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act 96").  On June 23, 2011, in accordance with Act 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of the Puerto Rico Infrastructure Financing Authority ("PRIFA") (see "Infrastructure Financing Authority" under PUBLIC CORPORATIONS for a description of the Corpus Account), were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%.  The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 114 of July 5, 2011 ("Act 114") and Act No. 116 of July 6, 2011 ("Act 116").  These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years.  As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021.  The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year.  With respect to the

increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $6.3 million, $12.8 million and $19.7 million in fiscal years 2012, 2013 and 2014, respectively.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowers the maximum amount of those loans from $15,000 to $5,000. This change is expected to improve gradually the Employees Retirement System's liquidity.

*Economic Reconstruction Plan*

In fiscal year 2009, the Government began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $7.1 billion in stimulus funds under the American Recovery and Reinvestment Act of 2009 ("ARRA") program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of May 11, 2012, approximately $6.1 billion in ARRA funds had been disbursed, representing approximately 86% of awarded funds.

The Government has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The Government has also developed the Strategic Model for a New Economy, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the Government enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The Government also enacted Acts No. 82 and 83 of July 19, 2010, which provided a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the Government adopted a comprehensive tax reform (described below) that takes into account the Commonwealth's current financial situation. See "Tax Reform" below.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships ("PPP") to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year

2010, the Government engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Government published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. As of September 30, 2011, the Government had completed the concession of toll roads PR-22 and PR-5 and had short-listed proponents for the procurement process leading to the award of an administrative concession of the Luis Muñoz Marín International Airport and school infrastructure projects.

The Government has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

The fiscal stabilization plan, the economic reconstruction plan, and the long-term economic development plan are described in further detail below in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Tax Reform*

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act 1 of 2011"), was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models

adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act 1 of 2011. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expected to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and expects to raise $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. For fiscal year 2011 (from February 2011 through June 2011), the collections from the excise tax were $677.6 million. For the first nine months of fiscal year 2012, the collections from the excise tax were $1.379 billion. These amounts have exceeded the Government's projection of collections from the excise tax and are consistent with the Government's expectation that the revenues therefrom would be sufficient to offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. It is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the

determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*Ratings of Commonwealth General Obligation Bonds*

On June 6, 2012, Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC company ("S&P"), affirmed its "BBB" rating on the Commonwealth of Puerto Rico's general obligation debt and revised its outlook on the Commonwealth of Puerto Rico's general obligation debt ratings from stable to negative. On March 7, 2011, S&P had raised its rating on the Commonwealth's unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook.

On June 5, 2012, Moody's Investors Service ("Moody's") reaffirmed its rating of "Baa1" with a negative outlook on the Commonwealth's unenhanced general obligation bonds. On August 8, 2011, Moody's had lowered its rating on the Commonwealth's unenhanced general obligation bonds to "Baa1" with a negative outlook from "A3". This rating action was a result of Moody's review of the Commonwealth's rating, which had been placed on watchlist on May 3, 2011.

On June 5, 2012, Fitch, Inc. ("Fitch") reaffirmed its rating of "BBB+" with a stable outlook on the Commonwealth's general obligation and appropriation debt. On January 19, 2011, Fitch had assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook.

The ratings reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

**Geographic Location and Demographic Trends**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

## Relationship with the United States

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government, Congress enacted Public Law 600, which provided that the existing political, economic and fiscal relationship between Puerto Rico and the United States would remain the same, but Puerto Rico would be authorized to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the United States.

The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

## Governmental Structure

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States under the same conditions as decisions from state courts. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central

government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officers Responsible for Fiscal Matters**

*Luis G. Fortuño* was sworn in as Governor of Puerto Rico on January 2, 2009. From 2005 until becoming Governor, Mr. Fortuño was Puerto Rico's elected Resident Commissioner in the U.S. House of Representatives. Mr. Fortuño was an attorney in private practice from 1985 to 1993, and again from 1997 to 2003. Mr. Fortuño was the Executive Director of the Tourism Company from 1993 to 1996. From 1994 to 1996, Mr. Fortuño served as the first Secretary of the Department of Economic Development and Commerce. Mr. Fortuño holds a Bachelor's Degree from the Edmund A. Walsh School of Foreign Service at Georgetown University and a Juris Doctor from the University of Virginia School of Law.

*Jesús F. Méndez* was designated Secretary of the Treasury Department on January 7, 2011 and confirmed by the Senate of Puerto Rico on January 24, 2011. Prior to his appointment, Mr. Méndez served as Executive Vice President and Director of Administration, Operation and Controllership of GDB and as Executive Director of PBA. From 2005 to 2008, Mr. Méndez held the position of President and Chief Executive Officer of Tresamici Management, Inc., a closely held corporation dedicated to the administration of assisted living facilities. From 1996 to 2004, he held several senior management positions within Banco Santander S.A. operating entities in Puerto Rico, including President of Santander Asset Management and First Senior Vice President and Trust Officer of Banco Santander Puerto Rico and Managing Director of Santander Securities Corporation. Prior to joining Santander Securities, Mr. Méndez served as Chief Financial Officer and Managing Director of BP Capital Markets. He also worked for Credit Suisse First Boston (Puerto Rico, Inc.) as Vice President and Deloitte & Touche as Senior Auditor. In addition, Mr. Méndez also held the position of Assistant Bank Examiner at the Federal Deposit Insurance Corporation in New York City. Mr. Méndez has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is a Certified Public Accountant.

*Juan Carlos Pavía* was appointed Director of OMB on February 16, 2011. Prior to his appointment as Director of OMB, Mr. Pavía was Executive Vice President and Fiscal Agent of GDB as well as Executive Director of the Fiscal Stabilization and Reconstruction Board, where he was responsible for the compliance, oversight and economic studies areas of GDB. Before being named Executive Vice President and Fiscal Agent of GDB, he was a senior advisor to the President of GDB and Deputy Advisor to the Governor. Prior to entering public service, Mr. Pavía was employed in the commercial banking field. Mr. Pavía earned a bachelor's degree in Business Administration from The George Washington University in Washington D.C.

*Juan Carlos Batlle* was appointed President of GDB effective March 2, 2011. Prior to his appointment, Mr. Batlle served 14 years as a top executive for Santander Group in Puerto Rico. As part of the Investment Banking Group of Santander Securities Corporation, he served consecutively as Assistant Vice President in 1999, Vice President in 2001, and Senior Vice President and Director in 2003. In 2005, Mr. Batlle was named First Senior Vice President of Banco Santander Puerto Rico and President and Chief Executive Officer of Santander Asset Management Corporation. In 2008, Mr. Batlle was named Managing Director of Santander

Securities Corporation. Prior to joining Santander in 1997, Mr. Batlle was employed by Popular Securities, Inc. Mr. Batlle has also been a member of the Boards of Directors of Santander Securities Corporation, Santander Asset Management Corporation and the First Puerto Rico Family of Funds. In addition, he has been a member of the Boards of Directors of the Puerto Rico Tourism Company, the Convention Center District Authority and the Hotel Development Corporation. He holds a degree in Economics from the College of Literature, Science and the Arts of the University of Michigan.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring statehood, represented by the New Progressive Party, and the other favoring the existing commonwealth status, represented by the Popular Democratic Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|                                   | 1992  | 1996  | 2000  | 2004  | 2008  |
|-----------------------------------|-------|-------|-------|-------|-------|
| New Progressive Party             | 49.9% | 51.1% | 45.7% | 48.2% | 52.8% |
| Popular Democratic Party          | 45.9% | 44.5% | 48.6% | 48.4% | 41.3% |
| Puerto Rico Independence Party    | 4.2%  | 3.8%  | 5.2%  | 2.7%  | 2.0%  |
| Others, Blank or Void             | -     | 0.5%  | 0.5%  | 0.6%  | 3.9%  |

With the results of the 2008 election, the New Progressive Party gained control of the Executive Branch and retained control of the Legislative Branch. The current membership of the Senate and House of Representatives by political party is as follows:

|                          | Senate | House |
|--------------------------|--------|-------|
| New Progressive Party    | 21     | 37    |
| Popular Democratic Party | 8      | 17    |
| Total                    | 29     | 54    |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2012.

## THE ECONOMY

**General**

The Commonwealth in the past has established policies and programs directed principally at developing the manufacturing and service sectors and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have historically been

stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico's economy experienced a considerable transformation during the second half of the twentieth century, from an agriculture economy to an industrial one. Factors contributing to this transformation included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing. In some years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. Nevertheless, the significant oil price increases experienced from January 2002 to June 2008, the continuous contraction of the manufacturing sector, and the budgetary pressures on government finances triggered a general contraction in the economy.

Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2007, 2008, 2009 and 2010, the real gross national product contracted by 1.2%, 2.9%, 3.8% and 3.4%, respectively. For fiscal year 2011, preliminary reports indicate that the real gross national product contracted by 1.5%. The Planning Board projects an increase in real gross national product of 0.9% for fiscal year 2012 and an increase of 1.1% for fiscal year 2013.

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2011. In fiscal year 2011, aggregate personal income was $59.4 billion ($48.9 billion at 2005 prices) and personal income per capita was $15,995 ($13,157 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $15.6 billion in fiscal year 2011 ($15.4 billion in fiscal year 2010). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.9 billion, or 70% of the transfer payments to individuals in fiscal year 2011 ($10.6 billion, or 69.2%, in fiscal year 2010). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

Total average annual employment (as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey") decreased during the last decade. From fiscal year 2000 to fiscal year 2011, total employment decreased at an average annual rate of 0.6%, from 1,150,291 to 1,077,006. A reduction in total employment began in the fourth quarter of fiscal year 2006 and has continued consistently through fiscal year 2011 due to the current recession and the fiscal adjustment measures. During the first ten months of fiscal year 2012, however, total employment has shown moderate signs of improvement based on an average growth rate of 0.5% as compared to the same period for the prior fiscal year.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the Puerto Rico gross national product for the five fiscal years ended June 30, 2011, compared to the annual percentage increase in real gross national product in the United States.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

| | 2007 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|
| Gross national product (PR) – $ millions[2] | $59,521 | $61,665 | $62,598 | $63,058 | $64,106 |
| Real gross national product (PR) – $ millions (2005 prices) | $53,400 | $51,832 | $49,885 | $48,195 | $47,488 |
| Annual percentage increase (decrease) in real gross national product (PR) (2005 prices) | (1.2)% | (2.9)% | (3.8)% | (3.4)% | (1.5)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 1.7% | 2.5% | (3.5)% | 0.4% | 2.9% |

[1] Preliminary.
[2] In current dollars.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2011, approximately 70.7% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 46.1% of Puerto Rico's imports. In fiscal year 2011, Puerto Rico experienced a positive merchandise trade balance of $20.2 billion.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2012 and 2013.



Estimate for Puerto Rico from the Puerto Rico Planning Board (Apr-2012).
** Estimate for U.S. from IHS-Global Insight (Apr-2012).

*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2011 shown in this Report are preliminary until the revised figures for fiscal year 2011 and the preliminary figures of fiscal year 2012 are released and the forecast for fiscal year 2013 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index (the "EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following table and published by GDB since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. The average contraction rate of the index for fiscal year 2011 was 2.7%, after a reduction of 5.6% for fiscal year 2010. For the first three quarters of fiscal year 2012, the EAI decreased by 0.4%. In the third quarter of fiscal year 2012, however, the EAI increased at an average rate of

0.3% compared to the same period for the prior fiscal year. This increase is the first quarterly increase since the third quarter of fiscal year 2006.



*Economic Forecast for Fiscal Years 2012 and 2013*

On April 2012, the Planning Board released its revised gross national product forecast for fiscal year 2012 and its gross national product forecast for fiscal year 2013. The Planning Board revised its gross national product forecast for fiscal year 2012 from a projected growth of 0.7% to 0.9%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2012 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of funds from ARRA, the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package (particularly in public construction investment). The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2013 projects an increase in gross national product of 1.1% in constant dollars. The Planning Board's forecast for fiscal year 2013 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction

due to the Government's local stimulus package (particularly in public construction investment) and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

*Fiscal Year 2011*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2011 indicate that real gross national product decreased 1.5% (an increase of 1.7% in current dollars) over fiscal year 2010. Nominal gross national product was $64.1 billion in fiscal year 2011 ($47.5 billion in 2005 prices), compared to $63.1 billion in fiscal year 2010 ($48.2 billion in 2005 prices). Aggregate personal income increased from $58.9 billion in fiscal year 2010 ($49.2 billion in 2005 prices) to $59.4 billion in fiscal year 2011 ($47.5 billion in 2005 prices), and personal income per capita increased from $15,790 in fiscal year 2010 ($13,177 in 2005 prices) to $15,995 in fiscal year 2011 ($13,157 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2011 averaged 1,077,006, a decrease of 25,700, or 2.3%, from the previous fiscal year. The unemployment rate for fiscal year 2011 was 15.9%, a slight reduction from 16.0% for fiscal year 2010.

Among the variables that contributed to the decrease in gross national product were the continuous contraction of the manufacturing sector and the significant increase in the average price of the West Texas Intermediate (WTI) oil barrel, which went up from $75.2/bbl in fiscal year 2010 to $89.4/bbl, a rise of 18.9%. On the other hand, the interest rates at historically low levels were not enough incentive to jumpstart private investment.

*Fiscal Year 2010*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.4% (an increase of 0.7% in current dollars) over fiscal year 2009. Nominal gross national product was $63.1 billion in fiscal year 2010 ($48.2 billion in 2005 prices), compared to $62.6 billion in fiscal year 2009 ($49.9 billion in 2005 prices). Aggregate personal income increased from $58.0 billion in fiscal year 2009 ($49.3 billion in 2005 prices) to $58.9 billion in fiscal year 2010 ($48.2 billion in 2005 prices), and personal income per capita increased from $15,467 in fiscal year 2009 ($13,137 in 2005 prices) to $15,790 in fiscal year 2010 ($13,177 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of some recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the WTI increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of

previous years were still felt in fiscal year 2009.  Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand.  Although the continuation of the difficulties associated with the financial crisis kept short-term interest rates at historically low levels, such low interest rates did not translate into a significant improvement in the construction sector due in part to the high level of inventory of residential housing units.

**Fiscal Stabilization and Economic Reconstruction**

In January 2009, the Government began to implement a multi-year Fiscal Stabilization Plan (the "Fiscal Plan") and Economic Reconstruction Plan (the "Economic Plan") that sought to achieve fiscal balance and restore economic growth. The Fiscal Plan was central to safeguarding the Commonwealth's investment-grade credit rating and restoring Puerto Rico's economic growth and development.

In addition, the administration designed and began to implement the *Strategic Model for a New Economy*, a series of economic development initiatives which aim to enhance Puerto Rico's competitiveness and strengthen specific industry sectors. These economic development initiatives were intended to support the prospects of long-term and sustainable growth.

*Fiscal Stabilization Plan*

The Fiscal Plan had three main objectives: (i) stabilize the short-term fiscal situation, (ii) safeguard and strengthen the Commonwealth's investment-grade credit rating, and (iii) achieve budgetary balance.  The Fiscal Plan, which was generally contained in Act 7, included operating expense-reduction measures, tax revenue enforcement measures, temporary and permanent revenue raising measures, and financial measures, as discussed below.

*Expense Reduction Measures.*  A significant portion of Puerto Rico's budget deficit is attributable to the accumulated effect of high operating expenses in the government. The Fiscal Plan sought to reduce the government's recurring expense base to make it consistent with the level of government revenues.  The Fiscal Plan established a government-wide operating expense-reduction program aimed at reducing operating expenses, including payroll.

Payroll expense is the most significant component of the government's recurring expense base.  The reduction in payroll expenses contemplated by the Fiscal Plan was implemented in three phases and included certain benefits conferred to participating employees, as follows:

- *Phase I: Incentivized Voluntary Resignation and Voluntary Permanent Workday Reduction Programs:* The Incentivized Voluntary Resignation Program offered public employees a compensation incentive based on the time of service in the government.   The Voluntary Permanent Workday Reduction Program was available to public employees with 20 or more years of service.  The Workday Reduction Program consisted of a voluntary reduction of one regular workday every fifteen calendar days, which is equivalent to approximately a 10% reduction in annual workdays.  Phase I commenced in March 2009 and public employees had until April 27, 2009 to submit the required information to participate in the voluntary programs available under Phase I and be eligible for the Public

Employees Alternatives Program.  Under Phase I, 2,553 employees resigned under the Incentivized Voluntary Resignation Program and 27 employees took advantage of the Voluntary Permanent Workday Reduction Program. Based on the number of employees who agreed to participate in these programs, the administration estimates that expenses for fiscal year 2010 were reduced by $90.9 million.

- *Phase II: Involuntary Layoff Plan:* As provided in Act 7, Phase II went into effect because the objective of reducing $2 billion in expenses was not achieved after implementation of Phase I and Phase III (see below).  Under Phase II, subject to certain exceptions, employees with transitory or non-permanent positions were terminated.  As a result, 1,986 positions were eliminated, representing an estimated savings of $44.6 million annually.  In addition, Phase II provided for one or more rounds of involuntary layoffs and applied to most central government public employees unless excluded pursuant to Act 7, strictly according to seniority in public service, starting with employees with the least seniority.  The plan excluded certain employees providing "essential" services, certain employees paid by federal funds, those on military leave, and political appointees and their trust employees (political appointees and their trust employees, who do not hold a permanent or career position in the government, are referred to herein as "non-career employees").  Employees in Phase II received a severance package that included health coverage payment for up to a maximum of six months or until the former public employee became eligible for health insurance coverage at another job. As of September 30, 2010, total government employees dismissed under Phase II (excluding the 1,986 transitory or non-permanent positions eliminated) was approximately 12,505, representing an estimated savings of $322.8 million annually.  This amount excludes approximately 1,784 employees rehired by the Department of Education as a result of an agreement with the union providing for certain salary and workday reductions and the inclusion of additional service requirements, among other things. The negotiation of this agreement by the administration resulted in annual savings of $51 million, an increase of $25 million over the estimated savings achievable through the termination of such employees.

- *Phase III: Temporary Suspension of Certain Provisions of Laws, Collective Bargaining Agreements, and Other Agreements:* Phase III went into effect on March 9, 2009 and imposed a temporary freeze on salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. Phase III remained in effect for a period of two years. The administration estimates that savings from the implementation of these measures was approximately $186.9 million for fiscal year 2010.

- *Public Employees Alternatives Program:*  The employees that elected to participate in the Incentivized Voluntary Resignation Program under Phase I or that were subject to involuntary layoffs under Phase II, were eligible to participate in the Public Employees Alternatives Program.  This program assists public employees in their transition to other productive alternatives, and offers vouchers

for college education, technical education, and professional training, as well as for establishing a business and for relocation.

Act 7 extended the term of collective bargaining agreements with public employees that had expired at the time of its enactment or that expire while it is in effect for a period of two years (until March 9, 2011) and provided that during this period such collective bargaining agreements may not be renegotiated or renewed. Act No. 73 of May 17, 2011 ("Act 73") extended the term of the non-economic clauses of such collective bargaining agreements for an additional period of two years (until March 9, 2013) and provided that the economic clauses may be negotiated considering primarily the fiscal condition of the applicable agency and the Government and the safeguarding of services to the people. Act 73 further provides that for the negotiation of any economic clauses, OMB must evaluate the current and projected fiscal condition of the applicable agency and the Government and issue a certification as to the available resources, if any, for such negotiations.

The following table summarizes the amount of employees affected by the workforce and labor related expense reduction measures included in Act 7 and the expected annual savings in operational expenses from the implementation of Phases I through III of the Fiscal Plan. The implementation of the workforce and labor related expense reduction measures included in Act 7 concluded on June 30, 2010.

| Phase | Affected Employees | Savings (in millions) |
|---|---|---|
| Phase I: Voluntary Resignation | 2,553 | $90.9 |
| Phase II: Involuntary Layoffs | | |
|    Termination of transitory and non-permanent employees | 1,986 | 44.6 |
|    Layoffs (as of April 30, 2010) | 12,505 | 322.8 |
| Phase III: Suspension of Certain Benefits | - | 186.9 |
| Total | 17,044 | $645.2 |

The second element of the expense-reduction measures, which pertains to other operating expenses, was conducted through an austerity program in combination with other expense reduction measures. The austerity program mandated a 10% reduction in other operational expenses, including cellular phone use, credit cards, and official vehicles.

In July 2010, the Governor renewed an executive order issued in September 2009 requiring all agencies and public corporations to reduce, modify or cancel service contracts to achieve a cost reduction of at least 15%. The executive order covers advertising, consulting, information technology, accounting, legal and other services (except for direct services to the public), and grants the Fiscal Restructuring and Stabilization Board created under Act 7 (the "Fiscal Board") the power to monitor agencies and public corporations in order to ensure the required 15% minimum cost reduction. Each agency or public corporation had 30 days to report the following to the Fiscal Board: (i) all service contracts currently in effect, (ii) all canceled and/or modified contracts and the corresponding savings, (iii) justification for any remaining contracts in light of the mission of the agency or public corporation, and (iv) the reasonableness of the fees or compensation terms for each remaining contract.

In July 2010, the Governor also renewed another executive order issued in September 2009 requiring all agencies and public corporations to report the following to the Fiscal Board within 30 days: (i) all lease contracts currently in effect, (ii) the uses of leased premises, (iii) the needs for such premises, (iv) the terms and conditions of each lease, and (v) budgeted amounts for rent and other related expenses. During fiscal year 2010, the administration achieved savings by, among other things, consolidating operations of one or more agencies or public corporations and renegotiating leases to obtain more favorable terms. The administration estimates annual savings as a result of the revision of all leases of at least 15% of rent and related expenses, or approximately $22 million annually.

*Tax Revenue Enforcement Measures.* The Fiscal Plan also sought to increase tax revenues by implementing a more rigorous and ongoing tax enforcement and compliance strategy. Specific tax enforcement initiatives included: (i) enhancements to the administration of federal grants and fund receipts, (ii) stronger collections and auditing efforts on Puerto Rico's sales and use tax, and (iii) a voluntary tax compliance program.

*Revenue Raising Measures.* The goal of achieving fiscal and budgetary balance required a combination of measures that included the introduction of permanent and temporary tax increases. The Fiscal Plan included six temporary and four permanent revenue increasing measures. The temporary revenue increasing measures consisted of: (i) a 5% surtax on income of certain individuals, (ii) a 5% surtax on income of certain corporations, (iii) a 5% income tax on credit unions (commonly known as "cooperativas" in Puerto Rico), (iv) a 5% income tax on Puerto Rico international banking entities, (v) a special property tax on residential and commercial real estate, and (vi) a moratorium on certain tax credits. The temporary measures were initially set to be in effect for up to three fiscal years beginning in fiscal year 2010. Act 1 of 2011, however, limited the duration of the 5% surtax on income derived by certain individuals and corporations and the special property tax to two years. The permanent measures include (i) modifications to the alternative minimum tax for individuals and corporations, (ii) an increase in the excise tax on cigarettes, (iii) a new excise tax on motorcycles, and (iv) an increase in the excise tax on alcoholic beverages. The total revenues from these temporary and permanent measures for fiscal year 2010 were $428 million. The total preliminary revenues from these temporary and permanent measures for fiscal year 2011 were $450 million.

*Financial Measures.* The administration has also carried out several financial measures designed to achieve fiscal stability throughout the Fiscal Plan implementation period. These measures included, among others, (i) a financing or bond issuance program, the proceeds of which were used to bridge the budgetary imbalance during the Fiscal Plan implementation period and fund some of the Economic Plan initiatives, (ii) the restructuring of the securities held in the Corpus Account of the Infrastructure Development Fund and (iii) the restructuring of a portion of the Commonwealth's debt service.

These financial measures were anchored on the bond-issuance program of COFINA. Act 7, in conjunction with Act No. 91 of May 13, 2006, as amended ("Act 91 of 2006"), and Act No. 1 of January 14, 2009 ("Act 1 of 2009"), allocated to COFINA, commencing on July 1, 2009, 2.75% (one-half of the tax rate of 5.5%) of the sales and use tax imposed by the central government, thus increasing COFINA's financing capacity and allowing the Commonwealth to achieve fiscal stability throughout the implementation period of the Fiscal Plan.

During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds from these bond issues were used for, among other uses, paying approximately $1.9 billion of Commonwealth obligations that did not have a designated source of repayment, paying or financing approximately $4.8 billion of operational expenses constituting a portion of the Commonwealth's deficit, and funding the Local Stimulus Fund (described below) and the Stabilization Fund for fiscal year 2011 with approximately $500 million and $1.0 billion, respectively. During fiscal year 2012, COFINA expects to issue approximately $2 billion of revenue bonds payable from sales and use tax collections transferred to COFINA, the proceeds of which will be mainly used to finance a portion of the government's operating expenses for fiscal year 2012 and refund outstanding bonds payable from Commonwealth appropriations.

Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to, among other things, make a deposit to the General Fund of approximately $319 million, which was applied to cover a portion of the Commonwealth's budget deficit and make a transfer to GDB of approximately $159 million as a capital contribution. The gross proceeds resulting from the sale were approximately $884 million.

Another financial measure taken has been the restructuring of a portion of the Commonwealth's debt service on the Commonwealth's general obligation bonds and bonds of PBA that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2009, the Commonwealth refinanced $159.6 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and PBA bonds. During fiscal year 2010, the Commonwealth refinanced $353.3 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on PBA bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by PBA. During fiscal year 2012, the Government refinanced approximately $686.0 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds. The Government also expects to refinance during fiscal year 2012 approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

During fiscal year 2013, the Government expects to refinance approximately $575 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $170 million of principal due in and interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

The Fiscal Plan has provided more fiscal stability, thereby safeguarding and strengthening Puerto Rico's credit. The fiscal structure resulting from the full implementation of the plan will be sustainable and conducive to economic growth and development.

*Economic Reconstruction Plan*

To balance the impact of the Fiscal Plan, the administration developed and is implementing an economic reconstruction program designed to stimulate growth in the short term and lay the foundation for long-term economic development. The Economic Plan consists of two main components: (i) two economic stimulus programs, and (ii) a supplemental stimulus plan.

*Economic Stimulus Programs.* The cornerstone of Puerto Rico's short-term economic reconstruction plan was the implementation of two economic stimulus programs aimed at reigniting growth and counterbalancing any adverse effects associated with the Fiscal Plan. The economic stimulus programs consisted of Puerto Rico's participation in ARRA (also referred to herein as the "Federal Stimulus") and a local plan (the "Local Stimulus") designed to complement the Federal Stimulus.

- *Federal Stimulus Program:* Puerto Rico was awarded $7.1 billion in stimulus funds from ARRA. The funds are distributed in four main categories: relief to individuals, budgetary and fiscal relief, taxpayers' relief, and capital improvements. In terms of government programs, the Federal Stimulus allocates funds to education, agriculture and food assistance, health, housing and urban development, labor, and transportation, among others. As of May 11, 2012, PRIFA, which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $6.1 billion in ARRA funds had been disbursed, representing approximately 86% of awarded funds.

- *Local Stimulus Program:* The administration formulated the Local Stimulus to supplement the Federal Stimulus and address specific local challenges associated with the local mortgage market, the availability of credit, and the infrastructure and construction sectors. Despite the fact that the Local Stimulus amounted to a $500 million investment by the government, it is estimated that its effect would be greater due to certain lending programs, which are being coordinated in collaboration with commercial banks in Puerto Rico. The administration has been disbursing funds under the $500 million local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The administration has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system. It is estimated that approximately $400 million of Local Stimulus funds will be used for infrastructure projects. As of April 30, 2012, approximately $416 million of Local Stimulus funds had been disbursed.

