## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS<br><br>(This court filing relates only to Case No. 17 BK 4780-LTS) |

**EXPERT DECLARATION OF MR. TOM SANZILLO, DIRECTOR OF FINANCE FOR THE INSTITUTE FOR ENERGY ECONOMICS AND FINANCIAL ANALYSIS (IEEFA) IN SUPPORT OF UTIER'S OBJECTION TO INSURERS' MOTION FOR RELIEF FROM AUTOMATIC STAY (DKT#975) AND TO PRAY FOR THE APPOINTMENT OF AN INDEPENDENT PRIVATE SECTOR INSPECTOR GENERAL ("IPSIG") (DKT#1158).**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

1

**I, TOM SANZILLO, PURSUANT TO 28 U.S.C. §1746, DECLARE AND STATE AS FOLLOWS:**

**I.      What is the subject of your testimony?**

1.      My testimony is in support of UTIER's Objection to Insurers' Motion for Relief from Automatic Stay (DKT#975) and to Pray for the Appointment of an Independent Private Sector Inspector General ("IPSIG").

**II.     What is your background?**

1.      My name is Tom Sanzillo, Director of Finance for the Institute for Energy Economics and Financial Analysis (IEEFA). The Institute provides financial and energy information and analysis on alternatives to fossil fuels. Since 2007, I have written reports individually and jointly on a host of energy and financial topics related to coal, oil and gas finance and markets, including individual power plants, coal mining, fossil fuel ports, coal producing companies, rural cooperatives, public power authorities, independently owned utilities, renewable energy financing, institutional investments, public and private financing, energy subsidies, oil and gas price and corporate trends, and individual mining and drilling projects.

2.      I have presented testimony and depositions to public service commissions, state and local governments, Congress and federal courts, including the Puerto Rico Energy Bureau (CEPR-AP-2015-0001).

3.      I have prepared reports, testimony and blogs on topics related to Puerto Rico's energy situation since 2015. Those publications have focused on the energy and financial condition of the Puerto Rico Electric Power Authority (PREPA), specifically pre- and post-

2

hurricane energy planning and priorities, debt management, consultant hiring and fee structure, renewable energy opportunities, management challenges, political interference, budget and fiscal plan, federal oversight, and fuel oil contract and other procurement issues and irregularities. My opinions and that of my coauthor on many pieces on Puerto Rico, Cathy Kunkel, have been cited in the Bond Buyer, The Hill, El Nuevo Día, El Vocero, Caribbean Business News, Fortune, Vox, The Intercept, USA Today, and Inside Climate News.

4.      Prior to my tenure at IEEFA, I spent 17 years at senior levels of management at the New York City and New York State Comptroller's Offices. I left state service in 2007 as the First Deputy Comptroller of New York State (and served for a short period as the State Comptroller due to an early resignation). In those positions, I had responsibility for the management of: a $150 billion pension fund; a 1 million member retirement system; $250 billion in state and local bond issuances; a $85 billion annual contracting budget and review/approval of 40,000 contracts; audits of all public authorities[2] and state and local governments; setting accounting standards for these units of government, and the review and monitoring of the state budget and expenditures (including payrolls) and the review of finances of 1400 units of local government. My work on state government finances has appeared in the New York State Oxford Handbook on Politics and Government.[3]

5.      Part of my responsibilities concerned the problem of local government fiscal distress. The New York City Comptroller is a member of the New York State Financial Control

---

[2] This included ongoing monitoring and evaluation of the state's two largest energy authorities the Long Island Power Authority and the New York State Power Authority. (LIPA audits and studies:
https://osc.state.ny.us/reports/pubauth/lipareport121205.pdf
https://osc.state.ny.us/press/releases/jul03/lipa703.pdf
https://osc.state.ny.us/reports/pubauth/lipasummer06.pdf
https://www.osc.state.ny.us/reports/pubauth/pubauthoritiesreform.pdf. Shortly after I left state service I was asked to serve as a private citizen on the Long Island Power Authority Advisory Board. https://libn.com/2008/12/17/lipa-appoints-advisory-council/
[3] http://www.oxfordhandbooks.com/view/10.1093/oxfordhb/9780195387230.001.0001/oxfordhb-9780195387230-e-11

Board and monitors the New York City government budget. The New York State Comptroller,
during my tenure, had statutory obligations for existing control boards in New York City and
Yonkers (including the city's exit from oversight). The office initiated new control boards in
Troy, Nassau County, Erie County and Buffalo. As part of the Comptroller's Executive
leadership team, I had direct responsibility for most of these initiatives.

6.      Each Comptroller prepares and issues the Comprehensive Annual Financial
Report for either the city or state.

### III.     What experience do you have with the operational aspects of an IPSIG[4]?

1.      In March 2004,[5] the New York State Racing Association (NYRA) entered into a
Deferred Prosecution Agreement (DPA) with the United States Attorney's Office for the Eastern
District of New York involving a series of criminal charges related to money laundering and
income tax evasion. The Agreement gave the New York State Comptroller responsibility to
"direct the Appointed Monitor regarding all aspects of the Monitorship".[6]   The Comptroller had
called for the creation of an Independent Private Sector Inspector General (IPSIG) in 2003.[7] The
Comptroller's Office was familiar with the issues facing NYRA because it conducted an annual

---

[4] [1] An IPSIG is an independent, private sector firm with legal, auditing, investigative, and loss prevention skills,
employed by an organization (voluntarily or by compulsory process) to ensure compliance with relevant law and
regulations and to deter, prevent, uncover, and report unethical and illegal conduct by, within and against the
organization. [2] Where the culture of the organization is primarily legitimate or amenable to reform, the IPSIG
may, in addition to the prevention and control of illegal and unethical conduct, be a major participant with
management in enhancing the economy, efficiency and effectiveness of the organization. Where the culture is
primarily illegitimate and hostile to change, the IPSIG's role may be essentially adversarial, limited to instituting
internal controls and monitoring organizational activities. https://getnicklaw.com/wp-
content/uploads/2019/04/20050913-NYRA-Monitor-Final-Report-PUBLIC.pdf
[5] United States of America against The New York Racing Association, Order Appointing Monitor, Cr. 03-1295,
March 1, 2004 ("Order Appointing") and https://www.justice.gov/archive/tax/usaopress/2004/txdv042004mar2.htm
[6] Order Appointing, paragraph 5, p. 4.
[7] The deferred prosecution agreement came after a series of criminal revelations about the agency. In September
2003, the New York State Comptroller called for the appointment of an IPSIG. See: New York State Office the
Comptroller,  The New York Racing Association: The Case for Reform, Office of the State Comptroller, September
2003.

