# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of,<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OBJECTION AND RESERVATION OF RIGHTS OF ASSURED GUARANTY CORP.
ASSURED GUARANTY MUNICIPAL CORP., FINANCIAL GUARANTY INSURANCE
COMPANY, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND
AMBAC ASSURANCE CORPORATION TO THE URGENT JOINT MOTION FOR
<u>ENTRY OF ORDER APPROVING STIPULATION AND AGREED ORDER</u>**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ...........................................................................................................................4

OBJECTION....................................................................................................................................6

     I.     Section 926(a) Does Not Authorize Appointment Of A Trustee Here ...................6

          A.     There is No "Request by a Creditor" of HTA..............................................7

          B.     The Debtor Has *Consented* to Such Avoidance Actions, Not
              Refused Them. .........................................................................................12

          C.     The Motion Does Not Adequately Describe Whether the Actions
              Are Actually Avoidance Actions ..............................................................15

     II.     *Commodore* And Consensual Derivative Standing Do Not Provide a Basis
           For This Stipulation ..............................................................................................17

     III.     The Committee Is Conflicted and Should Not Be Named As Trustee In
           HTA's Case..........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>CASES:</u>

*Aurelius Investment LLC v. Commonwealth of Puerto Rico*,
915 F.3d 838 (1st Cir. 2019) ....................................................................3, 5, 23, 26

*In re Bohack Corp.*,
292 B.R. 748 (Bankr. S.D.N.Y. 2003) ..................................................................24

*Campaign for S. Equal v. Bryant*,
197 F. Supp. 3d 905 (S.D. Miss. 2016) ................................................................22

*Connecticut Nat. Bank v. Germain*,
503 U.S. 249 (1992) ........................................................................................8, 17

*In re Baltimore Emergency Servs. II*,
432 F.3d 557 (4th Cir. 2005) ................................................................................18

*In re Baylis*,
313 F.3d 9 (1st Cir. 2002) ......................................................................................9

*In re BH & P Inc.*,
103 B.R. 556 (Bankr. D. N.J. 1989) .....................................................................25

*In re Chateaugay Corp.*,
120 B.R. 707 (Bankr. S.D.N.Y. 1990) ..................................................................25

*In re Commodore Intern. Ltd.*,
262 F.3d 96 (2d Cir. 2001) ........................................................................17, 19, 20

*In re Conde Vidal*,
818 F.3d 765 (1st Cir. 2016) .................................................................................22

*In re Fas Mart Convenience Stores, Inc.*,
265 B.R. 427 (Bankr. E.D. Va. 2001) ...................................................................30

*In re Financial Oversight & Mgmt Bd*,
583 B.R. 626 (D.P.R. Nov. 16, 2017) .................................................................6,19

## TABLE OF AUTHORITIES (cont'd)

PAGE(S)

*In re Fox,*
305 B.R. 912 (10th Cir. B.A.P. 2004) ...................................................18

*In re Garden Ridge Corp.,*
WL 423129 (Bankr. D. Del. March 2, 2005) ...........................................23

*In re Glendale Woods Apartments,*
25 B.R. 414 (Bankr. D. Md. 1982) ........................................................30

*In re Hill*
562 F.3d 29 (1st Cir. 2009) ...................................................................8

*In re Johns-Manville Corp.,*
26 B.R. 919 (Bankr. S.D.N.Y. 1983) .....................................................23

*In re Lyondell Chemical Co.,*
585 B.R. 41 (S.D.N.Y. 2018) ................................................................21

*In re Martin*
817 F.2d 175 (1st Cir. 1987) .................................................................25

*In re Parkway Calabasas Ltd,*
89 B.R. 832 (Bankr. C.D. Cal. 1988) .....................................................25

*In re SPM MFG. Corp.,*
984 F.2d 1305 (1st Cir. 1993) ...............................................................23

*In re Yasin,*
179 B.R. 43 (Bankr. S.D.N.Y. 1995) .....................................................15

*Law v. Siegel,*
571 U.S. 415 (2014) ............................................................................18

*Matter of North and South Shenango Joint Mun. Auth.,*
14 B.R. 414 (Bankr. W.D. Pa. 1981),
rev'd on other grounds 80 B.R. 57 (W.D. Pa. 1982) .............................14

*Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron
Corp.,*
2003 LEXIS 18149 (S.D.N.Y. Oct. 9, 2003) .........................................17

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) ...........................................................................................22

*Official Com. Ex. Rel. Cybergenics v. Chinery,*
    330 F.3d 548  (3d Cir. 2003) ...................................................................................18

*Perez  Santana v. Holder,*
    731 F.3d 50 (1st Cir. 2013) ......................................................................................8

*Puerto Rico v. Franklin California Tax-Free,*
    136 S Ct. 1938 (2016) .............................................................................................17

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) .................................................................................................9

*Surf N Sun Apts. v. Dempsey,*
    253 B.R. 490 (M.D. Fla. 1999) ..............................................................................17

*United States v. Johnson,*
    529 U.S. 53 (2000) ...................................................................................................8

*United States v. Zannino,*
    895 F.2d 1 (1st Cir. 1990) .......................................................................................11

*Vaqueria Tres Monjitas, Inc. v. Laboy,*
    2007 WL 9717626 (D.P.R. Aug. 2, 2007) .....................................................21, 22

*In re White Motor Credit Corp.,*
    18 B.R. 720 (Bankr. N.D. Ohio 1980) ...................................................................24

*Williams v. Taylor*
    529 U.S. 362 (2000) .................................................................................................9

*Woods v. City National Bank & Trust Co,*
    312 U.S. 262 (1941) ...............................................................................................24

## STATUTES:

11 U.S.C.:

    § 101(7) ...................................................................................................................10

§ 101(10) ................................................................................................................9
§ 901(a) ...............................................................................................................10
§ 926(a) .....................................................................................................6, 7, 12
§ 1104(a) ...............................................................................................................8
§ 1109(b) ...............................................................................................................8


Fed. R. Bankr. P. 9014. ..........................................................................................7

Fed. R. Civ. P. 2019(e) .........................................................................................31

PROMESA § 304(f)) ..............................................................................................27


## OTHER AUTHORITIES:

6 Collier on Bankr. ¶ 926.02 (16th ed. 2019) .........................................................7

S. Rep. 95-989, Bankruptcy Reform Act of 1978 ..............................................12, 13

Black's Law Dictionary, Definition of "Refusal" (10th ed. 2014) ............................12

Merriam-Webster, Definition of "Refuse." .............................................................12

David S. Kupetz, *Municipal Debt Adjustment Under the Bankruptcy Code*,
27 Urb. Law. 531, 571 (1995) ............................................................................15

Assured Guaranty Corp., Assured Guaranty Municipal Corp., the Financial Guaranty Insurance Company, National Public Finance Guarantee Corporation, and Ambac Assurance Corporation (collectively, the "Objectors") hereby submit this objection and reservation of rights to the *Urgent Joint Motion for Entry of Order Approving Stipulation and Agreed Order* (Dkt. No. 6867) (the "Motion").  In support hereof, the Objectors respectfully state as follows:

## INTRODUCTION

These Title III cases are now over two years old, and the pending expiration of the statute of limitations for avoidance actions comes as no surprise – it has been long known by anyone in this case.  In other Title III cases, such as in PREPA, the debtors and creditors worked collaboratively to toll certain statutes of limitation under section 546 of the Bankruptcy Code.  In HTA, the Committee and FOMB have unfortunately chosen a very different path.  Even though the Committee knew it would face vociferous objections to its appointment as trustee for HTA, FOMB and the Committee chose to file an "urgent" motion, seeking to appoint the Committee and certain FOMB members as "co-trustees" to pursue unspecified actions that belong to HTA.  They ask to do this, despite the absence of lawful authority supporting any such appointment and the existence of clear conflicts that should prevent such appointment in that both entities have previously taken positions adverse to HTA itself and to the class of HTA creditors that they claim to represent.  The Motion must be denied.

First, there is no legal basis for the grant of consensual derivative standing pursuant to section 926(a) of the Bankruptcy Code, nor can section 926 be used to cure FOMB's present infirmities under the Appointments Clause.  By its plain terms, section 926(a)—which is the only provision in chapter 9 or Title III that authorizes this Court to grant derivative standing—is inapplicable.  The movants have failed to proffer any evidence of a refusal by FOMB to pursue

causes of action belonging to HTA, or that any creditor of HTA is a movant here.  Indeed, the

proposed stipulation reflects FOMB's intent to pursue certain causes of action belonging to HTA.

Nor does the Motion describe the causes of action subject to the stipulation, which is required to

demonstrate the purported benefit that these causes of action would provide to the estate.

Therefore, this Court is without legal authority to appoint a trustee under section 926(a), because

the plain language requirements are not satisfied.

