# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>X | PROMESA<br>Title III<br><br>Case No. 3:17-bk-03283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>x | PROMESA<br>Title III<br><br>Case No. 3:17-cv-01685 (LTS)<br>Case No. 3:17-bk-03566 (LTS) |

## MOTION OF CERTAIN SECURED CREDITORS
## OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
## OF THE COMMONWEALTH OF PUERTO RICO
## TO COMPEL PRODUCTION OF DOCUMENTS FROM FINANCIAL
## <u>OVERSIGHT AND MANAGEMENT BOARD</u>

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 5

I.    The Bondholders Can Demonstrate A Substantial Need For The Materials The
      Oversight Board Has Withheld Pursuant To The Predecisional Privilege ....................... 5

II.   The Board Improperly Withheld Factual Information Under The Deliberative
      Process Privilege ............................................................................................................ 9

III.  The Board Fails To Carry Its Burden As To Attorney Client Privilege .......................... 10

      A.    Some Of The Withheld Documents Do Not Involve Legal Advice .................... 10

      B.    Most Of The Documents Were Sent To Or From Non-Lawyer Bankers
            And Consultants So They Are Not Protected By Attorney-Client Privilege ....... 11

IV.   The Board Has Not Met Its Burden With Respect To Its Work Product Claims ............ 12

V.    The Bondholders Preserve Their Prior Arguments On The Deliberative Process
      Privilege, Waiver, And The Fraud Exception ................................................................. 14

      A.    The Board's Withheld Documents Are Postdecisional and Non-
            Deliberative ...................................................................................................... 14

      B.    The Board Waived Privilege For Some Materials ............................................. 14

      C.    The Fraud Exception To Attorney Client Privilege Is Applicable ..................... 15

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Cavallaro v. United States*,
284 F.3d 236 (1st. Cir. 2002) ...................................................................................10, 11, 12

*Columbia Data Prods., Inc. v. Autonomy Corp.*,
No. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ................................11, 12

*In re Blier Cedar Co.*,
10 B.R. 993 (Bankr. D. Me. 1981) .........................................................................................15

*In re Grand Jury Proceedings*,
417 F.3d 18 (1st Cir. 2005) ....................................................................................................15

*Peaje Invs. LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017) ....................................................................................................6

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
60 F.3d 867 (1st Cir. 1995) ....................................................................................................14

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988) ..................................................................................................................6

*United States v. Kovel*,
296 F.2d 918 (2d Cir. 1961) ...................................................................................................11

*United States v. Textron Inc.*,
577 F.3d 21 (1st Cir. 2009) ...............................................................................................12, 13

### STATUTES

11 U.S.C. § 362 ...........................................................................................................................6

UCC § 9-315, 19 L.P.R.A. § 2265(a) .........................................................................................7

### OTHER AUTHORITIES

Fed. R. Civ. P. 26 ......................................................................................................................13

To the Chambers of the Honorable Judith G. Dein:

The Bondholders move to compel the Financial Oversight and Management Board for Puerto Rico ("Oversight Board") to produce materials withheld under the deliberative process privilege, the attorney-client privilege, and the work product doctrine, including the reasonably segregable portions of documents that contain both privileged and non-privileged material.

## **INTRODUCTION**

1. The Court is familiar with these discovery proceedings concerning the Bondholders' pending motion for relief from the automatic stay. The Bondholders previously moved to compel documents withheld by the Commonwealth, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") on similar grounds. *See* Dkt. Nos. 443, 446, 462, 475 in Case No. 17-3566. After briefing and argument, the Court entered orders on May 6 and 15, 2019.

2. The instant motion concerns the documents produced and privilege logs served by the Oversight Board. Despite the Bondholders' efforts to narrow their document requests to account for concerns of burden and privilege, the Board's document production has essentially been non-compliant, and its privilege log indicates that its claims of privilege are overbroad. This is particularly so with respect to the Board's assertions of the deliberative process privilege. As the Court is well aware, that privilege is exceedingly narrow under Puerto Rico law, and it is a qualified privilege in any event. As shown below, the Bondholders can demonstrate a substantial need for the materials the Board has withheld under the predecisional privilege.

