## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17-BK-3566 (LTS) |
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS,<br><br>and<br><br>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA), | Adv. Proc. No. _____ |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747).

as co-trustees of

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO,

Plaintiff,

v.

FIRST SOUTHWEST COMPANY, *et al.*,[2]

Defendants.

_____

### ADVERSARY COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS AND TO DISALLOW CLAIMS PURSUANT TO 11 U.S.C. §§ 502, 544, 548, AND 550 AND OTHER LAW

Pursuant to (i) Federal Rules of Bankruptcy Procedure 7001(1) and (9), made applicable to these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act (48 U.S.C. § 2170) ("PROMESA"), and the Stipulation and Agreed Order By and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Causes of Action of Puerto Rico Highways and Transportation Authority and Employees Retirement System of the Government of the Commonwealth of Puerto Rico [ECF No. 6990], (i) the Special Claims Committee (the "SCC") of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), acting by and through its members, as representative of the Employees Retirement System of the Government of Puerto Rico ("ERS"), and (ii) the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") (collectively, "Plaintiffs"), in each case by and through undersigned counsel, allege on actual

---

[2] A list of defendants (collectively, the "Defendants") is attached hereto as Appendix I. *See also* ¶ 9

knowledge as to their own status and actions and upon information and belief as to all other matters as follows:

## <u>NATURE OF PROCEEDING</u>

1.      This action arises from ERS's issuance of approximately $3 billion dollars ($3,000,000,000) in bonds (the "ERS Bonds") in underwritten public offerings.[3]  The Plaintiffs, on behalf of ERS, seek a declaration that the ERS Bonds were issued *ultra vires* and thus are null and void.  The Plaintiffs further seek to recover funds unlawfully transferred to the Defendants on account of principal and interest payments purportedly due on the ERS Bonds.  The recovery of these funds will benefit ERS's constituents and, indirectly, the residents, taxpayers, and legitimate creditors of Puerto Rico.

2.      The ERS Bonds were issued as part of the failed implementation of an ill-conceived "arbitrage" strategy ostensibly designed to rescue ERS from eventual insolvency.  Although ERS declared that it was in compliance with applicable statutes, ERS was never authorized to issue negotiable bonds to the public.  In 2011, the Puerto Rico Legislative Assembly underscored this fact, stating that the issuance of the ERS Bonds "was **illegally made** by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."  Act 116-2011 at Statement of Motives (emphasis added).[4]

---

[3]   This original principal amount does not include accretion on capital appreciation bonds, which will amount to an additional $1 billion of principal at maturity.

[4]   This Complaint contains numerous citations to publicly available documents, some of which are attached hereto.  In addition to substantiating the allegations contained herein, these citations are intended to demonstrate that sophisticated investors such as the Defendants (each of whom invested more than $2.5 million in the ERS Bonds) had access to requisite information relating to the infirmities in the bonds.  The citations are not a limitation on the factual or legal authority upon which the Plaintiffs can and will rely, and the Plaintiffs reserve all rights to cite any relevant source in support of the allegations raised in this Complaint.

3.      As previously raised by other parties in these Title III cases, the issuance of the ERS Bonds was "illegally made" in that the ERS Bonds were issued *ultra vires*.  ERS's statutory "authorization to incur debt" was at all relevant times limited to "seek[ing] a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts."  A government entity such as ERS has no inherent power to issue bonds to the public, and any such power must be expressly granted by statute.  Furthermore, as commonly understood in the finance world, a "direct placement of debts" means a private placement, not a public offering. Indeed, whenever the Puerto Rico Legislative Assembly has granted bond issuance authority to a Commonwealth instrumentality (both before and after it authorized ERS in 2008 to "seek loans"), it has done so expressly and specified that the bonds may be sold publicly or privately.

4.       There was no such express statutory authorization for the ERS Bonds. Accordingly, the ERS Bonds are null and void, and any amounts paid by ERS on account of such bonds (i) were *per se* unlawful and recoverable under Puerto Rico law and (ii) are avoidable and recoverable as fraudulent transfers pursuant to the Bankruptcy Code and either Puerto Rico or New York law.

