# EXHIBIT D

Anejo 1



# Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico

## *Report*

*Prepared for*

## Employees Retirement System of Government of Puerto Rico and Government Development Bank for Puerto Rico, as Fiscal Agent of the Government of Puerto Rico

*Submitted by*

## Conway MacKenzie, Inc.

October 2010

# Table of Contents

Section 1   Scope of Assignment  .................................................................................   2

Section 2   Findings  ......................................................................................................   3

Section 3   Summary of Conclusions .........................................................................   20

Exhibits  .......................................................................................................   22

## Section 1 – Scope of Assignment

On June 30, 2010, Conway MacKenzie, Inc. ("Conway MacKenzie") was retained to prepare for the Employees Retirement System and the Government Development Bank for Puerto Rico, as fiscal agent, (the "GDB") this report and to provide professional services in connection with its review of the Employees Retirement System (hereafter referred to as the "ERS," or "System") of the Government of Puerto Rico (the "Government").

Conway MacKenzie was retained to identify, analyze, and summarize the key events and decisions that have created the current financial crisis of the ERS. Specifically, Conway MacKenzie was engaged to:

- Review historical decisions, transactions and other actions taken by the Board of Trustees of the ERS and the Board of Directors of the GDB, or any committees thereof, to evaluate the deterioration in the funding ratio, and other key indicators, of the ERS during the period of June 2004 to December 2008;

- Review financial projections, budgets, strategic plans and other information to assess the current financial situation of the ERS, including analysis and validation of key assumptions;

- Review the analyses supporting the issuance and utilization of funds related to the issuance of Senior Pension Funding Bonds by the ERS in fiscal year 2008; and

- Review compliance with certain laws and regulations applicable to the ERS, including the Fiscal Reform Law of 2006, by the Board of Trustees of the ERS and the Board of Directors, or any committees thereof, of GDB.

In undertaking this assignment, Conway MacKenzie made multiple site visits to both the ERS and GDB offices, located in Puerto Rico. Conway MacKenzie also interviewed, either telephonically or in-person, a number of key personnel from the ERS. Lastly, Conway MacKenzie reviewed and analyzed various documents including, but not limited to:

- Historical meeting minutes of the GDB Board of Directors (from 2005 through 2008)
- Historical meeting minutes of the ERS Board of Trustees (from 2004 through 2009)
- Actuarial valuation reports of the ERS
- Historical financial statements of the ERS
- Various financial analyses prepared by ERS personnel
- GDB transaction files related to the Pension Obligation Bonds ("POB") transaction of the ERS
- Various presentations prepared by the ERS or outside parties

A complete list of documents relied upon is included as **Exhibit 1**.

2

## Section 2 – Findings

The Employees Retirement System of the Government of Puerto Rico is a trust funded by the contributions of active participants, governmental employers and proceeds from its investment portfolio to pay pensions and other post-employment benefits of government retirees. The current System was created by Act 447 of May 15, 1951 and, since its inception, has lacked proper planning and contribution levels.

The ERS is divided into three benefit structures and administers two separate retirement plans: a defined benefit plan and a defined contribution plan. Contributions to the ERS are set by legislation, and not determined by actuarial calculations. This has negatively impacted funding of the System due to statutorily required contributions being less than actuarially determined required contribution levels for years. The responsibility for the proper operation and administration of the System is vested with the Board of Trustees. As currently structured, the System has inadequate contribution levels relative to benefit obligation requirements, resulting in negative cash flows, a deteriorating asset base and declining funding ratios. Historically, the System has largely ignored many warning signs and addressed and cured its cash flow issues in various temporary ways including the sale of investments, obtaining loans from financial institutions and using Pension Obligation Bond proceeds.

Actions taken by the ERS to improve its fiscal health and reverse the increasing actuarial liability and deteriorating funding ratio have not been successful. If these problems are not properly addressed and the System is not restructured immediately, annual cash shortfalls will render the ERS insolvent in the near future. While the structure of the System has been fundamentally broken for years, certain concrete actions and events from 2004 to 2008 have exacerbated its problems.

**Findings**

Upon the conclusion of our work, we believe the following factors have been fundamental in the deterioration in the ERS's financial health throughout its nearly 60 year history, and particularly during our review period which primarily focused on years 2004 and beyond:

- Inadequate Funding Procedures;
- Special Laws;
- Early Retirement Programs;
- Personal Loans; and
- 2008 Pension Obligation Bond Transactions.

Our findings indicate that the System has essentially been underfunded since its inception in 1951. The underfunding is a direct result of statutory funding requirements that fall below actuarially determined contribution rates. In addition to deficient annual contributions, investment returns and other recurring income levels have been insufficient to cover the System's annual benefit payments and other operating obligations, resulting in negative cash flows. As a result, the System has been forced to liquidate nearly all of its net plan assets to address cash flow shortfalls. In order to bolster the System's prospects of long-term solvency, an increase in the statutorily required contribution rates will be

3

necessary, and only sufficient to reverse the ERS fiscal crisis if done in combination with other actions, some of which are mentioned throughout this report.

We also noted that Special Laws, which grant incremental retirement benefits to participants beyond those which are provided for under the Act 447 and Act 1 benefit structures, have exacerbated the System's fiscal situation through the years. In fact, many Special Laws that were passed appear to have failed in securing long-term, viable funding sources to compensate for their economic burden to the ERS. As a result, the System has shouldered the obligation of funding many Special Law benefits resulting in significant past-due receivables as many public corporations and municipalities simply could not afford to finance these incremental obligations. Since Special Law benefits are not an explicit component of the ERS, we believe the underlying legislation should be revisited and analyzed to determine whether much needed structural changes can be enacted, which would serve to reduce or eliminate unfunded Special Law payments, thereby strengthening the fiscal position of the Government, its various municipality and public corporation employers, and most importantly, the ERS.

Another factor which has aggravated the System's fiscal situation is early retirement programs. These programs were promoted by the Government of Puerto Rico in order to reduce the size of the public workforce, thereby decreasing payroll costs, which account for a substantial portion of the Government's general budget. Based on available information provided, it appears that early retirement programs did not accomplish their intended goals. In addition, since many of these programs were not funded up-front by the sponsoring employers, the ERS continues to remain exposed to collection problems, as well as future cash flow deficits, assuming the System funds additional early retirement benefits for which it is unable to collect reimbursement. It is therefore important that any additional early retirement programs enacted be funded in advance by the sponsoring employer in order to minimize the potential negative cash flow impact on the ERS.

Furthermore, the decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of plan assets. In addition, Conway MacKenzie did not come across any documented discussions or relevant documentation which indicated that the decision to increase the personal loan caps in 2007 was supported by a thorough analysis of its projected impacts on the System's financial health. As a result, we believe that both the System Administrator and Board of Trustees in office during 2007 may have failed to meet the requisite standards of due care and fiduciary duties in approving these changes.

Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS. In fact, the strategy has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future

4

administrations of the ERS. In addition, several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction.

There is a very strong possibility that without immediate, dramatic and encompassing changes to the structure of the System, the aforementioned dynamics will result in the full depletion of the System's net assets in the near future, potentially as early as 2014 as indicated in the ERS's 2009 actuarial valuation report prepared by ERS' actuarial Milliman without the POB available funds and 2018 if using POB available funds.

## Causes of Distress for the Employees Retirement System

The following section provides a more thorough summary of Conway MacKenzie's findings and conclusions as it pertains to the previously mentioned factors which have been fundamental in the deterioration of the ERS.

## Inadequate Funding Procedures

The current employee and employer contribution rates paid to the System are statutorily determined and have not changed since 1990, despite a precipitous drop in the System's funding status and the net assets of the ERS. These contributions are significantly below both the Annual Required Contribution ("ARC"), as determined by the actuarial valuation reports, and the level required to meet benefit and other operating obligations of the System. In fact, the amounts of the annual employee and employer contributions have historically been insufficient to cover even new actuarial liabilities incurred on an annual basis. As a result, the funding ratio continues to deteriorate. The following chart depicts the significant difference between historical employer contributions to the System and the ARC during our review period.[1] As demonstrated below, during the 2004 – 2010 period, the ERS amassed an accumulated ARC deficit of nearly $3.1 billion.

---

[1] The data included in this graph was taken directly from the ERS's June 30, 2009 and 2005 Audited Financial Statements, as well as the ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman. Actual Employer Contribution for the year ended June 30, 2010 is an estimate and assumes contributions of 9.275% of expected payroll for the basic system benefits, plus contributions of $149.9 million for special law pension benefits, plus contributions of $42.7 million for early retirement incentives.



Historical Employer Contribution versus Actuarial Required Contribution
for years ended June 30, 2004 to 2010

In addition, annual contributions and investment and other recurring income have not been sufficient to cover annual benefit payments and other operating obligations. As a result, the ERS is being forced to liquidate System assets in order to meet payment obligations. System assets are expected to continue to decline as negative cash flow (contributions less benefit payments) exceeds current and projected investment income. Simply put, the System is liquidating assets to meet its current obligations. The following chart highlights the anticipated cash flow shortfalls for plan years ended June 30, 2010 through 2020 under current laws, as well as the estimated declines in net plan assets through the same period.[2]

---

[2] The figures in this chart were obtained from the ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman. Certain key assumptions utilized in compiling this analysis are as follows:
- Estimated net plan assets at year-end assumes that the investment return assumption of 7.5% is met;
- Estimated payroll is assumed to grow 2.5% annually;
- Member and employer contributions were estimated to be 17.55% of estimated payroll for each plan year;
- The estimated benefit payments do not include amounts expected to be made to future participants, such as refund or contributions to terminated non-vested participants, disability benefits, death benefits, or retirement benefits due to service purchase, and thus are slightly understated;
- Administrative expenses are assumed to grow 2.5% annually,
- Contributions on behalf of and benefit payments to members of System 2000 are included in the table, and
- Estimated gross plan assets submitted by Milliman

