# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | Case No. 3:17-bk-03283 (LTS) |
| as representative of | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ———————————————————————— X | | |
| | ) | |
| In re: | ) | |
| | ) | |
| THE FINANCIAL OVERSIGHT AND | ) | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | Title III |
| | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ---------------------------------------------------------------------- X | | |

# OBJECTION OF CERTAIN ERS BONDHOLDERS TO
## THE MAGISTRATE JUDGE'S MAY 6 AND MAY 15, 2019
### ORDERS ON MOTIONS TO COMPEL

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................. 2

BACKGROUND ............................................................................................... 3

ARGUMENT .................................................................................................. 11

I.   Judge Dein's Denial Of The Bondholders' Deliberative Process And
     Executive Privilege Motion Is Clear Error And Contrary To Law............................. 11

     A.   The Bondholders' Need For The Documents Outweighs Any Harm
          From Disclosure ............................................................................ 11

     B.   Respondents Did Not Satisfy The Requirements Of The Deliberative
          Process Privilege ........................................................................... 15

          1.   The Documents Contain Factual Information That Can Be
               Segregated And  Produced........................................................ 15

          2.   Many Of The Withheld Materials Are Postdecisional............................. 17

          3.   Respondents Failed To Adequately Invoke the Deliberative
               Process Privilege................................................................. 21

     C.   Respondents Waived Any Privilege For Materials Shared With Each
          Other ....................................................................................... 22

     D.   AAFAF Is Not Entitled To The Executive Privilege........................................... 24

II.  Judge Dein's Denial Of The Bondholders' Attorney-Client Motion Is Clear
     Error And Contrary to Law....................................................................... 24

     A.   Documents Shared With Third-Party Non-Lawyers Are Not Privileged ........... 24

     B.   There Can Be No Common Interest Between ERS And Other
          Respondents ................................................................................ 26

III. The Court Should Overrule Respondents' Assertions Of The Work Product
     Doctrine........................................................................................ 28

CONCLUSION.................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aurelius Inv., LLC v. Puerto Rico,*
915 F.3d 838 (1st Cir. 2019) ................................................................................23

*Bank of Am., N.A. v. Terra Nova Ins. Co.,*
211 F. Supp. 2d 493 (S.D.N.Y. 2002) ..................................................................23

*Bhatia Gautier v. Gobernador,*
199 D.P.R. 59, 89 (P.R. 2017) ....................................................................... *passim*

*Bhatia Gautier v. Gobernador,*
Civil No. SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) ....................................12

*Cal. State Foster Parent Ass'n v. Wagner,*
No. C 07-05086 WHA, 2008 WL 2872775 (N.D. Cal. July 23, 2008) ..................13

*Cavallaro v. United States,*
284 F.3d 236 (1st. Cir. 2002) ...............................................................................25

*Columbia Data Prods., Inc. v. Autonomy Corp.,*
No. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ...............25, 29

*CSX Transp., Inc. v. ABC&D Recycling, Inc.,*
No. 11-30268-FDS, 2016 WL 6561551 (D. Mass. Nov. 3, 2016) ..........................29

*Dahl v. Bain Capital Partners,*
714 F. Supp. 2d 225 (D. Mass. 2010) ...................................................................25

*Data Gen. Corp v. Grumman Sys. Support Corp.,*
139 F.R.D. 556 (D. Mass. 1991) ...........................................................................30

*Davis v. City of New York,*
No. 10 Civ. 699(SAS)(HBP), 2012 WL 612794 (S.D.N.Y. Feb. 27, 2012)...........13

*Fairholme Funds, Inc. v. United States,*
128 Fed. Cl. 410 (2016) .......................................................................................13

*FDIC v. Ogden Corp.,*
202 F.3d 454 (1st Cir. 2000) ................................................................................27

*FTC v. Boehringer Ingelheim Pharm., Inc.,*
778 F.3d 142 (D.C. Cir. 2015) ..............................................................................31

*Hilsinger Co. v. Eyeego, LLC,*
No. 13-cv-10594, 2015 WL 11120842 (D. Mass. Aug. 13, 2015) .........................27

*In re Berks Behavioral Health LLC,*
500 B.R. 711 (Bankr. E.D. Pa. 2013) ...................................................................26

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
914 F.3d 694 (1st Cir. 2019)...............................................................................3, 7

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Fisher Island Invs., Inc.*,
No. 11016947-AJC, 2015 WL 148449 (S.D. Fla. Jan. 9, 2015)...............................................27

*In re MTBE Prods. Liab. Litig.*,
643 F. Supp. 2d 439 (S.D.N.Y. 2009)...........................................................................................21

*In re Pharm. Indus. Average Wholesale Price Litig.*,
254 F.R.D. 35 (D. Mass. 2008)......................................................................................................12

*In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*,
145 F.3d 1422 (D.C. Cir. 1998).....................................................................................................12

*Jordan v. U.S. Dep't of Justice*,
591 F.2d 753 (D.C. Cir. 1978).......................................................................................................19

*Khoday v. Symantec Corp.*,
No. 11-180, 2013 WL 12140484 (D. Minn. Sept. 24, 2013)........................................................27

*Landry v. FDIC*,
204 F.3d 1125 (D.C. Cir. 2000).....................................................................................................21

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011).............................................................................................................25

*Marilley v. McCamman*,
No. C 11-02418, 2012 WL 4120633 (N.D. Cal. Sept. 19, 2012) .................................................13

*Mullins v. Dep't of Labor of P.R.*,
269 F.R.D. 172 (D.P.R. 2010) ......................................................................................................29

*Noel v. City of New York*,
No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969 (S.D.N.Y. Dec. 18, 2018).....................19

*Peaje Invs. LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017)......................................................................................................4, 5

*People for Am. Way Found. v. U.S. Dep't of Educ.*,
516 F. Supp. 2d 28 (D.D.C. 2007)................................................................................................22

*Schreibman v. Walter E. Heller & Co. of P.R.*,
446 F. Supp. 141 (D.P.R. 1978)...............................................................................................22, 23

*SCM Corp. v. Xerox Corp.*,
70 F.R.D. 508 (D. Conn. 1976).....................................................................................................27

*Shell Oil Co. v. IRS*,
772 F. Supp. 202 (D. Del. 1991)...................................................................................................22

*Texaco P.R., Inc. v. Dep't of Comsumar Affairs*,
60 F.3d 867 (1st Cir. 1995)......................................................................................................16, 17

*United States v. Kovel*,
296 F.2d 918 (2d Cir. 1961)....................................................................................................25, 26

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Textron Inc.*,
  577 F.3d 21 (1st Cir. 2009) ................................................................................28, 29, 30

*W Holding Co. v. Chartis Ins. Co. of P.R.*,
  300 F.R.D. 58 (D.P.R. 2014) ....................................................................................29, 30

STATUTES

3 L.P.R.A. § 775 .................................................................................................................22

3 L.P.R.A. § 781a ...............................................................................................................22

3 L.P.R.A. § 786-6 .............................................................................................................22

11 U.S.C. § 362 ....................................................................................................................5

28 U.S.C. § 636 ....................................................................................................................1

48 U.S.C. § 2121 ................................................................................................................18

48 U.S.C. § 2141 ....................................................................................................17, 18, 19

48 U.S.C. § 2142 ................................................................................................................18

48 U.S.C. § 2144 ................................................................................................................18

48 U.S.C. § 2161 ..................................................................................................................5

48 U.S.C. § 2194 ..............................................................................................................3, 4

48 U.S.C. § 2195 ................................................................................................................22

OTHER AUTHORITIES

Fed. R. Civ. P. 26 ..................................................................................................28, 30, 31

Fed. R. Civ. P. 72 ..........................................................................................................1, 11

H.R. 5278, 114th Cong. (2016) ...........................................................................................3

