# **Exhibit 1**

**NEW ISSUE - BOOK-ENTRY ONLY**
**See "Book-Entry Only System" under THE BONDS**

| | RATINGS: | Moody's: | A3 |
|---|---|---|---|
| | See RATINGS | Fitch: | BBB+ |
| | | S&P: | BBB |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$442,015,000**
## COMMONWEALTH OF PUERTO RICO
**Public Improvement Refunding Bonds, Series 2011 C**
**(General Obligation Bonds)**

**Dated: Date of Delivery**                    **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2011. The Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2021 (July 1, 2016 in the case of the Bonds maturing on July 1, 2027, July 1, 2028, July 1, 2032, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037).

The scheduled payment of principal of and interest on the Bonds maturing July 1, 2026, July 1, 2027, July 1, 2028, July 1, 2032 bearing interest at a rate of 5.50%, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 17, 2011.

| **Morgan Stanley** | | | **Barclays Capital** |
|---|---|---|---|
| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citi** | **Goldman, Sachs & Co.** |
| **Jefferies & Company** | **J.P. Morgan** | **Ramirez & Co. Inc.** | **Raymond James** |
| **RBC Capital Markets** | **UBS Financial Services Incorporated of Puerto Rico** | | **Wells Fargo Securities** |

**BBVAPR MSD   FirstBank Puerto Rico Securities   Oriental Financial Services   Popular Securities   Santander Securities   VAB FINANCIAL**

March 10, 2011

**$442,015,000**
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2011 C
## (General Obligation Bonds)

| Maturity Date July 1 | Principal Amount | Interest Rate | Yield/Price | CUSIP[*] |
|---|---|---|---|---|
| 2026[†] | $ 16,435,000 | 5.25% | 5.38% | 74514LWY9 |
| 2027[†] | 17,865,000 | 5.25 | 5.40 | 74514LXD4 |
| 2028[†] | 10,700,000 | 5.375 | 5.49 | 74514LXE2 |
| 2032 | 5,000,000 | 5.75 | 6.00 | 74514LXA0 |
| 2032 | 15,000,000 | 6.00 | 100.00 | 74514LXB8 |
| 2032[†] | 20,000,000 | 5.50 | 5.75 | 74514LXF9 |
| 2035 | 35,000,000 | 6.00 | 6.20 | 74514LWZ6 |
| 2036[†] | 40,000,000 | 6.00 | 100.00 | 74514LXC6 |
| 2037[†] | 105,000,000 | 5.75 | 6.00 | 74514LXG7 |
| 2040 | 50,000,000 | 6.50 | 6.25[‡] | 74514LWX1 |

$127,015,000   5.75% Term Bonds due July 1, 2036   -Yield 6.25%   CUSIP[*] 74514LXH5

---

[*]   Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

[‡]   Priced at the stated yield to the July 1, 2021 optional redemption date at a redemption price of 100%. See *Optional Redemption* under DESCRIPTION OF THE BONDS.

# Government of Puerto Rico

**Governor**

LUIS G. FORTUÑO

**Members of the Cabinet**

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

| | | |
|---|---|---|
| KENNETH D. MCCLINTOCK<br>*Secretary of State* | GUILLERMO SOMOZA COLOMBANI<br>*Secretary of Justice* | JESÚS F. MÉNDEZ<br>*Secretary of the Treasury* |
| JESÚS RIVERA SÁNCHEZ<br>*Secretary of Education* | MIGUEL ROMERO LUGO<br>*Secretary of Labor and<br>Human Resources* | DR. LORENZO GONZÁLEZ<br>*Secretary of Health* |
| JAVIER RIVERA AQUINO<br>*Secretary of Agriculture* | RUBÉN A. HERNÁNDEZ GREGORAT<br>*Secretary of Transportation<br>and Public Works* | JOSÉ R. PÉREZ-RIERA<br>*Secretary of Economic<br>Development and Commerce* |
| YANITSIA IRIZARRY<br>*Secretary of Family Affairs* | MIGUEL HERNÁNDEZ VIVONI<br>*Secretary of Housing* | DANIEL J. GALÁN KERCADÓ<br>*Secretary of Natural and<br>Environmental Resources* |
| LUIS G. RIVERA MARÍN<br>*Secretary of<br>Consumer Affairs* | HENRY NEUMANN ZAYAS<br>*Secretary of Sports and Recreation* | CARLOS M. MOLINA RODRÍGUEZ<br>*Secretary of Corrections<br>and Rehabilitation* |

