# **Exhibit 5**

NEW ISSUE - BOOK-ENTRY ONLY
See "Book-Entry Only System" under *The Bonds*

*In the opinion of Bond Counsel, under the provisions of the Acts of Congress now in force, (i) subject to continuing compliance with certain tax covenants, interest on the Bonds will not be includable in gross income for federal income tax purposes, and (ii) the Bonds and interest thereon will be exempt from state, Commonwealth and local taxation under existing law. However, see "Tax Exemption" for a description of alternative minimum tax consequences with respect to interest on the Bonds and other tax considerations.*

## $835,650,000
## COMMONWEALTH OF PUERTO RICO
### $500,000,000 Public Improvement Bonds of 2006, Series A
### $335,650,000 Public Improvement Refunding Bonds, Series 2006 B
### (General Obligation Bonds)

**Dated: Date of Delivery**                                **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof. Interest on the Bonds will accrue from their date of issuance at the annual rates described on the inside front cover, except for CPI Bonds whose rates will be determined as described in *Appendix III* hereto, and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2007. The Bonds (other than the CPI Bonds) are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2016.

The scheduled payment of principal and interest on some of the Public Improvement Bonds of 2006, Series A, will be insured by Assured Guaranty Corp. and Financial Guaranty Insurance Company, as indicated on the inside cover of this Official Statement.

Following the issuance of the Bonds, the Commonwealth expects to issue one or more additional series of its Public Improvement Bonds and Public Improvement Refunding Bonds. A portion of the Public Improvement Bonds will be offered for sale solely to investors in the United States. The remaining portion of the Public Improvement Bonds and the Public Improvement Refunding Bonds will be offered for sale solely in the Commonwealth. These bonds will be offered pursuant to separate Official Statements.

**THE BONDS ARE GENERAL OBLIGATIONS OF THE COMMONWEALTH. THE GOOD FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH ARE IRREVOCABLY PLEDGED FOR THE PROMPT PAYMENT OF THE PRINCIPAL OF AND INTEREST ON THE BONDS. THE CONSTITUTION OF PUERTO RICO PROVIDES THAT PUBLIC DEBT OF THE COMMONWEALTH, WHICH INCLUDES THE BONDS, CONSTITUTES A FIRST CLAIM ON AVAILABLE COMMONWEALTH REVENUES.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Sidley Austin LLP, New York, New York, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of The Depository Trust Company on or about August 10, 2006.

| | | |
|---|---|---|
| **Morgan Stanley** | | **Goldman, Sachs & Co** |
| **Banc of America Securities LLC** | **Citigroup** | **JPMorgan** |
| **Lehman Brothers** | **Merrill Lynch & Co.** | **Popular Securities** |
| **Raymond James & Associates, Inc.** | **Samuel A. Ramírez & Co.** | **UBS Investment Bank** |
| | **Wachovia Bank, National Association** | |

August 2, 2006

# $835,650,000
# COMMONWEALTH OF PUERTO RICO
### $500,000,000   Public Improvement Bonds of 2006, Series A
### $335,650,000   Public Improvement Refunding Bonds, Series 2006 B
### (General Obligation Bonds)

## Public Improvement Bonds of 2006, Series A

| Maturity July 1, | Amount | Interest Rate | Price or Yield | CUSIP |
|---|---|---|---|---|
| 2017 | $ 720,000 | 4.50% | 4.51% | 74514LJQ1 |
| 2018* | 30,005,000 | CPI† | 100.00 | 74514LJR9 |
| 2019* | 31,280,000 | CPI† | 100.00 | 74514LJS7 |
| 2020* | 32,625,000 | CPI† | 100.00 | 74514LJT5 |
| 2021** | 32,815,000 | CPI† | 100.00 | 74514LJU2 |
| 2021 | 1,220,000 | 5.25% | 4.68% | 74514LJV0 |
| 2022 | 35,475,000 | 5.25% | 4.71% | 74514LJW8 |
| 2023 | 37,340,000 | 5.25% | 4.73% | 74514LJX6 |
| 2024 | 39,300,000 | 5.25% | 4.75% | 74514LJY4 |
| 2025 | 41,360,000 | 5.25% | 4.76% | 74514LJZ1 |
| 2026 | 43,530,000 | 5.25% | 4.77% | 74514LKA4 |
| 2027 | 45,820,000 | 5.25% | 4.79% | 74514LKB2 |

