**<u>EXHIBIT B</u>**

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF PUERTO RICO
 2   ------------------------------x

 3   IN RE: THE FINANCIAL OVERSIGHT    PROMESA
     & MANAGEMENT BOARD FOR PUERTO
 4   RICO,                            TITLE III

 5       as representative of
                                      17 BK 3283 (LTS)
 6   THE COMMONWEALTH OF
     PUERTO RICO, et al.              (Jointly Administered)
 7
                     Debtors.
 8
     ------------------------------x
 9                                    Motion Hearing
                                      May 16, 2019
10                                    2:00 p.m.

11   Before:

12           HON. LAURA TAYLOR SWAIN,

13                                      District Judge

14

15           APPEARANCES

16
     PROSKAUER ROSE LLP
17       Attorneys for Financial Oversight and Management Board
     BY:  BRIAN C. ROSEN
18
     PAUL HASTINGS LLP
19       Attorneys for Official Committee of Unsecured Creditors
         and its capacity as Commonwealth agent
20   BY:  LUC A. DESPINS
         G. ALEXANDER BONGARTZ
21
     O'MELVENY & MYERS LLP
22       Attorneys for AAFAF
     BY:  PETER FRIEDMAN
23
     BUTLER SNOW LLP
24       Attorneys for Financial Guaranty Insurance Company
     BY:  MARTIN A. SOSLAND
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                    APPEARANCES

 2

 3    ORRICK HERRINGTON & SUTCLIFFE LLP
           Attorneys for Cantor-Katz Collateral Monitor LLC
 4    BY:  DOUGLAS MINTZ

 5    MILBANK LLP
           Attorneys for Ambac Assurance Corp.
 6    BY:  ATARA MILLER
           ANNA DIMON

 7    CADWALADER, WICKERSHAM & TAFT LLP
           Attorneys for Assured Guaranty Corp. and Assured Municipal
 8         Corp.
      BY:  WILLIAM NATBONY
 9         THOMAS J. CURTIN

10    BROWN RUDNICK LLP
           Attorneys for Special Claims Committee
11    BY:  EDWARD WEISFELNER

12    WHITE & CASE
           Attorneys for the "Puerto Rico Funds"
13    BY:  JASON N. ZAKIA

14    WEIL, GOTSHAL & MANGES LLP
           Attorneys for National Public Finance Guarantee
15         Corporation
      BY:  MARCIA GOLDSTEIN
16         KELLY DIBLASI
           MOSHE FINK
17
      MCCONNELL VALDES LLC
18         Attorneys for AmeriNational Community Services, LLC as
           servicer for the GDB Debt Recovery Authority
19    BY:  NAYUAN ZOUAIRABANI

20    JENNER & BLOCK LLP
           Attorneys for Official Committee of Retired Employees of
21         the Commonwealth of Puerto Rico
      BY:  RICHARD LEVIN
22         CARL WEDOFF

