## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,

Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## AMBAC ASSURANCE CORPORATION'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 7

    A.    PRIFA Issues Bonds Secured by the Pledged Rum Taxes ......................... 7

    B.    The Commonwealth Confiscates the Pledged Rum Taxes ......................... 9

    C.    Upon the Filing of a Commonwealth Title III Petition, the
Oversight Board Files Notices of Stay With Respect to the Ambac
Actions Challenging the Dissipation of the Pledged Rum Taxes ............. 11

JURISDICTION AND VENUE ...................................................................................... 12

RELIEF REQUESTED .................................................................................................. 13

ARGUMENT ............................................................................................................... 13

    I.    The Automatic Stay Does Not Preclude Ambac from Pursuing the U.S.
Treasury Action and PRIFA Clawback Action .................................................. 13

        A.    The Automatic Stay Does Not Apply to the U.S. Treasury Action .......... 13

            1.    The Commonwealth Has No Property Interest in the
Pledged Rum Taxes ...................................................................... 14

            2.    If PRIFA Has No Property Rights in the Pledged Rum
Taxes Prior to their Delivery to PRIFA, then the
Commonwealth Has No Property Rights in the Pledged
Rum Tax Prior to their Delivery to the Commonwealth .............. 15

        B.    The Automatic Stay Does Not Apply to the PRIFA Clawback
Action ................................................................................................. 16

    II.    The Court Should Lift Any Applicable Automatic Stay to Permit Ambac
to Pursue its Remedies .................................................................................... 17

        A.    There Is Cause to Lift the Stay for Lack of Adequate Protection ............ 19

            1.    Ambac Has a Lien on the Pledged Rum Taxes ............................ 20

            2.    The Lien is Not Adequately Protected, and the
Commonwealth's Conduct Continues to Diminish the
Value of the Lien .......................................................................... 26

        B.    The Commonwealth Is Abusing the Automatic Stay to Strip
Ambac and PRIFA Bondholders of Their Constitutionally-
Protected Property Rights in Violation of PROMESA ............................. 29

        C.    The Stay Should Be Lifted Because the Commonwealth Has No
Equity in the Pledged Rum Taxes, and They Are Unnecessary to
an Effective Reorganization ..................................................................... 30

1.    Even Assuming the Commonwealth Has Some Interest in
       the Pledged Rum Taxes, that Interest Would Be at Most
       Bare Legal Title in Which the Commonwealth Has No
       Equity .......................................................................................... 31

2.    The Pledged Rum Taxes Are Not Necessary for an
       Effective Reorganization ............................................................. 33

III.    The Court Should Mandate Adequate Protection ................................... 33

**CONCLUSION** ....................................................................................................... 34

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Asociacion de Subscipcion Conjunta Del Seguro De Responsibilidad Obligatorio v.
Flores Galarza*,
484 F.3d 1 (1st Cir. 2007) ................................................................................................ 14, 32

*Austin v. Unarco Indus., Inc.*,
705 F.2d 1 (1st Cir. 1983) .................................................................................................... 14

*In re Bldrs. Grp. & Dev. Corp.*,
502 B.R. 95 (Bankr. D.P.R. 2013) ....................................................................................... 34

*In re Bologna*,
206 B.R. 628 (Bankr. D. Mass. 1997) .................................................................................. 32

*Boyd v. Martin Expl. Co.*,
56 B.R. 776 (E.D. La. 1986) ................................................................................................. 33

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ............................................................................................ 22

*City & Cty. of Dallas Levee Imp. Dist. ex rel. Simond Indus. Props. Corp.*,
89 F.2d 731 (5th Cir. 1937) .................................................................................................. 32

*In re City of Columbia Falls*,
143 B.R. 750 (Bankr. D. Mont. 1992) ............................................................................. 32, 33

*Cournoyer v. Town of Lincoln*,
790 F.2d 971 (1st Cir. 1986) .............................................................................................. 6, 29

*In re Deico Elecs., Inc.*,
139 B.R. 945 (B.A.P. 9th Cir. 1992) ..................................................................................... 27

*Den Norske Bank AS v. First Nat'l Bank of Bos.*,
75 F.3d 49 (1st Cir. 1996) ...................................................................................................... 8,

*FDIC v. Casady*,
106 F.2d 784 (10th Cir. 1939) .............................................................................................. 32

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
899 F.3d 13 (1st Cir. 2018) .................................................................................................... 1

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
919 F.3d 121 (1st Cir. 2019) ............................................................................... 17, 22, 23, 24

*Franklin California Tax-Free Trust v. Puerto Rico*,
    85 F. Supp. 3d 577 (D.P.R. 2015)......................................................................22

*García-Rubiera v. Calderón*,
    570 F.3d 443 (1st Cir. 2009)..........................................................................32

*García-Rubiera v. Fortuño*,
    665 F.3d 261 (1st Cir. 2011)..........................................................................32

*Hanson v. W.L. Blake & Co.*,
    155 F. 342 (D. Me. 1907) ..............................................................................26

*In re Heffernan Mem'l Hosp. Dist.*,
    202 B.R. 147 (Bankr. S.D. Cal. 1996) ..........................................................23

*In re J&M Salupo Dev. Co.*,
    388 B.R. 809 (Bankr. N.D. Ohio 2009) ........................................................27

*In re JE Livestock, Inc.*,
    375 B.R. 892 (B.A.P. 10th Cir. 2007)...........................................................17

*In re Lally*,
    38 B.R 622 (Bankr. N.D. Iowa 1984) ...........................................................33

*In re LAN Tamers, Inc.*,
    329 F.3d 204 (1st Cir. 2003).........................................................................15

*LNC Invs., Inc. v. First Fid. Bank N.A.*,
    247 B.R. 38 (S.D.N.Y. 2000)........................................................................33

*In re Lopez*,
    446 B.R. 12 (Bankr. D. Mass. 2011) .............................................................18

*In re Mack*,
    347 B.R. 911 (Bankr. M.D. Fla. 2006) .........................................................18

*In re Mammoth Mart, Inc.*,
    536 F.2d 950 (1st Cir. 1976).........................................................................34

*Martin v. United States*,
    761 F.2d 472 (8th Cir. 1985) .........................................................................27

*In re Maxon Eng'g Servs., Inc.*,
    332 B.R. 495 (Bankr. D.P.R. 2005)...............................................................26

*In re Montreal, Maine & Atl. Ry., Ltd.*,
    888 F.3d 1 (1st Cir. 2018).............................................................................15

*In re Mullock*,
   404 B.R. 800 (Bankr. E.D. Pa. 2009) ..................................................................31

*Mun. of Metro. Seattle v. O'Brien*,
   544 P.2d 729 (Wash. 1976)..................................................................................25

*In re Mural Holding Corp.*,
   75 F.2d 941 (2d Cir. 1935)...................................................................................27

*In re Natale*,
   174 B.R. 362 (Bankr. D.R.I. 1994) ......................................................................26

*Peaje Investments LLC v. García-Padilla*,
   845 F.3d 505 (1st Cir. 2017)...............................................................................28,

*Penobscot Nation v. Mills*,
   861 F.3d 324 (1st Cir. 2017) ...............................................................................22

*Reading Co. v. Brown*,
   391 U.S. 471 (1968) .............................................................................................34

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) .....................................................................26

*In re Satcon Tech. Corp.*,
   2012 WL 6091160 (Bankr. D. Del. 2012) ............................................................34

*In re Scarborough-St. James Corp.*,
   535 B.R. 60 (Bankr. D. Del. 2015) .......................................................................17

*In re Shaughnessy*,
   BAP No. MW 06-068, 2007 WL 2403280 (B.A.P. 1st Cir. Aug. 17, 2007)..........................19

*In re Sonnax Indus., Inc.*,
   907 F.2d 1280 (2d Cir. 1990)...............................................................................26

*Matter of Spencer*,
   115 B.R. 471 (D. Del. 1990)................................................................................33

*In re Swedeland Dev. Group, Inc.*,
   16 F.3d 552 (3d Cir. 1994)...................................................................................34

*In re Technologies Int'l Holdings, Inc.*,
   234 B.R. 699 (E.D. Ky. 1999) .............................................................................22

*In re Tellier*,
   125 B.R. 348 (Bankr. D. R.I. 1991) .....................................................................34

*Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*,
    763 S.E.2d 288 (N.C. Ct. App. 2014) .................................................................31

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1992) .............................................................................................27

*United States v. Espinal-Mieses*,
    313 F. Supp. 3d 376 (D.P.R. 2018) .....................................................................23

*United States v. Friedman*,
    143 F.3d 18 (1st Cir. 1998) ..................................................................................25

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) ...............................................................................................22

**STATUTES**

3 L.P.R.A. § 1901 .........................................................................................................7

3 L.P.R.A. § 1903 .........................................................................................................7

3 L.P.R.A. § 1906 ..................................................................................................20, 23

3 L.P.R.A. § 1907 ..................................................................................................20, 21

3 L.P.R.A. § 1914 .................................................................................................*passim*

13 L.P.R.A. § 2271v .....................................................................................................8

13 L.P.R.A. § 10042 .....................................................................................................8

13 L.P.R.A. § 31751 .....................................................................................................8

15 L.P.R.A § 75 ............................................................................................................7

23 L.P.R.A. § 104 .........................................................................................................9

11 U.S.C. § 361 ........................................................................................................7 34

11 U.S.C. § 362 ....................................................................................................*passim*

11 U.S.C. § 503 ...........................................................................................................34

