UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**<br><br>**AS REPRESENTATIVE OF PUERTO RICO ELECTRIC POWER AUTHORITY**<br><br>   **Debtor** | CIVIL NO. 17-04780 (LTS)<br>78<br><br>TITLE III PROMESA |

**RENEWED MOTION FOR RELIEF FROM STAY UNDER 11 USCS § 362(b)(4) & § 362(d)(1)**

**TO THE HONORABLE COURT:**

COMES NOW PV Properties, Inc. (hereinafter "PV Properties"), Petitioner in the matter of *PV Properties, Inc. v. Autoridad de Energía Eléctrica de Puerto Rico*, Case No. CEPR-QR-2017-0001 ("PV Properties Inc. v. AEE"), an administrative proceeding pending before the Energy Commission of Puerto Rico, and through undersigned counsel, very respectfully alleges, states and prays as follows:

1. PV Properties is the Petitioner in Case No. CEPR-QR-2017-0001, an administrative proceeding pending before the Energy Commission of Puerto Rico ("ECPR"), the regulatory agency for the Puerto Rico electricity sector with jurisdiction over PREPA. PREPA is the sole respondent in the aforementioned administrative proceeding.

2. In its Resolution and Order of June 2, 2017 in Case No. CEPR-QR-2017-0001, resolution entered before receipt of the *Notice of Automatic Stay of Proceedings Pursuant to the Commencement of Case Under Title III of PROMESA* of July 12th, 2017 ("Notice of Automatic Stay") in said administrative docket, ECPR summarizes the claims and causes of action: "[i]n its

1

Complaint, the Petitioner alleged that the Authority is not complying with the Puerto Rico energy policy as far as the requirements related to its Renewable Energy Portfolio. […] Likewise, the Petitioner alleged that the Authority is not complying with certain provisions of Act 82-2010 in regard to the acquisition of the RECs to ensure compliance with said act." ECPR then concluded that "It is clear, that under these circumstances, the instant case involves a controversy related to the Authority's alleged non-compliance with Puerto Rico's energy public policy. Therefore, […] the Commission has primary and exclusive jurisdiction to resolve it." [Appendix 1, p. 7, Certified Translation].

3. As of the date of receipt of the Notice of Automatic Stay, July 12th, 2017 Case No. CEPR-QR-2017-0001, was in the following status: as per the above cited Resolution and Order of June 2nd, ECPR had ruled in favor of PV Properties denying a Motion to Dismiss filed by PREPA on jurisdictional grounds and proceeded to order each party to file legal memoranda regarding several specific public policy/legal matters of interest to the ECPR. On June 22, 2017, PV Properties filed its Legal Memorandum as ordered. On that same day, PREPA filed its Response to the Complaint. PREPA also filed a Motion to Reconsider the denial of its Motion to Dismiss, and requested an Extension of Time to file the its Memorandum of Law. ECPR denied the Motion to Reconsider on July 11th and granted PREPA until July 27th to file its Memorandum of Law.

4. PV Properties files this Renewed Motion for Regarding Relief from Automatic Stay seeking automatic stay relief in Case No. CEPR-QR-2017-001, pursuant Paragraph III.Q of the *Second Amended <u>Notice, Case Management and Administrative Procedures</u>*, entered on August 17th, 2017, Docket 1065-1 (17-03283-LTS), for the following two limited proposes:

2

    a.    Obtaining a Public Policy Determination from the Puerto Rico Energy Commission, now the Puerto Rico Energy Bureau that the REC's do apply to distributed energy produced by consumers under net metering program with PREPA.

    b.    To the protect the REC's claimed by Movant from losing 100% of its value, as per article 211 d of Law 82 of 2010, which limits REC's value to two years, which will occur in the year 2019.

    5.    Movant is not requesting at this time the remanding of the economic claim which might accrue to PV Properties. Such economic claim will be litigated in the Federal Court Bankruptcy proceedings.

