IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>                              as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                              Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**REPLY OF ASSURED GUARANTY CORP. AND ASSURED
GUARANTY MUNICIPAL CORP. IN SUPPORT OF MOTION TO
COMPEL COMPLIANCE BY THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019
AND TO AMEND THE EIGHTH AMENDED CASE MANAGEMENT PROCEDURES**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

REPLY ...................................................................................................................................1

    A.    The UCC's Rule 2019 Statements Do Not Disclose the Nature and Amount of Each Member's Interests and Claims ........................................2

    B.    Clarifying Changes to the 2019 Order Are Necessary ................................8

CONCLUSION ....................................................................................................................13

## TABLE OF AUTHORITIES

**Page(s)**

*In re Caesars Entertainment Operating Company,*
  Case No. 15-01145, Dkt. No. 6365 (Bankr. N.D. Ill. Jan. 11, 2017) ........................................10

*In re Northwest Airlines Corp.,*
  363 B.R. 701 (Bankr. S.D.N.Y. 2007) ........................................................................................1

*In re Washington Mutual Inc.,*
  419 B.R. 271 (Bankr. D. Del. 2009) ...........................................................................................1

**STATUTES:**

Fed. R. Bankr. P.:

  2019(c)(2) ...............................................................................................................................1, 2
  2019(d) ..................................................................................................................................1, 10

**OTHER AUTHORITIES:**

9 *Collier on Bankruptcy* ¶ 2019.01 ...................................................................................................1

PR Fiscal Agency & Fin. Advisory Auth., *P.R. Dept. of Treas., Treas. Single Acct.
  ("TSA") FY 2019 Cash Flows As of May 17, 2019*, http://aafaf.pr.gov/assets/fy19-
  weeklytsacashflow-05-17-19.pdf ..............................................................................................12

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured") submit this reply (the "Reply") in further support of their *Motion to Compel Compliance by the Official Committee of Unsecured Creditors with Federal Rule of Bankruptcy Procedure 2019 and to Amend the Eighth Amended Case Management Procedures* (Dkt. No. 6963) (the "Motion") and in response to the objection filed by the UCC (Dkt. No. 7098) (the "Objection" or "Obj.").[2]

**REPLY**

The UCC's decision to fight rather than provide the minimal transparency required by Rule 2019 is a red flag. Rule 2019 requires "every entity or committee representing more than one creditor" to file a verified statement disclosing, among other things, the names and addresses of the creditors, and the nature and amounts of their claims. Fed. R. Bankr. P. 2019(c)(2). Rule 2019 is "designed to foster the goal of reorganization plans that deal fairly with creditors and are arrived at openly." 9 *Collier on Bankruptcy* ¶ 2019.01; *In re Washington Mutual Inc.*, 419 B.R. 271, 278 (Bankr. D. Del. 2009). Further, all creditor groups are under an ongoing duty to update their Rule 2019 disclosures upon any material change to a group's membership or to any of its members' economic interests. *See* Fed. R. Bankr. P. 2019(d); Dkt. No. 754 at ¶ I.3; *see also* Dkt. No. 7115-1 ¶ IV.C.

Rule 2019 "is long standing and there is no basis for failure to apply it as written." *In re Northwest Airlines*, 363 B.R. 701, 704 (Bankr. S.D.N.Y. 2007). Moreover, "there is no shortage of cases" enforcing Rule 2019. *See id.* (collecting cases). Indeed, as the UCC itself has

---

[2] Capitalized terms used herein, but not otherwise defined shall have the meanings given to them in the Motion. "Dkt. No." refers to filings in No. 17 BK 3283-LTS, unless otherwise noted. Following the filing of the Motion, the Court entered a Ninth Amended Case Management Procedures. *See* Dkt. No. 7115. References herein to the Case Management Procedures shall also include the Ninth Amended Case Management Procedures.

recognized, enforcement of Rule 2019 here is essential to maintain the integrity of the Rule, and to facilitate good-faith discussions in the context of litigation, settlements, and in these Title III Cases broadly. *See* Dkt. No. 850 ¶ 1. The UCC's Objection not only fails to refute that its Rule 2019 Statements are defective, it actually confirms the statements' shortcomings.

**A.     The UCC's Rule 2019 Statements Do Not Disclose the Nature and Amount of Each Member's Interests and Claims**

Rule 2019(c) requires that each member of a committee disclose the "nature and amount" of its claims against the debtor. Fed. R. Bankr. P. 2019(c)(2). The UCC's Rule 2019 Statements do not contain such information, and therefore fail to comply with Rule 2019's most basic requirements.

