## EXHIBIT 4



GOVERNMENT OF PUERTO RICO

Puerto Rico Fiscal Agency and Financial
Advisory Authority

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

## Additional / Voluntary Event-Based Disclosure

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:    **Puerto Rico Electric Power Authority (PREPA)**

Other Obligated Person's Name (if any): _____

Six-digit CUSIP number(s):    **PREPA: 745268 and 74526Q**

**TYPE OF INFORMATION PROVIDED:**

A. ☐ **Amendment to Continuing Disclosure Undertaking**

B. ☐ **Change in Obligated Person**

C. ☐ **Notice to Investor Pursuant to Bond Documents**

D. ☐ **Communication from the Internal Revenue Service**

E. ☐ **Bid for Auction Rate and Other Securities**

F. ☐ **Capital or Other Financing Plan**

G. ☐ **Litigation / Enforcement Action**

H. ☐ **Change of Tender Agent.  Remarketing Agent or Other On-going Party**

I. ☐ **Derivative or Other Similar Transaction**

J. ☒ **Other Event-Based Disclosures:    Puerto Rico Electric Power Authority preliminary restructuring support agreement (RSA) and associated term sheet dated July 30, 2018.**

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


*/s/ Sebastián M. Torres Rodríguez*
Sebastián M. Torres Rodríguez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth


Dated: July 30, 2018



PO Box 42001  •  San Juan, PR 00940-2001  •  Telephone (787) 722-2525

PUERTO RICO ELECTRIC POWER AUTHORITY

NOTICE OF VOLUNTARY FILING

On July 30, 2018, (i) the Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**," for its Spanish acronym), in its capacity as fiscal agent and financial advisor for PREPA, (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**") and (iv) members of the Ad Hoc Group of PREPA Bondholders (collectively the "**Ad Hoc Group**"), entered into a preliminary restructuring support agreement (the "**RSA**") and associated term sheet (the "**Term Sheet**").

A copy of the RSA is attached as Exhibit 1.  A copy of the Term Sheet is attached as Exhibit 2.  The Transition Charge agreed to in the RSA by year is set forth on the chart attached as Exhibit 3, which includes a column for the Transition Charge agreed to with the Ad Hoc Group for all bondholders under the terms in the Term Sheet and a separate column reflecting total expected Transition Charges to cover all bondholders and the Fuel Line Lenders under the terms in the Term Sheet.

PUERTO RICO ELECTRIC POWER AUTHORITY

Dated: July 30, 2018

EXHIBIT 1

RSA

*EXECUTION VERSION*

**THIS PRELIMINARY RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A PLAN OF ADJUSTMENT FOR PURPOSES OF PROMESA, SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF PROMESA AND THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PRELIMINARY RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**RESTRUCTURING SUPPORT AGREEMENT**

This Preliminary Restructuring Support Agreement (together with the exhibits attached hereto, which include, without limitation the Term Sheet (as defined herein) attached hereto as **Exhibit B**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Agreement**" or "**RSA**") dated as of July 30, 2018 is entered into by and among: (i) Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), in its capacity as fiscal agent and financial advisor for PREPA, (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), (iv) the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A, as such members may change from time to time in accordance with Section 5(e) (collectively the "**Ad Hoc Group Members**" or the "**Ad Hoc Group**" and each individually an "**Ad Hoc Group Member**"), and (v) any other persons who beneficially own or control Uninsured Bonds (as defined herein) and are party to this Agreement or execute a joinder to this Agreement pursuant to Section 5 hereof in the form of Exhibit A hereto (such persons, together with the Ad Hoc Group Members, the "**Supporting Holders**"). This Agreement collectively refers to FOMB, AAFAF, PREPA and the Supporting Holders as the "**Parties**" and each individually as a "**Party**."

**RECITALS**

**WHEREAS**, PREPA is the issuer of power revenue bonds and power revenue refunding bonds issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented, between PREPA and U.S. Bank National Association as successor Trustee (together, the "**Bonds**," and persons who beneficially own or control Bonds, "**Bondholders**").

**WHEREAS**, in connection with the issuance of certain of the Bonds (such Bonds, the "**Insured Bonds**"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by certain parties. Any Bonds that are not Insured Bonds are referred to herein as "**Uninsured Bonds**."

**WHEREAS**, as of the date hereof, the total outstanding principal amount of Uninsured Bonds that are beneficially owned by each member of the Ad Hoc Group is set forth on their respective signature pages hereto.

1

**WHEREAS**, on June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187, "**PROMESA**").

**WHEREAS**, PROMESA created FOMB with certain powers over the finances and restructuring process with respect to the Commonwealth of Puerto Rico and its instrumentalities as provided for in PROMESA, and FOMB has designated PREPA as a Covered Territorial Instrumentality (as defined in PROMESA).

**WHEREAS**, pursuant to Act 2-2017 AAFAF was granted authority over reaching agreements with creditors on any debt issued by any government entity of the Commonwealth of Puerto Rico.

**WHEREAS**, on July 2, 2017, FOMB filed a Title III petition on behalf of PREPA (the "__Title III Case__") in the United States District Court for the District of Puerto Rico (the "__Title III Court__").

**WHEREAS**, the FOMB is the representative of PREPA in the Title III Case pursuant to PROMESA Section 315(b).

**WHEREAS**, the Parties have engaged in good faith, arms-length negotiations regarding the principal economic terms of a proposed restructuring of the Bonds to be implemented in a manner to be mutually agreed upon as set forth in the Term Sheet and in this Agreement.

**WHEREAS**, FOMB and AAFAF consent to PREPA's entering into this Agreement and to PREPA exercising its rights under this Agreement (including its rights to terminate this Agreement and/or its right to consent to any waiver or amendment in accordance with the provisions of this Agreement).

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     *Agreement Effective Date.*  This Agreement shall become effective and binding upon each Party immediately following the occurrence of the following conditions (the "__Agreement Effective Date__"):

(a)     PREPA shall have executed and delivered counterpart signatures to this Agreement to each other Party;

(b)     AAFAF shall have executed and delivered counterpart signatures to this Agreement to each other Party;

(c)     the FOMB shall have executed and delivered counterpart signatures to this Agreement to each other Party; and

(d)     each Ad Hoc Group Member shall have executed and delivered counterpart signatures to this Agreement to each other Party.

2

**Section 2.**    ***The Restructuring Process***.  A summary of the principal economic terms of a proposed restructuring of the Bonds is set forth on the summary attached hereto as **Exhibit B** (the "**Term Sheet**").  The FOMB, PREPA, AAFAF and Ad Hoc Group intend to negotiate the terms of a restructuring support agreement consistent with the Term Sheet and with such other terms mutually agreed upon by the FOMB, PREPA, AAFAF and the Ad Hoc Group (the "**Definitive Restructuring Support Agreement**").    Upon execution of the Definitive Restructuring Support Agreement by the Ad Hoc Group, FOMB, PREPA and AAFAF, this Agreement shall terminate in its entirety as to all Parties and be superseded by the Definitive Restructuring Support Agreement.

