UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

RECEIVED & FILED
2019 JUN -3 PM 5: 19
CLERK'S OFFICE
U.S DISTRICT COURT
SAN JUAN P.R.

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

        Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

        Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

-------------------------------------------------------------------x

**[Further Response to Docket 4417]**

**RESPONSE TO REQUEST BY FOMB FOR ADDITIONAL INFORMATION
CONCERNING NATURE OF CONSTITUTIONAL AND OTHER CLAIMS ASSERTED
IN CLAIM NO. 10701**

May 29, 2019

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

I.   ADDITIONAL CONSEQUENCES OF THE FAILURE TO ADHERE TO THE
     U.S. CONSTITUTION AND THE RULE OF LAW ...........................................1

     A.   Bait and switch on bond coupons and on the rationale for the
          discrimination in favor of Puerto Rico institutions and individuals .........1

          1.   Bond coupons.................................................................................2

          2.   Rationale for discrimination in favor of Puerto Rico investors .................5

     B.   The Bonistas affair.................................................................................6

          1.   Misdepiction of Bonistas to secure Plan approval .......................6

          2.   Information about Bonistas belatedly emerges that had not been
               disclosed.......................................................................................7

     C.   Bait and switch on what individual investors in the 50 states would
          receive.....................................................................................................9

     D.   Special benefits for negotiators of the Plan in the confidential process .................9

II.  ANY PURPORTED RELEASE OR DISCHARGE OF MY CLAIM IS NOT
     CONSTITUTIONAL AND NOT IN ACCORDANCE WITH THE RULE OF
     LAW .....................................................................................................................13

     A.   Takings Clause.......................................................................................14

     B.   Contracts Clause ...................................................................................17

     C.   Privileges and Immunities, Equal Protection, Due Process and
          48 U.S.C. §737.......................................................................................18

     D.   Due Process, First Amendment and Public Right of Access to Court
          Proceedings ............................................................................................18

     E.   Retroactively abrogating bondholder rights by "vote" ..........................18

     F.   Appointments Clause ............................................................................19

     G.   PROMESA.............................................................................................19

CONCLUSION.........................................................................................................20

<u>APPENDIX</u>

[Note:  Citations in this Response to Appendix are in the form of:  "App.___"]

## TABLE OF AUTHORITIES

Page

**Cases**

*Armstrong* v. *United States,*
    364 U.S. 40 (1960)....................................................................................................... 15

*Horne* v. *Department of Agriculture,*
    576 U.S. ___, (2015)................................................................................................... 16

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014)..................................................................... 14

*Louisville Joint Stock Land Bank* v. *Radford,*
    295 U.S. 555 (1935).................................................................................................... 14

*Lucia* v. *SEC,*
    585 U.S. ___ (2018).................................................................................................... 19

*Matter of Valuation Proceedings Under the Regional Rail Reorganization Act,*
    445 F. Supp. 994 (Special Regional Rail Reorganization Court 1977)..................... 17

*Monongahela Navigation* v. *United States,*
    148 U.S. 312 (1893).................................................................................................... 17

*Slattery Co.* v. *United States,*
    231 F.2d 37 (5th Cir. 1956) ....................................................................................... 16

*United States* v. *Contra Costa County Water District,*
    678 F.2d 90 (9th Cir. 1982) ....................................................................................... 16

*United States* v. *Security Industrial Bank,*
    459 U.S. 70 (1982)............................................................................................... 14, 16

*United States Trust* v. *New Jersey,*
    431 U.S. 1 (1977)....................................................................................................... 17

**Rules and Statutes**

48 U.S.C. §737 ................................................................................................................ 18

48 U.S.C. §2141(b)(1)(N) ............................................................................................... 19

48 U.S.C. §2174(b)(1) ..................................................................................................... 19

48 U.S.C. §2174(b)(2) ..................................................................................................... 19

48 U.S.C. §2174(b)(3) ..................................................................................................... 19

48 U.S.C. §2174(b)(6) ..................................................................................................... 19

F.R. Evid. 408 ................................................................................................................. 16

## PRELIMINARY STATEMENT

This submission, made in response to the request by the FOMB at the April 24, 2019 hearing that I provide additional information concerning the claims asserted in Claim No. 10701: (1) discusses additional consequences of the failure to adhere to the U.S. Constitution and the rule of law; and (2) summarizes the constitutional violations, including that – as the Bankruptcy Court in the *Detroit* case recognized – it is not constitutional for any order confirming the Plan to release or discharge my Takings claim or claims for just compensation, or other rights and claims under the U.S. Constitution.

Previously filed papers and argument providing bases for Claim 10701 include: Response and Opposition to COFINA's Omnibus Objection (Docket#4585), including pages 5-to-40-of-43; Supplement (Docket#4595) including pages 4-to-18-of-21; Second Supplement (Docket#4673) including pages 3-to-13-of-17; Hein declaration and exhibits (Docket#4606-3 *et seq.*); Response to revised proposed findings (Docket#4911), including pages 2-to-5-of-8; Further Response (Docket#5041), including pages 3-to-7-of-10, and attached Jan. 2019 transcript of argument (as corrected), docketed as #5041-1 & #5041-2, including #5041-page-3-to-6-of-10, and #5041-2-page-4-to-22-of-22; Supplement to Response (Docket#6283-to-#6283-11).

