RECEIVED & FILE

UNITED STATES DISTRICT COURT  -3  PM 5: 19
DISTRICT OF PUERTO RICO

CLERK'S OFFICE
U S DISTRICT COURT

-------------------------------------------------------------------x

In re:                                            PROMESA
                                                  Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of                      No. 17 BK 3283-LTS
                                                  (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICfO,
et al.,

            Debtors.

-------------------------------------------------------------------x

In re:                                            PROMESA
                                                  Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of                      No. 17 BK 3284-LTS

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

            Debtor.

-------------------------------------------------------------------x

## APPENDIX TO ACCOMPANY

### [Further Response To 4417]

### RESPONSE TO REQUEST BY FOMB FOR ADDITIONAL INFORMATION CONCERNING NATURE OF CONSTITUTIONAL AND OTHER CLAIMS ASSERTED IN CLAIM NO. 10701

May 29, 2019

<u>INDEX TO APPENDIX</u>

[Note:  Citations to Appendix in Response are in the form of:  "App. __"]

| | Page |
|---|---|
| May 2019 Hein Declaration and Exhibits | 001 |
| Ex. 1: Mark Elliott 5/28/19 Declaration and exhibits A to L thereto | 004 |
| Ex. 2: Bonistas materials | 140 |

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

          Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA)

          Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

---------------------------------------------------------------x

**MAY 2019 DECLARATION OF PETER C. HEIN**

**to Accompany**

**[Further Response To 4417]**

**RESPONSE TO REQUEST BY FOMB FOR ADDITIONAL INFORMATION
CONCERNING NATURE OF CONSTITUTIONAL AND OTHER CLAIMS ASSERTED
IN CLAIM NO. 10701**

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1.     This declaration attaches certain documents and statements referred to in my accompanying "Response to Request by FOMB for Additional Information Concerning Nature

0001

Of Constitutional and Other Claims Asserted in Claim No. 10701." The factual statements in my Response are true and correct to the best of my knowledge and belief.

2.     Attached as Exhibit 1 is a Declaration of Mark Elliott dated May 28, 2019. The factual statements in the attached Mark Elliott Declaration (paragraphs 3 through 123), and the factual statements in the Mark Elliott Declaration dated April 10, 2019, previously submitted (Docket #6283-11)(paragraphs 3 through 7), are true and correct to the best of my knowledge and belief.

3.     A November 17, 2017 letter by Rafael E. Rojo, Chairman, Board of Directors of Bonistas del Patio, states in paragraph 1 that "I am one of the more than 60,000 U.S. citizens who are Puerto Rico residents and currently hold an estimated $12 billion, or nearly 20%, of Puerto Rico's outstanding debt".

a.     This letter shows a P.O. Box as the Bonistas "address" and a gmail account for the organization's email address.

b.     Googling "P.O. Box 20868 San Juan Puerto Rico" produces a web page from the Better Business Bureau identifying "Empresas VRM" "Building Construction Consultants" as having the same P.O. Box address and the same phone number ((787) 781-0025) shown on Mr. Rojo's letter.  (The web page notes that "This Business is not BBB accredited".)

c.     Other companies with the same P.O. Box address that came up on a Google search include "Seven Seas II, Corp.", "Rover Development, Inc.", "East Side Development, Inc." and Inland Investments, Inc.  Several of these companies list a street address of "322 Ave de Diego Suite 301".

d.     Googling that street address brings up "VRM Companies", with offices in San Juan, Coral Gables, Florida and Santo Domingo, Republica Dominicana.

e.     The VRM website lists Rafael Rojo as President & CEO.

f.     The VRM website has a tab for "Real Estate Development" and a tab for "Investment Companies", which includes the notation that "VRM invests in a

-2-

diversified portfolio of business interests that includes securities, bonds, stocks, notes, equities and investment lending". The website also states that "VRM has also diversified into several private equity and venture capital investments".

g.   The Bonistas del Patio website lists "P.O. Box 20868, San Juan" as its address. No street address, email or telephone number is provided for Bonistas on its website; only a fax number (787-625-2560).

h.   I was not able to take a usable screen shot of the VRM website. The contact page from the Bonistas website is attached as the first two pages of Exhibit 2, and Mr. Rafael Rojo's November 17, 2017 letter is attached as pages 3 to 5 of Exhibit 2.

Dated:  May 29, 2019

_____
Peter C. Hein

-3-

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

       Debtors.

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

       Debtor.

-------------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

PROMESA
Title III

No. 17 BK 3284-LTS

**DECLARATION OF MARK ELLIOTT**

    I, MARK ELLIOTT, hereby declare under penalty of perjury, pursuant to 28 U.S.C.
§ 1746, that the following statements are true and correct to the best of my knowledge and belief:

<u>Background Information</u>

    1.     I am the founder of the Registered Investment Advisory Firm Elliott Asset
Management, a Boston-based independent investment advisory firm.  I have a BS in Molecular
Biology, Magna Cum Laude, from the College at Charleston.  I attended Medical School at

**Exhibit 1 to Hein Declaration**

Dartmouth College and completed graduate coursework in Business Harvard University's Executive Education Program. I have passed the following industry exams and obtained the following licenses: Series 63, Series 65, and Series 66. I have been investing professionally for family and friends informally since 1999, and I founded Elliott Asset Management in 2006, which acts in a fiduciary capacity providing hedge fund style investments to individuals at an affordable cost.

2.      I submitted an Objection to the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (the "Objection") (Docket#4598) and a Declaration in support of my Objection (Docket#4769-1). I also testified at the January 16, 2019 hearing, and my declaration dated April 10, 2019 was docketed at #6283-11.

Tax-exemption determination

3.      On May 15, 2019, COFINA and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") issued an "Event Notice" stating that COFINA had received a determination from the IRS that will permit COFINA to exchange (x) tax-exempt bonds, for (y) the series "A-2" and series "B-2" new COFINA bonds that were issued following the February 12, 2019 effective date of the Plan without any opinion as to whether they were federally taxable. A copy is attached as Exhibit A.[1]

4.      However, that Event Notice also states each of the new tax-exempt bonds will have a coupon interest rate roughly 25 basis points lower than the no-tax-opinion-yet A-2 and B-2 series issued in February 2019. And thus it appears the upcoming exchange of no-tax-opinion-yet bonds for tax-exempt bonds with a tax opinion will be billed as a 'voluntary' exchange.

5.      It also appears from the Event Notice that all holders of series A-2 and series B-2 bonds — including Puerto Rico institutions and individuals who received a cash payment of 2%

---

[1] I understand that B-2 Series are bonds to be rewrapped and insured by Assured, and the B-2 series CUSIPs do not appear to have traded yet per EMMA.

2

of par of their original COFINA bonds and a single, more liquid, shorter maturity (2040) tranche of bonds — will now *also* have the option to get tax free bonds on the same terms as mainland investors, even though the Puerto Rico investors received special consideration that the mainland investors did not. The Event Notice, ¶ 2, says "COFINA will offer all holders" of the A-2/B-2 bonds the opportunity to exchange for tax-exempt bonds. Page 2 of the Event Notice shows that both CUSIP 74529JPY5 (which I understand was distributed to non-Puerto Rico election investors) and CUSIP 74529JQY4 (which I understand was distributed to the Puerto Rico investors who received the 2% cash and single maturity (2040) coupon bonds) will have the option to now obtain tax-exempt bonds. The fact the recent EMMA bond trading prices for these two CUSIPs are roughly equivalent also confirms that Puerto Rico investors who received special treatment are now getting federally tax-exempt bonds after all.

6.      COFINA and AAFAF did not attach the IRS determination letter to the May 15, 2019 Event Notice. However, since the IRS has determined that interest on the A-2 and B-2 bonds can be tax-exempt, it is unclear why any exchange is being done. The natural reading of the disclosure statement ("Taxation of COFINA Bonds"; Docket 4364-page-239-of-263) is that if bonds are determined to be tax-exempt, the bonds will be tax-exempt without the need for further action by bondholders. Alternatively, if there is some technical reason why an exchange is necessary now that the IRS has determined the A-2 and B-2 bonds are appropriately tax-exempt, one would have expected that the exchange would be done automatically on a 1-to-1 basis, with existing A-2/B-2 bonds being exchanged for identical bonds that are tax-exempt. It is no answer for FOMB to say there is a Tax Exemption Implementation Agreement: that agreement was entered into on February 12, 2019, only after the Plan became effective, with selected institutional parties, not with all bondholders, and certainly not with individual retail investors in the 50 states. (This document is in the docket at #6283-2.)

7.      Here, the "need" for a "voluntary" exchange appears to be prompted by the fact that the exchange of no-tax-opinion-yet bonds for tax-exempt bonds is being done with the tax-exempt coupons set roughly 25 basis points lower than the coupons represented in the disclosure

statement and provided for in the Plan itself for the maturities in question. If the coupon rates were kept the same — consistent with the coupon rates represented in the disclosure statement and the coupon rates provided for in the Plan approved by the Court — the exchange could be done automatically on a 1-to-1 basis because the new bonds would have the same coupon rates as the old bonds.

8.     The fact this additional exchange is being done as a "voluntary" exchange with lower coupons adversely impacts individual retail investors in two ways. A mainland retail investor may have ended up, following the mandatory exchange effected in February 2019, receiving as many as 14 fragments of bonds, including as many as three bond fragments as to which no opinion on federal taxability had yet been issued as of the Effective Date. The no-tax-opinion-yet bond fragments they received would often be in very small quantities, with many retail investors receiving as little as 1 bond ($1000 amount) or 2 bonds ($2000 amount) in particular maturities.

9.     As I previously explained in my April 10, 2019 declaration (Docket#6283-11), small quantities of this nature are illiquid and an investor who tried to sell small quantities like this in order to avoid incurring the costs of participating in a voluntary exchange will inevitably pay a significant spread, reducing what they can realize on sale (causing them further losses).

10.     Furthermore, because this no-tax-opinion-yet for tax-exempt exchange is being done as a supposed "voluntary" exchange — because the coupon rate is lower — many individual investors with modest-sized accounts will end up paying disproportionate fees for the exchange. For example, the Charles Schwab fee, charged to smaller or modest-sized accounts, for voluntary exchanges is $39 (whereas there is no fee for a mandatory exchange). (Charles Schwab is a discount broker that I and my firm (Elliott Asset Management) use; other brokers may have even higher fees.)

11.     Major institutional investors will have substantially larger, more liquid, bond lots, and likely not have to pay their brokers voluntary exchange fees (or, in any event, any fee would be miniscule as a proportion of their much larger holdings). Favored Puerto Rico institutions and

4

individuals — who received a cash payment equal to 2% of the par amount of their original COFINA bonds, plus a single 2040 coupon-bearing maturity — will also again be favored in this process because they would have received a larger quantity of that single 2040 maturity — not the splintered fragments that mainland investors received — and now can exchange into tax-exempt bonds that they can (if they wish) sell and reinvest in higher yielding taxable bonds from another issuer.

12.     But for a modest-sized individual investor in the mainland who received as many as 3 small no-tax-opinion-yet fragments, a $39 fee per "voluntary" exchange adds up.  There could be a separate $39 fee on each of the taxable fragments being exchanged.  For a mainland retail investor who had, say, 1 bond ($1000 amount) of the CUSIP 74529JPY5, 2040 maturity, 4.55% coupon, new COFINA bond, the $39 fee would be over 4% of the value of the bonds being exchanged.  This is quite substantial when one considers that such a fee would negate almost an additional entire year of interest on a small 1000 bond fragment.

13.     In addition, with a lower coupon rate, the loss in value due to the lower coupon rate could be another 3% to over 4% of the market value.  Therefore for a modest-sized retail investor who received 1 bond ($1000 amount) of a no-tax-opinion-yet CUSIP, as part of the 14 bond fragments distributed to mainland retail investors, an additional loss of value or 7% to 8% will be suffered as a result of how the no-tax-opinion-yet-for-tax-exempt exchange is being handled — on top of the over 50% loss in value suffered due to the COFINA plan itself.

14.     In many cases, it may not even pay for the individual investor to do the exchange because the present value of the benefit of tax exemption is offset by the $39 fee and the decrease in coupon interest rate.  The cost of the fee, assuming a 32% tax bracket and factoring in the decrease in coupon interest rate, would take approximately five years to be recouped through the economic benefit from receiving tax-exempt (versus taxable interest).  Recouping the additional loss in market value from the decreased coupon could require several additional years.  As a result of this, and the 20-day limit to exchange the bonds, many small investors may be forced to sell at disadvantageous prices or be locked in forever into no-tax-opinion bonds that

will be even less valuable and less marketable than they were when first issued in February 2019.[2]

15.     Individual retail investors on the mainland are also faced with far disproportionate tax and accounting costs, whatever they do, in light of the 14 splintered fragments and the additional, second exchange transaction.

16.     None of this was ever disclosed to me and other mainland investors.  The 11/26/18 disclosure statement (Docket#4364) specified the specific coupons and maturities for the new bonds.  (Docket#4364-page-19-to-23, 25-to-26, 168-to-169).  Nothing was said in the disclosure statement about a possible reduction in coupon rate.[3]  The Plan itself likewise spelled out the "coupons and maturity dates."  Docket#5055-1-page-91-of-91.  Nothing was said in the Plan about a possible reduction in coupon rates.

17.     There were statements in the disclosure statement to the effect that bondholders would be given a nationally recognized bond counsel opinion addressing tax status on the Effective Date (e.g., Docket#4364-page-230, 239-of-263) and one would expect from the disclosure statement that the Commonwealth would make reasonable efforts to get a tax ruling to classify the bonds as tax-free (Docket#4364-page-230, 239-of-263.)  The tax free nature of the replacement bonds was also assumed in the recovery estimates of the Plan (which assume the new bonds would trade at par, see Docket#4364-page-23-of-263) and the number of CUSIPs was

---

[2] Prior to now, the A-2 bonds likely have traded at prices that factored in some chance those series would be tax exempt.  But after the planned second exchange, a retail investor who does not exchange the series A-2 bonds will be apparently forever left with a no-tax-opinion bond and there will be much lower amounts of that no-tax-opinion bond outstanding, and thus institutional interest will be minimal.

[3] The 11/26/18 disclosure statement, to my knowledge, was never posted on EMMA, under the original COFINA bond CUSIPs (I have looked at a number of original COFINA bond CUSIPs on EMMA to try to find it, but it was not posted.)  Securities professionals like me will typically expect material information of this nature to be posted on EMMA for the securities we follow.  The need to post on EMMA would be particularly important when there is a short time frame over a holiday period when many people, like me, would be traveling and relying upon electronic notifications and EMMA postings, rather than expecting something in their U.S. mail delivery that they may not even see while traveling.

specified in the Plan (11 maturities listed).  Docket#4364-page-19-to-23, 25-to-26, 168-to-169-of-263.

18.      COFINA and AAFAF posted an information statement concerning the new COFINA bonds on February 14, 2019 (relevant excerpts attached as Exhibit B).  The chart on page 2 (sequence 003 in Exhibit B hereto) does **not** specify the A-2 bonds as taxable — it just has a footnote stating "No opinion was delivered on the Effective Date with respect to the treatment for federal tax income purposes with respect to these bonds."  A copy of the opinion of bond counsel as to the tax-exempt status of the A-1 bonds was attached as Exhibit C to the COFINA AAFAF information statement (sequence 014-017 in Exhibit B hereto).  This opinion does **not** state the A-2/B-2 series are taxable.

19.      Although the 11/26/2018 disclosure statement stated that "[t]he Commonwealth expects to cause an opinion of nationally recognized bond counsel ... addressing the tax status of the COFINA bonds to be delivered with the COFINA bonds on the Effective Date" (Docket#4364-page-239-263), that did not occur for the A-2/B-2 bonds.  And there certainly was no opinion of bond counsel that interest on the A-2/B-2 bonds was *taxable*.

20.      The May 15, 2019 COFINA-AAFAF Event Notice (Exhibit A hereto) states that bond counsel is expected to deliver its opinion that interest on the Exchange Bonds "accruing or accreting *from the original delivery date thereof (February 12, 2019)* will be excluded from gross income for federal tax purposes" (Exhibit A, p. 3, sequence 003 (emphasis added)).  So interest on the A-2 bonds qualifies as fully tax-exempt, going back to February 12, 2019 when the bonds were issued.  There is no justification expressed by COFINA or AAFAF in this Notice for why individual investors should be required to pay fees or receive lower coupons to get the tax-exempt interest, going back to February 12, 2019, the Effective Date, that they are clearly already entitled to and expected – and that was factored into the calculation of their "estimated" and "projected" recovery rates of 56.414%, as depicted in Table 2B of the 11/26/2018 disclosure statement (which assumed that the securities a subordinate bondholder would receive under the

7

Plan would trade at par, which in turn assumed that the interest was tax-exempt) (the relevant
pages of the disclosure statement for these points include Docket#4364-page-23,49,121-of-263).

21.     The effort of FOMB, COFINA and AAFAF to force bondholders to give up 25
basis points of the interest rate on the bonds in order to get the tax-exempt bonds they were
entitled to also violates provisions of the Plan.  For example, the Plan provides in the definition
of "Junior COFINA Bond Distribution" that

> *in the event applicable United States law does not permit* all COFINA Bonds to
> be issued on a federally tax-exempt basis, COFINA shall issue Taxable COFINA
> Bonds as a sub-series of COFINA Bonds, ... (Section 1.114, p.14, Docket#5055-
> 1-page 26-of-91) (emphasis added).

Since federal law *does* permit all COFINA bonds to be issued on a federally-tax-exempt basis,
that is what the Plan requires be done.

22.     Indeed, there is no justification for any subordinate bondholder who originally
held completely tax free bonds to have been given taxable bonds in the Plan's February 2019
mandatory exchange.  Mainland subordinate investors, as I have previously set forth in my
April 10, 2019 declaration, overwhelmingly had originally held bonds that were 100% tax-free.
It makes no sense to require them to pay fees or give up coupon yield to get tax free bonds —
which they should have had all along.

23.     And certainly there is no justification — now that the IRS has determined the A-
2/B-2 bonds can be tax-exempt, beginning with the original February 12, 2019 Effective Date —
to reduce the coupon rate or to force individual subordinate investors to incur fees in order to
receive the tax-exempt bonds that they should have received in the first place.

24.     The February 2019 mandatory exchange was structured so that — even though
40.5% of the senior bonds were originally taxable while less than 10% of junior bonds were
taxable (and those were largely held in Puerto Rico, where they were effectively tax free)
(Docket#6283-11-page-9-to-10-of-18), senior bondholders would get a far larger share of tax-
exempt new COFINA bonds, as explained in my April 10, 2018 declaration.  This facet of the
Plan's mandatory exchange was another maneuver to benefit the senior bondholders, who were

8

represented in the confidential negotiations, at the expense of small and modest junior COFINA investors in the 50 states who were not represented.

25.    As the post-consummation events have unfolded the true scope of the overreaching here has become even more clear.  By negotiating the decreases in pledged *revenue* to the COFINA structure, the senior bondholders accomplished two benefits to themselves:  First they created an excuse to claim the (albeit I believe wrongfully) that the subordination clause should come into play — because with pledged revenue given away they could argue that COFINA lacked the pledged revenue to pay all bonds.  Secondly, they could argue that the pledged revenue that was given away to the Commonwealth through the confidential process and the New Bond Legislation was the revenue that was backing bonds originally issued for non-tax-exempt qualified purposes, i.e., *taxable bonds*, which were disproportionately *senior* bonds.  By arguing the revenue that was given up to the Commonwealth was the revenue backing federally taxable (largely senior) bonds they could argue the entire remaining COFINA structure could be deemed completely tax free after reorganization.  It is presumably for this reason that a tax determination was sought from the IRS.  There is no reason why a mainland subordinate tax-free bondholder should end up with taxable bonds after a reorganization.

26.    This maneuver to transform what from the outset of their issuance were federal taxable original COFINA senior bonds into new tax-exempt COFINA bonds ended up increasing the effective economic return to the average senior investor — and was in addition to substantially added call protection and reasonably high interest rates on the new bonds (as compared to the original terms of the original senior bonds).  The result was a total economic return value to the average senior bondholder far exceeding par, as I noted in my previous declarations and objections.  Neither I nor my colleagues have ever previously seen a plan of adjustment that yields an economic return to *any* class or subclass *greater* than they would have been entitled to if not for the reorganization.

27.    Most bond reorganizations exchange multiple CUSIPs for one (or, at most, only a few CUSIPs).  Examples include the PR Government Development Bank exchanging many

9

CUSIPs for one new bond, as well as the proposed PREPA restructuring of many CUSIPS into *two* bonds. COFINA was different mainly because several hedge funds owned billions in value of the bonds that they intended to sell after the restructuring. By restructuring into 11 (actually, as it turned out, 14) different CUSIPS the hedge funds are able to appeal to a wider group of institutional buyers of various duration CIBs and CABs. In contrast, the average small investor was harmed by *less marketable* small positions as one CUSIP was exchanged for 14 different splinter bonds. This, again, shows that the COFINA senior coalition dominated the "negotiations" in the confidential settlement process — without regard to the interest of modest-sized bondholders. These multiple fractions of bonds also made use of rounding cash for its customarily intended purpose even more important to small and modest sized investors than other exchanges which involved only one or two new bonds.

COFINA pledged SUT revenues
would have been sufficient to repay <em>all</em> of the original COFINA Bonds

28.    An analysis of SUT collections demonstrates that COFINA was never insolvent, or even remotely in danger of becoming insolvent. Indeed, in the most recent years before COFINA filed its Title III proceeding, enough SUT revenue pledged to secure the COFINA bonds was accumulated by January or February of each year to cover debt service for the entire fiscal year through June 30. Or, otherwise stated, debt service coverage was approximately double what was required to pay all principal and interest on the bonds as they became due. This coverage is evident from the Puerto Rico Treasury Department data reporting pledged SUT collections for the fiscal years ended June 30, 2017 and June 30, 2016 (Donohue-Docket#4642-1-page-6-of-7), which show that for the year ending June 30, 2017 enough money had been collected to pay the entire debt service by January 2017, and showing the same situation for the year ended June 30, 2016. This ample coverage of both senior and subordinate debt service continued even despite the hurricanes, legislation modifying the sales tax, and poor tax collection practices, as shown in the Puerto Rico Treasury Department report for the year ended June 30, 2018 (pledged SUT was collected by February 2018, Docket#4642-1-page-1-6-of-7), and as is

10

further confirmed by the March 15, 2018 statement by Plan proponents COFINA Senior
Bondholders Coalition, Ambac, National Public Finance Guarantee Corporation and Puerto Rico
Funds attached hereto as Exhibit C.  In addition, the recent Supreme Court decision in *Wayfair*,
where SCOTUS opened the door for states and the Commonwealth to more effectively tax mail
order and internet ordered goods, will only further enhance SUT collection and further increase
coverage ratios.  Puerto Rico's efforts to enhance online sales tax collections, including post-
*Wayfair*, are discussed in Exhibit D, which references recent Puerto Rico legislation.

      29.    This same situation continued even after the Title III filing as monies continued to
be held by the trustee that were supposed to be used to pay bondholders.  This is evident from
periodic reports the trustee would issue concerning amounts the trustee was holding in trust, the
most recent of which the trustee issued on December 4, 2018 (Docket#4606-7-pages-393-to-
398).  The extent of the diversion of money belonging to COFINA bondholders to the
Commonwealth is evident from one of the schedules attached to the agreements between Plan
proponents, which shows year-by-year the literally billions of dollars – pledged to COFINA
bondholders – that under the agreements negotiated in the confidential process between Plan
proponents is now being diverted to the Commonwealth.  This schedule is in Docket#4364-2-
page-105.

      30.    I have also confirmed the adequacy of the originally pledged SUT revenues to pay
all COFINA bonds, subordinated and senior, by the analysis that follows.  The COFINA offering
statements discussed assumptions concerning the increases in SUT revenue that would be
necessary to provide enough SUT revenue to pay the COFINA bonds.  The 2011A COFINA
official statement dated November 16, 2011 (2011A was the last issuance of the original
COFINA subordinated bonds) appears in the record in Docket#4606-5-page-1-to-155-of-155.

      31.    As is shown in the table on page 40 of the Series 2011A official statement
(Docket#4606-5-page-46-of-155), if SUT revenue increased by as little as 1.61% per year, there
would be sufficient SUT revenue to pay both senior and subordinated bonds in each year (an
even lower rate of increase would have sufficed to pay both senior and subordinate by 2058).  It

was this ample coverage of debt service obligations that resulted in high investment-grade ratings (A1/A+ for the subordinate COFINA bonds when originally sold).

32.     Despite all the problems that have affected Puerto Rico in recent years – including two hurricanes – and changes in Puerto Rico tax laws that have reduced or eliminated sales tax on goods or services, the annual SUT collections have exceeded the growth assumptions on page 40 of the 2011 OS since 2011.  My calculation that SUT revenues since 2011 have increased at rate in excess of the growth rate of 1.61% assumed in the 2011 OS is based on reported 2011 SUT collections of $1,122,656,758 referenced in the 2011A OS (Docket#4606-5-page-46-of-155) and the SUT revenues most recently reported for the year ended June 30, 2018 ($2,522,230,000) in the report issued by the Puerto Rico Treasury Department which is attached to the Donohue Declaration (Docket#4606-2-page-6-of-7) (translation at Docket#4642-1-page-6-of-7).  I have adjusted the SUT receipts for the year ended 6/30/18 to back-out the increases in SUT that were not available to COFINA; as is apparent from the monthly allocations for 2017-2018 on the Puerto Rico Treasury report, approximately 6% of the 11.5% tax was available (if necessary) to pay COFINA bonds; $6 \div 11.5 = .521739$ x $2,522,210,000 (the total for the year 2018) = $1,315,935,000, which is almost 5% more than the assumed growth rate amount for 2018 on page 40 of the 2011A O.S. ($1,255,613,608).  Thus, even with the unusual challenges of the two major hurricanes, SUT revenues in the year ended June 30, 2018 were comfortably exceeding the growth rate required to pay *all* COFINA debt service.

33.     While lack of precise (or audited) published data from the Puerto Rico Treasury complicates efforts to calculate a precise rate of growth, what is clear is that had the lien on pledged SUT revenues not been abrogated, there would have been sufficient pledged SUT revenues to pay all COFINA bonds, senior and subordinate alike.

Plan proponents' purchases of COFINA bonds,<br>including COFINA subordinate bonds

34.     According to filings in the district court record, between 2017 and November 2018 several members of the *Senior* COFINA Bondholder Coalition purchased over $1.6 billion

12

of *subordinate* bonds for themselves and clients.  This is evident from comparing the Senior

COFINA Bondholder Coalition Rule 2019 filings dated July 25, 2017 (Docket#749) and dated

November 16, 2018 (Docket#4332).  During this time, the prices of COFINA subordinate bonds

fell as low as 8% to 10% of par (for the 2036 and 2041 maturity coupon bonds) and as low as 2%

to 4% of par (for the 2033 maturity CAB bonds).  This is shown on the Municipal Securities

Rulemaking Board EMMA pricing data attached as Exhibit B (pages 18-20) and C (page 8) to

the Hein declaration (Docket#4606-3-pages-2-to-4-of-13, #4606-4-page-19-to-21,#4606-4-page-

29), and in Exhibit E, page 1, attached hereto.

35.     Members of the QTCB noteholder group, another group with significant senior

COFINA holdings, acquired over $120 million of subordinate bonds (in addition to their

significant senior COFINA holdings) after 3/1/2018, as is evident from their filings on August

16, 2018 (Docket#3778).

36.     A third group, the Ad Hoc GO bondholders, increased their positions, from

August 8, 2017 to October 19, 2018, in COFINA senior bonds by over $143 million and in

COFINA subordinate bonds by over $416 million, all in addition to over $1.82 million GO

bonds (over $1.72 billion of which are uninsured) held by numbers of this group.  This is evident

from their filings on August 10, 2018 (Docket#3761) and October 19, 2018 (Docket#4079).

37.     It is notable that the foregoing groups – participants in the confidential negotiation

process – all increased their ownership of COFINA subordinates in the 2017-2018 time period.

None of these groups appear to have decreased holdings of COFINA subordinate bonds through

the record voting date in November 2018.  It is unusual, in my view, to have so many separate

entities make investment decisions all in the same direction, if based only on publicly available

information.

38.     Other members of the group negotiating the COFINA Plan in secret who are

aligned predominantly with senior COFINA interests also purchased subordinate COFINA

bonds, including Ambac which purchased COFINA subordinate bonds on the open market.  This

13

is evident from Ambac being listed on Exhibit B "List of Junior Holders Party Hereto" attached
to the Amended and Restated Plan Support Agreement (Docket#4364-2-page-2,42,72-73).

39.     Oppenheimer held over $300 million in COFINA senior uninsured and over $114
million in COFINA senior insured COFINA bonds, as well as $1.092 billion GO bonds, in
addition to its $1.084 billion of COFINA subordinate bonds, as shown in its August 15, 2018
disclosure (Docket#3776-page-41).

40.     Santander Asset Management – which manages the First Puerto Rico Funds –
held over $144 million COFINA senior uninsured and over $44 million COFINA senior insured
bonds, in addition to over $209 million of COFINA subordinate bonds (Docket#3776-page-42).

41.     UBS's Puerto Rico Funds held an aggregate of over $394 million
COFINA senior and over $200 million COFINA subordinate bonds, as is evident from adding
the positions on Docket#3768.

Assured Guaranty

42.     According to Assured Guaranty's publicly-issued Financial Supplement (excerpts
attached as Exhibit F-pp. 21-23), as of December 31, 2018 Assured had gross par outstanding
exposure to Puerto Rico issuers of $4.971 billion (with a net exposure of $4.767 billion).  Of this,
only $273 million, or about 5.5%, was attributable to COFINA subordinate bonds.  Assured's
largest exposure is to constitutionally guaranteed Puerto Rico bonds, totaling $1.531 billion
($1.383 billion GO and $.148 billion PBA).  In addition, Assured had "public corporation –
certain revenue potentially subject to claw back" exposures to Puerto Rico Highways and other
Puerto Rico issuers of $1.578 billion, among its various Puerto Rico holdings.  These other
insured holdings benefit markedly from the billions taken from non-insured subordinate
COFINA bondholders.

43.     Assured was given the ability to call its insured bonds early and then rewrap new
bonds as insured and sell them on the market for a premium over uninsured bonds, with the
Commonwealth and COFINA paying the underwriting costs (Docket#5091-Ex. M-pages-1844-

14

to-1848).  This further substantially increased Assured's effective net recovery.  In addition, Assured received its pro-rata share of "Consummation Costs" (Docket#4364-pages-49-50,103-104,109-110,112-114,121-122,152-Docket#4364-2-page-2).

44.     In light of the size of its position, its non-participation in Class 5, and its ability to re-wrap new bonds as insured, Assured was also not adversely impacted by the fact single bond CUSIPs were splintered into 14 fragments for distribution and Assured benefited from the unusual pro rata distribution of "rounding cash."

45.     Assured was treated separately in the Amended and Restated Plan Support Agreement and was not grouped with the "List of Junior Holders Party Hereto" on Exhibit B (Docket#4364-2-pages-2,44,72-73).

<u>Participation of Puerto Rico institutional investors</u>

46.     Puerto Rico institutions such as First Puerto Rico funds (which I understand is associated with Santander) and Puerto Rico funds (which I understand is associated with UBS) held COFINA securities and were Consummation Cost parties.  This is apparent from Docket#3768 and Docket#3776, which show their holdings, and Docket#4364-2-pages-57,63-64,70-73.

47.     Puerto Rico institutions who were Consummation Cost parties received their share of consummation costs, computed as 2% of "the aggregate face amount" of their pre-Petition original COFINA bond claims minus $1 billion "that will be allocated to on-island investors who choose to accept taxable bonds."  Docket#4364-page-112.  This amounted to about 3.52% par of their holdings.  (The aggregate bond claims totaled $17.6 billion; $17.6-$1 billion = $16.6 billion x 2% = $332 million Consummation Costs; since Consummation Cost parties held $10 billion of $17.6 billion, each received consummation costs equivalent to 2% x 17.6/10 = 3.52% of original par of their holdings).

48.     All Consummation Cost parties received this 3.52% original par of their holdings, including on their subordinate bond holdings.  However, in addition, if a Puerto Rico institution

15

elected the federally taxable option – even if they had originally bought taxable bonds (which they likely would have, since the federally taxable bonds were tax free for Puerto Rico residents) – they could receive another 2% (what was actually distributed was more than 2%) of original par (Docket#4364-page-120-122-123), for a total of 5.52% of the original pre-Petition par.

49.       Either the 3.52% or the 5.52% of par is a very significant number, which would increase the estimated or projected return to a subordinate bondholder under the Plan by as much as over 6% to almost 10%.  In addition, the cash to pay these parties came from dedicated accounts held in trust for individual bond issues, which were held in trust for the benefit of (in large part) subordinate COFINA bondholders who were residents of the mainland, as I discussed below in the Section titled "COFINA monies were held in trust," paragraphs 42 to 43.

Consummation Cost Parties

50.       The parties to the Amended and Restated Plan Support Agreement dated as of September 20, 2018 (attached to the 11/26/2018 Disclosure Statement, Docket#4364-2), were all entitled to share in the 3.52% of pre-Petition original COFINA bond par in so called "Consummation Cost" payments.  These parties are listed on the signature pages (Docket#4364-2-page-42-to-69 and Exhibit B-pages-103-to-104).  All except Assured (insurer of subordinated bonds) and National (insurer of senior bonds) held both senior and subordinate bonds (Docket#4364-2-pages-42-to-69 and Exhibits A and B on pages 70 to 73), although amounts are not disclosed.

