

# THE NEED TO PROMOTE AND DEFEND
# FAIR AND IMPARTIAL COURTS

A sequel to *Judicial Independence:*
*A Cornerstone of Democracy Which Must Be Defended (2006)*

Task Force on Judicial Independence

Approved by the Board of Regents
March 2019

# MISSION STATEMENT OF THE
# AMERICAN COLLEGE OF TRIAL LAWYERS

The American College of Trial Lawyers is an invitation only fellowship of exceptional trial lawyers of diverse backgrounds from the United States and Canada. The College thoroughly investigates each nominee for admission and selects only those who have demonstrated the very highest standards of trial advocacy, ethical conduct, integrity, professionalism and collegiality. The College maintains and seeks to improve the standards of trial practice, professionalism, ethics, and the administration of justice through education and public statements on important legal issues relating to its mission. The College strongly supports the independence of the judiciary, trial by jury, respect for the rule of law, access to justice, and fair and just representation of all parties to legal proceedings.

◆ ◆ ◆

*"In this select circle, we find pleasure and charm in the illustrious company of our contemporaries and take the keenest delight in exalting our friendships."*

—Hon. Emil Gumpert,
Chancellor-Founder, ACTL

American College of Trial Lawyers
1300 Dove Street, Suite 150
Newport Beach, California  92660
Telephone: (949) 752-1801
Website: www.actl.com
Email: nationaloffice@actl.com

Copyright © 2019
American College of Trial Lawyers
All Rights Reserved.

# AMERICAN COLLEGE OF TRIAL LAWYERS

## CHANCELLOR-FOUNDER
Hon. Emil Gumpert
(1895-1982)

## OFFICERS
**JEFFREY S. LEON, LSM**, *President*
**DOUGLAS R. YOUNG**, *President-Elect*
**RODNEY ACKER**, *Treasurer*
**MICHAEL L. O'DONNELL,** *Secretary*
**SAMUEL H. FRANKLIN**, *Immediate Past President*

## BOARD OF REGENTS

| | |
|---|---|
| **SUSAN S. BREWER**<br>Morgantown, West Virginia | **PAUL J. HICKEY**<br>Cheyenne, Wyoming |
| **JOE R. CALDWELL, JR.**<br>Washington, District of Columbia | **LARRY H. KRANTZ**<br>New York, New York |
| **JOHN A. DAY**<br>Brentwood, Tennessee | **MARTIN F. MURPHY**<br>Boston, Massachusetts |
| **RICHARD H. DEANE, JR.**<br>Atlanta, Georgia | **DANIEL E. REIDY**<br>Chicago, Illinois |
| **MONA T. DUCKETT, Q.C.**<br>Edmonton, Alberta | **MICHAEL J. SHEPARD**<br>San Francisco, California |
| **KATHLEEN FLYNN PETERSON**<br>Minneapolis, Minnesota | **ROBERT K. WARFORD**<br>Riverside, California |
| **SANDRA A. FORBES**<br>Toronto, Ontario | **ROBERT E. WELSH, JR.**<br>Philadelphia, Pennsylvania |
| **THOMAS M. HAYES III**<br>Monroe, Louisiana | |

