

# JUDICIAL INDEPENDENCE:
# A CORNERSTONE OF DEMOCRACY
# WHICH MUST BE DEFENDED

Approved by the Board of Regents
September 2006

# AMERICAN COLLEGE OF TRIAL LAWYERS

The American College of Trial Lawyers, founded in 1950, is composed of the best of the trial bar from the United States and Canada. Fellowship in the College is extended by invitation only, after careful investigation, to those experienced trial lawyers who have mastered the art of advocacy and those whose professional careers have been marked by the highest standards of ethical conduct, professionalism, civility and collegiality. Lawyers must have a minimum of 15 years' experience before they can be considered for Fellowship. Membership in the College cannot exceed 1% of the total lawyer population of any state or province. Fellows are carefully selected from among those who represent plaintiffs and those who represent defendants in civil cases; those who prosecute and those who defend persons accused of crime. The College is thus able to speak with a balanced voice on important issues affecting the administration of justice. The College strives to improve and elevate the standards of trial practice, the administration of justice and the ethics of the trial profession.

❖ ❖ ❖

*"In this select circle, we find pleasure and charm in the illustrious company of our contemporaries and take the keenest delight in exalting our friendships."*

—Hon. Emil Gumpert,
Chancellor-Founder, ACTL

American College of Trial Lawyers
19900 MacArthur Boulevard, Suite 610
Irvine, California 92612
Telephone: (949) 752-1801
Facsimile: (949) 752-1674
E-mail: nationaloffice@actl.com
Website: www.actl.com

Copyright © 2006
American College of Trial Lawyers
All Rights Reserved.

# AMERICAN COLLEGE OF TRIAL LAWYERS

**CHANCELLOR-FOUNDER**
Hon. Emil Gumpert
(1895—1982)

**OFFICERS**
MICHAEL A. COOPER, *President*
DAVID J. BECK, *President Elect*
JOHN J. (JACK) DALTON, *Secretary*
MIKEL L. STOUT, *Treasurer*
JAMES W. MORRIS, III, *Immediate Past President*

**BOARD OF REGENTS**

| | |
|---|---|
| DAVID J. BECK<br>Houston, Texas | GREGORY P. JOSEPH<br>New York, New York |
| ALBERT D. BRAULT<br>Rockville, Maryland | PHILIP J. KESSLER<br>Detroit, Michigan |
| RAYMOND L. BROWN<br>Pascagoula, Mississippi | JOAN A. LUKEY<br>Boston, Massachusetts |
| JOHN L. COOPER<br>San Francisco, California | JAMES W. MORRIS, III<br>Richmond, Virginia |
| MICHAEL A. COOPER<br>New York, New York | BRIAN B. O'NEILL<br>Minneapolis, Minnesota |
| J. DONALD COWAN, JR.<br>Greensboro, North Carolina | MIKEL L. STOUT<br>Wichita, Kansas |
| BRIAN P. CROSBY<br>Buffalo, New York | ROBERT W. TARUN<br>Chicago, Illinois |
| JOHN J. (JACK) DALTON<br>Atlanta, Georgia | THOMAS H. TONGUE<br>Portland, Oregon |
| FRANCES X. DEE<br>Newark, New Jersey | JOHN H. TUCKER<br>Tulsa, Oklahoma |
| CHARLES H. DICK, JR.<br>San Diego, California | CHILTON DAVIS VARNER<br>Atlanta, Georgia |

# AMERICAN COLLEGE OF TRIAL LAWYERS

## PAST PRESIDENTS

1950-51 EMIL GUMPERT*
    Los Angeles, California
1951-52 C. RAY ROBINSON*
    Merced, California
1952-53 CODY FOWLER*
    Tampa, Florida
1953-54 E. D. BRONSON*
    San Francisco, California
1954-55 CODY FOWLER*
    Tampa, Florida
1955-56 WAYNE E. STICHTER*
    Toledo, Ohio
1956-57 JESSE E. NICHOLS*
    Oakland, California
1957-58 LEWIS C. RYAN*
    Syracuse, New York
1958-59 ALBERT E. JENNER, JR.*
    Chicago, Illinois
1959-60 SAMUEL P. SEARS*
    Boston, Massachusetts
1960-61 LON HOCKER
    Woods Hole, Massachusetts
1961-62 LEON JAWORSKI*
    Houston, Texas
1962-63 GRANT B. COOPER*
    Los Angeles, California
1963-64 WHITNEY NORTH SEYMOUR*
    New York, New York
1964-65 BERNARD G. SEGAL*
    Philadelphia, Pennsylvania
1965-66 EDWARD L. WRIGHT*
    Little Rock, Arkansas
1966-67 FRANK G. RAICHLE*
    Buffalo, New York
1967-68 JOSEPH A. BALL*
    Long Beach, California
1968-69 ROBERT W. MESERVE*
    Boston, Massachusetts
1969-70 HON. LEWIS F. POWELL, JR.*
    Washington, District of Columbia
1970-71 BARNABAS F. SEARS*
    Chicago, Illinois
1971-72 HICKS EPTON*
    Wewoka, Oklahoma
1972-73 WILLIAM H. MORRISON*
    Portland, Oregon
1973-74 ROBERT L. CLARE, JR.*
    New York, New York
1974- AUSTIN W. LEWIS*
    New Orleans, Louisiana
1975-76 THOMAS E. DEACY, JR.
    Kansas City, Missouri
1976-77 SIMON H. RIFKIND*
    New York, New York
1977-78 KRAFT W. EIDMAN*
    Houston, Texas

