UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | PROMESA |
| | : | Title III |
| THE FINANCIAL OVERSIGHT AND | : | |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Case No. 17-BK-3283 (LTS) |
| | : | |
| as representative of | : | (Jointly Administered) |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO et al., | : | |
| | : | |
| Debtors.¹ | : | |

-------------------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | PROMESA |
| | : | Title III |
| THE FINANCIAL OVERSIGHT AND | : | |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Case No. 17-BK-3566 (LTS) |
| | : | |
| as representative of | : | (Jointly Administered) |
| | : | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | : | |
| GOVERNMENT OF THE COMMONWEALTH OF PUERTO | : | |
| RICO, | : | |
| | : | |
| Debtors. | : | |

-------------------------------------------------------------------------------X

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## ORDER ON MOTION TO COMPEL

This matter is before the Court on the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents from Financial Oversight and Management Board* (Dkt. No. 512 in 17-BK-3566; Dkt. No. 6998 in 17-BK-3283) ("Motion to Compel"). For the reasons addressed herein, the Motion to Compel is ALLOWED IN PART AND DENIED IN PART. The Financial Oversight and Management Board for Puerto Rico ("Oversight Board") shall review their currently withheld documents in accordance with the rulings herein. The Oversight Board shall make supplemental productions and submit updated privilege logs and affidavits to the Bondholders[2] as necessary by **June 12, 2019** unless otherwise agreed by the parties. The parties shall submit a status report to the Court on or before **June 14, 2019**.

### I. Introduction

Through the Motion to Compel, the Bondholders seek to compel documents from the Oversight Board in connection with the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay* (Dkt. No. 289)[3] ("Lift Stay Motion"). At issue in the Lift Stay Motion is whether, as the Bondholders contend, the new Pay-Go fees are simply the old ERS employer contributions in slightly different form, so that their liens on the old ERS employer contributions continue to attach to these funds or, as the Respondents contend, Joint Resolution 188 and Act

---

[2] As used in the Motion to Compel.

[3] Docket numbers refer to Case 17-BK-3566 unless otherwise indicated.

106 eliminated the Bondholders' collateral. Limited discovery has been authorized in connection with the Lift Stay Motion relating to the "attribution of any diminution in value resulting from the automatic stay." (Dkt. No. 313). Related thereto, in connection with the Bondholders' argument that they intend to prove that the payments made under the Pay-Go system are substantially the same as those employer payments on which the Bondholders have a secured lien, this Court has allowed discovery into "how the Pay-Go system worked, and how it compared to how the ERS system worked, and the similarities and differences." (May 2, 2019 Hearing Tr., Dkt. No. 498 at 102:14-16).

By its Motion to Compel, the Bondholders challenge the Oversight Board's decision to withhold documents on the grounds of the deliberative process privilege, the attorney-client privilege and the work product doctrine. The instant motion follows similar motions to compel brought by the Bondholders against the Commonwealth of Puerto Rico ("Commonwealth"), the Employees Retirement System ("ERS"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (collectively the "Commonwealth Motions") (Dkt. Nos. 446, 443). In connection with the Commonwealth Motions, this Court held a lengthy hearing on May 2, 2019, which the Oversight Board attended, and issued Orders on May 6, 2019 (Dkt. No. 493), May 15, 2019 (Dkt. No. 509) and May 30, 2019 (Dkt. No. 537) addressing the application of the deliberative process privilege, the attorney-client privilege and the work product doctrine to the documents being sought by the Bondholders. The legal bases for those Orders apply to the instant dispute as well, and familiarity with those Orders are assumed herein.

With respect to the request for documents from the Oversight Board, on March 4, 2019, the Bondholders served a subpoena on the Oversight Board seeking six categories of

3

documents. (Declaration of Geoffrey S. Stewart, Dkt. No. 512-1 ("Stewart Decl.") ¶ 2). On March 7, 2019, the Bondholders served a deposition subpoena on the Oversight Board. (Id. ¶ 3). The Oversight Board initially objected to producing any documents, or any witness for deposition, and the Bondholders filed a motion to compel on March 21, 2019. (Dkt. No. 402). This Court held a hearing on the motion to compel on April 1, 2019, and ruled that the Oversight Board must respond to the Bondholders' subpoena and produce a witness for deposition. (See Dkt. Nos. 429, 431). Following various telephonic hearings, court-ordered meet-and-confers and status reports, the Oversight Board produced documents on April 14, 2019, April 16, 2019, April 24, 2019 and May 1, 2019.[4] It served privilege logs on the Bondholders, and provided copies to the Court, on April 29, 2019 and May 1, 2019 ("April 29 Log" and "May 1 Log" respectively). Those logs contain personal information and are thus not being made publicly available.

