```
 1                    UNITED STATES BANKRUPTCY COURT

 2                      DISTRICT OF PUERTO RICO

 3
     In Re:                      )        Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )        Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,                )        (Jointly Administered)
                                 )
 7   as representative of        )
                                 )
 8   The Commonwealth of         )
     Puerto Rico, et al.,        )        November 7, 2018
 9                               )
                 Debtors.        )
10
     _____
11
     In Re:                      )        Docket No. 3:17-BK-4780(LTS)
12                               )
                                 )        (Jointly Administered)
13   The Financial Oversight and )
     Management Board for        )
14   Puerto Rico,                )
                                 )
15   as representative of        )
                                 )
16   Puerto Rico Electric        )
     Power Authority,            )
17                               )
                 Debtor.         )
18
     _____
19

20

21

22

23

24

25
```

```
 1  _____

 2
    In Re:                      )      Docket No. 3:17-BK-3567(LTS)
 3                              )
                               )      (Jointly Administered)
 4  The Financial Oversight and )
    Management Board for        )
 5  Puerto Rico,                )
                               )
 6  as representative of        )
                               )
 7  Puerto Rico Highways        )
    and Transportation          )
 8  Authority,                  )
                               )
 9              Debtor.         )

10  _____

11                    OMNIBUS HEARING

12   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13            UNITED STATES DISTRICT COURT JUDGE

14  _____

15
    APPEARANCES:
16
    For The Commonwealth
17  of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
                             Mr. Brian Rosen, PHV
18                               Appearing in New York
                             Mr. Hermann Bauer, Esq.
19
    For the U.S. Trustee
20  Region 21:              Ms. Monsita Lecaroz Arribas, AUST

21  For Official Committee
    of Unsecured Creditors:  Mr. Luc Despins, PHV
22                           Mr. Juan Casillas Ayala, Esq.

23  APPEARANCES, Continued:

24  For U.S. Bank National
    Association:             Mr. Clark T. Whitmore, PHV
25                           Mr. John T. Duffey, PHV
```

```
 1   For Puerto Rico Fiscal
     Agency and Financial
 2   Advisory Authority:        Ms. Suzzanne Uhland, PHV
                                Mr. Luis Marini Biaggi, Esq.
 3                              Ms. Carolina Velaz Rivero, Esq.
     For Puerto Rico
 4   Electric Power
     Authority:                 Mr. Kevin Finger, PHV
 5                              Mr. Nathan Haynes, PHV
                                Ms. Katiuska Bolaños Lugo, Esq.
 6
     For Pan American
 7   Grain Company, Inc.:       Ms. Maria Figueroa y Morgade, Esq.

 8   For Cooperative de
     Ahorro y Credito
 9   Vegabajeña:                Mr. Carlos Quilichini Paz, Esq.

10   Fee Examiner:              Mr. Brady Williamson, PHV
                                Ms. Katherine Stadler, PHV
11

12

13

14

15

16

17

18

19

20

21
     Proceedings recorded by stenography.  Transcript produced by
22   CAT.

23

24

25
```

```
1                           I N D E X

2    WITNESSES:                                        PAGE

3          None offered.

4

5    EXHIBITS:

6          None offered.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                  San Juan, Puerto Rico

2                                  November 7, 2018

3                                  At or about 9:45 AM

4                          *     *     *

5          THE COURT:  Good morning and welcome to counsel,

6    parties in interest, members of the public and the press here

7    in San Juan, those observing here and in New York and the

8    telephonic participants.  As always, it is good to be here in

9    San Juan.

10         A brief reminder.  The rules regarding devices in the

11   courtroom, not to be used for communication or recording,

12   apply to these and all proceedings, both here and in New York.

13   And I'm grateful for your continued compliance with those

14   principles.

15         I would now call upon counsel for the Oversight Board

16   to begin the status report.  Mr. Bienenstock.

17         MR. BIENENSTOCK:   Thank you.  Good morning, Judge

18   Swain.  Martin Bienenstock of Proskauer Rose for the Oversight

19   Board.

20         Your Honor's request for a status report identified a

21   few issues, the first of which was a report about the

22   evaluation of recent disclosures of McKinsey Security

23   Holdings.  Your Honor, my firm, Proskauer, represents McKinsey

24   in various matters, so the Oversight Board asked another of

25   its legal advisors, the Luskin & Stern firm, to look into
```

1   this.  And Michael Luskin, who is in New York, I can see him

2   now on the video, is prepared to respond to that portion of

3   the status report, if that's okay.

4           THE COURT:  Thank you.  That's much appreciated.

5           And so, Mr. Luskin, good morning.

6           I'm not able to hear Mr. Luskin, so we'll need to

7   have the sound checked.  Let's hold on for a minute.

8           MR. LUSKIN:  Can you hear me?  I'm at the lectern

9   mic.

10          THE COURT:  We're hearing you now.  Thank you.  Good

11  morning.

12          MR. LUSKIN:  Okay.  Good morning, Your Honor, and

13  thank you for allowing me to appear by video.  This is my

14  first in person appearance in these proceedings and I'm happy

15  to be here.

16          I am here, as Mr. Bienenstock referred, to confirm my

17  retention by the Board, my very recent retention by the Board

18  on this particular matter, which is to investigate the

19  consequences, the facts and implications of recent disclosures

20  concerning McKinsey and its work for the Board and its

21  holdings with Puerto Rico public debt.

22          As I said, this is at the very beginning of my

23  investigation.  It will culminate in a public report, not only

24  on the factual findings, but also the Board's own procedures

25  and policies concerning (inaudible) --

1        THE COURT:  You'll need to speak directly into the

2   microphone.  You're starting to fade.

3        Did you say that your work will culminate in a public

4   report?

5        MR. LUSKIN:  Yes, I did, Your Honor.

6        The Board has made very clear that this is to be a

7   transparent proceeding, that the report will be public.  I

8   expect it will take a couple of months at least, but it will

9   culminate in a public report.

10       So I have no substance to report now.  I really just

11  wanted to introduce myself and to assure the Court and parties

12  in interest that this matter is being taken, of course, very

13  seriously by the Board, and we're doing what I think the Court

14  and parties would expect us to be doing.

15       THE COURT:  Thank you.

16       MR. LUSKIN:  Unless the Court has any questions, I'm

17  happy to yield the microphone back to Mr. Bienenstock to

18  continue the status report.

19       THE COURT:  I just -- you may have mentioned this,

20  but do you have a particular time frame and prospect for the

21  work?

22       MR. LUSKIN:  I'm currently anticipating it will take

23  a couple of months, a few months.  I'd really like to get this

24  done by year end, if at all possible.

25       THE COURT:  Thank you, Mr. Luskin.

1     MR. LUSKIN:  Thank you, Your Honor.

2     MR. BIENENSTOCK:   Thank you, Your Honor.

3     In terms of the status report about the anticipated

4 timetables for the proposal of adjustment, plans of adjustment

5 of Title VI, Title VI Qualifying Modifications, I can report

6 as follows:  As the Court knows better than anyone else,

7 yesterday the order was entered approving the Qualifying

8 Modification for GDB, which was a major step forward, handles

9 about four to five billion dollars of the 74 billion

10 approximate amount of bond debt that we're trying to

11 restructure.

