Reply Deadline:  June 10, 2019
Hearing Date:  June 14, 2019 at 1:00 p.m. (A.S.T.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>**This filing relates only to PREPA, and shall be filed in the lead Case No. 17-BK-3283-LTS, and PREPA's Title III case (Case No. 17-BK-4780-LTS)** |

**OPPOSITION OF ASSURED GUARANTY CORP.
AND ASSURED GUARANTY MUNICIPAL CORP. TO
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OMNIBUS MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN
CONNECTION WITH PREPA RSA RULE 9019 SETTLEMENT MOTION**

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND .........................................................................................4

ARGUMENT ...............................................................................................8

I.     Assured's Loss Reserves Are Not The Proper Subject Of
Discovery Related to the 9019 Motion .......................................9

     A.    The UCC's Document Requests Did Not Seek Loss
Reserves ...........................................................................9

     B.    Assured's Loss Reserves Are Not Relevant To The
Proceedings Before This Court......................................10

     C.    Assured's Loss Reserves Are Protected By The Work
Product Doctrine ............................................................14

     D.    Assured Did Not Waive Privilege By Providing Loss
Reserves To Its Regulators ............................................16

     E.    The Loss Reserves Provided To Assured's Regulators Are
Protected By The Bank Examiner Privilege ..................18

II.    The Common Interest Privilege Applies To Communications
Between Assured, the Ad Hoc Group, and the Government Parties .........20

III.    The UCC Improperly Seeks Hardcopy Documents And Electronic
Messages ...................................................................................21

CONCLUSION...........................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES:</u>

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   No. 14-CV-7126, 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016) ...........................................17

*Blattman v. Scaramellino*,
   891 F. 3d 1 (1st Cir. 2018) ...........................................................16

*Bryan Corp. v. ChemWerth*,
   296 F.R.D. 31, (D. Mass. 2013) (Dein, M.J.) ...........................................17

*CH Properties, Inc. v. First Am. Title Ins. Co.*,
   48 F. Supp. 3d 143 (D.P.R. 2014) ...........................................14

*Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*,
   212 F. Supp. 3d 312 (D.P.R. 2016) ...........................................14

*Fed. Realty Inv. Trust v. Pac. Ins. Co.*,
   760 F. Supp. 533 (D. Md. 1991) ...........................................13

*Gill v. Gulfstream Park Racing Ass'n., Inc.*,
   399 F.3d 391 (1st Cir. 2005) .............................................8

*In re Citigroup Bond Litig.*, No. 08 Civ. 9522,
   2011 WL 8210671 (S.D.N.Y. Dec. 5, 2011) ...........................................18

*In re Genco Shipping & Trading Ltd.*,
   No. 14-111-8-SHL, ECF No. 26 (Bankr. S.D.N.Y. June 3, 2014) ............................ 10-11, 12

*In re Lyondell Chemical Company*, Case No. 09-10023,
   ECF No. 3592 (Bankr. S.D.N.Y Jan. 14, 2011) ...........................................21

*In re McDowell*,
   483 B.R. 471 (Bankr. S.D. Tex. 2012) ...........................................14

*In re Nat'l City Corp. S'Holders Litig.*, No. CIV.A. 4123-CC,
   2009 WL 1653536 (Del. Ch. June 5, 2009) ...........................................19

## TABLE OF AUTHORITIES, (cont'd)

**Page(s)**

## CASES:

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*,
   No. 13-cv-2419, 2015 WL 13715296 (D. Mass. Nov. 6, 2015) ..................................... 12-13

*In re Quigley Co.*, Case No. 04-15739,
   2009 Bankr. LEXIS 1352 (Bankr. S.D.N.Y. Apr. 24, 2009) ...................................................14

*In re Steinhardt Partners, L.P.*,
   9 F.3d 230 (2d Cir. 1993) ...................................................................................................17

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed.
Reserve Sys.*,
   967 F.2d 630 (D.C. Cir. 1992) ............................................................................................18

*In re The Dolan Co.*,
   No. 14-10614-BLS, ECF No. 284 (Bankr. D. Del. May 2, 2014) ...................................10, 12

*In re Tribune Co.*,
   No. 08-13141 KJC, 2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) ...................................20

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983) ..................................................................................................8

*Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*,
   937 F. Supp. 2d 202 (D.P.R. 2012), *aff'd*, 802 F.3d 99 (1st Cir. 2015) ..................................8

*Jeffrey v. Desmond*,
   70 F.3d 183 (1st Cir. 1995) ....................................................................................................8

*Matrix Essentials, Inc. v. Quality King Distributors, Inc.*,
   No. CV90-1070, 2006 WL 8435312 (E.D.N.Y. Jan. 12, 2006) ............................................16

*Mullins v. Dep't of Labor of Puerto Rico*,
   269 F.R.D. 172 (D.P.R. 2010) ..............................................................................................16

*Nicholas v. Bituminous Cas. Corp.*,
   235 F.R.D. 325 (N.D. W.Va. 2006) .......................................................................................15

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**CASES:**

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
No. 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) ...........................................17

*Progressive Cas. Ins. Co. v. F.D.I.C.*,
298 F.R.D. 417 (N.D. Iowa 2014) ......................................................................................15

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .......................................................................................................8, 12

*Schreib v. Am. Family Mut. Ins. Co.*,
304 F.R.D. 282 (W.D. Wash. 2014) ...................................................................................15

*State of Maine v. U.S. Dep't of Interior*,
298 F.3d 60 (1st Cir. 2002) ...............................................................................................14

*United States v. Adlman*,
134 F.3d 1194 (2d Cir. 1998) ............................................................................................15

*United States v. Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) .....................................................................................16, 18

*United States v. Gonzalez*,
669 F.3d 974 (9th Cir. 2012) .............................................................................................20

*United States v. Olano*,
507 U.S. 725 (1993) ..........................................................................................................16

