# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>**Court Filing Relates Only to PREPA and Shall Only be Filed in Case No. 17 BK 4780-LTS and Main Docket 17 BK 3283-LTS** |

**OBJECTION OF THE AD HOC GROUP OF PREPA BONDHOLDERS
TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OMNIBUS MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN
CONNECTION WITH PREPA RSA RULE 9019 SETTLEMENT MOTION**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .......................................................................................................3

ARGUMENT ...........................................................................................................10

I.     THE AD HOC GROUP HAS PROPERLY ASSERTED THE COMMON
INTEREST PRIVILEGE ...............................................................................10

     A.     The Common Interest Privilege Applied Once the Parties Agreed to the
July 27, 2018 Term Sheet .....................................................................10

     B.     FOMB's Counsel's Unilateral Disclosure of Documents Protected by the
Common Interest Privilege Did Not Waive the Privilege ....................14

II.    THE AD HOC GROUP SHOULD NOT BE REQUIRED TO PRODUCE THE
ADDITIONAL CATEGORIES AND TYPES OF DOCUMENTS SOUGHT BY
THE COMMITTEE .......................................................................................16

     A.     Because the Ad Hoc Group Selected Appropriate Custodians, No
Additional Custodians Should Be Required to Produce Documents...................16

     B.     Even if Members of the Ad Hoc Group Are Required to Produce
Documents, They Should Not Be Required to Produce Documents
Concerning Their Internal Valuations of Their "Collateral Position" ..................18

     C.     No Text or Instant Messages Should Be Required .................................21

CONCLUSION........................................................................................................21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Assymetrix Medical, Inc. v. McKeon*,
  No. 11-11079-NMG, 2013 WL 2181084 (D. Mass. May 16, 2013) ......................................13

*Bear Republic Brewing Co. v. Cent. City Brewing Co.*,
  275 F.R.D. 43 (D. Mass. 2011)..............................................................................................15

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*,
  656 F.3d 82 (1st Cir. 2011)...................................................................................................18

*Columbia Data Prods., Inc. v. Autonomy Corp. Ltd.*,
  No. Civ.A. 11-12077-NMG, 2012 WL 6212898 (D. Mass. Dec. 12, 2012) ..........................16

*CSC Tr. Co. of Del. v. Energy Future Immediate Holdings Co. (In re Energy Future
  Holdings Corp.)*,
  513 B.R. 651 (Bankr. D. Del. 2014) ......................................................................................20

*In re Dolan Co.*,
  No. 14-10614 (BLS), Tr., Dkt. No. 284 (Bankr. D. Del. May 2, 2014) ...........................19, 20

*In re Energy XXI Ltd.*,
  No. 16-31928, Tr., Dkt. No. 1141 (Bankr. S.D. Tex. Aug. 23, 2016) ..............................19, 20

*In re Genco Shipping & Trading Ltd.*,
  No. 14-111-8-SHL, Tr., Dkt. No. 267 (Bankr. S.D.N.Y. June 3, 2014)............................19, 20

*Hill v. Burdick (In re Moorhead Corp.)*,
  208 B.R. 87 (B.A.P. 1st Cir. 1997) ........................................................................................19

*In re JP Morgan Chase & Co. Securities Litigation*,
  No. 06 C 4674, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007)................................................13

*In re Leslie Controls, Inc.*,
  437 B.R. 493 (Bankr. D. Del. 2010) .................................................................................11, 12

*In re Lyondell Chemical Co.*,
  No. 09-10023, Tr., Dkt. No. 3592 (Bankr. S.D.N.Y. Jan 7, 2010)........................................13

*Schreib v. Am. Family Mut. Ins. Co.*,
  304 F.R.D. 282 (W.D. Wash. 2014) ......................................................................................18

*In re Taproot Sys., Inc.*,
  No. 11-05255-8-JRL, 2013 WL 3505621 (Bankr. E.D.N.C. July 11, 2013)..........................15

*In re Tribune Co.*,
    No. 08-13141 (KJC), 2011 WL 386827 (Bankr. D. Del. 2011) ................................11, 12, 14

*United States. v. Adlman*,
    134 F.3d 1194 (2d Cir. 1998) ................................................................................................18

*United States v. BDO Siedman, LLP*,
    492 F.3d 806 (7th Cir. 2007) ...............................................................................................15

**Rules**

Fed. R. Civ. P. 26(b)(1)..............................................................................................................17

Fed. R. Evid. 502(a) ...................................................................................................................15

**Other Authorities**

Elliot Moskowitz, *The Common Interest Privilege in Bankruptcy: Recent Trends
    and Practical Guidance,* 3 Nat'l J. Bankr. L. & Prac. 271 (2017) ....................................11, 12

To the Honorable United States Magistrate Judge Judith G. Dein:

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") respectfully submits this objection to the Official Committee of Unsecured Creditors' (the "Committee") Omnibus Motion to Compel Production of Documents (the "Motion") in Connection with PREPA RSA Rule 9019 Settlement Motion (the "9019 Motion").[1]

