# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | ) | CASE NO: 16-31928 |
| | ) | CHAPTER 11 |
| | ) | |
| ENERGY XXI, LTD, ET AL., | ) | Houston, Texas |
| | ) | |
| | ) | Tuesday, August 23, 2016 |
| Debtors. | ) | |
| | ) | (11:47 a.m. to 1:41 p.m.) |


HEARING

BEFORE THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:              (Continued on page 2)

For Debtors:              JORDAN W. LEU, ESQ.
                          REESE A. O'CONNOR, ESQ.
                          Vinson Elkins, LLP
                          1001 Fannin St., Suite 2500
                          Houston, TX 77002

                          BRADLEY R. FOXMAN, ESQ.
                          HARRY A. PERRIN. ESQ.
                          Vinson Elkins, LLP
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX 75201

Courtroom Deputy/ECRO:    Diyana Staples

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Case: 17-03283-LTS Doc#: 7334-3 Filed: 06/07/19 Entered: 06/07/19 23:04:42 Desc:
Case 16-31928 Document 1142 Filed in TXSB on 08/26/16 Page 2 of 93
Exhibit C Page 3 of 94

2

__APPEARANCES FOR:__                (CONTINUED)

Debtors:                 DAVID S. MEYER, ESQ.
                         JESSICA C. PEET, ESQ.
                         Vinson Elkins, LLP
                         666 Fifth Avenue, 26th Floor
                         New York, NY 10103


Wilmington Trust:        TODD MYERS, ESQ.
                         Cole Schotz
                         301 Commerce St., Suite 1700
                         Fort Worth, TX 76102


Delaware Trust           PHILIP D. ANKER, ESQ.
as Indenture Trustee,    CHRISTOPHER LOONEY, ESQ.
et al.:                  DENNIS L. JENKINS, ESQ.
                         Wilmer Cutler Pickering, et al.
                         7 World Trade Center
                         250 Greenwich Street
                         New York, NY 10007


Prosperity Bank:         ADAM R. SWONKE, ESQ.
                         Well Cuellar
                         440 Louisiana, Suite 718
                         Houston, TX 77002


Ad Hoc Group of EGC      GREGORY M. STARNER, ESQ.
Unsecured Noteholders:   JOEL ANDROPHY, ESQ.
                         White & Case
                         1155 Avenue of the Americas
                         New York, NY 10036


Ad Hoc Committee of      EDWARD L. ROTHBERG, ESQ.
Equity Holders:          Hoover Slovacek
                         Galleria Tower II
                         5051 Westheimer, Suite 1200
                         Houston, TX 77056


Wells Fargo:             ANA ALFONSO, ESQ.
                         Willkie Farr Gallagher
                         600 Travis St., Suite 2310
                         Houston, TX 77002


Official Committee of    CHRISTOPHER R. HARRIS, ESQ.
Unsecured Creditors:     HEATHER WALLER, ESQ.
                         ADAM J. GOLDBERG, ESQ.
                         Latham & Watkins
                         330 N. Wabash Avenue, Suite 2800
                         Chicago, IL 60611

**<u>APPEARANCES FOR:</u>**          (CONTINUED)


Ad Hoc Committee of      ANDREW M. LE BLANC, ESQ.
Second Lien Lenders:     SAMUEL KHALIL, ESQ.
                         Milbank Tweed Hadley & McCloy
                         28 Liberty Street
                         New York, NY 10005

4

1           **Houston, Texas; Tuesday, August 23, 2016; 11:47 a.m.**

2                         **(Call to Order)**

3           **THE CLERK:** All rise.

4           **THE COURT:** Thank you, everyone.  Please be seated.

5       All right.  Who's the keeper of all the info?

6           **MR. MEYER:** I guess that would start with me, your

7   Honor.

8           **THE COURT:** Fair enough.

9           **MR. MEYER:** David Meyer, Vinson and Elkins, on behalf

10  of the debtors.  I'm here with my colleagues, Jessica Peet,

11  Jordan Leu, Reese O'Connor, Brad Foxman, with Matt Moran and

12  Harry Perrin.

13          **THE COURT:** Thank you, folks.  Do you want to just

14  give me an update with where we are?

15          **MR. MEYER:** Sure.  Why don't I do that.

16          Your Honor, first of all, thank you for your patience

17  as we've been working through a handful of issues over the

18  course of the last couple of hours and over the last couple of

19  days as well.

20          **THE COURT:** Yeah.  Sure.

21          **MR. MEYER:** We have a handful of items on the agenda

22  today.  The principal reason that we originally scheduled this

23  date was status conference with respect to plan confirmation,

24  so perhaps I'll start there.  That necessarily dovetails with

25  the standing motions that were filed for today, first by the E

1  -- EPL Ad Hoc Group, then by the EGC Ad Hoc Group, and we have

2  two other items on the plan -- on the agenda today, for one,

3  the motion with respect to Prosperity and a contract objection

4  motion.

5          So, I'll start with the status conference, your

6  Honor.  And thank you to your chambers, as well, for assisting

7  us work through dates and potential options here.  Here is what

8  we -- where we currently sit, which is we would keep our dates

9  set for September 13th and 14th.  We currently have those

10 established for plan confirmation.

11         **THE COURT:**  Right.

12         **MR. MEYER:**  Given where we currently are, as part of

13 the discovery process and just where this case sits

14 generally --

15         **THE COURT:**  Uh-huh.

16         **MR. MEYER:**  -- in the absence of a change, we

17 anticipate that we will need more than two days for

18 confirmation.  And, so, as a consequence of that, we've also

19 requested and been advised that you're free on September 21st

20 and 22nd, as well as the morning of September 23rd.  And in

21 advance of all of that, your Honor, we would request that we

22 schedule a pretrial status conference for September 6th, that

23 we also understand is available based on your calendar.

24         **THE COURT:**  Let's see.  All right.  Let's go back.

25 Looks like there may have been a slight miscommunication, but

Case: 17-03283-LTS Doc#: 7334-3 Filed: 06/07/19 Entered: 06/07/19 23:04:42 Desc:
Case: 16-31928 Document 1142 Filed in TXSB on 08/26/16 Page 6 of 93
Exhibit C Page 7 of 94

6

 1    I -- I think we can get there.  I have the afternoon of the

 2    21st, not the whole day.  On the 22nd, I can move a couple of

 3    things.  We can probably start -- we can start, you know, 9:15-

 4    ish, 9:30-ish.  What I would probably suggest is that we go

 5    through the normal lunch hour just so you have maximum use of

 6    time.  I've got a 2:00 o'clock individual Chapter 11

 7    confirmation hearing.  It just can't take very long, and my

 8    thought would be is that, you know, we'll just schedule lunch

 9    around that and you all can take a break while I handle that,

10    if that works for everybody.  It will be a late lunch, but I

11    can't imagine that would be that bad.  We can start a little

12    later if we need to.  And, then -- and I have time on -- I have

13    a significant chunk of time on the 23rd, so I can certainly

14    give you those three days, if that helps.

15            **MR. MEYER:**  I think that's (indiscernible), your

16    Honor.  I think that that's --

17            **THE COURT:**  All right.

18            **MR. MEYER:**  -- consistent with the general discussion

19    we discussed -- the general schedule we discussed with the plan

20    objecting parties.  I think that --

21            **THE COURT:**  But the goal would still be to start on

22    the 13th?

23            **MR. MEYER:**  Correct.  That's right, your Honor.

24            **THE COURT:**  All right.

25            **MR. MEYER:**  And I think that, based on the

7

 1  discussions today, that's -- there is an agreement between each

 2  of the plan objecting parties.

 3          There is going to be a pretrial status conference on

 4  the 6th, and people may make different arguments at that point

 5  in time, to be clear, but as it relates to today and what we

 6  were targeting today and the purpose of it being, that's where

 7  we sit.

 8          THE COURT:  No, fair enough.  And on the status

 9  conference for the 6th, how much time were you thinking?  And

10  I'm not going to hold a stopwatch.  I'm just trying to

11  schedule.  Is this a 30-minute?  Is it a three-hour?  What do

12  you anticipate?

13          MR. MEYER:  From my standpoint, your Honor, and --

14  and -- I would anticipate that we're going to be on the shorter

15  side than the longer -- the longer side.

16          THE COURT:  All right.  Everybody agree with that?

17          Mr. Anker?

18          MR. ANKER:  Philip Anker, Wilmer Cutler Pickering

19  Hale and Dorr, your Honor, for Delaware Trust as EPL --

20          THE COURT:  And I didn't mean to pick on you; it's

21  just over the years I've --

22          Can we turn the microphone around?  She can't hear

23  you.  It's out in the front.

24          I didn't mean to pick on you.  It's just over the

25  years I have learned that you are a pretty good estimator of

 1  time.  That's all I was -- the only reason I looked to you.

 2          **MR. ANKER:**  I hope I'll be good to my past

 3  experience.  I suspect that it could be longer than that, but I

 4  don't think it's three hours.  I do want to underscore, your

 5  Honor -- and I think on this I speak for all the objectors, but

 6  if not, they should speak up.

 7          **THE COURT:**  Sure.

 8          **MR. ANKER:**  We do think it makes sense at the moment,

 9  and we are hopeful that we can go forward on the 13th and 14th.

10  We're hopeful that we will be able to persuade your Honor that

11  the plan that is currently on the table is not confirmable, and

12  so that we can move forward, and I think you've seen evidence

13  there are substantial negotiations going on of an

14  alternative --

15          **THE COURT:**  Sure.

16          **MR. ANKER:**  -- plan, and I would like a few minutes

17  to chat about that, not right this second.

18          **THE COURT:**  Sure.

19          **MR. ANKER:**  I do think in terms of the 6th, just to

20  give you a sense, there have been depositions every day.  There

21  are two, maybe three deps. scheduled tomorrow and each day the

22  rest of the week.  And I certainly think the debtors have been

23  operating in good faith.  Having said that -- and, again, I'm

24  not at all suggesting this is anything other than what happens

25  in the real world -- we got 18,000 pages of new documents the

Case: 17-03283-ht5-8 Doc#: 7234-3 Filed: 06/07/19 Entered: 06/07/19 23:04:42 Desc:
Case: 16-31928 Document: 1142 Filed in TXSB on 08/29/16 Page 9 of 93
Exhibit C  Page 10 of 94

9

 1    other day that we haven't had a chance to go through, but they

 2    may well require witnesses who have already been deposed to be

 3    redeposed.  The schedule in terms of sort of when we're likely

 4    to get done fact discovery has slipped easily a week, if not

 5    two.  And I want to just give the Court a heads up that it is

 6    possible -- I'm not predicting it -- it is possible that on the

 7    6th some or all of the objecting parties will have a different

 8    view on whether the 13th or 14th works.

 9              **THE COURT:**  Right.

10              **MR. ANKER:**  But at the moment I don't think any of us

11    are in a position to say to your Honor it doesn't work, period,

12    full stop.

13              **THE COURT:**  Got it.  So, with respect to the

14    scheduling conference on the 6th, that is a normal travel

15    afternoon for me to Corpus.  But what I would propose is this,

16    is to give you an 11:00 o'clock, and I'll just go ahead and

17    reserve the late flight Tuesday night, so you'll have five

18    hours max.  I hope we don't need it, but if we do and there are

19    other issues develop and there's need for emergency

20    consideration of whatever might occur, you've got a significant

21    block of time.  Does that work for everybody?

22              **MR. MEYER:**  It certainly works for me, your Honor.

23              **MR. SPEAKER:**  Yes, sir.

24              **THE COURT:**  All right.  All right.  So, Ms. Staples,

25    if you'd set a scheduling conference --

10

1          **(Voices and whispers off the record)**

2          **THE COURT:**  No, understood.  We'll set -- we'll set a

3    scheduling conference or a status conference for September the

4    6th at 11:00 o'clock.  Then, with respect to continued days for

5    confirmation, let's go ahead and block out -- I think you'd

6    already done this -- yeah, block out the 21st from

7    11:00 o'clock forward, the 22nd from -- we'll block out from

8    9:15 forward with the understanding that we've got that issue

9    at 2:00 o'clock, and then the 23rd we'll block out from 9:00

10   until 2:30, and then, dependent upon if you need it -- I

11   haven't yet figured out if the 3:00 o'clock is ten minutes or

12   two hours.  I just -- I haven't figured that out yet.  That

13   work?

14          **MR. MEYER:**  Yes, it does, your Honor.  Thank you.

15          **THE COURT:**  All right.  What else can -- what else do

16   we need to address today?

17          **MR. MEYER:**  Well --

18          **THE COURT:**  Do we still have discovery issues that we

19   need to deal with?

20          **MR. MEYER:**  We do.  There are a couple of discovery

21   items that we will address; a couple items before that, your

22   Honor.

23          **THE COURT:**  Okay.

24          **MR. MEYER:**  First, the standing motion that was filed

25   by the EPL Ad Hoc Group; they have agreed that that motion will

1    be carried to the confirmation hearing set for September 13th

2    as well.  The creditors committee supports that adjournment of

3    that motion, too.  The Ad Hoc EGC Group, you may recall, your

4    Honor, they filed a motion in response to the EPL motion

5    predicated on if the EPL group was granted standing, that the

6    Ad Hoc EGC Group should be granted standing.  They have not

7    agreed to that adjournment.  They would like to prosecute their

8    motion today, so we will be talking about that a little bit,

9    and --

10           **THE COURT:**  Well, let me just -- and hopefully this

11   will facilitate some additional discussions.  The way that I

12   look at this, and I -- I know that a transcript was gotten of

13   what I said in *Midstates*, and, you know, I don't pretend to be

14   the most eloquent in the world, but I meant what I said there,

15   and I think it applies here.  I don't see how standing can

16   coexist with a proposed compromise embodied in a plan.  If the

17   debtor fails, then the debtor fails, and then all bets are off.

18   And I think I've made that -- if I haven't made it pretty

19   clear, I'm, hopefully, reiterating that concept again.  But in

20   terms -- and I think that if the plan fails, I think that the

21   movants will almost, by definition, have established the

22   necessary criteria for standing.  I'm not saying it's -- I'm

23   not making that determination today, but it's going to be an

24   uphill battle if the plan fails for the debtor to convince me

25   that the requirements for standing haven't been met, because at

Case 17-03283-LTS  Doc#7334-31  Filed 06/07/19  Entered 06/07/19 23:04:42  Desc:
Case 16-31928   Document 31-42   Filed in TXSB on 08/25/16   Page 14 of 93
Exhibit C   Page 13 of 94

12

1   that point we have a failed compromise, we have a debtor,

2   and -- we have two debtors in untenable positions, at least in

3   terms of being able to evaluate those claims in a different

4   manner.

