## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------- X
:
In re:                                                               :
                                                                     :
THE FINANCIAL OVERSIGHT AND                                          :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                    :   Title III
                                                                     :
      as representative of                                      :   Case No. 17-BK-3283 (LTS)
                                                                     :
THE COMMONWEALTH OF PUERTO RICO *et al.,*                            :   (Jointly Administered)
                                                                     :
      Debtors.[1]                                              :
-------------------------------------------------------------------- X
:
In re:                                                               :
                                                                     :
THE FINANCIAL OVERSIGHT AND                                          :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                    :   Title III
                                                                     :
      as representative of                                      :   Case No. 17-BK-4780 (LTS)
                                                                     :
PUERTO RICO ELECTRIC POWER AUTHORITY                                 :   **This filing relates only to**
                                                                     :   **Case No. 17-BK-4780 (LTS)**
                                                                     :
      Debtor.                                                  :
-------------------------------------------------------------------- X

### OMNIBUS REPLY IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN CONNECTION WITH PREPA RSA RULE 9019 SETTLEMENT MOTION

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four
(4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto
Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico
Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of
Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case
No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the
Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last
Four Digits of Federal Tax ID: 9686); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy
Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as
Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................. 5

I.  NONPRODUCING PARTIES' PROPOSED STANDARD OF REVIEW
UNDER RULE 9019 IS INCORRECT ................................................................... 5

II.  RESPONDENTS' RESPONSES TO COMMITTEE'S DISCOVERY
REQUESTS ARE INSUFFICIENT ....................................................................... 9

    A.  Nonproducing Parties Must Provide Documents From Relevant
Custodians ................................................................................................... 9

    B.  Committee Should Be Allowed To Use Renewed Receiver Motion
Documents For Discovery Purposes ............................................................ 11

    C.  Non-Email Electronic Communications Should Be Produced ...................... 11

    D.  Government Parties Have Unjustifiably Refused To Produce, Or Unduly
Circumscribed, Their Review Of Documents In Response To Certain
Requests ..................................................................................................... 12

III.  ASSURED SHOULD BE REQUIRED TO PRODUCE LOSS RESERVES AND
INTERNAL VALUATION INFORMATION ....................................................... 14

    A.  Assured's Loss Reserves Are Responsive And Relevant .............................. 15

    B.  Assured's Loss Reserves Are Not Protected By Any Privilege ..................... 16

IV.  RESPONDENTS' PRIVILEGE CLAIMS ARE OVERBROAD ................................ 19

    A.  Government Parties And Ad Hoc Group Did Not Have A Common
Interest Upon Execution Of Preliminary RSA ............................................ 19

    B.  FOMB's Intentional Disclosure Of RSA Communications To Committee
Operates As Waiver As To All RSA Communications .................................. 21

    C.  Government Parties Are Not Entitled To Deliberative Process Privilege
With Respect To Their Execution of RSA .................................................... 22

CONCLUSION ............................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
　No. 14-7126, 2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016)...................................................18

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*,
　No. 04-4309, 2006 WL 278131 (S.D.N.Y. Feb. 2, 2006)......................................................17

*In re Bankers Tr. Co.*,
　61 F.3d 465 (6th Cir. 1995) ...................................................................................................18

*Czyzewski v. Jevic Holding Corp.*,
　137 S. Ct. 973 (2017)...............................................................................................................6

*F.D.I.C. v. Ogden Corp.*,
　202 F.3d 454 (1st Cir. 2000)...................................................................................................19

*Fed. Realty Inv. Trust v. Pac. Ins. Co.*,
　760 F.Supp. 533 (D. Md. 1991)...............................................................................................19

*In re Fryar*,
　570 B.R. 602 (Bankr. E.D. Tenn. 2017) ...................................................................................7

*In re Genco Shipping & Trading Ltd.*,
　No. 14-11108, Dkt. No. 267 (Bankr. S.D.N.Y. June 3, 2014).................................................16

*In Re Iridium Operating LLC*,
　478 F.3d 452 (2d Cir. 2007)......................................................................................................6

*Mullins v. Dep't of Labor of P.R.*,
　269 F.R.D. 172 (D.P.R. 2010) .................................................................................................16

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
　No. MDL 13-2419, 2015 WL 13715296 (D. Mass. Nov. 6, 2015) .........................................19

*In Re Nutraquest, Inc.*,,
　434 F.3d 639 (3d Cir. 2006)......................................................................................................6

*In re Nutritional Sourcing Corp.*,
　398 B.R. 816 (Bankr. D. Del. 2008) .........................................................................................7

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
　322 F.R.D. 1 (D.D.C. 2017).....................................................................................................12

*In re Pharm. Indus. Average Wholesale Price Litig.*,
254 F.R.D. 35 (D. Mass. 2008)........................................................................23

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
No. 06-5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010)....................................18

*Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
Anderson*,
390 U.S. 414 (1968)..................................................................................2, 5, 6

*In re Pub. Serv. Co. of N.H.*,
90 B.R. 575 (Bankr. D.N.H. 1988) ....................................................................8

*In re Smart World Techs., LLC*,
423 F.3d 166 (2d Cir. 2005)............................................................................6

*In re Subpoena Served Upon Comptroller of the Currency & Sec'y of Bd. of
Governors of Fed. Res. Sys.*,
967 F.2d 630 (D.C. Cir. 1992) ........................................................................18

*In re the Dolan Co.*,
No. 14-10614, Dkt. No. 284 (Bankr. D. Del. May 2, 2014) ....................................16

*The Official Committee of Unsecured Creditors of the Commonwealth of P.R.,
etc. v. Whyte, etc. (In re The Financial Oversight and Management board for
P.R.)*,
No. 17-00257 (Bankr. D.P.R. Feb. 4, 2019) .......................................................8

*In re Tribune Co.*,
No. 08-13141, 2011 WL 386827 (Bankr. D. Del. 2011) .........................................19

*U.S. v. AWECO, Inc.*,
725 F.2d 293, 298 (5th Cir. 1984) ..................................................................6, 8

