UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>   Debtor | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| IN RE:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br><br>   Debtor. | PROMESA Title III<br><br>No. 17 BK 4780-LTS |

**MOTION FOR PERMISSIVE INTERVENTION AND
OPPOSITION TO URGENT MOTION IN LIMINE TO EXCLUDE TESTIMONY
BYCOMITÉ DIÁLOGO AMBIENTAL, INC., EL PUENTE DE WILLIAMSBURG, INC.,
ENLACE DE ACCIÓN CLIMÁTICA, COMITÉ YABUCOEÑO PRO-CALIDAD DE
VIDA, INC., ALIANZA COMUNITARIA, AMBIENTALISTA DEL SURESTE, INC.,
SIERRA CLUB PUERTO RICO, INC., MAYAGÜEZANOS POR LA SALUD Y EL
AMBIENTE, INC., COALICIÓN DE ORGANIZACIONES ANTI INCINERACIÓN,
INC., and AMIGOS DEL RÍO GUAYNABO, INC.,**

1

**TABLE OF CONTENTS**

| HEADING | Page |
|---|---|
| PRELIMINARY STATEMENT | 5 |
| THE EFFECTS OF PROPONENTS' RESTRUCTURING SUPPORT AGREEMENT (RSA) ON THE DEBT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA): A CLEAR EXAMPLE OF PRIVATE INTERESTS SUBVERTING PUBLIC WELFARE | 7 |
| THE ENVIRONMENTAL INTERVENORS FULLFILL THE CRITERIA FOR PERMISSIVE INTERVENTION | 12 |
| THE ENVIRONMENTAL INTERVENORS HAVE STANDING TO APPEAR | 15 |
| THE TESTIMONY PROFFERED BY THE ENVIRONMENTAL INTERVENORS IS CERTAINLY RELEVANT UNDER RULE 401, ADMISSIBLE UNDER RULE 402, AND IT IS MORE PROBATIVE THAN PREJUDICIAL UNDER RULE 403. | 16 |
| PRAYER | 19 |
| CERTIFICATION | 19 |

**TABLE OF AUTHORITIES**

| CASE | Page |
|---|---|
| Assn of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 673 (D.C. Cir. 2013) | 16 |
| Byrd v. EPA, 174 F.3d 239, 244 (D.C. Cir. 1999) | 16 |
| Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S 167, 180-81 (2000) | 15 |
| Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977) | 15 |
| In re PM Cross_ LLC_ 2013 Bankr. LEXIS 4841 | 13 |
| In re Public Serv.Co., 88 BR 546, 17 Bankr. Ct. Dec (LRP) 1330 (Bankr. D.N.H. 1988) | 13,14 |
| Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999) | 16 |
| Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)) | 15 |
| Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 457–58 (D.C.Cir.1998); | 16 |
| Sierra Club v. EPA, 699 F.3d 530, 533 (D.C.Cir.2012))). | 16 |

**TABLE OF ADITIONAL AUTHORITIES**

| AUTHORITY | Page |
|---|---|
| Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority, URS Corporation, June 2013 | 8 |
| Restructuring Support Agreement (RSA) | passim |

**RULES**

| RULE | Page |
|---|---|
| Rule 24(b)(B) of the Federal Rules of Civil Procedure | 12 |
| Rule 401 of the Federal Rules of Evidence | 17 |
| Rule 402 of the Federal Rules of Evidence | 17 |
| Rule 403 of the Federal Rules of Evidence | 17 |
| Rule 2018(a) of the Federal Rules of Bankruptcy Procedure | 12,13.15 |

**Statutes**

| STATUTE | Page |
|---|---|
| 11 U.S.C. § 1109(b) | 13 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtor<br><br>IN RE:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br><br>    Debtor. | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered)<br><br><br><br><br><br><br><br><br>PROMESA Title III<br><br>No. 17 BK 4780-LTS |

