```
 1                    UNITED STATES BANKRUPTCY COURT

 2                      DISTRICT OF PUERTO RICO

 3
      In Re:                       )      Docket No. 3:17-BK-3283(LTS)
 4                                 )
                                   )      Title III
 5    The Financial Oversight and )
      Management Board for         )
 6    Puerto Rico,                 )      (Jointly Administered)
                                   )
 7    as representative of         )
                                   )
 8    The Commonwealth of          )
      Puerto Rico, et al.,         )      June 12, 2019
 9                                 )
      and                          )
10                                 )
                                   )
11    Puerto Rico Electric         )
      Power Authority,             )
12                                 )
                    Debtors.       )
13
      _____
14
      In Re:                       )      Docket No. 3:17-BK-3566(LTS)
15                                 )
                                   )      PROMESA Title III
16    The Financial Oversight and )
      Management Board for         )
17    Puerto Rico,                 )      (Jointly Administered)
                                   )
18    as representative of         )
                                   )
19    Employees Retirement System )
      of the Government of the     )
20    Commonwealth of              )
      Puerto Rico,                 )
21                                 )
                    Debtor.        )
22
      _____
23

24

25
```

```
  1   _____

  2   In Re:                        )      Docket No. 3:17-BK-3567(LTS)
                                    )
  3                                 )      PROMESA Title III
      The Financial Oversight and  )
  4   Management Board for          )
      Puerto Rico,                  )      (Jointly Administered)
  5                                 )
      as representative of          )
  6                                 )
      Puerto Rico Highways and      )
  7   Transportation Authority,     )
                                    )
  8                Debtor.          )

  9   _____

 10   In Re:                        )      Docket No. 3:17-BK-4780(LTS)
                                    )
 11                                 )      PROMESA Title III
      The Financial Oversight and  )
 12   Management Board for          )
      Puerto Rico,                  )      (Jointly Administered)
 13                                 )
      as representative of          )
 14                                 )
      Puerto Rico Electric          )
 15   Power Authority,              )
                                    )
 16                Debtor.          )

 17   _____

 18                        OMNIBUS HEARING

 19     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

 20               UNITED STATES DISTRICT COURT JUDGE

 21      AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 22               UNITED STATES DISTRICT COURT JUDGE

 23   _____

 24

 25
```

```
 1    APPEARANCES:

 2    For The Commonwealth
      of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
 3                             Mr. Paul Possinger, PHV
                               Ms. Laura Stafford, PHV
 4                             Mr. Gregg M. Mashberg, Esq.

 5    For the U.S. Trustee
      Region 21:               Ms. Monsita Lecaroz Arribas, AUST
 6
      For Official Committee
 7    of Unsecured Creditors:  Mr. Luc A. Despins, PHV

 8
      For Puerto Rico Fiscal
 9    Agency and Financial
      Advisory Authority:      Mr. Peter Friedman, PHV
10

11    For Financial Guaranty
      Insurance Company:       Mr. Martin Sosland, PHV
12                             Mr. Jason Callen, PHV

13    For Ad Hoc Group of
      General Obligation
14    Bondholders:             Mr. Mark T. Stancil, PHV

15
      For Ambac Assurance
16    Corporation:             Ms. Atara Miller, PHV

17    For Association of
      the Puerto Rico
18    Judiciary:               Mr. David Indiano Vicic, Esq.

19    For Ad Hoc Group of
      Constitutional
20    Debtholders:             Mr. Andrew Kissner, PHV

21    For Syncora Guarantee:   Mr. Carlos Rodriguez Vidal, Esq.

22    For Windmar Renewable
      Energy, Inc., et al.:    Mr. Fernando Agrait Betancourt, Esq.
23
      For National Public
24    Finance Guarantee:       Mr. Robert Berezin, PHV

25
```

```
 1    APPEARANCES, Continued:

 2
      For AmeriNational
 3    Community Services,
      LLC:                     Mr. Nayuan Zouairabani, Esq.
 4
      For U.S. Bank
 5    National Association:    Mr. Clark Whitmore, PHV

 6    For Assured Guaranty
      Corporation and Assured
 7    Guaranty Municipal
      Corporation:            Mr. William Natbony, PHV
 8
      For Union de
 9    Trabajadores de la
      Industria Electrica y
10    Riego, Inc.:            Mr. Rolando Emmanuelli Jiminez, Esq.

11    For Sistema de Retiro
      de los Empleados de la
12    Autoridad de Energia
      Electrica:              Ms. Jessica Mendez Colberg, Esq.
13
      For the Official
14    Committee of Retired
      Employees of the
15    Commonwealth of
      Puerto Rico:            Mr. Robert Gordon, PHV
16
      For Cortland Capital
17    Market Services, LLC:   Mr. Emil Kleinhaus, PHV

18    For the Fee Examiner:   Mr. Brady Williamson, Fee Examiner
                              Ms. Katherine Stadler, PHV
19

20    Additional speakers:    Mr. Jay Herriman
                              Mr. Carlos Cintron Garcia
21

22

23

24
      Proceedings recorded by stenography.  Transcript produced by
25    CAT.
```

```
1                              I N D E X

2   WITNESSES:                                          PAGE

3        None offered.

4

5   EXHIBITS:

6        None offered.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              San Juan, Puerto Rico
 2                              June 12, 2019
 3                              At or about 9:29 AM
 4                     *     *     *
 5          COURTROOM DEPUTY:  The United States District Court
 6   is now in session.  The Honorable Laura Taylor Swain
 7   presiding, also sitting, Magistrate Judge Dein.  God save the
 8   United States of America and this Honorable Court.
 9          THE COURT:  Again, good morning.  Welcome counsel,
10   parties in interest, and members of the public and press here
11   in San Juan, those observing here and in New York and to the
12   telephonic participants.  As always, it is good to be back
13   here.
14          I would like to note that we are also joined this
15   morning here in San Juan by the District Court Executive and
16   Clerk of Court of the Southern District of New York, Ed
17   Friedland and Ruby Krajick, and also Lisa Ng, who is regularly
18   my courtroom deputy in New York.  And we're pleased to be
19   together here.  And of course, our own Clerk of Court of the
20   District of Puerto Rico is here as well, Frances Rios de
21   Moran.
22          I will remind you, and this is my usual speech about
23   devices, but I make it every time because it's a serious
24   speech.  So consistent with court and judicial conference
25   policies and the Orders that have been issued, there is to be
```

1   no use of any electronic devices in the courtroom to

2   communicate with any person, source, or outside repository of

3   information, nor to record any part of the proceeding.  Thus,

4   all electronic devices must be turned off unless you are using

5   a particular device to take notes or to refer to notes or

6   documents already loaded on the device.

7          All audible signals, including vibration features,

8   must be turned off.  And no recording or retransmission of the

9   hearing is permitted by any person, including but not limited

10  to the parties or the press.  Anyone who is observed or

11  otherwise found to have been texting, e-mailing or otherwise

12  communicating with a device from the courtroom, whether here

13  or in New York, during the court proceeding, will be subject

14  to sanctions, including but not limited to confiscation of the

15  device and denial of future requests to bring devices into the

16  courtroom.

17         Our overall timetable today is until noon, and then

18  from 1:00 until 5:00.  Now, before we begin our proceedings

19  with the usual status report, I want to observe that my status

20  over the last few days and up through last night and early

21  this morning has included fielding voluminous, substantive

22  last minute filings on issues that could and should have been

23  foreseen and cued up in a more orderly and efficient fashion.

24         My time, Judge Dein's time and that of court staff

25  has been called upon in ways that are, frankly, highly

1    inefficient.  And I am certain that litigation costs to the

2    estate have been multiplied by the staffing required to churn

3    out pages on short notice.  This must not be the norm.  In the

4    future, I will expect that matters for an Omni will be briefed

5    in accordance with the Case Management Order, and that any

6    later filings will be limited to requests to adjourn matters

7    to permit orderly briefing and consideration of additional

8    issues, or notices that matters have been resolved

9    consensually.  And I will not look kindly on urgent motion

10   practice that could have been avoided by forethought.

11          One final note in this connection is that status

12   reports and informative filings are not appropriate vehicles

13   for initiating contested matters or requests for court action.

14   And with that, let's begin the status report of the Oversight

15   Board.

16          Mr. Bienenstock.

17          MR. BIENENSTOCK:  Good morning, Judge Swain.

18          THE COURT:  Good morning.

19          MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

20   Rose for the Oversight Board.

21          Your Honor identified five topics for the status

22   report and I will take them in order.  In terms of the general

23   status and activities of the Oversight Board, PROMESA Section

24   202 requires that certified budgets be in place by June 30 of

25   each year for the fiscal year beginning July 1.

1          Therefore, working backwards from June 30, the

2    Oversight Board must proceed, as required by PROMESA sections

3    201 and 202, to have certified fiscal plans and budgets in

4    place by June 30.  Therefore, that has been a major activity

5    the last several months and will continue that way through

6    June 30.

7          Simultaneously, the Oversight Board has engaged in

8    negotiations with numerous constituencies that will vote on

9    any Commonwealth plan.  These negotiations are all very

10   sensitive, constructive and in different stages.

11         The ones I can report on are as follows:  We are

12   pleased to inform the Court this morning that the Oversight

13   Board and the Retiree Committee have formulated a mutual

14   agreement and solution to the treatment of accrued pension

15   benefits in this case.  The Oversight Board recently entered

16   into a Plan Support Agreement with the Retiree Committee

17   regarding this agreement, which includes the Retiree

18   Committee's support for a Commonwealth Plan of Adjustment that

19   contains the substance of the agreement we reached.  The

20   Retiree Committee announced the agreement by press release

21   earlier this morning.

22         THE COURT:  I saw the report.

23         MR. BIENENSTOCK:  In summary, the total claims

24   provide that -- the total claims and bonus payments

25   prepetition will be reduced by up to 8.5 percent under a Plan

1   of Adjustment for the Commonwealth.  I say up to 8.5 percent

2   because we've agreed to a floor of 1,200 dollars per month,

3   below which no retiree's benefit will be reduced.  Those whose

4   total monthly benefit is already under 1,200 a month will not

5   incur any reduction at all.

6         There will also be a restoration of cut benefits in

7   the years the Commonwealth has a surplus and outperforms the

8   fiscal plan.  The agreement also calls for reserve to be

9   funded from budget surpluses in the first eight years

10  following plan confirmation, and segregated for payment of

11  pensions as needed in future deficit years.

12        The Oversight Board believes this solution achieves

13  needed savings for the Commonwealth while providing greater

14  security for retirees going forward and is an instrumental

15  component of a Plan of Adjustment for the Commonwealth.

16        I can also announce that the Oversight Board has

17  executed a plan support agreement with the Union, AFSCME, for

18  a new collective bargaining agreement and treatment of claims

19  arising from the existing CBA, which will be rejected; and

20  also engineered a deal and principles with the AFT, American

21  Federation of Teachers, for a similar plan support agreement

22  that remains subject to a member vote taking place today.

23  Both unions have announced these agreements by press release

24  in the last week or two.

25        The two union deals have special significance.  It is

 1   critical that negotiations with unions result in win-win

 2   situations.  The workers are the backbone of the Commonwealth

 3   and must be fairly compensated, while the other components of

 4   collective bargaining agreements need to be adjusted to create

 5   efficiencies and be sustainable in the 21st century.

 6           Both unions, officers and advisors have been the

 7   brightest, most dedicated and most enlightened people you can

 8   find.  They fiercely advocated their members' rights while

 9   recognizing that new collective bargaining agreements need to

10   be affordable and structured for long term.  They acted like

11   statesmen and stateswomen, not politicians, and the Board

12   appreciates what they did for their members and for the

13   Commonwealth.

14           Your Honor, there are two other very significant

15   negotiations in progress.  There are several other very

16   significant negotiations in progress, and except for one I

17   will identify, I can only say we hope there will be further

18   announcements such as the ones I've made in coming weeks.

19           The one additional negotiation I can identify was

20   made public by Syncora in the Joint Status Report dated June

21   7, 2019, docket number 1294, concerning the PREPA RSA.  At

22   page 23 of the status report, Syncora writes it has recently

23   made progress to enable it to become a part to the RSA subject

24   to certain issues.  We hope and think those issues will be

25   resolved in the next few days.

1          Finally, the Oversight Board has continued its

2     investigations into the Commonwealth's cash and cash systems,

3     and has continued urging the powers that be in Washington,

4     D.C., to provide cash and create investment incentives to and

5     for the benefit of the Commonwealth.

6          Judge Swain, in respect of the anticipated filing

7     dates of the Proposed Commonwealth Disclosure Statement and

8     Plan, I can report the Oversight Board hopes to file them

9     within the next 30 days.  The number of moving parts are

10    preventing me from making promises, but 30 days is the current

11    intent.

12         In respect of the timing and use of mediation in

13    facilitating confirmation of the plan, I can report we have

14    one mediation scheduled in the near term.  And the Board will

15    be open to mediation with all groups who ultimately have not

16    agreed in advance to the proposed plan that gets filed.

17         The Court asks for a response to the GO bondholders

18    assurance certification that clawback actions and the Bond

19    Invalidation Act are contingent, and a clarification of the

20    Oversight Board and Creditors' Committee's positions with

21    respect to ripeness of such litigation.

22         Before I provide the response, I want to note that

23    the Oversight Board hopes its proposed plan of adjustment will

24    propose settlements of the invalidation actions that may

25    eliminate the need for them or reduce their scope

1    significantly.  In terms of the actions requesting return of

2    principal and interest payments made on invalid debt, those

3    actions had to be filed when they were filed to avoid statute

4    of limitations issues.  But as the Creditors' Committee said

5    at the time, they should be stayed until we know which debt,

6    if any, is invalidated.

7         The invalidation objections are not contingent, but

8    the GO bondholders' motion raises an issue of -- a logistical

9    issue that may bear on how the Court determines to handle

10   these actions.  Every holder of debt sought to be invalidated

11   may raise as a defense certain prior issued debt was invalid,

12   therefore -- thereby creating more debt capacity to make

13   subsequent debt valid.

14        They can raise that defense concerning any defendant

15   regardless of whether the Oversight Board or Creditors'

16   Committee has sought to invalidate the debt raise as a

17   defense.  To avoid inconsistent rulings, the invalidation

18   rules should probably be consolidated for trial, and notice

19   should be given to all parties when appropriate about all the

20   debt that may be attacked.

21        By suggesting this, I want to acknowledge that the

22   invalidation of previous debt may make no difference as to

23   whether other subsequent debt is invalidated, and the

24   Oversight Board takes no position on that contention at

25   present.

1          Insofar as the update regarding the Oversight Board's

2    plans with respect to the anticipated July 15, 2019, issuance

3    of the First Circuit mandate -- well, prior to July 15, the

4    Board will be requesting the First Circuit and/or the United

5    States Supreme Court to issue a further stay.  The United

6    States Department of Justice may also request a stay.

7          President Trump announced he will propose the

8    existing board members to the Senate, and we believe that

9    should happen any day now and would buttress any of the

10   requests for a stay.

11         Your Honor, subject to the Court's questions, that is

12   the status report.

13         THE COURT:  Thank you, Mr. Bienenstock.

14         MR. BIENENSTOCK:  Thank you.

15         THE COURT:  I see Mr. Friedman is standing.

16   Mr. Stancil.  So let's see.  Mr. Stancil, you're closest to

17   the aisle.  Thank you.

18         MR. STANCIL:  Good morning, Your Honor.

19         THE COURT:  Good morning.

20         MR. STANCIL:  Mark Stancil for the Ad Hoc GO Group.

21         I'd like to request the Court's permission to file a

22   short response to the update on the contingency of the claims.

23   Mr. Bienenstock said that the claims against these other bonds

24   are not contingent.  He didn't offer any explanation as to how

25   that could be.

1          Count I of these clawback actions, which are directed

2    to more than just the bond -- the 2012s, 2011s and 2014s that

3    have been formally subject to a claim objection, Count I, for

4    example, on the PBA clawback action, Count I says those bonds

5    are null and void.  So either they're null and void or they're

6    not, but just saying it's not a contingent claim objection --

7    I think we'd like the opportunity to say, explain why it is

8    just as contingent, if not more so, than the position they

9    took when we filed a few months ago.

10         And also, Mr. Bienenstock suggested that all of the

11   bonds should be given notice and put in consolidation for

12   trial.  I would like to say that is precisely what we proposed

13   in April, and they opposed at the time.

14         I'd like to lay this out for Your Honor, if I could,

15   in maybe five pages.  If I could.  Would that be acceptable?

16         THE COURT:  Well, what I'd ask you to do, since

17   Mr. Bienenstock responded orally, as I requested him to do

18   given the timing and that we were going to have this Omni, I

19   think a meet and confer and a decision either on a joint

20   statement of the mutual positions or responsive, short

21   statements, please, would be a more orderly way to get the

22   information to me.

23         And so if you can get that all done by, say, the end

24   of next week, that would be acceptable to the Court.

25         MR. STANCIL:  Thank you, Your Honor.  That would be

1   excellent.

2           THE COURT:  Thank you.

3           Yes, sir.

4           MR. GORDON:  Good morning, Your Honor.  For the

5   record, Robert Gordon of Jenner & Block for the Official

6   Retiree Committee.

7           THE COURT:  Good morning, Mr. Gordon.

8           MR. GORDON:  Good morning, Your Honor.  Thank you.

9           On behalf of the Retiree Committee, I wish to confirm

10  the comments of Mr. Bienenstock and confirm that the Retiree

11  Committee and Oversight Board have entered into a plan support

12  agreement regarding the proposed treatment of the claims of

13  Puerto Rico's retirees who participated in the Government

14  Employee Retirement System, the Teachers Retirement System and

15  the Judiciary Retirement System under a prospective Puerto

16  Rico Plan of Adjustment to be filed and submitted to the Court

17  for consideration.

18          We believe this Plan Support Agreement is

19  significant, extremely significant in this case, and provides

20  a cornerstone for a plan of adjustment for Puerto Rico, which

21  will enable Puerto Rico to emerge from this Title III process

22  and focus on the brightness of its economic future, rather

23  than the darkness of its current financial predicament.

24          I realize this is not a Rule 9019 settlement hearing

25  or confirmation hearing, but if I may, knowing this is going

1    to raise more questions than it answers, I'd like to explain a

2    little to the public, as well as the Court, why and how we

3    arrived at this significant agreement.

4         To be clear, the Retiree Committee does not believe

5    there is any mandate under the applicable law or the facts of

6    this case for any cutting or modification of pension benefits.

7    However, the Retiree Committee recognizes that others, in good

8    faith, can harbor a different view.  And in this regard, the

9    Retiree Committee further recognizes that the Oversight Board

10   has clearly and consistently expressed the viewpoint that

11   pension cuts are necessary to achieve a confirmed plan of

12   adjustment for Puerto Rico.

13        Against this backdrop, the Retiree Committee has

14   taken the view that its fiduciary duties required it to, in

15   the first instance, engage in negotiations with the Oversight

16   Board and explore a consensual resolution rather than simply

17   decline negotiations, insist on no cuts, and assume the risks

18   of litigating such matters.  So the Retiree Committee indeed

19   engaged in extensive and intensive negotiations with the

20   Oversight Board over many, many, many months.

21        I emphasize that because that hard work by the

22   Retiree Committee's members and professionals and the

23   Oversight Board's members and professionals is work that

24   doesn't get reported in the papers, in the media.  It's not

25   visible to the public.  But let there be no doubt about the

1    extremely hard work that was done by both parties to reach

2    this agreement over a long period of time.

3         And the result of the parties' efforts, Your Honor,

4    is that Plan Support Agreement that we believe is highly

5    favorable in its proposed treatment of retirees.  A few

6    highlights, if I may.  Mr. Bienenstock has referenced some of

7    them already.

8         It is important to recognize that the Oversight

9    Board's proposed treatment of pensions under its various

10   iterations of its certified fiscal plan originally

11   contemplated cuts for retirees holding monthly pension

12   benefits of just 1,000 dollars, or just 600 dollars if they

13   also received Social Security.  Under the Plan Support

14   Agreement with the Retiree Committee, Social Security benefits

15   will not be subject to a cut at all, and the threshold for

16   cuts has been raised to 1,200 dollars a month, as

17   Mr. Bienenstock has indicated.

18        This vastly -- this provides vastly greater

19   protection for the most vulnerable retirees in our community.

20   It increases the percentage of retirees who will receive no

21   cut under a plan of adjustment from roughly 25 percent to

22   fully 61 percent of all retirees, and in absolute numbers, it

23   increases the number of protected retirees from 45,000 to

24   approximately 102,000 retirees.

25        The original proposal in the fiscal plan also

contemplated team progressive pension cuts with some

pensioners receiving cuts of approximately 25 percent.  Under

the Plan Support Agreement, the maximum cut to any pensioner

is capped at a maximum of 8.5 percent, reducing the top level

cut by roughly two-thirds.

The Plan Support Agreement also reflects a concern

regarding the security and assurance of future payments to

retirees under the Pay-Go system.  I want to emphasize that

this was a mutual concern of the Retiree Committee and the

Oversight Board.  The Retiree Committee suggested a mechanism

for creating a pension reserve and has taken the lead in

designing that pension reserve mechanism, and the Oversight

Board was receptive from the beginning.

Those -- the terms of that pension reserve are

included in the term sheet attached to the Plan Support

Agreement. Details of it are still being negotiated, to some

extent, and will come out in the future.  The agreement also

protects the monthly medical insurance benefits for all who

receive that.

As Mr. Bienenstock referenced, there's also a benefit

restoration mechanism.  So if the economy of Puerto Rico

substantially outperforms projections, there is the

opportunity for restoration of pension cuts in any given year

in which that overperformance occurs.  Also, to give

pensioners time to prepare for any possible cuts, there will

1  be no modification of pensions until at least July 1 of 2020.

2  THE COURT:  You said 2020?

3  MR. GORDON:  2020, Your Honor.  Yes.

4  THE COURT:  Thank you.

5  MR. GORDON:  Your Honor, there's also under

6  negotiation, but -- the concept has been referenced and is

7  still under negotiation, but is referenced in the Plan Support

8  Agreement of the creation of an independent board pursuant to

9  the Plan of Adjustment itself, consisting of retirees elected

10  by retirees to supervise the implementation of pension

11  reserve, the benefit restoration calculation, and payments

12  under the Pay-Go system and general compliance with the Plan

13  terms as they pertain to retirees.

14  We recognize that some have argued that fully

15  protecting pensions from any cuts is a desirable goal and we

16  agree.  And to that end, the Plan Support Agreement that we

17  are discussing today more than doubles the number of retirees

18  receiving no cuts.

19  And what we have said to parties that might criticize

20  the fact that there are cuts that are contemplated is that if

21  those parties can persuade the Oversight Board, the only

22  entity that can file a plan in this case, to propose a plan

23  with better treatment, we would welcome that.  But we do not

24  see a path to such a result, and only a path that involves a

25  very substantial risk of backfiring and resulting in

1    devastatingly worse treatment of pensions.

2            We do not take lightly any cuts to pensions.  We are

3    not pleased that cuts are contemplated; but we believe that we

4    have acted prudently and consistently with our fiduciary

5    duties to minimize the impact of this case on retirees and

6    have achieved a highly favorable result in light of the

7    circumstances.

8            Thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Gordon.

10           And I will call on Mr. Friedman, but I also just want

11    to thank and congratulate all concerned on the progress that

12    has been made so far.  All of these proposals and agreements

13    will obviously be subject to litigation and will need to be

14    brought before the Court, and some of them may well be

15    opposed.  And the Court will make determinations on them.  But

16    having proposals to focus on in aid of moving toward a plan of

17    adjustment is a very significant step indeed, and that step

18    appears to be taken on various fronts.  And so again, I thank

19    you for these presentations.

20           Mr. Friedman.

21           MR. FRIEDMAN:  Good morning, Your Honor.  Peter

22    Friedman on behalf of AAFAF and Governor Rossello.

23           To end the suspense, we will be opposing.  And that's

24    probably the last funny thing that can be said about pensions.

25    Look, Your Honor, I think, as you know, over the last two

1   years, the government has shown a lot of leadership both in

2   Title III, Title VI, working with the Oversight Board, trying

3   to reach creditors consensus.  We take the last line -- I

4   think it was the last lines of your CTO opinion seriously

5   about the need for constructiveness, and I think we've

6   demonstrated that over and over again.

7        But with respect to the two announcements today, we

8   can't support them and feel like we have to oppose them for a

9   variety of reasons.  Obviously the pension cut issue strikes

10   at the government's responsibility to protect very vulnerable

11   citizens, and with respect, I think something I hadn't really

12   focused on before, an aspect of the pension agreement creating

13   some independent board, as well as the agreement with the

14   unions to effectively negotiate a new CBA, are things that we

15   believe are even greater intrusions on the protected powers of

16   the government than the CTO motion.

17        We believe those, simply put, exceed the Oversight

18   Board's powers under Title I, II or III, to engage in those

19   kinds of transactions which severely trounce on the rights of

20   the government to engage in a collective bargaining agreement

21   as the actual employer, to set educational policy as the

22   actual employer of the Commonwealth's teachers, to oversee

23   funds to be apparently put in potentially some kind of trust.

24   Those are core governmental responsibilities and not things

25   that can be taken away from the government in our view.  And

1   as things go forward, we will affirmatively make our case on

2   those points.

3          With respect to retiree pension cuts, Your Honor, I

4   think what we note is -- the whole history of retirement

5   issues is that pensioners have seen cost of living adjustments

6   and freezes for years.  And we're not living in a zero

7   inflation environment.  So people have seen, retirees have

8   seen their standard of living erode, and we believe this does

9   so to an even greater extent.  And we will, you know, in

10  certain cases deprive people of up to 300 dollars a year.  For

11  people living on a fixed income, we think that's meaningful

12  and is going to force choices on people that can be avoided.

13  And can be avoided, I think, given -- particularly if you look

14  at the seven fiscal plans that have been certified over the

15  years.

16         They show that the government, through the leadership

17  of this Governor, and the economic growth that we've seen

18  here, has enough money not to make these cuts.  We think these

19  cuts -- the Commonwealth has been successful in implementing

20  substantial cost saving measures.  It's generating sufficient

21  cash flows to pay its Pay-Go obligations.  The Commonwealth

22  has assumed those liabilities, and we think it has a moral

23  obligation and capacity to keep paying them.  And we're

24  particularly troubled by the idea that pension cuts could be

25  made available to bolster off-island creditor recoveries when

1    it's not necessary.

2            The projected surpluses under the most recent fiscal

3    plan has increased to 22 billion dollars.  We think that's

4    enough certainly to cover the pension cuts, which I -- the net

5    present value of those cuts is tiny and can easily be covered

6    through choices the Board can make.  And we believe, frankly,

7    there is no legal ability to make those cuts in light of Act

8    106, which created post-petition obligations by the Oversight

9    Board to make those payments.

10            Your Honor, with respect to -- you know, I think,

11    again, I think the critical issue here is you -- if Mr. Gordon

12    and Mr. Bienenstock said something like 61 percent of

13    pensioners won't have to address cuts, but that leaves, we

14    believe, approximately 55,000 retirees who do.  And we think,

15    from a legal and moral and economic perspective, we have the

16    obligation to protect those rights as substantially as

17    possible.  And we will do that as this process unfolds.

18            Again, we are mindful and we will remain mindful of

19    the admonition to be constructive.  I think you will hear

20    shortly Ms. McKeen and Proskauer and the Board's PREPA teams

21    work hand in hand.  We're continuing to move forward on that,

22    but this is fundamental.

23            Your Honor, that raises critical issues, and I can't

24    be anything less than candid with you from the front that the

25    Board and -- Your Honor, we are at different positions with

1   respect to these cuts and CBA.  Thank you.

2          THE COURT:  Thank you.  And I do appreciate your

3   candor.

4          Mr. Sosland.

5          MR. SOSLAND:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. SOSLAND:  Martin Sosland of Butler Snow on behalf

8   of Financial Guaranty Insurance Company.

9          Not to announce the pension settlement -- we'll

10  review and respond if appropriate in due course, but to just

11  respond to a couple things that Mr. Bienenstock said, and one

12  comment by the Court relating to the fact that matters may

13  need to be brought before the Court and litigated, there are

14  critical issues in these cases, as critical as the

15  Commonwealth-COFINA settlement that the Court previously

16  approved in the case, relating to whether certain funds,

17  revenue streams are property of which covered entity under

18  PROMESA.

19         Those issues have been teed up in litigation brought

20  by the Oversight Board and the UCC that is being -- for which

21  stays are being sought to that litigation, and that will be

22  addressed before Judge Dein this afternoon.

23         THE COURT:  Yes.  That is on the agenda.

24         MR. SOSLAND:  But the point is whenever -- those

25  issues will have to be either litigated or settled before any

1    plan of adjustment can be confirmed by Your Honor.  And that

2    will affect timing.

3           And we heard in the retiree settlement -- the only

4    comment I'll make about it, issues about what might happen in

5    2020, and we've seen reports from -- that Ms. Jaresko has

6    stated, that she expects that a plan of adjustment for the

7    Commonwealth will be effective as of January 1, 2020.  Only if

8    those issues are resolved by either settlement, as would be

9    the norm, and in a complex restructuring, or by litigation,

10   are those dates possibly at all relevant.

11          And although we've heard comments about negotiations

12   with constituencies in the cases, and we note the retirement

13   deal and announcements related to PREPA, et cetera, with

14   respect to the entities that have an interest in the revenue

15   streams at interest, there have been either no negotiations

16   since the commencement of these cases or no negotiations under

17   the auspices of the mediator or otherwise in well over a year.

18          And unless those discussions go forward, or we're

19   litigating full blast before Your Honor, and to whatever

20   extent it's delegated before Judge Dein, then I don't see that

21   anything is going to be going effective in 2020, or perhaps

22   for several years later.  And we need to engage in those

23   discussions.  Thank you.

24          THE COURT:  Thank you.

25          And Mr. Bienenstock, I am taking you at your word

1   that there is desire and willingness to actually engage with

2   parties expected to oppose the plan that you intend to

3   propose.

4            MR. BIENENSTOCK:   Absolutely, Your Honor.   I said it

5   in opening.   The Court can take me at my word, yes.   And

6   Mr. Sosland and I have known each other for many years, having

7   been partners for a long time.   We both know how these cases

8   go, as does everyone else in this courtroom.   And if there are

9   settlements to be had, we'll do them.   Otherwise, we'll tee

10  them up for negotiation as appropriate, but the first, Your

11  Honor, is obviously settlement.

12           THE COURT:   So to take you at your word, by the

13  people -- the people at the door, it will require some action.

14           MR. BIENENSTOCK:   I understand, Your Honor.

15           Somehow Reorg Research has already informed I said I

16  would plan on filing a plan in three days.   I want to clear

17  that up.   I said 30 days.

18           THE COURT:   Those digits can be a problem.

19           MR. BIENENSTOCK:   And I will not take this point to

20  discuss Mr. Friedman's unfortunate remarks.   We'll do that in

21  due course.

22           THE COURT:   Thank you.

23           Yes, sir.

24           MR. RODRIGUEZ VIDAL:   Good morning, Your Honor.

25  Carlos Rodriguez Vidal of Goldman Antonetti & Cordova on

1    behalf of Syncora Guaranty.

2            THE COURT:  Good morning.

3            MR. RODRIGUEZ VIDAL:  Thank you.  As noted in the

4    Status Report filed on June 7, 2019, which is docket 1294, and

5    the Amended Joint Status Report that was filed on June 11,

6    which is docket 1334, Syncora and the government parties in

7    the Puerto Rico Electric Power Authority case have recently

8    made significant progress to enable Syncora to become a party

9    to the Restructuring Support Agreement.

10           Since the filing of the Joint Status Report, Syncora

11   has continued to negotiate with the parties and the other RSA

12   parties, and it is apparent Syncora has reached an agreement

13   in principle with all of the parties to the RSA.  This

14   agreement, of course, is subject to some approvals and

15   documentation.  And these are underway, and we expect to

16   complete those shortly.  Thank you.

17           THE COURT:  Thank you, Mr. Rodriguez Vidal.

18           Yes, sir.

19           MR. EMMANUELLI JIMENEZ:  Good morning.  Rolando

20   Emmanuelli Jimenez on behalf of UTIER.  I would like to

21   respond to Mr. Bienenstock's comments on the litigation.

22           And I would like to inform this Court on June 5th,

23   2019, UTIER filed a petition for a writ of certiorari, case

24   number 18-1521, requesting the invalidation of all the actions

25   and determinations of the Oversight Board based on solid

1    Supreme Court case law.  This case could be considered in the

2    June 20th conference of the Supreme Court.

3         The Supreme Court's review is warranted since the

4    Court of Appeals misconstrued the de facto officer doctrine

5    and applied it to an Appointments Clause challenge.  The

6    Supreme Court has expressly refused its application with

7    respect to Appointments Clause challenges in *Ryder versus U.S.*

8    --

9         THE COURT:  I understand that that is the argument

10   that you are making to the Supreme Court.

11        MR. EMMANUELLI JIMENEZ:  I understand, yes.

12        THE COURT:  In the petition.

13        MR. EMMANUELLI JIMENEZ:  But I would like to finish,

14   Your Honor, saying UTIER reiterates the seriousness of such

15   determinations on Puerto Rico, which may cause irreparable

16   damages and harmful consequences to the UTIER.  Therefore,

17   UTIER believes that this contested matter regarding PREPA's

18   RSA is an unnecessary and burdensome waste of resources of the

19   people of Puerto Rico, since based on its unconstitutionality,

20   UTIER already reserved the right to challenge any and all

21   actions taken by the Oversight Board in the adversary

22   proceeding that's filed at 17-0228, docket 145.

23        Therefore, we believe that the Oversight Board

24   members hold their position without legal authority.  Thus,

25   its previous and future actions are void.  Thank you.

1          THE COURT:  Thank you, Mr. Emmanuel Jimenez.

2          All right.  Before we move on to the Fee Examiner's

3     report, I'd like to briefly touch on two additional topics not

4     listed on the Agenda.  First, the Court has received and

5     reviewed the urgent motion of the Oversight Board and the UCC

6     for limited relief from the Supplemental Case Management Order

7     seeking to amend certain of the adversary complaints to add

8     additional defendants, adding up to a thousand defendants in

9     any given case.

10          I am currently working with the Clerk of Court to

11    establish appropriate procedures that would potentially allow

12    for necessary amendments.  Nothing should be filed until the

13    Court enters an Order.

14          And you should understand that in order to ensure

15    reliability and close quality control of the ECF recordkeeping

16    system, the procedures that will be announced are likely to

17    cap the number of additions well below one thousand per case

18    and may utilize related-case designation methodologies for

19    achieving the additions and corrections.  So stay tuned, and

20    sit tight until the procedural order is entered.

21          The Court has also received and reviewed the Joint

22    Status Report filed by Ambac and the Oversight Board in

23    connection with Ambac's motion concerning the application of

24    the automatic stay to the revenues securing PRIFA Rum Tax

25    Bonds, and the Court will be entering an appropriate order

1    soon.  So again, sit tight on the discovery dispute.  We

2    already have a briefing schedule and I will be entering an

3    order.

4           So with that, I would call upon the Fee Examiner's

5    counsel to present the fee-related matters.

6           Good morning, Ms. Stadler.

7           MS. STADLER:  Good morning, Your Honor.  Katherine

8    Stadler of Godfrey & Kahn appearing on behalf of the Fee

9    Examiner, Brady Williamson, who appears here today along with

10   our Puerto Rico counsel, Eyck Lugo.

11          We have two fee-related matters on the Agenda.  The

12   first is the Fifth Interim Fee Period Applications Recommended

13   for Court Approval.  We filed our report on June 5th, last

14   Wednesday.  I am happy to report that since that filing, we

15   have resolved a group of additional fee applications that were

16   listed on Exhibit B as recommended for deferral but will be

17   moved to Exhibit A for purposes of the entered order -- or the

18   recommended order, I should say.

19          The listing of recommended applications in the Agenda

20   that the Oversight Board filed earlier this week is the

21   current listing of recommended fee applications.  It includes

22   those that have been resolved since the filing of our report

23   last week, and I'm happy --

24          THE COURT:  Ms. Stadler, apparently your voice is not

25   coming through clearly to New York, so if you'd speak more

1    directly into the microphone, I'd be grateful.

2         MS. STADLER:   Okay.   Thank you.

3         THE COURT:  Thank you.   That should be better.

4         MS. STADLER:   Okay.   As I was saying, the list of

5    the recommended applications on page two and three of the

6    Agenda that the Court has before it for today's Omnibus

7    listing is the recommendation for referral amount.   It

8    includes several that have previously been listed on Exhibit B

9    as recommended for deferral, but happily I have resolved and

10   we'll now recommend for approval along with the others.

11        That application period, as you know, brings us up

12   through January of 2019, which means that some, not all, of

13   the applications that have been recommended for approval today

14   include the rate increase issue that we have discussed at

15   length, both in court and in our documents.

16        We have worked with all of the interested parties and

17   constituencies to reformulate the Presumption Standards Order,

18   as it relates to rate increases, to further clarify that the

19   purpose of the Order is a burden shifting goal.   And that is

20   to put professionals on notice that rate increases above the

21   rate of inflation will be subject to additional scrutiny by

22   the Fee Examiner and will require additional showing by

23   professionals of a market-based reason for the increase.

24        The professionals understand that these are standards

25   that have to be applied in the context of applications.   They

1    cannot be applied prospectively.  And they need to take into

2    consideration the unique circumstances of every single

3    timekeeper for every single professional working on these

4    cases.  And that number now, Mr. Williamson informed me

5    yesterday, is over 1,400 individual timekeepers.

6         So to create a rule that applies uniformly to 1,400

7    professionals of any category would be counterproductive in

8    our opinion.  And so the reformulated Presumptive Standards

9    Motion -- Order seeks to clearly articulate the standards the

10   Fee Examiner will apply, create a threshold for which the

11   burden falls even more heavily on professionals to establish

12   the reasonableness of their fees, but allows flexibility in

13   the application, as is always necessary in any fee review

14   process.

15        We worked with other interested parties.  We went

16   around many, many times with different formulations, and the

17   version that we filed last week with our informative motion

18   is, as I understand it, agreed by all of the interested

19   parties who've been in communication with us.

20        So I'm happy to answer questions either about fifth

21   interim applications or presumptive standards or anything else

22   on the Court's mind.

23        THE COURT:  Thank you, Ms. Stadler, and thank you for

24   your written submissions.  And I have reviewed the Fifth

25   Interim Report and the schedules thereto.  I've considered

1    them carefully, and the Fifth Interim Report, with its

2    recommendations as brought up-to-date by your remarks here,

3    and as reflected in the Agenda, is approved.  And I will

4    expect that you'll give me an updated order that will also

5    terminate the resolved motions and bring up to speed the

6    provisions for adjournment of the remaining applications that

7    will be reflected on Exhibit B.

8            MS. STADLER:   Yes.  We will submit a proposed order

9    this afternoon.  Thank you.

10           THE COURT:  Thank you.

11           And I'm also grateful for the extensive work that has

12   clearly gone into revisitation of the Presumptive Standards

13   Motion, which is -- well, the informative motion is docket

14   entry number 7214.  And I am persuaded that the revised

15   presumptive standards address appropriately the concerns that

16   the Court has raised concerning rate increases, and,

17   therefore, I will enter the Revised Proposed Presumptive

18   Standards Order.

19           MS. STADLER:  Thank you, Your Honor.

20           THE COURT:  Thank you.  And thank you for being here.

21           Mr. Williamson, did you wish to make any remarks

22   yourself?

23           MR. WILLIAMSON:  Your Honor, thank you.  Brady

24   Williamson, Fee Examiner.  There's really no need to

25   supplement Ms. Stadler's comments on either the fifth interim

1    recommendations or on the Presumptive Standards Motion.

2            With respect to the PREPA RSA, which is on the Agenda

3    for later in the day, we may have some comments on that as

4    well because of several specific provisions affecting

5    professional compensation, but I'll defer those to the

6    appropriate point.

7            THE COURT:  Thank you, Mr. Williamson.

8            And so now we will turn to Agenda item III, which are

9    the uncontested claims objections.

10           Ms. Stafford.  Good morning, Ms. Stafford.

11           MS. STAFFORD:  Good morning, Your Honor.

12           THE COURT:  And before you begin your remarks, I

13   would like to address some issues that arose in the context of

14   contested claim objections that appear to have implications

15   concerning the reliability and credibility of the claims

16   objection process.  And I see that last night there was a

17   document filed withdrawing several claims, but I do want to

18   address directly the underlying issues.

19           MS. STAFFORD:  Yes.

20           THE COURT:  So specifically, several of the omnibus

21   claim objections asserted that they were objecting to proofs

22   of claim that were described as quote, exact duplicates.  Each

23   of those objections included a declaration of Mr. Herriman of

24   the Alvarez and Marsal firm stating under penalty of perjury

25   that the claims had been reviewed and analyzed in good faith

1    by people under his supervision.  And he concluded that the

2    claims assert the exact same liabilities.  But then the

3    motions prompted over a dozen responses that asserted that the

4    claims were not, in fact, exact duplicates.

5         And my staff and I reviewed several of those proofs

6    of claim and others that were alleged to be duplicates and

7    found that many of them were asserted on behalf of children

8    whose parents or other guardians have asserted claims against

9    the Commonwealth for alleged violations of the Individuals

10   with Disabilities Act and other related issues.

11        Last night, the objections to many such claims were

12   withdrawn, but I am very troubled by these apparent errors in

13   the identification of objectionable claims.  If these

14   claimants, their lawyers, or the Court had not noticed the

15   debtors' mistakes, properly filed claims might have been

16   disallowed, prejudicing the legal rights of allegedly disabled

17   children and their parents or guardians, who are among the

18   most vulnerable people.

19        That's simply inexcusable, given the responsibilities

20   and the resources of the Oversight Board, and also raises

21   serious issues about the underlying process and whether due

22   care is being taken in the first instance in reviewing claims

23   and putting forward claims objections.  And so I would ask you

24   now to give me an overview of the process and any changes in

25   the process that are intended to be made going forward.

1          And I'll tell you, frankly, that I, at this point,

2   would not be prepared to sign off on final orders without the

3   filing of a certificate as to duplicate or amended claim

4   objections, which certificate would declare that all of the

5   claims have been re-reviewed and they are, in fact, actually

6   duplicate or amended claims, whether or not there has been a

7   response filed to them.

8          MS. STAFFORD:  I completely understand Your Honor's

9   concerns, and we were also concerned by the number of

10  responses filed that asserted that claims identified as exact

11  duplicates were not, in fact, exact duplicates.  And after we

12  saw the volume of those responses, we undertook to re-review

13  all of the claims that had been identified as exact

14  duplicates.  And in the amended schedules that were filed last

15  night, a number of claims were withdrawn from the objections

16  which were not specifically identified by claimants who

17  responded.

18          Mr. Herriman, who is here in the courtroom, I will

19  call upon him to give us a bit of information about the

20  process that we went through to re-review all of these claims.

21  And we will make sure that we are reviewing the claims with

22  greater care and certainty going forward.

23          THE COURT:  I am glad to hear that, and I'd be

24  grateful to hear from Mr. Herriman about the process now.

25          MR. HERRIMAN:  Good morning, Your Honor.

1          THE COURT:  Good morning, Mr. Herriman.

2          MR. HERRIMAN:  For the record, Jay Herriman from

3    Alvarez and Marsal.

4          As Ms. Stafford noted, after receiving those

5    objections, we went back through our processes and realized we

6    had one reviewer who was not following our own processes.  And

7    the system typically looked at an exact duplicate claim,

8    meaning someone took it on -- a claim, put it on a copy

9    machine and copied it, and that would be our proof.

10         In this case, one reviewer, in looking at litigation

11   claims, specifically did not notice certain information had

12   been changed.  Literally, some of the time it was the

13   children's initials that had changed, and in some cases we

14   noticed they didn't pick up a change in the case number as

15   well.  So we're going back through that review for training,

16   and also reaffirming with all of our reviewers, it literally

17   needs to be a photocopy of the claim before we sign off an

18   exact duplicate.

19         Also, we're putting additional QC processes in claims

20   to make sure an additional reviewer's spot checking the

21   initial reviewer's work to make sure those things don't slip

22   through again, Your Honor.

23         THE COURT:  Thank you.

24         So as I said, I will need a certificate with the

25   revised proposed order attesting to the accuracy of the claims

1    and the objections.

2          MR. HERRIMAN:  Absolutely, Your Honor.

3          MS. STAFFORD:  We'll be happy to provide those, Your

4    Honor.

5          And with that, would you like any further information

6    about the uncontested claim objections at this time?

7          THE COURT:  I don't believe so.  Let me just check.

8          No.  I just -- I had that portfolio issue about the

9    objections, and so having had a response to that portfolio

10   issue, and subject to the filing of the certification, the

11   uncontested claims objections are sustained and the subject

12   claims will be disallowed.  I'll enter the Order after the

13   filing of the certification.

14         MS. STAFFORD:  Thank you very much, Your Honor.

15         THE COURT:  Thank you.

16         Just one moment.  All right.  And so this brings us

17   now to the contested matters, which are at Agenda item IV, the

18   first of which is the Puerto Rico Funds Motion to Vacate the

19   Appointment of the Official Committee of Unsecured Creditors.

20   We've allowed 20 minutes for the argument on that motion.

21         Good morning.

22         MR. CUNNINGHAM:  Good morning, Your Honor.  John

23   Cunningham of White & Case on behalf of the Puerto Rico Funds.

24         Your Honor, in the ten minutes that I have, if I

25   could reserve two minutes for rebuttal?

1          THE COURT:  Yes.

2          MR. CUNNINGHAM:   Thank you.

3          Your Honor, the Puerto Rico Funds based here in San

4    Juan hold over three billion of the ERS bonds.  And with

5    respect to our motion, Your Honor, let me make one thing clear

6    right off the bat.  The sole relief my client seeks is an

7    order that the Commonwealth UCC cannot be the ERS UCC based on

8    the obvious irreconcilable conflict that such committee

9    members have as fiduciaries to creditors of both estates.

10         And what is the conflict?  It is undisputed, Your

11   Honor, at the behest of the Oversight Board, Commonwealth

12   legislature adopted Joint Resolution 188 and enacted 106,

13   mandating, as of July 2017, the dismantling of ERS, the

14   stripping of its assets, including ERS' stream of employer

15   contributions, and the diversion and siphoning of such assets

16   away from ERS into the Commonwealth's general funds.

17         All of this unprecedented legislation and actions by

18   the Commonwealth against ERS occurred post petition in total

19   disregard of ERS' automatic stay and without any approval by

20   this Court.  Your Honor, this utter destruction and plundering

21   of ERS and its assets by the Commonwealth of course has led to

22   a fight to the death by ERS creditors to recover ERS assets

23   for distribution to ERS creditors in this Title III case.

24   Predictably, the only ERS creditors to wage this fight have

25   been the ERS bondholders.

1        In the 22 months since the ERS UCC has formed, what

2   has it done?  What positions or actions has it taken to fight

3   the Commonwealth to recover ERS assets for the benefit of ERS

4   creditors?

5        The answer, absolutely nothing.  It has sat idly by

6   for almost two years and has not lifted a finger to engage in

7   this fight.  And there lies the conflict. The current members

8   of the ERS UCC, being current members of the Commonwealth UCC,

9   are completely incapable of taking an adverse position against

10  the Commonwealth that could lead to assets coming out of the

11  Commonwealth and back into ERS.

12       So how did we get this committee in the first place,

13  which is comprised, again, solely of the Commonwealth UCC

14  members?  Well, the United States Trustee finally answered

15  this question in its objection to our motion.  It states that

16  it solicited creditors of ERS for interest in serving on a

17  committee.

18       And then on page ten, the United States Trustee

19  admits, quote, No ERS unsecured creditors had been willing to

20  serve on a committee.  So rather than have no ERS UCC, the

21  United States Trustee decided to appoint the Commonwealth UCC

22  as the ERS UCC, irrespective of the conflict.

23       The United States Trustee, in the objection, says

24  it's not clear that the ERS unsecured creditors would be

25  better off with no representation by the committee.  Your

1    Honor, that's wrong.  We would rather have, and this estate, I

2    would think, would rather have no UCC than a hopelessly

3    conflicted UCC.

4         THE COURT:  I'd like to go back to that "we would

5    rather have" for a minute.

6         MR. CUNNINGHAM:  Certainly.

7         THE COURT:  You represent a constituency that claims

8    secured creditors status.  What gives you standing to complain

9    about who, if anybody, represents unsecured creditors'

10   interests?

11        And if your concerns regarding the motivations of the

12   UCC are meritorious, why isn't it sufficient for you to offer

13   them for consideration as to the validity and weight of

14   positions actually advanced by the UCC?

15        MR. CUNNINGHAM:  Your Honor, as a creditor, even as a

16   secured creditor, we have standing to seek the relief that

17   we're asking.  And you'll hear I've narrowed the relief.

18   We're asking for one specific section, 1102.  And that's

19   1102(a)(4).

20        And if I can get there, I'll explain that.  But we do

21   have standing, because that section says a party in interest

22   can file the motion and relief that we're seeking.

23        So back to the motion, there has been much briefing

24   back and forth on the powers of this Court to vacate a

25   committee.  We cited *Detroit*, similar cases saying you can.

1  They cited *Caesars,* similar cases saying you can't, but none

2  of those cases are in the First Circuit.

3      And we would say, Your Honor, we can resolve this

4  debate right now.  Congress handed Your Honor the power to fix

5  the ERS UCC members' irreconcilable conflict in section

6  1102(a)(4) cited at page nine of our motion, and not cited at

7  all by UCC, nor cited, though, the powers referenced by the

8  United States Trustee.  1102(a)(4) was -- what I was just

9  talking about, says, on request of party in interest and as a

10  creditor of ERS, we are a party in interest, and after

11  noticing a hearing, the Court may order the United States

12  Trustee to change the membership of the committee appointed

13  under the subsection if the Court determines the change is

14  necessary to ensure adequate representation of creditors.

15      Your Honor, both the UCC and the United States

16  Trustee cite the case of *ShoreBank* at 467 B.R. 156, and it

17  provides a very good overview of the history of 1102(a)(4) and

18  how it was added to the Bankruptcy Code in 2005, to make clear

19  this Court has the power to order a change to committee

20  composition to assure adequate representation.

21      THE COURT:  I understand that the Court has the

22  power, and that the power is directed to be used under

23  circumstances where it's necessary to assure adequate

24  representation, which is quite a high standard.

25      And so I would be grateful if you would, in some of

1    your remaining time, identify any actions that have been taken

2    by the UCC that you contend are breaches of fiduciary duty to

3    the unsecured creditors of ERS.

4         MR. CUNNINGHAM:  I think it's the inactions that have

5    been taken by this committee, Your Honor.  In the two years in

6    place, they have filed four pleadings in this case, all of

7    which address preservation of rights.  Joinder of opposing ERS

8    bondholders' adequate protection, and we in response to

9    everything located -- 179, 231, 280 and 296, all before they

10   started to get active in March of this year.

11        Why did they start to get active?  Why did they wake

12   up from their slumber?  The answer I submit is simple.

13   Because at the end of January, the First Circuit found ERS

14   bondholders have perfected security interest in this case.

15   And in the beginning of February, we filed a motion to seek

16   the appointment of a trustee under Section 926 to recover the

17   assets that I just described have been sent to the

18   Commonwealth, which occurred post petition, which we believe

19   that the estate of ERS should seek to recover.

20        We ultimately settled with the Oversight Board and

21   the Commonwealth to have a tolling agreement in place, which

22   Your Honor approved.  But none of that was done by this

23   committee.  But once they saw that we are back to active, and

24   most importantly that we have filed our claims, you know,

25   again, a total of three billion -- I think between our group

1      and the Jones Day group, we have close to two-thirds of that.

2      We have filed taking claims in the Commonwealth case, an

3      administrative claim we submit because it all took place post

4      petition.  But that's a very real threat to the unsecured

5      creditors of the Commonwealth, and for this committee to act.

6           So they've now awoken from their slumber and have

7      started taking action against our claims, which is fine

8      because, at the end of the day, the claim that they are

9      asserting has already been asserted by the Commonwealth.  It's

10     an alleged claim that our bonds are *ultra vires*.

11          This was asserted by the Commonwealth in the Motion

12     to Dismiss before Your Honor on the taking claim.  The UCC for

13     the Commonwealth never intervened in that action, took those

14     claims, repackaged it and filed the objection here in this

15     case.  This isn't about -- to avoid that objection.

16          The Retiree Committee has also done a copycat

17     objection, so Your Honor's going to deal with that objection.

18     We're going to deal with it --

19          THE COURT:  I need you to wrap up.

20          MR. CUNNINGHAM:  So in our view, again, the emperor

21     has no clothes here in that this is a very real conflict, and

22     both the *ShoreBank* case, which did say that lack of adequate

23     representation would include conflicts which show a breach of

24     fiduciary duties or likely breach -- we think any action by

25     this committee to fulfill fiduciary duties to recover assets

1    to -- for ERS to pay ERS creditors is going to violate its

2    fiduciary duties to the Commonwealth, to the extent the

3    Commonwealth is in the cross hairs, which it clearly is, Your

4    Honor.

5            THE COURT:  Thank you.

6            MR. CUNNINGHAM:  Thank you.

7            THE COURT:  Good morning.

8            U.S. TRUSTEE LECAROZ ARRIBAS:  Good morning, Your

9    Honor.  Monsita Lecaroz on behalf of the U.S. Trustee and

10   Department of Justice.

11           Good morning, everyone.

12           THE COURT:  Good morning, Ms. Lecaroz.

13           U.S. TRUSTEE LECAROZ ARRIBAS:  Your Honor, I wanted

14   to reiterate our objection to the Puerto Rico Funds request.

15   We understand our objection stands on its own.  However, given

16   the Puerto Rico Funds Reply, I wanted to clarify that at no

17   time did the U.S. Trustee imply that there was no ERS creditor

18   in the committee.  We did not affirmatively include it as an

19   argument because we understand that our other arguments under

20   1102, on their own warrant that the Puerto Rico Funds request

21   be denied.

22           We also wanted to assert the U.S. Trustee's interest

23   in and monitoring of the Official Committee's performance and

24   composition, which could undergo changes if we deemed it

25   necessary.  And we would have done so, so far, if it had been

1   deemed necessary.

2           Your Honor, we take our statutory duty very

3   seriously, and we believe it should not be entrenched upon.

4   Thank you.

5           THE COURT:  Thank you.

6           Mr. Despins.

7           MR. DESPINS:  Good morning, Your Honor.  Luc Despins

8   with Paul Hastings on behalf of the Official Committee.

9           Briefly, I will address some of the points that were

10  just made.  The first thing is that it seemed to be a switch

11  in the relief that was sought.  The motion clearly said it's a

12  motion to vacate the appointment of the committee as ERS'

13  committee.  Changing those words doesn't make the relief

14  different.

15          Again, I think you focused on it, and that's the

16  right analysis, which is I've never seen a case where a

17  secured creditor is heard to get a committee to be disbanded

18  for the simple reason that, we're natural enemies.  That's the

19  nature of the beast.  And of course, every secured creditor by

20  definition wants a committee to be eliminated.

21          What I would address very briefly, because in the

22  Reply they raise an issue, which is there is no evidence that

23  SEIU has the mantle, if you will, to represent these employees

24  that are members of SEIU.

25          And I want to cite very briefly to Puerto Rico Law,

1    Chapter 51(a), Labor Relations, Public Service Section

2    1453(g), that says that every duly certified exclusive

3    representative, which SEIU is pursuant to a collective

4    bargaining agreement, may sue or be sued and appear as

5    plaintiff or defendant before the commission, the courts of

6    justice, et cetera, as an entity or as the representative of

7    its members.

8         And if you look at the list of creditors that the

9    Commonwealth -- or that the Oversight Board filed for ERS,

10   there are thousands and thousands of SEIU members that are

11   listed as ERS creditors.  So I think that resolves the issue.

12        We don't think there's a need to have a member of the

13   committee be an ERS creditor, but in the event we have one

14   and, you know, we -- other than this alleged inaction, which

15   frankly, we don't follow, everything the Committee has done

16   has been to protect the interests of unsecured creditors of

17   ERS and to address the issue of how do we awaken from her

18   slumber.

19        The point is these bonds are non-recourse, Your

20   Honor.  If Your Honor ruled, and actually you did rule, that

21   effectually their collateral was nil or close to nil, that was

22   game over.  Unfortunately, from our point of view, the First

23   Circuit reversed, so there was no need to go after the

24   underlying bonds until the First Circuit reversed.

25        So yes, I would like to file these complaints all the

1    time.  It's good money.  But the point is why do that if

2    there's a ruling by the Court that the collateral -- there's

3    no collateral.  At that point, there's no need to do that.

4            Yes, First Circuit reversed.  At that point we needed

5    to go and assert those claims to avoid the bonds themselves --

6    it's why we took that time.  It's not because we didn't think

7    about it before.  It's because it didn't make sense to do that

8    before.

9            Thank you, Your Honor.

10           THE COURT:  Thank you.

11           Mr. Cunningham.

12           MR. CUNNINGHAM:  Your Honor, briefly, our motion to

13   vacate is as to this committee.  And we would, as I said,

14   modify that because we cited 1102(a)(4) to have Your Honor

15   simply order the removal of the Committee members, and if the

16   United States Trustee -- because there's a top 20 list that I

17   assume they've looked at of other unsecured creditors.

18   There's other claims that have been filed.  If they want to

19   appoint our committee members to this committee, we have no

20   problem with that.  We are not trying to eliminate the UCC.

21           THE COURT:  But given our current situation where the

22   UCC has been appointed for the Committee for ERS and your

23   request that I direct the U.S. Trustee to change the

24   composition of the Committee for ERS to include only ERS

25   creditors, you're either asking me effectively to direct the

```
 1   U.S. Trustee to appoint a stacked committee for ERS, or you're

 2   asking me to direct the U.S. Trustee to gut the current UCC,

 3   load it with ERS people, whereupon the Commonwealth and HTA

 4   unsecured creditors will complain that everything is stacked

 5   against them.

 6          So I don't really see a practical difference in your

 7   request for relief.  I think it always comes down, still, to

 8   an attack on the appointment of the committee as it has been

 9   done for ERS.

10          What am I missing?

11          MR. CUNNINGHAM:  Your Honor, six of the members --

12   you just described -- six of the members of the UCC admittedly

13   have no claims against ERS.  Why is that the case?  I mean,

14   that you're having unsecured creditors or not even ERS

15   creditors -- and this is not a multi-debtor case with

16   affiliated entities that they try to cite.

17          ERS is a trust, and the only reason the

18   instrumentality is -- it was created by statute, but it

19   doesn't mean they get to import some other creditors'

20   committee.  And some other creditors don't even have claims

21   against ERS.  If you're going to do that, borrow the

22   creditors' committee -- at least there won't be any conflict,

23   the one creditors' committee counsel just mentioned, SEIU,

24   that, I understand, Your Honor, has held they are creditors of

25   ERS for purposes of filing under that 906.  However, Your
```

1    Honor hasn't made a determination of whether they can

2    adequately represent the unsecured creditors in this case.

3    Given then again they labor under both concepts, they wear

4    both hats, but now, as we heard this morning, their mantle, as

5    he calls it, is to protect the retiree benefits.

6        Well, the retiree benefits here, which we just

7    described under this proposed deal, are going to have a range

8    of recoveries under those creditors between 91 percent and --

9    Your Honor, the maximum discount is eight and a half percent.

10   And ironically, you hear the government -- Governor and

11   Commonwealth say it's not enough.

12       In the meantime, all other ERS creditors, whether ERS

13   bondholders or other trade or other vendors that Mr. -- now,

14   in his pleading he says, we are left for road kill in terms of

15   this case --

16       THE COURT:  Please wrap up.

17       MR. CUNNINGHAM:  We think the focus has to be on the

18   issue of conflict.  If I can add this one last point, Your

19   Honor.

20       THE COURT:  Yes.

21       MR. CUNNINGHAM:  We cited and made mention of the

22   *Venturelink* case, the case predated 1102(a)(4), by Judge

23   Felsenthal years ago, dealt with a committee counsel and

24   removal of the chairman of a committee based on a conflict.

25   And at that time, without 1102(a)(4), it looked at whether the

1   trustee actions were arbitrary and capricious because of

2   claims against that former board member, chairman of the

3   board, with respect to monies that had flowed just prior to

4   the case and its removal.  And the judge thought that that was

5   the appearance of a conflict.

6          And the Court, in granting the -- in ordering the

7   removal, said -- this is 299 B.R. 420 at page 423.  This Court

8   has held that a conflict of interest that amounts to a breach

9   of that fiduciary duty constitutes the type of conflict that

10  would mandate removal of the creditor from the committee.  The

11  Court adds, the appearance of a breach of that fiduciary duty

12  should likewise mandate a removal.  The bankruptcy process

13  must be fair and appear fair.

14         We don't believe having the aggressors, Unsecured

15  Creditors' Committee, Commonwealth Committee, be the

16  Creditors' Committee for ERS, sets up a process that is fair

17  and appears fair in the largest municipality bankruptcy case

18  here.  We don't believe, analogous to HTA and PREPA, because

19  they have their Oversight Board, creditors, and they can raise

20  whatever claims they make -- they didn't have the

21  post-petition legislation we had, Your Honor.

22         THE COURT:  Thank you.

23         MR. CUNNINGHAM:  Thank you.

24         THE COURT:  Before the Court is the Motion of the

25  Puerto Rico Funds to Vacate the Appointment of the Official

1    Committee of Unsecured Creditors in the ERS case.  That motion

2    is docket entry number 6162 in the 17-3283 jointly

3    administered case; and docket entry 433 in the ERS case, which

4    is 17-3566.  And I will refer to it as "the Motion."

5        In the Motion, the Puerto Rico Funds request entry of

6    an order vacating the appointment of the Official Committee of

7    Unsecured Creditors in ERS' Title III case.  And I'll refer to

8    that committee as "the Committee."

9        Alternatively, the Puerto Rico Funds argue that the

10   Court should reconstitute the Committee's members in the ERS

11   case to be comprised solely of members holding unsecured

12   claims against ERS.  And the Court has carefully considered

13   all of the written submissions and listened carefully to the

14   arguments made in court today.

15       At the outset, the Court notes that there is a

16   question as to whether, as putative secured creditors of ERS,

17   the Puerto Rico Funds are properly in a position to attack the

18   membership of an unsecured creditors' committee. And this is a

19   point to which the U.S. Trustee also alluded in her

20   submission, docket entry number 7129.

21       Putting that question aside, and for the following

22   reasons, the Court concludes that it does not possess the

23   authority to disband the Committee under Sections 1102 and 105

24   of the Bankruptcy Code.  And as to the Movants' request that

25   the Court reconstitute the Committee, or direct the

1    reconstitution of the Committee, the Court finds that the

2    Puerto Rico Funds have failed to demonstrate that such a

3    change is necessary to ensure adequate representation of

4    creditors as required by Section 1102(a)(4) of the Bankruptcy

5    Code.  The Motion is therefore denied.

6         Section 1102(a) of the Bankruptcy Code governs the

7    formation, appointment, and modification of official

8    committees.  The powers set forth in that section are the only

9    powers over committees that the Code gives to the Court, and

10   nothing in Section 1102(a) confers on the Court the power to

11   disband a committee appointed by the United States Trustee

12   under Section 1102(a)(1).

13        Furthermore, Section 105 of the Code, 105(a), is

14   neither an independent source of rights, nor a source of

15   substantive authority.  And the Court does not find in Section

16   105(a) a source of authority to grant the relief requested by

17   the Puerto Rico Funds.

18        *In Re: City of Detroit,* 519 B.R. 673, (Bankr. E.D.

19   Mich. 2014), which I'll refer to as *Detroit;* and *In Re:*

20   *Pacific Avenue, LLC*, 467 B.R. 868, (Bankr. W.D. N.C. 2012),

21   which I'll refer to as *Pacific Avenue*, are not persuasive as

22   to the existence of court authority to vacate the appointment

23   of an official committee.

24        The *Detroit* decision is based in part on the

25   applicability of Section 1102(a) to proceedings commenced

1   under Chapter Nine of the Bankruptcy Code.  Here, Section

2   301(d) of PROMESA provides that a reference to this title,

3   this chapter, or words of similar import in a section of Title

4   11 of the United States Code, shall be deemed to be a

5   reference to Title III of PROMESA.

6        Thus, the reference in Section 1102(a) to an order of

7   relief under Chapter 11 of this Title is deemed to be a

8   reference to PROMESA Title III and requires the appointment of

9   a Committee of Official Unsecured Creditors after the Court

10  Order for Relief in the Title III case.  Thus, the reasoning

11  in *Detroit* regarding the inapplicability of Section 1102(a) to

12  Chapter Nine proceedings is not instructive in these Title III

13  proceedings.

14       The Court further concludes that Section 105(a) of

15  the Bankruptcy Code does not empower the Court to disband an

16  official committee appointed by the United States Trustee

17  under Section 1102(a), and therefore, declines to adopt the

18  *Detroit* Court's Section 105(a) analysis.

19       The *Pacific Avenue* Court's reasoning regarding

20  Section 105(d) is similarly unpersuasive.  Particularly since

21  the committee appointment in that case had been made by the

22  Court in the first instance in the absence of a U.S. Trustee

23  program.  The motion is therefore denied insofar as the Puerto

24  Rico Funds' request that the Court disband the committee that

25  has been appointed in ERS' Title III case.

1          As to the alternative request, the movant's request

2    that the committee's membership be reconstituted to be

3    comprised solely of members holding unsecured claims against

4    ERS, Section 1102(a)(4) of the Bankruptcy Code, incorporated

5    into PROMESA, permits the Court to order the United States

6    Trustee to change the membership of a committee appointed

7    under this subsection if the Court determines that the change

8    is necessary to ensure adequate representation of creditors.

9          The Puerto Rico Funds have not demonstrated that a

10   change in the membership of the committee is necessary to

11   ensure adequate representation of unsecured creditors in the

12   ERS case.  The alternative relief sought by the Puerto Rico

13   Funds would effectively result in a direction from the Court

14   to the U.S. Trustee to create a separate unsecured creditors

15   committee for ERS.  That is an extreme remedy that could

16   generate significant transaction costs for all creditors

17   involved in the ERS case.

18         As the U.S. Trustee and the Committee have noted in

19   their submissions, a single committee is frequently appointed

20   in large multi-debtor cases to represent the unsecured

21   creditors of related debtors whose cases are being jointly

22   administered.  These committees often consist of creditors

23   with a variety of viewpoints, and mere conflict of members of

24   an official committee is not a basis for modification of

25   committee membership in the absence of specific evidence that

1    committee members have breached fiduciary duties.

2          Movants have not persuaded the Court of any actual

3    breach of fiduciary duty on the part of the Committee, nor

4    have Movants demonstrated that an insurmountable conflict

5    exists among Committee members.  For this reason, the Motion

6    is denied.

7          Arguments regarding the potential conflicts on the

8    part of the Committee or individual members, where relevant,

9    can be raised and considered in context as the Committee takes

10   positions in these Title III proceedings.  And the Court will

11   enter an order reflecting this decision.

12         Thank you, Counsel.

13         The next contested item is the Committee's Motion to

14   Establish Procedures Regarding the Omnibus Objection to the

15   Claims of the ERS Bondholders, and before I hear from counsel,

16   I have some remarks.

17         So I observed on Monday night that Mr. Despins filed

18   an informative motion addressing a request from the Retiree

19   Committee that its claim objection from April 23rd should be

20   consolidated procedurally with the claim objection procedures

21   that are before the Court today.  And last night the ERS

22   Bondholder Group, represented by Jones Day, filed a response

23   to that informative motion.

24         Given that the Retiree Committee's Omnibus Objection

25   was filed nearly two months ago, it should be no surprise that

1    I was not expecting a new filing and a description of a

2    dispute in an informative motion at the 11th hour before this

3    hearing.   In the future, when such issues arise, I anticipate

4    that you will coordinate among the interested parties in a

5    timely fashion and submit a proposal to the Court for the

6    orderly presentation of the application, including briefing of

7    any disputes that cannot be resolved consensually.   And that

8    will allow disputes, like the one that appears to continue

9    here, to be considered and resolved in an orderly and

10   efficient manner.

11          There's no good reason to have to deal with

12   procedural issues like this on the fly.   And I don't believe,

13   given the objections that the ERS Bondholder Group has

14   previewed in the Response filed last night, that it would be

15   an efficient use of resources to address these issues today.

16   And I suggest that the parties meet and confer to try to work

17   out the issues, and if disputes remain, the parties should

18   work out a joint proposal for orderly briefing of the issues

19   regarding coordination with the Retiree Committee's

20   objections.

21          I have to point something out about the proposal that

22   does exist, however broad or narrow it ends up being.   I will

23   require one change.   The Revised Proposed Order that is on the

24   books now includes two provisions under which certain filings

25   in any given matter will be deemed filed in other contested

1   matters and/or adversary proceedings.  It sounds like

2   something that will be easy for counsel and work really well

3   for counsel, but it's entirely unworkable for the Court.  So

4   any filing that is expected to be considered in multiple

5   matters must reflect all the relevant captions and be filed in

6   each relevant matter.

7         So my proposal is that we adjourn this matter so that

8   you can work out an agreement and/or an orderly briefing of

9   the issues regarding coordination, so I can resolve it on

10  submission.  Does anyone want to be heard on this?

11        MR. DESPINS:  No, Your Honor.

12        THE COURT:  All right.  So we will mark this as

13  adjourned to the July Omni, but I will expect that I'll have

14  either an agreement or briefing substantially in advance of

15  the July Omni.  Thank you.

16        Just one moment.  Yes.  So now Agenda Item IV.3 is

17  the Debtors' Motion to Amend the Omnibus Objection Procedures.

18        MS. STAFFORD:  Good morning again, Your Honor.

19        THE COURT:  Good morning.

20        MS. STAFFORD:  Laura Stafford from Proskauer Rose on

21  behalf of the Financial Oversight and Management Board.

22        As Your Honor knows, there are well over 300 thousand

23  claims pending on this basis, and it isn't individual claims.

24  It would be overburdensome to the Court and, frankly, the

25  debtors themselves, to file objections to the docket on that

1   number of claims.  That's why we sought the modification of

2   procedures last fall, and now that we've identified issues

3   with many of the claims, we're here to file substantive

4   procedure objections as well.

5         These procedures were developed in confirmation and

6   coordination with the Court's office staff and we believe

7   represent an efficient means of handling the large number of

8   claims pending in this case, while preserving claimants' due

9   process rights.

10         THE COURT:  May I ask you to speak just a little

11   slower?

12         MS. STAFFORD:  I'm sorry.

13         THE COURT:  Thank you.

14         MS. STAFFORD:  The claimants receive information via

15   the Omnibus objections sufficient for them to understand

16   factual and legal bases on which there's objecting to their

17   claims.  The primary objection raised by the Committee to the

18   motion is the motion should be adjourned until an ADR motion

19   has been filed.

20         We filed an ADR motion last Wednesday.  It is

21   currently set for hearing at the July 24 Omnibus.  There is no

22   reason, in our view, to delay this motion and further delay

23   the ability to reconcile claims against them during the six

24   weeks while that other motion will be pending.

25         The Committee's other objections highlight concerns

1    about evidentiary issues, all of which we believe are better

2    suited to be considered by the Court in the context of

3    individual objections to individual claims.  To begin, the

4    Committee objects that the procedures purportedly put the

5    evidentiary burden on the creditor instead of debtors.  The

6    procedures don't purport to do anything of the sort.

7         And it appears the Committee is concerned they will

8    be boilerplate, that statements will parrot on which we seek

9    objections, but that is not the case.  The debtors will

10   provide enough information to understand what the bases for

11   their objections may be.

12        For example, for a books and records objection, we

13   would indicate that the debtors' books and records suggest

14   that an invoice of a certain amount was provided and a payment

15   was made on a certain date by a certain check.  That

16   information we believe is sufficient to provide the claimants

17   with enough notice of the evidence being presented against

18   them.

19        To the extent Your Honor has concerns about the

20   sufficiency of any of those bases for an objection, that we

21   believe is a question for the Court to consider at a hearing

22   on the objection and not a basis to deny our ability to

23   proceed with an Omnibus objection at all.

24        With respect to the specific additional substantive

25   grounds to which the Committee objects, we'd submit all three

1    of these grounds are very common grounds on which to object to

2    claims in bankruptcy cases, especially in large, complex cases

3    such as this one.  As we noted in our papers, certain

4    districts even permit these types of grounds for substantive

5    Omnibus objections in their rules.

6          With respect to the -- I'll just briefly note the

7    three substantive grounds that the Creditors' Committee has

8    objected to.  With respect to the books and records objection,

9    as I noted before, we intend to include pertinent information

10   from the debtors' books and records, and creditors of course

11   will retain the right to object and present their own evidence

12   in response.

13         With respect to the unliquidated claim basis, the

14   Creditors' Committee appears to be objecting on the basis that

15   a claim cannot be disallowed solely on the basis it is

16   unliquidated.  But as we noted in our papers, that's not what

17   we're seeking to file, an objection, on an Omnibus basis, such

18   that those claims can be limited in order to determine whether

19   and to what extent allowed.

20         And with respect to the final substantive basis that

21   the Creditors' Committee has challenged, which is the no

22   liability basis, I would submit that is a very common basis on

23   which to make Omnibus objections in large bankruptcy

24   proceedings.  And it's particularly necessary here where

25   thousands of claims have been filed that assert liabilities

1  that certainly are not properly asserted against the debtors,

2  or estate, because bonds arise out of other entities unrelated

3  to Title III debtors --

4       THE COURT:  And again, would you expect to lay that

5  out clearly in the objection to claim?

6       MS. STAFFORD:  We certainly would, Your Honor.

7       THE COURT:  Now, the proposed procedures include a

8  per motion cap that's substantially higher than a cap that I

9  understand was discussed with the Administrative Office, and

10  it raises logistical concerns both at the Clerk's Office level

11  and, frankly, at the level of my very limited staff in terms

12  of preparing for Omnibus Hearings.  And so with a cap of 30

13  omnibus objections for any single omni and the cap of 1,000

14  claims per motion, we could see up to 30,000 claims that are

15  the subject of substantive objections being cued up for a

16  single omnibus hearing.  And that -- and it makes me shudder.

17       So at what rate, as a practical matter, do you

18  contemplate you would be filing objections under these

19  procedures?  And I'd like your thoughts on how you would

20  intend to manage the process to avoid overburdening a single

21  hearing, such as by seeking to adjourn hearings on objections

22  that receive substantial responses, or some other techniques

23  to help me out here.

24       MS. STAFFORD:  Completely understood, Your Honor.

25  And I think one of the challenges that we face is that our

1  ability to put single Omnibus objections together that cover

2  500 or even a thousand claims at a time is somewhat difficult.

3  And as you'll notice, a number of the Omnibus objections that

4  are scheduled for hearing today, some of them meet the cap of

5  500, but many are well below and have more along the lines of

6  23, or seven, or -- at a low, seven claims per objection.

7           So even though we are hoping to set up to 30

8  objections per hearing, we understand that it's unlikely that

9  there will be up to 30,000 claims that will actually be heard

10  in any given hearing because of the way we need to bring

11  claims across Omnibus objections.  So we're hopeful we never

12  are in a position where 30,000 claims are heard at a single

13  hearing.

14           We're happy to consider, when appropriate, to adjourn

15  hearings if we receive a large number of responses, especially

16  that some of these are substantive responses, bases that need

17  to be dealt with over a longer period of time.  So we're happy

18  to work with the Court when it comes to finding a way to make

19  it as manageable as it can be.

20           THE COURT:  I appreciate that.

21           MS. STAFFORD:  Yes.

22           THE COURT:  And I have one other question for you.

23  You indicated in your papers that there are certain types of

24  claims or issues that you think would not be amenable to the

25  ADR process that you've proposed in connection with the July

1  Omni.  Can you elaborate on such categories of claims?

2            MS. STAFFORD:  Those would include bond claims,

3  principally claims arising out of funded indebtedness.  Those

4  are the types of claims we don't necessarily deem appropriate

5  for ADR procedure, which we are hoping to work with and deal

6  with vendor claims and accounts payable type claims.

7            THE COURT:  Thank you.

8            MS. STAFFORD:  Thank you.

9            THE COURT:  Mr. Despins.

10           MR. DESPINS:  Your Honor, we filed a limited

11  objection and it's based on two issues really.  One, there was

12  no AD -- before this draft motion was combined with an ADR

13  procedure, these two were separated.  Now we see the ADR

14  motion, and we say in our objection, paragraph one, that we

15  don't agree with that structure.

16           And you might say, well, that's not before me; we'll

17  deal with that later.  That's fine.  We just wanted you to

18  know that something along the lines of something like the

19  Detroit bankruptcy, with mediation and arbitration -- and to

20  put a fine point on this, arbitration with people based in

21  Puerto Rico that have legal training in Puerto Rico and that

22  speak Spanish.  The reason for that, Your Honor, is simple.  I

23  don't know if you remember this.  You probably remember this.

24  I remember in New York there was a COFINA claims objection.

25  The claimant was here in Puerto Rico.  And you were very

1   patient, and this is a claimant that said they owned land

2   around COFINA --

3        THE COURT:  Yes.

4        MR. DESPINS:  -- but there was no land.  But anyway,

5   the point is that was just a vignette or a little example of

6   that multiplied by hundreds of thousands of what's going to

7   happen.  And in that context, not having at first local

8   arbitrators I think will be a real impediment, but at the end

9   of the day, that's your call.  Meaning I have no legal tools

10  to make that happen over my -- we have no -- we raised that

11  with the Board.  They rejected it.  So I'll move on, but I

12  think it would help address a lot of the issues I am about to

13  address in a second.

14       THE COURT:  Well, in connection with the continuation

15  of the procedures in July, I'll invite you to, if you wish,

16  use your briefing argument space to explain how you would

17  anticipate coordinating the logistics of soliciting informed

18  consents and waiver of judicial processes by people to go into

19  a binding arbitration proceeding in the first instance, and,

20  you know, the transaction costs of that sort of approach in

21  addition to recruiting and managing arbitrators and how that

22  could happen.  I'd be happy to hear that, but not --

23       MR. DESPINS:  No.  No.  We can do that, and it's been

24  done in other cases before.

25       So now let me turn to the motion itself, and I would

1   say that generally this is -- I will stipulate this is a

2   standard motion, but the problem is this is not a standard

3   case.  And we heard this morning from Your Honor about just an

4   issue, very simple, what is a duplicative claim; what is not a

5   duplicative claim; and whether, when we're dealing with a

6   books and records objection -- and let's be clear about that.

7   A books and records objection is something that lawyers like

8   me created.  There's nothing like that under the Rules.  It is

9   necessary to deal with the claims, and practically, it's a

10  burden shifting device.

11          And the first question with books and records

12  objections -- Alvarez & Marsal is a good firm, but I guarantee

13  you they don't have all the books and records of the

14  Commonwealth.  In fact, the Oversight Board spent millions of

15  dollars for an investigation to investigate where is the cash.

16          If it takes you millions of dollars to investigate

17  where is the cash in the Commonwealth, and we know that the

18  Commonwealth's books and records for 2017 have not been

19  finished yet, they haven't been audited -- so the point we're

20  making, Your Honor, is that -- I know you said, will you put

21  more than books and records, and I said yes, of course we

22  will.  We have severe doubts that that can be accomplished,

23  and that's why a more informal arbitration process -- that's

24  why I'm not combining the two.

25          I know it's not before Your Honor, but with respect

1    to people who understand how the government works and local

2    laws and all that, it would be much more beneficial.  But

3    again, I can tell you in other cases, books and records

4    objections have been approved.  I filed them when I

5    represented debtors.  So I can't tell you it's not been done,

6    but on the record here, where there's been no auditing of

7    books and records we're talking about, and the fact that we

8    know that one of the -- in PROMESA, it talks about lack of

9    transparency.  I'm not making that up.  It's in the statute.

10   It's because of these issues.

11        And you might say, well, we can deal with that when

12   the objection process actually unfolds, but the reasons are --

13   I'm concerned we won't be there at that point.  Why?  Because

14   we can't represent individual claimants.  That's not our job.

15   We represent claimants as a whole.

16        So who is going to watch out for these people, the

17   pro se people?  That's why I'm raising now --

18        THE COURT:  So who would be watching out for them in

19   individual arbitrations?

20        MR. DESPINS:  Neither, but I think there a level

21   of -- or the Committee believes there will be a greater level

22   of comfort because, one, it's going to be done with people

23   that have a legal background in Puerto Rico law and that have

24   the experience of dealing with Puerto Rico claims involving

25   the government.  That is the goal or the -- that's the belief

1    at least, that it would be more beneficial to those claimants.

2    At least they will perceive it to be more beneficial to them.

3         Whether at the end of the day it accomplishes a

4    result, I don't know, Your Honor.  But it's true we're not

5    going to represent them in arbitration either.  But we do have

6    concerns to applying the typical big Chapter 11 rules to this

7    process, and that's what we are communicating to the Court,

8    Your Honor.

9         THE COURT:  And of course the Court is also sensitive

10   to not only the volume of claims but the nature of objections

11   and nature of claims; and at the end of the day, the Court

12   will have to determine whether whatever the Oversight Board

13   has offered up in the claims objection is sufficient to rebut

14   prima facie validity of the case.  This is not -- of the

15   claim.  You know, it will be me.  It's not a machine.

16        So, these things have to be taken into account and

17   considered at all levels, and no matter of mechanism -- the

18   boards aren't shifting.  There may be reasons for me to

19   scrutinize more carefully or be more concerned on the front

20   end of what's being offered up in the way of context in the

21   way of claims objections, but I want to assure you and

22   everyone listening that this -- the Court is not considering

23   any of these claims objections procedures rubberstamp

24   procedures.  And as you heard this morning, the Court

25   specifically raised the concern and had in mind the concern

1    before the withdrawal of the duplicate problem claims, you

2    know, the fact that it didn't seem to be working.  And so the

3    Court is putting that to the test.

4             MR. DESPINS:  It puts a huge burden on the Court, but

5    I was very pleased to hear what you said.  There is no doubt

6    about that.   It puts a huge burden on the Court.

7             THE COURT:  Don't I know it.

8             MR. DESPINS:  But again, this was on cookie cutter

9    stuff.  Now, going to the next level, pro se claimants, we're

10   just concerned about that.

11            THE COURT:  Thank you.  I hear you.

12            Anything further, Ms. Stafford?

13            MS. STAFFORD:  Just briefly, Your Honor.  We

14   appreciate that it does put some burden on the Court, and we

15   also appreciate the concerns that the Court had with the

16   previous claims.  Okay.  And I think our willingness to go

17   back and re-review the claims and confirm that the claims that

18   we've put on our objections are in fact exact duplicates,

19   that's exactly the same level of concern and care that we plan

20   to take as we move through these substantive objections as

21   well.

22            THE COURT:  Thank you.

23            MS. STAFFORD:  And would you like to proceed on to

24   the remaining contested motions as well?

25            THE COURT:  Well, I should rule on this I suppose.

1          MS. STAFFORD:  Yes.

2          THE COURT:  So this Motion for Entry of an Order

3    Approving the Amended Omnibus Objection Procedures and for the

4    relief, which is docket entry number 7051 in the 3283 case,

5    referred to as the motion, is before the Court.  And the Court

6    has considered carefully the requested relief and the parties'

7    written and oral argument and finds that the proposed relief

8    is appropriate under the circumstances.

9          The procedure will enable the debtors to resolve

10   efficiently tens of thousands of claims, and will thereby

11   reduce the transaction costs of the claims resolution process

12   significantly.  The Court acknowledges the concerns expressed

13   by the UCC concerning the need for fair and efficient

14   alternative dispute resolution procedures, and as we have all

15   noted, there are proposed ADR procedures scheduled to be

16   addressed at the July 24, 2019, Omnibus hearing.  And the

17   Committee has also raised legitimate concerns regarding the

18   need for debtors to meet their burden of overcoming the prima

19   facie validity of properly filed proofs of claim and the need

20   to protect the legitimate rights of every claimant.

21         The Court has reviewed the procedures carefully,

22   those being the amended Omnibus objection procedures, and

23   finds that the proposed procedures do not change the

24   allocation of the burden of proof.  Each properly filed proof

25   of claim will retain its prima facie validity pursuant to

1    bankruptcy three -- 3000(f), and the Oversight Board will have

2    the burden of coming forward with evidence or legal argument

3    sufficient to overcome the presumption of prima facie

4    validity.

5         The claimants will have the same right to the Omnibus

6    claims related to this Order as they would have with respect

7    to an ordinary individual claim objection.  And individuals

8    with claims in these Title III cases will have the ability to

9    submit supporting evidence and legal arguments in defense of

10   their claims.

11        The Committee has suggested the procedure should

12   advise claimants of their right to seek discovery concerning

13   the objection to their claims.  The Court declines to single

14   out that aspect of bankruptcy procedure for inclusion in

15   notices to claimants.  Claimants represented by counsel should

16   not need that reminder, and capturing the conceptual and

17   operational aspects of discovery and notice materials would

18   unduly lengthen those documents.

19        The process will be subject to supervision and

20   oversight by the Court, which will ensure that the process is

21   fair, transparent and efficient.  The procedures streamline

22   the claims resolution process in a manner that is common in

23   complex bankruptcy cases, and such procedures are necessary in

24   light of the large number of proofs of claim filed in these

25   Title III cases.

1    Accordingly, the motion is granted and the

2    Committee's objection is overruled.  The Court will enter the

3    debtors' Proposed Form of Order.

4    MS. STAFFORD:  Thank you, Your Honor.

5    THE COURT:  Thank you.

6    Now we can go on to the matters queued up as

7    contested objections to claims.  I think -- did we lose

8    somebody?  So have we lost Court Solutions?

9    All right.  We'll have to take a minute because we've

10   lost Court Solutions.

11   All right.  I understand that we are reconnected with

12   Court Solutions now and we can proceed.  Would everyone be

13   seated, except for Ms. Stafford?  Thank you.

14   MS. STAFFORD:  So we'll begin with the 20th Omnibus

15   Objection of Claims of the Commonwealth of Puerto Rico, which

16   is an objection to a number of claims that were amended and

17   subsequently superseded.  Only two responses were filed with

18   respect to this objection.

19   The first of these asserts that the -- acknowledges

20   that its original claim was amended and superseded and asserts

21   that the original claim would have been automatically deleted

22   as a result of the amendment, which unfortunately is not the

23   case and the original claim does remain on the register.

24   Because the claimant does not disagree that the original claim

25   has been amended and superseded, we request the objection be

1    granted as to this claim.

2            THE COURT:  So this is the Nestor Rodriguez Marty

3    claim?

4            MS. STAFFORD:  That is correct.

5            THE COURT:  The objection is sustained and the claim

6    will be disallowed.  And so that is the objection that was the

7    response filed at 7234.

8            MS. STAFFORD:  With respect to the next response

9    filed by the United States of America on behalf of Customs and

10   Border Protection, this response asks for an order preventing

11   the Commonwealth from later arguing that the amended claim

12   does not properly relate back to the original claim.

13           We spoke with the United States and reviewed their

14   response, and we understand that their concern is that if the

15   Court were to find that the amended claim is an improper

16   amendment, that the disallowance of the original claim would

17   prejudice it because it would be left without any claim

18   properly asserted against the Commonwealth.  We understand the

19   concerns, but we think that the proposed order the United

20   States is seeking is simply too broad.

21           We've agreed that we will not contest whether the

22   liabilities, as asserted in the original claim, were properly

23   asserted against the Commonwealth, and we think that

24   representation should resolve the United States' concerns.  To

25   the extent the amended claim does seek to assert liabilities

1   beyond those asserted in the original claim, we think it's

2   proper to preserve our right to object to those at a later

3   time.

4          THE COURT:  Would you be willing to amend the Order

5   to reflect that the objection is sustained without prejudice

6   to the parties' positions as to the timeliness aspects of the

7   amended claim that were not asserted in the original claim?

8          MS. STAFFORD:  That would be great, Your Honor.

9          THE COURT:  So if you will give me a revised proposed

10  order that includes that language as to this claim, I will

11  sign that order.

12         MS. STAFFORD:  We will be glad to do so.

13         No further responses were filed as to the 20th

14  Omnibus Objection, but I understand from Your Honor's comments

15  earlier that we would submit a certification with respect to

16  these subsequently amended claims that were not responded to,

17  correct?

18         THE COURT:  Yes.

19         MS. STAFFORD:  Very well.

20         THE COURT:  And so I will look forward to the revised

21  proposed order with the certification, and subject to those

22  submissions, the objections will be sustained.

23         MS. STAFFORD:  Thank you very much, Your Honor.

24         THE COURT:  Thank you.

25         MS. STAFFORD:  The next objection is the 21st

 1  Objection of the Commonwealth of Puerto Rico to deficient

 2  claims.  Only one response was filed as to this objection.  We

 3  reached out to and spoke with that respondent, and we are

 4  happy to report that she has withdrawn her claim and will be

 5  filing an amended claim asserting an appropriate amount of

 6  liability, which we reserve our right to object to at a later

 7  time.  But it's been withdrawn for purposes of this objection

 8  at this time.

 9       THE COURT:  Very good.  So you will be making a

10  submission reflecting that withdrawal and truing up the

11  paperwork?

12       MS. STAFFORD:  That withdrawal should be reflected in

13  the amended schedules that were filed last night.

14       THE COURT:  All right.  So I guess we just need to

15  figure out at least --

16       MS. STAFFORD:  Of course.

17       THE COURT:  I need to understand whether the Court

18  has to file an order reflecting the withdrawal of that claim,

19  and so I am hereby asking my staff to figure that out and

20  reach out to you for any additional proposed order that might

21  be necessary in that regard.

22       MS. STAFFORD:  And we'd be happy to submit anything

23  if anything further is required.

24       THE COURT:  Thank you.

25       So now we have the 23rd?

1          MS. STAFFORD:  Yes, Your Honor.  The 23rd objection

2    seeks to disallow 500 claims that are exact duplicates of

3    other claims.

4          THE COURT:  Okay.  I'm sorry.  So as to the remaining

5    responses, the remaining aspects of the 21st, you will provide

6    the certification with the proposed order or --

7          MS. STAFFORD:  So this is a deficient claim

8    objection, so we're happy to provide a certification that

9    they've been re-reviewed and that there's insufficient bases

10   for each of these claims as well.

11         THE COURT:  Thank you.  And so I suppose you could

12   include in that order my so ordering the withdrawal of the

13   other claim, and then that would satisfy my paperwork

14   concerns.

15         MS. STAFFORD:  That sounds perfect, Your Honor.

16         THE COURT:  Thank you.

17         MS. STAFFORD:  The 23rd Omnibus Objection, as I

18   noted, it seeks to disallow 500 claims that are exact

19   duplicates of other claims filed by the same claimants.  We

20   have five responses that were filed.  The first of these was

21   filed by Cooperativa de Seguros Multiples, and we have reached

22   out to the debtor in order to resolve their concerns.

23         THE COURT:  The claimant.

24         MS. STAFFORD:  The claimant.  I'm sorry.

25         We've removed proof of claim 25007, and we've swapped

1    two claims such that 21148 will be disallowed and 24275 will

2    be a remaining claim.  And that should be reflected in the

3    Revised Proposed Order and Schedule filed last night.

4              THE COURT:  So this is a Cooperativa de Seguros

5    claim?

6              MS. STAFFORD:  That's correct, Your Honor.

7              THE COURT:  Okay.  So with those swappings in and

8    out, that objection will be resolved?

9              MS. STAFFORD:  That's correct.

10             THE COURT:  And those will be reflected in the same

11   order.

12             MS. STAFFORD:  Yes.

13             THE COURT:  All right.  Are we all right?  Can we

14   proceed?  We can proceed?  Okay.

15             Okay.  Thank you.

16             MS. STAFFORD:  No problem.  The next three objections

17   that were filed were filed by individuals by the last names

18   Caraballo Martinez, Bravo Quiles and Centeno.  Each of those

19   we understand were incorrectly flagged as exact duplicates and

20   we've withdrawn our objections to those claims as reflected in

21   the schedules filed last night.

22             THE COURT:  Very good.

23             MS. STAFFORD:  The last response filed was filed by

24   Maritza Barris Rosario.  The response does not address the

25   substance of the action and simply notes the claimant's

1  service as a teacher.

2         We're deeply mindful of the concerns Ms. Barris

3  Rosario raises, but nothing in the claims raises the claim

4  that the claims are exact duplicates or that Ms. Barris

5  Rosario reserves her right to assert the claim under the

6  surviving claim.  So I assert the objection should be granted,

7  not withstanding the response.

8         THE COURT:  I've reviewed the Response and Reply to

9  the Response, and I sustain the objection as to the claim.

10  The two claims duplicate --

11         Apparently they can't hear on Court Solutions.  Is it

12  a volume issue or a can't-hear-at-all issue?  All right.

13  We're having trouble getting it unmuted.

14         MS. STAFFORD:  Okay.

15         COURTROOM DEPUTY:  It's claiming it's unmuted.

16         THE COURT:  I don't think anyone's sitting on the

17  edge of their chair to hear how I resolve this claim, so let

18  me just finish.

19         So the objection is sustained as to the two claims of

20  Ms. Barris that duplicate her earlier claim 152207, which will

21  remain on file.  And you'll reflect this in the revised order

22  with the certificate.

23         MS. STAFFORD:  That's correct, Your Honor.

24         THE COURT:  Okay.  So let's just wait one second to

25  see if there's anything we can do about the Court Solutions

1    problem.

2         This is a test.  I'm going to ask somebody who's

3    listening on Court Solutions if they hear this to I guess --

4    okay.  The person who is monitoring it, court staff, should

5    text or e-mail us to let us know if she can hear.  So we're

6    good?

7         All right.  I'm told it's working again so we can

8    proceed.  I think we are up to the 24th Omnibus.

9         MS. STAFFORD:  That's correct, Your Honor.  The 24th

10   Omnibus Objection seeks to disallow 500 duplicate claims.

11        THE COURT:  I'm sorry.  A little slower and a little

12   louder.

13        MS. STAFFORD:  The 24th Omnibus Objection seeks to

14   disallow 500 claims filed against the Commonwealth that are

15   exact duplicates of other claims.  Seven responses were filed,

16   and upon review of each of those responses, the claims were

17   withdrawn from the objections last night.  We actually also

18   re-reviewed the claims subject to objection and withdrew

19   additional claims.

20        And we'll be happy to submit a proposed order and a

21   certificate per Your Honor's request.

22        THE COURT:  Very good.  Subject to the submission of

23   the certification, the Court will sustain the objections

24   listed in the revised order, and I'll look forward to those

25   submissions.

1            MS. STAFFORD:  Thank you, Your Honor.

2            On the 25th Omnibus Objection to claims, this is also

3    an objection to 500 exact duplicate claims filed against the

4    Commonwealth by the same claimant.  One response was filed,

5    and upon review of that response, we've withdrawn our

6    objection, as noted in the schedules filed last night.  We've

7    also re-reviewed, as we re-reviewed all of the exact duplicate

8    objections, and removed additional claims from these

9    objections -- from this objection.  And we'll be happy to

10   provide a certificate with the proposed order and amended

11   schedules.

12           THE COURT:  And I will sustain the objection and

13   disallow the claims subject to that certification coming in.

14   Thank you.

15           MS. STAFFORD:  Thank you.

16           The 26th Omnibus Objection also seeks to disallow 500

17   claims filed against the Commonwealth that are exact

18   duplicates of other claims filed by the same claimant.  Only

19   one response was filed, which again, upon review, we realized

20   was not in fact an exact duplicate.

21           And as to the amended schedules filed last night, we

22   reviewed our objections and we reviewed all the claims subject

23   to objection.  And we reviewed additional claims, and we will

24   file a certificate as well.

25           THE COURT:  Thank you.  We will look forward to that

1  submission, and with that, sustain the objection and disallow

2  the claims properly subject to objection.

3      MS. STAFFORD:  With respect to the 27th Omnibus

4  Objection sought to disallow 299 claims of other claims filed

5  by the same claimant, five responses were filed.  The first

6  listed on agenda is filed by the University of Puerto Rico

7  Retirement System.  They objected solely on the basis that --

8  or responded solely on the basis that they had filed claims

9  through two different systems, and they wanted to confirm that

10  there would be no assertion that one system was not valid and

11  the other system was valid.

12      They did not dispute that the claims were

13  duplicative, and because they did not dispute the claims were

14  duplicative, we would request the Court grant the objection,

15  not withstanding the response.

16      THE COURT:  I've review the Response, and the

17  objection is sustained.  The trust is conceding that the

18  claims are duplicative, and therefore, they should be

19  disallowed in the order to be submitted.

20      MS. STAFFORD:  With respect to the -- thank you, Your

21  Honor.  And with respect to the remaining four responses,

22  these are all responses that indicated that the claims were

23  not in fact duplicative, and upon review of those responses,

24  we have withdrawn those claims from our objection, and also

25  re-reviewed the claims subject to this objection and submitted

1   revised amended schedules withdrawing additional claims.  And

2   we'll provide a certificate for the Court as well.

3            THE COURT:  Thank you.  And so subject to that

4   submission and the submission of the revised proposed order,

5   the Court will sustain the objections to the remaining claims.

6            MS. STAFFORD:  Thank you, Your Honor.

7            The 28th Omnibus Objection seeks to disallow 23

8   claims that are exact duplicates of other claims filed by the

9   same claimant against HTA.  Only one response was filed, also

10  by the University of the Puerto Rico Retirement System, on the

11  same bases as the prior objection.  Namely, that they filed

12  claims through both -- two systems and wanted to confirm that

13  one claim -- one system would not be viewed as more valid than

14  the other.

15           They do not dispute, again, that the claims are

16  duplicative, and as a result, we would request that the

17  objection be granted not withstanding the response.

18           THE COURT:  The objection is sustained.  And so you

19  will provide me with the certificate and revised proposed

20  order.

21           MS. STAFFORD:  We will do so, Your Honor.

22           THE COURT:  Thank you.

23           MS. STAFFORD:  Yes.  The 30th Omnibus Objection to

24  claims seeks to disallow 133 claims, exact duplicates of other

25  claims filed by the same claimant.  Only one response was

```
 1    filed, again by the University of Puerto Rico Retirement

 2    System, raising same concerns about filing claims through two

 3    different systems.  But again, Your Honor, it does not dispute

 4    the claims are duplicative, so we would request that the

 5    objection be granted, not withstanding the response filed.

 6              THE COURT:  The objection is sustained, and I look

 7    forward to the submission.

 8              MS. STAFFORD:  Yes, Your Honor.

 9              THE COURT:  Thank you.

10              MS. STAFFORD:  And I also wanted to note on the 28th

11    Omnibus Objection, we also have swapped two claims upon

12    reaching agreement with the United States of America.  Two

13    claims -- one claim from the disallowed category to the

14    allowed category, and vice versa.  And that's reflected in the

15    schedules filed with the Court.

16              THE COURT:  And so that will be reflected in the

17    order that comes in with the certificate?

18              MS. STAFFORD:  Yes, Your Honor.

19              THE COURT:  Thank you.

20              MS. STAFFORD:  Moving on to the 31st Omnibus

21    Objection to claims, this seeks to disallow 500 claims, exact

22    duplicates of other claims filed by the same claimant.  Only

23    one response was filed, and that response requested that we

24    also swap the claims disallowed and that would survive, which

25    we have done.  And we've filed an amended schedule to that
```

1   effect.

2         We've also re-reviewed all these claims that are

3   asserted to be exact duplicate claims for any issues, and

4   we'll be happy to provide Your Honor with a certificate

5   indicating that review.

6         THE COURT:  The objection is sustained, and I will

7   look forward to the submission.

8         MS. STAFFORD:  Thank you, Your Honor.

9         And finally, with respect to the 34th Omnibus

10  Objection to claims, which objects to a number of claims that

11  are late filed duplicate bond claims filed against COFINA,

12  only one response was filed.  And that response does not

13  address the argument that the claims are duplicative of a

14  master claim.  It simply states that the claims amend a

15  previously filed claim.

16        The original claim and the amended claim both assert

17  liabilities arising from COFINA bond bearing CUSIP numbers

18  governed by master proof of claim and a claim already

19  disallowed as duplicative of master proof of claim.  And so we

20  submit it should be granted, not withstanding the response.

21        THE COURT:  The objection is sustained, including as

22  to the duplicative claim of the Cooperativa that filed the

23  response.  And I look forward to the certificate and revised

24  order.

25        MS. STAFFORD:  Thank you.

1          THE COURT:  I believe that takes us through all of

2     the contested objections.

3          MS. STAFFORD:  I believe it does.

4          THE COURT:  Thank you.

5          And this also brings us to four minutes to 12:00, so

6     we will get an extra four minutes in our lunch break.  Please

7     be ready to resume at one o'clock.  Have a good lunch,

8     everyone.  We're adjourned.

9          (At 11:55 AM, recess taken.)

10         (At 1:09 PM, proceedings reconvened.)

11         THE COURT:  Buenas tardes.  Please be seated.

12         And so the next item on our Agenda is the APJ's

13    Motion for Relief from the Automatic Stay.  And so I would

14    invite the movant to come forward.  We've allotted a total of

15    25 minutes.

16         MR. INDIANO VICIC:  Thank you, Your Honor.  My name

17    is David Indiano of Indiano & Williams.  I represent the

18    association that represents the active judges here in Puerto

19    Rico, the APJ, Assocation of the Puerto Rico Judiciary.

20         With us today, we have the president of the board of

21    directors, as well as the treasurer, Judge Salgado and Judge

22    Rosado in the back row to your left, Your Honor.

23         THE COURT:  Good afternoon, Your Honors.  And good

24    afternoon, Mr. Indiano.

25         MR. INDIANO VICIC:  I know that the Court in these

1    lift stay hearings focuses on the *Sonnax* factors and analyzing

2    the determination to lift a stay.  I want to spend some time

3    in analyzing one of the more fundamental issues that we

4    believe precedes and even supercedes some of these

5    considerations in this particular matter, and that is the

6    issue of judicial independence.

7         The simplicity of our position has not been

8    appreciated by the Oversight Board.  The Board has no

9    authority to force any change in the Judges' compensation or

10   pensions.  This is based on some very fundamental historical

11   and legal facts, none of which can be seriously questioned.

12        Number one, Puerto Rico is a territory.

13        THE COURT:  May I just ask you to hold on for one

14   second?

15        MR. INDIANO VICIC:  Yes.

16        THE COURT:  And I've done something to my computer

17   that is problematic.  Okay.  I will start a new page.  I take

18   notes on the computer, and it is just not cooperating with me.

19        MR. INDIANO VICIC:  No problem, Your Honor.

20        THE COURT:  It still is not cooperating with me.  My

21   apologies.

22        MR. INDIANO VICIC:  No problem, Your Honor.

23        THE COURT:  And of course your clock is not running.

24        Okay.  I think it's time for pen and paper.  All

25   right.  Thank you.

1          MR. INDIANO VICIC:  I'll proceed?

2          THE COURT:  Yes.

3          MR. INDIANO VICIC:  As I was saying, number one,

4    Puerto Rico is a territory.  Number two, Congress' power to

5    govern Puerto Rico is found under the Territorial Clause,

6    which is plenary power.

7          Number three, in establishing the level of

8    self-governance for Puerto Rico, Congress specifically stated

9    in Law 600, and I quote, Said Constitution shall provide a

10   republican form of government.  That's at Section Two.

11         And point four, only then and if the President of the

12   United States found that the republican form of government,

13   quote, conforms with the Constitution of the United States,

14   could he submit the proposed Constitution to Congress for its

15   approval.

16         Section three, inherent in a republican form of

17   government under the United States Constitution are three

18   coequal, independent branches of government.  It envisions the

19   separation of power, and the independence of the judiciary is

20   of paramount importance to the functioning of this republican

21   form of government.

22         As clearly expressed, we know, and as I've drafted in

23   many of the motions, language of the Founding Fathers,

24   Hamilton in particular, and others at the very commencement of

25   the American experiments, in exercising its plenary powers to

1    allow Puerto Rico to have a measure of self government,

2    Congress used the most expansive reaches of this plenary power

3    to create and require this republican form of government.  And

4    this would essentially mirror the Government of the United

5    States itself.

6         Congress did not make an exception for the Puerto

7    Rico judiciary.  It is impossible to ignore this, nor is it

8    possible to imagine a Congress for a moment envisioning

9    anything other than a judiciary with independence.

10        This is one of the key grievances going back to the

11   Declaration of Independence against King George, that he had

12   the judges in their pockets.  The notion of judicial

13   independence is engrained in the American version of the

14   republican form of government.

15        Once you start there, the next steps in our analysis

16   are easy to see.  After using the maximum contours of its

17   plenary power to establish a republican form of government

18   under the Territorial Clause, Congress passed law after law

19   using parts of that plenary power, smaller slices to create

20   other laws to govern Puerto Rico.

21        One of these slices was used when it passed PROMESA,

22   a rather large slice, but that's all it did.  It did not undo

23   the basic essence of what it had done in the 1950s concerning

24   the nature of Puerto Rico and its form of government.

25        THE COURT:  Just one -- I'm sorry.  Something has

1  happened with our phone line again.

2          MR. INDIANO VICIC:  No problem.

3          THE COURT:  All right.  I'm sorry.  We have to take a

4  little break to get that fixed up.  And maybe -- I'm sorry.

5  Apparently we need a few more minutes for the technician to

6  check something, so if you'd like to have a seat.

7          MR. INDIANO VICIC:  Sure.

8          THE COURT:  Thank you for your patience.

9          So have we got the sound or -- still waiting.

10         This is a test.  Whoever is monitoring in New York

11  and whoever is monitoring in the overflow room, let us know.

12  Apparently New York can hear and we're back on the Court

13  Solutions Line.  Is that correct?  All right.

14         Mr. Indiano.

15         MR. INDIANO VICIC:  Thank you, Your Honor.  I'm going

16  to step back to what I was saying so it can flow.

17         THE COURT:  Yes.

18         MR. INDIANO VICIC:  When it passed PROMESA, what it

19  did was take a piece of that plenary power and pass a very

20  important law, a significant law, but it did not undermine the

21  basic form of government that Congress had required for Puerto

22  Rico back in the 1950s, concerning the not implicitly -- or

23  explicitly upset the concept of judicial independence, and

24  there was no reason for Congress to do so.

25         And when it's all said and done, this Court has

1    approved whatever plan, fiscal plan it approves, but all of us

2    remaining here need an independent judiciary.  The success or

3    the failure of the economy that eventually emerges from this

4    procedure is what the business world and the citizens of

5    Puerto Rico need in order to have this economy that goes

6    forward be successful.

7         The Board has stated that the judges are not unique

8    in their across-the-board attempts to cut pensions.  They are

9    wrong.  And there is no sense of entitlement or superiority

10   that attaches to this uniqueness.  Judicial independence is

11   more of a cross to bear by the judiciary than some lofty

12   perch, as the Board suggests.  It is a burden of every judge

13   to leave all personal and financial interests behind when he

14   or she dons the robes.  And I know I'm speaking to the choir,

15   Your Honor.

16        No act of the legislature or the executive should

17   attempt to impinge upon that independence.  And no board, also

18   a creature of Congress, but not Congress itself, can undo what

19   Congress has done by requiring the establishment of a

20   republican form of government with the intrinsic requirement

21   of independent judiciary.

22        Our position is clear.  There's no authority for the

23   Board to touch the judges' pensions.  And while the Board has

24   argued disingenuously, I think, that it would be the Court,

25   not the Board, that would ultimately cut the pensions, that

1    is, at best, a semantic dodge.

2          If the Board recognizes the limits of its power and

3    authority with respect to this fundamental aspect of the

4    necessity for judicial independence of Puerto Rico based on

5    the Congressional mandate, it would not be pushed, so we would

6    not be here, they would not be here opposing this motion to

7    stay.

8          While I do not believe that the *Sonnax* factors are

9    even necessary to address because of this preceding legal

10   mandate of Congress, I do want to make some comments on the

11   opposition and draw some of those factors --

12         THE COURT:  And I also would appreciate your

13   attention to the prematurity argument, which may have shifted

14   now given the announcement of the RSA today.

15         MR. INDIANO VICIC:  I'm sliding right into that.

16   That's one of my next comments, Your Honor.

17         But one of the first things the Board says at page 19

18   of their brief is they say the issue of whether Puerto Rico's

19   Constitution grants a priority enforceable in Title III is an

20   issue that virtually all major creditors' groups cannot afford

21   to ignore.  It could totally derail all pending discussions.

22         This shows a lack of focus by the Board on the source

23   of law for this position of the judges, which is the

24   Congressional exercise of its plenary power of the Territorial

25   Clause, which required a republican form of government, with

1    its inherent separation of powers and judicial independence.

2          It is not about the Puerto Rico Constitution.  It is

3    about what Congress did.  This is not a priority question

4    under the Puerto Rico Constitution.  This is a mandate of

5    Congress, and we have to look at it.

6          Congress never -- I mean PROMESA was never intended

7    to undo that when it was passed.  And there is no derailing

8    here.  The procedures have gone forward.  There are only about

9    386 judicial positions of the active judges, and those are the

10   only ones that are being held up here.

11         Obviously, as we've seen today, proceedings are going

12   forward.  There's settlement negotiations all over the place.

13   And this is a purely legal issue.  Our case that was filed

14   under the Federal Court as a declaratory judgment action.

15         What we need -- and it can be expedited briefings.

16   That is, there's no discovery required.  There's no trial

17   required.  It's simply briefing on whether our position is

18   accurate, correct or not.  That could be expedited.  It would

19   not hold up these proceedings in any way.

20         And despite the judges' claim that the judges are not

21   unique, I have no reservations saying that they are.  No other

22   branch of the government, looking at some of these other

23   discussions that there are today, can advance the position the

24   judiciary has of judicial independence.  There are no flood

25   gates waiting to open because of this position.

1          Let me now address specifically what you asked me to,

2    Your Honor.  On the point one, *Sonnax* factor one, they say in

3    their opposition that we are premature.  We know that's not

4    true anymore.  Today they basically said they're going to have

5    their Plan of Adjustment in 30 days, whatever they can do.

6          So at one point we were too early, and now we are

7    almost too late.  But surely that premature argument is

8    clearly gone.  They want us to only be able to raise this

9    purely legal question of Congressional power, and their power,

10   in the context of the objections in a Plan of Adjustment.

11         We have a right to have this decided in a federal

12   court with a right of appeal to the First Circuit, so there's

13   no question --

14         THE COURT:  Am I not a federal court from which

15   there's a right of appeal to the First Circuit?

16         MR. INDIANO VICIC:  No, that's all I'm asking --

17         THE COURT:  I'm not?

18         MR. INDIANO VICIC:  I'm not saying that you're not,

19   Your Honor.

20         THE COURT:  Okay.

21         MR. INDIANO VICIC:  I'm not saying that.  All I'm

22   saying is we have a right to have this issue decided by a

23   federal court so we can make it clear that this power does not

24   reside with the Board.

25         There is no need to delay this resolution so we are

1   not subjected to the constant pressure to cede to cuts on

2   their pensions when there is no power to do so.  The

3   noninterference with Title II -- Title III case, in *Sonnax*

4   factor two, in that case, the Board, I think, grossly

5   exaggerates the impact of lifting the stay.  If you follow

6   their logic, no stay would ever be lifted.

7        And this Board can be -- this matter can be resolved

8   as a matter of law in discovery.  We are at 386 potential

9   spots in the judiciary of active judges.  It's a very de

10  minimis amount of human beings that are subject to this

11  situation in the judicial branch.

12       In terms of judicial economy, a declaratory judgment

13  will relieve the Court, relieve the Board of its

14  self-perceived need to have these across-the-board cuts, in

15  their vision of fairness, when it's not a matter of fairness.

16  It's a matter of the form of government that we have in Puerto

17  Rico, as mandated by Congress, requires something that they

18  can't interfere with.  And this relieves them of the burden of

19  trying to do that with their, I think, understandable need to

20  want to be fair across the board, but the judiciary is in a

21  different situation.

22       In balancing the harms, the -- there is no

23  conceivable way for me to look at this small amount, de

24  minimis amount of judges as derailing the process which is

25  going forward.  And the only branch of government that has to

1    be protected is the judiciary in terms of its independence.

2    It's the one branch that can't stand up for itself.

3         That is what all the case law and all the language of

4    the Founding Fathers was clear on.  And that is also expressed

5    in the Puerto Rico Supreme Court case as well.  This branch

6    cannot stand up for itself and must be protected, and the

7    independence of the judiciary must be protected.  And the only

8    way to do it is to make it clear to the Board that they are

9    treading on grounds which are not in their ambit to deal with.

10        As we said in our Reply Brief, in ending, there is

11   precious little economic impact by the government and

12   tremendous benefit in preserving an independent judiciary that

13   Puerto Rico must have in order to marshal the respect and

14   confidence of all citizens of this yet-to-be-created world

15   left after restructuring is complete.

16        This new economy will be stillborn, absent an

17   independent, coequal branch of government in the judiciary.

18   The active judges of Puerto Rico, through the APJ, request to

19   this Honorable Court to lift the stay and allow its

20   declaratory judgment action to proceed so that can be clear.

21   Thank you.

22        THE COURT:  Thank you.

23        MR. BIENENSTOCK:  Good afternoon, Your Honor.

24        THE COURT:  Good afternoon.

25        MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

1   Rose, LLP, for the Oversight Board.

2          Your Honor, movant spent the bulk of the time talking

3   about the merits of the case and then got to the *Sonnax*

4   factors.  I'm going to start with the Motion for Stay Relief,

5   and then I'll make some very brief comments about the merits

6   of the case.

7          The problem, the essential reason why we oppose the

8   motion and we urge the Court not to grant it is that its logic

9   doesn't hold up, neither for why relief from the automatic

10  stay is beneficial to the process, is essential for the

11  Judge's Association, or that the Board needs to be told to

12  stop, that it's treading on waters that it has no power to

13  tread on.

14         Starting with I guess the Court's question about the

15  impact of the potential timing now of a proposed plan of

16  disclosure statement being filed, that would powerfully argue

17  for this Court to determine the issue that the Association

18  wants determined.

19         And let's compare -- and let's see why and let's

20  compare the two alternatives.  Movant could go off to the

21  federal court in which it filed its Complaint, and it could

22  prosecute its action against the Oversight Board.

23         Now, parenthetically, we don't think it would go too

24  far because of Section 106(e) of PROMESA, because they're

25  essentially saying they want a District Court to hold that the

1    Oversight Board can't promulgate or certify a fiscal plan that

2    impacts judges' pensions.  That's precisely what 106(e) says

3    no federal District Court can do.  But they want to do that,

4    and it's them against the Oversight Board.

5         Let's compare that to what we're proposing.  We're

6    going to propose a plan.  As this Court knows, and as movants

7    know, there are many parties in interest, some of them are in

8    the courtroom now, who assert priorities on different grounds.

9    True, no one else has the judicial independence ground.  But

10   we know the GO creditors say they have liens on all the assets

11   and they have -- even if they don't have liens, they have

12   first priority to all available resources.

13        We know that other creditors say they have an

14   entitlement to get clawback funds back, because the clawback

15   funds from HTA should never have been taken in the first

16   place.  All of these creditors and more are going to make

17   their cases for priorities unless we button down everything in

18   settlements.  And everyone will be able to defend against

19   other people's asserted priorities and prosecute their own

20   asserted priorities.  That's the way it should be.  That's the

21   way it is at confirmation hearings.

22        What movant is asking for is a one-off against the

23   Oversight Board without the other competing parties asserting

24   priority being present.  It just makes no sense.  They would

25   be -- they would either have to try to intervene in movant's

1   action, or there would be this ruling in a case where they

2   were not parties.

3          And then the first thing Your Honor would have to do

4   is decide, well, are they really bound by another case in

5   which they were not parties, that the judges have first

6   priority to this money?  So starting there just doesn't work.

7          Second, what is the need to know today before there's

8   a confirmation, or to start an action today before this is

9   resolved in confirmation for them to have a ruling that the

10  fiscal plan that proposes an impact on pensions cannot be

11  certified or has to be invalidated?

12         Everyone else in this case who has tried that has

13  been turned down by both this Court and the First Circuit

14  Court of Appeals, for reasons I don't have to go into.

15  Everyone in the courtroom knows them, and Your Honor wrote

16  some of those decisions.

17         THE COURT:  I'm sorry.  The sound has dropped again,

18  so hold that thought.

19         MR. BIENENSTOCK:  No problem.

20         THE COURT:  This is a test.  Would whoever is

21  monitoring Court Solutions and the remote courtrooms please

22  check in and let me know whether you can hear?

23         COURTROOM DEPUTY:  Judge, do you want to try one more

24  time?

25         THE COURT:  This is a test.  Would whoever's

1    monitoring please let us know whether we can be heard in the

2    remote locations?  Are we getting a yes?

3           COURTROOM DEPUTY:  We are, yes.

4           THE COURT:  All right.  We are back on.

5    Mr. Bienenstock.

6           MR. BIENENSTOCK:   Sure.  I think the most efficient

7    thing for me to do now is I'm going to run through the 12

8    *Sonnax* factors and then briefly address the merits.

9           Factor one, whether relief would result in complete

10    or partial resolution of the issues.  As I was just

11    explaining, a one-off determination that the judges' salaries

12    can't be reduced, or pensions can't be reduced, would not be a

13    complete resolution of the issue because you have the GO

14    claims that say we get first claim to all available resources,

15    no matter what.

16           So if the resources they say they have first priority

17    to have to first go to the GOs, there's obviously a dispute.

18    It would not resolve everything.  And if the Court -- if

19    there's one thing that is safely predictable, it's that

20    everyone is going to have a reason why their ruling doesn't

21    mean that they come ahead of all the other creditors asserting

22    priority for a variety of reasons.

23           *Sonnax* factor two, the lack of any connection with or

24    interference with the bankruptcy case.  Well, this is

25    completely connected and interferes with the bankruptcy case.

1    It will interfere with the confirmation hearing.

2              And what's more, Your Honor, what if they're in the

3    middle of their action in the Federal District Court or it's

4    been resolved and it's on appeal and Your Honor is posed with

5    priority issues at confirmation?

6              How does this Court now give deference to whatever

7    has been decided in another court or what might be decided and

8    reversed or affirmed on appeal?  It would only create

9    confusion and needless complexity.

10             *Sonnax* factor number three, whether the foreign

11   proceeding involves a debtor.  Well, that's inapplicable.

12             Four, whether a specialized tribunal has been

13   established.  Absolutely not.  So that goes in favor of not

14   terminating the stay.

15             Five, whether the debtors' insurance carrier has

16   assumed full responsibility.  Well, there is no insurance here

17   to pay the judges' pensions, so that goes in favor of not

18   giving stay relief.

19             Six, whether the action essentially involves third

20   parties rather than the debtor.  No, this most definitely

21   involves the debtor.  So in favor of the Board again, of not

22   granting stay relief.

23             Seven, whether the litigation can prejudice the

24   interest of other creditors.  Absolutely, it could, for the

25   reasons I've discussed.  Reason not to grant stay relief.

1       Eight, whether a judgment in the foreign action is

2   subject to equitable subordination.  Well, no foreign action,

3   so it's inapplicable.

4       Whether movant's success in the foreign proceeding --

5   this is nine -- would result in a judicial lien.  Again,

6   inapplicable.

7       Ten, the interest of judicial economy and the

8   expeditious and economical determination of litigation for the

9   parties.  For the reasons I explained, it's much more

10  efficient to do it in one confirmation hearing where

11  everyone's priority claims are on the table, rather than in

12  bifurcated proceedings where not everyone has a chance to be

13  in both.

14      Eleven, whether the foreign proceedings have

15  regressed.  Well, again, that's inapplicable.

16      And 12, the impact of the stay on the parties and the

17  balance of hurt.  Your Honor, there, I think, the fact that

18  virtually every factor that was applicable -- every factor

19  that was applicable was in favor of not giving stay relief

20  shows that the balance of hurt suggests that the stay should

21  not be modified.

22      Now, Mr. Indiano mentioned that he thinks it's sort

23  of a distinction without a difference that we said that if the

24  pensions are reduced, it would be the Court doing it and not

25  the government.  And I just want to explain why it's -- it's

1   most definitely a distinction with a difference, and that's

2   why we said it.

3        And we didn't say it to put the onus on Your Honor

4   either.  We said it because the Supreme Court said it in the

5   *Bekins* decision.  There, which was one of the first tests of

6   Chapter Nine after the Supreme Court had ruled the first

7   Chapter Nine was unconstitutional in *Ashton*, the issue again

8   came up.

9        How can a city, a municipality, avail itself of a

10  bankruptcy discharge without running afoul of the notion in

11  the Federal Constitution that states can't impair contractual

12  obligations?  And the answer that the Supreme Court gave is

13  the state, the municipality is not doing it.  It's the Federal

14  Court that's doing it.  And that's the reason why we made that

15  distinction.  It had -- go ahead, Your Honor.

16       THE COURT:  It seemed to me that Mr. Indiano's

17  arguing here today that even the Court would not have the

18  power under PROMESA to alter the judicial pensions; that by

19  making the basic specification that the Puerto Rico

20  Constitution has to embody a republican form of government,

21  Congress has implicitly decreed that only Congress itself

22  could invade judicial independence, the compensation element

23  of judicial independence here in Puerto Rico.

24       MR. BIENENSTOCK:  Well, the answer to that, Your

25  Honor, is that Congress wrote in Section Four of PROMESA,

1   that PROMESA, quote, Shall prevail over any general or

2   specific provisions of territory law, state law, or regulation

3   that is inconsistent with this Act, end of quote.

4            So Congress responded to Mr. Indiano and said, we are

5   passing this federal law that will allow you, among other

6   things, to impair contractual obligations throughout the

7   territory, and it prevails over any inconsistent territory

8   law, of which the Puerto Rico Constitution is one.

9            Now, I'll wrap up just with the most basic

10  observation on the merits, Your Honor.  Movant starts with

11  judicial independence and the republican form of government.

12  We respect both principles.  No issue.  But the dots are not

13  connected.

14           They're saying somehow that by a debt restructuring

15  dealing with the inadequacy of funds to pay all debts in full,

16  that if you reduce a judicial pension, the judge will no

17  longer be independent.  We reduced the legislature's budget by

18  ten percent last year.  They challenged it in this court.  The

19  Court ruled in favor of the Oversight Board.  It was appealed

20  to the First Circuit.  The First Circuit affirmed.

21           The -- we have to do what we have to do to deal with

22  the truism that we don't have enough money to go around.  It

23  would be one thing if the Puerto Rico legislature or the

24  Governor were saying, I don't like some judicial decisions

25  that have come down in Puerto Rico courts lately, so I'm going

 1   to lower the judges' salaries.  That's not what's happening

 2   here.  What's happening here is there is a global discount of

 3   debt because we don't have enough to go around.  It doesn't --

 4   there's no logic showing why that impacts independence.

 5        And as Mr. Indiano knows, because we've shared with

 6   him the cases, the jurisprudence in the Federal Courts, when

 7   challenges to changes in judicial salaries have come up, is

 8   that as long as the judges are not being targeted, there's no

 9   impact on their independence.  And there's no -- and they

10   haven't made a suggestion here that they're being targeted.

11   And of course, we would never do that and we haven't done

12   that.

13        So again, finally, we haven't decided how we're going

14   to treat their pension claims.  We appreciate what they do,

15   who they are, their arguments, but to isolate that one issue

16   and to send it to another court, albeit a federal court, when

17   not all the parties affected by the impact would be there to

18   be heard, and it could certainly complicate a confirmation

19   hearing, you know, that, with all of the *Sonnax* factors I

20   mentioned, I think makes fairly clear that this is not a good

21   situation for stay relief.

22        THE COURT:  One question for you before Mr. Indiano

23   comes back.  You said that there hasn't been a decision made

24   as to how to treat these judges' pension claims.  I think I

25   heard Mr. Gordon this morning saying that the deal with the

 1   Retiree Committee includes alterations to the Judicial

 2   Retirement System.  So is that something separate?

 3        MR. BIENENSTOCK:  Yes.  And Your Honor heard

 4   correctly and it is separate.

 5        We're anticipating, not in concrete, but we're

 6   anticipating that there's going to be a class of retirees, and

 7   that's what Mr. Gordon was talking about this morning.  But

 8   movants, our understanding is that movants are active judges

 9   who are concerned about what happens to their future pension,

10   and that is a separate class.  And we haven't made a final

11   determination on that.

12        THE COURT:  Thank you for clarifying that.

13        MR. BIENENSTOCK:  Thank you.

14        MR. INDIANO VICIC:  Your Honor, in response to your

15   question, Mr. Bienenstock cited parts of PROMESA.  He didn't

16   talk about overriding Congressional mandates regarding the

17   creation of Puerto Rico's system of government.  They were

18   hoping to form a government -- he mentioned territorial, state

19   regulations.  None of those are Congress, so that was

20   completely unresponsive to your question.

21        THE COURT:  Well, his point, as I understood it, is

22   that Congress may have made specifications for the Puerto Rico

23   Constitution, but Congress very specifically said in PROMESA

24   that PROMESA can override any law that is the law of the

25   territory, and there's no reason not to consider the

1    territory's Constitution, which was developed here, a law of

2    the territory.

3            Is that a fair summary, Mr. Bienenstock?

4            MR. BIENENSTOCK:  (Nodding head up and down.)

5            THE COURT:  He's nodding yes.

6            MR. BIENENSTOCK:  That's perfect, yes.

7            THE COURT:  He said it was perfect.  Thank you.  I

8    get a gold star.

9            MR. INDIANO VICIC:  And that shows the problem here.

10   We are not talking about the Puerto Rico Constitution.  We're

11   talking about what Congress required to be created in terms of

12   the form of government, republican form of government.

13           We're a step above the Puerto Rico Constitution in a

14   sense, and I don't mean that in a superiority sense, but in

15   terms of entering into a legal analysis, we're talking about

16   what Congress did when it mandated a creation of a form of

17   government of Puerto Rico, a republican form of government,

18   not a separate law.

19           It said whatever you come up with, it has to be this.

20   And you can't -- the laws that they're talking about in the

21   Constitution, that's why when we start -- immediately I

22   started hearing about bond claimants, they're trying to put

23   judges in this basic argument, which is the form of

24   government, on the level of a Puerto Rico constitutional

25   claim.  That's not really what we're talking about.  We're

1  talking about what Congress did in the creation of what we

2  have in Puerto Rico, and the requirements that this be a

3  three-part separated powers of government, with judicial

4  independence as an inherent quality of the judicial branch.

5       That's where the analysis gets off track, because

6  they keep trying to drag us into this analysis.  You're like

7  everybody else.  You have to compete at a confirmation

8  hearing.  That's not what we're talking about.  We're talking

9  about Congress stepped in before all that and created

10 something which has not been undone by PROMESA anywhere.

11      THE COURT:  Well, there will be other people who will

12 want to compete with that proposition, and so that is one

13 important consideration of the forum in which this debate

14 should occur.

15      MR. INDIANO VICIC:  It's difficult to imagine an

16 entity that's going to be able to compete given -- on that

17 historical basis, on that legal basis from a mandate of

18 Congress.

19      THE COURT:  You may think you have a slam dunk, but

20 due process demands that other people who want to challenge

21 that proposition be able to challenge it in a way that

22 everyone who was concerned can be bound by the results.

23      MR. INDIANO:  Everybody has told me, whatever this

24 is, it's not a slam dunk.  I know it's a difficult and unique,

25 perhaps, perspective, but that doesn't mean it's not correct.

1    I'm just trying to shift the argument to where I think it has

2    to be with respect to what Congress created when it

3    established whatever we have here in terms of form of

4    government.

5         So I understand the desire to put us on some kind of

6    level where we're just competing with equal components of this

7    process.  That's not what Congress created.  And we talked

8    about in the -- I understand the --

9         THE COURT:  I'll need you to wind up.

10        MR. INDIANO VICIC:  Yes.  I'll just wind up with the

11   issue of who's pushing the changes.  We already know -- and

12   Judge, I think you picked up on this.  They say they don't

13   know what they're going to do with the retirement of the

14   judges.  They have already essentially cut a deal with one

15   group of retired judges, and we're the active judges.  So it's

16   still disingenuous to say they don't know what they're doing.

17        They're going to have to try to force cuts in the

18   pensions.  And they want us to connect the dots, how do

19   pensions effect judicial independence.  There is a plethora of

20   case law describing how that has affected, going to the *Booth*

21   case, United States Supreme Court, and tons of other cases.

22        So that is to be seriously questioned.  Any effect on

23   judicial compensation is an attack on the independence of the

24   judiciary, and that's established by case law.

25        Thank you very much.

```
 1              THE COURT:  Thank you.

 2              And I thank both counsel for these arguments, and I

 3   will take this matter under submission.

 4              MR. INDIANO VICIC:  Thank you.

 5              THE COURT:  The next Agenda item is Roman IV, number

 6   16, the Motion for Relief from Stay of the AMPR.

 7              MR. BARRIOS RAMOS:  Good afternoon, Your Honor.

 8              THE COURT:  Good afternoon.

 9              MR. BARRIOS RAMOS:  Counsel, Jose Luis Barrios in

10   representation of Asociacion de Maestros de Puerto Rico and

11   its union, Asociacion de Maestros de Puerto Rico-Local

12   Sindical.

13              THE COURT:  Good afternoon, Mr. Barris Ramos.

14              MR. BARRIOS RAMOS:  Your Honor, we are pleased to

15   announce that AMPR and the Oversight Board have reached an

16   agreement in principle regarding the settlement that we, in

17   our view, will address in a complete form, the teachers'

18   relief or request for relief in the Motion for Relief of Stay.

19              As part of this settlement agreement, in principle,

20   the AMPR and the Oversight Board have identified a mechanism

21   to complete the payment of this unused, accrued sick leave to

22   the teachers that retired on or about the summer of 2017 and

23   were impacted by Law 26.  However, at this point, we will need

24   the Government's cooperation to implement this mechanism.

25              We are hopeful that given Mr. Friedman's earlier
```

1   statement in court, that it's the government's position to

2   protect all its pensioners, that their cooperation will come

3   in an immediate basis.

4         Besides that, Your Honor, I believe that it is the

5   position of the AMPR that this settlement agreement in

6   principle is a win-win situation, like Mr. Bienenstock

7   mentioned earlier, referencing other agreements that unions

8   have reached with the Oversight Board.  And we will have

9   nothing further.

10        I think counsel for the Oversight Board --

11        THE COURT:  Thank you.

12        Good afternoon, Mr. Possinger.

13        MR. POSSINGER:  Good afternoon, Your Honor.  Paul

14  Possinger of Proskauer Rose on behalf of the Oversight Board.

15        I can confirm what Mr. Barrios has said.  We have

16  reached an agreement with respect to how to handle the

17  underlying claims that relate to this motion and that will

18  result in the disposition of the motion itself.

19        We are awaiting confirmation from the government that

20  they will cooperate with the settlement payments themselves.

21  That has not yet occurred.  We think that is the last detail

22  to iron out.  Once that happens, we should be able to

23  implement this.

24        And then counsel had mentioned to me that you may

25  request a status report on this, or that we might agree to

1    submit a status report before the next Omnibus to inform Your

2    Honor as to where this has ultimately come out.

3         THE COURT:  Yes.  So shall I mark this, put over to

4    the July 24th Omni with a status report to be filed by July

5    17th at the latest?

6         MR. POSSINGER:  That works for us, Your Honor.

7         THE COURT:  Thank you.

8         MR. POSSINGER:  Thank you.

9         THE COURT:  Mr. Friedman.

10        MR. FRIEDMAN:  Your Honor, Peter Friedman on behalf

11   of AAFAF.  Again, you know, I mentioned this to Mr. Possinger

12   and I mentioned this to labor counsel, at this point, the

13   government -- I certainly don't have authorization or client

14   authorization to indicate what the government's going to do.

15        The government has been put in a position where the

16   Board has said here's a new expense to pay --

17        THE COURT:  I'm sorry.  I need you to talk a little

18   louder.  Thank you.

19        MR. FRIEDMAN:  Sorry, Your Honor.

20        Where the Board has said pay something, but hasn't

21   said where does that money come from, does something else get

22   cut -- we know they want to do this in furtherance of the

23   agreement they signed this morning, and there are parts of

24   that agreement that may be appealing, but we've expressed our

25   concerns already about some of the overreaching aspects of

1  that.

2       So obviously we will cooperate in terms of providing

3  a status update, but again, I want to be clear and not leave a

4  misimpression by silence that AAFAF and another department of

5  the government has authorized this payment in light of sort of

6  the circumstances and the uncertainty about where the money's

7  going to come from, what other funds may be, you know,

8  impinged upon or impeded by doing this, and sort of the

9  absence of a clear direction as to how that works out.

10       And like I said, we will participate in providing any

11  necessary information for a status update in a timely

12  manner.

13       THE COURT:  And I assume that you will participate in

14  discussions in between, to the extent there can be clarity in

15  some agreement reached as to the fiscal impact of this

16  agreement and sources of funding?

17       MR. FRIEDMAN:  Yes, Your Honor.

18       THE COURT:  All right.  I think that's the most that

19  can be asked at this moment, and I hope that there will be

20  some progress and clarity one way or the other.  And I will

21  look forward to the July 17 status report.

22       MR. FRIEDMAN:  Thank you, Your Honor.

23       THE COURT:  Thank you.  And I thank you all.

24       And so that takes me through Roman IV on the Agenda,

25  and I will turn the bench over to Judge Dein for the items at

1    Roman V.  And then I will return for the items at Roman VI.

2    Thank you.

3         HONORABLE MAGISTRATE JUDGE DEIN:  I'm authorized for

4    a seventh inning stretch.

5         MR. DESPINS:  Good afternoon, Your Honor.  Luc

6    Despins with Paul Hastings on behalf of the Committee.  And

7    I'm going to handle -- there are three motions for stay in the

8    three different cases, but I think it makes sense to handle

9    them all together.

10        HONORABLE MAGISTRATE JUDGE DEIN:  I think so.

11        MR. DESPINS:  And I would like to reserve maybe five

12   minutes for rebuttal at the end.

13        So the three motions seek to stay the proceedings

14   that the Board and the Committee started together all around

15   the time where the statute of limitations was about to expire

16   in these three cases.

17        And just to give you a sense of magnitude, Your

18   Honor, there were 26 adversary proceedings that were filed in

19   these three cases, 1,500 defendants, more or less.  In the

20   Commonwealth case, there were GO clawback actions, eight of

21   those adversary proceedings against 752 defendants.

22        There were also GO lien challenges where the Board

23   and the Committee said the GO holders are not secured

24   creditors.  Seven different adversary proceedings there

25   against 368 defendants in the ERS case.  There were only

1    clawback actions.  These are actions to get back the money

2    that was paid to the holders of ERS bonds.  Seven adversary

3    proceedings against 235 defendants.

4           And finally in the HTA case, there was only a lien

5    challenge, four different adversary proceedings against 143

6    defendants.

7           Since we filed the Motion to Stay -- the motions,

8    plural, to stay, there were obviously objections filed, and

9    we'll address that in a minute.  But also I wanted to mention

10   to the Court, because I'm not sure you know, that FGIC filed

11   an answer in the HTA -- I see you're nodding so, therefore,

12   you know about that.

13          HONORABLE MAGISTRATE JUDGE DEIN:  You answered that

14   on --

15          MR. DESPINS:  And also there was a motion to dismiss

16   filed by a group of GO bondholders to the lien challenge as

17   well, so I wanted to tee that up.

18          So the first, easiest part, Your Honor, is the Motion

19   to Stay in the ERS case.  We believe that is unopposed, so we

20   would -- we'll submit a separate form of order, if Your Honor

21   is agreeable, but I wanted to put that aside.

22          HONORABLE MAGISTRATE JUDGE DEIN:  I agree.  Let's put

23   it aside.

24          MR. DESPINS:  Okay.

25          HONORABLE MAGISTRATE JUDGE DEIN:  I think whatever is

 1   sort of agreed with the others, we'll go along with that.

 2         MR. DESPINS:  So now let's deal with the others.  And

 3   what we said in the Motion to Stay is that we wanted an

 4   extension of time to serve the various complaints on these

 5   1,500 defendants.  And that regardless of that, we thought

 6   that there should be a stay of the proceedings.

 7         We raised a number of issues, and I'd like to address

 8   some that were not addressed as well, looking back, as they

 9   should have.  But one of the points we made is that there is

10   already litigation, for example, in the ERS case, as to

11   whether bonds are valid or not.

12         If that litigation produces a result, why, good or

13   bad, why bother the people in the clawback until we know the

14   outcome of that underlying litigation?  So that's one reason

15   to stay the service of the complaints on the clawback.  And

16   generally that applies to the clawback.

17         I would say that the most disruptive type of action

18   that we can take is serving the clawback actions, because

19   you're telling people that got money three years ago that they

20   have to give it back.  And that is cause -- it's not the issue

21   of using a first-class stamp and mailing the Complaint to the

22   person.  It's what comes back after that.  That is going to

23   engender a lot of legal fees and costs to deal with the trauma

24   that that will cause.

25         I would say the main focus is on the clawback, and

1   also there's a reason to stay the clawback, which is that

2   there's an underlying action that relates to the clawback.

3   Let's see how that action turns out before we, you know,

4   disrupt the various people that are the targets there.

5            And the other point to be made is that -- is again,

6   it's not only the service of this.  Of course we can serve the

7   1,500.  We can put as many people as needed on that.   That's

8   not the point.  We don't need until necessarily November to do

9   that, but it's everything that will be caused by the service,

10  service at different times, you know, coordinating all of

11  that.

12           HONORABLE MAGISTRATE JUDGE DEIN:  Your papers say

13  that you needed the time to -- you have two separate issues,

14  right?  You have service and then you have the stay of

15  litigation?

16           MR. DESPINS:  Correct.

17           HONORABLE MAGISTRATE JUDGE DEIN:  But your papers

18  were pretty clear, I thought, that said you wanted the stay

19  for service for really administrative reasons.

20           MR. DESPINS:  Correct.  I'm getting to that.

21           So one of them is you have to coordinate service,

22  because people are served at different times.  Their time to

23  answer runs -- so there's a whole coordination effort.  But on

24  top of that, it's the issue of -- and, you know, I think when

25  we got approval to do this in New York, I remember Judge Swain

1   looking at me and saying -- there was a reference to some

2   circus.  I forget if it's -- but basically saying, look,

3   you're doing this because the statute of limitations is about

4   to expire.

5        The answer is yes.  I fully expect that what's going

6   to happen after that is an effort to resolve all of this

7   rather than having -- and I forget the expression.  That's

8   where the circus analogy came in.  But I fully expect there

9   will be efforts to settle all of this rather than litigate in

10  39 different directions.  I think that was the analogy that

11  was used.

12       And that's part of it as well.  Mr. Bienenstock says

13  that he thinks he will file a plan or may file a plan in the

14  next 30 days or so.  That will deal with a lot of the issues,

15  I would say with 99 percent of the issues that are built into

16  these complaints.

17       So it does make sense to see whether these issues can

18  be settled or not before we go all out and start dealing with

19  1,500 defendants, and the motions to dismiss, motions for

20  summary judgment, motions on the pleadings, et cetera, et

21  cetera.  We're happy to do that in a sense.  We can do it, so

22  it's not an impossibility.  But from a case management point

23  of view, we don't think that makes sense.

24       Now, obviously, does it have to be November 1st?  No.

25  It could be -- you know, I understand their concern, which is

1    hey, if there's a plan that's going full steam ahead while I'm

2    stayed here, that's not good.  But there's a safety valve in

3    the Order that says they can move to terminate the stay and

4    the Court for good cause can terminate the stay.

5         So there is a safety valve, and that is one of the

6    biggest arguments here, which is what is the prejudice to

7    them.  Yes, nobody likes a stay, but there's a very precise

8    safety valve that says that either the plaintiffs or the

9    defendants can terminate the stay.

10        The defendants have to show good cause.  I don't

11   think that's a -- we didn't try to define what good cause is

12   because that could take weeks to agree with everyone as to

13   what that means.  But the point is the Court has a lot of

14   discretion.

15        And that's where I started with this, and I would end

16   with this:  There is no point in me arguing a lot about this

17   because it's completely within your discretion as to whether

18   it should be a stay or not.  We think it makes sense, but if

19   Your Honor doesn't think it makes sense, then we'll operate

20   accordingly.  But I think the Court has a lot of discretion in

21   giving us more time to serve and on staying the litigation

22   generally.

23        HONORABLE MAGISTRATE JUDGE DEIN:  All right.  But

24   just clarify for me why you think you shouldn't serve as

25   opposed to just -- because clearly you can serve an order that

1   says, I'm serving this, the litigation is stayed.  There's no

2   answer due for 30 days until after the stay is lifted.

3           MR. DESPINS:  We can serve.  I would just say that in

4   the context of clawback actions, it causes a lot of trauma

5   because we're telling people that -- it's one thing to say

6   that you're not going to get paid or you're going to get paid

7   50 cents on the dollar.  It's quite another to tell people on

8   top of that, you need to give back X millions of dollars that

9   you received three years ago.

10          So that's why in the clawback context, we would

11  really urge the not serving until there's greater clarity,

12  because depending on what happens with the Plan, it may be

13  that these actions are never pursued to completion.  So why,

14  you know, inconvenience these people and cause all this --

15  because I know, I know what's going to come back because I

16  already receive calls from some of these people who want to

17  get me disbarred and all that.

18          So I'm telling you that there's a lot of agitation

19  over the clawback actions.  So if we cannot serve those folks,

20  I think that would aid in the process.

21          And the lien avoidance, we can serve.  It's just that

22  I believe the Plan will address a lot of these issues, so why

23  not see what's behind door number one, which is the Plan.  We

24  may not like it, in which case we can go forward, or people

25  may think it makes sense to settle it.

1        HONORABLE MAGISTRATE JUDGE DEIN:  Let me ask you, in

2   the Proposed Order that you had that you wrote that the

3   plaintiffs themselves could decide to go forward without Court

4   approval, what's the rationale behind that?

5        MR. DESPINS:  Well, because it's -- we're happy to

6   make it subject to good cause.  We're happy to make it -- I

7   thought we had fixed some of that, but we're happy to make it

8   completely parallel, Your Honor.

9        HONORABLE MAGISTRATE JUDGE DEIN:  All right.  All

10  right.

11       MR. DESPINS:  All right.  Thank you.

12       MR. STANCIL:  Good afternoon, Your Honor.  Mark

13  Stancil from Robins Russell for the Ad Hoc GO Group.

14       I'm going to try to cover some of the issues that I

15  think are common to several of the actions, and my colleagues

16  will address additional issues as well.  So I won't cover all

17  the waterfront, but I'll try to hit the main ones.

18       Let me start, if I may, with what I gather has now

19  been abandoned, which is the idea that these Complaints cannot

20  be served.  I would refer the Court to paragraph 20 of the

21  motion which says that claims that good cause exists to extend

22  the service deadline, because serving all domestic defendants

23  within 90 days would be difficult, if not impossible -- I take

24  it that is no longer the assertion.  And so with -- I hate to

25  beat a dead horse, but let me just --

```
1              HONORABLE MAGISTRATE JUDGE DEIN:  I'm with you on

2     that.

3              MR. STANCIL:  Okay.  Let me add one point in

4     particular that's specific to the lien avoidance action.

5     There's a lien avoidance and clawback.  On the lien avoidance

6     action, their Complaint alleges an address for each defendant

7     because everybody had to file one proof of claim.  So it's a

8     question of sending out 400 first-class envelopes.

9              Perhaps they need an order of the Court to say that

10    the proof of claim address suffices for service, but I think

11    they will get certainly consent from everybody here at our

12    table today.  We think that should be done immediately.  We

13    don't think there's any justification, certainly no good

14    cause.

15             The suggestion was made that there is -- this is a

16    modest form of relief.  Respectfully, we disagree.  We've been

17    trying to get clarity as to our liens for two years.  We

18    actually filed a declaratory judgment action in June of 2017,

19    which the Oversight Board and others claimed was not ripe.

20    They were correct in the judge's view and in the First

21    Circuit's view, which was affirmed, but now it's clearly ripe

22    because they've moved to avoid our liens.  We need this

23    resolved.

24             Mr. Despins says, well, we should wait for the plan

25    of adjustment, but we know they contest the liens.  We know,
```

1   therefore, I assume we can infer, that a plan of adjustment

2   will not give us credit for the liens.  Waiting to see a plan,

3   the premise of which is that there is no lien, doesn't

4   accomplish anything.  We need to get this done.

5        There's another suggestion made that -- well, the

6   claim objection that's been filed against certain of the bonds

7   would obviate the need for the lien avoidance action.  That's

8   both wrong and inefficient.

9        Let me tell you why on each count.  It's wrong

10  because there are certain bonds that they have not objected to

11  for which a lien claim has been asserted, so whatever the

12  result of the claim objection, the Court will still need to

13  address the lien issue with respect to the as yet unobjected

14  to bonds.

15       But let me tell you why I think it's just a bad idea

16  as well.  We're going to need clarity as to the status of

17  those claims.  Their assumption is, which we respectfully

18  disagree with and hopefully we'll get around to getting in to

19  Court to prove it, but their assumption is, well, they'll win

20  the claim objection.

21       My assumption is they're going to lose it

22  spectacularly, and then we're going to need to come in and say

23  not only do we have claims on all of these challenged bonds,

24  but they are secured claims for the reasons that we've

25  outlined.

1      We have outlined them in a Motion to Dismiss that we

2   and the Ad Hoc Group of Constitutional Debtholders filed

3   yesterday.  These claims have been well explained.  There's no

4   efficiency gain except to roll the dice and hope that they can

5   get out from some of their bond claims before having to

6   address the lien claims, with respect to the remainder.  We

7   should just get on with this and not have a six or 12 month

8   delay baked in at the end of the claim objection.

9      HONORABLE MAGISTRATE JUDGE DEIN:  Let me ask you

10  this.  I think you filed two motions to dismiss last night,

11  right?  Or was it just one?

12     MR. STANCIL:  I intended to file, I think we intended

13  to file only one --

14     HONORABLE MAGISTRATE JUDGE DEIN:  I thought it was

15  two different groups --

16     MR. STANCIL:  We filed with the Morrison & Foerster

17  firm, a joint motion.

18     HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

19     MR. STANCIL:  And there may have been, if I have my

20  facts straight, a corrected version filed that had to do with

21  the signature block.

22     HONORABLE MAGISTRATE JUDGE DEIN:  Among the late

23  night filings.

24     MR. STANCIL:  Well, we weren't noticing it for this

25  Omnibus Hearing.  I want to be clear about that.

1          HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  My question

2     is whether it makes sense to take some time to try to figure

3     out how to bring it in a uniform manner to the Court to have

4     these issues resolved, as opposed to having hundreds of -- or

5     even five or six or seven different motions.

6          And that, to me, is why it might make sense to stay

7     this for a finite period of time.  I think everybody's now

8     agreed that it's certainly -- an indefinite stay doesn't make

9     any sense, but I'm trying to figure out whether it makes the

10    most sense to do a finite stay within which period -- first of

11    all, anybody can move to lift the stay if they think their

12    issue is of critical importance.  But it's also a time when

13    some plan for bringing it before the Court in a unified

14    fashion can be developed.

15         MR. STANCIL:  We certainly don't oppose a unified

16    briefing schedule for the core legal issues, because that's

17    what we have long sought.  But may I suggest, what they're

18    trying to do, and we see this with the shift in positions

19    today, they're trying to play out every day of the 90 days of

20    service, plus some extra, plus a -- they're just slow-rolling

21    this to death.

22         What I would submit is why don't we give them a

23    deadline to serve that's maybe even a little ambitious.  How

24    about July 15th they serve, and then we'll have a Motion to

25    Dismiss due 30 days after that?  We can all get on a common

1   schedule.

2          I've already filed my Motion to Dismiss, and

3   everybody is free to look at it as they want.  We're all for

4   that.  But what we're hoping to avoid is this shifting

5   rationales, let's wait for the plan, let's wait for this,

6   let's wait for this.  Let's get to court.

7          They've built this entire process, the plan, on claim

8   objection, lien objection, litigation, litigation, litigation

9   that they filed, but they are running like mad from having to

10  answer any of it and we need to get on with it.

11         Some people are in the room negotiating this behind

12  the scenes.  We are not.  They will not talk to us.  They will

13  not talk to many others.  You will hear this from others as

14  well.  So I can infer from that what's going to be in this

15  plan in the next 30 days.

16         We need to get this thing in court.  They've chosen

17  the litigation.  We've got to get it moving.  So we are all

18  for a unified deadline, Your Honor, but let it be soon so we

19  can actually get this done, instead of just teeing up two

20  years of litigation that starts some indefinite form in the

21  future.

22         HONORABLE MAGISTRATE JUDGE DEIN:  Do you know when

23  the original service deadline was?

24         MR. STANCIL:  I think it was May 2nd, so I think --

25  I'm not supposed to do math on the fly, but August 1.  July

1   31st.   Somewhere in the late July, early August timeframe.

2          So if they could even get service done by that

3   deadline, I mean, I think we could have motions to dismiss due

4   on a standard deadline and we'd be just fine.

5          May I just briefly address one other point, Your

6   Honor?  With respect to the clawback actions, there are -- and

7   this is a problem that we have in this case that we're trying

8   to resolve.  There are clawback actions filed against

9   challenged bonds, bonds that are already the subject of a

10  claims objection.

11         We're fine in staying the clawback portion until

12  they've litigated the claim objection that they've filed, but

13  there are other bonds, the PBA bonds in particular, and the

14  2011 GOs that the UCC has objected to and the Oversight Board

15  has not yet objected to.  They filed a clawback action against

16  those bonds.

17         Count I says these bonds are all invalid, and the

18  counts that follow are premised on that.  We need that to be

19  moving forward as well.  So that's why we've objected to any

20  stay of those clawback actions insofar as they are challenging

21  additional bonds, but we're all pretending that they haven't.

22         So I don't know what else to say except the bonds are

23  either null and void in their view or they are not, but we

24  can't have it both ways.  And we need -- again, they're the

25  ones who filed all the lawsuits.  Let's start getting it

1    moving, these questions, and get some answers and get this

2    case over with.

3              HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

4              MR. STANCIL:  Thank you, Your Honor.

5              MS. MILLER:  Good afternoon, Your Honor.  Atara

6    Miller from Milbank on behalf of Ambac.  I don't want to

7    rehash territory, but I do think this is an important juncture

8    to make the point that what we're seeing here is really a

9    continuation of the strategy that the Oversight Board has

10   adopted since day one of these Title III cases.  Namely, push

11   everything to confirmation; put a plan; get some small,

12   impaired accepting class, and steamroll everyone else.  Put

13   everything into a massive confirmation that cannot be heard.

14             Mr. Bienenstock earlier this morning made a

15   representation about using mediation to facilitate settlements

16   and have a colloquy after that with Judge Swain where Judge

17   Swain said, I'm going to take you at your word that you're

18   going to use that.

19             I take Mr. Bienenstock at his word, but I listened

20   very carefully to what he said, and what he said was we're

21   going to file a plan.  And for those of you who didn't sign on

22   because you weren't included in the discussions and because

23   this door was slammed in your face, then after the plan is

24   filed, you can come in and talk to us about it.  Then we'll go

25   to mediation and we'll try to get you on side with a plan

1    that's already been proposed.

2          From day one, creditors have been standing here

3    trying to get declarations, trying to get other adjudications

4    about their rights, about their property interests, about

5    their liens.  The answer has been, they're not ripe.  They're

6    not ripe.  You can't listen to it.

7          In HTA in particular, one of the critical pieces of

8    their argument with respect to ripeness was well, you can't

9    bring a claim related to whether or not the fiscal plan

10   effects a taking because the fiscal plan is just a blueprint.

11         I reviewed a number of transcripts from the fall of

12   2017, the summer, fall and winter of 2017 in front of Your

13   Honor, oral argument in front of Judge Swain, and oral

14   argument to the First Circuit.  The Oversight Board

15   consistently took the position that the fiscal plan is a mere

16   blueprint with no legal effect.

17         There was a determination, Judge Swain's Order

18   dismissing our Complaint related to clawback, and HTA relied

19   on that representation by the Oversight Board.  Now they file

20   a motion that not only says that the blueprint actually has

21   binding legal effect, but that the fiscal plan and the budgets

22   actually reorder priority and can negate liens.

23         That's an issue.  If they're going to throw out

24   grenades, they have got to pull the pin and litigate it.  They

25   cannot throw a grenade, attach it to a trigger and put in a

1   motion that says we litigate when we feel like it.  There has

2   to be some resolution and some determination.

3        This is not -- you know, Mr. Bienenstock argued in

4   connection with respect to the second to last Lift Stay Motion

5   that, you know, there are going to be a lot of people arguing

6   about priorities.  We're not arguing about priorities.  We're

7   arguing about property rights.

8        This is like COFINA.  These are the core fundamental

9   threshold questions.  Is the money, even the Commonwealth's,

10  to be dealt with in a plan?  This is not saying the

11  Commonwealth has a fixed amount of money and we're going to

12  fight about who has a right to it.

13       We are entitled to litigate whether or not the money

14  that the Commonwealth is going to deal with -- and for the

15  Court to address in the Plan, whether it even belongs to the

16  Commonwealth or does it belong to the revenue bondholders.

17  Does it belong to the instrumentalities to which that money

18  was transferred by statute?

19       HONORABLE MAGISTRATE JUDGE DEIN:  As it now stands,

20  where do you see these issues being resolved?  Some have been

21  brought in various places.  What's your overall view of the

22  path of these issues?

23       MS. MILLER:  I think they should be litigated in

24  stand-alone cases where the property interests can be

25  addressed appropriately, and then you take that, once you

1   define what the property rights are, and you put out a plan.

2           HONORABLE MAGISTRATE JUDGE DEIN:  But who

3   participates in those cases?   Is it all of the bondholders?

4   How do you --

5           MS. MILLER:  I don't think all of the bondholders --

6   I don't think unaffected bondholders need to participate in

7   litigating over some of the threshold legal questions about

8   property interests, right?  It's either the Commonwealth's

9   property or it's not.

10          I expect that both the UCC and Oversight Board, and

11  potentially even AAFAF, will come in and adequately represent

12  the interests of those who say it's the Commonwealth's

13  property.  If people want to intervene, they wouldn't even

14  have standing to intervene.

15          HONORABLE MAGISTRATE JUDGE DEIN:  But who would be

16  the parties -- they're serving hundreds of people with these

17  adversary complaints.  Does everybody have the right to come

18  in and raise the same defenses that you want to raise?

19          MS. MILLER:  Well, I think it depends what box you're

20  in, right?  So they're filing against different boxes.  No, I

21  don't think a GO creditor has standing to come into the HTA

22  box and argue about anything.

23          HONORABLE MAGISTRATE JUDGE DEIN:  Right.  But do all

24  of the HTA, or do all of the GO?  I want to make sure that

25  everybody gets an opportunity to weigh in once or twice --

1          MS. MILLER:  Right.

2          HONORABLE MAGISTRATE JUDGE DEIN:  -- as opposed to

3   hundreds of times.

4          MS. MILLER:  So I think everybody does have the right

5   to weigh in and should be given that opportunity, which is why

6   I think Mr. Despins already said, service isn't the issue.  In

7   HTA in particular, there are only 143 defendants and they know

8   who we are.

9          I think all of us should be served, and then there

10  should be -- I don't dispute that there should be some

11  coordinated schedule and some process put in place for trying,

12  to the extent possible, to coordinate the briefing.  That

13  doesn't require an extended stay.  It requires service, you

14  know, at a minimum, according to the rules and on the schedule

15  provided for under the Federal Rules.

16         And then, you know, the ordinary briefing with an

17  expectation and maybe guidance from the Court about what you

18  would expect in connection with briefing.  I mean, certainly

19  that's what's happening with respect to PBA, and I think it's

20  working effectively.

21         HONORABLE MAGISTRATE JUDGE DEIN:  And apart from

22  these actions, so we have the claims objections, which are

23  raising some of the issues.  Where else are they being raised?

24  Is it -- what's your understanding as to whether or not any of

25  these issues are on a path to be resolved?

1          MS. MILLER:  Well, our view, I mean, we filed a Lift

2     Stay Motion, or our position is we don't have to lift the stay

3     because the stay simply doesn't apply with respect to PRIFA,

4     which is not directly addressed, but raises a number of the

5     same issues in terms of whether or not the statutes that

6     transferred certain revenue streams to instrumentalities

7     transferred property interests, such that those revenues are

8     no longer property of the Commonwealth.

9          So that's one avenue.  And certainly they're

10    currently up on appeal with respect to HTA in the First

11    Circuit.  The First Circuit hasn't ruled.  The -- Assured's

12    decision with respect to special revenues is subject to

13    reconsideration, but ours addressed much more broadly all of

14    these issues and whether or not, A, put them to the First

15    Circuit but also argued that in the event that the First

16    Circuit didn't want to, at a minimum, we should get a

17    declaration that we're free to pursue those claims.  In state

18    court, we're awaiting decision.  Oral argument on that was in

19    January.

20         So I think there are other places where these would

21    be litigated.  And I'm not suggesting that they can't also be

22    litigated in front of this Court.  Right.  So if we want to

23    start a process, we can do that.  I just don't know why

24    everything has to be dealt with in the context of

25    confirmation.

1          These are threshold questions that define what you

2  can put in your plan.  I mean, if COFINA had to be decided

3  before we could turn to the Commonwealth, the issues of the

4  revenue bonds also need to be decided before we can get to a

5  Commonwealth plan.

6          THE HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

7          MR. CALLEN:  Good afternoon, Your Honor.  Jason

8  Callen from Butler Snow, here on behalf of Financial Guaranty

9  Insurance Company.

10         I just want to address, within the context of HTA,

11 some of the questions that you've been having back and forth

12 with colleagues of mine here at the counsel table.

13 Specifically looking, in the context of HTA, do you need a

14 stay for some type of management purposes?

15         As you heard from Ms. Miller, we've got only 143

16 defendants in those cases.  They're all -- there are four lien

17 avoidance actions in HTA.  That's it.  Four lien avoidance

18 actions.

19         They all raise pretty much the same -- exact same

20 arguments in their complaints.  Those can be easily managed.

21 The summons can be served.  Parties can get together and we

22 can enter into an appropriate case management order that can

23 tee those issues up.  So I don't believe that any stay is

24 necessary for management purposes.

25         Then the next question would be is a stay required in

1    HTA for resolution purposes, whether because there will be a

2    resolution through settlement or resolution through other

3    litigation?

4          Well, I can tell Your Honor we feel very confident

5    there's not going to be a resolution through settlement or

6    something through the plan of adjustment, because

7    as Ms. Miller already laid out, the Board has made clear, and

8    all the plaintiffs through this Complaint that they filed in

9    HTA, that the plan of adjustment is going to declare that the

10   funds that are in dispute in the HTA cases belong to the

11   Commonwealth, that they don't belong to the HTA, and that

12   there are no valid liens held by the bondholders.

13         We know that that's coming.  We don't need to see a

14   plan of adjustment, because the plaintiffs have said that

15   those are coming down the line because of the fiscal plans

16   that have been certified and because of the budgets that have

17   been certified.  While we heard earlier those weren't written

18   in stone, they now say they are written in stone and that

19   those will dictate the plan of adjustment.

20         So there is no settlement.  We haven't been

21   contacted, as we noted in our papers, about any possible

22   settlement all this time.  Well, we have, as others here at

23   counsel table have been talking about seeking some type of

24   declaration, some order from the Court as to the validity of

25   our liens.

1    So these over here -- we hear a lot in this Court

2    about gating issues.  The validity of these liens, who owns

3    this money, in -- these are gating issues that have to be

4    decided in litigation before this Court.  And the appropriate

5    way to do it is in this litigation that has actually been

6    filed, is now pending, and that we have also answered and

7    filed a counterclaim and third party claims that address the

8    specific provisions of PROMESA and other applicable laws that

9    show that those liens are valid.

10    I also would say, Your Honor, that there really isn't

11    any other litigation where we can be assured that these issues

12    raised in the complaints in HTA, and in our answers and

13    counterclaims and third party claims, where we can be assured

14    that those issues will be decided.

15    Yes, it's true that there were adversarial

16    proceedings in HTA that were seeking access through special

17    revenue provisions under the Code incorporated through

18    PROMESA.  That is currently still up on appeal in the First

19    Circuit.  But it is highly likely that those decisions that

20    will ultimately be rendered by the First Circuit will not

21    decide the core issue of whether the liens are valid and who

22    owns the funds here that are in dispute.

23    Judge Swain did -- specifically did not decide that

24    issue when she granted the defendant's Motion to Dismiss in

25    that case, and the First Circuit specifically didn't decide

1    that issue.  So there's no outstanding litigation where those

2    issues can be resolved.

3         So for those reasons, we would say there shouldn't be

4    a stay.  The plaintiff should get on with serving summons and

5    complaints.  And then we should agree upon or try to reach an

6    agreement upon an appropriate case management order so that

7    this litigation can proceed.

8         The one thing, and I'm hesitant to even mention this,

9    Your Honor, but just because it's my one opportunity to get in

10   front of you, although we strongly believe there shouldn't be

11   a stay, if there is a stay, we have filed, as you know, a

12   counterclaim, but also some third party claims, a limited

13   number of third parties that we have included with our claims.

14   And we would like, if there is any stay that's entered, we

15   would like it to be clear that we can still serve copies of

16   the Summons and our third-party claims on that limited number

17   of individuals so that we don't run into any 90 days issues or

18   anything of that sort.

19        And if Your Honor has no further questions --

20        HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

21        MR. NATBONY:  Your Honor.  Good afternoon, Your

22   Honor.

23        HONORABLE MAGISTRATE JUDGE DEIN:  I think we're at

24   1.5 or something.

25        MR. NATBONY:  I think I asked for one, but I'll take

1.5.  I'm William Natbony from Cadwalader representing

Assured.

Your Honor, Assured looks forward to getting to these

important issues as quickly as possible, but obviously would

participate in any common management plan or briefing schedule

that the Court issues to coordinate this.

In my one minute now, I just wanted to point out that

in our limited objection, we pointed out to some language in

the proposed orders in the three motions that still provides

that the plaintiffs, as a whole, can cause any stay to be

lifted at their option without making a showing of good cause.

And whereas any single plaintiff or defendant would not have

to show -- would actually have to ask for and get good cause.

So in the interest of uniformity, we would hope that

that language would be adjusted in paragraphs three and four

to allow for anyone, whether it be a single plaintiff, a

single defendant, or all plaintiffs to actually make an

application and show good cause to lift any stay that Your

Honor orders.  Thank you.

HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

MR. ZOUAIRABANI TRINIDAD:  Your Honor, if I may.

Attorney Nayuan Zouairabani of McConnell Valdez representing

AmeriNational Community Services, LLC.

We have requested three minutes to speak, but it

seems some of my colleagues have taken some time.  I would ask

1   you to grant us the indulgence to at least have some time to

2   respond on our limited response.

3           HONORABLE MAGISTRATE JUDGE DEIN:  Go ahead.

4           MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

5           HONORABLE MAGISTRATE JUDGE DEIN:  I think we've given

6   a joint extra three minutes.

7           MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

8           Your Honor, movants had two bites at the apple to try

9   to meet their burden.  They have failed each time.  Under Rule

10  4(m), they need to show good cause.  Good cause requires good

11  faith and a reasonable basis for noncompliance to serve.

12          Now, first of all, that second prong, based on the

13  representations that were made to the Court, have gone out the

14  window.  They just admitted that they can serve and they just

15  need basically to get around to do that.  So right now the

16  good cause requirements for granting an extension under Rule

17  4(m) have gone out the window.

18          Second of all, they argue in their pleadings that the

19  fact that they are involved in other Title III matters

20  prevents them to handle these adversary complaints.  Well,

21  that is a predicament of their own creation.  Movants

22  specifically asked the Court to approve some procedures in

23  order to pursue the Complaints the way they have.

24          Now, if that creates an issue, that is more akin to

25  mistake or inadvertence and would not constitute good cause to

1   grant an extension under Rule 4(m).  Movants also would not

2   comply with permissive extension due to the fact of their

3   failure to account for the prejudice that the extension would

4   have on AmeriNat.

5        Now, Your Honor, AmeriNat did not ask to be sued.  It

6   was sued nonetheless, and it is ready to immediately respond

7   and defend itself on the Complaints.

8        Now, during the presentations to the Court, movants

9   argue that there's a safety valve in the procedures where the

10  stay could be lifted if the defendants show good cause.  Now,

11  it is a little bit interesting, Your Honor, because those

12  procedures, what they intend to do is invert the standard.  It

13  is movants who have the standard of good cause to get the

14  extension, not the defendants who have the standard of good

15  cause to get the stay lifted.  Now, that should not proceed,

16  Your Honor.

17       Finally, AmeriNat is in a very particular

18  circumstance, Your Honor.  Not only is it probably the largest

19  creditor of HTA, it can easily be served.  Now, with that in

20  mind, Your Honor, I have to echo some of the things my

21  colleagues have mentioned, which is that the movants decided

22  to proceed with this, and at some juncture, they need to

23  address and actually answer the Complaints or a motion to

24  dismiss, or whatever responsive pleadings defendant chooses to

25  answer.  As they say in my neck of the woods, at some point

1    they either need to put up or shut up, Your Honor.  So I

2    believe that time has come now.

3            There is no basis for the stay.  However, we would

4    not be opposed to some joint prosecution for the litigation in

5    order to have everything done orderly, Your Honor.  And in

6    that sense, even if the Court were to consider a stay, we ask

7    that that stay be bifurcated.  AmeriNat has very particular

8    defenses and a unique situation, and any such stay would be

9    prejudicial upon us, Your Honor.  Thank you.

10           HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

11           MR. BIENENSTOCK:  Your Honor --

12           HONORABLE MAGISTRATE JUDGE DEIN:  Let me just make

13   sure, are there any other opponents?

14           (No response.)

15           HONORABLE MAGISTRATE JUDGE DEIN:  We're done.  Okay.

16   Go ahead.

17           MR. BIENENSTOCK:  I had not been part of this, but

18   I've listened and wonder if I could have a few minutes both to

19   provide some information that might be helpful to everyone and

20   to respond to some unfounded accusations that were made

21   against my client.

22           HONORABLE MAGISTRATE JUDGE DEIN:  Why don't you take

23   a couple of minutes.

24           MR. BIENENSTOCK:  Thank you.

25           In terms of the information that might help everyone,

1   we know that the GO holders have asserted liens against the

2   property -- certain of the property taxes and the clawback

3   revenues.  We've disagreed with them, but we know they assert

4   them, because they filed a Complaint that went up to the First

5   Circuit.

6         While we disagree with them, in the plan we file,

7   we're going to provide that they get property taxes and they

8   get clawback funds, because we have to pay them out of

9   something, so we might as well pay them out of the things they

10  say they have a lien on first.  So that might make some of the

11  issues go away.  I just raise it for that purpose.

12        And as far as the accusations that were made by

13  Ambac, just three or four quick responses.  I was shocked to

14  hear about my client's -- the Oversight Board's strategy and

15  intentions.  I don't know where they got this from, but they

16  ended up saying that we took some very small agreements with

17  some small classes with the intent of ramming through a

18  confirmation.

19        Well, how could anyone be so silly as to think that

20  Judge Swain would ever let us do that?  That's never what we

21  wanted to do or intended to do, and that can never happen in

22  this Court.  When we file a plan, to the extent there are

23  overarching issues, I've actually said it I think at prior

24  Omnibus Hearings, we might ask Judge Swain to tee up some of

25  the issues, such as clawback revenues, at the disclosure

1    statement stage, because we know they're overarching.  They

2    have to be resolved.  We might ask to tee up the GO priority

3    at that time, because we know it has to be resolved.

4            And everything should be done in an orderly, fair

5    way.  We know the Court will require it.  We want it that way.

6    The Board wants it that way.  And all of the aspersions and

7    accusations to the contrary, I don't know where Ambac got

8    them, but they're just flatly wrong.

9            Second, Ambac voiced anger that when they raised

10   claims in the past, we didn't let them be adjudicated because

11   of ripeness.  Two things about that.  One is some of their

12   claims are just false.  They claimed the right to turnover

13   under Sections 922 and 928.  They lost.  It was decided on the

14   merits.

15           Before they could have it decided by the First

16   Circuit, another litigant had it decided by the First Circuit

17   and Judge Swain was affirmed.  So they've gotten

18   determinations on the merits on some of their most critical

19   issues.

20           Number two, the claims that were dismissed were

21   dismissed because this Court and the First Circuit found the

22   Court did not have subject matter jurisdiction to proceed.  I

23   don't know if they're angry at the law, at Judge Swain

24   following the law, the First Circuit affirming the law or the

25   Oversight Board saying what the law is, but I -- where does

1    that anger come from?  That was the law.  The Court didn't

2    have jurisdiction to decide things that they posed that they

3    should have known in the first place.  So it's just

4    inexplicable to us.

5         The other accusations made -- I'm over time, so I'll

6    just say we couldn't disagree more.  But the Oversight Board

7    is going to propose a plan and ask for scheduling that is fair

8    to everybody and gets the issues resolved in the most

9    efficient way.  That's always what it intended to do and that

10   is what it will do.

11        Thank you, Your Honor.

12        HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

13        MR. DESPINS:  Just two seconds, Your Honor.

14        We think there should be a stay of some kind.  It's

15   okay to build into the stay a case management process.

16   There's no problem with that.  And we're also okay to start

17   serving the lien challenge summons.

18        So we're -- where we have concerns is serving the

19   clawback action, so I want to make sure that's not lost in

20   this.  But your proposal to have a case management process

21   meet and confer, take place during that stay period, makes a

22   lot of sense.  There's no doubt about that.  So I don't

23   think --

24        HONORABLE MAGISTRATE JUDGE DEIN:  There's nothing

25   that you've asked for that would prevent you from serving, is

1    there?

2         MR. DESPINS:  No.

3         HONORABLE MAGISTRATE JUDGE DEIN:  I mean, you've

4    asked for an extension of time to serve, so you're the one --

5    within at least the initial 90 days, are the one that's making

6    the decision as to who to serve or who not to serve, right?

7         MR. DESPINS:  Correct, but we don't want to let the

8    90 days pass without an order saying it's okay.

9         HONORABLE MAGISTRATE JUDGE DEIN:  I understand that.

10   I want to make sure that I'm reading your proposed order

11   correctly.  You're not saying you can't serve within that

12   period.  So if you're making a distinction between the

13   clawback cases and the lien avoidance cases, there's nothing

14   that stops you from serving the lien avoidance matters

15   promptly.

16        MR. DESPINS:  I think that's where the danger is,

17   that I'm not in the weeds on that issue -- I think we have

18   most of the addresses for the lien avoidance.  I'm pretty sure

19   of that.  But I know for a fact we don't have all the

20   addresses for the clawback actions, for example.  And that's

21   why I'm concerned about saying absolutely we can serve all the

22   lien avoidance actions.

23        We certainly don't think we could serve the 1,500,

24   which includes the clawback, within that 90-day period,

25   because we don't have all the addresses for the clawback.  But

1   I think nobody is really pushing the clawback, in terms of

2   service, at this stage.

3       And in terms of lien avoidance, I want to leave

4   myself a little bit of room in case we don't have all the

5   addresses.  I think we do, but I'm not a hundred percent sure.

6       HONORABLE MAGISTRATE JUDGE DEIN:  All right.

7       MR. DESPINS:  Thank you.

8       MR. STANCIL:  Your Honor, may I make a constructive

9   suggestion?

10      HONORABLE MAGISTRATE JUDGE DEIN:  That would be

11  good.

12      MR. STANCIL:  May I suggest a meet and confer on -- I

13  don't know what to call this, but the unification procedure,

14  start right away, and we can report back to you hopefully with

15  a proposal at the next Omnibus?  Because as you're aware, in

16  the selective claim objection, we're coming up to Boston in a

17  couple of weeks to talk about when we can start the procedures

18  on that.

19      It's been five months since they filed the claim

20  objection.  I don't want to see the same thing happen on this

21  lien avoidance thing.  So if there's going to be a meet and

22  confer, let's get it started so we can meet and come back with

23  something.

24      HONORABLE MAGISTRATE JUDGE DEIN:  So what I'm

25  inclined to do is say let's enter a stay until September 1st

1    as of now.  Prior to that, in time for the next Omni, I will

2    -- I'll enter an order shortly.  I'll have to think it

3    through, but it would require a meet and confer and a proposed

4    joint case management proposal.

5          Before September 1st, parties can file motions for

6    relief from stay, but it really will have to be sort of an

7    emergency as to why you would -- why your issue needs to be

8    decided before we can have a uniform scheduling plan.  And I'm

9    trying to figure out, as I'm sitting here, and I'm not doing a

10   really good job of it, of how this schedule fits in with all

11   of the other schedules that we're going to be discussing in

12   Boston.  And I find myself unable to do that standing here.

13         I have to admit I started today thinking that there

14   was a real service problem with getting addresses, and

15   apparently that is not the motivating factor for this motion,

16   so I need to shift gears on that.  But I think for planning

17   purposes, right now I will enter an order that there is a stay

18   of proceedings except for service as of September 1st -- up

19   until September 1st.

20         I will enter an order requiring case management

21   before that, with something to be addressed at the next Omni.

22   And at that time, if this stay is no longer appropriate,

23   within the case management order, we can revisit it at that

24   point as well.  But as I see it now, that's sort of not a

25   great extension beyond the service period that's already in

1    place.  Okay?

2         Somebody else needs to talk to me?  Okay.

3         MR. KISSNER:  Good afternoon, Your Honor.  Andrew

4    Kissner, from Morrison & Foerster on behalf of the Ad Hoc

5    Group of Constitutional Debtholders.

6         Just a clarification.  As Mr. Stancil said before, of

7    the five motions to dismiss we filed last night, we're

8    informed by our local counsel that there may have been an

9    error with one of them.  The intention was to file a corrected

10   pleading sometime today.  I don't know if that's happened yet.

11   I just wanted to confirm that by fixing this clerical error,

12   we wouldn't be violating the stay --

13        HONORABLE MAGISTRATE JUDGE DEIN:  See, I don't want

14   you to do anything in a rush.  I want you to get it right the

15   first time.

16        MR. KISSNER:  I understand.  Understandable.  I just

17   don't want to violate the stay.

18        HONORABLE MAGISTRATE JUDGE DEIN:  What are you

19   saying?  You're going to withdraw something you filed last

20   night?

21        MR. KISSNER:  No.  I believe it's already happened.

22   There was literally a problem with the signature block.  It

23   should be fixed by now, but in case it hasn't hit ECF yet, I

24   just didn't want to be accused of violating the stay in doing

25   that.  That's all.

1            HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

2            MR. KISSNER:  Thank you.

3            MR. DESPINS:  Just a clarification, Your Honor.  So

4    we would have until September 1st to serve as well?  Is that

5    what you intended or --

6            HONORABLE MAGISTRATE JUDGE DEIN:  Yes, as of now, but

7    it's within your discretion.  So you can serve before then.

8            MR. STANCIL:  I'm sorry, Your Honor.  I was confused.

9    I thought Your Honor was suggesting he should serve now -- I'm

10   just saying this from a case management perspective.  The

11   sooner people are served, the sooner we can coordinate on how

12   to get everybody --

13           HONORABLE MAGISTRATE JUDGE DEIN:  Correct, but he has

14   until August 2nd to serve, regardless.

15           MR. STANCIL:  Correct.  He has a list of all the lien

16   avoidance defendants in his pocket.

17           HONORABLE MAGISTRATE JUDGE DEIN:  So I don't know if

18   I'm shortening his time.  So the lien avoidance, I'm hearing

19   from counsel that he expects to serve sooner rather than

20   later.

21           MR. STANCIL:  I haven't heard that.  Is that correct?

22           MR. DESPINS:  It's really the clawback that we

23   would --

24           HONORABLE MAGISTRATE JUDGE DEIN:  And the clawback

25   does not need to be served prior to September 1st.  The other

1   litigation, though, is stayed pending a case management order.

2   And I will actually issue an order on what I want in the case

3   management order when I have some time to think about it.

4           MR. CALLEN:  One point of clarification, Your Honor.

5   You said that --

6           HONORABLE MAGISTRATE JUDGE DEIN:  I didn't say that

7   much.

8           MR. CALLEN:  No, I know you didn't.  I know you

9   didn't.  And I think that this covers it.  When you said that

10  the stay to September 1st wouldn't apply with respect to

11  service, I just wanted to confirm that that wouldn't apply

12  with respect to service of our third party --

13          HONORABLE MAGISTRATE JUDGE DEIN:  Correct.

14          MR. CALLEN:  Thank you.

15          HONORABLE MAGISTRATE JUDGE DEIN:  But you need to

16  make it clear, if you're serving anything, that the litigation

17  itself is stayed.

18          MR. CALLEN:  Understood, Your Honor.  We will.  We

19  will.

20          HONORABLE MAGISTRATE JUDGE DEIN:  Wait.  Let's talk

21  about that.  If you're going to serve that, do we need to

22  enter an order that says that the litigation is stayed and no

23  response is due -- I need to see what you're going to serve.

24          MR. CALLEN:  Maybe the way to resolve it would be

25  this.  If you would enter an order requiring, when we serve

1    our Summons with the Complaint, that we also serve a copy of

2    your order that you're planning to enter that stays this

3    litigation until September 1st, we can serve that all in a

4    single package.

5         HONORABLE MAGISTRATE JUDGE DEIN:   All right.  So you

6    need to do that.

7         MR. CALLEN:  Yes.  We can absolutely do that, Your

8    Honor.

9         HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  All right.

10   Any more trouble I can get into in my two minutes up here?

11        All right.  Thank you.

12        THE COURT:  The next Agenda item is the status

13   conference with respect to the PREPA 9019 motion proceedings

14   that are scheduled for July.  And I have some opening remarks

15   to which I will expect counsel to react.

16        To begin with, I want to note that my instruction to

17   the government parties was to confer with potential objectors

18   and submit a joint status report concerning issues that they

19   wanted to address at this pretrial conference.  The Joint

20   Status Report that I received reads more, even in its amended

21   incarnations, like a collection of legal briefs or position

22   papers, and it does not appear to me to demonstrate a

23   meaningful attempt to narrow issues or suggest a path forward.

24        The arguments in the status report, many of which

25   were repeated in the briefing concerning the two motions in

1   limine, have lead me to conclude that there's a fundamental

2   flaw in the structure of the disclosure process contemplated

3   by the current schedule for the 9019 motion and in the opening

4   documentation on the 9019 motion itself.

5           The 9019 motion was filed without any proffer of

6   factual material, much less a proffer of facts sufficient to

7   make out a prima facie case for approval of the relief sought

8   in that motion.  And although the 9019 motion filing includes

9   legal discussion, that discussion is largely conclusory, and

10  it lacks the thorough analysis of the legal issues that would

11  be required to underpin an order approving a 9019 motion that

12  would compromise claims that are allegedly significant in

13  value.

14          So putting aside, for the moment, whether the motion

15  should have been filed in that more fulsome manner, the

16  current litigation schedule does not require that any

17  declarations be filed until July 17.  Frankly, I didn't

18  realize that the government parties hadn't filed any

19  declarations in support of their motion when I signed the

20  Order setting the schedule.  And I didn't notice the gap until

21  I reviewed the 9019 motion in preparation for this hearing to

22  see what anchors and guideposts there might be for resolution

23  of the breadth and scope issues that are cued up in the Joint

24  Status Report.

25          And so it seems to me that the lack of an opening

1   road map to the manner in which the government parties intend

2   to justify, if you will, the 9019 relief that's being sought

3   has lead to the current quite inefficient process in which we

4   have parties arguing over discovery concerning topics that may

5   or may not seriously be raised by the way the motion is

6   advocated or which might be addressed, perhaps even adequately

7   by factual proffers by the movants.

8          And we have here opponents and potential opponents of

9   the RSA seeking very broad discovery in an attempt to put meat

10  on the bones of the 9019 motion.  And as I read it, they've

11  essentially sought discovery on the full range of approaches

12  that might underlie the conclusory statements contained in the

13  9019 motion and the Proposed Order.

14         Therefore, I have concluded, subject to hearing

15  responses to this proposal from the parties present today,

16  that I will direct the government parties to file their

17  opening factual declarations and a supplemental memorandum of

18  law keyed to those declarations by the middle of next week.

19  Those papers must provide detailed factual proffers and legal

20  arguments that, if uncontroverted, would be sufficient to

21  demonstrate the movant's entitlement to the relief sought in

22  the 9019 motion.

23         Those papers, thus, will chart a potential pathway

24  for approval of the 9019 motion and put the Court in a better

25  position to assess the proper scope of the hearing and, if

1   any, necessary additional discovery in advance of the hearing.

2   For the avoidance of doubt, the additional submissions must

3   include discussion of precisely what relief the Court is being

4   asked to approve, the legal authority for such relief, and

5   facts, as opposed to conclusory assertions, that would justify

6   granting that relief.

7        And now I'm going to say that same thing about three

8   other ways, just to get the point across and share with you my

9   thinking.  So I expect that the submissions will not simply

10  repeat the conclusory statements in the 9019 motion.  And I

11  advise the government parties that the submissions shouldn't

12  take an aggressively narrow view of what is relevant to the

13  9019 motion, which contemplates approval of arrangements that

14  at this point appear to go beyond just setting a compromised

15  value of the secured claims asserted by supporting

16  bondholders.

17       Even if the Court were to adopt the narrow view

18  advanced by the government parties in their papers so far, the

19  Court will still need a record sufficient to establish the

20  benchmark range of reasonableness for potential recovery on

21  the bondholders' claims in order to determine whether the

22  discount to the claims that would be the result of the

23  settlement in the RSA falls within the range of

24  reasonableness.

25       And in the filings to date, the government parties

1    have relied principally on the fact that the RSA is a deal

2    struck by parties that were previously clearly at odds with

3    one another.  And that may well be one indicator of

4    reasonableness, but I think that the scope and complexity of

5    the deal demands significantly more to demonstrate that the

6    compromise reached by the parties is fair and equitable.

7         For instance, the government parties have not sought

8    to shed any light on their worst case/best case risk analyses.

9    They haven't explained how they considered the larger macro

10   economic effects of the deal, or otherwise demonstrated

11   tangibly that they've given reasoned consideration of relevant

12   factors that would merit the Court's deference to their

13   business judgment.

14        Presumably there are analytical constructs underlying

15   the compromise represented by the RSA, but the 9019 motion

16   does not provide much detail or insight as to how or why this

17   particular compromise was achieved.  So I'm not concluding

18   that no such showing meriting approval of the RSA is possible.

19   Far from it.  I'm simply pointing out that no such showing has

20   been made at this point.

21        Additionally, the 9019 motion clearly contemplates

22   approval of a deal that is far more complex and has

23   ramifications for many more interested parties than a deal

24   that simply sets a claim amount.  And the Court must be

25   persuaded that those aspects of the deal, such as imposing

1    charges, establishing priorities, making irretrievable

2    pre-plan payments and exempting matters from regulation under

3    local laws are within the Court's legal authority and

4    supported by relevant facts and analysis.

5          And while the 9019 motion argues that certain aspects

6    of the deal could be implemented by PREPA without Court

7    approval, the 9019 motion as filed asks for Court approval of

8    the RSA in its entirety, and therefore, seems to require the

9    Court to determine whether that transaction as a whole, in all

10    of its aspects, meets the standard for approval of agreements

11    under Rule 9019.

12          Each aspect of the Proposed Order that the Court is

13    being asked to approve must be adequately supported in fact

14    and law.  And you will remember that we did something of a

15    back end exercise with this on the COFINA related motions, and

16    I had hoped not to end up in that position again.  That's why

17    I'm trying to be as clear as I can today.

18          The government parties also have not provided much

19    detail as to the overall process required to implement the

20    RSA.  It's not clear to me, at least from the face of the

21    motion, what further legislative and regulatory steps will be

22    required to implement the RSA.  And frankly, that

23    informational gap makes it difficult for me to determine, for

24    instance, whether there is another proper forum for the

25    broader set of interested parties to have policy concerns

1    about things to speak to.

2         If people can go and lobby the legislature about

3    whether necessary legislation imposing charges or whatever

4    should be approved, yes, maybe that is a consideration that I

5    should account for in determining the scope of the proof here.

6    Also, it isn't clear to me which aspects of the deal the

7    Court's being asked to approve conceptually that will require

8    other changes to Commonwealth law versus what the Court is

9    being asked to declare valid, binding and effective on the

10   basis of an order issued by this Court.

11        This includes the description of modified charges and

12   rate structures with no clear explanation of what legal

13   authority there is for these changes.  And so if the Court's

14   being asked to approve and thereby validate these changes as a

15   legal matter, the movants will have to provide legal authority

16   for the Court's ability to do that.

17        Certain opponents of the RSA have contended that

18   aspects of the proposed deal would prematurely decide aspects

19   of a potential PREPA plan of adjustment and materially and

20   irrevocably affect the rights of non-settling creditors.  If

21   the government parties disagree that the RSA would have that

22   effect, they should lay out legally and factually their

23   position as to how the RSA will preserve the rights of

24   non-settling interested parties and have no constraining

25   effect on the ability of non-participants to litigate issues

1    that are normally material to confirmation that the government

2    parties contend are irrelevant to this 9019 motion practice.

3         To the extent the RSA would constrain such future

4    opportunities, movants should provide factual support and

5    legal authority justifying the Court's approval of the 9019

6    motion, notwithstanding concerns about the preemption of the

7    plan confirmation process.

8         To the extent that the Court's approval of the RSA

9    would provide parties with rights to pre-plan distributions,

10   the government parties should explain the legal and factual

11   basis for making such distributions, and the government

12   parties should also lay out the legal and factual basis for

13   the administrative claims and exculpatory provisions that are

14   included in the RSA.

15        I am proposing June 19 at noon, so that's a week from

16   today at noon, as the deadline for the government parties to

17   file the supplemental memorandum of law and supporting

18   declarations that I have described.  Thereafter, all of the

19   parties, opponents and proponents, must promptly meet and

20   confer to determine what aspects of the currently pending

21   discovery and evidentiary motions can be resolved without

22   Court intervention, and file, by the following Monday, a

23   status report concerning what discovery and pretrial issues

24   remain, the necessity for any further hearings on such issues,

25   and a proposed schedule for any further discovery.

1            As to the meet and confer process, the Court requires

2     more than an 11th hour distribution of a template into which

3     parties can plug disparate arguments.  There must be genuine,

4     timely interaction and an effort to reach realistic and

5     efficient compromises of any disputed issues, as the time

6     remaining for completion of discovery of a reasonable and

7     appropriate scope will have been shortened somewhat.

8            The 9019 motion must still be fully briefed by July

9     17 to give the Court an opportunity to consider properly and

10    appropriately the parties' various positions.

11           And so now, Counsel, I will hear your responses to

12    these remarks.  Mr. Bienenstock.

13           MR. BIENENSTOCK:  Your Honor, Mr. Despins requested

14    ten minutes for us to talk first.  Would that be okay with the

15    Court or would you like me just to --

16           THE COURT:  That's fine.  A ten-minute break has been

17    requested, and so everybody be back in your seats at 3:25 by

18    the clock in the courtroom, which is about 13 minutes from

19    now.  Thank you.

20           (At 3:11 PM, recess taken.)

21           (At 3:33 PM, proceedings reconvened.)

22           THE COURT:  Please be seated.

23           Mr. Bienenstock.

24           MR. BIENENSTOCK:  Thank you, Your Honor.  And thank

25    you for the recess.  Martin Bienenstock of Proskauer Rose,

1   LLP, for the Oversight Board, as representative of PREPA.

2        Your Honor, we had discussions both with Mr. Despins,

3   with Wachtell, for the fuel line lenders, and came to a number

4   of conclusions, part of which are requests that I'd like to

5   advise the Court of.  And I'd then very briefly like to go

6   over some of the Court's comments about the RSA, because we

7   think all of the paper might have given the Court -- when I

8   say we, I'm just speaking for the Oversight Board and the

9   government.

10       We also -- the government was part of the discussion

11  outside.  All of the paper might have given the Court the

12  wrong impression as to what the Court's being asked to do in

13  the motion.  And I think it would be good for us to explain

14  our view to Your Honor, because that may have something to do

15  with how we go forward.

16       In terms of the schedule, what the government, the

17  Oversight Board, and the objecting parties, and I'm speaking

18  to the Committee and the fuel line lenders, would like to do,

19  is to use between now and this coming Monday to file a new

20  joint status report with Your Honor attempting to narrow the

21  issues and set a schedule, but also because we think that some

22  of the issues probably won't be consensually resolved, to see

23  if Your Honor could give us a follow-up hearing in New York

24  sometime next week to deal with the issues that will be

25  identified in the new joint status report.

1    We don't think, for several reasons, we can file the

2  declarations and brief, et cetera, a week from today simply

3  because each of our clients, and especially the government,

4  simply require a lot of time before they sign off on

5  declarations and things of that sort.  And it will take more

6  time.  That we will propose in the status report that we would

7  file Monday, if it's okay with the Court.

8    We're -- because our clients aren't here, we don't

9  have authority today to agree on new schedules, but I think

10  it's clear from what I've said, that a new schedule may arise

11  out of what we file Monday, because we know that the Court

12  needs -- needed to have everything briefed, et cetera, by the

13  dates the Court previously ordered.  And if that turns out to

14  have to be delayed, other things may have to be delayed, but

15  we're not in a position now, we don't have authority now to

16  agree on changing dates.

17    In terms of the -- what we're asking the Court to

18  approve -- I want to go through the RSA very briefly, because

19  our view of what is at issue here is different from what we

20  think the Court thought it was.  And we take full

21  responsibility for the fact that the Court could have come to

22  its conclusion because we're asking Your Honor to approve the

23  whole RSA.

24    It seemed like a good idea at the time, and it may

25  stay a good idea, but I want to explain what's inside it,

1  because we don't think it's everything Your Honor thought it

2  was.

3          To the extent the RSA provides for payments to

4  various creditors, to the extent it provides for the accrual

5  of a claim, to the extent it provides for rates to be changed,

6  if that were all it did, we wouldn't be in court in the first

7  place, because since Congress didn't make Section 363 of the

8  Bankruptcy Code applicable to Title III cases, we can use

9  property without prior Court approval.

10          And in fact, all along, as Your Honor knows in this

11  case, the creditors would have been thrilled had we just

12  raised rates earlier, and thought we should have, and there

13  was -- no one on any side ever thought that Title III

14  required -- would require Court approval for that.  And it

15  wouldn't.  What a debtor charges for its services is what a

16  debtor charges, and it doesn't need Court approval for that.

17          To the extent Your Honor read the RSA -- so, well,

18  let me go back to -- that's what we don't need Court of

19  approval for.  The reason we were asking for Court approval,

20  and both sides, was this.  Early in this case, as Your Honor

21  saw, the Ad Hoc Creditors and others filed a motion for stay

22  relief so they could request the appointment of a receiver.

23  And they asserted in their pleadings, and they attached all

24  the documents, that they are oversecured; that not only the

25  net revenues, they said all revenues, but the covenant to

1  raise rates, the receivership remedy was all a package of

2  collateral; and when you put it all together, they were

3  oversecured.

4       The deal we've struck with them is that although they

5  were saying they're oversecured, a hundred percent plus

6  interest, they're getting approximately 67 percent of their

7  principal claim -- or 67 percent of their claim, and then if

8  that's paid, another note for ten percent, which is less

9  certain.  So it's 67, plus maybe a little more.

10       THE COURT:  And some time value of money provisions

11  in the form of administrative claims --

12       MR. BIENENSTOCK:  Yes.  Yes.  Yes.

13       THE COURT:  -- and payments.

14       MR. BIENENSTOCK:  Yes.

15       Now, from the debtors' point of view, the government

16  parties' point of view, that is a great deal we should grab,

17  because what they're saying is they're willing to commit that

18  no matter what their claim is, the ultimate plan that's

19  confirmed only has to give them treatment giving them the 67

20  percent, plus maybe a little more.

21       So to limit their claim so that that's all they're

22  entitled to, that's why we wanted -- that's why, from the

23  government parties' point of view, we wanted Court approval,

24  to reduce their allowed claim to that.  I think it was

25  reducing them to like the 67 to 77, 74 cents, whatever it

1    turns out to be.

2           THE COURT:  Now, as I think it was probably the

3    Committee pointed out, and as I recall from last summer, the

4    debtor was -- or two years ago, whenever the receivership

5    motion was made, the Oversight Board and the government were

6    arguing or PREPA were arguing that the -- if there is

7    collateral at all, it's net revenues; there won't be any net

8    revenues; the rate raising covenant is not collateral in the

9    sense of the Code; therefore, the claim to be settled is worth

10   zero; and if you thought about it in this context, you'd say,

11   well, it's zero augmented by the always present chance of an

12   aberrant result, and so that would be the bottom end of a

13   range.  Whereas the way you've articulated the rationale for

14   the deal here assumes that there's a very, very strong case

15   for all revenues are oversecured, and getting that discounted

16   by 25 to 35 percent is a great deal.

17           Let's wait for the phone.

18           Testing.  Would our monitor please send a message as

19   to whether this can be heard?

20           Testing.  Would our monitor please send us a message

21   if you can hear this?  All right.  Apparently we're back up.

22           And so what I was saying just before we dropped was

23   that there was another scenario last summer that might support

24   different economics and different assessment of the value of

25   the deal.

1          MR. BIENENSTOCK:  Exactly, Judge.  And I want to

2    emphasize, that was in the context of the Motion for Stay

3    Relief, and we were operating based on the jurisprudence,

4    which we would still be operating on.  That -- you look at

5    that from the collateral value on the petition date or the

6    date they're asking for stay relief, and whether it's going to

7    decline from there, and we said the collateral value was zero.

8          That is a different inquiry, and the Bankruptcy Code

9    makes clear that valuations for stay relief purposes are for

10   stay relief purposes, are not necessarily valuations for

11   confirmation purposes.  So with confirmation, if we're now

12   dealing with what is the value of their secured claim going

13   forward, we could argue it's quite small, and we may end up

14   doing that.  And we have facts and law.  But on the other

15   side, they're going to say things that -- I can't speak for

16   them obviously, but the arguments we would anticipate having

17   to deal with are:  What utility keeps rates unchanged forever?

18   And why are you not raising rates?  And if you do this great

19   transformation, you may have a greater net revenue than you

20   had before, because you're only doing it to improve things.

21   And on and on and on.

22          So there's a contest there.  And basically, you know,

23   it's pretty clear, we came out believing that locking in the

24   67 plus was better than rolling the dice and having that

25   contest.

1          Another issue, though, that I wanted to try to

2    clarify goes back to what Your Honor is being asked to approve

3    by approving even the whole RSA.  All the RSA requires and

4    allows us to do, us being the debtor, is to come to this Court

5    subsequently with a plan, and a plan that proposes the

6    treatment of the Ad Hoc Creditors and Assured in the manner

7    set forth in the RSA.

8          The key point is the Court is not being asked to say

9    at the RSA approval hearing that that treatment is legal or

10   will be -- can be part of a confirmed plan.  All we're

11   committing to, the debtor is committing to the ad hocs, we

12   will propose that treatment that all in all gets you your 67

13   plus return, but it's going to be up to the Court to confirm

14   or not to confirm a plan that does that to your claim.

15         And as for the fuel line lenders, and the unsecured

16   claimholders who are saying what's left, the reason we said

17   that's really out of bounds for this hearing is if we don't

18   give them enough to make the plan confirmable, Your Honor will

19   deny confirmation.

20         So, I mean, we really took their issues as to what's

21   left as sort of a negotiating thing that we're supposed to put

22   something on the table.  We will be doing that.  We're

23   speaking to them, but we don't know what it has to do with the

24   RSA, because the Court's not saying that anything in the RSA

25   will ultimately be confirmed or approved or legal.

1          Of course all we're doing is we're getting the Ad Hoc

2   commitment that if we bring a plan that pays them their 67

3   plus, they will vote to accept that plan, and all the other

4   confirmation issues are left for confirmation.

5          THE COURT:  But your RSA requires, and this may just

6   be the reality of the world, but it requires that you have

7   them over a threshold and in numbers that will give you a

8   consenting impaired class --

9          MR. BIENENSTOCK:  We have that.

10          THE COURT:  Yes.  And so that does put the rest of

11   the objecting world into, you know, a particular position of

12   potentially being crammed down, and puts them in that

13   standing.  And that's the way the Code works.

14          MR. BIENENSTOCK:   Let me put it a different way,

15   Your Honor, because this may make the case.  We don't need any

16   Court order to bring that plan to the Court.  And we don't

17   need -- and as I said, the Court, when we bring it, can

18   confirm it or not confirm it.

19          We don't need any Court order to make payments

20   because of the 363 issue.  We don't need a Court order to

21   change the prices.  We want the Court order because we don't

22   want the Ad Hocs to say tomorrow, 67 is too low, now we want

23   77 or 87 or something like that.  We don't want the deal to

24   fall out of bed.  But approving the R -- so from our point of

25   view, approving the RSA locks them into accepting that

1  treatment.

2  Virtually everything else going on, other than the

3  exculpation -- but that's not a normal exculpation where all

4  officers and directors are exculpated for everything to do

5  with the reorg.  That's a tiny, narrow exculpation of the

6  indenture trustee, who's being asked to sign a tolling

7  agreement on the lien challenge so we can bring it later.

8  And indenture trustees never want liability for

9  anything.  But, I mean, the exculpation is as narrow as I

10  think anyone can ever find.  And what it covers, I think, in

11  that situation is minor.

12  But that's the exculpation thing, and I -- well, I

13  shouldn't go further on that, but that's how narrow it is.  A

14  confirmation I'm sure will put a larger exculpation in the

15  plan, but again, the Court's not being asked to approve that

16  now.  And it will or won't when it comes up based on the facts

17  and law then.

18  As far as the local laws, the -- well, we think the

19  government, which is a party to all this, is going to get all

20  that's necessary to happen, as far as rates and legislation.

21  We think we could probably in a plan do it based on Section

22  305, which says this Court can interfere with governmental and

23  political powers with either Oversight Board consent or in a

24  plan.  And the Court would have both.  But we don't think

25  we'll have to test that here, because the government wants

1   this as much as the Oversight Board wants it.

2           So we don't think this Court would be going out on a

3   limb on any local law, certainly not in approving the RSA.  If

4   in the plan we ask the Court to declare that something in the

5   plan preempts some law, okay, then that's an issue for

6   confirmation.  And the Court will again agree with us or not,

7   grant it or not, but we're not asking for that now.

8           So that's why we're somewhat taken aback at how broad

9   the Court thought this was, because we're just locking in the

10  Ad Hocs not to ask for more.

11          THE COURT:  Well, I got where I got today by, you

12  know, looking at two lanes of a road and the information that

13  I had in those two lanes of the road.  You know, one was this

14  joint status report with very disparate views.  The other was,

15  frankly, first looking -- reading your motion, looking for

16  declarations and not finding them.  And then going through

17  your Proposed Order and seeing what sorts of findings of fact

18  and conclusions of law you were asking me to make in the

19  Proposed Order; and, you know, finding that a conclusion that

20  the entire RSA is fair and reasonable or whatever is supported

21  by an assertion in the motion that the entire RSA is fair and

22  reasonable, and, you know, valid and binding and wonderful.

23  So you might want to look at what rulings you're asking me to

24  make.

25          When I asked you that same question at the COFINA

1    confirmation about certain provisions being valid and binding

2    and wonderful, I'll say, because it's late in the day, the

3    answer on certain legal propositions was, well, you are

4    approving -- you can make this law essentially, because you

5    are approving the compromise that we reached.  And in the

6    compromise, we're creating a structure that doesn't otherwise

7    exist.  And we are invoking your power to make that happen.

8            And you know, there were further detailed legal

9    arguments as to why that should be, but those arguments only

10   came after I specifically asked for them twice.  So I'm asking

11   you to be precise as to what you want me to do and how you

12   think I should get there.  And that would give me some grip to

13   hold onto in evaluating arguments by a myriad of people from

14   other perspectives that, well, if what they really want you to

15   do is this, then they'll have to show that, and so on and so

16   forth.

17           MR. BIENENSTOCK:  Right.  Well, I assume -- I've

18   explained what the government parties want out of it.  We want

19   to lock in the reduced secured claim.  I assume the creditors

20   want out of it to have an order making us do what we promised

21   to do, which is to propose the plan giving them that treatment

22   and make the payments that we're already making, et cetera,

23   and raise the price as we said we'd do.  All of which -- as I

24   explained earlier, if that were all, we wouldn't have to come

25   to the Court.  It's just to deal with the claim that we do.

1          THE COURT:  And so for instance, on raising rates,

2     when you say PREPA can do that on its own, you're not asking

3     me to approve an extraordinary and novel means of rate setting

4     that wouldn't otherwise involve some sort of consideration of

5     public input and all sorts of things?

6          MR. BIENENSTOCK:  I don't believe so.  I may stand

7     corrected by the government parties, but I think they had

8     enough elbow room in the current rate structure to move things

9     as they've done already during this case.  They've lowered and

10    raised back rates, and they had a bunch of room to do things

11    like that.

12         THE COURT:  It would be nice to know.

13         MR. BIENENSTOCK:   Now, I assume that -- as I said,

14    I'm sure the creditors want us locked in to do what we say

15    we'll do under the RSA.  And you know, if I were them, I would

16    have said what they said, which is ask for the RSA to be

17    approved.  And I don't know if they'll move off that, but I

18    think that the -- it's the impact of what approval of the RSA

19    means that I wanted to explain to Your Honor.

20         There's only one thing in there that it really means

21    we're reducing their claim.  And yes, we're going to be

22    ordered to do what we say we'll do, but we want to do that

23    anyway.

24         In any event, I don't want to take up more of the

25    Court's time.  I wanted to explain what we thought we were

1   asking of the Court, and the problem we have with the schedule

2   and ask if it's okay if we submit a revised joint status

3   report on Monday.

4        Others may want to speak.  I'm not sure.

5        THE COURT:  Yes.  Mr. Friedman has been up and down a

6   couple of times.  So let me hear from Mr. Friedman and then

7   I'll respond to your question.

8        MR. BIENENSTOCK:  Thanks.

9        MR. FRIEDMAN:  Peter Friedman.  We join with

10  Mr. Bienenstock.  We think that for certain aspects, these are

11  within PREPA's powers.  To the extent other approval is

12  necessary, we think it's the kind of approval -- for example,

13  I think there are some things that may require legislative

14  approval.  Some things which arguably we'll have to assess,

15  whether they are present issues, but we don't think they are

16  Court approvals.

17       I also want to say, I don't think it will be a

18  surprise, we think that RSA issues, RSA approval, what's

19  necessary to get from the Court, what can be given here is

20  very different from other circumstances where the government

21  is not actually a party.

22       So I don't want to be again in a position where

23  somebody says, oh, you were silent when Mr. Bienenstock said

24  this can be done without Court approval or this can be done

25  under 305, and the Court can permit interference.

1          PREPA and AAFAF are both parties here.  We think that

2    makes it categorically different.  I don't need to get in a

3    debate about whether I'm right or wrong, but I just want to

4    lay that marker down and provide the information necessary for

5    you to at least think about where we come out in terms of who

6    has to approve what.

7          So thank you, Your Honor.

8          THE COURT:  Thank you.

9          Yes, sir.

10         MR. KLEINHAUS:  Good afternoon, Your Honor.  For the

11   record, my name is Emil Kleinhaus from Wachtell, Lipton, Rosen

12   & Katz.  I haven't been here in a couple of years.  I'm happy

13   to be back.

14         THE COURT:  Thank you.  Good afternoon.

15         MR. KLEINHAUS:  I represent Cortland Capital Market

16   Services, LLC, as successor administrative agent under a 2012

17   credit agreement that was originally entered by PREPA and a

18   group of Puerto Rico banks, with Scotia Bank of Puerto Rico as

19   agent.  We formerly represented Scotia.  We now represent

20   Cortland as an administrative agent on a facility of 550

21   million dollars in principal amount of fuel lines which are

22   loans that were made to PREPA to finance fuel purchases.

23         There's a separate facility owned primarily by funds

24   advised by Solus Capital Management of approximately 150

25   million, so in total, the fuel lines are approximately 700

1   million dollars of debt, and other than the bonds, are the

2   principal financial creditors of PREPA.

3        The fuel line lenders were fully involved in

4   pre-petition negotiations on an RSA, were a party to the

5   pre-petition RSA.  Unfortunately, despite trying on multiple

6   occasions to engage with the Oversight Board and the

7   Commonwealth post petition, we have not been able to get

8   traction on a post-petition negotiation, and we are therefore,

9   constrained to object to the RSA.

10       Just a couple of comments in response to

11   Mr. Bienenstock.  First of all, to Your Honor's comments at

12   the beginning of the hearing, we agree with the approach that

13   Your Honor has set out, because one of the things I was going

14   to say is we were getting set up here for a situation where in

15   light of how little the Oversight Board said in their opening

16   brief, particularly on the issues pertaining to my clients and

17   the 700 million they're owed, we were going to have a reply

18   brief in which the entire case was made there.  And then we

19   were going to end up with lots of substantive submissions

20   right before the hearing, which is precisely what the Court

21   said at the beginning today you were hoping to avoid.

22       So I think an approach that requires a much more

23   robust position from the parties at the outset, which frames

24   the issues and allows the issues to be addressed in hopefully

25   an organized way, is certainly preferable to what's happened.

1   So we agree, and Your Honor was directing it anyway, but I

2   note our agreement with that.

3          To Mr. Bienenstock's comments about the scope of the

4   hearing, I'm not going to repeat what was in our section of

5   that Joint Pretrial Report, but I do want to point out that in

6   addition to the objections that the Creditors' Committee will

7   be raising to the settlement, and we expect to join in some or

8   many of those objections, we have a very particular problem

9   with this RSA.  And the very particular problem is that our

10  fuel line is intended to be and was senior to the bonds from a

11  priority perspective under the pre-petition agreements, under

12  pre-petition resolutions, under pre-petition offering

13  memoranda to the bonds.

14         And we believe that this RSA, contrary to what the

15  Oversight Board has submitted, does not leave the fuel lines

16  unprejudiced and with their rights reserved for a plan, but

17  rather, in certain ways that can't be reversed, essentially

18  subverts that priority scheme by, number one, allowing

19  payments, significant payments out in the opposite of the

20  priority scheme, because what the priority scheme said, if

21  PREPA raises rates, that has to be used first for current

22  expenses, and everybody agreed that the fuel lines were a

23  current expense.  And only after current expenses are paid can

24  the bonds get paid.  This RSA suggests, dictates that the

25  opposite is going to happen.

1          There's also a most favorite nations provision in

2    this RSA which prevents the Oversight Board from entering into

3    any agreement with our clients, the fuel line lenders, on

4    terms that are better than the bond terms, which again locks

5    in the Oversight Board not to respect our priority.

6          There was even a provision in this agreement that

7    says that the Oversight Board can't enter into any kind of

8    restructuring agreement with the fuel lines without the

9    bondholders' approval, and there we believe the Oversight

10   Board is essentially giving the bondholders a veto over future

11   negotiations which we hope to have with them.

12         And Mr. Bienenstock said no approval is needed.

13   There is a significant body of case law that we intend to

14   invoke in our objection, starting from the Supreme Court,

15   going down to the Circuit Courts, in cases like *Iridium* and

16   *Aweco*, and a number of cases in this district which we cited

17   in the Pretrial Report regarding situations in which, outside

18   of a plan of reorganization, distributions can be made,

19   priority rights can be not honored, and essentially the

20   parties' rights that would otherwise be determined in the plan

21   context are instead determined in the context of a settlement.

22         If the Oversight Board's position is going to be that

23   despite all of the plan provisions in PROMESA, the government

24   can simply disregard priority rules and essentially lock in,

25   dictate the provisions of a plan through a pre-petition

1    settlement, that's a legal dispute that's going to have to be

2    resolved by this Court, because we certainly do not agree with

3    that.  And I didn't want to let that comment pass without

4    responding.

5           Lastly, Your Honor, to the point about the way

6    forward, Mr. Bienenstock told me before he got up about a

7    pre -- an additional report being submitted on Monday.  We

8    don't have any problem with that, but we do think if there's

9    going to be an additional report, we should avoid the

10   situation we had in the last report, which is round two of the

11   parties just stating very disparate positions.

12          What I hope we can do is actually zero in on what the

13   Oversight Board's position's going to be on this hearing.  And

14   on the priority issue in particular, we've been trying to get

15   clarity on that, because if what the government parties are

16   saying is they are not going to put priority at issue at this

17   hearing, and moreover, they're going to assume the fuel lines'

18   priority will be respected in the context of this hearing and

19   argue that this can be reviewed anyway because, for example,

20   there's no need for Court approval, that's one thing.  That's

21   a targeted, narrow hearing where the priority issue is

22   reserved for another day.  But we're entitled to argue that we

23   have priority, and this settlement violates that.

24          But the Oversight Board's not contested that at the

25   hearing.  Instead, what they're arguing is this should be

1   approved regardless of priority.  But in contrast, if the

2   Oversight Board members want to make this hearing into a

3   dispute that would otherwise be in a plan context or an

4   adversary proceeding, and without objecting to our proof of

5   claim which set forth the current expense position very

6   clearly, without bringing an adversary proceeding, without a

7   plan fully litigating rights that would otherwise be

8   determined in a plan context, then we're going to have to be

9   entitled to take appropriate discovery on that issue, and this

10  becomes a much messier hearing.

11      And for due process reasons and otherwise, we're

12  going to have to make a full case and we're going to be back

13  in front of this Court and back in front of Judge Dein, as we

14  were going to be on Friday, making our case as to what we need

15  to have a fair hearing.  So I'll stop there.

16      I also wanted to confirm, I understood Your Honor to

17  be saying in light of the process that's going to go forward,

18  we will not have the hearing with -- on the Motions to Compel

19  on Friday.  I'm open to discussing that.  I just wasn't

20  totally clear.  That's a reasonable outcome given Your Honor's

21  direction.  I just wanted to make sure that was clear one way

22  or the other.

23      THE COURT:  Thank you.

24      And as to that last point, my intention, and jointly

25  intended with Judge Dein, was to see where we come out with

1    respect to this recut of the schedule and to -- she was going

2    to come back up here, and entertain a discussion as to whether

3    there was anything useful to be done with a Friday hearing

4    date and whether there is certain discovery that, everyone,

5    you agree should go forward, whether that's controversial or

6    not and whether the Friday hearing is necessary.

7          And so I think I will still leave that question to be

8    answered after this discussion is completed.

9          MR. KLEINHAUS:  Thank you.

10         THE COURT:  Thank you.

11         Mr. Despins.

12         MR. DESPINS:  Good news, Your Honor.  I will not say

13   very much.  I know it's late in the day.

14         Unfortunately, I disagree with pretty much everything

15   that Mr. Bienenstock said.  That's all I need to say.  I'll

16   keep my powder dry on that.

17         In terms of the hearing on Friday, I don't think it

18   makes any sense to go forward with that given what has

19   transpired.  And I don't think the government parties disagree

20   with that, but they'll speak for themselves.  Thank you.

21         THE COURT:  Thank you.

22         Yes, ma'am.

23         MS. MENDEZ COLBERG:  Good afternoon, Your Honor.

24   Jessica Mendez Colberg on behalf of UTIER and Sistema de

25   Retiro de los Empleados de la Autoridad de Energia Electrica,

1    the pension plan, or the PREPA.

2         Just briefly, Your Honor, we wanted to state that we

3    are in the same position as the fuel line lenders in terms of

4    the priority that the RSA prejudices in terms of UTIER and the

5    members of the pension system due to the statement of the

6    trust agreement of 1974 that states that the authority has to

7    convey all the general funds that will be used first for the

8    payment of the current expenses.  And in the definition of

9    current expenses, it is included, the payment of the Pension

10   Plan.

11        So we stand at the same position of the fuel line

12   lenders, and we agree that the information that the Court has

13   requested from the government parties to supplement the

14   motion, the 9019 motion, is necessary to address that issue.

15        THE COURT:  Thank you.

16        Did anyone else wish to be heard?  Yes, sir.

17        MR. CINTRON GARCIA:  Good afternoon, Your Honor.

18   Carlos A. Cintron Garcia representing Somos, Inc.

19        Your Honor, I wanted to be brief.  The Oversight

20   Board had issued a motion in limine seeking to exclude expert

21   testimony by proposed interveners in this case.  And regarding

22   your initial statements regarding this motion in limine, I

23   wanted to clarify your position on this motion.

24        We propose that our interventions are crucial to this

25   process, as you well stated and we agreed that this process of

1    the 9019 motion must consider crucial matters as to the impact

2    on consumers where -- because this issue is in very -- it's

3    crucial to whether this settlement will be, realistically

4    speaking, even feasible.

5         We -- if this settlement is predicated on consumers

6    actually complying with whatever means of rate revision which

7    might have to be taken, it would require that consumers

8    actually play their part in these rate revisions.  If

9    consumers do not take a part in or comply with rate revisions,

10   this settlement by all means is unfeasible.  It's untenable.

11        Our proposed expert, Jose Almeida, is prepared to

12   testify on how the set -- the RSA will affect consumers and

13   how this RSA will be a great prejudice to consumers, to the

14   point where the settlement is untenable.

15        THE COURT:  Thank you.

16        For clarity, I did not say that the impact of -- that

17   I've concluded that the impact on consumers is necessarily

18   within the scope of 9019.  I raised that as an example of an

19   issue as to which the government might say, for instance,

20   well, there's another forum where those concerns can be

21   raised.  It's not this one, for a variety of reasons.  But at

22   this point, again, I didn't have enough information from the

23   government parties as to what they are trying to accomplish

24   before this Court, as opposed to, in other ways, to be able to

25   assess that or to assess their business judgment on issues on

1    which they're asking me to defer to their business judgment.

2         The short answer on the motions in limine is that I

3    am going to hold those under advisement pending the further

4    submissions, but the people against whom the motions in limine

5    have been filed should not work on the assumption that I

6    expect to permit them to intervene at the level of presenting

7    testimony or examining witnesses.

8         As everyone knows, and as the First Circuit has said,

9    the Court has discretion in shaping intervention to the extent

10   intervention is allowed.  And so I think it would be wise for

11   the parties who seek to intervene, to whom objection has been

12   made, to think about perhaps some briefing of common issues.

13        There were some overlaps in the submissions that I've

14   seen.  And it may be that to the extent I allow intervention,

15   it may be the submission of a brief, perhaps some brief

16   participation and oral argument at the 9019 hearing.  But in

17   order to make that sort of final determination, I need to have

18   a much better picture of what the scope of the hearing will

19   be.  And I need these additional submissions in order to be

20   able to do that.

21        MR. CINTRON GARCIA:  Understood.  Thank you, Your

22   Honor.

23        THE COURT:  Thank you.

24        Someone has come from the back.  Yes.

25        MR. BEREZIN:  Good afternoon, Your Honor.  Robert

1    Berezin of Weil, Gotshal and Manges on behalf of National

2    Public Finance Guarantee Corp.  Your Honor, I'll be very

3    brief.

4            National is PREPA's single largest creditor.  We've

5    been working with the government parties, as well as the

6    Board, to see if we can join this deal and resolve our

7    objections.  At present, we find ourselves shut out of the

8    RSA, not by the Board or by AAFAF, but by a certain creditor

9    group due to rights they were able to negotiate in our absence

10   during the negotiations.

11           So at this time, we must reserve our rights as an

12   objector, and while we are going to continue our work, we

13   wanted the Court to be aware that National, as a secured

14   creditor and as a bondholder, certainly has objections that

15   are unique from the others.  And again, we hope to resolve

16   them, but we wanted to reserve our rights for the record and

17   just make sure you understood where we stand at this juncture.

18           THE COURT:  Thank you.

19           MR. BEREZIN:  Thank you.

20           MR. AGRAIT BETANCOURT:  Good afternoon, Your Honor.

21           THE COURT:  Good afternoon.

22           MR. AGRAIT BETANCOURT:  Fernando Agrait.  I represent

23   both Windmar Renewable Energy and ICSE, and several not for

24   profit entities, all related to the general economic situation

25   in Puerto Rico; and in particular, the impact of PREPA's

1    reorganization and the RSA and their operations.

2         I am highly satisfied with your statement on the need

3    for additional information which will make possible for this

4    Court and for those of us who are requesting participation to

5    know where we are going and where do the government parties

6    want to go.  What worries me at this point is, even under your

7    statement by Wednesday we have a new report, or by the

8    government parties' statement that they want us to submit a

9    sort of rehash joint report for Monday, we don't have a sort

10   of route that we're going to follow.

11        I mean, it's already late on Wednesday.  It's -- you

12   said that you wanted real interaction and not just circulating

13   a form to be filled by each party.  So I would very much like

14   from you, the Judge, a specific instruction to different

15   parties on how we are going to reach what you expect us to do

16   for next week.  Because in my case, I was notified for the

17   first time by the government parties Friday at 3:30, which was

18   half an hour before the time for filing the joint report.

19        On Windmar's side, which is even a participant in the

20   negotiations going outside the courtroom, we were never

21   notified to be part of the joint report.  So I don't think we

22   should go out today and just expect all of the lawyers and all

23   the parties to start calling each other and sending e-mails to

24   establish the road map.

25        THE COURT:  Thank you.

1          And so, Mr. Bienenstock, first, I just want to be

2     clear that even if it's on a different schedule, I need front

3     end elucidation and substantiation of the factual and legal

4     case.  And these objectors, I expect, will need that to

5     finally come to grips with their positions on scope and

6     discovery and that sort of thing.

7          I will grant your request to do true conferring and

8     provide me a true joint issue identification and proposed

9     scheduling report on Monday, but as the last speaker observed

10    quite passionately, we need some agreement on the process that

11    will be undertaken between here and Monday, so that I don't

12    just get another collection of how people disagree, because I

13    know they disagree already.  That doesn't really help me.

14         So what do you propose to do in that regard,

15    Mr. Bienenstock?

16         MR. BIENENSTOCK:  We'll obviously speak with the

17    parties, the objecting parties.  I don't know if we're going

18    to be able to convince anyone that their proposed scope of the

19    hearing is wrong without Court rulings.

20         For instance, I mean, as Mr. Kleinhaus knows, he

21    doesn't have a document giving him seniority.  And even if he

22    did, we'll either have a plan that treats him so that the

23    Court confirms it or not.  So we just don't see what he -- why

24    he should find out what's left or whatever.  That's

25    negotiation, which we want to have with him.

1          THE COURT:  So what's the point of whatever it is you

2     want to give me Monday, besides perhaps trying to change a

3     timetable?

4          MR. BIENENSTOCK:  Well, partly it's changing the

5     timetable to be able to give Your Honor the declarations and

6     brief Your Honor asked for.  Partly, Your Honor, we might make

7     some progress with some of the parties on narrowing the issue.

8     I just didn't want to represent to Your Honor that we're going

9     to give you a fully agreed like pretrial schedule on scope and

10    everything, because I don't know that the parties will see eye

11    to eye.

12         Today -- I mean, today we were surprised that Your

13    Honor thought that we were asking you to approve so much more

14    than we thought we were asking you to approve.  And as I said

15    before, I get it, because we asked you to approve the whole

16    RSA, but hopefully now it's clear how little there is in the

17    RSA that really requires Court approval.

18         THE COURT:  That will be clearer to me when I see

19    that in writing and a skinnied up proposed order.  I heard

20    what you said, and I understood many of the words.  I still

21    don't frankly have a firm concept of what you believe you need

22    me to do to keep your supporting parties on board and how

23    that's different from what you appear to have asked me to do

24    in your -- the Proposed Order I currently have before me.

25         If I'm being asked to make the same determinations,

1    whether it's to make people happy or because the law would

2    require it, in any event, I'm still being asked to make

3    certain determinations, and I don't have a pathway that

4    explains to me the legal basis for doing it.

5           So as to -- you had mentioned I think when you first

6    made this proposal that you intended to share more of the

7    government parties' thinking about what's really being sought,

8    and you've done that here orally.  Did you have in mind to do

9    that to a greater degree with the objecting parties in order

10   to make some different scope proposal or substantiate your

11   scope proposal, together with the timing proposal, to then

12   distribute and take comments back or what did you want to do?

13          MR. BIENENSTOCK:  Well, I think clearly, based on

14   Your Honor's remarks today, the government parties would be

15   wise to skinny down the Proposed Order and/or add to it in

16   respect to the things we're not asking the Court to do.  So

17   spelling out the meaning of approving the RSA to a very -- so

18   it's very limited.  And that might convince some of the

19   objecting parties that the hearing should be more narrow.

20   But, you know, frankly, there's always the possibility that

21   they just saw this as an opportunity to hold it up until they

22   have their deals.  And we would love to have deals with them,

23   but I don't know if that will happen before the RSA comes on

24   for approval.

25          So I don't know if it will make the objecting parties

1    happy when we -- or change their positions when we -- if we

2    narrow down the Proposed Order, but we're certainly going to

3    give it a try.

4            THE COURT:  Well, and of course the immediate issue

5    here is the scope of the hearing, and obviously if you had

6    everybody on board with a deal, it would be a different kind

7    of hearing.  But assuming that there will still be contention,

8    I still have to deal with what we're going to have in terms of

9    pre-hearing discovery, what we would have in terms of witness

10   testimony, how long that would take, who gets to speak.  And

11   that still needs to be informed by your submissions.  And it

12   may be that your opponents' positions as to what discovery

13   they're going to continue to press for and whether they are

14   going to continue to contend that they want to put on X, Y and

15   Z witnesses may or may not change.

16           So I don't want to waste any time here, so let me

17   propose this.  By midday Friday, the government parties should

18   distribute to every objector and target of a motion in limine

19   whatever you're willing to provide in terms of a firmer road

20   map of what you would expect to substantiate in terms of what

21   is being asked for and the rationale for getting there in your

22   subsequent submission of declarations and supplemental

23   memorandum of law, plus your proposed timetable for the actual

24   filing of the declarations and supplemental memorandum of law,

25   and whatever other shifts in the timetable you propose to

1  make.

2       And I suppose you can include in that distribution

3  two requests:  One, for parties to have the opportunity to

4  respond back as to whether this information changes their view

5  as to the contested discovery issues that have been

6  identified; and second, whether that view has been changed or

7  not by this distribution, whether there are particular

8  objections to the timetable changes that you are proposing.

9       And then I suppose you react to that, and maybe you

10 have one more round of e-mailing with deadlines so that

11 everybody has had an opportunity to speak their piece by call

12 it noon Monday.  And by close of business Monday, you file

13 this joint statement.  And that's a very rough concept of how

14 you could do it, but that's a way it could be done.

15       Mr. Friedman's coming up.

16       MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

17       I think what you're proposing is going to result in a

18 multiple iterative process.  I think we'll be able to provide

19 together some of that by Friday.  I think the bulk of what

20 we'll be able to accomplish in this next submission will be

21 scheduling oriented, and then it's possible that we will wind

22 up after we actually submit whatever we submit in response to

23 your detailed requests.

24       Then being able to have a further and probably more

25 meaningful pretrial discussion, because --

1          THE COURT:  And that's why I had proposed filing the

2    further information, and then have the pretrial discussion.

3    It's -- you all have asked me for this interim step.

4          MR. FRIEDMAN:  So I think we'll see where we can get,

5    and we will commit to together providing the information we

6    can provide.  But it may be that this is an interim step and

7    there has to be a second round of it.

8          But to the extent we can start the process and wind

9    up, at a minimum, with a better engagement than last time

10   together, that would be useful.  It may be that people say,

11   look, in the interim 48 hours, really all we can comment on is

12   timing.  That may happen.  And it may be the effort to try to

13   do something as an interim step doesn't get us nearly as far

14   as we'd like, and that it does have to wait until after we do

15   the detailed submissions you suggested.

16         So I guess we'll do our best and we'll see.  Maybe us

17   having thought that we could do something in the next 48 hours

18   on that is overly ambitious, but it's worth a try.

19         THE COURT:  Okay.  So make sure everybody you know

20   who's concerned is in the loop.

21         MR. FRIEDMAN:  Okay.

22         THE COURT:  And that that happens as soon as possible

23   so that people aren't being presented with a *fait accompli* at

24   the 11th hour.

25         MR. FRIEDMAN:  I agree.  I guess what I'd ask is

1   counsel, if we file the motion -- if people know where to find

2   me -- we'll obviously do outreach, too, but if you want to be

3   on this distribution, please e-mail me so that we don't have

4   any slips.

5          I think people know where to find me.  Just send me

6   an e-mail and we'll match it up to a master list.  But I just

7   want to make sure that we don't inadvertently forget anybody.

8   And I will take on the responsibility of making sure that that

9   happens, but I would ask that people e-mail me.

10          THE COURT:  Thank you, Mr. Friedman.

11          MR. WHITMORE:  Your Honor, Clark Whitmore from the

12   lawfirm of Maslon LLP, as the Indenture Trustee.

13          I think Mr. Friedman just anticipated my request.

14   The U.S. Bank, as trustee, has been directed to join in the

15   motion and will -- exculpation is one of the subject matters.

16   And so we're interested and would very much appreciate being

17   included in the distribution and discussions that are going

18   on.

19          THE COURT:  Very good.  So e-mail your e-mail address

20   to Mr. Friedman.

21          MR. WHITMORE:  Yes.  Absolutely.  Thank you.

22          THE COURT:  Thank you.

23          Mr. Bienenstock.

24          MR. BIENENSTOCK:  Your Honor, we wonder if the Court

25   would change the close of business Monday to Tuesday noon?

```
 1   This is just hard to do that quickly, and we're all going to
 2   be traveling either tonight or tomorrow morning, so it doesn't
 3   leave really much time before Friday and Monday --
 4          THE COURT:  All right.  You're the one that said
 5   Monday.  Tuesday noon.
 6          MR. BIENENSTOCK:  Okay.  Thank you, Your Honor.
 7          THE COURT:  Okay.  Thank you.
 8          So does anybody need Judge Dein to come up here to
 9   talk about whether there should be a hearing Friday or can we
10   simply assume there won't be a hearing Friday?
11          Okay.  Raise your hand if you want to have a hearing
12   Friday.  Okay.  Seeing none --
13          HONORABLE MAGISTRATE JUDGE DEIN:  (Raised hand.)
14          THE COURT:  Okay.  Judge Dein, glutton for punishment
15   --
16          HONORABLE MAGISTRATE JUDGE DEIN:  Oh, well, I --
17          THE COURT:  All right.  Then --
18          HONORABLE MAGISTRATE JUDGE DEIN:  Can I just --
19          THE COURT:  Yes.  Come up here, please.
20          COURTROOM DEPUTY:  All rise.
21          HONORABLE MAGISTRATE JUDGE DEIN:  I'm certainly not
22   going to add a hearing, and I think it makes a lot of sense to
23   wait until the scope of the RSA hearing is defined, but some
24   of the discovery issues it seemed to me should be done on
25   submission.  There are some legal issues that were raised.  I
```

1   just ask the parties to think about that afterwards when you

2   get into the discussion as to the scope of discovery, whether

3   or not, excuse me, some of it should just be done on

4   submission on some legal rulings.  Okay?  But I'm canceling my

5   Friday afternoon hearing.

6           THE COURT:  Please be seated.

7           All right.  So I believe that this concludes today's

8   Agenda.  Seeing no one protesting that, this conclude today's

9   Agenda.

10          So the next scheduled hearing date is Wednesday, June

11  26th, in Boston, with a video connection with San Juan.  I

12  think that's about the GO Procedures Motion.

13          HONORABLE MAGISTRATE JUDGE DEIN:  Right.  We'll talk

14  about --

15          THE COURT:  Yes.

16          And so as of now, that's what's on the calendar.  And

17  there's also a June 28th date that's just been put on the

18  calendar.

19          HONORABLE MAGISTRATE JUDGE DEIN:  In New York.

20          THE COURT:  In New York.  So there may be some

21  switching around.  Keep flexible that week, folks.

22          Mr. Despins.

23          MR. DESPINS:  It might be helpful, Your Honor, if one

24  of your law clerks could e-mail the Board or us with a list of

25  blackout dates where you're not available in August.  We're

1    not saying we're changing dates yet, because they don't have

2    authority, but I think it helps people figure out if we know

3    those dates are out.

4              THE COURT:  Most of them.  August is not a good

5    month.  I am always on the radar.  I think I am the one person

6    in this room who has been literally on the radar for the past

7    two years and a month, and will be indefinitely because of

8    this lovely statute that we're all operating under.  But for

9    staffing and other reasons, August would be a difficult month

10   to conduct substantive court proceedings.

11             So Mr. Bienenstock, did you want to say something

12   before I make my usual closing speech?

13             MR. BIENENSTOCK:   No.  No, Your Honor.

14             THE COURT:  Okay.  So again, as usual, I thank the

15   court staff here in Puerto Rico, in Boston and New York.  And

16   today especially, Lisa Ng, who has operated as deputy here;

17   Sarah De Jesus, who has been doing it in New York; the IT and

18   AV staffs of the District of Puerto Rico and the Southern

19   District of New York in contending with our various

20   communications issues today; and our ace court reporter, Amy

21   Walker, who keeps up with all of us, and for that, I'm very

22   grateful.

23             And I'm grateful to the entire PROMESA team for their

24   work in preparing for and conducting today's hearing and their

25   superb ongoing support of the management and administration of

1    these very complex cases.

2            And so with that, keep well, thanks and safe travels

3    to all.

4            (At 4:36 PM, proceedings concluded.)

5                              *      *      *

```
1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 196 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain and the

8  Honorable United States District Court Magistrate Judge Judith

9  Gail Dein on June 12, 2019.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 23rd 57:19
August 1 126:25
August 2nd 149:14
January 1, 2020 26:7
July 1 8:25, 20:1
July 15 14:3
July 15, 2019 14:2
July 15th 125:24
July 17 113:21,
    152:17, 159:8
July 17th 112:4
July 2017 40:13
July 24 60:21
July 24, 2019 71:16
July 24th 112:4
July 31st 126:25
June 11 28:5
June 12, 2019 1:16,
    6:2, 196:9
June 19 158:15
June 26th 193:10
June 28th 193:17
June 30 8:24, 9:1,
    9:4, 9:6
June 5th 31:13
June 5th, 2019 28:22
June 7, 2019 11:20,
    28:4
May 2nd 126:24
November 1st 118:24
September 1st
    146:25, 147:5,
    147:18, 147:19,
    149:4, 149:25,
    150:10, 151:3


< 0 >
000 18:12


< 1 >
1 10:2, 18:12, 18:16
1,000 63:13
1,200 10:4
1,400 33:5, 33:6
1,500 114:19, 116:5,
    118:19, 145:23
1,500. 117:7

1.5 137:24
1.5. 138:1
102,000 18:24
105 53:23, 54:13
105(a 54:13, 54:16,
    55:14, 55:18
105(d 55:20
106 24:8, 40:12
106(e 97:24, 98:2
11 55:4, 55:7, 69:6
1102 46:20, 53:23
1102(a 54:6, 54:10,
    54:25, 55:6,
    55:11, 55:17
1102(a)(1 54:12
1102(a)(4 42:19,
    43:6, 43:8, 43:17,
    49:14, 51:22,
    51:25, 54:4, 56:4
1102. 42:18
11:55 86:9
11th 58:2, 159:2,
    190:24
12 100:7, 102:16,
    124:7
1294 11:21, 28:4
12:00 86:5
13 159:18
133 83:24
1334 28:6
143 115:5, 132:7,
    134:15
145. 29:22
1453(g 48:2
150 173:24
152207 79:20
156 43:16
16 110:6
17-0228 29:22
17-3283 53:2
17-3566. 53:4
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:28
17-BK-3567(LTS 2:3
17-BK-4780(LTS 2:19
179 44:9
18-1521 28:24
188 40:12
19 92:17
1950s 89:23, 90:22

196 196:4
1974 180:6
1:00 7:18
1:09 86:10


< 2 >
20 39:20, 49:16,
    121:20
200 10:2, 18:16
2005 43:18
201 9:3
2011 127:14
2011s 15:2
2012 173:16
2012) 54:20
2012s 15:2
2014) 54:19
2014s 15:2
2017 67:18, 110:22,
    122:18, 129:12
2019 32:12
202 8:24, 9:3
2020 20:2, 20:3,
    26:5, 26:21
2020. 20:1
20th 29:2, 73:14,
    75:13
21148 78:1
21: 3:10
21st 11:5, 75:25,
    77:5
22 24:3, 41:1
23 11:22, 64:6, 83:7
231 44:9
235 115:3
23rd 76:25, 77:1,
    77:17
24275 78:1
24th 80:8, 80:9,
    80:13
25 18:21, 19:2,
    86:15, 164:16
25007 77:25
25th 81:2
26 114:18
26. 110:23
26th 81:16
27th 82:3
280 44:9

28th 83:7, 84:10
296 44:9
299 52:7, 82:4

< 3 >
30 12:9, 12:10,
    27:17, 63:12,
    64:7, 94:5,
    118:14, 120:2,
    125:25, 126:15
30,000 63:14, 64:9,
    64:12
300 23:10, 59:22
3000(f 72:1
301(d 55:2
305 168:22, 172:25
30th 83:23
31st 84:20
3283 71:4
34th 85:9
35 164:16
363 162:7, 167:20
368 114:25
3799 196:14
386 93:9, 95:8
39 118:10
3: 1:6, 1:28, 2:3,
    2:19
3:11 159:20
3:25 159:17
3:30 184:17
3:33 159:21


< 4 >
4(m 139:10, 139:17,
    140:1
400 122:8
420 52:7
423. 52:7
433 53:3
45,000 18:23
467 43:16, 54:20
48 190:11, 190:17
4:36 195:4


< 5 >
50 120:7

500 64:2, 64:5,
    77:2, 77:18,
    80:10, 80:14,
    81:3, 81:16, 84:21
51(a 48:1
519 54:18
55,000 24:14
550 173:20
5:00. 7:18


< 6 >
600 18:12, 88:9
61 18:22, 24:12
6162 53:2
67 163:6, 163:7,
    163:9, 163:19,
    163:25, 165:24,
    166:12, 167:2,
    167:22
673 54:18


< 7 >
700 173:25, 174:17
7051 71:4
7129. 53:20
7214. 34:14
7234. 74:7
74 163:25
752 114:21
77 163:25, 167:23


< 8 >
8.5 9:25, 10:1, 19:4
868 54:20
87 167:23


< 9 >
90 121:23, 125:19,
    137:17, 145:5,
    145:8
90-day 145:24
9019 16:24, 151:13,
    152:3, 152:4,
    152:5, 152:8,
    152:11, 152:21,
    153:2, 153:10,

153:13, 153:22,
    153:24, 154:10,
    154:13, 155:15,
    155:21, 156:5,
    156:7, 158:2,
    158:5, 159:8,
    180:14, 181:1,
    182:16
9019. 156:11, 181:18
906. 50:25
91 51:8
922 143:13
926 44:16
928. 143:13
99 118:15
9:29 6:3


< A >
A. 3:13, 180:18
AAFAF 21:22, 112:11,
    113:4, 131:11,
    173:1, 183:8
aback 169:8
abandoned 121:19
aberrant 164:12
ability 24:7, 60:23,
    61:22, 64:1, 72:8,
    157:16, 157:25,
    196:5
able 94:8, 98:18,
    108:16, 108:21,
    111:22, 174:7,
    181:24, 182:20,
    183:9, 185:18,
    186:5, 189:18,
    189:20, 189:24
above 32:20, 107:13
absence 55:22,
    56:25, 113:9,
    183:9
absent 96:16
absolute 18:22
Absolutely 27:4,
    39:2, 41:5,
    101:13, 101:24,
    145:21, 151:7,
    191:21
accept 167:3
acceptable 15:15,

15:24
accepting 128:12, 167:25
access 136:16
accompli 190:23
accomplish 123:4, 181:23, 189:20
accomplished 67:22
accomplishes 69:3
accordance 8:5
according 132:14
Accordingly 73:1, 119:20
account 69:16, 140:3, 157:5
accounts 65:6
accrual 162:4
accrued 9:14, 110:21
accuracy 38:25
accurate 93:18, 196:5
accusations 141:20, 142:12, 143:7, 144:5
accused 148:24
ace 194:20
achieve 17:11
achieved 21:6, 155:17
achieves 10:12
achieving 30:19
acknowledge 13:21
acknowledges 71:12, 73:19
across 64:11, 95:20, 154:8
across-the-board 91:8, 95:14
Act 12:19, 24:7, 36:10, 45:5, 91:16, 104:3
acted 11:10, 21:4
action 8:13, 15:4, 27:13, 45:7, 45:13, 45:24, 78:25, 93:14, 96:20, 97:22, 99:1, 99:8, 101:3, 101:19, 102:1, 102:2, 116:17,

117:2, 117:3, 122:4, 122:6, 122:18, 123:7, 127:15, 144:19
actions 12:18, 12:24, 13:1, 13:3, 13:10, 15:1, 28:24, 29:21, 29:25, 40:17, 41:2, 44:1, 52:1, 114:20, 115:1, 116:18, 120:4, 120:13, 120:19, 121:15, 127:6, 127:8, 127:20, 132:22, 134:17, 134:18, 145:20, 145:22
active 44:10, 44:11, 44:23, 86:18, 93:9, 95:9, 96:18, 106:8, 109:15
activities 8:23
activity 9:4
actual 22:21, 22:22, 57:2, 188:23
actually 27:1, 37:5, 42:14, 48:20, 64:9, 68:12, 80:17, 122:18, 126:19, 129:20, 129:22, 136:5, 138:13, 138:17, 140:23, 142:23, 150:2, 172:21, 177:12, 181:6, 181:8, 189:22
Ad 3:25, 3:37, 14:20, 65:12, 121:13, 124:2, 148:4, 162:21, 166:6, 166:11, 167:1, 167:22, 169:10
add 30:7, 51:18, 122:3, 187:15, 192:22
added 43:18
adding 30:8
addition 66:21,

175:6
Additional 4:39, 8:7, 11:19, 30:3, 30:8, 31:15, 32:21, 32:22, 38:19, 38:20, 61:24, 76:20, 80:19, 81:8, 81:23, 83:1, 121:16, 127:21, 154:1, 154:2, 177:7, 177:9, 182:19, 184:3
Additionally 155:21
additions 30:17, 30:19
addressed 25:22, 71:16, 116:8, 130:25, 133:4, 133:13, 147:21, 153:6, 174:24
addresses 145:18, 145:20, 145:25, 146:5, 147:14
addressing 57:18
adds 52:11
adequate 43:14, 43:20, 43:23, 44:8, 45:22, 54:3, 56:8, 56:11
adequately 51:2, 131:11, 153:6, 156:13
adjourn 8:6, 59:7, 63:21, 64:14
adjourned 59:13, 60:18, 86:8
adjournment 34:6
adjudicated 143:10
adjudications 129:3
adjusted 11:4, 138:15
Adjustment 9:18, 10:1, 10:15, 12:23, 16:16, 16:20, 17:12, 18:21, 20:9, 21:17, 26:1, 26:6, 94:5, 94:10, 122:25, 123:1,

135:6, 135:9,
135:14, 135:19,
157:19
adjustments 23:5
Administered 1:11,
1:33, 2:8, 2:24,
53:3, 56:22
administration
194:25
Administrative 45:3,
63:9, 117:19,
158:13, 163:11,
173:16, 173:20
admit 147:13
admits 41:19
admitted 139:14
admittedly 50:12
admonition 24:19
adopt 55:17, 154:17
adopted 40:12,
128:10
ADR 60:18, 60:20,
64:25, 65:5,
65:12, 65:13,
71:15
advance 12:16,
59:14, 93:23,
154:1
advanced 42:14,
154:18
adversarial 136:15
adversary 29:21,
30:7, 59:1,
114:18, 114:21,
114:24, 115:2,
115:5, 131:17,
139:20, 178:4,
178:6
adverse 41:9
advise 72:12,
154:11, 160:5
advised 173:24
advisement 182:3
advisors 11:6
Advisory 3:18
advocated 11:8,
153:6
affect 26:2, 157:20,
181:12
affected 105:17,

109:20
affecting 35:4
affiliated 50:16
affirmatively 23:1,
46:18
affirmed 101:8,
104:20, 122:21,
143:17
affirming 143:24
afford 92:20
affordable 11:10
afoul 103:10
AFSCME 10:17
AFT 10:20
afternoon 25:22,
34:9, 86:23,
86:24, 96:23,
96:24, 110:7,
110:8, 110:13,
111:12, 111:13,
114:5, 121:12,
128:5, 134:7,
137:21, 148:3,
173:10, 173:14,
179:23, 180:17,
182:25, 183:20,
183:21, 193:5
afterwards 193:1
Agency 3:17
Agenda 25:23, 30:4,
31:11, 31:19,
32:6, 34:3, 35:2,
35:8, 39:17,
59:16, 82:6,
86:12, 110:5,
113:24, 151:12,
193:8, 193:9
agent 173:16,
173:19, 173:20
aggressively 154:12
aggressors 52:14
agitation 120:18
ago 15:9, 51:23,
57:25, 116:19,
120:9, 164:4
Agrait 3:44, 183:20,
183:22
agree 20:16, 65:15,
111:25, 115:22,
119:12, 137:5,

161:9, 161:16,
169:6, 174:12,
175:1, 177:2,
179:5, 180:12,
190:25
agreeable 115:21
agreed 10:2, 12:16,
33:18, 74:21,
116:1, 125:8,
175:22, 180:25,
186:9
agreements 10:23,
11:4, 11:9, 21:12,
111:7, 142:16,
156:10, 175:11
ahead 100:21,
103:15, 119:1,
139:3, 141:16
aid 21:16, 120:20
aisle 14:17
akin 139:24
al 1:16, 3:4, 3:44
albeit 105:16
alleged 36:6, 36:9,
45:10, 48:14
allegedly 36:16,
152:12
alleges 122:6
allocation 71:24
allotted 86:14
allow 30:11, 58:8,
89:1, 96:19,
104:5, 138:16,
182:14
allowed 39:20,
62:19, 84:14,
163:24, 182:10
allowing 175:18
allows 33:12, 166:4,
174:24
alluded 53:19
Almeida 181:11
almost 41:6, 94:7
already 7:6, 10:4,
18:7, 27:15,
29:20, 31:2, 45:9,
85:18, 109:11,
109:14, 112:25,
116:10, 120:16,
126:2, 127:9,

129:1, 132:6,
135:7, 147:25,
148:21, 170:22,
171:9, 184:11,
185:13
alter 103:18
alterations 106:1
alternative 56:1,
56:12, 71:14
Alternatively 53:9
alternatives 97:20
although 26:11,
137:10, 152:8,
163:4
Alvarez 35:24, 38:3,
67:12
Ambac 3:30, 30:22,
30:23, 128:6,
142:13, 143:7,
143:9
ambit 96:9
ambitious 125:23,
190:18
amenable 64:24
Amend 30:7, 59:17,
75:4, 85:14
Amended 28:5, 37:3,
37:6, 37:14, 71:3,
71:22, 73:16,
73:20, 73:25,
74:11, 74:15,
74:25, 75:7,
75:16, 76:5,
76:13, 81:10,
81:21, 83:1,
84:25, 85:16,
151:20
amendment 73:22,
74:16
amendments 30:12
America 6:8, 74:9,
84:12
American 10:20,
88:25, 89:13
Amerinat 140:4,
140:5, 140:17,
141:7
Amerinational 4:4,
138:23
Among 36:17, 57:5,

58:4, 104:5,
124:22
amount 32:7, 61:14,
76:5, 95:10,
95:23, 95:24,
130:11, 155:24,
173:21
amounts 52:8
AMPR 110:6, 110:15,
110:20, 111:5
Amy 194:20, 196:13,
196:14
analogous 52:18
analogy 118:8,
118:10
analyses 155:8
analysis 47:16,
55:18, 89:15,
107:15, 108:5,
108:6, 152:10,
156:4
analytical 155:14
analyzed 35:25
analyzing 87:1, 87:3
anchors 152:22
and/or 14:4, 59:1,
59:8, 187:15
Andrew 3:39, 148:3
anger 143:9, 144:1
angry 143:23
announce 10:16,
25:9, 110:15
announced 9:20,
10:23, 14:7, 30:16
announcement 92:14
announcements 11:18,
22:7, 26:13
answer 33:20, 41:5,
44:12, 103:12,
103:24, 115:11,
117:23, 118:5,
120:2, 126:10,
129:5, 140:23,
140:25, 170:3,
182:2
answered 41:14,
115:13, 136:6,
179:8
answers 17:1, 128:1,
136:12

anticipate 58:3,
66:17, 165:16
anticipated 12:6,
14:2, 191:13
anticipating 106:5,
106:6
Antonetti 27:25
anybody 42:9,
125:11, 191:7,
192:8
anyway 66:4, 171:23,
175:1, 177:19
apart 132:21
APJ 86:12, 86:19,
96:18
apologies 87:21
apparent 28:12,
36:12
Apparently 22:23,
31:24, 79:11,
90:5, 90:12,
147:15, 164:21
appeal 94:12, 94:15,
101:4, 101:8,
133:10, 136:18
appealed 104:19
appealing 112:24
Appeals 29:4, 99:14
appear 35:14, 48:4,
52:13, 151:22,
154:14, 186:23
appearance 52:5,
52:11
APPEARANCES 3:1, 4:1
appearing 31:8
appears 21:18, 31:9,
52:17, 58:8, 61:7,
62:14
apple 139:8
applicability 54:25
applicable 17:5,
102:18, 102:19,
136:8, 162:8
application 29:6,
30:23, 32:11,
33:13, 58:6,
138:18
Applications 31:12,
31:15, 31:19,
31:21, 32:5,

32:13, 32:25,
33:21, 34:6
applied 29:5, 32:25,
33:1
applies 33:6, 116:16
apply 33:10, 133:3,
150:10, 150:11
applying 69:6
appoint 41:21,
49:19, 50:1
appointed 43:12,
49:22, 54:11,
55:16, 55:25,
56:6, 56:19
Appointment 39:19,
44:16, 47:12,
50:8, 52:25, 53:6,
54:7, 54:22, 55:8,
55:21, 162:22
Appointments 29:5,
29:7
appreciate 25:2,
64:20, 70:14,
70:15, 92:12,
105:14, 191:16
appreciated 87:8
appreciates 11:12
approach 66:20,
174:12, 174:22
approaches 153:11
appropriate 8:12,
13:19, 25:10,
27:10, 30:11,
30:25, 35:6,
64:14, 65:4, 71:8,
76:5, 134:22,
136:4, 137:6,
147:22, 159:7,
178:9
appropriately 34:15,
130:25, 159:10
approvals 28:14,
172:16
approve 139:22,
154:4, 156:13,
157:7, 157:14,
161:18, 161:22,
166:2, 168:15,
171:3, 173:6,
186:13, 186:14,

186:15
approved 25:16,
34:3, 44:22, 68:4,
91:1, 157:4,
166:25, 171:17,
178:1
approves 91:1
Approving 71:3,
152:11, 166:3,
167:24, 167:25,
169:3, 170:4,
170:5, 187:17
approximately 18:24,
19:2, 24:14,
163:6, 173:24,
173:25
April 15:13
arbitrary 52:1
arbitration 65:19,
65:20, 66:19,
67:23, 69:5
arbitrations 68:19
arbitrators 66:8,
66:21
arguably 172:14
argue 53:9, 97:16,
131:22, 139:18,
140:9, 165:13,
177:19, 177:22
argued 20:14, 91:24,
130:3, 133:15
argues 156:5
arguing 74:11,
103:17, 119:16,
130:5, 130:6,
130:7, 153:4,
164:6, 177:25
argument 29:9,
39:20, 46:19,
66:16, 71:7, 72:2,
85:13, 92:13,
94:7, 107:23,
109:1, 129:8,
129:13, 129:14,
133:18, 182:16
Arguments 46:19,
53:14, 57:7, 72:9,
105:15, 110:2,
119:6, 134:20,
151:24, 153:20,

159:3, 165:16,
170:9, 170:13
arise 58:3, 63:2,
161:10
arising 10:19, 65:3,
85:17
arose 35:13
around 33:16, 66:2,
104:22, 105:3,
114:14, 123:18,
139:15, 193:21
arrangements 154:13
ARRIBAS 3:10, 46:8,
46:13
arrived 17:3
articulate 33:9
articulated 164:13
Ashton 103:7
aside 53:21, 115:21,
115:23, 152:14
asks 12:17, 74:10,
156:7
Asociacion 110:10,
110:11
aspect 22:12, 72:14,
92:3, 156:12
aspects 72:17, 75:6,
77:5, 112:25,
155:25, 156:5,
156:10, 157:6,
157:18, 158:20,
172:10
aspersions 143:6
assert 36:2, 46:22,
49:5, 62:25,
74:25, 79:5, 79:6,
85:16, 98:8, 142:3
asserted 35:21,
36:3, 36:7, 36:8,
37:10, 45:9,
45:11, 63:1,
74:18, 74:22,
74:23, 75:1, 75:7,
85:3, 98:19,
98:20, 123:11,
142:1, 154:15,
162:23
asserting 45:9,
76:5, 98:23,
100:21

assertion 82:10,
  121:24, 169:21
assertions 154:5
asserts 73:19, 73:20
assess 153:25,
  172:14, 181:25
assessment 164:24
assets 40:14, 40:15,
  40:21, 40:22,
  41:3, 41:10,
  44:17, 45:25,
  98:10
Assocation 86:19
Association 3:33,
  4:9, 86:18, 97:11,
  97:17
assume 17:17, 49:17,
  113:13, 123:1,
  170:17, 170:19,
  171:13, 177:17,
  192:10
assumed 23:22,
  101:16
assumes 164:14
assuming 188:7
assumption 123:17,
  123:19, 123:21,
  182:5
Assurance 3:30,
  12:18, 19:7
assure 43:20, 43:23
Assured 4:11, 4:12,
  133:11, 136:11,
  136:13, 138:2,
  138:3, 166:6
Atara 3:31, 128:5
attach 129:25
attached 19:15,
  162:23
attaches 91:10
attack 50:8, 53:17,
  109:23
attacked 13:20
attempt 91:17,
  151:23, 153:9
attempting 160:20
attempts 91:8
attention 92:13
attesting 38:25
Attorney 138:22

audible 7:7
audited 67:19
auditing 68:6
augmented 164:11
August 127:1,
  193:25, 194:4,
  194:9
auspices 26:17
AUST 3:10
Authority 1:22,
  2:13, 2:29, 3:18,
  28:7, 29:24,
  53:23, 54:15,
  54:16, 54:22,
  87:9, 91:22, 92:3,
  154:4, 156:3,
  157:13, 157:15,
  158:5, 161:9,
  161:15, 180:6,
  194:2
authorization
  112:13, 112:14
authorized 113:5,
  114:3
Automatic 30:24,
  40:19, 86:13, 97:9
automatically 73:21
Autoridad 4:23,
  179:25
AV 194:18
avail 103:9
available 23:25,
  98:12, 100:14,
  193:25
Avenue 54:20, 54:21,
  55:19, 133:9
avoid 13:17, 45:15,
  49:5, 63:20,
  122:22, 126:4,
  174:21, 177:9
avoidance 120:21,
  122:4, 122:5,
  123:7, 134:17,
  145:13, 145:14,
  145:18, 145:22,
  146:3, 146:21,
  149:16, 149:18,
  154:2
avoided 8:10, 23:12,
  23:13

awaiting 111:19,
  133:18
awaken 48:17
aware 146:15, 183:13
away 22:25, 40:16,
  146:14
Aweco 176:16
awoken 45:6


< B >
B. 34:7
backbone 11:2
backdrop 17:13
backfiring 20:25
background 68:23
backwards 9:1
bad 116:13, 123:15
baked 124:8
balance 102:17,
  102:20
balancing 95:22
Bank 4:8, 173:18,
  191:14
Bankr 54:18, 54:20
Bankruptcy 1:1,
  43:18, 52:12,
  52:17, 53:24,
  54:4, 54:6, 55:1,
  55:15, 56:4, 62:2,
  62:23, 65:19,
  72:1, 72:14,
  72:23, 100:24,
  100:25, 103:10,
  162:8, 165:8
banks 173:18
bargaining 10:18,
  11:4, 11:9, 22:20,
  48:4
Barrios 110:7,
  110:9, 110:14,
  111:15
Barris 78:24, 79:2,
  79:4, 79:20,
  110:13
based 28:25, 29:19,
  40:3, 40:7, 51:24,
  54:24, 65:11,
  65:20, 87:10,
  92:4, 139:12,

165:3, 168:16,
  168:21, 187:13
bases 60:16, 61:10,
  61:20, 64:16,
  77:9, 83:11
basic 89:23, 90:21,
  103:19, 104:9,
  107:23
basically 94:4,
  118:2, 139:15,
  165:22
basis 56:24, 59:23,
  61:22, 62:13,
  62:14, 62:15,
  62:17, 62:20,
  62:22, 82:7, 82:8,
  108:17, 111:3,
  139:11, 141:3,
  157:10, 158:11,
  158:12, 187:4
bat 40:6
bear 13:9, 91:11
bearing 85:17
beast 47:19
beat 121:25
become 11:23, 28:8
becomes 178:10
bed 167:24
begin 7:18, 8:14,
  35:12, 61:3,
  73:14, 151:16
beginning 8:25,
  19:13, 44:15,
  174:12, 174:21
behalf 16:9, 21:22,
  25:7, 28:1, 28:20,
  31:8, 36:7, 39:23,
  46:9, 47:8, 59:21,
  74:9, 111:14,
  112:10, 114:6,
  128:6, 134:8,
  148:4, 179:24,
  183:1
behest 40:11
behind 91:13,
  120:23, 121:4,
  126:11
beings 95:10
Bekins 103:5
belief 68:25

believes 10:12,
  29:17, 68:21
believing 165:23
belong 130:16,
  130:17, 135:10,
  135:11
belongs 130:15
below 10:3, 30:17,
  64:5
bench 113:25
benchmark 154:20
beneficial 68:2,
  69:1, 69:2, 97:10
benefit 10:3, 10:4,
  12:5, 19:20,
  20:11, 41:3, 96:12
benefits 9:15, 10:6,
  17:6, 18:12,
  18:14, 19:18,
  51:5, 51:6
BEREZIN 3:47,
  182:25, 183:1,
  183:19
Besides 111:4, 186:2
best 92:1, 190:16,
  196:5
BETANCOURT 3:44,
  183:20, 183:22
better 20:23, 32:3,
  41:25, 61:1,
  153:24, 165:24,
  176:4, 182:18,
  190:9
beyond 75:1, 147:25,
  154:14
bifurcated 102:12,
  141:7
big 69:6
biggest 119:6
billion 24:3, 40:4,
  44:25
binding 66:19,
  129:21, 157:9,
  169:22, 170:1
bit 37:19, 140:11,
  146:4
bites 139:8
blackout 193:25
blast 26:19
Block 16:5, 124:21,

148:22
blueprint 129:10,
  129:16, 129:20
boards 69:18
body 176:13
boilerplate 61:8
bolster 23:25
Bond 12:18, 15:2,
  65:2, 85:11,
  85:17, 107:22,
  124:5, 176:4
Bondholder 57:22,
  58:13, 183:14
Bondholders 3:27,
  12:17, 13:8,
  40:25, 44:8,
  44:14, 51:13,
  57:15, 115:16,
  130:16, 131:3,
  131:5, 131:6,
  135:12, 154:16,
  154:21, 176:9,
  176:10
Bonds 14:23, 15:4,
  15:11, 30:25,
  40:4, 45:10,
  48:19, 48:24,
  49:5, 63:2, 115:2,
  116:11, 123:6,
  123:10, 123:14,
  123:23, 127:9,
  127:13, 127:16,
  127:17, 127:21,
  127:22, 134:4,
  174:1, 175:10,
  175:13, 175:24
bones 153:10
bonus 9:24
books 58:24, 61:12,
  61:13, 62:8,
  62:10, 67:6, 67:7,
  67:11, 67:13,
  67:18, 67:21,
  68:3, 68:7
Booth 109:20
Border 74:10
borrow 50:21
Boston 146:16,
  147:12, 193:11,
  194:15

bother 116:13
bottom 164:12
bound 99:4, 108:22
bounds 166:17
box 131:19, 131:22
boxes 131:20
Brady 4:35, 31:9,
    34:23
branch 93:22, 95:11,
    95:25, 96:2, 96:5,
    96:17, 108:4
branches 88:18
Bravo 78:18
breach 45:23, 45:24,
    52:8, 52:11, 57:3
breached 57:1
breaches 44:2
breadth 152:23
break 86:6, 90:4,
    159:16
Brief 92:18, 96:10,
    97:5, 161:2,
    174:16, 174:18,
    180:19, 182:15,
    183:3, 186:6
briefed 8:4, 159:8,
    161:12
briefing 8:7, 31:2,
    42:23, 58:6,
    58:18, 59:8,
    59:14, 66:16,
    93:17, 125:16,
    132:12, 132:16,
    132:18, 138:5,
    151:25, 182:12
briefings 93:15
Briefly 30:3, 47:9,
    47:21, 47:25,
    49:12, 62:6,
    70:13, 100:8,
    127:5, 160:5,
    161:18, 180:2
briefs 151:21
brightest 11:7
brightness 16:22
bring 7:15, 34:5,
    64:10, 125:3,
    129:9, 167:2,
    167:16, 167:17,
    168:7

bringing 125:13,
    178:6
brings 32:11, 39:16,
    86:5
broad 58:22, 74:20,
    153:9, 169:8
broader 156:25
broadly 133:13
brought 21:14,
    25:13, 25:19,
    34:2, 130:21
budget 10:9, 104:17
budgets 8:24, 9:3,
    129:21, 135:16
Buenas 86:11
build 144:15
built 118:15, 126:7
bulk 97:2, 189:19
bunch 171:10
burden 32:19, 33:11,
    61:5, 67:10, 70:4,
    70:6, 70:14,
    71:18, 71:24,
    72:2, 91:12,
    95:18, 139:9
burdensome 29:18
business 91:4,
    155:13, 181:25,
    182:1, 189:12,
    191:25
Butler 25:7, 134:8
button 98:17
buttress 14:9

< C >
Cadwalader 138:1
Caesars 43:1
calculation 20:11
calendar 193:16,
    193:18
call 21:10, 31:4,
    37:19, 66:9,
    146:13, 189:11
called 7:25
CALLEN 3:23, 134:7,
    134:8, 150:4,
    150:8, 150:14,
    150:18, 150:24,
    151:7

calling 184:23
calls 10:8, 51:5,
    120:16
can't-hear-at-all
    79:12
canceling 193:4
candid 24:24
candor 25:3
cap 30:17, 63:8,
    63:12, 63:13, 64:4
capacity 13:12,
    23:23
Capital 4:32,
    173:15, 173:24
capped 19:4
capricious 52:1
captions 59:5
capturing 72:16
Caraballo 78:18
care 36:22, 37:22,
    70:19
carefully 34:1,
    53:12, 53:13,
    69:19, 71:6,
    71:21, 128:20
Carlos 3:41, 4:40,
    27:25, 180:18
carrier 101:15
case/best 155:8
cash 12:2, 12:4,
    23:21, 67:15,
    67:17
CAT 4:49
categorically 173:2
categories 65:1
category 33:7,
    84:13, 84:14
cause 29:15, 116:20,
    116:24, 119:4,
    119:10, 119:11,
    120:14, 121:6,
    121:21, 122:14,
    138:10, 138:11,
    138:13, 138:18,
    139:10, 139:16,
    139:25, 140:10,
    140:13, 140:15
caused 117:9
causes 120:4
CBA 10:19, 22:14,

25:1
cede 95:1
Centeno 78:18
cents 120:7, 163:25
century 11:5
Certain 8:1, 11:24,
    13:11, 23:10,
    25:16, 30:7,
    38:11, 58:24,
    61:14, 61:15,
    62:3, 64:23,
    123:6, 123:10,
    133:6, 142:2,
    156:5, 157:17,
    163:9, 170:1,
    170:3, 172:10,
    175:17, 179:4,
    183:8, 187:3
Certainly 24:4,
    42:6, 63:1, 63:6,
    105:18, 112:13,
    122:11, 122:13,
    125:8, 125:15,
    132:18, 133:9,
    145:23, 169:3,
    174:25, 177:2,
    183:14, 188:2,
    192:21
certainty 37:22
certificate 37:3,
    37:4, 38:24,
    79:22, 80:21,
    81:10, 81:24,
    83:2, 83:19,
    84:17, 85:4, 85:23
certification 12:18,
    39:10, 39:13,
    75:15, 75:21,
    77:6, 77:8, 80:23,
    81:13
certified 8:24, 9:3,
    18:10, 23:14,
    48:2, 99:11,
    135:16, 135:17
certify 98:1, 196:4
certiorari 28:23
cetera 26:13, 48:6,
    118:20, 118:21,
    161:2, 161:12,
    170:22

chair 79:17
chairman 51:24, 52:2
challenge 29:5,
    29:20, 108:20,
    108:21, 115:5,
    115:16, 144:17,
    168:7
challenged 62:21,
    104:18, 123:23,
    127:9
challenges 29:7,
    63:25, 105:7,
    114:22
challenging 127:20
chance 102:12,
    164:11
change 38:14, 43:12,
    43:13, 43:19,
    49:23, 54:3, 56:6,
    56:7, 56:10,
    58:23, 71:23,
    87:9, 167:21,
    186:2, 188:1,
    188:15, 191:25
changed 38:12,
    38:13, 162:5,
    189:6
changes 36:24,
    46:24, 105:7,
    109:11, 157:8,
    157:13, 157:14,
    189:4, 189:8
Changing 47:13,
    161:16, 186:4,
    194:1
Chapter 48:1, 55:1,
    55:3, 55:7, 55:12,
    69:6, 103:6, 103:7
charges 156:1,
    157:3, 157:11,
    162:15, 162:16
chart 153:23
check 39:7, 61:15,
    90:6, 99:22
checking 38:20
children 36:7,
    36:17, 38:13
choices 23:12, 24:6
choir 91:14
chooses 140:24

chosen 126:16
churn 8:2
CINTRON 4:40,
    180:17, 180:18,
    182:21
Circuit 14:3, 14:4,
    43:2, 44:13,
    48:23, 48:24,
    49:4, 94:12,
    94:15, 99:13,
    104:20, 122:21,
    129:14, 133:11,
    133:15, 133:16,
    136:19, 136:20,
    136:25, 142:5,
    143:16, 143:21,
    143:24, 176:15,
    182:8
circulating 184:12
circumstance 140:18
circumstances 21:7,
    33:2, 43:23, 71:8,
    113:6, 172:20
circus 118:2, 118:8
cite 43:16, 47:25,
    50:16
cited 42:25, 43:1,
    43:6, 43:7, 49:14,
    51:21, 106:15,
    176:16
citizens 22:11,
    91:4, 96:14
City 54:18, 103:9
claimant 65:25,
    66:1, 71:20,
    73:24, 77:23,
    77:24, 78:25,
    81:4, 81:18, 82:5,
    83:9, 83:25, 84:22
Claimants 36:14,
    37:16, 60:8,
    60:14, 61:16,
    68:14, 68:15,
    69:1, 70:9, 72:5,
    72:12, 72:15,
    77:19, 107:22
claimed 122:19,
    143:12
claimholders 166:16
claiming 79:15

clarification 12:19, 148:6, 149:3, 150:4
clarify 32:18, 46:16, 119:24, 166:2, 180:23
clarifying 106:12
clarity 113:14, 113:20, 120:11, 122:17, 123:16, 177:15, 181:16
Clark 4:9, 191:11
class 106:6, 106:10, 128:12, 167:8
classes 142:17
Clause 29:5, 29:7, 88:5, 89:18, 92:25
clear 17:4, 27:16, 40:5, 41:24, 43:18, 67:6, 91:22, 94:23, 96:4, 96:8, 96:20, 105:20, 113:3, 113:9, 117:18, 124:25, 135:7, 137:15, 150:16, 156:17, 156:20, 157:6, 157:12, 161:10, 165:9, 165:23, 178:20, 178:21, 185:2, 186:16
clearer 186:18
clearly 17:10, 31:25, 33:9, 34:12, 46:3, 47:11, 63:5, 88:22, 94:8, 119:25, 122:21, 155:2, 155:21, 178:6, 187:13
clerical 148:11
Clerk 6:16, 6:19, 30:10, 63:10
clerks 193:24
client 40:6, 112:13, 141:21, 142:14
clients 161:3, 161:8, 174:16, 176:3

clock 87:23, 159:18
close 30:15, 45:1, 48:21, 189:12, 191:25
closest 14:16
closing 194:12
clothes 45:21
Code 43:18, 53:24, 54:5, 54:6, 54:9, 54:13, 55:1, 55:4, 55:15, 56:4, 136:17, 162:8, 164:9, 165:8, 167:13
coequal 88:18, 96:17
COFINA 65:24, 66:2, 85:11, 85:17, 130:8, 134:2, 156:15, 169:25
Colberg 4:24, 179:23, 179:24
collateral 48:21, 49:2, 49:3, 163:2, 164:7, 164:8, 165:5, 165:7
colleagues 121:15, 134:12, 138:25, 140:21
collection 151:21, 185:12
collective 10:18, 11:4, 11:9, 22:20, 48:3
colloquy 128:16
combined 65:12
combining 67:24
comes 50:7, 64:18, 84:17, 105:23, 116:22, 168:16, 187:23
comfort 68:22
coming 11:18, 31:25, 41:10, 72:2, 81:13, 135:13, 135:15, 146:16, 160:19, 189:15
commenced 54:25
commencement 26:16, 88:24
comment 25:12, 26:4,

177:3, 190:11
comments 16:10, 26:11, 28:21, 34:25, 35:3, 75:14, 92:10, 92:16, 97:5, 160:6, 174:10, 174:11, 175:3, 187:12
commission 48:5
commit 163:17, 190:5
commitment 167:2
Committee. 53:8
committees 54:8, 54:9, 56:22
committing 166:11
common 62:1, 62:22, 72:22, 121:15, 125:25, 138:5, 182:12
Commonwealth-cofina 25:15
communicate 7:2
communicating 7:12, 69:7
communication 33:19
communications 194:20
Community 4:5, 18:19, 138:23
Company 3:22, 25:8, 134:9
compare 97:19, 97:20, 98:5
Compel 178:18
compensated 11:3
compensation 35:5, 87:9, 103:22, 109:23
compete 108:7, 108:12, 108:16
competing 98:23, 109:6
complain 42:8, 50:4
Complaint 97:21, 116:21, 122:6, 129:18, 135:8, 142:4, 151:1
Complaints 30:7, 48:25, 116:4,

116:15, 118:16,
121:19, 131:17,
134:20, 136:12,
137:5, 139:20,
139:23, 140:7,
140:23
complete 28:16,
96:15, 100:9,
100:13, 110:17,
110:21
completed 179:8
Completely 37:8,
41:9, 63:24,
100:25, 106:20,
119:17, 121:8
completion 120:13,
159:6
complex 26:9, 62:2,
72:23, 155:22,
195:1
complexity 101:9,
155:4
compliance 20:12
complicate 105:18
comply 140:2, 181:9
complying 181:6
component 10:15
components 11:3,
109:6
composition 43:20,
46:24, 49:24
comprised 41:13,
53:11, 56:3
compromise 152:12,
155:6, 155:15,
155:17, 170:5,
170:6
compromised 154:14
compromises 159:5
computer 87:16,
87:18
conceding 82:17
conceivable 95:23
concept 20:6, 90:23,
186:21, 189:13
concepts 51:3
conceptual 72:16
conceptually 157:7
concern 19:6, 19:9,
69:25, 70:19,

74:14, 118:25
concerned 21:11,
37:9, 61:7, 68:13,
69:19, 70:10,
106:9, 108:22,
145:21, 190:20
concerning 11:21,
13:14, 30:23,
34:16, 35:15,
71:13, 72:12,
89:23, 90:22,
151:18, 151:25,
153:4, 158:23
concerns 34:15,
37:9, 42:11,
60:25, 61:19,
63:10, 69:6,
70:15, 71:12,
71:17, 74:19,
74:24, 77:14,
77:22, 79:2, 84:2,
112:25, 144:18,
156:25, 158:6,
181:20
conclude 152:1,
193:8
concluded 36:1,
153:14, 181:17
concluded. 195:4
concludes 53:22,
55:14, 193:7
concluding 155:17
conclusion 161:22,
169:19
conclusions 160:4,
169:18
conclusory 152:9,
153:12, 154:5,
154:10
concrete 106:5
conduct 194:10
conducting 194:24
confer 15:19, 58:16,
144:21, 146:12,
146:22, 147:3,
151:17, 158:20,
159:1
conference 6:24,
29:2, 151:13,
151:19

conferring 185:7
confers 54:10
confidence 96:14
confident 135:4
confirm 16:9, 16:10,
70:17, 82:9,
83:12, 111:15,
148:11, 150:11,
166:13, 166:14,
167:18, 178:16
confirmable 166:18
confirmation 10:10,
12:13, 16:25,
60:5, 98:21, 99:8,
99:9, 101:1,
101:5, 102:10,
105:18, 108:7,
111:19, 128:11,
128:13, 133:25,
142:18, 158:1,
158:7, 165:11,
166:19, 167:4,
168:14, 169:6,
170:1
confirmed 17:11,
26:1, 163:19,
166:10, 166:25
confirms 185:23
confiscation 7:14
conflict 40:8,
40:10, 41:7,
41:22, 43:5,
45:21, 50:22,
51:18, 51:24,
52:5, 52:8, 52:9,
56:23, 57:4
conflicted 42:3
conflicts 45:23,
57:7
conforms 88:13
confused 149:8
confusion 101:9
congratulate 21:11
Congressional 92:5,
92:24, 94:9,
106:16
connect 109:18
connected 100:25,
104:13
connection 8:11,

30:23, 64:25,
66:14, 100:23,
130:4, 132:18,
193:11
consensual 17:16
consensually 8:9,
58:7, 160:22
consensus 22:3
consent 122:11,
168:23
consenting 167:8
consents 66:18
consequences 29:16
consider 61:21,
64:14, 106:25,
141:6, 159:9,
181:1
consideration 8:7,
16:17, 33:2,
42:13, 108:13,
155:11, 157:4,
171:4
considerations 87:5
considered 29:1,
33:25, 53:12,
57:9, 58:9, 59:4,
61:2, 69:17, 71:6,
155:9
considering 69:22
consist 56:22
consistent 6:24
consistently 17:10,
21:4, 129:15
consisting 20:9,
196:4
consolidated 13:18,
57:20
consolidation 15:11
constant 95:1
constituencies 9:8,
26:12, 32:17
constituency 42:7
constitute 139:25
constitutes 52:9
Constitution 88:9,
88:13, 88:14,
88:17, 92:19,
93:2, 93:4,
103:11, 103:20,
104:8, 106:23,

107:1, 107:10,
107:13, 107:21
Constitutional 3:38,
107:24, 124:2,
148:5
constrain 158:3
constrained 174:9
constraining 157:24
constructive 9:10,
24:19, 146:8
constructiveness
22:5
constructs 155:14
consumers 181:2,
181:5, 181:7,
181:9, 181:12,
181:13, 181:17
contacted 135:21
contained 153:12
contains 9:19
contemplate 63:18
contemplated 18:11,
19:1, 20:20, 21:3,
152:2
contemplates 154:13,
155:21
contend 44:2, 158:2,
188:14
contended 157:17
contending 194:19
contention 13:24,
188:7
contest 74:21,
122:25, 165:22,
165:25
contested 8:13,
29:17, 35:14,
39:17, 57:13,
58:25, 70:24,
73:7, 86:2,
177:24, 189:5
context 32:25,
35:13, 57:9, 61:2,
66:7, 69:20,
94:10, 120:4,
120:10, 133:24,
134:10, 134:13,
164:10, 165:2,
176:21, 177:18,
178:3, 178:8

contingency 14:22
contingent 12:19,
13:7, 14:24, 15:6,
15:8
continuation 66:14,
128:9
continue 9:5, 58:8,
183:12, 188:13,
188:14
Continued 4:1, 12:1,
12:3, 28:11
continuing 24:21
contours 89:16
contractual 103:11,
104:6
contrary 143:7,
175:14
contrast 178:1
contributions 40:15
control 30:15
controversial 179:5
convey 180:7
convince 185:18,
187:18
cookie 70:8
cooperate 111:20,
113:2
cooperating 87:18,
87:20
cooperation 110:24,
111:2
Cooperativa 77:21,
78:4, 85:22
coordinate 58:4,
117:21, 132:12,
138:6, 149:11
coordinated 132:11
coordinating 66:17,
117:10
coordination 58:19,
59:9, 60:6, 117:23
copied 38:9
copies 137:15
copy 38:8, 151:1
copycat 45:16
Cordova 27:25
core 22:24, 125:16,
130:8, 136:21
cornerstone 16:20
Corp. 183:2

Corporation 3:31,
   4:12, 4:14
Correct 74:4, 75:17,
   78:6, 78:9, 79:23,
   80:9, 90:13,
   93:18, 108:25,
   117:16, 117:20,
   122:20, 145:7,
   149:13, 149:15,
   149:21, 150:13
corrected 124:20,
   148:9, 171:7
corrections 30:19
correctly 106:4,
   145:11
Cortland 4:32,
   173:15, 173:20
cost 23:5, 23:20
costs 8:1, 56:16,
   66:20, 71:11,
   116:23
Counsel 6:9, 31:5,
   31:10, 50:23,
   51:23, 57:12,
   57:15, 59:2, 59:3,
   72:15, 110:2,
   110:9, 111:10,
   111:24, 112:12,
   134:12, 135:23,
   148:8, 149:19,
   151:15, 159:11,
   191:1
Count 15:1, 15:3,
   15:4, 123:9,
   127:17
counterclaim 136:7,
   137:12
counterclaims 136:13
counterproductive
   33:7
counts 127:18
couple 25:11,
   141:23, 146:17,
   172:6, 173:12,
   174:10
course 6:19, 25:10,
   27:21, 28:14,
   40:21, 47:19,
   62:10, 67:21,
   69:9, 76:16,

87:23, 105:11,
   117:6, 167:1,
   188:4
COURTROOM 6:5, 6:18,
   7:1, 7:12, 7:16,
   27:8, 37:18,
   79:15, 98:8,
   99:15, 99:23,
   100:3, 159:18,
   184:20, 192:20
courtrooms 99:21
Courts 48:5, 104:25,
   105:6, 176:15
covenant 162:25,
   164:8
cover 24:4, 64:1,
   121:14, 121:16
covered 24:5, 25:17
covers 150:9, 168:10
crammed 167:12
create 11:4, 12:4,
   33:6, 33:10,
   56:14, 89:3,
   89:19, 101:8
created 24:8, 50:18,
   67:8, 107:11,
   108:9, 109:2,
   109:7
creates 139:24
creating 13:12,
   19:11, 22:12,
   170:6
creation 20:8,
   106:17, 107:16,
   108:1, 139:21
creature 91:18
credibility 35:15
credit 123:2, 173:17
creditor 23:25,
   42:15, 42:16,
   43:10, 46:17,
   47:17, 47:19,
   48:13, 52:10,
   61:5, 131:21,
   140:19, 183:4,
   183:8, 183:14
critical 11:1,
   24:11, 24:23,
   25:14, 125:12,
   129:7, 143:18

criticize 20:19
cross 46:3, 91:11
crucial 180:24,
   181:1, 181:3
CSR 196:14
CTO 22:4, 22:16
cued 7:23, 63:15,
   152:23
CUNNINGHAM 39:22,
   39:23, 40:2, 42:6,
   42:15, 44:4,
   45:20, 46:6,
   49:11, 49:12,
   50:11, 51:17,
   51:21, 52:23
current 12:10,
   16:23, 31:21,
   41:7, 41:8, 49:21,
   50:2, 152:3,
   152:16, 153:3,
   171:8, 175:21,
   175:23, 178:5,
   180:8, 180:9
currently 30:10,
   60:21, 133:10,
   136:18, 158:20,
   186:24
CUSIP 85:17
Customs 74:9
cut 10:6, 18:15,
   18:21, 19:3, 19:5,
   22:9, 91:8, 91:25,
   109:14, 112:22
cuts 17:11, 17:17,
   18:11, 18:16,
   19:1, 19:2, 19:23,
   19:25, 20:15,
   20:18, 20:20,
   21:2, 21:3, 23:3,
   23:18, 23:19,
   23:24, 24:4, 24:5,
   24:7, 24:13, 25:1,
   95:1, 95:14,
   109:17
cutter 70:8
cutting 17:6


< D >
damages 29:16

danger 145:16
darkness 16:23
date 61:15, 154:25,
    165:5, 165:6,
    179:4, 193:10,
    193:17
dated 11:20
dates 12:7, 26:10,
    161:13, 161:16,
    193:25, 194:1,
    194:3
David 3:35, 86:17
Day 14:9, 35:3,
    45:1, 45:8, 57:22,
    66:9, 69:3, 69:11,
    125:19, 128:10,
    129:2, 170:2,
    177:22, 179:13
days 7:20, 11:25,
    12:9, 12:10,
    27:16, 27:17,
    94:5, 118:14,
    120:2, 121:23,
    125:19, 125:25,
    126:15, 137:17,
    145:5, 145:8
De 4:16, 4:17, 4:21,
    4:22, 4:23, 6:20,
    29:4, 77:21, 78:4,
    95:9, 95:23,
    110:10, 110:11,
    179:24, 179:25,
    194:17
dead 121:25
deadline 121:22,
    125:23, 126:18,
    126:23, 127:3,
    127:4, 158:16
deadlines 189:10
dealing 67:5, 68:24,
    104:15, 118:18,
    165:12
deals 10:25, 187:22
dealt 51:23, 64:17,
    130:10, 133:24
death 40:22, 125:21
debate 43:4, 108:13,
    173:3
debt 13:2, 13:5,
    13:10, 13:11,

13:12, 13:13,
    13:16, 13:20,
    13:22, 13:23,
    104:14, 105:3,
    174:1
Debtholders 3:39,
    124:2, 148:5
Debtor 1:42, 2:15,
    2:31, 77:22,
    101:11, 101:20,
    101:21, 162:15,
    162:16, 164:4,
    166:4, 166:11
Debtors 1:24, 36:15,
    56:21, 59:17,
    59:25, 61:5, 61:9,
    61:13, 62:10,
    63:1, 63:3, 68:5,
    71:9, 71:18, 73:3,
    101:15, 163:15
debts 104:15
decide 99:4, 121:3,
    136:21, 136:23,
    136:25, 144:2,
    157:18
decided 41:21,
    94:11, 94:22,
    101:7, 105:13,
    134:2, 134:4,
    136:4, 136:14,
    140:21, 143:13,
    143:15, 143:16,
    147:8
decision 15:19,
    54:24, 57:11,
    103:5, 105:23,
    133:12, 133:18,
    145:6
decisions 99:16,
    104:24, 136:19
Declaration 35:23,
    89:11, 133:17,
    135:24
declarations 129:3,
    152:17, 152:19,
    153:17, 153:18,
    158:18, 161:2,
    161:5, 169:16,
    186:5, 188:22,
    188:24

declaratory 93:14,
    95:12, 96:20,
    122:18
declare 37:4, 135:9,
    157:9, 169:4
decline 17:17, 165:7
declines 55:17,
    72:13
decreed 103:21
dedicated 11:7
deem 65:4
deemed 46:24, 47:1,
    55:4, 55:7, 58:25
deeply 79:2
defend 98:18, 140:7
defendant 13:14,
    48:5, 122:6,
    136:24, 138:12,
    138:17, 140:24
defendants 30:8,
    114:19, 114:21,
    114:25, 115:3,
    115:6, 116:5,
    118:19, 119:9,
    119:10, 121:22,
    132:7, 134:16,
    140:10, 140:14,
    149:16
defense 13:11,
    13:14, 13:17, 72:9
defenses 131:18,
    141:8
defer 35:5, 182:1
deference 101:6,
    155:12
deferral 31:16, 32:9
deficient 76:1, 77:7
deficit 10:11
define 119:11,
    131:1, 134:1
defined 192:23
definitely 101:20,
    103:1
definition 47:20,
    180:8
degree 187:9
delay 60:22, 94:25,
    124:8
delayed 161:14
delegated 26:20

deleted 73:21
demands 108:20,
    155:5
demonstrate 54:2,
    151:22, 153:21,
    155:5
demonstrated 22:6,
    56:9, 57:4, 155:10
denial 7:15
denied 46:21, 54:5,
    55:23, 57:6
deny 61:22, 166:19
Department 14:6,
    46:10, 113:4
depending 120:12
depends 131:19
deprive 23:10
DEPUTY 6:5, 6:18,
    79:15, 99:23,
    100:3, 192:20,
    194:16
derail 92:21
derailing 93:7,
    95:24
described 35:22,
    44:17, 50:12,
    51:7, 158:18
describing 109:20
description 58:1,
    157:11
designation 30:18
designing 19:12
desirable 20:15
desire 27:1, 109:5
despite 93:20,
    174:5, 176:23
destruction 40:20
detail 111:21,
    155:16, 156:19
detailed 153:19,
    170:8, 189:23,
    190:15
Details 19:16
determination 51:1,
    87:2, 100:11,
    102:8, 106:11,
    129:17, 130:2,
    182:17
determinations
    21:15, 28:25,

29:15, 143:18,
    186:25, 187:3
determine 62:18,
    69:12, 97:17,
    154:21, 156:9,
    156:23, 158:20
determined 97:18,
    176:20, 176:21,
    178:8
determines 13:9,
    43:13, 56:7
determining 157:5
Detroit 42:25,
    54:18, 54:19,
    54:24, 55:11,
    55:18, 65:19
devastatingly 21:1
developed 60:5,
    107:1, 125:14
device 7:5, 7:6,
    7:12, 7:15, 67:10
devices 6:23, 7:1,
    7:4, 7:15
dice 124:4, 165:24
dictate 135:19,
    176:25
dictates 175:24
difference 13:22,
    50:6, 102:23,
    103:1
different 9:10,
    17:8, 24:25,
    33:16, 47:14,
    82:9, 84:3, 95:21,
    98:8, 114:8,
    114:24, 115:5,
    117:10, 117:22,
    118:10, 124:15,
    125:5, 131:20,
    161:19, 164:24,
    165:8, 167:14,
    172:20, 173:2,
    184:14, 185:2,
    186:23, 187:10,
    188:6
difficult 64:2,
    108:15, 108:24,
    121:23, 156:23,
    194:9
digits 27:18

direct 49:23, 49:25,
    50:2, 53:25,
    153:16
directed 15:1,
    43:22, 191:14
directing 175:1
direction 56:13,
    113:9, 178:21
directions 118:10
directly 32:1,
    35:18, 133:4
directors 86:21,
    168:4
Disabilities 36:10
disabled 36:16
disagree 73:24,
    122:16, 123:18,
    142:6, 144:6,
    157:21, 179:14,
    179:19, 185:12,
    185:13
disagreed 142:3
disallow 77:2,
    77:18, 80:10,
    80:14, 81:13,
    81:16, 82:1, 82:4,
    83:7, 83:24, 84:21
disallowance 74:16
disallowed 36:16,
    39:12, 62:15,
    74:6, 78:1, 82:19,
    84:13, 84:24,
    85:19
disband 53:23,
    54:11, 55:15,
    55:24
disbanded 47:17
disbarred 120:17
discharge 103:10
Disclosure 12:7,
    97:16, 142:25,
    152:2
discount 51:9,
    105:2, 154:22
discounted 164:15
discovery 31:1,
    72:12, 72:17,
    93:16, 95:8,
    153:4, 153:9,
    153:11, 154:1,

158:21, 158:23,
158:25, 159:6,
178:9, 179:4,
185:6, 188:9,
188:12, 189:5,
192:24, 193:2
discretion 119:14,
119:17, 119:20,
149:7, 182:9
discuss 27:20
discussed 32:14,
63:9, 101:25
discussing 20:17,
147:11, 178:19
discussion 152:9,
154:3, 160:10,
179:2, 179:8,
189:25, 190:2,
193:2
discussions 26:18,
26:23, 92:21,
93:23, 113:14,
128:22, 160:2,
191:17
disingenuous 109:16
disingenuously 91:24
dismantling 40:13
Dismiss 45:12,
115:15, 118:19,
124:1, 124:10,
125:25, 126:2,
127:3, 136:24,
140:24, 148:7
dismissed 143:20,
143:21
dismissing 129:18
disparate 159:3,
169:14, 177:11
disposition 111:18
dispute 31:1, 58:2,
71:14, 82:12,
82:13, 83:15,
84:3, 100:17,
132:10, 135:10,
136:22, 177:1,
178:3
disputed 159:5
disputes 58:7, 58:8,
58:17
disregard 40:19,

176:24
disrupt 117:4
disruptive 116:17
distinction 102:23,
103:1, 103:15,
145:12
distribute 187:12,
188:18
distribution 40:23,
159:2, 189:2,
189:7, 191:3,
191:17
distributions 158:9,
158:11, 176:18
District 1:3, 2:36,
2:37, 2:39, 6:5,
6:15, 6:16, 6:20,
97:25, 98:3,
101:3, 176:16,
194:18, 194:19,
196:1, 196:2,
196:7, 196:8
districts 62:4
diversion 40:15
Docket 1:6, 1:28,
2:3, 2:19, 11:21,
28:4, 28:6, 29:22,
34:13, 53:2, 53:3,
53:20, 59:25, 71:4
doctrine 29:4
document 35:17,
185:21
documentation 28:15,
152:4
documents 7:6,
32:15, 72:18,
162:24
dodge 92:1
doing 102:24,
103:13, 103:14,
109:16, 113:8,
118:3, 147:9,
148:24, 165:14,
165:20, 166:22,
167:1, 187:4,
194:17
dollar. 120:7
dollars 10:2, 18:12,
18:16, 23:10,
24:3, 67:15,

67:16, 120:8,
173:21, 174:1
domestic 121:22
dons 91:14
door 27:13, 120:23,
128:23
dots 104:12, 109:18
doubles 20:17
doubt 17:25, 70:5,
144:22, 154:2
doubts 67:22
down 50:7, 98:17,
99:13, 104:25,
135:15, 167:12,
172:5, 173:4,
176:15, 187:15,
188:2
down. 107:4
dozen 36:3
draft 65:12
drafted 88:22
drag 108:6
draw 92:11
dropped 99:17,
164:22
dry 179:16
due 25:10, 27:21,
36:21, 60:8,
108:20, 120:2,
125:25, 127:3,
140:2, 150:23,
178:11, 180:5,
183:9
duly 48:2
dunk 108:19, 108:24
duplicate 37:3,
37:6, 38:7, 38:18,
70:1, 79:10,
79:20, 80:10,
81:3, 81:7, 81:20,
85:3, 85:11
duplicates 35:22,
36:4, 36:6, 37:11,
37:14, 70:18,
77:2, 77:19,
78:19, 79:4,
80:15, 81:18,
83:8, 83:24, 84:22
duplicative 67:4,
67:5, 82:13,

82:14, 82:18,
82:23, 83:16,
84:4, 85:13,
85:19, 85:22
during 7:13, 60:23,
140:8, 144:21,
171:9, 183:10
duties 17:14, 21:5,
45:24, 45:25,
46:2, 57:1
duty 44:2, 47:2,
52:9, 52:11, 57:3

< E >
e-mail 80:5, 191:3,
191:6, 191:9,
191:19, 193:24
e-mailing 7:11,
189:10
e-mails 184:23
earlier 9:21, 31:20,
75:15, 79:20,
110:25, 111:7,
128:14, 135:17,
162:12, 170:24
Early 7:20, 94:6,
127:1, 162:20
easiest 115:18
easily 24:5, 134:20,
140:19
easy 59:2, 89:16
ECF 30:15, 148:23
echo 140:20
economic 16:22,
23:17, 24:15,
96:11, 155:10,
183:24
economical 102:8
economics 164:24
economy 19:21, 91:3,
91:5, 95:12,
96:16, 102:7
Ed 6:16
edge 79:17
educational 22:21
effect 85:1, 109:19,
109:22, 129:16,
129:21, 157:22,
157:25

effective 26:7,
26:21, 157:9
effectively 22:14,
49:25, 56:13,
132:20
effects 129:10,
155:10
effectually 48:21
efficiencies 11:5
efficiency 124:4
efficient 7:23,
58:10, 58:15,
60:7, 71:13,
72:21, 100:6,
102:10, 144:9,
159:5
efficiently 71:10
effort 117:23,
118:6, 159:4,
190:12
efforts 18:3, 118:9
Eight 10:9, 51:9,
102:1, 114:20
either 15:5, 15:19,
25:25, 26:8,
26:15, 33:20,
34:25, 49:25,
59:14, 69:5,
98:25, 103:4,
119:8, 127:23,
131:8, 141:1,
168:23, 185:22,
192:2
elaborate 65:1
elbow 171:8
elected 20:9
Electric 1:21, 2:28,
28:7
Electrica 4:18,
4:24, 179:25
electronic 7:1, 7:4
element 103:22
Eleven 102:14
eliminate 12:25,
49:20
eliminated 47:20
elucidation 185:3
embody 103:20
emerge 16:21
emergency 147:7

emerges 91:3
Emil 4:33, 173:11
Emmanuel 30:1
EMMANUELLI 4:19,
28:19, 28:20,
29:11, 29:13
emperor 45:20
emphasize 17:21,
19:8, 165:2
Empleados 4:22,
179:25
Employee 16:14
Employees 1:37,
4:28, 47:23
employer 22:21,
22:22, 40:14
empower 55:15
enable 11:23, 16:21,
28:8, 71:9
enacted 40:12
end 15:23, 20:16,
21:23, 44:13,
45:8, 66:8, 69:3,
69:11, 69:20,
104:3, 114:12,
119:15, 124:8,
156:15, 156:16,
164:12, 165:13,
174:19, 185:3
ended 142:16
ending 96:10
ends 58:22
enemies 47:18
Energia 4:23, 179:25
Energy 3:44, 183:23
enforceable 92:19
engage 17:15, 22:18,
22:20, 26:22,
27:1, 41:6, 174:6
engaged 9:7, 17:19
engagement 190:9
engender 116:23
engineered 10:20
engrained 89:13
enlightened 11:7
enough 23:18, 24:4,
51:11, 61:10,
61:17, 104:22,
105:3, 166:18,
171:8, 181:22

ensure 30:14, 43:14,
    54:3, 56:8, 56:11,
    72:20
enter 34:17, 39:12,
    57:11, 73:2,
    134:22, 146:25,
    147:2, 147:17,
    147:20, 150:22,
    150:25, 151:2,
    176:7
entered 9:15, 16:11,
    30:20, 31:17,
    137:14, 173:17
entering 30:25,
    31:2, 107:15,
    176:2
enters 30:13
entertain 179:2
entire 126:7,
    169:20, 169:21,
    174:18, 194:23
entirely 59:3
entirety 156:8
entities 26:14,
    50:16, 63:2,
    183:24
entitled 130:13,
    163:22, 177:22,
    178:9
entitlement 91:9,
    98:14, 153:21
entity 20:22, 25:17,
    48:6, 108:16
entrenched 47:3
Entry 34:14, 53:2,
    53:3, 53:5, 53:20,
    71:2, 71:4
envelopes 122:8
environment 23:7
envisioning 89:8
envisions 88:18
equal 109:6
equitable 102:2,
    155:6
erode 23:8
error 148:9, 148:11
errors 36:12
especially 62:2,
    64:15, 161:3,
    194:16

Esq 3:7, 3:35, 3:41,
    3:44, 4:6, 4:19,
    4:24
essence 89:23
essential 97:7,
    97:10
essentially 89:4,
    97:25, 101:19,
    109:14, 153:11,
    170:4, 175:17,
    176:10, 176:19,
    176:24
Establish 30:11,
    33:11, 57:14,
    89:17, 154:19,
    184:24
established 101:13,
    109:3, 109:24
establishing 88:7,
    156:1
establishment 91:19
estate 8:2, 42:1,
    44:19, 63:2
estates 40:9
et 1:16, 3:4, 3:44,
    26:13, 48:6,
    118:20, 161:2,
    161:12, 170:22
evaluating 170:13
event 48:13, 133:15,
    171:24, 187:2
eventually 91:3
Everybody 108:7,
    108:23, 122:7,
    122:11, 125:7,
    126:3, 131:17,
    131:25, 132:4,
    144:8, 149:12,
    159:17, 175:22,
    188:6, 189:11,
    190:19
Everyone 27:8,
    46:11, 69:22,
    73:12, 86:8,
    98:18, 99:12,
    99:15, 100:20,
    102:11, 102:12,
    108:22, 119:12,
    128:12, 141:19,
    141:25, 179:4,

182:8
everything 44:9,
    48:15, 50:4,
    98:17, 100:18,
    117:9, 128:11,
    128:13, 133:24,
    141:5, 143:4,
    161:12, 162:1,
    168:2, 168:4,
    179:14, 186:10
evidence 47:22,
    56:25, 61:17,
    62:11, 72:2, 72:9
evidentiary 61:1,
    61:5, 158:21
exact 35:22, 36:2,
    36:4, 37:10,
    37:11, 37:13,
    38:7, 38:18,
    70:18, 77:2,
    77:18, 78:19,
    79:4, 80:15, 81:3,
    81:7, 81:17,
    81:20, 83:8,
    83:24, 84:21,
    85:3, 134:19
Exactly 70:19, 165:1
exaggerates 95:5
Examiner 4:35, 30:2,
    31:4, 31:9, 32:22,
    33:10, 34:24
examining 182:7
example 15:4, 61:12,
    66:5, 116:10,
    145:20, 172:12,
    177:19, 181:18
exceed 22:17
excellent 16:1
except 11:16, 73:13,
    124:4, 127:22,
    147:18
exception 89:6
exclude 180:20
exclusive 48:2
exculpated 168:4
exculpation 168:3,
    168:5, 168:9,
    168:12, 168:14,
    191:15
exculpatory 158:13

excuse 193:3
executed 10:17
Executive 6:15,
  91:16
exempting 156:2
exercise 92:24,
  156:15
exercising 88:25
Exhibit 31:16,
  31:17, 32:8, 34:7
EXHIBITS 5:9
exist 58:22, 170:7
existence 54:22
existing 10:19, 14:8
exists 57:5, 121:21
expansive 89:2
expect 8:4, 28:15,
  34:4, 59:13, 63:4,
  118:5, 118:8,
  131:10, 132:18,
  151:15, 154:9,
  175:7, 182:6,
  184:15, 184:22,
  185:4, 188:20
expectation 132:17
expected 27:2, 59:4
expecting 58:1
expects 26:6, 149:19
expedited 93:15,
  93:18
expeditious 102:8
expense 112:16,
  175:23, 178:5
expenses 175:22,
  175:23, 180:8,
  180:9
experience 68:24
experiments 88:25
expert 180:20,
  181:11
expire 114:15, 118:4
explain 15:7, 17:1,
  42:20, 66:16,
  102:25, 158:10,
  160:13, 161:25,
  171:19, 171:25
explained 102:9,
  124:3, 155:9,
  170:18, 170:24
explaining 100:11

explains 187:4
explanation 14:24,
  157:12
explicitly 90:23
explore 17:16
expressed 17:10,
  71:12, 88:22,
  96:4, 112:24
expression 118:7
expressly 29:6
extend 121:21
extended 132:13
extension 116:4,
  139:16, 140:1,
  140:2, 140:3,
  140:14, 145:4,
  147:25
extensive 17:19,
  34:11
extent 19:17, 23:9,
  26:20, 46:2,
  61:19, 62:19,
  74:25, 113:14,
  132:12, 142:22,
  158:3, 158:8,
  162:3, 162:4,
  162:5, 162:17,
  172:11, 182:9,
  182:14, 190:8
extra 86:6, 125:20,
  139:6
extraordinary 171:3
extreme 56:15
extremely 16:19,
  18:1
Eyck 31:10
eye 186:10, 186:11

< F >
face 63:25, 128:23,
  156:20
facie 69:14, 71:19,
  71:25, 72:3, 152:7
facilitate 128:15
facilitating 12:13
facility 173:20,
  173:23
fact 20:20, 25:12,
  36:4, 37:5, 37:11,

67:14, 68:7, 70:2,
  70:18, 81:20,
  82:23, 102:17,
  139:19, 140:2,
  145:19, 155:1,
  156:13, 161:21,
  162:10, 169:17
facto 29:4
Factor 94:2, 95:4,
  100:9, 100:23,
  101:10, 102:18,
  147:15
factors 87:1, 92:8,
  92:11, 97:4,
  100:8, 105:19,
  155:12
facts 17:5, 87:11,
  124:20, 152:6,
  154:5, 156:4,
  165:14, 168:16
factual 60:16,
  152:6, 153:7,
  153:17, 153:19,
  158:4, 158:10,
  158:12, 185:3
factually 157:22
failed 54:2, 139:9
failure 91:3, 140:3
fair 52:13, 52:16,
  52:17, 71:13,
  72:21, 95:20,
  107:3, 143:4,
  144:7, 155:6,
  169:20, 169:21,
  178:15
fairly 11:3, 105:20
fairness 95:15
fait 190:23
faith 17:8, 35:25,
  139:11
fall 60:2, 129:11,
  129:12, 167:24
falls 33:11, 154:23
false 143:12
Far 21:12, 46:25,
  97:24, 142:12,
  154:18, 155:19,
  155:22, 168:18,
  168:20, 190:13
fashion 7:23, 58:5,

125:14
Fathers 88:23, 96:4
favor 101:13,
    101:17, 101:21,
    102:19, 104:19
favorable 18:5, 21:6
favorite 176:1
feasible 181:4
features 7:7
February 44:15
Federal 93:14,
    94:11, 94:14,
    94:23, 97:21,
    98:3, 101:3,
    103:11, 103:13,
    104:5, 105:6,
    105:16, 132:15
Federation 10:21
Fee 4:35, 30:2,
    31:4, 31:8, 31:12,
    31:15, 31:21,
    32:22, 33:10,
    33:13, 34:24
fee-related 31:5,
    31:11
feel 22:8, 130:1,
    135:4
fees 33:12, 116:23
Felsenthal 51:23
Fernando 3:44,
    183:22
few 7:20, 11:25,
    15:9, 18:5, 90:5,
    141:18
FGIC 115:10
fiduciaries 40:9
fiduciary 17:14,
    21:4, 44:2, 45:24,
    45:25, 46:2, 52:9,
    52:11, 57:1, 57:3
fielding 7:21
fiercely 11:8
Fifth 31:12, 33:20,
    33:24, 34:1, 34:25
fight 40:22, 40:24,
    41:2, 41:7, 130:12
figure 76:15, 76:19,
    125:2, 125:9,
    147:9, 194:2
file 12:8, 14:21,

20:22, 42:22,
    48:25, 59:25,
    60:3, 62:17,
    76:18, 79:21,
    81:24, 118:13,
    122:7, 124:12,
    124:13, 128:21,
    129:19, 142:6,
    142:22, 147:5,
    148:9, 153:16,
    158:17, 158:22,
    160:19, 161:1,
    161:7, 161:11,
    189:12, 191:1
filing 12:6, 27:16,
    28:10, 31:14,
    31:22, 37:3,
    39:10, 39:13,
    50:25, 58:1, 59:4,
    63:18, 76:5, 84:2,
    131:20, 152:8,
    184:18, 188:24,
    190:1
filings 7:22, 8:6,
    8:12, 58:24,
    124:23, 154:25
filled 184:13
final 8:11, 37:2,
    62:20, 106:10,
    182:17
Finally 12:1, 41:14,
    85:9, 105:13,
    115:4, 140:17,
    185:5
Finance 3:47,
    173:22, 183:2
Financial 1:9, 1:31,
    2:6, 2:22, 3:17,
    3:21, 16:23, 25:8,
    59:21, 91:13,
    134:8, 174:2
find 11:8, 54:15,
    74:15, 147:12,
    168:10, 183:7,
    185:24, 191:1,
    191:5
finding 64:18,
    169:16, 169:19
findings 169:17
finds 54:1, 71:7,

71:23
fine 45:7, 65:17,
    65:20, 127:4,
    127:11, 159:16
finger 41:6
finish 29:13, 79:18
finished 67:19
finite 125:7, 125:10
firm 35:24, 67:12,
    124:17, 186:21
firmer 188:19
first-class 116:21,
    122:8
Fiscal 3:16, 8:25,
    9:3, 10:8, 18:10,
    18:25, 23:14,
    24:2, 91:1, 98:1,
    99:10, 113:15,
    129:9, 129:10,
    129:15, 129:21,
    135:15
fits 147:10
Five 8:21, 15:15,
    77:20, 82:5,
    101:15, 114:11,
    125:5, 146:19,
    148:7
fix 43:4
fixed 23:11, 90:4,
    121:7, 130:11,
    148:23
fixing 148:11
flagged 78:19
flatly 143:8
flaw 152:2
flexibility 33:12
flexible 193:21
flood 93:24
floor 10:2
flow 90:16
flowed 52:3
flows 23:21
fly 58:12, 126:25
focus 16:22, 21:16,
    51:17, 92:22,
    116:25
focused 22:12, 47:15
focuses 87:1
Foerster 124:16,
    148:4

folks 120:19, 193:21
follow 48:15, 95:5,
   127:18, 184:10
follow-up 160:23
following 10:10,
   38:6, 53:21,
   143:24, 158:22
follows 9:11
force 23:12, 87:9,
   109:17
foreign 101:10,
   102:1, 102:2,
   102:4, 102:14
foreseen 7:23
forethought 8:10
forever 165:17
forget 118:2, 118:7,
   191:7
Form 73:3, 88:10,
   88:12, 88:16,
   88:21, 89:3,
   89:14, 89:17,
   89:24, 90:21,
   91:20, 92:25,
   95:16, 103:20,
   104:11, 106:18,
   107:12, 107:16,
   107:17, 107:23,
   109:3, 110:17,
   115:20, 122:16,
   126:20, 163:11,
   184:13
formally 15:3
formation 54:7
formed 41:1
former 52:2
formerly 173:19
formulated 9:13
formulations 33:16
forth 42:24, 54:8,
   134:11, 166:7,
   170:16, 178:5
forum 108:13,
   156:24, 181:20
found 7:11, 36:7,
   44:13, 88:5,
   88:12, 143:21
Founding 88:23, 96:4
Four 44:6, 82:21,
   86:5, 86:6, 88:11,

101:12, 103:25,
   115:5, 134:16,
   134:17, 138:15,
   142:13
frames 174:23
Frances 6:20
Frankly 7:25, 24:6,
   37:1, 48:15,
   59:24, 63:11,
   152:17, 156:22,
   169:15, 186:21,
   187:20
free 126:3, 133:17
freezes 23:6
frequently 56:19
Friday 178:14,
   178:19, 179:3,
   179:6, 179:17,
   184:17, 188:17,
   189:19, 192:3,
   192:9, 192:10,
   192:12, 193:5
Friedland 6:17
Friedman 3:18,
   14:15, 21:10,
   21:20, 21:21,
   21:22, 27:20,
   110:25, 112:9,
   112:10, 112:19,
   113:17, 113:22,
   172:5, 172:6,
   172:9, 189:15,
   189:16, 190:4,
   190:21, 190:25,
   191:10, 191:13,
   191:20
front 24:24, 69:19,
   129:12, 129:13,
   133:22, 137:10,
   178:13, 185:2
fronts 21:18
fuel 160:3, 160:18,
   166:15, 173:21,
   173:22, 173:25,
   174:3, 175:10,
   175:15, 175:22,
   176:3, 176:8,
   177:17, 180:3,
   180:11
fulfill 45:25

full 26:19, 101:16,
   104:15, 119:1,
   153:11, 161:20,
   178:12
fully 18:22, 20:14,
   118:5, 118:8,
   159:8, 174:3,
   178:7, 186:9
fulsome 152:15
functioning 88:20
fundamental 24:22,
   87:3, 87:10, 92:3,
   130:8, 152:1
funded 10:9, 65:3
funding 113:16
Funds 22:23, 25:16,
   39:18, 39:23,
   40:3, 40:16,
   46:14, 46:16,
   46:20, 52:25,
   53:5, 53:9, 53:17,
   54:2, 54:17,
   55:24, 56:9,
   56:13, 98:14,
   98:15, 104:15,
   113:7, 135:10,
   136:22, 142:8,
   173:23, 180:7
funny 21:24
furtherance 112:22
future 7:15, 8:4,
   10:11, 16:22,
   19:7, 19:17,
   29:25, 58:3,
   106:9, 126:21,
   158:3, 176:10


< G >
Gail 2:38, 196:9
gain 124:4
game 48:22
gap 152:20, 156:23
GARCIA 4:40, 180:17,
   180:18, 182:21
gates 93:25
gather 121:18
gating 136:2, 136:3
gave 103:12
gears 147:16

General 3:26, 8:22,
    20:12, 40:16,
    104:1, 180:7,
    183:24
generally 67:1,
    116:16, 119:22
generate 56:16
generating 23:20
genuine 159:3
George 89:11
gets 12:16, 108:5,
    131:25, 144:8,
    166:12, 188:10
getting 79:13,
    100:2, 117:20,
    123:18, 127:25,
    138:3, 147:14,
    163:6, 164:15,
    167:1, 174:14,
    188:21
give 19:24, 34:4,
    36:24, 37:19,
    75:9, 101:6,
    114:17, 116:20,
    120:8, 123:2,
    125:22, 159:9,
    160:23, 163:19,
    166:18, 167:7,
    170:12, 186:2,
    186:5, 186:9,
    188:3
Given 13:19, 15:11,
    15:18, 19:23,
    23:13, 30:9,
    36:19, 46:15,
    49:21, 51:3,
    57:24, 58:13,
    58:25, 64:10,
    92:14, 108:16,
    110:25, 132:5,
    139:5, 155:11,
    160:7, 160:11,
    172:19, 178:20,
    179:18
gives 42:8, 54:9
giving 101:18,
    102:19, 119:21,
    163:19, 170:21,
    176:10, 185:21
glad 37:23, 75:12

global 105:2
glutton 192:14
goal 20:15, 32:19,
    68:25
God 6:7
Godfrey 31:8
gold 107:8
Goldman 27:25
Gordon 4:30, 16:4,
    16:5, 16:7, 16:8,
    20:3, 20:5, 21:9,
    24:11, 105:25,
    106:7
Gos 100:17, 127:14
Gotshal 183:1
gotten 143:17
govern 88:5, 89:20
governed 85:18
governmental 22:24,
    168:22
Governor 21:22,
    23:17, 51:10,
    104:24
governs 54:6
grab 163:16
grant 54:16, 82:14,
    97:8, 101:25,
    139:1, 140:1,
    169:7, 185:7
granted 73:1, 74:1,
    79:6, 83:17, 84:5,
    85:20, 136:24
granting 52:6,
    101:22, 139:16,
    154:6
grants 92:19
grateful 32:1,
    34:11, 37:24,
    43:25, 194:22,
    194:23
great 75:8, 147:25,
    163:16, 164:16,
    165:18, 181:13
greater 10:13,
    18:18, 22:15,
    23:9, 37:22,
    68:21, 120:11,
    165:19, 187:9
Gregg 3:7
grenade 129:25

grenades 129:24
grievances 89:10
grip 170:12
grips 185:5
grossly 95:4
ground 98:9
grounds 61:25, 62:1,
    62:4, 62:7, 96:9,
    98:8
Group 3:25, 3:37,
    14:20, 31:15,
    44:25, 45:1,
    57:22, 58:13,
    109:15, 115:16,
    121:13, 124:2,
    148:5, 173:18,
    183:9
groups 12:15, 92:20,
    124:15
growth 23:17
Guarantee 3:41,
    3:47, 67:12, 183:2
Guaranty 3:21, 4:11,
    4:13, 25:8, 28:1,
    134:8
guardians 36:8,
    36:17
guess 76:14, 80:3,
    97:14, 190:16,
    190:25
guidance 132:17
guideposts 152:22
gut 50:2


< H >
hairs 46:3
half 51:9, 184:18
Hamilton 88:24
hand 24:21, 192:11
hand. 192:13
handed 43:4
handle 13:9, 111:16,
    114:7, 114:8,
    139:20
handling 60:7
happen 14:9, 26:4,
    66:7, 66:10,
    66:22, 118:6,
    142:21, 146:20,

168:20, 170:7,
175:25, 187:23,
190:12
happened 90:1,
148:10, 148:21,
174:25
happening 105:1,
105:2, 132:19
happens 106:9,
111:22, 120:12,
190:22, 191:9
happily 32:9
happy 31:14, 31:23,
33:20, 39:3,
64:14, 64:17,
66:22, 76:4,
76:22, 77:8,
80:20, 81:9, 85:4,
118:21, 121:5,
121:6, 121:7,
173:12, 187:1,
188:1
harbor 17:8
hard 17:21, 18:1,
192:1
harmful 29:16
harms 95:22
Hastings 47:8, 114:6
hate 121:24
hats 51:4
head 107:4
hear 24:19, 37:23,
37:24, 42:17,
51:10, 57:15,
66:22, 70:5,
70:11, 79:11,
79:17, 80:3, 80:5,
90:12, 99:22,
126:13, 136:1,
142:14, 159:11,
164:21, 172:6
heard 26:3, 26:11,
47:17, 51:4,
59:10, 64:9,
64:12, 67:3,
69:24, 100:1,
105:18, 105:25,
106:3, 128:13,
134:15, 135:17,
149:21, 164:19,

180:16, 186:19
Hearings 63:12,
63:21, 64:15,
87:1, 98:21,
142:24, 158:24
heavily 33:11
held 50:24, 52:8,
93:10, 135:12
help 63:23, 66:12,
141:25, 185:13
helpful 141:19,
193:23
helps 194:2
hereby 76:19
HERRIMAN 4:39,
35:23, 37:18,
37:24, 37:25,
38:1, 38:2, 39:2
hesitant 137:8
high 43:24
higher 63:8
highlight 60:25
highlights 18:6
highly 7:25, 18:4,
21:6, 136:19,
184:2
Highways 2:12
historical 87:10,
108:17
history 23:4, 43:17
hit 121:17, 148:23
Hoc 3:25, 3:37,
14:20, 121:13,
124:2, 148:4,
162:21, 166:6,
167:1
Hocs 166:11, 167:22,
169:10
hold 29:24, 40:4,
87:13, 93:19,
97:9, 97:25,
99:18, 170:13,
182:3, 187:21
holder 13:10
holders 114:23,
115:2, 142:1
holding 18:11,
53:11, 56:3
honored 176:19
Honors 86:23

hope 11:17, 11:24,
113:19, 124:4,
138:14, 176:11,
177:12, 183:15
hoped 156:16
hopeful 64:11,
110:25
hopefully 123:18,
146:14, 174:24,
186:16
hopelessly 42:2
hopes 12:8, 12:23
hoping 64:7, 65:5,
106:18, 126:4,
174:21
horse 121:25
hour 58:2, 159:2,
184:18, 190:24
hours 190:11, 190:17
HTA 50:3, 52:18,
83:9, 98:15,
115:4, 115:11,
129:7, 129:18,
131:21, 131:24,
132:7, 133:10,
134:10, 134:13,
134:17, 135:1,
135:9, 135:10,
135:11, 136:12,
136:16, 140:19
huge 70:4, 70:6
human 95:10
hundred 146:5, 163:5
hundreds 66:6,
125:4, 131:16,
132:3
hurt 102:17, 102:20

< I >
ICSE 183:23
idea 23:24, 121:19,
123:15, 161:24,
161:25
identification
36:13, 185:8
identified 8:21,
37:10, 37:13,
37:16, 60:2,
110:20, 160:25,

189:6
identify 11:17,
  11:19, 44:1
idly 41:5
ignore 89:7, 92:21
II 22:18, 95:3
III 1:8, 1:30, 2:5,
  2:21, 16:21, 22:2,
  22:18, 35:8,
  40:23, 53:7, 55:5,
  55:8, 55:10,
  55:12, 55:25,
  57:10, 63:3, 72:8,
  72:25, 92:19,
  95:3, 128:10,
  139:19, 162:8,
  162:13
imagine 89:8, 108:15
immediate 111:3,
  188:4
immediately 107:21,
  122:12, 140:6
impact 21:5, 95:5,
  96:11, 97:15,
  99:10, 102:16,
  105:9, 105:17,
  113:15, 171:18,
  181:1, 181:16,
  181:17, 183:25
impacted 110:23
impacts 98:2, 105:4
impair 103:11, 104:6
impaired 128:12,
  167:8
impeded 113:8
impediment 66:8
impinge 91:17
impinged 113:8
implement 110:24,
  111:23, 156:19,
  156:22
implementation 20:10
implemented 156:6
implementing 23:19
implications 35:14
implicitly 90:22,
  103:21
imply 46:17
import 50:19, 55:3
importance 88:20,

125:12
important 18:8,
  90:20, 108:13,
  128:7, 138:4
importantly 44:24
imposing 155:25,
  157:3
impossibility 118:22
impossible 89:7,
  121:23
impression 160:12
improper 74:15
improve 165:20
in. 81:13, 118:8
inaction 48:14
inactions 44:4
inadequacy 104:15
inadvertence 139:25
inadvertently 191:7
inapplicability
  55:11
inapplicable 101:11,
  102:3, 102:6,
  102:15
Inc. 3:44, 4:19,
  180:18
incapable 41:9
incarnations 151:21
incentives 12:4
inclined 146:25
include 32:14,
  45:23, 46:18,
  49:24, 62:9, 63:7,
  65:2, 77:12,
  154:3, 189:2
included 7:21,
  19:15, 35:23,
  128:22, 137:13,
  158:14, 180:9,
  191:17
includes 9:17,
  31:21, 32:8,
  58:24, 75:10,
  106:1, 145:24,
  152:8, 157:11
including 7:7, 7:9,
  7:14, 40:14, 58:6,
  85:21
inclusion 72:14
income 23:11

inconsistent 13:17,
  104:3, 104:7
inconvenience 120:14
incorporated 56:4,
  136:17
incorrectly 78:19
increase 32:14,
  32:23
increased 24:3
increases 18:20,
  18:23, 32:18,
  32:20, 34:16
incur 10:5
indebtedness 65:3
indefinite 125:8,
  126:20
indefinitely 194:7
Indenture 168:6,
  168:8, 191:12
Independence 87:6,
  88:19, 89:9,
  89:11, 89:13,
  90:23, 91:10,
  91:17, 92:4, 93:1,
  93:24, 96:1, 96:7,
  98:9, 103:22,
  103:23, 104:11,
  105:4, 105:9,
  108:4, 109:19,
  109:23
independent 20:8,
  22:13, 54:14,
  88:18, 91:2,
  91:21, 96:12,
  96:17, 104:17
INDIANO 3:35, 86:16,
  86:17, 86:24,
  86:25, 87:15,
  87:19, 87:22,
  88:1, 88:3, 90:2,
  90:7, 90:14,
  90:15, 90:18,
  92:15, 94:16,
  94:18, 94:21,
  102:22, 103:16,
  104:4, 105:5,
  105:22, 106:14,
  107:9, 108:15,
  108:23, 109:10,
  110:4

indicate 61:13,
    112:14
indicated 18:17,
    64:23, 82:22
indicating 85:5
indicator 155:3
individual 33:5,
    57:8, 59:23, 61:3,
    68:14, 68:19, 72:7
Individuals 36:9,
    72:7, 78:17,
    137:17
indulgence 139:1
Industria 4:18
inefficient 8:1,
    123:8, 153:3
inexcusable 36:19
inexplicable 144:4
infer 123:1, 126:14
inflation 23:7,
    32:21
inform 9:12, 28:22,
    112:1
informal 67:23
information 7:3,
    15:22, 37:19,
    38:11, 39:5,
    60:14, 61:10,
    61:16, 62:9,
    113:11, 141:19,
    141:25, 169:12,
    173:4, 180:12,
    181:22, 184:3,
    189:4, 190:2,
    190:5
informational 156:23
informative 8:12,
    33:17, 34:13,
    57:18, 57:23, 58:2
informed 27:15,
    33:4, 66:17,
    148:8, 188:11
inherent 88:16,
    93:1, 108:4
initial 38:21,
    145:5, 180:22
initials 38:13
initiating 8:13
inning 114:4
input 171:5

inquiry 165:8
inside 161:25
insight 155:16
insist 17:17
Insofar 14:1, 55:23,
    127:20
instance 17:15,
    36:22, 55:22,
    66:19, 155:7,
    156:24, 171:1,
    181:19, 185:20
Instead 61:5,
    126:19, 176:21,
    177:25
instruction 151:16,
    184:14
instructive 55:12
instrumental 10:14
instrumentalities
    130:17, 133:6
instrumentality
    50:18
insufficient 77:9
Insurance 3:22,
    19:18, 25:8,
    101:15, 101:16,
    134:9
insurmountable 57:4
intend 27:2, 62:9,
    63:20, 140:12,
    153:1, 176:13
intended 36:25,
    93:6, 124:12,
    142:21, 144:9,
    149:5, 175:10,
    178:25, 187:6
intensive 17:19
intent 12:11, 142:17
intention 148:9,
    178:24
intentions 142:15
interaction 159:4,
    184:12
interest 6:10, 13:2,
    26:14, 26:15,
    41:16, 42:21,
    43:9, 43:10,
    44:14, 46:22,
    52:8, 98:7,
    101:24, 102:7,

138:14, 163:6
interested 32:16,
    33:15, 33:18,
    58:4, 155:23,
    156:25, 157:24,
    191:16
interesting 140:11
interests 42:10,
    48:16, 91:13,
    129:4, 130:24,
    131:8, 131:12,
    133:7
interfere 95:18,
    101:1, 168:22
interference 100:24,
    172:25
interferes 100:25
Interim 31:12,
    33:21, 33:25,
    34:1, 34:25,
    190:3, 190:6,
    190:11, 190:13
intervene 98:25,
    131:13, 131:14,
    182:6, 182:11
intervened 45:13
interveners 180:21
intervention 158:22,
    182:9, 182:10,
    182:14
interventions 180:24
intrinsic 91:20
intrusions 22:15
invade 103:22
invalid 13:2, 13:11,
    127:17
invalidate 13:16
invalidated 13:6,
    13:10, 13:23,
    99:11
Invalidation 12:19,
    12:24, 13:7,
    13:17, 13:22,
    28:24
invert 140:12
investigate 67:15,
    67:16
investigation 67:15
investigations 12:2
investment 12:4

invite 66:15, 86:14
invoice 61:14
invoke 176:14
invoking 170:7
involve 171:4
involved 56:17,
    139:19, 174:3
involves 20:24,
    101:11, 101:19,
    101:21
involving 68:24
Iridium 176:15
iron 111:22
ironically 51:10
irreconcilable 40:8,
    43:5
irrelevant 158:2
irreparable 29:15
irrespective 41:22
irretrievable 156:1
irrevocably 157:20
isolate 105:15
issuance 14:2
issued 6:25, 13:11,
    157:10, 180:20
Item 35:8, 39:17,
    57:13, 59:16,
    86:12, 110:5,
    151:12
items 113:25, 114:1
iterations 18:10
iterative 189:18
itself 20:9, 66:25,
    89:5, 91:18, 96:2,
    96:6, 103:9,
    103:21, 111:18,
    140:7, 150:17,
    152:4
IV 39:17, 110:5,
    113:24
IV.3 59:16


< J >
J. 3:4
January 32:12,
    44:13, 133:19
Jaresko 26:5
Jason 3:23, 134:7
Jay 4:39, 38:2

Jenner 16:5
Jessica 4:24, 179:24
Jesus 194:17
Jimenez 28:19,
    28:20, 29:11,
    29:13, 30:1
Jiminez 4:19
job 68:14, 147:10
John 39:22
join 172:9, 175:7,
    183:6, 191:14
Joinder 44:7
joined 6:14
Joint 11:20, 15:19,
    28:5, 28:10,
    30:21, 40:12,
    58:18, 124:17,
    139:6, 141:4,
    147:4, 151:18,
    151:19, 152:23,
    160:20, 160:25,
    169:14, 172:2,
    175:5, 184:9,
    184:18, 184:21,
    185:8, 189:13
Jointly 1:11, 1:33,
    2:8, 2:24, 53:2,
    56:21, 178:24
Jones 45:1, 57:22
Jose 110:9, 181:11
Juan 6:1, 6:11,
    6:15, 40:4, 193:11
Judges 86:18, 87:9,
    89:12, 91:7,
    91:23, 92:23,
    93:9, 93:20, 95:9,
    95:24, 96:18,
    98:2, 99:5,
    100:11, 101:17,
    105:1, 105:8,
    105:24, 106:8,
    107:23, 109:14,
    109:15
judgment 93:14,
    95:12, 96:20,
    102:1, 118:20,
    122:18, 155:13,
    181:25, 182:1
Judicial 6:24,
    66:18, 87:6,

89:12, 90:23,
    91:10, 92:4, 93:1,
    93:9, 93:24,
    95:11, 95:12,
    98:9, 102:5,
    102:7, 103:18,
    103:22, 103:23,
    104:11, 104:16,
    104:24, 105:7,
    106:1, 108:3,
    108:4, 109:19,
    109:23
Judiciary 3:35,
    16:15, 86:19,
    88:19, 89:7, 89:9,
    91:2, 91:11,
    91:21, 93:24,
    95:9, 95:20, 96:1,
    96:7, 96:12,
    96:17, 109:24
Judith 2:38, 196:8
July 59:13, 59:15,
    64:25, 66:15,
    127:1, 151:14
juncture 128:7,
    140:22, 183:17
June 29:2, 122:18
jurisdiction 143:22,
    144:2
jurisprudence 105:6,
    165:3
Justice 14:6, 46:10,
    48:6
justification 122:13
justify 153:2, 154:5
justifying 158:5


< K >
Kahn 31:8
Katherine 4:36, 31:7
Katz 173:12
Keep 23:23, 108:6,
    179:16, 186:22,
    193:21, 195:2
keeps 165:17, 194:21
key 89:10, 166:8
keyed 153:18
kill 51:14
kind 22:23, 109:5,

144:14, 172:12,
176:7, 188:6
kindly 8:9
kinds 22:19
King 89:11
KISSNER 3:39, 148:3,
148:4, 148:16,
148:21, 149:2
Kleinhaus 4:33,
173:10, 173:11,
173:15, 179:9,
185:20
knowing 16:25
known 27:6, 144:3
knows 59:22, 98:6,
99:15, 105:5,
162:10, 182:8,
185:20
Krajick 6:17


< L >
la 4:17, 4:22,
179:25
Labor 48:1, 51:3,
112:12
lack 45:22, 68:8,
92:22, 100:23,
152:25
lacks 152:10
laid 135:7
land 66:1, 66:4
lanes 169:12, 169:13
language 75:10,
88:23, 96:3,
138:8, 138:15
large 56:20, 60:7,
62:2, 62:23,
64:15, 72:24,
89:22
largely 152:9
larger 155:9, 168:14
largest 52:17,
140:18, 183:4
Lastly 177:5
late 85:11, 94:7,
124:22, 127:1,
170:2, 179:13,
184:11
lately 104:25

later 8:6, 26:22,
35:3, 65:17,
74:11, 75:2, 76:6,
149:20, 168:7
latest 112:5
Laura 2:36, 3:6,
6:6, 59:20, 196:7
lawfirm 191:12
laws 68:2, 89:20,
107:20, 136:8,
156:3, 168:18
lawsuits 127:25
lawyers 36:14, 67:7,
184:22
lay 15:14, 63:4,
157:22, 158:12,
173:4
lead 19:11, 41:10,
152:1, 153:3
leadership 22:1,
23:16
least 20:1, 50:22,
69:1, 69:2, 76:15,
139:1, 145:5,
156:20, 173:5
leave 91:13, 110:21,
113:3, 146:3,
175:15, 179:7,
192:3
leaves 24:13
LECAROZ 3:10, 46:8,
46:9, 46:12, 46:13
led 40:21
left 51:14, 74:17,
86:22, 96:15,
166:16, 166:21,
167:4, 185:24
legally 157:22
legislation 40:17,
52:21, 157:3,
168:20
legislative 156:21,
172:13
legislature 40:12,
91:16, 104:17,
104:23, 157:2
legitimate 71:17,
71:20
lenders 160:3,
160:18, 166:15,

174:3, 176:3,
180:3, 180:12
length 32:15
lengthen 72:18
less 24:24, 114:19,
152:6, 163:8
level 19:4, 63:10,
63:11, 68:20,
68:21, 70:9,
70:19, 88:7,
107:24, 109:6,
182:6
levels 69:17
liabilities 23:22,
36:2, 62:25,
74:22, 74:25,
85:17
liability 62:22,
76:6, 168:8
lien 102:5, 114:22,
115:4, 115:16,
120:21, 122:4,
122:5, 123:3,
123:7, 123:11,
123:13, 124:6,
126:8, 134:16,
134:17, 142:10,
144:17, 145:13,
145:14, 145:18,
145:22, 146:3,
146:21, 149:15,
149:18, 168:7
liens 98:10, 98:11,
122:17, 122:22,
122:25, 123:2,
129:5, 129:22,
135:12, 135:25,
136:2, 136:9,
136:21, 142:1
lies 41:7
Lift 87:1, 87:2,
96:19, 125:11,
130:4, 133:1,
133:2, 138:18
lifted 41:6, 95:6,
120:2, 138:11,
140:10, 140:15
lifting 95:5
light 21:6, 24:7,
72:24, 113:5,

155:8, 174:15,
178:17
lightly 21:2
likely 30:16, 45:24,
136:19
likes 119:7
likewise 52:12
limb 169:3
limine 152:1,
180:20, 180:22,
182:2, 182:4,
188:18
limit 163:21
limitations 13:4,
114:15, 118:3
limited 7:9, 7:14,
8:6, 30:6, 62:18,
63:11, 65:10,
137:12, 137:16,
138:8, 139:2,
187:18
limits 92:2
Line 22:3, 90:1,
90:13, 135:15,
160:3, 160:18,
166:15, 174:3,
175:10, 176:3,
180:3, 180:11
lines 22:4, 64:5,
65:18, 173:21,
173:25, 175:15,
175:22, 176:8,
177:17
Lipton 173:11
Lisa 6:17, 194:16
list 32:4, 48:8,
49:16, 149:15,
191:6, 193:24
listed 30:4, 31:16,
32:8, 48:11,
80:24, 82:6
listen 129:6
listened 53:13,
128:19, 141:18
listening 69:22,
80:3
listing 31:19,
31:21, 32:7
Literally 38:12,
38:16, 148:22,

194:6
litigant 143:16
litigate 118:9,
129:24, 130:1,
130:13, 157:25
litigated 25:13,
25:25, 127:12,
130:23, 133:21,
133:22
litigating 17:18,
26:19, 131:7,
178:7
little 17:2, 60:10,
66:5, 80:11, 90:4,
96:11, 112:17,
125:23, 140:11,
146:4, 163:9,
163:20, 174:15,
186:16
living 23:5, 23:6,
23:8, 23:11
LLC 4:6, 4:33,
54:20, 138:23,
173:16
LLP 97:1, 160:1,
191:12
load 50:3
loaded 7:6
loans 173:22
lobby 157:2
local 66:7, 68:1,
148:8, 156:3,
168:18, 169:3
located 44:9
locations 100:2
lock 170:19, 176:24
locked 171:14
locking 165:23,
169:9
locks 167:25, 176:4
lofty 91:11
logic 95:6, 97:8,
105:4
logistical 13:8,
63:10
logistics 66:17
long 11:10, 18:2,
27:7, 105:8,
125:17, 188:10
longer 64:17,

104:17, 121:24,
133:8, 147:22
Look 8:9, 21:25,
23:13, 48:8,
75:20, 80:24,
81:25, 84:6, 85:7,
85:23, 93:5,
95:23, 113:21,
118:2, 126:3,
165:4, 169:23,
190:11
looked 38:7, 49:17,
51:25
looking 38:10,
93:22, 116:8,
118:1, 134:13,
169:12, 169:15
looks 138:3
loop 190:20
los 4:22, 179:25
lose 73:7, 123:21
lost 73:8, 73:10,
143:13, 144:19
lot 22:1, 66:12,
116:23, 118:14,
119:13, 119:16,
119:20, 120:4,
120:18, 120:22,
130:5, 136:1,
144:22, 161:4,
192:22
lots 174:19
louder 80:12, 112:18
love 187:22
lovely 194:8
low 64:6, 167:22
lower 105:1
lowered 171:9
Luc 3:13, 47:7,
114:5
Lugo 31:10
Luis 110:9
lunch 86:6, 86:7


< M >
M. 3:7
ma'am 179:22
machine 38:9, 69:15
macro 155:9

mad 126:9
Maestros 110:10,
  110:11
magnitude 114:17
mailing 116:21
main 116:25, 121:17
major 9:4, 92:20
manage 63:20
manageable 64:19
managed 134:20
Management 1:10,
  1:32, 2:7, 2:23,
  8:5, 30:6, 59:21,
  118:22, 134:14,
  134:22, 134:24,
  137:6, 138:5,
  144:15, 144:20,
  147:4, 147:20,
  147:23, 149:10,
  150:1, 150:3,
  173:24, 194:25
managing 66:21
mandate 14:3, 17:5,
  52:10, 52:12,
  92:5, 92:10, 93:4,
  108:17
mandated 95:17,
  107:16
mandates 106:16
mandating 40:13
Manges 183:1
manner 58:10, 72:22,
  113:12, 125:3,
  152:15, 153:1,
  166:6
mantle 47:23, 51:4
map 153:1, 184:24,
  188:20
March 44:10
Maritza 78:24
Mark 3:27, 14:20,
  59:12, 112:3,
  121:12
marker 173:4
Market 4:33, 173:15
market-based 32:23
Marsal 35:24, 38:3,
  67:12
marshal 96:13
Martin 3:4, 3:22,

8:19, 25:7, 96:25,
  159:25
Martinez 78:18
Marty 74:2
Mashberg 3:7
Maslon 191:12
massive 128:13
master 85:14, 85:18,
  85:19, 191:6
match 191:6
material 152:6,
  158:1
materially 157:19
materials 72:17
math 126:25
matter 29:17, 58:25,
  59:6, 59:7, 63:17,
  69:17, 87:5, 95:7,
  95:8, 95:15,
  95:16, 100:15,
  110:3, 143:22,
  157:15, 163:18
matters 8:4, 8:6,
  8:8, 8:13, 17:18,
  25:12, 31:5,
  31:11, 39:17,
  59:1, 59:5, 73:6,
  139:19, 145:14,
  156:2, 181:1,
  191:15
maximum 19:3, 19:4,
  51:9, 89:16
Mcconnell 138:22
Mckeen 24:20
mean 50:13, 50:19,
  93:6, 100:21,
  107:14, 108:25,
  127:3, 132:18,
  133:1, 134:2,
  145:3, 166:20,
  168:9, 184:11,
  185:20, 186:12
Meaning 38:8, 66:9,
  187:17
meaningful 23:11,
  151:23, 189:25
means 32:12, 60:7,
  119:13, 171:3,
  171:19, 171:20,
  181:6, 181:10

meantime 51:12
measure 89:1
measures 23:20
meat 153:9
mechanism 19:10,
  19:12, 19:21,
  69:17, 110:20,
  110:24
media 17:24
mediation 12:12,
  12:14, 12:15,
  65:19, 128:15,
  128:25
mediator 26:17
medical 19:18
meet 15:19, 58:16,
  64:4, 71:18,
  139:9, 144:21,
  146:12, 146:21,
  146:22, 147:3,
  158:19, 159:1
meets 156:10
member 10:22, 48:12,
  52:2
members 6:10, 11:8,
  11:12, 14:8,
  17:22, 17:23,
  29:24, 40:9, 41:7,
  41:8, 41:14, 43:5,
  47:24, 48:7,
  48:10, 49:15,
  49:19, 50:11,
  50:12, 53:10,
  53:11, 56:3,
  56:23, 57:1, 57:5,
  57:8, 178:2, 180:5
membership 43:12,
  53:18, 56:2, 56:6,
  56:10, 56:25
memoranda 175:13
memorandum 153:17,
  158:17, 188:23,
  188:24
Mendez 4:24, 179:23,
  179:24
mention 51:21,
  115:9, 137:8
mentioned 50:23,
  102:22, 105:20,
  106:18, 111:7,

111:24, 112:11,
112:12, 140:21,
187:5
mere 56:23, 129:15
merit 155:12
meriting 155:18
meritorious 42:12
merits 97:3, 97:5,
100:8, 104:10,
143:14, 143:18
message 164:18,
164:20
messier 178:10
methodologies 30:18
Mich 54:19
microphone 32:1
midday 188:17
middle 101:3, 153:18
Milbank 128:6
Miller 3:31, 128:5,
128:6, 130:23,
131:5, 131:19,
132:1, 132:4,
133:1, 134:15,
135:7
million 173:21,
173:25, 174:1,
174:17
millions 67:14,
67:16, 120:8
mind 33:22, 69:25,
140:20, 187:8
mindful 24:18, 79:2
mine 134:12
minimis 95:10, 95:24
minimize 21:5
minimum 132:14,
133:16, 190:9
minor 168:11
minute 7:22, 42:5,
73:9, 115:9, 138:7
minutes 39:20,
39:24, 39:25,
86:5, 86:6, 86:15,
90:5, 114:12,
138:24, 139:6,
141:18, 141:23,
151:10, 159:14,
159:18
mirror 89:4

misconstrued 29:4
misimpression 113:4
missing 50:10
mistake 139:25
mistakes 36:15
modest 122:16
modification 17:6,
20:1, 54:7, 56:24,
60:1
modified 102:21,
157:11
modify 49:14
moment 39:16, 59:16,
89:8, 113:19,
152:14
Monday 57:17,
158:22, 160:19,
161:7, 161:11,
172:3, 177:7,
184:9, 185:9,
185:11, 186:2,
189:12, 191:25,
192:3, 192:5
money 23:18, 49:1,
99:6, 104:22,
112:21, 113:6,
115:1, 116:19,
130:9, 130:11,
130:13, 130:17,
136:3, 163:10
monies 52:3
monitor 164:18,
164:20
monitoring 46:23,
80:4, 90:10,
90:11, 99:21,
100:1
Monsita 3:10, 46:9
month 10:2, 10:4,
18:16, 124:7,
194:5, 194:7,
194:9
monthly 10:4, 18:11,
19:18
months 9:5, 15:9,
17:20, 41:1,
57:25, 146:19
moral 23:22, 24:15
Moran 6:21
Morrison 124:16,

148:4
Motion. 53:4
Motions 34:5, 36:3,
70:24, 88:23,
114:7, 114:13,
115:7, 118:19,
118:20, 124:10,
125:5, 127:3,
138:9, 147:5,
148:7, 151:25,
156:15, 158:21,
178:18, 182:2,
182:4
motivating 147:15
motivations 42:11
Movant 56:1, 86:14,
97:2, 97:20,
98:22, 98:25,
102:4, 104:10,
153:21
Movants 53:24, 57:2,
57:4, 98:6, 106:8,
139:8, 139:21,
140:1, 140:8,
140:13, 140:21,
153:7, 157:15,
158:4
move 24:21, 30:2,
66:11, 70:20,
119:3, 125:11,
171:8, 171:17
moved 31:17, 122:22
Moving 12:9, 21:16,
84:20, 126:17,
127:19, 128:1
multi-debtor 50:15,
56:20
multiple 59:4,
174:5, 189:18
Multiples 77:21
multiplied 8:2, 66:6
Municipal 4:13
municipality 52:17,
103:9, 103:13
mutual 9:13, 15:20,
19:9
myriad 170:13
myself 146:4, 147:12

< N >
name 86:16, 173:11
Namely 83:11, 128:10
names 78:17
narrow 58:22,
    151:23, 154:12,
    154:17, 160:20,
    168:5, 168:9,
    168:13, 177:21,
    187:19, 188:2
narrowed 42:17
narrowing 186:7
Natbony 4:14,
    137:21, 137:25,
    138:1
National 3:46, 4:9,
    183:1, 183:4,
    183:13
nations 176:1
natural 47:18
nature 47:19, 69:10,
    69:11, 89:24
Nayuan 4:6, 138:22
nd 143:13
near 12:14
nearly 57:25, 190:13
necessarily 65:4,
    117:8, 165:10,
    181:17
necessary 17:11,
    24:1, 30:12,
    33:13, 43:14,
    43:23, 46:25,
    47:1, 54:3, 56:8,
    56:10, 62:24,
    67:9, 72:23,
    76:21, 92:9,
    113:11, 134:24,
    154:1, 157:3,
    168:20, 172:12,
    172:19, 173:4,
    179:6, 180:14
necessity 92:4,
    158:24
neck 140:25
needed 10:11, 10:13,
    49:4, 117:7,
    117:13, 161:12,
    176:12
needless 101:9

needs 38:17, 97:11,
    147:7, 148:2,
    161:12, 188:11
negate 129:22
negotiate 22:14,
    28:11, 183:9
negotiated 19:16
negotiating 126:11,
    166:21
negotiation 11:19,
    20:6, 20:7, 27:10,
    174:8, 185:25
negotiations 9:8,
    9:9, 11:1, 11:15,
    11:16, 17:15,
    17:17, 17:19,
    26:11, 26:15,
    26:16, 93:12,
    174:4, 176:11,
    183:10, 184:20
Neither 54:14,
    68:20, 97:9
Nestor 74:2
net 24:4, 162:25,
    164:7, 165:19
New 6:11, 6:16,
    6:18, 7:13, 10:18,
    11:9, 22:14,
    31:25, 58:1,
    65:24, 87:17,
    90:10, 90:12,
    96:16, 112:16,
    117:25, 160:19,
    160:23, 160:25,
    161:9, 161:10,
    184:7, 193:19,
    193:20, 194:15,
    194:17, 194:19
news 179:12
next 11:25, 12:9,
    15:24, 57:13,
    70:9, 74:8, 75:25,
    78:16, 86:12,
    89:15, 92:16,
    110:5, 112:1,
    118:14, 126:15,
    134:25, 146:15,
    147:1, 147:21,
    151:12, 153:18,
    160:24, 184:16,

    189:20, 190:17,
    193:10
Ng 6:17, 194:16
nice 171:12
night 7:20, 35:16,
    36:11, 37:15,
    57:17, 57:21,
    58:14, 76:13,
    78:3, 78:21,
    80:17, 81:6,
    81:21, 124:10,
    124:23, 148:7,
    148:20
nil 48:21
Nine 43:6, 55:1,
    55:12, 102:5,
    103:6, 103:7
No. 1:6, 1:28, 2:3,
    2:19, 39:8, 66:23,
    118:24, 148:21,
    194:13
nobody 119:7, 146:1
Nodding 107:4,
    107:5, 115:11
non-participants
    157:25
non-recourse 48:19
non-settling 157:20,
    157:24
noncompliance 139:11
None 5:5, 5:11,
    43:1, 44:22,
    87:11, 106:19,
    192:12
nonetheless 140:6
noninterference 95:3
noon 7:17, 158:15,
    158:16, 189:12,
    191:25, 192:5
nor 7:3, 43:7,
    54:14, 57:3, 89:7
norm 8:3, 26:9
normal 168:3
normally 158:1
note 6:14, 8:11,
    12:22, 23:4,
    26:12, 62:6,
    84:10, 151:16,
    163:8, 175:2
noted 28:3, 38:4,

56:18, 62:3, 62:9,
  62:16, 71:15,
  77:18, 81:6,
  135:21
notes 7:5, 53:15,
  78:25, 87:18
Nothing 30:12, 41:5,
  54:10, 67:8, 79:3,
  111:9, 144:24,
  145:13
notice 8:3, 13:18,
  15:11, 32:20,
  38:11, 61:17,
  64:3, 72:17,
  152:20
noticed 36:14, 38:14
notices 8:8, 72:15
noticing 43:11,
  124:24
notified 184:16,
  184:21
notion 89:12, 103:10
notwithstanding
  158:6
novel 171:3
November 117:8
null 15:5, 127:23
numbers 18:22,
  85:17, 167:7
numerous 9:8


< O >
o'clock 86:7
object 62:1, 62:11,
  75:2, 76:6, 174:9
objected 62:8, 82:7,
  123:10, 127:14,
  127:15, 127:19
objecting 35:21,
  60:16, 62:14,
  160:17, 167:11,
  178:4, 185:17,
  187:9, 187:19,
  187:25
objectionable 36:13
objector 183:12,
  188:18
objectors 151:17,
  185:4

objects 61:4, 61:25,
  85:10
Obligation 3:26,
  23:23, 24:16
obligations 23:21,
  24:8, 103:12,
  104:6
observation 104:10
observe 7:19
observed 7:10,
  57:17, 185:9
observing 6:11
obviate 123:7
obvious 40:8
Obviously 21:13,
  22:9, 27:11,
  93:11, 100:17,
  113:2, 115:8,
  118:24, 138:4,
  165:16, 185:16,
  188:5, 191:2
occasions 174:6
occur 108:14
occurred 40:18,
  44:18, 111:21
occurs 19:24
odds 155:2
off-island 23:25
offer 14:24, 42:12
offered 5:5, 5:11,
  69:13, 69:20
offering 175:12
Office 60:6, 63:9,
  63:10
officer 29:4
officers 11:6, 168:4
Official 3:12, 4:26,
  16:5, 39:19,
  46:23, 47:8,
  52:25, 53:6, 54:7,
  54:23, 55:9,
  55:16, 56:24,
  196:15
often 56:22
Omni 8:4, 15:18,
  59:13, 59:15,
  63:13, 65:1,
  112:4, 147:1,
  147:21
Once 44:23, 89:15,

111:22, 130:25,
  131:25
one-off 98:22,
  100:11
one. 62:3, 104:8
ones 9:11, 11:18,
  93:10, 121:17,
  127:25
ongoing 194:25
onus 103:3
open 12:15, 93:25,
  178:19
opening 27:5,
  151:14, 152:3,
  152:25, 153:17,
  174:15
operate 119:19
operated 194:16
operating 165:3,
  165:4, 194:8
operational 72:17
operations 184:1
opinion 22:4, 33:8
opponents 141:13,
  153:8, 157:17,
  158:19, 188:12
opportunities 158:4
opportunity 15:7,
  19:23, 131:25,
  132:5, 137:9,
  159:9, 187:21,
  189:3, 189:11
oppose 22:8, 27:2,
  97:7, 125:15
opposed 15:13,
  21:15, 119:25,
  125:4, 132:2,
  141:4, 154:5,
  181:24
opposing 21:23,
  44:7, 92:6
opposite 175:19,
  175:25
opposition 92:11,
  94:3
option 138:11
Oral 71:7, 129:13,
  133:18, 182:16
orally 15:17, 187:8
ordered 161:13,

171:22
ordering 52:6, 77:12
orderly 7:23, 8:7,
    15:21, 58:6, 58:9,
    58:18, 59:8,
    141:5, 143:4
Orders 6:25, 37:2,
    138:9, 138:19
ordinary 72:7,
    132:16
organized 174:25
oriented 189:21
original 18:25,
    73:20, 73:21,
    73:23, 73:24,
    74:12, 74:16,
    74:22, 75:1, 75:7,
    85:16, 126:23
originally 18:10,
    173:17
Others 17:7, 32:10,
    36:6, 88:24,
    116:1, 116:2,
    122:19, 126:13,
    135:22, 162:21,
    172:4, 183:15
Otherwise 7:11,
    26:17, 27:9,
    155:10, 170:6,
    171:4, 176:20,
    178:3, 178:7,
    178:11
ourselves 183:7
outcome 116:14,
    178:20
outlined 123:25,
    124:1
outperforms 10:7,
    19:22
outreach 191:2
outset 53:15, 174:23
outside 7:2, 160:11,
    176:17, 184:20
outstanding 137:1
overall 7:17,
    130:21, 156:19
overarching 142:23,
    143:1
overburdening 63:20
overburdensome 59:24

overcome 72:3
overcoming 71:18
overflow 90:11
overlaps 182:13
overly 190:18
overperformance
    19:24
overreaching 112:25
override 106:24
overriding 106:16
overruled 73:2
oversecured 162:24,
    163:3, 163:5,
    164:15
oversee 22:22
overview 36:24,
    43:17
owed 174:17
own 6:19, 38:6,
    46:15, 46:20,
    62:11, 98:19,
    139:21, 171:2
owned 66:1, 173:23
owns 136:2, 136:22


< P >
Pacific 54:20,
    54:21, 55:19
package 151:4, 163:1
PAGE 5:3, 11:22,
    32:5, 41:18, 43:6,
    52:7, 87:17, 92:17
pages 8:3, 15:15,
    196:4
paid 115:2, 120:6,
    163:8, 175:23,
    175:24
paper 87:24, 160:7,
    160:11
papers 17:24, 62:3,
    62:16, 64:23,
    117:12, 117:17,
    135:21, 151:22,
    153:19, 153:23,
    154:18
paperwork 76:11,
    77:13
paragraph 65:14,
    121:20

paragraphs 138:15
parallel 121:8
paramount 88:20
parenthetically
    97:23
parents 36:8, 36:17
parrot 61:8
part 7:3, 11:23,
    54:24, 57:3, 57:8,
    110:19, 115:18,
    118:12, 141:17,
    160:4, 160:10,
    166:10, 181:8,
    181:9, 184:21
partial 100:10
participant 184:19
participants 6:12
participate 113:10,
    113:13, 131:6,
    138:5
participated 16:13
participates 131:3
participation
    182:16, 184:4
particular 7:5,
    87:5, 88:24,
    122:4, 127:13,
    129:7, 132:7,
    140:17, 141:7,
    155:17, 167:11,
    175:8, 175:9,
    177:14, 183:25,
    189:7
Particularly 23:13,
    23:24, 55:20,
    62:24, 174:16
Partly 186:4, 186:6
partners 27:7
parts 12:9, 89:19,
    106:15, 112:23
party 28:8, 42:21,
    43:9, 43:10,
    136:7, 136:13,
    137:12, 150:12,
    168:19, 172:21,
    174:4, 184:13
pass 90:19, 145:8,
    177:3
passed 89:18, 89:21,
    90:18, 93:7

passing 104:5
passionately 185:10
past 143:10, 194:6
path 20:24, 130:22,
    132:25, 151:23
pathway 153:23,
    187:3
patience 90:8
patient 66:1
Paul 3:5, 47:8,
    111:13, 114:6
pay 23:21, 46:1,
    101:17, 104:15,
    112:16, 112:20,
    142:8, 142:9
Pay-go 19:8, 20:12,
    23:21
payable 65:6
paying 23:23
payment 10:10,
    61:14, 110:21,
    113:5, 180:8,
    180:9
payments 9:24, 13:2,
    19:7, 20:11, 24:9,
    111:20, 156:2,
    162:3, 163:13,
    167:19, 170:22,
    175:19
pays 167:2
PBA 15:4, 127:13,
    132:19
pen 87:24
penalty 35:24
pending 59:23, 60:8,
    60:24, 92:21,
    136:6, 150:1,
    158:20, 182:3
Pension 9:14, 17:6,
    17:11, 18:11,
    19:1, 19:11,
    19:12, 19:14,
    19:23, 20:10,
    22:9, 22:12, 23:3,
    23:24, 24:4, 25:9,
    104:16, 105:14,
    105:24, 106:9,
    180:1, 180:5,
    180:9
pensioner 19:3

pensioners 19:2,
    19:25, 23:5,
    24:13, 111:2
pensions 10:11,
    18:9, 20:1, 20:15,
    21:1, 21:2, 21:24,
    87:10, 91:8,
    91:23, 91:25,
    95:2, 98:2, 99:10,
    100:12, 101:17,
    102:24, 103:18,
    109:18, 109:19
per 10:2, 30:17,
    63:8, 63:14, 64:6,
    64:8, 80:21
perceive 69:2
percent 9:25, 10:1,
    18:21, 18:22,
    19:2, 19:4, 24:12,
    51:8, 51:9,
    104:18, 118:15,
    146:5, 163:5,
    163:6, 163:7,
    163:8, 163:20,
    164:16
percentage 18:20
perch 91:12
perfect 77:15,
    107:6, 107:7
perfected 44:14
performance 46:23
Perhaps 26:21,
    108:25, 122:9,
    153:6, 182:12,
    182:15, 186:2
Period 18:2, 31:12,
    32:11, 64:17,
    125:7, 125:10,
    144:21, 145:12,
    145:24, 147:25
perjury 35:24
permission 14:21
permissive 140:2
permit 8:7, 62:4,
    172:25, 182:6
permits 56:5
permitted 7:9
person 7:2, 7:9,
    80:4, 116:22,
    194:5

personal 91:13
perspective 24:15,
    108:25, 149:10,
    175:11
perspectives 170:14
persuade 20:21
persuaded 34:14,
    57:2, 155:25
persuasive 54:21
pertain 20:13
pertaining 174:16
pertinent 62:9
Peter 3:18, 21:21,
    112:10, 172:9,
    189:16
petition 28:23,
    29:12, 40:18,
    44:18, 45:4,
    165:5, 174:7
phone 90:1, 164:17
photocopy 38:17
PHV 3:4, 3:5, 3:6,
    3:13, 3:18, 3:22,
    3:23, 3:27, 3:31,
    3:39, 3:47, 4:9,
    4:14, 4:30, 4:33,
    4:36
pick 38:14
picked 109:12
picture 182:18
piece 90:19, 189:11
pieces 129:7
pin 129:24
place 8:24, 9:4,
    10:22, 41:12,
    44:6, 44:21, 45:3,
    93:12, 98:16,
    132:11, 144:3,
    144:21, 148:1,
    162:7
places 130:21,
    133:20
plaintiff 48:5,
    137:4, 138:12,
    138:16
plaintiffs 119:8,
    121:3, 135:8,
    135:14, 138:10,
    138:17
planning 147:16,

151:2
plans 9:3, 14:2, 23:14, 135:15
play 125:19, 181:8
pleading 51:14, 148:10
pleadings 44:6, 118:20, 139:18, 140:24, 162:23
Please 15:21, 51:16, 86:6, 86:11, 99:21, 100:1, 159:22, 164:18, 164:20, 191:3, 192:19, 193:6
pleased 6:18, 9:12, 21:3, 70:5, 110:14
plenary 88:6, 88:25, 89:2, 89:17, 89:19, 90:19, 92:24
plethora 109:19
plug 159:3
plundering 40:20
plural 115:8
plus 125:20, 163:5, 163:9, 163:20, 165:24, 166:13, 167:3, 188:23
PM 86:10, 159:20, 159:21, 195:4
pocket 149:16
pockets 89:12
point. 68:13, 117:8, 155:20
pointed 138:8, 164:3
pointing 155:19
points 23:2, 47:9, 116:9
policies 6:25
policy 22:21, 156:25
political 168:23
politicians 11:11
portfolio 39:8, 39:9
portion 127:11
posed 101:4, 144:2
positions 12:20, 15:20, 24:25, 41:2, 42:14, 57:10, 75:6, 93:9,

125:18, 159:10, 177:11, 185:5, 188:1, 188:12
possess 53:22
possibility 187:20
possible 19:25, 24:17, 89:8, 132:12, 135:21, 138:4, 155:18, 184:3, 189:21, 190:22
possibly 26:10
Possinger 3:5, 111:12, 111:13, 111:14, 112:6, 112:8, 112:11
post 40:18, 44:18, 45:3, 174:7
post-petition 24:8, 52:21, 174:8
potential 57:7, 95:8, 97:15, 151:17, 153:8, 153:23, 154:20, 157:19
potentially 22:23, 30:11, 131:11, 167:12
powder 179:16
Power 1:22, 2:29, 28:7, 43:4, 43:19, 43:22, 54:10, 88:4, 88:6, 88:19, 89:2, 89:17, 89:19, 90:19, 92:2, 92:24, 94:9, 94:23, 95:2, 97:12, 103:18, 170:7
powerfully 97:16
powers 12:3, 22:15, 22:18, 42:24, 43:7, 54:8, 54:9, 88:25, 93:1, 108:3, 168:23, 172:11
practical 50:6, 63:17
practically 67:9
practice 8:10, 158:2

pre 177:7
pre-hearing 188:9
pre-petition 174:4, 174:5, 175:11, 175:12, 176:25
pre-plan 156:2, 158:9
precedes 87:4
preceding 92:9
precious 96:11
precise 119:7, 170:11
precisely 15:12, 98:2, 154:3, 174:20
predated 51:22
predicament 16:23, 139:21
predicated 181:5
predictable 100:19
Predictably 40:24
preemption 158:6
preempts 169:5
preferable 174:25
prejudice 74:17, 75:5, 101:23, 119:6, 140:3, 181:13
prejudices 180:4
prejudicial 141:9
prejudicing 36:16
premature 94:3, 94:7
prematurely 157:18
prematurity 92:13
premise 123:3
premised 127:18
PREPA 11:21, 24:20, 26:13, 29:17, 35:2, 52:18, 151:13, 156:6, 157:19, 160:1, 164:6, 171:2, 172:11, 173:1, 173:17, 173:22, 174:2, 175:21, 180:1, 183:4, 183:25
preparation 152:21
prepare 19:25
prepared 37:2,

181:11
preparing 63:12,
    194:24
prepetition 9:25
present 13:25, 24:5,
    31:5, 62:11,
    98:24, 153:15,
    164:11, 172:15,
    183:7
presentation 58:6
presentations 21:19,
    140:8
presented 61:17,
    190:23
presenting 182:6
preservation 44:7
preserve 75:2,
    157:23
preserving 60:8,
    96:12
President 14:7,
    86:20, 88:11
presiding 6:7
press 6:10, 7:10,
    9:20, 10:23,
    188:13
pressure 95:1
Presumably 155:14
Presumption 32:17,
    72:3
Presumptive 33:8,
    33:21, 34:12,
    34:15, 34:17, 35:1
pretending 127:21
Pretrial 151:19,
    158:23, 175:5,
    176:17, 186:9,
    189:25, 190:2
pretty 117:18,
    134:19, 145:18,
    165:23, 179:14
prevail 104:1
prevails 104:7
prevent 144:25
preventing 12:10,
    74:10
prevents 139:20,
    176:2
previewed 58:14
previous 13:22,

29:25, 70:16
previously 25:15,
    32:8, 85:15,
    155:2, 161:13
price 170:23
prices 167:21
PRIFA 30:24, 133:3
prima 69:14, 71:18,
    71:25, 72:3, 152:7
primarily 173:23
primary 60:17
principal 13:2,
    163:7, 173:21,
    174:2
principally 65:3,
    155:1
principle 28:13,
    110:16, 110:19,
    111:6
principles 10:20,
    104:12
Prior 13:11, 14:3,
    52:3, 83:11,
    142:23, 147:1,
    149:25, 162:9
priorities 98:8,
    98:17, 98:19,
    98:20, 130:6,
    156:1
priority 92:19,
    93:3, 98:12,
    98:24, 99:6,
    100:16, 100:22,
    101:5, 102:11,
    129:22, 143:2,
    175:11, 175:18,
    175:20, 176:5,
    176:19, 176:24,
    177:14, 177:16,
    177:18, 177:21,
    177:23, 178:1,
    180:4
pro 68:17, 70:9
probably 13:18,
    21:24, 65:23,
    140:18, 160:22,
    164:2, 168:21,
    189:24
problem 27:18,
    49:20, 67:2, 70:1,

78:16, 80:1,
    87:19, 87:22,
    90:2, 97:7, 99:19,
    107:9, 127:7,
    144:16, 147:14,
    148:22, 172:1,
    175:8, 175:9,
    177:8
problematic 87:17
procedural 30:20,
    58:12
procedurally 57:20
procedure 60:4,
    65:5, 65:13, 71:9,
    72:11, 72:14,
    91:4, 146:13
Procedures 30:11,
    30:16, 57:14,
    57:20, 59:17,
    60:2, 60:5, 61:4,
    61:6, 63:7, 63:19,
    66:15, 69:23,
    69:24, 71:3,
    71:14, 71:15,
    71:21, 71:22,
    71:23, 72:21,
    72:23, 93:8,
    139:22, 140:9,
    140:12, 146:17,
    193:12
proceed 9:2, 61:23,
    70:23, 73:12,
    78:14, 80:8, 88:1,
    96:20, 137:7,
    140:15, 140:22,
    143:22
proceeding 7:3,
    7:13, 29:22,
    66:19, 101:11,
    102:4, 178:4,
    178:6
Proceedings 4:48,
    7:18, 54:25,
    55:12, 55:13,
    57:10, 59:1,
    62:24, 86:10,
    93:11, 93:19,
    102:12, 102:14,
    114:13, 114:18,
    114:21, 114:24,

115:3, 115:5,
116:6, 136:16,
147:18, 151:13,
159:21, 194:10,
195:4, 196:6
processes 38:5,
38:6, 38:19, 66:18
produced 4:48
produces 116:12
professional 33:3,
35:5
professionals 17:22,
17:23, 32:20,
32:23, 32:24,
33:7, 33:11
proffer 152:5, 152:6
proffers 153:7,
153:19
profit 183:24
program 55:23
progress 11:15,
11:16, 11:23,
21:11, 28:8,
113:20, 186:7
progressive 19:1
projected 24:2
projections 19:22
PROMESA 1:30, 2:5,
2:21, 8:23, 9:2,
25:18, 55:2, 55:5,
55:8, 56:5, 68:8,
89:21, 90:18,
93:6, 97:24,
103:18, 103:25,
104:1, 106:15,
106:23, 106:24,
108:10, 136:8,
136:18, 176:23,
194:23
promised 170:20
promises 12:10
prompted 36:3
promptly 145:15,
158:19
promulgate 98:1
prong 139:12
proof 38:9, 71:24,
77:25, 85:18,
85:19, 122:7,
122:10, 157:5,

178:4
proofs 35:21, 36:5,
71:19, 72:24
proper 75:2, 153:25,
156:24
properly 36:15,
53:17, 63:1,
71:19, 71:24,
74:12, 74:18,
74:22, 82:2, 159:9
property 25:17,
129:4, 130:7,
130:24, 131:1,
131:8, 131:9,
131:13, 133:7,
133:8, 142:2,
142:7, 162:9
proponents 158:19
proposal 18:25,
58:5, 58:18,
58:21, 59:7,
144:20, 146:15,
147:4, 153:15,
187:6, 187:10,
187:11
proposals 21:12,
21:16
propose 12:24, 14:7,
20:22, 27:3, 98:6,
144:7, 161:6,
166:12, 170:21,
180:24, 185:14,
188:17, 188:25
proposes 99:10,
166:5
proposing 98:5,
158:15, 189:8,
189:17
proposition 108:12,
108:21
propositions 170:3
prosecute 97:22,
98:19
prosecution 141:4
Proskauer 8:19,
24:20, 59:20,
96:25, 111:14,
159:25
prospective 16:15
prospectively 33:1

protect 22:10,
24:16, 48:16,
51:5, 71:20, 111:2
protected 18:23,
22:15, 96:1, 96:6,
96:7
protecting 20:15
Protection 18:19,
44:8, 74:10
protects 19:18
protesting 193:8
prove 123:19
provide 9:24, 12:4,
12:22, 39:3,
61:10, 61:16,
77:5, 77:8, 81:10,
83:2, 83:19, 85:4,
88:9, 141:19,
142:7, 153:19,
155:16, 157:15,
158:4, 158:9,
173:4, 185:8,
188:19, 189:18,
190:6
provided 61:14,
132:15, 156:18
provides 16:19,
18:18, 43:17,
55:2, 138:9,
162:3, 162:4,
162:5
providing 10:13,
113:2, 113:10,
190:5
provision 176:1,
176:6
provisions 34:6,
35:4, 58:24,
104:2, 136:8,
136:17, 158:13,
163:10, 170:1,
176:23, 176:25
prudently 21:4
Public 3:46, 6:10,
11:20, 17:2,
17:25, 48:1,
171:5, 183:2
pull 129:24
punishment 192:14
purchases 173:22

purely 93:13, 94:9
purport 61:6
purportedly 61:4
purpose 32:19,
    142:11
purposes 31:17,
    50:25, 76:7,
    134:14, 134:24,
    135:1, 147:17,
    165:9, 165:10,
    165:11
pursuant 20:8, 48:3,
    71:25
pursue 133:17,
    139:23
pursued 120:13
push 128:10
pushed 92:5
pushing 109:11,
    146:1
putative 53:16
puts 70:4, 70:6,
    167:12
Putting 36:23,
    38:19, 53:21,
    70:3, 152:14


< Q >
QC 38:19
quality 30:15, 108:4
question 41:15,
    53:16, 53:21,
    61:21, 64:22,
    67:11, 93:3, 94:9,
    94:13, 97:14,
    105:22, 106:15,
    106:20, 122:8,
    125:1, 134:25,
    169:25, 172:7,
    179:7
questioned 87:11,
    109:22
questions 14:11,
    17:1, 33:20,
    128:1, 130:9,
    131:7, 134:1,
    134:11, 137:19
queued 73:6
quick 142:13

quickly 138:4, 192:1
Quiles 78:18
quite 43:24, 120:7,
    153:3, 165:13,
    185:10
quote 35:22, 41:19,
    88:9, 88:13,
    104:1, 104:3


< R >
radar 194:5, 194:6
Raise 13:11, 13:14,
    13:16, 17:1,
    47:22, 52:19,
    94:8, 131:18,
    134:19, 142:11,
    163:1, 170:23,
    192:11
Raised 18:16, 34:16,
    57:9, 60:17,
    66:10, 69:25,
    71:17, 116:7,
    132:23, 136:12,
    143:9, 153:5,
    162:12, 171:10,
    181:18, 181:21,
    192:13, 192:25
raises 13:8, 24:23,
    36:20, 63:10,
    79:3, 133:4,
    175:21
raising 68:17, 84:2,
    132:23, 164:8,
    165:18, 171:1,
    175:7
ramifications 155:23
ramming 142:17
RAMOS 110:7, 110:9,
    110:13, 110:14
range 51:7, 153:11,
    154:20, 154:23,
    164:13
rate 32:14, 32:18,
    32:20, 32:21,
    34:16, 63:17,
    157:12, 164:8,
    171:3, 171:8,
    181:6, 181:8,
    181:9

rates 162:5, 162:12,
    163:1, 165:17,
    165:18, 168:20,
    171:1, 171:10,
    175:21
rather 16:22, 17:16,
    41:20, 42:1, 42:2,
    42:5, 89:22,
    101:20, 102:11,
    118:7, 118:9,
    149:19, 175:17
rationale 121:4,
    164:13, 188:21
rationales 126:5
Re 1:6, 1:28, 2:3,
    2:19, 54:18, 54:19
re-review 37:12,
    37:20, 70:17
re-reviewed 37:5,
    77:9, 80:18, 81:7,
    82:25, 85:2
reach 18:1, 22:3,
    76:20, 137:5,
    159:4, 184:15
reached 9:19, 28:12,
    76:3, 77:21,
    110:15, 111:8,
    111:16, 113:15,
    155:6, 170:5
reaches 89:2
reaching 84:12
react 151:15, 189:9
read 153:10, 162:17
reading 145:10,
    169:15
reads 151:20
ready 86:7, 140:6
reaffirming 38:16
real 45:4, 45:21,
    66:8, 147:14,
    184:12
realistic 159:4
realistically 181:3
reality 167:6
realize 16:24,
    152:18
realized 38:5, 81:19
really 22:11, 34:24,
    50:6, 59:2, 65:11,
    99:4, 107:25,

117:19, 120:11,
128:8, 136:10,
146:1, 147:6,
147:10, 149:22,
166:17, 166:20,
170:14, 171:20,
185:13, 186:17,
187:7, 190:11,
192:3
Reason 32:23, 47:18,
50:17, 57:5,
58:11, 60:22,
65:22, 90:24,
97:7, 100:20,
101:25, 103:14,
106:25, 116:14,
117:1, 162:19,
166:16
reasonable 139:11,
159:6, 169:20,
169:22, 178:20
reasonableness
33:12, 154:20,
154:24, 155:4
reasoned 155:11
reasoning 55:10,
55:19
reasons 22:9, 53:22,
68:12, 69:18,
99:14, 100:22,
101:25, 102:9,
117:19, 123:24,
137:3, 161:1,
178:11, 181:21,
194:9
rebut 69:13
rebuttal 39:25,
114:12
recall 164:3
receive 18:20,
19:19, 60:14,
63:22, 64:15,
120:16
received 18:13,
30:4, 30:21,
120:9, 151:20
receiver 162:22
receivership 163:1,
164:4
receiving 19:2,

20:18, 38:4
recent 24:2
recently 9:15,
11:22, 28:7
receptive 19:13
recess 86:9, 159:20,
159:25
recognize 18:8,
20:14
recognizes 17:7,
17:9, 92:2
recognizing 11:9
recommend 32:10
recommendation 32:7
recommendations
34:2, 35:1
Recommended 31:12,
31:16, 31:18,
31:19, 31:21,
32:5, 32:9, 32:13
reconcile 60:23
reconnected 73:11
reconsideration
133:13
reconstitute 53:10,
53:25
reconstituted 56:2
reconstitution 54:1
reconvened. 86:10,
159:21
record 7:3, 16:5,
38:2, 68:6,
154:19, 173:11,
183:16
recorded 4:48
recording 7:8
recordkeeping 30:15
records 61:12,
61:13, 62:8,
62:10, 67:6, 67:7,
67:11, 67:13,
67:18, 67:21,
68:3, 68:7
recover 40:22, 41:3,
44:16, 44:19,
45:25
recoveries 23:25,
51:8
recovery 154:20
recruiting 66:21

recut 179:1
reduce 12:25, 71:11,
104:16, 163:24
reduced 9:25, 10:3,
100:12, 102:24,
104:17, 170:19
reducing 19:4,
163:25, 171:21
reduction 10:5
refer 7:5, 53:4,
53:7, 54:19,
54:21, 121:20
reference 55:2,
55:5, 55:6, 55:8,
118:1
referenced 18:6,
19:20, 20:6, 20:7,
43:7
referencing 111:7
referral 32:7
referred 71:5
reflect 59:5, 75:5,
79:21
reflected 34:3,
34:7, 76:12, 78:2,
78:10, 78:20,
84:14, 84:16
reflecting 57:11,
76:10, 76:18
reflects 19:6
reformulate 32:17
reformulated 33:8
refused 29:6
regard 17:8, 76:21,
185:14
Regarding 9:17,
14:1, 16:12, 19:7,
29:17, 42:11,
55:11, 55:19,
57:7, 57:14,
58:19, 59:9,
71:17, 106:16,
110:16, 176:17,
180:21, 180:22
regardless 13:15,
116:5, 149:14,
178:1
Region 3:10
register 73:23
regressed 102:15

regularly 6:17
regulation 104:2,
    156:2
regulations 106:19
regulatory 156:21
rehash 128:7, 184:9
reiterate 46:14
reiterates 29:14
rejected 10:19,
    66:11
relate 74:12, 111:17
related 26:13,
    36:10, 56:21,
    72:6, 129:9,
    129:18, 156:15,
    183:24
related-case 30:18
relates 32:18, 117:2
relating 25:12,
    25:16
Relations 48:1
release 9:20, 10:23
relevant 26:10,
    57:8, 59:5, 59:6,
    154:12, 155:11,
    156:4
reliability 30:15,
    35:15
relied 129:18, 155:1
relieve 95:13
relieves 95:18
remain 24:18, 58:17,
    73:23, 79:21,
    158:24
remainder 124:6
remaining 34:6,
    44:1, 70:24, 77:4,
    77:5, 78:2, 82:21,
    83:5, 91:2, 159:6
remains 10:22
remarks 27:20, 34:2,
    34:21, 35:12,
    57:16, 151:14,
    159:12, 187:14
remedy 56:15, 163:1
remember 65:23,
    65:24, 117:25,
    156:14
remind 6:22
reminder 72:16

remote 99:21, 100:2
removal 49:15,
    51:24, 52:4, 52:7,
    52:10, 52:12
removed 77:25, 81:8
rendered 136:20
Renewable 3:43,
    183:23
reorder 129:22
Reorg 27:15, 168:5
reorganization
    176:18, 184:1
repackaged 45:14
repeat 154:10, 175:4
repeated 151:25
Reply 46:16, 47:22,
    79:8, 96:10,
    174:17
reported 17:24
Reporter 194:20,
    196:15
reports 8:12, 26:5
repository 7:2
represent 42:7,
    47:23, 51:2,
    56:20, 60:7,
    68:14, 68:15,
    69:5, 86:17,
    131:11, 173:15,
    173:19, 183:22,
    186:8
representation
    41:25, 43:14,
    43:20, 43:24,
    45:23, 54:3, 56:8,
    56:11, 74:24,
    110:10, 128:15,
    129:19
representations
    139:13
representative 1:13,
    1:35, 2:10, 2:26,
    48:3, 48:6, 160:1
represented 57:22,
    68:5, 72:15,
    155:15, 173:19
representing 138:1,
    138:22, 180:18
represents 42:9,
    86:18

republican 88:10,
    88:12, 88:16,
    88:20, 89:3,
    89:14, 89:17,
    91:20, 92:25,
    103:20, 104:11,
    107:12, 107:17
request 14:6, 14:21,
    43:9, 46:14,
    46:20, 49:23,
    50:7, 53:5, 53:24,
    55:24, 56:1,
    57:18, 73:25,
    80:21, 82:14,
    83:16, 84:4,
    96:18, 110:18,
    111:25, 162:22,
    185:7, 191:13
requested 15:17,
    54:16, 71:6,
    84:23, 138:24,
    159:13, 159:17,
    180:13
requesting 13:1,
    14:4, 28:24, 184:4
requests 7:15, 8:6,
    8:13, 14:10,
    160:4, 189:3,
    189:23
require 27:13,
    32:22, 58:23,
    89:3, 132:13,
    143:5, 147:3,
    152:16, 156:8,
    157:7, 161:4,
    162:14, 172:13,
    181:7, 187:2
required 8:2, 9:2,
    17:14, 54:4,
    76:23, 90:21,
    92:25, 93:16,
    93:17, 107:11,
    134:25, 152:11,
    156:19, 156:22,
    162:14
requirement 91:20
requirements 108:2,
    139:16
requires 8:24, 55:8,
    95:17, 132:13,

139:10, 159:1,
166:3, 167:5,
167:6, 174:22,
186:17
requiring 91:19,
147:20, 150:25
Research 27:15
reservations 93:21
reserve 10:8, 19:11,
19:12, 19:14,
20:11, 39:25,
76:6, 114:11,
183:11, 183:16
reserved 29:20,
175:16, 177:22
reserves 79:5
reside 94:24
Resolution 17:16,
40:12, 71:11,
71:14, 72:22,
94:25, 100:10,
100:13, 130:2,
135:1, 135:2,
135:5, 152:22
resolutions 175:12
resolve 43:3, 59:9,
71:9, 74:24,
77:22, 79:17,
100:18, 118:6,
127:8, 150:24,
183:6, 183:15
resolved 8:8, 11:25,
26:8, 31:15,
31:22, 32:9, 34:5,
58:7, 58:9, 78:8,
95:7, 99:9, 101:4,
122:23, 125:4,
130:20, 132:25,
137:2, 143:2,
143:3, 144:8,
158:21, 160:22,
177:2
resolves 48:11
resources 29:18,
36:20, 58:15,
98:12, 100:14,
100:16
respected 177:18
Respectfully 122:16,
123:17

respond 25:10,
25:11, 28:21,
139:2, 140:6,
141:20, 172:7,
189:4
responded 15:17,
37:17, 75:16,
82:8, 104:4
respondent 76:3
responding 177:4
response. 141:14
responses 36:3,
37:10, 37:12,
63:22, 64:15,
64:16, 73:17,
75:13, 77:5,
77:20, 80:15,
80:16, 82:5,
82:21, 82:22,
82:23, 142:13,
153:15, 159:11
responsibilities
22:24, 36:19
responsibility
22:10, 101:16,
161:21, 191:8
responsive 15:20,
140:24
rest 167:10
restoration 10:6,
19:21, 19:23,
20:11
Restructuring 26:9,
28:9, 96:15,
104:14, 176:8
result 11:1, 18:3,
20:24, 21:6,
56:13, 69:4,
73:22, 83:16,
100:9, 102:5,
111:18, 116:12,
123:12, 154:22,
164:12, 189:17
resulting 20:25
results 108:22
resume 86:7
retain 62:11, 71:25
Retired 4:27,
109:15, 110:22
Retiree 9:13, 9:16,

9:17, 9:20, 10:3,
16:6, 16:9, 16:10,
17:4, 17:7, 17:9,
17:13, 17:18,
17:22, 18:14,
19:9, 19:10, 23:3,
26:3, 45:16, 51:5,
51:6, 57:18,
57:24, 58:19,
106:1
retirees 10:14,
16:13, 18:5,
18:11, 18:19,
18:20, 18:22,
18:23, 18:24,
19:8, 20:9, 20:10,
20:13, 20:17,
21:5, 23:7, 24:14,
106:6
Retirement 1:37,
16:14, 16:15,
23:4, 26:12, 82:7,
83:10, 84:1,
106:2, 109:13
Retiro 4:21, 179:25
retransmission 7:8
return 13:1, 114:1,
166:13
revenue 25:17,
26:14, 130:16,
133:6, 134:4,
136:17, 165:19
revenues 30:24,
133:7, 133:12,
142:3, 142:25,
162:25, 164:7,
164:8, 164:15
reversed 48:23,
48:24, 49:4,
101:8, 175:17
review 25:10, 29:3,
33:13, 38:15,
80:16, 81:5,
81:19, 82:16,
82:23, 85:5
reviewed 30:5,
30:21, 33:24,
35:25, 36:5,
71:21, 74:13,
79:8, 81:22,

81:23, 129:11,
152:21, 177:19
reviewer 38:6,
38:10, 38:20,
38:21
reviewers 38:16
reviewing 36:22,
37:21
Revised 34:14,
34:17, 38:25,
58:23, 75:9,
75:20, 78:3,
79:21, 80:24,
83:1, 83:4, 83:19,
85:23, 172:2
revision 181:6
revisions 181:8,
181:9
revisit 147:23
revisitation 34:12
Rico-local 110:11
Riego 4:19
rights 11:8, 22:19,
24:16, 36:16,
44:7, 54:14, 60:9,
71:20, 129:4,
130:7, 131:1,
157:20, 157:23,
158:9, 175:16,
176:19, 176:20,
178:7, 183:9,
183:11, 183:16
Rios 6:20
ripe 122:19, 122:21,
129:5, 129:6
ripeness 12:21,
129:8, 143:11
rise 192:20
risk 20:25, 155:8
risks 17:17
road 51:14, 153:1,
169:12, 169:13,
184:24, 188:19
Robert 3:47, 4:30,
16:5, 182:25
robes 91:14
Robins 121:13
robust 174:23
Rodriguez 3:41,
27:24, 27:25,

28:3, 28:17, 74:2
Rolando 4:19, 28:19
roll 124:4
rolling 165:24
Roman 110:5, 113:24,
114:1
room 90:11, 126:11,
146:4, 171:8,
171:10, 194:6
Rosado 86:22
Rosario 78:24, 79:3,
79:5
Rose 8:20, 59:20,
97:1, 111:14,
159:25
Rosen 173:11
Rossello 21:22
rough 189:13
roughly 18:21, 19:5
round 177:10,
189:10, 190:7
route 184:10
row 86:22
rubberstamp 69:23
Ruby 6:17
Rule 16:24, 33:6,
48:20, 70:25,
139:9, 139:16,
140:1, 156:11
ruled 48:20, 103:6,
104:19, 133:11
Rules 13:18, 62:5,
67:8, 69:6,
132:14, 132:15,
176:24
ruling 49:2, 99:1,
99:9, 100:20
rulings 13:17,
169:23, 185:19,
193:4
Rum 30:24
run 100:7, 137:17
running 87:23,
103:10, 126:9
runs 117:23
rush 148:14
Russell 121:13
Ryder 29:7

< S >
S/ 196:13
safe 195:2
safely 100:19
safety 119:2, 119:5,
119:8, 140:9
salaries 100:11,
105:1, 105:7
Salgado 86:21
San 6:1, 6:11, 6:15,
40:3, 193:11
sanctions 7:14
Sarah 194:17
sat 41:5
satisfied 184:2
satisfy 77:13
save 6:7
saving 23:20
savings 10:13
saw 9:22, 37:12,
44:23, 162:21,
187:21
says 15:4, 41:23,
42:21, 43:9, 48:2,
51:14, 92:17,
98:2, 118:12,
119:3, 119:8,
120:1, 121:21,
122:24, 127:17,
129:20, 130:1,
150:22, 168:22,
172:23, 176:7
scenario 164:23
scenes 126:12
Schedule 31:2, 78:3,
84:25, 125:16,
126:1, 132:11,
132:14, 138:5,
147:10, 152:3,
152:16, 152:20,
158:25, 160:16,
160:21, 161:10,
172:1, 179:1,
185:2, 186:9
scheduled 12:14,
64:4, 71:15,
151:14, 193:10
schedules 33:25,
37:14, 76:13,
78:21, 81:6,

81:11, 81:21,
83:1, 84:15,
147:11, 161:9
scheduling 144:7,
147:8, 185:9,
189:21
scheme 175:18,
175:20
scope 12:25, 152:23,
153:25, 155:4,
157:5, 159:7,
175:3, 181:18,
182:18, 185:5,
185:18, 186:9,
187:10, 187:11,
188:5, 192:23,
193:2
Scotia 173:18,
173:19
scrutinize 69:19
scrutiny 32:21
se 68:17, 70:9
seat 90:6
seated 73:13, 86:11,
159:22, 193:6
seats 159:17
Second 66:13, 79:24,
87:14, 99:7,
130:4, 139:12,
139:18, 143:9,
189:6, 190:7
seconds 144:13
Section 8:23, 42:18,
42:21, 43:5,
44:16, 48:1, 54:4,
54:6, 54:8, 54:10,
54:12, 54:13,
54:15, 54:25,
55:1, 55:3, 55:6,
55:11, 55:14,
55:17, 55:18,
55:20, 56:4,
88:10, 88:16,
97:24, 103:25,
162:7, 168:21,
175:4
Sections 9:2, 53:23,
143:13
secured 42:8, 42:16,
47:17, 47:19,

53:16, 114:23,
123:24, 154:15,
165:12, 170:19,
183:13
securing 30:24
Security 10:14,
18:13, 18:14,
19:7, 44:14
Seeing 128:8,
169:17, 192:12,
193:8
seek 42:16, 44:15,
44:19, 61:8,
72:12, 74:25,
114:13, 182:11
seeking 30:7, 42:22,
62:17, 63:21,
74:20, 135:23,
136:16, 153:9,
180:20
seeks 33:9, 40:6,
77:2, 77:18,
80:10, 80:13,
81:16, 83:7,
83:24, 84:21
seem 70:2
seemed 47:10,
103:16, 161:24,
192:24
seems 138:25,
152:25, 156:8
seen 23:5, 23:7,
23:8, 23:17, 26:5,
47:16, 93:11,
182:14
segregated 10:10
Seguros 77:21, 78:4
SEIU 47:23, 47:24,
48:3, 48:10, 50:23
selective 146:16
self 89:1
self-governance 88:8
self-perceived 95:14
semantic 92:1
Senate 14:8
send 105:16, 164:18,
164:20, 191:5
sending 122:8,
184:23
senior 175:10

seniority 185:21
sense 49:7, 91:9,
98:24, 107:14,
114:8, 114:17,
118:17, 118:21,
118:23, 119:18,
119:19, 120:25,
125:2, 125:6,
125:9, 125:10,
141:6, 144:22,
164:9, 179:18,
192:22
sensitive 9:10, 69:9
sent 44:17
separate 56:14,
106:2, 106:4,
106:10, 107:18,
115:20, 117:13,
173:23
separated 65:13,
108:3
separation 88:19,
93:1
serious 6:23, 36:21
seriously 22:4,
47:3, 87:11,
109:22, 153:5
seriousness 29:14
serve 41:20, 116:4,
117:6, 119:21,
119:24, 119:25,
120:3, 120:19,
120:21, 125:23,
125:24, 137:15,
139:11, 139:14,
145:4, 145:6,
145:11, 145:21,
145:23, 149:4,
149:7, 149:9,
149:14, 149:19,
150:21, 150:23,
150:25, 151:1,
151:3
served 117:22,
121:20, 132:9,
134:21, 140:19,
149:11, 149:25
Service 48:1, 79:1,
116:15, 117:6,
117:9, 117:10,

117:14, 117:19,
117:21, 121:22,
122:10, 125:20,
126:23, 127:2,
132:6, 132:13,
146:2, 147:14,
147:18, 147:25,
150:11, 150:12
Services 4:5, 4:33,
138:23, 162:15,
173:16
serving 41:16,
116:18, 120:1,
120:11, 121:22,
131:16, 137:4,
144:17, 144:18,
144:25, 145:14,
150:16
session 6:6
set 22:21, 54:8,
60:21, 64:7,
156:25, 160:21,
166:7, 174:13,
174:14, 178:5,
181:12
sets 52:16, 155:24
setting 152:20,
154:14, 171:3
settle 118:9, 120:25
settled 25:25,
44:20, 118:18,
164:9
settlement 16:24,
25:9, 25:15, 26:3,
26:8, 27:11,
93:12, 110:16,
110:19, 111:5,
111:20, 135:2,
135:5, 135:20,
135:22, 154:23,
175:7, 176:21,
177:1, 177:23,
181:3, 181:5,
181:10, 181:14
settlements 12:24,
27:9, 98:18,
128:15
Seven 23:14, 64:6,
80:15, 101:23,
114:24, 115:2,

125:5
seventh 114:4
several 9:5, 11:15,
26:22, 32:8, 35:4,
35:17, 35:20,
36:5, 121:15,
161:1, 183:23
severe 67:22
severely 22:19
Shall 55:4, 88:9,
104:1, 112:3
shaping 182:9
share 154:8, 187:6
shared 105:5
shed 155:8
sheet 19:15
shift 109:1, 125:18,
147:16
shifted 92:13
shifting 32:19,
67:10, 69:18,
126:4
shifts 188:25
shocked 142:13
Shorebank 43:16,
45:22
short 8:3, 14:22,
15:20, 182:2
shortened 159:7
shortening 149:18
shortly 24:20,
28:16, 147:2
shouldn't 119:24,
137:3, 137:10,
154:11, 168:13
show 23:16, 45:23,
119:10, 136:9,
138:13, 138:18,
139:10, 140:10,
170:15
showing 32:22,
105:4, 138:11,
155:18, 155:19
shown 22:1
shows 92:22, 102:20,
107:9
shudder 63:16
shut 141:1, 183:7
sick 110:21
side 128:25, 162:13,

165:15, 184:19
sides 162:20
sign 37:2, 38:17,
75:11, 128:21,
161:4, 168:6
signals 7:7
signature 124:21,
148:22
signed 112:23,
152:19
significance 10:25
significant 11:14,
11:16, 16:19,
17:3, 21:17, 28:8,
56:16, 90:20,
152:12, 175:19,
176:13
significantly 13:1,
71:12, 155:5
silence 113:4
silent 172:23
silly 142:19
similar 10:21,
42:25, 43:1, 55:3
similarly 55:20
simple 44:12, 47:18,
65:22, 67:4
simplicity 87:7
simply 17:16, 22:17,
36:19, 49:15,
74:20, 78:25,
85:14, 93:17,
133:3, 154:9,
155:19, 155:24,
161:2, 161:4,
176:24, 192:10
Simultaneously 9:7
Sindical 110:12
single 33:2, 33:3,
56:19, 63:13,
63:16, 63:20,
64:1, 64:12,
72:13, 138:12,
138:16, 138:17,
151:4, 183:4
siphoning 40:15
sir 16:3, 27:23,
28:18, 173:9,
180:16
Sistema 4:21, 179:24

sit 30:20, 31:1
sitting 6:7, 79:16,
  147:9
situation 49:21,
  95:11, 95:21,
  105:21, 111:6,
  141:8, 168:11,
  174:14, 177:10,
  183:24
situations 11:2,
  176:17
Six 50:11, 50:12,
  60:23, 101:19,
  124:7, 125:5
skinnied 186:19
skinny 187:15
slam 108:19, 108:24
slammed 128:23
slice 89:22
slices 89:19, 89:21
sliding 92:15
slip 38:21
slips 191:4
slow-rolling 125:20
slower 60:11, 80:11
slumber 44:12, 45:6,
  48:18
small 95:23, 128:11,
  142:16, 142:17,
  165:13
smaller 89:19
Snow 25:7, 134:8
Social 18:13, 18:14
sole 40:6
solely 41:13, 53:11,
  56:3, 62:15, 82:7,
  82:8
solicited 41:16
soliciting 66:17
solid 28:25
Solus 173:24
solution 9:14, 10:12
Solutions 73:8,
  73:10, 73:12,
  79:11, 79:25,
  80:3, 90:13, 99:21
Somebody 73:8, 80:2,
  148:2, 172:23
Somehow 27:15,
  104:14

Someone 38:8, 182:24
sometime 148:10,
  160:24
somewhat 64:2,
  159:7, 169:8
Somewhere 127:1
Somos 180:18
Sonnax 87:1, 92:8,
  94:2, 95:3, 97:3,
  100:8, 100:23,
  101:10, 105:19
soon 31:1, 126:18,
  190:22
sooner 149:11,
  149:19
Sorry 60:12, 77:4,
  77:24, 80:11,
  89:25, 90:3, 90:4,
  99:17, 112:17,
  112:19, 149:8
sort 61:6, 66:20,
  102:22, 113:5,
  113:8, 116:1,
  137:18, 147:6,
  147:24, 161:5,
  166:21, 171:4,
  182:17, 184:9,
  185:6
sorts 169:17, 171:5
Sosland 3:22, 25:4,
  25:5, 25:7, 25:24,
  27:6
sought 13:10, 13:16,
  25:21, 47:11,
  56:12, 60:1, 82:4,
  125:17, 152:7,
  153:2, 153:11,
  153:21, 155:7,
  187:7
sound 90:9, 99:17
sounds 59:1, 77:15
source 7:2, 54:14,
  54:16, 92:22
sources 113:16
Southern 6:16,
  194:18
space 66:16
Spanish 65:22
speaker 185:9
speakers 4:39

speaking 91:14,
  160:8, 160:17,
  166:23, 181:4
special 10:25,
  133:12, 136:16
specialized 101:12
specific 35:4,
  42:18, 56:25,
  61:24, 104:2,
  122:4, 136:8,
  184:14
Specifically 35:20,
  37:16, 38:11,
  69:25, 88:8, 94:1,
  106:23, 134:13,
  136:23, 136:25,
  139:22, 170:10
specification 103:19
specifications
  106:22
spectacularly 123:22
speech 6:22, 6:24,
  194:12
speed 34:5
spelling 187:17
spend 87:2
spent 67:14, 97:2
spoke 74:13, 76:3
spot 38:20
spots 95:9
ssure 69:21
stacked 50:1, 50:4
Stadler 4:36, 31:6,
  31:7, 31:8, 31:24,
  32:2, 32:4, 33:23,
  34:8, 34:19, 34:25
staff 7:24, 36:5,
  60:6, 63:11,
  76:19, 80:4,
  194:15
staffing 8:2, 194:9
staffs 194:18
stage 143:1, 146:2
stages 9:10
stamp 116:21
STANCIL 3:27, 14:16,
  14:18, 14:20,
  15:25, 121:12,
  121:13, 122:3,
  124:12, 124:16,

124:19, 124:24,
125:15, 126:24,
128:4, 146:8,
146:12, 148:6,
149:8, 149:15,
149:21
stand 96:2, 96:6,
171:6, 180:11,
183:17
stand-alone 130:24
standard 23:8,
43:24, 67:2,
127:4, 140:12,
140:13, 140:14,
156:10
Standards 32:17,
32:24, 33:8, 33:9,
33:21, 34:12,
34:15, 34:18, 35:1
standing 14:15,
42:8, 42:16,
42:21, 129:2,
131:14, 131:21,
147:12, 167:13
stands 46:15, 130:19
star 107:8
start 44:11, 87:17,
89:15, 97:4, 99:8,
107:21, 118:18,
121:18, 127:25,
133:23, 144:16,
146:14, 146:17,
184:23, 190:8
started 44:10, 45:7,
107:22, 114:14,
119:15, 146:22,
147:13
Starting 97:14,
99:6, 176:14
starts 104:10,
126:20
state 103:13, 104:2,
106:18, 133:17,
180:2
stated 26:6, 88:8,
91:7, 180:25
Statement 12:7,
15:20, 97:16,
111:1, 143:1,
180:5, 184:2,

184:7, 184:8,
189:13
statements 15:21,
61:8, 153:12,
154:10, 180:22
statesmen 11:11
stateswomen 11:11
stating 35:24,
177:11
statute 13:3, 50:18,
68:9, 114:15,
118:3, 130:18,
194:8
statutes 133:5
statutory 47:2
stayed 13:5, 119:2,
120:1, 150:1,
150:17, 150:22
staying 119:21,
127:11
stays 25:21, 151:2
steam 119:1
steamroll 128:12
stenography 4:48
step 21:17, 90:16,
107:13, 190:3,
190:6, 190:13
stepped 108:9
steps 89:15, 156:21
stillborn 96:16
stipulate 67:1
stone 135:18
stop 97:12, 178:15
stops 145:14
straight 124:20
strategy 128:9,
142:14
stream 40:14
streamline 72:21
streams 25:17,
26:15, 133:6
stretch 114:4
strikes 22:9
stripping 40:14
strong 164:14
strongly 137:10
struck 155:2, 163:4
structure 65:15,
152:2, 170:6,
171:8

structured 11:10
structures 157:12
stuff 70:9
Subject 7:13, 10:22,
11:23, 14:11,
15:3, 18:15,
21:13, 28:14,
32:21, 39:10,
39:11, 63:15,
72:19, 75:21,
80:18, 80:22,
81:13, 81:22,
82:2, 82:25, 83:3,
95:10, 102:2,
121:6, 127:9,
133:12, 143:22,
153:14, 191:15
subjected 95:1
submission 53:20,
59:10, 76:10,
80:22, 82:1, 83:4,
84:7, 85:7, 110:3,
182:15, 188:22,
189:20, 192:25,
193:4
submissions 33:24,
53:13, 56:19,
75:22, 80:25,
154:2, 154:9,
154:11, 174:19,
182:4, 182:13,
182:19, 188:11,
190:15
submit 34:8, 44:12,
45:3, 58:5, 61:25,
62:22, 72:9,
75:15, 76:22,
80:20, 85:20,
88:14, 112:1,
115:20, 125:22,
151:18, 172:2,
184:8, 189:22
submitted 16:16,
82:19, 82:25,
175:15, 177:7
subordination 102:2
subsection 43:13,
56:7
subsequent 13:13,
13:23, 188:22

subsequently 73:17, 75:16, 166:5
substance 9:19, 78:25
substantial 20:25, 23:20, 63:22
substantially 19:22, 24:16, 59:14, 63:8
substantiate 187:10, 188:20
substantiation 185:3
substantive 7:21, 54:15, 60:3, 61:24, 62:4, 62:7, 62:20, 63:15, 64:16, 70:20, 174:19, 194:10
subverts 175:18
success 91:2, 102:4
successful 23:19, 91:6
successor 173:16
sue 48:4
sued 48:4, 140:5, 140:6
suffices 122:10
sufficiency 61:20
sufficient 23:20, 42:12, 60:15, 61:16, 69:13, 72:3, 152:6, 153:20, 154:19
suggest 58:16, 61:13, 125:17, 146:12, 151:23
suggested 15:10, 19:10, 72:11, 190:15
suggesting 13:21, 133:21, 149:9
suggestion 105:10, 122:15, 123:5, 146:9
suggests 91:12, 102:20, 175:24
suited 61:2
summary 9:23, 107:3, 118:20
summer 110:22, 129:12, 164:3,

164:23
Summons 134:21, 137:4, 137:16, 144:17, 151:1
superb 194:25
supercedes 87:4
superiority 91:9, 107:14
superseded 73:17, 73:20, 73:25
supervise 20:10
supervision 36:1, 72:19
supplement 34:25, 180:13
Supplemental 30:6, 153:17, 158:17, 188:22, 188:24
Support 9:16, 9:18, 10:17, 10:21, 16:11, 16:18, 18:4, 18:13, 19:3, 19:6, 19:15, 20:7, 20:16, 22:8, 28:9, 152:19, 158:4, 164:23, 194:25
supported 156:4, 156:13, 169:20
supporting 72:9, 154:15, 158:17, 186:22
suppose 70:25, 77:11, 189:2, 189:9
supposed 126:25, 166:21
Supreme 14:5, 29:1, 29:2, 29:3, 29:6, 29:10, 96:5, 103:4, 103:6, 103:12, 109:21, 176:14
surely 94:7
surplus 10:7
surpluses 10:9, 24:2
surprise 57:25, 172:18
surprised 186:12
survive 84:24
surviving 79:6

suspense 21:23
sustain 79:9, 80:23, 81:12, 82:1, 83:5
sustainable 11:5
sustained 39:11, 74:5, 75:5, 75:22, 79:19, 82:17, 83:18, 84:6, 85:6, 85:21
Swain 2:36, 6:6, 8:17, 12:6, 117:25, 128:16, 128:17, 129:13, 129:17, 136:23, 142:20, 142:24, 143:17, 143:23, 196:7
swap 84:24
swapped 77:25, 84:11
swappings 78:7
switch 47:10
switching 193:21
Syncora 3:41, 11:20, 11:22, 28:1, 28:6, 28:8, 28:10, 28:12
System 1:37, 16:14, 16:15, 19:8, 20:12, 30:16, 38:7, 82:7, 82:10, 82:11, 83:10, 83:13, 84:2, 106:2, 106:17, 180:5
systems 12:2, 82:9, 83:12, 84:3

< T >
T. 3:27
table 102:11, 122:12, 134:12, 135:23, 166:22
taken. 86:9, 159:20
talked 109:7
talks 68:8
tangibly 155:11
tardes 86:11
target 188:18
targeted 105:8, 105:10, 177:21

targets 117:4
Tax 30:24
taxes 142:2, 142:7
Taylor 2:36, 6:6,
  196:7
teacher 79:1
Teachers 10:21,
  16:14, 22:22,
  110:17, 110:22
team 19:1, 194:23
teams 24:20
technician 90:5
techniques 63:22
tee 27:9, 115:17,
  134:23, 142:24,
  143:2
teed 25:19
teeing 126:19
telephonic 6:12
template 159:2
Ten 39:24, 41:18,
  102:7, 104:18,
  159:14, 163:8
ten-minute 159:16
tens 71:10
term 11:10, 12:14,
  19:15
terminate 34:5,
  119:3, 119:4,
  119:9
terminating 101:14
terms 8:22, 13:1,
  19:14, 20:13,
  51:14, 63:11,
  95:12, 96:1,
  107:11, 107:15,
  109:3, 113:2,
  133:5, 141:25,
  146:1, 146:3,
  160:16, 161:17,
  173:5, 176:4,
  179:17, 180:3,
  180:4, 188:8,
  188:9, 188:19,
  188:20
Territorial 88:5,
  89:18, 92:24,
  106:18
territory 87:12,
  88:4, 104:2,

104:7, 106:25,
  107:1, 107:2,
  128:7
test 70:3, 80:2,
  90:10, 99:20,
  99:25, 168:25
testify 181:12
testimony 180:21,
  182:7, 188:10
Testing 164:18,
  164:20
tests 103:5
text 80:5
texting 7:11
Thanks 172:8, 195:2
themselves 49:5,
  59:25, 111:20,
  121:3, 179:20
Thereafter 158:18
thereby 13:12,
  71:10, 157:14
thereto 33:25
they'll 123:19,
  170:15, 171:17,
  179:20
They've 45:6, 49:17,
  77:9, 122:22,
  126:7, 126:16,
  127:12, 143:17,
  153:10, 155:11,
  171:9
thinking 147:13,
  154:9, 187:7
thinks 102:22,
  118:13
third 101:19, 136:7,
  136:13, 137:12,
  137:13, 150:12
third-party 137:16
thorough 152:10
though 43:7, 64:7,
  150:1, 166:1
thoughts 63:19
thousand 30:8,
  30:17, 59:22, 64:2
thousands 48:10,
  62:25, 66:6, 71:10
threat 45:4
three 27:16, 32:5,
  40:4, 44:25,

61:25, 62:7, 72:1,
  78:16, 88:7,
  88:16, 88:17,
  101:10, 114:7,
  114:8, 114:13,
  114:16, 114:19,
  116:19, 120:9,
  138:9, 138:15,
  138:24, 139:6,
  142:13, 154:7
three-part 108:3
threshold 18:15,
  33:10, 130:9,
  131:7, 134:1,
  167:7
thrilled 162:11
throughout 104:6
throw 129:23, 129:25
tight 30:20, 31:1
timeframe 127:1
timekeeper 33:3
timekeepers 33:5
timeliness 75:6
timely 58:5, 113:11,
  159:4
timetable 7:17,
  186:3, 186:5,
  188:23, 188:25,
  189:8
timing 12:12, 15:18,
  26:2, 97:15,
  187:11, 190:12
tiny 24:5, 168:5
Title 1:8, 1:30,
  2:5, 2:21, 16:21,
  22:2, 22:18,
  40:23, 53:7, 55:2,
  55:3, 55:5, 55:7,
  55:8, 55:10,
  55:12, 55:25,
  57:10, 63:3, 72:8,
  72:25, 92:19,
  95:3, 128:10,
  139:19, 162:8,
  162:13
together 6:19, 64:1,
  114:9, 114:14,
  134:21, 163:2,
  187:11, 189:19,
  190:5, 190:10

tolling 44:21, 168:6
tomorrow 167:22,
    192:2
tonight 192:2
tons 109:21
took 15:9, 38:8,
    45:3, 45:13, 49:6,
    129:15, 142:16,
    166:20
tools 66:9
top 19:4, 49:16,
    117:24, 120:8
topics 8:21, 30:3,
    153:4
total 9:23, 9:24,
    10:4, 40:18,
    44:25, 86:14,
    173:25
totally 92:21,
    178:20
touch 30:3, 91:23
toward 21:16
Trabajadores 4:17
track 108:5
traction 174:8
trade 51:13
training 38:15,
    65:21
transaction 56:16,
    66:20, 71:11,
    156:9
transactions 22:19
Transcript 4:48,
    196:4
transcription 196:5
transcripts 129:11
transferred 130:18,
    133:6, 133:7
transformation
    165:19
transparency 68:9
transparent 72:21
transpired 179:19
Transportation 2:13
trauma 116:23, 120:4
traveling 192:2
travels 195:2
tread 97:13
treading 96:9, 97:12
treasurer 86:21

treat 105:14, 105:24
treatment 9:14,
    10:18, 16:12,
    18:5, 18:9, 20:23,
    21:1, 163:19,
    166:6, 166:9,
    166:12, 168:1,
    170:21
treats 185:22
tremendous 96:12
trial 13:18, 15:12,
    93:16
tribunal 101:12
tried 99:12
trigger 129:25
TRINIDAD 138:21,
    139:4, 139:7
trouble 79:13,
    151:10
troubled 23:24,
    36:12
trounce 22:19
True 69:4, 94:4,
    98:9, 136:15,
    185:7, 185:8,
    196:5
truing 76:10
truism 104:22
Trump 14:7
trust 22:23, 50:17,
    82:17, 180:6
Trustee 3:9, 41:14,
    41:18, 41:21,
    41:23, 43:8,
    43:12, 43:16,
    44:16, 46:8, 46:9,
    46:13, 46:17,
    46:22, 49:16,
    49:23, 50:1, 50:2,
    52:1, 53:19,
    54:11, 55:16,
    55:22, 56:6,
    56:14, 56:18,
    168:6, 191:12,
    191:14
trustees 168:8
try 50:16, 58:16,
    98:25, 99:23,
    109:17, 119:11,
    121:14, 121:17,

125:2, 128:25,
    137:5, 139:8,
    166:1, 188:3,
    190:12, 190:18
trying 22:2, 49:20,
    95:19, 107:22,
    108:6, 109:1,
    122:17, 125:9,
    125:18, 125:19,
    127:7, 129:3,
    132:11, 147:9,
    156:17, 174:5,
    177:14, 181:23,
    186:2
Tuesday 191:25,
    192:5
tuned 30:19
turn 35:8, 66:25,
    113:25, 134:3
turned 7:4, 7:8,
    99:13
turnover 143:12
turns 117:3, 161:13,
    164:1
twice 131:25, 170:10
two-thirds 19:5,
    45:1
Two. 10:24, 67:24,
    88:10
type 52:9, 65:6,
    116:17, 134:14,
    135:23
types 62:4, 64:23,
    65:4
typical 69:6
typically 38:7

< U >
UCC 25:20, 30:5,
    40:7, 41:1, 41:8,
    41:13, 41:20,
    41:21, 41:22,
    42:2, 42:3, 42:12,
    42:14, 43:5, 43:7,
    43:15, 44:2,
    45:12, 49:20,
    49:22, 50:2,
    50:12, 71:13,
    127:14, 131:10

ultimate 163:18
ultimately 12:15,
  44:20, 91:25,
  112:2, 136:20,
  166:25
ultra 45:10
unable 147:12
unaffected 131:6
uncertainty 113:6
unchanged 165:17
unconstitutional
  103:7
unconstitutionality
  29:19
uncontested 35:9,
  39:6, 39:11
uncontroverted
  153:20
undergo 46:24
underlie 153:12
underlying 35:18,
  36:21, 48:24,
  111:17, 116:14,
  117:2, 155:14
undermine 90:20
underpin 152:11
understand 27:14,
  29:9, 29:11,
  30:14, 32:24,
  33:18, 37:8,
  43:21, 46:15,
  46:19, 50:24,
  60:15, 61:10,
  63:9, 64:8, 68:1,
  73:11, 74:14,
  74:18, 75:14,
  76:17, 78:19,
  109:5, 109:8,
  118:25, 145:9,
  148:16
Understandable
  95:19, 148:16
understanding 106:8,
  132:24
Understood 63:24,
  106:21, 150:18,
  178:16, 182:21,
  183:17, 186:20
undertaken 185:11
undertook 37:12

underway 28:15
undisputed 40:10
undo 89:22, 91:18,
  93:7
undone 108:10
unduly 72:18
unfeasible 181:10
unfolds 24:17, 68:12
unfortunate 27:20
Unfortunately 48:22,
  73:22, 174:5,
  179:14
unfounded 141:20
unification 146:13
unified 125:13,
  125:15, 126:18
uniform 125:3, 147:8
uniformity 138:14
uniformly 33:6
Union 4:16, 10:17,
  10:25, 110:11
unions 10:23, 11:1,
  11:6, 22:14, 111:7
unique 33:2, 91:7,
  93:21, 108:24,
  141:8, 183:15
uniqueness 91:10
University 82:6,
  83:10, 84:1
unless 7:4, 26:18,
  98:17
unlikely 64:8
unliquidated 62:13,
  62:16
unmuted 79:13, 79:15
unnecessary 29:18
unobjected 123:13
unopposed 115:19
unpersuasive 55:20
unprecedented 40:17
unprejudiced 175:16
unrelated 63:2
unresponsive 106:20
Unsecured 3:13,
  39:19, 41:19,
  41:24, 42:9, 44:3,
  45:4, 48:16,
  49:17, 50:4,
  50:14, 51:2,
  52:14, 53:1, 53:7,

  53:11, 53:18,
  55:9, 56:3, 56:11,
  56:14, 56:20,
  166:15
untenable 181:10,
  181:14
until 7:17, 7:18,
  13:5, 20:1, 30:12,
  30:20, 48:24,
  60:18, 116:13,
  117:8, 120:2,
  120:11, 127:11,
  146:25, 147:19,
  149:4, 149:14,
  151:3, 152:17,
  152:20, 187:21,
  190:14, 192:23
unused 110:21
unworkable 59:3
up-to-date 34:2
update 14:1, 14:22,
  113:3, 113:11
updated 34:4
upset 90:23
urge 97:8, 120:11
urgent 8:9, 30:5
urging 12:3
useful 179:3, 190:10
using 7:4, 89:16,
  89:19, 116:21,
  128:15
usual 6:22, 7:19,
  194:12, 194:14
UTIER 28:20, 28:23,
  29:14, 29:16,
  29:17, 29:20,
  179:24, 180:4
utility 165:17
utilize 30:18
utter 40:20


< V >
V. 114:1
Vacate 39:18, 42:24,
  47:12, 49:13,
  52:25, 54:22
vacating 53:6
Valdez 138:22
valid 13:13, 82:10,

82:11, 83:13,
116:11, 135:12,
136:9, 136:21,
157:9, 169:22,
170:1
validate 157:14
validity 42:13,
69:14, 71:19,
71:25, 72:4,
135:24, 136:2
valuations 165:9,
165:10
value 24:5, 152:13,
154:15, 163:10,
164:24, 165:5,
165:7, 165:12
valve 119:2, 119:5,
119:8, 140:9
variety 22:9, 56:23,
100:22, 181:21
various 18:9, 21:18,
116:4, 117:4,
130:21, 159:10,
162:4, 194:19
vastly 18:18
vehicles 8:12
vendor 65:6
vendors 51:13
Venturelink 51:22
versa 84:14
version 33:17,
89:13, 124:20
versus 29:7, 157:8
veto 176:10
VI 22:2, 114:1
via 60:14
vibration 7:7
vice 84:14
VICIC 3:35, 86:16,
86:25, 87:15,
87:19, 87:22,
88:1, 88:3, 90:2,
90:7, 90:15,
90:18, 92:15,
94:16, 94:18,
94:21, 106:14,
107:9, 108:15,
109:10, 110:4
Vidal 3:41, 27:24,
27:25, 28:3, 28:17

video 193:11
view 17:8, 17:14,
22:25, 45:20,
48:22, 60:22,
110:17, 118:23,
122:20, 122:21,
127:23, 130:21,
133:1, 154:12,
154:17, 160:14,
161:19, 163:15,
163:16, 163:23,
167:25, 189:4,
189:6
viewed 83:13
viewpoint 17:10
viewpoints 56:23
views 169:14
vignette 66:5
violate 46:1, 148:17
violates 177:23
violating 148:12,
148:24
violations 36:9
vires 45:10
Virtually 92:20,
102:18, 168:2
visible 17:25
vision 95:15
voice 31:24
voiced 143:9
void 13:3, 15:5,
29:25, 127:23
volume 37:12, 69:10,
79:12
voluminous 7:21
vote 9:8, 10:22,
167:3
vulnerable 18:19,
22:10, 36:18


< W >
Wachtell 160:3,
173:11
wage 40:24
Wait 79:24, 122:24,
126:5, 126:6,
150:20, 164:17,
190:14, 192:23
Waiting 90:9, 93:25,

123:2
waiver 66:18
wake 44:11
Walker 194:21,
196:13, 196:14
wanted 46:13, 46:16,
46:22, 65:17,
82:9, 83:12,
84:10, 115:9,
115:17, 115:21,
116:3, 117:18,
138:7, 142:21,
148:11, 150:11,
151:19, 163:22,
163:23, 166:1,
171:19, 171:25,
178:16, 178:21,
180:2, 180:19,
180:23, 183:13,
183:16, 184:12
wants 47:20, 97:18,
143:6, 168:25,
169:1
warrant 46:20
warranted 29:3
Washington 12:3
waste 29:18, 188:16
watch 68:16
watching 68:18
waterfront 121:17
waters 97:12
ways 7:25, 127:24,
154:8, 175:17,
181:24
wear 51:3
Wednesday 31:14,
60:20, 184:7,
184:11, 193:10
weeds 145:17
week 10:24, 15:24,
31:20, 31:23,
33:17, 153:18,
158:15, 160:24,
161:2, 184:16,
193:21
weeks 11:18, 60:24,
119:12, 146:17
weigh 131:25, 132:5
weight 42:13
Weil 183:1

Welcome 6:9, 20:23
whatever 26:19,
    52:20, 69:12,
    91:1, 94:5, 101:6,
    107:19, 108:23,
    109:3, 115:25,
    123:11, 140:24,
    157:3, 163:25,
    169:20, 181:6,
    185:24, 186:1,
    188:19, 188:25,
    189:22
whenever 25:24,
    164:4
Whereas 138:12,
    164:13
whereupon 50:3
White 39:23
WHITMORE 4:9,
    191:11, 191:21
who've 33:19
Whoever 90:10,
    90:11, 99:20,
    99:25
whole 23:4, 68:15,
    117:23, 138:10,
    156:9, 161:23,
    166:3, 186:15
whom 182:4, 182:11
William 4:14, 138:1
Williams 86:17
Williamson 4:35,
    31:9, 33:4, 34:21,
    34:23, 34:24, 35:7
willing 41:19, 75:4,
    163:17, 188:19
willingness 27:1,
    70:16
win 123:19
win-win 11:1, 111:6
wind 109:9, 109:10,
    189:21, 190:8
Windmar 3:43,
    183:23, 184:19
window 139:14,
    139:17
winter 129:12
wise 182:10, 187:15
wish 16:9, 34:21,
    66:15, 180:16

withdraw 148:19
withdrawal 70:1,
    76:10, 76:12,
    76:18, 77:12
withdrawing 35:17,
    83:1
withdrawn 36:12,
    37:15, 76:4, 76:7,
    78:20, 80:17,
    81:5, 82:24
withdrew 80:18
within 12:9, 119:17,
    121:23, 125:10,
    134:10, 145:5,
    145:11, 145:24,
    147:23, 149:7,
    154:23, 156:3,
    172:11, 181:18
without 29:24, 37:2,
    40:19, 51:25,
    74:17, 75:5,
    98:23, 102:23,
    103:10, 121:3,
    138:11, 145:8,
    152:5, 156:6,
    158:21, 162:9,
    172:24, 176:8,
    177:3, 178:4,
    178:6, 185:19
withstanding 79:7,
    82:15, 83:17,
    84:5, 85:20
witness 188:9
WITNESSES 5:3,
    182:7, 188:15
wonder 141:18,
    191:24
wonderful 169:22,
    170:2
woods 140:25
word 26:25, 27:5,
    27:12, 128:17,
    128:19
words 47:13, 55:3,
    186:20
work 17:21, 17:23,
    18:1, 24:21,
    34:11, 38:21,
    58:16, 58:18,
    59:2, 59:8, 64:18,

65:5, 99:6, 182:5,
    183:12, 194:24
worked 32:16, 33:15
workers 11:2
working 9:1, 22:2,
    30:10, 33:3, 70:2,
    80:7, 132:20,
    183:5
works 68:1, 112:6,
    113:9, 167:13
world 91:4, 96:14,
    167:6, 167:11
worries 184:6
worse 21:1
worst 155:8
worth 164:9, 190:18
wrap 45:19, 51:16,
    104:9
writ 28:23
writes 11:22
writing 186:19
written 33:24,
    53:13, 71:7,
    135:17, 135:18
wrote 99:15, 103:25,
    121:2


< Y >
year 8:25, 19:23,
    23:10, 26:17,
    44:10, 104:18
years 10:7, 10:9,
    10:11, 22:1, 23:6,
    23:15, 26:22,
    27:6, 41:6, 44:5,
    51:23, 116:19,
    120:9, 122:17,
    126:20, 164:4,
    173:12, 194:7
yesterday 33:5,
    124:3
yet-to-be-created
    96:14
York 6:11, 6:16,
    6:18, 7:13, 31:25,
    65:24, 90:10,
    90:12, 117:25,
    160:23, 193:19,
    193:20, 194:15,

194:17, 194:19
yourself 34:22


< Z >
zero 23:6, 164:10,
  164:11, 177:12
zero. 165:7
ZOUAIRABANI 4:6,
  138:21, 138:22,
  139:4, 139:7