# EXHIBIT 1



| **Company** | | # Order Form |
| --- | --- | --- |
| Quality Systems, Inc. | | |

| Quote Number | 29178 |
| --- | --- |
| Valid Until | 2016-03-31 |
| Sales Person | Marvin Pascua |
| Quote Stage | Original |

Company
Quality Systems, Inc.
18111 Von Karman Ave
Suite 700
Irvine, CA 92612
Tel: (855) 289-6478
Tel: (714) 389-1210

## Mirth HIE SaaS Solution - Puerto Rico

**SAP # 40053944**

| Customer | Bill To | Ship To |
| --- | --- | --- |
| Puerto Rico Department of Health<br>Attn: Antonio Sisco<br>Departamento de Salud<br>PO Box 70184<br>San Juan, PR  00936<br>US | Puerto Rico Department of Health<br>Attn: Antonio Sisco<br>Departamento de Salud<br>PO Box 70184<br>San Juan, PR  00936<br>US | Puerto Rico Department of Health<br>Attn: Antonio Sisco<br>Calle Maga, Edificio E altos<br>Centro Medico<br>San Juan, PR  00926<br>US |

### SaaS

| Part Number | Product | Qty | Unit Price | Ext. Price |
| --- | --- | --- | --- | --- |
| 700-345-600020 | Mirth HIE SaaS Bundle | 40,000 | $0.25 | $10,000.00 |

Hosted software provided as a monthly service including 1 production environment, 1 test environment, and 1 on-demand disaster recovery environment. Includes base implementation, standard configuration, and train-the-trainer end user and admin training. External interfaces, custom configuration, and custom reports not included.

Service Term: 36 months commencing with the Fulfillment Date

Usage Metric: Lives (shown as Qty)

Monthly Fee Calculation: Variable PMPM (shown as Unit Price) =50/SQRT(Lives); Minimum PMPM =$0.015

Minimum Lives = 40,000



**Company**
Quality Systems, Inc.
18111 Von Karman Ave
Suite 700
Irvine, CA 92612
Tel: (855) 289-6478
Tel: (714) 389-1210

# Order Form

| Quote Number | 29178 |
| --- | --- |
| Valid Until | 2016-03-31 |
| Sales Person | Marvin Pascua |
| Quote Stage | Original |

## Service Level Agreement

| Part Number | Product | Qty | Unit Price | Ext. Price |
| --- | --- | --- | --- | --- |
| 700-345-600005 | Mirth Availability Service Level Credit | 1 | $0.00 | $0.00 |
| | Service Level: 99.9% Uptime each month | | | |
| | Service Level Credit: 1% of the Monthly Fee for each 0.1% (or fraction thereof) by which the actual Uptime is less than the committed Service level. | | | |
| 700-345-600050 | Mirth Support Service Level Credit | 1 | $0.00 | $0.00 |
| | Service Level: | | | |
| | PRIORITY - ticket response time, resolution status updates CRITICAL - 1 hour 24x7, hourly updates URGENT - 2 Business Hours, daily updates IMPORTANT - 1 Business Day, weekly updates; MINOR - 2 Business Days, weekly updates. | | | |
| | Service Level Credit: 1% of the Monthly Fee for each ticket failing to meet the committed Service level. | | | |
| 700-345-600015 | Mirth DR Service Level Credit | 1 | $0.00 | $0.00 |
| | Service Level: 8 hour Recovery Time Objective and 1 hour Recovery Point Objective | | | |
| | Service Level Credit: 100% of the Monthly Fee. | | | |
| 700-345-600045 | Mirth Performance Service Level Credit | 1 | $0.00 | $0.00 |
| | Service Level: 10 second average monthly Server Response Time (SRT) | | | |
| | Service Level Credit: 1% of the Monthly Fee for each second (or fraction thereof) by which the average SRT exceeds the committed Service level. | | | |

DocuSign Envelope ID: 360E8B65-809A-4D39-A658-8B23E0405AD6



**Company**
Quality Systems, Inc.
18111 Von Karman Ave
Suite 700
Irvine, CA 92612
Tel: (855) 289-6478
Tel: (714) 389-1210

# Order Form

| | |
|---|---|
| **Quote Number** | 29178 |
| **Valid Until** | 2016-03-31 |
| **Sales Person** | Marvin Pascua |
| **Quote Stage** | Original |

## Professional Services

| Part Number | Product | Qty | Unit Price | Ext. Price |
|---|---|---|---|---|
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #1 - ADT Interface to Mirth Results: Metro-Pavia Hospital System - Infomedika | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #2 - ADT Interface to Mirth Results: Menonita Health System - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #3 - ADT Interface to Mirth Results: Ashford Presbyterian Hospital - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #4 - ADT Interface to Mirth Results: San Lucas Episcopal System - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #5 - ADT Interface to Mirth Results: San Carlos Borromeo - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #6 - ADT Interface to Mirth Results: Hospital Buen Samaritano - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #7 - CCDA Interface to Mirth Results: Metro-Pavia Hospital System - Infomedika | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #8 - CCDA Interface to Mirth Results: Menonita Health System - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #9 - CCDA Interface to Mirth Results: Ashford Presbyterian Hospital - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #10 - CCDA Interface to Mirth Results: San Lucas Episcopal System - Meditech | | | |

DocuSign Envelope ID: 360E8B95-869A-4D39-A658-8B23E0105AD6



| Company |
|---|
| Quality Systems, Inc. |
| 18111 Von Karman Ave |
| Suite 700 |
| Irvine, CA 92612 |
| Tel: (855) 289-6478 |
| Tel: (714) 389-1210 |

# Order Form

| Quote Number | 29178 |
|---|---|
| Valid Until | 2016-03-31 |
| Sales Person | Marvin Pascua |
| Quote Stage | Original |

| | | | | |
|---|---|---|---|---|
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #11 - CCDA Interface to Mirth Results: San Carlos Borromeo - Meditech | | | |
| 600-820-600180 | Mirth Fixed Fee Deliverable | 1 | $7,000.00 | $7,000.00 |
| | Mirth professional Services Deliverable described in attached Statement of Work. | | | |
| | Deliverable: #12 - CCDA Interface to Mirth Results: Hospital Buen Samaritano - Meditech | | | |

| | |
|---|---|
| Subtotal: | $84,000.00 |
| Shipping: | $0.00 |
| Total: | $84,000.00 |

DocuSign Envelope ID: 360E8B65-889A-4D39-A658-8B23E0405AD6



**Company**
Quality Systems, Inc.
18111 Von Karman Ave
Suite 700
Irvine, CA 92612
Tel: (855) 289-6478
Tel: (714) 389-1210

# Order Form

| | |
|---|---|
| **Quote Number** | 29178 |
| **Valid Until** | 2016-03-31 |
| **Sales Person** | Marvin Pascua |
| **Quote Stage** | Original |

## Additional VPN (Hosting)

| Part Number | Product | Ext. Price |
|---|---|---|
| | Mirth H1000 Hosted - VPN<br>Annual price for 1 hosted IPSec virtual private network connection - $300<br>*as needed | |

| | |
|---|---|
| Subtotal: | $0.00 |
| Shipping: | $0.00 |
| Total: | $0.00 |



| Company | | **Order Form** | |
| --- | --- | --- | --- |
| Quality Systems, Inc. | | **Quote Number** | 29178 |
| 18111 Von Karman Ave | | **Valid Until** | 2016-03-31 |
| Suite 700 | | **Sales Person** | Marvin Pascua |
| Irvine, CA 92612 | | **Quote Stage** | Original |
| Tel: (855) 289-6478 | | | |
| Tel: (714) 389-1210 | | | |

## Payment Schedule

Mirth HIE SaaS Bundle will be billed monthly for the previous month's actual Monthly Fees calculated based on Lives.

Mirth Hourly Engineering will be billed monthly for the actual hours worked in the previous month. Unused hours will expire 18 months after the Effective Date and will not be invoiced.

Payment Terms for monthly invoices will be Net 30.

## Terms and Conditions

This Order Form(s) is subject to the following Schedules, as well as any Addenda and/or Attachments thereto, and collectively shall be referred to as the "Master Agreement":

-General Terms and Conditions (2015.03.11 – Version 1)
-Software as a Service Schedule (2015.03.11 – Version 2)
-Mirth Statement of Work ( v2015-11-17 PRHIN)
-Business Associate Agreement (v.12.2013)

By signing below Customer indicates its acceptance of the terms and conditions of the Master Agreement and that the Master Agreement is the complete and exclusive agreement between the parties. The Master Agreement: (i) contains the entire understanding between the parties with respect to the subject matter set forth herein, and neither party is relying on any representations or warranties other than those found in the Master Agreement, (ii) supersedes all prior and contemporaneous negotiations, agreements, contracts, commitments and understandings, both verbal and written, between the parties, and (iii) does not operate as an acceptance of any conflicting terms or conditions and shall prevail over any conflicting provisions of any purchase order, request for proposal, request for information or any other instrument. Customer understands that the headings used in the Master Agreement are solely for convenience of reference and are not intended to have any substantive significance in interpreting the Master Agreement. The Master Agreement shall not be binding upon either party unless authorized representatives of both parties sign it. Signed counterparts shall not be deemed binding.

**FOR CUSTOMER**

| | | | |
| --- | --- | --- | --- |
| Signature | *Antonio J. Sisto Oquerdo* | *Director* | March 23 2016 |
| | Printed Name | Title | Date |

**FOR COMPANY**

| | | | |
| --- | --- | --- | --- |
| DocuSigned by: | Jeff Peters | VP Operations | 3/23/2016 |
| B4611912CDB14C6... | | | |
| Signature | Printed Name | Title | Date |

## General Terms and Conditions

## 1. PAYMENT OF FEES

**1.1 Payment.** Customer must pay the fees according to the payment terms set forth in the applicable Schedule or Order Form. Customer understands that any payment terms offered by Company are an extension of credit by Company and may require that Customer provide credit information to Company. Should Company be unable to obtain through commercially reasonable means using reasonable commercial underwriting principles a favorable creditworthiness approval of Customer (as determined by Company in its sole discretion), Company may require alternate payment terms or, at its option, immediately terminate the Master Agreement (or any applicable Order Form) upon written notice to Customer. Any customer requirements as it relates to needed information on any Company invoice must be identified, in writing, within 10 days from the Effective Date. Any subsequent changes requested to be included within the invoice shall be sent to billingquestions@qsii.com and any agreed to change will only be effective for invoices prospectively issued. Any fees that are owed as of the date of termination or expiration of this Agreement will be immediately due and payable. Except as provided in an Order Form or Statement of Work, Implementation Services and Consulting Services are supplied on a time and materials basis (and not on a fixed fee basis) at the rates set forth in the Order Form. Hours and timelines presented in an Order Form or Statement of Work shall be estimates only. Payment is due as set forth in the Order Form. Company will invoice monthly for Service Hours, fees and out of pocket expenses actually incurred and/or rendered during the prior month. Implementation Services contracted and paid for, but not utilized by Customer, are non-refundable and expire 18 months after the Effective Date.

**1.2 Billing Disputes.** If Customer believes in good faith that Company has incorrectly billed Customer, Customer may withhold from payment the disputed amount, not to exceed the estimated fair value of the disputed item, provided Customer timely pays all undisputed portions of the invoice and contacts Company in writing (at billingquestions@qsii.com) prior to the date payment is due, which notice shall specify, in detail, the error. Unless Customer has properly notified Company of the dispute, Customer may be required to reimburse Company's reasonable collection costs. If Company does not agree with Customer's notice, the parties will resolve the dispute in accordance with Section 13.4.

**1.3 Failure to Pay.** If Customer fails to pay any undisputed amount due under this Agreement within 30 days of the date of Company's notice of Customer's failure to pay, Company may, in its sole discretion, (A) terminate this Agreement or the applicable Order Form, (B) suspend or restrict provision of the Products and Services, (C) discontinue any currently provided discount for the affected Products and Services, (D) discontinue any future right to purchase Products and Services, whether at a discount price or otherwise and/or (E) withdraw any previously granted, non-standard payment terms. (For items (C) (D) and (E), Company will provide an adjusted invoice that reflects the applicable list price and revise the associated payment schedule as applicable to reflect the new remaining balance and/or payment terms.) Unless otherwise agreed to by the parties in writing, Company's failure to invoice for any item set forth in the Order Form shall not relieve Customer's obligation to pay for the item. Company may charge interest at a monthly rate equal to the lesser of 1½% per month or the maximum rate permitted by applicable Law on any overdue, undisputed fees, from the due date until the date the overdue amount (plus applicable interest) is paid in full. However, Company will not exercise its rights under items (A) through (D) above or apply any interest charge if Customer is disputing the applicable charges reasonably and in good faith and is cooperating diligently to resolve the dispute.

