**Objection Deadline:** July 9, 2019
**Hearing Date:** July 24, 2019

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br><br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AMBAC ASSURANCE CORPORATION'S MOTION FOR ENTRY OF ORDER AUTHORIZING DISCOVERY UNDER BANKRUPTCY RULE 2004 <u>CONCERNING PENSION LIABILITIES</u>

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

JURISDICTION ................................................................................................................... 3

RELIEF REQUESTED.......................................................................................................... 8

BASIS FOR RELIEF REQUESTED .................................................................................... 9

     A.     Rule 2004 Entitles Ambac to Broad Discovery Concerning the
Financial Condition of the Commonwealth. ....................................................... 9

     B.     The Size of the Commonwealth's Pension Obligations, and the Basis
for the Calculations Underlying the Stated Obligations, Is Within the
Ambit of Rule 2004. .......................................................................................... 10

CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1.......... 13

NOTICE.............................................................................................................................. 14

NO PRIOR REQUEST FOR RELIEF.................................................................................. 14

CONCLUSION.................................................................................................................... 13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re China Fishery Grp. Ltd.*,
2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) .........................................9, 10

*In re Coffee Cupboard, Inc.*,
128 B.R. 509 (Bankr. E.D.N.Y. 1991)..................................................................11

*In re Drexel Burnham Lambert Grp., Inc.*,
123 B.R. 702 (Bankr. S.D.N.Y. 1991).............................................................9, 11

*In re Gawker Media LLC*,
2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017).......................................9, 10

*In re Hughes*,
281 B.R. 224 (Bankr. S.D.N.Y. 2002) ....................................................................9

*In re Ionosphere Clubs, Inc.*,
156 B.R. 414 (Bankr. S.D.N.Y. 1993) ....................................................................9

*In re Johns-Manville Corp.*,
36 B.R. 743 (Bankr. S.D.N.Y. 1984) ....................................................................10

*Lorber v. Vista Irrigation Dist.*,
127 F.2d 628 (9th Cir. 1942) .........................................................................12, 13

*In re Recoton Corp.*,
307 B.R. 751 (Bankr. S.D.N.Y. 2004) ..................................................................11

*In re Summit Corp.*,
891 F.2d 1 (1st Cir. 1989) .....................................................................................10

*In re Velo Holdings Inc.*,
472 B.R. 201 (Bankr. S.D.N.Y. 2012) ..................................................................13

**Statutes**

11 U.S.C. § 105..........................................................................................................9

11 U.S.C. § 1109........................................................................................................10

11 U.S.C. § 1125........................................................................................................12

11 U.S.C. § 1129........................................................................................................12

28 U.S.C. § 1331 ................................................................................................2, 3

28 U.S.C. § 1391 ................................................................................................2, 3

48 U.S.C. § 2170 ....................................................................................................9

P.R. Laws Ann. tit. 32 § 1781 ..............................................................................12

**Other Authorities**

Fed. R. Bankr. P. 2004 ................................................................................1, 3, 9, 10

H.R. Rep. No. 94- 686, 94th Cong., 1st Sess. 33 (1977) ............................................13

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"), made applicable to this proceeding by Section 310 of PROMESA, Ambac Assurance Corporation ("Ambac") respectfully submits this motion for entry of an order, substantially in the form attached hereto as Exhibit 1 (the "Proposed Order"), to take discovery of (i) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"); (ii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"); and (iii) the Commonwealth (collectively, the "Respondents").  In support of its motion, Ambac states as follows:

## PRELIMINARY STATEMENT

1.      In each of the fiscal plans developed by the Commonwealth and certified by the Oversight Board during these Title III cases—including the current operative fiscal plan dated May 9, 2019 (the "New Fiscal Plan")—the pension liabilities are staggering, totaling approximately $50 billion.  At no time, however, has either the Commonwealth or the Oversight Board investigated or substantiated that massive figure; rather, virtually all attention to the pension liabilities has focused on the amount of any actual or proposed cuts to the overall number, rather than to the overall claimed liability amount.  Transparency into the size and scope of the Commonwealth's true pension liabilities is necessary if the Commonwealth is to pursue a restructuring of its liabilities and successful exit from bankruptcy.

2.      Cognizant of this reality, Ambac has long sought to understand a number of pension-related issues, opting to do so in the first instance through a voluntary process with AAFAF.  Through that voluntary process, Ambac has sought (without waiver) to focus on the most central issues concerning the pensions picture:  namely, (1) the size of the Commonwealth's

pension liabilities and the underlying actuarial assumptions used to determine the Commonwealth's past and future funding obligations; (2) documents concerning large-scale reporting of improper pension claims or other irregularities in the Commonwealth's pension systems (of the kind that has been reported periodically in the media over the years); and (3) relevant beneficiary-related information, including the amount of pension benefits to be paid to pensioners on-island versus off-island. Although AAFAF has made certain limited productions in response to these requests, the productions have largely consisted of reports generated by an actuarial firm, Milliman, Inc. (the "Milliman Reports"). The Milliman Reports, however, contain only hard-coded numbers that make it impossible to understand the underlying assumptions and drivers. Perhaps more concerning, the Milliman Reports expressly disclaim any assessment of the integrity of the data provided by the Commonwealth and relied on in the Milliman Reports, leading to a significant "garbage in, garbage out" concern. Despite slowly rolling productions from AAFAF, with very limited exception, Ambac is no closer to understanding the $50 billion asserted pension liability today than it was over a year ago.

