# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| as representative of | ) | Case No. 3:17-bk-03283 (LTS) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| Debtors. | ) | |
| | X | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| as representative of | ) | Case No. 3:17-cv-01685 (LTS) |
| | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| Debtor. | ) | |
| | X | |

## OBJECTION OF CERTAIN ERS BONDHOLDERS TO
## THE MAGISTRATE JUDGE'S JUNE 6, 2019
## <u>ORDER ON MOTION TO COMPEL</u>

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 7

I.      Judge Dein's Denial Of The Bondholders' Motion To Compel Documents
        Withheld Under The Deliberative Process Privilege Is Clear Error And Contrary
        To Law ............................................................................................................... 7

        A.      The Bondholders' Need For The Documents Outweighs Any Harm
                From Disclosure ...................................................................................... 8

        B.      The Board Did Not Satisfy The Requirements Of The Deliberative
                Process Privilege ................................................................................... 13

        C.      The Board Waived Any Privilege For Materials Shared With The
                Commonwealth, Its Advisors, Or AAFAF ............................................ 17

II.     Judge Dein's Denial Of The Bondholders' Motion To Compel Documents
        Withheld Under The Attorney-Client Privilege Is Clear Error And Contrary
        To Law ............................................................................................................. 19

III.    Judge Dein's Denial Of The Bondholders' Motion To Compel Documents
        Withheld Under The Work-Product Doctrine Is Clear Error And Contrary
        To Law ............................................................................................................. 20

CONCLUSION ............................................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aurelius Inv., LLC v. Puerto Rico*,
    915 F.3d 838 (1st Cir. 2019) ..................................................................................17

*Bank of Am., N.A. v. Terra Nova Ins. Co.*,
    211 F. Supp. 2d 493 (S.D.N.Y. 2002) ...................................................................18

*Bhatia Gautier v. Gobernador*,
    199 D.P.R. 59, 89 (P.R. 2017) ...........................................................................8, 16

*Bhatia Gautier v. Gobernador*,
    Civ. No. SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) ...................................8, 9

*Cal. State Foster Parent Ass'n v. Wagner*,
    No. C 07-05086 WHA, 2008 WL 2872775 (N.D. Cal. July 23, 2008) ...................9

*Data Gen. Corp v. Grumman Sys. Support Corp.*,
    139 F.R.D. 556 (D. Mass. 1991) ...........................................................................21

*Davis v. City of New York*,
    No. 10 Civ. 699(SAS)(HBP), 2012 WL 612794 (S.D.N.Y. Feb. 27, 2012) ..........9

*Fairholme Funds, Inc. v. United States*,
    128 Fed. Cl. 410 (2016) ..........................................................................................9

*In re Blier Cedar Co.*,
    10 B.R. 993 (Bankr. D. Me. 1981) ........................................................................20

*In re Grand Jury Proceedings*,
    417 F.3d 18 (1st Cir. 2005) ....................................................................................19

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    254 F.R.D. 35 (D. Mass. 2008) ...............................................................................9

*In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*,
    145 F.3d 1422 (D.C. Cir. 1998) ..............................................................................9

*Jordan v. U.S. Dep't of Justice*,
    591 F.2d 753 (D.C. Cir. 1978) ..............................................................................15

*Lluberes v. Uncommon Prods., LLC*,
    663 F.3d 6 (1st Cir. 2011) ......................................................................................19

*Marilley v. McCamman*,
    No. C 11-02418, 2012 WL 4120633 (N.D. Cal. Sept. 19, 2012) ............................9

*Noel v. City of New York*,
    No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969 (S.D.N.Y. Dec. 18, 2018).....16

*Peaje Invs. LLC v. García-Padilla*,
    845 F.3d 505 (1st Cir. 2017) ..................................................................................10

ii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*People for Am. Way Found. v. U.S. Dep't of Educ.*,
   516 F. Supp. 2d 28 (D.D.C. 2007) ..............................................................17

*Schreibman v. Walter E. Heller & Co. of P.R.*,
   446 F. Supp. 141 (D.P.R. 1978) ................................................................18

*Shell Oil Co. v. IRS*,
   772 F. Supp. 202 (D. Del. 1991) ...............................................................17

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
   60 F.3d 867 (1st Cir. 1995) .......................................................................13

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
   484 U.S. 365 (1988) ..................................................................................10

STATUTES

3 L.P.R.A. § 775 ..............................................................................................17

3 L.P.R.A. § 786-6 ..........................................................................................18

3 L.P.R.A. § 781a ............................................................................................18

19 L.P.R.A. § 2265 ..........................................................................................11

11 U.S.C. § 362 ...............................................................................................10

28 U.S.C. § 636 .................................................................................................1

48 U.S.C. § 2121 .............................................................................................14

48 U.S.C. § 2141 ........................................................................................14, 15

48 U.S.C. § 2142 .............................................................................................14

48 U.S.C. § 2144 .............................................................................................14

48 U.S.C. § 2195 .............................................................................................17

OTHER AUTHORITIES

Fed. R. Civ. P. 26 ...........................................................................................21

Fed. R. Civ. P. 72 .........................................................................................1, 7

To the Chambers of the Honorable Judge Laura Taylor Swain:

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a), the Bondholders[1] hereby object in part to the *Order on Motion to Compel*, Docket No. 7261 in Case No. 17-bk-03283 and Docket No. 546 in Case No. 17-bk-03566, issued by Magistrate Judge Dein on June 6, 2019 (the "June 6 Order"). In the June 6 Order, Judge Dein allowed in part and denied in part the *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents from Financial Oversight and Management Board*, Docket No. 6998 in Case No. 17-bk-03283 and Docket No. 512 in Case No. 17-bk-03566 (the "Motion to Compel").

