**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO REGARDING THE MOTION OF CERTAIN SECURED CREDITORS OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO FOR RELIEF FROM THE AUTOMATIC STAY** |

---

[1] The Debtors in these jointly-administered PROMESA Title III cases (these "**Title III Cases**"), along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority  (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ...............................................................................................1

FACTUAL BACKGROUND .................................................................................2

ARGUMENT ....................................................................................................6

I.      Cause Does Not Exist To Modify The Automatic Stay .................................................6

    A.      If Movants' Collateral Is Limited To The Employer Contributions ERS
            Held As Of Its Petition Date, Movants' Interests Are Adequately Protected
            Because Those Employer Contributions Have Not Decreased In Value
            Since The Petition Date Or The Motion Date ...........................................................6

    B.      Alternatively, If The Court Finds That Movants Have Established A
            Colorable Interest In The Commonwealth's PayGo Fees, Movants Are
            Still Adequately Protected Because There Is No Dispute That This Stream
            Of Payments Exceeds The Amount Owed To The ERS Bondholders. .................11

II.     Movants' Cannot Establish A Colorable Claim To The PayGo Fees ..........................17

III.    Movants' Motion Should Be Denied As To The Commonwealth, As Movants
        Have No Claim Against The Commonwealth. ..........................................................22

CONCLUSION ...................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*,
  217 F. Supp. 3d 508, 532 (D.P.R. 2016).........................................................1, 11, 13

*Grella v. Salem Five Cent Sav. Bank*,
  42 F.3d 26 (1st Cir. 1994).........................................................................2, 6, 17

*In re American Cartage, Inc.*,
  656 F.3d 82 (1st Cir. 2011)..............................................................................19

*In re Bronikowski*,
  569 B.R. 48 (Bankr. W.D.N.C. 2017)................................................................22

*In re Builders Group & Dev. Corp.*,
  502 B.R. 95 (Bankr. D.P.R. 2013).......................................................................9

*In re Cason*,
  190 B.R. 917 (Bank N.D. Ala. 1996)................................................................10

*In re Cont'l Airlines, Inc.*,
  154 B.R. 176 (Bankr. D. Del. 1993)....................................................................7

*In re Continental Airlines, Inc.*,
  146 B.R. 536 (Bankr. D. Del. 1992)..................................................................10

*In re Dynaco Corp.*,
  162 B.R. 389 (Bankr. D.N.H. 1993)..................................................................12

*In re Elmira Litho, Inc.*,
  174 B.R. 892 (Bankr. S.D.N.Y. 1994)..................................................................7

*In re Gateway Access Sols., Inc.*,
  368 B.R. 428 (Bankr. M.D. Pa. 2007).............................................................20, 21

*In re Johnson*,
  756 F.2d 738 (9th Cir. 1985).........................................................................2, 17

*In re Klein-Swanson*,
  488 B.R. 628 (8th Cir. BAP. 2013)..................................................................22

*In re Mellor*,
  734 F.2d 1396 (9th Cir. 1984).....................................................................12, 21

*In re Mullen*,
    172 B.R. 473 (Bankr. D. Mass. 1994) .........................................................................7

*In re Nashua Trust Co.*,
    73 B.R. 423 (Bankr. D.N.J. 1987) ............................................................................12

*In re Planned Sys., Inc.*,
    78 B.R. 852 (Bankr. S.D. Ohio 1987).........................................................................7

*In re Quality Seafoods, Inc.*,
    104 B.R. 560 (Bankr. D. Mass. 1989) ......................................................................20

*In re Rose*,
    21 B.R. 272 (Bankr. D.N.J. 1982) ............................................................................14

*In re Smithfield Estates, Inc.*,
    48 B.R. 910 (D.R.I. 1985).............................................................................................7

*In re SW Boston Hotel Venture LLC*,
    449 B.R. 156 (Bankr. D. Mass. 2011) ......................................................................12

*In re Wheeler*,
    12 B.R. 908 (Bankr. D. Mass. 1981) ..........................................................................6

*In re Worldcom, Inc.*,
    No. 02-13533, 2003 WL 22025051 (Bankr. S.D.N.Y. Jan. 30, 2003) ......................6

*Matter of Mendoza*,
    111 F.3d 1264 (5th Cir. 1997) ..................................................................................12

*Matter of Vitreous Steel Products Co.*,
    911 F.2d 1223 (7th Cir. 1990) .............................................................................2, 17

*Peaje Investments LLC v. Garcia-Padilla*,
    845 F.3d 505 (1st Cir. 2017)................................................................................11, 13

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988).......................................................................................................7

*Van Diest Supply Co. v. Shelby Cnty State Bank*,
    425 F.3d 437 (7th Cir. 2005) ....................................................................................11

**STATUTES**

19 L.P.R.A. § 2212(a)(64)(C).............................................................................................19

19 L.P.R.A. § 2265(b)(2) ....................................................................................................11

19 L.P.R.A. § 2324 .............................................................................................................20

48 U.S.C. § 2161 ................................................................................................................1, 7

11 U.S.C. § 361 ........................................................................................................1, 7, 9, 21

11 U.S.C. § 362 ..................................................................................................................2

11 U.S.C. § 552 ............................................................................................................17, 18

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the
"**Retiree Committee**") submits its Supplemental Objection to the *Motion Of Certain Secured
Creditors Of The Employees Retirement System Of The Government Of The Commonwealth Of
Puerto Rico For Relief From The Automatic Stay* (Case No. 17-bk-3283, Dkt. 3418; Case No. 17-
bk-3566, Dkt. 289) (the "**Motion**") filed by certain holders of bonds (the "**Movants**") issued by
the Employees Retirement System of the Government of the Commonwealth of Puerto Rico
("**ERS**"), and states:

## INTRODUCTION

1.      The Retiree Committee reasserts and incorporates herein by reference the
arguments it made in its initial *Objection Of The Official Committee Of Retired Employees Of The
Commonwealth Of Puerto Rico To The ERS Bondholders' Motion For Relief From The Automatic
Stay* (Case No. 17-bk-3283, Dkt. 3468; Case No. 17-bk-3566, Dkt. 293) (Ex. A hereto). It also
adopts the Financial Oversight and Management Board's arguments in its oppositions to the
Motion.

