# **EXHIBIT F**

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF PUERTO RICO

In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
                    as representative of
THE COMMONWEALTH OF PUERTO RICO, et al.
                    Debtor,
_____

In re:
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
                    as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,
                    Debtor.



                    Two Vesey Street
                  New York, New York
               June 4, 2019 - 9:36 A.M.
```

   EXAMINATION BEFORE TRIAL of LUIS COLLAZO RODRIGUEZ, the Witness herein, taken by the attorneys for the respective parties, pursuant to Notice, held at the above-stated time and place, before Melissa Leonetti, RPR, a Notary Public of the State of New York.



18

1  L. COLLAZO
2  contributions would not actually result in funds
3  being transferred into ERS?
4  MR. POCHA: Objection. Outside the
5  scope.
6  A. So far as I understand, that is correct.
7  Q. Before June 2017, would ERS invest its
8  revenues in investment assets?
9  MR. POCHA: Objection to the form.
10  A. Yes, some assets were invested in
11  different types of investments.
12  Q. Okay. Was one of the purposes of the
13  investment of the assets in order to build up a fund
14  to help pay pension benefits?
15  A. Yes. So far as I understand, yes.
16  Q. Before June of 2017, were employer
17  contributions calculated based on a percentage of
18  each employer's payroll?
19  A. Correct.
20  Q. Between 2013 and June of 2017, did
21  employers also contribute what were known as
22  additional uniform contributions to ERS?
23  MR. POCHA: Objection to the form and
24  also outside the scope.
25  A. Law 3, which is established, confirms the

51

1  L. COLLAZO
2  that we did not make the commentary, either by
3  phone or via written form, or that we did not.  We
4  talked about many topics and we maintain ourselves
5  in conversation.  Yes.
6      Q.    All right.  The bullet on page 11 there
7  says:  Contributions to PRG ERS are primarily based
8  on statutory percentages of payroll.
9          From what I understand your earlier
10 testimony to be -- correct me if I'm wrong -- is
11 that referring to the system that was in place
12 before June of 2017?
13         MR. POCHA:  Objection.  Outside the
14    scope.  The question lacks foundation.
15     A.    Yes.  I'm going to refer once again to my
16 previous statement that, to the best of my
17 knowledge, the statutory percentage of the payroll
18 was calculated according to employer contributions
19 before June of 2017.
20         The Pay-Go, it is not based on
21 statutory percentages of the payroll.
22     Q.    Pay-Go is based on the current benefits
23 that are owed at any particular point in time; is
24 that correct?
25     A.    Correct.  The real cost of the pensioners

52

1  L. COLLAZO
2  and the beneficiaries, that varies according from
3  time to time, according to when you have new
4  pensioners and when they pass away.
5     Q.   Does ERS provide the information about
6  the current benefits and the beneficiaries to AAFAF
7  in order so that AAFAF can calculate the Pay-Go fee
8  that is owed?
9          MR. POCHA:  Objection.  Outside the
10     scope.
11    A.   Yes, that's correct.  We offer that
12 information so they can make the calculations with
13 that data.
14    Q.   And as you understand the system, does
15 AAFAF provide that information to -- who?
16    A.   I don't -- AAFAF is our fiscal agent.
17 And who they share the data which we give them is
18 not something I can articulate or specify.
19    Q.   Let me try a different question.  That
20 was a bad question.
21         When AAFAF calculates the Pay-Go fee
22 that is owed, who does AAFAF communicate that
23 amount to?
24         MR. POCHA:  Objection.  Outside the
25     scope.  Lacks foundation.

75

L. COLLAZO

Q. Okay. And if you look at footnote 2 there, it refers to Pay-Go projections.

Do you see that, sir?

A. Yes, I see it.

Q. All right. Are the Pay-Go projections referred to in footnote 2 the same as the employer contributions referred to in the text?

MR. POCHA: Objection. Calls for speculation. Lacks foundation.

A. No, it's not the same.

Q. Okay. What are the difference between the employer contributions as referred to in the text of page 7 and the Pay-Go fees -- Pay-Go projections that are referred to in footnote 2?

MR. POCHA: Objection. Lacks foundation. Calls for speculation.

A. Yes. Basically there's many differences. The first is how the employer contributions are calculated as is seen in the text of page 7. It's not the same way that the Pay-Go is calculated.

Secondly, those employer contributions that are mentioned on page 7, the purpose is different than the purpose for the Pay-Go.

And the employer contributions are to

76

1 L. COLLAZO
2 fund the system, the retirement system, to be able
3 to comply with future payments of the system.
4 On the other hand, the Pay-Go is to
5 satisfy the real and present payment of the
6 pensioners and -- of the current pensioners and
7 beneficiaries.
8 And thirdly, those employer
9 contributions were already determined by law, and
10 the way that it was going to be calculated -- and
11 the Pay-Go is calculated according to the cost of
12 pension and the way that it varies, according to
13 the current pensioners and those that are passing
14 away.
15 Q. Let me take those in sort of reverse
16 order and ask a few questions about each of them.
17 You first said that employer
18 contributions were determined by law, but the
19 Pay-Go were calculated according to the cost of
20 the pensions and how that cost varies according to
21 the pensioners and to the folks who pass away,
22 correct?
23 A. Correct.
24 Q. Okay. Is there any -- well, first of
25 all, who does the calculation today about the cost

Case:17-03283-LTS Doc#:7554-6 Filed:06/21/19 Entered:06/21/19 21:37:57 Desc:
Exhibit F Page 8 of 13
Video Deposition of Luis Rodriguez, 6/4/2019

96

1                    L. COLLAZO
2      A.    To begin with, we have Law 447, which is
3  the original law.  And there were some specific
4  benefits.  Later, the system, we tried to reform it