*Supplemental Stimulus Plan.* The Supplemental Stimulus Plan was designed to provide investment in strategic areas with the objective of laying the foundations for long-term growth in

Puerto Rico. The coordinated implementation of the Supplemental Stimulus Plan is expected to reinforce continuity in reigniting economic growth while making key investments for long-term development.

The Supplemental Stimulus Plan is being conducted through a combination of direct investments and guaranteed lending. Specifically, the Supplemental Stimulus Plan targets critical areas such as key infrastructure projects, public capital improvement programs, private sector lending to specific industries, and the export and research-and-development knowledge industries. The Supplemental Stimulus Plan takes into account the strategic needs that Puerto Rico must fulfill in order to become a more competitive player in its region and in the global economy.

On September 1, 2010 the Governor signed Act No. 132, also known as the Real Estate Market Stimulus Act of 2010 ("Act 132"), which provides certain incentives to help reduce the existing housing inventory. The incentives provided by Act 132 were effective from September 1, 2010 through June 30, 2011, and were subsequently extended until October 31, 2011 by Act No. 115 of July 5, 2011. On November 1, 2011, the Government approved Act 216, which provides incentives similar to the ones available under Act 132 and establishes an orderly transition to gradually reduce those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216, as amended by Act No. 288 of December 30, 2011, are effective from November 1, 2011 to December 31, 2012, with certain reductions after June 30, 2012. See "Economic Performance by Sector—Construction" below.

*Economic Development Program*

The Department of Economic Development and Commerce ("DEDC"), in coordination with other government agencies, is in the process of implementing the *Strategic Model for a New Economy*, which consists of a comprehensive, long-term, economic development program aimed at improving Puerto Rico's overall global relevance, competitiveness, and business environment, and increasing private-sector capital formation and participation in the economy. These initiatives are centered on the dual mission of fostering multi-sector growth while reducing costs and barriers to business and investment, and are a medium-to-long-term counterpart to the Economic Plan and the Supplemental Stimulus Plan described above.

The administration is emphasizing the following initiatives to enhance Puerto Rico's competitive position: (i) overhauling the permitting process, (ii) reducing energy costs, (iii) reforming the tax system, (iv) promoting the development of various projects through public-private partnerships, (v) implementing strategic initiatives targeted at specific economic sectors, and (vi) promoting the development of certain strategic/regional projects.

*Permitting Process.* The first initiative, the reengineering of Puerto Rico's permitting and licensing process, has already been achieved. On December 1, 2009, the Governor signed into law Act No. 161, known as the Law for the Restructuring & Unification of the Permit Evaluation & Authorization Process, which overhauls the existing permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. In the short term, this restructuring is focused on eliminating the significant backlog of unprocessed permits that are currently in the pipeline of various

government agencies. In the long term, this law seeks to significantly reduce the number of inter-agency processes and transactions currently required by creating a centralized, client-focused system that simplifies and shortens the permitting process for applicants. The Integrated Permits System (SIP by its Spanish acronym), as the new Puerto Rico permits process is called, became operational on December 1, 2010. Through September 2011, 38,500 permits requests had been filed and 88% of these have already been resolved.

The Permit Management Office (OGPe, by its Spanish acronym), the government body responsible for evaluating permit applications and issuing final determinations concerning construction and land use, currently offers 80% of its services online, representing 90% of the total volume of transactions.

*Energy Policy.* On July 19, 2010, the Governor signed Acts No. 82 and 83, providing for, among other things, the adoption of a new energy policy, which is critical for Puerto Rico's competitiveness. Presently, fluctuations in oil prices have a significant effect on Puerto Rico's overall economic performance. Act No. 82 of 2010, known as the "Public Policy on Energy Diversification through Renewable and Alternative Sources," focuses on reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies. This new energy policy seeks to lower energy costs, reduce energy-price volatility, and establish environmentally sustainable energy production through a reduction in ecologically harmful emissions. Act 82 of 2010 creates a Renewable Portfolio Standard, recognizing many sources of renewable energy utilizing various technologies, setting a hard target of 12% renewable energy production by 2015 and 15% by 2020, and a requirement for retail energy providers to establish a plan to reach 20% renewable energy production by 2035.

Moreover, Act No. 83 of 2010, also known as the "Green Energy Incentives Act," assembles under one law the incentives for the construction and use of renewable energy sources. Act 83 offers new benefits to stimulate the development of green energy projects, creates Renewable Energy Certificates (RECs) and creates the Green Energy Fund (the "GEF"). Through the GEF the Government will co-invest $290 million in renewable energy projects over the next 10-years. Initial funding of $20 million began on July 1, 2011 and steps up to $40 million per year by fiscal year 2016. Through the GEF, the Puerto Rico Energy Affairs Administration will offer cash rebates of up to 60% on the cost of installing Tier 1 projects (0 – 100 kW) for residences and small businesses and up to 50% on the cost of Tier 2 projects (100 kW – 1 MW) for commercial or industrial use. In its first round of funding, the GEF backed 25 solar energy projects with $6.6 million, including grants to 13 businesses and a government agency. These initiatives are expected to address energy prices in Puerto Rico and provide a means of attracting investment in the energy sector.

*Tax Reform.* Legislation to implement the first and second phases of the tax reform was enacted as Act No. 171 of 2010 and Act 1 of 2011, respectively. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

*Public-Private Partnerships.* The Government believes that PPPs represent an important tool for economic development, particularly in times of fiscal difficulties. PPPs are long-term contracts between government and non-governmental entities—such as private companies, credit

unions, and municipal corporations—to develop, operate, manage or maximize infrastructure projects and/or government services. PPP contracts are centered on the concept of risk transfer. The non-governmental partner takes on certain responsibilities and risks related to the development and/or operation of the project in exchange for certain benefits. PPPs can play a pivotal role in restoring investment in infrastructure and bringing about economic growth.

PPPs provide the opportunity for the government to lower project development costs, accelerate project development, reduce financial risk, create additional revenue sources, establish service quality metrics, re-direct government resources to focus on the implementation of public policy, create jobs and attract new investment. Puerto Rico has opportunities for the establishment of PPPs in the areas of toll roads, airports and maritime ports, public schools, water provision, correctional facilities, and energy, among others.

On June 8, 2009, the Legislative Assembly approved Act No. 29 ("Act 29"), which established a clear public policy and legal framework for the establishment of PPPs in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. Act 29 created the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding PPPs. On December 19, 2009, the PPP Authority approved regulations establishing the administrative framework for the procurement, evaluation, selection, negotiation and award process for PPPs in Puerto Rico.

During fiscal year 2010, the PPP Authority engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the PPP Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects.

As part of the Government's PPPs initiative, the PPP Authority and the Highways and Transportation Authority (collectively, the "Sponsors") recently completed the procurement for a concession of toll roads PR-22 and PR-5 (the "Toll Roads"). On June 10, 2011, the Sponsors selected Autopistas Metropolitanas de Puerto Rico, LLC ("Metropistas"), a consortium comprised of Goldman Sachs Infrastructure Partners and Abertis Infraestructuras, as the winning proponent based on a bid of $1.080 billion. On June 27, 2011, Metropistas and the Highways and Transportation Authority executed the concession agreement for the Toll Roads and, on September 22, 2011, the parties successfully completed the financial closing. As a result of this transaction, the Highways and Transportation Authority received a lump-sup payment of $1.136 billion and a commitment to invest $56 million in immediate improvements and comply with world-class operating standards.

To modernize public school facilities throughout the island and improve academic performance, the PPP Authority launched the "Schools for the 21st Century" program, which will modernize and build a selected number of public schools throughout Puerto Rico. At least one school in each municipality will benefit from the "Schools for the 21st Century" program. The Government expects this project will impact nearly 50,000 students, 2,000 teachers and various communities and create 14,000 jobs throughout Puerto Rico's 78 municipalities. The Government will fund this project with the proceeds of Qualified School Construction Bonds

(QSCB) issued by PBA in the aggregate principal amount of $756 million. As of June 2011, the PPP Authority had awarded approximately $464 million in contracts and construction had begun in approximately 57 schools.

On August 8, 2011, the PPP Authority and the Puerto Rico Ports Authority ("Ports Authority") received statements of qualifications from twelve (12) world-class consortia in response to the Request for Qualifications (RFQ) to acquire a concession to finance, operate, maintain and improve the Luis Muñoz Marín International Airport ("Airport"), the busiest airport in the Caribbean. The PPP Authority and Ports Authority are seeking to achieve their primary objectives of: (i) maximizing the upfront value for the Airport, (ii) improving the Airport's safety standards, service levels and quality, (iii) maintaining and improving the quality of service to travelers as well as achieving a higher level of customer satisfaction, and (iv) creating a world-class gateway to Puerto Rico while increasing the Island's profile as a destination in the Caribbean, in order to positively impact the development of the tourism industry and overall economic prospects in Puerto Rico. On September 23, 2011, the PPP Authority and Ports Authority published a short-list of six consortia.  The PPP Authority published the Request for Proposals for the Airport in October 2011 and on May 2, 2012 announced the selection of two finalists.  The PPP Authority expects to select a winning bidder in the third quarter of calendar 2012.

*Sector Initiatives.*   The administration will complement the previously mentioned initiatives with specific strategic initiatives with the objective of creating jobs and increasing economic activity across various sectors of the Puerto Rico economy.  The Commonwealth has natural or structural competitive advantages in several areas, such as pharmaceutical and biotechnology manufacturing.  These advantages provide opportunities for the development of regional clusters in high-tech manufacturing, research and development, tourism, renewable energy, international trade and professional services.  The specific initiatives will be designed to promote sustainable economic growth while accelerating to a knowledge-based and innovation driven economy, focused mainly in the development of human capital and intellectual property, thus diversifying Puerto Rico's economic base.

*Strategic/Regional Projects.*   The administration has also targeted strategic/regional projects that will generate investments in various regions of the Island in order to foster balanced economic development.

One of the strategic projects for the northern region is called the Urban Bay (formerly known as the Golden Triangle), an urban redevelopment project that incorporates the areas of Old San Juan, Puerta de Tierra, Isla Grande, including the Puerto Rico Convention Center District, and Condado, as well as other communities in the vicinity of historic San Juan Bay. The aim of the Urban Bay project is to develop San Juan Bay into a major tourism, recreation, commercial and residential sector which serves the local community and becomes a major attraction for leisure and business travelers, both local and external.   Construction of the immediate improvements on the project footprint is currently underway.

Also in the northern region, Science City represents a critical effort to move Puerto Rico to the forefront of science, technology and research and development. It seeks to leverage Puerto Rico's competitive advantages in the knowledge-based sectors.  Through the recently enacted

Law No. 208 of October 20, 2011, the benefits of investing in and performing science and technology research and development activities in the newly denominated "Science District" were expanded through the inclusion of such activities as eligible for tax exemption under the Economic Incentives Act. See "Tax Incentives – Industrial Incentives Program" under THE ECONOMY. The benefits of the Science District under Law 208 may also be expanded to satellite districts throughout the island. Demolition related activities and earth movement is expected to commence before the end of fiscal year 2012.

In the eastern region, the Caribbean Riviera project entails the redevelopment of the old Roosevelt Roads navy facility in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. This tourist complex will include hotels, casinos, eco-tourist attractions, international airport, retail, yacht marina, and cruise ship ports. Negotiations with the Navy regarding the transfer of the property to the Local Redevelopment Authority are in advanced stages and should be completed by the end of 2012.

In the western region, the administration is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub. The Government is in the process of submitting a formal application to obtain a Foreign Trade Zone designation for the Aguadilla airport area.

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2011 averaged 1,077,006, a decrease of 2.3% compared to previous fiscal year; and the unemployment rate averaged 15.9%. During the first ten months of fiscal year 2012, total employment averaged 1,083,289, an increase of 0.5% with respect to the same period of the prior year; and the unemployment rate decreased to 15.2%.

The following table presents annual statistics of employment and unemployment for fiscal year 2007 through fiscal year 2011, and the average figures for the first ten months of fiscal year 2012. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2011.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over, in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011 | 1,281 | 1,077 | 204 | 15.9 |
| 2012[3] | 1,278 | 1,083 | 194 | 15.2 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first ten months of fiscal year 2012 (July 2011 through April 2012).
*Source:* Department of Labor and Human Resources – Household Survey

## Economic Performance by Sector

From fiscal year 2007 to fiscal year 2011, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2011.

## Commonwealth of Puerto Rico
### Gross Domestic Product by Sector and Gross National Product
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
| | 2007 | 2008 | 2009 | 2010 | 2011[1] |
|---|---|---|---|---|---|
| Manufacturing | $37,637 | $40,234 | $43,872 | $46,554 | $47,988 |
| Service[2] | 40,190 | 41,372 | 39,626 | 40,286 | 40,620 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,350 | 8,229 |
| Agriculture | 430 | 519 | 567 | 707 | 670 |
| Construction[4] | 2,027 | 2,032 | 1,777 | 1,477 | 1,388 |
| Statistical discrepancy | (464) | (312) | 480 | (226) | (138) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,370 | $97,147 | $98,757 |
| Less: net payment abroad | (28,884) | (30,941) | (32,772) | (34,089) | (34,651) |
| Total gross national product[5] | $59,521 | $61,665 | $62,598 | $63,058 | $64,106 |

[1] Preliminary.

[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.

[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.

[4] Includes mining.

[5] Totals may not add due to rounding.

*Source:* Planning Board

Traditionally, the Government has presented the industrial distribution of production in Puerto Rico using gross domestic product because the Planning Board had not published such a distribution using real gross national product as a base measurement. Recently, the Planning Board presented an industrial distribution of production based on real gross national product, which shows significant differences in the importance of the manufacturing sector to the Puerto Rico economy:

**Commonwealth of Puerto Rico**
**Gross National Product by Sector**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011**[1] |
| Service[2] | $35,443 | $36,127 | $34,483 | $35,072 | $35,223 |
| Manufacturing | 12,570 | 13,556 | 15,135 | 16,536 | 17,596 |
| Government[3] | 9,529 | 9,757 | 10,168 | 9,505 | 9,378 |
| Construction[4] | 2,013 | 2,018 | 1,764 | 1,465 | 1,377 |
| Agriculture | 430 | 520 | 568 | 707 | 670 |
| Statistical discrepancy | (464) | (312) | 480 | (226) | (138) |
| Total gross national product[5] | $59,520 | $61,665 | $62,598 | $63,058 | $64,106 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

The share of industrial production of the service sector (which includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services) based on gross national product appears significantly higher than the share of the manufacturing sector when compared to the shares of industrial production of these sectors based on gross domestic product. This variance occurs because manufacturing activity in Puerto Rico is principally carried out by non-resident entities whose income is not accounted for in Puerto Rico's real gross national product.

The data for employment by sector or industries presented here, as in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System ("NAICS") for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Economic Sector[1]
### (number of employees)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011**[2] |
| Natural resources and construction | 64,700 | 59,675 | 49,067 | 35,942 | 31,767 |
| Manufacturing | | | | | |
| Durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,900 |
| Non-durable goods | 62,442 | 60,950 | 57,483 | 53,533 | 51,658 |
| Sub-total | 107,858 | 104,050 | 96,725 | 88,325 | 85,558 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
| Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 32,008 |
| Retail trade | 133,750 | 130,883 | 127,492 | 126,233 | 128,050 |
| Transportation, warehouse, and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,333 |
| Sub-total | 184,008 | 181,342 | 176,450 | 173,317 | 174,392 |
| | | | | | |
| Information | 22,642 | 21,442 | 20,217 | 18,783 | 18,750 |
| Finance | 49,108 | 48,483 | 48,492 | 45,808 | 43,683 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,508 | 105,642 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,333 | 114,167 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 71,142 |
| Other services | 21,892 | 21,217 | 20,117 | 18,758 | 17,992 |
| Government[3] | 298,125 | 297,742 | 300,708 | 276,533 | 260,550 |
| Total non-farm | 1,035,925 | 1,024,058 | 996,033 | 942,158 | 923,642 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of gross national product. The Planning Board figures show that in fiscal year 2011 manufacturing generated $48.0 billion, or 48.6%, of gross domestic product. Manufacturing, however, only generated $17.6 billion, or 27.4%, of gross national product in fiscal year 2011. During fiscal year 2011, payroll employment for the manufacturing sector was 85,558, a decrease of 3.1% compared with fiscal year 2010. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2011, however, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.5% of the average mainland U.S. rate.

In the last three decades, industrial development in Puerto Rico has been relatively capital intensive and dependent on skilled labor. This gradual shift in emphasis from labor intensive to capital intensive industrial development is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under THE ECONOMY and "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector
### (at current prices, in millions)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011**[1] |
| Food | $1,083 | $ 822 | $ 977 | $ 924 | $ 931 |
| Beverage and Tobacco Products | 925 | 1,243 | 1,209 | 1,385 | 1,330 |
| Textile Mills & Product Mills | 15 | 15 | 12 | 12 | 13 |
| Apparel | 201 | 252 | 270 | 294 | 280 |
| Leather and Allied Products | 17 | 20 | 18 | 22 | 25 |
| Wood Products | 24 | 22 | 20 | 19 | 20 |
| Paper | 71 | 66 | 63 | 64 | 67 |
| Printing and Related Support Activities | 124 | 119 | 100 | 105 | 104 |
| Petroleum and Coal Products | 371 | 95 | 348 | 338 | 344 |
| Chemical | 27,017 | 29,339 | 30,380 | 32,137 | 32,553 |
| Plastics and Rubber Products | 122 | 118 | 108 | 108 | 110 |
| Nonmetallic Mineral Products | 285 | 219 | 148 | 90 | 87 |
| Primary Metals | 102 | 151 | 145 | 205 | 208 |
| Fabricated Metal Products | 239 | 248 | 207 | 176 | 170 |
| Machinery | 218 | 234 | 174 | 185 | 227 |
| Computer and Electronic Products | 4,217 | 4,463 | 7,037.3 | 7,491 | 8,334 |
| Electrical Equipment, Appliances and Components | 511 | 657 | 654 | 617 | 670 |
| Transportation Equipment | 78 | 78 | 72 | 67 | 70 |
| Furniture and Related Products | 66 | 56 | 48 | 45 | 42 |
| Miscellaneous | 1,956 | 2,019 | 1,883 | 2,271 | 2,402 |
| Total gross domestic product of manufacturing sector[2] | $37,637 | $40,234 | $43,872 | $46,554 | $47,988 |

[1]   Preliminary.
[2]   Totals may not add due to rounding.

*Source:* Planning Board

The following table presents annual statistics of average manufacturing employment by industry based on the NAICS for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (number of employees)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 3,825 | 3,758 | 3,058 | 2,492 | 2,133 |
| Fabricated metal products | 5,675 | 5,375 | 4,908 | 4,042 | 3,625 |
| Computer and electronic | 10,092 | 8,600 | 7,042 | 5,733 | 5,983 |
| Electrical equipment | 6,617 | 6,658 | 5,867 | 5,058 | 5,042 |
| Miscellaneous manufacturing | 12,292 | 11,967 | 11,975 | 11,675 | 11,633 |
| Other durable goods manufacturing | 6,917 | 6,742 | 6,392 | 5,792 | 5,483 |
| Total – durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,900 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,183 | 11,725 | 11,383 | 11,592 | 11,908 |
| Beverage and tobacco products manufacturing | 3,258 | 3,267 | 3,133 | 3,275 | 3,000 |
| Apparel manufacturing | 7,708 | 9,633 | 9,825 | 8,808 | 8,658 |
| Chemical manufacturing | 30,467 | 27,900 | 25,042 | 22,392 | 21,033 |
| Plastics and rubber products | 2,200 | 1,983 | 1,967 | 1,908 | 1,750 |
| Other non-durable goods manufacturing | 6,625 | 6,442 | 6,133 | 5,558 | 5,308 |
| Total – non-durable goods | 62,442 | 60,950 | 57,483 | 53,533 | 51,658 |
| Total manufacturing employment | 107,858 | 104,050 | 96,725 | 88,325 | 85,558 |

---

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 31,700 from fiscal year 2005 to fiscal year 2011. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009, 2010 and 2011, manufacturing employment decreased by 4.2%, 3.5%, 7.0%, 8.7% and 3.1%, respectively. For the first ten months of fiscal year 2012, average employment in the sector declined by 3,200 jobs, or 3.7%, compared to the same period of the previous year. Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global

economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

### Service Sector

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2011, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 0.4%, while payroll employment in this sector decreased at an average annual rate of 0.9%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2011, the service sector generated $40.6 billion, or 41.1%, of gross domestic product, while it generated $35.2 billion, or 54.9%, of gross national product. Trade, utilities, professional and business support, and education and health experienced growth at current prices in fiscal year 2011, as measured by gross domestic product, while transportation and warehousing, information, finance, and other services experienced reductions in fiscal year 2011, as measured by gross domestic product at current prices. Service-sector employment decreased from 565,242 in fiscal year 2007 to 545,767 in fiscal year 2011 (representing 59.1% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2011 represents an increase of 0.8% compared to the prior fiscal year. For the first ten months of fiscal year 2012, average service-sector employment was 539,811, a decrease of 1.1% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of December 30, 2011, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of December 30, 2011 were $70.8 billion, as compared to $75.5 billion as of December 31, 2010. On April 30, 2010,

the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. Considering the magnitude of the consolidations, the amount of jobs lost to date as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA"), the U.S. Securities and Exchange Commission and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $5.5 billion as of December 30, 2011, as compared to $6.0 billion on December 31, 2010. Another relevant component of the financial sector in Puerto Rico is the investment company industry. Local investment companies had recorded assets under management of $15.3 billion as of December 30, 2011, as compared to $14.2 billion as of December 31, 2010 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as cooperativas). IBEs are licensed financial businesses that conduct offshore banking transactions. As of December 30, 2011, there were 32 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $43.9 billion, an increase from $40.6 billion in total assets as of December 31, 2010. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.8 billion in assets as of December 30, 2011, a slight increase from $7.5 billion as of December 31, 2010.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| Wholesale trade | $ 2,752 | $ 2,951 | $ 2,846 | $ 2,856 | $ 2,847 |
| Retail trade | 4,471 | 4,569 | 4,467 | 4,577 | 4,700 |
| Transportation and warehousing | 968 | 979 | 895 | 910 | 907 |
| Utilities | 2,214 | 2,118 | 1,967 | 1,989 | 2,001 |
| Information | 2,467 | 2,363 | 2,426 | 2,601 | 2,585 |
| Finance and insurance | 6,694 | 7,120 | 5,105 | 5,403 | 5,497 |
| Real Estate and rental | 11,686 | 12,064 | 12,644 | 12,308 | 12,082 |
| Professional and business | 3,113 | 3,184 | 3,009 | 3,167 | 3,382 |
| Education and health | 3,593 | 3,786 | 4,106 | 4,263 | 4,366 |
| Leisure and hospitality | 1,862 | 1,875 | 1,773 | 1,821 | 1,865 |
| Other services | 372 | 363 | 390 | 391 | 388 |
| Total[2] | $40,190 | $41,372 | $39,626 | $40,286 | $40,619 |

[1] Preliminary.
[2] Totals may not add due to rounding.
*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Service Sector
### (thousands of persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011[1] |
| Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 32,008 |
| Retail trade | 133,750 | 130,883 | 127,492 | 126,233 | 128,050 |
| Transportation, warehouse and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,333 |
| Information | 22,642 | 21,442 | 20,217 | 18,783 | 18,750 |
| Finance | 49,108 | 48,483 | 48,492 | 45,808 | 43,683 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,508 | 105,642 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,333 | 114,167 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 71,142 |
| Other services | 21,892 | 21,217 | 20,117 | 18,758 | 17,992 |
| Total[2] | 565,242 | 562,592 | 549,533 | 541,358 | 545,767 |

[1] Preliminary.
[2] Totals may not add due to rounding.
*Source*: Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,910,700, an increase of 5.9% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during fiscal year 2011 was 68.9%, a decrease of 0.2% from the prior fiscal year. Also, during fiscal year 2011, the average number of rooms available in tourist hotels increased by 5.5% to 11,472 rooms compared to the same period of fiscal year 2010.

During the first eight months of fiscal year 2012, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,313,800, an increase of 7.5% over the number of persons registered during the same period of fiscal year 2011. The average occupancy rate in tourist hotels during the first eight months of fiscal year 2012 was 67.6%, an increase of 0.7% from the prior fiscal year. Also, during the first eight months of fiscal year 2012, the average number of rooms available in tourist hotels increased by 2.7% to 11,651 rooms compared to the same period of fiscal year 2011.

In terms of employment figures, this sector has shown a behavior that seems not totally consistent with the registration figures presented in the previous paragraphs. According to the Payroll Survey, employment in the leisure and hospitality sector was 71,100 for fiscal year 2011, a slight increase of 0.4% over employment for fiscal year 2010, a growth rate significantly smaller than the growth rates of tourist hotel registrations for the same time period (5.9%). Moreover, for the first ten months of fiscal year 2012, employment in this sector increased by only 1.9% to 72,400 compared to the same period of the prior fiscal year, which is still a smaller rate than the average growth rate observed for the first eight months on the tourist hotel registrations (7.5%).   These figures could imply a significant improvement on the labor productivity of this sector during fiscal years 2011 and 2012.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

### Commonwealth of Puerto Rico
### Tourism Data[1]
### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 1,905,503 | 4,415,262 |
| 2010 | 1,349,449 | 1,193,549 | 1,836,157 | 4,379,155 |
| 2011[5] | 1,408,536 | 1,165,758 | 1,639,379 | 4,213,673 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2007 | $1,501.6 | $172.2 | $1,740.1 | $3,413.9 |
| 2008 | $1,526.3 | $194.3 | $1,814.3 | $3,535.0 |
| 2009 | $1,464.4 | $173.7 | $1,537.7 | $3,175.8 |
| 2010[5] | $1,541.8 | $171.4 | $1,497.5 | $3,210.7 |
| 2011[5] | $1,618.9 | $169.3 | $1,354.6 | $3,142.8 |

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1 million attendees. A 500-room hotel located next to the convention center commenced operations in November of 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one

during the second half of the 20th century, providing the basic infrastructure and services necessary for the modernization of Puerto Rico.

In fiscal year 2011, the government (federal, state and local) accounted for $8.2 billion, or 8.3%, of Puerto Rico's gross domestic product.  The government is also a significant employer, employing 260,550 workers (federal, state and local), or 28.2% of total, non-farm, payroll employment in fiscal year 2011.  In fiscal year 2009, state and municipal government employment averaged 285,600.  During fiscal year 2010, state and municipal government employment decreased by 25,700 jobs, or 9.0%.  According to the payroll survey, the distribution of the job reductions during fiscal year 2010 was 20,700 jobs in the state government (including public corporations) and approximately 5,000 jobs in municipal government.  During fiscal year 2011, state and municipal government employment decreased further by 14,400 jobs, or 5.5%, compared to fiscal year 2010.  According to the payroll survey, the decrease was attributable to a reduction of 12,000 jobs in the state government and approximately 2,400 jobs in municipal government.  Nevertheless, during the first ten months of fiscal year 2012, total government employment (federal, state and local) increased by 2.7% from the previous fiscal year, or by an average of 6,900 jobs.  This increase in government employment for the first ten months of fiscal year 2012 consists of an average increase of 7,900 jobs, or 4.3%, in state government offset by an average reduction of 500 jobs, or 0.8%, and 500 jobs, or 3.6%, in federal government, respectively.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements.  In addition, Act 7 provided that, for a period of two years after its enactment (until March 9, 2011), collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees could not be renegotiated or renewed.  Act 73 extended the term of the non-economic clauses of such collective bargaining agreements for an additional period of two years (until March 9, 2013) and provided that the economic clauses may be negotiated considering primarily the fiscal condition of the applicable agency and the overall Government as well as the safeguarding of services to the people.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports.  San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, Patillas and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines.  The airport receives over 8 million passengers per year, making it the busiest airport in the Caribbean.  At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland.  San Juan has also

become a hub for intra-Caribbean service. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain.