4

audit of the Association's franchise fee paid to the State of New York[8] and because the

Association's capital program had been the subject of an extraordinary joint review by the

Comptroller and the New York State Attorney General that identified weak controls on capital

spending.[9] The Association had been cited by the Comptroller's office as a prominent example

of the need for an overhaul of the State's public authorities.[10]

2.      As the First Deputy Comptroller, my responsibilities associated with the oversight

of the NYRA IPSIG included planning and review of the audits, reports and recommendations,

internal staff management, coordination with external organizations, ongoing communication

and decision making with the State Comptroller, receipt of documents from and coordination

with the IPSIG, and other operational efforts to support the IPSIG.

3.      The IPSIG at NYRA concluded its tenure with a Final Report [11]to the Court that

documented NYRA's compliance with the Deferred Prosecution Agreement. The Report

contains numerous areas where NYRA improved operations and where NYRA and its

stakeholders introduced significant reforms:[12]

     a.  Passed new laws regulating "free passes" to the racetrack and the terms upon

         which the franchise agreement for the race tracks would be granted in the future.

     b.  Entered into new business deals that improved NYRA's revenue position.

     c.  Improved relations with regulators and external oversight entities.

     d.  Reorganized senior management and the NYRA Board of Trustees, including

         replacement of several board members and senior management officials. The

---

[8] https://osc.state.ny.us/audits/allaudits/093001/00s18.pdf
[9] https://osc.state.ny.us/audits/audits/9798/96j89.pdf
[10] https://www.osc.state.ny.us/reports/pubauth/pubauthoritiesreform.pdf, p. 21.
[11] https://getnicklaw.com/wp-content/uploads/2019/04/20050913-NYRA-Monitor-Final-Report-PUBLIC.pdf
("Final Report")
[12] These achievements are summarized on pages 4-11 of the Final Report
https://www.chronofhorse.com/forum/forum/discussion-forums/racing/5274-nyra-approved-for-25-year-renewal-of-ny-s-big-3-tracks

reforms included changes in NYRA's pari-mutuel betting, legal, security, internal control and human resources units.

e.  Ended a major business scam involving offshore and Indian reservation gambling.

f.  Improved conditions for backstretch employees including renovation of living quarters, improved health benefits and the establishment of an ongoing management-employee committee.

g.  Improved NYRA's ability to contract for goods and services during its period of indictment and introduced ongoing procurement reforms.

h.  Oversaw the restatement of NYRA's financial statements.

i.  Pushed out criminal elements and behavior in NYRA.

j.  Implemented a new Code of Ethics for the Board of Trustees.

4.      The Final Report also included a Part II that was submitted to the court under seal.

5.      There are a number of other achievements that are particularly relevant to the consideration of PREPA as a candidate for the creation of an IPSIG team. They are important because they show that the IPSIG's job is to assist the organization and to establish professional, fair standards for decision making.

6.      Under the IPSIG's oversight, NYRA implemented numerous procurement and contracting reforms, which included replacement of several senior managers. The IPSIG also worked to resolve labor disputes, leading to improvements in the collective bargaining agreement that were satisfactory to both labor and management. [13]

7.      NYRA holds a franchise agreement from the State of New York to operate three race tracks in New York State. The franchise agreement requires renewal from time to time and the criminal indictment led to a broad discussion of whether the state should revoke or not renew

---

[13] Final Report, p.97-98.

the franchise. The improvements at NYRA provided the foundation for the renewal of NYRA's

franchise (after the termination of the IPSIG period).[14]


### IV.      Why is PREPA a good candidate for an IPSIG?

1.      The mismanagement of and political interference in PREPA's operations is well

known and documented. Yet the numerous audits, reports and recommendations have not

resulted in effective corrective actions.

2.      The IPSIG model is driven by a commitment to improving professional standards

and operational efficiency. It is fully equipped, in fact its raison d'etre, is to handle an

organization like PREPA where professionalism, efficiency and the public's need for reliable

electricity have been compromised by systemic practices driven by political interference and, in

some cases, outright corruption.

3.      In PREPA's case, the lack of enduring professional standards has distorted the

essential functions of the organization: personnel selection, energy planning, budgeting and

tracking of expenditures, payment of obligations, capital allocation and debt management.

4.      The culture has prevented employees from doing their jobs in an environment that

supports professional development, ethical standards and sound business decision-making.

5.      As noted in UTIER's motion the IPSIG model differs from that of a traditional

receiver that typically is court appointed and replaces management. The receiver is usually

charged with marshalling assets and freeing up resources to pay creditors. This rational ordering

of PREPA's creditor obligations is essential, but taken alone will provide only short term relief

for creditors and address none of the organization's problems. It will most likely serve to further

---

[14] https://www.horseracing.com/blog/nyra-keeps-horse-racing-franchise/ and
https://www.chronofhorse.com/forum/forum/discussion-forums/racing/5274-nyra-approved-for-25-year-renewal-of-ny-s-big-3-tracks

distort PREPA's organizational priorities at a time when the organization is attempting reforms that bring it back to its core function of providing electricity.

### V.     Are there any examples of PREPA's past practice that might have benefited from the presence of an IPSIG team?

1.     Yes.  PREPA officials participated in a fuel contracting scandal whereby for well over a decade the authority paid full price to oil suppliers for sub-quality oil.[15] Laboratory testing results were falsified to show that sub-standard oil met PREPA's fuel quality specifications.  To sustain the scandal, internal audits were suppressed and contracts were let to vendors with criminal convictions.