Second, because section 926(a) very clearly does not apply here and it is the only

provision that authorizes derivative standing in municipal bankruptcy cases, this Court has no

statutory or legal authority to grant derivative standing to the Committee, let alone to appoint it as

"trustee."  Nothing in PROMESA or the Bankruptcy Code provides for such derivative standing.

Indeed, even AAFAF agrees with this point, as demonstrated in its brief in opposition to the

Committee's prior request for derivative standing in connection with the GDB restructuring.  *See*

Dkt. No. 3961¶ 19, n. 18, ¶¶ 23-25.  And as this Court has recognized, PROMESA section 305

does not confer any substantive rights on the FOMB.  Because there is no statutory basis for the

relief sought herein, the Motion should be denied.

Even if this Court had the power to grant derivative standing (and it does not), the

Motion fails even to meet the tests articulated in the cases cited in the proposed Stipulation

concerning the grant of derivative standing.  Even assuming that FOMB has consented to the

Committee's standing, the Stipulation is not in the best interests of the estate, nor will it result in

a fair and efficient resolution of these Title III cases.  The only basis that the movants offer this

Court for the approval of this motion is that it will purportedly serve as "insurance" for what the

movants call the "Aurelius problem."  As an initial mater, even if that argument had merit in the

context of the equivalent stipulation concerning claims belonging to the Commonwealth (at a time

when expiration of the First Circuit's stay of the mandate was weeks away), the situation is

fundamentally different here because the First Circuit extended the stay of the mandate to July 15, noting that President Trump had announced his intent to nominate the current members to serve out their current terms.   In any event, proposing an end-run around a serious constitutional infirmity by creating another infirm structure will not solve anything.  It will just result in appeals of any order granting this Motion, which will result in a cloud of uncertainty that will hang over every single action that the FOMB and Committee purport to commence pursuant to that order. The Objectors understand that this Court is concerned about the statute of limitations.  But nothing has stopped and is stopping the FOMB from timely filing its complaints or entering into tolling arrangements.  This Court should not "be induced to engage in an ultra vires act merely by siren songs."  *Aurelius Investment LLC v. Commonwealth of Puerto Rico*, 915 F.3d 838, 855 (1st Cir. 2019).

Finally, and most importantly, the Committee and the members of FOMB are conflicted and therefore unfit to serve as trustees for HTA.  Over the past two years, FOMB and the Committee have actively supported the raiding of HTA's property, which FOMB's own fiscal plans show has caused enormous financial harm to HTA.  The Committee's support for this conduct is unsurprising, given that its Rule 2019 statements demonstrate that the Committee is dominated by Commonwealth creditors—including trade creditors and vendors—who since the bar date have seen their claims paid down by anywhere from 32 to 51 percent, possibly including from funds taken from HTA.  This concern was entirely absent from the stipulation concerning Commonwealth causes of action in light of the fact that the Committee has at all times during these Title III cases served the interests of Commonwealth creditors, not creditors of HTA and other Title III debtors the Committee purports to represent.  The Committee's past conduct cannot be ignored in evaluating the appointment requested.

## BACKGROUND

On May 21, 2017, the Financial Oversight and Management Board ("FOMB") filed petitions on behalf of HTA and ERS pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").

The Official Committee of Unsecured Creditors (the "Committee" or "UCC") was appointed by the United States Trustee on June 15, 2017.  Dkt. No. 338.  When it was first created, the Committee was appointed to represent the Commonwealth's unsecured creditors, but not those of other Title Debtors, such as HTA, ERS, or PREPA.  In August 2017, the U.S. Trustee purported to file notices indicating that the Committee would also represent unsecured creditors of HTA, PREPA, and ERS, and purportedly appointing additional Committee members to serve on that basis.  Notwithstanding that notice, the Committee is dominated by entities purporting to hold claims against the Commonwealth, not other Title III Debtors.  For example, there are no ERS creditors serving on the Committee.

As it relates to HTA, the deficient Rule 2019 statements filed to date by the Committee indicate that only one member, Genesis Security Services Inc. ("Genesis"), asserts putative claims against HTA, and Genesis also purports to hold claims against other Debtors, including the Commonwealth and PREPA.  *See* Dkt. No. 6874. Since its appointment to the Committee, however, Genesis's claims against these other Title III Debtors have been paid down considerably. *Compare*  Dkt. No. 1050 *with* 6874.  Genesis's remaining alleged claims are almost entirely against the Commonwealth.  Dkt. No. 6874.  The Committee has no pure HTA creditors (Dkt. No. 6874), and given the composition of the Committee, the Commonwealth members will

always outvote the lone HTA member, which is itself more a Commonwealth creditor than an

HTA creditor.[2]

On April 16, 2019, the Committee and FOMB filed an urgent motion seeking

approval of a stipulation between FOMB and the Committee, which purported to authorize the

Committee to act as co-plaintiff and co-trustee to pursue certain causes of action belonging to the

Commonwealth (including as amended, the "Commonwealth Stipulation").

On April 26, 2019, this Court entered an order approving an amended version of

the Commonwealth Stipulation.  The Court offered the following principal reason for approving

the Commonwealth Stipulation:

> [I]n light of the decision of the First Circuit in *Aurelius v.
> Commonwealth of Puerto Rico,* 915 F.3d 838 (1st Cir. 2019), the
> method and appointment of the current Oversight Board has been
> determined to be unconstitutional, and the 90-day stay period
> provided in that decision will expire on May 16 of 2019.
> Accordingly, the Committee and the Oversight Board are faced with
> a situation where even if the Oversight Board were to commence
> these actions prior to May 2nd, its authority to continue to prosecute
> the actions may expire or be interrupted soon thereafter, presenting
> a risk of detriment to the rights asserted in pending litigation by
> reason of the Oversight Board's inability to act on behalf of the
> Commonwealth.
>
> [T]hese unique circumstances present a situation where the
> Oversight Board has decided to share its responsibility to prosecute
> certain claims, and it has, therefore, effectively refused to pursue the
> causes of action to the extent that it has sought, by means of the
> motion, to have the Committee share responsibility for prosecution
> of the causes of action. That refusal is a necessary and beneficial
> refusal in light of the Statutes of Limitations **and the potential
> practical consequences of the end of the 90-day stay of the
> Aurelius decision provided by the First Circuit**.

---

[2] Indeed, given that Genesis's claims have apparently been satisfied at least in part in the course of these
Title III cases, it is unclear whether Genesis continues to hold any valid HTA claims or how much longer
it will continue to do so.

Transcript of Hearing, Apr. 24, 2019 at p. 235-37 (emphasis added). Put simply, as articulated by this Court, the circumstances that purportedly justified the Commonwealth Stipulation was expiration of the stay of the First Circuit's mandate in the appointments clause appeals.

Since this Court approved the Commonwealth Stipulation, two important developments have occurred that have eliminated the primary basis for this Court's approval of the Commonwealth Stipulation. First, on April 29, 2019, the White House announced President Trump's intention to nominate "the current seven members of [FOMB] to fill out the remainder of the three year terms to which they were initially appointed in 2016." *See* Dkt. No. 6695 (FOMB Motion to Inform), Ex. A. Second, on May 6, 2019, the First Circuit granted, in part, FOMB's request for an extension of the period for the First Circuit to withhold its mandate. *See* Ex. C (Copy of First Circuit Order). Recognizing that the White House had recently announced its intent to nominate the current FOMB members to serve out the remainder of their current terms, the First Circuit extended the stay of its mandate by 60 days to July 15, 2019. *Id.*

## OBJECTION[3]

### I.     Section 926(a) Does Not Authorize Appointment Of A Trustee Here

1.     The Motion seeks relief that is without statutory basis and therefore cannot be granted. As this Court itself recognized in connection with FOMB's motion to appoint a chief transformation officer for PREPA, relief cannot be granted when there is no statutory authority for the relief sought. *See In re Financial Oversight & Mgmt Bd*, 583 B.R. 626, 636 (D.P.R. Nov. 16,

---

[3] For the avoidance of doubt, the Objectors object (i) to the appointment of individual members of FOMB's Special Claims Committee as trustees under section 926, and (ii) to any other purported grant of derivative standing to these individuals, to the same extent, and for the same reasons, as the Objectors object to the appointment of and/or grant of derivative standing to the Committee. For example, no creditor has moved for the appointment of these individuals, no basis exists to grant derivative standing where the requirements of section 926 have not been satisfied (as they have not with respect to these individuals), the requirements for purported derivative standing have not been satisfied with respect to these individuals, and these individuals are conflicted, because they have played a role in FOMB's raiding of HTA's revenues for the benefit of the Commonwealth.