## **BACKGROUND**

3. The instant motion concerns two things: (a) the Oversight Board's incomplete and inadequate production of documents and (b) the privilege logs served by the Board on April 29 and May 1. The Board has asserted an array of privileges, including the deliberative process

privilege, the attorney-client privilege, the work product doctrine, and the mediation privilege. The Board has redacted the substance of 47 documents and withheld altogether 288 documents.[1]

4.      On March 4, 2019, the Bondholders served a narrowly tailored document subpoena on the Oversight Board with six requests for documents. The Board lodged broad objections—including sweeping objections based on privilege, overbreadth, vagueness and relevance—and refused to produce any documents whatsoever in response to four of the six requests. On March 7, 2019, the Bondholders served a narrow deposition subpoena on the Board, designating eight topics for questioning. The Board again responded with a broad set of objections, completely refusing to designate a deponent on any of the eight topics.

5.      On March 18, 2019, the parties engaged in a 90-minute telephonic meet-and-confer session, during which the Board agreed to review its objections to the Bondholders' document and deposition subpoenas. The next day, counsel for the Oversight Board indicated that the Board would not withdraw or narrow any of its objections to the subpoenas. Dkt. No. 401 in Case No. 17-3566, ¶ 32–34. Since the Board refused to compromise in any way, the Bondholders were forced to move to compel on both subpoenas.

6.      On April 1, 2019, the Court overruled the Board's general objections and instructed the Board to comply with the document subpoena. *See* Apr. 1, 2019 Tr. 77:2–6. The Court later entered an order requiring the Board to produce documents in accordance with the Court's ruling in open court and to submit a status report on document production. Dkt. No. 431 in Case No. 17-3566, ¶ 3. The Court also ordered the Board to designate a witness for deposition. *Id.* ¶ 4.

7.      On April 5, 2019, the parties submitted a status report. Dkt. No. 432 in Case No. 17-3566. It provided that the parties had agreed upon search parameters for the Oversight Board's

---

[1] The Board previously provided the Court with its April 29 log. It indicated that it would provide the May 1 log today.

production. *Id.* ¶ 2. As to the Bondholders' deposition subpoena, in contravention of the Court's

order, the Board stated that the Bondholders should depose the Commonwealth and ERS in the

first instance. *Id.* ¶ 3. To date, the Oversight Board has failed to designate a witness.

8.      On April 8, 2019, the parties engaged in a meet-and-confer session on the Board's

production. The Board took the position that it was not bound by Judge Swain's discovery schedule

for document production. Dkt. No. 439 in Case No. 17-3566, ¶ 13. On April 12, 2019, at an urgent

telephonic status conference, the Court ordered the Board (i) to produce documents on a rolling

basis with an initial production on April 14, 2019, (ii) to make a supplemental production on April

16, 2019, (iii) to serve a privilege log by April 19, 2019, and (iv) to file a status report with the

Bondholders by April 23, 2019. Dkt. No. 445 in Case No. 17-3566, ¶ 4.

9.      On April 23, 2019, the parties filed a joint status report. Dkt. No. 465 in Case No.

17-3566. The Board stated that it had "completed its initial and second-level review of the 7,466

documents identified through the agreed-upon search parameters" and was in the process of

completing its final review. *Id.* ¶ 2. The Bondholders noted that the Board's two productions

contained only 27 documents, with several of those documents being duplicates and/or heavily

redacted (out of 760 total pages, 534 pages were redacted and completely blank). *Id.* ¶ 11. On the

same day, the Court ordered the Board to serve its privilege log by April 29, 2019 at 3:00 pm and

to complete its document production by May 1, 2019. Dkt. No. 468 in Case No. 17-3566.

10.     The Board completed its document production on May 1, 2019, and served its

privilege logs on April 29 and May 1. Subsequently, counsel for the Bondholders reviewed the

Board's document production and determined that it was inadequate for the reasons set forth below.

On May 10 and 13, the Bondholders informed the Board that they intended to challenge the

Board's assertions of privilege. On May 16, 2019, the parties engaged in a further meet-and-confer

session. The Bondholders discussed the issues presented in this motion and the Board maintained its assertions of privilege, prompting this motion. *See* Decl. of Geoffrey S. Stewart, ¶ 14.