5.      The Plaintiffs understand the unique nature of this action and the significance of the relief they are requesting.  In particular, the Plaintiffs acknowledge that ERS did receive certain purported bond proceeds, and some purported bondholders may have relied upon legal opinions and disclosures of purported facts by the issuer, underwriters, and other professionals as to the purported propriety of the issuances.  Although the Plaintiffs acknowledge these positions, the laws of Puerto Rico limit the borrowing authority of its instrumentalities for a fundamental reason: to prevent the government and its financiers from burdening the Commonwealth and its

instrumentalities, as well as taxpayers and legitimate creditors with debts that cannot be repaid without imperiling the Commonwealth's ability to provide the essential services necessary to maintain the health, safety, and welfare of Puerto Rico and its people.  These Title III cases are evidence, *per se*, of the need to enforce these limitations to protect the retired employees of the government, as well as Puerto Rico's taxpayers, and other legitimate creditors more generally.

6.      It would not be equitable, or legal, to ask the taxpayers and legitimate creditors of Puerto Rico to bear a burden from which they are protected by law.  That burden should instead be shouldered by those who, despite ERS's insolvency and its lack of express statutory authority to issue the ERS Bonds, chose to purchase such bonds, which carried high effective interest rates as a reflection of risk.

## PARTIES

7.      Co-Plaintiff the Oversight Board (acting through the members of its Special Claims Committee) was established by PROMESA to help Puerto Rico "achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  The Oversight Board "is the representative of the debtor" in any Title III case, and the term "trustee" under title 11 of the United States Code (the "Bankruptcy Code"), as incorporated into PROMESA, means the Oversight Board.  PROMESA §§ 301 and 315.

8.      Co-Plaintiff the Committee is the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA).  The Committee was appointed by the United States Trustee on June 15, 2017.

9.      The Defendants, whose names and addresses of record are provided in Appendix I to this Complaint, received payments from ERS on account of the ERS Bonds.

10.     As required by the *Further Order Pursuant to Bankruptcy Rules 1007(i) and 2004 Authorizing Discovery and Compelling Disclosure of Lists of Security Holders* [Case No. 17-

03283, ECF No. 6493] and the *Order Allowing Motions to Enforce* [Case No. 17-03283, ECF No. 6967] (the "Confidentiality Orders"), at ¶ 3(b), certain Defendants to this adversary proceeding (which is an "ERS Bond Avoidance Action" as defined in the Confidentiality Orders and related documents) are identified in this initial pleading by pseudonyms, and a "key" to their real names will be filed contemporaneously under seal. These Defendants are hereby advised that, under the Confidentiality Orders, "the obligation to utilize a pseudonym as provided herein extends only to the initial pleading and case commencement materials and shall terminate twenty-one (21) days after the [the Plaintiffs] provide[] such defendant, at the time of service, with reasonable notice and an opportunity to object to the use of its Confidential Information," which includes the Defendants' real names. The Confidentiality Orders further provide that "notice and opportunity . . . may be provided by [the Plaintiffs] in the body of any initial pleading and no further notice shall be required." This paragraph constitutes such notice.

## JURISDICTION AND VENUE

11.     This is an adversary proceeding brought pursuant to Federal Rule of Bankruptcy Procedure 7001 and sections 105(a), 544, 548, and 550 of the Bankruptcy Code to avoid and recover transfers of money by ERS.

12.     An actual and justiciable controversy exists between the Plaintiffs and the Defendants. Section 2201(a) of title 28 of the United States Code provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

13.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to section 306(a) of PROMESA. 48 U.S.C. § 2166(a).

14.     Venue is proper in this district pursuant to section 307(a) of PROMESA.   48
U.S.C. § 2167(a).

## BACKGROUND

### I.     ERS Issued the ERS Bonds in 2008 After the Legislative Assembly Rejected its Proposed Issuance of GO Bonds

15.     The Plaintiffs incorporate by reference herein all factual statements in paragraphs
4-70 of the *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted
by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico*
[Case No. 17-03283-LTS; ECF No. 5580] (the "ERS Claim Objection") and paragraphs 5-27 of
the *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of
Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims
Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth* [Case 17-
03283-LTS; ECF No. 6482] (the "Retirees' ERS Claim Objection").[5]

16.     ERS is a retirement and benefit system created by Act 447-1951 of the Puerto
Rico Legislative Assembly (as amended, the "ERS Enabling Act") and is both a trust and an
instrumentality of the Commonwealth.   ERS was created to provide pension and other benefits to
retired employees of the Commonwealth and its instrumentalities and municipalities
(collectively, the "Government Employers").   These benefits were to be funded from, among
other sources, contributions from the Government Employers as required by the ERS Enabling
Act ("Employer Contributions").