6

($ millions)

| Year Ended June 30 | Estimated Payroll | Estimated Member and Employer Contributions | Estimated Benefit Payments and Administrative Expense | Net Cash Flow | Estimated Net Plan Assets at Year-End | Estimated Gross Plan Assets at Year-End |
|---|---|---|---|---|---|---|
| 2010 | $4,293 | $753 | $1,181 | ($428) | $1,546 | $4,554 |
| 2011 | 4,400 | 772 | 1,191 | (419) | 1,228 | 4,284 |
| 2012 | 4,510 | 792 | 1,210 | (418) | 887 | 3,996 |
| 2013 | 4,623 | 811 | 1,231 | (420) | 518 | 3,684 |
| 2014 | 4,739 | 832 | 1,258 | (426) | 115 | 3,342 |
| 2015 | 4,857 | 852 | 1,292 | (440) | (333) | 2,961 |
| 2016 | 4,978 | 874 | 1,330 | (456) | (831) | 2,534 |
| 2917 | 5,102 | 895 | 1,370 | (475) | (1,385) | 2,055 |
| 2018 | 5,230 | 918 | 1,415 | (497) | (2,005) | 1,517 |
| 2019 | 5,361 | 941 | 1,464 | (523) | (2,697) | 913 |
| 2020 | 5,495 | 964 | 1,513 | (549) | (3,469) | 236 |

In order to bolster the prospects of the System's long-term solvency, an increase in the statutorily required contribution rates will be necessary, but that alone will most likely not be sufficient. Conversely, decreases in ERS benefits could also serve to bridge the gap between the statutorily required contributions and the ARCs, thereby enhancing the ERS's long-term solvency prospects. However, reductions in benefit obligations are considered long-term corrections and will not address the System's immediate cash flow issues. While such changes are both straightforward and logical, they remain long overdue as numerous actuarial recommendations stressing the need to implement these changes have been submitted to the ERS for decades. Unfortunately, failure to address the mismatch between benefits earned and contributions made has now resulted in the near total elimination of net plan assets and put the System at the brink of not being able to make current benefit payments.

Special Laws

Special Laws, which are a series of post-employment benefits granted to ERS participants through enabling legislation passed by previous legislators and governors, provide incremental retirement benefits to participants beyond those which are provided for under the Act 447 and Act 1 benefit structures and include:

- Additional minimum pension benefits;
- Additional minimum death benefits;
- Ad-hoc cost-of-living adjustments (COLAS) provided in past years;
- Additional benefits due to death or disability for reasons specified in Act 127 (specified high-risk positions who died in line of work);
- Medical insurance plan contributions;
- Summer bonuses;
- Medication bonuses; and
- Christmas bonuses.

Many of the Special Laws appear to have been introduced and approved throughout the years by way of highly political processes, often with competing and conflicting goals relative to those which would serve to bolster the long-term viability of the ERS. Importantly, Special Law approvals also seem to have overlooked the importance of ensuring long-term, viable funding sources are available to

7

compensate for their economic burden. Ostensibly, these incremental benefits are funded on a pay-as-you-go basis from the General Fund or specific public employer entities of the Government and are therefore obligations which should not be funded by ERS assets. However, many public corporations and municipalities, which bear the responsibility of funding the Special Laws, simply cannot afford to finance these incremental obligations and as a result, have not paid the System the appropriations and have generated significant past-due receivables with the ERS. Specifically, as of June 30, 2010, ERS assets have been used to fund approximately $92.5 million of Special Law obligations, for which various municipalities and public corporations are yet to reimburse the ERS.[3]

As of June 30, 2009, Special Laws accounted for nearly $2.3 billion of the roughly $19 billion in actuarial liabilities.[4] A summary of the costs of Special Laws for plan years ended June 30th 2004 – 2010 is as follows:[5]

($ in millions)

| Special Laws | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Total Cost | $163.20 | $201.60 | $245.80 | $232.30 | $261.30 | $272.50 | $272.40 |

Please refer to **Exhibit 3** for a detailed analysis of the cost of each Special Law to the Government for fiscal years ended June 30, 2004 – 2010.[6]

Special Law benefits play a large role in the fiscal situation plaguing both the Government's General Fund and the ERS. Stated frankly, we question how these Special Laws could have ever been passed with what appears to be such little attention to confirming that long-term, viable funding sources would be available to cover their costs and minimize their potential negative impacts on the System's cash flows and funding ratio. Because the Special Law benefits are not an explicit component of the ERS, we believe the underlying legislation should be revisited and analyzed to determine whether much needed structural changes can be enacted, which would serve to reduce or eliminate unfunded Special Law payments, thereby strengthening the fiscal position of the Government, its various municipality and public corporation employers, and most importantly, the ERS. Conway MacKenzie's scope of work did not include determining whether the various participating employers had the ability to fund Special Laws.

Early Retirement Programs

The Government of Puerto Rico began to promote early retirement programs in 1994 in order to reduce the size of the public workforce, thereby decreasing payroll costs, which account for a substantial portion of the general budget. Since 1994, nearly 20 early retirement programs have been implemented, at a total cost of approximately $631 million.[7]

---

[3] Refer to Exhibit 2 for a summary of outstanding municipality and public corporation Special Law accounts receivable.
[4] Per ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman.
[5] This information was provided by Teresa Meaux Pereda, of the ERS.
[6] Ibid.
[7] This information was obtained from "Estudio Relacionado con los Programas de Retiro Temprano Aprobados desde el 2005 hasta el 2008, Propósito, Resultados y Recomendaciones, Volumen 2" published in March 2010.

Conway MacKenzie was provided with two studies prepared by The Government of Puerto Rico's Permanent Special Committee on Retirement Systems, which both appeared to indicate that the early retirement programs did not accomplish their intended goals of shrinking the size of the government workforce.

Because many of these programs were not funded up-front by the sponsoring employers, the ERS continues to remain exposed to collection problems, as well as future cash flow deficits, assuming the System funds additional early retirement benefits for which it is unable to collect reimbursement. Specifically, as of July 31, 2010, the ERS was owed approximately $19.1 million[8] in past-due early retirement program costs by certain employers who did not remit their payments to the System in accordance with previously agreed upon payment plans. In total, the ERS currently has approximately $80.5 million[9] in outstanding accounts receivable pertaining to early retirement programs. To the extent additional employers don't comply with previously agreed upon payment plans, the ERS's exposure to early retirement program expenses could continue to grow. While opining on the overall success or failure of any particular early retirement plan (as defined by the costs saved from payroll reductions versus the costs spent on early retirement benefits) was outside of the scope of our engagement, it is clear to us that early retirement programs have indeed had, and could continue to have, a negative cash flow impact on the ERS.

To this end, it is important that any additional early retirement programs enacted be funded in advance or have specific funding plans by the sponsoring employer in order to minimize the potential negative cash flow impact on the ERS.

<u>Personal Loans</u>

The ERS currently offers and administers a Personal Loan program to its plan members. Personal loans can be obtained by System participants for a variety of different reasons and can be taken for up to $15,000.

The decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of ERS assets. As a result, the ERS's investment portfolio is now heavily weighted in illiquid assets (i.e. personal loans) and includes a large amount in receivables from participants that have questionable short term cash recovery. This overconcentration of illiquid assets has also accelerated the System's forecasted insolvency date by nearly two years. The chart below illustrates the significant growth in the ERS's personal loan portfolio as a result of the System's decision to increase the loan caps in 2007.[10]

---

[8] This figure was obtained from the July 31, 2010 Early Retirement Accounts Receivable Schedule, provided by Cecile Tirado Soto, Controller of the ERS.

[9] Ibid.

[10] Figures referenced in this chart are in 000's and as of 6/30 for each respective year included. All figures were obtained from Luis Garcia Lopez, Director of Investment Officer at the ERS.



The potential impact of increasing the cap on personal loans from $5,000 to $15,000 on the System's liquidity profile and investment portfolio should have been thoroughly vetted before the ERS decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us and interviews with various key employees of the ERS, it appears that appropriate due care was not exercised by the System's management and Board of Trustees in allowing this change in 2007. Specifically, we did not come across any documented discussions or other data which indicated that this change was supported by a thorough analysis of its projected impacts on the System's financial health. We were advised by ERS personnel that such analyses were, in fact, never prepared in connection with the decision to increase the personal loan caps in 2007.

Given the current liquidity crisis that the ERS is facing, we believe the System should immediately consider its options to reduce personal loan exposure, with the ultimate goal of reallocating these assets into more liquid and diversified investment options to ensure that funds will be available in the near-term to fund plan benefit expenses. While securitization of the personal loan portfolio could serve as one potential option of accomplishing this goal, the ERS may not be able to execute on a securitization due to legal implications.

<u>2008 Pension Obligation Bond Transactions</u>

In addition to identifying the above factors which have negatively impacted the financial condition of the ERS, Conway MacKenzie also reviewed the 2008 Pension Obligation Bond transactions. The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage. In evaluating the POB transactions, we focused our attention on the following three questions:

1. Was the Pension Obligation Bond strategy reasonable?
2. Was it prudent to issue the Pension Obligation Bonds?
3. Were Pension Obligation Bond proceeds utilized appropriately?

As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated.

## 1. Was the Pension Obligation Bond strategy reasonable?

In addressing this question, Conway MacKenzie evaluated the following:

a. If issued, would the POB transaction resolve the System's liquidity needs?
b. If issued, would the POB transaction increase the System's funded ratio?
c. Were the likelihood of success and potential risk factors properly vetted?

Would the POB transaction resolve the system's liquidity needs?

Based upon its financial analysis, in an August 7, 2007 presentation to the ERS, Merrill Lynch highlighted that $7.0 billion in bond proceeds were required to address the liquidity needs of the System.[11] The employer contributions, which solely secured the POB obligations, were forecasted to be sufficient to service the debt obligations related a $7.0 billion POB issuance. The POB transaction was essentially a pull ahead of future employer contributions to fund short term cash flow requirements. As the defined benefit plan matured and its benefit obligations declined, future employer contributions would continue to be used to fund POB debt service.

Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements.

Would the POB transaction increase the System's funded ratio?

As described in ERS Board of Trustee minutes and various presentations by the ERS, an underlying reason for the POB transaction was to increase the total assets of the System and therefore increase the funding ratio. Per ERS Board of Trustee minutes and various rating agency reports, the funding ratio of the System was expected to increase to approximately 70% with the issuance of $7.0 billion of pension obligation bonds. However, the current funding ratio calculated by Milliman in the June 30, 2009 actuarial report is 9.7%, significantly less than 70% as communicated and estimated by the ERS during the POB issuance process. A primary reason for this significant variance is treatment of the

---

[11] See Exhibit 4 for the complete Merrill Lynch Global Markets & Investment Banking Group presentation to the Employee Retirement System regarding Pension Funding Bonds: Debt Structure and Funding Analysis dated August 7, 2007.

bond debt liability in the funding calculation. The June 30, 2009 actuarial valuation report calculates the funding ratio based upon "net assets" in which the $2.961 billion of bond debt is netted or subtracted from the total market value of assets, consistent with how prior funding ratios were determined. However, in calculating the estimated 70% funding ratio, the proposed $7.0 billion of bond debt was not netted or subtracted from the total market value of assets to calculate net assets, essentially ignoring the liability.

Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted funding ratio's computation methodology. Given the dramatic increase in the funding ratio presented to them, ERS management, the Board of Trustees and GDB Board of Directors had a responsibility to fully understand if the increase was reasonable and calculated consistently with prior period calculations. This lack of understanding falls short of what is expected from a director or a fiscal agent that is exercising prudence or acting within the general standards of reasonability.

<u>Were the likelihood of success and potential risk factors properly vetted?</u>

Given the financial leverage that it imposed upon the System, the proposed POB transaction was a very risky and speculative transaction, such that if certain assumptions failed to materialize, the System could be forced to bear higher costs and/or face increased liquidity requirements. Potential risks that existed when the POB transaction was undertaken included, among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Both of these risks became realities as the POB transaction was not only undersubscribed, but it also failed to experience the planned investment returns, thereby resulting in negative arbitrage. It appears that numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action plans were not altered.

<u>Conclusion</u>

Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, the transaction was subject to significant risks among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Based upon our review of supporting documents, it appears that these risks were not fully understood or vetted by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care.

**2. Was it prudent to issue the Pension Obligation Bonds?**

The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual

net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cash flow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS.

In determining if it was prudent to proceed with the POB transaction, emphasis should be placed on whether or not the ERS ignored early warning signs prior to issuing the POBs. Based upon our review of the information, we believe that the following early warning signs existed related to the POB issuance:

a.  It appears that Merrill Lynch's failed offering in the global marketplace during December 2007 should have been an indication that there was no viable market to raise the full $7.0 billion necessary to comprehensively address the ERS' objectives.

b.  Series A, B and C of the POBs were all issued in the local Puerto Rican market by UBS after Merrill Lynch was unsuccessful in generating sufficient interest in the international market. A reasonable concern that should have been assessed thoroughly by the ERS management, Board of Trustees and GDB Board of Directors prior to moving forward on the POB transaction strategy with UBS was whether the local market was large enough to absorb a $7.0 billion bond offering.

c.  In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing."[12]

d.  By June 2008 there were also signs that the stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized.

Conclusion

Based upon advice and analysis from Merrill Lynch, the ERS believed that at least a $7.0 billion POB issuance was required to resolve the System's liquidity needs. Although POB proceeds of less than $7.0 billion would assist the System by improving liquidity in the short term and extending the date by which it would deplete its assets, they did not provide a permanent solution to the System's problems and actually harmed the System because negative arbitrage was realized. The parties responsible for the oversight and administration of the ERS had a fiduciary responsibility to ensure market conditions were supportive of issuing at least the full $7.0 billion transaction required to solve the System's financial crisis before proceeding with the transaction.

It is Conway MacKenzie's opinion that several warning signs existed concerning market conditions, principally Merrill Lynch's inability to issue the POBs in the global market, that should have given ERS management, Board of Trustees and GDB Board of Directors probable cause to either postpone the bond transaction or request additional due diligence be performed.

---

[12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008.

Additionally, we believe that by June 2008 it should have been apparent to the decision-makers and their advisors, that it was very unlikely that the incremental $5.5 billion in POB issuances required to reach the full $7.0 billion could be raised given deteriorating market conditions.

For these reasons, it is our opinion that the decisions made by the governing boards of the ERS and GDB to pursue and enter into Series A, Series B and Series C transactions were not prudent given the risks inherent in the transactions, several of which risks appear to have increased significantly in probability prior to the issuance of these bonds.

### 3. Were the Pension Obligation Bond proceeds utilized appropriately?

Two objectives of the POB issuance were to raise funds to cover the System's operating expenses (cash flow objective) and to generate a profit (arbitrage objective). In determining whether the POB proceeds were utilized in accordance with these objectives, we note following:

- Of the $1.6 billion raised from Series A, approximately $937 million was transferred to Citibank which was eventually invested in various stocks and bonds. The balance of $642 million in Series A proceeds were utilized to pay closing costs, fund debt service reserves and pay the Department of Treasury for overdrafts.

- Of the combined $1.4 billion raised from Series B and C, approximately $1.3 billion was transferred to a GDB account, where it was held in cash. Since 2008, $564 million of Series B and C proceeds have been used to cover the System's operating cash shortfalls and fund pension liabilities. As such, only approximately $737 million remains in the GDB cash account as of June 30, 2010.

<u>Conclusion</u>

The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed based on the current liquidity needs of the System. In fact, the POB transaction has and will continue to cost the System money, as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees.

### Overall Conclusion on POB Transaction Review

In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little

14

effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.

Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.

The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. Consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS.

Lastly, throughout the review process, it was clear to us that certain critical decisions, or lack thereof, made by those responsible for the ERS's oversight and management have negatively impacted the ERS and resulted in further deterioration of the System's liquidity profile and funding status. Furthermore, we believe that certain actions and omissions of the ERS Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed. As such, further investigation into the POB decision-making process should be pursued by the appropriate authorities.

## Evaluation of Past Management Practices of the ERS

While the combination of Act 447 benefit arrangements, Special Laws, and historically inadequate funding procedures have resulted in significant deterioration of the ERS's funding ratio throughout its near 60 year history, certain recent decisions made by those responsible for the management and oversight of the ERS have exacerbated this issue.

In this section of the report, we focus on the evaluation of certain actions that were taken by the ERS's management during the 2004 – 2008 review periods, namely:

- The issuance of the Pension Obligation Bonds;
- Decisions to increase the ERS's personal loan portfolio; and
- Accounts receivable collection efforts.

The Issuance of the Pension Obligation Bonds

In analyzing management's decision to enter into the POB transaction, we question the initial assumption made that such a strategy would improve the funded status of the System. The treatment of bond obligations in the calculation of the UAAL by the actuaries Milliman and Buck Consultants appear to support the practical reality that the incurrence of additional debt to increase assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the System by the parties that made the decision to enter into the POB transaction.

Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed suggesting full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency.

Based on our review of the relevant ERS and GDB POB transaction working paper files, which include various meeting minutes of the ERS's Board of Trustees and the GDB's Board of Directors, it does not appear that this risk was properly considered or addressed by the various Boards. Specifically, in proceeding forward with the POB issuance just after Merrill Lynch's failed attempts to close the originally contemplated transaction, the decision-makers ignored a major warning sign which indicated that the requisite level of demand did not exist for the ERS's planed $7.0 billion POB issuance. Given a successful transaction required issuance of at least $7.0 billion, ERS management, ERS Board of Trustees and GDB Board of Directors had a duty to thoroughly understand the risks associated with not achieving at least $7.0B of POB proceeds.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the POB transaction merely provided a short-term temporary measure to address the System's liquidity needs. This short-term measure is pricey and its costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. We also believe that certain actions and omissions of the Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed. As such, Conway MacKenzie

recommends that further investigation into the POB decision-making process should be pursued by the appropriate authorities.

<u>Decisions to Increase the ERS's Personal Loan Portfolio</u>

As mentioned more thoroughly elsewhere in this report, the decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of ERS assets. As a result, the ERS's investment portfolio is now heavily weighted in illiquid assets (i.e. personal loans) and includes a large amount in receivables from participants that have questionable short term cash recovery. This overconcentration of illiquid assets has also accelerated the System's forecasted insolvency date by nearly two years.

The potential impact of increasing the cap on personal loans from $5,000 to $15,000 on the System's liquidity profile and investment portfolio should have been thoroughly vetted before the ERS decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us, including the 2007 ERS Board of Trustee minutes, and interviews with various key employees of the ERS, it appears that such due care was not used by the System Administrator in supporting this change or by the Board of Trustees in approving this change. Specifically, we did not come across any documented discussions or other data which indicated that this change was supported by a thorough analysis of its projected impacts on the System's financial health and were advised by key ERS personnel that such analyses were, in fact, never prepared in connection with the decision to increase the personal loan caps in 2007. Approving such a decision without supporting analyses demonstrates lack of fiduciary responsibility by ERS management and the Board of Trustees.

<u>Accounts Receivable Collection Efforts</u>

Based on interviews conducted with current and former ERS personnel, Conway MacKenzie was informed that ERS invoices were not being issued on a timely basis, and in certain instances, were not being issued at all to certain employers who participated in the System prior to 2005. When this was discovered, the prior ERS Administration put forth significant extra effort in cleaning up, monitoring and managing the invoicing and collection process. Additionally, the ERS vigorously arranged payment plans for delinquent municipalities and corporations to further enhance the collections process during 2007. The lax management of account receivable balances by the Administration prior to 2005 is an area that that has negatively impacted the ERS. Conway MacKenzie was also informed that certain corporations and municipalities have not been remitting both employer and (withheld) employee contributions to the ERS. Upon further investigation by the System's accountants, it was determined that these contributions were used by certain participating employers to cover their own cash shortfalls or for other unspecified reasons. While investigating the use of these proceeds falls outside of the scope of Conway MacKenzie's assignment, this is still an area of concern, particularly as it relates to employee withholdings.

**Lack of Proper and Accurate Record Keeping**

Mesirow Report

Conway MacKenzie learned through various interviews and by review of various POB documents that Mesirow Financial ("Mesirow") acted as the financial advisor to the GDB for the POB transaction. We were also advised by ERS personnel that Mesirow may have issued a report or correspondence expressing its concerns or an adverse position regarding the POB transaction. A physical or electronic copy of such report or position was not included in either ERS or GDB documents provided. Conway MacKenzie attempted to obtain a copy of Mesirow's report or position on the POB transaction through Luis Garcia (Director of Investments at the ERS), but was unsuccessful. When contacted by Luis Garcia, Mesirow responded that all information requests relating to the POB transaction should be channeled to Mesirow's legal department. The GDB sent a formal request for such information to Mesirow's Associate General Counsel on September 14, 2010. As of the date that this report was published, we had not obtained any of the requested information from Mesirow.