To the Chambers of the Honorable Judge Laura Taylor Swain:

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a), the Bondholders[1] hereby object to the *Order on Motions to Compel*, Docket No. 6836 in Case No. 17-bk-03283 and Docket No. 493 in Case No. 17-bk-03566, issued by Magistrate Judge Dein on May 6, 2019 (the "May 6 Order"), and to the *Supplemental Order on Motions to Compel*, Docket No. 6971 in Case No. 17-bk-03283 and Docket No. 509 in Case No. 17-bk-03566, issued by Magistrate Judge Dein on May 15, 2019 (the "May 15 Order"). In the May 6 Order and the May 15 Order, Judge Dein denied the *Motion of Certain Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents in Privilege Log Categories 1, 5 to 7 [Deliberative Process Privilege and Executive Privilege]*, Docket No. 6320 in Case No. 17-bk-03283 and Docket No. 446 in Case No. 17-bk-03566, and the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents in Privilege Log Categories 1 to 4 [Attorney-Client Privilege, Attorney Work Product, Common Interest]*, Docket No. 6253 in Case No. 17-bk-03283 and Docket No. 443 in Case No. 17-bk-03566. The Bondholders object to those denials and ask that the Court reverse accordingly. In support thereof, the Bondholders state as follows:

---

[1] The Bondholders are Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund L.P., Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.

1

## INTRODUCTION

1.     These discovery disputes arise out of the latest effort by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Commonwealth of Puerto Rico (the "Commonwealth"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (together, "Respondents") to deny the Bondholders the adequate protection they are entitled to under the Bankruptcy Code. The First Circuit has rejected each prior attempt, most recently in its January 30, 2019, decision holding that the Bondholders are perfected secured creditors with liens on ERS's property. The Bondholders' *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay*, Docket No. 3418 in Case No. 17-bk-03283 and Docket No. 289 in Case No. 17-bk-03566 (the "Stay Relief Motion"), is set for a final hearing on July 2, 2019.

2.     In discovery related to the Stay Relief Motion, Respondents withheld hundreds of responsive documents based on sweeping privilege assertions. They relied on the deliberative process privilege, the executive privilege, the attorney-client privilege, the attorney-work product doctrine, and the common-interest doctrine. Respondents did not, however, properly substantiate their privilege claims.

3.     In the May 6 Order and the May 15 Order, Judge Dein denied the Bondholders' motions to compel the production of these responsive, improperly withheld documents. In doing so, Judge Dein clearly erred in her application of the exceptionally narrow deliberative process and executive privileges under Puerto Rico law. And she either applied the wrong legal standard or clearly erred in her application of the First Circuit's strict standards for attorney-client privilege over documents shared with third-party consultants and for documents withheld under the common-interest and attorney work-product doctrine. The Court should reverse.

## BACKGROUND

4.      ERS "is a trust and government agency created in 1951 by an Act of the Commonwealth," and it "is structured to provide pensions and other retirement benefits to employees and officers of the Commonwealth government, members and employees of the Commonwealth's Legislative Assembly, and officers and employees of the Commonwealth's municipalities and public corporations." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d 694, 704 (1st Cir. 2019). ERS "is designated as 'independent and separate' from other Commonwealth agencies." *Id.*

5.      In 2008, "[s]eeking to decrease an unfunded liability of approximately $9.9 billion," ERS issued approximately $3 billion in bonds. *Id.* An integral part of this transaction was an extensive security package to protect the Bondholders' investment. ERS granted the Bondholders, through a Fiscal Agent, a security interest in and lien on certain property of ERS ("Pledged Property"), as defined in a Bond Resolution dated January 24, 2008. Pledged Property is defined broadly to include, *inter alia*, "all employer contributions received by ERS" and "any assets in lieu thereof or derived thereunder"; all "right, title, and interest of [ERS] in and to" those contributions; "all rights to receive the same"; and "any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property," including, "without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of" such property. ERS Bond Resolution § 501 & Ex. B, VI-33, VI-36, VI-37.

6.      On June 30, 2016, Congress passed PROMESA in response to Puerto Rico's fiscal crisis. PROMESA created a federal Oversight Board "to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances." H.R. 5278, 114th Cong. (2016). The passage of PROMESA triggered an automatic stay of the Commonwealth's obligations. *See* 48

U.S.C. § 2194. In September 2016, shortly after the automatic stay went into effect, the Bondholders moved for relief from the stay in the absence of adequate protection. In opposing that motion, ERS argued, *inter alia*, that the Bondholders were adequately protected because of their "valid and enforceable liens over hundreds of millions of dollars of ERS revenue, which [would] continue to grow." *Resp't Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Brief in Opp'n to Mot. for Relief From the PROMESA Automatic Stay*, No. 16-cv-2696, Docket No. 52, at 10 (Oct. 26, 2016). Likewise, the Commonwealth argued that "[t]he security interest and lien in favor of [the Bondholders] is indefinite, and ends only upon satisfaction of the ERS's outstanding debt obligations." *Resp'ts' Brief in Opp'n to Mot. for Relief From the PROMESA Automatic Stay*, No. 16-cv-2696, Docket No. 53, at 5 (Oct. 26, 2016). Specifically relying upon these assurances from ERS and the Commonwealth, this Court denied the Bondholders' motion.

7.     On appeal, the First Circuit vacated the denial and remanded the case for further proceedings on the question of whether the Bondholders were adequately protected. *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 509, 514 (1st Cir. 2017). The First Circuit recognized that even "prior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection 'to the extent of the value of the[ir] property.'" *Id.* at 511 (quoting *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940)). It held that even a temporary diversion of the Bondholders' collateral and the resulting uncertainty about ERS's ability to repay the ERS Bonds established a legally sufficient claim that the Bondholders lacked adequate protection. *Id.* at 514 (the Bondholders "included in their district court filings a 2014 statement by ERS that uncertainty about future employer contributions could affect 'the repayment of the [ERS] bond payable'"); *see also* Unofficial Tr., *Altair Glob. Credit*

*Opportunities Fund (A), LLC v. Garcia-Padilla*, No. 16-2433, at 36:21–37:1 ("But I'm just having great difficulty with your argument that there's this seven-month window where the government can entirely, entirely destroy the value of collateral a hundred percent and yet that wouldn't in and of itself be good cause."). Indeed, the First Circuit described the Bondholders' request for adequate protection as "quite modest." *Peaje*, 845. F.3d at 514 n.5.

8.     Meanwhile, on October 14, 2016, the Oversight Board instructed Puerto Rico's Governor to provide a fiscal plan for the Commonwealth, including ERS. Upon information and belief, the Oversight Board, the Commonwealth, ERS, and AAFAF soon began devising a plan to divert the Bondholders' collateral from ERS to the Commonwealth, by channeling the employer contributions away from ERS and into the Commonwealth Treasury. Although there was no economic difference between the old and new structures, the Board and Respondents renamed the pension system "PayGo," short for "pay-as-you-go," in an effort to mask their conduct.

9.     On May 3, 2017, the Oversight Board filed a petition commencing a case under Title III of PROMESA on behalf of the Commonwealth. On May 21, 2017, the Oversight Board filed a Title III petition on behalf of ERS. ERS's Title III filing triggered the operation of a second automatic stay to protect ERS's property. 11 U.S.C. § 362(a); 48 U.S.C. § 2161(a). Shortly thereafter, the Puerto Rico Legislative Assembly and the Oversight Board implemented the PayGo plan in two enactments during the summer of 2017: Joint Resolution 188 and Act 106.