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.**

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and *Appendix III - Specimen Municipal Bond Insurance Policy.*

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ............................................................................................................. 1
OVERVIEW ............................................................................................................................................... 3
RECENT DEVELOPMENTS .................................................................................................................... 4
    Commonwealth's Structural Imbalance ................................................................................................ 4
    Preliminary Result for the First Six Months of Fiscal Year 2011 ....................................................... 5
    Tax Reform ........................................................................................................................................... 5
    Financial Condition of Retirement Systems ......................................................................................... 7
    Reduction in Expenditures through Early Retirement .......................................................................... 9
    Local Incentives for Rum Producers .................................................................................................... 9
    Recent Rating Actions ........................................................................................................................ 10
    Appointment of New President of GDB and Director of OMB .......................................................... 11
    Recent Bond Issue by the Commonwealth ......................................................................................... 11
PLAN OF FINANCING ........................................................................................................................... 12
    Sources and Uses of Funds ................................................................................................................. 12
THE BONDS ............................................................................................................................................ 13
    General ................................................................................................................................................ 13
    Book-Entry Only System .................................................................................................................... 13
    Discontinuance of the Book-Entry Only System ............................................................................... 15
    Authorization ...................................................................................................................................... 16
    Redemption ......................................................................................................................................... 16
    Notice of Redemption; Effect of Redemption .................................................................................... 17
    Security ............................................................................................................................................... 18
    Payment Record .................................................................................................................................. 19
    Debt Limitation ................................................................................................................................... 20
    Maturity Limitation ............................................................................................................................ 22
BOND INSURANCE ............................................................................................................................... 22
    Bond Insurance Policy ........................................................................................................................ 22
    Assured Guaranty Municipal Corp. .................................................................................................... 23
    Bond Insurance Provisions under the Bond Resolution ..................................................................... 24
PUBLIC SECTOR DEBT OF THE COMMONWEALTH ....................................................................... 25
    Public Sector Debt .............................................................................................................................. 25
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt .......... 26
TAX MATTERS ...................................................................................................................................... 27
    Discount Bonds ................................................................................................................................... 28
    Premium Bonds .................................................................................................................................. 28
LEGAL MATTERS ................................................................................................................................. 29
LEGAL INVESTMENT .......................................................................................................................... 29
UNDERWRITING ................................................................................................................................... 29
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO .......................................................... 31
RATINGS ................................................................................................................................................ 32
CONTINUING DISCLOSURE ................................................................................................................ 32
    Continuing Disclosure Undertaking ................................................................................................... 32
    Prior Continuing Disclosure Non-Compliance ................................................................................... 35
MISCELLANEOUS ................................................................................................................................ 36

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated February 10, 2011 ................................................................................................................ I-1

Appendix II – Proposed Form of Opinion of Bond Counsel ..................................................................... II-1

Appendix III – Specimen Municipal Bond Insurance Policy ..................................................................... III-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

$442,015,000
# COMMONWEALTH OF PUERTO RICO
## Public Improvement Refunding Bonds, Series 2011 C
## (General Obligation Bonds)

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $442,015,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 C (the "Bonds").

The Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended (the "Act"), and pursuant to a resolution authorizing the issuance of the Bonds (the "Bond Resolution") adopted in accordance with the Act by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the Governor of Puerto Rico on March 10, 2011. The Bonds are being issued to provide funds to repay advances made to the Commonwealth under a Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB") line of credit used to make deposits to the Commonwealth's Redemption Fund (as defined below) for the payment of interest on certain general obligation bonds and notes, as discussed under PLAN OF FINANCING.