$128,510,000   5.25% Term Bonds due July 1, 2030   -Yield 4.84%   74514LKC0

## Public Improvement Refunding Bonds, Series 2006 B

$139,295,000   5.25% Term Bonds due July 1, 2032   -Yield 4.87%   74514LKD8

$196,355,000   5.00% Term Bonds due July 1, 2035   -Yield 4.95%   74514LKE6

---

\*   Insured by Assured Guaranty Corp.
\*\*  Insured by Financial Guaranty Insurance Company.
†   For a description of the CPI Rate and its calculation, see *Appendix III – CPI Bonds Provisions*.

# Commonwealth of Puerto Rico

### Governor

ANÍBAL ACEVEDO VILÁ

### Members of the Cabinet

JORGE P. SILVA-PURAS
*Chief of Staff*

FERNANDO BONILLA
*Secretary of State*

ROBERTO J. SÁNCHEZ RAMOS
*Secretary of Justice*

JUAN C. MÉNDEZ TORRES
*Secretary of the Treasury*

RAFAEL ARAGUNDE TORRES
*Secretary of Education*

ROMÁN M. VELASCO GONZÁLEZ
*Secretary of Labor and Human Resources*

ROSA PÉREZ PERDOMO
*Secretary of Health*

JOSÉ O. FABRE LABOY
*Secretary of Agriculture*

GABRIEL ALCARAZ EMMANUELLI
*Secretary of Transportation and Public Works*

RICARDO RIVERA CARDONA
*Acting Secretary of Economic Development and Commerce*

FÉLIX MATOS
*Secretary of Family Affairs*

JORGE RIVERA JIMENEZ
*Secretary of Housing*

JAVIER VÉLEZ AROCHO
*Secretary of Natural and Environmental Resources*

ALEJANDRO GARCIA PADILLA
*Secretary of Consumer Affairs*

DAVID E. BERNIER RIVERA
*Secretary of Sports and Recreation*

MIGUEL A. PEREIRA
*Secretary of Corrections and Rehabilitation*

---

*Legislative Officers*

KENNETH D. MCCLINTOCK
President, Senate

JOSÉ F. APONTE
Speaker, House of Representatives

*Fiscal Officers*

ESPERANZA RUIZ
Acting Director, Office of Management and Budget

ALFREDO SALAZAR
Acting President,
Government Development
Bank for Puerto Rico

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS AND THE COMMONWEALTH'S OUTSTANDING GENERAL OBLIGATION BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

CERTAIN STATEMENTS CONTAINED IN THIS OFFICIAL STATEMENT REFLECT NOT HISTORICAL FACTS BUT FORECASTS AND "FORWARD-LOOKING STATEMENTS." THESE STATEMENTS ARE BASED UPON A NUMBER OF ASSUMPTIONS AND ESTIMATES THAT ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMMONWEALTH OF PUERTO RICO. IN THIS RESPECT, THE WORDS "ESTIMATES," "PROJECTS," "ANTICIPATES," "EXPECTS," "INTENDS," "BELIEVES" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL PROJECTIONS, FORECASTS, ASSUMPTIONS, EXPRESSIONS OF OPINIONS, ESTIMATES AND OTHER FORWARD-LOOKING STATEMENTS ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THIS CAUTIONARY STATEMENT: ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED BY FORWARD-LOOKING STATEMENTS.