23

24

25
```

1      (Case called)

2      THE COURT:  Good afternoon and welcome, counsel,

3  parties in interest, and members of the public and press here

4  in New York as well as the telephonic participants and

5  observers in San Juan.

6      We are here today for oral argument on the urgent

7  joint motion of the Financial Oversight and Management Board

8  and the Official Committee of Unsecured Creditors seeking

9  approval of a stipulation concerning joint prosecution of

10  certain causes of action of the Puerto Rico Highways and

11  Transportation Authority and the Employees Retirement System.

12      I will, as usual, remind you that, consistent with

13  Court and judicial conference policies and the orders that have

14  been issued, there is to be no use of any electronic devices in

15  the courtroom to communicate with any person, source or

16  repository of information, nor to record any part of the

17  proceeding.  All devices must be turned off unless you are

18  using them for stored information, and all audible signals,

19  including vibration features, must also be turned off.

20      No recording or retransmission of the hearing is

21  permitted by any person, whether they are in the courtroom or

22  not, including but not limited to the parties or the press, and

23  anyone observed or found to have otherwise been texting or

24  emailing or communicating from a device from the courtroom

25  during the court proceeding will be subject to sanctions,

1    including but not limited to confiscation of the device and

2    denial of future requests to bring devices into the courtroom.

3            I will conclude my friendly greeting here by asking

4    counsel to bear in mind that in order to ensure consistent

5    sound quality across all of our locations and telephone lines,

6    the only live microphone in the well is the microphone at the

7    podium.  When you need to speak, you will need to speak from

8    the podium so that everyone will be able to hear you.  Thank

9    you for cooperating with all of these technical issues and

10   rules.

11           I understand that Mr. Despins will be opening for us.

12   You have been allotted 20 minutes in total but you are using 7

13   for reply?

14           MR. DESPINS:  That is correct, your Honor.

15           THE COURT:  Thank you.  Good afternoon.

16           MR. DESPINS:  Good afternoon, your Honor.  I looked at

17   all these things for the committee.  Your Honor, I think it

18   makes sense for me to make some preliminary comments and

19   address a few points briefly.  I am sure you already have views

20   on all of this, and therefore it is a better use of my time to

21   answer questions or comments you may have.  But let me start

22   with a few background points.

23           First, this is practically the same stipulation as the

24   Commonwealth stipulation.  In fact, we marked the Commonwealth

25   stipulation to show changes as an attachment to the motion at

1    docket 6867.  Obviously, it deals with two other debtors, ERS

2    and HTA, where the committee is the sole official committee in

3    both of these cases.

4           In terms of the types of adversary proceedings, your

5    Honor, there will be the same three types as with the

6    Commonwealth.  First, what we call the garden-variety type of

7    avoidance actions, preferences, fraudulent transfers claims

8    against vendors, except that they will be much less.  There

9    were hundreds in the Commonwealth case.  In this case, although

10   that number is not fixed -- it is still moving because there is

11   due diligence that is ongoing -- it will be much less than

12   that.  It would be probably a dozen or so.

13          As I said, there is due diligence ongoing as to every

14   claim to make sure that all the facts can be asserted against

15   each defendant.  That's the garden-variety type of claim, same

16   thing as the Commonwealth.

17          The second category are the clawback actions.  These

18   are claims again similar to the Commonwealth.  It is a

19   different theory, but it is the same concept.  You received

20   payments of principal and interest on bonds that we believe are

21   invalid.  The Court has not ruled on that.  But if the Court

22   rules that they are invalid, we, the estates, want the money

23   back that was paid on these bonds that are void.  So it is not

24   exactly the same theory, but it is the same concept as the

25   Commonwealth.

1          Your Honor, the game plan would be to file a motion to

2     stay all these proceedings so that we, first of all, save

3     money, not incur unnecessary expenses, and not trouble the

4     defendants until further progress has been made on the

5     underlying merits, which is are these bonds void or not.  There

6     is no point in having all these summons served on all these

7     people if at the end of the day your Honor is going to rule

8     that, no, the bonds are perfectly valid.

9          The third category, same thing as the Commonwealth, is

10    the lien avoidance type of claims that Proskauer is handling

11    the same way they are handling them in the Commonwealth.  I can

12    describe those generally because I have not seen the complaint

13    yet.  It's still percolating.  "Complaints" plural, to be more

14    precise.  But it applies to both debtors, to ERS and to HTA.

15         For example, in ERS, your Honor, you will recall that

16    there was a motion to amend the complaint.  You denied that

17    recently.  But there was an attachment which was the proposed

18    new complaint.  Essentially, it would be along those lines in

19    the ERS case except that they would name the fiscal agent as

20    well as the bondholders.  In HTA it's the same situation.

21    There would be a lien avoidance action against the fiscal agent

22    and the bondholders that have asserted that they are secured

23    based on section 544 and other similar sections.

24         That covers the universe.  Although there are

25    different defendants, different types of claims, they are

1  really generically the same.

2          What I would like to say, your Honor, before we get

3  into any questions you may have is that the objectors here have

4  no right to pre-notice, pre-approval of any kind if the board

5  were suing them on its own.  The only thing that is changing

6  here is that the committee is being added as a co-plaintiff.

7  But the objectors are absolutely protected against that if they

8  think that it is inappropriate through paragraph 27 of the

9  stipulation, which says every defendant can challenge exactly

10  that.  Therefore, we don't believe that the objectors should

11  prevail.

12          I would also point out that Genesis, which is a member

13  of the committee which has HTA claims, filed a joinder very

14  recently, docket number 6934, a joinder to our original section

15  926 procedure motion.  You know from prior hearings that SEIU

16  had already filed a joinder way back to that motion, docket

17  number 6433.

18          Finally, your Honor, I would say that there are no

19  interdebtor issues here.  The interdebtor claims are covered by

20  a tolling stipulation that your Honor entered, docket number

21  6182, entered two weeks ago.  Footnote 4 of the stipulation

22  expressly says that none of these claims that are covered are

23  interdebtor claims.

24          Your Honor, I could go on and talk about Aurelius and

25  things like that, but I think by now you have a pretty firm

1   grasp of these issues.  I would be happy to answer any

2   questions or comments you may have.

3        THE COURT:  At this point I just have a couple of

4   Aurelius-related questions for you.  These are addressed to

5   some extent in your papers, but I would like to be clear on the

6   record.

7        What is the basis of your position that the joint

8   plaintiff-joint trustee construct is still necessary for

9   Aurelius reasons given that the president has issued the press

10  release stating that he intends to nominate the current board