11 U.S.C. § 902 ...........................................................................................................23

11 U.S.C. § 922 ....................................................................................................17, 22

26 U.S.C. § 7652 ...........................................................................................7, 16, 23

28 U.S.C. § 1331 ......................................................................................................12

28 U.S.C. § 1391 ......................................................................................................12

48 U.S.C. § 2161 ......................................................................................................34

48 U.S.C. § 2163 ................................................................................................10, 11

48 U.S.C. § 2166 ......................................................................................................12

48 U.S.C. § 2167 ......................................................................................................12

48 U.S.C. § 2195 ..................................................................................................... 29

Amended Moratorium Act .......................................................................................11

Moratorium Act ........................................................................................................9

## OTHER AUTHORITIES

H.R. Rep. No. 100-1011 .....................................................................................23, 24

S. Rep. No. 100-506 ...........................................................................................24, 25

Collier on Bankruptcy ¶ 362.07 ..............................................................................27

Collier on Bankruptcy ¶ 506.03 ..............................................................................27

Collier on Bankruptcy ¶ 927.02 ..............................................................................24

Collier on Bankruptcy ¶ 944.03 ..............................................................................34

Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts
are 'Not Payable'*, N.Y. TIMES, June 28, 2015......................................................9

1.  Ambac Assurance Corporation ("Ambac"), an insurer and/or holder of more than $529 million in bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA") moves for an order finding that the automatic stay does not apply to certain anticipated lawsuits relating to PRIFA bonds. In the alternative, Ambac moves for relief from the automatic stay to pursue those lawsuits in alternative fora. Further in the alternative, Ambac moves for an order requiring the Commonwealth to provide adequate protection for Ambac's collateral. In support of its motion, Ambac respectfully states as follows:

## PRELIMINARY STATEMENT

2.  The automatic stay is designed to provide debtors with a breathing spell, not to authorize lawlessness in the form of wholesale collateral grabs. And yet it is precisely such lawlessness that has characterized the Commonwealth's treatment of PRIFA and its creditors, both prior to and during the Title III proceedings. The Commonwealth transferred the first $117 million in each fiscal year of rum taxes to PRIFA, and authorized PRIFA to pledge those funds to bondholders to support borrowings to shore up and develop Puerto Rico's infrastructure. PRIFA did just that, raising over $1.6 billion in bond proceeds. Yet, the Commonwealth and Oversight Board, through legal artifice, contend that the monies are not PRIFA's, that PRIFA bondholders have no rights in such monies, and that the Commonwealth's taking and use of the property is shielded from scrutiny by the automatic stay and section 305[2] of the Puerto Rico Oversight, Management, and Stability Act ("PROMESA"). The Oversight Board and the Commonwealth are

---

[2] Section 305 limits only the jurisdiction of the Title III court and has no application to this motion. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 18-19 (1st Cir. 2018) (finding that creditors should not be required to stand by and watch their collateral be dissipated, and holding that section 305 does not bar the Title III court from lifting the automatic stay).

not above the law.  Ambac seeks a declaration that the automatic stay does not preclude it from enforcing its rights.

3.      The need for stay relief is particularly acute here.  The Commonwealth's position (articulated by the Oversight Board) appears to be that Ambac's lien is limited to Pledged Rum Taxes that the Commonwealth actually deposits into the Special Fund account.[3]  Thus, by willfully violating contractual, statutory, and constitutional requirements and diverting the Pledged Rum Taxes, as it has been doing for the past four years, the Commonwealth believes it can strip Ambac of its property rights and the entire value of its lien—eviscerating Ambac's property interest.  This Court cannot allow the automatic stay to be used as part of a scheme to deprive Ambac of its property without just compensation, in violation of the Fifth Amendment, and thus must grant stay relief to permit meaningful judicial recourse for these violations.

4.      In the absence of the requested relief, the Commonwealth's taking of PRIFA's and its creditors' property will remain an affront to the rule of law, leaving the Commonwealth (and other municipal debtors) with the dangerous misperception that they are free to confiscate and dissipate collateral during the bankruptcy proceedings, implement a scheme for the ongoing diversion of pledged property, and leave nothing to give back at the plan of adjustment stage, all while preventing creditors from challenging their conduct.  Such actions are expressly contrary to

---

[3] *See* Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr., *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, Case No. 18-1214 (1st Cir. Aug. 20, 2018), at 47-48 (where the Oversight Board has made similar arguments as related to HTA special revenues).

PROMESA, which requires that the Oversight Board respect Commonwealth-law liens at every stage, including in any fiscal plans, budgets, and plans of adjustment.[4]

5.      Revenue bonds lie at the heart of the municipal finance market.  They allow municipal borrowers to raise funds by pledging dedicated revenue streams, including excise taxes—in the case of the PRIFA bonds, the rum excise tax.  The pledge and restrictions on the revenue stream from the rum excise tax (i) divest the Commonwealth of ownership in the pledged rum taxes in all future years; (ii) transfer the ownership of such pledged excise taxes to PRIFA; and (iii) subject such rum taxes to the liens of PRIFA's bondholders even when not yet transferred to PRIFA.  The Commonwealth acts only as a collection agent and custodian with respect to these revenues, or at most holds bare legal title to the revenues while they are in its possession.

6.      PRIFA bonds are quintessential revenue bonds.  They are secured by a pledged special revenue stream (excise taxes on the sale of Puerto Rico rum on the mainland) and the bonds they secure are non-recourse to the Commonwealth.

7.      The U.S. government imposes an excise tax on the import of Puerto Rico rum, and remits the revenues collected from that tax to the Commonwealth (the "Rum Taxes").  In 1988, to

---

[4] *See, e.g.*, 48 U.S.C. § 2141(b)(1)(M) (requiring that any fiscal plan "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of" the Commonwealth or another instrumentality "unless permitted by the constitution of the [Commonwealth], an approved plan of adjustment . . . or a Qualifying Modification"); *id.* § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016"); *id.* § 2144(c)(3)(A) (prohibiting "new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of June 30, 2016"); *id.* § 2163(c) ("[U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this chapter."); *id.* § 2195(a) (providing remedies for the transfer of "any property of any territorial instrumentality of Puerto Rico . . . in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property").

fund infrastructure improvements, the Commonwealth transferred its rights in these Rum Taxes to PRIFA (up to a maximum of $117 million per fiscal year), and granted PRIFA authority to issue bonds secured by its portion of the Rum Taxes (the "Pledged Rum Taxes").  PRIFA subsequently issued bonds and granted creditors a lien on the Pledged Rum Taxes.  Beginning in 2015, the Commonwealth decided to ignore the applicable legal constructs and instead simply take PRIFA's money and spend it on ordinary Commonwealth expenses, causing hundreds of millions of dollars in defaults by PRIFA.

8.      This illegal diversion of revenue bond collateral continues unabated, and is referred to colloquially in these Title III cases (and elsewhere) as "clawback"—a term which aptly describes what the Commonwealth is doing—clawing back for itself property that belongs to PRIFA and its bondholders.

9.      The Commonwealth has resisted accountability for its illegal clawback scheme at every turn.  Before the Title III cases, the Commonwealth attempted (and failed) to secure dismissal of Ambac's legal challenges to clawback on the ground that the claims were barred by sovereign immunity.  *See Assured Guaranty Corp. v. García-Padilla*, Civ. No. 3:16-cv-01037 (D.P.R. Oct. 4, 2016) (Dkt. No. 58) (denying motion to dismiss complaint challenging diversion of collateral from PRIFA, HTA, and the Puerto Rico Convention Center District Authority).  Within the Title III process, the Commonwealth and Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") have invoked concepts of ripeness and finality to defer any reckoning, arguing that secured creditors must stand aside and observe the ongoing dissipation of their collateral until the plan of adjustment stage.  According to the Commonwealth and

Oversight Board, Ambac's **only** remedy to prevent the taking of its property is to move for relief from the automatic stay for lack of adequate protection.[5]

10. Setting aside whether that position is true in the context of HTA,[6] it plainly is not the case with PRIFA. Ambac seeks to proceed with two lawsuits: (1) an already-filed action against the U.S. Department of Treasury and Treasury Secretary Steven Mnuchin for an equitable lien on and escrowing of the Pledged Rum Taxes before they are transferred to the Commonwealth (the "U.S. Treasury Action"); and (2) an action against the Commonwealth to enforce Ambac's lien and halt the ongoing appropriation of the Pledged Rum Taxes (the "PRIFA Clawback Action").

11. The stay does not apply to either the U.S. Treasury Action or the PRIFA Clawback Action because the Commonwealth has no property interest in the Pledged Rum Taxes—either they are PRIFA's revenues or they are federal monies, generated by the federal government and beyond the control of the Commonwealth. The stay does not apply to the PRIFA Clawback Action for the additional reason that the Pledged Rum Taxes are "pledged special revenues" within the meaning of Section 922(d) of the Bankruptcy Code; application of those monies is thus exempt from the stay. Nonetheless, because the consequences of stay violations are severe, Ambac seeks

---

[5] *See* Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr., *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, Case No. 18-1214 (1st Cir. Aug. 20, 2018), at 40 ("To the extent Ambac alleges it has a lien secured by collateral that is diminishing in value, its remedy is to move for stay relief for lack of adequate protection, as other parties have done.").

[6] This Court's opinion and order granting defendants' motion to dismiss in *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, No. 3:17-ap-00159-LTS (D.P.R. Feb. 27, 2018) (Dkt. No. 156), is presently on appeal to the U.S. Court of Appeals for the First Circuit.

by this motion a declaration that the automatic stay does not apply to either of the contemplated actions.