    6.    Movant PV Properties certifies that pursuant above cited Paragraph III.Q of the *Second Amended Notice, <u>Case Management and Administrative Procedures</u>*, it conferred with Debtor telephonically and thru emails, during the required Lift Stay Notice period prior to filing the instant Motion to for Relief from Stay, and that said period expired without agreement from Debtor.

## DISCUSSION

    7.    In this Court opinion, denying the remand requested by PV Properties, the Court Stated (Docket 1624, page 5).

> "The First Circuit has recognized that a governmental proceeding commenced by a private party can come within the section 362(b)(4) exception under certain circumstances, and applies "two interrelated, fact-dominated inquiries—the so-called 'public policy' and 'pecuniary purpose' tests—for assessing whether a particular governmental proceeding comes within the section 362(b)(4) exception." McMullen, 386 F.3d at 325. "These inquiries contemplate that the bankruptcy court, after assessing the totality of the circumstances, determine whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, or represents a governmental attempt to recover from property

3

of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties." Id. Application of these standards to the PREC Proceeding leads this Court to the conclusion that the section 362(b)(4) exception is not applicable here. Notwithstanding PREC's characterization of the Proceeding as one focused on the clarification of the scope of PREC's own regulatory powers, Movant's claims in the PREC Proceeding clearly and exclusively focus on its interest in a determination that PREPA is obligated to purchase Movant's commodities. Movant has not requested an abstract determination of the circumstances under which PREC can exercise its regulatory powers; to the contrary, the issue of whether PREC can act on Movant's complaint was raised by PREPA by way of a jurisdictional defense. Thus, while PREC's interest in the issues raised by the Proceeding goes to public energy policy and the scope of its own regulatory powers, the PREC Proceeding is primarily designed to impose financial obligations on PREPA, the debtor, in favor of the Movant, which is a private party. Furthermore, the public policy issue identified in PREC's Resolution and Order—clarification of the scope of its general authority to promote compliance with Puerto Rico's RPS—is not an issue implicating "ongoing debtor conduct which would seriously threaten the public safety and welfare." Cf. McMullen, 386 F.3d at 325. The PREC Proceeding, viewed in light of the totality of the circumstances, thus fails to meet both the "public policy" and "pecuniary interest" prongs of the McMullen test and is not exempt from the automatic stay under section 362(b)(4). Relief from the Automatic Stay for "Cause"

It added that the Government Unit's police or regulating power exception did not apply

because: "pages 6-7

"Movant has not demonstrated that the Sonnax criteria weigh in its favor with respect to the continuation of the PREC Proceeding. Continuation of the PREC Proceeding, which is in its initial stages, would not necessarily result in an expeditious resolution of Movant's claims. Indeed, even Movant concedes that the PREC Proceeding cannot move forward to a determination of any obligation on PREPA's part to purchase Movant's RECs at a price demanded prior to Hurricane Maria; thus, the requested relief from the automatic stay would not result in a complete or materially significant partial resolution of Movant's claims against PREPA. For the same reasons, relief from stay to continue the PREC Proceeding would not serve the interests of judicial economy or the economical resolution of Movant's dispute with PREPA. Furthermore, the continuation of the PREC Proceeding would prejudice PREPA at a time when its resources are particularly constrained by requiring the expenditure of PREPA resources and diverting attention from the reconstruction of PREPA's electrical grid, which was destroyed by Hurricane Maria in September 2017. The hardship of the demands on PREPA's resources at a time when it must focus on the restoration of power to the vast majority of Puerto Rico's residents and businesses and formulate appropriate

4

energy policies going forward far outweighs the burden on Movant that may result from the deprivation of a ruling that might give it a future business advantage. Thus, Movant has not demonstrated that the harm from delaying the PREC Proceeding outweighs the burden on PREPA that would arise from recommencing the Proceeding. Accordingly, the Court concludes that Movant has neither demonstrated that the section 362(b)(4) exception to the automatic stay applies, nor shown that cause exists to lift the automatic stay and allow the PREC Proceeding to move forward. Movant's motion for relief from the automatic stay is denied."