The UCC does not meaningfully dispute that it failed to disclose the amount of each member's claims, as required under Rule 2019(c)(2). Rather, the UCC suggests that the Unions' claims are so unique that the Unions do not need to comply with the requirements of Rule 2019.[3] This misses the point. The Unions are members of the UCC, and by virtue of that membership, they and other members of the UCC have an ongoing obligation to disclose the nature and amount of their claims. *See* Fed. R. Bankr. P. 2019(c)(2) (requiring disclosure of *each* committee member's disclosable economic interests).

The UCC intimates that SEIU's claims are entirely unliquidated and therefore claim amounts cannot be stated. Objection ¶¶ 19-20. But Rule 2019 requires disclosure of the amounts that are contingent and unliquidated—there is nothing in Rule 2019 that provides otherwise. Moreover, the UCC's current position is at odds with prior filings. The UCC's Third

---

[3] The lone case cited in the Objection to support the UCC's argument that Rule 2019 is inapplicable to certain of its members was decided decades before Rule 2019 was amended, and was the minority view before the Rule was amended. Motion n.10. Rule 2019, as amended, is the controlling authority here and contains no relevant exceptions to compliance. Moreover, the Unions' independent obligations to file their own Rule 2019 statements are not the subject of the Motion.

-2-

Supplemental Statement discloses that SEIU holds "prepetition unsecured contingent *and non-contingent claims*, *liquidated* and unliquidated claims" against the Commonwealth and certain of its instrumentalities on account of pay, benefits, or grievance claims. Dkt. No. 6874, Ex. A at 2 (emphasis added). Similarly, SEIU's proof of claim states that a portion of its asserted claim has already been liquidated and determined prior to the petition date. *See* Attachment to SEIU Proof of Claim, Claim No. 21351 ¶ 2 ("The resolved Grievances…were resolved *and liquidated* by settlement or arbitration award as of February 28, 2018; and remain unpaid.").[4] Thus, both the UCC and SEIU have previously admitted that at least a portion of SEIU's alleged claim is liquidated and non-contingent. Amounts for those claims should therefore be readily ascertainable and should be disclosed.

The UCC complains that it is impractical to include amounts for contingent and unliquidated claims belonging to the Unions. Objection ¶ 22. Yet, as noted in the Motion (and undisputed by the UCC), there are many examples of other official committees since Rule 2019 was amended in 2011 that have listed both (i) non-contingent and liquidated claims *and* (ii) estimated amounts for contingent and non-liquidated claims. *See* Motion at 14-15. They did so because it is required under the Rule. The UCC cites no authority for its "impracticability" defense. There is no such defense.

The UCC also contends that it complied with Rule 2019 because it listed the liabilities of certain pension funds. Objection ¶¶ 19, 21. But the language that the UCC points to merely states the *total liability* of the entire retirement fund, not the actual or even estimated amount of SEIU and AFT's independent claims against the Title III Debtors. At a minimum, an

---

[4] SEIU admits it did not attach all of the relevant documents evidencing that its claims are liquidated. *See* Attachment to SEIU Proof of Claim, Claim No. 21351 ¶ 4 (only attaching documents "to the extent available").

-3-

estimated amount of the Unions' actual pension claims is required to be disclosed under Rule 2019(c). Further, the language that the UCC relies upon merely states that AFT and SEIU's members may make a claim upon a *"portion"* of the total unfunded liability. None of the 2019 Statements or even the proofs of claim specify what that portion is. And, at least as importantly, there is another official committee in these cases charged with representation of pension claims. The question at hand here is the representation of general unsecured creditors. Persons or entities with a focus on pension liabilities are arguably in conflict with general unsecured creditors. That is why a separate retiree committee was created.