**Section 3.**    ***Exhibits Incorporated by Reference.***  Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.

**Section 4.**    ***Commitments of the Parties.***

    4.01.    Commitments of the Parties.

        (a)    For so long as this Agreement has not been terminated, each of the Parties to the Agreement agrees, severally and not jointly, to cooperate and coordinate activities (to the extent practicable and subject to the terms of this Agreement) with the other Parties and to use commercially reasonable efforts to negotiate the terms and forms of the Definitive Restructuring Support Agreement. *provided*, *however*, that with respect to any member of the Ad Hoc Group or any other Supporting Holder, it shall not be required by this Agreement to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like, or provide any documentation or information to any regulatory or self-regulatory body having jurisdiction over the Parties in connection with this Agreement, other than information that is already included in this Agreement or is otherwise in the public domain.

        (b)    Nothing in this Agreement shall limit or restrict any Party from taking any action that such Party shall deem necessary or appropriate to preserve, protect or defend any of its rights.

    4.02.    Capacity of the Parties. Each reference herein to a Supporting Holder, including in its capacity as an Ad Hoc Group Member or as a Party, shall be construed as applying to such Supporting Holder solely in its capacity as a Bondholder.

**Section 5.**    ***Transfer of Claims and Interests***.

        (a)    For the period commencing as of the Agreement Effective Date until the termination of this Agreement as to such Supporting Holder pursuant to the terms hereof (the "**Bond Transfer Limitation Period**"), such Supporting Holder shall not sell, assign, transfer or otherwise pledge or dispose ("**Transfer**") any Uninsured Bonds beneficially owned by such Supporting Holder, or any voting, consent or direction rights related to such Uninsured Bonds, except such Transfer may be made (A) if the transferee is a Supporting Holder at the time of the Transfer or (B) if the transferee is not a Supporting Holder at the time of the Transfer, such transferee (a transferee pursuant to this clause (B) or the immediately preceding clause (A), a

"**Bond Qualified Transferee**") delivers to counsel to the Ad Hoc Group, PREPA, AAFAF and FOMB, at or prior to the consummation of the Transfer, the joinder attached hereto as <u>Exhibit A</u>, pursuant to which such transferee shall assume all obligations of such Supporting Holder transferor hereunder (such transferee, if any, shall also be a "Supporting Holder" hereunder).  To the extent that a Transfer violates the provisions of this section, the Transfer shall be void *ab initio* and the applicable Uninsured Bonds and the Supporting Holder attempting the Transfer of the Uninsured Bonds shall continue to remain subject to the terms of this Agreement.  This Agreement shall in no way be construed to preclude any of the Supporting Holders from acquiring additional Bonds; *provided* that any such acquired Uninsured Bonds shall automatically and immediately upon acquisition by a Supporting Holder be deemed subject to all of the terms of this Agreement.

(b)     Notwithstanding anything contained in this Agreement to the contrary, (i) a Supporting Holder may Transfer any right, title or interest in the Uninsured Bonds to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Supporting Holder; *provided* that such Qualified Marketmaker subsequently Transfers such right, title or interest in the Uninsured Bonds to a Supporting Holder or a Bond Qualified Transferee within the date that is ten (10) days after such Qualified Marketmaker's acquisition of such right, title or interest; and (ii) to the extent that a Supporting Holder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Uninsured Bonds that the Qualified Marketmaker acquires from a holder of the Uninsured Bonds that is not a Supporting Holder without the requirement that the transferee be or become a Supporting Holder.

(c)     "**Qualified Marketmaker**" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Bonds or enter with customers into long and short positions in debt securities such as the Bonds, in its capacity as a dealer or market maker in such Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to Bonds, is registered with the Securities and Exchange Commission and Financial Institutions Regulatory Authority.

(d)     Any disclosures by any Supporting Holders to any other Party of its holdings of Bonds shall be treated as confidential information by such other Party unless such other Party receives such information through other means that are not subject to a duty of confidentiality.  The foregoing shall not prohibit FOMB, PREPA or AAFAF from disclosing the aggregate principal amount of Bonds held by the Ad Hoc Group or all Supporting Holders collectively.

(e)     The Ad Hoc Group Members as of the date hereof are listed on Annex A hereto. The members of the Ad Hoc Group may change from to time upon delivery by counsel to the Ad Hoc Group of a notice to the FOMB, PREPA and AAFAF with an updated Annex A, and, in the case of the addition of a person to the Ad Hoc Group who is not otherwise party to this Agreement, execution by such person of a joinder in the form of Exhibit A hereto and delivery of such joinder to counsel to the FOMB, PREPA and AAFAF.

**Section 6.     *Representations and Warranties.***

4

6.01.  <u>Mutual Representations and Warranties</u>.   Each Party hereby represents and warrants to the other as follows:

        (a)      it has the legal right, power and authority to enter into this Agreement;

        (b)      it is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe the terms and provisions of, this Agreement; and

        (c)      the execution, delivery, performance and observance of this Agreement by such Party (A) have been duly authorized by all necessary action on the part of such Party, do not and will not conflict with, or result in a violation of, any law applicable to it, and do not require it to obtain any permit, consent, approval, order or authorization of, or provide notice to or make a filing with, any court, governmental or regulator agency or authority or other person or entity that has not been obtained, provided or made, as applicable, (B) except to the extent modified, stayed or otherwise excused by PROMESA, (1) with respect to the FOMB, AAFAF and PREPA, do not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument binding on the FOMB, AAFAF or PREPA, as applicable and (2) with respect to each Party, do not and will not violate, conflict with or result in the breach of any provision of its organizational or governance documents and (C) do not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which it is a party, which would materially adversely affect its ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Termination Event.

6.02.  <u>Additional Representations of Supporting Holder</u>.   Each Supporting Holder individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant): that it owns or has investment management responsibility for accounts that own Uninsured Bonds in the principal amounts set forth on its respective signature page hereto or joinder to this Agreement in the form of Exhibit A (as applicable), which it would be entitled to vote on in a plan solicitation, and that it has not sold, assigned, transferred, participated or otherwise pledged such Uninsured Bonds, or any voting, consent or direction rights related to such Uninsured Bonds, to any other person or entity, that would prevent or adversely affect in any way such Supporting Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed, in each case, except as permitted by section 5 of this Agreement.

6.03.  <u>Additional Representation of Initial Supporting Holders</u>. Each Supporting Holder that is party to this Agreement on the Agreement Effective Date individually represents and warrants to the other Parties that as of the Agreement Effective Date it does not beneficially own or control any Uninsured Bonds in a Qualified Marketmaker capacity.

**Section 7.      *Acknowledgement*.**  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of adjustment for purposes of PROMESA, sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of PROMESA and the Bankruptcy Code.