## I.   ADDITIONAL CONSEQUENCES OF THE FAILURE TO ADHERE TO THE U.S. CONSTITUTION AND THE RULE OF LAW

### A.   Bait and switch on bond coupons and on the rationale for the discrimination in favor of Puerto Rico institutions and individuals

On May 15, 2019, COFINA and the Puerto Rico Fiscal Agency ("AAFAF") issued an "Event Notice" stating that COFINA had received a determination from the IRS that will permit COFINA to exchange tax exempt bonds for the "A-2" and "B-2" COFINA bonds initially issued, without an opinion on federal tax-exempt status, following the February 12, 2019 effective date of the Plan.  App.049-051.  However, that Event Notice also states each of the new tax-exempt bonds will have a coupon interest rate roughly 25 basis points lower than the A-2 and B-2 bonds issued in February 2019.  App.051.

As discussed below, (1) FOMB and COFINA are now seeking to reduce coupon interest rates on the coupon bonds from what was represented in the disclosure statement and provided for in the Plan, and (2) FOMB's past assertions that there was a purported benefit to investors in the 50 states from granting discriminatory treatment in favor of Puerto Rico institutional and individual investors is now shown to be incorrect – and perhaps a contrivance all along. *See* App.005-013.

1.     **Bond coupons**.  The 11/26/18 disclosure statement specified specific coupons and maturities for 11 new COFINA bonds.  (Docket#4364-page-19-to-23,25-to-26,168-to-169).  Nothing was disclosed about a possible reduction in coupon rate.  There was also no disclosure that individual investors in the 50 states would get an even more splintered collection of 14 bond fragments (or cash in lieu) – 3 fragments issued without an opinion as to tax status. App.007.

The Plan (Docket#5055) attached a schedule entitled "Coupons and Maturity Dates" that also spelled out the coupons and maturity dates.  Docket#5055-1-page-91-of-91.  Nothing was said in the Plan about a possible reduction in coupon rates.

Nothing was disclosed anywhere about (i) issuing bonds whose tax treatment was not yet opined on, but then (ii) requiring a reduction in interest rate in order for bonds without a tax-opinion on the Effective Date to be exchanged into tax-free bonds, were an opinion later given that tax-free treatment was appropriate all along.  The disclosure statement and the Plan were to the contrary:  as noted, both set forth that there were specific maturities and interest rates for the bonds to be issued.  App.009.  Furthermore, specific coupons and maturities were factored into the calculation of the "estimated" and "projected" recovery rates of 56.414%, as depicted in Table 2B of the disclosure statement (which also assumed that the securities a subordinate bondholder would receive under the Plan would trade at par, which in turn assumed that the interest was tax-exempt) (Docket#4364-page-23,49,121-of-263; App.009-010).

The disclosure statement had said "the proportion of COFINA Bonds that will be Tax-Exempt COFINA Bonds is uncertain and cannot be determined as of the date of this Disclosure

Statement" (Docket#4364-page-230-of-263), but the disclosure statement went on to say this would be opined on by Bond Counsel: "The Commonwealth expects to cause an opinion of nationally recognized bond counsel addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds *on the Effective Date*" (Docket#4364-page-230-of-263, emphasis added).

But no sooner had the Plan become effective on February 12, 2019 than AAFAF, COFINA and FOMB, and self-selected holders of COFINA bonds, executed a "Tax Exemption Implementation Agreement." *See* 2/12/19 "Event Notice" (Docket#6283-2-page-2-of-24).  (It is hard to believe that this extensive and turgid tax implementation agreement entered into on February 12 was first conceived of, discussed, negotiated, wording worked out, and executed by 28 parties all in the space of just hours after plan became effective on February 12.)

The 2/12/19 event notice for the first time revealed that on December 14, 2018 COFINA had requested a private letter ruling or closing agreement with the IRS (Docket#6283-2-page-3-of-24, Recital "E").  The governmental parties to the 2/12/19 Tax Exemption Implementation Agreement agreed that "upon the issuance of such IRS determination" to "offer all holders" of the no-tax-opinion-yet bonds an "opportunity" to exchange such bonds for "new COFINA tax exempt bonds," but with yields 25 basis points *lower*.  (Docket#6283-2-page-2-of-24).

Nothing had been said in the disclosure statement (or any supplemental pre-vote disclosure), or the Plan itself, about:

- the prospect of a "Tax Exemption Implementation Tax Agreement";
- the prospect of bondholders being required to accept a lower interest rate – below those listed in the disclosure statement – in order to receive tax exempt bonds;
- COFINA requesting a private letter ruling or closing agreement with the IRS – to the contrary, the disclosure statement stated that "a private letter ruling has not been submitted to the Internal Revenue Service (the "IRS") and no written or other formal determination has been issued by the IRS" (Docket#4364-page-232-of-263).

- that even though a (undisclosed) request for a private letter ruling had been made, Plan proponents would rush to consummate without waiting for the IRS to issue it. Compare Docket#4364-pages-232-to-248-of-263.

The Tax Exemption Implementation Agreement states in recital "B" as follows:

> Pursuant to the [September 20, 2018] Plan Support Agreement, each of the Oversight Board, COFINA, and AAFAF has covenanted to use its "reasonable best efforts to cause the new COFINA securities [*i.e.*, the new COFINA Bonds], ... to be tax-exempt ...." The *Government Parties*, on the one hand, and the Supporting Holders, on the other, *dispute whether such covenants* under the Plan Support Agreement *survive the occurrence of the Effective Date*. (Docket#6283-2-page-3-of-24) (emphasis added)

If it was the position of FOMB, COFINA and AAFAF that their covenant to use "reasonable best efforts" to cause the new COFINA securities to be tax-exempt would expire upon the coming of the Effective Date, then:

- It was incumbent upon FOMB, COFINA and AAFAF to disclose that in the disclosure statement (nothing is said to this effect), or at least in a supplement to the disclosure statement, before voting and before the Plan confirmation hearing.