Payments to Bonistas Del Patio, Inc

51.       The court's opinion states that Bonistas, "advocating the interest of Puerto Rico resident bondholders", "actively participated" in the "process" by which the plan was negotiated (Docket#5053-page-43).  The language used in the court's opinion is basically the same as the language in the disclosure statement, which had stated that Bonistas was "an organization advocating for the interests of local bondholders" (Docket#4364-pages-37,39,112).  The

16

attorneys for Bonistas were identified as Davis, Polk & Wardwell (Docket#4364-page-162), which appeared at the COFINA confirmation hearings as counsel for the "Commonwealth Bondholder Group" (a group of GO bondholders) (Docket#4742-page-3). For purposes of the COFINA plan, I believe that GO Bondholders had interests contrary to those of Junior COFINA bondholders. I also found it notable that Bonistas – which was not a COFINA bondholder of any type – is listed on the same signature page as FOMB, COFINA and the Puerto Rico Fiscal Agency and Financial Advisory Authority on the Amended and Restated Plan Support Agreement and, of course, was not on the Exhibit A and B lists of bondholders. (Docket#4364-2-page-2,41,70-73).

52.     On February 11, 2019, at approximately 10:09 pm (the night before the Plan proponents sought to consummate the Plan of Adjustment), the Puerto Rico Fiscal Agency and Financial Advisory Authority filed an "informative motion regarding stipulation section 15.2 expenses" in which it was revealed that Bonistas had "represented" (with no documentation) "that it has incurred expenses in the aggregate amount of $7,000,000.00 for professional services rendered in connection with the development, negotiation, confirmation and consummation of the Plan and the compromise and settlement of the Commonwealth–COFINA Dispute". AAFAF stipulated and agreed that the asserted Bonistas expenses are "expenses" "within the meaning of Section 15.2 of the Plan and are payable by the Commonwealth on the Effective Date" (¶ 2). This filing is in Docket#5097.

53.     On February 12, 2019, the official committee of unsecured creditors filed a response requesting that the court maintain the status quo and raising questions about the $7 million payment to Bonistas, asserting that "this is the first time that the Court and other parties in interest, including the Committee, have been advised" of the agreement to pay Bonistas (¶ 1). This is Docket#5100.

54.     An additional submission was made by the unsecured creditors committee (Docket#5136) raising further questions about Bonistas and the proposed payment. AAFAF

filed a response (Docket#5117), and the COFINA Senior Bondholders Coalition submitted a statement in support of the $7 million payment to Bonistas (Docket#5118).

55.     It does not appear, based on the court docket, that these issues have as of yet been substantively addressed by the court.  The court on April 22, 2019 extended the administrative bar date for claims by Bonistas and the Internal Revenue Service to June 30, 2019 (this is at Docket#6432).  On May 22, 2019 the court further extended deadlines set forth in the court's February 14, 2019 order and further adjourned the Bonistas matter to July 24, 2019 (Docket#7064).

The voting results must be put in context

56.     I have identified a number of factors that influenced the class 5 voting results, which are described below.

a.     First, as shown in the Prime Clerk report of voting results (Docket#4794-page-9), 5560 subordinate bondholders were removed from the class 5 pool because they were induced to take the added consideration offered to Puerto Rico residents. This number far exceeds the 1940 vote difference between the class 5 "yes" votes and the 1826 subordinate bondholders in class 5 who voted "no".  Had the special consideration not been offered to Puerto Rico residents, and those Puerto Rico residents voted as part of class 5, that itself could have led to a rejection of the Plan by class 5.

b.     I know from my personal experience that because mailings to bondholders (which were mailed through the brokerage firms at which individual accounts were held) arrived on the eve of the Christmas and New Year's holidays, many retail bondholders did not have an opportunity to vote.  For example, I was away from my home in Boston, where my personal mail is delivered, from mid-November 2018 until roughly January 19, 2019 (during this time I was traveling on business, including out-of-the country, visiting family members for the holidays and

vacation, and traveling from out-of-the country directly to Puerto Rico to appear at the COFINA hearing). Because of my absence from my home in Boston during this time I did not receive the notice and mailings for my personal IRA account at Merrill Lynch and as a result was not able to vote my COFINA positions held in my personal retirement account at Merrill Lynch against the Plan of Adjustment.

c.    It appears from the Prime Clerk data in Docket#4794-page-9 that approximately 500 individuals in class 5 whose bonds were held by a brokerage firm likewise failed to vote.

d.    An extension of time granted only for Puerto Rico residents to elect the Puerto Rico preference option (Docket#4569, Docket#4583) added confusion as to what the voting deadline was for individuals in the mainland U.S.

57.    In assessing the number of voting accounts, one needs to bear in mind that many of the large investors who were Plan proponents act for multiple different funds and accounts (and subaccounts). For example:

a.    The Senior COFINA Bondholders Coalition members include multiple funds (e.g. Decagon Holdings 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10). Other secured COFINA Bondholder Coalition members – such as Tilden Park Capital Management LP, Golden Tree Asset Management LP, Canyon Capital Advisors LLC, Old Bellows Partners LP, Scroggin Management LP, Whitebox Advisors LLC, Taconic Capital Advisors LP and Aristeia Capital, LLC – are listed as holding not just for themselves but also "on behalf of its participating clients" or "on behalf of funds under management." (Docket#4332).

b.    Members of the QTCB noteholder group are listed as filing "on behalf of its participating clients" or as "investment advisor to its affiliated funds" or "on behalf of certain of its funds." (Docket#3778).

  c.  UBS advises multiple Puerto Rico funds, each of which had its own positions. (Docket#3768).

  d.  Oppenheimer Funds is listed as holding "on behalf of funds and/or accounts managed or advised by it" (Docket#3776-page-41). Similar terminology is used in describing the holdings of Santander Asset Management, LLC (Docket#3776-page-42).

 58. While there was a provision for aggregation of "separate claims held by a single creditor" (Docket#4382-¶26i-on-page-15 (Order) and Docket#4794-page-9n.**), it would appear that each beneficial holder could separately vote, and thus if an institution advised or managed 100 or more accounts, each of which was itself a beneficial holder, separate ballots of each of the 100+ accounts could have been separately tabulated and counted. My investment firm advises accounts with a tiny fraction of the COFINA assets as all of the aforementioned entities hold, and we had more than 50 accounts eligible for voting. However, as we are organized as a registered investment advisor, without custody, we cannot vote on behalf of our clients (unlike some other institutions). Therefore, we had many clients on holiday, as I was, who also could not vote their bonds.

The Commonwealth has reduced taxes and has<br><u>provided significant tax preferences to favored parties</u>

 59. Attached as Exhibit G is the English language version of the explanatory memorandum for Law No. 257, dated December 10, 2018, whereby Puerto Rico reduced tax rates on individuals, reduced tax rates on corporations, and eliminated or reduced elements of its sales and use tax. According to the explanatory memorandum, "In the case of individuals, a dollar-for-dollar reduction of 5 (five) percent of what they pay today is given" (page 4). The corporate rate of tax was reduced from 20% to 18.5% for the "normal contribution" rate (pages 7-8). The "B2B" 4% sales and use tax was eliminated (pages 8-9) and the rate of sales and use tax on prepared foods was lowered to 7% (pages 9-10). Contemporaneous reports of the tax legislation stated that taxes were being lowered by $2 billion. Docket#4606-8-page-167-to-170-

20

of-180.  Whatever the merits of these tax reductions – and other tax credits and incentives that
Puerto Rico has given out – the fact remains that the Commonwealth took the property of
COFINA's subordinated bondholders and at the very same time enacted tax reductions.

Commonwealth Cash Balances

60.     The Puerto Rico Department of Treasury single account ("TSA") fiscal year 2019
cash flow statement as of May 10, 2019 is attached as Exhibit H.  As indicated on page 5, the
TSA "actual cash balance" as of May 10, 2019 is $6,542,000,000.  As noted on pages 5 and 6,
the year-to-date net cash flow is running $1.797 billion (about 38.3%) ahead of the liquidity plan.
This surplus over the liquidity plan includes $412 million received as a consequence of the
COFINA effective date (see pages 5, 6 and 10).  A positive variance of actual to date general
fund collections versus the liquidity plan is also shown on page 10.

61.     Attached as Exhibit I is the Summary of Bank Account Balances for the
Government of Puerto Rico and its instrumentalities, as of March 29, 2019, dated April 30, 2019
(excerpts).  As is evident from the "executive summary" on page 4, the aggregate balances of the
Government of Puerto Rico and its instrumentalities as of March 29, 2019 were $12.566 billion.

62.     There is no indication in the TSA cash flow statement (Exhibit H) that interest on
the $6.542 billion of "actual cash balance" is being earned for the benefit of the Commonwealth
or its bondholder-creditors.  I have raised the question directly, via Twitter, with the FOMB (via
its Twitter account "@FOMBPR") and with David Skeel (one of the members of the FOMB who
also uses Twitter, "@daskeel"), whether the Commonwealth is earning interest on its massive
TSA "actual cash balance" (currently $6.542 billion).  While @FOMBPR is actively used and
while Mr. Skeel has responded to queries on other subjects on his Twitter account, they have
conspicuously refused to respond to inquiries as to whether the massive "actual cash balance"
maintained by the Commonwealth is earning interest for the benefit of the Commonwealth and
its creditors.  Another individual, an analyst who follows Puerto Rico affairs, and who is also
active on Twitter, has posed the same queries, also to my knowledge without response.

63.     One possibility is that the "actual cash balance" being held at banks is collateralized by U.S. government securities.  One would normally expect that, were that to be the case, the U.S. government securities would earn interest (the one-month bill rate is currently about 2.37%, so we are talking potentially staggering amounts of interest ($6.54 billion x 2.37% would be approximately $155,000,000 per year of interest)).

64.     A normal, common sense commercial arrangement would have the party with the funds (here the Commonwealth) receiving virtually all of the interest income from the securities posted by a bank as collateral.  If the Commonwealth is not earning interest on its staggering "actual cash balances" at rates approximating at least what could be earned from an investment in U.S. Treasury notes – yet the FOMB is going through extraordinary efforts to refuse to pay bondholders what is owed to them, including secured subordinated COFINA bondholders like me -- that would be very troubling.

65.     The failure of the FOMB representatives to forthrightly explain the terms on which banks are holding these staggering "actual cash balances" also raises an obvious concerns as to whether individuals presently or formerly associated with the FOMB and/or the Commonwealth government, or their friends and/or relatives, are improperly benefiting from whatever undisclosed arrangements exist with the banks holding the Commonwealth's staggering "actual cash balances".

The actual distributions pursuant to the February 2019 mandatory COFINA
exchange differed from what the disclosure statement represented

66.     The mandatory exchange effected in February 2019 involved distributions of fragments of securities and (eventually) bits of cash to the average individual investor in the 50 states that could only have been bewildering to the average investor, and perhaps even their broker.  The distributions would have required a detailed analysis and multiple mathematical computations for individual account holders to even begin to check whether they received what they were supposed to.  And it would have been next to impossible for an individual, even with the assistance of their broker or accountants, to check if they received what had been promised in

22

the disclosure statement that investors had received on the eve of the Christmas-New Year's holidays because the rationale for the specific distributions made for each CUSIP, and the formulas employed, were not disclosed, and the formulas underlying the representations of the recovery of a bondholder represented in the disclosure statement were also not disclosed.

67.     The complexity resulted in significant part from the fact that the exchange took a single CUSIP and converted it into what was supposed to be 11, but turned out to be 14, different securities, and, for the average individual investor in the 50 states, the result was that the investor received very small bond lots and bits of cash.  The distribution matrix utilized — and only disclosed post-Effective Date (and even then, *still* without disclosing rationales for the specific amounts or formulas employed) — is extraordinarily complex to say the least (a copy appears in the record at Docket#6293-3-page-6-to-15-of-15; additional copies of the distribution matrices for senior (class 1) and subordinate (class 5) bondholders on the mainland, Exhibit J hereto, and senior (class 4) and subordinate (class 7) bondholders who elected the preferred treatment for Puerto Rico investors, Exhibit K hereto, are also attached to this declaration).  To make matters even more difficult, and opaque, there were no formulas or mathematical explanations provided to show how the numbers used in the 11/26/2018 disclosure statement Table 2B illustration (Docket#4364-page-23-of-263) — or even in the complex distribution matrix disclosed post-Effective Date — were derived.

68.     I have analyzed what actually occurred and compared it to what was promised to investors in the 11/26/2018 disclosure statement (Docket#4364).  I have concluded that the illustrations of recovery amounts in the disclosure statement differ significantly from what individual subordinate holders on the mainland actually received, including with respect to the actual number and the make-up of the securities received.

69.     The disclosure statement set forth in all bold, capital letters as follows:

**IF YOU DO NOT ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES AND NO CASH** (Docket#4364-page-43-of-263).

70.     This statement is significant because it represented to individuals in the 50 states what "you **will receive**," which would be "a distribution consisting **primarily of COFINA bonds**" and that would be "approximately equal to **56.414%** of your 'first subordinate' existing securities and **no cash**." (emphasis added).

71.     The disclosure statement also featured in multiple locations a representation that an individual subordinate investor who was not a Puerto Rico investor would receive an "estimated" or "projected" recovery of 56.414%. (Docket#4364-page-23,43,49,121-of-263).

72.     That recovery was depicted in Table 2B (Docket#4364-page-23-of-263). Table 2B depicted a distribution in which the amounts of the new COFINA securities to be distributed (11 different bond maturities, 4 coupon and 7 CAB) are depicted in whole bond amounts (in other words, increments of 1000) — apparently including being slightly rounded *up* in some cases. So, for example, Table 2B shows an investor starting with 50,000 par amount of original COFINA coupon bonds and ending up with 7000 of the 2040 maturity. Table 2B depicts only a small amount of so-called "rounding cash" being received ($92.60) and there is nothing in Table 2B about receipt of fractional bonds or cash in lieu from forced-sales into a depressed market.

73.     Notably, FOMB was very precise: FOMB said in the disclosure statement, "**YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 56.414% OF YOUR 'FIRST SUBORDINATE' EXISTING SECURITIES AND NO CASH**." The statement of **56.414%** — calculated to 5 digits — and the detailed presentation in Table 2B conveyed a level of precision that should have been complied with when it was time to make the distribution in February 2019 — but it was not. In addition, the "no cash" statement was misleading in light of the fact that (as discussed further below) fractional bonds were subject to forced-sale at depressed and distressed prices, with "*cash* in lieu" distributed to retail investors instead of bonds. The "cash in lieu" resulting from forced-sales at depressed and distressed prices was a substantial (and in some cases the *entire* amount) of the recovery for small and modest sized mainland investors, even an individual with the 50,000 initial par value in the illustration from the 11/26/2018 disclosure statement.

24

74.     The Plan itself was express that a "Junior COFINA Bond Distribution" was to include

> "a distribution of COFINA Bonds, Section 103 Cash, if applicable,
> and Rounding Amount Cash, if necessary, ... equal to fifty-six and
> forty-one one hundredths percent (56.41%) of such holders'
> aggregate Junior COFINA Bond Claims ..."  (Section 1.114, p. 14
> (Docket#5055-1-page-26-of-91)).

75.     The disclosure statement made a number of references to "Rounding Amount Cash," which most individuals would interpret as cash distributed and used as needed to ensure that any fractional bond resulting from the exchange could be rounded up or down to a minimum bond par denomination of $1,000 per bond (and compensate recipients for the full par value of any fractions).  These references appeared, for example, in Docket#4364-page-23, 49,121,128,215-of-263.

76.     The Plan itself defined Rounding Amount Cash:

> Rounding Amount Cash:  The amount of Cash necessary, up to a
> maximum aggregate amount of Twenty-Five Million Dollars
> ($25,000,000.00), for distribution to holders ... in the form of
> rounding amounts to ensure that all holders ... receive their Pro
> Rata Share of CIBs, in the minimum bond par denomination of
> One Thousand Dollars ($1,000.00) per COFINA Bond.

77.     Both the disclosure statement, and the Plan itself, were express that class 5 would receive "Rounding Amount Cash, if necessary" (Docket#4364-page-49-of-263; Docket#5055-1-page-26-of-91).

78.     As set forth in my April 10, 2019 declaration (Docket #6283-11-page-2-to-6-of-18), I computed that the actual recovery received by retail subordinate bondholders on the mainland was in the area of approximately the mid-40%s, or about 20% less than what was represented as "projected" or "estimated" by the disclosure statement.

79.     I have now been able to look in greater detail at what was received by an individual account I advised that had 50,000 of "first subordinate" COFINA securities (CUSIP 74529JHN8) and that should have received the distributions depicted in Table 2B in the

disclosure statement (Docket#4364-page-23-of-263).  However, that account has **not** received
the bonds promised in the disclosure statement.

80.     Table 2B had a chart of "Summary of New Bond terms."  Starting with coupon
interest bonds (CIBs), the left section of that chart depicted "Current Interest Bond Terms",
listing "Final Maturity", "Rate" and "Par" for the four CUSIPs to be reviewed.  All bonds were
shown in whole bond amounts (1000 or multiples of 1000).

81.     However, what the individual account with 50,000 original subordinate COFINA
bonds received fell far short of what was represented.  Thus:

- In terms of the coupon interest bonds (CIBs), a 50,000 existing COFINA subordinate
  bondholder was supposed to have received total par of $21,000 (Docket#4364-page-
  23-of-263).

- In fact, this $50,000 original COFINA subordinate bondholder received only $16,000
  of CIBs.

Specifically:

- The account was supposed to have received 1,000 of the 4.5% 2034 maturity
  (Docket#4364-page-23-of-263); the account received zero.

- The account was supposed to have received 7,000 of the 4.55% 2040 maturity
  (Docket#4364-page-23-of-263); it received only 4,000 (all 4,000 as to which there
  was not initially a tax opinion; although these bonds were initially characterized as
  "taxable" (Docket#6283-7-page-5-of-14), that characterization has now been shown
  to be inaccurate).

- The account was supposed to receive 3,000 of the 4.75% 2053 maturity
  (Docket#4364-page-23-of-263), and did receive in fact 3,000.

- The account was supposed to receive 10,000 of the 2058 5% maturity (Docket#4364-
  page-23-of-263), but received only 9,000.

82.     Similar problems occurred as to capital appreciation bond (CAB) securities as
well.  Table 2B also provides a chart, to the right of the CIB chart, listing "Capital Appreciation

Bond Terms".  This listed the Maturity", "Yield", "Initial Principal" (i.e., in essence the value of

the CAB at time of issuance), "Accredited Interest" (the interest to be earned over the life of the

bond) and "Total Cash Flow" (which represented in effect the par amount that the holder would

receive on maturity).  These par mounts were in whole bond amounts for the first five maturities

listed; for 2046 and 2051 the amounts are not even amounts because sinking fund pre-payments

appear to be assumed.

83.     What was received in CAB also did not match what was represented on Table 2B:

Thus:

- Table 2B in the disclosure statement represents that a COFINA subordinate

  bondholder starting with 50,000 original subordinate bonds was supposed to receive

  1,000 par amount (one bond) of the 2024 maturity CABs with an initial principal of

  779.71.  However, due to rounding down in the February 2019 distribution even a

  fraction as high as .99999 (derived from dividing the initial principal of **779.71** on

  Table 2B by the calculated initial offering price for the 2024 CAB issue)[4], would be

  rounded down to zero.  And for this individual investor, in fact **zero** 2024 CAB bonds

  were received.  The actual result was even worse, because for original COFINA

  CUSIP 74529JHN8 bonds, the February 12, 2019 distribution matrix, Ex. J, page 2-

  of-2, line 2, provides that only \$10.67890876 face amount per \$1000 original

  principal of 2024 CAB would be distributed; multiply by 50 (for 50,000), that is a

  fractional amount of 533.945438, or less than one bond (1000).  Since under

  Distribution Notices made public only after the Effective Date (which are discussed

  below) there was effectively no rounding up for individual customers – just rounding

---

[4] The par amounts are, as noted, shown under "total cash flow."  The calculations of the fractions
discussed here are computed using the data in Table 2B and the August 1, 2018 date for the start
of accretion.  The fact that the calculation produces a fraction of .99999 – just under one bond –
suggests Table 2B may have employed slight rounding up to show the whole bond amounts of
1000 listed.

down – the fractional bonds the individual was entitled to were force-sold.  The
reason that the actual distributions were markedly lower than what the 11/26/2018
disclosure statement represented remains a mystery, since as noted there was no
disclosure even post-Effective Date of how the amounts in the distribution matrices
were determined or what formulas were used.  Since the shortest maturity CABs are
the most valuable, this loss of the shortest maturity CAB has a greater impact on the
individual bondholder than receiving or losing a CAB with one of the longer
maturities.

- Table 2B shows the investor was supposed to received $1,000 par amount (one bond)
  of the 2027 maturity CAB.  However, with rounding down, even a fraction as high as
  .99999 (the initial principal of 679.83 on Table 2B divided by the calculated initial
  offering price on for CUSIP 74529JQC2, the CUSIP for the 2027 CAB) would be
  rounded down to zero.  Again, in fact, **zero** of the 2027 CAB were received by the
  individual.  And the fractional amount distributed as per the February 12, 2019
  distribution matrix (and then force-sold) was only 0.9043512 bonds.

- Table 2B shows the investor was supposed to receive 1,000 of the 2029.  In fact, **zero**
  were received.  Again, the fraction based on Table 2B and the calculated initial
  offering price was .99998.  Yet the fractional amount distributed (and then force-sold)
  was only 0.8814534 bonds.

- The 1 CAB bond (1,000) illustrated in Table 2B was, in fact, received in each of the
  2031 and 2033 denominations.  In addition, the CAB bond amounts received for 2046
  and 2051 were also approximately consistent with Table 2B.

84.     My analysis of distributions reflected in the account statements for my client's
account with the 50,000 subordinate bond position are confirmed by, and consistent with, the
distribution matrices that were released post-Effective Date that set forth (albeit in very complex
and hard to follow form) what investors were supposed to get.  See Docket #6283-3-page-6-to-
15-of-15 and Exhibit J.  So the shortfalls I identified are the result of looking at the distributions

28

shown on the account statement, confirmed by the mathematics of the distribution matrix released post-Effective Date.

85.     There appear to have been a number of reasons why the actual recovery fell short of the "will receive", "projected" or "estimated" recovery of 56.414% for subordinate bondholders in the 50 states.

86.     One reason is that the distribution of whole bonds (including the rounding **up**, if necessary, that was evident from the presentation in Table 2B of the disclosure statement) did **not** happen for individual holders.

87.     **After** the Plan became effective, a Notice of Distribution was issued on or about February 12, 2019.  That Notice acknowledged that

> The Plan provides that no fractional bonds will be distributed, with fractional bonds rounded up or down to the nearest $1,000.
> (Docket #6283-3-page-8-of-15).

But then the February 12, 2019 Notice went on to say, **for the first time**, that

> *DTC is considered a single holder for rounding and distribution purposes* and **no additional securities or cash will be distributed to DTC or otherwise on account of rounding at the participant or beneficial holder level.** (emphasis added)

This Notice is in the record at Docket#6283-3-page-6-to-15-of-15, at page-8-¶1.  The Notice was issued using the court caption (Docket#6283-3-page-7-of-15), but I am not aware of any court order approving the Notice.

88.     A subsequent, supplemental Notice of Distribution dated February 21, 2019 was posted, apparently because many broker-dealers and other custodians were confused about how to handle distributions in light of the initial instructions.  This supplemental Notice appears at Docket#6283-5-page-2-to-3-of-3 and states:

> The Effective Date of the Plan occurred on February 12, 2019.  On the Effective Date, pursuant to sections 19.1 and 19.5 of the Plan, COFINA fulfilled its obligations as Disbursing Agent by distributing or causing to be distributed, Cash and COFINA Bonds to The Bank of New York Mellon, in its capacity as trustee and paying agent in connection with the Existing Securities ("BNYM").  *BNYM distributed the Cash and COFINA Bonds to*

29

*The Depository Trust Company ("DTC")*, which is the Bondowner as defined in the Plan.

Consistent with the Notice of Distribution to the Holders filed on February 12, 2019, COFINA Bonds and Cash were allocated by DTC to participants in accordance with the allocation procedures described in such notice. Participants and nominees (as applicable) are responsible for allocating the COFINA Bonds and Cash they receive to beneficial holders.

In order to maximize allocations to its participants (and their underlying beneficial holders), DTC is authorized to distribute additional bonds to its participants by first aggregating their bond entitlements on a participant level, *and then rounding up or down to the nearest $1,000.* To further maximize the amount of bonds for each participant, DTC is authorized to adjust the threshold at which bonds would be rounded down (as needed). *It is our understanding that the **participants and nominees** (as applicable) **may round down** bond distributions to their clients,* depending on inventory and as per their customary procedures, *and provide cash in lieu of any rounded down amounts* (subject to availability of cash for that purpose). *The funds available for Rounding Amount Cash were allocated to participants on a pro rata basis* and such funds, as available, are intended for participants to allocate as cash in lieu of fractional bonds for any holders whose bonds are rounded down (which should supplement any funds participants receive on account of their market action taken on fractional bonds in accordance with such participants' customary practices if consistent with account terms of beneficial holders securities may be liquidated for this purpose). (Docket#6283-5-page-3-of-3, emphasis added).

89.     The February 21, 2019 Notice was also under the court's caption (Docket#6283-5-page-2-of-3) (although, again, I am not aware of the court entering any order approving it).

The Notice was preceded by a "NOTE FROM DISSEMINATION AGENT" that stated

The attached notice was prepared by Prime Clerk and posted on the Prime Clerk website on February 21, 2019. The attached notice does not reflect the views or the input of the Puerto Rico Sales Tax Financing Corporation ("COFINA") or the Puerto Rico Fiscal Agency and Advisory Authority ("AAFAF").

Questions concerning this notice may be directed to Prime Clerk by email at puertoricoballots@primeclerk.com.

PUERTO RICO FISCAL AGENCY AND ADVISORY AUTHORITY

This is at Docket#6283-5-page-1-of-3.

30

0033

90.     The significance of the post-Effective-Date Notice of Distribution dated February 12, 2019 is that if DTC is the only "bondowner," then effectively there is no rounding up to whole bond amounts — as had been depicted in Table 2B of the disclosure statement — for individual bondholders.  Only rounding down.  The change reflected in the February 12, 2019 notice made it practically *impossible* for any bonds to be rounded up to whole numbers — as had been presented in the disclosure statement.  So far as I know, no bond was rounded up in any individual account that my firm maintains at any of the custodians whose account statements I have reviewed (my firm maintains accounts at, and I have reviewed client account statements issued by, six large custodians/clearing firms).

91.     While the February 21, 2019 Notice suggested DTC could round up or down for its participants (major securities firms and custodians) – thus again recognizing the principle that rounding up (as well as down) was contemplated – the February 21, 2019 Notice referred **only** to the possibility that participants and nominees would round **down** for purposes of distributions to their clients.  The Notice also made clear that funds available for Rounding Amount Cash were allocated only pro rata – **not** rounding cash "as needed" to compensate individuals whose bonds were rounded down.

92.     The foregoing was not disclosed in the 11/26/18 disclosure statement.  Cash-in-lieu, following a forced sale, was nowhere illustrated in the illustrative example in Table 2B of the disclosure statement — not even a penny.  Also, the disclosure statement was silent on forced-sales and cash-in-lieu, even though that would make up as much as the entire recovery amounts for some small and middle-sized mainland subordinate COFINA investors.  In my view use of forced-sales and cash-in-lieu generated from those forced sales constitutes a material change from the disclosure statement and Plan sent to investors prior to voting and the confirmation hearing, and very significantly and materially affects the recoveries for small and modest sized mainland COFINA investors.  To the best of my knowledge, prior to February 12, 2019 there was no statement communicated to retail bondholders that referenced the use of forced-sales and cash-in-lieu or the fact that no rounding up would be used.

31

93.     Moreover, the example in Table 2B of the disclosure statement appears to have been crafted to cherry-pick a 50,000 initial par amount so that, mathematically, many of the bonds shown as received would be either almost exactly full bond increments (1000 or multiples thereof) or would be rounded up very slightly to a whole bond (1000 or multiples thereof) — thereby obviating the need to show the use of rounding cash to bring a recovery up to par, and also obscuring and not disclosing the need for forced-sales and cash in lieu in the absence of available rounding cash.  As noted above, dividing the "initial principal" for the CABs on Table 2B of the disclosure statement by the post-Effective-Date disclosed initial offering prices on EMMA shows ratios in the area of .9999.

94.     This suggests that Table 2B was crafted to obscure and not disclose (1) the fact that rounding cash would not be available, and would not be used, in its commonly understood sense as money to bring recoveries of small bondholders with fractional bonds up to par, and thus (2) that forced-sales and cash in lieu — matters not addressed in the 11/26/2018 disclosure statement — would be the norm for small investors on the mainland.  There was no way for readers to check how differing original par amounts of COFINA bonds would impact their particular recoveries because no mathematical explanation or formulas were given for the amounts used in the Table 2B illustration in the 11/26/2018 disclosure statement.  Post-Effective-Date removing rounding up out of the equation for individual customers on the mainland significantly lowers their recovery.

95.     One practical effect of only rounding down (not up) at the individual customer level — and of having a pro rata distribution of "rounding cash," based simply on claim size (rather than on actual need for use of rounding cash in its commonly understood sense) was that almost all "rounding cash" would be distributed to the largest holders (for whom rounding was not a significant issue and thus who would not "need" rounding cash, if it were distributed "if necessary").  Because rounding cash was distributed pro rata, no rounding cash was left to be used to make up, at full par, for non-receipt of fractional bonds by individual investors.  Thus, individual investors on the mainland suffered when – in the absence of rounding cash that *was*

32

*needed* to compensate them at par for fractional distributions – fractional bonds were liquidated at distressed prices (and, for the 3 CUSIPS originally issued without a tax opinion, at especially depressed prices in light of the lack of a tax opinion).

96.     The consequences of the forced sales are highlighted by the fact that, once COFINA announced on May 15, 2019 that an opinion would issue after all and that interest on all bonds was tax-exempt from the outset (the February 12, 2019 Effective Date), the bonds originally issued without a tax opinion traded up significantly — no doubt to the benefit of the funds who took advantage of the depressed prices, at which individuals had had their fractional bonds force-sold, to buy up these bonds at the temporarily depressed prices that prevailed in February 2019. But small-to-moderate-size mainland subordinate COFINA investors were harmed disproportionately, since other bondholders did not have their recoveries fractioned off into such miniscule pieces. Imagine what 14 fractions from one original bond, sold at fire-sale prices, would do to effect a small mainland investor, versus at most one fraction of one bond maturity (on top of a larger number of full bonds) plus cash received by Puerto Rico investors, or millions of dollars of bonds with only one left over fractional bond rounded down received by a large holder (and the millions of "rounding cash" that normally goes to compensate smaller investors instead given to large holders which would then more than compensate the largest holders for rounding down a few fractions of one bond of their millions in value).

97.     The consistent (but not disclosed pre-Effective Date) rounding down and use of forced-sales and cash-in-lieu generated from forced-sales underscores the significance of the disclosure statement's misleading statements that Class 5 would receive "Rounding Amount Cash, **if necessary**". (Docket#4364-page-49-of-263 (emphasis added). The Plan itself, similarly, provided for a "Junior COFINA Bond Distribution" that would include "Rounding Amount Cash, if necessary" (Docket#5055-1-page-26-of-91). Instead of distribution of rounding cash to Class 5 investors "if necessary", the rounding cash was instead given pro rata (pro rata for the entire claim amount, not "if *necessary*"), meaning large investors who did *not* need it received *virtually all* of the rounding cash. To say rounding cash would be distributed "if

33

necessary" was misleading if COFINA intended to distribute pro rata to large holders who did not need the rounding cash, making it unavailable to address shortfalls from rounding.

98.     I have reviewed approximately 50 plans of adjustments for bonds (mostly corporate), and I have conferred with colleagues who are also experienced with reviewing and evaluating plans of adjustment for bonds. None of us recall a situation, like what occurred here, where rounding cash was distributed only pro rata and not as needed to make up rounding shortfalls. The way the COFINA Plan was implemented made the term "rounding cash" misleading and meaningless—since it was just distributed pro rata (based on overall claim amount) and unrelated to the need to compensate for rounding shortfalls.

99.     In short, individual investors suffered significantly from only rounding down (not up and down, as necessary, in order to distribute whole bond amounts as were depicted in the disclosure statement, Docket#4364-page-23-of-263), and from the odd pro rata distribution of rounding cash (along with the much greater quantities of resultant fractional bonds issued and force-liquidated at depressed prices than normally would have resulted had "rounding cash" been employed in the normal sense that that term is understood by investors, which is to provide compensation for fractional lots). This was highly detrimental to retail investors in the 50 states. Large bondholders benefitted from this arrangement at the expense of small bondholders.

100.     As noted, the highlighted example in Table 2B omitted forced-sales of fractional bonds and cash-in-lieu, the effect of issuing even more CUSIPS (and fractions), i.e., 14 as opposed to 11, as well as omitting the tax implications of the transactions to individuals in the 50 states, and the effect of OID (original issue discount) — all of which could and did substantially adversely impact the ultimate recoveries of retail investors in the 50 states. Following the Effective Date, *all* 14 of the 14 CUSIPs traded at discounts to par ("OID"), sometimes (especially for the CUSIPs for which there was not yet a tax opinion) at massive (in some cases almost 20%) discounts. This is evident from the COFINA AAFAF March 20, 2019 Notice of Issue Prices (Docket#6283-6-page-2-to-3-of-4) and EMMA trading data (Docket#6283-7-page-1-to-14-of-14).