_____

DENNIS J. MAGGI, CAE, Executive Director

# AMERICAN COLLEGE OF TRIAL LAWYERS

## PAST PRESIDENTS

1950-51 EMIL GUMPERT*
Los Angeles, California

1951-52 C. RAY ROBINSON*
Merced, California

1952-53 CODY FOWLER*
Tampa, Florida

1953-54 E. D. BRONSON*
San Francisco, California

1954-55 CODY FOWLER*
Tampa, Florida

1955-56 WAYNE E. STICHTER*
Toledo, Ohio

1956-57 JESSE E. NICHOLS*
Oakland, California

1957-58 LEWIS C. RYAN*
Syracuse, New York

1958-59 ALBERT E. JENNER, JR.*
Chicago, Illinois

1959-60 SAMUEL P. SEARS*
Boston, Massachusetts

1960-61 LON HOCKER*
Woods Hole, Massachusetts

1961-62 LEON JAWORSKI*
Houston, Texas

1962-63 GRANT B. COOPER*
Los Angeles, California

1963-64 WHITNEY NORTH SEYMOUR*
New York, New York

1964-65 BERNARD G. SEGAL*
Philadelphia, Pennsylvania

1965-66 EDWARD L. WRIGHT*
Little Rock, Arkansas

1966-67 FRANK G. RAICHLE*
Buffalo, New York

1967-68 JOSEPH A. BALL*
Long Beach, California

1968-69 ROBERT W. MESERVE*
Boston, Massachusetts

1969-70 HON. LEWIS F. POWELL, JR.*
Washington, District of Columbia

1970-71 BARNABAS F. SEARS*
Chicago, Illinois

1971-72 HICKS EPTON*
Wewoka, Oklahoma

1972-73 WILLIAM H. MORRISON*
Portland, Oregon

1973-74 ROBERT L. CLARE, JR.*
New York, New York

1974- AUSTIN W. LEWIS*
New Orleans, Louisiana

1975-76 THOMAS E. DEACY, JR.*
Kansas City, Missouri

1976-77 SIMON H. RIFKIND*
New York, New York

1977-78 KRAFT W. EIDMAN*
Houston, Texas

1978-79 MARCUS MATTSON*
Los Angeles, California

1979-80 JAMES E. S. BAKER*
Chicago, Illinois

1980-81 JOHN C. ELAM*
Columbus, Ohio

1981-82 ALSTON JENNINGS*
Little Rock, Arkansas

1982-83 LEON SILVERMAN*
New York, New York

1983-84 GAEL MAHONY*
Boston, Massachusetts

1984-85 GENE W. LAFITTE*
New Orleans, Louisiana

1985-86 GRIFFIN B. BELL*
Atlanta, Georgia

1986-87 R. HARVEY CHAPPELL, JR.*
Richmond, Virginia

1987-88 MORRIS HARRELL*
Dallas, Texas

1988-89 PHILIP W. TONE*
Chicago, Illinois

1989-90 RALPH I. LANCASTER, JR.*
Portland, Maine

1990-91 CHARLES E. HANGER*
San Francisco, California

1991-92 ROBERT B. FISKE, JR.
New York, New York

1992-93 FULTON HAIGHT*
Santa Monica, California

1993-94 FRANK C. JONES*
Atlanta, Georgia

1994-95 LIVELY M. WILSON*
Louisville, Kentucky

1995-96 CHARLES B. RENFREW*
San Francisco, California

1996-97 ANDREW M. COATS
Oklahoma City, Oklahoma

1997-98 EDWARD BRODSKY*
New York, New York

1998-99 E. OSBORNE AYSCUE, JR.
Charlotte, North Carolina

1999-2000 MICHAEL E. MONE
Boston, Massachusetts

2000-2001 EARL J. SILBERT
Washington, District of Columbia

2001-2002 STUART D. SHANOR
Roswell, New Mexico

2002-2003 WARREN B. LIGHTFOOT
Birmingham, Alabama

2003-2004 DAVID W. SCOTT, Q.C.*
Ottawa, Ontario

2004-2005 JAMES W. MORRIS, III*
Richmond, Virginia

2005-2006 MICHAEL A. COOPER
New York, New York

2006-2007 DAVID J. BECK
Houston, Texas

2007-2008 MIKEL L. STOUT
Wichita, Kansas

2008-2009 JOHN J. (JACK) DALTON
Atlanta, Georgia

2009-2010 JOAN A. LUKEY
Boston, Massachusetts

2010-2011 GREGORY P. JOSEPH
New York, New York

2011-2012 THOMAS H. TONGUE
Portland, Oregon

2012-2013 CHILTON DAVIS VARNER
Atlanta, Georgia

2013-2014 ROBERT L. BYMAN
Chicago, Illinois

2014-2015 FRANCIS M. WIKSTROM
Salt Lake City, Utah

2015-2016 MICHAEL W. SMITH
Richmond, Virginia

2016-2017 BARTHOLOMEW J. DALTON
Wilmington, Delaware

2017-2018 SAMUEL H. FRANKLIN
Birmingham, Alabama

* Deceased

# Task Force on Judicial Independence

### Chairperson

### Kathleen M. Trafford
Columbus, OH

### Vice Chairperson
### John Robbins Wester
Charlotte, NC

### Members

### Robert L. Byman
Chicago, IL

### Colin L. Campbell, Q.C.
Toronto, ON

### Barry Coburn
Washington, DC

### David V. Harbach II
Richmond, VA

### Olivier F. Kott, Ad. E.
Montreal, QC

### Roberto Martinez
Coral Gables, FL

### A. Howard Matz
Los Angeles, CA

### Virginia C. Nelson
Coronado, CA

### Kent E. Thomson
Toronto, ON

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................................... 1

Current and Continuing Threats to Judicial Independence ...................................... 2

    *Presidential Disparagement of Judges, the Courts and the Rule of Law* ................. 2

    *State Legislatures Threaten to Curtail Judicial Authority* ...................................... 4

    *Executive Encroachment at the State Level* ......................................................... 5

    *Lack of Resources Undermines the Full and Fair Functioning of the Courts* ............ 5

    *Denigrating Personal Attacks on Judges Undermine the Public's Confidence in the
Fairness and Impartiality of the Courts* ............................................................... 6

The Canadian Perspective ....................................................................................... 7

Conclusion .............................................................................................................. 9

Citations to Referenced Source Materials ............................................................... 11

# THE NEED TO PROMOTE AND DEFEND
# FAIR AND IMPARTIAL COURTS

**Introduction**

In 2006 the College published a report, "*Judicial Independence: A Cornerstone of Democracy Which Must Be Defended*."  In this report, the College gave perspective to the deep roots that judicial independence occupies in the founding documents of our democracy.  The College defined "judicial independence" to mean that "judges should decide cases, faithful to the law, without 'fear or favor' and free from political or external pressures."  The 2006 Report offered historical and contemporaneous examples of how the legislative and executive branches – and even the public – threaten the judicial branch's freedom from external pressures that would compromise its role in our democracy.  The report called for action by the College, lawyers, and professional organizations to assure the public is fully informed of the critical role of the judiciary and to respond to threats to judicial independence wherever they occur.

In this report, the College looks back at the past decade to evaluate the collective efforts of the College and others in our profession to meet the goals the 2006 Report set out.  This report complements the 2006 Report.  The two reports should be considered together for a broader understanding of the importance of fair and impartial courts throughout our history as well as today.

This report concludes that the threat level to fair and impartial courts in the United States rose over the past decade.  The threats have increased in volume – both number and pitch – and at both the federal and state levels.  We recognize that the preceding decade saw significant social changes that carried significant impact for public and political discourse in several contexts.  There is little question that America is more polarized and its politicians and citizens have become less civil in their discourse in the past decade.  Likewise, the national conversation, often dominated by sound bites and social media tweets, has diminished the thoughtful exchange of information and opinion.  These facts, however, offer no solace.

The Founders envisioned judicial independence as a singular benefit for our citizens, all of whom are entitled to the fair and impartial administration of justice consistent with the rule of law.  As one constitutional scholar points out:

> Modern presidents and Congresses have awesome powers affecting our lives, fortunes and freedoms.  It follows that federal courts need the independence and respect to not only review presidential orders and federal legislation, but also to declare them invalid.

The statement has equal application to state executives, legislatures and courts. All citizens need, and have the right to expect, the rule of law to be fairly applied by impartial judges, especially now when there is so much dissonance in our social and political environments.