1978-79 MARCUS MATTSON*
    Los Angeles, California
1979-80 JAMES E. S. BAKER*
    Chicago, Illinois
1980-81 JOHN C. ELAM*
    Columbus, Ohio
1981-82 ALSTON JENNINGS*
    Little Rock, Arkansas
1982-83 LEON SILVERMAN
    New York, New York
1983-84 GAEL MAHONY
    Boston, Massachusetts
1984-85 GENE W. LAFITTE
    New Orleans, Louisiana
1985-86 GRIFFIN B. BELL
    Atlanta, Georgia
1986-87 R. HARVEY CHAPPELL, JR.
    Richmond, Virginia
1987-88 MORRIS HARRELL*
    Dallas, Texas
1988-89 PHILIP W. TONE*
    Chicago, Illinois
1989-90 RALPH I. LANCASTER, JR.
    Portland, Maine
1990-91 CHARLES E. HANGER*
    San Francisco, California
1991-92 ROBERT B. FISKE, JR.
    New York, New York
1992-93 FULTON HAIGHT*
    Santa Monica, California
1993-94 FRANK C. JONES
    Atlanta, Georgia
1994-95 LIVELY M. WILSON
    Louisville, Kentucky
1995-96 CHARLES B. RENFREW
    San Francisco, California
1996-97 ANDREW M. COATS
    Oklahoma City, Oklahoma
1997-98 EDWARD BRODSKY*
    New York, New York
1998-99 E. OSBORNE AYSCUE, JR.
    Charlotte, North Carolina
1999-2000 MICHAEL E. MONE
    Boston, Massachusetts
2000-2001 EARL J. SILBERT
    Washington, District of Columbia
2001-2002 STUART D. SHANOR
    Roswell, New Mexico
2002-2003 WARREN B. LIGHTFOOT
    Birmingham, Alabama
2003-2004 DAVID W. SCOTT, Q.C.
    Ottawa, Ontario
2004-2005 JAMES W. MORRIS, III
    Richmond, Virginia

\* Deceased

# AD HOC COMMITTEE
# ON JUDICIAL INDEPENDENCE

**CHAIRPERSON**

ROBERT L. BYMAN, CHICAGO, IL

**MEMBERS**

E. OSBORNE AYSCUE, JR., CHARLOTTE, NC

HON. BARBARA M. G. LYNN, DALLAS, TX

EDWARD W. MADEIRA JR., PHILADELPHIA, PA

PHILLIP J. KESSLER. DETROIT, MI

WILLIAM T. HANGLEY, PHILADELPHIA, PA

MICHAEL A. POPE PC, CHICAGO, IL

TERRY O. TOTTENHAM, AUSTIN, TX

# Judicial Independence:
# A Cornerstone of Democracy Which
# Must Be Defended[1]

### Introduction

*"It has been said that democracy is the worst form of government except all the others that have been tried."*
—— Winston Churchill, to Parliament (1947)

*"There is no liberty, if the power of judging be not separated from the legislative and executive powers."*
—— Montesquieu, *Spirit of Laws* (1752)

An Englishman and a Frenchman thus concisely expressed what we Americans know: the best possible form of government is one built upon a foundation of separation of the legislative, executive and judicial functions. Judicial independence is a core value of such a system, our system, one that ensures our liberty.

"Judicial independence" is an oft misunderstood phrase. Justice Randall Shepard, Chief Justice of the Indiana Supreme Court and President of the Conference of Chief Justices, puts it simply: "Judicial independence is the principle that judges must decide cases fairly and impartially, relying only on the facts and the law."