At the May 2, 2019 hearing on the Commonwealth Motions, the Oversight Board had been instructed to review its privilege logs in accordance with the Court's rulings at the hearing. The parties' subsequent efforts to resolve their outstanding disputes were unsuccessful, and the Bondholders filed the instant Motion to Compel on May 17, 2019. The Oversight Board filed its response on May 23, 2019 (Dkt. No. 528) ("Response"), and the Bondholders filed their reply on May 29, 2019. (Dkt. No. 535) ("Reply").

According to the Bondholders, "On April 14, 2019, the Oversight Board made its first production of 12 documents, which consisted of 284 pages, 264 of which were completely

---

[4] Relevant docket entries include Dkt. Nos. 431, 432, 445, 465 and 507.

4

redacted." (Stewart Decl. ¶ 8). "On April 16, 2019, the Oversight Board made its supplemental production of 15 documents consisting of 476 pages, 270 of which were completely redacted." (Id.). "On April 24, 2019, the Oversight Board made its third production of 21 documents, which consisted of 325 pages, 282 of which were fully redacted." (Id. ¶ 10). "On May 1, 2019, the Oversight Board made its final document production[.]" (Id. ¶ 11). "Altogether, the Oversight Board has produced about 669 documents, amounting to a little more than 9,700 pages", (id.), of which fewer than 10 were non-repetitive and, in the Bondholder's view, relevant to the Lift Stay Motion. (Motion to Compel ¶ 12). According to the Bondholders, the non-blank pages produced included "over 3,900 pages of accounting detail" that "was of no clear relevance to anything, [and] was outside the scope of anything the Bondholders had asked for," hundreds of pages of "isolated strings of text, or graphics with no context[,]" and multiple copies of Resolution 187, Resolution 189, the March 13, 2017 Fiscal Plan, and the same four weekly account reports from mid-2017. (Id. ¶ 11). The Bondholders have made it clear that while they have not described individually their objections to each of the 335 documents listed on the privilege logs, they are objecting to the claims of privilege for each one of the documents. (See Reply ¶ 4).

## II. Discussion

### A. Deliberative Process

#### Pre-decisional Documents

The Oversight Board has claimed the deliberative process privilege with respect to the March 13, 2017 Fiscal Plan, the Fiscal Year 2018 and 2019 Territory Budgets, the April 18, 2018 Fiscal Plan, and potential revisions and corrections to the March 13, 2017 Fiscal Plan. In order

5

to preserve the issue for appeal, the Bondholders continue to assert that the only relevant deliberations were those leading up to the certification of the March 13, 2017 Fiscal Plan, and that all subsequent documents were post-decisional and therefore not protected by the deliberative process privilege.[5] See Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995) ("to qualify for the privilege, a document must be (1) predecisional, that is, antecedent to the adoption of agency policy . . ." (internal quotation and citation omitted)). For the reasons detailed in this Court's Orders with respect to the Commonwealth Motions, this Court rules that each of these events constitute separate decisions, and the deliberations leading up to each decision are entitled to protection.[6]

### Substantial Need

The Bondholders contend that, even assuming that the deliberative process could be asserted, they have established a substantial need for the materials in connection with the Lift Stay Motion. As the Puerto Rico Supreme Court held In Bhatia Gautier v. Gobernador, 199 D.P.R. 59, 88-89 (2017) (translation provided at Dkt. No. 446-3) ("Bhatia Gautier I"):

---

[5] The Bondholders have acknowledged that they have raised a number of issues in connection with the instant Motion to Compel which this Court had decided adversely to them in connection with the Commonwealth Motions merely to preserve the issues for appeal. These include the post-decisional nature of withheld documents under the deliberative process privilege for all documents after the certification of the March 13, 2017 Fiscal Plan, the purported waiver of privilege by the disclosure of information between the Oversight Board on the one hand, and the Commonwealth, its advisors and AAFAF on the other given their divergent interests, and the application of the crime fraud exception to the attorney-client privilege. (Motion to Compel ¶¶ 32-35). This Court has not altered its decision on these issues, and they will not be discussed further herein. This Court does find, however, contrary to the Oversight Board's position, that it was not frivolous for the Bondholders to re-assert these arguments in order to preserve them for appeal. (See Response ¶ 15).