12     The COFINA deal that resulted from the process Your

13 Honor kicked off with the approval of a stipulation way back

14 towards the beginning of the case led to a proposed plan of

15 adjustment that has already been filed.  And the proposed

16 disclosure statement is to be heard, I believe, in less than

17 the next two weeks.  I think it's --

18     THE COURT:  November 20th.

19     MR. BIENENSTOCK:  Oh, November 20.

20     THE COURT:  Yes.

21     MR. BIENENSTOCK:   And if that is approved, and

22 nothing goes wrong, including tinkering with the deal through

23 legislation, et cetera, we hope to -- we hope that that will

24 be confirmed in January of 2019.

25     The next major matter -- they're all major matters,

1   but the next major debt restructuring that I can report on is

2   PREPA.  PREPA, as Your Honor knows, has approximately eight to

3   nine billion dollars of bond debt and several billion more of

4   other types of financial debt and other debt.

5          The first two segments of my report on PREPA are

6   based on information that we've received from PREPA's

7   representatives.  In terms of its cash position, as of

8   November 2, operating cash balances were approximately 327

9   million dollars.  Because the Commonwealth debtor in

10  possession loan facility requires the cash on hand above 300

11  million dollars be paid to the Commonwealth on account of the

12  loan, a payment of 27 million dollars was made on November 2,

13  2018, leaving a debtor in possession loan balance of

14  approximately 147 million dollars as of that date.

15         PREPA's operational cash receipts are currently

16  sufficient to serve as expenditures for operations.  During

17  the month of October, average weekly cash collections from

18  customers were approximately 65 million dollars.  PREPA,

19  therefore, should not require additional financing for

20  operations in the near term.  I want to emphasize that's

21  operations.

22         As the Court knows, because of the hurricane, there

23  was lots of repair and replacement to do, and some of it -- of

24  course we get significant amounts from the Federal Government,

25  but that doesn't cover everything.

1    THE COURT:  Have the Federal Government dollars

2  actually been coming in?  I understand that there are some

3  respects in which federal money has been approved but not

4  actually disbursed.

5    MR. BIENENSTOCK:  I'm not aware of that money coming

6  in, but the Federal Government has obviously expended major

7  funds for repair and replacement, which are funds that PREPA

8  would otherwise have to expend.  So in that sense, we've been

9  the beneficiary of very substantial federal funds for the last

10  year.

11    In terms of PREPA operations, PREPA is moving forward

12  with reviewing responses to several requests for proposals for

13  generation -- for generation for different parts of the

14  island.

15    As Your Honor knows, the -- when we speak about the

16  restructuring of PREPA, unlike the restructuring of some of

17  the other entities, we're really talking about two

18  restructurings proceeding simultaneously.  One is for the

19  debt.  The other is to transform the method of generation from

20  fossil fuels to other fuels that are both less expensive and

21  cleaner.  And it's somewhat tricky to coordinate the two, but

22  that's what's happening.

23    As a practical matter, we believe investors will want

24  to know what amount of debt they need to prepare to carry

25  going forward, or that will be carried somehow going forward.

1  And we are anxious to deal with the debt in any event, so both

2  processes are proceeding simultaneously.

3          PREPA continues to run the generation fleet as

4  economically as possible, while keeping in mind the

5  overarching goal of maintaining grid resiliency.  PREPA is

6  actively pursuing different alternatives for generation

7  resources or a conversion to cleaner burning fuels, such as

8  liquid natural gas.

9          Power has been restored to over 99 percent of the

10  customers on the island.  Current average weekly generation

11  delivered to the power grid is approximately 93 percent of

12  2016 levels.  Approximately 96 percent of the island's 342

13  substations, and 96 percent of the 56 transmission centers are

14  energized.  Approximately 88 percent of 103 large transmission

15  lines are fully in service.

16          In respect of the debt restructuring aspect of PREPA,

17  Your Honor, PREPA, the Oversight Board and AAFAF entered into

18  a preliminary Restructuring Support Agreement, RSA, with an Ad

19  Hoc Group of uninsured bondholders in July 2018, which has

20  been extended several times and remains in place to allow the

21  parties to complete negotiations on a more comprehensive RSA,

22  for which we expect to seek Court approval when it's done.

23          The consenting holders hold a significant amount of

24  the outstanding approximate 8.8 billion of PREPA bond debt.

25  We will be meeting this week, and in fact, I believe it's in a

1    few hours in New York, with the Ad Hoc Group and

2    significantly, one of the monoline insurers that filed the

3    receiver motion to continue working through certain provisions

4    of a definitive agreement.

5         So we're trying to expand the group from the

6    uninsured bondholders that we did the initial RSA with to

7    include the monolines that obviously they are the insurers of

8    the insured group of bonds, and they have significant

9    exposures and therefore, are significant to any debt

10   restructuring.

11        We have also reviewed our current proposal with other

12   monoline insurers that are party to the receiver motion.  So

13   there's communication and progress with both the insured and

14   uninsured bonds.

15        It's hard to predict timing, but we certainly hope,

16   and we know the bondholders hope, that we're talking about

17   something that will culminate in at least a request for this

18   Court's approval of the RSA in a matter of months when we

19   might have a final plan of adjustment.  We want it as soon as

20   possible, but it's really hard to -- with any reliability, to

21   give Your Honor a sense of when that might be possible.

22        As far as the transformation process, the process to

23   transform the electric sector is proceeding on schedule in

24   accordance with the Fiscal Plan.

25        The following is a summary of the recent and updated

1    milestones from the Fiscal Plan.  The Public-Private

2    Partnership, P3 Authority completed a market sounding process

3    in mid June, which confirmed significant industry interest in

4    a concession transaction for the private operation of the

5    transmission and distribution system.

6         The P3 Authority posted a Request for Qualifications,

7    an RFQ, on October 31 asking interested parties to submit

8    their qualifications for operating and improving the

9    transmission and distribution system, with responses due on

10   December 5, 2018.  The RFQ has been filed under an informative

11   motion with this Court.

12        The P3 Authority will then issue a request for

13   proposal seeking bids from the qualified candidates.  And

14   supporting legislation and the integrated resource plan are

15   also in process and are expected to be completed in January.

16        So, Your Honor, we're -- as the Court can tell,

17   simultaneous progress is being made, both on the physical

18   transformation and on the debt restructuring.  And it is so

19   critical to reenergize growth on the island -- the cost of

20   power is a fundamental factor in future growth -- that it's in

21   everyone's interest, the government's, the people's and the

22   creditors' to get this done as quickly as possible, and that's

23   what we're trying to do.

24        THE COURT:  And the qualifications and proposals that

25   are being reviewed in this current P3 related process, that's

1   for an entity that will move and make more concrete the

2   visioning for the transformation?  Is that the phase or --

3           MR. BIENENSTOCK:  Well, they will propose exactly how

4   they would like to generate power, what type of fuel they will

5   use, and the economic terms on which they're willing to do

6   that and how much they're willing to pay for the right to do

7   that.