*W Holding Co. v. Chartis Ins. Co. of Puerto Rico*,
300 F.R.D. 48 (D.P.R. 2014) .............................................................................................15

**STATUTES & OTHER AUTHORITIES:**

Fed. R. Civ. P. 26(b)(1) ..................................................................................................8, 13

N.Y. Ins. Law 1504(c) .........................................................................................................17

N.Y. Pub. Off. L. § 87(2)(d) ...............................................................................................17

To the Honorable United States Magistrate Judge Judith G. Dein:

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") respectfully submit this opposition ("Opposition") to the *Official Committee of Unsecured Creditors' Omnibus Motion to Compel Production of Documents in Connection with PREPA RSA Rule 9019 Settlement Motion* (ECF No. 1269)[2] ("Motion to Compel"), filed by the Official Committee of Unsecured Creditors of All Title III Debtors (other than COFINA) ("UCC"), seeking certain types and categories of documents, including "loss reserve communications and documents shared with New York regulatory authorities" (collectively, "Loss Reserves"), be produced by Assured in discovery for the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(A)(I) and 9019 for Order Approving Settlements Embodied in Restructuring Support Agreement and Tolling Certain Limitations Periods* (ECF No. 1235) ("9019 Motion").

## PRELIMINARY STATEMENT

1.     The discovery at issue in the Motion to Compel relates to a motion for the approval of a settlement under Bankruptcy Rule 9019, now pending before Judge Swain. The settlement resolves both a lift stay motion for the appointment of a receiver for PREPA brought by Assured and a putative attack on the liens held by Assured and the Ad Hoc Group of PREPA Bondholders. By creating certainty around these two critical issues, the settlement paves the way for the eventual restructuring of PREPA in a manner that will transform it into a reliable and reasonably priced provider of power for Puerto Rico.

---

[2]    "ECF No." refers to documents filed in Case No. 17-BK-4780-LTS, unless otherwise noted. Capitalized terms not defined in Preliminary Statement are defined elsewhere in this Opposition.

2.      Even though Assured is not a party to the 9019 Motion, it has agreed to comply with discovery requests on an expedited schedule. Assured has, accordingly, responded to the requests it received, participated in good faith in meet and confer sessions with UCC counsel, and engaged in follow-up correspondence with the UCC's counsel. Assured has already commenced producing materials and will ultimately produce thousands of documents in response to the various document requests served by the UCC and other parties.

3.      Not to be satisfied with these responses from a non-party, the UCC now seeks to compel discovery on issues far beyond the scope of the 9019 Motion before Judge Swain, and even beyond the terms of the document requests that the UCC served on Assured.

4.      The Motion to Compel raises three issues with respect to Assured.

5.      First, the UCC once again asks this Court to compel production of Assured's Loss Reserves that were shared with its New York regulator. *See* Mot. to Compel ¶¶ 54-57.[3] This Court has twice already rejected arguments that Assured's loss reserves are relevant to this litigation, and the UCC offers no plausible reason for this Court to reverse course now. As Assured has previously demonstrated to this Court, Assured's loss reserves only reflect Assured's subjective evaluation of various potential settlement or litigation outcomes, developed in collaboration with counsel. *See* ECF No. 1084-7 (Declaration of Benjamin Rosenblum, dated February 14, 2019 ("Rosenblum Decl.")) ¶¶ 11-17.[4] The issue for Judge Swain to decide in the

---

[3]      Because the Motion to Compel failed to define a date range for the Loss Reserves that the UCC seeks, Assured understands the timeframe under the Motion to Compel and accompanying proposed order to be consistent with the UCC's Document Requests for documents and communications concerning the RSA. *See* Mot. to Compel, Ex. 20 at 13-14. To the extent the UCC seeks older loss reserve information, those documents are even less responsive and even more irrelevant to these proceedings.

[4]      An unredacted copy of the Rosenblum Declaration was provided to the Court via email and other parties on February 14, 2019 when Assured served the *Opposition of Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee Inc. to the Urgent Motion of Financial Oversight and Management Board, as Representative of Debtor, to Compel Production Of Documents From Movants Relating To Their Motion For Relief From Automatic Stay* (ECF No. 1084). The UCC was also provided an unredacted copy of the Rosenblum Declaration.

9019 Motion is whether the settlement falls within the range of likely litigation outcomes on both the lift stay motion for the appointment of a receiver and the putative lien challenge. In determining the range of outcomes, the Court is to make an objective, independent evaluation of the facts and the law relating to the issues being settled. Assured's subjective litigation assessments have no possible relevance. Indeed, if a party's internal analysis became discoverable simply by entering into a proposed settlement with a debtor, no party would ever settle. Among other things, in the event that the 9019 Motion were denied, the parties would resume litigation, but with highly sensitive, routinely privileged internal analysis of counsel now disclosed to Assured's prejudice. That has never been the rule, and never will be.

6.      In addition, the Loss Reserves remain protected by the attorney work product privilege. The UCC does not dispute the privilege, but claims—incorrectly—that the privilege was waived when Assured shared the Loss Reserves with its regulator. The law is clear that delivery of otherwise privileged materials to a regulator in response to a statutory mandate or the regulator's request is not a waiver.

7.      <u>Second</u>, the UCC seeks documents relating to the negotiation of the Definitive RSA during the period of March 26, 2019 and May 3, 2019. *See* Mot. to Compel ¶¶ 21, 28. Starting on March 26, 2019, Assured, the Ad Hoc Group and the Government Parties reached an agreement in principle regarding the RSA. Following the agreement in principle, Assured, the Ad Hoc Group and the Government Parties shifted from negotiation of the material terms of the RSA to their shared legal purpose in obtaining approval of the RSA pursuant to Bankruptcy Rule 9019. Consequently, any communications and attorney work product exchanged from March 26, 2019 to May 3, 2019 between the Government Parties and Assured had a shared legal purpose and fall squarely within the common interest privilege. Similarly, Assured shared a common interest privilege with the Ad Hoc Group during the negotiation of the RSA beginning with Assured's

involvement in negotiations starting in October 2018 because the Ad Hoc Group had accepted the economic terms of Assured's treatment on that date.