## **PRELIMINARY STATEMENT**

1.     The Committee's discovery requests are significantly overbroad, seek numerous categories of privileged, proprietary and irrelevant information that has no bearing on the 9019 Motion, and appear to have been designed to impose as great a burden on the Ad Hoc Group as possible.  The Ad Hoc Group nevertheless agreed to produce significant amounts of discovery from five of its lead negotiators with the other RSA parties – *i.e.*, the only people likely to have discovery relevant to the 9019 Motion.  The Ad Hoc Group also spoke at length with the Committee's counsel in an effort to reach a reasonable accommodation with the Committee.  The Committee has nevertheless made this motion to compel, in which it continues its efforts to obtain inappropriate discovery that would impose significant burden on the members of the Ad Hoc Group for no purpose.  The Committee's Motion is meritless and should be denied in its entirety.

2.     The Committee's Motion – insofar as it relates to the Ad Hoc Group – has three main prongs:

3.     First, the Committee seeks production of privileged communications between the Ad Hoc Group and various settling parties.  In particular, the Committee disputes that the Ad Hoc Group had a common interest with the Government Parties at any time prior to signing the

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the Committee's Motion.

May 3, 2019 RSA (the "RSA" or the "Definitive RSA") [Dkt. No. 1235-1] and therefore contends that all communications between the Ad Hoc Group and the Government Parties prior to that date must be produced.  But there is no doubt that the Ad Hoc Group had a common interest with the Government Parties as of July 27, 2018.  That is the date on which the Ad Hoc Group and the Government Parties agreed on the structure and material terms of their settlement, and agreed to work in concert to consummate and obtain Court approval for their deal.  The deal remained materially unchanged since then.  Although this was explained to the Committee at length, it is still seeking to invade, and even claim waiver of, the privilege.  This hostile effort should be rejected out of hand.

4.     Second, the Committee seeks burdensome discovery from the three largest funds in the Ad Hoc Group, demanding that they produce documents from the "teams" of people working on PREPA-related matters.  The Committee provides no justification for this baseless, arbitrary and burdensome demand, particularly when the Ad Hoc Group already has agreed to produce documents from its five key representatives that led the Ad Hoc Group's negotiations with the Government Parties.  The Committee's insistence on this point – in the face of the representation that the deal was negotiated by the professionals, and without regard to whether the members whose documents are demanded were involved at all – is plainly designed to harass the Ad Hoc Group's members.  This prong of the motion also should be denied.

5.     Third, the Committee seeks the production of inappropriate categories and types of documents, including, most significantly, subjective assessments and opinions by the Ad Hoc Group's members of the value of the settlement and their PREPA collateral.  These documents are both privileged and proprietary.  They are highly sensitive analyses, prepared with counsel, in an effort to understand the Group's litigation position.  Moreover, they are utterly irrelevant to

2

the 9019 Motion, which involves the Government Parties' decision on what is reasonable, not the Ad Hoc Group's.  There is ample precedent supporting the Ad Hoc Group's objection to these requests.  By contrast, the Committee did not cite any decisions supporting its position.  It failed even to *try* to justify this plainly overreaching request, simply slipping this demand into its Motion *en passant*.  This, too, should be rejected.

## **BACKGROUND**

**The Establishment of the Common Interest
and the RSA Negotiation Process**

6.      On July 27, 2018, after months of negotiations, as well as protracted and contentious litigation, the Government Parties and the Ad Hoc Group reached an agreement on the structure and material economic terms for a consensual resolution of the parties' disputes and a restructuring of PREPA's debt.  That structure, and those material economic terms, were memorialized in a written term sheet (the "July 27, 2018 Term Sheet").

7.      Over the ensuing weekend, the advisors to the Government Parties and the Ad Hoc Group documented a Preliminary Restructuring Support Agreement (the "Preliminary RSA"), which their respective clients entered into and publicly filed on July 30, 2018.  The July 27, 2018 Term Sheet was an exhibit to the Preliminary RSA.  *See* Motion Exh. 4.

8.      On May 3, 2019, the Government Parties, the Ad Hoc Group, and Assured entered into the Definitive RSA.  As shown in the chart below, the structure and material economic terms of the RSA are virtually identical to those agreed to in the Preliminary RSA.

| Term | Preliminary RSA | Definitive RSA |
|---|---|---|
| **Overall Structure**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA Ex. C. at § II* | Exchange of PREPA revenue bonds into Tranche A and Tranche B Securitization Bonds issued by an SPV | No change |
| **Exchange Ratio**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA Ex. C. at § IV(a)-* | Tranche A: 67.5% | No change |
|  | Tranche B: 10% | No change |