5            So, my inclination, I'm not going to proceed forward

6   with a prosecution of the standing motion today.  I think it

7   would be a waste of everybody's time.  I came out prepared this

8   morning to talk about continuing those to confirmation.  It

9   only makes sense.  It's -- the issues are intertwined, so -- if

10  that causes anybody heartburn, I'll certainly hear it.  I'll

11  hear arguments, but you're going to be -- it's going to be a

12  tough battle to get me to hear that today ahead of

13  confirmation, because I just think I'm going to hear the same

14  thing twice.  I mean, maybe in a different form, but it's --

15  substantively, it's the same thing.  You know, that's -- those

16  are my thoughts.

17           **MR. MEYER:**  Thank you, your Honor.  Those certainly

18  reflect our views based on the papers, as well.

19           A couple of additional points for your Honor related

20  to scheduling and housekeeping.  Our scheduling order, there is

21  a -- there was for the plan objectors a milestone that expert

22  reports would be provided by this Friday, August 26th.  In

23  connection with these discussions, we've agreed to -- and I

24  should, more importantly, say the plan objectors have agreed

25  to -- extend that deadline to this upcoming Monday,

1    August 29th, at 6:00 p.m. central time.

2              **THE COURT:**  All right.

3              **MR. MEYER:**  And the corollary to -- and that is to in

4    part address the concern that Mr. Anker reflected that we'll

5    talk about a little bit with respect to the finer points of the

6    discovery disputes, as well as the corresponding date for our

7    rebuttal reports to come in would be extended to Tuesday,

8    September 6th, at 2:00 p.m. central time, that being -- it had

9    previously been the preceding Friday, September 2nd.

10             **THE COURT:**  So, that -- that will fall after our

11   status conference.  Do we want to reverse those?  Or -- I don't

12   know what is going to come up.  Do you want to have that status

13   conference later in the day so that you can then, if there are

14   expert issues that you see and you need to raise -- I know

15   you're not going to have a lot of time, but --

16             **MR. ANKER:**  Your Honor, I think that's a very

17   thoughtful and good suggestion.  That would make sense.  It

18   would give us a little bit of time to at least digest those

19   reports, so if that would be agreeable to your Honor, it would

20   be good for us.

21             **THE COURT:**  It's fine with me.  You have the whole

22   day.  When would you like to -- when would you like to start?

23   Seems to me it would make a whole lot of sense, if you all can

24   agree, is that you get the rebuttals maybe by noon and you have

25   the hearing at 2:00.  And that -- that gives you a couple

1   hours.

2           **MR. ANKER:**  I see a (indiscernible) --

3           **MR. MEYER:**  I'm a -- I'm a very reasonable guy, your

4   Honor, and I also read body language well, and so, yes, that's

5   amenable to us.

6           **THE COURT:**  All right.  So, and are we going to

7   embody this in an agreed order, or are we simply just going to

8   make the announcements on the record?

9           **MR. MEYER:**  I'm comfortable -- we made the

10  representations on the record.  I think everybody is acting in

11  good faith with respect to these changes.  I don't think there

12  is anything that we need to do more formally than that, your

13  Honor.

14          **THE COURT:**  All right.  So, rebuttal -- rebuttal

15  reports by noon.  We'll move the scheduling hearing on the 6th

16  till 2:00, and that way if something major exists we can just

17  take it up then.

18      **(Pause)**

19          **MR. MEYER:**  Thank you, your Honor.

20          **THE COURT:**  Uh-huh.

21          **MR. MEYER:**  I will step back and just take a

22  couple -- make a couple observations for today's hearing based

23  on a couple of the discussions associated with the intercompany

24  note, plus the creditors committee's exclusivity objection that

25  was filed on Friday night, and that dovetails with some of

1    Mr. Anker's comments, before go to the agenda for the rest of

2    the day.

3              And I think, your Honor, the first day we came into

4    your courtroom here, we provided a very detailed overview of

5    the company's capital structure, and one of the items we had

6    flagged that we anticipated would become a key issue in these

7    cases is the second intercompany note --

8              **THE COURT:**  Right.

9              **MR. MEYER:**  -- from EPL to EGC.  And it's an

10   important reason, your Honor, one of several, why independent

11   directors are at both boxes and that independent directors have

12   separate counsel.  And just by way of refresher, EGC has

13   Mr. George Morris as its independent director, and he's engaged

14   Andrews Kurth as his counsel, and Jim Latimer at EPL is the EPL

15   independent director, and he has engaged Porter Hedges as his

16   counsel.  As part of our standing objection, your Honor, we did

17   attach the resolutions that appointed Mr. Morris and

18   Mr. Latimer, respectively, as effectively restructuring

19   committees of one to deal with any issues in which there are

20   conflicts between EGC and EPL.

21             **THE COURT:**  Uh-huh.

22             **MR. MEYER:**  And, so, while we made that prediction to

23   your Honor -- and the WilmerHale group had the -- WilmerHale

24   was representing a smaller ad hoc group at that particular

25   point in time -- as a reminder, the unsecured noteholders in

 1   this case had not organized prior to the petition date.  It was

 2   a very unique circumstance in which an interest payment was

 3   missed in February on the EPL bonds; that interest payment was

 4   cured in March; and ultimately the company, as you know, filed

 5   in April.  And, similarly, on the ad hoc EGC side, an interest

 6   payment was missed in March and ultimately not made, in part

 7   leading to the commencement of these cases in April.

 8           And, so, I give that backdrop just for where we are

 9   and where we're going.  It's no surprise that we have ad hoc

10   groups in a big fight about this nuanced issue.

11           **THE COURT:**  Sure.

12           **MR. MEYER:**  I'd also note that there has been

13   significant turnover, we believe, in the bond group from --

14   well, for (indiscernible) various points in time between the

15   time the second intercompany note was issued and where we sit

16   today, including during the course of these cases.  And I think

17   your Honor appropriately noted that what we've done here is

18   seek to settle all disputes that are raised in the standing

19   motion as part of our -- the plan that's been filed and as --

20   we agree with your Honor that that will be taken up in

21   connection with confirmation, and there is also no dispute that

22   discovery on these issues remain and is ongoing.  John Schiller

23   is going to be deposed tomorrow.  He is the company's CEO, as

24   you know.  He's also a board member at both EGC and EPL, and

25   he's a 30(b)(6) witness on certain topics, too.  And Mr. Morris

17

 1   and Mr. Latimer will be deposed on Thursday and Friday of this

 2   week, respectively.  And, so, there is no question that parties

 3   in interest will have their ability to object to confirmation

 4   if they want to do so on this particular point, and the Court

 5   will take a good, hard look at that.

 6           The other comment that I make, quickly, your Honor,

 7   relates to the exclusivity objection that was filed on Friday

 8   night.  We filed our short statement yesterday leading up to

 9   today's status conference, and I would emphasize that, as

10   (indiscernible) -- and I don't want to belabor the point, but

11   we had not received proposals and we still have not received

12   any term sheet from any particular party.  And it's

13   unquestioned that the debtor controls exclusivity at this

14   point.  And we're going to take a hard look at that particular

15   issue.  The fact that outlines of proposals were included in

16   exclusivity objections in advance of today's hearing, people

17   know where we are.  We're in constant communication with folks.

18   If there is a proposal to be had, and there is an idea that

19   somebody has, the appropriate way for that to be channeled in

20   the best interests of the company and all of the stakeholders

21   is through the debtors as estate fiduciaries.  The company and

22   its directors, as well as the independents, take those

23   fiduciary duties very seriously.  There is a robust fiduciary

24   out in the restructuring support agreement that reflects

25   exactly that.

Case 17-03283-LTS Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:42 Desc:
Case 16-31928 Document 1142 Filed in TXSB on 08/25/16 Page 18 of 93
Exhibit C Page 19 of 94

18

1          And, so, I think, you know, your Honor, as a general

2    tenor, we wanted to make sure we explained that to the Court,

3    but I think an important point that I would also raise is,

4    while we'll continue to have those discussions -- and I don't

5    think there is any question that we have been, in particular,

6    very active in all of those with various parties, and most

7    specifically, the advisers to the creditors committee -- we

8    also believe that the plan that's currently been proposed is

9    confirmable.  And, of course, that's not an issue for today,

10   but we believe that the plan will satisfy the requirements of

11   Section 1129 and can be confirmed.

12          So, with that, your Honor, I will turn the podium

13   over.  I think it's likely to Mr. Anker first to comment on his

14   standing motion, as well as some other items, to Mr. Goldberg

15   to discuss the standing motion, and then Mr. Starner.

16          **THE COURT:**  Let me -- and just to -- because I -- if

17   you folks are talking, I want that to continue, and I don't

18   want to say something or do something that changes the balance

19   of those negotiations.  With respect to exclusivity today,

20   having read everything, what I was contemplating doing was, to

21   the extent that it's required, extending exclusivity through

22   what would now be the 23rd.  I've said it multiple times, and

23   I've said it different ways.  I'm going to give the debtor its

24   shot.  I haven't yet been able to assess your chances of

25   success; I just don't know.  But I'm going to give the debtor

19

```
 1  its shot to either negotiate some of the issues down to where

 2  they're manageable, or if you think that you can just beat

 3  everybody, I'm going to give you that shot.  And I don't want

 4  the existence of another plan or other discussions to get in

 5  the way of that.  I want that to be fully vetted.

 6          What I will do on the 23rd in terms of plan

 7  alternatives or anything else -- and that's just assuming,

 8  Mr. Anker, that you take all the time that I've given you; the

 9  end of confirmation, be it the 13th, 14th, or the 23rd -- what

10  I will do at that point with respect to plan alternatives

11  and -- and, you know, allowing other folks to file plans is

12  going to depend on what I hear, in large part.  And, so, my

13  thought is, you know, I'm not going to say you've got -- you

14  know, that you've got exclusivity through the end of the year.

15          MR. MEYER:  Uh-huh.

16          THE COURT:  And what I'm telling you is, I'll give it

17  to you through the end of the confirmation process, and I'm

18  going to watch and I'm going to listen and I'm going to then

19  ask for arguments and try to figure out the right thing to do

20  going forward.

21          MR. MEYER:  Uh-huh.

22          THE COURT:  That -- that's kind of my thought on the

23  process.  I don't --

24          MR. MEYER:  So, I think, your Honor, actually, we've

25  thought about it very similarly.  We filed our exclusivity
```

1   motion several weeks back now.  And the objection deadline that

2   was part of the bridge order that we reached with the plan

3   objecting parties --

4           **THE COURT:**  Uh-huh.

5           **MR. MEYER:**  -- contemplates that our exclusive period

6   to file a Chapter 11 plan is extended through the earlier of

7   the end of confirmation or September 30th or a date on or

8   around that date, with the theory being that we were protected

9   to be able to go prosecute our plan, and if we don't succeed,

10  then we reserve whatever rights we have to request a further

11  extension of exclusivity --

12          **THE COURT:**  Right.

13          **MR. MEYER:**  -- other parties reserve whatever rights

14  they have to either object to that extension request or to move

15  to terminate exclusivity.  And, so, your Honor has entered a

16  bridge order to that effect, so I think we're largely --

17          **THE COURT:**  We're already through the end of

18  September, so I'm -- I don't know why I had in my mind that

19  that was still an issue.  So, we're good through September 30?

20          **MR. MEYER:**  That's correct.  The way that it works,

21  just to be -- and I'll let Mr. Goldberg comment if he feels --

22          **THE COURT:**  Okay.

23          **MR. MEYER:**  -- I'm getting the words wrong here, but

24  it's -- the exclusivity extension itself contemplates that our

25  motion that we filed would be heard either on the earlier or of

Case 17-03283-LTS  Doc#7334-31 Filed 06/07/19 Entered 06/07/19 23:04:42  Desc:
Case 16-31928  Document 142  Filed in TXSB on 08/25/16  Page 21 of 93
Exhibit C  Page 22 of 94

21

1    immediately following the confirmation hearing, the conclusion

2    of the confirmation hearing, or around September 30th.  And I

3    say "around" because that's based on the availability of the

4    Court.

5              **THE COURT:**  All right.  I'll just tell you, and

6    I'm -- I'm going to be asking the questions once we conclude

7    the hearing on confirmation, assuming that I don't confirm it.

8    So, I mean, I want everybody to have that on their list of

9    things to be prepared for.  Because I do think everybody

10   deserves an answer.  I mean, if you don't -- if you have

11   difficulty -- you all were in here when you heard my 9:15.  You

12   know, that's real life.  Those are folks who can't make the car

13   payment and who are in a house that's $50,000 under water.

14   Those are the people that get affected most by all of this.

15   And, so, I'm not going to delay it.  You know, if you can win,

16   you can win.  If you can't, I'm going to look for the next best

17   winner.  And I'm going to do that quickly.  So, everybody --

18   you know, if you can't -- if you don't prevail, be ready to

19   talk about Plan B.  I'm not going to -- not going to give

20   everybody two weeks to go figure out what the plan is; you'd

21   better have Plan B in your pocket when you come.

22             **MR. MEYER:**  Uh-huh.

23             **THE COURT:**  Fair enough?

24             **MR. MEYER:**  That's fair enough, your Honor, and --

25             **THE COURT:**  Okay.

1          **MR. MEYER:**  -- that's probably why, one, we believe

2   we'll be able to confirm the plan, and, two, that's why the

3   order is set up exactly in that manner.

4          **THE COURT:**  Got it.  Okay.

5          **MR. GOLDBERG:**  Good morning, your Honor.

6          **THE COURT:**  Good morning.

7          **MR. GOLDBERG:**  For the record, Adam Goldberg of

8   Latham and Watkins on behalf of the official committee of

9   unsecured creditors.

10          **THE COURT:**  Yes, sir.

11          **MR. GOLDBERG:**  I'm joined today with -- by

12   Christopher Harris and Heather Waller from Latham, as well as

13   Tristan Manthey and Billy Patrick from Heller Draper.

14          **THE COURT:**  Good afternoon, folks.  I -- actually,

15   when I came out, I thought all of this had been resolved, so I

16   apologize for -- I thought I was going to get an announcement

17   that everything was all agreed to, and that's why I didn't take

18   appearances, so my -- my error.

19          **MR. GOLDBERG:**  Understood, your Honor, and we -- and

20   we did make quite a bit of progress.

21          **THE COURT:**  Sure.

22          **MR. GOLDBERG:**  If I might be heard for just a minute

23   or two to respond to -- I think --

24          **THE COURT:**  Of course.

25          **MR. GOLDBERG:**  -- it's important to note that the

23

1   committee shares the debtor's desire to move quickly, as well

2   as your Honor's desire to move quickly.  We did see real life

3   here today in the courtroom, and the members of our committee,

4   including trade creditors, are very deeply vested in the future

5   of this company and are looking forward to a speedy

6   reorganization.  I would say that the debtor -- the committee

7   shares also the debtor's desire to move forward with the

8   confirmation hearings, although for a somewhat different

9   reason, because our view is that defeat of the plan is the

10  fastest way to advance towards confirmation.