*U.S. v. Mass. Inst. of Tech.*,
129 F.3d 681 (1st Cir. 1997)..........................................................................17

*U.S. v. Textron Inc. & Subsidiaries*,
577 F.3d 21 (1st Cir. 2009)............................................................................16

*W. Holding Co., v. Chartis Ins. Co. of P.R.*,
300 F.R.D. 48 (D.P.R. 2014) ..........................................................................16

**Statutes**

N.Y. Ins. Law § 1504(c) ................................................................................18

N.Y. Pub. Off. L. § 87(2)................................................................................17

11 NYCRR § 241.3(a) ...........................................................................................................17

**Other Authorities**

Fed. R. Civ. P. 26...............................................................................................................19

Fed. R. Evid. 502(a)............................................................................................................21

To the Honorable Magistrate Judge Judith Gail Dein:

The Official Committee of Unsecured Creditors of all Title III Debtors (the

"Committee") hereby submits this reply (the "Reply") in support of its motion to compel

production of documents [Dkt. No. 1269] (the "Motion to Compel" or the "Motion") from the

Nonproducing Parties[1] and in response to the objections to the Motion filed by (i) the Oversight

Board and AAFAF [Dkt No. 1304] (the "Government Obj."), (ii) Assured [Dkt. No. 1299] (the

"Assured Obj."), and (iii) the Ad Hoc Group [Dkt. No. 1303] (the "AHG Obj.").[2]  In support of

its Reply, the Committee respectfully states as follows:

## INTRODUCTION

1.      The Government Parties concede in their objection that "[t]he settlement

embodied in the [] RSA [is] an ***enormous and complicated transaction***."  Government Obj. ¶ 50

(emphasis added).   The Committee agrees.  In fact, the transaction is so enormous, complex, and

sweeping in its scope that the Committee fears it may all but resolve PREPA's title III case by

practically dictating the terms of any plan of adjustment, thus constituting an impermissible *sub

rosa* plan under PROMESA and the Bankruptcy Code.  In this context, the attempts by the

Government Parties, along with the Ad Hoc Group and Assured, to limit the Committee to only

minimal discovery concerning the proposed settlement—including by failing to produce

documents of key custodians, flatly refusing to produce ***any*** non-email documents, and asserting

overbroad and improper privileges—are entirely inappropriate.

2.      At the outset, the Government Parties' contention that the Committee is entitled to

"little, if any, discovery" on the 9019 Motion, *id.* ¶ 8, is erroneous as a matter of law.  The

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2]      The Government Parties, the Ad Hoc Group, and Assured are collectively referred to herein as the
"Respondents."

Supreme Court has made clear that, before approving a compromise in a bankruptcy case, the

court must apprise itself of **all** facts necessary to conduct "a full and fair assessment of the

wisdom of the proposed compromise."[3]  This inquiry necessarily may entail significant

discovery.  The mere fact that the Court does not need to conduct a trial on the merits of the

claims being settled does not mean that the parties opposing the settlement are not entitled to

broad discovery to fully evaluate the compromise and advance their objections.  The

Government Parties rely on this Court's decision in the COFINA dispute to support their

contrary view, but that settlement was critically different from the present one for a number of

reasons, including that it was significantly less complex, did not address the distribution of

debtor assets to different creditor classes (rather, it involved a settlement between two debtors),

and had the support of both official committees.  Moreover, the approval of the COFINA

settlement occurred after months of discovery and full summary judgment briefing.

       3.      In any event, the level of discovery that may be appropriate in other cases is not

controlling here, because the RSA is not a typical settlement—indeed, it may effectively end this

case.  The Court need look no further than the FOMB's own filings in this case to understand a

key basis for the Committee's concern.  In responding to certain bondholders' initial motion

seeking the appointment of a receiver, which was filed in July 2017, the Oversight Board

submitted a declaration asserting that PREPA cannot raise its rates to more than $0.214 per kWh

without "reducing economic growth below the minimum amount of real economic growth

necessary for Puerto Rico to achieve fiscal and debt sustainability."[4]  Taking this assertion as

---

[3]     *See Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

[4]     *See Declaration Of Andrew Wolfe In Support Of Opposition Of Oversight Board To Motion Of Certain Bondholders To Enforce Statutory Right To Have Receiver Appointed*, dated July 31, 2017 [Dkt. No. 149-2].

true, the rate surcharges the Government Parties seek to impose in the RSA are unsustainable and leave no room for a further surcharge to provide a recovery to other creditors. The settlement would thus distribute all of PREPA's assets of value to the bondholders and practically dictate the terms of any plan by giving bondholders rights and claims that the Court cannot "undo" after the Rule 9019 order is entered.

4. Even if the potentially sweeping impact of the proposed settlement did not warrant heightened scrutiny of the 9019 Motion (though it does), the Court must permit the Committee to fully explore the Government Parties' stated rationale for entering into the RSA since approval of the RSA will eventually permit the Government Parties to transfer billions of dollars in value in contravention of the Bankruptcy Code's priority scheme. Specifically, the Government Parties assert in the 9019 Motion that the RSA, by providing billions of dollars to the bondholders (purportedly given them a recovery in the range of 67.5-77.5% on account of their allegedly secured claims), will help facilitate PREPA's proposed transformation without prejudicing the rights of other creditors. Recent Supreme Court precedent cautions that distributions outside of a plan of reorganization are to be limited to situations that serve significant bankruptcy objectives, and thus, the Committee has an undeniable right to investigate and test payments to the bondholders will lead to a successful transformation

5. From their objections, it is clear that the Government Parties, Assured, and the Ad Hoc Group allow their inappropriately narrow view of the permissible scope of discovery to influence their position on whether and to what extent they should be required to search for and produce documents in response to the Committee's requests. This is especially true for each of the Respondents' arguments concerning (i) the number and identity of custodians whose documents they should have to search, (ii) whether they should be required to search for ***any***

documents other than emails, and (iii) whether they should be required to search for documents in response to requests that cover certain subject matters, including, in the case of Assured, its loss reserve or other calculations of the value of the proposed settlement.  As discussed below, the running theme that permeates the Respondents' position on each of these issues is that conducting a further search would be burdensome and may not uncover documents that Respondents believe are relevant.  But any such burden must be viewed within the context of the significance of this dispute, which involves payments that would eventually total in excess of $20 billion, and the Court cannot simply defer to the unsubstantiated assertions of counsel that relevant documents might not exist.  To the extent an area of inquiry is open to discovery, the Respondents must produce all the relevant documents (or categories of documents) that exist— they cannot decide, unilaterally, to produce only the documents they want to produce.