**MOTION FOR PERMISSIVE INTERVENTION AND
OPPOSITION TO URGENT MOTION IN LIMINE TO EXCLUDE TESTIMONY**

**COME NOW** the, COMITÉ DIÁLOGO AMBIENTAL, INC., EL PUENTE DE WILLIAMSBURG, INC., ENLACE DE ACCIÓN CLIMÁTICA, COMITÉ YABUCOEÑO PRO-CALIDAD DE VIDA, INC., ALIANZA COMUNITARIA, AMBIENTALISTA DEL SURESTE, INC., SIERRA CLUB PUERTO RICO, INC., MAYAGÜEZANOS POR LA SALUD Y EL AMBIENTE, INC., COALICIÓN DE ORGANIZACIONES ANTI INCINERACIÓN, INC., and AMIGOS DEL RÍO GUAYNABO, INC., (hereinafter, the "Environmental

4

Intervenors") through their undersigned representative, and they hereby respectfully oppose the "URGENT MOTION IN LIMINE TO EXCLUDE TESTIMONY" submitted by the Financial Oversight and Management Board for Puerto Rico ("FOMB"), in its capacity as representative of the Puerto Rico Electric Power Authority ("PREPA"), among others (hereinafter, collectively designated the "Proponents"). The "Environmental Intervenors" also request that they be granted the status of permissive intervenors.

**PRELIMINARY STATEMENT**

1. Puerto Rico's energy infrastructure is so notoriously expensive and unreliable that it constitutes a known impediment to any present and future economic recovery. The current infrastructure and distribution network are outdated and fragile, and singularly prone to destruction by atmospheric events (such as the disastrous Hurricane María), the frequency and severity of which will only worsen with climate change. The current reliance on fossil fuels is harmful to the environment and public health and contributes to climate change. The consensus is that Puerto Rico must cease its reliance on the susceptible traditional environmentally unsafe energy sources, practices, and distribution grids. Puerto Rico's economic recovery *requires* that Puerto Rico turn to renewable, cheaper, environmentally safer energy sources, and that it develops microgrids that are less reliant on island-wide distribution and thus less susceptible to widespread power outages which even now are commonplace. Indeed, Puerto Rico's government has adopted as a fundamental public policy the migration from traditional fossil fuels and centralized distribution to a system of clean energy and less centralized microgrids. (Law 17 April 11. 2019; Law of Energy Public Policy of Puerto Rico)

2. Rather than propitiating this necessary transformation, Proponents instead propose to burden and slow it down by, among other things, assessing a penalty on citizens who have invested or would invest in solar energy. The proposed fee structure contemplated by Proponents would

not be for a service rendered, but rather a penalty on those who choose to eschew harmful environmental practices. This "sun tax" would inevitably discourage citizens from investing in this much needed conversion, and hinder Puerto Rico's economic recovery. Indeed, the proposals presented by Proponents specifically and expressly contemplate exemption from Puerto Rico's just adopted fundamental environmental policies. (See Recovery Plan Term Sheet Exhibit C to 9019 Motion)

3. The Court must consider creditors' realistic expectations without destroying Puerto Rico's future economic recovery. After all, a main purpose of any bankruptcy process is to permit the debtor to get back on its feet in the most expedient way and in the shortest time feasible. Given the particular context of the current proceedings, this is not a case between private parties, but instead involves the present and future of an island of three million American citizens. Surely, this merit special care in understanding and weighing the impact of Proponents' Restructuring Support Agreement (RSA) on a whole population.

4.The Environmental Intervenors have proffered expert testimony that would allow the Court to best evaluate the short- and long-term negative impact of Proponent's sun tax and other aspects of its current **RSA** with Puerto Rico's creditors. The members of the Environmental Intervenors are all direct consumers of electricity and have a direct stake in the outcome of the present proceedings, as they will pay for Proponents' unconscionable **RSA** either in the form of a tax or penalty and in the slowdown on the adoption of environmentally safe and healthier practices. The Environmental Intervenors are thus much more than representatives of other consumers. No other entity is in an equivalent or better position to fully describe and accurately voice intervenors' concerns and those of the countless citizens who will be hugely adversely burdened for years to come by the proposed sun tax on alternative energies. The Environmental Intervenors have legitimate concerns that are wholly different from those expressed by original parties to this case.