**1.4 Taxes.** Prices do not include applicable taxes. Company will invoice Customer for any applicable taxes, and Customer must pay these taxes. Where applicable, Customer must provide any tax-exemption claim to Company before, or contemporaneously, when, placing an order.

## 2. CUSTOMER RESPONSIBILITIES

**2.1 General.** Customer will comply, and Customer will cause all Affiliated Organizations, End Users, Personnel and other persons to whom Customer provides any access to Products, Services or other Company Confidential Information to comply, with the provisions of this Agreement, and Customer shall be responsible for the non-compliance of any such Affiliated Organization, End User, Personnel or other person.

DocuSign Envelope ID: 360E8B95-889A-4D39-A658-8B23E0495AD6

## General Terms and Conditions

**2.2    Required Resources**.  Except as provided in the Agreement or as otherwise provided in a SaaS or Hosting Schedule and/or any other Schedule, Customer must provide, at its own expense, all Facilities & Equipment (including any Third Party licenses therein) and Personnel required for use of Products and Services, whether required under a Schedule or otherwise, for the proper conduct of Customer's business.  Customer must, also obtain any consents, authorizations and approvals necessary to enable Company to perform its obligations under this Agreement.

**2.3    Special Programs.**  Company has no responsibility to identify, evaluate or assist Customer in Customer's decision to participate in any Special Program. Customer is solely responsible for determining whether to participate in such opportunities. Customer will notify Company in writing before agreeing to participate in any Special Program that will require change to Products or Services or affect Company's performance under this Agreement. Company is not required to take or refrain from taking any action relating to or arising from such Special Program, except as otherwise set forth in an Order Form, Statement of Work, or Schedule.

**2.4    Professional Diagnosis and Treatment.**  Products and Services do not make clinical, medical or other professional decisions, and are not substitutes for Customer's Personnel applying professional judgment and analysis.  Customer is solely responsible for (A) verifying the accuracy of all information and reports produced by Products and Services; (B) obtaining necessary consents for use and disclosure of patient information; (C) determining data necessary for decision-making by Customer and its Personnel; and (D) making all diagnoses and treatments and determining compliance, and complying, with all Laws and licensing requirements for the operation of Customer's business.  Company is not responsible for: (A) ensuring that any Providers (i) have active professional licenses and any other credentials required for the provision of services by them, (ii) are not suspended from providing services and (B) performing reasonable credentialing activities to ensure that Providers are authorized and suitable for providing services pursuant to applicable Law or otherwise.

**2.5    Limitations on Use.** Except to the limited extent expressly permitted in this Agreement, Customer will not:

(A) record or capture in electronic form any Software or Services, including without limitation transmitting, transferring or disclosing, such content through any means including social media or other content sharing services;

(B) sell, transfer, lease, assign, or sublicense any Software or Services;

(C) use any Software or Services as a service bureau, for outsourcing, for sharing access to any Services with any Third Party (except for authorized End Users), or for otherwise offering or making available the functionality of the Products or Services to any Third Party;

(D) permit any End User or other person to access or use Products or Services using another End User's ID, login or password or otherwise make an End User's ID, login or password available to any Third Party;

(E) import, add, modify or delete data in any Software or Service database by any method other than direct data entry through the Software, Service or through a Company-developed Interface, unless such method is pre-approved in writing by Company; or

(F) use any Software or Service to process anything other than Customer's, an Affiliated Organization's, or an End User's data.

## 3.    CONFIDENTIALITY

**3.1.    No Use or Disclosure.**  Recipient will only use Confidential Information for the purposes of this Agreement and will not reproduce, disseminate, or disclose Confidential Information to any Third Party, except to its employees and authorized representatives (i.e., temporary employees, consultants, and contractors) who need to know the Confidential Information for the purposes of this Agreement and are bound by confidentiality obligations at least as restrictive as those in this Section 3.1.  Recipient will treat all Confidential Information with at least the same degree of care as it treats its own information of similar sensitivity, but never with less than reasonable care. Recipient shall notify Discloser of any breaches of security that result in or are likely to result in disclosure of Discloser's Confidential Information.

## General Terms and Conditions

      **3.2**    **Required Disclosure.**  Recipient may disclose Confidential Information:

    (A)  as approved in a writing signed by Discloser;

    (B)  as necessary to comply with any Law; or

    (C)  as necessary to establish the rights of either Party, but only if, in the case of Sections 3.2(B) or 3.2(C), Recipient: (1) promptly notifies Discloser with the particulars of the required disclosure; and (2) gives Discloser all assistance reasonably required by Discloser to enable Discloser to take available steps to prevent the disclosure or to ensure that disclosure occurs subject to an appropriate obligation of confidence.

      **3.3**    **Government Audits of Customer**.  If any government agency auditing Customer requires to audit Company as the result of its provision of Services to Customer, Company will cooperate to the extent required subject to its lawful actions to protect Company Confidential Information.  Customer may be required to reimburse Company on a time and materials basis at then-current hourly rates in connection with any such audit.

**4.**      **PRIVACY**

      **4.1**    **Personal Information.**  If Customer orders Services that require Customer to provide to Company personal health information that is protected under any Laws, the Parties will enter into a mutually agreed Business Associate Agreement or similar agreement if Customer itself is a Business Associate rather than a Covered Entity. Company will request, and Customer will provide Company with, only the minimum personal health information required to perform the Services hereunder.

      **4.2**    **De-Identified Data**. Company may De-Identify personal data before such data is incorporated into any Analytics Database. Customer grants Company a non-exclusive, worldwide, paid-in-full, perpetual and irrevocable right and license to:

    (A)  extract, copy, aggregate, process and create derivative works of De-Identified Data to derive Analytics Databases;

    (B)  employ data analytics on the Analytics Databases for purposes of developing Data Analytics solutions; and

    (C)  prepare derivative works of the Analytics Databases, and use, execute, reproduce, display, perform, transfer, distribute, and sublicense the Analytics Databases and such derivative works.

De-Identified Data will be aggregated with de-identified data from a sufficient number of other customers in a manner reasonably designed to prevent Company or others from using the Analytics Databases to analyze the particular characteristics of Customer's business. Company will not individually identify Customer as a source of the De-Identified Data for the Analytics Databases, although Company may disclose that certain of its customers allow the use of customer data for such purposes.

**5.**      **CONSULTING SERVICES, IMPLEMENTATION SERVICES AND ELEARNING.**

      **5.1**    **Consulting Services**.  Company will perform Consulting Services set forth in any Order Form in accordance with a mutually agreed to Statement of Work and, if applicable, additional terms within the Order Form.

      **5.2**    **Implementation Services**. Each Statement of Work will include an implementation project plan and target timeline that: (A) best utilizes the Implementation Services purchased and/or (B) identifies the date of achievement of mutually agreed to milestones.  Upon execution, Company will perform Implementation Services in accordance with the applicable Statement of Work and this Agreement.

      **5.3**    **eLearning Materials Subscription/Training Materials**.  For certain Company Software and/or Services, as part of certain required Company training thereon:

(A) a subscription for access by End Users to Company's "eLearning" online training materials (the "**eLearning Materials**") may be required to be purchased by Customer. Company provides eLearning Materials only for online access by End Users for the sole purpose of learning how to use Software and/or Services. Customer may not make any copies or download any of the eLearning Materials unless such materials expressly state otherwise. Except as may be set forth in the Order Form, each End User must have his or her own subscription and use his or her own ID and password to access eLearning Materials; and/or

(B) use of printed materials (as may be provided during onsite training sessions) and/or electronic materials (available for download for remote training sessions) may be required. Materials are licensed to Customer for their own use and may need to be purchased by Customer. Customer may not make any copies of these materials unless such materials expressly state otherwise.

Except under SaaS offerings: the Order Form sets forth the subscription fees for eLearning Materials and/or Training Materials. Such fees are due in advance for each Service Term. The initial Service Term is 1 year commencing upon the Effective Date. Subscriptions automatically renew for successive 1 year terms at then-current rates unless a Party provides written notice of its intent not to renew at least 60 days before the end of the then-current Service Term.

## 6    SOFTWARE MAINTENANCE SERVICES.

**6.1    Support Issues**.  Company offers Software Maintenance Services to help End Users maintain the Software it accesses and uses under the Agreement. Customer is not required to purchase or maintain Software Maintenance, but Customer will only receive Software Maintenance Services while Customer has a current subscription for Software Maintenance. Company's response times and the actions it takes to resolve Software Maintenance issues is based on an assessment of the impact of the reported technical issue on Customer's business. The more serious the business impact, the higher the assigned priority.  Company's support consultant may raise or lower priority in its reasonable discretion based on Customer's information and/or subsequent diagnosis or remediation efforts, including the availability of a work-around pending final resolution. A workaround may include requiring Customer to operate on the most current version of the applicable Company Software (including any Updates thereto) if doing so will resolve the incident. Company's Help Desk will follow the following response timeframe objectives that are based on ticket priority:

| Targeted response times# | Hours of Availability |
|---|---|
| Priority 1: One hour | 24x7 support, 365 days a year |
| Priority 2: Two Business Hours | 8:30am-8:30pm Eastern each Business Day* |
| Priority 3: One Business Day | 8:30am-8:30pm Eastern each Business Day* |
| Priority 4: Two Business Days | 8:30am-8:30pm Eastern each Business Day* |

**6.2    Ticket Priority.**  Customer is required to provide, through their Certified Professional(s), End User Support, including but not limited to (A) receiving and logging initial contacts by End Users, (B) reviewing and isolating likely root causes for support cases and ruling out obvious causes such as user error or failure in items not supplied by Company before escalating a Problem, and (C) using reasonable efforts to resolve problems prior to contacting the Help Desk Support, including accessing and reviewing web-based support tools and databases such as Company's Q&A Knowledge Exchange.  Company's support consultants will provide support to Customer's Certified Professional(s) to provide technical assistance in remedying failures of Company Software and/or Services, which are being used in a production environment, to perform in accordance with their respective User Materials. Each specific and discrete problem, question or issue with Company Software or Service reported by Customer's Certified Professional to Company's Help Desk Support shall be issued a ticket, which will include a record of the support incident, a unique tracking number and the identity of the initial Company personnel assigned to the matter.  In addition, each ticket will be assigned one of following priority levels.

DocuSign Envelope ID: 360E8B65-889A-4D39-A658-8B23F0405AD6

Case:17-03283-LTS Doc#:7449-1 Filed:06/14/19 Entered:06/14/19 17:27:46 Desc:
Exhibit 1 Page 12 of 45
General Terms and Conditions

CRITICAL **(Priority 1):** the problem results in extremely serious interruptions to a production system. It has affected, or could affect, the entire user community. Tasks that should be executed immediately cannot be executed because of a complete crash of the system or interruptions in core functions of the production system. Data integrity is compromised and the service request requires immediate processing as the issue can result in financial losses. Customer shall call Company's Help Desk Support for all critical priority 1 issues.

URGENT **(Priority 2):** the problem results in serious interruptions to normal operations, will negatively impact an enterprise-wide installation, or urgent deadlines are at risk. In a production system, important tasks cannot be performed, but the error does not impair essential operations. Processing can still continue in a restricted manner, and data integrity may be at risk. In a pre-production environment, the problem hinders deployment of an enterprise installation. The service request requires timely processing, because the malfunction could cause serious interruptions to critical processes or negatively impact business.

IMPORTANT **(Priority 3)**: the problem causes interruptions in normal operations. It does not prevent operation of a production system, or there could be minor degradation in performance. The error is attributed to malfunctioning or incorrect behavior of the software.

MINOR **(Priority 4)**: the problem results in minimal or no interruptions to normal operations (no business impact). The issue consists of "how to" questions including issues related to APIs and integration, installation and configuration inquiries, enhancement requests, or documentation questions.

**6.3    Exclusions.**    Software Maintenance Services do not include support for:  (A) issues that cannot be reproduced by Company, (B) issues caused by a modification of Software by any party other than Company or by a third party that has received Company certification for the provision of Software maintenance support, (C) issues that arise because of any cause external to Company Software, such as a force majeure event, Third Party Materials or services except as provided in the License Purchase-Maintenance Schedule, or (D) changes in, or additions to, hardware, other software, configurations, data, or any other items other than the Software.