3.      The need to obtain the information necessary to understand the Commonwealth's pension liabilities is even more pressing now. At the June 12, 2019 omnibus hearing held last week, counsel to the Oversight Board advised the Court that a proposed plan of adjustment will be filed in the next 30 days. It is to be expected that the massive—and still opaque—pension liability number will be reflected in the proposed plan. Meanwhile, instead of investigating the pension liabilities, as directed by PROMESA, the Oversight Board has been actively negotiating agreements with labor unions and, most recently, with the Official Committee of Retired Employees of the Government of Puerto Rico (the "Retirees' Committee"). Creditors cannot

evaluate the settlements or their impact on the financial condition of the Commonwealth without complete transparency into the buildup of the pension liabilities.

4.      While Ambac appreciates the importance of pensions to the people of Puerto Rico, including some of its most vulnerable citizens, and does not question the legitimate interest of the Commonwealth government in seeking to provide a reliable social safety net for its retirees, that does not insulate pension claims from scrutiny.  Given the gargantuan scale of the asserted pension liabilities, even relatively minor flaws (on a percentage basis) in the actuarial analysis have the potential, when corrected, to free up billions of dollars for other purposes.  Put simply, creditors cannot begin to understand the financial condition of the Commonwealth without fully understanding the underpinnings of the stated pension obligation.

5.      Because Ambac has been unsuccessful in obtaining the necessary information on a voluntary basis, it has no choice but to pursue the information through this formal process. Accordingly, Ambac hereby moves pursuant to Rule 2004 for authorization to conduct an examination into the Commonwealth's pension obligations.

## JURISDICTION

6.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1331 and PROMESA § 306(a).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a).

## BACKGROUND

7.      As a holder and/or insurer of more than $1 billion in bonds issued by the Commonwealth or its instrumentalities, Ambac has long been focused on understanding the Commonwealth's pension obligations.  Accordingly, on May 22, 2018, Ambac, together with Assured Guaranty Corp. and National Public Finance Guarantee Corporation (the "Monolines"),

served document requests, attached hereto as <u>Exhibit A</u>, for information pertaining to Puerto Rico's pension liabilities.  Through these requests, the Monolines sought, among other things, information concerning the methodology applied to determine the Commonwealth's future annual required contributions, materials prepared for and/or relied upon in connection with the actuarial analysis of pension funding requirements, and documents concerning pension payments or claims determined or alleged to be improper or invalid.  (*See* Ex. A at 2-4.)  These requests were designed to allow the Monolines to understand the size of the Commonwealth's pension liabilities and, critically, to test the underlying assumptions used to determine the Commonwealth's past and future funding obligations and evaluate the validity and integrity of the pension claims.

8.      AAFAF initially indicated a willingness to cooperate with the requests by providing information concerning the Commonwealth's pension obligations on a voluntary basis.  (*See* Email from P. Friedman to E. Weiss, dated June 5, 2018, attached hereto as <u>Exhibit B</u>, at 1 (confirming AAFAF's agreement to search for and produce information concerning the actuarial assumptions used to determine the Commonwealth's past and future funding obligations; reports or analyses concerning actual or potential fraud in the pension systems; and beneficiary residential status).)  The parties engaged in telephonic conversations over the course of that summer to discuss the status of AAFAF's document collection and review efforts.

9.      AAFAF eventually produced a limited number of documents on June 28, July 6, July 11, August 20, August 28, September 14, and September 21, 2018.  As Ambac subsequently explained by letter, however, those documents proved anything but illuminating.  (*See* Letter from G. Mainland to E. McKeen & M. Pocha, dated November 8, 2018, attached hereto as <u>Exhibit C</u>, at 1 ("Ambac appreciates AAFAF's cooperation on this matter to date.  We remain concerned, however, that we have yet to receive certain information that the parties agreed would be

produced[.]").)  Specifically, Ambac observed that the information produced—which concerned pension recipients, payroll, audited financial statements for the various plans, consolidated TSA cash flow reports, and the Milliman Reports—did not provide any insight into the underlying assumptions used as the basis for the figures reflected in the documents.  (*See id.* at 2.)  Ambac further noted that certain documents purportedly relating to Milliman's methodology in analyzing future pay-go contributions expressly stated that those analyses were prepared in reliance on census and other data provided by the Commonwealth, and that the Milliman valuation would be inaccurate or incomplete to the extent the underlying data was inaccurate or incomplete.  (*Id.*)  Finally, Ambac explained that most of the data produced by AAFAF lacked any identifying information, such that Ambac and its advisors could not make heads or tails of the information it was reviewing.  (*Id.*)  Ambac received no response to this letter.