## INTRODUCTION

1.      The Court is familiar with these discovery proceedings related to the Bondholders' motion for relief from the automatic stay, set for a final hearing on July 2, 2019. *Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay*, Docket No. 3418 in Case No. 17-bk-03283 and Docket No. 289 in Case No. 17-bk-03566 (the "Stay Relief Motion"). The instant objection challenges hundreds of documents withheld by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") on sweeping claims of privilege. In sustaining those privilege claims, Judge Dein clearly erred in her application of the exceptionally

---

[1] The Bondholders are Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund L.P., Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., SV Credit, L.P., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.

narrow deliberative process privilege under Puerto Rico law, and she either applied the wrong legal standard or clearly erred in her application of the First Circuit's strict standards for attorney-client privilege and the attorney work-product doctrine. The Court should reverse.

## BACKGROUND

2.      Throughout the discovery proceedings ordered by this Court in connection with the Stay Relief Motion, the Oversight Board has openly stonewalled discovery at every turn.[2] On March 4, 2019, the Bondholders served a narrowly tailored document subpoena on the Board with six requests for documents. The Board lodged broad objections—including sweeping objections based on privilege, overbreadth, vagueness, and relevance—and refused to produce any documents whatsoever in response to four of the six requests.

3.      On April 1, 2019, Judge Dein overruled the Board's general and overbroad objections and instructed the Board to comply with the document subpoena. *See* Apr. 1, 2019 Tr. 77:2–6. Judge Dein later entered an order requiring the Board to produce documents in accordance with the ruling in open court and to submit a status report on document production. Docket No. 431 in Case No. 17-03566, ¶ 3. On April 5, 2019, the parties submitted a status report. Docket No. 432 in Case No. 17-03566. It provided that the parties had agreed upon search parameters for the Board's production. *Id.* ¶ 2. Yet on April 8, 2019, during a meet-and-confer session on the Board's production, the Board took the position that it was not bound by this Court's discovery schedule for document production. *See* Docket No. 439 in Case No. 17-03566, ¶¶ 6, 13.

4.      On April 12, 2019, at an urgent telephonic status conference, Judge Dein ordered the Board (i) to produce documents on a rolling basis with an initial production on April 14, 2019, (ii) to make a supplemental production on April 16, 2019, (iii) to serve a privilege log by April 19,

---

[2] The Bondholders incorporate the background described in the *Objection of Certain ERS Bondholders to the Magistrate Judge's May 6, 2019 and May 15, 2019 Orders on Motions to Compel*, Docket No. 518 in Case No. 17-03566 (filed May 20, 2019).

2019, and (iv) to file a status report with the Bondholders by April 23, 2019. Docket No. 445 in Case No. 17-03566, ¶ 4.

5.      On April 23, 2019, the parties filed a joint status report. Docket No. 465 in Case No. 17-03566. The Board stated that it had "completed its initial and second-level review of the 7,466 documents identified through the agreed-upon search parameters" and was in the process of completing its final review. *Id.* ¶ 2. The Bondholders noted that the Board's two productions contained only 27 documents, with several of those documents being duplicates and/or heavily redacted (out of 760 total pages, 534 pages were redacted and completely blank). *Id.* ¶ 11. On the same day, Judge Dein ordered the Board to serve its privilege log by April 29, 2019 at 3:00 pm and to complete its document production by May 1, 2019. Docket No. 468 in Case No. 17-03566.

6.      The Board completed its document production on May 1, 2019. The Board's document productions fell far short of what the Federal Rules require. Its initial production consisted of 284 pages, 264 of which were completely blank: each and every page of these documents had been totally redacted. *See* Stewart Decl., ¶ 8, Docket No. 512-1 in Case No. 17-03566. Its later productions were little better. In volume, most of its production was a single document—evidently a budget for the Commonwealth—that, when printed, contained over 3,900 pages of accounting detail. Stewart Decl., ¶ 11(a); FOMB_ERS00002527-6463. The information was of no clear relevance to anything, was outside the scope of anything the Bondholders had asked for, and was self-evidently filler material to inflate the size of the Board's document production. Similarly, hundreds of other pages the Board produced were simply isolated strings of text, or graphics with no context. Stewart Decl., ¶ 11(b). Much of the rest of the Board's production was simply the same handful of documents produced again and again. This included 15 copies of the Legislature's Resolution 186, another 15 copies of Resolution 187, 9 copies of Resolution 189,

and 16 copies of the March 13, 2017 Fiscal Plan. Stewart Decl., ¶ 11(c). Additionally, when it
came to the weekly reports showing the balances in the Commonwealth Treasury's main account,
the Board produced the same four weekly reports from mid-2017 again and again (for a total of 14
times), yet produced no year-end reports that would allow the Bondholders to calculate final
numbers, much less any documents for the Commonwealth's more recent fiscal periods. Stewart
Decl., ¶ 11(d).

7.      Altogether, as of May 1, 2019, the Board had produced about 669 documents,
running to about 9,700 pages. Of these, fewer than ten were non-repetitive and relevant to the Stay
Relief Motion, and even some of these were documents that already were publicly available. *See*
Stewart Decl., ¶ 11–12. The rest were simply the pretense of a document production, the evident
purpose and intent of which was to avoid giving any meaningful discovery at all.