2.      Since the filing of the Retiree Committee's initial Objection, discovery taken in
connection with the final hearing on the Motion has further demonstrated that Movants are
adequately protected and therefore, their request for stay relief should be denied. Movants continue
to argue otherwise, taking the position that they are entitled to stay relief because, following the
expiration of a prior adequate protection stipulation, ERS has refused to make periodic cash
payments to the ERS bondholders. The unstated premise of Movants' argument is that periodic
cash payments are the only way to adequately protect a secured claim. The plain language of
section 361 of the Bankruptcy Code, however, makes it clear that this is not the case. 48 U.S.C.
§ 2161 incorporating 11 U.S.C. § 361; *see, e.g., Brigade Leveraged Capital Structures Fund Ltd.
v. Garcia-Padilla*, 217 F. Supp. 3d 508, 532 (D.P.R. 2016) (noting alternative forms of adequate

protection). As the evidence at the final hearing will demonstrate, the value of Movants' secured claim has not decreased as a result of the automatic stay or ERS's use of Movants' alleged collateral, making Movants' demands for additional adequate protection inappropriate.

3.     At that final hearing, the Court should not allow Movants to transform a summary lift stay hearing into an adjudication of their claims and liens. As Movants themselves have argued, "hearings [under § 362] do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has *colorable claim to property of the estate*." *See Reply Of Certain Secured Creditors Of The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico In Support Of Motion For Relief From The Automatic Stay*, at ¶ 14 citing *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32 (1st Cir. 1994) (Case No. 17-bk-3283, Dkt. 3592; Case No. 17-bk-3566, Dkt. 303) (emphasis added); *accord Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1234 (7th Cir. 1990) ("Questions of the validity of liens are not generally at issue at a § 362 hearing, but only whether there is a colorable claim of a lien on property of the estate"); *In re Johnson*, 756 F.2d 738, 740 (9th Cir. 1985).

4.     Here, Movants' Bond Resolution by its own terms expressly defines the bounds of Movants' collateral. Movants' attempts to advance creative theories about why their collateral should be expanded to cover property beyond that identified in their loan documents and owned by another debtor is outside of the scope of a lift stay motion and must be rejected.

## FACTUAL BACKGROUND

5.     The Retiree Committee adopts and incorporates the Factual and Procedural Background set forth in the Oversight Board's Objection and Supplemental Objection and provides the following additional background about Movants' alleged collateral.

6.       The ERS bonds are non-recourse debt. Section 201 of the ERS Bond Resolution states: "The Bonds shall be special obligations of [ERS] payable solely from the Pledged Property without recourse against other assets of [ERS]. *The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility*." (Ex. B, ERS Bond Resolution §201 (emphasis added).)

7.       The Bond Resolution similarly limits Movants' collateral to: (a) "Revenues," which included "[a]ll Employers' Contributions [but not employee contributions] *received* by [ERS] or the Fiscal Agent[;]" (b) the "right, title and interest" of ERS in the Revenues as well as ERS's "rights to receive" the Revenues; (c) the funds, accounts and subaccounts held by the Fiscal Agent; and (d) any other rights or personal property subsequently assigned by ERS to the Fiscal Agent. (Ex. B at 36-37) (emphasis added).) Movants have no liens upon any other ERS assets, such as the employee contributions made to ERS pursuant to various pension statutes. *See* Act of May 15, 1951, No. 447, as amended; Act of February 16, 1990, No. 1; Act of September 24, 1999, No. 305; Act of April 4, 2013, No. 3.

8.       The Bond Offering Statement also made clear that there was no guaranty that Employer Contributions would continue in the future. In the section entitled "Investment Considerations," potential buyers of ERS bonds were warned that "*[t]he Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.*" (Ex. C, Bond Offering Statement, Series A at 26 (emphasis in original).) ERS told buyers of its bonds that the Legislature of the Commonwealth was not making any promises not to amend the law "in a way adverse to Bondholders" and that "as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act." *Id.* ERS further warned that if the Legislature changed

3

the law establishing Employer Contributions "*the ability of [ERS] to pay debt service on Bonds when due could be adversely affected.*" (*Id.* (emphasis added).) ERS even went so far as to expressly state that one of the conditions that might cause the Legislature to make changes to Employer Contributions was "where there is severe financial stress affecting one or more of the Government Employers." (*Id.*) Plainly, anyone buying an ERS bond understood that there was substantial risk that the collateral securing these non-recourse bonds could be eliminated and, if that happened, the Bond Resolution precluded any recourse to ERS's other assets or to those of the Commonwealth.