5  with Law 1, because it was understood that the law
6  wasn't sustainable from the benefits from Law 447.
7            After that, after having approved Law 1
8  in 1990, ten years later, we tried to reform the
9  retirement system with a benefit of the law of the
10 year 2000, reform 2000, making changes to the
11 defined contributions.
12           After that, 13 years later, another
13 alternative is sought out, and, once again, the
14 attempt was made to reform it again with Law 3
15 from 2013, which is known as the hybrid program.
16           So we so see that there's years and
17 years and years of trying to reform the system
18 that wasn't given any results.  The system wasn't
19 funded as it should have been and so simply wasn't
20 sustainable.
21           So the public policy was -- went into
22 effect.
23           (In English)  The government recognized
24 the problem and make a public policy decision
25 instead of drafting, you know, again -- tried to

97

1  L. COLLAZO
2  reform the system. It was insolvent. The
3  government make a definite decision, you know, to
4  guarantee the pension payments.
5  Q. Well, did ERS have an understanding of
6  why the government assumed the payments through the
7  general fund instead of just guaranteeing those
8  pension payments by increasing the funding to ERS?
9  MR. POCHA: Objection. Privilege.
10  You can answer if you exclude
11  privileged information.
12  A. By then, Law 3 already established those
13  increases, progressive increases to the employer
14  contributions. And on top of that, they added this
15  -- the uniform additional contribution. And those
16  funds weren't arriving as they should have been or
17  as they imagined they would.
18  So increasing the contributions even
19  more than what it had already been thought of --
20  what had already been established based on the
21  experience that had already been had.
22  We had to ask ourselves if it was
23  logical and reasonable, if it was a reasonable
24  idea to continue -- if it was a real -- if it was
25  a real option and if it was a reasonable option to

98

1                      L. COLLAZO

2 continue increasing the employer contributions.

3       Q.    Can we agree that whether the input into

4 the pension benefit is employer contributions or

5 Pay-Go fees, the money to pay that, the retirement

6 benefits, has to come from somewhere?

7           MR. POCHA:   Objection to the form.

8       A.    Yes.

9       Q.    Okay.  Before July of 2017, the employer

10 contributions were made in part by the Commonwealth,

11 correct?

12       A.    The Commonwealth made their employer

13 contributions, but it didn't arrive into the ERS.

14       Q.    After July of 2017, the general fund

15 assumed the payments that ERS could not take,

16 correct?

17       A.    Correct.

18       Q.    Okay.  And the general fund is the

19 Commonwealth General Fund, correct?

20       A.    Correct.

21       Q.    Is ERS aware of any reason why the

22 general fund after July of 2017 can pay the defined

23 benefit pensioners that it could not pay in adequate

24 levels before July of 2017?

25           MR. POCHA:   Objection.  Vague.

120

L. COLLAZO

2   Do you see this is a letter to you from
3   the executive director of AAFAF?
4   A.  Yes.
5   Q.  And he directs you in the second
6   paragraph to sell ERS' assets, correct?
7   A.  To liquidate immediately all the liquid
8   investments from the retirement system.
9   Q.  Okay.  Did ERS do that in and around July
10  2017?
11  A.  We liquidated our liquid investments.
12  Q.  How much was the proceeds from that
13  liquidation?
14  A.  Approximately 296 million.
15  Q.  You'll see in the second to the last
16  paragraph the director of AAFAF instructs you to
17  transfer at least 190,480,000 of the proceeds from
18  the sale of the investment and to transfer that to
19  the treasury.
20      Do you see that?
21  A.  Yes.
22  Q.  And did ERS do that?
23  A.  Yes.
24  Q.  Okay.
25  A.  We transferred the quantity that's

Video Deposition of Luis Rodriguez, 6/4/2019

121

1    L. COLLAZO
2    requested in the letter.
3        Q.    The remaining 150 or so million dollars
4    from the sale of the proceeds, what happened to
5    that?
6        A.    Yes. When I mentioned the assets that
7    the system had before, I mentioned the quantity 109
8    million. That quantity we have inside of a
9    restricted account because we liquidated it, yes.
10   It's inside that account, that amount. That was --
11   that amount was not transferred to the Department of
12   the Treasury.
13       Q.    Why was that amount not transferred to
14   the Department of Treasury?
15           MR. POCHA:    Objection.
16           Exclude any privileged information.
17       You can answer if you can.
18       A.    Well, certainly I received a letter to
19   send a first amount. I haven't received any other
20   instructions from my physical agent, which is AAFAF,
21   which would be to remit the remaining amount. And
22   it's important to mention that Resolution 188 also
23   doesn't set a set amount of time, a determined
24   amount of time to be able to transfer that. Right?
25   It's like we're waiting for instructions. Right?

122

L. COLLAZO

1
2  Q.    Is that money in an interest-bearing bank
3  account?
4  A.    It's generating interest, yes.
5         (Whereupon, a letter was marked as
6    Exhibit 41 for identification, as of this
7    date.)
8  Q.    I'm going to hand you what I'm marking as
9  Exhibit 41.  This one should be quick.  Is this a
10 letter from you to an individual at Banco Popular
11 instructing him to transfer 190,480,000 from ERS to
12 the Department of Treasury?
13 A.    Yes.
14 Q.    And you transferred that 190,480,000
15 pursuant to this letter?
16 A.    What letter?  This one?
17        MR. PAPEZ:  Let me withdraw that
18    question.
19 Q.    As far as you know, did Mr. Garcia Alvira
20 transfer the 190,480,000 you requested to the
21 Department of Treasury?
22 A.    To the best of my knowledge, the quantity
23 was transferred.
24 Q.    I'm handing you what was marked as
25 Exhibit 18.