On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-private partnership. On July 5, 2011, the PPP Authority published its "Request for Qualifications to Acquire a Lease to Finance, Operate, Maintain and Improve the Luis Muñoz Marin International Airport." On August 8, 2011, the PPP Authority and Ports Authority received statements of qualifications from twelve world-class consortia and, on September 23, 2011, published a short-list of six consortia. In October 2011, the PPP Authority issued a Request for Proposals for the Airport to the shortlisted consortia. On May 2, 2012, the PPP Authority announced the selection of two finalists to proceed to the final phase of the Request for Proposals process. The PPP Authority and the Ports Authority expect to select a winning bidder in the third quarter of calendar 2012.

Regarding other airports, Rafael Hernandez Airport in Aguadilla is served by JetBlue and Spirit and has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport is served by JetBlue and has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2011, totaled approximately 4,640 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 232 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,061 miles of tertiary highways and roads serving local, intra-regional traffic. On September 22, 2011, the PPP Authority and the Highways and Transportation Authority completed the procurement for a concession of toll roads PR-22 and PR-5. See "Economic Development Program – Public-Private Partnerships" under Fiscal Stabilization and Economic Reconstruction.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Authority of the Port of Ponce, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2012. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as

the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. From its peak in fiscal year 2000 to fiscal year 2011, real construction investment declined at an average annual rate of 7.4%. Construction investment started to decrease significantly in fiscal year 2005, as a consequence of the general economic conditions in Puerto Rico. During the last four fiscal years (from fiscal year 2007 to 2011) real construction investment decreased at an average annual rate of 11.5%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%. The Planning Board projects an increase in construction investment of 5.0% in real terms for fiscal year 2012, and of 9.7% for fiscal year 2013.

Public investment has been an important component of construction investment. During fiscal year 2011, approximately 53.1% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools, water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. During the first ten months of fiscal year 2011 (the most recent data available), the total value of construction permits decreased further by 15.7%. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010 and by 5.0% in 2011, respectively, reaching levels not seen in almost three decades. During the first ten months of fiscal year 2012, however, cement sales increased by 4.9% from the previous fiscal year.

Average payroll employment in the construction sector during fiscal year 2011 was 31,800, a reduction of 11.6% from fiscal year 2010. Nevertheless, during the first ten months of fiscal year 2012, payroll employment in the construction sector averaged 33,400, an increase of 4.9% for the same period in fiscal year 2011.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided by Act 132 were effective from September 1, 2010 through June 30, 2011, and were subsequently extended until October 31, 2011 by Act No. 115 of July 5, 2011. Certain permanent incentives are also available for rental housing. On November 1, 2011, the Government approved Act 216, which provides incentives similar to the ones available under Act 132 and establishes an orderly

transition to gradually reduce those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216 are limited to residential real property and are effective from November 1, 2011 to December 31, 2012, with certain reductions after December 31, 2011 and June 30, 2012. New incentives are also available for property that constitutes the seller's principal residence, as defined in Act 216.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2011, gross income from agriculture was $789.8 million at current prices, which remained virtually unchanged (an increase of 0.1%) as compared with fiscal year 2010. In terms of gross domestic product, agriculture generated a level of production of $670.2 million at current prices in fiscal year 2011, a reduction of 5.2% compared to fiscal year 2010.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

## Higher Education

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 14,791,224 | 54.5% |
| 2001 | 430,880[3] | 184,126 | 42.7% | 27,992,652[3] | 15,312,289 | 54.7% |
| 2002 | 428,065[3] | 190,776 | 44.6% | 28,480,708[3] | 15,927,987 | 55.9% |
| 2003 | 423,338[3] | 199,842 | 47.2% | 28,916,746[3] | 16,611,711 | 57.4% |
| 2004 | 417,141[3] | 206,791 | 49.6% | 29,302,179[3] | 16,911,481 | 57.7% |
| 2005 | 408,044[3] | 208,032 | 51.0% | 29,441,546[3] | 17,272,044 | 58.7% |
| 2006 | 398,586[3] | 209,547 | 52.6% | 29,602,839[3] | 17,487,475 | 59.1% |
| 2007 | 389,640[3] | 225,402 | 57.8% | 29,808,025[3] | 17,758,870 | 59.6% |
| 2008 | 384,751[3] | 227,546 | 59.1% | 30,194,274[3] | 18,248,128 | 60.4% |
| 2009 | 379,500[3] | 235,618 | 62.1% | 30,530,346[3] | 19,102,814 | 62.6% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,427,711 | 66.6% |

[1]   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]   Based on census population as of April 1 of the stated year.
[3]   Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2010-2011 was approximately 61,722 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2010-2011 of approximately 188,470 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico

financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes.  Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Individual Investors Act and Export Services Act*

On January 17, 2012, the Legislative Assembly of Puerto Rico approved new legislation to promote the economic development of Puerto Rico: (i) Act No. 22, also known as the Act to Promote the Relocation of Individual Investors to Puerto Rico (the "Individual Investors Act), and (ii) Act No. 20, also known as the Act to Promote the Exportation of Services (the "Export Services Act"), which supersedes the provisions of the Economic Incentives Act that provide benefits to designated services performed for markets outside of Puerto Rico.

The Individual Investors Act seeks to attract new residents to Puerto Rico by providing total exemption from Puerto Rico income taxes on passive income realized or accrued after such individuals become bona fide residents of Puerto Rico. The Individual Investors Act applies to any individual investor that becomes a Puerto Rico resident on or before the taxable year ending on December 31, 2035, provided that such individual was not a resident of Puerto Rico at any time during the 15-year period preceding the effective date of the Individual Investors Act. This relocation should result in new local investments in real estate, services, and other consumption products, and in capital injections to the Puerto Rico banking sector, all of which will stimulate the economy of Puerto Rico.

The Export Services Act seeks to establish and develop in Puerto Rico an international export services center. This act seeks to encourage local service providers to expand their services to persons outside of Puerto Rico, promote the development of new businesses in Puerto Rico and stimulate the inbound transfer of foreign service providers to Puerto Rico. The Export Services Act also creates a special fund for the continuous development of new tax incentives that will promote export services and the establishment of new businesses in Puerto Rico. The Export Services Act applies with respect to any entity with a bona fide office or establishment located in Puerto Rico that is or may be engaged in an eligible service.  Service providers operating under a tax exemption decree issued under the Export Services Act will enjoy various Puerto Rico tax incentives during the term of such decree, such as a 4% flat income tax rate on export services income and 100% tax-exempt dividend distributions.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010 ("Act 83"), also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale.  The activities eligible for tax exemption under the

Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the assembly and installation of machinery and equipment for the production of green energy, and the leasing of property used for the production of green energy (not including financing leases).

Companies qualifying under the Green Energy Incentives Act can avail themselves of the following tax benefits: a preferential income tax rate of 4% on Green Energy Income and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies.  In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their earnings and profits derived from the eligible activities free of Puerto Rico income taxes.  Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

In order to enjoy the tax benefits mentioned above, an eligible business must request and obtain a grant of tax exemption, which is a contract between the Government of Puerto Rico and the exempt business, and has a term of 25 years.

Moreover, the Green Energy Incentives Act creates a rebate program of a portion of the acquisition, installation, and related costs of the physical plant and the machinery and equipment of small and medium green energy projects located in Puerto Rico. In the case of large scale green energy projects (more than 1 MW) developed in Puerto Rico, the Green Energy Incentives Act creates a renewal green energy certificates program.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island.  The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years.  The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects.  The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects.  To date, the Fund has provided direct loans and financial guarantees in

the aggregate of approximately $1.442 billion for loans made or bonds issued to finance the development of twenty-five tourism projects representing 5,109 new hotel rooms and a total investment of approximately $2.345 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

On September 22, 2011, HR No. 3020 was presented in the U.S. Congress House of Representatives, which allows corporations organized under the laws of Puerto Rico which derive fifty percent (50%) or more of their gross income from Puerto Rico sources to elect to be treated as domestic U.S. corporations for almost all provisions of the U.S. Code, including Section 243 of the U.S. Code pertaining to the dividends received deduction. By way of exception, the electing Puerto Rico corporations would not consider as part of their gross income for federal income tax purposes income derived from sources within Puerto Rico.

# DEBT

## Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.   Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the Sales Tax (as defined under "Major Sources of General Fund Revenues—Sales and Use Taxes" under "Puerto Rico Taxes, Other Revenues, and Expenditures" below) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

As of May 15, 2012, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $989,231,968 in fiscal year ending June 30, 2016 (based on the assumption that the (i) Public Improvement Refunding Bonds, Series 2004A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and (ii) the outstanding Public Improvement Refunding Bonds, Series 2003 C, Public Improvement Bonds of 2006, Series A, and Public Improvement Refunding Bonds, Series 2007A that are variable rate bonds, bear interest at 12% per annum).  This amount ($989,231,968) *plus* the amount paid by the Commonwealth in fiscal year 2011 on account of bonds or notes guaranteed by the Commonwealth ($16,520,000), for a total of $1,005,751,968, is equal to 13.24% of $7,595,987,000, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2010 and 2011.  If the interest on the outstanding bonds described in items (ii) through (iii) above was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the future maximum annual debt service for the Commonwealth outstanding general obligations debt would be $947,895,697 in fiscal year 2020 and the

percentage referred to in the preceding sentence would be 12.70%. The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation. For a discussion of the Commonwealth's obligations under its interest rate exchange agreements, see "Interest Rate Exchange Agreements" under DEBT.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of March 31, 2012, Port of the Americas Authority ("PAA") had outstanding bonds guaranteed by the Commonwealth (the "PAA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $214.8 million. The Commonwealth has begun to make payments of debt service on the PAA Guaranteed Bonds and expects to make all payment on the PAA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2011, the Commonwealth made payments under its guaranty of the PAA Guaranteed Bonds of $16.5 million. In addition, the Commonwealth had made special budgetary appropriations to PRASA to provide a subsidy for its operational expenses. See "Commonwealth Guaranteed Debt" below.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth (other than refunding bonds) is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of March 31, 2012. This table includes debt primarily payable from Commonwealth or municipal taxes, Commonwealth appropriations and rates charged by public corporations for services or products, as well as debt payable from other sources, some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $988.4 million of outstanding bonds (as of March 31, 2012) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities. This table does not take into consideration the following debt issued after March 31, 2012: (1) $2,318,190,000 Public

Improvement Refunding Bonds, Series 2012A (General Obligation Bonds) issued by the Commonwealth on April 3, 2012, which proceeds were used to, among other things, refund approximately $1.2 billion of Commonwealth general obligation bonds and repay approximately $654.7 million of GDB lines of credit, and (2) $630,110,000 Power Revenue Bonds, Series 2012A and $19,890,000 Power Revenue Refunding Bonds, Series 2012B, issued by PREPA on May 1, 2012, which proceeds were used to, among other things, refund approximately $21.3 million of outstanding bonds and repay approximately $161.9 million of GDB lines of credit.

**Commonwealth of Puerto Rico**
**Public Sector Debt***
**(in millions)**

|  | March 31, 2012 |
|---|---|
| **GENERAL FUND RELATED DEBT** | |
| Direct full faith and credit obligations | $ 9,833 |
| Puerto Rico guaranteed debt[1] | 5,483 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,819 |
| Tax and Revenue Anticipation Notes[3] | 900 |
| Pension Obligation Bonds[4] | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $22,983 |
| | |
| Sales Tax debt | $15,224 |
| Public corporations and agencies[5] | 25,147 |
| Municipal debt | 3,658 |
| Limited obligations/non-recourse debt[6] | 2,263 |
| TOTAL PUBLIC SECTOR DEBT | $69,275 |

\* Totals may not add due to rounding.
[1] Consists of $658 million of bonds issued by Aqueduct and Sewer Authority, $440 million of State Revolving Fund Loans incurred under various federal water laws, $214.8 million of bonds issued by Port of the Americas Authority and $4.170 billion of PBA bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.
[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation bonds.
[3] Includes related short-term financings.
[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.
[5] Excludes $6.3 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, public corporations, agencies and municipalities. Loans made by GDB to the Commonwealth, public corporations, agencies and municipalities are included in the table.
[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $170.8 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); $331.9 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; $149 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $74.6 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $73.6 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Debt Service Requirements for Commonwealth General Obligation Bonds**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding on May 15, 2012. This table, however, does not include payments made by the Commonwealth on the PAA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the PAA Guaranteed Bonds. The amounts paid by the Commonwealth under the PAA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

## Puerto Rico General Obligation Debt Service Requirements*
## (In thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
| --- | --- | --- | --- |
| | Principal | Interest[3] | Total[3] |
| 2012[1] | $ 100,221 | $ 47,402 | $ 147,623 |
| 2013 | 468,235[2] | 447,186 | 915,421 |
| 2014 | 376,453 | 451,181 | 827,634 |
| 2015 | 407,055 | 457,721 | 864,775 |
| 2016 | 425,640 | 512,947 | 938,588 |
| 2017 | 371,192 | 492,990 | 864,181 |
| 2018 | 327,015 | 474,966 | 801,981 |
| 2019 | 475,981 | 443,627 | 919,608 |
| 2020 | 534,935 | 412,961 | 947,896 |
| 2021 | 403,150 | 387,294 | 790,444 |
| 2022 | 350,690 | 369,002 | 719,692 |
| 2023 | 273,615 | 352,547 | 626,162 |
| 2024 | 272,545 | 339,291 | 611,836 |
| 2025 | 291,470 | 325,956 | 617,426 |
| 2026 | 366,935 | 310,442 | 677,377 |
| 2027 | 308,600 | 290,578 | 599,178 |
| 2028 | 329,780 | 274,016 | 603,796 |
| 2029 | 305,180 | 255,981 | 561,161 |
| 2030 | 316,925 | 239,508 | 556,433 |
| 2031 | 319,000 | 223,069 | 542,069 |
| 2032 | 231,220 | 206,538 | 537,758 |
| 2033 | 345,450 | 193,865 | 539,315 |
| 2034 | 293,885 | 175,463 | 469,348 |
| 2035 | 375,975 | 160,079 | 536,054 |
| 2036 | 318,145 | 139,505 | 457,650 |
| 2037 | 336,405 | 121,248 | 457,653 |
| 2038 | 398,575 | 102,245 | 500,820 |
| 2039 | 421,130 | 79,691 | 500,821 |
| 2040 | 505,180 | 55,640 | 560,820 |
| 2041 | 532,625 | 28,194 | 560,819 |
| | $10,783,206 | $8,371,131 | $19,154,337 |

* Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.
[1] Excludes approximately $685 million of principal and interest due in fiscal year 2012 paid and to be paid from the proceeds of Commonwealth general obligation bonds.
[2] Includes $75 million in Commonwealth bond anticipation notes issued in January 2012 and payable in fiscal year 2013.
[3] The figures for interest have been reduced by the interest that was capitalized through the issuance of Commonwealth general obligation bonds in the following amounts: $672 thousand in fiscal year 2012, $120.1 million in fiscal year 2013, $97.0 million in fiscal year 2014 and $73.9 million in fiscal year 2015.

*Sources:* Government Development Bank for Puerto Rico and Treasury Department

**Interest Rate Exchange Agreements**

*General.*   The Commonwealth and various public corporations are party to various interest rate exchange agreements or swaps.   Except for the basis swaps discussed below, the purpose of all of the interest rate exchange agreements currently in place is to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith. When the Commonwealth or a public corporation has issued variable rate bonds, it has entered into an interest rate exchange agreement with a counterparty pursuant to which the Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to match the variable rate payable on the bonds (a "synthetic fixed rate swap").   In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate payments on the bonds and, thus, the Commonwealth or the public corporation is left with a net fixed rate payment to a counterparty.   The intention of these swaps was to lower the all-in cost of borrowing below what could have been achieved by issuing fixed rate bonds.

*Basis Swap.*   The Commonwealth and PREPA are also party to agreements ("basis swaps"), entered into in June 2006 and March 2008, respectively, pursuant to which they are making payments on a specified notional amount based on a short-term interest rate index published by the Securities Industry and Financial Markets Association ("SIFMA") and are receiving from their counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate ("LIBOR") plus a specified fixed rate payment (the "basis annuity").   The basis swaps are the only interest rate exchange agreements that do not hedge specific variable rate debt.   For fiscal year 2011 and the first nine months of fiscal year 2012, the Commonwealth received $7.3 million and $7.4 million, respectively, from its counterparties under the basis swap, net of the Commonwealth's payments to the counterparties, and PREPA received $9.6 million and $8.7 million, respectively, from its counterparty under the basis swap, net of PREPA's payments to the counterparty.   In addition, in January 2012, PREPA received approximately $265,000 in connection with the unwinding of $225 million of notional amount of the basis swap.

*Risks.*   By using derivative financial instruments, the Commonwealth exposes itself, among other risks, to credit risk (based on the counterparty's ability to perform under the terms of the agreement), market risk (based on the changes in the value of the instrument resulting from changes in interest rates and other market factors) and, in the case of basis swaps, basis risk (based on changes to the correlation between different indexes used in connection with a derivative and the variable rate debt they hedge).   GDB, as fiscal agent, regularly monitors the exposure of the Commonwealth and the public corporations under the interest rate exchange agreements and attempts to minimize the risks.   To minimize some of the credit risk, the Commonwealth and the public corporations enter into agreements with highly-rated counterparties.   The outstanding interest rate exchange agreements are with eight different counterparties, all of which are rated in one of the three highest rating categories by either Moody's or S&P.   In addition, most of the agreements contain requirements of posting collateral by the counterparties based on certain valuation thresholds and credit ratings.

During fiscal years 2009, 2010, 2011 and the first nine months of fiscal year 2012, in order to reduce the risks associated with the swaps portfolio, the Commonwealth and the public corporations terminated approximately $4.4 billion of swaps. The aggregate notional amount of the swaps for the Commonwealth and the public corporations has decreased from $9.2 billion as of June 30, 2008, to $4.6 billion as of March 31, 2012, an aggregate decrease of 50%.

*Notional Amounts.* The table below shows the aggregate notional amount as of March 31, 2012 of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

### Swap Portfolio Breakdown
### Notional Amount
(as of March 31, 2012)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $587,565,000 | $1,698,370,000 | $2,285,935,000 |
| Electric Power Authority | 411,825,000 | 1,150,000,000 | 1,561,825,000 |
| Highways and Transportation Authority | 647,025,000 | — | 647,025,000 |
| Sales Tax Financing Corporation | 136,000,000 | — | 136,000,000 |
| Total | $1,782,415,000 | $2,848,370,000 | $4,630,785,000 |

*Market Value.* Generally, the interest rate exchange agreements may be terminated by the Commonwealth or the public corporations at any time at their then current market values. The agreements may also be terminated upon the occurrence of certain credit events. If a termination occurs due to a credit event, the Commonwealth or the public corporations may be obligated to pay to the applicable swap counterparty an amount based on the terminating swap's market value, which may be substantial, or vice versa, with other termination costs being paid by the defaulting party. The mark-to-market value of the swaps fluctuates with interest rates and other market conditions. The Commonwealth's obligations under the interest rate exchange agreements are secured by the full faith, credit and taxing power of the Commonwealth.

The following table shows, as of March 31, 2012, the net mark-to-market value of all outstanding interest rate exchange agreements. Except for the basis swap of PREPA and two swaps of Highways and Transportation Authority, the mark-to-market value of all swaps of the Commonwealth and the public corporations was negative as of March 31, 2012. Thus, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

### Swap Portfolio Mark-to-Market Valuation
(as of March 31, 2012)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $(101,975,450) | $(19,545,950) | $(121,521,400) |
| Electric Power Authority | (87,967,370) | 10,732,622 | (77,234,748) |
| Highways and Transportation Authority | (174,336,580) | — | (174,336,580) |
| Sales Tax Financing Corporation | (67,450,448) | — | (67,450,448) |
| Total | $(431,729,848) | $(8,813,328) | $(440,543,176) |

*Collateral Requirements.* Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. During the fourth quarter of 2008, as a result of the U.S. financial market crisis, the Commonwealth and the public corporations were required to post collateral of approximately $251.8 million and $82.5 million, respectively, to their counterparties on certain interest rate exchange agreements. Based on an improvement in the mark-to-market value of the swap portfolio since then, the Commonwealth, PREPA and COFINA had no collateral posted as of March 31, 2012 and Highways and Transportation Authority had posted collateral of $28.0 million as of March 31, 2012. However, if the mark-to-market value of the swaps portfolio deteriorates or the credit ratings of the Commonwealth or the public corporations are lowered, the collateral posting obligations contained in the agreements may require further deliveries of collateral.

## Variable Rate Bonds and Mandatory Tender Bonds

*Variable Rate Bonds.* The Commonwealth and various public corporations have outstanding variable rate bonds, consisting of (1) variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds"), (2) variable rate bonds and notes that have been purchased directly from the Commonwealth by certain financial institutions where the interest rate changes periodically based on the LIBOR or SIFMA index and that are subject to mandatory tender on certain dates prior to their maturities ("Mandatory Tender FRNs"), and (3) other bonds and notes where the interest rate changes periodically based on the LIBOR rate or a particular index but that are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers with respect to all variable rate bonds. Pursuant to these agreements, the Commonwealth and the public corporations receive a variable rate payment expected to approximate the interest cost of the variable rate bonds, and pay a fixed rate. See "Interest Rate Exchange Agreements."

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of March 31, 2012.

### Variable Rate Debt Breakdown
(as of March 31, 2012)

| | VRDO Bonds | Mandatory Tender FRNs | Other Variable Rate Debt | Total |
|---|---|---|---|---|
| Commonwealth (General Obligation) | $203,625,000 | $257,215,000 | $ 126,725,000 | $587,565,000 |
| Electric Power Authority | — | — | 411,825,000 | 411,825,000 |
| Highways and Transportation Authority | 200,000,000 | — | 447,025,000 | 647,025,000 |
| Sales Tax Financing Corporation | — | — | 136,000,000 | 136,000,000 |
| Total | $403,625,000 | $257,215,000 | $1,121,575,000 | $1,782,415,000 |

The VRDO Bonds bear a floating interest rate adjusted at specified intervals, such as daily or weekly (each, a "remarketing date") and provide investors the option to tender or put the bonds at par on each remarketing date. The tendered bonds are then resold by a remarketing agent in the secondary market to other investors. The VRDO Bonds are secured by letters of credit or other liquidity or credit facilities ("credit/liquidity facilities") that provide for the payment of the purchase price payable upon the tender of the bonds. The credit/liquidity facilities expire prior to the final maturity of the bonds. If, upon the expiration or termination of any credit/liquidity facility with respect to a series of VRDO Bonds, the Commonwealth or the applicable public corporation is unable to renew or replace such facility with an alternate credit/liquidity facility, the VRDO Bonds of such series are subject to mandatory tender for purchase by the credit/liquidity facility provider and generally become subject to higher interest rates and accelerated amortization schedules pursuant to the terms of each expiring credit/liquidity facility.

The recent U.S. financial market crisis has resulted in a significant reduction in the availability of credit/liquidity facilities to support VRDO Bonds, and a related increase in the price of these facilities when they can be obtained. Thus, if the Commonwealth and the public corporations are not able to renew or rollover the expiring credit/liquidity facilities with respect to VRDO Bonds, or are not able to do so at an acceptable price, the Commonwealth and the public corporations would have to refinance the VRDO Bonds or otherwise obtain financing for such bonds in order to avoid the higher interest rates and accelerated amortization schedules set forth in the expiring credit/liquidity facility.

In addition, since there are interest rate exchange agreements with respect to all VRDO Bonds, if the Commonwealth or the applicable public corporation cannot renew or replace a credit/liquidity facility upon its expiration or remarket the related series of bonds successfully upon their mandatory tender as variable rate bonds, the Commonwealth or the applicable public corporation may have to terminate the interest rate exchange agreements associated with such series of VRDO Bonds. Termination of the applicable interest rate exchange agreement may result, depending on then current interest rate levels and market conditions, in the payment of a termination amount, which may be substantial, by the Commonwealth to compensate the counterparty for its economic losses. As of March 31, 2012, the mark-to-market value of all the interest rate exchange agreements with respect to VRDO Bonds was negative $39.9 million for the Commonwealth and negative $46.9 million for the public corporations. See "Interest Rate Exchange Agreements – Market Value."

The following table shows, by fiscal year, the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit/liquidity facilities.

**VRDO Bonds Rollover**
(by Fiscal Year)

| | 2012 | 2013 | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | — | $203,625,000 | $203,625,000 |
| Highways and Transportation Authority | — | 200,000,000 | 200,000,000 |
| Total | — | $403,625,000 | $403,625,000 |

The Mandatory Tender FRNs are discussed in the "Mandatory Tender Bonds" section below.

*Mandatory Tender Bonds.*  As of March 31, 2012, the Commonwealth and the public corporations also had outstanding $257.2 million of Mandatory Tender FRNs and $464.9 billion of fixed rate bonds also subject to mandatory tender for purchase prior to maturity (collectively, the "Mandatory Tender Bonds").  The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds.  If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds or, in some cases, the bonds would become subject to higher interest rates and an accelerated amortization schedule.

The following table shows, as of March 31, 2012, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

### Mandatory Tender Bonds Breakdown
#### (as of March, 2012)

|  | Mandatory Tender Bonds | Type | Mandatory Tender Date |
|---|---|---|---|
| Commonwealth (General Obligation) | $ 14,925,000 | Variable | April 1, 2013 |
|  | 44,905,000 | Variable | May 1, 2013 |
|  | 197,385,000 | Variable | June 1, 2014 |
| Public Buildings Authority | 335,580,000 | Fixed | July 1, 2012 |
|  | 129,300,000 | Fixed | July 1, 2017 |
| Total | $722,095,000 |  |  |

As discussed previously, the Commonwealth has entered into interest rate exchange agreements with respect to all Mandatory Tender FRNs.  In the event the Commonwealth cannot remarket these bonds on their mandatory tender dates as variable rate bonds, the Commonwealth may have to terminate the associated interest rate exchange agreements.  As of March 31, 2012, the mark-to-market value of all interest rate exchange agreements with respect to the Mandatory Tender FRNs was negative $55.3 million.

### Ratings of Commonwealth General Obligation Bonds

The Commonwealth's general obligation and appropriation debt is currently rated "Baa1" with a negative outlook by Moody's, "BBB+" with a stable outlook by Fitch, and "BBB" with a negative outlook by S&P.