2.     The scandal is not a secret. A Puerto Rico Senate investigative committee published a report in 2016, the Puerto Rico Comptroller completed an audit in 2002, a New York Times article covered the scandal, ratepayers are in court on a class action suit, and a referral was made to the FBI.[16] The details of the audit and the Senate investigation are summarized in a report by my organization.[17]

3.     One of the many disturbing findings of the Senate and Puerto Rico Comptroller, also included in the allegations in the class action suit, is the long-term, systematic suppression of those employees within PREPA who attempt to perform their assignments according to the rules.

---

[15] Sanzillo and Kunkel, "Multi-billion dollar oil scandal goes unaddressed in PREPA contract reform and privatization," Institute for Energy Economics and Financial Analysis, July 2018.
[16] Puerto Rico Senate, Special Commission for the Study of the Standards and Procedures Related to the Purchase and Use of Oil by the Puerto Rico Electric Power Authority and of Government Integrity, Final Report, December 5, 2016; Puerto Rico Office of the Comptroller, Audit Report CP-02-26, May 13, 2002; *Marrero-Rolón v. PREPA*, Civ. No. 15-1167 (JAG) (D.P.R. Feb. 24, 2015.) ECF No. 367 ("Third Amended Class Action Complaint"); M. Williams Walsh, "In scandal at Puerto Rico utility, ex-fuel buyer insists he took no bribes," New York Times, March 2, 2016.
[17] http://ieefa.org/wp-content/uploads/2018/07/Multibillion-Dollar-Oil-Scandal-Goes-Unaddressed-in-PREPA-Contract-Reform-and-Privatization-_July-2018.pdf

4.      No corrective action plan has been publicly identified or adopted by PREPA or the governor.  It is entirely possible that PREPA continues to over-pay for oil today.

5.      This scandal increased costs to PREPA ratepayers in two ways. First, lawyers for a class action lawsuit brought by PREPA ratepayers estimate that the fraud cost customers more than $1 billion, or nearly 5% of the total fuel budget, from 2002 to 2014.[18]

6.      Second, while this scandal was occurring, PREPA failed to meaningfully diversify into lower-cost renewable energy, despite a legal mandate to do so. As of 2015, 1.4% of PREPA's electricity came from renewable energy sources,[19] in violation of the island's renewable portfolio standard of 12%. The few renewable energy contracts that PREPA entered into with private developers were significantly overpriced.[20]

7.      In PREPA's August 2018 Fiscal Plan, the agency determined that it must reduce its annual fuel payments by between $400-$500 million annually if it is to become solvent and maintain affordable rates. The path to achieving this goal, according to the financial plan, is increased reliance on renewable energy and natural gas. In other words, the fiscal plan for the agency can only be achieved if the procurement and use of oil as the primary fuel for its generation is substantially reduced.

## VI.      Are there other examples that are more recent?

1.      Yes. In the immediate aftermath of hurricane Maria, PREPA bypassed the mutual aid resource available from mainland electric utilities to aid in the emergency reconstruction of

---

[18] Hagens Berman, Puerto Rico Electric Power Authority (PREPA), https://www.hbsslaw.com/cases/puerto-rico-electric-power-authority-prepa.
[19] June 2015 Monthly Report to the PREPA Governing Board, https://aeepr.com/es-pr/investors/FinancialInformation/Monthly%20Reports/2015/June%202015.pdf
[20] Puerto Rico Energy Commission Case No. CEPR-AP-2015-0002, Commission Order, September 23, 2016, pp. 59-60.

the grid and instead awarded a contract to Whitefish Energy Holdings, a small firm that was ill equipped to handle the needs of the Puerto Rican people during the crisis.

2.      The contractor failed and the contract was cancelled amid the ensuing scandal.[21] Yet the Puerto Rico Comptroller has not yet released the results of its investigation into the contract, despite a promised release date of October 2018.[22] An investigation by the Homeland Security Inspector General has also not yet produced a public report.[23] The House Committee on Natural Resources[24] has written letters and held hearings but issued no final findings and recommendations regarding the Whitefish matter. Nor have there been any reports on the effectiveness of a contracting reform implemented by the Governor in response to the scandal.[25]

## VII.    Are there any other examples?

1.      Yes. One of the major causes of PREPA's weak management, as identified by the FOMB's independent investigator Kobre & Kim LLP., is the plethora of political appointees within PREPA. According to Kobre & Kim, the patronage army consists of 150 to 300 political appointees from the major political parties, many of whom have been appointed to technical and

---

[21] https://www.nytimes.com/2017/10/29/us/whitefish-cancel-puerto-rico.html
[22] Amanda Pérez Pintado, "La contralora no encuentra irregularidades en la contratación de Whitefish," El Nuevo Día, September 22, 2018.
[23] José Delgado Robles, "Valdivieso defends Whitefish contract," El Nuevo Día, October 28, 2018.
[24] Senators Wyden and Cantwell at the time of the revelations about the contract requested an audit by the United States Government Accountability Office (GAO)
https://www.energy.senate.gov/public/index.cfm?a=files.serve&File_id=5FB1032F-DC0B-430A-8507-4765A45B3B84
[25] In the immediate aftermath of the Whitefish controversy, Governor Rosselló issued Executive Order 2017-66. The Order established the Office of Contract Procurement and Compliance (OCPC) within PREPA. The mission of the office was to ensure that PREPA's future procurements complied with existing local and federal law and were efficient. The Office was charged with responsibility for approval of all contracts valued at $500,000 o more and using "independent review" from technical experts to ensure compliance. However, there are no public reports of the newly formed office on the FAFAA, PREPA or FOMB websites. We have only an indirect concern raised by the FOMB that PREPA and many other Commonwealth agencies have been late with quarterly budget reporting requirements. The reports even when submitted are not public information. Email from: Alejandro J. Figueroa Ramirez, Utility Sector Transformation Manager response to Tom Sanzillo, Director of Finance, IEEFA, April 15, 2019.

professional positions without regard for qualifications.[26] PREPA has allegedly been one of the largest sources of political fundraising on the island.[27]  This matter has received no public response from either the Governor or PREPA, despite the release of the findings more than six months ago.