2017) (denying motion of FOMB to appoint chief transformation officer because the Court found "no express provision within PROMESA and its incorporated Bankruptcy Code provisions" that authorized the appointment of such officer).[4]

2.      Section 926(a) of the Bankruptcy Code provides:

> If a debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a) or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action.

11 U.S.C § 926(a).  By its plain terms, there are three conditions to section 926 that must be satisfied (i) the debtor must refuse to pursue certain causes of action, (ii) the request for a trustee must be made by a creditor, and (iii) the trustee may only pursue avoidance causes of action (i.e. those arising under sections 544, 545, 547, 548, 549(a), or 550).  Based on the record before this Court, not one of these conditions is satisfied here and therefore this Court is without authority to appoint any "trustee."

## A.      There is No "Request by a Creditor" of HTA

3.      By its plain terms, section 926(a) only permits *creditors* to petition the court for the appointment of a trustee.  11 U.S.C. § 926(a) ("If the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then **on request of a creditor**, the court may appoint a trustee to pursue such cause of action.") (emphasis added). Because section 926 applies only to non-consensual derivative standing (and, as this Court has found, constitutes the only basis for derivative standing),[5] a "request" for a trustee must be brought by a creditor

---

[4] This Court also found when it denied the FOMB's motion to appoint a chief transformation officer that not only did PROMESA not give FOMB authority to exercise the authority of a chief executive officer of the debtor, it also did not grant FOMB the power to "delegate that authority to an agent of FOMB."  *Id.* That principle applies equally here.

[5] *See* Tr. of Hearing, Apr. 24, 2019, at 159:18-21 ("the Court finds that Section 926 is the only mechanism that allows the Court to grant a third party standing to bring a cause of action on behalf of a Title III debtor").

through a motion, because it is a contested matter. Fed. R. Bankr. P. 9014. This is underscored in *Collier on Bankruptcy* (a treatise on which this Court has frequently relied): "The appointment may not be made by the court *sua sponte*, but requires ***a request by a creditor. Such a request must be made by motion***." 6 Collier on Bankr. ¶ 926.02 (16th ed. 2019) (emphasis added); *see also* Fed. R. Bankr. P. 9014. Here, there is no motion by any creditor.

4.    The Motion presents no evidence that any HTA creditors have requested that HTA pursue any particular causes of action specified in section 926, nor is there any evidence that an HTA creditor is a movant here. The Motion currently before the Court was filed by the FOMB and the Committee and no HTA creditor is a movant. The Committee is merely a party in interest.

5.    If Section 926(a) were meant to apply to committees, it would have said so or specifically allowed a "party in interest" to pursue avoidance actions. *Compare* 11 U.S.C. § 1104(a) ("At any time after the commencement of the case but before confirmation of a plan, **on request of a party in interest** or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee[.]") (emphasis added). However, here because the Committee is a party in interest but not a creditor, it lacks standing to seek appointment of a trustee in a chapter 9 case (or a case under PROMESA). *See United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."); *Perez Santana v. Holder*, 731 F.3d 50, 56 (1st Cir. 2013) (refusing to imply additional exception to statute as "[t]he absence of such a limitation, despite the explicit enumeration of others, serves as a strong indication that Congress imposed the restrictions that it deemed important and declined to impose others."); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have

stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (citations omitted).

6.     The Motion impermissibly seeks to blur any distinction between a creditors' committee and a creditor.  *Cf. In re Hill*, 562 F.3d 29, 33 (1st Cir. 2009) ("'Trustee' and 'creditor' are separate nouns, with distinct meanings, and the Bankruptcy Code does not treat them as synonyms."). The Bankruptcy Code recognizes that important distinction.     *See* 11 U.S.C. § 1109(b) ("A party in interest, including the debtor, the trustee, **a creditors' committee**, an equity security holders' committee, **a creditor**, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.") (emphasis added). If Congress had intended for the Committee to be subsumed within the definition of creditor, it would not have included "creditors' committee" as an additional term in section 1109 of the Bankruptcy Code.  *See In re Baylis*, 313 F.3d 9, 20 (1st Cir. 2002) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979)); *see also Williams v. Taylor*, 529 U.S. 362, 364 (2000) (noting that it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute[.]").

7.     Moreover, the Bankruptcy Code's definition of "creditor" does not include a creditors' committee.  Instead, the Bankruptcy Code defines a "creditor" to include an "(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor; (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of [the Bankruptcy Code]; or (C) entity that has a community claim." 11 U.S.C. § 101(10).

8.     First, the Committee cannot be said to have a "claim against the debtor that arose at the time of or before the order for relief concerning the debtor" because the Committee

did not exist on the Petition Date and indeed was appointed by the United States Trustee after the

Title III petition was filed.  *See* Dkt. No. 338 (notice appointing the Committee dated June 15,

2017).  Second, the Committee does not hold a claim against the Commonwealth under

Bankruptcy Code sections 348(d) (addressing post-petition, pre-conversion claims other than

administrative expense claims under Bankruptcy Code section 503(b)), 502(f) (addressing certain

claims arising in an involuntary case), 502(g) (addressing rejection damages claims and certain

claims arising from swap agreements, securities contracts, etc.), 502(h) (addressing claims arising

from the recovery of property relating to exemptions, avoided transfers, or setoff), or 502(i)

(addressing certain post-petition tax claims).  Finally, the Committee does not have a community

claim, which is defined in the Bankruptcy Code as a claim "that arose before the commencement

of the case concerning the debtor for which property of the kind specified in section 541(a)(2) of

this title is liable, whether or not there is any such property at the time of the commencement of

the case." 11 U.S.C. § 101(7).  Section 541 is not incorporated into PROMESA or into chapter 9,

and thus there can be no "community claim." *See* 11 U.S.C. § 901(a).  Accordingly, the Committee

is not a creditor and therefore lacks standing to seek appointment of a trustee under section 926 of

the Bankruptcy Code.[6]

9.     While this Court observed at the April 24 omnibus hearing that the

Commonwealth Committee members would make a request for the debtor to pursue actions

specified in section 926, no such evidence is presented here that any HTA creditors have done the

same.[7]  The Motion presents no evidence regarding whether Committee members voted in favor

---

[6] Underscoring that the Committee is not a "creditor," it has not filed any proofs of claim in this Title III
case.  *See* Prime Clerk, https://cases.primeclerk.com/puertorico/Home-ClaimInfo.  As even this Court
recognized,  "the Committee itself is not a creditor." *See* Tr. of Hearing 4.24.19 at 236:15-16.

[7] The Objectors dispute that any such requests were in fact made.  The Objectors note that the
Commonwealth Committee members did not, in fact, make any request by motion for the pursuit of
avoidance actions or for appointment of a trustee pursuant to section 926, and that the Committee never

of the Committee's entry into the Stipulation (which would itself be inadequate to satisfy the

requirement, under section 926(a), that a creditor, rather than the Committee as such, bring the

Motion), and if so, which specific members voted in favor of the Stipulation. The identity of these

members is important because, as its most recent (and defective) Rule 2019 statement

demonstrates,[8] the Committee is entirely dominated by putative creditors of the Commonwealth,

not HTA or ERS. And whatever asserted claims certain members may have against Title III

Debtors other than the Commonwealth have diminished rapidly. If the Commonwealth members

voted in favor of the Stipulation, that would not even come close to qualifying as a request by a

creditor of HTA, which is unambiguously required for section 926 to apply. On that basis alone,

the Motion fails because it presents no evidence of any request by an HTA creditor.

10.     It is truly remarkable that the Committee has not proffered evidence on, or

even addressed this point, in its Motion. The Committee was well aware that this was a key defect

with respect to the motion for approval of the Commonwealth Stipulation, which was heard only

two weeks ago. This is not a "new" argument being raised by the Objectors in response to the

Motion. The Committee had ample notice of these arguments. One would think that in light of

its awareness of these issues, the Committee would have presented such evidence up front in its

---

presented any such evidence in connection with the Commonwealth Stipulation. Instead, certain members of the Committee joined Dkt. No. 5997, which was a *procedural* motion that did not even seek the appointment of a section 926 trustee. *See* Dkt. No. 6443. As that procedural motion noted, "this Motion is only procedural in nature and does not affect the rights of the Oversight Board to object ***to an eventual Section 926 Motion on any basis.***" Dkt. No. 5997 ¶ 7 (emphasis added). None of the Committee's Commonwealth members actually filed a motion seeking appointment of a trustee, nor did they join in the Commonwealth Stipulation or the motion seeking approval of the Commonwealth Stipulation.