**The Oversight Board's Inadequate Document Productions**

11.   The Board's document productions fell far short of what the Federal Rules require. The Board's initial production consisted of 284 pages, 264 of which were completely blank: each and every page of these documents had been totally redacted. *See* Stewart Decl., ¶ 8. Its later productions were little better. In volume, most of its production was a single document—evidently a budget for the Commonwealth—that, when printed, contained over 3,900 pages of accounting detail. Stewart Decl., ¶ 11(a); FOMB_ERS00002527-6463. The information was of no clear relevance to anything, was outside the scope of anything the Bondholders had asked for, and was self-evidently filler material to inflate the size of the Board's document production. Similarly, hundreds of other pages the Board produced were simply isolated strings of text, or graphics with no context. Stewart Decl., ¶ 11(b). Much of the rest of the Oversight Board's production was simply the same handful of documents produced again and again. This included 15 copies of the Legislature's Resolution 186, another 15 copies of Resolution 187, 9 copies of Resolution 189, and 16 copies of the March 13, 2017 Fiscal Plan. Stewart Decl., ¶ 11(c). Similarly, when it came to the weekly reports showing the balances in the Commonwealth Treasury's main account, the Board produced the same four weekly reports from mid-2017 again and again (for a total of 14 times), yet produced no year-end reports that would allow the Bondholders to calculate final numbers, much less any documents for the Commonwealth's more recent fiscal periods. Stewart Decl., ¶ 11(d).

12.   Altogether, the Oversight Board produced about 669 documents, running to about 9,700 pages. Of these, fewer than ten are non-repetitive and relevant to the Stay Relief Motion,

and even some of these are simply documents that already were publicly available. *See* Stewart Decl., ¶ 11–12. The rest are simply the pretense of a document production, the evident purpose and intent of which was to avoid giving any meaningful discovery at all.

13.     An example of the Board's approach is a draft "Actuarial Valuation Report" from Milliman, ERS's independent actuary, dated as of June 16, 2016. Stewart Decl., ¶ 11(e). In a case where the issues include the inflows and outflows of money for a retirement system, and the projected economics of that retirement system under an ostensibly new funding mechanism, it is difficult to think of anything more relevant than the actuarial report projecting the pension obligations that system is facing in the coming years and giving the assumptions underlying those projections. Nevertheless, the Board completely redacted 70 of the report's 73 pages under the deliberative process privilege. Stewart Decl., ¶ 11(e).

**The Oversight Board's Privilege Log**

14.     The Board served privilege logs on April 29 and May 1 for a total of 335 documents. The logs broadly invoked the following privileges: (a) attorney-client privilege (224 documents), (b) attorney work product (199 documents), (c) deliberative process privilege (173 documents), and (d) mediation privilege (13 documents). For documents withheld under the deliberative process privilege, the logs identify a number of "decisions" to which the documents contributed: the March 13, 2017 Fiscal Plan, the Fiscal Year 2018 and 2019 Territory Budgets, the April 18, 2018 Fiscal Plan, and potential revisions and corrections to the March 13, 2017 Fiscal Plan.

<u>**ARGUMENT**</u>

**I.     The Bondholders Can Demonstrate A Substantial Need For The Materials The Oversight Board Has Withheld Pursuant To The Predecisional Privilege**

15.     The deliberative process privilege is a qualified privilege that can be overcome upon a showing of need. The court "must make an analysis of balance of interests," weighing the

- 5 -

government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 DP.R. at 88.

16.     The Bondholders can demonstrate that they do indeed have a substantial need for these materials. As the Court is well aware, a central issue in the Stay Relief motion is the Bondholders' statutory right to adequate protection of the collateral securing the bonds in which they invested. 11 U.S.C. § 362. Adequate protection is required, by statute and by constitutional law, when there is a diminution in the value of collateral during the term of the automatic stay imposed by the Bankruptcy Code. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988); *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017). Respondents' principal defense is that the motion should be denied because there now is no collateral: two statutes enacted by the Puerto Rico Legislature simply took the collateral away, so there is nothing left to diminish in value and, thus, no point in lifting the automatic stay.