17.     When first created in 1951, ERS had no borrowing power.   In 1988, the ERS
Enabling Act was amended to include the following "authorization to incur debt":

---

[5]   As of the filing hereof, Plaintiff the Oversight Board has not objected to the ERS Bonds or joined in the ERS Claim Objection or Retirees'
ERS Claim Objection.   The Oversight Board reserves all rights to join in the ERS Claim Objection and/or the Retirees' ERS Claim
Objection, and otherwise to take any appropriate action regarding claims filed against ERS in respect of purported ERS Bond obligations.

> The Board of Trustees may authorize the Administrator to **seek a loan** from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or **through the direct placement of debts**, securing said debt with the assets of the System.

Act 46-1988, § 1 (emphasis added).

18.     In 2006, in an effort to address ERS's severe underfunding, Puerto Rico's Legislative Assembly considered legislation to authorize the issuance of Commonwealth general obligation ("GO") bonds and use the proceeds to fund an "arbitrage" strategy for ERS.  This strategy was to invest the bond proceeds in the hope that the resulting income would exceed the cost of debt service, generating a surplus return sufficient to eliminate ERS's ever-growing funding deficit before ERS finally ran out of money.  *See* Kobre & Kim LLP, Final Investigative Report, dated August 20, 2018 (the "Kobre & Kim Final Investigative Report"), at 204.

19.     The Legislative Assembly rejected the authorization bill for the proposed GO bond issuance and arbitrage strategy.  *See id.*  Nonetheless, ERS began to contemplate a bond issuance of its own.

20.     In 2008, ERS issued three series of ERS Bonds in underwritten public offerings. *See* Exhibit A, Official Statement, dated January 29, 2008, for ERS Senior Pension Funding Bonds, Series A (the "ERS Series A Official Statement"), at cover page; Exhibit B, Official Statement, dated May 28, 2008, for ERS Senior Pension Funding Bonds, Series B (the "ERS Series B Official Statement"), at cover page; Exhibit C, Official Statement, dated June 26, 2008, for ERS Senior Pension Funding Bonds, Series C (the "ERS Series C Official Statement"), at cover page.

21.     As of February 2017, the aggregate outstanding principal amount of the ERS Bonds (including accretion on capital appreciation bonds) was approximately $3,156,000,000. Government of Puerto Rico: Puerto Rico Fiscal Agency and Financial Advisory Authority,

Fiscal Plan for Puerto Rico, at 26 (March 13, 2017) available at
http://www.aafaf.pr.gov/assets/planfiscal13demarzo2017.pdf.

22.     The ERS Bonds were issued as "limited, non-recourse obligations of [ERS],
payable solely from and secured solely by Employer Contributions made after the date of
issuance of the Bonds and funds on deposit with the Fiscal Agent in the various accounts
established [under the Bond Resolution]."  ERS Series A Official Statement, at 37, Ex. 1; ERS
Series B Official Statement, at 38, Ex. 2; ERS Series C Official Statement, at 39, Ex. 3; *see also*
ERS Series A Official Statement, at cover page, 2, and 23, Ex. 1; ERS Series B Official
Statement, at cover page, 2, and 22, Ex. 2; and ERS Series C Official Statement, at cover page, 2,
and 22, Ex. 3.

23.     The ERS Bonds were issued for the stated purposes of (i) increasing the funds
available to ERS to pay pension benefits to certain of its beneficiaries by using a portion of the
proceeds of the ERS Bonds to pay those benefits and (ii) reducing ERS's unfunded accrued
actuarial pension liability by adding the remaining portion of the proceeds of the ERS Bonds to
the assets that were invested by ERS for the benefit of participating employees, retirees, and
beneficiaries.  ERS Series A Official Statement, at cover page, 2, and 6; ERS Series B Official
Statement, at cover page, 2, and 6; ERS Series C Official Statement, at cover page, 2, and 6.

24.     More specifically, but not expressly disclosed in the Official Statements for the
ERS Bond offerings, the proceeds of the ERS Bonds were supposed to be used to fund
investments as part of the previously rejected go-for-broke "arbitrage" strategy ostensibly
designed to close the gap between ERS's pension obligations and its available sources of
payment.  *See* Kobre & Kim Final Investigative Report at 186 (reporting findings on ERS and
the circumstances surrounding the issuance of the ERS Bonds).