Given the potential implications which Mesirow's report or position on the feasibility of the POB transaction may have, we strongly encourage the GDB to review copies of both Mesirow's report and their working papers related to the POB transaction. If Mesirow did, in fact, raise concerns regarding the POB transaction that were communicated to its client, the GDB, reasons why the GDB Board of Directors and/or ERS Board of Trustees did not act on such concerns and advice from the advisor should be investigated to determine whether a lack of due care exists.

GDB Minutes

During Conway MacKenzie's review of GDB files related to the POB transaction, including Board of Director and Executive Committee meeting minutes, we noted that numerous GDB meeting minutes during the review period of 2004 – 2008 were either missing or incomplete. As such, we were unable to trace certain discussion threads or validate the timing of certain decisions made by the Board of Directors and/or Executive Committee which could have assisted us in verifying whether certain issues were identified or raised within the GDB organization, either prior to or during the issuance of Series B and C.

Section 107 of the GDB Board by-laws states that, "The Secretary of the Board shall issue calls for all regular meetings, shall keep minutes of all meetings, shall be custodian of the minute books and the Seal of the Bank and shall perform such other duties as are incident of his office or properly required of him by the Board of Directors who may also appoint one or more Assistant Secretaries to perform such duties as the Board my prescribe…"

Given the poor condition of the GDB Board of Director and Executive Committee meeting minutes, an investigation should be conducted to evaluate the process and determine who was responsible for the lack proper record keeping. In addition to the individuals responsible for record keeping, former Board of Directors and Executive Committee members should be questioned as to their knowledge of the situation. Current GDB management is aware and has taken remedial actions. Accordingly, we were informed by General Counsel of the GDB that the GDB has made referrals for further investigation to the

Department of Justice, the Government Ethic's Office and the Office of the Comptroller regarding their findings with respect to poor record keeping by the former Secretary of the GDB Board of Directors.  We strongly encourage the proper authorities to conduct further investigations as it relates to the state of record keeping by the former GDB Board of Directors.

## Section 3 – Summary of Conclusions

The following table summarizes Conway MacKenzie findings, illustrates decision-makers, officers and directors responsible for the findings during the analyzed period and provides certain recommendations about the System:

| Factors that led to the Financial Crisis | Findings | Responsible Decision-Makers, Officers and Directors | Recommendations |
|---|---|---|---|
| **Inadequate Funding Procedures** | Failure to address at all from 2000-2008 funding status of the System after actions taken in year 1999 to close the defined benefit plans | ERS Board of Trustees and ERS management during relevant period | An increase in the statutory contribution rates and decrease in ERS benefit obligations is necessary |
| **Special Laws** | Enactment of special laws without long-terms viable funding sources introduced and approved by way of highly political process | Parties associated with the enactment of Special Laws, specifically Act. No. 524 of 2004, Act No. 144 of 2005 and Act No. 35 of 2007 and ERS management | Reduce or eliminate special law payments |
| **Early Retirement Programs** | Promotion of early retirement programs that were not funded up front by sponsoring employer | Parties associated with the enactment of early retirement programs and ERS management | Any additional early retirement program must be funded in advance or have specific funding plans by the sponsoring employer |
| **Personal Loans** | Increase in the maximum loan balance for personal loans resulted in a significant cash drain, as a result the ERS investment portfolio is heavily weighted in illiquid assets | Juan Cancel Alegria (ERS), Alfredo Salazar (GDB), Jorge Irizarry (GSB), Other select individuals from ERS management and ERS Board of Trustees as identified in **Exhibit 4** | The ERS should immediately consider alternatives to reduce personal loan exposure |

| Factors that led to the Financial Crisis | Findings | Responsible Decision-Makers, Officers and Directors | Recommendations |
|---|---|---|---|
| **2008 Pension Obligation Bond Transactions** | The $3.0 billion POB transaction was inherently flawed, misconceived and speculative as a mechanism to improve the System's funded ratio. It merely provided a short-term temporary cash measure which blindly guided decision-makers despite many warning signs. The negative arbitrage and fees paid actually worsened the funding position | Alfredo Salazar (GDB), Jorge Irizarry (GDB), Juan Cancel Alegria (ERS), Harold Gonzalez (ERS), Minia Gonzalez (ERS), Other select individuals from ERS management, ERS Board of Trustees and GDB Board of Directors as identified in **Exhibit 4** | Due to lack of care demonstrated by the decision-makers, further investigation is warranted |

21

## List of Exhibits

| | | |
|---|---|---|
| Exhibit 1 | - | List of Documents Relied Upon |
| Exhibit 2 | - | Summary of Outstanding Municipality and Public Corporation Special Law Accounts Receivable as of June 30, 2010 |
| Exhibit 3 | - | Detailed Cost Analysis by Special Law by Year (2004 – 2010) |
| Exhibit 4 | - | List of Decision-makers, Officers and Directors |

# Exhibit 1

**Exhibit 1**
**Documents Relied Upon**

1 2003-2004 to 2009-2010.xls
2 2007-08 Pension Funding Bonds Debt Structure and Funding Analysis.pdf
3 2010-02 ERS General Information.pdf
4 Act 11 Amendment-TRS-English.pdf
5 Act 34 Amendment-TRS-English.pdf
6 Act 35 of 2007.pdf
7 Act 447-ERS-English.pdf
8 Act 70 of 2010.pdf
9 Act 70 Regulation.pdf
10 Act 91-TRS-English.pdf
11 Actuarial Study in Respect to Active Members as of June 30, 1975 of the Retirement System of the Government of Puerto Rico and Its
   Instrumentalities, and Supplementary Comments (prepared by A. Estrella and C.J. Nesbitt) dated June 20, 1977
12 Actuarial Valuation 2005.pdf
13 Actuarial Valuation 2007.pdf
14 Actuarial Valuation 2009.pdf
15 Actuarial Valuation-ERS-2009-06-03.pdf
16 Actuarial Valuation-JRS-2009-06-03.pdf
17 Actuarial Valuation-TRS-2009-06-03.pdf
18 acuerdos11AGOSTO.xls
19 Alternate Allocation Scenario Comparison for Administrative Resolution Num. 2008-17
20 America's Prison Hell is a Little Slice of Heaven.pdf
21 approved laws.pdf
22 ASR-General Information-Actuarial Overview-ERS-JRS-TRS- 2009-09-21-English.pdf
23 ASR-Historical Presentation-JRS-2010-English.pdf
24 ASR-Retirement System Overview-2010-03-12-Spanish.pdf
25 Caribbean Business-2010-04-01-The Employee Retirement System is bankrupt-by Carlos Marquez.pdf
26 Cash Flows Statements.xls
27 Cashflow shortfall.pdf
28 cashflow2011proyeccion.xls
29 Chapter 7 - The Economy of Puerto Rico.pdf
30 Comision Reforma Retiro-Resource Library-v2010-05-25.xlsx
31 Comunicado de Prensa-2010-03-12 Spanish.pdf
32 Contact List-ASR-TRS.pdf
33 Contact List-ASR-TRS.xlsx
34 Contact List-Reform Commision Members-Español.doc
35 Employees Retirement System of the Government of the Commonwealth of Puerto Rico (ERS): Covered Payroll Outlook (2008-2059)
36 Enmiendas por decadas Sistema de Retiro.doc
37 EnnisKnupp-Asset Liability Study-Completion Ratio-2010-01-English.pdf
38 ERS 1989-2009.xls
39 ERS Board of Trustee By-Laws
40 ERS Board of Trustee meeting minutes (2004 - 2009) - various files
41 ERS Functional Organization Chart
42 ERS Position Papers for Laws 35, 144, and 524
43 ERS-JRS-TRS-Executive Summaries-English-2010.pdf
44 EST FIN ELA 2009-2010 (3).xls
45 Estudio Relacionado con los Programas de Retiro Temprano Aprobados desde el 2005 hasta el 2008, Proposito, Resultados y
   Recomendaciones Vol. 2.pdf
46 Financial Statements-ERS-2007-06-30.pdf
47 Financial Statements-ERS-2009-06-30.pdf
48 Fiscal Reform Law of 2006(A-0103-2006).pdf
49 FS 2007.pdf
50 FS 2008.pdf
51 FS 2009.pdf
52 GDB Board of Directors By-Laws
53 GDB Board of Directors Meetings, 2004 (Draft) files
54 GDB Board of Directors Meetings, 2005 (Final) files
55 GDB Board of Directors Meetings, 2006-2007 (Final) files
56 GDB Board of Directors Meetings, 2006-2008 (Draft) files