10.     After the First Circuit's decision in *Peaje*, the parties entered into a series of stipulations to provide the Bondholders with adequate protection for the interim. *Order Approving Stipulation, Setting Aside Hr'g And Dismissing Case*, No. 16-cv-2696, Docket No. 83 (Jan. 17, 2017); *Joint Stipulation and Order*, No. 16-cv-2696, Docket No. 86, at 3 (Apr. 11, 2017); *Order Approving Stipulation*, No. 17-bk-03566, Docket No. 171 (July 17, 2017). In July 2018,

Respondents refused to continue the previously ordered protections, which prompted the Bondholders to file another motion to lift the automatic stay in the absence of adequate protection—the Stay Relief Motion that is presently before the Court.

11.     In support of the Stay Relief Motion, the Bondholders argued that, as secured creditors, they were entitled to adequate protection or relief from the automatic stay on account of actions by ERS and the Commonwealth that decreased the value of the Bondholders' collateral. In opposition, the Oversight Board, on behalf of the debtors, argued that the Bondholders were not entitled to relief from the automatic stay because of Joint Resolution 188 and Act 106. In particular, the Oversight Board argued that the Bondholders had no collateral to begin with because the new legislation had irrevocably altered the Bond Resolution's system for the remittance and handling of employer contributions. *See, e.g.*, *Debtor's Opp'n to Mot. of Certain Secured Claimholders of Employees Retirement System of Government of Commonwealth of Puerto Rico for Relief from Automatic Stay* at 12, Docket No. 3465 in Case No. 17-bk-03283 and Docket No. 292 in Case No. 17-bk-03566 (the automatic stay is "not at issue" because "Movants are complaining about legislation by the Commonwealth creating a new pension system that does not generate Employers' Contributions"). Since there was no collateral, the logic went, there was nothing that could be diminished in value.

12.     In addition to contending that Act 106 and Joint Resolution 188 had eliminated the Bondholders' collateral, ERS recanted its prior judicial admissions—that the Bondholders held valid and enforceable liens that would continue indefinitely—and argued that the Bondholders' liens were unperfected and unenforceable. This Court agreed, holding that the Bondholders' security interests in ERS's property were unperfected and therefore avoidable pursuant to § 544 of the Bankruptcy Code. *See Op. and Order Granting and Den. in Part Cross Mots. for Summ. J.*,

Docket No. 215 in Case No. 17-ap-00213 (Aug. 17, 2018); *Order*, Docket No. 318 in Case No. 17-bk-03566 (Aug. 21, 2018). But the First Circuit again reversed, finding that the Bondholders possess perfected and non-voidable security interests in ERS's property. It held "that the Bondholders satisfied the filing requirements for perfection as of December 17, 2015," and "PROMESA's incorporation of the Bankruptcy code does not allow for the avoidance of perfected liens." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d at 703, 721. It remanded the matter to this Court, leading to the renewal of the Stay Relief Motion that is set for a final hearing on July 2, 2019.

13.     In preparation for the submission of supplemental briefing and the final hearing on the Stay Relief Motion, the parties served discovery. Respondents took the position that the Bondholders were not entitled to any meaningful discovery at all, arguing among other things that the facts surrounding the enactment of Joint Resolution 188 and Act 106, which Respondents themselves contend have eliminated Movants' collateral, were irrelevant. *Resp'ts' Opp'n to Mot. of Certain Creditors of the Employees Retirement System of the Government of Puerto Rico to Compel Disc.* at 5–6, Docket No. 410 in Case No. 17-bk-03566. In a ruling on the Bondholders' first motion to compel, Judge Dein rejected that argument, explaining that in order to "follow[] the [Bondholders'] security interest" the Court and the Bondholders "need to understand . . . whether we're talking about the same funds or not." Tr. of Apr. 1, 2019 Hr'g at 33. Judge Dein explained that "[the Bondholders] are entitled to figure out" how the laws in question "c[a]me to be"—"are we talking about the same funds, not the same funds, and where did they end up." *Id.*

14.     Having been ordered to respond to the Bondholders' discovery requests, however, the Respondents proceeded to withhold nearly all relevant documents—a total of 509 responsive documents—on grounds of privilege. Initially, they did so based only on a categorical privilege

log that was so general and nebulous as to be completely useless. *See* Docket No. 443-2 in Case
No. 17-bk-03566. It grouped all of the withheld documents into seven overall categories of
documents, each category covering a period of many months and embracing communications sent
and received by hundreds of different people. There was no identification of individual documents
by date, subject line, author/recipient, or document control number; thus it was literally impossible
to identify any single document covered by the privilege log. Of the hundreds of authors and
recipients, many were non-lawyer third parties, although it is not possible to tell the identity of any
person who wrote a particular document, nor the identity of any person who received it. Some
documents apparently fell into multiple categories, but it was not possible to determine which ones
they were. The categories provided no concrete information on the documents included within
them. Instead, there were generic descriptions such as "Confidential communications with in-
house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in
connection with pension reform proposals, including conversion to PayGo, the PayGo fee structure,
legal theories regarding potential litigation, and treatment of benefits." *Id.* No. 2.

15.     After a telephonic hearing on April 12, 2019, Judge Dein ordered Respondents to
produce a document-by-document log, but only as to documents withheld based on deliberative
process or executive privilege, and not as to documents withheld based on attorney client privilege
or the work-product doctrine. Respondents then produced a document-by-document log for those
123 documents, which they later supplemented. *See* Docket No. 446-2 in Case No. 17-bk-03566.

16.     Based on those two privilege logs, the Bondholders filed the two motions to compel
that are the subject of this Objection. In the first, Docket No. 443 in Case No. 17-bk-03566 (the
"Attorney-Client Motion"), the Bondholders challenged Respondents' invocations of attorney-
client privilege and the attorney-work-product doctrine. The Bondholders argued, *inter alia*, that

(1) documents sent by or to non-lawyer third parties were not protected by the attorney-client privilege, (2) the common-interest doctrine did not cover documents shared between ERS and the other Respondents due to their fundamental legal adversity, and (3) Respondents had not adequately supported their work-product claims. *Id.*

17.     In the second motion, Docket No. 446 in Case No. 17-bk-03566 (the "Deliberative Process and Executive Privilege Motion"), the Bondholders challenged Respondents' invocations of Puerto Rico's deliberative process and executive privileges. The Bondholders argued that (1) Respondents had not met the requirements for invoking the deliberative process privilege under Puerto Rico law, (2) many of the withheld documents were either postdecisional or factual and therefore unprotected by the narrow privilege applicable in Puerto Rico, (3) the qualified deliberative process and executive privileges were overcome by the Bondholders' substantial need for the document, (4) the deliberative process privilege was waived as to documents shared between ERS and the other Respondents due to their adversity, and (5) the executive privilege protects only the Governor and his immediate subordinates, and does not extend to agencies like AAFAF and its advisors. *Id.*

18.     In the May 6 Order, Judge Dein denied both motions in part. As to the Deliberative Process and Executive Privilege Motion, Judge Dein ordered that the withheld documents were predecisional because they preceded the enactment of Joint Resolution 188 in June 2017 and Act 106 in August 2017, even though the Commonwealth's March 13, 2017 Fiscal Plan had already required the Commonwealth to convert ERS into a PayGo system; that the privilege was not waived by the sharing of documents between entities, because the entities shared "a common interest in effective pension reform"; that AAFAF was entitled to claim executive privilege; that the Bondholders had not shown a substantial need for the withheld information in connection with

9

the Stay Relief Motion; and that Respondents had adequately invoked the privilege under Puerto
Rico law. May 6 Order at 2–6. The Court deferred a ruling on whether factual information had
been wrongly withheld and on the application of the executive privilege to one advisor, pending
the submission of additional information. *Id.* at 4–5. As to the Attorney-Client Motion, Judge Dein
deferred a ruling on documents sent by and to non-lawyer third parties and attorney work-product
claims, ordering the production of a supplemental privilege log as to certain documents. *Id.* at 9.
Judge Dein held that ERS and the Commonwealth were entitled to the common interest privilege
because they "share a common interest in pension reform for the benefit of pensioners." *Id.* at 8.