The scheduled payment of principal of and interest on the Bonds maturing on July 1, 2026, July 1, 2027, July 1, 2028, July 1, 2032 bearing interest at a rate of 5.50%, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM"), as indicated on the inside cover of this Official Statement.

Under the Act, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated February 10, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*. The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, preliminary unaudited year-end results of fiscal year 2010, the budget for fiscal year 2011, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems, and certain litigation involving the Commonwealth, and should be read in its entirety.

The Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2009 was prepared by the Department of the Treasury of the Commonwealth (the

"Commonwealth's Annual Financial Report") and is incorporated by reference herein. The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2009, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2009), dated October 22, 2010, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on October 25, 2010 (after the May 1, 2010 requirement discussed below) by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. The Commonwealth complies with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings, as discussed below.

In the case of the Commonwealth's Annual Financial Report for fiscal years 2006, 2007 and 2008, the Commonwealth failed to file such report by the May 1 continuing disclosure update deadline due to accounting rules changes and other reasons (mostly related to delays in receipt of component units' audited financial statements). For each fiscal year in which it did not comply with the filing deadline, the Commonwealth filed the Commonwealth's Annual Financial Report by the end of the first quarter of the following fiscal year. The Commonwealth's Annual Financial Report for the fiscal year ended June 30, 2009 was not filed prior to the continuing disclosure update deadline of May 1, 2010 due to delays in the engagement of and transition to new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. Such report was filed on October 25, 2010.

In the case of the Commonwealth Report, except for the Commonwealth Report relating to fiscal year ended June 30, 2008, the Commonwealth has timely filed such reports. The Commonwealth Report for the fiscal year ended June 30, 2008 was filed on June 1, 2009. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report and the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a

voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2009 (which ended on June 30, 2009), the Commonwealth's gross national product (preliminary, in current dollars) was $62.8 billion, and personal income per capita (preliminary, in current dollars) was $14,905.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank. The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, preliminary unaudited year-end results of fiscal year 2010, the approved budget for fiscal year 2011, the debt of the Commonwealth's public sector, the fiscal situation of the Government's retirement systems, and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

Certain of the information appearing below is discussed in greater detail in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Structural Imbalance

Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and total expenditures. The structural imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total recurring revenues of $7.583 billion and total expenditures of $10.890 billion. The

4

administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. It is estimated that the deficit for fiscal year 2010 was approximately $2.1 billion and it is estimated that the deficit for fiscal year 2011 will be approximately $1.0 billion. The Government expects to present the budget for fiscal year 2012 in April 2011, which will be designed to advance the Government's efforts to reduce the deficit, and expects that the deficit for that fiscal year to be lower than for fiscal year 2011. See "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in *Appendix I.*

**Preliminary Results for the First Six Months of Fiscal Year 2011**

Preliminary General Fund net revenues for the first six months of fiscal year 2011 (from July 1, 2010 to December 31, 2010) were $3.207 billion, a decrease of $207 million, or 6.06%, from $3.414 billion of net revenues for the same period in the prior fiscal year, and a decrease of $165 million, or 4.89%, from the original estimate of revenues of $3.372 billion made for budget purposes prior to the design and implementation of the tax reform described below. Preliminary General Fund net revenues for the month of December 2010 were $566 million, representing a decrease of $156 million, or 21.6%, from $722 million of revenues for December 2009.

The decrease in preliminary General Fund net revenues for the first six months of fiscal year 2011 and December 2010 is due mostly to the implementation of the first phase of the tax reform, which immediately granted taxpayers the benefit of the reduction in tax rates effected as part of the tax reform by eliminating the withholding required for wages paid to employees during December 2010. As a result of the implementation of the first phase of the tax reform, the Treasury Department had revised its December 2010 revenue estimate from $754 million to $560 million. Preliminary collections for December 2010 exceeded the Treasury Department revised estimate by approximately $6 million, or 1.07%.