Other than with respect to information concerning Assured Guaranty Corp. ("Assured") and Financial Guaranty Insurance Company ("FGIC") contained under the caption *Bond Insurance* and the insurance policy specimens appearing in *Appendices IV* and *V* herein, none of the information in this Official Statement has been supplied or verified by Assured and FGIC, respectively, and Assured and FGIC make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information, (ii) the validity of the Bonds, or (iii) the tax-exempt status of the interest on the Bonds.

# TABLE OF CONTENTS

|   | Page |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| OVERVIEW | 3 |
| RECENT DEVELOPMENTS | 4 |
|     The Commonwealth's Budget Deficit for Fiscal Year 2006, Its Structural Budget Imbalance and Other Fiscal Challenges | 4 |
|     Tax and Fiscal Reform and Government Reorganization Plan | 6 |
|     Fiscal Year 2007 Budget | 8 |
|     Rating Action Involving the Commonwealth | 10 |
| PLAN OF FINANCING | 10 |
|     Sources and Uses of Funds | 11 |
| THE BONDS | 11 |
|     General | 11 |
|     Book-Entry Only System | 11 |
|     Payments and Transfers | 14 |
|     Discontinuance of Book-Entry Only System | 14 |
|     Authorization | 14 |
|     Redemption | 15 |
|     Notice of Redemption; Effect of Redemption | 15 |
|     Security | 16 |
|     Payment Record | 17 |
|     Debt Limitation | 18 |
|     Maturity Limitation | 19 |
| BOND INSURANCE | 19 |
|     The Assured Insurance Policy | 19 |
|     The FGIC Insurance Policy | 22 |
|     Concerning the Insurance Policies of the Bond Insurers | 25 |
| PUBLIC SECTOR DEBT OF THE COMMONWEALTH | 26 |
|     Public Sector Debt | 26 |
|     Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt | 27 |
| TAX EXEMPTION | 29 |
|     Discount Bonds | 30 |
|     Premium Bonds | 30 |
| LEGAL MATTERS | 31 |
| LEGAL INVESTMENT | 31 |
| UNDERWRITING | 31 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 31 |
| RATINGS | 32 |
| CONTINUING DISCLOSURE | 32 |
| MISCELLANEOUS | 35 |
| Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated July 1, 2006 | I-1 |
| Appendix II – Form of Opinions of Bond Counsel | II-1 |
| Appendix III – CPI Bonds Provisions | III-1 |
| Appendix IV – Specimen of the Assured Insurance Policy | IV-1 |
| Appendix V – Specimen of the FGIC Insurance Policy | V-1 |

Commonwealth's general obligation bonds, which was paid from the proceeds of a Government Development Bank loan that is being refunded with the proceeds of the Series 2006 B Bonds and the Series 2006 C Bonds (the "Financed Debt Service"). These excluded expenditures are referred to as the "Additional Expenditures." See the discussion of "Additional Expenditures" in "Summary and Management's Discussion of General Fund Results – Commonwealth's Structural Budget Imbalance" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in *Appendix I*.

*Commonwealth's Structural Budget Imbalance.* The budget imbalance in fiscal year 2006 comes in the wake of several recent fiscal years during which the Commonwealth's recurring expenditures exceeded its recurring revenues. These budget imbalances were covered in the past with loans from Government Development Bank, financing transactions (including long-term bond issues payable from the General Fund) and other non-recurring resources. The Commonwealth's recurring operating expenditures during fiscal year 2006 exceeded recurring revenues (the so-called structural imbalance) by approximately $1.2 billion, compared to $1 billion for fiscal year 2005. The $1.2 billion structural imbalance for fiscal year 2006 is the difference between estimated expenditures of $9.683 billion plus the Financed Debt Service, for a total of $10.05 billion, less budgeted recurring revenues of $8.895 billion. The calculation of the $1.2 billion structural imbalance does not take into account (i) the $350 million reduction in recurring revenues during fiscal year 2006 discussed above because the government does not consider it a permanent reduction in recurring revenues and (ii) net proceeds of $100 million received in fiscal year 2006 from the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A. The amount of estimated expenditures also does not take into account certain of the Additional Expenditures discussed above, which, if considered recurrent, would increase the structural budget imbalance. See "Summary and Management's Discussion of General Fund Results – Commonwealth's Structural Budget Imbalance" under *Puerto Rico Taxes, Other Revenues, and Expenditures* and "2006 Budget Approval Process" under *Budget of the Commonwealth of Puerto Rico* in *Appendix I*.