11  and the First Circuit has allowed sufficient time to do that?

12       MR. DESPINS:  The point, and we make this in our

13  papers, is that we are in exactly the same position today as we

14  were when the Commonwealth stipulation was approved in the

15  sense that the stay of the mandate then was going to expire on

16  May 15th and the statute of limitations on Commonwealth was

17  going to expire on May 2nd or 3rd.

18       Therefore, the rationale was not that there was no

19  stay or that we would run out of the stay before the expiration

20  of the statute of limitations but rather it's the Aurelius

21  theory -- not our theory, the Aurelius theory -- that the de

22  facto officer defense cannot apply once you are on notice that

23  you are no longer a de facto officer because you are acting

24  illegally, and therefore any actions taken by the board post

25  the decision by the First Circuit in February of this year are

1  void.

2          THE COURT:  So, pending some regularization of the

3  board from the appointments clause point of view or overturning

4  of the First Circuit decision, the relevant dates that drive

5  urgency here are February 15th as a potentially significant

6  date given Aurelius's argument and the expiry of the statute of

7  limitations, which is well before July 15th?

8          MR. DESPINS:  Correct.  The statute of limitations

9  expires on Monday of next week.  That's exactly the point.

10  Let's be careful.  Where the president said he intends to

11  nominate, as far as we know there has been no such nomination

12  process formally yet.  In fact, we don't know the vagaries of

13  the political process, meaning it has to go to the Senate.  We

14  don't know when that is going to happen and whether it will

15  happen.  I think if that process had been completed, we would

16  be in a different position today.  But that process cannot be

17  completed we know for sure by next Monday.

18          THE COURT:  What, to your knowledge, does the board

19  foresee as a potential course of action if I were at the June

20  omnibus to grant the motion to disband the committee as to ERS?

21          MR. DESPINS:  I can't speak for the board.  The first

22  point I would make is that it is not because we would not be

23  the committee in ERS, but we cannot be co-plaintiff in that

24  case.  There is no requirement that that be the case.  In any

25  event, we'll forcefully debate this and I think the U.S.

1  trustee will come in to object to that motion for obvious

2  reasons.

3      The most obvious one is that we have claims ERS.

4  Second, even if that were not the case, it is impossible in

5  every case to have every debtor represented on the committee in

6  the sense that there are dozens of cases where there are at

7  least 50 debtors.  There is no way that each and every debtor

8  has a creditor on the committee.

9      Members of the committee act as a fiduciary for all

10  debtors.  That is hornbook law, and it is on that basis that

11  the U.S. trustee appoints here.  Whether there is one creditor

12  or five or none on the committee that have claims against a

13  particular debtor, the committee owes fiduciary duties to the

14  unsecured creditors of that debtor.

15      I can't speak for the board, but I think there could

16  be a substitution if required.  But I'm not sure it would be

17  required because, as I said, I don't think the committee would

18  be in a worse position because of that.  As opposed to what

19  other committee?  There is no other committee in the ERS case

20  at this point other than this committee.

21      THE COURT:  I think I hear you representing that the

22  members of the committee and their counsel understand that even

23  if the particular committee member is a Commonwealth creditor,

24  not a creditor of another debtor instrumentality, that in

25  acting for the other instrumentality the fiduciary duty of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    committee member and the committee as a whole is to act in the

2    interest of that other particular instrumentality, and both you

3    and the members of the committee understand that.

4         MR. DESPINS:  Absolutely.  For example, we have two

5    creditors on the committee that have claims against PREPA, two

6    out of seven.  That's not a lot, but we spent hours, hours, on

7    PREPA issues.  You might say why are the other committee

8    members not dropping off at that point?  They are not dropping

9    off because they know that that is part of their job to look

10   after the PREPA unsecured creditors.

11        THE COURT:  Thank you.  That answered my questions.

12        MR. DESPINS:  Thank you, your Honor.

13        THE COURT:  Mr. Natbony, I have you down for the four

14   minutes.

15        MR. NATBONY:  Yes.  Thank you, your Honor.  Good

16   afternoon.  William Natbony from Cadwalader on behalf of

17   assured.  I would like to focus the brief time that I have on

18   what differentiates this stipulation from the stipulation

19   relating to the Commonwealth claims that your Honor addressed

20   at the last omnibus.

21        First, when your Honor approved the Commonwealth

22   stipulation, that was done after the parties were able to reach

23   a limited agreement on a number of the objections.  That

24   agreement was applicable solely to that stipulation with no

25   precedential value, as your Honor and both stipulations say.

 1   That does not exist here today.  Any attempt by Mr. Despins to

 2   argue that there is precedential impact or the same is

 3   inconsistent with the facts.

 4        Second, when your Honor previously approved the

 5   Commonwealth stipulation, it did so because of the time-

 6   sensitive nature and also upon a representation that there were

 7   creditors at the time willing to engage in such process if need

 8   be.  Much time has elapsed since that last representation, and

 9   we still have no creditor that has signed on to a motion for

10   the trustee.  We have Genesis.  And each of those is joining

11   only the procedural motion.  There is no motion before your

12   Honor that is made by any creditor.

13        It would be our position that the committee has had

14   ample time and ample notice since the last omnibus at the very

15   least when it made the representation and could have made those

16   arrangements and did not.

17        THE COURT:  That argument is specific to the

18   requirements of section 926 of the code?

19        MR. NATBONY:  That's correct, your Honor.

20        Third, the 926 argument is limited to actions

21   specified in sections 544 to 549.  We do have more information

22   now.  We still don't have schedules that have been presented to

23   us, but we do know what kind of cases they are going to file.

24        We have heard Mr. Despins talk about lien avoidance

25   actions.  We know from the hundreds of cases that were filed

1   that many of them were adversary complaints that had

2   declaratory relief relating to liens.  We had other

3   disallowances under section 502.  Those are not part of the

4   limited type of claims that 926(a) would allow.

5           Third, we have some serious concerns here that did not

6   potentially exist with respect to the Commonwealth stipulation

7   concerning conflict.  While the UCC owes duties not only to the

8   Commonwealth's unsecured creditors but also HTA's and ERS's

9   unsecured creditors, it is great that we have a representation

10  that says, oh, yes, we'll keep that in mind and we'll act

11  appropriately.

12          But the bottom line is the UCC has already proven

13  itself to take certain positions that are not in accordance

14  with HTA's unsecured creditors.  The rule 2019 statements first

15  show that the Commonwealth creditors far outnumber the low HTA

16  number, and the members have seen their claims paid down during

17  this case.  So there is an interest here, whether we want to

18  admit it or not.

19          And the committee has supported the position of the