12.     In the alternative, if the Court were to find that the stay does apply, the Court should lift the stay for three independent reasons.  First, there is cause to lift the stay under Section 362(d)(1) because Ambac lacks adequate protection; far from enjoying an "equity cushion," Ambac lacks any cushion at all because PRIFA's accounts have been emptied and any future replenishment of such funds is entirely speculative and contingent, in part, on forces outside the Commonwealth's or the Oversight Board's control, including the continued rum production in Puerto Rico and transfer of rum excise taxes from the federal government.  Second, there is cause to lift the stay for the additional reason that the dissipation of Ambac's collateral is the result of the Commonwealth's brazen violation of PROMESA and Puerto Rico law, to say nothing of the United States Constitution, and the Oversight Board's apparent intention to continue taking PRIFA's property and to present a Commonwealth plan of adjustment premised on such taking. [7] *See, e.g.*, *Cournoyer v. Town of Lincoln*, 790 F.2d 971, 977 (1st Cir. 1986) ("[T]he automatic stay should not be used as a shield against the application and enforcement of valid state and local laws.").  Third, the stay should be lifted under Section 362(d)(2) because the Commonwealth lacks any equity whatsoever in the Pledged Rum Taxes, and under the law, cash funds in which there is no equity interest are deemed entirely unnecessary to an effective reorganization.

---

[7] Indeed, the recently filed complaint against HTA bondholders and insurers makes plain the Oversight Board's intention to continue to divert pledged special revenues and impermissibly use them for general Commonwealth purposes. *See* Complaint ¶¶ 1, 2, 17, 24, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ambac Assurance Corp.*, No. 19-363 (May 20, 2019 D.P.R.) (Dkt. 1).  This position is not surprising given that the three certified fiscal plans of the Commonwealth each included all of the rum excise taxes, without regard to PRIFA and its bondholders' rights in the first $117 million of rum taxes each year.

13.     Finally, and further in the alternative, the Court should require that the Commonwealth provide adequate protection for Ambac's collateral under Section 361 of the Bankruptcy Code, to ensure that Ambac receives the "indubitable equivalent" and is not further harmed by the Commonwealth's diversion of its pledged revenues.  *See* 11 U.S.C. 361(1)-(3).

## BACKGROUND

### A.     PRIFA Issues Bonds Secured by the Pledged Rum Taxes

14.     PRIFA was created in June 1988, by Act 44-1988 (the "Enabling Act" or the "Act"), to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities.  *See* 3 L.P.R.A. §§ 1901, 1903.

15.     PRIFA receives funding from, among other sources, a portion of certain excise taxes imposed by the federal government on imports of Puerto Rico rum. 26 U.S.C. § 7652.  Under the statute, "[a]ll taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States . . . shall be covered into the treasury of Puerto Rico." *Id*. § 7652(a)(3).

16.     By virtue of precisely the same language in the PRIFA Enabling Act, the Commonwealth is legally obligated to transfer the first $117 million in Rum Taxes each fiscal year to the Puerto Rico Infrastructure Fund, for the benefit of PRIFA.  3 L.P.R.A. § 1914; Trust Agreement dated October 1, 1998, between PRIFA and U.S. Bank Trust National Association, successor trustee (the "Trust Agreement"), Section 601.  The Enabling Act states:

> the **first proceeds of the federal excise taxes** remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, . . . in the case of fiscal years 2006-07 to 2008-09, and in subsequent years until fiscal year 2056-57, **the**

7

> **participation** shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which **when received by the Department of the Treasury of Puerto Rico, shall be covered into** a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes . . . .

3 L.P.R.A. § 1914 (emphasis added). Both federal and Commonwealth statutes effect a statutory transfer of ownership (to the Commonwealth and PRIFA, respectively) that is mandatory, immediate, and self-effectuating.[8] The immediacy of the required transfer—"when received"— is unique to the PRIFA Enabling Act[9] and highlights the Commonwealth's position as a mere conduit in the transfer of the pledged rum taxes to PRIFA.

17. In turn, PRIFA is empowered to pledge the Pledged Rum Taxes as security for bonds. *See* 3 L.P.R.A. §§ 1906(m), 1907(a). Any lien granted by PRIFA is automatically perfected, and attaches to the Pledged Rum Taxes immediately "without the need of the physical delivery thereof or any other act . . . ." 3 LPRA § 1907(a). This provision is unique to PRIFA among the relevant bond issues and statutorily cements PRIFA bondholders' lien on the Pledged Rum Taxes retained by the Commonwealth and not deposited in PRIFA's account.

---

[8] PRIFA's ownership in the Pledged Rum Taxes is further evidenced by the Enabling Act's description of PRIFA's right as a "participation," which equates to ownership under Puerto Rico law. *See* 15 L.P.R.A § 75 (prohibiting the transfer of ownership and control, including any "share or participation" in the ultimate controlling person of a gambling room without prior regulatory approval); 13 L.P.R.A. § 10042(i)(3) (exempting certain ownership transfers from taxation, including "participations" in partnerships, joint ventures and corporations); *see also Den Norske Bank AS v. First Nat'l Bank of Bos.*, 75 F.3d 49, 51 (1st Cir. 1996) ("participation" indicative of ownership in commercial lending transactions). Notably, no other revenue bond statute describes the interest provided to the borrower in the excise taxes as a participation.

[9] Other excise taxes are required to be transferred monthly or as otherwise agreed. *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(A), (B) (requiring excise tax on crude oil to be transferred to HTA monthly); 13 L.P.R.A. 2271v(a)(4) (hotel occupancy taxes, pledged for payment to Convention Center District Authority bonds, paid "through monthly transfers" from the Puerto Rico Tourism Company).

18.     PRIFA has issued debt with an outstanding principal amount of approximately $1.6 billion secured by the Pledged Rum Taxes.

**B.      The Commonwealth Confiscates the Pledged Rum Taxes**

19.     On June 28, 2015, then-Governor Alejandro García-Padilla stated that the Commonwealth was in a "death spiral" and could not pay its debts.[10]  Ever since, the Commonwealth has been improperly siphoning hundreds of millions of dollars from Commonwealth instrumentalities to fund its general expenses—including the Pledged Rum Taxes.

20.     On November 30, 2015, the Governor issued Administrative Bulletin OE-2015-046 (the "First Clawback Order"), which declared that cash flow projection for the then-current fiscal year was insufficient to pay general obligation ("GO") debt and to continue making ordinary course appropriation payments.  The Commonwealth had already started taking PRIFA's property. The First Clawback Order ordered the Secretary of the Treasury not to transfer revenues theoretically subject to clawback,[11] presumably to pay Commonwealth general operating expenses.  The monies clawed back from PRIFA beginning in July 2015 have not been applied to public debt, nor have they been returned to PRIFA.

21.     On April 6, 2016, the Governor of Puerto Rico signed into law the Moratorium Act, which authorized the Governor to declare a "state of emergency" over the Commonwealth or any Commonwealth entity (including PRIFA).  Moratorium Act § 201(a).  Under color of the Moratorium Act, the Governor (i) declared a state of emergency over PRIFA and stayed all

---

[10] Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts are 'Not Payable'*, N.Y. TIMES, June 29, 2015, at A1.

[11] It has never been established—and there is substantial reason to doubt—that the Treasury Department only retained clawback revenues necessary for payment of GO debt obligations. Indeed, approximately one month after the issuance of this order, and while still retaining clawback funds, the Commonwealth defaulted on GO obligations.

litigation arising from nonpayment of PRIFA bonds, *see* Administrative Bulletin OE-2016-14 (Apr. 30, 2016), (ii) suspended all PRIFA bond payments, *see* Administrative Bulletin EO-2016-30 (June 30, 2016), and (iii) halted the Commonwealth's obligation to transfer revenues to PRIFA, *see* Administrative Bulletin EO-2016-31 (June 30, 2016).

22.     The Commonwealth had no legal right to halt the transfer of monies to PRIFA.  The Enabling Act requires without exception that the first $117 million of rum taxes in each fiscal year be immediately deposited in PRIFA's accounts.  Thereafter, the monies need to be used to pay PRIFA bondholders subject only to the provision in the Enabling Act that monies already deposited in the PRIFA Special Fund ***may*** be used for payment of public debt, if the Commonwealth has insufficient available resources and other requirements are met.  3 L.P.R.A. § 1914.  This additional conditional permitted use of the funds does not limit or alter PRIFA's ownership interest in, or entitlement to receive, the revenues.

23.     PROMESA, signed into law on June 30, 2016, preempted the Moratorium Act, including sections that created an explicit moratorium on debt payments.  *See* 48 U.S.C. § 2163(1) ("a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest . . . may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium").

24.     Despite the express intent of Congress to preempt all Commonwealth moratorium laws and to halt the illegal sweeping of cash by the Commonwealth from its instrumentalities, including PRIFA, on January 29, 2017, the Governor signed into law the Amended Moratorium Act which, while repealing certain sections of the Moratorium Act, replaced them with

functionally identical provisions.  *See* Amended Moratorium Act §§ 201-203, 206, 208, 211, 301.[12]
The Amended Moratorium Act expressly prohibits the payment of principal and interest and is
thus preempted by PROMESA section 303.  *See* 48 U.S.C. § 2163(1).