The Court can now re- visit this issue for PV is not requesting any determination from the Government entity, PREB, for payment by PREPA, it is only requesting a public policy determination and interpretation of Law 82 of 2010 concerning applicability to consumer –not industrial- renewable energy production.

8. More important: Law 82 of 2010, which is the basis for the Policy interpretation of the PREB and the basis form Movant request specifically states at Article 2.11 (d):

"(d) RECs Temporary Retention – Subject to the provisions of this subsection, a retail electricity supplier shall temporarily retain for future use any RECs held. Any retail electricity supplier shall start retaining RECs temporarily on calendar year 2013. Once temporarily retained, such REC may not be sold or otherwise transferred. <u>Any REC temporarily retained may be used to evidence compliance with the Renewable Portfolio Standards applicable to the two (2) following calendar years, counted as of the date when the REC was retained</u>. Any REC temporarily retained and subsequently filed during the following first calendar year shall constitute one (1) megawatt-hour (MWh) of electric power produced by a sustainable renewable energy or alternative renewable energy source operator. Any REC filed during the second calendar year shall constitute one-half (0.5) megawatt-hour (MWh) of electric power produced by a sustainable renewable energy or alternative 30 renewable energy source operator. For example, a retail electricity supplier may file a REC issued on calendar year 2015 (denominated "2015-REC") to evidence compliance with the Renewable Portfolio Standard applicable to that calendar year. If any supplier holds 2015-RECs in excess of the amount required to comply with the Renewable Portfolio Standard applicable to the 2015 calendar year, such supplier may temporarily retain such 2015-RECs in excess, and filed them to evidence compliance with the Renewable Portfolio Standard applicable to 2016 calendar year, in which case, each 2015-REC retained shall constitute, for purposes of compliance with 2016 calendar year, one (1) megawatt-hour (MWh) of electricity generated by a sustainable renewable energy or alternative renewable energy source operator. If such supplier holds RECs in excess of the amount

5

required to comply with the Renewable Portfolio Standard applicable to the 2016 calendar year, such supplier may temporarily retain such 2015-RECs in excess, and filed them to evidence compliance with the Renewable Portfolio Standard applicable to 2017 calendar year, in which case, each 2015-REC retained by the supplier shall constitute, for purposes of compliance with 2017 calendar year, one-half (0.5) megawatt-hour (MWh) of electricity produced by a sustainable renewable energy or alternative renewable energy source operator."

As the Law clearly states, the REC's claimed by PV Properties in the 2017 filling in the then PR Energy Commission, now Puerto Rico Energy Bureau, will disappear in the year 2019- The claim will be lost completely.

9. As the First Circuit Court of Appeals, decided in Peaje Investments LLC v. Garcia Padilla 845 F. 3d 505 (2017):

> "Peaje is the beneficial owner of certain bonds issued by the Puerto Rico Highways and Transportation Authority ("PRHTA"). The bonds are secured by a lien on toll revenues, among other things. In July 2016, Peaje initiated the instant action in district court by filing a motion to lift the PROMESA stay so that it could challenge the diversion of PRHTA toll revenues pledged as collateral for the bonds. Peaje alleged that, acting pursuant to the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act ("Moratorium Act"), [**4] see 2016 P.R. Laws Act 21, the Puerto Rico government was diverting the toll revenues to other uses, thereby diminishing the value of Peaje's collateral."
> . . .
> After consolidating the actions, the district court scheduled a November 3 hearing on the motions to lift the PROMESA stay for cause. On the eve of the hearing, however, [**5] the court issued an order denying the lift-stay motions. In seeking to define the "cause" standard, the court looked to the Bankruptcy Code's automatic stay provision. The court held that "lack of adequate protection" for creditors constitutes cause for lifting the PROMESA stay, just as it does under the Bankruptcy Code. Turning to the Movants' specific claims, the court held that neither Peaje nor the Altair Movants lacked adequate protection. Because the toll revenues are "constantly replenished," Peaje continued "to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the PRHTA bonds." Similarly, the employer contributions in which the Altair Movants claimed an interest "are a perpetual revenue stream whose value is not decreased by the Commonwealth's acts of temporary suspension." The Movants timely appealed.
> . . .
> Turning to the merits of the lift-stay motions, the parties primarily dispute two issues concerning whether actions by Puerto Rico that impair or remove the