In addition to failing to disclose specific claim amounts, the Rule 2019 Statements also fail to adequately describe the "nature" of each member's disclosable economic interests in at least two respects. The Third Supplemental Statement provides that SEIU's alleged claims are held against the "Commonwealth *and/or its instrumentalities*." Dkt. No. 6874. Ex. A (emphasis added). But the Rule 2019 Statements do not specify *which* "instrumentalities" SEIU holds claims against. This is especially important for parties in interest to know, because, for example, SEIU may have an interest in the Commonwealth assuming those non-debtor liabilities. In response, the UCC states only that one of those instrumentalities is ERS. Objection ¶ 21. But that misses the point: Some of SEIU's asserted interests may be against entities that are not Title III Debtors, some of which non-Debtor entities may have claims adverse to the Commonwealth. Indeed, the UCC has recognized that the claims of such non-Debtor entities may be "fundamentally at odds with the economic interests of the Commonwealth and its other creditors." Adv. Proc. No. 18-149-LTS, Dkt. No. 43 ¶ 1. It is impossible for parties in interest to determine any of this because the 2019 Statements do not specify which instrumentalities SEIU holds claims against.

Moreover, it is important for the UCC to specify the instrumentalities that its members hold claims against because only claims asserted against entities that are part of the Commonwealth government (*i.e.*, the "Central Government") qualify as claims against the Commonwealth itself. Indeed, in the context of the Bar Date Order, AAFAF filed an informative motion, which specified the entities that are part of the Commonwealth. *See generally* Dkt. No. 2828. As AAFAF and its advisors noted, "all entities receiving general fund appropriations were not automatically considered part of the Commonwealth." Dkt. No. 2828-1 ¶¶ 3, 4. Thus, to clarify what would potentially qualify as a claim against the Commonwealth, AAFAF provided a list of the agencies that it deemed to be part of the Central Government (and thus part of the Commonwealth). This provided guidance to creditors as to whether they would need to file proofs of claim on account of claims against entities that are not Title III Debtors, including certain agencies and public corporations.

A review of certain UCC members' asserted claims and their websites reveals that portions of their claims may not be against these Central Government entities, which is exactly why specification as to who the claims are held against is justified. For example, one local chapter of SEIU purports to represent members who may assert claims against a number of public corporations and municipalities that are not Title III Debtors.[5] A number of these public corporations were not included in the list of Central Government entities. *See* Dkt. No. 2828. And yet, because the 2019 Statements do not specify which instrumentalities are being included in SEIU's alleged claims, it is impossible to assess whether or not these non-Central Government entities are being included in the Rule 2019 Statements.

---

[5] https://ugtpr.org/sobre-nosotros/grupos-representados/ (disclosing that while certain claims may be against the Central Government, other claims are against public corporations).

Similarly, the 2019 Statements provide that the claims of another member of the UCC, Baxter, are against the Commonwealth on account of certain goods that it delivers to certain hospitals. However, a portion of the claims asserted within Baxter's proof of claim may not be against Title III Debtors or even entities that AAFAF has stated are part of the Central Government.[6] *See* Proof of Claim of Baxter Sales and Distribution Puerto Rico Corp. Claim No. 111825, Ex. A at 1 (asserting claims against the Corporación Fondo del Seguro del Estado,[7] Centro Cardiovascular, and certain hospitals that do not appear to be owned by the Department of Health). The entities that were not included on AAFAF's list of Central Government entities were determined by AAFAF and its advisors to be entities that are legally independent from the Commonwealth. *See* Dkt. No. 2828 Ex. A ¶ 3, 4.

If those entities are not part of the Central Government, then the 2019 Statements do not accurately reflect claim amounts – if any – against the Commonwealth. The Statements must disclose what claims of the UCC's members are actually outstanding against the Commonwealth itself, and any claims against entities independent from the Commonwealth should be excluded. Disclosure related to Baxter illustrates why disclosure of who the claims are against is important: Baxter's claims have decreased by 32% between the Bar Date and the Third Supplemental Statement. It is unclear from the Rule 2019 Statements what portion of Baxter's claim decreased—the portion against the Central Government or the non-Central Government entities. If the portion against the Commonwealth decreased, the question becomes

---

[6] Baxter states in a footnote in its proof of claim that it did not include the entities that are not part of the Central Government, but a number of entities listed in its proof of claim are not included in the list of Central Government entities. *Compare* Dkt. No. 2828 *with* Proof of Claim of Baxter Sales and Distribution Puerto Rico Corp. Claim No. 111825, Addendum at n.1.

[7] Corporación Fondo del Seguro del Estado is the State Insurance Fund. It is a public corporation established pursuant to 11 L.P.R.A. § 1. Unsurprisingly, because this entity is a public corporation, it is not listed in the list of Central Government entities. Dkt. No. 2828, Exhibit B.

what amounts (if any) remain outstanding against the Commonwealth. Of course, if there are no claims against the Central Government entities left, that will call into question whether Baxter is eligible to serve on the UCC.[8] However, as a result of the deficient Rule 2019 Statements, all of these issues remain unanswered.