**Section 8.      *Fees and Expenses*.** Without limitation to the provisions of the Term Sheet, the reasonable fees and reasonable expenses of the members of the Ad Hoc Group incurred in connection with the RSA, the Definitive Restructuring Support Agreement, and any documents and transactions (including a plan of adjustment) relating to or implementing the foregoing on or after July 23, 2018, limited to one (1) primary law firm, one (1) municipal bond counsel law firm, one (1) Puerto Rico law firm, one (1) financial advisor, and one (1) utility consultant, shall be reimbursed by PREPA on a monthly basis within forty-five (45) days following submission of an invoice and redacted time detail summary to counsel to the FOMB, PREPA and AAFAF. Payment of reasonable fees and expenses of the members of the Ad Hoc Group pursuant to this Section 8 shall be subject to delivery of all required certifications under Puerto Rico law, and shall also be subject to inclusion of such reasonable fees and expenses in a budget or budgets for PREPA in accordance with its post-petition financing facility with the Commonwealth of Puerto Rico, as approved by the FOMB.  Each of the FOMB, PREPA, and AAFAF covenants and hereby agrees to take all steps necessary, as soon as practicable, to provide for the inclusion of the reasonable fees and expenses of the members of the Ad Hoc Group in the budget or budgets for PREPA in accordance with its post-petition financing facility with the Commonwealth of Puerto Rico.

**Section 9.      *Amendments and Waivers*.**  The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of (i) the FOMB, (ii) PREPA, (iii) AAFAF, and (iv) the Ad Hoc Group Members that beneficially own or control at least two-thirds in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Ad Hoc Group Members at such time; provided, if any material provision of the Term Sheet or of Sections 5 or 9 of this Agreement is materially amended, modified, supplemented or waived without the written consent of a Supporting Holder in a manner materially adverse to such Supporting Holder, then such Supporting Holder shall have the right to withdraw from this Agreement in accordance with Section 10.02(d) hereof.

**Section 10.      *Termination*.**

10.01.  Mutual Consent.  This agreement may be terminated by the mutual consent of (i) the FOMB, (ii) PREPA, (iii) AAFAF and (iv) the Ad Hoc Group Members that beneficially own or control at least a majority in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Ad Hoc Group Members at such time (the "**Required Holders**").

10.02.  Termination Events.

6

(a)     This Agreement may be terminated by (i) the FOMB, (ii) PREPA, (iii) AAFAF or (iv) the Required Holders, upon five (5) business days' prior written notice delivered to the other aforementioned Parties within ten (10) business days after the occurrence of any of the following events (each a "**Termination Event**"); provided, however, that this Agreement may be terminated solely by the Required Holders upon the occurrence of the Termination Event set forth in clauses (iv)-(v) below, and solely by the FOMB, PREPA or AAFAF upon the occurrence of the Termination Event set forth in clause (vi) below.

(i)     following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(ii)     any Party publicly disavows any of the terms set forth on the Term Sheet or enters into, or publicly supports, a proposed transaction materially inconsistent with such terms.

(iii)     the dismissal of the Title III Case;

(iv)     the determination by the FOMB, PREPA or AAFAF (i) not to proceed with the transactions materially consistent with those contemplated by the Agreement or (ii) to proceed with a transaction that would be materially inconsistent with the terms of, or the transactions contemplated by, this Agreement;

(v)     the approval, recommendation, or any public statement in support by a duly authorized representative of the FOMB, PREPA, or AAFAF regarding or entry by the FOMB, PREPA or AAFAF into any direct negotiations, any agreement, agreement in principle, understanding, term sheet, letter of intent, purchase agreement, option or similar contract, instrument or arrangement with respect to a debt restructuring transaction that is materially inconsistent with the Term Sheet; and

(vi)     the Ad Hoc Group ceases to collectively beneficially own or control, in the aggregate, at least two-thirds in principal amount of the aggregate amount of the Uninsured Bonds collectively beneficially owned or controlled by the Ad Hoc Group as of the date hereof.

(b)     Additionally, this Agreement shall automatically terminate as to all Parties on August 27, 2018 at 5 PM New York City Time (the "**Outside Date**"), provided, however, that the Outside Date may be extended to such date as agreed to by the FOMB, PREPA, AAFAF and the Ad Hoc Group Members that beneficially own or control at least two-thirds in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Ad Hoc Group Members at such time.

(c)     The date on which this Agreement is terminated in accordance with the provisions of Section 2, Section 10.01, Section 10.02(a) or Section 10.02(b) shall be referred to as the "**Termination Date**".  On the Termination Date, the provisions of this Agreement shall terminate, except as otherwise provided in this Agreement, unless the FOMB, AAFAF, PREPA

and the Ad Hoc Group Members that beneficially own or control at least two-thirds in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Ad Hoc Group Members at such time waive, in writing, the occurrence of the Termination Event giving rise to the occurrence of such Termination Date.

(d)     If any material provision of the Term Sheet or of Sections 5 or 9 of this Agreement is materially amended, modified, supplemented or waived without the written consent of a Supporting Holder in a manner materially adverse to such Supporting Holder, such Supporting Holder shall have the right to withdraw from this Agreement within five (5) business days of receiving notice of such amendment, modification, supplement or waiver by delivering notice of such withdrawal to counsel to the FOMB, PREPA, AAFAF and Ad Hoc Group. Such withdrawal shall be effective two (2) business days after delivery of such notice of withdrawal (to the extent such amendment is not rescinded), whereupon this Agreement shall terminate solely as to such Supporting Holder and such Supporting Holder shall no longer be a Supporting Holder hereunder or Party hereto.

(e)     Additionally, if at any time a Supporting Holder is no longer the beneficial owner of any Uninsured Bonds subject to this Agreement as a result of a Transfer that complies with Section 5 hereof, then this Agreement shall terminate solely as to such Supporting Holder, and such Supporting Holder shall no longer be a Supporting Holder hereunder or Party hereto unless and until such Supporting Holder subsequently becomes a beneficial owner of any Uninsured Bond (other than in the capacity of a Qualified Market Maker) whereupon it will be deemed to be a Supporting Holder under this Agreement.