- It was also incumbent upon FOMB, COFINA and AAFAF to alert the Court that, if the Court complied with their rush to consummate, that they could (and would) seek to hold cooperation to ensure tax exempt status hostage to their demands for even more that they were never entitled to in the first place.

Finally, the attempt by FOMB, COFINA and AAFAF to force bondholders to give up 25 basis points of the interest rate on the bonds in order to get the tax-exempt bonds they were entitled to all along violates provisions of the Plan, which provides:

> *in the event applicable United State law does not permit* all COFINA Bonds to be issued on a federally tax-exempt basis, COFINA shall issue Taxable COFINA Bonds ... (Section 1.114, p.14, Docket#5055-1-page 26-of-91) (emphasis added).

The May 15, 2019 Event Notice states that bond counsel is expected to deliver its opinion that interest on the Exchange Bonds "accruing or accreting *from the original delivery date thereof (February 12, 2019)* will be excluded from gross income for federal tax purposes" (App.051, emphasis added). So it is conceded that interest on the A-2 bonds qualifies as tax-exempt, back

to February 12, 2019 when the bonds issued. Since federal law admittedly *does* permit all COFINA bonds to be issued on a federally-tax-exempt basis, that is what the Plan requires be done – and without any "holdup" to extract a reduction in the Plan-specified coupon rates.

        **2.**      **Rationale for discrimination in favor of Puerto Rico investors**. Plan proponents sought to justify the discriminatory additional consideration made available only to Puerto Rico residents as supposedly benefiting everybody by maximizing the availability of tax exempt bonds to holders in the 50 states. *See* FOMB proposed findings of fact and conclusions of law ¶ 142 (Docket#4846-1-page-56-to-57-of-121), *adopted* in ¶ 145 of this Court's opinion (at 5053-page-64-of-88).

        Yet now it turns out that the Puerto Rico institutions and individuals who received the 2% cash fee and single relatively short-term 2040 maturity interest-bearing coupon bonds – and no longer-term zero coupon bonds – get to have their cake and eat it too: they too have the option to elect federally tax-exempt bonds. Thus, the May 15, 2019 Event Notice states that "all holders" will be offered federally tax exempt bonds. App.005-006,050.

        Did the Plan proponents know all along that the transaction they structured should result in federal tax exempt treatment for all bonds – including bonds for those who elected the Puerto Rico preference? The answer may be found in the December 14, 2018 request to the IRS for a ruling and the IRS May 2019 response, but neither has been publicly disclosed by FOMB, to my knowledge. This Court should direct that these documents be disclosed.

        Furthermore, it appears that by giving up COFINA pledged revenues in the confidential negotiations the senior bondholders could actually enjoy economic recoveries above 100% as they ***convert*** (through the Plan) ***into*** new tax-exempt bonds what were originally issued (in or prior to 2011) as taxable senior bonds – albeit in many cases these taxable bonds were acquired post-PROMESA at depressed prices by senior bondholder Plan proponents (Docket#6283-11-page-9-to-10,18-of-18; App.011-012,015-017).

**B.    The Bonistas affair**

      **1.    Misdepiction of Bonistas to secure Plan approval**.  FOMB's disclosure

statement (Docket#4364, approved at #4382) described Bonistas as follows:

> BONISTAS DEL PATIO, INC. (AN ORGANIZATION ADVOCATING
> FOR THE INTERESTS OF LOCAL BONDHOLDERS …
> (Docket#4364-page-37-of-263)

FOMB's statement about Bonistas was in bold, all capitalized type.

      The disclosure statement went on to say that Plan proponents, including Bonistas,

> … BELIEVE THE PLAN OF ADJUSTMENT REPRESENTS A FAIR AND
> REASONABLE OUTCOME FOR ALL CREDITORS OF COFINA AND,
> THEREFORE, CONFIRMATION OF THE PLAN OF ADJUSTMENT IS IN
> THE BEST INTERESTS OF COFINA AND ITS CREDITORS….
>
> … BONISTAS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN
> OF ADJUSTMENT.  (Docket#4364-page-37-of-263)

      Proposed findings of fact and conclusions of law submitted by FOMB to this Court set

forth the following as to Bonistas (Docket#4846-1-page-41-of-121):

> Bonistas, advocating for the interests of Puerto Rico resident bondholders,
> actively participated.  (Docket#4846-1page-41-of-121)

      This Court, in its opinion approving the Plan (Docket#5053-page-43-of-88), adopted

word for word the FOMB's assertions with respect to Bonistas:

> Bonistas, advocating for the interests of Puerto Rico resident bondholders,
> actively participated.  (Docket# 5053-page-43-of-88).

      Bonistas' support was critical to winning the support of Puerto Rico investors.  Bonistas

agreed to "actively encourage support by 'on island' bondholders."  (Docket#4364-2-page-27-of-

110).  Bonistas' counsel has stated that Bonistas "[c]ommunicated with Local Bondholders"

"through phone calls, emails, at least eight public statements published throughout local media

outlets" and on Bonistas' website, as well as having in-person and video conference meetings

with Local Bondholders.  (Docket#5117-1-page-7-of-10).