101.    The adverse impact on individual investors on the mainland could have been mitigated in many ways. To begin, FOMB and COFINA could have waited until they had an opinion on federal taxability before consummating the Plan and having the bonds issued. That would have allowed all bonds to have been issued with opinions as to tax-exempt status from the outset. If the FOMB and COFINA were insistent on pressing ahead to consummate even before opinions as to federal taxability were available as to all bonds, they could at least have chosen just one of the existing CUSIPs to issue without an opinion (on the Effective Date) as to federal taxability of interest, in order to reduce the number of additional CUSIPs and to minimize the number of additional fractional bonds. (For example, at worst, it would appear that by concentrating bonds as to which there was not an opinion as to federal taxability of interest in one or at most two CUSIPs, at most 12 CUSIPs would have had to be issued, not 14.) In addition, rounding cash could have been employed in the conventional (and defined) manner in which rounding cash is used, to ensure investors who would otherwise receive fractional bonds get paid, at par, in rounding cash — rather than using forced-sales of fractional shares at depressed or distressed prices to generate cash for cash-in-lieu payments. Another way to mitigate the detriment to retail investors on the mainland would have been to have at least done what was done in the GDB plan, which was to allow bonds to be issued and traded in fractional amounts. The trading of GDB bonds, post-restructuring, in fractions is illustrated on Exhibit L (from EMMA). And, of course, once the tax treatment of bonds initially issued without an opinion as to federal taxability became determined — and tax exempt status confirmed — tax opinions could simply have been issued to cover the bonds initially issued without an opinion. Requiring a "voluntarily" exchange — for bonds with a coupon 25 basis points less than what was represented in the disclosure statement — in order to get bonds with a tax-exempt opinion is nothing more than unauthorized, coercive, overreaching by FOMB, COFINA and AAFAF that no court should tolerate.

102.    Second, even apart from rounding down, shortfalls have been experienced in what individual investors received versus what was depicted in the disclosure statement in Table 2B.

Table 2B in the disclosure statement showed someone with 50,000 initial par amount receiving 7000 of the 2040 maturity. In fact, as noted, my client account with a 50,000 initial par amount received only 4,000 of the 2040 maturity, and there were shortfalls also in other CIB maturities, including the 2034 and 2058 maturities of CIBs and in the shorter (and more valuable) CAB maturities. Altogether, for an investor with 50,000 par of original of COFINA bonds, the shortfalls in distributions versus what was promised in the disclosure statement — and what was the premise for the "will receive" "projected" and "estimated" recovery of 56.414% represented in the disclosure statement — appears to be an approximately 20% shortfall. While some cash in lieu was received as fractional bonds were force-liquidated, as noted, the liquidation occurred at generally distressed and depressed prices. And the prevalent use of forced-sales and cash-in-lieu had not been disclosed in the 11/26/2018 disclosure statement. The wide spreads between high and low prices in the EMMA-trading data after the February 12, 2019 Effective Date underscores the distressed and depressed prices that occurred in the market (illustrative pricing data is in the record at Docket#6283-7).

103.    Because the Plan used May 5, 2017 as a cut off for claims, someone with 50,000 par amount of bonds as of May 5, 2017 would have the same claim amount as any other 50,000 holder, irrespective of coupon rate or tax status, and should receive the same recovery. The differences in coupon rates were only relevant to the amount of section 103 cash (reflecting interest accrued from February 1, 2017 to May 5, 2017) and should not have affected the distribution of bonds. Thus, the actual results of my firm's client account that started with 50,000 original subordinate bonds should have matched what was illustrated in Table 2B. However, as is evident from Exhibit J and K hereto (and the full February 12, 2019 Notice of ` Distribution in the record at Docket#6283-3-page-7-to-15-of-15) there are unexplained differences in recoveries between original COFINA CUSIPs, even within the same Plan class. Because the rationale for the calculations and the formulas are not disclosed, it remains a mystery why some identically situated CUSIPs receive more favorable distributions than others.

104.     Third, one may wonder where the bonds that should have gone to individual investors in the mainland — who were being disadvantaged from the outset with the lowest projected or estimated recovery of 56.414% — went, such that those investors ended up with recoveries in the mid-40%s, not 56.414% or anything close to it.

105.     I have done an analysis applying the distribution matrix to someone who elected the Puerto Rico investor option.  This suggests a partial answer.  It appears that some of those who elected the Puerto Rico investor option received actually **more** than the disclosure statement had projected or estimated (receiving as much as 59.395% of their claim, versus the 58.414% "estimated" or "projected" recovery level referred to in the disclosure statement (Docket#4364-page-49,121-of-263)).  This is apparent from the distribution matrix itself.  For example, the post-Effective Date distribution matrix shows that a class 7 subordinate "Puerto Rico" investor who started with original CUSIP 74529JHP3 of the original COFINA subordinate bonds ("Contra CUSIP" 74599BGK7), and then elected the taxable option, received 573.6193583 per 1000 of the 2040 maturity CUSIP 74529JQY4 bonds (on its face greater than 56.414%) and 20.33583333 per 1000 (2.0335%) "taxable election cash" (on its face greater than the 2% referenced in the disclosure statement, Docket#4364-page 43-of-263), for a total recovery of 59.395% (Ex. K; Docket#6283-3-page-12-to-15-of-15) – which, on its face, is greater than the 58.414% recovery specified in the disclosure statement (Docket#4364-page-49,121-of-263).  (As noted, a copy of Exhibit B to the February 12, 2019 Notice of Distribution is annexed hereto as Exhibit K; "Original CUSIP" 74529JHP3 and "Contra CUSIP" 74599BGK7 appear on page 2-of-3, line 13.).

106.     The post-Effective Date distribution matrix also shows that a class 4 senior "Puerto Rico" investor who started with "Original CUSIP" 74529JNX9 ("Contra CUSIP" 74599BDW4) of the original senior bonds and then elected the taxable option received 942.7651594 per 1000 of the 2040 maturity CUSIP 74529JQY4 bonds (on its face greater than the 93.015% in the disclosure statement, Docket#4364-page-42-of-263) and 20.27128 per 1000 (2.027125%) of taxable election cash (Exhibit K, page 1-of-3, line 50; Docket#6283-3-page-12-

37

to-15-of-15) (on its face greater than the 2% referenced in Docket#4364-page-42-of-263), plus
.21502085 (a category a subordinate did not receive) – for a grand total of 96.325%, on its face
greater than the 95.01% in the disclosure statement (Docket#4364-page-49,120-of-263).

107.    As is evident, the recovery per original CUSIP varies — which is unexplained,
because differences in coupon rates were only relevant to the amount of section 103 cash (for
interest accrued from February 1, 2017 to May 5, 2017) and should not have affected the
distribution of tax or bonds or the distribution of taxable election cash.

108.    The complexity introduced into the mandatory exchange by Plan proponents, and
their failure to provide backup that shows how distributions are calculated, makes it difficult to
get to the bottom of what happened.  But what is clear is that Plan negotiators and senior
bondholders and Puerto Rico investors benefited, but individual investors in the mainland —
who were not part of the secret negotiations — were severely disadvantaged — and large
bondholders were significantly advantaged, much more so than under other plan of adjustments
that I have been exposed to.  Furthermore, the level of complexity, confusion and lack of clear
explanations for the transactions that was experienced here by individual investors on the
mainland was unprecedented in my experience and in the experience of colleagues with whom I
have discussed the mandatory COFINA exchange.

COFINA monies were held in trust
for subordinate holders but were instead paid to others

109.    As of December 2018, over 2/3's – over $1.2 billion – of the over $1.8 billion
held in trust by the bond trustee, was held in trust for subordinate bondholders.  And of the over
$1.2 billion cash held in trust for the periods prior to July 1, 2018, approximately 62% (over
$745 million) was held in trust for subordinate bondholders.  (Docket#4606-7-page-398).

110.    Yet, as is evident from one of the schedules attached to the agreement between
Plan proponents, under the agreement reached between the Plan proponents, most of the
available cash was disbursed as so called "fees" to bondholders who negotiated the Plan, was
dispersed to senior bondholders in cash, or was set aside for expenses of the Commonwealth or

38

COFINA or payments to specially favored Puerto Rico institutions and individuals.
(Docket#4364-2-page-106-of-110).  Little cash went to the subordinate bondholders for whom it
had been held in trust.

The COFINA Settlement Process

111.    I was never included in the COFINA negotiations and mediation sessions, and
whatever transpired in those negotiations and mediation sessions appears to have been kept
confidential.  Only Plan terms agreed upon (by the negotiators participating in these confidential
sessions), after being negotiated in secret, were announced.  I was also not spoken to by any
representative of COFINA regarding the terms of the marketability of the new COFINA bonds.  I
object to any consideration in these proceedings of (i) what supposedly occurred in these
confidential settlement negotiations – for which there is no record and in which I and other
modest-sided bondholders in the 50 states were not participants, and (ii) the outcome of
confidential settlement negotiations for which there is no record.

112.    As the chief principal of Elliott Asset Management, I purchased significant
quantities of COFINA bonds – principally junior COFINA bonds – on behalf of me and my
firm's clients.  Despite my reaching out to a number of parties – including representatives of the
COFINA Senior Bondholders Coalition and Oppenheimer – we were never included in the
confidential settlement negotiations.

113.    As I testified at the January 16, 2019 hearing (Docket#4848-pages-204-205-of-
270), on May 11, 2018 I reached out to Matthew Rodrigue, who I understood was with Miller
Buckfire & Co., as part of my effort to be included in the negotiations.  In an initial conversation
with Mr. Rodrigue, he told me that a "purge event" – by which I understood Mr. Rodrigue to be
referring to a nonpublic matter that would become the subject of a public announcement – was
going to be occurring the next week and that we needed to delay our conversation until after that.

114.    The "purge event" that Mr. Rodrigue had said would be coming was announced
by the Senior Bondholders Coalition early on the morning of May 14, 2018 (5/14/18 7:09 am

39

EDT, Business Wire release entitled "COFINA Senior Bondholders Coalition Discloses
Participation in Constructive Settlement Discussions to Help Resolve Puerto Rico's Debt
Crisis"). Thereafter, I followed up with Mr. Rodrigue – I believe this was the week of May 14,
2018 – and (as I testified, Docket#4848-page-205-of-270) in an additional conversation I asked
Mr. Rodrigue how any unconflicted junior bondholder could possibly accept what I viewed as a
horrible deal for the juniors. Mr. Rodrigue responded that there was no one at the table
representing junior interests. As I believe is clear from my testimony in Docket#4848-pages-
204-205-of-270, this additional conversation was *not* on May 11, 2018. It occurred thereafter; I
believe the week of May 14.

<u>Letters to the Court</u>

115.    I wrote to the Court in October 2017 to advise the Court of my view that by
upholding COFINA property rights, a restructuring could occur that would allow Puerto Rico the
ability to gain access to the Capital Markets at competitive rates. Docket#1559. The Court
placed my letter on the Court docket, with a covering statement that the Court had "received and
reviewed" my letter. Docket#1559-pages-1-of-14.

116.    In 2018, as the results of the confidential settlement process began to be made
public, dozens of letters or emails from individuals who expressed their objections to the results
of that confidential settlement process were submitted to the Court and then docketed.

117.    Many of these letters and emails advised the Court that retail subordinate
bondholders had not been represented in the confidential settlement negotiations. Some of the
letters and emails also noted that senior COFINA bondholders were recovering their legal fees,
and even additional unsubstantiated "fees" and "expenses", as part of the settlement and asked
the court to approve funding for representation of the subordinate bondholders as well, since
retail subordinate bondholders had not been represented during the confidential negotiations.
(Neither I nor other modest-sized subordinate bondholders could have known until well after the

times for objection and for voting had passed that the Commonwealth would also be seeking to pay Bonistas' legal and other "fees.")

118.   The Court had repeatedly stated that these letters and emails were being "received and reviewed" by the Court (for example, Docket#3680) until – on December 10, 2018 – the Court issued an order stating that such letters would not be considered (I quote this order below), giving modest-sized subordinate holders very limited time to attempt to lodge formal objections.

119.   For example, my letter to the Court (filed 7/25/18 in Docket#3680, pages-25-30) noted specifically that

- Subordinated bondholders "are without legal representation" (page 25, ¶1), and are "the only party who has not been represented – and is still not adequately represented" at the table (page 25, ¶5, page 26, ¶4).
- The subordinated bondholders involved, such as Oppenheimer, were "conflicted" (page 26, ¶¶1-2).
- That I had contacted Oppenheimer's law firm, but it had refused to discuss the matter with me (page 26, ¶3).
- That a representative of the seniors had told me that "no one was representing junior bondholder interests during the settlement talks" (page 26, ¶5).  (Note that I wrote this letter *before* the voting for the Plan of Adjustment *and before* my testimony regarding this conversation during the confirmation hearing.)
- That since senior bondholders had negotiated a settlement that would pay them their so called legal fees (including, even, undocumented ones), "it is clearly fair to approve funds for proper and separate representation for the subordinate bondholders who have thus far not been represented" (page 28, ¶1, page 30, ¶4).

120.   Other letters were likewise docketed, including the following:

- Docket 3680 (filed 7/24/2018) at 3-5 of 30, letter dated 6/20/2018 from Eric R. Cohen; at 10-12 of 30, letter dated 6/22/2018 from Seema Balwada; at 25-30, letter from Mr. Mark Elliott.

41

0044

- Docket 3859 pages 6, 19 and 31 of 37 (8/8/18, 8/15/18 and 8/31/18 emails of Luis
  Abbott), pages 7-15 of 37 (correspondence from Stephen T. Mangiaracina), pages 25
  to 27 of 37 (8/27/18 letter from Seema Balwada), pages 28-29 of 37 (8/28/18 letter
  from me, Mark Elliott).

- Docket 4033 (filed 10/19/18), at 3-9 (letter from Seema Balwada dated 9/7/2018), at
  11-79 (letters and emails from Stephen T. Mangiaracina dated 9/20/2018, 8/15/2018,
  8/10/2018, 8/7/2018, 6/27/2018, 6/15/2018, 5/17/2018, 10/1/2018, 10/3/2018), at 80
  (email from Luis Abbott dated 10/14/2018), at 81 (email from Seema Balwada dated
  10/5/2018).

- Docket 4348 (filed 11/20/18) at 12 of 1000, email from Seymour Finder; at 13-14 of
  1000, letter dated 10/22/2018 from Iliana Paz Castellanos; at 18-22 of 1000, letter
  dated 10/29/2018 from Seema Balwada; at 23 of 1000, letter dated 11/2/2018 from
  Donna Wright.

- Docket 4460 at 3 (12/7/2018 email from Alan Katz), 4 (12/7/2018 email from James
  and Elizabeth Erickson), 7-12 (12/10/2018 email from Engalbert, with attachment),
  13 (12/10/2018 email from Armand Caraviello), 65-71 (12/10/2018 email from Mark
  Peterson, with attachments), 72 (12/10/2018 email from Stephen Vessels), 73
  (12/11/2018 email from Clifford Day), 85-86 (12/11/2018 letter from John Dimarco).

- Letters and emails attached to Docket 4481, including 10/24/18 letter of Maria
  Mercedes Navia (Docket 4481-page-9); 9/4/2018 letter of Seema Balwada (Docket
  4481-page-12); and then beginning Docket 4481-page-191: 12/4/2018 email from
  Martin & Marilyn Feldman; 11/16/2018 letter from Seema Balwada; 12/3/2018 email
  from Leopold Montanaro; 12/4/2018 email from Adam Jacobs; 12/4/2018 email from
  Jack Girton; 12/4/2018 email from Gerard Reynolds; 12/4/2018 email from Larry
  Hollrah; 12/4/2018 email from Larry Kenna; 12/4/2018 email from Manley;
  12/4/2018 email from Mike Steets; 12/4/2018 email from Robert Ackerman and
  Roberta Shiffman; 12/4/2018 email from Ron Reed; 12/4/2018 email from Sion

Zerah; 12/5/2018 email from Craig Hayes; 12/6/2018 email from Julian Roberts; 12/6/2018 email from Jane Walmsley; and 12/6/2018 email from Leslie Pokrass.

- Docket 4494 at 14-19 of 46, letter dated 12/13/2015 from Teresa Volmar Swany and what appear to be family members.

- Docket 4567 at pages 44-46 of 151 (filed 12/26/18), letter dated 12/20/2018 from Travis A. Knadle.

- Docket 4576 at 70 (12/24/2018 email from Alan Fischel).

- Docket 4650 at 9-10, 13-15 (12/29/2018 email from Arthur Samodovitz), 16-23, 24-26, 28, 29-33 (12/31/2018 email from Arthur Samodovitz), 37, 40.

- Docket 4809 at 6-7 (1/2/2019 letter from Eduardo A. Nin), 9-10 (1/7/2019 email from Leigh Myers), 23-30 (1/10/2019 email from Adam Jacobs), 67-74 (1/14/2019 email from Adam Jacobs).

- Docket 4838 at 6-12 (1/15/2019 submission by Arthur Samodovitz), 131, 132, 133-135.

- Docket 4990 at 19, email 1/17/2019 from Matthew Perry; at 42, email 1/17/2019 from Steven Susko; at 45-48, letter from Daniel Nagy; at 80, 1/20/2019 email from Arthur Samodovitz, Jr.; at 84-85, email 1/21/2019 from Arthur Samodovitz, Jr.; at 142-143, 1/25/2019 email from Arthur Samodovitz, Jr.

- Docket 5145 at 4, email from Michael B. George, 1/29/2019; at 10-11, email from Frederic Konigsberg 1/31/2019; at 12, email 1/31/2019 from Mark Peterson; at 19, 2/4/2019 email from Mark Peterson.

- Docket 6551 at 3, email 2/20/2019 from Russell Stoever; at 4, email 2/28/2019 from J. Lind; at 5, email 3/7/2019 from Russell Stoever; at 7-9, email 3/18/2019 from Robin Deshayes.

121.     Despite the many COFINA bondholders who had submitted letters that the Court had docketed, and the Court's repeatedly stating that it "received and reviewed" the

correspondence it docketed (Docket#3680, page 1), on December 10, 2018 the Court entered a

"notice" (Docket#4441) stating:

> The Court has learned that a financial advisor has disseminated incorrect
> information regarding the submission of objections to the proposed plan of
> adjustment for the Puerto Rico Sales Tax Financing Corporation ("COFINA").
> Parties who wish to lodge objections to the proposed plan of adjustment should
> refer to the Court's order approving, among other things, the proper procedures
> for the submission of such objections (the "Order," Docket Entry No. 375 in Case
> No. 17-3284). Only objections that have been filed and served in accordance with
> those procedures will be recognized in connection with the motion for
> confirmation of the proposed plan of adjustment. Communications sent to the
> Court by email or made through any other method that does not comply with the
> procedures established in the Order will not be recognized as objections to the
> confirmation motion.
>
> Although the Court reviews all materials submitted to its correspondence inbox,
> as well as physical letters received by chambers, such materials do not constitute
> formal submissions in the proceedings that are before the Court. As such, such
> email correspondence and letters concerning the proposed plan of adjustment for
> COFINA will not be considered or included in the Court's analysis of the legal
> issues associated with the motion for confirmation of the proposed plan. The
> Court will only consider legal submissions that are properly filed on the docket
> and served on other parties in interest, as required by the Order.

122.    To my knowledge, no notification of this "notice" was sent by email or mail to

COFINA bondholders, even those who had submitted letters or emails to the Court, telling them

that they needed to re-submit their communications as formal objections or else they would not

be considered. In any event, December 10, 2018 – when this "Notice" was placed on the court

docket – was shortly before the holiday period and just three weeks before the Objection

deadline, giving modest-sized bondholders little time to try to navigate the Court's procedures to

file formal objections.

123.    The importance of providing advance notice – before a Plan is negotiated in secret

– and offering all bondholders an opportunity to participate, is shown by the responses of

individual GO bondholders who were notified in February 2019 of the fact that their rights might

be affected by a challenge to the validity of their general obligation bonds. Literally hundreds of

individual GO bondholders, acting pro se, filed notices of participation in response to a notice

that was mailed to GO bondholders in February 2019.  These notices appear in the docket beginning with Docket#5214 and continued to be filed through at least May 16, 2019.

124.   No similar notice had been sent to COFINA bondholders – *prior* to the confidential settlement and mediation process that led to the Commonwealth-COFINA settlement and the Plan being agreed in a confidential process – providing individual COFINA bondholders both notice and a practical means to participate in that confidential process.  There is every reason to believe, based on the response of individual general obligation bondholders to the notice sent to them in February 2019, that had such a notice been sent many individual COFINA bondholders, including subordinate COFINA bondholders in the 50 states, would have sought to participate in any proceeding that could affect their rights.  I actively sought to participate in the COFINA negotiations; the parties negotiating in secret who achieved special benefits and payments for themselves were clearly incentivized to not facilitate new parties – such as modest-sized subordinate bondholders on the mainland – to join the discussions.  Had there been notice sent to COFINA bondholders with instructions for how to participate I would have done so (as is evidenced by my letters pleading with the court for representation for the juniors and recounting my actual efforts to participate well before the Plan confirmation hearing and even before the voting for the Plan took place).  The response to advance notice being sent in the general obligation case underscores that providing a notice only after settlements are struck and a plan is crafted through a confidential process is no substitute for providing advance notice, and a meaningful opportunity to participate, *before* the process begins.

May 28, 2019

Mark Elliott



## GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

### Municipal Secondary Market Disclosure Information Cover Sheet
### Municipal Securities Rulemaking Board (MSRB)
### Electronic Municipal Market Access System (EMMA)

### Additional / Voluntary Event-Based Disclosure

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:   **Puerto Rico Sales Tax Financing Corporation (COFINA)**

Other Obligated Person's Name (if any):

Six-digit CUSIP number(s):   **74529J**

**TYPE OF INFORMATION PROVIDED:**

A.   ☐ Amendment to Continuing Disclosure Undertaking

B.   ☐ Change in Obligated Person

C.   ☐ Notice to Investor Pursuant to Bond Documents

D.   ☒ Communication from the Internal Revenue Service

E.   ☐ Bid for Auction Rate and Other Securities

F.   ☐ Capital or Other Financing Plan

G.   ☐ Litigation / Enforcement Action

H.   ☐ Change of Tender Agent.  Remarketing Agent or Other On-going Party

I.   ☐ Derivative or Other Similar Transaction

J.   ☐ Other Event-Based Disclosures

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.

*/s/ Iván Garau González*
Iván Garau González
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: May 15, 2019



PO Box 42001  •  San Juan, PR 00940-2001  •  Telephone (787) 722-2525

0049

Exhibit A to Elliott Declaration

## PUERTO RICO SALES TAX FINANCING CORPORATION

### EVENT NOTICE

On February 12, 2019, the Puerto Rico Sales Tax Financing Corporation ("COFINA") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") announced the occurrence of the "Effective Date" of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated January 9, 2019, approved by the U.S. District Court for the District of Puerto Rico pursuant to Title III of the Puerto Rico Oversight, Management and Economic Stability Act. On the Effective Date, COFINA issued $11,869,739,717.80 Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019A, consisting of: $8,277,930,717.80 Restructured Sales Tax Bonds, Series 2019A-1 and $3,591,809,000.00 Restructured Sales Tax Bonds, Series 2019A-2 (the "Series 2019A-2 Bonds"); and $151,582,099.55 Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019B, consisting of: $106,012,099.55 Restructured Sales Tax Bonds, Series 2019B-1 and $45,570,000.00 Restructured Sales Tax Bonds, Series 2019B-2 (the "Series 2019B-2 Bonds," and, together with the Series 2019A-2 Bonds, the "2019 A-2 B-2 Bonds").

COFINA, AAFAF and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" and, together with COFINA and AAFAF, the "Government Parties"), and certain beneficial holders of 2019 A-2 B-2 Bonds previously entered into a Tax Exemption Implementation Agreement (the "Tax Exemption Implementation Agreement"). Pursuant to the Tax Exemption Implementation Agreement, the Government Parties agreed that if the IRS made a determination to the effect that interest on the 2019 A-2 B-2 Bonds is excludable from gross income for federal income tax purposes, COFINA will offer all holders of 2019 A-2 B-2 Bonds the opportunity to exchange (the "Exchange") such 2019 A-2 B-2 Bonds for COFINA tax exempt bonds (the "Exchange Bonds"), and to effectuate such Exchange. The parties to the Tax Exemption Implementation Agreement further agreed that the yield on the Exchange Bonds will be twenty-five (25) basis points lower than that of the 2019 A-2 B-2 Bonds for which they were exchanged.

Notice is hereby given that, on May 15, 2019, COFINA received a determination from the U.S. Internal Revenue Service that will permit COFINA to offer the Exchange Bonds for the 2019 A-2 B-2 Bonds in accordance with the terms of the Tax Exemption Implementation Agreement.

COFINA expects to launch an exchange offer on or prior to May 31, 2019 pursuant to which holders of 2019 A-2 B-2 Bonds will be provided with the opportunity to exchange their 2019A-2 B-2 Bonds for an equal principal amount of Exchange Bonds, which Exchange Bonds shall bear interest at the applicable interest rates per annum set forth below. Holders of 2019 A-2 B-2 Bonds will have twenty (20) business days from the launch date of the exchange to accept COFINA's offer. It is expected that the Exchange Bonds will be issued, and the exchange transaction consummated, on or about July 1, 2019.

## Restructured Sales Tax Bonds, Series 2019A-2

| Year | Principal Amount | Current Interest Rate | Exchange Bond Interest Rate* | Current CUSIP |
|------|------------------|-----------------------|------------------------------|---------------|
| 2040 | $1,905,085,000 | 4.550% | 4.329% | 74529JPY5 |
| 2040 | $865,919,000 | 4.550 | 4.329 | 74529JQY4 |
| 2053 | 57,021,000 | 4.750 | 4.535 | 74529JPZ2 |
| 2058 | 763,784,000 | 5.000 | 4.783 | 74529JQA6 |

## Restructured Sales Tax Bonds, Series 2019B-2

| Year | Principal Amount | Current Interest Rate | Exchange Bond Interest Rate* | Current CUSIP |
|------|------------------|-----------------------|------------------------------|---------------|
| 2040 | $35,156,000 | 4.550% | 4.329% | 74529JQN8 |
| 2053 | 723,000 | 4.750 | 4.535 | 74529JQP3 |
| 2058 | 9,691,000 | 5.000 | 4.783 | 74529JQQ1 |

COFINA expects that on the date of the exchange Nixon Peabody LLP, bond counsel to COFINA, will deliver its opinion to COFINA and The Bank of New York Mellon, as trustee for the Exchanged Bonds that, subject to customary qualifications, interest on the Exchange Bonds accruing or accreting from the original delivery date thereof (February 12, 2019) will be excluded from gross income for federal income tax purposes under Section 103 of the U.S. Internal Revenue Code.

Further details relating to the COFINA exchange offer will be included in the Invitation to Exchange which is expected to be released by COFINA on or before May 31, 2019.

PUERTO RICO SALES TAX FINANCING CORPORATION

Dated: May 15, 2019

---

* Preliminary, subject to change.



# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

### Additional / Voluntary Disclosure
### Financial / Operating Data

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Issuer's Name: **Puerto Rico Sales Tax Financing Corporation (COFINA)**

Name of bond issue: **$11,869,739,717.80 RESTRUCTURED SALES TAX BONDS, SERIES 2019A**

Nine-digit CUSIP number(s): **74529JPU3, 74529JPV1, 74529JPW9, 74529JPX7, 74529JQY4, 74529JPY5, 74529JPZ2, 74529JQA6, 74529JQB4, 74529JQC2, 74529JQD0, 74529JQE8, 74529JQF5, 74529JQG3, 74529JQH1**

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:_____

Other Obligated Person's Name (if any): _____

Nine-digit CUSIP number(s):_____

**TYPE OF INFORMATION PROVIDED:**

A. ☐ **Quarterly / Monthly Financial Information**

B. ☐ **Change in Fiscal Year / Timing of Annual Disclosure**

C. ☐ **Change in Accounting Standard**

D. ☐ **Interim / Additional Financial Information / Operating Data**

E. ☐ **Budget**

F. ☐ **Investment / Debt / Financial Policy**

G. ☐ **Information Provided to Rating Agency, Credit / Liquidity Provider or Other Third Party**

H. ☐ **Consultant Reports**

I. ☒ **Other Financial / Operating Data:** **Information regarding COFINA's Restructured Sales Tax Bonds, Series 2019A**

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.

*/s/ Sebastián M. Torres Rodríguez*
Sebastián M. Torres Rodríguez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: February 14, 2019

FAFAA

PO Box 42001  •  San Juan, PR 00940-2001  •  Telephone (787) 722-2525

0052

001

# GOVERNMENT OF PUERTO RICO

## Puerto Rico Sales Tax Financing Corporation

# $11,869,739,717.80 RESTRUCTURED SALES TAX BONDS, SERIES 2019A

consisting of

### Restructured Sales Tax Bonds, Series 2019A-1 Current Interest Bonds

| Year | Principal Amount | Interest Rate | CUSIP[†] |
|------|------|------|------|
| 2034 | $  370,347,000 | 4.500% | 74529JPU3 |
| 2040 | 187,553,000 | 4.550 | 74529JPV1 |
| 2053 | 1,375,772,000 | 4.750 | 74529JPW9 |
| 2058 | 3,479,051,000 | 5.000 | 74529JPX7 |

### Restructured Sales Tax Bonds, Series 2019A-1 Capital Appreciation Bonds

| Maturity | Initial Accreted Value | Maturity Value | Accrual/Accretion Rate | CUSIP[†] |
|------|------|------|------|------|
| 2024 | $  164,709,059.24 | $  211,244,000.00 | 4.250% | 74529JQB4 |
| 2027 | 243,231,616.89 | 357,783,000.00 | 4.375 | 74529JQC2 |
| 2029 | 217,406,113.14 | 348,709,000.00 | 4.375 | 74529JQD0 |
| 2031 | 252,923,999.95 | 449,395,000.00 | 4.500 | 74529JQE8 |
| 2033 | 260,417,551.04 | 505,783,000.00 | 4.500 | 74529JQF5 |
| 2046 | 1,094,968,244.54 | 4,813,682,000.00 | 5.375 | 74529JQG3 |
| 2051 | 631,551,133.00 | 3,921,460,000.00 | 5.625 | 74529JQH1 |

### Restructured Sales Tax Bonds, Series 2019A-2 Current Interest Bonds

| Year | Principal Amount | Interest Rate | CUSIP[†] |
|------|------|------|------|
| 2040 | $1,905,085,000 | 4.550% | 74529JPY5 |
| 2040 | $865,919,000 | 4.550 | 74529JQY4 |
| 2053 | 57,021,000 | 4.750 | 74529JPZ2 |
| 2058 | 763,784,000 | 5.000 | 74529JQA6 |

[*]   Maturity Value" reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.

[†]   CUSIP® is a registered trademark of the American Bankers Association. CUSIP data herein is provided by CUSIP Global Services, managed by S&P Capital IQ on behalf of The American Bankers Association. This information is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services Bureau. CUSIP numbers have been assigned by an independent company not affiliated with the Puerto Rico Sales Tax Financing Corporation (the "Corporation") and are included solely for the convenience of the registered owners of the applicable Bonds. The Corporation is not responsible for the selection or uses of these CUSIP numbers and makes no representation as to their correctness on the applicable Bonds or as included herein. The CUSIP number for a specific maturity is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part or as a result of the procurement of secondary market portfolio insurance or other similar enhancement by investors that is applicable to all or a portion of certain maturities of the Bonds.