In sharp contrast to the courts, legislatures are political bodies elected to represent the views of their constituents who are often pushing fiercely-held beliefs and controversial issues. We are

witnessing a polarized passage in America's history, one that is driving more and more high-voltage policy issues into litigation in our courts. This polarized environment makes the need to protect the independence of the judiciary that much greater. As Chief Justice John Roberts remarked in October 2018, the judicial branch is, and must be, distinct from the representative branches that speak for the people. That is so because judges "do not speak for the people, but we speak for the Constitution. Our role is very clear. We are to interpret the Constitution and laws of the United States, and to ensure that the political branches act within them. That job obviously requires independence from the political branches." Citing to *Brown v. Board of Education* and *West Virginia v. Barnette*, the Chief Justice noted "the story of the Supreme Court would be very different without that sort of independence."

For these reasons, the College must reaffirm and redouble its commitment to protecting fair and impartial courts. It must do more than "going on the record." The College must reach out beyond our Fellows and beyond our profession. The College must use its voice to educate politicians and the public on how and why the judiciary's independence from the legislative and executive branches is essential to safeguarding the liberty of our citizens. The College must be proactive to counteract the negativity and misinformation that are undermining the public's confidence in the courts. Doing so will demand vigilance and prompt denunciation of statements or actions demeaning the judiciary. Retired Justice Sandra Day O'Connor reminds us: "Judicial independence doesn't happen all by itself. It's tremendously hard to create and easier than most people imagine to destroy."

**Current and Continuing Threats to Judicial Independence**

Criticism of the judiciary comes in many forms. Some critiques reflect the normal, salutary expression of opinion enshrined in the constitutional rights of the People and woven into the history of our nation. Some critiques, by contrast, are improper, cynical, and destructive. We should welcome and encourage vigorous public engagement, expression and dissent, while remaining vigilant against unfounded diatribes that diminish confidence in the fairness and integrity of our judiciaries. The following are recent examples of such threats to judicial independence.

### *Presidential Disparagement of Judges, the Courts and the Rule of Law*

During the last two years, a historically uncommon kind of criticism emerged in repeated presidential denunciations of judges and of the judicial system. To be sure, the President has the right to disagree with and to criticize a judicial ruling. President Trump has not stopped, however, at criticizing rulings. He has attacked the judicial system and leveled personal attacks on individual judges.

Before he took office, Candidate Trump attacked United States District Judge Gonzalo Curiel based on the judge's ethnic background, pronouncing him incapable of fairly deciding a fraud case against Trump University because the judge was "Mexican" and Latinos opposed Mr. Trump's promise to build a border wall. He called Judge Curiel a "hater of Donald Trump" and demanded that the court system look into Judge Curiel because "what Judge Curiel is doing is a total disgrace."

Soon after the election, President Trump attacked United States District Court Judge James Robart, for his decision enjoining the President's executive order banning immigration from predominantly Muslim countries. He labeled Judge Robart a "so-called judge" whose opinion "takes enforcement away for our country and is 'ridiculous.'" He accused Judge Robart of "putting our country in such peril. If something happens blame him and the court system."

When United States District Judge William Orrick enjoined the administration's attempt to deny federal funding to sanctuary cities, the President proclaimed: "This case is yet one more example of egregious overreach by a single, unelected district judge." . . . . "Today's ruling undermines faith in our legal system and raises serious questions about circuit shopping."

President Trump has tweeted: "Our legal system is broken," declaring that terrorist attacks on American soil were not surprising because the American judicial system is a "joke" and "laughingstock."

The President's tweets have focused often on the federal courts of the Ninth Circuit, with comments such as: "We have a big country. We have lots of locations. But they immediately run to the Ninth Circuit . . . that's like a semi-automatic. . . . You have to see, take a look at how many times they been overturned with their terrible decisions. Take a look. And that is what we have to live with." He also chastised the Chief Justice of the Supreme Court for creating "total turmoil" throughout the country by not doing "the right thing" in not voting to overturn the Affordable Care Act.

President Trump escalated his campaign to politicize the judiciary as the American public prepared to celebrate our day of Thanksgiving for the privilege of living in our great democracy. Angry with the decision of United States District Court Judge Jon Tigar enjoining the President's effort to deny asylum to migrants entering the United States illegally, the President disparaged Judge Tigar as "an Obama Judge." He then repeated his now familiar exhortation that the Ninth Circuit is "a disgrace," warning he would make sure "it is not going to happen like this anymore." Chief Justice Roberts immediately responded to the President's attempt to politicize the judiciary: "We do not have Obama judges or Trump judges. Bush judges or Clinton judges. What we have is an extraordinary group of individual judges doing their level best to do equal right to those appearing before them. That independent judiciary is something we all should be thankful for." The College applauded the Chief Justice's response pointing out that the President's "political characterization of judges is an affront to the fundamental principle of judicial independence that cannot be ignored."

Through his recurring attacks on judges who rule against his policies, President Trump undermines our citizens' faith in a fair and impartial judiciary. His ridiculing individual judges displays contempt for the rule of law that our nation's judges – like the President – have sworn to uphold.

To be sure, previous presidents have expressed differences with the courts. Presidents Lincoln, Nixon, Bush, and Obama, for example, also spoke out when they disagreed with decisions that appeared to limit their authority or curtailed their policies. When stating their disagreement with a particular ruling, however, these Presidents conveyed their support and respect for the independence

of the judiciary.  President Trump has attacked the integrity of judges and the legitimacy of the judicial system.  As Trump-nominee, now Supreme Court Justice Gorsuch observed, the President's comments against judges and the courts are "disheartening" and "demoralizing."

### *State Legislatures Threaten to Curtail Judicial Authority*

Legislative authority includes the power to enact, amend or repeal a statute after a court has interpreted the law in a way the legislature disagrees with, thereby requiring a different result in future cases. That is an appropriate legislative response and function.  Such authority also includes the power to revise the jurisdiction of the courts so long as such enactments do not prevent the judicial branch from accomplishing its core constitutional functions.  The exercise of legitimate legislative powers, in itself, does not present a threat to the judiciary.