Chief Justice Michael Wolff of Missouri, in his 2006 State of the Judiciary address, elaborated eloquently:

> "Independence," quite frankly, is both overused and misunderstood. It should not be interpreted, either by the public or by any judge, to mean that a judge is free to do as he or she sees fit. Such behavior runs counter to our oaths to uphold the law, and any attempt to put personal beliefs ahead of the law undercuts the effectiveness of the Judiciary as a whole. Better stated, "independence" refers to the need for courts that are fair and impartial when reviewing cases and rendering decisions. By necessity, it also requires freedom from outside influence or political intimidation, both in considering cases and in seeking the office of judge. Courts are not established to follow opinion polls or to try to discern the will of the people at any given time but rather are to uphold the law. The people rely on courts to protect their access to justice and to protect their legal rights. For the sake of the people, then, judicial independence must always be coupled with the second stated measure – accountability.[2]

---

[1] The principal draftsman of this paper was Robert L. Byman, FACTL, Jenner & Block, LLP, Chicago, Illinois.

[2] *The Missouri Bar, Vol. 62, No. 2, March-April 2006.*

This independence is not established for the benefit of the *judges,* but rather for all of us; it is the *citizens* who are the intended beneficiaries of fair and impartial administration of justice consistent with the rule of law.

The three separate branches of government are, however, decidedly *not* equal. The judicial branch is, by design, the weakest and least powerful of the three.

> Whoever attentively considers the different departments of power must perceive that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

*Federalist Papers No. 78 (Hamilton).*

Because it is the weakest of the three, the judicial branch has the greatest need to be defended. But who is to provide the defense? Not the judiciary itself, because it is by design not a political entity; its power to enforce its decrees and protect its independence are limited. The other two branches, its potential antagonists, cannot always be counted on for that defense.

The judiciary's principal defense must then come from its intended beneficiaries, the people. As a practical matter, lawyers, both individually and through the organized bar, must take the lead in that defense.

### Judicial Independence as a Fundamental Principle

The Declaration of Independence was addressed to the world, but it focused on the acts of a single man, King George III. Each of the grievances it listed, grievances which led our Founding Fathers to commit treason in the most public of ways, was an act of a King who had usurped to himself and denied to the colonists rights long recognized in his subjects at home. It was, thus, the tyranny imposed by an all-powerful King that led to the American Revolution, and it was the need to ensure against any such future tyranny that molded the United States Constitution. A century before Lord Acton was to utter in Parliament his famous phrase, "Power tends to corrupt, and absolute power corrupts absolutely," our forefathers already knew that it was essential to divide and separate the powers of government.

Of all the grievances detailed in the Declaration of Independence, none was greater than the total dependence of Colonial judges upon King George:

2

> He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.

*Declaration of Independence*, July 4, 1776.

English judges were assured life tenure during their "good behavior" by the Act of Settlement of 1700, but their Colonial counterparts served at the pleasure of the King. Their salaries were subject to his whims. Judges beholden to the King, not surprisingly, often ruled as he pleased, no matter how unfairly. Our post-Revolution government needed to ensure an independent judiciary.

In 1780, nearly a decade before the United States Constitution was ratified, John Adams drafted as the introductory provision of the Massachusetts Constitution a Declaration of Rights, Article XXIX of which provided in part:

> It is the right of every citizen to be tried by judges as free, impartial, and independent as the lot of humanity will admit.

The concept of judicial independence, that judges should decide cases, faithful to the law, without "fear or favor" and free from political or external pressures, remains one of the fundamental cornerstones of our political and legal systems, both federal and state.

The first three articles of the United States Constitution separated the three branches of government into the Legislative (Article I), the Executive (Article II), and the Judiciary (Article III). Each Article invested in the branch it created the entirety of the powers that pertained to its function. Each is thus to act as a check and balance against the abuse of power by the others.

The United States Constitution, as Alexander Hamilton explained in *Federalist 78*, is "*limited*." In contrast to the British theory of government that its powers were granted by the King, the powers of our government were granted by "We, the People." Unless the point of the Revolution was simply to substitute one form of tyranny for another, it was essential that no single person or body be vested with unlimited power. The People, from whom all power to govern was derived, made limited grants of power to the various branches. What was not so granted was reserved to the People. Thus, Congress may enact laws, but only within its limited grant of authority. The Executive may exercise powers, but only within constitutional limits. And it was to the Courts that the People entrusted oversight to ensure that the other branches do not exceed their limited powers.

Hamilton went on to explain:

> By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex-post-facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

*Federalist Papers No. 78 (Hamilton)*.

3

We live in a democratic society, but our system of government is *not* a pure democracy, one in which every decision is put to a vote of the people in which the majority rules. In a pure democracy, substantively important decisions: Should we have an income tax? Should medicinal marijuana be permitted? procedurally important decisions: Should we drive on the right or the left? trivial decisions: Should the motor vehicle office be open 9-5 or 8-6? would be put to a vote.