[6] The 2018 and 2019 Territory Budgets were not addressed in the Commonwealth Motions. However, the Bondholders do not contend that the evaluation of these Budgets by the Oversight Board should be treated any differently than any other post-March 2017 Fiscal Plan decision, and this Court sees no reason to do so.

> To determine if [the deliberative process] privilege prevails, as the privilege of official information, the court must make an analysis of balance of interests. Among the factors that the court must consider when pondering the balance of interests, are: the interests of the private litigant, the need for accurate judicial fact finding, the public's interest in learning how effectively the government is operating, the relevance of the evidence sought, the availability of other evidence, the role of the government in the litigation and issues involved, and the impact on the effectiveness of government employees. Also, the impact that the divulgation in the process of frankly discussing the policies and decisions in question must be evaluated. In sum, this privilege can budge when it is fully demonstrated that there is a particularized need to obtain the information which is of greater weight than the reasons for confidentiality.

(emphasis, punctuation, and internal citations omitted). While this Court agrees that the Bondholders' "substantial need" may overcome the deliberative process privilege in certain circumstances, this Court confirms its ruling made in connection with the Commonwealth Motions that the need for such information is not great in connection with the Lift Stay Motion.

The Bondholders argue in their Motion to Compel that information about the deliberations behind the switch to the Pay-Go system is necessary for the litigation of the Lift Stay Motion. (Motion to Compel ¶ 18) ("The thinking behind, and details of, that decision are relevant and material."). The Bondholders argue that they need the deliberative information to show that the contributions to the retirement system before the switch to Pay-Go, which they claim a lien on, are in fact the same monies going into the current Pay-Go system. (Motion to Compel ¶ 19) ("The central defense offered by Respondents in the [Lift Stay Motion] is that the Bondholders now have no collateral at all. But, as we have pointed out before, that is false: it is black-letter law that a lien follows the collateral. *See* UCC § 9-315, 19 P.L.R.A. § 2265(a)."). Thus, the Bondholders "assume that the materials the Oversight Board is withholding will include documents that talk about the fact that the only way to fund ERS's pension systems is contributions from employers (since the Treasury itself was broke), that employer contributions

7

were subject to the Bondholders' lien, that there was a need to find ways around the lien, and that a purportedly new Pay-Go system would provide cover for destruction of the lien." (Motion to Compel ¶ 20).[7]

As this Court previous ruled in connection with the Commonwealth Motions, while the Respondents' motivation may be interesting , and tangentially relevant, the facts needed by the Bondholders to present their theory of a continuing security interest in connection with the Lift Stay Motion are those relating to the actual functioning of the new and old pension systems.[8] (See Dkt. No. 493 at 5). Thus, as the District Judge recently ruled, the "evidence of intent to circumvent rights in collateral is, at best, of marginal relevance to the central question to be considered at the Stay Relief Hearing: whether Bondholders have any security interest in employer payments under the Pay-Go system established by the Pension Reform Legislation." (Memorandum Order Granting Respondents' Urgent Motion in Limine to Exclude Evidence and Argument Regarding an Alleged April 27, 2016, Meeting with Movants' Representatives, Dkt. No. 544 at 5). Moreover, "[t]hese issues must be determined based on the legal effects of the Pension Reform Legislation rather than the parties' alleged intentions as to what those effects should be." (Id. at 6). In light of the fact that the motivation behind the change in systems is not controlling, balancing the interests of the litigants and the need for transparency with the

---

[7] The Court expresses no opinion as to the Oversight Board's motivation or the possible existence of any such documents.

[8] The Court engaged in a substantial discussion with Bondholders' counsel on this point at the May 2 hearing. (See May 2 Hr'g Tr. at 38-39, 43-44, 57). The Court expresses no opinion as to whether the Bondholders can establish a substantial need for this information in connection with other pending litigation regarding the Bondholders' security interest in ERS assets. (See Adversary Proceeding 17-AP-213).

importance of the deliberative process privilege, this Court rules that the Bondholders have not established a substantial need for the material to justify circumventing the privilege. See In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (holding that the privilege's "ultimate purpose [] is to prevent injury to the quality of agency decisions by allowing government officials freedom to debate alternative approaches in private." (citing N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 151, 95 S. Ct. 1504, 1516-17, 44 L. Ed. 2d 29) (internal punctuation omitted)).