8           THE COURT:  Thank you.

9           MR. BIENENSTOCK:  Your Honor, the other major debt

10  restructurings, some of which can be handled independently and

11  some which have interrelationships, are basically the

12  Commonwealth, HTA, PRASA, PBA, UPR and others.  And some of

13  these, most likely UPR, but not definitely, are more prone to

14  a Title VI than a Title III.

15          What I can tell you about these is not nearly as

16  specific as what I could advise the Court about PREPA, but I

17  can say that in every single one of these situations, there

18  have been and are ongoing negotiations with either all or a

19  subset of the creditors of each entity.

20          As Your Honor knows, to provide an example of the

21  interconnectedness, there's a dispute between creditors of the

22  Commonwealth on the one hand and creditors of HTA on the other

23  as to whether the so-called clawback revenues can and should

24  be clawed back from HTA to the Commonwealth and on what

25  conditions.

1          That might create the need to propose or confirm both

2     plans at once for HTA and the Commonwealth or not.  It's not

3     necessarily critical.  But negotiations are ongoing with

4     keeping those things in mind.

5          In some cases, things like toll hikes or other

6     increased rates have to be part of the discussion, and the

7     government is involved in that.  And I can, from personal

8     knowledge, say that every day is spent working on these

9     things.  But again, to give the Court a timetable would be

10    really more guesswork than probabilistic.

11         I will say that if at all possible, we want to pull

12    together restructurings that could be heard in some form or

13    final form by the Court by this summer.  That may or may not

14    be possible with all of them, but certainly with some of them.

15              THE COURT:  That is good news.

16              MR. BIENENSTOCK:  Thank you, Your Honor.

17              THE COURT:  Thank you, Mr. Bienenstock.

18              MR. BIENENSTOCK:  The next item on the agenda are the

19    Fee Examiner report and applications, so I'll turn things over

20    to Mr. Williamson.

21              THE COURT:  Thank you, Mr. Bienenstock.

22              MR. BIENENSTOCK:  Mr. Williamson's colleague, Your

23    Honor.

24              THE COURT:  Good morning, Ms. Stadler.

25              MS. STADLER:  Good morning, Judge.  Katherine Stadler

1   of Godfrey & Kahn on behalf of Brady Williamson, the Fee

2   Examiner, who is also here in person.

3         Judge, we filed our report on the third interim fee

4   period applications last week recommending 28 applications for

5   the Court's approval.  Since the filing of that report, one

6   additional application, that of Bennazar, Garcia & Milian, has

7   been resolved.  That application is on your agenda at item 11

8   on the deferred list.

9         So we will be moving the Bennazar application to the

10  list of resolved applications that was attached to our report

11  and submitting a Proposed Order, with Your Honor's permission,

12  that will include all of the originally recommended

13  applications, plus that one additional.  And we will do that

14  as soon as we have a ruling and instructions from the Court on

15  our recommendations.

16        As you know, our report in this period addressed the

17  McKinsey Consulting applications, all three of the interim

18  pending fee period applications.  So we successfully worked

19  through a significant backlog there.

20        THE COURT:  Yes.

21        MS. STADLER:  We tried to carry out Your Honor's

22  instructions in previous hearings and discussions to come up

23  with a methodology for evaluating the reasonableness of the

24  McKinsey fees, not withstanding the nature of their

25  timekeeping or nontimekeeping, as the case may be.

1          As you know, they are retained on a flat fee that is

2    based on a GSA contract price that the government has

3    negotiated.  While the Oversight Board is not technically an

4    entitled user of that GSA price schedule, that pricing has

5    been used as the foundation of the pricing that McKinsey uses.

6    And we've gone through that for you in our report and I'm

7    happy to answer any questions you have about that.

8          The other suggestion that Your Honor made that we

9    took to heart was to try, as we might, to come up with some

10   estimation of time being spent and number of timekeepers.  And

11   so the efforts described in the report resulted in the Exhibit

12   B to the report, which is very crude, and I almost feel the

13   need to apologize to McKinsey because I'm quite sure it

14   understates the amount of work and person hours that are put

15   into these projects on a weekly basis.

16         But not withstanding that, even using this very

17   conservative estimate of hours expended, we've calculated an

18   average blended hourly rate, which is generally consistent

19   with other consultants working on these cases and in the

20   market in general.

21         So with those observations, the Fee Examiner is

22   comfortable now recommending to the Court approval of the

23   McKinsey applications as they are filed based on the reasoning

24   laid out in our report.  And I'm happy to answer any questions

25   you may have on that.

1        THE COURT:  I would just comment that I commend and

2   very much appreciate the fact that you took my request and

3   guidance to heart, and the way in which you have laid out in

4   the report the nature of the investigations and the benchmarks

5   that you have used to make the evaluation that led you to

6   support approval of the fees, and the insight that you have

7   given us into the extent and nature of the work that is being

8   performed for those fees.  So thank you.

9        MS. STADLER:  You're welcome, Your Honor.

10       If Your Honor has no other questions, I think a

11  couple of the informative motions indicated that some speakers

12  want to address fee matters.  So the Fee Examiner has asked

13  that those people speak first, and then he has a few wrap-up

14  comments he would like to make.

15       THE COURT:  I do have a couple of questions --

16       MS. STADLER:  Okay.

17       THE COURT:  -- before that.

18       MS. STADLER:  Yes.

19       THE COURT:  The report indicated some discomfort in

20  ongoing discussions with fee increases --

21       MS. STADLER:  Yes.

22       THE COURT:  -- by service providers.

23       MS. STADLER:  Yes.

24       THE COURT:  Are those across the board, firm hikes in

25  rates?  Are those seniority, promotion related?  Can you give

1  me a little bit more color as to what those are?

2       MS. STADLER:  Yes, they are both and they are not

3  uniform.  As you know, all of the professionals have different

4  engagement agreements with their respective clients, and some

5  of those address issues.

6       For example, the Oversight Board counsel has a flat

7  hourly rate which does not provide for rate increases at all.

8  Others have contracts that explicitly allow them, and most

9  have contracts that don't address whether they are appropriate

10  or not, other than to say we will charge, you know, our

11  pricing based on the following discount model.  But the issue

12  of rate increases and adjustments isn't explicitly addressed

13  in most of the engagement agreements of the professionals that

14  we are reviewing.

15       The increases that we have seen encompasses both of

16  those categories that Your Honor just described.  Seniority

17  increases, which apply almost exclusively to associates in

18  their first ten years of practice, those tend to be although

19  aren't uniformly imposed in the fall on the employment

20  anniversaries of many associates.  And then there are also

21  market adjustments that many firms implement, tending to be in

22  connection with their fiscal year ends, many of which, but not

23  all of which are also at the end of the calendar year.

24       So with this fee period falling fully in 2018 for the

25  first time, we've really seen the impact of the rate increases

1  that might have happened last fall and in January for many

2  firms.  And I think as the report previews for you, the Fee

3  Examiner is concerned not so much about the impact so far,

4  although that is calculated for you and is not insignificant,

5  but the potential for exponential --

6          THE COURT:  Yes.

7          MS. STADLER:  -- growth and the impact of those rate

8  increases over time, given what we know about the expected

9  timeline of the debt restructuring processes that

10  Mr. Bienenstock just addressed.

11          And so Mr. Williamson, and he'll address this

12  directly I'm sure, but he feels strongly that much as we did

13  with the presumptive standards that we talked about last time,

14  that he would like to propose and put into place presumptive

15  caps on rate increases so that everyone's expectations are

16  clear and so that hopefully we can minimize contested issues

17  over rate increases.