8.     Third, the UCC claims that Assured has refused to search for and produce hard copy documents and non-email electronic communications, such as text messages, instant messages and WhatsApp messages (collectively, "Electronic Messages").  *See* Mot. to Compel ¶¶ 43-45.  As set forth in its responses and objections to the UCC's document requests, Assured has agreed to undertake a reasonable search for responsive and non-privileged documents for the various categories of documents.  While Assured maintains the vast majority of its documents in electronic form, Assured never told the UCC that hard copy documents located as a result of such reasonable search would be withheld from production.  Assured is currently engaged in that reasonable search process and is producing or has already produced thousands of pages of documents, including responsive, non-privileged hard copy documents.

9.     As to the UCC's request that Assured search for and produce Electronic Messages (other than e-mails), Assured asserts that such request is unduly burdensome and disproportionate to the issues presented.  Consistent with Assured's internal policies, the relevant Assured personnel, including Assured's negotiator of the RSA and Assured's outside counsel, negotiated the RSA only by e-mail, phone and in-person meetings.  Therefore, searching for Electronic Messages is both unnecessary and unduly burdensome.

## **BACKGROUND**

10.     On October 3, 2018, Assured, National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora" and, collectively with Assured and National, the "Insurers") filed the *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for*

*Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed* (ECF No. 975) ("Lift Stay Motion").

11.     Following the filing of the Lift Stay Motion, the parties engaged in extensive discovery.   In response to substantial document requests issued by the Financial Oversight and Management Board for Puerto Rico ("FOMB"), in its capacity as representative of the Puerto Rico Electric Power Authority ("PREPA" or "Debtor") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[5] and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF" and, together with FOMB and PREPA, "Government Parties"), Assured produced over 1,800 documents comprising over 24,000 pages of documents.  Assured is in the process of producing these same documents, as well as additional documents, in response to document requests served in the 9019 Motion by the UCC and other parties.[6]

12.     On February 7, 2019, the FOMB filed the *Urgent Motion of Financial Oversight and Management Board, as Representative of Debtor, to Compel Production of Documents from Movants Relating to Their Motion for Relief from Automatic Stay* (ECF No. 1066) ("FOMB Motion to Compel"), seeking an order compelling Assured and the other Insurers to

---

[5]     PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[6]     Assured joins in the Government Parties' objection to the UCC's request for an Order allowing for the "use" in the 9019 Motion of all documents produced in connection with the Receiver Motion.  *See Joint Opposition of Financial Oversight and Management Board For Puerto Rico and Puerto Rico Fiscal Agency and Financial Advisory Authority to (1) Omnibus Motion of General Creditors' Committee to Compel Production of Documents in Connection with PREPA RSA Rule 9019 Settlement Motion; and (2) Omnibus Motion of Cortland Capital Market Services LLC, as Administrative Agent, and Solus to Compel Discovery Responses in Connection with PREPA RSA Settlement Motion*, filed contemporaneously herewith ("Government Parties Opposition").  The matters at issue in the Lift Stay Motion were far broader than and distinct from the issues Judge Swain will need to address in deciding the 9019 Motion.  Although Assured is producing to the UCC all documents it produced in the Lift Stay Motion, Assured reserves all rights to object to the admissibility or use of any document produced in connection with the hearing on the 9019 Motion and the production of any document should not be construed as consent to the admissibility or use of any such document at the hearing on the 9019 Motion.

produce certain loss reserve information.  Assured and the other Insurers objected to the FOMB

Motion to Compel.  *See* ECF No. 1084.

13.     On February 26, 2019, the Court heard oral argument on the FOMB Motion

to Compel.  *See* ECF No. 1115 (Feb. 26, 2019 Hr'g Tr.).  Counsel for the UCC argued in favor of

the Court granting the FOMB Motion to Compel.  *Id.* at 19-21.

14.     At the conclusion of the February 26 hearing, the Court stated that it would

deny the Motion to Compel and suggested that the parties submit a proposed order.  On March 5,

2019, the Court entered an Order denying the FOMB Motion to Compel.  *See* ECF No. 1119.

15.     On March 8, 2019, the FOMB filed the *Motion of the Financial Oversight*

*and Management Board for Reconsideration Pursuant to Fed. R. Civ. P. 59 and 60* (ECF No.

1122) ("Reconsideration Motion") seeking reconsideration of the FOMB Motion to Compel.

Assured and the other Insurers objected to the Reconsideration Motion.  *See* ECF No. 1134.  On

March 25, 2019, the FOMB filed a reply in further support of the Reconsideration Motion.

*See*  ECF No. 1143.  Also on March 25, 2019, the UCC filed a statement in support of the Motion

for Reconsideration.  *See* ECF No. 1142.

16.     On April 4, 2019, the Court issued a *Memorandum of Decision and Order*

*Denying Motion for Reconsideration* (ECF No. 1165).  Neither the FOMB nor the UCC further

appealed the Court's Orders denying the FOMB Motion to Compel and the Reconsideration

Motion.

17.     On March 26, 2019, Assured, the Government Parties, and members of the

Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group") reached an agreement in principle

("Agreement in Principle") on the material terms for a settlement embodied in the Definitive

Restructuring Support Agreement, dated as of May 3, 2019 ("RSA" or "Definitive RSA").  The

existence of the agreement in principle was publicly disclosed in court papers filed on April 9, 2019. *See* ECF No. 1176 ¶ 4.