3

| Term | Preliminary RSA | Definitive RSA |
|---|---|---|
| *(b)* | | |
| **Claim Amount**<br>*Prelim. RSA Ex. B at n.1*<br>*Def. RSA at § 2(d)(i)-(iii)*<br>*and Ex. C. at n.3* | Principal plus interest through Effective Date for all Supporting Holders | No change; other than after 5/1/19, Administrative Expense Claims and cash payments replace interest |
| **Tranche A Bond Terms**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at §*<br>*V(a)(i)-(ii), § VIII(a)* | 5.25% tax-exempt coupon | No change |
| | 40 year stated maturity | No change |
| | 35 year expected maturity under Oversight Board's May 2018 load projections | 33 year expected maturity projections (as a result of negotiations between Assured and Government Parties) |
| | Callable after 5 to 10 years, to be agreed upon | Callable starting in year 10 |
| **Tranche B Bond Terms**<br>*Prelim. RSA Ex. B at 1-2*<br>*Def. RSA Ex. C at §*<br>*VI(a)(i)-(iv), § VIII(b)* | 7.0% tax-exempt coupon OR 8.75% taxable coupon | No change |
| | 45 year stated maturity – unpaid debt service expires unpaid | 47 year stated maturity – unpaid debt service expires unpaid (as a result of negotiations between Assured and Government Parties) |
| | No Tranche B payments while Tranche A outstanding | No change |
| | Call protection TBD | Callable starting in year 10 at levels set forth in Definitive RSA |
| **Tranche B Tax Covenant**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at n.5* | Covenant to work in good faith to try to obtain tax-exempt status for Tranche B Bonds or as great a portion thereof as possible | Covenant remains |
| **DSRF Size**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA Ex. C at § IX(a)* | Set at 5% of Tranche A Bonds | No change |
| **Securitization Bond Collateral**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA, Ex. C, Annex A,*<br>*Schedule I-B at § III.* | Securitization Bonds secured by Transition Charge | No change; further details included |
| **Transition Charge Life**<br>*Prelim. RSA Ex. B at 2*<br>*Def. RSA, Ex. C at § X(c)* | Transition Charge does not extend past Tranche B stated maturity unless Tranche A Bonds are still outstanding. | No change |
| **Transition Charge Levels**<br>*Prelim. RSA Ex. B at 1*<br>*Def. RSA, Ex. C at § III*<br>*and Annex A at 8* | Fixed schedule of Transition Charge levels; ratepayers are not taking the risk of declining power demand due to reduced economic activity | No change to structure; additional terms set forth |
| **Demand Protections**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Ex. C, Annex A*<br>*at Schedule I-A* | To be mutually agreed upon | Agreed upon in Demand Protection Term Sheet |

4

| Term | Preliminary RSA | Definitive RSA |
|---|---|---|
| **Remedies**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Exhibit C at § XI*<br>*and Annex A at 8 and*<br>*Schedule I-B at § VI* | Framework for remedies agreed upon; additional remedies to be mutually agreed upon in definitive documentation | No change, but certain additional details spelled out |
| **Securitization Protections**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA, Ex. C at Annex A* | To be mutually agreed upon | Agreed upon in Securitization Term Sheet |
| **Implementation**<br>*Prelim. RSA Ex. B at 3*<br>*Def. RSA at §§ 2-3, 5(c),*<br>*and 9* | Timeline and implementation mechanics to be mutually agreed upon | Agreed upon in Definitive RSA, including target milestones, Administrative Claims, Settlement Payments, Delayed Implementation Date, Increased Settlement Payments, Adequate Protection Payments, termination rights, Stipulated Treatment, and litigation stay, forbearance and tolling provisions |

9.     The parties spent the months between execution of the Preliminary RSA and the Definitive RSA in discussions and working together on how to implement the material terms of their deal.[2] These discussions were complicated by the fact that PREPA is in the midst of reviewing and considering massive changes to its generation system, and bringing in outside parties to further professionalize and privatize management of its transmission and distribution system in what could be the largest privatization of a public utility in recent years.  Because PREPA does not expect to propose a Title III plan until after it has chosen a private operator or concessionaire, confirmation of a plan is likely to occur in 2020, at least 18 months *after* the Preliminary RSA was signed.

10.     The Government Parties and the Ad Hoc Group had a common goal in these months of discussions: to create an RSA that was flexible enough to accommodate a long-dated

---

[2] These discussions were contemplated by the Preliminary RSA itself.  It reflects that the parties expected the Preliminary RSA to be superseded by a definitive RSA (Preliminary RSA § 2) and that they would "cooperate and coordinate activities . . . with the other Parties" to reach that common objective.  *Id.* ¶ 4.01(a)

Title III plan process and different potential PREPA operating structures, while ensuring that the Ad Hoc Group would get the benefit of the bargain that it struck in the Preliminary RSA. Negotiations during this period were almost entirely about legal and implementation mechanics, rather than financial terms.

11.     Although the process was lengthy and sometimes arduous, the parties arrived at their common goal in May 2019, when they signed the Definitive RSA, a much more detailed document that addressed these challenges while leaving the structure and material economic terms set forth in the Preliminary RSA substantially unchanged.