11          To frame the landscape of these cases for your Honor,

12  we filed our exclusivity objection on Friday.  Two important

13  points to note there.  One, which I think the debtors did not

14  bring up, is that the committee has worked with unsecured

15  creditors towards -- to safeguard the estates through a standby

16  DIP financing facility to provide liquidity in the event that

17  there is a destructive storm and the debtor needs to bridge

18  until the time when its insurers honor their obligations.  As a

19  result of those efforts, the debtors have now received a term

20  sheet for a standby DIP facility from a global investment bank,

21  and we'd encourage the debtors to work with them and other

22  potential financing sources on that term sheet.

23          Second, the committee has been engaged with creditors

24  and other parties to develop a confirmable plan that would

25  maximize value for unsecured creditors.  Our exclusivity

1  objection describes a framework that would be designed to pay

2  the second lien noteholders in new debt and cash at a value to

3  which they have agreed and support under the debtor's plan

4  through -- through new money investments by unsecured

5  creditors.  What that reflects, your Honor, is that groups have

6  organized not only to litigate, but also to speak with their

7  checkbooks and bring new value and underwrite greater value for

8  all unsecured creditors.

9       So, in sum, we look forward to progressing with

10  confirmation hearing as quickly as possible so that the estates

11  can benefit for the opportunity for unsecured creditors to

12  bring that new value to the table.  And to sustain that

13  process, we think it prudent that the debtors should engage

14  with financing sources over a potential liquidity facility to

15  guard the estates in light of the hurricane risks that the

16  debtors have described and because, at least in the committee's

17  view, the current plan will not result in confirmation.

18       **THE COURT:**  All right.  And, so, what do you think it

19  is that I ought to be doing that's different than what I've

20  indicated my thought process is?

21       **MR. GOLDBERG:**  I think your Honor has set out exactly

22  what we'd like to hear, which is that we will move forward with

23  confirmation and that we'll take stock of where we stand at

24  that point.  In the meantime, you know, we have expressed our

25  views that the debtors engage with financing sources on a

25

1   potential DIP facility and that we think that's the prudent

2   approach for the time being.

3          **THE COURT:**  All right.  Thank you.

4          **MR. GOLDBERG:**  Thank you, your Honor.

5          **THE COURT:**  Mr. Anker?

6          **MR. ANKER:**  Philip Anker again, your Honor, and I'm

7   joined by my partner, Dennis Jenkins, and my colleague, Chris

8   Looney.

9          Your Honor, I rise only to say a few things, some of

10  which are small and concrete and some of which are bigger

11  picture perhaps, more unconcrete.  I would ask that the Court -

12  - and I think it's implicit in what you said -- but we would

13  request that the standing motions be continued to the

14  confirmation hearing rather than after the confirmation

15  hearing.  We read what you said in *Midstate*.  I was prepared to

16  argue today, but I like to think I listen to judges, and I

17  thought you were going to say exactly what you said, and that's

18  why we were prepared to continue it.

19         **THE COURT:**  Okay.

20         **MR. ANKER:**  But we agree it's the flip side of a

21  coin.  And we agree with the proposition that if this plan does

22  not get confirmed, and we firmly believe it will not be,

23  that we need to move forward in that direction.

24         **THE COURT:**  All right.

25         **MR. ANKER:**  Second, then, I hate to be the bearer of

26

1   bad news rather than good news -- I'm not sure anyone in this

2   courtroom is comfortable that at the end of the 23rd the

3   confirmation hearing will be done.  I think there are different

4   views on how many witnesses there are.

5           **THE COURT:**  All right.

6           **MR. ANKER:**  But I want to give you a fair warning.  I

7   just think people thought, rather than put days on your

8   calendar today and mess it up so you couldn't deal with other

9   cases, we'd take stock then.  But I'm going to make a

10  prediction.  My prediction is we're not done then --

11          **THE COURT:**  Got it.

12          **MR. ANKER:**  -- to be candid.

13          **THE COURT:**  No, I appreciate you telling me that.

14          **MR. ANKER:**  It may be different views.

15          Third, look, every time everyone rises here -- and I,

16  therefore, don't mean to be critical -- part of what you try to

17  do is influence the Court, and Mr. Meyer is a very skilled

18  advocate, and he did that.  So, if you would bear with me, just

19  bear with me one minute while I try to do the same, albeit in a

20  different direction.

21          We've heard about these independent directors, and we

22  will take their depositions.  But there was unequivocal

23  testimony under oath yesterday by their financial advisor, and

24  this is almost a direct quote:  "The plan was fully negotiated

25  before they were appointed."  Asked twice; same answer given

1   both times.  That's the reality of the record here.  What

2   they're going to tell you about is how when it came to

3   negotiating the crumbs left on the table between the EGC bonds

4   and us, you know, one half of one percent of the equity, they

5   ended up negotiating that between the two independent

6   directors.  But when it came to giving the lion's share of

7   everything to the two L's, that was negotiated without any EPL

8   or EGC unsecured creditor around.  You're going to hear a lot

9   of testimony like that.  I'm not going to give you a preview of

10  all of it, but what I've heard this week has been, frankly,

11  startling about the lack of serious negotiations and serious

12  diligence.

13          Let me say this to the Court.  We take seriously

14  exactly what you said and what Mr. Goldberg said, which is we

15  don't want to be at ground zero if at the end of the 23rd, or

16  whatever day it is, your Honor says, "This plan is not

17  confirmable."  So, what we will be doing in the interim,

18  although we understand exclusivity is extended, is working

19  hard.  My partner, Mr. Jenkins -- we heard you loud and clear

20  about the concern about a hurricane.  That's what caused

21  everyone on our side to say, "Can we deal with that issue and

22  protect this estate?"  Mr. Jenkins sent over that proposal from

23  a bank which is a member of our group.  We have not heard a

24  response from the debtor.  But we're prepared to negotiate to

25  provide contingent financing that takes that issue off the

28

 1   table, and we hope and expect that the debtor will respond.

 2           We are working on a plan structure that has the

 3   support of the EPL notes, the EGC notes, and reflects a

 4   settlement of the EGC intercompany, but really reflects one

 5   other critical point.  And that is that there is a fundamental

 6   disagreement on value.  The debtor's value of the whole

 7   enterprise is a fraction of the view on, to my left, this side

 8   of the table, of the enterprise.  And we heard yesterday out of

 9   the PGT expert that the two L's think it's worth less.  And

10   when different people have different views on value, the way to

11   solve that problem is they get what they think it's worth and

12   we get what -- we take the upside if we're right.  And, so, the

13   basic structure that we have in mind is we will take out their

14   claims on, frankly, the debtor's valuation, which is higher

15   than the two L's.  And, so, if the two L's really believe it,

16   they should be sending us thank you notes, not fighting it.

17   And if they fight it, their actions will speak louder than

18   their words about what they really think value is.

19           We have retained management, management to come into

20   place; management that is familiar with these assets, in fact,

21   operated these assets before -- the EPL assets, at least --

22   before Energy XXI's acquisition of EPL.  We are cognizant of

23   the need to deal with employees, to deal with BOEM.  We have --

24   we're working hard on each and every one of those issues to

25   come up with a comprehensive alternative so if you agree with

Case 17-03283-LTS  Doc#7334-31  Filed 06/07/19  Entered 06/07/19 23:04:42  Desc:
Case 16-31928  Document 142  Filed in TXSB on 03/25/18  Page 29 of 93
Exhibit C  Page 30 of 94

29

 1  us at confirmation -- and I understand it's confirmation of

 2  their plan; you're not going to litigate alternatives plans --

 3          **THE COURT:**  Right.

 4          **MR. ANKER:**  -- but we will be ready to go.  And I can

 5  assure you there will be a lot of evidence on why this plan is

 6  not confirmable.

 7          **THE COURT:**  Got it.

 8          **MR. ANKER:**  Thank you, your Honor.

 9          **THE COURT:**  Let me ask you this.  Have you -- have

10  you tailored -- let's just -- just so I can think about this in

11  my mind, have you tailored your plan such that it can coexist

12  with the approved disclosure statement, or do you -- are you

13  contemplating an entirely new process?

14          **MR. ANKER:**  One answer, your Honor, is I've given no

15  thought to the issue.  That's a direct answer.  I think to the

16  extent the disclosure statement describes a background history

17  of these companies, one could take it largely and cut and

18  paste.  There are assertions in there by the Debtor about

19  disputed facts that we might say different people have

20  different views.

21          To the extent the disclosure statement, however, has

22  within it -- and I'm giving you off-the-cuff reactions -- as it

23  always would, a description of a plan, that would have to be

24  different.

25          **THE COURT:**  Well, it has to be supplemented but there

Case 17-03283-LTS Doc#7334-3 Filed 06/07/19 Entered 06/07/19 22:04:42 Desc:
Case 16-31928 Document 3142 Filed in TXSB on 03/25/18 Page 30 of 93
Exhibit C Page 31 of 94

30

1    are --

2            **MR. ANKER:**  Sure.

3            **THE COURT:**  -- there are conclusions and logical

4    extensions based on valuations and some other things that you

5    might take issue with.  And what I was really trying to figure

6    out was, are we going to need to -- if the Debtors can't

7    confirm their plan and don't have a deal or whatever it turns

8    out to be, are we starting from scratch where we've got to

9    start anew or what -- what's in your game plan if you'll share

10   that?

11           **MR. ANKER:**  Your Honor, we will -- I pledge to the

12   Court.  We will work to come up with a mechanism and a process

13   that takes maximum advantage of the work that has been done to

14   date so we don't end up reinventing the wheel and it moves as

15   expeditiously as possible but also gives everyone due process.

16           **THE COURT:**  Okay.

17           **MR. ANKER:**  Certainly we can do that.  Supplemental

18   disclosure statements are prepared all the time.  Certainly a

19   lot of the discovery that has occurred to date, if not all of

20   it, would be applicable.  We think we could move quite

21   expeditiously down a different route.

22           **THE COURT:**  What I would also ask that you do is, as

23   you think through that plan, if you would spend -- because I

24   think it will be time well-spent -- spend a little time talking

25   to the U.S. Trustee.  My guess is -- not my guess.  Mr. Duran

1   has a pretty good sense of how I deal with shortening deadlines

2   and that sort of thing.  It just -- I think that getting his

3   input as to what he would be comfortable with so that if we get

4   there, you can have that number in mind so -- as I start to

5   look at what a Plan B looks like.  I would greatly appreciate

6   that.

7           **MR. ANKER:**  We very much appreciate your Honor's

8   guidance and we will do that.  Thank you, your Honor.

9           **THE COURT:**  All right, thank you.

10          **MR. STARNER:**  Your Honor, Greg Starner, White & Case,

11  on behalf of the EGC note group.  I wanted to address some of

12  the points Mr. Anker raised and also discuss a little bit the

13  standing motion.  I certainly heard your Honor's position with

14  respect to that motion.

15          Let me start with the alternative plan.  I think

16  Mr. Anker hit the highlights.  He basically outlined for the

17  Court kind of what the framework looks like but that is a very

18  large, complex, you know, plan that the parties are working

19  very hard to put together.  A lot of parties are involved with

20  that but -- and obviously this is happening in parallel with

21  preparation for a very contested confirmation hearing which we

22  certainly are prepared to go forward with.

23          We just note that in terms of what the plan looks

24  like, you know, sort of the commitment is to ensure that the

25  company's operations continue seamlessly with respect to this

Case 17-03283-LTS  Doc#7334-31  Filed 06/07/19  Entered 06/07/19 23:04:42  Desc:
Case 16-31928  Document 1142  Filed in TXSB on 03/25/18  Page 32 of 93
Exhibit C  Page 33 of 94

32

1    alternative plan.  And on the hurricane issue, your Honor, I

2    think Mr. Anker did address that very well.  What I will say is

3    we took it very seriously.  We spent a lot of time digging into

4    the issue trying to understand what the company's coverage

5    looked like, what kind of management and mitigation was in

6    place for that and the DIP financing was something that was put

7    together with the goal of trying to address some of those

8    risks, your Honor.

9            Just with respect to the standing motion, if I may,

10   your Honor.

11           **THE COURT:**  Sure.

12           **MR. STARNER:**  I heard what the Court's position with

13   respect to the timing of it.  You know, I just wanted to

14   briefly outline why we thought it was important to kind of talk

15   about this a little bit today and we're happy to address it at

16   the confirmation hearing again.  But the context here really is

17   -- and it touches a little bit on the Debtors coming forward

18   and pointing to their special committee and some of the process

19   that occur here because, you know, seeking confirmation and

20   asking the Court to approve certain imbedded settlements really

21   doesn't address the process that was in place here.

22           You know, we were entitled to have unconflicted

23   fiduciaries with disinterested counsel and what we had here was

24   the primary unencumbered asset at EGC is this intercompany note

25   where it was effectively the same management and the same

33

1   advisors on both sides of that note.

2          **THE COURT:**  Why does the process -- why is the

3   process not directly at issue when that 9019 is evaluated, if

4   you will?  I mean, there's -- inherent in that is a requirement

5   of good faith and Circuit cases all reference, you know, arm's

6   length negotiation and a fair and open process and, you know,

7   all the pluses and minuses were weighed and there really was a

8   true, if you will, sort of, you know, give and a take in terms

9   of reaching a deal.  Why doesn't that put the process right

10  square in the middle and available for everyone to take a shot

11  at?

12         **MR. STARNER:**  It does, your Honor.  I think you're

13  absolutely right and, frankly, the 9019 issue, we would suggest

14  to the Court it's really subject to entire fairness because you

15  had people on both sides of that issue but the issue is the

16  process leading up to the plan.  The plan that has been

17  proposed --

18         **THE COURT:**  Right.

19         **MR. STARNER:**  -- is a product of this conflicted

20  process.

21         **THE COURT:**  Right.

22         **MR. STARNER:**  And so we think it's very important to

23  talk about what was that process and trying to even put in

24  place fixes if we can.

25         **THE COURT:**  Right.

34

1      **MR. STARNER:**  I mean, this is a potential -- not a

2  cure-all but it is a fix providing standing to an unconflicted

3  fiduciary to at least deal with these issues on the

4  intercompany note.

5      **THE COURT:**  Aren't I -- I mean, I'm assuming at some

6  point I'm going to get a good-faith objection to confirmation

7  if I don't already have it.  I mean, I would think that the

8  entire journey of how we got from Point A to September the 13th

9  is going to be part of the discussion.  At least, that's what

10  I'm expecting to hear.

11      I mean, if there's going to be a challenge to -- that

12  this plan doesn't work because it is the byproduct of flawed

13  negotiations, I mean, I don't know what the answer to all of

14  that is but I'm expecting that if that's an issue, I'm going to

15  hear testimony about what was done and what wasn't done.  Am I

16  off base on that?

17      **MR. STARNER:**  No, you're absolutely on target --

18      **THE COURT:**  Okay.