6.      The Respondents also take an overly broad and impermissible view of the privileges they claim shield many of their documents from disclosure.  As to their claimed common interest privilege, neither the Government Parties nor the Ad Hoc Group provide any meaningful rebuttal to the communications the Committee has cited which directly undermine the notion that they shared a legal interest sufficient to support the existence of the privilege for the nine-month period between the Preliminary RSA and the Definitive RSA.  They instead compare the terms of the Preliminary RSA to the Definitive RSA, arguing that not much has changed.  But this is simply not true based on a close review of the very comparisons they provide.  In any event, any similarities in the two documents' terms have no bearing on whether the parties in fact had agreed on all material terms at the time of the Preliminary RSA, because that document was in substance a non-binding "agreement to agree."

7.      The same is true with respect to the Government Parties' assertion of the deliberative process privilege.  The Government Parties provide no credible rebuttal to the Committee's argument that the privilege does not apply where, as here, the government's decision-making is directly at issue in the dispute.  The Government Parties argue only that their subjective, as opposed to objective, business judgment is not at issue, even though they make the exact opposite argument in their 9019 Motion.  The Government Parties also assert that it is premature to evaluate the application of the deliberative process privilege because they have not yet withheld documents on that basis.  While that may be true, the expedited nature of this litigation simply does not allow for multiple additional rounds of motions to compel after the Government Parties produce privilege logs, and legal determination of the proper application of the deliberative process privilege to the types of communications at issue in this dispute is ripe for resolution by the Court on this Motion to Compel.

8.      If approved, the RSA will restructure nearly $9 billion in bonds, eventually lead to the transfer of $20 billion in consideration over nearly half a century, and dictate PREPA's future plan of adjustment.  With so much riding on this litigation there is no reason why a full factual record should not be presented to the Court.  Accordingly, for the foregoing reasons and those discussed further below, the Motion to Compel should be granted.

## ARGUMENT

## I.      NONPRODUCING PARTIES' PROPOSED STANDARD OF REVIEW UNDER RULE 9019 IS INCORRECT

9.      Bankruptcy courts considering Rule 9019 settlements "take their guidance from the Supreme Court case of *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*."  10 Collier on Bankruptcy P 9019.02 (16th 2019).  In *Anderson*, the Supreme Court declared that a bankruptcy court considering a settlement must:

"apprise [itself] of *all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated*. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, . . . and *all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise*."

390 U.S. 414, 424 (1968) (emphasis added). Lower courts have followed suit. *See, e.g.*, *In re Smart World Techs., LLC*, 423 F.3d 166, 179 (2d Cir. 2005) (holding that 9019 settlement should not be approved without discovery and that "absence of a more fully developed record" precluded conclusion that settlement was fair). In other words, the court may not merely "rubber stamp" the settlement without factual inquiry.

10.     Circuit courts, applying *Anderson*, have held further that a bankruptcy court considering approval of a settlement (whether a standalone rule 9019 settlement or one that is part of a plan) must, among other things, (i) ensure that that the settlement is "fair and equitable" by "look[ing] to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle," *In Re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006), and (ii) consider the "paramount interests of the creditors" by examining "each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement." *In Re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotations omitted). In that context, the respect afforded by the settlement to the relative priority of creditors affected by the settlement is paramount. *United States v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). In fact, in a different context, the Supreme Court recently admonished that distributions outside of a plan of reorganization are to be limited to situations that serve "significant Code-related objectives." *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (reversing judgment that approved payments that contravened Bankruptcy Code's priority

scheme because creditors affected by such payments had not consented and payments did not serve significant Bankruptcy Code objective).[5]

11.     A thorough factual inquiry is particularly important in this matter because the RSA is far from a garden-variety settlement.  The Government Parties seek Court authority to provide, over time, the bondholders billions of dollars in value in the form of new collateral, post-petition interest, cash payments and administrative claims, all of which may effectively tie the hands of the Court with respect to the future of the PREPA case and any plan of adjustment—all in violation of the foregoing precedent.  And while the Government Parties contend these payments are necessary to permit PREPA to move its title III case forward, the Committee is entitled to obtain discovery to refute any assertion that the proposed payments fall into the very limited exception set forth in *Jevic* that permits a distribution on a prepetition claim outside of a plan of reorganization over the objection of affected parties.

12.     The record already before the Court demonstrates that the Committee's concerns are well founded.  As noted above, the FOMB has previously argued that PREPA cannot withstand the rate surcharge that the RSA proposes, which would mean that the settlement would give all of PREPA's earning capacity to the bondholders, thus leaving nothing for other creditors.  In addition, the bondholders themselves are not typical creditors.  The combined effects of the non-recourse feature of their bonds and the lack of any collateral over which they have a perfected security interest—other than perhaps approximately $33 million held on the

---

[5]     *See also In re Fryar*, 570 B.R. 602, 608 (Bankr. E.D. Tenn. 2017) (denying approval of 9019 settlement which proposed to pay proceeds from asset sale in contravention of Bankruptcy Code's priority scheme because debtor offered no evidence "from which the court could determine how [the settlement] helps the Debtor move forward with a plan or how that plan will ultimately leave the Code's distribution scheme priorities intact"); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835 (Bankr. D. Del. 2008) (finding that plan settlement could not be approved as it "severely adversely impacts [certain] trade creditors who were not at the negotiating table and who were not adequately represented in their absence").

petition date in a specified bank account—means that the bondholders are effectively junior to unsecured creditors, or not creditors at all.  This aspect of the settlement requires the Court to exercise greater scrutiny over this motion than it would in other cases.[6]