Any outcome which does not take the Environmental Intervenors' undeniable interests and reasoned arguments into account will certainly have a pecuniary and other negative impact on the Environmental Intervenors, and on Puerto Rico. The Environmental Intervenors' interests are not already adequately represented by the original parties to these proceedings. No other entity will precisely describe how this will affect Puerto Rico's economic recovery and the environment, nor provide critical elements for the Court's decision-making.

5. Proponents attempt to prevent the Court from fairly considering arguments that will surely affect and shape this Court's momentous decision. Specifically, Proponents invoke Article III standing and evidentiary rules, to urge the Court to exclude in its entirety the testimony proffered by the Environmental Intervenors, incorrectly claiming that this proffered testimony is allegedly wholly irrelevant to the standard the Court must apply in deciding the pending Rule 9019 Motion. The environmental Intervenors wholly disagree for the following reasons.

### THE EFFECTS OF PROPONENTS' RESTRUCTURING SUPPORT AGREEMENT (RSA) ON THE DEBT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA): A CLEAR EXAMPLE OF PRIVATE INTERESTS SUBVERTING PUBLIC WELFARE

6. On May 3, 2019 Iván Garau González on behalf of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA) filed a Restructuring Support Agreement (RSA) for the Debt of the Puerto Rico Electric Power Authority (PREPA). The RSA exists between the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Financial Oversight and Management Board for Puerto Rico ("FOMB"), the members of the Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group Members), any other persons who beneficially own or control Uninsured Bonds ("Uninsured

Supporting Holders") and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured").[1]

**7. The primary effect of the "Transition charge" currently defined in the RSA is to change the warranty of PREPA's outstanding bonds debt from a debt guaranteed by electric energy sales to new debt guaranteed by electric energy consumption.**

8. PREPA is the issuer of power revenue bonds and power revenue refunding bonds ("Bonds") issued and outstanding pursuant to a Trust Agreement, dated as of January 1, 1974, as amended and supplemented ("Trust Agreement"), between PREPA and U.S. Bank National Association ("Trustee"). As of June 30, 2013, the outstanding debt under the 1974 Trust Agreement was $8,048,485,000.[2]

9. A revenue bond is a special type of municipal bond <u>distinguished by its guarantee of repayment solely from revenues generated by a specified revenue-generating entity associated with the purpose of the bonds</u>, rather than from a tax. Revenue bonds are issued to construct or expand upon revenue-generating entities, such as: water and wastewater (sewer) utilities, toll roads and bridges, transportation hubs (such as airports and seaports), power plants and electric utilities, and others.

10. Unlike general obligation bonds, <u>only the revenues specified in the legal contract between the bond holder and bond issuer are required to be used for repayment of the principal and interest of the bonds</u>; other revenues, such as tax revenues, and the general credit of the issuing agency are not so encumbered.

---

[1] The Assured and the Uninsured Supporting Holders are collectively referred to as ("**Supporting Holders**"). The RSA collectively refers to FOMB, AAFAF, PREPA, and the Supporting Holders as the "**Parties**" and each individually as a "**Party**."

[2] Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority, URS Corporation, June 2013.

11. **All revenue bonds issued by PREPA had the same guarantee: electric energy sales. The new bonds encumber the private generation of electric energy by an end-user of electricity using renewable energy systems purchased by the end-user.**

12. The so called "Transition charge" referenced in the RSA will be used to pay the outstanding power revenue and revenue refunding bonds issued by PREPA. This "transition charge" is not applied only to electric energy sales by PREPA, the current guarantee of the power revenue bonds, but it is also applied to electric energy generated by renewable energy systems owned by individuals electrically connected to Puerto Rico's electric power system. PREPA customers currently (FY 2019) pay a transition charge of 1 ₡/kWh and will continue to do so during FY 2020. The "Recovery Plan Term Sheet" of the RSA states a "Transition charge" as shown in Table 1.