**6.4    Customer Responsibility.**    For each ticket opened, Customer is responsible for: (i) collecting error messages, logs and other information required by Company to work a ticket; (ii) determining procedure, data, and conditions necessary to reproduce a problem; (iii) determining if the issue has been documented and fixed in a newer version of the Company Software; (iv) apply Updates if Customer is self-hosted and the issue has been addressed in a more recent version of the Software; (v) unless installation of Updates is specifically included in the Company Services purchased by Customer, Customer is solely responsible for proper installation of all Updates, including any changes to operating systems, database software and other Third Party Materials required in connection with the Update; (vi) before installing any Update in Production, Customer must test the Update in a non-Production environment; and, if self-hosted, perform a backup of Customer's Production configurations and data before applying any Update.

**6.5    Sunset – Version Control Policy.**    Company may not make Updates available for all versions of Company Software and each Update will function with the most recent generally commercially released version of the applicable Company Software.  Company may choose to sunset Software product, feature, functionality or compatibility and cease to provide Updates to that product.  For older versions of Company's Software, Company will, through its Software Maintenance Services, assist with issues relating to the use and configuration of older versions of Company Software, including providing possible workarounds. However, Company is under no obligation to provide Updates to such older versions and Customer's sole remedy for an issue associated with an older version may be to upgrade to a newer version of the Company Software. Sunset versions of older versions may no longer be eligible for any form of support.

## General Terms and Conditions

7.    **TERM AND TERMINATION**

    **7.1    Term.**  This Agreement applies to each Product and Service from the Effective Date until the expiration of the applicable License Term or the applicable Service Term, unless terminated earlier under this Agreement.

    **7.2    Termination with Cause**.

      **(A) Material Breach by Either Party.** If either Party commits a material breach of this Agreement, the non-breaching Party may give written notice describing, in reasonable detail, the nature and basis of the breach to the breaching Party.  Except as otherwise allowed under this Agreement, if the breach is not cured within 30 days of the notice date, the non-breaching Party may immediately terminate this Agreement, in whole or in part.

      **(B) Bankruptcy.** Each Party may terminate this Agreement immediately upon written notice if the other Party ceases to conduct its business, makes a general assignment for the benefit of its creditors, admits publicly its inability to meet its obligations as they come due, voluntarily files for bankruptcy or insolvency, or is the subject of a filing by a Third Party for bankruptcy, insolvency, receivership or similar protection that is not dismissed within 45 days.

    **7.3.    Survival.**  The termination or expiration of this Agreement will not affect any provisions of this Agreement which by their nature survive termination or expiration, including the provisions that deal with the following subject matters: Customer Responsibilities, Confidentiality, Privacy, Term and Termination, Proprietary Rights, Warranty Disclaimers, Limitation of Liability and General Provisions.

8.    **PROPRIETARY RIGHTS**

    **8.1    Ownership.**  Company and its licensors own the Company Technology.  To the extent Software and Content are obtained by Customer, the Software and Content are always licensed, not sold.  Unless specifically stated, in writing, by Company to the contrary, Customer has no right to use Company's or any Third Party's name, trademarks or logo, or any goodwill now or hereafter associated therewith, all of which is the sole property of and will inure exclusively to the benefit of Company or such Third Party.

    **8.2    No Modifications**.  Unless specifically stated, in writing, by Company to the contrary, Customer agrees not to modify, create derivative works of, adapt, translate, reverse engineer, decompile, disassemble, or otherwise attempt to discover the source code in any Company Technology. Breach of this Section 8.2 will be deemed a material breach of the Agreement and entitle Company to immediately terminate the Agreement.

    **8.3    Feedback.** Company or any of its employees do not accept or consider unsolicited ideas, including ideas for new advertising campaigns, new promotions, new or improved products or technologies, product enhancements, processes, materials, marketing plans or new product names. The sole purpose of this section is to avoid potential misunderstandings or disputes when Company's products and/or marketing strategies might seem similar to ideas submitted to Company.   If despite Company's request that Customer not send Company its ideas, Customer still submits them, then regardless of what is stated when Customer makes such a submission, the following terms shall apply to Customer's submissions:  A) Customer agrees that: (1) its submissions and their contents will automatically become the property of Company, without any compensation to Customer; (2) Company may use or redistribute the submissions and their contents for any purpose and in any way; (3) there is no obligation for Company to review the submission; and (4) there is no obligation to keep any submission confidential.   Should Company seek out Customer's, and/or any of its Personnel's, feedback and/or Customer elects to submit feedback on Company's existing products and/or marketing strategies, then do not include any ideas that Company policy will not permit it to accept or consider.  Any feedback Customer provides shall be deemed to be non-confidential. Company shall be free to use such information on an unrestricted basis and Customer will not assert, and Customer will not authorize, assist, or encourage any Third Party to assert, against Company or its customers, vendors, business partners, or licensors, any intellectual property infringement claim based upon any Products or Services provided hereunder, or any related feedback.

8.4 **License To Deliverables.** Without limiting or modifying any license granted to Customer for the Company Software, Company grants Customer a non-exclusive, non-sublicensable and non-transferable license to use the Deliverables solely for Customer's direct beneficial business purposes and solely with the applicable Products and Services unless specifically limited or modified, in writing, by Company in the applicable Statement of Work.   Company retains all rights, title and interest (including intellectual property rights) in and to the Deliverables, unless such Deliverable are "Proprietary to Customer".   Except for any Deliverable that is "Proprietary to Customer", to the extent that Customer participates in the creation or modification of any Company Technology or Deliverables, Customer waives and assigns to Company all rights, title and interest (including intellectual property rights) in the Company Technology or Deliverables.

## 9.   LIMITED WARRANTIES

9.1 **General.**  Each Party represents and warrants that:

(A) it is duly organized and in good standing under the Laws of the state of its organization;

(B) it has full authority to execute and perform under this Agreement, and such performance is not prohibited by any agreement to which the Party is bound or any applicable Law; and

(C) it will comply with all Laws applicable to its business and operations.

9.2 **Compliance.**  Customer represents and warrants that to the best of its knowledge:

(A) it, its affiliates and its Personnel are not under or subject to a "Corporate Integrity Agreement" or any other restriction or investigation by any payer, government agency or industry self-regulating organization;

(B) neither it nor any of its affiliates, directors or Personnel are (a) listed on the General Services Administration's Excluded Parties List System or (b) suspended or excluded from participation in any Government Payer Programs; and

(C) there are no pending or threatened governmental investigations against Customer or any of its affiliates, directors or Personnel that may lead to suspension or exclusion from Government Payer Programs or may be cause for listing on the General Services Administration's Excluded Parties List System.

Breach of this Section 9.2 will be a material breach of the Agreement and entitle Company to immediately terminate the Agreement.

9.3 **Services**.  Company warrants for 90 days from performance of the Implementation Services and/or Consulting Services, as applicable, that each such Service is performed in a professional and workmanlike manner. Customer must notify Company during such 90 day period, in writing, and in reasonable detail of any breach of this warranty. To the extent permitted by law, Customer's sole and exclusive remedy and Company's sole liability under or in connection with this warranty will be re-performance of the relevant Service.

9.4 **Deliverables.**  Company warrants for 90 days from delivery that each Deliverable, in the form provided by Company and when used in accordance with the User Materials (if any) and Statement of Work, will perform substantially in accordance with the specifications and criteria set forth in the applicable Statement of Work. Customer must notify Company during such 90 day period, in writing, and in reasonable detail of any breach of this warranty. To the extent permitted by law, Customer's sole and exclusive remedy and Company's sole liability under or in connection with this warranty will be, at Company's option, to (A) correct the Deliverable or provide a reasonable workaround or (B) if after reasonable efforts the Company cannot provide a correction or workaround, then Company will refund the fees paid by Customer specifically for the non-conforming Deliverable. This warranty does not cover any failure that (A) cannot be reproduced by Company, (B) arises from a use of the Deliverable not set forth in the Statement of Work, (C) arises from any modification to the Deliverable except by Company, and/or (D) is caused by any aspect of the System not provided by Company.  This warranty does not apply to any Third Party Materials included in or with a Deliverable.

## General Terms and Conditions

### 10. WARRANTY DISCLAIMERS

**10.1    Content; Third Party Materials**. Company does not make, and hereby expressly disclaims, any warranties in connection with Content and Third Party Materials. All Content and Third Party Materials are provided "As-Is" without any warranty or indemnification from Company whatsoever.

**10.2    Limited General Release Testing.**  From time to time Customer may be offered the opportunity to participate in the LGR testing of Software or Services.  All LGR versions of Software or Services are provided on an "As-Is" basis. Customer's use of any LGR versions of Software or Services is at Customer's own risk and expense, and without any change in the provisions of, or fees set forth in, this Agreement.

**10.3    Implied Warranties.**  To the maximum extent permitted by Law and except for the express warranties in this Agreement, Company and its licensors provide the Products and Services on an "As-Is" and "As Available" basis.  Company and Third Party suppliers disclaim and make no other representations, warranties and conditions of any kind, express, implied or statutory, including representations, guarantees, conditions or warranties of merchantability, title, non-infringement, fitness for a particular purpose, accuracy, or implied by the provisions of any Laws that by their terms can be disclaimed (such as the Uniform Commercial Code or the Uniform Computer Information Transactions Act).  If such provisions cannot be excluded and disclaimed, then the provisions of this Agreement will control to the maximum extent permitted.  Without any limitation, neither Company nor its licensors (A) warrant that any Content, Product or Services will be complete, accurate, uninterrupted, free of Viruses, error free, or that any error can be corrected, or (B) guarantees or agrees to ensure that any Products or Services comply with applicable Laws.

### 11.    LIMITATION OF LIABILITY

(A)  Except for Excluded Claims, in no event is each Party (or Company licensors) liable for any of the following arising out of or concerning this Agreement, however caused:  consequential, special, moral, incidental, indirect, reliance, punitive or exemplary damages; loss of goodwill, profits, use, opportunities, revenue or savings; business interruption; or loss or corruption of data.

(B)  Except as set forth in this Agreement, in no event are Company's licensors liable to Customer under this Agreement on any basis whatsoever.

(C)  Except for Excluded Claims, each Party's maximum aggregate liability for each and all Claims (individually and together) under or relating to this Agreement or its subject matter is limited to an amount equal to the aggregate of the fees paid or owed by Customer under this Agreement.

(D)  The limitations in this section apply regardless of the form or source of Claim or Loss, whether or not they may cause this Agreement or any remedy available to a Party to fail of its essential purpose, whether the Claim or Loss was foreseeable, and whether the applicable Party has been advised of the possibility of the Claim or Loss.

### 12.    INDEMNIFICATION

**12.1    Duty to Indemnify.** Company will defend any Third Party Claim against Customer during the License Term for any Infringement Claim.  Company will pay Customer the Losses (including reasonable legal fees) that are directly attributable to an Infringement Claim and are either finally awarded by a court of competent jurisdiction against Customer or agreed to in a written settlement agreement signed by Company.

**12.2    Company's Options**.  In the defense or settlement of any Infringement Claim, Company may, at its sole option and expense:

(A)  procure for Customer a license to continue using the Indemnified Technology under the terms of this Agreement;

(B)  replace or modify the allegedly infringing Indemnified Technology to avoid the infringement; or

(C)  terminate this Agreement with respect to the infringing part of the Indemnified Technology if neither of the foregoing is commercially reasonable and refund a pro rata portion of the applicable

fees (based on the applicable License Term or in the case of a perpetual license, a useful life equal to five (5) years) paid by Customer for the infringing technology.

**12.3    Exclusions.**  Company will have no liability for any Infringement Claim that arises from:

(A) use of the Indemnified Technology in violation of this Agreement;
(B) modification of the Indemnified Technology by anyone other than Company or a party authorized in writing by Company to modify the Indemnified Technology;
(C) failure by Customer to install the latest updated version of the Indemnified Technology as requested by Company to avoid infringement;
(D) installation or use of Indemnified Technology contrary to the specifications and directions contained in the User Materials or other reasonable instructions of Company;
(D) Third Party products, services, hardware, software, or other materials, or combination of these with Indemnified Technology if the Indemnified Technology would not be infringing without this combination.