10.     Weeks later, on November 21, 2018, Ambac joined a letter, together with other creditors, that continued to press for pension-related information.  (*See* Letter to M. Dale & E. McKeen, dated Nov. 21, 2018, attached hereto as <u>Exhibit D</u>.)  The November 21 letter sought fiscal plan-related information that had previously been ordered by the Court to be produced pursuant to prior Rule 2004 proceedings relating to certain fiscal plan development materials. Among the information sought was "Request No. 4," which sought "[a]ll models, documents, and actuarial reports supporting the calculation of the pension benefit and administrative cost projections in the October 2018 Fiscal Plan."  (Ex. D at 3.)  The November 21 letter detailed why the information produced to date provided insufficient transparency into the pension liability, not least because the Milliman Reports merely set forth the ***outputs***, not the ***inputs***, of Milliman's model and calculations.  A letter sent from the same creditor group on January 14, 2019 continued to articulate the same concerns.  (*See* Letter to M. Dale & E. McKeen, dated Jan. 14, 2019, attached

hereto as Exhibit E.)  Because Ambac believes that the information sought with other creditors in response to Request No. 4 was required to be produced pursuant to certain orders of this Court, Ambac is moving contemporaneously herewith to compel compliance with that particular request. Nonetheless, the difficulty the broader creditor group has experienced in obtaining meaningful pension-related information as a part of their pursuit of fiscal plan development materials only underscores the lack of transparency characterizing AAFAF's responses to Ambac's voluntary pension-related requests.

11.    Over the past weeks, there have been repeated indications that the Oversight Board intends to file a proposed plan of adjustment for the Commonwealth soon.  Last week, counsel for the Oversight Board announced at the June 12, 2019 omnibus hearing that it hopes to file a Commonwealth plan of adjustment within 30 days.  *See* "*Bienenstock Discusses 'Sensitive' and 'Constructive' Plan of Adjustment Talks; Oversight Board Hopes to File Plan with Court within 30 Days; Praises Union Negotiators*," Reorg Research, June 12, 2019.  This projection was confirmed by the Oversight Board's release of a plan support agreement ("PSA") on June 16, 2019, a summary of which reiterated that it is the Oversight Board's intention to file a plan of adjustment within 30 days.  *See Commonwealth of Puerto Rico Title III Case: Plan Support Agreement*, June 16, 2019.

12.    At the same, there has been a flurry of pension-related deals reported in the press. On June 3, the Puerto Rico Teachers Association announced support for an agreement, which was ultimately rejected by the union's members, with the Oversight Board regarding the treatment of pensions in a future Commonwealth plan of adjustment.  Then, on June 10, the Puerto Rico United Public Servants Union made a similar announcement, and noted an agreement with the Oversight Board that includes a $1.36 billion investment to assure pension funding for workers hired during

and after 2000.  Finally, on the morning of June 12, the Retirees' Committee announced it had reached a tentative agreement with the Oversight Board on the treatment of pension benefits in the eventual Commonwealth plan of adjustment.  That deal includes a raise in the minimum pension threshold below which cuts will not be imposed, and certainty that cuts to monthly pension benefits will not exceed 8.5%, as compared to the 25% originally proposed by the Oversight Board.  *See* "*Official Retirees Committee Announces Pension Agreement with PROMESA Oversight Board; Will be Incorporated into a Commonwealth Plan of Adjustment*," Reorg Research, June 12, 2019. None of these announcements provides any insight into the key question Ambac has been focused on—the basis for the Commonwealth's calculation of its pension liabilities.  Ambac believes it is necessary to understand the true valid current and future pension liabilities to be able to evaluate its impact on the finances of the Commonwealth.  Indeed, Ambac is baffled at how the Oversight Board feels comfortable locking in claim treatment without first investigating the assumptions underlying the stated liability, and whether there is pervasive fraud in the system.

13.     On the evening of June 16, 2019, the Oversight Board released an executed PSA for the Commonwealth's plan of adjustment.  In a contemporaneously filed PSA summary, the Oversight Board noted that $55 billion of pension liabilities are expected to be adjusted through the Commonwealth's plan of adjustment.  *See Commonwealth of Puerto Rico Title III Case: Plan Support Agreement*, June 16, 2019.  Between the release of the New Fiscal Plan and the PSA, pensions obligations have ballooned approximately $5 billion more, and yet Ambac and other creditors are no closer to understanding the assumptions underlying the massive figure.

14.     Additionally, in a press release today, Governor Ricardo Rosselló announced that his administration will present a joint resolution that will segregate $1.4 billion from the

Commonwealth's treasury to restore past contributions made by public servants to individual retirement accounts under the System 2000 program.

## **RELIEF REQUESTED**

15.     Pursuant to Bankruptcy Rule 2004, Ambac requests entry of an order:

a.   Directing Respondents to produce responsive, non-privileged documents requested on Attachment A hereto for examination by Ambac;

b.   Directing Respondents to designate an individual or individuals with knowledge of the matters described in Attachment A hereto and to produce such individual or individuals to be examined by Ambac under oath on such date and time and at such location in Puerto Rico as may be designated in writing by Ambac on not less than 14 days' notice;

c.   Authorizing Ambac to issue subpoenas directing the production of documents and the examination of other witnesses who may have knowledge of the matters described in Attachment A without separate application to this Court for each subpoena or witness, and in accordance with the procedures set forth herein and in the Proposed Order; and

d.   Authorizing Ambac to issue interrogatories to the Respondents without separate application to this Court, and in accordance with the procedures set forth herein and in the Proposed Order.