8.      An example of the Board's approach is a draft "Actuarial Valuation Report" from
Milliman, ERS's independent actuary, dated as of June 16, 2016. Stewart Decl., ¶ 11(e);
FOMB_ERS00008385-8457. In a case where the issues include the inflows and outflows of money
for a retirement system, and the projected economics of that retirement system under an ostensibly
new funding mechanism, it is difficult to think of anything more relevant than the actuarial report
projecting the pension obligations that system is facing in the coming years and giving the
assumptions underlying those projections. Nevertheless, the Board completely redacted 70 of the
report's 73 pages under the deliberative process privilege. Stewart Decl., ¶ 11(e).

9.      The Board served privilege logs on April 29 and May 1 for a total of 335
documents.[3] The logs broadly invoked the following privileges: (a) attorney-client privilege (224

---

[3] The Board served copies of the logs on the parties and Judge Dein but did not file them on the docket
because they contained personal email addresses for the senders and recipients. *See* Docket No. 483 in Case No. 17-
03566.

documents), (b) attorney work product (199 documents), (c) deliberative process privilege (173 documents), and (d) mediation privilege (13 documents). For documents withheld under the deliberative process privilege, the logs identify a number of "decisions" to which the documents contributed: the March 13, 2017 Fiscal Plan, the Fiscal Year 2018 and 2019 Territory Budgets, the April 18, 2018 Fiscal Plan, and potential revisions and corrections to the March 13, 2017 Fiscal Plan.

10.     Based on those two privilege logs, the Bondholders filed the Motion to Compel that is the subject of this Objection. In the Motion to Compel, the Bondholders challenged the Board's invocations of deliberative process privilege, attorney-client privilege, and the attorney work-product doctrine. Docket No. 6998 in Case No. 17-bk-03283 and Docket No. 512 in Case No. 17-bk-03566. The Bondholders argued, *inter alia*, that (1) the Bondholders can demonstrate a substantial need for the materials withheld pursuant to the deliberative process privilege, (2) the Board improperly withheld factual information under the deliberative process privilege, (3) the Board improperly withheld documents under the attorney-client privilege that do not involve legal advice, (4) documents sent by or to non-lawyer third parties were not protected by the attorney-client privilege, and (5) the Board had not adequately supported its work-product claims. *Id.* To preserve the issues for appeal, in light of Judge Dein's prior adverse rulings on related motions, the Bondholders also asserted that the Board had waived privilege by disclosing information to ERS, the Commonwealth, and AAFAF, that the crime fraud exception to the attorney-client privilege applies, and that the only relevant decision for purposes of the deliberative process privilege was the certification of the March 13, 2017 Fiscal Plan. *Id*. at 14–15.

11.     In the June 6 Order, Judge Dein denied the Motion to Compel in part. As to the deliberative process privilege, Judge Dein ordered that the withheld documents were predecisional,

because they preceded potential revisions or corrections to the March 13, 2017 fiscal plan, as well as the 2018 and 2019 territory budgets, even though these "decisions" merely implemented the changes already imposed by the March 13, 2017 fiscal plan; that the privilege was not waived by the sharing of documents between entities, because the entities shared a common interest; and that the Bondholders had not shown a substantial need for the withheld information in connection with the Stay Relief Motion. June 6 Order at 5–9. However, the Court ruled that the Board had not met its burden to demonstrate that factual information withheld under this privilege could not be segregated from the privileged information, and therefore ordered the Board to supplement its privilege logs and supporting affidavit or to produce the factual information. *Id.* at 9–12.

12.    As to the attorney-client privilege, Judge Dein deferred a ruling on documents sent by and to non-lawyer third parties, as well as on documents whose descriptions on the privilege logs insufficiently showed that the entire communication consisted of privileged legal advice, ordering the production of a supplemental privilege log as to certain documents. *Id.* at 12–15. Judge Dein denied that the crime-fraud exception to attorney-client privilege applied here, and also denied that the privilege had been waived through sharing documents with the Respondents. *Id.* at 6 n.5.

13.    As to attorney work-product doctrine, Judge Dein held that the privilege logs were inadequate to establish that work-product protection applied to all the documents for which it was claimed, and therefore ordered that these documents be produced or a supplemental privilege log supplied. *Id.* at 15–17. Finally, Judge Dein held that the Bondholders had not established a substantial need for any documents protected by the work-product doctrine and that this protection had not been waived. *Id.* at 17.

14.     On June 12 and 13, in response to the June 6 Order, the Oversight Board produced a supplemental and amended privilege log and declaration, produced 16 previously withheld documents, and reproduced 18 previously redacted documents. *See* Decl. of Cheryl T. Sloane, ¶¶ 2–4, Docket No. 562-1 in Case No. 17-03566. Following a meet-and-confer session on June 14, the Board produced another supplemental and amended privilege log on June 17, withdrawing the assertion of work-product protection for one document. *See id*. ¶¶ 7–8. The Board continues to claim deliberative process privilege, attorney-client privilege, and work-product protection for hundreds of documents. *Id*. Because the disclosures remain inadequate in light of Judge Dein's prior rulings, and because the parties were unable to reach agreement after conferring, the Bondholders filed a renewed motion to compel, which is currently pending before Judge Dein. *See Renewed Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to Compel Production of Documents from Financial Oversight and Management Board*, Docket No. 562 in Case No. 17-03566 ("<u>Renewed Motion to Compel</u>").