9.     In 2017, the precise situation the Bond Offering Statement explicitly warned of occurred. Following ERS's Title III filing, the Commonwealth changed its laws to eliminate the obligation of employers to make Employer Contributions to ERS and it also eliminated ERS's corresponding right to receive Employer Contributions. On June 24, 2017, the Legislative Assembly passed Joint Resolution 188 and, on August 23, 2017, passed Act 106, both of which were signed into law by Governor Rossello. Together, Joint Resolution 188 and Act 106 substantially changed the funding of pensions in the Commonwealth for both retirees and active employees.

10.    Under the PayGo legislation, the Commonwealth eliminated a funded pension system and provided for ERS's eventual dissolution. (*See* Ex. D, Act 106, §§ 1.3; 1.4; 2.1, 2.4, 3.1, 3.2, 3.3, 3.4 Ex. E, J. Res. 188, § 4.) Instead of a funded pension system, the Commonwealth now makes pension payments directly to retirees. Covered government employers reimburse the Commonwealth, through PayGo fees, for the actual amounts the Commonwealth advances to retirees and beneficiaries. Instead of the Legislature determining a rate that employers must pay based on the wages active employers earn—a rate that was calculated to address ERS's chronic

4

underfunding and not the amounts required to fund current pension payments then due—PayGo fees are "calculated according to the cost of the pension and the way that it varies, according to the current pensioners and those that are passing away." (Ex. F, L. Rodriguez Dep. at 75:12-76:14.) Act 106 also eliminated employers' obligations to ERS. (*See* Ex. D, Act 106, §§ 2.1(b), 2.4(e); Ex. E, J. Res. 188, § 4.) The PayGo legislation also made other significant changes to the Commonwealth's provision of retirement benefits for active employees, creating a new defined contribution plan for active employees as of July 1, 2017 and for any new employees hired after that date. (Ex. D, Act 106, §§ 3.1, 3.2; *see also* Ex. G, P.R. Gov't Employees Ret. Sys., June 30, 2017 Actuarial Valuation Report, p. 6.)

11.     All of the available evidence demonstrates that the Commonwealth enacted PayGo because the former system of funding pensions had failed to address ERS's chronic underfunding and that such change was necessary because of the severe financial crisis facing the Commonwealth and other governmental employers. (Ex. F, L. Rodriguez Dep. at 75:12-76:14; 96:14-98:2; Ex. H, F. Montañez Dep. at  43:3-9; 78:25-79:5; Ex. I, Oversight Board Res. Adopted on March 13, 2017; Ex. E, J. Res. 188, Statement of Legislative Intent; Ex. D, Act 106, Statement of Legislative Intent.)

12.     Following the enactment of Joint Resolution 188 and Act 106, Movants have alleged that they hold claims against the Commonwealth and a lien upon PayGo fees, but (i) no Court has held that Movants actually possess such claims and liens, (ii) the proofs of claim that Movants have filed asserting these alleged liens are the subject of pending objections (*see* Case No. 17-bk-3283, Dkt. 5580, 6482; Case No. 17-bk-3566, Dkt. 381, 384, 469) and thus, Movants' claims are not allowed, and (iii) the Bond Resolution, which is the operative document creating Movants' claims, on its face does not grant Movants a lien in PayGo fees and in fact expressly

5

states that Movants have no right of recourse against the Commonwealth and no lien on anything

other than "Revenues" which are defined to be Employer Contributions.

## ARGUMENT

### I.   Cause Does Not Exist To Modify The Automatic Stay.

13.    To establish a right to stay relief under section 362, Movants must first establish a

colorable claim to property of the estate. *Grella*, 42 F.3d at 32; *accord In re Worldcom, Inc.*, No.

02-13533, 2003 WL 22025051, at *4 (Bankr. S.D.N.Y. Jan. 30, 2003). The Bankruptcy Code does

not require the Oversight Board to prove that cause does not exist to modify the automatic stay

unless and until Movants establish this colorable claim. *Id*. As set forth below, Movants cannot do

so here because there is nothing in the operative documents or the law that would extend Movants'

purported lien on defined collateral held by ERS to funds held by the Commonwealth. But even if

one puts the facts and the law to the side, there has been no diminution in the value of Movants'

collateral as a result of the automatic stay or the use of this collateral.  Movants' Motion must be

denied.

### A.   If Movants' Collateral Is Limited To The Employer Contributions ERS Held As Of Its Petition Date, Movants' Interests Are Adequately Protected Because Those Employer Contributions Have Not Decreased In Value Since The Petition Date Or The Motion Date.

14.    If the Court were to determine that Movants have only established a colorable claim

to the Employer Contributions ERS held as of its petition date, the evidence will establish that

Movants' alleged interest in those Employer Contributions is adequately protected.

15.    The concept of adequate protection has a simple purpose: it "represents the

maintenance of the status quo of the creditor while the automatic stay maintains the status quo of

the debtor." *In re Wheeler*, 12 B.R. 908, 909 (Bankr. D. Mass. 1981). Maintaining the "status quo"

means protecting a creditor holding a secured claim from a "decrease in the value" of the secured

claim caused by the automatic stay or the debtor's use of the collateral. 48 U.S.C. § 2161 (incorporating 11 U.S.C. § 361); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988); *In re Mullen*, 172 B.R. 473, 476 (Bankr. D. Mass. 1994); *In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993). Consequently, an adequate protection analysis compares the value of the applicable collateral as of the petition date against its value as of the date the creditor files its adequate protection motion. *See, e.g., In re Elmira Litho, Inc.*, 174 B.R. 892, 903 (Bankr. S.D.N.Y. 1994); *accord In re Smithfield Estates, Inc.*, 48 B.R. 910, 914 (D.R.I. 1985); *In re Planned Sys., Inc.*, 78 B.R. 852, 863 (Bankr. S.D. Ohio 1987).