### Commonwealth Guaranteed Debt

As of March 31, 2012, $4.170 billion of Commonwealth guaranteed bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).  Maximum annual debt service on these bonds is $993.1 million in fiscal year 2028, assuming the receipt of the issuer subsidy from the federal government on the $756,449,000 Government Facilities Revenue Bonds, Series R (Qualified School Construction

Bonds – Issuer Subsidy) and the $121,528,000 Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment), and $1.032 billion in fiscal year 2028 without taking into consideration said subsidy, with their final maturity being July 1, 2041. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of March 31, 2012, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of March 31, 2012, GDB held approximately $214.8 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The proceeds from these bonds have been used to continue the development of the Port of the Americas. Payments of $43.4 million under the Commonwealth guaranty have been required to pay interest and principal on these bonds. While the responsibility for the development and operation of the Port of the Americas was transferred from the Port of the Americas Authority to the Authority of the Port of Ponce in December 2011, the Port of the Americas Authority retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under the guarantee. See "Other Public Corporations—Port of the Americas Authority" under "Public Corporations" below.

As of March 31, 2012, the aggregate outstanding principal amount of obligations of the Commonwealth guaranteed by the Commonwealth was $1.098 billion. This amount consisted of $284.8 million in revenue bonds sold to the public, $373.0 million in bonds issued to the United States Department of Agriculture, Rural Development, and $440.1 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. The Commonwealth, however, has been making certain subsidy payments to PRASA for its operational expenses. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under "Public Corporations" below.

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2011 and the nine months ended March 31, 2012.  As of March 31, 2012, outstanding short-term debt, relative to total debt, was 7.3%.  Total public sector debt for fiscal year 2011 shown in the table below represented 91.9% of gross national product for fiscal year 2011.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross National Product**
**(dollars in millions)\***

| June 30, | Public Sector | | | | | Gross National Product[1] | |
|---|---|---|---|---|---|---|---|
| | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Amount | Rate of Increase |
| 2007 ......................... | 39,492 | 3,326[4] | 42,818 | 7.8 | 7.2 | 59,521 | 4.9 |
| 2008 ......................... | 43,663 | 3,269[4] | 46,932 | 7.0 | 10.0 | 61,665 | 3.6 |
| 2009 ......................... | 48,332 | 4,648[4] | 52,980 | 8.8 | 13.0 | 62,598 | 1.5 |
| 2010 ......................... | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 63,058 | 0.7 |
| 2011 ......................... | 54,804 | 4,380 | 59,184 | 7.4 | 4.2 | 64,106 | 1.7 |
| March 31, 2012 ........... | 59,387 | 4,677 | 64,064 | 7.3 | 8.2 | - | - |

---

\*    Totals may not add due to rounding.
[1]   In current dollars.
[2]   Does not include debt totaling $5.3 billion consisting of (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3]   Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
[4]   Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

*Source:* Government Development Bank

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2011 and the nine months ended March 31, 2012.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2007 | 10,335 | 224[4] | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| 2008 | 9,273 | 519[4] | 9,792 | 2,507 | 313 | 2,820 | 31,633 | 2,437 | 34,070 | 43,413 | 3,269 | 46,682 |
| 2009 | 9,382 | 557[4] | 9,939 | 2,691 | 306 | 2,997 | 36,259 | 3,785 | 40,044 | 48,332 | 4,648 | 52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| 2011 | 10,199 | 164 | 10,363 | 3,204 | 333 | 3,537 | 41,401 | 3,883 | 45,284 | 54,804 | 4,380 | 59,184 |
| March 31, 2012 | 11,098 | 1,116 | 12,214 | 3,293 | 365 | 3,658 | 44,996 | 3,196 | 48,192 | 59,387 | 4,677 | 64,064 |

* Totals may not add due to rounding.

[1] Does not include the Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[2] Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[3] Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

[4] Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

*Source:* Government Development Bank

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of March 31, 2012 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

# Commonwealth of Puerto Rico
## Outstanding Debt of Public Corporations
### March 31, 2012
### (in thousands)

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 657,722 | $ 3,434,345 | $ 4,092,067 | $440,137 | $ 39,504 | $479,641 | $ 1,097,859 | $ 3,473,849 | $ 4,571,708 |
| Convention Center District Authority | - | 438,120 | 438,120 | - | 147,600 | 147,600 | - | 585,720 | 585,720 |
| Electric Power Authority | - | 7,605,435 | 7,605,435 | - | 427,234 | 427,234 | - | 8,032,669 | 8,032,669 |
| Highway and Transportation Authority | - | 5,116,827[1] | 5,116,827 | - | 1,765,647 | 1,765,647 | - | 6,882,474 | 6,882,474 |
| Housing Finance Authority | - | 285,374[2] | 285,374 | - | 83,303 | 83,303 | - | 368,677 | 368,677 |
| Industrial Development Company | - | 222,385 | 222,385 | - | 88,532 | 88,532 | - | 310,917 | 310,917 |
| Infrastructure Financing Authority[3] | - | 2,477,348 | 2,477,348 | - | 35,294 | 35,294 | - | 2,512,642 | 2,512,642 |
| Port of the Americas Authority | 214,808 | - | 214,808 | - | - | - | 214,808 | - | 214,808 |
| Ports Authority | - | 46,326[4] | 46,326 | - | 213,807 | 213,807 | - | 260,133 | 260,133 |
| Public Buildings Authority | 4,170,459 | - | 4,170,459 | - | 244,326 | 244,326 | 4,170,459 | 244,326 | 4,414,785 |
| Public Finance Corporation | - | 1,021,993[5] | 1,021,993 | - | - | - | - | 1,021,993 | 1,021,993 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 15,223,821 | 15,223,821 | - | - | - | - | 15,223,821 | 15,223,821 |
| University of Puerto Rico | - | 532,846[6] | 532,846 | - | 73,552 | 73,552 | - | 606,398 | 606,398 |
| Others[7] | - | - | - | - | 3,185,505 | 3,185,505 | - | 3,185,505 | 3,185,505 |
| Total[8] | $5,042,989 | $36,404,820 | $41,447,809 | $440,137 | $6,304,304 | $6,744,441 | $5,483,126 | $42,709,124 | $48,192,250 |

[1] Excludes $149.0 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

[2] Excludes $170.8 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from HUD; and $331.9 million of Housing Finance Authority Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD.

[3] Includes $42.2 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement. Also includes $669.2 million of Revenue Bonds (Ports Authority Project), Series 2011, which are limited obligations of the Infrastructure Financing Authority payable solely from loan payments made by the Ports Authority.

[4] Excludes $155 million of Special Facilities Revenues Bonds issued by the Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5] Payable primarily from Commonwealth appropriations.

[6] Excludes $74.6 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7] Includes lines of credit with GDB.

[8] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.3 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, 2005 and 2008 which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below.

*Source:* Government Development Bank

## Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with the

Aqueduct and Sewer Authority, Electric Power Authority, Highway and Transportation Authority, Ports Authority, Health Insurance Administration and Medical Services Administration. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of June 30, 2011, GDB (including its blended component units) had total assets of $15.5 billion and total liabilities of $12.9 billion. As of March 31, 2012, GDB's total assets were $17.3 billion and its total liabilities were $14.6 billion (preliminary, unaudited). GDB's debt is currently rated Baa1 (negative outlook) and BBB by Moody's and S&P, respectively, with a stable outlook.

As of March 31, 2012, $6.6 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $6.3 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of March 31, 2012. As of said date, GDB also had approximately $9.5 billion in loans outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB has not made any payment to the General Fund under Act 82 since fiscal year 2004.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of March 31, 2012, the Perpetual Trust had repaid $131.8 million of its line of credit and had an outstanding balance of $368 million and no interest due. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover operating expense, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and

liquidity.  As of March 31, 2012, GDB had outstanding loans to the Commonwealth in the aggregate principal amount of $3.3 billion, outstanding loans to, and bonds of, the public corporations in the aggregate principal amount of $4.3 billion, and outstanding loans to the municipalities in the aggregate principal amount of $1.9 billion.

GDB has several subsidiaries that perform various functions.  The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.*  Puerto Rico Housing Finance Authority ("Housing Finance Authority") (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs.  Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority.  Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs.  It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency.  As of March 31, 2012, Housing Finance Authority's total outstanding principal balance of loans to the private sector for development of housing projects targeted to low and moderate income families were $156.4 million.  The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $125.5 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions.  As of March 31, 2012, $331.9 million of these bonds were outstanding.

As of March 31, 2012, the Housing Finance Authority had total notes and bonds outstanding of $660.9 million (including $124.1 million of debt outstanding under GDB lines of credit and $505.9 million in bonds issued to fund certain payments under its mortgage subsidy programs for low and moderate income families). As of March 31, 2012, Housing Finance Authority had total unrestricted net assets of $261.7 million.

*Puerto Rico Tourism Development Fund.*  Puerto Rico Tourism Development Fund ("TDF") was created in September 1993 to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects.  TDF can provide guarantees to interim and permanent financings.  In certain transactions, TDF can act as direct lender, guarantee mezzanine financings, and provide preferred equity capital.  As of June 30, 2011, TDF had $518.5 million in guarantees and $345.5 million in loans, net of loan loss reserves of $86.8 million.  As of June 30, 2011, TDF's net assets were $154.1 million.

In addition, TDF has a $50 million preferred equity investment in a tourism-related project.

Since 1993, TDF has made payments under its guarantees and letters of credit in the aggregate amount of approximately $221.3 million with respect to several projects. Of the total amount disbursed, TDF has been able to recover approximately $172.3 million from the borrowers.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") was created in November 1992 for the purpose of investing and trading in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to the Tourism Development Fund, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of March 31, 2012, the Capital Fund had assets of $222,000, consisting principally of money market investments.

*Puerto Rico Development Fund.* Puerto Rico Development Fund (the "Development Fund") was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. On December 31, 2010, the Development Fund acquired for $8.5 million a commercial loan from a private commercial bank, secured by a first mortgage over a 2.34 acre parcel of land in the Convention Center District. As of March 31, 2012, the Development Fund had assets of $22 million, including $8.0 million in loans to private entities, $10.2 million in an interest bearing accounts, and $3.8 million in preferred shares of various private entities.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health and the Aqueduct and Sewer Authority, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. As of March 31, 2012, PFC had $1.0 billion aggregate principal amount of limited obligation bonds outstanding.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

## Other Public Corporations

*Aqueduct and Sewer Authority.* PRASA owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 58% of the Commonwealth's population, respectively.

PRASA reported an operating loss of $39.6 million for fiscal year 2011, compared to operating losses of $58.3 million and $63.7 million for fiscal years 2010 and 2009, respectively.

In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

As of March 31, 2012, PRASA's total debt was $4.6 billion, including approximately $39.5 million of outstanding indebtedness with GDB. PRASA's senior debt is rated Baa2, BBB- and BBB by Moody's, S&P and Fitch Ratings ("Fitch"), respectively. On November 9, 2010, Moody's affirmed PRASA's rating but revised its outlook to negative from stable. The negative outlook reflects PRASA's continued reliance on GDB and the Commonwealth for financial support, as well as the operational challenges it faces to reduce the significant amount of water lost through its Systems.

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

On April 28, 2006, the Authority entered into a consent decree with the U.S. Environmental Protection Agency ("EPA") that requires the Authority to implement system wide remedial measures at all of the wastewater treatment plants operated by the Authority. The EPA consent decree establishes deadlines for the compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between the Authority and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. The Authority agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the Systems, to finance its expansion for new users and to implement remedial measures required by a consent decree between PRASA and the EPA and a settlement agreement with the DOH. Funds for this investment will be provided through a combination of revenues from PRASA, financing transactions, federal grants and other sources. PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the consent decree and the settlement agreement. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

*Children's Trust.* Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution

payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $397 billion Tobacco Settlement Asset-Backed Bonds in November 2002.  The proceeds were used to pay certain capital expenditures, to fund the Liquidity Reserve account and certain costs of issuance.  On June 30, 2005, Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth.  On May 1, 2008, Children's Trust issued an additional $195.9 million of subordinate Tobacco Settlement Asset-Backed Bonds to make grants to third parties, pay certain expenses of the Commonwealth and cost of issuance.  As of March 31, 2012, Children's Trust had outstanding bonds in the principal amount of $1.3 billion.  These bonds and any other additional senior bonds issued by Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement.  To date, all principal and interest payments required to be made by Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.*  Convention Center District Authority was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center, a new convention center, and designated private parcels located within the Convention Center District in San Juan.  The convention center opened in November 17, 2005.  Convention Center District Authority also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum.  As of March 31, 2012, Convention Center District Authority's debt was $438.1 million in outstanding bonds issued in March 2006 to finance the Convention Center and payable from a portion of a hotel room tax.  As of March 31, 2012, Convention Center District Authority also had outstanding indebtedness to GDB of approximately $147.6 million related to the financing of the Coliseum.

*Electric Power Authority.*  Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported net operating income of $326.9 million and $348.1 million during fiscal years 2011 and 2010, respectively.  The total debt of PREPA was $8.0 billion as of March 31, 2012.  This debt includes outstanding bonds of $7.6 billion and interim financing for operations of $427.2 million.  PREPA's debt is rated A3, BBB+ and A- by Moody's, S&P and Fitch, respectively.

On May 1, 2012, PREPA issued $630,110,000 Power Revenue Bonds, Series 2012A and $19,890,000 Power Revenue Refunding Bonds, Series 2012B, which proceeds were used to, among other things, refund approximately $21.3 million of outstanding bonds and repay approximately $161.9 million of GDB lines of credit.

As a means of reducing its dependency on oil, PREPA entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil. Currently, these two co-generation plants provide approximately 31% of PREPA's energy needs.  PREPA has also commenced developing plans for the conversion of its main oil-fired

units into natural gas and clean-coal fired units, as well as other strategies to further reduce its dependency on oil.

*Health Insurance Administration.* The Health Insurance Administration was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selected, through a bidding process, one private health insurance company in each of eight designated regions of the island and paid such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covered the entire island. Approximately 1.5 million persons were covered by the system during fiscal year 2011.

The total cost of the health insurance program was $2.017 billion for fiscal year 2011, $1.962 billion for fiscal year 2010 and $1.861 billion for fiscal year 2009. During fiscal year 2011, the General Fund covered $1.132 billion of the total cost of the health insurance program and $85 million was covered with proceeds of COFINA bonds. The remaining $800 million was paid from federal, municipal, internal and other sources. As of March 31, 2012, the Health Insurance Administration had outstanding indebtedness to GDB and private financial institutions of $387.7 million, consisting of loans used to pay amounts owed to suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

On October 1, 2010, the administration implemented "Mi Salud," which is the health program that replaced the government's Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. During the implementation of the program's second phase, eligibility requirements will be expanded to include small to medium businesses. The estimated cost for "Mi Salud" during fiscal year 2012 is $2.140 billion. The General Fund is expected to cover $867 million, while the remaining $1.273 billion will be paid as follows: $100.5 million from federal funds that the administration was able to identify from grant awards for previous years, $977.2 million from federal funds for this fiscal year and $195.3 million from municipal and other sources. This projection includes forecasted increases in the enrollment of new beneficiaries.

The Commonwealth has entered into various contracts with several Medicare Advantage organizations for the provision of health coverage to approximately 180,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

On July 7, 2011, the Secretary of Health of the Commonwealth announced the cancellation of the MCS contract effective on October 31, 2011. MCS HMO administered five regions, with approximately 850,000 insureds, of the "Mi Salud" program.. On October 17, 2011, the Health Insurance Administration and Triple-S Salud, Inc. ("Triple-S") entered into an agreement pursuant to which Triple-S will administer the provision of healthcare services to insureds in the five regions previously administered by MCS HMO. Pursuant to the agreement, Triple-S will act as a third party administrator and will be compensated based on a per member

per month administrative fee. In contrast to the agreement with MCS HMO, the Government will now be financially responsible and bear the risk for the provision of services to insureds in the five regions administered by Triple-S. Effective November 1, 2011, the Government implemented additional cost-containment measures. After six months of experience, these measures have been effective in controlling costs and, therefore, the Government expects to finish fiscal year 2012 within the estimated cost projections.

*Highways and Transportation Authority.* Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA, and federal and Commonwealth grants.

PRHTA reported a net operating loss of $530.8 million for fiscal year 2011, compared to a net operating loss of $445.3 million for fiscal year 2010 and $493.9 million for fiscal year 2009. As of June 30, 2011, PRHTA's total debt was $7.4 billion, consisting of $6.1 billion of bonds and $1.3 billion of GDB financings. As of March 31, 2012, PRHTA's total debt decreased to $6.9 billion, consisting of $5.1 billion of bonds and $1.8 billion of GDB financings.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

PRHTA's Highway Revenue Bonds are rated A3 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated Baa1 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at PRHTA's election. The cost of the project was $2.4 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005. The operation of the Tren Urbano generated a loss of $54 million, $51.7 million, $64.5 million, and $62.5 million in fiscal years 2011, 2010, 2009 and 2008, respectively.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In

certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

On September 22, 2011, PRHTA and PPP Authority completed the procurement process whereby a concession agreement was awarded to Metropistas, for the operation of toll roads PR-22 and PR-5. In connection with the establishment of the concession, PRHTA defeased, redeemed and/or purchased approximately $873.1 million aggregate principal amount of its bonds. See "Public-Private Partnerships – Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Industrial Development Company.* Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. PRIDCO reported consolidated change in net assets of $13.6 million for fiscal year 2011, compared to consolidated change in net assets of $10.3 million for fiscal year 2010, and consolidated change in net assets of $6.0 million for fiscal year 2009. Rentals derived from the leasing of specified facilities of PRIDCO are pledged to the payment of PRIDCO's revenue bonds. As of March 31, 2012, PRIDCO's total debt was $405.5 million, including approximately $88.5 million from GDB financings and the outstanding debt of Puerto Rico Industrial Investment Corporation, a subsidiary of PRIDCO. PRIDCO's debt is rated Baa1 and BBB- by Moody's and S&P, respectively.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.* The Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of March 31, 2012, approximately $1.37 billion of AFICA bonds were outstanding. In addition, as of March 31, 2012, AFICA had a $5.6 million outstanding under line of credit with GDB used for the acquisition of assets from PREPA. This line of credit was cancelled on May 1, 2012.

*Infrastructure Financing Authority.* Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.

As of March 31, 2012, PRIFA's total debt was $2.5 billion. This debt includes bonds outstanding of $2.4 billion and interim financing for capital improvements of $35.3 million. PRIFA's outstanding bonds include $669.2 million of limited obligations bonds, the proceeds of which were loaned to the Ports Authority and are payable solely from loan payments to be made by Ports Authority. PRIFA's debt is rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually thru fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. The Authority is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account were being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

As part of the Government's actions to address in part the financial condition of the Employees Retirement System, the Government enacted Act 96. On June 23, 2011, in accordance with Act 96, $162.5 million of funds on deposit in the Corpus Account were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. PRIFA also invested $165.0 million of funds on deposit in the Corpus Account in capital appreciation bonds of COFINA maturing annually on August 1, 2045 through 2050 and accreting interest at 7%.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also has responsibility for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico

municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of March 31, 2012, MFA had $988.4 million of bonds outstanding.

*Port of the Americas Authority.* Up to the approval of Act 240 of December 12, 2011, PAA was responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. With the approval of said Act 240, the Authority of the Port of Ponce was created with the exclusive jurisdiction of the Port of the Americas.

PAA was authorized to issue bonds guaranteed by the Commonwealth, in a maximum aggregate principal amount of $250 million, for the development of the Port. GDB was authorized by law to purchase said bonds of PAA. As of March 31, 2012, GDB held approximately $214.8 million of PAA's outstanding guaranteed bonds. While the responsibility for the development and operation of the Port of the Americas was transferred from PAA to the Authority of the Port of Ponce, PAA retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under the guarantee.

*Ports Authority.* Ports Authority owns and operates the major airport and seaport facilities in Puerto Rico. Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Ports Authority reported operating losses of $38.7 million and $46.7 million during fiscal years 2010 and 2009, respectively. As of March 31, 2012, the Ports Authority had $260.1 million in debt, including approximately $141.0 million from GDB financings, but excluding the loan payable to PRIFA for the repayment of PRIFA's $669.2 million limited obligation bonds. See "– Infrastructure Financing Authority" above.

As of March 31, 2012, the outstanding balance of the credit facilities for capital improvements with private financial institutions was $67.4 million, which is guaranteed by GDB.

*Public Buildings Authority.* PBA is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.3 billion of bonds guaranteed by the Commonwealth.

On August 24, 2011 PBA issued $756,449,000 Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) and $303,945,000 Government Facilities Revenue Bonds, Series S. The proceeds of the Series R bonds will be used to pay part

of the cost of constructing, renovating, remodeling and/or improving approximately 100 public schools.

On December 19, 2011, PBA issued $121,528,000 Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment). The proceeds will be used to pay part of the cost of renovating and rehabilitating certain public schools.

As of March 31, 2012, PBA had $4.170 billion principal amount of bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of March 31, 2012, PBA's line of credit with GDB had an outstanding balance of $244.3 million.

PBA debt is rated Baa1, BBB and BBB+ by Moody's, S&P and Fitch, respectively.

*Sales Tax Financing Corporation.* COFINA is an independent governmental instrumentality of the Commonwealth created by Act 91 of 2006. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.

In 2009, the Legislative Assembly of Puerto Rico expanded the purposes for which COFINA was created and, correspondingly, increased its revenues by increasing from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion that is transferred to COFINA of the sales and use tax imposed by the central government. As a result, COFINA was authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Government of Puerto Rico, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund. As of March 31, 2012, COFINA had approximately $15.2 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds). COFINA's Sales Tax Revenue Bonds are rated Aa2, AA- and AA- by Moody's, S&P and Fitch, respectively, and the Sales Tax Revenue Bonds, First Subordinate Series are rated A1, A+ and A+ by Moody's, S&P and Fitch, respectively.

*Special Communities Perpetual Trust.* The Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB made a special capital contribution to Perpetual Trust of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. As of March 31,

2012, Perpetual Trust had disbursed most of its funds and its line of credit with GDB had an outstanding balance of $367.9 million. The line of credit is payable from legislative appropriations.

*University of Puerto Rico.*   The University of Puerto Rico (the "University"), with approximately 62,342 students at the beginning of academic year 2010-2011, is by far the largest institution of higher education on the Island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been financed mainly by revenue bonds. As of March 31, 2012, the University's total debt was $604.0 million (excluding $18.6 million owed by the University's Medical Services), consisting of $532.8 million of bonds and $71.1 million of loans. The University's debt is rated Baa3 and BBB- by Moody's and S&P, respectively. Moody's rating of the University is currently on "watchlist" for possible revision.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2007, the Board of Trustees of the University approved Certification No. 60 establishing a new policy and methodology for tuition fees structure. This new structure covers the tuition fees to be charged to new students until academic year 2012-2013. This policy was adopted to pursue continued development and financial stability of the University.

In June 2010, the Board of Trustees of the University approved Certification No. 146 establishing a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University. This stabilization fee was imposed to address the University's fiscal difficulties and is expected to increase annual revenues by approximately $40 million.

As a result of a student-led strike that lasted approximately two months, on June 26, 2010, the Middle States Commission on Higher Education (the "Commission"), the regional accreditation entity of the eleven units that comprise the University system, placed on probation ten of the University's units for lack of evidence of compliance with two of fourteen accreditation standards. This action was prompted by a student stoppage that interrupted the operations of these units for up to 62 days, but less in most cases. The ten affected units will remained fully accredited while on probation. After a Monitoring Report submitted by the ten affected units in September 2010 and subsequent evaluation visits, in June 2011 the Commission lifted probation and reaffirmed accreditation of seven of the ten affected units and in November 2011 lifted probation and reaffirmed accreditation of the three remaining units.

*Other public corporations.* Public corporations not described above have outstanding debt in the aggregate amount of $2.4 billion as of March 31, 2012. Debt service on $1.4 billion of such outstanding debt is being paid from legislative appropriations. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of the Commonwealth (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System covers employees of the University of Puerto Rico and Electric Power Authority, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951 ("Act 447") and is a hybrid defined benefit plan consisting of different benefit structures. Members who entered the Employees Retirement System on or before December 31, 1999 generally participate in a defined benefit program. Members participating in the defined benefit program prior to April 1, 1990 ("Act 447 Participants") are entitled to the highest benefits structure, while those who became members on or after April 1, 1990 ("Act 1 Participants") are subject to a longer vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("Act 1 of 1990").

In 1999, Act 447 was amended to close the defined benefit program and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is

referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Under the System 2000 benefits structure, a participant is entitled to receive a lump-sum payment, which may be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed by such participant. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions with respect to System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the original defined benefit structure and System 2000 will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined benefit pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

*Governance.* Governance of the Employees Retirement System and the Judiciary Retirement System is vested in a Board of Trustees, which sets policy and oversees the operations consistent with applicable laws. There are nine members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or his appointee), the President of GDB (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Government of Puerto Rico (or his appointee), as *ex officio* members; three members appointed to three year terms by the Governor of Puerto Rico, two of whom must be members of the Employees Retirement System or the Judiciary Retirement System, with at least ten years of credited service; and a member who is a pensioner of the Employees Retirement System or the Judiciary Retirement System. The Board is also responsible for appointing the Administrator of the Employees Retirement System and the Judiciary Retirement System.

Governance of the Teachers Retirement System is also vested in a Board of Trustees. There are nine members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or his appointee), the President of GDB (or his appointee) and the Puerto Rico Secretary of Education (or his appointee), as *ex officio* members; one member who is the President of a teacher's organization, or his representative designated by the Governor of Puerto Rico, with the advice and consent of the Senate, for a term of four years; three teachers of the System, one of which shall represent active teachers and two of which shall represent retired teachers, each appointed by the Governor of Puerto Rico, with the advice and consent of the Senate, for a term of four years; one member who is the President of the collective bargaining unit for teachers

pursuant to Puerto Rico law (or his appointee); and a member who represents the public interest, appointed by the Governor of Puerto Rico, with the advice and consent of the Senate, for a term of four years.   The Board is also responsible for appointing an Executive Director of the Teachers Retirement System.

*Covered Employees.*   The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico or the Electric Power Authority) and municipalities, except for those employees that are covered by the other two Retirement Systems.   The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions.  Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied.  Currently, there are no teachers from private schools or other educational institutions participating in the Teachers Retirement System.

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2011.

**Participant Data**
**(as of June 30, 2011)**

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| Act 447 Participants | 30,057 | 79,177 | 16,208 | 13,073 | - | 138,515 |
| Act 1 Participants | 50,346 | 4,239 | 462 | 32 | - | 55,079 |
| System 2000 Participants | 55,569 | - | - | - | - | 55,569 |
| **Total** | 135,972 | 83,416 | 16,670 | 13,105 | - | 249,163 |
| **Teachers Retirement System** | 43,402 | 30,431 | 2,095 | 2,835 | 768 | 79,531 |
| **Judiciary Retirement System** | 362 | 335 | 0 | 56 | 48 | 801 |

[1]   Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.   There are terminated vested members of the Employees Retirement System, but the Employees Retirement System does not possess reliable data on the amount of such members.

The Commonwealth central government (consisting of department and agencies) is not the only employer participating in the Employees Retirement System.  The municipalities and most public corporations participate as employers as well with respect to their employees.  However, the assets contributed by the Commonwealth central government and all other

employers are invested together and not otherwise segregated. As of June 30, 2011, the central government was responsible for making contributions with respect to 82,554 active members of the Employees Retirement System, or 60.7% of total active members (consisting of 19,230 Act 447 Participants, 33,347 Act 1 Participants and 29,977 System 2000 Participants). Municipalities were responsible for 32,264, or 23.7%, active members, and public corporations were responsible for 21,154, or 15.6% active members.