2.      Another example of a situation where an IPSIG would have been beneficial is in the oversight of PREPA's contracts with legal and financial restructuring consultants. In 2016, the Puerto Rico Energy Bureau raised red flags about a lack of competitive bidding,[28] a complicated contracting process,[29] poor monitoring of costs[30] and a lack of preparedness to control costs.[31] The Commission added additional reporting requirements to its order requiring PREPA to provide a complete list of these financial restructuring expenditures[32] and it stated it would investigate the fees under two separate areas of its authority.[33] In the post-hurricane environment and subsequent reorganization of Puerto Rico's regulatory apparatus, these investigations have not proceeded. PREPA currently has a $21.6 million contract through June 2019 with its restructuring advisor, Filsinger Energy Partners, paid for by Puerto Rico ratepayers. It is unclear what, if any, internal contracting reforms took place before signing this contract.[34]

### VIII.   Would the current state of PREPA's fiscal reporting benefit from an IPSIG?

---

[26] Kobre & Kim, Final Investigative Report to the Financial Oversight and Management Board of Puerto Rico, August 20, 2018, p. 113-120.
[27] Ibíd., p. 120.
[28] Puerto Rico Energy Bureau, Restructuring Order, Case No. CEPR-AP-2016-0001,  http://energia.pr.gov/wp-content/uploads/2016/06/21-junio-2016-Restructuring-Order-English-1.pdf, ¶ 262.
[29] Ibid., ¶ 260.
[30] Ibid., ¶ 261 and 265.
[31] Ibid., ¶ 271.
[32] Ibid., ¶ 335 (e) and (i).
[33] Ibid., ¶ 261 and ¶ 274.
[34] The FOMB also raised issues with the price of the Filisinger project. https://www.elnuevodia.com/noticias/locales/nota/lajuntadesupervisionfiscaladviertesobrecontratacionenlaaee-2439142/

1.      The authority's FY 2017 and FY 2018 audited financial statements are late. PREPA recently posted its FY 2016 audit over two years late.[35] That audit contained more than $2 billion in restated costs including a $900 million write off to the Commonwealth. [36]

2.      PREPA also has not produced an on-time fiscal plan in response to the timetable set by the FOMB. Its FY 2019 fiscal plan was due April 5th. [37]  PREPA requested and was given an extension.[38]

3.      The lack of fiscal reporting discipline in the agency will serve to weaken any attempt to secure renewed access to the bond market.


**IX.     How does PREPA's long-term energy planning process also illustrate the need for IPSIG monitoring?**

1.      PREPA produced its first integrated resource plan (IRP) to the Puerto Rico Energy Bureau (then Commission) in 2015, pursuant to Puerto Rico Law 57-2014. The Commission ordered PREPA to undertake several revisions to the plan before finally rejecting it, identifying flaws in seven areas: "modeling framework; fuel, price and capital sensitivities; sharing of model and work papers with the Commission and intervenors; demand-side resources; environmental compliance; renewable energy assumptions; and action plans."[39] The Bureau further noted that, "Together with its chief consultant, Siemens Power Technologies International … PREPA disregarded our rules, failed to use standard planning techniques,

---

[35] The Auditor's Letter is dated December 12, 2018 https://aeepr.com/es-pr/investors/FinancialInformation/Annual%20Reports/PREPA%20Audited%20Financial%20Statements%20-%20June%2030%202016.pdf
[36] https://aeepr.com/es-pr/investors/FinancialInformation/Annual%20Reports/PREPA%20Audited%20Financial%20Statements%20-%20June%2030%202016.pdf
[37] https://drive.google.com/file/d/1u1oTHlDbMcBBhR-z_sygaB6T2SuqOL-f/view
[38] https://drive.google.com/file/d/1u1oTHlDbMcBBhR-z_sygaB6T2SuqOL-f/view
[39] Puerto Rico Energy Commission, Final Resolution and Order, Case No. CEPR-AP-2015-0002, September 23, 2016, Paragraph 92.

delayed the production of required information, and displayed insufficient appreciation of the potential for energy efficiency and demand response."[40]   The Bureau also noted that Siemens suffered from an apparent conflict of interest because the company (a manufacturer of gas turbines) prepared a plan that specifically modeled the construction of Siemens gas turbines.[41]

2.       Four years later, in February 2019, PREPA presented its second IRP to the Energy Bureau. PREPA again used the same consultant, Siemens, despite the previous conflict of interest concerns. And, again, PREPA's IRP has been rejected by the Energy Bureau. In a March 2019 order, the Bureau found PREPA's IRP to be incomplete and gave PREPA a 30-day deadline to address various deficiencies in the filing, including correcting certain cost assumptions and developing several new modeling runs.[42] The case before the Energy Bureau is ongoing.

3.       Meanwhile, the governor and PREPA have failed to take the need for a robust, transparent and professionally sound energy planning process seriously. For example, PREPA conducted stakeholder meetings in August and October of 2018. In between those stakeholder meetings and the filing of its IRP in February 2019, PREPA added a new, natural gas-intensive scenario to its IRP and stated that one of the purposes of this scenario ("ESM Plan") "is to expedite the implementation of a preferred plan utilizing procurement options presented by the Public Private Partnership Authority."[43] The ESM plan was presented as PREPA's lowest cost option, a poorly supported conclusion that was questioned by the Energy Bureau.[44] The ESM plan forms the basis of PREPA's "5-Year Action Plan," the set of near-term investment

---

[40] Ibid., paragraph 13.
[41] "We acknowledge that Siemens's witness asserted that the consulting arm of Siemens was "independent" of the manufacturing arm. However, both arms are commonly owned. At a time of deep citizen concern about PREPA's rates and performance, perceptions of bias or favoritism matter." (Ibid., Paragraph 112)
[42] Puerto Rico Energy Bureau, Resolution and Order, Case No. CEPR-AP-2018-0001, March 14, 2019.
[43] PREPA, Puerto Rico Integrated Resource Plan 2018-2019, February 12, 2019, page 1-3.
[44] Puerto Rico Energy Bureau, Resolution and Order, Case No. CEPR-AP-2018-0001, March 14, 2019, p. 15.

decisions that it proposes to implement if the IRP is approved. The ESM plan achieves only 24%
renewable energy by 2038, despite the fact that while this scenario was being developed, the
Puerto Rico Senate had already passed a target of 100% renewable energy by 2050. The insertion
of this natural gas-focused scenario at the last minute to become the backbone of PREPA's
recommended action plan strongly points to political interference in the energy planning process.