[8] For reasons that are unknown, the Committee's most recent supplemental verified 2019 statement still fails to list the "nature and amount" of *each* of its members' disclosable economic interests, as required under Bankruptcy Rule 2019(c). Because the Committee's statements are *still* defective (even after Assured pointed out to the Committee the specific defects), the Objectors reserve the right to file a motion to challenge the Committee's ability to take any positions herein, to compel the Committee's compliance with Rule 2019 and to amend the case management procedures order so that the Committee has proper guidance about its continuing disclosure obligations in these Title III cases.

Motion. Instead, the Motion offers not one argument or statement that any HTA creditor requested that FOMB pursue the actions specified in section 926(a). As the First Circuit has stated, cursory arguments are waived because "a litigant has an obligation 'to spell out its arguments squarely and distinctly or else forever hold its peace.'" *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).

11.    Because there is no "request by a creditor" of HTA, and there is no motion by an HTA creditor, the Motion must be denied on that basis alone. Further, the Committee has no standing to bring a section 926 motion. Only creditors of HTA would be entitled to bring a section 926 motion with respect to claims belonging to HTA.

### B.    The Debtor Has *Consented* to Such Avoidance Actions, Not Refused Them.

12.    Section 926(a) is also only applicable "[i]f the debtor <u>refuses to pursue</u> a cause of action under section 544, 545, 547, 548, 549(a) or 550 of" the Bankruptcy Code. 11 U.S.C. §926(a)(emphasis added). The Senate Report to the 1978 amendments underscored that section 926(a) of the Bankruptcy Code would only apply where the debtor had actually refused to pursue particular actions:

> This section adopts current section 85(h) which provides for a trustee to be appointed for the purpose of pursuing an action under an avoiding power, **if the debtor refuses to do so.** This section is necessary because a municipality might, by reason of political pressure or desire for future good relations with a particular creditor or class of creditors, make payments to such creditors in the days preceding the petition to the detriment of all other creditors. No change in the elected officials of such city would automatically occur upon filing of the petition, and it might be very awkward for those same officials to turn around and demand the return of payments following the filing of the petition. *Hence, the need for a trustee for such purpose.*

S. Rep. 95-989, Bankruptcy Reform Act of 1978, at 111 (emphasis added).

13.    Nothing in section 926 suggests that it could apply to a consensual delegation of standing by the debtor to a committee or other entity (such as the members of the

Special Claims Committee), especially where no actual creditor moves for such appointment.

Section 926(a) uses the word "refuses", which absent a specific statutory definition must be

interpreted in accordance with the word's common, ordinary meaning.   Towards that end, Black's

Law Dictionary defines "refusal" as "the denial or rejection of something offered or demanded."

Black's Law Dictionary, Definition of "Refusal" (10th ed. 2014).   Likewise, Merriam Webster

defines "refuse" as "to express oneself as unwilling to accept," "to show or express unwillingness

to do or comply with," or to "not allow someone to have or do something."  *See* Merriam-Webster,

Definition of "Refuse."   None of these definitions mentions consensual delegation; indeed, these

definitions show that consent is the *opposite* of refusal.   The example provided within the Senate

Report for the 1978 amendments buttresses this common understanding of the term "refuse."   In

the context of section 926, Congress made clear that such refusal would entail the municipality

declining to take action for political or other improper reasons.   S. Rep. 95-989, Bankruptcy

Reform Act of 1978, at 111.   There has been no such refusal to take action here.

   14. By contrast, there was in fact a refusal by FOMB to pursue particular causes

of action in connection with the Committee's section 926 motion with respect to the

Commonwealth Stipulation.   This was underscored in the original version of the Commonwealth

Stipulation, which stated:

> During the meet and confer process with respect to the joint prosecution of claims and causes of action of the Commonwealth and the allocation of litigation responsibilities, the Committee requested that the Oversight Board pursue Commonwealth claims or causes of action (the "Additional Claims"), in addition to those to be asserted by the Oversight Board or the Special Claims Committee, related to or with respect to the offerings of the Commonwealth's GO bonds, PBA bonds, and ERS bonds against the Financial Party Targets, including on theories of fraudulent transfer, fraud, breach of fiduciary duty, and/or deepening insolvency. ***The Special Claims Committee declined to assert the Additional Claims.***

*See* Dkt. No. 6305-1 ¶ 18 (emphasis added).  In accordance with that paragraph of the Stipulation, the Committee then filed a motion pursuant to section 926 seeking to pursue such claims.  Section 926 applied there because FOMB had plainly refused to pursue certain causes of action, although the Committee lacked standing to bring the motion and the claims subject to that motion were not exclusively avoidance actions.  This Court properly denied that motion.

15.     The fact that the current proposed Stipulation contemplates appointment of the FOMB members and the Committee *as co-trustees* demonstrates that no such refusal has occurred here.  It instead demonstrates a *willingness* by FOMB to pursue those causes of action, and indeed, the movants openly admit that the Stipulation is intended to serve as an "insurance policy" against certain constitutional infirmities that exist in this case with respect to FOMB.  The Motion presents no evidence that the FOMB considered and refused to pursue any of the avoidance actions specified within section 926(a).  In fact, the Motion does not identify the actions subject to the Stipulation at all, and the movants admit that they are still preparing the schedules and do not even know what the causes of action are.  Motion ¶ 10.  The Motion and Stipulation in fact reflect FOMB's *desire to pursue these actions*.

16.     The movants point to certain statements made by this Court to the effect that the FOMB "effectively refused" to pursue certain causes of action because it consensually delegated such actions to the Committee and to certain of members of the FOMB.  *See* Motion ¶ 10 (citing 4.24 Transcript at 236:21-237:5).  However, the plain text of section 926 does not say anything about "effective" refusal, and nor did its legislative history.  More importantly, as a matter of common sense, there is nothing in the record before this Court that indicates that the FOMB would actually refuse to pursue any actions on or before May 20, 2019.  The evidence then and the evidence now is that the FOMB desires and intends to pursue these causes of action, and is only seeking to appoint certain of its members as "trustee" to continue prosecuting this case due

-14-

to certain constitutional infirmities.  Consequently, section 926(a) does not apply, because FOMB
has not refused to pursue avoidance actions.

### C.  The Motion Does Not Adequately Describe Whether the Actions Are Actually Avoidance Actions

17.     Section 926 only authorizes the pursuit of the causes of action, colloquially
referred to as avoidance actions, specified in sections 544, 545, 547, 548, 549(a) or 550.  *See
Matter of North and South Shenango Joint Mun. Auth.*, 14 B.R. 414, 420 (Bankr. W.D. Pa. 1981),
*rev'd on other grounds* 80 B.R. 57 (W.D. Pa. 1982) (noting that trustees generally cannot be
appointed in municipal bankruptcy cases "except to take appropriate action to avoid fraudulent
and preferential transfers if the debtor fails to do so"); *In re Yasin*, 179 B.R. 43, 48 n.6 (Bankr.
S.D.N.Y. 1995) ("In chapter 9, the court can appoint a trustee solely for the purpose of bringing
certain avoiding actions. The chapter 9 trustee can neither assume nor reject unexpired leases or
executory contracts or be compelled to do so; only the debtor can.").  Indeed, ***this is the complete
extent of the court's authority to appoint a trustee in a chapter 9 case."***  David S. Kupetz*,
Municipal Debt Adjustment Under the Bankruptcy Code*, 27 Urb. Law. 531, 571 (1995) (emphasis
added).  Section 926 therefore provides for a closed list of actions for which a trustee may be
appointed.

18.     Since the Commonwealth Stipulation was entered by this Court, hundreds
of adversary complaints have been filed (including against charitable organizations), in which the
Committee has named itself as "co-trustee."  Many of these actions seek relief extending beyond
the avoidance powers under sections 544 through 549.  Instead, these actions assert claims that no
underlying contract exists between the Commonwealth and the defendant and seek to disallow

-15-

claims under section 502 of the Bankruptcy Code on that basis.[9]  *See, e.g.*, Dkt. No. 6560, Prayer

For Relief A, F, G.  Similarly, the Committee has purported to file, in its capacity as a would-be

section 926 trustee, a series of complaints that seek declaratory relief with respect to the liens

securing the Commonwealth's general obligation bonds.  *See, e.g.*, Adv. Proc. No. 19-291-LTS,

Dkt. No. 1, Prayer For Relief A, B, D, F, G, I, J.  Section 926(a) does not authorize the appointment

of trustees to pursue these types of declaratory judgment actions, which do not arise under sections

544-550, and cannot serve as the statutory basis here for the appointment of trustees to pursue

similar actions related to HTA.  Because no schedules have been filed with the Motion, it is simply

not possible to assess what specific causes of action might be subject to the Stipulation.  The

Committee must file public versions of those schedules immediately, and should not wait until the

hearing to disclose these actions, leaving the Objectors with little or no time to evaluate the nature

of the claims and their impact on the Motion.