17.     It is undisputed that the directive ordering the Puerto Rico government to replace ERS with the Pay-Go system came from the Oversight Board itself. Dkt. No. 446 in Case No. 17-3566, ¶¶ 17–18. In fact, until the Board imposed its dictates upon the Commonwealth, Puerto Rico planned to restore financial health to ERS by simply increasing the amounts of money employers paid into the system each month. *Id.* ¶ 17. Therefore, it is uncontested that the decision to create Pay-Go was one made by the Board.

18.     The thinking behind, and details of, that decision are relevant and material. It came at a time when Puerto Rico was in dire financial shape and desperately short of money. A central element of the new Pay-Go system was to confiscate ERS's liquid assets, which were deposited in the Commonwealth Treasury, commingled with other monies, and spent on unrelated things.

- 6 -

Simultaneously, the Pay-Go structure imposed billions of dollars in new financial obligations upon Puerto Rico at a time when the Commonwealth was admittedly bankrupt. There was no source of money to fund these new Pay-Go obligations except for the contributions from employers ERS had been receiving for years. But those employer contributions were subject to the Bondholders' liens, and the Bondholders had to be paid before the Commonwealth would be free to arrogate the employer contributions to fund Pay-Go. The Oversight Board—and it was the Board alone—devised the plan to circumvent this inconvenience by directing the Commonwealth to restructure ERS in a way that defeated the Bondholders' liens. This included the sleight-of-hand whereby mandatory contributions from employers were ostensibly eliminated and replaced by mandatory assessments of Pay-Go fees upon the same employers and the re-routing of this money away from ERS and directly into the Commonwealth Treasury. Each of these measures had the purpose of defeating the Bondholders' liens, and it is these very measures that Respondents rely upon in opposing the Stay Relief Motion.

19.     The central defense offered by Respondents in the Stay Relief motion is that the Bondholders now have no collateral at all. But, as we have pointed out before, that is false: it is black-letter law that a lien follows the collateral. *See* UCC § 9-315, 19 L.P.R.A. § 2265(a). Thus, if the Pay-Go fees are simply the old employer contributions with a different name, then the Bondholders' lien attaches to them, and the Bondholders are thus entitled to adequate protection.

20.     There is no stronger evidence probative of the equivalence of Pay-Go fees to employer contributions than information revealing how and why the Oversight Board devised the Pay-Go system and decided to impose it. Since the Board and Respondents have resolutely refused to disclose anything about their analysis or deliberations on this point, the Bondholders are in the dark. However, it is reasonable to assume that the materials the Oversight Board is withholding

- 7 -

will include documents that talk about the fact that the only way to fund ERS's pension systems is contributions from employers (since the Treasury itself was broke), that employer contributions were subject to the Bondholders' lien, that there was a need to find ways around the lien, and that a purportedly new Pay-Go system would provide cover for destruction of the lien. These assumptions are all the more credible given the fact that the Commonwealth's financial adviser already had threatened in April 2016 to do this very thing. Dkt. No. 402-1 in Case No. 17-3566, ¶ 3, Dkt. No. 402-2 in Case No. 17-3566, ¶ 3.

21.     It is clear that the Bondholders have no other source for this information. First, all of these decisions were made by the Oversight Board, with the help of its various consultants. The other parties to this motion—ERS and the Commonwealth—in fact, had other plans and accepted the Board's decision only after it was forced upon them in March 2017. Second, we now know that the Board has not disclosed sufficient evidence in discovery to answer any of these important questions. As described above, its document production consists mainly of irrelevant filler; most documents that might shed light on the facts the Board relied upon, the Board's analysis, the Board's analysis of the comparability of employer contributions to Pay-Go fees, or the Board's thinking of how to structure a Pay-Go system have been withheld or entirely redacted. Having now filed two motions to compel, attended repeated meet-and-confer sessions, and unsuccessfully attempted to resolve this matter by negotiation, the Bondholders have no alternative but to now ask the Court for this relief. The discovery process itself, clearly, has failed.