25.    As detailed in an October 2010 report of Conway MacKenzie, Inc. ("Conway"), this ill-conceived strategy failed at the outset because ERS failed to issue the full $7 billion of bonds necessary for the strategy to have any hope of success, and most of the proceeds from the issued ERS Bonds ended up being used as an "expensive, temporary solution" for funding ERS's current pension obligations.  Thus, the ERS Bonds were issued as part of the "flawed execution of a failed strategy."  Exhibit D, Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, at 15-16 (2010).

26.    Conway further concluded that the ERS Bond issuance was "a very risky and speculative transaction" that was "not fully understood or vetted by decision-makers" and that "ERS management, the [ERS] Board of Trustees and GDB Board of Directors did not exercise due care."  *Id.* at 12.

27.    In 2011, the Puerto Rico Legislative Assembly confirmed that the issuance of the ERS Bonds "was illegally made by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."  Act 116-2011 at Statement of Motives.

28.    On May 21, 2017 (the "Petition Date"), the Oversight Board approved and certified the filing of a PROMESA Title III petition for ERS.

## II.    Payments on Account of the ERS Bonds Were Unlawful Because the Bonds Were Issued *Ultra Vires*

### A.    The ERS Bonds Were Issued *Ultra Vires* and Thus Are Null and Void

29.    As set forth above, ERS was statutorily authorized to seek loans from certain government entities or "through the direct placement of debts."

30.     The phrase "direct placement of debts" means a private sale of securities directly to institutional investors.  Black's Law Dictionary, Direct Placement (10th ed.) (A "direct placement" of debt means "[t]he sale by a company, such as an industrial or utility company, of an entire issue of securities directly to a lender (such as an insurance company or group of investors), instead of through an underwriter.").

31.     The phrase "direct placement" is defined specifically in contrast to a placement of debts on the public market through an underwriter, and is understood interchangeably with the term "private placement."  *See id.*; *Equitable Life Assur. Soc. of U.S. v. Arthur Andersen & Co.*, 655 F. Supp. 1225, 1227 (S.D.N.Y. 1987) (identifying "direct or private placement" as interchangeable terms).

32.     A "direct placement" or "private placement" is distinguished from a public issuance in that, among other differences, (a) it involves the purchase of bonds for investment (and not for resale) by a limited number of sophisticated institutional purchasers; (b) it eliminates underwriting fees and expenses (which are the single largest component of issuance costs in public offerings); (iii) it eliminates rating agency presentations and fees (because it does not require a credit rating); (d) it frequently eliminates the need for a debt service reserve fund (thereby lowering the amount of the bonds and eliminating the risk of negative arbitrage on the investment of the fund); (e) it requires less comprehensive financial and transaction disclosure (because there is no need for the protection of unsophisticated retail purchasers); (f) it affords the issuer the ability to negotiate directly with the purchasers at the outset (thereby permitting the issuer to limit covenants and other terms to those that meet the purchaser's requirements without being unduly restrictive from the issuer's standpoint); and (g) it affords the issuer the ability to negotiate directly with the purchasers in the event a waiver, amendment, or restructuring

becomes necessary (which is not feasible in the case of bonds offered publicly to a large number

of purchasers).  Overall, a "direct placement" or "private placement" is quicker, easier, and less

expensive to execute than a public offering.  *See, e.g.*, 2 GELFAND, STATE AND LOCAL

GOVERNMENT DEBT FINANCING §12:42 (2d ed.); HFA Partners, *The Pros and Cons of*

*Bank Direct Placements* (September 7, 2011) *available at* https://w.w.hfapartners.com/104.

Accordingly, the differences between the two types of debt offerings are material and can be

critical to a government issuer.

33.     Furthermore, U.S. Supreme Court cases addressing municipal bonding authority

recognize a fundamental distinction between negotiable bonds sold in the open market for fund-

raising purposes and bonds issued, for example, as payment for services rendered or as evidence

of a bank loan.  *See, e.g.*, *Merrill v. Town of Monticello*, 138 U.S. 673, 687 (1891) ("[T]here is a

marked legal difference between the power to give a note to a lender for the amount of money

borrowed, or to a creditor for the amount due, and the power to issue for sale, in open market, a

bond, as a commercial security, with immunity, in the hands of a bona fide holder for value,

from equitable defences[sic].").