**Exhibit 1**
**Documents Relied Upon**

57  GDB Board of Directors Meetings, 2007 (Final) files
58  GDB Board of Directors Meetings, 2008-2009 (Draft) files
59  GDB Bond Documents, Series A - File I (various files)
60  GDB Bond Documents, Series A - File II (various files)
61  GDB Bond Documents, Series A - File III (various files)
62  GDB Bond Documents, Series A - File IV - Cost of Issuance (various files)
63  GDB Bond Documents, Series B - Cost of Issuance (various files)
64  GDB Bond Documents, Series B - File I (various files)
65  GDB Bond Documents, Series B - File II (various files)
66  GDB Bond Documents, Series C - File I (various files)
67  GDB Bond Documents, Series C - File II - Cost of Issuance (various files)
68  GDB Exectuive Committee Meetings, 2006 (Final) files
69  GDB Exectuive Committee Meetings, 2006-2008 (Draft) files
70  GDB Org Chart.ppt
71  Historicos Flujos de Efectivo 2005 a 2009 eng.xls
72  Internal Financial Statements.xls
73  Investment Company Act of 1940.pdf
74  Investment Consultants.doc
75  June 30, 2010 Unaudited Financial Statements
76  June 30, 2010 Unaudited Financial Statements
77  KITJUNTAJUNIO2010.xls
78  Laws and Early Retirement Programs (8-23-10).doc
79  Letter address to the ERS' Board of Trustees from Wodward and Fondiller (a division of Martin E. Segal Co., Inc) dated June 29, 1971
80  Letter from John Thomas Enger of UBS Consulting Services of Puerto Rico to Jorge Irizarry Herrans dated June 4, 2008
81  LOAN OVERVIEW JUNE 2009.ppt
82  Memo to the Reform Commission General Overview-2010-English.pdf
83  Milliman Law 70 Analysis.pdf
84  Milliman-Review of Pension Funding and Solvency Issues-2010-04-06-English.pdf
85  Milliman-Review of Pension Funding and Solvency Issues-2010-05-11-English.ppt
86  NASRA-Public Fund Survey-Summary_of_Findings_FY08-by Keith Brainard-2009-10.pdf
87  NASRA-SustainabilityChanges-2010-05-24.pdf
88  NASRA-sustainabilitymeasures-2009-12-22.pdf
89  OE-2010-10 Orden Ejecutiva Sistema de Retiro-Spanish.pdf
90  Pew Center-Promises with a Price-Public Sector Retirement Benefits-2009-11-24.pdf
91  Pew Center-The trillion dollar gap-2010-02-18.pdf
92  Programas de Retiro Temprano Aprobados desde el 1994 hasta el 2005, Proposito, Resultados y Recomendaciones.pdf
93  Related to Series A, B and C Issues.xls
94  Related to Telefonica de PR Dividends and Sale of Shares.xls
95  Report to the Governor's Special Commission on Retirement System (submitted by Aon Consulting, Inc.) dated August 2010
96  Return Summary.pptx
97  S&P-Public Finance-US States OPEB Liabilities-2009-06-03.pdf
98  Santander Credit Line.xls
99  Senior Pension Funding Bond Series A - $1.59B.pdf
100 Senior Pension Funding Bond Series B - $1.06B.pdf
101 Senior Pension Funding Bond Series C - $300M.pdf
102 Sistema De Retiro De Los Empleados Del Gobierno: Origen, Deficit Actuarial y Recomendaciones (CEPSR report) dated March 2009
103 SistemaDeRetiroDeLosEmpleadosDelGobierno.doc
104 Social Secutiry Reform-National Commission-by Greenspan-1983-01.pdf
105 Special Commission on Retirement Systems Reform.pdf
106 The Puerto Rico Government Emplyees' and Judiciary Retirement Systems Statement of Investment Policy and Perfomance Objectives
     (dated April 6, 2010)
107 TIMEDEPOSTJUNTA.xls
108 UBS Consulting Services of Puerto Rico Presentation to the Puerto Rico Employee's Retirement System (various dates)
109 UBS in PR Pension_07-27-09 Bloomberg article.pdf
110 UBS in Puerto Rico Pension Gets Fee Bonanza Seen as Conlicted (Bloomberg article) dated February 27, 2009
111 Univ Minnesota Law School-Public Pension Plan Reform-The Legal Framework by Amy B. Monahan.pdf

# Exhibit 2

Exhibit 2
Summary of Outstanding Municipality Special Law Accounts Receivable
As of June 30, 2010

| Municipality | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| ADJUNTAS | 301 | - | - | - | 76,951 | - | 76,951 |
| AGUADA | 302 | - | - | - | - | - | - |
| AGUADILLA | 303 | - | - | - | - | - | - |
| AGUAS BUENAS | 304 | - | - | - | 3,576 | - | 3,576 |
| AIBONITO | 305 | - | - | - | 95,240 | - | 95,240 |
| AÑASCO | 306 | - | - | - | - | - | - |
| ARECIBO | 307 | - | - | - | - | - | - |
| ARROYO | 308 | - | - | - | - | - | - |
| BARCELONETA | 309 | - | - | - | 2,531 | - | 2,531 |
| BARRANQUITAS | 310 | - | - | - | 243,979 | - | 243,979 |
| BAYAMON | 311 | 122,866 | - | - | - | - | 122,866 |
| CABO ROJO | 312 | - | - | - | 149,829 | - | 149,829 |
| CAGUAS | 313 | - | - | - | 562,324 | - | 562,324 |
| CAMUY | 314 | - | - | 4,227 | 136,300 | - | 140,527 |
| CANOVANAS | 378 | - | - | - | 3,211 | - | 3,211 |
| CAROLINA | 315 | - | - | 104,316 | 101,028 | - | 205,344 |
| CATAÑO | 316 | - | - | - | 202,861 | - | 202,861 |
| CAYEY | 317 | - | - | - | - | - | - |
| CEIBA | 318 | - | - | - | 71,233 | - | 71,233 |
| CIALES | 319 | - | 5,779 | 59,665 | 67,572 | - | 133,015 |
| CIDRA | 320 | - | - | - | - | - | - |
| COAMO | 321 | - | - | 92,657 | 107,689 | - | 200,345 |
| COMERIO | 322 | - | - | - | 35,105 | - | 35,105 |
| COROZAL | 323 | - | - | - | 74,797 | - | 74,797 |
| CULEBRA | 324 | - | - | - | - | - | - |
| DORADO | 325 | - | - | - | 97,445 | - | 97,445 |
| FAJARDO | 326 | - | - | - | - | - | - |
| FLORIDA | 377 | - | - | - | 5,557 | - | 5,557 |
| GUANICA | 327 | - | - | - | 5,429 | - | 5,429 |
| GUAYAMA | 328 | - | - | - | 18,407 | - | 18,407 |
| GUAYANILLA | 329 | - | - | 80,848 | 104,573 | - | 185,421 |
| GUAYNABO | 330 | - | - | - | - | - | - |
| GURABO | 331 | - | - | - | - | - | - |
| HATILLO | 332 | - | - | - | 69,920 | - | 69,920 |
| HORMIGUEROS | 333 | - | - | - | - | - | - |
| HUMACAO | 334 | - | - | - | 226,540 | - | 226,540 |
| ISABELA | 335 | - | - | - | - | - | - |
| JAYUYA | 336 | - | - | - | - | - | - |
| JUANA DIAZ | 337 | - | - | - | 97,928 | - | 97,928 |
| JUNCOS | 338 | - | - | - | 91,456 | - | 91,456 |
| LAJAS | 339 | - | - | - | - | - | - |
| LARES | 340 | - | - | - | 101,115 | - | 101,115 |

Exhibit 2
Summary of Outstanding Municipality Special Law Accounts Receivable
As of June 30, 2010

| Municipality | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| LAS MARIAS | 341 | - | - | - | 68,331 | - | 68,331 |
| LAS PIEDRAS | 342 | - | - | - | 4,270 | - | 4,270 |
| LOIZA | 343 | - | - | - | 40,448 | - | 40,448 |
| LUQUILLO | 344 | - | - | - | - | - | - |
| MANATI | 345 | - | - | - | 6,119 | - | 6,119 |
| MARICAO | 346 | 98,326 | 53,033 | 60,261 | 66,703 | 3,906 | 282,229 |
| MAUNABO | 347 | 228,497 | 99,559 | 102,044 | 116,139 | - | 546,239 |
| MAYAGUEZ | 348 | 461,831 | 455,664 | 487,269 | 552,870 | - | 1,957,634 |
| MOCA | 349 | - | - | - | - | - | - |
| MOROVIS | 350 | 84,637 | 22,152 | - | 184,731 | - | 291,720 |
| NAGUABO | 351 | - | 2,324 | - | 10,588 | - | 12,913 |
| NARANJITO | 352 | - | - | - | 96,860 | - | 96,860 |
| OROCOVIS | 353 | - | - | - | 40,745 | - | 40,745 |
| PATILLAS | 354 | 88,378 | 72,487 | 79,882 | 86,464 | - | 327,210 |
| PEÑUELAS | 355 | - | - | - | 148,370 | - | 148,370 |
| PONCE | 356 | 518,438 | - | 725,509 | 779,971 | - | 2,023,919 |
| PONCE MUELLE | 357 | - | - | - | - | - | - |
| QUEBRADILLAS | 379 | - | - | - | - | - | - |
| RINCON | 358 | 60,304 | 118,262 | 117,753 | 146,272 | - | 442,591 |
| RIO GRANDE | 359 | - | 47,334 | - | 75,555 | - | 122,890 |
| SABANA GRANDE | 360 | 89,670 | 109,130 | 98,120 | 117,491 | - | 414,410 |
| SALINAS | 361 | - | - | 149,962 | 168,999 | - | 318,951 |
| SAN GERMAN | 362 | 0 | 0 | - | - | - | 0 |
| SAN JUAN | 363 | 1,922,228 | 4,796,915 | 5,232,328 | 5,411,655 | - | 17,363,126 |
| SAN LORENZO | 364 | 368,884 | 184,473 | 195,187 | 220,342 | - | 968,885 |
| SAN SEBASTIAN | 365 | 156,986 | 85,453 | 88,735 | 100,450 | - | 431,624 |
| SANTA ISABEL | 366 | - | 0 | 100,516 | 110,702 | - | 211,219 |
| TOA ALTA | 367 | - | - | - | - | - | - |
| TOA BAJA | 368 | - | - | - | - | - | - |
| TRUJILLO ALTO | 369 | - | 101,469 | - | 184,574 | - | 286,043 |
| UTUADO | 370 | - | - | - | - | - | - |
| VEGA ALTA | 371 | 3,476 | - | 155,074 | 173,825 | - | 332,376 |
| VEGA BAJA | 372 | - | - | - | 81,454 | - | 81,454 |
| VIEQUES | 373 | - | - | - | 2,800 | - | 2,800 |
| VILLALBA | 374 | - | - | 87,809 | 105,972 | - | 193,781 |
| YABUCOA | 375 | - | - | 71,960 | 168,170 | - | 240,130 |
| YAUCO | 376 | - | - | - | - | - | - |
| **Total Municipality** | | $ 4,204,720 | $ 6,154,034 | $ 8,094,121 | $ 12,023,471 | $ 3,906 | $ 30,480,253 |