19.     In the May 15 Order, Judge Dein denied the remainder of the motions to compel.[2]
Based on additional affidavits submitted by Respondents, Judge Dein also ruled that factual
information in deliberative documents was properly withheld because it could not be segregated,
May 15 Order at 4, and that AAFAF had properly asserted the executive privilege, *id.* at 2. And
based on Respondents' submission of a new, document-by-document log of privileged documents
in one of the categories on their categorical privilege log, Judge Dein held that the Respondents
had properly invoked the attorney-client privilege over documents shared with non-lawyer third
parties. *Id.* at 7. In response to Respondents' representations that no documents were withheld
solely on work-product grounds, she declined to rule on the Bondholders' challenge to
Respondents' work-product claims. *Id.* at 6.

---

[2] In so doing, Judge Dein indicated that she had not received a further objection from the Bondholders after
Respondents' submission of supplemental information less than a week earlier, on May 9. May 15 Order at 2, 3, 7.
The Bondholders, in fact, were about to file those very objections, which were mooted by the May 15 Order. *See* May
6 Order at 10 ("Thereafter, Bondholders shall notify the Court of whether their objection still stands."). Therefore, on
May 16, the Bondholders therefore filed a new Motion to Compel addressing the subjects addressed by the May 15
Order, to ensure that Judge Dein was aware that the Bondholders' objections still stand and had considered those
objections. Docket No. 510 in Case No. 17-bk-03566. However, because the May 15 Order purports to be a final
resolution of the issues and Judge Dein has not vacated that order, the Bondholders also include it in this Objection.

## ARGUMENT

20.     Under Federal Rule of Civil Procedure 72(a), the Court must "modify or set aside any part of [the Magistrate Judge's] order that is clearly erroneous or is contrary to law." For the reasons that follow, the Court should set aside the May 6 Order and May 15 Order and compel Respondents to produce additional documents to the Bondholders in connection with the Stay Relief Motion.

## I.    Judge Dein's Denial Of The Bondholders' Deliberative Process And Executive Privilege Motion Is Clear Error And Contrary To Law.

21.     The deliberative process privilege in Puerto Rico is an exceedingly narrow one. The Commonwealth's "evidentiary system demands a restrictive interpretation when determining the existence of a privilege." *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 89 (P.R. 2017) ("*Bhatia Gautier I*"). The Puerto Rico Supreme Court has held that because "the right of . . . citizens" "to have access to public information [is] a fundamental right of constitutional rank," claims of privilege by the government "must be scrutinized with particular zealousness." *Id.* at 80. "When claiming the confidentiality of official information, it is the *government* that has to prove *in a precise and unequivocal manner* the applicability of the privilege." *Id.* (emphasis added). Indeed, Puerto Rico courts routinely use the language of strict scrutiny when describing the showing the government must make under the deliberative process privilege. *E.g.*, *id.* at 87–89 (the government "must . . . present evidence and show the existence of [a] compelling interest of greater hierarchy than the values protected by [the] right of freedom of information of the citizens.").

### A.    The Bondholders' Need For The Documents Outweighs Any Harm From Disclosure.

22.     Even if the deliberative process privilege does apply, *but see* Part I.B, the Court must then "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private

litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 D.P.R. at 88.

23.     Applying this balancing test, Puerto Rico courts have ordered disclosure of materials remarkably similar to those Respondents seek to withhold. In *Bhatia Gautier II*, the trial court ordered the Commonwealth to produce the final draft budget submitted by Puerto Rico's governor to the Oversight Board as part of the PROMESA-dictated budgeting process. *Bhatia Gautier v. Gobernador*, Civil No. SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) ("*Bhatia Gautier II*") (attached as Exhibit A). The court held that "by weighing the interests in conflict, the State was not able to establish that a deliberative process existed that must be protected vis-à-vis the constitutional right to have access to information . . . to monitor government operations in light of the presence of a new governmental actor, the Board." *Bhatia Gautier II*, at 20. The court further added that "[t]he State also could not prove that the public interest would be better served by the confidentiality of the document than by its disclosure," because "secrecy in public affairs is an exception, not the rule." *Id.*

24.     Federal law, too, requires this balancing, and courts routinely hold that the deliberative process privilege must give way when the government's intent is relevant and government deliberations are central to the case. *See, e.g.*, *In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) (holding that "the deliberative process privilege is not appropriately asserted . . . when a plaintiff's cause of action turns on the government's intent"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 41–42 (D. Mass. 2008) (overruling the deliberative process privilege because the "[g]overnment knowledge could conceivably be relevant to two elements" of the claim at issue and the defendant "ha[d] the right during discovery to see documents reflecting the government's

knowledge" so that it could "mount [its] defense"); *Fairholme Funds, Inc. v. United States*, 128

Fed. Cl. 410 (2016), *mandamus granted in part and denied in part*, *In re United States*, 678 F.

App'x 981 (Fed. Cir. 2017) (requiring the government to disclose privileged material because of

its centrality to the litigation and the government's role as a defendant in the case); *Davis v. City

of New York*, No. 10 Civ. 699(SAS)(HBP), 2012 WL 612794, at *8 (S.D.N.Y. Feb. 27, 2012)

("The privilege is routinely found to be inapplicable where the agency deliberations are central to

the case."). Indeed, courts have repeatedly ordered disclosure of materials *connected with the

legislative process* in such cases. *See, e.g.*, *Marilley v. McCamman*, No. C 11-02418, 2012 WL

4120633, at *1–3 (N.D. Cal. Sept. 19, 2012) (ordering disclosure of "draft enrolled bill reports,

draft bill analyses, a final bill analysis, and a draft proposed amendment" prepared by an executive

agency); *Cal. State Foster Parent Ass'n v. Wagner*, No. C 07-05086 WHA, 2008 WL 2872775, at

*1, 4–6 (N.D. Cal. July 23, 2008) (ordering disclosure of "six legislative analyses" prepared by

the Department of Social Services)

25.    Under this test, the withheld materials should have been disclosed here.

Respondents maintain that the Bondholders are not entitled to relief from the Bankruptcy Code's

automatic stay because Joint Resolution 188 and Act 106 altogether eliminated their collateral by

replacing the longstanding employer contributions to ERS with the new PayGo fees. To rebut this,

the Bondholders intend to show that the new PayGo fees are simply the old ERS employer

contributions in slightly different clothing and that their liens continue to attach to these funds. It

is difficult to imagine that there would be any stronger evidence of this fact than documents

showing that Respondents intended to create a pretext to divert the Bondholders' collateral away

from the Fiscal Agent who collected employer contributions and disbursed payments. The

documents Respondents withheld as predecisional go straight to these proofs: their privilege log

lists no fewer than 123 documents relating to the steps by which they engineered this diversion of the Bondholders' collateral. This, of course, was done in secrecy, so the Bondholders have no way of obtaining this evidence except from the Puerto Rico government itself.

26.    Judge Dein rejected this argument on the ground that "[t]he factual information necessary for the Bondholders to present their position to the Court on [the Stay Relief Motion] has been produced." May 6 Order at 5. Judge Dein reasoned that "to the extent that there has been a production with respect to the actual workings of both the pre- and post-PayGo systems, that that's what's needed for the lift stay motion, and I don't see where the intent comes in." Tr. of May 2, 2019, Hr'g at 58:1–6 (explaining that for that reason, "I don't feel that there's a substantial need for those documents."). But this was clear error.