The Treasury Department also reported that preliminary collections from corporate income taxes for December 2010 increased by $30 million, or 16.1%, compared to December 2009. Sales and use tax preliminary collections for December 2010 were $97.3 million, an increase of 2.3% compared to December 2009, and preliminary collections for January 2011 were $124 million, an increase of approximately 4.5% compared to January 2010.

The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154 (as defined below). The first monthly excise tax payment was due on February 15, 2011 and amounted to approximately $108.9 million, which is consistent with the Government's projection of annual collections from the excise tax. For more information on the tax reform and Act No. 154, see "Tax Reform" below.

See "Overview of Economic and Fiscal Condition – Fiscal Condition" under INTRODUCTION in *Appendix I.*

**Tax Reform**

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at promoting economic growth and job

creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to Puerto Rico's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed at a declining rate (from 4% for 2011 to 1% for 2016) on certain acquisitions from related parties, and (iv) an expansion of taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships that are members of controlled groups that have members that are engaged in manufacturing or production or manufacturing services in Puerto Rico. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154 of October 25, 2010, as amended ("Act No. 154"). In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six year period that the excise tax is in place.

The first monthly excise tax payment was due on February 15, 2011. The Treasury Department recently announced that preliminary collections for the first excise tax payment were $108.9 million. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Act No. 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with government appropriations. As of June 30, 2009, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.092 billion, $6.564 billion and $273 million, respectively, and the funded ratios were 9.8%, 24.7% and 15.6%, respectively. According to preliminary actuarial valuations as of June 30, 2010, the unfunded actuarial accrued liability of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System increased to $17.834 billion, $7.058 billion and $283 million, respectively, the funded ratios of the Employees Retirement System and Teachers Retirement System decreased to 8.5%

and 23.9%, respectively, and the funded ratio of the Judiciary Retirement System increased to 16.4%.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $752 million, $274 million and $8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest preliminary actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three government retirement systems, in February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010. The individual recommendations made by the members of the special commission, which included increasing the amount of the employer and

employee annual contributions and changing the benefits structure, are being analyzed with the intent of presenting a comprehensive, consensus legislation package during 2011. The Secretary of Labor, who chaired the special commission, is evaluating proposing additional employer contributions to improve the funding ratio, the impact of special laws that have provided additional retirement benefits, and the impact on the system's cash flow of prior increases in the amount that members may borrow from the systems under various loan programs.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems, see RETIREMENT SYSTEMS in *Appendix I.*

**Reduction in Expenditures through Early Retirement**

Act No. 70, approved by the Legislative Assembly on July 2, 2010, is designed to reduce government expenditures by providing an early retirement window for eligible employees (who opted to retire by January 14, 2011) under a formula that results in a positive actuarial impact for the government's retirement systems. Employees that elected to participate in the program will receive retirement benefits based on a lower salary and a lower pension rate than what they would otherwise have been entitled to if they had continued in their employment until full vesting, but at a higher rate than what they would be entitled to based on their current years of service. Approximately 2,398 employees opted for early retirement under Act No. 70.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $ 352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery

("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act 1 replaced Act No. 178 and contains identical provisions.

Pursuant to Act No. 178, the Government entered into a definitive agreement with one of the local rum producers providing it with certain subsidies and incentives and allowing it to benefit from the cover-over program rebate. The Government is also in discussions with certain other rum producers to provide them similar subsidies and incentives in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this would allow such other companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

**Recent Rating Actions**

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth of Puerto Rico (the "Commonwealth") general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook and assigned such rating to the Bonds. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measure that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems.