*Other Fiscal Challenge.* Other than its current budgetary shortfalls, the principal challenge facing the Commonwealth involves resolving the increasing unfunded pension liability of the Employees Retirement System and the Teachers Retirement System, which were $9.2 billion as of June 30, 2003 and $2.3 billion as of June 30, 2004, respectively. The Commonwealth expects to reduce the unfunded liability of the Employees Retirement System through passage of proposed legislation which provides for increased employer and employee contributions, the issuance of up to $2 billion of pension obligation bonds, which would be payable from the Commonwealth's General Fund, and, subject to regulatory approval and other conditions, the sale of its remaining Puerto Rico Telephone Company ("PRTC") stock for approximately $500 million, which the Employees Retirement System expects to invest in higher-yielding assets.

The Employees Retirement System and the Teachers Retirement System are seeking reimbursement from the Commonwealth for certain special retirement benefits paid by them in prior fiscal years under legislation providing such retirement benefits. The Employees Retirement System is seeking reimbursement from the Commonwealth in the amount of $77.4 million for cumulative benefits paid to beneficiaries through June 30, 2005. The Employees

5

Retirement System projects an additional shortfall of $39.4 million for fiscal year 2006 in connection with payments pursuant to special benefit laws. OMB believes that the basis of the claims from the Employees Retirement System is valid but that the amounts claimed remain to be verified and reconciled. Recently, the Employees Retirement System received a $42.9 million payment from OMB to cover shortfalls related to payments made in connection with special benefit laws. OMB does not recognize as a Commonwealth liability part of the claims by the Teachers Retirement System ($119 million). OMB and the Teachers Retirement System are currently under inter-agency arbitration in an effort to resolve their differences. Pursuant to Act No. 91 of May 13, 2006, the Commonwealth must use any future budget surplus to pay any amounts owed to the retirement systems.

For more details about the retirement systems and their finances, see *Retirement Systems* in *Appendix I*.

**Tax and Fiscal Reform and Government Reorganization Plan**

In an effort to address the Commonwealth's structural budget imbalance and its other fiscal difficulties, the Executive Branch and the Legislative Assembly enacted and the Governor signed legislation providing for tax reform and fiscal reform, as discussed below. The tax reform legislation is aimed at increasing revenues by expanding the tax base through the implementation of a broad-based sales tax. The fiscal reform legislation is aimed at limiting expenditures in relation to past spending rates and stabilizing expenditure growth at a level below that of recurring revenues.

*Tax Reform.* Act No. 117 of July 4, 2006 ("Act 117") amends the Puerto Rico Internal Revenue Code of 1994 (the "PR Code") to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Central Government Sales Tax"). Act 117 also authorizes each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Central Government Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Central Government Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations provided therein. The Sales Tax will not be imposed on, among other things: (i) taxable items acquired by merchants for resale, (ii) taxable items acquired by manufacturing plants, (iii) taxable items acquired for use and consumption outside of Puerto Rico, (iv) certain food products that do not need to be heated before their sale, (v) prescription drugs, (vi) the rental payments received by a lessor of real property which is used for residential or commercial purposes, (vii) services provided by designated professionals, (viii) cash, cash equivalents, stocks, bonds, notes, mortgage loans, insurance, securities and interest derived for the use or forbearance of money, (ix) sales of real property, and (x) leases in which the Industrial Development Company is the owner of the property.

6

Act 117 repeals the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Certain items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items and will not be subject to the Sales Tax.