20  Commonwealth on the clawback issue.

21          THE COURT:  Mr. Natbony, this proposed stipulation is

22  peculiar to and specific to actions against third parties, not

23  interdebtor issues and actions against third parties concerning

24  certain types of clawback issues.  What is there in this record

25  that would support a proper inference that the UCC would not be

1    able to prosecute faithfully these particular types of

2    adversaries against third parties solely for the benefit of ERS

3    on the one hand or HTA on the other?

4         I realize you have a bigger argument about the

5    universe of issues that might arise and positions that have

6    been taken in the past. But what we are talking about is a

7    plaintiff against a third party for the benefit of a particular

8    debtor. What is the irresolvable conflict there?

9         MR. NATBONY: To the extent you also heard him talk

10   about lien avoidance actions or declaratory judgments, those

11   may come into play. What he said was there wouldn't be

12   necessarily interdebtor claims, but the issues may be there.

13        When the money comes in, where does it go? If it's

14   money that is earmarked for HTA, is it going to stay in some

15   secured account that is going to be only applicable to HTA

16   unsecured creditors, or is that money going to be able to be

17   siphoned off somehow to be used to pay Commonwealth claims when

18   there is an interest for those Commonwealth unsecured creditors

19   to have their claimed paid out as they have in the past?

20   That's really the issue.

21        THE COURT: Mr. Despins can clarify this in his reply,

22   but it would be my expectation that a lien avoidance complaint

23   filed for HTA would seek the relief of return of money to HTA.

24   There might be some follow-on litigation, there might be some

25   separate litigation, and yes, there would be issues as to who

1   should be representing HTA, who should be representing the

2   Commonwealth in sorting out competing claims of Commonwealth

3   and HTA.  But I'm not hearing that there is proposed to be a

4   complaint filed that says avoid that lien and take the money

5   out of HTA and put it somewhere else.

6         MR. NATBONY:  I'll certainly look forward to

7   clarification on reply.  The answer is I haven't heard what

8   your Honor is suggesting from Mr. Despins, nor have I heard

9   that there aren't going to be situations where there will be a

10   conflict of where the money goes.

11         You've got a situation where the unsecured creditors

12   for the Commonwealth have clearly stated their position that

13   the various moratorium laws to prevent the flow of revenues are

14   not preempted by Promessa section 303.  So we do have a

15   position and several positions that the committee has taken

16   that actually consider an actual conflict that exists.  If Mr.

17   Despins is going to get up and say, oh, we will not do this, we

18   will not do that, we will listen to it, but there is a conflict

19   there that really can't be avoided.

20         THE COURT:  I have taken you well over your allotted

21   time, so I will thank you.

22         MR. NATBONY:  Thank you, your Honor.

23         THE COURT:  Ms. DiBlasi.

24         MS. DiBLASI:  Good afternoon, your Honor.  Kelly

25   DiBlasi, Weil Gotshal & Manges, on behalf of National.

1   National joins in the objecting parties' arguments and raises

2   two additional points.

3        First, the movants' solution to this so-called

4   Aurelius problem is not a solution at all.  The Oversight Board

5   and the Committee, as you discussed previously, contend that

6   the stipulation is necessary in the event a court later

7   determines that actions taken by the Oversight Board are void.

8   But they inappropriately assume that this would apply only to

9   the commencement of adversary proceedings.

10       What about the Oversight Board's decision to delegate

11  authority to the Committee and name them as a co-plaintiff?  In

12  their hypothetical, that decision, that action, would be void

13  as well.  And there is no reason to stop there.  The Court

14  could rule that all actions of the Oversight Board are void,

15  even dating prior to the First Circuit's decision, which would

16  include the commencement of the Title III cases.

17       So, while the Oversight Board and the Committee are

18  here today saying that these decisions, the decisions to

19  commence litigation, are at risk, they are otherwise behaving

20  as if every other decision and action by the Oversight Board

21  will stand.

22       The Oversight Board is acting business as usual in

23  these Title III cases, acting independently to negotiate deals,

24  file pleadings, and prosecute the cases without a co-trustee

25  and without a co-plaintiff.  We submit that appointing the

1  Committee as a co-plaintiff and co-trustee here does nothing to

2  resolve these issues.  They are merely trying to solve one

3  problem with another.

4       That leads to the second argument.  If the proposed

5  stipulation is not a solution, then we must question why we are

6  here.  Most telling are the last-minute new disclosures about

7  which actions the stipulation covers.  We heard for the first

8  time in the reply after the monoline insurers' objection was

9  filed that they were going to seek to avoid liens granted to

10  the HTA bondholders.  Today we are hearing for the first time

11  that they are also going to seek to invalidate HTA bonds and

12  clawback principal and interest payments.

13       Both the Committee and the Oversight Board are

14  conflicted from representing the HTA in pursuing these matters.

15  As you heard from counsel to Assured, there is a conflict.  We

16  do not believe that they are acting in order to return funds to

17  HTA and make them available to HTA creditors.  As noted, they

18  supported the Commonwealth's clawback of HTA funds, and we

19  believe that they will argue that if HTA's bondholders are

20  stripped of their liens, they will have no right to try to

21  pursue and challenge the clawback.

22       THE COURT:  I'm going to ask you to wrap up because

23  you are over your time.

24       MS. DiBLASI:  Your Honor, we submit that the movants

25  have manufactured a solution to a hypothetical problem that is

1    not a solution at all.  They could have come to the monoline

2    insureds to try to involve the issue, perhaps through a tolling

3    of the statute of limitations.  They did not.  The stipulation

4    should be denied.

5              THE COURT:  Thank you.

6              Ms. Miller.

7              MS. MILLER:  Good afternoon, your Honor.  Atara Miller

8    from Milbank.

9              THE COURT:  I'm told it is hard to hear the speakers

10   in Puerto Rico.  Do your best.

11             MS. MILLER:  I'll try to speak up.

12             THE COURT:  Thank you.

13             MS. MILLER:  I have already lost 13 seconds.  I am

14   going to try speak quickly here.

15             THE COURT:  We'll give them back.

16             MS. MILLER:  I want to make two points.  The first one

17   is with respect to your question specifically about what in the

18   record here would indicate potential conflict.  Particularly

19   given the representations about the nature of the claims that

20   would be co-represented and co-litigated, I want to make two

21   points.

22             One is, although we haven't seen the schedule of the

23   third-party vendors, I think we can expect that there is a very

24   high likelihood that many, if not all, of those would be

25   crossover vendors that supply either services or products both

1  to the Commonwealth as well as to HTA.  There is no question in

2  my mind that with respect to potentially resolving and settling

3  those claims with crossover vendors, the Committee would favor

4  the Commonwealth in any such settlement.

5       THE COURT:  Try even closer and louder now.  It's a

6  phone problem.  Sorry about that.  We are doing something with