25.     The Commonwealth has not made any payment on its public debt since 2016.  On
information and belief, the Commonwealth has been using the Pledged Rum Taxes (and other
pledged revenues) to fund general Commonwealth expenses, including making payments to rum
producers.

26.     To date, the Commonwealth has diverted hundreds of millions of dollars in Pledged
Rum Taxes from PRIFA.  This has caused multiple payment defaults and forced Ambac to pay
$167 million in claims to PRIFA bondholders.  Ambac is subrogated to, and has been assigned,
the rights of PRIFA bondholders with respect to such payments.  Ambac insures or is subrogated
to the rights with respect to approximately $529 million of the rum tax bonds, guaranteeing
payment of scheduled principal and interest should PRIFA default on any such payment.  Ambac
directly owns $136 million of those rum tax bonds.

**C.     Upon the Filing of a Commonwealth Title III Petition, the Oversight Board
Files Notices of Stay With Respect to the Ambac Actions Challenging the
Dissipation of the Pledged Rum Taxes**

27.     At the time of the Commonwealth's Title III filing, Ambac had three pending
lawsuits challenging the Commonwealth's ongoing clawback scheme as it related to the Pledged
Rum Taxes (among other pledged revenues).  The first two of these lawsuits were brought against
various Commonwealth officials and sought injunctive and declaratory relief to halt the diversion
of the Pledged Rum Taxes and other pledged revenues.  *See Assured Guar. Corp. v. García-*

---

[12] The Amended Moratorium Act acknowledged that PROMESA had "preempt[ed] and
supersede[d] provisions of the [prior] Moratorium Act."  *See* Amended Moratorium Act, Statement
of Intent.

*Padilla*, No. 3:16-cv-01037 (D.P.R., filed Jan. 7, 2016); *Ambac Assurance Corp. v. Rosselló Nevares*, No. 3:17-cv-01568 (D.P.R., filed May 2, 2017). The third was the U.S. Treasury Action, which named as defendants the U.S. Department of the Treasury, Steven Mnuchin in his official capacity as Treasury Secretary, and any successor to Secretary Mnuchin, and sought an equitable lien against the Pledged Rum Taxes and an injunction precluding the defendants from transferring any Rum Taxes to the Commonwealth until the other actions were resolved. *See Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809 (D.D.C., filed May 2, 2017).

28.     After filing a Title III petition on behalf of the Commonwealth, the Oversight Board filed purported automatic stay notices in connection with each of these actions. The U.S. District Court for the District of Puerto Rico granted the stays of the two actions against the Commonwealth and/or its officials without comment. *See Ambac Assurance Corp. v. Rosselló Nevares*, No. 3:17-cv-01568 (D.P.R., May 17, 2017) (Dkt.7); *Assured Guaranty Corp. v. Garcia Padilla*, No. 1:17-cv-01037 (D.P.R., May 17, 2017) (Dkt. 82). The U.S. District Court for the District of Columbia, expressly relying on the Oversight Board's "representations" that the U.S. Treasury Action was "automatically stayed in its entirety," entered a minute order staying the U.S. Treasury Action pending resolution of the Commonwealth's bankruptcy proceedings. *Ambac Assurance Corp. v. U.S. Dep't of Treasury*, No. 1:17-cv-00809 (D.D.C., May 25, 2017) (Dkt. No. 8).

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

**RELIEF REQUESTED**

31.     Ambac seeks an order of this Court, substantially in the form attached hereto as

**Exhibit A**, finding that the U.S. Treasury Action and PRIFA Clawback Action are not subject to

the automatic stay that went into effect upon the filing of the Commonwealth's Title III petition.

In the alternative, Ambac seeks an order lifting the automatic stay under Section 362(d) so that

Ambac may pursue the U.S. Treasury Action and PRIFA Clawback Action in alternative fora.

Further in the alternative, Ambac seeks an order that the Commonwealth provide adequate

protection for Ambac's lien on the Pledged Rum Taxes.

**ARGUMENT**

**I.     THE AUTOMATIC STAY DOES NOT PRECLUDE AMBAC FROM PURSUING
THE U.S. TREASURY ACTION AND PRIFA CLAWBACK ACTION**

32.     In advising the courts that the U.S. Treasury Action and clawback litigation were

automatically stayed, the Oversight Board and the Commonwealth used the automatic stay as a

sword to stave off creditors and preclude review of their illegal actions.   Notwithstanding the

representation to the contrary, the U.S. Treasury Litigation is not subject to the automatic stay, nor

is the contemplated PRIFA Clawback Action.

33.     PRIFA itself is not a Title III debtor; as a result, the only stay that could conceivably

apply would be the one arising from the Commonwealth's Title III proceedings.   As explained

below, however, that stay has no application to the U.S. Treasury Action or the PRIFA Clawback

Action.

**A.     The Automatic Stay Does Not Apply to the U.S. Treasury Action**

34.     The automatic stay in effect in the Commonwealth's Title III case covers only

certain enumerated proceedings, including, as asserted by the Oversight Board to be relevant here,

"any act to obtain possession of property of the estate or of property from the estate or to exercise

13

control over property of the estate," "any act to create, perfect, or enforce any lien against property

of the estate," and "any act to create, perfect, or enforce against property of the debtor any lien to

the extent that such lien secures a claim that arose before the commencement of the case under this

title." 11 U.S.C. § 362(a).  In other words, by its express terms, Section 362 precludes only certain

acts that implicate the property of a ***debtor***.  *See Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4 (1st

Cir. 1983) ("[T]he automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt

debtor.").  Because the Pledged Rum Taxes are property of PRIFA, not the Commonwealth, the

automatic stay arising from the Commonwealth's Title III filing does not apply.

### 1.    The Commonwealth Has No Property Interest in the Pledged Rum Taxes

35.    The U.S. Treasury Action—a lawsuit against the federal government seeking to

freeze or escrow PRIFA's property—is not barred by the automatic stay because the

Commonwealth has no property interest in the Pledged Rum Taxes.  The Enabling Act expressly

provides that the Pledged Rum Taxes, "when received by the Department of the Treasury of Puerto

Rico, ***shall*** be covered into a Special Fund maintained by or on behalf of [PRIFA]."  3 L.P.R.A.

§ 1914 (emphasis added).  The transfer of the Pledged Rum Taxes to PRIFA is mandatory ("shall

be covered into"), immediate and automatic ("when received").  *Id*.  The Commonwealth acts as

a pure pass-through for funds to PRIFA; the Commonwealth is a "mere conduit" or "delivery

vehicle" of the funds and lacks ownership.

36.    In an analogous context, the First Circuit found that certain insurance premiums

collected by the Commonwealth were the property of a private association because the governing

statute provided that the association "shall receive," and the Commonwealth "shall transfer," the

premiums.  *Asociacion de Subscipcion Conjunta Del Seguro De Responsibilidad Obligatorio v.*

*Flores Galarza*, 484 F.3d 1, 6, 29 (1st Cir. 2007); *see id.* at 29 ("While the Secretary collects

14

[liability insurance premiums] and holds them for some unspecified amount of time before relinquishing them . . . he is merely the custodian of these funds."); *see also Mun. of Metro. Seattle v. O'Brien*, 544 P.2d 729, 732, 733 (Wash. 1976) (noting "commonsense interpretation" that motor vehicle taxes raised by state legislation could be held by treasurer in purely custodial capacity; "[t]he mere fact that the state treasurer may be made the custodian of a particular fund . . . does not of itself make the moneys so received and held by him state funds in the state treasury").

37.     "[P]roperty is excluded from the estate where the debtor merely receives property in order to deliver it to its intended recipient without any control or ownership over it."  *In re LAN Tamers, Inc.*, 329 F.3d 204, 210 (1st Cir. 2003); *see id*. at 206 (stating debtor holds no ownership when it "must pass the funds" through to its intended recipient); *see also In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d 1, 10 (1st Cir. 2018).  Because the Commonwealth acts as nothing more than a pass-through or "delivery vehicle" for the Pledged Rum Taxes, and does not itself obtain any ownership interest in the funds, the Pledged Rum Taxes are not Commonwealth property and are not subject to the automatic stay.  As the First Circuit recently explained, where "the debtor was a mere 'transfer station along the road to payment' . . . it lack[s] a cognizable property interest."  *In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d at 10 (citation omitted).

> **2.     If PRIFA Has No Property Rights in the Pledged Rum Taxes Prior to their Delivery to PRIFA, then the Commonwealth Has No Property Rights in the Pledged Rum Tax Prior to their Delivery to the Commonwealth**

38.     Throughout these Title III cases, the Oversight Board and Unsecured Creditors Committee have taken the position, with respect to HTA, that the pledged excise taxes do not become HTA property, and remain property of the Commonwealth, until they are actually

transferred to HTA and deposited in the HTA account.[13]  Ambac expects they will make the same argument here with respect to PRIFA.  While Ambac strenuously disagrees with their position as a matter of law (particularly in light of the PRIFA statutory language), applying their logic to the Pledged Rum Taxes leads to the conclusion that rum excise taxes collected and still held by the federal government are not property of the Commonwealth.  The federal statute and the Commonwealth statute include exactly the same mandate—requiring that the rum excise taxes and the Pledged Rum Taxes "***shall be covered into***" the treasury of Puerto Rico or the PRIFA account, as applicable.  *Compare* 26 U.S.C. § 7652(a)(3) *with* 3 L.P.R.A. § 1914.  This language must be interpreted and applied consistently.  Accepting the Oversight Board's argument that the Pledged Rum Taxes only become PRIFA's property when deposited into PRIFA's account, the U.S. Treasury Litigation, which seeks only to escrow funds in the possession of U.S. Treasury ***before*** they are transferred to the Commonwealth, would have no impact on any property of the Commonwealth.