collateral securing the pertinent bonds is cause for lifting the stay: (1) whether such an impairment or removal satisfies PROMESA's "cause" standard if it leaves the creditor's interest in having the debt repaid inadequately protected; and (2) if so, did the district court commit reversible error by failing to conduct a hearing on whether the Movants here were inadequately protected. On the record in this case, we answer the first question in the affirmative. On the second question, we issue a split decision. Because Peaje failed even to make a legally sufficient claim that it lacked adequate protection, we conclude that the district court did not [**7] commit reversible error in denying its lift-stay motion without an evidentiary hearing. The Altair Movants, on the other hand, were entitled to such a hearing.

On the threshold issue of whether lack of adequate protection constitutes cause to lift the PROMESA stay, Appellees García-Padilla, Zaragoza-Gómez, Cruz-Batista, Villar-Prados, and ERS (together, the "Appellees") point out that the relevant section of the Bankruptcy Code, unlike PROMESA, expressly defines "cause" to include lack of adequate protection. Compare 11 U.S.C. § 362(d)(1), with 48 U.S.C. § 2194(e)(2). They contend that PROMESA's omission on this point is meaningful and reflects Congress's intent that "cause" not be defined to include actions impairing the collateral in a manner that leaves the interest in having the debt repaid inadequately protected.

But the Appellees' contention runs headlong into the "cardinal principle" of constitutional avoidance. Crowell v. Benson, 285 U.S. 22, 62, 52 S. Ct. 285, 76 L. Ed. 598 (1932). HN3 Under this canon, when confronted with a statute of questionable constitutional validity, we must "first ascertain whether a construction . . . is fairly possible by which the [constitutional] question may be avoided." Id. If so, we adopt that construction. In the bankruptcy context, Congress's explicit designation [**8] of lack of adequate protection as cause to lift a stay was based, at least in part, on constitutional concerns. See H.R. Rep. No. 95-595, at 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6295 (explaining that the concept of adequate protection "is derived from the [F]ifth [A]mendment protection of property interests"). Indeed, prior to the enactment of the current bankruptcy stay provision, the Supreme Court had recognized that creditors are constitutionally entitled to protection "to the extent of the value of the[ir] property." Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278, 61 S. Ct. 196, 85 L. Ed. 184 (1940); see also United States v. Sec. Indus. Bank, 459 U.S. 70, 75-78, 103 S. Ct. 407, 74 L. Ed. 2d 235 (1982) (applying principle of constitutional avoidance to provision of Bankruptcy Code where a contrary reading "would result in a complete destruction of the property right of the secured party" in its collateral). The PROMESA stay implicates these same constitutional concerns. Under the Appellees' reading of the statute, the Commonwealth could expend every penny of the [*512] Movants' collateral, leaving the debt entirely unsecured. Because we doubt the constitutionality of such a result, we hold that lack of adequate protection for creditors constitutes cause to lift the PROMESA stay.

HN4 In the bankruptcy context, one "common form" of adequate protection is "the existence [**9] of an equity cushion." 3 Collier on Bankruptcy ¶ 362.07[3][d][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016)

[hereinafter Collier]; see also Baybank-Middlesex v. Ralar Distribs., Inc., 69 F.3d 1200, 1203 (1st Cir. 1995). Such an equity cushion exists "if the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim." Collier ¶ 362.07[3][d][i]. The widespread acceptance of an equity cushion as a form of adequate protection makes eminent sense. Indeed, the "interest" for which the bankruptcy stay statute requires protection is "the right of a secured creditor to have the security applied in payment of the debt." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) (emphasis added). Therefore, an oversecured creditor cannot "demand to keep its collateral rather than be paid in full." In re Pac. Lumber Co., 584 F.3d 229, 247 (5th Cir. 2009).