Moreover, as set forth in the Motion, there have been instances in which certain claims actually *increased* during the Title III cases (at least according to the 2019 Statements). For example, Genesis's putative claims against PREPA increased by approximately $50,000 between the first supplemental verified statement and the second supplemental verified statement. *Compare* Dkt No. 3036 *with* Dkt. No. 4028. The UCC provided no explanation for this increase. The increase raises a question as to whether the claims held by the UCC's members arose pre-petition or post-petition. Members that hold post-petition claims may assert administrative expense priority status under section 503 of the Bankruptcy Code, which would put such members in an adverse position with respect to other unsecured creditors, disabling them from serving as fiduciaries on the UCC—just as secured creditors cannot serve as fiduciaries.[9]

---

[8] The UCC's reliance on creditor lists in its Objection is puzzling. Genesis Security—the only alleged HTA member on the UCC—does not appear on either the HTA creditor list or on the list of largest unsecured creditors that are not insiders of HTA filed with HTA's petition. Case No. 17-03567-LTS Dkt. No. 1; Dkt. No. 2163-3, p. 2 (not appearing on HTA schedule of creditors). By contrast, Genesis's claims against the Commonwealth do appear on the Commonwealth creditor list. Dkt. No. 1215-6, p. 2035.

[9] Likewise, the UCC's contention that it is explicitly clear that members' claims are exclusively pre-petition claims and that five of seven of its members have remained unpaid cannot be substantiated given the shortcomings of the 2019 Statements. The UCC has included no amounts for two of its members. And contrary to the UCC's suggestions that pension and other employee claims have not been paid (Obj. ¶¶ 15, 18, 20, 22), the monthly Treasury Single Account reports show that the largest outflows are to pay vendor claims, pensions, and payroll. *See, e.g.*, Treasury Single Account Cash Flows, May 17, 2019, *available at* http://aafaf.pr.gov/assets/fy19-weeklytsacashflow-05-17-19.pdf. Indeed, even FOMB's counsel has admitted before this Court that such claims are getting paid. *See* Sept. 13, 2018 Hr'g Tr. at 88:8-13 ( "And the Commonwealth has been paying vendor claims, pre-petition vendor claims throughout the case. The Commonwealth has been paying the retirees. Strange, we haven't heard a peep from either committee about all these stay violations going on all the time that benefit their constituency.").

-7-

Disclosure of the information required under Rule 2019(c) is imperative at this stage of the case. Beginning in April 2019, FOMB and the UCC commenced hundreds of adversary proceedings, which seek disallowance of certain vendors' contractual claims, avoidance of liens, clawback of certain payments, and declarations that PROMESA preempts Commonwealth laws assigning certain revenues to non-Commonwealth Title III Debtors. The UCC has sought a stay of many of the lawsuits that it filed. It claims that these stays are necessary to "explore settlement discussions" with defendants. Dkt No. 7060 ¶ 2, 4. Of course, in order for the defendants to meaningfully participate in those discussions, they need to understand who their counterparties are and their motivations. *See* Dkt. No. 850 ¶ 1. That is not possible without the disclosures sought here and resisted by the UCC.

B.    **Clarifying Changes to the 2019 Order Are Necessary**

Rule 2019(d) and the 2019 Order require timely disclosure of material changes to *any* fact from the prior 2019 statement. The 2019 Order expressly provides that supplemental statements must be filed within 48 hours of taking any positon before the Court if a material change to any fact has occurred. Dkt. No. 7115-1 ¶ IV.C. Nevertheless, the UCC has ignored these continuing disclosure requirements. Dkt. No. 6874 ¶ 9. The UCC's position, as reflected in its Objection, demonstrates that modifications to the Rule 2019 Order are necessary. Such modifications will clarify Rule 2019(d)'s continuing disclosure requirements and better ensure timely compliance and transparency.