(f)     No Party may terminate this Agreement upon a Termination Event if such Termination Event is the result of such Party failing to perform or comply in any material respect with the terms and conditions of this Agreement.  Nothing in this Section 10 shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

**Section 11.     *Miscellaneous*.**

11.01.  Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the Restructuring Process contemplated herein and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

11.02.  Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11.03.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Title III Court (or court of proper appellate jurisdiction) (the "**Chosen**

**Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

11.04. <u>Trial by Jury Waiver</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.05. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.06. <u>Rules of Construction</u>.  When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email.  Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

11.07. <u>Interpretation; Representation by Counsel</u>. This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (a) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (b) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

11.08. <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and

permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

11.09.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) (and if by any method other than electronic mail, then with a copy by electronic mail) to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)     if to PREPA or AAFAF, to:

           O'Melveny & Myers LLP
           7 Times Square
           New York, NY 10036
           Attention: Nancy Mitchell, Maria DiConza and Matthew Hinker
           Email: nmitchell@omm.com; mdiconza@omm.com;
           mhinker@omm.com

      (b)     if to the FOMB, to:

           Proskauer Rose LLP
           11 Times Square
           New York, NY 10036
           Attention: Martin Bienenstock, Paul V. Possinger, Ehud Barak
           Email: mbienenstock@proskauer.com;
           ppossinger@proskauer.com; ebarak@proskauer.com

      (c)     if to the Ad Hoc Group, to:

           Kramer Levin Naftalis & Frankel LLP
           1177 Avenue of the Americas
           New York, New York 10036
           Attention: Amy Caton, Alice J. Byowitz and Steven Segal
           Email address: acaton@kramerlevin.com;
           abyowitz@kramerlevin.com; and ssegal@kramerlevin.com.

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

11.10.  <u>Independent Analysis</u>.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

11.11.  <u>Waiver</u>.  No Party shall be deemed to have waived any rights as a result of its entry into this Agreement, and, if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other

applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

11.12.  <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of PREPA and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "**<u>Exchange Act</u>**"); (v) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

11.13.  <u>Remedies</u>.  The sole and exclusive remedy of any Party for any breach of this Agreement by any other Party shall be termination in accordance with the terms hereof, and no such breach shall give rise to any claims against any Party at law or in equity. For the avoidance of doubt, no Party shall be entitled to monetary damages for any breach of any provision of this Agreement.

For the avoidance of doubt, any consent right, termination right or withdrawal right provided to a Supporting Holder under this Agreement shall be cumulative to, and not in lieu of, any other consent right, termination right or withdrawal right provided to such Supporting Holder hereunder.

11.14.  <u>Several, Not Joint and Several, Obligations</u>.  Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

11.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.16.  <u>Public Disclosure</u>.  Any public filing of this Agreement, with the Title III Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the Bonds held by each Supporting Holder. For the avoidance of doubt, nothing in this Agreement absolves the Ad Hoc Group from their duties to comply with Bankruptcy Rule 2019 and the Case Management Order.

11

11.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

11.18. <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

[*Remainder of page intentionally left blank.*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

Financial Oversight and Management Board for Puerto Rico

By: _____

Name: Natalie A. Jaresko

Title: Executive Director

[Signature Page to Preliminary RSA]

Puerto Rico Electric Power Authority

By: _____

Name:  José Ortiz
Title:   Chief Executive Officer

[Signature Page to Preliminary RSA]

Puerto Rico Fiscal Agency and Financial Advisory
Authority

By: _____

Name: Gerardo Portela Franco
Title: Executive Director

KNIGHTHEAD (NY) FUND, L.P.

BY: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: Thomas Wagner
Title: Managing Member

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ███████

[Signature Page to Preliminary RSA]

KNIGHTHEAD ANNUITY & LIFE ASSURANCE
COMPANY

BY: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____
    Name:    **Thomas Wagner**
    Title:   **Managing Member**

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ██████████████

[Signature Page to Preliminary RSA]

KNIGHTHEAD MASTER FUND, LP

By: Knighthead Capital Management, LLC, its
Investment Manager

By: _____

Name:        Thomas Wagner

Title:        Managing Member

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ███████

[Signature Page to Preliminary RSA]

FRANKLIN ADVISERS, INC. on behalf of the
following funds:

CALIFORNIA INTERMEDIATE TERM TAX
FREE INCOME FUND

CALIFORNIA HIGH YIELD MUNICIPAL BOND
FUND

TENNEESEE MUNICIPAL BOND FUND

CALIFORNIA TAX FREE INCOME FUND

NEW YORK TAX FREE INCOME FUND

FEDERAL TAX FREE INCOME FUND

COLORADO TAX FREE INCOME FUND

GEORGIA TAX FREE INCOME FUND

PENNSYLVANIA TAX FREE INCOME FUND

HIGH YIELD TAX FREE INCOME FUND

MISSOURI TAX FREE INCOME FUND

OREGON TAX FREE INCOME FUND

VIRGINIA TAX FREE INCOME FUND

FLORIDA TAX FREE INCOME FUND

LOUISIANA TAX FREE INCOME FUND

MARYLAND TAX FREE INCOME FUND

NORTH CAROLINA TAX FREE INCOME
FUND

NEW JERSEY TAX FREE INCOME FUND

FRANKLIN STRATEGIC INCOME FUND –
CANADA

FTIF-FRANKLIN STRATEGIC INCOME FUND

FSS-FRANKLIN STRATEGIC INCOME FUND

[Signature Page to Preliminary RSA]

FTVIP – FRANKLIN STRATEGIC INCOME VIP
FUND

FIST-FRANKLIN TOTAL RETURN FUND

By: _____

Name: *Rafael R. Costas JR.*

Title: *Vice President*

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ▮▮▮▮▮▮▮▮

[Signature Page to Preliminary RSA]

BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.
BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.
BLUEMOUNTAIN CREDIT OPPORTUNITIES
MASTER FUND I L.P.
BLUEMOUNTAIN KICKING HORSE FUND L.P.
BLUEMOUNTAIN FURSAN FUND L.P.
BLUEMOUNTAIN TIMBERLINE LTD.
BLUE MOUNTAIN CREDIT ALTERNATIVES
MASTER FUND L.P.
BLUEMOUNTAIN MONTENVERS MASTER FUND
SCA SICAV-SIF
BLUEMOUNTAIN LOGAN OPPORTUNITIES
MASTER FUND L.P.
BLUEMOUNTAIN SUMMIT TRADING L.P.

By: BLUEMOUNTAIN CAPITAL MANAGEMENT,
LLC, ITS INVESTMENT MANAGER


By: _____
     Name: David M. O'Mara
     Title: Deputy General Counsel

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ████████████

[Signature Page to Preliminary RSA]

OPPENHEIMER FUNDS, INC., as investment advisor
for the following accounts:

OPPENHEIMER ROCHESTER AMT –FREE
MUNICIPAL FUND

OPPENHEIMER ROCHESTER AMT –FREE NEW
YORK MUNICIPAL FUND

OPPENHEIMER ROCHESTER CALIFORNIA
MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM
CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER SHORT DURATION
HIGH YIELD MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MUNICIPAL FUND)

OPPENHEIMER ROCHESTER LIMITED TERM
NEW YORK MUNICIPAL FUND (A SERIES OF
ROCHESTER PORTFOLIO SERIES)

OPPENHEIMER ROCHESTER NEW JERSEY
MUNICIPAL FUND (A SERIES OF OPPENHEIMER
MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER PENNSYLVANIA
MUNICIPAL FUND (A SERIES OF OPPENHEIMER
MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER HIGH YIELD
MUNICIPAL FUND (A SERIES OF OPPENHEIMER
MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER FUND MUNICIPALS

OPPENHEIMER ROCHESTER MINNESOTA
MUNICIPAL FUND;

and

[Signature Page to Preliminary RSA]

OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:

MASSMUTUAL INTERNATIONAL HOLDING MSC, INC.