      And Plan proponents noted Bonistas' significant supporting role:

> Once the ultimate compromise was reached, the Bonistas remained avid and vocal
> supporters of the Plan, and *their outreach efforts on-Island were instrumental in
> marshalling voters. The results of those efforts are reflected in the multiple thousands of
> on-Island holders who voted on, and made elections in respect of the Plan.*  In addition,

the benefits of the Bonistas' efforts accrued in favor of both the Commonwealth and
COFINA as they were able to achieve, among other things, a largely uncontested 9019
settlement motion and a consensual Plan, respectively. *Moreover, a significant portion of
local bondholders elected to receive their ratable share of taxable bonds and 2% cash
payment that was also distributed along with the taxable bonds.* (Docket#5118-page-3-
to-4-of-6). (emphasis added)

> ### 2.    Information about Bonistas belatedly emerges that had not been

**disclosed**. After the Plan was approved – with the aid of the Bonistas endorsement and the

special preference for on-island holders -- Plan proponents sought to award Bonistas $7 million.

Literally on the eve of the Effective Date, at 10:09 p.m. on February 11, 2019, AAFAF filed an

"Informative Motion" regarding Section 15.2 Expenses. Docket#5097-1-page-3-of-5. (One can

presume that the idea of a multi-million dollar payment to Bonistas had come up at some point

before the (literally) "eleventh hour," but public disclosure was held back.)

In reaction, other facts about Bonistas also began to emerge, including that Bonistas'

principals had other undisclosed interests and transactional relationships with Debtors and their

instrumentalities (Docket#5136-page-1-to-18-of-18;Docket#5136-2-page-2-to-3-of-3).

The FOMB praise of Bonistas as "advocating for the interests of the Puerto Rico resident

bondholders" in the disclosure statement was misleading, as FOMB failed to tell bondholders –

or the Court in the proposed findings FOMB submitted – that:

- While Bonistas did not own any COFINA bonds (Docket#4364-2-page-15-of-110),
  Bonistas principals did own other Puerto Rico bonds (App.002,142: "hold … Puerto
  Rico's outstanding debt;" Docket#5136-page-10-of-18). The inference is that
  Bonistas' principals owned GO Bonds, or other Puerto Rico bonds, that would *benefit*
  from COFINA *giving up* pledged tax revenues to the Commonwealth.

- Counsel for Bonistas was also counsel to a major GO bondholder group (*compare*
  Docket#5117-1-page-1-of-10-*with*-Docket#4742-page-1-of-3), which had an interest
  in diverting COFINA pledged revenues to the Commonwealth.

- The principals of Bonistas include a former GDB President, and the President of
  Bonistas transacted with the Commonwealth, including GDB (including purchasing

property appraised at $19.6 million from the GDB for $12 million).  Docket#5136-page-10-of-18; #5136-2-page-2-to-3-of-3.

- Bonistas viewed the Puerto Rico investors that it supposedly advocated for as "approximately evenly weighted" between senior and subordinate bondholders (Docket#5117-1-page-5-of-10) – perhaps a reference to Puerto Rico institutional holdings of senior COFINA bonds (App.017).  So Bonistas was not an advocate specifically for *subordinate* bondholders, even in Puerto Rico.

- Bonistas intended to seek a multi-million dollar payment for its troubles and "expenses" in urging Puerto Rico COFINA holders to accept the Plan.

- The Commonwealth was willing to pay millions of dollars to Bonistas because "Bonistas played a critical role" in advancing the COFINA Plan "which had critical and manifestly obvious *benefits to the Commonwealth*" (Docket#5117-page-3-of-7, emphasis added).  In short, the Commonwealth is willing to pay Bonistas for providing "benefits to the Commonwealth," not benefits to subordinate bondholders.

Based on the Bonistas advocacy and the special preference to Puerto Rican institutions and individuals, 5560 subordinate bondholders opted out of Class 5 and elected the special Puerto Rico preference under class 7.  Docket#4794-page-9-of-28.  This number dwarfs the 1940 vote difference between the class 5 "yes" and "no" votes.  *Id.*  Had the special consideration not been offered to Puerto Rico residents, and those Puerto Rico residents voted as part of class 5, that likely would have resulted in a rejection of the Plan by class 5.  And since – as Plan proponents admit – Bonistas' "out-reach efforts on Island were instrumental in marshalling voters" and prompting elections taking Puerto Rico holders out of class 5 (Docket#5118-page-3-to-4-of-6), it is apparent that the misrepresentations in the disclosure statement about the nature of Bonistas' interests, coupled with the Puerto Rico preference, made the difference in the class 5 vote result.

**C.      Bait and switch on what individual investors in the 50 states would receive.**

The 11/26/2018 disclosure statement set forth in all bold, capital letters as follows:

> **IF YOU DO NOT ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES AND NO CASH**.  (Docket#4364-page-43-of-263).

This statement represented to individuals in the 50 states what "you will receive:" "a distribution … approximately equal to 56.414%."  But, this **BOLD, ALL CAPS** representation in the disclosure statement was not true.  Docket#6283-11-page-2-to-8-of-18; App.025-041.

The disclosure statement's Table 2B "Illustrative example of $50,000 holdings of 'first subordinate' existing securities if you <u>DO NOT</u> elect to receive taxable COFINA Bonds" identified the specific maturities of coupon interest-bearing bonds (CIBs) and capital appreciation bonds (CABs) that an individual holder with $50,000 par existing COFINA securities would receive.  #4364-page-23-of-263.  While anyone with 50,000 par original COFINA subordinate securities should have received the distribution promised in Table 2B (App.039), individuals did **not** receive the promised quantities of bonds.  #6283-11-page-2-to-8-of-18; App.025-041.

The disclosure statement also repeatedly stated that a subordinate bondholder in the 50 states "will receive" a "projected" or "estimated" recovery of 56.414% (Docket#4364-page-49,121-of-263).  This was also not the case.  Docket#6283-11-page-2-to-8-of-18; App.025-041.  Losses to 50-states individuals turned out much higher in the chaotic exchange process:  forced sales of fractional bonds occurred as "rounding cash" was distributed pro rata; splintered fragments of 14 new bonds lacked liquidity; and 50-states holders of tax-*exempt* bonds were issued 20%+ bonds initially without a tax opinion.  (#6283-page-3-to-7,8-to-12-of-13;#6283-11-page-2-to-10-of-18; App.025-041.)