0053
002

**Puerto Rico Restructured Sales Tax Bonds Distribution: Series 2019A and Series 2019B**

| Series | CUSIP | Type | Tax-Status | Maturity (7/1) | Coupon / Accretion Yield | Initial Par Amount | Maturity Value |
|--------|-------|------|-----------|----------------|--------------------------|--------------------|----------------|
| Series 2019A-1 | 74529JPU3 | Current Interest Bond | Tax-Exempt | 2034 | 4.500% | $370,347,000 | $370,347,000 |
| Series 2019A-1 | 74529JPV1 | Current Interest Bond | Tax-Exempt | 2040 | 4.550% | 187,553,000 | 187,553,000 |
| Series 2019A-1 | 74529JPW9 | Current Interest Bond | Tax-Exempt | 2053 | 4.750% | 1,375,772,000 | 1,375,772,000 |
| Series 2019A-1 | 74529JPX7 | Current Interest Bond | Tax-Exempt | 2058 | 5.000% | 3,479,051,000 | 3,479,051,000 |
| Series 2019A-2 | 74529JPY5 | Current Interest Bond | * | 2040 | 4.550% | 1,905,085,000 | 1,905,085,000 |
| Series 2019A-2 | 74529JQY4 | Current Interest Bond | * | 2040 | 4.550% | 865,919,000 | 865,919,000 |
| Series 2019A-2 | 74529JPZ2 | Current Interest Bond | * | 2053 | 4.750% | 57,021,000 | 57,021,000 |
| Series 2019A-2 | 74529JQA6 | Current Interest Bond | * | 2058 | 5.000% | 763,784,000 | 763,784,000 |
| Series 2019A-1 | 74529JQB4 | Capital Appreciation Bond | Tax-Exempt | 2024 | 4.250% | 164,709,059 | 211,244,000 |
| Series 2019A-1 | 74529JQC2 | Capital Appreciation Bond | Tax-Exempt | 2027 | 4.375% | 243,231,617 | 357,783,000 |
| Series 2019A-1 | 74529JQD0 | Capital Appreciation Bond | Tax-Exempt | 2029 | 4.375% | 217,406,113 | 348,709,000 |
| Series 2019A-1 | 74529JQE8 | Capital Appreciation Bond | Tax-Exempt | 2031 | 4.500% | 252,924,000 | 449,395,000 |
| Series 2019A-1 | 74529JQF5 | Capital Appreciation Bond | Tax-Exempt | 2033 | 4.500% | 260,417,551 | 505,783,000 |
| Series 2019A-1 | 74529JQG3 | Capital Appreciation Bond | Tax-Exempt | 2046 | 5.375% | 1,094,968,245 | 4,813,682,000 |
| Series 2019A-1 | 74529JQH1 | Capital Appreciation Bond | Tax-Exempt | 2051 | 5.625% | 631,551,133 | 3,921,460,000 |
| Series 2019B-1 | 74529JQJ7 | Current Interest Bond | Tax-Exempt | 2034 | 4.500% | 4,743,000 | 4,743,000 |
| Series 2019B-1 | 74529JQK4 | Current Interest Bond | Tax-Exempt | 2040 | 4.550% | 2,402,000 | 2,402,000 |
| Series 2019B-1 | 74529JQL2 | Current Interest Bond | Tax-Exempt | 2053 | 4.750% | 17,619,000 | 17,619,000 |
| Series 2019B-1 | 74529JQM0 | Current Interest Bond | Tax-Exempt | 2058 | 5.000% | 44,554,000 | 44,554,000 |
| Series 2019B-2 | 74529JQN8 | Current Interest Bond | * | 2040 | 4.550% | 35,156,000 | 35,156,000 |
| Series 2019B-2 | 74529JQP3 | Current Interest Bond | * | 2053 | 4.750% | 723,000 | 723,000 |
| Series 2019B-2 | 74529JQQ1 | Current Interest Bond | * | 2058 | 5.000% | 9,691,000 | 9,691,000 |
| Series 2019B-1 | 74529JQR9 | Capital Appreciation Bond | Tax-Exempt | 2024 | 4.250% | 2,109,895 | 2,706,000 |
| Series 2019B-1 | 74529JQS7 | Capital Appreciation Bond | Tax-Exempt | 2027 | 4.375% | 3,114,981 | 4,582,000 |
| Series 2019B-1 | 74529JQT5 | Capital Appreciation Bond | Tax-Exempt | 2029 | 4.375% | 2,784,372 | 4,466,000 |
| Series 2019B-1 | 74529JQU2 | Capital Appreciation Bond | Tax-Exempt | 2031 | 4.500% | 3,238,972 | 5,755,000 |
| Series 2019B-1 | 74529JQV0 | Capital Appreciation Bond | Tax-Exempt | 2033 | 4.500% | 3,334,878 | 6,477,000 |
| Series 2019B-1 | 74529JQW8 | Capital Appreciation Bond | Tax-Exempt | 2046 | 5.375% | 14,023,071 | 61,648,000 |
| Series 2019B-1 | 74529JQX6 | Capital Appreciation Bond | Tax-Exempt | 2051 | 5.625% | 8,087,931 | 50,220,000 |

| Summary | Initial Par Amount | Maturity Value |
|---------|--------------------|----------------|
| Aggregate | $12,021,321,817 | $19,863,330,000 |
| Series 2019A | $11,869,739,718 | $19,612,588,000 |
| Current Interest Bonds | 9,004,532,000 | 9,004,532,000 |
| A-1 | 5,412,723,000 | 5,412,723,000 |
| A-2 | 3,591,809,000 | 3,591,809,000 |
| Capital Appreciation Bonds | 2,865,207,718 | 10,608,056,000 |
| Series 2019B | $151,582,100 | $250,742,000 |
| Current Interest Bonds | 114,888,000 | 114,888,000 |
| B-1 | 69,318,000 | 69,318,000 |
| B-2 | 45,570,000 | 45,570,000 |
| Capital Appreciation Bonds | 36,694,100 | 135,854,000 |

Source: COFINA First and Second Supplemental Indentures; Citi

---

* No opinion was delivered on the Effective Date with respect to the treatment for federal income tax purposes with respect to these bonds.  A copy of the approving opinion of Nixon Peabody LLP is attached hereto as Exhibit C.

2

# GENERAL

On February 12, 2019, the Puerto Rico Sales Tax Financing Corporation (the "Corporation") issued (i) $5,412,723,000 of its Restructured Sales Tax Bonds, Series 2019A-1 as current interest bonds (the "Series 2019A-1 Current Interest Bonds"), (ii) $2,865,207,717.80 of its Restructured Sales Tax Bonds, Series 2019A-1 as capital appreciation bonds (the "Series 2019A-1 Capital Appreciation Bonds") and (ii) its $3,591,809,000 Restructured Sales Tax Bonds, Series 2019A-2 as current interest bonds (the "Series 2019A-2 Current Interest Bonds" and together with the Series 2019A-1 Current Interest Bonds, the "Series 2019A Current Interest Bonds") pursuant to the Master Indenture of Trust, dated as of February 12, 2019, by and between the Corporation and The Bank of New York Mellon, as trustee (the "Trustee") (the "Master Indenture"), as supplemented by the First Supplemental Indenture, dated as of February 12, 2019, by and between the Corporation and the Trustee (the "First Supplement Indenture" and, together with the Master Indenture, the "Indentures"). Capitalized terms used herein shall have the meaning ascribed to such terms in the Indentures.

The execution version of the Master Indenture is attached hereto as Exhibit A and the execution version of the First Supplemental Indenture is attached hereto as Exhibit B. The form of the approving opinion of Nixon Peabody LLP, as transaction counsel, is attached hereto as Exhibit C.

# SERIES 2019A-1 CURRENT INTEREST BONDS

**Interest Payments.**

The Series 2019A Current Interest Bonds shall bear interest from August 1, 2018 until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided on page 1. Interest on the Series 2019A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months. Interest shall accrue on overdue interest and principal at the rates provided on page 1, and shall compound on each Interest Payment Date. All overdue interest and principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2019A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations. If any Interest Payment Date or Principal Payment Date (July 1) is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Redemption Prices and Terms.**

The Series 2019A Current Interest Bonds shall be subject to redemption prior to maturity as provided below.

(a)   *Optional Redemption.*  The Series 2019A Current Interest Bonds maturing on July 1, 2034 are subject to redemption prior to maturity on and after July 1, 2025, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination)

on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

The Series 2019A Current Interest Bonds maturing on July 1, 2040, July 1, 2053 and July 1, 2058 are subject to redemption prior to maturity on and after July 1, 2028, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the Principal amount thereof, plus accrued interest to the date fixed for redemption.

(b)    *Mandatory Redemption of the Series 2019A-1 Current Interest Bonds*.    The Series 2019A-1 Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as provided in the Indentures, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2019A-1 Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption. Unless none of the Series 2019A-1 Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of paragraph (d) below permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019A-1 Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2019A-1 Current Interest Bonds:

$370,347,000
Series 2019A-1
Current Interest Bonds
maturing July 1, 2034

| Year | Amount* |
|------|---------|
| 2033 | $  52,300,000 |
| 2034† | 318,047,000 |

† Stated maturity.

$187,553,000
Series 2019A-1
Current Interest Bonds
maturing July 1, 2040

| Year | Amount |
|------|--------|
| 2035 | $22,967,000 |
| 2036 | 25,982,000 |
| 2037 | 29,214,000 |
| 2038 | 32,675,000 |
| 2039 | 36,377,000 |
| 2040[†] | 40,338,000 |

[†] Stated maturity.

$1,375,772,000
Series 2019A-1
Current Interest Bonds
maturing July 1, 2053

| Year | Amount |
|------|--------|
| 2052 | $671,928,000 |
| 2053[†] | 703,844,000 |

[†] Stated maturity.

$3,479,051,000
Series 2019A-1
Current Interest Bonds
maturing July 1, 2058

| Year | Amount |
|------|--------|
| 2054 | $629,622,000 |
| 2055 | 661,101,000 |
| 2056 | 694,157,000 |
| 2057 | 728,863,000 |
| 2058[†] | 765,308,000 |

[†] Stated maturity.

(c)    *Mandatory Redemption of the Series 2019A-2 Current Interest Bonds*.  The
Series 2019A-2 Current Interest Bonds shall be subject to mandatory redemption, in part, through
application of Sinking Fund Installments, as provided in the Indentures, upon notice given as
prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per
centum (100%) of the Principal amount of each Series 2019A-2 Current Interest Bond or portion
thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the
Series 2019A-2 Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding
and, subject to the provisions of Section 5.07(b) of the Master Indenture and of paragraph (d)
below permitting amounts to be credited to part or all of any one or more Sinking Fund Installments
or the payment due at stated maturity, there shall be due and the Corporation shall be required to

pay for the retirement of the Series 2019A-2 Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2019A-2 Current Interest Bonds:

$1,905,085,000
Series 2019A-2
Current Interest Bonds
maturing July 1, 2040
CUSIP: 74529JPY5

| Year | Amount |
| --- | --- |
| 2035 | $233,284,000 |
| 2036 | 263,917,000 |
| 2037 | 296,743,000 |
| 2038 | 331,892,000 |
| 2039 | 369,510,000 |
| 2040[†] | 409,739,000 |

[†] Stated maturity.

$865,919,000
Series 2019A-2
Current Interest Bonds
maturing July 1, 2040
CUSIP: 74529JQY4

| Year | Amount |
| --- | --- |
| 2035 | $106,035,000 |
| 2036 | 119,958,000 |
| 2037 | 134,878,000 |
| 2038 | 150,855,000 |
| 2039 | 167,953,000 |
| 2040[†] | 186,240,000 |

[†] Stated maturity.

6

$57,021,000
Series 2019A-2
Current Interest Bonds
maturing July 1, 2053

| Year | Amount |
|------|--------|
| 2052 | $27,849,000 |
| 2053[†] | 29,172,000 |

[†] Stated maturity.

$763,784,000
Series 2019A-2
Current Interest Bonds
maturing July 1, 2058

| Year | Amount |
|------|--------|
| 2054 | $138,226,000 |
| 2055 | 145,137,000 |
| 2056 | 152,395,000 |
| 2057 | 160,013,000 |
| 2058[†] | 168,013,000 |

[†] Stated maturity.

(d)  *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2019A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2019A Current Interest Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture.  Series 2019A Current Interest Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2019A Current Interest Bonds redeemed at the option of the Corporation, purchased by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture), or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2019A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

# SERIES 2019A-1 CAPITAL APPRECIATION BONDS

**Interest Accretion.**  Interest on the Series 2019A-1 Capital Appreciation Bonds shall accrue and accrete from their dated dates until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation).  Interest on the Series 2019A-1 Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Corporation).  See "Exhibit D - Table of Accreted Value for the Series 2019A-1 Capital Appreciation Bonds" for the Accreted Values for Series 2019A-1 Capital Appreciation Bonds on each Valuation Date, assuming that no Accreted Value Payments will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

**Redemption Prices and Terms.**  The Series 2019A-1 Capital Appreciation Bonds shall be subject to redemption prior to stated maturity as provided in the Indentures.

(a)    *Optional Redemption*.  The Series 2019A-1 Capital Appreciation Bonds maturing on July 1, 2024 and on July 1, 2027 are not subject to optional redemption prior to stated maturity.

The Series 2019A-1 Capital Appreciation Bonds maturing July 1, 2029 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day from July 1, 2028 through and including June 30, 2029 at a Redemption Price equal to 103% of the Accreted Value thereof on the date fixed for redemption.

The Series 2019A-1 Capital Appreciation Bonds maturing July 1, 2031 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2029 | 105% of Accreted Value |
| July 1, 2029 through June 30, 2031 | 103% of Accreted Value |

The Series 2019A-1 Capital Appreciation Bonds maturing July 1, 2033 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2031 | 107.5% of Accreted Value |
| July 1, 2031 through June 30, 2032 | 105% of Accreted Value |
| July 1, 2032 through June 30, 2033 | 103% of Accreted Value |

The Series 2019A-1 Capital Appreciation Bonds maturing July 1, 2046 and July 1, 2051 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2033 | 107.5% of Accreted Value |
| July 1, 2033 through June 30, 2038 | 105% of Accreted Value |
| July 1, 2038 through June 30, 2043 | 103% of Accreted Value |
| On or after July 1, 2043 | 100% of Accreted Value |

(b)     *Mandatory Redemption for the Series 2019A-1 Capital Appreciation Bonds*.  The Series 2019A-1 Capital Appreciation Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as provided in the Indentures, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2019A-1 Capital Appreciation Bond or portion thereof to be redeemed.  Unless none of the Series 2019A-1 Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of paragraph (c) below permitting amounts to be credited to part or all of any one or more Accreted Value Payments, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019A-1 Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2019A-1 Capital Appreciation Bonds:

$211,244,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|---|---|---|---|
| 2019 | $18,626,492.19 | $19,358,690.04 | $23,889,000.00 |
| 2020 | – | – | – |
| 2021 | 15,265,942.09 | 17,258,301.13 | 19,579,000.00 |
| 2022 | 29,862,893.00 | 35,210,339.00 | 38,300,000.00 |
| 2023 | 43,811,904.90 | 53,875,533.90 | 56,190,000.00 |
| 2024†† | 57,141,827.06 | 73,286,000.00 | 73,286,000.00 |

\*  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

9

$357,783,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2027

| Year | Initial Accreted Value | Accreted Value at Redemption Date[*] | Maturity Value[**] |
|---|---|---|---|
| 2025 | $69,295,071.90 | $ 93,477,964.40 | $101,930,000.00 |
| 2026 | 81,266,198.37 | 114,475,327.96 | 119,539,000.00 |
| 2027[††] | 92,670,346.62 | 136,314,000.00 | 136,314,000.00 |

[*]   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$348,709,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2029

| Year | Initial Accreted Value | Accreted Value at Redemption Date[*] | Maturity Value[**] |
|---|---|---|---|
| 2028 | $103,533,637.98 | $159,028,571.32 | $166,063,000.00 |
| 2029[††] | 113,872,475.16 | 182,646,000.00 | 182,646,000.00 |

[*]   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$449,395,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2031

| Year | Initial Accreted Value | Accreted Value at Redemption Date[*] | Maturity Value[**] |
|---|---|---|---|
| 2030 | $121,924,907.16 | $207,205,834.92 | $216,636,000.00 |
| 2031[††] | 130,999,092.79 | 232,759,000.00 | 232,759,000.00 |

[*]   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$505,783,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|---|---|---|---|
| 2032 | $139,598,384.64 | $259,325,798.16 | $271,128,000.00 |
| 2033†† | 120,819,166.40 | 234,655,000.00 | 234,655,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$4,813,682,000 Maturity Value
Series 2019A-1
Capital Appreciation Bonds
maturing July 1, 2046

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|---|---|---|---|
| 2041 | $207,519,061.24 | $699,773,578.60 | $912,292,000.00 |
| 2042 | 196,800,219.90 | 699,775,451.10 | 865,170,000.00 |
| 2043 | 186,632,765.84 | 699,772,364.08 | 820,472,000.00 |
| 2044 | 176,990,994.95 | 699,770,744.75 | 778,085,000.00 |
| 2045 | 167,847,838.30 | 699,770,602.60 | 737,890,000.00 |
| 2046†† | 159,177,364.31 | 699,773,000.00 | 699,773,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$3,921,460,000 Maturity Value
Series 2019A-1 Capital Appreciation Bonds
maturing July 1, 2051

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|---|---|---|---|
| 2047 | $140,697,628.35 | $699,775,227.00 | $873,627,000.00 |
| 2048 | 133,104,765.05 | 699,773,197.89 | 826,481,000.00 |
| 2049 | 125,922,901.35 | 699,773,227.26 | 781,887,000.00 |
| 2050 | 119,127,396.60 | 699,770,822.76 | 739,692,000.00 |
| 2051†† | 112,698,441.65 | 699,773,000.00 | 699,773,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

11

(c)     *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Accreted Value Payments payable on a Series 2019A-1 Capital Appreciation Bond entitled to the payment of such Accreted Value Payments an amount equal to the Accreted Value calculated to the Redemption Date  of such Series 2019A-1 Capital Appreciation Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture.  Series 2019A-1 Capital Appreciation Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2019A-1 Capital Appreciation Bonds redeemed at the option of the Corporation, purchased by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture) and delivered to the Trustee for cancellation, or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part of one or more Accreted Value Payments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee, together with a revised redemption schedule, which must be certified to as correct by a Qualified Municipal Advisor Firm, for the affected maturity of Series 2019A-1 Capital Appreciation Bonds, at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019A-1 Capital Appreciation Bonds entitled to such Accreted Value Payments may be given by the Trustee and the Accreted Value Payment due on each date specified in such direction shall be reduced by the Accreted Value on the Redemption Date of the Series 2019A-1 Capital Appreciation Bonds so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Accreted Value Payments  as set forth in such direction.

0064
013

**EXHIBIT C**
**FORM OF APPROVING OPINION OF NIXON PEABODY LLP**

February 12, 2019

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by the Puerto Rico Sales Tax Financing Corporation (the "Corporation"), an independent public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting an entity separate from the Commonwealth and any other instrumentality of the Commonwealth, created pursuant to Act No. 91-2006, as amended, including as amended by Act No. 241, approved November 15, 2018 (as amended, "Act 91"), of its (a) $8,277,930,717.80 aggregate principal amount at issuance of Restructured Sales Tax Bonds, Series 2019A-1 (the "Series 2019A-1 Bonds"); (b) $3,591,809,000 aggregate principal amount of Restructured Sales Tax Bonds, Series 2019A-2 (the "Series 2019A-2 Bonds", and together with the Series 2019A-1 Bonds, the "Series 2019A Bonds"); (c) $106,012,099.55 aggregate principal amount at issuance of Restructured Sales Tax Bonds, Series 2019B-1 (the "Series 2019B-1 Bonds"); and (d) $45,570,000 aggregate principal amount of Restructured Sales Tax Bonds, Series 2019B-2 (the "Series 2019B-2 Bonds", and together with the Series 2019B-1 Bonds, the "Series 2019B Bonds"). The Series 2019A Bonds and the Series 2019B Bonds are collectively referred to herein as the "Series 2019 Bonds". The Series 2019 Bonds and any additional bonds authorized by the Master Trust Indenture (as such term is defined below) to be issued by the Corporation are collectively referred to herein as the "Bonds".

The Series 2019 Bonds are being issued under and secured by the Master Trust Indenture, dated as of the date hereof (the "Master Trust Indenture"), by and between the Corporation and The Bank of New York Mellon, as trustee (the "Trustee"), as supplemented by the First Supplemental Trust Indenture, dated as of the date hereof, by and between the Corporation and the Trustee (the "First Supplemental Trust Indenture") and the Second Supplemental Trust Indenture, dated as of the date hereof, by and between the Corporation and the Trustee (the "Second Supplemental Trust Indenture", and together with the First Supplemental Trust Indenture and the Master Trust Indenture, the "Indentures"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indentures.

On May 5, 2017, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), established pursuant to the provisions of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), filed a voluntary petition for relief for the Corporation pursuant to PROMESA in the United States District Court for the District of Puerto Rico (the "Title III Court").

C-1

The Oversight Board subsequently filed with the Title III Court a *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* dated January 9, 2019 (such plan, in the form approved in the *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* entered February 5, 2019 (the "Judgment") and as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing and as may have been modified pursuant to Section 313 of PROMESA, the "COFINA Plan of Adjustment").   On February 5, 2019, the Title III Court also issued a *Memorandum of Findings of Fact and Conclusions of Law in connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* containing Findings of Fact and Conclusions of law with respect to the Bonds, and matters relevant to the Bonds, in addition to, and consistent with those of the Judgment (collectively with the Judgment, the "Confirmation Order").

The Series 2019 Bonds are being issued for the purposes set forth in the Indentures.  The Series 2019 Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Indentures.  The Series 2019 Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Indentures and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Series 2019 Bonds.

As Transaction Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Series 2019 Bonds, (iii) the Indentures, (iv) one Series 2019 Bond, as executed and authenticated, (v) the COFINA Plan of Adjustment, and (vi) the Confirmation Order. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

With respect to opinions set forth below, we have assumed legality of PROMESA and all determinations made, and actions taken, by the Commonwealth, the Oversight Board, the Title III Court and the Corporation pursuant thereto.  In addition, with respect to the opinions 1, 2, 3 and 4 below, we have expressly relied upon the determinations of the Title III Court contained in the Confirmation Order, portions of which are also set forth in the Recitals of the Master Trust Indenture.

The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Series 2019A-1 Bonds and Series 2019B-1 Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Series 2019A-1 Bonds and Series 2019B-1 Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Series 2019A-1 Bonds and Series 2019B-1 Bonds.

Pursuant to the Indentures and/or the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Corporation, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Series 2019A-1 Bonds and Series 2019B-1 Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation, AAFAF and the Commonwealth have made certain representations and certifications in the Indentures and/or Tax Certificate. We have not undertaken to independently verify the accuracy of those certifications and representations.

Based upon the foregoing, and subject to the assumptions, limitations and qualifications set forth herein, we are of the opinion that:

1. Act 91 is valid in all respects material to the matters covered in this opinion.

2. The Corporation is duly constituted and validly existing as an independent public corporation and instrumentality of the Commonwealth, constituting an entity independent and separate from the Commonwealth and any other instrumentality of the Commonwealth.

3. The Indentures have been duly and lawfully authorized, executed and delivered by the Corporation. The Indentures are in full force and effect and are valid and binding upon the Corporation and enforceable in accordance with their respective terms.

4. The Corporation is authorized and entitled to issue the Series 2019 Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, the Series 2019 Bonds will be duly and validly issued and will constitute valid and binding special obligations of the Corporation entitled to the benefits of the Indentures and enforceable in accordance with their respective terms. The Statutory Lien creates the valid pledge and the valid lien upon the right, title and interest of the Corporation in the Trust Estate in favor of the Trustee (for the benefit of the Holders of Bonds) which it purports to create, subject only to the provisions of the Indentures permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the Indentures.

5. Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest (including original issue discount) on the Series 2019A-1 Bonds and the Series 2019B-1 Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code. We express no opinion regarding interest and other amounts with respect to the Series 2019A-1 Bonds and the Series 2019B-1 Bonds that have accrued from the dated date of such bonds to the date hereof.

6. Interest on the Series 2019A-1 Bonds and the Series 2019B-1 Bonds is exempt from state, Commonwealth and local income taxation.

Except as stated in paragraphs (5) and (6) above, we express no opinion as to: (a) any other Federal, state, Commonwealth, local or foreign tax consequences of the ownership or disposition of, or the amount, accrual or receipt of interest on, the Series 2019 Bonds, or (b) any transaction that is not expressly referenced in this opinion, or the effect of any such transaction on either (I) the character or treatment of interest on the Series 2019 Bonds for Federal, state, Commonwealth, local or foreign tax purposes, or (II) the amount of interest on the Series 2019 Bonds that will be treated as interest for Federal, state, Commonwealth, local or foreign tax purposes. Furthermore, we express no opinion as to any Federal, state, Commonwealth, local or foreign tax law consequences with respect to the Series 2019 Bonds, or the interest thereon, if any action is taken with respect to the Series 2019 Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Series 2019 Bonds and the enforceability thereof and of the Statutory Lien and the Indentures may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

# COFINA Constituents Set the Record Straight with Facts on Sales & Use Tax Collection Data

NEWS PROVIDED BY

**Group of COFINA Constituents →**

Mar 15, 2018, 09:00 ET

NEW YORK, March 15, 2018 /PRNewswire/ -- A group of COFINA constituents that includes Ambac, the COFINA Seniors Coalition, National Public Finance Guarantee Corporation and the Puerto Rico Funds, which collectively accounts for more than $6.5 billion of bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), released the following statement today regarding the January 2018 revenue report issued by the Government of Puerto Rico on March 8:

**"As the citizens of Puerto Rico look to their government for leadership and transparency, we are concerned that the public's continued receipt of inaccurate information about the island's financial situation now extends to Sales & Use Tax ("SUT") collections. This troubling pattern is adversely impacting every one of Puerto Rico's residents and stakeholders by extending – rather than accelerating – the expensive restructuring process as well as critical post-hurricane recovery efforts intended to revitalize the island. The latest misrepresentations can be found in last week's report on net revenues, which distorts SUT collection data.**

**The truth, which was omitted from last week's report, is that post-hurricane SUT collections are strong and they continue to trend upward despite ongoing power outages and the full SUT exemptions that the government invoked for small businesses, mid-size enterprises and prepared foods between November 2017 and January 2018. The government's report did not account for these exemptions, which reduced revenues by approximately $60 million.**

0069

**Exhibit C to Elliott Declaration**

Adjusting for the government's decision to reduce revenues, year-over-year SUT collections are down approximately 6% through March 2, 2018. This figure is far smaller than the misleading 11% decline reported by the government[1], and it reinforces the fact that SUT collections remain robust even in the aftermath of recent devastating hurricanes.

In addition, Puerto Rico's Treasury Department attributes lower SUT revenue flowing to the General Fund to the fact that the required buildup of cash within the COFINA structure concluded in February instead of in early January, as was the case in 2017. Last week's report does not mention that the Government of Puerto Rico enacted Law 84, which altered the flow of funds to COFINA by redirecting 0.5% of the SUT to municipalities beginning in July 2017. Had this change not been made, COFINA would have been funded in January 2018.

Looking ahead, there is real cause for optimism based on data that indicate February 2018 SUT collections are in-line with February 2017 figures. COFINA, which is the most widely-held bond issuance among local savers and retirees, remains Puerto Rico's most affordable vehicle to re-access the capital markets going forward. The structure has consistently provided financing at a lower cost than General Obligation debt. These are just a few of the reasons why we call on the administration to shift from obfuscating the facts and undermining COFINA to driving a transparent, pro-growth agenda for the future."

For a copy of Miller Buckfire & Company's analysis of SUT collection data, please reach out to: Greg.Marose@edelman.com and Nicole.Briguet@edelman.com

[1] Press release titled "Puerto Rico Treasury Reports Net Revenues to the General Fund for January 2018" dated March 8, 2018.

SOURCE Group of COFINA Constituents

Puerto Rico Sales and Use Tax Collection



# Puerto Rico Sales and Use Tax Collection

*Posted on March 04, 2019*



Since the Supreme Court decision on the South Dakota vs. Wayfair case, we've noticed many states reviewing the way economic nexus can be established with out of state retailers. This decision has encouraged many states to start legislation to take advantage of the benefits of this new ruling. Others, like the US territory of Puerto Rico, have seen the ruling as an ally on their quest to collect sales and use tax though online retailers.

Exhibit D to Elliott Declaration

Puerto Rico started their online tax collecting endeavor with the establishment of Law #1-2011 on January 31, 2011 named Internal Revenue Code for a New Puerto Rico. This law replaced Law # 120-94 of October 31, 1994. One of the goals of this law was the establishment of the basis on which Puerto Rico will handle the collection of taxes and the due dates for the payment of these taxes to the government. This includes taxes to be collected and paid from retailers who sell tangible goods in Puerto Rico through the internet, regardless if they have physical presence on the island or not.

With this law, the payment of use tax was implemented requiring citizens to pay for use tax on their internet purchases even if the retailer did not impose a sales tax. To clarify the language on sales and use tax, the Puerto Rico legislature approved two more laws in subsequent years: Law #42-2013 on June 30, 2013 and the most recent Law # 25-2017 of April 29, 2017. Law #42-2013 was created with the main purpose of adding amendments to help with the collection of sales and use tax (also known as IVU by its Spanish acronym).

The biggest change on this legislation came with the approval of Law #25-201. With this amendment the government of Puerto Rico introduced reporting requirements for online retailers. One of these requirements obligates all online retailers that do not collect sales taxes with customers in Puerto Rico, to inform all their customers that they must pay use tax on their purchases. This notice must be included on the bill, receipt, and any other physical or electronic means. They must also file a monthly report with all the sales transactions for each month. On this sales report, retailers must include names, addresses, dates, category of the purchase, and whether it is sale tax exempt or not.

The retailers that fail to comply with this law are subject to fines. Many retailers, including Amazon, have agreed to collect and remit sales taxes as well as comply to reporting to avoid paying fines. The Puerto Rico DOR (Departamento de Hacienda) is expecting to increase their yearly online sales tax collection from $15 million to $40 million.

All these laws were enacted before the Wayfair case decision, but the Supreme Court's decision gives them a more robust backup to be upheld in court. In a recent interview, Francisco Parés Alicea, the Deputy Secretary of Internal Revenue at the Puerto Rico Treasury Department, stated that after December 2018 his agency will start to assemble invoices to send to those customers who had the legal obligation to pay use tax on online purchases where sales tax was not charged.

*Tips for the Taxpayer*

Be well informed of the sales and use tax laws specific to transactions occurring in Puerto Rico. If sales tax is not being charged on the invoice, question the reason. If no exemptions exist for the transaction, self-accrue and remit use tax. Compliance with sales and use tax laws is best obtained at the time of transaction rather than at a later date under audit.

*For More Information*

If you are interested in learning more about this topic or other tax topics, please visit our Tax Publications under News and Publications at **www.allynintl.com.**

*How Can We Help?*

Allyn's tax team is staffed with seasoned tax professionals experienced in all aspects of federal, multi-state, as well as local tax compliance and consulting for large US and global corporations. We use that experience to your advantage. Allyn files state and local sales and use tax returns in every US taxing jurisdiction. We can manage your tax compliance, create a solid tax process, and provide audit defense for your company.

Contact us and we can provide a customized cost-effective solution to meet your company's needs. For further information on Allyn Tax services, please contact: tax@allynintl.com.

*Contributor: Luis Rivera*

**About Allyn International**

Allyn International is dedicated to providing high quality, customer centric services and solutions for the global marketplace. Allyn's core products include transportation management, logistics sourcing, freight forwarding, supply chain consulting, tax management and global trade compliance. Allyn clients range from small local businesses to Fortune 500 firms. Allyn conducts business in more than 20 languages and has extensive experience in both developed and emerging markets. Highly trained experts are positioned throughout North and South America, Europe and Asia. Allyn's regional headquarters are strategically located in Fort Myers, Florida, U.S.A., Shanghai, P.R. China and Prague, Czech Republic. For more information, visit **www.allynintl.com**.

©2019 Allyn International Services, Inc. All rights reserved.



Providing Market Transparency Since 2008

Advanced Search    Browse Issuers    Tools and Resources    Market Activity    EMMA Help    A-  100%  A+

Home > Issuers By State > Puerto Rico > Issuer Homepage > Issue Details > Security Details

## Security Details

↩ Return to search results



**CUSIP: 74629JMD4***
PUERTO RICO SALES TAX FINANCING CORPORATION SALES TAX REVENUE BONDS, FIRST SUBORDINATE SERIES 2011A-1 CAPITAL APPRECIATION BONDS (PR)
PUERTO RICO SALES TAX FING CORP SALES TAX REV CAP APPREC-FIRST SUBSER A-1 (PR)*

| | |
|---|---|
| Coupon: | 0 % |
| Maturity Date: | 08/01/2033 |
| Dated Date: | 11/23/2011 |
| Initial Offering Price/Yield: | 26.045% |
| Principal Amount at Issuance: | $4,548,759.25 |
| Closing Date: | 11/23/2011 |



Trade Activity    Ratings    Disclosure Documents    Related Securities    Final Scale    Compare

View real-time price and yield information for trades in this security.

⇄ Trade Summary        ☰ Trade Details        🔍 Search Trades

Display 100 ▾ results    Search within list: [          ]        First  Previous  1  2  Next  Last

| | Trade Date | High/Low Price (%) | High/Low Yield (%) | Trade Count | Total Trade Amount ($) |
|---|---|---|---|---|---|
| ⊕ | 02/05/2019 | 17.41 / 16.66 | 12.765 / 12.442 | 4 | 80,000 |
| ⊕ | 01/16/2019 | 16.95 / 16.785 | 12.662 / 12.591 | 4 | 2,000,000 |
| ⊕ | 09/25/2018 | 15.704 / 15.644 | 12.896 / 12.868 | 2 | 550,000 |
| ⊕ | 08/13/2018 | 16.324 / 16.039 | 12.615 / 12.489 | 5 | 500,000 |
| ⊕ | 05/16/2018 | 10.591 / 10.266 | 15.547 / 15.327 | 3 | 270,000 |
| ⊕ | 05/01/2018 | 8.015 / 7.825 | 17.431 / 17.26 | 4 | 360,000 |
| ⊕ | 01/05/2018 | 4.019 / 3.857 | 22.052 / 21.759 | 3 | 300,000 |
| ⊕ | 01/03/2018 | 3.265 / 3.205 | 23.36 / 23.227 | 2 | 200,000 |
| ⊕ | 12/28/2017 | 3.799 / 3.774 | 22.178 / 22.131 | 2 | 60,000 |
| ⊕ | 12/06/2017 | 2.178 / 1.941 | 26.848 / 26.014 | 3 | 30,000 |
| ⊕ | 11/14/2017 | 4.053 / 3.805 | 21.93 / 21.485 | 4 | 400,000 |
| ⊕ | 10/24/2017 | 4.89 / 4.89 | 20.091 / 20.091 | 1 | 15,000 |
| ⊕ | 09/28/2017 | 5.244 / 4.994 | 19.856 / 19.517 | 4 | 60,000 |
| ⊕ | 08/17/2017 | 8.946 / 8.575 | 16.017 / 15.73 | 3 | 570,000 |
| ⊕ | 08/03/2017 | 8.724 / 8.31 | 16.188 / 15.86 | 5 | 625,000 |
| ⊕ | 08/02/2017 | 8.72 / 8.418 | 16.098 / 15.86 | 3 | 840,000 |
| ⊕ | 07/26/2017 | 8.494 / 8.434 | 16.068 / 16.02 | 2 | 200,000 |
| ⊕ | 07/25/2017 | 7.65 / 7.534 | 16.822 / 16.719 | 3 | 540,000 |
| ⊕ | 06/15/2017 | 7.003 / 6.985 | 17.217 / 17.2 | 3 | 45,000 |
| ⊕ | 06/12/2017 | 8.354 / 8.354 | 16 / 16 | 1 | 125,000 |



# Financial Supplement

**Assured Guaranty Ltd.**
December 31, 2018

# Assured Guaranty Ltd.

Exposure to Puerto Rico (1 of 3)

As of December 31, 2018

(dollars in millions)

**Exposure to Puerto Rico**

| | Par Outstanding | | Debt Service Outstanding | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Total | $ 4,971 | $ 4,767 | $ 8,035 | $ 7,743 |

**Exposure to Puerto Rico by Risk**

| | Net Par Outstanding | | | | | |
|---|---|---|---|---|---|---|
| | AGM | AGC | AG Re | Eliminations (1) | Total Net Par Outstanding | Gross Par Outstanding |
| **Commonwealth Constitutionally Guaranteed** | | | | | | |
| Commonwealth of Puerto Rico - General Obligation Bonds [2] [3] | $ 647 | $ 301 | $ 393 | $ (1) | $ 1,340 | $ 1,383 |
| Puerto Rico Public Buildings Authority (PBA) | 9 | 142 | — | (9) | 142 | 148 |
| **Public Corporations - Certain Revenues Potentially Subject to Clawback** | | | | | | |
| Puerto Rico Highways and Transportation Authority (PRHTA) (Transportation revenue) [3] | 233 | 495 | 195 | (79) | 844 | 874 |
| PRHTA (Highways revenue) [3] | 351 | 84 | 40 | — | 475 | 536 |
| Puerto Rico Convention Center District Authority (PRCCDA) | — | 152 | — | — | 152 | 152 |
| Puerto Rico Infrastructure Financing Authority (PRIFA) | — | 15 | 1 | — | 16 | 16 |
| **Other Public Corporations** | | | | | | |
| Puerto Rico Electric Power Authority (PREPA) [3] | 544 | 72 | 232 | — | 848 | 866 |
| Puerto Rico Aqueduct and Sewer Authority (PRASA) [4] | — | 284 | 89 | — | 373 | 373 |
| Puerto Rico Municipal Finance Agency (MFA) [4] | 189 | 40 | 74 | — | 303 | 349 |
| Puerto Rico Sales Tax Financing Corporation (COFINA) [5] | 264 | — | 9 | — | 273 | 273 |
| University of Puerto Rico (U of PR) [4] | — | 1 | — | — | 1 | 1 |
| Total exposure to Puerto Rico | $ 2,237 | $ 1,586 | $ 1,033 | $ (89) | $ 4,767 | $ 4,971 |

1) Net par outstanding eliminations relate to second-to-pay policies under which an Assured Guaranty insurance subsidiary guarantees an obligation already insured by another Assured Guaranty insurance subsidiary.