But there is a fundamental, critical distinction between the exercise of legitimate power, wise or unwise, and the improper use of such power.  If Congress, responding to an unpopular decision, were to threaten a federal judge with impeachment proceedings, Congress would have gone too far. The Constitution permits impeachment of federal judges only in cases of "treason, bribery or other high crimes and misdemeanors." U.S. Constitution, Art. II, Section 4. Similar "for cause" language appears in virtually every state constitution.  An unpopular, unsound or even blatantly erroneous opinion — indeed even a series of such opinions — do not make for an impeachable offense.  The law sometimes demands unpopular outcomes.  A judge who is weighing approval by the legislature or the popular will, rather than focusing on what the law demands, has surrendered at least some independence.

In recent years, we have seen repeated attempts by state legislators in numerous states to remove judges solely because of their disagreement with a particular opinion.  2011 was a watershed year for legislative attempts to impeach sitting judges based solely on legislators' disagreement with the judge's ruling in a particular case. Several state legislators introduced impeachment or removal bills against sitting judges in Iowa, Massachusetts, Missouri, New Hampshire, New Jersey, and Oklahoma.  In 2018, legislation was introduced to impeach five Pennsylvania Supreme Court justices for their decision striking down the Commonwealth's redistricting map.  This same year several Massachusetts lawmakers introduced a petition to impeach a state trial judge for granting probation to an immigrant guilty of drug dealing.

Of course, voters in states that elect judges have the power to remove judges simply because they disagree with even a single decision.  Consider, for example, the ouster of three Iowa Supreme Court justices for their decision allowing gay marriages and the recall of a California state court judge for an unpopular sentencing decision in a high profile case. These examples do not conflict with the constitutional principle of separation of powers because the electorate removed the judges at the ballot box. But they present a concern, nevertheless, because in both instances the judges' removal resulted solely from a majoritarian disagreement with a single lawful decision.

The Iowa justices lost their retention elections in 2010 for recognizing a same-sex couple's constitutional right to marry – a right the United States Supreme Court later recognized in *Obergefell v. Hodges*.  Likewise, a majority of California voters (59%) recalled Judge Aaron Persky because they believed he was too lenient in sentencing a criminal defendant, even though he gave

the sentence the county probation department recommended.  The district attorney who prosecuted the case "vehemently opposed" the light sentence, but later explained why he opposed the recall. "Subjecting judges to recall when they follow the law and do something unpopular undermines judicial independence. When judges believe that they will lose their careers for making unpopular but lawful decisions, they may lack the courage to stand up for the rights of minorities or others needing protection from powerful majorities." As Chief Justice Roberts reminded us, judges are not representatives of the people; they are not supposed to speak for the people.  Their role is to speak for the Constitution; they do so by fairly and impartially applying the law.

There have been other more subtle legislative threats in play in recent years.  The Brennan Center for Justice reports that 41 bills introduced in 15 state legislatures in 2017 sought to politicize, limit or control state courts and judges.  The Center found that during 2018 legislators in 16 states introduced 46 bills that would diminish the role or independence of the courts. This 2018 "state crop" included bills that would: change how judges are selected, in most cases injecting greater politics into the process; make it easier to remove judges for unpopular decisions; reduce judicial resources or exert more control over courts in exchange for resources; shorten judicial terms; or restrict the courts' power to find legislative acts unconstitutional.

Although overt legislative assaults on the judiciary have had little success thus far as final measures, it would be shortsighted to underestimate their potential.  The message that such attempted measures send conflicts with the fundamental principle of separation of powers. Likewise, such measures confuse the public as to the singular, apolitical role of the judiciary in our Constitutional democracy.  Efforts to push the judiciary to factor politics and popular opinion into their decision-making are real threats with real consequences.

### *Executive Encroachment at the State Level*

Although state executives have less ability than legislatures to intrude on the judiciary, they have incited the legislative branch to encroach upon the judiciary on their behalf. The most familiar tack has been through intemperate personal attacks and advocating for the removal of judges who decide cases opposing the executives' initiatives or interests. Governors also have used their role in the state budgeting and appropriations process to exert control over the judiciary.  In June 2015, the Governor of Kansas signed a bill stripping the courts of funding if a court invalidated legislation limiting the power of the state supreme court to appoint chief district court judges.  This measure retaliated for a supreme court decision ordering the legislature to increase funding for public education. (After the supreme court declared unconstitutional the chief judge appointment law, the governor signed a bill repealing the offending court-defunding law.)  In his 2019 budget proposal, the Governor of New York proposed to condition an increase in funding for the state courts on a requirement that the state's 1,250 judges certify each month that their court was open and functioning for 40 hours each week, such certifications to be audited by the state controller. (The state legislature rejected the Governor's proposal.)

### *Lack of Resources Undermines the Full and Fair Functioning of the Courts*

The failure to fund a court system adequately, whether through neglect or from deliberate starvation by those controlling the purse strings, presents another major threat to judicial

independence.  The current decade gave the courts some good news while it also displayed some tough challenges.

Good news first.  The College's 2006 Report identified, as an assault on judicial independence, the erosion of federal judicial salaries due to infrequent pay raises that failed even to keep pace with inflation.  The picture improved as a result of the Federal Circuit Court's holding in *Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012), *cert. denied*, 133 S.Ct. 1997, that the denial of certain cost-of-living adjustments to judges violated the Compensation Clause and its order that federal judicial salaries be reset to recoup the missed adjustments.  Judicial salaries increased by 14% in 2014 and have almost kept pace with inflation through 2018.  For 2018, district court judges earned $208,000, circuit court judges, $220,600, and Supreme Court justices, $253,000. That said, however, the level of compensation still requires those willing to serve in the judiciary, and their families, to sacrifice the financial benefits they likely would enjoy in the private sector.

By contrast, during the past decade, state courts faced significant financial challenges. The Great Recession drastically slashed state court funding across the United States, causing significant staff reductions and darkened courthouses, imperiling access to justice. The National Center for State Courts reported that courts in two-thirds of the states experienced a decrease in state funding in 2010 and 60 percent experienced a decrease in 2011.  A Fall 2016 NCSC survey revealed that state court funding had "somewhat improved, but the courts are still struggling." More than half the states responding to the survey reported being in better shape than they were at the start of the Great Recession, but a third reported being in worse shape.