It is neither practical nor desirable for every citizen to vote on every issue. And so our Founding Fathers gave us a republic in which we elect representatives who in turn make the day-to-day decisions. This is democracy once removed. And since the People who, through their chosen representatives, created the Constitution knew that they must, as a practical matter, be removed from direct decision-making, they imposed important limits on their elected representatives. Indeed, the Constitution placed limits on each of the three branches of government by creating a system of checks and balances.

The elected representatives of the People do not, for instance, have the authority to make adherence to Islam or Judaism a crime. The First Amendment prohibits the legislative branch from making any law that impinges upon freedom of religion. And, lest Congress exceed its authority and enact such a law, or any law that transgresses constitutional limitations on its legislative power, it is the role of the courts to declare the law unconstitutional.[3]

The framers left to the judiciary the power to interpret the constitutional limits on the other two branches, precisely because those branches could not always be counted on to stay within those limits. The Founding Fathers, as the voice of the People, bargained for protection from the temporary whims of their successors, the caprices of the elected representatives of the People, in order to keep the nation on a course that is true to our core values. They bargained for a judiciary that would remain sufficiently independent to strike down unconstitutional laws, and the independence of that judiciary became crucially important to the framework of our government.

Of the three branches, the judiciary is least likely to offend the Constitution. It cannot enact a statute, and so it cannot enact an unconstitutional one. It cannot exercise executive powers. By the same token, the judiciary is positioned to stand up to the other two branches when they exceed their powers, because it was given the power to do so.

Judicial independence is not, however, merely a matter of checks and balances of constitutional dimension. It is essential to the day-to-day workings of society, to provide a system for the orderly resolution of disputes that is fair, impartial and just and that is so perceived, so that no citizen who has his day in court will feel ill treated, win or lose. Only judges who are insulated from outside intimidation and pressure can fairly administer justice and be perceived to be doing so.

---

[3] We cannot conceive that our country would ever repeal the First Amendment, but we should never forget that it is a theoretical – remote, but frightening -- possibility. In fact, the People retain the collective power to abolish any of the liberties we are granted under the Constitution, because they reserved to themselves the power to amend. But the People were wise enough at the creation of the Constitution to put limits on *themselves* to insure against the caprices of thin transient majorities. The amendment process is difficult, and amendments cannot be lightly made. A constitutional amendment cannot be put to a vote unless two-thirds of Congress or the States propose it, and an amendment cannot be enacted without the approval of three-fourths of the States. Those limitations do not, however, justify complacency. One need only look at the Eighteenth and Twenty-first Amendments (Prohibition and Repeal of Prohibition) to see that social issues of the day, issues that may seem trivial seventy-five years later, can grow to constitutional proportions.

To preserve judicial independence for Federal judges, the United States Constitution provides for life tenure for judges and prohibits diminution of their compensation. The Courts themselves later articulated a third protection, judicial immunity.[4]

More than 95% of the country's judicial business is, however, conducted in the state courts by approximately 30,000 judges sitting in courts of first resort and hundreds of appellate judges. Eighty-seven per cent of those judges are elected.[5] Unlike their federal counterparts, state judges generally do not have life tenure. They are subject to periodic reappointment or reelection, with the attendant political pressures that accompany those processes. There has been an ongoing debate among the states about the preferable method of judicial selection and retention. The result is a patchwork of systems, each with its own strengths and weaknesses.

The states that stop short of life tenure for their judges nevertheless usually provide terms of appointment or election that are sufficiently long to afford those judges reasonable job stability. By design, judges are generally left free from pressure that they will be sued, fired or starved in reaction to an unpopular ruling. Freed of that pressure, judges are able to make just rulings, however unpopular they may be.

Two Twentieth-Century examples illustrate the value of judicial independence to the survival of the nation.

In 1955, President Eisenhower appointed 37-year-old Frank M. Johnson to the United States District Court in Alabama. The next year, following the Montgomery bus boycott, Judge Johnson ruled that racial segregation of city buses was unconstitutional. He was the first judge to order that the names of qualified African-Americans be added to county voting rolls, and he wrote the first statewide decree ordering an end to public school desegregation. His later opinions outlawed racial discrimination in Alabama's libraries, transportation centers and its agricultural extension service. He placed numerous state agencies that had refused to comply under judicial supervision. After members of the Ku Klux Klan brutally beat Freedom Riders at the Montgomery Greyhound Terminal, he temporarily restrained the City and the Klan from future wrongs against the protesters. In ordering voting registrars to apply consistent standards, he struck down literacy tests and other discriminatory practices . He opened U.S. Route 80 to freedom marchers, finding that the right of individuals to assemble ─ the right to march ─ far outweighed the state's right to maintain unobstructed sidewalks and highways.