Recognizing this Court's earlier ruling, the Bondholders argue that their need for the information is even greater from the Oversight Board which, according to the Bondholders, is the entity that "devised the plan to circumvent [the Bondholders' rights] by directing the Commonwealth to restructure ERS in a way that defeated the Bondholders' liens." (Motion to Compel ¶ 18). The fact that the Oversight Board may have been the motivating force behind the Pay-Go system (about which this Court expresses no opinion) does not alter the significance of the sought information to the issues raised by the Lift Stay Motion. Even if the Court were to adopt the Bondholders' claim about the Oversight Board's role as true, the Board's intent remains of marginal, if any, relevance. This Court overrules the Bondholders' argument that substantial need warrants the production of documents over which the Oversight Board has properly asserted the deliberative process privilege.

### Factual Information

The Bondholders next argue that "many of the Board's withheld or redacted documents appear to contain entirely factual material, including cash flow statements, forecasts, projections, models, and other documents." (Motion to Compel ¶ 23). Consistent with this Court's previous rulings, this Court again stresses that factual information is generally not

9

protected by the deliberative process privilege, with the exception that "where disclosing the factual information will disclose the deliberative information protected by privilege, that factual information is properly withheld as well." (May 15 Order at 4 relying on Stalcup v. CIA, 768 F.3d 65, 70 (1st Cir. 2014)). "The question is not merely whether the documents contain factual information – or even whether the document is predominantly comprised of findings of fact – but rather the degree to which the facts are indissolubly linked to the broader analysis." Stalcup v. CIA, 768 F.3d at 70.

In the May 15 Order, this Court held that AAFAF, ERS and the Commonwealth had met their burden of showing that for some of their withheld documents, factual information is intertwined with the privileged deliberations. (May 15 order at 4). Therein, the Court relied on the descriptions in the privilege log as well as declarations provided by the withholding entities. (Id.). In contrast, the Oversight Board has not met its burden here. Many of the privilege log descriptions for documents over which the deliberative process privilege has been claimed refer only to "embedded spreadsheet[s]" or "appendix materials." There is no indication in the description either that the disclosure of the factual information would disclose the deliberative process, or that the factual information cannot be segregated. The Oversight Board's *Declaration of Natalie A. Jaresko in Support of the Financial Oversight and Management Board for Puerto Rico's Assertions of Privilege* (Dkt. No. 535-2) ("Jaresko Declaration") does not add the necessary detail. Therein, Ms. Jaresko merely reiterates the importance of the deliberative process privilege to the Oversight Board's work, attesting as follows:

> It is vital to emphasize the importance of the deliberative process privilege to the work of the Oversight Board and its collaboration with the Commonwealth government and its instrumentalities. The fiscal plan and budget development processes involve review, analysis and exercise of judgments in developing the policies that a fiscal plan or a

10

>budget represents. In adopting those policies, the Oversight Board analyzed and
>debated various alternative assumptions, possibilities and judgments.

(Id. ¶ 6). Nowhere in Ms. Jaresko's declaration does she explain why factual information included in documents generated by the Oversight Board cannot be segregated without disclosure of privileged information. The information provided by the Oversight Board is significantly less detailed than the information provided in connection with the Commonwealth Motions. (Cf., e.g., Mahmud Declaration, Dkt. No. 502 ¶ 4(f)) (explaining that AAFAF was withholding a spreadsheet of financial projections where "[t]he projections, which include Pay-Go, were used by decision makers to determine appropriate revenue and expenditure levels for government entities under the Fiscal Plan. Disclosing the spreadsheets would reveal pension reform proposals and assumptions that were under consideration, thereby revealing the decision makers' thought process.").

Finally, it is unclear to this Court whether the Oversight Board has elected not to produce factual information because it believes that such information has already been provided by the other Respondents. (See Response ¶ 3) ("Movants do not address why there can be a 'substantial need' to obtain privileged deliberative materials in view of the Court's holding that '[t]he factual information necessary for [Movants] to present their position to the Court on [the Lift Stay Motion] has been produced.'"). Given the Oversight Board's role in the pension reform at issue, it is obligated to produce necessary documents regardless whether the Bondholders have obtained some of the information from other sources.

In light of the general descriptions in the privilege log and the supporting affidavit, neither the Bondholders nor the Court can confirm the Oversight Board's representation that the factual information which can be segregated has all been produced. (See Response ¶ 24).

Therefore, the Oversight Board is ordered to supplement its privilege log and supporting affidavit, and/or to produce the factual information producible in accordance with this Order by **June 12, 2019**.