18          At the moment, many of the applications that are on

19  the deferred list are on the deferred list because they have

20  that issue.  And we're working very hard with the

21  professionals, and the professionals are working very hard

22  with us to work through those issues and try to bring those to

23  a consensual resolution for the fees that have already been

24  charged.

25          But going forward, Mr. Williamson feels very strongly

1    that in a case like this, there are some limits on rate

2    increases that need to be imposed, and that without explicitly

3    stating them, it creates, you know, a disincentive for people

4    to exercise discipline in the imposition of those rate

5    increases.

6          So much as we have in other areas, he intends to

7    articulate either through a motion or objection, should that

8    be necessary, hopefully through another advisory motion or

9    motion for presumptive standards, we would bring back in

10   December a proposal for a prospective treatment of rate

11   increases that would cover both categories, both the market

12   annual adjustments and the seniority adjustments, which

13   probably will require slightly different treatment to each of

14   them.

15         THE COURT:  Well, I am glad to hear that

16   Mr. Williamson is engaging these issues directly, and I will

17   look forward to the results of the current negotiated work and

18   also to his insight and advice as to appropriate structural

19   measures to put in place, because we all know why we're here.

20         We all know how big the job is and how important it

21   is for resources to be maximized for efficient, economical and

22   productive work in creating a platform on which Puerto Rico

23   can go forward with resources that can be used for the

24   island's growth.

25         So thank you, and thanks to all of the professionals

1   who are cooperating in this process.

2            MS. STADLER:  Thank you, Judge.

3            THE COURT:  Thank you.

4            And so who would like to be heard next on fee issues?

5   I have the names of a couple of people who are in New York.

6   Is there anyone in this courtroom?  All right.

7            We'll turn to -- I understand that -- was there

8   someone in New York who wished to be heard on the fee-related

9   issues?  No.  All right.

10           Then, Mr. Williamson.  Thank you.  Good morning.

11           MR. WILLIAMSON:  Thank you.  Good morning, Your

12   Honor.  Brady Williamson, Godfrey & Kahn.

13           Let me start with a generic but quite important

14   observation, which is this is the third report we've given the

15   Court.  And I think at each juncture, we have commented on the

16   cooperative, collegial approach for which much of the credit

17   goes to the professionals themselves.

18           Now, I know the Court expects that.  The Court

19   expects that out of the professionals.  The Court expects that

20   of us.  But it's noteworthy because as we're now finishing the

21   review of the third period, the issues, quite frankly, are

22   getting more difficult, which means the negotiations take a

23   little longer and the negotiations themselves get more

24   difficult.

25           But with respect to the communication, the collegial

1    nature of the discussions, I think the Court can be satisfied

2    that if there are objections, if there are problems, it will

3    not be for want of trying to avoid them.

4         In about two weeks, Your Honor, the professionals

5    will file their fourth set of fee applications, which then

6    gets us into the second year of the review process.  And it's

7    important, I think, to note that we view our challenges as

8    both retrospective, that is, to look at the fee applications,

9    which are always two or three months behind, or the process by

10   definition is.  But as the Court could tell from Ms. Stadler's

11   remarks and the report, we're also trying, with the

12   cooperation of the professionals, to be prospective, so that

13   we're not constantly saying, oh, you should have done this,

14   you should have done that.

15        And I think as Ms. Stadler said, the December

16   hearing, I think, will feature at least two points that we'll

17   either bring as a motion or, if necessary, in the form of an

18   objection.  But again, our goal is not just hindsight, but

19   hopefully foresight.

20        And as the Court said, while massive resources are

21   needed here in the Commonwealth, they also need to be massive

22   resources applied efficiently.  Thank you.

23        THE COURT:  Thank you.

24        Mr. Bienenstock.

25        MR. BIENENSTOCK:  Your Honor, thank you.  I just

1    wanted to add one new item that pertains to the discussion

2    that just occurred.  It has nothing to do with what

3    Mr. Williamson wants to do or to contradict anything that's

4    been said, but it's simply new information that's going to

5    likely lead to changes that the Court might as well know about

6    now rather than be surprised later.

7            There is legislation that we understand has a

8    likelihood to be enacted in Puerto Rico that will for the

9    first time single out advisors in these cases and tax them,

10   creating -- starting with a withholding tax of 29 percent for

11   time spent working on the case outside of Puerto Rico.  If

12   that happens, I know from my own firm and I suspect for other

13   similar firms both in and outside the legal industry, no firm

14   can afford to provide the services for 29 percent less than

15   it's currently providing.

16           So there will probably be adjustments to

17   professionals' fee arrangements that will obviously be in the

18   applications that the Fee Examiner will be looking at, but

19   they will be unavoidable if this legislation is enacted.

20           THE COURT:  Are there hearings being conducted at

21   which publicly and formally professionals who will be affected

22   will be able to make this point to the legislators?

23           MR. BIENENSTOCK:  To my knowledge, no.  We're just

24   being told that this is what's happening.  And the sad part

25   about it is it likely will not result in any net benefit to

1   the revenues of the government, because the tax will be offset

2   by increased rates to cover the tax.

3           Just to give Your Honor a sense of the perspective,

4   at the outset of this, I think we were all aware that there

5   was something like a 1.5 percent tax on time spent in Puerto

6   Rico.  And we all knew that when we made our fee proposals.

7   But there was never anything like a 29 percent tax on time

8   spent outside Puerto Rico, which is the bulk of the time for

9   most of the professionals.

10          THE COURT:  Yes.  And when you say withholding --

11  although you say withholding, I think I'm hearing you that

12  this isn't just a timing of money issue.  This is a

13  withholding that is understood to be commensurate with

14  intended actual tax collection that under current federal and

15  out-of-state tax principles would not offset other taxes, but

16  would be a net increase, or a net decrease in the revenues?

17          MR. BIENENSTOCK:  Well, Your Honor, that's exactly

18  what we're studying before we, and I think the other advisors

19  and professionals, request any type of amendments.  If it's a

20  dollar-for-dollar credit against other taxes, it may just be a

21  timing issue and have very little impact.  But if it's not

22  just a credit, and I don't think it is, then it's basically a

23  reduction, a very material reduction of what everyone's -- but

24  we will know exactly what it is before we -- at least in my

25  firm's case, but I'm sure in everyone's case, before we

1    propose or suggest any amendments to any fee arrangements.

2           THE COURT:  And are you able to -- are you working

3    with AAFAF's counsel to be able to communicate to government

4    interests the complexities of the concerns here?

5           MR. BIENENSTOCK:  Your Honor, yesterday I was

6    surprised when I raised it that I was giving them information.

7           THE COURT:  Better late than never.

8           MR. BIENENSTOCK:  Which is rare.  Usually they know

9    before I know.  And so yes, the answer to Your Honor is yes,

10   we're discussing it with AAFAF.