18. On May 3, 2019, Assured, the Ad Hoc Group, and the Government Parties entered into the Definitive RSA. *See* ECF No. 1235-1. The Definitive RSA preserved the material economic terms as set forth in the Agreement in Principle.

19. On May 10, 2019, the Government Parties filed the 9019 Motion, seeking an order approving the Definitive RSA. *See* ECF No. 1235.

20. On May 22, 2019, the Court entered the *Order Extending and Establishing Certain Deadlines Applicable to the Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement [ECF No. 1235]* (ECF No. 1253) ("Scheduling Order"), which extended and established certain deadlines for the 9019 Motion, including deadlines to serve discovery.

21. On May 22, 2019, the UCC served a subpoena attaching requests for documents on Assured ("Document Requests"). None of the Document Requests on Assured seek Loss Reserves. *See* Mot. to Compel, Ex. 20 at 13-15.

22. On May 29, 2019, Assured served its responses and objections to the Document Requests, including objections to producing any privileged documents encompassed by the Document Requests. *See* Mot. to Compel, Ex. 21.

23. On May 31, 2019, counsel for Assured and the UCC held a meet and confer. During that meet and confer, the UCC, for the first time, told Assured that it was seeking Assured's Loss Reserves as part of discovery. Assured objected to this request during the meet and confer and subsequent follow-up correspondence with the UCC.

24. On June 3, 2019, the UCC filed the Motion to Compel. *See* ECF No. 1269.

## ARGUMENT

25.     Rule 26(b)(1) of the Federal Rules of Civil Procedure ("<u>Federal Rules</u>")[7]

provides that the scope of discovery includes relevant and non-privileged matter "proportional to

the needs of the case, considering . . . the importance of the discovery in resolving the issues, and

whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R.

Civ. P. 26(b)(1); *Gill v. Gulfstream Park Racing Ass'n., Inc.*, 399 F.3d 391, n.5 (1st Cir. 2005);

*Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan*, 937 F. Supp. 2d 202, 204-205 (D.P.R. 2012),

*aff'd*, 802 F.3d 99 (1st Cir. 2015).

26.     In the context of the settlement of bankruptcy claims, such as the 9019

Motion, a court should "apprise [itself] of all facts necessary for an intelligent and ***objective***

opinion of the probabilities of ultimate success should the claim be litigated."  *Protective Comm.

for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)

(emphasis added).   Like most courts, the First Circuit applies a four-factor test to proposed

settlements under Rule 9019, considering "(i) the probability of success in the litigation being

compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the

complexity of the litigation involved, and the expense, inconvenience and delay attending it; and,

(iv) the paramount interest of the creditors and a proper deference to their reasonable views in the

premise." *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).  Ultimately, courts will consider

whether a proposed settlement falls within the lowest bounds of a "range of reasonableness."  *In

re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).  These various considerations are the "needs

of the case" that inform discovery for purpose of the 9019 Motion.  Fed. R. Civ. P. 26(b)(1).

---

[7]     The Federal Rules are applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy
Procedure ("<u>Bankruptcy Rules</u>") and Section 310 of PROMESA.

27.     None of the documents sought by the UCC in its Motion to Compel as to Assured consist of an appropriately proportional request relevant to the resolution of the 9019 Motion.

## I.     Assured's Loss Reserves Are Not The Proper Subject Of Discovery Related to the 9019 Motion

28.     The UCC seeks Loss Reserves regarding PREPA that were sent to Assured's New York regulator, the New York Department of Financial Services ("NYDFS"). *See* Mot. to Compel ¶ 55.  That portion of the UCC's Motion to Compel should be denied for three reasons.  First, the production of Loss Reserves is beyond the scope of the UCC's Document Requests.  The current request is, at best, an afterthought.  Second, even if Loss Reserves had been actually requested, such information has no bearing on the issues before the Court on the 9019 Motion.  Third, Assured's Loss Reserves are privileged, and Assured did not waive any privilege by providing such Loss Reserves to its regulator, the NYDFS.

### A.     The UCC's Document Requests Did Not Seek Loss Reserves

29.     As an initial matter, the UCC did not seek Loss Reserves in its Document Requests.  Instead, the UCC's Document Requests focus on the Definitive RSA, the Receiver Motion and Assured's collateral and security relating to the PREPA bonds and various other topics. *See* Mot. to Compel, Ex. 20 at 13-15.  Indeed, the UCC's Motion to Compel fails to identify a single request that expressly or implicitly calls for production of loss reserves.  This is not surprising, given the Court's prior Orders finding that loss reserves were not a proper subject for discovery in this case. *See* ECF Nos. 1119, 1165.

30.     On May 31, 2019, counsel for Assured and the UCC held a meet and confer.  During the meet and confer, for the first time, the UCC stated that it was seeking Assured's Loss Reserves as part of its Document Requests.  The Scheduling Order set a deadline of May 22, 2019

to serve initial document requests.  *See* ECF No. 1253 at 3.  Given that the UCC first made a request for the Loss Reserves on May 31, 2019, the UCC's request should be denied on that ground, alone.

**B.      Assured's Loss Reserves Are Not Relevant To The Proceedings Before This Court**

31.      The UCC's Motion to Compel suffers from a fundamental misunderstanding, or refusal to accept, what the Loss Reserves are and how they are calculated. The UCC claims that the Loss Reserves are relevant, even as pure probabilistic assessments of potential litigation, because "the 9019 Motion asks the Court to evaluate the reasonableness of the price PREPA would pay to resolve the claims of its bondholders, including Assured."  Mot. to Compel ¶ 54.  This statement of the issue before Judge Swain is incorrect.  In determining the 9019 Motion, Judge Swain will arrive at an objective, independent determination of the likely litigation outcomes.  Assured's views, as a non-party to the 9019 Motion, or even the Government Parties' views, are not probative.  The point of Bankruptcy Rule 9019 is that the court, which would ultimately decide the issues if not settled, reaches its own view of the merits based on a summary showing of law and facts.