12.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████ Those documents, however, do not reflect changes to the material terms agreed upon in July 2018. Rather, they reflect precisely what the parties previously agreed upon: robust efforts to create an implementation structure for the RSA, finalize certain terms (such as demand protections) required to implement the deal set forth in the Preliminary RSA, create a structure to incentivize other holders to join the RSA, and secure Court approval for the deal. For instance:

•     ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ██████████████████

6

•

13.     That the parties had disagreements about some of these issues while

memorializing an $8.259 billion deal is unsurprising and insignificant. The parties' common

interest and goal did not change, but rather required thoughtful discussions about how to

implement the RSA, which the parties ultimately succeeded in working through.[3]

14.     While efforts were underway to finalize the Definitive RSA, the parties also

sought the support and participation of other constituencies. In particular, they obtained

Assured's agreement to join in the settlement (subject to some modifications requested by

Assured), and on March 26, 2019, the Government Parties, the Ad Hoc Group, and Assured

agreed to a term sheet for a definitive restructuring support agreement (the "March 26, 2019

Term Sheet"). Therefore, as of that date, the Ad Hoc Group, the Government Parties and

Assured had a tripartite common interest.[4]

**Relevant Procedural History and the Committee's
Burdensome and Overbroad Document Subpoena**

15.     On May 10, 2019, the Government Parties moved pursuant to Bankruptcy Rule

9019 for approval of the settlement embodied in the Definitive RSA. Various interested parties

including the Government Parties, the Committee, Assured and the Ad Hoc Group then

---

[3] The Ad Hoc Group did not know that these documents were being shared with the Committee,
and did not agree to that disclosure. Notwithstanding the foregoing, it appears that FOMB's
attorney was trying to keep counsel for the Committee – an estate fiduciary – apprised of, and
hopefully on board with, the settlement progress. The Committee's current use of these
documents as a spear with which to attack the settling parties is both disingenuous and
disappointing.

[4] The Ad Hoc Group understood that Assured accepted the economic terms of the settlement in
October 2018, and cooperated with Assured to formally fold Assured into the deal that was
eventually signed in March. Thus, as between the Ad Hoc Group and Assured, there was a
separate common interest that attached in October 2018.

7

negotiated a consensual schedule for discovery and a hearing on the 9019 Motion.  The schedule called for written discovery requests to be served on May 22, 2019, and document production to be completed by June 20, 2019.

16.     The Committee served a document subpoena on the Ad Hoc Group (among many other interested constituencies), and insisted that the subpoena be deemed applicable to the Ad Hoc Group itself, each of the Group's eight members, its lawyers at Kramer Levin Naftalis & Frankel LLP, and its financial advisor Houlihan Lokey, Inc. – a total of eleven separate corporate groupings or entities.

17.     The subpoena is burdensome.  It calls for significant searches of internal and external communications from each of these eleven corporate groupings for "[a]ll documents and communications" concerning a host of different topics.  The Committee is demanding emails, hard copy documents, texts and instant messages.  In some instances, it also is seeking categories of documents not relevant to anything at issue on the 9019 Motion, and that are replete with privileged information (thereby making the review process far more complex, time consuming, risky and burdensome).  Among other things, the Committee is demanding internal assessments from each Ad Hoc Group member of matters that are proprietary and would have been prepared with the advice of counsel, including:

a)      "the various payments that You will receive under the terms of the Settlement" (Request No. 4);

b)      "the nature, extent, and value of any security interest that PREPA bondholders purport to hold in assets of PREPA, including the extent to which the value of such security interest has decreased since PREPA's title III petition date, including documents evidencing or concerning any re-marking, change in, or reevaluation of Your members' PREPA exposure" (Request No. 5);

c)      "projected revenues from the sale of electricity or other revenue sources in Puerto Rico" (Request No. 8); and

      d)      "projected demand forecasts, sales forecasts, electricity pricing forecasts, and related assumptions for electricity in Puerto Rico, including the effect, if any, of the Settlement (including the Settlement Charge and/or the Transition Charge) on such forecasts, pricing, and assumptions, and any spreadsheets or models concerning the same" (Request No. 9).

Motion, Ex. 22.

18.      The Ad Hoc Group timely served detailed objections.  Motion, Ex. 23.  As relevant here, the Ad Hoc Group agreed to produce documents (excluding text and instant messages) from five lead negotiators at Kramer Levin and Houlihan Lokey.  Given that Kramer Levin and Houlihan led the negotiations on the Group's behalf, and therefore are likely to have the overwhelming preponderance of relevant information, the Ad Hoc Group objected to searching for and producing documents from its individual members.  The Ad Hoc Group also objected to the specific document requests identified above, on numerous grounds – including that it is the Debtors' judgment at issue in the 9019 Motion, not the Ad Hoc Group's, and because these documents are privileged and proprietary.

19.      In meet and confers, the parties discussed their position with respect to these (and other) disputed items.  The Committee did not offer any genuine compromise.  The closest it came was with regard to custodians.  Instead of requiring Kramer Levin, Houlihan Lokey, and *all* of the Ad Hoc Group's members, it said it would accept Kramer Levin, Houlihan and three members' PREPA "teams."  Because the negotiations were led by the professionals, and because the Ad Hoc Group is producing documents from five lead negotiators, there is no basis to require three additional teams of custodians.