19      **MR. STARNER:**  -- your Honor.  It's really just a

20  matter of timing.  I guess -- it's our view is, you know, these

21  are issues that are ripe now.  I mean, certainly we could put

22  it off to confirmation when it all will be absolutely addressed

23  but, you know, you could -- you know, this is a conflict that's

24  in place right now.  This is a flaw in the process right now

25  and so I view that there are some ways we could try to fix it

35

1  now and try to put in place some fixes to provide us -- you

2  know, provide standing to -- or at least put in place

3  protections and the type of unconflicted representation that

4  we're entitled to under the Code.

5          **THE COURT:**  What is it that you think that you're

6  entitled to that you're not getting?

7          **MR. STARNER:**  Well, first off, a fiduciary that has

8  no conflicts.

9          **THE COURT:**  And is there anything -- I mean, I don't

10  think that -- if they're truly is a -- if there truly is an

11  issue with a fiduciary to the estate, a motion for standing is

12  not the way to address that.

13          **MR. STARNER:**  To that point, I hear what your Honor

14  is saying and, look, this is not something that comes up --

15  this is not unusual.  It comes up a lot in cases where you have

16  inter-debtor issues --

17          **THE COURT:**  Uh-huh.

18          **MR. STARNER:**  -- and oftentimes it's addressed

19  through negotiations and reaching consensus but obviously the

20  Debtors here didn't go that route.  That's their prerogative as

21  the Court made clear to them.

22          **THE COURT:**  Sure.

23          **MR. STARNER:**  And standing isn't necessarily the most

24  comprehensive fix and certainly you could seek to disqualify

25  counsel.  You could ask for the employment of a Trustee but it

36

1    was argued that this was a modest attempt to try to put a fix

2    in place.  They didn't go that -- all the way down the road on

3    that.

4         **THE COURT:**  Can I ask for the appointment of

5    independent board members?  I mean, there are all sorts of

6    things that could be done.  And I get what you're saying.  I

7    look at just -- and I'm not asking you to see it from my

8    vantage point but I don't know whether the plan is the

9    byproduct of arm's length negotiations.  I got -- you know I've

10   got one set of lawyers who are saying it absolutely all works.

11   I've got another set of lawyers saying, nope, it's not, it's

12   flawed.

13        And I hear all of that and I -- you can give me

14   examples but until I actually get an evidentiary record under

15   oath, you know, I don't know what the answer to that is and now

16   we've just started describing testimony that you're going to

17   have to put on in order to support or challenge confirmation

18   and I've been in cases as a lawyer where we have plans that are

19   at different points and it's just a big, unqualified mess has

20   been my experience.  It's really difficult to manage.

21        It's hard for me to understand where everybody's

22   motivation is and if you haven't figured out, you know, I'm

23   very -- I look in the eyes of people and, you know, I have my

24   own ideas about where -- what people's true motivations are and

25   that all factors into what I do and what I say and, you know,

1    the orders I write and the language I use.  I mean, all of that

2    factors into that.

3            It's just been my experience that if I say, okay, you

4    can go out and start working on a plan, then everybody's

5    motivation changes and people start negotiating from different

6    positions and I get even less of an accurate picture of where

7    people truly stand than I normally get.

8            And so it's -- I don't see the corresponding benefit

9    given where we are timewise.  Now, if I'm missing something,

10   you know, I'm wrong every day about things and I fully

11   acknowledge that.  So if I'm missing something that would push

12   the scale back the other way, I absolutely want to know it but

13   I don't see -- I just don't see a corresponding benefit to the

14   mess that I know that gets created once I open that up.

15   Serious about it if -- you know, if they fail, what I'm going

16   to consider to be important is going to change immediately but

17   that's -- I mean, that's just my thought process as I sit here

18   today.

19           **MR. STARNER:**  And I appreciate that, your Honor.

20   Hopefully we're transparent kind of in our motives.  Our

21   motives have always been focused on, you know, maximizing value

22   of EGC and having --

23           **THE COURT:**  I've been a lawyer for 20 years and a

24   judge for five.  There is no one in this courtroom that is

25   transparent, me included.

38

1          **MR. STARNER:**  Fair.  But just maybe to wrap it up and

2     sum, I think I've heard what the Court's position is on this.

3     We certainly will be developing the record and be putting

4     forward evidence on these issues --

5          **THE COURT:**  Okay.

6          **MR. STARNER:**  -- and, you know, our concern was

7     having this thought process and the costs involved in having to

8     go to what we think is a flawed and a doomed confirmation

9     hearing and --

10         **THE COURT:**  Well, let me say this.  I've thought

11    about that a lot too and if it is as self-evident as you say it

12    is, then that's going to factor into my ultimate determination

13    as to what the proper amount of compensation that ought to be

14    received should be.  I mean, that's -- it would -- I could not

15    possibly be doing my job by signing a fee application for fees

16    on a final basis for a course of action that is unambiguously

17    destined to not comply with the Code.  I mean, I just -- I

18    couldn't possibly meet standards I'm required to follow.

19         Now, if it's subject to genuine dispute, then that's

20    what -- you know, that's -- unfortunately costs are part of the

21    process that makes our system better than anybody else's and I

22    get that but I haven't forgotten about that.  I mean, that's

23    been raised all along and in my mind, the cost factor -- if it

24    really is as one-sided as you say it is, they'll be a true-up

25    day and that's my way of dealing with that.

1        MR. STARNER:  I understand, your Honor.

2        THE COURT:  All right.

3        MR. STARNER:  Keep in mind we're not paid by the

4   estate, of course.

5        THE COURT:  Well, I'm assuming that you're going to

6   -- well, I -- but you might be.  If what you're -- if you're

7   really doing God's work, as you want me to believe, I mean,

8   there's -- there are provisions under the Code that allow me to

9   recognize that.  I mean, I don't know if we've met that

10  standard or not.  I don't know if we've gotten there but there

11  are ways -- depending upon, you know, how far you're willing to

12  go, there are ways to even all of this out in terms of the cost

13  perspective.  Dealing with the dollars is easy for me.  It's

14  dealing with all the other things that causes me to lose sleep

15  at night.

16       MR. STARNER:  Thank you, your Honor.

17       THE COURT:  All right, thank you.

18       Yes, ma'am?

19       MS. ALFONSO:  Good afternoon, your Honor.

20       THE COURT:  Good afternoon.

21       MS. ALFONSO:  For the record, Ana Alfonso from

22  Willkie Farr & Gallagher, counsel for Wells Fargo which is the

23  first lien agent.

24       THE COURT:  Yes, ma'am.

25       MS. ALFONSO:  We've, your Honor, been largely outside

40

1    of the fray here.  We caught our deal, if you will, several

2    months ago.  So we're just footing the bill for all of these

3    skirmishes and I don't mean to belittle them.  The bank

4    understands that there are a lot of incredibly nuanced issues

5    to contend with in order to get through to confirmation but I

6    rise because the Debtors have asked the first lien agent to

7    consent to extend cash collateral through September 30th which

8    certainly makes sense given the time table that's in front of

9    us now but the forecasted professional fee budget, not just for

10   the Debtors but for all the fees that the Debtor is --

11           **THE COURT:**  Okay.

12           **MS. ALFONSO:**  -- supposed to pay from the beginning

13   of the case through October 10th is $75 million, your Honor,

14   and the go-forward projected burn rate, which I'm told could be

15   higher, is 8 to $10 million thereafter.  So --

16           **THE COURT:**  So that's through the end of September?

17           **MS. ALFONSO:**  Through the end of September --

18   actually technically through October 10th --

19           **THE COURT:**  October 10th, okay.

20           **MS. ALFONSO:**  -- $75 million.  Now, I don't know if

21   they'll hit that or not.  It'd be nice if people could find

22   some common sense and economical solutions to all of these

23   issues to try to get to an agreed confirmation hearing but

24   hopes springs eternal.

25           Your Honor, I'm saying this because we really read

1  for the first time over the weekend these aspirations about a

2  hurricane disaster DIP which obviously no one's spoken to Wells

3  about having their liens primed by a DIP, let alone extending

4  this case through October and beyond to try to roll the dice

5  through hurricane season, not to mention deal with all of these

6  fees.

7          There's a lot to contend with and I rise in part to

8  just send a message to everyone in this courtroom, not just

9  your Honor, that we really do need to do exactly what your

10 Honor has admonished which is to try to get everything on the

11 table and get it over with in September or there are going to

12 be a lot more problems ahead of us.

13          **THE COURT:**  That's helpful.  Thank you.

14          **MS. ALFONSO:**  Thank you, your Honor.

15          **THE COURT:**  Thank you.

16          Mr. Androphy, I saw you get up and then sit down and

17 I'm --

18          **MR. ANDROPHY:**  I was standing up with my co-counsel,

19 your Honor.

20          **THE COURT:**  I'm sorry.

21          **MR. ANDROPHY:**  I was thinking of saying something but

22 I really wasn't sure.

23          **THE COURT:**  All right.  I'm sorry, sir.  Please --

24          **MR. MYERS:**  Your Honor, for the record, Todd Myers,

25 Kilpatrick Townsend, on behalf of Wilmington Trust as the

Case 17-03283-LTS   Doc#7334-31   Filed 06/07/19   Entered 06/07/19 22:04:42   Desc:
Case 16-31928   Document 142   Filed in TXSB on 03/25/16   Page 42 of 93   Desc:
Exhibit C   Page 43 of 94

42

 1   Indenture Trustee for the EGC unsecured notes.  Your Honor, I

 2   know obviously we're not arguing confirmation today but I think

 3   everybody is just giving your Honor a couple things to think

 4   about as we head towards that hearing and I think echoing some

 5   of the conflicts that were pointed out by counsel for the Ad

 6   Hoc EGC Noteholders, your Honor, there were some papers filed

 7   last night -- a lot of papers filed last night including a

 8   pleading by the Debtor which was their omnibus objection to the

 9   derivative standing motions.

10           **THE COURT:**  Uh-huh.

11           **MR. MYERS:**  Your Honor, in Paragraph 28 of that

12   motion, the Debtors state that they worked -- that they have

13   worked and continue to work on a transparent basis towards

14   achieving their restructuring goals of eliminating

15   substantially all of their funded indebtedness.

16           Your Honor, I think every CEO in America would like

17   to eliminate all of their funded indebtedness but my client

18   represents the interests of holders of over $700 million in

19   notes that don't think their indebtedness should be eliminated

20   and I don't want your Honor to gloss over what sounds like a

21   noble goal.

22           That is not what you're entitled to under the

23   Bankruptcy Code.  You're certainly entitled to rehabilitation

24   and a relief from your debt but depending on values and

25   1129(a)(7) and 1129(b)(1), you're not entitled to elimination

1 of all of your funded indebtedness and I don't think that if we

2 had a -- I'm not suggesting that we're -- we certainly have not

3 moved for the appointment of a Chapter 11 Trustee but because a

4 Debtor acts as a Trustee with a fiduciary duty to the estate

5 and its creditors, I want you to think about whether a Trustee

6 here trying to reorganize this company would have as its goal

7 eliminating substantially all of the funded indebtedness.

8          Now, the second liens have presented the Debtors with

9 -- as any second lien creditor in this situation would -- with

10 the perfect path to do that. They've said, if you get rid of

11 all of your unsecured debt, we'll get rid of our secured debt

12 and we'll be the equity and of course they would. Why would a

13 secured creditor not be? If you control the company, you

14 control the board coming out and you have no debt above you,

15 then you not only can get repaid the value that you have in

16 this as secured creditor but you get all of the upside. Okay?

17          But that is not the -- you will hear at confirmation

18 that's just not the dynamic that is presented here. We don't

19 have assets that are 100-percent encumbered and under water

20 such that the unsecured creditors are out of the money. Even

21 by the Debtors own admission in their disclosure statement and

22 in the plan, the unsecured creditors are in the money.

23          Now, we disagree exponentially with what -- with how

24 much we are in the money but even under the Debtors' admission,

25 we are in the money and yet the consideration of providing for

1    that is out-of-the-money warrants which don't get in the money

2    until the second liens have been paid in full.  That is giving

3    the second liens their cake and eating it too.  So that's

4    simply what we want your Honor to consider as we move to

5    confirmation.

6              **THE COURT:**  Fair enough.

7              **MR. MYERS:**  Thank you.

8              **THE COURT:**  Let me give you an area of comfort if I

9    can.

10             **MR. MYERS:**  I'll take it.

11             **THE COURT:**  Because of my push toward confirmation

12   often gets misread as that I think the plan works or I think

13   this is a good idea, totally mutually exclusive and I -- the

14   one thing that I have learned over the years is that what I

15   will see on the day of confirmation is probably different than

16   what exists today.  My focus is only on the process.  When we

17   get through the process and we get to confirmation, then I'll

18   get to the substance.

19             And I just don't want you to think that my comments

20   -- and I know I do it with a lot of colloquialism and it's just

21   -- it's my personality.  You know, when I say that I'm going to

22   give the Debtors their shot, what I mean is that they've asked

23   for a confirmation date.  I'm going to give them a confirmation

24   date.  In terms of whether or not they've made good decisions

25   or bad decisions, you know, that's what we will determine on

45

 1    September the 13th, not beforehand.

 2           And that's all I'm doing is I'm trying to get to the

 3    substance by pushing the process forward but I'm by no means

 4    giving an endorsement of a gleaning of how I feel about a

 5    particular plan or a particular provision.  All of that is a

 6    very separate issue with me and so I don't want you to think

 7    that I in any way am trying to push something through.  I am

 8    trying to push.  I'm trying to push to that day because I think

 9    -- I mean, $75 million -- I hadn't heard that number.

10           That's got to make anybody worry a little bit.  You

11    know, when you think about this morning I spent, you know, an

12    hour on somebody's 30,000-dollar car and a hundred-and-fifty-

13    thousand-dollar home, you know, $75 million is a lot of money.

14    Now, the zeros don't bother me one way or the other.  Lawyers

15    have to get paid.  You know, I understand that but it ought to

16    be a sign to us all that we ought to get this process to a

17    conclusion.  We ought to find out if the Debtors are right or

18    if they're wrong and if they're right or at least I think

19    they're right, then the course of action is dictated for

20    everybody who disagrees with that conclusion.

21           If I find that the Debtors are wrong, then

22    everybody's got to immediately react and go down a different

23    path and hopefully does not cost another $75 million.

24           **MR. MYERS:**  Right.

25           **THE COURT:**  That's all and I didn't mean to drone on.

46

1    I just tried to give you some insight.  I'm not endorsing

2    anything.  I'm -- all I'm doing is trying to get to a date.

3            **MR. MYERS:**  Understood, your Honor.  I appreciate the

4    comfort.  Thank you.

5            **THE COURT:**  All right, thank you.

6            **MR. LEBLANC:**  Your Honor --

7            **THE COURT:**  I think we've got one more and I'll give

8    you second round.

9            **MR. LEBLANC:**  I apologize, your Honor.  Andrew

10   LeBlanc of Milbank, Tweed, Hadley & McCloy on behalf of the

11   Ad Hoc Group of Second Lien Lenders.

12           **THE COURT:**  Yes, sir.