13.     The Government Parties ignore the unusual nature of the relief sought in the 9019 Motion and argue for a much narrower view of the appropriate scope of discovery.  They rely primarily on this Court's decision in *the Official Committee of Unsecured Creditors of the Commonwealth of P.R., etc. v. Whyte, etc.* (*In re The Financial Oversight and Management board for P.R.*), No. 17-00257 (Bankr. D.P.R. Feb. 4, 2019) [Dkt. No. 5045] (the "COFINA Settlement").  The COFINA Settlement, however, occurred under entirely different circumstances.  In COFINA, the settlement divided sales tax revenues between two settling debtors.  By Court order, the debtors, through their representatives, were precluded from allocating the settlement proceeds among each debtor's creditors, and both the Official Committee of Retirees and the Committee supported the settlement.[7]  Thus, the extent to which certain creditor groups may be adversely affected by the settlement was not at issue in COFINA. Here, it is just the opposite: the RSA takes an asset of a debtor (PREPA) and allocates it to one group of its creditors (the bondholders) to the exclusion of all others.  In this context, it is

---

[6]      *See, e.g., U.S. v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) ("a bankruptcy court abuses its discretion in approving a settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors"); *In re Pub. Serv. Co. of N.H.*, 90 B.R. 575, 582 (Bankr. D.N.H. 1988) ("The degree of scrutiny" for transactions outsider a plan "necessarily must be elastic—becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option.").

[7]      *See Stipulation And Order Approving Procedure To Resolve Commonwealth-COFINA Dispute* [Dkt. No. 996 in Case No. 17-3283] at 4(j).

entirely appropriate—indeed, necessary—for the Court to consider the effect of the settlement on other creditors.[8]

## II.    RESPONDENTS' RESPONSES TO COMMITTEE'S DISCOVERY REQUESTS ARE INSUFFICIENT

14.    As noted in the objections, the Committee and the Respondents have made some progress during their meet-and-confer sessions, as well as during follow on correspondence, towards an agreed-upon set of documents to be produced.  Nevertheless, the Respondents' productions remain deficient in several material respects.

### A.    Nonproducing Parties Must Provide Documents From Relevant Custodians

15.    Although the Government Parties and the Ad Hoc Group agreed, after meeting and conferring, to slightly expand the list of custodians whose documents they are willing to search, their lists remain deficient.  The lists all generally suffer from the same defect in that they largely consist of counsel and advisors and omit key decision-makers of the real parties-in-interest.

16.    **FOMB**.  The FOMB refuses to produce documents from a single board member, accusing the Committee of having "not provided any rationale as to why the communications of any particular [board] member" are relevant.  Government Obj. ¶ 20.  But the rationale is clear: the decision by the FOMB to enter into the RSA was made not by its outside counsel or its Executive Director, but rather by each of the board members.  *See* Ex. 1 (Unanimous Written Consent of FOMB, signed by each member (but not its executive director), authorizing the Executive Director to enter into the RSA); Ex. 2 (same, but for Preliminary RSA).  On a motion that asks the Court to evaluate the FOMB's exercise of its business judgment, the documents in

---

[8]     The Court also had the benefit of a more developed factual record in deciding the COFINA Settlement, which occurred after the parties to the underlying dispute had, after months of extensive discovery, fully briefed and argued summary judgment.

the hands of these individuals are among the most relevant in the entire dispute.  They should be produced.

17.     **AAFAF/PREPA**.  AAFAF's and PREPA's list of custodians is no more defensible than the FOMB's.  None of the custodians that they have offered are actually employed by PREPA or the entity running PREPA's day-to-day operations (Filsinger).  AAFAF and PREPA claim that Messrs. Diaz, Ortiz, and Morales and individuals at Filsinger did not have "significant" involvement in *negotiating* the RSA, but, even if true, this does not mean they have no documents relevant to *evaluating* the RSA, including how the electricity system would react to the surcharges, how the RSA will impact the Proposed Transformation, and, finally, the timing and possible impediments to the Proposed Transformation.  In fact, based on documents already produced in this matter, it appears that Filsinger was involved in discussions regarding the RSA's impact on the Proposed Transformation.  *See* Ex. 3 (PRP3-00057401) (calendar invitation including four individuals from Filsinger, as well as others, regarding a "Discussion . . . on RSA, Transformation and financial model").

18.     **Ad Hoc Group.**  The Ad Hoc Group has refused to produce documents from a single custodian from any of its member firms, claiming that its offer of three custodians from its counsel and two from its financial advisor is sufficient.  *See* AHG Obj. at 9.  As with the FOMB, however, none of these persons are decision-makers.  Moreover, individual directors and analysts at the member firms specialize in investing in distressed debt, including that of PREPA and Puerto Rico issuers, and likely engage in frequent communication regarding such investments.  The Committee is entitled to review these communications to the extent relevant and has offered to discuss search terms for this purpose that would apply only to the three largest (by bond holdings) member firms.  The Ad Hoc Group has rejected this proposal.

B.      <u>Committee Should Be Allowed To Use Renewed Receiver Motion Documents
        For Discovery Purposes</u>

19.      The Government Parties' continued refusal to permit the Committee to use the

documents produced in the Renewed Receiver Motion in this dispute—for discovery purposes

only—is indefensible.  As the Government Parties concede, access is not an issue, because the

Committee already has these documents in its possession.  The Government Parties instead claim

that, because not all the documents are relevant, ***they*** should decide which documents the

Committee may use.  This perverse rationale seeks to substitute the judgment of the Government

Parties for that of the Court and is clearly not the law.  Whether a document is relevant is an

***evidentiary*** issue relating to admissibility, not a ***discovery*** issue.  The Committee should be

allowed to use any documents in its possession for discovery purposes—such as for use in

depositions—with the Government Parties reserving the right to object to the admissibility of

such documents if and when they are used at trial.