Table 1. " Transition charge" as per the "Recovery Plan Term Sheet" of the RSA

| FY | ₡/kWh |
|---|---|
| 2021 | 2.768 |
| 2022 | 2.768 |
| 2023 | 2.768 |
| 2024 | 2.957 |
| 2025 | 2.957 |
| 2026 | 2.957 |
| 2027 | 2.957 |
| 2028 | 2.957 |
| 2029 | 3.242 |
| 2030 | 3.323 |
| 2031 | 3.406 |
| 2032 | 3.492 |
| 2033 | 3.579 |
| 2034 | 3.668 |
| 2035 | 3.76 |
| 2036 | 3.854 |
| 2037 | 3.95 |
| 2038 | 4.049 |
| 2039 | 4.15 |
| 2040 | 4.254 |

| | |
|---|---|
| 2041 | 4.361 |
| 2042 | 4.47 |
| 2043 | 4.552 |
| 2044 | 4.552 |
| 2045 | 4.552 |
| 2046 | 4.552 |
| 2047 | 4.552 |
| 2048 | 4.552 |
| 2049 | 4.552 |
| 2050 | 4.552 |
| 2051 | 4.552 |
| 2052 | 4.552 |
| 2053 | 4.552 |
| 2054 | 4.552 |
| 2055 | 4.552 |
| 2056 | 4.552 |
| 2057 | 4.552 |
| 2058 | 4.552 |
| 2059 | 4.552 |
| 2060 | 4.552 |
| 2061 | 4.552 |
| 2062 | 4.552 |
| 2063 | 4.552 |
| 2064 | 4.552 |
| 2065 | 4.552 |
| 2066 | 4.552 |
| 2067 | 4.552 |

Figure 1 illustrates the proposed transition charge.



Figure 1. The proposed " Transition charge" .

13. According to the Schedule I-A of the RSA titled the "Demand Protection Term Sheet" the "transition charge" will be collected from all current and future Customers <u>which have benefitted, are benefitting, or will benefit from the use of the System and which have benefitted from PREPA's generation assets</u>, as set forth in this Term Sheet. Thus, the RSA replaces the original bond guarantee, electric energy sales, for a new guarantee "the benefits from the use of the System". These "benefits" are conveniently not defined in the otherwise exhaustive "Demand Protection Term Sheet".

14. Although these "benefits" are not defined the proposed measure of "the benefits from the use of the System" is electric energy consumption and not just consumption from the electric grid (otherwise known as "electric energy sales") but " "**Consumption**" means, for any given time period, the amount of electricity consumed by a Customer, <u>regardless of the source of such electricity, including thermal, solar, wind, geothermal or other renewable or recyclable sources, whether owned by</u> PREPA or any successor, lessor or concessionaire, an independent power producer, municipality, cooperative or <u>a Customer</u>." (RSA p. I-A-2; emphasis added)

11

15. Two classes of customers are singled out in the RSA: Customers with behind the meter generation ("BTMG Customers") that was approved, in place, and operational prior to the Implementation Date (each, a "Grandfathered BTMG Customer") and All BTMG Customers other than Grandfathered BTMG Customers, including former BTMG Customers that cease to be Grandfathered BTMG Customers (each, a "Non-Grandfathered BTMG Customer").

16. These two types of "customers" are people who decided to invest their own money in a renewable energy generation system, in Puerto Rico the vast majority of these are solar photovoltaic systems, under a net metering agreement with PREPA. Now instead of being charged a fair amount for "grid services" the existing and new net metering customers will pay debt charges on the electricity they generate simply because the RSA has changed the guarantee of PREPA's outstanding bonds from electric energy sales to electric energy consumption.