**12.4    Conditions to Indemnification.**  Company will have no liability for any Infringement Claim if Customer fails to:

(A) notify Company in writing of the Infringement Claim promptly upon the earlier of learning of or receiving a notice of the infringement claim, to the extent that Company is prejudiced by this failure;
(B) provide Company with reasonable assistance requested by Company for the defense or settlement (as applicable) of the Infringement Claim;
(C) provide Company with the exclusive right to control and the authority to settle the Infringement Claim (Customer may participate in the matter at its own expense); or
(D) refrain from making admissions about the Infringement Claim without Company's prior written consent.

**12.5    Sole and Exclusive Remedy.** The remedies in this Section 12 are Customer's sole and exclusive remedies and Company's sole liability regarding the subject matter giving rise to any Claim that the Products and Services infringe or misappropriate any Third Party's intellectual property rights.

**13.    GENERAL PROVISIONS**

**13.1    Equitable Relief.**  Actual or threatened breach of certain sections of this Agreement (including, without limitation, provisions on intellectual property, license, privacy, data protection and confidentiality) may cause immediate, irreparable harm that is difficult to calculate and cannot be remedied by the payment of damages alone. Either Party will be entitled to seek preliminary and permanent injunctive relief and other equitable relief for any such breach.

**13.2    Notices.**  Any notice given under this Agreement must be in writing and, other than service of process, may be delivered by email (A) if to Company, to both billingquestions@qsii.com and legal@qsii.com and (B) if to Customer, to the email address set forth on the Order Form.  Notices delivered personally or via overnight mail will be effective upon delivery, and notices delivered by U.S. mail will be deemed effective five (5) Business Days after being deposited in an official U.S. Postal Service mailbox.  A notice is deemed to be received by email the first Business Day after sending by email, unless the sender receives an automated message that the email has not been delivered, provided email shall not be sufficient for notices of termination, default or an indemnifiable claim.)

**13.3    Viruses and Other Malware.**  Each Party will use and maintain updated commercial Virus scanning software and/or use reasonable efforts to ensure that its electronic communications (and, as it relates to Company, the Company Software) do not contain any Virus.

**13.4    Dispute Resolution and Arbitration.**   Any dispute, claim, or controversy arising out of or

# General Terms and Conditions

relating to this Agreement, including the determination of the scope or applicability of this clause, will be determined exclusively in Orange County, California by binding arbitration before a single arbitrator mutually agreed to by the parties.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. There shall be no right to arbitrate on a class action basis or on behalf of the general public or other group of persons similarly situated.  Each party will be responsible for its own attorneys' fees and shall split the costs of arbitration.  The arbitrator shall have authority to apportion costs (other than attorneys' fees) at the end of any such proceeding.  Judgment on any award may be entered in any court having jurisdiction.  Nothing in this clause shall preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

**13.5    Waiver; Modification.**  Neither Party's waiver of the breach of any provision constitutes a waiver of that provision in any other instance.  This Agreement may not be modified nor any rights under it waived, in whole or in part, except in writing signed by the Parties.

**13.6    Relationship of Parties.**  Company is an independent contractor, and nothing in this Agreement is intended to constitute an employment, partnership, joint venture, fiduciary, trust or agency relationship between the Parties, or authorize Customer or Company to enter into any commitment or agreement with any Third Party that is binding on the other Party; provided that a Services Schedule may appoint Company to serve as Customer's limited agent to perform the Services set forth therein.  Subject to the other terms of this Agreement, each Party solely determines which of its Personnel will perform its obligations.

**13.7    Assignment; Binding Effect; Subcontractors.**  This Agreement is personal to Customer, and Customer may not assign this Agreement or any of Customer's rights or duties hereunder without the advance written consent of Company, which shall not be unreasonably withheld. Company may assign this Agreement or its rights and/or duties to its affiliates or to its successor in the event of a sale of all or substantially all of its assets, voting securities, or the assets or business related to the Products or Services provided under this Agreement.  Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties' respective legal representatives, and permitted transferees, successors, and assigns.  Company may subcontract the performance of its obligations to Third Parties as it determines appropriate.

**13.8    Force Majeure.**  A Party's failure to perform its obligations under this Agreement, other than the payment of money, is excused to the extent that the failure is caused by an event outside its reasonable control, including an act of God, act or threat of terrorism, shortage of materials, strike or labor action, war or threat of military or significant police action, natural disaster, failure of Third Party suppliers, denial of service attacks and other malicious conduct, utility failures, power outages, governmental acts, orders, or restrictions, or other cause beyond its reasonable control.

**13.9    Severability.**  If any term of this Agreement is held invalid or unenforceable for any reason, the remainder of the term and this Agreement will continue in full force and effect.

**13.10    Customer Cooperation.**  Company may publicly identify Customer as Company's customer.

**13.11.    Covenant not to Solicit or Hire.**  Each Party recognizes the expense and time associated with recruiting, hiring, training and maintaining employees.  Each Party agrees that, except as consented to by the other Party in advance in writing, it will not during the term of this Agreement or a period of 2 years after any termination of this Agreement, directly or indirectly, solicit to reduce their relationship with the other Party, or hire for it or on behalf of any Third Party any of the other Party's employees who are then engaged by the other Party as an employee or who within the prior 12 months was an employee of the other Party.  This section does not prohibit general advertising and solicitations by a Party, but does not permit the hiring of the other Party's employees who respond to such advertising or solicitations.  For any violation of this section by a Party or its Personnel, such Party will pay to the other Party liquidated damages in the amount of the annual salary of the solicited employee, plus any costs to recruit a replacement for such employee.  Each agrees that the damages to be incurred by the other Party for a violation of this section are difficult to estimate, and that the liquidated damages set forth in this section are reasonable estimates of those damages, and agrees that such damages are enforceable and will be paid upon any such violation.

**13.12.   Third Party Beneficiaries.**  Customer agrees to comply with all Third Party vendor terms and conditions accompanying Third Party Materials.  Customer acknowledges and agrees that Company's licensors are third party beneficiaries of this Agreement, with the right to enforce the obligations in this Agreement directly against Customer.  Except as set forth above or in any Schedule, the Parties agree and acknowledge that this Agreement is not made for the benefit of any Third Party and nothing in this Agreement, whether expressed or implied, is intended to confer upon any Third Party any rights or remedies under or by reason of this Agreement, nor is anything in this Agreement intended to relieve or discharge the liability of either Party hereto, nor shall any provision hereof give any entity any right of subrogation against or action over or against either Party.

**13.13   U.S. Government Licensing.**  For US Government end users: Customer acknowledges that Products and Services are "Commercial Item(s)," as that term is defined at 48 C.F.R. section 2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation," as the terms are used in 48 C.F.R. section 12.212 or 48 C.F.R. section 227.7202, as applicable. Customer agrees, consistent with 48 C.F.R. section 12.212 or 48 C.F.R. sections 227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (A) only as Commercial Items; and (B) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished rights reserved under the copyright laws of the United States.

**13.14   Export Rules.**  Customer acknowledges that the Products and Services may be subject to the U.S. Export Administration Regulations and other export laws and regulations, and Customer will comply with them.

**13.15   License Compliance.**  During each License Term and for 3 years thereafter, Customer and its Affiliated Organizations shall keep complete and accurate books and records relating to use of Products and Services and any fees payable under this Agreement.  Company may, at its expense and no more than once every quarter, appoint its own Personnel or an independent third party (or both) to inspect such records and access related computers and systems to verify that use, installation, and deployment of the Products and Services by Customer and its Affiliated Organizations comply with the terms of this Agreement. Any verification may include an onsite audit conducted at Customer's or its Affiliated Organizations' relevant places of business upon 15 days prior notice, during regular Business Hours, and will not unreasonably interfere with Customer's business activities.  If a verification shows that Customer, its Affiliated Organizations, End Users or Third Party contractors of Customer or its Affiliated Organizations are deploying, installing or using the Products and Services (A) beyond the quantity that was legitimately licensed; or (B) in any way not permitted under this Agreement, so that additional fees apply, Customer must pay the additional license fees and any applicable related maintenance and support fees based on Company's then-current list price, within 30 days of invoice date.

14.   **DEFINITIONS.**  Capitalized terms shall have the meaning set forth in the Order Form or as defined below.

1.   **"Account Limit"** means the Metric based onthe maximum number of: (A) authorized End Users allowed under a Company Software agreement or (B) configured accounts allowed under a Company Software agreement excluding accounts created or required by the Company for purposes of Software maintenance and support..

2.   **"Affiliated Organization"** means a company, practice, group and/or other legal entity (including those having separate tax identification numbers) located within the United States that is controlled by or otherwise affiliated with Customer.  Each Affiliated Organization must enter into a binding agreement with Customer obligating it and its End Users to comply with this Agreement prior to access to or use of any Products or Services.

3.   **"Analytics Database"** means a data collection derived from De-Identified Data.

4.   **"Business Day/Business Hour"** means time during which Company is actively staffed and most Company resources (including its Maintenance Services staff) are available, but excludes nights, weekends and holidays observed by Company.

5.   **"Certified Professional"** means any Customer Personnel who:  (A) is actively involved in the day-to-day operation and support of the Products and Services within Customer's organization, (B) has

suitable education and experience to understand the Products and Services, (C) has passed the applicable Company certification tests, and (D) if a contractor and not an employee of Customer, Company must pre-approve in writing such contractor or such contractor is certified by Company as a Third Party Certified Professional.

6. "**Claim**" means a claim, action, proceeding, or demand made against a person or entity, however arising and whether present or future, fixed or unascertained, actual, threatened or contingent.

7. "**Company Appliance**" means a platform required to run certain Company Software.

8. "**Company Hardware**" means equipment and other hardware distributed under Company's brand that is purchased or leased by Customer from Company and identified as Company Hardware in an Order Form. Hardware that is not identified as Company Hardware in the Order Form is Third Party Hardware.

9. "**Company Software**" means software in object code form licensed under an Order Form or as may be made available for access and/or use under a SaaS offering and identified as Company Software, including any Interfaces, templates, and any and all updates, modifications, improvements, extensions, and derivative works made thereto by or for Company, Customer, or any Third Party. "Company Software" specifically excludes Content.

10. "**Company Technology**" means the Products, Services and User Materials, including all Interfaces, templates, forms, software tools, algorithms, software (in source code and object code forms), user interface designs, architecture, toolkits, plug-ins, objects, documentation, network designs, ideas, processes, know-how, methodologies, formulas, systems, data, heuristics, designs, inventions, techniques, trade secrets, and any related intellectual property rights throughout the world included therein, as well as any derivatives, modifications, improvements, enhancements, or extensions of the above, whenever developed.

11. "**Confidential Information**" means a Discloser's non-public information (including copies, summaries, and extracts): (A) that is identified in writing as confidential at the time of disclosure, whether in printed, textual, graphic, or electronic form; or (B) that is disclosed in non-tangible form, identified as confidential at the time of disclosure, summarized in a writing labeled as "confidential", and delivered to Recipient within 15 days after disclosure. Confidential Information of Company includes the terms of this Agreement, Company Technology, customer lists, and employee lists whether or not marked or identified as confidential. The Party disclosing Confidential Information is referred to as "**Discloser**" and the Party receiving Confidential Information is referred to as "**Recipient**". Confidential Information does not include information that:

    11.1. is or becomes generally publicly available at or after the time of disclosure through no fault of either Recipient;

    11.2. was known to Recipient free of any confidentiality obligations, before its disclosure by Discloser;

    11.3. becomes known to Recipient free of any confidentiality obligations from a source other than Discloser; or

    11.4. is independently developed by either Recipient without use of Confidential Information.

12. "**Consulting Services**" means services provided or to be provided by Company under one or more Order Forms to create reports and forms, customize certain aspects of Customer's system and provide other technical and provisional services, as more specifically set forth in Section 5 above.

13. "**Content**" means any clinical content, in any form, included within Company Software and/or Services, including but not limited to Company's KBM.

14. "**De-Identify**" or "**De-Identified**" means to de-identify personal data in accordance with the "safe harbor" requirements of section 164.514(b)(2) of the HIPPA regulations, or in a manner that otherwise meets the requirements of section 164.514.

15. "**De-Identified Data**" means personal data that has been De-Identified.

16. "**Deliverable(s)**" means any document, information, functionality, data, content, channel, module, plug-in, connector, extension or other tangible or electronic item of any nature delivered by Company to Customer as result of the performance of Services. Company Software is not a Deliverable.

17. "**Effective Date**" means the date last signed on the applicable Order Form by the authorized representatives of both parties.