## BASIS FOR RELIEF REQUESTED

A.    **Rule 2004 Entitles Ambac to Broad Discovery Concerning the Financial Condition of the Commonwealth.**

16.    Federal Rule of Bankruptcy Procedure 2004 applies to these proceedings pursuant to PROMESA § 310.  48 U.S.C. § 2170 (providing that the Bankruptcy Rules apply to Title III proceedings and civil proceedings arising thereunder).

17.    Rule 2004 allows examination of the "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate."  Fed. R. Bankr. P. § 2004(b).  "The understanding generally acceptable today is that the scope of a Rule 2004 examination is very broad," *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991), even broader than discovery under the Federal Rules of Civil Procedure.  *See In re China Fishery Grp. Ltd.*, 2017 WL 3084397, at *4 (Bankr. S.D.N.Y. July 19, 2017) (noting that Rule 2004 discovery can be "legitimately compared to a fishing expedition") (citation omitted).; *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (Bankr. S.D.N.Y. 1993) ("The investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c), is supposed to be a 'fishing expedition,' as exploratory and groping as appears proper to the Examiner.") (internal citations omitted); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. at 711 (noting that Rule 2004 provides few of the procedural safeguards of the Federal Rules of Civil Procedure).

18.    The granting of a motion under Bankruptcy Rule 2004 is within the discretion of the Court.  *See In re Gawker Media LLC*, 2017 WL 2804870, at *5 (Bankr. S.D.N.Y. June 28, 2017) ("Rule 2004 gives the Court 'significant' discretion.") (internal citation omitted).  Furthermore, section 105(a) of the Bankruptcy Code "sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code." *In re Hughes*,

- 9 -

281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) (quoting *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986)).

19.     Rule 2004 provides that any party in interest may move for examination.  Fed. R. Bankr. P. 2004(a).   As a significant long-term creditor of the Commonwealth and its instrumentalities, and as a party committed to the long-term fiscal health of Puerto Rico, Ambac is a party in interest entitled to information regarding the state of the Commonwealth's finances and its pension liabilities.  *See In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) ("Courts have generally construed the term 'party in interest' as used in 11 U.S.C. § 1109(b) liberally."); *see also In re Johns-Manville Corp.*, 36 B.R. 743, 747-48 (Bankr. S.D.N.Y. 1984) (finding that the term "party in interest" is to be construed broadly).

20.     In assessing Rule 2004 motions, courts balance the competing interests of the parties, "weighing the relevance of and necessity of the information sought by examination."  *In re China Fishery Grp. Ltd.*, 2017 WL 3084397, at *5.  Further, courts look to whether the party seeking to conduct a Rule 2004 examination has demonstrated good cause.  *In re Gawker Media LLC*, 2017 WL 2804870, at *5.  This can include a showing that the information requested is necessary to the claim of the party seeking examination or that denial of the request would cause the examiner undue hardship or injustice.  *Id*. (citation omitted).

### B.    The Size of the Commonwealth's Pension Obligations, and the Basis for the Calculations Underlying the Stated Obligations, Is Within the Ambit of Rule 2004.

21.     Ambac has demonstrated good cause to be granted a Rule 2004 investigation.  As the Title III proceedings move toward confirmation and pension settlements are announced, creditors must have fulsome information concerning the financial condition of the Commonwealth, and specifically with regard to its true pension obligations.  Indeed, the $50 billion pension obligation number set forth in the New Fiscal Plan and prior iterations thereof effectively

constitutes the Commonwealth's single largest obligation; by comparison, the Commonwealth's general obligation debt amounts to approximately $12 billion, less than one third of the asserted pension obligation.  Ambac cannot accept the accuracy of that number—which, unlike bond debt, involves complicated actuarial projections relating to future obligations—merely on the Commonwealth's say-so.

22.     Ambac will clearly suffer "undue hardship [and] injustice" if it is not provided the information it seeks.  *See In re Drexel Burnham Lambert*, 123 B.R. at 712.  The information Ambac seeks relates to the ERS, JRS, and TRS pension plans, information regarding the unfunded accrued actuarial pension liability for each pension plan and the methodology used to determine that figure, information regarding the future annual required pay-as-you-go contributions for each pension plan and the methodology used to determine that figure, investment information and strategies for the pension plans, and information concerning the recent deals struck with the Oversight Board. Without that information, Ambac—and creditors more generally—cannot participate meaningfully in the process of advancing these Title III cases towards successful plans of adjustment—a process that, as mentioned above, is fast approaching.  Indeed, discovery of this critical information is the very "purpose of a Rule 2004 examination." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991).

23.     Creditor access to such information regarding pension obligations is also a fundamental tenet of PROMESA.  Both Titles III and VI of PROMESA provide that creditors are entitled to information that enables them to make informed decisions about potential restructurings. *See, e.g.*, PROMESA § 206(a) (providing that in order for the Oversight Board to issue a restructuring certification (a prerequisite to Title III eligibility), an entity must have "made

public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring"); *id.* at § 301(a) (incorporating the disclosure requirements of 11 U.S.C. § 1125 to a Title III plan of adjustment); *id.* at § 601(f) (requiring delivery of certain information, including "a description of the Issuer's economic and financial circumstances" to creditors prior to soliciting votes on a bond modification under Title VI of PROMESA).