## **ARGUMENT**

15.     Under Federal Rule of Civil Procedure 72(a), the Court must "modify or set aside any part of [the Magistrate Judge's] order that is clearly erroneous or is contrary to law." For the reasons that follow, the Court should set aside the portions of the June 6 Order denying the Motion to Compel and order the Board to produce additional documents to the Bondholders in connection with the Stay Relief Motion.

## I.    **Judge Dein's Denial Of The Bondholders' Motion To Compel Documents Withheld Under The Deliberative Process Privilege Is Clear Error And Contrary To Law.**

16.     The deliberative process privilege in Puerto Rico is an exceedingly narrow one. The Commonwealth's "evidentiary system demands a restrictive interpretation when determining the

existence of a privilege." *Bhatia Gautier v. Gobernador*, 199 D.P.R. 59, 89 (P.R. 2017) ("*Bhatia Gautier I*"). The Puerto Rico Supreme Court has held that because "the right of . . . citizens" "to have access to public information [is] a fundamental right of constitutional rank," claims of privilege by the government "must be scrutinized with particular zealousness." *Id.* at 80. "When claiming the confidentiality of official information, it is the *government* that has to prove *in a precise and unequivocal manner* the applicability of the privilege." *Id.* (emphasis added). Indeed, Puerto Rico courts routinely use the language of strict scrutiny when describing the showing the government must make under the deliberative process privilege. *E.g.*, *id.* at 87–89 (the government "must . . . present evidence and show the existence of [a] compelling interest of greater hierarchy than the values protected by [the] right of freedom of information of the citizens."). Contrary to Judge Dein's ruling, the Board has not satisfied this test.[4]

### A.   The Bondholders' Need For The Documents Outweighs Any Harm From Disclosure.

17.    Even if the deliberative process privilege could apply here (which it does not, *see* Part I.B), the Court still must "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 D.P.R. at 88. Courts routinely hold that the deliberative process privilege must give way when the government's intent is relevant and government deliberations are central to the case. *See, e.g.*, *Bhatia Gautier v. Gobernador*, Civ. No.

---

[4] Accepting the Bondholders' argument that the Board had not met its burden to establish that none of the factual information withheld could be produced without revealing privileged information, Judge Dein ordered the Board to produce supplemental privilege logs and supporting affidavits or to produce nonprivileged factual information by June 12, 2019. June 6 Order at 11–12. While the Board has now produced supplemental privilege logs and affidavits, those productions remain inadequate. The Bondholders have renewed the Motion to Compel before Judge Dein in light of these inadequate disclosures, and the renewed motion remains pending. *See* Renewed Motion to Compel.

SJ2017CV00271 (P.R. Sup. Ct. Mar. 16, 2018) ("*Bhatia Gautier II*") (ordering the Commonwealth to produce the final draft budget submitted by Puerto Rico's governor to the Board as part of the PROMESA-dictated budgeting process); *In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) (holding that "the deliberative process privilege is not appropriately asserted . . . when a plaintiff's cause of action turns on the government's intent"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 41–42 (D. Mass. 2008) (overruling the deliberative process privilege because the "[g]overnment knowledge could conceivably be relevant to two elements" of the claim at issue and the defendant "ha[d] the right during discovery to see documents reflecting the government's knowledge" so that it could "mount [its] defense"); *Fairholme Funds, Inc. v. United States*, 128 Fed. Cl. 410 (2016), *mandamus granted in part and denied in part*, *In re United States*, 678 F. App'x 981 (Fed. Cir. 2017) (requiring the government to disclose privileged material because of its centrality to the litigation and the government's role as a defendant in the case); *Davis v. City of New York*, No. 10 Civ. 699(SAS)(HBP), 2012 WL 612794, at *8 (S.D.N.Y. Feb. 27, 2012) ("The privilege is routinely found to be inapplicable where the agency deliberations are central to the case."). Indeed, courts have repeatedly ordered disclosure of materials *connected with the legislative process* in such cases. *See, e.g.*, *Marilley v. McCamman*, No. C 11-02418, 2012 WL 4120633, at *1–3 (N.D. Cal. Sept. 19, 2012) (ordering disclosure of "draft enrolled bill reports, draft bill analyses, a final bill analysis, and a draft proposed amendment" prepared by an executive agency); *Cal. State Foster Parent Ass'n v. Wagner*, No. C 07-05086 WHA, 2008 WL 2872775, at *1, 4–6 (N.D. Cal. July 23, 2008) (ordering disclosure of "six legislative analyses" prepared by the Department of Social Services).

18.     The Bondholders unquestionably have a substantial need for the withheld materials. As the Court is well aware, a central issue in the Stay Relief Motion is the Bondholders' statutory right to adequate protection of the collateral securing the bonds in which they invested. 11 U.S.C. § 362. Adequate protection is required, by statute and by constitutional law, when there is a diminution in the value of collateral during the term of the automatic stay imposed by the Bankruptcy Code. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988); *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017). Respondents' principal defense to the Stay Relief Motion is to assert that there is no more collateral: according to Respondents, two statutes enacted by the Puerto Rico Legislature simply took the collateral away, so there is nothing left to diminish in value and, thus, no point in lifting the automatic stay.