16.     When that comparison is made here, it is clear that Movants have suffered no diminution in value of their alleged collateral. That is because, except for some minor operating expenses, the only reason why ERS's cash balances have decreased at all is because ERS was making payments to Movants or making payments to the Commonwealth that have been earmarked to pay ERS bondholders in the event Movants ultimately prevail.

17.     (*See* Ex. J, ERS_LS0002187; ERS_LS0002875; ERS_LS0002570; ERS_LS0003543; ERS_LS0003813.) In comparison, the Fiscal Agent's bank account summary thirteen months later, as of June 30, 2018 (immediately preceding the filing of the Motion), shows that ERS's cash accounts held a total of $377.7 million, consisting of:[2]

---

[2] Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of June 30, 2018 (publicly filed July 24, 2018), *available at* http://www.aafaf.pr.gov/assets/aafaf-bank-account-balances-government-pr-instrum-06-30-2018.pdf.

| $ in millions | Balance as of[1] | | Notes |
| Grouping Subcategory | 5/31/2018 | 6/30/2018 | |
|---|---|---|---|
| ERS Related Accounts | 394.1 | 377.7 | • $113M for operational purposes.<br>• $6.1M in a Pre-petition Segregated Account created as part of a stipulation entered into prior to the commencement of Title III proceedings.<br>• $107M relating to proceeds from sale of investments.<br>• $93M corresponding to a Post-petition Segregated Account created as part of a stipulation entered into as part of the Title III proceedings. |

18.     The $117.3 million decrease in ERS's cash balances between the date on which ERS commenced its Title III case, May 17, 2017, and the date on which Movants filed their Motion, July 3, 2018, is wholly explained by the fact that ERS paid Movants $179.9 million. But for the payment to Movants, ERS's cash balance would have been approximately $557.6 million, a $62.6 million *increase* in ERS's cash position from its petition date. That amount includes $93 million in a Postpetition Segregated Account that has been set aside pending a final determination as to the validity and extent of Movants' alleged security interest. (*See* Case No. 17-bk-3566, Dkt. 170 at 4-5.)

19.     Since the filing of the Motion, ERS's account balances have remained constant. The Fiscal Agent's most recent bank account balance summary report indicates that, as of March 29, 2019, ERS's cash accounts held funds totaling $370.7 million, which includes:[3]

| $ in millions | Balance as of[1] | | Notes |
| Grouping Subcategory | 2/28/2019 | 3/29/2019 | |
|---|---|---|---|
| ERS Related Accounts | 370.5 | 370.7 | • $109M relating to proceeds from sale of investments.<br>• $93M corresponding to a Post-petition Segregated Account created as part of a stipulation entered into as part of the Title III proceedings. |

---

[3] Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of March 29, 2019 (publicly filed April 30, 2019), *available at* http://www.aafaf.pr.gov/assets/aafaf-bank-account-balances-government-pr-instrum-03-29-2019.pdf.

Again, but for payments to ERS Bondholders, ERS's cash position would have *increased* by approximately $61.7 million since ERS filed its Title III case.

20.     Under these circumstances, Movants' interests have been adequately protected. The plain language of section 361 states that adequate protection "of an interest of an entity in property" (*i.e.*, a creditor holding a secured claim) is only required where the automatic stay or use of the collateral by the debtor "results in the decrease in the value of such entity's interest in such property." 11 U.S.C. § 361. Paying a creditor with its own collateral obviously does not decrease the value of the secured creditor's interest in that collateral; the creditor's interest in the collateral is limited to the amount of indebtedness it secures, which is reduced dollar-for-dollar as cash collateral is delivered to the secured creditor. As a bankruptcy court in this District explained, there is only a diminution in the value of a creditor's collateral if there is "a diversion of any portion of the [cash collateral] to a party *other than the secured party* ...." *In re Builders Group & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013) (emphasis added)).

21.     The fact that ERS transferred $190.48 million to the Treasury Department in accordance with Joint Resolution 188 also is not a basis to modify the stay or order additional adequate protection payments. (*See* Ex. K, ERS-AAFAF_LS001506; Ex. F, L. Rodriguez Dep. at 120:15-23.) Movants are protected as the Commonwealth is holding those funds pending a final determination of Movants' lien rights and has stated that all of those funds will be released to the ERS bondholders should the Court rule that Movants hold a lien on those funds that is not subject to avoidance and is allowed. (Case No. 17-bk-03283, Dkt. 7075, at ¶68 n.20). Consequently, the $190.4 million serves as additional adequate protection.

22.     Moreover, AAFAF's Director of Fiscal Agency, Mohammad Yassin-Mahmud, and ERS's Administrator, Luis Rodriguez, both testified that other than the $190.4 million that is being

held for Movants' benefit, ERS has not transferred any additional funds to the Treasury Department and ERS's remaining funds and assets continue to be on deposit in accounts held by ERS. (Ex. L, Yassin-Mahmud Dep. at 104:2-8; 114:22-115:20; 151:23-152:9; Ex. F, L. Rodriguez Dep. at 121:3-122:4.)