*Funding Requirements.* The Commonwealth central government is responsible for approximately 59% of total employer contributions to the Employees Retirement System, and the other 41% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the Retirement Systems and required contributions to the Retirement Systems by employers and employees are determined by law rather than by actuarial requirements. The Commonwealth is ultimately responsible for any funding deficiency with respect to central government employees in the three Retirement Systems.

As of July 1, 2011, after the adoption of Act 116, the statutory employer contribution for the Employees Retirement System increased from a minimum of 9.275% to a minimum of 10.275% of covered payroll, and will continue to increase annually until fiscal year 2021. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below. Covered payroll is the compensation regularly paid to active employees on which contributions to the retirement systems are computed and is generally equivalent to their annual salary. The employer contribution rate of 9.275% had been in effect since February 1990. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the System, plus administrative costs, and (ii) the contributions that employees are required to make to the System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

Required employee contributions for the Employees Retirement System vary according to how the individual employee's retirement benefits are coordinated with social security benefits.

As of July 1, 2011, after the adoption of Act 114, the statutory employer contribution for the Teachers Retirement System increased from 8.5% to 9.5% of covered payroll, and will continue to increase annually until fiscal year 2021. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below. The statutory employee contribution for the Teachers Retirement System is 9.0% of covered payroll. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and 8% for the employees. The employer contribution rate for the Judiciary Retirement System increased from 20.0% to 30.34% of payroll as of July 1, 2008.

The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used to pay public debt before being used for other purposes. Public debt of the Commonwealth includes general obligation bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to

opinions rendered by the Attorney General of the Commonwealth, also any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities. See DEBT. Furthermore, Puerto Rico law provides "priority norms" for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, as follows: first, the payment of the interest on, and amortization requirements for, public debt (Commonwealth general obligation and guaranteed debt); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain and certain commitments to protect the name, credit and good faith of the Commonwealth government; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes. Thus, according to the priority norms, contributions by the Commonwealth to the Retirement Systems expressly fall within the third priority. These restrictions do not apply to employer contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not "available resources" of the Commonwealth.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2011 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been recuperated by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the

remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. In July 2011, the Teachers Retirement System received the second installment.

The Employees Retirement System is also seeking reimbursement from the Commonwealth, the municipalities and public corporations in the amount of approximately $78 million, $24 million and $40 million, respectively, for cumulative System Administered Pension Benefits paid to its beneficiaries through June 30, 2011.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2011, the market value of the Employees Retirement System's investment portfolio was $4.940 billion, compared to $4.795 billion as of June 30, 2010. As of June 30, 2011, the investment portfolio was comprised of approximately 27.7% of equity investments, 20.8% of fixed income securities, 25.8% of internally managed mortgage and personal loans portfolio, 24.3% of short-term cash equivalents, and 1.33% of other investments. As of December 31, 2011, the market value of the Employees Retirement System's investment portfolio was $4.226 billion. The decrease in value of the investment portfolio since June 30, 2011 principally reflects the continued use of investment portfolio assets to pay current benefits as discussed below.

As of June 30, 2011, the market value of the Teachers Retirement System's investment portfolio was $2.407 billion, compared to $2.205 billion as of June 30, 2010. As of June 30, 2011, the investment portfolio was comprised of approximately 50.3% of equity investments, 24.6% of fixed income securities, 16.9% of internally managed mortgage and personal loans portfolio, 7.1% of short-term cash equivalents, and 1.1% of other investments. As of December 31, 2011, the market value of the Teachers Retirement System's investment portfolio was $2.176 billion. The decrease in value of the investment portfolio since June 30, 2011 principally reflects the continued use of investment portfolio assets to pay current benefits as discussed below.

As of June 30, 2011, the market value of the Judiciary Retirement System's investment portfolio was $73.9 million, compared to $83.9 million as of June 30, 2010. As of June 30, 2011, the investment portfolio was comprised of approximately 30.0% of equity investments, 54.1% of fixed income securities, 1.1% of internally managed mortgage and personal loans portfolio, and 14.8% of short-term cash equivalents. As of December 31, 2011, the market value of the Judiciary Retirement System's investment portfolio was $68.9 million.

*Actuarial Valuations of the Retirement Systems.* Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems began conducting annual actuarial valuations effective June 30, 2009. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2011.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System as well as other financial information are available on the website of the Administration of the Retirement Systems at www.retiro.pr.gov. Informational copies of the actuarial valuation report of the Teachers Retirement System as well as other financial information are available at the website of the Teachers Retirement System at

www.srm.pr.gov. No information contained on these websites is deemed incorporated herein by reference.

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislature.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal year 2009 was significantly lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of each of the Retirement Systems for fiscal year 2010 and 2011, however, was higher than the assumed investment return used in the actuarial valuations as of June 30, 2011.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 9.8%, negative 16.0% and negative 18.0%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal

year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively. For fiscal year 2011, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 16.0%, 22.5% and 20.5%, respectively.

The June 30, 2011 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method, with an assumed investment return of 6.4% per year, in the case of the Employees Retirement System, and 6.6% per year, in the case of the Judiciary Retirement System, and yearly salary increases of 3% per year. The actuarial valuations of the Employees Retirement System and the Judiciary Retirement System as of June 30, 2010 had assumed investment returns of 7.5% per year. Under the "projected unit credit" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service.

The June 30, 2011 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 6.4% per year and yearly salary increases of 3.5%. The actuarial valuation of the Teachers Retirement System as of June 30, 2010 had assumed investment returns of 8% per year. Under the "entry age normal" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase

in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

### Funding Status
### Actuarial Valuations as of June 30, 2011
### (in millions)

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,724 | $25,457 | $23,734 | 6.8% | $3,666 | 647.3% |
| Teachers Retirement System | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| Judiciary Retirement System | 64 | 383 | 319 | 16.7 | 32 | 1,002.2 |
| Total | $4,174 | $37,289 | $33,116 | 11.2% | $5,018 | 659.9% |

[1] The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

[4] The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.

[6] The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System.

Source: Actuarial valuation reports as of June 30, 2011 for each of the Retirement Systems.

## Historical Funding Status[1]
## Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2005 | $2,328 | $13,969 | $11,641 | 16.7% | $4,126 | 282.2% |
| 2007 | 2,892 | 16,770 | 13,878 | 17.2 | 4,246 | 326.8 |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 21,370 | 19,703 | 7.8 | 3,818 | 516.1 |
| 2011 | $1,724 | $25,457 | $23,734 | 6.8 | $3,666 | 647.3 |
| **Teachers Retirement System** | | | | | | |
| 2004 | $2,403 | $ 4,702 | $ 2,299 | 51.1% | $1,294 | 177.7% |
| 2007 | 3,163 | 7,756 | 4,593 | 40.8 | 1,370 | 335.3 |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| 2011 | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| **Judiciary Retirement System** | | | | | | |
| 2005 | $70 | $174 | $105 | 40.0% | $29 | 356.8% |
| 2007 | 81 | 259 | 177 | 31.5 | 31 | 566.6 |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| 2011 | 64 | 383 | 319 | 16.7 | 32 | 1002.2 |

[1] Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.

Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last four fiscal years.

### Schedule of Employer Contributions
### to Retirement Systems
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $1,191 | $663 | $528 | 55.7% |
| 2009 | 1,259 | 595 | 664 | 47.3 |
| 2010 | 1,460 | 534 | 926 | 36.6 |
| 2011 | 1,735 | 702 | 1,033 | 40.5 |
| 2012 | 2,019 | 597 | 1,422 | 29.6 |
| **Teachers Retirement System** | | | | |
| 2008 | $341 | $159 | $182 | 46.6% |
| 2009 | 394 | 173 | 221 | 43.9 |
| 2010 | 477 | 166 | 311 | 34.8 |
| 2011 | 528 | 161 | 367 | 30.5 |
| 2012 | 659 | 175 | 484 | 26.6 |
| **Judiciary Retirement System** | | | | |
| 2008 | $20 | $7 | $13 | 35.0% |
| 2009 | 22 | 11 | 11 | 50.0 |
| 2010 | 28 | 11 | 17 | 39.3 |
| 2011 | 30 | 11 | 19 | 36.7 |
| 2012 | 34 | 11 | 23 | 32.4 |
| **Total** | | | | |
| 2008 | $1,552 | $829 | $723 | 53.4% |
| 2009 | 1,675 | 779 | 896 | 46.5 |
| 2010 | 1,965 | 711 | 1,254 | 36.2 |
| 2011 | 2,293 | 874 | 1,419 | 38.1 |
| 2012 | 2,712 | 783 | 1,929 | 28.9 |

[1]   The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2011.

[2]   The actual employer contributions for fiscal year 2012 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the actuarial valuations as of June 30, 2011.

[3]   Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2011 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

Based on the current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems will continue to increase indefinitely into the future instead of being amortized and future scheduled contributions at the current funding rates will not be sufficient to make future benefit payments when due.   Additional funding from the Commonwealth will ultimately be necessary to cover such unfunded obligation.   It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls and Issuance of Pension Obligation Bonds.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the System's assets.

During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), with interest rates ranging from 5.85% to 6.55%, for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds are limited, non-recourse obligations of the Employees Retirement System payable solely from and secured solely by the employer contributions. The maturity of the Pension Bonds is not subject to acceleration for any reason including non-payment of debt service on the bonds. As of June 30, 2011, approximately $2.9 billion of the Pension Bonds remain outstanding. The Pension Bonds increased the funds of the Employees Retirement System currently available to pay pension benefits. The original expectation was that the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds would exceed the cost of the debt. The Employees Retirement System, however, has not obtained the expected arbitrage on invested proceeds and has also used some proceeds to pay current system benefits and operational expenses.

The table below shows the funding shortfalls for each of the last five fiscal years and the projected funding shortfall for the following five fiscal years for each of the Retirement Systems.

### Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[3] | Net Funding Shortfall |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2007 | $713 | $ (850) | $(137) |
| 2008 | 726 | (990) | (264) |
| 2009 | 762 | (1,023) | (261) |
| 2010 | 727 | (1,102) | (375) |
| 2011 | 671[2] | (1,183) | (512) |
| 2012 | 689 | (1,528) | (839) |
| 2013 | 744 | (1,550) | (806) |
| 2014 | 801 | (1,584) | (783) |
| 2015 | 860 | (1,629) | (769) |
| 2016 | 921 | (1,679) | (758) |
| **Teachers Retirement System** | | | |
| 2007 | $257 | $(394) | $(137) |
| 2008 | 249 | (447) | (198) |
| 2009 | 263 | (473) | (210) |
| 2010 | 249 | (503) | (254) |
| 2011 | 236 | (550) | (314) |
| 2012 | 244 | (559) | (315) |
| 2013 | 267 | (579) | (312) |
| 2014 | 290 | (600) | (310) |
| 2015 | 315 | (624) | (309) |
| 2016 | 341 | (650) | (309) |
| **Judiciary Retirement System** | | | |
| 2007 | $10 | $(16) | $(6) |
| 2008 | 10 | (16) | (6) |
| 2009 | 13 | (17) | (4) |
| 2010 | 13 | (19) | (6) |
| 2011 | 13 | (19) | (6) |
| 2012 | 12 | (21) | (9) |
| 2013 | 13 | (22) | (9) |
| 2014 | 13 | (23) | (10) |
| 2015 | 13 | (24) | (11) |
| 2016 | 14 | (25) | (11) |

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits. For fiscal years 2012 through 2016, estimated payroll is assumed to grow 3% annually and employer contributions include the rate increases provided for by Act 114 and Act 116.

[2] Excludes $162.5 million contributed to the Employees Retirement System on June 23, 2011 and invested in COFINA bonds pursuant to Act, 96.

[3] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2008, 2009 and 2010 and 2011 in the amounts of $47 million, $187 million, $188 million and $189 million, respectively, and for fiscal years 2012 through 2016, debt service of $167 million per year.

Source: Information obtained from each of the Retirement Systems and the June 30, 2011 actuarial valuation reports.

The Employees Retirement System anticipates that, based on the current contributions and benefit structure, its future cash flow needs for disbursement of benefits to participants, administrative expenses and debt service are likely to continue to exceed the sum of the

employer and employee contributions received and its investment and other recurring income. For fiscal year 2012, the Employees Retirement System expects to have a funding shortfall (after payment of debt service on the Pension Bonds) of $839 million and this negative trend is expected to continue, as shown in the table above, even after taking into account the increases in employer contributions provided for by Act 116, as described below. Based on the Employees Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2011 states that the System is being rapidly defunded and projects that its net assets (total assets minus the Pension Bonds and other liabilities) will be depleted by fiscal year 2014 and its gross assets will be depleted by fiscal year 2020. This means that during the period from fiscal year 2014 through fiscal year 2020, benefits are expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits or debt service on the pension obligation bonds.

The Teachers Retirement System has also covered funding shortfalls during the prior five fiscal years through the sale of investment portfolio assets. For fiscal year 2012, the Teachers Retirement System expects to have a funding shortfall of approximately $315 million, and this negative trend is expected to continue as shown in the table above, even after taking into account the increases in employer contributions provided for by Act 114, as described below. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2011 states that the System is being gradually defunded and projects that its net and gross assets will be depleted by fiscal year 2022.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. For fiscal year 2012, the Judiciary Retirement System expects to have a funding shortfall of approximately $9 million, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2011 states that the System is being defunded and projects that its net and gross assets will be depleted by fiscal year 2019.

For fiscal year 2012, the combined unfunded amount of the Retirement Systems corresponding to the Commonwealth (assuming the Commonwealth is responsible for approximately 64% of the funding deficiency of the Employees Retirement System), is approximately $861 million, which represents approximately 10% of projected General Fund revenues for the fiscal year.

If the level of contributions to the Retirement Systems and the level of benefits were to remain unchanged, the funding deficiencies are expected to continue to be covered with the investment income from, and the sale of, assets of the Retirement System, thus continuing to deplete such assets. Based on the actuarial valuation reports, for the period from fiscal year 2012 to fiscal year 2022, the average annual funding deficiency is projected to be approximately $746 million for the Employees Retirement System, approximately $307 million for the Teachers Retirement System and approximately $12 million for the Judiciary Retirement System. Once the assets of the Retirement Systems are depleted, the funding deficiency would have to be

covered by the employers.  As indicated above, it is estimated that the Commonwealth would have to cover approximately 64% of the funding deficiency of the Employees Retirement System and substantially all of the funding deficiency of the Teachers Retirement System and the Judiciary Retirement System.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations (including the assumed investment rate of return), as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.

*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*  On June 30, 2010, the Employees Retirement System and GDB, as fiscal agent, retained Conway MacKenzie, Inc ("CMI"), a financial advisory firm, to identify and analyze key events and decisions that have contributed to the current financial crisis of the Employees Retirement System, including the deterioration of its funded ratio.  CMI issued its report in October 2010.  In its report, CMI identified the following five factors as fundamental in the deterioration of the financial health of the Employees Retirement System: (i) historical inadequate funding levels, (ii) special laws, (iii) early retirement programs, (iv) personal loans, and (v) the 2008 issuances of Pension Bonds.

The report reviews the historical funding levels of the Employees Retirement System and concludes that the Employees Retirement System has been underfunded since its inception in 1951, essentially as a result of statutory funding rates that fall below actuarially determined contribution rates.  In addition to inadequate annual contributions, CMI notes that investment returns and other recurring income have been insufficient to cover annual benefit payments and operating expenses, resulting in cash flow shortfalls that have forced the Employees Retirement System to liquidate plan assets.

CMI also identified the enactment of numerous special laws, which have granted incremental retirement benefits to participants beyond those provided by Act 447 and Act 1 of 1990, as having exacerbated the deteriorating financial condition of the Employees Retirement System.  Many special laws were adopted without the Government securing a viable, long-term source of funding for such additional benefits, including the adoption of special laws during periods when the Government was incurring in budgetary deficits.  As a result, the Employees Retirement System was forced to fund the benefits granted under these special laws, resulting in significant past-due receivables from the Commonwealth and participating public corporations and municipalities.

The adoption of several early retirement programs is also identified as having affected the financial solvency of the Employees Retirement System.  These programs were adopted in order to reduce the size of the public workforce and thereby decrease payroll costs.  These programs,

however, were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the System funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality. In addition, the CMI report notes that it appears that many of these programs did not ultimately result in their intended goals of reducing the size of the public workforce.

Another factor identified by CMI as having contributed to the deterioration of the Employees Retirement System is the adoption in 2007 of an increase in the maximum loan balance for personal loans to members, from $5,000 to $15,000. This increase has resulted in a significant cash flow drain to the Employees Retirement System, amounting to approximately $600 million during the last four fiscal years. Although the loans are secured by the employee contributions and collected through payroll withholdings, the significant cash flow to provide personal loans has required the liquidation of plan assets. As a result, a significant percentage of the Employees Retirement System's assets are now invested in personal loans that are illiquid investments.

The CMI report also addressed the 2008 issuances of approximately $2.9 billion in Pension Bonds. The Pension Bonds were issued with the intent of increasing the funds available to the Employees Retirement System to pay benefit obligations and to reduce the UAAL. The Employees Retirement System expected to achieve these goals by investing the proceeds of the Pension Bonds at a higher return than the cost of the debt, thereby achieving a positive arbitrage. However, CMI found that potential risks were not thoroughly or properly analyzed. The Employees Retirement System has not obtained the expected arbitrage on invested proceeds and has also used some bond proceeds to pay current system benefits and operational expenses.

Finally, the CMI report addresses governance deficiencies and states that many of the measures described above, and in particular the issuances of Pension Bonds, were adopted and implemented without conducting any rigorous analysis of their impact on the financial condition of the Employees Retirement System and the risks associated with the measures. The report concludes that immediate and dramatic changes to the structure of the Employees Retirement System are necessary to avoid full depletion of the System's net assets in the near future, as discussed above.

*Impact of Funding Shortfall on the Commonwealth.* The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems. The depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. Due to its multi-year fiscal imbalances previously mentioned, however, the Commonwealth is currently unable to make the actuarially recommended contributions to the Retirement Systems. If the Commonwealth fails to take action to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the Retirement Systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the Retirement Systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding

the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. There may be limitations on the Government's ability to change certain pension rights afforded to participants in the Retirement Systems.

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.* The Retirement Systems is evaluating measures to improve the financial solvency of the Retirement Systems. In order to maintain the long-term fiscal integrity of the Retirement Systems and their ability to pay required benefits to their members, a combination of some or all of the following will be required: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems. Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.

In March 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the Retirement Systems. The Commission issued its report on October 21, 2010. The Commission's report does not make a consensus set of recommendations for addressing the financial solvency of the Retirement Systems, but rather discusses the principal recommendations made by different members of the Commission in the following areas: (i) employer and employee contributions, (ii) benefit structure, (iii) retirement age, (iv) benefits under special laws, (v) early retirement programs, (vi) mortgage loans and personal loans, and (vii) governance structure. All members of the Commission agreed that there has to be an increase in employer contributions, while some members also recommended an increase in employee contribution rates. One of the proposals was that employer contribution rates be increased by 1% of payroll per year for the next 10 to 15 years. In the benefits areas, the recommendations included various proposals to reduce or limit benefits, such as eliminating merit pensions, establishing caps on benefits, increasing the retirement age in order to receive full benefits and modifying or eliminating some benefits granted under special laws. Some members of the Commission also recommended prohibiting all future early retirement programs unless they are actuarially positive to the Retirement Systems. In order to address the liquidity position of the Retirement Systems, various members of the Commission recommended eliminating the loan programs or restricting their use. Various members also commented that improvements to the governance structure of the Retirement Systems was necessary, as it appeared that in the past governance had not been as rigorous as it should have been. Other recommendations included increasing penalties for late payments by participating employers and creating other dedicated revenue sources for the Retirement Systems, such as a special lottery drawing or a special tax on government contractors.

The administration assigned to a task force headed by the Secretary of Labor the evaluation of the Commission's recommendations. As a result of the Commission's report and the Government's analysis, the Governor submitted various bills to the Legislative Assembly to address in part the retirement systems' financial condition. One of such bills was enacted as Act Act 96. On June 23, 2011, in accordance with Act 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The

principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

Another bill submitted by the Governor was enacted as Act 114 and Act 116. These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $37 million and $13 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71.8 million per fiscal year) to approximately $515 million and $203 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $27.5 million, $30.2 million and $32.9 million in fiscal years 2012, 2013 and 2014, respectively. The tables below show the projected additional contributions to the Employees Retirement System and the Teachers Retirement System as a result of Act 116 based on the expected payroll assumptions used in the actuarial reports as of June 30, 2011.

### Projected Additional Employer Contributions
### Employees Retirement System
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2012 | 9.275% | 1.000% | 10.275% | $3,666 | $340 | $37 | $377 |
| 2013 | 9.275% | 2.000% | 11.275% | 3,758 | 349 | 75 | 424 |
| 2014 | 9.275% | 3.000% | 12.275% | 3,852 | 357 | 116 | 473 |
| 2015 | 9.275% | 4.000% | 13.275% | 3,948 | 366 | 158 | 524 |
| 2016 | 9.275% | 5.000% | 14.275% | 4,047 | 375 | 202 | 578 |
| 2017 | 9.275% | 6.250% | 15.525% | 4,148 | 385 | 259 | 644 |
| 2018 | 9.275% | 7.500% | 16.775% | 4,252 | 394 | 319 | 713 |
| 2019 | 9.275% | 8.750% | 18.025% | 4,358 | 404 | 381 | 786 |
| 2020 | 9.275% | 10.000% | 19.275% | 4,467 | 414 | 447 | 861 |
| 2021 | 9.275% | 11.250% | 20.525% | 4,579 | 425 | 515 | 940 |

## Projected Additional Employer Contributions
## Teachers Retirement System
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2012 | 8.50% | 1.00% | 9.50% | $1,320 | $112 | $13 | $125 |
| 2013 | 8.50% | 2.00% | 10.50% | 1,367 | 116 | 27 | 144 |
| 2014 | 8.50% | 3.00% | 11.50% | 1,414 | 120 | 42 | 163 |
| 2015 | 8.50% | 4.00% | 12.50% | 1,464 | 124 | 59 | 183 |
| 2016 | 8.50% | 5.00% | 13.50% | 1,515 | 129 | 76 | 205 |
| 2017 | 8.50% | 6.25% | 14.75% | 1,568 | 133 | 98 | 231 |
| 2018 | 8.50% | 7.50% | 16.00% | 1,623 | 138 | 122 | 260 |
| 2019 | 8.50% | 8.75% | 17.25% | 1,680 | 143 | 147 | 290 |
| 2020 | 8.50% | 10.00% | 18.50% | 1,739 | 148 | 174 | 322 |
| 2021 | 8.50% | 11.25% | 19.75% | 1,800 | 153 | 203 | 356 |

Because of the Commonwealth's current budgetary constraints and the significant underfunding of the Retirement Systems discussed above, however, improving the financial solvency of the Retirement Systems will require the adoption of other measures mentioned above and it will take several years before a significant improvement is achieved. The financial situation of the Retirement Systems presents a budgetary challenge to the Commonwealth. The required increase in employer contributions may have an adverse impact on the Commonwealth's budgetary situation.

A fourth bill with respect to the Employees Retirement System was enacted as Act No. 196 of September 18, 2011, which authorized the Employees Retirement System to sell or pledge personal and mortgage loans in its portfolio. This bill also set up a loan program for members of the Employees Retirement System thorough certain financial institutions, while also limiting the amount of employee contributions that a member can pledge as collateral for a loan.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowered the maximum amount of those loans from $15,000 to $5,000. This change is expected to improve gradually the Employees Retirement System's liquidity.

On July 2, 2010, the Government enacted Act 70 ("Act 70"), which is designed to reduce Government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria who opted for early retirement by January 14, 2011 receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees

opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments.  As of September 30, 2011, approximately 3,373 employees participated of the benefits provided by Act 70.

*Statements of Plan Net Assets and Changes in Plan Net Assets*.  The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2008, 2009, 2010 and 2011.

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2008, 2009, 2010 and 2011**
**(in thousands)**

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ASSETS** | | | |
| CASH AND SHORT TERM INVESTMENTS | | | |
| Deposits at Commercial Banks | $ 220,852 | $ 54,175 | $ 21,792 |
| Deposits with Treasury Department | 134,319 | 110,931 | 103,527 |
| Deposits with GDB: | | | |
| Unrestricted | 51,396 | 51,446 | 79,500 |
| Restricted | 411,946 | 741,082 | 1,028,878 |
| Restricted Cash Bonds | 170,653 | 172,226 | 193,537 |
| Total Cash and Short Term Investment | 989,166 | 1,129,860 | 1,427,234 |
| SECURITIES LENDING, COLLATERAL INVESTED | | | |
| Marketable Securities: | | | |
| Notes and Bonds | 1,125,914 | 563,454 | 565,366 |
| Stocks | 1,270,736 | 1,492,386 | 1,477,945 |
| Master Repo | -- | -- | -- |
| Private Equity Investments | 65,457 | 55,307 | 34,922 |
| Total Investments | 2,462,107 | 2,111,147 | 2,078,233 |
| LOANS TO PLAN MEMBERS | | | |
| Mortgage | 148,155 | 141,588 | 128,365 |
| Personal | 1,048,983 | 1,018,498 | 916,934 |
| Cultural Trips | 75,198 | 63,729 | 50,317 |
| PEC | 3,045 | 2,340 | 1,827 |
| Total Loans to Plan Members | 1,275,381 | 1,226,155 | 1,097,443 |
| Investment in PRTA Holdings | 0 | -- | -- |
| Total cash, investments and loans to plan members | 4,726,654 | 4,467,162 | 4,602,910 |
| RECEIVABLES: | | | |
| Employers | 184,152 | 273,139 | 289,427 |
| General Fund | 6,147 | 11,222 | 7,833 |
| Judiciary Retirement System | 881 | 19,138 | 17,942 |
| Investment Sales | 9,546 | 12,189 | 24,509 |
| Accrued Interest | 7,594 | 6,597 | 6,939 |
| Other | 4,595 | 3,893 | 5,081 |
| Total Receivables | 212,915 | 326,178 | 351,731 |
| CAPITAL ASSETS | 8,951 | 8,964 | 9,171 |
| OTHER ASSETS | 6,375 | 7,224 | 8,892 |
| Prepaid Bond Cost | 32,172 | 33,267 | 34,363 |
| Total assets | 4,987,067 | 4,842,795 | 5,007,067 |
| **LIABILITIES** | | | |
| Book overdraft | 62,843 | 22,933 | 37,961 |
| Payables for securities lending | 134,319 | 110,931 | 103,527 |
| Funds of Mortgage Loans and Guarantee Insurance | | | |
| Reserve for Loans | 9,596 | 8,964 | 6,372 |
| Investment Purchases | 1,854 | 5,277 | 13,926 |
| Accounts Payable and Accrued Liabilities | 12,923 | 12,250 | 14,228 |
| Bonds Payable | 3,003,482 | 2,981,775 | 2,961,359 |
| Other Liabilities | 24,363 | 21,798 | 13,675 |
| Bonds Interest Payable | 13,876 | 13,876 | 13,876 |
| Total Liabilities | 3,263,256 | 3,177,804 | 3,164,924 |
| **Net Assets Held in Trust for Pension Benefits** | **$1,723,811** | **$1,664,991** | **$1,842,143** |

\* Totals may not add due to rounding.