4.      As a second example, in April 2019, Governor Rosselló announced a deal with
the AES plant to end the burning of coal for electricity generation in Puerto Rico by the end of
2020. Subsequently this claim was called into question, including by AES itself, which cast
doubt on its ability to meet that deadline.[45] The episode raises questions about the governor's
role in energy planning decisions and what other negotiations with private generators might be
being conducted without reference to PREPA's long-term planning process.

### X.      Are there any issues before the agency currently that exhibit these same patterns of non-transparency and political interference?

1.      Yes. Most recently, PREPA has entered into a contract with a firm called New
Fortress Energy (NFE) to convert two units at the San Juan power plant to burn natural gas and
to supply natural gas to the plant for five years. The project itself – reinforcing generation
capacity in the San Juan area – meets a longstanding need. Puerto Rico currently generates the
majority of its electricity in the sparsely-populated south and brings it to the north via long-
distance transmission lines that are vulnerable to severe storms.

---

[45] Gerardo Alvarado Leon, "Mar de dudas en torno al fin del carbon," El Nuevo Dia, April 9, 2019.

2.      The contract was awarded outside the bounds of Puerto Rico's energy planning process.[46] In fact, the process by which the contract was awarded is now a matter of litigation brought by the business community.[47]

3.      The company seems an odd choice.  If NFE succeeds in selling the volume of natural gas forecasted for this single project, it will more than triple the company's current revenue.[48] By contrast, competitors in the process were bond-rated businesses with a history in Puerto Rico.[49]

4.      The concern over the vendor selection is heightened by the release of an internal email at PREPA from the head of its Planning and Studies Division to various staff at the Authority:

> "This morning we received the order from the Energy Commission on this matter [the RFP for the San Juan conversion]. Given the subject matter, it should be referred to the Director of Generation."
> We inform you that the RFP mentioned was prepared by the consultant Filsinger Energy Partners, along with whatever analysis produced to justify it. The Planning and Studies Division did not participate in this process." [50]

5.      A principal rationale for the contract is the ability for PREPA to achieve fuel cost savings to help it out of its financial morass. NFE claimed to the Securities and Exchange

---

[46] "[T]he implementation of this project will result in the [operational] reconfiguration of the generation assets located in the north and, most likely, the reconfiguration of several other assets throughout the electric system… Without an integrated analysis of these effects, it cannot be concluded that the conversion of San Juan Units 5 and 6 will result in the least-cost option to supply Puerto Rico's long-term energy demand. PREPA's fragmented approach to resource analysis and acquisition is what the public policy of integrated resource planning seeks to avoid." (Dissenting Opinion of Commissioner Angel Rivera, Case No. CEPR-AI-2018-0001, October 4, 2018).

[47] "El ICSE busca revocar contrato para la conversión a gas en la central de San Juan," El Nuevo Dia, February 18, 2019.

[48] According to its Form S-1 filed with the SEC, New Fortress Energy's operating revenues in 2017 were $97 million. Selling 25 million MMBTU per year of natural gas to PREPA at an approximate price of $10 per MMBTU will generate revenues of $250 million per year, resulting in total revenues of nearly $350 million, all else being equal.

[49] https://caribbeanbusiness.com/aes-ready-for-a-more-renewable-future/ ; see Fitch rating http://cbonds.com/news/item/1002009

[50] Mary C. Zapata Acosta, Head of Planning Studies, To: Nitza Vasquez Rodriguez, et. al. August 15, 2018, Subject: PREPA issues order re: PREPA RFP for conversions of San Juan 5-6.

15

Commission (SEC) that it will save $285 million per year.  PREPA has made several lower

projections,[51] the most recent by the Executive Director of $100 million per year.[52] PREPA has

a poor history of identifying initiatives and achieving savings.[53] The presentation of the savings

on this critical budget initiative follows that pattern.[54]

6.        The contract has also been criticized by a commissioner of the Energy Bureau

because it uses PREPA's fuel budget to cover capital expenditures, a practice that is prohibited

by Puerto Rico law.[55] The technical criticism that the contract inappropriately combines a capital

expenditure and a fuel cost in the payment to NFE raises one of the most important internal

control issues facing PREPA going forward. Fuel costs and debt service costs need to be reduced

if PREPA is to regain financial solvency. The payments made under this contract will distort the

itemization and tracking of both costs making it even more difficult to understand if and how

much actual fuel cost savings result from this initiative. And, by including capital expenditure

reimbursement in the fuel cost price, the contract acts as a form of backdoor borrowing by