19.  In an email from Alex Bongartz, counsel to the Committee, dated May 3,

2019 (attached as Exhibit B hereto), counsel shared a draft of the Stipulation concerning HTA and

ERS.  In that email, counsel stated that "the only types of HTA and ERS claims covered by this

stipulation would be 'garden variety' avoidance actions."  In a follow up email, counsel for

Assured asked counsel to the Committee what it specifically meant by "'garden variety' avoidance

actions."  In a response, Luc Despins, counsel to the Committee, defined such actions as: "Garden

variety avoidance actions, as described at the April 18 hearing, are actions alleging preferences

and/or fraudulent transfers against supplier of goods or services. Hundreds of those actions were

filed last week but only with respect to the Commonwealth."  Ex. B.

---

[9] A number of these adversary complaints appear to have been mass-replicated, and assert that certain
payments should be clawed back under section 548.  But those complaints also seek disallowance based on
theories other than those enumerated under sections 544 through 549.

20.     In the event the Court fails to deny the Motion in its entirety (as it must), and in light of those representations to HTA and ERS creditors, the Objectors propose that, at a minimum, certain revisions to the Stipulation, reflected in Exhibit A hereto, should be implemented.  Those minimal edits will clarify that only avoidance actions could be commenced and only against the defendants specified by counsel to the Committee, which would only include avoidance actions against "supplier[s] of goods or services."

21.     However, if the scope of the Stipulation has changed from the representations previously made by the Committee's counsel to the HTA creditors (including if other non-avoidance actions are contemplated), then the Committee must disclose that information immediately to all parties in interest and to this Court, and must specify what those claims are.  And if the Committee is seeking to pursue such other claims, section 926 cannot be utilized to appoint the Committee or the FOMB members as "trustees" with respect to any such non-avoidance actions.

## II. *Commodore* And Consensual Derivative Standing Do Not Provide a Basis For This Stipulation

22.     The Motion and Stipulation conclude, without any analysis, that the FOMB can confer derivative standing on the Committee "when necessary and beneficial to do so." Stipulation ¶ 3.  This conclusion is erroneous for a number of reasons.

23.     First, the only provision in chapter 9 or Title III that provides for derivative standing is section 926(a).  This reflects Congress's careful consideration of who may bring avoidance actions, when they can be commenced, and what types of actions can be commenced in derivative fashion.  *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Puerto Rico v. Franklin California Tax-Free*,

-17-

136 S Ct. 1938, 1946 (2016) ("The plain text of the Bankruptcy Code begins and ends our analysis.").

24.      The Stipulation appears to assume that certain cases governing consensual derivative standing apply here, primarily *Commodore*.  However, in the face of a specific provision (section 926) that governs derivative standing in municipal bankruptcy proceedings, *Commodore* is irrelevant.  Indeed, while the movants try to create the impression that courts routinely grant consensual derivative standing, significant authority suggests that no such standing is available in bankruptcy cases, much less in municipal bankruptcy cases.  *See Surf N Sun Apts. v. Dempsey*, 253 B.R. 490, 494-95 (M.D. Fla. 1999) ("The bankruptcy court may not, however, unilaterally confer standing upon the creditor to pursue the claim itself.  If such authority is to be granted it must come from Congress and not the courts.").  For example, the U.S. Court of Appeals for the Fourth Circuit questioned whether derivative standing is permitted—even where the debtor consents—finding that it "is far from self-evident that the Bankruptcy Code permits creditor derivative standing."  *In re Baltimore Emergency Servs. II*, 432 F.3d 557, 561 (4th Cir. 2005).

25.      Similarly, the Tenth Circuit Bankruptcy Appellate Panel ("BAP") specifically addressed "whether creditors may bring derivative suits on behalf of the bankruptcy estate."  *In re Fox*, 305 B.R. 912, 914 (10th Cir. B.A.P. 2004).  The BAP concluded that the Bankruptcy Code did not authorize such actions.  It held that chapter 5's avoidance powers were vested solely with the trustee and with no other entity.  In so holding, the BAP disagreed with *Cybergenics*,[10] finding that that case's analysis was based on policy reasons, rather than the actual language of the statute.  And if the debtor refused to pursue valuable causes of action, the BAP

---

[10] *Cybergenics* was an en banc decision, which elicited a four judge dissent.  In that dissent, Judge Fuentes found that equity did not provide any basis for expanding the class of potential plaintiffs beyond the statutory provisions provided for under the Code.  *Official Com. Ex. Rel. Cybergenics v. Chinery*, 330 F.3d 548, 580-87 (3d Cir. 2003).

noted that the creditor could always petition the court for dismissal of the case, for the appointment

of a trustee pursuant to section 1104, or for removal under section 324. *Id.* at 916.  The Court thus

concluded that any policy considerations in favor of derivative standing would "best considered

by Congress, and it is not up to us to create a remedy for creditors it has not granted to them,

especially when that right is given exclusively to the trustee." *Id.*

       26.     It is well-settled that the Court's equitable powers cannot supplant express

statutory provisions, which here only confer derivative standing pursuant to section 926.  *Law v.*

*Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy

court to override explicit mandates of other sections of the Bankruptcy Code.'") (internal citations

omitted).[11]  This Court adhered to that principle when it denied FOMB's motion to appoint a chief

transformation officer for PREPA.  *In re Fin. Oversight & Mgmt. Bd.*, 583 B.R. at 634.  There,

this Court found no statutory provision that authorized FOMB to appoint an officer of its own

choosing to supplant PREPA's governance structure.   In so holding, this Court recognized

thatsection 305 of PROMESA does not confer on the FOMB any powers that are not expressly

provided in other sections of PROMESA or the Bankruptcy Code.  This Court specifically found:

> [S]ections 305 and 306 do not empower the FOMB to interfere
> unilaterally with the debtor's political and governmental powers, or
> with the debtor's property or revenues. Section 306 is a
> jurisdictional provision, and does not confer any powers on the
> FOMB. See id. § 306. Section 305 restrains territorial government
> concessions of authority or property without the FOMB's consent,
> and serves as a defense against third party invasions of the same.
> See id. § 305. It does not authorize the FOMB to interfere
> proactively with PREPA's governance structure.

*Id.* at 635.  That reasoning applies equally here: nothing in section 305 of PROMESA grants any

substantive power on the FOMB to confer derivative standing on the Committee.  As there is no

---

[11] Indeed, AAFAF recognized this principle when it objected to the Committee's motion for derivative
standing to prosecute claims related to the GDB restructuring.  *See* Dkt. No. 3961¶ 19, n. 18, ¶¶ 23-25.

other Bankruptcy Code provision that authorizes the grant of derivative standing to the Committee, the Court has no statutory basis to approve the Motion.  It must therefore be denied.

27.     Even if this Court were to find that *Commodore* applied in Title III (and it does not), the Motion is still defective because it completely fails to satisfy the test articulated in *Commodore*.  Under that test, even where a debtor consents to a grant of derivative standing to a committee to prosecute claims on its behalf, such standing may only be conferred if "(1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *In re Commodore Intern. Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001).  Notably, in *Commodore*, the Second Circuit affirmed the *denial* of a grant of standing to the committee (even with the debtor's consent) to pursue breach of fiduciary duty claims because the Court found that the committee's suit was not necessary or beneficial, in light of a pending lawsuit brought in another jurisdiction.  *Id.*

28.     The Motion does not even try to meet *Commodore's* two pronged test, instead beginning and ending its analysis with FOMB's alleged consent.  Yet that was precisely the argument that the Second Circuit rejected in *Commodore*.  Instead, the Court in *Commodore* required an additional showing by the litigants: the relevant actions must be demonstrated to be in the best interests of the bankruptcy estate and must be "'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *Id.* at 100.  Here, the Motion and Stipulation fail to disclose what actions, if any, are even subject to the Stipulation.  Indeed, no schedules were even filed with the Stipulation, and the Committee declined to share them with HTA creditors. This Court cannot make any determination about whether certain claims or litigations would be in the best interests of the estate and would promote the fair and efficient resolution of these Title III cases without knowing what litigations are contemplated.  On the contrary, all the Court knows at

this point is that the prosecution of whatever actions might be contemplated by the Stipulation will drain resources from HTA in the form of legal fees and expenses, and the Court has no evidence whatsoever of any countervailing benefit to HTA or its creditors. Therefore, the Court currently has only evidence of harm, and no evidence of benefit.  Nor is it "fair and efficient" to file hundreds of duplicative complaints like the ones filed two weeks ago, many of them based on speculative, untested, or obviously meritless legal theories.