22.     And the Board stands on different footing than ERS, the Commonwealth or AAFAF, whose claims of privilege were adjudicated by the Court earlier this month. Although each of those plays a somewhat different role, none of them made the decision to adopt Pay-Go. The Commonwealth initially seemed to oppose the idea; AAFAF, in turn, is simply the financial

advisor assisting in the implementation. The decision to adopt Pay-Go and the basic features of its operations was made by the Oversight Board alone.

## II. The Board Improperly Withheld Factual Information Under The Deliberative Process Privilege.

23. As we previously explained, the predecisional privilege does not shield purely factual material including factual material that can be reasonably segregated from deliberative material. Dkt. No. 446 in Case No. 17-3566, ¶¶ 20–23; Dkt. No. 476 in Case No. 17-3566, ¶¶ 11–13. Yet many of the Board's withheld or redacted documents appear to contain entirely factual material, including cash flow statements, forecasts, projections, models, and other documents. *E.g.*, Doc. 331 ("draft actuarial valuation report"); Doc. 320 ("redacted embedded spreadsheet" related to 2018 budget); Docs. 1–4 (documents "summarizing forecasts, objectives, and proposals in connection with drafting of fiscal plan" and "analyzing 2018 Territory Budget and its compliance with the fiscal plan"); Doc. 191 ("[l]oose electronic copy of printed draft financial model for Commonwealth fiscal plan dated March 11, 2017"); Docs. 209–210, 227, 245, 247–248, 260 (emails on "Commonwealth budget and fiscal plan model update"); Doc. 11 (email "attaching draft Commonwealth Fiscal Plan"); Docs. 17, 20, 23, 50, 66, and 69 ("revised projections for Commonwealth Fiscal Plan" and "draft projections and model for Commonwealth Fiscal Plan"); Docs. 22, 59 ("budget and liquidity projections"); Docs. 31–35 (attachments on "Commonwealth budget vs. actual expenditures," "Commonwealth payroll information," "Commonwealth revenue vs. target revenue collections," "right-sizing measures and models," "sample monthly report for monthly reporting framework," and "analysis of cash outlays vs. Commonwealth budget"); Docs. 37–38 ("analysis of cash flow vs. Commonwealth"); Docs. 40–41 ("cash flow analyses for Commonwealth"); Docs. 103–104 (emails "discussing liquidity issues for Commonwealth budget"); Doc. 84 (email "regarding variations between certified fiscal plan and government

model"); Docs. 106–107, 110–111, 120 (emails on "projected pension costs through 2065"); Docs.

163–168 (presentations and excel spreadsheets "regarding and outlining proposed Fiscal Year

2018 Territory Budget"); Doc. 265 (email on "PayGo calculations"). The Board must produce

those documents or, at a minimum, produce the reasonably segregable factual information from

the purportedly deliberative material. *E.g.*, *Bhatia Gautier I*, 199 D.P.R. at 87–88.

## III. The Board Fails To Carry Its Burden As To Attorney Client Privilege.

24. The Board also claims attorney-client privilege over 224 documents. As we

previously explained, the attorney-client privilege applies:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his
> capacity as such, (3) the communications relating to that purpose, (4) made in confidence
> (5) by the client, (6) are at his instance permanently protected (7) from disclosure by
> himself or by the legal adviser, (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st. Cir. 2002).

### A. Some Of The Withheld Documents Do Not Involve Legal Advice.

25. Some of the Board's documents suffer from the fundamental defect that they do not

involve legal advice in the first place. *E.g.*, Docs. 56, 62, 94, 116 (emails "between" members of

the Oversight Board and its legal counsel where author of the document is an external non-lawyer

advisor); Doc. 21 (email from McKinsey to the Oversight Board discussing "forecasts and analyses

for Fiscal Year 2018"); Docs. 13–14 ("[e]mail between Oversight Board members . . . regarding

certification of the Commonwealth Fiscal Plan"); Doc. 16 (email from McKinsey to Oversight

Board and its legal counsel discussing a presentation of the Commonwealth's restructuring and

the creation of a fiscal plan). Other documents only partially involve legal advice. *E.g.*, Doc. 9

("[e]mail from Oversight Board member to Oversight Board's legal counsel and the Oversight

Board's consultants containing, reflecting, and seeking analysis (including legal analysis) of

prospective pension reform legislation"). And others include only vague descriptions. *E.g.*, Docs. 112, 116, 118 (email "reflecting legal advice and requests for legal advice to counsel").