34.     Thus, under the traditional rule reflected in the weight of U.S. Supreme Court and

other case law, the authority of a municipal entity to issue "negotiable bonds" for sale to the

public must be expressly granted by the legislature and cannot be implied from a general power

to borrow money or incur debts.  *See generally* 15 McQuillin Mun. Corp. § 43:22 (3d Ed.)

("[A]uthority to issue bonds can be enforced only by language which leaves no reasonable doubt

of an intention to grant it, and . . . if the intention of a statute to authorize the issuance of bonds is

doubtful, the doubt will be resolved against the authority to issue the bonds"); *id.* at § 43:20 ("If

there is no express provision authorizing the issuance of bonds, the question then arises whether

there is implied power.  This question is answered somewhat differently in the various states, although the general rule is that there is no authority to issue bonds unless it has been expressly conferred."); 64A C.J.S. Mun. Corp. § 2182 ("The power to issue negotiable bonds may not be implied from the right to borrow money or to contract an indebtedness, but there is authority to the contrary."); *see, e.g.,City of Brenham v. German-American Bank*, 144 U.S. 173, 181-82 (1872) ("It is easy for the legislature to confer upon a municipality, when it is constitutional to do so, the power to issue negotiable bonds; and, under the well-settled rule that any doubt as to the existence of such power ought to be determined against its existence, it ought not to be held to exist in the present case."); *Rathbone v. Bd. of Comm'rs*, 73 F. 395, 399 (D. Kan. 1896) ("The rule of law in relation to the issue of negotiable bonds is that, whenever the power to issue is called in question, the authority to issue must be clearly shown, and will not be deduced from uncertain inferences, and can only be conferred by language which leaves no reasonable doubt of an intention to confer it."), *rev'd on other grounds*, 83 F. 125 (8th Cir. 1897); *Fullerton v. Cent. Lincoln People's Util. Dist.*, 201 P.2d 524, 529-30 (Or. 1948) (holding that a municipal corporation's "general power to issue, sell and assume evidences of indebtedness" under the relevant statute did not imply the power to issue negotiable bonds).

35.     Parties to contracts that violate Puerto Rico law are not entitled to payment and must return any funds already received under the contract.  *See Plaza Carolina Mall, L.P. v. Municipality of Barceloneta,* 91 F. Supp.3d 267, 290 (D.P.R. 2015); *E.L.A. v. Cole Velazquez*, 164 D.P.R. 608, 642-43 (2005) (noting that an illegal disbursement of funds is "intolerable" and that "[i]t is . . . the obligation of the courts to reclaim" such funds); *see also E.L.A. v. Hon. Bernardo Negrón, et al.*, 184 D.P.R. 464 (2012) (recognizing that Article VI, section 9 of the

Puerto Rico Constitution "forces every governmental entity, state and municipal, to safeguard the legitimate disbursement of all public funds").

36.    No legal or equitable theory permits ERS to make payments on purported borrowings that violate Puerto Rico law.  *See CMI CapitalMkt. Inv., LLC v. Municipality of Bayamon,* 410 F.Supp.2d 61, 76 (D.P.R. 2006) (noting potential problems that could arise from the application in Puerto Rico of common law equitable estoppel); *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1010 (1994) (holding that a medical equipment supplier could not recover as unjust enrichment the value of equipment delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts); *Morales v. Mun. De Toa Baja,* 119 D.P.R. 682, 692-93 (1987) (holding that common law *actos propios* doctrine was inapplicable where the public policy of protecting public funds and the general welfare of the municipality was implicated); *Mendoza Aldarondo v. Asociacion de Empleados,* 94 D.P.R. 564, 579 (1967) (explaining the "general rule that 'estoppel' cannot arise from acts by government officials or government agents").

37.    The issuance of the ERS Bonds in violation of Puerto Rico law renders them null and void and, as a result, the holders are not entitled to any payment on such bonds and must disgorge any payments already received.