Exhibit 2
Summary of Outstanding Public Corporation Special Law Accounts Receivable
As of June 30, 2010

| Corporations | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| ADM. DE ASUNTOS FEDERALES | 112 | | | | | | - |
| ASEM | 115 | 3,384,895 | 2,534,629 | 2,533,083 | 2,435,106 | 2,516,515 | 13,404,228 |
| JUNTA RETIRO PARA MAESTRO | 116 | | | | | 46,133 | 46,133 |
| COMISION SEGURIDAD EN EL TRANSITO | 123 | | | | 13,033 | | 13,033 |
| CORP. FOND. SEG. ESTADO | 163 | 1,027,073 | | | | | 1,027,073 |
| CIA. DE PARQUES NACIONALES DE PR | 174 | | | 332,777 | 454,349 | | 787,126 |
| A.A.A. | 201 | | 7,783,447 | 7,241,263 | 6,639,442 | | 21,664,152 |
| AUT. EDIFICIO PUBLICOS | 203 | | 360,890 | 1,197,217 | 1,156,694 | | 2,714,801 |
| AEE | 204 | | | | | | - |
| A.M.A. | 205 | | 591,626 | 1,420,982 | 1,626,817 | | 3,639,425 |
| AUT. PUERTOS | 206 | 953,936 | 1,623,449 | 1,540,172 | 1,597,859 | | 5,715,416 |
| AUT. DE TIERRAS | 207 | | | | 321,923 | | 321,923 |
| AUT. CARRETERAS | 208 | | | 2,246,007 | 2,058,580 | | 4,304,587 |
| AUT. NAVIERAS DE PR | 209 | | | | | | - |
| AUT. DESP. SOLIDOS | 210 | 141,621 | 90,642 | 87,676 | 76,270 | | 396,209 |
| ADM. TERRENOS | 211 | 60,040 | | | 124,428 | | 184,469 |
| CORP. CENTRO DE BELLAS ARTES | 212 | | | | 1,885 | | 1,885 |
| A.D.T. | 213 | 254,956 | 83,621 | 454,207 | 202,368 | | 995,152 |
| A.C.A.A. | 214 | 21,298 | | | 477,740 | | 499,039 |
| CORP. ARTES MUSICALES | 217 | | | | 1,589 | | 1,589 |
| AEELA | 218 | | | | 5,494 | | 5,494 |
| BCO. GUB. FOMENTO | 219 | | | | | | - |
| BANCO FINANCIAMIENTO VIVIENDA | 220 | | | | 26,245 | | 26,245 |
| CIA. COMERCIO Y EXPORTACION | 221 | | | | 81,414 | | 81,414 |
| CIA. DE FOMENTO INDUSTRIAL | 222 | | | | 1,226,695 | | 1,226,695 |
| CIA DE TURISMO | 224 | | | | | | - |
| CENTRO CARDIOVASCULAR | 227 | | | | 38,920 | | 38,920 |
| COSSEC | 228 | | 58,178 | 56,800 | 12,871 | 23,345 | 151,194 |
| CORP. AZUCARERA | 229 | 911,309 | 559,875 | 532,387 | 527,039 | 228,643 | 2,759,253 |
| NEGOCIADO SEG. EMPLEO | 232 | | | | | 83,381 | 83,381 |
| A.C.D. CULEBRA | 235 | | | | | | - |
| SERV. EXT. AGRICOLA | 236 | | | | | 3,974 | 3,974 |
| FIDEIC. PARQ. NACIONALES | 238 | | | 10,261 | 14,850 | | 25,111 |
| CENTRO DE ESTUDIO ESPECIALES GEN. GOBIERNO | 239 | 251,013 | | 340,934 | 1,039,348 | | 1,631,294 |
| ASD. AGROPECUARIO | 241 | | | | | | - |
| OFICINA ETICA GUBERNAMENTAL | 242 | | | | 44,214 | | 44,214 |
| INSTITUTO MEDICINA FORENCE | 243 | | | | | | - |
| BCO DES. ECONOMICO | 245 | | | | | | - |
| C. EMP. ADIESTRAMIENTO Y TRAB. | 248 | | 14,082 | 28,325 | 33,176 | | 75,583 |
| CORPORACION DIFUSION PUBLICA | 249 | | | | 1,127 | | 1,127 |
| PANEL. FIS. INDEP. | 250 | | | | | | - |
| CONSEJO DE DESARROLLO OCUPACIONAL | 253 | | | | 12,709 | | 12,709 |

Exhibit 2
Summary of Outstanding Public Corporation Special Law Accounts Receivable
As of June 30, 2010

| Corporations | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| CORPORACION DE SEGUROS AGRICOLAS | 270 | - | - | 166,794 | - | - | 166,794 |
| FID.INST GUARDIA NACIONAL | 271 | - | 4,588 | 3,530 | - | - | 8,118 |
| ESCUELA ARTES PLASTICA | 272 | - | 1,410 | 1,767 | 8,014 | - | 11,192 |
| CENTRO RECAUDACIONES INGRESOS MUN. | 279 | - | - | - | - | - | - |
| ADM. SEGUROS DE SALUD | 292 | - | - | - | 400 | - | 400 |
| CONSEJO EDUCACION SUPERIOR | 293 | - | - | - | - | - | - |
| CONSERVATORIO DE MUSICA | 295 | - | - | - | 16,087 | - | 16,087 |
| JUNTA DE GOBIERNO 911 | 296 | - | - | - | - | - | - |
| SALUD CORRECCIONAL | 417 | - | - | - | - | - | - |
| AUTORIDAD TRANSPORTE MARITIMO | 502 | - | - | - | 2,000 | - | 2,000 |
| **Total Corporations** | | $ 7,005,140 | $ 13,706,439 | $ 18,194,183 | $ 20,278,687 | $ 2,901,991 | $ 62,087,441 |

# Exhibit 3

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2003-2004)

| | Estimated OGP 2003 - 2004 | Estimated Corporations 2003 - 2004 | Estimated Municipalities 2003 - 2004 | Total Estimated Special Laws 2003 - 2004 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $     4,070,000 | $             - | $             - | $     4,070,000 |
| Act No. 207, Year 1995 | - | 1,531,885 | 407,777 | 1,939,662 |
| Act No. 40, Year 2001 | 20,625,000 | 2,649,257 | 766,032 | 24,040,289 |
| Act No. 157, Year 2003 | - | - | 441,240 | 441,240 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,307,682 | - | 2,307,682 |
| **Total COLA** | **25,468,000** | **6,488,824** | **1,615,049** | **33,571,872** |
| | | | | |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,528,000 | - | - | 19,528,000 |
| Act No. 159, Year 2003 | - | 1,412,300 | 965,600 | 2,377,900 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | - | - | - |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **19,942,000** | **1,412,300** | **965,600** | **22,319,900** |
| | | | | |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 6,431,500 | 928,703 | 347,496 | 7,707,700 |
| Act No. 169, Year 1968 | 5,019,000 | - | - | 5,019,000 |
| Act No. 2, Year 1965 | 75,000 | - | - | 75,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | **11,569,500** | **928,703** | **347,496** | **12,845,700** |
| | | | | |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 45,347,968 | - | - | 45,347,968 |
| Act No. 155, Year 2003 | 6,030,000 | 1,412,700 | 965,500 | 8,408,200 |
| **Total Medical Plan** | **51,377,968** | **1,412,700** | **965,500** | **53,756,168** |
| | | | | |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 417,000 | | | 417,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,664,000 | | | 16,664,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | - | | | - |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 6,500,000 | 403,536 | 1,998,129 | 8,901,666 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 270,000 | | | 270,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 11,000 | | | 11,000 |
| **Total Others** | **38,384,000** | **403,536** | **1,998,129** | **40,785,666** |
| **Total Special Laws** | **$   146,741,468** | **$   10,646,063** | **$   5,891,775** | **$   163,279,306** |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2004-2005)

| | Estimated OGP 2004 - 2005 | Estimated Corporations 2004 - 2005 | Estimated Municipalities 2004 - 2005 | Total Estimated Special Laws 2004 - 2005 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,212,000 | $ - | $ - | $ 4,212,000 |
| Act No. 207, Year 1995 | - | 1,339,947 | 361,372 | 1,701,319 |
| Act No. 40, Year 2001 | 24,262,000 | 3,031,842 | 828,098 | 28,121,940 |
| Act. No. 157, Year 2003 | - | 3,194,452 | 852,990 | 4,047,442 |
| Act No. 35, Year 2007 | | | | |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,326,406 | - | 2,326,406 |
| **Total COLA** | 29,247,000 | 9,892,647 | 2,042,460 | 41,182,107 |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,549,000 | - | - | 19,549,000 |
| Act No. 159, Year 2003 | - | 1,434,100 | 985,300 | 2,419,400 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | - | - | - |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | 19,963,000 | 1,434,100 | 985,300 | 22,382,400 |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 12,663,000 | 1,234,898 | 455,621 | 14,353,519 |
| Act No. 169, Year 1968 | 5,019,000 | - | - | 5,019,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | 17,786,000 | 1,234,898 | 455,621 | 19,476,519 |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 60,000,000 | - | - | 60,000,000 |
| Act No. 155, Year 2003 | 6,030,000 | 1,433,800 | 985,500 | 8,449,300 |
| **Total Medical Plan** | 66,030,000 | 1,433,800 | 985,500 | 68,449,300 |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,664,000 | | | 16,664,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 398,750 | | | 398,750 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 13,276,000 | 779,192 | 3,674,646 | 17,729,838 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 372,000 | | | 372,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| **Total Others** | 45,670,750 | 779,192 | 3,674,646 | 50,124,588 |
| **Total Special Laws** | $ 178,696,750 | $ 14,774,637 | $ 8,143,526 | $ 201,614,913 |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2005-2006)

| | Estimated OGP 2005 - 2006 | Estimated Corporations 2005 - 2006 | Estimated Municipalities 2005 - 2006 | Total Estimated Special Laws 2005 - 2006 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,212,000 | $ - | $ - | $ 4,212,000 |
| Act No. 207, Year 1995 | - | 1,313,605 | 351,995 | 1,665,599 |
| Act No. 40, Year 2001 | 24,262,000 | 3,032,595 | 813,040 | 28,107,635 |
| Act No. 157, Year 2003 | - | 3,123,329 | 837,477 | 3,960,806 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,034,484 | - | 2,034,484 |
| **Total COLA** | **29,247,000** | **9,504,013** | **2,002,511** | **40,753,524** |
| | | | | |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,549,000 | - | | 19,549,000 |
| Act No. 159, Year 2003 | - | 1,479,700 | 1,005,900 | 2,485,600 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,479,700 | 1,004,600 | 2,484,300 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | | | 414,000 |
| **Total Christmas Bonus** | **19,963,000** | **2,959,400** | **2,010,500** | **24,932,900** |
| | | | | |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 12,663,000 | 1,038,666 | 415,298 | 14,116,964 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | **17,367,000** | **1,038,666** | **415,298** | **18,820,964** |
| | | | | |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 60,000,000 | - | - | 60,000,000 |
| Act No. 155, Year 2003 | 6,030,000 | 1,479,700 | 1,006,200 | 8,515,900 |
| **Total Medical Plan** | **66,030,000** | **1,479,700** | **1,006,200** | **68,515,900** |
| | | | | |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,684,000 | | | 16,684,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 399,000 | | | 399,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 13,276,000 | 708,789 | 3,487,229 | 17,472,017 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 372,000 | | | 372,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| Additional Asignment | 42,900,000 | | | 42,900,000 |
| **Total Others** | **88,591,000** | **708,789** | **3,487,229** | **92,787,017** |
| **Total Special Laws** | **$ 221,198,000** | **$ 15,690,567** | **$ 8,921,738** | **$ 245,810,305** |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2006-2007)