27.    As the Bondholders explained, the actual mechanics of how the two pension systems calculate what they are owed, collect money, and disburse benefits to retirees are just one piece of the puzzle on the central issue in the Stay Relief Motion, that is, whether the new PayGo fee is simply another version of the old employer contributions such that the Bondholders' liens continues to attach to them. The deliberations underlying the decision to abandon the longstanding ERS system for the ostensibly new PayGo system are critically important for three reasons. First, there can be no stronger evidence of the equivalence of employer contributions and PayGo fees than evidence that the creators of the PayGo system considered them equivalent or took steps to mask their equivalence. Second, the fact that the authors of the PayGo system expressed the intention to divert the Bondholders' collateral is compelling evidence that the PayGo fees are simply diverted employer contributions. Finally, evidence that a motivation behind PayGo was to avoid paying the Bondholders the value they were owed, while continuing to make employers contribute to the pension plan, is strong evidence that the PayGo plan is pretextual and that the

employer contributions were never truly eliminated in the first place. Contrary to Judge Dein's mistaken reasoning, these proofs are not simply about "intent": evidence of how the PayGo system was designed is strongly probative of whether or not the Bondholders' collateral continues to exist.

28.     There is no question that Respondents withheld responsive documents created in the course of inventing the PayGo system. Docket No. 476 in Case No. 17-bk-03566, ¶ 17. Public records show that there were communications between the Commonwealth and the Oversight Board about the Commonwealth's early fiscal plans that would have left ERS intact. There also must have been documents explaining why an entirely new structure was used, instead of simply modernizing the system ERS had in place for over 60 years or increasing the level of employer contributions to levels sufficient to meet pension obligations. And there must have been documents explaining why Respondents dismantled ERS and confiscated all of its assets. Respondents have produced almost no documents addressing that issue, yet they alone possess them. The Bondholders therefore have shown a substantial need for those documents, and Judge Dein clearly erred in concluding otherwise.[3]

### B.     Respondents Did Not Satisfy The Requirements Of The Deliberative Process Privilege.

#### 1.     The Documents Contain Factual Information That Can Be Segregated And Produced.

29.     Materials withheld under the deliberative process privilege must be *deliberative*. The privilege does not shield any factual material, including factual material that can be reasonably

---

[3] If the Court affirms Judge Dein's ruling that Respondents' intent is not relevant to issues in the pending Stay Relief Motion, it should preclude Respondents from offering any evidence about the intent, purpose, and justifications of the government parties in adopting and implementing a PayGo pension system and preparing, enacting, and implementing Joint Resolution 188 and Act 106. The Bondholders were precluded from seeking discovery on these topics after Respondents successfully argued that they are irrelevant to the issues in the Stay Relief Motion. Respondents should likewise be precluded from offering any evidence on these topics. The Bondholders are still meeting and conferring with Respondents in an effort to resolve this issue. If those discussions are unsuccessful, the Bondholders will file a motion *in limine* on this subject.

segregated from deliberative material. *See, e.g.*, *Texaco P.R., Inc. v. Dep't of Comsumar Affairs*, 60 F.3d 867, 884–85 (1st Cir. 1995). Yet many of the documents Respondents listed on their privilege log contain factual material—and sometimes only factual material. For example, it is not plausible that a "preliminary draft of presentation to employers covered by PayGo system regarding PayGo implementation, collection of PayGo fees, and enforcement mechanisms and penalties for nonpayment" does not mainly consist of factual information. Docket No. 446-2 in Case No. 17-bk-03566, Docs. 105, 122; *see also id.*, Docs. 85, 86 (similar presentations). Nor can it be that a "spreadsheet of pension related inflows and outflows for FY 2018" is anything other than factual. *id.*, Doc. 60; *see also, e.g.*, *id.*, Docs. 54–59 (similar spreadsheets).

30.    In response to this problem, Judge Dein ordered Respondents to provide supplemental declarations addressing why factual information could not be segregated from deliberative material and produced. May 6 Order at 4–5. Respondents' supplemental declarations stated baldly that *none* of the factual information contained in these documents could be segregated from the privileged material, and that the disclosure of *any* factual material would inescapably disclose privileged matters. *See* Decl. of Mohammad Yassin Mahmud, Docket No. 502 in Case No. 17-bk-03566; Decl. of Philippe Mesa Pabón, Docket No. 503 in Case No. 17-bk-03566. Put differently, Respondents represented—in the most conclusory and general terms—that there was not one statistic, not a single projection, not any calculation, no graph or chart, and not a single fact in any one of the hundreds (or perhaps even thousands) of pages they withheld on grounds of privilege that could be segregated in any way without revealing privileged information. On its face, of course, this representation was not credible. However, Judge Dein accepted that supplemental information as sufficient to sustain these claims of privilege, too. May 15 Order at 3–5.

31.     That was clear error. Even when read liberally, Respondents' supplemental declarations fail to justify the withholding of factual information. For example, some of the withheld factual information includes "both pre-measures and post-measures" financial information. *E.g.*, Mahmud Decl. ¶ 4.f. Even if the "post-measures" information could reveal the proposals under consideration, Respondents provide no explanation of how the "pre-measures" information would have that effect, given that it reflects the projections in the absence of any change. *See id.* Moreover, while Respondents flatly state that disclosing the factual information would "reveal pension reform proposals and assumptions that were under considerations," *e.g.*, *id.*, they do not explain how that is so or what it is about the factual information that would enable the Bondholders to reverse engineer the proposals from the projection, much less explain how it could be that there is not a single fact in the entire range of these withheld documents that is susceptible of being segregated and disclosed.

### 2.     Many Of The Withheld Materials Are Postdecisional.

32.     The deliberative process privilege is a narrow one. It protects only materials that "actively contribute to the agency's decisionmaking process"; it does not shield "post-decisional documents that "explain[] or justify[] a decision already made." *Texaco P.R., Inc.*, 60 F.3d at 885. Yet Judge Dein allowed Respondents to withhold many postdecisional documents under the deliberative process privilege. Judge Dein wrongly treated Joint Resolution 188 and Act 106 as separate "decisions" for purposes of the privilege even though those laws did no more than execute a decision that had already been made in the March 13, 2017 fiscal plan.

33.     Under PROMESA, the Governor cannot submit a budget to the Commonwealth legislature until the Oversight Board has certified a fiscal plan. 48 U.S.C. § 2141(c). The Oversight Board, moreover, has the "sole discretion" to determine if the Governor's proposed fiscal plan meets PROMESA's requirements for purposes of Title III. *Id.* § 2141(c)(3). If the Oversight Board

determines that a fiscal plan is deficient, PROMESA requires it to so inform the Governor and include specific recommendations for revisions to the fiscal plan to correct the deficiencies. *Id.* If the Governor fails to submit a fiscal plan that meets PROMESA's requirements, the Oversight Board can step in, develop its own plan, and submit it to the Governor and the legislature. *Id.* § 2141(d)(2). That fiscal plan is "deemed approved by the Governor." *Id.* § 2141(e)(2).

34.     Similarly, the Oversight Board has the sole discretion to determine whether any "instrumentality" of the Commonwealth, like ERS, must submit their own fiscal plans or be included in the Commonwealth's. *Id.* § 2121(d)(1). Whether separate or combined, the budgets of the Commonwealth and its instrumentalities, including ERS, must comply with the certified fiscal plans, *id.* § 2142, as must all Commonwealth legislation, *id.* § 2144.

35.     The Commonwealth originally submitted fiscal plans to the Oversight Board that would have left ERS intact, or even strengthened it by providing for the funding of retirement benefits through payments of actuarially-determined amounts.[4] But on March 13, 2017, the Oversight Board rejected those proposals. It instead certified a revised fiscal plan submitted by the Commonwealth that now had a mandatory amendment requiring that the Commonwealth's pension systems "[s]witch to pay-as-you-go model."[5] That amendment directed the Commonwealth and the Board to formulate a "system overhaul" on or before June 30, 2017, to compel ERS to "liquidat[e] [its] assets" and transfer all of the proceeds to the Commonwealth. *Id.* Under this new, mandatory system, the Commonwealth itself would use its "general fund revenues to pay benefits owed" to pension beneficiaries, bypassing the existing ERS structure. *Id.* In turn,

---

[4] *See* Commonwealth of Puerto Rico Fiscal Plan at 11 (Oct. 14, 2016), https://drive.google.com/file/d/1nXSBaus9EJy0RetoDfcN9OkiuSQuLNON/view; Commonwealth of Puerto Rico Fiscal Plan (Feb. 28, 2017), https://drive.google.com/file/d/1_PFyfO2q5Ipg_bBgb7rPGVs2_8D8ZBFR/view.