**Appointment of New President of GDB and Director of OMB**

On February 16, 2011, the Governor announced the appointment of Juan Carlos Batlle as President of GDB and of José R. Otero-Freiría as Executive Vice President for Financing, each effective March 2, 2011. The appointment of Mr. Batlle and Mr. Otero-Freiría follows the resignation of Carlos M. García, the current President of GDB, and Fernando L. Batlle, the current Executive Vice President for Financing and Treasury, each of which will step down from their respective positions on March 1, 2011. In order to ensure an orderly transition for the new management team, Mr. García and Mr. Batlle will remain at GDB as the Chairman of the Board of Directors and as Special Aide to the President of the Board of Directors, respectively, until March 30, 2011.

Mr. Juan Carlos Batlle has approximately 15 years of experience in the banking industry, most recently serving as one of the top executives in the Santander Group's operations in Puerto Rico. Mr. Otero-Freiría has served in the Office of the Governor as Advisor to the Governor for Economic Development and Finance and Deputy Chief of Staff for Public Policy. He also has held top positions in the financial field at top U.S. and Puerto Rico companies.

The Governor also announced on February 16, 2011 the appointment of Mr. Juan Carlos Pavía as the new director of OMB. Mr. Pavía replaced Ms. Maritza Garay, who held the position since January 2011 on an interim basis. Mr. Pavía has served as Assistant Advisor to the Governor for Economic Development and Finance, Senior Advisor to the President of GDB, Executive Director of the Board of Fiscal Stability and Reconstruction and, most recently, as Executive Vice President and Fiscal Agent of GDB. Prior to his government service, Mr. Pavía was employed in the commercial banking field.

**Recent Bond Issue by the Commonwealth**

On February 17, 2011, the Commonwealth issued $356,520,000 of its Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds) (the "Series 2011 A Bonds") and terminated approximately $231 million of synthetic fixed rate swaps associated to the general obligation bonds refunded by the Series 2011 A Bonds.

On March 2, 2011, the Commonwealth issued $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (General Obligation Bonds) (the "Series 2011 B Bonds"). The Series 2011 B Bonds were directly purchased by an institutional investor and the proceeds were used to refund on a current basis the Commonwealth's Public Improvement Refunding Bonds, Series 2007A-8, Series 2007A-9 and Series 2008 B.

## PLAN OF FINANCING

The Bonds are being issued to provide funds to (i) repay advances made to the Commonwealth under a GDB line of credit used to make deposits to the Commonwealth's Redemption Fund for the payment of interest (but not principal) due during fiscal year 2011 on certain general obligation bonds and notes, (ii) pay capitalized interest on the Bonds, and (iii) pay the cost of issuance of the Bonds.

### Sources and Uses of Funds

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $442,015,000.00 |
| Net Original Issue Discount | (12,849,202.45) |
| Total sources | $429,165,797.55 |

Uses:

| | |
|---|---|
| Repayment of a GDB line of credit | $412,500,254.91 |
| Capitalized Interest | 7,440,113.06 |
| Underwriting discount and other financing expenses* | 9,225,429.58 |
| Total uses | $429,165,797.55 |

* Includes bond insurance premium, legal, printing and other financing expenses.

The Commonwealth routinely explores opportunities to restructure its debt to reduce debt service. The Commonwealth expects to issue from time to time additional Public Improvement Refunding Bonds to refund certain of its outstanding general obligation bonds. The Commonwealth is also considering refunding, converting or remarketing certain variable rate bonds and may terminate the interest rate exchange agreements related to any such refunded, converted or remarketed debt. If the Commonwealth decides to proceed with any or all of the aforementioned transactions, the refunding and termination of interest rate exchange agreements would be funded through the issuance of additional Public Improvement Refunding Bonds. No assurance can be given that the Commonwealth will refund, convert or remarket any of its outstanding general obligation bonds or terminate any interest rate exchange agreement in connection therewith.

In addition, subject to the approval of the Legislative Assembly, the Commonwealth expects to issue additional general obligation bonds to finance capital improvement projects.