The Sales Tax and the repeal of the 5% general excise tax will be effective on November 15, 2006. Municipalities, however, may implement the Municipal Sales Tax starting on July 1, 2006, and some have already done so. The revenues derived from the Sales Tax will be distributed as follows: (i) municipal governments will retain 1.3% of the Sales Tax, (ii) the Financial Assistance Fund, created by Act No. 91 of May 13, 2006, will receive 1% of the Sales Tax, and (iii) the General Fund will receive 4.7% of the Sales Tax. The Secretary of the Treasury projects that each percentage point of the Sales Tax will generate annually approximately $191 million of gross revenues and that the Sales Tax will generate total annual gross revenues of approximately $1.337 billion. The additional revenues to be generated by the Sales Tax will be partly offset by the partial elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

Act 117 also provides for special income tax rates with respect to certain transactions occurring on and between July 1, 2006 and December 31, 2006. These special tax rates will apply to eligible dividends declared by domestic corporations or partnerships and "built-in" gains associated with capital assets held for periods in excess of six months. These special tax rates are only available for transactions in connection with capital assets consisting of stock or participations of domestic and foreign corporations and partnerships, and real property located in Puerto Rico. In the case of resident corporations and partnerships, these special tax rates apply only to real property located in Puerto Rico.

The Secretary of the Treasury expects the aforementioned provisions of Act 117 to generate approximately $264 million by December 31, 2006. The Legislative Assembly, however, authorized the Governor to increase by Executive Order the Sales Tax by 1% if these provisions do not generate $1 billion by December 31, 2006. This 1% increase in the Sales Tax would remain in effect until it has produced, along with the aforementioned provisions of Act 117, a total of $1 billion.

Members of the House of Representatives have indicated that they may challenge the validity of the Sales Tax because the House of Representatives intended to enact a 6.5% aggregate sales and use tax (consisting of a 5.5% aggregate sales and use tax, which includes the portion attributable to the municipalities, plus a 1% increase at the Governor's discretion). The Secretary of Justice, however, has opined that any potential challenge to the Sales Tax rate would be without merit.

*Fiscal Reform Legislation.* On May 25, 2006, the Governor signed legislation providing for a fiscal reform of the Commonwealth government (the "Fiscal Reform Legislation"). The legislation applies to every instrumentality and entity of the Executive Branch funded, in whole or in part, from the General Fund and sets forth as the public policy of the Commonwealth the reduction of government spending, the elimination or consolidation of redundant agencies, the reduction of government payroll without causing the layoff of regular employees or increasing

7

the actuarial liability of the retirement systems, the limitation of unnecessary, extravagant or excessive spending, and the limitation of public relations and other similar expenses. For a discussion of the Fiscal Reform Legislation, see "Fiscal Reform" under *Budget of the Commonwealth of Puerto Rico* in *Appendix I*.

Despite his approval of the Fiscal Reform Legislation, the Governor has stated that certain of its provisions may be unconstitutional because they infringe on Executive Branch prerogatives. As such, the Governor has informed the Legislative Assembly that certain provisions of the Fiscal Reform Legislation will be implemented at the Executive Branch's discretion and through the use of the Executive Branch's prerogatives. There is no assurance that the Fiscal Reform Legislation will generate the expected savings or that it will be implemented as enacted.

*Government Reorganization Plan.* The Commonwealth has launched the Government Efficiency Project (the "Project") as part of its efforts to implement a thorough fiscal reform. The main objective of the Project is to review and analyze the functions, financial situation, and performance of every government agency and public corporation. This review and analysis will permit the Commonwealth to implement a comprehensive reorganization via the restructuring, consolidation, and/or elimination of public entities. The Project's aim is to refocus the Commonwealth's resources in a more efficient and effective manner, geared towards implementing a "customer service" culture in public service. The Project was launched on June 22, 2006, and is referred to as the "100 Day Plan." The Project's purpose is to establish the parameters, objectives, and goals of the Commonwealth's restructuring efforts in order to provide a cohesive and integrated action plan for its implementation.