7  the levels here.

8       MS. MILLER:  I'll try.  This sounds better.

9       The second point that I want to make is with respect

10  to the clawback actions and the colloquy that you had with Mr.

11  Natbony.  I want to point out that when you think about

12  clawback and lien avoidance, there isn't going to be a

13  subsequent fight about who gets the money because their entire

14  theory with respect to the lien avoidance is that the money is

15  the Commonwealth's money and it never has to go down to the HTA

16  box.

17       When you think about HTA having two major revenue

18  streams, one is the toll revenues.  That is a separate set of

19  issues.  But it also has all of the excise taxes, all of the

20  vehicle fees, and all of the other fees that belong to HTA that

21  the Commonwealth has for many years been holding.

22       I think the real answer and the real way, if the

23  Oversight Board were concerned about the issues it purports to

24  be concerned with, would be to have had the secured creditors

25  acting as co-plaintiff here.  Because of the unique structure

1    of this, I know that sounds absurd, but let me explain.

2          For the past many years the toll revenues have been

3    diverted and used to cover operating expenses.  As a result of

4    that, all of those payments have come out of secured moneys and

5    liened moneys of the bondholders.  What happens is any dollar

6    that goes in relieves the need -- which we think is illegal and

7    will fight that out later -- relieves the need to rely on the

8    toll revenues for operating expenses because you have more cash

9    in the system.  That allows toll revenues, which are collateral

10   to the bondholders, to be released back to the bondholders.

11         We on behalf of AMBAC put a call in to Mr. Weisfelner

12   to propose this before the proposed HTA stipulation was filed.

13   We did not get a call back to discuss it.  If the Oversight

14   Board wants to prosecute these and thinks it is a real

15   probable, it should be joined in with the secured creditors,

16   not with the Committee that is inherently conflicted here.

17   Thank you.

18         THE COURT:  Thank you.

19         Mr. Sosland.

20         MR. SOSLAND:  Your Honor, FGIC joins in the objection

21   of the three immediately preceding speakers.  I won't repeat

22   what they said.  I do want to address what Ms. Miller said and

23   make a point on the conflict.

24         Your Honor asked what is in this record.  This record

25   is basically a motion, a stipulation, and objections.  There is

1    nothing factual in the record other than the form of

2    stipulation itself.  As to the asserted conflict, there is a

3    pleading.  I do not know the adversary number that was assigned

4    to this because it is one of the late-filed adversaries, but it

5    is filed in the main case at docket number 6820.  It's an

6    adversary proceeding filed by the UCC and the special Committee

7    or the Oversight Board against a number of parties beginning

8    with Autonomy, 6820, in which, to Ms. Miller's point, the liens

9    on various revenue streams that have been asserted by certain

10   GO holders are sought to be avoided for the benefit of the

11   Commonwealth.

12           From the agencies' perspective, each of those,

13   specifically HTA here, is to be avoided for the benefit of the

14   Commonwealth and its creditors, which does conflict directly

15   with the interests of those of us who have secured claims

16   against the HTA and who want to see those revenues remain

17   within HTA.  So there is evidence in the record, at least in a

18   pleading, of which the Court can take notice of the precise

19   conflict.

20           We also don't think there is any evidence in the

21   record of why the Oversight Board benefits from the

22   stipulation, and we don't think Mr. Despins' answer gives you

23   that record.  We ask that the motion be denied.

24           THE COURT:  Thank you.

25           Messrs. Zouairabani and Mintz.

1          MR. MINTZ:  Mintz thank you, your Honor.  Good

2   afternoon.  Doug Mintz of Orrick for Cantor-Katz Collateral

3   Monitor LLC, which serves as the collateral monitor for new

4   bonds issued by the GDB Debt Recovery Authority, with our

5   fellow counsel Nayuan Zouairabani, whose client is

6   AmeriNational Community Services LLC, which is the servicer for

7   the Debt Recovery Authority.

8          We are here on behalf of the Debt Recovery Authority,

9   which has notes cited by the GDB.  As you know, it was created

10  by the GDB Title VI late last year.  We have acceded to many of

11  the GDB's assets, and that includes with respect to HTA more

12  than a billion-7 in principal of HTA loans as well as

13  $200 million in principal of HTA bonds.

14         We share many of the concerns expressed today, as you

15  saw in our pleadings, both legal and practical, and wanted to

16  talk very briefly about one legal point.  As you have seen and

17  heard, section 926 requires that the debtors refuse to bring

18  certain avoidance actions.  That hasn't happened here.  The

19  legislative history talks about why that matters.  This is

20  discussed in the Off-Track Betting case that we cited in our

21  brief.

22         The purpose of the refusal provision in section 926(a)

23  is to permit a trustee to come in only when some political

24  reason is keeping the debtor from proceeding.  Congress talks

25  about that in the legislative history.  That is not the case

1    here.  That is admittedly not the case here.

2         The concern is about the structural infirmities

3    created by the Aurelius litigation.  That is not what Congress

4    had in mind by 926(a), by their own view.  It seems we are

5    trying to squeeze totally different concerns through the narrow

6    hoop of 926(a).  Those structural infirmities seem like an

7    issue for Congress, not for us to decide here today.

8         THE COURT:  The 926 arguments, including that specific

9    argument, were made in connection with the Commonwealth

10   stipulation, and I ruled on that in connection with the

11   Commonwealth stipulation.  It seems to me that is law of the

12   case.  What are you bringing forward that would warrant and

13   meet the high standard for reconsideration of that decision?

14        MR. MINTZ:  We were not a party to that, but I

15   understand.  I read all the prior discussions.  I don't know

16   that there are new issues, but I do believe that the

17   appropriate standard under 926 is not met here.

18        Mr. Zouairabani.

19        MR. ZOURAIRABANI:  Good afternoon, your Honor.  Nayuan

20   Zouairabani of McConnell Valdes presenting on behalf of

21   AmeriNational Community Services LLC.

22        Your Honor, we are here for the second time in a row

23   asking to be named as co-trustees under section 926 and to

24   approve joint prosecution procedures.  The request is modeled

25   on the same situation as the Commonwealth Title III cases

1 admitted during argumentation today while exalting the virtues

2 of that model and stating that that model should be adopted in

3 the ERS and HTA cases.

4      The model is simply flawed, your Honor.  Members of

5 the Oversight Board have even recognized such, as highlighted

6 in the Newsweek board that was referenced at docket 6910.  The

7 real effect of that model, your Honor, is as follows.

8      Movants began sending notices to myriad governmental

9 suppliers, vendors, professionals, and other parties saying

10 that they would be liable for millions of dollars in a

11 complaint.  The notice lacks specificity or any determination

12 and calculation of potential exposure.

13      This created an aura of chaos and uncertainty on the

14 island which finally resulted in 256 adversary proceedings

15 being filed between April 30 and May 2, 2019.  This model does

16 not benefit the debtors whom the movants purport to represent,

17 but it benefits themselves specifically in order to save face

18 on a looming deadline that they knew from the beginning