### B. The Automatic Stay Does Not Apply to the PRIFA Clawback Action

39.  The PRIFA Clawback Action, whereby Ambac would pursue its rights to enforce its lien on the Pledged Rum Taxes and halt the continued impairment of its lien, is likewise inoffensive to the automatic stay.  For the reasons set forth above, the Pledged Rum Taxes do not belong to the Commonwealth.  And although the PRIFA Clawback Action (unlike the U.S.

---

[13] *See* Brief of Defendants-Appellees Financial Oversight and Management Board for Puerto Rico, for Itself and as Representative for the Commonwealth of Puerto Rico and Puerto Rico Highways & Transportation Authority, Jose B. Carrion, III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos and David A. Skeel, Jr., *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 18-1214 (1st Cir. Aug. 20, 2018), at 47-48, 58; Brief of the Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors (Other than COFINA) in Support of Affirmance, *Ambac Assurance Corp.*, Case No. 18-1214, at 1-2, 3, 5-8, 22-23; *see also* Complaint, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ambac Assurance Corp.*, Case No. 19-363 (D.P.R. May 20, 2019) (Dkt. 1), ¶¶ 1, 2, 17, 24.

Treasury Action) would assert a claim against the Commonwealth—and thus can be argued to be an action "to recover a claim against the debtor," 11 U.S.C. § 362(a)(1)—a bankruptcy filing "does not operate as a stay of application of pledged special revenues . . . to payment of indebtedness secured by such revenues." 11 U.S.C. § 922. As shown below, *see infra* Section II.A.1.a, the Pledged Rum Taxes are such "pledged special revenues."[14]

## II.    THE COURT SHOULD LIFT ANY APPLICABLE AUTOMATIC STAY TO PERMIT AMBAC TO PURSUE ITS REMEDIES

40.     In the event the Court finds that the automatic stay precludes the U.S. Treasury Action or the PRIFA Clawback Action, the Court should lift the stay to permit Ambac to protect its interest in the Pledged Rum Taxes.

41.     Section 362(d)(1) of the Bankruptcy Code provides: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest." Whether "cause" exists for lifting the stay is determined based on the "totality of the circumstances." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (citing *In re Tribune*, 418 B.R. 116, 126 (Bankr. D. Del. 2009); *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)). "The totality of the circumstances of a case encompasses, among other things, how the parties have conducted themselves, their good or bad faith, and their motives. Good faith is an intrinsic and integral component of the bankruptcy process." *See In re JE Livestock,*

---

[14] The First Circuit's decision in *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d 121 (1st Cir. 2019), does not resolve this issue. While the First Circuit found that Section 922(d) does not empower the Title III court to mandate the application of pledged special revenues, *id.* at 130 (a ruling on which appellants are seeking *en banc* review), that appeal did not directly address whether creditors could pursue claims for the application of pledged special revenues in another forum. That question is pending before the First Circuit in *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, No. 18-1214 (1st Cir., appeal filed Mar. 9, 2018, argued Jan. 15, 2019). *See* Jan. 15, 2019 Hr'g Tr. at 7:21-8:15.

*Inc.*, 375 B.R. 892, 897 (10th Cir. B.A.P. 2007); *In re Mack*, 347 B.R. 911, 915, 916 (Bankr. M.D. Fl. 2006) (finding cause to lift the stay where debtor filed for bankruptcy to thwart ongoing litigation). In considering the totality of the circumstances, courts should consider both prepetition and postpetition conduct. *Id.* at 916 (citing *In re Trident Assoc. Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir.1995)).

42. The Commonwealth's bad faith in dealing with PRIFA bondholders, perpetuated by the Oversight Board, warrants a lifting of the stay. As detailed above, the Commonwealth began taking PRIFA's property even before the First Clawback Order purportedly authorizing the diversion. The taking continued even after PROMESA clearly preempted the executive order and Moratorium Act that the Commonwealth was relying on to purportedly validate its illegal acts. Throughout, the Commonwealth and Oversight Board have used statutory litigation stays—in the Moratorium Act, PROMESA, and now the automatic stay in bankruptcy—and procedural arguments to bar all challenges to and any judicial review of their unlawful conduct. The litigation stay is being used as to stave off creditors, as the Commonwealth and Oversight Board implement a scheme to permanently dissipate PRIFA bondholders' collateral, presumably with the intention of using those revenues to support a Commonwealth plan of adjustment, as contemplated by the certified Commonwealth fiscal plan. The misappropriation of these funds is in clear violation of the provisions of PROMESA, which expressly prohibits the transfer of property of one instrumentality to another, or to the Commonwealth, at any time (and which even provides creditors with a direct right of action to recover improperly transferred monies). *See, e.g.*, 48 U.S.C. §§ 2141(b)(1)(M), 2144(c)(3)(A), 2195.

43. "Cause" for granting relief from the stay can also be found where a secured creditor's collateral is diminishing in value during the pendency of the case. *See, e.g.*, *In re Lopez*,

446 B.R. 12, 20 (Bankr. D. Mass. 2011).  Ambac's liens remain intact, but the value of the liens is

being materially diminished.  Indeed, if the Oversight Board is allowed to continue to confiscate

PRIFA's property and press forward with a plan of adjustment premised on the diversion of the

Pledged Rum Taxes as reflected in the certified fiscal plan, Ambac's collateral risks being reduced

to nothing.

44.     Section 362(d)(2) provides that stay relief shall be granted where "the debtor does

not have an equity in [the] property" and "[the] property is not necessary to an effective

reorganization."  When the property is cash, it cannot be necessary to an effective restructuring if

the debtor lacks equity in the cash.  In general, "cause exists when the harm that would result from

a continuation of the stay would outweigh any harm that might be suffered by the debtor or the

debtor's estate if the stay is lifted."  *In re Shaughnessy*, BAP No. MW 06-068, 2007 WL 2403280,

at *3 (B.A.P. 1st Cir. Aug. 17, 2007).

45.     Because the Commonwealth is abusing the automatic stay to violate Puerto Rico

and federal law with impunity in an attempt to strip Ambac of its statutorily and constitutionally

protected property rights, the stay should be lifted to allow Ambac to stop the continued taking of

its property and erosion of its collateral.

### A.     There Is Cause to Lift the Stay for Lack of Adequate Protection

46.     If the Court finds that the stay applies to the PRIFA Clawback or the U.S. Treasury

Action, the stay should be lifted "for cause" because of a "lack of adequate protection of an interest

in property," 11 U.S.C. § 362(d)(1).  As shown below, (1) Ambac has a lien on the Pledged Rum

Taxes; and (2) the lien is not adequately protected, as the Commonwealth has (and continues to)

diminish the value of the lien.  Upon information and belief, the Commonwealth is diminishing

the value of the lien by diverting the Pledged Rum Taxes, spending the Pledged Rum Taxes, and

transferring the Pledged Rum Taxes to third parties, including rum producers whose contractual right to a portion of the rum taxes is expressly subordinate to Ambac's.

### 1. Ambac Has a Lien on the Pledged Rum Taxes

47.     Ambac has a lien on the Pledged Rum Taxes that either must be enforced pursuant to its terms, or adequately protected, during the bankruptcy proceedings.

### a. The Trust Agreement for the Rum Tax Bonds, and the Enabling Act, Create a Consensual Lien

48.     The Trust Agreement and the Enabling Act create a lien enforceable against all of the first $117 million of rum taxes in each fiscal year, regardless of whether or not received by PRIFA or deposited into the bondholder trust account.  The Trust Agreement grants a lien on Pledged Rum Taxes, which attaches to the monies deposited with the trustee, and pursuant to the Enabling Act, to monies not yet made available to PRIFA.  *See* Trust Agreement, Section 601.

49.     This lien is specifically authorized under the Enabling Act, which allows PRIFA to grant a lien on the proceeds of any taxes which pursuant to the Enabling Act are "made available to [it] by the Commonwealth," including the Pledged Rum Taxes.  3 L.P.R.A. § 1907(a).  By its express terms, this statutory authorization extends beyond funds actually transferred to PRIFA. Indeed, the lien extends to "all or any portion of the federal excise taxes or other funds ***which should have been transferred by the Commonwealth to [PRIFA]***," whether or not the funds actually are transferred.  3 L.P.R.A. § 1906(m) (emphasis added).  Thus, the lien extends to revenues that were not "received by [PRIFA]," because the statute states that all of the Pledged Rum Taxes—"including" (and therefore not limited to) the taxes actually "received by [PRIFA]"—are subject to the lien.  3 L.P.R.A. § 1907(a).

50.     The Enabling Act further dictates that whenever PRIFA pledges revenues to secure

bonds, a lien automatically attaches to the pledged revenues "immediately" and regardless of

whether the funds are delivered to PRIFA.  The Act provides:

> The revenues so pledged, including those subsequently received by
> [PRIFA], shall immediately be subject to said lien **without the need of the
> physical delivery thereof or any other act** . . . .

3 L.P.R.A. § 1907(a) (emphasis added).  This provision of the Act mandates that, with respect to

any revenues PRIFA pledges to bondholders, the revenues "***shall immediately*** be subject" to a

lien, whether or not the revenues have actually been delivered to PRIFA.  *Id.* (emphasis added.)