Here, in denying the lift-stay motions, the district court, while not using the precise term, relied on the existence of an equity cushion. It cited future toll revenues and employer contributions, which it concluded would eventually flow to the fiscal agents in sufficient quantity to repay the bonds, to support its finding of adequate protection. On appeal, the Movants contend that the district court erred in finding these future funds sufficient to ensure repayment [**10] of the bonds without first holding a hearing.

HN5 PROMESA appears to contemplate that rulings on lift-stay motions will issue only "after notice and a hearing." 48 U.S.C. § 2194(e)(2). And we agree that it certainly could have simplified matters had the district court conducted a hearing in these cases. But, under the bankruptcy stay statute, we have held that this same language does not require an actual hearing in every case. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 814 F.2d 844, 847 (1st Cir. 1987) (affirming decision vacating stay without a hearing where "the court had the benefit of the papers filed by both parties" and the debtor "identified no . . . viable reasons for maintaining the stay"); see also In re Sullivan Ford Sales, 2 B.R. 350, 354 (Bankr. D. Me. 1980) ("There was complete awareness on the part of the principal congressional architect of the Code that 'after notice and a hearing' did not contemplate a hearing in every instance."). A hearing may be unnecessary where, for example, the material facts are not disputed. See In re Marron, 485 B.R. 485, 491 (D. Mass. 2012).

. . .

While the complexity of the Bankruptcy Code and the sui generis nature of PROMESA counsel caution in too readily inferring that any silence in PROMESA on a matter addressed in the Code is a legislative rejection of the Code's approach on that matter, such differences nevertheless do raise the possibility that such was precisely Congress's intent. See Helmer v. Goodyear Tire & Rubber Co., 828 F.3d 1195, 1202 (10th Cir. 2016) (explaining that where "a legislature models an act on another statute but does not include a specific provision in the original, a strong presumption exists that [**12] the legislature intended to omit that provision" (citation omitted)). Enhancing that possibility here is the fact that, prior to the enactment of § 362, bankruptcy courts placed the burden on creditors to show that they would be harmed by continuation of the stay. See, e.g., In re Planned Sys., Inc., 78 B.R. 852, 858 (Bankr. S.D. Ohio 1987); Anchorage Boat Sales, 4 B.R. at

8

641 n.6. Where the alleged harm was a decrease in the value of the creditor's collateral, the required showing included evidence "that the value of the collateral [was] not substantially in excess of the amount of the debt." In re Wynn Homes, Inc., 14 B.R. 520, 523 (Bankr. D. Mass. 1981). HN7 In light of Congress's decision not to transplant the Bankruptcy Code's express alteration of the pre-Code burden regime into PROMESA, we hold that PROMESA, like the pre-Code regime, places the burden on creditors to establish cause, including lack of adequate protection.

Indeed, there are sound policy reasons supporting Congress's choice to allocate the burden of proof differently under PROMESA and the Bankruptcy Code. The PROMESA stay, while similar in operation to its bankruptcy counterpart, was designed to address a truly unique situation, namely the "immediate . . . and imminent" fiscal crisis facing Puerto Rico. 48 U.S.C. § 2194(n)(1). Congress found that a stay of litigation was necessary to allow the Commonwealth [**13] "a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." Id. § 2194(n)(2). Moreover, the PROMESA stay, which lasts a maximum of about ten months, is less burdensome to creditors than a bankruptcy stay, which may persist for the entirety of the bankruptcy proceeding. 4 In light of the temporary nature of the PROMESA stay, as well as Congress's express intent to minimize "creditor lawsuits," it makes sense to require creditors to shoulder the burden of demonstrating that the impairment of the collateral will likely harm their protected interest in repayment.

 [*514] Thus, in order to establish an entitlement to relief, the Movants were required to prove, respectively, that future toll revenues and employer contributions more likely than not failed to provide a sufficient equity cushion to protect their interests in the wake of the Commonwealth's ongoing diversion of collateral. It follows that, absent any allegation that these future funds would be insufficient, the Movants lacked a viable claim to relief, and the district court was not required to hold a hearing to consider a claim [**14] that was facially insufficient. See Mitsubishi, 814 F.2d at 847.