First, a change in the membership of any group or committee is a material change for purposes of Rule 2019(d). That is why, for example, ad hoc groups of bondholders have promptly filed Rule 2019 statements following the resignation or addition of a member to that group. *E.g.*, Dkt. No. 1989 (supplemental verified statement filed only one month after prior statement in order to disclose the addition of Silver Point Capital to the PREPA ad hoc group);

-8-

Dkt. No. 3336 (supplemental statement filed by ad hoc GO group following resignation of FCO Advisors from group); Dkt. No. 5444 (supplemental statement promptly filed after resignation of Monarch from ad hoc GO group); Dkt. No. 5991 (supplemental verified statement promptly filed after resignation of Whitebox and Taconic from the PBA funds group).[10] These groups promptly filed their Rule 2019 supplemental statements following a change in the membership of the group because it is required under the 2019 Order and Rule 2019(d).

There is no reason why changes in the composition of the UCC's membership should be any different. As set forth in the Motion, there have been numerous instances in these Title III cases where the UCC has waited several months to update its Rule 2019 Statements following the appointment of new members to the UCC by the U.S. Trustee. *See* Motion at 5. During that timeframe, the UCC took a number of positions before the Court, including filing pleadings, intervention motions, adversary complaints, and substantive motions to inform. *See*, *e.g.*, Dkt. No. 2359 ¶ 3 (arguing that PREPA should be forced to pay a higher rate of interest under DIP facility).

The UCC claims that it does not need to update its Rule 2019 Statements following the appointment of new members by the U.S. Trustee or following resignation of such members because "changes in Committee membership are publicly disclosed in notices filed by the U.S. Trustee." Objection ¶ 25. Of course, the U.S. Trustee's notices do not describe the disclosable economic interests of the new members that are appointed, or even which debtor the new member holds claims against. For example, in the Third Amended Notice of Appointment of Official Committee of Unsecured Creditors, the U.S. Trustee appointed Baxter Sales and Distribution Puerto Rico Corp. as a new member of the UCC, but it did not describe (i) the

---

[10] The resignation of these members can be ascertained when comparing the statements listed above against the prior statements filed by the ad hoc groups.

-9-

amount of Baxter's claims or (ii) which Debtor Baxter held claims against. Dkt. No. 3058. Other notices also failed to provide such information. *E.g.*, Dkt. No. 3947 (noting that Tradewinds was appointed to UCC, but not specifying the nature and amount of Tradewinds' claims or which Debtor Tradewinds held claims against). Creditors should not be forced to speculate about this important information. Instead, as proposed by Assured in its Proposed Order, the UCC should promptly file a 2019 Statement if a new member is appointed to the UCC or if any members resign from the UCC. This proposal is both reasonable and rational – the UCC's refusal to do so has no support whatsoever.[11]

Second, the UCC appears to believe that there can be no material changes for purposes of Rule 2019(d) unless the aggregate holdings of the UCC change. *See* Objection ¶ 8; *see also* Dkt. No. 6874 ¶ 9. But that belief is not supported by the Rule 2019 Order or in Rule 2019(d), which requires supplemental filings if "***any fact***" disclosed in the prior statement has changed. Fed. R. Bankr. P. 2019(d) (emphasis added). "Any fact" would include any change to the amount or nature of any disclosable economic interest held by any member of a Rule 2019(b) group. If any of these facts change, then Rule 2019(d) requires the prompt filing of a verified supplemental statement. A "material change" is thus not tied to the aggregate holdings of a committee or group. To underscore this point, consider the following hypothetical: Suppose an ad hoc group of bondholders appeared in these cases and filed an initial statement disclosing aggregate holdings against the Commonwealth and HTA totaling $2 billion. If a member sells off a large portion of its HTA holdings and increases its Commonwealth holdings—but the

---

[11] Indeed, in other bankruptcy cases, other official committees—including those represented by FOMB's current counsel—filed supplemental statements promptly after the resignation of a member. *See In re Caesars Entertainment Operating Company*, Case No. 15-01145, Dkt. No. 6365 (Bankr. N.D. Ill. Jan. 11, 2017) ("Caesars") (2019 statement filed one day after the resignation of a member); *Caesars*, Dkt. No. 2306 (2019 statement filed same day that the U.S. Trustee appointed a new member and only seven days after a member resigned).

-10-

aggregate amount of holdings of that ad hoc group remains the same—has a material change occurred for purposes of Rule 2019(d)? The answer is yes. Likewise, if the vendor constituents on the UCC are being paid down to the point that they hold virtually no claims against one Title III Debtor, a material change of "any fact" has occurred for purposes of Rule 2019(d). This is so even if the aggregate holdings of the UCC have not changed.[12] Under the UCC's position, no disclosure would be required.