MASSMUTUAL UNIFIED TRADITIONAL

By: _____
    Name: Richard Stein
    Title: Senior Vice President

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ████████

[Signature Page to Preliminary RSA]

Silver Point Capital Fund, L.P.
Silver Point Capital Offshore Master Fund, L.P.

By: Silver Point Capital, L.P., Its Investment Manager

By: _____

Name: Michael A. Gatto

Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially owned by accounts for which Supporting Holder has investment management responsibility, which it would be entitled to vote on in a plan solicitation: ███████

AG MM, L.P.
AG CAPITAL RECOVERY PARTNERS VIII, L.P.
AG CORPORATE CREDIT OPPORTUNITIES FUND,
L.P.
AG SUPER FUND INTERNATIONAL PARTNERS,
L.P.
NUTMEG PARTNERS, L.P.
AG CENTRE STREET PARTNERSHIP, L.P.
AG SUPER FUND, L.P.

By: Angelo, Gordon & Co., L.P., its manager or advisor

By: _____
Name: D. Forest Wolfe
Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ███████████

[Signature Page to Preliminary RSA]

By Marathon Asset Management, LP solely in its
capacity as Investment Advisor to the
Fund(s)/Account(s) named in Schedule A of this
Agreement

By: _____

Name: Louis Hanover
Title: Authorized Signatory

Principal amount of Uninsured Bonds beneficially owned by Supporting Holder, or beneficially
owned by accounts for which Supporting Holder has investment management responsibility,
which it would be entitled to vote on in a plan solicitation: ███████

**Schedule A:**
AS MARATHON CREDIT
BSF Multi-Manager Alternative Strategies Fund
TRS CREDIT FUND LP
MARATHON BLUE GRASS CREDIT FUND LP
MARATHON CENTRE STREET PARTNERSHIP LP
MARATHON CREDIT DISLOCATION FUND, LP
MARATHON CURRITUCK FUND, LP – SERIES C
MARATHON CURRITUCK FUND, LP – SERIES D
MARATHON LES GRANDES JORASSES MASTER FUND
MARATHON SPECIAL OPPORTUNITY FUND, LTD.
MARATHON STRATEGIC OPPORTUNIES PROGRAM, LP
MAMPR METRIC FUND, LTD

[Signature Page to Preliminary RSA]

**<u>Exhibit A</u>**
**<u>Form of Joinder</u>**

## FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Preliminary Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "**RSA**"), dated as of July 30, 2018 by and among: (i) Puerto Rico Electric Power Authority ("**PREPA**"), (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), in its capacity as fiscal agent and financial advisor for PREPA, (iii) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), (iv) the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A thereto and party thereto (the "**Ad Hoc Group**"), and (v) the other  Supporting Holders from time to time party thereto, is executed and delivered by [_____] (the "**Joining Supporting Creditor**") as of _____, __, 2018. Each capitalized term used herein but not defined herein shall have the meaning set forth in the RSA.

1.      Agreement to be Bound.  The Joining Supporting Creditor hereby agrees to be bound by all of the terms of the RSA.  The Joining Supporting Creditor shall hereafter be deemed to be a "Supporting Holder" and a Party for all purposes under the RSA, including for the avoidance of doubt with respect to any Uninsured Bonds held by the Joining Supporting Creditor as of the date of this Joinder Agreement (other than any Uninsured Bonds held in a Qualified Marketmaker capacity).

2.      Representations and Warranties.  With respect to the aggregate principal amount of Uninsured Bonds held by the Joining Supporting Creditor, including upon consummation of Transfer of Uninsured Bonds to the Joining Supporting Creditor, the Joining Supporting Creditor hereby makes, as of the date hereof, the representations and warranties of the Holders set forth in sections 6.01 and 6.02 of the RSA to each of the other Parties to the RSA.

4.      Governing Law.  Section 11.03 of the RSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "RSA" shall be replaced with references to Joinder Agreement.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date set forth above.

**[NAME OF INSTITUTION]**

By: _____

Name: _____

Title: _____

Address:

Attention:

Email:

Principal amount of Uninsured Bonds beneficially owned by Joining Supporting Creditor, or beneficially owned by accounts for which Joining Supporting Creditor has investment management responsibility, which it would be entitled to vote on in a plan solicitation: $_____

[Signature Page to Joinder to Preliminary RSA]

**<u>Exhibit B</u>**
**<u>Term Sheet</u>**

*EXECUTION VERSION*

## RECOVERY PLAN TERM SHEET

*This Recovery Plan Term Sheet does not address all material terms that would be required in definitive documents and in order to consummate the transactions set forth in this Recovery Plan Term Sheet, which terms shall be mutually agreed upon. Nothing in this Term Sheet shall constitute a binding commitment of any Party or constitute an admission or representation of any fact or circumstance or an admission of any liability or waiver of any right or claim. Unless and until the execution of definitive documentation, the Parties shall retain their respective rights. If executed, the terms of such definitive documentation will control. This Recovery Plan Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities.*

*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Preliminary Restructuring Support Agreement to which this Recovery Plan Term Sheet is annexed (the "**RSA**" or the "**Agreement**").*

| | |
|---|---|
| **AD HOC GROUP EXCHANGE** | ▪ The members of the Ad Hoc Group and any other holders of PREPA Bonds subject to the RSA (the "**Supporting Holders**") shall commit to exchange all of their uninsured bonds for Securitization Bonds (as defined below) on the terms and in the manner set forth below. |
| **SECURITIZATION BONDS** | ▪ The Puerto Rico Electric Power Authority Revitalization Corporation or a new bankruptcy-remote special purpose vehicle as may be agreed upon shall issue Tranche A and Tranche B Securitization Bonds, secured by the Transition Charge. |
| **TRANSITION CHARGE** | ▪ The Transition Charge allocable to the outstanding power revenue and revenue refunding bonds issued by PREPA under the 1974 Trust Agreement shall be set at the following levels: |
| |      -   2.636 c/kWh for Years 1-5 |
| |      -   2.729 c/kWh for Years 6-10 |
| |      -   2.868 c/kWh in Year 11 |
| |      -   Starting year 12, annual 2.500% increases over the prior year's Transition Charge |
| | ▪ The Transition Charge allocable to the outstanding power revenue and revenue refunding bonds issued by PREPA under the 1974 Trust Agreement shall be capped at 4.348 c/kWh |
| **EXCHANGE RATIO**[1] | ▪ 67.5% of PREPA Bonds to Tranche A Bonds |
| | ▪ 10.0% of PREPA Bonds to Tranche B Bonds |
| **TRANCHE A BONDS** | ▪ Tranche A Bonds will extend beyond the stated maturity if not paid in full on the stated maturity, until paid in full, including unpaid interest. |
| | ▪ Unpaid interest on the Tranche A Bonds will accrete. |
| **TRANCHE B BONDS** | ▪ PIK interest to accrue annually starting in Year 1. |
| | ▪ Tranche B Bonds shall receive 100% of total excess cash flow after repayment of the Tranche A Bonds.  Potential recovery on the Tranche B Bonds shall be |