**D.      Special benefits for negotiators of the Plan in the confidential process**

1.      The Commonwealth took bondholders' property by releasing the lien on almost one-half of pledged tax revenues.  *See* below, and Part II.A, below.

- COFINA is "an instrumentality of the Commonwealth." Docket#4606-4-page-36-of-173;#4606-4-page-73-of-173;#4606-5-page-7-of-155;#4606-5-page-49-of-155.

- Plan proponent FOMB serves as "representative of" both Commonwealth and COFINA (see case caption, Docket#5055-page-1-of-45).

- To "implement" the "settlement," the Commonwealth's legislature enacted "New Bond legislation" that amended the statute that created COFINA "to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues," making "[t]hese revenues … available for use by [Commonwealth]." The legislation said the benefit to the Commonwealth would be "approximately $437.5 million per year." Docket#5053-1-page-25-of-43.

- The charge for the "COFINA Agent" was to negotiate "from the perspective of what result is best for the Debtor" as opposed to "any particular type of creditor of the Debtor." Docket#5053-page-20-of-88.

- The Commonwealth committed by statute to a nonimpairment covenant. (Docket#4606-4-page-57-of-173;#4606-5-page-30-of-155.) But its "negotiation" with its instrumentality COFINA to abrogate the lien and its enactment of the New Bond legislation to take bondholders' property did the opposite.

2.      The institutions who negotiated the Plan shared $332 million in fees (and to the extent those fees covered supposed expenses, the amount of those expenses were not documented). The $332 million "consummation costs" were paid to these institutions at the effective rate of 3.52% of par of the $10 billion par held by them. (Docket#4364-page-112-to-114-of-263; App.018-019). These payments to favored bondholders not only covered $135 million of "estimated" (but undocumented) supposed "fees and expenses," but $197 million more. (Docket#4364-page-112-to-114-of-263; Docket#6283-page-7-of-13)

3.      Post-enactment of PROMESA, the price of subordinate COFINA bonds dropped below 10% of par (Docket#4606-3-page-2-to-4;#4606-4-page-19-21,29-of-173; App.015-016). A number of participants in the confidential process acquired large positions, at distressed prices,

and enjoyed large profits at the Plan's recovery levels—even before their additional 3.52% of par (Docket#4769-1-page-3-to-4-of-27; App.015-017).

4.      Negotiating institutions bought over $2 billion of COFINA subordinate bonds post-PROMESA at these distressed prices, voted these subordinate bonds for the Plan, and enjoyed substantial profits on the recovery terms they negotiated.

- Between 7/25/2017 and 11/16/2018, several *senior* bondholders purchased over $1.6 billion of *subordinate* bonds.  *Compare* Docket#749-*with*-Docket#4332.

- After 3/1/2018, other senior bondholders acquired over $120 million of *subordinates*. Docket#3778.

- Between 8/8/2017 and 10/19/2018, several GO holders increased their positions in COFINA *subordinates* ($416+ million), as well as COFINA seniors ($143+ million)—in addition to holdings of over $1.72 billion uninsured GO bonds. *Compare* Docket#3761-page-7-of-30-*with*-Docket#4079-page-6-to-7-of-8.

5.      Over $1.2 billion was held in trust for subordinate holders (Docket#4606-7-page-398-of-447; App.041-042).  Yet instead of paying all subordinate bondholders their share of cash held in trust, almost all of the pre-7/1/2018 debt service cash was distributed to favored parties: $332 million of "consummation costs" was paid to bondholder participants in the confidential process; most of the rest was paid to senior bondholders (Docket#4364-2-page-106-of-110). Little was paid to modest-sized subordinate bondholders in the 50 states.  Docket#4585-page-15-to-16-of-43; Docket#4364-2-page-106-of-110; App.041-042.

6.      Both senior and subordinate were secured by the same pledged tax revenues and legal structure (Docket#4585-page-5-to-6,17-to-20-of-43; Docket#4606-3-page-4-to-6;#4606-4-page-30,39-51,57-64-of-173;#4606-6-page-1,11-25,28-37-of-241).  If the lien was invalid, senior and subordinate bondholders would suffer alike; if the lien was valid both senior and subordinate bondholders would be paid (*see* Part II.A and App.013-015).  Yet, participants in the confidential process skewed the recovery to senior bonds.

7.      Special benefits were given to Puerto Rico institutions and individuals in order to assuage Puerto Rico interests and remove potential "no" votes from Class 5.  Docket#4364-page-17-to-24,37-of-263; App.021:

- Puerto Rico institutions and individuals were provided added and different consideration based on residence in Puerto Rico.  (Docket#4585-page-12-to-17-of-43; Docket#4364-page-17-to-23,42&43,112-of-263).  This included Puerto Rico funds, associated with Santander and UBS, which participated in the confidential process.  (Docket#1057;#3776;#4364-2-page-57,63-64,70-73; App.017).

- Puerto Rico institutions and individuals owning subordinate bonds could elect 2% of par cash and a *single* tranche of shorter-maturity, current-interest-paying bonds that are more liquid in modest-sized quantities, even if the investor had bought its bonds post-PROMESA, at depressed prices.  (Docket#4364-page-21-to-23-of-263; Docket#4585-page-12-to-15-of-43).  For Puerto Rico consummation cost parties, this meant 5.52% par in cash, on top of everything else.  App.018-019.