2) Includes exposure to capital appreciation bonds with a current aggregate net par outstanding of $2 million and fully accreted net par at maturity of $3 million.

3) As of the date of this filing, the seven-member financial oversight board established by the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) has certified a filing under Title III of PROMESA for these exposures.

4) As of the date of this filing, the Company has not paid claims on these credits.

5) As of the date of this filing, a plan of adjustment under PROMESA is effective for this credit.

**Assured Guaranty Ltd.**
Exposure to Puerto Rico (2 of 3)
As of December 31, 2018
(dollars in millions)

**Amortization Schedule of Net Par Outstanding of Puerto Rico**

| | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 -2033 | 2034 -2038 | 2039 -2043 | 2044 -2047 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Commonwealth Constitutionally Guaranteed** | | | | | | | | | | | | | | | | | | |
| Commonwealth of Puerto Rico - General Obligation Bonds [1] | $ — | $ — | $ 87 | $ — | $141 | $ 15 | $ 37 | $ 14 | $ 73 | $ 68 | $ 34 | $ 90 | $ 33 | $ 341 | $ 407 | $ — | $ — | $ 1,340 |
| PBA | — | — | 3 | — | 5 | 13 | — | 7 | — | 7 | 11 | 40 | — | 36 | 20 | — | — | 142 |
| **Public Corporations - Certain Revenues Potentially Subject to Clawback** | | | | | | | | | | | | | | | | | | |
| PRHTA (Transportation revenue) | — | — | 32 | — | 25 | 18 | 28 | 33 | 4 | 29 | 24 | 29 | 34 | 127 | 296 | 165 | — | 844 |
| PRHTA (Highway revenue) | — | — | 21 | — | 22 | 35 | 6 | 32 | 33 | 34 | 1 | — | 9 | 145 | 137 | — | — | 475 |
| PRCCDA | — | — | — | — | — | — | — | — | — | — | — | 19 | — | 50 | 83 | — | — | 152 |
| PRIFA | — | — | — | — | — | — | — | 2 | — | — | — | — | — | — | 3 | 11 | — | 16 |
| **Other Public Corporations** | | | | | | | | | | | | | | | | | | |
| PREPA | — | — | 26 | — | 48 | 28 | 28 | 95 | 93 | 68 | 106 | 105 | 68 | 174 | 9 | — | — | 848 |
| PRASA | — | — | — | — | — | — | — | 2 | 25 | 26 | 28 | 29 | — | 2 | — | 261 | 373 |
| MFA | — | — | 55 | — | 45 | 40 | 40 | 22 | 17 | 17 | 34 | 12 | 11 | 10 | — | — | — | 303 |
| COFINA | — | — | — | — | (1) | (2) | (2) | 1 | — | (2) | (2) | (2) | (2) | 20 | 11 | 254 | — | 273 |
| U of PR | — | — | — | — | — | — | — | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Total | $ — | $ — | $ 224 | $ — | $285 | $147 | $137 | $206 | $222 | $246 | $234 | $321 | $182 | $ 904 | $ 968 | $ 430 | $ 261 | $4,767 |

1) Includes exposure to capital appreciation bonds with a current aggregate net par outstanding of $2 million and fully accreted net par at maturity of $3 million.

0077

# Assured Guaranty Ltd.
## Exposure to Puerto Rico (3 of 3)
### As of December 31, 2018
(dollars in millions)

**Amortization Schedule of Net Debt Service Outstanding of Puerto Rico**

| | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 -2033 | 2034 -2038 | 2039 -2043 | 2044 -2047 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Commonwealth Constitutionally Guaranteed** | | | | | | | | | | | | | | | | | | |
| Commonwealth of Puerto Rico - General Obligation Bonds [1] | $ 35 | $ — | $ 121 | $ — | $ 206 | $ 74 | $ 94 | $ 71 | $ 128 | $ 119 | $ 82 | $ 136 | $ 73 | $ 512 | $ 457 | $ — | $ — | $ 2,108 |
| PBA | 3 | — | 7 | | 12 | 20 | 6 | 13 | 6 | 13 | 17 | 44 | 4 | 51 | 23 | — | — | 219 |
| **Public Corporations - Certain Revenues Potentially Subject to Clawback** | | | | | | | | | | | | | | | | | | |
| PRHTA (Transportation revenue) | 22 | — | 54 | — | 67 | 59 | 68 | 72 | 41 | 66 | 59 | 63 | 66 | 262 | 374 | 180 | — | 1,453 |
| PRHTA (Highway revenue) | 13 | — | 34 | — | 46 | 58 | 27 | 52 | 51 | 51 | 17 | 15 | 25 | 208 | 152 | — | — | 749 |
| PRCCDA | 3 | — | 4 | — | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 26 | 6 | 78 | 91 | — | — | 257 |
| PRIFA | — | — | — | — | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 3 | 7 | 12 | — | 32 |
| **Other Public Corporations** | | | | | | | | | | | | | | | | | | |
| PREPA | 17 | 3 | 43 | 3 | 87 | 63 | 62 | 128 | 121 | 91 | 126 | 122 | 80 | 198 | 10 | — | — | 1,154 |
| PRASA | 10 | — | 10 | — | 19 | 19 | 19 | 19 | 21 | 44 | 44 | 44 | 44 | 68 | 70 | 68 | 300 | 799 |
| MFA | 8 | — | 62 | — | 58 | 50 | 48 | 28 | 23 | 21 | 37 | 14 | 11 | 11 | — | — | — | 371 |
| COFINA | 6 | — | 6 | — | 13 | 13 | 13 | 16 | 15 | 12 | 13 | 13 | 13 | 95 | 76 | 296 | — | 600 |
| U of PR | — | — | — | — | — | — | — | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Total | $ 117 | $ 3 | $ 341 | $ 3 | $ 516 | $ 364 | $ 345 | $ 408 | $ 414 | $ 425 | $ 403 | $ 478 | $ 323 | $ 1,487 | $ 1,260 | $ 556 | $ 300 | $ 7,743 |

1) Includes exposure to capital appreciation bonds with a current aggregate net par outstanding of $2 million and fully accreted net par at maturity of $3 million.

(P. de la C. 1544)
(Conference)

## LAW NO. 257
## 10 December 2018

To amend 1000.02, 1001.01, 1010.01, 1010.04, 1010.05, 1021.01, 1021.02, 1021.03, 1022.01, 1022.03, 1022.04, 1023.04, 1023.06, 1023.08, 1023.09, 1023.21, 1023.22, 1031.01, 1031.02, 1032.05 sections, 1033.02, 1033.07, 1033.10, 1033.14, 1033.15, 1033.17, 1034.01, 1035.01, 1035.02, 1035.02, 1051.01, 1051.01, 1051.06, 1051.06, 1051.07, 1051.09, 1051.10, 1051.01, 1051.12, 1051.13, 1051.14, 1052.01, 1061.01, 1061.02, 1061.03, 1061.04, 1061.06, 1061.07, 1061.15, 1061.16, 1061.17, 1062.01, 1062.02, 1062.03, 1062.08, 1062.08, 1062.09, 1063.01, 1063.03, 1063.07, 1063.09, 1063.12, 1071.02, 1071.04, 1071.08, 1074.03, 1081.01, 1081.02, 1081.05, 1101.01, 1112.01, 1113.04, 1114.06, 1115.01, 2051.01, 3050.02, 3050.10, 3060.08, 4010.01, 4030.14, 4030.19, 4030.20, 4060.01, 4210.01, 5022.01, 5050.06, 6010.01, 6010.02, 6010.05, 6010.06, 6010.07, 6021.02, 6030.10, 6041.09, 6041.10, 6041.11, 6051.02, 6051.07, 6051.08, 6051.11, 6051.12, 6051.17, 6054.03, 6073.01, 6073.02, 6073.05, 6080.01, 6080.05 and 6080.06; repeal Sections 1032.06, 6073.03, 6073.04; add new Sections 1021.06, 1022.07, 1033.21, 1035.08, 1051.15, 1063.15, 1101.02, 1116.16, 1116.17, 1116.18, 4030.26, 6010.09, 6030.23, 6030.24, 6030.25, 6051.20, 6051.21, 6051.22 as amended, known as the "Internal Revenue Code for a New Puerto Rico "; amend subsections (a) and (c) of Section 6.03 of Act 83-1991, as amended; amend subsection (B) of Article (24) of Law 272-2003, as amended; repeal Law 156-2015; amend Section 208 of Act 210-2015, as amended, and amend Act No. 11 of August 22, 1933, as amended; for the purpose of establishing the simplification plan of the contributory system; and for other related purposes.

EXPLANATORY MEMORANDUM

In the past 20 years, the tax system of Puerto Rico has lost the capacity to generate income, mainly as a result of a gradual decrease in the tax base and the approval of special laws that had the effect of increasing the complexity of the taxpayer. same. It is not a novel situation, because they are challenges that have been faced before.

The Tax Reform of 1994, Law 120-1994, as amended, was developed according to principles, including the establishment of a progressive system where contributions would be imposed according to the ability of people to pay, create a simple tax structure that provides incentives for economic development and promotes an administration that is effective in controlling tax evasion without creating burdensome burdens on citizens in complying with their tax obligations.

The Tax Reform of 1994 reduced the tax burden on the middle class through

2

reductions in tax rates; from nine (9) to eight (8) percent in the minimum rate and from thirty-six (36) to thirty-three (33) percent in the maximum rate. Likewise, tax rates for corporations and companies were reduced from forty-two (42) to thirty-nine (39) percent. These reductions resulted in contributory reliefs that totaled around $ 400 million.[1]

Subsequently, the tax policy of the Government of Puerto Rico began a transformation of the tax regime for consumption. Law 117-2006 replaced the general tax on imports and manufacturing products by a Tax on Sales and Use (SUT) on goods and services, under the assumption that a broader tax base would be achieved and betting on consumption as the driving force behind economic activity in Puerto Rico.

In 2011, the Internal Revenue Code of Puerto Rico was amended with the intention of granting tax relief, promoting economic development and creating jobs. For such purposes, the Internal Revenue Code for a New Puerto Rico of 2011 approved by virtue of Law 1-2011 (Code), implemented a reduction of tax rates for individuals and corporations. In turn, it established a regime for the Basic Alternate Contribution (CBA) with greater rigor in terms of claiming certain deductions against gross income. This Code introduced a change in public policy that was governed by the maxim that a dollar in the pockets of people is worth more than a dollar in the pocket of the Government.

However, that public policy of more money in the pocket of the Puerto Rican was thrown aside by the past administration. Little by little they were destroying a tax reform that benefited all Puerto Ricans, and they were replacing it with numerous taxes that directly affected the working class of Puerto Rico.

The inefficient public policy of the García Padilla Administration tried to find an easy and politically convenient way out of the chaos that it created through its four (4) years of improvisations and incoherent policies. The García Padilla Administration governed under the philosophy of: "first taxes and then cuts." This philosophy led to the continuation of excessive spending and the rejection of public policies that would have allowed efficient handling of the fiscal affairs of the Government of Puerto Rico. Also, this past administration increased the rate of Sales and Use Tax from seven (7) to eleven point five (11.5) percent and approved arbitrary increases over crude oil. The García Padilla Administration never made necessary efficiencies to the operation of the Government and excessive government spending. This public policy of imposing more than a hundred new taxes has had a negative effect on the economy and wealth of the Puerto Rican. As a result, the economic crisis that affected Puerto Rico became so acute that countless local businesses were forced to cease operations.

Since we assumed the reins of Puerto Rico in January 2017, the public policy of

---

[1] Pub. Law 115–97, 131 Stat. 2054.

3

this administration has been to demonstrate that Puerto Rico is open to doing business. In the same way, we understand that one of the main ways to get out of this fiscal crisis is by promoting economic development. Until 2016, the image of Puerto Rico was lacerated worldwide. It is our north to direct Puerto Rico to become a solid jurisdiction economically.

Certainly, Puerto Rico is going through an unprecedented fiscal and economic crisis. A comprehensive reform is necessary that addresses the imperfections of our contributory system that not only stimulates economic development but also promotes an environment where the voluntary and exemplary compliance of all sectors permeates to achieve a truly fair and equitable system.

For years, the Government has operated with a structural deficit that has been financed with bond issues and loans to the Government Development Bank. Along with the foregoing, for years, the Government of Puerto Rico has faced a cash flow crisis in the government coffers, in part, due to the reduction in the tax base caused by massive emigration and the closure of businesses due to the economic crisis. To combat this reduction, previous governments have resorted to increasing taxes as a measure to alleviate the cash flow crisis. However, these measures proved counterproductive, since they did not take into account the effect that new taxes could have on our fragile economy. Excessive contributions and complex contributory systems restrict the development of companies and individuals and weaken the economic potential of the economic deeds carried out by them. That is why, when modifying a contributory system, economic development should be the north that directs those who propose it.

Recently, a group of leading economists and specialists in economic development, headed by the former director of the International Monetary Fund (IMF), the doctor in economics, Anne Krueger, presented a Report to the Government of Puerto Rico (hereinafter, "Krueger Report") , which highlights the need to achieve an accelerated growth of our economy to be able to cope with the fiscal crisis. See *Puerto Rico - A Way Forward* (June 29, 2015), p. 1, 16. This reform is one of the steps we have taken to achieve that growth. Likewise, the Fiscal Oversight Board, created in accordance with the provisions of PROMESA, has also suggested that taxes be rationalized and optimized, as well as a simpler tax system.

The Organization for Economic Development and Collaboration (OECD for its acronym in English), states that the segregation of sectors or classification by type of taxpayer allows to identify with a greater degree of precision the risks of non-compliance.[2] Therefore, in the fiscal administration exercise, the fiscal agency must evaluate the behavior and characteristics of specific sectors of the population in order to develop more effective control strategies.

---

[2] Orden Ejecutiva Núm. OE-2017-47.

4

In agreement with the best practices in the world, this new tax model aims to redefine the philosophy of tax administration and adopt proactive behavior instead of continuing to be reactive in the process of identifying failures in complying with the tax obligations established by the Code and the possible causes that cause such non-compliance. This contributory reform is based on fundamental principles and best tax administration practices: (i) the use of technology as a tool to increase compliance; (ii) restructuring of the line of services to taxpayers; (iii) refinement of the control and mitigation strategies for non-compliance risks; and (iv) a transformation of processes to facilitate full compliance with tax obligations.

## A. INDIVIDUALS

John F. Kennedy said that "the integrity of a system that operates on the basis of self-determination depends to a large extent on the continuous willingness of each citizen to discharge his or her responsibility to contribute to the cost of maintaining a civilized society, in a fair and fair, with the highest degree of honesty and accuracy. To the extent that a sector of the population does not fulfill this responsibility, the rest of the population is forced to bear a greater burden in the payment of contributions. "

Franklin D. Roosevelt said that:" the social conscience of an individual it is measured with certainty when evaluating their behavior regarding the payment of contributions; after all, it is the price we pay as citizens for the privilege of being part of a civilized society. "

This reform introduces a series of changes in the income contribution regime for both individuals and corporations. In the case of individuals, a dollar-for-dollar reduction of five (5) percent of what they pay today is given, thus tilting the balance of justice and equity in favor of taxpayers who historically have borne a higher contributory burden compared to other sectors of the population. In short, this reform is nothing more than a redistribution of the tax burden and the implementation of mechanisms to combat the evasion of the payment of contributions. For this reason, this new tax model is fiscally neutral (revenue neutral) for government purposes. That is to say, by redistributing the tax burden, adding a more aggressive and efficient collection and inspection system, we can assure that the vast majority of our taxpayers will pay less contributions, thus injecting the economy of Puerto Rico.

On the other hand, new thresholds are established for the purposes of the Alternate Basic Contribution, including new tax rates that would fluctuate from 1% to 24%, as detailed below:

5

Table 2.1 - Current Alternate BasicRates applicable to Individuals

| TaxIncome net Subject to Alternate Basic | Rate Contributivas: |
|---|---|
| $ 150,000 but not more than $ 200,000 | 10% |
| in excess of $ 200,000 but not more than $ 300,000 | 15% |
| in excess of $ 300,000 | 24% |

Table 2.2 - Rate Proposed Alternate Basic Tax applicable to Individuals

| net Income Subject a Basic Contribution Alternates Tax | Rates: |
|---|---|
| In excess of $ 25,000 but not more than $ 50,000 | 1% |
| In excess of $ 50,000 but not more than $ 75,000 | 3% |
| In excess of $ 75,000 but not more than $ 150,000 | 5% |
| In excess of $ 150,000 but not more than $ 250,000 | 10 % |
| In excess of $ 250,000 | 24% |

One of the fundamental aspects of this tax reform is to use greater controls on deductions that taxpayers claim in the computation of their tax liability. For the purposes of the Basic Alternate Contribution, the deductibility of the expenses will be subject to certain terms and conditions, such as compliance by the taxpayer in duly reporting the expenses incurred in the corresponding informative declarations, or the presentation of reliable evidence that demonstrates, in effect, that said expenses were incurred by the taxpayer. In cases where the nature of the expenses claimed does not allow for their immediate and easy corroboration, the deduction will be allowed as long as the taxpayer submits a certification prepared by a professional where the veracity and correctness of the claimed expenses are validated. These control and compliance mechanisms are introduced with the purpose of providing a greater degree of certainty regarding the deductions for expenses incurred in the exercise of an industry or business activity. The deductions will be available for those honest taxpayers, but with better control mechanisms to discourage tax evasion.

Optional Contribution

Another of the main objectives of this tax reform is to reduce the cost of compliance to taxpayers, whether in time or money. In order to simplify the processes for compliance with tax obligations, and considering the new economic reality of self-employed persons, an optional contribution is introduced for individuals who carry out industry or business on their own account (self-employed individuals), and whose

source of income comes substantially from services subject to withholding tax.

The optional contribution would allow the individual to be taxed at a fixed rate of tax on the gross income received, as long as the income generated by self-employment is subject to withholding tax or estimated payment and have been duly informed. in the corresponding informative statement. The tax rates and income thresholds subject to the Optional Contribution are illustrated as follows:

Table 3.1 - Optional Contribution to Individuals who carry out Industry or Business by Own Account

| Gross Income Tax | Rates: |
|---|---|
| No greater than $ 100,000 | 6% |
| In excess of $ 100,000 but not more than $ 200,000 | 10% |
| In excess of $ 200,000 but not more than $ 300,000 | 13% |
| In excess of $ 300,000 but not more than $ 400,000 | 15% |
| In excess of $ 400,000 but not more than $ 500,000 | 17% |
| In excess of $ 500,000 | 20% |

Payroll System "Premium"

Technological advances and the availability of highly sophisticated information systems make possible the implementation of fundamental changes in our contributory system. The exponential growth in the use of technology and the digitalization of information opens the way to consider platforms and technological tools that allow: (i) simplifying and speeding up the interaction of taxpayers with the Department of the Treasury; (ii) increase efficiency in the process of making tax administration decisions through an integrated analysis of the information collected; (iii) improve the operational aspects of the Department of the Treasury, including, but not limited to, the filing of returns and the payment of contributions by electronic means; and (iv) reduce the complexity of the tax administration by consolidating all types of contributions in a unified and integrated system.

According to the data and available information, approximately 890,000 income tax returns are filed each year, of which 20% are salaried individuals who only include a Withholding Statement (Form 499R-2 / W-2PR). The electronic filing system has greatly reduced the costs of processing payrolls. However, there is room to further maximize the savings. Through the use of technology, the Department will collect the information of these individuals and, based on this information, a form will be generated *pro forma*, which must be reviewed and accepted by the taxpayer to be filed. This would have the effect of simplifying compliance and filing regulations for around 300,000 taxpayers, who could be subject to certification *pro forma* of their return without the need for additional procedures.

7

That is why, this project includes amendments aimed at encouraging and enforcing compliance with tax responsibilities electronically. In addition, the Secretary of the Treasury is empowered to establish simpler filing procedures for the income tax return for those individuals whose gross income is reported in an informative statement or withholding receipt and the entire amount of the tax has been withheld at the source. , by payment of estimated as appropriate.

## B. CORPORATIONS

The income tax regime of corporations requires a greater degree of attention after the federal tax reform recently approved by the United States Congress. The enactment of this reform has created an uncertain scenario for Puerto Rico, so this administration must take the necessary measures to minimize the possible harmful effects of the *Tax Cuts and Jobs Act of 2017*[3], as it is called. It is imperative to establish a reduction in corporate tax rates in order to place Puerto Rico in a position to compete in the global economy, avoid the exodus of companies currently operating in Puerto Rico and minimize the accelerated erosion of the tax base. All this, without forgetting the small and medium corporations.

In line with the above, the Normal Contribution and Alternative Basic Contribution rates applicable to corporations are modified, as well as the income thresholds that would be subject to these types of contribution, as indicated below:

Table 4.1 - Normal Contribution to Corporations

| Taxes Current Contributive Tax | Rates Proposals |
|---|---|
| Normal Contribution Normal 20% | Contribution 18.5% |
| Additional Contribution Additional Up to 19% | Contribution Up to 19% |

Similar to the sector of individuals, control and compliance mechanisms are established for purposes of the Minimum Alternative Contribution, with the purpose of providing a greater degree of certainty regarding the deductions for expenses incurred. The deductible expenses will be subject to certain terms and conditions, such as duly informing the same in the corresponding informative declarations, or the presentation of reliable evidence that shows, in effect, that said expenses were incurred. In cases where the nature of the expenses claimed does not allow for their immediate and easy

---

3 Véase Determinación Administrativa Núm. 17-12 del Departamento de Hacienda.

8

corroboration, the deduction will be allowed as long as the taxpayer submits a certification prepared by a professional where the veracity and correctness of the claimed expenses are validated.

### Optional Contribution for Corporations dedicated to the provision of services

Another of the main objectives of this tax reform is to reduce the cost of compliance to taxpayers, whether in time or money. In order to simplify the processes for compliance with the tax obligations, an Optional Contribution is introduced for corporations, whose source of income comes substantially from the provision of services subject to withholding tax or estimated payment. Under this method, these corporations could choose to pay a fixed tax rate on the gross income received, as long as the income generated in the provision of services has been subject to withholding tax in full or for payment of estimated and have been duly informed in the corresponding informative statement. The tax rates and income thresholds subject to the Optional Contribution are illustrated as follows:

Table 4.2 - Optional Contribution to Corporations that Provide Services

| Gross Income Tax | Rates: |
|---|---|
| No greater than $ 100,000 | 6% |
| In excess of $ 100,000 but not more than $ 200,000 | 10 % |
| in excess of $ 200,000 but not more than $ 300,000 | 13% |
| excess of $ 300,000 but not more than $ 400,000 | 15% |
| excess of $ 400,000 but not more than $ 500,000 | 17% |
| excess of $ 500,000 | 20% |

### C.  SALES TAX AND USE

#### B2B4%

Tax on the rendering of services rendered to other merchants and designated professional services, commonly called the B2B, has a direct effect on the exchange of goods and services in Puerto Rico. It is a tax that, by its nature, increases the cost of doing business and distorts the effectiveness of a productive economy or that aspires to be so.

The public policy of this administration has been to demonstrate that Puerto Rico is open to doing business. In addition, the elimination of the B2B tax for 77% of taxpayers is one of several programmatic commitments of this administration and with this reform we enforce it.

9

The elimination of the B2B tax is established in harmony with a public policy to promote the use of electronic methods in commercial transactions. Therefore, the Secretary of the Treasury is empowered to establish rules and procedures aimed at encouraging and enforcing compliance with the tax responsibilities electronically. With the elimination of the B2B tax, we also fulfilled one of the commitments we made to the people in the Plan for Puerto Rico, government plan endorsed by the voters in the last elections of 2016.

Special Rate of IVU in Prepared Foods

The perception of The industry of restaurants and establishments dedicated to the sale of prepared foods has evolved over time. The benefits and convenience that these businesses offer daily to working citizens and Puerto Rican families should not be ignored, as it is an industry that contributes over $ 500 million to local agriculture, generates over $ 3,000 million in sales around the island and employs more of 50 thousand people.

On September 18, 2017, the Governor of Puerto Rico, Hon. Ricardo Rosselló Nevárez, issued an Executive Order declaring Puerto Rico in a state of emergency before the imminent passage of Hurricane Maria.[4] After Hurricane Maria passed through Puerto Rico, the electricity infrastructure was decimated, so that most of the population was without electric service for a prolonged period.

Faced with this situation, the Secretary of the Treasury, acting within the powers provided by the Code, established an exemption from payment of IVU on sales of those taxable items that were considered "prepared foods".[5] This exemption was established by the Department in circumstances where the purchase of prepared food became an essential need for the citizens of Puerto Rico as a result of the collapse of the electricity system on the Island.

After Hurricane Maria, it was demonstrated that the industry of restaurants and establishments dedicated to the sale of prepared foods represent an important component in our socioeconomic environment. The tenacity and perseverance of the members of this industry to resume their operations, even with the limitations in the electric power and telecommunications services, exemplifies the entrepreneurial spirit during one of the most critical moments of our history.

This reform introduces a special intermediate rate of SUT of 7% which will be applicable to the sale of prepared foods, as defined by our Code. However, the imposition and collection of this special rate will be treated as a kind of privilege for

[4]

[5]

10

those merchants that comply with certain parameters established by the Secretary.

Puerto Rico is going through the most severe fiscal crisis in recent times. This crisis has led us to establish an unelected board making decisions, sometimes in contravention of the public policy of this administration and the best interests of the Puerto Rican people. However, we must be proactive in achieving a more equitable and more effective contributory system. The maxim that a dollar held by Puerto Ricans yields much more than a dollar in the hands of the government has been put into effect again. The changes established here will allow Puerto Ricans to have more money in their pockets, positively impacting the economy.

In just under 18 months of our administration, we have begun to restore confidence in the Government, and after having received the onslaught of two (2) powerful hurricanes. Investors, banks and financial markets look towards Puerto Rico with more optimism. It is projected to the world that the administration is in control of the government and that it is not improvising. To this is added tens of billions in emergency recovery funds that will be injected into our economy.

After having taken the necessary measures to reroute to our island, today we can offer a new tax model that will be beneficial for taxpayers, while being fiscally neutral (revenue neutral) for the Government. The same, will be covered by the new public policy of this new contributory model. Although there are many obstacles that we still have to overcome on the road to final recovery, there is hope and optimism in our people. There is a new dawn on our island, and that should motivate us all so as not to disappoint Puerto Rico. The road to economic recovery is laid out. This administration will continue to be committed to Puerto Rico to direct it towards the definitive rebound of our economy. That is our north and that is what we are heading for. We are confident that with the actions we have taken and will take, Puerto Rico will rise, with more strength than ever.

*BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:*

Section 1.-Section 1000.02 of Act 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:

"Section 1000.02.-classification provisions

the provisions of this Code are hereby classified and designated as:

Taxpayer Bill of Rights
Subtitle a - Income Tax



**Puerto Rico Department of Treasury**

*Treasury Single Account ("TSA") FY 2019 Cash Flow*

*As of May 10, 2019*

**Disclaimer**

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Nor does this document constitute an audit of compliance with any other federal law, rule, or regulation. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

## Glossary

| Term | Definition |
| --- | --- |
| ACAA | - Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | - Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI / PRIFA | - Infrastructure Financing Authority. |
| Agency Collections | - Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| ASC | - Compulsory Liability Insurance, private insurance company. |
| ASES | - Puerto Rico Health Insurance Administration, a public corporation and component unit of the Commonwealth of Puerto Rico. |
| BBA | - BBA refers to the Bipartisan Budget Act of 2018 passed by the United States Congress on 2/9/2018. The BBA includes provisions for additional disaster relief funding for Puerto Rico in addition to incremental federal funds to support Puerto Rico's public health care costs (Medicaid funding) for two years. |
| CINE | - Puerto Rico Cinema Fund, a recipient of certain assigned sales and use tax revenues. |
| COFINA | - Puerto Rico Sales Tax Financing Corporation. |
| DTPR | - Department of the Treasury of Puerto Rico. |
| DTPR Collection System | - This is the software system that DTPR uses for collections. |
| FAM | - Muncipal Fund Administration, a recipient of certain assigned sales and use tax revenues. |
| General Collections | - All Gross tax collections received and deposited into the TSA from all Hacienda Collection Posts and/or through the Hacienda Colecturia Virtual (online). |
| General Fund | - General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| HTA | - Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| JRS | - Judiciary Retirement System means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| Liquidity Plan (LP) | - The Liquidity Plan is the translation of the Certified Fiscal Plan ("CFP") and Certified Budget ("Budget") into a cash flow projection. The TSA Liquidity Plan encompasses all cash flow activity within the TSA. Certain cash flow activity is contemplated in the CFP and Budget, but occurs outside the TSA. Cash flow bridges from the TSA to the CFP and Budget have been included to facilitate comparison. |
| Net Payroll | - Net payroll is equal to gross payroll less tax withholdings and other deductions. |
| NAP | - NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Pension PayGo | - Pension PayGo - Puerto Rico pension system that is funded through a pay-as-you-go system. Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PREPA | - Puerto Rico Electric Power Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| PRHA | - Puerto Rico Housing Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| PSTBA | - The PSTBA is an amount established under Act 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended and restated on June 10, 2009 (the "Bond Resolution"), that currently must be received by COFINA from 5.5% of the SUT before the Commonwealth can receive any of the other 5.5% SUT. |
| Public Corporation | - Public corporations are governmental authorities with autonomous structure separate from the central  government administration and with independent treasury functions. |
| Retained Revenues | - Revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts. The largest of these pass-through accounts consist of (i) AACA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, (iv) HTA toll revenues. |
| SIFC | - State Insurance Fund Corporation, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| Special Revenue Funds | - Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. |
| SURI | - Sistema Unificada de Rentas Internas is the new digital tool of the Department of the Treasury that will allow integration and streamlining of the administration of taxes and revenues and eliminate the complexity of the current systems for the benefit of the Treasury and the taxpayers. |
| TSA | - Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

**Introduction**

- Enclosed is the weekly Treasury Single Account ("TSA") cash flow report and supporting schedules with weekly actual results YTD FY19 compared to the FY2019 Liquidity Plan. Note that on September 6, 2017 Hurricane Irma made landfall on Puerto Rico, followed by Hurricane Maria on September 20, 2017. Variances that arise when compared to the prior year may be largely driven by differences in September and October in the comparable period in FY18 and are largely driven by the DTPR's limited ability to make disbursements and collect receipts immediately following the hurricanes.

- TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.

- Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.

- Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

- Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"). Funds may be transferred to the TSA either: (i) after admissible disbursements (per approved Project Worksheets) have been made or (ii) once supporting documentation for an accrual or related expense are provided to and approved by FEMA. Therefore, FEMA funding may also be received in advance of actual cash disbursement, as payments to vendors may occur subsequent to when the corresponding services are rendered / expenses are recorded.

- Data limitations and commentary:
  The government has focused on cash transaction information for which access to reliable, timely, and detailed data is readily available. The government continues to work with DTPR and other parties to access additional reliable data that would help to provide additional detail in the future.