The overall funding of state courts – judicial, staff and clerks' compensation – moves under the radar of public awareness and merits our significant attention.

### *Denigrating Personal Attacks on Judges Undermine the Public's Confidence in the Fairness and Impartiality of the Courts*

Criticism of a judge or judicial decision may or may not be valid, but it is never, in and of itself, a threat to judicial independence.  When a judge issues an unpopular ruling, he or she can anticipate, and should expect some criticism. The late Chief Justice William Rehnquist once said that criticism of judges and their decisions "is as old as our Republic" and can be a healthy part of the balance of power among the branches of government. Such legitimate criticism can come from many sources – public officials, law professors and lawyers, political commentators, interest groups, the media, and private citizens.  Disagreement – even harsh disagreement – with a judicial ruling or rationale demonstrates the strength of our democracy.  When criticism escalates, however, to *ad hominem* attacks against individual judges or broadside attacks on the judiciary generally, that criticism crosses a bright line.

There are some instances in which judges and judicial candidates become complicit in undermining the integrity of the judiciary by condoning negative campaign advertising in contested elections.  The common feature of such advertising is the intentional depiction of an opponent as biased or corrupted by special interest.  Hotly contested judicial races have become the norm in some states. All too frequently, these races create and reinforce a perception that judges are only politicians in robes who will be influenced by the funds raised and spent to finance their campaigns.

The Brennan Center reports in The Politics of Judicial Elections that $38.4 million was spent on state supreme court elections in 2009-10.  $70 million was spent in the 2015-2016 cycle – a 53% increase over the average amount, adjusted for inflation, spent in the preceding three election cycles.  Over the last four cycles, the percent of funding raised by outside interest groups (in contrast to funds raised by the candidate, individual supporters or a political party) increased from 17.5% to 26.2%, 30% and 40%, respectively. However fair and impartial a state judge may be, the perceived existence of "justice for sale" undermines the public's confidence in the court's impartiality.  The Brennan Center reports: "Polling shows that 95 percent of the public believes campaign spending influences how judges rule in cases."  Whether or not the perception is valid, its existence demonstrates a major threat to the integrity of our justice system. Retired Justice O'Connor summarized the core risk embedded in this issue: "The mere appearance of impropriety and partiality is enough to shake the foundation of our judiciary." *Thoughts on Safeguarding Judicial Independence*, Litigation, Vol. 35, No. 3, p. 9, American Bar Association, Spring 2009.

**The Canadian Perspective**

The Canadian judicial system shares the same heritage and many of the traditions and processes found in the United States.  Judicial independence is a cornerstone of Canadian democracy, and, as in the States, is intended for the benefit of the People, not for the benefit of judges.

In a speech delivered in October 2018 by Justice Abella of the Supreme Court of Canada in honour of the 70th anniversary of the Supreme Court of Israel, she emphasized the crucial importance of judicial independence not only in Canada, but also in other countries including Israel. Justice Abella observed that "an attack on the independence of a court anywhere is an attack on all courts."  She warned of the potential consequence associated with undermining the strength and legitimacy of the judiciary, including by deliberate attempts to undermine public confidence in the integrity of members of the judiciary and the use of "hyperbolic rhetoric" to criticize unpopular decisions:

What have I learned about judicial independence from Canada's experience? I learned that democracy is strengthened in direct proportion to the strength of rights protection and an independent judiciary, and that injustice is strengthened in direct proportion to their absence.  A Supreme Court must be independent because it is the final adjudicator of which contested values in a society should triumph.  In a polarized society, it is especially crucial to have an institution whose only mandate is to protect the rule of law.

The Canadian Judicial Council (CJC), which consists of the Chief Justices and Associate Chief Justices of the Superior Courts in each Province and Territory as well as the Federal Court and the Supreme Court of Canada, provides in its "Ethical Principles for Judges" the following guideline:

An independent judiciary is the right of every Canadian. A judge must be and seen to be free to decide honestly and impartially on the basis of the law and the evidence, without external pressure or influence and without fear of interference from anyone.

Judges should be encouraged and uphold arrangements and safeguards to maintain and enhance the institutional and operational independence of the Judiciary.

Canada, however, is underrepresented in this report, and for good reason. At the present time Canada rests in a much more comfortable place when it comes to the guarantee of the right to fair and impartial courts. Although one can find isolated examples of threats to the security and independence of the Canadian judiciary over the past twenty-five years, the current relationship among the federal government, provincial governments and the judiciary is with a few rare exceptions harmonious. It would be easy to say that the differences between Canadians and their stateside neighbors stem from the Canadians' reputation for politeness, tactfulness and tolerance. But the more likely explanation is that there are important structural differences between the nations, particularly regarding the appointment and discipline process for judges.

In the Superior Courts in each of the Provinces and Territories (which are the only courts of general jurisdiction), judges are appointed by the Minister of Justice of Canada following consultation with the Province in which the judge will sit. The administration of justice is funded in large part by the Provinces and Territories. They provide the courthouses, court staff and the associated resources for those offices. Each Province or Territory has at least one appointment committee composed of eight persons, including legal and community representatives, and chaired by a judge. Each committee classifies applicants as being highly recommended, recommended or unable to recommend.

From the pool of confidentially recommended names, the federal Minister of Justice, with further consultation with the appropriate Chief Justice, appoints an individual suited to the needs of the particular court with respect to language, legal background, and considerations of diversity. There are no judicial elections, and no campaigns for the election, or appointment of Superior Court judges. Rather, they hold office (unless they retire, become infirmed or are removed for misconduct) until their mandatory retirement age of 75. The salary and benefits of judges in Canada are in most instances significantly higher than those of their U.S. Colleagues.