Judge Johnson's actions earned him the public ire of the Governor of Alabama, his law school classmate, who branded him an "integrating, scalawagging, carpetbagging liar." Judge Johnson's decisions also put him at great personal risk. His mother's home was bombed and a cross was burned in his yard. His family often needed the protection of United States Marshals.

---

[4] "[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 80 U.S. 335, 347 (U.S. 1872) The *Bradley* court drew on hundreds of years of English common law to conclude that judicial immunity has always existed.

[5] "*Electing Judges and the Impact on Judicial Independence,*" Hon. Randall T. Shepard, *Tennessee Bar Journal*, Vol. 42, No. 6, June 2006, p. 22ff.

In awarding Judge Johnson the Presidential Medal of Freedom, the country's highest civilian award in 1995, President Clinton remarked that, "[D]uring forty years on the bench, Judge Johnson made it his mission to see to it justice was done within the framework of law. In the face of unremitting social and political pressure to uphold the traditions of oppression and neglect in his native South, never once did he yield. His landmark decisions in the areas of desegregation, voting rights and civil liberties transformed our understanding of the Constitution."

Similarly, United States District Judge Robert R. Merhige, Jr. presided over numerous cases that raised the public hackles in Virginia. In 1970, he ordered the University of Virginia to admit women. He presided over the trials of Ku Klux Klan and American Nazi Party members accused of injuring and killing members of the Communist Workers Party. Many considered him the most hated man in Richmond when he ordered the integration of the Virginia public school system. He required 24-hour protection. Even so, his family, threatened, had to leave town for many months. Protesters spat in his face and held weekly parades outside his home. His dog was shot. A guest cottage on his property, where his mother-in-law lived, was set afire.[6]

Judges should expect public criticism for unpopular opinions. They should expect appellate review and, when appropriate, reversal on appeal. They should expect calls for impeachment if they themselves violate the law. But they should not have to expect to have their mothers' homes bombed, their dogs shot or their families threatened. They should not expect, nor should any person who values liberty allow, improper assaults on their judicial independence.

The nation owes its thanks to Judge Johnson, Judge Merhige, and countless others like them. Without judicial independence, the schools in Alabama, Virginia, and other states would have remained segregated.

Judges know that their judicial decisions will sometimes be unpopular. But the Constitution gives them a mandate, in both senses of that word, to do justice. They are mandated – required ─ by their oath of office to uphold the law. They also have the mandate – the protection – of the Constitution to do so despite the disapproval of their decisions by a temporal majority. Their judicial independence is necessary to enable them to do what is right.

Judicial independence does not imply the absence of judicial accountability. Appellate courts can reverse erroneous lower court decisions on appeal. Collectively, other judges can discipline their peers through enforcement of ethical standards and administrative rules. Judges are in that sense accountable to one another. Judges are accountable to the public, always in the court of public opinion, and from time to time at the ballot box in those states where judges are selected or retained by election. Judges are accountable to the legislative branch, which can prospectively change the law in reaction to an opinion and can impeach judges for high crimes and misdemeanors.

### Manifestations of Threats To Judicial Independence

Attacks on the judiciary come in many forms. Some are perfectly legal, though they may be unwise. Some are the normal, even salutary, expression of opinion engrained in the constitutional

---

[6] In 2004, a few months before he died, the American College of Trial Lawyers conferred upon Judge Merhige its Samuel E. Gates Award for a lifetime of achievement as a lawyer and judge.

rights of the People and in the history of our nation. Some are, however, improper, some even unconstitutional. We must accept the salutary role of public expression and dissent, while remaining vigilant against unwise and improper attacks that threaten the independence of judges and the integrity of our system of government.

Some examples of such threats to judicial independence follow.

*Incursions by the Public*

When individuals criticize a judge or a judicial decision, the criticism may or may not be valid, but it is never, in and of itself, a threat to judicial independence. So long as the Constitution as we know it exists, when a judge issues a ruling that is unpopular, he or she can anticipate, and should *expect,* a certain amount of criticism. An editorial in the local paper criticizing the decision or a peaceful demonstration by a group of citizens, is simply an exercise of their First Amendment rights. Criticism from individuals, standing alone, poses no threat to the independence of the judiciary.[7]

But criticism is one thing, while intimidation is another. In one state, an organization which professes to have chapters in all fifty states, obtained nearly 50,000 signatures to place a referendum on an upcoming ballot that, if passed, would strip judges in that state of judicial immunity and submit them to the jurisdiction of a special grand jury and court, one that could impose civil and criminal penalties for such things as the "willful rendering of an unlawful or void judgment or order." Furthermore, the judges would be taxed a percentage of their salaries to create the fund out of which the operating expenses of that special grand jury would be drawn.