### B. <u>Attorney-Client Privilege</u>

The Bondholders next challenge the Oversight Board's assertion of the attorney-client privilege over 224 documents. (Motion to Compel ¶ 24). As addressed below, the Bondholders' objections are sustained in part.

First, the Bondholders argue that many of the withheld documents appear not to contain legal analysis at all, or are described on the privilege logs through a vague claim that they contain legal advice. The First Circuit has identified eight essential elements of the attorney-client privilege. These are:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

<u>Cavallaro v. United States</u>, 284 F.3d 236, 245 (1st Cir. 2002) (internal citation omitted).

The Oversight Board carries the burden of establishing the privilege. <u>Id.</u> at 246. Some of the Oversight Board's documents, from their descriptions on the privilege logs, appear to reflect legal advice. (<u>See</u>, <u>e.g.</u>, April 29 Log at 8) ("Email between Oversight Board legal counsel, Oversight Board members, Oversight Board financial advisors, and Oversight Board staff discussing legal strategy and anticipated litigation in response to letter from purported ERS bondholders requesting adequate protection."). However, other of the Oversight Board's entries do not sufficiently show that the entire communication or attached documents consist of privileged legal advice. (<u>See</u>, <u>e.g.</u>, April 29 Log at 2 ("Email from Oversight Board member to

12

Oversight Board's legal counsel and the Oversight Board's consultants containing, reflecting, and seeking analysis (including legal analysis) of prospective pension reform legislation, with attachment.")). Documents and segregable parts of documents which do not contain or seek legal advice are not protected by the attorney-client privilege. Where that information is not otherwise protected, it must be disclosed. Accordingly, the Oversight Board must produce any non-legal information improperly withheld. This includes disclosing, to the extent possible, those segregable sections of documents which are not privileged. To the extent that any document remains privileged in the Board's view, the description in the privilege log should be more complete.

Second, the Bondholders argue that many of the documents are not protected by attorney-client privilege because they were sent to or from non-lawyer bankers and consultants. (Motion to Compel ¶ 26). The Bondholders contend that "these communications cannot be attorney-client communications, since the employees of these non-legal advisors are neither the attorney nor the client." (Id.). As this Court recently held, the presence of third-party advisors does not prevent application of the attorney-client privilege in limited circumstances. (May 30 Order at 7). In order for this narrow exception to apply, however, three elements must exist. First, "the third-party communications must be necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." Columbia Data Prods., Inc. v. Autonomy Corp., 2012 WL 6212898 at *15 (D. Mass. Dec. 12, 2012) (internal quotations and citations omitted). Second, "the third party's communication must serve to translate information between the client and the attorney." Id. (internal quotations and citations omitted). Third, "the third party's

13

communication must be made for the purpose of rendering legal advice, rather than business advice." Id. (internal quotations and citations omitted).

Third parties are present on many of the documents over which the Oversight Board claims the attorney-client privilege. The Court acknowledges the crucial importance of advisors to the work of the Oversight Board in this complicated and novel restructuring. The Court accepts that those advisors are often needed to translate between the Oversight Board and its attorneys in order for those attorneys to render adequate legal counsel, and the Court also understands that these advisors are often consulted solely for a legal purpose. However, the Oversight Board's privilege log does not show that this is the case every time these third parties are included in communications over which the Oversight Board has claimed the attorney-client privilege. For example, the Oversight Board has claimed the privilege over an "[e]mail between Oversight Board members, advisors, and legal counsel regarding certification of the Commonwealth Fiscal Plan, with attachments." (April 29 Log at 4). The communication includes third party consultants as well as counsel, and it is unclear from the description whether the third parties are serving a legal or a business function. Thus, the Oversight Board is hereby instructed to re-review those documents over which the attorney-client privilege has been claimed where third parties are present. Where the strict test outlined above is not met, and the document is not otherwise protected, the document must be produced. If the test is met, the description in the privilege log should be updated to more clearly state so.

In accordance with the rulings in this section, the Oversight Board must produce documents improperly withheld prior to this order and supplement the existing privilege log as

necessary for those documents over which it continues to assert the privilege. The Oversight Board must do so by **June 12, 2019**.