11          THE COURT:  Thank you.

12          MR. BIENENSTOCK:  Yes.

13          THE COURT:  That is a matter of great concern if at

14   the end of the day, there are transaction costs and very real

15   out-of-pocket costs in terms of firms seeking to be grossed up

16   for the effect of the tax.

17          So I know that professionals have a deep and personal

18   interest in this, and I hope that there will be effective

19   discussion so that at the end of the day, whatever happens is

20   truly for the benefit of the Commonwealth and doesn't impede

21   these proceedings.

22          Now, I had been given notes that a couple of people

23   might have wanted to speak in relation to the COFINA status

24   from New York, and so I didn't call for that in connection

25   with the status reports, and I apologize for any oversight in

1   that regard.

2           So is there anyone in New York who -- here's someone

3   coming to the podium now.  Thank you.

4           MR. ROSEN:  Thank you, Your Honor.  This is Brian

5   Rosen of Proskauer Rose.  I just wanted to supplement what

6   Mr. Bienenstock said.

7           Your Honor, things are moving very well with respect

8   to the COFINA Plan of Adjustment.  And he is correct and you

9   are correct when you were referring to the dates for the

10  upcoming hearings.

11          The other item, though, I wanted to bring to the

12  Court's attention was that on October 18, the Unsecured

13  Creditors' Committee slash Commonwealth agent had filed a

14  motion for a Scheduling Order, and it was in connection with

15  what was referred to as a motion to enforce that they were

16  planning to file by a date certain.  After that was filed,

17  Your Honor, there was a period of negotiation between the

18  Oversight Board, the Unsecured Committee slash agent, and also

19  the COFINA agent.

20          And we are happy to report that on Monday, under the

21  cover of an informative motion filed by the Unsecured

22  Creditors' Committee, was attached a stipulation which

23  compromised and settled the motion to enforce, which actually

24  was not even filed.

25          It provides for that matter to be essentially held in

1    abeyance pending events that might or might not occur between

2    now and the hearing on January 16 in connection with the

3    approval of a 9019 motion and the confirmation of the COFINA

4    Plan of Adjustment.

5         Specifically, Your Honor, there is a provision in

6    there with respect to a supplemental certified fiscal plan

7    being filed for the Commonwealth.  And if, in fact, that

8    doesn't occur, then the motion to enforce will not be filed.

9    And also, the Unsecured Committee slash Commonwealth agent

10   will not otherwise object to the confirmation of the plan or

11   the 9019 motion for approval in the Commonwealth case, Your

12   Honor.

13        I don't know if the Court had the opportunity to

14   review that informative motion or the stipulation at this

15   point, but I wanted to bring it to the Court's attention.

16        THE COURT:  I am in the process of reviewing it.

17   It's something like a 27-page stipulation with many details.

18   So we are in the process of reviewing it.

19        And I take it the request, although it was filed

20   under an informative motion as opposed to a notice of

21   presentment or anything, the request and expectation is that

22   the Court enter it sooner rather than later since one of the

23   provisions is that if it's not entered soon, a November 16

24   deadline comes back?

25        MR. ROSEN:  That is correct, Your Honor.  The

1    stipulation provided for a so Ordered line for the Court.  But

2    yes, it would otherwise require the Creditors' Committee slash

3    agent to file some pleadings by next week.

4           THE COURT:  All right.  So as I say, we are in the

5    process of reviewing it to ensure that I understand what I am

6    being asked to sign.  And if anybody has any major,

7    substantive issues with it, they'd better let -- file an

8    informative motion and let us all know sooner rather than

9    later, because it is my goal to get that in place, as long as

10   I don't have problems with it, sooner rather than later.

11          MR. ROSEN:  Thank you very much, Your Honor.

12          THE COURT:  Thank you.

13          There was someone from Willkie Farr in New York?  Did

14   anyone else want to be heard from New York?

15          MR. ROSEN:  Your Honor, it's Brian Rosen again.

16   Mr. Forman is here, but he said in as much as there's nothing

17   to address, he has nothing further to say.

18          THE COURT:  Thank you very much.

19          And I neglected before Ms. Stadler and Mr. Williamson

20   needed to leave to conclude the Fee Examiner portion by saying

21   that the Court approves the Fee Examiner's recommended actions

22   on the fee applications that are listed in the operative

23   schedule to the Fee Examiner's report, with the addition of

24   the formerly deferred item that Ms. Stadler referred to that

25   had been number 11 in the list of deferred items.

1          And the Court expects that the Fee Examiner will

2    promptly be submitting a Proposed Order, and the Court does

3    intend to enter that Order.

4          And so the next item on the Agenda is the Debtors'

5    Motion to Establish the Omnibus Claims Objection Procedures,

6    which is ECF entry number 4052 in case 3283.

7          MR. ROSEN:  Your Honor, it's Brian Rosen again from

8    Proskauer Rose.

9          Your Honor, we filed this motion, excuse me, and it

10   entailed or it provided a connection within the notice period

11   of October 23.  We did not receive any objections to the

12   relief that was being requested in the motion.

13         Specifically, Your Honor, what we had asked to do in

14   there, in the proposed objection procedures, was really to

15   comply with Rule -- Bankruptcy Rule 3007, and essentially to

16   allow us to file Omnibus objections in amounts greater than

17   100.

18         Specifically, as the Court recalls, when I reported

19   previously, there are approximately 165,000 to 170,000 claims

20   that were filed in this case.  And as an example of this, in

21   connection with COFINA, there were between 3,500 and 4,000

22   claims filed.

23         Most of those, Your Honor, are multiples of the same

24   bond type of claims and really didn't need to be filed.  When

25   we distilled down what the number of claims actually might be

1   in COFINA, they number approximately ten.

2         So, Your Honor, it's obviously important for us to

3   try and remove as many of these claims as expeditiously as

4   possible, specifically in connection with solicitation for the

5   Plan of Adjustment that hopefully will begin by the end of

6   November.

7         So we are envisioning filing multiple Omnibus

8   objections, and we were looking to increase the number of

9   claims which might be included in an Omnibus objection from

10   the 100 to approximately 500.

11         As I said, Your Honor, these are multiples of bond

12   claims, and if we have the claim that's already been allowed,

13   or we will allow with respect to the Trustee, the Bank of New

14   York Mellon, there is no reason for the multiple claims to be

15   on the register.

16         Likewise, Your Honor, there are other claims in

17   COFINA that have nothing to do with COFINA.  And to the extent

18   that they are one-off claims and cannot be handled in a common

19   type of form of objection, we will file individual objections

20   to those claims.  And we envision there will be approximately

21   50 of those, Your Honor, all of which, though, are for no

22   liability save that they really relate to a different entity

23   or not any of the Title III debtors at all.

24         But specifically, Your Honor, in connection with this

25   Omnibus Procedures Motion, we did, upon consultation with the

1    Creditors' Committee, file an Amended Notice of Revised

2    Procedures.  Your Honor, we did that on October 31st.  And we

3    included with that a blackline copy of the Proposed Order, as

4    well as slight modifications to the objection procedures

5    themselves.

6           Specifically, Your Honor, we removed the possibility

7    that we could oppose any of these claims on a substantive

8    basis.  Rather, they were all nonsubstantive in nature.