32.      In similar contexts, bankruptcy courts have denied discovery requests for creditor's own internal valuations of the value of RSA settlements.  In *In re The Dolan Co.*, the bankruptcy court rejected discovery of an internal valuation by a lender who was party to an RSA, holding that the lender's valuation was not "an appropriate area of inquiry" and is "of limited relevance, as the [plan confirmation] burden rests with the debtor to demonstrate the value of the company."  No. 14-10614-BLS, ECF No. 284 at 9-10, 19-20 (Bankr. D. Del. May 2, 2014). Likewise, in *In re Genco Shipping & Trading Ltd.*, which also involved requests for internal valuations of the debtor's business from parties to an RSA, the bankruptcy court found that internal

valuations "would be of limited relevance to the inquiry" because "the burden rest[s] with the debtor on the value of the company."  No. 14-111-8-SHL, ECF No. 267 at 62 (Bankr. S.D.N.Y. June 3, 2014).

33.    Moreover, Assured's Loss Reserves are not an assessment of the RSA. Assured fully incorporates by reference its detailed explanation of loss reserves in the Insurers' opposition to the FOMB Motion to Compel loss reserves.  *See* ECF No. 1084 ¶¶ 5-10, 28-38.  In summary, loss reserves are the amounts that Assured sets aside to satisfy its estimated insurance obligations.  They allow Assured to cover future claims made against their respective policies, including future claims on PREPA bonds and other bonds issued by Puerto Rico entities. *See* Rosenblum Decl. ¶ 7.  Assured's Loss Reserves do not reflect the objective probability of success of any litigated claim, and they do not inform whether the proposed settlement set forth in the RSA falls outside the Debtor's zone of reasonableness.  Assured's Loss Reserves are calculated by considering multiple subjective assessments by Assured of the probability of certain and varied litigation and settlement outcomes, developed in consultation with counsel.  *See* Rosenblum Decl. ¶¶ 10-17.

34.    The Loss Reserves reflect probabilistic assessments of potential litigation and settlement outcomes regarding PREPA as well as other Title III litigations and disputes. *See* Rosenblum Decl. ¶¶ 11-17.  These assessments are necessarily based on the advice of counsel regarding the strength of Assured's legal positions and likelihood of certain litigation outcomes. *Id.*  In short, the Loss Reserves are not a calculation of the value of any one proposed settlement, including the RSA.  Rather, the Loss Reserves evaluate a number of different settlement possibilities and account for the ***likelihood*** of particular settlements coming to fruition based on a variety of litigation outcomes, and not the merits or fairness of the RSA or any settlement by itself. The UCC asserts that Assured's Loss Reserves will provide some sort of valuation of the RSA

-11-

and/or an objective determination of Assured's likelihood of success on the Receiver Motion. *See* Mot. to Compel ¶ 54.  As detailed in the Rosenblum Declaration, the Loss Reserves do not provide such information.  *See* Rosenblum Decl. ¶¶ 11-17.  The Loss Reserves are based on more than just the actual merits of a particular claim—they account for economic and legal risks, the political climate, willingness to settle and ability to pay, as well as a host of other factors unrelated to the actual merits of the claims.  *Id.*

35.     In determining a motion based on Bankruptcy Rule 9019, the law is clear that the courts will consider ***objective*** evidence related to the likelihood of success in the litigation. *See  Protective Comm. for Indep. Stockholders*, 390 U.S. at 424.  The UCC fails to explain why or how the opinions of Assured and its counsel comparing the likelihood of potential litigation and settlement outcomes affect the "reasonableness" of the RSA.  Assured's necessarily ***subjective*** assessments about risks, claim positions and probabilities of various outcomes are far removed from objective evidence.  Nor are Assured's range of subjective assessments of whether or not a particular settlement will be approved, or will be able to be implemented, indicative of the underlying reasonableness of the RSA itself and whether it falls outside the zone of reasonableness. The  court  decisions  on  point,  thus,  clearly  demonstrates  that  the  subjective  valuation  of  a settlement by a creditor is inadmissible and thus not a proper subject for discovery.  *See Dolan.*, No. 14-10614-BLS, ECF No. 284 at 9-10, 19-20; *Genco*, No. 14-111-8-SHL, ECF No. 267 at 62.

36.     Given that Assured's Loss Reserves are not probative of the issues to be resolved in the 9019 Motion, any purported benefit of production is far outweighed by the prejudice to Assured.  "While Rule 26 contemplates liberal discovery and a broad concept of relevance, the Rule also recognizes that discovery must be proportionate to the case and issues at hand and must protect responding parties from undue burden or expense."  *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-cv-2419, 2015 WL 13715296, at *1 (D.

Mass. Nov. 6, 2015) (citation omitted); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment (emphasizing proportionality in discovery); *Fed. Realty Inv. Trust v. Pac. Ins. Co.*, 760 F. Supp. 533, 540 (D. Md. 1991) (finding that "[r]eserve decisions are mere guesses at the outcome of litigation based on conservative accounting principles" and holding that loss reserve evidence was not admissible at trial because "the probative value of [the loss reserve] predictions, if any, is substantially outweighed by its prejudicial aspects").

37.    Disclosure of the Loss Reserves would be prejudicial to Assured. *See* Rosenblum Decl. ¶¶ 10-12, 17, 25.  The Loss Reserves contain proprietary and highly sensitive commercial and financial information. *Id.* ¶¶ 10, 17, 25.  In particular, if the Court denies the 9019 Motion or the RSA cannot be implemented, the production of Assured's Loss Reserves would expose Assured's reserve analyses to all counterparties by revealing its assessment of strengths, weaknesses, and worst-case scenarios.  Instead, this Court should simply follow the precedent it has already set in this case and acknowledge that loss reserves remain irrelevant to these proceedings—just as irrelevant as they were when this Court denied the FOMB Motion to Compel loss reserves on February 26, 2019 (which the UCC supported), and when this Court denied the FOMB's Reconsideration Motion on April 4, 2019 (which the UCC also supported).[8]  The prior decisions in Bankruptcy Rule 9019 cases are in accord.