20.      With respect to the Ad Hoc Group's substantive objections to the above-referenced document requests, the Committee simply modified its wording.  It now proposed that the Group's members produce documents concerning their fund's "collateral position" and "monitoring and oversight of its credit positions" in PREPA.  *See* Motion ¶ 41.  In discussions

9

about the meaning of this nebulous language, it became clear that the Committee is requesting essentially the same documents it was requesting in its original subpoena.

21.     The parties also conferred concerning the Committee's demand for text and instant messages.  The Committee first requested that the Ad Hoc Group confirm that its custodians (*i.e.*, those at Kramer Levin and Houlihan Lokey) did not negotiate the Definitive or Preliminary RSA by text or instant messages.  But when the Ad Hoc Group later confirmed precisely what the Committee had asked (and stated that the only texts related to minor matters such as setting up telephone conferences and the like) the Committee reneged, and claimed that this confirmation was not sufficient.  At bottom, the Committee's claim of "compromise" is nothing more than a feint.

## ARGUMENT

## I.     THE AD HOC GROUP HAS PROPERLY ASSERTED THE COMMON INTEREST PRIVILEGE

### A.     The Common Interest Privilege Applied Once the Parties Agreed to the July 27, 2018 Term Sheet

22.     The Committee does not dispute that the Government Parties, the Ad Hoc Group, and Assured have a common interest.  It only disputes the date the privilege began to apply, and requests an order providing that the common interest only arose on May 3, 2019, when the parties entered into the definitive agreement.  *See* Motion ¶ 29.  The Committee challenges the Government Parties and the Ad Hoc Group's assertion of a common interest after entering into the July 27, 2018 Term Sheet, and the joinder of Assured in that group when it signed a March 26, 2019 Term Sheet.  The Committee's position hinges therefore on the untenable argument that a common interest attached only after the parties entered into a definitive agreement, as opposed to when they actually agreed to the material terms of their deal and agreed to work together. That argument is not supported by either the law or the facts.

10

23.     The common interest privilege provides for the expansion of the attorney-client and attorney work product privilege when such information is shared with certain third parties. *In re Leslie Controls, Inc.*, 437 B.R. 493, 496 (Bankr. D. Del. 2010).  To establish the existence of a common interest privilege, the party invoking the doctrine must demonstrate that "(1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege was not otherwise waived."  *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *4 (Bankr. D. Del. 2011) (citing *In re Leslie Controls, Inc.*, 437 B.R. at 496-98).  As at least one commentator has recently noted, the common-interest doctrine has special importance and value in bankruptcy proceedings "as parties to complex disputes align with one another in the negotiation of plans of reorganization or resolution of contested matters," and therefore it "has been applied with increasing frequency" in that context.   Elliot Moskowitz, *The Common Interest Privilege in Bankruptcy: Recent Trends and Practical Guidance*, 3 Nat'l J. Bankr. L. & Prac. 271, 271 (2017) (noting that "bankruptcy proceedings can make for strange bedfellows, and debtors, official and ad hoc committees, secured and unsecured creditors, and other parties in interest may be aligned with or adverse to one another at various points in the life of a [bankruptcy] case").

24.     As this Court recently held in these very proceedings, parties can share common interests in some issues even if their interests diverge elsewhere.  *See* Order on Motion to Compel, No. 17-03283, Dkt. No. 6836, at 8 ("Although ERS and Commonwealth may be adverse in some respects, with respect to the issues presently before the Court, they share common interests . . . .") (citing *In re Mortg. & Realty Tr.*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (holding that the common interest doctrine "does not require a complete unity of interests among the participants.  The privilege applies where the interests of the parties are not identical,

11

and it applies even where the parties' interests are adverse in substantial respects")); *see also In re Tribune Co.*, 2011 WL 386827, at *4 ("the community of interest privilege can apply to parties whose interests are not totally in accord").

25.     Of particular importance to this Motion, courts have also held that parties who settle bankruptcy-related disputes may share a common interest *before* executing definitive agreements.  In *In re Tribune Company*, for instance, the court held that while the interests of certain settlings parties were "not completely in accord," they "share[d] the common legal interest of obtaining approval of their settlement and confirmation of the [] Plan, thereby resolving the legal disputes between and among them."  2011 WL 386827, at *4.  Moreover, in rejecting an objector's argument that a common interest could not attach until the plan documents were finalized and filed, the court held that a common interest existed when the settling parties agreed to *term sheets* containing material terms of their agreement even though "the parties *continued to negotiate and certain terms changed*."  *Id.* at *5 (emphasis added).  Indeed, the terms in *Tribune* changed materially.  There was an increase in the distributable enterprise value from $6.1 billion to $6.75 billion, but the common interest still applied.  *Id.  See also In re Leslie Controls, Inc.*, 437 B.R. at 501-02 (rejecting argument "that parties engaged in negotiations can never share a common interest" and holding that, where plan negotiations were ongoing, documents regarding insurance that had been shared between negotiating parties before an agreement were protected by common interest doctrine);  Moskowitz, *supra* ¶ 23, at 273 (courts have concluded that the common interest privilege may attach to documents and

12

communications exchanged prior to the commencement of a bankruptcy case, and even prior to the time adversaries reach an agreement").[5]

26.    Here, just as in *In re Tribune Company*, the common interest attached to communications between the Government Parties and the Ad Hoc Group once they agreed to the July 27, 2018 Term Sheet.  That is when the parties agreed to the structure and material economic terms of their arrangement, when they committed to work together to finalize other documents, and when they agreed to cooperate to seek approval for a final RSA.