13           **MR. LEBLANC:**  I'll try to be very brief but there was

14   a lot of comments and then there seems to be an almost

15   unnatural amount of commentary about Plan B and about the

16   alternative plan and I do want to give the Court just a little

17   context because I think your Honor -- I think was

18   understandably confused about when exclusivity was actually up

19   because objections were filed over the weekend or late last

20   week.

21           Those objections weren't actually due until September

22   6th which would have been both after the status conference --

23   be that as it may -- but also after the votes would have been

24   calculated and I think that goes back to what Mr. Myers

25   suggested about they're looking very seriously about the -- at

47

1    the exclusivity issues.

2          Now, I also think we need -- I need to comment for a

3    little bit about what Mr. Anker has said and we're -- our head

4    is a little bit spinning about their views as to valuation.

5    We're now delayed for a few days and actually finally seeing

6    what their valuation is.  We'll understand that on August 29th

7    now, not this coming Friday but the reason we're confused is --

8    and I can't imagine this has been lost on the Court but they're

9    -- they filed a standing motion seeking standing to pursue

10   claims that they contend are colorable that are predicated on

11   insolvency of EPL in 2014 and 2015 and they're telling the

12   Court at the same time that we think they're grossly -- the

13   Debtors are grossly undervaluing this enterprise but at the

14   same time when we get to proposing an alternative plan, what we

15   intend to do is to use the Debtors' valuation for the purposes

16   of that plan or at least use the Debtors' valuation to pay one

17   group of creditors but not to pay ourselves.

18         And so, your Honor, I think what -- at the end of the

19   day, I think your Honor has suggested this.  We need to get to

20   the confirmation hearing with respect to the only plan that is

21   appropriately before the Court and that's what we would urge

22   the Court to do, is to focus on getting us to confirmation of

23   that plan.

24         Now, obviously, whatever they want to do in the

25   background to negotiate, to prepare themselves in the

1   eventuality -- in the event that your Honor doesn't confirm the

2   plan, no issues with that but publicly announcing, debating

3   what the terms of their alternative plan are at this point in

4   time, we don't think that's appropriate.  We don't think that's

5   what should be happening here and we think it was done entirely

6   strategically.

7           Presumably the primary motivation was to be able to

8   say these things to your Honor today.  That's why they filed

9   their objection several weeks early and it wasn't directed at

10  disrupting the voting that's occurring now through September

11  6th when their objection is actually due but you haven't seen

12  many times that litigators have filed objections several weeks

13  before they're due in advance of a September 30th hearing.  And

14  I wanted to make those points, your Honor.

15          And let me just briefly address the standing issue

16  because your Honor had made some comments about what may happen

17  at the conclusion of confirmation and there's -- and the EGC

18  bondholders, the White and Case represented group, makes the

19  continuous -- has this continuous mantra that they're the only

20  independent party that could possibly have standing to do this

21  and we made this point in our response to their standing

22  motion.  That isn't the case.

23          To the extent that the Court doesn't confirm the plan

24  and if it doesn't confirm it for -- it agrees with the Debtors'

25  valuation but doesn't confirm it for some other reason, we have

49

```
 1   a massive, massive deficiency claim -- we, the second lien
 2   lenders on the EGC side.  We have every incentive to protect
 3   and preserve the value of that secured intercompany claim
 4   against the EPL entities.  We have a greater interest than they
 5   do because their claims are simply smaller than ours on a
 6   deficiency basis.
 7         Moreover, I think if I understand their exclusivity
 8   papers that were filed early properly, they're also working
 9   with the EPL noteholders and trying to come up with an
10   alternative plan.  It certainly doesn't sound to us like that
11   will ultimately be an unconflicted party but rather someone who
12   will strategically use a settlement of that intercompany claim
13   in an effort to try to confirm their plan.
14         And so when we get to that point -- the reason I
15   wanted to raise is your Honor had made comments about at the
16   conclusion of confirmation, I'll deal with that issue, the
17   standing issue --
18         THE COURT:  Uh-huh.
19         MR. LEBLANC:  -- as well because I'll hear evidence
20   about it.  I didn't want the Court to lose the fact that if you
21   do deny confirmation of this plan, which we don't think you
22   will but if you do, we're also a party that should have
23   standing to deal with that claim and we have a greater interest
24   than the EGC stand-alone noteholders do and we would in that
25   circumstance be truly unconflicted at that point.
```

Case 17-03283-LTS Doc#7334-3 Filed 06/07/19 Entered 06/07/19 22:04:42 Desc:
Case 16-31928 Document 1142 Filed in TXSB on 08/25/16 Page 90 of 93
Exhibit C Page 51 of 94

50

1          **THE COURT:** Well, in part, when I made those

2   comments, I was actually talking to you and I meant what I

3   said, is you need to have -- whatever your Plan B is, you need

4   to be ready to go. I wasn't just talking to the person at the

5   podium. I get it and can I go back to something that you said

6   earlier? I want to make sure that I'm not overlooking

7   something. Am I doing, in your mind, anything inconsistent

8   with getting to confirmation?

9          **MR. LEBLANC:** No -- you, your Honor, no --

10         **THE COURT:** Okay.

11         **MR. LEBLANC:** -- not at all.

12         **THE COURT:** All right. And I'll tell you, to the

13  extent that it was --

14         **MR. LEBLANC:** I will answer it just with respect to

15  the issue that was asked. No, you were not.

16         **THE COURT:** Understood. That's -- I can -- I have

17  more control over me than anyone else. So that's where I have

18  to leave that.

19         And I'll tell you, to the extent -- I mean, I -- you

20  know, I get strategic filings and I get standing up and to the

21  extent that it was directed to me, it had zero effect. I mean,

22  it just did. You know, folks who have known me just know once

23  I've decided on a course of action, I'm hard to change and, you

24  know, I'm going to do my best. I'm going to get to that date

25  and it's going to take some really, hopefully, acts that I

51

1   don't have to hear about and deal with to stop that process but

2   then I'm going to substantively evaluate where folks are and --

3   you know, again, it's -- my only goal is to get it right.

4   That's all.

5          MR. LEBLANC:  No, and my point, your Honor, with the

6   strategic filing and -- we've put things in pleadings to try to

7   influence a judge before.  I don't know that I've ever filed a

8   pleading three weeks before it's due for that purpose but I'd

9   have to really think about that one.  But we do believe

10  exclusivity actually means something and there's an actual

11  solicitation happening at this moment in time and the idea of

12  putting forward alternative plan structures in the middle of

13  that process --

14         THE COURT:  Yeah.  If I were to find out that there

15  is a letter going out to folks who have a vote about saying,

16  hey, vote a particular way -- I know this would never be done.

17  So I'm comfortable giving the example but if there were a

18  communication going out saying, hey, don't vote this way on

19  this plan because we've got something better, you know,

20  everybody in the courtroom will see another side to me that a

21  few in here have seen but you just don't want to see that day.

22  I mean, that -- you know, that would not be a good day for

23  anybody.  But I'm pretty comfortable that that just would not

24  occur.

25         MR. LEBLANC:  We have no reason to believe that

52

1  letter exists.  What we do know exists is the filing that they

2  made last week.

3          **THE COURT:**  Yeah, I see that.  That's -- you know,

4  again, to the extent that it was directed at me, it had zero

5  effect.  To the extent that somebody else is going to read it

6  and be persuaded, you know, I can't comment on that.  That's --

7  you could say that about any pleading that's been filed.

8          **MR. LEBLANC:**  Well, you could say that about any

9  pleading but one where -- with the -- and I'll leave it at

10  this, your Honor.  I think the specificity -- I think this is

11  what Mr. Myer was referring to earlier.  I wanted to point out

12  the elements of the timing that your Honor may not have

13  appreciated, that it may have looked like that was being filed

14  because that was the deadline to file it and this was being

15  heard but, in fact, it wasn't and it -- the deadline for filing

16  that actually coincides with the voting deadline.

17          **THE COURT:**  Got it.  All right, no, I appreciate your

18  pointing that out.

19          **MR. LEBLANC:**  And, your Honor, we'll have a couple of

20  issues -- we have a couple of discovery issues that are

21  discrete that we'll address.  I think we still have disputes

22  that we'll address when the opportunity comes a little bit

23  later.

24          **THE COURT:**  All right.

25          **MR. LEBLANC:**  Thank you, your Honor.

Case 17-03283-LTS  Doc#7334-31  Filed 06/07/19  Entered 06/07/19 22:04:42  Desc:
Case 16-31928  Document 142  Filed in TXSB on 08/25/16  Page 53 of 93
Exhibit C   Page 54 of 94

53

1          **THE COURT:**  Thank you.

2          Mr. Anker?

3          **MR. ANKER:**  Your Honor, I'll -- I will do my darndest

4    to spend less than one minute at the podium right now.  I rise

5    only for two things.  One, I plead guilty.  I file strategic

6    pleadings.  I try to represent my clients.  I've known

7    Mr. LeBlanc.  He's a spectacularly good litigator.  He does the

8    same.  As you put it, no one's transparent.

9          **THE COURT:**  Right.

10         **MR. ANKER:**  I'm here to do the best for my client.

11   He's here to do the best for his client which brings me to my

12   second point.  One thing I appreciate about your Honor is I

13   think, as you put it, you look at people's motivations and you

14   don't check your common sense at the door.  I would leave you

15   with this thought on the big issue as you head toward a

16   confirmation.

17         Why is $75 million being spent just for the estate

18   professionals?  That doesn't include the EGC notes.  It doesn't

19   include myself.  Why are there three Milbank Tweed partners in

20   this room if this company is really worth as little as the

21   Debtor says it is?  Actions speak louder for words -- than

22   words.  Why have the company's executives negotiated so hard to

23   maximize equity, not cash, in a reorganized company?  What does

24   that tell you from a common-sense standpoint?

25         Final point, what you will hear at confirmation and

1   when you look at the issues is that for this plan to be

2   confirmable as against the EPL notes, it has to both be true --

3   both be true that the intercompany note is a valid, secured

4   obligation so the first 325 million goes to EGC and that the

5   value of EPL be as low as they're suggesting because if the

6   value is higher, then even if that note is valid, we get all

7   the dollars after the intercompany.  And so one of the answers

8   to Mr. LeBlanc is he needs to prevail on both positions.  Thank

9   you, your Honor.

10          **THE COURT:**  All right, thank you.

11          All right.  Mr. Myer?

12          **MR. MEYER:**  Thank you, your Honor.  I'll be quick.  I

13   think just one note as it relates to the exclusivity item.  I

14   would note, as Mr. LeBlanc did not, I think it is slightly

15   heightened when you have a letter that we've agreed to include

16   as part of our solicitation package from the Creditors'

17   Committee encouraging unsecured creditors to vote to reject the

18   plan.  I don't think that that can go unnoticed combined with

19   the detailed outlines that were included in their objection on

20   Friday, I think.

21          So I did want to mention that but I would just come

22   back to the fact that, again, a lot of the discussion you heard

23   is about alternatives.

24          **THE COURT:**  So do you think that they've -- you think

25   that they've violated exclusivity?

1          **MR. MEYER:**  I think that we're taking a hard look at

2    it, your Honor.

3          **THE COURT:**  Okay.  Well, that's -- you know what you

4    need to do.

5          **MR. MEYER:**  Uh-huh.

6          **THE COURT:**  I -- if you file the appropriate motion,

7    I'll set it for hearing and I'll get to the bottom of it and

8    try to make the best decision that I can.  I -- it doesn't

9    scare me or bother me or it isn't something that I don't want

10   to do.  If you file it, I'm more than happy to deal with it but

11   I'm not going to, you know, make comments and -- because

12   someone says something.  I mean, if you think there's a

13   problem, I expect you to put it in a written motion, sign it

14   under 9011 and then I'll deal with it and figure out, you know,

15   what's right and what's wrong.

16         **MR. MEYER:**  Understood, your Honor.  Thank you.

17         **THE COURT:**  Yeah, all right.

18         **MR. MEYER:**  A couple of other quick points just in

19   the discussion of alternatives.  I will come back again to it.

20   There was discussions about lines, about how there's going to

21   be this financing commitment.  We as the Debtor, we've talked

22   with our boards about --

23         **THE COURT:**  Yeah.  You just don't have to -- you

24   don't have to respond.  I -- you've got your date.  You know,

25   you're either going to win, lose or you're going to compromise

56

1   you're way out of it.  I mean, it's -- there are three defined

2   paths and I'm going to give you your shot.  You know, you're

3   going to give advice to your clients.  You're going to put

4   forth your best case that you can and you're going to try to

5   win.  That's what you're here for.

6            I -- you know, I am not a baby splitter.  I'm just

7   not.  I believe that people ought to win and people ought to

8   lose.  I just -- it's just what -- it's what makes the system

9   work.  So that's -- I'm coming prepared for somebody to win and

10  somebody to lose.  If you-all take that out of my hands, that's

11  a different thing but that's what I'm coming to do.

12           **MR. MEYER:**  Understood, your Honor.

13           **THE COURT:**  Uh-huh.

14           **MR. MEYER:**  With that, I don't think I have any

15  additional comments.  I would turn the podium over to my

16  colleague Jordan Leu to discuss some of the discovery disputes

17  that are -- I believe are still active between the parties.

18           **THE COURT:**  All right, thank you.

19           **MR. LEU:**  Thank you, your Honor.  Jordan Leu for the

20  Debtors with Ms. Waller.  I think we've worked out most of

21  this.

22           **THE COURT:**  Okay.

23           **MR. LEU:**  We just have a few discreet issues.

24           **(To Ms. Waller):**  Do you want to start out with the

25  disputed issues or --

Case 17-03283-LTS   Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:42   Desc:
Case 16-31928   Document 142   Filed in TXSB on 03/25/16   Page 57 of 93
Exhibit C   Page 58 of 94

57

1          **MS. WALLER:**  Sure.  As he said, your Honor, we can

2   walk through the small number of disputed issues and I think in

3   lieu of an Order we would just note on the record the areas

4   that we have agreement to, so --

5          **THE COURT:**  Okay.

6          **MS. WALLER:**  -- you don't have to go through that in

7   the Order.

8          **THE COURT:**  All right.

9          **MS. WALLER:**  The first issue that we have disputed is

10  the matter of materials related to the valuation that the

11  Debtors' expert, PJT, and their valuation.  I don't think I

12  have to tell anybody in this room how important valuation is to

13  this case.  It is everything.  And yesterday Mr. Laurinaitis,

14  the expert from PJT Partners, was deposed and through that

15  deposition, as well as the expert report that the Debtors have

16  served on the parties, there have been five matters that have

17  come to light that are very important in terms of understanding

18  Mr. Laurinaitis's valuation.

19          To take a step back, there are a couple of key

20  factors that really drive the valuation and can significantly

21  impact the valuation of this company.  One of them is risk

22  adjustment factors that are applied to the Debtors' reserves.