C.      <u>Non-Email Electronic Communications Should Be Produced</u>

20.      In addition to producing emails, the Respondents should be required to collect,

review and produce responsive non-email electronic communications.  The Government Parties

claim that the "Committee offers no reasonable basis to believe that the information that is

contained in text messages, instant messages and WhatsApp messages is not also captured in the

emails the Government Parties have already agreed to produce."  Government Obj. ¶ 28.  But the

idea that these types of communications would be merely duplicative of emails defies logic and

common sense.  Indeed, the very purpose for which people often use text messages and chat

rooms is to have more candid conversations than they would over email.[9]

---

[9]      To the extent the Respondents contend it would be costly and burdensome to search for and produce such
documents, any such costs and burdens must be weighed against the possible relevance of the documents and be

21.     There is in fact a history of people who are now public officials in Puerto Rico using non-email forms of communication—in particular, WhatsApp group chats—to conduct business that they hope to keep off the record.  In 2018, one of these controversial chat rooms, known as "TeamP3R-coffee break," came to light as part of a highly-publicized scandal that led to multiple resignations.[10]  News outlets reported at the time that Christian Sobrino, currently the Chief Executive Officer of AAFAF, a PREPA Board member, and an *ex officio* member of FOMB, was a participant in that group chat.  Therefore, if history is any indication, it is critical that non-email documents be searched in response to the Committee's requests.

D.     <u>Government Parties Have Unjustifiably Refused To Produce, Or Unduly Circumscribed, Their Review Of Documents In Response To Certain Requests</u>

22.     As detailed in the Motion to Compel, the Government Parties have unjustifiably refused to produce certain categories of documents that are relevant to the Court's analysis of the 9019 Motion.  To avoid unnecessary duplication, the Committee will largely stand on its prior arguments, subject to the following.

23.     **Requests 17, 18, and 19.**  These requests seek communications and documents with the Puerto Rico Energy Bureau, as well as documents and communication concerning the legislation necessary to implement the rate surcharges and other aspects of the RSA.  The Government Parties assert that the legislative risks associated with the RSA "do not bear on the value of the settlement, but rather only on how the settlement is implemented."  Government Obj. ¶ 32.  It is critical for the Committee to know whether the RSA will be fully implemented, however, because the bondholders stand to receive millions of dollars in purported adequate

---

viewed in context of the magnitude of this dispute.  *See, e.g.*, *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 7-9 (D.D.C. 2017) (finding no undue burden and granting defendants' motion to compel where, among other Rule 26 factors, the amount-in-controversy of more than $150 million far exceeded the $1.4 million spent on production and the additional requested production costing $142,000).

[10]     *See* Ex. 4 (Certified Translation of El Vocero Article).

protection payments and other consideration, even if full implementation does not occur.  The
Government Parties cannot, on the one hand, tout the RSA as beneficial to privatization, and, on
the other hand, declare irrelevant any information that would shed light on the issues of whether
and when the privatization will occur.  In this regard, it is important for the Court to take notice
of the fact that the RSA contains deadlines spanning as far into the future as March 2021.

24.    **Request 8.**  This request seeks documents and communications concerning any
alternative restructuring or litigation strategies or transactions considered by the Government
Parties.  The Government Parties assert that they should not produce evidence of alternatives
because they are irrelevant, noting that even a disclosure statement "need not include information
about any other possible or proposed plan. . . ."  Government Obj. ¶ 36 (internal quotation marks
omitted).  This argument, however, ignores the Committee's legitimate need to test the
Government Parties' decision to seek approval of a settlement that appears to give all of the
economic value to a single class of creditors who, at best, have only a very limited security
interest.  This argument also ignores the Government Parties' repeated assertion that the
settlement will facilitate the Proposed Transformation, which entitles the Committee to explore,
among other things, whether other settlements were or could have been considered that would
have facilitated the Proposed Transformation while also leaving value for other creditors.

25.    **Requests 4, 9, 25, and 26.**  These requests seek the Government Parties' analysis
of the impact of the RSA on other PREPA creditors, and the ability of Puerto Rico's electric
system to absorb and pass on the Settlement Charge and Transition Charge.  While the FOMB
and other Government Parties have agreed to produce the analyses and forecasts responsive to

these requests, the FOMB has wholly refused to produce any responsive communications.[11]  This

refusal is unjustified.  Indeed, it is possible that the communications discussing these analyses

would contain highly relevant commentary and therefore tell the most comprehensive story.

26.    **Requests 10, 11, and 12.**  These requests seek documents concerning the

Proposed Transformation, including its current status and the extent to which it may be affected

by the RSA.  AAFAF and PREPA assert that the Committee should obtain these documents from

the P3 Authority, which "is handling" the Proposed Transformation.  The Committee has no

desire to obtain duplicative productions from multiple sources and, ordinarily, would be happy to

first review documents produced by the Puerto Rico Public-Private Partnerships Authority ("P3

Authority") before deciding whether additional documents are required.  But there is no time to

proceed in this manner here given the expedited litigation schedule.  Moreover, the P3 Authority

has informed the Committee that, unlike PREPA and AAFAF, it had no involvement in

negotiating or developing the RSA.  It therefore is likely that most documents concerning the

effect of the RSA on the Proposed Transformation would be in PREPA's or AAFAF's

possession, not the P3 Authority's.

## III.    ASSURED SHOULD BE REQUIRED TO PRODUCE LOSS RESERVES AND INTERNAL VALUATION INFORMATION

27.    Assured goes to great lengths to avoid producing documents concerning its loss-

reserve calculations, arguing that such documents are non-responsive to the Committee's

requests, not relevant to this dispute, and covered by multiple privileges.  The Court should reject

each of these arguments and compel Assured to produce the requested documents.

---

[11]    AAFAF appears to have agreed to produce responsive communications regarding these analyses and
forecasts.  *See* Government Obj. ¶ 41.  If that is the case, the Committee has no further demands vis-a-vis AAFAF
on these requests.