17. Footnote number 18, on page I-A-1, of Schedule I-A "Demand Protection term Sheet") of the RSA states that :

> "A Customer shall not include any permanently disconnected service location or premise that does not benefit from any agreement that requires the System to provide the Customer with electricity under any condition, including without limitation, an obligation to provide power on a standby, maintenance, emergency, or similar basis. For the purposes of this definition, "permanently disconnected" means any service location or premises, including one connected to a microgrid, municipal utility or electric cooperative, not capable of receiving any electricity from, delivering electricity to, or being synchronized with, the System, including, but not limited to, for standby, maintenance, emergency, or similar purposes, or providing electricity to the System."

Based on the preceding information, we conclude that the proposed RSA is a clear example of private interests subverting public welfare.

## THE ENVIRONMENTAL INTERVENORS FULLFILL THE CRITERIA FOR PERMISSIVE INTERVENTION

18. Rule 24(b)(B) of the Federal Rules of Civil Procedure states that "[o]n timely motion, the court may permit anyone to intervene who … (B) has a claim or defense that shares with the

12

main action a common question of law or fact." Although there is little direct guidance for interpreting the scope of permissive intervention under PROMESA, Rule 2018(a) of the Federal Rules of Bankruptcy Procedure states that "In a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit **any interested entity** to intervene **generally** or with respect to **any specified matter**." Emphasis ours. The Note to Subdivision (a) of this Rule "permits intervention of an entity not otherwise entitled to do so under the Code or this rule", but "[s]uch a party seeking to intervene must show cause therefor." The bankruptcy code in 11 U.S.C. § 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." The terms of "party in interest" and "permissive intervention" are "expansive" and "designed to give the Court great latitude to ensure fair representation of all constituencies impacted in any significant way by the court proceedings." In Re: PM Pross 2013 Bankr. LEXIS 4841 (D.N.H. 2013) (unreported case). A potential intervener must have "a sufficient stake in the outcome of the proceeding so as to require representation. Id. When determining whether to grant permissive intervention in a case under Bankruptcy Rule 2018(a), a court should weigh whether the outcome will have a pecuniary or other negative impact on the proposed intervenor, whether intervenors' arguments were different from those expressed by original parties and/or whether intervenor's interests are already adequately represented, and whether intervention would result in undue delay or prejudice to original parties. In re Public Serv.Co., 88 BR 546, 17 Bankr. Ct. Dec (LRP) 1330 (Bankr. D.N.H. 1988).

19. The Environmental Intervenors fulfill the criteria for permissive intervention. The Environmental Intervenors are all direct consumers of electricity and have a direct stake in the outcome of the present proceedings, as they will pay for a tax or penalty on renewable energy and

13

endure a slowdown in the adoption of environmentally safe and healthier practices. The Environmental Intervenors are in the best position to fully describe and accurately voice their concerns and those of the residents of Puerto Rico who will be negatively affected for years to come by the proposed charges on the use of alternative energy sources. The Environmental Intervenors have legitimate concerns which are wholly different from those expressed by the parties to the proposed RSA. Any outcome which does not take into account the interests of the Environmental Intervenors will negatively impact them, and the people of Puerto Rico. The Environmental Intervenors' interests were not adequately represented in the "hard fought" negotiations that the Proponents allege have taken place. Meanwhile, the Environmental Intervenors' proposed witnesses are in the best position to describe how the proposed RSA will affect Puerto Rico's economic recovery and the environment, which are critical elements for the Court's decision-making.

20. Intervention does not result in undue delay or prejudice to original parties. The present case has been raging for only two years now, and will continue for years to come. Especially, if the First Circuit's ruling that procedure for naming the members of the THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO was constitutionally flawed is upheld. Deposing the experts, we have identified would not unduly delay procedures, but would rather provide the Court with essential information for deciding whether the agreements that Proponents have arrived at are reasonable.