18. "**End User(s)**" means each individual Provider, administrative staff, technical staff, operator, care manager, case manager or other Personnel of Customer or an Affiliated Organization who: (A) is based

in the United States and (B) is authorized by Customer or an Affiliated Organization to use any portion of the Products or Services or (C) is an authorized member of a community using the Software for purposes of health information exchange or care coordination.  Unless specifically stated otherwise in the applicable User Material, each End User will be assigned a unique ID and password.

19. **"Excluded Claims"** means Claims arising from Customer's breach of Sections 2, 3, 8 or 9.2.

20. **"Excused Unavailability"** means an occurrence when Company SaaS or Hosting Services are not available to the End User due to one or more of the following conditions:  (A) overall Internet congestion, slowdown, or unavailability; (B) unavailability of generic Internet services (e.g. DNS servers) due to virus or hacker attacks; (C) force majeure events as described in the Master Agreement; (D) actions or inactions of Customer (unless undertaken at the express direction of Company) or third parties beyond the control of Company; (E) a result of Customer equipment or third-party computer hardware, software, or network infrastructure not within the sole control of Company and/or (F) scheduled infrastructure maintenance. Updates and patches that occur during the year may require downtime in additional to Scheduled Maintenance and collectively these items shall also be considered Excused Unavailability.

21. **"Facilities & Equipment"** means a data center with all infrastructures, security controls, connectivity, systems, including back-up and recovery capabilities to avoid loss of data in the event of any failure, as well as all computers, background technology and equipment (including appropriate chipsets, processing speeds, RAM, storage, operating systems, connectivity, services, data, subscriptions, software, configurations other components necessary to operate the Products and/or Services.

22. **"Government Payer Programs"** means, collectively, any federal health care or insurance program or any form of state Medicaid or other health care or insurance program.

23. **"Group of Charts"** means the aggregation of all patient charts within a practice or within separate disciplines within a practice.

24. **"Hardware"** means Company Hardware and Third Party Hardware.

25. **"Help Desk Support"** means the support services provided by Company help desk under its then current Software Maintenance Program.

26. **"Implementation Services"** means services provided or to be provided by Company under one or more Order Forms to configure, install and implement Software and Hardware for Customer's use as more specifically set forth in section 5 above.

27. "**Indemnified Technology**" means Company Software and Services paid for by Customer, but excludes any Third Party Software, Content, Hardware, sample code, SDK, open source, trial or LGR versions of the Company Software and/or Services.

28. **"Infringement Claim"** means any Claim that alleges that the Indemnified Technology directly infringes a Third Party's United States patent, copyright, or trademark.

29. **"Instances"** means a single installation of Company Software running on a Company Appliance or such other physical or virtual server Customer may provide.

30. **"Interface"** means the part of any Company Software designed to exchange data between or among Company Software components and other software or between Company Software and Hardware.

31. **"Knowledge Based Module"** or **"KBM"** mean the Company provided databases and similar or related content for patient diagnosis and treatment for use with Company's Software and/or Services.

32. **"Law"** means those applicable federal and state statutes, regulations, codes, ordinances, agency directives, binding court orders and other binding government requirements.

33. **"License Term"** means the period set forth in an Order Form for which Customer has purchased the applicable Software license.

34. **"Lives"** means the net number of individuals whose data is stored in the database of Company Software, regardless of data source, as measured by the master patient index.

35. **"LGR"** or **"Limited General Release"** means versions of the Software and/or Services made available by Company on a limited general release basis.

36. "**Loss**" means any damage, loss, cost, expense, or liability incurred by a person or entity.

37. **"Metric"** means each standard specified by Company in the Order Form that describes either: (i) the scope of Customer's rights to use the Software and/or Services, as applicable or (ii) the measure by which Customer's use of the applicable SaaS offering will be calculated and charged as reported to Customer in periodic reports.

38. "**Non-Production Instance**" means an additional installation of Company Software used to directly support one or more Production Instances. – Including but not limited to system used to test or stage software configurations or interfaces prior to deployment in a Production Instance, development environment or passive standby or failover system or a demo/training system.

39. **"Order Form"** means each sales order form that is executed between Customer and Company for Customer's procurement of Products and Services.

40. "**Party**" means Company or Customer, as applicable.

41. **"Personnel"** means, with respect to each Party, such Party's officers, employees and contractors.

42. **"Plug-in Software"** means certain, if any, locally installed software necessary for SaaS End Users to access and use the SaaS environment. "Plug-in Software" is Company Software.

43. **"Population Limit"** means the Metric based on the maximum number of Lives allowed under the Company Software.

44. **"Practice License"** means each distinct and separate server license required for the ambulatory Software  for: (1) each tax identification number associated with Customer and its Affiliated Organizations and/or (2) each separate Group of Charts kept by Customer and its Affiliated Organizations within the Software.

45. **"Products**" means one or more of the following procured by Customer as set out in an Order Form: Company Software, Third Party Software, Content, Company Hardware, and Third Party Hardware.

46. **"Production Instance"** means is an Instance that is used to serve the primary purpose for which Customer has purchased a license to use Company Software - including but not limited to, primary system housing or handling live production data, secondary system used for reporting purposes, additional active system used to distribute or segregate load.

47. **"Proprietary to Customer"** means Deliverables that are specifically identified as proprietary to or owned by Customer in a fully executed Statement of Work including: (1) Deliverables that are unique to Customer's application or data environment and/or specifically designed to function for Customer's own data solely; and/or (2) Deliverables that were developed using Customer's proprietary and Confidential Information.

48. **"Provider"** means any licensed provider of healthcare services, including physicians, osteopathic physicians, dentists, optometrists, physical therapists, nurse practitioners, physician assistants and all other licensed providers.

49. **"Recovery Point Objective"** means for certain Company provided Hosting and/or SaaS offering the maximum age of production files, databases or data backed up or replicated prior to the occurrence of a disaster or disruption as measured from the time of most recent recoverable backup to point of failure or disruption.

50. **"Recovery Time Objective"** means for certain Company provided Hosting and/or SaaS offering the targeted duration of time and a service level within which a production business process must be restored after a disaster or disruption as measured from the time a fail-over decision is made to point when End User access and services are restored, exclusive of data feeds and Interfaces.

51. **"SaaS"** means Company services that (A) make Software functionality accessible to Customer on a subscription basis via the Internet and a browser as more specifically set forth in the applicable User Materials and (B) are identified as "SaaS" on an Order Form.

52. **"SaaS End User"** means any End User that needs to have log-in authority to the SaaS environment.

53. **"Schedule"** means a written document executed by both Parties or incorporated by reference into an Order Form, which describes additional terms, related to Products and Services.

54. **"Server Response Time"** means for certain Company provided Hosting and/or SaaS offering the time to process an End User or web service request as measured from receipt of request at the server to time response is sent back to the requester, exclusive of transit time over networks and rendering time on End User workstations.

55. **"Service(s)"** means each service procured from Company under one or more Order Forms, including Implementation Services, Software Maintenance Services, Hardware Maintenance Services, Consulting Services, eLearning services, Hosting Services and SaaS as such terms are defined in the applicable Schedule.

56. **"Service Level Credit"** means a credit (not a cash refund) against a future Monthly Fee for the applicable Service fee due as a result of a failure by Company to meet the applicable Service level

DocuSign Envelope ID: 360E8B95-889A-4D39-A658-8B23E0495AD6

Case:17-03283-LTS   Doc#:7449-1   Filed:06/14/19   Entered:06/14/19 17:27:46   Desc:
Exhibit 1   Page 22 of 45

agreement. Such credit shall be calculated based on: (A) the Monthly Fee in which the failure occurred and (B) after the application of any discount and before any other credits.

57. **"Service Term"** means the period set forth in an Order Form for which Customer has purchased the applicable Service.

58. **"Software"** means Company Software and Third Party Software.

59. **"Special Program"** means any governmental or non-governmental program, project, grant, incentive-based opportunity, plug-in, extension use case or other program relating to Customer's business.

60. **"Statement of Work"** means a written document executed by the Parties or incorporated by reference into an Order Form that describes specific Implementation Services or Consulting Services to be provided by Company as well as all Deliverable(s) or milestone(s).

61. **"System"** means collectively, the Company Software, appropriate Third Party database software, operating system software, Third Party Materials and other hardware, software and items described in an applicable Statement of Work functioning together as a single system.

62. **"Third Party"** means any person or entity other than Company or Customer.

63. **"Third Party Hardware"** means equipment and other hardware distributed under a Third Party's brand that is purchased or leased by Customer from Company under an Order Form.

64. **"Third Party Materials"** means Third Party Software, Third Party Services and Third Party Hardware.

65. **"Third Party Services"** means Third Party services identified in an Order Form that are offered and/or made available by and/or through Company, under a Third Party's brand and are accessed and/or used by Customer.

66. **"Third Party Software"** means Third Party software and/or content (A) identified as Third Party Software in an Order Form or otherwise provided to Customer in connection with Customer's permitted use of Company Software, including related data, graphics, subscriptions, libraries, diagnosis and procedure code sets, and patient education and drug interaction databases and (B) in the case of Hardware, Third Party software pre-installed on such Hardware including BIOS, firmware, operating systems and similar technology.

67. **"Update(s)"** means any patch, fix, improvement, enhancement or change to Company Software that Company makes generally commercially available at no additional charge to customers in connection with Software Maintenance. Updates do not include additional modules and/or capabilities for which Company or any Third Party provider charges a separate license fee. Updates are not Deliverables

68. **"Uptime"** means for any Company provided Hosting and/or SaaS offering, the percentage of time Customer's production system was available for use, excluding any Excused Unavailability.

69. **"User Materials"** means generally available documentation relating to Products and Services, including user guides, technical manuals, release notes, installation instructions, information pertaining to maintenance services and online help files regarding use of Software, and all updates thereto.

70. **"Virus"** means viruses, worms, and other malware or malicious code intended to cause or that cause computers or systems to fail to act properly or to function in an unintended manner or permit unintended access to such computers or systems by any Third Party. License keys and other functionality intentionally inserted in Software by the licensor are not Viruses.

## Software as a Service Schedule

**1.      MONTHLY FEES.**  Fees for SaaS are calculated monthly and are set forth in the Order Form.   Unless otherwise stated in the Order Form, Company may increase fees upon 30 days written notice if Company's costs to provide SaaS Services increase materially beyond its reasonable control. Company will monitor Customer's Metrics and use of Third Party Materials. If additional Metrics and/or Third Party Materials are used in the prior month then, unless the applicable Order Form specifies otherwise, Company will also invoice Customer for the additional, actual usage during the prior month.

**2.      PLUG-IN SOFTWARE LICENSE.**  Certain SaaS offerings may require Customer to install on its equipment Plug-In software in order to access and use the SaaS offering.  Subject to Customer's compliance with the terms of this Agreement and solely as it relates to such Plug-In Software, Company grants Customer, during the Service Term, a non-transferable and non-exclusive license to (A) permit SaaS End Users to access the SaaS through the applicable interfaces solely for their internal operations and (B) install, use and implement Plug-In Software solely for use by SaaS End Users to access and use the SaaS as permitted under this Schedule. Customer must take steps to prevent unauthorized access to its login IDs and passwords.

**3.      SERVICE TERM AND EFFECT OF TERMINATION.**

**3.1      Service Term.**  The Service Term for each SaaS offering will commence upon the Fulfillment Date and continue for the Service Term.  The Service Term will be set forth in the Order Form; and, if no Service Term is specified in the Order Form, the initial Service Term will be for 4 years unless terminated earlier in accordance with the Agreement.  Each Service Term automatically renews for successive 1 year terms unless a Party provides written notice of its intent not to renew at least 3 months prior to the end of the then-current Service Term.

**3.2      Effect of Termination; Transition**.  Upon termination of SaaS, (A) Customer's right to access and use such SaaS and all related functionality immediately terminates and (B) Customer must, at its expense, remove and delete all copies of any Company Software. Customer will promptly identify in writing a named individual authorized to download a copy of any Customer data stored within the SaaS environment.  Company will provide written notice to Customer's named representative that such Customer data is available for secure download. Customer's representative will have 90 days after Company's notice to download and confirm receipt of Customer's data.  Upon expiration of such 90 days or upon Customer's confirmation of receipt of Customer's data, whichever is earlier, Company will delete all of Customer's data residing on hardware controlled by Company to the extent allowed by law.  Customer may procure additional transition services at Company's then current hourly rates and standard terms and conditions.