24.     This federally legislated transparency is consistent with Puerto Rico law.  The Puerto Rico legislative and executive branches have taken steps to ensure that citizens have access to information about public entities such as AAFAF, the Oversight Board, and the Commonwealth itself.  For example, subject to certain exceptions, Puerto Rico law grants every citizen the right to inspect and copy any public document.  *See* P.R. Laws Ann. tit. 32 § 1781.  Recently, in Executive Order OE 2017-10, the Governor reinforced the Commonwealth's public policy in favor of transparency and access to information concerning government entities, and outlined a procedure by which citizens can obtain such information.

25.     Furthermore, the information sought is relevant to the requirement that, to be confirmed over an impaired class's objection, a plan of adjustment must be "fair and equitable." 11 U.S.C. § 1129(b)(1); *see* PROMESA §§ 301(a), 314(b)(1) (incorporating this requirement). This inquiry necessarily considers both the revenue and expense sides of the Commonwealth's budget, which in turn depend on the assumptions and projections in the operative fiscal plan.  *See, e.g., Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (finding that a municipal debtor's plan of adjustment may be approved only upon a factual finding that the recovery proposed for creditors is "the maximum that the [debtor] could reasonably pay"); *see also In re*

*Velo Holdings Inc.*, 472 B.R. 201, 211 (Bankr. S.D.N.Y. 2012) (noting that one of the goals of Chapter 11 is to maximize recovery for creditors).

26.     In any contested confirmation proceeding, the Oversight Board will have to demonstrate to the Court's satisfaction that the proposed plan of adjustment does all that is reasonably possible to maximize creditor recoveries.  *See Lorber*, 127 F.2d at 639; *see also* 6 Collier 943.03[1][f][i] ("A plan under chapter 9 is fair and equitable if the amount to be received by the bondholders is all that they can reasonably expect in the circumstances." (quotation marks omitted)); H.R. Rep. No. 94- 686, 94th Cong., 1st Sess. 33 (1977) (noting that the debtor "must exercise its taxing power to the fullest extent possible for the benefit of its creditors").  Creditors will be entitled to challenge the assumptions, projections, and analyses that underlie the operative fiscal plan's pension liabilities.

27.     Ambac's information requests are narrowly focused, targeting specific information needed to better understand the assumptions made about the Commonwealth's pension obligations.  Respondents have not identified an appropriate basis on which to object to these requests; indeed, they have largely conceded their relevance as part of the voluntary process.

### CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1

28.     Undersigned counsel hereby certifies that, prior to filing this motion, Ambac met and conferred with Respondents and exchanged a series of letters regarding discovery into the Commonwealth's pension obligations.  *See* Exhibits A-E.  Those efforts have not resulted in

- 13 -

satisfactory responses to Ambac's voluntary requests, and counsel does not believe any further meet-and-confer sessions would be productive.

## NOTICE

29.      Under the Ninth Amended Case Management Procedures, the deadline to file an objection to this Motion is July 9, 2019.  Ambac therefore provides the following notice pursuant to Rule 2004-1(d) of the Puerto Rico Local Bankruptcy Rules, modified accordingly with respect to the objection deadline: Any party who objects to the examination shall serve and file an objection or motion for protective order with the United States Bankruptcy Court for the District of Puerto Rico by July 9, 2019.  If no objection or motion for protective order is timely filed, the court may grant the motion for examination without further notice or a hearing.

## NO PRIOR REQUEST FOR RELIEF

No previous request for the relief sought herein has been made by Ambac to this or any other Court.

## CONCLUSION

Ambac respectfully requests authority to direct the production of documents, the examination of witnesses, and direct responses to interrogatories pursuant to Rule 2004 as set forth herein and consistent with the Proposed Order, and that Ambac be granted such other and further relief as is just and proper.


[*Remainder of Page Intentionally Omitted*]

Dated:  June 18, 2019
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com
scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
Dennis F. Dunne
Andrew M. Leblanc
Atara Miller
Grant R. Mainland
(admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770
Email: ddunne@milbank.com
aleblanc@milbank.com
amiller@milbank.com
gmainland@milbank.com

***Attorneys for Ambac Assurance Corporation***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

*/s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)

## **Exhibit 1**

**Proposed Order**

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>      Debtors.[1] | PROMESA<br><br>Title III<br><br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## [PROPOSED] ORDER GRANTING AMBAC ASSURANCE CORPORATION'S MOTION FOR ENTRY OF ORDER AUTHORIZING DISCOVERY UNDER BANKRUPTCY RULE 2004 CONCERNING PENSION LIABILITIES

Upon the motion ("the Motion") of Ambac Assurance Corporation ("Ambac"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"), for entry of an Order authorizing Ambac to take discovery of (i) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"); (ii) the Puerto Rico Fiscal Agency and Financial

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Advisory Authority ("AAFAF"); and (iii) the Commonwealth, (collectively, the "Respondents"), as well as the examination of and production of documents from entities determined by Ambac to have information in connection with Ambac's investigation, and responses to interrogatories as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. § 1331 and PROMESA § 306(a); and venue being proper before this Court pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a); and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion and granted herein is in the best interests of the Debtor, its respective creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted as provided herein.