19.     There is, accordingly, no doubt that the cause and effect of these two statutes are central to the Stay Relief Motion. There is also no doubt that the directive ordering the Puerto Rico government to replace ERS with the PayGo system came from the Board itself. Docket No. 446 in Case No. 17-03566, ¶¶ 17–18; *see also* Joint Resolution 188 at 4 (stating that the provisions are "approved pursuant to the actions *required* under . . . the Fiscal Plan approved and certified *by the Financial Oversight Board*") (emphasis added). In fact, until the Board imposed its dictates upon the Commonwealth, Puerto Rico planned to restore financial health to ERS by simply increasing the amounts of money employers paid into the system each month. Docket No. 446 in Case No. 17-03566, ¶ 17. Therefore, it is patently clear that the decision to create PayGo was one made by the Board.

20.     The thinking behind, and details of, that decision are relevant and material. It came at a time when Puerto Rico was in dire financial shape and desperately short of money. A central feature of the new PayGo system was to confiscate ERS's liquid assets, which were then deposited

10

in the Commonwealth Treasury, commingled with other monies, and spent on unrelated things. Simultaneously, the PayGo structure directed that the Commonwealth general fund would assume the billions of dollars in accrued pension liabilities that ERS owed to its members, thus imposing billions of dollars in new financial obligations upon Puerto Rico at a time when the Commonwealth was admittedly bankrupt. There was no source of money to fund these new PayGo obligations—except for the contributions from employers ERS had been receiving for years. But those employer contributions were subject to the Bondholders' liens, and the Bondholders had to be paid before the Commonwealth would be free to arrogate the employer contributions to fund PayGo. The Board—and it was the Board alone—therefore devised the plan to circumvent this inconvenience by directing the Commonwealth to restructure its pension system in a way that defeated the Bondholders' liens. This included the sleight-of-hand whereby mandatory contributions from employers were ostensibly eliminated and replaced by mandatory assessments of PayGo fees upon the same employers and the re-routing of this money away from ERS and directly into the Commonwealth Treasury. Each of these measures had the purpose of defeating the Bondholders' liens, and it is these very measures that Respondents rely upon in opposing the Stay Relief Motion.

21.     The premise underlying Respondents' defense in the Stay Relief Motion—that the Bondholders now have no collateral at all—is, however, false. It is black-letter law that a lien follows the collateral. *See* UCC § 9-315, 19 L.P.R.A. § 2265(a). Thus, if the PayGo fees are simply the old employer contributions with a different name, then the Bondholders' liens attach to them, and the Bondholders are thus entitled to adequate protection.

22.     It is clear that the Bondholders have no other source for this information. First, all of these decisions were made by the Board, with the help of its various consultants. The other parties to this motion—ERS and the Commonwealth—in fact, had other plans and accepted the

Board's decision only after it was forced upon them in March 2017. Second, we now know that the Board has not disclosed sufficient evidence in discovery to answer any of these important questions. As described above, its document production consists mainly of irrelevant filler; most documents that might shed light on the facts the Board relied upon, the Board's analysis of the comparability of employer contributions to PayGo fees, or the Board's thinking of how to structure a PayGo system have been withheld or entirely redacted. Having now filed two motions to compel, attended repeated meet-and-confer sessions, and unsuccessfully attempted to resolve this matter by negotiation, the Bondholders have no alternative but to now ask the Court for this relief. The discovery process itself, clearly, has failed.

23.     Judge Dein rejected this argument on the ground that "the facts needed by the Bondholders to present their theory of a continuing security interest in connection with the Lift Stay Motion are those relating to the actual functioning of the new and old pension systems." June 6 Order at 8. Judge Dein reasoned that this Court had recently rejected the Bondholders' substantial need arguments as to documents withheld by ERS, the Commonwealth, and AAFAF, and concluded that "[e]ven if the Court were to adopt the Bondholders' claim about the Oversight Board's role as true, the Board's intent remains of marginal, if any, relevance." *Id*. at 9. But Judge Dein's reasoning and ruling were clear error.

24.     As the Bondholders explained, the actual mechanics of how the two pension systems calculate what they are owed, collect money, and disburse benefits to retirees are just one piece of the puzzle on the central issue in the Stay Relief Motion, that is, whether the new PayGo fee is simply another version of the old employer contributions such that the Bondholders' liens continue to attach to them. The deliberations underlying the decision to abandon the longstanding ERS system for the ostensibly new PayGo system are critically important for three reasons. First,

there can be no stronger evidence of the equivalence of employer contributions and PayGo fees than evidence that the creators of the PayGo system considered them equivalent or took steps to mask their equivalence. Second, the fact that the authors of the PayGo system expressed the intention to divert the Bondholders' collateral is compelling evidence that the PayGo fees are simply diverted employer contributions. Finally, evidence that a motivation behind PayGo was to avoid paying the Bondholders the value they were owed, while continuing to make employers contribute to the pension plan, is strong evidence that the PayGo plan is pretextual and that the employer contributions were never truly eliminated in the first place.

25.     Further, the Board is differently situated than ERS, the Commonwealth, or AAFAF with respect to these deliberations, as the Board alone mandated the adoption of PayGo. Judge Dein therefore clearly erred when she concluded that "[t]he fact that the Oversight Board may have been the motivating force behind the Pay-Go system . . . does not alter the significance of the sought information to the issues raised by the Lift Stay Motion." *Id*. Contrary to Judge Dein's reasoning, evidence of how the PayGo system was designed is strongly probative of the continued existence of the Bondholders' collateral. The Bondholders therefore have shown a substantial need for those documents, and Judge Dein clearly erred in concluding otherwise.