23.     Finally, if the Court compares the current value of Movants' alleged collateral to the value of that collateral as of the petition date, the Court will be overly solicitous in its protection of Movants. Some courts have held that a movant is only entitled to adequate protection for the period after they have filed their adequate protection motion. *See, e.g.*, *In re Continental Airlines, Inc.*, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992); *In re Cason*, 190 B.R. 917, 929 (Bank N.D. Ala. 1996) (collecting cases). As the above demonstrates, however, such an approach here would not result in a different conclusion. Any decrease in ERS's cash position since Movants filed their Motion is solely attributable to payments that ERS made to Movants and the other ERS Bondholders. On the date of the Motion, July 3, 2018, ERS held $377.7 million and it holds $370.7 million today. But as noted above, this minor difference in account values is again accounted for by the fact that ERS paid the ERS Bondholders $6.1 million.

24.     In sum, Movants have already received all of the funds in the Prepetition Segregated account, and, if they prevail in the lien dispute, will receive all of the funds in the Postpetition Segregated Account, as well as the $190.4 million that the Commonwealth currently holds. And if that was not sufficient, the Commonwealth's records establish that the remaining value of ERS's liquid assets have actually increased in value since its petition date. Consequently, Movants have not suffered a decline in the value of their alleged collateral and thus, are adequately protected.

25.     Although no further adequate protection payments are required, if the Court

considers ordering such payments, it should first require Movants to trace ERS's funds as of its petition date (or the Motion date) to the Employer Contributions in which Movants assert a lien. *See* 19 L.P.R.A. § 2265(b)(2); *Van Diest Supply Co. v. Shelby Cnty State Bank*, 425 F.3d 437, 440 (7th Cir. 2005). Such tracing is necessary to avoid transferring employee contributions, employee loan repayments, investments and investment proceeds, and assets acquired before the ERS bonds were issued in 2008, that are not subject to Movants' liens, but are part of the commingled cash that ERS holds. If Movants cannot trace the existing ERS assets to pre-petition Employer Contributions (and it appears that they cannot), then the Court should not order any further payments to Movants.

> **B.**   **Alternatively, If The Court Finds That Movants Have Established A Colorable Interest In The Commonwealth's PayGo Fees, Movants Are Still Adequately Protected Because There Is No Dispute That This Stream Of Payments Exceeds The Amount Owed To The ERS Bondholders.**

26.     Even if the Court assumes, as Movants argue, that Movants' collateral includes PayGo fees held by the Commonwealth, the Motion still should be denied because there is no dispute that the present value of the PayGo fees exceeds the value of the ERS Bondholders' claim. The First Circuit has held if there is an identifiable ongoing stream of payments that could be used to satisfy a debtor's obligation to a secured creditor, the secured creditor is adequately protected by that stream of recurring payments. *See Peaje Investments LLC v. Garcia-Padilla*, 845 F.3d 505, 514 (1st Cir. 2017); *accord Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F.Supp.3d 508, 532-33 (D.P.R. 2016). In *Peaje*, the First Circuit affirmed the denial of Peaje's lift-stay motion because the replenishing nature of the toll revenues serving as Peaje's cash collateral rendered Peaje adequately protected. 845 F.3d at 514. Consequently, if Movants are right that all of the PayGo fees generated are subject to their alleged liens, then under the logic of *Peaje*, Movants are adequately protected by those fees.

11

27.     Here, there is no dispute that the net present value of the PayGo fees exceeds the amount owed to the ERS Bondholders. The face value of the ERS bonds is $3 billion and the Fiscal Agent under the ERS bonds contend that ERS Bondholders are owed $3.8 billion. (*See* Proof of Claim No. 16777.) █████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ (*See* Ex. M, Dec. of Gaurav Malhotra In Connection With Motion For Relief From The Automatic Stay at ¶15; Ex. N, Rebuttal Dec. of Gaurav Malhotra In Connection With Motion For Relief From The Automatic Stay at ¶6.) ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Ex. O, Rebuttal Report of Faten Sabry, Ph.D. at ¶ 23, n.30.)

28.     ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ Either way it is more than sufficient to adequately protect Movants' interests. *See, e.g.*, *In re SW Boston Hotel Venture LLC*, 449 B.R. 156, 176 (Bankr. D. Mass. 2011) (finding 12.3% equity cushion sufficient adequate protection); *In re Dynaco Corp.*, 162 B.R. 389, 398 (Bankr. D.N.H. 1993) (17% is adequate); *accord Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (20% is adequate); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (same); *In re Nashua Trust Co.*, 73 B.R. 423, 434 (Bankr. D.N.J. 1987) (50% is adequate).

29.     Because Movants cannot argue that the net present value of PayGo fees is less than the ERS Bondholders' claims, their expert Sabry instead argues that ████████████████

█████████████████████

a.     ████████████████████████████████████ (Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶28(c)(i));

12

b.  (*id.* at ¶28(c)(ii)); and

c. (*id.* at ¶28(d)).

None of Sabry's arguments, however, change the adequate protection calculus.

30.      **First**, the *Peaje* and *Brigade* decisions establish that the existence of an identifiable stream of payments is sufficient for adequate protection even if the government uses some of that stream of funds for other purposes. *See Peaje Investments LLC*, 845 F.3d at 514; *Brigade Leveraged Capital Structures Fund Ltd.*, 217 F.Supp.3d at 532-33.

31.      **Second**,



(Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶65). That statement is likely true for almost every debtor who files for bankruptcy. If financial distress and future uncertainty were a valid basis on which to order adequate protection, no creditor ever would fail to receive it.[4]

---

[4] Also, the bond restructuring contemplated in the recently announced Plan Support Agreement with many GO and PBA bondholders would reduce the Commonwealth's current bond debt obligations by over 60% which would free up billions of dollars in funds and further reduce any risk that the Commonwealth would not pay its share of the PayGo fees. (*See* Ex. Q, FOMB June 16, 2019 Media Release.)

32. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ (Ex. O, Rebuttal Report of Faten Sabry, Ph.D. at ¶¶8-9.) Again, a secured creditor

can always create a factual scenario where their collateral is at risk in the future, and that is why

the case law is clear that neither general concerns of financial health of a debtor nor doomsday

predictions unmoored from present facts can serve as the basis for ordering adequate protection.

*See, e.g., In re Rose*, 21 B.R. 272, 277 (Bankr. D.N.J. 1982) ("There is no doubt that, at the present

time, plaintiff is adequately protected…. Plaintiff's argument as to adequate protection is entirely

speculative, and the facts it alludes to may never occur").

33.     Moreover, Sabry's argument proves too much—█████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

34.     ***Third***, █████████████████████████████████████████

███████████████████████ (*See* Ex. R, F. Sabry Dep. at 72:16-73:1; 80:11-17; 90:5-10.) ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  ██████████████████

████████████████████████████████████████████████ (Ex. O,

Rebuttal Report of Faten Sabry, Ph.D. at ¶¶ 22-23; Ex. R, F. Sabry Dep. at 92:3-8.) ███████████

14



[5] These omissions are telling. Risks that cannot be quantified cannot serve to undercut Malhotra's analysis which, as explained in more detail below, ███████████████████████████████████████████ ███████████████████████████████████████████.

35.    ***Fourth***, ██████████████████████████████████████████

(Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶ 57, Ex. 10; Ex. S, Chart Summarizing ERS Debt Service.)

(Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶ 57.) In 2035, PayGo will generate $1.597 billion. (*Id.* at ¶ 57.)

(Ex. N, Rebuttal Dec. of Gaurav Malhotra in Response to Expert Report of Faten Sabry in Connection with Motion for Relief from the Automatic Stay at ¶ 4(a).)

(Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶ 57, Ex. 10).

---

[5] Using such a rate would not, in fact, be appropriate. The Commonwealth and significant holders of GO bonds have agreed, subject to confirmation of a plan of adjustment that the Commonwealth will issue $11.7 billion dollars in new GO bonds to be paid over 30 years. (*See* Ex. V, Plan Support Agreement at Ex. E, p. 4; *id.* at Ex. E, Ex. A (Scheduled Cash Flows of the New Bonds).) These bonds have an implied interest rate of 6% assuming a yearly payment. This is the rate a large group of sophisticated bondholders have negotiated in the context of these Title III proceedings and therefore to the extent the GO bonds are relevant to the ERS dispute, this rate would be a superior indicator of risk and if so used would produce a NPV of $19.8 billion. (*See* Ex. W, Analysis Based on MALHOTRA0000179.)

██████████████████████████████████████ (Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶ 57.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ (*See* Ex. S, Chart Summarizing ERS Bond Debt Service; Ex. C,

Bond Offering Statement, Series A, at 18-19; Ex. T, Bond Offering Statement, Series B, at 18-19;

Ex. U, Bond Offering Statement, Series C, at 18-19; Ex. N, Rebuttal Dec. of Gaurav Malhotra in

Response to Expert Report of Faten Sabry in Connection with Motion for Relief from the

Automatic Stay at ¶ 4(b).)

36.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ (Ex. P, Expert Report of Faten Sabry, Ph.D. at ¶ 66.) ██████████

████████████████████████████████████████ (Ex. M, Dec. of Gaurav

Malhotra in Connection with Motion for Relief from the Automatic Stay at ¶ 11.) ██████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (Ex. P, Expert Report

of Faten Sabry, Ph.D. at ¶ 69.) But municipalities and public corporations make up only a small

part of the PayGo fees. Significantly, the Commonwealth itself is responsible for the 65.9% of the

PayGo fees and Movants have not identified any payments that the Commonwealth has failed to

make. Because the Commonwealth's share of PayGo is so large, even if every municipality and

public corporation ceased paying any PayGo fees, the net present value of future PayGo fees due

solely from the Commonwealth would still be between $21 billion and $21.6 billion dollars—or

over five times the asserted amount of the ERS bondholders' claims. (*See* Ex. W, Analysis Based

on MALHOTRA000179.) In other words, one would have to make apocalyptic assumptions

regarding non-payment before anticipated PayGo fees would be insufficient to cover the ERS bond

debt service, assuming Movants have a lien in PayGo fees (and they do not).

37.     Given that highly improbable and unquantified scenarios should not be considered

when evaluating adequate protection, none of the possibilities Sabry raises are material enough to

decrease the value of the PayGo fees below the amount owed to the ERS bondholders. In short,

Sabry's analysis does not alter the fact that as even Sabry admits, ███████████████████

████████████████████████████████████████████████████████████████████.

Therefore, even if the Court assumes that Movants hold a lien in PayGo fees, that alleged lien is

adequately protected. Accordingly, the Motion should be denied.

## II.     Movants' Cannot Establish A Colorable Claim To The PayGo Fees.

38.     Lift stay hearings are summary proceedings and do not involve a full adjudication

on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a

creditor has colorable claim to property of the estate. *Grella*, 42 F.3d at 32; *Vitreous Steel*, 911

F.2d at 1234; *Johnson*, 756 F.2d at 740. Movants concede as much.  (*See Reply Of Certain Secured*

*Creditors Of The Employees Retirement System Of The Government Of The Commonwealth Of*

*Puerto Rico In Support Of Motion For Relief From The Automatic Stay*, at ¶14 (Case No. 17-bk-

3283, Dkt. 3592; Case No. 17-bk-3566, Dkt. 303).) But even under that relaxed standard, Movants

will not be able to establish a colorable interest in the PayGo fees.