I-103

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, 2010 and 2011**
**(in thousands)**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ADDITIONS:** | | | |
| Contributions: | | | |
| Employer | $ 349,207 | $ 381,243 | $ 400,405 |
| Participating employees | 322,008 | 345,265 | 362,040 |
| Other Special Laws | 170,369 | 171,843 | 175,254 |
| Early Retirement | 305 | 3,399 | 47,146 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 |
| Cofina Investments | 162,500 | -- | -- |
| Total Contributions | 1,021,389 | 918,750 | 1,001,845 |
| | | | |
| Investment (loss) Income: | | | |
| Realized Gain or Loss | 472,076 | 148,173 | (152,583) |
| Unrealized Gain or Loss | | 67,838 | (405,969) |
| Dividend Income | 7,334 | 10,663 | 15,774 |
| Interest Income | 172,783 | 179,585 | 198,734 |
| Total | 652,203 | 406,259 | (344,044) |
| Less Investment Expense | (6,483) | (7,649) | (7,589) |
| Other Income | 49,257 | 31,783 | 35,878 |
| Net Investment Income | 694,977 | 430,393 | (315,755) |
| Total Additions | 1,716,366 | 1,349,143 | 686,090 |
| | | | |
| **DEDUCTIONS:** | | | |
| Annuities | 1,133,926 | 1,047,695 | 970,843 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 |
| Benefits under Special Laws | 170,369 | 171,843 | 175,254 |
| Death Benefits | 7,932 | 12,968 | 11,532 |
| Refunds of Contributions: | | | |
| Employers | 992 | 1,469 | 2,013 |
| Participating Employees | 90,203 | 43,677 | 32,517 |
| Other Expenses | 13,199 | 10,255 | 22,415 |
| Administrative Expenses | 34,583 | 33,063 | 32,590 |
| Interest on Bonds | 189,342 | 188,055 | 186,869 |
| Total Deductions | 1,657,546 | 1,526,295 | 1,451,033 |
| | | | |
| Net (decrease) Increase | 58,820 | (177,152) | (764,943) |
| | | | |
| Net Assets Held in Trust for Pension Benefits: | | | |
| Beginning of the Year | 1,664,991 | 1,842,143 | 2,607,086 |
| End of Year | $1,723,811 | $1,664,991 | $1,842,143 |

* Totals may not add due to rounding.

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Plan Net Assets***
**As of June 30, 2008, 2009, 2010 and 2011**
**(in thousands)**

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash: | | | |
| Cash and cash equivalents | $ 97,269 | $ 24,019 | $ 19,134 |
| Cash with fiscal agent | 110 | - | 450 |
| Collateral for Security Lending | 70,938 | 48,673 | 46,751 |
| Cash deposited with Government | | | |
| Development Bank for Puerto Rico | 3,291 | 3,288 | 3,276 |
| Total Cash | 171,608 | 75,980 | 69,611 |
| Investments, at fair value: | | | |
| Bonds and notes | 591,769 | 397,109 | 425,911 |
| Stocks | 1,211,084 | 1,295,232 | 1,259,169 |
| Total investment at fair value | 1,802,853 | 1,692,341 | 1,685,080 |
| Other investments: | | | |
| Mortgage notes acquired from third parties | | | |
| Private equity investments | 25,630 | 26,683 | 26,139 |
| Total investments | 1,828,483 | 1,719,024 | 1,711,219 |
| Loan to plan members: | | | |
| Mortgage | 128,312 | 119,937 | 109,508 |
| Personal | 276,692 | 288,463 | 288,410 |
| Cultural trips | 1,660 | 1,481 | 1,462 |
| Total loans to plan members | 406,664 | 409,881 | 399,380 |
| Total investments and loans | 2,235,147 | 2,128,905 | 2,110,599 |
| Accounts receivable: | | | |
| Receivable for investments sold | 2,320 | 332 | 23,231 |
| Accrued interest and dividends receivable | 3,982 | 4,584 | 5,445 |
| Other | 44,883 | 56,085 | 2,930 |
| Total accounts receivable | 51,185 | 61,001 | 31,606 |
| Property and equipment, net | 22,204 | 22,970 | 26,167 |
| Other assets | 472 | 832 | 876 |
| Total Assets | 2,480,616 | 2,289,688 | 2,238,859 |
| **LIABILITIES** | | | |
| Investments purchased | 1,701 | 2,722 | 18,981 |
| Payable for securities lending | 70,938 | 48,673 | 46,751 |
| Cash overdraft in cash with fiscal agent | | 2,199 | - |
| Accounts payable | 1,530 | 1,476 | 4,188 |
| Accrued expenses | 13,321 | 6,184 | 5,925 |
| Escrow fund of mortgage loans and guarantee | | | |
| insurance reserve for loans to plan members | 6,322 | 5,763 | 4,580 |
| Other liabilities | 941 | 694 | 841 |
| Total liabilities | 94,753 | 67,711 | 81,266 |
| **Net Assets Held in Trust for Pension Benefits** | $2,385,863 | $2,221,977 | $2,157,593 |

\* Totals may not add due to rounding.

### The Commonwealth of Puerto Rico
### Teachers Retirement System
### Statements of Changes in Plan Net Assets*
### As of June 30, 2008, 2009, 2010 and 2011
### (in thousands)

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ADDITIONS:** | | | |
| Contributions: | | | |
| Participating Employees | $  123,297 | $  129,888 | $  136,305 |
| Employer | 112,071 | 118,127 | 125,165 |
| Contributions transferred from other systems** | 828 | 1,265 | 1,479 |
| Special | 47,753 | 46,572 | 46,214 |
| Total contributions | 283,949 | 295,852 | 309,163 |
| Investment Income: | | | |
| Interest income | 57,008 | 61,303 | 66,927 |
| Dividend Income | 6,915 | 10,111 | 13,194 |
| Net appreciation (depreciation) in fair value of investments | 421,923 | 203,265 | (518,862) |
| Total investment income | 485,846 | 274,679 | (438,741) |
| Less investment expense | (4,682) | (4,735) | (4,660) |
| Net investment income | 481,164 | 269,944 | (443,401) |
| Other income | 968 | 53,771 | 2,444 |
| **Total additions** | $766,081 | $ 619,567 | ($ 131,794) |
| **DEDUCTIONS:** | | | |
| Benefit paid to participants: | | | |
| Annuities and death benefits | 513,874 | 470,683 | 418,414 |
| Special benefits | 48,286 | 47,870 | 46,747 |
| Refunds of contributions | 8,465 | 7,847 | 5,313 |
| Administrative expenses | 31,570 | 28,783 | 25,485 |
| **Total deductions** | 602,195 | 555,183 | 495,959 |
| Net increase in net assets held in trust for pension benefits | 163,886 | 64,384 | (627,753) |
| **Net assets held in trust for pension benefits** | | | |
| Beginning of year | 2,221,977 | 2,157,593 | 2,785,346 |
| **End of year** | $2,385,863 | $2,221,977 | $2,157,593 |

\* Totals may not add due to rounding.

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Plan Net Assets\***
**As of June 30, 2008, 2009, 2010 and 2011**
**(in thousands)**

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and Investments: | | | |
| Cash and Cash Equivalents | $ 6,409 | $ 4,007 | $ 3,985 |
| Cash Deposited with GDB or Treasury Department: | 1,011 | 30 | 2,353 |
| Collateral from Securities Lending | 3,218 | 2,474 | 1,482 |
| Total Cash | 10,638 | 6,511 | 7,820 |
| Receivables: | | | |
| Accrued Interest | 263 | 271 | 215 |
| Investment Sales | - | 41 | 117 |
| Other | 27 | 27 | 28 |
| Total receivables | 290 | 339 | 360 |
| Marketable Securities: | | | |
| Notes and Bonds | 39,954 | 25,973 | 22,805 |
| Stocks | 22,136 | 50,275 | 44,634 |
| Total Investments | 62,090 | 76,248 | 67,439 |
| Loans and Interest Receivable from Members: | | | |
| Mortgage | 17 | 20 | 8 |
| Personal | 750 | 702 | 462 |
| Cultural Trips | 78 | 46 | 60 |
| Total Loans to Plan Members | 845 | 768 | 530 |
| Total cash, investments and loans to plan members | 73,863 | 81,393 | 76,149 |
| **LIABILITIES** | | | |
| Due to Treasury Department | 5,560 | 5,841 | 4,513 |
| Due to the Employee's Retirement System of the Government of Puerto Rico | 881 | 19,138 | 17,942 |
| Collateral from Securities ending | 3,218 | 2,474 | 1,482 |
| Escrow Funds to plan Members and Guarantee Insurance | 66 | 62 | 59 |
| Investment Purchases | 2 | 869 | 867 |
| Other Liabilities | 161 | 72 | 720 |
| Total Liabilities | 9,888 | 28,456 | 25,583 |
| **Net Assets Held in trust for Pension Benefits** | $ 63,975 | $ 55,410 | $ 50,566 |

\* Totals may not add due to rounding.

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and 2011**
**(in thousands)**

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| **ADDITIONS:** | | | |
| Contributions: | | | |
| Employer | $   9,966 | $   10,021 | $   9,970 |
| Participating employees | 2,789 | 3,104 | 3,138 |
| Special Laws | 629 | 629 | 691 |
| Total Contributions | 13,384 | 13,754 | 13,799 |
| Investment Income: | | | |
| Realized Gain or Loss | 12,928 | 5,644 | (3,158) |
| Unrealized Gain | -- | 1,741 | (13,582) |
| Dividend Income | 176 | 211 | 218 |
| Interest Income | 1,352 | 1,284 | 1,313 |
| Total | 14,456 | 8,880 | (15,209) |
| Less Investment Expense | (162) | (164) | (170) |
| Other Income | 10 | 804 | 50 |
| Net Investment Income | 14,304 | 9,520 | (15,329) |
| Total Additions | 27,688 | 23,274 | (1,530) |
| **DEDUCTIONS:** | | | |
| Annuities | 18,627 | 17,268 | 15,538 |
| Benefits Under Special Laws | -- | 629 | 691 |
| Administrative Expenses | 496 | 533 | 986 |
| Total Deductions | 19,123 | 18,430 | 17,215 |
| Net Increase | 8,565 | 4,844 | (18,745) |
| Net Assets Held in Trust for Pension Benefits: | | | |
| Beginning of the Year | 55,410 | 50,566 | 69,311 |
| **End of Year** | $   **63,975** | $   **55,410** | $   **50,566** |

* Totals may not add due to rounding.

## POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

In addition to the pension benefits, the Commonwealth provides non-pension post-employment benefits that consist of a medical insurance plan contribution for retired employees meeting the service credit eligibility requirements. These benefits are administered by the Retirement Systems. The medical insurance plan contribution is a payment of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

The Commonwealth funds these post-employment benefits on a "pay-as-you-go" basis from the General Fund, which means that the Commonwealth does not pre-fund, or otherwise establish a reserve or other pool of assets against the medical insurance plan contribution expenses that the Commonwealth may incur in future years. For fiscal year 2011, the Commonwealth paid $125.4 million for these benefits for the eligible retirees of the Retirement Systems (including retirees of public corporations and municipalities, which are also paid for by the Commonwealth). For fiscal year 2012, these benefits are expected to amount to $142.7 million.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The most recent actuarial valuation reports of these benefits are dated as of June 30, 2011. Many of the actuarial assumptions used to project the actuarial accrued liability for these benefits are the same as those used to determine the accrued actuarial liabilities of the Retirement Systems. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

**Post-Employment Benefits Other Than Pensions**
**Actuarial Valuations as of the Indicated Fiscal Years**
**(in millions)**

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | - | $1,557 | $1,557 | 0% | $4,246 | 36.7% |
| 2009 | - | 1,633 | 1,633 | 0 | 4,293 | 38.0 |
| 2010 | - | 1,699 | 1,699 | 0 | 3,818 | 44.5 |
| 2011 | | 1,758 | 1,758 | 0 | 3,666 | 48.0 |
| **Teachers Retirement System** | | | | | | |
| 2007 | - | $652 | $652 | 0% | $1,370 | 47.6% |
| 2009 | - | 750 | 750 | 0 | 1,418 | 52.9 |
| 2010 | - | 694 | 694 | 0 | 1,370 | 50.7 |
| 2011 | | 706 | 706 | 0 | 1,320 | 53.5 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | - | $5 | $5 | 0% | $31 | 15.0% |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010 | - | 6 | 6 | 0 | 32 | 18.1 |
| 2011 | | 6 | 6 | 0 | 32 | 18.3 |

---

[1]  The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits other than pensions administered by each of the Retirement Systems' for the last three fiscal years and the current fiscal year.

## Schedule of Employer Contributions to Retirement Systems on Account of Post-Employment Benefits Other Than Pensions
### (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $111 | $80 | $31 | 72.1% |
| 2009 | 112 | 87 | 25 | 77.7 |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 129 | 94 | 35 | 72.3 |
| 2012 | 134 | 109 | 25 | 81.3 |
| **Teachers Retirement System** | | | | |
| 2008 | $37 | $26 | $11 | 70.6% |
| 2009 | 38 | 28 | 10 | 73.2 |
| 2010 | 42 | 28 | 14 | 66.9 |
| 2011 | 40 | 32 | 8 | 79.1 |
| 2012 | 41 | 34 | 7 | 82.5 |
| **Judiciary Retirement System** | | | | |
| 2008 | $0.4 | $0.2 | $0.2 | 55.4% |
| 2009 | 0.4 | 0.3 | 0.1 | 62.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 61.5 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.4 |
| 2012 | 0.6 | 0.3 | 0.3 | 59.0 |
| **Total** | | | | |
| 2008 | $148.4 | $106.2 | $42.2 | 71.6% |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 169.5 | 126.3 | 43.2 | 74.5 |
| 2012 | 175.6 | 143.3 | 32.3 | 81.6 |

[1]   The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2011.

[2]   The actual employer contributions for fiscal year 2012 are based on the expected pay-as-you-go amounts for the post-employment benefits other than pensions, as set forth in the actuarial valuations as of June 30, 2011.

[3]   Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

# COMMONWEALTH AUDITED FINANCIAL STATEMENTS

## General

For fiscal year 2011, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated April 27, 2012 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2011). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The CAFR for fiscal year 2011, which includes the basic financial statements of the Commonwealth for fiscal year 2011, was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through its Electronic Municipal Markets Access System ("EMMA") on April 30, 2012, in compliance with its continuing disclosure undertakings pursuant to Rule 15c2-12 of the Securities and Exchange Commission promulgated under the Securities Exchange Act of 1934, as amended.

## Prior Non-Compliance with Continuing Disclosure Obligations

The Commonwealth has made continuing disclosure undertakings in connection with its bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the Commonwealth's financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for such Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Report, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of the Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

## Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2007, 2008, 2009, 2010 and 2011.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal year 2012 and the proposed budget for fiscal year 2013 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
(in thousands)

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $3,071,655 | $2,759,305 | $2,648,261 | $2,593,598 | $2,187,080 |
| Corporations | 2,002,718 | 1,565,534 | 1,375,596 | 1,682,321 | 1,677,345 |
| Partnerships | 2,960 | 1,942 | 1,839 | 1,688 | 3,249 |
| Withheld from non-residents | 933,728 | 1,087,782 | 1,081,739 | 830,352 | 1,000,428 |
| Tollgate taxes | 25,083 | 21,610 | 19,372 | 15,034 | 12,607 |
| Interest | 12,112 | 13,657 | 11,738 | 9,902 | 6,985 |
| Dividends | 138,859 | 59,770 | 48,663 | 29,774 | 26,756 |
| Total income taxes | 6,187,115 | 5,509,600 | 5,187,208 | 5,162,669 | 4,914,450 |
| Sales and use tax | 582,560 | 911,000 | 797,194 | 540,348 | 531,837 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 279,028 | 268,094 | 277,401 | 284,796 | 280,963 |
| Foreign (Act 154) | - | - | - | - | 677,565 |
| Cigarettes | 132,399 | 119,124 | 129,429 | 182,501 | 201,965 |
| Motor vehicles | 396,667 | 366,341 | 310,920 | 350,764 | 364,170 |
| Other excise taxes | 314,340 | 110,014 | 86,874 | 77,978 | 77,649 |
| Total Commonwealth excise taxes | 1,122,434 | 863,573 | 804,624 | 896,039 | 1,602,312 |
| Property taxes | 800 | 219 | 1,011 | 227,812 | 246,619 |
| Inheritance and gift taxes | 4,663 | 6,600 | 5,064 | 3,617 | 3,101 |
| Licenses | 97,610 | 87,690 | 96,423 | 95,768 | 81,381 |
| **Other:** | | | | | |
| Traditional lottery | 73,014 | 46,636 | 51,480 | 42,826 | 46,165 |
| Electronic lottery | 71,815 | 105,298 | 75,213 | 80,006 | 55,690 |
| Miscellaneous non-tax revenues | 330,064 | 466,741 | 284,436 | 314,754 | 346,580 |
| Total Other | 474,893 | 618,675 | 411,129 | 770,843 | 448,435 |
| Total revenues from internal sources | 8,470,075 | 7,997,357 | 7,302,653 | 7,363,839 | 7,828,135 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[1] | 377,872 | 356,827 | 404,265 | 352,301 | 330,181 |
| Customs | 14,504 | 4,846 | 3,269 | | |
| Total revenues from non-Commonwealth sources | 392,376 | 361,673 | 407,534 | 352,301 | 330,181 |
| Total revenues | 8,862,451 | 8,359,030 | 7,710,187 | 7,716,140 | 8,158,316 |
| Other Income (refunds)[2] | (8,335) | (10,797) | 148,966 | (57,241)[8] | (180,362) |
| (Transfer) Refunding to Redemption Fund[3] | (512,197) | (202,954) | (607,305) | (447,312) | (86,834) |
| Proceeds of notes and other borrowings[4] | 1,872,096 | 2,710,000 | 3,982,893 | 2,375,000 | 1,850,000 |
| Repayment of notes and other borrowings[5] | (1,926,273) | (2,580,764) | (3,858,393) | (2,698,818) | (1,850,000) |
| Receipt of COFINA Bond Proceeds | | | 3,051,008 | 2,501,053[9] | 1,243,898 |
| Adjusted revenues | 8,287,742 | 8,274,515 | 10,427,356 | 9,388,822 | 9,135,018 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,387,199 | 3,471,922 | 3,117,817 | 3,581,751 | 3,996,469 |
| Personal services | 4,590,962 | 4,563,192 | 5,273,590 | 4,355,111 | 4,143,299 |
| Other services | 594,345 | 685,112 | 859,323 | 822,019 | 746,755 |
| Materials and supplies | 79,186 | 99,486 | 109,386 | 85,906 | 72,663 |
| Equipment purchases | 27,965 | 49,498 | 51,204 | 44,381 | 60,257 |
| Capital outlays and other debt service | 21,576 | 11,222 | 211,499 | 110,850 | 46,822 |
| Prior year disbursements | 92,770 | - | - | - | - |
| Total expenditures | 8,794,003 | 8,880,432 | 9,622,818 | 9,000,018 | 9,066,265 |
| Adjusted revenues less expenditures | (506,261) | (605,917) | 804,538 | 388,804 | 68,753 |
| Ending cash balance | $ (506,261) | $(1,112,178) | $ (307,640) | $ 81,164 | $ 149,917 |

(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.
(2) Consists of net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(3) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.
(7) Includes $50 million from the Emergency Fund used for operating expenses.
(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.
(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund

*Source:* Treasury Department

*General Fund Preliminary Revenues for Fiscal Year 2011 Compared to Fiscal Year 2010*

General Fund preliminary total revenues (including lottery revenues) for fiscal year 2011 were $8.158 billion, representing an increase of $442.2 million, or 5.7%, from fiscal year 2010 revenues. The major changes from fiscal year 2010 were: (i) decreases in income taxes from individuals of $406.5 million or 15.7%, resulting from the implementation of the tax reform (ii) an increase of $170.1 million in taxes withheld from non-residents, and (iii) an additional $677.6 million from the a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below.

General Fund preliminary total expenses (on a cash basis) for fiscal year 2011 amounted to $9.153 billion, which were composed of $9.1 billion of operational expenses and $86.8 million transferred to the redemption fund. The difference between preliminary revenues and expenses for fiscal year 2011 of $995 million was covered principally with proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009.*

General Fund total revenues (including lottery revenues) for fiscal year 2010 were $7.716 billion, representing an increase of $6 million from fiscal year 2009 revenues and an increase of $46 million from budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $256.8 million due to the increased allocation of this tax to COFINA, as discussed in "Major Sources of General Fund Revenues – Sales and Use Taxes" below. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $226.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act 7. See "Major Sources of General Fund Revenues – Income Taxes" below.  Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

General Fund total expenses (on a cash basis) for fiscal year 2010 amounted to $9.447 billion, which were composed of $9.0 billion of operational expenses and $447.3 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2010 of $1.7 billion was covered principally with proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2009 Compared to Fiscal Year 2008*

General Fund total revenues (including lottery revenues) for fiscal year 2009 were $7.710 billion, representing a decrease of $648.8 million, or 7.8%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $111 million and in corporate income taxes of $189.9 million, (ii) a decrease of $58.9 million in excise taxes, (iii) a decrease of $182.3 million in miscellaneous non-tax revenues, and (iv) a decrease of $113.8 million in the sales and use tax revenues due primarily to a one-time change in the manner sales and use tax collections are reported by the Treasury Department. Please refer to "Major Sources of General Fund Revenues – Sales and Use Taxes" below further

information regarding this reporting change. The decreases in revenues in these categories for fiscal year 2009 as compared to fiscal year 2008 reflect the acceleration of the economic recession during that fiscal year.

General Fund total expenses (on a cash basis) for fiscal year 2009 amounted to $10.230 billion, which were composed of $9.623 billion of operational expenses and $607 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2009 of $2.5 billion was covered principally by proceeds from COFINA bond issues.

*Fiscal Year 2008 Compared to Fiscal Year 2007*

General Fund total revenues (including lottery revenues) for fiscal year 2008 were $8.359 billion, representing a decrease of $234.4 million, or 2.7%, from actual revenues for fiscal year 2007 (excluding the collection of $269 million from special temporary tax measures in fiscal year 2007). The major changes from fiscal year 2007 were: (i) decreases in income taxes from individuals of $312.4 million and in corporate income taxes of $437.2 million, (ii) a decrease of $258.9 million in excise taxes, and (iii) an increase of $328.4 million in the sales and use tax revenues, which had only been in effect for seven and a half months during fiscal year 2007. The decrease in 2008 revenues was principally due to the ongoing economic recession and high oil prices, which directly affected income and excise tax collections.

General Fund total expenses (on a cash basis) for fiscal year 2008 amounted to $9.083 billion, which were composed of $8.880 billion of operational expenses and $203 million transferred to the redemption fund. The difference between adjusted revenues and expenses for fiscal year 2008 of $724 million was covered principally by cash-management procedures such as delaying payments to certain vendors and a GDB loan of $190 million.

## Major Sources of General Fund Revenues

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Internal Revenue Code for a New Puerto Rico, enacted as Act 1 of 2011, which will apply for taxable years commencing after December 31, 2010. See "Tax Reform" below. Many of the provisions of Act 1 of 2011 are identical to the equivalent provisions of the PR Code. Thus, unless otherwise noted, the discussion below refers to the provisions of both the PR Code and Act 1 of 2011.

The PR Code imposed a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax was imposed on certain payments made to non-residents of Puerto Rico, which was collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000.

Under Act 1 of 2011, the highest income tax bracket gradually increases every year for the next six years from $60,000 to $121,500. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under Act 1 of 2011. After January 1, 2016, the top individual rate is lowered to 30%. See "Tax Reform" below for certain requirements that must be satisfied in order for tax benefits under Act 1 of 2011 to enter into effect for taxable years starting after December 31, 2013. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at an income tax rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at an income tax rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for an income tax rate of 10%.

*Corporations.* Puerto Rico corporations are subject to tax on income from all sources; foreign corporations that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the PR Code provided for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, were taxed at a maximum regular income tax rate of 15%. Under Act 1 of 2011, for taxable years commencing after December 31, 2010, the highest corporate income tax rate is lowered to 30% for net taxable income in excess of $1,750,000 (it will be reduced to 25% for taxable years starting after December 31, 2013 subject to the satisfaction of certain conditions) and the alternative minimum tax is also reduced from a rate of 22% to the greater of (i) the amount produced by applying a minimum rate of 20% to the alternative minimum net income or, (ii) subject to certain exceptions, the amount produced by applying a 1% excise tax on the purchase from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $50 million or more during any of three preceding taxable years. Dividends received by Puerto Rico corporations and partnerships from foreign corporations engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and the partners of partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations and the partners of partnerships

covered by the Tourism Development Act are subject to a maximum tax rate of 39% on their taxable income after applying the 90% exemption granted under the Tourism Development Act, which results in a maximum effective tax rate of 3.9% on their net tourism development income. Under Act 1 of 2011, the net income of corporations and partnerships covered under the Tourism Development Act is subject generally to a maximum effective tax rate of 3%.

The PR Code and Act 1 of 2011 generally impose a branch profits tax on resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid by Puerto Rico resident borrowers to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid by Puerto Rico resident borrowers to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding.

*Act No. 7 – Special Tax Measures Implemented as part of the New Administration's Fiscal Stabilization Plan.* Act 7 was enacted as part of the new administration's Fiscal Plan, and sought, among other things, to increase the tax revenues of the Puerto Rico government by imposing certain permanent and temporary tax increases.

With respect to income taxes, Act 7 included the following temporary measures that were applicable for taxable years commenced after December 31, 2008 and before January 1, 2012:

(i)     taxable corporations and individuals whose adjusted gross income equal or exceeds $100,000 (for single individuals) or $150,000 (in the case of married persons filing jointly) are subject to a surtax of 5% on their total tax liability (for taxable years commencing after December 31, 2010, Act 1 of 2011 eliminates this surtax);

(ii)    international banking entities that do not operate as bank units will be subject to a 5% income tax on their entire net income computed in accordance with the PR Code (international banking entities operating as bank units are subject to this 5% tax on their net income that does not constitute excess net income);

(iii)   credit unions, their subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7), however, if the Government of Puerto Rico collects $690 million prior to January 1, 2012, the 5% tax will not be applicable for the remaining period;

(iv)   the Cooperative Bank, its subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7);

(v)   insurance cooperatives are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7); and

(vi)   international insurers and holding companies of international insurers are subject to a 5% tax on their net income (these entities were totally exempt before the enactment of Act 7).

Notwithstanding the above, Act 1 of 2011 limited the duration of the 5% surtax on income derived by certain individuals and corporations and the special property tax to two years.

Act 7 also provided as a permanent measure a change in the method of computing the net income subject to alternative minimum tax ("AMT") in the case of individuals by including in the computation various categories of exempt income and income subject to preferential tax rates under the PR Code, such as: (a) long-term capital gains, which enjoy a preferential tax rate of 10% under the PR Code; (b) dividends that are taxable at the rate of 10% under the PR Code; (c) interest on bank deposits and individual retirement accounts subject to the special 10% and 17% preferential income tax rates, respectively; and (d) interest from notes or bonds eligible for the special 10% tax rate provided by the PR Code.

Another change introduced by Act 7, for taxable years commenced after December 31, 2008 and before January 1, 2012 was an adjustment to the calculation of the net income subject to the AMT in the case of entities taxed as corporations that denies a deduction for expenses paid or accrued for services rendered outside of Puerto Rico by a related party. Lastly, different income tax credits awarded to investors under certain special laws for activities such as revitalization of urban centers (only in part), venture capital, solid waste, housing infrastructure, and rehabilitation of social-interest housing (only projects without qualification certifications as of March 9, 2009), among others, may not be claimed or granted for taxable years commenced after December 31, 2008 and before January 1, 2012. Tax credits associated to manufacturing, tourism, and cinematographic projects, however, were not affected by Act 7.