---

[51] New Fortress Energy, Form S-1, November 9, 2018, p. 5; PREPA, "Motion in compliance with order," Puerto
Rico Energy Bureau Case No. CEPR-AI-2018-0001, August 16, 2018, p. 198; Puerto Rico Energy Bureau,
Resolution and Order. CEPR-AI-2018-0001, January 25, 2019, p.3.
[52] https://naturalresources.house.gov/imo/media/doc/Testimony%20Ortiz%204.96.19.pdf. P. 1.
[53] http://ieefa.org/wp-content/uploads/2018/05/The-Puerto-Rico-Electric-Power-Authoritys-Flawed-Fiscal-
Plan_May-2018.pdf.
[54] We also note that PREPA has failed to provide quarterly budget reports to the Financial Oversight and
Management Board in a timely manner. These quarterly budget reports are supposed to inform the FOMB and
PREPA's various stakeholders of the progress that PREPA is making on its certified fiscal plan and annual budget.
These reports should document the specific goals of individual budget initiatives, tasks and timelines, individual
staff accountability, chain of command, standards for achieving savings or revenue enhancements, corrective actions
identified and taken and new budgetary resources quantified and integrated into actual revenue and expenditure
accounting and budget documents.  These reports are crucial for the early identification of slippage in execution of
the many initiatives that comprise PREPA's road back to sound management and fiscal stability. (See: January 14,
2019 letter from FOMB to Governor Ricardo Rosselló, https://drive.google.com/file/d/1udjNofZUTLdhBlC7VMr-
DmJL_QovaV3m/view). PREPA has recently submitted its first and second quarter reports for FY 2019, but these
are not being made public at this time.  See: email response from Alejandro J. Figueroa-Ramirez, Utility Sector
Transformation Manager, FOMB to Tom Sanzillo, Director Finance, IEEFA, April 15, 2019.
[55] "PREPA intends to treat the CAPEX associated to the conversion of San Juan Units 5 and 6 as a fuel cost … San
Juan Units 5 and 6 CAPEX costs are not directly related to the purchase of fuel. Nor such CAPEX costs are directly
related to the fluctuations due to price changes in fuel and purchased power. Therefore, according to the provisions
of Section 6A of Act 83, and Section 6.25(b)(9) of Act 57-2014, PREPA is precluded from recovering such costs
through the fuel adjustment clause." (Dissenting Opinion of Commissioner Angel Rivera, Case No. CEPR-AI-2018-
0001, January 25, 2019.)

16

PREPA, with no transparency as to the terms of the effective loan that PREPA is obtaining from

NFE. This action hinders PREPA's transparency going forward, a factor that in this case could

mask expenditures that are unaffordable.

7.      There are two contract areas where an IPSIG might help PREPA save money.

8.      First, the contract contains provisions that create risk to PREPA and require extra

diligence by professional (non-political) managers at PREPA. An IPSIG could provide support

to professional managers involved in this process. For example, Article XII of the contract

Natural Gas Manufacturing Surcharge, Section 12.1 states that for the Initial Contract Term (5

years) PREPA shall pay NFE $833,333.33 per month. This is an amortized expense to repay

NFE for the improvements made to the generating station as part of its conversion to natural gas.

The amount may be prepaid and adjustments made to the outstanding balance that could impact

the $833,333.33 monthly payment. The specific clauses cited are: (a) (Clause 12.3) prepayment

right of the Buyer; (b) (Clause 17.4-b) change of control; (c) (Clause 19.5) balance due at

termination based upon conditions of termination. These conditions may occur over the course of

the contract period and the contract process and obligations are outlined.

9.      Another condition that is almost certain to occur and will impact the Natural Gas

Manufacturing Surcharge identified in Article XII is excluded from treatment in this Article of

the contract. Annex A which provides for the Terms and Conditions of the Work related to

natural gas conversion contains a provision (Article 9.1 of Annex A) entitled Changes and or

Extra Work. The provision states that the Buyer "at any time" can request change orders in the

work.

10.     Article 9.2 states: "If Buyer agrees with Seller's statement as to the impact of the

Change Event, the parties shall proceed promptly to enter into a written change order in

connection with such change to equitably adjust Seller's cost (increase or decrease), schedule (lengthen or shorten), or other obligations under this Agreement in connection with such Change Event, ***including by modifying the Natural Gas Manufacturing Surcharge to include allowance for the relevant costs***." (Emphasis added).

11.     This provision of the contract is not cross-referenced in Article XII as a potential trigger for increases in the Natural Gas Manufacturing Surcharge and yet it is the most likely cause of any adjustments to the monthly surcharge. Further Exhibit D, which is untitled and serves as a type of amortization table is identified for Information Purposes Only.

12.     An IPSIG would be useful to oversee the period from contract signing to start of construction to monitor any changes made to the scope of work that would impact the cost of construction or subsequent financing assumptions. During construction, the IPSIG would be useful in overseeing the work of the Operations Committee and Construction Committee identified in Annex D: Operations Committee and Construction Committee including, but not limited to, its composition, changes of staff, attempts at interference and protocols for work quality and invoice approvals.

13.     Second, the issue of the initial deliveries and protocols for acceptance of the quality and quantity of natural gas deliveries requires oversight. With regard to the deliveries of natural gas, the contract specifies that both the buyer and seller shall have metering equipment that tests the quantity being delivered.[56] The contract then requires the Seller on at least a monthly basis to pay for the testing of the equipment and to report any calibration variation of more than 1% to PREPA.[57] PREPA is also to be provided with copies of all readings. On the

---

[56] Article X, Measurement and Testing, Section 10.2 (a-c) Metering Equipment, p. 27.
[57] Article X, Measurement and Testing, Section 10.3(a) Verification, p. 30.

matter of natural gas quality, the contract[58] appears to make the seller responsible for notifying PREPA of any variations in quality.

14.     Given the elaborate nature of the oil procurement scandal (discussed above) and steps taken to manipulate reports and protect the fraudulent processes, PREPA's verification protocols for both the quality and quantity would benefit from oversight.

**XI.     What kind of a tone does PREPA management display when discussing these issues generally?**

1.     The tone of PREPA's top management is one of awareness of the general problem, unaware of any specific problems and skeptical that anything can be done about the problem of political interference. In a hearing held before the House Natural Resources Committee on April 9, 2019, Mr. Jose Ortiz-Vazquez, Executive Director of PREPA, answered in the following manner to inquiries from members of both parties.