29.     It is also not in the best interests of the estate (let alone an efficient resolution of these Title III cases) for two or more sets of estate representatives to prosecute claims as "co-trustees."  With four different law firms often appearing on the adversary complaints that have been filed thus far, there is a substantial risk that unnecessary legal fees will be foisted on HTA and its creditors.  As the Fee Examiner noted, the complaints that were filed thus far often bear the names of six different law firms and a total of 20 individually named attorneys.  *See* Dkt No. 6906.  There is reason for creditors to be concerned about the fees and expenses incurred in this case, which FOMB itself disclosed will be in the **billions** of dollars.[12]  That amount will not only harm creditors—the people of Puerto Rico will have to pay for that amount. Moreover, the fee examiner has repeatedly—and rightfully—complained about duplication of efforts by estate professionals.  This Court should be wary of so many different estate professionals pursuing litigation, particularly given that these sorts of lawsuits can often go for years.[13]

30.     Rather than attempt to demonstrate that any of their claims are actually colorable or why such claims would benefit the estate, the movants instead believe that everyone

---

[12] Indeed, the Committee has disclosed in its most recent fee application that through January 2019, Paul Hastings alone, as counsel to the Committee, had requested payment of nearly $40 million in fees and expenses.  *See* Dkt No. 5822 at 4-5.

[13] For example, nearly eight years after Lyondell Chemical Company received court approval of its plan of reorganization, the estate is still unsuccessfully pursuing similar claims seeking to claw back payments. *See In re Lyondell Chemical Co.*, 585 B.R. 41 (S.D.N.Y. 2018).

should accept the grant of derivative standing because of the so-called "*Aurelius*-problem".  The

Committee contends that "the filing of a complaint by the Oversight Board, acting alone, would

be a nullity, and thus causes of action could lapse after the expiration of the statutes of limitation."

Dkt. No. 6876 ¶ 2.  Objectors appreciate that the Court relied in part on this argument in granting

the prior stipulation concerning prosecution of the Commonwealth's claims, but the situation there

was fundamentally different because the First Circuit's stay of the mandate was set to expire two

weeks after expiration of the statute of limitations governing Commonwealth claims.  No such

urgency is presented here in light of the extension of the stay of the mandate to July 15 (nearly two

months after expiration of the HTA statute of limitations).  Even if that were not the case, Objectors

respectfully submit that the "*Aurelius* problem" remains an unsound basis for granting this Motion.

If the FOMB can no longer prosecute this case, the appointment of the Committee as "trustee"

without any sound legal or statutory basis will not solve anything.

31.     Any attempt to end-run the First Circuit's decision in *Aurelius* by creating

another infirm structure would be akin to fixing a leaky faucet in a burning building.  Courts often

see through similar sorts of attempts by states to end-run a constitutional infirmity or to ignore a

decision from an appellate court.  *Vaqueria Tres Monjitas, Inc. v. Laboy*, 2007 WL 9717626, at

*2 (D.P.R. Aug. 2, 2007) ("Allowing the interim orders of the Administrator and the Secretary of

Agriculture to continue, setting ad hoc interim remedies, is simply a continuation of the

constitutional infirmity which was prohibited and ordered cured and remedied by the injunctive

relief.").  Indeed, appellate courts did not look kindly upon lower courts and states that attempted,

either through court orders or through newly enacted legislation, to circumvent the Supreme

Court's holding in *Obergefell v. Hodges*. 135 S. Ct. 2584 (2015) that same-sex couples have the

right to marry.  This was perhaps best seen in *In re Conde Vidal*, where the First Circuit addressed

an interlocutory order from the Puerto Rico District Court, which had held that, notwithstanding

-22-

*Obergefell*, the right to same sex marriage had not been determined to apply in Puerto Rico. 818

F. 3d 765, 766-67 (1st Cir. 2016). In a decision issued by the same panel that issued the *Aurelius*

decision, the First Circuit found:

> The district court's ruling errs in so many respects that it is hard to
> know where to begin…In ruling that the ban is not unconstitutional
> because the applicable constitutional right does not apply in Puerto
> Rico, the district court both misconstrued that right and directly
> contradicted our mandate. And it compounded its error (and
> signaled a lack of confidence in its actions), by failing to enter a final
> judgment to enable an appeal in ordinary course. Error of this type
> is not so easily insulated from review.

*Id.; see also Campaign for S. Equal v. Bryant*, 197 F. Supp. 3d 905, 912 (S.D. Miss. 2016). The

Court in *Conde Vidal* then granted the petitioners' request for mandamus, and ordered the removal

of the judge from the case. While these cases involved a different constitutional issue, they

nevertheless demonstrate that constitutional infirmities cannot be so easily worked around or

ignored, and that attempts to do so are frowned upon by the First Circuit. The parties cannot

stipulate around a constitutional infirmity or an order from the Circuit Court of Appeals by creating

yet another infirm arrangement.

32.     Any attempt by FOMB and the Committee to replace one constitutional

infirmity with another infirm structure here will undoubtedly result in immediate appeals of any

order granting this particular Motion, because that order would not be grounded in any sound legal

reasoning or statutory basis. This Court should not "be induced to engage in an ultra vires act

merely by siren songs." *Aurelius Investment LLC v. Commonwealth of Puerto Rico*, 915 F.3d 838,

855 (1st Cir. 2019). And far from serving as an "insurance policy," any order granting this Motion

will create a cloud of uncertainty over the Committee's ability to serve as trustee or plaintiff due

to resulting appeals, which will put before the First Circuit whether this Court's order served as an

end-run around a very serious constitutional infirmity that the First Circuit has already found to exist in this case.

### III.    The Committee Is Conflicted and Should Not Be Named As Trustee In HTA's Case

33.    The Committee asks that it be appointed as trustee to pursue claims on HTA's behalf.  The Objectors strongly oppose this request, because the Committee has proven itself to be entirely incapable of satisfying its fiduciary duties with respect to HTA creditors.   The Committee and its members owe fiduciary duties to the *class* of creditors that it represents.  *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993) ("the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally.");  *Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.)*, 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983) ("[A] holder of a claim or an equity interest who serves on a committee undertakes to act in a fiduciary capacity on behalf of the members of the class he represents."); *In re Garden Ridge Corp.*, No. 04-10324, 2005 WL 523129, at *3 (Bankr. D. Del. March 2, 2005) ("[O]fficial committee of unsecured creditors has a duty to represent all general unsecured creditors, including landlords to the extent that they have general unsecured claims.").   In keeping with that duty to the class of creditors that it represents, the Committee "must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."  *In re Bohack Corp.*, 607 F.2d 258, 262 n. 4 (2d Cir. 1979); *In re Spiegel*, 292 B.R. 748, 750-51 (Bankr. S.D.N.Y. 2003).  Here, the Committee was purportedly appointed to represent not only the Commonwealth, but also unsecured creditors of HTA, ERS, and PREPA.  It owes fiduciary duties to the unsecured creditors of all of those Title III Debtors.

34.    Those duties may be left unfulfilled when a member has competing interests or if it answers to two masters. *See Woods v. City National Bank & Trust Co*, 312 U.S. 262, 269

-24-

(1941) ("A fiduciary who represents security holders in a reorganization may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.").   And where, as here, only one committee was appointed for *multiple estates* that have not been substantively consolidated a conflict of interest arises, disabling the committee from fulfilling its fiduciary duties.  This was recognized by a bankruptcy court in *In re White Motor Credit Corp,* 18 B.R. 720 (Bankr. N.D. Ohio 1980).   In *White Motor*, the court held that separate committees were required to be appointed when there were multiple estates that were not substantively consolidated.  The court found that "absent a successful effort toward substantive consolidation, creditors of one debtor cannot be presumed to have a material or other qualifying interest in the assets or future of an affiliated debtor."  *Id.* at 722.  The court specifically stated:

> As a matter of law, section 1102 indicates that each case should have a Court-appointed committee. While such language does not, preclude the Court from appointing identical committees in related cases, *it cannot be said to authorize a single committee under the circumstances of these proceedings. Section 1102 indicates that each case must have a committee of unsecured creditors appointed by the Court.*

*Id.* at 722 (emphasis added).

35.     Similarly, in *In re Parkway Calabasas Ltd*, the court addressed whether or not a single creditors committee should be appointed in cases that had not been substantively consolidated.  89 B.R. 832 (Bankr. C.D. Cal. 1988).   The court concluded that the presumption should be against the appointment of a single committee when certain circumstances may be present.  According to the court, these circumstances include: (1) when the affairs of the debtors appear to be substantially entangled, (2) when there are transfers of assets between two of the debtors that were not at arms' length, and (3) when the creditors have dealt with the debtors as an economic unit.  *Id.* at 834-35, n. 3; *see also In re BH &P Inc.,* 103 B.R. 556, 572 (Bankr. D. N.J.