### B. Most Of The Documents Were Sent To Or From Non-Lawyer Bankers And Consultants So They Are Not Protected By Attorney-Client Privilege.

26.     Most of the materials withheld under the attorney-client privilege involve communications with non-lawyer bankers and consultants, including Ernst & Young LLP, McKinsey & Company, Inc., Pension Trustee Advisors, Citigroup, Hub International, and the Federal Home Loan Bank New York. In fact, McKinsey & Company, Inc., Ernst & Young LLP, and Citigroup are included in over 180 of the 224 documents withheld under the privilege. As we previously explained, these communications cannot be attorney-client communications, since the employees of these non-legal advisors are neither the attorney nor the client. Dkt. No. 443 in Case No. 17-3566, ¶¶ 11–18; Dkt. No. 462 in Case No. 17-3566, ¶¶ 8–12. "For a communication to be covered by the attorney-client privilege, the communication must be made in confidence" and "not be waived. The presence of third parties during an attorney-client communication is often sufficient to undermine the 'made in confidence' requirement, or to waive the privilege." *Cavallaro*, 284 F.3d at 246 (citations omitted). Absent an exception, then, the fact that third parties received the materials means the privilege never arose or has been waived. *Id.*

27.     The Board cannot rely upon the "*Kovel* doctrine." *Id.* at 247; *see also United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). As we explained, the First Circuit has never recognized the *Kovel* doctrine, but even if does apply in this Circuit, it is extremely narrow. Dkt. No. 443 in Case No. 17-3566, ¶¶ 13–14. "[T]hree separate elements must be met." *Columbia Data Prods., Inc. v. Autonomy Corp.*, No. 11-12077-NMG, 2012 WL 6212898, at *14 (D. Mass. Dec. 12, 2012). *First*, "the third-party communications must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* at

*15; *Cavallaro*, 284 F.3d at 247–48 (same). This is a very high standard—it is not enough that the third-party's involvement be "useful and convenient," rather it "must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Columbia Data Prods.*, 2012 WL 6212898, at *15; *Cavallaro*, 284 F.3d at 249 (same). *Second*, the third party must play "an interpretive role. In other words, the third party's communication must serve to translate information between the client and the attorney." *Columbia Data Prods.*, 2012 WL 6212898, at *15. "The exception does not apply where the lawyer merely obtains information from the third party in order to give advice to the client." *Id. Third*, "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice." *Id*. "[I]f the advice sought is the [third party's] rather than the lawyer's, no privilege exists." *Id.*

28.     The Board does not carry its heavy burden of showing (1) that the third parties' involvement was "necessary, or at least highly useful, in facilitating the legal advice" in all instances, (2) that legal counsel was "relying on [the third parties] to translate or interpret information between the lawyers and" the client, or (3) that the purpose of including the third parties was to facilitate legal advice by the lawyers, rather than financing, accounting, or consulting advice by the non-lawyer advisors. *See id.* at *15–16. The documents are not privileged.

## IV.    The Board Has Not Met Its Burden With Respect To Its Work Product Claims.

29.     The Board claims work-product protection as to 199 documents. But its descriptions do not adequately substantiate the requirements for such protection. As we previously explained, "[i]t is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated . . . . Nor is it enough that the materials were prepared by lawyers or represent legal thinking." *United States v. Textron Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (en banc); *see* Dkt. No. 443 in Case No. 17-3566, ¶¶ 30–37; Dkt. No. 462 in Case No. 17-3566, ¶¶ 23–24. Similarly, "[w]ork product protection does not extend to

documents that . . . would have been created in essentially similar form irrespective of the litigation." *Textron Inc.*, 577 F.3d at 30. Rather, materials must be have been "prepared for *use in litigation*, whether the litigation was underway or merely anticipated." *Id.* at 29 (emphasis added).