B.    **ERS Did Not Receive Reasonably Equivalent Value for Principal and Interest Payments on the ERS Bonds**

38.    Because the ERS Bonds are null and void, the bondholders had no enforceable right to payment on such bonds.

39.    Likewise, ERS had no enforceable obligation to pay the bondholders principal or interest (the "EB Payments").

40.     Although ERS received certain proceeds of the ERS Bonds, such proceeds cannot be characterized under Puerto Rico law as lawful consideration for the EB Payments.

41.     ERS received no value in exchange for the EB Payments.

### III.     ERS Was Insolvent at the Time of the Challenged Transfers

42.     Like other pension systems, the financial health of ERS was, at any given time, expressed through its "funding ratio," which is the ratio of its assets to its projected future liabilities to pension participants based on actuarial assumptions discounted to present value.

43.     By way of reference, federal law governing certain private sector pension plans provides that a plan with a funding ratio below 80% is "endangered" and that a plan with a funding ratio below 65% and ongoing funding deficits is "critical," meaning that employer contributions and investment income are not likely to prevent near-term, cash-zero insolvency. *See* 29 U.S.C. § 1085; *see also* Kobre & Kim Final Investigative Report at 200-202 (describing the funding ratio calculation and ERS's historical underfunding).

44.     When the ERS Bonds were issued, ERS's funding ratio was below 20% and Employer Contributions to fund ERS's pension liabilities were falling short by hundreds of millions of dollars per year.  *See* Exhibit D at 5-7 (noting the $3.1 billion contribution deficit for the period 2004-2010).

45.     Accounting for liabilities incurred through the issuance of the ERS Bonds, ERS's funding ratio fell below 10%.  *See id.* at 11-12.[6]

---

[6]     The ERS Board of Trustees apparently expected the ERS Bonds to increase ERS's funding ratio above 70%.  However, that calculation ignored repayments on the ERS Bonds, essentially treating the bond proceeds as a gift.  *See* Exhibit D at 11-12 ("We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted

46.     ERS's funding ratio continued to decline to the point that ERS was projected to reach cash-zero insolvency no later than 2017.  *See* Kobre & Kim Final Investigative Report at 217.

47.     ERS's books and records, which reflect a consistent trend of mounting liabilities and dwindling assets starting no later than fiscal year 2010, confirm that the EB Payments were made when ERS's liabilities exceeded the value of its assets.

48.     No later than 2010, ERS knew with reasonable certainty that, sometime in the near future, it would be unable to pay its debts as they came due.

49.     During the course of this proceeding, the Plaintiffs may learn (through discovery or otherwise) of additional avoidable transfers made to the Defendants in the four years prior to the Petition Date.  The Plaintiffs intend to avoid and recover all transfers of an interest in ERS's property made to or for the benefit of any transferee on account of any ERS Bonds.  The Plaintiffs reserve their right to amend this Complaint to include, without limitation, (i) additional information regarding the EB Payments, (ii) additional transfers, (iii) modifications of and/or revisions to the Defendants' names, (iv) additional defendants, and/or (v) additional causes of action (including but not limited to causes of action under 11 U.S.C. §§ 542, 544, 545, 548, and/or 549) (collectively, "Amendments") that become known (through formal discovery or otherwise) and for any Amendments to relate back to this Complaint.

**IV.     ERS Paid Substantial Sums to the Defendants on Account of the ERS Bonds**

50.     Notwithstanding its lack of any legal obligation to make the EB Payments, and the lack of value received in exchange therefor, ERS did make certain EB Payments to purported holders of ERS Bonds in the two years prior to the Petition Date (the "2-Year ERS Bond

---

funding ratio's computation methodology . . . This lack of understanding falls short of what is expected from a director or a fiscal agent that is exercising prudence or acting within the general standards of reasonableness.").

Transfers" to the "2-Year Defendants") and in the four years prior to the Petition Date (inclusive of the 2-Year ERS Bond Transfers, the "4-Year ERS Bond Transfers" to the "4-Year Defendants").

51.     Recipients of the 4-Year ERS Bond Transfers are listed in Appendix I hereto.

## CLAIMS FOR RELIEF

## COUNT I

### 28 U.S.C. § 2201(a)
### 3 L.P.R.A. §§761 *et seq.* (the ERS Enabling Act, as Enacted at Relevant Times)
### (Declaration That ERS Bonds Were Issued *Ultra Vires* and Are Thus Null and Void)

52.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

53.     The Plaintiffs incorporate herein by reference the legal arguments contained in paragraphs 4-70 of the ERS Claim Objection and paragraphs 65-78 of the Retirees' ERS Claim Objection.