| | Estimated OGP 2006 - 2007 | Estimated Corporations 2006 - 2007 | Estimated Municipalities 2006 - 2007 | Total Estimated Special Laws 2006 - 2007 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,203,000 | $ - | $ - | $ 4,203,000 |
| Act No. 207, Year 1995 | - | 972,817 | 274,108 | 1,246,925 |
| Act No. 40, Year 2001 | 21,717,000 | 2,492,896 | 771,302 | 24,981,198 |
| Act No. 157, Year 2003 | - | 4,070,211 | 1,246,151 | 5,316,362 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 500,000 | - | - | 500,000 |
| Act No. 134, Year 1996 | 415,000 | - | - | 415,000 |
| Act No. 221, Year 1998 | - | 1,574,730 | - | 1,574,730 |
| **Total COLA** | 26,835,000 | 9,110,655 | 2,291,561 | 38,237,216 |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 28,200,000 | - | - | 28,200,000 |
| Act No. 159, Year 2003 | - | 1,448,400 | 981,200 | 2,429,600 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,448,400 | 982,500 | 2,430,900 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | 28,614,000 | 2,896,800 | 1,963,700 | 33,474,500 |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 9,513,000 | 1,038,666 | 414,213 | 10,965,878 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | - | - | - | - |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | | | 20,000 |
| **Total Widows** | 14,217,000 | 1,038,666 | 414,213 | 15,669,878 |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 84,500,000 | - | - | 84,500,000 |
| Act No. 155, Year 2003 | 6,400,000 | 1,448,400 | 980,900 | 8,829,300 |
| **Total Medical Plan** | 90,900,000 | 1,448,400 | 980,900 | 93,329,300 |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 6,000,000 | | | 6,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,880,000 | | | 8,880,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 300,000 | | | 300,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,760,000 | 700,112 | 3,433,883 | 16,893,995 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 650,000 | | | 650,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| **Total Others** | 47,467,000 | 700,112 | 3,433,883 | 51,600,995 |
| **Total Special Laws** | $ 208,033,000 | $ 15,194,632 | $ 9,084,257 | $ 232,311,890 |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2007-2008)

| | Estimated OGP 2007 - 2008 | Estimated Corporations 2007 - 2008 | Estimated Municipalities 2007 - 2008 | Total Estimated Special Laws 2007 - 2008 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $       4,267,000 | $              - | $              - | $       4,267,000 |
| Act No. 207, Year 1995 | - | 1,156,530 | 418,263 | 1,574,792 |
| Act No. 40, Year 2001 | 41,567,000 | 4,458,409 | 1,415,432 | 47,440,841 |
| Act No. 157, Year 2003 | - | 4,519,890 | 1,521,935 | 6,041,825 |
| Act No. 35, Year 2007 | - | 5,537,768 | 1,641,943 | 7,179,710 |
| Act No. 41, Year 2001 | 597,000 | - | - | 597,000 |
| Act No. 134, Year 1996 | 489,000 | - | - | 489,000 |
| Act No. 221, Year 1998 | - | 1,749,974 | - | 1,749,974 |
| **Total COLA** | 46,920,000 | 17,422,570 | 4,997,572 | 69,340,143 |
| | | | | |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 28,200,000 | - | - | 28,200,000 |
| Act No. 159, Year 2003 | - | 1,717,700 | 1,097,500 | 2,815,200 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,717,700 | 1,097,500 | 2,815,200 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | 28,614,000 | 3,435,400 | 2,195,000 | 34,244,400 |
| | | | | |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 7,326,000 | 1,018,372 | 368,911 | 8,713,283 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | |
| Act No. 33, Year 2002 –Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | 12,009,000 | 1,018,372 | 368,911 | 13,396,283 |
| | | | | |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 87,500,000 | - | - | 87,500,000 |
| Act No. 155, Year 2003 | 6,309,000 | 1,530,638 | 921,786 | 8,761,424 |
| **Total Medical Plan** | 93,809,000 | 1,530,638 | 921,786 | 96,261,424 |
| | | | | |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 406,000 | | | 406,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,789,000 | | | 16,789,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,587,000 | | | 5,587,000 |
| Act No. 37, Year 1941 - Summer bonus | 9,483,000 | | | 9,483,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 1,000 | | | 1,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 236,000 | | | 236,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,399,000 | | | 1,399,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,401,000 | 300,873 | 1,070,404 | 13,772,277 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 403,000 | | | 403,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 3,000 | | | 3,000 |
| **Total Others** | 46,708,000 | 300,873 | 1,070,404 | 48,079,277 |
| **Total Special Laws** | $   228,060,000 | $   23,707,853 | $   9,553,673 | $   261,321,526 |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2008-2009)

| | Estimated OGP 2008 - 2009 | Estimated Corporations 2008 - 2009 | Estimated Municipalities 2008 - 2009 | Total Estimated Special Laws 2008 - 2009 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 5,959,000 | $ - | $ - | $ 5,959,000 |
| Act No. 207, Year 1995 | - | 972,917 | 360,334 | 1,333,251 |
| Act No. 40, Year 2001 | 33,990,000 | 4,591,950 | 1,316,298 | 39,898,248 |
| Act No. 157, Year 2003 | - | 4,642,821 | 1,397,653 | 6,040,474 |
| Act No. 35, Year 2007 | - | 6,195,013 | 2,985,579 | 9,180,592 |
| Act No. 41, Year 2001 | 691,000 | - | - | 691,000 |
| Act No. 134, Year 1996 | 500,000 | - | - | 500,000 |
| Act No. 221, Year 1998 | - | 1,552,509 | - | 1,552,509 |
| **Total COLA** | **41,140,000** | **17,955,211** | **6,059,864** | **65,155,075** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 37,650,000 | - | - | 37,650,000 |
| Act No. 159, Year 2003 | - | 1,191,100 | 1,810,414 | 3,001,514 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,777,205 | 1,192,500 | 2,969,705 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **38,064,000** | **2,968,305** | **3,002,914** | **44,035,219** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 7,500,000 | 589,860 | 168,425 | 8,258,285 |
| Act No. 169, Year 1968 | 5,880,000 | - | - | 5,880,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | |
| **Total Widows** | **13,443,000** | **589,860** | **168,425** | **14,201,285** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 90,000,000 | - | - | 90,000,000 |
| Act No. 155, Year 2003 | 7,552,000 | 2,062,867 | 1,206,200 | 10,821,067 |
| **Total Medical Plan** | **97,552,000** | **2,062,867** | **1,206,200** | **100,821,067** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 400,000 | | | 400,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,500,000 | | | 5,500,000 |
| Act No. 37, Year 1941 - Summer bonus | 10,200,000 | | | 10,200,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 1,000 | | | 1,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 400,000 | | | 400,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,370,000 | | | 1,370,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,400,000 | 179,669 | 211,057 | 12,790,726 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 620,000 | | | 620,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 3,000 | | | 3,000 |
| **Total Others** | **47,894,000** | **179,669** | **211,057** | **48,284,726** |
| **Total Special Laws** | **$ 238,093,000** | **$ 23,755,911** | **$ 10,648,460** | **$ 272,497,371** |

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2009-2010)

| | Estimated OGP 2009 - 2010 | Estimated Corporations 2009 - 2010 | Estimated Municipalities 2009 - 2010 | Total Estimated Special Laws 2009 - 2010 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 7,066,000 | $ - | $ - | $ 7,066,000 |
| Act No. 207, Year 1995 | - | 1,354,292 | 425,209 | 1,779,501 |
| Act No. 40, Year 2001 | 33,786,000 | 2,748,362 | 761,427 | 37,295,789 |
| Act No. 157, Year 2003 | - | 3,693,387 | 914,145 | 4,607,532 |
| Act No. 35, Year 2007 | - | 5,570,044 | 2,268,385 | 7,838,429 |
| Act No. 41, Year 2001 | 629,000 | - | - | 629,000 |
| Act No. 134, Year 1996 | 462,000 | - | - | 462,000 |
| Act No. 221, Year 1998 | - | 1,552,448 | - | 1,552,448 |
| **Total COLA** | **41,943,000** | **14,918,533** | **4,369,166** | **61,230,699** |
| | | | | |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 34,862,000 | - | - | 34,862,000 |
| Act No. 159, Year 2003 | - | 1,728,300 | 1,343,100 | 3,071,400 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,728,300 | 1,343,100 | 3,071,400 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **35,276,000** | **3,456,600** | **2,686,200** | **41,418,800** |
| | | | | |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 9,553,000 | 3,334,631 | 1,293,359 | 14,180,991 |
| Act No. 169, Year 1968 | 8,481,000 | - | - | 8,481,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | - |
| **Total Widows** | **18,097,000** | **3,334,631** | **1,293,359** | **22,724,991** |
| | | | | |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 85,755,000 | - | - | 85,755,000 |
| Act No. 155, Year 2003 | 8,000,000 | 1,746,800 | 1,356,600 | 11,103,400 |
| **Total Medical Plan** | **93,755,000** | **1,746,800** | **1,356,600** | **96,858,400** |
| | | | | |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 386,000 | | | 386,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 6,153,000 | | | 6,153,000 |
| Act No. 37, Year 1941 - Summer bonus | 10,400,000 | | | 10,400,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | - | | | |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 473,000 | | | 473,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,328,000 | | | 1,328,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 11,559,000 | 425,610 | 1,928,038 | 13,912,648 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 521,000 | | | 521,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 2,000 | | | 2,000 |
| **Total Others** | **47,822,000** | **425,610** | **1,928,038** | **50,175,648** |
| **Total Special Laws** | **$ 236,893,000** | **$ 23,882,174** | **$ 11,633,363** | **$ 272,408,537** |