[5] *See* Commonwealth of Puerto Rico Fiscal Plan Revised Version (March 13, 2017), at 22, https://drive.google.com/file/d/1J9zz8xhOyBOkj8ScZOiC48dV_nCcIomC/view.

"existing pension obligations [would be funded] on a 'paygo' basis," thus diverting employer contributions from ERS directly to the Commonwealth. *Id.*

36.     Once the Oversight Board certified the new fiscal plan on March 13, 2017, the Commonwealth and ERS were required by PROMESA to comply, and there was nothing left for them to deliberate about. 48 U.S.C. § 2141(e)(2). The adoption of Joint Resolution 188 and Act 106 merely implemented the policy decision that had already been made with the adoption of the March 13, 2017, fiscal plan. Joint Resolution 188 ordered ERS to liquidate itself and transfer its assets to the Commonwealth, and it relieved the Commonwealth, its public corporations, and its municipalities, from their obligations to make employer contributions to ERS. Joint Resolution 188 §§ 1–4. And Act 106 made the Commonwealth the direct payer of retiree pensions and reiterated the Commonwealth's earlier efforts to eliminate contributions to ERS and force ERS to liquidate its assets. Act 106 §§ 1, 4.2, 5.1–5.3.

37.     Given this history, many of Respondents' withheld documents—and particularly those dated after the Oversight Board's certification decision on March 13, 2017—almost certainly do not reflect the give-and-take of governmental deliberations at all. Instead, they include postdecisional materials explaining or carrying out the decisions the Board had already made: to dissolve ERS, take its assets, and establish a "new" pension system to circumvent the Bondholders' liens. By the time these documents were generated, the time for deliberation had passed. These postdecisional documents should therefore be produced. *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) ("Communications that occur [a]fter a policy has already been settled upon for example, a communication promulgating or implementing an established policy [a]re not privileged."); *Noel v. City of New York*, No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969, at *4 (S.D.N.Y. Dec. 18, 2018) (finding that withheld documents "do not reflect any pre-

19

decisional deliberative process and fall into the category of post-decision communications [and] post-decision strategy for implementation of decided policy. . . .").

38.     Judge Dein rejected this argument and concluded that Joint Resolution 188 and Act 106 were separate "decisions" for purposes of the deliberative process privilege. May 6 Order at 3. This was clear error. Respondents provided, and Judge Dein articulated, no basis for concluding that the fiscal plan left the Puerto Rico legislature any choice but to adopt the PayGo system mandated by the fiscal plan. The Court should reverse Judge Dein's order, and order that documents dated after March 13, 2017, are postdecisional and unprotected by the deliberative process privilege.

39.     Moreover, even if the fiscal plan's mandate to adopt PayGo still left Respondents with some number of less significant implementation decisions, Respondents have not shown that the documents they withheld relate to implementation rather than the policy decision to adopt PayGo that the fiscal plan had already imposed. And under *Bhatia Gautier I*, the Court must "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 D.P.R. at 88; *see supra* Part I.A. The government's interest in confidential deliberations over implementation details is surely less than its interest in deliberations over significant policy decisions. Thus, the fact that post-March 13, 2017 documents related solely to implementation details should have at least affected the balancing analysis. Judge Dien clearly erred by ignoring that issue.

20

3.    Respondents Failed To Adequately Invoke the Deliberative Process
Privilege.

40.    To invoke the deliberative process privilege under Puerto Rico law, "the government must comply with the following process":

> (1) the head of the agency that controls the information must claim it formally, after pondering it; (2) an officer from the agency must provide the precise reasons why the confidentiality of the documents is claimed[;] and (3) the government must identify and describe the information or the documents that it wants to protect.

*Bhatia Gautier I*, 199 D.P.R. at 87. Respondents did not meet those strict procedural requirements. *First*, Respondents did not provide a contemporaneous affidavit from a high-ranking agency official—only affidavits drafted *after* the privilege had already been claimed. But deliberative process privilege claims must stem from "actual personal consideration" by a government official of the need to protect deliberations, not just government's lawyers' attempt to block evidence. *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000); *see also, e.g.*, *Bhatia Gautier I*, 199 D.P.R. at 87 ("[T]he head of the agency that controls the information must claim [the privilege] formally, after pondering it."); *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d 439, 443 (S.D.N.Y. 2009) ("An attorney is an advocate for the agency and has every incentive to withhold documents from an adversary."). There is no evidence that happened here. Instead, Respondents provided after-the-fact, formulaic declarations in nearly identical terms, showing that lawyers—not the officials themselves—made the decision to withhold the documents.

41.    Judge Dein rejected this argument without explanation, writing that "[t]he Court overrules those objections but reemphasizes its instruction at the Hearing for Respondents to provide missing information where possible." May 6 Order at 6. This was clear error and contrary to law, and the Court should reverse.

### C.      Respondents Waived Any Privilege For Materials Shared With Each Other.

42.      The deliberative process privilege may be waived by knowing disclosure to other entities, especially where those entities have interests adverse to one another. *See, e.g.*, *People for Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28 (D.D.C. 2007) (materials shared among the Department of Education, the D.C. Mayor's Office, and private grant recipients had to be disclosed because of that sharing); *Shell Oil Co. v. IRS*, 772 F. Supp. 202, 203–04 (D. Del. 1991) (no privilege over information that was read aloud at a private "meeting of government and oil industry officials"). Respondents must therefore disclose any materials that passed among them. Docket No. 476 in Case No. 17-bk-03566, ¶ 35 (collecting examples).

43.      ERS is "a trust," governed by its own, independent Board of Trustees, that is "independent and separate from other" Commonwealth agencies. 3 L.P.R.A. § 775. And ERS's Title III proceedings are separate from the Commonwealth's—PROMESA even expressly prohibits inter-debtor transfers between them, 48 U.S.C. § 2195. The reason for ERS's independent status is clear: ERS was created to be in an inherently adverse, creditor position to the rest of the Commonwealth government. Employers were required by statute to pay substantial contributions to ERS to fund pension benefits, and ERS had the statutory authority to enforce those obligations. 3 L.P.R.A. § 786-6(b); *see also id.* § 781a (penalties). The resulting adversity is not hypothetical. When the Title III proceedings commenced, the Commonwealth and its instrumentalities owed ERS more than $411 million in past-due employer contributions.[6] The legal relationship between ERS and the Commonwealth here was and is the fundamentally adverse relationship between a creditor (ERS) and its debtors (the Commonwealth). Courts have repeatedly recognized that such a relationship is inherently adverse. *See, e.g.*, *Schreiman v. Walter E. Heller & Co. of P.R.*, 446

---

[6] *See* ERS, *Annual Financial Information, FY 2016*, at 13 n. 1 (Apr. 25, 2017), https://emma.msrb.org/ ER1050099-ER822796-ER1223828.pdf

F. Supp. 141, 143–44 (D.P.R. 1978); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d

493, 496–97 (S.D.N.Y. 2002).