12

# THE BONDS

**General**

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

**Book-Entry Only System**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities

and Exchange Commission ("SEC").    More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.  Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.  Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents.  For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC.  If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

14

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

**Redemption**

The Bonds are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2021 (July 1, 2016 in the case of the Bonds maturing on July 1, 2027, July 1, 2028, July 1, 2032, July 1, 2036 bearing interest at a rate of 6.00%, and July 1, 2037), either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The Bonds maturing July 1, 2036 bearing interest at a rate of 5.75% are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2035, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

## Amortization Requirements for the Bonds

| Year | Term Bonds due July 1, 2036 |
|------|------------------------------|
| 2035 | $63,145,000 |
| 2036 | 63,870,000* |

* Maturity

If the amount of the Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

### Notice of Redemption; Effect of Redemption

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym) for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the

Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010 and 2011, the Secretary of the Treasury satisfied his obligation to deposit moneys in the Redemption Fund by drawing on a line of credit provided by Government Development Bank. Commencing in fiscal year 2012, the Secretary of the Treasury will not be able to use borrowed funds to satisfy his obligation to make deposits in the Redemption Fund. On December 31, 2010, the amount on deposit in the Redemption Fund was $33.6 million, which was the required amount.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with

20

issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in *Appendix I* for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of December 31, 2010.

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $957,900,517.25 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2008 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to

which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($957,900,517.25) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $968,391,820.25, is equal to 13.23% of $7,320,525,500, which is the average of the adjusted preliminary internal revenues for the fiscal years ended June 30, 2009 and 2010. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 11.97%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% constitutional debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations* in *Appendix I*. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

As of September 30, 2010, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $198.7 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2010, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million. See "Commonwealth Guaranteed Debt" under *Debt* in *Appendix I*.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

**Bond Insurance Policy**

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix III to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

22

**Assured Guaranty Municipal Corp.**

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA+" (stable outlook) by Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("S&P") and "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's"). An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

*Current Financial Strength Ratings*

On January 24, 2011, S&P published a Request for Comment: Bond Insurance Criteria (the "Bond Insurance RFC") in which it requested comments on its proposed changes to its bond insurance ratings criteria. In the Bond Insurance RFC, S&P notes that it could lower its financial strength ratings on existing investment-grade bond insurers (including AGM) by one or more rating categories if the proposed bond insurance ratings criteria are adopted, unless those bond insurers (including AGM) raise additional capital or reduce risk. Reference is made to the Bond Insurance RFC, a copy of which is available at www.standardandpoors.com , for the complete text of S&P's comments.

On October 25, 2010, S&P published a Research Update in which it downgraded AGM's counterparty credit and financial strength rating from "AAA" (negative outlook) to "AA+" (stable outlook). Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2010,

which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 1, 2011.

*Capitalization of AGM*

At December 31, 2010, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,578,146,678 and its total net unearned premium reserve was approximately $2,298,456,380, in each case, in accordance with statutory accounting principles.

*Incorporation of Certain Documents by Reference*

Portions of the following documents filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)     The Annual Report on Form 10-K for the fiscal year ended December 31, 2010 (which was filed by AGL with the SEC on March 1, 2011);

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption "Assured Guaranty Municipal Corp." under BOND INSURANCE or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE.

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

**Public Sector Debt**

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of September 30, 2010, as adjusted for the issuance of the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded by the issuance of the Series 2011 A Bonds and the Series 2011 B Bonds. The table also shows the public sector debt as adjusted for the issuance of the Bonds. The table should be read in conjunction with the information set forth under DEBT in *Appendix I*.

## Commonwealth of Puerto Rico
## Public Sector Debt*
### (in millions)

| | September 30, 2010, as adjusted by the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded thereby | As Adjusted by the Bonds |
|---|---|---|
| GENERAL FUND RELATED DEBT | | |
| Direct full faith and credit obligations | $ 9,232 | $9,674 |
| Puerto Rico guaranteed debt[1] | 4,254 | 4,254 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,389 | 3,389 |
| Tax and Revenue Anticipation Notes[3] | 900 | 900 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $20,723 | $21,165 |
| Sales and Use Tax (COFINA) debt | $13,437 | $13,437 |
| Public corporations and agencies | 23,574[5] | 23,574[5] |
| Municipal Debt | 3,202 | 3,202 |
| Limited Obligations/non-recourse debt [6] | 2,431 | 2,431 |
| TOTAL PUBLIC SECTOR DEBT | $63,367 | $63,809 |

---

\* Totals may not add due to rounding.