**Fiscal Year 2007 Budget**

On July 10, 2006, the Governor signed a General Fund budget for fiscal year 2007 of $9.488 billion, or approximately $195 million less than the estimated expenditures for fiscal year 2006 of $9.683 billion (excluding the Additional Expenditures). This reduction of approximately $195 million is attributable principally to decreases in the amount allocated to the Department of Education and certain health related expenditures. Currently, the Department of Education is working on an internal restructuring to reduce its expenditures so as to remain within its reduced operating budget. The Commonwealth expects to cover certain of its health related expenditures with a fund transfer from the State Insurance Fund of $230 million. This transfer, however, will be subject to approval by the Legislative Assembly.

The Secretary of the Treasury's revenue projection for fiscal year 2007 is $9.163 billion, an increase of $618 million, or 7.2%, from estimated net revenues for fiscal year 2006 of $8.545 billion. The Secretary of the Treasury's revenue projection for fiscal year 2007 consists of $8.899 billion of recurring revenues, a 4.1% increase over fiscal year 2006, and $264 million to be generated by certain non-recurring tax measures. See "Tax and Fiscal Reform and Government Reorganization Plan – Tax Reform" above. The revenue projections for fiscal year 2007 have been adjusted to take into account (i) the Planning Board's downward revision of its forecast for real growth in gross national product from 2.5% to 0.6%, (ii) the substitution of the Sales Tax for the 5% general excise tax (4.7% of which Sales Tax is allocated to the General

8

Fund) starting on November 15, 2006 through June 30, 2007, and (iii) certain income tax rate reductions included in the tax reform legislation. See "Summary and Management's Discussion of General Fund Results – Fiscal Year 2007 Projected Revenues" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in *Appendix I.*

The revenues projected by the Secretary of the Treasury for fiscal year 2007 include approximately $643 million from the implementation of the Sales Tax. This amount consists of the 4.7% allocable to the General Fund for the period from November 15, 2006 through June 30, 2007 and the additional 1% that the Legislative Assembly authorized the Governor to impose, as discussed above, beginning on February 1, 2007. Although the projections include the additional 1% Sales Tax for a five month period in fiscal year 2007, the government will examine alternatives (including cost cutting measures) that would avoid the imposition of such additional Sales Tax. Only in the event of extraordinary circumstances, and once all other alternatives are exhausted, would that option be exercised. The additional revenues to be generated by the Sales Tax during fiscal year 2007 will be partly offset by a projected $368 million reduction in revenues due to the partial elimination of the 5% general excise tax on November 15, 2006 and a projected $166 million reduction in revenues due to the income tax reductions provided by Act 117.

The Commonwealth's budgeted expenditures for fiscal year 2007 of $9.488 billion exceed projected revenues of $9.163 billion by approximately $325 million. In addition, the Commonwealth must cover a $243 million cash shortfall relating to fiscal year 2006 and a $52 million cash shortfall relating to fiscal year 2007 consisting of (i) certain payments excluded from the fiscal year 2007 budget and (ii) temporary differences in cash flow during fiscal year 2007. The Commonwealth expects to cover this combined budget deficit and cash shortfall of $620 million through the implementation of additional expenditure reducing measures, a possible increase in tax revenues resulting from the reduction of the uncertainty surrounding the government's fiscal crisis, and cash management mechanisms. The possible increase in tax revenues may be tempered by the adverse economic impact resulting from increases in the price of oil and the implementation of the Sales Tax.

The Commonwealth has also excluded from the fiscal year 2007 budget approximately $522 million of debt service payments on its outstanding appropriation debt. Of this amount, Government Development Bank advanced and, on July 15, 2006, deposited with the trustee $303 million corresponding to debt service of the Public Finance Corporation. Additional debt service requirements for fiscal year 2007 will be covered with amounts to be deposited in the Financial Assistance Fund, a special fund created by Act No. 91 of May 13, 2006. The Financial Assistance Fund will be funded with 1% of the Sales Tax, which is expected to generate annually approximately $191 million. However, due to the implementation of the Sales Tax on November 15, 2006, the 1% Sales Tax is expected to generate approximately $120 million for fiscal year 2007. The Commonwealth is currently evaluating various restructuring alternatives for its outstanding appropriation debt in order to cover these debt service payments with the expected revenues of the Financial Assistance Fund. Amounts not covered by the Financial Assistance Fund, if any, would have to be covered by additional legislative appropriations from the Commonwealth's General Fund.