19 existed.

20      Movants might argue, so what, Aurelius actions are

21 part and parcel of any bankruptcy case.  To that I posit as

22 follows.  This is no ordinary bankruptcy case.  We are talking

23 about the largest municipal bankruptcy in the history of the

24 United States.  That means that you would expect a heightened

25 level of diligence and care from an ordinary bankruptcy case,

1  specifically to a deadline that was known to all from the

2  beginning.

3          In conclusion, your Honor, movants should bear the

4  cost and the burden of their lack of diligence, not the parties

5  in interest in the HTA and ERS cases and much less the citizens

6  of Puerto Rico.  Thank you.

7          THE COURT:  Thank you.

8          Mr. Zakia.

9          MR. ZAKIA:  Good afternoon, your Honor.  Jason Zakia

10  of White & Case on behalf of the Puerto Rico funds.

11          THE COURT:  Louder, please.

12          MR. ZAKIA:  Sorry.  That is not normally a problem I

13  have.

14          I won't repeat what has been said by counsel before.

15  I would like to target a few issues that are unique to ERS.

16  One is, as a threshold issue, following up on the colloquy your

17  Honor just had, with regard to the 926 question of whether a

18  creditor has asked for the appointment of a trustee, which I

19  think everyone has acknowledged is a legal requirement.

20          In the Commonwealth case, Mr. Despins' answer was

21  individual members of the Committee have joined and therefore

22  that cured that defect.  He doesn't have that argument with

23  regard to ERS because there are no creditors of ERS on the

24  Committee.  That gets to the larger point I'm going to talk to

25  you about in a moment.

1      I believe what you may hear is that the union, which

2  is a Commonwealth creditor, may have members that made

3  themselves be ERS creditors.  But the union does not stand in

4  the shoes of those members for purposes of determining whether

5  it is a creditor.

6      So there is no ERS creditor making any request under

7  926 for the appointment of a trustee here.  And that is, with

8  regard to ERS at least, we would submit fatal, and it is

9  fundamentally different from the issues your Honor dealt with

10  before in approving a similar stipulation with regard to the

11  Commonwealth.

12      Second, and we are not going to try and argue the

13  motion which is set for June, but because the Committee is

14  seeking here co-standing with regard to ERS causes of action,

15  we can't let that go by without pointing out, your Honor, that

16  you are going to hear next month our motion to disband the

17  Committee on the grounds that (1) there are no ERS creditors on

18  this Committee and (2) there is a fundamental conflict similar

19  to some of the HTA issues you heard about, a fundamental

20  conflict between the interests of the debtor, the Commonwealth,

21  and the debtor ERS.

22      As your Honor is probably more well aware than you

23  would like to be because of all the litigation that has

24  proceeded before you, there is a war really between these two

25  debtors as to who owns the assets which we at least contend

1   belong to ERS.  So, for the Committee to have any role in the

2   ERS case when it is composed of no ERS creditors and almost

3   entirely or overwhelmingly of Commonwealth creditors who have a

4   direct financial interest that is antagonistic to the interests

5   of ERS, we contend it is wholly inappropriate.

6          I will say this.  It is beneficial that the

7   stipulation carves out the interdebtor claims.  If it hadn't,

8   we would be even more vociferously objecting to having the

9   Committee have any involvement in disputes between the two

10  debtors.

11         But even if we ignore that and we just look at claims

12  against third parties, what is the appropriate role of the

13  unsecured creditors committee, which we would submit is the

14  unsecured creditors committee of the Commonwealth, in

15  prosecuting the ERS's cause of action?  None.

16         Mr. Despins put his finger on this point when he

17  answered your question of what happens if in June you agree

18  with us and disband the Committee in the ERS case.  I think his

19  answer was it doesn't matter because there is no requirement

20  that we have the Committee in the ERS case to be the

21  co-plaintiff.

22         At that point, your Honor, what I was going to say is

23  it is almost the same as picking random people out of the phone

24  book.  If they are not the Committee in the case and they are

25  not creditors in the case, what interest do they have in being

1    trustee?  I actually think my hypothetical is less severe.  You

2    would be better off with random names out of a phone book

3    because at least those people don't have financial interests

4    that are directly adverse to the interests of ERS.

5           We would submit that it is inappropriate for this

6    Committee to have any role in prosecuting any causes of action

7    of ERS or acting in any way as the Committee in the ERS case

8    because they have no interests aligned with ERS and in fact

9    their interests are directly opposite.

10          I think I finished directly on time.  Unless your

11   Honor has any questions, I'll stop.

12          THE COURT:  Thank you.

13          MR. ZAKIA:  Thank you.

14          THE COURT:  Mr. Levin.

15          MR. LEVIN:  Good afternoon, your Honor.  Richard Levin

16   for the Retiree Committee.  First, I want to thank Mr. Zakia

17   for supporting our position that the Retiree Committee should

18   be appointed for ERS causes of action.  I say that only partly

19   tongue-in-cheek, but let me get to the substance of what I'm

20   going to say.

21          First of all, like Mr. Zakia, I'm here only on the ERS

22   issue, not on HTA.  We do not oppose the appointment of a

23   co-plaintiff, a co-trustee, to bring these causes of action.

24   We just think it should be the Retiree Committee, which has a

25   direct interest, rather than the UCC.  We join Mr. Zakia's

1    arguments about the potential conflict with the UCC.

2           Ultimately, this is not so much a legal question as it

3    is a question of what is the wisdom, what is wise to do here.

4    Let me make the following points.

5           First of all, the Retiree Committee constituents are

6    the principal beneficiaries of any actions on behalf of ERS.

7    They are the major creditors.  Second, and to support that

8    point, the Retiree Committee has filed a proof of claim in the

9    ERS case.  It is quite a substantial claim, $58½ million.

10          THE COURT:  It hasn't been appointed as the Committee

11   in ERS, correct?

12          MR. LEVIN:  That's correct.  But it has filed a proof

13   of claim.  It might be a disputed claim, but disputed claim

14   holders are creditors under the code, so it is a creditor.  The

15   UCC and its members are not creditors of ERS.  So the Retiree

16   Committee is better positioned for that reason.

17          There would be two bases to uphold this order when, as

18   can be expected, the defendants in these actions challenge the

19   appointment.  One basis is section 926 and the other is the

20   derivative standard issue.  The 926 involves the appointment of

21   a trustee.  The Retiree Committee would qualify for both

22   categories, either as a trustee to pursue these actions or for

23   derivative standing, being a creditor in the ERS case, which

24   the UCC would not be if the motion to remove the UCC in that

25   case is granted in June.

1          THE COURT:  I held in April in approving the

2    Commonwealth stipulation that these co-plaintiff and co-trustee

3    arrangements and derivative standing require the debtors'

4    consent.  I approved them as consensual arrangements.  Has the

5    Oversight Board consented to your proposed appointment?

6          MR. LEVIN:  No, it has not, your Honor.  But 926 does

7    not require the debtors' consent.  And the case law on