51.     This statutory language confirms that the lien on the Pledged Rum Taxes extends

beyond revenues actually deposited in PRIFA's accounts, and includes revenues received by the

Commonwealth that should have been, but were not, transferred to PRIFA (such as the diverted

Pledged Rum Taxes).  Thus, the Enabling Act mandates that any pledge by PRIFA results in a lien

with a defined scope for the benefit of PRIFA bondholders.[15]  This language is unique to PRIFA.

No other Commonwealth revenue bond statute provides for the automatic perfection of the lien,

or is express that the lien extends to monies not yet received by the borrower.

52.     The lien on the Pledged Rum Taxes to be received by PRIFA in the future is not

cut off by Section 552(a) for two reasons:

53.     *First*, Section 552(a) does not apply to Ambac's lien because the lien did not

"result[] from any security agreement entered into by the [Commonwealth.]"  The lien arose based

on the Trust Agreement, which is a contract between PRIFA and its bondholders, and the Enabling

---

[15] The Enabling Act also provides that any pledge by PRIFA results in a lien that is automatically
perfected, without the need for any separate UCC filing.  *See* 3 L.P.R.A. § 1907(a) ("Neither the
trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's
rights on any revenues are pledged or assigned shall have to be presented or recorded in order to
perfect the lien thereon against any third party except in the records of the Authority.").

Act.  PRIFA is not a debtor, and the Commonwealth is not a party to the Trust Agreement.  In

addition, for the reasons detailed above, *see supra* Section I.A.1, the Commonwealth lacks

property interests in such future revenues and, therefore, they are not "property acquired by the . .

. debtor."

54.     *Second*, even if Section 552(a) were found to apply through the Commonwealth or

if the Oversight Board were to file PRIFA for Title III, that section would not cut off Ambac's

liens because the Pledged Rum Taxes are "pledged special revenues" under Section 922(d).[16]

### i)      The Rum Taxes Are "Pledged Special Revenues" Under the Plain Language of the Statute

55.     "It is elementary that in resolving a dispute over the meaning of a statute we begin

with the language of the statute itself."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919

F.3d 121, 128 (1st Cir. 2019); *see also Penobscot Nation v. Mills*, 861 F.3d 324, 330 (1st Cir.

2017) (quoting *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)).  The Bankruptcy Code defines

"special revenues" as, inter alia, "special excise taxes imposed on particular activities or

---

[16] If Section 552 were used by the Oversight Board to cut of PRIFA bondholder liens, it would
give rise to a takings claim under the U.S. constitution.  The Enabling Act transfers an enforceable
property interest in the Pledged Rum Taxes that cannot be taken by the Commonwealth.  *See In re
Techns. Int'l Holdings, Inc.*, 234 B.R. 699, 714-16 (Bankr. E.D. Ky. 1999) (enjoining post-petition
enforcement of statute diverting statutory payments from debtor directly to its creditors, essentially
bypassing bankruptcy; court held plaintiff had demonstrated substantial likelihood of success on
the merits where statute deprived it of contractually earned payments under prior statutory
scheme); *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577, 612 (D.P.R. 2015)
(statute repealing bondholders' statutory right to have receiver appointed in event of issuer's
default constituted taking in violation of Fifth Amendment); *Cienega Gardens v. United States*,
331 F.3d 1319, 1330-31 (Fed. Cir. 2003) (federal statutes abrogating real estate developers'
contractual rights to prepay mortgages under regulatory agreements with HUD constituted taking
in violation of Fifth Amendment; developers had property right in contractual agreements with
HUD; rejecting government position that no property right vested because the rights arose from a
regulatory and statutory scheme that HUD and Congress could amend at any time).  *See generally
United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) ("The bankruptcy power is subject to the
Fifth Amendment's prohibition against taking private property without compensation.").

transactions." 11 U.S.C. § 902(2)(B).  The Rum Taxes fit squarely within this statutory definition:

The Rum Taxes are "excise taxes."  *See, e.g.,* 3 L.P.R.A. § 1906(m) (describing the pledged

revenues as "federal excise taxes"); *id.* § 1914 (same).  The Rum Taxes also are imposed on

particular transactions, specifically, the sale of imported Puerto Rico rum on the mainland United

States.  *See* 26 U.S.C. § 7652.

56.     As revenues that are pledged for a particular use and not available to general

creditors, they are "special," as that term is used in 11 U.S.C. § 922.  Nothing in the plain language

of the statute can be read to impose any limitation on the nature or source of the excise tax.  There

is also no distinction in the statutory text between an excise tax levied by the Commonwealth and

an excise tax levied by the federal government.  Both, if pledged to bondholders in a non-recourse

borrowing, would be pledged special revenues under the Code.[17]

57.     Because "the language at issue has a plain and unambiguous meaning," the

interpretive inquiry ends with the plain text.  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,

919 F.3d at 128.  Where, as here, "'the meaning of the text is unambiguous' the Court's interpretive

task ends, and the Court must apply the statute's plain meaning."  *United States v. Espinal-Mieses*,

313 F. Supp. 3d 376, 381 (D.P.R. 2018) (quoting *Correa-Ruiz v. Fortuño*, 573 F.3d 1, 9 (1st Cir.

2009)).  The Pledged Rum Taxes are pledged special revenues.

        ii)      **If the Court Finds the Statute Ambiguous, the
Legislative History Makes Plain that the Pledged Rum
Taxes Are Pledged Special Revenues**

---

[17] Indeed, it is not uncommon for one governmental unit to impose the tax while another receives
the revenue and pledges it to bondholders.  *See, e.g., in re Heffernan Mem'l Hosp. Dist.*, 202 B.R.
147, 149 (Bankr. S.D. Cal. 1996) (tax revenues deemed special revenues under § 922 where the
California legislature authorized a special sales tax, the city imposed the tax, and the revenue
stream was pledged to a hospital that in turn pledged the revenues to bondholders).

58.     If the Court finds the statute ambiguous, it should consider "other tools of statutory construction, such as legislative history." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d at 128.  Here, the legislative history uniformly confirms that the Pledged Rum Taxes are pledged special revenues.  The "pledged special revenues" provisions of the Bankruptcy Code were added to the Code in 1988.  The congressional reports concerning the legislation noted that these provisions "provide[d] protection for the holders of the revenue bonds."  S. Rep. No. 100-506, at 2, 3 (1988); *see also* Collier on Bankruptcy ¶ 927.02 (16th ed. 2019).  Both the House and Senate reports so confirm.

59.     The House Report on the amendments explain that municipalities finance public works with either general obligation bonds or revenue bonds—noting that revenue bonds may be backed by a specific excise tax.  H.R. Rep. No. 100-1011, at 4 (1988); *id.* at 6 ("The intent is to define special revenues to include the revenue derived from . . . a specific tax levy, where such revenues are meant to serve as security to the bondholders.").  The purpose of the special revenue provisions was to "mak[e] special revenues still subject to a post-petition lien in a chapter 9 bankruptcy," *id.*, because revenue bonds depend on a continuing lien on future revenue streams.

60.     The Senate Report likewise noted that, if revenue bonds are not protected in bankruptcy, the municipality might "prohibit the specified payment of pledged revenues to the bondholders," which could "effectively destroy the distinction between general obligation debt and limited revenue obligation debt."  S. Rep. No. 100-506, at 4-5 (1988).  Noting the constitutional concerns involved in destroying a lien in bankruptcy, the Senate's view was that then-existing law should be interpreted to "prohibit the interpretation that pledges of revenues granted pursuant to state statutory or constitutional provision to bondholders can be terminated by the filing of a chapter 9 case."  *Id.* at 6.  In the Senate's view, the special revenues provisions

clarified the law to remove any uncertainty concerning the enforceability of revenue bonds after a bankruptcy filing.

61.     This legislative history confirms that the congressional intent of the "special revenues" provisions specifically is to protect the holders of revenue bonds, such as the rum tax bonds.  To allow the Commonwealth to avoid the lien on the rum tax revenues plainly would be inconsistent with the express congressional intent to ensure that revenue bonds maintain a lien on the pledged revenues.  PRIFA bonds are non-recourse to the Commonwealth and rely exclusively on the first $117 million in annual rum taxes for repayment.

62.     The House and Senate Reports further eliminate any ambiguity with respect to the rum taxes, as each expressly identifies "the sale of alcoholic beverages" as an example of "special activity" that would be covered by Section 902(2)(B).  *See* H.R. Rep. No. 100-1011, at 6 (1988); S. Rep. No. 100-506, at 21 (1988) ("An excise tax on hotel and motel rooms or the sale of alcoholic beverages would be a special excise tax under clause (B).").  Thus, the legislative history confirms that the Rum Taxes are special revenues under Section 902(2)(B), and the Pledged Rum Taxes are "pledged special revenues" under Section 922(d).

### b.     PRIFA Bondholders Have an Equitable Lien on the Pledged Rum Taxes

63.     Ambac also has an equitable lien on the Pledged Rum Taxes because Puerto Rico law imposes an equitable lien on any funds that are earmarked for the purpose of paying a particular debt.  *See generally United States v. Friedman*, 143 F.3d 18, 23 (1st Cir. 1998) (equitable lien is "[a] right, not existing at law, to have specific property applied in whole or in part to payment of a particular debt or class of debts. An equitable lien arises . . . from . . . a written contract which shows an intention to charge some particular property with a debt or obligation . . . ." (quoting Black's Law Dictionary 539 (6th ed. 1990))).