Peaje's claim failed to clear this hurdle. In its motion, Peaje alleged that the applicable bond resolution requires the PRHTA to deposit monthly toll revenues with a fiscal agent. The agent, in turn, credits the funds to one of several accounts, which must be maintained at certain levels. According to Peaje, the Commonwealth has stopped making the required deposits, resulting in depletion of the accounts. In opposing Peaje's lift-stay motion, the Commonwealth responded that "[a]ny particular toll revenue not allocated to the . . . bonds today could simply be made up for by toll revenues collected tomorrow." Peaje sought to rebut this proposition by asserting that the Commonwealth failed to "argue, let alone demonstrate, that any future collateral will be sufficient to cover the expenses coming due" in the future "and to make up all obligations falling into arrears during the stay period." This statement reflects a misunderstanding of the adequate protection requirement. While Peaje may have had a contractual right to monthly deposits with the fiscal agent and the maintenance of the accounts at particular levels, its protected interest

for purposes of [**15] the lift-stay motion was limited to its interest in repayment of the debt owed. See Timbers, 484 U.S. at 370; Pac. Lumber, 584 F.3d at 247. Nowhere in its district court filings did Peaje claim that the current diversion of toll revenues would leave that interest inadequately protected. In light of Peaje's admitted security interest in future toll revenues, this omission was fatal."

10. It is obvious that the determination requested originally from the now PREB, if not obtained at least in the year 2019 will eliminate the value of the claimed REC's, not only "diminish" in value but simply, its value would be zero.

11. It is a clear case of lack of adequate protection. The least this Court can do is to grant a hearing to determinate cause for lifting the stay.

12. More important, on April 11, 2019, Governor Ricardo Rosello signed Law 17 of 2019, the new Law on Energy Public Policy of Puerto Rico.

The Law specifically state:

"(f) To establish demand response, demand-side management, and energy efficiency programs and strategies that take into account short-, medium-, and long-term goals and incentivize customers to become more energy efficient, with a focus that results in a reduction in costs and energy consumption, as well as greater stability and reliability;
. . .
8) Distributed Energy, Energy Storage, and Technology Integration. (a) To ensure the integration of renewable energy into the Electrical System in a safe and reliable manner and at a reasonable cost, as well as identify the appropriate technologies and sites, such as closed sanitary landfills and previously contaminated lands, that shall make such integration feasible in accordance with the best interests of Puerto Rico; and ensure the improvements necessary to achieve the metrics of the Renewable Portfolio Standard pursuant to Act No. 82-2010 are made;
. . .
"Section 1.- Mandate. The Electric Power Authority, its successor, or the transmission and distribution network Contractor are hereby directed and authorized to establish and maintain a net metering program allowing the interconnection to the electric power grid in order to allow electricity feedback for customers who have installed a solar electric equipment, windmill, or any other renewable energy source capable of producing electric power using a meter that registers the flow of energy in two directions, in accordance with the applicable provisions of the federal legislation and regulations, such as the Energy Policy Act,

10

Pub. L. 102-486, Oct. 24, 1992, 106 Stat. 2776, as amended, and the Standards for Electric Utilities, Pub. L. 95-617, Title I, Sec. 111, Nov. 9, 1978, 92 Stat. 3121, as amended, among others, and the regulations to be adopted thereunder…

. . .

8) 'Renewable Energy Certificate or REC'.- means a personal property that constitutes a tradeable and negotiable asset or commodity that may be purchased, sold, assigned, and transferred between persons for any lawful purpose, which is integrally and inseparably equal to one (1) megawatt-hour (mwh) of electricity generated from a sustainable renewable energy source or alternative renewable energy source in Puerto Rico (issued and registered pursuant to this Act) and, in turn, represents all environmental and social attributes, as defined in this Act.

. . .

14) 'Distributed Renewable Energy'.- Means sustainable renewable energy or alternative renewable energy supplying electric power to an electric power service company or generated for self-consumption or for sale to third-parties. Community solar projects are considered distributed renewable energy at the residential level and their maximum capacity shall be determined by the Puerto Rico Energy Bureau with the advice of the Electric Power Authority or the transmission and distribution network Contractor, as applicable.