Third, Assured has proposed that the Rule 2019 Order be amended to specify that, for certain creditors whose claims are being paid in the ordinary course by the Title III Debtors or who may be accruing post-petition claims against the Debtors, a "material change" should be defined as occurring if such members' claims increase or decrease by more than $50,000. As noted in the Motion, Genesis's claims against PREPA increased by $50,000 between the first and second supplemental verified statements. *Compare* Dkt No. 3036 *with* Dkt. No. 4028. The UCC claims that such a requirement would be "unduly burdensome" and "completely pointless" because "no party in interest will change its evaluation of the Committee based on such a minor change." Objection ¶ 26. This is an assumption without basis. Indeed, Assured is not the only creditor that is requesting this information. *See* Dkt. No. 7094.

If a vendor's claim is being paid down during the Title III cases, parties in interest have a right to know such information to assess whether or not such payments color the member's motivations in these Title III cases. For example, if a member of the UCC holds larger claims against the Commonwealth than against other Title III Debtors, such as HTA, then it may have a financial incentive to see its claims against the Commonwealth paid in lieu of its

---

[12] Moreover, the UCC's contention that its aggregate holdings have not changed (Obj. at ¶ 8) is impossible to assess given that it has not provided any amounts for the claims of at least two of its members.

smaller claims against other Title III Debtors. Indeed, this appears to be the case with Genesis Security. Genesis, the only purported HTA creditor on the UCC, has seen its larger claims against the Commonwealth—initially listed at approximately $22 million—decrease to slightly less than $7 million. That represents a 68% decrease in Genesis's claims against the Commonwealth. Timely disclosure of these reductions will allow creditors to assess which UCC members' claims are getting paid down in this case and by which Debtor. And this will allow creditors to determine whether or not such UCC members are acting, and continue to act, as loyal fiduciaries for the unsecured creditors of HTA and the Commonwealth, or if such members are acting to serve their own pecuniary interests.

Moreover, a reduction in unsecured claims held by UCC members should be expected. Contrary to the UCC's suggestions that pension and other employee claims have not been paid, the monthly Treasury Single Account reports show that the largest outflows are to pay vendor claims, pensions, and payroll.[13] Indeed, even FOMB's counsel has admitted before this Court that such claims are getting paid. *See* Sept. 13, 2018 Hr'g Tr. at 88:8-10 ("And the Commonwealth has been paying vendor claims, pre-petition vendor claims throughout the case. The Commonwealth has been paying the retirees."). This raises the serious possibility that there really are no unsecured creditors in this case, except those with disputed claims. The UCC may well be concerned about this fact becoming obvious through its 2019 Statements, but that is an argument for disclosure, not against it.

---

[13] *See, e.g.*, PR Fiscal Agency & Fin. Advisory Auth., *P.R. Dept. of Treas., Treas. Single Acct. ("TSA") FY 2019 Cash Flows As of May 17, 2019*, http://aafaf.pr.gov/assets/fy19-weeklytsacashflow-05-17-19.pdf.

## CONCLUSION

Granting the requested relief will protect the integrity of Rule 2019 and ensure uniformity of the application of that Rule in these cases. The Motion should be granted.[14]

---

[14] The UCC claims that it should not be singled out, and that Assured's proposed changes should apply to other Rule 2019 groups. Objection ¶ 28. Assured's proposed language, as drafted, does apply to other Rule 2019 groups that consist of vendors. FOMB has admitted that the pre-petition claims of such vendors are being paid. And unlike the UCC, other Rule 2019 groups consisting of bondholders have promptly filed their Rule 2019 statements following a reduction or increase in their members' claims. It is only the UCC that has ignored the Rule.

New York, New York
May 31, 2019

CASELLAS ALCOVER & BURGOS P.S.C.

By: /s/ Heriberto Burgos Pérez

Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, PR 00936-4924
Telephone: (787) 756-1400
Facsimile: (787) 756-1401
Email:  hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

CADWALADER, WICKERSHAM & TAFT LLP

By: /s/ Howard R. Hawkins, Jr.

Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William J. Natbony*
Ellen Halstead*
Thomas J. Curtin*
Casey J. Servais*
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 406-6666
Email:  howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*Admitted *pro hac vice*

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

-14-

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 31st day of May, 2019.

By: */s/ Howard R. Hawkins, Jr*
Howard R. Hawkins, Jr.*
* Admitted pro hac vice