---

[1] Initial Claims include unpaid interest through July 1, 2018 and will continue to accrue through the effective date of the exchange.  The Transition Charge shall increase to cover accrual of claims and waiver and support fees after July 1, 2018.

| | |
|---|---|
| | capped at the exchange amount, plus PIK interest. |
| | ▪ Tranche B Bonds will mature at stated 45 year maturity, and all unpaid debt service will expire unpaid. |
| **MATURITY** | ▪ Tranche A Bonds:  40 year stated maturity, subject to early mandatory redemption from sweep of Transition Charge cash flow (35 year expected maturity under Oversight Board's May 2018 projections, which may change) |
| | ▪ Tranche B Bonds:  45 year stated maturity |
| **COUPON** | ▪ Tranche A Bonds:  5.25% cash interest |
| | ▪ Tranche B Bonds:  7.00% PIK interest / 8.75% PIK interest to the extent the Tranche B Bonds are not tax-exempt (solely for portion that is not tax-exempt) |
| **TAX TREATMENT** | ▪ Tranche A Bonds:  Tax-exempt |
| | ▪ Tranche B Bonds:  Parties will work together in good faith to try to obtain tax-exempt status for Tranche B Bonds or as great a portion thereof as possible; provided, however, that failure of such good faith effort to obtain tax-exempt status for Tranche B Bonds shall not constitute grounds for any party to terminate the RSA. |
| **CALL PROTECTION** | ▪ Tranche A Bonds:  Callable after 5 to 10 years, to be mutually agreed upon |
| | ▪ Tranche B Bonds:  Callable after period of time and on terms to be mutually agreed upon |
| **DEBT SERVICE RESERVE FUND ("DSRF")** | ▪ The DSRF shall be set at 5% of Tranche A Bonds. |
| | ▪ DSRF will be funded over approximately 7 years from the Transition Charge, unless the parties mutually agree upon a different financing structure for the DSRF, including a surety bond on terms to be mutually agreed upon. |
| **PAYMENT DEFAULT** | ▪ No default on either Tranche A or Tranche B Bonds for failure to pay scheduled debt service, so long as full amount collected under the Transition Charge (minus administrative fees) is used to pay debt service.  Interest shall continue to accrue (and pay-in-kind, as applicable) and accrete at the original Coupon rate. |
| | ▪ The Transition Charge shall extend, and interest shall continue to accrue (and pay-in-kind, as applicable) at the original Coupon rate, until the later of (1) the date necessary to pay the Tranche A Bonds in full, even if past their stated maturity, and (2) the earlier of (i) the stated maturity of the Tranche B Bonds, and (ii) the date on which the Tranche B Bonds are paid in full. |
| **REMEDIES** | ▪ Remedies will be mutually agreed upon and will include, at a minimum, the right to replace the Transition Charge servicer and the right to enforce the Securitization Bonds' trust agreement, the servicing agreement, and non-impairment covenants. Requirements for replacement servicer to be mutually agreed upon as part of Definitive Documentation. |

| TREATMENT PROTECTIONS | <ul><li>To be mutually agreed upon</li><li>MFN clause for deals struck with other legacy debt holders, to be mutually agreed upon and to apply to monoline insurers, fuel line lenders and, subject to a materiality threshold to be mutually agreed upon, certain other claims</li><li>The Ad Hoc Group shall not object if other legacy debt holders (including fuel line lenders) receive the same treatment with the same terms as the Ad Hoc Group is receiving, so long as such treatment does not adversely affect the Ad Hoc Group's recoveries.  Adjustments to coupons and par are authorized, so long as total cash flow payable each year remains the same (with proportional adjustments for the varying claim sizes of varying legacy debt claims), and so long as such treatment shall not adversely affect the Ad Hoc Group's recoveries.</li></ul> |
|---|---|
| SECURITIZATION PROTECTIONS | <ul><li>To be mutually agreed upon</li></ul> |
| DEMAND PROTECTIONS | <ul><li>To be mutually agreed upon</li></ul> |
| ADMINISTRATIVE AND WAIVER/SUPPORT FEES | <ul><li>Terms, structure, and cap on administrative fees to be mutually agreed upon</li><li>Reimbursement of Ad Hoc Group members' reasonable fees and expenses through effective date of transaction, with monthly reimbursement to begin upon execution of the RSA.</li><li>Contingent upon consummation of the proposed exchange transaction, in exchange for (i) waiver of claims unique to the issuance of the 2016 PREPA Bonds and (ii) participation, the Ad Hoc Group shall receive a waiver and support fee in the form of Tranche A Bonds initially equal to 1.72% of the par amount of PREPA Bonds held by the Ad Hoc Group as of July 1, 2018 (and accruing after July 1, 2018 at the same rate as the Ad Hoc Group's 2016 PREPA Bonds).</li><li>Additional support (and potential waiver) fee in the form of Tranche A Bonds initially equal to 0.95% of par amount of total outstanding PREPA bonds (and accruing after July 1, 2018 at same rate as the 2016 PREPA Bonds), to be provided to Supporting Holders, including additional signatories, in manner to be mutually agreed upon.</li></ul> |
| IMPLEMENTATION | <ul><li>Timeline and implementation mechanics to be mutually agreed upon</li></ul> |

## Annex A

### Ad Hoc Group Members

AG MM, L.P.

AG CAPITAL RECOVERY PARTNERS VIII, L.P.

AG CORPORATE CREDIT OPPORTUNITIES FUND, L.P.

AG SUPER FUND INTERNATIONAL PARTNERS, L.P.

NUTMEG PARTNERS, L.P.

AG CENTRE STREET PARTNERSHIP, L.P.

AG SUPER FUND, L.P.

BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.

BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.

BLUEMOUNTAIN CREDIT OPPORTUNITIES MASTER FUND I L.P.

BLUEMOUNTAIN KICKING HORSE FUND L.P.

BLUEMOUNTAIN FURSAN FUND L.P.

BLUEMOUNTAIN TIMBERLINE LTD.

BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.

BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF

BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND L.P.

BLUEMOUNTAIN SUMMIT TRADING L.P.