- While those who elected the Puerto Rico preference were said to receive federally taxable securities, "on island" investors are generally not subject to federal taxation (Docket#4364-page-17,233,255-of-263;#4569-page-8-9-of-14).  Many COFINA bonds were originally sold as taxable (Docket#6283-11-page-9-to-10,18-of-18; App.011-012).  A Puerto Rico investor who originally bought taxable bonds and elected preferential treatment would receive the same type of bonds originally bought.

- Mainland retail investors received no cash fee and securities they received were splintered, with single CUSIPs mandatorily exchanged into 14, including 3 no-tax-opinion-yet splintered fragments.  (Docket#6283-page-8-to-12-of-13;#6283-1-page-3-of-3).  Most of the repayment of principal to 50-states investors is back-loaded to 2046, 2051 and 2058.  (#4364-page-21-to-23-of-263).  The splintered fragments distributed to 50-states investors are substantially less marketable.  (#6283-11-page-6-to-8-of-18).  Even 50-states investors who had purchased taxable COFINA bonds for

-12-

tax-exempt accounts (*e.g.*, IRAs) were *not* offered the option of 2% par cash and single-tranche, coupon-paying bonds. #4364-page-41-to-43-of-263.

8.    Special benefits were given to institutional subordinate holders who participated:

- Assured received added consideration:  (1) Its share of Consummation Costs (Docket#4364-page-103-to-104,112-to-114-of-263;#4364-2-page-2,44).  (2) The ability to call its insured bonds early, "rewrap" new bonds as insured and sell them on the market for a premium over uninsured bonds, at the expense of Commonwealth (Docket#4364-page-49-50-of-263; #5091-Ex. M-page-1844-to-1848).

   (3) Enhancement of its position as insurer of other Puerto Rico government bonds (Assured's overall Puerto Rico exposure, including GO bonds, was almost *20-fold greater* than its COFINA subordinate exposure. App.017-018, 075-078).

- Subordinate bondholders such as Oppenheimer, Santander, UBS Puerto Rico funds and Goldman Asset Management:  (1) Received Consummation Cost payments for subordinate, as well as senior, holdings (Docket#4364-page-103-to-104,112-114-of-263;#4364-2-page-2,70-to-73-of-110).  (2) Had significant COFINA senior and GO positions, as well as COFINA subordinates (Oppenheimer held $300+ million senior uninsured, as well as $1.092 billion GO bonds; Santander held $144+ million senior uninsured; UBS's Puerto Rico funds held $394+ million senior; Goldman-held senior and subordinate.  (Docket#3776-page-41-to-42-of-42;#3768-page-5-to-10-of-10; #4364-2-page-70-to-73-of-110; App.017).

- Because of larger positions, and (for Assured) nonparticipation in Class 5 and ability to "re-wrap," these Consummation Cost parties were not adversely impacted by splintering of single bond CUSIPs into 14 fragments (App.017-018).

## II.    ANY PURPORTED RELEASE OR DISCHARGE OF MY CLAIM IS NOT CONSTITUTIONAL AND NOT IN ACCORDANCE WITH THE RULE OF LAW

The rule of law requires not simply that there be a "law", but also that the law be Constitutional.  PROMESA maybe a "law" but, if it is a "law" that retroactively permits one

group of bondholders – induced by fees and profit for themselves – to negotiate in secret and then vote to approve a plan that disadvantages a second group of unrepresented bondholders, it is not constitutional. The New Bond Legislation – that "release[s] the lien that holders of COFINA bonds currently have" making "[t]hese revenues … available for use by [Commonwealth]" (Document#5053-1-page-25-of-43) – may be a "law," but is not Constitutional.

### A. Takings Clause

The Takings claims, including claims for just compensation, cannot be released or discharged under the Plan. Nor can other rights and claims under the Constitution, whether as against the debtor or, *e.g.*, as against the Commonwealth. *See In re City of Detroit*, 524 B.R. 147, 267-70 (Bankr. E.D. Mich. 2014) (holding that a plan that impaired a constitutional claim for just compensation would violate the Fifth Amendment); Docket#4585-page-24-to-25,29-of-43 (discussing *United States* v. *Security Industrial Bank*, 459 U.S. 70, 75 (1982) ("[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation," *citing Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555, 589-90, 601-02 (1935)); Docket#4911-page-4-of-6; #5041-2-page-19-to-21-of-22.

The Plan, which retroactively abrogated pre-PROMESA liens, violated the Takings Clause. *See* Docket#4585-page-24-to-25-of-43; Docket#4595-page-4-to-6-of-21, and below.

- COFINA subordinate bonds were "secured by a statutory lien against pledged SUT revenues" (to quote FOMB itself). (Docket#4585-page-10-to-11,17-to-20-of-43; #4595-page-4-to-6-of-21; #4911-page-2-to-4-of-6; #5041-page-5-to-6-of-10; #5041-page-4-to-5-of-11; #5041-2-page-4-to-6-of-22; #5041-2-page-15-to-17,18-to-21-of-22; #4606-7-page-20-23,33,78-of-447).

- In November 2018, the Commonwealth Legislature, in its "Statement of Motives" for the New Bond Legislation, conceded that bondholders had a lien over pledged SUT revenues, stating "[t]hese amendments will serve to release the lien that holders of COFINA bonds *currently have* ….". (Docket#4585-page-22-of-43; Docket#5053-1-page-25-of-43 (emphasis added).)