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**

*Executive Summary - TSA Cash Flow Actual Results*
*(figures in Millions)*

| $6,542 | ($407) | ($611) | $3,444 | $1,797 |
|---|---|---|---|---|
| Bank Cash Position | Weekly Cash Flow | Weekly Variance | YTD Net Cash Flow | YTD Net Cash Flow Variance |

**Bridge from Liquidity Plan projected cash balance and actual ending cash balance as of May 10, 2019**

| Cash Flow line item | Variance Bridge | Comments |
|---|---|---|
| Liquidity Plan Projected Cash Balance at 5/10/2019: | $ 4,745 | 1. COFINA Plan of Adjustment settlement amounts were received throughout the week ended February 15, 2019 in accordance with the approved Title III COFINA Adjustment Plan. This variance is mostly temporary, as these inflows were originally projected in June (pg. 12). |
| 1 State Collections: COFINA Plan of Adjustment settlement | 412 | |
| 2 State Collections: All Other | 701 | 2. State collections which primarily consist of the General Fund revenues (excluding SUT $412M in COFINA Plan of Adjustment settlement amounts) are ahead of plan. |
| 3 Federal Fund Net Cash Flow Variance | 552 | |
| 4 PREPA Loan Repayment | 147 | 3. Total difference between projected and actual Federal Fund net cash flows (FF inflows less FF outflows) is driven by temporary variances due to receiving funds for Medicaid, Nutritional Assistance, disaster-related expenditures, and other federal programs in advance of their subsequent disbursement. |
| 5 All Other | (15) | |
| Actual Cash Balance at 5/10/2019: | $ 6,542 | |

4. YTD variance due to excess revenues collected by PREPA that were applied to the repayment of the $300M loan extended to PREPA by the Central Government. As of the date of this report, the full loan amount has been repaid.

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*YTD TSA Cash Flow Summary - Actual vs LP*



**TSA Cumulative YTD Net Cash Flow ($M)**

| | |
|---|---|
| Actual Bank Cash Balance: | $6,542 |
| LP Bank Cash Balance: | $4,745 |

$1,797

— Net YTD Actual Cumulative Cash Flow  - - - LP YTD Cumulative Cash Flow

**YTD Actuals vs. Liquidity Plan**

YTD net cash flow is $3,444M and cash flow variance to the Liquidity Plan is +$1,797M. The cash build in FY19 is largely due to strong General Fund collections; on track spending; temporary surplus of federal funds received in advance of disbursement; $412M in COFINA Plan of Adjustment settlement amounts;  and enhanced federal Medicaid support at ASES, resulting in less required General Fund / TSA support.

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*YTD Cash Flow Summary - TSA Cash Flow Actual Results*

**Net Cash Flow - YTD Actuals**

1.) Federal Fund inflows of $8,414M represent 41% of YTD inflows, but are largely offset by Federal Fund disbursements, with YTD net surplus of $611M (pg.13) contributing to the $3,444M cash build in FY19. State fund cash flows account for the remainder of the forecast with the primary positive drivers being strong General Fund collections and on-budget spending.



**Net Cash Flow YTD Variance - LP vs. Actual**

1.) The largest YTD variance driver is $412M in COFINA Plan of Adjustment settlement amounts received ahead of Plan (included within State Collections in the graph to the right).



**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results for the Week Ended May 10, 2019*

| | (figures in Millions) | FY19 Actual 5/10 | FY19 LP 5/10 | Variance 5/10 | FY19 Actual YTD | FY19 LP YTD | FY18 Actual YTD (a) | Variance YTD FY19 vs LP |
|---|---|---|---|---|---|---|---|---|
| | **State Collections** | | | | | | | |
| 1 | General fund collections (b) | $96 | $223 | ($127) | $9,645 | $8,718 | $7,939 | $927 |
| 2 | Non-General fund pass-through collections (c) | 6 | 71 | (65) | 640 | 916 | 923 | (276) |
| 3 | Other special revenue fund collection | 17 | 12 | 5 | 540 | 550 | 461 | (10) |
| 4 | Other state collections (d) | 79 | 9 | 70 | 686 | 214 | 195 | 472 |
| 5 | Subtotal - State collections | $198 | $315 | ($117) | $11,511 | $10,398 | $9,518 | $1,113 |
| | **Federal Fund Receipts** | | | | | | | |
| 6 | Medicaid | 46 | 90 | (44) | 2,626 | 2,489 | 1,651 | 137 |
| 7 | Nutrition Assistance Program | 38 | 46 | (8) | 2,597 | 2,616 | 1,916 | (19) |
| 8 | FEMA | 8 | 20 | (12) | 1,374 | 886 | 48 | 488 |
| 9 | Employee Retention Credits (ERC) | – | 16 | (16) | 416 | 683 | – | (267) |
| 10 | Vendor Disbursements, Payroll, & Other | 31 | 46 | (15) | 1,401 | 1,873 | 1,015 | (472) |
| 11 | Subtotal - Federal Fund receipts | $123 | $218 | ($95) | $8,414 | $8,547 | $4,630 | ($133) |
| | **Balance Sheet Related** | | | | | | | |
| 12 | Paygo charge | 30 | – | 30 | 415 | 292 | 627 | 123 |
| 13 | Public corporation loan repayment | – | – | – | 300 | 153 | – | 147 |
| 14 | Other | – | – | – | – | – | – | – |
| 15 | Subtotal - Other Inflows | $30 | – | $30 | $715 | $445 | $627 | $270 |
| 16 | **Total Inflows** | $351 | $533 | ($182) | $20,640 | $19,390 | $14,775 | $1,250 |
| | **Payroll and Related Costs (e)** | | | | | | | |
| 17 | General Fund | (108) | (1) | (107) | (2,319) | (2,264) | (2,532) | (55) |
| 18 | Federal Fund | (24) | – | (24) | (457) | (521) | (536) | 64 |
| 19 | Other State Funds | (4) | – | (4) | (147) | (106) | (192) | (41) |
| 20 | Subtotal - Payroll and Related Costs | ($136) | ($1) | ($135) | ($2,923) | ($2,891) | ($3,260) | ($32) |
| | **Vendor Disbursements (f)** | | | | | | | |
| 21 | General fund | (35) | (43) | 8 | (1,090) | (1,536) | (1,024) | 446 |
| 22 | Federal fund | (83) | (55) | (28) | (1,979) | (2,214) | (666) | 235 |
| 23 | Other State fund | (13) | (6) | (7) | (713) | (448) | (604) | (265) |
| 24 | Subtotal - Vendor Disbursements | ($131) | ($104) | ($27) | ($3,782) | ($4,198) | ($2,294) | $416 |
| | **Appropriations - All Funds** | | | | | | | |
| 25 | General Fund | (12) | (6) | (6) | (1,421) | (1,420) | (2,021) | (1) |
| 26 | Federal Fund | (320) | (109) | (211) | (2,431) | (2,470) | (1,507) | 39 |
| 27 | Other State Fund | (4) | (1) | (3) | (414) | (333) | (405) | (81) |
| 28 | Subtotal - Appropriations - All Funds | ($336) | ($116) | ($220) | ($4,266) | ($4,223) | ($3,933) | ($43) |
| | **Other Disbursements - All Funds** | | | | | | | |
| 29 | Pension Benefits | (98) | – | (98) | (2,140) | (2,094) | (1,832) | (46) |
| 30 | Tax Refunds & Garnishments (g) | (16) | (32) | 16 | (923) | (1,008) | (604) | 85 |
| 31 | Nutrition Assistance Program | (39) | (46) | 7 | (2,520) | (2,601) | (1,864) | 81 |
| 32 | Title III Costs | (2) | (6) | 4 | (210) | (220) | – | 10 |
| 33 | FEMA Cost Share | – | (24) | 24 | (136) | (219) | – | 83 |
| 34 | Other Disbursements | – | – | – | (296) | (289) | (75) | (7) |
| 35 | Cash Reserve | – | – | – | – | – | – | – |
| 36 | Loans and Tax Revenue Anticipation Notes | – | – | – | – | – | (151) | – |
| 37 | Subtotal - Other Disbursements - All Funds | ($155) | ($108) | ($47) | ($6,225) | ($6,431) | ($4,526) | $206 |
| 38 | **Total Outflows** | ($758) | ($329) | ($429) | ($17,196) | ($17,743) | ($14,013) | $547 |
| 39 | **Net Operating Cash Flow** | (407) | 204 | (611) | $3,444 | $1,647 | 762 | $1,797 |
| 40 | Bank Cash Position, Beginning (h) | 6,949 | 4,541 | 2,408 | 3,098 | 3,098 | 1,799 | – |
| 41 | **Bank Cash Position, Ending (h)** | $6,542 | $4,745 | $1,797 | $6,542 | $4,745 | $2,561 | $1,797 |

**Note:** *Refer to the next page for footnote reference descriptions.*

Source: DTPR

As of May 10, 2019

**Puerto Rico Department of Treasury | AAFAF**

*FY19 TSA Cash Flow Actual Results - Footnotes*

Footnotes:

(a) Represents FY2018 actual results through May 11, 2019.

(b) Represents gross tax collections received and deposited from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online) and/or SURI.

(c) These revenues are collected by DTPR and immediately appropriated.

(d) Inflows related to the State Insurance Fund, the Department of Labor and Human Resources, the Commissioner of Financial Institutions, and others.  Additionally, as of the date of this report, the "Other State Collections" line item includes approximately $499M in unreconciled collections due to DTPR transition to collecting various gross tax receipts through the new SURI system. The transition from the Hacienda Colecturia collections system to SURI is ongoing and as such, revenue concept detail for the general tax SURI collections is not available at this time for the portion of collections received by the new general tax SURI account.  This resulted in timing-related unreconciled gross colections (approximately $499M) which will be retroactively allocated to "General Collections" as appropriate once this information becomes available.

(e) Represents total gross payroll. Gross payroll includes net payroll disbursed to government employees, cash transfers to the Police Department for payroll costs, and other payroll related costs (employee withholdings, social security, insurance, and other deductions).

(f) Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.

(g) FY 2019 includes $84mm of garnishments and $800mm in Federally Funded Employee Retention Credits.

(h) Excludes BPPR Clawback Accounts (for clawback revenues prior to June 2016) of $147M.

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*General Fund Collections Summary*

### Key Takeaways / Notes

1.) The government is still evaluating total collections to determine the nature of certain YTD variances. Due to the on-going transition of various gross tax collections from Hacienda Colecturia to SURI, revenue concept detail for April general tax SURI collections is not available at this time, resulting in unallocated TSA Collections of approximately $499M.

2.) SUT Collections variance is mostly due to $412M in COFINA Plan of Adjustment settlement amounts received throughout the week ended February 15, 2019 in accordance with the approved Title III COFINA Adjustment Plan. This variance is mostly temporary, as these inflows were originally projected in June.

**General Fund Collections Year to Date: Actual vs. Forecast ($M)**

| | Actual (a) YTD 5/10 | LP YTD 5/10 | Var $ YTD 5/10 | Var % YTD 5/10 |
|---|---|---|---|---|
| **General Fund Collections** | | | | |
| Corporations | $ 2,081 | $ 1,625 | $ 456 | *28%* |
| Individuals | 2,055 | 2,152 | (97) | *-5%* |
| Act 154 | 1,873 | 1,558 | 315 | *20%* |
| Non Residents Withholdings | 503 | 629 | (126) | *-20%* |
| Motor Vehicles | 405 | 348 | 57 | *16%* |
| Rum Tax | 206 | 196 | 10 | *5%* |
| Alcoholic Beverages | 208 | 224 | (16) | *-7%* |
| Cigarettes | 126 | 197 | (71) | *-36%* |
| Other General Fund | 328 | 340 | (12) | *-4%* |
| **Total (b)** | **$7,785** | **$7,269** | **$516** | ***7%*** |
| SUT Collections (c) | 1,860 | 1,449 | 411 | *28%* |
| **Total General Fund Collections** | **$ 9,645** | **$ 8,718** | **$ 927** | ***11%*** |

**YTD General Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category (d) ($M)**



Legend: Individual Income Tax — Corporate Income Tax — Non Residents Witholdings — Act 154 Collections — SUT — All Other General Fund Receipts

(Date)

Footnotes:
(a) Gross cash receipts by concept for January through March are estimated using net General Fund revenues adjusted for recurring monthly gross-ups and other adjustments.
(b) Receipts in collections accounts occur approximately two business days prior to being deposited into the TSA.
(c) SUT collections excludes PSTBA, FAM & CINE, and only includes the amounts deposited into the TSA for General Fund use.
(d) The Liquidity Plan incorporates actual results through December, hence there is no variance prior to week ended 1/4/19.

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**

*Non-General Fund Pass-Through Collections Summary (a)*

Key Takeaways / Notes

1.) YTD variance mainly relates to HTA pass-through collections of gasoline and deisel taxes. The variance is assumed to be temporary at this time.

**Non-GF Pass-through Collections Year to Date: Actual vs. Forecast ($M)**

| | Actual YTD 5/10 | LP YTD 5/10 | Var $ YTD 5/10 | Var % YTD 5/10 |
|---|---|---|---|---|
| **Non-GF pass-throughs** | | | | |
| HTA | $ 320 | $ 579 | $ (259) | *-45%* |
| Transfer Petroleum Tax "CRUDITA" | 125 | 132 | (7) | *-5%* |
| ACAA | 68 | 68 | - | *0%* |
| ASC | 42 | 67 | (25) | *-37%* |
| AFI | 1 | 6 | (5) | *-83%* |
| Other Special Revenue Fund | 84 | 64 | 20 | *31%* |
| **Total Non-GF Collections** | $ 640 | $ 916 | $ (276) | *-30%* |



**YTD Non-General Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category (b) ($M)**

Footnotes

(a) These amounts are collected by DTPR and immediately appropriated as set forth in the table on this page.
(b) The Liquidity Plan incorporates actual results through December, hence there is no variance prior to week ended 1/4/19.

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Sales and Use Tax Collections Summary*

**Key Takeaways / Notes**

1.) The proceeds from the Puerto Rico 10.5% SUT rate are allocated as follows: Of the 10.5%, 5.5% is deposited into a COFINA BNY Mellon account until the PSTBA cap is reached, and 4.5% is deposited into the General Fund. The remaining 0.5% is remitted to FAM. Before the COFINA Plan of Adjustment ("POA") became effective, the PSTBA cap for FY19 was $783 million. Now the cap for FY19 is $420 million. Once the PSTBA cap is met, the full 10% is deposited into the General Fund. The original PSTBA cap was reached in January 2019. The COFINA POA became effective in February 2019, after which, the excess FY19 funds deposited in the COFINA account was remitted to the General Fund along with $44 million in collections from prior years. This chart has been updated to better reflect the flow of funds when the COFINA POA became effective.



**YTD Gross SUT Collections - General Fund and PSTB ($M)**

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Federal Funds Net Cash Flow Summary*

**Key Takeaways / Notes**

1.) Receipts for the Nutritional Assistance Program (NAP) and Medicaid (ASES Pass-through) are received in advance of the subsequent pass through disbursements to NAP and ASES. There may be a lag between receipt of federal funds and subsequent pass through outflows. Federal Funds received for Employee Retention Credits are typically received and passed through to the appropriate entity within one business day that funds are received. Federal Funds received for Payroll and Vendor Payments are typically reimbursed following disbursement, though timing differences due to carryover vendor payments from prior years may create temporary surpluses. Federal funds are received for disaster related spend once supporting documentation for an accrual or related expense are provided to and approved by FEMA. Therefore, FEMA funding may be received in advance of actual cash disbursement, as payments to vendors may occur subsequent to when the corresponding services are rendered / expenses are recorded.

| **Weekly FF Net Surplus (Deficit)** | **FF Inflows** | **FF Outflows** | **Net Cash Flow** |
|---|---|---|---|
| Medicaid (ASES) | $ 46 | $ (320) | $ (274) |
| Nutritional Assistance Program (NAP) | 39 | (35) | 4 |
| Payroll / Vendor Disbursements / Other Federal Programs | 31 | (43) | (12) |
| FEMA / Disaster Funding | 8 | (64) | (56) |
| Employee Retention Credit (ERC) | - | - | - |
| **Total** | $ 124 | (462) $ | (338) |

| **YTD Cumulative FF Net Surplus (Deficit)** | **FF Inflows** | **FF Outflows** | **Net Cash Flow** |
|---|---|---|---|
| Medicaid (ASES) | $ 2,626 | $ (2,431) | $ 195 |
| Nutritional Assistance Program (NAP) | 2,597 | (2,520) | 77 |
| Payroll / Vendor Disbursements / Other Federal Programs | 1,401 | (1,294) | 107 |
| FEMA / Disaster Funding | 1,374 | (1,142) | 232 |
| Employee Retention Credit (ERC) | 416 | (416) | - |
| **Total** | 8,414 | $ (7,803) $ | 611 |

**YTD Federal Funds Net Cash Flows ($M)**



**As of May 10, 2019**

### Puerto Rico Department of Treasury | AAFAF
*Payroll / Vendor Disbursements Summary*

#### Key Takeaways / Notes : Gross Payroll

1.) The Liquidity Plan incorporates actual results through December, hence there is no variance prior to week ended 1/4/2019. Police payroll variance is due to the determined police "Pay Out" for prior year debts ($45M) and the timing of cash transfers to the Police Department for regular payroll. Payroll variances will be partially offset by next week's cash activity.

| Gross Payroll ($M) (b) | | YTD |
|---|---|---|
| Agency | | Variance |
| Department of Correction & Rehabilitation | $ | 29 |
| Department of Education | | - |
| Department of Health | | (23) |
| Police | | (40) |
| All Other Agencies | | 2 |
| **Total YTD Variance** | **$** | **(32)** |



Cumulative YTD Variance - Payroll by Agency ($M) (a)

#### Key Takeaways / Notes : Vendor Disbursements

1.) YTD Vendor Disbursement variance is mainly due to lower than expected carryover payments from prior years, largely due to federally supported vendor disbursements lagging plan which is expected to be timing.

| Vendor Disbursements ($M) | | YTD |
|---|---|---|
| Agency | | Variance |
| Department of Education | $ | 206 |
| Department of Health | | 96 |
| Department of Justice | | 7 |
| Department of Correction & Rehabilitation | | (2) |
| General Court of Justice | | (3) |
| All Other Agencies | | 112 |
| **Total YTD Variance** | **$** | **416** |



Cumulative YTD Variance - Vendor Disbursements by Agency ($M) (a)

Footnotes

(a) The Liquidity Plan incorporates actual results through December, hence there is no variance prior to week ended 1/4/2019

(b) Gross Payroll is equal to the sum of: (i) Net Payroll by Agency from the DTPR RHUM system; (ii) Other Payroll allocated by Agency based on the FY2019 budgeted amount for total payroll by agency. The aforementioned allocation of Other Payroll is used because the information is not available by agency. Gross Payroll cash disbursements excludes cash outlays for wage garnishments by Agency as this data is not available at a detailed level on a timely basis.

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Appropriations Summary*

**Key Takeaways / Notes**

1.) Appropriations are generally executed throughout the year on a consistent basis each month. HTA is ahead of the expected FY19 budgeted distribution of appropriations due to receipt of FY18 budget reapportionments in July 2018. Additionally, ASEM has received certain special revenue fund appropriations that are not delivered on a consistent monthly basis.

**YTD FY2019 Budgeted Appropriations Executed ($M)**



| | | |
|---|---|---|
| ASES | $2,431 | $2,925 |
| UPR | $591 | $646 |
| CRIM | $203 | $228 |
| HTA | $245 | $259 |
| ASEM | $63 | $71 |
| PRITA | $64 | $71 |
| All Other | $668 | $673 |

0%  10%  20%  30%  40%  50%  60%  70%  80%  90%  100%  110%

**Remaining Approporation Budget ($M)**

| Entity Name | | Actual YTD | | Full Year Expectation | | Remaining |
|---|---|---|---|---|---|---|
| ASES | $ | 2,431 | $ | 2,925 | $ | 494 |
| UPR | | 591 | | 646 | | 55 |
| CRIM | | 203 | | 228 | | 25 |
| HTA | | 245 | | 259 | | 14 |
| ASEM | | 63 | | 71 | | 8 |
| PRITA | | 64 | | 71 | | 7 |
| All Other | | 669 | | 673 | | 4 |
| **Total** | **$** | **4,266** | **$** | **4,873** | **$** | **607** |

**YTD Approporation Variance ($M)**

| Entity Name | | Actual YTD | | Liquidity Plan YTD | | Variance |
|---|---|---|---|---|---|---|
| ASES | $ | 2,431 | $ | 2,479 | $ | 48 |
| UPR | | 591 | | 584 | | (7) |
| CRIM | | 203 | | 193 | | (10) |
| HTA | | 245 | | 243 | | (2) |
| ASEM | | 63 | | 64 | | 1 |
| PRITA | | 64 | | 62 | | (2) |
| All Other | | 669 | | 598 | | (71) |
| **Total** | **$** | **4,266** | **$** | **4,223** | **$** | **(43)** |

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Tax Refunds / PayGo and Pensions Summary*

**Key Takeaways / Notes : Tax Refunds**

1.) YTD Tax Refunds includes $416M of Employee Retention Credits (ERC). Historical seasonality suggests that largest portion of tax refunds will be disbursed to tax payers in Q4.



**Key Takeaways / Notes : Pension PayGo**

1.) YTD Pension Paygo and Outflow variance is temporary, and is expected to reverse in subsequent weeks.



Source: DTPR

0104  16

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Schedule A: Central Government - Live Web Portal AP by Payee Type (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued...*

| ID | Agency Name | 3rd Party Payables | Intergovernmental Payables | Total |
|----|-------------|-------------------:|---------------------------:|------:|
| 078 | Department of Housing | $ 186,071 | $ - | $ 186,071 |
| 071 | Department of Health | 80,956 | 69,436 | 150,392 |
| 081 | Department of Education | 67,739 | 6,757 | 74,496 |
| 123 | Families and Children Administration | 22,421 | 160 | 22,581 |
| 049 | Department of Transportation and Public Works | 22,560 | 20 | 22,580 |
| 025 | Hacienda (entidad interna - fines de contabilidad) | 11,477 | 2,932 | 14,409 |
| 024 | Department of the Treasury | 12,470 | 87 | 12,557 |
| 040 | Puerto Rico Police | 10,960 | 19 | 10,979 |
| 095 | Mental Health and Addiction Services Administration | 8,745 | 1,622 | 10,367 |
| 127 | Adm. for Socioeconomic Development of the Family | 8,490 | 247 | 8,737 |
| 016 | Office of Management and Budget | 7,538 | 1 | 7,539 |
| 043 | Puerto Rico National Guard | 6,871 | 532 | 7,403 |
| 038 | Department of Justice | 6,452 | 194 | 6,646 |
| 122 | Department of the Family | 5,995 | 64 | 6,059 |
| 137 | Department of Correction and Rehabilitation | 5,509 | 72 | 5,581 |
| 050 | Department of Natural and Environmental Resources | 3,104 | 2,165 | 5,269 |
| 021 | Emergency Management and Disaster Adm. Agency | 4,242 | 65 | 4,307 |
| 028 | Commonwealth Election Commission | 3,827 | 66 | 3,893 |
| 124 | Child Support Administration | 3,577 | 85 | 3,662 |
| 126 | Vocational Rehabilitation Administration | 3,429 | 3 | 3,432 |
| 067 | Department of Labor and Human Resources | 2,831 | 241 | 3,072 |
| 031 | General Services Administration | 2,850 | 60 | 2,910 |
| 087 | Department of Sports and Recreation | 2,019 | 119 | 2,138 |
| 120 | Veterans Advocate Office | 2,008 | 2 | 2,010 |
| 010 | General Court of Justice | 1,750 | - | 1,750 |
| 241 | Administration for Integral Development of Childhood | 622 | 921 | 1,543 |
| 014 | Environmental Quality Board | 1,179 | 284 | 1,463 |
| 015 | Office of the Governor | 1,263 | 25 | 1,288 |
| 290 | State Energy Office of Public Policy | 1,188 | - | 1,188 |
| 082 | Institute of Puerto Rican Culture | - | 894 | 894 |
| 220 | Correctional Health | 889 | - | 889 |
| 022 | Office of the Commissioner of Insurance | 833 | 3 | 836 |
| 045 | Department of Public Security | 812 | - | 812 |

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Schedule A: Central Government - Live Web Portal AP by Payee Type (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued...*

| ID | Agency Name | 3rd Party Payables | Intergovernmental Payables | Total |
|----|-------------|-------------------:|---------------------------:|------:|
| 221 | Emergency Medical Services Corps | 726 | 16 | 742 |
| 105 | Industrial Commission | 533 | 189 | 722 |
| 155 | State Historic Preservation Office | 496 | - | 496 |
| 055 | Department of Agriculture | 476 | - | 476 |
| 152 | Elderly and Retired People Advocate Office | 369 | - | 369 |
| 018 | Planning Board | 315 | 1 | 316 |
| 035 | Industrial Tax Exemption Office | 297 | 1 | 298 |
| 065 | Public Services Commission | 239 | - | 239 |
| 023 | Department of State | 238 | - | 238 |
| 141 | Telecommunication's Regulatory Board | 218 | 1 | 219 |
| 042 | Firefighters Corps | 163 | - | 163 |
| 075 | Office of the Financial Institutions Commissioner | 162 | - | 162 |
| 098 | Corrections Administration | 150 | - | 150 |
| 096 | Women's Advocate Office | 148 | - | 148 |
| 139 | Parole Board | 92 | - | 92 |
| 069 | Department of Consumer Affairs | 64 | 2 | 66 |
| 089 | Horse Racing Industry and Sport Administration | 64 | - | 64 |
| 273 | Permit Management Office | 59 | - | 59 |
| 060 | Citizen's Advocate Office (Ombudsman) | 55 | - | 55 |
| 037 | Civil Rights Commission | 52 | - | 52 |
| 226 | Joint Special Counsel on Legislative Donations | 37 | - | 37 |
| 030 | Office of Adm. and Transformation of HR in the Govt. | 34 | - | 34 |
| 062 | Cooperative  Development Commission | 28 | - | 28 |
| 153 | Advocacy for Persons with Disabilities of the Commonwealth | 27 | - | 27 |
| 034 | Investigation, Prosecution and Appeals Commission | 20 | - | 20 |
| 266 | Office of Public Security Affairs | 7 | - | 7 |
| 281 | Office of the Electoral Comptroller | 5 | - | 5 |
| 224 | Joint Commission Reports Comptroller | 3 | - | 3 |
| 231 | Health Advocate Office | 3 | - | 3 |
| 132 | Energy Affairs Administration | 1 | - | 1 |
| | Other | 14,586 | 2,178 | 16,764 |
| | **Total** | **$      520,344** | **$       89,464** | **$      609,808** |

Footnotes:

(a) *Data presented above represents the Central Government live AP Web Portal repository of third party and intergovernmental invoices by agency, implemented for FY2019. The full transition to managing central government payables through the web portal is complete, however government agencies and vendors continue to analyze the information contained in this report to ensure its accuracy. Ongoing efforts with the largest agencies and their vendors to implement the appropriate processes and controls needed to realize improvements in reporting and efficiency continue as of the date of this report.*

(b) *On a go-forward basis, vendors submit invoices for approval through the live AP Web Portal where they are logged electronically, matched with the appropriate purchase order or other relevant documentation, and approved / vouchered at the agency level through the online interface.*

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Schedule B: Central Government - Live Web Portal AP Aging (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued…*

| ID | Agency Name | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 days | Total |
|----|-------------|-------:|--------:|--------:|------------:|------:|
| 078 | Department of Housing | $ 5,576 | $ 24,826 | $ 410 | $ 155,259 | $ 186,071 |
| 071 | Department of Health | 24,516 | 16,188 | 9,715 | 99,973 | 150,392 |
| 081 | Department of Education | 24,275 | 20,147 | 4,945 | 25,129 | 74,496 |
| 123 | Families and Children Administration | 11,739 | 1,760 | 1,208 | 7,874 | 22,581 |
| 049 | Department of Transportation and Public Works | 948 | 1,070 | 531 | 20,031 | 22,580 |
| 025 | Hacienda (entidad interna - fines de contabilidad) | 4,604 | 349 | 269 | 9,187 | 14,409 |
| 024 | Department of the Treasury | 8,745 | 1,687 | 668 | 1,457 | 12,557 |
| 040 | Puerto Rico Police | 1,488 | 744 | 1,273 | 7,474 | 10,979 |
| 095 | Mental Health and Addiction Services Administration | 3,421 | 1,252 | 422 | 5,272 | 10,367 |
| 127 | Adm. for Socioeconomic Development of the Family | 1,691 | 1,367 | 85 | 5,594 | 8,737 |
| 016 | Office of Management and Budget | 1,062 | 250 | 90 | 6,137 | 7,539 |
| 043 | Puerto Rico National Guard | 1,166 | 2,117 | 677 | 3,443 | 7,403 |
| 038 | Department of Justice | 1,885 | 1,307 | 100 | 3,354 | 6,646 |
| 122 | Department of the Family | 1,082 | 1,013 | 613 | 3,351 | 6,059 |
| 137 | Department of Correction and Rehabilitation | 1,917 | 1,611 | 702 | 1,351 | 5,581 |
| 050 | Department of Natural and Environmental Resources | 489 | 855 | 382 | 3,543 | 5,269 |
| 021 | Emergency Management and Disaster Adm. Agency | 1,037 | 31 | 13 | 3,226 | 4,307 |
| 028 | Commonwealth Election Commission | 134 | 64 | 24 | 3,671 | 3,893 |
| 124 | Child Support Administration | 940 | 848 | 203 | 1,671 | 3,662 |
| 126 | Vocational Rehabilitation Administration | 1,093 | 299 | 202 | 1,838 | 3,432 |
| 067 | Department of Labor and Human Resources | 1,075 | 590 | 315 | 1,092 | 3,072 |
| 031 | General Services Administration | 13 | 212 | 63 | 2,622 | 2,910 |
| 087 | Department of Sports and Recreation | 263 | 61 | 128 | 1,686 | 2,138 |
| 120 | Veterans Advocate Office | 1,419 | 3 | - | 588 | 2,010 |
| 010 | General Court of Justice | 1,750 | - | - | - | 1,750 |
| 241 | Administration for Integral Development of Childhood | 55 | 224 | 58 | 1,206 | 1,543 |
| 014 | Environmental Quality Board | 95 | 253 | 283 | 832 | 1,463 |
| 015 | Office of the Governor | 85 | 86 | 79 | 1,038 | 1,288 |
| 290 | State Energy Office of Public Policy | 16 | 1 | 37 | 1,134 | 1,188 |
| 082 | Institute of Puerto Rican Culture | - | 894 | - | - | 894 |
| 220 | Correctional Health | - | - | - | 889 | 889 |
| 022 | Office of the Commissioner of Insurance | 77 | 52 | 47 | 660 | 836 |
| 045 | Department of Public Security | 101 | 19 | 2 | 690 | 812 |

Source: DTPR

**As of May 10, 2019**

**Puerto Rico Department of Treasury | AAFAF**
*Schedule B: Central Government - Live Web Portal AP Aging (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued...*

| ID | Agency Name | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 days | Total |
|----|-------------|--------|---------|---------|--------------|-------|
| 221 | Emergency Medical Services Corps | 120 | 78 | 56 | 488 | 742 |
| 105 | Industrial Commission | 72 | 131 | 57 | 462 | 722 |
| 155 | State Historic Preservation Office | 19 | 27 | 1 | 449 | 496 |
| 055 | Department of Agriculture | 25 | 60 | 46 | 345 | 476 |
| 152 | Elderly and Retired People Advocate Office | 167 | 127 | 34 | 41 | 369 |
| 018 | Planning Board | 20 | 2 | 50 | 244 | 316 |
| 035 | Industrial Tax Exemption Office | 24 | 45 | 41 | 188 | 298 |
| 065 | Public Services Commission | 40 | 58 | 23 | 118 | 239 |
| 023 | Department of State | 120 | 51 | 20 | 47 | 238 |
| 141 | Telecommunication's Regulatory Board | 126 | 38 | 10 | 45 | 219 |
| 042 | Firefighters Corps | 120 | 12 | 2 | 29 | 163 |
| 075 | Office of the Financial Institutions Commissioner | 119 | 18 | 3 | 22 | 162 |
| 098 | Corrections Administration | - | - | 147 | 3 | 150 |
| 096 | Women's Advocate Office | 42 | 13 | 30 | 63 | 148 |
| 139 | Parole Board | 2 | - | - | 90 | 92 |
| 069 | Department of Consumer Affairs | 42 | 1 | 2 | 21 | 66 |
| 089 | Horse Racing Industry and Sport Administration | 10 | - | 1 | 53 | 64 |
| 273 | Permit Management Office | 14 | 8 | 33 | 4 | 59 |
| 060 | Citizen's Advocate Office (Ombudsman) | 19 | - | 5 | 31 | 55 |
| 037 | Civil Rights Commission | 23 | 3 | - | 26 | 52 |
| 226 | Joint Special Counsel on Legislative Donations | 2 | 1 | - | 34 | 37 |
| 030 | Office of Adm. and Transformation of HR in the Govt. | 8 | 2 | 17 | 7 | 34 |
| 062 | Cooperative  Development Commission | 16 | 5 | - | 7 | 28 |
| 153 | Advocacy for Persons with Disabilities of the Commonwealth | 3 | 8 | 3 | 13 | 27 |
| 034 | Investigation, Prosecution and Appeals Commission | 8 | 1 | 2 | 9 | 20 |
| 266 | Office of Public Security Affairs | 2 | 1 | - | 4 | 7 |
| 281 | Office of the Electoral Comptroller | 2 | - | - | 3 | 5 |
| 224 | Joint Commission Reports Comptroller | 2 | - | 1 | - | 3 |
| 231 | Health Advocate Office | 3 | - | - | - | 3 |
| 132 | Energy Affairs Administration | - | - | - | 1 | 1 |
| | Other | 3,153 | 6,098 | 391 | 7,122 | 16,764 |
| | **Total** | **$ 107,080** | **$ 86,968** | **$ 24,519** | **$ 391,241** | **$ 609,808** |

Footnotes:

(a) *Data presented above represents the Central Government live AP Web Portal repository of third party and intergovernmental invoices by agency, implemented for FY2019. The full transition to managing central government payables through the web portal is complete, however government agencies and vendors continue to analyze the information contained in this report to ensure its accuracy. Ongoing efforts with the largest agencies and their vendors to implement the appropriate processes and controls needed to realize improvements in reporting and efficiency continue as of the date of this report.*

(b) *On a go-forward basis, vendors submit invoices for approval through the live AP Web Portal where they are logged electronically, matched with the appropriate purchase order or other relevant documentation, and approved / vouchered at the agency level through the online interface.*

Source: DTPR



## GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities

*Information as of March 29, 2019*

**April 30, 2019**

**Exhibit I to Elliott Declaration**

0109

# Disclaimer

- This presentation was prepared and is being published by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as part of the ongoing evaluation of financial matters of the Government of Puerto Rico, including certain of its public corporations and its instrumentalities (the "Government").  The information contained herein provides the cash balances of Government accounts as of the dates indicated but is not intended to provide an analysis of the source of these funds or their adequacy to satisfy the Government's liquidity needs. Government creditors and other third parties should not rely on this information to make any investment decision regarding securities issued by the Government or any instrumentality thereof.