The Supreme Court of Canada process is somewhat different. The Supreme Court of Canada consists of nine judges, including the Chief Justice of Canada, who are appointed by the Governor in Council and all of whom must have been either a judge of a superior court or a member of at least ten years' standing of the bar of a province or territory. Of the nine, the Supreme Court Act requires that three be appointed from Quebec. Traditionally, the Governor in Council has appointed three judges from Ontario, two from the Western provinces or Northern Canada and one from the Atlantic provinces. Recently, appointees have appeared before a Parliamentary Committee before confirmation of their appointment. Those appearances are largely perfunctory in nature, and largely a non-event. They do not resemble the confirmation process to which appointees to the United States Supreme Court are subjected.

As with the lower courts, the appointment process receives some criticism but for the most part proceeds without strong controversy.

Any complaint regarding a federally-appointed judge goes before the CJC. The ultimate

penalty is removal from the bench and this requires an address before both Houses of Parliament. There has only been one such removal in Canada's history, but a number of judges have resigned following such a recommendation from the CJC.

Largely due to these structural differences, the relationship between the executive branch and the Canadian judiciary is traditionally respectful and harmonious.  Two recent departures from that tradition, however, must be noted.

In 2014, the Canadian Prime Minister publicly and wrongfully attacked Chief Justice Beverly McLachlin, accusing her of improperly lobbying against the appointment of a Justice of the Federal Court to the Supreme Court when his eligibility for that office was a matter that would come before the high court.  The College issued a public statement in defense of Chief Justice McLachlin and the Geneva-based International Commission of Jurists issued an opinion stating: "the criticism [of Justice McLachlin] was not well founded and amounted to an encroachment upon the independence of the judiciary and integrity of the chief justice."

This past year Ontario Premier Doug Ford invoked a section of the Canadian Charter of Rights and Freedoms known as the "notwithstanding clause," to override a judicial decision that held legislation he proposed to radically reduce the size of the Toronto City Council because it violated the Charter's guarantee of freedom of expression.  The notwithstanding clause had rarely been invoked in Canada to revive a law that was struck down by a court, and had never been invoked by the Government of Ontario.  In defending his action, Premier Ford argued that he was preserving the will of the people and protecting the electorate from the tyranny of unelected judges. His remarks were met with staunch criticism from a variety of sources, including legal scholars who explained that the "judiciary acts as an independent check on government authority *because* it is unelected, not in spite of it" and "[w]e appoint judges and grant them security of tenure to preserve their impartiality and protect them from political reprisal."

Ultimately, the Court of Appeal for Ontario stayed the decision that prompted the Premier's attack on unelected judges, finding that there was a strong likelihood the decision was erroneous and would be reversed on appeal.  The Toronto City Council elections went forward with the reduced number of wards favored by the Premier.  The outcome illustrates that there is a perfectly acceptable way for governments to challenge a judicial ruling – one that protects the rule of law and respects the democratic legitimacy of the judiciary.

The above are recent examples of the need for prompt response to attacks on the independence of the Canadian judiciary, and of the role the College can play in its protection.

**Conclusion**

During the past decade, numerous prestigious organizations, as well as individual lawyers and judges, have devoted significant energy to educating the public and politicians about the need for judges to be free to decide cases based solely upon the rule of law, unconstrained by external pressures or fear of reprisals.  Yet in 2018 the assaults on judicial independence have become more frequent and more threatening than ten years ago.  These assaults now emanate from a broad range of public officials, including those at the highest levels of our state and national governments, from

officials who have taken an oath to defend our Federal and state constitutions.  They have passed beyond rhetorical salvos into concrete actions.

An October 2018 poll of sitting judges conducted by the National Judicial College showed that nine out of 10 judges believe judicial independence is under siege.  The judges identify false or misleading media reports, attacks through social media, recall elections triggered by unpopular rulings, and coercive budget cuts as leading elements of this siege.  The obvious conclusion is more must be done.  Reacting to individual threats as they occur will not be adequate.  Writing reports to explain the importance of fair and impartial courts is salutary, but it will not be sufficient.

We as a profession must find new resolve and creative measures to promote – not just defend – the role of the judiciary and to safeguard fair and impartial courts.  We must bring the message into the open forum of ideas, not expecting others to seek out what we have to say.  As lawyers we are professional advocates and we must, as our ethical code requires, apply our special skills to "further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority." The greatest threat to judicial independence may well be ignorance about the role of the judiciary.

We need to bring together and maximize the best resources of our profession to promote judicial independence.  The College holds a unique position to stand with and support national organizations speaking directly on behalf of the judiciary.  At the same time the College encourages its Fellows to become actively engaged in meaningful ways at the state and local level. For its part, the College will seek to identify or provide the resources and strategies to assure they are successful.

Our efforts to educate the public, the politicians, and the media about the role of the judiciary and the importance of fair and impartial courts must appreciate that there are multiple audiences taking in and processing information in diverse ways.  We must take up the public education task with the long view in mind and incorporate multiple communication strategies.  The risks are too real and the stakes are too high for anything less.  If our courts are devalued, we will have witnessed a devaluation of the rule of law itself.

## CITATIONS TO REFERENCED SOURCE MATERIALS

p. 1    <u>2006 Report</u>
*Judicial Independence: A Cornerstone of Democracy Which Must Be Defended*,
American College of Trial Lawyers, 2006
https://www.actl.com/docs/default-source/default-document-library/position-statements-and-white-papers/actl_judicial_independence_a_cornerstone_of_democracy.pdf?sfvrsn=4

<u>Constitutional Scholar</u>
*It's OK to criticize judges, but not to delegitimize them.*
Op-Ed by Glenn C. Smith (April 26, 2017)
http://www.latimes.com/opinion/op-ed/la-oe-smith-judicial-respect-20170426-story.html

p. 2    <u>Chief Justice Roberts</u>
*Remarks at the University of Minnesota Law School*, October 16, 2018
https://www.c-span.org/video/?451977-1/chief-justice-roberts-stresses-supreme-courts-independence-contentious-kavanaugh-hearings&start=0