There is nothing constitutionally impermissible about a group of citizens attempting, by lawful means, to turn their Constitution inside out, but ballot initiatives of this sort are an attack of epic proportion on judicial independence. They turn the constitutional right to petition the government into a threat to judicial independence.

When the threat comes, not from individuals or from the people themselves, but rather from one of the other two branches of government, threats to the judiciary may be more than unwise; they may become illegal or even unconstitutional.

---

[7] Perhaps ironically, judges do not enjoy the degree of free speech that their critics do. Proposed Rule 2.11(a) of the preliminary draft of the ABA Model Code of Judicial Conduct (June 30, 2005) would provide that, "A judge shall not make any comment that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court." This provision may do no more than codify the unspoken rule to which most judges already adhere. Judges' rulings are a matter of public record. To the extent, however, that a ruling needs to be explained outside the four corners of the document, judges are not free to do so while a case remains pending.

7

*Legislative Incursions*

Congress has the power to amend a law after a court has interpreted that law in a way with which it does not agree, thereby requiring a court to come to a different result in future cases. That is an appropriate legislative function. So long as the new law is constitutional, the courts must enforce it as written. If it is not, the courts must strike it down. The legitimate exercise of legislative powers is never, in itself, a threat to the independent judiciary.[8]

But there is a fundamental, critical distinction between the exercise of legitimate power, wise or unwise, and excesses of power. If, in response to an unpopular decision, Congress were to threaten the ruling judge with impeachment proceedings, it would go too far. The Constitution permits impeachment only in cases of "treason, bribery or other high crimes and misdemeanors."[9] A single unpopular or even blatantly erroneous opinion ─ indeed even a series of such questionable opinions ─ does not constitute an impeachable offense:

> Federal judges should not and cannot be impeached for judicial decision making, even if a decision is an erroneous one. . . . [E]ntering a judgment and order—is an act that judges are required to do under the Constitution. . . . If this was otherwise, the impeachment remedy would become merely another avenue for judicial review.[10]

Only thirteen federal judges have been impeached in the history of the United States, and of those, only seven were convicted, each of them, with one ancient exception,[11] as a result of actual crimes such as treason, perjury or accepting bribes. No judge ever been impeached and convicted because Congress or the public disagreed with his opinions.

Nevertheless, individual members of Congress have not resisted the urge to make improvident calls for impeachment. Recent incidents illustrate the growing problem. In 2005, when the state courts of Florida declined to prevent Terri Schiavo's husband from removing her from life support, the United States Congress promptly enacted legislation that both conferred and *imposed* jurisdiction on the federal courts in order to create for those who wished to maintain her life support another forum in which to make their case.[12] When the Federal courts at every level then refused to intervene, the leadership in the House of Representatives publicly suggested that the judges involved should be impeached, made public reference to the House's power of the purse and suggested that the House Judiciary Committee look into judicial activism and the *Schiavo* case in particular.[13]

---

[8] For example, in *Kelo v. New London*, 125B S.Ct. 2655 (2005), the United States Supreme Court issued a somewhat controversial ruling affirming a city's right to condemn private property for use in a private economic development. The decision prompted a number of calls for amendments to laws and state constitutions that would lead to a different result in future cases. It also provoked calls, however, for the condemnation of the homes of certain Supreme Court justices. The former was a legitimate reaction to a ruling with which some disagreed; the latter was not.

[9] U. S. Constitution, Art. II, Section 4. Similar language can be found in virtually every state constitution.

[10] *What Would the Founding Fathers Say?*, Christian Science Monitor (April 4, 1997) (quoting a 1986 statement of Rep. Robert Kastenmaier (D) of Wisconsin, the then chair of a House Judiciary Subcommittee).

[11] In 1804, Federal District Judge John Pickering of New Hampshire was impeached and convicted on grounds of drunkenness and insanity.

[12] Public Law 109-3 (109th Cong.)

[13] *Washington Post,* April 2, 2005, p. A09.