### C. Work Product

Finally, the Bondholders challenge the Oversight Board's assertion of the work product doctrine. (Motion to Compel ¶ 29) ("The Board claims work-product protection as to 199 documents. But its descriptions do not adequately substantiate the requirements for such protection."). The work product doctrine was first articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947) and is partially codified in Fed. R. Civ. P. 26(b)(3). It prohibits disclosure of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . ." Fed. R. Civ. P. 26(b)(3). The First Circuit takes a narrow view of the work product doctrine, and has articulated the standard as being a determination of whether the document was "prepared *for use* in possible litigation[.]" United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 27 (1st Cir. 2009) (en banc) (emphasis in original), cert. denied, 560 U.S. 924, 130 S. Ct. 3320, 176 L. Ed. 2d 1219 (2010). Under Textron;

> [i]t is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated. Rather . . . . 'the literal language of [Rule 26(b)(3)] protects materials *prepared for* any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.'

Id. at 29 (quoting Fed. Trade Comm'n v. Grolier Inc., 462 U.S. 19, 25, 103 S. Ct. 2209, 2213, 76 L. Ed. 2d 387 (1983)) (emphasis in original). Further, the First Circuit instructed in Textron that:

> Nor is it enough that the materials were prepared by lawyers or represent legal thinking. Much corporate material prepared in law offices or reviewed by lawyers falls in that vast category. It is only work done in anticipation of or for trial that is protected. Even if prepared by lawyers and reflecting legal thinking, '[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for

15

other nonlitigation purposes are not under the qualified immunity provided by this subdivision.'

Id. at 29-30 (quoting Fed. R. Civ. P. 26 advisory committee's note (1970)).

It appears from the Oversight Board's privilege log that some of the withheld information meets the First Circuit's high standard, and it appears that in other instances the Oversight Board has applied the protection too liberally. For example, based on the information in the privilege log, the Oversight Board properly applied the work product doctrine to "[e]mails between the Oversight Board, its counsel, and its consultants containing, reflecting, and seeking legal advice concerning demands for adequate protection from purported ERS bondholders, and discussion of legal strategy concerning the same." (April 29 Log at 2). The withheld documents include communications reflecting legal strategy intended for use in defense of legal action either already taken or to be taken by bondholders seeking adequate protection. On the other hand, the very next document listed on the log does not appear to meet the First Circuit's test. That document contains an "[e]mail from Oversight Board member to Oversight Board's legal counsel and the Oversight Board's consultants containing, reflecting, and seeking analysis (including legal analysis) of prospective pension reform legislation, with attachment." (Id.). This document does not appear to have been created for use in litigation.

The Oversight Board argues that "[g]iven the constant litigation concerning the ERS Bonds since the Oversight Board's inception, it should be no surprise that the Oversight Board reasonably anticipated, and continues to anticipate, extensive litigation concerning ERS, the ERS Bonds, and the Commonwealth's Pay-Go system." (Response ¶ 36). The Court acknowledges that Puerto Rico's restructuring has been heavily litigated since its inception and that the

Oversight Board expects litigation on much of what it does. However, such an expectation of litigation does not warrant work product protection in the First Circuit. Those documents that were not prepared for use in litigation are not protected.

Finally, the Bondholders argue that all of the work product claims should be overruled because the work product doctrine is a qualified privilege that can be overcome through a showing of need. (Motion to Compel ¶ 31). The Bondholders contend they "have demonstrated that this evidence is at the heart of the Stay Relief Motion and that only the Board and the other Respondents are in possession of these critical materials." (Id.). The Bondholders have not shown why unveiling any of the documents the Oversight Board has created for use in litigation would be necessary for their effective litigation of the Lift Stay Motion. As detailed above, the Bondholders have not established that there is a substantial need for them to have privileged documents to prove the intent behind pension reform in connection with the Lift Stay Motion in general, and they have not established any more pressing need for the production of litigation documents. Accordingly, the Court denies the Bondholders' request to override the attorney work product doctrine in those instances where it was properly asserted by the Oversight Board.

Accordingly, the Oversight Board must re-review its documents and privilege log, and where information does not meet the First Circuit's test and is not otherwise protected from disclosure, the Oversight Board must produce that information. Again, if the documents are to remain privileged, the description in the privilege logs must satisfy the requirements of the work product doctrine. The Oversight Board must do so by **June 12, 2019.**

### III. Conclusion

In accordance with the above, the Motion to Compel is ALLOWED IN PART AND DENIED IN PART. The Oversight Board shall produce documents, supplemental logs and supporting affidavits as described herein on or before **June 12, 2019** unless the parties agree otherwise. The parties shall meet and confer and provide a status report to the Court on or before **June 14, 2019**.

This order resolves Dkt. No. 512 in 17-BK-3566 and Dkt. No. 6998 in 17-BK-3283.

SO ORDERED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

DATED: June 6, 2019