9           We wanted to make sure that the notices were both in

10   Spanish and in English.  And we provided for the notice of

11   filing of reports with the Court when we do settle some of

12   these claims.  This would have been quite possibly the only

13   objection, had it been interposed, but as I indicated, Your

14   Honor, we were able to resolve this with the Creditors'

15   Committee, and that's why we filed the Amended Notice and the

16   Proposed Order.

17          Hopefully, Your Honor, that might allay any concerns

18   the Court might have with respect to this, and we ask the

19   Court to enter the revised Order that we filed under the

20   Amended Notice.

21          THE COURT:  The clarifications in the revised Order

22   are quite helpful.  I just have one question and one request,

23   I'll call it.

24          So the question is just to confirm that you

25   anticipate noticing up these large Omnibus objections in

 1  connection with scheduled Omnibus hearing dates; is that

 2  correct?

 3          MR. ROSEN:  Yes, Your Honor.

 4          THE COURT:  All right.  And then the request is that

 5  we move the reply deadline from two business days before the

 6  Omnibus hearing date, which is a travel date for many of us,

 7  to seven calendar days before the Omnibus hearing date.  Can

 8  you live with that?

 9          MR. ROSEN:  Absolutely, Your Honor.

10          THE COURT:  Thank you.

11          MR. ROSEN:  We'll make the modifications and if you

12  don't mind, we'll then submit a proposed final Order for the

13  Court's entry.

14          THE COURT:  I appreciate that very much.  Thank you,

15  Mr. Rosen.

16          And Mr. Despins is coming to the podium here.

17          MR. DESPINS:  Good morning, Your Honor.  Luc Despins

18  with Paul Hastings on behalf of the Committee.

19          We're happy that we're able to resolve the issues

20  regarding this procedure.  I just want to mention because it's

21  important that these are, I would say, the easy claims to deal

22  with.  The main event is really dealing with all the other

23  claims.

24          And we are working with the Oversight Board on coming

25  to court with an ADR procedure that would be expedited, that

 1  would be streamlined, because as the creditors on my committee

 2  will often say, even a plan of adjustment, it would be adopted

 3  tomorrow, confirmed tomorrow that would say we get X cents on

 4  the dollar, unless these cents are actually given because the

 5  claims have been resolved is meaningless, and meaningless also

 6  for the economy of Puerto Rico.

 7          They need to get those dollars, to spend those

 8  dollars.  And so, therefore, that process is complex and it's

 9  very important.  We're working with the Oversight Board on

10  that, hopefully coming back to the Court soon on that.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.  Do you have a sense of a time

13  frame?  Yes, I did notice when this was filed that it was

14  the --

15          MR. DESPINS:  Easy claims.

16          THE COURT:  The easy ones, yes.  And so I've been

17  waiting to hear what structure will be proposed for the ones

18  that are more complicated.

19          MR. DESPINS:  Well --

20          MR. ROSEN:  Your Honor, if I could perhaps address

21  that?

22          THE COURT:  Yes.

23          MR. ROSEN:  Yes.  We have been working with the

24  Unsecured Committee with respect to global procedures, and

25  we've been working with Ms. Uhland, who has been sitting there

1   on behalf of AAFAF, to come up with a concept that works for

2   everyone.

3          Obviously we had hoped to do this in the context of a

4   plan of adjustment, but as Mr. Bienenstock indicated, that is

5   not going to be as timely as we hoped it might be.  So we are

6   hoping to finalize these procedures.  If we can get it done

7   and filed before year end, that is our goal, Your Honor.  We

8   are actively engaged in that dialogue.

9          It will set up a process that will extremely

10  streamline not only the time frame in connection with hearing

11  these matters and bringing them on among the parties, but also

12  the amount of information that might otherwise be required for

13  the person who will be hearing and determining the allowance

14  of these claims so that it would be relatively small paperwork

15  and something easy for the Court or such other person to

16  ascertain.

17         THE COURT:  Thank you.  And so we might expect to

18  have something in connection with the January Omni or the Omni

19  after that?

20         MR. ROSEN:  I would hope it would be considered in

21  connection with January, Your Honor.

22         THE COURT:  Thank you very much.

23         MR. ROSEN:  Thank you, Your Honor.

24         THE COURT:  All right.  Is there anything else we

25  need to address before we move to the contested matters?  All

1    right, then.

2         The next agenda item is Pan American Grain Company's

3    Motion for Relief from Stay, which is ECF number 4004 in case

4    3283.

5         Good morning, Ms. Figueroa y Morgade.

6         MS. FIGUEROA Y MORGADE:  Yes, Your Honor.  Good

7    morning.  My name is Maria Mercedes Figueroa y Morgade on

8    behalf of Pan American Grain Company, Inc.

9         Pan American is the movant in the Motion for Relief

10   from Stay to request an Order to execute set-off, as the Court

11   mentioned, at ECF number 4004.  In order to efficiently use

12   this time before the Court, Pan American would like to focus

13   today's hearing on the pivotal issue in this matter.

14        Pan American filed the request for set-off in order

15   to use the value of its prepetition bonds due prior to the

16   filing of the Title III case and set-off against a prepetition

17   power service liability owed by Pan American to PREPA.

18        And the pivotal issue here stems from the oppositions

19   filed by the PREPA Trustee, U.S. Bank National Association and

20   PREPA itself.  Both of these objectors were -- both of these

21   objectors stem their arguments on the no-action clause

22   included in the Trust Agreement.

23        The objections are well-taken and well-founded, but

24   the Court can use, and Pan American moves the Court to use its

25   equitable powers and just eliminate Pan American from that

1  no-action clause.

2  THE COURT:  How is it that the Court could, by use of

3  an equitable power, essentially rewrite a contract and grant a

4  right to a party that does not exist under a contract that

5  binds not only that party but many other similarly situated

6  bondholders, binds the Trustee, and obviously to which the

7  bond issuer is also a party?

8  MS. FIGUEROA Y MORGADE:  Well, Your Honor, Pan

9  American is not requesting that under the Court's equitable

10  powers, it rewrite the contract or rewrite the no-action

11  clause.  What Pan American is requesting is that under the

12  factual scenario where there are eight billion dollars in debt

13  by PREPA to bondholders, this one million dollar set-off

14  transaction that is allowed under the Bankruptcy Code and is

15  allowed under PROMESA, because it is incorporated in PROMESA's

16  general provisions, that would allow the Court to provide Pan

17  American the opportunity to execute the set-off.

18  If the Court finds -- that is why it's the pivotal

19  issue, is the no-action clause.  If the Court finds that the

20  no-action clause is a broad application and will be applied

21  also to Pan American's right to set-off under Section 553 of

22  the Bankruptcy Code, then the matter is over.

23  If the Court finds that there are factual grounds

24  regarding the amounts and the harmless execution of the

25  set-off, which will really not effect other bondholders, will

1    not effect PREPA -- PREPA will receive cash upon the execution

2    of the set-off, and it will not effect the work of the

3    indentured Trustee.

4         THE COURT:  Thank you.  So I am -- before you sit

5    down, I'm assuming that the facts on which you would want me

6    to focus in such an analysis basically boil down to the

7    question of whether this particular proposed settlement would

8    be de minimis financially in the broad scheme of things.