38.    The UCC already has Assured's PREPA insurance policies.   Assured produced them.  The UCC already has Assured's PREPA claim notices.  Assured produced those too.  The UCC also has access to Assured's public reporting of its total PREPA exposure.  Most importantly, the UCC has the terms of the RSA—those terms will be at the heart of the entire Rule

---

[8]    As set forth above, to the extent that the UCC is seeking older loss reserve calculations from before the time the RSA was negotiated and entered into, those documents are even less responsive and even more irrelevant to these proceedings.  *See supra* note 3.

9019 settlement hearing.  As a result, the UCC already knows the amounts of Assured's claim

payments on the bonds it insures, how those payments compare to Assured's total exposure, and

the treatment Assured receives under the RSA.  In sum, the UCC has everything it needs to

determine the objective value of the RSA to Assured.  The only thing the UCC thinks they are

missing is what they have no right to see:  Assured's work product informing regulators of a

subjective calculated analysis, which is the result of accounting for several settlement and litigation

outcome scenarios.  The Loss Reserves reflecting the ***likelihood*** of various outcomes cannot

inform the ***reasonableness*** of the single outcome embodied in the RSA.  The Loss Reserves only

reflect Assured's subjective assessment of the likelihood of whether various settlements or

litigation outcomes will ultimately materialize based on a variety of factors.

### C.    Assured's Loss Reserves Are Protected By The Work Product Doctrine

39.    The Motion to Compel should also be denied because Assured's Loss

Reserves are protected by the work product privilege and thus are not an appropriate subject for

discovery.  The work product privilege protects "work done by an attorney in anticipation of, or

during, litigation from disclosure to the opposing party."  *State of Maine v. U.S. Dep't of Interior*,

298 F.3d 60, 66 (1st Cir. 2002); *CH Properties, Inc. v. First Am. Title Ins. Co.*, 48 F. Supp. 3d 143,

149-150 (D.P.R. 2014).  The doctrine "protects (1) documents and tangible things; (2) prepared in

anticipation of litigation or for trial; (3) by or for another party or by or for that other party's

representative, protecting the mental impressions, conclusions, or legal theories of a party's

attorney concerning the litigation."  *Fed. Deposit Ins. Corp. v. Arrillaga-Torrens*, 212 F. Supp. 3d

312, 368 (D.P.R. 2016).  For the purpose of the work product doctrine, bankruptcy filings can be

considered litigation.  *See In re Quigley Co.,* Case No. 04-15739, 2009 Bankr. LEXIS 1352, at *21

(Bankr. S.D.N.Y. Apr. 24, 2009); *see also In re McDowell*, 483 B.R. 471, 494 (Bankr. S.D. Tex.

2012).

40.     The Loss Reserves were prepared in anticipation of and during litigation. Thus, the work product doctrine applies to the Loss Reserves. *United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) (the work product doctrine applies if a company's attorneys "estimate[e] the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses."); *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 285 (W.D. Wash. 2014) ("[R]eserve information that was created in anticipation of litigation is protected by the work product doctrine."); *Progressive Cas. Ins. Co. v. F.D.I.C.*, 298 F.R.D. 417, 426 (N.D. Iowa 2014) (finding work product doctrine applicable to loss reserves when litigation was reasonably foreseeable); *Nicholas v. Bituminous Cas. Corp.*, 235 F.R.D. 325, 331–34 (N.D. W.Va. 2006) (finding that "all documents concerning loss reserves . . . are protected by the work-product doctrine and are not discoverable").

41.     Assured's Loss Reserves with regard to PREPA were specifically prepared in anticipation of and during litigation.  Assured's Loss Reserves are prepared in consultation with Assured's outside and in-house attorneys. *See* Rosenblum Decl. ¶¶ 11-17.  The calculations within the Loss Reserves reflect legal assessments and risks, the nature and likelihood of prospective settlement and/or litigation success, and other confidential work product of counsel. *Id.* ¶¶ 11-17, 25.

42.     Even if the Loss Reserves did not have such a specific litigation-oriented purpose, work product in the First Circuit is not limited to documents created exclusively for litigation.  Documents created with the dual purpose of business operations and litigation are entitled to work product protection so long as they were created in anticipation of litigation. *W Holding Co. v. Chartis Ins. Co. of Puerto Rico*, 300 F.R.D. 48, 50 (D.P.R. 2014) ("Litigation does not need to be the primary purpose for which the document was created; the document simply

has to be prepared *because of* litigation or the prospect of litigation.") (emphasis in original);

*Mullins v. Dep't of Labor of Puerto Rico*, 269 F.R.D. 172, 175 (D.P.R. 2010) (rejecting the notion

that litigation must be the "primary" purpose of a document because that "implies that documents

prepared with a dual purpose of litigation and business do not fall within the protective scope of

the Rule."). Consequently, Assured's Loss Reserves constitute attorney work product, and this

Court should enforce that privilege against compelled production.

### D. Assured Did Not Waive Privilege By Providing Loss Reserves To Its Regulators

43. The UCC does not dispute that the reserves are privileged, but instead

claims that Assured waived privilege by providing its Loss Reserves to its regulator, the NYDFS.

*See* Mot. to Compel ¶ 56. Contrary to this assertion, disclosure to a regulator with statutory

assurances of confidentiality does not waive work product privilege.