27.    The Committee contends that "many material terms remained undetermined" when the Preliminary PSA was executed.  Motion ¶ 24.  But, in fact, the entire structure of the deal and the material economic terms were agreed to in the July 27, 2018 Term Sheet.  As shown above, those terms match almost perfectly with the terms in the Definitive RSA.  Negotiations undoubtedly continued, but they were not about the fundamental deal structure or terms.  They were about how to implement the agreement, how best to memorialize and finalize the definitive documents that the parties contemplated months earlier, and how to present the deal to the Court for approval.

---

[5] The committee cites *Assymetrix Medical, Inc. v. McKeon*, No. 11-11079-NMG, 2013 WL 2181084, at *2 (D. Mass. May 16, 2013) and *In re JP Morgan Chase & Co. Securities Litigation*, No. 06 C 4674, 2007 WL 2363311, at *5 (N.D. Ill. Aug. 13, 2007), neither of which are at odds with the holding in *In re Tribune Company* or the Ad Hoc Group's position.  Those cases address negotiations among *adverse* parties.  The Ad Hoc Group has not asserted a common interest over settlement negotiations when it was adverse to the Government Parties; it has asserted common interest when it was not adverse and was working towards a common goal.  The Committee wrongly relies on *In re Lyondell Chemical Co.*, No. 09-10023, Tr. at 15, Dkt. No. 3592 (Bankr. S.D.N.Y. Jan 7, 2010) (Motion, Ex. 9), to argue that the execution date of the Definitive RSA is the earliest point at which Assured, the Ad Hoc Group, and the Government Parties can have a common interest privilege.  *Lyondell* is distinguishable because in that case, unlike here, Lyondell's official committee of unsecured creditors alleged that the debtor and settling creditors had colluded on the settlement.  *Id* at Tr. 20-22, 41-45.  There are no such allegations here.

13

28. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ But, as *In re Tribune*

*Company* instructs, because the Government Parties and the Ad Hoc Group had already agreed
to the material terms, that they "continued to negotiate and certain terms changed" does not at all
negate their common interest. 2011 WL 386827, at *5.

29.   The Committee also incorrectly claims the Government Parties and the Ad Hoc
Group did not share a common interest because the Government Parties had an "absolute right"
to terminate the Preliminary RSA. Motion ¶ 24. Not only is that contention wrong as a factual
matter – Section 10.2(a)(iv) of the Preliminary RSA is a termination right of the Ad Hoc Group,
not the Government Parties – it also is beside the point. Regardless of whether any party had a
*right* to terminate the Preliminary RSA, no one *exercised* that right. The Ad Hoc Group is not
aware of any authority ascribing any significance to the mere fact that a party *could* terminate a
common interest agreement, but did not do so. Tellingly, the Committee did not cite any such
authority.

30.   Accordingly, the Government Parties, the Ad Hoc Group, and Assured have
properly asserted the common interest privilege and the Committee's request for an order stating
that the common interest privilege did not apply before May 3, 2019 should be denied.

B.   FOMB's Counsel's Unilateral Disclosure of Documents Protected by the
     Common Interest Privilege Did Not Waive the Privilege

31.   The Committee erroneously claims that the common interest privilege between
the Government Parties, the Ad Hoc Group and Assured was waived in its entirety because
counsel to FOMB apparently provided counsel to the Committee with fourteen emails
concerning the status of the parties' settlement. This disclosure was made without the

14

knowledge or consent of the Ad Hoc Group, and therefore counsel's actions cannot constitute a waiver of the common interest privilege. *See United States v. BDO Siedman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007) (holding that the privileged status of common interest communication cannot be waived by one party's unilateral disclosure); *In re Taproot Sys., Inc.*, No. 11-05255-8-JRL, 2013 WL 3505621, at *3 (Bankr. E.D.N.C. July 11, 2013) ("one party to [a common interest] agreement cannot unilaterally waive") (citing *United States. v. Gonzalez*, 669 F.3d 974, 982 (9th Cir. 2012)).

32.     Even if the disclosure of counsel to FOMB could unilaterally waive privilege, under Federal Rule of Evidence 502(a), the waiver would be limited to those fourteen emails, not every protected communication.  Rule 502(a) states that when a disclosure is made that "waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication . . . only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.  Fed. R. Evid. 502(a).