23  Part of that is what is the source of where those risk factors

24  come from, what type of range did Mr. Laurinaitis use.  We

25  understand that he looked to one particular report from 2014

58

1    for where he obtained those risk adjustment factors and we

2    would like to dig into that and understand the basis for that

3    versus what PJT and Mr. Laurinaitis has done in other

4    valuations.  The difference in terms of the range that he is

5    looking to as well is very important, as well as the results.

6    So if you used two-year-old data, do you look at 2016?

7              There's a lot of different sources for risk

8    adjustment factors and a lot of questions that we have about

9    the ones that Mr. Laurinaitis has applied and we think it's

10   fair for us to be able to test those assumptions based on prior

11   engagements that Mr. Laurinaitis has been involved in, both in

12   personally valuing offshore assets himself.  We understand he's

13   only been involved in two matters where he's valued offshore

14   assets.  That's what we learned yesterday.  And we'd like to

15   understand the methodology and obtain documents reflecting that

16   methodology so that we can test the assumptions that he has

17   used in this case.

18             **THE COURT:**  All right.  So you want documents that

19   Mr. Laurinaitis used in the course of other representations

20   with other clients.  Is that what you're asking for?

21             **MS. WALLER:**  Correct.  There are three matters

22   where --

23             **THE COURT:**  Did you give those folks notice of your

24   request?

25             **MS. WALLER:**  We have not.  We have asked the Debtors

Case 17-03283-LTS  Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:43  Desc:
Case 16-31928  Document 1142 Filed in TXSB on 08/25/16  Page 59 of 93
Exhibit C  Page 60 of 94

59

```
 1    for it and --

 2              THE COURT:  Okay, that request is denied.  Next?

 3              MS. WALLER:  We also have asked for the working

 4    papers of PJT and Opportune, and let me just give you some

 5    background in terms of what that means.  We're not asking for

 6    drafts of their report.  What we are asking for is the

 7    materials that underlie their calculations in terms of

 8    information that we understand they received from the Debtors

 9    to the information that they put forward in their valuation.

10    And it's extremely complicated in terms of anything -- having

11    our own experts work through how do you get from Point A to

12    Point B and sitting down and trying to do that all through a

13    deposition is extremely tedious.

14              THE COURT:  Sure.  What is that?  What are we looking

15    at?  What is it specifically that you want?  Have we identified

16    a set of documents that are being withheld?  Are we not

17    looking?  What -- I mean I hear what you're saying, I just

18    don't know what you're asking for.

19              MS. WALLER:  Sure.  We're looking for the bridge

20    between the company's information and how they have gotten to

21    what they put forth in their valuation, so the spreadsheets

22    that are imbedded in their report that will help us to

23    understand how did they get to those numbers.

24              THE COURT:  Do you know what she's asking for?

25              MR. LEU:  Not entirely, your Honor, but my position
```

60

1    on this is if you look at the report, it says he had this PV10

2    value, here's the risk, here's the conclusion, here are the

3    deductions, all the methodology is explained in the report.

4    During the deposition, that's when you should ask an expert how

5    do you get this number into this number.  On the list of

6    documents reviewed, that's where you list these are the company

7    provided documents.  And in every other case I've worked on

8    that's part of the job of the deposition, part of the job of

9    the opposing expert, part of the job of the law firm to figure

10   out how all that fits together.  And what I've not seen is

11   experts being required to turn over what I would call draft

12   reports and internal work papers to do all that work for the

13   opposing side.

14        **THE COURT:**  And so what did you do with respect to

15   this request to figure out what existed?

16        **MR. LEU:**  I didn't understand this request until

17   today.  You know, working papers.

18        **THE COURT:**  All right.  What I'm going to do, I'm

19   going to let -- because I -- and I'm not -- I'm trying to be as

20   open and as candid as I can possibly be.  I don't have the

21   foggiest notion what you're asking for.  It sounds like

22   Debtors' counsel doesn't know either.  I'm going to let you all

23   talk about this and if there is a dispute I will get the two of

24   you back over here on an emergency basis.  But what I really

25   want, what will help me, is I want a calculation of what went

1   into this number.  I want anything having to do with this

2   assumption.  How did you get there?  I mean that will help me.

3   To the extent you can give me more specificity, the better I am

4   able to make a decision and also give you an Order that's

5   enforceable.

6          I mean if I sign an Order today that says you get

7   everything that's the bridge --

8          **MS. WALLER:**  We're not going to do that, your Honor.

9          **THE COURT:**  I mean I could never enforce that Order

10  because I don't know what it means.

11         But have that conversation.  If you still have a

12  dispute, then let Mr. Alonzo know and I will get you both back

13  over here and we'll figure it out.  Okay?

14         **MR. LEU:**  Yes, your Honor.

15         **THE COURT:**  All right?

16         **MS. WALLER:**  We'll do that.

17         The second issue -- sorry, the third issue that we

18  have is with respect to depositions.  So as your Honor knows,

19  this is an extremely tight schedule in terms of discovery.

20  We've been working together --

21         **THE COURT:**  Sure.

22         **MS. WALLER:**  -- in terms of --

23         **THE COURT:**  Is this the seven hour issue or the

24  multiple appearance issue?

25         **MS. WALLER:**  It is.  There are three witnesses who we

1    would like to have additional time with.  Mr. Laurinaitis, who

2    was deposed yesterday --

3             **THE COURT:**  You got it.  He's crucial.  I want you to

4    be --

5             **MS. WALLER:**  Thank you, your Honor.

6             **THE COURT:**  -- reasonable, but you're going to get

7    some more time.

8             **MS. WALLER:**  Mr. Chiller's deposition is tomorrow.

9    He is, as your Honor knows, the CEO of the companies.  There's

10   a need for multiple 30(b)(6) topics for the Debtors, including

11   negotiations with the Second Lien for the RSA and the Plan.

12            **THE COURT:**  And so what are you proposing?

13            **MS. WALLER:**  What I propose to do is to have

14   Mr. Chiller available on a second day, if needed.  Obviously,

15   the parties are going to work as hard as they can, and they

16   have been working hard together to try and streamline things,

17   but --

18            **THE COURT:**  All right, I think that --

19            **MS. WALLER:**  -- given that today was our

20   opportunity --

21            **THE COURT:**  I think that given who he is and all of

22   his issues, I think that a second day is fair.  If it goes --

23   but not beyond a second day.

24            **MS. WALLER:**  Thank you.

25            **THE COURT:**  Okay?

Case 17-03283-LTS  Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:42  Desc:
Case 16-31928  Document 142  Filed in TXSB on 08/25/16  Page 63 of 93
Exhibit C  Page 64 of 94

63

1          **MS. WALLER:**  The third witness is Mr. Baggett, who is

2     the second of the Debtors' experts.  He is from Opportune.  He

3     is I believe providing a liquidation analysis.  He's on

4     Thursday, your Honor.  Again, we will do our best to try and

5     get it done in one day.  Given that today was our shot to talk

6     to your Honor, we wanted to have the opportunity to ask for a

7     second day, if it is needed, based on our best efforts to

8     streamline things, that we have another opportunity.

9          **THE COURT:**  No, you have it.

10          **MS. WALLER:**  Thank you.

11          **THE COURT:**  Okay.

12          **MS. WALLER:**  I believe that that is the outstanding

13     disputes today.  I think the one pending that we had before

14     your Honor at the previous discovery hearing is Mr. Chiller's

15     personal financial information.  I believe that has already

16     been submitted to you in camera.

17          **THE COURT:**  You guys have already gotten that back,

18     right?

19          **MR. LEU:**  I believe we have the information back.

20          **THE COURT:**  I thought that -- I will check on this.

21     I thought there was a list of what documents would be produced

22     and what wouldn't be.  I know I created a list.  So you guys

23     have never seen that --

24          **MR. LEU:**  Don't believe we've seen that.

25          **THE COURT:**  -- is what you're telling me.

Case 17-03283-LTS  Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:43  Desc:
Case 16-31928  Document 142  Filed in TXSB on 03/25/18  Page 64 of 93
Exhibit C  Page 65 of 94

64

 1          **MS. WALLER:**  I don't believe we have.  We actually

 2    don't have a list of what's been submitted.  So if we could --

 3          **THE COURT:**  I will deal with that when I step down.

 4    I went -- I've been through all of those and I created a list

 5    of what I thought was appropriately private and what I thought

 6    ought to be produced.  And if that somehow got lost, my fault

 7    and I'll fix that.

 8          **MS. WALLER:**  There are a lot of moving pieces,

 9    your Honor.  No problem.

10          And so then I can just tick through and Jordan can --

11    and Mr. Leu can, of course, jump in where anything I describe

12    (indiscernible) of the agreement that we've come to.

13          **THE COURT:**  Sure.

14          **MS. WALLER:**  So we've already discussed the expert

15    reports for PJT and Opportune.  Mr. Leu has represented that

16    the investor presentations and press releases have been

17    identified and that has been relied upon by Mr. Laurinaitis.

18          Mr. Leu and I also came to an agreement in terms of

19    the business plan.  They've noted the documents that have been

20    produced and were actually going to produce.

21          Mr. Leu also checked with the Opportune folks and the

22    current understanding is that they don't have any notes and

23    memos that are cited on Page 8 of the Opportune report, but

24    they are going to work, if there does appear to be some that

25    get identified later, they'll work with us in terms of

Case 17-03283-LTS   Doc#7334-3   Filed 06/07/19   Entered 06/07/19 22:04:42   Desc:
Case 16-31928   Document 142   Filed in TXSB on 03/25/18   Page 65 of 93
Exhibit C   Page 66 of 94

65

1    producing those.

2            **MR. LEU:**  And just to make clear, I'm saying

3    specifically look for notes of these particular interviews that

4    are listed on Item 5, Docket 1117.

5            **THE COURT:**  Got it.

6            **MS. WALLER:**  The working papers we addressed with

7    your Honor, we will continue to address that.

8            In terms of the Debtor documents with starts on

9    Page 6 of the Debtors' Response in Docket 1117, the Debtors are

10   looking to located the reconciliation of the Aries database and

11   they'll get back to us on that.

12           The Debtors believe that they've already produced the

13   quarterly impairment testing by both the accounting group and

14   the auditors and they will work with us to help us identify

15   that in what's been produced.

16           The documents regarding an evaluation of potential

17   acquisitions sounds like is subject to our nondisclosure

18   agreement.  They are going to check with the counterparties to

19   see if they are able to produce that.

20           The internal evaluations have been identified in the

21   Debtors' Response (indiscernible) we're going to -- I think

22   we'll take the time to confirm that that's the information

23   we're looking for and we'll confer with the Debtors, as needed.

24           The estimation of the unencumbered tort claims are

25   being in the process of looking for that information, whether

1   in the specific document that Mr. Foxmire [sic] identified or a

2   similar document, that essentially supports the value of the

3   unencumbered tort claims in the most recently filed Disclosure

4   Statement.

5          The documents related to the Debtors' insurance, we

6   have come to an agreement that the Debtors will help us to set

7   up some discussions with the company, including the insurance

8   professionals, to help understand the information that's being

9   targeted there.

10          **THE COURT:**  All right.

11          **MS. WALLER:**  The communications between the Debtors

12   and the OEM I believe have been --

13          **MR. LEU:**  Yes.

14          **MS. WALLER:**  -- resolved as well.

15          **MR. LEU:**  That's resolved.  My understanding is we're

16   going to look by people at the company to see if there are any

17   communications in writing relating to the statements made in

18   the Disclosure Statement about BOEM's position in the case.

19          **THE COURT:**  All right.

20          **MS. WALLER:**  The monthly financial statements and the

21   standalone financial statements on the next page have been

22   resolved in the Debtors' Response.  And the parties -- the

23   Committee and the Debtors have agreed to continue to confer on

24   the board minutes and the Debtors are going to go back and take

25   a second look at the redactions and confirm the privilege for

67

```
 1   each of the redactions based on the concerns that the Committee

 2   has raised.

 3           THE COURT:  All right.

 4           MS. WALLER:  That is it, your Honor --

 5           THE COURT:  All right.

 6           MS. WALLER:  -- I believe.

 7           MR. LEU:  That's it, your Honor.

 8           THE COURT:  Is that the agreement?

 9           MS. WALLER:  That is the agreement.  I believe there

10   are some Second Lien issues that I think other counsel will

11   cover.

12           THE COURT:  Got it.  Thank you.

13           MS. WALLER:  Thank you.

14           MR. STARNER:  Your Honor, may I approach the podium?

15           THE COURT:  If you intend on speaking.

16           MR. STARNER:  Very briefly, your Honor.  Greg Starner

17   of White & Case on behalf the EGC Ad Hoc Group.  I've been

18   asked to speak for the objecting parties about a discreet

19   issue.

20           THE COURT:  Okay.

21           MR. STARNER:  I think we've teed this up for the

22   Court.  What we're seeking is valuation-related information

23   from within the Second Lien Ad Hoc Group.

24           You know, Judge, this is an issue that's come up

25   rarely, but it has been addressed a few times.  Some Courts
```

1   have expressed some skepticism about requiring creditors just

2   to produce valuation materials.  But I think what we have here

3   is a somewhat unique circumstance.  You know, this is an issue

4   where the Second Liens have been kind of the driving force

5   behind the RSA and the terms of the RSA that are imbedded into

6   the Plan.  Valuation obviously is a critical issue.  And this

7   is not an issue where we're seeking their opinion.  The

8   evidence we're seeking doesn't necessarily go to establish

9   valuation.  It really I think ties directly into what we've

10  heard from the Debtors' expert.  He's articulated his approach

11  and methodologies he's applied is the way to approach

12  valuation.  That's a critical issue that's going to be in

13  dispute at a confirmation hearing and we believe it would be

14  highly probative to see how highly sophisticated investors that

15  are the members of the Second Lien Group, how they look at this

16  valuation.  Do they use the same type of assumptions?  Do they

17  use the same type of approach?  And I think that's probative

18  evidence as to whether or not how the Debtors have approached

19  this is consistent and also it also ties into whether or not

20  the Debtors in fact have employed the exact same methodologies

21  as, you know, the kind of key plan proponents here.

22          So that's kind of where our focus is, your Honor.

23  And I'll just finally end with the issues of confidentiality,

24  there's been some objection as this is proprietary information,

25  you know, frankly, if it is proprietary I find that

Case 17-03283-LTS   Doc#7334-3 Filed 06/07/19 Entered 06/07/19 22:04:42   Desc:
Case 16-31928   Document #: 42   Filed in TXSB on 08/25/16   Page 69 of 93
Exhibit C   Page 70 of 94

69

1   interesting, because the Debtors' expert has made it very clear

2   this is standard industry approach to valuation.  And to the

3   extent that, you know, the economic (indiscernible) investors,

4   the Second Lien Group, are approaching it differently, you

5   know, that by itself would be I think relative and probative

6   here.