A.    <u>Assured's Loss Reserves Are Responsive And Relevant</u>

28.    Assured is incorrect that its loss reserve calculations are beyond the scope of the

Committee's document requests.  In fact, the calculations are directly responsive to a number of

the requests, including Request No. 4, which asks for all "documents and communications

concerning [Assured's] analysis or calculation of the various payments that [Assured] will

receive under the terms of the Settlement."  This request would necessarily call for production of

documents that compare amounts Assured stands to receive under the settlement to amounts

Assured believes it may receive absent a settlement, as reflected by its loss reserves.  Loss

reserves would also be captured by Request No. 11, which calls for all "documents and

communications consisting of any spreadsheets or models concerning projected revenues from

the sale of electricity or other revenue sources in Puerto Rico."  Because Assured has argued that

it is secured by PREPA's revenues, its loss reserves would necessarily involve some projection

of such revenues.  In short, the loss reserve calculations are responsive to multiple requests.

29.    Assured next attempts use this Court's decision in the Renewed Receiver Motion

to shield the loss reserves from disclosure in this matter.  As Assured acknowledges, however,

the 9019 Motion requires the Court to, among other things, assess whether the settlement falls

within the range of likely litigation outcomes.  Assured Obj. ¶ 5.  Assured's "litigation

assessments" in its loss reserves may not be ***dispositive*** of that question, but they are certainly

***probative***.  If, for example, Assured's loss reserves indicate a litigation valuation of its PREPA

claims of 40 cents on the dollar (or 5 cents on the dollar), and Assured is found to be settling

now for 80 cents on the dollar, this contrast would undeniably be relevant to the Court's

assessment of whether the settlement is reasonable.

30.    The cases cited by Assured in which bankruptcy courts have refused to compel

production of a creditor's internal valuations are inapposite.  In each of those cases, the crux of

the creditor's objection was that the requested information was proprietary and internal to the creditor.  *In re the Dolan Co.*, No. 14-10614, Dkt. No. 284 at 6 (Bankr. D. Del. May 2, 2014) (Creditor counsel explained objection: "our internal analysis of value we believe to be, not only irrelevant, but proprietary information that we shouldn't be forced to share with our competitors."); *In re Genco Shipping & Trading Ltd.*, No. 14-11108, Dkt. No. 267 at 60 (Bankr. S.D.N.Y. June 3, 2014) (Court characterizing question as "[t]he question is whether their internal communications and views on values shared with nobody outside their group would be relevant.")  Here, by contrast, Assured has already shared its loss reserve calculations with regulators—parties potentially adverse to it—and the calculations also are among the bases for Assured's public financial statements.

       B.     <u>Assured's Loss Reserves Are Not Protected By Any Privilege</u>

31.     Assured argues that, even if its loss reserve calculations are responsive and relevant, they are protected from disclosure by the work product doctrine.  But the cases Assured cites acknowledge that "work product protection does not attach to documents that were prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation,"  *W. Holding Co., v. Chartis Ins. Co. of P.R.*, 300 F.R.D. 48, 50 (D.P.R. 2014), and that "materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes are not under the qualified immunity provided by this subdivision."  *Mullins v. Dep't of Labor of P.R.*, 269 F.R.D. 172, 174 (D.P.R. 2010).  Other cases that Assured does ***not*** cite, including the leading First Circuit case governing work product standards, *U.S. v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 26-30 (1st Cir. 2009), hold that the work product privilege does not apply to materials that are "independently required by statutory and audit requirements," even if those documents are "prepared by lawyers and reflect[] legal thinking."  Here, although Assured's loss reserve

calculations may reflect litigation valuation analysis, Assured created them because it is required by law to do so, not because of its participation in litigation.[12]  The calculations are therefore not protected work product.

32.     In any event, even if Assured's loss reserve calculations were protected at inception as work product, any such protection has been waived because the information was submitted by Assured to its regulator in New York, which has chosen not to assert any bank examiner privilege over them.  *U.S. v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) (work product protection forfeited, as "disclosure to the audit agency was a disclosure to a potential adversary"); *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co*., No. 04-4309, 2006 WL 278131, at *2 (S.D.N.Y. Feb. 2, 2006) (disclosure of otherwise protected work product to New York Insurance Department, the predecessor of the NYDFS, would waive privilege).[13]

33.     Contrary to Assured's claims, nothing in section 87(2) of New York's Public Officers Law "directly protect[s] these submissions from further disclosure by the NYDFS and disclosure through public records requests."  Assured Obj. ¶ 46.  Rather, the statute states, as a general matter, "each agency shall, in accordance with its published rules, make available for public inspection and copying all records" before setting forth certain circumstances in which the "agency may deny access to records or portions thereof."  N.Y. Pub. Off. L. § 87(2).  Notably, the Insurance Regulations of NYDFS similarly provide that "all records produced shall be available for public inspection and copying" unless an exception applies.  11 NYCRR § 241.3(a).

---

[12]     *Declaration Of Benjamin Rosenblum*, dated Feb. 14, 2019 [Dkt. No. 1084-7] ¶¶ 8, 18-19.

[13]     The NYDFS "supervises" insurance companies, and "registers, approves, permits, authorizes and de-authorizes" them to conduct business in New York.  (https://www.dfs.ny.gov/who_we_supervise, last visited June 9, 2019).  In light of its stated mission, the relationship between Assured and the NYDFS is undoubtedly adversarial at times.

There can be no dispute that the public policy of New York favors public disclosure of such
records unless an exception is established.  Assured's claimed reliance on the trade secrets
exception is misplaced, as it conflates the notion of privilege with a trade secret.  They are not
the same.[14]

34.   Finally, Assured baldly claims that the assertion of a bank examiner privilege by
the **_Maryland Insurance Administration_** somehow gives rise to a privilege barring disclosure of
materials provided to the **_NYDFS_**.  Assured offers no legal support for this sweeping proposition,
and for good reason.  It cannot be the case that one regulator's assertion of privilege restricts the
use of documents provided to an entirely different regulator.[15]  It is worth noting that the
Committee is not seeking discovery of communications and documents authored by any
regulators—all that the Committee is seeking are Assured's loss reserve documents and
communications provided to NYDFS.[16]

35.   Perhaps recognizing the vulnerability of its positions, Assured resorts to
hyperbole, complaining that "if a party's internal analysis became discoverable simply by

---

[14]   In any event, none of the conditional protections afforded by New York law are analogous to the
particularized and specific non-waiver agreements that were at issue in cases finding that privilege can in some
circumstances survive a regulatory disclosure, such as _Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc._, No.
06-5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010) or _Alaska Elec. Pension Fund v. Bank of Am. Corp._, No. 14-
7126, 2016 WL 6779901, at *5 (S.D.N.Y. Nov. 16, 2016) (disclosure to CFTC pursuant to confidentiality and non-
waiver agreement).  _Compare_ with N.Y. Ins. Law 1504(c), which permits the Insurance Superintendent to publicly
disclose materials submitted by Assured if the Superintendent "determine[s] that the interests of policyholders,
shareholders or the public will be served by the publication thereof."  N.Y. Ins. Law § 1504(c).