21. Proponents state that "only a 'party in interest' may appear and be heard in a bankruptcy proceeding." This is false. For example, in <u>In re Public Serv. Co.</u>, 1988 Bankr. LEXIS 1049 (D. N.H. 1988), a sister First Circuit District Court judge denied 'party in interest' status to a consumer group, while granting it limited permissive intervention status. The court reasoned that the group

had a special expertise concerning specific discreet issues within the bankruptcy, which merited a limited hearing of this special expertise.

### THE ENVIRONMENTAL INTERVENORS HAVE STANDING TO APPEAR

21. Proponents argue, incorrectly, that the Environmental Intervenors have no standing to appear in this case. However, Rule 2018(a) of the Federal Rules of Bankruptcy Procedure does not specify that a party must have full standing to intervene. It merely states that the court may permit **any interested entity** to intervene **generally** or with respect to **any specified matter**. In fact, the Note to Subdivision (a) of this Rule permits intervention of an entity not otherwise entitled to do so under the Code or this rule." We certainly meet this requirement.

22. Nonetheless, if evidence of standing were required by this Court, we also meet those criteria. To satisfy Article III's standing requirements, "a party must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)). In addition, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 181 (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).

23. The members of the Environmental Intervenors' organizations would have standing to sue in their own right. The individual members, who are residents of Puerto Rico, suffer concrete injuries as a result of Proponents' **RSA**. They have to pay the sun tax or forego their desire for a

transition to environmentally responsible systems. These injuries are actual or imminent and not conjectural, as illustrated in the previous section. These injuries are "fairly traceable" to the provisions of the **RSA** negotiated by Proponents. The members' injuries would be redressed by a favorable decision rejecting the **RSA**. See generally Byrd v. EPA, 174 F.3d 239, 244 (D.C. Cir. 1999) (plaintiff satisfied redressability prong where a finding that the agency had acted illegally "might" cause EPA to "reevaluate and change" its practices); Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999) ("[T]he possibility that the EPA would change its rules if the ones it had promulgated were vacated satisfied the redressability requirement because it gave the petitioner the opportunity of a favorable outcome in the new rulemaking." (citing Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 457–58 (D.C.Cir.1998))); Ass'n of Battery Recyclers, Inc. v. EPA, 716 F.3d 667, 673 (D.C. Cir. 2013) ("[W]ere we to require EPA 'to regulate the HAPs to which [their] members are exposed more stringently than the agency has already purported to do,' as petitioners ask, this alleged injury would likely be redressed." (quoting Sierra Club v. EPA, 699 F.3d 530, 533 (D.C.Cir.2012))).

24. The Environmental Intervenors have organizational standing because the issues at stake here—an **RSA** which burdens and hinders the transition to cleaner environmental practices—are central to the groups' institutional missions.

25. Finally, Petitioners are bringing record-based claims, and thus the participation of individual members in this case is not necessary.

For all of these reasons, Petitioners have standing to pursue this action.

**THE TESTIMONY PROFFERED BY THE ENVIRONMENTAL INTERVENORS IS CERTAINLY RELEVANT UNDER RULE 401, ADMISSIBLE UNDER RULE 402, AND IT IS MORE PROBATIVE THAN PREJUDICIAL UNDER RULE 403.**

26. Proponents incorrectly allege that the testimony proffered by the Environmental Intervenors is irrelevant under Rule 401, inadmissible under Rule 402, and is more prejudicial than probative under Rule 403. We disagree.