**4.      LIMITED WARRANTY; REMEDIES.**

**4.1      Warranty.** During the Service Term, Company will maintain and update the applicable Software on Company's servers. Company warrants during the Service Term that the Plug-In Software as delivered to Customer will substantially conform to the User Materials for the applicable version of the Software. Customer must notify Company of a claim under this warranty within 30 days of the date on which the condition that gives rise to the claim first appeared.

**4.2      Sole and Exclusive Remedies.** To the extent permitted by law, Customer's sole and exclusive remedy and Company's sole liability arising out of or in connection with a breach of the warranty in Section 4.1 of this Schedule is limited to, at Company's option: (A) Company correcting the nonconformity within a commercially reasonable period of time; or (B) if correction is not commercially reasonable, a termination of the applicable SaaS offering and a refund of any pre-paid unused fees for the remaining balance of the applicable Service Term.

**5.      SERVICE LEVEL AGREEMENT.** During the Service Term, Company will perform to the service level(s) set forth in the Order Form and, more generally, as set forth in Company's then current SaaS Services program.   Company's failure to meet the service level(s) as measured

## Software as a Service Schedule

over the prior month may be reflected in the issuance of a Service Level Credit against Monthly Fee(s) as more specifically set forth in the applicable Order Form.  If Customer determines, in its reasonable judgment, that the service level has not been met, it may request a Service Level Credit.  All such requests must be made within 30 days of the end of the month in which such failure occurred.  A Service Level Credit may be issued following Company's receipt of the written request from Customer and its good faith determination that the reported service level was not met.

**6.      DEFINITIONS.**  Capitalized terms shall have the meaning set forth in the Order Form, General Terms and Conditions or as defined below.

      **6.1     "Fulfillment Date"** means the earlier of (A) the date Company provides notice that the SaaS environment is available for use by Customer or (B) 60 days after the Effective Date.

      **6.2     "Monthly Fee**" means the amount calculated by Company for a given month for Software subscriptions and services, hosting, maintenance and recurring service fees only.  Monthly Fees do not include one-time charges such as implementation, interface, consulting, and non-recurring software license fees.  In the case of a monthly service being invoiced annually or quarterly, the Monthly Fee shall be deemed to be one-twelfth of the annual fee or one-third of the quarterly fee, respectively.



# Statement of Work

This Statement of Work ("**SOW**") describes with specificity a Project to be undertaken by Company on behalf of Customer under the terms and conditions of the Agreement referenced on the Order Form/Quote.

1. **Definition.**

   This Statement of Work defines work and services that Company will provide and what Customer will receive as a framework for the implementation of the Company Software specified on the Order Form/Quote.  This Statement of Work shall include the following: (i) the Scope of Work to be performed by Company; (ii) list of Background Technology and key assumptions; and (iii) the Project timeline and payment schedule.

2. **Scope of Work.**

   Company will develop a single ADT and a single CCDA unidirectional interface inbound to Mirth Results for each facility/system pair listed below:

   - Metro-Pavia Hospital System - Infomedika
   - Menonita Health System - Meditech
   - Ashford Presbyterian Hospital - Meditech
   - San Lucas Episcopal System - Meditech
   - San Carlos Borromeo - Meditech
   - Hospital Buen Samaritano - Meditech

   The following service description documents ("**Service Descriptions**"), attached, describe the scope of work for each type of interface:

   - Deliverable - Inbound HL7 Interface Configuration
   - Deliverable - Inbound CDA Interface Configuration

3. **Background Technology.**

   The following Company Software is considered Background Technology for purposes of this SOW:

   - Mirth Appliance
   - Mirth Connect
   - Mirth Match
   - Mirth Results

   Company retains all copyright to Company owned Background Technology, including copyright for modifications to the Background Technology produced under this SOW.

CONFIDENTIAL



**Statement of Work**

4. **Customer-Supplied Prerequisites.**
   Customer must provide the prerequisites for each Milestone or Deliverable specified in the attached Service Descriptions prior to the start of any technical or engineering work. Any timeline or date commitments are dependent on the timely completion of Customer-supplied prerequisite items.

5. **Additional Terms and Conditions.**

   If the Project is unable to progress based on failure of Customer to complete prerequisite items or a lack of readiness on the part of Customer's data source partners, Company may exercise its right to terminate the Statement of Work and require payment from Customer for the work that has been performed.

6. **Project Timeline.**
   Company is prepared to begin Project by scheduling a kickoff meeting within two weeks of the Effective Date. The kickoff meeting will introduce the team, review the SOW, confirm project management methodologies, and review Customer prerequisite information.

   Company anticipates the work to be completed within 20 weeks of the Effective Date. Factors impacting the anticipated completion date of the Project will be discussed during the kickoff meeting.

   During the term of the Project a primary point of contact for project management will be provided. Issues not addressed by the primary contact may be escalated to Loyd Bittle, AVP, Professional Services. Contact information will be provided during the kickoff meeting.

   The role of Company's project manager is to manage the Company team and provide periodic reports to Customer. Periodic status reports will be provided by Company to Customer via email on a weekly basis. These reports will include a summary of work completed, issues requiring resolution, identification of anticipated risks, and an assessment of progress as compared to the project schedule.

   At Project completion, Company's project manager will conduct a final meeting with Customer to review the Project, Milestones, and Deliverables. The options and process for post-Project support will be discussed at the final meeting.

7. **Payment Schedule.**
   The Project described in this SOW is being delivered at a fixed price as specified on the Order Form. Company will invoice Customer upon completion of each Milestone or Deliverable summarized  below and will bill the amount shown on the corresponding line item of the Order Form

| | |
|---|---|
| Deliverable 1 | ADT Interface to Mirth Results: Metro-Pavia Hospital System - Infomedika |
| Deliverable 2 | ADT Interface to Mirth Results: Menonita Health System - Meditech |
| Deliverable 3 | ADT Interface to Mirth Results: Ashford Presbyterian Hospital - Meditech |

Version: Mirth SOW v2015-11-17 PRHIN
**CONFIDENTIAL**



**Statement of Work**

| Deliverable 4 | ADT Interface to Mirth Results: San Lucas Episcopal System - Meditech |
| Deliverable 5 | ADT Interface to Mirth Results: San Carlos Borromeo - Meditech |
| Deliverable 6 | ADT Interface to Mirth Results: Hospital Buen Samaritano - Meditech |
| Deliverable 7 | CCDA Interface to Mirth Results: Metro-Pavia Hospital System - Infomedika |
| Deliverable 8 | CCDA Interface to Mirth Results: Menonita Health System - Meditech |
| Deliverable 9 | CCDA Interface to Mirth Results: Ashford Presbyterian Hospital - Meditech |
| Deliverable 10 | CCDA Interface to Mirth Results: San Lucas Episcopal System - Meditech |
| Deliverable 11 | CCDA Interface to Mirth Results: San Carlos Borromeo - Meditech |
| Deliverable 12 | CCDA Interface to Mirth Results: Hospital Buen Samaritano - Meditech |

Milestones and Deliverables may be completed in any order as determined by the project plan and availability of prerequisite information.

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL



Statement of Work

## ACCEPTANCE

IN WITNESS WHEREOF, each of the parties hereto has executed this Statement of Work by its duly authorized representatives.

Customer

_____
Signature

Antonio J. Sisco-Ogrend.
Printed Name

Director
Title

23/March/2016
Date

Company

_____
Signature

Jeff Peters
Printed Name

VP Operations
Title

3/23/2016
Date

CONFIDENTIAL



**Statement of Work**

## Appendix Service Descriptions

### Deliverable - Inbound HL7 Interface Configuration

**Service Summary**

The scope of the standardized interface (Inbound) is considered to be a single message type from a single data source sent to the Mirth Connect integration engine for consumption by Mirth Results. The deliverable from this service offering will be a Mirth Connect channel that will accept the HL7 message, transform it to the appropriate specifications, and deliver to the Mirth Results application for viewing.

**Terms and Definitions**

- **HL7 2.x** - A Health Level 7 formatted message of one of the following types: Demographics, Lab Results, Radiology, Transcription, Immunization, Prescription/Medication, Problem List.
- **Interface** - the combination of a single source system sending a single message type inbound to the Mirth Results application
- **Transformations** - code written in Mirth Connect to manipulate a message to meet requirements of the receiving/destination system
- **Filter** - code written in Mirth Connect to prevent messages from filing into Mirth Results
- **Mirth Results** - the clinical data repository application that holds patient data for display in the provider portal
- **Mirth Connect** - the application used as the interface engine to send and receive HL7 messages
- **De-identified** - removal of Protected Health Information or confidential information from messages
- **Interface Checklist Form** - A form that identifies the specifics of the interface being requested

**Prerequisites**

The following items are required to successfully configure HL7 interfaces for inbound messages **prior to work beginning**:

- Mirth Connect and Mirth Results have previously been installed and properly configured
- Data Source VPN Configured (if applicable)
- Sample set of "live" data. A least "1" day's worth of messages (De-identification is acceptable)
- Data feed is able to send messages to a Mirth Connect channel
- Interface checklist form completed and returned

**Configuration Process**

- Message types defined

**CONFIDENTIAL**



**Statement of Work**

● Sample messages reviewed
● Channel Created
● Transformations identified and coded according to Mirth Results specifications
● Sample messages processed through Mirth Connect channel
● Validate sample data in Mirth Results
● Interface connectivity established
● Data feed enabled
● Message ingestion validated
● Adjustments made to code
● Client Acceptance Testing
● Production migration

**Estimated Time to Complete**
Each interface will be completed in 8 weeks from the start of the configuration process through activation in production. Once we have reviewed the sample data provided, your Project Manager can develop a more detailed project plan along with an estimated time frame to activation in production.

**Connectivity**
Connectivity for the interface may be accomplished via one of the following methods:
● MLLP over VPN (Preferred)
● MLLP over SSL
● HTTP over SSL
● SFTP

**Standard Configurations**
The following actions will be considered as standard transformations within the scope of the fixed fee interface.

**Filtering**
The Mirth Interface Team can add custom filtering criteria to prevent them from filing into the Mirth Results application. The filters must be based off existing data in the current message.

**Alerting**
The Mirth Connect engine can be set up to send Email alerts based on triggered events. The standard trigger events are High Queue and Errors.

Version: Mirth SOW v2015-11-17 PRHIN
**CONFIDENTIAL**



**Statement of Work**

**Transformations**

A Mirth Engineer can "map" or move data from one location in the message to the other as needed. This can include reformatting of data, eliminating data, translating customer defined fields to standardized fields.

**Concept Mapping**

A Mirth Engineer can set up "concept mappings" in Mirth Results to automatically translate customer-defined non-clinical or patient data concepts to a standardized value.

Examples Include:

●     Language
●     Race
●     Ethnicity
●     Religion
●     Admission Type
●     Patient Class

**Deliverables**

    **Channel Export**

    A xml export of the channel configuration will be provided at the end of the configuration process.

    **Documentation**

    At the end of the build, once the interface has gone live, channel documentation will be generated and provided using the Mirth Connect Documentation Generating Tool.

    **Work Flow Diagram**

    A general diagram in a PDF explaining the workflow of the channel will be provided.

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL



**Statement of Work**

## Deliverable - Inbound CDA Interface Configuration

**Service Summary**

The scope of the standardized interface (Inbound) is considered to be a single CDA document type from a single data source sent to the Mirth Connect integration engine for consumption by Mirth Results. The deliverable from this service offering will be a Mirth Connect channel that will accept the CDA message, and deliver to the Mirth Results application for viewing.