2.      The Respondents shall comply with the document requests in Attachment A by no later than ten (10) days after entry of this Order.

3.      The Respondents shall designate an individual or individuals with knowledge of the matters described in Attachment A hereto (the "Designated Individual(s)").  The Designated Individual(s) shall make themselves available for examination by counsel to Ambac under oath and in accordance with Rule 2004 on such date and time and at such location as may be designated in writing by counsel to Ambac.

4.      Ambac is authorized, pursuant to Rule 2004, to issue such subpoenas as may be necessary to compel the production of documents and/or testimony of a third party witness to accomplish the discovery authorized by this Order.

5.      Third-party witnesses shall have fourteen (14) days from the service of a subpoena to either (i) produce to Ambac all responsive non-privileged documents requested in Ambac's subpoena, or (ii) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

6.      Third-party witnesses are directed to either (i) submit to oral examination upon reasonable notice and, absent other agreement with Ambac, in no event more than fourteen (14) days from the date of the service of a deposition subpoena upon such witness, or (ii) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

7.      Ambac shall serve each subpoena and a copy of this Order on the target of the subpoena.

8.      Ambac is authorized, pursuant to Rule 2004, to issue interrogatories to the Respondents without further application to the Court by no later than ten (10) days after entry of this Order.

9.      Nothing herein shall limit Ambac's right to request additional discovery, including any additional documents or depositions, under Rule 2004 and applicable law, based on any information that may be revealed as a result of the information provided pursuant to this Order or otherwise.

10.      This Court shall retain jurisdiction to resolve any dispute arising from or related to this Order and to interpret, implement and enforce the provisions of this Order.

11.     This Order is without prejudice to Ambac's right to file further motions seeking

additional documents pursuant to Rule 2004 or any other applicable law.

SO ORDERED.

Dated: _____, 2019

San Juan, Puerto Rico

_____

HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

**Attachment A**

**<u>DEFINITIONS</u>**

The following definitions shall apply to all document requests herein:

1.      "<u>Commonwealth</u>," "<u>you</u>", or "<u>your</u>" means the Commonwealth of Puerto Rico, including its executive and legislative branches of government, and each of their present or former representatives, employees, and agents.

2.      "<u>Document</u>" or "<u>documents</u>" is used in the broadest sense permitted under the Federal Rules of Civil Procedure and the Local Rules for the District of Puerto Rico, including tangible things, correspondence, internal or external memoranda, letters, drafts, non-identical copies, notes including handwritten notes, minutes of meetings, computer records (*e.g.*, email messages), any electronically stored information, recordings (*e.g.*, voicemail recordings), diaries, exhibits, sketches, designs, catalogs, newspapers, magazines, appointment or telephone records, banking records, and notices.

3.      "<u>ERS</u>" means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico and each of its present or former agents, representatives, and employees.

4.      "<u>Including</u>" means including but not limited to.

5.      "<u>JRS</u>" means the Judiciary Retirement System of the Commonwealth of Puerto Rico and each of its present or former agents, representatives, and employees.

6.      "<u>New Fiscal Plan</u>" means the New Fiscal Plan for Puerto Rico, dated May 9, 2019.

7.      "<u>Oversight Board</u>" means the Financial Oversight and Management Board for Puerto Rico and each of its present or former board members, agents, representatives, and employees.

8.      "Pension Systems" means ERS, JRS, and TRS.

9.      "Petition" means the Title III Petition for Covered Territory or Covered Instrumentality filed by the Oversight Board, on behalf of the Commonwealth, on May 3, 2017 in the above-captioned proceeding.

10.     "TRS" means the Puerto Rico Teachers Retirement System and each of its present or former agents, representatives, and employees.

11.     "PROMESA" means the Puerto Rico Oversight, Management, and Economic Stability Act as codified at 48 U.S.C. §§ 2101 *et seq.*

## INSTRUCTIONS

1.      The documents requested herein include all responsive documents in your possession, custody, or control, regardless of whether such documents are possessed by you personally or by your agents, employees, representatives, affiliates, accountants, investigators, or your attorneys or advisors or their agents, employees, representatives, or investigators.

2.      Each document request herein seeks production of each document in its entirety, without abbreviation or redaction, with all non-identical copies and drafts thereof, including any document appended to, included with, incorporated by, or referred to in the document.

3.      If any document cannot be produced in full, produce it to the extent possible, specifying the reasons for your inability to produce the remainder and stating whatever information, knowledge, or belief you have concerning the unproduced portion.  Any purportedly privileged document containing non-privileged matter shall be produced with the purportedly privileged portion redacted.  You shall identify the specific location on each page where any purportedly privileged matter has been redacted.  All redactions based on purported privilege must contain text stating the redaction is for privilege.  Non-privileged information shall not be redacted;

2

instead, the entire document shall be marked "Confidential," or as otherwise determined by a valid and applicable protective order.