**B.     The Board Did Not Satisfy The Requirements Of The Deliberative Process Privilege.**

26.     The deliberative process privilege is a narrow one. Because it protects only materials that "actively contribute to the agency's decisionmaking process," it does not shield "post-decisional documents [that] explain[] or justify[] a decision already made." *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995). Yet Judge Dein allowed the Board to withhold many postdecisional documents under the deliberative process privilege. Judge Dein wrongly treated "the Fiscal Year 2018 and 2019 Territory Budgets, the April 18, 2018 Fiscal Plan,

13

and potential revisions and corrections to the March 13, 2017 Fiscal Plan" as separate "decisions"
for purposes of the privilege even though those laws did no more than execute a decision that had
already been made in the March 13, 2017 fiscal plan. June 6 Order at 5.

27. Under PROMESA, the Governor cannot submit a budget to the Commonwealth
legislature until the Board has certified a fiscal plan. 48 U.S.C. § 2141(c). The Board, moreover,
has the "sole discretion" to determine if the Governor's proposed fiscal plan meets PROMESA's
requirements for purposes of Title III. *Id.* § 2141(c)(3). If the Board determines that a fiscal plan
is deficient, PROMESA requires it to so inform the Governor and include specific
recommendations for revisions to the fiscal plan to correct the deficiencies. *Id.* If the Governor
fails to submit a fiscal plan that meets PROMESA's requirements, the Board can step in, develop
its own plan, and submit it to the Governor and the legislature. *Id.* § 2141(d)(2). That fiscal plan
is "deemed approved by the Governor." *Id.* § 2141(e)(2).

28. Similarly, the Board has the sole discretion to determine whether any
"instrumentality" of the Commonwealth, like ERS, must submit its own fiscal plan or be included
in the Commonwealth's. *Id.* § 2121(d)(1). Whether separate or combined, the budgets of the
Commonwealth and its instrumentalities, including ERS, must comply with the certified fiscal
plans, *id.* § 2142, as must all Commonwealth legislation, *id.* § 2144.

29. The Commonwealth originally submitted fiscal plans to the Board that would have
left ERS intact, or even strengthened it by providing for the funding of retirement benefits through
payments of actuarially-determined amounts.[5] But on March 13, 2017, the Board rejected those
proposals. It instead certified a revised fiscal plan submitted by the Commonwealth that now had

---

[5] *See* Commonwealth of Puerto Rico Fiscal Plan at 11 (Oct. 14, 2016), https://drive.google.com/file/d/
1nXSBaus9EJy0RetoDfcN9OkiuSQuLNON/view; Commonwealth of Puerto Rico Fiscal Plan (Feb. 28, 2017),
https://drive.google.com/file/d/1_PFyfO2q5Ipg_bBgb7rPGVs2_8D8ZBFR/view.

a mandatory amendment requiring that the Commonwealth's pension systems "[s]witch to pay-as-you-go model." [6] That amendment directed the Commonwealth and the Board to formulate a "system overhaul" on or before June 30, 2017, to compel ERS to "liquidat[e] [its] assets" and transfer all of the proceeds to the Commonwealth. *Id.* Under this new, mandatory system, the Commonwealth itself would use its "general fund revenues to pay benefits owed" to pension beneficiaries, bypassing the existing ERS structure. *Id.* In turn, "existing pension obligations [would be funded] on a 'paygo' basis," thus diverting employer contributions from ERS directly to the Commonwealth. *Id.*

30.     Once the Board certified the new fiscal plan on March 13, 2017, the Commonwealth and ERS were required by PROMESA to comply, and there was nothing left for them to deliberate about. 48 U.S.C. § 2141(e)(2). Potential revisions to the March 13, 2017 fiscal plan, corrections to the March 13, 2017 fiscal plan, later versions of the fiscal plan, and the 2018 and 2019 territory budgets merely implemented the changes already imposed by the March 13, 2017 fiscal plan, and therefore do not reflect the give-and-take of governmental deliberations.

31.     Given this history, many of the Board's withheld documents—and particularly those dated after the certification decision on March 13, 2017—almost certainly do not reflect the give-and-take of governmental deliberations at all. Instead, they include postdecisional materials explaining or carrying out the decisions the Board had already made: to dissolve ERS, take its assets, and establish a "new" pension system to circumvent the Bondholders' liens. By the time these documents were generated, the time for deliberation had passed. These postdecisional documents should therefore be produced. *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) ("Communications that occur [a]fter a policy has already been settled upon for

---

[6] *See* Commonwealth of Puerto Rico Fiscal Plan Revised Version (March 13, 2017), at 22, https://drive.google.com/file/d/1J9zz8xhOyBOkj8ScZOiC48dV_nCcIomC/view.

example, a communication promulgating or implementing an established policy [a]re not privileged."); *Noel v. City of New York*, No. 15-cv-05236 (LTS) (KHP), 2018 WL 6649969, at *4 (S.D.N.Y. Dec. 18, 2018) (finding that withheld documents "do not reflect any pre-decisional deliberative process and fall into the category of post-decision communications [and] post-decision strategy for implementation of decided policy. . . .").

32.     Judge Dein rejected this argument and concluded that adoption of "the Fiscal Year 2018 and 2019 Territory Budgets, the April 18, 2018 Fiscal Plan, and potential revisions and corrections to the March 13, 2017 Fiscal Plan" were separate "decisions" for purposes of the deliberative process privilege. June 6 Order at 5–6. This was clear error. The Board provided, and Judge Dein articulated, no basis for concluding that these "decisions" did anything but implement the changes mandated by the March 13, 2017 certification. The Court should reverse Judge Dein's order, and order that documents dated after March 13, 2017, are postdecisional and unprotected by the deliberative process privilege.