39.     For starters, because the PayGo fees did not exist until after the Commonwealth

and ERS filed their Title III cases and thus, have all been paid post-petition, Movants cannot state

a colorable claim to PayGo fees if section 552(a) applies to cut-off Movants' alleged liens in post-

petition property. The Court currently has that exact issue under advisement in Commonwealth

Adversary Case No. 17-213. If the Court rules that section 552(a) cuts-off Movants' liens before

the Court decides the instant Motion, then Movants will not be able to establish a colorable claim to the PayGo fees.

40.     But even if the Court does not decide the section 552 dispute before the final hearing or rules in favor of Movants on this issue, Movants still will not be able to establish a colorable claim to the PayGo fees. The focus of Movants' discovery has been on establishing that PayGo fees are similar to Employer Contributions, but that argument is beside the point. In the context of a summary lift stay hearing, the question is whether there is a security agreement or some other law that grants the ERS bondholders a lien in the PayGo fees, not whether through a creative legal argument, the Court might someday impose a lien where none currently exists.

41.     Basically, Movants' argument boils down to this: PayGo fees are used to pay retirement benefits and in that respect they are allegedly similar to Employer Contributions. Because PayGo fees are allegedly similar to Employer Contributions, the Court may in some future action impose a lien upon them in favor of Movants even though there is no loan document pursuant to which the Commonwealth has granted such a lien or any legal theory that Movants have identified that would allow the Court to impose such a lien. The entire focus of Movants' argument—and the largely irrelevant evidence they intend to present at the lift stay hearing—is on trying to squeeze the square peg of PayGo fees into the round hole of Employer Contributions.

42.     But whether any of that matters depends on whether there is a clear legal theory that would allow the Court to summarily determine that there is a sufficient basis to find that Movants have a colorable claim to the PayGo fees. Movants have never identified any such legal theory. And even if they had, suggesting that all the colorable claim requirement demands is that the movant state that it might someday prove up a novel legal claim is no different than arguing that adequate protection should be denied whenever the trustee argues it might someday prove up

18

a defense to the creditor's claim. Both positions necessarily require the court to stray from the summary nature of a lift stay hearing and to adjudicate the claims themselves. Put another way, because there is no contractual document or statute that on its face grants Movants a lien in PayGo fees, Movants have not and cannot summarily establish a colorable interest in the PayGo fees and they are not entitled to seek adequate protection of their alleged interest in those fees.

43.    Movants are likely to respond that, by pointing to the alleged similarities between PayGo Fees and Employer Contributions, they are establishing that PayGo fees meet the definition of Employer Contributions found in the Bond Resolution. But the Bond Resolution is clear that "Employers' Contributions shall mean contributions paid from and after the date [of the Bond Resolution] that are made by the Employers and any assets in lieu thereof or derived thereunder *which are payable to the System pursuant to Section 2-116, 3-105 and 4-113 of the Act."* (Ex. B, Bond Res. at 37.) The "Act" is defined as "Act 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented," which is commonly called the ERS Enabling Act. (*Id*. at 33.) No matter how similar PayGo fees are to Employer Contributions (and in fact they are not similar at all), PayGo fees are not "payable to the System pursuant to Section 2-116, 3-105 and 4-113 of [Act 447]" and thus, they can never fit within the definition of Employer Contributions as set forth in the Bond Resolution.

44.    Nor do the PayGo fees fit the definition of proceeds. UCC section 9-102(a)(64)(C) defines proceeds as property that is related to or flows out of the collateral. 19 L.P.R.A. § 2212(a)(64)(C); *see also In re American Cartage, Inc.*, 656 F.3d 82, 88-89 (1st Cir. 2011). The classic example of a proceed is the $1.00 paid to a shopkeeper when she sells a piece of inventory. Here, the PayGo fees are not related to the Employer Contributions for the simple reason that PayGo fees were not created under Act 447 or "payable to the System pursuant to Section 2-116,

3-105 and 4-113 of [Act 447]." Nor can Movants argue that PayGo fees are "proceeds" of ERS's

right to receive Employer Contributions because by statute ERS no longer has a right to receive

Employer Contributions, something the ERS Bond Offering Statement predicted could occur.

45.     Movants' position that the Court can and should ignore the Bond Resolution's

definition of what constitutes Movants' collateral would undermine the law of secured transactions

in a fundamental way. One of the reasons why Article 9 requires a grant of a lien in specific

collateral is to put the world on notice as to what property of a debtor is subject to a secured

creditor's lien. 19 L.P.R.A. § 2324 (UCC § 9-504, Comment 2.)[6] Precisely defining collateral

permits would be creditors of a debtor to make informed decisions about what assets are available

to satisfy their claims if they chose to lend to a debtor. *See In re Quality Seafoods, Inc.*, 104 B.R.

560, 562 (Bankr. D. Mass. 1989) ("[i]n this area of the law . . . the desideratum is certainty").