*Tax Reform*

The tax reform consists of two phases focused on providing tax relief to individual and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform is projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The first phase, enacted as Act No. 171 of November 15, 2010, applied to the 2010 tax return and provides a tax credit to each individual and corporate taxpayer. The tax credit applicable to individuals and determined by reference to the tax liability ranges from 7% for those taxpayers in higher brackets to 15% for taxpayers in the lowest bracket. Corporate taxpayers were also entitled to a 7% tax credit determined by reference to the tax liability; provided, that such taxpayer paid the statutorily required Christmas bonus for 2010. Also, the corporate net operating loss carry forward is extended from 7 years to 10 years. This first phase was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010.

The second phase, enacted as Act 1 of 2011, (i) promotes employment by doubling the earning income credit and increasing the maximum applicable income to qualify for such credit; (ii) provides a $400 tax credit to individuals over 65 years of age with an income below $15,000; (iii) significantly reduces individual income tax rates and only allow the following five deductions (a) mortgage interest up to 30% of adjusted gross income, (b) charitable contributions up to 50% of adjusted gross income, (c) medical expenses in excess of 6% of adjusted gross income, (d) interest on student loans, and (e) contributions to retirement plans and accounts, including individual retirement accounts, health savings accounts and education savings accounts; and (iv) significantly reduces corporate income tax rates.

The reduction in income tax revenues resulting from the implementation of the tax reform is expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures is expected to be revenue positive. Act 1 of 2011 conditions the implementation of the tax reductions applicable to individuals and corporations after fiscal year 2014 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals and corporations for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. There is no assurance that sufficient revenues will be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform.

*Act 154 – Expanded Income Taxation and New Excise Tax.* Act 154, approved on October 25, 2010, as amended, seeks, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Government. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships (each a taxpayer) by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and the act imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010.

The Act provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, will instead be subject to the excise tax in lieu of any income tax. The excise tax will apply for a period of six years. The excise tax is based on the value of the personal property or services acquired and was 4% for calendar year 2011, declining to 3.75% in 2012, 2.75% in 2013, 2.5% in 2014, 2.25% in 2015 and 1% in 2016. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. At the time of adoption of Act 154, the Government expected to raise approximately $1.4 billion from the excise tax during the first year of implementation and $5.6 billion for the six year period that the excise tax is in place.

While the Government expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their U.S. federal income tax liabilities, it is uncertain how this new tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

The first monthly excise tax payment was due in February 2011. For fiscal year 2011 (from February 2011 through June 2011), the collections from the excise tax were $677.6 million. For the first nine months of fiscal year 2012, the collections from the excise tax were $1.379 billion. These amounts have exceeded the Government's projection of collections from the excise tax and are consistent with the Government's expectation that the revenues therefrom would be sufficient to offset the reduction in income tax revenues expected from other aspects of the tax reform.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than

not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the IRS issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprepared foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as content in a manufactured good, whether or not bound for export.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the

Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91 of 2006, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department has reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated revenues for the General Fund of approximately $553.0 million for fiscal year 2011.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7, which was subsequently incorporated into Act 1 of 2011, requires a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Act 1 of 2011 also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid on merchandise acquired for resale that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles, heavy equipment, boats and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages,

the increase ranged between $0.30 and $0.70 per standard gallon. Act 1 of 2011 incorporated most of the increases made by Act 7, but provided an increase in the tax applicable to concentrated wine must (from $4.48 to $7.00 per gallon), while reducing the tax payable with respect to champagne from concentrated wine must (from $4.48 to $2.25 per gallon). Motorcycles, all terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10% under Act 1 of 2011.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $150,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

One of the amendments incorporated in Act 7 was that, for fiscal years 2010 through 2012, the appraisal values of real property in Puerto Rico were increased tenfold and the real personal property tax rates applicable to such values were reduced tenfold so as to offset any increased tax that would have otherwise been applicable due to the increase in appraisal values. This temporary amendment, which is expected to be revenue neutral, was intended to increase the borrowing capacity of Puerto Rico's municipalities.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax applied during fiscal years 2010, 2011 and 2012. The additional real property tax, which was collected by the Treasury Department, amounted to 0.591% of such properties' appraised value as determined by CRIM. Act 1 of 2011 eliminated this additional real property tax for fiscal year 2012.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2008 to 2012.

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2008 | 27,941,285 | 1,031,277 | 788,364 | 119,062 | 907,426 |
| 2009 | 28,903,996 | 1,032,570 | 634,040 | 244,411 | 878,451 |
| 2010 | 175,025,782 | 1,093,769 | 666,429 | 269,857 | 936,286 |
| 2011 | 187,293,462 | 1,152,718 | 712,706 | 225,280 | 937,986 |
| 2012 | 190,635,287 | 1,143,427 | 689,555 | 229,851 | 919,406 |

[1]  Valuation set as of July 1 of each fiscal year.
[2]  During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM.  In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source:* Municipal Revenues Collection Center.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

*Revenues from Non-Commonwealth Sources*

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland.  The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth.  The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon.  Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth.  Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon.  For fiscal year 2011, the total excise taxes on rum shipments returned to the Commonwealth was $430 million, of which $329 million went to the General Fund.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012.  Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011.  The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons.  These rum exports of Captain Morgan resulted in an

estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act 1 of 2011 replaced Act No. 178 and contains identical provisions.

As permitted under Act 1 of 2011, the Government has entered into a definitive agreement with two rum producers and is currently in negotiations with other producers to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of total revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

## Administrative Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to foster tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosures agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, the creation of technological solutions to improve collections, and the establishment of cooperation agreements with federal and local governmental agencies. The Treasury Department is also integrating its databases and establishing a tax intelligence project to identify tax evasion and improve its audit selection process.

Specifically, the Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Commonwealth sales tax through the

implementation of various enforcement and compliance programs. Among these revenue raising initiatives is a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has reviewed 568 cases and collected approximately $64.2 million. In May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, the Treasury Department sent 1,000 additional letters in March 2011 and 2,200 additional letters in April 2011 as a second notice to taxpayers that did not respond to the first letter of May 2010.

Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed in November 2010 the integration of its general computer systems with the sales tax database in order to better detect non-compliance. The Treasury Department has also implemented a program whereby its officers use hand held scanning devices to cross-check merchant licenses. Recently, the Treasury Department discontinued the use of the hand held scanning devices and will provide tablet computers to its agents, beginning in December 2011, that will allow them to review a broader range of compliance criteria, such as merchant licenses, Commonwealth Sales Tax sales and point of sale system compliance.

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its sales tax enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto"). The Treasury Department began a two phase implementation of this new point of sale system in December 1, 2010, through a pilot program in which 200 merchants in the Municipality of Ponce were selected to participate. The second phase, which includes the initial implementation of the point of sale system throughout the island, started in March 2011. Implementation of the new system is expected to be completed by the end of Fiscal Year 2011-2012 and is expected to increase sales tax collections by $200 million during the first year. As of November 7, 2011, the point of sale devices captured approximately 187.4 million transactions which resulted in sales of $4.4 billion and Commonwealth Sales Tax collections of $155.6 million. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants register for participation in the point of sale system program on or prior to April 30, 2011. As of October 27, 2011, 191,037 locations had registered in the program and 59,884 of such locations will be required to acquire and use the new point of sale system.

The Treasury Department has begun to detect inconsistencies between the information captured by the point of sale system and that reported by merchants and retailers. The principal inconsistencies are: (i) merchants and retailers that report sales through the point of sale system but do not file monthly returns, (ii) sales reported through the point of sale system are higher than those reported in the monthly returns, (iii) cash credits claimed through the point of sale

system are equal to the sales reported, and (iv) merchants and retailers are not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department has created a task force consisting of fiscal auditors and agents from the Sales and Use Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Sales and Use Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Evasion Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the Sales and Use Tax Bureau. As a result of this initiative, as of October 5, 2011, the Treasury Department had identified approximately 33,481 unfiled monthly returns and sent notices to approximately 5,125 merchants and retailers. As of October 31, 2011, approximately 1,181 merchants and retailers had responded to the notices and approximately 2,577 unfiled monthly returns were filed resulting in taxable sales reported of approximately $24.7 million and sales and use tax collections of $1.4 million. Merchants and retailers that filed monthly returns reporting no sales will receive a deficiency notice and all other merchants and retailers that have not responded will be referred to a fiscal auditor or the Tax Evasion Bureau.

In addition, the Treasury Department established "IVU Alerta" in order to enhance Commonwealth Sales Tax compliance. The "IVU Alerta" is an internet and telephone hotline through which customers and merchants can report violations related to the Commonwealth Sales Tax. This initiative started in November 29, 2010 and, as of November 4, 2011, has received 5,610 complaints, which 4,229 have been investigated resulting in fines of approximately $5.5 million.

Other initiatives include the establishment of tax liens pursuant to the procedures of Act No. 12 of January 20, 2010, which enables the creation of tax liens through an expedited process. As of October 2011, the Treasury Department has established 16,000 liens in favor of the Commonwealth over approximately $742.5 million in assets. The Treasury Department is also enforcing a provision of Act 7 that allows the Treasury Department to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month. Also, the Treasury Department will begin to seize the assets of businesses that are delinquent on their sales tax payments. In addition, the Treasury Department has entered into agreements with various municipalities to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts as the ones described above.

Act No. 172 of November 15, 2010, established that taxpayers which apply for a voluntary disclosure program on or before April 15, 2011 will be eligible for a 20% flat income tax rate on the gross amounts reported and will not be subject to interest, surcharges and penalty fees. This legislation extends the benefits of the program to municipal license tax declarations for which taxpayers will pay principal on the municipal tax determined, but will not be subject to interest, surcharges and penalty fees. Declarations by taxpayers must relate to tax years commenced after July 1, 2003 and ending on or before December 31, 2009, and payment of tax determined under the program must be paid no later than June 30, 2011. Recently, the Governor signed Act No. 64 of April 19, 2011, which extended the disclosure period until June 30, 2011.

The Treasury Department has also implemented a temporary measure to collect on payroll and employer withholding debts. This measure allows employers to enter into payment plans with the Treasury Department, subject to employer making a down payment of 25%, in the case of payroll debts, and 40%, in the case of employer withholding debts, of the total outstanding debt. The payment plans do not provide for the abatement of interest, surcharges and penalties and the same must be initiated on or before June 30, 2011. As of June 31, 2011, 216 employers entered into payment plan agreements in the amount of $5.5 million and made down payments in the amount of $1.7 million.

Act No. 218 of November 7, 2011 ("Act 218"), also known as the Act for the Strengthening of Safety and Public Health, established a program pursuant to which taxpayers could pay the total principal amount of income, estate and gift or additional real property tax owed to the Treasury Department without being subject to the payment of interest, surcharges, penalties or other additions to the tax. Most of the amounts collected pursuant to Act 218 will be used to cover expenses related to the safety of the people of Puerto Rico. Although a taxpayer initially had until February 29, 2012 in order to avail himself of the benefits provided by Act 218, pursuant to Act No. 64 of April 19, 2012 the deadline was extended to June 15, 2012.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law reviewed to be reimbursed to the General Fund.

*Federal Grants*

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government are estimated to be $4.619 billion for fiscal year 2012, a decrease of $405 million, or 8%, from fiscal year 2011. This decrease in federal grants is due to the termination of the ARRA program. Federal grants for fiscal year 2013 are projected at $4.606 billion, which is consistent with the level for fiscal year 2012. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2009 through 2011 are actual figures. The figures for fiscal year 2012 and 2013 are the amounts included in the adopted budget and the proposed budget, respectively.

Puerto Rico expects to receive a total of approximately $7.090 billion in stimulus funds from ARRA, of which $509 million, $2.68 billion and $2.18 billion were disbursed by the

government during fiscal years 2009, 2010 and 2011, respectively. The amount of $916 million is expected to be disbursed by the government during fiscal year 2012 and $680 million is expected to be disbursed in fiscal year 2013. As of May 11, 2012, approximately $6.1 billion in ARRA funds, or 86% of awarded funds, had been disbursed. The table below only included the portion of these funds disbursed by agencies whose accounting systems are centralized in the Treasury Department.

### The Commonwealth of Puerto Rico
### Federal Grants*
### (in thousands)

| | 2009 | 2010 | 2011 | 2012[1] | 2013[2] |
|---|---|---|---|---|---|
| Education | $1,813,455 | $1,270,589 | $1,364,393 | $1,028,471 | $1,018,238 |
| Social Services | 2,453,605 | 2,481,447 | 2,431,381 | 2,413,800 | 2,409,232 |
| Health | 583,190 | 655,060 | 472,983 | 491,287 | 481,299 |
| Labor and Human Resources[3] | 277,127 | 138,425 | 225,090 | 101,063 | 94,046 |
| Crime | 64,155 | 29,459 | 35,826 | 42,590 | 31,695 |
| Housing[4] | 416,667 | 534,987 | 340,728 | 394,060 | 437,046 |
| Drug and Justice | 53,067 | 21,628 | 21,968 | 24,339 | 26,952 |
| Agriculture and Natural Resources | 114,920 | 25,501 | 14,960 | 14,576 | 14,713 |
| Contributions to Municipalities | 47,656 | 60,559 | 52,087 | 43,698 | 28,348 |
| Other | 67,017 | 73,813 | 64,219 | 64,687 | 64,539 |
| TOTAL | $5,890,859 | $5,291,468 | $5,023,635 | $4,618,571 | $4,606,108 |

\*     Does not include grants received by agencies whose accounting systems are not centralized at the Treasury Department.
[1]    Preliminary, unaudited.
[2]    Proposed budget.
[3]    Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
[4]    Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

### Office of Management and Budget

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of

I-132

revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of

the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficits. As of May 1, 2012, the balance in the Budgetary Fund was $3.1 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of May 1, 2012, the balance in the Emergency Fund was $0.7 million and $8.5 million was available to be borrowed from GDB. Joint Resolution No. 60 of July 1, 2011 authorized the conversion of this loan into a revolving line of credit with the same authorized limit of $150 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)     *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.* These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

(iii)     *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

    (iv)    *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

    In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

    For fiscal year 2011, approximately 25% of the General Fund was committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to PBA, and debt service on the direct debt of the Commonwealth (excluding debt service that was refinanced, as discussed below). This proportion is expected to remain stable in fiscal years 2012 and 2013.

    For fiscal year 2009, over 64% of the controllable funds portion of the General Fund was committed for the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). In fiscal year 2011 and 2012, the Commonwealth decreased this proportion to an average of 54% due mainly to the savings in operational expenses from the implementation of the Fiscal Plan.

    The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2011 through 2013. The expenses shown in the table for rent payments to PBA and debt service on the general obligation bonds exclude the amounts of debt service on the PBA bonds and general obligation bonds refinanced, or expected to be refinanced, in those fiscal years. See "Fiscal Stabilization Plan – Financial Measures" under Fiscal Stabilization and Economic Reconstruction. If these amounts were included, the percent of non-controllable expenses to total General Fund expenses would be higher.

### Expenses Breakdown for the General and Stabilization Funds
### (in millions)

|  | 2011 | 2012* | 2013+ |
|---|---|---|---|
| **Non-Controllable Expenses** |  |  |  |
| Mandated Expenses (Formula) |  |  |  |
| Contributions to Municipalities | $ 355 | $ 380 | $ 388 |
| University of Puerto Rico | 691 | 704 | 757 |
| Judicial Branch | 348 | 328 | 343 |
| Rent Payments to Public Buildings Authority[1] | 216 | 218 | 208 |
| General Obligation Debt Service | 201 | 179 | 148 |
| Other Debt Service | 517 | 491 | 417 |
| Total of Non-Controllable Expenses | $2,328 | $2,300 | $2,261 |
| Percent of Total General Fund Expenses | 25% | 25% | 25% |
|  |  |  |  |
| **Controllable Expenses** | $6,930 | $6,960 | $6,822 |
| Payroll and Related Costs[1] [2] | $3,693 | $3,799 | $3,692 |
| Payroll as a Percentage of Controllable Expenses | 53% | 55% | 54% |
|  |  |  |  |
| **Total General & Stabilization Funds Expenses** | $9,258 | $9,260 | $9,083 |

\*    Estimated, Adopted FY 2012 Budget
+    Proposed Budget
(1)  Excludes University of Puerto Rico and the Judicial Branch.
(2)  Includes the Schoolwide Program teachers payroll appropriated in the Non-Distributed Allocations expense category.
*Source: Office of Management and Budget*

**Budget for Fiscal Year 2012**

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2012.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2012**
**(in thousands)\***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ 40,000 | - | $ 116,321 | $ 156,321 |
| Personal income taxes | 2,134,000 | - | - | 2,134,000 |
| Retained non-resident income tax | 917,000 | - | - | 917,000 |
| Corporate income taxes | 1,531,000 | - | - | 1,531,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 7,000 | - | - | 7,000 |
| 17% withholding tax on interest | 7,000 | - | - | 7,000 |
| 10% withholding tax on dividends | 26,000 | - | - | 26,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 560,000 | - | - | 560,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 284,000 | - | - | 284,000 |
| Foreign (Act 154) | 1,799,000 | - | - | 1,799,000 |
| Motor vehicles and accessories | 387,000 | - | - | 387,000 |
| Cigarettes | 185,000 | - | - | 185,000 |
| Other (excise taxes) | 76,000 | - | 729,306 | 805,306 |
| Licenses | 76,000 | - | - | 76,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 45,000 | - | - | 45,000 |
| Electronic lottery | 53,000 | - | - | 53,000 |
| Registration and document certification fees | 159,000 | - | - | 159,000 |
| Other | 58,000 | - | 365,135 | 423,135 |
| Total revenues from internal sources | 8,351,000 | | 1,210,762 | 9,561,762 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 291,000 | | | 291,000 |
| Federal grants[1] | 0 | - | 4,618,571 | 4,618,571 |
| Customs | 8,000 | | - | 8,000 |
| Total revenues from non-Commonwealth sources | 299,000 | - | 4,618,571 | 4,917,571 |
| Total revenues | 8,650,000 | - | 5,829,333 | 14,479,333 |
| Other: | | | | |
| Balance from previous year | 0 | - | 1,379,091 | 1,379,091 |
| COFINA Stabilization Fund | 610,000 | - | 0 | 610,000 |
| Bonds authorized | - | $290,000 | - | 290,000 |
| Total other sources | 610,000 | 290,000 | 1,379,091 | 2,279,091 |
| Total resources | 9,260,000 | 290,000 | 7,208,424 | 16,758,424 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 830,984 | - | 61,079 | 892,063 |
| Education | 3,077,142 | - | 1,422,047 | 4,499,189 |
| Health | 1,367,265 | - | 540,927 | 1,908,192 |
| Welfare | 445,562 | - | 2,646,848 | 3,092,410 |
| Economic development | 359,517 | - | 203,518 | 563,035 |
| Public safety and protection | 1,523,677 | - | 135,819 | 1,659,496 |
| Transportation and communication | 150,561 | - | 51,843 | 202,404 |
| Housing | 18,814 | - | 397,454 | 416,268 |
| Contributions to municipalities | 395,644 | - | 4,809 | 400,453 |
| Special pension contributions | 420,312 | - | 0 | 420,312 |
| Debt service | 179,359 | - | 116,321 | 295,680 |
| Other debt service (appropriations) | 491,163 | - | 734,552 | 1,225,715 |
| Total appropriations – current expenses | 9,260,000 | - | 6,315,217 | 15,575,217 |
| Capital improvements | 0 | 290,000 | 158,201 | 448,201 |
| Total appropriations | 9,260,000 | 290,000 | 6,473,418 | 16,023,418 |
| Year-end balance | 0 | - | 735,006 | 735,006 |
| Total appropriations and year-end balance | $9,260,000 | $290,000 | $7,208,424 | $16,758,424 |

\* Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

The budget for fiscal year 2012 provided for total resources of $16.8 billion and total General Fund revenues of $9.260 billion, compared to General Fund revenues of $9.165 billion for fiscal year 2011.  The budgeted General Fund revenues of $9.260 billion included $610 million in additional resources from the COFINA Stabilization Fund.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2011 budget were accounted mainly by projected increases in new temporary excise tax under Act 154 (up $1,121.2 million), sales and use taxes (up $28.3 million), excise taxes on motor vehicles and accessories (up $22.8 million) and projected decreases in cigarettes taxes (down $17.0 million), federal excise taxes on offshore shipments (down $37.5 million), personal income taxes (down $52.2 million), retained non-resident income taxes (down $83.4 million), corporate income tax (down $143.1 million), and property taxes (down $206.6 million).

The fiscal year 2012 budget provided for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that were covered with proceeds of COFINA deposited in the Stabilization Fund.  The budgeted total expenditures for fiscal year 2012 were $9.260 billion, or 2%, higher than budgeted total expenditures of $9.062 billion for fiscal year 2011, and $1.087 billion, or 11%, lower than total expenditures of $10.170 billion for fiscal year 2010.

Budgeted expenses and capital improvements for the central government of all budgetary funds totaled $16.0 billion, an increase of $180.3 million from fiscal year 2011 budgeted appropriations.  The principal changes in General Fund expenditures by program areas in fiscal year 2012 compared to the fiscal year 2011 budget were mainly due to increases in education (up $214.0 million), general obligation bonds debt service (up $118.1 million), economic development (up $103.9 million), special pension contributions (up $85.8 million), and public safety and protection (up $36.9 million), and decreases in welfare (down $8.7 million), other debt service appropriations (down $26.0 million), general government (down $40.7 million), and health (down $320.2 million).

**Proposed Budget for Fiscal Year 2013**

The following table presents a summary of the Commonwealth's central government proposed budget for the fiscal year ending June 30, 2013.

**Commonwealth of Puerto Rico**
**Summary of Proposed Central Government Annual Budget**
**Fiscal Year Ending June 30, 2013**
**(in thousands)\***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $          0 | - | $   116,843 | $   116,843 |
| Personal income taxes | 2,107,000 | - | - | 2,107,000 |
| Retained non-resident income tax | 942,000 | - | - | 942,000 |
| Corporate income taxes | 1,623,000 | - | - | 1,623,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 7,000 | - | - | 7,000 |
| 17% withholding tax on interest | 7,000 | - | - | 7,000 |
| 10% withholding tax on dividends | 27,000 | - | - | 27,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 691,000 | - | - | 691,000 |
| Excise taxes: | | - | - | |
| Alcoholic beverages | 290,000 | - | - | 290,000 |
| Foreign (Act 154) | 1,750,000 | - | - | 1,750,000 |
| Motor vehicles and accessories | 400,000 | - | - | 400,000 |
| Cigarettes | 173,000 | - | - | 173,000 |
| Other (excise taxes) | 78,000 | - | 740,426 | 818,426 |
| Licenses | 79,000 | - | - | 79,000 |
| Miscellaneous non-tax revenues: | | - | | |
| Contributions from lottery fund | 43,000 | - | - | 43,00 |
| Electronic lottery | 65,000 | - | - | 65,000 |
| Registration and document certification fees | 168,000 | - | - | 168,000 |
| Other | 70,000 | - | 335,788 | 405,788 |
| Total revenues from internal sources | 8,527,000 | - | 1,193,057 | 9,720,057 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 219,000 | - | - | 219,000 |
| Federal grants[1] | 0 | - | 4,606,108 | 4,606,108 |
| Customs | 4,000 | - | - | 4,000 |
| Total revenues from non-Commonwealth sources | 223,000 | - | 4,606,108 | 4,829,108 |
| Total revenues | 8,750,000 | - | 5,799,165 | 14,549,165 |
| Other: | | | | |
| Balance from previous year | 0 | - | 735,006 | 735,006 |
| COFINA Stabilization Fund | 332,700 | - | - | 332,700 |
| Bonds authorized | 0 | - | - | 0 |
| Total other sources | 332,700 | - | 735,006 | 1,067,706 |
| Total resources | 9,082,700 | - | 6,534,171 | 15,616,871 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 901,948 | - | 49,473 | 951,421 |
| Education | 3,076,357 | - | 1,356,121 | 4,432,478 |
| Health | 1,373,089 | - | 499,454 | 1,872,543 |
| Welfare | 437,747 | - | 2,623,224 | 3,060,971 |
| Economic development | 157,413 | - | 102,654 | 260,067 |
| Public safety and protection | 1,526,716 | - | 115,847 | 1,642,563 |
| Transportation and communication | 144,912 | - | 52,212 | 197,124 |
| Housing | 18,975 | - | 383,318 | 402,293 |
| Contributions to municipalities | 400,664 | - | 567 | 401,231 |
| Special pension contributions | 489,558 | - | 0 | 489,558 |
| Debt service | 148,437 | - | 116,843 | 265,280 |
| Other debt service (appropriations) | 406,884 | - | 745,595 | 1,152,479 |
| Total appropriations – current expenses | 9,082,700 | - | 6,045,308 | 15,128,008 |
| Capital improvements | 0 | - | 115,274 | 115,274 |
| Total appropriations | 9,082,700 | - | 6,160,582 | 15,243,282 |
| Year-end balance | 0 | - | 373,589 | 373,589 |
| Total appropriations and year-end balance | $9,082,700 | - | $6,534,171 | $15,616,871 |

---

\*   Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

The budget provides for total resources of $15.6 billion and General Fund total revenues of $9.083 billion.  The budgeted General Fund total revenue of $9.083 billion includes $333 million in additional resources from the COFINA Stabilization Fund and other sources.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2012 budget are accounted mainly by the projected collections from sales and use taxes (up $131.0 million), corporate income tax (up $92.0 million), withholding taxes on non-residents (up $25.0 million), alcoholic beverage (up $6.0 million), excise taxes on motor vehicles and accessories (up $13.0 million), and projected decreases in the new temporary excise tax under Act 154 (down $49.0 billion), federal excise taxes on offshore shipments (down $72.0 million), property taxes (down $40.0 million) and personal income taxes (down $27.0 million).

The fiscal year 2013 budget provides for total expenditures of $9.083 billion, consisting of General Fund expenditures of $8.750 billion and additional expenditures of $333 million that are expected to be covered with proceeds of COFINA bonds deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2013 are $9.083 billion, or 1.9%, lower than budgeted total expenditures of $9.260 billion for fiscal year 2012, and $21 million, or 0.2%, higher than total expenditures of $9.062 billion for fiscal year 2011.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $15.2 billion, a decrease of $780.1 million from fiscal year 2012 budgeted appropriations.  The principal changes in General Fund expenditures by program in fiscal year 2013 compared to the fiscal year 2012 budget are mainly due to increases in, special pension contributions (up $69.2 million), health (up $5.8 million), contributions to municipalities (up $5.0 million) public safety and protection (up $3.0 million), and decreases in welfare (down $7.8 million), general obligation bonds debt service (down $30.9 million), other debt service appropriations (down $84.3 million) and economic development (down $202.1 million).

### Differences between Budget and Basic Financial Statements

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)    Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)   Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program.  Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

# LITIGATION

*General.* The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations.  Under Act No. 104 of June 25, 1955, as amended ("Act 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act.  The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them.  There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2011, the Commonwealth has included in its financial statements reported liabilities of approximately $281 million for awarded and anticipated unfavorable judgments.  Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed exceed $17 billion; however, the ultimate liability cannot be presently determined.  The Commonwealth believes that the claims are excessive and that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997.  In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must make Medicaid "wraparound" payments to the health centers to cover the difference between the reimbursement they are owed and what they are paid by managed care organizations.  The Court of Appeals of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the FQHCs certain grants received by these centers from the federal government.  Currently, attorneys in the case filed in Commonwealth court are trying to determine the amounts due to FQHCs thereunder.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers.  In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction entered against two of the FQHCs and

determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings.