> Congressman Kevin Hern (R-Ok) described PREPA as having "consistently misled its clients, operated with minimal transparency and accountability, incurred a $9 billion debt and is riddled by corruption" and asked "to your knowledge, has PREPA done anything over the past several years to enhance their accountability standards, and has PREPA terminated, fired the individuals involved with this corruption?"
> Ortiz: "which corruption?"
> Hern: "Well, misleading debt that one would argue the billions of dollars of debt that's been incurred and still the problems with getting it back online, minimal transparency, accountability … The accusations of corruption. If you deny there's been any, then that would be your opinion."
> Ortiz: "I have not been addressed about any specific corruption in PREPA, particularly."[59]
> Later in the hearing Congresswoman Nydia Velazquez turned back to corruption and mismanagement:

---

[58] Article IV, Quality, 4.2(a)
[59] https://naturalresources.house.gov/hearings/the-status-of-the-rebuilding-and-privatization-of-the-puerto-rico-electric-power-authority-prepa1, (1:28:59-1:30:41)

Velazquez (to Ortiz): You have heard all of the criticism about the political interference in the work of PREPA. What guarantees and assurances can you give us that that type of interference will not happen when important decisions are made?

Ortiz: "That is a big guarantee … What I can tell you - Puerto Rico -and to be honest, I agree with all of these criticisms about PREPA. But second, I have to say that I ran the American Recovery and Reinvestment Act – "

Velazquez: "But yet, excuse me, when you are given the opportunity to involve more than just the political elite class in Puerto Rico, then we hear complaints … saying when the community has been consulted, basically, mechanisms have not been in place for them to be able to provide input that represents the interests of the people of Puerto Rico."

Ortiz: "Right, and there were many processes that were running even before I joined PREPA, which I joined recently. But let me tell you, the people of Puerto Rico do not believe in PREPA."[60]

2.      The acknowledgement of the problems with PREPA and the lack of public trust in the agency, coupled with an apparent lack of understanding of how to address the alleged corruption, points strongly to the need for an IPSIG.


**XII.    What would be the operational basis for IPSIG? Where does the court start?**

1.      In this instance, the IPSIG's creation would be by the order of this court. The general scope of the order is outlined in the UTIER motion.

2.      The court would assist this process by providing the IPSIG with a scope of responsibility that is quite broad initially. The problems at PREPA are pervasive and the need to establish priorities will require sorting through a series of analyses and options that will be initially contradictory and confusing. Upon analysis and consultation with stakeholders, the list of priority areas will become more focused and an orderly review process developed.

---

[60] Ibid. 1:48-:13-1:49:30

**XIII.   Where does the court and the IPSIG start?**

1.      There are a series of past and recent audits, studies and reports that all contain both implicit and explicit recommendations for PREPA's improvement. A review of these reports would be a reasonable place to start in order to draw up a coherent list of options.[61] The sorting process can begin from there. We include as Exhibit A a short list of studies and audits by way of illustration, with a short statement as to their expected relevance.

**XIV.   Please summarize your conclusions.**

1.      Based on my experience overseeing an IPSIG for the New York Racing Association, an IPSIG can produce operational reforms, including procurement and contracting reforms, restructuring of management, and transparent financial reporting. These are exactly the types of reforms that have been needed at PREPA for many years, but which the current political structure appears unable to produce. Without the appointment of an independent monitor, there is no clear path to the lasting operational reforms that are necessary for Puerto Rico's electrical system to become operationally functional and a going concern.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Tom Sanzillo**
**May 2, 2019**

---

[61] See discussion of the Master List in https://getnicklaw.com/wp-content/uploads/2019/04/20050913-NYRA-Monitor-Final-Report-PUBLIC.pdf, p. 137-138.

**Exhibit A: Studies of relevance to an IPSIG**

**Government Oversight and Audit recommendations**

The reports in this section were all drawn up by governmental or quasi-governmental entities charged with oversight of various aspects of PREPA's energy, fiscal and administrative oversight responsibilities. While some of the documents and recommendations have the potential to be enforced in a court, most are management reviews that have only the most perfunctory accountability requirements attached to them.

1. **Puerto Rico Commission for the Comprehensive Audit of the Public Credit**. This Commission was established by gubernatorial executive action and was initially intended as a tool to examine a series of debt related matters. The Commission issued two reports, one related to PREPA.[62] The PREPA report reviews the diligence process undertaken on a controversial bond offering and identifies specific areas where advice from third parties proved inadequate. Governor Rosselló disbanded the Commission.[63]

2. **Puerto Rico Energy Commission**. From 2015 through early 2017, the Commission (now the Puerto Rico Energy Bureau) conducted hearings on three separate aspects of PREPA's operations and finance that would be especially relevant to an IPSIG.[64] This was the first time that PREPA was ever subjected to an external review by a third party charged with the task of establishing professional standards of utility management for the Authority.

3. The Orders in all three cases identified weaknesses in PREPA's energy and financial planning, management, budget and rate processes, fuel cost projections, capital planning and

---

[62] http://sptpr.net/wp-content/uploads/2016/10/Second-Interim-Pre-Audit-Report-on-2013-PREPA-debt-emission-con-anejos.pdf

[63] https://caribbeanbusiness.com/puerto-rico-government-repeals-commission-to-audit-debt/

[64] The Commissions review of PREPA's rates: http://energia.pr.gov/wp-content/uploads/2017/01/Final-Resolution-and-Order.pdf; proposed debt deal and establishment of transition rate charge: http://energia.pr.gov/wp-content/uploads/2016/06/21-junio-2016-Restructuring-Order-English-1.pdf

PREPA's first integrated resource plan: http://energia.pr.gov/wp-content/uploads/2016/09/23-sept-2016-Final-Resolution-and-Order-IRP-CEPR-AP-2015-0002.pdf

management, contracting, contract monitoring and cost controls. The Orders contain a series of corrective actions expected by the Commission and offer topics and commentary on future areas of review.

4. **Audits on Oil Procurement and Deliveries.** The Puerto Rico Comptroller[65] uncovered several major problems with the oil scandal many years before it received the attention of Puerto Rico's Senate. That audit detailed some of the problem and offered a series of recommendations. An IPSIG team should familiarize themselves with the findings and recommendations to assess which ones may still be relevant.