1989) (adopting same presumption "where one estate has claims against the other"), *affirmed and remanded on other grounds,* 119 B.R. 35 (D.N.J. 1990) (affirming determination of bankruptcy court that an actual conflict existed among professionals).   Further, other courts have recognized that when there is a conflict between two debtors, bifurcation of a singular creditors' committee may be necessary to cure conflicts of interest.  *In re Chateaugay Corp.,* 120 B.R. 707 (Bankr. S.D.N.Y. 1990) (noting that after the court perceived conflicts between a parent company and its subsidiary, the court split the committee).

36.    In assessing conflicts of interest within committees, courts look to analogous conflicts of interest (conflicted trustees or conflicted professionals) to guide the analysis. *See Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 U.S. Dist. LEXIS 18149, at *19 (S.D.N.Y. Oct. 9, 2003) (*citing In re BH&P, Inc.*, 949 F.2d 1300, 1310, 1313 (3rd Cir. 1991) and *In re Martin*, 817 F.2d 175, 181 (1st Cir. 1987)). In *Martin*, the First Circuit promoted a fact-intensive, case-by-case approach to assessing conflicts of interest, assessing "the nature and extent of the conflict must be assayed, along with the likelihood that a potential conflict would turn into an actual one." 817 F.2d at 182.  The Court in *Martin* specifically stated:

> An effort should be made to measure the influence the putative conflict may have in subsequent decisionmaking. Perceptions are important; how the matter likely appears to creditors and to other parties in legitimate interest should be taken into account. There are other salient factors as well: whether the [conflict] threatens to hinder or to delay the effectuation of a plan, whether it is (or could be perceived as) an impediment to reorganization, and whether the fundamental fairness of the proceedings might be unduly jeopardized (either by the actuality of the arrangement or by the reasonable public perception of it).

*Id.*   In keeping with the First Circuit's instruction in *Martin*, this Court should examine the "influence the putative conflict may have in subsequent decisionmaking" of the UCC in its actions regarding HTA.

37.   Over the past two years, the Committee's actions have proven that its Commonwealth members entirely dominate the Committee.   This is also evident from the Committee's defective Rule 2019 statements, which have all shown that the Commonwealth members hold putative claims totaling at least $330 million versus $1 million for the Committee's lone alleged HTA member (which itself has asserted larger claims against the Commonwealth than against HTA).   *See* Dkt. No. 6874. The Commonwealth members far outnumber the lone alleged HTA member, and the Commonwealth members all have a pecuniary interest in preventing HTA funds that have been diverted to the Commonwealth from being returned to HTA.   Indeed, the Commonwealth creditors may be receiving payments from illegally diverted revenues that belong to HTA and its creditors.

38.   When comparing the proofs of claim submitted by each of the Committee members and the most recent Rule 2019 statement filed by the Committee, one trend is obvious: certain of the Commonwealth creditors' claims decreased by approximately 32 to 51% over the period between the bar date and the most recent 2019 statement filed on May 8, 2019.   For example, Unitech's proof of claim listed the amount of its asserted claims against the Commonwealth at $23.2 million.   POC No. 39388.   The Third Supplemental Verified Statement identifies Unitech's claims as $11.2 million.   Dkt. No. 6874.   That is a *51%* decrease in Unitech's claims between June 2018 and May 2019.

39.   Similarly, in its proof of claim filed in 2018, Baxter Sales Distributions Puerto Rico Corp. asserted claims against the Commonwealth totaling $3.3 million.   POC No.

-27-

111825.   In the most recent 2019 statement, that claim had been reduced to $2.2 million.  Dkt No.
6874.

      40.        Finally, Genesis filed proofs of claim in June 2018 asserting claims against
three debtors in an amount totaling $13.6 million.  The most recent 2019 statement lists Genesis's
claims as totaling $8.12 million, representing a 40% decrease.  Virtually all of this decrease was
to Genesis' putative claims against the Commonwealth (a 44% decrease), and its claims against
the Commonwealth represent 85% of its total claims in these Title III cases.  Because Genesis's
claims are almost entirely against the Commonwealth, it is hard to see how that entity could
properly act as a fiduciary for HTA when it has a very clear financial interest in seeing its claims
against the Commonwealth being paid down.  Indeed, when comparing the Committee's initial
2019 statement against its most recent version, this trend becomes even more dramatic for Genesis.
In its initial statement filed by the Committee in August 2017, Genesis listed its claims against the
Commonwealth at $22 million.  In other words, between the Committee's formation date and May
2019, Genesis's claims against the Commonwealth have decreased *by $14 million.*  *Compare* Dkt
No. 1050-1 *with* Dkt. No. 6874.

      41.        The Committee appears to be of the view that these pecuniary interests are
irrelevant, because the Committee hypothetically acts as a fiduciary for all unsecured creditors.
Dkt No. 6847.  But that statement defies common sense.  As an initial matter, these cases are not,
and cannot be, substantively consolidated (*see* PROMESA § 304(f)), and therefore the Committee
does owe a duty to *each* class of unsecured creditors that it represents.  As the Committee itself
has noted in its own filings, there are serious inter-debtor conflicts in these Title III cases, most
notably regarding the "clawback" of HTA revenues by the Commonwealth.  Dkt. No. 3432 ¶ 27.
These conflicts concern certain taxes, which have been illegally taken from HTA and its creditors,
all to the benefit of the Commonwealth.  Both FOMB itself and HTA's auditors have admitted that

this diversion of HTA's property has had devastating consequences for HTA, so much so that HTA's auditors have expressed substantial doubt about whether HTA will be able to continue as a going concern.  For example, the 2017 version of HTA's fiscal plan disclosed that HTA had a "$4.49 billion financial gap for the next 10 year *mostly impacted by the clawback provision which directs 74%, or about $4.57 billion, of its operating revenues to the Central Government.*" *See* 2017 HTA Fiscal Plan Ex. D, at 5 (emphasis added).  The fiscal plan went on to warn that this would result in a default on HTA's debt obligations, which would in turn impact HTA's ability to receive grants from certain federal agencies, including the Federal Highway Authority.  *See id.* The fiscal plan likewise disclosed that the "current fiscal situation continues to be dire for PRHTA and *was recently aggravated by the need of the Government of Puerto Rico to clawback revenues pledged to the Authority*.  These revenues are now being used within the Government of Puerto Rico." *Id.* at 16 (emphasis added).  Finally, leaving aside payment of HTA's legacy bonds, the fiscal plan stated that this clawback also prevents HTA from funding costs of operation.  In other words, the clawback harms both HTA's revenue bondholders *and* its unsecured creditors.

42.     One would think that if the Committee were acting as a fiduciary for HTA's unsecured creditors, it would seek to vindicate HTA's right to the tax revenues currently being diverted to the Commonwealth.  Rather than do that, however, the Committee has taken the side of *the Commonwealth* on the clawback.  As just one example, the Committee has actively supported the "clawback" of taxes belonging to HTA, including joining arguments of the FOMB that the moratorium laws are not preempted by PROMESA section 303.  *See, e.g.*, Adv. Proc. No. 17-159-LTS, Dkt. No. 102 ¶ 7 (joining arguments of FOMB regarding PROMESA section 303 and 407, and Contracts Clause claims); *id.* n. 13 (asserting that Committee owes no duty to HTA or its creditors on clawback issue).  This clawback not only harms HTA's bondholders, it deprives HTA of liquidity needed to fund other creditors' recoveries as well.  And because the Committee

has openly supported this unlawful action, it has failed to serve as a fiduciary to HTA's unsecured creditors.  Indeed, HTA's own audited financial statements admit that the clawback has hindered HTA's ability to continue as a going concern.[14]  The Committee has therefore openly supported the Commonwealth's raiding of HTA's property at the expense of *all* HTA creditors (including unsecured creditors).

43.    This glaring conflict was perhaps best seen in the arguments that the Committee made in the *Ambac* appeal.  There, the Committee argued in its briefs that as a result of the illegal clawback and moratorium laws, "PRHTA has no ownership interest in the Clawback Revenues" and that "PRHTA would not have any property interest in the Clawback Revenues." Brief of Committee in Support of Affirmance at 13-14, Ambac Assurance Corp. v. Commonwealth of Puerto Rico, (1st Cir.) Case No. 18-1214, Doc. No. 00117328807.   Leaving aside the Committee's belief that it does not represent HTA's bondholders, all of these statements took a clear position on the clawback, supported the moratorium laws, and were harmful to HTA itself and to its unsecured creditors.   And the Committee itself admitted HTA holds claims against the Commonwealth, which should militate in favor of the presumption that a single committee should not have been appointed here.  *See generally* Brief of Committee in Support of Affirmance at 12-17, Ambac Assurance Corp. v. Commonwealth of Puerto Rico, (1st Cir.) Case No. 18-1214, Doc. No. 00117328807; *In re BH &P Inc.,* 103 B.R. 556, 572 (Bankr. D. N.J. 1989) (adopting presumption against formation of single committee for multiple debtors "where one estate has claims against the other.").