30.     The Board's privilege log does not meet this high standard. Many of the withheld documents do not identify specific litigation. *E.g.*, Doc. 9 (analysis "of prospective pension reform legislation"); Doc. 11 (email "attaching draft Commonwealth Fiscal Plan reflecting edits from Oversight Board's legal counsel"); Docs. 12, 172–74 (materials concerning creditor meetings); Docs. 43–44 ("materials prepared at the direction of counsel in preparation for [an undisclosed] mediation"); Doc. 53 ("draft litigation documents and internal discussions concerning Commonwealth budget"); Doc. 56 (discussions of the "Commonwealth's non-compliance with proposed Commonwealth budget"); Docs. 63, 101, 144, 192, 246, 261 ("legal advice and analysis concerning effect of anticipated pension reform legislation on Fiscal Year 2018 Territory Budget"); Doc. 94 ("soliciting legal advice and to prepare for meeting concerning certification of Commonwealth Fiscal Plan"); Docs. 112, 116, 118, 258 (topics for "pension subcommittee meeting"); Doc. 134 ("legal advice concerning analysis of ERS bond documentation"); Docs. 138–39, 311–15 ("legal advice concerning Commonwealth proposed legislation concerning pension reform"); Docs. 146, 188, 259 ("prospective pension reform legislation"); Doc. 176 ("preparation for upcoming meeting"); Docs. 278, 302–303 (forwarding mediation materials).

31.     In addition, the work-product doctrine is a qualified privilege that can be overcome upon a showing of need. Fed. R. Civ. P. 26(b)(3)(A)(ii). The Bondholders have demonstrated that this evidence is at the heart of the Stay Relief motion and that only the Board and the other Respondents are in possession of these critical materials. *See supra* Part I.

## V.    The Bondholders Preserve Their Prior Arguments On The Deliberative Process Privilege, Waiver, And The Fraud Exception.

32.    In its May 6, 2019 order, the Court rejected certain of the Bondholders' arguments raised in connection with documents withheld by ERS, the Commonwealth, and AAFAF. Those arguments are equally applicable to documents withheld by the Oversight Board and the Bondholders seek to preserve them for purposes of appeal.

### A.    The Board's Withheld Documents Are Postdecisional and Non-Deliberative.

33.    The deliberative process privilege does not protect "post-decisional documents explaining or justifying a decision already made." *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995). As we explained, the relevant decision is the Board's March 13, 2017 certification of a revised fiscal plan with a mandatory amendment requiring that the Commonwealth's pension systems "[s]witch to pay-as-you-go model." Dkt. No. 446 in Case No. 17-3566, ¶ 17. Yet the Board identifies a number of later "decisions": potential revisions to the March 13, 2017 fiscal plan, corrections to the March 13, 2017 fiscal plan, later versions of the fiscal plan, and the 2018 and 2019 territory budgets. These "decisions" merely implemented the changes already imposed by the March 13, 2017 fiscal plan, and therefore do not reflect the give-and-take of governmental deliberations. The documents should be produced. Dkt. No. 446 in Case No. 17-3566, ¶¶ 13–19; Dkt. No. 476 in Case No. 17-3566, ¶¶ 8–10.

### B.    The Board Waived Privilege For Some Materials.

34.    The Board has also waived privilege over documents shared with the Commonwealth, its advisors, and AAFAF. *E.g.*, Docs. 39, 106, 107, 110, 111, 120, 125, 126 (documents shared with AAFAF); Docs. 46, 106, 107, 110, 111, 120, 158, 161, 209, 210, 227, 245, 260 (documents shared with Commonwealth financial advisors); Docs. 201, 202 (documents shared with the Commonwealth). The Board previously has admitted that its interests often diverge

- 14 -

from the Commonwealth and its instrumentalities. Dkt. No. 446 in Case No. 17-3566, ¶ 36. And

AAFAF is a representative of ERS, which is adverse to the Commonwealth as a matter of law. *Id.*

¶ 37. There is obviously waiver when documents are shared among these parties. *See* Dkt. No. 446

in Case No. 17-3566, ¶¶ 35–37; Dkt. No. 476 in Case No. 17-3566, ¶¶ 20–22.