54.     The ERS Bonds were issued *ultra vires* because ERS lacked statutory authorization to issue the ERS Bonds.

55.     The ERS Bonds are thus null and void, and any of ERS's purported obligations under the ERS Bonds are unenforceable.

## COUNT II

### RETURN OF UNLAWFUL DISBURSEMENTS
### (3 L.P.R.A. § 283h, Puerto Rico Common Law)
### (Against all Defendants)

56.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

57.     The ERS Bonds violated the law of Puerto Rico.

58.     The 4-Year ERS Bond Transfers to the 4-Year Defendants were disbursements of public funds not authorized by law.  *See* 3 L.P.R.A. § 283h(a).

59.     The 4-Year ERS Bond Transfers, being public monies disbursed unlawfully, may be recovered.  *See Mun. de Quebradillas v. Corp. de Salud de Lares*, 180 D.P.R. 1003, 1015-16 (2011) (citing similar restrictions on municipal disbursements and noting that holding otherwise "would be leaving public funds in private hands that do not correspond to them" and citing "public policy of protecting the interests and money of the people against waste, prevarication, favoritism and the risks of non-compliance") (citing *Cancel v. Mun. de San Juan*, 101 D.P.R. 296, 300 (1973)).

60.     The Plaintiffs are entitled to a declaration that ERS is entitled to recover funds equal to the aggregate amount of the 4-Year ERS Bond Transfers from the respective 4-Year Defendants.

## COUNT III

### FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 550 and 31 L.P.R.A. §§ 3491-3500)
### (Against the 4-Year Defendants)

61.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

62.     The Plaintiffs incorporate herein by reference the claims register maintained in these Title III cases.

63.     Pursuant to 11 U.S.C. § 544(b), the Plaintiffs have standing to avoid any obligation incurred by ERS that is voidable under applicable law by a creditor holding an unsecured claim.

64.     As of the Petition Date, ERS was indebted on an unsecured basis to various parties pursuant to agreements and conduct governed by, among others, the laws of Puerto Rico.

65.     In the four years prior to the Petition Date, the Debtors made the 4-Year ERS Bond Transfers to the 4-Year Defendants.

66.     At the time of the 4-Year ERS Bond Transfers, ERS was in a state of insolvency.

67.     The 4-Year Defendants knew or should have known that ERS was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

68.     ERS's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

69.     There was insufficient consideration for the 4-Year ERS Bond Transfers, as the ERS Bonds were null and void.

70.     Consequently, the Plaintiffs request that the 4-Year ERS Bond Transfers made to each 4-Year Defendant, or the aggregate value thereof, be returned to ERS pursuant to 31 L.P.R.A. §§ 3491-3500 and 11 U.S.C. §§ 544 and 550.

71.     Other than such remedy as may be afforded pursuant to other causes of action alleged herein, ERS has no remedy other than that provided under 31 L.P.R.A. §§ 3491-3500.

## COUNT IV

### FRAUDULENT TRANSFER
**(11 U.S.C. §§ 544(b) and 550 and New York Debtor and Creditor Law §§ 273 and 273-a)**
**(Against all Defendants)**

72.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

73.     As of the Petition Date, ERS was indebted to various parties on an unsecured basis pursuant to agreements and conduct governed by, among others, the laws of New York.

74.     The 4-Year ERS Bond Transfers constitute "Conveyances" as defined by New York Debtor and Creditor Law § 270.

75.     The 4-Year ERS Bond Transfers were not made for fair consideration consistent with New York Debtor and Creditor Law § 272.

76.      ERS made the 4-Year ERS Bond Transfers at a time when it intended or believed it would incur debts beyond its ability to pay as they matured or when it was already insolvent as defined by New York Debtor and Creditor Law § 271(1).

77.     Accordingly, pursuant to New York Debtor and Creditor Law §§ 273 and 278(1)(a)-(b) and Bankruptcy Code sections 544 and 550, the 4-Year ERS Bond Transfers constitute fraudulent conveyances and should be avoided and recovered.