# Exhibit 4

Exhibit 4
Select List of ERS Personnel (2004 - 2008)

| Name | Title / Position | 2004 | 2005 | 2006 | 2007 | 2008 | Pension Obligation Bonds | Personal Loans | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|---|
| **ERS Board of Trustees (BOT)** | | | | | | | | | |
| Alfredo Salazar Conde | Acting Chairman of the GDB; Vice President of the BOT | | x | | | | x | | |
| Angel A. Ortiz Garcia | Secretary, Treasury Department | | | | | x | x | | |
| Angel M. Carrillo Rodriguez | Commissioner of Municipal Affairs; Chairman of the BOT | x | | x | x | | x | | |
| Angel M. Carrillo Rodriguez | Commissioner of Municipal Affairs, Vice Chairman of the BOT | | | | | x | x | | |
| Angel M. Carrillo Rodriguez | Commissioner of Municipal Affairs | | x | | | | x | | |
| Antonio Faria Soto | President of GDB; Vice Chairman of the BOT | x | | | | | | | |
| Barbara Sanllorenzo Zaragoza | Commissioner for Municipal Affairs | x | | | | | | | |
| Carlos J. Rosa Jimenez | Director of Human Resources Office of the Commonwealth of Puerto Rico | | | x | | | | | |
| Debralee Carrazana | Acting director of Human Resources, Office of the Commonwealth of PR | | | x | | | | | |
| Emmaleil Garcia Garcia | Administrator, Central Advisory Office for Education and Human Resource Administration; Secretary of the BOT | x - pre 6/04 | | | | | | | |
| Jorge Irizarry Herrans | Interim president, GDB; Vice Chairman of the BOT | | | | x - 9/29/07 | | x | x | |
| Jorge Irizarry Herrans | President, GDB; Chairman of the BOT | | | | | x | x | x | |
| Jose G. Davila Matos | Secretary of Treasury | | | | | x | x | | |
| Juan A. Flores Galarza | Secretary of Treasury, Chairman of the Board of Trustees | x | | | | | | | |
| Juan C. Mendez Torres | Secretary of Treasury | | x | x | x | | x | | |
| Luisa Herrera Jimenez | Special Assistant, Department of Transportation and Public Works; Secretary of BOT | x - post 6/04 | x | | | | | | |
| Luisa Herrera Jimenez | Special Assistant, Department of Transportation and Public Works | x | | | | | | | |
| Luz Nisbel Mendez Colon | Acting Director of the Human Resources Office of the Commonwealth of PR | | | | x | | | | |
| Maria Beltran Dones | Director of the Human Resources Office of the Commonwealth | | | x | | | | | |
| Maria Vera Ramirez | Director of the Human Resources Office of the Commonwealth | | | | x | x | | | |
| Maria Vera Ramirez | Executive Assistant, Secretary of Management and Development; Reconstruction participant | | | | | x | x | | |
| Robert E. Aquino Garcia | Member Representative - Pensioners; President of the BOT | | x | x | | | x | | |
| Robert E. Aquino Garcia | Member Representative - Pensioners | x | | | | | x | | |
| Robert E. Aquino Garcia | President, Pensioner's Association; Member Representative - Pensioners | | | | | x | x | | |
| Roberto E. Aquino Garcia | President of the Association of Pensioners, Representative of Pensioners | | | | | x | x | x | |
| Roberto Santiago Cancel | Assistant Secretary of General Affairs, Department of Labor; Representative - Pensioners | | | | | x | x | | |
| Roberto Santiago Cancel | Assistant Inspector, Office of Inspector Corporative, Representative - Pensioners | | | x | x | | | | |
| Roberto Santiago Cancel | Assistant Inspector, Office of Inspector Corporative, Representative - Pensioners | | | | x | x | x | x | |
| Rosa Castro Rivera | Executive Assistant, Administration of Housing Development and Improvements; Representative - participants | | | x | | | x | | |
| Rosa Castro Rivera | Secretary to the BOT | | | | | x | x | | |
| Rosa Castro Rivera | Executive Assistant to the Secretary for Management and Development, Management of Developers and Home Improvement; Representative - Participants; Secretary of the BOT | | | | | x | x | | |
| William Lockwood Benet | President of the GDB; Vice Chairman of the BOT | | x | | | | x | | |
| **Representative from the Offices of the Board of Trustees** | | | | | | | | | |
| Maritza Indie Figueroa | General Counsel of the BOT | x | x | x | x | x | x | | |
| **Representative from the ERS Administration that participated in certain ERS BOD meetings** | | | | | | x - July 2008 | | | |
| Harold Gonzalez Rosado | Administrator | | | x | x | | x | | x |
| Jose L. Monroy Gonzaque | Deputy Administrator | | | x | x | | x | | x |
| Jose L. Villafane Ramos | Assistant Manager | | | x | | | x | | x |
| Jose O. Reyes Portalatin | Assistant Director for Finance and Investments | | | | | x | x | | x |
| Jose Sierra Morales | Deputy Administrator | x | | | | | x | | |
| Juan Cancel Alegria | Administrator | | x | x | x | x | x | | x |
| Luis Alvarez Miranda | Director, Office of Investment and Actuarial Studies | | | | x | x | x | x | |
| Luis Garcia Lopez | Director, Investment and Actuarial Studies Office | | | | | | x | x | |
| Maribel Marchand Castro | Administrator | x | | | | | x | | x |
| Mirla Gonzalez Alvarez | Acting Administrator | | | x | | | x | | |
| Ramon Rodriguez Ortega | Deputy Administrator | x | | | | | | | |
| Roberto Rivera Cruz | Deputy Administrator | | x | x | | | | | |

Note:
2004 - 2008 information based on monthly meeting minutes of the Board of Trustees - ERS

Exhibit 4
Select List of GDB Personnel (2005 - 2008)

| | | 2005 | 2006 | 2007 | 2008 | Relevant Area of Responsibility | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Board of Directors - GDB** | Title / Position | | | | | Pension Obligation Bonds | Personal Loans | Accounts Receivable |
| Alfredo Salazar-Conde | Chairman | x | x | x - until 12/4/07 | | x | | |
| Ana I. Vila-Davila | Member | | | | x | x | | |
| Armando Valdes Prieto | Member | | | | x | x | | |
| Ernesto A. Melendez-Perez | Member | x | x | x | | x | | |
| Ileana I. Fas-Pacheco | Member | x | | | | x | | |
| Jorge P. Silva-Puras | Member | x | x | x | x | x | | |
| Jose F. Rodriguez-Parello | Vice Chairman | x | x | | | x | | |
| Jose G. Davila Matos | Member | | x - as of 6/06 | x | x | x | | |
| Juan C. Mendez-Torres | Member | x | x | x | | x | | |
| Luis A. Aviles-Pagan | Vice Chairman | | | x | x | x | | |
| Rafael F. Martinez-Margarida | Member | x | x | x | | x | | |
| Rafael F. Martinez-Margarida | Chairman | | | x - as of 12/07 | x | x | | |
| | | | | | | | | |
| **Officers of the Board - GDB** | | | | | | | | |
| Olga L. Ortiz-Guadalupe | Secretary | x | x | x | | x | | |
| Mirla Gozalez-Alvarez | Assistant Secretary | x | x | x | | x | | |
| | | | | | | | | |
| **Officers of the Bank - GDB** | | | | | | | | |
| Alfredo Salazar-Conde | Acting President | x | | | | x | | |
| Alfredo Salazar-Conde | President | | x | x - before 8/07 | | x | | |
| Ana E. Torres | Assistant Vice President | | | x | x | x | | |
| Hugo Diaz-Molini | Executive Vice President and Treasurer | | | | | x | | |
| Jorge Irizarry-Herrans | Executive Vice President | x | x | x | | x | | |
| Jorge Irizarry-Herrans | Acting President | x | x | x - as of 6/07 | | x | | |
| Jorge Irizarry-Herrans | President | | | x - as of 12/07 | x | x | | |
| Jose G. Davila | Executive Vice President | x | | | | | | |
| Luis Alfero Martinez | Vice President | | | | | x | | |
| Mirla Gozalez-Alvarez | Senior Vice President | x | x | | | | | |
| Mirla Gozalez-Alvarez | Acting General Counsel and SVP | | x - as of 6/06 | x | | | | |
| William Lockwood-Benet | President | x - resigned | x - as of 6/06 | | | x | | |

Notes
(a) All 2005 designations based on M1010 - various resolutions
(b) All 2006 designations based on M1032 - various resolutions
(c) All 2007 designations based on M1049 - various resolutions
(d) 2008 designations based on ERS meeting minutes and M1076 GDB BOD meeting minutes

Exhibit 4
Select List of Other Parties of Interest (2007 - 2008)

| | Role | 2005 | 2006 | 2007 | 2008 | Pension Obligation Bonds | Personal Loans | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|
| Merrill Lynch<br>4 World Financial Center<br>250 Vessey Street, 8th Floor<br>New York, NY 10080 | Lead Bookrunner &<br>Senior Manager | | | x | x | x | | |
| UBS Financial Services<br>Incorporated of PR<br>8th Floor American International Plaza<br>254 Muñoz Rivera Avenue<br>San Juan, PR 00918 | Lead Bookrunner &<br>Senior Manager | | | | x | x | | |
| DEPFA Bank<br>623 Fifth Avenue<br>22nd Floor<br>New York, NY 10022 | Co-Senior Manager | | | x | x | x | | |
| First Albany Capital<br>One Penn Plaza, 42nd Floor<br>New York, NY 10119 | Co-Senior Manager | | | x | x | x | | |
| UBS Investment Consultants<br>of Puerto Rico /<br>UBS PR Consulting | Investment Consultants | | | x | x | x | | |
| Mesirow Financial<br>350 North Clark Street<br>Chicago, IL 60610 | Financial Advisor to GDB | | | x | x | x | | |
| Fiddler Gonzalez and Rodriguez<br>254 Muñoz Rivera Ave. 6th Floor<br>Hato Rey, Puerto Rico 00918 | Bond Counsel | | | x | x | x | | |
| O'Neill & Borges<br>American International Plaza<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, Puerto Rico 00975-1913 | Underwriter's Counsel | | | x | x | x | | |
| Sidley Austin LLP<br>787 Seventh Avenue<br>New York, NY 10019 | Underwriter's Counsel | | | x | x | x | | |

Relevant Area of Responsibility

Note:
2007 - 2008 information based POB Tenders and Action Plan included in working papers provided by the GDB