44.     Confirming this adversity, in 2008 ERS committed itself to take *the Bondholders*'

side in any pension reform debate touching on the Bondholders' interests. In exchange for the

billions of dollars it raised by selling ERS Bonds, ERS promised:

> The System shall *oppose any attempt by the Legislature of the Commonwealth* to reduce
> the Employers' Contribution Rate or *to make any* other *change in the Act or any other*
> *relevant legislation that would have a material adverse effect on Bondholders*. Such
> opposition shall include delivering written position papers to the Legislature of the
> Commonwealth, appearing before Legislative committees, and contacting individual
> legislators and other government officials to make legislators and other governmental
> officials aware that such reductions in the Employers' Contribution Rate or other changes
> may adversely affect the ability of the System to comply with its obligations and may
> ultimately have an adverse effect on the credit of the Commonwealth.

Bond Resolution § 709 (emphasis added).

45.     Meanwhile, the Oversight Board is a distinct legal entity that is not even part of the

Puerto Rico government. *See Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856–59 (1st Cir.

2019). The Board admitted as much when it sent a letter to Congress on March 12, 2018, in which

it stated "the Commonwealth and its instrumentalities . . . have retained their own counsel and

other advisors for the Title III proceedings, on the grounds that the Commonwealth and its

instrumentalities *often have divergent interests* from those of the [Board]." Docket No. 446-4 in

Case No. 17-bk-03566; Docket No. 446 in Case No. 17-bk-03566, ¶ 36.

46.     Documents shared between these adverse entities obviously cannot be protected by

the predecisional privilege. Judge Dein rejected this argument, holding that "[t]he deliberative

process can and does protect inter-agency memoranda where, as here, the governmental entities

share a common goal." May 6 Order at 3. But as explained above, this is clear error given the

adversity described above. Moreover, Judge Dein's reasoning did not address the fact that the

Oversight Board is not part of the Puerto Rico government at all, or cite any authority for an *inter*-government privilege. The Court should therefore reverse.

### D. AAFAF Is Not Entitled To The Executive Privilege.

47. Finally, the executive privilege is a narrow privilege that protects only "communications between the [Governor] and his respective subordinates, counselors or assistants." *Bhatia Gautier I*, 199 D.P.R. at 89. AAFAF, an independent government entity, is not protected by the privilege. Judge Dein ruled that AAFAF could claim the privilege "in connection with its role as an advisor to the Governor." May 6 Order at 4. But in doing so, Judge Dein offered no explanation as to how an entire agency could be eligible for the executive privilege, rather than individual counselors to the Governor in their communications with the Governor himself. There is no legal support for the extension of the executive privilege to communications involving AAFAF. In addition, like the deliberative process privilege, the executive privilege is "qualified, therefore, it does not give the Executive Branch an absolute faculty [to] 'retain[] information [on] the basis of its alleged confidentiality.'" *Bhatia Gautier I*, 199 D.P.R. at 89 (explaining that to determine the "frontiers" of this privilege, courts must "weigh the conflicting interests"). For the same reasons discussed above with respect to the predecisional privilege, Respondents' claims of executive privilege are outweighed by the Bondholders' need for this evidence. *See supra* Part I.A. The Court should therefore reverse.

### II. Judge Dein's Denial Of The Bondholders' Attorney-Client Motion Is Clear Error And Contrary to Law.

### A. Documents Shared With Third-Party Non-Lawyers Are Not Privileged.

48. The senders and recipients of documents that Respondents' withheld as attorney-client privileged include dozens of employees of banks, consulting firms, accountants, and other non-legal advisors. By definition, these communications cannot be attorney-client

communications, since the employees of these non-legal advisors are neither the attorney (they are not lawyers) nor the client (they are not receiving legal advice). And as the First Circuit has explained, "[f]or a communication to be covered by the attorney-client privilege, the communication must be made in confidence" and "not be waived. The presence of third parties during an attorney-client communication is often sufficient to undermine the 'made in confidence' requirement, or to waive the privilege." *Cavallaro v. United States*, 284 F.3d 236, 246 (1st. Cir. 2002) (citations omitted). Absent an exception, then, the fact that third parties received the materials means the privilege never arose or has been waived. *Id.*

49.     The sole exception invoked by Respondents is the "*Kovel* doctrine" that applies to "third parties employed to assist a lawyer in rendering legal advice." *Id.* at 247; *see also United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). The First Circuit has never recognized that doctrine. *Cavallaro*, 284 F.3d at 240 ("Assuming *arguendo* that this circuit would adopt the *Kovel* rule, we conclude that the documents are not privileged."); *see also Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 n.20 (1st Cir. 2011). But even assuming that it is available, district courts in the First Circuit consistently hold that for it to apply, "three separate elements must be met." *Columbia Data Prods., Inc. v. Autonomy Corp.*, No. 11-12077-NMG, 2012 WL 6212898, at *14 (D. Mass. Dec. 12, 2012). The third party must be "must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer," meaning "nearly indispensable" rather than just "useful and convenient." *Id.* at *15. The third party must play "an interpretive role," helping "to translate information between the client and the attorney." *Id.* And "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice." *Id.*; *see also, e.g., Dahl v. Bain Capital Partners*, 714 F. Supp. 2d 225, 229 (D. Mass. 2010) (applying the same three elements).

25

50.      Respondents made no showing that those required elements were met, because neither their log nor the supporting declarations offered any adequate explanation of the roles played by the non-lawyer third parties in the purportedly privileged communications. After the May 2 Hearing, Judge Dein ordered them to produce a document-by-document log as to one category of privileged documents for that reason. *See* Tr. of May 2, 2019, Hr'g at 118–20. Yet when Respondents did so, they still failed to provide any explanation at all as to the role of non-lawyer third parties in the communications at issue. *See* Docket No. 501-1 in Case No. 17-bk-03566. The new information did nothing to remedy Respondents' failure to show that these documents meet the requirements of the *Kovel* exception. In nevertheless denying the Bondholders' motion to compel the production of documents shared with non-lawyer third parties, Judge Dein offered no explanation of how the *Kovel* requirements were met. *See* May 15 Order at 6–7.

### B.      There Can Be No Common Interest Between ERS And Other Respondents.

51.      According to Respondents' categorical privilege log, documents in Categories 1 to 3 were shared between ERS and other Respondents. As the Bondholders argued to Judge Dein, these documents cannot be privileged because ERS and the other Respondents are adverse with respect to the subjects of these communications. *See* Attorney-Client Motion ¶¶ 19–26; Reply In Supp. of Attorney-Client Motion, Docket No. 462 in Case No. 17-bk-03566, ¶¶ 13–19. As explained above, ERS is a statutorily independent agency with an interest in pension reform that was directly adverse to the interests of the other Respondents. *See supra* ¶¶ 43–44. The common-interest doctrine cannot apply between adverse parties. *See In re Berks Behavioral Health LLC*, 500 B.R. 711, 721–23 (Bankr. E.D. Pa. 2013).

52.      In rejecting this argument, Judge Dein reasoned that "[a]lthough ERS and the Commonwealth may be adverse in some respects, with respect to the issues presently before the

Court, they share a common interest in pension reform for the benefit of pensioners." May 6 Order at 8. In doing so, Judge Dein cited a California bankruptcy court case holding that common-interest privilege "applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects." *Id.* (quoting *In re Mortg. & Realty Tr.*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997)). But this was the wrong standard. As the Bondholders had explained in the Attorney-Client Motion (at 8), in the First Circuit "[t]he term 'common interest' typically entails an identical (or nearly identical) legal interest as opposed to a merely similar interest." *FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000); *see also, e.g.*, *Hilsinger Co. v. Eyeego, LLC*, No. 13-cv-10594, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015) (same).