[1] Consists of $601 million of bonds issued by Aqueduct and Sewer Authority, $384 million of State Revolving Fund Loans incurred under various federal water laws, $198.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.

[3] Includes related short-term financings.

[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5] Includes the Electric Power Authority's $218,225,000 Power Revenue Refunding Bonds issued in October 2010 and $355,730,000 Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) issued in December 2010.

[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $189 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on September 30, 2010, as adjusted for the issuance of the Series 2011 A Bonds, the Series 2011 B Bonds and the exclusion of the bonds refunded by the issuance of the Series 2011 A Bonds and the Series 2011 B Bonds; (ii) the Bonds; and (iii) total debt service on Commonwealth general obligation bonds.  Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

Commonwealth of Puerto Rico
Debt Service Requirements*
(in thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds | | Grand Total |
|---|---|---|---|---|
| | | Principal | Interest | |
| 2011 | $ 486,120 | - | $ 7,440 | $ 493,560 |
| 2012 | 821,678 | - | 25,754 | 847,432 |
| 2013 | 824,774 | - | 25,754 | 850,528 |
| 2014 | 812,291 | - | 25,754 | 838,045 |
| 2015 | 826,366 | - | 25,754 | 852,120 |
| 2016 | 826,219 | - | 25,754 | 851,974 |
| 2017 | 751,884 | - | 25,754 | 777,638 |
| 2018 | 735,988 | - | 25,754 | 761,742 |
| 2019 | 804,852 | - | 25,754 | 830,606 |
| 2020 | 839,960 | - | 25,754 | 865,714 |
| 2021 | 687,855 | - | 25,754 | 713,609 |
| 2022 | 597,813 | - | 25,754 | 623,567 |
| 2023 | 550,911 | - | 25,754 | 576,666 |
| 2024 | 551,215 | - | 25,754 | 576,969 |
| 2025 | 539,766 | - | 25,754 | 565,520 |
| 2026 | 514,430 | $ 16,435 | 25,754 | 556,619 |
| 2027 | 513,866 | 17,865 | 24,891 | 556,623 |
| 2028 | 521,884 | 10,700 | 23,953 | 556,537 |
| 2029 | 466,464 | - | 23,378 | 489,843 |
| 2030 | 463,588 | - | 23,378 | 486,966 |
| 2031 | 465,924 | - | 23,378 | 489,303 |
| 2032 | 261,158 | 40,000 | 23,378 | 324,537 |
| 2033 | 229,645 | - | 21,091 | 250,736 |
| 2034 | 230,553 | - | 21,091 | 251,643 |
| 2035 | 185,277 | 98,145 | 21,091 | 304,513 |
| 2036 | 185,279 | 103,870 | 15,360 | 304,509 |
| 2037 | 185,279 | 105,000 | 9,288 | 299,567 |
| 2038 | 185,279 | - | 3,250 | 188,529 |
| 2039 | 185,276 | - | 3,250 | 188,526 |
| 2040 | 85,415 | 50,000 | 3,250 | 138,665 |
| Total | $15,337,009 | $442,015 | $633,782 | $16,412,806 |

---

\*  Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

(1)  Since fiscal year 1997, the Commonwealth had been paying approximately $30 million annual debt service on PRASA bonds and other obligations guaranteed by the Commonwealth. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making such payments and PRASA resumed making all payments due on and after such date from its net revenues. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund.  The amounts shown in this column do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds.  The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

(2)  Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.

Sources: Government Development Bank and Department of the Treasury

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.