**Rating Action Involving the Commonwealth**

*Recent Rating Action.* On July 20, 2006, Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), confirmed its "BBB" and "BBB-" rating on the Commonwealth's general obligation debt and appropriation debt, respectively, and removed the rating from CreditWatch with negative implications, where it had been placed on March 22, 2006. S&P's ratings outlook, however, remains negative.

On July 21, 2006, Moody's Investors Service ("Moody's") confirmed its "Baa3" and "Ba1" rating on the Commonwealth's general obligation debt and appropriation debt, respectively, and removed the ratings from Watchlist with negative implications, where it had been placed on February 24, 2006. Moody's ratings outlook, however, also remains negative.

*Previous Rating Action.* On March 22, 2006, S&P placed the Commonwealth's rating on CreditWatch with negative implications as a result of the Commonwealth's anticipated budget deficit for fiscal year 2006, slow progress on tax and fiscal reform and the apparent political impasse regarding these measures. This action had been preceded in May 2005 by a reduction in S&P's rating of the Commonwealth's general obligation debt and appropriation debt rating from "A-" to "BBB" and from "BBB" to "BBB-," respectively.

On May 8, 2006, Moody's downgraded the Commonwealth's general obligation and appropriation bond ratings from "Baa2" to "Baa3" and from "Baa3" to "Ba1," respectively, and kept the ratings on Watchlist for possible further downgrade. Moody's action reflected the Commonwealth's strained financial condition, ongoing political conflict and lack of agreement regarding the measures necessary to end the government's multi-year trend of financial deterioration. For a discussion of previous rating actions affecting the Commonwealth, see "Rating of Commonwealth General Obligation Bonds" under *Debt* in *Appendix I*.

## PLAN OF FINANCING

The net proceeds of the Series A Bonds will be deposited in the 2006 Public Improvements Fund established under Act 43 and will be used to carry out certain capital improvements programs authorized by the Legislature in Act 43. The net proceeds of the Series 2006 B Bonds will be used to refinance a portion of a Government Development Bank line of credit which the Secretary of the Treasury drew upon to pay a portion of the Commonwealth's general obligation bonds debt service for fiscal year 2006.

**Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $835,650,000.00 |
| Original Issue Premium | 18,412,327.10 |
| Total sources | $854,062,327.10 |

Uses:

| | |
|---|---|
| Deposit into the 2006 Public Improvements Fund | $507,050,871.90 |
| Repayment of Government Development Bank line of credit | 338,000,000.00 |
| Underwriting discount, bond insurance premium, legal, printing, and other financing expenses | 9,011,455.20 |
| Total uses | $854,062,327.10 |

## THE BONDS

**General**

The Bonds will be dated, bear interest at such rates (except for the CPI Bonds, as defined below), be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. The Bonds (other than the CPI Bonds) are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

The $30,005,000 Series A Bonds maturing on July 1, 2018, $31,280,000 Series A Bonds maturing on July 1, 2019, $32,625,000 Series A Bonds maturing on July 1, 2020, and $32,815,000 Series A Bonds maturing on July 1, 2021 bear interest at the CPI Rate, as indicated on the inside front cover (the "CPI Bonds"). The CPI Rate and its calculation are described in *Appendix III*. The CPI Rate is a variable interest rate based on changes in the Consumer Price Index. Holders of the CPI Bonds should review *Appendix III* with respect to further details on the CPI Bonds and the CPI Rate.