8    derivative standing does not require the debtors' consent.

9          Finally, your Honor, let me make the point on the

10   wisdom issue.  The Retiree Committee has been involved in all

11   of the earlier ERS litigation in this case up to this point;

12   the UCC has not.  The Retiree Committee has filed a claim

13   objection against the bondholders already and is ready to go on

14   all of the litigation that they are discussing.

15         On the point that Mr. Despins had made in his reply

16   papers that they are up to speed and we are not, he stood at

17   the lectern here and said, I've not seen the complaints, they

18   are still percolating.  We could get in as quickly as he could

19   under those circumstances.  Thank you, your Honor.

20         THE COURT:  Thank you.

21         Mr. Friedman.

22         MR. FRIEDMAN:  Your Honor, may I be heard as not an

23   objection but for just one minute?

24         THE COURT:  Yes, but louder.

25         MR. FRIEDMAN:  Peter Friedman from O'Melveny & Myers

1    on behalf of AAFAF.  One thing that was referenced in

2    discussion and I wanted to bring to the Court's attention with

3    respect to the suits being brought potentially in HTA, AAFAF

4    and HTA in particular have been working with the special claims

5    Committee to try to avoid some of the issues that were

6    referenced by counsel for the trustee of the GDB recovery such

7    that perhaps the suits that are brought may be less disruptive

8    to operations, may be somewhat more refined, aren't necessarily

9    pursuing parties that could constitute critical vendors or

10   other disruptive acts to HTA.

11          There has been some reference, in the news and

12   otherwise, to disruption given the 250-plus causes of action

13   that were brought in the Commonwealth.  We are trying to work

14   with the special committee to avoid that happening here, which

15   we think is quite important and would be beneficial for HTA as

16   an operating entity as well as Puerto Rico.  I wanted to

17   mention we have been in consultation with the special committee

18   on HTA causes of action.

19          Thank you, your Honor.

20          THE COURT:  Thank you.

21          Mr. Despins, we are back to you.

22          MR. DESPINS:  Briefly, your Honor.  First, we can't

23   lose sight of the fact that all of these people except for the

24   Retiree Committee are defendants.  They don't want any

25   litigation to be brought.  Their game plan is to try to confuse

1    things or to impede things as much as they can.  By the way,

2    none of them offer a solution other than AMBAC that says let's

3    have the secured creditors be co-plaintiffs against secured

4    creditors.  That one I really didn't follow.

5         Your Honor, this issue of conflict, I think you got

6    the point about there are no interdebtor issues.  But more than

7    that, the issue on the clawback, we have always, to my

8    recollection from looking at our pleading, argued in the

9    alternative, which is that if the Court is going to rule that

10   the monolines are secured and they grab all the assets at HTA,

11   then, in the alternative, we think the Commonwealth should get

12   it.  Therefore, there was no harm to our constituents.  If the

13   Court were going to rule that the monolines have secured claims

14   on HTA, it's only then that the Court should consider our

15   alternative argument.

16        In the event none of that can happen, and I want to

17   clarify this, if we are suing a vendor for $5 million and we

18   get the $5 million, first of all, the Committee has no say on

19   how the $5 million is going to be spent.  I would love that.

20   We have no say in that.  It is the board through our plan that

21   will decide where that money goes.  We have no ability to say

22   let's transfer all that money to the Commonwealth.  Absolutely

23   not.  And I don't see how we could do that.

24        Also, National said something, and perhaps I wasn't

25   clear.  The validity of the bond challenge is with ERS, not

1  HTA.  If I said the opposite before, I'm clarifying that.

2  That's always been on the ERS side, not the HTA side, in terms

3  of the underlying validity of those bonds.  That removes one of

4  the points.

5       The argument made by National was it's possible that

6  the board's consent to the derivative standing could be

7  challenged and therefore what's the answer to that?  To do

8  nothing?  We know 926 is solid in the sense that the Court has

9  found that it can be done.

10       Clearly, 99 percent of the causes of action that will

11  be brought are 926 types of causes of action.  So I don't think

12  it makes sense to say that because there is some vulnerability

13  on one point, we should do none of it.  Of course, as a

14  defendant, that's what I would like to do, but that shouldn't

15  be what governs here.

16       I think I have covered AMBAC's points.

17       FGIC.  The point about the fact that we are

18  challenging Commonwealth alleged secured creditors' liens and

19  that creates a conflict with HTA secured creditors I don't,

20  frankly, understand.  Some people are asserting that they are a

21  secured creditor of the Commonwealth.  We challenge that.

22  That's one issue.

23       And now we are challenging the fact that some HTA

24  secured creditors are saying that they are secured creditors of

25  HTA.  These are separate issues, and I don't know where the

1   conflict comes up.

2          THE COURT:  I will ask this at the simplest, most

3   naive level.  You are not proposing to challenge bonds of one

4   of these other creditors; you are challenging liens of HTA or

5   ERS in a complaint that concludes with "and if there is no

6   lien, therefore the money belongs to the Commonwealth"?

7          MR. DESPINS:  Not in these complaints.  It has been

8   our position on the clawback that if the Court rules or is

9   prepared to rule that they are secured in HTA, our position is

10  that at that point we are allowed to argue, because the secured

11  creditors of HTA would get nothing, that the Commonwealth

12  defeats their interest because they are not a secured creditor

13  of the Commonwealth.  But not in these complaints.  That's the

14  short answer.

15         THE COURT:  Not in these complaints?

16         MR. DESPINS:  Absolutely not.

17         The point on ERS, your Honor, is that the employees

18  that are subject to the collective bargaining agreement with

19  SEIU, these are current employees.  That is very important.

20  The Retiree Committee represents retired employees.  The

21  committee represents active employees with respect to their

22  retirement benefits.

23         There are tons of these people.  These are janitors in

24  schools and all that are represented by SEIU that have put

25  millions of dollars of their own money pursuant to a law that

1    was adopted in 2000 where they were forced to fund their own

2    pension.  They put that money in ERS.

3         That money is gone.  This is not the same thing as

4    having an entitlement to a pension.  This was their own money

5    they were putting in.  That money is gone.  These employees are

6    still employees because this happened in 2000.  They haven't

7    retired yet.  They are current employees and they are

8    represented by SEIU.

9         THE COURT:  As to the argument that SEIU would not

10   have standing to file a proof of claim for the individual

11   underlying employee and therefore can't be a creditor in that

12   sense for 926 purposes, your response is?

13        MR. DESPINS:  It's exactly that.  If you look at the

14   Altair Airline case cited in our reply, it is the only circuit

15   decision that addresses this.  What happened there was people

16   like monolines came in and said a union cannot be on the

17   Committee, they are not a creditor.  The Third Circuit said

18   absolutely they can be on the Committee as a creditor.  That is

19   the only circuit decision that I know that has addressed the

20   issue.