64.     Under Puerto Rico law, an agreement to apply specific property to the repayment of an obligation gives rise to an equitable lien.  *See In re Maxon Eng'g Servs., Inc.*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005).  In *Maxon*, a surety company issued payment and performance bonds on various construction projects that had been awarded to a contractor.  *Id.* at 497.  The contractor entered into an indemnity agreement that provided that payments the contractor received under the bonded contracts would be deemed held in a trust for the surety's benefit, in the event that the surety incurred any liability or loss under the bonds.  *Id.* at 499.  The court found that this arrangement not only vested the surety with an equitable interest in the receivables but also created an equitable lien in the receivables for the benefit of the surety.  *Id.* at 500.

65.     Even absent an express trust, an agreement to pay an obligation from specific funds creates an equitable lien.  *See Friedman*, 143 F.3d at 23 (a promise to repay a claim from the proceeds of a sale of real estate owned by the debtor gave rise to an equitable lien on the sale proceeds); *In re Natale*, 174 B.R. 362, 364-65 (Bankr. D.R.I. 1994) (where a debtor-mortgagor was contractually required to name the mortgagee as an insurance policy beneficiary but failed to do so, the insurance proceeds were impressed with an equitable lien for the benefit of the mortgagee); *Hanson v. W.L. Blake & Co.*, 155 F. 342, 357-58 (D. Me. 1907) (same).  Here the Enabling Act creates a contract whereby the Commonwealth "shows an intention" that the Pledged Rum Taxes will be available for and used to pay debt service on PRIFA's bonds.

### 2.     The Lien is Not Adequately Protected, and the Commonwealth's Conduct Continues to Diminish the Value of the Lien

66.     The Commonwealth bears the burden to prove that Ambac's lien is adequately protected.  11 U.S.C. § 362(g)(1), (2); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *aff'd*, 359 F. App'x 352 (3d Cir. 2010).  The Bankruptcy Code does not define the term "adequate protection," but

indicates that "adequate protection may be provided by" (1) requiring a cash payment or series of cash payments, (2) providing an additional or replacement lien, or (3) granting other relief (besides administrative expense priority) that will "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361; Collier on Bankruptcy ¶ 362.07[3][b]. The Commonwealth has not made any cash payments or provided any additional or replacement lien or collateral to Ambac or PRIFA bondholders, so the only basis on which the Commonwealth could argue that Ambac is adequately protected is by proving that Ambac has received "the indubitable equivalent" of the dissipation in value of the lien.

67. As the Supreme Court has explained, adequate protection is required to safeguard "the right of a secured creditor to have the security applied in payment of the debt." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988). "It is plain that 'adequate protection' must be completely compensatory," that it protects not merely the right to be paid, but also "the safety of [the lienholder's] principal," and that it recognizes that "payment ten years hence is not generally the equivalent of payment now." *In re Mural Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (Learned Hand, J.); *see* Collier on Bankruptcy ¶ 506.03[7][a] 506-51 n. 163; *In re Deico Elecs., Inc.*, 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992) ("Adequate protection prevents creditors from becoming more undersecured[.]"). Thus, "a proposal of adequate protection for a secured creditor[] should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Martin v. United States*, 761 F.2d 472, 476 (8th Cir. 1985) (internal quotation marks excluded); *see also In re J&M Salupo Dev. Co.*, 388 B.R. 809, 812 (Bankr. N.D. Ohio 2009) (finding that lack of adequate protection may be shown by "erosion of creditor's position or of threatened erosion").

68.    The Commonwealth and the Oversight Board cannot carry their burden of showing that Ambac enjoys "the indubitable equivalent" of its collateral.  11 U.S.C. § 361(3).  Ambac is injured by the dissipation of the Pledged Rum Taxes because the amount of Rum Taxes that the Commonwealth (and PRIFA) ultimately will receive depends on a variety of factors that cannot be controlled or predicted even by the Commonwealth, such as (i) determinations made by the U.S. government as to the level of customs duties to impose on rum imports and the formula for allocating such duties to the Commonwealth, (ii) the amount of rum produced in Puerto Rico in the future, and (iii) the amount of Puerto Rico-origin rum that is exported to the mainland United States for consumption there.  All of these factors are subject to change over time, and thus—even absent the Commonwealth's unlawful conduct—Ambac would have no assurance that the Pledged Rum Taxes will be sufficient to repay the rum tax bonds.  The Commonwealth's unlawful "clawback" diminishes the value of the lien even further by materially and substantially increasing the risk that the Pledged Rum Taxes will not be sufficient to repay the rum tax bonds in full (or by increasing the magnitude of any deficiency).

69.    This case is distinguishable from the First Circuit's decision in *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017),  because (1) that case was decided under the PROMESA stay, which does not incorporate section 362(g) of the Bankruptcy Code, and thus places the burden on the moving party to demonstrate that it lacks adequate protection; (2) the nature of the revenue stream here is different, principally insofar as it is not generated by, and therefore not controlled by, the debtor; and (3) this motion comes more than two years later, after the Commonwealth's taking has continued unabated and after the Commonwealth has clearly articulated its view that revenue bondholders have no rights in the pledged revenues.  *See id.* at 512.

70. In *Peaje*, the First Circuit held that a creditor seeking relief from the PROMESA stay bears the burden to prove it is not adequately protected, and that Peaje failed to show that it was under-collateralized. *Id.* at 513-14. While Peaje had shown that the Commonwealth was diverting certain special revenues, it did not show that the diversion would leave insufficient funds to adequately protect the amount of debt it was owed.

71. Here, unlike under the PROMESA stay, the Commonwealth will have to prove that Ambac's lien is adequately protected. Because the Commonwealth has provided no value to Ambac, it will have to demonstrate that Ambac is adequately protected by virtue of its lien on a perpetual revenue stream. The Commonwealth will be able to make no such showing. First, the certified fiscal plan assumes that all of the Pledged Rum Taxes are used for general Commonwealth expenses at least for the entire period covered by the fiscal plan. *See* 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity 24-25 (May 9, 2019). Second, unlike other revenue streams, including the HTA toll revenues considered by the First Circuit in *Peaje*, the Commonwealth does not control the rum excise taxes, and cannot guarantee whether and in what amount it will be maintained.

**B.     The Commonwealth Is Abusing the Automatic Stay to Strip Ambac and PRIFA Bondholders of Their Constitutionally-Protected Property Rights in Violation of PROMESA**

72. That the Commonwealth is abusing the automatic stay to violate PROMESA is additional cause to grant relief from the stay. PROMESA requires the Commonwealth to comply with applicable law by imposing transferee liability under Section 407 of PROMESA for any transfers made in violation of applicable law. *See* 48 U.S.C. § 2195. This reflects a more basic policy of the Bankruptcy Code "that the automatic stay should not be used as a shield against the application and enforcement of valid state and local laws." *Cournoyer*, 790 F.2d at 977.

73.     Here, the Commonwealth is abusing the stay in an attempt to inoculate itself against applicable law—which PROMESA requires the Commonwealth to respect.  As shown above, even if the Commonwealth had a property interest in the Pledged Rum Taxes, those funds are, at a minimum, restricted funds or funds held in trust to be used only as statutorily prescribed.  *See infra* Section II.C.1.  There is no legal basis for the Commonwealth to invoke "clawback," or to redefine it as allowing the diversion of the Rum Taxes away from the PRIFA account entirely.

74.     The illegality of the Commonwealth's actions are particularly flagrant under the current circumstances where the Commonwealth is running a budgetary surplus, not a shortfall, and there can be no suggestion that the clawback conditions have been met.  *See* 2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity 24-25 (May 9, 2019).

75.     Even if the conditions for triggering clawback were present, the Commonwealth still would be obligated to transfer the Pledged Rum Taxes to PRIFA, and only then may the funds be used to make payment on outstanding public debt, if no other funds are available during that fiscal year.  Critically, the clawback analysis must be conducted annually, with reference to the applicable budget and revenues for that year.  There is no legal authority for a perpetual clawback.  Yet, through the fiscal plan and budgeting process, the Oversight Board is mandating the continued stripping of revenues from PRIFA, even in years where the fiscal plan shows a surplus.  And as the Oversight Board and the Commonwealth implement the perpetual taking of PRIFA property, they weaponize PROMESA and the automatic stay and claim immunity from challenge.  The brazen and ongoing disregard for property rights must be stopped.

### C.    The Stay Should Be Lifted Because the Commonwealth Has No Equity in the Pledged Rum Taxes, and They Are Unnecessary to an Effective Reorganization

76.     Relief from the stay is also appropriate because the Commonwealth "does not have an equity" in the Pledged Rum Taxes, rendering them unnecessary to an effective reorganization.

*See* 11 U.S.C. § 362(d)(2).  While the moving party bears the burden of demonstrating that the debtor lacks equity in the property, it is the debtor's burden to prove that the property in question is necessary for its plan.  11 U.S.C. § 362(g); *see In re Mullock*, 404 B.R. 800, 805 (Bankr. E.D. Pa. 2009).

### 1. Even Assuming the Commonwealth Has Some Interest in the Pledged Rum Taxes, that Interest Would Be at Most Bare Legal Title in Which the Commonwealth Has No Equity

77.     As shown above, the Commonwealth has no property interest in the Pledged Rum Taxes, and thus the requested stay relief would have no effect on the Commonwealth or its reorganization.  *See supra* Section I.A.1.