. . .

29) 'Prosumer'.- Shall mean any users or customers of the Electrical System who have the capacity to generate electric power for self-consumption that, in turn, have the capacity to supply any energy surplus through the electric power grid.

. . .

(e) For purposes of attesting compliance with this Section, the amount of distributed renewable energy generated by prosumers shall be measured and there shall be access to the Registry of Renewable Energy Certificates in accordance with the provisions of this Act, the Puerto Rico Energy Public Policy Act, and the regulations adopted by the Energy Bureau for such purposes.

. . .

"Section 2.10.- Renewable Portfolio Standard Compliance. (a) Any retail electricity supplier shall comply with the Renewable Portfolio Standard herein created, upon filing with the Bureau any of the following or combination thereof: (i) A REC issued and registered in the renewables registry in favor of the retail electricity supplier for each megawatt-hour (MWh) of electric power generated from sustainable renewable energy sources or alternative renewable energy sources in Puerto Rico, and/or (ii) In the case of a retail electricity supplier, that quantifies the electricity generated by or purchased from distributed renewable energy producers located in Puerto Rico through a net metering program, and whenever it is not feasible to obtain RECs that represent such electricity, a report evidencing that the retail electricity supplier has complied with the Renewable Portfolio Standard through the purchase of renewable energy together with all environmental and social attributes related to the production of such energy, pursuant to subsection (e) of this Section."

It is obvious that under the new public Law, Law 17 of 2019 the substantive issue of the applicability of the REC's to distributed net metered individual consumers, has been decided in favor of PV's position, which makes PREPA's position invalid. It is clear by law that REC's apply to distributed –net metered consumers.

13. The In Re: Sonmax Industries, Inc. 907 F2d 1280, 1286, (2nd Cir. 1990), balance that, now obviously goes in few of lifting the stay to avoid the possibility of the Rec's asset value disappearing.

These factors include:

(1) whether the relief will result in a partial or complete resolution of the issues; (2) the lack of any connection with or interference with the bankruptcy case; (3) whether the foreign proceeding involves the debtor as fiduciary; (4) whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases; (5) whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) whether the action essentially involves third parties; (7) whether litigation in another forum would prejudice the interest of other creditors and/or other interested parties; (8) whether the judgment claim arising from the foreign action is subject to equitable subordination under section 510(c); (9) whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor; (10) the interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) whether the foreign proceedings have progressed to the point where the parties are prepared for trial; (12) the impact of the stay on the parties and (13) the balance of hurt. In re Sonnax, supra; In re Guzman, 513 B.R. at 208-09 (quoting C&A, S.E. v. P.R Solid Waste Magmt., 369 B.R. 87, 95-96 (D.P.R. 2007). "The party moving for the automatic stay to be lifted need not prove a plurality of these factors[,] . . . [and] Courts will generally rely in only a few factors . . . to determine that sufficient cause exist[s] to lift the stay." Id. at 208. "Relief from stay hearings are merely summary proceedings to ascertain whether the party seeking relief has a colorable claim to estate property" rather than determinations of "the merits of the underlying substantive claims, defenses or counterclaims." In re Bailey, 574 B.R. 15, 19 (Bankr. D. Me. 2017).

**WHEREFORE**, PV Properties respectfully requests that the Honorable Court grant the current Motion, lift the stay as requested and/or grant a hearing to discuss the lifting of the current stay**.**

**I CERTIFY** that today this document was filed electronically through the **CM/ECF** system which will send notification to the parties to their registered email addresses.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 31 day of May, 2019.

S/ **FERNANDO** E. **AGRAIT-BENTANCOURT**
Fernando E. Agrait - Betancourt

**USDC-PR 127212**
Fernando Agrait Law Office
Centro de Seguros BLDG Suite 414

701 Ponce de León Ave.
San Juan, P.R. 00907
Tel. (787)725-3390/3391
Fax. (787)724-0353

E-Mail: agraitfe@agraitlawpr.com