CALIFORNIA INTERMEDIATE TERM TAX FREE INCOME FUND

CALIFORNIA HIGH YIELD MUNICIPAL BOND FUND

TENNESSEE MUNICIPAL BOND FUND

CALIFORNIA TAX FREE INCOME FUND

NEW YORK TAX FREE INCOME FUND

FEDERAL TAX FREE INCOME FUND

COLORADO TAX FREE INCOME FUND

GEORGIA TAX FREE INCOME FUND

PENNSYLVANIA TAX FREE INCOME FUND

HIGH YIELD TAX FREE INCOME FUND

MISSOURI TAX FREE INCOME FUND

OREGON TAX FREE INCOME FUND

VIRGINIA TAX FREE INCOME FUND

FLORIDA TAX FREE INCOME FUND

LOUISIANA TAX FREE INCOME FUND

MARYLAND TAX FREE INCOME FUND

NORTH CAROLINA TAX FREE INCOME FUND

NEW JERSEY TAX FREE INCOME FUND

FRANKLIN STRATEGIC INCOME FUND – CANADA

FTIF-FRANKLIN STRATEGIC INCOME FUND

FSS-FRANKLIN STRATEGIC INCOME FUND

FTVIP – FRANKLIN STRATEGIC INCOME VIP FUND

FIST-FRANKLIN TOTAL RETURN FUND

KNIGHTHEAD (NY) FUND, L.P.

KNIGHTHEAD ANNUITY & LIFE ASSURANCE COMPANY

KNIGHTHEAD MASTER FUND, LP

AS MARATHON CREDIT

BSF Multi-Manager Alternative Strategies Fund

TRS CREDIT FUND LP

MARATHON BLUE GRASS CREDIT FUND LP

MARATHON CENTRE STREET PARTNERSHIP LP

MARATHON CREDIT DISLOCATION FUND, LP

MARATHON CURRITUCK FUND, LP – SERIES C

MARATHON CURRITUCK FUND, LP – SERIES D

MARATHON LES GRANDES JORASSES MASTER FUND

MARATHON SPECIAL OPPORTUNITY FUND, LTD.

MARATHON STRATEGIC OPPORTUNITIES PROGRAM, LP

MAMPR METRIC FUND, LTD

OPPENHEIMER ROCHESTER AMT –FREE MUNICIPAL FUND

OPPENHEIMER ROCHESTER AMT –FREE NEW YORK MUNICIPAL FUND

OPPENHEIMER ROCHESTER CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER SHORT DURATION HIGH YIELD MUNICIPAL FUND (A
SERIES OF OPPENHEIMER MUNICIPAL FUND)

OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND (A
SERIES OF ROCHESTER PORTFOLIO SERIES)

OPPENHEIMER ROCHESTER NEW JERSEY MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER PENNSYLVANIA MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER FUND MUNICIPALS

OPPENHEIMER ROCHESTER MINNESOTA MUNICIPAL FUND

MASSMUTUAL INTERNATIONAL HOLDING MSC, INC.

MASSMUTUAL UNIFIED TRADITIONAL

Silver Point Capital Fund, L.P.

Silver Point Capital Offshore Master Fund, L.P.

EXHIBIT 2

TERM SHEET

*EXECUTION VERSION*

# RECOVERY PLAN TERM SHEET

*This Recovery Plan Term Sheet does not address all material terms that would be required in definitive documents and in order to consummate the transactions set forth in this Recovery Plan Term Sheet, which terms shall be mutually agreed upon. Nothing in this Term Sheet shall constitute a binding commitment of any Party or constitute an admission or representation of any fact or circumstance or an admission of any liability or waiver of any right or claim. Unless and until the execution of definitive documentation, the Parties shall retain their respective rights. If executed, the terms of such definitive documentation will control. This Recovery Plan Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities.*

*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Preliminary Restructuring Support Agreement to which this Recovery Plan Term Sheet is annexed (the "**RSA**" or the "**Agreement**").*

| | |
|---|---|
| **AD HOC GROUP EXCHANGE** | ▪ The members of the Ad Hoc Group and any other holders of PREPA Bonds subject to the RSA (the "**Supporting Holders**") shall commit to exchange all of their uninsured bonds for Securitization Bonds (as defined below) on the terms and in the manner set forth below. |
| **SECURITIZATION BONDS** | ▪ The Puerto Rico Electric Power Authority Revitalization Corporation or a new bankruptcy-remote special purpose vehicle as may be agreed upon shall issue Tranche A and Tranche B Securitization Bonds, secured by the Transition Charge. |
| **TRANSITION CHARGE** | ▪ The Transition Charge allocable to the outstanding power revenue and revenue refunding bonds issued by PREPA under the 1974 Trust Agreement shall be set at the following levels: |
| |      -   2.636 c/kWh for Years 1-5 |
| |      -   2.729 c/kWh for Years 6-10 |
| |      -   2.868 c/kWh in Year 11 |
| |      -   Starting year 12, annual 2.500% increases over the prior year's Transition Charge |
| | ▪ The Transition Charge allocable to the outstanding power revenue and revenue refunding bonds issued by PREPA under the 1974 Trust Agreement shall be capped at 4.348 c/kWh |
| **EXCHANGE RATIO[1]** | ▪ 67.5% of PREPA Bonds to Tranche A Bonds |
| | ▪ 10.0% of PREPA Bonds to Tranche B Bonds |
| **TRANCHE A BONDS** | ▪ Tranche A Bonds will extend beyond the stated maturity if not paid in full on the stated maturity, until paid in full, including unpaid interest. |
| | ▪ Unpaid interest on the Tranche A Bonds will accrete. |
| **TRANCHE B BONDS** | ▪ PIK interest to accrue annually starting in Year 1. |
| | ▪ Tranche B Bonds shall receive 100% of total excess cash flow after repayment of the Tranche A Bonds. Potential recovery on the Tranche B Bonds shall be |

---

[1] Initial Claims include unpaid interest through July 1, 2018 and will continue to accrue through the effective date of the exchange. The Transition Charge shall increase to cover accrual of claims and waiver and support fees after July 1, 2018.