-14-

- This lien is a constitutionally protected property right. Docket#4595-page-5-of-21, *citing Armstrong* v. *United States*, 364 U.S. 40, 44-49 (1960). No court ever ruled that the COFINA structure and lien were invalid. Docket#4585-page-17-to-20-of-43; #4595-page-4-to-6-of-21; #4911-page-2-to-4-of-6; #5041-page-5-to-6-of-10; #5041-1-page-4-to-5-of-11; #5041-2-page-4-to-6,15-to-17,18-19-of-22. The confirmation orders declare that substantially the same COFINA structure and lien *are* valid. #5053-page-48-to-51,76-81; #5055-page-8-to-10-of-45. That the new COFINA structure and lien are materially the same as the original COFINA structure and lien in Act 91 was confirmed by the Commonwealth legislature's pronouncement that the New Bond legislation "[made] clear the original legislative intent of Act 91-2006, as amended." Docket#5053-1-page-25-of-43; #4585-page-18-of-43.

- Based on the lien, the subordinate bonds, when sold by COFINA, were highly rated—A+1/A1—investment-grade bonds with modest interest rates. (Docket#4585-page-6-of-43; #4606-3-page-5-of-13;#4606-4-page-30,76-of-173;#4606-5-page-1,52-of-155). At the time of sale, COFINA subordinate bonds were rated higher than Puerto Rico general obligation bonds (*compare* #4606-7-page-182-of-447).

- While bonds were being sold and investor monies collected, no one—not the Commonwealth, not general obligation bondholders—challenged the legal validity of the COFINA lien or structure, which was materially similar to structures used by other municipal issuers. Docket#4585-page-7-to-11,17-20-of-43; #4606-4-page-57-to-67-of-173;#4606-5-page-30-to-42-of-155;#4606-7-page-7-to-19-of-447;#4606-7-page-380-to-389-of-447.

- The Official Statements and bond resolutions were explicit that no modification or amendment may permit a reduction in the principal or rate of interest "without the consent of each Bondholder." Docket#4585-page-6&7-of-43; #4606-4-page-151-152-of-173;#4606-5-page-134-135-of-155;#4606-6-page-227-of-241.

- COFINA was never insolvent.  COFINA's Title III was filed despite the fact that pledged tax revenues continued to be deposited into the Trustee's accounts (Docket#4606-7-page-398-of-447) and were sufficient to pay all COFINA bonds in full, as Plan proponents' own witness (Rodrigue) acknowledged.  Docket#4848-page-154:5-23; #4606-1-page-2-of-3;#4606-2-page-6-of-7;#4642-1-page-6-of-7; #4606-3-page-6,9-12-of-13;#4606-7-page-398-of-447;#4606-7-page-437-of-447; #4585-page-32-to-39-of-43; #4364-4-page-27-of-141; App.013-015.

- The fact Puerto Rico took property "for itself," *Security Industrial Bank*, 459 U.S. at 77-78, underscores the Takings Clause violation.  Allowing government to justify a taking by an asserted desire or need for money ("[t]hese revenues will now be available for use by the Government" (Docket#5053-1-page-25-of-43)) would render the Takings Clause a dead letter.

- *Horne* v. *Department of Agriculture*, 576 U.S. __ (2015), slip op. 4-11, underscores that *Penn Central* does not apply.  The Constitution protects against takings of personal property or intangibles (like patents), and against partial takings.

- The results of a confidential settlement process cannot be considered as evidence of validity or amount, much less relied upon to assess whether "just compensation" was provided to *non*participants.  F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (*citing* 408); *Slattery Co.* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").  *A fortiori*, when there is no contemporaneous record of what actually occurred in the confidential process, and thus no record support for any "discount" assertedly "determined" in that confidential process.  In any event, *non*participants may not be bound by "determinations" through a confidential process "among sophisticated parties," particularly when those "sophisticated" participants receive benefits that *non*participants do not and/or have conflicting interests.  *See* Part I.D, above and Part II.D, below.

- Since the new lien is materially the same as the original lien, and the court endorsed the validity of the new lien, the "value" of reducing "litigation risks" to the original lien is subjective and speculative. *E.g.* Docket#4673-page-3-to-9-of-17. "Compensation required by the Fifth Amendment must be sure and certain and equivalent in value to the property taken." *Matter of Valuation Proceedings*, 445 F. Supp. 994, 1003-04 (Special Regional Rail Reorganization Court 1977). "Compensation must be a fair and perfect equivalent for the property taken." *Monongahela Navigation* v. *United States*, 148 U.S. 312, 326 (1893).

- If one did attach a "value" to eliminating "litigation risks" to the validity of the lien, seniors and subordinates would be equally affected. Docket#4585-page-20-of-43. Yet the "sophisticated parties" who "determined" the "allocation" chose an allocation to benefit themselves. *See* Part I.D above.

Highlighting the egregiousness of the Constitutional violation, FOMB and COFINA teamed up with major institutions to ensure that the adverse consequences of the taking fell disproportionately on unrepresented retail investors in the 50 states, even while many major institutions actually profited from the Plan. *See* Parts I.B.2, I.D.

## B.    Contracts Clause

The New Bond Legislation adopted by the Puerto Rico legislature, that by its terms "released[d] the lien the holders of COFINA bonds currently have," violates the Contracts Clause. Docket#4585-page-22-to-24,32-to-39-of-43 (discussing *United States Trust* v. *New Jersey*, 431 U.S. 1 (1977)); #4673-page-11-to-13-of-17; #5041-1-page-2-to-5-of-11; #5041-2-page-9-to-15-of-22. As the Supreme Court observed, "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised" (*United States Trust*, 431 U.S. at 26). *A fortiori* here, where Puerto Rico *lowered* taxes by $2 billion. Docket#4585-page-37-of-43; Docket#4606-8-page-167-to-170-of-180; App.023-024. If the Supreme Court hears this matter, I will urge the adoption of a more stringent standard to govern whether a state or the Commonwealth may seek to abrogate contracts with its bondholders, such as that

articulated by Chief Judge Burger concurring in *United States Trust*. Docket#5041-2-page-15-of-22.