- The account balances included herein are based on information AAFAF obtained from governmental instrumentalities and financial institutions as of the dates indicated as part of an ongoing review of the bank accounts and balances of the Government and its instrumentalities.  AAFAF has not validated all the information received and, as a result, cannot and does not assume any responsibility for the accuracy of such information. As additional information becomes available and the validation process is completed, there could be material changes to the information contained herein.

- The account balances included herein are provided to show the cash position as of specific dates, and this presentation does not purport to provide, nor take into consideration, any changes since such dates.  Such balances are expected to change, potentially materially, on a day to day basis based on, among other things, the financial needs of the Government and its instrumentalities, as well as judicial determinations regarding such funds.

- The information contained herein regarding the restricted or unrestricted nature of any cash balance is preliminary and subject to further analysis.

- The account balances included herein have not been confirmed through an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. This document does not constitute an audit of compliance with any federal law, rule, or regulation.

0110

# Disclaimer (cont'd.)

- Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- AAFAF, the Government, and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein, and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including, without limitation, consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of or reliance upon this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms described in the "Disclaimer" slides.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined.

- The Parties do not undertake any duty to update the information contained herein.

3

# Executive Summary



**Key takeaways:**

1. Overall **balance** of reported accounts **increased by approximately $752M** from February 28th to March 29th.

2. Mainly **driven by:**

   a) **+752M** Increase in central Government's Treasury Single Account balance ("TSA[1]")

   b) **+36M Increase in Pension Related Accounts**

   c) **+$3M Increase** Public Corporations and Legally Separate Entities

   d) **+$19M Increase** in Central Gov't Non-TSA Accounts.

   e) **($33M)** Decrease in Restricted Accounts and/or subject to Title III Proceedings

[1] Includes TSA Sweep Accounts.
[2] Refer to the footnotes on Slide 19 - Appendix A, pertaining to revised balances and newly identified accounts as of 2/28/2019.
* Refer to the groupings, 'G', as they summarize the current classifications presented in detail on Slide 8.

4

# Executive Summary (cont'd.)

- AAFAF started its efforts to identify government bank accounts and their balances to obtain a comprehensive view of the cash position of the Government. Requests were sent to governmental instrumentalities, the Office of the Commissioner of Financial Institutions ("OCIF") and various commercial banks.

- Based on the information obtained, AAFAF prepared an inventory of bank accounts across governmental instrumentalities, including those outside the scope of the fiscal plans submitted to the Financial Oversight and Management Board for Puerto Rico ("FOMB").

- The exercise and the inventory described in this presentation, which had not been conducted by prior administrations, obtained information on +800 bank accounts. AAFAF now has centralized access to bank account information for most of the Government.

- AAFAF has conducted this process in consultation with the FOMB and its advisors, and has been providing periodic reports to the FOMB since July 2017.

- On October 31, 2017, AAFAF commenced publishing weekly cash flow reports for the TSA on its website and EMMA. On December 18, 2017, AAFAF commenced reporting on month-end cash balance position of the bank accounts included in this presentation to provide additional transparency.

- On December 18, 2017, the FOMB announced that it would conduct an independent forensic investigation of the information on Government bank accounts published by AAFAF. On February 6, 2018, the FOMB announced the retention of Duff & Phelps, LLC ("D&P") to conduct this forensic analysis.

- D&P published an *"Independent Forensic Analysis Team" Report on Title III Bank Accounts as of June 30, 2018*, on March 12, 2019. AAFAF takes no position in this summary on the D&P Report.

- The information presented excludes certain funds as set forth in the "Excluded Funds" slide.

5

# Excluded Funds

| Agency | Description |
| --- | --- |
| **Legislative Branch** | ▪ The Puerto Rico Legislative Assembly receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. |
| **Judicial Branch** | ▪ The Puerto Rico Judicial Branch receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. The Judicial Branch also holds funds in custody related to legal proceedings. |
| **Municipal Funds** | ▪ Municipal funds include funds of Puerto Rico municipalities, the Municipal Revenue Collections Center and the Puerto Rico Municipal Finance Agency. |
| **Government Development Bank** | ▪ GDB was the subject of a Qualifying Modification which went effective on November 29, 2018.  No funds either held by GDB or transferred to any entity as a result of the Qualifying Modification are accounted for herein. |
| **Investment Accounts** | ▪ Various investment accounts are included for certain instrumentalities (e.g. ERS, TRS, JRS, State Insurance Fund Corporation and Automobile Accident Compensation Administration, UPR). |

6

# Bank Account Balances for the Government and its Instrumentalities

| $ in millions | Balance as of[1] | | Notes |
|---|---|---|---|
| Revised Grouping | 2/28/2019 | 3/29/2019 | Notes |
| **G5** TSA | 4,927.9 | 5,644.2 | • Reported on a weekly basis on AAFAF's website. |
| **G5** TSA Sweep | 55.8 | 46.2 | • Accounts that collect income and completely pass through to TSA on a daily basis. |
| **G3** **G2** Pension Related | 697.4 | 733.1 | • On January 17, 2019, the Commonwealth, as grantor, and the Retirement Board for the Government of Puerto Rico, as administrator, created a trust pursuant to Act 106-2017 to hold temporarily in said trust individual employee contributions to be credited to their defined contribution retirement accounts. As of March 29th, 2019, the balance on the Trust accounts was of $436.5 million of such contributions at the trust. <br> • Also included, the repayment of employee loans issued by the retirement system ($261M). |
| Central Gov't Non-TSA | 1,703.5 | 1,722.9 | • $622M at US Treasury pertaining to the PR Unemployment Trust Fund from the Department of Labor <br> • $465M federal funds administered by the Public Housing Authority. <br> • $228M lottery related funds. |
| **G1** **G1** COFINA | 22.3 | 22.3 | • Balance previously on deposit at BNYM and subject to the *Third Amendment Title III Plan of Adjustment of the Debts of Puerto Rico  Sales Tax Financing Corporation* ('the COFINA Plan'). The United States District Court for the District of Puerto Rico confirmed the COFINA Plan by amended order dated February 5, 2019. The COFINA Plan became effective on February 12, 2019, and such funds were distributed pursuant to the Plan. Given the resolution of ownership of future SUT by the COFINA Plan, AAFAF does not intend to include COFINA bank account balances in this summary going forward. <br> • The balance shown on the COFINA accounts as of 3/29/19 reflects operational funds post-effectiveness of the Plan of Adjustment. |
| **G1** Other Restricted Title III Accounts | 785.2 | 785.5 | • ERS related accounts ($371M), GO Redemption Fund ($268M), and clawback funds ($147M). |
| **G4** PREPA | 428.0 | 413.5 | • Refer to the PREPA slide for breakdown of classified accounts. |
| **G1** PRASA | 575.9 | 588.3 | • Refer to the PRASA slide for breakdown of classified accounts. |
| HTA | 459.3 | 440.8 | • Refer to the HTA slide for breakdown of classified accounts. |
| **G4** UPR | 406.6 | 416.4 | • Refer to the UPR slide for breakdown of classified accounts. |
| **G4** ASES | 270.5 | 284.9 | • State and federal funds used mainly for payments of health insurance premiums and claims. |
| **G4** Other Public Corps & Legally Separate Entities | 1,501.5 | 1,467.7 | • Government entities with autonomous fiscal authority established by law. <br> • Slide 21 includes an overview of the entities and balances. |
| **TOTAL** | **$11,834M** | **$12,566M** | |

[1] Except for accounts with an aggregate balance of $52M (27 accounts), which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.
* Refer to the groupings, 'G' as they are summarized on Slide 4.

7

# TSA, TSA Sweep and Pension Related Accounts

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Grouping Subcategory** | **2/28/2019** | **3/29/2019** | *Notes* |
| TSA | 4,927.9 | 5,644.2 | ▪ The TSA is the Government's main operational bank account in which a majority of receipts from governmental funds are deposited and from which most expenses are disbursed.<br>▪ It includes tax collections, charges for services, intergovernmental collections, the proceeds of prior short and long term debt issuances held in custody by the Secretary of Treasury for the benefit of Government fiduciary funds, and other receipts. |
| **TOTAL** | **$4,061M** | **$4,927M** | |

**TSA Sweep Accounts¹:**

| | | | |
|---|---|---|---|
| General Collection Posts | - | - | ▪ Account used for Government receipts from all the collection posts Island wide and the web based platform, known by its Spanish name as *Colecturía Virtual*. Receipts in collections posts account sweep daily to the TSA. |
| SUT & Other | 55.7 | 46.2 | ▪ Account used for consolidated receipts of Sales and Use Tax. Balances are swept on a daily basis into accounts held by the trustee of the COFINA bonds, the General Fund and/or the Municipal Administration Fund. |
| Agency Collection Posts | - | - | ▪ Account used to receive amounts collected by collection officers at the agencies mainly for charges for services and fees. Receipts in agency collections posts account sweep daily to the TSA. |
| **TOTAL** | **$56M** | **$46M** | |

**Pension Related:**

| | | | |
|---|---|---|---|
| Employee Withholding | 697.3 | 733.0 | ▪ On January 17, 2019, the Commonwealth, as grantor, and the Retirement Board for the Government of Puerto Rico, as administrator, created a trust pursuant to Act 106-2017 to hold temporarily in said trust individual employee contributions to be credited to their defined contribution retirement accounts. As of March 29, 2019, the balance of the Trust accounts was $437 million. The Commonwealth does not claim any interest in the funds held in the Trust.<br>▪ Also included, the repayment of employee loans issued by the retirement system ($271M). |
| Pay-go charges | - | - | ▪ Pay-go charges include balances from payments made by municipalities and public corporations in connection with benefits paid to retirees. These Pay-Go related charges are being deposited in a separate specific account, and now programmed to sweep back to the TSA account for reimbursement of pension payments pertaining to Municipalities and Public Corporations. |
| **TOTAL** | **$697M** | **$733M** | |

¹ Includes Zero Balance Accounts which are accounts used for disbursements of vendors payments, payroll and pensions. These accounts make disbursements and are automatically replenished from the TSA account.

8

# Central Government – Non-TSA

| $ in millions | Balance as of[1] | | Notes |
|---|---|---|---|
| **Central Government Entity** | *2/28/2019* | *3/29/2019* | |
| Public Housing Administration | 465.2 | 464.9 | • PHA accounts include grants of federal funds received to finance public housing programs and their operations. |
| Other Treasury Custody Accounts | 36.9 | 36.6 | • Other Treasury Custody Accounts include balances from the *Lotteries*. |
| Department of Labor and Human Resources | 765.3 | 764.9 | • DLHR accounts include operational accounts and other funds as follows:<br>– PR Unemployment Trust Fund at US Treasury ($622M)<br>– Work Opportunity Incentive Fund to finance an incentive program to promote job creation.<br>– Contribution Trust Fund from employers' receipts used to pay claims to employees.<br>– Act No. 15 special revenues for operations. |
| Child Support Administration | 49.9 | 58.8 | • Custody bank account containing child support payments from non-custodial parents. |
| Puerto Rico Police | 20.6 | 17.2 | • Bank account used to process Police Department payroll funded through budget appropriations. |
| Department of Housing | 8.0 | 4.4 | • DOH accounts include grants of federal funds received to finance public housing programs and their operations. |
| DDEC | 16.0 | 22.2 | • DDEC accounts include operational accounts from General Fund appropriations and internally generated revenues, Act No. 22-2012, film program and federal funds. |
| 9-1-1 Services | 20.2 | 20.7 | • 9-1-1 Services account represents their operational account from special revenues (Act 144-1994). |
| Other Non-TSA Entities | 319.0 | 331.5 | • Description included in Appendix B. |

| | | | |
|---|---|---|---|
| **TOTAL** | **$1,704M** | **$1,723M** | |

[1] Except for accounts with an aggregate balance of $30M, which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

9

# Restricted Accounts Subject to Title III Proceedings - COFINA

$ in millions

| Grouping | Balance as of | |
|---|---|---|
| | 2/28/2019 | 3/29/2019 |
| COFINA - Post-effectiveness of the Plan of Adjustment. | $22.3 | $22.3 |

- The Puerto Rico Sales Tax Financing Corporation ("COFINA") was created pursuant to Act No. 91-2006, as amended, and, prior to the commencements of its Title III proceeding, had issued bonds payable solely from a portion of the sales and use tax imposed by the Government on qualified transactions.

- Sales and use tax collections are consolidated at an account at Banco Popular de Puerto Rico ("BPPR").

- Amounts are swept on a daily basis into corresponding accounts at BNYM, as trustee for the COFINA bondholders, the Puerto Rico Treasury Department and/or the Municipal Administration Fund.

- As of January 31, 2019, subject to orders of the Title III Court, COFINA's Amended and Restated  Sales Tax Revenue Bond Resolution, as amended on June 10, 2009, (the "2009 Resolution"), governed application of funds held by BNYM. BNYM applies the funds received from BPPR pursuant to the waterfall set forth in the 2009 Resolution. BNYM also receives certain funds from the Federal Government in connection with certain bonds issued by COFINA that receive a federal interest subsidy. The funds on deposit at BNYM may solely be used to pay COFINA bonds and obligations.

- Balance as of January 31, 2019 was restricted pursuant to the court order issued by the United States District Court for the District of Puerto Rico in Adversary Proceeding Nos. 17-133-LTS and 17-257-LTS in COFINA's Title III proceeding under PROMESA.

- The COFINA Pledged Sales Tax Base Amount deposit requirement for FY19 has been met. Further allocations of the 5.5% Sales and Use Tax transferred through June 30th, 2019,  go to the Commonwealth's General Fund.

- The United States District Court for the District of Puerto Rico confirmed the Third Amendment Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation (the "COFINA Plan") by amendment order dated February 5, 2019. The COFINA Plan became effective on February 12, 2019.

- Given the resolution of ownership of future SUT by the COFINA Plan, AAFAF does not intend to include COFINA bank account balances in this summary going forward.

- The balance shown on the COFINA accounts as of 3/20/19 reflects operational funds post-effectiveness of the Plan of Adjustment.

10

# Restricted Accounts Subject to Title III Proceedings

| $ in millions | Balance as of[1] | | Notes |
| Grouping Subcategory | 2/28/2019 | 3/29/2019 | |
|---|---|---|---|
| ERS Related Accounts | 370.5 | 370.7 | • $109M relating to proceeds from sale of investments.<br>• $93M corresponding to a Post-petition Segregated Account created as part of a stipulation entered into as part of the Title III proceedings. |
| GO Redemption Funds | 268.1 | 268.1 | • Revenues from the 1.03% property tax collected since fiscal year 2017 and deposited in the Public Debt Redemption Fund, the use of which is currently restricted to the payment of general obligation debt. |
| Clawbacks | 146.6 | 146.6 | • $147M corresponding to revenues retained (or "clawed-back") by the Government in fiscal year 2016 pursuant to Executive Order 2015-46 for the payment of General Obligation debt. |
| **TOTAL** | **$785** | **$786** | |

*The aforementioned funds are held in segregated accounts and most of them are subject to various claims under the Title III proceedings. The ultimate use of the funds may be subject to court determination.*

[1] Except for accounts with an aggregate balance of $20.3M, which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

11

0119

# Restricted Accounts / Subject to Title III Proceedings - PREPA

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| *Grouping Subcategory* | *2/28/2019* | *3/29/2019* | |
| Operating | 324.9 | 310.4 | ▪ Decrease primarily due to timing of payments to restoration contractors made in advance of corresponding FEMA reimbursement and paydown of Commonwealth Loan. |
| Segregated | 0.0 | 0.0 | ▪ No significant change from prior month |
| FEMA | 2.0 | 2.0 | ▪ No significant change from prior month |
| Insurance (Restricted) | 50.7 | 50.8 | ▪ No significant change from prior month |
| Construction & Other Restricted | 33.9 | 33.9 | ▪ No significant change from prior month |
| US Bank Accounts | 16.5 | 16.5 | ▪ No significant change from prior month |
| **TOTAL** | **$428M** | **$414M** | |

0120

# UPR

| $ in millions | Bank Balances as of | | Notes |
|---|---|---|---|
| Grouping Subcategory | 2/28/2019 | 3/29/2019 | |
| Operational Accounts[1] | 299.1 | 308.9 | • Increase of $9.8M in operational account balances is primarily due to an increase in money market account at BPPR with a partial offsetting decrease in Fin Student Aid - Pell Grant at Recinto de Mayaguez campus.<br><br>• Approximately $296.2M, or 95.9% of UPR operational funds are held in five (5) accounts managed by Central Administration, $142.8M of which are restricted:<br>   • $159.0M market value of a securities account ($90M internally restricted)[1],<br>   • $80.6M in a money market account ($15.5M[2] restricted),<br>   • $33.9M in hurricane insurance proceeds account (restricted),<br>   • $19.2M in concentration account (unrestricted),<br>   • $3.5M in UBS Pell grant account at Recinto de Mayaguez at BPPR (restricted).<br><br>• Approximately $12.2M is in thirty nine (39) active Banco Popular bank accounts managed by UPR, or it's units, which typically contain deposits of federal student aid ($12.2M restricted).[3] |
| Component Units Accounts | 39.0 | 36.1 | • Decrease of $2.9M in component unit account balances mainly due to decrease in Retirement System accounts.<br><br>• $16.1M in 12 accounts at *DUI* ($14.7M restricted),<br>• $15.6M in 4 accounts at *Servicios Médicos Universitarios, Inc. ("SMU")* ($8.3M restricted),<br>• $2.3M in 2 restricted accounts at *University of Puerto Rico Parking System Inc.,*<br>• $1.8M in 2 restricted accounts related to Retirement Systems,<br>• $0.4M in 2 accounts at *Materials Characterization Center, Inc.* ($0.1M restricted). |
| Bond Sinking Fund Accounts | 68.4 | 71.4 | • Increase of $3.0M is primarily due to scheduled funding deposits required for the biannual debt payments according to the UPR Bond Trust Agreement.  Next payment is due in June of 2019.<br><br>• Three restricted US Bank accounts related to debt service obligations on UPR revenue bonds. |
| **TOTAL** | **$407M[4]** | **$416M[4]** | • 2/28/19: $270.6M Restricted ($172.5M operational; $29.7M CUs; $68.4M bonds), or 66.6%.<br>• 3/31/19: $254.0M Restricted ($155.4M operational; $27.1M CUs; $71.4M bonds), or 61.0%. |

*In general, the unrestricted account balances in operational accounts are used as working capital for payments of the ordinary obligations of the University, which are not subsidized by other sources. For example, accounts payable, budget deficits (including those related to UPR's Retirement System), and needs resulting from spend/reimbursement timing and uninsured portions for 2017 hurricane damages.*

1 UPR purchased T-Bills with monies from the BPPR money market account in three trades, each $50M - with maturities of only 30, 60 and 90 days, most of which has been earmarked for Capital Expenditure projects.

2 Building and Facilities (Molecular Sciences/Plant Nursery): $7.8M; Endowment Fund: $6.2M; Perkins Federal Program: $1.0M; Donations: $0.5M.

3 Overall balance also includes restricted funds totaling $0.4M in an account at Banco Santander.

4 Confirming whether there are other legally separate entities, under the UPR structure that could have additional bank accounts. For example, totals do not include approximately $51M in restricted endowment funds held in a separate bank account at BNY Mellon.  Will continue to update disclosure as information is available and validated.

# PRASA

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| *Grouping Subcategory* | *2/28/2019* | *3/29/2019* | |
| Debt Service Accounts | 71.6 | 90.1 | ▪ Payment of principal and interest on senior and senior sub indebtedness due on 1/1/19.<br>▪ Funding for the Commonwealth Guaranteed Debt and Commonwealth Supported Obligations |
| Debt Service Reserve | 94.8 | 94.9 | ▪ Debt service required as requested by the MAT for 2008 Series A&B Bonds |
| Operating Reserve | 98.0 | 100.3 | ▪ To cover the operating reserve fund for current expenses as required per the MAT. Increase considers deposits made by PRASA following requirements under the MAT. |
| Current Expense Fund | 121.6 | 114.8 | ▪ For payment of operational expenses. |
| Revenue Fund | 4.9 | 5.1 | ▪ To fund trust reserves with amounts held in deposit following the MAT priority schedule (Sr Debt Service, Sr Sub Debt Service, Current Expense Fund, Operating Reserve, Capital Improvement Fund and the Commonwealth Payment Fund. June increase is related of government payments received. |
| Capital Improvement | 60.8 | 57.9 | ▪ Balance to pay for capital improvement investments deposited on a fund held by the Trust |
| Construction Fund | 52.8 | 53.9 | ▪ To pay cost of improvements, payment of the costs of issuance of bonds, and interests during construction. |
| Disaster Recovery | 69.7 | 68.9 | ▪ Proceeds in accounts for Disaster Recovery Efforts. Moneys including advancements on Insurance proceeds and FEMA Public Assistance Program |
| Compliance Escrow | 1.2 | 1.2 | ▪ Established through Consent Decree and Transactional Agreements with the Department of Health. |
| **TOTAL** | **$575M** | **$587M** | |

# Restricted Accounts / Subject to Title III Proceedings - HTA

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| *Grouping Subcategory* | *2/28/2019* | *3/29/2019* | *Notes* |
| Operational | 25.3 | 19.9 | ▪ Includes construction and operational accounts. This bank account is the main deposit account for HTA. Funds from this account are commonly transferred to other HTA bank accounts to cover operational expenses, including payroll accounts for payroll, payroll taxes, and discounts. The decrease (-$5.4M) is primarily due to the net effect of operating expenses other than payroll (-$28.0M) during the month offsetting operating and intra-government receipts (+$18.2M) and transfers from/to other accounts (+$4.3M). |
| Payroll | 6.5 | 5.4 | ▪ Related to payroll and payroll taxes. The decrease (-$1.1M) is due to payroll and payroll taxes payments for the month of March (-$7.1M) offsetting transfers from the Operational Account (+$6.0M). |
| Federal Funds | 3.0 | 1.3 | ▪ HTA receives federal funds from the Federal Highway Administration ("FHWA") and the Federal Transit Administration ("FTA") and uses those funds to spend on FHWA and FTA earmarked infrastructure projects. The decrease (-$1.7M) is primarily due to net effect during the month of FHWA and FTA inflows (+$9.0M) offsetting federal capex spending (-$10.4M) and transfers to other accounts (-0.4M) during the month. |
| Reserve | 341.7 | 331.5 | ▪ Consists of restricted/reserved funds for operational and construction contracts. The decrease (-$10.2) is primarily due to net effect of transfers from/to other accounts (-10.2M) during the month. |
| BNY Accounts (Debt Issuance) | 82.8 | 82.8 | ▪ Consists of restricted/reserved funds for debt issuance. |
| **TOTAL** | **$459M** | **$441M** | |

15

# ASES

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Grouping Subcategory** | **2/28/2019** | **3/29/2019** | **Notes** |
| Premium Payments Account | 138.1 | 180.0 | • Premium Payments account receives federal and state funding, and makes disbursements for Managed Care Organizations ("MCO") premiums. |
| Control Account | 132.9 | 104.8 | • The Control Account receives monies from the Rebates and Operational accounts, and makes disbursements for MCO premiums, and general overhead and payroll expenses.<br>• The monthly reduction is a timing variance related to receipt of offsetting federal funds related to the federal Bipartisan Budget Agreement, incremental to the approved FY18 federal funds budget, and the related discontinuation of Commonwealth funds to ASES. |
| Rebates and Operational Accounts | - | - | • The Operational account receives monies from appropriations of approximately $4M per month and additional $4M to $5M from federal administrative reimbursements.<br>• Each day cash is swept into the control accounts, which brings balance to zero in Operational Account. The Rebate Account operates the same way in that monies are swept from it to Control Account. |

| | | | |
|---|---|---|---|
| **TOTAL** | **$271M** | **$284M** | |

16

# Other Public Corporations and Legally Separate Entities

| $ in millions | Balance as of[1] | | Notes |
|---|---|---|---|
| **PC or Legally Separate Entity** | **2/28/2019** | **3/29/2019** | |
| State Insurance Fund Corporation | 319.4 | 285.8 | • Almost all of the balances include unrestricted operational accounts for premium collections and concentration purposes. The remaining balance consists of reserve and operational pass-through accounts. |
| Automobile Accident Compensation Administration | 132.2 | 133.9 | • The majority of these funds represent investment reserves for the purposes of meeting future benefit payments, a standard operating procedure of insurance providers. The remaining amounts are mostly used for operational expenses. |
| Tourism Company | 116.1 | 122.5 | • $66.9M in debt service reserve accounts, $7.3M related to room tax revenues and the rest are funds in operational accounts. |
| Agricultural Enterprises Development Administration | 66.1 | 63.7 | • The majority of the balances include operational accounts including sweep and deposit accounts. The remaining balances consist of restricted/reserve accounts. |
| Housing Financing Authority | 53.2 | 52.5 | • A portion of the balances are composed of restricted accounts including debt service, escrow, and federal funds. The remaining accounts are unrestricted operational accounts. |
| Industrial Development Company | 160.7 | 164.9 | • Most of these funds are deposited for specific uses including, but not limited to, debt service reserves, incentive payments established by law, and capital expenditures. Remaining funds are mostly used for PRIDCO and Rums of PR operating expenses. |
| Other Public Corporations[2] | 654.0 | 645.0 | • Description included in Appendix C. |
| **TOTAL** | **$1,501M** | **$1,467.7M** | |

[1] Except for accounts with an aggregate balance of $1.2M which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

17

0125

# Appendix A: Reconciliations and Revisions of Reported Balances to Date

**Detail of Updated Balances vs. April 1st disclosure**
*(2/28/2019 balances reported on April, $ in millions)*

| $ in M | TSA | TSA Sweep | Pension related | Central Government - Non TSA | COFINA DSR | Other Restricted Title III Accounts | PREPA | PRASA | HTA | UPR | ASES | Other Public Corp's. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reported 2/28 Balances | 4,927.9 | 67.4 | 697.4 | 1,693.8 | 22.3 | 785.2 | 428.0 | 575.4 | 459.3 | 406.6 | 270.5 | 1,499.9 | 11,834 |
| Account Reclassifications | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| Revisions to Balances | - | (11.7) [1] | - | 11.6 | - | - | - | - | - | - | - | 1.5 | 0 |
| Incorporated Accounts | - | - | - | 1.1 | - | - | - | 0.4 | - | - | - | - | 0 |
| Removed Accounts | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| Restated 2/28 Balances | 4,927.9 | 55.7 | 697.4 | 1,706.5 | 22.3 | 785.2 | 428.0 | 575.8 | 459.3 | 406.6 | 270.5 | 1,501.4 | 11,918 |

1 A single account was found duplicated, in the mount of $11.7M. The account has been removed from the inventory, and the balances have been revised and updated.

18

# Appendix B: Central Government – Non TSA

*$ in '000s*

| | Balance as of | | DELTA |
| Agency Name | 2/28/2019 | 3/29/2019 | 3/29/2019 |
|---|---|---|---|
| Electronic Lottery | $ 128,409 | $ 142,097 | $ 13,687 |
| Traditional Lottery | 83,995 | 86,208 | 2,212 |
| PR Government Investment Trust | 33,841 | 33,847 | 6 |
| Department of Education | 23,254 | 18,044 | (5,210) |
| Telecommunication's Regulatory Board | 13,421 | 13,917 | 496 |
| Institute of Forensic Sciences | 9,183 | 11,954 | 2,771 |
| Office of the Comptroller | 6,102 | 6,249 | 147 |
| Office of Government Ethics | 6,069 | 6,207 | 138 |
| Institute of Statistics | 2,990 | 2,985 | (5) |
| Department of Correction and Rehabilitation | 3,022 | 2,748 | (274) |
| OCAM - OGP | 2,539 | 2,539 | - |
| Environmental Quality Board | 1,438 | 1,438 | (0) |
| Department of the Family | 824 | 861 | 38 |
| Department of Consumer Affairs | 711 | 686 | (25) |
| Families and Children Administration | 514 | 472 | (42) |
| Puerto Rico National Guard | 497 | 451 | (46) |
| Office of Socioeconomic Development | 353 | 356 | 3 |
| Commonwealth Election Commission | 302 | 261 | (41) |
| Administration for Socioeconomic Development of the Family | 129 | 144 | 15 |
| Other | 1,428 | - | (1,428) |
| **Total** | **$ 319,021** | **$ 331,463** | **$ 12,442** |

19

# Appendix C: Other Public Corporations and Legally Separate Entities

*$ in '000s*

| | | Balance as of | | DELTA | |
| --- | --- | --- | --- | --- | --- |
| **Agengy Name** | | **2/28/2019** | | **3/29/2019** | **3/29/2019** |
| | | | | $ | - |
| Economic Development Bank | $ | 90 | $ | 98 | 8 |
| Public Buildings Authority | | 73 | | 75 | 2 |
| Infrastructure Financing Authority | | 70 | | 68 | (2) |
| Fiscal Agency and Financial Advisory Authority | | 51 | | 52 | 1 |
| Medical Services Administration | | 35 | | 38 | 4 |
| Ports Authority | | 34 | | 34 | (0) |
| Financial Oversight Board | | 30 | | 33 | 4 |
| Comprehensive Cancer Center | | 29 | | 28 | (0) |
| Public Private Partnership Authority | | 22 | | 20 | (3) |
| COR3 | | 43 | | 24 | |
| Other | | 22 | | 20 | (1) |
| Convention Center District Authority | | 19 | | 18 | (1) |
| Land Authority | | 16 | | 16 | 0 |
| Puerto Rico Trade and Export Company | | 14 | | 14 | (0) |
| Puerto Rico and the Caribbean Cardiovascular Center Corporation | | 12 | | 14 | 1 |
| Integrated Transport Authority | | 14 | | 13 | (1) |
| Land Administration | | 12 | | 13 | 1 |
| Energy Commission | | 12 | | 12 | (0) |
| Solid Waste Authority | | 12 | | 12 | 0 |
| Teacher's Retirement System | | 8 | | 8 | (1) |
| National Guard Institutional Trust | | 6 | | 6 | 0 |
| Farm Insurance Corporation | | 6 | | 6 | (0) |
| Musical Arts and Stagecraft Corporation | | 6 | | 5 | (0) |
| Fine Arts Center Corporation | | 4 | | 4 | 0 |
| Institute of Puerto Rican Culture | | 3 | | 3 | (0) |
| Public Broadcasting Corporation | | 3 | | 2 | (0) |
| Authority for the Redevelopment of the land and facilities of the Roosevelt Roads Naval Station | | 2 | | 2 | (0) |
| Conservatory of Music | | 2 | | 2 | (0) |
| School of Plastic Arts | | 1 | | 1 | (0) |
| Center for Research, Education and Medical Services for Diabetes | | 1 | | 1 | (0) |
| Company for the Integral Development of Cantera's Peninsula | | 1 | | 1 | (0) |
| Bosque Modelo de PR | | 0 | | 0 | 0 |
| Culebra Conservation and Development Authority | | 0 | | 0 | (0) |
| Martín Peña Canal ENLACE Project Corporation | | 0 | | 0 | - |
| | | | | | - |
| | $ | 654 | $ | 644 | 9 |