<u>Retired Justice O'Connor</u>
*Remarks on Judicial Independence* (September 9, 2005), 58 Fla. L. Rev. 1 (2006)
http://www.floridalawreview.com/2010/sandra-day-oconnor-remarks-on-judicial-independence/

<u>Judge Gonzalo Curiel</u>
*Trump's attacks on Judge Curiel are still jarring to read*, Z. Byron Wolf, CNN (February 27, 2018)
https://www.cnn.com/2018/02/27/politics/judge-curiel-trump-border-wall/index.html

p. 3    <u>Judge John Robart</u>
*American College of Trial Lawyers' Statement* (February 5, 2017)
https://www.actl.com/docs/default-source/default-document-library/press-releases/2017_actl_response_to_trump_federal_judge.pdf?sfvrsn=4

<u>Judge William Orrick</u>
*Trump attacks judiciary for blocking order on sanctuary cities*,
Louis Nelson, POLITICO (April 26, 2017)
https://www.politico.com/story/2017/04/26/trump-tweets-sanctuary-cities-237620

<u>Legal System Tweets</u>
*In His Own Words: The President's Attacks on the Courts*,
Brennan Center for Justice (June 5, 2017)
https://www.brennancenter.org/analysis/his-own-words-presidents-attacks-courts

Judge Jon Tigar
*Trump Takes Aim at Appeals Court, Calling It a Disgrace*, Adam Liptak,
The New York Times (November 20, 2018)
https://www.nytimes.com/2018/11/20/us/politics/trump-appeals-court-ninth-circuit.html

Chief Justice Roberts' Response
*Chief Justice Defends Judicial Independence After Trump Attacks "Obama Judge,"* Adam
Liptak, The New York Times (November 21, 2018)
https://www.nytimes.com/2018/11/21/us/politics/trump-chief-justice-roberts-rebuke.html

ACTL College Statement
*American College of Trial Lawyers Statement* (November 21, 2018)
https://www.actl.com/detail/news/2018/11/21/actl-issues-statement-in-support-of-response-
by-chief-justice-john-roberts-to-remarks-by-president-trump-concerning-federal-judiciary

President Lincoln
*Speech on the Dred Scott Decision* (June 26, 1857)
http://www.virginia.edu/woodson/courses/aas-hius366a/lincoln.html

President Nixon
*Nixon, The Supreme Court, And Busing*, Evan Vassar, The Nixon Foundation
 (April 2, 2015)
https://www.nixonfoundation.org/2015/04/nixon-the-supreme-court-and-busing/

President Bush
*Justices, 5-4, Back Detainee Appeals for Guantanamo*, Linda Greenhouse,
The New York Times (June 13, 2008)
https://www.nytimes.com/2008/06/13/washington/13scotus.html?mtrref=www.brennancenter.
org&auth=login-email

President Obama
*Statement by the Press Secretary on* State of Texas v. United States of America
The White House (February 17, 2015)
https://obamawhitehouse.archives.gov/the-press-office/2015/02/17/statement-press-secretary-
state-texas-v-united-states-america

p. 4.   Supreme Court Justice Gorsuch
*Supreme Court Nominee Calls Trump's Attacks on the Judiciary "Demoralizing,"*
Julie Hirschfeld Davis, The New York Times (February 8, 2018)
https://www.nytimes.com/2017/02/08/us/politics/donald-trump-immigration-ban.html

Impeachment Proceedings
*Rehnquist Joins Fray on Rulings, Defending Judicial Independence*, Linda Greenhouse, The
New York Times (April 10, 1996)
https://www.nytimes.com/1996/04/10/us/rehnquist-joins-fray-on-rulings-defending-judicial-
independence.html

State Legislative Attempts
*Focus: Removal from Office for Specific Decisions*, Gavel to Gavel, National Center for State
Courts (December 2010)
https://www.ncsc.org/~/media/Microsites/Files/Gavel%20to%20Gavel/archived%20
pdfs/G%20to%20G%20Special%20Impeachment.ashx

2011 Impeachment/Removal Bills
*2011 Year in Review: Record number of impeachment attempts against judges for their
decision*. Gavel to Gavel, National Center for State Courts
 (December 27, 2011)
http://gaveltogavel.us/2011/12/27/2011-year-in-review-record-number-of-impeachment-
attempts-against-judges-for-their-decisions/

Pennsylvania Supreme Court Justices
*Impeachment of 5 PA Supreme Court Justices*, House Co-Sponsorship Memorandum, Rep.
Chris Dush (February 5, 2018)
https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm?chamber=H&SPick=
20170&cosponId=25163

Massachusetts Petition
*Mass. law makers turning up the heat on Superior Court Judge Timothy Feeley,* MassLive
(June 6, 2018)
https://www.masslive.com/news/index.ssf/2018/06/mass_lawmakers_turning_up_the.html

Iowa Supreme Court Justices
*Iowa Vote Shows the Injustice of Electing Judges*, Adam Cohen. TIME
(November 10, 2010)
http://content.time.com/time/nation/article/0,8599,2030526,00.html

California State Court Judge
*Voters Recall Aaron Persky, Judge Who Sentenced Brock Turner*,
Richard Gonzales & Camilla Domonoske, The Two-Way, National Public Radio
(June 5, 2018)
https://www.npr.org/sections/thetwo-way/2018/06/05/617071359/voters-are-deciding-
whether-to-recall-aaron-persky-judge-who-sentenced-brock-tur

p. 5   State Bills in 2017
*Assaults on the Courts: A Legislative Round-Up*, Alicia Bannon & Nathaniel Sobel, Brennan
Center for Justice (May 8, 2017)
https://www.brennancenter.org/analysis/assaults-courts-legislative-round

State Bills in 2018
*Legislative Assaults on State Courts - 2018*,
Brennan Center for Justice (March 6, 2018)
https://www.brennancenter.org/analysis/legislative-assaults-state-courts-2018