In 2005, the United States Court of Appeals for the Seventh Circuit issued an opinion affirming criminal sentences handed down by the district court.[14] The Chairman of the House Judiciary Committee wrote a letter to the Chief Judge of the Seventh Circuit, expressing the view that the sentence had been improperly calculated and asking for "a prompt response with respect to what steps the Court of Appeals intends to take to rectify the Panel's actions." The Court correctly responded that it could not and would not comment on a pending case. A spokesman for the Congressman was quoted, in defense of his unusual interjection into the judicial appeals process, as saying "We can't have judges violating the law." The Congressman also disclosed that his Committee was considering the creation of an office of inspector general to monitor the federal judiciary,[15] and bills to create that office have since been introduced.[16]

In 2003, after the Ninth Circuit Court of Appeals ruled that the recitation of the Pledge of Allegiance in public schools was unconstitutional,[17] a resolution was introduced in the U.S. House of Representatives which, had it been approved, would have stripped federal courts of jurisdiction to hear any claim that recitation of the Pledge of Allegiance violates the First Amendment.[18]

Other similar congressional attempts to usurp judicial authority are found in such proposed legislation as the Constitutional Restoration Act of 2004,[19] which would have prohibited federal courts from reviewing cases involving religion; the Congressional Accountability for Judicial Activism Act of 2005,[20] which would have authorized Congress to overturn, by a two-thirds majority, any Supreme Court decision finding an act of Congress unconstitutional, and a recent proposed resolution that would preclude the federal courts from citing analogous law of a foreign jurisdiction in ruling on constitutional issues.[21]

None of these assaults on the judiciary has come to a vote. That they would be seriously proposed, however, should be a cause for alarm.

This growing problem is not confined to the federal courts. In 2004, the Delaware Supreme Court issued a tentative decision which would have made a convicted rapist eligible for parole. While the case remained pending, the Delaware Legislature enacted, and the Governor of Delaware signed, a bill declaring the decision of the Supreme Court of Delaware "null and void" and directing the Court to construe the state's sentencing statute in the way it desired. Having first found the statute passed by the Delaware Legislature wholly unconstitutional, the Delaware Supreme Court

---

[14] *United States v. Rivera*, 411 F. 3d 864 (7th Cir. 2005).

[15] Article in *Chicago Tribune,* July 10, 2005.

[16] H.R. 5219 (109 Cong. 2006); S. 2678 (109 Cong. 2006). The College is on record as opposed to both bills. See letter dated July 21, 2006 from President Michael Cooper to Senator Arlen Specter, et al.

[17] *Newdow v. U.S. Congress*, 328 F.3d 466 (9th Cir. 2003), *rev'd on other grounds, Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 124B S.Ct. 2301 (2003),

[18] H.R. Res. 2028 (108th Cong.)

[19] H.R. Res. 3799 (108th Cong.)

[20] H.R. Res. 3073 (109th Cong.)

[21] S. Res. 92 (109th Cong.); H.R. Res. 97 (109th Cong.)

9

withdrew its original opinion and issued a new one, reversing its earlier decision.[22] It did so on its own.

Legislative calls for impeachment prompted by disagreement over rulings of the courts, legislative intrusion into the handling of pending cases and after-the-fact legislative attempts to overrule judicial decisions threaten the independence of the judiciary. So also do "jurisdiction-stripping" proposals that would deprive the courts of jurisdiction in matters already before the court or matters involving constitutional interpretation. Yet such proposals are made with what appears to be increasing frequency.

*Executive Incursions*

Executive incursion into judicial independence is no stranger to our history. Some of our most revered Presidents have usurped the authority of the courts. Thomas Jefferson called for, and convinced the Senate to institute, impeachment proceedings against Justice Samuel Chase after Chase had criticized Jefferson's political party during a trial. The Senate did not convict Justice Chase, but he nevertheless had to endure a ten-day impeachment trial. [23]

President Franklin Delano Roosevelt's unsuccessful attempt to add members to a United States Supreme Court that had found unconstitutional some of his New Deal legislation was, likewise, generally viewed as an attack on judicial independence.

That both of these attempts failed is evidence that a proper appreciation for the need for judicial independence can prevail over attempted encroachments

*Financial Incursions*

Economic pressure is a less overt, but no less troublesome assault on judicial independence. Although the Constitution guarantees that judges' compensation may not be diminished during their tenure in office, it is a fact of economic life that Federal judges' real compensation has been eroded over time as the infrequent pay raises they have received have failed to keep pace with inflation. Adjusted for inflation, federal judicial salaries dropped 24% during the period between 1969 and 2000, while the average national salary, adjusted for inflation, increased 12.4%.[24]

Inflation is not unique to modern times. The drafters of the Constitution were aware of the problem, and they thought they had solved it. Explaining that, "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support," Hamilton set out to explain the importance of fixed compensation, in *Federalist Paper No. 79*, stating, "It will readily be understood that the fluctuations in the value of money and in the state

---

[22] *Evans v. State of Delaware*, 872 A.2d 539 (Del. 2005) There is an interesting parallel between the Delaware court's decision in *Evans* and the decision of the United States Supreme Court in *Marbury v. Madison.* In both cases, the reviewing court made it clear that it had the judicial power to declare legislative acts unconstitutional, but its ruling then gave the incumbent administration the result it sought.