9         I would ask whether there's any kind of difficulty

10   with that approach when you think -- when I have to consider

11   the possibility that there are other PREPA bondholders who may

12   also be customers.  There might also be other bondholders who

13   have some equally compelling rationale out of other commercial

14   transactions so that there would be -- even if this were

15   possible legally, this could be a situation that's not a

16   one-off situation, that would have individualized

17   complications, transaction costs, and ultimately, financially

18   might even add up to something that's not de minimis.

19        Is there a way that you have in mind for me to manage

20   my thinking about this issue that would give me some comfort

21   in that regard?

22        MS. FIGUEROA Y MORGADE:  Your Honor, it's really a

23   factual review upon the particular circumstances of what comes

24   before the Court and is requested by other bondholders.  There

25   is really no bright light to resolve this case.  It has to be

1   on a factual review and fact intensive.

2          And we do understand that the Court would be

3   concerned with how events unfold and if this would open the

4   door to other bondholders coming forward, but each one would

5   have to meet the standard of having factual grounds to come

6   forward and convince the Court of their legal request.

7          Here, Pan American has a right to set-off, and most

8   importantly, Pan American, as a bondholder, did not

9   voluntarily agree to waive its rights to set-off.  It did not

10  expressly consent to the application of the no-action clause.

11  And the Trustee Agreement, the indenture contract is really a

12  standard contract that was imposed on Pan American.

13         So what we have here is an entity requesting to

14  set-off to a prepetition debt with PREPA, and that is a

15  statutory right under the Bankruptcy Code applicable in

16  PROMESA.

17         And we have the indenture agreement, but it appears

18  that from the arguments of both the Trustee and PREPA, what

19  they want to do is elevate the indenture agreement to a

20  statutory provision of the Bankruptcy Code.

21         So the balances of equities here and the Court's

22  equitable relief would allow, in fairness to Pan American,

23  which is a request that is of limited amount, of a limited

24  amount, and that will yield cash for PREPA to simply have the

25  Court allow Pan American to execute the set-off.

1        THE COURT:  Thank you.

2        MS. FIGUEROA Y MORGADE:  That's our position.  Thank

3   you.

4        MR. FINGER:  Good morning, Your Honor.

5        THE COURT:  Good morning.

6        MR. FINGER:  Kevin Finger of Greenberg Traurig on

7   behalf of PREPA.

8        As counsel noted, PREPA did file an objection, as did

9   the PREPA Bond Trustee, U.S. Bank.  Counsel for U.S. Bank and

10  I have agreed to divide our time so that I'll take nine

11  minutes and he'll have six minutes for his argument.

12        THE COURT:  Thank you.

13        MR. FINGER:  And Your Honor, let me take what was

14  going to be the end of my argument and put it at the beginning

15  because of the way counsel has presented it.  But essentially

16  in Pan American's reply, they ask the Court to adopt the

17  concept of equitable set-off.

18        There is no provision under the law for a concept of

19  equitable set-off.  In fact, the First Circuit in the *Public

20  Service Company of New Hampshire* has explicitly rejected the

21  concept of equitable setoff.  So there is no basis here for

22  the Court to apply that principle and permit Pan American to

23  move forward with set-off.

24        This brings us back to the law.  There is no right to

25  set-off.  They have claimed a right to set-off, but it doesn't

1    actually exist under the law.  And that's because of the

2    requirements of Section 553 of the Bankruptcy Code, which

3    requires both a mutuality of debt, as well as a substantive

4    provision either under federal or applicable state law that

5    creates the right to set-off.  A movant cannot satisfy either

6    requirement.

7          The First Circuit has defined mutuality as debts with

8    the same right, between the same parties, in the same

9    capacity.  And the rights here are defined by the Trust

10    Agreement.  It's not an elevation of the Trust Agreement to

11    that of a statute, but it's the document by which bondholders

12    agree to be bound in the provisions therein, and that's what

13    defines the rights of the parties.

14          So to be sure, Pan American owes a set debt to PREPA

15    in the form of two million dollars owed for electrical service

16    prepetition, but PREPA does not owe that obligation to Pan

17    American.  PREPA owes the obligation to repay the bonds to the

18    PREPA Bond Trustee who acts on behalf of the bondholders who

19    share in any receipts to the Trustee in a prorata basis.

20          So they are not the same parties, and that is made

21    clear by, as counsel referenced, the no-action clause, which

22    is Section 808 of the Trust Agreement, which does not permit a

23    single bondholder or even a collection of bondholders to bring

24    an action unless they have at least ten percent of the

25    outstanding bonds.

1        That particular exception to the no-action clause

2    does not apply in this case.  So in the words of movant's

3    counsel, that essentially ends the analysis.  The no-action

4    clause does not permit the bondholder to bring this action

5    and, therefore, there is no mutuality of the parties or of the

6    debts.

7        The debtors are also not in the same capacity.  For

8    many reasons, because they're not mutual parties, the

9    obligations don't run the same way, but also because the

10   obligation on the part of PREPA to repay the bonds is secured

11   and the debt that's owed by Pan American to PREPA is

12   unsecured, so there are different capacities for this.

13       Also, the request for set-off essentially amounts to

14   a recourse against PREPA for the payment of the bonds.  Under

15   both the Bankruptcy Code, Section 927, and the Trust

16   Agreement, the PREPA bonds are nonrecoursed to PREPA.  But to

17   allow setoff in this case essentially recategorizes that and

18   makes it a recourse to PREPA.

19       So Section 553 mutuality is not achieved.  There's

20   also not a substantive permission of Puerto Rico law that

21   permits set-off in this case.  The two statutes at issue -- 31

22   LPRA 3221 essentially imposes a mutuality requirement for

23   there to be set-off, and as discussed, that is not met.

24       The next section, 3222, has a five-part test for

25   which the movant fails to satisfy at least three of those

1    requirements.  The first is essentially, again, a mutuality

2    requirement that because the no-action clause is not met here,

3    also again because of the no-action clause, the debt is not

4    demandable.  In this case, Pan American is not permitted to

5    bring a claim to enforce the terms of the Trust Agreement.

6           And the fifth requirement under this statute is that

7    there not be a third party who has retention rights.  And it's

8    explained in our papers.  Section 905 of the Trust Agreement

9    does provide retention rights to the PREPA Bond Trustee.

10          And, Your Honor, even if the Court can find that

11   there's a setoff right here, that relief is still permissive,

12   not mandatory by the Court.  And the harms here that would be

13   invoked on a variety of levels are significant.  They're not

14   de minimis.

15          First of all, Pan American owes over two million

16   dollars to PREPA for prepetition electrical service.  PREPA's

17   need for dollars has been well-documented in this case and it

18   continues to this day.  That failure to provide two million

19   dollars affects not only PREPA, but other constituents who

20   rely on increased revenues to PREPA to continue to operate.

21          Mr. Whitmore can address this a little more

22   particularly, but it also would -- this recovery, a hundred

23   cents on the dollar for the bond holdings would also deprive

24   that amount to the other bondholders who, under the Trust

25   Agreement, share in any recovery on account of the bonds on a

1   prorata basis.