44. "[W]aiver is the intentional relinquishment or abandonment of a known

right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted). The First Circuit has

specifically recognized that "disclosure of work-product to a third-party does not necessarily waive

the protection; only disclosing material in a way inconsistent with keeping it from an adversary

waives work product protection." *Blattman v. Scaramellino*, 891 F. 3d 1, 5 (1st Cir. 2018) (citation

omitted); *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (finding that work

product privilege was not waived over material shared with an independent auditor because that

third-party disclosure was not inconsistent with maintaining secrecy from their litigation

adversary); *Matrix Essentials, Inc. v. Quality King Distributors, Inc.*, No. CV90-1070, 2006 WL

8435312, at *3 (E.D.N.Y. Jan. 12, 2006).

45. In its Motion to Compel, the UCC simply relies on caselaw for the

proposition that third party disclosure *can* waive privilege, but the UCC glosses over the

distinction between disclosure that is made in a manner consistent with keeping privileged material from an adversary compared to disclosure that is made in a manner inconsistent with that purpose. This Court has recognized this important distinction. *Bryan Corp. v. ChemWerth*, 296 F.R.D. 31, 38-40 (D. Mass. 2013) (Dein, M.J.) (no waiver of the work product privilege when a plaintiff disclosed materials to its agent because: (1) the agent was not an adversary of the plaintiff, (2) the disclosure did not substantially increase an adversary's likelihood of obtaining the materials, and (3) all of the relevant communication occurred in furtherance of a common strategy against the defendant). Given this standard, submissions to regulators do not waive work product privilege when there is an expectation of confidentiality. *See Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No. 06 Civ. 5797, 2010 WL 935317, at *1 (S.D.N.Y. Mar. 12, 2010); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *see generally Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126, 2016 WL 6779901, at **4-5 (S.D.N.Y. Nov. 16, 2016).

46.     Here, disclosure of the Loss Reserves to Assured's regulator, the NYDFS, was not a disclosure to a litigation adversary and the disclosure did not increase the probability that any litigation adversary of Assured would obtain the privileged information. Instead, Assured shared the Loss Reserves pursuant to regulatory request and an understanding with the NYDFS that such information is protected against further disclosure. *See* Rosenblum Decl. ¶¶ 20-25. Indeed, New York State statutes directly protect these submissions from further disclosure by the NYDFS and disclosure through public records requests. *See* N.Y. Pub. Off. L. § 87(2)(d); N.Y. Ins. Law 1504(c); *see also* Rosenblum Decl. ¶ 20.

47.     The UCC completely ignores these New York statutes. Instead, the UCC baldly suggests that Assured had no anticipation of confidentiality when it submitted its Loss Reserves to the NYDFS unless the NYDFS asserts the bank examination privilege. *See* Mot. to Compel ¶ 56. The Loss Reserves are highly proprietary, sensitive, and confidential, and were

shared with the NYDFS with the legally supported expectation that their confidentiality would be preserved.  Whether or not the NYDFS asserts the bank examination privilege, New York law and past practice with NYDFS gave comfort to Assured that its disclosures to the NYDFS would remain protected.  *See* Rosenblum Decl. ¶¶ 20-22, 24-25.  As such, disclosure to the NYDFS did not increase the probability that any litigation adversary of Assured would obtain the privileged information or that such information would be disclosed to the general public.  As a result, the disclosure was fully consistent with maintaining secrecy from litigation adversaries.  *Deloitte*, 610 F.3d at 140.

### E.    The Loss Reserves Provided To Assured's Regulators Are Protected By The Bank Examiner Privilege

48.    The bank examiner privilege protects bank examiner reports and communications against disclosure.  *See In re Citigroup Bond Litig.*, No. 08 Civ. 9522, 2011 WL 8210671, at *1 (S.D.N.Y. Dec. 5, 2011); *In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d 630, 633 (D.C. Cir. 1992).  The privilege protects a critical "flow of communication between the bank and the regulatory agency." *In re Subpoena*, 967 F.2d at 634.  That necessary flow of information would not be possible "if communications between the bank and its regulators were not privileged."  *Id*.  Therefore, bank examination reports, related communications, and agency reports are not subject to discovery unless a court determines that the documents are necessary to promote the interests of justice.  *See id*. at 635-636.

49.    As set forth in previous filings with this Court, in a letter to Assured, the Maryland Insurance Administration ("MIA") acknowledged that Assured falls within the MIA's direct regulatory purview, and that Assured regularly shares sensitive information and analysis. *See* Rosenblum Decl., Ex. A.   Assured's Loss Reserves constitute part of the open flow of

information that enables effective regulation, and serves the policy interest of the bank
examination privilege.  The MIA, by its letter, specifically objects to the disclosure of the type of
loss reserve information sought here and has asserted all privileges to do so, including Maryland's
statutory protection mechanisms which is "in the nature of a 'bank examination' privilege statute."
*Id.* at 2.

50.     As the UCC acknowledges, the bank examiner privilege "'belongs to the
regulatory authority'" rather than the regulated entity.  *See* Mot. to Compel ¶ 56 (citation omitted).
As a result, the privilege "can only be waived by the government, not [the regulated entity]."  *In
re Nat'l City Corp. S'Holders Litig.*, No. CIV.A. 4123-CC, 2009 WL 1653536, at *1 (Del. Ch.
June 5, 2009).  As Assured's Loss Reserves are provided concurrently to both the MIA and
NYDFS, the assertion of the bank examiner privilege over Assured's Loss Reserves by the MIA
equally impacts the same submission to NYDFS.  *See* Rosenblum Decl. ¶¶ 19-20.  Assured asserts
that in such case the bank examiner privilege invocation remains in effect.  The MIA has not
waived such privilege.