33.     None of those elements is satisfied here.  First, the Ad Hoc Group did not intentionally waive privilege.  As discussed, the Ad Hoc Group was not even contemporaneously aware that counsel to FOMB had disclosed the emails to counsel to the Committee, and therefore it could not have intentionally waived the privilege.  *See Bear Republic Brewing Co. v. Cent. City Brewing Co.*, 275 F.R.D. 43, 47 (D. Mass. 2011) ("The Rule provides that the 'waiver' rather than the disclosure has to be intentional to meet the provision of subdivision (a) of the Rule.  This means that a party must intend to waive the privilege or protection in order for there to be a waiver of undisclosed information . . . .").  Second, the disclosed communications do not relate to the exact same subject matter of all of the communications that are subject to the

common interest privilege. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Third,

since the Ad Hoc Group did not disclose the fourteen emails and, in fact, was not even aware that

they were disclosed, it would be grossly unfair to require disclosure of any other

communications protected by the common interest.[6]

## II.    THE AD HOC GROUP SHOULD NOT BE REQUIRED TO PRODUCE THE ADDITIONAL CATEGORIES AND TYPES OF DOCUMENTS SOUGHT BY THE COMMITTEE

34.    In addition to seeking documents protected by the common interest privilege, the

Committee further overreaches in three ways: (a) it seeks production from additional Ad Hoc

Group representatives; (b) it requests improper categories of information from those

representatives; and (c) it requests texts and instant messages that are both burdensome and

irrelevant. As explained below, each of the requests is improper under the circumstances.

A.    Because the Ad Hoc Group Selected Appropriate Custodians, No Additional Custodians Should Be Required to Produce Documents

35.    The individual member of the Ad Hoc Group should not be required to incur the

substantial expense associated with searching for and producing documents because their

professionals are already doing so and the professionals are likely to have the vast preponderance

of relevant information. The Committee has several non-objectionable requests for documents

concerning the drafting and negotiation of the Preliminary RSA and Definitive RSA. The Ad

---

[6] Citing to *Columbia Data Prods., Inc. v. Autonomy Corp. Ltd.*, No. Civ.A. 11-12077-NMG, 2012 WL 6212898, at *18 (D. Mass. Dec. 12, 2012) (Dein, MJ), the Committee suggests that undisclosed communications should be produced because the parties sharing the common interest put their discussions concerning the RSA at issue. Not so. It is the Committee – not the Ad Hoc Group or the Government Parties – that seeks to put those communications at issue in connection with the Motion and the 9019 Motion.

Hoc Group agreed to produce non-privileged documents responsive to these requests in the possession of five individuals at Kramer Levin and Houlihan Lokey. As described above, it was those professionals – not the individual Ad Hoc Group members – who led the negotiations and drafting of the RSA-related documents. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

36.     Moreover, as the Ad Hoc Group explained to the Committee, many of the electronic tools sometimes used to alleviate burden and expense are not as useful here. For example, search terms associated with the settlement are unlikely to limit results because (a) many of the Ad Hoc Group members are invested in other Puerto Rican credits; and (b) they all trade in various different credits generally. Accordingly, searching for Puerto Rico-related terms (*e.g.*, the names of governmental officials) or terms like "RSA" and "term sheets" are likely to result in many false hits. Similarly, domain name searches are also unlikely to be effective because – as investment professionals – many of the Ad Hoc Group members have relationships from other matters with the professionals representing various parties in this matter.

37.     Accordingly, the burden on Ad Hoc Group members, who did not lead the negotiations, materially outweighs any benefit to the Committee. *See* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit"). The five people whose documents the Ad Hoc Group is providing (four Kramer Levin lawyers and one Houlihan Lokey representative) should be deemed sufficient.

17

B.　　Even if Members of the Ad Hoc Group Are Required to Produce Documents, They Should Not Be Required to Produce Documents Concerning Their Internal Valuations of Their "Collateral Position"

38.　　The Committee has not even attempted to explain how documents concerning Ad Hoc Group members' internal valuations of their collateral position could possibly be relevant to the issues presented on the 9019 Motion.  The Court should deny the Committee's request for these documents on this ground alone.

39.　　What's more, as the Ad Hoc Group informed the Committee, any documents that exist concerning these subjects are likely to be privileged because they were created with counsel's input, for the evaluation of issues being litigated, and based on assumptions about resolution of complex substantive and procedural legal issues.  *See United States. v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) (the work product doctrine applies if a company's attorneys "estimat[e] the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses"); *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 285 (W.D. Wash. 2014) ("reserve information that was created in anticipation of litigation is protected by the work product doctrine").  The Committee has failed even to mention this dispositive objection by the Ad Hoc Group to this requested category of documents.

40.　　In any case, the Ad Hoc Group members' internal valuation documents are irrelevant to whether the Settlement should be approved, because the Rule 9019 analysis is focused on reasonableness of the settlement, giving deference to the *debtor*'s judgment of reasonableness, not the judgment of the parties with whom the debtor settles.  *See City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91-92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is to canvass the issue and see whether the settlement falls below the lowest point in the range of

18

reasonableness . . . . If a *trustee* chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), *his* judgment is entitled to some deference.") (emphasis added and citations omitted);  *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997) (holding that on a Rule 9019 motion the bankruptcy judge "is not to substitute her judgment for that of the *trustee*, and the *trustee's* judgment is to be accorded some deference.") (emphasis added and citation omitted).  And even insofar as the Court uses "objective" criteria, the Committee's requests plainly seek the Ad Hoc Group members' subjective opinions.  These subjective opinions are not relevant.