7              So we're actually very happy to work with the counsel

8   for the Second Lien as to burden and narrowly tailor and work

9   with them as to giving just the discreet information that we're

10  looking for here on these valuation assumptions and how they

11  approached valuation, your Honor.

12             **THE COURT:**  All right.  Thank you.

13             **MR. LEBLANC:**  Your Honor, again Andrew LeBlanc of

14  Milbank Tweed on behalf of the Second Lienholders.  A couple of

15  points, your Honor.  And Mr. Starner had suggested this is an

16  issue that comes up he said infrequently, I actually think that

17  three of us in this courtroom have argued this and the Judges

18  in those cases all came out the same way and precluded this

19  information.

20             And just -- but to step back one step, just to give

21  you some context to this, your Honor.  We were served document

22  requests on the 25th of July.  We had a -- we scheduled a meet

23  and confer session on the 26th.  We took this position.  We --

24  at the request of the requesting parties, we sent them the

25  authority for this position, which is the same documents, same

1  citations that are included in our papers.  We had more meet

2  and confer sessions over the course of the next several days.

3          And the predicate for this in the cases that both

4  I've litigated and the other of my colleagues here who have

5  litigated it, including Mr. Starner and Mr. Anker, the

6  predicate for this is if a party is not putting on their own

7  valuation testimony, even through the form of their retained

8  expert --

9          THE COURT:  It doesn't matter what you think.

10          MR. LEBLANC:  I'm sorry, your Honor?

11          THE COURT:  It's -- the ultimate conclusion is if

12  you're not putting on evidence it doesn't matter what you

13  think.

14          MR. LEBLANC:  It does.  And there's a variety of

15  reasons for that.  It's not relevant.  And you just think about

16  a transaction.  Necessarily if somebody's purchasing a bond in

17  the open market, they think it's going to increase in value.

18  You also have a person selling that bond in the open market,

19  they think it's going to decrease in value.  And I think this

20  is probably the -- the closest example is the *Genco* decision,

21  your Honor, where Judge Lane in that case, we were the ones

22  arguing this, looked at this and said I'm not going to have a

23  series of mini trials and then require evidence from every

24  layperson out there, because presumably it's going to be all

25  over the map because you have sellers and you have buyers and

1    people have different views as to valuation.

2            And so for those reasons, your Honor, we think it's

3    irrelevant, it's inappropriate, it's admissibility would be

4    constricted by Rule 701, but we also think it's irrelevant

5    because it can't possibly be probative on the value of the

6    company, particularly where we have -- and this was a

7    concession.  We had a discussion with everybody and there was a

8    back and forth on a lot of things and we were asked are you

9    putting Houlihan on to testify as to value and we said we don't

10   intend to at this time, if that changes we will tell you.  We

11   don't intend to.

12           And so we thought this was resolved the first time we

13   heard about it.  We produced documents.  We were open and

14   notorious that we were excluding this information because we

15   redacted with a label that said internal valuation in our

16   productions.  And what -- and we produced our documents from

17   the 9th through the 12th of August and the first we heard of

18   this was Sunday that this was still an open issue.  We thought

19   this had been resolved.  To the extent that it hasn't, that's

20   fine.  We're not saying that they've waived the argument.  But

21   we are suggesting, your Honor, that you should follow the

22   decisions that we've cited in our pleadings and conclude that

23   this information doesn't have to be produced.

24           **THE COURT:**  All right.

25           **MR. STARNER:**  I'll just say, your Honor, in terms of

1  the timing issue, this is something we've always been focused

2  on.  We just got the last of their documents on the 18th, so we

3  certainly have been trying to tee it up in a consolidated

4  fashion along with the other discovery disputes for this status

5  conference.

6          I will say regarding the other cases where this has

7  been raised, Mr. Anker and I both raised this in front of

8  Judge Sontchi in Delaware, two different motions.  I lost mine

9  on more of a procedural timing issue as premature.  And I would

10  distinguish Judge Sontchi's ruling in the other matter because

11  there it was a question of solvency in the context of a

12  (indiscernible) dispute.  So I think very distinguished with

13  what we have here.

14          And really what we have here is not necessarily an

15  issue about whether the Second Liens are going to put forward a

16  valuation of their own.  The question is do we have an

17  opportunity to test how the Debtors' approach, how they

18  approached valuation.  Is it consistent with how other relevant

19  kind of market makers are approaching valuation?  And I would

20  suggest to the Court that probative value can be found or

21  probative evidence would be in the files of the Second Liens,

22  the ones who are effectively working closely with the Debtors

23  and having kind of oversight, how they approached valuation.

24  If it's wildly different in the way the Second Liens approached

25  valuation, I think that would be critical and very relevant to

 1  how this Court would consider the Debtors' valuation.

 2          **THE COURT:**  Thank you.

 3          Mr. Rothberg, do you want to weigh in?

 4          **MR. ROTHBERG:**  Yes, your Honor.  Ed Rothberg for the

 5  Equity Committee.  And I have with me Ms. Brown and also our

 6  chairperson.

 7          And I would say that it seems -- when I saw this

 8  fight come up, it seems to me to be one of the most

 9  extraordinary things I've ever seen.  How could it possibly be

10  that the evidence of a lender, this is a lender, a secured

11  lender, of what they think the value is is not admissible when

12  they're coming into the Court and asserting that they're an

13  undersecured creditor.  How could it possibly be that it's not

14  relevant?  I can think of one exception:  consulting expert.

15  But what -- I have not seen one iota of authority for a secured

16  lender in a case who's asserting affirmatively that they are

17  undersecured --

18          **THE COURT:**  But they're not asserting that in the

19  context of confirmation.

20          **MR. ROTHBERG:**  Absolutely they are, your Honor.  They

21  asserted it --

22          **THE COURT:**  They have zero burden.

23          **MR. ROTHBERG:**  They asserted it in the motion to

24  oppose the appointment of the Equity Committee and --

25          **THE COURT:**  Which has nothing to do with

1  confirmation.

2        **MR. ROTHBERG:**  Well, your Honor, Mr. LeBlanc came up

3  to me in this hearing today and said they have a huge

4  undersecured deficiency claim.

5        **THE COURT:**  Which has to be dealt with if the Plan

6  fails.  I get it, I --

7        **MR. ROTHBERG:**  Well, your Honor, point me, somebody,

8  to some ruling.  In the hundreds of debtor cases that I have

9  handled over 36 years, in virtually every single one if there's

10  a dispute about value I subpoena the appraisal testimony, I

11  subpoena the bank records to get their understanding of what

12  the value is, I've never had a problem getting that.  And so it

13  seems extremely extraordinary to me today that in a case where

14  the key issue is value we are not to be able to learn what the

15  beneficiaries of this Plan are asking the Court to give them to

16  what they think the value is.  It's an extraordinary concept.

17        **THE COURT:**  But they're not asking.

18        **MR. ROTHBERG:**  They absolutely are asking,

19  your Honor.  They are asking the Court --

20        **THE COURT:**  All right --

21        **MR. ROTHBERG:**  -- to swap their --

22        **THE COURT:**  Then --

23        **MR. ROTHBERG:**  -- their debt for equity.

24        **THE COURT:**  Then let me rephrase that.  In this

25  courtroom today they're not asking.  The Debtor is asking.  And

1   I will respectfully disagree and I don't think it's appropriate

2   for you to tell me what it is that's going on in my courtroom.

3            **MR. ROTHBERG:**  Well, your Honor, maybe you haven't

4   been in the trenches in this case, but I can tell you they are

5   advocating --

6            **THE COURT:**  Thank you, Mr. Rothberg.

7            Mr. Anker?

8            **MR. ANKER:**  Your Honor, I rise only to draw one

9   distinction, just to make sure we're on the same page.  And

10  Mr. LeBlanc's recitation is accurate.  I litigated this issue

11  in another case on the side of asking for the valuation

12  testimony and had it denied.  And that's one reason I didn't

13  rise at the beginning and I haven't pressed this issue.  So I'm

14  not going to argue with Mr. LeBlanc.

15           What I understand we're talking about today is

16  whether documents that may or may not exist within the Second

17  Lien Ad Hoc Group about what they think the Reorganized Debtor

18  will be worth if this Plan gets confirmed, whether those need

19  to be produced.  And I appreciate both the case law that is

20  existing today and the discussions we had with Milbank, which

21  have been productive and very professional.

22           I don't think what we're talking about, and I just

23  want to make sure I'm right about this, is historical

24  documents, for example, with respect to the negotiation end of

25  the Second Lien facility back in 2014.  If in that historical

76

1  context, whereas we've talked about the intercompany notes and

2  the history here matter, if in that context there are documents

3  where, you know, any lender is going to be talking about what

4  the collaterals were, if -- I don't think we're having a

5  dispute about that historical stuff and I rise only to make

6  sure I'm right about that.  If I'm right about that, I'm

7  content and I sit down.  I don't think anyone's arguing that

8  historical set of materials, to the extent it exists, are not

9  producible.

10      MR. LEBLANC:  Your Honor, I don't think there's a

11  disagreement about that.  I don't know if there are any

12  documents that are responsive to that.  There's obviously

13  been -- not all of my clients are original lenders here.  But

14  that's not the issue that we're dealing with on this and it's

15  not -- frankly, it's not the issue that was dealt with in *Genco*

16  and *EFH* and the case before Judge Shannon and *Molycorp*, which I

17  just recently argued in front of Judge Sontchi.  It's the issue

18  that Mr. Anker thought it was.

19      THE COURT:  Got it.

20      MR. ANKER:  (Indiscernible)

21      THE COURT:  Thank you.

22      MR. STARNER:  And just one last point, your Honor.  I

23  will just note, you know, we're not focused or looking for -- I

24  know that a lot of these funds have a lot of internal modeling

25  they do focused on IR and return on investments and modeling.

Case 17-03283-LTS Doc#7334-3 Filed 06/07/19 Entered 06/07/19 23:04:42 Desc:
Case 16-31928 Document #142 Filed in TXSB on 08/25/16 Page 77 of 93
Exhibit C Page 78 of 94

77

1   That's not what we're focused on here.  We're looking at, I

2   think as Mr. Anker articulated, what the value, what the

3   anticipated value of this company will be coming out of

4   bankruptcy and the focus really is their methodologies and the

5   assumptions that apply and whether it's consistent or

6   inconsistent with how the Debtors expert approached this and

7   his statement that that's standard, the way they do it.

8           **THE COURT:**  Fair enough.  I agree with the Second

9   Lienholders.  This can't be -- this just can't be possibly

10  relevant to the Debtors' thought process and the Debtors'

11  valuation, their methodologies.  It is simply too far removed,

12  too invasive.  I'm going to sustain the objection.  All right?

13          **MR. LEBLANC:**  Thank you, your Honor.  We have one --

14  I'm now trading opponents.  The final issue, your Honor,

15  relates to depositions.  We have -- in the course of those meet

16  and confers it was clearly identified to us that there are two

17  holders that they wanted to take, so we had those -- we haven't

18  had schedules for those, because those, they're going to be

19  backdated and back loaded, but we focused on that.  And what

20  we've told them throughout is if there's a reason you need

21  additional depositions, just tell us what that reason is and

22  we'll consider it.  We've now got to a point, and we outlined

23  this in our paper, that they've said we want all five of your

24  Committee members, we'll limit it to a half day.  And our

25  response to that was why do you need all of them?  We haven't,

78

1    frankly, gotten a response to that.

2           We understand there's been some discussion about

3    limiting that, but then there's other components to that so I

4    won't go into it, but the issue here, your Honor, is just one

5    of burden, relevance, duplication of efforts.  There's five

6    Committee members.  We don't know why all five of them need to

7    be deposed.  We've asked the question and haven't gotten an

8    answer to it.

9           **THE COURT:**  So you've offered two.

10          **MR. LEBLANC:**  We've offered two and we would

11   consent -- they've asked -- they've identified a third that we

12   I think would be prepared to consent to that as well.  The

13   issue, and we've pointed -- and your Honor knows this better

14   than I do, but a half day deposition takes no less preparation

15   than a full day deposition.  And so if next week we're going to

16   be doing a deposition with each of our clients, that means

17   we're doing a full day of preparation, because they're not --

18   these aren't 30(b)(6) witnesses, so there's not a topic that we

19   can point to.  We've asked them if they could -- if they want

20   to just authenticate documents through witnesses, that we could

21   have a discussion about that if they tell us what documents.

22   And if they want to have a deposition just to do that, we don't

23   have to spend a day prepping.  But we haven't been able to come

24   to a conclusion.

25          So we would ask that the Court just limit them to

1     three depositions.  We've always offered two and if they want

2     to identify a third, we'll do that even without them

3     articulating a basis for doing so.

4          **THE COURT:**  All right.

5          **MR. MANTHEY:**  Your Honor, let me first say we're

6     dealing with five members of the Ad Hoc Committee, each owed

7     over a hundred million dollars.  We served document requests

8     upon them and we did several meet and confers.  As a result of

9     those meet and confers -- first we were told we were going

10    to -- look, we're going to have to produce 40,000, 50,000

11    pages, each one of our members, it's impossible, we can't do

12    this.  So what we did in those meet and confers is we tailored

13    it down and worked and worked hard to tailor it down.  We

14    agreed that, okay, these search terms, let's go forward with

15    them.  We saw on average from 500, or at a range 500 pages to

16    2500 pages for each of these noteholders.  We didn't see the

17    thousands and thousands of documents in the extreme burden that

18    the Second Lienholders, who are ending up with 99 percent of

19    the equity in this company, went through to do this document

20    production.

21          After we got the document production, we went through

22    those documents for each of the five members.  In each of those

23    productions there are interesting documents that we think are

24    appropriate to ask those individuals about.

25          **THE COURT:**  Okay.

1          **MR. MANTHEY:**  They offered, correct, two of the

2    members a few weeks ago, dates in Los Angeles and

3    San Francisco.  We said we would like dates for each of the

4    others, given this calendar we're working with, we'd like to

5    figure out how to overlay.  No, we're not giving you dates on

6    the other three deponents.  I said, well, we haven't reviewed

7    the documents in full, but when we review the documents it

8    would be helpful just to have dates so we can agree.

9          We finally made the request.  All the objecting

10   parties got together and said, look, we're willing to cut

11   Houlihan loose.  We're not going to depose Houlihan.  You have

12   represented you're not putting him on for valuation.  But we

13   would like to depose each of the five individual members.  We

14   will limit it to a half a day.  We'll do the depositions in

15   California via videoconference.  We did everything we could to

16   try to make this workable for, again, the Second Lienholders

17   who are ending up with 99 percent of the company.

18          **THE COURT:**  What's the topic?

19          **MR. MANTHEY:**  The topics are the documents.