[15]   If NYDFS were to decide, pursuant to N.Y. Ins. Law 1504(c), to make public materials provided to it by
Assured, it is inconceivable that Maryland would have the ability to interfere with such disclosure through the
assertion of a bank examiner privilege.

[16]   Further, the "bank examiner" privilege, contrary to Assured's contentions, is both narrow and qualified:  it
does not protect "[p]urely factual material," and it must bend to good cause.  _In re Bankers Tr. Co._, 61 F.3d 465, 471
(6th Cir. 1995); _see also In re Subpoena Served Upon Comptroller of the Currency & Sec'y of Bd. of Governors of
Fed. Res. Sys._, 967 F.2d 630, 634-35 (D.C. Cir. 1992).  Even if the Court were inclined to consider Maryland's
assertion of privilege as being at all relevant to the present analysis, the Court would have to consider additional
factors (including relevance, the unavailability of other evidence, and the seriousness of the litigation, _see In re
Bankers Tr. Co._, 61 F.3d at 472), each of which militate against the privilege.

entering into a proposed settlement with a debtor, no party would ever settle."  Assured Obj. ¶ 5.

But this is not what the Committee is arguing.  Rather, the Committee's position is much

narrower: when an interested party generates litigation valuations relevant to a court's

assessment of the reasonableness of a settlement, and that party shares such litigation valuations

with a regulator, which declines to assert a bank examiner privilege, the valuations are subject to

discovery.  This conclusion does not threaten anything like the broadly disruptive effects that

Assured complains about.  None of the cases cited by Assured argue to the contrary.[17]

## IV.   RESPONDENTS' PRIVILEGE CLAIMS ARE OVERBROAD

### A.   Government Parties And Ad Hoc Group Did Not Have A Common Interest Upon Execution Of Preliminary RSA

36.   Under First Circuit precedent, common interest is narrowly defined as an

"*identical (or nearly identical) legal interest* as opposed to a merely similar interest."  *F.D.I.C.

v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000) (emphasis added).  As demonstrated by the

communications that the Committee attached to its Motion to Compel, the Government Parties

and the Ad Hoc Group did not have close to an identical (or even nearly identical) legal interest

at the time of the Preliminary RSA.  The Government Parties' claims that a common interest

privilege attaches even when "parties whose interest are not totally in accord" nevertheless

"share the same common legal interest of obtaining approval of their settlement . . ."[18] are

---

[17]     *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, No. MDL 13-2419, 2015 WL
13715296, at *2 (D. Mass. Nov. 6, 2015) simply sets forth the general standards for discovery under Fed. R. Civ. P.
26(b)(1), and has nothing to do with discovery of loss reserves.  *Fed. Realty Inv. Trust v. Pac. Ins. Co.*, 760 F.Supp.
533, 540 (D. Md. 1991) addresses admissibility, not discoverability, and focuses on the risk of prejudice to an
insurer from use at trial of its loss reserves in a claim against it by its insured.  The loss reserves at issue in that case,
of course, had been produced in discovery, as they should be here.

[18]     *Cf.* Government Obj. ¶ 45 (*citing In re Tribune Co.*, No. 08-13141, 2011 WL 386827, at *4 (Bankr. D. Del.
2011)).  Even under *In re Tribune*, no common interest would attach until the proponents reached "agree[ment] upon
material terms of a settlement" (*id.* at *5), but as set forth herein, numerous material terms remained open well after
the execution of the Preliminary RSA.

contrary to First Circuit law and, in any event, irrelevant, because the Government Parties and the Ad Hoc Group did not satisfy even this more lenient standard.

37.     In support of their arguments to the contrary, the Government Parties and Ad Hoc Group provide charts that compare what they consider the material terms of the Preliminary RSA and the RSA.  *See* Government Obj. at Appx. A; AHG Obj. ¶ 8.  But these charts themselves give up the game.  The last four entries in the Government Parties' Appendix show that the terms of the RSA regarding "Demand Protections," "Remedies," "Securitization Protections," and— most importantly—"Implementation" were still "to be agreed upon" at the time of the Preliminary RSA.  Indeed, this chart shows that it was only in the Definitive RSA that key Implementation terms, "including target milestones, Administrative Claims, Settlement Payments, Delayed Implementation Date, Increased Settlement Payments, Adequate Protection Payments, termination rights, Stipulated Treatment, and litigation stay, forbearance and tolling provisions," were agreed upon by the parties.  Government Obj. at Appx. A.[19]

38.     In any event, even if there was substantial similarity between the terms of the Preliminary RSA and the Definitive RSA—and there was not—the fact that the Preliminary RSA was not binding on any party[20] means that the parties had not, as the Government Parties and the Ad Hoc Group claim, reached final agreement on its terms in July 2018.  The Government

---

[19]     For example, the RSA includes (but the Preliminary RSA lacks) the "Demand Protection" term sheet, which governs the process by which PREPA will ensure that it collects revenues on customers that choose to generate their own electricity (and therefore not pay for electricity from PREPA).  This ability to collect the surcharge on "behind-the-meter" electricity generation is a critical term for the bondholders, because the surcharges that are being imposed by the RSA are likely to render the costs of electricity sufficiently high that many PREPA customers will seek ways to avoid paying PREPA for their electricity.  Likewise, the RSA includes (but the Preliminary RSA lacks) a "Securitization" term sheet, which sets out the significant terms under which the new bonds will be issued to the settling bondholders.  It is hard to see how the Demand Protection and Securitization term sheets do not constitute material terms of the RSA, and yet they did not even exist at the time of the execution of the Preliminary RSA.