27. Rule 401 of the Federal Rules of Evidence states that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Rule 402 states that "[r]elevant evidence is admissible" unless the United States Constitution, a federal statute, or a federal rule otherwise provides. Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

28. The first issue raised by the Proponents' so-called *in limine* motion[3] relates to what the Environmental Intervenors' proffered evidence will prove. A threshold issue here is precisely what is it that the Proponents are asking the Court to do, and why the Environmental Intervenors' experts' testimony is relevant and needed. The Proponents have reached an **RSA** with creditors of the electrical utility which includes, *inter alia*, that owners of solar panel systems will pay an amount of money for buying and installing solar panel systems, which amount will increase in proportion to the amount each such owner generates. Proponents are asking the Court to approve the RSA which provides essentially for guaranteed payments to certain creditors backed by transition charges (which are really hidden subsidies, taxes or penalties), without presenting any evidence of the clear injurious consequences of this arrangement. We ask the Court to see through

---

[3] Though Proponents dub their motion an "*in limine*" motion which is intended to prevent evidence from being introduced at trial, in reality it is a motion to dismiss the Environmental Intervenors' allegations during the discovery phase and to prevent their unfavorable evidence from being heard.

17

Proponents' attempt to push forward an RSA without having to address the real-life consequences it will have. A citizen consumer pays his/her hard-earned money to purchase solar panels and supporting equipment (batteries, converters, etc.), and pays installation costs. Under the proposed arrangement, the citizen is penalized for having done so, the more energy he/she generates, the more she/he pays. The end result is to discourage citizen consumers from leaving the power company's grid, and to deter migration to cleaner environmentally friendly systems. The expert evidence proffered by the Environmental Intervenors' expert will expose and demonstrate that the energy regime sought by the power company will burden and harm Puerto Rico's environment and citizens, and that at least this aspect of the RSA must be rejected.

29 The second issue raised by Proponents' motion is precisely what is the nature and substance of our proffered expert testimony, and what weight and credibility it merits. They say that the evidence is more prejudicial than probative, without any significant analysis or proof, aside from suggesting that it might prolong the scheduled Rule 9019 Motion hearing. But, how can the Court accurately assess the complete relevance and weight of the evidence, without listening to expert testimony and submitting it to the crucible of cross-examination by Proponents' lawyers, supported by their witnesses' contrary testimony? The more prudent approach is to listen to the evidence and *then* assess its probative worth.

30. Proponents suggest that the proffered evidence is premature at this stage of the proceedings, and should be dismissed at this time. They suggest that the proffered evidence would prolong the scheduled Rule 9019 Motion hearing, in which "the sole question for the Court to decide … is whether the settlement meets or exceeds the lowest point in the range of reasonableness in terms of benefits to the debtor."

31. However, we note that the Rule 9019 Motion hearing is itself premature. The RSA for which Proponents seek the Court's approval specifies that for the RSA to be valid, 60% of the

insured bonds must subscribe to the RSA two days before the July 24, 2019 hearing and 67% of the bondholders must subscribe to the RSA on or before September 1, 2019. Thus, Proponents are seeking the Court's backdoor approval for an RSA which may not ever be validated. Surely, Proponents argument that permitting testimony of the Environmental Intervenors' experts will prejudice them by delaying the process cannot be taken seriously.

32. The best moment to assess the proffered evidence is now, before more time is wasted on a clearly flawed RSA which may never be executed. This would allow the Proponents and creditors to negotiate a more suitable RSA sooner rather than later. It is better to spend hours now to evaluate the Environmental Intervenors' expert witnesses' testimony, than to later find that the Proponents' insistence on rushing an unreasonable RSA has wasted months' worth of this Court's time.

## PRAYER

For the preceding reasons, the Environmental Intervenors respectfully request that this Honorable Court reject Proponents' *in limine* motion, and grant the Environmental parties' request for status as permissive intervenors.

**I HEREBY CERTIFY** that, on this same date, I filed this document electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record and CM/ECF participants in this case.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 11th day of June, 2019.

S/WILLIAM SANTIAGO-SASTRE
USDC PR NO. 201106
P.O. BOX 1801
SABANA SECA, P.R. 00952-1801
(786) 622-3939
wssbankruptcy@gmail.co

19