**Terms and Definitions**

- **CDA -** for the purposes of this document, CDA refers to any variation of the CCD or C-CDA specification
- **Interface** - the combination of a single source system sending a single message type inbound to the Mirth Results application
- **Transformations** - code written in Mirth Connect to manipulate a message to meet requirements of the receiving/destination system
- **Filter** - code written in Mirth Connect to prevent messages from filing into Mirth Results
- **Mirth Results** - the clinical data repository application that holds patient data for display in the provider portal
- **Mirth Connect** - the application used as the interface engine to send and receive HL7 messages
- **De-identified** - removal of Protected Health Information or confidential information from messages
- **Interface Checklist Form** - A form created by the Mirth team that identifies the specifics of the interface being requested

**Supported Document Types**

Mirth Results can support the following types of CDA Documents:

**CCD**

| Document Type |
| --- |
| BPPC (Basic Patient Privacy Consents) |
| C32 (Patient Summary) |

**CONFIDENTIAL**



Statement of Work

| C37 (Lab Reports) |
| C48 (Discharge Summary) |
| C62 (Unstructured Documents) |
| SSA CCD |
| Summarization of Episode |

**CCDA**

| Document Type | Template ID |
|---|---|
| Summarization of Episode Note | 2.16.840.1.113883.10.20.22.1.2 |
| History and Physical Note | 2.16.840.1.113883.10.20.22.1.3 |
| Consultation Note | 2.16.840.1.113883.10.20.22.1.4 |
| Procedure Note | 2.16.840.1.113883.10.20.22.1.6 |
| Operative Note | 2.16.840.1.113883.10.20.22.1.7 |
| Discharge Summary | 2.16.840.1.113883.10.20.22.1.8 |

**Supported CCDA Fields**

| Entry Name | Template ID | Fields Consumed |
|---|---|---|
| Advance Directive Observation | 2.16.840.1.113883.10.20.22.4.48 | All |
| Age Observation | 2.16.840.1.113883.10.20.22.4.31 | All |

DocuSign Envelope ID: 360E8B65-889A-4D39-A658-8B23E0195AD6



**Statement of Work**

| Allergy - Intolerance Observation | 2.16.840.1.113883.10.20.22.4.7 | All |
|---|---|---|
| Allergy Problem Act | 2.16.840.1.113883.10.20.22.4.30 | Allergy - Intolerance Observation |
| Allergy Status Observation | 2.16.840.1.113883.10.20.22.4.28 | All |
| Encounter Activities | 2.16.840.1.113883.10.20.22.4.49 | All |
| Encounter Diagnosis | 2.16.840.1.113883.10.20.22.4.80 | Problem Observation |
| Estimated Date of Delivery | 2.16.840.1.113883.10.20.15.3.1 | All |
| Family History Death Observation | 2.16.840.1.113883.10.20.22.4.47 | All |
| Family History Observation | 2.16.840.1.113883.10.20.22.4.46 | All |
| Family History Organizer | 2.16.840.1.113883.10.20.22.4.45 | All |
| Immunization Activity | 2.16.840.1.113883.10.20.22.4.52 | <ul><li>moodCode</li><li>negationInd</li><li>id</li><li>statusCode</li><li>text</li><li>administered date (effectiveTime)</li><li>routeCode</li><li>doseQuantity</li><li>consumable</li><li>Reaction Observation</li></ul> |

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL

DocuSign Envelope ID: 360E9B95-889A-4D39-A658-8B23F0195AD6



**Statement of Work**

| | | ● Medication Dispense |
|---|---|---|
| Immunization Medication Information | 2.16.840.1.113883.10.20.22.4.54 | All except<br>● id |
| Indication | 2.16.840.1.113883.10.20.22.4.19 | All |
| Instructions | 2.16.840.1.113883.10.20.22.4.20 | All |
| Medication Activity | 2.16.840.1.113883.10.20.22.4.16 | ● Medication Supply Order<br>● Precondition for Substance Administration |
| Medication Dispense | 2.16.840.1.113883.10.20.22.4.18 | ● id<br>● statusCode<br>● dispense date (effectiveTime)<br>● fill number (repeatNumber)<br>● quantity dispensed (quantity) |
| Medication Information | 2.16.840.1.113883.10.20.22.4.23 | All |
| Medication Supply Order | 2.16.840.1.113883.10.20.22.4.17 | ● id<br>● statusCode<br>● effectiveTime<br>● fills (repeatNumber)<br>● quantity ordered (quantity)<br>● medication information (manufacturedProduct)<br>● author<br>● Instructions |

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL

DocuSign Envelope ID: 360E8B65-889A-4D39-A658-8B23E0485AD6



**Statement of Work**

| Non-Medicinal Supply Activity | 2.16.840.1.113883.10.20.22.4.50 | All |
|---|---|---|
| Plan of Care Activity Act | 2.16.840.1.113883.10.20.22.4.39 | All |
| Plan of Care Activity Encounter | 2.16.840.1.113883.10.20.22.4.40 | All |
| Plan of Care Activity Observation | 2.16.840.1.113883.10.20.22.4.44 | All |
| Plan of Care Activity Procedure | 2.16.840.1.113883.10.20.22.4.41 | All |
| Plan of Care Activity Substance Administration | 2.16.840.1.113883.10.20.22.4.42 | All |
| Plan of Care Activity Supply | 2.16.840.1.113883.10.20.22.4.43 | All |
| Policy Activity | 2.16.840.1.113883.10.20.22.4.61 | • id<br>• code<br>• health plan insurance information source id (assignedEntity id)<br>• assignedEntity code<br>• health plan insurance information source address (assignedEntity addr)<br>• health plan insurance information source phone (assignedEntity telecom) |

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL



**Statement of Work**

|  |  | <ul><li>participant</li><li>health plan coverage dates (participant time)</li><li>participantRole</li></ul> |
|---|---|---|
| Pregnancy Observation | 2.16.840.1.113883.10.20.15.3.8 | All |
| Problem Concern Act (Condition) | 2.16.840.1.113883.10.20.22.4.3 | Problem Observation |
| Problem Observation | 2.16.840.1.113883.10.20.22.4.4 | All except: <ul><li>Age Observation</li><li>Health Status Observation</li></ul> |
| Problem Status | 2.16.840.1.113883.10.20.22.4.6 | All |
| Procedure Activity Act | 2.16.840.1.113883.10.20.22.4.12 | All except: <ul><li>priorityCode</li><li>participant</li><li>Medication Activity</li></ul> |
| Procedure Activity Observation | 2.16.840.1.113883.10.20.22.4.13 ' | <ul><li>procedure id (id)</li><li>procedure type (code)</li><li>statusCode</li><li>value</li><li>performer</li><li>instructions</li><li>indication</li></ul> |
| Procedure Activity Procedure | 2.16.840.1.113883.10.20.22.4.14 | <ul><li>moodCode</li><li>procedure id (id)</li><li>statusCode</li><li>procedure date (effectiveTime)</li></ul> |

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL



**Statement of Work**

| | | ● performer<br>● participant<br>● Instructions<br>● Indications |
|---|---|---|
| Product Instance | 2.16.840.1.113883.10.20.22.4.37 | All |
| Reaction Observation | 2.16.840.1.113883.10.20.22.4.9 | All except code |
| Result Observation | 2.16.840.1.113883.10.20.22.4.2 | All except<br>● methodCode<br>● targetSiteCode |
| Result Organizer | 2.16.840.1.113883.10.20.22.4.1 | All |
| Service Delivery Location | 2.16.840.1.113883.10.20.22.4.32 | All |
| Severity Observation | 2.16.840.1.113883.10.20.22.4.8 | All |
| Smoking Status Observation | 2.16.840.1.113883.10.22.4.78' | All |
| Social History Observation | 2.16.840.1.113883.10.20.22.4.38 | All |
| Tobacco Use | 2.16.840.1.113883.10.20.22.4.85 | All |
| Vital Sign Observation | 2.16.840.1.113883.10.20.22.4.27 | All except<br>● methodCode<br>● targetSiteCode |
| Vital Sign Organizer | 2.16.840.1.113883.10.20.22.4.26 | Vital Sign Observation |

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL

DocuSign Envelope ID: 360E8B95-889A-4D39-A658-8B23F0105AD6



**Statement of Work**

**Prerequisites**
The following items are required by Mirth to successfully configure CDA interfaces for inbound messages **prior to work beginning**:
● Mirth Application stack has been installed and properly configured
● Data Source VPN Configured (if applicable)
● Sample set of "live" data.  A least a group of messages the represents 100 patients. (De-identification is acceptable)
● Data feed ready to start sending messages to Mirth Connect channel
● Interface checklist form completed and returned
● A NIST Validated CDA message generated by the source system

**Configuration Process**
● Message types defined
● Sample messages reviewed
● Channel Created
● Transformations identified and coded according to Mirth Results specifications
● Sample messages processed through Mirth Connect channel
● Validate sample data in Mirth Results
● Interface connectivity established
● Data feed enabled
● Message ingestion validated
● Adjustments made to code
● Client Acceptance Testing
● Production migration

**Estimated Time to Complete**
Each interface will be completed in 10 weeks from the start of the configuration process through go live. Once we have reviewed the sample data provided, your Project Manager can develop a more detailed project plan along with an estimated time frame to Go Live.

**Connectivity**
Connectivity for the interface may be accomplished via one of the following methods:
● HTTPS
● TCP over SSL
● SFTP
● Web Service - Requires separate purchase of XDS.b interface

Version: Mirth SOW v2015-11-17 PRHIN
CONFIDENTIAL



**Statement of Work**

**Standard Configurations**

The following actions will be considered as standard transformations within the scope of the fixed fee interface.

**Filtering**

The Mirth Interface Team can add custom filtering criteria to prevent them from filing into the Mirth Results application. The filters must be based off existing data in the current message.

**Alerting**

The Mirth Connect engine can be set up to send Email alerts based on triggered events. The standard trigger events are High Queue and Errors.

**Transformations**

The Mirth Interface team can add code in the MIrth Connect engine to modify the CDA to ensure it meets Mirth Results standards

**Concept Mapping**

The Mirth Interface Team can add mappings in the Mirth Results application to translate demographic fields and encounter information.

**Deliverables**

    **Channel Export**

        A xml export of the channel configuration will be provided at the end of the configuration process.

    **Documentation**

        At the end of the build, once the interface has gone live, channel documentation will be generated and provided using the Mirth Connect Documentation Generating Tool.

    **Work Flow Diagram**

        A general diagram explaining the workflow of the channel will be provided.

Version: Mirth SOW v2015-11-17 PRHIN

CONFIDENTIAL

**BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Agreement ("BAA") is entered into by and between Quality Systems, Inc. and each of its wholly owned subsidiaries (collectively referred to herein as "QSI") and _Puerto Rico Department of Health_ ("Customer") and is effective as of ___3/23/2016___ (the "BAA Effective Date").  QSI and Customer may be individually referred to as a "Party" and collectively as the "Parties" in this BAA.

**RECITALS**

A.      QSI is providing services to Customer under an existing written agreement (the "Underlying Agreement"), and Customer wishes to disclose certain information to QSI pursuant to the terms of such Underlying Agreement, some of which may constitute Protected Health Information ("PHI") (defined below).

B.      Customer and QSI intend to protect the privacy and provide for the security of PHI disclosed to QSI pursuant to the Underlying Agreement in compliance with (i) the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191 ("HIPAA"); (ii) Subtitle D of the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), also known as Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-005 ("ARRA"); and (iii) regulations promulgated thereunder by the U.S. Department of Health and Human Services, including the HIPAA Omnibus Final Rule, which amended the HIPAA Privacy and Security Rules (as those terms are defined below) and implemented a number of provisions of the HITECH Act (the "HIPAA Final Rule") and caused business associates and their subcontractors to be directly regulated under HIPAA.

C.      The purpose of this BAA is to satisfy certain standards and requirements of HIPAA, the Privacy Rule and the Security Rule (as those terms are defined below), and the HITECH Act, including, but not limited to, Title 45, §§ 164.314(a)(2)(i), 164.502(e) and 164.504(e) of the Code of Federal Regulations ("C.F.R.").

In consideration of the mutual promises below and the exchange of information pursuant to this BAA, the Parties agree as follows:

1.      Definitions.

        a.      Capitalized Terms.  Capitalized terms used in this BAA and not otherwise defined herein shall have the meanings set forth in the Privacy Rule, the Security Rule, and the HITECH Act, which definitions are incorporated in this BAA by reference.

        b.      "Breach" shall have the same meaning given to such term in 45 C.F.R. § 164.402.

        c.      "Designated Record Set" shall have the same meaning given to such term in 45 C.F.R. § 164.501.

        d.      "Electronic Protected Health Information" or "Electronic PHI" shall have the same meaning given to such term under the Privacy Rule and the Security Rule, including, but not limited to, 45 C.F.R. § 160.103, as applied to the information that QSI creates, receives, maintains or transmits from or on behalf of Customer.

        e.      "Individual" shall have the same meaning given to such term in 45 C.F.R. § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

        f.      "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

        g.      "Protected Health Information" or "PHI" shall have the same meaning given to such term in 45 C.F.R. § 160.103, as applied to the information created or received by QSI from or on behalf of Customer.

        h.      "Required by Law" shall have the same meaning given to such term in 45 C.F.R. § 164.103.

        i.      "Secretary" shall mean the Secretary of the Department of Health and Human Services or his or her designee.

        j.      "Security Incident" shall have the same meaning given to such term in 45 C.F.R. § 164.304, but shall not include (i) unsuccessful attempts to penetrate computer networks or servers maintained by QSI; and (ii) immaterial

incidents that occur on a routine basis, such as general "pinging" or "denial of service" attacks.

k.    "Security Rule" shall mean the Security Standards at 45 C.F.R. Part 160 and Part 164, Subparts A and C.

l.    "Unsecured PHI" shall have the same meaning given to such term in 45 C.F.R. § 164.402, and guidance promulgated thereunder.

2.    Permitted Uses and Disclosures of PHI.

a.    Uses and Disclosures of PHI Pursuant to Underlying Agreement.  Except as otherwise limited in this BAA, QSI may use or disclose PHI to perform functions, activities or services for, or on behalf of, Customer as specified in the Underlying Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Customer.  To the extent QSI is carrying out one or more of Customer's obligations under the Privacy Rule pursuant to the terms of the Underlying Agreement or this BAA, QSI shall comply with the requirements of the Privacy Rule that apply to Customer in the performance of such obligation(s).

b.    Permitted Uses of PHI by QSI.  Except as otherwise limited in this BAA, QSI may use PHI for the proper management and administration of QSI or to carry out the legal responsibilities of QSI.

c.    Permitted Disclosures of PHI by QSI.  Except as otherwise limited in this BAA, QSI may disclose PHI for the proper management and administration of QSI, provided that the disclosures are Required by Law, or QSI obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and will be used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person (which purpose must be consistent with the limitations imposed upon QSI pursuant to this BAA), and that the person agrees to notify QSI of any instances of which it is aware in which the confidentiality of the information has been breached.  QSI may use PHI to report violations of law to appropriate federal and state authorities, consistent with 45 C.F.R. § 164.502(j)(1).

d.    Data Aggregation.  Except as otherwise limited in this BAA, QSI may use PHI to provide Data Aggregation services as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B), including use of PHI for statistical compilations, reports and all other purposes allowed under applicable law.

e.    De-identified Data.  QSI may create de-identified PHI in accordance with the standards set forth in 45 C.F.R. § 164.514(b) and may use or disclose such de-identified data for any purpose.

3.    Obligations of QSI.

a.    Appropriate Safeguards.

(i)    Privacy of PHI.  QSI will continue to develop, implement, maintain, and use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by the Underlying Agreement and this BAA.  The safeguards will reasonably protect PHI from any intentional or unintentional use or disclosure in violation of the Privacy Rule and this BAA, and limit incidental uses or disclosures made pursuant to a use or disclosure otherwise permitted by this BAA.

(ii)    Security of PHI.  QSI shall use appropriate safeguards and shall, after the compliance date of the HIPAA Final Rule, comply with the Security Rule with respect to Electronic PHI, to prevent use or disclosure of such information other than as provided for by the Underlying Agreement and this BAA.

b.    Reporting of Improper Use or Disclosure, Security Incident or Breach.  QSI shall report to Customer any use or disclosure of PHI not permitted under this BAA or any Security Incident, without unreasonable delay, and in any event no more than thirty (30) days following discovery; provided, however, that the Parties acknowledge and agree that this Section constitutes notice by QSI to Customer of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which notice to Customer by QSI shall be required only upon request.  "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on QSI's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of PHI.  QSI's notification to Customer of a Breach shall include: (i) the identification of each individual whose Unsecured PHI has been, or is reasonably believed by QSI to have been, accessed, acquired or disclosed during the Breach; and (ii) any particulars regarding the Breach that Customer would need to include in its notification, as such particulars are identified in 45 C.F.R. § 164.404.

c.    QSI's Agents.  In accordance with 45 C.F.R. § 164.502(e)(1)(ii) and 45 C.F.R. § 164.308(b)(2), as applicable, QSI shall enter into a written agreement with any agent or subcontractor that creates, receives, maintains or transmits PHI on behalf of QSI for services provided to Customer, providing that the agent agrees to restrictions and conditions that are substantially similar to those that apply through this BAA to QSI with respect to such PHI.

d.    Access to PHI.  To the extent QSI has PHI contained in a Designated Record Set, it agrees to make such information available to Customer pursuant to 45 C.F.R. § 164.524, as applicable, within ten (10) business days of QSI's receipt of a written request from Customer; provided, however, that QSI is not required to provide such access where the PHI contained in a Designated Record Set is

duplicative of the PHI contained in a Designated Record Set possessed by Customer.  If an Individual makes a request for access pursuant to 45 C.F.R. § 164.524 directly to QSI, or inquires about his or her right to access, QSI shall direct the Individual to Customer.

e.   Amendment of PHI.  To the extent QSI has PHI contained in a Designated Record Set, it agrees to make such information available to Customer for amendment pursuant to 45 C.F.R. § 164.526 within twenty (20) business days of QSI's receipt of a written request from Customer.  If an Individual submits a written request for amendment pursuant to 45 C.F.R. § 164.526 directly to QSI, or inquires about his or her right to amendment, QSI shall direct the Individual to Customer.

f.   Documentation of Disclosures.  QSI agrees to document such disclosures of PHI and information related to such disclosures as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528, as applicable.  QSI shall document, at a minimum, the following information ("Disclosure Information"):  (i) the date of the disclosure, (ii) the name and, if known, the address of the recipient of the PHI, (iii) a brief description of the PHI disclosed, (iv) the purpose of the disclosure that includes an explanation of the basis for such disclosure, and (v) any additional information required under the HITECH Act and any implementing regulations.

g.   Accounting of Disclosures.  QSI agrees to provide to Customer, within twenty (20) business days of QSI's receipt of a written request from Customer, information collected in accordance with Section 3(f) of this BAA, to permit Customer to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528, as applicable.  If an Individual submits a written request for an accounting of disclosures of PHI pursuant to 45 C.F.R. § 164.528 directly to QSI, or inquires about his or her right to an accounting of disclosures of PHI, QSI shall direct the Individual to Customer.

h.   Governmental Access to Records.  QSI shall make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by QSI on behalf of, Customer available to the Secretary for purposes of the Secretary determining compliance with the Privacy Rule and the Security Rule.

i.   Mitigation.  To the extent practicable, QSI will cooperate with Customer's efforts to mitigate a harmful effect that is known to QSI of a use or disclosure of PHI not provided for in this BAA.

j.   Minimum Necessary.  QSI shall request, use and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure, in accordance with 45 C.F.R. § 164.514(d), and any amendments thereto.

k.   HITECH Act Applicability.  QSI acknowledges that enactment of the HITECH Act, as implemented by the HIPAA Final Rule, amended certain provisions of HIPAA in ways that now directly regulate, or will on future dates directly regulate, QSI under the HIPAA Privacy and Security Rules.  QSI agrees to comply with applicable requirements imposed under the HITECH Act, as of the effective date of each such requirement.

4.   Obligations of Customer.

a.   Notice of Privacy Practices.  Customer shall notify QSI of any limitation(s) in its notice of privacy practices in accordance with 45 C.F.R. § 164.520, to the extent that such limitation may affect QSI's use or disclosure of PHI.  Customer shall provide such notice no later than fifteen (15) days prior to the effective date of the limitation.

b.   Notification of Changes Regarding Individual Permission.  Customer shall notify QSI of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect QSI's use or disclosure of PHI.  Customer shall provide such notice no later than fifteen (15) days prior to the effective date of the change.  Customer shall obtain any consent or authorization that may be required by the HIPAA Privacy Rule, or applicable state law, prior to furnishing QSI with PHI.

c.   Notification of Restrictions to Use or Disclosure of PHI.  Customer shall notify QSI of any restriction to the use or disclosure of PHI that Customer has agreed to in accordance with 45 C.F.R. § 164.522, to the extent that such restriction may affect QSI's use or disclosure of PHI.  Customer shall provide such notice no later than fifteen (15) days prior to the effective date of the restriction.  If QSI reasonably believes that any restriction agreed to by Customer pursuant to this Section may materially impair QSI's ability to perform its obligations under the Underlying Agreement or this BAA, the Parties shall mutually agree upon any necessary modification of QSI's obligations under such agreements.

d.   Permissible Requests by Customer.  Customer shall not request QSI to use or disclose PHI in any manner that would not be permissible under the Privacy Rule, the Security Rule or the HITECH Act if done by Customer, except as permitted pursuant to the provisions of Section 2 of this BAA.

5.   Term and Termination.

a.   Term.  The term of this BAA shall commence as of the BAA Effective Date, and shall terminate when all of the PHI provided by Customer to QSI, or created or received by QSI on behalf of Customer, is destroyed or returned to Customer or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with Section 5(c).

b.    Termination for Cause.  Upon either Party's knowledge of a material breach by the other Party of this BAA, such Party shall provide written notice to the breaching Party stating the nature of the breach and providing an opportunity to cure the breach within thirty (30) business days.  Upon the expiration of such 30-day cure period, the non-breaching Party may terminate this BAA and, at its election, the Underlying Agreement, if cure is not possible.

c.    Effect of Termination.

(i)    Except as provided in paragraph (ii) of this Section 5(c), upon termination of the Underlying Agreement or this BAA for any reason, QSI shall return or destroy all PHI received from Customer, or created or received by QSI on behalf of Customer, and shall retain no copies of the PHI.

(ii)    If it is infeasible for QSI to return or destroy the PHI upon termination of the Underlying Agreement or this BAA, QSI shall: (i) extend the protections of this BAA to such PHI; (ii) limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as QSI maintains such PHI; and (iii) never disclose such PHI to another QSI client or third party unless such information has been de-identified in accordance with the standards set forth in 45 C.F.R. § 164.514(b).

6.    Cooperation in Investigations. The Parties acknowledge that certain breaches or violations of this BAA may result in litigation or investigations pursued by federal or state governmental authorities of the United States resulting in civil liability or criminal penalties.  Each Party shall cooperate in good faith in all respects with the other Party in connection with any request by a federal or state governmental authority for additional information and documents or any governmental investigation, complaint, action or other inquiry.

7.    Survival.  The respective rights and obligations of QSI under Section 5(c) of this BAA shall survive the termination of this BAA and the Underlying Agreement.

8.    Effect of BAA.  In the event of any inconsistency between the provisions of this BAA and the Underlying Agreement, the provisions of this BAA shall control.  In the event of inconsistency between the provisions of this BAA and mandatory provisions of the Privacy Rule, the Security Rule or the HITECH Act, as amended, or their interpretation by any court or regulatory agency with authority over QSI or Customer, such interpretation shall control; provided, however, that if any relevant provision of the Privacy Rule, the Security Rule or the HITECH Act is amended in a manner that changes the obligations of QSI or Customer that are embodied in terms of this BAA, then the Parties agree to negotiate in good faith appropriate non-financial terms or amendments to this BAA to give effect to such revised obligations.  Where provisions of this BAA are different from those mandated in the Privacy Rule, the Security Rule, or the HITECH Act, but are nonetheless permitted by such rules as interpreted by courts or agencies, the provisions of this BAA shall control.

9.    General.  This BAA is governed by, and shall be construed in accordance with, the laws of the State that govern the Underlying Agreement.  Any action relating to this BAA must be commenced within (1) one year after the date upon which the cause of action accrued.  Customer shall not assign this BAA without the prior written consent of QSI, which shall not be unreasonably withheld.  If any part of a provision of this BAA is found illegal or unenforceable, it shall be enforced to the maximum extent permissible, and the legality and enforceability of the remainder of that provision and all other provisions of this BAA shall not be affected.  All notices relating to the Parties' legal rights and remedies under this BAA shall be provided in writing to a Party, shall be sent to its address set forth in the signature block below, or to such other address as may be designated by that Party by notice to the sending Party, and shall reference this BAA. This BAA may be modified, or any rights under it waived, only by a written document executed by the authorized representatives of both Parties.  Nothing in this BAA shall confer any right, remedy, or obligation upon anyone other than Customer and QSI.  This BAA is the complete and exclusive agreement between the Parties with respect to the subject matter hereof, superseding and replacing all prior agreements, communications, and understandings (written and oral) regarding its subject matter.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have duly executed this BAA as of the BAA Effective Date.

**CUSTOMER**

Address: _PO Box 70 184_
_San Juan, P.R. 00936_
_____

By: _____

Print Name: _Antonio J. Sisco-Oquendo_

Title: _Director_

Date: _March 23, 2016_

**QSI**

Address: _18111 Von Karman Ave, Suite 700_

_Irvine, CA 92612_

By: _____
B4611912CDB14C8...

Print Name: _Jeff Peters_

Title: _VP Operations_

Date: _3/23/2016_

v.12.2013