4.       All documents should be produced as they are kept in the ordinary course of business, or shall be organized and labeled to correspond to the specific paragraph(s) to which they are responsive.  If you are producing the requested documents according to how they are kept in the ordinary course of business, the integrity and internal sequence of the requested documents within each file or folder shall not be disturbed, nor shall the contents of any file or folder be commingled with the contents of another file or folder.  If you are producing the requested documents by reference to the specific paragraph(s) to which they are responsive, the integrity and internal sequence of each of the requested documents must be preserved, and you must produce information sufficient to identify how the document was kept in the ordinary course of business.

5.       The document requests herein are continuing.  Any response hereto shall be supplemented promptly upon possession or discovery of other or additional information or documents responsive to any request herein.

6.       If any documents, or any portion of a document, responsive to this request is withheld by you under a claim of privilege, you shall, pursuant to Federal Rule of Civil Procedure 26(b)(5), identify the nature of the privilege (including work product) that is being claimed, and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the privilege rule being invoked.  If a portion of a document contains information subject to a claim of privilege, only that portion shall be redacted, and the remainder shall be produced.

7.       If any document responsive to this request has been, but is not longer, in your possession, custody, or control, you shall furnish a list specifying each such document and setting forth the following information:  (a) the type of document; (b) the general subject matter of the

document; (c) the date of the document; and (d) the name(s) and address(es) of each person who prepared, received, viewed, and has or has had possession, custody, or control of the document.

8.     If there are no documents responsive to a particular request, you shall so state in writing.

9.     If and to the extent any request is objected to, state with specificity all grounds for the objection.  Any ground not stated within the time allowed for responding to these requests shall be waived.

10.    The terms "all," "any," "each," and "every" shall each be construed as encompassing any and all.

11.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

12.    The use of the singular form of any word includes the plural and vice versa.

13.    Ambac demands that you preserve all documents and prevent the alteration or deletion of any such relevant documents.

14.    Electronically stored information should be produced in accordance with the following specifications:

     a.     <u>Form of Production</u>.  Produce electronically stored information in single-page tiff format (Group IV tiff at 300 dpi) with standard Concordance formatted load file (.dat), including all metadata.  Name each tiff file with a unique name matching the Bates number (or similar identifying mark) labeled on the corresponding page.  Group every 1000 tiffs into a new folder; do not create a separate folder for each document.

b.  Image Load File.  Provide an image load file (Opticon file) that contains document boundaries and page counts.

c.  Document Text.  For documents that were originally stored as native electronic files and which do not have redactions, produce the extracted full text (not OCR) from the body of each document in separate document-level *.txt files named for the beginning Bates number of the associated document.  Provide OCR text for documents without extracted text available (non-searchable PDFs, etc.).  Group 1000 document text files per incrementally named "TEXT" directories, separate from image directories.  For documents that were originally stored as native electronic files and which have redactions, produce the OCR text from the redacted image(s) associated with each document, in separate document-level *.txt files named for the beginning Bates number of the associated document.  Clearly label any redacted material to show the redactions on the tiff image.  Also provide a comma-delimited extracted text list file with each document's beginning Bates number along with the path to the associated extracted text/OCR text file.

d.  Native Production For Certain File Types.  For files created by Excel or other spreadsheet programs, PowerPoint or other special presentation programs, database files, or any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the files in native and tiff formats.  Name the produced native file with the Bates number on the first page of the corresponding tiff production of the file /

5

document.   Group native files within incrementally named "NATIVE"
directories; separate from images directories.

e.   <u>Metadata</u>.  Produce extracted metadata for each document in the form of a
Concordance load file (.dat), including the following fields (where applicable):
Bates range begin, Bates range end, Bates family range begin, Bates family
range end, email subject line, file name, email sent date, email sent time, created
date, created time, last modified date, last modified time, author, from, to, CC,
BCC, custodian, source, source folder, MD5 hash value, native file path
location, and confidentiality designation.  Documents should be produced in
such fashion as to identify the location of the document and, where applicable,
the natural person in whose possession it was found.

15.   If, in responding to the requests, you encounter any ambiguities when construing a
request or definition, your response shall set forth the matter deemed ambiguous and the
construction used in responding.

16.   Unless otherwise specified herein, the period of time covered by these requests is
June 30, 2016 to the present (the "<u>Period</u>").

## DOCUMENT REQUESTS

1.   Documents, communications, studies, data, and/or analyses sufficient to show a
summary plan description for each component of the Pension Systems.

2.   All documents, communications, studies, data, and/or analyses concerning the
current trust or trusts for the Pension Systems.

3.   All documents, communications, studies, data, and/or analyses regarding the
Treasury Single Account allocation or mechanism for the Pension Systems.

4.     All documents, communications, studies, data, and/or analyses showing the rationale, calculations, or additional data supporting the yield shown for "hybrid accounts."

5.     All documents and communications concerning the calculations and/or rationale behind the 10% pension reduction.

6.     All documents, communications, studies, data and/or analyses concerning the actual, audited, and updated payroll data that supports the future contribution amounts projected in the fiscal plan pension model.

7.     All documents, communications, studies, data and/or analyses concerning the actual, audited, and updated benefit payments data that supports to hard-coded benefit payments amounts in the fiscal plan pension model.

8.     All documents, communications, studies, data, and/or analyses concerning the amount and/or valuation of the Pension Systems' unfunded accrued actuarial pension liability, including, without limitation, the actuarial assumptions used to value the Pension Systems' unfunded accrued actuarial pension liability, and any changes relating to such assumptions.

9.     All documents, communications, studies, data, and/or analyses concerning the methodology applied by the Pension Systems to determine their unfunded accrued actuarial pension liability, and the reasons for selection of that methodology.

10.     All documents, studies, and/or data used to determine or calculate pension benefit obligations for all Pension Systems' members or their beneficiaries.

11.     All documents, studies, and/or data used to determine or calculate projected pension benefit obligations for all Pension Systems' members or their beneficiaries.

12.     All documents, communications, studies, data, and/or analyses concerning updated contribution and disbursement amounts for the ERS and TRS plans for plan years 2014-2018.

13.     All documents and communications concerning any guidelines, policies, procedures, practices, rules, staff instructions, or standards applicable to the Pension Systems or used by the Pension Systems that relate to the determination, analysis, or review of the Pension Systems' pensions liabilities.

14.     All documents, communications, studies, data, and/or analyses concerning the amount and/or valuation of the Pension Systems' future annual required pay-as-you-go contributions.

15.     All documents, communications, studies, data, and/or analyses concerning the methodology applied by the Pension Systems to determine their future annual required pay-as-you-go contributions, and the reasons for selection of that methodology.

16.     All documents and communications concerning any guidelines, policies, procedures, practices, rules, staff instructions, or standards applicable to the Pension Systems or used by the Pension Systems that relate to the determination, analysis, or review of the Pension Systems' future annual required pay-as-you-go contributions.

17.     All documents, communications, studies, data, and/or analyses concerning the amount and/or valuation of the Pension Systems' invested assets.

18.     All documents and communications concerning the Pension Systems' investment strategy for its invested assets.

19.     All documents and communications concerning any guidelines, policies, procedures, practices, rules, staff instructions, or standards applicable to the Pension Systems or used by the Pension Systems with respect to how the investment managers are permitted to invest the Pension Systems' assets.

20.     All documents and communications concerning the Pension Systems' determination, calculation, estimation, or projection of future investment return on assets.

21.     All documents, communications, studies, data, and/or analyses prepared for or relied upon in connection with the actuarial analysis of pension funding requirements referenced on page 181 of the New Fiscal Plan.

22.     Documents sufficient to show Pension Systems' member census data, including the number of active, retired, disabled, and terminated vested members or beneficiaries and the place of residence, average age, average salary, average creditable service, and average monthly benefits received for members in each such category.

23.     All documents, communications, studies, data, and/or analyses concerning pension payments or claims determined or alleged to be fraudulent.

24.     Documents sufficient to identify the individuals and entities responsible for (i) determining and/or valuing the Pension Systems' current and projected pension liabilities and (ii) determining and/or implementing the Pension Systems' investment strategy for its invested assets.

25.     All documents, communications, studies, data, and/or analyses concerning the impact of Hurricanes Irma and María on (i) the actuarial assumptions used to value the Pension Systems' unfunded accrued actuarial pension liability, and (ii) the amount and/or valuation of the Pension Systems' future annual required pay-as-you-go contributions.

26.     All census files used in developing the last three annual sets of aggregate liability and benefit payment projects for each component of the Pension Systems.

27.     All ProVal library files (in provaldd.sf, pvvip.sf, pvasmp.sf, and/or pvout.sf format) used in developing the last three sets of aggregate liability and benefit payment projects for each component of the Pension Systems.

28.     All documents, communications, studies, data, and/or analyses concerning the announcement made by Governor Ricardo Rosselló regarding a joint resolution to use $1.4 billion from the Commonwealth's single treasury account to restore past contributions made by public servants to individual retirement accounts under the System 2000 program.

29.     All documents shared with or received from the Puerto Rico Teachers Association in connection with its attempted agreement with the Oversight Board, announced on or about June 3, 2019, regarding the treatment of pensions in a future Commonwealth plan of adjustment, including, but not limited to, the use of cash contemplated by such agreement and/or whether any such cash will be placed in trust.

30.     All documents shared with or received from the Puerto Rico United Public Servants Union in connection with its agreement with the Oversight Board, announced on or about June 10, 2019, regarding the treatment of pensions in a future Commonwealth plan of adjustment, including, but not limited to, the use of cash contemplated by such agreement and/or whether any such cash will be placed in trust.

31.     All documents shared with or received from the Official Committee of Retired Employees of the Government of Puerto Rico in connection with its agreement with the Oversight Board, announced on or about June 12, 2019, regarding the treatment of pensions in a future Commonwealth plan of adjustment, including, but not limited to, the use of cash contemplated by such agreement and/or whether any such cash will be placed in trust.

32.     All documents concerning whether, in connection with any of the agreements or attempted agreements referred to in Request Nos. 29-31, the Commonwealth has undertaken any pension liabilities previously borne by Puerto Rico municipalities.