33.     Moreover, even if the fiscal plan's mandate to adopt PayGo still left the Board with some number of less significant implementation decisions, the Court must "make an analysis of balance of interests," weighing the government's interest in confidentiality against the many interests favoring disclosure—such as "the interests of the private litigant," "the need for accurate judicial fact finding," and "the role of the government in the litigation." *Bhatia Gautier I*, 199 D.P.R. at 88; *see supra* Part I.A. The government's interest in confidential deliberations over implementation details is surely less than its interest in deliberations over significant policy decisions. Thus, the fact that post–March 13, 2017 documents related solely to implementation details should have at least affected the balancing analysis. Judge Dein clearly erred by ignoring that issue.

### C.    The Board Waived Any Privilege For Materials Shared With The Commonwealth, Its Advisors, Or AAFAF.

34.    The deliberative process privilege may be waived by knowing disclosure to other entities, especially where those entities have interests adverse to one another. *See, e.g.*, *People for Am. Way Found. v. U.S. Dep't of Educ.*, 516 F. Supp. 2d 28, 35–42 (D.D.C. 2007) (materials shared among the Department of Education, the D.C. Mayor's Office, and private grant recipients had to be disclosed because of that sharing); *Shell Oil Co. v. IRS*, 772 F. Supp. 202, 203–04 (D. Del. 1991) (no privilege over information that was read aloud at a private "meeting of government and oil industry officials"). The Board must therefore disclose any materials that it shared with the Commonwealth, its advisors, or AAFAF. *See* Motion to Compel, ¶ 34 (citing, *e.g.*, Docs. 39, 106, 107, 110, 111, 120, 125, 126 (documents shared with AAFAF); Docs. 46, 106, 107, 110, 111, 120, 158, 161, 209, 210, 227, 245, 260 (documents shared with Commonwealth financial advisors); Docs. 201, 202 (documents shared with the Commonwealth)).

35.    The Board is a distinct legal entity that is not even part of the Puerto Rico government. *See Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856–59 (1st Cir. 2019). The Board admitted as much when it sent a letter to Congress on March 12, 2018, in which it stated "the Commonwealth and its instrumentalities . . . have retained their own counsel and other advisors for the Title III proceedings, on the grounds that the Commonwealth and its instrumentalities *often have divergent interests* from those of the [Board]." Docket No. 446-4 in Case No. 17-bk-03566; Docket No. 446 in Case No. 17-bk-03566, ¶ 36.

36.    Meanwhile, ERS is "a trust," governed by its own, independent Board of Trustees, that is "independent and separate from other" Commonwealth agencies. 3 L.P.R.A. § 775. And ERS's Title III proceedings are separate from the Commonwealth's—PROMESA even expressly prohibits inter-debtor transfers between them, 48 U.S.C. § 2195. The reason for ERS's independent

status is clear: ERS was created to be in an inherently adverse, creditor position to the rest of the

Commonwealth government. Employers—including the Commonwealth itself—were required by

statute to pay substantial contributions to ERS to fund pension benefits, and ERS had the statutory

authority to enforce those obligations. 3 L.P.R.A. § 786-6(b); *see also id.* § 781a (penalties). The

resulting adversity is not hypothetical. When the Title III proceedings commenced, the

Commonwealth and its instrumentalities owed ERS more than $411 million in past-due employer

contributions.[7] The legal relationship between ERS and the Commonwealth here was and is the

fundamentally adverse relationship between a creditor (ERS) and its debtors (the Commonwealth).

Courts have repeatedly recognized that such a relationship is inherently adverse. *See, e.g.*,

*Schreibman v. Walter E. Heller & Co. of P.R.*, 446 F. Supp. 141, 143–44 (D.P.R. 1978); *Bank of*

*Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 496–97 (S.D.N.Y. 2002).

      37.    Confirming this adversity, in 2008 ERS committed itself to take *the Bondholders*'

side in any pension reform debate touching on the Bondholders' interests. In exchange for the

billions of dollars it raised by selling ERS Bonds, ERS promised:

> The System shall *oppose any attempt by the Legislature of the Commonwealth* to reduce
> the Employers' Contribution Rate or *to make any* other *change in the Act or any other*
> *relevant legislation that would have a material adverse effect on Bondholders*. Such
> opposition shall include delivering written position papers to the Legislature of the
> Commonwealth, appearing before Legislative committees, and contacting individual
> legislators and other government officials to make legislators and other governmental
> officials aware that such reductions in the Employers' Contribution Rate or other changes
> may adversely affect the ability of the System to comply with its obligations and may
> ultimately have an adverse effect on the credit of the Commonwealth.

Bond Resolution § 709 (emphasis added).

      38.    Documents shared among these adverse entities obviously cannot be protected by

the predecisional privilege. Judge Dein rejected this argument by referencing her earlier rulings in

---

[7] *See* ERS, *Annual Financial Information, FY 2016*, at 13 n. 1 (Apr. 25, 2017), https://emma.msrb.org/
ER1050099-ER822796-ER1223828.pdf.

Case:17-03283-LTS   Doc#:7518   Filed:06/20/19   Entered:06/20/19 15:32:13   Desc: Main
Document   Page 23 of 27

relation to the deliberative process privilege invoked by the Commonwealth. June 6 Order at 6 n.5.

But given the adversity described above, this is clear error. Moreover, Judge Dein's reasoning did

not address the fact that the Board is not part of the Puerto Rico government at all, or cite any

authority for an *inter*-government privilege. The Court should therefore reverse.

## II.   Judge Dein's Denial Of The Bondholders' Motion To Compel Documents Withheld Under The Attorney-Client Privilege Is Clear Error And Contrary To Law.

39.     The Bondholders argued before Judge Dein that the Board's invocations of

attorney-client privilege were inadequate because (1) some of the documents the Board withheld

on this basis do not involve legal advice, (2) documents shared with third-party non-lawyers are

not privileged, (3) the crime-fraud exception to attorney-client privilege operates to destroy the

privilege here, and (4) the privilege was waived as to materials shared with the Commonwealth,

ERS, or AAFAF. Judge Dein held that the Board's privilege logs were inadequate to determine

whether documents were properly withheld as privileged based on the first and second of these

arguments, and ordered the Board to produce the documents or supplemental privilege logs by

June 12, 2019.[8] June 6 Order at 12–15. However, Judge Dein rejected the Bondholders' arguments

regarding the crime-fraud exception and waiver. This was clear error, and should be reversed.

40.     The attorney-client privilege does not apply where "the client sought or employed

legal representation in order to commit or facilitate a . . . fraud." *In re Grand Jury Proceedings*,

417 F.3d 18, 22 (1st Cir. 2005); *see* Docket No. 443 in Case No. 17-03566, ¶¶ 27–29; Docket No.

462 in Case No. 17-03566, ¶¶ 20–22. Here, the Board's privilege logs demonstrate that it

---

[8] While the Board has produced additional documents and supplemental privilege logs, the disclosures remain inadequate, as discussed in the pending Renewed Motion to Compel. Judge Dein also held that "the presence of third-party advisors does not prevent application of the attorney-client privilege in limited circumstances." June 6 Order at 13. The Bondholders continue to object to the application of the "*Kovel* doctrine," which has never been recognized by the First Circuit. *See Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 n. 20 (1st Cir. 2011). Judge Dein has not yet held that the Board may withhold any document as privileged on the basis of this doctrine, but the Bondholders will object if Judge Dein denies the Renewed Motion to Compel on the basis of the *Kovel* doctrine.

communicated with others (including AAFAF, a representative of ERS) about the plan to create

the PayGo system, the resultant transfer of employer contributions away from ERS to the

Commonwealth, and the diversion of the Bondholders' collateral. Thus, the log concedes that the

legal advice sought with respect to these documents was an unalloyed effort to "hinder[] the

enforcement of a security interest" and carry out a "fraudulent transfer" in bankruptcy. *In re Blier*

*Cedar Co.*, 10 B.R. 993, 999–1000 & n.14 (Bankr. D. Me. 1981). Because the fraud exception to

the attorney-client privilege applies, the Board's privilege claims must be overruled.

41.    Further, the Board has also waived privilege over documents shared with the

Commonwealth, its advisors, or AAFAF. *See* Motion to Compel, ¶ 34 (citing, *e.g.*, Docs. 46, 158,

161, 209, 227, 245, 260 (documents shared with Commonwealth financial advisors)). As discussed

above, the Commonwealth, its advisors, and AAFAF have divergent interests from those of the

Board, and sharing documents with those entities constituted waiver of any attorney-client

privilege.

III.    **Judge Dein's Denial Of The Bondholders' Motion To Compel Documents Withheld
Under The Work-Product Doctrine Is Clear Error And Contrary To Law.**

42.    Judge Dein sustained in part the Bondholders' challenge to the Board's assertions

of the work-product doctrine and ordered the Board to re-review its documents and privilege logs,

and either supplement the logs or produce the documents not protected from disclosure. June 6

Order at 15–17. [9] However, Judge Dein overruled the Bondholders' objections based on the

Board's waiver of protection for these documents and based on the Bondholders' substantial need

for the documents. *Id*. These rulings were error and should be reversed.

---

[9] The Board has now made their supplemental productions, and the privilege log remains inadequate, as
described in the Renewed Motion to Compel.

43.     Documents shared with adversaries are not entitled to work-product protection, and as explained above, ERS and the other Respondents are adverse to the Board with respect to the subject matter of these documents. *See, e.g.*, *Data Gen. Corp v. Grumman Sys. Support Corp.*, 139 F.R.D. 556, 558 (D. Mass. 1991) ("Since the policy behind work product immunity is to bolster the adversarial system, disclosure of a document to an adversary is fundamentally inconsistent with this policy."); *see also supra* Part I. The work-product doctrine therefore provides no protection for any documents shared among the Board, ERS, and the other Respondents.

44.     In addition, the work-product doctrine is a qualified privilege that can be overcome upon a showing of need. Fed. R. Civ. P. 26(b)(3)(A)(ii). As explained above in connection with the deliberative process privilege, the Bondholders have demonstrated that this evidence is at the heart of the Stay Relief Motion and that only the Board and the other Respondents are in possession of these critical materials. *See supra* Part I.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse Judge Dein's June 6 Order, insofar as she denied in part the Bondholders' motions to compel the production of documents withheld as privileged.

In San Juan, Puerto Rico, today June 20, 2019.

By:

| | |
|---|---|
| */s/ Alfredo Fernández-Martínez* | */s/ Geoffrey S. Stewart* |

Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3939
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, Floor 21
Boston, MA 02110
Tel. (617) 960-3939
Fax: (617) 449-6999
drfox@jonesday.com

*Counsel for ERS Bondholders Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, LP, Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Ocher Rose, L.L.C., and SV Credit, L.P.*

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*