46.     Movant's theory that a secured creditor can make a claim to anything that is

remotely similar to its collateral undercuts this important policy. If adopted, it would mean that

any secured creditor who was unhappy with the limits of its defined collateral following a breach

could look to property outside of that definition to make the secured creditor whole, so long as the

property was sufficiently similar to its collateral. Such a result is inconsistent with the law of

secured transactions and basic notions of property law. For this reason, courts routinely hold

secured creditors to the specific bounds of their collateral. *See In re Gateway Access Sols., Inc.*,

368 B.R. 428, 433-34 (Bankr. M.D. Pa. 2007) ("It is not the duty of this Court to protect creditors

from themselves when they risk limiting their collateral.")

---

[6] Puerto Rico looks to the UCC's Official Comments and interpretation of the UCC in other states. *See Statement of Motives* to Act No. 21-2012 at 2.

47.     Movants also ignore that ERS Bondholders expressly relinquished the right to seek

recourse against the Commonwealth. By claiming a lien in PayGo fees, which is Commonwealth

property, Movants are not only claiming a lien that is outside of the bounds of the definition of

their collateral but also one that is contrary to an important term of the Bond Resolution. *Gateway

Access* is instructive. There, a bankruptcy court held that section 363(e) "was not intended to

protect creditors who unwisely choose very narrow property interests to secure their liens." 368

B.R. at 433. The court offered the following example:

> The instant situation is akin to a creditor taking a security interest in a cow A's
> milk, only to have cow A get sick, becoming barren. The hypothetical creditor
> would still have his security interest in the milk, but the interest would not be worth
> anything as cow A will never again produce milk.

*Id.* So too here. The ERS Bondholders chose to limit their collateral to Employer Contributions

paid to ERS pursuant to Act 447. They still have a lien on that collateral, but like the barren cow,

employers will no longer produce those contributions. The effect of the PayGo legislation on the

ERS Bondholders' collateral "could have been avoided by different loan document drafting," but

it is not this Court's duty "to protect [the ERS Bondholders] from themselves." *Id.* at 434.

48.     Finally, assuming equity has any role in defining security interests and it does not,

there is nothing unfair about holding that Movants cannot establish a colorable claim to the PayGo

fees given that they were expressly warned that the Commonwealth might repeal or amend Act

447 creating the Employer Contributions. The risk that ERS might one day stop receiving

Employer Contributions altogether was plainly laid out for Movants when they purchased the ERS

bonds. Movants cannot now cry foul because that risk became reality. *See, e.g.*, *Gateway Access

Solutions,* 368 B.R. at 433-34 ("It is not the duty of this Court to protect creditors from themselves

when they risk limiting their collateral to contingent interests"); *In re Mellor*, 734 F.2d 1396, 1401

(9th Cir. 1984) ("The purpose of adequate protection under § 361 is to insure that the secured

creditor receives in value essentially what he bargained for, not a windfall"); *see also In re Bronikowski*, 569 B.R. 48, 53 (Bankr. W.D.N.C. 2017) (holding that "a debtor's expectation or hope of receiving something in the future is not a property right and would not became property of the estate"); *In re Klein-Swanson*, 488 B.R. 628, 633 (8th Cir. BAP. 2013) (stating that when the future receipt of property is based on the exercise of another party's discretion, the debtor has "a contingent interest in nothing").

### III. Movants' Motion Should Be Denied As To The Commonwealth, As Movants Have No Claim Against The Commonwealth.

49.     In addition to seeking adequate protection from ERS, Movants also seek adequate protection from the Commonwealth despite the fact that the Bond Resolutions plainly state that the Commonwealth has no liability for any ERS bond and that the ERS bonds do not constitute a debt of the Commonwealth. (Ex. B, Bond Resolution, at §201; *see also* Ex. C, Bond Offering Statement, Series A at 37.)

50.     Previously, Movants have argued that their adequate protection request against the Commonwealth is proper because "the Commonwealth now claims an interest in property of ERS [Employer Contributions]…." (Case No. 17-bk-3283, Dkt. 3592 at ¶29; Case No. 17-bk-3566, Dkt. 303 at ¶ 29.) For the reasons laid out above, that argument is wrong. The funds under the current PayGo system have never been assets of ERS. To the extent that Movants are referring to the $190 million of ERS assets transferred to the Commonwealth, the Commonwealth is holding those assets pending this Court's rulings in the various adversary proceedings about the extent and validity of Movants' alleged liens. Consequently, there is no basis for Movants to demand adequate protection from the Commonwealth.

## CONCLUSION

For all of the foregoing reasons, the Motion should be denied and the Court should grant

such other relief as may be just.

Dated: June 21, 2019                    Respectfully submitted,


JENNER & BLOCK LLP                      BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:                                     By:
*/s/ Robert Gordon*                     */s/ A.J. Bennazar-Zequeira*
Robert Gordon (admitted *pro hac vice*) A.J. Bennazar-Zequeira
Richard Levin (admitted *pro hac vice*) Héctor M. Mayol Kauffmann
919 Third Ave                           Francisco del Castillo Orozco
New York, NY 10022-3908                 Edificio Union Plaza,
rgordon@jenner.com                      1701 Avenida Ponce de León #416
rlevin@jenner.com                       Hato Rey, San Juan
212-891-1600 (telephone)                Puerto Rico 00918
212-891-1699 (facsimile)                ajb@bennazar.org
                                        hector.mayol@bennazar.com
Catherine Steege (admitted *pro hac vice*)  787-754-9191 (telephone)
Melissa Root (admitted *pro hac vice*)  787-764-3101 (facsimile)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street                     *Counsel for The Official Committee of Retired*
Chicago, IL 60654                       *Employees of Puerto Rico*
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)