Recently, the Court entered a preliminary injunction as to the remaining 15 health centers, and granted a request by the Department of Health for Eleventh Amendment sovereign immunity. The plaintiff FQHCs immediately filed an appeal regarding the issue of Eleventh Amendment.

Meanwhile, the Department of Health filed a counter appeal regarding the Court's interpretation of certain components of the wraparound formula that must be used under the preliminary injunction to calculate wraparound payments owed to the plaintiffs. The Department has already made approximately $40 million in uncontested wraparound payments owed under the injunction. However, the Court granted the Department's request for a stay pending appeal regarding payment of an additional $29 million that are owed under the Court's wraparound formula. This sum has already been consigned with the Court pending appeal or otherwise deposited in specially earmarked accounts, but may have to continually be increased to reflect the difference between the amounts owed under the Court's formula and the Department's formula since the consignment.

As of June 30, 2011, the Commonwealth accrued $500 million in its financial statements for this legal contingency.

*Special Education Students*. The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court of First Instance denied damages for the class as a whole. The plaintiffs appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages within this case. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least $5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2011, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX II**



BASIC FINANCIAL STATEMENTS AND
REQUIRED AND OTHER SUPPLEMENTARY
INFORMATION

Public Buildings Authority
Years Ended June 30, 2011 and 2010
With Report of Independent Auditors

*ЕУ ERNST & YOUNG*

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and Required and Other Supplementary Information

Years Ended June 30, 2011 and 2010

# Contents

Report of Independent Auditors ................................................................................ 1
Management's Discussion and Analysis................................................................. 3

Basic Financial Statements

Balance Sheets................................................................................................... 16
Statements of Revenues, Expenses and Changes in Net Assets.............................. 18
Statements of Cash Flows .................................................................................. 19
Notes to Financial Statements ............................................................................ 21

Required Supplementary Information

Schedule of Funding Progress for Postemployment Healthcare Benefits .................... 57

Other Supplementary Information

Schedule of Bond Sinking Fund Accounts ............................................................. 58
Schedule of Operating Cash Accounts .................................................................. 59
Schedule of Operating Rental Revenues and Receivables........................................ 60
Schedule of Capital Improvements Program Compared to Budget............................. 61

**ЕЙ ERNST & YOUNG**

Ernst & Young LLP
1000 Scotiabank Plaza
273 Ponce de León Avenue
San Juan, PR 00917-1951

Tel: 787 759 8212
Fax: 787 753 0808
www.ey.com

## Report of Independent Auditors

The Board of Directors of
Public Buildings Authority

We have audited the accompanying balance sheet of the Public Buildings Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2011, and the related statements of revenues, expenses and changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Public Buildings Authority as of June 30, 2010, were audited by other auditors whose report dated September 28, 2010, expressed an unqualified opinion on those statements. Those financial statements were restated and reissued dated November 15, 2011.

We conducted our audit in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Authority's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the 2011 financial statements referred to above present fairly, in all material respects, the financial position of the Public Buildings Authority at June 30, 2011, and the changes in its net assets and its cash flows for the year then ended in conformity with U.S. generally accepted accounting principles.

The management's discussion and analysis and schedule of funding progress for postemployment healthcare benefits on pages 3 to 15 and page 57 are not a required part of the basic financial statements, but are supplementary information required by the Governmental Accounting Standards Board. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

**ΞII ERNST & YOUNG**

Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The other supplementary information is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the 2011 basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the 2011 basic financial statements taken as a whole.

In accordance with *Government Auditing Standards*, we have also issued our report dated December 15, 2011, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

*Ernst & Young LLP*

December 15, 2011

Stamp No. 2614136
affixed to
original of
this report.

A member firm of Ernst & Young Global Limited

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

Years Ended June 30, 2011 and 2010

Following is an overview and analysis of the financial activities of the Public Buildings Authority (the Authority) for the fiscal years ended June 30, 2011 and 2010. This discussion and analysis is designed to assist the reader in focusing on the significant financial issues and activities and to identify any significant changes in financial position. It is intended to serve as an introduction to the Authority's financial statements, which are comprised of the basic financial statements and the notes to financial statements. We encourage readers to consider the information presented here in conjunction with the financial statements taken as a whole.

The *Statement of Net Assets* presents information on all of the Authority's assets and liabilities with the difference between the two reported as net assets. Over time, increases or decreases in net assets may serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating. Net assets increase when revenues exceed expenses. Increases to assets, without a corresponding increase to liabilities, result in increased net assets, which also indicate an improved financial position.

The *Statement of Revenues, Expenses and Changes in Net Assets* presents information showing how the Authority's net assets are reported as soon the underlying event occur, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods.

The *Statement of Cash Flows* reports cash receipts, cash payments, and net changes in cash resulting from operations, non-capital financing activities, capital and related financing activities, and investing activities.

The notes to the financial statements provide additional information that is essential to the full understanding of the data provided in the basic financial statements.

In addition to the basic financial statements and accompanying notes, various schedules present certain information concerning changes in bonds sinking funds accounts, activity at operating cash accounts, detail of rental operating revenues and receivable, and summary of capital improvements programs compared to budget.

Public Buildings Authority

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Financial Highlights**

- The Authority's net assets decreased by $168,793,902 (162.0%) on June 30, 2011 and by $15,989,301 (13.3%) on June 30, 2010. For the year ended June 30, 2011, the Authority reported an operating loss of $12,865,997; however, this loss was mainly due to a reduction in rent revenue caused by a Scoop & Toss transaction where a significant portion of bond interest payment was covered by a line of credit. This transaction has the effect to reduce the debt service component paid by the client agencies.

- The Authority's operating income decreased from $128.1 million for year ended June 30, 2010 to an operating loss of $12.9 million for year ended June 30, 2011. That decrease was mainly due to the same reason mentioned above.

**Overview of the Financial Statements**

***Statements of Net Assets*** – Following is condensed financial information of the statements of net assets of the Authority.

**Analysis of 2011 and 2010**

| | 2011 | 2010 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| Current assets | $ 86,989,991 | $ 57,301,917 | $ 29,688,074 | 51.8% |
| Capital assets | 2,989,269,976 | 2,895,140,953 | 94,129,023 | 3.0% |
| Other noncurrent assets | 529,421,301 | 618,188,831 | (88,767,530) | (14.4)% |
| Total assets | $3,605,681,268 | $3,570,631,701 | $ 35,049,567 | 1.0% |
| | | | | |
| Current liabilities | $ 268,433,570 | $ 341,589,392 | $ (73,155,822) | (21.4)% |
| Noncurrent liabilities | 3,401,864,336 | 3,124,865,045 | 276,999,291 | 8.9% |
| Total liabilities | 3,670,297,906 | 3,466,454,437 | 203,843,469 | 5.9% |
| | | | | |
| Net assets (deficit): | | | | |
| Invested in capital assets, net of related debt | 37,267,277 | 13,664,857 | 23,602,420 | 172.7% |
| Restricted | 67,019,252 | 38,117,890 | 28,901,362 | 73.9% |
| Unrestricted | (168,903,167) | 52,394,517 | (221,297,684) | (321.0)% |
| Total net assets (deficit) | (64,616,638) | 104,177,264 | (168,793,902) | (162.0)% |
| Total liabilities and net assets | $3,605,681,268 | $3,570,631,701 | $ 35,049,567 | 1.0% |

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

## Analysis of 2010 and 2009

|  | 2010 | 2009 | Change In Dollars | Percentage |
|---|---|---|---|---|
| Current assets | $   57,301,917 | $  154,346,458 | $  (97,044,541) | (62.9)% |
| Capital assets | 2,895,140,953 | 2,868,073,813 | 27,067,140 | 0.9% |
| Other noncurrent assets | 618,188,831 | 538,968,222 | 79,220,609 | 14.7% |
| Total assets | $3,570,631,701 | $3,561,388,493 | $      9,243,208 | 0.3% |
|  |  |  |  |  |
| Current liabilities | $  341,589,392 | $  448,404,052 | $(106,814,660) | (23.8)% |
| Noncurrent liabilities | 3,124,865,045 | 2,992,817,876 | 132,047,169 | 4.4% |
| Total liabilities | 3,466,454,437 | 3,441,221,928 | 25,232,509 | 0.7% |
|  |  |  |  |  |
| Net assets: |  |  |  |  |
| Invested in capital assets, net of related debt | 13,664,857 | 148,935,233 | (135,270,376) | (90.8)% |
| Restricted | 38,117,890 | 770,500 | 37,347,390 | 4,847.2% |
| Unrestricted | 52,394,517 | (29,539,168) | 81,933,685 | (177.4)% |
| Total net assets | 104,177,264 | 120,166,565 | (15,989,301) | (13.3)% |
| Total liabilities and net assets | $3,570,631,701 | $3,561,388,493 | $      9,243,208 | 0.3% |

## Analysis of Net Assets at June 30, 2011 and 2010

The total net assets at June 30, 2011, compared to prior year, had a decrease of 162.0%. This was caused by a reduction in rent revenue due to a decrease in the debt service rental invoicing.

When compared June 30, 2011 with June 30, 2010, there was a decrease in current liabilities of 21.4%. This decrease was the net effect of a reclassification to noncurrent liabilities due to various lines of credit to be paid with a Series S issuance, a decrease in accounts payable, and an increase in due to other government agencies, related to the Schools for the 21st Century Program. During the year ended June 30, 2011, the Authority disbursed $20 million to the Puerto Rico Electric Power Authority as partial payment of the $36.4 million in arrears owed to the utility agency as of June 30, 2010. The Authority has continued to pay its current utility expenses.

Other non-current assets show a decrease of 14.4% mainly driven by the decrease in rent receivable, related to a $38.5 million commitment for past due receivable.

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Analysis of Net Assets at June 30, 2010 and 2009

The total net assets at June 30, 2010, compared to prior year, had a decrease of 13.3%. The decrease in balance is mainly the result of increase in interest on bonds and notes and increase in the amortization of bond issuance costs. In addition, for the fiscal year ended June 30, 2009, the Authority recognized a gain on sale of real estate in the amount of $29.7 million. No such event occurred during fiscal year 2010.

The decrease in current assets when compared June 30, 2010 with June 30, 2009, is mainly the result of collections of the rent revenue related with fiscal year 2009-10. For fiscal year 2009-10, the Authority collected 93% of the contractual amount, as compared to 65% for prior fiscal year.

When compared June 30, 2010 with June 30, 2009, there was a decrease in current liabilities of 23.8%. This decrease was due to payments made to suppliers and to other governmental entities, principally for utility expenses. During the year ended June 30, 2010, the Authority disbursed $25 million to the Puerto Rico Electric Power Authority as partial payment of the $57.9 million in arrears owed to the utility agency as of June 30, 2009. The Authority has continued to pay its current utility expenses. It is expected that the remaining fees owed to the Puerto Rico Electric Power Authority will be substantially paid during fiscal year 2011.

Other non-current assets shows an increase of 14.7% mainly had driven by the increase in bonds sinking funds.

### Statements of Revenues, Expenses and Changes in Net Assets

| | 2011 | 2010 | Change In Dollars | Percentage |
|---|---|---|---|---|
| Operating revenues – rent revenue | **$212,814,430** | $332,316,169 | $(119,501,739) | (36.0)% |
| Non-operating revenues: | | | | |
| Contributions from P.R. Sales Tax Financing Corporation | **5,639,813** | 12,857,123 | (7,217,310) | (56.1)% |
| Interest income | **157,348** | 185,753 | (28,405) | (15.3)% |
| Intergovernmental | **10,350,978** | 15,752,411 | (5,401,433) | (34.3)% |
| Float interest, service charges, and others | **2,626,535** | — | 2,626,535 | 100.0% |
| Other income | **—** | 3,439,660 | (3,439,660) | (100.0)% |
| Total revenues | **231,589,104** | 364,551,116 | (132,962,012) | (36.5)% |

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

### Management's Discussion and Analysis (continued)

### Statements of Revenues, Expenses and Changes in Net Assets (continued)

| | 2011 | 2010 | Change In Dollars | Percentage |
|---|---|---|---|---|
| *Balances brought forward* | **231,589,104** | 364,551,116 | (132,962,012) | (36.5)% |
| Operating expenses: | | | | |
| Salaries and employee benefits | **82,009,762** | 90,085,812 | (8,076,050) | (9.0)% |
| Depreciation | **67,387,667** | 66,266,227 | 1,121,440 | 1.7% |
| Utilities | **22,504,298** | 20,257,372 | 2,246,926 | 11.1% |
| Repairs and maintenance | **20,652,645** | 6,633,985 | 14,018,660 | 211.3% |
| Termination benefits | **13,409,606** | — | 13,409,606 | 100.0% |
| Security services | **3,528,225** | 7,596,315 | (4,068,090) | (53.6)% |
| Rent and insurance | **7,260,485** | 8,207,208 | (946,723) | (11.5)% |
| Settlement of legal claim and other contingencies | **1,549,216** | 1,994,334 | (445,118) | (22.3)% |
| General and administrative | **7,378,523** | 3,163,865 | 4,214,658 | 133.2% |
| Total operating expenses | **225,680,427** | 204,205,118 | 20,350,809 | 10.5% |
| Non-operating expenses: | | | | |
| Interest on bonds and notes, net of capitalized interest | **167,711,431** | 159,806,600 | 4,904,831 | 3.1% |
| Float interest, service charges, and others | **—** | 2,235,078 | ( 2,235,078) | (100.0)% |
| Amortization of deferred loss on bond defeasance | **7,462,637** | 7,270,561 | 192,076 | 2.6% |
| Amortization of bond issuance costs | **2,505,609** | 4,407,052 | (1,901,443) | (43.1)% |
| Loss on disposition of capital assets | **22,902** | 2,616,008 | (2,593,106) | (99.1)% |
| Total non-operating expenses | **174,702,579** | 176,335,299 | (1,632,720) | (1.0)% |
| Total expenses | **400,383,006** | 380,540,417 | 19,842,589 | 5.2% |
| Change in net assets | **(168,793,902)** | (15,989,301) | (152,804,601) | 955.7% |
| Net assets at beginning of year | **104,177,264** | 120,166,565 | (15,989,301) | (13.3)% |
| Net assets (deficit) at end of year | **$ (64,616,638)** | $104,177,264 | $(168,793,902) | (162.0)% |

### Analysis of Fiscal Years 2011 and 2010

For fiscal years 2011 and 2010, operating revenues were approximately $212.8 million and $332.3 million, respectively. This change resulted in a 36% decrease of the rental income. The decrease was mainly due to a reduction in the debt service rental invoicing.

# Public Buildings Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Analysis of Fiscal Years 2011 and 2010 (continued)

For the year ended June 30, 2011, the operating expenses increased compared to prior year ended June 30, 2010. The main reason for increase was due to the net effect of increase in repairs and maintenance and general and administrative due to the School Summer Program 2010, that is required to perform the necessary improvements as painting, trimming, fumigating, among others, in order that the schools be in good condition for the beginning of the semester. Decrease in salaries and employee benefits, increase in termination benefits due to the enacted Act No. 70 for voluntary employment termination program, and a decrease in security services. Note the Authority followed GASB No. 47, *Accounting for Termination Benefits*. Non-operating expenses for the year ended June 30, 2011 increased due to increase on bond interest and notes and the decrease of intergovernmental income.

### Statements of Revenues, Expenses and Changes in Net Assets

| | 2010 | 2009 | Change In Dollars | Change Percentage |
|---|---|---|---|---|
| Operating revenues – rent revenue | $332,316,169 | $326,119,053 | $ 6,197,116 | 1.9% |
| Non-operating revenues: | | | | |
| Gain on sale of real estate | – | 29,699,209 | (29,699,209) | (100.0)% |
| Contributions from P.R. Sales Tax Financing Corporation | 12,857,123 | – | 12,857,123 | 100.0% |
| Interest income | 185,753 | 2,075,925 | (1,890,172) | (91.1)% |
| Intergovernmental | 15,752,411 | 15,902,637 | (150,226) | 0.9% |
| Float interest, service charges, and others | – | 2,468,655 | (2,468,655) | (100.0)% |
| Other income | 3,439,660 | – | 3,439,660 | 100.0% |
| Interest on swaps | – | 2,502,145 | (2,502,145) | (100.0)% |
| Total revenues | 364,551,116 | 378,767,624 | (14,216,508) | (3.8)% |
| | | | | |
| Operating expenses: | | | | |
| Salaries and employee benefits | 90,085,812 | 92,040,210 | (1,954,398) | (2.1)% |
| Depreciation | 66,266,227 | 66,153,843 | 112,384 | 0.2% |
| Utilities | 20,257,372 | 20,431,222 | (173,850) | (0.9)% |
| Repairs and maintenance | 6,633,985 | 10,104,829 | (3,470,844) | (34.3)% |
| Security services | 7,596,315 | 14,099,069 | (6,502,754) | (46.1)% |
| Rent and insurance | 8,207,208 | 8,157,327 | 49,881 | 0.6% |
| Settlement of legal claim and other contingencies | 1,994,334 | 1,335,400 | 658,934 | 49.3% |
| General and administrative | 3,163,865 | 2,636,638 | 527,227 | 20.0% |
| Total operating expenses | 204,205,118 | 214,958,538 | (10,753,420) | (5.0)% |

## Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

### Analysis of Fiscal Years 2011 and 2010 (continued)

#### Statements of Revenues, Expenses and Changes in Net Assets (continued)

| | 2010 | 2009 | Change In Dollars | Percentage |
|---|---|---|---|---|
| *Balances brought forward* | 204,205,118 | 214,958,538 | (10,753,420) | (5.0)% |
| Non-operating expenses: | | | | |
| Interest on bonds and notes, net of capitalized interest | 159,806,600 | 156,391,048 | 3,415,552 | 2.2% |
| Float interest, service charges, and others | 2,235,078 | – | 2,235,078 | 100.0% |
| Amortization of deferred loss on bond defeasance | 7,270,561 | 7,270,561 | – | 0.0% |
| Amortization of bond issuance costs | 4,407,052 | 631,140 | 3,775,912 | 598.3% |
| Loss on disposition of capital assets | 2,616,008 | 93,725 | 2,522,283 | 2691.2% |
| Total non-operating expenses | 176,335,299 | 164,386,474 | 11,948,825 | 7.3% |
| Total expenses | 380,540,417 | 379,345,012 | 1,195,405 | 3.2% |
| Change in net assets | (15,989,301) | (577,388) | (15,411,913) | 2669.2% |
| Net assets at beginning of year | 120,166,565 | 120,743,953 | (577,388) | (0.5)% |
| Net assets at end of year | $104,177,264 | $120,166,565 | $(15,989,301) | (13.3)% |

### Analysis of Fiscal Years 2010 and 2009

For fiscal years 2010 and 2009, operating revenues were approximately $332.3 million and $326.1 million, respectively. This change resulted in a 1.9% increase of the rental income. The increase was mainly due to increase in debt service requirements.

For the year ended June 30, 2010, the net operating expenses decreased compared to prior year ended June 30, 2009. The main reason for decrease was due to decrease in salary and employee benefits. Also, there was a decrease in security services. Non-operating expenses for the year ended June 30, 2010 increased due to increase on interest on bonds and notes and the amortization of bond issuance costs.

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Capital Assets**

Capital assets as of June 30, 2011 and 2010 were as follows:

| | June 30 | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **Change** |
| Capital assets being depreciated | $ 3,533,911,730 | $ 3,445,719,899 | $ 88,191,831 |
| Accumualted depreciation and amortization | (971,832,713) | (904,855,207) | (66,977,506) |
| | 2,562,079,017 | 2,540,864,692 | 21,214,325 |
| Land | 130,730,944 | 130,735,879 | (4,935) |
| Construction in progress | 296,460,015 | 223,540,382 | 72,919,633 |
| Capital assets, net | $ 2,989,269,976 | $ 2,895,140,953 | $ 94,129,023 |

| | June 30 | | |
| --- | --- | --- | --- |
| | **2010** | **2009** | **Change** |
| Capital assets being depreciated | $ 3,445,719,899 | $ 3,324,016,558 | $ 121,703,341 |
| Accumualted depreciation and amortization | (904,855,207) | (839,082,347) | (65,772,860) |
| | 2,540,864,692 | 2,484,934,211 | 55,930,481 |
| Land | 130,735,879 | 118,756,957 | 11,978,922 |
| Construction in progress | 223,540,382 | 264,382,645 | (40,842,263) |
| Capital assets, net | $ 2,895,140,953 | $ 2,868,073,813 | $ 27,067,140 |

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Capital Assets (continued)**

*June 30, 2011 and 2010*

The Authority's investment in capital assets as of June 30, 2011 and 2010 amounted to approximately $3.0 billion and $2.9 billion, respectively, net of accumulated depreciation. Capital assets include land, land improvements, construction in progress, buildings, equipment, furniture, and vehicles. Most buildings consist of governmental facilities that are leased to the Commonwealth's agencies and public corporations. For more information, please refer to Note 8 of the basic financial statements.

During the years ended June 30, 2011 and 2010, the Authority invested approximately $157 million and $83 million, respectively, for the construction of buildings that will then be leased to the Commonwealth. This construction activity was financed through interim lines of credit with the Governmental Development Bank (GDB) and the proceeds of the bonds issuances. The rent revenue generated by these buildings is pledged first for the payment of long-term debt.

*June 30, 2010 and 2009*

The Authority's investment in capital assets as of June 30, 2010 and 2009 amounted to approximately $2.9 billion for both years, net of accumulated depreciation. Capital assets include land, land improvements, construction in progress, equipment, furniture, and vehicles. Most buildings consist of governmental facilities that are leased to the Commonwealth's agencies and public corporations. For more information, please refer to Note 8 of the basic financial statements.

During the years ended June 30, 2010 and 2009, the Authority invested approximately $83 million and $90 million, respectively, for the construction of buildings that will then be leased to the Commonwealth. This construction activity was financed through interim lines of credit with the Governmental Development Bank (GDB) and the proceeds of the bonds issuances. The rent revenue generated by these buildings is pledged first for the payment of long-term debt.

## Public Buildings Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Debt Administration**

Long-term debt at June 30, 2011 and 2010 was as follows:

| Bonds Payable | June 30 | | Change |
| --- | --- | --- | --- |
| | 2011 | 2010 | |
| Revenue bonds | $     37,315,000 | $     43,380,000 | $     (6,065,000) |
| Public education and health | – | 32,585,000 | (32,585,000) |
| Government facilities | 3,032,224,085 | 3,078,424,085 | (46,200,000) |
| Total bonds | 3,069,539,085 | 3,154,389,085 | (84,850,000) |
| | | | |
| Add (deduct): | | | |
| Bond discounts | (25,272,894) | (26,454,183) | 1,181,289 |
| Deferred loss on bonds deferred | (142,673,870) | (151,563,716) | 8,889,846 |
| Accreted value on bonds outstanding | 30,341,471 | 26,197,997 | 4,143,474 |
| Bond premiums | 76,268,664 | 84,785,495 | (8,516,831) |
| Total bonds | $ 3,008,202,456 | $ 3,087,354,678 | $ (79,152,222) |

## Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Management's Discussion and Analysis (continued)

**Debt Administration (continued)**

|  | June 30 | | |
|  | 2011 | 2010 | Change |
|---|---|---|---|
| Bonds payable | $ 3,008,202,456 | $ 3,087,354,678 | $ (79,152,222) |
| Borrowings under line of credit | 415,182,000 | 165,749,102 | 249,432,898 |
| Long-term debt outstanding | 3,423,384,456 | 3,253,103,780 | 170,280,676 |
|  |  |  | − |
| Other long-term liabilities: |  |  | − |
| Due to contractors | 40,568,111 | 40,954,604 | (386,493) |
| Advances from other governmental agencies | 3,024,596 | 1,949,596 | 1,075,000 |
| Compensated absences | 12,146,386 | 12,019,413 | 126,973 |
| Contingencies | 10,026,514 | 9,419,778 | 606,736 |
| Other postemployment benefit obligations | 5,910,172 | 3,127,048 | 2,783,124 |
| Voluntary termination benefits | 13,409,606 | − | 13,409,606 |
| Due to Commonwealth | 1,683,808 | 1,683,808 | − |
| Total other long-term liabilities | 86,769,193 | 69,154,247 | 17,614,946 |
| Total long-term obligations | 3,510,153,649 | 3,322,258,027 | $ 187,895,622 |
|  |  |  |  |
| Less: |  |  |  |
| Current portion | 108,289,313 | 197,392,982 |  |
| Long-term obligations, less current portion | $ 3,401,864,336 | $ 3,124,865,045 |  |

The Authority's long-term debt increased by $170.3 million from $3.253 million as of June 30, 2010 to $3.423 million as of June 30, 2011.

As of June 30, 2011 and 2010, the Authority has outstanding bonds payable of $3.008 billion and $3.087 billion, respectively. The balance is net of unamortized bond discounts, bond premium, deferred loss on bonds refunding, and bonds issuance costs. For more information, please refer to Note 12 of the basic financial statements.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Other Currently Known Facts**

As discussed in Note 19, the Authority is currently involved in the "Schools for the 21st Century" program, which is a multi-agency effort with the objective of rehabilitating, renovating and/or constructing approximately 100 public schools through the use of an innovative procurement approach that effectively transfers the risk of design, construction and maintenance to the private sector. Under this program, the Puerto Rico Public-Private Partnerships Authority ensures overall compliance with procurement requirements while the Puerto Rico Infrastructure Financing Authority serves as procurement and construction manager. The public schools included under the program will undergo major repairs of structural deficiencies, renovations of electrical and mechanical defects, and the creation of new community spaces, sciences labs, art centers, among other things.

The Authority is issuing its $756,449,000 aggregate principal amount of Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds-Issuer Subsidy) (the "Series R Bonds"). The proceeds of the Series R Bonds will be used to finance the rehabilitation, renovation or construction of at least 100 public schools under this program. The Authority expects to finance the rehabilitation, renovation or construction of the remaining public schools through a future issuance of bonds also designated as "Qualified School Construction Bonds".

Concurrently with the issuance of the Bonds, on August 24, 2011 the Authority issued its $303,945,000 aggregate principal amount of Government Facilities Revenue Bonds, Series S Guaranteed by the Commonwealth of Puerto Rico. The bonds are being issued to (i) repay certain advances made to the Authority by Government Development Bank under line of credit facilities to (a) pay interest due January 1 and July 1, 2011 on certain bonds issued under the 1995 Bond Resolution and the 1970 Bond Resolution, and (b) pay a portion of the construction costs of certain buildings and facilities leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth; and (ii) pay costs of issuance the bonds. The Government Facilities Revenue Bonds, Series S, repay the lines of credit principals by the amounts of $147.8 million, $162.2 million and $122 million, and accrued interest of $16 million.

In July 2011, the Authority repaid the accrued interest for the line of credit of $98,000,000 with annual rate equal to 1.50%. The accrued interest paid at July 30, 2011 was in the amount of $309,490.

Public Buildings Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (continued)

**Request for Information**

This financial report is designed to provide a general overview of the Authority's finances for all those interested parties. Questions concerning any of the information provided in this report or request for additional financial information should be addressed to the Comptroller's Office, Public Buildings Authority, PO Box 41029, San Juan, PR 00940-1029.