5. **Puerto Rico Energy Resiliency Working Group.**[66] This group, convened by Governor Cuomo of New York, consisted of a team of energy experts from the public and private sector. The report was written shortly after the hurricanes and contained extensive commentary on storm damage and initial priority areas. The paper also contained many important long-term recommendations

6. **Financial Oversight and Management Board (FOMB), "Kobre & Kim Final Investigative Report".**[67] This report, commissioned by the FOMB, reviewed the question of how the Commonwealth, including PREPA, got to the point of bankruptcy. This is principally a management document with significant legal and financial implications. It identifies the extent of PREPA's reliance on political appointees and explains some of the pressures on the agency that led to its high level of indebtedness. The report also contains a lengthy discussion of the poor diligence received by Commonwealth's debt issuers.

---

[65] https://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=96c74a8e-58e9-4073-a0a3-94dc6f83171a&nombre=CP-02-26
[66] https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/PRERWG_Report_PR_Grid_Resiliency_Report.pdf
[67] http://creditorspr.com/wp-content/uploads/2018/02/FOMB-Final-Investigative-Report-Kobre-Kim-20180820.pdf

7. **United States Government Accountability Office (GAO).** The GAO has responded to three recent Congressional requests[68] related to Puerto Rico. Most recently the GAO issued a report on the status of FEMA and other disaster relief federal funds and set out a framework for more effective relations between Puerto Rico and various federal funding sources. The other two audits on debt and economic data provide background information and analysis, but the recommendations are aimed at federal changes at the American Community Survey, Labor Department, and Securities Exchange Commission and potential legislative issues related to Puerto Rico's tax exempt status.

8. **U.S. Department of Energy (DOE)**. DOE released a report entitled "Energy Resilience Solutions for the Puerto Rico Grid" in July 2018. The report included a detailed list of resiliency-related recommendations in the areas of "transmission and distribution", "generation", "microgrids", and "system operations, management and planning."

9. **Puerto Rico Senate**. The Puerto Rico Senate's final report on its investigation into PREPA's fuel oil scandal was issued in 2016. It contains a set of recommendations related to internal restructuring of PREPA's fuel office, fuel testing protocols, possible courses of legal action and more.

10. **Unreleased audits.** The Department of Homeland Security Inspector General has an outstanding audit of the Whitefish contract, as does the Puerto Rico Comptroller.[69] These oversight reports, started in the aftermath of the hurricanes (October 2017), should be released immediately.

---

[68] Those reports: status of FEMA funds: https://www.gao.gov/assets/700/697528.pdf; origins of debt crisis: https://www.gao.gov/assets/700/691675.pdf and economic data in Puerto Rico https://www.gao.gov/assets/700/692908.pdf

[69] See: https://www.oig.dhs.gov/reports/ongoing-projects.  Audit of FEMA's Public Assistance Grant Awards to Puerto Rico Electric Power Authority (PREPA) and https://www.fortaleza.pr.gov/content/government-puerto-rico-refers-whitefish-contract-audit-office-comptroller

**External Third Party Letters, Reviews and Reports**

A number of Puerto Rico and mainland based organizations have devoted time and resources to offer blueprints for Puerto Rico's energy and economic future. Many of them are targeted at achieving the complicated task of rebuilding Puerto Rico's energy grid so that it is affordable, resilient, reliable, and economically and environmentally sustainable.

1. **Queremos Sol:** A consortium of principally on-island non-profit community and environmental organizations, academic institutions and labor groups produced Queremos Sol.[70] The paper focuses on a series of recommendations for PREPA's energy future, governance, financing and regulation. It focuses heavily on the importance of local economic development and the use of Puerto Rico's indigenous labor organizations and workforce. IEEFA played a substantial role in the production of this report.

2. **Center for New Economy (CNE):** CNE is an on-island think tank and has been a leader in establishing the need for a strong regulator of Puerto Rico's energy system. They have also recently focused on the need to develop Puerto Rico's local economy as part of PREPA's rebuilding effort. [71]

3. **Rocky Mountain Institute (RMI)**: RMI is a mainland based organization. It partnered with the Puerto Rico based Institute for Competitive and Sustainable Economics (ICSE) to produce a document[72] that reflected a cross section of opinion on Puerto Rico's energy future.

4. **Rockefeller Commission**: The Rockefeller Foundation and several other foundations sponsored a planning effort in the wake of the hurricanes. The effort produced a series of

---

[70] https://www.queremossolpr.com/project-4
[71] http://grupocne.org/2018/09/26/transforming-the-recovery-into-locally-led-growth-federal-contracting-in-the-post-disaster-period/
[72] https://rmi.org/insight/public-collaborative-for-puerto-ricos-energy-future/

monographs, including one on energy[73] that contains an outline of the issues and a focus on a new strategy for Puerto Rico.

5. **IEEFA Studies** – The Institute for Energy Economics and Financial Analysis (IEEFA), where I am the Director of Finance, has offered a series of recommendations on PREPA. The most recent studies and reports that bear most directly on the IPSIG's work relate to privatization,[74] fuel procurement reform,[75] and energy policy (see: Queremos Sol above).

6. **Cambio IEEFA letters on PREPA Transparency:** IEEFA and Cambio (a Puerto Rico-based organization) have sent letters to PREPA seeking information, under Puerto Rico access to information law, regarding the electrical system privatization. The letters have been ignored.

---

[73] https://www.resilientpuertorico.org/wp-content/uploads/2018/10/RePR_ENERGY_ENG_WEB_09212018.pdf
[74] http://ieefa.org/wp-content/uploads/2019/01/PREPA-Privatization-Will-Hurt-Consumers-and-Slow-Economic-Recovery_January-2019.pdf
[75] http://ieefa.org/wp-content/uploads/2018/07/Multibillion-Dollar-Oil-Scandal-Goes-Unaddressed-in-PREPA-Contract-Reform-and-Privatization-_July-2018.pd