---

[14] *See* Audited Financial Statement for HTA, at 33-34, *available at* https://emma.msrb.org/ER1354539.pdf.

44. Ironically, as the Committee claimed that all unsecured creditors should be treated ratably and receive "equality of distribution,"[15] certain of its Commonwealth members' claims were paid down by as much as 51 percent. *See infra* ¶ 38. That sure does not seem like ratable treatment or equality of distribution. The financial benefits that the Committee members have reaped at the expense of HTA's creditors, coupled with the clear positions that the Committee has taken on the "clawback," constitute an actual conflict of interest that should, at a minimum, disqualify the Committee from serving as trustee for HTA. Indeed, courts have found that such conflicts of interest are not to be tolerated. *See In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427 (Bankr. E.D. Va. 2001) (removing member of committee where the member had a conflict of interest that disabled it from being able to perform fiduciary duties to other unsecured creditors); *In re Johns-Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("Conflicts of interest on the part of representative persons or committees are thus not [to] be tolerated."); *In re Glendale Woods Apartments*, 25 B.R. 414, 414-415 (Bankr. D. Md. 1982) (removing committee members that had conflicts that disabled them from fulfilling fiduciary duties). The same results should obtain here and the conflicts should prevent the appointments requested.

45. Finally, the Committee has no right to even be heard in these Title III cases because, two years into this case, its Rule 2019 statements are still not in compliance with Rule 2019 or with the Eighth Amended Case Management Procedures Order. Even the most recent statements filed by the Committee on May 8 are defective. Those statements, for example, do not provide so much as even estimates of the amounts of AFT's or SEIU's purported claims against the Commonwealth, and the Committee's amended 2019 statements appear to indicate that SEIU

---

[15] *See* Brief of Committee in Support of Affirmance at 15-16, Ambac Assurance Corp. v. Commonwealth of Puerto Rico, (1st Cir.) Case No. 18-1214, Doc. No. 00117328807 ("It is blackletter law that prepetition creditors…are not entitled to payment of prepetition claims during the pendency of a bankruptcy case. This is closely related to another one of the basic tenets of bankruptcy law—equality of distribution.").

has potential claims against ERS, even though these are not reflected in SEIU's proof of claim or in any of the prior 2019 statements.  Indeed, no amounts are listed within the 2019 statements for these members' asserted claims, even though Rule 2019(c) requires disclosure of the nature and amount of *each* member's disclosable economic interests.  Last week, counsel to Assured reached out to counsel to the Committee to specifically express these concerns.  The statements filed on May 8 did not correct these deficiencies.[16]  Having failed to comply with Rule 2019, the Committee should not be heard with respect to the Motion or, indeed, any other matter.  See, e.g., Fed. R. Civ. P. 2019(e) (authorizing the Court to "refuse to permit [an] entity, group, or committee to be heard" where "there has been a failure to comply with any provision" of Rule 2019).

### **Reservation of Rights**

46.     The Objectors reserve all rights and remedies with respect to the Stipulation and any potential amendments thereto.  The Objectors reserve all rights to challenge the standing of any plaintiff who purports to bring a claim or cause of action pursuant to the Stipulation.

---

[16] Certain of the Objectors may file shortly a motion challenging the Committee's ability to take any position,  compelling the Committee's compliance with Rule 2019, and seeking to amend the case management procedures order to clarify the Committee's continuing disclosure requirements.

Dated:  May 12, 2019
New York, New York

CASELLAS ALCOVER & BURGOS P.S.C.

/s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR No. 204,809
Ricardo F. Casellas-Sánchez
USDC-PR No. 203,114
Diana Pérez-Seda
USDC–PR No. 232,014
E-mail: hburgos@cabprlaw.com
rcasellas@cabprlaw.com
dperez@cabprlaw.com

P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT
LLP

/s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William Natbony*
Ellen M. Halstead*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 406-6666
Email:  howard.hawkins@cwt.com
mark.ellenberg@cwt.com
bill.natbony @cwt.com
ellen.halstead@cwt.com
thomas.curtin@cwt.com
casey.servais@cwt.com

* admitted pro hac vice
*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

REXACH & PICÓ, CSP

/s/ *María E. Picó*
María E. Picó
USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
E-mail:mpico@rexachpico.com

*Counsel for Financial Guaranty Insurance
Company*

BUTLER SNOW LLP

/s/ *Martin A. Sosland*
Martin A. Sosland (*pro hac vice*)
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
E-mail: martin.sosland@butlersnow.com

Stanford G. Ladner (*pro hac vice*)
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (646) 606-3996
Facsimile: (646) 606-3995
E-mail: stan.ladner@butlersnow.com

Christopher R. Maddux (*pro hac vice*)
J. Mitchell Carrington (*pro hac vice*)
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: (601) 985-2200
Facsimile: (601) 985-4500
E-mail: chris.maddux@butlersnow.com
mitch.carrington@butlersnow.com

Jason W. Callen (*pro hac vice*)
150 3rd Avenue, South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6774
Facsimile: (615) 651-6701
E-mail: jason.callen@butlersnow.com

*Counsel for Financial Guaranty Insurance Company*

ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email: epo@amgprlaw.com
loliver@amgprlaw.com
acasellas@amgprlaw.com
larroyo@amgprlaw.com

By:  *s/ Marcia Goldstein*
WEIL, GOTSHAL & MANGES LLP
Marcia Goldstein (admitted pro hac vice)
Kelly DiBlasi (admitted pro hac vice)
Gabriel A. Morgan (admitted pro hac vice)
Jonathan Polkes (admitted pro hac vice)
Gregory Silbert (admitted pro hac vice)
Jared R. Friedmann (admitted pro hac vice)

767 Fifth Avenue New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: marcia.goldstein@weil.com
kelly.diblasi@weil.com
gabriel.morgan@weil.com
jonathan.polkes@weil.com
gregory.silbert@weil.com
jared.friedman@weil.com

*Counsel for National Public Finance Guarantee Corporation*

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
  Roberto Cámara-Fuertes (USDC-PR No.
    219002)
  Sonia Colón (USDC-PR No. 213809)
  221 Ponce de León Avenue, 5th Floor
  San Juan, PR 00917
  Telephone: (787) 766-7000
  Facsimile:  (787) 766-7001
  Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
  Dennis F. Dunne
  Andrew M. Leblanc
  Atara Miller
  Grant R. Mainland
  (admitted *pro hac vice*)
  55 Hudson Yards
  New York, NY 10001
  Telephone: (212) 530-5000
  Facsimile:  (212) 530-5219
  Email: ddunne@milbank.com
       aleblanc@milbank.com
       amiller@milbank.com
       gmainland@milbank.com

*Counsel for Ambac Assurance Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.  Further, I directed that the following counsel of record be served by U.S. Mail:

Office of the United States Trustee
  for Region 21
Edificio Ochoa
500 Tanca Street, Suite 301
San Juan, PR 00901-1922

Gerardo Portela
Mohammad Yassin
Puerto Rico Fiscal Agency and Financial
Advisory Authority (AAFAF)
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

John J. Rapisardi, Esq.
Suzzanne Uhland, Esq.
Peter Friedman, Esq.
Nancy A. Mitchell, Esq.
Maria J. DiConza, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036

Luis C. Marini-Biaggi, Esq.
Carolina Velaz-Rivero Esq.
Maria T. Alvarez-Santos Esq.
Marini Pietrantoni Muniz, LLC
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, PR 00917

Martin J. Bienenstock, Esq.
Paul V. Possinger, Esq.
Ehud Barak, Esq.
Maja Zerjal, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299

Hermann D. Bauer, Esq.
O'Neill & Borges LLC
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

Luc A. Despins, Esq.
James Bliss, Esq.
James Worthington, Esq.
Paul Hastings LLP
200 Park Avenue
New York, New York 10166

Arturo Diaz-Angueira, Esq.
Cancio, Nadal, Rivera & Diaz, P.S.C.
403 Muñoz Rivera Ave.
San Juan (Hato Rey), PR 00918-3345

Robert Gordon, Esq.
Richard Levin, Esq.
Catherine Steege, Esq.
Jenner & Block LLP
919 Third Avenue
New York, New York 10022

Juan. J. Casillas Ayala
Diana M. Batlle-Barasorda
Alberto J. E. Añeses Negrón
Ericka C. Montull-Novoa
Casillas, Santiago & Torres LLC
El Caribe Office Building
53 Palmeras Street, Suite 1601
San Juan, PR 00901-2419

At New York, New York, 12th day of May, 2019.


By: /s/ Howard R. Hawkins, Jr
Howard R. Hawkins, Jr.*
* Admitted pro hac vice