> **C.     The Fraud Exception To Attorney Client Privilege Is Applicable.**

35.     As we previously explained, the attorney-client privilege does not apply where "the

client sought or employed legal representation in order to commit or facilitate a . . . fraud." *In re*

*Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005); *see* Dkt. No. 443 in Case No. 17-3566,

¶¶ 27–29; Dkt. No. 462 in Case No. 17-3566, ¶¶ 20–22. Here, the Board's privilege log

demonstrates that it communicated with others (including AAFAF, a representative of ERS) about

the plan to create the Pay-Go system, the resultant transfer of employer contributions away from

ERS to the Commonwealth, and the diversion of the Bondholders' collateral. Thus, the log

concedes that the legal advice sought with respect to these documents was an unalloyed effort to

"hinder[] the enforcement of a security interest" and carry out a "fraudulent transfer" in bankruptcy.

*In re Blier Cedar Co.*, 10 B.R. 993, 999–1000 & n.14 (Bankr. D. Me. 1981). Because the fraud

exception to the attorney-client privilege applies, the Board's privilege claims must be overruled.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should compel the Oversight Board to produce

all 335 documents in its privilege logs.[2]

---

[2] In light of the Court's rulings on the motion to compel documents withheld by ERS, the Commonwealth, and AAFAF, the Bondholders intend to file a motion *in limine* to preclude those parties from introducing any evidence regarding the intent, purpose, or justifications behind Joint Resolution 188 and Act 106. If the instant motion is denied, the Bondholders will file a similar motion as to the Oversight Board.

In San Juan, Puerto Rico, today May 17, 2019.

By:

/s/ Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon
Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P.,
Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Cheryl T. Sloane

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Jesse Green (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
jgreen@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

**Proposed Order**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------

In re:                                                )
                                                      )
                                                      )   PROMESA
THE FINANCIAL OVERSIGHT AND                           )   Title III
MANAGEMENT BOARD FOR PUERTO RICO,                     )
                                                      )   Case No. 3:17-bk-03283 (LTS)
         as representative of                         )
                                                      )
THE COMMONWEALTH OF PUERTO RICO, *et al.*,            )
                                                      )
         Debtors.                                     )
                                                      )
---------------------------------------------------------------  X
                                                      )
In re:                                                )
                                                      )
                                                      )
THE FINANCIAL OVERSIGHT AND                           )   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO                      )   Title III
                                                      )
         as representative of                         )   Case No. 3:17-cv-01685 (LTS)
                                                      )   Case No. 3:17-bk-03566 (LTS)
THE EMPLOYEES RETIREMENT SYSTEM OF THE                )
GOVERNMENT OF THE COMMONWEALTH OF                     )
PUERTO RICO,                                          )
                                                      )
         Debtor.                                      )
                                                      )
--------------------------------------------------------------- x

**[PROPOSED] ORDER GRANTING MOTION OF CERTAIN SECURED CREDITORS
OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT
OF THE COMMONWEALTH OF PUERTO RICO TO COMPEL PRODUCTION OF
<u>DOCUMENTS FROM FINANCIAL OVERSIGHT AND MANAGEMENT BOARD</u>**

Upon consideration of the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents from Financial Oversight and Management Board* (the "Motion")[1] filed by the Bondholders,[2] the Court having reviewed the Motion and the relief requested; the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a); the Court determining that venue of this proceeding and the Motion in this District is proper under 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a); notice of the Motion being adequate and proper under the circumstances; and after due deliberation and sufficient cause appearing; therefore, it is hereby ORDERED that:

1.      The Motion is GRANTED as set forth herein.

2.      The Financial Oversight and Management Board for Puerto Rico is required to produce to the Bondholders the documents withheld in the privilege logs served on April 29, 2019 and May 1, 2019.

3.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: _____
Boston, Massachusetts

_____
UNITED STATES MAGISTRATE JUDGE

---

[1] Capitalized terms used but not otherwise defined herein will have the meaning as set forth in the Motion.

[2] Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund L.P., Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax- Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.