## COUNT V

### FRAUDULENT TRANSFER
### (11 U.S.C. §§ 548 and 550)
### (Against the 2-Year Defendants)

78.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

79.     In the two years prior to the Petition Date, ERS made the 2-Year ERS Bond Transfers to the 2-Year Defendants.

80.     The 2-Year Defendants were initial, immediate, and/or mediate transferees of the 2-Year ERS Bond Transfers.

81.      ERS had a property interest in the funds transferred to the 2-Year Defendants via the 2-Year ERS Bond Transfers.

82.     At the time of the 2-Year ERS Bond Transfers, ERS was (i) insolvent or became insolvent as a result of the transfers; and/or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

83.     Because the ERS Bonds were null and void, ERS had no obligation to make the 2-Year ERS Bond Transfers and thus disposed of its assets without receiving value in exchange.

84.     At all relevant times, there were actual creditors of ERS holding allowable, unsecured claims.

85.     Accordingly, the 2-Year ERS Bond Transfers should be avoided and recovered pursuant to 11 U.S.C. §§ 548 and 550.

**COUNT VI**

**OBJECTION TO CLAIMS**
**(11 U.S.C. § 502)**
**(Against all Defendants)**

86.     The Plaintiffs repeats and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

87.     The Defendants are entities from which property is recoverable under 11 U.S.C. § 550.

88.     The Defendants are transferees of transfers avoidable under 11 U.S.C. §§ 544 and 548.

89.     The Defendants have not repaid the amount of the avoidable transfers or turned over such property to ERS and thus are liable under 11 U.S.C. § 550.

90.     Accordingly, pursuant to 11 U.S.C. § 502(d), any and all claims of the Defendants and/or their assignees against the Debtors must be disallowed until such time as the Defendants pay to ERS an amount equal to the aggregate amount of the transfers for which they are liable under 11 U.S.C. § 550, plus interest thereon and costs.

91.     Furthermore, pursuant to 11 U.S.C. § 502(j), any and all claims of any Defendant and/or its assignees against ERS previously allowed by ERS must be reconsidered and

disallowed until such time as such the Defendants pay to ERS an amount equal to the aggregate amount of the transfers for which they are liable under 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that the Court grant the following relief to the extent not inconsistent:

1) On Count I, a judgment declaring (i) that ERS issued the ERS Bonds *ultra vires* and (ii) that the ERS Bonds are therefore null and void and ERS had no legal obligation to pay principal or interest in respect thereof;

2) On Counts II, III, and IV, a judgment against each 4-Year Defendant in an amount equal to the 4-Year ERS Bond Transfers received by that defendant, plus interest thereon;

3) On Count V, a judgment against each of the 2-Year Defendants in an amount equal to the 2-Year ERS Bond Transfers they received, plus interest thereon;

4) On Count VI, disallowing claims filed by each Defendant and its successors and assignees until such time as such Defendant pays to ERS an amount sufficient to satisfy judgments entered in respect of Counts III, IV, and V; and

5) Such other and further relief as the Court deems just and proper.

Dated:  May 17, 2019
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Edward S. Weisfelner*
BROWN RUDNICK LLP
Edward S. Weisfelner, Esq. (*Pro Hac Vice*)
Angela M. Papalaskaris, Esq. (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
eweisfelner@brownrudnick.com
apapalaskaris@brownrudnick.com

Stephen A. Best, Esq. (*Pro Hac Vice*)
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
Tel: (202) 536-1700
sbest@brownrudnick.com

Sunni P. Beville, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and
Management Board, acting by and through the
members of the Special Claims Committee*

and

*/s/ Alberto Estrella*
ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial Oversight and
Management Board, acting by and through the
members of the Special Claims Committee*

*/s/ John Arrastia*
GENOVESE JOBLOVE & BATTISTA, P.A
John Arrastia, Esq. (*Pro Hac Vice*)
John H. Genovese, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Proposed Special Litigation Counsel to the
Official Committee of Unsecured Creditors for
all Title III Debtors (other than COFINA)*

- and -

*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq.,
        (USDC-PR 218312)
Alberto J. E. Añeses Negrón, Esq.,
        (USDC-PR 302710)
Israel Fernández Rodriguez, Esq.,
        (USDC-PR 225004)
Juan C. Nieves González, Esq.,
        (USDC-PR 231707)
Cristina B. Fernández Niggemann, Esq.
        (USDC-PR 306008)
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
aaneses@cstlawpr.com
jfernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to Official Committee of
Unsecured Creditors for all Title III Debtors
(other than COFINA)*

63400806 v1