53.     ERS and the other Respondents cannot meet that standard. At the time of the purportedly privileged communications, the Commonwealth had an enormous and growing debt to ERS (which, as it happened, was erased upon adoption of the PayGo system), putting ERS and the other Respondents in a position akin to a debtor and creditor negotiating a business transaction. The common-interest doctrine does not apply to such discussions. *See, e.g.*, *In re Fisher Island Invs., Inc.*, No. 11016947-AJC, 2015 WL 148449, at *2 (S.D. Fla. Jan. 9, 2015) ("No common legal interest could have existed between" a debtor and purported creditors because "their legal interests in those proceedings were adverse, not common."); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 513 (D. Conn. 1976) (no common-interest doctrine for parties "negotiating a business proposition between themselves" instead of "advancing [a] joint interest vis-a-vis the rest of the world"); *Khoday v. Symantec Corp.*, No. 11-180,(JRT/TNL), 2013 WL 12140484, at *3 (D. Minn. Sept. 24, 2013) ("[T]he common interest doctrine preserves the privilege for parties working towards a common purpose who seek guidance from counsel, rather than for parties negotiating at arms-length who disclose privileged documents to one another in the course of the negotiations.").

54.    Nor is a joint objective so nebulous as "common interest in pension reform for the benefit of pensioners," May 6 Order at 8, a common interest at all. Indeed, it would have been close to impossible in those years to find anyone—within Puerto Rico or elsewhere—who did not advocate "pension reform for the benefit of pensioners." By extending the common interest privilege to encompass everyone with that aspiration, Judge Dein stretched it beyond its breaking point. Judge Dein's ruling was therefore contrary to law, and the Court should reverse and rule that documents shared between ERS and the other Respondents are not privileged.

## III.   The Court Should Overrule Respondents' Assertions Of The Work Product Doctrine.

55.    Respondents also claimed work-product protection as to Categories 1 to 3 in their categorical privilege log. In the May 6 Order, Judge Dein ordered Respondents to serve a document-by-document log for any documents withheld solely based on the attorney work-product doctrine. May 6 Order at 10; *see also* Tr. of May 2 Hr'g at 114:2–4 ("[O]n attorney work product, I do agree that it appears to be very broadly used in this privilege log. It is really narrow in the First Circuit."). Respondents advised Judge Dein that they did not withhold any documents based solely on the attorney work-product, but they did not withdraw those privilege assertions. In the May 15 Order, Judge Dein found that "the Court need not rule on whether the Government Parties appropriately invoked the work product doctrine." May 15 Order at 6.

56.    The Court should overrule Respondents' assertions of the work-product doctrine. As the First Circuit has explained, under Rule 26(b)(3)(A), "[i]t is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated . . . . Nor is it enough that the materials were prepared by lawyers or represent legal thinking." *United States v. Textron Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (en banc). Similarly, "[w]ork product protection does not extend to documents that . . . would have been created in

essentially similar form irrespective of the litigation." *Id.* at 30. Rather, materials must have been "prepared for *use in* litigation, whether the litigation was underway or merely anticipated." *Id.* at 29 (emphasis added); *see also, e.g.*, *CSX Transp., Inc. v. ABC&D Recycling, Inc.*, No. 11-30268-FDS, 2016 WL 6561551, at \*3 (D. Mass. Nov. 3, 2016) ("The [work product] doctrine only protects against disclosure of materials actually prepared for litigation or trial.").

57.   Courts therefore reject work-product protection where the withholding party fails to show that the documents were specifically intended for use in litigation. *See, e.g.*, *W Holding Co. v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 58, 51 (D.P.R. 2014) (where, "aside from the fact that the subject matter of the document pertains to then-existing litigation, [the withholding party] has not offered specific facts, evidence, or any other proof to show that the memorandum was prepared because of litigation," the party "has failed to carry its burden of showing that the privilege applies to" the withheld document); *Columbia Data Prods.*, 2012 WL 6212898, at \*12 (rejecting work-product protection for documents where the evidence showed that entity was engaged for a factual investigation rather than "to provide expert advice in anticipation of litigation"); *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 175–76 (D.P.R. 2010) (withholding party failed to show that "internal investigation report" prepared by an agency's "Legal Affairs Division" was work-product, where the party had not "offered facts, evidence or any other proof to support its contention" that the report was entitled to work product protection).

58.   Respondents' privilege log does not meet this high standard. In fact, it does no more than mechanically recite that the withheld documents are

> [c]onfidential communications with in-house counsel and/or outside counsel providing, requesting, and/or discussing legal advice in connection with": (1) "anticipated and ongoing litigation with ERS Bondholders," (2) "pension reform proposals, including conversion to PayGo, the PayGo fee structure, legal theories regarding potential litigation, and treatment of benefits," and (3) "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees.

Docket No. 443-2 in Case No. 17-bk-03566. At most, those descriptions assert that "the *subject matter* of [the] document[s] relates to" the present litigation, which is not enough. *Textron Inc.*, 577 F.3d at 29. Nowhere does the log say, much less "offer[] specific facts, evidence, or any other proof to show," *W Holding Co.*, 300 F.R.D. at 51, that the documents were prepared specifically "for *use in* litigation" rather than for other purposes, as the law requires. *Textron Inc.*, 577 F.3d at 29 (emphasis added). Respondents have therefore not met their burden to invoke the work-product doctrine for Categories 1 to 3.

59.     And there are further deficiencies as well. Documents shared with adversaries are not entitled to work-product protection, and as explained above, *supra* ¶ 53, ERS and the other Respondents are adverse with respect to the subject matter of these documents. *See, e.g.*, *Data Gen. Corp v. Grumman Sys. Support Corp.*, 139 F.R.D. 556, 558 (D. Mass. 1991) ("Since the policy behind work product immunity is to bolster the adversarial system, disclosure of a document to an adversary is fundamentally inconsistent with this policy.").

60.     Finally, the work-product doctrine is a qualified privilege that can be overcome upon a showing of need. Fed. R. Civ. P. 26(b)(3)(A)(ii). For the reasons stated above, the evidence about "pension reform proposals," "conversion to PayGo," "the PayGo fee structure," and "treatment of benefits" (Category 2), as well as "PayGo implementation, including treatment, calculation, invoicing, and collection of PayGo fees" (Category 3), are at the heart of the Stay Relief Motion and only Respondents are in possession of these critical materials. *See supra* Part I.A. Respondents' productions of unprivileged documents have contained few, if any, documents shedding meaningful light on these subjects and what happened to the Bondholders' collateral. The Bondholders therefore have a "substantial need" for the purportedly protected documents, and no "substantial[ly] equivalent" contemporaneous evidence of Respondents' actions is available.

Fed. R. Civ. P. 26(b)(3)(A)(ii); *see also FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 157–58 (D.C. Cir. 2015) (ordering production of work product where it "provide[d] unique information about" a party's intent in entering a challenged settlement that could not be otherwise obtained).

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should reverse Judge Dein's May 6 Order and May 15 Order, in which she denied the Bondholders' motions to compel the production of documents withheld as privileged.

In San Juan, Puerto Rico, today May 20, 2019.

By:

*/s/ Alfredo Fernández-Martínez*　　　　　　　　　*/s/ Geoffrey S. Stewart*

Alfredo Fernández-Martínez　　　　　　　　　Bruce Bennett (*pro hac vice*)
DELGADO & FERNÁNDEZ, LLC　　　　　　JONES DAY
PO Box 11750　　　　　　　　　　　　　　555 South Flower Street
Fernández Juncos Station　　　　　　　　　Fiftieth Floor
San Juan, Puerto Rico 00910-1750　　　　Los Angeles, California 90071
Tel. (787) 274-1414　　　　　　　　　　Tel. (213) 489-3939
Fax: (787) 764-8241　　　　　　　　　　Fax: (213) 243-2539
afernandez@delgadofernandez.com　　　bbennett@jonesday.com
USDC-PR 210511

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

*/s/ Alicia I. Lavergne-Ramírez*

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@sanpir.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanpir.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@sanpir.com

SÁNCHEZ PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
jcunningham@whitecase.com
gkurtz@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com
csloane@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*