In connection with the CPI Bonds, the Commonwealth will enter into an interest rate swap agreement with an affiliate of Morgan Stanley, the lead underwriter of the Bonds, as described in *Appendix III*. The Commonwealth is obligated to make debt service payments on the Bonds regardless of the performance of a swap provider of its obligations under the interest rate swap agreement.

**Book-Entry Only System**

The following information concerning The Depository Trust Company ("DTC"), New York, New York and DTC's book-entry system has been obtained from DTC. Neither the Commonwealth nor the Underwriters take any responsibility for the accuracy thereof.

11

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered bond will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has the highest rating issued by S&P: "AAA." The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of a Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchases. Beneficial Owners are, however, expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and

their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the bond documents. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on such record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, its nominee, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under

13

such circumstances, in the event that a successor securities depository is not obtained, definitive Bonds will be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor depository). In that event, definitive Bonds will be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Commonwealth that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Beneficial Owners. The Commonwealth is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

For every transfer and exchange of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax, fee or other charge that may be imposed in relation thereto.

**Discontinuance of the Book-Entry Only System**

In the event that the book-entry only system is discontinued, the following provisions will apply: principal of and redemption premium, if any, on the Bonds shall be payable in lawful money of the United States of America at the principal office of the Registrar in San Juan, Puerto Rico. Interest on the Bonds will be payable by check mailed to the respective addresses of the registered owners determined as of the 15th day of the month preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar. The Bonds will be issued only as registered bonds without coupons in denominations of $5,000 or any integral multiple thereof. The transfer of the Bonds will be registrable and they may be exchanged at the corporate trust office of the Registrar in San Juan, Puerto Rico, upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted Act 43, which authorizes the Secretary of the Treasury to issue the Series A Bonds pursuant to one or more resolutions adopted by the Secretary of the Treasury and approved by the Governor. In accordance with Act 43, the Secretary of the Treasury adopted and the Governor approved the Series A Bond Resolution.

Act 33 authorizes the Secretary of the Treasury to issue the Series 2006 B Bonds pursuant to one or more resolutions adopted by the Secretary of the Treasury and approved by the Governor. In accordance with Act 33, the Secretary of the Treasury adopted and the Governor approved the Series 2006 B Bond Resolution.

**Redemption**

The Bonds (other than the CPI Bonds, which are not subject to redemption) maturing on or after July 1, 2016 are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' notice, the Bonds (other than the CPI Bonds) maturing on or after July 1, 2016 are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, on and after July 1, 2016, either in whole or in part (and if in part, in such order of maturity as directed by the Secretary of the Treasury), on any date, at the principal amount of the Bonds to be redeemed, together with accrued interest to the date fixed for redemption, without premium.

*Mandatory Redemption.* The Bonds maturing July 1, 2030, July 1, 2032 and July 1, 2035 (the "Term Bonds") are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Term Bonds and otherwise subject to adjustment as described below), upon at least 30 days' notice, on July 1, 2028, July 1, 2030 and July 1, 2033, respectively, and on July 1 in each year thereafter at a redemption price of par plus accrued interest to the dates fixed for redemption:

**Amortization Requirements for the Term Bonds Due**

| Year | July 1, 2030 | July 1, 2032 | July 1, 2035 |
|---|---|---|---|
| 2028 | $48,225,000 | | |
| 2029 | 50,755,000 | | |
| 2030 | 29,530,000* | $23,890,000 | |
| 2031 | | 56,225,000 | |
| 2032 | | 59,180,000* | |
| 2033 | | | $62,285,000 |
| 2034 | | | 65,400,000 |
| 2035 | | | 68,670,000* |
| Average Life | 22.75 years | 25.15 years | 27.92 years |

* Maturity

If the amount of the Term Bonds purchased or redeemed in a fiscal year exceeds the amount of the amortization requirement for such Bonds for such fiscal year, the amortization requirement for such Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice by mail to DTC or, if the book-entry only system described above has been discontinued, by first class mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolutions.

15