21        It is very important to point out the bar date order.

22   Pension claims were exempted from filing, and therefore the

23   fact that there was no claim filed at ERS is of no moment

24   because these are pension claims.  They are expressly excluded

25   from the bar date, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    I would conclude with the Retiree Committee.  That is

2 the point you made.  They lobbied heavily with the Oversight

3 Board to replace the Committee, and that did not bear fruit.  I

4 don't know how it's possible for them to be substituted at this

5 point given that the board does not desire that.

6    I think that addresses all the points, your Honor.

7    THE COURT:  Thank you.  We will take a five-minute

8 break.  Actually, we will take a ten-minute break.  Let's

9 everyone be back in their seats by 3:10 by the clock on the

10 wall.  Thank you.

11    (Recess)

12    THE COURT:  I will now make my ruling as to the motion

13 on the record.

14    Pending before the Court is the movants' urgent joint

15 motion for entry of order approving stipulation and agreed

16 order by and among the *Financial Oversight and Management*

17 *Board, its Special Claims Committee, and Official Committee of*

18 *Unsecured Creditors Related to Joint Prosecution of Certain*

19 *causes of action of Puerto Rico Highways and Transportation*

20 *Authority and Employees Retirement System of the Government of*

21 *the Commonwealth of Puerto Rico*.  (Docket entry number 6867 in

22 case 17-3283).  I will refer to this as "the motion."

23    The Court has considered carefully the motion and the

24 terms of the proposed stipulation as well as the objections

25 filed by several parties in interest and the arguments made in

1    court today.  For the reasons that follow, the objections are

2    overruled and the motion is granted.

3         At the April 24, 2019 omnibus hearing, the Court

4    approved a similar stipulation with respect to the Commonwealth

5    that is filed as docket entry number 6524, and the Court

6    articulated its reasoning for doing so on the record.

7         In summary, the Court previously determined that it

8    has the authority to approve the consensual grant of derivative

9    standing.  The Court further determined that the Oversight

10   Board's decision to share its responsibility to pursue causes

11   of action in light of the so-called Aurelius risk constitutes

12   the necessary refusal for purposes of section 926(a) of the

13   Bankruptcy Code.

14        The Court hereby adopts and incorporates by reference

15   its earlier reasoning regarding consensual derivative standing

16   and section 926 of the code as reflected in the transcript of

17   the Court's oral opinion on the Commonwealth stipulation motion

18   at the April 24, 2019 hearing.

19        The Court finds that movants have established that

20   both necessity and debtor benefit support the grant of

21   authority to the Unsecured Creditors Committee and members of

22   the Oversight Board's Special Claims Committee to pursue causes

23   of action for the benefit of HTA and ERS in accordance with the

24   terms of the proposed stipulation.

25        The Court finds for substantially the reasons set

1  forth in the relevant portion of the movants' reply brief that

2  SEIU has the requisite creditor status under section 926 of the

3  code by virtue of its members' claims against ERS.

4          In the context of the HTA and ERS Title III cases, the

5  relevant statutes of limitation expire on May 20, 2019,

6  pursuant to bankruptcy code sections 108(a) and 546(a).  The

7  litigation contemplated by the stipulation must be commenced

8  within the next few days.

9          Additionally, although the President of the United

10  States has indicated that he intends to renominate the current

11  members of the Oversight Board to continue serving in such

12  capacities, he has not yet acted on his intention to do so, and

13  the First Circuit's stay of its mandate is set to expire on

14  July 15, 2019.  Therefore, despite the arguments made by the

15  objectors, the future status of the Oversight Board remains in

16  question and the movants are still in a situation where the

17  Oversight Board's authority to prosecute the actions may expire

18  or be interrupted soon after the May 20, 2019 deadline.

19          In the face of such uncertainty, it would be imprudent

20  for the Court to deny the requested relief.  Accordingly, the

21  Court finds that the framework contemplated by the proposed

22  stipulation is both necessary and beneficial to HTA and ERS.

23          The Court is satisfied that the Committee is the

24  proper party to be appointed as co-plaintiff and co-trustee in

25  these cases at this juncture.  It is the only official

1  committee that has been appointed in both the HTA and ERS

2  cases.

3          Moreover, the Court finds the argument that there are

4  relevant conflicts of interest on the part of the Committee

5  unpersuasive.  As made clear in the pleadings, the stipulation

6  seeks to pursue claims against third parties, not interdebtor

7  claims.  Interdebtor claims are subject to the

8  intergovernmental tolling stipulation approved by the Court on

9  May 2, 2019, and filed at docket entry number 6812.

10          There is no factual basis in the record for the

11  objectors' assertion that the Committee's role and positions

12  taken as official committee in the Commonwealth case on the one

13  hand and the HTA and ERS cases on the other impede the ability

14  or willingness of the Committee to vigorously pursue claims

15  against nondebtors on behalf of HTA and ERS to recover monies

16  or protect rights of those debtors, that is, HTA and ERS.

17          The fact that a pending motion exists that challenges

18  this authority of the Committee in the ERS case does not change

19  this analysis.  Unless and until the Court determines

20  otherwise, the Committee is a valid statutory entity in both

21  the ERS and HTA cases.  Moreover, it is the only entity with

22  which the Oversight Board has agreed to share its

23  responsibility to pursue causes of action.

24          In the event the Court subsequently decides to disband

25  the Committee in the ERS case and in light of the any other

 1    actions affecting the Oversight Board's status that may have

 2    been taken by that time, the Oversight Board will need to

 3    evaluate the circumstances and determine whether it deems it

 4    necessary to seek to replace the Committee with another party

 5    plaintiff or request other relief from the Court to address the

 6    so-called Aurelius risk.

 7            For the foregoing reasons, the objections are

 8    overruled and the motion is granted.  Movants are directed to

 9    submit a Word version of the stipulation to Chambers.  The

10    Court will thereafter enter an appropriate order approving the

11    stipulation.

12            This concludes our proceeding today.  Is there

13    anything else that we need to discuss together?  I thank the

14    Court staff in New York and Puerto Rico for their unfailing

15    excellence and support.  The next scheduled hearing is the June

16    12th Omnibus Hearing in San Juan.  We are adjourned.  Keep well

17    everyone.

18            (Adjourned)

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT)
                                )  ss.
2  OF PUERTO RICO               )

3

4                      REPORTER'S CERTIFICATE

5

6          I, Thomas W. Murray, do hereby certify that the above

7  and foregoing pages, consisting of the preceding 80 pages

8  constitutes a true and accurate transcript of our stenographic

9  notes and is a full, true, and complete transcript of the

10  proceedings to the best of our ability.

11          Dated this 18th day of April, 2019.

12          S/Thomas W. Murray _____

13          Thomas W. Murray

14          Official Court Reporters
           500 Pearl Street
15          New York, NY 10007
           212-805-0320

16

17

18

19

20

21

22

23

24

25