78.     Even if the Court were to conclude that the Commonwealth has some ownership interest in the funds, PRIFA is the beneficial owner of the Pledged Rum Taxes, and the Commonwealth holds at most bare legal title, for at least two reasons:

79.     *First*, any Pledged Rum Taxes in the possession of the Commonwealth are "restricted funds" that the Commonwealth cannot lawfully use or dispose of, except by transferring them to PRIFA.  The Enabling Act requires that the funds "when received" by the Commonwealth "shall" be covered into the designated PRIFA account.  There is no other permissible use of the Pledged Rum Taxes.  Thus, PRIFA, not the Commonwealth, is the beneficial owner of these funds. The Enabling Act prohibits the Commonwealth from using the Pledged Rum Taxes for any purpose other than turning them over to PRIFA.  The Commonwealth has no discretion over how the funds are applied—the hallmark of "restricted funds" in which the debtor effectively has no property interest.  *See, e.g.*, *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.*, 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) ("restricted funds" are those with "a limited use and specific purpose, such as to fund a special program").

80.     *Second*, any Pledged Rum Taxes in the custody of the Commonwealth are held in "trust" for the benefit of PRIFA.  *See García-Rubiera v. Calderón,* 570 F.3d 443, 457 (1st Cir. 2009); *In re City of Columbia Falls*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992).  Even a statute that does not explicitly use the word "trust" creates a trust if it manifests a legislative intent to impose a trust-type relationship.  *In re Bologna*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997); *Columbia Falls*, 143 B.R. at 762.  Here, the Enabling Act indicates a clear legislative intent that the Commonwealth holds the Pledged Rum Taxes (a clearly defined trust *res*) for the benefit of PRIFA.

81.     The Commonwealth is "merely a custodian, and its duties relative to such funds are purely ministerial.  It may not use or divert them."  *Columbia Falls*, 143 B.R. at 762 (quoting *State ex rel. Clark v. Bailey*, 44 P.2d 740, 746 (Mont. 1935)); *see also FDIC v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (finding that structure whereby city holds sinking fund for bondholders creates relationship where city is the trustee and bondholders are cestui que trustents); *City & Cty. of Dallas Levee Imp. Dist. Ex rel. Simond Indus. Props. Corp.*, 89 F.2d 731, 733 (5th Cir. 1937) (finding that the statute under consideration requires that funds be held in trust for the purposes of paying the principal and interest of the bond indebtedness); *cf. Flores Galarza*, 484 F.3d at 30 (finding that Law 253 recognizes a *lack* of JUA's property right to those duplicate premiums paid by those already covered by privately obtained insurance policies); *García-Rubiera v. Fortuño*, 665 F.3d 261, 266 (1st Cir. 2011) (same); *Calderón,* 570 F.3d at 457 (motor vehicle owners, as opposed to the JUA, had a property interest in those duplicate premiums paid by those already covered by privately obtained insurance policies for purposes of Takings and Due Process claims). Because PRIFA is the beneficial owner of the Pledged Rum Taxes, the Commonwealth lacks any equity in the Pledged Rum Taxes.

### 2.   The Pledged Rum Taxes Are Not Necessary for an Effective Reorganization

82.    Given the Commonwealth's lack of equity in the funds, it is "difficult to imagine"
how the Commonwealth could meet its burden to demonstrate that it requires the Pledged Rum
Taxes in which it holds only "naked legal title" to effectuate any plan.  *In re Lally*, 38 B.R at 622,
626 (Bankr. N.D. Iowa 1984) ("cause exist[ed] to justify the termination of the stay" because
debtors "armed with only naked legal title" lacked "equity" in the property).  Indeed, where the
property at issue is cash, if it is determined that the debtor lacks equity under the first prong, the
property is not necessary, and indeed cannot be used at all, in a reorganization of the debtor.

83.    A municipal debtor cannot use property in which the debtor holds, at best, bare
legal title, to effectuate any plan.  *See Columbia Falls*, 143 B.R. at 762.  Thus the Pledged Rum
Taxes will have no bearing on any plan of reorganization, as they must be returned to PRIFA
bondholders.  *See also, e.g.*, *Matter of Spencer*, 115 B.R. 471, 485 (D. Del. 1990) (where the debtor
holds bare legal title but not equitable title, stay should be lifted so that "equitable title [can] be
united with legal title."); *Boyd v. Martin Expl. Co.*, 56 B.R. 776, 779, 781 (E.D. La. 1986) (where
debtor held "bare legal title," and the employees were the equitable and beneficial owners of the
property, the property can be returned to the beneficial owners).

## III.   THE COURT SHOULD MANDATE ADEQUATE PROTECTION

84.    In the event that the Court does not find the automatic stay inapplicable or lift the
stay, it should require the Commonwealth to provide adequate protection for the Pledged Rum
Taxes.  "The concept of adequate protection is derived from the fifth amendment protection of
property interests as enunciated by the Supreme Court."  *LNC Invs., Inc. v. First Fid. Bank N.A.*,
247 B.R. 38, 44 (S.D.N.Y. 2000) (citation omitted).  "The focus of the [adequate protection]
requirement is to protect a secured creditor from diminution in the value of its interest in [its]

particular collateral during the period of use by the debtor." *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).  Adequate protection must be provided "to insure that the creditor receives the value for which [it] bargained prebankruptcy." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citation omitted).  "[A]dequate protection . . . is a flexible concept to be tailored to the individual facts and circumstances of each case." *In re Tellier*, 125 B.R. 348, 349 (Bankr. D. R.I. 1991) (citations omitted).

85.     Ambac has a lien on the Pledged Rum Taxes entitled to protection under the Bankruptcy Code.  *See supra* Section II.A.1.  Such protection can be provided in the form of (i) cash payments equal to the decrease in the value of the secured creditor's interest, (ii) an additional or replacement lien, or (iii) other relief "as will result in the realization by [the secured creditor] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(1)-(3); *see* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 361 into PROMESA); *see also In re Bldrs. Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013).[18]

## CONCLUSION

86.     Congress specifically included protections for revenue bonds in the Bankruptcy Code and PROMESA because of the importance of revenue bonds to municipal finance.  Allowing

---

[18] Additionally, absent adequate protection, Ambac would be entitled to an administrative expense priority claim under 11 U.S.C. § 503(b)(1)(A) for each postpetition diversion of Pledged Rum Taxes.  The Commonwealth has repeatedly insisted that the clawback of revenue bond collateral is "necessary" to fund its ongoing operations—which brings these expenses within the ambit of section 503(b)—and postpetition liabilities incurred by the debtor are accorded administrative expense priority.  *See, e.g., Reading Co. v. Brown*, 391 U.S. 471, 485 (1968) (tort liabilities incurred postpetition give rise to administrative expense priority claims); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (liabilities arising under postpetition contractual arrangements with debtor give rise to administrative expense priority claims).  At a minimum, the Commonwealth's postpetition liability for clawbacks cannot be discharged as part of the Commonwealth's plan of adjustment, which adjusts only prepetition liabilities.  *See* 6 Collier on Bankruptcy ¶ 944.03 (16th ed. 2018) (Section 944 (incorporated into PROMESA) discharges only prepetition debts of a municipal debtor).

the Commonwealth, for the exigencies of this particular case, to disavow those statutory protections and the property rights created by statute will upend the revenue bond market and do serious, long-lasting damage to state and municipal governments' legitimate efforts to borrow and fund capital investments at reasonable rates.  This is particularly true here, where it is the restructuring of *the Commonwealth* that the Oversight Board contends—without any legal support—allows PRIFA's and PRIFA bondholders' property to be taken.

87.     For the foregoing reasons, the Court should enter an order, substantially in the form attached hereto as **<u>Exhibit A</u>**, finding that the U.S. Treasury Action and PRIFA Clawback Action are not subject to the automatic stay that went into effect upon the filing of the Commonwealth's Title III petition.  In the alternative, the Court should lift the automatic stay under Sections 362(d)(1) and (d)(2) so that Ambac may pursue the U.S. Treasury Action and PRIFA Clawback Action.  Further in the alternative, the Court should order that the Commonwealth provide adequate protection for Ambac's lien on the Pledged Rum Taxes.

Dated: May 30, 2019
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ Roberto Cámara-Fuertes
     Roberto Cámara-Fuertes (USDC-PR No. 219002)
     Sonia Colón (USDC-PR No. 213809)
     221 Ponce de León Avenue, 5th Floor
     San Juan, PR 00917
     Telephone: (787) 766-7000
     Facsimile: (787) 766-7001
     Email: rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ Andrew M. Leblanc
     Dennis F. Dunne
     Andrew M. Leblanc
     Atara Miller
     Grant R. Mainland
     (admitted *pro hac vice*)
     55 Hudson Yards
     New York, NY 10001
     Telephone: (212) 530-5000
     Facsimile: (212) 530-5219
     Email: ddunne@milbank.com
          aleblanc@milbank.com
          amiller@milbank.com
          gmainland@milbank.com

**ARENT FOX LLP**

By: /s/ David L. Dubrow
     David L. Dubrow
     Mark A. Angelov
     (admitted *pro hac vice*)
     1301 Avenue of the Americas
     New York, NY 10019
     Telephone: (212) 484-3900
     Facsimile: (212) 484-3990
     Email: david.dubrow@arentfox.com
          mark.angelov@arentfox.com

Randall A. Brater (admitted *pro hac vice*)
1717 K Street, NW
Washington, DC  20006
Telephone:  (202) 857-6000
Facsimile:  (202) 857-6395
Email:  randall.brater@arentfox.com

**<u>Attorneys for Ambac Assurance Corporation</u>**