| | |
|---|---|
| | capped at the exchange amount, plus PIK interest. |
| | ▪ Tranche B Bonds will mature at stated 45 year maturity, and all unpaid debt service will expire unpaid. |
| **MATURITY** | ▪ Tranche A Bonds:  40 year stated maturity, subject to early mandatory redemption from sweep of Transition Charge cash flow (35 year expected maturity under Oversight Board's May 2018 projections, which may change) |
| | ▪ Tranche B Bonds:  45 year stated maturity |
| **COUPON** | ▪ Tranche A Bonds:  5.25% cash interest |
| | ▪ Tranche B Bonds:  7.00% PIK interest / 8.75% PIK interest to the extent the Tranche B Bonds are not tax-exempt (solely for portion that is not tax-exempt) |
| **TAX TREATMENT** | ▪ Tranche A Bonds:  Tax-exempt |
| | ▪ Tranche B Bonds:  Parties will work together in good faith to try to obtain tax-exempt status for Tranche B Bonds or as great a portion thereof as possible; provided, however, that failure of such good faith effort to obtain tax-exempt status for Tranche B Bonds shall not constitute grounds for any party to terminate the RSA. |
| **CALL PROTECTION** | ▪ Tranche A Bonds:  Callable after 5 to 10 years, to be mutually agreed upon |
| | ▪ Tranche B Bonds:  Callable after period of time and on terms to be mutually agreed upon |
| **DEBT SERVICE RESERVE FUND ("DSRF")** | ▪ The DSRF shall be set at 5% of Tranche A Bonds. |
| | ▪ DSRF will be funded over approximately 7 years from the Transition Charge, unless the parties mutually agree upon a different financing structure for the DSRF, including a surety bond on terms to be mutually agreed upon. |
| **PAYMENT DEFAULT** | ▪ No default on either Tranche A or Tranche B Bonds for failure to pay scheduled debt service, so long as full amount collected under the Transition Charge (minus administrative fees) is used to pay debt service.  Interest shall continue to accrue (and pay-in-kind, as applicable) and accrete at the original Coupon rate. |
| | ▪ The Transition Charge shall extend, and interest shall continue to accrue (and pay-in-kind, as applicable) at the original Coupon rate, until the later of (1) the date necessary to pay the Tranche A Bonds in full, even if past their stated maturity, and (2) the earlier of (i) the stated maturity of the Tranche B Bonds, and (ii) the date on which the Tranche B Bonds are paid in full. |
| **REMEDIES** | ▪ Remedies will be mutually agreed upon and will include, at a minimum, the right to replace the Transition Charge servicer and the right to enforce the Securitization Bonds' trust agreement, the servicing agreement, and non-impairment covenants. Requirements for replacement servicer to be mutually agreed upon as part of Definitive Documentation. |

| TREATMENT PROTECTIONS | <ul><li>To be mutually agreed upon</li><li>MFN clause for deals struck with other legacy debt holders, to be mutually agreed upon and to apply to monoline insurers, fuel line lenders and, subject to a materiality threshold to be mutually agreed upon, certain other claims</li><li>The Ad Hoc Group shall not object if other legacy debt holders (including fuel line lenders) receive the same treatment with the same terms as the Ad Hoc Group is receiving, so long as such treatment does not adversely affect the Ad Hoc Group's recoveries.  Adjustments to coupons and par are authorized, so long as total cash flow payable each year remains the same (with proportional adjustments for the varying claim sizes of varying legacy debt claims), and so long as such treatment shall not adversely affect the Ad Hoc Group's recoveries.</li></ul> |
|---|---|
| SECURITIZATION PROTECTIONS | <ul><li>To be mutually agreed upon</li></ul> |
| DEMAND PROTECTIONS | <ul><li>To be mutually agreed upon</li></ul> |
| ADMINISTRATIVE AND WAIVER/SUPPORT FEES | <ul><li>Terms, structure, and cap on administrative fees to be mutually agreed upon</li><li>Reimbursement of Ad Hoc Group members' reasonable fees and expenses through effective date of transaction, with monthly reimbursement to begin upon execution of the RSA.</li><li>Contingent upon consummation of the proposed exchange transaction, in exchange for (i) waiver of claims unique to the issuance of the 2016 PREPA Bonds and (ii) participation, the Ad Hoc Group shall receive a waiver and support fee in the form of Tranche A Bonds initially equal to 1.72% of the par amount of PREPA Bonds held by the Ad Hoc Group as of July 1, 2018 (and accruing after July 1, 2018 at the same rate as the Ad Hoc Group's 2016 PREPA Bonds).</li><li>Additional support (and potential waiver) fee in the form of Tranche A Bonds initially equal to 0.95% of par amount of total outstanding PREPA bonds (and accruing after July 1, 2018 at same rate as the 2016 PREPA Bonds), to be provided to Supporting Holders, including additional signatories, in manner to be mutually agreed upon.</li></ul> |
| IMPLEMENTATION | <ul><li>Timeline and implementation mechanics to be mutually agreed upon</li></ul> |

EXHIBIT 3

TRANSITION CHARGE UNDER RSA

| | | Transition Charge | Transition Charge |
|---|---|---|---|
| | | w/ Fuel Line | w/o Fuel Line |
| Year | Yr # | c/kWh | c/kWh |
| 2019 | 1 | 2.850 | 2.636 |
| 2020 | 2 | 2.850 | 2.636 |
| 2021 | 3 | 2.850 | 2.636 |
| 2022 | 4 | 2.850 | 2.636 |
| 2023 | 5 | 2.850 | 2.636 |
| 2024 | 6 | 2.950 | 2.729 |
| 2025 | 7 | 2.950 | 2.729 |
| 2026 | 8 | 2.950 | 2.729 |
| 2027 | 9 | 2.950 | 2.729 |
| 2028 | 10 | 2.950 | 2.729 |
| 2029 | 11 | 3.100 | 2.868 |
| 2030 | 12 | 3.178 | 2.940 |
| 2031 | 13 | 3.257 | 3.013 |
| 2032 | 14 | 3.338 | 3.089 |
| 2033 | 15 | 3.422 | 3.166 |
| 2034 | 16 | 3.507 | 3.245 |
| 2035 | 17 | 3.595 | 3.326 |
| 2036 | 18 | 3.685 | 3.409 |
| 2037 | 19 | 3.777 | 3.494 |
| 2038 | 20 | 3.871 | 3.582 |
| 2039 | 21 | 3.968 | 3.671 |
| 2040 | 22 | 4.067 | 3.763 |
| 2041 | 23 | 4.169 | 3.857 |
| 2042 | 24 | 4.273 | 3.954 |
| 2043 | 25 | 4.380 | 4.052 |
| 2044 | 26 | 4.490 | 4.154 |
| 2045 | 27 | 4.602 | 4.258 |
| 2046 | 28 | 4.700 | 4.348 |
| 2047 | 29 | 4.700 | 4.348 |
| 2048 | 30 | 4.700 | 4.348 |
| 2049 | 31 | 4.700 | 4.348 |
| 2050 | 32 | 4.700 | 4.348 |
| 2051 | 33 | 4.700 | 4.348 |
| 2052 | 34 | 4.700 | 4.348 |
| 2053 | 35 | 4.700 | 4.348 |
| 2054 | 36 | 4.700 | 4.348 |

|      |    | Transition Charge | Transition Charge |
|------|----|-------------------|-------------------|
| 2055 | 37 | 4.700 | 4.348 |
| 2056 | 38 | 4.700 | 4.348 |
| 2057 | 39 | 4.700 | 4.348 |
| 2058 | 40 | 4.700 | 4.348 |
| 2059 | 41 | 4.700 | 4.348 |
| 2060 | 42 | 4.700 | 4.348 |
| 2061 | 43 | 4.700 | 4.348 |
| 2062 | 44 | 4.700 | 4.348 |
| 2063 | 45 | 4.700 | 4.348 |