### C.     Privileges and Immunities, Equal Protection, Due Process and 48 U.S.C. §737

The discrimination that occurred in the Plan, which provided benefits and consideration to residents of Puerto Rico not made available to me and other bondholders in the 50 states, violates the Privileges and Immunities, Equal Protection and Due Process Clauses and 48 U.S.C. §737. *See* Docket#4585-page-12-to-17,22n9,25-to-27-of-43; #4595-6-to-13-of-21; #5041-2-page-6-to-9-of-22.

### D.     Due Process, First Amendment and Public Right of Access to Court Proceedings

The use of a confidential settlement process to establish the terms of a Plan that is imposed upon nonparticipating bondholders, and to purport to establish the "value" of the property interests of nonparticipating bondholders, violates the Constitution, including Due Process and the First Amendment right of public access to court proceedings. This is especially so since there was no actual advance notice to nonparticipating bondholders that provided them a meaningful opportunity to participate, negotiators in the confidential process received special benefits not shared by nonparticipants, and an unduly rapid and burdensome objection process placed impediments on the ability of nonparticipants to effectively object. *See Part I.D. above*; Docket#4585-page-27-to-28-of-43; #4595-page-15-to-17-of-21; #4911-page-4-to-5-of-8; #5041-page-4-to-6-of-10; #5041-2-page-17-to-19-of-22; #6283-page-12-to-13-of-13. App. 021-22, 042-048.

### E.     Retroactively abrogating bondholder rights by "vote"

Retroactively abrogating bondholder property and other rights by a "vote" under PROMESA – and even despite pre-PROMESA bond covenants that precluded changes in principal amounts or coupon rate without the consent of each bondholder – violates the Takings Clause, Contracts Clause and Due Process Clauses as discussed above and below. A "vote" cannot abrogate constitutional rights. Docket#5041-2-page-21-to-22.

- PROMESA was retroactively applied to override the requirement that no reduction in principal amount or rate of interest could occur without the consent of each bondholder.  Docket#4585-page-6-to-7-of-43.

- Pre-PROMESA, institutions could not collude in secret to negotiate for themselves special benefits and then "vote" for a plan that retroactively abrogates the lien securing, and reduces the principal and interest of, nonconsenting bondholders. PROMESA's "vote" mechanism cannot retroactively abrogate bondholders' rights. Docket#4585-page-27-of-43; App.021-023.

- Billions of dollars of subordinate bonds were purchased post-PROMESA at distressed prices by Plan proponents who then voted the bonds for a plan that specially benefited them.  *See* above Part I.D; App.015-017,021-023.

- 5,560 subordinate bondholders in Puerto Rico, who could have voted "no" if left in Class 5, were given the option to elect special benefits that removed them from Class 5.  *See* above Part I.B & I.D; Docket#4794-page-9-of-28; App.019-023.

- Other subordinate bondholders did not vote, one result of the on-the-eve-of-the-holidays notice.  Docket#4585-page-27-to-28-of-43; Docket#5041-2-page-17-to-19-of-22; App.021-022.

## F.   Appointments Clause

FOMB—a Plan proponent whose certification was a condition precedent to the Plan (Docket#5055-1-page-70-of-91)—was appointed in violation of the Appointments Clause, and all of FOMB's actions, including those in furthering the Plan, and including the filing of the COFINA title III proceeding, are void.  *See* Docket#4585-page-29-of-43, *citing Lucia* v. *SEC* and its ruling on remedy, 585 U.S. ___ (2018), slip op. 12-13.

## G.   PROMESA

Provisions of PROMESA have not been complied with, including 48 U.S.C. §2141(b)(1)(N) and §§2174(b)(1),(2),(3),(6).  Docket#4585-page-12-to-20,21-22,29-31-of-43; Docket#4595-page-13-to-14-of-21; Docket#4673-page-9-to-10-of-17; Docket#5041-2-page-9-

11-21-of-22; Docket#6283-page-3-to-12-of-13; Docket#6283-1 through Docket#6283-11;
Part I.A and I.C, above.

## CONCLUSION

Respectfully, the failure to follow the U.S. Constitution and the rule of law in this matter
– whatever the short term benefits in money to the Puerto Rico treasury – will have long-term
costs to both Puerto Rico and states and municipalities throughout the country that will dwarf
any short-term benefits to Puerto Rico.  Long-term investors – if they are willing to lend money
to Puerto Rico on any terms – will demand higher interest rates from the Commonwealth, as well
as other state and municipal issuers, to compensate for the risk that the "rules" will be changed to
their detriment after an investment is made.  The hedge funds that led the senior coalition here
are not traditional municipal market lenders, and are not a feasible ongoing source of funding for
municipal borrowers.  Whether a retroactive "change in rules after the game is played" is a
legislative gambit (legislators are happy to fund their agenda with other people's money) or
through judicial rulings that upset long-accepted financing structures (*e.g.*, Docket#4585-page-7-
to-11-of-43; #4606-7-page-7-to-19,380-to-389-of-447; Claim 10701 Ex. B), the result will be
substantially higher financing costs for municipal issuers throughout the country and
impairments of public infrastructure and services.  FOMB's objection to Claim No. 10701
should be denied.

Dated:  May 29, 2019

Respectfully Submitted,

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com

-20-