20

**Exhibit A**

**Mandatory Exchange Distribution Allocation Information**

**Exhibit J to Elliott Declaration**

COFINA

Mandatory Exchange of Cash and New Securities

Mandatory Exchange

0131

## Exhibit B

**Voluntary Exchange Distribution Allocation Information**

Voluntary Exchange Information

| CONTRA CUSIP | ORIGINAL CUSIP | CLASS | Rate per $1,000 Principal Amount of Ambac Certificate Units Maturity 2047 CUSIP 19237J AA0 | Rate per $1,000 Principal Amount of Ambac Certificate Maturity 2054 CUSIP 19237J AB8 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2040 (Taxable) CUSIP 19237R AA8 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2040 (Tax-Exempt) CUSIP 19237R AA8 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2041 (Taxable) CUSIP 19237R AB6 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2042 (Tax-Exempt) CUSIP 19237C AA6 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2042 (Taxable) CUSIP 19237C AA6 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2043 (Tax-Exempt) CUSIP 19237D AA0 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2043 (Taxable) CUSIP 19237D AA0 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2043 (Tax-Exempt) CUSIP 19237D AB2 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2044 (Taxable) CUSIP 19237D AB2 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2044 (Tax-Exempt) CUSIP 19237D AB0 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2045 (Taxable) CUSIP 19237D AB0 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2045 (Tax-Exempt) CUSIP 19237D AB3 | Rate per $1,000 Principal Amount of National Certificate Units Maturity 2045 (Taxable) CUSIP 19237R AB5 | Rate per $1,000 Principal Amount of Class 4 Taxable Bond (2040 Bond) CUSIP 74529J QH4 | Principal Amount of Class 4 Taxable Election Cash | Rate per $1,000 Principal Amount of Class 4 Rounding Cash | Class 4 Unused Rounding Cash | Rate per $1,000 Principal Amount of Class 7 Taxable Bond (2040 Bond) CUSIP 74529J QH4 | Principal Amount of Class 7 Taxable Election Cash | Class 7 Rounding Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74519XWD1 | 745293AM1 | 2 | 1.000 | | | | | | | | | | | | | | | | | | | | | |
| 74519XWE9 | 745293AP4 | 2 | | 1.000 | | | | | | | | | | | | | | | | | | | | |
| 74519XWC3 | 745293AN9 | 3 | | | 86.53061949 | 262.76799915 | | | | | | | | | | | | | | | | | | |
| 74519XWF6 | 745293AR0 | 3 | | | | | 82.02448975 | 249.09641467 | | | | | | | | | | | | | | | | |
| 74519XWG4 | 745293AS8 | 3 | | | | | | | 77.91051568 | 236.59798430 | | | | | | | | | | | | | | |
| 74519XWH2 | 745293AT6 | 3 | | | | | | | | | 73.80866225 | 224.14643551 | | | | | | | | | | | | |
| 74519XWJ8 | 745293AU3 | 3 | | | | | | | | | | | 69.89876702 | 212.26451072 | | | | | | | | | | |
| 74519XWK5 | 745293AV1 | 3 | | | | | | | | | | | | | 66.33712403 | 201.45476486 | | | | | | | | |
| 74519XWL3 | 745293AW9 | 3 | | | | | | | | | | | | | | | 62.94922662 | 191.16249558 | | | | | | | |
| 74519XWN9 | 745293AA1 | 4 | | | | | | | | | | | | | | | | 468.218907 | 10.0676 | $1 for $1 | 0.10678887 | | | |
| 74519XWP4 | 745293AC7 | 4 | | | | | | | | | | | | | | | | 468.218907 | 10.0676 | $1 for $1 | 0.10678887 | | | |
| 74519XWF2 | 745293AC5 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XWT6 | 745293AD3 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XWU3 | 745293AE1 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XWV1 | 745293AF8 | 4 | | | | | | | | | | | | | | | | 117.5986645 | 2.5286 | $1 for $1 | 0.02682132 | | | |
| 74519XWW9 | 745293AG6 | 4 | | | | | | | | | | | | | | | | 942.7051594 | 20.27125 | $1 for $1 | 0.21502080 | | | |
| 74519XWX7 | 745293AH4 | 4 | | | | | | | | | | | | | | | | 437.877414 | 9.4152 | $1 for $1 | 0.09986474 | | | |
| 74519XWY5 | 745293AJ0 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XWZ2 | 745293AK7 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XZ11 | 745293BB5 | 4 | | | | | | | | | | | | | | | | 930.6189586 | 20.01008333 | $1 for $1 | 0.21225061 | | | |
| 74519XXA6 | 745293AL9 | 4 | | | | | | | | | | | | | | | | 502.673163 | 10.8084 | $1 for $1 | 0.11464667 | | | |
| 74519XXB4 | 745293BA7 | 4 | | | | | | | | | | | | | | | | 445.746483 | 9.5844 | $1 for $1 | 0.10166348 | | | |
| 74519XXC2 | 745293BC3 | 4 | | | | | | | | | | | | | | | | 419.7487905 | 9.0254 | $1 for $1 | 0.09573406 | | | |
| 74519XXE8 | 745293BD1 | 4 | | | | | | | | | | | | | | | | 395.276544 | 8.4992 | $1 for $1 | 0.09015256 | | | |
| 74519XXF5 | 745293BE9 | 4 | | | | | | | | | | | | | | | | 930.615075 | 20.01 | $1 for $1 | 0.21224972 | | | |
| 74519XXG3 | 745293BF6 | 4 | | | | | | | | | | | | | | | | 930.615075 | 20.01 | $1 for $1 | 0.21224972 | | | |
| 74519XXH1 | 745293BG4 | 4 | | | | | | | | | | | | | | | | 930.615075 | 20.01 | $1 for $1 | 0.21224972 | | | |
| 74519XXJ7 | 745293BH2 | 4 | | | | | | | | | | | | | | | | 930.615075 | 20.01 | $1 for $1 | 0.21224972 | | | |
| 74519XXK4 | 745293BJ8 | 4 | | | | | | | | | | | | | | | | 930.615075 | 20.01 | $1 for $1 | 0.21224972 | | | |
| 74519XXL2 | 745293BK5 | 4 | | | | | | | | | | | | | | | | 596.4958935 | 12.8258 | $1 for $1 | 0.13604916 | | | |
| 74519XXM0 | 745293BL3 | 4 | | | | | | | | | | | | | | | | 596.4958935 | 12.8258 | $1 for $1 | 0.13604916 | | | |
| 74519XXN8 | 745293BM1 | 4 | | | | | | | | | | | | | | | | 561.0013695 | 12.0626 | $1 for $1 | 0.12795020 | | | |
| 74519XXP3 | 745293BN9 | 4 | | | | | | | | | | | | | | | | 527.618286 | 11.3448 | $1 for $1 | 0.12053636 | | | |
| 74519XXQ1 | 745293BP4 | 4 | | | | | | | | | | | | | | | | 527.618286 | 11.3448 | $1 for $1 | 0.12053636 | | | |
| 74519XXR9 | 745293BQ2 | 4 | | | | | | | | | | | | | | | | 496.216422 | 10.6676 | $1 for $1 | 0.11317439 | | | |
| 74519XXS7 | 745293BR0 | 4 | | | | | | | | | | | | | | | | 930.6251506 | 20.01021666 | $1 for $1 | 0.21225262 | | | |
| 74519XXT5 | 745293BS8 | 4 | | | | | | | | | | | | | | | | 930.6251506 | 20.01021666 | $1 for $1 | 0.21225262 | | | |
| 74519XXU2 | 745293BT6 | 4 | | | | | | | | | | | | | | | | 930.6251506 | 20.01021666 | $1 for $1 | 0.21225262 | | | |
| 74519XXV0 | 745293BU3 | 4 | | | | | | | | | | | | | | | | 930.6251506 | 20.01021666 | $1 for $1 | 0.21225262 | | | |
| 74519XXW8 | 745293BV1 | 4 | | | | | | | | | | | | | | | | 930.6251506 | 20.01021666 | $1 for $1 | 0.21225262 | | | |
| 74519XXX6 | 745293BW9 | 4 | | | | | | | | | | | | | | | | 939.76155 | 20.20666666 | $1 for $1 | 0.2143358 | | | |
| 74519XXY4 | 745293BX7 | 4 | | | | | | | | | | | | | | | | 939.76155 | 20.20666666 | $1 for $1 | 0.2143358 | | | |
| 74519XXZ1 | 745293BY5 | 4 | | | | | | | | | | | | | | | | 939.76155 | 20.20666666 | $1 for $1 | 0.2143358 | | | |
| 74519XYA5 | 745293BZ2 | 4 | | | | | | | | | | | | | | | | 943.1644375 | 20.28 | $1 for $1 | 0.21488384 | | | |
| 74519XYB3 | 745293CA6 | 4 | | | | | | | | | | | | | | | | 943.1644375 | 20.28833333 | $1 for $1 | 0.21488384 | | | |
| 74519XYC1 | 745293CB4 | 4 | | | | | | | | | | | | | | | | 943.1644375 | 20.28833333 | $1 for $1 | 0.21488384 | | | |
| 74519XYD9 | 745293CC2 | 4 | | | | | | | | | | | | | | | | 941.16272166 | 20.24541666 | $1 for $1 | 0.21478683 | | | |
| 74519XYE7 | 745293CD0 | 4 | | | | | | | | | | | | | | | | 942.7651594 | 20.271275 | $1 for $1 | 0.21502085 | | | |
| 74519XYF4 | 745293CE8 | 4 | | | | | | | | | | | | | | | | 327.339785 | 7.038 | $1 for $1 | 0.07465335 | | | |
| 74519XYG2 | 745293CF5 | 4 | | | | | | | | | | | | | | | | 327.339785 | 7.038 | $1 for $1 | 0.07465335 | | | |
| 74519XYH0 | 745293CG3 | 4 | | | | | | | | | | | | | | | | 269.7341985 | 5.7998 | $1 for $1 | 0.06151953 | | | |
| 74519XYJ6 | 745293CH1 | 4 | | | | | | | | | | | | | | | | 252.6938505 | 5.4334 | $1 for $1 | 0.05763306 | | | |
| 74519XYK3 | 745293CJ7 | 4 | | | | | | | | | | | | | | | | 236.628516 | 5.088 | $1 for $1 | 0.05396934 | | | |
| 74519XYL1 | 745293CK4 | 4 | | | | | | | | | | | | | | | | 930.4447475 | 20.00633333 | $1 for $1 | 0.21223063 | | | |
| 74519XYM9 | 745293CL2 | 4 | | | | | | | | | | | | | | | | 930.4447475 | 20.00633333 | $1 for $1 | 0.21223063 | | | |
| 74519XYN7 | 745293CM0 | 4 | | | | | | | | | | | | | | | | 930.4678013 | 20.00683333 | $1 for $1 | 0.21223613 | | | |
| 74519XYP2 | 745293CN8 | 4 | | | | | | | | | | | | | | | | 930.4678013 | 20.00683333 | $1 for $1 | 0.21223613 | | | |
| 74519XYQ0 | 745293CP3 | 7 | | | | | | | | | | | | | | | | 930.5259356 | 20.00808333 | $1 for $1 | 0.21224980 | | | |
| 74519XYR8 | 745293CQ1 | 7 | | | | | | | | | | | | | | | | | | | | 564.4449275 | 20.03056333 | $1 for $1 |
| 74519XYS6 | 745293CR9 | 7 | | | | | | | | | | | | | | | | | | | | 564.4449275 | 20.03056333 | $1 for $1 |
| 74519XYT4 | 745293CS7 | 7 | | | | | | | | | | | | | | | | | | | | 451.3622517 | 16.00159999 | $1 for $1 |
| 74519XYU1 | 745293CT5 | 7 | | | | | | | | | | | | | | | | | | | | 451.3622517 | 16.0016 | $1 for $1 |
| 74519XYV9 | 745293CU2 | 7 | | | | | | | | | | | | | | | | | | | | 173.9940327 | 6.1684 | $1 for $1 |
| 74519XYW7 | 745293CV0 | 7 | | | | | | | | | | | | | | | | | | | | 173.9940327 | 6.1684 | $1 for $1 |
| 74519XYX5 | 745293CW8 | 7 | | | | | | | | | | | | | | | | | | | | 570.3402574 | 20.23958333 | $1 for $1 |
| 74519XYY3 | 745293CX6 | 7 | | | | | | | | | | | | | | | | | | | | 570.7046039 | 20.2325 | $1 for $1 |
| 74519XYZ0 | 745293CY4 | 7 | | | | | | | | | | | | | | | | | | | | 570.7046039 | 20.2325 | $1 for $1 |
| 74519XZA4 | 745293CZ1 | 7 | | | | | | | | | | | | | | | | | | | | 570.8867742 | 20.23895833 | $1 for $1 |
| 74519XZB2 | 745293DA5 | 7 | | | | | | | | | | | | | | | | | | | | 570.8867742 | 20.23895833 | $1 for $1 |
| 74519XZC0 | 745293DB3 | 7 | | | | | | | | | | | | | | | | | | | | 571.413291 | 20.25833333 | $1 for $1 |
| 74519XZD8 | 745293DC1 | 7 | | | | | | | | | | | | | | | | | | | | 571.0689465 | 20.24541666 | $1 for $1 |
| 74519XZE6 | 745293DD9 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |
| 74519XZF3 | 745293DE7 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |
| 74519XZG1 | 745293DF4 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |
| 74519XZH9 | 745293DG2 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |
| 74519XZJ5 | 745293DH0 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |
| 74519XZK2 | 745293DJ6 | 7 | | | | | | | | | | | | | | | | | | | | 572.1629801 | 20.28416666 | $1 for $1 |

Voluntary Exchange Information



Return to search results

Advanced Search　　Browse Issuers　　Tools and Resources　　Market Activity　　EMMA Help　　A-　100%　A+

Home > Issuers By State > Puerto Rico > Issuer Homepage



### GDB DEBT RECOVERY AUTH OF COMWLTH PUERTO RICO (PR)
Click on a tab to access data and documents about this issuer's municipal securities.

**Issuer's Contact Information**　　　　This issuer has not provided contact information.

**Educational Resources**
Customizing an Issuer Homepage
How Can Issuers Use EMMA?
Contact Us

Issues　Trade Activity　Pre-Sale Documents　Official Statements　Refunded Issues　Financial Disclosures　Event-Based Disclosures

Trade date range may not exceed 31 days. Trade Date 04/23/2019 to 05/23/2019 ▶

Trades in this issuer's municipal securities are displayed. Click on the security description to view details about the security, including a graph of trade prices over time.

Display 100 ▾ results　Search within list: [　　　　]

First　Previous　1　2　3　4　5　...　8　Next　Last

| Trade Date/Time | Security Description | Coupon (%) | Maturity Date | Price (%) | Yield (%) | Calculation Date & Price (%) | Trade Amount ($) | Trade Type | Special Condition |
|---|---|---|---|---|---|---|---|---|---|
| 05/23/2019 04:16:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.801 | 10.626 | 08/20/2040 @ 100 | 64,000 | Inter-dealer trade | - |
| 05/23/2019 04:16:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.801 | 10.626 | 08/20/2040 @ 100 | 765 | Inter-dealer trade | - |
| 05/23/2019 04:16:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73 | 10.749 | 08/20/2040 @ 100 | 12,408 | Customer sold | - |
| 05/23/2019 04:16:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73 | 10.749 | 08/20/2040 @ 100 | 52,357 | Customer sold | - |
| 05/23/2019 02:45:22 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.055 | 10.897 | 08/20/2040 @ 100 | 2,503 | Customer sold | - |
| 05/23/2019 02:45:22 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.6 | 10.811 | 08/20/2040 @ 100 | 2,000 | Inter-dealer trade | A |
| 05/23/2019 02:45:19 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.6 | 10.657 | 08/20/2040 @ 100 | 2,000 | Inter-dealer trade | A |
| 05/23/2019 02:13:27 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.55 | 10.819 | 08/20/2040 @ 100 | 15,061 | Customer sold | - |
| 05/23/2019 02:02:41 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.375 | 10.691 | 08/20/2040 @ 100 | 29,000 | Customer sold | - |
| 05/23/2019 02:02:41 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.5 | 10.672 | 08/20/2040 @ 100 | 29,000 | Inter-dealer trade | - |
| 05/23/2019 01:31:06 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.65 | 10.649 | 08/20/2040 @ 100 | 61 | Inter-dealer trade | A |
| 05/23/2019 01:29:05 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.65 | 10.649 | 08/20/2040 @ 100 | 15,000 | Inter-dealer trade | A |
| 05/23/2019 12:51:16 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.685 | 10.798 | 08/20/2040 @ 100 | 50,311 | Customer sold | - |
| 05/23/2019 12:41:18 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.685 | 10.644 | 08/20/2040 @ 100 | 311 | Inter-dealer trade | - |
| 05/23/2019 12:41:18 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.685 | 10.644 | 08/20/2040 @ 100 | 50,000 | Inter-dealer trade | - |
| 05/22/2019 03:46:18 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 827 | Inter-dealer trade | - |
| 05/22/2019 03:45:34 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 827 | Customer sold | - |
| 05/22/2019 03:43:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.09 | 10.582 | 08/20/2040 @ 100 | 726 | Inter-dealer trade | B |

Exhibit L to Elliott Declaration

5/28/20

| Trade Date/Time | Security Description | Coupon | Maturity | Price | Yield | Calculation Date & Price (%) | Trade Amount ($) | Trade Type | Special Condition |
|---|---|---|---|---|---|---|---|---|---|
| 05/22/2019 03:43:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 726 | Inter-dealer trade | B |
| 05/22/2019 03:43:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 107,000 | Inter-dealer trade | B |
| 05/22/2019 03:43:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.09 | 10.582 | 08/20/2040 @ 100 | 107,000 | Inter-dealer trade | B |
| 05/22/2019 03:40:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.25 | 10.71 | 08/20/2040 @ 100 | 57,729 | Customer sold | - |
| 05/22/2019 03:40:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.175 | 10.722 | 08/20/2040 @ 100 | 29,666 | Customer sold | - |
| 05/22/2019 03:40:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.9 | 10.61 | 08/20/2040 @ 100 | 20,331 | Customer sold | N |
| 05/22/2019 03:38:11 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.125 | 10.576 | 08/20/2040 @ 100 | 9,000 | Customer sold | N |
| 05/22/2019 03:38:11 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.125 | 10.576 | 08/20/2040 @ 100 | 9,000 | Inter-dealer trade | - |
| 05/22/2019 03:33:35 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.45 | 10.834 | 08/20/2040 @ 100 | 13,278 | Customer sold | - |
| 05/22/2019 03:30:15 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.125 | 10.576 | 08/20/2040 @ 100 | 32,000 | Inter-dealer trade | - |
| 05/22/2019 03:30:15 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 32,000 | Customer sold | - |
| 05/22/2019 02:40:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 70.5 | 11.147 | 08/20/2040 @ 100 | 558 | Inter-dealer trade | - |
| 05/22/2019 02:38:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 70.5 | 11.147 | 08/20/2040 @ 100 | 7,000 | Customer sold | N |
| 05/22/2019 02:36:30 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 70.5 | 11.147 | 08/20/2040 @ 100 | 7,000 | Inter-dealer trade | - |
| 05/22/2019 02:35:59 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72 | 10.905 | 08/20/2040 @ 100 | 558 | Inter-dealer trade | B |
| 05/22/2019 02:35:50 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72 | 10.905 | 08/20/2040 @ 100 | 7,000 | Inter-dealer trade | B |
| 05/22/2019 02:28:10 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.45 | 10.679 | 08/20/2040 @ 100 | 278 | Inter-dealer trade | - |
| 05/22/2019 02:28:10 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.45 | 10.679 | 08/20/2040 @ 100 | 13,000 | Inter-dealer trade | - |
| 05/22/2019 11:21:38 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.375 | 10.539 | 08/20/2040 @ 100 | MM+ | Customer bought | - |
| 05/22/2019 10:48:17 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 908 | Inter-dealer trade | - |
| 05/22/2019 10:47:19 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 908 | Customer sold | - |
| 05/22/2019 09:11:41 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.25 | 10.557 | 08/20/2040 @ 100 | 5,000,000 | Customer sold | - |
| 05/22/2019 08:47:03 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.02 | 10.592 | 08/20/2040 @ 100 | 75,000 | Customer bought | - |
| 05/22/2019 08:47:03 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.02 | 10.592 | 08/20/2040 @ 100 | 985 | Customer bought | - |
| 05/22/2019 08:44:50 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 985 | Customer sold | - |
| 05/22/2019 08:44:50 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 75,000 | Customer sold | - |
| 05/21/2019 05:10:24 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.515 | 10.669 | 08/20/2040 @ 100 | 25,156 | Customer sold | - |
| 05/21/2019 04:06:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 4,000 | Inter-dealer trade | - |
| 05/21/2019 04:06:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 4,000 | Customer sold | - |
| 05/21/2019 04:03:36 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 17,000 | Customer bought | - |
| 05/21/2019 04:03:36 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 5,000 | Customer bought | - |
| 05/21/2019 04:03:36 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 10,555 | Customer bought | - |

| Trade Date/Time | Security Description | Coupon | Maturity Date | Price | Yield | Calculation Date & Price (%) | Trade Amount ($) | Trade Type | Special Condition |
|---|---|---|---|---|---|---|---|---|---|
| 05/21/2019 03:20:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.75 | 10.633 | 08/20/2040 @ 100 | 555 | Inter-dealer trade | A |
| 05/21/2019 03:19:41 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 32,000 | Inter-dealer trade | A |
| 05/21/2019 03:19:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.75 | 10.633 | 08/20/2040 @ 100 | 32,000 | Inter-dealer trade | A |
| 05/21/2019 02:55:53 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 72.6 | 10.811 | 08/20/2040 @ 100 | 22,592 | Customer sold | - |
| 05/21/2019 02:34:10 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.5 | 10.671 | 08/20/2040 @ 100 | 592 | Inter-dealer trade | A |
| 05/21/2019 02:34:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.75 | 10.633 | 08/20/2040 @ 100 | 592 | Inter-dealer trade | A |
| 05/21/2019 02:33:53 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.75 | 10.633 | 08/20/2040 @ 100 | 22,000 | Inter-dealer trade | A |
| 05/21/2019 02:33:53 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.5 | 10.671 | 08/20/2040 @ 100 | 22,000 | Inter-dealer trade | A |
| 05/21/2019 02:00:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 555 | Inter-dealer trade | A |
| 05/21/2019 01:30:39 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.07 | 10.585 | 08/20/2040 @ 100 | 300,000 | Inter-dealer trade | - |
| 05/21/2019 01:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.31 | 10.701 | 08/20/2040 @ 100 | 504,010 | Customer sold | - |
| 05/21/2019 01:26:23 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.57 | 10.661 | 08/20/2040 @ 100 | 25,000 | Inter-dealer trade | A |
| 05/21/2019 01:26:23 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.47 | 10.676 | 08/20/2040 @ 100 | 25,000 | Customer sold | - |
| 05/21/2019 01:20:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.055 | 10.587 | 08/20/2040 @ 100 | 20 | Inter-dealer trade | - |
| 05/21/2019 01:20:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.055 | 10.587 | 08/20/2040 @ 100 | 309,000 | Inter-dealer trade | - |
| 05/21/2019 01:18:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.25 | 10.71 | 08/20/2040 @ 100 | 309,020 | Customer sold | - |
| 05/21/2019 01:12:54 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 10 | Inter-dealer trade | - |
| 05/21/2019 01:12:08 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 504,000 | Inter-dealer trade | - |
| 05/21/2019 01:05:57 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.56 | 10.662 | 08/20/2040 @ 100 | 504,000 | Inter-dealer trade | - |
| 05/21/2019 01:05:57 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.56 | 10.662 | 08/20/2040 @ 100 | 504,000 | Inter-dealer trade | - |
| 05/21/2019 01:05:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.86 | 10.616 | 08/20/2040 @ 100 | 504,000 | Inter-dealer trade | - |
| 05/21/2019 01:05:27 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.56 | 10.662 | 08/20/2040 @ 100 | 10 | Inter-dealer trade | - |
| 05/21/2019 01:05:27 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.56 | 10.662 | 08/20/2040 @ 100 | 10 | Inter-dealer trade | - |
| 05/21/2019 01:00:45 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.86 | 10.616 | 08/20/2040 @ 100 | 10 | Inter-dealer trade | - |
| 05/21/2019 12:38:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 244,000 | Inter-dealer trade | - |
| 05/21/2019 12:38:49 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 554 | Inter-dealer trade | - |
| 05/21/2019 12:35:39 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.525 | 10.668 | 08/20/2040 @ 100 | 62,976 | Customer sold | - |
| 05/21/2019 12:34:46 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.525 | 10.668 | 08/20/2040 @ 100 | 181,578 | Customer sold | - |
| 05/21/2019 12:06:27 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 12,000 | Inter-dealer trade | - |
| 05/21/2019 12:06:27 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 846 | Inter-dealer trade | - |
| 05/21/2019 12:06:06 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.525 | 10.668 | 08/20/2040 @ 100 | 12,846 | Customer sold | - |
| 05/21/2019 11:12:00 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.565 | 10.661 | 08/20/2040 @ 100 | 25,000 | Inter-dealer trade | - |

5/2

| Trade Date/Time | Security Description | Coupon | Maturity Date | Price | Yield | Calculation Date & Price (%) | Trade Amount ($) | Trade Type | Special Condition |
|---|---|---|---|---|---|---|---|---|---|
| 05/21/2019 11:12:00 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.565 | 10.661 | 08/20/2040 @ 100 | 156 | Inter-dealer trade | - |
| 05/20/2019 03:32:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.05 | 10.587 | 08/20/2040 @ 100 | 70 | Inter-dealer trade | - |
| 05/20/2019 03:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.225 | 10.713 | 08/20/2040 @ 100 | 75,299 | Customer sold | - |
| 05/20/2019 03:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.25 | 10.71 | 08/20/2040 @ 100 | 113,511 | Customer sold | - |
| 05/20/2019 03:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.05 | 10.587 | 08/20/2040 @ 100 | 250,000 | Inter-dealer trade | - |
| 05/20/2019 03:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.05 | 10.587 | 08/20/2040 @ 100 | 254,000 | Inter-dealer trade | - |
| 05/20/2019 03:30:00 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.225 | 10.713 | 08/20/2040 @ 100 | 65,260 | Customer sold | - |
| 05/20/2019 02:56:35 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 270,000 | Inter-dealer trade | - |
| 05/20/2019 02:56:35 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.875 | 10.614 | 08/20/2040 @ 100 | 270,000 | Customer sold | - |
| 05/20/2019 01:41:57 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74.4 | 10.535 | 08/20/2040 @ 100 | 37,000 | Customer bought | - |
| 05/20/2019 10:51:06 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 83,000 | Customer sold | - |
| 05/20/2019 10:51:06 AM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 83,000 | Inter-dealer trade | - |
| 05/17/2019 04:29:52 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 263 | Inter-dealer trade | - |
| 05/17/2019 04:28:45 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 263 | Customer sold | - |
| 05/17/2019 02:32:48 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 20,000 | Inter-dealer trade | - |
| 05/17/2019 02:32:48 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 74 | 10.595 | 08/20/2040 @ 100 | 20,000 | Customer sold | - |
| 05/17/2019 01:26:32 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.88 | 10.613 | 08/20/2040 @ 100 | 301 | Inter-dealer trade | A |
| 05/17/2019 01:20:29 PM | GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE) | 7.5 | 08/20/2040 | 73.88 | 10.613 | 08/20/2040 @ 100 | 100,000 | Inter-dealer trade | A |

Displaying 1 to 100 of 704 results

First | Previous | 1 | 2 | 3 | 4 | 5 | ... | 8 | Next | Last

About EMMA | Sitemap | Privacy Policy | Terms of Use | MSRB.org | MSRB Systems Status

 MSRB

© 2019 Municipal Securities Rulemaking Board (MSRB)

EMMA is a service of the Municipal Securities Rulemaking Board, which protects investors, state and local governments, and the public interest. Portions of EMMA data are provided by Standard & Poor's Securities Evaluations, Inc., CUSIP Global Services & American Bankers Association.

Ratings data are provided by the following and are reprinted with permission, and copyright notices for the respective owners are as follows: Copyright © 2019, Fitch, Inc. All rights reserved. Copyright © 2019, Kroll Bond Rating Agency, Inc., and/or its licensors and affiliates (together, "KBRA"). All rights reserved. Copyright © 2019, Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved. Copyright © 2019, Standard and Poor's Financial Services LLC. All rights reserved.

1.0.7801-241-R



Home　　Sobre Nosotros　　Noticias　　Docume



 *Información*

Fax: 787- 625-2560

Dirección: Po Box 20868, San Juan PR 00928

**Nombre Completo:**

Ingresar nombre completo

**Email:**

Ingresar email

**Teléfono:**

5/26/2019                                    Bonistas del Patio | Información de Contacto



      Home     Sobre Nosotros     Noticias     Docume

## Mensaje:

Mensaje/Comentario/Duda

Enviar

Para más información escríbenos a:

bonistasdelpatio@gmail.com



P.O. Box 20868
San Juan, PR 00928
(787) 781-0025
bonistasdelpatio@gmail.com
www.bonistasdelpatio.com

November 17, 2017

The Honorable Elizabeth Warren
317 Hart Senate Office Building
United States Senate
Washington, DC 20510

The Honorable Nydia Velázquez
2302 Rayburn House Office Building
United States House of Representatives
Washington, DC 20515

**Re:  Your Proposal Regarding Puerto Rico's Bond Debts**

Dear Senator Warren and Representative Velázquez:

I am one of the more than 60,000 U.S. citizens who are Puerto Rico residents and currently hold an estimated $12 billion, or nearly 20%, of Puerto Rico's outstanding debt.  I have seen your press release and letter to Mr. José B. Carrión, Chairman of the Financial Oversight and Management Board for Puerto Rico, expressing your views regarding the proposed handling of the island's outstanding debt, and feel it is important to bring certain facts to your attention.

I share and am very grateful for your interest in our island's recovery after Hurricanes Irma and María and I am equally concerned about the possibility of unfair and unequal treatment of Puerto Rico in connection with Congressional appropriations for disaster relief.  However, it is important to recognize that substantial harm would be done to individual citizens of Puerto Rico if your proposal to repudiate all of the island's debt were adopted.  Moreover, I fear your proposal to repudiate Puerto Rico's debts, whether or not legally possible, will be used by congressional opponents of an appropriate aid package for Puerto Rico as an excuse for denying Puerto Rico its fair share of disaster relief funds.

The majority of Puerto Rico's bond debt, which was used to help Puerto Rico build most of its infrastructure, was initially purchased by investors who live in Puerto Rico and in many cases invested their life's savings in these bonds.  In addition, many individual U.S. citizens living on the mainland also invested in Puerto Rico government bonds, either directly or through U.S.



mutual funds. None of these investors were speculating; they did not buy stocks. Instead they invested in long-term government bonds that were created and offered with a promise of repayment under Puerto Rico's Constitution, laws and regulations — laws that purported to protect their investments. Had these investors known that anyone would advocate the repudiation of the debts owed to them to permit payments to other parties, Puerto Rico would not have been able to raise the funds to build its existing infrastructure that, although damaged, saved many lives when Hurricanes Irma and María struck.

I am genuinely grateful for your efforts to help Puerto Rico receive its rightful share of federal economic relief to overcome this historic catastrophe and I share your concerns that Congress's response may not be sufficient. But regardless whether that turns out to be the case, there will be a need for additional capital to fuel economic growth in Puerto Rico. Where will this capital come from? If PROMESA is used to discriminate against bond investors, who will make new loans to the government? If Puerto Rico repudiates its existing debts, under what conditions and when will it be able to access new capital? Moreover, what impact would such a repudiation have on other state and municipal bond issuers?

Puerto Rico's local bondholders include numerous private sector retirees who chose to invest in their island as a way to support their retirements. Local bondholders also include the island's "Cooperativas"; these are local credit unions that invested in local government bonds and have close to one million members whose average savings are merely $7,000 per account. Another component of the local bondholder community is local business people who placed their savings in government bonds for retirement purposes or as a temporary investment pending use of the funds to support their businesses. Have you considered the effect it will have on the island if $12 billion or more of local investors' funds is entirely eliminated from our economy? The mere suggestion of "writing off Puerto Rico's debt" is creating panic among local residents, who fear the loss of their entire life's savings. Your statements may drive many of these investors, in desperation, to sell their investments for pennies on the dollar to more knowledgeable mainland investors, and if the legality of the proposed debt repudiation is successfully challenged, mainland investors will have effectively stripped local bondholders of their rightful recoveries. I understand this is not your intended purpose, but it is the foreseeable consequence of your proposal.

You are correct that the people of Puerto Rico have demonstrated remarkable spirit through this time of hardship. This includes local bondholders who have suffered the catastrophic consequences of two hurricanes while many are receiving no income at all from their savings invested in Puerto Rico's bonds. Local bondholders of course understand that a significant restructuring of Puerto Rico's debts will be necessary and, even before the hurricanes, local investors had voluntarily agreed to accept significant haircuts to their savings invested in the Government Development Bank of Puerto Rico.



As a local businessman in Puerto Rico for over 20 years, I know that the only way for Puerto Rico to pivot away from disaster and distress and build a sustainable economic recovery is by attracting and incentivizing investment capital.  However, repudiating the existing loans to our government and discriminating against current investors will permanently damage Puerto Rico's credibility with potential future investors.  If Puerto Rico wants to attract new capital to recover and grow, it must act in a fair and responsible way with respect to its existing debts.  It does not want to be categorized with countries that have repudiated their debts by fiat to favor other interests.

As a proud U.S. citizen and Puerto Rico resident, I saw four siblings emigrate from our island, but I still hold faith.  I plan to remain in Puerto Rico and invest in our reconstruction.  I implore you to reconsider your well-intentioned proposal because implementing it would grievously harm the residents of Puerto Rico.  Only through a transparent process that leads to voluntary consensual agreements among the island's debt investors, our government and the Oversight Board, will the island rebound and attract the type of investors and capital that we need to secure a prosperous future.

Respectfully,

Rafael E. Rojo
Chairman, Board of Directors

cc:  José B. Carrión, Chairman, Financial Oversight and Management Board for Puerto Rico
     Natalie Jaresko, Executive Director, Financial Oversight and Management Board for Puerto Rico
     Andrew G. Biggs, Member, Financial Oversight and Management Board for Puerto Rico
     Carlos M. García, Member, Financial Oversight and Management Board for Puerto Rico
     Arthur R. Gonzáles, Member, Financial Oversight and Management Board for Puerto Rico
     José R. Gonzáles, Member, Financial Oversight and Management Board for Puerto Rico
     Ana J. Matosantos, Member, Financial Oversight and Management Board for Puerto Rico
     David A. Skeel Jr., Member, Financial Oversight and Management Board for Puerto Rico
     Christian Sobrino Vega, Governor's Representative, Financial Oversight and Management Board for Puerto Rico