<u>Personal Attacks</u>
*Matt Bivens rips judge involved in pension case as 'incompetent hack'*,
Tom Loftus, Louisville Courier Journal (May 8, 2018)
https://www.courier-journal.com/story/news/politics/2018/05/08/matt-bevin-blasts-franklin-circuit-judge-incompetent-hack/589605002/

<u>Kansas Bills</u>
*Courts Budget Intensifies Kansas Dispute Over Powers*, John Eligon,
The New York Times (June 6, 2015)
https://www.nytimes.com/2015/06/07/us/courts-budget-intensifies-kansas-dispute-over-powers.html; http://kslegislature.org/li_2016/b2015_16/measures/hb2449/

<u>New York Proposal</u>
*Courts chief: Cuomo's plan for judges' time proof not needed*, Chris Carola, AP News
(January 30, 2018)
https://www.apnews.com/7ebe5330237e47da9f60b57d6d87821f
https://assembly.state.ny.us/Reports/WAM/2018changes/2018changes.pdf

p. 6    <u>Federal Judicial Salaries</u>
*Judicial Compensation*, United States Courts
http://www.uscourts.gov/judges-judgeships/judicial-compensation

<u>State Court Funding</u>
*Funding Justice, Strategies and Messages for Restoring Court Funding*,
Justice At Stake & National Center for State Courts, First Edition 2012
https://www.ncsc.org/~/media/Files/PDF/Information%20and%20Resources/fundingjustice.ashx

<u>National Center for State Courts' Surveys</u>
*Funding Justice*, Daniel J. Hall, The Council on State Governments
(July/August 2017)
https://www.csg.org/pubs/capitolideas/2017_mar_apr/court_funding.aspx

<u>Chief Justice William Rehnquist</u>
*Rehnquist Resumes His Call for Judicial Independence*,
The New York Times, (January 1, 2005)
https://www.nytimes.com/2005/01/01/politics/rehnquist-resumes-his-call-for-judicial-independence.html

<u>Campaign Advertising</u>
*Judges v. Attack Ads – Part Five: A Fair Fight for a Fair Court,* Jess Engebretson,
Life of the Law (November 1, 2016)
http://www.lifeofthelaw.org/2016/11/judges-v-attack-ads/

p. 7    The Politics of Judicial Elections
        *Who Pays for Judicial Races?* Alicia Bannon, Cathleen Lisk & Peter Hardin
        Brennan Center for Justice
        https://www.brennancenter.org/sites/default/files/publications/Politics_of_Judicial_Elections_Final.pdf

        The Brennan Center Poll
        *News Analysis: 2016 Judicial Elections See Secret Money and Heightened Outside Spending*,
        Brennan Center for Justice (September 14, 2016)
        https://www.brennancenter.org/press-release/new-analysis-2016-judicial-elections-see-secret-money-and-heightened-outside-spending

        Judicial Independence in Canada
        *Why Is Judicial Independence Important to You?* Canadian Judicial Council,
        Conseil canadien de la magistrature (May 2016)
        http://www.cjc-ccm.gc.ca/cmslib/general/Why is Judicial Independence Important to You.pdf

        Justice Abella
        *Democracy Needs an Independent Judiciary*, The Globe and Mail
        (October 27, 2018)
        https://ca.rbcwealthmanagement.com/documents/616937/1474986/Globe+%26+Mail+-+Democracy+Needs+an+Independent+Judiciary+-+October+27th+2018.pdf/d3257bb6-0e72-4667-a96a-439028c27614

p. 8    Harmonious Relationship
        *How to criticize a Canadian judge (without undermining democracy)*, Provincial Court of
        British Columbia (September 5, 2017)
        http://provincialcourt.bc.ca/enews/enews-09-05-2017

        Canadians' Reputation
        *Canadian cultural values and beliefs*, Live&Learn (November 21, 2016)
        https://livelearn.ca/article/about-canada/canadian-cultural-values-and-beliefs/

p. 9    Chief Justice Beverly McLachlin
        '*Shocked*': *Retiring chief justice was blindsided by Stephen Harper's public attack*, Kathleen
        Harris & Rosemary Barton, CBC News (December 14, 2017)
        https://www.cbc.ca/news/politics/mclachlin-supreme-court-harper-battle-1.4433283;

        *American College of Trial Lawyers Expresses Support for Chief Justice of Canada*
        (May 14, 2014) https://www.actl.com/docs/default-source/default-document-library/press-releases/2014---actl-issues-letter-of-support-for-chief-justice-mclachlin.pdf?sfvrsn=2;

        *Letter to Dr. Gerald Heckman from Wilder Tayler, Secretary General, International
        Commission of Jurists* (July 23, 2014) https://www.icj.org/wp-content/uploads/2014/07/Canada-JudicialIndependenceAndIntegrity-CIJL-OpenLetter-2014.pdf

Ontario Premier Doug Ford
*Doug Ford, no power grab is worth undermining Canada's solid foundation*,
Marie Henein, The Globe and Mail (September 13, 2018)
https://www.theglobeandmail.com/opinion/article-doug-ford-no-power-grab-is-worth-undermining-canadas-solid/;

*Doug Ford's powers are not limitless – thanks to a system he neither understands or values*,
Carissima Mathen, The Globe and Mail, (September 11, 2018)
https://www.theglobeandmail.com/opinion/article-doug-fords-powers-are-not-limitless-thanks-to-a-system-he-neither/

*Toronto (City) v. Ontario (Attorney Genera)*, 2018 ONCA 761, DKt. C65861 (M49615) and
(M49624) (September 19, 2018)
http://www.ontariocourts.ca/decisions/2018/2018ONCA0761.htm

p. 10   The National Judicial College Poll
*Survey says: 90% of judges think judicial independence is threatened*,
Judicial Edge Today, National Judicial Center (October 9, 2018)
https://www.judges.org/survey-says-90-of-judges-think-judicial-independence-is-threatened/

American College of Trial Lawyers
Phone: 949-752-1801
Website:  www.actl.com
Email: nationaloffice@actl.com