[23] See Rehnquist, "*Remarks at the Symposium on Judicial Independence*,," University of Richmond T. C. Williams School of Law, Mar. 21, 2003.

[24] Statement of Associate Justice Stephen G. Breyer to the National Commission on the Public Service, July 15, 2002.

of society rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant to-day might in half a century become penurious and inadequate."

The framers consciously drew a distinction between the salaries of judges and those of the President and Congress: "It will be observed that a difference has been made by the Convention between the compensation of the President and of the judges. That of the former can neither be increased nor diminished; that of the latter can only not be diminished. This probably arose from the difference in the duration of the respective offices."[25]

The failure adequately to fund a court system, whether through neglect or from deliberate starvation by those who control the purse strings, is also a major potential threat to judicial independence. Indeed, at least one state legislature is thought to have transparently under-funded its court system, apparently in part because of unhappiness with a particular decision.

State court judges face another form of economic pressure. Those who must stand for election face the challenge of raising campaign funds without creating the appearance, or raising the suspicion, that their independence is for sale. Many of their contributions traditionally come from lawyers who appear before them. More insidious are contributions from litigants and potential litigants. When, as occurred recently, a successful candidate for election to a state appellate court bench who had received substantial contributions from tobacco interests cast the deciding vote in overturning a jury award against a tobacco company, the appearance of independence was placed into question. A study of guardianship appointments in another state court system has disclosed a high degree of correlation between campaign contributions to judicial elections and appointments. However fair and impartial a state judge may be, even the apparent existence of such a "pay to play" system undermines the public's confidence in the court's independence and fairness.

No state system is perfect. Election of judges carries the potential of special-interest campaign contributions. Likewise, appointment systems, where a judge may feel politically indebted for his or her position have their own obvious shortcomings.

### What Threats to Judicial Independence Require of All of Us

We have alluded to only a few of the apparently growing number of perceived threats to judicial independence.

Nearly a century ago, Jacob M. Dickenson, then President of the American Bar Association, summed it up:

> [F]or a long time . . . judgments of courts . . . were received with the greatest of respect. . . . If decisions were publicly criticized, the criticism was generally temperate, addressed to particular questions, and was not of such a character as to break down in the minds of the people respect for the judiciary.[26]

---

[25] Federalist Paper No. 79.

[26] American Bar Ass'n, *Address of the President,* 33 Report of the Thirty-first Annual Meeting of the American Bar Association 341 (1908), quoted in American Bar Ass'n, *Report of the Commission on Separation of Powers and Judicial Independence*, July 4, 1997, p. 65 at fn 214.

Mr. Dickenson made his observation in 1908. In that light, it is fair to ask whether attacks on the independence of the judiciary are simply an age-old annoyance or whether there is an actual, present-day erosion of independence that requires action.

The public seems generally to understand the problem. In a nationwide poll conducted in 2005, the Maxwell School of Citizenship and Public Policy of Syracuse University found that the respondents were nearly split on whether courts are in or out of step with the American people. Forty-six per cent said that the courts are not in step; 44% said that they are. A large number, but nowhere near a majority, believe that judges should be held more accountable to elected officials: 41% say yes; 54% say no. But the most significant finding of the survey is that a large majority, 73%, believe that judges should be shielded from outside pressure and allowed to make decisions based upon their own independent reading of the law.[27]

Similarly, a survey conducted by the polling firm, Belden, Russonello & Stewart, yields similar results. In that poll, 81% of the respondents either strongly or somewhat agreed with the proposition that there should be more accountability for the courts, but 40% disagreed that there should be more Congressional checks on the courts and 61% believe that Congress was wrong to interfere with the courts in the *Schiavo* case.

The public thus seems not to trust the courts completely, but it does not appear to want Congress to manage the justice system. The public appears to understand the need for and to want an independent judiciary.

### Conclusion

Any perceived threat to judicial independence should summon the legal profession to action. Lawyers must constantly remind themselves that judicial independence is critical to a free society and must educate others who may have lost sight of that. Lawyers must recognize genuine threats to judicial independence and, when they arise, call attention to them and confront them.

Beyond working to preserve a sound, fair and impartial court system, assaults on judicial independence must be addressed, both by lawyers as individuals and by the professional organizations they have created. And they must be addressed in a way that will both educate the public and meet the threat.

Consistent with the purposes for which it was created, it is the policy of the American College of Trial Lawyers to undertake to address in an appropriate manner threats to judicial independence wherever they manifest themselves.

The professional obligations of lawyers, individually and collectively, both to our system of justice and to those who serve it on the bench demand no less of us.

---

[27] Media Release, Maxwell School of Syracuse University, October 17, 2005.