2          So there are significant harms here that would be

3   worked to permit a set-off, so the Court should, even if it

4   were to find a right to set-off, not permit it to move

5   forward.

6          Finally, with respect to the stay, Your Honor, there

7   is nothing on the factors that demonstrates cause to lift the

8   stay.  There is no judicial economy or any other factor that

9   can be saved here.

10          As counsel has asked, the proposed way of handling

11   all the different types of claims here would be on a factual

12   review, which would require apparently an examination of the

13   facts underlying each request for set-off, and that simply

14   requires Court time, PREPA's time and other parties' time that

15   can better be spent to do the type of activities that

16   Mr. Bienenstock described already.

17          So there is no basis.  There is no right to set-off

18   and there is no basis to lift the stay or permit the set-off,

19   even if the Court does find one.

20          THE COURT:  Thank you, Mr. Finger.

21          MR. FINGER:  You're welcome.

22          THE COURT:  Mr. Whitmore.

23          MR. WHITMORE:  Your Honor, Clark Whitmore from the

24   Maslon LLP law firm on behalf of U.S. Bank, National

25   Association, as the PREPA Bond Trustee.

1      I believe that movant's counsel conceded the fact

2  that the no-action clause was applicable to bar their ability

3  to bring this, and that also destroys mutuality for purposes

4  of set-off, so it's a fairly simple equation for the Court to

5  deny the motion.

6      I would simply like, Your Honor, in light of the

7  request, that the Court take into account equities, which

8  obviously exist.  Every small business wants to get all the

9  money that they can, and I certainly appreciate the

10  perspective of equities from Pan American's perspective.  I

11  would like to make sure that the Court appreciates the

12  equities from the perspective of the other bondholders who we

13  have duties to under the Trust Agreement.

14      There are really two fundamental principles under the

15  Trust Agreement that they're seeking to have the Court

16  disregard.  The first is that of collective action.  They want

17  to just take a shortcut and ignore the requirement under the

18  Trust Agreement that either the Trustee or groups of

19  bondholders who have various rights to direct the Trustee or

20  act independently proceed in that way.

21      These are -- this is an important principle.  And

22  just allowing somebody to say, hey, I'm only owed a million

23  dollars, let me just violate the rules, really does put that

24  principle at risk in ways that could create unanticipated

25  problems later on.

1        And perhaps more fundamentally, the second major

2   fairness principle under the Trust Agreement is that pledged

3   revenues were pledged to all of the bondholders, and the

4   recoveries from those pledged revenues are supposed to go to

5   all the bondholders after they share the cost of expenses.

6        So what you have here under the rubric of equities is

7   you have somebody saying, I would like to take some of PREPA's

8   revenues that should have gone to PREPA and were pledged to

9   all the bondholders and just grab it for myself.

10        So obviously we think that's not an equity that cuts

11   in favor of the movant, but rather one that cuts in favor of

12   the other, albeit more diluted bondholders who we'd like to

13   give voice to here today.

14        So I can go on, but I don't think it's really

15   necessary in light of the concessions that have been made by

16   movant's counsel.  I would just like to note that U.S. Bank's

17   position with respect to its claim and the nature of its claim

18   is we don't necessarily agree with all of the statements that

19   PREPA has made in its papers with respect to the nature of the

20   debt.  It's not necessary for the resolution of this motion.

21   But our position with respect to the claim is set forth in our

22   Proof of Claim, and if need be, we'll address that at some

23   later time.

24        And then finally, I would like to point out that U.S.

25   Bank favors the active involvement of bondholders in the Title

1    III process and doesn't intend for the decision it made to

2    step up in this particular case and file an objection to

3    standing to discourage bondholders from participating in these

4    Title III cases, because this case really presented a very

5    unusual attack on the fundamental principles of the Trust

6    Agreement and rose to a level of contradiction to the rights

7    of other bondholders where we felt it was appropriate to lodge

8    an objection.

9            THE COURT:  Thank you, Mr. Whitmore.

10           Ms. Figueroa y Morgade, would you like to make reply

11   remarks?

12           MS. FIGUEROA Y MORGADE:  No, Your Honor.  The matter

13   is submitted for the Court's consideration.

14           THE COURT:  Thank you.  And so the motion and

15   arguments are fully submitted.

16           I did read very carefully all of the submissions

17   before coming to court today and have listened carefully to

18   what has been said here.  I will now make my oral ruling on

19   the record.

20           Before the Court is Pan American Grain Company,

21   Inc.'s Motion for Relief from Stay to Execute Set-off, which

22   is docket entry number 4004 in case 17-3283, and I'll refer to

23   it as the motion.

24           The motion seeks relief from the automatic stay to

25   effectuate a set-off under Section 553 of the Bankruptcy Code,

1  which applies in these Title III proceedings pursuant to

2  Section 301 of PROMESA, to set off movant's PREPA bond

3  investments against its prepetition electricity bill owed to

4  PREPA.

5          The Court has considered carefully all of the

6  parties' submissions and arguments, and for the reasons that I

7  will now explain, the motion is denied.

8          I will first take up the question of standing or the

9  power or ability of the movant to make this application in the

10  first place.  Due to the collective structure of bondholder

11  rights and remedies under the Operative Trust Agreement, and

12  specifically because of the no-action clause of that

13  agreement, which counsel have discussed, movant does not have

14  standing to unilaterally bring proceedings to enforce

15  collection upon its PREPA bonds.

16          Section 808 of the Trust Agreement, which we are

17  referring to as a no-action provision, prohibits individual

18  PREPA bondholders who hold less than ten percent of the

19  principal amount of outstanding PREPA bonds from pursuing

20  remedies in their own name without complying with certain

21  requirements.

22          Counsel, may I remind you that court is in session

23  and I would ask that if you need to have conversations, you do

24  that outside of the courtroom.  Thank you.

25          Moreover, the no-action clause of the Trust Agreement

1    requires that all proceedings in law or equity brought by

2    individual PREPA bondholders be maintained for the benefit of

3    all PREPA bondholders.  Nothing in the trust instrument or in

4    bankruptcy law changes the powers of an individual bondholder

5    under the Trust Agreement upon the issuer's entry into a

6    bankruptcy proceeding.

7           Movant's attempt to distinguish the case *In Re:*

8    *American Roads, LLC,* 496 B.R. 727, from the Bankruptcy Court

9    of the Southern District of New York in 2013, a case that

10   construed an intercreditor agreement that defined bondholders'

11   rights inter se and vis-a-vis the Trustee is similarly

12   unpersuasive.

13          Here, as in that case, the operative agreement

14   defines and limits bondholders' rights and centralizes powers

15   to take actions with respect to the bonds.  The Court,

16   therefore, finds that not withstanding the broad provisions of

17   Bankruptcy Code Section 1109, movant lacks standing to bring

18   the present motion in violation of the Trust Agreement's

19   no-action clause.

20          And turning specifically to the no-action clause and

21   whether an equitable exclusion from that clause would be

22   feasible or appropriate, movant offers no statutory or

23   precedential authority in support of its argument that the

24   Court should use its equitable powers to exclude the movant

25   from the limitations imposed by the Trust Agreement's