*                    *                    *                    *

51.     This Court should adhere to its prior ruling in this case regarding the non-
discoverability of Assured's Loss Reserves.  Assured's Loss Reserves are irrelevant to these
proceedings, including the Court's determination of the 9019 Motion.  And, as this Court properly
recognized, the Loss Reserves are not akin to any collateral valuation.  Their production would
offer no benefit to the Court, but would create an unfair burden on Assured by revealing its
subjective combined assessment of a variety of litigation and settlement probabilities and
hampering Assured's potential future negotiating positions if the Rule 9019 Motion were to be
denied or the RSA could not be implemented.  The Loss Reserves are furthermore protected by

the work product and bank examiner privileges—issues not meaningfully addressed by the UCC's cursory analysis in the Motion to Compel.

## II.   The Common Interest Privilege Applies To Communications Between Assured, the Ad Hoc Group, and the Government Parties

52.   In its Motion to Compel, the UCC claims that the common interest privilege does not exist between Assured, the Ad Hoc Group, and the Government Parties with respect to the RSA until the actual execution of the Definitive RSA on May 3, 2019.  *See* Mot. to Compel ¶¶ 21-29.  Assured joins in, and incorporates herein, the arguments made by the Government Parties and the Ad Hoc Group that the common interest privilege applied to communications between those parties regarding the Definitive RSA starting, at a minimum, from March 26, 2019 to the present when the Agreement in Principle was reached.  *See* Government Parties Opposition. Assured also joins in, and incorporates herein, the arguments made by the Ad Hoc Group that the common interest privilege applied to communications between those parties regarding the Definitive RSA starting, at a minimum, in October 2018 to the present.  *See Objection of the Ad Hoc Group of PREPA Bondholders to the Official Committee of Unsecured Creditors' Omnibus Motion to Compel Production of Documents in Connection With PREPA RSA Rule 9019 Settlement Motion*, filed contemporaneously herewith ("Ad Hoc Group Opposition").

53.   Courts have found that the common interest privilege applies when negotiating parties reach agreement on material terms, even if some "adverse motives" remain. *See In re Tribune Co.*, No. 08-13141 KJC, 2011 WL 386827, at *5 (Bankr. D. Del. Feb. 3, 2011) ("Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan."); *United States v. Gonzalez*, 669 F.3d 974, 976 (9th Cir. 2012) (holding that "parties to an asserted [common

interest privilege] need not have identical interests and may even have some adverse motives," although "communications are privileged to the extent that they concern common issues and are intended to facilitate representation.").[9]  Once Assured joined the Ad Hoc Group's negotiations with the Government Parties, the common interest between the Ad Hoc Group and Assured was evident.  Once the Government Parties, Assured and the Ad Hoc Group reached their Agreement in Principle, their common interest in seeking and obtaining approval and implementation of the settlement was also evident.

54.     As further set forth in the Government Parties Opposition and Ad Hoc Group Opposition, the Court should find that the common interest privilege applies to communications (i) between Assured, the Ad Hoc Group, and the Government Parties starting on March 26, 2019 and (ii) between Assured and the Ad Hoc Group starting in October 2018.  Those dates are when those respective parties reached agreement on material terms.  Assured should not be compelled to produce communications advancing common legal interests after such dates.

## III.     The UCC Improperly Seeks Hardcopy Documents And Electronic Messages

55.     The UCC also seeks to compel Assured to produce hard copy documents and Electronic Messages.  *See* Mot. to Compel ¶ 43.  Such requests are misdirected as to Assured.

56.     As to hard copy documents, for the subject matters and categories of documents that Assured has agreed to provide, Assured has previously agreed to undertake a reasonable search for responsive and non-privileged documents, including hard copy documents.  *See* Mot. to Compel, Ex. 21.  While Assured maintains its documents primarily in electronic form,

---

[9]     The UCC wrongly relies on *In re Lyondell Chemical Company*, Case No. 09-10023, ECF No. 3592 (Bankr. S.D.N.Y Jan. 14, 2011) to argue that the execution date of the Definitive RSA is the earliest point at which Assured, the Ad Hoc Group, and the Government Parties can have a common interest privilege. *Lyondell* is distinguishable because in that case, unlike here, Lyondell's official committee of unsecured creditors alleged that the debtor and settling creditors had colluded on the settlement.  *See* Mot. to Compel, Ex. 9 at 20-22, 41-45.  There are no such allegations here.

to the extent a reasonable search reveals any responsive, non-privileged hard copy documents, Assured will produce and is producing such documents.

57.    As to Electronic Messages, Assured's counsel has confirmed that, consistent with Assured's internal policies, the relevant Assured custodians, including Assured's negotiator of the RSA and Assured's outside counsel that negotiated the RSA, conducted all RSA negotiations by e-mail, phone and in-person meetings.  This representation should satisfy any concern the UCC expressed in its Motion to Compel.  Assured should not be compelled to engage in a burdensome search for Electronic Messages when such alternate means of communication were simply not used by Assured and its representatives in negotiating the RSA.

## <u>CONCLUSION</u>

58.    Assured respectfully requests that the Court deny the Motion to Compel as to Assured in all respects.

Dated:   June 7, 2019
         New York, New York


CASELLAS ALCOVER & BURGOS P.S.C.

By: /s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, PR  00936-4924
Telephone:  (787) 756-1400
Facsimile:  (787) 756-1401
Email:   hburgos@cabprlaw.com
         rcasellas@cabprlaw.com
         dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

CADWALADER, WICKERSHAM & TAFT
LLP

By:/s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
William J. Natbony*
Ellen Halstead*
Thomas J. Curtin*
Casey J. Servais
200 Liberty Street
New York, NY  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 406-6666
Email:   howard.hawkins@cwt.com
         mark.ellenberg@cwt.com
         bill.natbony@cwt.com
         ellen.halstead@cwt.com
         thomas.curtin@cwt.com
         casey.servais@cwt.com

*admitted pro hac vice

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 7th day of June 2019.

By: _/s/ Howard R. Hawkins, Jr._
　　　Howard R. Hawkins, Jr.*
　　　* Admitted *pro hac vice*