41.    There are many cases denying requests for creditor internal valuations in the analogous plan approval context.  For example, in *In re The Dolan Co.*, a party sought discovery of an internal valuation by a lender who was party to an RSA.  It argued that the lender "may well have in their files valuation materials that can contradict [the plan value that] has been presented to the Court, or otherwise provide information that will be useful in analyzing and critiquing that valuation."  *In re Dolan Co.*, No. 14-10614 (BLS), Tr. at 9, Dkt. No. 284 (Bankr. D. Del. May 2, 2014) ("*Dolan*") (Ex.  A).  The court rejected this argument, holding that the lender's valuation was not "an appropriate area of inquiry" and is "of limited relevance, as the [plan confirmation] burden rests with the debtor to demonstrate the value of the company."  *Id*. at 19-20.  The court issued a similar ruling in *In re Genco Shipping & Trading Ltd*., which also involved requests for internal valuations of the debtor's business from parties to an RSA.  *In re Genco Shipping & Trading Ltd.*, No. 14-111-8-SHL, Tr. at 62, Dkt. No. 267 (Bankr. S.D.N.Y. June 3, 2014) ("*Genco*") (Ex. B) (internal bondholder valuations "would be of limited relevance to the inquiry" because "the burden rest[s] with the debtor on the value of the company").  *See also In re Energy XXI Ltd.*, No. 16-31928, Tr. at 77, Dkt. No. 1141 (Bankr. S.D. Tex. Aug. 23,

2016) ("*Energy XXI*") (Ex. C) (holding that Second Lienholders' internal valuation of the debtors' assets "just can't be possibly relevant to the Debtors' thought process and the Debtors' valuation, their methodologies.  It is simply too far removed, too invasive").

42.     In addition, documents concerning the Ad Hoc Group members' internal valuations of "collateral positions" are also irrelevant because the Ad Hoc Group has not offered, and does not intend to offer, any evidence on these issues in the 9019 Motion hearing.  Again, *Dolan* and *Genco* are instructive.  In both cases, the court refused to require a party to produce internal valuations where the party was not taking a position or offering any evidence on the issue of valuation.  *Dolan*, Tr. at 21-22 ("I have, in a number of instances, consistently held that this type of inquiry is not appropriate until and unless [the buyer/party] becomes an active participant in presenting evidence and testimony to the Court regarding the value of the company") (emphasis added); *Genco*, Tr. at 62 ("this type of inquiry is not appropriate unless a party becomes an active participant in presenting evidence and testimony to the court regarding the value of the company"); *see also CSC Tr. Co. of Del. v. Energy Future Immediate Holdings Co. (In re Energy Future Holdings Corp.)*, 513 B.R. 651, 663 (Bankr. D. Del. 2014) (refusing to require third party to produce valuation of the debtor in the context of a makewhole dispute because third party "does not plan to take a position or offer evidence regarding the solvency of the [debtor] in connection with the makewhole litigation").

43.     For all of these reasons, the Ad Hoc Group's internal valuation documents are protected and entirely irrelevant.  No member of the Ad Hoc Group should be required to produce such documents.

C.    <u>No Text or Instant Messages Should Be Required</u>

44.    Producing text or instant messages is burdensome and significantly disruptive of people's lives (much more so than emails, for example, which can be collected remotely without disrupting a person's use of their computer).  This burden and disruption makes no sense here, where the Ad Hoc Group's professionals whose documents are being collected each confirmed – at the Committee's request – that they did not negotiate the Preliminary RSA, Definitive RSA or Settlement by text or instant message.  At most, we understand that any text messages – which were rare – involved efforts to schedule phone calls, and similar non-substantive matters. Regrettably, the Committee re-traded on this issue, and still is demanding these forms of communications.  This demand should be denied.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny the Committee's Motion in its entirety.[7]

---

[7] The Ad Hoc Group joins the arguments made in the Government Parties' and Assured's pleadings filed in opposition to the Motion, to the extent they address the same issues raised herein.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, June 7, 2019.

<table>
<tr>
<td>

**TORO COLÓN MULLET P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

*s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcm.law

*s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcm.law

*s/ Nayda Perez-Roman*
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA Bondholders*

</td>
<td>

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000

*s/ Natan Hamerman*
AMY CATON*
THOMAS MOERS MAYER*
GREGORY HOROWITZ*
NATAN HAMERMAN*
ALICE J. BYOWITZ*
Email: acaton@kramerlevin.com
        tmayer@kramerlevin.com
        ghorowitz@kramerlevin.com
        nhamerman@kramerlevin.com
        abyowitz@kramerlevin.com
*Admitted Pro Hac Vice*

*Counsel for the Ad Hoc Group of PREPA Bondholders*

</td>
</tr>
</table>