20   Your Honor, I'm under a Protective Order and I'll tell you, you

21   were on one of the issues that are central to this case, good

22   faith.  I think the documents show -- and let me, before I get

23   there.  Where we ended up was we agreed that we'd do three of

24   the members, and I can name them, but we agreed to do three of

25   those members, and the other two, as long as they agreed that

Case 17-03283-LTS Doc#7334-3 Filed 06/07/19 Entered 06/07/19 22:04:42 Desc:
Case 16-31928 Document 2142 Filed in TXSB on 03/25/18 Page 81 of 93
Exhibit C Page 82 of 94

81

 1   the documents were authentic and admissible, subject to their

 2   reservation of the relevancy of the documents, we would forego

 3   the other two depositions.  They would not agree to that.

 4           So, your Honor, what we would offer is, we're under a

 5   Protective Order, we see these documents as to the two holders

 6   they have refused to produce, I'd offer to produce those

 7   documents to your Honor for review in camera and if your Honor

 8   believes we're entitled to a deposition, we'll have a

 9   deposition.  If they're not, you don't think they rise to the

10   level for us to do that deposition, then we'll respect your

11   ruling and move forward with the other three deponents.

12           **THE COURT:**  So let me ask this.  So you've gotten a

13   folder of documents.

14           **MR. MANTHEY:**  Correct.

15           **THE COURT:**  And is the intent of the depos to just go

16   through and authenticate them or is it substantive questioning

17   about certain documents?

18           **MR. MANTHEY:**  There is substantive questioning.

19   Your Honor, you'll see from the documents --

20           **THE COURT:**  Now, with respect to the other two,

21   you're willing to let them go if they will agree to

22   authenticity and admissibility.

23           **MR. MANTHEY:**  Correct.

24           **THE COURT:**  So at least those two couldn't have been

25   substantive.

82

1          MR. MANTHEY:  Well, there's emails in there and

2    documents in there that we do want to bring to your Honor, but

3    we respect the fact that, you know, we have time constraints

4    here.  Our preference is to depose all five, but given, in the

5    spirit of trying to work through this issue, we agreed that we

6    would do the three.  But again, your Honor, we'd love to submit

7    the emails and documents to you to review in camera and you can

8    make a decision if we're on base or off base.

9          You'll see that the documents among the Second Lien

10   Lenders will show that the Second Lienholders were heavily

11   involved directly with the company involving the negotiation of

12   the RSA and the MIP, that the Second Lienholders have other

13   plans for these assets.  And again, I'm hesitant to go much

14   further because I'm under a Protective Order.

15          THE COURT:  No, I don't want you to.  So your scope

16   of the inquiry runs to the negotiation of the deal that's

17   embodied in the Plan?

18          MR. MANTHEY:  As well as the plans for these assets.

19          THE COURT:  And why is that going to be relevant to

20   confirmation?

21          MR. MANTHEY:  It's relevant to confirmation in terms

22   of the value.  One of the arguments is that these assets have

23   not been subject to market and the evidence will show through

24   these lienholders that there are parties interested in

25   potentially buying the assets.

83

1          **THE COURT:**  Okay.

2          **MR. LEBLANC:**  May I be heard, your Honor?

3          **THE COURT:**  Please.

4          **MR. LEBLANC:**  So the proposal you just heard,

5    your Honor, I have not heard that before.  Last night there was

6    communication between Mr. Manthey and my partner, who's here in

7    the courtroom, Mr. Renenger, who is in town for a deposition

8    yesterday, which is why he's here today in the courtroom,

9    your Honor.  There were conversations between the two of them

10   where the concept of we'll limit it to three and then you agree

11   to -- we have no issue with authenticity, not an issue -- to

12   admissibility of any other documents that are in your

13   production.  We've made the point to them that not all

14   documents are admissible simply because they've been produced

15   by us.  For example, if there was a third party communication.

16         **THE COURT:**  I also don't know what good it's going to

17   do if you agree to admissibility and no one else agrees to that

18   as well, but --

19         **MR. LEBLANC:**  And so --

20         **THE COURT:**  -- I got it.

21         **MR. LEBLANC:**  -- we didn't -- our view, your Honor,

22   was that simply wasn't a workable solution.  They're not

23   necessarily business records.  They may be, but they may not

24   be.  And so we said we can't agree to what you suggested.

25         What we've offered to them is, and I would make the

1  same proposal, rather than showing them to your Honor

2  in camera, show them to us and we will tell you if we agree --

3  if we have any issue with their being admissible.  And then,

4  obviously, other parties would have a view on that as well.

5  But we thought that was a better solution to this.  We also

6  said if you want to do -- if we can't say that they're

7  admissible but you want to do a deposition just to admit a

8  document, that can be a very short deposition.  Or if you want

9  to do some of these depositions solely for that purpose that

10  are not substantive, then I don't have to prepare these

11  witnesses as though they're going to be deposed for three and a

12  half hours on any topic imaginable.

13         We've tried to come to a workable solution,

14  your Honor.  I think -- they have not yet articulated to us why

15  the other two that aren't being -- that are subject to this

16  proposal, what relevance their documents or their testimony

17  would possibly have.  We've asked that question, we haven't

18  gotten an answer to it.  So we object on that basis,

19  your Honor.

20         **MR. MANTHEY:**  Your Honor, I guess the response is I

21  don't really necessarily feel sorry for the Second Lien Lenders

22  having to sit through a half day deposition, given the stakes

23  here.  There is elimination of all funded debt that is trying

24  to be done and the beneficiary of that is the Second Lien

25  Lenders.  We limited the scope of the documents significantly

85

1   from, again, the 40,000 that we were supposed to be produced

2   to, again, 500 to 2500, which include numerous duplicates.

3   Quite frankly, a subject area for those depositions is whether

4   we've been produced -- whether all the documents responsive

5   have been produced.

6          So we don't think it's extreme hardship, given the

7   stakes, and we would ask that we conduct the five depositions

8   or conduct the three depositions and present the documents to

9   your Honor in camera and you can make the decision whether it's

10  appropriate for us to depose those two individuals.

11         **THE COURT:**  All right.

12         **MR. LEBLANC:**  Your Honor, can I respond just to the

13  document production issue?

14         **THE COURT:**  Sure.

15         **MR. LEBLANC:**  There's not a 30(b)(6) request for a

16  document custodian or someone involved in the production of

17  documents.  They're going to be asking -- we would present --

18  they've asked for one individual among the group, but otherwise

19  they've allowed us to choose which of the business people at

20  these institutions would testify.  So if their purpose is to

21  ask them what steps did you take to do production, they're not

22  going to get it, unless they want to serve a 30(b)(6), which I

23  don't think they could do at this time.

24         But more importantly, Mr. Manthey is talking about

25  the difference between 40,000 per client and a much smaller

86

1   number.  And in candor, your Honor, we did it, and this was

2   agreed by everybody, we ran it through a sample, one of the

3   firm's information, and we extrapolated from that.  That's the

4   difference between their initial set of search terms and the

5   last set of agreed search terms.  They proposed to us a set of

6   search terms.  We gave them the information to show what it

7   would return and we talked about burden.  We then negotiated a

8   new set of search terms that yielded a different number of

9   documents.  It is completely unremarkable -- well, this was an

10  agreed set of search terms, your Honor.

11          And so I don't need Mr. Manthey to feel sorry for me.

12  That's not what I'm looking for.  All I'm looking for,

13  your Honor, is your Honor's decision on whether or not it is

14  appropriate for them to require, without any articulation of

15  relevance, depositions of five different institutions, even if

16  for only half a day, where the burden on us to prepare them is

17  completely unmoved by limiting it to three and a half hours.

18          **THE COURT:**  Fair enough.  Let me tell you what I'm

19  going to do and part of it -- I haven't gotten a good sense of

20  what the purpose of these depositions is either.  I'm also

21  unwilling to conclude that I ought to not have them based upon

22  a reluctance or an inability to tell me why.  So here's what

23  I'm going to do.

24          Mr. Manthey, you have ten hours.  You allocate it

25  however you want.

87

 1          MR. MANTHEY:  Okay.

 2          THE COURT:  You can take two hours apiece, you can

 3  take one five hours, but you have ten hours total.  And I'll

 4  leave it to you all to work out the appearances and whatever it

 5  is that you decide that you want to do with those folks.  All

 6  right?

 7          MR. MANTHEY:  Thank you, your Honor.

 8          THE COURT:  Okay.  What else?

 9          MR. LEBLANC:  I think those are my only issues,

10  your Honor.

11          THE COURT:  All right, thank you.

12          MR. LEBLANC:  Unless somebody tells me otherwise.

13          THE COURT:  Anyone else?

14          All right.

15          MR. MEYER:  I think we have, your Honor, two

16  additional items on the agenda today.  I anticipate they should

17  move more quickly than the ones we've had so far.

18          The first, your Honor, is a motion seeking approval

19  of a stipulation to provide adequate protection for Prosperity

20  Bank.  Your Honor, Mr. Rothberg filed an objection to this

21  pleading.  We've been in discussions with the Equity Committee.

22  They would like to adjourn our motion further.  Prosperity, as

23  of the time before this hearing, was objecting to that.  We do

24  not intend to go forward with this motion today, your Honor,

25  and I'll cede the podium to Prosperity's counsel to the extent

 1  that they're still objecting to that position.

 2          **THE COURT:**  All right.  Thank you.

 3          **MR. SWONKE:**  Good afternoon, your Honor.  Adam Swonke

 4  for Prosperity Bank.  S-w-o-n-k-e.

 5          The stip -- the agreed stipulation that was filed was

 6  the result of a lift stay motion -- negotiations resulting from

 7  a lift stay motion that was filed back in June.

 8          **THE COURT:**  Okay.

 9          **MR. SWONKE:**  As the other agreed party to the Order

10  that was submitted, we'd like to go forward with the hearing

11  today.

12          **THE COURT:**  All right.  And did you file your witness

13  and exhibit list?

14          **MR. SWONKE:**  I'm sorry?

15          **THE COURT:**  Did you file your witness and exhibit

16  list?

17          **MR. SWONKE:**  I did not, your Honor.

18          **THE COURT:**  It's going to be awfully difficult for

19  you to proceed ahead without any witnesses or exhibits, isn't

20  it?

21          **MR. SWONKE:**  I'm not sure that I need any -- it was

22  agreed until -- well, it's still agreed.

23          **THE COURT:**  You've got to prove it up.  Just because

24  something's agreed doesn't mean that I just sign it.  I have an

25  objection, so you've got a burden, correct?  And how do we meet

Case 17-03283-LTS   Doc#7334-3   Filed 06/07/19   Entered 06/07/19 23:04:42   Desc:
Case 16-31928   Document #147   Filed in TXSB on 08/25/16   Page 89 of 93
Exhibit C   Page 90 of 94

89

 1   our burden?

 2          MR. SWONKE:  Well, the objection isn't to the

 3   position Prosperity has taken.  The objection is to, I believe,

 4   a position that the Debtors are taking.

 5          THE COURT:  Okay.  So you'd like to proceed?

 6          MR. SWONKE:  We're just looking for adequate

 7   protection payments and your signature on the Order that was

 8   submitted at Docket Number 917.

 9          THE COURT:  Okay.  Is that your case?

10          MR. SWONKE:  I suppose so.

11          THE COURT:  The Order is denied.

12          MR. SWONKE:  Yes, sir.

13          THE COURT:  A really bad decision.  I mean you just

14   took something that you could kick down the road and now you

15   have a definitive ruling.  The request has been denied.  There

16   will be no adequate protection.

17          That was a really bad decision.  You've got to learn

18   to read the room.  I mean there isn't -- you could see that one

19   coming a mile away.

20          All right, what's next?

21          MR. SWONKE:  May I be excused?

22          THE COURT:  Yes, sir.

23          MR. MEYER:  Your Honor, one more item on the agenda

24   and I'll turn the podium to my colleague, Jessica Pete, to

25   cover the contract rejection motion.

Case 17-03283-LTS  Doc#7334-31 Filed 06/07/19 Entered 06/07/19 22:04:43  Desc:
Case 16-31928  Document 1142 Filed in TXSB on 08/29/18  Page 90 of 93
Exhibit C  Page 91 of 94

90

1           **THE COURT:**  Thank you.

2           **MS. PETE:**  Good afternoon, your Honor.

3           **THE COURT:**  Good afternoon.

4           **MS. PETE:**  Jessica Pete for the Debtors.

5           **THE COURT:**  Will that not bend down any further?

6           **MS. PETE:**  I wasn't going to try it again.

7           **THE COURT:**  All right.

8           **MS. PETE:**  I thought I'd just speak up.

9           Thank you, Mr. Anker.

10          All right (indiscernible)

11      **(Laughter)**

12          **THE COURT:**  He didn't get it, either.

13          **MS. PETE:**  We filed a motion to reject a couple of

14   operational contracts on July 26th.  The objection deadline was

15   August 16th.  We received no formal objections filed on the

16   docket.  We did receive an informal response from Archrock's

17   counsel.  For that reason, we agreed to some modified language

18   that just clarifies which of their contracts are not being

19   rejected pursuant to this Order.

20          **THE COURT:**  All right.

21          **MS. PETE:**  We have no issue with that.  They've

22   agreed to the Order that we submitted and filed yesterday at

23   Docket Number 1091.  And --

24          **THE COURT:**  So that's got the additional language in

25   it?

Case 17-03283-LTS Doc#7334-3 Filed 06/07/19 Entered 06/07/19 22:04:42 Desc:
Case 16-31928 Document #142 Filed in TXSB on 08/25/16 Page 91 of 93
Exhibit C Page 92 of 94

91

 1          MS. PETE:  Yes, your Honor, it does.  And I believe

 2  we uploaded to the Court a redline as well that just shows --

 3  it's Paragraph 4, the part -- ah, we did not upload a redline,

 4  but we do have hard copies if you are interested.

 5          THE COURT:  You're saying it's all in Paragraph 4?

 6          MS. PETE:  Correct.  Where it says "For the avoidance

 7  of doubt, we do not reject…," yes.

 8          THE COURT:  All right.  And Archrock has reviewed and

 9  approved --

10          MS. PETE:  They have.

11          THE COURT:  -- the exceptions?  All right.

12          Anyone else wish to be heard?

13      **(No audible response)**

14          All right.  Based on those representations, I will

15  grant the motion.  I have signed the Order that was uploaded at

16  Docket Number 1091.  It's been signed, it's on its way to

17  docketing.

18          MS. PETE:  Thanks very much, your Honor.

19          THE COURT:  Thank you.

20          Anything else?

21          MR. MEYER:  I don't believe so, your Honor.  Thank

22  you for your patience today --

23          THE COURT:  All right.

24          MR. MEYER:  -- and I do not believe we have anything

25  else for today.

1          THE COURT:  Anything else I can do to help the

2  process.  All right.  Safe travels home, everybody.  We'll be

3  adjourned.

4       (Counsel thank the Court)

5          THE MARSHAL:  All rise.

6       (This proceeding was adjourned at 1:41 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____         August 25, 2016

TONI HUDSON, TRANSCRIBER