[20]     *See* Motion ¶ 24.

Parties may have had an interest, for a number of strategic reasons, in executing and publishing a restructuring support agreement in July 2018, but what is clear from the documents is that the Preliminary RSA was only a free option for the parties to that agreement.  In other words, the parties to the Preliminary RSA were free not to pursue negotiations for any reason, even after the parties had already ostensibly agreed to negotiate.  Therefore, the common interest argument is significantly weakened if non-existent.  Indeed, as the correspondence cited in the Motion shows, *see id*. ¶¶ 25-27, there were key points thereafter when it appeared possible that negotiations might break down altogether.  It simply makes no sense for parties to both have a common interest and at the same time be so far apart or to have the ability to abandon the "agreement" for any reason.

> B.     FOMB's Intentional Disclosure Of RSA Communications To Committee
>        Operates As Waiver As To All RSA Communications

39.     The Government Parties' argument that the FOMB's selective disclosure of communications regarding the RSA negotiation do not operate as a waiver as to all RSA communications is unavailing.

40.     As explained in the Motion, under Federal Rule of Evidence 502(a), the attorney client privilege will be waived when (1) waiver is intentional, (2) the disclosed and undisclosed communications or information concern the same subject matter, and (3) the communications ought "in fairness" to be considered together.  *See id*. ¶ 31.  The Government Parties do not appear to dispute the first two prongs of Rule 502(a), and instead argue that the communications should not in fairness be considered together.  In particular, the Government Parties argue that FOMB's disclosure was "extrajudicial" and thus akin to disclosures that occur in the context of a "business negotiation," which do not necessarily operate as a waiver as to all privileged communications on a given subject.  *See* Government Obj. ¶ 53 (citing *XYZ Corp. v. U.S. (In re*

*Keeper of Records)*, 348 F.3d 16, 24 (1st Cir. 2003)).  The Government Parties also argue that "[b]ecause the disclosure was not for the purpose of distorting the truth telling process, . . . fairness does not require the disclosure of the other, similar communications."  *Id*. ¶ 54.

41.    But, as the Government Parties explain, "[t]he context of the disclosure of privileged material matter[s.]"  *Id*. ¶ 53.  The disclosure of the communications by the FOMB to the Committee was not extrajudicial, as the question of whether the RSA should be approved was destined to be "judicially" determined as part of a motion under Rule 9019.  Likewise, although the FOMB has asserted that its selective disclosures were not made "in an effort to obtain a tactical advantage at trial through selective disclosure," *id*., neither the Committee nor the Court has any way of knowing whether this assertion is true without seeing the other communications that the FOMB chose not to disclose.  Finally, the fairness of disclosure of these documents has already been proven, in that they have served the "truth-seeking process" by showing that, contrary to their representations, the Government Parties and the Ad Hoc Group had not agreed upon all material terms to the RSA in July 2018.

C.    <u>Government Parties Are Not Entitled To Deliberative Process Privilege With Respect To Their Execution of RSA</u>

42.    As discussed in the Motion to Compel, the law is clear that, where the government's intent is at issue, the deliberative process privilege does not apply to its internal deliberations.  *See* Motion to Compel ¶¶ 18-19.  Here, the central issue on the 9019 Motion is the reasonableness of the Government Parties' decision to enter into the RSA, which necessarily involves an assessment of their intentions and motivations.  Therefore, any communications disclosing such intentions and motivations should not be privileged.

43.    The Government Parties respond to this argument in two principal ways.  <u>First</u>, they argue that the Committee's concerns regarding the Government Parties' assertions are

premature and unfounded because the Government Parties have not indicated that they intend to apply the privilege to a significant portion of their documents.  The Committee had a much different impression from the parties' meet-and-confer discussions.  Regardless, to the extent the Government Parties truly intend to apply the privilege only to a narrow subset of responsive documents, the Committee is happy to hear it.

44.     Second, the Government Parties argue that the exception to the deliberative process privilege is inapplicable here because the 9019 Motion does not involve an assessment of the Government Parties' "subjective motivations."  But this argument is undermined by the fact that the 9019 Motion itself, which the Government Parties filed jointly, states that the Government Parties' decision to enter into the settlement "should be given substantial deference."  See 9019 Motion ¶ 62.  The 9019 Motion is also full of assertions concerning the Government Parties' subjective beliefs as to why the settlement should be approved.  For example, the Government Parties claim, among other things, that the RSA will "lay the foundation for a plan that will have the support of key stakeholders" and that "approval of the RSA will facilitate the PREPA transformation process."  Id. ¶¶ 52, 64.

45.     The Committee is entitled to take discovery of these and other facts underlying the Government Parties' intentions and motivations, and the deliberative process privilege cannot protect such facts from disclosure.  See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 254 F.R.D. 35, 41-42 (D. Mass. 2008) (holding that the deliberative process did not prohibit the production of documents where "[g]overnment knowledge could conceivably be relevant to two elements" of the claim at issue).

[Remainder of page intentionally left blank.]

## **CONCLUSION**

For all of the foregoing reasons, the Motion to Compel should be granted in full.

Dated:  June 10, 2019

*/s/ Luc A. Despins*
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel:  (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel:  (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors*[21]

- and –

*/s/ John Arrastia*
John H. Genovese, Esq. (*Pro Hac Vice*)
John Arrastia, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
GENOVESE JOBLOVE & BATTISTA, P.A
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jgenovese@gjb-law.com
jarrastia@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors with Respect to Claims against Citi*

---

[21]     Paul Hastings LLP does not represent the Committee with respect to any statements in this Reply regarding Citigroup Global Markets, Inc.

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Alberto J. E. Añeses Negrón, Esq. (USDC - PR 302710)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
aaneses@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors*